UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,    .      Docket No. 13-53846
        MICHIGAN,           .
                            .      Detroit, Michigan
                            .      September 17, 2014
                  Debtor.   .      8:32 a.m.
. . . . . . . . . . . . . . . .

TRIAL RE. OBJECTIONS TO CONFIRMATION OF CHAPTER 9 PLAN
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  EVAN MILLER
                            THOMAS CULLEN, JR.
                            GEOFFREY S. IRWIN
                       51 Louisiana Avenue, N.W.
                       Washington, DC  20001
                       (202) 879-3939

                       Jones Day
                       By:  ROBERT W. HAMILTON
                       325 John H. McConnell Blvd., Suite 600
                       Columbus, OH  43215
                       (614) 281-3848

For Financial          Weil, Gotshal & Manges, LLP
Guaranty Insurance     By:  EDWARD SOTO
Company:               1395 Bricknell Avenue, Suite 1200
                       Miami, FL  33131
                       (305) 577-3177

                       Weil, Gotshal & Manges, LLP
                       By:  ALFREDO PEREZ
                       700 Louisiana, Suite 1600
                       Houston, TX  77002
                       (713) 546-5040

For County of          Dechert, LLP
Macomb, Michigan:      By:  ALLAN BRILLIANT
                       1095 Avenue of the Americas
                       New York, NY  10036
                       (212) 698-3600

APPEARANCES (continued):

For Official          Dentons, US, LLP
Committee of          By:  DAN BARNOWSKI
Retirees:             1301 K Street, NW
                      Suite 600, East Tower
                      Washington, DC  20005-3364
                      (202) 408-6417

For Ad Hoc Water      Kramer Levin Naftalis & Frankel, LLP
and Sewer             By:  JONATHAN M. WAGNER
Bondholders:          1177 Avenue of the Americas
                      New York, NY  10036
                      (212) 715-9393




Court Recorder:       LaShonda Moss
                      United States Bankruptcy Court
                      211 West Fort Street, 21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE COURT:  All right.  Let's resume with our trial,

2     please.

3          MR. CULLEN:  Good morning, your Honor.  Thomas

4     Cullen of Jones Day for the city.  I thought I'd inform the

5     Court of the current order in light of developments

6     yesterday, and this is what we have in mind for the order

7     going forward to the end of Thursday.

8          THE COURT:  Okay.  Thank you, sir.

9          MR. BARNOWSKI:  Good morning, your Honor.  Dan

10    Barnowski, Dentons, on behalf of the Official Committee of

11    Retirees.  The committee calls now Ron Bloom.

12         THE COURT:  Okay.  Step forward please, sir.  Please

13    raise your right hand.

14         RON BLOOM, RETIREE COMMITTEE'S WITNESS, SWORN

15         THE COURT:  Please sit down.

16                        DIRECT EXAMINATION

17    BY MR. BARNOWSKI:

18    Q    Good morning, Mr. Bloom.

19    A    Good morning.

20    Q    Could you introduce yourself to the Court?

21    A    My name is Ron Bloom.

22    Q    One background issue, Mr. Bloom, the microphone.  You

23    might have to lean it forward to make sure that everyone can

24    hear you.

25    A    Okay.

1   Q   Who do you work for, Mr. Bloom?

2   A   I work for an investment bank in New York City called

3   Lazard Freres.

4   Q   And how long have you been with Lazard?

5   A   About two years.

6   Q   Can you give us just a brief overview of the type of work

7   that Lazard does?

8   A   Lazard is a financial advisory firm, so we give advice to

9   companies and other enterprises.  You know, significantly, in

10   the mergers and acquisitions field, one company might want to

11   buy or sell another company.  We also have a very active what

12   we call a restructuring practice where we're advising either

13   creditors or debtors in either Chapter -- in chapter

14   proceedings or out-of-court restructurings.

15   Q   Okay.  And do you have a formal title at Lazard?

16   A   I'm a vice chairman.

17   Q   Has Lazard played a formal role in this bankruptcy?

18   A   Yes, we have.

19   Q   Tell the Court what that is.

20   A   We were retained by the Retiree Committee in September of

21   last year and have served as their financial advisor

22   throughout that period.

23   Q   And what are Lazard's responsibilities with respect to

24   the committee just generally?

25   A   Generally speaking, as the financial advisor, our

1   responsibility has been to try to analyze the city's
2   financial circumstance, to give advice to the committee about
3   what the economics of the city are, and then to look --
4   specifically in the negotiations regarding the pension matter
5   and the OPEB matter, to look at creative ways to solve the --
6   you know, the significant problems that the city faced, and
7   then to bring to bear our general experience in restructuring
8   to help the committee navigate through the complex multi-
9   stakeholder dimension of this matter.
10  Q    Okay.  And without getting into the details of them, have
11  you been involved in negotiations with the city on behalf of
12  the committee?
13  A    Yes.
14  Q    And who leads the retention on behalf of Lazard?
15  A    I do.
16  Q    Before we dig into those areas a little bit, I'd like to
17  talk to you a little bit about your background.  Where did
18  you go to college?
19  A    I went to college at a university in Connecticut called
20  Wesleyan University.
21  Q    Okay.  And where did you go to work after you graduated
22  Wesleyan?
23  A    Shortly after graduating from Wesleyan, I became employed
24  by the Service Employees International Union in Boston,
25  served as what we called at the time -- the title was

1    research and negotiating specialist.  The Service Employees
2    at that time had significant representation in the public
3    sector, a little bit in the healthcare, and a little bit in
4    the building service sector but principally in the public
5    sector in and around the Boston area, broader New England
6    actually, in and around that area, and I served as both doing
7    research trying to, again, ferret out the facts of
8    circumstances as well as helping in particular collective
9    bargaining opportunities.
10   Q    And how long did you work there?
11   A    I was there about five years.
12   Q    And then you went to business school; is that right?
13   A    Yes, I did.
14   Q    Where did you go to business school?
15   A    I went to business school at Harvard.
16   Q    Why did you -- why did you decide to go to business
17   school?
18   A    Well, I'd been working for the SEIU, and my observation
19   had been that unions oftentimes were not equipped with the
20   business skills, the financial skills that would be required
21   to have kind of a constructive intelligent dialogue with
22   employers, and I found the idea of better understanding
23   business and how business is operated to be personally
24   interesting.  There were a lot of great union side labor
25   lawyers around, and so I chose a slightly different path,

1  thought I would have a sort of unique value add on the basis
2  of gaining those skills.
3  Q   Okay.  And after you obtained your MBA, where did you go
4  work?
5  A   After I got my MBA, I went to work actually at Lazard
6  Freres in New York City.
7  Q   Okay.  And you worked at Lazard for how long?
8  A   I was there for about five years.  I was an associate and
9  then a vice president, again, principally involved in both
10 mergers, acquisitions, and restructurings.
11 Q   And you left Lazard to open your own investment bank; is
12 that correct?
13 A   Yes.  Myself and another gentleman who, at the time, was
14 a partner of the firm, fellow named Gene Keilin and I in 1990
15 formed a firm that we called Keilin & Bloom, and our business
16 was advising mostly unions, employee groups, in -- largely in
17 restructuring situations, so sort of a continuation of some
18 of what I'd been doing at Lazard but with more of a focus
19 just on union clients.
20 Q   What was your next job?
21 A   So I did that for about five years, and when I was there
22 and actually dating back to my period at Lazard, the
23 steelworkers union was one of our largest clients.  There
24 were a lot of restructurings in the steel industry in the
25 late '80s and mid-'90s.  I worked for other unions as well,

1   but the steelworkers were the single largest client, and I

2   decided to go to work directly for the steelworkers union in

3   Pittsburgh, Pennsylvania, in 1996.

4   Q    What was your title with the steelworkers?

5   A    I was a special assistant to the president.

6   Q    And what kind of work did you do?

7   A    In some ways it was a continuation of what I had been

8   doing, giving the union advice in restructurings in complex

9   situations.  I took on a bit broader responsibility as well.

10  The steelworkers union is a very diverse industrial union

11  mostly in what would be called primary manufacturing, so

12  steel, tires, and plastic, aluminum, paper, those sorts of

13  sectors.  And in each of those sectors, the union has kind of

14  a collective bargaining program where it's attempting to do

15  the best for its members in those different sectors.  And my

16  responsibility was to provide broad oversight and

17  coordination to the unions' efforts in those primary

18  entities, in those big larger companies.  The union has many

19  contracts with smaller companies, but for the 15 or 20 large

20  companies who would represent a significant percentage of the

21  steelworker membership and would, in union parlance, set the

22  pattern for other bargaining circumstances, my responsibility

23  was to try to help coordinate and bring structure to those

24  sorts of situations.  In addition, again, similar to what had

25  been happening in the '80s and '90s before I got there, there

1   was a lot of restructuring in all of those industries.  These
2   were old line manufacturing industries they felt faced
3   pressure from imports.  They face pressure from what are
4   called legacy costs.  So I found myself involved again in a
5   significant amount of restructuring work for the steelworkers
6   union.
7   Q   You mentioned the steelworkers membership.  Tell the
8   Court roughly how many members there were at the time.
9   A   During the time I was there, I would say roughly 1.2
10  million active and retired members, maybe six or 700,000
11  active, depending on the time exactly, and maybe five or
12  600,000 retirees who the union was trying to look after.
13  Q   You left the steelworkers when?
14  A   In early 2009.
15  Q   Why?
16  A   Well, as everyone I'm sure remembers, in 2008 the great
17  recession began, and one of the signal events of it for me
18  anyway was the collapse of General Motors and Chrysler.  I
19  had never had any direct dealings with the automobile
20  companies.  I'd had deals with parts suppliers.  But if
21  you're in the manufacturing sector, in some ways the auto --
22  an auto company kind of sits at the top of the pyramid, so if
23  you think about what's in a car, it's just about everything
24  that's made, you know, and so whether it's steel or whether
25  it's plastic or whether it's rubber or chemicals, everything

1  kind of goes into a car.  And so a company like GM or

2  Chrysler, GM obviously larger than Chrysler, but a company

3  like GM really, as I said, sort of sits at the pyramid of the

4  entire manufacturing economy.  In late 2008, General Motors

5  collapsed.  They were literally on the verge of extinction.

6  If the Bush administration had not provided the emergency

7  assistance, I believe the company would have literally

8  liquidated, and the ramifications of that for the

9  manufacturing economy more broadly were just -- to my way of

10  thinking, just dramatic and, candidly, kind of unthinkable.

11  And so given my background and given what I'd been doing for

12  the prior 25 years, I said to my wife -- I said, "I've been

13  in training for this job my whole life.  I really want to try

14  to be part of this.  I want to see if I can help."  There'd

15  been a, you know, new president elected, and it was clear

16  from the way that the Bush administration structured the loan

17  that the Obama administration was going to be responsible for

18  resolving this problem, and so I found a way into the Obama

19  administration to work on the President's auto task force and

20  help lead that effort.

21  Q   Okay.  And how long did you stay with the -- well,

22  technically, you were -- what was your title?

23  A   I was a senior advisor to the Secretary of the Treasury.

24  Q   Okay.  And how many restructurings did you work on in

25  that position?

1  A    Well, they were -- GM and Chrysler was really the

2  exclusive focus of our work.

3  Q    Okay.

4  A    That's not quite right.  We also worked a bit on Delphi,

5  but Delphi was GM-related.  But it was about the car industry

6  generally, but the focus was GM and Chrysler.

7  Q    And tell the Court generally the number of actives and

8  retirees who were tied up in those restructurings.

9  A    Well, I think by memory I would say that at the time of

10  the GM failure, in terms of blue collar workers, GM probably

11  had roughly 50 or 60,000 UAW members -- that's the union that

12  represents the blue collar workers -- and probably on the

13  order of 500,000 retirees.  That's on the blue collar side.

14  In Chrysler there were probably roughly 30,000 active UAW

15  members and probably 150 to 200,000 retirees, so rather

16  dramatic numbers of retirees and a rather dramatic ratio of

17  retirees to actives.

18  Q    Is it fair then to conclude that there was a

19  disproportionate number or amount of legacy costs involved in

20  these restructurings?

21  A    Clearly one of the very significant issues facing the car

22  companies and, candidly, facing a number of situations I've

23  been in -- and this was one of the reasons why I sought the

24  assignment is that this is a -- this is a matter that I had

25  dealt with before where because an old line company either

1   shrinks, its market share goes down, or there's significant

2   productivity enhancement, you wind up with a very small

3   number of actives per retiree, and that kind of ratio,

4   because in these companies, generally speaking, there were

5   promises made to provide pensions, healthcare to folks after

6   they retired, those promises became a very significant

7   obligation and liability of the company, and in otherwise

8   challenging economic times -- there were many issues facing

9   GM, but among those issues -- and Chrysler, but among those

10   issues was the company's very significant legacy cost. And

11   as I said, that's an issue -- that's a movie I'd seen, I'd

12   kind of been in a lot over my prior career, and so I was very

13   eager to try to work on it.

14   Q   And those restructurings were fairly quick. Is that

15   fair?

16   A   Yes. General Motors was in and out of bankruptcy in 39

17   days. Chrysler was in and out of bankruptcy in 42 days.

18   Q   So what did you do after the 42 days were up?

19   A   Well, there was a bit of run-up to it, so there was that.

20   And then the bankruptcies occurred, and then most of the

21   team -- we essentially assembled what you might call a deal

22   team of people who'd not prior been in government who kind of

23   came down to work on the case and worked in the Treasury

24   Department. I decided to stay on. The government had

25   invested, you know, close to $50 billion in these companies,

1 and so there was a lot of interest in making sure that

2 investment was going okay and the companies were being

3 responsible with the money.  The government was not directly

4 involved in the day-to-day oversight or management of the

5 company, but, nevertheless, with an investment of that size,

6 there was a keen interest on the part of the administration

7 and the government generally in what was going on, so at that

8 stage a number of the other members of the task force had

9 left, and so I was asked to lead up the remaining effort,

10 which was to monitor the two investments.

11 Q    Okay.  And did you subsequently move to a different

12 position within the administration?

13 A    Yeah.  So I did that for another six or eight months,

14 maybe nine months, and then at that -- by that point -- it

15 was closer to a year.  I apologize.  At that point, General

16 Motors -- we were successful, and I was responsible at the

17 Treasury Department for leading the Treasury Department's

18 effort in the initial public offering of GM, and so we'd been

19 able in a relatively short period of time, 17 months, to

20 return General Motors to the public markets.  Chrysler had --

21 was on its way to a recovery despite many people feeling that

22 wouldn't happen, and there was pretty good visibility to the

23 government getting its money back for Chrysler.  And so after

24 the GM IPO and after we had visibility at Chrysler to the

25 government being able to exit its Chrysler investment, I felt

1  like there was not, you know, tremendous amounts still to do.

2  While the government still had investment in GM, there was

3  now a public market.  It was pretty clear what was going to

4  happen, a gradual sell-down, and so at that stage I decided

5  to -- and was offered an opportunity to move over to the

6  White House where I served as an assistant to the President

7  for manufacturing policy.

8  Q    Okay.  One more question about GM and Chrysler.  What was

9  the ratio of retirees to actives at those two companies?

10  A    Well, as I said, in the case of the blue collar, probably

11  roughly ten to one in the case of GM and maybe six or eight

12  to one in the case of Chrysler, very, very significant.

13  Q    Now, in 2012 you went back to Lazard; is that right?

14  A    Yeah.  I took a little bit of time off.  I'd been

15  commuting to Washington from my home in Pittsburgh, and so I

16  had some family business to attend to, but, yes, shortly

17  thereafter I went -- I came back to Lazard after a 20-odd-

18  year hiatus.

19  Q    Okay.  So let's talk about the work that Lazard has done

20  on behalf of the Official Committee.

21  A    Okay.

22  Q    First of all, can you describe just generally the nature

23  of the committee's relationship with the city in this case?

24  A    Well, you know, we viewed ourselves as representing by

25  far and away the largest creditor interest, the pension and

1  retiree healthcare, roughly -- depending on how one scores

2  it, roughly 80 percent of the claim amount -- of the total

3  unsecured claim amount in the city, so we viewed ourself as a

4  very significant stakeholder in the case, in the matter, an

5  important creditor.  And we believe that we had, you know,

6  very valid and important claims relative to our claims.  I

7  think, in general, our relationship with the city was, you

8  know, professional.  The city had serious professionals on

9  their side.  I hope we had the same on ours.  But, you know,

10  we had a pretty different view of how the case should go.

11  The city had put forward a plan -- not a plan but sort of an

12  indication of where they saw things going in June before they

13  filed.  That approach, that plan with a small "P" was not

14  something we thought was remotely fair to the retirees, and

15  so we had a -- you know, a pretty vigorous disagreement with

16  how we thought the case should go.  We took the position the

17  city didn't belong in the Bankruptcy Court at all.  We took

18  the position that the pensions were constitutionally

19  protected.  We took the position that when the city tried to

20  implement the 214 changes for the retiree healthcare that

21  that was inappropriate and not consistent with law, so, you

22  know, I think we always -- at least we tried to be

23  professional and direct, but we had a pretty serious

24  disagreement, at least from where the city started and where

25  we started compared to the starting points of both of the

1   parties.

2   Q   As someone who was involved in the negotiations, did you

3   ever conclude that the city was treating the retirees or the

4   committee like favored insiders?

5   A   Not in the least; not in the least.  We felt like we had

6   very significant claims here, legal and political.  As I

7   said, we felt we were 80 percent of the claim amount, and

8   that justified a significant attention to our concerns.  As I

9   said earlier, we felt we had very strong legal arguments as

10   to the protection of our position.  We obviously had been

11   ruled against that, but we were appealing it.  And, no, we

12   felt like we got -- you know, we got the best we could get,

13   but in no sense did we view that as favoritism.

14   Q   Okay.  Did the committee treat the negotiation of the

15   OPEB and the pension benefits as part of the same global

16   negotiation?

17   A   Yes.  The Retiree Committee viewed as its charge both of

18   those obligations for inactive employees.  And while there's

19   not a perfect overlap between the retiree insurance claim and

20   the pension claim in terms of the people -- there are a few

21   people who have a retiree insurance program and don't have a

22   pension and vice versa -- the overwhelming majority is the

23   same human beings -- and, again, it's not a perfect match,

24   but the overwhelming majority is the same people, and so from

25   our perspective, this was one set of promises.  The city had

1    promised people pension and it had promised people

2    healthcare.  Those were two promises that, in our view, were

3    important promises, and so we always viewed our job as trying

4    to represent and advocate on behalf of both of those

5    promises.

6    Q    Okay.  And how did that play out in terms of -- I don't

7    want you to talk about discussions with the city or

8    mediation, but in terms of the negotiations, was the

9    committee willing to give a little on one side in order to

10   get more on the other, or --

11   A    Early in the case -- early in the case, the committee

12   determined that pensions would be a priority, and I think

13   there were a number of different reasons for that, but, in

14   any event, the committee concluded that there were other

15   options, at least to a degree, on the healthcare.  And while

16   changes in retiree healthcare would be very painful for

17   people, the committee determined perhaps because we believed

18   we had a better legal argument on the pension, perhaps

19   because of people's emotional connection to their pension,

20   for a constellation of reasons, the committee strongly

21   believed that the priority should be on pensions.  And so as

22   we approached the situation, that's what we did on behalf of

23   the committee, and the committee, as it advocated for itself,

24   determined that its highest priority was protecting the

25   pension.  And, again, our initial position was the pension

1  should remain untouched in its entirety, but pretty early on

2  we signaled that we could see a compromise in the OPEB, in

3  the retiree insurance arena.

4      MR. WAGNER:  Your Honor, just note my objection.  To

5  the extent the testimony is being offered as the witness'

6  subjective views concerning OPEB and pension, I believe

7  that's not relevant with respect to the reasonableness of any

8  settlement, and also to the extent that OPEB and pension are

9  being combined we have an objection.

10      MR. SOTO:  A separate objection, your Honor, would

11  also be that to the extent the witness is talking about

12  anything that has to do with the mediation, I think the

13  mediation order is still in place, and it's hard for me to

14  figure that out yet.

15      THE COURT:  Well, I think it's a little bit broad to

16  prohibit the witness from talking about anything that has to

17  do with mediation.  What the Court's order prohibits is

18  disclosure of anything that took place during mediation, and

19  the Court will abide that order, of course.  Beyond that, the

20  objections are overruled.  You may proceed.

21  BY MR. BARNOWSKI:

22  Q    Did the committee have any other goals going into the

23  negotiations with the city?  And, again, don't talk about

24  what was talked about with the city or the actual

25  negotiations.

1   A   No. I would talk about how we approached it.

2   Q   Right.

3   A   The committee's objective, at least as I perceived it and

4   as one of their advisors what I believe the direction they

5   were giving to me was to do as best as we could -- and I

6   described the relative weighting of the claims, but to do as

7   best as we could to maximize the value of the claims. But we

8   viewed it in a -- within what I would call constraints or

9   context. The committee early on established or believed that

10   the city's objective, which had been stated early on in the

11   June presentation and the city had been very public and vocal

12   about, was a key priority of the proceeding -- and this was

13   before the filing, but even after the filing -- was that

14   Detroit be able to revitalize itself. Detroit had been --

15   and this was well-documented and discussed, you know, quite

16   broadly -- self-evident I think would be fair, at least from

17   my perspective, self-evident, that Detroit had been in

18   decline for a long time. And, you know, I'd been observing

19   that from a distance. And when you work with GM and

20   Chrysler, you can't help observe what's going on in Detroit,

21   so to me those -- that was self-evident that Detroit was in a

22   long-term decline and that part of the test of whether a

23   reorganization would be successful was whether or not Detroit

24   was given a reasonable chance to revitalize itself. So for

25   us we determined for some different reasons which I can talk

1   about, but we determined that anything we put forward we had

2   to in good faith feel was consistent with revitalizing the

3   City of Detroit.  We felt that, number one, because we had no

4   expectation -- again, from the beginning, we had no

5   expectation that we were going to get a one-time lump sum

6   cash payout.  We had these big claims.  They are reducible to

7   present value.  In theory, they could be resolved simply by

8   the city, you know, writing a check as it were for the whole

9   amount, and we would go away.  We had no expectation that

10  that was feasible.  It didn't take, again, long looking at

11  the public documents that the city -- were available to

12  anybody that the city would not be capable of writing

13  enormous checks.  So for one -- so one reason we cared about

14  revitalization was at the end of the day we were relying on

15  the City of Detroit to be there to honor these promises out

16  on into the future.  And while we felt like we had strong

17  legal arguments that no matter what the city agreed to on

18  pension in this case it should be protected by the

19  Constitution, the reality is, as we observed, when you get

20  yourself in bankruptcy, bad things happen.  And so for us to

21  bet -- so we were, whether we liked it or not, betting on the

22  city because our promises, the promise -- the revised

23  promises that the city would make, whatever they would be,

24  would be promises that would pay out over time, and so we had

25  to have belief that revitalization could occur because if the

1  city continued in this long-term decline, the revised

2  promises it made would likely be challenged, not as a legal

3  matter but as a financial matter, so for that reason we were

4  concerned about revitalization.  Second -- I'm sorry.  Go

5  ahead.

6  Q   No.  I was going to say were there any other reasons why

7  you were interested in revitalization?

8          THE COURT:  Excuse me.  Before you answer that

9  question --

10         THE WITNESS:  Yes, sir.

11         THE COURT:  -- was the "we" that you referred to

12  many times in that answer you, Lazard, the committee, you and

13  Lazard, or some other answer?

14         THE WITNESS:  Okay.  Well, I was the leader of the

15  Lazard team, so I think I can speak for Lazard on this

16  matter.  And I think I am reflecting the views of the

17  committee, yes.  It is also Lazard's view, but I think in

18  this case it's coincident with the view of the committee --

19         THE COURT:  Okay.

20         THE WITNESS:  -- yes.

21         THE COURT:  It would help me if you could -- if you

22  could explicitly state who your answers refer to.

23         THE WITNESS:  Yes, sir.  Okay.

24  BY MR. BARNOWSKI:

25  Q   So the question was --

1           THE COURT:  We're waiting for -- we're waiting for a

2    question.  What was your question?

3           MR. BARNOWSKI:  Right.

4    BY MR. BARNOWSKI:

5    Q    The question was were there any other reasons why the

6    committee was interested in the city's ability to revitalize

7    itself through this bankruptcy?

8    A    Yeah.  I think the -- I think the committee also believed

9    that the political overlay -- this is a political

10   environment.  The city is a political entity.  There are many

11   stakeholders who are political entities who are involved in

12   this case whether it be the -- whether it be the other

13   counties or whether it be the State of Michigan itself, and

14   our perception -- the committee's perception was they had a

15   keen interest in revitalization as well, and so, again, we

16   felt like to put ourselves adverse to that view that

17   revitalization was key, we thought to put ourselves adverse

18   to that would make it very unlikely that we would be

19   successful in our advocacy to bring other stakeholders into

20   support of our overall view.  So irrespective of whether we

21   were getting a long-term payout, which we were, but separate

22   and apart from that, we believed that the resolution of this

23   case would involve the -- would include the involvement of

24   other stakeholders, and, again, reading the newspapers,

25   watching -- and, again, everyone on the committee, you know,

1  lived in and around Detroit.  They had views of what the

2  politics were, and so, again, the committee felt like being

3  on the wrong side of revitalization was just not a place that

4  would get us where we needed to go.

5  Q   Okay.  Now, you talked a little bit about the committee's

6  goals or purposes going into the negotiations.  I want to

7  fast forward a little bit and just ask you did the committee

8  achieve all it hoped to do through the negotiations?

9  A   No, I don't think we achieved all that we hoped to

10 achieve.  Certainly in the beginning, again, we had been very

11 public and vocal about the fact that we thought the pensions

12 should be left untouched.  I believe what the committee

13 thought and the reason they determined to support the plan

14 was we believe that we received enough, that it was enough to

15 get -- again, in the context of the situation, given the

16 constraints I've prior talked about, given the reality of the

17 various other stakeholders and the other contending matters

18 in the case, and given the alternative in the city's

19 solicitation, we felt like support of the plan was

20 appropriate and in the best interest of the people we were

21 representing.  But there was -- you know, there was enormous

22 disappointment by the members of the committee that they were

23 going to be recommending to their fellow retirees that they

24 vote in favor of having their pensions reduced.  That's a --

25 you know, in my experience, that's a challenging thing to ask

1  an elected or appointed representative to do.

2  Q    Did the committee believe that the settlement proposal

3  would further the city's ability to revitalize itself in the

4  ways that you've described?

5  A    I think the committee felt that the -- our settlement and

6  the POA generally would help to facilitate the revitalization

7  of the city.  There are no guarantees.  We did not view there

8  is guarantees, but we believed that it was a reasonable

9  amount that could be done in the context of a court

10  proceeding to set the stage for possible revitalization.

11  Q    Okay.  And putting aside the financial means of

12  revitalization, were there other purposes of the

13  revitalization or ways that the plan would further

14  revitalization in the committee's mind?

15  A    Well, one thing we observed, some of it in the plan and

16  some of it simply in the city's behavior as we watched them

17  negotiate with us and with other entities, was we saw the

18  city taking a different view toward its workforce, and,

19  again, our view was that a workforce that is motivated and

20  excited about the opportunity to participate in the

21  revitalization of Detroit is an important element of that

22  revitalization.  You know, we believed that the city needed

23  money, just, you know, money to remove blighted houses, to

24  buy new police cars, et cetera, and that was critical, and

25  that had to be provided for in the plan, but at the end of

1  the day, the face of the city and the execution of a plan is
2  by the human beings who work for the city. The city in the
3  end is nothing but its employees in terms of its governmental
4  role. It's nothing but the people. And so we observed the
5  city taking a different approach, and while we were not
6  directly involved in the collective bargaining or its public
7  and private statements to its active workers, you know, we
8  did have active worker representatives on our committee, and
9  we were observing what was going on. Many of our committee
10 members had social and familial relations with active
11 workers, and so we believed that that was another thing the
12 city was doing that to us was a positive sign that the city
13 really meant to do things different in the future and to try
14 to have a more constructive approach to solving problems and
15 to revitalizing itself.
16 Q   One phrase that's been used in this proceeding a little
17 bit is "worker morale." Are you talking about worker morale,
18 or are you talking about something broader than that?
19 A   Well, I'm not an English professor. I sometimes see -- I
20 sometimes think of the word "morale" a bit narrowly, you
21 know. Are the people enjoying going to work? That's
22 obviously important. But at least as I was trying to
23 describe this, I view it more broadly. The city was
24 dysfunctional, in my judgment, from the outside looking at it
25 before the case began. The city was dysfunctional. It had

 1   difficult relations with all of its key stakeholders, as I
 2   observed it.  And so to me the decision to try to engage in
 3   good faith negotiation -- and, by the way, that included us.
 4   I mean we had very tough discussions, as I said, but we felt
 5   like there was professionalism.  We felt like the city was
 6   sincere about revitalization, and that sincerity extended to
 7   the treatment of other stakeholders, not just us.  So to me
 8   it's a deeper question than just, you know, are the employees
 9   smiling, which is better than not, but that's not what I'm
10   trying to convey.  What I'm trying to convey is that we saw
11   the city taking a fresh start to how it dealt with long-
12   seated problems, to be honest about them, and some of that
13   came back on us in a bad way because we had substantial
14   reductions in benefits that we'd been promised, and we didn't
15   like that.  But at least -- but I think one of the things the
16   city persuaded us of over the course of the case was they
17   were sincere, so we didn't like what they had to say often,
18   but we felt that their commitment to revitalization was
19   sincere.  And when we saw evidence of that, as to how they --
20   for instance, how they were treating the active workers, that
21   was to us a positive sign that our long-term interest was
22   going to be served and the revised promises we got would
23   eventually be honored.
24   Q   In your years representing or negotiating with Chrysler,
25   with GM, with the steelworkers and all the restructurings you

1 talked about, have you observed that active workers care

2 about how retirees are treated in that kind of restructuring?

3         MR. WAGNER:  Objection on relevance and foundation.

4 Unclear what treatment in those other matters bears -- how

5 that bears here.

6         MR. BARNOWSKI:  Well, your Honor --

7         MR. WAGNER:  And he's not -- he was not -- he's not

8 offered as an expert witness.  He was specifically disclaimed

9 as an expert witness.

10         MR. BARNOWSKI:  Your Honor, we don't believe this is

11 expert testimony.  I'm asking him to, first of all --

12         THE COURT:  What's the relevance?

13         MR. BARNOWSKI:  The relevance is he's going to

14 explain what he saw in these negotiations, which are very

15 similar, and why he concluded that the active workers here

16 cared about how the retirees were being treated and were

17 treated through this negotiation, thereby helping build --

18 worker morale is the issue that the objectors have put into

19 play, but we would say it's a broader topic.  It's actually

20 worker investment in the city.  He's uniquely situated to

21 talk about that issue.  He's been negotiating and involved in

22 these kind of things for 30 years, including both with the

23 government and with the steelworkers and now in this case,

24 and he's just going to give his -- what he observed factually

25 happened before him.  And I'm just laying the foundation of

1    how he developed that opinion.

2            MR. WAGNER:  Your Honor, then I have two additional

3    objections.  One, to the extent he's testifying to what went

4    on in negotiations, that, I think, is covered by order.  Two,

5    to the extent he's repeating or he's basing his views on

6    what's been said to him by others, that's hearsay.

7            THE COURT:  I'll permit you to question the witness

8    on this subject in connection with his experience and

9    observations in this case.

10           MR. BARNOWSKI:  Okay.

11   BY MR. BARNOWSKI:

12   Q   Mr. Bloom, do you understand the limitation?

13           THE COURT:  Why don't you --

14           MR. BARNOWSKI:  Okay.

15           THE COURT:  -- reask the question consistent with

16   the Court's ruling?

17   BY MR. BARNOWSKI:

18   Q   Did you observe in the course of your work in this case

19   that -- and did you conclude that the actives would care how

20   retirees were treated through this plan of reorganization?

21           MR. WAGNER:  Objection.  Leading and hearsay.

22           THE COURT:  Overruled.  Go ahead, sir.

23           THE WITNESS:  I think I observed it in two different

24   ways, one direct and one indirect.  The direct way is that

25   there were members of our committee who were active -- one

1  was an active employee and one was a representative of active

2  employees.  And in both those cases, I heard them say to me

3  directly that they were -- that the active employees did care

4  about how the retirees were treated and that that was

5  relevant to them in their view of what was right and what

6  should happen in the case.  And second was while, again, I

7  was not involved in the collective bargaining negotiation

8  itself -- excuse me -- other members of our committee were

9  regularly in touch with other active workers who they knew --

10  as I said, family relations, et cetera -- and they also --

11  and they also reported the same thing.

12          MR. SOTO:  Objection, your Honor.  Hearsay.

13          MR. WAGNER:  Yes.  And I object to the second piece

14  on foundation grounds.

15          THE COURT:  Both objections are overruled as

16  untimely.

17  BY MR. BARNOWSKI:

18  Q   Tell me why?  Why did you come to that conclusion?

19  A   I mean in the case of the active -- in the case of the

20  members of the committee who were active, they told us.  I

21  mean --

22          MR. SOTO:  Objection, your Honor.  Hearsay.

23          THE WITNESS:  They told me.  Excuse me.

24          THE COURT:  Hold on.

25          THE WITNESS:  I apologize.

1           THE COURT:  When there's an objection, I need to

2    deal with it.

