## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
----------------------------------------------------x
                                    :
In re                               :        Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          :        Case No. 13-53846
                                    :
                        Debtor.     :        Hon. Steven W. Rhodes
                                    :
                                    :
----------------------------------------------------x
```

### CONSOLIDATED REPLY TO SUPPLEMENTAL OBJECTIONS
### TO CONFIRMATION OF THE SEVENTH AMENDED PLAN
### FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

The City of Detroit (the "City") hereby files this consolidated reply

(the "Reply") in support of confirmation of the Seventh Amended Plan for the

Adjustment of Debts of the City of Detroit (Docket No. 7502) (the "Seventh

Amended Plan" or, as it may be further supplemented, modified or amended,

the "Plan"), in accordance with the Order Approving Stipulation By and Between

the City of Detroit, Michigan and Creditors Regarding Adjournment of the Hearing

on Plan Confirmation (Docket No. 7530) (the "Adjournment Order").[1]  In support

of this Reply, the City respectfully represents as follows:

---

[1]     Capitalized terms not otherwise defined in this Reply have the meanings
given to them in the Plan.  The City incorporates by reference into this Reply
all previously filed briefs and other papers in support of confirmation of the
Plan (the "Prior Briefing"), including, without limitation:  (a) the

## PRELIMINARY STATEMENT

1.    A total of nine objections or other papers (collectively, the "Objections") were filed in response to the Seventh Amended Plan by the deadline set forth in the Adjournment Order.  Of these Objections, four assert objections relating to the modifications proposed in the Seventh Amended Plan.[2]

---

Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5034) (the "Consolidated Reply"); (b) the Debtor's Supplemental Brief on Legal Issues Relating to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5707); (c) the Consolidated (A) Pretrial Brief in Support of Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and (B) Response to (I) Certain Objections Filed by Individual Bondholders and Individual Retirees and (II) Supplemental Objections (Docket No. 7143) (the "Pretrial Brief"); and (d) the Consolidated Response to Certain *Pro Se* Objections to Confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7303).

[2]    These Objections consist of the following:  (a) the limited Objection and reservation of rights filed by Wilmington Trust, National Association ("Wilmington Trust") (Docket No. 7603); (b) the Objection filed by Financial Guaranty Insurance Company ("FGIC") (Docket No. 7611); (c) the Objection filed by the Macomb Interceptor Drain Drainage District ("MIDDD") (Docket No. 7612); and (d) the joinder and supplemental Objection filed by certain COPs holders (the "COPs Holders") (Docket No. 7615).  The City requests that the Court overrule the remaining five Objections, which Objections either (a) repeat arguments made in prior objections to confirmation (to which the City has previously responded) or (b) make arguments wholly unrelated to the modifications proposed in the Seventh Amended Plan.  These Objections consist of (a) the Objection of Jamie S. Fields (Docket No. 7523), (b) the Objections of William M. Davis (Docket Nos. 7604, 7608), (c) the Objection of Laurence Aurbach (Docket No. 7628) and (d) the Objection of Dan Headapohl (Docket No. 7629).

2. The City's primary purpose in filing the Seventh Amended Plan is to incorporate into the Plan the terms of the Syncora Settlement. The Syncora Settlement: (a) represents a series of agreements achieved between the City and Syncora after extensive arm's-length negotiations and mediation; (b) provides for Syncora's acceptance of the Plan COP Settlement on account of its Class 9 COP Claims; (c) eliminates substantial amounts of litigation that could obstruct the City's expeditious emergence from bankruptcy; and (d) lays the foundation for a prospective, decades-long partnership between the City and Syncora that could advance a core goal of this Chapter 9 Case (i.e., substantial investment in, and rehabilitation of, City assets) on a mutually beneficial basis.

3. Holders of Class 9 COP Claims can only benefit from the modifications contained in the Seventh Amended Plan; they cannot – and do not – suffer. Specifically, the new Plan COP Settlement offers Class 9 claimants the prospect of a *pro rata* share in (a) $88.4 million in New C Notes and (b) $25 million in Class 9 Settlement Credits. The City estimates that recoveries for Holders of COP Claims that elect to participate in the Plan COP Settlement will increase from a *contingent* maximum of approximately 10% (in the event that the Holders of COP Claims were to prevail in the COP Litigation) to a *guaranteed*

recovery estimated at 13.7%.[3] This potential enhancement is the *only* change made to the treatment of Class 9 COP Claims.

4.      This unambiguous improvement in Plan treatment was greeted with a wave of objections. For example, FGIC – an insurer of the majority of the COPs that stands to gain more from the enhanced recoveries provided Settling COP Claimants than any other party – attacks the Seventh Amended Plan on the grounds that it allegedly provides an unfair recovery to Syncora over other Holders of COP Claims. Of course, this is belied by the plain language of Section II.B.3.p of the Plan, which offers exactly the same treatment to all holders of Class 9 Claims. FGIC (and MIDDD) attempt to argue around this inconvenient fact by alleging that discrete consideration provided to Syncora – consideration that is completely unrelated to Class 9 Claim recoveries – is actually a disguised recovery on account of its COP Claims.

5.      As demonstrated herein, this argument fails. Apart from the treatment of its Class 9 Claims pursuant to the Plan COP Settlement, the Syncora Settlement provides Syncora with (a) $5 million to resolve certain litigation claims

---

[3]      At the September 15, 2014 hearing, the City inadvertently misstated this percentage as 13.9% in one instance, although it had previously stated the correct estimated percentage recovery for Settling COP Claimants of 13.7%. Compare Hr'g Tr. 6:4 Sept. 15, 2014 (stating that the estimated percentage recovery is 13.7%) with Hr'g Tr. 13:3 Sept. 15, 2014 (stating that the estimated percentage recovery is 13.9%).

arising from the COP Swap Documents (i.e., Claims that are not classified in Class 9) and (b) distinct agreements between the City and Syncora on certain long-term redevelopment initiatives (collectively, the "Redevelopment Transactions") that, in the City's business judgment, will contribute significantly to its revitalization. None of the foregoing constitutes a distribution on account of Class 9 Claims, and assertions to the contrary (and Objections founded on such assertions) should be rejected.

6. By concentrating solely on the resolution of Syncora's Class 9 COP Claims pursuant to the Plan COP Settlement and ignoring both (a) Syncora's interest in the City arising out of its separate commercial relationships with the City and (b) the value to the City of resolving Syncora's many litigations relating to this Chapter 9 Case, FGIC and MIDDD misunderstand and mischaracterize that the Syncora Settlement contains several separate elements. Because, at their core, these Objections rely upon a fundamental mischaracterization of the nature and purpose of the Syncora Settlement, they should be overruled.

