# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |

## SYNCORA GUARANTEE, INC. AND SYNCORA CAPITAL ASSURANCE, INC.'S CONCURRENCE IN THE CITY OF DETROIT'S CONSOLIDATED REPLY TO SUPPLEMENTAL OBJECTIONS TO CONFIRMATION OF THE SEVENTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

Syncora Guarantee, Inc. and Syncora Capital Assurance, Inc. (collectively, "Syncora")[1] hereby concur with the City's *Consolidated Reply to Supplemental Objections to Confirmation of the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit* and respectfully state as follows:

### Preliminary Statement

1. The evidence will show that, with the introduction of the Plan COP Settlement option, the City's seventh amended plan (the "New Plan") satisfies all confirmation requirements. Accordingly, the Court should confirm the New Plan, including all provisions regarding the three elements of the Syncora Settlement—

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Seventh Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 7502].

(1) the Development Agreement; (2) the sale and settlement of COP Claims; and (3) the settlement of secured claims.

2. The Syncora Settlement is a product of arm's-length negotiations between the parties in the context of mediation over the course of many months. The Syncora Settlement reflects a sophisticated structured resolution of all issues between Syncora and the City in light of the parties' multi-faceted and now-strengthened ongoing commercial relationship.[2]

3. The Syncora Settlement contemplates three components: the Development Agreement, the sale of COP Claims and settlement of related litigation, and the settlement of secured claims and other litigation claims. The Syncora Settlement satisfies the four-factor test for approving a settlement under Rule 9019. Additionally, each individual element of the Syncora Settlement is reasonable and should be approved in connection with confirmation of the Plan.

---

[2] The Syncora Settlement expressly preserves Syncora's right to make any arguments, objections, or other assertions, pursue any litigation, appeals, or other disputes related to confirmation of the New Plan (or any other plan) or any other matter resolved by the Syncora Settlement if the Syncora Settlement is not approved, and Syncora expressly reserves such right consistent with the Syncora Settlement.

**Argument**

**I. Evidence Will Show that the New Plan Should Be Confirmed.**

4. The New Plan, including the Plan COP Settlement, satisfies all confirmation requirements and should be confirmed. Objecting creditors allege that the Syncora Settlement violates section 1123(a)(4) of the Bankruptcy Code because it provides disparate treatment to Syncora and non-settling COP Holders. [Docket Nos. 7611, 7615.] Section 1123(a)(4) requires similar treatment of creditors within the same class. 11 U.S.C. § 1123(a)(4) ("a plan shall provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest"). This objection rests on the fundamentally flawed belief that Syncora is receiving all the Syncora Settlement consideration on account of Syncora's Class 9 Claims. Only one of the three elements of the Syncora Settlement, the Plan COP Settlement, is related to Syncora's Class 9 Claims. The Development Agreement is related to Syncora's preexisting commercial relationship with the City and the secured claim settlement is related to Syncora's secured claims pending in the chapter 9 case.

**II. The Development Agreement Was Entered Into on Account of Syncora's Pre-Existing Commercial Relationship with the City, Is Supported by the Debtor's Business Judgment, and Should Be Approved.**

5. The Development Agreement was executed to strengthen Syncora's commercial presence in the City and provide the City another partner for the revitalization of Detroit. In September 2013, prior to negotiating the Syncora Settlement, Pike Pointe Holdings, LLC ("Pike Pointe"), a Syncora subsidiary, acquired the Detroit Windsor Tunnel (the "Tunnel") operator through another bankruptcy proceeding. *In re Am. Roads LLC*, No. 13-12412 (Bankr. S.D.N.Y. Aug. 30, 2013) [Docket No. 129] (confirmation order). Since then, Pike Pointe has enjoyed a commercial presence in downtown Detroit, maintaining its national headquarters in the City, and employing approximately 100 individuals in and around the City.

