**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---------------------------------------------------------x
                              :

In re                            :           Chapter 9
                              :

CITY OF DETROIT, MICHIGAN,    :           Case No. 13-53846
                              :

                   Debtor.     :           Hon. Steven W. Rhodes
                              :
                              :
---------------------------------------------------------x

## NOTICE OF FILING EXIT FINANCING TRANSACTION DOCUMENTS

**PLEASE TAKE NOTICE THAT:**

1.      On August 27, 2014 the City and the Michigan Finance Authority (the "MFA") executed a commitment letter ("Commitment Letter") with Barclays Capital Inc. ("Barclays"), which, among other items, includes a commitment from Barclays to provide up to $275 million in exit financing (the "Exit Financing").  A copy of the Commitment Letter and related term sheet was filed with this Court on August 28, 2014 [Docket No. 7167].

2.      On September 17, 2014, the City, the MFA and Barclays executed an amended and restated Commitment Letter which increased the available Exit Financing to $325 million.

3.      Since that time, the parties have negotiated and prepared the transaction documents governing the Exit Financing consistent with the

Commitment Letter and related term sheet, as amended. Attached hereto are the following Exit Financing transaction documents, which are in substantially final form:

(1) the Financial Recovery Bond Trust Indenture between the City of Detroit and UMB Bank, N.A., as Trustee, attached hereto as Exhibit A;

(2) the Deposit Account Control Agreement by and among the City of Detroit, UMB Bank, N.A., as Trustee under the Indenture and Comerica Bank, attached hereto as Exhibit B; and

(3) Order No. 13 of the Emergency Manager of the City of Detroit dated September 25, 2014 authorizing the Exit Financing in an amount not to exceed $325 million, attached hereto as Exhibit C.

4. On September 15, 2014, the Detroit City Council approved the Exit Financing in an amount not to exceed $325 million. On September 26, 2014, the Local Emergency Financial Assistance Loan Board also approved the Exit Financing in an amount not to exceed $325 million. No further approvals of the Exit Financing under applicable state law are necessary to consummate the transaction.

Dated:  September 29, 2014

Respectfully submitted,

 /s/  Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens
David A. Hall
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com
dahall@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

## CERTIFICATE OF SERVICE

I, Heather Lennox, certify that the foregoing Notice was filed and served via the Court's electronic case filing and noticing system on this 29th day of September, 2014.

/s/ Heather Lennox
Heather Lennox

CHI-181943658v2

# EXHIBIT A

**FINANCIAL RECOVERY BOND**

**TRUST INDENTURE**

Between

**CITY OF DETROIT**

County of Wayne, Michigan

and

**UMB BANK, N.A.**

as Trustee

$_____

**FINANCIAL RECOVERY INCOME TAX REVENUE AND
REFUNDING BONDS, SERIES 2014**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETATION ................................................................. 3
    Section 101. Definitions ........................................................................................................ 3
    Section 102. Interpretation .................................................................................................. 13

ARTICLE II TERMS OF BONDS ................................................................................................ 14
    Section 201. Authorization for Indenture and Bonds; Indenture to Constitute a
        Contract ...................................................................................................... 14
    Section 202. Authorization of Bonds ................................................................................. 15
    Section 203. Issuance and Delivery of Bonds ................................................................... 15
    Section 204. Conditions Precedent to Delivery of Bonds .................................................. 15

ARTICLE III GENERAL TERMS AND PROVISIONS OF BONDS ...................................... 16
    Section 301. Designation of Bonds; Form of Bonds ........................................................ 16
    Section 302. The MFA's Depository ................................................................................. 18
    Section 302A. Book-Entry Only System for the Bonds .................................................... 18
    Section 303. Conversion of Bonds .................................................................................... 19
    Section 304. Interchangeability of Bonds .......................................................................... 19
    Section 305. Negotiability, Transfer and Bond Registry ................................................... 19
    Section 306. Transfer of Bonds ......................................................................................... 20
    Section 307. Regulations With Respect to Exchanges and Transfers ............................... 20
    Section 308. Bonds Mutilated, Destroyed, Stolen or Lost ................................................ 20
    Section 309. Cancellation and Destruction of Bonds ....................................................... 21
    Section 310. Redemption ................................................................................................... 21
    Section 311. Selection of Bonds to be Redeemed ............................................................ 22
    Section 312. Notice of Redemption ................................................................................... 22
    Section 313. Payment of Redeemed Bonds ...................................................................... 23

ARTICLE IV PLEDGE OF INDENTURE; SOURCES OF PAYMENT AND
        SECURITY FOR THE BONDS ................................................................................... 23
    Section 401. The Bonds; Pledge of Indenture; Grant of Security Interest ....................... 23
    Section 402. Creation of Liens ........................................................................................... 24

ARTICLE V ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS ......... 24
    Section 501. Debt Service Fund; Income Tax Account and Pledged Income Tax
        Account ....................................................................................................... 24
    Section 502. Debt Service Reserve Account ..................................................................... 27
    Section 503. Costs of Issuance Fund ................................................................................. 27
    Section 504. Prior Bonds Refunding Fund ........................................................................ 27
    Section 505. Bond Proceeds Fund ..................................................................................... 28
    Section 506. Amounts Remaining in Funds and Accounts ................................................ 28

ARTICLE VI INVESTMENT OF FUNDS ................................................................................. 29
    Section 601. Permitted Investments .................................................................................. 29
    Section 602. Valuation and Sale of Investments ............................................................... 30

ARTICLE VII PARTICULAR COVENANTS OF THE CITY .................................................. 30
    Section 701. Payment of Bonds ......................................................................................... 30

Section 702. Power to Issue Bonds and Pledge Revenues, Funds and Other Property .............................................................................................. 31
Section 703. Maintenance of Perfected Security Interests; Further Assurances; Notices of Default ............................................................................ 31
Section 704. Tax Covenants ............................................................................... 31
Section 705. Compliance With Conditions Precedent ........................................ 31
Section 706. Accounts and Reports .................................................................... 31
Section 707. Issuance of Additional Obligations ............................................... 32
Section 708. Income Tax Revenues and Accounts ............................................. 32
Section 709. Contesting Enforceability ............................................................. 33
Section 710. Debt Service Covenant ................................................................. 33

ARTICLE VIII THE TRUSTEE AND CALCULATION AGENT ........................................ 33
Section 801. Powers and Duties of Trustee ....................................................... 33
Section 802. Fees and Expenses of Trustee ....................................................... 36
Section 803. Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale .............................................. 36
Section 804. Removal of Trustee ....................................................................... 37
Section 805. Appointment of and Transfer to Successor Trustee ....................... 37
Section 806. Calculation Agent ......................................................................... 38

ARTICLE IX EVENTS OF DEFAULT AND REMEDIES ON DEFAULT ............................ 38
Section 901. Events of Default .......................................................................... 38
Section 902. Remedies ...................................................................................... 39
Section 903. Waiver of Default ......................................................................... 39
Section 904. Possession of Bonds by Trustee Not Required .............................. 39
Section 905. Remedies Cumulative ................................................................... 39
Section 906. Knowledge by Trustee of an Event of Default .............................. 39
Section 907. Application of Monies ................................................................... 40

ARTICLE X SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE ..................................................................................... 40
Section 1001. Modifications and Amendments Not Requiring Consent ............. 40
Section 1002. Amendments Requiring Consent ................................................. 41
Section 1003. Consent of Trustee ...................................................................... 42
Section 1004. General Provisions Relating to Supplemental Indentures ............ 42

ARTICLE XI MISCELLANEOUS ............................................................................... 42
Section 1101. Notices ........................................................................................ 42
Section 1102. Termination ................................................................................. 43
Section 1103. Defeasance .................................................................................. 43
Section 1104. Severability ................................................................................. 44
Section 1105. Headings ..................................................................................... 44
Section 1106. Indenture Executed in Counterparts ........................................... 44
Section 1107. Parties Interested Herein ............................................................. 44
Section 1108. Jurisdiction ................................................................................. 44

EXHIBIT A  FORM OF SERIES 2014 BOND ............................................................. A-1

EXHIBIT B  FORM OF ACCOUNT CONTROL AGREEMENT ......................................... B-1

## FINANCIAL RECOVERY BOND TRUST INDENTURE

This Trust Indenture, dated as of _____, 2014 (the "Indenture"), between the City of Detroit, County of Wayne, State of Michigan (the "City") and UMB Bank, N.A., and its successors in trust and assignees, as trustee (the "Trustee").

## W I T N E S S E T H :

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City of Detroit (the "City") pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board, established pursuant to the Emergency Municipal Loan Act, Act 243, Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; and

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and with the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to chapter 9 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") initiating Bankruptcy Case No. 13-53846 (the "Bankruptcy Case"); and

WHEREAS, on September 16, 2014, the Emergency Manager filed on behalf of the City a Seventh Amended Plan of Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City in the Bankruptcy Case pursuant to and in accordance with chapter 9 of the Bankruptcy Code; and

WHEREAS, on _____, 2014, the Bankruptcy Court entered an order in the Bankruptcy Case confirming the Plan of Adjustment (the "Bankruptcy Court Order") [Docket Entry# _____]; and

WHEREAS, on April 8, 2014, pursuant to Section 36a of Act 279, Public Acts of Michigan, 1909, as amended ("Act 279"), a bond authorizing order adopted by the Emergency

Manager of the City on March 4, 2014 (the "Initial Authorizing Order") and a sale order issued by the Emergency Manager on April 8, 2014 (the "Initial Sale Order" and together with the Initial Authorizing Order, the "Initial Bond Orders"), the City issued its $120,000,000 Financial Recovery Bonds, Series 2014 (the "Prior Bonds") to finance certain quality of life projects in the City and a portion of the costs of issuance of the Prior Bonds; and

WHEREAS, the Prior Bonds were sold by negotiated sale to Barclays Capital, Inc., as purchaser and bond placement arranger ("Barclays"), and on June 9, 2014, Barclays syndicated the Prior Bonds pursuant to a purchase agreement between the City and Barclays; and

WHEREAS, pursuant to the Plan of Adjustment, the City (i) seeks to issue bonds to refund the Prior Bonds and (ii) in connection therewith is authorized to issue additional financial recovery bonds (a) to finance the costs (the "Additional Project Financing") of certain reinvestment and revitalization incentive projects in the City (the "Projects"); (b) to pay all or a portion of the City's obligations with respect to certain classes of claims identified in the Bond Authorizing Order (the "Claims") under the Plan of Adjustment; (c) to fund the Debt Service Reserve Account; and (d) to pay costs of issuance of such bonds; and

WHEREAS, Section 36a(7) of Act 279 authorizes a city to issue financial recovery bonds to be sold to the Michigan Finance Authority (the "MFA") for the purpose of refunding all or a portion of prior bonds issued under Section 36a and for such other purposes as approved by the Board; and

WHEREAS, in accordance with the Plan of Adjustment, on September ___, 2014, the Emergency Manager adopted an order (the "Bond Authorizing Order") authorizing the issuance of financial recovery income tax revenue and refunding bonds (the "Bonds") in one or more series, in the aggregate principal amount of not to exceed Three Hundred Twenty-Five Million Dollars ($325,000,000) to fund (i) the refunding of the Prior Bonds, (ii) the costs of the Projects, (iii) the costs of the Claims, (iv) the funding of the Debt Service Reserve Account and (v) payment of costs of issuance of the Bonds; and

WHEREAS, pursuant to Section 36a(7) of Act 279, the Bonds will be secured by a pledge of certain income tax revenues derived under Act 284, Public Acts of Michigan, 1963, as amended, in addition to a pledge of the City's limited tax full faith and credit; and

WHEREAS, in connection with the issuance of the Bonds, the Trustee shall enter into the Account Control Agreement (as hereinafter defined) with the City and the Depository Bank.

**NOW, THEREFORE, THIS TRUST INDENTURE WITNESSETH** that in order to secure the payment of the Bonds, for the benefit of the respective Registered Owners thereof and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Trustee for the benefit of the respective owners from time to time of the Bonds as follows:

2

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101.  Definitions.  In addition to the terms defined in the preambles to this Indenture and in the Bond Orders, the following terms shall have, unless the context otherwise requires, the meanings herein specified:

*"1 Month LIBOR Rate"* means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("BBA LIBOR") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Calculation Agent from time to time, upon notice to the City) at approximately 11:00 A.M. (London Time) two London Banking Days prior to a 1 Month LIBOR Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates.  If, for any reason, such rate is not available, the term 1 Month LIBOR Rate shall mean the rate of interest per annum determined by the Calculation Agent to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London Time) two London Banking Days prior to the 1 Month LIBOR Reset Date.  In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, the 1 Month LIBOR Rate shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage.

*"1 Month LIBOR Reset Date"* means the first Business Day of each calendar month.

*"Account"* means any of the trust funds and accounts created and established by, or pursuant to, this Indenture.

*"Account Control Agreement"* means that certain Deposit Account Control Agreement dated as of _____, 2014, by and among the City, the Trustee, and the Depository Bank in favor of the Trustee with respect to the Income Tax Account that holds the Pledged Income Tax Revenue.

*"Act 279"* means Act No. 279, Public Acts of Michigan, 1909, as amended.

*"Act 284"* means Act No. 284, Public Acts of Michigan, 1964, as amended, and any replacement or successor thereto.

*"Act 436"* means Act No. 436, Public Acts of Michigan, 2012.

*"Applicable Base Spread"* means the rate corresponding to the Ratings of the Bonds in the table set forth below.  In the event of a split Rating (i.e., one of the Rating Agencies' Ratings is at a different level from the Rating of the other of the Rating Agency or Agencies), then the Applicable Base Spread will be the average of the Applicable Base Spreads shown in the table

3

corresponding to the two Rating levels; provided that if the Bonds are rated by three Rating Agencies, the Applicable Base Spread will be determined by averaging the Applicable Base Spreads shown in the table corresponding to the two highest of such Rating levels. If the Bonds have been assigned a Rating by only one of the Rating Agencies, the Applicable Base Spread will be the rate corresponding to such Rating plus 0.50%. If none of the Rating Agencies has assigned a Rating to the Bonds as of the Public Offering Date, the Applicable Base Spread will be the Applicable Base Spread shown below for the "BB/Ba2 or Below" category plus 0.50%.

(a)     With respect to the Tax-Exempt Bonds:

| Rating | Applicable Base Spread |
| --- | --- |
| A-/A3 or Above | 2.00% |
| BBB+/Baa1 | 2.25% |
| BBB/Baa2 | 2.50% |
| BBB-/Baa3 | 3.25% |
| BB+/Ba1 | 4.25% |
| BB/Ba2 or Below | 4.50% |

(b)     With respect to Taxable Bonds:

| Rating | Applicable Base Spread |
| --- | --- |
| A-/A3 or Above | 2.25% |
| BBB+/Baa1 | 2.50% |
| BBB/Baa2 | 2.75% |
| BBB-/Baa3 | 3.50% |
| BB+/Ba1 | 4.50% |
| BB/Ba2 or Below | 4.75% |

"*Applicable Market Flex*" means, in connection with the determination of the Fixed Rates upon the consummation of the Public Offering, such increase (expressed as a positive market flex) or decrease (expressed as a negative market flex) in the fixed rates that would otherwise be applicable (in the absence of such Applicable Market Flex) as the Purchaser, in its capacity as underwriter of the MFA Bonds, determines, in its reasonable discretion and in consultation with the City and the MFA, to be necessary to achieve a Successful Public Offering within 150 days after the Closing Date, which Applicable Market Flex shall be subject to the Maximum Market Flex and the Maximum Negative Market Flex shown in the rates corresponding to the Ratings of the Bonds in the tables set forth below. In the event of a split Rating (i.e., one of the Rating Agencies' Ratings is at a different level from the Rating of one or more of the other Rating Agencies), then the Maximum Market Flex and the Maximum Negative Market Flex will each be the average of the Maximum Market Flex and the Maximum Negative Market Flex, respectively, shown in the table corresponding to the two Rating levels; provided, that if the Bonds are rated by three Rating Agencies, the Maximum Market Flex and the Maximum Negative Market Flex, respectively, will be determined by averaging the Maximum Market Flex and the Maximum Negative Market Flex, respectively, shown in the table corresponding to the two highest of such Rating levels. If the Bonds have been assigned a Rating by only one of the Rating Agencies, the Maximum Market Flex and the Maximum

4

Negative Market Flex will be the rates corresponding to such Rating plus 0.50% and -0.50%, respectively. If none of the Rating Agencies has assigned a Rating to the Bonds as of the Public Offering Date, the Maximum Market Flex and Maximum Negative Market Flex will be as shown below for the "BB/Ba2 or Below" category plus 0.50% and -0.50% respectively.

| Rating | Maximum Market Flex | Maximum Negative Market Flex |
| --- | --- | --- |
| A-/A3 or Above | 1.75% | -1.75% |
| BBB+/Baa1 | 2.00% | -2.00% |
| BBB/Baa2 | 2.25% | -2.25% |
| BBB-/Baa3 | 2.75% | -2.75% |
| BB+/Ba1 | 3.50% | -3.50% |
| BB/Ba2 or Below | 3.75% | -3.75% |

*"Authorized Denominations"* means with respect to Bonds of a subseries (i) in a Variable Rate Mode, $100,000 and any integral multiple of $5,000 in excess thereof and (ii) in a Fixed Rate Mode, $5,000 and any integral multiple thereof.

"*Authorized Officer*" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the Mayor or Finance Director of the City, (ii) if the City is operating under a financial emergency pursuant to Act 436, but no Emergency Manager (or successor thereto) has been appointed, any person or entity with legal authority to act on behalf of the City or (iii) any other person authorized by a Certificate of an Authorized Officer issued to the Trustee to act on behalf of or otherwise represent the City in any legal capacity, which such Certificate shall be delivered, if at all, in the City's sole discretion.

"*Bankruptcy Case*" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

*"Board"* has the meaning set forth in the recitals hereto.

"*Bond*" or *"Bonds"* means the Series 2014 Bonds.

"*Bondowner*", *"Owner"* or *"Registered Owner"* means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry under Section 305, and shall be the MFA.

*"Bond Authorizing Order"* means that Order of the Emergency Manager dated September 25, 2014 authorizing the issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"*Bond Counsel*" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"*Bond Orders*" means collectively the Bond Authorizing Order and the Sale Order.

5

"***Bond Proceeds Fund***" means the fund established pursuant to Section 505 hereof by the Trustee and pursuant to the Bond Orders in which, on the Date of Original Issue, the proceeds of the Bonds shall be deposited.

"***Bond Purchase Contract***" means that certain Purchase Contract by and between the MFA and the City dated as of _____, 2014 with respect to the Series 2014 Bonds.

"***Bond Registry***" means the books for the registration of Bonds maintained by the Trustee.

"***Business Day***" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee (at its office primarily responsible for the administration of this Indenture) or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"***Calculation Agent***" means the Purchaser or such other person as may be appointed by the City, with the consent of the Purchaser, to perform the functions of the Calculation Agent under this Indenture.

"***Certificate***" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called for by this Indenture, as the case may be.

"***Closing Date***" means the Date of Original Issue.

"***City***" means the City of Detroit, County of Wayne, Michigan.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Conversion Date***" means the Business Day on which the interest rate on Bonds initially issued with Variable Rates shall convert to Fixed Rates, which shall be the date established on the date of the Public Offering and which shall be not more than 150 days after the Closing Date, as determined by the Purchaser in consultation with the City and the MFA.

"***Costs of Issuance Fund***" means the fund established under Section 503 hereof for the payment of the costs of issuance of the Bonds.

"***Date of Original Issue***" means the date upon which all conditions precedent set forth in the Bond Purchase Contract to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the MFA.

"***Debt Service Account***" means the Account established within the Debt Service Fund for the benefit of the Series 2014 Bonds pursuant to Section 501 of this Indenture.

"***Debt Service Fund***" means the Debt Service Fund established under Section 501 hereof, for the payment of principal of and interest on the Bonds.

6

"**Debt Service Requirement Amount**" means, as applicable, an amount equal to (i) the interest and principal (or Redemption Price, as applicable), if any, due on the Bonds on the next succeeding Interest Payment Date plus if such Payment Date is also a Redemption Date, premium owing on such Redemption Date, if any, or (ii) the amount equal to the interest, premium, if any, and principal due on the Bonds on the Stated Maturity Date, plus any fees or expenses for which the Trustee is entitled to be paid from the Debt Service Fund.

"**Debt Service Reserve Account**" means the Account established within the Debt Service Fund pursuant to Section 502 of this Indenture.

"**Depository Bank**" means Comerica Bank and any successor thereto.

"**DTC**" means The Depository Trust Company, New York, New York and its successors and assigns

"**Electronic Means**" means telecopy, facsimile transmission, e-mail transmission or other similar electronic means of communication providing evidence of transmission, including a telephonic communication confirmed by any other method set forth in this definition.

"**Emergency Manager**" has the meaning set forth in the recitals hereto.

"**Event of Default**" has the meaning attributed to it in Section 901 hereof.

"**Favorable Opinion**" means a Bond Counsel's Opinion to the effect that the action proposed to be taken is authorized or permitted by the Indenture and will not, in and of itself, adversely affect the exclusion from gross income for federal income tax purposes of interest on the Tax-Exempt Bonds which are subject of such opinion.

"**Financing Documents**" means this Indenture, the Bond Purchase Contract, the Account Control Agreement, the Series 2014 Bonds, the Bond Orders and any other document related to the issuance, sale or delivery of the Bonds.

"**Fiscal Year**" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"**Fitch**" means Fitch Ratings, Inc., and its successors.