3           THE WITNESS:  I'm sorry, sir.

4           THE COURT:  I'm sorry, sir.  Would you repeat that?

5           MR. SOTO:  Hearsay.  He's about to testify about

6    what somebody has taken out of this --

7           MR. WAGNER:  Right.  And just --

8           THE COURT:  And you agree?

9           MR. WAGNER:  I always agree with Mr. Soto.  Just to

10   go back to --

11          MR. SOTO:  Then why did he just roll his eyes at

12   that?

13          MR. WAGNER:  He's just being nice.  Just going back

14   to the prior point on the untimeliness, we don't know what's

15   going to -- I'd ask that the answer be stricken.  We don't

16   specifically know.

17          THE COURT:  Ah, that's a different question.  That's

18   not untimely.

19          MR. WAGNER:  Okay.  And I would ask that it be

20   stricken to the extent he's relying on what other people told

21   him.  Those people aren't here.  It's clearly hearsay.  It's

22   being offered for the truth.  It should be stricken.

23          THE COURT:  The motion is denied.  You may proceed.

24   BY MR. BARNOWSKI:

25   Q   Can you tell me why you came to that conclusion?

1  A    The committee had vigorous discussions about how to
2  prioritize its position, about how to evaluate how the other
3  stakeholders in the case viewed things, and as part of those
4  conversations, you know, the committee met frequently.  We
5  talked a lot.  And it was the committee's belief that the
6  active employees were concerned, and we had active employees
7  who were putting that forward as a concern.
8          THE COURT:  And for the record, I'll just say that
9  the Court overruled the hearsay objections and denied the
10 motion to strike on the grounds that the Court perceives that
11 this testimony is not being offered for the truth of it but,
12 rather, to establish why the committee was taking the
13 positions it was in this litigation.  Go ahead.
14         MR. WAGNER:  Thank you, your Honor.
15 BY MR. BARNOWSKI:
16 Q    Were you surprised that this was the instruction or the
17 negotiation position you were being instructed to take; i.e.,
18 protect the -- that the actives care about how retirees are
19 treated?
20 A    Was I surprised?  I wasn't surprised at all.  I'd had a
21 lot of experience in this matter, and it was consistent --
22 entirely consistent with my prior experience.
23         MR. WAGNER:  Your Honor, I ask that that be stricken
24 because he's referring now back to his prior experiences in
25 some other matter.

1  THE COURT: I'm not sure what the witness' surprise

2  or how that's relevant here, so I'll grant the motion to

3  strike.

4  BY MR. BARNOWSKI:

5  Q  Okay. One last topic, Mr. Bloom. Can you describe how

6  the OPEB settlement, Class 12, is designed to work?

7  A  I think I can generally describe it, yes. Going into the

8  case, the city, like many similar employers, had a promise to

9  its -- to the people who'd worked there that it would provide

10  them with a healthcare benefit package after they retired,

11  and so it was a -- it was a -- it was what would be called a

12  defined benefit, meaning there was a benefit that was

13  provided. And while there were copays and deductibles,

14  ultimately the cost of the benefit was borne by the employer,

15  and the employee had a defined -- had a defined amount they

16  had to pay, but the benefit was the responsibility of the

17  employer. In the course of the negotiation -- in the course

18  of the negotiation, we determined that we were willing to

19  accept -- I guess I would describe it as two different kinds

20  of changes to that promise. One was in the nature of the

21  promise. What replaced a defined benefit is what I would

22  call a defined contribution. In other words, the city

23  eventually provided to the two VEBAs notes, financial

24  instruments, that had a fixed obligation, a fixed interest

25  rate, and a fixed period of payment. That defines entirely

the city's obligation on this benefit.  And if those notes
trade well in the marketplace, then they'll be worth more.
If they trade poorly in the marketplace, they'll be worth
less.  But whatever they're worth -- and if the notes are
sold and the money is reinvested well, there will be more to
provide benefits.  If the money is reinvested poorly or
there's a bad stock market or whatever it is, there will be
less.  So all of the risk as to whether or not any particular
level of benefits could be maintained is borne by the VEBA
beneficiaries, by the people themselves, and the trustees
will have to decide how much to reduce benefits, how long to
continue, all those sorts of questions, so there's a
fundamental what I would call a risk shift between the city
as obligor and this trust as obligor, and the city is solely
an obligor regarding a note of fixed amount, fixed duration,
fixed interest rate, so I think a fundamental change in
approach on the benefit.

　　　　And then second, the level of -- the level of
support, a stipend of, depending on the exact person, 150 or
so dollars a month, 125 -- there are different pieces and
parts, but roughly speaking -- would not permit the purchase
of healthcare benefits anywhere near the level of -- that
people enjoyed prior to the case, so there's both an absolute
reduction in the level of healthcare that people can buy with
the stipend, and there's this risk shift that I prior

1   discussed.

2   Q    Is the city getting out of the healthcare business?

3   A    The city is getting out of the healthcare business

4   entirely.  The city is in the business of servicing a

5   financial obligation.  That is the full extent of their

6   promise.

7   Q    And you talked about a stipend.  Is the city paying a

8   stipend?

9   A    No.  The only source of payment of the stipend is either

10  the interest on the note or the selling of pieces of the note

11  and, therefore, the reinvestment of the proceeds of that

12  sale, but it's a fixed pot of money, and the size of that

13  stipend -- there will be an initial setting of it, but the

14  size of that stipend over time is entirely dependent on, as I

15  said, how well the note trades in the marketplace if and when

16  it will be sold, if it's sold for a lot or a little, and

17  whether the proceeds of the sale are invested in a way that

18  they make a lot of money on return on investment or they

19  don't.  And that will be the sole determinant of what the

20  size of that stipend is.  The city will not pay the stipend.

21  The trust will pay the stipend.

22  Q    What is the amount of those two notes, the cumulative

23  amount?

24  A    $450 million.

25  Q    Do you have an understanding of what the committee was

1 | hoping to accomplish or achieve through pursuing a note for

2 | $450 million in terms of benefits?

3 | A    Yeah.  I mean the city -- sorry.  The city.  I apologize.

4 | I think the committee had a view when we settled that if a

5 | series of things occurred in terms of the value of the note

6 | and the reinvestment of the proceeds that we had a reasonable

7 | probability of being able to maintain the 214 benefit

8 | program, but, again, I think that the committee understood

9 | that that was based on a series of assumptions, and while it

10 | could be a little better, I think there was more -- candidly,

11 | more risk to the downside than the upside, but the hope was

12 | that the 214 benefit could be maintained without inflation,

13 | so -- and obviously there's generally inflation in the

14 | economy.  This has to last 30 years, so from a value

15 | perspective, the expectation is the stipend would be worth

16 | less, not worthless, but worth less in the future than it

17 | would be out of the -- out of the gate.

18 | Q    And has Lazard examined those assumptions to determine

19 | whether it is reasonably likely that the notes will allow the

20 | VEBAs to provide coverage similar to 2014?

21 | A    Yes.

22 |        MR. WAGNER:  Objection, your Honor.  This is veering

23 | off into what I believe is expert testimony.  He's not an

24 | expert.

25 |        MR. BARNOWSKI:  I'm not asking for his expert

1  testimony, your Honor.  I'm just asking him whether the notes

2  will spill off enough income to purchase the same benefits.

3  It's calculations.

4      MR. WAGNER:  That's clearly expert testimony.  We've

5  been presented with no calculations.  No one prevented him

6  from putting in an expert report, but -- and he was

7  originally identified as a potential expert.  He didn't put

8  in an expert report, and he specifically disclaimed at his

9  deposition that he would be an expert.

10      MR. BARNOWSKI:  Your Honor, I don't believe that

11  this is expert testimony.  This is solely an analysis of the

12  $450 million, whether it will spill out enough cash to allow

13  the VEBAs to purchase similar benefits.

14      MR. WAGNER:  I think that's -- I'm sorry.  I think

15  that that's expert testimony.

16      THE COURT:  I have to agree.  The objection is

17  sustained.

18  BY MR. BARNOWSKI:

19  Q   Last question, Mr. Bloom.  What happens if the

20  assumptions don't work out?  Who bears the burden or the

21  risk?

22  A   Whatever the assumptions are, if the note is not worth as

23  much as one might hope it would be, if the proceeds of the

24  note are not reinvested in a manner that they can earn

25  substantial interest, then that risk entirely sits on the

1  retirees who will see their stipends reduced.

2         MR. BARNOWSKI:  Thank you, Mr. Bloom.  No further

3  questions.

4                   CROSS-EXAMINATION

5  BY MR. WAGNER:

6  Q   Good morning, Mr. Bloom.  Nice to meet you in a more

7  formal setting than an elevator at ten o'clock at the hotel.

8  A   Good morning.

9  Q   Jonathan Wagner on behalf of the COPs.  Sir, you gave

10  some testimony about employee morale a few minutes ago.  Do

11  you recall that?

12  A   Yes.

13  Q   And am I right the committee has conducted no formal

14  survey of active employees bearing on the morale issue?

15  A   The committee did not conduct a formal -- any formal

16  survey.  The committee has a number of interactions with

17  active employees all the time, but there was no formal

18  survey.

19  Q   And the committee had the means to conduct such a survey,

20  didn't it?

21  A   I'm not sure that the committee had the resources to do

22  that, but the committee did not.

23  Q   Well, Lazard through March has billed over a million

24  dollars in this matter; right?

25  A   Sounds right.

1   Q   And are you aware that a survey like this costs about
2   $50,000?
3   A   I'm not aware of the cost of it.  The committee didn't do
4   it.
5   Q   And you've presented no documents today bearing on the
6   morale issue, have you?
7   A   I don't believe so.
8   Q   Now, sir, you testified that you and the committee have
9   been very public and vocal about this matter; correct?
10  A   Yes.
11  Q   And you've made several public statements about this
12  matter?
13  A   I believe I've made a few, yes.
14  Q   And you take care when you make those public statements,
15  don't you?
16  A   I try to.
17  Q   Now, do you remember stating the following, quote, "The
18  city seeks to use assumptions regarding the health of the
19  pension plans that are significantly different from those
20  used by the State of Michigan and hundreds of cities across
21  the state and around the country"?  Do you recall you made
22  that statement publicly?
23  A   I do.
24  Q   And you were specifically referencing the discount rate
25  for the pension funds; right?

1   A    Yes, I was.

2   Q    Now, Segal is the actuary for the Retiree Committee;

3   correct?

4   A    Yes.

5   Q    And by this time the Segal folks had told you that the

6   discount rate used in Michigan -- other Michigan pension

7   funds was eight percent; right?

8   A    Yes, they had.

9   Q    And you made the statement in February of 2014?

10  A    I believe that's correct.

11  Q    So let me just understand.  Before the settlement, the

12  Retiree Committee's position was the city was proposing a

13  discount rate that was too low; right?

14  A    Yes.

15  Q    Now that you've settled, the Retiree Committee is urging

16  a rate that's much lower; correct?

17  A    The Retiree Committee is urging -- was urging the support

18  for an overall settlement that had many elements.  Among

19  those elements was the city's discount rate, but this was a

20  multi-part settlement.  It had many different pieces, and

21  among the pieces the committee determined that the use of the

22  lower discount rate was acceptable in light of the overall

23  settlement.

24  Q    And, sir, were you in court yesterday when the Segal

25  actuary testified?

1  A   I was not.

2           MR. WAGNER:  Nothing further.

3           THE COURT:  Any other questions for the witness?

4  No?  All right, sir.  You are excused.  Thank you very much

5  for coming today.

6           THE WITNESS:  Thank you.

7      (Witness excused at 9:27 a.m.)

8           THE COURT:  Mr. Cullen, can we get a printout of

9  that latest schedule of witnesses?  Do you have one

10  available?

11          MR. CULLEN:  I'll make one for you.

12          THE COURT:  Or maybe if you could just flash it on

13  the screen again, we could just write it down.  It was just

14  for today and tomorrow; right?

15          MR. CULLEN:  Could you --

16          THE COURT:  Would you write it down for me?

17          MR. PEREZ:  And, your Honor, I just wanted to make

18  sure that the Court was aware that last night around ten

19  or -- ten o'clock last night we did file the stipulation with

20  respect to the adjournment.

21          THE COURT:  Right.  And I entered the order -- or

22  had it entered this morning.

23          MR. PEREZ:  Okay.  Fine.  Thank you.

24          MR. HAMILTON:  The witness is on the way from the

25  jury room, your Honor.

1          THE COURT:  Okay.

2          MR. HAMILTON:  Good morning, your Honor.  Robert

3   Hamilton of Jones Day on behalf of the City of Detroit.  Our

4   next witness is Sue McCormick, the director of the Department

5   of Water and Sewer.  We have binders of the exhibits that I

6   want to ask of her.  Can I approach, your Honor, with your

7   set?

8          THE COURT:  Yes, please.  Please raise your right

9   hand.

10          SUE F. MCCORMICK, CITY'S WITNESS, SWORN

11          THE COURT:  Please sit down.

12                     DIRECT EXAMINATION

13   BY MR. HAMILTON:

14   Q    Good morning, Ms. McCormick.

15   A    Good morning.

16   Q    Can you tell the Court who you are?

17   A    I'm Sue McCormick, and I'm the current director of

18   Detroit Water and Sewage Department.

19   Q    When did you start as the director of the Department of

20   Water and Sewerage?

21   A    In January of 2012.

22   Q    All right.  What were you doing prior to that?

23   A    I was the public service administrator in the City of Ann

24   Arbor.  I had responsible charge for all of the city's

25   infrastructure there.

1  Q   And did that include water and sewer at Ann Arbor?

2  A   It did.

3  Q   All right.  And prior to -- when did you start at the --

4  in the City of Ann Arbor?

5  A   I was there for 11 years.  I had started in 2001.

6  Q   And prior to that, where did you work?

7  A   I worked 22 years for the Lansing Board of Water and

8  Light.

9  Q   And what did you do there?

10 A   I did a variety of things.  I grew up in my career there

11 starting in the environmental science lab doing testing for

12 the utility.  I worked in systems planning, ran the

13 environmental lab, and ultimately I spent the last ten years

14 I was there helping Lansing build a regional water system in

15 conjunction with other local communities.

16 Q   Do you hold a college degree?

17 A   I do.  I have a bachelor of science from Michigan State

18 University.

19 Q   And what was the major or what was the --

20 A   It's in biological sciences.

21 Q   All right.  From Michigan State.  And are you a member of

22 any particular professional organizations?

23 A   I am, several, including the American Water Works

24 Association where I've served in a variety of capacities,

25 including as vice president of the association.

1   Q   What is the American Water Works Association?

2   A   It's a professional association that represents about

3   40,000 professionals that provide water supply services

4   across the U.S. and actually across the world.

5   Q   What are your duties as the director of the Department of

6   Water and Sewerage?

7   A   Well, I'm the chief executive officer, so the full gamut

8   of the chief executive officer including making sure that we

9   meet all regulatory compliance standards, that we have

10   harmonious labor relations, that we meet our financial

11   metrics, performance metrics.  I interface with all of the

12   local communities that we provide service to and certainly

13   with the governance board for the utility as well.

14   Q   All right.  When you first started, what was the nature

15   of the -- as the director of the department, what was the

16   nature of your work?

17   A   Well, I started with a very significant challenge.  In

18   November of 2011, a court order was issued, Judge Sean Cox,

19   who had oversight of the department as a result of over a 30-

20   year case history of intermittent violations of the Clean

21   Water Act.  Judge Sean Cox had worked with a root cause

22   committee and had developed a set of solutions to addressing

23   the long-term noncompliance issues.  That order required in a

24   fairly short time frame a number of substantial changes to

25   occur at the department to create a quasi independent

1  department I guess I would describe it, to become independent
2  in several key areas, including finance, labor, law, and
3  procurement.
4  Q   All right.  Does the phrase "management initiatives" have
5  meaning to you?
6  A   It does.
7  Q   Can you explain to the Court what that refers to in the
8  context of DWSD?
9  A   So in the context of DWSD, management initiatives means
10  in addition to having these new stand-up independence
11  abilities establishing this new capacity within the
12  department that the department had never had before, we also
13  took a look at what the department's history was in terms of
14  rate increases.  The rate increases were quite substantial,
15  and they were projected to be quite substantial for the
16  foreseeable future, on the order of eight to eight and a half
17  percent per year.  Stemming the tide of those rate increases
18  in order to assure affordability in the community for
19  services at the same time of standing up these new
20  independence meant that we had to be very creative.  I did an
21  assessment of my own over the first 90 days talking with
22  employees throughout the department, talking with a number of
23  our customers, and then I commissioned a study, a 90-day
24  study by EMA, a well-known consultant, to take a look at what
25  the potential was to reinvent the department, to optimize its

1   operations.  And in that process, we identified a number of

2   key initiatives to assist the department in becoming both

3   more effective as well as more efficient.

4   Q   Can you describe for the Court generally what some of

5   those initiatives are?

6   A   One of them -- probably one of the most substantial in

7   terms of our early accomplishments was taking a look at the

8   number of different job classifications that were described

9   in the department.  I heard from many employees that in their

10  conduct of their work that based on the narrow description of

11  their jobs, they could do certain tasks, but then they had to

12  stop.  And even though they might be capable, may have even

13  held a position previously where they did those tasks, they

14  had to hand it off to someone else because of the narrow

15  nature of their job classification.  So in working with

16  employees, we put job design teams in place of employees that

17  worked in those classifications, and we consolidated roughly

18  270 different job classifications into just over 50.  We

19  created career pathing for individuals.  These broad-banded

20  jobs take a lot of delay, allow a lot more effective

21  operation, and ultimately because of that we can downsize the

22  organization quite substantially.  In fact, we have reduced

23  the organization by about 30 percent in the last two and a

24  half years.

25  Q   You used the phrase "organizational optimization"?

1  A    We do.  In our discussion with employees, this is -- we

2  want to be clear that our path of continuous improvement is

3  not something that ends at a number.  We try to avoid using a

4  final number around most of our initiatives because we want

5  the organization to adopt a continuous improvement culture.

6  Q    Do you have any management initiatives with respect to

7  increasing the department's independence from the city?

8  A    Yes.  We are going through -- in our finance area, for

9  instance, we have an initiative that's called financial

10 transformation, and this gets to the issue of conducting many

11 of the items internally to the department that have never

12 been done there before.  Treasury management, for instance is

13 one of them.  Representing ourselves independently as we go

14 for bond market and financing is another.  And so that's an

15 example of the type of thing that we're doing.

16 Q    And then what initiatives are you undertaking with

17 respect to improving the financial stability of the

18 department?

19 A    There have been several.  Probably the one that is most

20 notable, we have worked with our customers -- our major

21 customers, primarily the three counties, in looking at trying

22 to achieve revenue stability on the sanitary sewer side of

23 our business, so we are a business whose revenues can vary

24 quite significantly from year to year because a lot of that

25 is based on weather variability, but we're also a very large

1    fixed cost business, so much of our obligations each year are

2    based on already made capital investment and debt service,

3    the number of employees we have.  Very little of our costs

4    are actually variable, but the revenues are quite variable

5    because of unit cost pricing.  The revenues can vary quite

6    substantially based on weather.  The customers recognize this

7    issue along with DWSD, and we spent nearly a year, about ten

8    months, having good conversation with our customers about how

9    we in that environment provided a situation that made every

10   customer feel that the charges were equitable to them but

11   that also provided revenue stability for the department.  And

12   as a result of that, as of July 1st of this year, when we

13   developed our budget, we took a look at the allocation of

14   costs and revenues on average over the preceding history, and

15   we agreed to shares, and our customers are now paying a fixed

16   share of our actual budget costs, and they make those

17   payments monthly so that at the end of the year, our budgeted

18   revenues are guaranteed.

19   Q   All right.  And did you establish any goals for the

20   department as to what level of rate increases you would seek

21   on an annual basis going forward?

22   A   Yes.  As a part of recognizing the -- both the

23   opportunity that we had for savings and recognizing that we

24   wanted to keep necessary revenue adjustments at or below the

25   cost of service, we set a goal of reducing those financial

1    plan projections of eight to eight and a half percent to 50

2    percent of that or no more than four percent in our financial

3    plan moving forward.

4    Q    And when you say four percent, what does that four

5    percent relate to?  What does it mean?

6    A    It's actually new revenue, so, for instance, if this

7    year's revenue requirements for the utility are 800 million,

8    then next year they would be no more than 832 million.  That

9    will translate to a variety of calculations of rates for

10   various communities depending upon how they use service, but

11   the revenue requirement for the department's operation, the

12   goal is to increase no greater than four percent each year.

13   Q    All right.  Did you end up preparing a report, what was

14   called a compliance report, with respect to complying with

15   Judge Cox's orders?

16   A    Yes.  As a part of the assignment to the director, the

17   Court asked that compliance reports be provided periodically

18   as we moved forward, and that included a final compliance

19   report that was filed as well.

20   Q    When did you prepare and file the final compliance report

21   that you just referred to?

22   A    That was in 2013.

23   Q    In March of 2013?

24   A    Correct.

25   Q    And as a result of that, what order did Judge Cox enter?

1  A    He issued an order dismissing the case, and ultimately

2  his determination was the department had achieved substantial

3  compliance with those items that he had laid out for the

4  director to accomplish, and we also had at that point

5  established a compliance record with the Clean Water Act.

6  Q    Do you continue to give periodic reports on compliance

7  with the initiatives that were set forth in the court orders?

8  A    We do, no longer to the Court, of course, but to my board

9  of directors.  Every month in the director's report I report

10  on compliance issues.

11  Q    And are those reports also available to the public?

12  A    All of that is available to the public.

13  Q    Where is it available?

14  A    We post it on our Internet.

15  Q    All right.

16        MR. HAMILTON:  If I could, I'd like to ask if we

17  could bring up Exhibit M to the disclosure statements.  It's

18  City Exhibit 3 at page 190 of 2012.  186.  So many different

19  numbers, your Honor.  It's actually page 685 of the exhibit.

20        THE COURT:  All right.

21        THE WITNESS:  Glasses.  Thank you.

22        THE COURT:  Do you need your glasses, ma'am?

23        THE WITNESS:  Well, we'll see.  If I can get the

24  dust off of these, they may work.

25        THE COURT:  Busted.

1          MR. HAMILTON:  Are they in here, too?

2          THE WITNESS:  Yes.  Thank you.

3          MR. HAMILTON:  May I approach, your Honor?

4          THE COURT:  Yes.

5          THE WITNESS:  Yours are either greater or less

6     magnifying than mine.  I'm not quite sure which.  Okay.  I

7     can see now.

8     BY MR. HAMILTON:

9     Q    Ms. McCormick, are you familiar or are you aware of these

10    projections?

11    A    I am.

12    Q    Do you have a general understanding as to how these

13    projections came about?

14    A    I believe so.  If this is a ten-year projection -- again,

15    I'm just looking at the caption here, this ten-year

16    projection.  Can you tell me when this was done?

17    Q    Yeah.  This is --

18         MR. HAMILTON:  Can we do the previous page?

19    BY MR. HAMILTON:

20    Q    This is Exhibit M to the disclosure statement that the

21    city filed.

22    A    All right.

23    Q    Do you have an understanding as to how these projections

24    came about?

25    A    I do.

1  Q   Can you tell the Court what your understanding is?

2  A   The financial projections here are based on -- are

3  these -- I'm sorry.  I'm going to back up.  I'm trying to

4  understand.  When you say "of the disclosure statement,"

5  you're talking about in the bankruptcy?

6  Q   Yes, for the plan of adjustment that was --

7  A   For the plan of adjustment.

8  Q   -- proposed by the city.

9  A   Okay.  So these are the Conway MacKenzie projections.

10 Okay.  Conway MacKenzie was retained to do a ten-year

11 projection for DWSD.  DWSD, at this particular point in time,

12 was not doing ten-year projections.  We had a five-year

13 projection.  The projection was also intended to reflect

14 changes that were occurring that would impact DWSD's

15 financial projections as a result of the plan of adjustment.

16 The DWSD projections would not have included that nor would

17 we have known what those impacts might be.  In this

18 particular case, we worked with Conway MacKenzie providing

19 information from DWSD's financial projection so that they

20 could prepare a ten-year projection.

21 Q   And what was the time period that you were providing this

22 information to Conway when they were preparing these

23 projections?  How long ago was this?

24 A   I believe this was like in the fall of 2012.

25 Q   '13?  I'm getting my years mixed up.

1  A   Perhaps I am, but --

2  Q   It was after the bankruptcy was filed; is that correct?

3  A   Oh, that's true.  In the fall of 2013.

4  Q   Okay.

5  A   The years run together.  My apologies.

6  Q   And at that time, I believe you said the department

7  didn't have ten-year financial projections; is that right?

8  A   That's correct.

9  Q   Can you describe for the Court what kind of projections

10 the department did have at that time?

11 A   The projections the utility was doing at that time were

12 those that were more pertinent to taking a look at near term

13 impacts for rate purposes, so the department was preparing

14 both five-year CIPs, capital investment projections, as well

15 as five-year financial forecasts.

16 Q   All right.  And are the -- the five-year CIPs, are those

17 submitted to the Board of Water Commissioners for approval?

18 A   They are on an annual basis, so even though it's a five-

19 year plan, it's renewed annually and submitted to the Board

20 of Commissioners for approval.

21 Q   All right.  So in the summer of -- late summer of 2013,

22 you had a five-year stip that had been approved by the Board

23 of Water Commissioners; is that right?

24 A   That's correct.

25 Q   And you had one -- one for water and one for sewer; is

1   that right?

2   A   That's correct.

3   Q   Okay. How did Conway -- or what information did Conway

4   use to project what the department's capital improvement

5   programs would be over a ten-year period?

6   A   At that particular point in time, OHM had been retained

7   to prepare a ten-year forecast for capital.

8   Q   Was the Department of Water and Sewer involved in working

9   with OHM to prepare those forecasts?

10   A   We were. There were a number of master planning

11   documents that were provided to them, consultant reports from

12   various sources, so we worked with OHM to assemble all of

13   that information and give it to them for the purposes of an

14   independent forecast.

15             MR. HAMILTON: Can we bring up City Exhibit 178?

16   BY MR. HAMILTON:

17   Q   Ms. McCormick, are you familiar with this document?

18   A   I am.

19   Q   And what is this document?

20   A   This is the ten-year CIP that was prepared. OHM was the

21   lead advisor. They had held the contract. Many of the other

22   consultants that you see listed here had specific experience

23   relative to different asset classes at DWSD.

24   Q   And what did the people that were involved in preparing

25   this ten-year CIP do in terms of interacting with your

1    department to prepare that document?

2    A    They gathered information from all of the plans.  I

3    believe they interviewed people in some of our facilities as

4    well to see what might be different from what was in plans

5    that might have been several years old.  They did a pretty

6    comprehensive independent evaluation.

7    Q    And how does the CIP forecast for the first five years in

8    this document generally -- do you have a general

9    understanding as to how those forecasts compare to the

10   department's five-year capital improvement plan that had been

11   approved by the Board of Water Commissioners?

12   A    My recollection is they were similar in nature.  I would

13   have to take a look at them to see what specific differences

14   there might be, but certainly anytime you're at a point in

15   time there may be more current information, but I believe

16   that they're generally similar.

17   Q    Okay.  All right.

18            MR. HAMILTON:  Can we go back now to the previous

19   exhibit, which was City Exhibit 3, at page 6 --

20            UNIDENTIFIED SPEAKER:  685.

21            MR. HAMILTON:  685.  Thank you.

22   BY MR. HAMILTON:

23   Q    All right.  Now, in the ten-year projections that

24   Conway did, I believe you said they used the OHM projections

25   for capital improvements for ten years; is that right?

1   A    That's correct.

2            MR. HAMILTON:  Can we go to 692?  And can you just

3   expand the top three lines there including the text, if you

4   could?  All right.

5   BY MR. HAMILTON:

6   Q    All right.  Ms. McCormick, can you tell the Court what

7   you understand these figures to show?

8   A    These figures show basically the first five years of a --

9   of capital forecasts based on the assembly of projects, and

10  then in later years, in addition to the identified projects,

11  they identify what appears to be, from my understanding of

12  this, basically the free -- what we would call available

13  revenue at the end of a year, so after all expenses -- after

14  all expenses are accounted for, these are dollars that can be

15  used for any purpose.

16  Q    So on the line that says "unidentified capital projects,"

17  it has dash marks for every year up until 2020, and then

18  there's positive numbers there.

19  A    Correct.

20  Q    What do those positive numbers reflect is your

21  understanding?

22  A    On our balance sheet generally we would show after all

23  obligations are met we will end up with net revenue, which is

24  available for any purpose, and it appears that that's what

25  they have identified here as being available for unidentified

1  capital projects.

2  Q   All right.  And the top line are the projects that were

3  recommended in the OHM report; is that right?

4  A   I believe so, yes.

5  Q   Okay.  All right.  Since the time that Conway MacKenzie

6  prepared these ten-year forecasts for the department, has the

7  department itself prepared its own updated financial

8  projections going forward?

9  A   Yes.  And most recently as we were preparing to go out

10  for bond financing, we did an updated CIP on the sanitary

11  sewer side, which was actually adopted by our board.  We

12  would have done a similar sort of thing on the water side,

13  but we weren't early enough in the process to anticipate the

14  refunding through our tender process to have the board do

15  that, but we do have a more current water forecast as well.

16  Q   All right.  And I want to -- I want to go through in

17  detail how those were -- the sequence of how you created

18  those.

19  A   All right.

20  Q   Did you prepare and get board approval of a new water

21  capital improvement program sometime in the winter of 2013?

22  A   As a part of our annual process of going through the

23  budget and ratemaking process, we have the board consider a

24  updated capital improvement plan.  They would have done that.

25  I don't know if they did it in December of 2013 or January of

1    '14, but it would have been in roughly that time frame.

2         MR. HAMILTON:  Can we bring up City Exhibit 193?

3    BY MR. HAMILTON:

4    Q   Ms. McCormick, what is this document?

5    A   This is the updated water supply capital improvement

6    program that the board approved in December of 2013.

7         MR. HAMILTON:  Your Honor, I would move City Exhibit

8    193 into evidence.

9         MR. SOTO:  No objection, your Honor.

10        THE COURT:  It is admitted.

11        (City Exhibit 193 received at 9:53 a.m.)

12   BY MR. HAMILTON:

13   Q   All right.  Now, was there also a new CIP for sewer that

14   was approved at approximately the same time in December --

15   A   Yes, there was.

16   Q   -- 2013?  Okay.  Did the department prepare and get board

17   approval of a new budget for fiscal year of 2015?

18   A   Yes, they did.

19   Q   Approximately when did they get that approval?

20   A   Again, we would generally be having the conversation

21   following or in conjunction with the capital improvement

22   program, and then shortly after the CIP, the board would have

23   also adopted a budget, so in the same time frame, probably

24   into January of 2014.

25   Q   Okay.  And I believe you said that you even prepared a

1  more updated CIP for sewer; is that right?

2  A   We did.

3  Q   Why was that?

4  A   Because we were getting ready to go out for bond

5  financing, and there were several things that had materially

6  changed, and we wanted to make sure that we had the most

7  current CIP approved by the board as we went into financing.

8          MR. HAMILTON:  Can you bring up City Exhibit 205?

9  BY MR. HAMILTON:

10 Q   All right.  Do you recognize this document,

11 Ms. McCormick?

12 A   I do.

13 Q   What is this document?

14 A   This is the CIP that we prepared for the board as we were

15 getting ready for financing, and this was adopted by the

16 board on July 9th of 2014.

17 Q   And is this the document that updated the CIP for sewer

18 that had been approved back in December?

19 A   Yes, it is.

20 Q   Okay.

21         MR. HAMILTON:  Your Honor, I would move Exhibit --

22 City's Exhibit 205 into evidence.

23         MR. WAGNER:  No objection.

24         THE COURT:  It is admitted.

25      (City Exhibit 205 received at 9:55 a.m.)

1    BY MR. HAMILTON:

2    Q   All right.  Ms. McCormick, what happened in August of

3    this year that consumed much of the time of senior management

4    in the department?

5    A   Yeah.  Well, actually, we started right around Memorial

6    Day talking about -- we had been working for some time to

7    take a look at new money financing for the sewer system.  We

8    needed dollars in order to continue our capital improvement

9    program.  As a part of those discussions with our financial

10   advisors, we identified which was a much bigger concern, and

11   that was the long-term availability of capital.  In

12   conjunction with our financial advisors and underwriters and

13   as a result of some mediation, we presented an opportunity to

14   the market for a voluntary tender of DWSD bonds, a refunding,

15   refinancing as well as new money.  And in that process, we

16   were -- we moved forward for financing.

17   Q   All right.  And in connection with that process, did you

18   prepare updated financial forecasts for the department?

19   A   We did.  We prepared updated financial forecasts.  We did

20   this update for the CIP, and we did very extensive

21   preparation of preliminary operating statements in order for

22   the market to understand the situations that were going on at

23   DWSD --

24   Q   And were those operating --

25   A   -- in full disclosure.

1  Q   Were those operating statements included in the official

2  statements that were issued for the bond offering?