## BACKGROUND REGARDING THE SYNCORA SETTLEMENT

7. The elements of the Syncora Settlement, and the modifications made to the Plan to incorporate the Syncora Settlement, can be subdivided into three distinct categories. First, to promote the core goals of this Chapter 9 Case and resolve all pending litigation involving the City and Syncora, the parties have

agreed to enter into the Redevelopment Transactions that, in the informed business judgment of the City, will provide the City with various benefits that the City otherwise would be unable to realize. Second, the parties have agreed to resolve Syncora's Class 9 COP Claims pursuant to Syncora's acceptance of the Plan COP Settlement. Third, the Plan provides for the resolution of certain asserted secured and other litigation claims relating to the COP Swap Agreements. Further details regarding each of these discrete elements of the Syncora Settlement are set forth below.

## I.    THE REDEVELOPMENT TRANSACTIONS

### A.    The Tunnel Lease Amendment

8.    Through Detroit Windsor Tunnel LLC (the "Tenant") – a subsidiary of Syncora that is headquartered in Detroit and employs approximately 100 people – Syncora is indirectly party to two leases (together, the "Tunnel Leases") with the City regarding the operation and maintenance of the Detroit side of the Detroit-Windsor Tunnel (the "Tunnel").

9.    The Redevelopment Transactions[4] include the amendment, assumption and extension of the Tunnel Leases.[5] Under the Plan, the Tunnel

---

[4]    The summaries of the various elements of the Syncora Settlement are for descriptive purposes only. In the event of any inconsistency between the definitive agreements and this Reply, the definitive agreements shall control.

[5]    A copy of the proposed First Amendment to Lease with respect to the Tunnel (the "Tunnel Lease Amendment") is included among the documents

Leases, which currently expire in November 2020, will be extended to December 2040. Tunnel Lease Amendment, at ¶ 2. In addition to requiring its continuing operation of the Tunnel, the Tunnel Lease Amendment requires Syncora, through the Tenant, to maintain the Tunnel through increased capital investment therein consistent with a new five-year plan and schedule for such capital expenditures. Id. at ¶ 3(b-c). The Tunnel Lease Amendment also requires greatly improved reporting to the City by the Tenant with respect to, among other things, (a) the Tunnel's financial condition (including results of operations), (b) changes in equity and cash flows of the Tenant and (c) all capital expenditures related to the Tunnel. Id. at ¶ 7. In exchange, the Tunnel Lease Amendment permits Syncora, through the Tenant, to offset certain capital expenditures dedicated to Tunnel improvements against the Tenant's rent obligations to the City. Id. at ¶¶ 3(a), 4(a).

  **B.**  **The Development Agreement**

    10.  The Redevelopment Transactions also include the Option to Purchase and Develop Land (the "Development Agreement") between the City and

---

comprising Exhibit I.A.338 to the Plan. The Tunnel Leases consist of: (a) the Tube Lease, dated March 20, 1978, with respect to the Tunnel itself; and (b) the Sublease, also dated March 20, 1978, with respect to certain surrounding property defined in the Tunnel Lease Amendment as the "Plaza Premises." Tunnel Lease Amendment, at ¶ B.

Pike Pointe Holdings, LLC (the "Developer"), another subsidiary of Syncora.[6]
Under the Development Agreement, for a period of five years following the
Effective Date (which time period may be extended under certain circumstances),
the Developer is granted an option to acquire certain clusters of contiguous parcels
of property within City boundaries (collectively, the "Properties"). Development
Agreement, at ¶ 1(A).

        11.    If and when the option on a particular Property is exercised, the
Developer is required to develop the applicable Property into parking facilities,
residential housing, commercial retail space or another use suitable for the
location, consistent with the City's urban planning policies and the City's
comprehensive development plan. Id. at ¶ 5(A). Such development must begin
within 15 months of the closing date with respect to the Property (the "Closing"),
otherwise the Property will revert to the City, at its option. Id. at ¶ 6(B).
In addition, construction must be completed within 39 months of the Closing. Id.
at ¶ 5(A).

---

[6]    A copy of the Development Agreement is attached as Exhibit I.A.115 to the
Plan.

### C. The Grand Circus Parking Garage Option

12.     The Redevelopment Transactions also include an agreement (the "Option Agreement")[7] between the Developer and the City that provides the Developer, for a period of one year following the Effective Date, with the option to enter into a 30-year concession agreement (the "Concession Agreement") to operate and maintain the Grand Circus Parking Garage (the "Garage"). See Option Agreement, at Ex. 2. If the Developer exercises this option, it assumes the responsibility for all necessary capital expenditures with respect to the Garage, including, without limitation, $13.5 million in capital expenditures during the first five years of the term of the Concession Agreement (the "Initial Capital Expenditures"). Id. Once the Developer has received a return of 140% on the Initial Capital Expenditures, the City shall receive 25% of Garage revenue after operating expenses and other capital expenditures.

## II.     THE PLAN COP SETTLEMENT

13.     Pursuant to the Syncora Settlement, the City and Syncora also resolved the treatment of Syncora's Class 9 COP Claims under the Plan through Syncora's agreement to accept the Plan COP Settlement. Pursuant to the Plan COP Settlement, as of the Effective Date, the Litigation Trust will purchase Syncora's

---

[7]     A copy of the Option Agreement is attached among the documents comprising Exhibit I.A.338 to the Plan.

COP Claims in exchange for (a) $23.5 million in New B Notes,[8] (b) $21.3 million in New C Notes[9] and (c) $6.25 million in Class 9 Settlement Credits.[10]

Importantly, the Plan makes this same treatment – i.e., the Plan COP Settlement – available to all other Holders of COP Claims that opt in prior to the Effective Date. See Plan, at § II.B.3.p.iii.A. Thus, under the Plan, all Settling COP Claimants (and not simply Syncora) shall receive their *pro rata* share of (a) the Class 9 Settlement Asset Pool (which includes up to $88.4 million in New C Notes and $25 million in Class 9 Settlement Credits) and (b) New B Notes in the face amount of $97,690,000. Id. Those Holders of COP Claims that do not opt into the Plan COP Settlement will receive the default treatment for Class 9 Claims (which remains unchanged from the Sixth Amended Plan for the Adjustment of Debts of the City

---

[8]     The approximately $15.4 million of New B Notes that previously had been allocated to the Disputed COP Claims Reserve on account of the disputed Class 9 COP Claims held or insured by Syncora will be distributed among the Detroit General VEBA, the Detroit Police and Fire VEBA and the Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed Other Unsecured Claims.

[9]     The New C Notes are unsecured obligations bearing interest at a rate of 5%. Plan, at Ex. I.A.242. Although the New C Notes mature in 2026, they (a) must be prepaid in the event of certain parking asset dispositions and (b) may be prepaid at the City's option at any time. Id. As part of the Plan COP Settlement, the City has committed to segregate certain parking revenues each year until monies sufficient to meet annual debt service on the New C Notes have been set aside. Id.

[10]    The Class 9 Settlement Credits are assignable, transferable credits that may be applied to offset not more than 50% of the purchase price of a Class 9 Eligible City Asset. See Plan, at § I.A.67.