6. It is in the best interests of Syncora (through subsidiaries) and the City to continue their commercial relationship. In light of its existing business interests in the City, Syncora desires to build its presence in the City going forward. Similarly, the City desires to engage with business partners (like Syncora) willing to invest in the City and maintain continuity in Tunnel operations and maintenance.

7. Recognizing these complementary goals, Syncora and the City negotiated an amendment to the Tunnel Lease, extending Syncora's presence in the City through 2040. With Syncora's future presence in the City resolved, the

parties entered into the Development Agreement (including the Option Agreement (as defined herein)) to expand Syncora's presence beyond an infrastructure operator to a City partner and investor.

8.  The terms of the Development Agreement are consistent with other third-party development deals executed by the City, transferring real estate to developers for nominal or no cash consideration in exchange for investment in and development of the land. *See* Joe Guillen & JC Reindl, *Detroit council votes today on arena deal; Ilitches to get land for $1*, DETROIT FREE PRESS (Feb. 4, 2014) http://www.freep.com/article/20140204/NEWS01/302040023/Detroit-red-wings-new-stadium-deal-vote-today (noting that the Ilitch family received 39 parcels of land for $1 pursuant to development agreement).

9.  The Development Agreement grants Pike Pointe an option to own and develop certain properties, the majority of which are located near the terminus of the Tunnel, where Pike Pointe's offices are currently located. *See* Development Agreement Sec. 1(A), Ex. A. If Pike Pointe exercises the option as to any property, Pike Pointe will be obligated to develop that property in a specified time frame, contributing to the City's revitalization and ensuring the property will not remain vacant while at the same time offering Pike Pointe the development opportunity upside associated with the property. *Id.* at Sec. 1(C). Additionally, Pike Pointe must develop the property in a manner consistent with the City's urban

5

planning policies. *Id.* The Development Agreement benefits the City by increasing development in the City (at no expense to the City) and generating tax revenue from the properties once the option is exercised. If Pike Pointe does not exercise its option with respect to any property within the option period, the property will revert back to the City. *Id.*

10. Similarly, the option agreement related to the Grand Circus Parking Garage (the "Option Agreement") grants Pike Pointe an option to enter into a 30-year concession agreement with respect to the Grand Circus Parking Garage, pursuant to which Pike Pointe will be obligated to make $13.5 million in capital expenditures in the first five years to improve the Grand Circus Parking Garage. *See* Option Agreement Sec. 1, Ex. B. Additionally, Pike Pointe will be solely responsible for all other capital expenditures during the term of the concession. *Id.* at Ex. B. If the Grand Circus Parking Garage is profitable, the City will receive a share of the revenues from its operation. *Id.* If Pike Pointe does not exercise its option, it will lose all rights to the Grand Circus Parking Garage at the end of the one-year option period. *Id.* at Sec. 1. Absent Pike Pointe's potential investment in the Grand Circus Parking Garage, the City does not have sufficient funds to continue operating the Grand Circus Parking Garage and likely would lose revenue associated therewith.

KE 33560792
13-53846-tjt    Doc 7711    Filed 09/26/14    Entered 09/26/14 19:36:16    Page 6 of 14

11.  Syncora and the City's collaboration and creativity allowed them to negotiate a mutually beneficial ongoing commercial relationship based on Syncora's current presence in the City.  The ongoing business relationship (entirely distinct from Syncora's role as a creditor in the City's chapter 9 case) would not benefit from continued litigation related to the City's bankruptcy.  Accordingly, the parties likewise negotiated and agreed to the Syncora Settlement as it relates to Syncora's COP Claims and other claims.[3]

### III. Plan COP Settlement Option Inures to the Benefit of All Holders of COP Claims and Should be Approved.

12.  As a result of (and in parallel with) the successful business negotiations, the City and Syncora entered into arm's-length negotiations regarding Syncora's claims in the City's chapter 9 case that ultimately brought about the Syncora Settlement's other elements.  While the City may have preferred to settle with Class 9 in its entirety, the City's decision to settle with only Syncora was