"**Fixed Rate**" means, with respect to each series of Bonds, a fixed interest rate effective on the Conversion Date and extending through the Stated Maturity Date, determined by the Calculation Agent according to the following formulas:

For Tax-Exempt Bonds, the sum of:

     (i)     the yield on Thomson Reuters Municipal Market Data [15-year] AAA Index as published on the Public Offering Date, plus

     (ii)    the Applicable Base Spread, plus

     (iii)   the Applicable Market Flex.

For Taxable Bonds, the sum of:

> (i)      the yield on [7-year] US Treasury Notes as published on the Public Offering Date, plus
>> (ii)     the Applicable Base Spread, plus
>> (iii)    the Applicable Market Flex.

*"Fixed Rate Mode"* means the period from the Conversion Date until the applicable Stated Maturity Date, during which Bonds bear interest at Fixed Rates.

*"Governmental Obligations"* means non-callable (a) direct obligations of the United States of America for the full and timely payment of which the full faith and credit of the United States of America is pledged, (b) obligations issued by a person controlled or supervised by and acting as an instrumentality of the United States of America, the payment of the principal of, premium, if any, and interest on which is fully guaranteed as a full faith and credit obligation of the United States of America (including any securities described in (a) or (b) issued or held in book-entry form on the books of the Department of Treasury of the United States of America or any Federal Reserve Bank, and (c) securities which represent an interest in the obligations described in (a) and (b) above.

*"Income Tax Account"* means that certain bank account in the City's name, established at Comerica Bank, Account No. 1850706191, that collects solely Income Tax Revenues.

*"Income Tax Revenues"* means revenues collected by or on behalf of the City from a levy of an excise tax on income pursuant to Act 284 or pursuant to any other applicable State or local law.

*"Indenture"* means this Trust Indenture, dated as of _____, 2014, as may be amended or supplemented from time to time.

*"Initial Interest Rate"* means a Variable Rate, for the Tax-Exempt Bonds equal to SIFMA Municipal Swap Index plus 4.25%, and for the Taxable Bonds equal to the 1 Month LIBOR Rate plus 4.75%.

*"Interest Payment Date"* means the following dates upon which interest is payable on Bonds of a subseries:

(a)     the Stated Maturity Date, the Conversion Date or any Redemption Date;

(b)     with respect to the Variable Rate Mode, the first Business Day of the first calendar month after the issuance of such Bonds and the first Business Day of each calendar month thereafter;

(c)     with respect to the Fixed Rate Mode, each _____ 1 and _____ 1.

*"Interest Period"* means the period of time that any interest rate remains in effect, which period:

8

(i)    with respect to Tax-Exempt Bonds in the Variable Rate Mode, shall be the period from and including the Closing Date to but excluding the following SIFMA Reset Date and thereafter commencing on and including each SIFMA Reset Date to but excluding the earlier of the next succeeding SIFMA Reset Date or the Conversion Date or the Maturity Date;

(ii)    with respect to Taxable Bonds in the Variable Rate Mode, shall be the period from and including the Closing Date to but excluding the first Business Day of the following calendar month and thereafter commencing on and including the first Business Day of each calendar month to but excluding the earlier of the first Business Day of the following calendar month or the Conversion Date or the Maturity Date; and

(iii)    with respect to Bonds of a subseries in the Fixed Rate Mode, shall be the period from and including the Conversion Date to and including the Stated Maturity Date or date of redemption prior to the Stated Maturity Date.

*"London Banking Day"* means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

*"Make-Whole Redemption Price"* has the meaning set forth in Section 3.10(c).

*"Maturity Date"* or *"Stated Maturity Date"* means for the Tax-Exempt Bonds no later than the 15th anniversary of the Date of Original Issue, and for the Taxable Bonds no later than the 8th anniversary of the Date of Original Issue, as set forth in the Sale Order.

*"Maximum Rate"* means eighteen percent (18%) per annum or such higher rate of annual interest as permitted by applicable law.

"*MFA*" means the Michigan Finance Authority, as successor to the Michigan Municipal Bond Authority.

*"MFA Bonds"* means the Michigan Finance Authority, Local Government Loan Program, Series 2014F (City of Detroit Local Project Bonds) issued pursuant to the Sixth Supplemental Indenture (Local Government Loan Program) dated the date hereof between the MFA and UMB Bank., N.A., as Trustee.

*"Mode"* means the Variable Rate Mode or the Fixed Rate Mode.

*"Moody's"* means Moody's Investors Service.

*"Non-Arbitrage and Tax Compliance Certificate*" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the date of issuance of the Bonds, regarding rebate requirements and other tax responsibilities of the City relating to the Tax-Exempt Bonds.

*"Notice Parties"* means the City, the Trustee and the Calculation Agent.

9

"***Outstanding***" when used with respect to the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered pursuant to the Bond Orders and this Indenture, except:

(A)     Bonds theretofore canceled by the Trustee or delivered to such Trustee for cancellation;

(B)     Bonds for whose payment money in the necessary amount has been theretofore irrevocably deposited with the Trustee in trust for the registered owners of such Bonds;

(C)     Bonds delivered to the Trustee for cancellation in connection with (i) the exchange of such Bonds for other bonds or (ii) the transfer of the registration of such Bonds;

(D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the Bond Orders or otherwise pursuant to law; and

(E)     Bonds deemed paid as provided in Section 801 of the Bond Authorizing Order.

"***Payment Date***" means each Interest Payment Date, Maturity Date and Redemption Date.

"***Permitted Investments***" means those investments specified in Article VI of this Indenture.

"***Person***" means a natural person, firm, joint venture, limited liability company, corporation, partnership, association, joint stock company, trust, any unincorporated organization or a governmental unit or political subdivision thereof.

"***Petition Date***" has the meaning set forth in the recitals hereto.

"***Pledged Income Tax Account***" means that certain bank account in the name of and in exclusive control of the Trustee, on behalf of the holders of the Bonds, established at the Depository Bank, into which Pledged Income Tax Revenues are remitted and deposited by the Depository Bank pursuant to the Account Control Agreement.

"***Pledged Income Tax Revenue***" means the Income Tax Revenues, but shall not include that portion of Income Tax Revenues transferred into the budget of the City's police department at any time, to be used exclusively to retain and hire police officers, in an amount equal to the sum of 0.2% of the income tax rate levied on resident individuals and 0.1% of the income tax rate levied on non-resident individuals, for so long as bonds, obligations or other evidences of indebtedness of the City's Public Lighting Authority are outstanding and payable from taxes levied by the City under the Utility Users Tax Act, Act 100, Public Acts of Michigan, 1990, as amended, MCL 141.1151, *et seq*.

"***Prior Bonds***" means the City's $120,000,000 Financial Recovery Bonds, Series 2014, as described in the recitals hereto.

"***Prior Bonds Refunding Fund***" means the fund so designated and established under Section 504 hereof.

"***Prior Bonds Trustee***" means UMB Bank, N.A., in its capacity as trustee for the Prior Bonds.

"***Projects***" means those certain reinvestment and revitalization incentive projects determined by the Emergency Manager or Authorized Officer to be financed with the proceeds of the Series 2014 Bonds constituting the Additional Project Financing.

"***Public Offering***" means a one-day secondary market sale of the MFA Bonds by the Purchaser in a manner similar to a primary offering of bonds in the municipal bond market.

***Public Offering Date"*** means the Business Day on which the Public Offering occurs.

"***Purchaser***" means Barclays Capital Inc. as the initial purchaser of the MFA Bonds.

***"Rate Determination Date"*** means any date on which the Variable Rate on any Bonds of a series or subseries is required to be determined, being _____, 2014 for the Initial Interest Rate and thereafter: (i) in the case of Tax-Exempt Bonds, each SIFMA Reset Date; (ii) in the case of Taxable Bonds, the first Business Date of each calendar month; and (iii) in the case of any Bonds of a series or subseries to be in the Fixed Rate Mode, the Public Offering Date.

***"Rating Agencies"*** means S&P, Moody's, Fitch or such other nationally recognized securities rating agencies selected by the City.

***"Rating"*** or ***"Ratings"***, plural, means a long term unenhanced debt rating assigned by one or more than one of the Rating Agencies to the Bonds at the time of the consummation of the Public Offering of the Bonds.

***"Record Date"*** means (i) with respect to each Interest Payment Date during the Variable Rate Mode, the close of business on the Business Day preceding such Interest Payment Date and (ii) with respect to each Interest Payment Date during the Fixed Rate Mode, (a) with respect to the first Interest Payment Date following the Conversion Date, (x) the close of business on the Conversion Date, if the Conversion Date occurs after the 15th day of the calendar month immediately preceding such Interest Payment Date or (y) the close of business on the fifteenth (15th) day of the calendar month immediately preceding such Interest Payment Date if the Conversion Date occurs on or before the 15th day of a calendar month immediately preceding such Interest Payment Date, and (b) with respect to each Interest Payment Date thereafter, the close of business on the 15th day of the calendar month immediately preceding such Interest Payment Date, regardless of whether such day is a Business Day.

"***Redemption Date***" means each date upon which Bonds of a subseries are to be called for redemption, in whole or in part, pursuant to this Indenture.

"***Redemption Price***" means, with respect to any Bond, as applicable, either the principal amount thereof plus the applicable premium, if any, or the Make Whole Redemption Price, in each case payable upon redemption thereof.

11

"**_Reserve Percentage_**" means, relative to any day of interest period, the maximum aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustment or other scheduled changes in reserve requirements) under any regulations of the Board of Governors of the Federal Reserve System (the "Board") or other governmental authority having jurisdiction with respect thereto as issued from time to time and then applicable to assets or liability consisting of "Eurocurrency Liabilities", as currently defined in Regulation D of the Board, having a term approximately equal or comparable to such interest period.

"**_Reserve Requirement_**" means the amount required to be on deposit in the Debt Service Reserve Account pursuant to Section 502 hereof, equal to the lesser of (1) the maximum annual debt service due on the Bonds at such time; (2) 125% of the average annual debt service due on the Bonds at such time, or (3) 10% of the original principal amount of the Bonds, each as determined on the Closing Date based on an assumed fixed interest rate of 6.00% per annum and on the Conversion Date based on the actual Fixed Rates.

"**_S&P_**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors.

"**_Sale Order_**" means that order of an Authorized Officer dated _____, 2014 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"**_Series 2014 Bonds_**" means the City's Financial Recovery Income Tax Revenue and Refunding Bonds, Series 2014, issued in connection with this Indenture, in two or more series, each series bearing a letter designation as determined and confirmed by an Authorized Officer in the Sale Order.

"**_SIFMA Municipal Swap Index_**" means, on any date, a rate determined on the basis of the seven-day high grade market index of tax-exempt variable rate demand obligations, as produced by Municipal Market Data and published or made available by the Securities Industry and Financial Markets Association ("SIFMA"), or any Person acting in cooperation with or under the sponsorship of SIFMA and acceptable to the Trustee, and effective from such date.

"**_SIFMA Reset Date_**" means every Thursday or if any Thursday is not a U.S. Government Securities Business Day, the next succeeding U.S. Government Securities Business Day, except that the initial SIFMA Reset Date shall be the Closing Date.

"**_Sinking Fund Installment_**" means the amount of principal required to be paid by the City on a certain future date for the retirement of Outstanding Bonds which mature after said future date, but does not include any amount payable by the City by reason of the maturity of a Bond or by call for redemption at the election of the City.

"**_State_**" has the meaning set forth in the recitals hereto.

"**_State Treasurer_**" means the Treasurer of the State of Michigan.

12

"**Successful Public Offering**" means (i) if at the time of the Public Offering, the MFA Bonds carry at least one long-term public credit rating from either Moody's or S&P in the investment grade category, a Public Offering in which the MFA Bonds are sold to the market at a price, in the aggregate equal to par and (ii) if at the time of the Public Offering, the MFA Bonds do not carry at least one long-term public credit rating from either Moody's or S&P in the investment grade category, a Public Offering in which the MFA Bonds are sold to the market at a price, in the aggregate, equal to par plus an amount equal to $2.50 per $1,000 bonds. For the avoidance of doubt, the Purchase may retain the proceeds of the Public Offering shall be retained by the Purchaser, representing par plus any such premium of $2.50/$1,000.

"**Supplemental Indenture**" means any indenture supplemental to or amendatory of this Indenture, executed by the City and the Trustee and effective in accordance with Article X.

"**Taxable Bonds**" means those Bonds, the interest on which is not excludable from gross income for federal tax purposes as of the Closing Date.

"**Tax-Exempt Bonds**" means those Bonds, the interest on which is excluded from gross income for federal tax purposes as of the Closing Date.

"**Trustee**" means initially, UMB Bank, N.A., as trustee, as bond registrar, transfer agent and paying agent for the Bonds and any successor in trust or assignees pursuant to Section 803 hereof.

"**Trust Estate**" shall have the meaning set forth in Section 401 hereof.

"**U.S. Government Securities Business Day**" means any day except for a Saturday, Sunday or a day on which SIFMA recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities.

"**Variable Rate**" means, with respect to each series of Bonds, the variable Initial Interest Rate borne by such Bonds until the Conversion Date.

"**Variable Rate Mode**" means the period from the Closing Date until the Conversion Date, during which Bonds bear interest at Variable Rates.

Section 102. <u>Interpretation</u>. (A) In this Indenture, unless the context otherwise requires:

(1)　the terms "hereby", "hereof", "herein", "hereunder" and similar terms, as used in this Indenture, refer to this Indenture, and the term "heretofore" means before, and the term "hereafter" means after, the date of this Indenture;

(2)　words of the masculine gender mean and include correlative words of the feminine and neuter genders and words importing the singular number mean and include the plural number and vice versa;

(3)　words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations and other legal entities, including public bodies, as well as natural persons;

(4)     any headings preceding the texts of the several Articles and Sections of this Indenture and any table of contents or marginal notes appended to copies hereof shall be solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect;

(5)     this Indenture shall be governed by and construed in accordance with the applicable laws of the State;

(6)     references to the payment of the Bonds shall be deemed to include reference to the payment of interest thereon;

(7)     references to time shall mean the applicable local time in New York City, New York; and

(8)     references to Sections and Articles, unless otherwise indicated, refer to Sections and Articles in this Indenture.

(B)     Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person, other than the City, the Trustee, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation thereof.  All the covenants, stipulations, promises and agreements herein contained by and on behalf of the City, shall be for the sole and exclusive benefit of the City, the Trustee, and the Owners of the Bonds.

(C)     If any one or more of the covenants or agreements provided herein on the part of the City or the Trustee to be performed should be contrary to law, then such covenant or covenants or agreement or agreements shall be deemed separable from the remaining covenants and agreements hereof and shall in no way affect the validity of the other provisions of this Indenture or of the Bonds.

**ARTICLE II**

**TERMS OF BONDS**

Section 201.   <u>Authorization for Indenture and Bonds; Indenture to Constitute a Contract</u>. This Indenture and the issuance of Bonds hereunder have been duly authorized by the City.  The City has ascertained and it is hereby determined and declared that the execution and delivery of this Indenture is necessary to carry out and effectuate the purposes of the City and that each and every covenant or agreement herein contained and made is necessary, useful or convenient in order to better secure the Bonds and is a contract or agreement necessary, useful and convenient to carry out and effectuate the purposes of the City.  In consideration of the purchase and acceptance of the Bonds by those who shall purchase and hold the same from time to time, the provisions of this Indenture, any Bond Order and any Supplemental Indenture shall be deemed to be and shall constitute a contract between the City, the Trustee and the Owners from time to time of the Bonds, and such provisions are covenants and agreements with such Owners which the City hereby determines to be necessary and desirable for the security and payment thereof.  The pledge hereof, and the provisions, covenants and agreements herein set forth to be performed by

the City, shall be for the equal benefit, protection and security of the Owners of any and all Bonds which shall be of equal rank without preference, priority or distinction among all Bonds, except as may otherwise be expressly set forth herein.

Section 202.   <u>Authorization of Bonds</u>.   In order to provide sufficient funds for the purposes set forth in the Bond Orders, obligations of the City in the form of Bonds are hereby authorized to be issued from time to time hereunder in two or more series or subseries.   No Bonds shall be issued unless they are part of an issue described in the Bond Orders and until the conditions contained in this Indenture are satisfied.

Section 203.   <u>Issuance and Delivery of Bonds</u>.   After their authorization by the City, Bonds may be executed by or on behalf of the City and delivered to the Trustee in accordance with the Bond Authorizing Order and this Indenture for authentication and, upon compliance by the City with the requirements of Section 204, the Trustee shall thereupon authenticate and deliver such Bonds to or upon the order of the City.   No Bond shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Exhibit A of this Indenture, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Trustee by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

Section 204.   <u>Conditions Precedent to Delivery of Bonds</u>.   The Bonds shall be authenticated and delivered upon the order of the City, but only upon the receipt by the Trustee of:

(1)     a copy of the Bond Orders authorizing each such series, executed by the City, which shall specify:

(a)     the authorized principal amount and designation of such Bonds;

(b)     the purposes for which such Bonds are issued;

(c)     the dated dates and maturity dates of the Bonds;

(d)     the interest rates, if any, of and principal amounts payable upon such Bonds (or the manner of determining such rates or amounts) and the interest payment dates, if any, and principal installment dates therefor;

(e)     the denominations of, and the manner of dating, numbering and lettering, such Bonds;

(f)     the places of payment of such Bonds or the manner of appointing and designating the same;

(g)     provisions concerning the forms of such Bonds and of the Trustee's certificate of authentication, if applicable ;

(h)     evidence of compliance with Act 279, including receipt of an order of the Board approving all terms and conditions of the Bonds;

(i)     any other provisions deemed advisable by the City as shall not conflict with the provisions hereof; and

(j)     the Redemption Price, if any, of and the redemption terms for such Bonds.

(2)     a Bond Counsel's Opinion in the form as agreed to by the City and the Purchaser. to the effect that (i) such Bond Order and/or Supplemental Indenture and this Indenture have been duly authorized, executed and delivered by the City and are valid and binding upon, and enforceable against, the City; and (ii) upon the execution, authentication and delivery thereof, such Bonds will have been duly and validly authorized and issued in accordance with the constitution and statutes of the State and in accordance with this Indenture with such qualifications and exceptions to such opinion as specified in the Bond Purchase Contract; and

(3)     evidence of the receipt by the Trustee of the amount of the proceeds of such Bonds to be deposited with the Trustee pursuant to Section 505, which shall be conclusively established by the executed certificate of the Trustee so stating.

## ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

Section 301.    Designation of Bonds; Form of Bonds.

(a) *Designation and Form of Bonds.*  Bonds designated as "Financial Recovery Income Tax Revenue and Refunding Bonds, Series 2014" are hereby authorized to be issued pursuant to the provisions of this Indenture in the principal amount of $_____.  The Bonds shall bear a Date of Original Issue of _____, 2014.  The Bonds shall be issued in fully registered form, without coupons, and in Authorized Denominations, and shall be subject to interest rate conversion and redemption as set forth in this Indenture.  The Bonds shall contain a recital that they are issued pursuant to the laws of the State and may have printed thereon such legend or legends as may be required to comply with any law, rule or regulation.  Each Bond shall be numbered as determined by the City.  The Bonds shall be substantially in the form set forth in Exhibit A, with such appropriate changes, omissions and insertions as are permitted or required by this Indenture or the Bond Authorizing Order.  The Bonds shall be payable, as to principal, interest and redemption premium, if any, in lawful money of the United States of America. Principal and interest on the Bonds shall be due and payable as set forth in the form of Bond set forth in Exhibit A.  Interest shall be calculated as provided herein and in the Sale Order.  The principal amount of the Bonds of each series shall be payable on the Maturity Date.  The Bonds shall bear CUSIP numbers as provided by the CUSIP Service Bureau.

(b) *Payment of Principal and Interest.*  Principal of (or Redemption Price, if applicable), and premium, if any, on the Bonds are payable upon presentation and surrender thereof at the designated corporate trust office of the Trustee.  Payment as aforesaid shall be made in any coin

16

or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.

Bonds of a series or subseries shall initially bear interest at the Initial Interest Rate, as established by the Calculation Agent pursuant to Section 301(c).  All Bonds shall be subject to conversion to Fixed Rates upon the Conversion Date; provided, however, that the Bonds shall convert to Fixed Rates only if the MFA Bonds simultaneously convert to Fixed Rates.  The Purchaser may, after consultation with the City and the MFA, cause the Calculation Agent to increase or decrease the Fixed Rates by the Applicable Market Flex if the Purchaser determines, in its reasonable discretion and in consultation with the City and the MFA, that a Successful Public Offering is unable to be achieved within 150 days after the Closing Date without such adjustment.

Accrued and unpaid interest on the Bonds of a subseries shall be due on the Interest Payment Dates and payable by wire transfer of immediately available funds to the account specified by the Owner in a written direction received by the Trustee on or prior to a Record Date or, if no such account number is furnished, by check mailed by the Trustee to the Owner at the address appearing on the books required to be kept by the Trustee pursuant to this Indenture. Any such direction shall remain in effect until revoked or revised by such Owner by an instrument in writing delivered to the Trustee, as the case may be.  Interest on Bonds of a subseries in the Variable Rate Mode shall be calculated on the basis of a 365/366-day year for the actual number of days elapsed to the Interest Payment Date, and based on the weighted average of the Variable Rates in effect for each Interest Period during which such interest is accrued.  Interest on Bonds of a subseries in the Fixed Rate Mode shall be calculated on the basis of a 360-day year composed of twelve 30-day months.  Absent manifest error, the interest rates for Bonds of a subseries contained in the records of the Trustee shall be conclusive and binding upon the City and the Owners.

No Bond of a series or subseries may bear interest at an interest rate higher than the Maximum Rate.  Upon the occurrence of an Event of Default, the Bonds may be subject to an interest rate increase equal to the rate of interest which is two percent above the MFA's cost of providing funds (as determined by the MFA) to make payment on the MFA Bonds, but in no event to a rate higher than the Maximum Rate.