3  A   They were.

4  Q   All right.

5       MR. HAMILTON:  Can we bring up City Exhibit 637?

6  Can you just like blow up the first top fourth of the

7  document?  Thanks.

8  BY MR. HAMILTON:

9  Q   Ms. McCormick, do you have an understanding of what this

10  document is?

11  A   It is.  This is the final OS as a result of that

12  financing.  This is dated August 27th, 2014.

13  Q   All right.  And is it in this document that you included

14  your most updated and accurate financial projections for the

15  department?

16  A   It is, yes.

17       MR. HAMILTON:  Can you go to page 114 of this

18  document, and can you blow up just the top half of it?

19  BY MR. HAMILTON:

20  Q   All right.  Are these the most updated projected

21  financial forecasts for the department for water?

22  A   It is.

23  Q   All right.

24       MR. HAMILTON:  Your Honor, I would move City Exhibit

25  637 into evidence.

1          MR. SOTO:  No objection.

2          THE COURT:  It is admitted.

3      (City Exhibit 637 received at 9:58 a.m.)

4          MR. HAMILTON:  All right.  Can we bring up City

5   Exhibit 636?

6   BY MR. HAMILTON:

7   Q    Do you recognize this document, Ms. McCormick?

8   A    I do.  This is the official statement dated the same,

9   August 27th.  This is the final official statement as a part

10   of that same financing, and this is for the sewage disposal

11   system.

12          MR. HAMILTON:  And can you go to page 118 of this

13   document and blow up the first half?  It's the bottom right-

14   hand corner.  That one, yeah.

15   BY MR. HAMILTON:

16   Q    All right.  Are these the most updated and accurate

17   financial projections for the sewer service at the

18   department?

19   A    Yes.

20   Q    All right.

21          MR. HAMILTON:  Your Honor, I would move City Exhibit

22   636 into evidence.

23          MR. WAGNER:  No objection, your Honor.

24          THE COURT:  It is admitted.

25      (City Exhibit 636 received at 9:59 a.m.)

1   BY MR. HAMILTON:

2   Q   Ms. McCormick, what are the two or three most significant

3   categories of changes in the financial projections that are

4   reflected in these official statements versus the projections

5   the department had back in the early fall of 2013?

6   A   Well, there would be several, but I think most

7   significantly we would have had a -- we would have an -- add

8   an additional year where we would have had actual performance

9   numbers.

10  Q   That's for fiscal year what?  Two thousand -- the one

11  that ended on June 30th of 2014?

12  A   Right.  Here we have the unaudited results for 2014.

13  We'd have had final audited for '13 and unaudited results for

14  '14, so that would have been substantially different.   In

15  addition to that, this is the first forecast, I believe, that

16  the department issued officially that would have included at

17  least our estimate of the impacts of the plan of adjustment,

18  and it would have also reflected the results of the tender

19  process.

20  Q   All right.  And also had you modified in any material way

21  the capital improvement plans with the department from fall

22  of 2013 to August of this year?

23  A   Yes, and as indicated previously in the documents that we

24  looked at that were updated by the board.

25          MR. HAMILTON:  Can we go -- can we go to 637, page

1   110?  No.  I must have the wrong --

2            THE WITNESS:  This is 636, 110?

3            MR. HAMILTON:  There we go.  All right.  Can you

4   blow up the fourth and fifth -- no, the one above.  It

5   says -- yeah, those two.

6   BY MR. HAMILTON:

7   Q   Ms. McCormick, can you describe the variance for the

8   Court between what had been budgeted for fiscal year 2014 and

9   what actually happened?

10  A   Um-hmm.  So I mentioned, I think, earlier that one of the

11  things that is quite significant to water and sewer utilities

12  is the variation in sales from year to year primarily

13  weather-driven, and, again, we typically project for budget

14  purposes what we consider to be a normal weather year.

15  Unfortunately, we've had a couple of back to back very wet

16  weather years, and as a result of that, the expected water

17  sales volume was lower than anticipated.  In addition to

18  that, the level of bad debt was higher than what was

19  anticipated, some of this most substantially due to a couple

20  of significant increases in bad debt associated with local

21  agencies in financial distress, including the City of Detroit

22  and the Detroit Public Schools.

23  Q   And can you describe -- or expand a little bit about

24  that, about the bad debt associated with the City of Detroit

25  and the public schools -- and the public school system?

1    A    City of Detroit had made little to no payment of their

2    utility bills for the year preceding bankruptcy, and they had

3    made until very recently little to no payment on their debt

4    during bankruptcy, their utility bills during bankruptcy.

5    Q    What about the school system?

6    A    The school system had a amount --

7             THE COURT:  Excuse me one second.

8             THE WITNESS:  I'm sorry.

9             THE COURT:  I'm sorry.  When you say "City of

10   Detroit utility bills," are you talking about the bills that

11   the city itself owes or that its residents owe?

12            THE WITNESS:  The municipal government.

13   BY MR. HAMILTON:

14   Q    And can you describe for the school system its bad debts?

15   A    The school system has been struggling for a couple of

16   years.  A year ago they were $10 million in owing to the

17   department.  They did enter into a payment arrangement and

18   were able to reduce that, but we still have a bad debt

19   remaining of over $5 million.

20   Q    All right.  And then the second paragraph here refers to

21   operating expenses being estimated at over $9 billion under

22   budget.  Do you see that?

23   A    Um-hmm.

24   Q    Can you describe for the Court what that reflects?

25   A    This is basically the result of the department's

1   optimization, and we have gone into each of the last several

2   years projecting a natural attrition experience as well as a

3   cost constrained objective, but we have been very successful

4   in overachieving our reductions.

5   Q   All right.

6               THE COURT:  Can we bring up page -- Exhibit 636,

7   which is the sewer official statement, page 114?  And can you

8   blow up those two paragraphs there?  Yes.

9   BY MR. HAMILTON:

10  Q   All right.  Ms. McCormick, did you have a similar

11  experience with budget variances for the sewer department for

12  the fiscal year 2014?

13  A   That's correct.

14  Q   Could you describe that for the Court?

15  A   Very similar.  On billable wastewater volumes, again,

16  weather impacts relate to that.  And while one might think

17  wet weather means more wastewater billable volume, in fact,

18  when the water billable volume goes down, the sewerage

19  charges on wastewater return are much greater than those for

20  what we would call dilute strength water, which is

21  stormwater, so from a revenue standpoint, it's still a net

22  negative experience for us.  And the same issues that I

23  mentioned in terms of bad debt apply here as well.

24  Q   All right.

25               MR. HAMILTON:  Can we go now to City Exhibit 637 at

1  page 110?  And can you blow up the bottom paragraph under

2  fiscal year 2015 budget?

3  BY MR. HAMILTON:

4  Q   All right.  Ms. McCormick, can you describe what the

5  revenue projections were in the fiscal year 2015 budget as

6  compared to the 2014?

7  A   This is the budget in total, and this is -- yeah.  This

8  is the budget in total for 2015.  This is a very modest

9  increase.  $9 million is certainly a lot of money to nearly

10  everyone, but this $9 million as compared to fiscal year 2014

11  budget is actually an increase of about one percent in the

12  total budget of the utility.

13  Q   Well, let me ask you, now, that's a $9 billion increase

14  compared to the fiscal 2014 budget; right?

15  A   Um-hmm.

16  Q   Now, you already testified and explained to the Court how

17  you had missed the -- the actual results of 2014 had missed

18  the budgeted by -- the budgeted results or revenues by over

19  $40 million; right?

20  A   Um-hmm.

21  Q   Why are you showing an increase over the budget you

22  missed by 40 million in 2015?

23  A   So this is a -- this is a revenue requirement increase,

24  so when the utility establishes a budget, we look first at

25  our current obligations, debt service and et cetera.  We look

1    at any new CIP projects and any new financing expenses.  We

2    look at a projection of our operating expenses, and we set a

3    revenue requirement.  This is a revenue requirement.

4    Q    Okay.

5    A    And then we -- and then we propose and adopt rates in

6    order to deliver that revenue requirement.

7            MR. HAMILTON:  Can we go to the next page of this

8    exhibit, which is 111, and can you blow up that top

9    paragraph?

10   BY MR. HAMILTON:

11   Q    All right.  So can you describe for the Court how the

12   rate was set in 2015?

13   A    For 2015, again, we looked at those revenue requirements,

14   and we take into consideration what's changing in terms of

15   sale volumes.  So while the net increase in new revenues

16   requirement might only be one percent, the fact that we also

17   have to make up for changes in volume, changes in estimates

18   of bad debt, et cetera, we establish this -- we establish

19   rates in accordance with that.

20   Q    All right.  So if we look at the first line of that full

21   paragraph --

22   A    Um-hmm.

23   Q    -- the fiscal year 2015 budget with respect to revenues

24   from supply services, how does that compare to the same

25   revenues that were projected in the 2014 budget?

1    A    Again, repeat the question, please.

2    Q    Sure.

3    A    I want to make sure that we're -- that I'm absolutely

4    clear that you're asking about a revenue projection as

5    opposed to a sales volume.  I want to make sure I distinguish

6    that.

7    Q    Right; right.  You had revenues for water supply services

8    projected in the 2014 budget; is that correct?

9    A    That's correct.

10   Q    What assumptions did the department make regarding

11   weather with respect to the projections of water -- of

12   revenue from water supply services in the 2014 budget?

13   A    Very commonly practiced what we assumed was normal

14   weather conditions.

15   Q    And what, in fact, happened in 2014?

16   A    Another wet weather year.

17   Q    Okay.  So the revenues were higher or lower in 2014

18   compared to the budget?

19   A    They would have been lower.

20   Q    All right.  What assumption did you make with respect to

21   weather in estimating what the revenue from water supply

22   services would be for fiscal year 2015?

23   A    A normal weather year.

24   Q    Okay.  So if we compare the two budgets as opposed to

25   what actually happened, 2014 and 2015, in terms of revenue

1  from sale of water services, how does 2015's budget compare
2  to 2014?
3  A   It would be -- it would -- I think the sales revenue --
4  I'd have to take a look at the budget, but I believe the
5  budgeted revenues would have been a little more -- the
6  budgeted revenues would have gone up because we were asking
7  for a four-percent increase in net revenue, but we would not
8  probably have included -- I want to make sure I understand
9  the question.
10 Q   Well, let me ask you, do you see the line that says the
11 more conservative estimates of sales to customers in that
12 sentence that's highlighted?
13 A   Correct.  Primarily --
14 Q   What does that refer to?
15 A   Yeah.  Primarily in the city one of the things that we
16 have continued to see within the City of Detroit is a decline
17 in overall sales, and that was adjusted for in the budget.
18 Q   Okay.  So while there was a decline in overall sales, the
19 board also approved an increase in rates for 2015; is that
20 right?
21 A   Correct.  And so here's an example of the net impact of
22 that.  While the operating costs assignable to the City of
23 Detroit may have gone down, the rates would have gone up to
24 reflect both a decline in sales as well as an increase in bad
25 debt, and so the net rate increase to the city would have

1  been very different than the budgeted revenue requirement

2  change.

3  Q   All right.  Now, did the -- when did the Board of Water

4  Commissioners approve the fiscal year 2015 budget?

5  A   I believe that -- I believe that was in January.

6  Q   Okay.  And after it was approved, did the department

7  continue to refine its financial projections for the next

8  five years?

9  A   Certainly, particularly as we neared -- again, as we

10  neared the financing wanting to use the most current

11  information that we had available.

12  Q   All right.

13       MR. HAMILTON:  Can we go lower on the same page and

14  blow up the last paragraph at the bottom?

15  BY MR. HAMILTON:

16  Q   Ms. McCormick, that paragraph and, in particular, the

17  third sentence talks about a review that the department did

18  from February through April of 2014.  Are you familiar with

19  that review?

20  A   Yes, I am.

21  Q   Can you describe that for the Court?

22  A   So in addition to just looking at the annual volumes,

23  what we did was a fairly sophisticated evaluation taking a

24  look at month-to-month comparisons during what we consider

25  normal dry weather months, so looking at that October through

1    April time frame when irrigation and other sorts of things

2    that can cause variation from year to year, you sort of take

3    those out and normalize to try to -- to try to take a look at

4    the true -- you know, a more accurate potential trend of

5    what's happening in sales.  And as a result of that, we made

6    an adjustment in the sales volumes anticipated for the city.

7    Q    This indicates it was a five-percent reduction for 2015;

8    is that right?

9    A    Correct.

10   Q    All right.  And then that established the baseline, and

11   you had an additional -- for additional years projected out

12   additional reductions in volume; is that right?

13   A    Correct.

14   Q    Why is that?

15   A    We look at outside agencies to try to confirm, you know,

16   these sort of long-term trends in communities generally

17   related to things like population trends, business trends,

18   and et cetera.  I believe in this particular case, we took a

19   look at the SEMCOG data for population changes within the

20   City of Detroit.

21   Q    If you look at the last line of that paragraph --

22   A    Um-hmm.

23   Q    -- there is an assumption regarding bad debt expense.

24   Can you describe your reasoning behind that assumption for

25   the Court?

1  A   Yes.  Now, the first thing I would say is this is a

2  operating statement that's prepared for both the rating

3  agencies as well as the investor community.  We make it a

4  point to be as conservative as we can be.  This is -- in our

5  long-term relationship with these agencies, if anything, we

6  want to make sure that we underpromise and overdeliver.  And

7  while we have a number of initiatives to get at the bad debt

8  situation, we want to be very conservative with regards to

9  projections, and so we looked at about an 83-percent

10  collections rate, particularly for the city throughout this

11  five-year period.

12  Q   Okay.

13          MR. HAMILTON:  Can we go now to the next -- or to

14  page 114?

15          THE COURT:  Excuse me.  Before we move on, let's

16  take our morning recess at this time and reconvene at 10:30,

17  please.

18          MR. HAMILTON:  Thank you, your Honor.

19          THE CLERK:  All rise.  Court is in recess.

20      (Recess at 10:14 a.m., until 10:30 a.m.)

21          THE CLERK:  All rise.  Court is back in session.

22  You may be seated.

23          THE COURT:  You may proceed, sir.

24          MR. HAMILTON:  Thank you, your Honor.

25  BY MR. HAMILTON:

1  Q   Ms. McCormick, I have up on the screen now page 114 from

2  the offering statement of the water supply system bonds,

3  which is Exhibit 637, and this is the -- what you testified

4  as the most current financial projections for the water

5  supply system.  And I want to ask you about the first line

6  here on operating revenue under existing rates.  For year --

7  for fiscal year 2014, there's the phrase "unaudited

8  estimate," and it has the figure 347 -- about 348 million.

9  Do you see that?

10 A   I do.

11 Q   All right.  That reflects the revenues -- the estimate of

12 the revenues that were actually received by the department;

13 is that right?

14 A   That's correct.

15 Q   So that reflects the bad weather year that we had for

16 fiscal year 2014; is that right?

17 A   That's correct.

18 Q   Okay.

19 A   And actually, if -- when we say fiscal year '14,

20 remember, it includes the residual bad weather effect from

21 the prior summer as well as the wet weather effect from this

22 summer as well, so --

23 Q   Okay.  And then for the projections for fiscal years 2015

24 through '19, the operating revenues that are projected are

25 substantially higher than what you have for fiscal year 2014.

1   Do you see that?

2   A    Yes.

3   Q    And the biggest jump is in years 2015 and then it

4   gradually goes down in subsequent years.  Do you see that?

5   A    I do.

6   Q    Why are the years 2015 through 2019 -- why are the

7   revenues projected to be so much higher than they were in

8   2014?

9   A    Again, what you will see is each of the years is

10  projected on a normal weather year, but you will also see the

11  decline based on the anticipated continued trend line that we

12  see from the dry weather usage.

13  Q    All right.  So if we were to compare the 2014 number with

14  the 2015 number, one explanation that I believe you just said

15  is that you're assuming normal weather in 2015; is that

16  right?

17  A    That's correct.

18  Q    And was there a rate change in between 2014 and 2015?

19  A    Yes, and this would have included that adjustment as

20  well.

21  Q    Okay.  So the difference between the 347 and the 379

22  figure in those two years is related to weather and the rate

23  change.  Is that fair?

24  A    That's correct.

25  Q    Okay.  All right.

1    MR. HAMILTON:  Can we go to page 85 of this exhibit?

2  And can you blow up the top half of the -- the chart on the

3  top half of the page?

4  BY MR. HAMILTON:

5  Q   All right.  Ms. McCormick, this is again from the

6  official statement of August 27th for the water supply

7  system, Exhibit 637.  What is this -- what does this table

8  show?

9  A   This is the capital improvement program estimated

10 expenditure schedule.

11 Q   All right.  And is this the most current projections of

12 your capital improvement plans for the water supply system at

13 the time for the department?

14 A   It is.

15 Q   All right.  And if you look in the bottom right-hand

16 corner, the last number for the total system for the six

17 years that are projected there, it's 713 million; is that

18 right?

19 A   That's correct.

20 Q   All right.  I want to compare that number just generally

21 to what was in the city's projections attached to the

22 disclosure statement which we had as Exhibit M to the

23 disclosure statement.

24    MR. HAMILTON:  Can we bring up Exhibit 178?  It's

25 page 200 or 212.  What is the -- I'm sorry.  Exhibit 3.  I'm

1  sorry.  The disclosure statement.  200.  And can you blow up

2  the top table, chart?  Yeah.  Actually, include the caption

3  if you could, a little higher.  Thank you.

4  BY MR. HAMILTON:

5  Q   All right.  Ms. McCormick, this is from the -- what you

6  called the Conway MacKenzie projections that were attached to

7  the disclosure statement, and we talked about this earlier,

8  but this is just for the water fund.  If you look at the

9  capital spending that the OHM estimates had for the same time

10 period that we just looked at in the official statement, 2014

11 through 2019, how do these numbers compare to what you have

12 in the official statement?  Are they higher or lower?  Do you

13 know?

14 A   They're comparable.  There are some adjustments, but they

15 are comparable.

16 Q   Can you describe generally for the Court what the

17 adjustments were for the water system in the official

18 statement as compared to this document?

19 A   Well, certainly for this document, again, the information

20 here would be a bit aged for the early years, and so there

21 would be adjustments there.  And also for the -- as we were

22 preparing for the OS, one of the things that we wanted to

23 incorporate for the purposes of the investors in the bond

24 markets was the current forecasted impacts of the latest

25 information from our water master plan, and so that would

1  have impacted the last couple of years of the five-year
2  forecast.
3  Q    And why would it have impacted?  What changes did you
4  make with respect to capital improvements for water from --
5  during the last year?
6  A    The five-year forecast acknowledges the fact that we have
7  five water treatment plants, but in order to serve the
8  projected requirements for the region, we can meet the
9  capacity requirements with three of those facilities, so
10  within the five-year forecast, it's envisioned that one of
11  those facilities could be removed from service.  And so
12  capital expenditures for that facility would cease, but there
13  may be some capital investment required in transmission
14  systems in order to move the water more effectively, and so
15  those adjustments are reflected.
16  Q    Okay.  All right.  I now want to ask you about the
17  current level of the services that are provided by the
18  Department of Water and Sewer.  What is the department's
19  understanding of the current level of the quality of service
20  that the water system supplies to its customers?
21  A    The water system has an excellent reputation for both
22  service as well as quality.  It's award-winning.  It's
23  complimented by our customer communities.  I would say it was
24  an excellent level of service.
25         MR. HAMILTON:  Can you bring up Exhibit 637, page

1  86?  Can you highlight the second paragraph?

2  BY MR. HAMILTON:

3  Q   All right.  Now, Ms. McCormick, the very first sentence

4  of this paragraph appears to summarize what you just stated

5  to the Court; is that right?

6  A   That's correct.

7  Q   And this is the offering -- the official statement that

8  you provided to the bond markets in connection with the

9  refunding bonds; is that right?

10  A   That's correct.

11  Q   Did you engage an outside firm to assess the quality

12  of -- in part, the quality of the water supply service that's

13  being provided?

14  A   We engaged a feasibility consultant.

15  Q   And did you also engage an engineering advisor as well?

16  A   We did.

17  Q   All right.

18          MR. HAMILTON:  Can you go to page 114 of this

19  exhibit, 637, which is the official statement for the water

20  refunding bond?  That's not it, no.  Page -- is that 637?

21  All right.  So I have the wrong note.  Excuse me, your Honor.

22  It's 126.  All right.  If you could blow up the first

23  paragraph under the system evaluation report.

24  BY MR. HAMILTON:

25  Q   All right.  Does this paragraph refer to the engineering

1  advisor that you just referred to?

2  A    It is.

3  Q    And so now we know what OHM stands for; is that right?

4  A    That's correct.

5  Q    Orchard Hiltz & McCliment?

6  A    Um-hmm.

7  Q    All right.  And did their report -- how did their report

8  affect your assessment as to the quality of service that is

9  provided by the Department of Water Sewer with respect to

10  water?

11  A    I would say that it confirmed my assessment.

12          MR. HAMILTON:  Could you go down to the next

13  paragraph in this and highlight the first bullet?

14  BY MR. HAMILTON:

15  Q    Is this the confirmation that you got from OHM that you

16  just referred to?

17  A    Yes, it is.

18  Q    Okay.  Ms. McCormick, what is your understanding of the

19  quality of service that's provided by the sewer supply system

20  for the Department of Water and Sewer?

21  A    I would say substantial progress has been made there as

22  well.  Significant new investment has occurred at the

23  wastewater treatment plant, and, you know, from a system

24  performance standpoint during our most recent extremely large

25  storm, the system performed with outstanding performance, so

1  my assessment is that the system is really doing quite well.

2  Obviously it will need continued investment, but the system

3  is doing quite well.  In the last two years the department

4  has actually earned the NACWA silver award for its

5  performance meeting water quality standards.

6  Q    Would you say it's fair to say that the department is

7  providing an adequate level of sewer supply services to its

8  residents and customers?

9  A    I believe that's a fair statement.

10  Q    Did you get confirmation of that from the OHM advisors?

11  A    That's my recollection.

12          MR. HAMILTON:  Can you go to page 80 -- I'm sorry --

13  page 130 of Exhibit 636?  Can you blow up the two paragraphs

14  under "system evaluation report," the paragraph in the first

15  bullet?

16  BY MR. HAMILTON:

17  Q    Ms. McCormick, is this the confirmation that you just

18  referred to that you received from OHM regarding the sewer

19  services that are supplied by the department?

20  A    Yes, it is.

21  Q    And it's referring to three minor violations.  Do you see

22  that?

23  A    Yes.

24  Q    Have you solved those problems?

25  A    These types of three -- these three minor violations may

1  be based on an untimely performance of a piece of equipment,

2  and so while those types of things are pretty typical, they

3  are generally minor in nature, typical of all of wastewater

4  service providers, so this is not an atypical issue.

5  Q   All right.  Ms. McCormick, now I want to ask you a couple

6  questions about how the rates that the department charges for

7  its water and sewer services compare to comparable systems in

8  other cities.

9  A   Okay.

10 Q   Do you have an understanding as to where Detroit falls in

11 terms of comparing its rates to the rates of other systems in

12 comparable cities?

13 A   We have looked -- we look every year as we adjust rates

14 as to our comparability within our service area.  We also

15 look for comparability for other large utilities.  Utilities

16 of our size typically have an economy of scale that gives us

17 an advantage, and so it's important to benchmark against

18 other similar large utilities.  We do that as well as

19 utilities generally in the -- you know, in the general

20 regional area.  And all our valuations over the course of the

21 last several years have indicated we run at or about the

22 average.

23 Q   All right.

24          MR. HAMILTON:  Can you bring up on Exhibit 637 page

25 104?  And, again, this is the -- yeah.  Actually, make it

1    105.  Can you blow it up a little bit for me?

2    BY MR. HAMILTON:

3    Q    This is, again, the official statement for the water

4    bonds, Ms. McCormick, and it's a table that was included in

5    the official statement.  Can you describe what this table

6    shows?

7    A    This is a collection of the data from the largest 50 U.S.

8    cities for the total for water and sewerage charges

9    experienced in those communities compared on a common use

10   basis.

11   Q    And what does it show about Detroit compared to other

12   cities here?

13   A    It shows us right in the middle of the pack.

14   Q    Okay.  And did you get a confirmation of where Detroit's

15   rate system falls compared to other cities from the Foster

16   Group in conjunction with their feasibility study?

17   A    Yes, a very similar sort of analysis.

18           MR. HAMILTON:  Can you go to page 125 of this

19   exhibit?  Can you highlight the first bullet?

20   BY MR. HAMILTON:

21   Q    Ms. McCormick, is this the summary of the confirmation

22   you received from the Foster Group on where your rates fall?

23   A    It is.

24   Q    All right.

25           MR. HAMILTON:  Can we go to the second bullet there,

1  I believe?

2  BY MR. HAMILTON:

3  Q    Ms. McCormick, I want to ask you what is your assessment

4  of the attractiveness of the water and sewer services

5  provided by your department to businesses in deciding where

6  to locate their business?

7  A    For businesses that would be water use intense, I think

8  we provide a significant advantage.  Not only are our rates

9  very attractive in terms of being comparable to other large

10 U.S. cities on average, but in addition to that, we have a

11 pretty significant advantage in that we have excess capacity,

12 which means if there are high-volume users that come into the

13 system, they will actually decrease our unit cost, which will

14 provide a cost advantage to them and all other customers of

15 the system.  We don't have to make huge investments in order

16 to accommodate additional growth or additional large

17 customers.

18 Q    Do you believe that the quality of water and sewer

19 services that the department provides is a positive or

20 negative factor to businesses in deciding where they might

21 locate -- whether to locate in the City of Detroit and

22 surrounding areas?

23 A    I think positive.

24 Q    Okay.  All right.  I now want to ask you some questions

25 about a series of demonstrative exhibits that were shown to

1  the Court by lawyers for Oakland County at the beginning of

2  trial, and the first one I want to ask you about is Exhibit

3  6111.

4          MR. HAMILTON:  You don't have it?  Okay.  Well, we

5  have hard copies; right?  If you can -- it should be in her

6  binder.  Yeah.  May I approach the witness, your Honor?

7          THE COURT:  Yes.  Oh, we have it.

8          MR. HAMILTON:  Yep.

9  BY MR. HAMILTON:

10 Q   It's now on the screen.

11 A   That one is easier to look at.

12 Q   All right.  Do you have an understanding of what this

13 chart purports to show, Ms. McCormick?

14 A   I do.

15 Q   Can you explain it to the Court?

16 A   Sure.  What you see here is the annual capital

17 improvement expenditures for a number of prior years, 2004

18 through 2014, as well as the projected capital improvements

19 moving forward from there, and it shows both the budget as

20 well as the actual.

21 Q   All right.  And you'll see the dotted line that says 70

22 percent of POA.  Do you see that?

23 A   I do.

24 Q   All right.  Do you have an understanding as to why the

25 actual expenditures on capital improvements for the

1　department have historically been approximately 70 percent of

2　what was budgeted for the same time period?

3　A　　Um-hmm.  Well, there's a couple of interesting things in

4　the way that this is laid out, but most typically when we do

5　our capital improvement projects, every capital improvement

6　project is going to carry some level of contingency.  The

7　smallest amount of contingency on a project we carry is about

8　ten percent.  Often it's more than that depending upon where

9　in the process we are in estimating, so about ten percent of

10　that variation is generally due to the fact that you don't

11　spend contingencies.  The objective is not to spend

12　contingencies.  They're there for things that you haven't

13　accounted for in your design process, so that's a piece of

14　this.  The other part I can -- hopefully I won't insult any

15　engineers in the room, but generally in every system I have

16　worked in engineers have a little more appetite to be able to

17　accomplish things, and so it's very typical to see 15 percent

18　or so of what is actually planned to be expended be deferred

19　and kind of slide into the next year, and that kind of slides

20　out on the schedule.  So typically when you look at capital

21　budgets, you will see fairly heavy loading in the first few

22　years, and then you'll see a tail-off.  Again, engineers have

23　a big appetite for getting things done quickly, and then

24　often you see deferrals.  It's not uncommon.  When I worked

25　for the Lansing Board of Water and Light, we actually planned

 1  in our expenditures for a 15-percent deferral from what was

 2  budgeted.  Those two factors alone could well account for

 3  about 25 percent of this.

 4  Q    Do you believe it would be fair to conclude from this

 5  chart that the department historically has had -- not had

 6  sufficient revenue to pay for its planned capital

 7  improvements?

 8  A    That's categorically untrue because the vast majority of

 9  the capital, almost without exclusion, has been based on

10  capital financing, so bond financing for projects that are

11  projected several years into the future, so those funds are

12  already on hand.  This is not an issue of funds on hand.

13  We're not revenue financing our capital.  We're debt service

14  financing capital.

15              MR. HAMILTON:  Can we bring up -- can you bring up

16  the next exhibit, 6112?

17  BY MR. HAMILTON:

18  Q    This was another demonstrative from counsel for Oakland

19  County, Ms. McCormick, and I want to ask you about each one

20  of these bullets.  The first bullet says that for the past 15

21  years sewer and water volume steadily declined, yet the POA

22  projects significantly increased billable water and sewer

23  sales in 2014 and 2015.

24  A    Um-hmm.

25  Q    Do you have an understanding as to why the Conway

1  MacKenzie projections of water and sewer sales were increased
2  compared to 2013 for years 2014 and 2015?
3  A    Again, we didn't prepare those projections, but I do
4  believe that Conway MacKenzie used the department's
5  projections, which would have acknowledged from an actual to
6  a projected the uptick from wet weather to normal weather.
7  Q    What was the weather like in 2013?  Was it a bad year?
8  A    It was very wet.
9  Q    All right.  And when the projections were made for the
10 disclosure statement, you didn't have the actual results from
11 2014 yet; is that right?
12 A    That's correct.
13 Q    So what was the assumption regarding weather in 2014-2015
14 in preparing those objections -- those projections?
15 A    That they would have been normal weather.
16 Q    Okay.  All right.  Second bullet, bad debt expense,
17 extraordinarily high and increasing, yet POA projects bad
18 debt expenses will decline.  Do you have a view as to whether
19 it is appropriate to expect that the department will reduce
20 its bad debt expense going forward?
21 A    Yes, I do.
22 Q    What is it and why?
23 A    Well, two.  Again, one, I think it is reasonable to
24 expect that when the city emerges from bankruptcy it will pay
25 its bills, and so we would expect that to reduce the bad

1  debt.  I mentioned that is one of the significant near term

2  bad debt experiences we're having, and similarly with the

3  schools.  While they have struggled, they have been getting

4  better at making payment arrangements and getting closer to

5  erasing much of their bad debt as well.  And the department

6  has continued to make more efforts in reducing bad debt as

7  well.

8  Q    All right.  Let's talk about the third bullet.  Can you

9  explain to the Court what's been going on with the provision

10  of service to Flint and the surrounding county?

11  A    Well, at the time that the Conway MacKenzie projections

12  were made, the department believed that Flint was going to be

13  on the system until the KWA pipeline was actually constructed

14  and in service, and instead Flint exited the system early, so

15  they did not stay on line until 2016.  They actually came off

16  line when they put their plant in service with River Water

17  Supply much earlier.  However, there's another factor here as

18  well, and that is the Flint contract actually provides

19  service to the City of Flint as well as to Genesee County,

20  and while Flint has exited the system, Genesee County remains

21  to be served, and they're each about 50 percent of the

22  revenues and volumes that are in that single contract, and so

23  Genesee does -- is still on line.  Even if Genesee proceeds

24  with the construction of their water plant, 2016 is the

25  earliest exit date, but the department is actually still in

1   negotiations with Genesee for backup service, so, you know,

2   again, as you move forward in time, things are different than

3   they may have been at a particular point in time.

4   Q   All right.

5           MR. HAMILTON:  And can we go then to Exhibit 6113?

6   BY MR. HAMILTON:

7   Q   All right.  Ms. McCormick, this is another demonstrative

8   that counsel for Oakland County used in her opening

9   statement, and this purports to show a pretty big spike in

10  projected volume for water in 2014.  Do you see that?

11  A   I do.

12  Q   All right.  Do you have an understanding as to why that

13  spike was projected?

14  A   Again, if you take a look at the actual volume, you will

15  see the big spike in 2011, which was closer to a normal

16  weather year.  And if you were to take that even with a

17  slight downward trend line for decline in sales overall, 2014

18  is not an unreasonable estimate for a normal weather year

19  given the then current information.

20  Q   And that current information -- at the time the

21  projections were made back in the fall 2013, the assumption

22  for the weather for fiscal year 2014 was what?

23  A   Normal.

24  Q   Normal or bad?

25  A   Normal weather.

1   Q   All right.  So that would be comparable to what the

2   weather was like in the year 2011; is that right?

3   A   That's correct.

4   Q   Okay.  So does this spike in the projection of volume

5   show any -- in your judgment, any attempt by the city to

6   manipulate or improperly state what projected revenues would

7   be?

8   A   I don't believe so.

9   Q   All right.  Finally, I want to ask you, Ms. McCormick,

10  about --

11          THE COURT:  Wait.  Before we leave that slide --

12          MR. HAMILTON:  Sure.

13          THE COURT:  -- can you account for the difference

14  between the red and the green lines, the red being the plan

15  of adjustment projection and the green being your own

16  department's projection?