of Detroit (Docket No. 6908) (the "Sixth Amended Plan")).  See Plan, at

§ II.B.3.p.iii.B.  The Litigation Trust will then litigate the validity of the COPs

(and other related issues), ultimately determining the allocation of the New B

Notes on account of those Claims.

## III.    THE SWAP-RELATED CONSIDERATION

14.    Syncora asserted Secured Claims against the City arising under

the COP Swap Documents in the amount of more than $89 million under various

theories, in addition to Secured Claims in the amount of more than $8 million

associated with fees and expenses incurred with respect to the COP Swap

Agreements and the COPs.  See, e.g., Addendum to Proof of Claim No. 1352, filed

by Syncora Guarantee, Inc., at 1-14.  In addition, Syncora asserted an unliquidated

and unsecured abuse of process Claim arising from the COP Swap Documents.

See id. at 10-11.

15.    On April 15, 2014, the Court entered the COP Swap Settlement

Approval Order (Docket No. 4094) that, among other things, provided that the

liens allegedly securing Claims arising from the COP Swap Documents would be

released upon full payment of the Distribution Amount to the COP Swap

Counterparties.  See COP Swap Settlement Approval Order, at ¶ 14.  The COP

Swap Settlement Approval Order has not become a Final Order, however, because

it is subject to appeal by Syncora, among other parties.  See Syncora Guarantee

Inc. and Syncora Capital Assurance Inc. v. City of Detroit, Michigan (In re City of Detroit, Michigan), Case No. 14-109 (6th Cir.) (the "Syncora Swap Appeal"). FGIC did not appeal the COP Swap Settlement Approval Order.

16.    Pursuant to the Syncora Settlement, the City will pay Syncora the sum of $5 million (the "Swap-Related Consideration") in consideration for Syncora's (a) dismissal of the Syncora Swap Appeal and a related appeal[11] of this Court's order (Docket No. 670) (the "Casino Revenue Order") providing that casino revenues are property of the City and subject to the automatic stay of sections 362 and 922 of the Bankruptcy Code and (b) withdrawal of Syncora's other litigation claims arising from the COP Swap Documents.

## ARGUMENT

17.    By their Objections, FGIC and MIDDD improperly conflate the Redevelopment Transactions and the Swap-Related Consideration with the proposed treatment of Class 9 COP Claims under the Plan and assert that, as a result, the Syncora Settlement provides Syncora with materially favorable treatment relative to:  (a) other COP Claims, in violation of section 1123(a)(4) of the Bankruptcy Code; or (b) other Classes of unsecured Claims, in violation of the prohibition on unfair discrimination set forth in section 1129(b)(1) of the

---

[11]    Syncora Guarantee Inc. and Syncora Capital Assurance Inc. v. City of Detroit, Michigan (In re City of Detroit Michigan), Case No. 14-1864 (6th Cir.) (the "Casino Revenue Appeal").

Bankruptcy Code. In addition, FGIC, the COPs Holders and Wilmington Trust express certain concerns regarding the mechanical implementation of the treatment of Settling COP Claims proposed under the Plan. For the reasons set forth below, these Objections should be overruled.

## I. THE REDEVELOPMENT TRANSACTIONS ARE NOT RELATED TO THE TREATMENT OF CLASS 9 CLAIMS

18. MIDDD and FGIC argue that the purpose of the Redevelopment Transactions is to provide Syncora with additional disguised recovery on account of its COP Claims. Because FGIC and MIDDD's conclusions are based upon flawed assumptions, these Objections should be overruled.

### A. A Plan May Provide a Creditor With Additional or Different Consideration Unrelated to the Creditor's Claim

19. Whether couched in terms of improper disparate treatment of Claims within a Class or unfair discrimination, the fundamental flaw in FGIC and MIDDD's arguments is that they "confuse[] equal treatment of *claims* with equal treatment of *claimants*." In re UNR Indus. Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992) (emphasis in original), rev'd on other grounds sub nom. UNR-Rohn, Inc. v. Bloomington Factory Workers (In re UNR Indus., Inc.), 173 B.R. 149 (N.D. Ill. 1994); see also 7 Collier on Bankruptcy ¶ 1123.01[4][b] (16th ed. 2014) ("Creditors should not confuse equal treatment of claims with equal treatment of creditors.") (quoting UNR Industries).

20.     Where, as here, the relationship between a creditor and a debtor is complex and multi-faceted, it is entirely appropriate for a plan to provide additional or different consideration to the creditor to address issues other than the treatment of one of the creditor's claims.  In <u>In re Heron, Burchette, Ruckert & Rothwell</u>, 148 B.R. 660 (Bankr. D.D.C. 1992), for example, certain former partners of the debtor objected to confirmation of the debtor's chapter 11 plan on the grounds that, for various reasons, the plan funding contributions required from participating partners in exchange for certain releases and other protections varied between partners, thereby resulting in allegedly disparate treatment of the partners' claims in violation of section 1123(a)(4) of the Bankruptcy Code.  <u>Id.</u> at 670-71. The court overruled the objections and held that the treatment of the partners' proofs of claim under the plan was uniform, and the varying contribution amounts required from participating partners in exchange for the releases and other protections provided by the plan were not part of such treatment.  <u>Id.</u> at 671-72.

> The objectors fail to distinguish between a partner's treatment under the plan on account of a claim or interest and treatment for other reasons.  Only the former is governed by [section 1123(a)(4) of the Bankruptcy Code].…  The plan's provisions dealing with partner contributions, releases, and the permanent injunction have no connection to a partner's status as a claim or interest holder within a particular class.  These provisions constitute a separate feature of the plan, designed to allow adequate funding of the plan.

<u>Id.</u> at 672.

21.    Similarly, in <u>In re Aleris International, Inc.</u>, No. 09-10478,

2010 WL 3492664, at *14 (Bankr. D. Del. May 13, 2010), the United States

Bankruptcy Court for the District of Delaware held that differences in

consideration being provided to claimants that held claims in the same class did not

amount to disparate treatment of claims in violation of section 1123(a)(4) of the

Bankruptcy Code.  <u>Id.</u>  In that case, the court held that the differences in

consideration did not relate to the treatment of the allegedly favored creditors'

claims but rather their (a) commitment to backstop a rights offering that would

fund the debtor's reorganization and future operations and (b) settlement of

disputes regarding the rights and priorities of certain lenders.  <u>Id.</u> at **4, 14;

<u>see also</u> <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 242 (3d Cir. 2000) (holding that a

plan provision releasing equity holders from fraudulent transfer claims did not

transfer value to the equity holders "on account of" their interests in violation of

the absolute priority rule because the releases were provided to protect the debtor

from potential indemnification claims, crossclaims and counterclaims); <u>In re Piece</u>

<u>Goods Shops Co.</u>, 188 B.R. 778, 789 (Bankr. M.D.N.C. 1995) (holding that certain

negotiated corporate governance provisions with respect to a reorganized

chapter 11 debtor that would favor one of the debtor's key creditors over another

did not give rise to disparate treatment of claims because the provision "is not part

of the treatment of claims, but rather, a negotiated corporate governance provision

which will be included in the Reorganized Company's certificate of incorporation").