---

[3]  Settlement of ongoing litigation in favor of resuming or entering into a commercial relationship with litigation adversary is not unusual.  *See, e.g.*, Press Release, Alcoa and Alba Resolve Civil Litigation (Oct. 9, 2012) (http://www.alcoa.com) (confirming settlement of lawsuit, resumption of commercial relationship, and entry into long-term supply agreement); *Sepracor enters agreements with Arrow for COPD drugs; settles Xopenex litigation*, PHARMA AGREEMENT NEWS (May 2, 2008) (announcing settlement of ongoing litigation and entry into global licensing and development agreement).

necessary because the other Class 9 creditors were either unable or unwilling to settle with the City.[4]

14. The majority of Syncora's recent litigation regarding the City's proposed plan of adjustment focused on COP treatment in prior iterations of the Plan of Adjustment. The New Plan improves the treatment embodied in prior versions of the Plan of Adjustment, offering higher recoveries to Holders of COP Claims. The Plan COP Settlement (consistent with the Syncora Settlement) and its benefits are available to all Holders of COP Claims that elect to become Settling COP Holders.

14. Pursuant to the Plan COP Settlement, any COP Holder may transmit, prior to the Effective Date, a Notice of COP Settlement Acceptance. After submitting the Notice of COP Settlement Acceptance, Settling COP Holders will receive an Allowed Claim not subject to invalidation as a result of the COPs litigation. The Allowed Claim will be sold to the Litigation Trust in exchange for the Settling COP Holders' *pro rata* share of the COPs Asset Pool.[5] Plan Art. II.B.3.p.iii.A.

---

[4] For the avoidance of doubt, Syncora's election to participate in the Plan COP Settlement pertains only to COPs owned and insured by Syncora.

[5] The *pro rata* treatment of various holders of COP Claims contemplated by the New Plan, as opposed to distribution pursuant to the Waterfall (as defined herein), is consistent with the Bankruptcy Code.

15. The Plan COP Settlement is not, as the ad hoc COP holders allege, illusory. [*See* Docket No. 7615.] The ability to sell bankruptcy claims is not unique to Syncora. Any COP Holder may elect to do so and receive the benefit of the Plan COP Settlement, including obviating the risk of invalidation as a result of the COP litigation.[6]

16. Similarly, the Plan COP Settlement does not contravene the COPs transaction documents. Pursuant to the COPs transaction documents, payments by the City to the Service Corporation on account of principal and interest due on the COPs must flow through the priority scheme set forth in the Service Contracts (the "Waterfall"). In contrast, the Plan COP Settlement provides for the payment by the Litigation Trust to COP Claim holders for purchase of their COP Claims.

17. "COP Claims" is defined very broadly under the New Plan, including any claim on account of any act, omission or representation (however described) based upon, arising out of or relating to "the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs" or the COPs transaction documents. New Plan at 7. Syncora's proofs of claim contain multiple COP Claims unrelated to payment of principal and interest on account of the COPs.

---

[6] Invalidation of the COPs would invalidate the Service Contracts, as well. The Plan COP Settlement settlement resolves all claims related to the COPs, including distribution rights and the Waterfall, which arise out of the Service Contracts. Hence, the Waterfall-related arguments raised in the objections are irrelevant under the structure of the Plan COP Settlement.

18. The Waterfall provisions do not mean that all payments (by any party) in any way related to the COPs must flow through the Waterfall. Multiple COP Holders, for instance including those objecting to the New Plan, have purchased COPs during the pendency of this chapter 9 case. [Docket No. 6459]. None of those sale proceeds were distributed in accordance with the Waterfall. Similarly, the proceeds of the sale of bankruptcy claims to a third-party need not be distributed in accordance with the Waterfall.