(c)  *Determination of Interest Rates*.  The interest rate for Tax-Exempt Bonds in the Variable Rate Mode for each such Interest Period shall be the Initial Interest Rate as determined by the Calculation Agent by [4:00 p.m.] on the applicable Rate Determination Date.  The Calculation Agent shall make the rate available by Electronic Means to each other Notice Party by [4:30 p.m.], on the Rate Determination Date or at such other times as may be agreed to by the City and the Calculation Agent.  The determination of each interest rate by the Calculation Agent shall be conclusive and binding, in the absence of manifest error, upon the Calculation Agent, the Trustee, the City and the Owners.

The interest rate for Taxable Bonds in the Variable Rate Mode for each such Interest Period shall be the Initial Interest Rate as determined by the Calculation Agent by [4:00 p.m.] on and as of the applicable Rate Determination Date.  The Calculation Agent shall make the rate available by Electronic Means to each other Notice Party by [4:30 p.m.], on the Rate

Determination Date or at such other times as may be agreed to by the City and the Calculation Agent. The determination of each interest rate by the Calculation Agent shall be conclusive and binding, in the absence of manifest error, upon the Calculation Agent, the Trustee, the City and the Owners.

Section 302. <u>The MFA's Depository</u>. Notwithstanding any other provision herein to the contrary, as long as the MFA is the owner of the Bonds, the Bonds are payable as to principal, premium, if any, and interest at the corporate trust office of UMB Bank, N.A., Kansas City, Missouri, or such other qualified bank or financial institution as shall be designated in writing to the City by the MFA (the "MFA's Depository"). The City will deposit with the MFA's Depository payments of the principal of, premium, if any, and interest on the Bonds in immediately available funds at least five business days prior to the date on which any such payment is due whether by maturity, redemption or otherwise. Written notice of any redemption of the Bonds shall be given by the City and received by the MFAs Depository at least 40 days prior to the date on which such redemption is to be made

Section 302A. <u>Book-Entry Only System for the Bonds</u>. (a) Except as provided in Sections 302 and 302A(b) hereof, the ownership of the Bonds may be registered in the Bond Registry in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered in the Bond Register in the name of Cede & Co., as nominee of DTC, the City and the Trustee shall have no responsibility or obligation to any broker-dealer, bank or other financial institution for which DTC holds Bonds from time to time as securities depository (each such broker-dealer, bank or other financial institution being referred to herein as a "DTC Participant") or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds. Without limiting the immediately preceding sentence, the City and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any notice with respect to the Bonds, including any notice of redemption, or (iii) the payment to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any amount with respect to principal of, premium, if any, or interest on the Bonds. Notwithstanding any other provision of this Indenture to the contrary, the City and the Trustee shall be entitled to treat and consider the Person in whose name each Bond is registered in the Bond Registry as the absolute owner of such Bond for the purpose of payment of principal of, premium, if any, and interest on such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondowners, as shown in the Bond Registry as provided in this Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to satisfy and discharge the City's obligations fully with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. No Person other than a Bondowner, as shown in the Bond Registry, shall receive a Bond certificate evidencing the obligation of the City to make payments of principal, premium, if any, and interest pursuant to this Indenture. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and

18

subject to the provisions in this Indenture with respect to interest checks or drafts being mailed to the registered owner as of the close of business of the Record Date, the word "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(b)    In the event that the City or the Trustee determines that DTC is incapable of discharging its responsibilities described herein and in the Letter of Representations between the City and DTC (the "Letter of Representations") or that it is in the best interest of the beneficial owners of the Bonds that they be able to obtain certificated Bonds, the City shall either (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities Act of 1934, as amended, notify DTC and DTC Participants of the appointment of such successor securities depository or (ii) transfer one or more separate Bond certificates to DTC Participants having Bonds credited to their DTC accounts.  In such event, the Bonds shall no longer be restricted to being registered in the Bond Registry in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondowners transferring or exchanging Bonds shall designate, in accordance with the provisions of this Indenture.  The Trustee shall give written notice to the City of a determination to issue certificated bonds.

(c)    Notwithstanding any other provision of this Indenture to the contrary, so long as any series of the Bonds is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on the Bonds and all notices with respect to such Bonds shall be made and given, respectively, in the manner provided in the Letter of Representations.  The Trustee shall request in each notice sent to Cede & Co., pursuant to the terms of this Indenture, that Cede & Co. forward or cause to be forwarded such notice to the DTC Participants, but neither the Trustee nor the City shall be liable if Cede & Co. fails to honor such request.

Section 303.    <u>Conversion of Bonds</u>.    The Bonds of each series shall be subject to conversion to Fixed Rates upon the Conversion Date; provided, however, that the Bonds shall convert to Fixed Rates only if the MFA Bonds simultaneously convert to the same Fixed Rates.

Section 304.    <u>Interchangeability of Bonds</u>.    In the event that Bonds are no longer registered in the name of Cede & Co., as nominee of DTC, Bonds, upon surrender thereof at the corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the Owner or his duly authorized attorney, may at the option of the Owner thereof, and upon payment by such Owner of any charges which the Trustee may make as provided in Section 306, be exchanged for an equal aggregate principal amount of Bonds of the same series or subseries and maturity bearing the same rate of interest and having the same terms of any of the Authorized Denominations; provided, however, that the exchange of Bonds may be restricted by the Supplemental Indenture pursuant to which such Bonds are issued.

Section 305.    <u>Negotiability, Transfer and Bond Registry</u>.    All the Bonds issued under this Indenture shall be negotiable, subject to the provisions for registration, transfer and exchange contained in this Indenture and in the Bonds.  So long as any of the Bonds remain Outstanding, the City shall maintain and keep, at the designated corporate trust office of the Trustee books for the registration, transfer and exchange of Bonds. Upon presentation thereof for such purpose at said office, the City shall register or cause to be registered in such books, and

permit to be transferred thereon, any Bonds pursuant to such reasonable regulations as it or the Trustee may prescribe. So long as any of the Bonds remain Outstanding, the City shall make all necessary provisions to permit the exchange of Bonds at the corporate trust office of the Trustee.

Section 306.  Transfer of Bonds.  (A) The registration of each Bond is transferable, only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(B)  Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the designated corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 307.  Regulations With Respect to Exchanges and Transfers.  (A) In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the City shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of this Indenture.  All Bonds surrendered in such exchanges or transfers shall be forthwith canceled by the Trustee.

(B)  For every such exchange or transfer of Bonds, the City or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, and may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or transfer, which sums shall be paid by the Bondowner requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(C)  The Trustee and the City shall not be required (i) to issue, exchange or transfer any Bond during a period beginning on the opening of business 15 days before the giving of a notice of redemption and ending on the date of the mailing of notice of such redemption, or (ii) to transfer or exchange Bonds called or being called for redemption, except the unredeemed portion of Bonds being redeemed in part.

Section 308.  Bonds Mutilated, Destroyed, Stolen or Lost.  If any Bond shall become mutilated, the City, at the expense of the Registered Owner of the Bond, shall execute, and the Trustee shall authenticate and deliver, a new Bond of like tenor in exchange and substitution for the mutilated Bond, upon surrender to the Trustee of the mutilated Bond.  If any Bond issued under this Indenture shall be lost, destroyed or stolen, evidence of the loss, destruction or theft may be submitted to the Trustee and, if this evidence is satisfactory to both and indemnity satisfactory to the Trustee shall be given, and if all requirements of any applicable law including Act 354, Public Acts of Michigan, 1972, as amended ("Act 354"), being sections 129.131 to 129.135, inclusive, of the Michigan Compiled Laws have been met, the City, at the expense of

the Owner, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor and bearing the statement required by Act 354, or any applicable law hereafter enacted, in lieu of and in substitution for the Bond so lost, destroyed or stolen. If any such Bond shall have matured or shall be about to mature, instead of issuing a substitute Bond the Trustee may pay the same without surrender thereof.

Section 309. <u>Cancellation and Destruction of Bonds</u>. All Bonds paid or redeemed by the City, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bond, together with all Bonds purchased by the Trustee, shall thereupon be promptly cancelled. Bonds so cancelled may at any time be cremated or otherwise destroyed by the Trustee, who shall execute a Certificate of cremation or destruction in duplicate by the signature of one of its authorized officers describing the Bonds so cremated or otherwise destroyed. Such executed Certificate shall be filed with the City and the other executed Certificates shall be retained by the Trustee.

Section 310. <u>Redemption</u>. (a) The Bonds shall be subject to optional and mandatory redemption as set forth in this Section 310 and in the form of Bonds attached hereto as Exhibit A. The Bonds shall only be redeemed in Authorized Denominations. No partial redemption of Bonds is authorized, unless as a result of such partial redemption, the remaining Outstanding Bonds of a series shall be in Authorized Denominations.

(b)     The Tax Exempt Bonds shall be subject to redemption at the option of the City, in whole or in part, on any Business Day upon 40 days prior written notice on or after the tenth anniversary of the Closing Date, or such shorter period as the Purchaser determines on or before the Public Offering Date that the Tax Exempt Bonds may become subject to optional redemption without a pricing penalty, at the redemption price equal to the principal amount thereof, plus accrued interest to the Redemption Date. The City shall provide a Direction to the Trustee no less than five (5) Business Days prior to the date the Trustee is to provide notice to the Owners.

(c)     Prior to the Public Offering Date, the Taxable Bonds may be called for redemption in whole or in part on any Interest Payment Date upon 40 days' prior written notice at a redemption price equal to 100% of the principal amount thereof, plus accrued interest on the Bonds to be redeemed through the applicable Redemption Date. Following the Public Offering Date, Taxable Bonds which have converted to a Fixed Rate Mode shall be subject to redemption at the option of the City, in whole or in part, on any Business Day upon 40 days prior written notice, at a price (the "Make-Whole Redemption Price") equal to the greater of (i) 100% of the principal amount of such Bonds to be redeemed, and (ii) the sum of the present value of the remaining scheduled payments of principal and interest to the maturity date of the Bonds to be redeemed, not including any portion of those payments of interest accrued and unpaid as of the date on which the Bonds are to be redeemed, discounted to the date on which the Bonds are to be redeemed on a semi-annual basis, assuming a 360-day year consisting of twelve 30-day months, at the adjusted Treasury Rate plus 30 basis points, plus accrued interest on the Bonds to be redeemed through the Redemption Date. For purposes of this subsection, "Treasury Rate" means the yield to maturity as of the Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least five (5) business days prior to the Redemption Date (excluding inflation indexed securities), or if such Statistical Release is no

longer published, any publicly available source of similar market data) most nearly equal to the period from the Redemption Date to the maturity date of the Bonds to be redeemed; provided, however, that if the period from the Redemption Date to such maturity date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used. The City shall provide a Direction to the Trustee no less than five (5) Business Days prior to the date the Trustee is to provide notice to the Owners.

(d)     The Make-Whole Redemption Price of the Bonds to be redeemed pursuant to the optional redemption provision described in Section 310(c) above will be determined by an independent accounting firm, investment banking firm or financial advisor retained by the City at the City's expense to calculate such Make-Whole Redemption Price. The Trustee and the City may conclusively rely upon the determination of such Make-Whole Redemption Price by such independent accounting firm, investment banking firm or financial advisor and neither the Trustee nor the City will be liable for such reliance.

Section 311.    <u>Selection of Bonds to be Redeemed</u>.  Subject to any rules and procedures of a securities depository for Bonds held in book-entry form, in the event of redemption of less than all the Outstanding Bonds of like series and maturity, the Trustee shall assign to each such Outstanding Bond a distinctive number for each minimum denomination of the principal amount thereof so as to distinguish each such minimum denomination from each other portion of the Bonds subject to such redemption. The Trustee shall select by lot, using such method of selection as it shall deem proper in its sole discretion, from the numbers of all such Bonds then Outstanding of such series and maturity, as many numbers as, at the minimum denomination for each number, shall equal the principal amounts of such Bonds to be redeemed. The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; but only so much of the principal amount of each such Bonds of a denomination of more than the minimum denomination shall be redeemed as shall equal the minimum denomination for each number assigned to it and so selected. For the purposes of this Section, Bonds which have theretofore been selected by lot for redemption shall not be deemed Outstanding.

Section 312.    <u>Notice of Redemption</u>.  When redemption of Bonds is required by this Indenture, the Trustee shall give notice, in the name of the City, of the redemption of such Bonds. Such notice shall specify the series and maturities of the Bonds to be redeemed, the Redemption Date and the place or places where amounts due upon such redemption will be payable and, if less than all the Bonds of any like series and maturity are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, such notice shall also specify the respective portions of the principal amount thereof to be redeemed. Such notice shall further state that on such date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the principal thereof in the case of registered Bonds to be redeemed in part only, together with interest accrued to the Redemption Date, and that from and after such date interest thereon shall cease to accrue and be payable. Such notice shall be given by first class mail or registered or certified mail, return receipt requested, at least forty (40) days before the Redemption Date to the Owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registry books, but failure to mail any such notice shall not affect the validity of the proceedings for the redemption of Bonds with respect to which no such failure occurred. As directed by the City, further notice

22

shall be given by the Trustee in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 313. <u>Payment of Redeemed Bonds</u>. Notice having been given by mail in the manner provided in Section 312, the Bonds or portions thereof so called for redemption shall become due and payable on the Redemption Date so designated at the Redemption Price, plus interest accrued and unpaid to the Redemption Date, and, upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the Redemption Date. If there shall be called for redemption less than the entire principal amount of a Bond, the City shall execute, the Trustee shall authenticate and the Trustee shall deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered at the option of the Owner, Bonds of like series and maturity in any of the Authorized Denominations. If, on the Redemption Date, moneys for the redemption of all the Bonds or portions thereof of any like series and maturity to be redeemed, together with interest to the Redemption Date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been mailed as aforesaid, then, from and after the Redemption Date, interest on the Bonds or portions thereof of such series and maturities so called for redemption shall cease to accrue and become payable. If said moneys shall not be available on the Redemption Date, such Bonds or portions thereof shall continue to bear interest until paid or provided for at the same rate as they would have borne had they not been called for redemption.

**ARTICLE IV**
**<u>PLEDGE OF INDENTURE; SOURCES OF PAYMENT</u>**
**<u>AND SECURITY FOR THE BONDS</u>**

Section 401. <u>The Bonds; Pledge of Indenture; Grant of Security Interest</u>. The City hereby grants a valid, binding, enforceable, non-avoidable, continuing security interest in, assigns, transfers, pledges, grants, conveys and hypothecates unto the Trustee and its successors and assigns, on behalf of the Bondowners, forever, on a first priority lien basis, all of the right, title and interest of the City in all of the following described property (collectively, the "Trust Estate"):

(a)     All rights and interests of the City in the Pledged Income Tax Revenue (the "Collateral").

(b)     Amounts on deposit from time to time in the Accounts created pursuant hereto subject to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein.

The Bonds are also limited tax general obligations of the City, which will be payable from ad valorem taxes annually levied on all taxable property within the City, subject to applicable constitutional, statutory and charter tax rate limitations.

To the fullest extent provided by applicable laws, the money and property hereby pledged shall immediately be subject to the lien of such pledge without any physical delivery thereof, without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents or the possession or control by the Trustee over any of the Trust Estate, or further act and such lien shall be valid and binding against all parties having claims in tort, contract or otherwise against the City, irrespective of whether such parties have notice of the claim. Neither the Bond Orders authorizing the Bonds nor this Indenture nor any Supplemental Indenture need be recorded.

Section 402. <u>Creation of Liens</u>. In order to further implement the liens on the Collateral in favor of the holders of the Bonds, the City and the Trustee each hereby covenant to enter into the Account Control Agreement with the Depository Bank, and the Trust Estate shall include the Trustee's rights thereunder in and to the Pledged Income Tax Account and all amounts deposited therein.

**ARTICLE V**

**<u>ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS</u>**

Section 501. <u>Debt Service Fund; Income Tax Account and Pledged Income Tax Account</u>.

(a) *Establishment of Debt Service Fund and Accounts.* There is hereby created and established in the name of the Trustee, pursuant to the Bond Orders and this Indenture, a single trust fund designated the "Financial Recovery Income Tax Revenue and Refunding Bonds, Debt Service Fund" (hereinafter referred to as the "Debt Service Fund").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Income Tax Revenue and Refunding Bonds, Series 2014 – Debt Service Account" (hereinafter referred to as the "Debt Service Account").

(b) *Establishment of Pledged Income Tax Account*. There is hereby created and established at the Depository Bank the Pledged Income Tax Account, which shall be in the name and under the exclusive control of the Trustee. The Pledged Income Tax Account shall be maintained in the name of the Trustee, on behalf of the holders of the Bonds, for so long as the Bonds (or any portion thereof) remain outstanding. On each day of each calendar month, all Pledged Income Tax Revenues on deposit in the Income Tax Account shall be remitted and deposited by the Depository Bank ("Daily Transfer Obligation") into the Pledged Income Tax Account.

(c) *Deposits to Debt Service Fund.* During the Variable Rate Mode, there shall be set aside and transferred from the Pledged Income Tax Account to the Debt Service Account on a first dollar basis on the first Business Day of each month for interest on the Bonds an amount equal to the total amount of interest on the Bonds next coming due on the next Interest Payment Date. For purposes of this subsection, interest on Bonds in the Variable Rate Mode shall be assumed to bear interest at the rate of 6.00% per annum, or if the Bonds are then bearing interest

at a higher rate, the actual rate of interest borne by the Bonds. During the Fixed Rate Mode, there shall be set aside and transferred from the Pledged Income Tax Account to the Debt Service Account on a first dollar basis on the first Business Day of each month for interest on the Bonds an amount which shall be the fractional amount of the total amount of interest on the Bonds next coming due on the next Interest Payment Date, derived from the number of months from the Public Offering of the MFA Bonds (the "Public Offering Date") to the first Payment Date thereafter. Such transfers shall be reduced by amounts, including investment earnings, available in the Debt Service Account which are available for such purpose. Commencing with the Public Offering Date, the amount set aside and transferred from the Pledged Income Tax Account to the Debt Service Account each month for interest on the Bonds shall be 1/6 of the total amount of interest on the Bonds next coming due. Commencing on the Public Offering Date, there shall also be set aside and transferred from the Pledged Income Tax Account to the Debt Service Account each month for principal, the fractional amount of the total amount of principal on the Bonds next coming due on the next principal payment date, if any, by maturity or sinking fund redemption derived from the number of months from the Public Offering Date to the first principal payment date. The amount set aside and transferred from the Pledged Income Tax Account to the Debt Service Account each month for principal payment commencing with the first principal payment date after the Public Offering Date shall be 1/12 of the amount of principal next coming due by maturity or sinking fund redemption. The last such transfer preceding each Payment Date shall be reduced by amounts, including investment earnings, available in the Debt Service Account which are available for such purpose. If there is any deficiency in the amount previously set aside, that deficiency shall be added to the next succeeding monthly requirements. In each case of the above transfers for set asides of interest and principal on the Bonds the Debt Service Account shall be fully funded one month in advance of each Payment Date.

On the first Business Day of each calendar month that (a) there is no deficiency in the Debt Service Account balance or the Debt Service Reserve Account balance, in each case, as required under this Section 501(c) hereof, and (b) the City's obligation under this Section 501(c) hereof to make fractional monthly interest and principal debt service deposits has been fully met for such calendar month, the Trustee shall send notice to the Depository Bank by Electronic Means to permit the transfer at the direction of the City from the Income Tax Account any Income Tax Revenue to one or more deposit accounts in the name of the City to be used by the City in its sole discretion, and neither the City nor the Depository Bank shall have any Daily Transfer Obligation with respect to that portion of the Income Tax Revenue. Thereafter, the Depository Bank shall discontinue the Daily Transfer Obligation until the last Business Day of such calendar month, whereupon the Depository Bank will recommence the Daily Transfer Obligation on the first Business Day of the next calendar month. This cycle shall be repeated on a month-to-month basis until the Account Control Agreement is terminated.

In the event that (i) thirty (30) days prior to any Payment Date during the Fixed Rate Mode or (ii) four (4) Business Days prior to any Payment Date during the Variable Rate Mode, amounts on deposit in the Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Bonds on such Payment Date, the Trustee shall promptly notify the City in writing of such deficiency and the City shall, promptly after receiving such notice, cause to be deposited with the Trustee other available funds of the City for deposit to the Debt Service Account, in an amount necessary to make up the Debt Service Requirement

Amount owing on such Payment Date. The Trustee shall confirm in writing to the City the receipt of each additional payment of additional funds for deposit into the Debt Service Account.

The Trustee, in its capacity as transfer agent and paying agent for the Bonds, shall withdraw from the Debt Service Account of the Debt Service Fund the amounts necessary to pay when due the Debt Service Requirement Amount for the Bonds on each Payment Date.