17          THE WITNESS:  There is a -- I think this projection

18  is probably more current and does reflect the early loss of

19  Flint as compared to the earlier plan of adjustment

20  projection.  And the 2014 green line would have been the

21  actual data point in 2014 after we actually experienced a wet

22  weather, but you will see the department for 2015 would have

23  done an uptick again noting the expectation that we would

24  have a normal weather year.

25          THE COURT:  I got the sense from your answer that

1   you were speculating that that's what the difference is and

2   that you don't really know.

3           THE WITNESS:  Well, certainly I would love to be

4   able to look at the back calculations to confirm that --

5           THE COURT:  Let me ask you to --

6           THE WITNESS:  -- but to the best of my knowledge,

7   I --

8           THE COURT:  Let me ask you to do that perhaps over

9   lunch.

10          THE WITNESS: Yeah.  Okay.

11          MR. HAMILTON:  Well, your Honor, the problem is is

12  that this was an Oakland County demonstrative exhibit, so I

13  don't know what --

14          THE COURT:  If the exhibit is inaccurate, then

15  that's possibly the explanation --

16          MR. HAMILTON:  Okay.

17          THE COURT:  -- but I want this investigated.

18          MR. HAMILTON:  We will do that, your Honor.

19  BY MR. HAMILTON:

20  Q   Finally, Ms. McCormick, I want to ask you about the 837

21  miles of transmission main pipes that was referenced by

22  Oakland County's lawyer during her opening statement.

23          MR. HAMILTON:  Can we bring up Exhibit 178, page 13?

24  This is, I believe, the OHM report, your Honor.  And can you

25  blow up the first -- Item B there?

1  BY MR. HAMILTON:

2  Q   Ms. McCormick, can you explain for the Court what the

3  difference is between a transmission main pipe and a

4  distribution and service main pipe that's referenced here in

5  this paragraph?

6  A   First of all, transmission main is a main that's

7  generally moving large volumes of water from location to

8  location, so in the DWSD system we have pipes that are 24

9  inch and larger in diameter, up to 96 inch in diameter, that

10 will move water from our treatment facilities out to local

11 communities, and then in each local community they're going

12 to have distribution mains.  Those are mains that are

13 generally tapped to provide services into individual homes.

14 Transmission mains are generally not tapped for regular

15 service connections.

16 Q   All right.  So the distribution mains tap into the

17 transmission mains; is that correct?

18 A   Correct.

19 Q   All right.  So the 3,100 miles of distribution and

20 service main that's referenced here, is that the distribution

21 and service mains that are owned and operated by the DWSD?

22 A   Correct.

23 Q   All right.  Who owns the distribution and service mains

24 in the outside communities not in Detroit?

25 A   The individual communities do.

1  Q   All right.  And who pays for the maintenance and service

2  of those distribution and service mains, DWSD or the

3  communities?

4  A   No.  The individual communities do.

5  Q   All right.  What are the distribution and service mains

6  that are owned by DWSD?

7  A   Those are the ones within the City of Detroit.

8  Q   Okay.  And who pays for the maintenance and repair of

9  those distribution mains?

10 A   DWSD does, and they're allocated in the City of Detroit

11 rates.

12 Q   Okay.  What are the department's plans for the

13 maintenance and replacement of its main -- transmission main

14 water pipes?

15 A   I believe the CIP identifies a number of planned

16 transmission main projects and, in addition to that, carries

17 an allowance for those things that may occur that are not yet

18 planned.

19 Q   All right.  Are you generally familiar with the concept

20 of the useful life of transmission water pipe -- main water

21 pipes?

22 A   I am.

23 Q   Can you describe for the Court how that concept plays in

24 the department's plans for when, if ever, it plans to repair

25 or replace a transmission water pipe?

1  A    Typically when we think about a useful life, this is

2  another way of saying for the utilities that use enterprise

3  fund accounting that we have -- that we're basically funding

4  depreciation, and so whenever we put an asset on the books,

5  we say it has a useful life of "X" number of years, and so we

6  fund through our rates the depreciation schedule.  That's

7  what the useful life is generally used for.  It's an

8  accounting practice.  There is -- every type of water main

9  that goes into service is going to have its own

10  characteristics.  We have a lot of different types of

11  materials.  Each material is going to have a different

12  experience depending upon the soils that it's in, the quality

13  of the water, so while there is perhaps some relationship

14  between service life and when an asset might need

15  replacement, there's no direct -- there's no direct

16  connection, and so generally water mains are replaced based

17  on their actual experience in service, whether or not there's

18  creating a water quality problem, if there's internal

19  corrosion, whether or not you have service line breaks,

20  interruptions of service.  Those are more generally the kinds

21  of experiences in performance characteristics that would

22  drive replacement of mains.

23  Q    All right.

24          MR. HAMILTON:  Can we go to page 25 of this exhibit,

25  the OHM report?  All right.  And I need you to blow up the

1    top half of this chart.  There you go.  No.  That's not good.

2    Let's take -- let's just -- we don't need the numbers.  Let's

3    just take the narrative here.

4    BY MR. HAMILTON:

5    Q    All right.  Ms. McCormick, Item D, the very top, large

6    diameter water mains, what are those?

7    A    Those are transmission mains.

8    Q    Okay.  And what are the project -- what are these

9    projects under Item D, under 32, what do they refer to?

10   A    These are transmission main improvement projects.

11   Q    All right.  And like, for instance, the first one, can

12   you describe that?

13   A    Yes.  This is a water main relocation on 24 Mile Road and

14   Dequindre.  This is the installation of about five miles of

15   very large diameter transmission main.

16   Q    All right.  By five miles, we're -- you know, roughly

17   5,000 feet for a mile?

18   A    Correct.

19   Q    And so 25,000 feet, five miles; is that right?

20   A    Correct.

21   Q    All right.  The next one, what's this one?

22   A    This is, again, 42-inch water main in 24 Mile Road.  This

23   is about seven miles of transmission main being installed.

24   Q    All right.  So that's five above and now seven miles.

25   What's the next one?

1 A    This is 36-inch diameter water main in Telegraph.  This

2 is about two miles.

3 Q    All right.  So now we got it up to 14 miles total for

4 those three projects?

5 A    Yes.

6 Q    That's going to be a little harder to read, but here we

7 go.  All right.  And then I think we're on D now.  What's the

8 Wick station?

9 A    Correct.  Again, that's 48-inch main, about three miles.

10 Q    So we're up to 17 miles?

11 A    Correct.

12 Q    All right.  And then if we go -- the next one doesn't

13 have -- what is the E?  What is that?

14 A    So this is undetermined.  As a part of Flint coming off

15 line on the 72-inch line that goes west from Imlay City, that

16 reduces the amount of flow on the line.  In 2016 if Genesee

17 comes off the line, that will reduce the flow on the line

18 again.  We think in terms of maintaining water quality,

19 difficult to do when you have extremely low flow on a very

20 large main, and we do have customers who will continue to

21 need to be served like Lapeer, Imlay City, and others, and so

22 what we are identifying here is that we need to develop a

23 project -- assuming those customers remain on the system, we

24 need to have a project ultimately to do something different

25 than serving them off that 72-inch main, so that's a yet to

1   be determined project.

2   Q   Okay.  And then the last one is Garland main.  Can you

3   describe that?

4   A   Again, this is rehabilitation of a section of

5   transmission main, and, again, this is 43,000 feet, so not

6   quite eight miles of main.

7   Q   All right.  So we add eight to the previous seventeen.

8   You're up to 25 miles.

9   A   Correct.

10  Q   All right.

11         MR. HAMILTON:  And, again, can we go back to the

12  chart as a whole?

13  BY MR. HAMILTON:

14  Q   And that shows that those 25 miles of replacements of

15  transmission mains are over the next three years; is that

16  right?

17  A   That's correct.

18  Q   Okay.  All right.

19         MR. HAMILTON:  Now, can we blow up Item 34, which

20  was -- yeah, that one.

21  BY MR. HAMILTON:

22  Q   Can you describe for the Court what this allowance is

23  for?

24  A   In the CIP in a variety of places what we have done is

25  made provision for adequate funding for what I would call

1  unknown circumstances, so this is an example in transmission

2  main replacement where we have an allowance because things

3  may happen.  If we had a section of transmission main that

4  failed and we needed to replace some amount of it, we want to

5  make sure that we have funds and a plan on hand to do that,

6  and so this allowance allows us to have the flexibility to

7  address those kinds of situations.

8  Q   Ms. McCormick, would it be fair to infer from this

9  particular item in the report that it's the department's plan

10  to replace only one to two miles of transmissions mains every

11  year for the foreseeable future?

12  A   No, of course not.  The planned projects are really what

13  is identified for defined projects that we're planning and

14  engineering.  The one to two miles is just -- that's a

15  contingency, again, for something that we might not have

16  recognized, and if it happens, we're prepared to address it,

17  but the vast majority of what we're doing is in the planned

18  projects.

19  Q   So like for the next three years, you're doing over 25

20  miles of replacement of transmission mains; is that right?

21  A   That's correct.

22  Q   Right.  That's a little over eight miles a year; right?

23  A   Right.  And those are both replacements as well as some

24  additions, and so some of what we do is parallel something

25  that's existing so we increase reliability.  We might not

1    necessarily abandon what's there.  As long as it's there, we

2    may interconnect and have some flexibility, but, yes, a

3    significant investment in transmission.

4    Q   All right.  All right.  Ms. McCormick, are the projects

5    that are contemplated by the department's capital improvement

6    programs sufficient to enable the department to continue to

7    provide adequate levels of water and sewer services to its

8    customers for the foreseeable future?

9    A   We believe so.  Much of what you see in our CIP has not

10   only been reviewed by our staff but by independent engineers,

11   and this is something that we share with our customer

12   communities as well every year.  They have an opportunity to

13   review the CIP.  If they believe that there are areas of the

14   system that are servicing them for which they think

15   investment is needed, they share that with us, and that's

16   considered in the development of the capital improvement

17   plan, so, yes, I believe so.

18   Q   Does the department believe there's any material risk of

19   a failure of the DWSD infrastructure that would prevent it

20   from providing adequate levels of water and sewer services to

21   its customers?

22   A   Like any system, I think we will have -- we will most

23   certainly have failures.  We will have water main breaks.  We

24   will have sanitary sewer failures in very specific areas

25   impacting customers, but a failure of the system overall and

1   its ability to serve customers, no, I don't believe so.

2   Q    Do the department's internal financial projections show

3   that the department will have access to sufficient funds to

4   pay for the capital improvement programs that it has

5   determined it needs for the foreseeable future?

6   A    Yes, we believe so.

7              MR. HAMILTON:  I have no further questions, your

8   Honor.

9              MR. SOTO:  No questions.

10             THE COURT:  Any cross-examination?

11             MR. BARNOWSKI:  No questions, your Honor.

12             THE COURT:  All right.  So let me ask you over the

13  lunch break perhaps working with counsel to get my little

14  question answered, and we'll recall you at that time.

15             THE WITNESS:  Okay.

16             THE COURT:  And we'll do this testimony like first

17  thing after lunch --

18             THE WITNESS:  Okay.

19             THE COURT:  -- so you can get on your way.  All

20  right.  So you're excused for now.

21             THE WITNESS:  Thank you.

22        (Witness excused at 11:10 a.m.)

23             THE COURT:  As a technical matter, counsel, is there

24  any objection to admitting into evidence the slides from the

25  Oakland County opening statement that the witness was asked

1    about not for the truth of any of it but only so that the

2    record is complete in terms of what the witness was examined

3    on?

4            MR. SOTO:  No, your Honor.  As a demonstrative, we

5    have no problem.

6            MR. HAMILTON:  That's fine, your Honor.

7            THE COURT:  All right.  What were those numbers

8    again, please?

9            MR. HAMILTON:  Yeah.  It's 6111, 6112, and I

10   believe --

11           MR. SOTO:  6113.

12           MR. HAMILTON:  -- 61113.

13           THE COURT:  6113.  Okay.  For that limited --

14           MR. HAMILTON:  11, 12, 13.

15           THE COURT:  Yeah.  For that limited purpose, the

16   Court will admit those documents.

17       (Oakland County Exhibits 6111, 6112, 6113 received at

18       11:11 a.m.)

19           MR. MILLER:  Good morning, your Honor.  Evan Miller

20   for the City of Detroit, Jones Day.  May I approach with some

21   sets of exhibits?

22           THE COURT:  Okay.

23           MR. MILLER:  The city would like to call as its next

24   witness Suzanne Taranto.

25           THE COURT:  Okay.  Please raise your right hand.

1          SUZANNE TARANTO, CITY'S WITNESS, SWORN

2              THE COURT:  All right.  Please sit down.  Counsel,

3      for planning purposes, I want to advise you that we're going

4      to break for lunch a little before 11:40.

5              MR. MILLER:  Thank you.

6                          DIRECT EXAMINATION

7      BY MR. MILLER:

8      Q    Please state your full name for the record.

9      A    Suzanne Taranto.

10     Q    And where do you live, Ms. Taranto?

11     A    In Ridgewood, New Jersey.

12     Q    And could you please describe your educational

13     background?

14     A    Yes.  I have a bachelor's of science in biology and

15     mathematics from Stonehill College.

16     Q    And when did you receive that degree?

17     A    In 1983.

18     Q    And what is your profession?

19     A    I'm an actuary.

20     Q    And where are you employed?

21     A    I'm employed with Milliman, Inc.

22     Q    And how long have you been employed at Milliman?

23     A    Since 2005.

24     Q    And where were you employed before Milliman?

25     A    I started my career with the Wyatt Company, now known as

1  Towers Watson, as a pension analyst.

2  Q   And how long were you employed at Towers?

3  A   Sixteen years.

4  Q   And after leaving Towers, where did you -- where were you

5  employed?

6  A   I was the director of benefits for Ingersoll Rand.

7  Q   And can you please describe to the Court Ingersoll Rand

8  Corporation and what it does?

9  A   Ingersoll Rand is a multi-national at that point Fortune

10 250 company that is in a number of different industries.

11 Q   And how long were you employed at Ingersoll?

12 A   About three years.

13 Q   And after leaving Ingersoll, what was your next place of

14 employment?

15 A   I worked for AXA Equitable Life Insurance Company.

16 Q   And what was your job title at AXA?

17 A   Senior vice president of compensation and benefits.

18 Q   And how long were you employed at AXA?

19 A   About three years.

20 Q   And after AXA?

21 A   Milliman.

22 Q   What is your title at Milliman?

23 A   I'm a principal and consulting actuary.

24 Q   And in what office of Milliman do you practice?

25 A   The New York office.

1  Q   And do you have any designations in the actuarial field?

2  A   Yes.  I'm an enrolled actuary and a member of the

3  American Academy of Actuaries.

4  Q   And do you have a specialty within the actuarial field?

5  A   Yes, I do.

6  Q   And what is that specialty?

7  A   I am trained as a pension actuary, although currently I

8  practice as a health actuary.

9  Q   And what portion of your practice is devoted to health

10  benefits consulting?

11  A   A hundred percent.

12  Q   And what kinds of consulting services do you provide in

13  connection with health benefits issues?

14  A   We consult with employers and other health plans on the

15  design and financing of their health benefits.

16  Q   And do you prepare for your clients actuarial liability

17  valuation reports on retiree health benefit programs?

18  A   Yes, I do.

19  Q   And for how many years have you been preparing actuarial

20  liability valuation reports respecting retiree health

21  benefits?

22  A   My first retiree medical valuation was performed in 1987,

23  so I've been doing it for awhile.

24  Q   And approximately how many actuarial liability valuation

25  reports for retiree health programs do you prepare annually?

1  A    My team prepares about a hundred reports a year.  I'm

2  involved with a little over half of them.

3  Q    Okay.  And how many of these reports are in connection

4  with governmental retiree health programs?

5  A    It varies year to year.  About a dozen or so.

6  Q    Okay.  And just for the record, by "governmental," I

7  meant retiree health programs sponsored by governments for

8  their employees.

9  A    Correct.  Understood.

10  Q    And do you have any leadership roles at Milliman?

11  A    Yes.  I lead the health practice for the New York region

12  employee benefits practice.

13  Q    And how many individuals does Milliman employ in the

14  health practice in the New York region?

15  A    About a dozen.

16  Q    And how many clients does the New York region's employer

17  health practice group serve?

18  A    About a hundred or so.

19  Q    Have you published in connection with health benefits

20  issues?

21  A    Yes, I have.

22  Q    And can you describe for the Court some of those

23  publications?

24  A    My recent publications have been focused on the impact of

25  the Affordable Care Act on employer plans, including

1  compliance and issues on private exchanges.

2  Q   And where do you publish?

3  A   Generally in Milliman's available publications.

4  Q   Have you published outside of Milliman generally

5  available publications?

6  A   No, not really.

7  Q   Are you familiar with the concept known as a VEBA --

8  A   Yes, I am.

9  Q   -- or VEBA trust?

10  A   Yes, I am.

11  Q   And what is a VEBA?

12  A   A VEBA is a voluntary employees beneficiary association.

13  It's a trust that's described in Internal Revenue Code

14  Section 501(c)(9).

15  Q   And have you been involved in any transactions or matters

16  in which a company transferred its retiree health obligations

17  to a VEBA facility or trust?

18  A   Yes, I have.

19  Q   And can you describe some of those?

20  A   Yes.  I have been involved with the United Auto Workers

21  in a number of VEBA transactions, including the VEBAs that

22  hold the retirees of GM, Ford, and Chrysler, Mack Trucks,

23  Daimler Trucks North America, and a few others.

24  Q   And do you currently serve as the actuary for any retiree

25  health VEBA trusts?

1   A    Yes.  About a dozen.

2   Q    And what's the nature of the services that you provide

3   for such trusts as an actuary?

4   A    We provide funding projections, design consultation, and

5   other support in delivering benefits under the trust.

6   Q    And can you identify for the Court some of the larger

7   VEBA trusts for which you are currently providing actuarial

8   consulting services?

9   A    Yes.  Besides the UAW, GM, Ford, and Chrysler VEBAs, I

10  also provide consulting for Dana Corp., UAW VEBA, as well as

11  Mack Trucks, Daimler Trucks North America, and so on.

12  Q    And what is the approximate value of the assets in these

13  trusts for which you serve as consulting actuary?

14  A    The GM, Ford, and Chrysler combined assets are, I

15  believe, just in excess of 60 billion.

16  Q    And have you previously been retained to provide expert

17  opinion on retiree health matters in litigation?

18  A    I have.

19  Q    And approximately how many cases have you been retained

20  to provide expert testimony in connection with retiree health

21  matters?

22  A    About eight.

23  Q    Okay.  Did any of them involve a bankruptcy?

24  A    Yes.

25  Q    Which bankruptcy matters were you retained as an expert

1  in?

2  A   Dana Corporation.

3  Q   And who retained you in Dana?

4  A   I was jointly retained in that engagement by the auto

5  workers and the steelworkers.

6  Q   And on what matters did you offer opinions in that case?

7  A   In that case, I offered opinions as to the size, the

8  magnitude of the retiree medical obligations reported by Dana

9  as well as some commentary on the designs -- proposed designs

10  that Dana had been proposing to the auto workers and

11  steelworkers.

12  Q   And were you qualified as an expert in the Dana

13  bankruptcy?

14  A   I was.

15  Q   And did you, indeed, testify in the Dana bankruptcy?

16  A   I did.

17  Q   Have you been deposed in any other cases in which you've

18  been retained to provide expert testimony?

19  A   Yes.  I was recently deposed in a matter, United

20  Steelworkers versus Cliffs Natural Resources.  That was last

21  month.

22  Q   And can you please briefly summarize for the Court other

23  cases in which you've been retained to provide expert

24  opinions but were not deposed or did not testify at trial?

25  A   Generally, I've provided expert opinions in the VEBA

1   negotiations that we referenced earlier.

2   Q   Okay.  And did any of these cases have any connection to

3   Detroit?

4   A   Yes.  I believe a few of them were heard right here in

5   this court, GM, Ford, and Chrysler.

6   Q   And those would be the cases involving the United Auto

7   Workers and the VEBAs for the big three auto companies?

8   A   Yes.

9           MR. MILLER:  Your Honor, the city moves to have Ms.

10  Taranto qualified as an expert on matters of actuarial

11  science with respect to retiree health benefit matters.

12          MR. SOTO:  No objection, your Honor.

13          THE COURT:  You may proceed.

14          MR. MILLER:  Okay.

15  BY MR. MILLER:

16  Q   Ms. Taranto, I'd like to begin this part of the

17  examination by discussing some basic concepts regarding

18  retiree health accounting and valuation.  Are you familiar

19  with the term OPEB, O-P-E-B?

20  A   Yes.

21  Q   And what does OPEB mean?

22  A   OPEB stands for other post-employment benefits, which

23  generally means anything other than a pension benefit.

24  Q   Okay.  And can you describe for the Court some of the

25  forms of benefits that would fall into the category of OPEB

1  benefits?

2  A    Sure.  That would include retiree medical, retiree life

3  insurance, long-term disability benefits, and other benefits

4  payable to retirees.

5  Q    And how do employers customarily pay for OPEB benefits?

6  A    Employers can pay for OPEB benefits in one of two ways.

7  For the most part, employers pay on a pay-as-you-go basis out

8  of operating assets, although employers can pre-fund some

9  retiree medical benefit obligations.

10 Q    Okay.  You said a moment ago out of operating assets.

11 Did you mean operating cash?

12 A    Operating cash, yes.

13 Q    Okay.  And do cities and municipalities, do they

14 typically, in your experience, pay for OPEB benefits on a

15 cash basis?

16 A    More often than not.

17 Q    Are employers required to set aside money to pay for

18 future OPEB benefits?

19 A    No, they're not.

20 Q    And is this in contrast to the rules that we heard about

21 yesterday and on Monday governing employers paying for

22 pension benefits?

23 A    Yes, it is.

24        MR. SOTO:  Your Honor, foundation.  I don't know if

25 she was here yesterday and Monday.

1  BY MR. MILLER:

2  Q   Were you in court yesterday?

3  A   Yes, I was.

4  Q   Okay.  And based on the testimony you heard yesterday,

5  the allowance of employers to pay for OPEB benefits with

6  cash, is that in contrast to the rules governing how

7  employers pay for pension benefits?

8  A   Yes.  There's no prefunding requirements.

9  Q   Are you familiar with the term EPBO?

10  A   Yes.

11  Q   And what does EPBO mean?

12  A   EPBO stands for expected post-retirement benefit

13  obligation, which represents the present value of all

14  benefits expected to be paid over time from a retiree medical

15  plan.

16  Q   And does an EPBO measurement typically include the

17  present value of retiree health benefits for currently active

18  employees as well as retirees?

19  A   Yes, it does.

20  Q   And can you briefly summarize how an actuary performs an

21  EPBO calculation?

22  A   Yes, I can.  The first step in performing an EPBO

23  calculation is to determine the value of the benefits being

24  provided from the plan.  The next step is to project that

25  value into the future in all future years typically using

1  medical inflation.  The next step would be to determine how

2  many individuals will be around to receive those benefits

3  multiplying the number of people times the value of benefits

4  to develop a payout stream.  That payout stream is then

5  discounted back to today dollars to determine the present

6  value of the benefit promise.

7  Q    Thank you.  Okay.  I now want to turn to Milliman's work

8  for the City of Detroit in connection with retiree health

9  benefits.  Did there come a time when Milliman was engaged by

10  the City of Detroit in connection with retiree health

11  benefits matters?

12  A    Yes.

13  Q    And when was that?

14  A    That was in June of 2012.

15  Q    And who approached Milliman on behalf of the City of

16  Detroit?

17  A    Jack Martin, who is the CFO.

18  Q    Okay.  And who at Milliman did Mr. Martin approach?

19  A    He approached me.

20  Q    Did you know Mr. Martin at that time?

21  A    Yes.  Mr. Martin serves as a trustee on four of the

22  retiree medical VEBAs that I work on.

23  Q    And what was the primary purpose of your engagement by

24  the city in 2012?

25  A    The primary purpose was for us to assist the city in

1    first understanding the obligations of their plans and -- of

2    the retiree medical plan and, second, to help them design a

3    program or plan that would be affordable.

4    Q    And since that initial engagement, have you performed a

5    variety of projects respecting the city's retiree health

6    benefits programs?

7    A    Yes, I have.

8    Q    And as a consequence of those efforts, have you gained an

9    in-depth understanding of the health benefits arrangements

10   that the city historically provided to its retirees?

11   A    Yes, I have.

12   Q    What was the first task that you undertook following Jack

13   Martin's engagement on behalf of the city of Milliman?

14   A    Our first task was to understand the plans that the city

15   was currently offering to its retirees.

16   Q    Okay.  And how did you go about obtaining the information

17   respecting the existing plans and programs?

18   A    We requested information from the city and from the

19   city's advisors, including such things as retiree enrollment

20   guides, communications to retirees, contracts with medical

21   providers, and collective bargaining agreements.

22   Q    Okay.  And why did you request collective bargaining

23   agreements from the city?

24   A    Because the benefits were subject to collective

25   bargaining, and some of the variations among the programs

1    were outlined in collective bargaining agreements.

2    Q    So did you review the terms relating to retiree health

3    obligations that may have been set forth in these bargaining

4    agreements?

5    A    I did or my team did, yes.

6    Q    Can you summarize for the Court what you learned about

7    the key features of the retiree health plans that were

8    sponsored by the City of Detroit in 2012?

9    A    Based on our investigations, we found the city was

10   offering 24 plans, 24 different programs, 10 of which applied

11   to Medicare-eligible retirees, and 14 applied to pre-

12   Medicare-eligible retirees or non-Medicare-eligible.

13   Q    And what determines Medicare eligibility?

14   A    For individuals who pay into the Medicare system,

15   typically attaining age 65 and signing up.

16   Q    And the ten options that were offered to Medicare-

17   eligible retirees, how did they interact with the federal

18   government's Medicare program?

19   A    Those programs supplemented Medicare; that is, they

20   provided benefits to wrap around what Medicare would

21   otherwise provide.

22   Q    And did the city's costs to provide such options -- did

23   they include the cost of Medicare coverage?

24   A    No.  No, it did not.

25   Q    Okay.  Approximately how many retirees were receiving

1  health benefits from the city in 2012?

2  A    About 17,000.

3  Q    And how many of that number were Medicare-eligible?

4  A    About 11,000.

5  Q    And did the city at that time also provide retiree health

6  coverage to the spouses and dependents of the retirees?

7  A    Yes, it did.

8  Q    Okay.  And approximately how many spouses did the city

9  provide coverage to in 2012?

10  A    About 8,500 spouses and dependents.

11  Q    Collectively?

12  A    Collectively, yes.

13  Q    Did those figures, the roughly 17,000 retirees in

14  coverage and 8,500 dependents and spouses in coverage, did

15  they materially change as of the time of the Chapter 9

16  filing?

17  A    No, they hadn't.

18  Q    Did the city prefund any of its retiree health

19  obligations?

20  A    No, it did not.

21  Q    Historically, how did the city go about paying for these

22  retiree health benefits?

23  A    Operating cash.

24  Q    And what is your understanding of how the city pays for

25  retiree health benefits today?

1    A    Operating cash.

2    Q    So after educating yourself about the benefit design of

3    the Detroit retiree health programs, what was the next major

4    step that you undertook in your engagement for the city?

5    A    Our next step was to calculate the retiree medical

6    liability, and so in order to do that, we first replicated

7    the existing actuarial valuation that the city had of its

8    benefit plans.

9    Q    And as of 2011 and 2012, who served as the healthcare

10   actuary for the city?

11   A    Gabriel, Roeder, Smith.

12   Q    And Gabriel, Roeder, Smith at the time was also the

13   actuary for the two Retirement Systems?

14   A    That's my understanding.

15   Q    And at the time that you began this audit, what was the

16   date of Gabriel, Roeder's last completed retiree health

17   valuation for the city?

18   A    June 30th, 2011.

19   Q    And was that, indeed, the actuarial valuation report that

20   you conducted your audit upon?

21   A    Yes.

22   Q    Did that valuation report contain a so-called EPBO

23   liability number?

24   A    Yes, it did.

25            MR. MILLER:  Can you flip on the screen Exhibit 518?

1  BY MR. MILLER:

2  Q   Ms. Taranto, can you go about describing for the Court

3  the process by which you undertook and completed that

4  replication audit?

5  A   Yes.  In order to complete a replication of another

6  actuary's work, we need to use -- we need to first determine

7  that we have the same data and processes that the actuary

8  used.  Our first step was to request the data file that

9  Gabriel, Roeder, Smith used in calculating the -- in

10 performing the valuation.  By "data file" I mean the

11 individual participant data information for current and

12 future retirees of the city that was used in their valuation.

13 The second step was to determine the assumptions and methods

14 that were used to project future benefits.  Assumptions and

15 methods included demographic assumptions as well as other

16 assumptions as to the cost of the benefit plan.  We coded our

17 valuation system to perform those calculations using that

18 data and those assumptions and generated liabilities, which

19 we compared to Gabriel, Roeder, Smith.

20 Q   So you, in fact, did receive census data from the city in

21 connection with this audit?

22 A   We received the Gabriel, Roeder, Smith data, yes.

23 Q   Yeah.  And did you review and check that data before

24 inputting it into your system?

25 A   We validate it to make sure that the counts were

1  consistent with the data reported by Gabriel, Roeder, Smith

2  in their documents.

3  Q   And in connection with the assumptions that you used in

4  making this calculation, did Milliman develop its own

5  assumptions?

6  A   Not for the replication.  We used Gabriel, Roeder,

7  Smith's assumptions as they stated.

8  Q   And in connection with the benefit rules and provisions

9  of the retiree health program, how did you go about

10  determining what those provisions were?

11  A   We used the information summarized in Gabriel, Roeder,

12  Smith's report.

13  Q   And so once you had assembled the data and reviewed it

14  and identified the assumptions and benefit plan provisions,

15  did you, indeed, employ a software system to calculate the

16  liability amount?

17  A   Yes, we did.

18  Q   Okay.  And what was that system?

19  A   That system was the VAL 2000 system, which is the

20  calculation engine for Milliman's liabilities.

21  Q   Okay.  And that is the software system that Mr. Bowen had

22  testified to earlier this week?

23  A   Yes.

24  Q   Okay.  And did you employ the VAL 2000 system in a manner

25  consistent with the manner testified to by Mr. Bowen?

1   A    Yes.

2   Q    Okay.

3           MR. MILLER:  Can we blow up the chart on that page?

4   BY MR. MILLER:

5   Q    And was your team at Milliman successful in replicating

6   the Gabriel, Roeder results?

7   A    Yes, we were.

8   Q    And can you discuss that chart and explain the numbers on

9   it?

10  A    Yes.  Working from top to bottom, this chart compares the

11  EPBO calculated by Gabriel, Roeder, Smith as of June 30th,

12  2011, separately for the General and Police and Fire Systems,

13  with the Milliman calculations of the same EPBO liabilities.

14  Our calculations were within less than one-percent different

15  of what Gabriel, Roeder, Smith had calculated, and so

16  Gabriel, Roeder, Smith's total liability on an EPBO basis was

17  7.182 billion.  Our liability was 7.117 billion.

18  Q    And of the $7.117 billion number that you calculated,

19  approximately how much of that liability figure was

20  attributed to then current retirees of the city?

21  A    About 3.5 billion.

22  Q    And what discount rate did you utilize in preparing this

23  audit?

24  A    We used Gabriel, Roeder, Smith's assumption.  Their

25  discount rate in this case was four percent.

1    Q    Did you prepare City Exhibit 518?

2    A    Yes.

3    Q    Okay.  And let's go back to the full page of the exhibit,

4    page Number 1, and that exhibit is dated June 29th, 2013.

5    And did you sign this letter?

6    A    Yes, I did.

7    Q    And does this letter set forth the results of your

8    replication audit?

9    A    Yes, it does.

10   Q    And does it accurately describe those results?

11   A    Yes, it does.

12            MR. MILLER:  Your Honor, the city moves for the

13   admission of 518 into evidence.

14            MR. SOTO:  No objection, your Honor.

15            THE COURT:  All right.  It is admitted.

16        (City Exhibit 518 received at 11:38 a.m.)

17            THE COURT:  And we will pause now for lunch and

18   reconvene, please, at 1:45.

19            THE CLERK:  All rise.  Court is in recess.

20        (Recess at 11:38 a.m., until 1:45 p.m.)

21            THE CLERK:  All rise.  Court is back in session.

22   You may be seated.  Recalling Case Number 13-53846, City of

23   Detroit, Michigan.

24            THE COURT:  Sir.

25            MR. HAMILTON:  Good afternoon, your Honor.  Robert

1   Hamilton of Jones Day.

2         SUE F. MCCORMICK, CITY'S WITNESS, PREVIOUSLY SWORN

3                 DIRECT EXAMINATION (CONTINUING)

4   BY MR. HAMILTON:

5   Q   Ms. McCormick, during the lunch break, did you have the

6   opportunity to review some financial data that is reflected

7   in the Oakland County exhibit that we were discussing before

8   the lunch break?