22.     Just as in the foregoing cases, the City's entry into the Redevelopment Transactions, and the consideration being provided to Syncora pursuant thereto, while part of the comprehensive Syncora Settlement, does not constitute part of the treatment of Syncora's COP Claims under the Plan.[12]  Rather, the City, in the exercise of its reasonable business judgment, has embraced the opportunity provided by the Syncora Settlement to enter into the Redevelopment Transactions because these transactions are expected to:  (a) resolve issues related to the City's separate commercial relationship with Syncora affiliates; and (b) provide the City with numerous benefits, separate and apart from the resolution of Syncora's Class 9 Claims, that will further its goals of developing and revitalizing stagnant City land.

23.     Each of the Redevelopment Transactions is independently justified – without reference to the treatment accorded Class 9 COP Claims – by the different commercial relationships between the parties and the specific benefits that will flow to them, fostering the City's own reinvestment initiatives. The Tenant's leasehold interest in the Tunnel, for example – and its resulting

---

[12]     Notably, FGIC and MIDDD do not allege that the consideration being provided to Syncora on account of the Redevelopment Transactions arises from Syncora's Unlimited Tax General Obligation Bond Claims.

continuing relationship with the City – incentivizes Syncora to partner with the City on development and revitalization initiatives over the long term, separate and distinct from Syncora's immediate financial interests as insurer of certain COPs and COP Swap Agreements, among other instruments.[13]

24.     The City anticipates that James Doak, Managing Director with Miller Buckfire & Co., will testify that Syncora's options for maximizing the value of the Tenant's leasehold interests in the Tunnel and surrounding properties are limited because the Tunnel constitutes only one-half of a privately owned international border crossing.  As such, the Tenant's future value to Syncora depends largely upon its continued and profitable operation of the Tunnel, yet the Tunnel Leases currently expire in 2020.  Syncora thus has a strong interest in enhancing the value of its subsidiary by obtaining an extension of the Tunnel Lease and maximizing utilization of the Tunnel and surrounding properties.

25.     The City expects Mr. Doak to further testify that the extension of the Tunnel Lease pursuant to the Tunnel Lease Amendment will provide the City with multiple benefits.  The assumption and extension of the Tunnel Lease

---

[13]     For these reasons, FGIC's assertion that there is no connection between the various properties that are the subject of the Redevelopment Transactions and Syncora is incorrect.  See FGIC Objection, at ¶ 8.  In any event, there is no requirement under the Bankruptcy Code that the City establish such a connection between Syncora and the consideration being provided to it. Indeed, in the case of fungible consideration such as cash, this would be impossible.

provides continuity of operation of the Tunnel and certainty to the City in an environment where the City's alternatives with respect to the Tunnel are unclear given the unusual nature of the asset and the potential construction of a competing border crossing in the near future. Moreover, the extension of the Tunnel Lease and the provisions of the Tunnel Lease Amendment that promote capital expenditure by Syncora will encourage Syncora to commit to a long-term partnership with the City to maximize the value of its interest. Accordingly, because the parties' entry into the Tunnel Lease Amendment is mutually beneficial for, and justified by, reasons independent of Syncora's ownership or insurance of the COPs, the Tunnel Lease Amendment should not be deemed a disguised recovery upon Syncora's Class 9 COP Claims.

26. Syncora's expressed commitment to the development and revitalization of the City – to which it is inextricably tied by the Tunnel Lease – is further evidenced by the parties' entry into the Development Agreement and the Option Agreement. The City anticipates that Mr. Doak will testify that the Properties that are the subject of the Development Agreement (a) are currently undeveloped and vacant, (b) do not produce any income for the City and (c) are generally unmarketable (either in a piecemeal auction or request-for-proposal process). The Properties are, however, generally clustered together and, if developed, would be expected to have a material and positive impact on the

surrounding neighborhoods.  Consequently, the options provided Syncora under the Development Agreement – if exercised – are expected to:  (a) shift the developed Properties from the transfer rolls to the tax rolls, thereby transforming them from a liability of the City to a future source of revenue; and (b) lead to further development in the area, thereby enhancing City tax revenues from other properties.  If, on the other hand, Syncora determines not to develop the Properties, then they will revert to the City, thereby making them available for alternative redevelopment initiatives in the future.

27.     The Option Agreement relating to the Garage also requires substantial capital expenditure by Syncora that the City cannot afford to make, given its other commitments.  The redevelopment of the Garage will provide benefits to the City in the form of improved services to City residents and an income stream (once Syncora has recovered its initial investment, pursuant to the terms of the Option Agreement) that the City would otherwise have been unable to capture.  Moreover, regardless of whether Syncora exercises its option to enter into the Concession Agreement, the City retains ownership of the Garage.

28.     None of the foregoing justifications for the Development Agreement and the Option Agreement are impacted by the existence of Syncora's Class 9 COP Claims.  As such, the objectors' arguments that the resolution of Syncora's COP Claims was the primary motivation for the parties' agreement are

false.  Accordingly, these agreements do not constitute consideration for Syncora's Class 9 COP Claims, and the Plan does not violate section 1123(a)(4) of the Bankruptcy Code on account thereof.

29.     Indeed, the only relevant connection between the Redevelopment Transactions and the Chapter 9 Case was the City's refusal to establish a continuing partnership with an entity that was embroiling it in litigation and thereby impeding its exit from bankruptcy.  Accordingly, as a condition to its entry into the Redevelopment Transactions, the City required – and received – Syncora's commitment to cease *all* litigation against the City (some of which has been ongoing since before the commencement of the Chapter 9 Case).  Settlement Agreement, at § 3.  In addition, all of Syncora's various objections to confirmation of the Plan will be withdrawn.  Id. at § 3.2.  Syncora has further agreed to seek a stay and ultimately dismissal with prejudice of its pending appeals[14] and to provide reasonable active support to the City or the Litigation Trust in the COP Litigation. Id. at § 3.4.  For the City, the cessation of this barrage of litigation was a *sine qua non* of its agreement to enter into the Redevelopment Transactions.

---

[14]     These appeals include the appeals of this Court's orders (a) authorizing the public lighting authority transaction (Case No. 14-cv-10501), (b) approving the City's postpetition financing (Case No. 14-cv-11995), (c) approving the Swap Settlement (Case No. 14-cv-12062), (d) holding that Casino Revenues are subject to the automatic stay of sections 362 and 922 of the Bankruptcy Code (Case No. 13-cv-14305) and (e) denying the motion to unseal the order regarding mediation confidentiality (Case No. 14-cv-13044).  Id. at § 3.3.