19. Accordingly, any third-party objections to direct distribution of the COP Claims purchase price to the Settling COP Holder should be overruled based on the inapplicability of the Waterfall to the COPs Asset Pool. Even if such objections are not overruled, Syncora is protected under the Exculpation provisions in the New Plan.[7]

20. Exculpation clauses can be included in bankruptcy plans as products of negotiation among interested parties. *In re WCI Cable, Inc.*, 282 B.R. 457, 479 (Bankr. D. Or. 2002). Properly tailored exculpation provisions may be extended beyond a debtor's professionals and official committees appointed in the case. *See, e.g.*, *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519

---

[7] "[T]he Syncora Exculpated Parties solely to the extent permitted by law and solely in connection with acts or omissions taken in connection with the Syncora Settlement Documents and any actions or litigation positions taken by the Syncora Exculpated Parties in the Chapter 9 Case." Plan Art. III.D.6.

10

F.3d 640, 655–58 (7th Cir. 2008) (exculpation of third party financier/creditor appropriate where (a) the provision (i) contained a carve out for willful misconduct and (ii) was limited to claims arising out of or in connection with the bankruptcy case; and (b) the creditor required the limitation before it would provide the requisite financing, which was essential to the reorganization); *In re Granite Broad. Corp.*, 369 B.R. 120, 139–40 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that included creditor/financier and controlling shareholder where the provision (a) contained a carve out for gross negligence and intentional misconduct and (b) was limited to claims arising in connection with the plan and the bankruptcy cases).

21. The New Plan's exculpation provision contains a carve out for gross negligence and willful misconduct and is limited to claims arising out of the bankruptcy case. *See* New Plan Art. III.D.6. Syncora, through its active participation in the City's chapter 9 case and pursuant to the Syncora Settlement is providing financing to assist the City's revitalization. Pursuant to the various elements of the Syncora Settlement, Syncora, through its subsidiaries, will make a substantial contribution to the City's redevelopment efforts. Additionally, Syncora's involvement in the City's chapter 9 case has had other significant benefits, including reducing the cost of the Swap Settlement by approximately $100 million and providing the City with additional liquidity. For these and other

11

reasons, each of which will be demonstrated by the evidence at trial, exculpation of Syncora is appropriate and should be approved pursuant to the New Plan.

**IV.  Settlement of Syncora's Secured Claims Should Be Approved.**

22.  The third element of the Syncora Settlement is settlement of Syncora's secured claims. Syncora has multiple secured claims against the City, as noted in its proofs of claim, including claims related to the $15 million in the City's "cash trap." [Proof of Claim Nos. 1352, 1354]. The Syncora Settlement settles Syncora's secured claims in exchange for a $5 million cash payment from the City. *See* Settlement Agreement Sec. 5. Further, Syncora agrees to withdraw all appeals related to its secured claims. *See Id.* at Sec. 3.3. Accounting for litigation risk, $5 million is reasonable in light of the $15 million in the "cash trap" to which Syncora believes it is entitled. Because the secured claim settlement is reasonable in light of Syncora's claims against the City, it should be approved.

23.  Objections alleging that the secured claim settlement implicates section 1123(a)(4) are a red herring. Section 1123(a)(4) applies only to claims within the same class. Syncora's secured claims are not in Class 9, which is comprised only of unsecured COP Claims. The secured claim settlement is on account of Syncora's secured claims, not its Class 9 Claims. As a result, section 1123(a)(4) objections to the Syncora Settlement based on the secured claim settlement should be overruled.

12

24. The New Plan should be confirmed. The Plan COP Settlement contained therein cures the previous flaws with respect to COP Claim treatment. Further, the Syncora Settlement resolves multiple disputes between Syncora and the City while strengthening the commercial relationship between the parties. The Syncora Settlement satisfies the four-factor test for approving settlements under Rule 9019. Additionally, each element of the Syncora Settlement is reasonable and should be approved.

Dated: September 26, 2014            Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: */s/ Ryan B. Bennett*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*