(d)     *Deposits and Withdrawals from Debt Service Fund upon Termination of the Account Control Agreement.* In the event that (i) the Depositary Bank provides the City and the Trustee written notice of termination of the Account Control Agreement and (ii) the City and the Trustee have not entered into a new Account Control Agreement (the "Successor Account Control Agreement") on terms agreeable to the City and the Trustee with a successor Depositary Bank within seventy-five (75) days following such notice, or such longer period of time as may be agreed upon between the City and the Trustee, then, the City and the Trustee shall begin the implementation of this Section. From the date of termination of the Account Control Agreement until the date the Successor Account Control Agreement is effective, the parties agree that:

(i)     (a) the City shall establish a deposit account dedicated solely for the receipt of Pledged Income Tax Revenues (the "City Back-Up Income Tax Deposit Account") with, and shall enter into depositary banking agreements with, UMB Bank, N.A., (or such other bank as may then be serving as trustee hereunder) as depositary bank (the "Successor Depositary Bank") for, the City Back-Up Income Tax Deposit Account. Such City Back-Up Income Tax Deposit Account will be owned by and in the name of the City, and will incur the Depositary Bank's then usual and customary fees for services rendered by the Depositary Bank to the City Back-Up Income Tax Deposit Account and (b) the City shall cause at least 75% of all Pledged Income Tax Revenues net of refunds to be deposited directly by the applicable taxpayers, or the City if remitted by the taxpayers to the City, into such City Back-Up Income Tax Deposit Account on a daily basis. Nothing in this subsection (d)(ii) shall alter the obligation to make deposits to the Pledged Income Tax Account as provided in Section 501(b), which deposits shall be made under this subsection from the City Back-Up Income Tax Deposit Account;

(ii)     in the event that the City Back-Up Income Tax Deposit Account is not established as of the termination date of the Account Control Agreement, then (a) the Trustee shall establish a deposit account dedicated solely for the receipt of Pledged Income Tax Revenues (the "Trustee Back-Up Income Tax Deposit Account") with, and shall enter into depositary banking agreements with, the Successor Depositary Bank for the Trustee Back-Up Income Tax Deposit Account. Such Trustee Back-Up Income Tax Deposit Account will be owned by and in the name of the Trustee, and will incur the Successor Depositary Bank's then usual and customary fees for services rendered by the Depositary Bank to the Trustee Back-Up Income Tax Deposit Account, (b) the City shall cause at least 75% of all Pledged Income Tax Revenues net of refunds to be deposited directly by the applicable taxpayers, or the City if remitted by the taxpayers to the City, into such Trustee Back-Up Income Tax Deposit Account on a daily basis, all in compliance with applicable law, (c) the Trustee shall instruct the Successor Depositary Bank in writing (in such form and text as the Successor Depositary Bank and the Trustee shall reasonably require) to transfer the balance of the Trustee Back-Up Income Tax Deposit Account each banking day to the Pledged Income Tax Account established by the Trustee and such balance shall be remitted from the Pledged Income Tax Subaccount to the City daily pursuant to subsection (iv) hereof,

and (d) the actions of the Trustee under this subsection (ii) shall be compensable and are protected by Sections 801 and 802 of this Indenture. Nothing in this subsection (d)(ii) shall alter the manner in which deposits are made as provided in Section 501(c);

(iii)      in the event that (A) thirty (30) days prior to any Payment Date during the Fixed Rate Mode or (B) four (4) Business Days prior to any Payment Date during the Variable Rate Mode, amounts on deposit in the Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Bonds on such Payment Date, the Trustee shall promptly notify the City in writing of such deficiency and the City shall, promptly after receiving such notice, cause to be deposited with the Trustee other available funds of the City for deposit to the Debt Service Account, in an amount necessary to make up the Debt Service Requirement Amount owing on such Interest Payment Date.  The Trustee shall confirm in writing to the City the receipt of each additional payment of additional funds for deposit into the Debt Service Account.

Section 502.    Debt Service Reserve Account.

(a)      There is established a separate account in the Debt Service Fund to be known as the Debt Service Reserve Account (the "Debt Service Reserve Account").  There shall be deposited in the Debt Service Reserve Account from the initial proceeds of the Bonds, the Reserve Requirement.  Earnings from the investment of the Debt Service Reserve Account shall be transferred to the Debt Service Fund on a monthly basis so long as the Reserve Requirement remains in the Debt Service Reserve Account.

(b)      Except as otherwise provided in this Section, the moneys credited to the Debt Service Reserve Account shall be used solely for the payment of the principal (or Make Whole Redemption Price, as applicable) of, redemption premiums (if any) and interest on the Bonds as to which there would otherwise be a default.  If at any time it shall be necessary to use moneys credited to the Debt Service Reserve Account for such payment, then the moneys so used shall be replaced from the Pledged Income Tax Revenue first received thereafter in the Pledged Income Tax Account which are not required for current principal and interest requirements until the amount on deposit equals the Reserve Requirement.  If on any principal payment date the amount in the Debt Service Reserve Account exceeds the Reserve Requirement, the excess shall be transferred to the Debt Service Fund for payment of principal and interest on the Bonds due on that date.

Section 503.    Costs of Issuance Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Income Tax Revenue and Refunding Bonds Costs of Issuance Fund" (the "Costs of Issuance Fund").  Upon the issuance of the Bonds, there first shall be deposited in the Costs of Issuance Fund, a portion of the proceeds of the Bonds, in an amount as necessary to pay the costs of issuance of the Bonds, as directed in writing by the City.  Moneys on deposit in the Costs of Issuance Fund shall be used by the Trustee to pay the costs related to the issuance of the Bonds, as directed in writing by the City.

Section 504.    Prior Bonds Refunding Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the

"Financial Recovery Income Tax Revenue and Refunding Bonds, Refunding Fund" (the "Prior Bonds Refunding Fund"). There shall be deposited into the Prior Bonds Refunding Fund an amount sufficient to pay in full the Prior Bonds, as directed in writing by the City; and the Trustee shall promptly transfer such amount to the Prior Bonds Trustee on the Date of Original Issue, as directed in writing by the City.

Section 505. <u>Bond Proceeds Fund</u>. (a) There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Income Tax Revenue and Refunding Bonds, Bond Proceeds Fund" (the "Bond Proceeds Fund").

(b) There is hereby created and established with the Trustee in the Bond Proceeds Fund, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Income Tax Revenue and Refunding Bonds, Series 2014 – Bond Proceeds Account" (hereinafter referred to as the "Bond Proceeds Account"). There shall be deposited into the Bond Proceeds Account the remainder of the net proceeds of the Bonds after the deposits of amounts pursuant to Sections 501, 502, 503 and 504, as specified in the Bond Orders. Moneys on deposit in the Bond Proceeds Account shall be used only to pay for the Projects all in such amounts and for such Projects as directed by an Authorized Officer in a form acceptable to the Trustee (upon which the Trustee may conclusive rely), <u>provided</u>, <u>however</u>, that the City shall not be required to seek the Trustee's approval for Project expenditures and shall not be required to keep any funds on deposit in the Bond Proceeds Account following the date or dates on which Project expenditures are made. Any balance remaining in such Account after the Maturity Date shall be deposited in the Debt Service Account.

(c) There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, a separate account within the Bond Proceeds Fund designated the "Financial Recovery Income Tax Revenue and Refunding Bonds, Series 2014 – Prior Bond Proceeds Account" (hereinafter referred to as the "Prior Bond Proceeds Account"). The Trustee is directed to transfer remaining funds in the Financial Recovery Bonds, Bond Proceeds Fund for the Prior Bonds to the Prior Bond Proceeds Account to be used only to pay for the quality of life projects financed with the Prior Bonds in such amounts and for such projects as directed by an Authorized Officer in a form acceptable to the Trustee (upon which the Trustee may conclusively rely), <u>provided</u>, <u>however</u>, that the City shall not be required to seek the Trustee's approval for Project expenditures and shall not be required to keep any funds on deposit in the Bond Proceeds Account following the date or dates on which Project expenditures are made. Any balance remaining in such Account after the Maturity Date shall be deposited in the Debt Service Account.

Section 506. <u>Amounts Remaining in Funds and Accounts</u>. Any amounts remaining in any fund or account after full payment of the Bonds or provision for payment thereof shall be distributed by the Trustee to the City in accordance with Section 1102 and 1103.

# ARTICLE VI

## INVESTMENT OF FUNDS

Section 601.  <u>Permitted Investments</u>.  All money held by the Trustee pursuant to this Indenture shall be invested by the Trustee in accordance with written instructions from the City in Permitted Investments for the funds of the City.  If the Trustee does not receive written investment direction from the City, the Trustee shall invest all money held by it as provided in subsection (f) hereof.  For purposes of this Article VI, "Permitted Investments" shall mean and include any of the following, as may be further restricted in each Sale Order or Supplemental Indenture for the related series of Bonds:

(a)  bonds, securities, and other obligations of the United States or an agency or instrumentality of the United States;

(b)  certificates of deposit, savings accounts, deposit accounts, or depository receipts of a financial institution having a long term rating of not less than A2/A/A;

(c)  commercial paper rated at the time of purchase within the highest classifications (A-1/P-1/F1) established by not less than 2 standard rating services and that matures not more than 90 days after the date of purchase (but in any event no later than when the funds are required);

(d)  repurchase agreements consisting of instruments listed in subdivision (a);

(e)  Bankers' acceptances of United States banks rated at least A2/A/A;

(f)  mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, with authority to purchase only investment vehicles that are legal for direct investment by a public corporation, however, a mutual fund is not disqualified as a permissible investment solely by reason of one of the following:

(i)  the purchase of securities on a when-issued or delayed delivery basis,

(ii)  the ability to lend portfolio securities as long as the mutual fund receives collateral at all times equal to at least 100% of the value of the securities loaned, or

(iii)  the limited ability to borrow and pledge a like portion of the portfolio's assets for temporary or emergency purposes;

(g)  obligations described in subdivisions (a) through (f) if purchased through an interlocal agreement under the Urban Cooperation Act of 1967, Act 7, Public Acts of Michigan, 1967 (Ex Sess), as amended, MCL 124.501 to 124.512;

(h)  investment pools organized under the Surplus Funds Investment Pool Act, Act 367, Public Acts of Michigan, 1982, as amended, MCL 129.111 to 129.118;

(i)     the investment pools organized under the Local Government Investment Pool Act, Act 121, Public Acts of Michigan, 1985, MCL 129.141 to 129.150; and

The Trustee may conclusively rely on the written directions from the City as to whether any investment is a "Permitted Investment" and shall not be liable or responsible for any losses incurred on any investment directed by the City.

Section 602.    <u>Valuation and Sale of Investments</u>.    In computing the amount in any Account, obligations purchased as an investment of moneys therein shall be valued at their Value, as hereinafter defined, plus accrued interest in each case.  "Value" means the value of any investments calculated as follows:

(a)     as to investments the bid and asked prices of which are published on a regular basis in The Wall Street Journal (or, if not there, then in The New York Times): the average of the bid and asked prices for such investments so published on or most recently prior to the time of determination;

(b)     as to investments the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times: the average bid price at such time of determination for such investments by any two nationally recognized government securities dealers (selected by the Trustee in its absolute discretion) at the time making a market in such investments or the bid price published by a nationally recognized pricing service;

(c)     as to certificates of deposit and banker's acceptances: the face amount thereof, plus accrued interest, if any; and

(d)     as to any investment not specified above: the value thereof established by prior agreement between the City and the Trustee or any other valuation method customarily used by the Trustee.

Except as otherwise provided herein, the Trustee shall sell, or present for redemption, any Permitted Investment whenever it shall be requested in writing by an Authorized Officer to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from any Account held by it in accordance with the terms of this Indenture.  As set forth hereunder a Permitted Investment may be credited on a pro rata basis to more than one Account and need not be sold in order to provide for the transfer of amounts from one Account to another.

## ARTICLE VII

## <u>PARTICULAR COVENANTS OF THE CITY</u>

The City covenants and agrees with the Trustee and the Owners of the Bonds as follows:

Section 701.    <u>Payment of Bonds</u>.    The City shall duly and punctually pay or cause to be paid, as herein provided, the principal or Redemption Price of every Bond and the interest, if any, thereon, at the dates and places and in the manner stated in the Bonds, according to the true intent and meaning thereof.

Section 702.  Power to Issue Bonds and Pledge Revenues, Funds and Other Property. As of the date hereof, the City is duly authorized to issue the Bonds and to enter into, execute and deliver this Indenture and to pledge the assets and revenues purported to be pledged hereby in the manner and to the extent herein provided.  As of the date hereof, the assets and revenues so pledged are and will be free and clear of any pledge, lien, charge or encumbrance thereon, or with respect thereto, and all corporate or other action on the part of the City to that end has been and will be duly and validly taken.  As of the date hereof, the Bonds and the provisions of this Indenture are and will be the valid and legally enforceable obligations of the City in accordance with their terms and terms of this Indenture.  The City shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Trust Estate and other assets and revenues, including rights therein pledged under this Indenture, and all the rights of the Bondowners under this Indenture against all claims and demands of all persons whomsoever.  Except as otherwise provided herein, the City shall not, without the prior consent of the Trustee, sell, transfer, encumber or hypothecate the Pledged Income Tax Revenue or any City receivables of levies of excise taxes on income pursuant to applicable law that would otherwise become Pledged Income Tax Revenue.

Section 703.  Maintenance of Perfected Security Interests; Further Assurances; Notices of Default.  At any and all times the City shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be reasonably necessary or desirable to convey, grant, pledge and perfect to the Trustee for the benefit of the Bondowners first priority security interests in the Trust Estate.  The City shall notify the Trustee immediately upon becoming aware of any Event of Default or occurrence of an event that, with the passage of time, will become an Event of Default hereunder, including, for the avoidance of doubt, any failure to comply with Section 708 hereof.

Section 704.  Tax Covenants.  The City shall at all times do and perform all acts and things necessary or desirable in order to assure that interest paid on Tax-Exempt Bonds shall, for the purposes of federal income taxation, be excludable from the gross income of the recipients thereof and exempt from such taxation under Section 103 of the Code, or any successor provisions thereto.  The City shall comply with all requirements of any Non-Arbitrage and Tax Compliance Certificate delivered by the City in connection with a Series of Tax-Exempt Bonds. The Trustee shall not be responsible for monitoring any yield restriction or arbitrage rebate requirements or any expenditure or use by the City of the proceeds of any Bonds.

Section 705.  Compliance With Conditions Precedent.  Upon the date of issuance of any of the Bonds, all conditions, acts and things required by law or by this Indenture to exist, to have happened or to have been performed precedent to or in the issuance of such Bonds shall exist, have happened and have been performed, or will have happened or been performed, and such Bonds, together with all other indebtedness of the City, shall be within every debt and other limit prescribed by law.

Section 706.  Accounts and Reports.  The City shall keep, or cause to be kept, proper books of record and account in which complete and accurate entries shall be made of all of its transactions relating to the Bonds or the Trust, the Pledged Income Tax Account and all Accounts established by this Indenture which shall at all reasonable times be subject to the

inspection of the Trustee. The City shall report, or cause to be reported, on a monthly basis balances in the Pledged Income Tax Account.

Section 707. <u>Issuance of Additional Obligations</u>. (a) The City hereby covenants that as long as the Bonds are outstanding, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Pledged Income Tax Revenue that has a lien or payment priority which is superior to the Bonds. The issuance of any series of bonds hereunder, other than the Bonds and other than as permitted by (c) below, shall require compliance with Section 1002 of this Indenture.

(b)    Prior to the Public Offering Date, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Pledged Income Tax Revenue which is on parity with the Bonds.

(c)    Following the Public Offering Date, the City will not create or permit the creation of or issue any additional parity indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Pledged Income Tax Revenue which is on parity with the Bonds except that the City may issue additional bonds secured by a charge or lien on the Pledged Income Tax Revenue which is on a parity with the Bonds provided that (x) such bonds are issued pursuant to this Indenture and (y) the City has filed a certificate of an Authorized Officer with the Trustee certifying (i) the Pledged Income Tax Revenue deposited to the Income Tax Account for a 12 consecutive month period of the immediately prior 15 months applicable to the Fiscal Year in which such additional parity indebtedness is to be issued and (ii) the maximum annual debt service that will be due on such additional parity indebtedness, the Bonds and any other outstanding parity indebtedness, in any subsequent Fiscal Year, and showing that the amount in clause (i) at least equals 2 times the amount in clause (ii); provided that if any such additional indebtedness is to be issued as variable rate debt, the maximum annual debt service with respect to such additional indebtedness shall, for purposes of the calculations set forth herein, be made at an assumed fixed rate equal to the greater of (x) 6.00% per annum and (y) in the case of proposed tax exempt variable rate debt the average of the SIFMA Municipal Swap Index plus a percentage reflective of the ratings assigned to such debt for the twelve months preceding the date of issuance, or in the case of proposed taxable variable rate debt the average of the 1 Month LIBOR Rate plus a percentage reflective of the ratings assigned to such debt for the twelve months preceding the date of issuance; provided further that any outstanding variable rate indebtedness shall be assumed to bear interest at the weighted average of the actual rates on such variable rate debt for each day during the 365 consecutive days (or such lesser period as such debt has been outstanding) ending on the last day of the calendar month next preceding the computation. Any variable rate debt which is the subject of an interest rate exchange agreement shall be assumed to bear interest at the effective fixed rate resulting therefrom while such agreement remains in effect.

Section 708. <u>Income Tax Revenues and Accounts</u>. The City shall at all times:

(a)    each month deposit or cause to be deposited to the Income Tax Account at least 75% of all Pledged Income Tax Revenues net of refunds collected during such month.

(b)    (i) take such steps as shall be reasonably necessary to levy the taxes generating the Pledged Income Tax Revenue to satisfy the covenants set forth in this Article VII and (ii) take such steps as shall be reasonably necessary to collect the taxes generating the Pledged Income Tax Revenue to the maximum extent required by the City to comply with its covenants and obligations under the Financing Documents.

(c)    Nothing in this Indenture shall preclude the City from entering into an arrangement with another party, including, but not limited to, the State, to collect Income Tax Revenues on behalf of the City, provided that no such arrangement shall diminish or otherwise limit the City's obligations hereunder with respect to the covenants of the City set forth herein.

Section 709.    Contesting Enforceability.    The City covenants that it will not seek to invalidate or refute the enforceability of any Financing Document, notwithstanding the dismissal of the Bankruptcy Case.

Section 710.    Debt Service Covenant.    The City will maintain income tax rates sufficient to generate on an annual basis deposits of Pledged Income Tax Revenue deposited to the Income Tax Account which are no less than 2.0X (two times) the aggregate maximum annual debt service on the Bonds and any outstanding indebtedness secured by a charge or lien on the Pledged Income Tax Revenue which is on parity with the Bonds.    For purposes of making the foregoing calculation, with respect to variable rate indebtedness, the maximum annual debt service with respect to such indebtedness shall be calculated at an assumed fixed rate equal to the greater of (x) 6.00% per annum and (y) the weighted average of the actual rates on such variable rate debt for each day during the 365 consecutive days (or such lesser period as such debt has been outstanding) ending on the last day of the calendar month next preceding the computation. The City shall increase income tax rates in accordance with applicable law to the extent necessary to satisfy such requirement; provided, however, that to the extent that income tax rates in the City are set at the maximum rate allowed by law, the City shall not be in default if annual deposits of Pledged Income Tax Revenues to the Income Tax Account are less than 2.0X (two times) the aggregate maximum annual debt service on the Bonds and any outstanding indebtedness secured by a charge or lien on the Pledged Income Tax Revenue which is on parity with the Bonds.

## ARTICLE VIII

## THE TRUSTEE AND CALCULATION AGENT

Section 801.    Powers and Duties of Trustee.

(a)    The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.    The Trustee may act or refrain from acting based upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

33

(b)     The Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Indenture, or of any supplements thereto or instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the Bonds intended to be secured hereby.

(c)     The Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Indenture.

(d)     The Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(e)     As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City by an authorized officer of the City as sufficient evidence of the facts therein contained, and the Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be required to secure the same.

(f)     The permissive right of the Trustee to do things enumerated in this Indenture, as amended, shall not be construed as a duty and the Trustee shall not be answerable for other than its gross negligence or willful misconduct.  The immunities and exceptions from liability of the Trustee shall extend to its officers, directors, employees and agents.

(g)     The Trustee shall not be required to give any note or surety in respect to the execution of its rights and obligations hereunder.

(h)     All moneys received by the Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they were received, but need not be segregated from other funds except to the extent required by this Indenture, as amended, or by law.  The Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.  The Trustee shall have no responsibility for the use of any money disbursed by it in accordance with this Indenture.

(i)     The Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Indenture or to take any steps in the execution of the trusts created by this Indenture or in the enforcement of any rights and powers under this Indenture until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(j)     The Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Bonds, other than information provided by the Trustee.

(k)     The Trustee may become the holder of Bonds with the same rights it would have if it were not Trustee, and, to the extent permitted by law, may act as depositary for and permit

34

any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or not such committee shall represent the holders of a majority in principal amount of the Bonds then outstanding. The Trustee may engage in or be interested in any financial or other transactions with the City.

(l)     The Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts.

(m)     The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than twenty-five percent (25%) in aggregate principal amount of the Bonds at the time outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or in exercising any trust or power conferred upon the Trustee under this Indenture. If the Trustee receives directions from more than one such group of holders, it shall act in accordance with the direction of the holders holding the largest aggregate principal amount of the Bonds at the time outstanding, provided that such directions are consistent with this Indenture.

(n)     No provision of this Indenture or any of the related documents shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or thereunder, or in the exercise of any of its rights or powers, if in the judgment of the Trustee there shall be reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(o)     Whether or not therein expressly so provided, every provision of this Indenture or related documents, including the Account Control Agreement, relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article.

(p)     The Trustee is authorized and directed by the City to enter into the Account Control Agreement.

(q)     The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. If an Event of Default shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs in exercising any rights or remedies or performing any of its duties hereunder.

(r)     In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, act of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are

35

consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(s)     To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each Person who opens an account.  For a non-individual Person such as a business entity, a charity, a trust or other legal entity the Trustee will ask for documentation to verify its formation and existence as a legal entity.  The Trustee may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

Section 802.   Fees and Expenses of Trustee.   (a) The Trustee shall be entitled to reasonable fees for ordinary services rendered under this Indenture, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services.  Such fees and expenses shall be payable by the City in an amount agreed to by the City and the Trustee.

(b)     Without limiting the foregoing, in the event it should become necessary that the Trustee perform extraordinary services or default administration services, it shall be entitled to reasonable compensation therefore and to reimbursement for its reasonable and necessary expenses (including reasonable fees and expenses of attorneys, appraisers, engineers, and other consultants engaged by the Trustee) in connection therewith.