9   A   I did.

10  Q   All right.

11        MR. HAMILTON:  Can I ask you to bring up City

12  Exhibit 3, the Exhibit M to the disclosure statement, which

13  is the Conway MacKenzie projections and, in particular, page

14  682 of that?  I'm sorry.  687.  Can't even read my own

15  writing.  And could you blow up just the first part about

16  volumes?  Yeah.  All right.

17  BY MR. HAMILTON:

18  Q   And you see the first assumption listed in the Conway

19  projections, Ms. McCormick?  Can you describe to the Court

20  what that is?

21  A   I do.  It indicates that in the Conway MacKenzie

22  projections, the first fiscal years, both fiscal year '14 and

23  '15, were based DWSD's budget estimates.  Beyond that point,

24  it indicates that there's a volume decline through 2023 based

25  on the SEMCOG population decline.

1  Q   All right.  And the 2014 and 2015 budget estimates are

2  the ones that your department provided to Conway MacKenzie

3  when they were preparing this document; is that right?

4  A   That's correct.

5         MR. HAMILTON:  Could we go to page 711 of this

6  document?  And could you blow up just the water system the

7  first three years and go all the way down to the footnote?

8  All right.

9  BY MR. HAMILTON:

10  Q   All right.  This is the water system, and we're focusing

11  just on retail, Ms. McCormick.  What is the -- what was the

12  actual amount of water volume for retail in the water system

13  in 2013?

14  A   In 2013 the retail sales would have been 3,660,327.

15  Q   So approximately 3.7?

16  A   That's correct.

17  Q   Okay.  And then 2014 the retail water system estimate was

18  what?

19  A   Four million units of sale.

20  Q   And there's a -- next to '14 there's a "B" up there with

21  a footnote one.  Do you know what the "B" stands for?

22  A   I don't know what the "B" stands for.

23  Q   If you look at the footnote down before --

24  A   I do know -- I do know that in 2014 the -- this indicates

25  the water wholesale budgeted volumes have been reduced by two

1    percent.

2    Q    So that --

3    A    That doesn't apply to retail.

4    Q    Is the four million what was in your fiscal year 2014

5    budget at that time?

6    A    Yes, it was.

7    Q    Okay.  All right.  And then if you go back, the 2015, the

8    retail budgeted volume was what?

9    A    3,775,000.

10   Q    Okay.  So now if we go back to Oakland County Exhibit

11   6113, all right, and if you look at the blue line, the

12   actual, all right, if you look at 2013 where all the lines

13   seem to intersect, the blue and the dark red one right there,

14   that's about what given the column on the left?  367?

15   A    That would be the -- that would be a good approximation.

16   If you held a ruler across there, that's a good

17   approximation.

18   Q    Okay.  And then if you look at where they have what this

19   chart calls the POA projection for, 2014 what is the retail

20   volume on that chart?

21   A    About four million units of sale.

22   Q    Which was in the fiscal year 2014 budget?

23   A    Correct.

24   Q    Okay.  And then if you look at the 2015 number for the

25   POA projection, on the scale on this chart what is it about?

1  A    That's about the three million 775.

2  Q    Which was in your fiscal year 2015 budget at the time?

3  A    That's correct.

4  Q    Okay.  All right.  So now let's look at Exhibit 367 -- I

5  mean 637 -- excuse me -- and, in particular, page 234.  Now,

6  just to set the record, Ms. McCormick, Exhibit 637 is the

7  official statement from August 27th for the water refunding

8  bonds.  Do you recall that?

9  A    That's correct.

10  Q    Okay.  And this is a document that's from that official

11  statement, and if we blow up the table -- all right.  What

12  does this table reflect?

13  A    This table reflects the water sales that are projected

14  most recently for the official statement.

15  Q    Okay.  And if you look at 2014, again, the column for

16  2014 is the actual results, not the budget; is that right?

17  A    That's correct.

18  Q    All right.  So what does it show for water retail down at

19  the bottom under 2014?  What's the volume?

20  A    3,400,000 units of sale.

21  Q    Okay.  And if you look at 2015, what's the volume for

22  retail water?

23  A    3,500,000.

24  Q    Okay.  So now if we go back to Oakland Exhibit 6113, all

25  right, and now we look at the very first data point for

1  what's called the DWSD projection for 2014, can you estimate

2  approximately where that is on the scale on the left-hand

3  side?

4  A    About three million four.

5  Q    Which was what's in the official statement of a few weeks

6  ago?

7  A    That's correct.

8  Q    All right.  And if we look at for 2015, it goes up a

9  little bit approximately to what?

10  A    A little over three million five.

11  Q    Which is commensurate with the figure in the official

12  statement?

13  A    That's correct.

14  Q    All right.  So now if we compare in 2015 --

15  A    Um-hmm.

16  Q    -- the number that was in the POA projection, which I

17  think you said was around 3.775, to what you just said is in

18  the most current DWSD projection, which was I think you said

19  3.5 --

20  A    Correct.

21  Q    What's the difference there between what Conway MacKenzie

22  had projected back in the fall of 2013 and what the

23  department is now projecting as its volume as of August 27th

24  of this year?

25  A    So one of the things that the department was projecting

1  that was incorporated in the Conway MacKenzie -- in those

2  first two years of Conway MacKenzie, we were actually

3  projecting at that particular time that the Detroit water

4  volumes were going to plateau.  A year later we had another

5  year's worth of data, and in the review of that data, we went

6  back and did a pretty significant review of the seasonal

7  volumes both during the nonpeak season as well as during the

8  peak season.  Two things we discovered.  One is that the

9  peaking factor in Detroit has just about evaporated, not

10 quite, but there's very little summer irrigation, and so

11 there's a lot less weather variability.  And so the size of

12 the adjustment to go to normal weather in that initial

13 forecast you'll see is much smaller, the uptick from the wet

14 weather conditions.

15      The other thing we saw is that there was additional

16 decline in the normal weather kinds of situations, and so we

17 actually made about a five-percent adjustment in the overall

18 volume in the first year, and then we also did adjust the

19 long-term projection to be a continuing decline of about 2.5

20 percent for the first five years and then beyond that point

21 matching the SEMCOG projections.

22      MR. HAMILTON:  Can you bring up page 111 of 637 --

23 of City Exhibit 637, which, again, is the official statement

24 for the water refunding bonds?  And can you highlight the

25 bottom paragraph for me or expand it?

1  BY MR. HAMILTON:

2  Q   All right.  Does this paragraph describe that review and

3  your decision to reduce volumes by five percent in fiscal

4  year 2015 from what was originally budgeted?

5  A   It does.

6  Q   Okay.

7          MR. HAMILTON:  Does that answer your questions, your

8  Honor, on this chart?

9          THE COURT:  Well, so let's just close the loop on

10  this.  Does this five-percent reduction that you decided was

11  appropriate account for the difference between the two

12  numbers mathematically?

13          THE WITNESS:  Yes, I believe it does.

14          THE COURT:  Okay.  All right.  Are you done?

15          MR. HAMILTON:  I am done, your Honor.

16          THE COURT:  All right.  Let me just ask a few

17  questions of you.  Did you testify earlier that all of the

18  department's capital improvement projects -- well, let me

19  state it backwards -- that none of the city's capital

20  improvement projects are paid for or financed by revenues and

21  that it is all through borrowings?

22          THE WITNESS:  If I used the term "all," I would say

23  substantively.  There may be two or three percent in any

24  given year, but quite substantively through borrowing.

25          THE COURT:  Okay.  I've had a lot of numbers thrown

1  at me here this morning in your testimony especially, and so

2  my head is swimming a little bit on this question, so let me

3  just ask you to give your best estimate at this point in time

4  as you sit here.  How much in capital improvement projects do

5  you foresee for the next ten years?

6  　　　　THE WITNESS:  That's a good question.  We foresee on

7  average about a hundred million dollars a year on each side

8  of the system on average over the course of the next ten

9  years.

10  　　　　THE COURT:  So that's two billion?

11  　　　　THE WITNESS:  That's about that; right.

12  　　　　THE COURT:  So your testimony is that over the next

13  ten years the department will have borrowed approximately $2

14  billion?

15  　　　　THE WITNESS:  No.  And the difference is the current

16  Board of Commissioners -- one of the things that we are doing

17  in our rates, while we are constrained in operating expenses,

18  the projection for four-percent increases in revenue is

19  intended to grow us into revenue-financed capital slightly,

20  so we will reduce the amount of borrowing that we do in order

21  to finance the capital program.

22  　　　　THE COURT:  So what is your best estimate then as to

23  how much the department will be required to borrow for

24  capital improvement projects over the next ten years?

25  　　　　THE WITNESS:  Well, we would -- our projections

1    indicate that we will on the sewer side be constraining

2    borrowing after the next few years, so the vast majority of

3    that would be revenue-financed capital.  On the water side,

4    our projections indicate that we will likely borrow for some

5    period of time before we are able to have substantial revenue

6    financing.

7              THE COURT:  Um-hmm.

8              THE WITNESS:  I know I didn't give you a number.

9              THE COURT:  What are the risks as you assess them

10   that that goal will be met?

11             THE WITNESS:  Some of it has to do with our cost of

12   borrowing.  The higher our cost of borrowing, the more that

13   our revenue will be used for debt service payments as opposed

14   to being able to revenue finance capital.  That has been a

15   significant concern of us, particularly as we've gone through

16   the bankruptcy process.  Do we have risk that there may be

17   further declines in volume?  We have projections, projections

18   that we think are consistent with the data and recognize the

19   national trends.  In our marketing plans, we hope to be able

20   to offset some of what we think will be the natural trend of

21   loss by projected new market opportunities, so there are

22   risks certainly.

23             THE COURT:  Did you also testify, in effect, that

24   it's the department's policy to replace the larger -- I think

25   you called them transmission lines or transmission mains.

1    What's the technology --

2            THE WITNESS:  Transmission mains.

3            THE COURT:  -- terminology?  Transmission mains.

4            THE WITNESS:  Um-hmm.

5            THE COURT:  When they appear to need it; is that

6    right?

7            THE WITNESS:  That's correct.

8            THE COURT:  So there's not a plan to replace these

9    lines on a periodic basis just because of age, for example?

10           THE WITNESS:  No.  That would be at the highest

11   level of capital investment that any system could bear is if

12   you replaced it according to some type of arbitrary schedule.

13           THE COURT:  Um-hmm.

14           THE WITNESS:  We do leak detection.  We've started

15   doing helium detection, various ways of being able to check

16   the status of underground infrastructure so that we have

17   advance information, but certainly not according to some

18   arbitrary schedule.

19           THE COURT:  And is that consistent with the

20   generally accepted practice among water systems of this

21   approximate size?

22           THE WITNESS:  Yes, it is.

23           THE COURT:  What is your assessment of what impact

24   the new Great Lakes Water Authority would have on the

25   department's operations, especially as they relate to

1  continued feasibility to provide water service for our area?

2       THE WITNESS:  I generally see it as a positive.

3  Certainly it -- I believe that perhaps, if not immediately,

4  in the relatively short term it would allay many of our

5  concerns with regards to access to affordable capital.  I

6  also believe, based on the current memorandum of

7  understanding, the ability to help support some of the

8  infrastructure renewals that are required in the City of

9  Detroit without that being a direct impact on the customers

10  will help support affordability, so I think there are some

11  very positive signs there.  One of the things that we have

12  focused on is the ability to operate both effectively and

13  efficiently.  We have been just by the nature of these

14  transactions, unfortunately, impeded in some of our progress,

15  so we hope to move faster, and we think that the authority

16  governance will assist us with that, so we think that will

17  help reduce costs.

18       THE COURT:  Um-hmm.  And now the most general

19  question I can pose to you, what challenges do you foresee

20  your department facing over the next ten years in fulfilling

21  its mission?

22       THE WITNESS:  Unknowns, the things we don't know.

23  One of the challenges that I think, particularly as we move

24  to an authority, there has been a long-term relationship

25  between DWSD and its customers that's been very one on one,

City of Detroit and a conversation on the other side.  As we
move to a regional authority, we have to change that to be a
collaborative conversation and think more in terms of
regional planning terms.  That will be a big shift just in
communities working with one another for the benefit of the
system.  That will be a huge challenge, one that I think will
be worth the returns, but it will be a big change in the way
that it operates.  I think one of the challenges for the
department, as I understand the MOU, is that portion of the
system that is retained by the City of Detroit and operating
in some aspects of its operations independent of the
authority and sort of standing up the ability for that,
again, to be supported by the city.  That's a challenge.
Every system does that, and they do it successfully.  I would
have hope and faith that the city can do that as well, but it
is a challenge to make that separation effective,
particularly for the city as it's separated from a larger
entity.

We will continue to see changes in consumer
behaviors.  I think we have to be smart about watching that.
In our most recent master planning efforts, we have tried to
establish benchmark criteria that we will monitor on an
ongoing basis so that when you plan, you plan based on a
point in time, and you look out for some period.  Typically
utilities renew these plans every five to ten years, but a

1  lot can change in five or ten years and so just continuing to

2  take a look at the plan and making sure that it remains

3  relevant.  A number of things that I have seen at DWSD as we

4  have begun work on certain things we weren't watching as a

5  system what was changing, and we got down the road and made

6  some investment that ultimately didn't result in a project,

7  and we had to write those -- we had to write those dollars

8  off.  We want to be much smarter about that and make sure

9  that everything we're doing in planning stays relevant for

10 the current time.  And I think those are some of the biggest

11 challenges.

12         THE COURT:  What will be your role and the

13 department's role in meeting those challenges?  And I want

14 you to focus on the first two that you identified.

15         THE WITNESS:  Um-hmm.  Over the course of the next

16 200 days or so, if the authority moves forward -- and we'll

17 know that in fairly short order -- we've already begun to lay

18 out the challenge in just getting all of the questions first

19 asked and then answered.  There are a series of activities

20 that are going to have to occur to consider impacts on

21 permits, impacts on systems, impacts on people, financial

22 planning, so there is a significant amount of work to be done

23 in 200 days.  I'm already working with folks to lay out those

24 project plans so that we can get that work done, so I will

25 certainly participate in that.

1          THE COURT:  Was that answer intended to address the

2    issue of shifting the culture of the department from a one-

3    on-one relationship to a multi-party discussion?

4          THE WITNESS:  In the multi-party discussions, we

5    have -- we've begun to talk about that with our customers

6    over the course, frankly, of the last year or so as the

7    authority conversations have been in various forms --

8          THE COURT:  Um-hmm.

9          THE WITNESS:  -- in conversation, and I was

10   fortunate at the time of being hired to have had the

11   perspective both from the city governance as well as from my

12   board of the recognition of this system's operation as a

13   regional entity and regional service provider.  So much of

14   the conversations I've had with customers and customer

15   communities for the last two and a half years has been to try

16   to begin to change the thinking.  We have established a

17   number of things, including bringing members from various of

18   our customer communities into actual project teams, into

19   selection of key personnel, into some of the major decisions

20   we've made on biosolids.  We've had customer community

21   representatives right alongside the DWSD staff, so I think

22   we've made inroads into that.  I think many of our customer

23   communities are encouraged about that and will willingly come

24   to participate.  Thinking between them, some of that has

25   happened by the nature of the way we've changed our

 1   contracts, encouraging communities in various geographical

 2   areas in the system to begin to do planning amongst three or

 3   four communities, and we need to expand and leverage that.

 4   That will be a huge advantage to the system.

 5           THE COURT:  This could perhaps be what you were

 6   talking about, but I'm going to speak perhaps a little more

 7   bluntly.

 8           THE WITNESS:  Sure.

 9           THE COURT:  Is it fair to say, in your estimation,

10   that certain customers, communities, and others carried a

11   certain amount of distrust or lack of confidence or

12   skepticism about the department's ability to carry out its

13   mission in the most efficient way?

14           THE WITNESS:  Not trying to be too blunt, there is

15   an undeniable history.  There have been challenges from some

16   of the customer communities.  Interestingly enough, as

17   I've -- since I wasn't a part of that history, as I've talked

18   with some of the community representatives who have engaged

19   in interactions with DWSD over the years, much of that from

20   their perspective, even their challenges to some of what was

21   happening in the department, was what they say as defending

22   the department from the city, which is an interesting

23   perspective that there was a challenge as to the --

24           THE COURT:  What is meant by -- what is meant by

25   that?

1          THE WITNESS:  There were certain instances where the

2    city, for instance, allocated costs to DWSD for services

3    provided, which is very appropriate, but there were certain

4    costs allocated to the department that the customer

5    believed -- customers believed were not equitable.

6          THE COURT:  Um-hmm.

7          THE WITNESS:  One of those was a 800-megahertz radio

8    transaction where the majority of the benefit of the system

9    was to police and fire, but the majority of costs were

10   disproportionately allocated to DWSD and, of course, then

11   borne by the customers of the water and sewer system.  And

12   there are handful of those types of instances that I hear

13   over and over again as some of the stories where the

14   customers challenged those sorts of things in defense of

15   DWSD.  They didn't attribute it to the DWSD staff or the DWSD

16   operation as much as to the influence of DWSD being a

17   department of the city.

18         THE COURT:  And so in your estimation, to what

19   extent do those concerns still exist and do you feel need to

20   continue to be addressed?

21         THE WITNESS:  Judge Cox's order went a very long way

22   to giving our customers of the system comfort that many of

23   the things that they had observed in the past would not or

24   could not occur in the future.

25         THE COURT:  Um-hmm.

1          THE WITNESS:  I get a lot of very positive feedback

2    about the governance board that we have that has established

3    integrity.  I get a lot of positive feedback about how

4    encouraged they are about the department's demonstrated

5    integrity and the transparency in our operations, sharing

6    information, inviting folks interdecision-making.  There's

7    a -- there is a much greater interaction today in open space,

8    if you will, between the department and our customers, so is

9    it tenuous?  It has a short history, three years since the

10   new board was put in place, two and a half years since the

11   new department administration has been there but,

12   nonetheless, substantial progress I think and trust.  To some

13   degree I think the discussion about the regional authority is

14   welcome in terms of creating additional arm's length

15   separation from the city and a governance board that is

16   predominantly suburban community.

17         THE COURT:  Um-hmm.  It sounds like you support the

18   creation of this authority and think it's in the best

19   interest of the department?

20         THE WITNESS:  I do.  I think it is actually for the

21   city and for the system a very good solution.  It assists the

22   city in its capital needs.  It assists the region by setting

23   up this larger affordability structure for customers who have

24   payment issues throughout the system, which I think is

25   wonderful.  And I do think that the regional authority will

1  allow greater efficiency, greater collaborative planning,

2  greater market access and development, which will help

3  everybody keep costs down, so, yes, I do think it's a good

4  thing.

5         THE COURT:  All right.  That's all the questions I

6  have.  Anything further from counsel?

7         MR. HAMILTON:  No, your Honor.

8         THE COURT:  Thank you for your testimony and for

9  coming today.

10         THE WITNESS: Thank you.

11     (Witness excused at 2:13 p.m.)

12         MR. MILLER:  Good afternoon, your Honor.  Evan

13  Miller, Jones Day, for the City of Detroit.

14         THE COURT:  You may proceed.

15         MR. MILLER:  Thank you.

16      SUZANNE TARANTO, CITY'S WITNESS, PREVIOUSLY SWORN

17             DIRECT EXAMINATION (CONTINUING)

18  BY MR. MILLER:

19  Q   Well, Ms. Taranto, when we broke for lunch, I think you

20  had just wrapped up a discussion of the replication audit of

21  Gabriel, Roeder, Smith's retiree health work, and

22  approximately when was that replication audit work completed?

23  A   In June of 2013.

24  Q   And after having completed that work, what was your next

25  significant assignment from the city?

1   A   Our next assignment was to update the valuation to be

2   current with respect to the benefit plan that was being

3   offered by the city so that we may begin to look at

4   alternative designs for the city in the long term.

5   Q   Okay.  Were there, in fact, changes made to the benefit

6   design between 2011, '12, and 2013?

7   A   Yes, there were.  Some of the plans that we talked about

8   had changed in terms of copayments and other cost-sharing

9   features.  As well there were changes in some of the

10  providers, including notably prescription drugs.

11  Q   So essentially you were tasked to conduct another

12  valuation?

13  A   Yes, to update.

14  Q   And can you walk the Court through the steps that

15  Milliman undertook in connection with this liability

16  valuation?

17  A   Yes.  The first step was to gather updated participant

18  data.  We relied on two sources for that.  The first was the

19  July 1, 2012, pension active census that we received -- that

20  Milliman received from Gabriel, Roeder, Smith.  The second

21  was to solicit from the city itself a file of retirees and

22  the medical programs that they participated in, which we did

23  in February of 2013.

24  Q   And did you take any actions to check and evaluate the

25  quality of this additional data?

1  A   Yes.  We put it through our standard data checking

2  procedures.  We compared it to the prior data to understand

3  what had changed since the July 1, '11, valuation and

4  otherwise did a series of checks to ensure that there were no

5  major data discrepancies.

6  Q   Okay.  And how did you go about evaluating the benefit

7  provisions and rules that govern the 2013 version of the

8  program?

9  A   We used both -- we used a combination of updated premium

10 amounts for the fully insured plans and developed new per

11 capita baseline rates for the self-insured plans reflecting

12 claim experience and adjustments for changes in plan design

13 that we calculated using Milliman systems that are designed

14 to provide a value or an adjustment for a plan design change.

15 Q   Okay.  Why don't you explain to the Court the difference

16 between a self-insured program and a fully insured program

17 and how they played into the overall framework of the retiree

18 health program as it stood in 2013?

19 A   Sure.  The city engaged with insurance companies and

20 carriers in two different ways with respect to receiving

21 healthcare benefits.  For some plans they purchased a fully

22 insured plan; that is, a single premium set by the insurance

23 company which covered the entire cost of that package of

24 benefits.  For other providers, the providers paid claims on

25 behalf of the city as well as handling the administration,

1   and so those programs were known as self-insured programs.

2   Q   And in both instances the city paid for these programs

3   out of what source of funds?

4   A   Operating cash.

5   Q   And in connection with this liability audit, what

6   assumptions did you apply in performing the task?

7   A   We used a combination of Gabriel, Roeder, Smith

8   assumptions from the July '11 -- or the June '11 valuation

9   and some Milliman assumptions for other elements of the

10  calculation.

11  Q   And what were the important assumptions in which you

12  applied Milliman-determined assumptions?

13  A   One of the things that we did was use Milliman's models

14  for calculating medical trend or future medical inflation.

15  Milliman has a proprietary model that it uses.  It's based on

16  a Society of Actuaries study, and we feel that is -- that's

17  our standard for calculating liabilities under retiree

18  medical plans.

19  Q   And is a medical trend assumption an important assumption

20  in developing a present value of liability for retiree health

21  benefits?

22  A   Absolutely, yes.

23  Q   Aside from medical trend, what are the other key

24  assumptions that are needed in undertaking a present value

25  calculation of retiree health liability?

1   A   One of the other important assumptions was discount rate,

2   and as we talked earlier, we did not have a pool of assets

3   which -- with investment returns that we could use to develop

4   a discount rate, so we turned to a bond matching approach

5   that is commonly used for developing long-term liability

6   discount rates.

7   Q   And what is that bond matching approach that you used in

8   connection with this liability analysis?

9   A   A bond matching approach pairs corporate bonds with

10  future benefit payments, so the process includes matching a

11  bond yield rate at each future year with the expected

12  payments and discounting it back to today to develop a

13  present value.

14  Q   And was there a particular bond yield curve that you used

15  in undertaking this analysis?

16  A   Yes.  Typically we use the Citigroup yield curve.

17  Q   Okay.  And is the Citi yield curve a readily available

18  published source of duration matched bonds?

19  A   Yes.  The Citigroup publishes on a monthly basis, and

20  it's fairly commonly used.

21  Q   Okay.  And in applying the Citigroup yield curve, did you

22  arrive at a single discount rate number that you then used

23  for purposes of the valuation?

24  A   Yes.  Typically we do this discounting based on different

25  payments and then develop a single discount rate that gets

1  you to the same liability.

2  Q    Okay.  And is the Citigroup yield curve a commonly used

3  methodology for determining a long-term obligation?

4  A    Yes.  Under financial statement accounting standards, the

5  bond matching methodology is the recommended methodology for

6  determining discount rates, so it's commonly used.

7  Q    And that's primarily in the private sector?

8  A    Correct.

9  Q    Were there any other key assumptions that went into the

10 liability analysis determination?

11 A    No.  That was it.

12        MR. MILLER:  Can we put on the screen City Exhibit

13 525?  And let's go to page 5.  And let's blow up the

14 paragraph and table right under "B," overview of results.

15 BY MR. MILLER:

16 Q    Ms. Taranto, does the information on this paragraph

17 include the result of the liability analysis that you

18 conducted and we were just discussing?

19 A    Yes, it does.

20 Q    And which line contains the numerical result of that

21 analysis?

22 A    The line called -- starting baseline plan.

23        MR. MILLER:  Please highlight that line.

24 BY MR. MILLER:

25 Q    And, in fact, what was your EPBO valuation result for the

1  liabilities that you analyzed?

2  A    Six billion 522.3 million.

3  Q    And approximately how much of that 6.522 billion was

4  attributable to then current retirees?

5  A    About 3.2 billion.

6  Q    And you may recall in the prior testimony before lunch

7  when we were talking about the replication audit, I think you

8  testified that the percentage of that liability that was

9  attributable to then current retirees was approximately $3.5

10 billion.  Do you recall that testimony?

11 A    The liability -- the prior liability was 3.5, yes.

12 Q    Yes.  And what was the primary reason for the difference

13 between the $3.5 billion number that you had arrived at in

14 connection with the replication audit and this $3.2 billion

15 number for current retiree liabilities relating to this

16 audit?

17 A    The changes in the plan design that we talked about,

18 primarily increased retiree cost sharing both from

19 contributions and copayments and deductibles.

20 Q    And these changes were made between 2011 and '12, on the

21 one hand, and 2013 on the other?

22 A    Yes.

23 Q    Let's go back to the first page of this letter.  Did you,

24 in fact, prepare this letter dated, I believe, October --

25 what is it -- 30th, 2013?

1   A    Yes.

2   Q    And does this letter set forth the results of the

3   valuation analysis that you just described?

4   A    Yes, it does.

5   Q    Does it accurately describe those results?

6   A    Yes, it does.

7   Q    And in undertaking the calculations set forth in City

8   Exhibit 525, did you employ the VAL 2000 software tool?

9   A    We did.

10  Q    And did you employ it in a manner -- in a similar manner

11  testified to by Mr. Bowen earlier this week?

12  A    We did.

13       MR. MILLER:  The city moves for the admission of

14  Exhibit 525 into evidence.

15       MR. SOTO:  Your Honor, I don't know what the

16  privileged material redacted line is on there, but there

17  doesn't appear to be anything redacted in the one I have, and

18  I don't know if it's just mislabeled or if I'm just missing

19  what's redacted or --

20       MR. MILLER:  The only item that is redacted is

21  literally a label that says "attorney-client privilege."

22       MR. SOTO:  In which case we have no objection.

23       THE COURT:  All right.  Thank you.

24       MR. MILLER:  Thank you.

25       THE COURT:  The document is admitted.

1     (City Exhibit 525 received at 2:25 p.m.)

2    BY MR. MILLER:

3    Q   Ms. Taranto, did the city amend its retiree health

4    program following the filing of the Chapter 9 petition?

5    A   Yes, it did.

6    Q   And when did that revised program take effect?

7    A   Generally March 1st, 2014.

8    Q   You said generally in March of 2014.  Why did you say

9    that?

10   A   There were some other additional changes that happened, I

11   think, in May of 2014, some minor changes.

12   Q   And did you participate in the development of this

13   program that took effect in March of this year?

14   A   I did.

15   Q   And in what manner did you participate?

16   A   I helped the city with both determination of the value of

17   benefits that they could afford for the year as well as

18   negotiating appropriate designs and insurance contracts in

19   the case of the Medicare plan that would deliver those

20   benefits.

21   Q   And was the benefit design of this program the subject of

22   litigation?

23   A   Yes, it was.

24   Q   And with whom was that litigation?

25   A   The Retiree Committee.

1  Q   The Retiree Committee and the city?

2  A   Yes.

3  Q   Can you briefly summarize for the Court the retiree

4  health plan program that took effect in March of this year?

5  A   Yes.  The retiree program that took effect in March of

6  this year had two components.  For the Medicare-eligible

7  participants, Medicare-eligible participants received a

8  Medicare supplemental plan that was either available through

9  Blue Cross or HAP for the retiree and the retiree's Medicare-

10 eligible spouse.  With respect to the non-Medicare-eligible

11 participants, those participants received stipends in various

12 amounts depending on their status from the city.

13 Q   And can you please summarize for the Court the

14 modifications that were made to that program several months

15 after its implementation in March?

16 A   The adjustments in May were generally related to stipend

17 amounts, cash received by different groups.

18 Q   In connection with the development of this 2014 program,

19 did the city ask you to model its cash flow obligations

20 respecting retiree health benefits?

21 A   Yes, it did.

22 Q   And what particular retiree health benefit plans were you

23 asked to run cash flow models in connection with?

24 A   We were asked to model both the current plan and a number

25 of alternative plan cash flows.

1          MR. MILLER:  Can you queue up City Exhibit 484,

2   please, and turn to page 7?  I think it's entitled Exhibit 1.

3   Thank you.

4   BY MR. MILLER:

5   Q   Ms. Taranto, can you please walk the Court through the

6   chart and tables and please elucidate the particular numbers

7   respecting the city's cash flow obligations?

8   A   Yes, I can.  The information on this page provides

9   expected future cash payments from the retiree medical plans

10  separately for non-Medicare, which are on the left, and

11  Medicare-eligible retirees.  We provide for each future year

12  the total cost of the plan, the expected portion to be paid

13  from retirees, direct contributions from retirees, and the

14  net amount that's payable from the city.  So, for example, in

15  2014, for non-Medicare-eligible retirees, the net expected

16  city cost was 83.7 million, and for Medicare-eligible

17  retirees, the net expected city cost was 80.79 million.

18  Q   And it says right near the top under City of -- under

19  Exhibit 1, City of Detroit Baseline Plan.  Can you please

20  advise the Court what was meant by the baseline plan?

21  A   The baseline plan was the plan in effect in 2013 that we

22  provided the valuation we just talked about as of July 1st,

23  2012.

24  Q   Okay.  And so this cash flow model, for example,

25  indicates that under the baseline plan, the plan as it

1   existed in 2013, the expected cost for the city would have

2   been roughly $164 million?

3   A   That's correct.

4   Q   Okay.

5           MR. MILLER:  Can you highlight in bold the data

6   running from fiscal year 2014 through fiscal year 2023?

7   BY MR. MILLER:

8   Q   So, Ms. Taranto, this highlighted material would show the

9   net city costs for the 2013 program over a ten-year period;

10  is that right?

11  A   That's correct.

12  Q   And, in fact, did you do the simple math in connection

13  with that cash obligation?

14  A   Yes, I did.

15  Q   Yes.  And can you advise the Court what the math

16  indicated?

17  A   $2.05 billion over ten years.

18  Q   That's 2.05 billion in --

19  A   Billion.

20  Q   -- a cash obligation?

21  A   In cash obligation, in cash payouts over ten years.

22  Q   For what program again?

23  A   This is the baseline, the 2013 -- excuse me -- city

24  program.

25  Q   Thank you.  And did you prepare these cash flow

1   projections using the VAL 2000 model?

2   A   Yes, we did.

3   Q   And did you prepare these cash flow projections

4   consistent with application of the model that's been

5   previously testified to?

6   A   Yes, we did.

7           MR. MILLER:  Your Honor, the city moves that City

8   Exhibit 484 be admitted into evidence.

9           MR. SOTO:  No objection, your Honor, assuming it's

10  the same label issue we had.

11          MR. MILLER:  Yeah.  And, indeed, it is.

12          THE COURT:  The $2 billion that you testified to,

13  that's for both non-Medicare and Medicare?

14          THE WITNESS:  Yes.  That's combined.

15          THE COURT:  And that's just the total dollar payout,

16  not present value?

17          THE WITNESS:  No discounts; correct.

18          THE COURT:  All right.  The document --

19          MR. MILLER:  That is the cash obligation.

20          THE COURT:  Yeah.  The document is admitted.

21      (City Exhibit 484 received at 2:32 p.m.)

22  BY MR. MILLER:

23  Q   In connection with the retiree health liability, the

24  present value calculations that you have been previously

25  testifying to, the ones made in 2012 and 2013, those were so-

1  called EPBO calculations?

2  A   Yes, they were.

3  Q   And, thus, what population did they include?

4  A   They included both current and future retirees of the

5  city.

6  Q   Did there come a time when the city asked you to model

7  the present value of the city's retiree health benefits

8  program focusing only on current retirees?

9  A   Yes.

10  Q   Okay.  And when was that?

11  A   That was in April of '14.

12  Q   Did the city at that time advise you of the intended

13  purpose for those calculations?

14  A   Yes.  The city advised us that these calculations were

15  settlement calculations.

16  Q   Okay.  And in your experience, what's a retiree health

17  settlement calculation?

18  A   A settlement generally is an irrevocable one-time action

19  that -- transaction that relieves a plan sponsor of future

20  obligations to provide those benefits.

21  Q   Is a -- does the word "settlement" have a meaning in

22  accounting that's widely understood?