~~~~~~~~~~~~~~~~~~~~~

30.     The Redevelopment Transactions form the basis of an

integrated partnership between the City and Syncora for their mutual benefit.

Moreover, the City possesses numerous justifications for entering into each of the

Redevelopment Transactions in its business judgment that have nothing to do with

the resolution of Class 9 COP Claims.  Because the Redevelopment Transactions

patently are unrelated to the treatment of COP Claims under the Plan, FGIC and

MIDDD's allegations of disparate treatment and unfair discrimination are

misplaced, and these Objections should be overruled.

### B.     FGIC and MIDDD Do Not Require Further Information Regarding the Value of the Redevelopment Transactions

31.     FGIC and MIDDD object that the City has provided insufficient

information regarding the value of the Class 9 Settlement Asset Pool, the Tunnel

Lease, the Development Agreement, the Properties, the Garage, the Option

Agreement and the Concession Agreement to permit the objectors to evaluate the

extent of any disparate treatment or unfair discrimination.  FGIC Objection, at ¶ 4;

MIDDD Objection, at ¶ 4.  Because, for all of the reasons set forth above, the

Redevelopment Transactions are unrelated to the treatment of Syncora's COP

Claims under the Plan, this data is irrelevant to any evaluation of the treatment of

Syncora's COP Claims.  Moreover, the City expects that Mr. Doak will testify at

the Confirmation Hearing that the value of the properties and agreements relating

to the Redevelopment Transactions cannot be established with any degree of

certainty.[15]  Accordingly, because the Redevelopment Transactions are unrelated to

the treatment of COP Claims under the Plan, FGIC and MIDDD's Objections

related to disclosure should be overruled.

## II.    THERE IS NO UNFAIR DISCRIMINATION WITH RESPECT TO THE TREATMENT OF COP CLAIMS PRESENTED IN THE PLAN

32.    MIDDD and FGIC argue that the Plan should not be confirmed

because it unfairly discriminates against their Claims.  For the reasons set forth

below, these Objections are unfounded and should be overruled.

33.    MIDDD argues that (a) the Sixth Amended Plan unfairly

discriminated against Class 14 Claims by providing materially greater percentage

recoveries to other Classes of unsecured Claims and (b) the Seventh Amended

Plan's treatment of Claims held by Settling COP Claimants exacerbates such

alleged unfair discrimination.  See MIDDD Objection, at ¶¶ 1-2.  As the City

demonstrated at length in the Prior Briefing, however, no unfair discrimination

existed in the prior versions of the Plan under either of the prevailing legal

standards, i.e., the tests for unfair discrimination articulated in (a) In re Aztec Co.,

107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989) (holding that, where certain other

---

[15]    With respect to the assets comprising the Class 9 Settlement Pool, the Plan provides FGIC and MIDDD with all information necessary to determine the value of the New C Notes, and the value of the Class 9 Settlement Credits is not material relative to the size of the pool of Class 9 Claims.

elements are satisfied, the treatment of classes of claims under a plan does not discriminate unfairly provided that "a rational or legitimate basis" exists for such treatment) (the "Aztec" test); and (b) In re Dow Corning Corp., 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999) (holding that a rebuttable presumption of unfair discrimination arises where a plan provides materially unequal percentage recoveries, or allocates materially unequal risk, to similarly-situated classes of creditors), aff'd, 255 B.R. 445 (E.D. Mich. 2000) (the "Markell" or "Dow Corning" test). See Consolidated Reply, at § II; Pretrial Brief, at § I.[16] As set forth below, the Seventh Amended Plan does not create or exacerbate any such alleged disparity.

---

[16] Contrary to MIDDD's unsupported allegations, there was no unfair discrimination under the Sixth Amended Plan arising from the allowance, for voting purposes, of MIDDD's $26 million Claim. As the City explained in its Pretrial Brief, the City refreshed its estimated aggregate allowed amount of Class 14 Claims to include MIDDD's Claim, and adequate New B Notes will be issued under the Plan to reflect the City's refreshed estimate. See Pretrial Brief, at ¶ 70. Moreover, in the Prior Briefing, the City demonstrated that the differentials in estimated percentage recoveries provided to Classes of unsecured Claims – including Class 14 – under prior versions of the Plan were fair, appropriate under the circumstances of the City's Chapter 9 Case and did not give rise to any unfair discrimination. See id. at § I; Consolidated Reply, at § II.