(c)     If the City shall fail to make any payment required by this Section 802, the Trustee may make such payment from the Debt Service Fund and/or Debt Service Reserve Account, and shall be entitled to a preference therefor over any Outstanding Bonds.

Section 803.   Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale.  (a)   The Trustee and any successor Trustee may resign only upon giving 60 days' prior written notice to the City and the Bondowners.  Such resignation shall take effect only upon the appointment of a successor Trustee as described in Section 805 below and the acceptance of such appointment by the successor Trustee.  Upon appointment of a successor Trustee, the resigning Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Pledged Income Tax Revenue and transfer and assign its right, title and interest in the Indenture to the successor Trustee.  The successor Trustee shall meet the requirements of Section 803(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b)     In case the Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the prior written consent of the City (to the extent that no "Event of Default" shall have occurred and be continuing under this Indenture), be appointed by the owners of a majority in aggregate principal amount of Bonds then Outstanding, by an instrument or concurrent instruments in writing signed by such owners, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the City, the retiring Trustee, and the successor Trustee.  In the absence of an appointment by the Bondowners, the City may appoint a successor Trustee, by an

36

instrument in writing signed by an authorized officer of the City, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Trustee and the successor Trustee. If the owners of the Bonds and the City fail to so appoint a successor Trustee, hereunder within thirty (30) days after the Trustee has given notice of its resignation, has been removed, has been dissolved, has otherwise become incapable of acting hereunder or has been taken under control by a public officer or receiver, the Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor hereunder. Every such Trustee appointed pursuant to the provisions of this Section 803 (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $500,000,000 and having a long term rating of at least A2/A/A, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c)     Any corporation or association into which the Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 803(b) hereof, shall be and become successor Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

Section 804.    Removal of Trustee.    The Trustee may be removed at any time by an instrument or concurrent instruments in writing (a) delivered to the Trustee and the City and signed by the owners of a majority in aggregate principal amount of Bonds then Outstanding, or (b) delivered to the Trustee and signed by the City; provided that if an Event of Default has occurred and is continuing hereunder, the Trustee may not be removed without the consent of the holders of a majority in aggregate principal amount of the Bonds then Outstanding. No removal of the Trustee and no appointment of a successor Trustee shall become effective until the successor Trustee has accepted its appointment in the manner provided in Section 803 hereof. Upon such removal and the payment of its fees, costs and expenses, the Trustee shall assign to the successor Trustee all of its right, title and interest in the Trust Estate in the same manner as provided in Section 803 hereof.

Section 805.    Appointment of and Transfer to Successor Trustee.    If the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor trustee shall be appointed by the City as soon as possible thereafter in accordance with this Article VIII.

Any successor Trustee appointed hereunder shall execute and deliver to its predecessor and the City an instrument in writing accepting such appointment and thereupon shall become fully vested with all the powers and duties under the Indenture, as amended. The Trustee, if it ceases to act as Trustee, shall execute, acknowledge and deliver such instruments of conveyance, without warranty or recourse, and further assurance and do such other things as may reasonably

be required for more fully and certainly vesting and confirming in such successor Trustee all the trusts, powers and duties under the Indenture, as amended, and any property held by it under the Indenture, as amended, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.

Section 806. <u>Calculation Agent</u>. The Purchaser is hereby appointed as the initial Calculation Agent. The City shall appoint and employ the services of the Calculation Agent prior to the Conversion Date while the Bonds of any subseries are in the Variable Rate Mode. The Calculation Agent shall perform all the duties imposed upon it by this Indenture. Unless otherwise provided by contract with the Calculation Agent, the City shall pay to the Calculation Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder.

The Calculation Agent may resign at any time by giving thirty (30) days' notice to the City and the Trustee. No such resignation shall become effective until a successor Calculation Agent has been appointed and has accepted its duties and obligations hereunder. The City may remove the Calculation Agent at any time upon thirty (30) days' notice to the Calculation Agent and the Trustee and, if such removal is to occur on or prior to the Public Offering Date, with the consent of the Purchaser. No such removal shall become effective until a successor Calculation Agent has been appointed and has accepted its duties and obligations hereunder.

If the Calculation Agent shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Calculation Agent for any cause, the City shall promptly appoint a successor Calculation Agent, which may be the Trustee, and if not the Trustee, shall be acceptable to the Trustee, provided that the Calculation Agent shall be the same Person serving in the role of "Calculation Agent" under the MFA Bonds. Any successor Calculation Agent shall signify its acceptance of such appointment and its assumption of the duties and obligations imposed upon it by this Agreement by execution and delivery of an agreement satisfactory to the City and, if the Calculation Agent is not the Trustee, to the Trustee.

## ARTICLE IX

### EVENTS OF DEFAULT AND REMEDIES ON DEFAULT

Section 901. <u>Events of Default</u>. Any one or more of the following events shall be deemed an "Event of Default" hereunder:

(a) The failure of the City to pay, when due, any interest on any or all of the Bonds on any date when such interest is due and payable;

(b) The failure of the City to pay, when due, any principal (or Make Whole Redemption Price, as applicable) or premium, if any, on any or all Bonds on any date when such principal (or Make Whole Redemption Price, as applicable) or premium is due and payable; or

(c) The failure by the City to comply with the provisions of Section 708(a) or Section 710 with respect to Pledged Income Tax Revenue in the Income Tax Account and such failure is not cured within two (2) Business Days.

38

Section 902.  Remedies.  (a)  *General*.  Upon the occurrence of an Event of Default, subject to Section 1108, the Trustee may pursue any remedy permitted by law to enforce the performance of or compliance with the provisions of this Indenture.

(b)  *Enforcement*.  Upon the occurrence and continuation of an Event of Default, subject to Section 1108, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed in its own name, to protect or enforce the rights of the Trustee and the holders of the related Bonds by mandamus or other suit, action or proceedings at law or in equity, to (i) enforce the rights of the Registered Owners and the obligations of the City under this Indenture and the Financing Documents, (ii) enjoin any act or thing which may be unlawful or in violation of the rights of Registered Owners; and (iii) enforce the rights of Registered Owners in and to the Trust Estate.

(c)  *Owner Right of Action*.  If the Registered Owners holding at least 25% of the Outstanding amount of the Bonds shall have complied with all conditions prerequisite to the requiring of action on the part of the Trustee and said Trustee shall refuse to act, then one or more of the Owners of the Bonds shall have the right to bring any action or actions as the Trustee might have instituted for and on behalf of the Owners of all Outstanding Bonds.

Section 903.  Waiver of Default.  Following an Event of Default, the Trustee shall at the direction of the Registered Owners holding at least 51% of the Outstanding amount of the Bonds, waive an Event of Default hereunder and annul its consequences.  No such waiver shall extend to or affect any subsequent Event of Default or shall impair any right consequent thereon.

Section 904.  Possession of Bonds by Trustee Not Required.  All rights of action under this Indenture enforceable by the Trustee may be enforced by it without the possession of any of the Bonds or the production thereof at any proceedings relative thereto.  Any action instituted by the Trustee shall be brought in its name for the benefit of all the holders of the related Bonds, subject to the provisions of this Indenture.

Section 905.  Remedies Cumulative.  The rights and remedies of the Trustee and the holders of Bonds shall be cumulative, and any failure on its or their part to act shall not constitute a waiver of any right or remedy to which it or they may be entitled to hereunder or under applicable law or in equity.

Section 906.  Knowledge by Trustee of an Event of Default.  The Trustee shall not be deemed to have knowledge of any Event of Default under Section 901(c) hereinabove unless and until an officer responsible for the administration of this Indenture shall have actual knowledge thereof, or shall have received written notice thereof from any Owner at its address and location specifically designated for receiving notices pursuant hereto.  Except as otherwise expressed herein, the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, conditions, covenants or agreements herein or of any of the documents executed in connection with the Bonds, or as to the existence of an Event of Default hereunder.

Section 907.  Application of Monies.  All moneys received by the Trustee and deposited in the Debt Service Fund or other Account pursuant to any right given or action taken under the provisions of this Article shall be applied first to the payment of the costs and expenses of the

proceedings resulting in the collection of such moneys and expenses, liabilities, advances and charges incurred or made by the Trustee.

**ARTICLE X**

**<u>SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE</u>**

Section 1001.  <u>Modifications and Amendments Not Requiring Consent</u>.  Any provision of this Indenture may be amended at any time by the parties hereto, without the consent of the holders of the Bonds, for any one or more of the following purposes:

(a)     To cure any ambiguity or formal defect or omission in this Indenture or in any supplemental agreement.

(b)     To grant to or confer upon the Trustee for the benefit of the holders of Bonds any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon such holders or the Trustee.

(c)     To accomplish, implement or give effect to any other action which is expressly authorized or required by this Indenture.

(d)     To comply with the requirements of the Internal Revenue Code of 1986, as amended, applicable to the Bonds.

(e)     To appoint separate or successor trustees, paying agents or bond registrars.

(f)     To implement changes in connection with any Public Offering of the MFA Bonds by the Purchaser consistent with the terms of the Commitment Letter of the Purchaser, dated September 17, 2014 and the Term Sheet attached thereto as Exhibit A.

(g)     To make any other change which, in the judgment of the Trustee, is not to the material prejudice of holders of the Bonds, based upon the opinion of Bond Counsel or other professionals.

Within thirty (30) days after the execution of any supplement pursuant to this Section 1001, the Trustee shall cause notice thereof to be mailed, postage prepaid to all owners of Bonds at their addresses as they appear on the registration books.  The notice shall briefly set forth the nature of the supplement and shall state that copies thereof are on file at the corporate trust office of the Trustee for inspection by all such holders.  Any such supplement so executed shall be valid and binding notwithstanding any failure of the Trustee to mail the notice herein required and notwithstanding any objections which may be received pursuant to any mailed notice.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be deemed to be modified and amended in accordance therewith and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of outstanding Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

40

Section 1002. <u>Amendments Requiring Consent</u>. Any provision of this Indenture may be amended at any time by written agreement of the parties hereto, but, except as provided in this Section 1002, no such amendment made after the issuance of any Bonds shall become effective until approved in writing by the holders of a majority of the principal amount of all outstanding Bonds, other than those in the possession of the City or under its control; provided, however, no such amendment may (i) extend the maturity or due date of the principal of or the interest on any Bonds or (ii) reduce the principal amount of any Bonds or the rate of interest thereon, or (iii) grant a privilege or priority of any Bonds over any other Bonds of the same series, or (iv) reduce the aggregate principal amount of the Bonds required for consent to such supplemental or amendatory indenture unless approved by the holders of all outstanding Bonds. Nothing herein contained, however, shall be construed as making necessary the approval of the holders of Bonds of the execution of any supplement as authorized in Section 1001 of this Article.

If at any time the City shall request the Trustee to execute any supplement for any of the purposes of this Section 1002, the Trustee shall cause notice of the proposed supplement to be mailed, postage prepaid to all applicable owners of registered Bonds at their addresses as they appear on the registration books. The notice shall briefly set forth the nature of the proposed supplement and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by any holders of Bonds. The Trustee shall not, however, be subject to any liability to any holder of Bonds by reason of its failure to mail the notice required by this Section 1002, and any such failure shall not affect the validity of such supplement when executed as provided in this Section.

Whenever, at any time within one year after the date of the first mailing of such notice, the City shall deliver to the Trustee an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the Bonds outstanding, which instrument or instruments shall refer to the proposed supplement described in such notice and shall specifically consent to and approve the acceptance thereof in substantially the form of the copy thereof referred to in such notice, the Trustee may, thereupon, but not otherwise, execute such supplement, without liability or responsibility to any holder of any Bond, whether or not such holder shall have consented thereto. If the holders of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the acceptance of such supplement shall have consented to and approved the acceptance thereof as herein provided, no holder of any Bonds shall have any right to object to the acceptance of said supplement, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the acceptance thereof or to enjoin or restrain the Trustee from executing the same or from taking any action pursuant to the provisions thereof.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of Bonds outstanding shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1003. <u>Consent of Trustee</u>. Prior to executing any supplement to this Indenture, the Trustee shall be entitled to receive and shall be fully protected in relying upon a certificate of the City as proof of the necessity or desirability of any such supplement provided for in Section

1001 hereof and an opinion of counsel for the City that such supplement complies with the provisions of such Section. Such certificate shall specifically request the Trustee to enter into such supplement. Whenever the provisions of Sections 1001 and 1002 hereof require the Trustee to include in notices to holders of Bonds a description of a proposed amendment or supplement, such description shall be provided by the City.

The Trustee may in its discretion, but shall not be obligated to, enter into any such supplement to this Indenture authorized by Section 1001 and 1002 which adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 1004. General Provisions Relating to Supplemental Indentures. This Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article X. Nothing contained in this Article X shall affect or limit the rights or obligations of the City to execute and deliver to the Trustee any instrument elsewhere in this Indenture provided for or permitted to be delivered to the Trustee.

It shall be a prerequisite of every Supplemental Indenture entered into pursuant to this Indenture that a Bond Counsel's Opinion be delivered to the Trustee stating that such Supplemental Indenture has been duly and lawfully adopted in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, is valid and binding upon the parties to the Supplemental Indenture and enforceable in accordance with its terms and, in the case of Bonds the interest upon which is excludable from gross income for federal income tax purposes, stating that such Supplemental Indenture will not adversely affect the exclusion from gross income for federal income tax purposes of the interest on such Bonds.

## ARTICLE XI
## MISCELLANEOUS

Section 1101. Notices. Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Indenture shall be deemed sufficiently given when sent by hand delivery, by overnight mail with postage prepaid or by Electronic Means, addressed as follows:

| | | |
|---|---|---|
| A. | If to the City, to: | City of Detroit<br>Finance Administration<br>Coleman A. Young Municipal Center<br>2 Woodward Ave., Suite 1200<br>Detroit, MI 48226 |
| B. | If to the Depository<br>Bank, to: | Comerica Bank<br>411 W. Lafayette MC 3354<br>Detroit, MI 48226<br>Fax. No.: 313-222-3900<br>Attn: LaJenna Turner |
| | And with a copy to: | Comerica Bank<br>39200 6 Mile Road MC 7619<br>Livonia, MI 48152 |

42

Fax. No. 734-632-4540
Attn: Chris Georvassilis

C.     If to the Trustee, to:          UMB Bank, N.A.
                                       Attn:  Anthony Hawkins, V.P.
                                       Corporate Trust Division
                                       1010 Grand Boulevard, 4th Floor
                                       Kansas City, MO  64106
                                       Ph. 816-860-3014
                                       Fax 816-860-3029
                                       Email  Anthony.hawkins@umb.com

E.     If to the Calculation
       Agent, to:                      Barclays Capital Inc.
                                       745 Seventh Avenue, 19th Floor
                                       New York, NY 10019
                                       Ph. 212-526-3466
                                       Attn: John Gerbino

The City, the Trustee, the Depository Bank and the Calculation Agent may by notice given hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

Section 1102. <u>Termination</u>. This Indenture shall terminate following delivery of written direction from the City to the Trustee to so terminate, together with written notice: (1) that all Bonds have been paid in full at maturity or defeased (and for each series of Bonds that have been or are to be defeased prior to termination, such notice shall include written certification by an independent verification agent for the City that sufficient cash or obligations necessary to defease such Bonds in accordance with the applicable defeasance requirements are on deposit with the Trustee as of the date of the City's notice), and (2) that all fees and expenses owed to the Trustee have been paid in full.  Upon termination of this Indenture, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

The Trustee shall give written notice of the termination of this Indenture to each of the other parties listed in Section 1101 hereof.

Section 1103. <u>Defeasance</u>.  Bonds of each series shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Trustee.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held

43

for the exclusive benefit of the Registered Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Indenture (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Indenture for the benefit of such Bonds shall be discharged.

Section 1104. <u>Severability</u>. If any one or more sections, clauses or provisions of this Indenture shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Indenture.

Section 1105. <u>Headings</u>. Any headings shall be solely for convenience of reference and shall not constitute a part of the Indenture, nor shall they affect its meaning, construction or effect.

Section 1106. <u>Indenture Executed in Counterparts</u>. This Indenture may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 1107. <u>Parties Interested Herein</u>. Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the MFA, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Indenture on behalf of the City shall be for the sole and exclusive benefit of the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the MFA and the Purchaser.

Section 1108. <u>Jurisdiction</u>. To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan with respect to any actions or disputes with respect to this Indenture or the Bonds. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

44

IN WITNESS WHEREOF, this Indenture has been signed on behalf of the City by its Emergency Manager and UMB Bank, N.A. to evidence the acceptance of the trust, has caused this Indenture to be executed in its behalf by its authorized officer, all as of the date first above written.

CITY OF DETROIT

By _____

    Its:  Finance Director


UMB BANK, N.A.,

as Trustee

By _____

    Its: _____

**EXHIBIT A**

**FORM OF SERIES 2014 BOND**

A-1

**EXHIBIT B**

**FORM OF ACCOUNT CONTROL AGREEMENT**

# EXHIBIT B



# DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement (this "Agreement") is entered into as of _____, 2014, by and among the City of Detroit, County of Wayne, State of Michigan ("Customer"), UMB Bank, N.A., as Trustee under the Indenture (as defined below) ("Trustee" and "Secured Party") and COMERICA BANK ("Bank") with reference to the following facts:

A.    Customer maintains the Deposit Account (as defined below) at Bank.

B.    Pursuant to the Indenture (as defined below) Customer has granted Secured Party a security interest in the Deposit Account and all funds now or at any time hereafter held in the Deposit Account.

C.    Secured Party, Customer and Bank have agreed to enter into this Agreement to provide for the control of the Deposit Account by Secured Party and to facilitate Secured Party's perfected security interests in the Deposit Account.

NOW, THEREFORE, in consideration of the mutual promises and covenants, contained herein the parties hereto mutually agree as follows.

## ARTICLE 1 -  DEFINITIONS

**1.01    Definitions.**    As used in this Agreement, the following terms shall have the following meanings:

"Account Charges" means those items described in clauses (i) through (vii) of Section 2.02(c) of this Agreement.

"Banking Office" means, collectively, the locations set forth as the addresses for notice to Bank in Section 3.08 of this Agreement.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Bank or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"Collected Balance" means the balance in the Deposit Account that reflects deposits, posted withdrawals and other debits, less deposited items in the process of collection and less Account Charges.

"Debt Service Reserve Account" has the meaning specified in the Indenture.

"Deposit Account" means deposit account number 1850706191 held at Bank and including without limitation any and all other deposit account(s) of Customer established with Bank from time to time in replacement or substitution therefor.

"Indenture" means the Financial Recovery Bond Trust Indenture between the City of Detroit, County of Wayne, Michigan and UMB Bank, N.A. as Trustee, dated _____, 2014.

"Notice of Control" means written notice to Bank in the form attached hereto as Exhibit A.

"Order" means any instruction issued by any person with respect to the disposition of any funds contained in the Deposit Account.  For the avoidance of doubt, the Notice of Control is an Order.

"Pledged Income Tax Account" has the meaning specified in the Indenture and refers to deposit account number _____ held at Bank pursuant to the Indenture in the name of the Trustee, including all other deposit account(s) of Trustee established with Bank from time to time in replacement or substitution therefor.

"Pledged Income Tax Revenue" means Pledged Income Tax Revenue, as that term is defined in the Indenture.

"Trustee" means Trustee, as defined in the first paragraph hereof.

**1.02    Construction.**  Any reference herein to any document includes any and all alterations, amendments, extensions, modifications, renewals, or supplements thereto or thereof, as applicable. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Bank, whether under any rule of construction or otherwise.  This Agreement has been reviewed by each of the parties hereto, and, to the extent applicable, their respective counsel.  This Agreement shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of Customer and Secured Party.

## ARTICLE 2 -  CONTROL

**2.01    Bank Obligations and Compliance with Orders Following its Receipt of a Notice of Control.**  The parties agree that upon receipt of the Notice of Control by Bank at the Banking Office and without further consent from Customer, Bank shall:

(a)      On each Business Day of each calendar month, transfer the Collected Balance of the Deposit Account ("Daily Transfer Obligation") into the Pledged Income Tax Account until the Bank receives notice from the Secured Party, in the form attached hereto as Exhibit B (the "Monthly Satisfaction Notice").  Secured Party agrees to send the Monthly Satisfaction Notice to Bank by electronic or facsimile transmission within one Business Day following satisfaction of the conditions set forth in Exhibit B.  Thereafter, the Bank shall discontinue the Daily Transfer Obligation and honor any Order of the Customer through the last Business Day of such calendar month, whereupon Bank will recommence the Daily Transfer Obligation on the first Business Day of the next calendar month subject to the terms of this Section 2.01(a).  This cycle shall be repeated on a month-to-month basis until this Agreement is terminated; and

(b)      Not honor any Order originated by Customer during any calendar month unless and until the Bank has received a Monthly Satisfaction Notice from the Secured Party in respect of such calendar month.

Anything contained in the foregoing to the contrary notwithstanding, Secured Party hereby agrees that before it attempts to give Bank any Orders concerning the Deposit Account, Secured Party shall deliver to the Banking Office such documentation as Bank may from time to time reasonably request to evidence the authority of those person(s) whom Secured Party may designate to give Orders, which Bank acknowledges have been provided contemporaneously with execution of this Agreement and that Bank shall be entitled to assume without further inquiry that the person(s) named in any such evidence of authority have the authority to give such Orders. Customer hereby agrees that Bank shall have no duty to notify Customer or make any inquiry whatsoever as to Secured Party's right or authority to give any such Notice of Control or any such Orders, instructions or directions.  Secured Party hereby further agrees that before it attempts to give Bank any Orders concerning the Deposit Account requesting a transfer, disposition and/or delivery of funds contained in the Deposit Account by wire transfer, Secured Party shall deliver to the Banking Office such documentation as Bank may from time to time reasonably request to evidence the agreement of Secured Party to Bank's customary wire transfer terms and conditions, including without limitation Bank's Global Wire Transfer Authorization and Security Procedure Agreement and Bank's Declaration for Entering Into Wire Transfer Agreements and designation of authorized agents which Bank acknowledges have been provided contemporaneously with execution of this Agreement.