23  A   Yes.  Financial statement 88 describe -- and the

24  accounting statement that applies to post-retirement medical

25  plans, FAS 106, now with new names, 715-60 -- sorry --

1  describes a settlement as a one-time -- as a specific --

2  specifically describes a settlement as a one-time event that

3  irrevocably removes liability or responsibility of a plan

4  from a plan sponsor.

5  Q    Thank you.   In undertaking the retiree only actuarial

6  present value modeling this past April, did you use the

7  benefit design from 2013 or the benefit design from 2011-12?

8  A    The 2013.   Excuse me.

9  Q    And did you make the decision to use that design in the

10 calculation?

11 A    The city advised us to do that.

12 Q    And in undertaking this modeling, did you take another

13 look at the benefit provisions in 2013 to make sure that they

14 were accurate as far as Milliman was concerned?

15 A    They were accurate as far as Milliman was concerned.

16 Q    And what census data did you use to conduct these

17 valuations in April?

18 A    We used the census data that was the basis of the retiree

19 component of the baseline valuation that we just talked

20 about.

21 Q    And what discount rate did you employ in making this

22 analysis?

23 A    We were provided with a series of discount rates from the

24 city to use.

25 Q    So you were directed to use a set of discount rates?

1   A    Yes.

2   Q    In conducting this sensitivity analysis, did you change

3   any of the demographic assumptions respecting retiree

4   benefits in comparison to those assumptions you had been

5   previously using in your efforts?

6   A    Yes, we did.

7   Q    And can you advise the Court of those changes in

8   assumptions?

9   A    Yes.  There were two changes in assumptions that we made

10  for this calculation.  The first was to assume that retirees

11  of the city who currently were electing to receive dental and

12  vision benefits but not medical benefits elected to begin

13  receiving medical benefits immediately.

14  Q    So let me stop you right there.  So there was an

15  assumption that you made about people who had been electing

16  only dental and vision coverage from the city?

17  A    Correct.

18  Q    And what was the assumption that you made in connection

19  with this effort?

20  A    For purposes of this calculation, we assumed that those

21  participants would begin to receive, that would come back

22  into the plan to receive medical as well as dental and vision

23  benefits.

24  Q    Were there any other changes in assumptions that you --

25  A    Yes.  There was another group of retirees who were not --

1    who were eligible for coverage but who were not electing any

2    benefits from the city's plan, and we assumed that those

3    participants for this exercise would also elect to come back

4    into the plan and receive benefits.

5    Q    And did anybody instruct you to make those changes in

6    assumptions?

7    A    Yes.  The city did.

8    Q    Did you have -- in connection with these changes in

9    assumptions, did you have any understanding as to whether

10   retirees who were eligible for health insurance but had

11   chosen not to elect and enroll, whether they could opt back

12   into the program?

13   A    Yes.  It was our understanding that retirees could elect

14   to participate or not on an annual basis in the plan.

15   Q    And did the 2013 benefit design impose any barriers or

16   costs on retirees who had opted out to opt back in?

17   A    Not that we were aware of.

18   Q    Let's focus for a moment on the retirees who were

19   receiving only dental and vision coverage.  How many retirees

20   and dependents were receiving only dental and vision coverage

21   from the city?

22   A    There were about a thousand retirees and about 440

23   dependents.

24   Q    And how did you arrive at the number?

25   A    Those were the individuals in our data.  We had them in

1   the previous valuation but only electing dental and vision

2   coverage.

3   Q   And why were they previously in the system?

4   A   Because they're receiving benefits from the plan.

5   Q   And how many retirees and dependents were eligible for

6   retiree health but not receiving retiree health benefits in

7   2013?

8   A   We included 1,829 of those retirees.

9   Q   Did you include any spouses?

10  A   Not -- no, I don't think so.

11  Q   Did you make any assumptions as it might relate to

12  spouse -- the extent to which these retirees who had opted

13  out might have spouses who were eligible?

14  A   No.  We didn't assume any spouses.

15  Q   What was the -- generally speaking, what was the impact

16  on the liability numbers that you obtained from these changes

17  to the assumptions about the retiree population and coverage?

18  A   Generally, based on the range of discount rates that we

19  used in the calculation, between 400 and $500 million of

20  additional liability.

21  Q   Is it reasonable to include in a retiree health liability

22  calculation the value of medical coverage for retirees who

23  are participating in the program but only electing to

24  participate to a limited degree such as electing only dental

25  and vision coverage?

1  A   In a settlement calculation, it's reasonable to assume

2  that people will come back in.  This calculation provided the

3  city with the outer boundary of that liability.  It assumed a

4  hundred percent came in.

5  Q   And, similarly, is it reasonable to include in a retiree

6  health liability present value calculation of medical

7  coverage for retirees those retirees who are eligible but are

8  not, in fact, participating in the program at the time of

9  measurement?

10  A   It's reasonable to assume that people would come back.

11  Again, as an outer boundary, our calculation included all of

12  them.

13           MR. MILLER:  Can you put on the screen City Exhibit

14  456?  And let's turn to page 6, and let's blow up the chart

15  and table at the top of page 6.

16  BY MR. MILLER:

17  Q   Ms. Taranto, we'll get into this chart in a little bit

18  more detail in a moment, but I just for now would like you to

19  summarize this chart and advise the Court about what it

20  represents.

21  A   Okay.  The column on the left represents the discount

22  rate that was used to generate the liability, and the figures

23  on the right under "present value of benefits" represent the

24  liability in billions of dollars associated with that

25  discount rate of the retiree only obligation.

1 Q   And these discount rates that are on the left-hand side,

2 are these the discount rates that the city directed you to

3 use in the calculation?

4 A   Yes, they are.

5 Q   And just to clarify the record, the results on the right-

6 hand side, those are in billions?

7 A   Billions with a "B," yep.

8 Q   And in running the calculations using these directed

9 discount rates, did you, indeed, employ the VAL 2000 system?

10 A   Yes, we did.

11 Q   Okay.  And after assembling the census data and the

12 benefit provisions and inputting the assumptions, did you use

13 that system in the manner previously testified to?

14 A   Yes.

15       MR. MILLER:  Your Honor, the city moves to have this

16 chart from Ms. Taranto's expert report as a stand-alone

17 exhibit, and I believe it would be City Exhibit 708.

18       MR. SOTO:  No objection, your Honor.

19       THE COURT:  It is admitted.

20    (City Exhibit 708 received at 2:43 p.m.)

21 BY MR. MILLER:

22 Q   Okay.  Ms. Taranto, focusing again on this chart, can you

23 please describe the discount rates that are on the bottom of

24 the table on the left, the ones that begin 3.47 percent and

25 below that 2.60 percent?

1  A    Yes.  The discount rates on the bottom of -- the bottom

2  two lines represent the PBGC termination -- PBGC interest

3  rates for terminating plans at two different points in time.

4  Q    And can you explain to the Court how those two different

5  rates operate in making a present value calculation?

6  A    Yes.  The 3.75 for the first 20 years, three point --

7  Q    All right.

8  A    Sorry.

9  Q    I think you said 3.75?

10  A    I'm sorry.  The 3.47 for the first 20 years, 3.67

11  thereafter, means that for the first 20 years of benefit

12  payments, they are discounted at 3.47 percent, and for

13  benefit payments thereafter they're discounted at 3.64

14  percent.

15  Q    And the line item below that, can you explain how that

16  works?

17  A    Similar mechanics.  The 2.6 percent was used to discount

18  for the first 20 years, and the 3.43 percent was used

19  thereafter.

20  Q    And you indicated that these rates were prepared by the

21  PBGC?

22  A    Yes.

23  Q    Is that right?  And once again, for the record, can you

24  indicate the purpose by which -- or purpose for the PBGC

25  creating and publishing these rates?

1    A    These rates are published for use in calculating the

2    value or the liability associated with terminating pension

3    plans.

4    Q    Okay.  And how often does the PBGC publish these rates?

5    A    These rates are published quarterly.

6    Q    And the 3.47 for the first 20 years and 3.64 percent

7    thereafter, that was the published PBGC rate for what period?

8    A    The second quarter of 2014.

9    Q    And the rates of 2.60 percent for the first 20 years and

10   3.43 percent thereafter, that was published for what period?

11   A    July 1, 2013, that quarter.

12   Q    That quarter?  The quarter running July 1 through 9-30?

13   A    9-30, yes.

14   Q    What is your understanding of how the PBGC goes about

15   developing these rates?

16   A    The PBGC develops these rates by surveying life insurance

17   companies who sell annuities, who do annuity transactions, to

18   understand what the discount rates they use are for their

19   transaction.  They compile the results and, as I understand

20   it, make adjustments to remove some of the profit margin

21   that's inherent in annuity purchase rates and publish these

22   rates for use in -- for use by terminating pension plans.

23   Q    So, therefore, what is your understanding of the

24   relationship between the PBGC published rates and commercial

25   annuity rates?

1   A    They're a proxy for commercial insurance rates.

2   Q    As an actuarial matter, do you have an opinion whether it

3   is reasonable to calculate the present value of retiree

4   health liabilities in the context of a settlement using PBGC

5   rates?

6   A    Yes, I do.

7   Q    And what is your opinion?

8   A    My opinion is based on Actuarial Standards of Practice

9   27, which I believe was discussed yesterday.  That actuarial

10  standard is the standard which drives -- which determines the

11  discount rates that an actuary must use to perform

12  calculations.  In looking to that standard, the current

13  standard -- in fact, the standard that I think Ms. Nichol

14  referenced yesterday that's coming into effect for this

15  quarter, specifically provides an example of a settlement

16  calculation and reports that an actuary may use annuity

17  purchase rates to perform a settlement calculation.

18  Q    And, thus, what is your view of using PBGC rates for

19  settling a retiree health liability obligation?

20  A    Well, as mentioned previously, this retiree health plan

21  is a defined benefit retiree health plan.  It provides its

22  benefits in a series of future payments, albeit a little more

23  complicated than a pension plan because of medical inflation,

24  but, nonetheless, a series of periodic payments that are

25  similar to an annuity.  The type of benefit is consistent --

1  or not inconsistent with a pension plan.  This is -- an

2  annuity purchase rate for settling that type of periodic

3  payment is, in my opinion, reasonable with respect to a rate

4  to use.

5  Q   And can you, again, just put into the record so it's

6  clear what the present value of benefit calculations that you

7  made when you used the 3.4 percent for the first 20 years,

8  3.64 percent thereafter, and the 2.60 percent for first 20

9  years and 3.43 percent thereafter?

10  A   The 3.47 for the first 20 years, 3.64 thereafter,

11  resulted in a present value of 4.0 billion, and the 2.6 for

12  the first 20 years, 3.43 thereafter, resulted in a present

13  value of 4.49 billion.

14  Q   And just to clarify again, this is for what population?

15  A   This is for current retirees of the city.

16          MR. MILLER:  Thank you.  Thank you, your Honor.  I

17  have no further questions.

18          THE COURT:  Okay.

19          MR. SOTO:  May I approach the witness, your Honor?

20          THE COURT:  Yes.

21          THE WITNESS:  Thank you.  Okay.

22                      CROSS-EXAMINATION

23  BY MR. SOTO:

24  Q   We haven't met, Ms. Taranto.  My name is Ed Soto.  I have

25  a very few questions for you, and they relate to your

1  testimony --

2          THE COURT:  Could you pull the microphone closer to

3  you?  There you go.

4  BY MR. SOTO:

5  Q   They relate to your testimony today and to your testimony

6  at your deposition.  Let me start with making sure I

7  understand what you're not offering testimony on today.  You

8  weren't -- am I correct, you weren't involved in Milliman's

9  work assessing pension liability, were you?

10 A   I was not.

11 Q   And you were not offering any opinions that relate to the

12 pension classes; correct?

13 A   That's correct.

14 Q   And your testimony today is solely about matters

15 pertaining to OPEB; correct?

16 A   That's correct.

17 Q   Okay.  In Section 2 of your report that was an exhibit --

18 and I think they made one chart a separate exhibit, and we'll

19 go to that chart in a bit -- you list three opinions that

20 you're offering in this case; correct?

21 A   I think so.  I don't have it in front of me.  Thank you.

22 Q   And so --

23 A   Thank you.

24 Q   If you'll turn to Section 2 of that, you list three

25 opinions, I believe; correct?

1  A    Yes.

2  Q    And those are the only opinions that you're giving in

3  this case; correct?

4  A    Yes.

5  Q    And the third opinion relates to the range of possible

6  discount rates to calculate the OPEB claim in this

7  bankruptcy; correct?

8  A    Yes.

9  Q    And the purpose of applying a reasonable present value

10  rate is to approximate the current value of the stream of

11  future benefits; correct?

12  A    Yes.

13  Q    So it's a way of calculating the cost of the future

14  benefits in today's dollars; right?

15  A    Correct.

16  Q    Okay.  The range -- that range of possible rates for

17  calculating the OPEB claims, that's what was set forth in

18  that table that we just saw; right?

19  A    Those were the calculations that I performed, yes.

20  Q    Okay.

21        MR. SOTO:  Could you put up that table?  I think

22  it's a new exhibit, 708, but -- there we go.  There we go.

23  BY MR. SOTO:

24  Q    That's the same one we were talking about a moment ago?

25  A    Yes.

1    Q    Okay.  So starting from the top down, the first discount

2    rate is 4.5 percent; right?  And then it goes down to four

3    percent, 3.5 percent, and then to the two lines that Mr.

4    Miller spent most time with; correct?

5    A    Yes.

6    Q    All right.  And then it goes to the present values on the

7    right, and those benefits are measured in billions you

8    pointed out; right?

9    A    Correct.

10   Q    Okay.  And as you sit here, you are not offering an

11   opinion as to which of those rates is the most appropriate

12   rate, are you?

13   A    That's correct.

14   Q    And it's your opinion that all of those rates are within

15   the range of reasonable discount rates to calculate the OPEB

16   claims; correct?

17   A    They can be, yes.

18   Q    Okay.  But these discount rates that are on this chart

19   are not the entirety of the range of reasonable discount

20   rates that could be used to calculate the OPEB claim in this

21   case, are they?

22   A    I haven't thought about that.

23   Q    Okay.  And it's possible, isn't it, for someone to use a

24   discount rate that is higher than the highest discount

25   rate -- well, let me go back.  You know, I just thought of

1  something.  Let me ask you to look in your deposition.  This

2  might help refresh your recollection.  On page 33, it's line

3  10 through 17, and I actually realize that that question was

4  asked to you by another attorney in this case.  Question.

5  See if this refreshes your recollection.

6             "Is it your opinion that the discount rates that

7             are laid out in the table on the top of page 6 of

8             your report are the range -- are the entirety of the

9             range of reasonable discount rates that could be

10            used in calculating the OPEB claim?

11            Answer:  Not necessarily."

12      So that's sort of consistent with your answer today,

13  but it takes it a step further; right?  This is not the

14  entirety of the range.  There could be others; correct?

15  A   Correct.

16  Q   And it's possible, isn't it, for someone to use a

17  discount rate that is higher than the highest discount rate

18  that you have on your table there on page 6, and as an expert

19  in this field you could still find that to be a reasonable

20  discount rate; correct?

21  A   Potentially.

22  Q   Now, the discount rates listed on page 6 of your report

23  are rates that you were specifically asked to value in

24  support of the city's negotiations with the Retiree Committee

25  on the OPEB claim; correct?

1  A   Correct.

2  Q   Okay.  Would you agree with me that if the city had asked

3  you to calculate the city's liabilities to current retirees

4  with other potential discount rates that aren't on your chart

5  but that you believe could be within the range of reasonable

6  discount rates, as you previously testified, that you would

7  have calculated those, too?

8  A   I certainly would have calculated rates to support the

9  city in their work, yes.

10 Q   But you weren't asked to perform the calculations of OPEB

11 obligations for all of the possible ranges of reasonable

12 discount rates, were you, only the ones they gave you?

13 A   Correct.

14 Q   Okay.  Now, you didn't perform a zero-percent discount

15 rate calculation, did you?

16 A   That's correct.

17 Q   And you've never been involved in a valuation where a

18 zero-percent discount rate was appropriate or would meet the

19 relevant accounting standards; correct?

20 A   I have not personally been involved, but we did not

21 perform a GASB 45 valuation for the city.

22 Q   And it's your view that to apply a zero-percent rate here

23 you would have to conclude that the city had no investable

24 assets; correct?

25 A   Can you explain "here"?  I'm sorry.

1    Q   Here in this -- in these proceedings, in this situation.

2    A   For this -- for settlement purposes?  Is that your

3    question?

4    Q   Yeah, as you were preparing here in this chart, yes.

5    A   I'm not sure about that.

6    Q   Let me ask you to look at page 76 of your deposition, see

7    if this will refresh your recollection, starting on line 9,

8    Evan.

9            "Question:  What information would be required

10           about the city's finances that would allow you to

11           have an opinion regarding a zero-percent discount

12           rate that are not necessary for you to have an

13           opinion about a four-percent discount rate?

14           Answer," line 15, "A zero-percent discount rate

15           would be the result of an analysis that said that

16           the city had no investable assets and would be a

17           rate that might be determined under GASB 45

18           methodology."

19           Correct?

20   A   That's what I said, yes.

21   Q   And that was true then, and it's true now?

22   A   The statement, yes.

23   Q   Okay.  So shifting gears a little bit, let's look at your

24   first opinion, which relates to the total present value of

25   future benefits.  And I think you said those are -- I love

1  these acronyms -- the expected post-retirement benefit

2  obligation or EPBO; correct?

3  A    Correct.

4  Q    Okay.  So the first thing I think you said you did was

5  calculate the EPBO associated with the pre-filing health plan

6  by replicating the June 30, 2011, valuation done by an

7  actuarial firm called Gabriel, Roeder, Smith; correct?

8  A    Correct.

9  Q    And you did that to make sure that you were correctly

10  interpreting the data and also to make sure that you were

11  correctly applying the plan's provisions; right?

12  A    Yes.

13  Q    Okay.  And you determined that Gabriel, Roeder, Smith's

14  work had no material defects with respect to the valuation;

15  correct?

16  A    We were able to replicate it, yes.

17  Q    And you were comfortable that the range of difference

18  between your calculations when you replicated it and theirs

19  was not significant and you could still -- you were matching

20  what they had done; correct?

21  A    Correct.

22  Q    And after that analysis, then you took the next step of

23  doing an independent valuation of the EPBO as of July 1,

24  2012; correct?

25  A    Correct.

1  Q   And in performing that EPBO calculation, you included

2  both active employees and retirees; correct?

3  A   Yes.

4  Q   Okay.  And you made certain assumptions about how many

5  then active employees would move from active to retirement

6  status or would pass away; correct?

7  A   Correct.

8  Q   And for those retirees who elected to opt out of

9  healthcare benefits, you assumed that for purposes of your

10  July 1, 2012, valuation that they would continue to opt out;

11  correct?

12  A   Or a comparable number would continue to opt out, yes.

13  Q   Okay.  Fair enough.  And you did the same thing when you

14  performed your calculation of the EPBO associated with the

15  2014 retirement health plan.  You did not include retirees

16  who had either opted out or who had not opted into benefits;

17  correct?

18  A   I'm not sure about that.  I'd have to look at the work to

19  determine what assumptions we made about individuals,

20  particularly individuals who had access to a stipend.

21  Q   I have to say you have had amazing memory here today, but

22  there are just a few things that your deposition might help.

23  Look at page 95 --

24  A   Okay.

25  Q   -- starting on line 23.

1          "Question:  I apologize, and I actually wasn't

2          this person, but I do apologize.  I've got to go

3          through this three steps now.  When you performed

4          what I'm going to call your present value of

5          benefits for the 2014 retiree health plan

6          calculation, you did not include retirees who had

7          opted out or had not opted into medical coverage;

8          correct?

9              Answer:  Can you give me a second?

10             Question:  Sure.

11             Answer:  That is correct."

12         You probably had more materials in front of you

13   then.

14   A    Okay.

15   Q    Does this refresh your recollection?

16   A    That's what I said.

17   Q    And it was true then, and it's true now, too?

18   A    Presume, yes.

19   Q    And when you were asked by the city to calculate the OPEB

20   claim in this case, you were told to include retirees who had

21   opted out or had not elected to opt into the pre-filing

22   retiree health plan; right?

23   A    Say that again, please.  I'm sorry.

24   Q    So when you were asked by the city to calculate the OPEB

25   claim in this case, you were told by the city to include

1   retirees who had opted out or who had not elected to opt into

2   the pre-filing retiree health plan?

3   A   Correct.

4   Q   Okay.  And there were, I think you said, 1,829 retirees

5   who were eligible for but had not elected healthcare benefits

6   that you included in your calculation here that you had not

7   included, for example, in your analysis of 2014 or 2012;

8   correct?

9   A   Correct.

10  Q   But as you sit here today, you don't know whether any of

11  those retirees who had chosen to opt out or who have chosen

12  not to opt in will, indeed, opt in, do you?

13  A   I have not done any analysis.

14  Q   Just one last area.  You're familiar with the term

15  "actuarial value"?

16  A   Yes.

17  Q   Well, that makes one of us.  And in reference to

18  measuring or evaluating healthcare programs, the actuarial

19  value refers to the share of the cost of the healthcare plan

20  that is paid by the health plan sponsor, which in my world is

21  usually the employee or some other source like Medicare as

22  opposed to the share of the cost of the healthcare plan

23  that's paid out of pocket by the participant; correct?

24  A   Generally, yes.

25          THE COURT:  Hold on.

1          THE WITNESS:  I think you said employee.

2          THE COURT:  Yeah.  You said employee, and you meant

3    employer.

4          MR. SOTO:  Oh, I'm sorry.  Yeah.  I told you there

5    was only one of us, Judge.  That's true.  Let's try this

6    again.

7    BY MR. SOTO:

8    Q    So the actuarial value --

9          THE COURT:  Okay.  If you want me to keep up with

10   you because that's a really long question --

11         MR. SOTO:  Slow down.

12         THE COURT:  -- slow down, please.

13         MR. SOTO:  Okay.

14   BY MR. SOTO:

15   Q    The actuarial value refers to the share of the cost of

16   the healthcare plan that's paid by the healthcare sponsor,

17   which is usually the employer --

18   A    Correct, yes.

19   Q    -- or in some part may be paid by a governmental entity

20   like Medicare --

21   A    Correct.

22   Q    -- as opposed to the share that is paid out of pocket by

23   the participant, which is usually the employee?

24   A    Correct.

25   Q    Okay.  So you measured the actuarial value of the 2013

1  retiree health plan; correct?

2  A   Yes, I did.

3  Q   And you found that the share of medical spending paid by

4  the plan or outside sources for Medicare-eligible retirees

5  was 90 percent, so you found that the actuarial value for the

6  Medicare-eligible retirees was about 90 percent; correct?

7  A   Correct.

8  Q   Okay.  And you found that the share of the medical

9  spending paid by the plan or outside sources for non-

10 Medicare-eligible retirees was 83 to 90 percent, and so you

11 found that the actuarial value for non-Medicare-eligible

12 retirees ranged from 83 to 90 percent; correct?

13 A   Correct, with one exception.  For the non-Medicare-

14 eligible plans, it was entirely the plan that paid for it.

15 There was no Medicare equivalent.

16 Q   Okay.  Fair enough.  And it's true that if a city paid 50

17 percent of the costs for a particular participant and

18 Medicare paid 40 percent of the costs and the participant

19 ended up paying only 10 percent out of pocket, that the

20 actuarial value for such a health plan would be 90 percent;

21 correct?

22 A   If the participant paid ten percent, yes.

23 Q   Okay.  But nowhere in your report do you calculate the

24 actuarial value for the 2014 healthcare plan, did you?

25 A   No, I did not.

1    Q    Okay.

2           MR. SOTO:  I think I have no more questions.  Thank

3    you.

4                        CROSS-EXAMINATION

5    BY MR. BRILLIANT:

6    Q    Hi, Ms. Taranto.  We've never met.  I'm Allan Brilliant

7    representing MIDDD.  I'm just going to have a few questions.

8    With respect to the chart that we looked at in your report

9    with the discount rates and the present value of benefits --

10   it's on page 6 of your report, which is Exhibit 456?

11   A    Yes.

12   Q    Now, I believe you testified that with the two

13   adjustments that you made at the city's request that this

14   really gives the outside, you know, brackets the outside

15   amount of the full amount of the present value of the

16   benefits; is that right?

17   A    With respect to the two data assumptions, yes.

18   Q    Right.  And those data assumptions are -- if put into

19   this chart are 400 to 500 million?

20   A    Roughly, yes.

21   Q    So just assuming these discount rates, so if you

22   subtracted, you know, roughly 400 million for all of them

23   with respect to the highest number you would get, you know,

24   $4.09 billion; is that right?

25   A    If I subtracted 400 million, yes.

1    Q    And I'm right, aren't I, that the -- under the plan the

2    amount that the city agreed to for the calculation of the

3    claim is 4.3 billion; is that right?

4    A    I believe so.  I don't recall off the top of my head.

5    Q    Okay.  So that number would be larger than the -- you

6    know, if you adjusted, you know, for the -- you know, for,

7    you know, the other amounts, the total amount that was

8    settled is larger than the highest number on your chart with

9    that adjustment; isn't that right?

10   A    Mathematically, yes.

11           MR. BRILLIANT:  I have nothing further.

12           THE COURT:  Thank you.  Any further questions for

13   the witness?

14           MR. MILLER:  Very briefly, your Honor.

15                     REDIRECT EXAMINATION

16   BY MR. MILLER:

17   Q    There was a mention of GASB 45.  What is GASB 45?

18   A    GASB is the government accounting standard that applies

19   to retiree medical plans for governmental entities.

20   Q    Does GASB 45 address pensions at all?

21   A    No, not that I'm aware of.

22           MR. MILLER:  No further questions.

23           THE COURT:  Thank you.  Any further questions for

24   the witness?

25           MR. SOTO:  No, your Honor.

1    THE COURT:  All right, ma'am.  You are excused.

2    THE WITNESS:  Thank you.

3    THE COURT:  Thank you very much for coming today.

4    (Witness excused at 3:07 p.m.)

5    THE COURT:  We'll be in recess now for afternoon

6  recess until 3:25, please.

7    THE CLERK:  All rise.  Court is in recess.

8    (Recess at 3:07 p.m., until 3:26 p.m.)

9    THE CLERK:  All rise.  Court is back in session.

10  You may be seated.

11    THE COURT:  Sir.

12    MR. IRWIN:  Good afternoon, your Honor.  Geoff

13  Irwin, Jones Day, for the city.  The city would next call

14  Michael Plummer as a witness.  I have distributed some

15  binders for the Court and for staff.  They're on the table

16  here and one in the witness well as well.

17    THE COURT:  Please raise your right hand.

18    MICHAEL PLUMMER, CITY'S WITNESS, SWORN

19    THE COURT:  All right.  Please sit down.

20    DIRECT EXAMINATION

21  BY MR. IRWIN:

22  Q   Welcome, Mr. Plummer.

23  A   Thank you.

24  Q   You and I have met before, but can you please state your

25  full name for the record?

1  A   Michael John Plummer.

2  Q   And where do you live?

3  A   New York City.

4  Q   And by whom are you employed?

5  A   Artvest Partners.

6  Q   In what business is Artvest partners?

7  A   Artvest Partners provides art and financial advice to --

8  art finance advice to private clients, art businesses, art

9  professionals, and Fortune 500 companies.

10 Q   And what type of advice does Artvest provide to those

11 clients?

12 A   We advise clients on buying and selling activities,

13 broker art loans for them, the disposition of large

14 collections, negotiate with the auction houses for best

15 terms, guarantees, that sort of thing.

16 Q   Were you retained by the city and by the Detroit

17 Institute of Arts in 2014 in connection with this bankruptcy

18 matter?

19 A   I was.

20 Q   At a very high level and without telling me what those

21 opinions are, what were the principal opinions that you were

22 asked to analyze?

23 A   I was asked to evaluate the value of the DIA collection

24 in totality.  I was asked to evaluate the recommendations for

25 monetization from Christie's.  I was asked to evaluate the

1    offers of interest from another party, from one of the

2    creditors, and I was -- I believe that those were the three

3    things.

4    Q    Were you asked to provide opinions on sale conditions

5    relating to --

6    A    Yes.  I was asked to provide sales -- yes, yes.  I was

7    asked to provide sales conditions.

8    Q    And are you prepared to describe for the Court the

9    process behind that analysis and your results?

10   A    I am.

11   Q    Before we do that, let's talk about your education and

12   your background.  Where did you go to college?

13   A    I went to the Wharton School of the University of

14   Pennsylvania.

15   Q    And when did you graduate?

16   A    1980.

17   Q    What degree did you receive?

18   A    A bachelor of science in economics.

19   Q    In economics.  You had economics training at --

20   A    Yes, I did.

21   Q    And did you study any art or art history?

22   A    I did study art history at Penn.

23   Q    Okay.  Did you take -- what form did that take?

24   A    It was a survey course at Penn.

25   Q    And what did you do after graduating from Penn in 1980?

1  A   Well, that art history course inspired me a passion for

2  and love of art, so I set about actually visiting most of the

3  major museums of the world and major collections of the world

4  and got a job at Sotheby's in the fall of 1980 after I

5  graduated from Sotheby's --

6  Q   How long --

7  A   -- from Wharton.

8  Q   From Wharton.  How long did you work at Sotheby's

9  starting in -- in 1980; right?

10  A   Yes.

11  Q   Okay.  How long did you work there?

12  A   Till the beginning of 1996, so 16 years.

13  Q   All right.  And what was your first position at

14  Sotheby's?

15  A   I was -- I worked in the treasury department, and I was

16  responsible for extending credit, collecting money from

17  dealers, negotiating deals with dealers, and managing one of

18  Sotheby's very first art loans, which was managing the

19  collateral, doing interest calculations, making sure property

20  was coming in and out to keep the loan to value ratio at a

21  certain level.

22  Q   And what was your title at the time?

23  A   It was account manager.

24  Q   Okay.  Was there any art valuation associated with

25  managing art loans at that time?

1  A   I would work with the specialists at Sotheby's to ensure

2  that there were values on the works of art that were included

3  in the loan and that they were revalued periodically to make

4  sure that the value of the collateral was maintained at a

5  certain level.

6  Q   How long were you an account manager at Sotheby's?

7  A   About three and a half years.

8  Q   And what position did you take next?

9  A   Business manager at Sotheby's for the Asian art division.

10  Q   And how did your job function -- roles and

11  responsibilities change in connection with that position?

12  A   Well, in that position I was actually on the selling side

13  of the business.  I was imbedded in various expert

14  departments, specialist departments, where I worked with the

15  specialists to accumulate their values for their upcoming

16  sales and assemble them into a forecast for the sales that

17  the company would then use to determine its own larger

18  financial forecast, its spending on catalogs and marketing

19  expenses, and establish a solid forecast for the company for

20  the next six months to a year.

21  Q   Did you personally play a role in financial forecasting

22  for Sotheby's at that time?

23  A   Yes, I did.  I was responsible for forecasting for that

24  division of the company.

25  Q   And how did you work with the specialists in connection

1  with your forecasting responsibilities?

2  A    Well, we would sit down and look at the estimates that

3  they were putting in for a sale, and we would determine what

4  the realistic sales rate would be, whether or not they would

5  sell 80 percent of it or 90 percent of it or 6 percent of it,

6  what the market conditions were, whether or not they were

7  lowballing their estimates to get interest in -- from buyers

8  and what the real numbers should be, where the sale would

9  really likely end up.

10  Q    Was part of your responsibility trying to determine if

11  low estimates as opposed to high estimates would be hit at

12  auction?

13  A    Yes.

14  Q    And how did you do that?

15  A    Well, you would look at market conditions, past sales.

16  You would look at sort of general comments going on in the

17  trade, amongst the trade, economic trends, what the

18  specialist's track record was in the past for hitting their

19  mark as it were, and the strength of the sale overall, the

20  quality of the property, whether it was fresh or it was

21  property that had been around for awhile, whether it was more

22  dealer property or fresh private collector property, which

23  tended to do better.

24  Q    And how long were you the business manager of the Asian

25  art division?

1   A    For approximately three years.

2   Q    What did you do after that?

3   A    After that I moved to the real estate division where I

4   became effectively the COO of that division and where I was

5   responsible for forecasting, financial forecasts, financial

6   operations and marketing.

7   Q    That was still at Sotheby's?

8   A    That was still at Sotheby's.

9   Q    So that's what?  1987 or so?

10  A    That would have been about nineteen eighty -- yeah,

11  eighty -- end of '87, beginning of '88.

12  Q    Okay.  And how long were you with the real estate

13  division?

14  A    Again, about three and a half, four years.

15  Q    Okay.  So taking us into the early '90s.

16  A    Right.

17  Q    What position did you occupy next at Sotheby's?

18  A    I was recruited back to the auction company to manage

19  their marketing expenses in the face of the downturn of --

20  the market downturn of 1990, '91.

21  Q    So you were in the marketing division at that point in

22  time?

23  A    Yes.

24  Q    Did there come a point in time when you assumed a

25  different role within the marketing department?

1   A    Yeah.  Within two years I was running the marketing

2   division and managing marketing expenses and working with

3   specialists to budget and plan marketing operations for sales

4   related to their estimates and their forecasts for their

5   specific auctions upcoming.