### A. The Plan's Treatment of Claims Held By Settling COP Claimants Does Not Give Rise to Unfair Discrimination Against Class 14

#### 1. *The Modifications in the Seventh Amended Plan Do Not Create a Material Disparity Between the Estimated Percentage Recoveries of Classes 9 and 14*

34.     The *de minimis* differential between the aggregate estimated percentage recoveries provided to Classes 9 and 14 under the Seventh Amended Plan do not give rise to unfair discrimination.  As a threshold matter, the City disputes MIDDD's assertion that the recoveries on Class 9 Claims under the Plan will exceed 16%.  MIDDD Objection, at ¶ 2.  During the hearing held on September 15, 2014, the City provided the Court with what it believes is a more realistic aggregate estimated percentage recovery for COP Claims under the Seventh Amended Plan of 13.7%.[17]

35.     Even if MIDDD's estimate of a 16% recovery on COP Claims were accurate, however, the enhanced recoveries provided to Settling COP Claimants under the Plan still would not give rise to unfair discrimination. A comparison of (a) MIDDD's inflated estimate of the aggregate percentage recovery provided to COP Claims under the Seventh Amended Plan and (b) the estimated percentage recovery for Class 14 provided in the Disclosure Statement (10%-13%) yields a difference of only 3%-6%.  Such a disparity in estimated percentage recoveries is *not* material and, accordingly, does not constitute unfair

---

[17]     See Hr'g Tr. 6:4 Sept. 15, 2014.

discrimination under any standard.  See, e.g., In re Greate Bay Hotel & Casino,

Inc., 251 B.R. 213, 231-32 (Bankr. D.N.J. 2000) (holding that a 4% differential in

estimated percentage recoveries was not material under the Markell test);

see also Consolidated Reply, at ¶¶ 81, 90-92.  Moreover, the Plan's treatment of

Claims held by Settling COP Claimants is fair and reasonable in light of

well-established bankruptcy policy considerations that strongly favor plan

settlements.  See, e.g., In re Dow Corning Corp., 244 B.R. 634, 668

(Bankr. E.D. Mich. 1999) ("Settlements … are strongly favored and encouraged by

the law.  In fact, a prime objective of the reorganization process is to foster a

negotiated resolution to the many disputes underlying the bankruptcy.") (citing

Franks v. Kroger Co., 670 F.2d 71, 72 (6th Cir. 1982)) (internal citation omitted),

aff'd, 255 B.R. 445, 501 (E.D. Mich. 2000), aff'd in relevant part sub nom. Class

Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),

280 F.3d 648 (6th Cir. 2002).

   36. Accordingly, the treatment of Claims held by Settling COP

Claimants under the Seventh Amended Plan does not give rise to unfair

discrimination against Class 14 under (a) the Aztec test, because "a rational or

legitimate basis" exists for the minimal differential in the estimated percentage

recoveries provided to Classes 9 and 14 under the Seventh Amended Plan;[18] or

(b) the Markell test, because the modifications in the Seventh Amended Plan do

not give rise to any *material* disparity in the aggregate estimated percentage

recoveries provided to Classes 9 and 14 under the Plan.

### 2.     *The Plan Does Not Allocate Materially Greater Risk to Holders of Class 14 Claims Than to Holders of COP Claims*

37.     The Plan also does not expose MIDDD to a materially greater

risk of non-payment than holders of COP Claims.  MIDDD argues that the Plan's

proposed treatment of Claims held by Settling COP Claimants gives rise to unfair

discrimination against Class 14 because the New C Notes that will be distributed to

Settling COP Claimants under the Plan are "materially less risky" than the New B

Notes that holders of Other Unsecured Claims will receive under the Plan.

See MIDDD Objection, at ¶ 5.  Specifically, MIDDD argues that, because certain

parking revenues of the City would be directed into a lockbox account solely for

the benefit of holders of New C Notes, the New C Notes are a superior credit to the

New B Notes.  See id.

38.     MIDDD's assertions lack merit.  The existence of a dedicated

revenue stream supporting (but, importantly, not securing) repayment of the New

C Notes neither increases the risk profile of the New B Notes nor gives rise to a

---

[18]     MIDDD does not attempt to show that any other element of the Aztec test is
unsatisfied.

material disparity in risk allocation between Classes 9 and 14. If the Plan is confirmed, the City will emerge from bankruptcy newly delevered and well positioned to meet all of its financial obligations going forward, regardless of the presence or lack of revenues specifically allocated for repayment of a given obligation.[19] Because the City's post-confirmation credit is expected to be strong, and its risk of default low, the risk of non-payment on the New B Notes is practically identical to that of the New C Notes. Certainly, any difference in such risk cannot be deemed so material as to support a claim of unfair discrimination, and MIDDD's objections to this effect must be overruled.

39. MIDDD also points to certain differences between the terms of the New C Notes and the terms of the New B Notes – e.g., that the New C Notes will bear a higher rate of interest and reach maturity sooner than the New B Notes – as evidence that the Plan discriminates unfairly against Class 14 Claims. See MIDDD Objection, at ¶ 5. These distinctions do not amount to unfair discrimination against Class 14. From a cash-flow perspective, it should come as no surprise to MIDDD that the City is able to amortize $80 million in New C Notes more quickly than $632 million in New B Notes. MIDDD makes no attempt to support its conclusory allegation that the differences between the New B Notes

---

[19] As Kenneth Buckfire is expected to testify at the Confirmation Hearing, the City's credit profile is likely to be viewed favorably post confirmation.

and the New C Notes under the Plan give rise to a *material* disparity in the claim treatment of Classes 9 and 14 under the Plan.  For the reasons set forth in paragraphs 34-36 above, no material disparity exists in the estimated aggregate percentage recoveries of Classes 9 and 14 under the Plan.  Accordingly MIDDD's Objection should be overruled.