**2.02    Priority of Lien.**  Bank hereby acknowledges and agrees that:

(a)      Bank has received notice of the existence of the security interest of Secured Party in the Pledged Income Tax Revenue and the Deposit Account, and recognizes the security interest granted to Secured Party by Customer;

(b)      Said security interest shall be noted by Bank on its books and records;

(c)     All of Bank's present and future rights against the Deposit Account are subordinate to Secured Party's security interest therein and Bank waives any right of setoff with respect to the Deposit Account; provided, however, that Secured Party hereby acknowledges and agrees that nothing herein subordinates or waives, and that Bank expressly reserves, all of its present and future rights against amounts on deposit in the Deposit Account (whether described as rights of setoff, banker's lien, security interest, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account, or otherwise) with respect to: (i) items deposited to the Deposit Account and returned unpaid, whether for insufficient funds or for any other reason, and without regard to the timeliness of return of any such items or the occurrence or timeliness of any drawee's notice of non-payment of such items; (ii) ACH entries credited to the Deposit Account and later reversed, whether for insufficient funds or for any other reason, and without regard to the timeliness of such entries' reversal; (iii) chargebacks to the Deposit Account of credit card transactions, without regard to the timeliness of such chargebacks; (iv) erroneous entries to the Deposit Account; (v) overdrafts on the Deposit Account, (vi) claims of breach of the transfer or presentment warranties made to Bank pursuant to the Code in connection with items deposited to the Deposit Account; and (vii) Bank's usual and customary charges for services rendered in connection with the Deposit Account; and

(d)     Except as otherwise required by law, Bank shall not enter into any agreement with any third party relating to the Deposit Account or agree that it will comply with any Orders concerning the Deposit Account originated by any such third party without the prior written consent of Secured Party and Customer.

**2.03    Control of Deposit Account.**  At all times during the effectiveness of this Agreement, the parties agree that:

(a)     Bank shall comply with Orders originated by Secured Party in accordance with Section 2.01 without further consent by Customer and consequently, Secured Party has control of the Deposit Account as provided herein, which constitutes "control" under the Michigan Uniform Commercial Code;

(b)     Bank shall not comply with any Orders or other instructions concerning the Deposit Account from any third party, other than pursuant to court orders (including an Order of the United States Bankruptcy Court for the Eastern District of Michigan in the Customer's Chapter 9 proceeding, Case No. 13-53846), without the prior written consent of Secured Party and Customer, and

(c)     Solely in accordance with the terms of Section 2.01, Bank may accept and comply with Orders from Customer for the payment of any funds from the Deposit Account to Customer or any third person, or permit Customer to withdraw any funds in the Deposit Account without the specific prior written consent of Secured Party.

**2.04    Representations, Warranties and Acknowledgments.**

(a)     Bank represents and warrants to Secured Party that:

(i)      the Deposit Account has been established and is maintained with Bank at the Banking Office solely in Customer's name as recited above;

(ii)     Bank has no knowledge of any claim to, security interest in or lien upon the Deposit Account, except the security interests in favor of Secured Party and Bank's rights described in Section 2.02(c)(i) – (vii) hereof; and

(iii)    Bank has not knowingly entered into any agreement with any third party regarding the Deposit Account or agreed that it will comply with any Orders concerning the Deposit Account originated by any such third party.

(b)     Consistent with the terms of the Indenture, Customer represents, warrants and covenants to the Bank and the Secured Party that (i) on a daily basis the Customer shall cause at least 75% of all Pledged Income Tax Revenue net of refunds to be deposited directly by the applicable taxpayers, or the Customer if remitted by taxpayers to the Customer, into the Deposit Account, (ii) it will not issue any Order to the Bank contrary to the terms of the Indenture, and (iii) it will not transfer its rights or duties under this Agreement

contrary to the terms of the Indenture or without the prior written consent of Bank and Secured Party. Bank is not a party to the Indenture and has no obligations thereunder.

(c)     Customer and Secured Party severally represent and warrant to Bank (each with respect to itself only) that the execution, delivery, and performance of this Agreement (i) is within Customer's and Secured Party's powers, (ii) has been duly authorized, executed and delivered by such party, and (iii) does not conflict with nor constitute a breach of any provision contained in any material agreement by which Customer or Secured Party, as applicable, is bound.

**2.05     Agreements of Bank and Customer.**  Bank and Customer agree that:

(a)     Bank will provide Trustee with online read-only Internet access to Deposit Account balance information;

(b)     Customer authorizes Bank to disclose to Secured Party such other information concerning the Deposit Account as Secured Party may from time to time reasonably request;

(c)     Bank shall use commercially reasonable efforts to promptly notify Secured Party and Customer if any other party asserts any claim to, security or property interest in or lien upon the Deposit Account; and

(d)     The Secured Party has been directed to enter into this Agreement pursuant to the Indenture.

**2.06     Bank's Responsibility.**  Anything contained in the foregoing to the contrary notwithstanding:

(a)     Except for permitting a withdrawal not permitted by  Section 2.01 or 2.03, Bank shall not be liable to Secured Party for complying with Orders from Customer.

(b)     This Agreement does not create any obligation of Bank except for those expressly set forth in this Agreement.  In particular, Bank need not investigate whether the Secured Party is entitled under the Indenture or Secured Party's other agreements with Customer to issue a Notice of Control or to give Orders.  In acting or performing under this Agreement, Bank may rely on any papers, documents, notices and communications it believes are given, signed or sent by the appropriate party or its authorized representative;

(c)     Other than as provided in Section 2.06(a) hereof, Bank will not have any liability to Customer or Secured Party for claims, losses, liabilities or damages suffered or incurred by Customer or Secured Party as a result of or in connection with this agreement except to the extent such losses, liabilities and damages directly result from Bank's gross negligence or willful misconduct;

(d)     In the event that Bank is liable to Customer or Secured Party under this Agreement, Bank's liability shall be limited to the lesser of (i) the actual direct and provable amount of money damages suffered by the claiming party, or (ii) the amount maintained in the Deposit Account immediately prior to the action that gave rise to the claim for such liability; and

(e)     In no event shall Bank have any liability to Customer or Secured Party for (1) any consequential, special, punitive or exemplary damages, indirect loss or damage or any lost profits, whether or not any claim for such damages is based on tort or contract or an allegation that Bank knew or should have known the likelihood of such damages in any circumstances, (2) any failure to perform the Bank's responsibilities under this Agreement if such failure is due to strikes, lockouts or other labor disturbances, riots or civil commotions, fire or other casualty, earthquakes, floods, windstorms, lightning or other acts of God, epidemics, sabotage, insurrection, war, civil disorders, hostilities, expropriation or confiscation of properties, equipment failures or malfunctions, power failures, failures of or delays by carriers or other third parties, interference by civil or military authorities, or any other cause or condition beyond the Bank's control, (3) any act or failure to act by Customer or Secured Party, or (4) acting pursuant to a court order, subpoena, garnishment, tax levy or similar process in regard to any account or service covered by this Agreement.

**2.07** **Indemnity.**

(a)     Other than as provided in Section 2.06(a) hereof, Customer and Secured Party hereby agree that Bank is released from any and all claims and liabilities to Customer and Secured Party arising from the terms of this Agreement and the compliance by Bank with the terms hereof, except to the extent that such liabilities arise directly from Bank's gross negligence or willful misconduct.

(b)     Customer shall indemnify and hold harmless Bank, its officers, directors, employees, and agents from and against any and all claims, liabilities, demands, losses, damages, costs and expenses arising out of this Agreement, except to the extent the claims, liabilities, damages or expenses are caused directly by Bank's gross negligence or willful misconduct.

(c)     Customer shall indemnify and hold harmless Secured Party, its officers, directors, employees, and agents from and against any and all claims, liabilities, demands, losses, damages, costs and expenses arising out of this Agreement, except to the extent the claims, liabilities, damages or expenses are caused directly by Secured Party's gross negligence or willful misconduct.

**2.08** **Termination, Survival.**

(a)     This Agreement shall terminate:

(i)     immediately upon receipt by the Bank at the Banking Office of written notice in the form of Exhibit C attached hereto from Secured Party expressly stating that Secured Party is terminating this Agreement, and thereupon Bank's duties under this Agreement shall be terminated; and

(ii)     ninety (90) days after delivery to Secured Party and Customer of written notice from Bank stating that it is terminating this Agreement, and thereupon Bank's duties under this Agreement shall be terminated.

(b)     Sections 2.06, "Bank's Responsibility," and Section 2.07, "Indemnity," shall survive termination of this Agreement.

## ARTICLE 3 -  GENERAL PROVISIONS

**3.01**     Conflicts; Controlling Agreement.  As to the matters specifically the subject of this Agreement, in the event of any conflict between this Agreement and any other agreement between Bank and Customer, the terms of this Agreement shall control.

**3.02**     Final Agreement; Amendments and Waivers.  In addition to the terms contained in this Agreement, the parties agree that the Deposit Account will be subject to the terms contained in the Bank's Business and Personal Deposit Account Contract, or such other agreement(s) in effect between Customer and Bank governing the Deposit Account ("Account Contract").  To the extent any term of the Account Contract conflicts with any term of this Agreement, the terms of this Agreement shall prevail. This Agreement and the Account Contract, together with any other document, instrument, or agreement entered into between Bank, Customer and Secured Party in connection therewith with respect to the subject matter contained therein constitutes the entire understanding among each of them with respect to the subject matter thereof.  This Agreement supersedes any and all prior oral or written agreements relating to the subject matter hereof.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the party asserted to be bound thereby, and then such amendment or waiver shall be effective only in the specific instance and specific purpose for which given.

**3.03**     **Successors and Assigns.**

(a)     This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, and permitted successors and assigns of the parties.  Except as provided

in this Section, a voluntary transfer of a party's rights or duties under this Agreement without the written consent of the other parties will be void.

(b)     Bank may transfer its rights and duties under this Agreement to a transferee to which, by contract or operation of law, Bank transfers substantially all of its rights and duties under the Account Contract.

(c)     Secured Party may transfer its rights and duties under this Agreement to a transferee to which, by contract or operation of law, the Secured Party transfers substantially all of its rights and duties under the Indenture or which is named as successor trustee under the Indenture.

(d)     No transfer under this Section will be binding upon a non-transferring party until the transferring party or the transferee notifies the non-transferring parties of the transfer in a writing signed by the transferee that identifies the transferee, gives the transferee's address for communications under this Agreement, and states that the transferee is a successor of the transferor or other transferee permitted under this Section and is entitled to the benefit of the transferring party's rights and has assumed all of the transferring party's duties under this Agreement.

(e)     A non-transferring party need not request proof of any transfer or that the transferee is a successor of the transferor or other transferee permitted by this Section. If requested by a non-transferring party, however, the transferring party or the transferee will provide reasonable proof thereof. If Bank or Secured Party, as a non-transferring party, requests such proof, then the effectiveness of the notification of transfer as to the non-transferring party will be suspended until the proof is provided.

(f)     When a transfer becomes binding on the non-transferring parties, the transferring party will not be entitled to exercise any rights, and will be relieved of its obligations, accruing under this Agreement from and after that time. Those rights may be exercised and those obligations will be incurred by the transferee.

(g)     The provisions of subsections (d) and (e) requiring notification for a transfer to be binding on the non-transferring parties and suspending the effectiveness of the notification of transfer until reasonable proof of the transfer has been provided do not apply to Bank as the transferring party if the transfer is by operation of law and by operation of the law (i) the transferee succeeds to all or substantially all of the rights and becomes generally bound by all of the duties of Bank, including Bank's duties under this Agreement, and (ii) the Bank ceases to exist.

**3.04**     <u>Amendments, Modifications</u>. This Agreement may be amended or modified only in writing signed by all parties hereto.

**3.05**     <u>Severability of Provisions</u>. If any provision of this Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Agreement.

**3.06**     <u>Section Headings</u>. Headings and numbers used to identify sections and paragraphs of this Agreement have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each section applies equally to this entire Agreement.

**3.07**     <u>Counterparts; Facsimile Execution</u>. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile shall be equally as effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile also shall deliver a manually executed counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

**3.08**     <u>Notices</u>.          All notices, requests and demands which any party is required or may desire to give to any other party under any provision of this Agreement must be in writing (unless otherwise specifically provided) and delivered to each party at the following address:

| | |
|---|---|
| Bank: | Comerica Bank |
| | 411 W. Lafayette MC 3354 |
| | Detroit, MI 48226 |
| | Fax. No.: 313-222-3900 |
| | Attn: LaJeanna Turner |
| | |
| And With a copy to: | Comerica Bank |
| | 39200 6 Mile Road MC 7619 |
| | Livonia, MI 48152 |
| | Fax. No.: 734-632-4540 |
| | Attn: Chris Georvassilis |
| | |
| Customer: | City of Detroit |
| | Coleman A. Young Municipal Center |
| | 2 Woodward Ave., Suite 1200 |
| | Detroit, MI 48226 |
| | Attn: John Naglick, |
| | Interim Treasurer and Finance Director |
| | |
| Secured Party: | UMB Bank, N.A., as Indenture Trustee |
| | Corporate Trust Division |
| | 1010 Grand Boulevard, 4th Floor |
| | Kansas, MO 64106 |
| | Fax. No.: (816) 860-3029 |
| | Attn: Anthony Hawkins |

or to such other address or facsimile number as any party may designate by written notice to all other parties. Each such notice, request and demand shall be deemed given or made as follows: (i) if sent by hand delivery, upon delivery; (ii) if sent by facsimile, upon receipt; by overnight mail, postage prepaid, upon delivery and (iv) if sent by facsimile or electronic transmission, upon receipt; provided, however, that in any case, receipt by Bank of any Notice of Control shall not be deemed to have occurred until the Bank delivers written notification (by email or facsimile copy) confirming receipt to the Secured Party.  Bank shall attempt in good faith to deliver written notification confirming receipt to the Secured Party promptly following Bank's actual receipt at the Banking Office of the Notice of Control.

**3.09**    Governing Law. This Agreement shall be deemed to have been made in the state of Michigan and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and construed in accordance with the internal laws of the state of Michigan without regard to principles regarding the conflicts or choice of law.

**3.10**    WAIVER OF JURY TRIAL.      THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT BETWEEN THE UNDERSIGNED PARTIES.

**3.11**    Consent to Jurisdiction.  During the pendency of Customer's chapter 9 bankruptcy case, the Customer, Bank and Secured Party hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Agreement, and Customer, Bank and Secured Party hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in the Bankruptcy Court, provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of any United States Federal Court or Michigan state court sitting in Detroit, Michigan in any action or proceeding arising out of or

relating to this Agreement and Customer, Bank and Secured Party hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in any such United States Federal Court or Michigan state court.

**3.12** Only Collected Funds are to be Transferred from the Deposit Account. In no event shall Bank be obligated to transfer uncollected funds from the Deposit Account.

**3.13** Effectiveness. This Agreement shall not become effective until executed by the Bank. The effectiveness of this Agreement is conditioned on the termination of the Deposit Account Control Agreement dated April 8, 2014 by and among Customer, UMB Bank, N.A. as Trustee and Bank under the Financial Recovery Bond Trust Indenture dated April 8, 2014.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date set forth in the first paragraph hereof.

CUSTOMER:                                     CITY OF DETROIT

By: _____
Name: John Naglick, Jr.
Title: Finance Director

BANK:                                           COMERICA BANK

By: _____
Name: _____
Title: _____

SECURED PARTY:                 UMB BANK, as Trustee

By: _____
Name: _____
Title: _____

EXHIBIT A

[FORM OF NOTICE OF CONTROL]

[DATE]

To:     Comerica Bank
        411 W. Lafayette MC 3354
        Detroit, MI 48226
        Fax. No.: 313-222-3900
        Attn: LaJeanna Turner

And With a copy to:

        Comerica Bank
        39200 6 Mile Road MC 7619
        Livonia, MI 48152
        Fax. No.: 734-632-4540
        Attn: Chris Georvassilis

Re:     Deposit Account Control Agreement for
        Account No. _____ (the "Deposit Account")

Ladies and Gentlemen:

The City of Detroit, County of Wayne, State of Michigan ("Customer") , UMB Bank, N.A., a national banking association, ("Trustee" and "Secured Party"), and Comerica Bank ("Bank") previously entered into a Deposit Account Control Agreement dated as of _____, 2014 (as amended or otherwise modified from time to time, the "Agreement"), a copy of which is attached as Exhibit A.  All capitalized terms, unless otherwise defined in this letter, shall have the meanings assigned to them in the Agreement.

Pursuant to the Agreement, the Trustee is hereby providing Notice of Control to the Bank, granting the Trustee rights in the Deposit Account in accordance with the Agreement, more specifically the Trustee instructs the Bank to:

(a)     On each Business Day of each calendar month, transfer the Collected Balance of the Deposit Account ("Daily Transfer Obligation") into the Pledged Income Tax Account until the Bank receives notice from the Secured Party in the form of Exhibit B to the Agreement (the "Monthly Satisfaction Notice").  Thereafter, the Bank shall discontinue the Daily Transfer Obligation and honor any Order of the Customer until the last Business day of such calendar month, whereupon the Bank will recommence the Daily Transfer Obligation on the first Business Day of the next calendar month subject to the terms of Section 2.01(a) of the Agreement.  This cycle shall be repeated on a month-to-month basis until the Agreement is terminated.

(b)     Not honor any Order originated by Customer during any calendar month unless and until the Bank has received a Monthly Satisfaction Notice from the Secured Party in respect of such calendar month.

Nothing in this Notice shall limit the rights of the Trustee under the Indenture.

Please let me know if you have any questions regarding this material.

Sincerely,


[Secured Party]

Enclosure

Acknowledged by Comerica Bank on _____, 20___, by _____

cc: [copy Customer per Section 3.08 of Agreement]

EXHIBIT B

[FORM OF MONTHLY SATISFACTION NOTICE]
[DATE]

To: Comerica Bank
411 W. Lafayette MC 3354
Detroit, MI 48226
Fax. No.: 313-222-3900
Attn: LaJeanna Turner

And With a copy to:                                      **VIA ELECTRONIC OR**
**Comerica Bank**                                        **FACSIMILE TRANSMISSION**
39200 6 Mile Road MC 7619
Livonia, MI 48152
Fax. No.: 734-632-4540
Attn: Chris Georvassilis

And with a copy to:

City of Detroit
Finance Administration
Coleman A. Young Municipal Center
2 Woodward Ave., Suite 1200
Detroit, MI 48226

Re: Notice of Debt Service Requirement Amount satisfaction related to Deposit Account Control Agreement for
Account No. _____ (the "Deposit Account")

Ladies and Gentlemen:

The City of Detroit, County of Wayne, State of Michigan ("Customer") , UMB Bank, N.A., a national banking association ("Trustee" and "Secured Party"), and Comerica Bank ("Bank") previously entered into a Deposit Account Control Agreement dated as of _____, 2014 (as amended or otherwise modified from time to time, the "Agreement"), a copy of which is attached as Exhibit A. All capitalized terms, unless otherwise defined in this letter, shall have the meanings assigned to them in the Agreement.

There is no deficiency in the required balances as of the date hereof in each of the Pledged Income Tax Account, the Debt Service Account or the Debt Service Reserve Account balance, and in each case the requirements under Sections 501(c) and 502(b) of the Indenture to make monthly interest and principal Debt Service Fund deposits has been fully met for the month of _____, 20__ [current calendar month]. Thus, pursuant to the Agreement, the Trustee is hereby providing notice to the Bank to cease transferring the Collected Balance of the Deposit Account into the Pledged Income Tax Account until _____ 1, 20__ [first Business Day of next calendar month], on which date the Bank shall recommence the Daily Transfer Obligation.

Please let me know if you have any questions regarding this material.

Sincerely,

Enclosure

EXHIBIT C

TERMINATION LETTER

[Insert Date]


Comerica Bank
411 W. Lafayette MC 3354
Detroit, MI 48226
Fax. No.: 313-222-3900
Attn: LaJeanna Turner


with a copy to:


Comerica Bank
39200 6 Mile Road MC 7619
Livonia, MI 48152
Fax. No.: 734-632-4540
Attn: Chris Georvassilis

     Re:    CITY OF DETROIT, ACCOUNT NUMBER _____ LISTED IN AGREEMENT
              (the "Deposit Account")

Ladies and Gentlemen:

     Comerica Bank ("Bank"), UMB Bank, N.A., as Trustee ("Secured Party") and City of Detroit, County of Wayne, State of Michigan ("Customer"), have entered into certain restricted account arrangements as set forth in the Deposit Account Control Agreement dated _____, 2014, by and among Bank, Secured Party and Customer (as amended or otherwise modified from time to time, the "Agreement") with respect to the Deposit Account. Capitalized terms used, but not otherwise defined herein, shall have the meanings given to them in the Agreement.

     Effective as of [_____] (the "Effective Date") and pursuant to Section 2.08(a)(i) of the Agreement, as of the Effective Date: (i) the Agreement is terminated and is and shall be of no further force and effect, (ii) Secured Party shall have no other or further security interest in or under the Agreement or in the Deposit Account or any amounts received therein or held or deposited therein, and (iii) the name of the Deposit Account shall be changed to omit any reference to Secured Party therein.