6   Q    Did you run the marketing department for all of the

7   company or part of it?

8   A    For all of North America and -- North and Latin America,

9   for all of the Americas and Asia.

10  Q    Did you have any occasion in connection with that

11  position to work with the company's budgets or forecasting?

12  A    Yes, I did.

13  Q    And please describe that.

14  A    Well, again, it was sort of a step up from being a

15  business manager.  I was now working at a higher level with

16  the specialists and with the division heads, as it were, and

17  working with the bigger sales and making sure that they were

18  properly marketed and marketed within an affordable or cost-

19  effective budget that fit the scale of the sale.

20  Q    Okay.  And how long were you in that position?

21  A    Two years.

22  Q    All right.  Does that take us through the end of your

23  employment at Sotheby's?

24  A    Yes, it does.

25  Q    And that was, I think you said, 1996?

1    A    Correct.

2    Q    Okay.  Fast forwarding a little bit, did there come a

3    point in time when you took a position at a company by the

4    name of Fernwood Art Investments?

5    A    Yes.

6    Q    Okay.  And what had you done -- when was that, by the

7    way?

8    A    That was in 2003.

9    Q    Okay.  What had you done between 1996 and 2003?

10   A    I had first worked at a marketing and branding firm

11   called Carbone Smolan, who I had actually hired to work for

12   me at Sotheby's when I was head of marketing to rebrand

13   Sotheby's, and we together rebranded Christie's.  And then I

14   went on to start an on line technology business in the art

15   space that provided art data to appraisers and inventory

16   services to art collectors.

17   Q    And what was the nature of the business at Fernwood Art

18   Investments?

19   A    Fernwood was a new kind of business, the first of its

20   kind in America, which was set up to bring financial

21   practices to the art world.  It was founded by an ex-Merrill

22   Lynch executive, and it was -- its ambition was and its

23   business plan was to bring -- make art into -- promote art as

24   an asset class and justify it as an asset class, create art

25   funds and bring financial discipline to the art world so that

we were not only creating art funds but we were doing
financial analysis.  We were doing sector analysis of
volatility, comparative performances of different sectors
against each other and against equity markets and bond
markets, and how art would fit into an overall portfolio
looking at present values of collections, future values of
collections, all sorts of things like that.

Q    And what was your position at Fernwood?

A    I was president and chief operating officer.

Q    And what was your role?  What did your role include among
the various activities that you just described?

A    My primary role was marrying the financial with the art
so that I was the most knowledgeable person in the company on
the art market, so I had to translate the financial practices
and tools into the reality of the art market.  I was also
responsible for hiring the art specialist team of advisors
who we were lucky enough to get some of the leading art
dealers in the industry at the time, and I was responsible
for engaging with them and working with them to help set up
the indices we used, define the sectors in the funds that we
were creating and interface with them on a regular basis just
on market intelligence.

Q    So you've mentioned art funds a couple times.  Did you
have a personal role in connection with launching an art
fund?

1  A   Yes.  We created two art funds.  One was called the

2  Sector Fund, and one was called the Opportunity Fund.  And we

3  were -- we had put them through due diligence at Merrill

4  Lynch and had gotten approval to sell them to --

5  Q  Well, let's just step back for a minute.  I'd like to

6  know more about an art fund and how it works.

7  A   Sure.

8  Q  What was the idea at Fernwood behind the particular art

9  fund that you were about to launch?

10  A   Well, the idea was that the fund was structured in a

11  way -- there were two funds.  One was segregated into eight

12  sectors, which covered different sectors of the art market,

13  which, as I was suggesting earlier, performed differently and

14  created a sort of balanced fund approach to the art market.

15  And the other was an opportunity fund, which was set up to

16  take advantage of distressed situations or unique

17  opportunities that would arise in the art market.

18  Q  And was this a buy and hold fund?  Is that the idea?

19  A  The Sector Fund was a buy and hold fund.  The Opportunity

20  Fund was more of a trading fund, so it would have performed

21  more like a dealer.

22  Q  Okay.  What was the time horizon for the buy and hold

23  fund?

24  A  The time horizon for the buy and hold fund was roughly --

25  again, it would depend on opportunities that presented

1  themselves, but it was anticipated to be about a two- to

2  three-year acquisition period, a three- to four- or five-year

3  holding period, and then a three- to four-year disposition

4  period.

5  Q   And what's the rationale for that?  Why do you have art

6  assets in that portfolio that you're holding over that time

7  period?

8  A   Well, you're waiting for, to some extent, the market to

9  increase in value.  To another extent you would -- we had

10 planned to manage the art so that it would enhance its value

11 so that we were planning to put it in museums and other

12 things that would raise its value, conduct research on

13 provenance and other things that would enhance its value, so

14 time would add value to it plus those additional attributes

15 or aspects that we were to engage in.

16 Q   In connection with soliciting participation or investment

17 in this fund, what was the targeted rate of return?

18 A   Fifteen to eighteen percent, and we were actually hoping

19 to get closer to eighteen percent.

20 Q   And why is that?  Why was the rate so high?

21 A   Because investors, especially at that time, we were -- as

22 I said, we were the first to be doing this in the United

23 States -- were very skeptical of art as an asset class, and

24 they felt that it was -- with some justification, as our

25 research showed, that it was riskier and more volatile than

1　other sectors of the market and, therefore, that it merited a

2　higher return to account for or offset that volatility, so

3　they expected a return of 15 to 18 percent.

4　Q　And how did you select the pieces of art or how were you

5　to select the pieces of art that would be placed into this

6　portfolio?

7　A　Well, we were intending to work with the specialist that

8　we had hired to identify those works of art.  We also were

9　intending to source the art mostly privately because it was

10　our general feeling and our strategy that buying art

11　privately is less competitive, and if you can source the

12　right deals, you're much better off than competing with

13　private collectors at auction where prices tend to run higher

14　these days.

15　Q　Is there an economic incentive to buy a group of pieces

16　of art as a collection as opposed to individually at auction?

17　A　Yes.  If you can -- if you can find a collection intact

18　and buy it as such, you can sometimes get a significant

19　discount.  There are some examples that were in my report of

20　that such as the Pierre Matisse Gallery.

21　Q　Did you do -- we're going to -- we're going to get to

22　that in a moment, but did you do any economic or financial

23　forecasting or modeling at Fernwood?

24　A　Yes, we did.  We conducted a -- we conducted a report

25　which was breakthrough at the time, pioneering, and still to

1  this day is -- has not been replicated except for additional

2  work that my business partner and I have done at Artvest, but

3  we took the different art sectors of the art market, which,

4  you know, Ms. Fusco alluded to in her testimony yesterday,

5  that the art market is not one market but various sectors,

6  and those sectors are driven by the behavior and makeup of

7  the collector base that collects them, so, for example,

8  American art pre-1950 is almost -- is exclusively bought by

9  American collectors, generally older American collectors of a

10 certain age.  Post-war and contemporary is bought by an

11 international crowd and a much younger crowd.  Impressionist

12 and modern is yet a different crowd, and so all of these

13 sectors tend to perform differently based on the makeup of

14 those collecting bases, and they have over time different

15 performance attributes.

16 Q   Okay.  Did the fund that you're describing at Fernwood --

17 was it actually put to market?

18 A   No, it wasn't.

19 Q   Okay.  And what is it that happened?

20 A   Shortly after we got approval from Merrill Lynch to sell

21 it to their private banking group, I uncovered malfeasance on

22 the part of the CEO and that there was a large sum of

23 money -- investor money missing, and so shortly thereafter

24 myself and at my advice the expert specialist advisors

25 resigned collectively.

1  Q   And was there a soft landing for you in terms of your

2  next career opportunity?

3  A   Yes.  Fortunately for me Christie's had been watching our

4  activity at Fernwood with some admiration and envy, so they

5  hired me to bring that learning to them and develop not only

6  a fund business for them but also an art lending business for

7  them.

8  Q   And when was that?

9  A   That would have been in 2007.

10 Q   Okay.  In connection with your new employment at

11 Christie's, what is it specifically that they had asked you

12 to do?

13 A   They had asked me to work with Goldman Sachs in setting

14 up four art funds for them and also to develop and manage a

15 loan portfolio for them.

16 Q   Did Christie's have an art loan business at that time?

17 A   They did not.  They had a couple of one-off transactions

18 that they did for clients, you know, special clients who came

19 to them, but they did not have a dedicated business of that

20 where Sotheby's did, and they wanted to compete with

21 Sotheby's.

22 Q   Okay.  Let's take the art loan business first.  What is

23 it that you did personally for Christie's in connection with

24 getting that business up and running?

25 A   Well, I oversaw what then was a multi-million dollar

1 portfolio of art loans and developed best practices and

2 underwriting procedures and implemented KYC, which was the

3 know your client practices that were developed by the

4 financial industry after 9-11. I also -- sorry.

5 Q    That's okay.  Let me ask you what -- was there a certain

6 amount of education that Christie's required in connection

7 with learning this new business?

8 A    Yes.  Yes, yes, yes, yes.  They were new to the lending

9 business, so, again, I had to introduce them to best

10 practices, loan to value ratios, those sorts of things.  Also

11 they had no banking relationships which facilitated art

12 lending.  They had banking relationships for loans for the

13 operating business, but they didn't have banking

14 relationships to support the lending business, so I was

15 responsible for reaching out to banks and setting up those

16 relationships such as with Barclays, U.S. Trust and also

17 Royal Bank of Canada.

18 Q    Did these entities -- and I mean both Christie's, your

19 employer, and the potential lenders -- did they have

20 experience with valuing art as collateral for an art loan?

21 A    Christie's had a little bit of experience but not enough,

22 and I had to upgrade that experience or that knowledge base.

23 Barclays had none, so that was actually an extended process

24 of educating them because they had some misperceptions about

25 how one liquidates a large portfolio in the art market and

1   various factors that can apply that can cause a portfolio to

2   lose value.  And RBC was new to the business as well, but

3   U.S. Trust already had an established business.

4   Q    Is there a generally accepted loan to value ratio that is

5   used in the art lending business?

6   A    Yes.

7   Q    And what is it?

8   A    Almost universally and consistently it's 50 percent loan

9   to a -- to the value of the collection, and value we're

10  talking low estimate of the collection, low auction estimate.

11  Q    So if you have a -- if you have a range of estimates and

12  a low auction estimate and a high auction estimate or a fair

13  market valuation, which points is the loan to value ratio

14  tied to?

15  A    I'm sorry.  Ask the question again.

16  Q    Yes.  Which of those values do you mark your loan to

17  value, your 50-percent rule, the low estimate or the high

18  estimate?

19  A    The low estimate.

20  Q    And why is that?

21  A    Because you're assuming a -- I wouldn't say a worst case

22  scenario.  You're assuming that the property is going to be

23  sold quickly if you were in a distress situation, so you want

24  to make a conservative and realistic estimate of what you're

25  going to net in a six-month period or a very short period of

1  time to liquidate what you have to to recover your capital.

2  Q   And was that standard practice back at this point in

3  time?

4  A   It was standard practice at that point in time.  It was

5  standard practice at Sotheby's.  It is today.  It's standard

6  practice at every art lender out there.

7  Q   Okay.  Tell me about your -- tell me about whether

8  these -- let's talk about the art fund business at Christie's

9  as well.  What did you do in capacity with getting an art

10  fund off the ground?

11  A   We worked extensively with Goldman Sachs, although we at

12  Christie's did all the heavy lifting.  We did the -- had the

13  intellectual capital from what I brought over from Fernwood.

14  We structured four funds, and one was an impressionist and

15  modern fund for that sector.  One was a post-war and

16  contemporary sector.  One was an old master fund, and the

17  other was what we called a BRIC fund to take the -- get the

18  advantages of emerging markets.  And these funds were -- the

19  concept behind having four funds was that Goldman Sachs

20  wanted to take four different products to its high net worth

21  clients in Europe most specifically and give them options in

22  terms of risk levels so that, for instance, the BRIC fund

23  would be the highest risk, higher return -- highest return

24  fund, and the old master fund would be the most conservative,

25  lowest return fund.  It was not unlike how one creates funds

1  in equity markets.

2  Q   Did those funds get off the ground?  Were they launched

3  from Christie's?

4  A   No, they did not.  Unfortunately, around that time came

5  the crash of 2008, and so we reconfigured the funds from four

6  funds to make it into -- this was in the fall of 2008 -- into

7  one fund that was opportunistic, which would be a distress

8  fund.  In early 2009 we went to market with it -- excuse

9  me -- in Europe, and we soft-circled about a hundred million

10  dollars for the fund, and we came back to Christie's, but,

11  unfortunately, Christie's was in the -- at the nadir of its

12  problems from the market crash.  They had -- there were

13  various setbacks in their core business, and they were unable

14  to come up with the $5 million good faith investment that

15  they had to make in the fund, so the whole project was

16  scrapped.

17  Q   And what became of Christie's financial services?  I

18  think we're in the 2009 --

19  A   Yeah.

20  Q   -- time period or so.

21  A   It was shut down as part of the general pullback at

22  Christie's, and they stopped doing art loans but actually in

23  the last nine months are reentering that business.

24  Q   And so what did you do next in 2009?

25  A   In 2009 the fellow I worked with at Christie's who I met

there, who was working with me on the art funds, who had a
background in finance, he and I started Artvest Partners.
And we brought with us all of the intellectual capital from
Christie's, which was my right as per my contract with
Christie's, and we set up Artvest to advise on art
investments and art loans and all the things we talked about
earlier.

Q   And so do clients come to Artvest for financial
counseling in connection with dealing with art as an
investment?

A   Yes.  They come to us for advice on selling, on buying,
on restructuring collections for investment purposes, and for
liquidating collections and maximizing the value.

Q   How about art loans?

A   And -- yes.  We get requests for art loans almost on a
weekly basis.

Q   All right.  Do you have reason to interact with
specialists and dealers in connection with your work at
Artvest?

A   Yeah.  We often partner with dealers in buying and
selling art, in valuing art, and also we own an art fair
called Spring Masters New York.

Q   What is an art fair?

A   It is an event that is held once -- in this case, once a
year at the Park Avenue Armory in May where there are

1    approximately about 50 or so dealers who rent booths from us

2    and sell art, and so we have a very intimate relationship

3    with these dealers and are in a dialogue with them weekly

4    about the nature of their businesses and the nature of the

5    market.

6    Q    What is the Art Investment Council?

7    A    The Art Investment Council is a not for profit group that

8    Jeff and I set up about three years ago to promote best

9    practices in the art investment industry because at the time

10   there were a lot of new people entering it who either didn't

11   have the credentials or the know-how and were putting things

12   out there that we felt were putting at risk the whole idea of

13   art investment.

14   Q    Have you been published?  Do you have publications in

15   your name, sir?

16   A    Yes.  At Artvest we published three different market

17   analyses in the period of around 2011, 2012, that were very

18   well regarded at the time.  They were distributed to

19   collectors and art professionals and investment

20   professionals.  And we published them for awhile but then

21   stopped publishing them because the purpose of them was to

22   build our brand and awareness, and after a certain point that

23   was done, and we now get calls from the Wall Street Journal

24   and the New York Times and Bloomberg and various outlets for

25   opinions on the art market, so we didn't need to self-publish

1  anymore.

2  Q   Okay.  By the way, back to -- on the Art Investment

3  Council, are there any similar organizations to the Art

4  Investment Council that you're aware of?

5  A   That are active currently, no.

6  Q   Do you have occasion to lecture or speak regularly?

7  A   Yes, I do.

8  Q   And can you describe some of those?

9  A   I frequently lecture at the Sotheby's -- the Institute of

10 Art at Sotheby's, at Christie's education, at the NYU

11 program, and have spoken at Wharton to the Wharton graduate

12 students --

13 Q   On what --

14 A   -- on the art market.

15 Q   Yeah.  On what topics I was going to ask?

16 A   On the sector analysis, on the volatility of the art

17 market, on the illiquidity of the art market, on the

18 different sectors, on how the art market performs relative to

19 equity markets, that sort of thing.

20      MR. IRWIN:  Your Honor, at this point, I would move

21 to qualify Mr. Plummer as an expert in the commercial art

22 markets, including valuation and market dynamics.

23      MR. SOTO:  No objection.

24      THE COURT:  You may proceed, sir.

25      MR. IRWIN:  Thank you.

1  BY MR. IRWIN:

2  Q   Mr. Plummer, before we get into some of your opinions,

3  I'd like to ask you some questions about some general art

4  market dynamics --

5  A   Sure.

6  Q   -- if we could.  In your analysis, did you consider sales

7  volumes and values at the low end and the high end of the

8  marketplace?

9  A   Yes.

10 Q   Did you prepare any visuals in connection with that

11 analysis?

12 A   Yes, I did.

13 Q   Okay.  I'd like you, if you could -- there's a binder.

14 There should be a binder in your witness well, but we'll put

15 it up on the screen, City 644.  You see that, sir?

16 A   Yes, I do.

17 Q   What is City Exhibit 644?

18 A   644 shows the extreme nature of the art market in that --

19 Q   Well, before we get into the content, tell me what it

20 purports to depict.

21 A   It reports to predict the bands of value, lots sold by

22 value versus lots sold by volume, and so the bright red chart

23 is lots sold by volume, and the dark red bands are lots sold

24 by value.  And so as you can see from this, there is a very

25 high preponderance of activity in the lower ranges of the art

1   market and a very small amount of activity in the upper range

2   of the art market, so --

3   Q   Let me ask you first did you prepare this chart?

4   A   Yes, I did.

5   Q   And where did you get the data for it?

6   A   The data came from Art Economics and TEFAF, TEFAF, the

7   European Fine Art Foundation, who prepare this report on an

8   annual basis based on the survey of the art market, and it's

9   one of the more reliable sources out there on the art market.

10  Q   And this purports to cover art sales in 2013; is that

11  right?

12  A   Yes, it does.

13  Q   Is that all art sales?

14  A   Yes, it is.

15          MR. IRWIN:  Your Honor, before I go further, I'd

16  like to offer City Exhibit 644 as a demonstrative.

17          MR. SOTO:  No objection, your Honor, as a

18  demonstrative.

19          THE COURT:  It is admitted.

20      (City Exhibit 644 received at 3:57 p.m.)

21  BY MR. IRWIN:

22  Q   Mr. Plummer, why is this chart important in your

23  analysis?

24  A   Well, for us it makes the point that the art market is

25  very distorted towards the low end in terms of transaction

1   volume, and as you can see from this, about 50 percent of

2   transactions fall below 4.1 thousand, and about 90-some

3   percent fall below 69,000.  And if you go to the upper end,

4   the values that are reported --

5   Q   I just mean to interrupt -- you said 42.1 percent fall

6   below 4.1 thousand; is that right?

7   A   Forty -- well, in total, it's about --

8   Q   Right.  It would be the -- it would be the sum of the

9   first three red columns --

10   A   Yeah.

11   Q   -- is that right?

12   A   Correct.

13   Q   Okay.

14   A   Correct.  So that below 70,000 you're looking at 90-some

15   percent of the market.  And when you get up to the higher end

16   of the market, say sales over 13.8 million, which is -- which

17   are the sales that you see reported in the press, you're only

18   dealing with two-hundredths of a percent of the transaction

19   volume of the market, so we feel that this is an important

20   chart to explain and have used it often to explain how the

21   art market actually breaks out and that the reports one hears

22   in the press about record prices are misleading as to the

23   overall volume and activity -- nature and volume of activity

24   in the art market.  This is also a fair reflection of what is

25   out there in collections and in museums that there's just a

1  high concentration of value in very small numbers, and a

2  large proportion of the property out and around in the art

3  market is of little value.

4  Q   Are you familiar with the term "market sectors"?

5  A   Yes.

6  Q   And what does that term mean to you?

7  A   It means different segments of the art market that have

8  different characteristics based on the period of art and the

9  style of art that's being sold and the type of collector base

10 that is buying it.

11 Q   In connection with your work on this matter, have you had

12 occasion to consider how the art market has performed by

13 sector?

14 A   Yes, I have.

15 Q   Okay.

16      MR. IRWIN:  Can I please put up City Exhibit 645,

17 which should also be in your binder, but will also be on your

18 screen?

19 BY MR. IRWIN:

20 Q   Do you have that in front of you?

21 A   I do.

22 Q   What is contained in City Exhibit 645?

23 A   This exhibit shows the market share by sector of the fine

24 art auction market.

25 Q   Did you prepare this chart?

```
1   A   I prepared it with data from art economics and TEFAF.

2   Q   And over what time period does this chart purport to

3   cover?

4   A   This is 2013 activity.

5   Q   Okay.  And all sales or something less than all sales?

6   A   This would be auction sales.

7   Q   Auction sales in 2013?

8   A   Not counting private sales, auction sales.  And this

9   shows you that the left chart is sales by value.  The right

10  chart is by volume.  They're actually not that different, but

11  the left chart shows you that certain sectors dominate the

12  art market, and this is the fine art part of the art market.

13  This does not include decorative art.  But of the fine art

14  market, post-war and contemporary has a 46-percent market

15  share, so it is by far the leader and the fastest growing.

16  Modern art is the second largest sector at 29 percent.

17  Impressionist and post-impressionist art is 13 percent, and

18  old master paintings is 10 percent.  And American art would

19  fit into that other sector of two percent because it's not

20  globally traded.

21  Q   So what proportion of the overall art marketplace in

22  terms of commercial sales is occupied by these four sectors?

23  A   It's in the -- it's, yeah, 98 percent.

24  Q   Ninety-eight percent by value?

25  A   Right.
```

1  Q   Is that right?

2  A   Right.

3       MR. IRWIN:  Your Honor, we would offer at this point

4  in time City Exhibit 645 as a demonstrative.

5       MR. SOTO:  No objection as a demonstrative.

6       THE COURT:  All right.  It is admitted.

7     (City Exhibit 645 received at 4:02 p.m.)

8  BY MR. IRWIN:

9  Q   All right.  Could we please take a look at City Exhibit

10 646?  Mr. Plummer, in connection with this exercise, did you

11 have occasion to consider how the various art sectors have

12 performed over time?

13 A   Yes, I did.

14 Q   And is Exhibit 646 one of your charts?

15 A   Yes, it is.

16 Q   Okay.  What are you purporting to depict in 646?

17 A   We're purporting to depict the -- from the period of 2003

18 to 2013 the growth of value and sales volume by year, and the

19 bars represent value, and the line represents volume.  And

20 you can see from 2003 --

21 Q   Well, let me ask you to pause just for a moment just so

22 we understand what the chart is.  Is this chart one of the

23 sectors, or is this a total art market chart?

24 A   This is just the modern art sector.

25 Q   The modern art sector, which is one of the four sectors

1  we just --

2  A    Correct

3  Q    -- looked at?

4  A    Correct.

5  Q    Okay.  And it purports to track the modern art sector

6  performance from 2003 to 2013; is that right?

7  A    Correct.

8  Q    Okay.  Can you describe what conclusions you draw from

9  this data focusing for the moment on how the market performed

10 from 2003 to 2011?

11 A    Well, from 2003 to 2011, there was exponential growth

12 with the exception of 2008 and 2009, which was a result of

13 the great recession or the global economic crisis, but the

14 art market recovered very quickly in 2010, and in this

15 particular sector it peaked in 2011.

16 Q    To what do you attribute all of the growth that we see in

17 a chart like this all the way through 2011?

18 A    Well, we see this pattern in almost every sector, and we

19 believe that it is a function of the growth in

20 billionaires -- in the sudden growth of billionaires that is

21 an after effect of the joining of the global economy of

22 Russia, China, India, and eastern Europe in the '90s.  And

23 there was a bit of lag effect, so while those people were

24 making their billions in the '90s, the art market was

25 actually struggling, but only then in the early 2000s did

1 they turn to spending their money in the art market, and it

2 boomed tremendously and grew by such a large proportion.

3 Q   Did you have occasion in connection with your analysis to

4 consider the same metrics for the other three principal

5 sectors that we looked at previously?

6 A   Yes, we did.

7 Q   And have they performed similarly over this time period?

8 A   The impressionist and post-impressionist market performs

9 the same.  The American market has performed similarly,

10 although a little less well, and the exception -- the

11 outliers, post-war and contemporary -- and actually old

12 masters has performed similar to this -- the outliers, post-

13 war and contemporary, because that market has come to stand

14 alone in terms of its performance.

15 Q   Okay.  Let's set that aside for a moment.  Let's set

16 post-war and contemporary aside for just a moment.  With

17 respect to the other three sectors, have they performed like

18 this?

19 A   Yes.

20 Q   Have you formed an opinion as to whether those other

21 sectors, including this one, for the time period from 2003 to

22 2011 would replicate the same growth for the next ten years?

23 A   We have come to the conclusion that's extremely unlikely.

24 Q   And why is that?

25 A   Because global economic growth has slowed, and growth in

1   the art market tends to follow a period of high economic

2   growth.  So with global growth slow now in the general

3   economy worldwide that there won't be growth in the --

4   significant growth in the art market for the next five years

5   or so or longer.

6   Q   And what, in fact, has happened in your chart in City

7   Exhibit 646 after 2011?

8   A   Well, indeed, in 2011 and two thousand -- or sorry --

9   2012 and 2013, except in the post-war market, all of the

10  other markets seem to have stalled.

11  Q   Okay.  So let's talk about post-war and contemporary

12  then.  Did you perform a similar analysis for post-war and

13  contemporary?

14  A   I did.

15  Q   Okay.

16          MR. IRWIN:  By the way, before I do that, your

17  Honor, could I offer City Exhibit 646 as a demonstrative?

18          THE COURT:  Any objections?

19          MR. SOTO: Not as a demonstrative, your Honor.

20          THE COURT:  It is admitted.

21      (City Exhibit 646 received at 4:07 p.m.)

22          MR. IRWIN:  All right.  Could we please publish City

23  Exhibit 653?

24  BY MR. IRWIN:

25  Q   Do you have that in front of you, sir?

1    A    650 --

2    Q    653.

3    A    653, yes, I do have it.

4    Q    What is depicted in City Exhibit 653?

5    A    This is the post-war and contemporary sector, 2003 to

6    2013, again, by value and by volume.

7    Q    And how has post-war and contemporary as a sector

8    performed differently than the other three principal sectors

9    we've discussed?

10   A    Well, it differs in two significant ways.  The first is

11   that, as you can see, from 2008 to 2009, the crash, the drop

12   in value is more significant, which points to our argument

13   about its volatility.  The other is that after it recovered,

14   it has continued to grow and is continuing to grow.  It is

15   actually booming.  It is unlike all of the others.  It is --

16   each year seems to exceed the previous year.

17   Q    Is post-war and contemporary as a sector the only sector

18   that is performing in this manner?

19   A    Yes.

20   Q    Okay.  Have you formed an opinion as to whether or not

21   this growth in post-war and contemporary is sustainable over

22   time?

23   A    To the extent that it has been growing, it's not

24   sustainable, so there is a general perception out there that

25   I hold and others hold that there is a correction likely at

1  some point, though we can't say when that will happen, but

2  the growth has been so significant and unfettered that there

3  are concerns that it will not be sustained.

4  Q   Can you address, if you could, whether or not this

5  particular sector has demonstrated volatility relative to

6  other art sectors?

7  A   Yes.  When we did the analysis of sector volatility, as I

8  was talking about, at Fernwood and then followed up with at

9  Christie's and whatnot, by far contemporary art is the most

10  volatile.  It has the highest returns, but it is the most

11  volatile, so it had a correction in 1990 and '91, and it had

12  a significant correction in 2008 to 2009.  And it tends to

13  suffer a correction in the range of 50 percent.

14  Q   Okay.  I think in the last chart we looked at the -- that

15  sector, too, suffered a decline from 2007 to 2009.  Do you

16  recall that?

17  A   Yes, I do.

18  Q   Was the decline in the post-war and contemporary sector

19  more pronounced from 2007 to 2009?

20  A   Yes.

21  Q   How so?

22  A   Well, it -- as I said, it was -- the indices that we had

23  at the time indicated a 50-percent decline in the index in

24  that period whereas impressionist and modern art and old

25  masters were showing declines in the range of 25 or 30

1  percent, so not nearly as bad as this.  And as a general

2  rule, the further back in time a sector goes in history, the

3  less volatile it gets, so while post-war and contemporary is

4  the most volatile, impressionist and modern is less volatile,

5  and old masters is less volatile than that, so it tends to

6  follow chronology.

7  Q   All right.  With that background in mind, sir, let's turn

8  our attention to your valuation of the Detroit Institute of

9  Arts collection in this case.

10 A   Okay.

11 Q   All right.  When did you begin your evaluation of the DIA

12 collection?

13 A   In late May of 2014.

14 Q   What did you know about the DIA at the time you accepted

15 this engagement?

16 A   I knew it was a world-class institution considered by

17 many to be one of the top five or so museums in the country;

18 that it was an encyclopedic collection; that it had some

19 astonishing works of art, of course, the Bruegel, but also

20 the Gates of Ishtar, a gate from the Gates of Ishtar, a tile

21 from the Gates of Ishtar, of course, the Diego Rivera room, a

22 phenomenal American paintings collection, one of the best old

23 master paintings collection in America, a great German

24 exhibitionist collection, so it was -- I knew it to be a fine

25 institution.

1    Q   Are you aware or were you aware at the time of any prior

2    example of a museum collection of this quality and

3    significance being sold to the marketplace?

4    A   No.  I had never heard of anything even remotely close to

5    this ever happening.

6    Q   Did you become aware at the time or were you aware that

7    Christie's had performed an appraisal of some portion of the

8    DIA collection?

9    A   I was aware of that, yes.

10   Q   Okay.  Did you incorporate that work in connection with

11   your own analysis?

12   A   We did.  We looked at it closely, and also having worked

13   at Christie's and known many of the -- and knowing many of

14   the people who worked on that appraisal and knowing their

15   practices and having reviewed it, we felt that it was a sound

16   ingredient in our evaluation of the collection.

17   Q   And what did you understand Christie's to have done in

18   connection with their work?

19   A   Well, that they had used a market data approach.  They

20   had, whenever they could, examined the works in person and

21   that they created a fair market value appraisal.  And, you

22   know, one of the things that appealed to me about Christie's

23   values -- and it was the approach that we were to take -- was

24   that Christie's has their -- unlike sort of a random

25   appraiser who may not be close to market activity, Christie's

1  has their finger on the pulse of the market, so when it comes

2  to valuing something like the Bruegel, the example that Ms.

3  Fusco gave in terms of the calculations of comparing the

4  Reubens and "The Card Players" was exactly the kind of logic

5  that's required for a sophisticated valuation like this.

6  Q    Okay.  So were you provided the Christie's data then?

7  A    Yes, we were.

8  Q    Okay.  And what did you do with it?

9  A    The way Christie's had done it in terms of phase one,

10  phase two, phase three was a little confusing for our

11  purposes, so we recast the data and recast it into bands of

12  value.

13  Q    What were those bands?

14  A    We cast it into what we call high-value property starting

15  with a low estimate of 750,000 under the assumption that in

16  the art world generally a million dollars is considered to be

17  the threshold for an important work of art, and by using a

18  750 low estimate, that basically was capturing that million

19  dollar mid-estimate.  And then we segregated the rest of the

20  property from 750 below into sectors and into value bands

21  within sectors, so there were probably roughly about five or

22  six value bands from zero to a thousand, a thousand to 5,000,

23  five to 50,000, and on up to 750,000.

24          MR. IRWIN:  Your Honor, I am reminded that I did not

25  offer City Exhibit 653 for demonstrative purposes.

1          MR. SOTO:  No objection as a demonstrative, your

2     Honor.

3          THE COURT:  All right.  It is admitted.

4       (City Exhibit 653 received at 4:15 p.m.)

5          MR. IRWIN:  Sorry for that interruption.

6     BY MR. IRWIN:

7     Q   You were describing how you broke down the Christie's

8     data into value bands.

9     A   Correct.

10    Q   All right.

11         MR. IRWIN:  Can we publish, please, City Exhibit

12    665?  There we go.

13    BY MR. IRWIN:

14    Q   Do you have that in front of you, sir?

15    A   Yes, I do.

16    Q   Sir, is this a table that you prepared?

17    A   Yes, it is.

18    Q   And what does it purport to show?

19    A   It shows that of -- when we divided the Christie's into

20    these different groups, the Christie's COD property, we

21    determined that there were 68 objects that were greater than

22    750,000 with a low estimate of 427 million and a high

23    estimate of 812 million and that there were 1,654 works below

24    750,000 that totaled 27 million in the low estimate and 54

25    million in a high estimate.  Then there was a group of

property that we felt was statistically significant for the
analysis that had been treated a bit somewhat dismissively in
the letter that Christie's sent, but we felt that it was
representative of a museum's collection, and, indeed, Ms.
Fusco more or less validated that in her testimony about the
low value property in a collection, and that was that they
had 1,038 items which they assigned a value to of effectively
zero, meaning somewhere between a thousand and zero.

Q   Did that surprise you?

A   No, not at all because, like the example we showed of the
transaction volume in the art market, there is a high
propensity for value at the low end, and their museums often
have items in their collection that have no commercial value
but are there for scholarly reasons or sentimental reasons or
historical reasons but really are not desirable on the
auction market.

Q   Okay.  Now, I notice in the first row you've got high
value works greater than 750, then lower than 750.  Do you
see that divider?