### B. No Unfair Discrimination Results From the Distribution of Excess New B Notes

40.     MIDDD further argues that (a) the Plan's treatment of OPEB Claims unfairly discriminates against Class 14 Claims because the aggregate Class 12 Claim amount contemplated in the Plan is overstated and (b) such alleged unfair discrimination is exacerbated by the distribution of $11.03 million of Excess New B Notes to the Detroit General VEBA and the Detroit Police and Fire VEBA (together, the "VEBAs") under the Plan.  See MIDDD Objection, at ¶¶ 6-7. This argument is groundless and should be rejected.  MIDDD asserts, without any explanation – or even a single citation to the record – that the "evidence has shown [that] the total OPEB claims are vastly overstated." Id. at ¶ 7.  The City disputes this contention.  For all of the reasons set forth in the Prior Briefing and to be demonstrated by the City's witnesses during the Confirmation Hearing, the agreed-upon amount of the Allowed Class 12 Claim falls well within the range of reasonableness and settles a dispute between the City and the Retiree Committee regarding the valuation of the Allowed Class 12 Claim.  See Pretrial Brief,

at § XIII.A.1.b; Consolidated Reply, at § I.C. Because (a) the valuation of OPEB Claims under the Plan is reasonable and (b) the estimated percentage recoveries provided to Classes 12 and 14 under the Plan are essentially identical,[20] there is no meaningful disparity between the estimated percentage recoveries of Classes 12 and 14, and certainly no unfair discrimination.

41.     Moreover, the additional distribution of Excess New B Notes under the Seventh Amended Plan cannot possibly give rise to a material disparity between the estimated percentage recoveries provided to Classes 12 and 14 because the effect of such additional distribution upon Class 12's estimated percentage recovery under the Plan is *de minimis*. The City estimates that the additional consideration provided to Class 12 under the Seventh Amended Plan enhances the estimated percentage recovery of Class 12 by only ***0.22%***.[21] Moreover, Class 14 also will receive additional consideration under the Seventh Amended Plan in the form of Excess New B Notes, totaling ***0.13%*** of its estimated

---

[20]     See Disclosure Statement, at 41 (stating that the range of estimated percentage recoveries for both Classes 12 and 14 is 10%-13%).

[21]     This figure is calculated as $9.60 million (the present value of the $11.03 million in Excess New B Notes allotted to the Detroit General VEBA and the Detroit Police and Fire VEBA) expressed as a percentage of the $4.303 billion estimated aggregate allowed amount of OPEB Claims. See Plan, at § II.B.3.p.iii.A; Disclosure Statement, at § II.B. MIDDD's similarly *de minimis* but not identical estimate of 0.26% fails to discount to present value the $11.03 million in Excess New B Notes allotted to the VEBAs. See MIDDD Objection, at ¶ 7 n.5.

percentage recovery. Thus, the improved Class 12 treatment about which MIDDD complains amounts to an increase of *0.09%* in excess of the enhancement Class 14 stands to receive under the Seventh Amended Plan, a *de minimis* difference in estimated percentage recoveries by any measure. See, e.g., In re Unbreakable Nation Co., 437 B.R. 189, 202-03 (Bankr. E.D. Pa. 2010) (holding that a *de minimis* differential in estimated percentage recoveries of 0.25% was not material under the Markell test); Greate Bay Hotel & Casino, 251 B.R. at 231-32 (4% differential in estimated percentage recoveries not material under the Markell test); see also Consolidated Reply, at ¶¶ 81, 90-92. Accordingly, because a 0.09% difference in recoveries does not constitute unfair discrimination, MIDDD's Objection should be overruled.

42. Similarly, FGIC argues that the distribution of Excess New B Notes to the VEBAs, Class 7 and Class 14 under the Seventh Amended Plan gives rise to unfair discrimination against Class 9. FGIC Objection, at ¶ 17. This argument also must be rejected. The total value of Excess New B Notes provided to Class 7 under the Seventh Amended Plan improves Class 7's estimated percentage recovery by only *2.2%* – and, as set forth above, the total value of Excess New B Notes provided to Classes 12 and 14 under the Seventh Amended Plan amounts to a *de minimis* enhancement of such Classes' estimated percentage recoveries. The distribution of Excess New B Notes under the Seventh Amended

Plan thus does not come close to giving rise to any material disparity in treatment between Class 9 and other Classes of unsecured Claims.  Accordingly, the modifications in the Seventh Amended Plan create no unfair discrimination against Class 9, and FGIC's Objection is unavailing.

## III.   THE SWAP-RELATED CONSIDERATION DOES NOT VIOLATE SECTION 1123(a)(4) OF THE BANKRUPTCY CODE

43.    FGIC fleetingly asserts that the Swap-Related Consideration to be provided under the Syncora Settlement runs afoul of section 1123(a)(4) of the Bankruptcy Code because FGIC has asserted similar claims arising from its insurance of the certain COP Swap Agreements.  FGIC Objection, at ¶ 14.

44.    This contention misses the point because the Swap-Related Consideration is not being provided to Syncora on account of its Claims arising from the COP Swap Documents.  Rather, Syncora will receive the Swap-Related Consideration in consideration for Syncora's agreement to dismiss the Syncora Swap Appeal and the Casino Revenue Appeal, in addition to withdrawing all other litigation claims arising from the COP Swap Documents.  Because FGIC elected not to appeal the COP Swap Settlement Approval Order or the Casino Revenue Order, it is not similarly situated to Syncora and cannot extract value from the City in this regard.  In any event, because the City is not providing the Swap-Related Consideration to Syncora on account of its Claims arising from the COP Swap Documents, there is no violation of section 1123(a)(4) of the Bankruptcy Code.

## IV. THE CITY CAN EFFECTUATE THE TRANSACTIONS CONTEMPLATED BY THE PLAN COP SETTLEMENT

45. Wilmington Trust argues that Syncora has no right to sell any COP Claims to the Litigation Trust because such Claims are held by Wilmington Trust and not Syncora. Wilmington Trust Objection, at ¶ 5 (stating that COP Claims may "be filed and proved, and therefore held, only by the Contract Administrator"). This position is incorrect. Wilmington Trust (a) is not the holder of all COP Claims, (b) does not have the exclusive right to a file a proof of claim on behalf of COP holders, (c) does not possess the right to vote a Claim (and, in fact, it did not vote the COP Claims in this case) and (d) has no right to compromise any claim or accept or reject the Plan or any compromise on behalf of the Holders of COP Claims.[22] Further, COP Claims is defined broadly and encompasses many claims beyond those for principal and interest on account of the COPs.