Sincerely,

[Insert Secured Party name]


By: _____
Name: _____
Title: _____


cc: [copy Customer per Section 3.08 of Agreement]

# EXHIBIT C

ORDER NO. 13

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $325,000,000 FINANCIAL RECOVERY INCOME TAX REVENUE AND REFUNDING BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF REFUNDING CERTAIN OUTSTANDING FINANCIAL RECOVERY BONDS OF THE CITY OF DETROIT; PROVIDING CERTAIN BANKRUPTCY PLAN OF ADJUSTMENT FINANCING FOR THE CITY OF DETROIT; AND AUTHORIZING THE AUTHORIZED OFFICERS TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE SALE AND DELIVERY OF THE BONDS.

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City of Detroit (the "City") pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board, established pursuant to the Emergency Municipal Loan Act, Act 243, Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; and

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and with the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to chapter 9 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, on April 8, 2014, pursuant to Section 36a of Act 279, Public Acts of Michigan, 1909, as amended ("Act 279"), a bond authorizing order adopted by the Emergency Manager of the City on March 4, 2014 and a sale order issued by the Emergency Manager on April 8, 2014, the City issued its $120,000,000 Financial Recovery Bonds, Series 2014 (the "Prior Bonds") to finance certain quality of life projects in the City and a portion of the costs of issuance of the Prior Bonds; and

WHEREAS, the Prior Bonds were sold by negotiated sale to Barclays Capital, Inc., as purchaser and bond placement arranger ("Barclays"), and on June 9, 2014, Barclay's syndicated the Prior Bonds pursuant to a purchase agreement between the City and Barclays; and

WHEREAS, on September 16, 2014, the Emergency Manager filed on behalf of the City a Seventh Amended Plan of Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City pursuant to and in accordance with chapter 9 of the Bankruptcy Code; and

WHEREAS, pursuant to the Plan of Adjustment, the City (i) seeks to issue bonds to refund the Prior Bonds and (ii) in connection therewith is authorized to issue additional financial recovery bonds (a) to finance the costs of certain reinvestment and revitalization incentive projects in the City (the "Projects"); (b) to pay all or a portion of the City's obligations with respect to certain classes of claims identified on Exhibit A hereto (the "Claims") under the Plan of Adjustment (c) to fund the Debt Service Reserve Account and (d) to pay costs of issuance of such bonds; and

WHEREAS, Section 36a(7) of Act 279 authorizes a city to issue financial recovery bonds to be sold to the Michigan Finance Authority (the "MFA") for the purpose of refunding all or a portion of prior bonds issued under Section 36a and for such other purposes as approved by the Board; and

WHEREAS, in accordance with the Plan of Adjustment, the Emergency Manager deems it necessary to authorize the issuance of financial recovery bonds (the "Bonds") in one or more series, in the aggregate principal amount of not to exceed Three Hundred Twenty Five Million Dollars ($325,000,000) to (i) refund the Prior Bonds, (ii) finance the costs of the "Projects, (iii) pay all or a portion of the Claims, (iv) fund the Debt Service Reserve Account and (v) to pay costs of issuance of the Bonds; and

WHEREAS, pursuant to Section 36a(7) of Act 279, the Bonds will be secured by a pledge of certain income tax revenues derived under Act 284, Public Acts of Michigan, 1963, as amended ("Income Tax Revenues"), in addition to a pledge of the City's limited tax full faith and credit; and

WHEREAS, the City must receive prior approval of the terms and conditions for the issuance of the bonds from the Board in accordance with Section 36a of Act 279; and

WHEREAS, on September 5, 2014, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City (the "City Council") his request (the "Request") for the City Council to approve of the issuance of Financial Recovery Bonds in the aggregate principal amount not to exceed $275,000,000, the proceeds of which would be used to fund (i) the refunding of the Prior Bonds, (ii) the costs of the Projects, (iii) the costs of the Claims, (iv) the funding of the Debt Service Reserve Account and (v) payment of

2

costs of issuance of the Bonds, which Request was amended to not to exceed $325,000,000 in bonds on September 9, 2014; and

WHEREAS, on September 15, 2014, the City Council adopted a resolution approving the Request, as amended; and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

WHEREAS, on or after the Effective Date, pursuant to this Order, the City shall issue and deliver its Financial Recovery Income Tax Revenue and Refunding Bonds (the "Bonds") in one or more series to the MFA; and

WHEREAS, simultaneously with the delivery of the Bonds, the MFA will issue and delivery its Local Government Loan Program Revenue Bonds, Series 2014F (City of Detroit Limited Tax General Obligation Local Project Bonds) (the "MFA Bonds"), pursuant to a purchase contract between the City and the MFA; and

WHEREAS, the MFA Bonds will be sold to Barclays Capital Inc. as the initial purchaser; and

WHEREAS, the MFA may distribute one or more preliminary official statements or similar offering documents (together with any supplements thereto, each a "Preliminary Official Statement") and final official statements or similar offering documents (together with any supplement thereto, each an "Official Statement") or other offering document in connection with the sale of the MFA Bonds; and

WHEREAS, the Emergency Manager desires to authorize the submission of disclosure information to the MFA, as applicable, in connection with the distribution of the Preliminary Official Statement and Official Statement or other offering document in connection with the offering for sale of bonds sold by the MFA; and

WHEREAS, the MFA will submit to the City, through an Authorized Officer, as hereinafter defined, a proposed offer to purchase the Bonds which shall be detailed in a purchase contract between the City and the MFA, providing for the terms and conditions of the purchase of the Bonds by the MFA, subject to the parameters of this Order and confirmed at the time of sale of the Bonds in an order of an Authorized Officer related to the sale of the Bonds (the "Sale Order); and

WHEREAS, the MFA will require, as a condition precedent to purchasing the Bonds, that the City agree to provide, contemporaneously with issuance of the Bonds or at the subsequent public offering of the MFA Bonds, continuing disclosure as required by Section (b)(5) of Rule 15c2-12 promulgated by the Securities and Exchange Commission under the Securities and Exchange Act of 1934, as amended; and

3

NOW, THEREFORE, BE IT ORDERED BY THE EMERGENCY MANAGER OF THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN, PURSUANT TO THE CHARTER AND ACT 279 AS FOLLOWS:

## ARTICLE I
### DEFINITIONS AND INTERPRETATION

Section 101. <u>Definitions</u>. The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed to them therein, herein or in the Plan of Adjustment unless a different meaning clearly appears from the context:

"Account Control Agreement" means that certain Deposit Account Control Agreement, by and among the City, the Trustee, and the Depository Bank in favor of the Trustee with respect to the Comerica Bank account that holds the Pledged Income Tax Revenue.

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Act 284" means Act No. 284, Public Acts of Michigan, 1964, as amended, and any replacement or successor thereto.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the Mayor of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Court Order" has the meaning set forth in recitals hereto.

"Board" has the meaning set forth in recitals hereto.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"Bond" or "Bonds" means the Financial Recovery Income Tax Revenue and Refunding Bonds, Series 2014 of the City authorized to be issued by the Bond Orders in the aggregate principal amount not to exceed $325,000,000, in one or more series, and bearing such other designations as determined by the Emergency Manager or another Authorized Officer in the Sale Order.

"Bond Orders" means collectively this Order and the Sale Order.

4

"Bond Proceeds Fund" means the fund or funds so designated and established under Section 501 hereof.

"Bond Registry" means the books for the registration of Bonds maintained by the Trustee.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee (at its office primarily responsible for administering the Indenture) or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"Certificate" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to the Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called by the Indenture, as the case may be.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Claims" means those certain claims held by classes of creditors determined by the Emergency Manager or other Authorized Officer to be financed with proceeds of the Bonds in the Sale Order.

"Closing Date" means the date or dates upon which the Bonds are issued to and purchased by the MFA.

"Code" means the Internal Revenue Code of 1986, as amended.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Conversion Date" shall have the meaning ascribed to that term in the Indenture.

"Costs of Issuance Fund" means the fund established under Section 501 hereof for the payment of the costs of issuance of the Bonds.

"Debt Service Fund" means the Debt Service Fund established under Section 501 hereof, and any subaccounts thereof established for the payment of principal of and premium and interest on the Bonds.

"Emergency Manager" has the meaning set forth in the recitals hereto.

"Event of Default" shall have the meaning ascribed to that term in the Indenture.

5

"Finance Director" means the Finance Director of the City or his or her deputy or designee.

"Fiscal Year" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"Income Tax Revenues" means revenues collected by the City from a levy of an excise tax on income pursuant to Act 284 or pursuant to any other applicable State or local law.

"Indenture" means the Financial Recovery Bond Trust Indenture between the City and the Trustee, pursuant to Section 601 herein.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"Maximum Interest Rate" means the rate of eighteen percent (18%) per annum or such higher rate of annual interest as permitted by law.

"MFA" means the Michigan Finance Authority, as successor to the Michigan Municipal Bond Authority.

"MFA Bonds" has the meaning set forth in the recitals hereto.

"Non-Arbitrage and Tax Compliance Certificate" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the date of issuance of the Bonds, regarding rebate requirements and other tax responsibilities of the City relating to the Tax-Exempt Bonds.

"Order" means this Order of the Emergency Manager.

"Pledged Income Tax Revenue" means the Income Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Bonds. Pledged Income Tax Revenue does not include that portion of income tax revenues transferred into the budget of the City's police department at any time, to be used exclusively to retain and hire police officers, in an amount equal to the sum of 0.2% of the income tax rate levied on resident individuals and 0.1% of the income tax rate levied on non-resident individuals, for so long as bonds, obligations or other evidences of indebtedness of the City's Public Lighting Authority are outstanding and payable from taxes levied by the City under the Utility Users Tax Act, Act 100, Public Acts of Michigan, 1990, as amended, MCL 141.1151, *et seq*.

"Prior Bonds" means the City's $120,000,000 Financial Recovery Bonds, Series 2014.

"Prior Bonds Refunding Fund" means the fund so designated and established under Section 501 hereof.

"Prior Bonds Trustee" means UMB Bank, N.A., in its capacity as trustee for the Prior Bonds.

6

"Projects" means those certain projects determined by the Emergency Manager or another Authorized Officer in the Sale Order to be financed with the proceeds of the Bonds, or financed with proceeds of the Bonds and subsequently confirmed by an Authorized Officer.

"Purchase Contract" means the purchase contract negotiated by the Finance Director between the City and the MFA, providing for the terms and conditions of the sale of the Bonds to the MFA.

"Registered Owner" means the registered owner of a Bond as the registered owner's name appears on the Bond Registry under Section 306.

"Sale Order" means the order or orders of the Emergency Manager or other Authorized Officer approving the sale of the Bonds and making certain determinations and confirming the final details on the Bonds upon sale and/or interest rate conversion, in accordance with the parameters of this Order and the Purchase Contract.

"State" has the meaning set forth in the recitals hereto.

"State Treasurer" means the Treasurer of the State of Michigan.

"Tax-Exempt Bonds" means those Bonds, if any, the interest on which is excluded from gross income for federal tax purposes, as determined by the Emergency Manager or other Authorized Officer in the Sale Order.

"Trustee" means UMB Bank, N.A., Kansas City, Missouri, or such other bank qualified to act as trustee for the Bonds to be designated and confirmed by an Authorized Officer in the Sale Order.

Section 102.   Interpretation. (a)    Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b)    Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

(c)    Articles and Sections referred to by number mean the corresponding Articles and Sections of this Order.

(d)    The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Order, refer to this Order as a whole unless otherwise expressly stated.

## ARTICLE II
## DETERMINATIONS

Section 201.   Finding, and Declaration of Need to Borrow. The Emergency Manager hereby finds and declares that it is necessary for the City to borrow hereunder such sum as shall

7

be determined and approved by the Emergency Manager, not in excess of $325,000,000 (the "Maximum Aggregate Principal Amount"), and to evidence such borrowing by the issuance of the Bonds in one or more series not in excess of the Maximum Aggregate Principal Amount, in Authorized Denominations, pursuant to and in accordance with the provisions of Section 36a of Act 279, for the purpose of (i) refunding the Prior Bonds, (ii) paying the costs of the Projects, (iii) paying the costs of the Claims, (iv) satisfying payment obligations to the holders of the Prior LTGO Bonds and/or Ambac under financial guaranty insurance policies that were issued contemporaneously with certain Prior LTGO Bonds, pursuant to the terms of the Settlement Agreement, (v) funding the Debt Service Reserve Account and (vi) paying all or a portion of the legal, financial, accounting, printing, and other expenses related to the issuance of the Bonds (collectively, the "Costs of Issuance"), all as finally determined by an Authorized Officer in the Sale Order.

## ARTICLE III
## AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301. <u>Authorization of Bonds and Pledge</u>. (a)  The City hereby authorizes the issuance of the Bonds in such series and in such principal amounts as shall be confirmed in the Sale Order, not in excess of the Maximum Aggregate Principal Amount.  The City hereby pledges the Pledge income Tax Revenues for the payment of principal (or redemption price, as applicable) of and interest and any redemption premiums on the Bonds. As additional security for the Bonds, the City hereby pledges its limited tax full faith and credit for the payment of the principal of and interest on the Bonds, including the proceeds of an annual levy of ad valorem taxes on all taxable property in the City, subject to applicable constitutional, statutory and charter tax rate limitations.

(b)     Bonds of the City aggregating the principal amount of not to exceed Three Hundred Twenty-five Million Dollars ($325,000,000) shall be issued in the discretion of the Emergency Manager or other Authorized Officer for the purposes of (i) refunding the Prior Bonds; (ii) financing the Projects as shall be specified by an Authorized Officer in the Sale Order, or subsequently confirmed by an Authorized Officer to Bond Counsel; (iii) paying certain Claims identified on Exhibit A hereto; (iv) funding the Bond Reserve Account and (v) paying all or a portion of the Costs of Issuance of the Bonds from proceeds of the Bonds or other available funds of the City, all as shall be determined by an Authorized Officer and confirmed in the Sale Order.

(c)     An Authorized Officer is hereby authorized and directed to negotiate, approve and execute such documents as determined by an Authorized Officer in the Sale Order necessary to secure the payment of the Bonds in accordance with the Bankruptcy Order, and to pledge the Pledged Income Tax Revenue as security for the payment of debt service on the Bonds when due.

Section 302. <u>Designations, Date, Interest, Maturity and Other Terms of the Bonds</u> . (a) The Bonds shall be designated "FINANCIAL RECOVERY INCOME TAX REVENUE AND REFUNDING BONDS, SERIES 2014" (the "Bonds") with such appropriate series or subseries designations as determined by an Authorized Officer in the Sale Order.

8

(b)     The Bonds shall mature on such dates as shall be determined and confirmed by an Authorized Officer in the Sale Order. The Bonds shall bear interest at fixed or variable rates as set forth in the Indenture, on a tax-exempt or taxable basis, and shall be subject to adjustment and conversion as set forth in the Indenture, in any event not exceeding the Maximum Interest Rate, payable on the interest payment dates, all as shall be determined and confirmed by an Authorized Officer in the Sale Order. The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(c)     In connection with the sale of the Bonds to the MFA, the following additional provisions shall apply:

(1)     Each series of Bonds shall be in the form of a single fully-registered, nonconvertible bond in the denomination of the full principal amount thereof, dated as of the date of delivery of the Bonds, payable in principal installments serially as finally determined at the time of sale of the Bonds and approved by the MFA and the Authorized Officer. Final determination of the principal amount of a series and the payment dates and amounts of principal installments of a series of Bonds shall be evidenced by execution of a Purchase Contract between the City and the MFA providing for sale of the Bonds, and an Authorized Officer is authorized and directed to negotiate the terms, approve the form of and to execute and deliver the Purchase Contract when it is in final form and to make the determinations set forth above. An Authorized Officer is authorized and directed to approve of a series designation with respect to each series of Bonds.

(2)     The Bonds or principal installments thereof will be subject to prepayment prior to maturity in the manner and at the prices and times as provided in the form of the Bonds contained in this Order or as may be approved by an Authorized Officer at the time of sale of the Bonds or by the MFA at the time of prepayment.

(3)     The Bonds of each series shall bear interest initially at rates specified in the Purchase Contract and approved as evidenced by execution of the Purchase Contract, subject to adjustment and conversion as set forth in the Indenture, but in any event not to exceed the Maximum Interest Rate, and an Authorized Officer shall deliver the Bonds in accordance with the delivery instructions of the MFA.

(4)     The Bonds shall not be convertible or exchangeable into more than one fully-registered bond. Principal of and interest on the Bonds shall be payable as provided in the Bond form in this Order as the same may be amended to conform to MFA requirements.

(5)     The Trustee shall record on the registration books payment by the City of each installment of principal or interest or both when made and the cancelled checks or other records evidencing such payments shall be retained by the City Treasurer.

9

(6) Upon payment by the City of all outstanding principal of and interest on a Bond, the MFA shall deliver the respective Bond to the City for cancellation.

Section 303. <u>Execution, Authentication and Delivery of Bonds</u>. The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Mayor of the City, and the Finance Director of the City, and approved by the Emergency Manager, if the Emergency Manager is thus empowered pursuant to Act 436, and a facsimile of the seal of the City shall be imprinted on the Bonds. Anything in this Order to the contrary notwithstanding, the Bonds bearing the manual or facsimile signatures of the Mayor of the City, and the Finance Director and approved by the Emergency Manger, if the Emergency Manager is thus empowered pursuant to Act 436, shall require no further authorization. An Authorized Officer is authorized to deliver the Bonds in accordance with delivery instructions of the MFA.

Section 304. <u>The MFA's Depository</u>. Notwithstanding any other provision herein to the contrary, as long as the MFA is the owner of the Bonds, the Bonds are payable as to principal, premium, if any, and interest at the corporate trust office of UMB Bank, N.A., Kansas City, Missouri, or such other qualified bank or financial institution as shall be designated in writing to the City by the Authority (the "Authority's Depository"). The City will deposit with the Authority's Depository payments of the principal or, premium, if any, and interest on the Bonds in immediately available funds at least five business days prior to the date on which any such payment is due whether by maturity, redemption or otherwise. Written notice of any redemption of the Bonds shall be given by the City and received by the Authority's Depository at least 40 days prior to the date on which such redemption is to be made.

Section 305. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, and subject to the Indenture, if (i) any mutilated Bond is surrendered to the City, and the City receives evidence to its satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City such security or indemnity as may be required by it to save the City harmless, then, in the absence of notice to the City that such Bond has been acquired by a bona fide purchaser, the City shall execute and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b) If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c) Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds of like tenor issued under this Order.

Section 306. <u>Forms of the Bonds</u>. The Bonds shall be in substantially the following forms with such insertions, omissions, substitutions and other variations as shall not be

10

inconsistent with this Order or required by the Michigan Attorney General and the MFA or permitted by the Sale Order or as approved by an Authorized Officer and Bond Counsel:

[Form of Bond in Variable/Fixed Rate Mode]

UNITED STATES OF AMERICA
STATE OF MICHIGAN
COUNTY OF WAYNE

CITY OF DETROIT

FINANCIAL RECOVERY INCOME TAX REVENUE AND
REFUNDING BOND, SERIES 2014 [A/B]

REGISTERED OWNER:        Michigan Finance Authority

PRINCIPAL AMOUNT:        _____ Dollars ($____,000)

DATE OF ORIGINAL ISSUE:        _____, 2014

INTEREST RATE:        Variable/Fixed as provided herein

The CITY OF DETROIT, County of Wayne, State of Michigan (the "City"), for value received, hereby promises to pay to the Michigan Finance Authority (the "Authority"), or registered assigns, the Principal Amount shown above, as shall have been advanced to the City pursuant to a Purchase Contract between the City and the Authority, in lawful money of the United States of America, unless prepaid prior thereto as hereinafter provided. Capitalized terms used herein, but not defined herein, shall have the meanings ascribed to them in the Order and the Indenture, as hereinafter defined.

The Principal Amount shall be payable on the dates and in the annual principal installment amounts set forth in Schedule A attached hereto and made a part hereof, or if a portion of the Principal Amount is prepaid as provided below, with interest on said principal installments from the date each said installment is delivered to the holder hereof until paid, as set forth in the Purchase Contract.

Interest on this bond shall initially be payable at the Variable Rate as defined in the Indenture (as hereinafter defined). Interest payment dates and the interest rate determination method and the provisions for conversion of the interest rate from the Variable Rate to the Fixed Rate are set forth in the Financial Recovery Bond Trust Indenture (the "Indenture") between the City and UMB Bank, N.A., as Trustee (the "Trustee"), which provisions are incorporated herein by this reference.

Notwithstanding any other provision of this bond, as long as the Authority is the owner of this bond, (a) this bond is payable as to principal, premium, if any, and interest at the corporate

12

trust office of UMB Bank, N.A., Kansas City, Missouri, or at such other place as shall be designated in writing to the City by the Authority (the "Authority's Depository"); (b) the City agrees that it will deposit with the Authority's Depository payments of the principal of, premium, if any, and interest on this bond in immediately available funds at least five business days prior to the date on which any such payment is due whether by maturity, redemption or otherwise; and (c) written notice of any redemption of this bond shall be given by the City and received by the Authority's Depository at least 40 days prior to the date on which such redemption is to be made.

Additional Interest

In the event of a default in the payment of principal or interest hereon when due, whether at maturity, by redemption or otherwise, the amount of such default shall bear interest (the "additional interest") at a rate equal to the rate of interest which is two percent above the Authority's cost of providing funds (as determined by the Authority) to make payment on the bonds of the Authority issued to provide funds to purchase this bond but in no event in excess of the maximum rate of interest permitted by law. The additional interest shall continue to accrue until the Authority has been fully reimbursed for all costs incurred by the Authority (as determined by the Authority) as a consequence of the City's default. Such additional interest shall be payable on the interest payment date following demand of the Authority. In the event that (for reasons other than the default in the payment of any municipal obligation purchased by the Authority) the investment of amounts in the reserve account established by the Authority for the bonds of the Authority issued to provide funds to purchase this bond fails to provide sufficient available funds (together with any other funds which may be made available for such purpose) to pay the interest on outstanding bonds of the Authority issued to fund such account, the City shall and hereby agrees to pay on demand only the City's pro rata share (as determined by the Authority) of such deficiency as additional interest on this bond.