A   Yes.

Q   What was the significance of $750,000 as a --

A   As a threshold?

Q   Correct.

A   Yes.  Well, as I was saying earlier, the million dollars
is considered to be the break point for what is an important

1   work in the art market and what is not.  It's a generally

2   accepted principle.  Sotheby's and Christie's report their

3   sales over a million dollars as a matter of pride, and so to

4   capture that, because Christie's had used an estimate range,

5   we made the cutoff 750,000 because that would mean that that

6   was a mid-range of the hundred -- of $1 million, so that

7   basically enabled us to capture everything that we felt was

8   around a million dollars in value.

9   Q    Okay.  And did you understand the Christie's valuation to

10  purport to include anything about sale conditions?

11  A    No.  We understood that each of these values was assigned

12  in isolation and a value just taken at a point in time and

13  not taking into account any impact of a sale or sale

14  conditions or volume discounts or any sale conditions or

15  economic conditions that might apply.

16  Q    By the way, did you do anything to corroborate or cross-

17  check any of the Christie's valuations?

18  A    Yes.  We reviewed them and looked at them and found them

19  to be acceptable.

20  Q    Okay.  What did you do next structurally in terms of your

21  analysis?

22  A    Well, we then solicited from the museum a list of

23  property that they felt was in excess of a million dollars

24  and got a list from them of approximately 420-some items, of

25  which 68 Christie's had already appraised, which left us with

1  a net grouping of about 350, which we decided we would

2  evaluate in the same manner that Christie's did using the

3  market data approach and setting a fair market value and a

4  range of values.

5  Q   Okay.  So why did you ask for a list of any type

6  reflecting works of art valued at a million dollars or more?

7  A   We felt it was the most logical way to attack the

8  collection to look at where the value would be concentrated

9  because as in most collections and as was borne out with the

10  Christie's appraisal, the highest concentration of value in

11  the collection would be in the high value items.

12  Q   And so were you trying to -- was Artvest going to

13  appraise in the manner that Christie's did high value items

14  that were not COD purchases?

15  A   Correct.  So we were comparing apples to apples.

16  Q   And how did you go about doing that?

17  A   I hired a team of four specialists, consulting

18  specialists, one with expertise in American paintings -- in

19  the sectors where the most -- the largest holdings were, one

20  in American paintings, one in European paintings, and another

21  in old master paintings, and then a separate specialist for

22  objects.

23  Q   And did you visit the museum in order to carry out that

24  assignment?

25  A   Yes, we did.

1    Q    Okay.  And did you go with the specialists?

2    A    Yes.

3    Q    Okay.  And how did you go about valuing these pieces with

4    your specialists?

5    A    Well, we examined them physically, though, just as

6    Christie's did, we did not take them off the wall.  We did

7    not disrupt the museum.  We were very conscious not to do

8    that.  We went during normal business hours or normal museum

9    hours.  We did not trouble the staff.  So we looked at what

10   was on view.  We did not remove anything from the wall or out

11   of a case.  And we then looked for comparables.  We had a

12   master database which we all had access to on Google

13   documents, and we sourced comparables through Artnet and

14   Artinfo and Askart, and then we looked at those comparables

15   and had various conversations about what those prices should

16   be and various factors and specifically instances where there

17   were one of a kind items that there were no comparables for,

18   which is often the case when you get into museum collections,

19   and then set a value for those 350 items.

20   Q    How does your methodology compare with, say, the

21   methodology that Christie's employed?

22   A    It's our sense that it was essentially identical.

23   Q    Okay.

24        MR. IRWIN:  Your Honor, I'm going to put a new

25   demonstrative up, but before I do, I'd like to offer for

1  demonstrative purposes City Exhibit 665.

2          MR. SOTO:  For demonstrative purposes, no objection.

3          THE COURT:  Thank you.  It is admitted.

4      (City Exhibit 665 received at 4:22 p.m.)

5          MR. IRWIN:  So can we put up, please, City Exhibit

6  666?

7  BY MR. IRWIN:

8  Q   You have that in front of you?

9  A   Yes, I do.

10 Q   What is contained in City Exhibit 666?

11 A   This is the objects other than what Christie's did added

12 to what Christie's did to come to a total valuation, and I

13 can go through it line by line.

14 Q   Well, let's do it together.  Let's start toward the

15 bottom.  You've got an entry.  It says "Total COD property,

16 2,773."  Do you see that?

17 A   Yes.

18 Q   Okay.  What line -- what values do you -- are you

19 assembling in that line?

20 A   That is the -- that is the total valuation for Christie's

21 appraisal that they submitted to the city and with their low

22 estimate for the 2,773 items of 454 million and a high

23 estimate of 866 million.

24 Q   Okay.  Now let's move up to toward the top, and it says,

25 "Artvest evaluation of works greater than $750,000."  Do you

1    see that?

2    A    Yes.

3    Q    That line has -- for object numbers it has 350.  Do you

4    see that?

5    A    Correct.

6    Q    Is that the process that you've been describing?

7    A    Yes; correct.

8    Q    Okay.  And are those the values in the aggregate that you

9    assigned in connection with that exercise?

10   A    They are.  They are.

11   Q    The next line says "Additional 73."  What is that line in

12   reference to?

13   A    When we visited the museum, we didn't want just to rely

14   on the data that the museum had given us.  We wanted to do a

15   cross-check of what was there to make sure that we weren't

16   leaving important objects out, so we took photographs of

17   those things that we suspected were of higher value that were

18   not included in the list that the DIA gave us, and that came

19   to 73 items.  And so we then -- but as that came so late in

20   the process, in terms of filing this report, we had not yet

21   finished doing an evaluation of all of these, so by the time

22   we filed this report, we put in an estimated number for those

23   extra 73, which was this number of 80 million to 164.

24   Q    Okay.  So this chart actually came from your report; is

25   that right?

1  A   Correct.

2  Q   Okay.  At the time you provided your report, you had

3  identified these 73, but you hadn't finished the

4  valuations --

5  A   Correct.

6  Q   -- is that right?

7  A   Correct.

8  Q   When you finished the valuations, how did those compare

9  with the 80 million and 164 million low and high estimates?

10  A   It was slightly lower than the low and a good bit lower

11  than the high.  It came in to about 70 million for the low

12  and about 120 million for the high.

13  Q   So are the actuals lower or higher than what is provided

14  here in this line?

15  A   The actuals are lower than what's provided there.

16  Q   All right.  So that brings us to -- I see that you

17  subtotaled that on the next line, but there's a line that

18  says "remaining DIA."  Do you see that?

19  A   Correct, yes.

20  Q   It's got a little more than 57,000 items in it.

21  A   Right.

22  Q   How did you approach the remaining items at the DIA that

23  were not individually appraised?

24  A   Well, this we gave considerable thought to as to what

25  would be the most supportable and logical way to go about

this since with that many items you couldn't conduct a hands-
on appraisal or a valuation, so we knew that we had to do
this statistically or mathematically, so we needed to find
something that we could connect to the collection that was
logical.  At an early stage, we looked at using data from
Sotheby's, Christie's sales, but we rejected that because we
felt that there was no logical connection as to what they
were selling on an annual basis as to what was in the
collection.  Where we actually settled on was using the
Christie's data because the Christie's data was actually a
statistically significant sample being, you know, 3,000
objects, including the ones that had no value, and they were
broken out by sector.  So we got a -- we got Christie's to
supply us with a native file of their appraisal, which I
mentioned earlier, and we divided it into sectors and into
what we'd refer to as price bands or lot bands in the art
world, and -- that I mentioned earlier from zero to one to
one to five to five to 1,000, and then we also got a data
download from the DIA of their sectors, and we eliminated all
of the items in the DIA collection that were in excess of
750,000, which had already been accounted for in the hands-on
inspection.  And then we extrapolated the weighted averages
from the Christie's data by sector and applied that to the
DIA data by sector, and this -- these are the numbers that
we -- that resulted from that calculation.

1  Q   Let's unpack that a little bit.  So you started with a --

2  the Christie's data; is that right?

3  A   Correct.

4  Q   And the Christie's data reflected a sampling of the

5  actual DIA collection; is that right?

6  A   Correct.

7  Q   Okay.  I think you testified you also received a listing

8  of the remaining 57,000 objects from the DIA.

9  A   Correct.

10  Q   Were you able to break down each group into corresponding

11  sectors?

12  A   Yes.

13  Q   Okay.  So then what did you do?  Let's assume you had one

14  sector as an example, as a hypothetical, in a Christie's

15  sampling.  You had a corresponding sector in the DIA.  What

16  did you do within that sector of the Christie's data before

17  applying it to the DIA sector?

18  A   So let's say the Christie's American sector had ten works

19  of art in it, and it would have two works of art below a

20  thousand dollars.  It would have one work of art between

21  1,000 and 5,000.  It would have three works of art between

22  5,000 and 50,000.  It would have then the balance maybe

23  between 500 and 750,000.  We would then take that same

24  percentage and apply it to the breakdown of the American

25  sector in the DIA collection.  So if you had ten items in the

1  American sector in the Christie's data, you might have a

2  hundred items in the DIA data, so then you would apply the

3  values in those different lot bands to -- from Christie's to

4  the same -- to the number of objects in the --

5  proportionately in the Detroit collection.

6  Q    So were you able by these value bands in the Christie's

7  data to determine where in the DIA data -- the number of

8  objects that would be within those value bands?

9  A    Yes; correct.

10  Q    And how did you determine the multiplier that would be

11  used to those DIA value bands?

12  A    They were taken from the estimates for those bands in the

13  original Christie's data, and then they were projected onto

14  the same bands in the DIA data.

15  Q    Did you account in your consideration of the Christie's

16  data for one sector as the example we've described?  Did you

17  account for the fact that Christie's found so many objects as

18  to which there was no commercial value?

19  A    Yes.  They were in the zero to 1,000 band.

20  Q    Okay.  And so it was that same arithmetic used in terms

21  of projecting --

22  A    Correct.

23  Q    -- onto the DIA collection?

24  A    Correct.

25  Q    I think you said the value bands in the Christie's

1  sampling -- I didn't hear you say there were any value bands

2  above $750,000.

3  A    There were not, no, because --

4  Q    Why was that?

5  A    Because that was accounted for in the hands-on appraisal.

6  That would have been double counting.

7  Q    In what sense?  Can you explain that?

8  A    Well, we had -- Christie's had -- we had separated the

9  Christie's appraisal above 750, and we had also done our own

10 analysis of 750, so it would have distorted the numbers if we

11 had included any of those in those calculations because we

12 were trying to assign the value to everything in the DIA

13 collection below 750, so we needed to use numbers below 750.

14 Q    To your satisfaction in terms of the remaining 57,000

15 pieces, had you already accounted for the high value items?

16 A    Yes.

17 Q    So then why would it be appropriate to include high value

18 items in the multiplier that you were going to use to those

19 sections?

20 A    Well, it wouldn't have been because it would have

21 distorted the numbers, and at such a large multiple of 57,000

22 objects, it could have a hugely distorting effect on the

23 valuation.

24 Q    Did you consider any other -- well, let me ask you this.

25 Are you comfortable with the results that you reached in

1  connection with this analysis?

2  A   Yes, we are, because we felt that the City of Detroit

3  property valued by Christie's was not only logical but also

4  if it had a bias would have a bias on the high side because

5  the City of Detroit property was most likely purchased

6  strategically whereas the rest of the collection that had

7  been given with gifts and had been acquired -- I wouldn't say

8  randomly but in an ad hoc basis by curators, some of it for

9  educational purposes and scholarship, probably would have an

10  even higher number of low value items than City of Detroit

11  property would, so we felt that this was a fair -- the

12  fairest representation of the collection.

13  Q   Did you consider any other possible approaches in terms

14  of valuing these 57,000 items?

15  A   We did.  We did another cut just using a straight

16  unweighted average from all of the Christie's property below

17  750,000, and it resulted in a radically lower number, which

18  made us comfortable with this number that this was probably

19  the right number to work with.

20  Q   What was the radically lower number that your other

21  approach came in with?

22  A   It came in with a number of 90 million to 200 million.

23  Q   Instead of the 650 million to almost --

24  A   Correct.

25  Q   -- 1.3 billion --

1  A  Correct; correct.

2  Q  -- it came in at what number?

3  A  90 million to a hundred -- to 200 million.

4  Q  And you chose not to use that approach?

5  A  Yes, because we felt using the weighted average approach

6  really was a more balanced approach and was probably more

7  reflective of what's in the collection.

8  Q  Did you consider using Christie's or Sotheby's sales data

9  as an alternative approach for this?

10 A  We did.  We looked at it for about an hour and dismissed

11 it fairly quickly because there was -- there were two flaws

12 with it.  One was that there was no logical connection

13 between what is sold at Sotheby's and Christie's in any one

14 year and what is actually in the DIA collection.  And the

15 other was that you can't break out the high value items from

16 the Sotheby's and Christie's data, so if you're using the

17 average value of the Sotheby's and Christie's data, you're

18 actually creating an aggressive or excessively high average

19 because you're including in that hundred million dollar sales

20 and ten million dollar sales and all those things above

21 750,000, which we're trying to exclude.

22 Q  Okay.  Does City Exhibit 666 -- does this contain your

23 conclusions as to the indicative value of the total DIA

24 collection?

25 A  Yes, it does.

1   Q    And you've got a low estimate and a high estimate.  Do

2   you see that?

3   A    Yes.

4   Q    And then the third column says mid-estimate.  Is the mid-

5   estimate a separate analysis, or is this some sort of

6   arithmetic calculation?

7   A    It's just an arithmetic calculations, the midpoint

8   between the low and the high.

9   Q    Okay.  Do these baseline valuations that are in City

10  Exhibit 666, do they assume anything about sale conditions?

11  A    No.  They're the -- they are the same as the Christie's

12  evaluation.  They are taking a value at a point in time in

13  isolation of anything that's going on in the marketplace and

14  any sales factors or volume discounts or any factors that

15  would affect the marketplace.

16  Q    Is there anything about your analysis or the conclusions

17  that are depicted in City 666 that speak to whether the city

18  could actually sell these items?

19  A    No.  It does not consider clarity of title or

20  restrictions by donors or anything like that.  None of that

21  is taken into account here.

22  Q    Okay.

23         MR. IRWIN:  Your Honor, at this time, we would offer

24  City Exhibit 666 for demonstrative purposes.

25         MR. SOTO:  No objection as a demonstrative.

1          THE COURT:  May I call your method the weighted
2    average method?

3          THE WITNESS:  Sure.

4          THE COURT:  Does it have any other name?

5          THE WITNESS:  I don't have another name for it.

6          THE COURT:  Is this a method that is generally used
7    and relied upon in the expertise of evaluating museum or
8    privately held collections?

9          THE WITNESS:  Such an evaluation has never been done
10   before of this magnitude, and --

11         THE COURT:  In that event, counsel, you need to
12   establish its reliability by some other means.

13         MR. IRWIN:  Your Honor, are you speaking directly to
14   the 57,000 --

15         THE COURT:  Yes.

16         MR. IRWIN:  -- piece component of it?

17         THE COURT:  Yes.

18         MR. IRWIN:  Okay.

19         THE COURT:  The rest of it is just Christie's
20   rejiggered; right?

21         MR. IRWIN:  Well, in Artvest's calculations.
22   There's a Christie's component to it and an Artvest
23   independent appraisal component.

24         THE COURT:  Okay.  Fair enough, but, yeah, it's the
25   remaining DIA 57,181 that has been the subject of this

1  weighted average approach, right, sir?

2          THE WITNESS:  Yes.

3          MR. IRWIN:  May I offer the -- may I offer the

4  exhibit for demonstrative purposes for those other aspects of

5  it, your Honor?

6          THE COURT:  Yes.

7          MR. IRWIN:  Okay.

8          THE COURT:  What was the number again?

9          MR. IRWIN:  666.

10         THE COURT:  All right.  So except for the line that

11 says "remaining DIA," the document will be admitted for

12 demonstrative purposes.

13     (City Exhibit 666 received at 4:37 p.m.)

14 BY MR. IRWIN:

15 Q   Mr. Plummer, I do want to ask you some more questions

16 about this, but let me ask you something else first.  You've

17 got low estimates and high estimates on this chart.  Do you

18 see that?

19 A   Yes.

20 Q   We're talking about the mid-estimate.

21 A   Yes.

22 Q   Do you see that?  And that's an arithmetic calculation?

23 A   Correct.

24 Q   Is that what you said?  Okay.  Did you reach an opinion

25 or did you have occasion to reach an opinion as to whether

1  the high estimate in connection with this exercise was more
2  or less likely?
3  A   Because of the conditions in the marketplace that we
4  discussed earlier with most of the categories in which the
5  DIA's collection is held, meaning everything other than
6  contemporary art, that it was highly unlikely that the high
7  estimate would be hit because that pretty much assumes that
8  every work of art has to hit the high estimate, whereas most
9  of the collection of the DIA is in sectors other than post-
10  war and contemporary where property is selling at or around
11  the low estimate.
12  Q   Okay.  We talked about some of the -- the performance of
13  some of these sectors earlier, I believe.
14  A   Right.
15  Q   Do you recall that?
16          MR. IRWIN:  Could we publish, please, City Exhibit
17  649?
18          THE COURT:  Before we do that, leave this one up,
19  please.  Am I correct in interpreting this chart that the
20  bottom line where it says "Total DIA Collection" includes the
21  line that says "Remaining DIA"?
22          THE WITNESS:  Correct.
23          THE COURT:  Then I can't admit that as a
24  demonstrative either.
25          MR. IRWIN:  We have admitted, I think, the first

1  two --

2          THE COURT:  First two.

3          MR. IRWIN:  What's highlighted in yellow.

4          THE COURT:  Yeah, yeah.  The first two lines that

5  are highlighted in yellow, I'll admit those as

6  demonstratives.

7          MR. IRWIN:  Okay.

8  BY MR. IRWIN:

9  Q   Mr. Plummer, have you had a chance -- I think we were

10 talking about whether you had a chance to consider as to

11 whether the high estimate in your valuation as a concept

12 is --

13 A   Right.

14 Q   -- likely to be realized in this case.

15 A   Right.

16 Q   Okay.  Could we look at Exhibit -- City Exhibit 649?  Do

17 you have that in front of you, sir?

18 A   Yes, I do.

19 Q   And what is it that is purported -- what is purported to

20 be depicted in 649?

21 A   This shows -- the bar is the hammer price, and the red

22 dot is the low estimate, and the dark dot is the high

23 estimate.  And the chart on the left -- the bar on the left

24 is impressionist and modern art, and the chart on the right

25 is post-war and contemporary.  And this is a pretty

1  consistent trend now.  This happened in May 2013 and happened
2  as recently as 2014, the most recent sales, where the post-
3  war and contemporary sales are far exceeding their high
4  estimates and the impressionist and modern sales are either
5  just meeting their low estimates or just barely exceeding
6  them.
7  Q   Okay.  And I think you said this chart is -- this is
8  Christie's data for May 2013 evening sales.
9  A   Correct.
10 Q   Do you see that?
11 A   Correct.
12 Q   What is the significance of May 2013?  Did you pick it
13 for a particular reason?
14 A   Yes.  It is an ongoing trend.  It happened back then, and
15 it has happened most recently in May 2014.  Both sales at
16 Sotheby -- of impressionist and modern art and post-war and
17 contemporary art were good quality art that was fresh to the
18 market.  They both had strong attributes, but the one market
19 is -- the post-war and contemporary is very aggressive, and
20 the impressionist and modern market has become very
21 selective.
22 Q   And I was focusing more on the date.  Is there a reason
23 for May of 2013?
24 A   Oh, yeah.  The evening sales at Sotheby's and Christie's,
25 which are the bellwether of the industry, are held every year

in the first two weeks of May and the first two weeks of

November, and those are the -- those are the biggest sales of

the year and the ones that market watchers observe to see how

the industry is faring.

Q    And so the chart on the right, this is post-war and

contemporary on the right.  That's something we've talked

about before; is that right?

A    Um-hmm, yes.

Q    And what is depicted on the left?

A    On the left is impressionist and modern art.

Q    And what conclusions do you draw about the performance of

impressionist and modern at these evening sales in May 2013?

A    That most of the art that is being sold there is selling

at close to the low estimate.

Q    Okay.  Does the -- have you done an investigation as to

whether other sectors performed in May 2013 more like

impressionist and modern or post-war and contemporary?

A    Most other sectors are performing in the same fashion as

impressionist and modern art.

Q    And how does that relate to your opinion as to whether

the sale of the -- a potential sale of the DIA collection

would hit low or high estimates?

A    Well, the percentages of the collection in the DIA are

mostly in noncontemporary areas, so that would give me an

expectation that that property would likely sell at or around

1 the low estimate and not near the high estimate. Perhaps the

2 post-war and contemporary sector would, but most of the other

3 art would not.

4 Q   Okay.  And this was in May of 2013?

5 A   Right.

6 Q   Okay.  Can we -- this is not in your binder but I would

7 like to put on the screens for you.

8          MR. IRWIN:  Can we please publish City Exhibit

9 Number 460?  Yeah.  I'm reminded I should offer, your Honor,

10 City Demonstrative Exhibit 649.

11          THE COURT:  Which one was that, sir?

12          MR. IRWIN:  It was the chart that we were just

13 looking at, the May 2013 evening sales.

14          THE COURT:  All right.  Please put it back up.

15 Thank you.  Sir, can you tell me again what the bar

16 represents?

17          THE WITNESS:  Sure.  The bar is actually the sale

18 results, the hammer price, what was referred to as the hammer

19 price without buyer's premium, and -- in each case, and then

20 the red dot is the low estimate, and the dark dot is the high

21 estimate.

22          THE COURT:  So these are aggregates for all of the

23 sales?

24          THE WITNESS:  These are aggregates for the sales at

25 Christie's New York on those days, evening sales.

1     THE COURT:  Thank you.  Any objections?

2     MR. SOTO:  Not as a demonstrative.

3     THE COURT:  All right.  It is admitted.

4     (City Exhibit 649 received at 4:44 p.m.)

5     MR. IRWIN:  All right.  Can we pull up City Exhibit

6     460, please?  And then I'd like to -- and then I think we

7     need to go to page 9 of this document.

8     BY MR. IRWIN:

9     Q    Mr. Plummer, do you have this chart in front of you?

10    A    I do, yes.

11    Q    Does this chart come from your report?

12    A    Yes, it does.

13    Q    Okay.  What does Chart 6 in your report purport to

14    represent?

15    A    The same thing in comparison of auction results versus

16    hammer price auction results for May sales in 2014.  The bar

17    represents the aggregate results for the hammer price and

18    then the bottom dot the low estimate and the higher dot the

19    high estimate.

20    Q    Okay.  So this is a -- is this a similar chart from what

21    we just saw --

22    A    Yes; correct.

23    Q    -- just repeated in 2014?

24    A    Correct.

25    Q    And what do you -- what conclusions do you draw about the

1  performance of the post-war and contemporary sector?

2  A   Again, that it is exceeding its estimates and, as you

3  can -- as you might compare it to the other one, that it's

4  actually growing, so these sales are growing each year, and

5  that the impressionist and modern sales are performing around

6  their low estimate, below or slightly above.

7  Q   Now, this was -- this particular chart was included in

8  your report when it was prepared; is that right?

9  A   Correct.

10 Q   Have you had any reason to investigate further the data

11 that informed the bar graph on the left side, the

12 impressionist and modern?

13 A   Yes.  After we submitted the report, we issued a

14 correction because there was some data missing, some sales

15 results missing for the impressionist and modern sale, but it

16 didn't materially change the impact.  The number was actually

17 250 million, so it was the hammer price, so it was slightly

18 above the low estimate rather than slightly below, but it

19 still was far off of the high estimate.

20 Q   So for 2014, you would need to correct the bar on the

21 left, and you would have to raise it and bring it, what, just

22 inside that 230 --

23 A   Correct.

24 Q   -- $230 million figure?

25 A   Correct, but very far away from the high estimate of 481

1  million.

2  Q   Okay.  And how, if at all, does this chart, the data

3  reflected in this chart, relate to your opinion as to whether

4  or not the DIA would achieve high estimates or low estimates?

5  A   Well, again, as the preponderance of the collection is in

6  sectors like impressionist and modern art that are performing

7  around their low estimates, that -- we feel that using high

8  estimates in the evaluation would not be the correct way to

9  go.

10  Q   Are other market sectors performing more like

11  impressionist and modern or post-war and contemporary in

12  terms of evening sales?

13  A   All sectors are performing other than post-war and

14  contemporary like impressionist and modern.

15  Q   Including with regard to whether or not they're hitting

16  low estimates or high estimates at evening auction sales?

17  A   They're hitting either low estimates or in between the

18  low and the highs --

19  Q   Okay.

20  A   -- or below the lows.

21  Q   Have you had a chance to consider the profile of the art

22  collection at the DIA and analyze it by market sector?

23  A   Yes, I have.

24  Q   Okay.

25        MR. IRWIN:  Could we please put up City Exhibit 664,

1  please?

2  BY MR. IRWIN:

3  Q    Do you have City Exhibit 664 in front of you?

4  A    I do.

5  Q    What does City Exhibit 664 purport to represent?

6  A    It purports to show the value of the DIA collection by

7  category.

8  Q    Where did you get the -- well, first of all, did you

9  prepare this chart?

10  A    Yes.

11  Q    And where did you get the data to create the chart?

12  A    This was data combined from Christie's and from the DIA

13  to come up with a master data file that -- with a value on it

14  that segregated these by sector.

15  Q    I know it's hard to read.  It's certainly hard for me to

16  read from here, but where are the -- where are the -- where's

17  the DIA collection concentrated?

18  A    It's concentrated with 28 percent in European paintings

19  or what we'd refer to in the auction world as old masters,

20  19th century, into European modern art to 1950, which would

21  actually also include impressionist and post-impressionist,

22  and that's 24 percent.  American art before 1950 is 15

23  percent, and then the area of the market that's quite hot is

24  16 -- is contemporary art, which is 16 percent.

25  Q    And what about the -- what is in the balance of the DIA

1  collection?

2  A    The balance of the DIA collection is more the decorative

3  arts, and the only other area that might fit -- have a

4  characteristic similar to contemporary art would be Asian

5  art, which is only three percent of the collection, but that

6  collection is not necessarily of the caliber that collectors

7  are looking for right now, so I'm not sure I would propose

8  that it have the same aspects of contemporary art.

9  Q    So how much of the profile of the DIA collection, if this

10 were contemplated for sale in a commercial marketplace, how

11 much of it is in a part of the art market that is performing

12 strongly right now?

13 A    Only 16 percent.

14 Q    And which portion is that?

15 A    That's the contemporary art after 1950.

16 Q    The purple section of the --

17 A    Right.

18 Q    -- pie chart?

19        MR. IRWIN:  Your Honor, at this point, I would move

20 City Exhibit 664 into evidence as a demonstrative.

21        MR. SOTO:  No objection as a demonstrative.

22        THE COURT:  It is admitted.

23     (City Exhibit 664 received at 4:50 p.m.)

24 BY MR. IRWIN:

25 Q    Have you had occasion to track the performance of these

1   particular market sectors, the market sectors that correspond

2   to the DIA profile over time?

3   A    Yes, I have.

4   Q    Okay.  And do you have any visuals to support that?

5   A    Yes, I do.

6   Q    Okay.

7          MR. IRWIN:  Okay.  Can we please publish City

8   Exhibit 661?

9   BY MR. IRWIN:

10  Q    You have that, City 661 --

11  A    Yeah.

12  Q    -- in front of you?  What is City Exhibit 661?

13  A    This is the Mei Moses Art Index, and it is tracking

14  performances of four sectors from 2003 through 2013, a ten-

15  year period, and it shows you -- just to clarify, the blue

16  line is the American sector before 1950.  The dotted green

17  line is impressionist and modern sector.  The black line is

18  old masters and 19th century, and the dotted gold line --

19  orange line is post-war and contemporary.  And as you can

20  see, they all suffered in the downturn of 2008 to 2009,

21  though, as we discussed earlier, post-war and contemporary

22  suffered the most, but since that downturn, they have

23  recovered at different paces.  Post-war and contemporary has

24  not only regained the old ground but has gone far beyond it.

25  Impressionist and modern declined less and has regained the

1 ground but has stagnated or stabilized. And old masters and

2 American paintings have not yet recovered fully from the

3 downturn in 2008 and have actually shown some decline since

4 2012.

5 Q   Do these four lines -- do the four lines that are

6 depicted in City Exhibit 661, do they bear any relation to

7 the four principal sectors that we saw on the pie chart for

8 the DIA profile?

9 A   Yes.  This is where a high preponderance of the DIA

10 collection is held in these sectors.

11 Q   And when you say "in these sectors," do you mean in all

12 four of these sectors?

13 A   Yes.

14 Q   Okay.  Among those four sectors, how much is post-war and

15 contemporary, which is the dotted red line?

16 A   I believe it was 16 percent, if I remember correctly.

17 Q   And how much of the DIA collection is represented by the

18 other three lines, by the blue line, the black line, and the

19 dotted green line?

20 A   I can't remember off the top of my head, but it's maybe

21 80 percent or 60-some percent.  It's a very significant

22 number.

23 Q   And so for -- let's take a look at one of these other

24 lines.  The American before 1950, do you see the blue line on

25 the chart?

1  A   Yes.

2  Q   Okay.  What conclusions have you drawn, if any, about the

3  trend line of American art before 1950?

4  A   Well, that market is actually suffering worse than all of

5  them because its collector base is dying off, and young

6  collectors are moving into post-war and contemporary.  Old

7  masters has a similar sort of problem but is a little less

8  extreme because it's collected internationally.  Excuse me.

9  And impressionist and modern is not quite as severely hit as

10 the other two.

11 Q   By the way, is this a chart that you prepared personally?

12 A   No.  It was prepared by Mei Moses Art Indices.

13 Q   And who is -- who or what is Mei Moses Art Indices?

14 A   Michael Moses and Jianping Mei have this index, which is

15 now widely used by finance people and others to track the art

16 market.  It's a repeat sales index.

17 Q   And did you -- where did you get the -- did they produce

18 a chart just like this, or did you get the data from them?

19 A   No, no.  They produced the chart.

20 Q   And I just want to be clear, Mr. Plummer.  When you talk

21 about the valuation, do you mean from a commercial

22 perspective or from other perspectives?

23 A   I mean from a commercial perspective.

24 Q   Okay.

25      MR. IRWIN:  Your Honor, I'm about to move into a

1  large section.  I'd be very happy to resume tomorrow morning.

2          THE COURT:  Okay.

3          MR. IRWIN:  Yes.  Actually, before we -- thank you.

4  I would like to move in City Exhibit 660 -- well, 661 as a

5  demonstrative.

6          THE COURT:  Any objections?

7          MR. SOTO:  No objection as a demonstrative.

8          THE COURT:  Okay.  Any further business before we

9  adjourn?  All right.

10          MR. IRWIN:  We'd actually -- I'm sorry.  We'd like

11  to move this in as a market report for its truth.  This one

12  is not prepared by the witness.  This is a market report.

13          MR. SOTO:  As a demonstrative, fine, but otherwise

14  it's hearsay.  It's a market report that I'm not familiar

15  with and that they haven't backed up with --

16          THE COURT:  Well, the witness testified as to what

17  it is.

18          MR. SOTO:  Yeah, and that he relied on it, but it

19  had nothing to do with the substantive nature of it.

20          THE COURT:  Well, but he testified that it's a

21  market report that the market relies on.  Didn't you say

22  that, sir?

23          THE WITNESS:  I did.

24          THE COURT:  All right.  The objection is overruled,

25  and the document is admitted for all purposes.

1     (City Exhibit 661 received at 4:55 p.m.)

2          THE COURT:  All right.  So we'll be in recess until

3   tomorrow morning at 8:30.

4          THE CLERK:  All rise.  Court is adjourned.

5     (Proceedings concluded at 4:55 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Ron Bloom | 3 | 37 | | |
| Sue F. McCormick | 41/121 | | | |
| Suzanne Taranto | 102/138 | 161/174 | 175 | |
| Michael Plummer | 176 | | | |

| EXHIBITS: | Received |
|---|---|
| City Exhibit 193 | 57 |
| City Exhibit 205 | 58 |
| City Exhibit 484 | 150 |
| City Exhibit 518 | 120 |
| City Exhibit 525 | 146 |
| City Exhibit 636 | 61 |
| City Exhibit 637 | 61 |
| City Exhibit 644 (demonstrative) | 199 |
| City Exhibit 645 (demonstrative) | 203 |
| City Exhibit 646 (demonstrative) | 206 |
| City Exhibit 649 (demonstrative) | 234 |
| City Exhibit 653 (demonstrative) | 212 |
| City Exhibit 661 | 243 |
| City Exhibit 664 (demonstrative) | 238 |
| City Exhibit 665 (demonstrative) | 217 |
| City Exhibit 666 (demonstrative) | 228 |
| City Exhibit 708 | 157 |
| Oakland County Exhibit 6111 (demonstrative) | 101 |
| Oakland County Exhibit 6112 (demonstrative) | 101 |
| Oakland County Exhibit 6113 (demonstrative) | 101 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    September 23, 2014
_____         _____
Lois Garrett