---

[22] See, e.g., Fed. R. Bankr. P. 3003(c) (trustee or holder may file claim); 11 U.S.C. § 1126 (only holder may vote claim); William L. Norton, 6 Norton Bankr. L. & Prac. 3d § 110:20 (2014) ("Although Bankruptcy Rule 3003(c)(5) specifically authorizes an indenture trustee to file a proof of claim on behalf of all known or unknown security holders pursuant to the trust, the indenture trustee is not the holder of a claim and, accordingly, is not entitled to accept or reject a plan."); accord Contract Administration Agreement, at § 6.4.2 ("Nothing herein contained shall authorize the Contract Administrator to authorize or consent to or accept or adopt on behalf of any Certificateholder any plan of adjustment or composition affecting the Certificateholders or the rights of any Holder, or to authorize the Contract Administrator to vote in respect of *the claim of any Certificateholder* in any such proceeding.") (emphasis added).

46.     Wilmington Trust and the COP Holders further argue that Settling COP Claimants should not be required to transfer their COPs to the Litigation Trust, or else they will forfeit any rights to insurance they may otherwise have possessed.  Wilmington Trust Objection, at ¶ 7; COP Holders Objection, at ¶¶ 5-7.  To be clear – the Plan **_does not_** condition or require COP claimants wishing to settle their Claims to transfer the underlying certificates themselves to the Litigation Trust or otherwise give up their rights against their insurer.  Settling COP Claimants are free to retain such insurance rights as a collateral source of value. [23]

47.     In the Joinder to Motion of Creditors for Adjournment of Confirmation Hearing and Relief from Scheduling Order and Limited Statement Respecting Settlement Terms (Docket No. 7476) (the "Limited Statement"), Wilmington Trust also expressed concern that the _pro rata_ payments to be made to Settling COP Claimants, including Syncora, under the Plan may not comply with the distribution scheme (or "waterfall") set forth in the COP Documents.  Limited Statement, at  ¶¶ 9-15.  The _pro rata_ treatment of the various holders of COP

---

[23]     In addition, FGIC argues that Syncora would receive additional consideration unavailable to other Holders of COP Claims if the Plan COP Settlement required the transfer of the COP certificates themselves to the Litigation Trust because forgoing insurance recoveries will have no effect on the COPs with respect to which Syncora is both the holder and insurer. FGIC Objection, at ¶¶ 10-11.  Because no Settling COP Claimant is being required to surrender its COP certificates, this argument is moot.

Claims contemplated by the plan of adjustment is, in the City's view, mandated by the Bankruptcy Code. See, e.g., In re Dow Corning Corp., 211 B.R. 545, 598 (Bankr. E.D. Mich. 1997) (stating that claims within a class share in available funds on a *pro rata* basis). Additionally, distribution of the Class 9 Settlement Asset Pool and New B Notes by the Litigation Trust to Settling COP Holders on account of the purchase and sale of bankruptcy claims is not a payment that must be distributed according to the waterfall set forth in the COP Documents. Accordingly, the waterfall set forth in the COP Documents does not govern the distributions to be made under the Plan,[24] and Wilmington Trust's concern is misplaced.[25]

48.     Wilmington Trust also complains that, while the Plan COP Settlement is available to it, there is no way for it to meaningfully take advantage of the settlement since it does not own claims for principal or accrued prepetition

---

[24]     To the extent any COP Holder seeks to collaterally attack the direct distribution mechanism contemplated by the Plan COP Settlement, Syncora may also rely upon the exculpation provisions set forth at Section III.D.6 of the Plan.

[25]     If Wilmington Trust's arguments relate to distributions it would otherwise make on account of unpaid interest under the waterfall set forth in the COP Documents, such amounts are not allowable under the Bankruptcy Code, at least to the extent not matured as of the Petition Date. See 11 U.S.C. § 502(b)(2); see also Thompson v. Kentucky Lumber Co. (In re Kentucky Lumber Co.), 860 F.2d 674, 676 (6th Cir. 1988) ("The general rule of actions in bankruptcy is that unsecured creditors are not entitled to postpetition interest upon their allowable claims.").

interest on the COPs.  Wilmington Trust Objection, at ¶ 6.  Wilmington Trust

acknowledges, however, that the Plan COP Settlement already benefits it because

Settling COP Claimants agree to pay their *pro rata* share of Wilmington Trust's

allowed COP Agent Fees (except to the extent such fees relate to the COP

Litigation and the Settling COP Claimant did not participate in such COP

Litigation).[26]  Id.  The Plan does not – and should not – allow Wilmington Trust to

recover multiple times on the same claims.

49.     Several of the Objections seek clarifications regarding certain

points associated with the implementation of the Plan COP Settlement.  FGIC, for

example, notes that the Plan does not provide for the cancellation of the COPs held

by Settling COP Claimants, which, theoretically, could give rise to a Settling COP

Claimant receiving two recoveries in the event the defendants prevail in the COP

Litigation.  FGIC Objection, at ¶ 15.  The City has no intention of allowing

Settling COP Claimants to receive two recoveries, and the City intends to clarify

this fact through the filing of an errata sheet or otherwise.  In addition, Wilmington

---

[26]     FGIC objects that it is unfair that Settling COP Claimants pay their *pro rata* share of the allowed COP Agent Fees with respect to the COP Litigation only to the extent they participated in the COP Litigation.  FGIC Objection, at ¶ 16.  Creditors that compromise with the City and sell their claims to the Litigation Trust have no contractual or other requirement to fund or otherwise subsidize those parties who wish to litigate.  And there is certainly no unfairness in requiring parties to bear the costs of their own litigation decisions.

Trust seeks confirmation that nothing in the Syncora Settlement will affect the COPs insured but not held by Syncora. Wilmington Trust Objection, at ¶ 5. Wilmington Trust's statement is correct. COPs insured but not held by Syncora will be unaffected by the Syncora Settlement.

## <u>CONCLUSION</u>

50. For the reasons set forth herein, the City requests that the Court overrule the Objections, to the extent not resolved herein, and confirm the Plan.

Dated:  September 26, 2014                Respectfully submitted,


   /s/  Heather Lennox                 
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY

## <u>CERTIFICATE OF SERVICE</u>

I, Heather Lennox, hereby certify that the foregoing Consolidated Reply to Supplemental Objections to Confirmation of the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit was filed and served via the Court's electronic case filing and noticing system on this 26th day of September, 2014.

/s/  Heather Lennox