This bond is a single, fully-registered, non-convertible bond in the principal sum of $___,000, issued pursuant to and in accordance with Act 279, Public Acts of Michigan, 1909, as amended ("Act 279"), and pursuant to and in accordance with an Order duly adopted by the Emergency Manager of the City on _____, a resolution duly adopted by the City Council of the City on _____, 2014 and a Sale Order of the Authorized Officer of the City issued on _____, ____ (together, the "Order"). This bond is issued for the purpose of refunding the City's $120,000,000 outstanding principal amount Financial Recovery Bonds, Series 2014 and providing certain bankruptcy Plan of Adjustment financing for the City as described in the Order, pursuant to the City's Plan of Adjustment under the Bankruptcy Case, funding the Bond Reserve Account and paying the costs of issuance of the Bonds.

This bond is subject to redemption prior to maturity by the City on such terms and subject to the conditions specified in the Indenture and incorporated herein by this reference.

Pursuant to the Order, this bond is a limited tax general obligations of the Issuer which will be payable from ad valorem taxes annually levied on all taxable property in the Issuer, subject to applicable constitutional, statutory and charter tax rate limitations. Pursuant to Act 279 and the Order, this bond is secured by a first priority lien on the Pledged Income Tax Revenues, in the manner provided by the Order.

13

This bond is transferable only upon the registration books of the City by the registered owner of record in person, or by the registered owner's attorney duly authorized in writing, upon the surrender of this bond together with a written instrument of transfer satisfactory to the City duly executed by the registered owner or the registered owner's attorney duly authorized in writing, and thereupon a new registered bond or bonds in the same aggregate principal amount and of the same maturity shall be issued to the transferee in exchange therefor as provided in the resolution authorizing this bond and upon the payment of the charges, if any, therein prescribed.

It is hereby certified and recited that all acts, conditions and things required by law to be done, precedent to and in the issuance of this bond and the series of bonds of which this is one, exist and have been done and performed in regular and due form and time as required by law, and that the total indebtedness of the City, including this bond and the series of bonds of which this is one, does not exceed any constitutional, statutory or charter debt limitation.

IN WITNESS WHEREOF, the City of Detroit by authority of its [Emergency Manager][Mayor], has caused this bond to be signed for and on its behalf and in its name by the manual or facsimile signature of the Mayor of the City and the manual or facsimile signature of its Finance Director and the official seal of the City to be impressed hereon, all as of the Date of Original Issue.

**CITY OF DETROIT**
County of Wayne
State of Michigan

By_____

Its Mayor


(SEAL)


By_____

Its Finance Director


[Approved

By: _____

Its Emergency Manager]


14

## ARTICLE IV
## SPECIAL COVENANTS

Section 401.  Compliance Covenant.  The City covenants and agrees with the successive holders of the Bonds so long as any of the Bonds remain unpaid as to either principal or interest:

(a)  The City will apply and use the proceeds of sale of the Bonds, and the Pledged Income Tax Revenue will be pledged as security for the payment of the Bonds, all in the manner required by the provisions of this Order, the Bankruptcy Court Order, the Indenture and Act 279.

(b)  The City will maintain and keep proper books of record and account relative to the application of bond proceeds.

Section 402.  Tax Exemption Covenant.  The City covenants that it will not take any action, or fail to take any action required to be taken, if taking such action or failing to take such action would adversely affect the general exclusion from gross income of interest on any Tax-Exempt Bonds from federal income taxation under the Code.

Section 403.  Arbitrage Covenant.  The City will not directly or indirectly (1) use or permit the use of any proceeds of any Tax-Exempt Bonds or other funds of the City or (2) take or omit to take any action required by Section 148(a) of the Code in order to maintain the exclusion from gross income of the interest on any of the Tax-Exempt Bonds for federal income tax purposes.  To that end, the City will comply with all requirements of Section 148 of the Code to the extent applicable to Tax-Exempt Bonds and the requirements set forth in the Non-Arbitrage and Tax Compliance Certificate of the City.

## ARTICLE V
## FUNDS AND ACCOUNTS; DISPOSITION OF BOND PROCEEDS

Section 501.  Establishment of Accounts and Funds.  The City hereby establishes and creates or retains the following special, separate and segregated accounts and funds which shall be held for and on behalf of the City by the Trustee:

A.  Costs of Issuance Fund;

B.  Bond Proceeds Fund – Bond Proceeds Account;

C.  Bonds Proceeds Fund – Prior Bond Proceeds Account;

D.  Prior Bonds Refunding Fund; and

E.  Debt Service Fund.

The Authorized Officers are each hereby authorized to establish such accounts, subaccounts or funds as shall be required for the Bonds, if any, to accommodate the requirements

15

of one or more series of Bonds, including, but not limited to, such accounts, subaccounts or funds necessary to facilitate the allocation and use of funds on deposit with the Trustee to pay each portion of the total debt service on the Bonds. An Authorized Officer is authorized to allocate any net original issue premium, if any, received upon the sale of the Bonds to such accounts and in such amounts as permitted by applicable law and the Code.

Section 502. Costs of Issuance Fund. From the proceeds of the Bonds there shall first be set aside in the Costs of Issuance Fund a sum sufficient to pay all or a portion of the costs of issuance of the Bonds.

Section 503. Prior Bonds Refunding Fund. After making the deposit required by Section 502, there shall be deposited from the remainder of the proceeds of the sale of the Bonds an amount, which together with any money held by the Prior Bonds Trustee in the Debt Service Fund for the Prior Bonds, will be sufficient to pay in full the principal of and interest on the Prior Bonds to the Closing Date. The Trustee shall promptly transfer the funds in the Prior Bonds Refunding Fund to the Prior Bonds Trustee on the Closing Date to redeem the Prior Bonds on the Closing Date.

Section 504. Debt Service Fund. From the remaining proceeds of the Bonds there shall be set aside in the Bond Reserve Account of the Debt Service Fund established under the Indenture, the Reserve Requirement as defined in the Indenture. The City shall transfer funds for the payment of debt service on the Bonds to the Debt Service Fund and accounts established therein for each series of bonds, to be held in trust by the Trustee under the Indenture for the payment of interest (and principal, and premium, if any) on the Bonds when due, and so long as the principal of, premium, if any, or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Service Fund except to pay such principal, premium, if any, and interest. Any amounts remaining in the Debt Service Fund after payment in full of the Bonds and the fees and expenses of the Trustee shall be retained by the City to be used for any lawful purpose.

Section 505. Bond Proceeds Fund. From the remaining proceeds of the Bonds there shall be set aside in the Bond Proceeds Account of the Bond Proceeds Fund a sum sufficient to pay for the Projects and Claims as shall be specified by an Authorized Officer in the Sale Order. The Trustee is hereby directed to pay the Claims on the Closing Date subject to the instructions of an Authorized Officer. The Trustee is, further, directed to transfer remaining funds in the Bond Proceeds Fund for the Prior Bonds to a separate Prior Bond Proceeds Account of the Bond Fund to pay for the quality of life projects financed with the Prior Bonds.

An Authorized Officer is hereby authorized to negotiate with the Trustee, for and on behalf of the City, the procedures for the sale and delivery of the Bonds and the use of proceeds of the Bonds under the Indenture.

Section 506. Investment of Monies in the Funds and Accounts. (a) The Emergency Manager or Finance Director shall direct the investment of monies on deposit in the funds and accounts established hereunder, and the depository or Trustee, as the case may be, upon written direction or upon oral direction promptly confirmed in writing by the Emergency Manager or

16

Finance Director, shall use its best efforts to invest monies on deposit in the funds and accounts in accordance with such direction.

(b)     Monies on deposit in the Funds and Accounts may be invested as specified in the Indenture in such investments, permitted by applicable law.

## ARTICLE VI
## THE TRUSTEE

Section 601.  Trustee.  The Trustee for the Bonds shall act as bond registrar, transfer agent and paying agent for the Bonds.  The Authorized Officer is authorized to enter into the Indenture with such a bank or trust company, and from time to time as required, may designate a similarly qualified successor Trustee and enter into an agreement therewith for such services.

Section 602.  The Indenture; Events of Default.  The Bonds shall be subject to Events of Default in the manner, at the times and subject to the terms and conditions specified in the Indenture and incorporated herein and made a part hereof by reference.

Section 603.  Agreements with Third Parties Related to Deposit of Pledged Income Tax Revenue in Trust; Approval of Third Parties.  An Authorized Officer is hereby authorized and directed on behalf of the City to take any and all other actions and perform any and all acts that shall be required, necessary or desirable to enter into and implement the Indenture with the Trustee, including, but not limited to, negotiate the terms and enter into the Account Control Agreement in such form and with such terms as shall be subsequently approved by an Authorized Officer (such subsequent approval to be conclusively evidenced by the Authorized Officer's execution and delivery of the Account Control Agreement) as security for the Bonds.

## ARTICLE VII
## SUPPLEMENTAL ORDERS

Section 701.  Supplemental Orders Not Requiring Consent of Holders of the Bonds. The City may without the consent of any Registered Owner of the Bonds enter an order supplemental to this Order for any one or more of the following purposes:

(i)      to confirm or further assure the security hereof or to grant or pledge to the Registered Owners of the Bonds any additional security;

(ii)     to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)    to cure any ambiguity or formal defect or omission in this Order;

(iv)     to evidence conversion of the interest rates on the Bonds to fixed rates in accordance with the terms of the Indenture;

17

(v)     to amend provisions in the Order relating to rebate to the United States Government or otherwise, which in the opinion of Bond Counsel are required in order to maintain the exclusion of interest on the Bonds issued on a tax-exempt basis from gross income for federal income tax purposes; and

(vi)    such other action not materially, adversely and directly affecting the security of the Bonds;

provided that no supplemental order amending or modifying the rights or obligations of the Trustee shall become effective without the consent of the Trustee.

## ARTICLE VIII
## DEFEASANCE

Section 801.    Defeasance.  Bonds of each series shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Trustee.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Registered Owners of such Bonds.  After such deposit, such Bonds shall no longer be entitled to the benefits of this Order or the Indenture (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

## ARTICLE IX
## OTHER PROVISIONS OF GENERAL APPLICATION

Section 901.    Approval of the Bonds.  The Bonds shall neither be sold nor issued until the issuance of the Bonds as provided herein shall have been approved by the Board in accordance with the applicable provisions of Act 279.

Section 902.    Approving Legal Opinions with Respect to the Bonds.  Sale and delivery of the Bonds shall be conditioned upon receiving, at the time of delivery, (i) the approving opinion of Bond Counsel, approving the legality of the Bonds and the exclusion, or exemption, as the case may be, if any, of the interest paid on Tax-Exempt Bonds from Federal, State and local income taxation only and (ii) the approving opinion of Jones Day as to bankruptcy issues.

Section 903.    Preservation of Records.  So long as any Bonds remain outstanding, all documents received by the Trustee under the provisions of this Order shall be retained in its possession and shall be subject at all reasonable times to the inspection of the City, and the

18

owners of the Bonds, and their agents and representatives, any of whom may make copies thereof.

Section 904. <u>Determination to Issue Bonds on Taxable Basis</u>. An Authorized Officer, upon the advice of Bond Counsel may determine to issue all the Bonds or any portion of the Bonds on a tax-exempt basis or taxable basis in the Sale Order.

Section 905. <u>Authorization of Other Actions</u>. The Emergency Manager, the Mayor, the Finance Director, the City Clerk and the City Treasurer are each hereby authorized and directed on behalf of the City to take any and all actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Order.

Section 906. <u>Continuing Disclosure Undertaking</u>. At the time of issuance of the Bonds, or subsequent public offering of the MFA Bonds, as determined by the MFA, The City shall enter into a continuing disclosure undertaking pursuant to Rule 15c2-12 promulgated by the Securities and Exchange Commission (the "Rule") for the benefit of the MFA and the holders and beneficial owners of the bonds issued by the MFA for the purchase of the Bonds as to which the Rule is applicable, as more specifically set forth in Exhibit B hereto (the "Undertaking"); provided, however, that the terms of the Undertaking are subject to completion and modification prior to delivery of the Bonds by the Finance Director to such extent as the Finance Director shall deem necessary to comply with law or market requirements. The Finance Director is authorized to execute and deliver the Undertaking after completion and modification as provided in this Order and the Sale Order.

Section 907. <u>Delegation of City to, and Authorization of Actions of the Emergency Manager and the Finance Director</u>. (a) Prior to the delivery date for the Bonds and prior to the Conversion Date, the Finance Director may cause the preparation and approve the form and distribution of City disclosure, if necessary, for any offering materials to be used in conjunction with the sale of the Bonds to the MFA, the sale of the MFA Bonds to Barclays Capital Inc. or the subsequent public offering of the MFA Bonds, and an Authorized Officer shall deem the City's disclosure "final" for purposes of Rule 15c2-12 of the Securities and Exchange Commission.

(b)     The Finance Director is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Order, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from Bond proceeds or other available funds, for and on behalf of the City.

(c)     Except as otherwise provided herein, all determinations and decisions of the Finance Director with respect to the issuance and sale of the Bonds as permitted or required by this Order shall be confirmed by the Authorized Officer in a Sale Order or Sale Orders, and such

19

confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Authorized Officer have been fulfilled.

Section 908. _Negotiated Sale of Bonds_. (a) The Bonds shall be sold by negotiated sale to the MFA as provided in the Purchase Contract approved by an Authorized Officer within the parameters established hereby, and confirmed by an Authorized Officer in the Sale Order.

(b)    Subject to the foregoing, the Purchase Contract shall be dated the date of the sale of the Bonds. The Finance Director is hereby authorized and directed to execute the Purchase Contract for and on behalf of the City.

Section 909. _Delivery of Bonds_. Subject to the approval of the Sale Order, the Finance Director is hereby authorized to deliver the Bonds to the MFA upon receiving the MFA Bonds.

Section 910. _Appointment of Bond Counsel; Engagement of Other Parties_. The appointment by the Emergency Manager of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds. The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel and other accumulated bond related fees and expenses shall be payable as a cost of issuance from proceeds of the Bonds or other available funds in accordance with the agreement of such firm on file with the Emergency Manager.

Section 911. _Parties in Interest_. Nothing in this Order, expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, and the owners of the Bonds, any right, remedy or claim under or by reason of this Order or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Order contained by and on behalf of the City shall be for the sole and exclusive benefit of the City and the registered owners of the Bonds.

Section 912. _No Recourse Under Order_. All covenants, agreements and obligations of the City contained in this Order shall be deemed to be the covenants, agreements and obligations of the City and not of any emergency manager, councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Order against any councilperson, member officer or employee of the City or any person executing the Bond in his or her official individual capacity.

Section 913. _Severability_. If any one or more sections, clauses or provisions of this Order shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 914. _Conflict_. All orders, resolutions or parts of orders, resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflicts exist.

20

Section 915.  <u>Order is a Contract</u>.  The provisions of this Order shall constitute a contract between the City and the owners of the Bonds.

Section 916.  <u>Effective Date</u>.  This Order shall take effect immediately upon its execution by the Emergency Manager.

Section 917.  <u>Cover Page, Table of Contents and Article and Section Headings</u>.  The cover page, table of contents and Article and Section headings hereof are solely for convenience of reference and do not constitute a part of this Order, and none of them shall affect its meaning, construction or effect.

SO ORDERED this 25th day of September, 2014.

Kevyn D. Orr
Emergency Manager
City of Detroit, Michigan

22

**EXHIBIT A**

**CLAIMS TO BE PAID WITH PROCEEDS OF THE BONDS**

Any or portions of the following Allowed Claims:

    Class 5 COP Swap Claims

    Class 7 Limited Tax General Obligation Bond Claims

## EXHIBIT B

### FORM OF CONTINUING DISCLOSURE UNDERTAKING

This Continuing Disclosure Undertaking (the "Undertaking") is executed and delivered by the City of Detroit, County of Wayne, State of Michigan (the "City") in connection with bonds issued by the City, purchased or to be purchased with funds from the Michigan Finance Authority Local Government Loan Program Revenue Bonds, Series 2014_, of the Type designated City of Detroit Limited Tax General Obligation Local Project Bonds (the "Local Project Municipal Obligations") by the Michigan Finance Authority (the "MFA"). The City covenants and agrees for the benefit of the Bondholders, as hereinafter defined, as follows:

(a) *Definitions.* The following terms used herein shall have the following meanings:

"Audited Financial Statements" means the annual audited financial statement pertaining to the City prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"Bondholders" shall mean the MFA and the registered owner of any MFA Bond or any person which (a) has the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any MFA Bond (including any person holding an MFA Bond through a nominee, depository or other intermediary), or (b) is treated as the owner of any MFA Bond for federal income tax purposes.

"EMMA" shall mean the MSRB's Electronic Municipal Market Access System or such other system, Internet Web Site, or repository hereafter prescribed by the MSRB for the submission of electronic filings pursuant to the Rule.

"MFA Bond" means any bond issued by the MFA which is secured in whole or in part by payments to be received on the Local Project Municipal Obligations.

"MSRB" means the Municipal Securities Rulemaking Board.

"Rule" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"SEC" means the United States Securities and Exchange Commission.

(b) *Continuing Disclosure.* The City hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to the MSRB through EMMA no later than 270 days after the end of its fiscal year the following annual financial information and operating data, commencing with the fiscal year ended June 30, 2015 in an electronic format as prescribed by the MSRB, the Audited Financial Statements and updates of certain financial and

operating data of the City appearing under the headings and tables in the Official Statement of the MFA dated _____, 2014 relating to the MFA Bonds as follows: [Tables 1 through 32, inclusive, and 42 in Appendix II to the Official Statement ("Annual Financial Information").]

If the fiscal year of the City is changed, the City shall send notice of such change to the MSRB through EMMA prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

In the event that the Audited Financial Statements are not available by the date specified above, they will be provided when available and Unaudited Financial Statements will be filed by such date and the Audited Financial Statements will be filed as soon as available.

Such annual financial information and operating data described above are expected to be provided directly by the City by specific reference to documents available to the public through EMMA or filed with the SEC.

(c)     *Notice of Failure to Disclose*.  The City agrees to provide or cause to be provided, in a timely manner, to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, notice of a failure by the City to provide the annual financial information with respect to the City described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)     *Occurrence of Events.*  The City agrees to provide or cause to be provided to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days after the occurrence of the event, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Local Project Municipal Obligations:

(1)     principal and interest payment delinquencies;

(2)     non-payment related defaults, if material;

(3)     unscheduled draws on debt service reserves reflecting financial difficulties;

(4)     unscheduled draws on credit enhancements reflecting financial difficulties;

(5)     substitution of credit or liquidity providers, or their failure to perform;

(6)     adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Local Project Municipal Obligations, or other material events affecting the tax status of the Local Project Municipal Obligations;

(7)     modifications to rights of Bondholders, if material;

(8)     bond calls, if material, and tender offers;

(9)     defeasances;

(10)    release, substitution, or sale of property securing repayment of the Local Project Municipal Obligations, if material;

25

      (11)    rating changes;

      (12)    bankruptcy, insolvency, receivership or similar event of the City, which is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the City in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the City, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the City;

      (13)    the consummation of a merger, consolidation, or acquisition involving the City or the sale of all or substantially all of the assets of the City, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; or

      (14)    appointment of a successor or additional trustee or the change of name of a trustee, if material.

    (e)    *Materiality Determined Under Federal Securities Laws*. The City agrees that its determination of whether any event listed in subsection (d) is material shall be made in accordance with federal securities laws.

    (f)    *Termination of Reporting Obligation*. The City reserves the right to terminate their obligation to provide annual financial information and notices of material events, as set forth above, if and when the City is no longer an "obligated person" with respect to the MFA Bonds within the meaning of the Rule, including upon legal defeasance of all MFA Bonds.

    (g)    *Identifying Information*. All documents provided to the MSRB through EMMA shall be accompanied by the identifying information prescribed by the MSRB.

    (h)    *Benefit of Bondholders*. The City agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Bondholders and shall be enforceable by any Bondholder; provided that, the right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the City's obligations hereunder and any failure by the City to comply with the provisions of this undertaking shall not constitute a default or an event of default with respect to the Bonds.

    (i)    *Amendments to the Undertaking*. Amendments may be made in the specific types of information provided or the format of the presentation of such information to the extent deemed necessary or appropriate in the judgment of the City, provided that the City agrees that any such amendment will be adopted procedurally and substantively in a manner consistent with

the Rule, including any interpretations thereof by the SEC, which, to the extent applicable, are incorporated herein by reference. Such interpretations currently include the requirements that (a) the amendment may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the City or the type of activities conducted thereby, (b) the undertaking, as amended, would have complied with the requirements of the Rule at the time of the primary offering of the MFA Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and (c) the amendment does not materially impair the interests of Bondholders, as determined by parties unaffiliated with the City (such as independent legal counsel), but such interpretations may be changed in the future. If the accounting principles to be followed by the City in the preparing of the Audited Financial Statements are modified, the annual financial information for the year in which the change is made shall present a comparison between the financial statements as prepared on the prior basis and the statements as prepared on the new basis, and otherwise shall comply with the requirements of the Rule, in order to provide information to investors to enable them to evaluate the ability of the City to meet its obligations. A notice of the change in accounting principles shall be sent to the MSRB through EMMA.

(j)     *Municipal Advisory Council of the State of Michigan.* The City shall also file by electronic or other means any information or notice required to be filed with the MSRB through EMMA pursuant to this Undertaking in a timely manner with the Municipal Advisory Council of the State of Michigan.

CITY OF DETROIT
County of Wayne
State of Michigan


By_____
    Its: Finance Director


Dated: _____, 2014


22244239.11\022765-00202