UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF,            Case No. 13-53846
                            Detroit, Michigan
CITY OF DETROIT, MI         September 30, 2014
_____/  8:31 a.m.

    IN RE: CONTINUED TRIAL RE: OBJECTIONS TO CHAPTER 9 PLAN
        BEFORE THE HONORABLE STEVEN W. RHODES
        TRANSCRIPT ORDERED BY: ROBIN WYSOCKI

APPEARANCES:

For the City of Detroit, MI:  THOMAS CULLEN, ESQ.
                              GREGORY SHUMAKER, ESQ.
                              Jones, Day
                              51 Louisiana Avenue, N.W.
                              Washington, D.C. 20001
                              202-879-3939

                              ROBERT HAMILTON, ESQ.
                              Jones, Day
                              325 John H. McConnell Blvd.
                              Suite 600
                              Columbus, OH 43215
                              614-469-3939

                              ROBERT HERTZBERG, ESQ. (P30261)
                              Pepper, Hamilton
                              4000 Town Center
                              Suite 1800
                              Southfield, MI 48075-1505
                              248-359-7300

For COPS:                     JONATHAN WAGNER, ESQ.
                              Kramer, Levin, Naftalis &
                              Frankel
                              1177 Avenue of the Americas
                              New York, NY 10036
                              212-715-9100

For MIDD:                     DEBORAH O'GORMAN, ESQ.
                              Dechert, LLP
                              1095 Avenue of the Americas
                              New York, NY 10036
                              212-698-3500

```
 1 │ For Financial Guaranty        EDWARD SOTO, ESQ.
   │ Insurance Company:            Weil, Gotshal & Manges
 2 │                              1395 Brickell Avenue
   │                              Suite 1200
 3 │                              Miami, FL 33131
   │                              305-577-3100
 4 │
   │                              ALFREDO PEREZ, ESQ.
 5 │                              700 Louisiana Street
   │                              Suite 1600
 6 │                              Houston, TX 77002
   │                              713-546-5000
 7 │
   │ Court Recorder:              LaShonda Moss
 8 │                              Kristel Trionfi
   │
 9 │ Transcriber:                 Deborah L. Kremlick
   │
10 │
   │
11 │ Proceedings recorded by electronic sound recording, transcript
   │ produced by transcription service.
12 │
   │
13 │
   │
14 │
   │
15 │
   │
16 │
   │
17 │
   │
18 │
   │
19 │
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │
   │
25 │
```

INDEX

| WITNESSES FOR THE CITY: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| VYTO KAUNELIS | 4 | | | |
| KENNETH BUCKFIRE | 36 | 139,182 | 210 | 223 |

| EXHIBITS: | | ID | ADM |
|---|---|---|---|
| CX178 | Ten Year Capital Improvement Program | 9 | 15 |
| CX462 | Expert Report | 60 | 63 |
| CX639 | Email | 100 | 102 |
| CX640 | Presentation | 112 | 112 |
| CX641 | Final Recommendation | 117 | 118 |
| CX642 | Analysis | 105 | 105 |
| CX643 | Exit Financing Commitment | 122 | 123 |
| CX712 | Presentation | 125 | 126 |
| CX744 | Supplemental Expert Report | 60 | 63 |
| CX768 | Kenneth Buckfire Curriculum Vitae | 42 | 43 |
| CX770 | Exit Financing Documents | 135 | 135 |
| FX3298 | Email | 142 | 143 |
| FX3496 | Email | 145 | 146 |

1       (Court in Session)

2           THE CLERK:  All rise.  Court is in session.  Please

3   be seated.  13-53846, City of Detroit, Michigan.

4           THE COURT:  It appears everyone is present.  Let's

5   proceed.

6           MR. HAMILTON:  Good morning, Your Honor.  Robert

7   Hamilton of Jones, Day on behalf of the City of Detroit.  Our

8   next witness is Vyto Kaunelis of OHM.  Your Honor, we have

9   binders of the three exhibits.  I'm going to ask, can Ms.

10  Nelson approach with them for the Court?

11          THE COURT:  Sure.  Please raise your right hand.

12      (WITNESS VYTO KAUNELIS WAS SWORN)

13          THE COURT:  All right.  Please sit down.

14          MR. HAMILTON:  They're thick binders, Your Honor,

15  but there are only three documents.

16          THE COURT:  Okay.

17                        DIRECT EXAMINATION

18  BY MR. HAMILTON:

19  Q   Good morning, Mr. Kaunelis.  Can you tell the Court who

20  you are?

21  A   My name is Vyto Kaunelis.  I'm an engineer with Orchard,

22  Hiltz, and McCliment, Incorporated.

23  Q   Okay.  And is that commonly referred to as OHM?

24  A   Yes.

25  Q   And can you describe for the Court what is OHM?

1 A    We are an architectural engineering and planning

2 consulting firm.

3 Q    And how long have you worked at OHM?

4 A    I've worked for 11 years at OHM.

5 Q    What is your title there?

6 A    I am a principal and the chairman of the board.

7 Q    All right.  And what are your job responsibilities at

8 OHM?

9 A    I typically work for several clients.  I represent my

10 clients in various activities, various engineering studies

11 performing various engineering things for them making sure

12 that the engineering work we do for them meets qualities of

13 standard, meets their needs that they're after, getting the

14 resources of the firm to provide whatever, whether it's a

15 study or a design, or construction activities.

16 Q    And what type of engineering work do you focus on at OHM?

17 A    I'm a civil engineer and I focus on water resources.  My

18 degree is in hydraulics and hydrology.

19 Q    Okay.  And when you say water resources, does that

20 typically include just water systems, or also sewer systems,

21 or both, or how would you break that down for the Court?

22 A    All different types of water.  So water systems, sanitary

23 sewer systems, storm sewer systems, combined systems.

24 Q    And how long have you been working in connection with

25 providing engineering services for water and sewer systems?

 1  A     For my entire career which has been about 38 years.

 2  Q     Okay.  Well, where did you work before you joined OHM?

 3  A     Before OHM I worked for Wayne County Department of

 4  Environment.  I was the Deputy Director.  Worked there for ten

 5  years.

 6  Q     And what did you do for Wayne County when you were -- you

 7  were the Deputy Director of what for Wayne County?

 8  A     It was the Department of Environment.  Wayne County has a

 9  waste water system.  The down river system where there's a

10  waste water treatment plant and a major collection system that

11  takes flow from the various communities that it serves and

12  transports them down to the waste water treatment plant.

13        We also had the northeast system which takes -- flows

14  from the northeast portion of Wayne County and the

15  southeastern portion of Macomb County, collects that and

16  transports it to the Detroit water and sewer system.  And the

17  same thing for the Rouge Valley system which is the western

18  part of Wayne County, also touches a little bit of the

19  southwest portion of Oakland County.  Again collecting flow

20  from the communities, bringing that to -- through a collection

21  system to the City of Detroit system.

22  Q     All right.  And in connection with your work as the

23  Deputy Director at Wayne County, did you interact with the

24  Detroit Department of Water and Sewer?

25  A     Yes.  In -- in various capacities.  One is as a customer.

1  The -- representing the -- for example the western Wayne

2  communities in -- in transporting to the DWSD and working with

3  them in the northeast system.

4      Also we worked on the Rouge River national wet weather

5  demonstration project which was a -- a very major project to

6  look at wet weather treatment and look at how to restore the

7  Rouge River.  And as part of that working with DWSD as the

8  federal grant money flowed through Wayne County.  And so we

9  worked with DWSD on some of those grants.  For example, some

10 of the CSO basins that were built in Detroit were financed

11 through that.

12 Q    And when you say CSO basin, what does CSO stand for?

13 A    Combined sewer overflow.

14 Q    Okay.  And in connection with your work at Wayne County

15 and interacting with the DWSD, did you have occasion to review

16 the department's five year capital improvement plans?

17 A    Yes.

18 Q    Commonly referred to as CIPS?

19 A    Correct.

20 Q    And what was the nature of your involvement or

21 interaction with the department with respect to their five

22 year CIPS?

23 A    Typically the department would publish each year annually

24 a capital improvement program.  And as a customer the -- some

25 of that capital improvement is paid for by the customers.

1  It's allocated in various ways, so it's looking at the

2  projects that affect the customers in Wayne County and to make

3  sure that those projects are reasonable, that they make sense,

4  and that the magnitude of the project is -- is reasonable for

5  the work that needed to be done.

6  Q    All right.  And prior to working for OHM, and prior to

7  Wayne County, where did you work?

8  A    I worked for a firm called McNamee, Porter and Sealey for

9  17 years.  They have since become a part of a big national

10 firm Tetra Tech.

11 Q    Okay.  Did you graduate from college?

12 A    Yes.  The University of Michigan, Bachelor's and Master's

13 Degrees in civil engineering and hydraulics and hydrology.

14 Q    And then after you left Wayne County and went to work at

15 OHM, did you continue to work with Wayne County and DWSD?

16 A    Yes.  I continued my role as working with DWSD through

17 Wayne County and also the Wayne County saw the need on the

18 water system as well for the communities in Wayne County to

19 interact on a more technical basis with DWSD.  So I also

20 represented the communities in Wayne County on the water side

21 as well.

22 Q    And in representing them at OHM, representing the Wayne

23 County communities, were you again reviewing the five year

24 CIPS that were issued by the department?

25 A    Yes.  That is correct.

1  Q    All right.  So you have been reviewing the CIPS on and

2  off for the past how many years, 20?

3  A    About 20 years.

4  Q    Okay.  All right.  Can we bring up on the screen Exhibit

5  178, just the first page.  And you should -- you should be

6  able to see the screen in front of you also, Mr. Kaunelis.

7  Can you tell the Court what this is?

8  A    This is the -- the cover from a ten year capital

9  improvement program that we developed.  We were hired by DWSD

10 through the -- actually through the emergency manager to

11 develop a ten year capital improvement program.

12       We were hired along with a number of expert firms that --

13 that had a lot of knowledge of the DWSD systems to develop a

14 ten year CIP.

15       (City's Exhibit 178 was identified)

16 Q    What was your understanding of the purpose of -- of

17 developing this ten year CIP?

18 A    As part of the bankruptcy process the -- the emergency

19 manager needed to know what kind -- what's the magnitude of

20 the capital improvement program that was going to be necessary

21 for DWSD for the next ten years.

22 Q    And do you have an understanding as to how your report

23 would be used when you were preparing it?

24 A    I knew it would be used in the financial projections.  I

25 did not know the specifics.

1  Q    All right.  Can you describe for the -- the Court how you

2  went about preparing this document once you were retained to

3  do so?

4  A    Yes.  We were -- along with OHM, the -- the various firms

5  where you see the logos at the bottom were also retained.

6  These are all firms that have been actively involved with the

7  DWSD system for many years, had specific expertise on

8  different parts of the system.

9        For example Arcadis is a firm that has done a lot of work

10  at the waste water treatment plant and was very familiar with

11  the needs at the waste water treatment plant.  Wade Trim had

12  done a lot of work on the Detroit combined sewer overflow

13  facilities and the pumping stations.

14        CDM Smith was working on the master plan update along

15  with Tucker, Young, Jackson, and Tull is a major sub

16  consultant to them.  And CH2M Hill is a firm that had actually

17  done the earlier master plan back in about 2003, 2004.

18  Q    All right.  Who was the person that led this group of

19  various consultants to prepare this document?

20  A    I did.

21  Q    Okay.  And how did you go about deciding which additional

22  firms would be involved as part of your team to develop this

23  program?

24  A    Four of the firms were suggested by DWSD.  That would be

25  Arcadis, Wade Trim, CDM Smith, and Applied Science.  And we

1  suggested two additional firms, CH2M Hill and Tucker, Young,

2  Jackson, and Tull.

3      So part of it was DWSD suggested folks that were well --

4  that knew the system well, that would work well with it.  We

5  concurred with that.  And then we asked that we add a couple

6  other firms which they concurred.

7  Q    What was your understanding as to why the four firms that

8  the department suggested, why they already had an

9  understanding of the department systems?

10 A    For example, Arcadis, some of the people that worked

11 there, they had worked on a needs assessment study for the

12 department starting in about the year -- about the year 2000

13 or so they had done an extensive evaluation of the waste water

14 treatment plant, what the needs were there.

15     And then they had continued to work on it.  They had done

16 updates to that needs assessment every couple years since that

17 period of time.  So they were very familiar with the needs,

18 what work had already been done, what was the further work

19 that was necessary to be done.

20     Similarly, CDM Smith was very familiar with the water

21 system.  As doing the master plan update, they were very

22 familiar with that.

23     As I indicated, Wade Trim, on the combined sewer overflow

24 facilities and the pumping stations, and then Applied Science

25 on the linear systems, the piping systems.

1  Q    All right.  Did the department already have its own

2  existing ten year CIP plan at the time?

3  A    They had a five year capital improvement program.

4  Q    Okay.  In preparing the ten year CIP, did you have

5  discussions with anybody outside of the department as to what

6  should be included in the capital improvement projects

7  included this plan?

8  A    Yes.  When -- within the team, once we developed a draft

9  of what we thought was a -- a reasonable program, we did meet

10 with the three customer counties, Wayne, Oakland, and Macomb

11 to get their input on the capital improvement program as well.

12      And then after we had incorporated their comments, their

13 suggestions, then we met with the upper management staff of

14 the department, Sue McCormick, Sam Smalley on the waste water

15 side, and then Cheryl Porter on the water side.  And I think

16 there were a few others involved as well.

17 Q    All right.  And does this document contain -- what does

18 this document contain in terms of capital improvement

19 projects?  How did you decide what to put in here?

20 A    The -- when we started the -- the program -- the project,

21 the first thing that we did is we asked that each of the firms

22 -- we divided up the -- the work into the different areas

23 depending on the areas of expertise.

24      And we asked the firms to internally with their staff

25 come up with what they thought for their portion, what would

1  be a reasonable capital improvement program.  We asked them to

2  list the projects.  We asked them to estimate the cost.

3      And we asked them to -- actually we did a ranking from

4  one to five, things -- one ranking was things that were very

5  clearly needed and were high priority that needed to be done

6  right away.  Five were things that they had a good sense

7  needed to be done but probably were going to be towards the

8  end of the ten year program and perhaps were not really as

9  well defined.

10 Q   All right.  In -- in preparing this document and

11 including the projects during the ten year span that we've

12 talked about, did you consider the existing five year CIP that

13 had already been prepared by the department?

14 A   Yes.  We did not directly -- we did not start from that

15 as the base document.  We wanted to start independently to

16 look at what the -- the experts on our -- our group thought

17 were the right things that needed to be done.

18     By and large the projects that we had in the -- that we

19 came up with were similar to the ones -- in the first five

20 years were similar to the ones that the department had.  But

21 we did not constrain ourselves by what they had previously

22 identified and we didn't constrain ourselves by their cost

23 estimate or their plans for timing.  We tried to do that

24 independently.

25 Q   And so what is -- in terms of the end result, how does

1  the first five years in this document 178, compare to the --

2  at that time the existing five year CIP of the department?

3  A    We did -- when we -- we came up with our -- our -- our

4  final document we added up the first five years of -- of our

5  program and we found that it was very close to the -- the

6  monetary value that the DWSD five year CIP was.  We did not

7  try to do a line by line, project by project comparison.

8  Q    All right.  Are there -- were there any projects that

9  were in the department's five year CIP that are not included

10 somewhere in your ten year CIP in this document?

11 A    No.

12 Q    Okay.  All right.  Are the projects that are identified

13 except for in Exhibit 178, adequate to enable the department

14 to provide adequate levels of water and sewer system over the

15 next ten years in your opinion?

16 A    Yes.  We believe it is a very reasonable program that

17 will provide adequate service for -- for the ten year period.

18       MR. HAMILTON:  Your Honor, earlier in this case Mr.

19 Moore testified that he relied upon this document in preparing

20 his projections for the department and on that basis we

21 introduced Exhibit 178 as -- into evidence as reliance

22 material for Mr. Moore.  At this point I would offer Exhibit

23 178 into evidence for all purposes.

24       THE COURT:  Any objections?

25       MR. SOTO:  No objection, Your Honor.

1          THE COURT:  All right.  It is admitted.

2      (City's Exhibit 178 was admitted)

3   Q    Mr. Kaunelis, could you explain to the Court what the

4   difference is between a distribution main pipe and a

5   transmission main pipe in -- in the water system for Detroit?

6   A    Yes.  The transmission mains are the typically the larger

7   mains.  And typically they -- they take water a longer

8   distance.  So the transmission to take it for -- for example

9   from the water plant to the further communities, particularly

10  in a regional system like this you're going to have pipes that

11  are going to -- to transport the water significant distances.

12      Compared to the distribution system, for example, each of

13  the communities that are served by the Detroit Water and Sewer

14  Department system have their own distribution system.  So for

15  example, a community like Auburn Hills, there's a transmission

16  main that's owned and operated by DWSD that brings the flow to

17  a meter pit.

18      At that meter pit it's -- it's -- it's metered for

19  billing purposes.  And then at that point it's -- it's -- the

20  remaining pipes are Auburn Hills for distributing the flow in

21  the system, in their own system.

22      Within the City of Detroit you have actually a

23  combination of transmission mains as well as distribution

24  mains.

25  Q    Can I ask you to sort of bring up Page 13 of this

1  exhibit?  And could you -- no, that's -- it's actually Page 11

2  of the exhibit.  Page -- there you go.  Could you expand the

3  first paragraph at the top?

4      All right.  Mr. Kaunelis, the -- the first sentence where

5  it talks about 837 miles of transmission main.  What is that a

6  reference to?

7  A    That's the -- the larger water mains that -- that take

8  the flow basically from one part of the system to the longer

9  distances that transmission the larger pipes.

10 Q    Right.  And so those transmission mains are they just

11 within the City of Detroit, or do they go outside the City of

12 Detroit?

13 A    They go outside the City of Detroit.  Within the City of

14 Detroit it's defined as pipes that are 24 inch and larger.  So

15 24 inch and larger are transmission mains, smaller than 24

16 inch are considered distribution mains.

17 Q    And then the pipes that go outside of Detroit, those are

18 still transmission mains?

19 A    That's correct.

20 Q    And what do they do?

21 A    Again they -- they take the flow for example from the

22 water treatment plant and take in all the way to the community

23 boundaries for the other communities that they serve.

24 Q    All right.  Now there's a reference to the 3,100 miles of

25 distribution and service main of the DWSD system.  What is

1  that a reference to?

2  A    That's the pipes within the City of Detroit that take

3  flow from the transmission mains and deliver it to the

4  individual residences or businesses.

5  Q    Okay.  And those -- the distribution and service main

6  pipes that are within the City of Detroit, who owns and

7  maintains those pipes?

8  A    DWSD does.

9  Q    Okay.  And the distribution pipes that are in the outside

10  counties -- outside counties, who owns and maintains those

11  pipes?

12  A    The individual communities.

13  Q    Can you bring up Page 1 of this exhibit?  No, the -- I'm

14  sorry, it would be Page 3 of the exhibit.  There you go.  Can

15  you blow up the second paragraph at the bottom there?

16      All right.  Mr. Kaunelis, can I ask you to explain the

17  last sentence of this paragraph for the Court?

18  A    Yes.  The -- the distribution system and -- and there is

19  a similar corollary on the waste water side with -- with the

20  collection system.  But the distribution system pipes that are

21  within the City of Detroit, those pipes are in the rate

22  analyses, those costs for maintaining and operating those

23  pipes are allocated to the City of Detroit.  That's a cost to

24  the retail customer.

25      They -- in -- in looking at the -- in developing a cost

1   for those piping systems we had to estimate a reasonable

2   amount of -- of rehabilitation and replacement cost for those

3   pipes.

4        Because the -- we understand that affordability within

5   the City of Detroit has been a concern, we --

6   Q    When you say affordability within the City of Detroit,

7   who are you concerned about being able to afford it?

8   A    The City of Detroit retail customers.  So the individual

9   residences and businesses within the City of Detroit.

10  Q    Okay.

11  A    They have done a -- as part of working with the state,

12  they had done some financial affordability analyses and they

13  had shown that the criteria for affordability within the City

14  of Detroit was exceeding some guidelines, EPA guidelines set

15  by EPA.  So they -- they are considered -- it is considered

16  financial issues are considered in the permit process by the

17  state.

18  Q    All right.  Now does this paragraph and that concern

19  relate at all to the transmission mains or the distribution

20  mains?

21  A    Strictly distribution mains.

22  Q    All right.  So this isn't relevant to the 837 miles of

23  transmission mains?

24  A    That is correct.

25  Q    All right.  And with respect to these -- this is the

1  3,100 miles of distribution mains, is that right?

2  A    That's correct.

3  Q    And with respect to them, can we go to Page 27 of this

4  document which is I believe it says 9 of 11 at the bottom.

5  Can we blow that up?  Just the text on the left if you could

6  blow that up.  We can see it better.  There we go.

7       All right.  Can you look at item number 46 and describe

8  what this is referring to for the Court?

9  A    In Item 46, that's the leak detection work.  The -- it's

10 suspected that the water mains within the City of Detroit are

11 -- are -- have a lot of leaks.  And so there is a lot of water

12 being lost in that.  So that item is the work to track down

13 the -- the areas where they have significant leakage.

14 Q    Why is it in yellow?

15 A    That is something that's allocated to operation and

16 maintenance funds.  It's not -- it's not allocated to a

17 capital improvement.  Since it's ongoing work that does not

18 result in a new asset, it is considered operation and

19 maintenance work.  So you won't see that appearing in the

20 totals of the capital improvement program.

21 Q    All right.  Now can we blow up Item 45 right above it?

22 All right.  What does this -- can you describe for the Court

23 what this refers to?

24 A    This refers to the work of rehabilitation and replacement

25 of water main -- the -- the distribution mains within the City

1  of Detroit.  And we looked at -- there's about 3,100 miles.

2       What we looked at there is the Detroit future city's

3  report that talked about planning for different areas of the

4  city.  And talked about the work to concentrate in the higher

5  density areas, the downtown area and then the -- the

6  industrial areas as areas to concentrate on.

7       And so in looking at the cost of and estimating a -- a

8  capital improvement program for water main replacement, we

9  considered the different areas and we estimated that we would

10  replace about 1% or about I think it ended up about 16 miles

11  per year of water main within the distribution system.

12  Q    Is that a -- a reasonable amount of -- of -- for a

13  replacement allowance for the distribution mains in the City

14  of Detroit?

15  A    Yes.  It is a reasonable amount.  It is about the lowest

16  reasonable amount that we felt we could recommend.  Because of

17  the affordability we were trying to keep it as -- as low as

18  possible to keep the rates affordable, but we felt that that

19  amount was -- was reasonable.  It -- it made sense.

20  Q    Okay.  Can we go to now Page 25 of this exhibit?  Can we

21  just blow up the text on the left hand side?  There you go.

22       All right.  Mr. Kaunelis, can you describe generally what

23  the items are in Items 32, what those refer to?

24  A    These are -- these are pieces of the transmission main

25  that we felt were the high priority for replacement or

1  rehabilitation.  These are some of the projects like B and D

2  are remaining parts of projects that the department already

3  had underway that they were in phased work they're about -- I

4  think they were doing -- each of them was done in about three

5  phases and this is the final phase of -- of those projects.

6  Q    All right.  How did you determine which portions of the

7  837 miles of transmission mains needed to be repaired --

8  repaired or replaced in this particular item?

9  A    The B and D, those works were in process because they had

10 problems with that particular pipe.  There was a -- it's the

11 type of -- it's a type of pipe that they had problems in the

12 manufacture of that pipe.

13      The -- it's -- it's a problem with quality control of

14 that pipe.  It didn't just affect DWSD but other large

15 utilities as well.  And so it was known that those sections of

16 pipe were problematic.  They had experienced failures that

17 were higher rates of failure than you would expect for a -- a

18 pipe of that type.  And so they were working on providing a

19 parallel pipe for each of those.

20 Q    Is there a -- a basic protocol, or -- or number of

21 breaks, or leaks that indicate the need to replace a pipe?

22 A    DWSD uses a -- a number of five breaks per mile for the

23 distribution system.  So for the smaller pipes they use five

24 breaks per mile.

25      For something like the transmission main, you're going to

1  look at something -- a lower number than that.  Even a couple

2  breaks per mile will probably trigger a more detailed

3  investigation as to why you're seeing that kind of a breakage

4  problem with -- with a large pipe like that.

5  Q    And with respect to Item C on 32, on Telegraph Road.  Why

6  is that there?

7  A    That's there because the Michigan Department of

8  Transportation is doing a major road project on Telegraph

9  Road.  And so at the -- having the opportunity while the road

10 is torn up to replace an older water main is good -- good

11 practice, good business practice to take a look at it in

12 conjunction with other infrastructure, coordinate it with

13 other infrastructure.  That's the best time to do that sort of

14 work.  It's the most cost effective time to do that work.

15 Q    And it's most cost effective because why?

16 A    You already have the road torn up.  Somebody else is

17 paying for the road replacement.  There's already a big

18 construction project there.  So you're -- you're -- there is

19 significant savings there.

20      That particular piece of water main is of an age and they

21 have experienced some -- some incidents of problems with that

22 pipe that they felt that that was a good candidate for

23 replacement.

24 Q    If -- if the Department of Transportation wasn't already

25 tearing up Telegraph Road, would you have included this

1  project in the first five years of your CIP?

2  A    No.

3  Q    Okay.

4  A    No.  It probably would have been beyond the ten year.

5  Q    All right.  Is that a typical practice among cities in

6  the United States, to take advantage of transportation

7  projects that -- take advantage of those opportunities to

8  replace the water mains?

9  A    Yes, absolutely.  There's nothing more frustrating for

10 people than to see a new road put down and then a few years

11 later the road ripped up to replace a water main, or vice

12 versa.

13 Q    All right.  Can we blow up item number 34 on this?  All

14 right.  Can you describe for the Court what this is, Mr.

15 Kaunelis?

16 A    Yes.  This is a -- this is a general allowance for

17 additional transmission main replacement.  In addition to the

18 known issues that we have with some of the existing mains, we

19 know that there needs to be a ongoing program of transmission

20 main replacement so that's -- we've allowed for that.

21     Now that could be in other cases, for example, where MDOT

22 is doing a project that you may again choose to -- to do a

23 water main replacement as part of that project, or if there

24 are over the course of the ten years it would not be unusual

25 to find that there's another section of main someplace that

1  for one reason or another is determined that it's a reasonable

2  candidate for replacement.

3  Q    Uh-huh.  And what is the most efficient and cost

4  effective way for a city to go about replacing its -- its

5  transmission mains?

6  A    In terms of studying which ones to --

7  Q    Yes.

8  A    Yes.  Asset management is -- is a -- is the title that's

9  often used now as the -- the way to systematically look at

10  what parts of your system are the highest priority for

11  rehabilitation or replacement.  So you look at a -- a variety

12  of factors of the -- the system.

13       For example, you might use the age, the material of

14  construction, the period of construction, the incidents of

15  past problems with that particular infrastructure, and you may

16  do some specific testing to determine the condition of the --

17  of the system to determine where you need the work.

18       And in the asset management program then you'll typically

19  lay out which pieces of the system you're -- you believe are

20  the highest priority that need to be handled.

21  Q    Why wouldn't you just estimate what the useful life is of

22  a particular transmission pipe and then replace it once you've

23  exceeded the useful life?

24  A    The -- with a major system like this there's a tremendous

25  investment in the infrastructure in the -- in the pipes in the

1  plant and you want to maximize the benefit of that investment.

2  So you want to get all the useful life out of that investment

3  that you possibly can.

4      In some cases that may mean selective rehabilitation.

5  For example if you have a -- a section of main for -- for

6  whatever reason.  Perhaps it's in a particularly corrosive

7  soil that's eating away at the -- at the pipe, the metal is

8  deteriorating rapidly, you certainly want to try to find the

9  smallest piece that you can replace rather than replacing

10  everything.  You want to replace only the pieces that are --

11  that show the sign of distress and let you know need to be

12  taken care of.

13  Q    What is the typical practice among cities both here and

14  -- in this country and elsewhere with respect to replacement

15  of their transmission mains?

16  A    Usually a -- for example under 32 there are specific

17  projects with a specific reason why each of those are on

18  there.  So you want to budget for a certain amount of work but

19  then when it actually comes time to do the work, you want to

20  make sure that you have a very good justification for the

21  specific section that you're addressing.

22      So for example, the first item on there is a 96 inch main

23  that is now under a landfill.  And so there's very much of a

24  concern of contamination of that pipe and getting that out

25  from underneath the landfill, putting in a parallel pipe.

 1      So you have a very specific reason why that -- that

 2   project is on there.  So you're not actually going to do it

 3   just based on -- on something -- a single parameter like age.

 4   You're going to do it based on the best available information

 5   that you have on something specific needing to be done.

 6   Q    Would it be fair to infer from Item 34 that the

 7   department only plans to replace one to two miles of its

 8   transmission mains a year for the -- for the next 100 -- or

 9   500 years?

10   A    No.  You certainly have under Item 32 there, you have a

11   very large number of -- I don't know how many miles that is,

12   but it's a large number of miles that you're already doing.

13   And so the Item 34 is in addition to that.

14      The expectation is if you were to do the next ten years,

15   you would see again a -- a list of significant number of

16   projects that you know specifically what those are and why

17   they're being taken care of.  And then in addition you again

18   have a allowance for things you don't know of at that time.

19   Q    All right.  After you completed this ten year CIP,

20   Exhibit 178, did you continue to do work regarding the

21   department's capital improvement plans for the foreseeable

22   future?

23   A    Yes.  In fact the department does a rolling five year

24   CIP.  So each year they -- they look at another year, they add

25   another year to the program.  So they're always looking out

1  five years.  And it's always adjusting off of the previous

2  five year program.

3  Q    All right.  And were you asked to prepare any additional

4  reports this year for the department regarding its water and

5  sewer systems?

6  A    Yes.  As part of the financing for the sewer financing,

7  the bonds that they were going out to sell, we did a

8  engineering condition assessment of the system for that work.

9  And then also then we -- they decided to do some financing for

10 the water system, the refinancing of some of the bonds.  So we

11 did a similar report for the water system as well.

12 Q    All right.  Can you bring up Exhibit 637, Page 249?

13        MR. HAMILTON:  And again, Your Honor, this is

14 already in evidence based on Ms. McCormick's testimony.

15 Q    And if you could go to the -- the third page of this.

16 There you go.  What is this document, Mr. Kaunelis?

17 A    This is the document that we just referenced.  This is --

18 was prepared on the water system as part of the financing.  So

19 it was an evaluation of the water system for the -- for the

20 official statement.

21 Q    And what did you do to prepare this water system

22 evaluation?

23 A    We did a site visit to a number of the water treatment

24 plants, booster stations, and reservoirs in the system to get

25 a firsthand look at the facilities and to evaluate them.

1    Q    All right.  And could we go to Page 283 of this document?

2    And if you could blow up the paragraph above the -- above the

3    table.

4        What changed here in the -- in the projects that are --

5    that are discussed here from what was in your original ten

6    year CIP the year before?

7    A    The -- since the -- and when we did the ten year CIP at

8    that point the water master plan update was just a few months

9    into the project.  As part of this work in -- in July of this

10   year, they had already published a first phase report and were

11   part way into their second phase work.

12       Their -- all their work is going to be wrapped up in

13   about I think April of next year.  So they have a lot of their

14   work completed at this point.

15   Q    All right.  Can you blow up the bottom table on this

16   chart -- or on this page?  What does this table show, Mr.

17   Kaunelis?

18   A    This shows the five year -- the additions to the five

19   year capital improvement program.  So for example, previously

20   the -- you would not have seen these projects in the five year

21   capital improvement program.

22   Q    All right.  Were all of the -- all of the projects here

23   are now within the five year CIP of the department, is that

24   correct?

25   A    Yes.  It's not been officially adopted yet, but it's in

1  their draft that I believe that they're going to be presenting

2  to the customers and to the board.

3  Q    Okay.  And are all these projects already included in the

4  ten year CIP you did last year?

5  A    Yes.

6  Q    Okay.  Are they within the first five years of your ten

7  year CIP?

8  A    Some of them were, some of them were in the later

9  portions.

10 Q    And now they've all been moved to the first five years?

11 A    That's correct.

12 Q    Okay.  And then if we could go to the -- the next page of

13 this exhibit.  Are these your opinions with respect to the

14 quality of water service that's provided by the department to

15 its customers?

16 A    That is correct.

17 Q    And if you look at number 2, are the projects that are

18 current -- that the department is current -- currently in the

19 department's five year CIP, are those adequate to enable the

20 department to provide an adequate level of water service going

21 forward for the next five years?

22 A    Yes, although I would characterize the -- the -- that

23 table that we were looking at, I would suggest that they add

24 those projects into the next version of the five year CIP.

25 Q    All right.  And your opinions here are predicated on the

1 assumption that those projects are included in the five year

2 plan, is that right?

3 A    That is correct.

4 Q    Okay.  All right.  Can we go to Exhibit 636?  And Page

5 255.  And if you go two -- two pages in.  There you go.  What

6 is this document?

7 A    This is the similar report for the sewerage system.

8 Q    And if we go to Page 283.  And if we blow up the -- the

9 table.  What does this reflect, Mr. Kaunelis?

10 A    This -- these are the projects that are -- major projects

11 that are on their current five year capital improvement

12 program.

13 Q    Now were these projects included somewhere in your ten

14 year CIP you did last year?

15 A    Yes, they were.

16 Q    Okay.  And what if anything has changed with respect to

17 the sewer system on your ten year CIP from last year?

18 A    Actually very little has changed on the sewer system.

19 The -- the -- there are no new major studies ongoing and

20 everything seems to confirm the -- the past evaluations of the

21 things that need to be done.

22 Q    All right.  If we go to Page 285.  And if we can blow up

23 the first five opinions that would be great.  Are these the

24 opinions you set forth in your report, Mr. Kaunelis?

25 A    Yes.

1  Q    All right.  Can you describe for the Court -- or tell the

2  Court a little bit about what you're reporting here in your

3  first opinion about the three minor, relatively minor

4  violations?

5  A    Yes.  The -- well, let me start a little bit over the --

6  the previous.  Of course we -- we all know that the department

7  has had problems in the past with getting consistent water

8  quality treatment at the waste water treatment plant.

9       And they had extensive violations at different times

10 because of that.  Since 2012, their performance has actually

11 been quite good.  And they actually have had relatively high

12 -- high quality effluent occurring.

13      Now even with the -- the good quality effluent there have

14 been minor accedences.  So for example, and I don't recall

15 it's -- it's specified in the report, I believe.  But there

16 were -- there were times where they slightly exceeded a

17 particular parameter.

18      Like, for example, I think there was one where there was

19 a metal -- one of the metal limits was exceeded a little bit

20 one time.  But a relatively small percentage accedence.

21      Which is something that can occasionally happen, but it's

22 not an -- it's an indication that there's no major problem at

23 the -- major ongoing problem at the waste water treatment

24 plant.  So that's why we considered these are -- are minor and

25 they are not chronic.  They are not something that you're

1 seeing the same violation month after month after month.

2 Q    All right.  Let me ask you about your third opinion

3 there.  Do the -- are the projects set forth for the sewer

4 system for the next five years in this document, are they

5 sufficient to enable the department to provide an adequate

6 level of sewer service to its customers for the next five

7 years?

8 A    Yes.

9 Q    Mr. Kaunelis, do you have any reason to believe that

10 there is a material risk that there will be a -- a major

11 system wide failure in the infrastructure of -- of Detroit's

12 water and sewer system that would prevent it from providing

13 adequate levels of service to its customers for the

14 foreseeable future?

15 A    No.

16          MR. HAMILTON:  I have no further questions, Your

17 Honor.

18          THE COURT:  Any cross examination?

19          MR. SOTO:  No, Your Honor.

20          THE COURT:  Just a couple of -- of questions

21 regarding some terminology that you used.  I assume there are

22 a range of problems that either transmission lines or

23 distribution lines experience, right?

24 A    Yes.

25          THE COURT:  Can -- can you describe that range for

1   me?

2   A     Sure. The most -- the typical for your piping systems

3   are -- are occasions where the -- the piping network for

4   whatever reason you get a break in the piping network. And

5   then you have to do a repair, a spot repair on that piping

6   system.

7       So it's a -- it's a structural -- structural failure at a

8   point is -- is typical. And that can occur for a number of

9   reasons. For example, one example I gave if -- if the pipe --

10   a metal pipe in a corrosive soil, the soil is actually going

11   to eat away at the metal and the metal is actually -- you're

12   going to -- over time you'll see the thickness of the pipe

13   gets smaller.

14       And eventually if you leave that for too long you'll

15   eventually lose the pipe. So some of those structural kind of

16   conditions.

17       Another one where there's a structural for example when

18   you get a sudden change in pressure typically known as water

19   hammer. So you'll get a very sharp change in pressure that

20   occurs in the system.

21       So if a -- if a pump comes on very suddenly, or goes off

22   very suddenly, you'll actually see a pressure wave occur

23   through the system that's much higher than the normal

24   pressures and that can break a pipe.

25       Other types of things can happen. Another class of -- of

1   problems is on interior of the pipe.  You get deterioration,

2   what's known as tuberculation.

3       Over time you'll see the metal on the inside of the pipe

4   will actually start to close in.  You'll -- you'll lose a

5   little bit of metal and along with some of the other minerals

6   in the water, it will create a deposit so when you look on the

7   interior of a pipe it's actually much smaller diameter than

8   what you started with.  So that sort of a tuberculation is

9   another type of problem that can occur in the pipe.

10          THE COURT:  Okay.  And so those failures result in

11  these leaks that you talked about and then you -- and then you

12  discovered those by leak detection systems?

13  A    Yes, that is correct.

14          THE COURT:  And what does that involve?

15  A    Leak detection, there is a number of ways to do it.  One

16  of the common ways is to -- you actually through sound if you

17  actually have some very sensitive listening equipment that you

18  attach to the pipe, you can actually hear the flow of water.

19  So if you -- if there is a flow of water at a time or at a

20  location where you don't expect it, you can actually determine

21  that there is a leak there particularly large leaks.

22      And there is some further testing that you can do to

23  determine the location of it.  And then you would do a dig up

24  and -- and repair whatever the problem is at that location.

25          THE COURT:  So is there a recognized concept for

1  water systems of a useful life of a -- of a transmission line

2  or a distribution line?

3  A    There are general guidelines that people use and in the

4  United States you hear numbers.  Typically that range from say

5  50 years to somewhat over 100 years that are typically used in

6  -- in general thoughts about what's the useful life.

7      I will point out that in -- in other parts of the world

8  like for example in Europe, you -- there are -- are many

9  pieces of their infrastructure that have been around for much

10  longer than that and are still providing good useful life.

11      So they are -- are good general indicators that you

12  certainly want to consider when you're doing your planning.

13  But for example you don't want to use age all on its own.

14  For --

15          THE COURT:  That was really my question.

16  A    Yeah, you don't want to use age.

17          THE COURT:  So useful life is not -- in the

18  profession, or in the industry, understood to mean the time at

19  which the -- the pipe should be replaced?

20  A    Correct.

21          THE COURT:  Okay.  That's all, sir.  Thank you.

22  A    Thank you.

23      (WITNESS VYTO KAUNELIS WAS EXCUSED AT 9:18 A.M.)

24          MR. CULLEN:  Good morning, Your Honor.  Thomas

25  Cullen of Jones, Day representing the city.  At this point the

1  city would like to call its next witness, Mr. Kenneth

2  Buckfire.

3          THE COURT:  Okay.

4          MR. CULLEN:  And we have some books that we're going

5  to --

6          THE COURT:  Okay.  Please raise your right hand.

7      (WITNESS KENNETH BUCKFIRE WAS SWORN)

8          THE COURT:  Please sit down.  While it's on my mind,

9  may I ask whether the issue of the admissibility of the

10  exhibits that only Syncora had objected to was worked out

11  among counsel?

12          MR. SOTO:  Your Honor, we've gone through all but

13  about 50 and we expect to be able to be done with that

14  analysis today.

15          THE COURT:  Okay.  Then -- then we'll defer it.  Go

16  ahead, sir.

17          MR. CULLEN:  Okay.

18                      DIRECT EXAMINATION

19  BY MR. CULLEN:

20  Q    Good morning, Mr. Buckfire.

21  A    Good morning.

22  Q    What's your full name and address, sir?

23  A    Kenneth Allen Buckfire.

24  Q    And address?

25  A    1175 Park Avenue, New York, New York.

1  Q    Where do you work?

2  A    Miller, Buckfire and Company.

3  Q    Could you describe for the Court the nature of Miller,

4  Buckfire's business?

5  A    Miller, Buckfire is an investment bank specializing in

6  restructuring advice to cities, municipalities, and

7  governments, and corporations.

8  Q    And when you say -- what -- what kind of investment

9  advice?

10 A    We specialize in working with entities, corporations, and

11 governments that have difficulty accessing normal capital

12 markets.  Their ability to survive and operate in the ordinary

13 course is in question, therefore that requires a specialized

14 set of services to allow them to negotiate with creditors.  We

15 raise capital when necessary, sell assets when necessary to

16 put the entity back on a solid financial footing.

17 Q    Okay.  And in the range of advice, could you give us an

18 idea of the range of advice or services you offer to these

19 financially distressed companies?

20 A    Well, the services we provide to governments and

21 corporations that are financially stressed include always an

22 extensive diagnosis and due diligence of the operating or

23 business plans depending on what the entity is.

24      The goal of that is to determine what the balance sheet

25 should be to support the operations of the government or the

1  corporation so that it can operate without undue financial

2  pressure while delivering the appropriate services or goods

3  and services to its customers.

4  Q    Does raising capital get involved in this?

5  A    In almost every situation.

6  Q    Is there any need to evaluate the debt capacity of these

7  companies?

8  A    It's an essential condition to determining how much

9  capital could be raised and on what terms.

10 Q    Could you explain the concept of debt capacity for the

11 Court, please?

12 A    Debt capacity is a concept that bankers employ to

13 determine what the carrying capacity of the entity is in terms

14 of being able to borrow money and repay it without undue

15 pressure or undue risk of going into default or an inability

16 to deliver services or operate in the ordinary course.

17 Q    Is Miller, Buckfire occasionally tasked with assessing or

18 overseeing asset sales or divestitures?

19 A    Very frequently.

20 Q    Has Miller, Buckfire received any recognition for the

21 quality of the work it has performed for its clients?

22 A    Yes.  Over our nearly 20 year history we have received

23 numerous industry awards including for most recently General

24 Growth Properties which is a $28,000,000,000 bankruptcy a few

25 years ago.  It was the mega restructuring of the year

1    Earlier than that we received a similar award for the

2  mega energy company restructuring of the year for Calabrian

3  Corporation.  That was about $22,000,000,000.  And we have

4  received numerous awards for smaller situations in the course

5  of our history.

6  Q    Is Miller, Buckfire regulated?

7  A    We are.

8  Q    In what ways?

9  A    We are regulated both by a FINRA and the SEC and we're

10  also an IMRA advisor which is a new term they created recently

11  for investment banks that provide fiduciary advice to

12  municipalities.  And we are an IMRA advisor as well.

13  Q    One -- one second.  Are both the individuals and the firm

14  itself regulated?

15  A    Yes, we are.

16  Q    Okay.  And for instance under FINRA do you hold any

17  particular certifications?

18  A    Yes.  I told three, series 7, series 24, and also series

19  63.

20  Q    And what are they?

21  A    They are requirements of FINRA to anybody dealing with

22  securities to make sure you comply with the rules and

23  regulations that allow you to effectively discuss, offer, and

24  transact with securities in the marketplace.

25    Series 7 is what's called the registered rep

1 authorization, similar to what a stockbroker would have to

2 have to deal with the public.

3      Series 24 is a much more serious standard where a

4 supervisor has to satisfy the requirements.  You can supervise

5 registered representatives.  And I hold those.

6 Q    Okay.  And 63?

7 A    That's a New York State requirement similar to series 7.

8 Q    All right.  You mentioned something called IMRA.  Would

9 you tell me what that is?

10 A    It's the -- known as the IMRA -- we are an independent

11 municipal registered advisor pursuant to the Securities and

12 Exchange Commission requirements.  They require that

13 registration be held by firms that advise municipalities.

14      Every municipality normally requires an advisor to

15 provide fiduciary advice when issuing securities as opposed to

16 the underwriter.  So in this situation, Barclay is

17 theoretically the underwriter of the securities, but we are

18 advising Detroit as its IMRA.

19 Q    And under this regulation, you are precluded from being

20 an underwriter of any of -- any of the securities on which you

21 advise a city, correct?

22 A    Yes.

23 Q    Okay.  You say a fiduciary role with respect to the

24 municipality.  What does that entail?

25 A    We are charged with the task of advising our client as a

1  municipality as to how to select the best financing available

2  to it from underwriters who are because they're providing

3  underwriters they're acting on their own account.  They are

4  not at arm's length from the city.

5  Q    Tell me about Miller, Buckfire's role for the city in

6  connection with this case in general terms.

7  A    We are tasked with being the investment banker to the

8  city which encompasses a wide range of responsibilities

9  including due diagnostic analysis of the debt capacity of the

10 city, potential value of assets, negotiating with creditors,

11 raising capital limits when -- when necessary.

12 Q    Okay.  Did the engagement with the city have phases?

13 A    Yes.  Our first engagement with the City of Detroit was

14 in the summer of 2012 when we were hired to do a 60 day

15 financial evaluation of the city's financial condition.

16 Q    And what was the -- what was the goal of that effort?

17 A    That was designed to provide to the -- the state and to

18 the city leaders an independent assessment of its financial

19 prospects, conditions, and ability to operate in the ordinary

20 course.

21 Q    And then were you engaged again in January of 19 --

22 January of 2013?

23 A    Yes, we were.

24 Q    And what was that role?

25 A    At that point we were hired as the investment banker by

1  the city to begin to provide general strategic financial

2  advice about how to address its overwhelming financial

3  problems, and help design a strategy along with other

4  professionals and the city leadership to address the pressing

5  liquidity concerns of the city and recommend a strategy to put

6  the city on a solid financial footing.

7  Q    Who was the leader of this Miller, Buckfire engagement?

8  A    I -- I was.

9  Q    How big was your team?

10  A    At our peak we had approximately 15 bankers working on

11  various aspects of this engagement.

12  Q    How long have you been providing investment banking

13  services to clients?

14  A    Since 1987.

15  Q    And particularly in the field of restructuring finance?

16  A    Since 1987.

17            MR. CULLEN:  All right.  Let us take a look at what

18  we've marked as City Exhibit 768 which is a copy of Mr.

19  Buckfire's C.V. which has been produced in various documents

20  here.  We thought it would just be simpler to provide it

21  separately, Your Honor.

22  Q    Is this your C.V.?

23  A    Yes, it is.

24       (City's Exhibit 768 was identified)

25  Q    Does it remain true and correct to the best of your -- to

1  the best of your memory and knowledge?

2  A    Yes.

3       MR. CULLEN:  All right.  I'd like to offer 768 into

4  evidence if I could, please.

5       THE COURT:  Any objections?

6       MR. SOTO:  No, Your Honor.

7  Q    Have there been any changes since you've previously --

8       THE COURT: Excuse me.

9  Q    -- any material changes --

10      THE COURT:  Excuse me.  It is admitted.

11     (City's Exhibit  768 was admitted)

12      MR. CULLEN:  I know I shouldn't hang around with

13  Stewart.

14  Q    Have there been any material changes in your C.V. since

15  the time you prepared it?

16  A    I'm older.

17      THE COURT:  Is that a material change, sir?

18  A    It certainly feels that way.

19      MR. CULLEN:  With that, Your Honor, I think I'll

20  dispense with going through that because the Court is familiar

21  with the aspects of -- of that.

22  Q    Do you participate -- we can take it down now.  Do you

23  participate in any professional associations?

24  A    I do.

25  Q    What are they?

1  A    I'm a member of the American Bankruptcy Institute, the

2  firm is a member of the Turnaround Management Association, and

3  I serve on one of the committees of the existing Bankruptcy

4  Reform Commission.

5  Q    Can you tell me what those committees are?

6  A    Well, I'm on the plan process committee.

7  Q    Have you ever testified in Federal Court?

8  A    Yes.

9  Q    Have you testified in Bankruptcy Court?

10  A    Yes.

11  Q    How many times?

12  A    More than 20.

13  Q    Okay.  Have you been accepted as an expert to testify

14  about restructuring finance?

15  A    Yes.

16  Q    And were you indeed qualified as an expert about

17  restructuring finance in the -- in an earlier phase of this

18  proceeding?

19  A    Yes.

20  Q    Do you have experience analyzing a distressed entity's

21  liquidity needs?

22  A    Yes.

23  Q    Could you characterize the depth or scope of that

24  experience?

25  A    I've done that work for my entire professional career,

1  Q     And do you have experience designing securities?  Does

2  designing securities mean something to you?

3  A     Yes.

4  Q     What does it mean?

5  A     Well, it means designing the securities that a borrower

6  would offer to either its creditors as consideration as part

7  of a plan of reorganization, or to attract new capital from

8  the market, either before or after a bankruptcy case.

9  Q     Could you describe the elements involved in designing a

10 security?

11 A     Well, it's not a simplistic task.  It's very iterative

12 because we have to consider a number of factors, the most

13 important of which is the inherent debt capacity of the

14 organization.

15       And that we've already talked about means how much debt

16 can the organization reasonably borrow and have a very high

17 probability of being able to repay.

18 Q     Okay.  And what about the particular features of the

19 security to be designed?

20 A     Well, all those features would be dependent upon how much

21 debt capacity you have.  You can't exceed the debt capacity

22 which tells you how much principal amount you can issue.

23 That's the most important factor.

24       But then you have to design the principal amount that

25 you're offering to borrow or effectively to repay and you have

1  to consider the coupon interest rate, the term of the debt,

2  amortization features, in other words how fast you pay back

3  the debt over time.

4      Whatever package of financial covenants are required to

5  allow the lender to lend back to the borrower.  And the level

6  of security and seniority of the underlying instrument.

7  Q    And what are you trying to achieve for a client when you

8  design a security?

9  A    Well, we're always focusing on primarily three things

10 first.  Designing a security to allow it to borrow at the

11 lowest possible cost.

12     Second, to impose no risk on the borrower that it will

13 suffer a default or other financial event prior to the

14 maturity of the debt.  Which means we want to make sure the

15 security itself doesn't have features that would trigger a

16 default or an event even if the city or the borrower has the

17 ability to repay.  Those are all very important.

18 Q    What about the -- does the long term balance sheet of the

19 issuer play into this in any way?

20 A    Well, that's the predicate of all of this.  It all comes

21 back to debt capacity.  You can't just look at the debt

22 capacity as of the date you issue the securities, you have to

23 look at the borrower's long term ability to repay.  And that

24 requires a very careful understanding of the underlying

25 business prospects and operations of the borrower

1  Q    Are there aspects of security design that you would

2  identify as unfavorable for a client, or that would cause you

3  heightened concern?

4  A    Well, there are always certain features that lenders try

5  to get and we always encourage our clients to resist.  And the

6  most important of which is too rapid amortization.

7       Clearly a borrower that's come through a restructuring

8  frankly there is –- in the restructuring is they don't have

9  complete control over their operations and their ability to

10 project forward.  That means you don't want to put undo stress

11 to repay too early whatever borrowings you are taking into

12 account as part of the exit, that's number one.  So too rapid

13 amortization, too near maturity is always a problem.

14      Secondly, the covenants that the –- the lenders "require"

15 to make sure that the borrower has adequate capacity to repay.

16 Those can be often demanded to be too tight too onerous.

17      Thirdly, we don't want to create a security that does not

18 allow the borrower to borrow more if it turns out its

19 advantageous to do so.  And one of the common issues you run

20 into there is where a lender will say, well, if you want to

21 borrow more money, you have to pay me first.  And that would

22 be a very onerous condition even if they have adequate debt

23 capacity to repay.

24 Q    Okay.  You've described your practice area as

25 restructuring finance.  Can you explain to the Court how that

1  differs if it does from more general finance activities?

2  A    Well, it's entirely different.  Bankers who work with

3  companies that are well run which have stable operations, you

4  know, really don't have to spend much time on due diligence of

5  the company itself.  They can rely with much greater

6  confidence on the company's projections and statements that in

7  fact it will be a going concern going forward because it's a

8  well run company.

9       The kind of clients that we have almost never have that

10 level of confidence because the reason they're in

11 restructuring or bankruptcy is because their business plan, or

12 their operating plan if it's the government, no longer works.

13 And that requires us to spend a great deal of time doing a

14 extensive due diligence and diagnostic analysis of the real

15 operations of the corporation or the government to determine

16 well, what does it really need to spend to provide services or

17 produce goods and services as the case may be.

18      And then once you've done that analysis, that then tells

19 you how much debt capacity you have.  And then at the very end

20 of that process, we will figure out how to get from the

21 balance they happen to have to the one that they should have.

22 Which is the execution phase of our engagement.

23 Q    Now with respect to the difference between normal --

24 normal financing and restructuring financing.  In the

25 restructuring case, are the normal capital markets available

1  to the borrower?

2  A     Typically not.

3  Q     No?

4  A     Typically no.

5  Q     Now with respect to a distressed borrower, does this

6  process of looking for financing outside of the normal course,

7  require an intention on your part to the prospective

8  borrower's balance sheet or business plan?

9  A     Yes.

10 Q     Could you describe that, please?

11 A     Well, the company in restructuring or in government

12 restructuring has typically lost the confidence of normal

13 market participants who no longer necessarily believe that the

14 civic leadership or corporate leadership has control or really

15 can adequately project its business.

16       And therefore its incumbent upon Miller, Buckfire or

17 similarly situated restructuring investment bank to

18 effectively re-underwrite the credit, to re-explain the

19 government's operations, balance sheet, or a corporation's

20 balance sheet to the market and basically re-introduce the

21 credit to a new group of investors who are more used to taking

22 a risk on a situation which is in flux and one in which the

23 borrower has demonstrated over several years that they in fact

24 can manage the situation responsibly and can actually have

25 confidence in their projections.

1  Q    And do the relationships that you developed over time in

2  the restructuring arena with lenders who operate in that

3  arena, is that in any way important to the way you deal with

4  this problem?

5  A    It's crucial.

6  Q    Explain that, please.

7  A    Well, the kinds of lenders or investors who provide

8  financing to our kinds of clients are used to dealing with us.

9  They have gotten to know us over 20 years, they know this is

10  the kind of work we do.

11      And when we bring them a borrower who needs capital, they

12  understand that we've done our homework, that in fact we have

13  exhaustively studied the operations, and we can then represent

14  to them that on a restructured basis, assuming that the

15  restructuring is executed, their investment will be safe and

16  they will earn an appropriate rate of return.

17  Q    You've described with respect to this function a

18  diagnostic process, or diagnostic approach.  Did I hear that

19  correctly, sir?

20  A    Yes.

21  Q    Did you apply that approach with respect to the City of

22  Detroit?

23  A    We did.

24  Q    Could you describe that for me, please?

25  A    Well, immediately after being hired by the city in early

1  January of 2013, we recommended the city expand the role of

2  Ernst & Young which had already been providing much more

3  limited services to the city to -- to help us really

4  understand the cash flows of the city, understand where the

5  money was being spent, to really help design a long term set

6  of projections that we could then use to determine what the

7  debt capacity of the city was.

8       At the same time the city on our advice, hired Conway,

9  MacKenzie to do a reinvestment analysis given the lack of

10  service solvency in the city.  It was clear to all of us that

11  the city needed to re-invest in appropriate areas of its

12  activities to allow at a minimum the tax base and revenues to

13  be stabilized while encouraging new people to come to the city

14  and new businesses to locate here.

15       We had no ability to do that, that's not Miller,

16  Buckfire's expertise.  And so we began working with Ernst &

17  Young and Conway beginning in January of last year really in a

18  six month effort to determine two things.

19       One, what were the long term projections of revenues and

20  expense of the city.  And secondly, what would the city need

21  to spend to restore service solvency.  And at the end of that

22  process which I recollect, we finally finished our initial

23  review in early May of last year.

24       That allows us determine how much cash would you have

25  left with then forms our basis for concluding how much debt

1 capacity the city would have.

2 Q    So what is the relationship between cash balance and debt

3 capacity?

4 A    Well, if you're not generating cash you can't pay back

5 your debt.  So once you've taken care of your service needs

6 whatever is left over from tax revenues can be used to satisfy

7 your obligations.

8          MR. CULLEN:  Your Honor, if I could put up on the

9 screen Exhibit 734, the 40 year projections that were admitted

10 yesterday.

11 Q    And if I could direct your attention, Mr. Buckfire, to

12 Page 8 of 14, I believe.  And if you could pull up just the

13 ending cash balance of that.  Right there.  Just that bottom

14 is fine.  And can you -- can you read that, sir?

15 A    I can.

16 Q    Okay.  And you're -- you're familiar with this document

17 and have worked with it?

18 A    I have.

19 Q    Can you tell me what impact if any that ending cash

20 balance as reflected in Exhibit 734 has on issues of the

21 city's debt capacity?

22 A    Well, this is a very complicated balance sheet and

23 clearly as you're trying to determine the debt capacity of the

24 city, you need to look at the end result after paying back all

25 of our creditors and dealing with service insolvency, how do

1  you know you've not over spent and you haven't over levered in

2  terms of your operations.

3      The cash line is a very good proxy for whether or not we

4  have done that, whether we have reached our available debt

5  capacity and we have also funded our requirements for

6  reinvestment.  So given that the cash line is around

7  $80,000,000 over the ten year period, I am highly confident

8  that we have not exceeded our debt capacity because if we did,

9  our cash number would be going down.

10     At the same time if our cash number was going up, that

11 would mean that we actually had more debt capacity or

12 differently we're spending too little on reinvestment relative

13 to our tax base.  So I'm very confident that we have optimized

14 from a debt capacity point of view, you know, how much we can

15 actually borrow and pay out.

16 Q    Okay.

17 A    And that's what this indicates.

18          THE COURT:  One second, please.

19          MR. CULLEN:  Sure.

20          THE COURT:  Can you put that back up for me?  And

21 this projection takes into account that debt repayment?

22 A    Yes, it does.

23          THE COURT:  And this is the debt repayment on the

24 borrowing that the city proposes, the exit financing?

25 A    That's correct

1          THE COURT:  And just to close the loop on this,

2   where do -- where does one see that on here?

3   A    Well, it's on the -- it's a little bit above this bottom

4   line, Your Honor.  If you go to uses you'll see a section that

5   says retiree payments which are the ongoing contributions to

6   the pension funds.

7          THE COURT:  Yes.

8   A    And secondly, you see note and cash payments which are

9   all the various debt securities that we propose to issue

10  pursuant to the plan.

11         THE COURT:  Well, but do those include the exit

12  financing?

13  A    I don't see that here.

14         THE COURT:  Can you help us out here, counsel?

15         MR. CULLEN:  I believe that -- give me one moment,

16  Your Honor.

17         THE COURT:  Okay.  Take your time because I want to

18  -- I want to pin this down.

19         MR. CULLEN:  Yeah, this -- this is the ten year

20  period, Your Honor.  If we could move forward to the 40 year

21  period.

22         THE COURT:  Okay.

23         MS. O'GORMAN:  This is the 40 year.

24         MR. CULLEN:  That's the 40?  I mean --

25  A    This schedule only runs out to 2024 though, so --

1          MR. CULLEN:  Yeah.

2   A    This page doesn't pick up the exit financing.

3   Q    The exit financing picks up in the out years?

4   A    Primarily, yes.  But it --

5   Q    Let's look at the next page.  No.

6          MR. CULLEN:  I will find this for you on the morning

7   break, Your Honor, and we'll -- we'll get it straight, okay?

8          THE COURT:  I think actually while we're focused on

9   it, I'm going to ask you to take a minute and discuss among

10  yourselves and -- and get this figured out and then we'll

11  continue.  So let me just sit here while you do that.

12         MR. CULLEN:  Okay.  Thank you.  714, please.  No,

13  not -- Exhibit 714.

14  Q    Now if I could direct your attention to two lines on that

15  exhibit.  One under revenues, QOL/exit financing protocols.

16  And under -- under expenditures down below QOL/exit financing

17  interest payments.  Do you see that, sir?

18  A    I do.

19  Q    And that's over the ten year period that reflects -- tell

20  me what that reflects with respect to the account it goes in

21  the proceeds and in the payment line.

22  A    Well, on the revenue line it reflects the borrowings

23  anticipated by the exit financing commitment which is I

24  believe now $325,000,000.  And that's why in 2015 which is a

25  fiscal year we show it's a lower number because I don't

1  believe that these projections are updated as of the decisions

2  last night to increase the facility to three twenty-five.  But

3  then --

4          THE COURT:  Wait, hold on.  Break that -- break that

5  down into baby steps for me.

6  A    I'm sorry, Your Honor.  The original request that we made

7  in the market was for a $275,000,000 exit financing which

8  would have allowed the city to repay the balance of the swap

9  obligation, the quality of life loan, a hundred and twenty,

10  and the balance would go into a debt reserve fund, fees of the

11  offering and cash for the city.

12          But we also negotiated as part of our settlement process,

13  to repay the LTGO $55,000,000 in cash.  And in order to do

14  that we've asked the city council and they've approved for

15  permission to upsize the exit financing to $325,000,000.  And

16  to take out the LTGO requirements.  And these projections I

17  think were filed before that decision was made and approved by

18  city council, the MFA and the ELB.

19          THE COURT:  So are there updated projections with

20  that change in it to show me how that works?

21  A    I haven't seen them, but I'm sure they're available.

22          THE COURT:  Do you know anything about this?

23          MR. CULLEN:  Yes.  I think that E & Y has updated

24  those projections, Your Honor.

25          THE COURT:  Are they in evidence?

1          MR. CULLEN:  I believe the most recent updates of

2  the projections are in evidence, but I will check with that

3  and if there's an update required based upon the city council

4  vote, to provide it to the Court.

5          THE COURT:  Have you seen the update?

6  A    No, I haven't.

7          THE COURT:  Well, all right.  This is an open issue

8  that --

9          MR. CULLEN:  We'll have to plug up.

10          THE COURT:  You'll have to address for me whenever

11  you're ready.

12          MR. CULLEN:  Yes.  Thank you, Your Honor.

13  Q    What is -- if you could put that down, please, and put up

14  the --

15          A VOICE:  Page 6.

16  Q    Page 6.  Could you review that -- that page, Mr. Buckfire

17  and I would direct your attention particularly to the total

18  secured debt service, including quality of life exit

19  financing.  Do you see that, sir?

20  A    I do.

21  Q    What does that tell us about these costs as of the

22  previous version of the exit financing?

23  A    Well, the -- the incremental change would only be

24  $50,000,000 over these numbers.  They'd be increase -- I don't

25  believe this takes into account the increased size of the exit

1  financing which was two seventy-five and it should be three

2  twenty-five.

3      But that's not really material relative to the amount of

4  debt the city will have borrowed.  And the total borrowings

5  here are about 2.3 billion over the ten year period.  It's --

6  it's a relatively small amount.

7  Q    But I will --

8          THE COURT:  A $1,000,000 sounds like a lot of money

9  to me.

10 A    Well, but from a debt capacity point of view, Your Honor,

11 it's only 2% of the total debt.

12         THE COURT:  All right.  You don't object if I want

13 to see it?

14 A    No, of course not.

15         THE COURT:  Thank you.

16 A    But if I could just make a final point.  The --

17         THE COURT:  Yes.

18 A    It's also important to think about the net debt position

19 of the city because that incremental borrowing does not impact

20 the city's net cash position upon emerging from bankruptcy if

21 the plan is approved.  And that's a very important

22 consideration.  The city will still realize from the financing

23 75,000,000 to $80,000,000 to support its RI initiatives.

24         THE COURT:  Fair enough.  But I've got -- I've got

25 to look at the long term feasibility of this, right?

1  A     I do understand that.

2        THE COURT:  Okay.

3  Q     What has Miller, Buckfire done in addition to what you've

4  talked about, or -- to prepare the city to re-enter the

5  capital markets?

6  A     Well, we began to prepare the city to re-enter the

7  capital markets and be what I would call a normal borrower

8  when we began the process of securing post-petition financing.

9        It's important to note that the city had really not been

10 in the markets previously to last year since 2005.  Not

11 counting the small financing they did in 2011 as a

12 representative transaction because that was relatively small

13 and was supported by state revenues.  The city's credit was

14 never an issue in the marketplace.

15       So we knew in order to prepare the city to re-enter the

16 markets after bankruptcy, that we would have to re-explain the

17 city, its prospects, and its operations to the capital markets

18 to start to build a base of potential lenders and investors

19 who would be willing to provide credit to the city in the

20 ordinary course.  We began that process last year during the

21 post-petition financing process.

22       MR. CULLEN:  At -- at this point I'd like to offer

23 Mr. Buckfire as an expert witness in the area of restructuring

24 finance.

25       THE COURT:  Any objections?

1          MR. SOTO:  No objection, Your Honor.

2          THE COURT:  You may proceed, sir.

3   Q    Mr. Buckfire, did you prepare a -- an expert report in

4   this matter?

5   A    I did.

6   Q    If you could take a look at the front page of City

7   Exhibit 462, the Buckfire expert report.  Is that -- is this

8   that report?

9   A    It is.

10         (City's Exhibit 462 was identified)

11  Q    And at some point did you prepare a supplemental expert

12  report?  Could we see at this point city Exhibit 744, the

13  supplemental expert report?

14  A    I did.

15         (City's Exhibit 744 was identified)

16  Q    And this is it?

17  A    It is.

18  Q    And these reports taken together set forth the opinions

19  that you are currently offering in connection with the city's

20  efforts to confirm its plan of adjustment?

21  A    Yes.

22  Q    And in the first report you offered an opinion with

23  respect to the appropriate discount rate to estimate

24  recoveries for Classes 7, 9, 12, 13, and 14, is that correct?

25  A    Yes.

1  Q    If we could look at Exhibit 769, Page 2.  And just blow

2  up the unsecured claims portion.  Are these -- are these as

3  numbered on the left the classes for which you have offered

4  the appropriate discount rate?

5  A    Yes.

6  Q    Then again 7, 9, 12, 13, and 14 limited tax general

7  obligation bond claims, COP claims, Downtown Development

8  Authority claims, and other unsecured claims, is that correct?

9  A    Yes.

10  Q    Okay.  And have you also offered an opinion with respect

11  to the city's ability to access capital markets?

12  A    Yes.

13  Q    Did -- I'm going to say it this way.  What happened, Mr.

14  Buckfire, between the time of your first report and your

15  supplemental expert report that caused you to file a

16  supplemental expert report?

17  A    Well, a number of transactions were effective -- were

18  successfully executed.  First, we advised the city with

19  respect to its tender exchange on the DWSD bonds which means

20  those bonds are now unimpaired.  And that allowed the city to

21  borrow effectively at a lower interest rate on DWSD that had

22  projected originally in the plan.

23      Secondly, we were able to secure and recommend an exit

24  financing commitment which is an important factor that was not

25  in evidence in my original report.  Those are the two most

1  important things.

2  Q    And have you also decided to excise another portion of

3  your initial report?

4  A    Yes.  I'm no longer rendering an opinion on best interest

5  of creditors.

6          MR. CULLEN:  So, Your Honor, with -- at this point

7  for demonstrative purposes, as we've done before in this

8  proceeding, I'd like to offer City Exhibit 462, the initial

9  report, except for Paragraph 7 and 17 which were excluded by

10  the Court in limine on the best interest inquiry.  And

11  Paragraphs 11 and 12, re-market interest rates for impaired

12  bonds under prior versions of POA which are no longer

13  relevant.

14          THE COURT:  Any objection to that?

15          MR. SOTO:  I'm sorry, which of the paragraphs that

16  are excised?

17          MR. CULLEN:  7 and 17, and 11 and 12.

18          MR. SOTO:  Your Honor, if I understood your prior

19  ruling, I would -- I think it would be 7, 8, and 9 which are

20  all under the heading of plan treatment upon dismissal which

21  are best interest.

22          MR. CULLEN:  That's fine.

23          MR. SOTO:  With that no objection if used for

24  demonstrative purposes.

25          THE COURT:  All right.  For that purpose it is

1  admitted.

2      (City's Exhibit 462 was admitted)

3          MR. CULLEN:  And I would also like to offer City

4  Exhibit 744, which supplements the previous report with

5  respect to the discount rate and -- and -- and -- and includes

6  the discount rate report by reference.  744 is the new opinion

7  on access to capital supplemented by the exit financing

8  experience and includes the discount rate analysis by

9  reference.

10         THE COURT:  Any objections?

11         MR. SOTO:  No, Your Honor.

12         THE COURT:  All right.  It is admitted.

13     (City's Exhibit 744 was admitted)

14         MR. CULLEN:  Okay.

15  Q   Mr. Buckfire, what is the opinion with respect to the

16  appropriateness of the interest rate for the identified

17  classes that you have offered in your expert report?

18  A   Well, in my opinion the -- the discount rate is a

19  reasonable rate for the city.

20  Q   What -- in the context of the treatment of these classes'

21  claims, what is the function of a discount rate?

22  A   It's a proxy for the cost the city should expect to pay

23  to borrow new capital in the market when the expectation is

24  that the buyers of that new debt will hold the paper to

25  maturity.

1  Q    And how is the process of determining an appropriate

2  discount rate conducted from the municipality as compared to a

3  -- a commercial buyer?

4  A    Well, it's quite different.  First of all, a city or a

5  government has the -- you can make the assumption normally of

6  perpetual life.  For a corporation that is not normally the

7  assumption made by the capital markets, they're always

8  assessing the risk of business plan failure or management

9  errors.  But in a case of a municipality, that is not the

10 assumption, therefore the investment horizon is typically

11 assumed to be the maturity of the debt or beyond.

12      And the primary risk that one assesses, is the ability of

13 the city or the borrower in the case of another government, to

14 refinance and repay existing debt.  That's the presumption

15 that is often employed in the municipal finance market.

16 Q    And is this something called the perpetual life

17 assumption?

18 A    Yes.

19 Q    Okay.  Why is the discount rate in that connection not --

20 simply not the weighted average cost of capital?

21 A    Well, it's -- it's totally different.  First of all, in a

22 corporate situation the cost of financing a company is assumed

23 to be the weighted average cost to capital and that's a

24 function of the cost of equity and the cost of debt.

25      For a corporation to issue debt and take advantage of the

1  so-called tax shield is an important function that obviously a

2  municipality overwhelmingly will issue tax exempt debt.  So

3  that doesn't happen.

4       Secondly, there's no concept of equity for a government.

5  So the implicit cost of financing for a government entity is

6  almost always assumed to be the long term taxes and borrowing

7  costs.

8  Q    In your experience are there any generally accepted

9  methods in your industry for determining an appropriate

10  discount rate?

11  A    Well, it's more -- it's a art or science.  One can look

12  at available information to guide a judgment on what the rates

13  should be.  And normally one would look at what's similarly

14  situated borrowers are paying for capital, over a range of

15  maturities and durations.

16       One also look at, you know, market tests.  For example

17  recent financing is done by similarly situated borrowers to

18  indicate what the current conditions are in the market today.

19  And then it becomes more difficult because relatively few

20  borrowers are so identical to others that you can simply look

21  at one borrower and say well, that's what I should pay for

22  capital, especially in a situation like Detroit which is very

23  unique.

24       So one can look at comparable market indexes and

25  comparable transactions but then you have to apply judgment

1 | based on the changing conditions applying in this situation.

2 | Q    What did you consider in assessing the appropriateness of

3 | 5% as the discount rate for these classes?

4 | A    Well, we looked at as much market information as we

5 | could.  We looked at the published MMA curves.  They're a part

6 | of my expert report.  That was a very important indicator.

7 |          THE COURT:  Published what curves?

8 | A    The MMA curve.  It's the Municipal Market Access curve.

9 | It's where single A and -- of debt of rate of borrowers.  It's

10 | publicly reported on the Moonberg data service.

11 |      And that's a very important benchmark to understand.  If

12 | you're a "single A" or better rated borrower what can you

13 | expect to pay.  And it shows the cost over a range of

14 | maturities out to 30 years.

15 |      Now that's very important because of course when you're

16 | trying to analyze he cost of borrowing, you need to take into

17 | account for how long you're borrowing.  Because the shorter

18 | you borrow the lower the cost is.

19 |      But then it imposes liquidity pressures on the borrower.

20 | Obviously the tension obviously is, you want to borrow as long

21 | as possible then you have to pay too much for it.  So judging

22 | where you want to be on that curve is an important element of

23 | judgment as well.  And those curves are very important for

24 | that reason.

25 | Q    What role if any did the city's projection play in the

1  appropriateness of discount rate?

2  A    Well, they're crucial because in order to re-underwrite

3  the city's credit, one of the most important factors has to be

4  the city's ability to repay the debt being issued pursuant to

5  the plan.

6      So therefore the fact that the plan reduces total

7  liabilities from 10,000,000,000 to 3,000,000,000 on an

8  unsecured basis, Your Honor.  I'm not talking about the water

9  debt.

10      That we have effectively eliminated the -- the

11  uncertainties of the OPEB and pension costs so we have

12  effectively reduced and now have certainty around our debt

13  service obligations.  And not only that but the city's budget

14  assumes that the re-investment program will allow it to have

15  stable revenues over the -- at least the next ten years.

16      All should give the markets a great deal of confidence

17  that the borrowings were being requested by the city will get

18  repaid in the ordinary course.  So the projections are

19  actually the most important element to determine whether 5% is

20  a reasonable rate and I'd just also note that 5% is what

21  bankers would call a point estimate.

22      That normally when advising the client on the cost of

23  capital, it's a range.  So I think for this purpose we should

24  think about 5% as the midpoint of a range and that we would

25  expect as the city goes forward, depending on market

1 | conditions, it should be able to borrow around that range,

2 | that number. But it may not be exactly 5%.

3 | Q    Did you take into account the post-confirmation

4 | governance provisions for the city in -- in looking at this

5 | issue?

6 | A    We think that's another element of the credit

7 | post-bankruptcy that will give the market a lot of confidence

8 | that the city will be able to repay when due because clearly

9 | as a credit aspect, reducing liabilities from 10,000,000,000

10 | to 3,000,000,000 giving far greater certainty to the city in

11 | terms of its remaining debt obligations and making sure there

12 | is another body overseeing the long term financial affairs of

13 | the city, especially with respect to collective bargaining

14 | agreements, future debt issuances and the like, is a crucial

15 | element to the credit story. We believe that will give the

16 | city the ability to access capital post-bankruptcy at the

17 | lowest possible cost.

18 | Q    Okay. If we could look at Page 24 of your expert report,

19 | 744. There we go. Could you tell us what this page

20 | represents, Mr. Buckfire?

21 | A    Yes. This is our analysis of what the balance sheet of

22 | the city will look like assuming the plan is confirmed.

23 | Q    And how did you put this analysis together?

24 | A    We based --

25 | THE COURT: One second. Are -- are you still

 1  pursuing the witness' testimony regarding the 5% discount

 2  rate?

 3           MR. CULLEN:  Yes.

 4           THE COURT:  Okay.  I ask because at some point I

 5  need to have him explain to me in detail how he got to that

 6  number because I don't think I've heard that yet.

 7           MR. CULLEN:  Okay.  All right.  And we will, Your

 8  Honor.  We haven't --

 9           THE COURT:  Okay.

10  Q    Could you take a look at --

11           MR. CULLEN:  This is one of the steps, actually.

12           THE COURT:  Okay.

13  Q    If you can take a look at that document.  How -- how did

14  you put it together?

15  A    Well, this is a result of inspection of the pre-petition

16  obligations of the City of Detroit.  And then the resulting

17  balance sheet after the restructuring proposed by this plan.

18  And this is simply a mathematical analysis of where we begin

19  and where we plan to end.

20  Q    And if I could direct your attention to total obligations

21  line.  Could you explain that line to me and tell me what

22  bearing, if any, it had on your consideration of the

23  appropriateness of 5%?

24  A    Well, prior to the bankruptcy the city had total

25  obligations both on balance sheet and off balance sheet of

1  over $10,000,000,000 which is ten times the tax revenues of

2  the city.

3       And that is why the city could not borrow in the ordinary

4  course prior to the bankruptcy, it's too much debt.  As a

5  result of this plan of adjustment, if it's approved, the city

6  will have eliminated 7.3 billion of that 10.4, leaving the

7  city with only 3.1 billion of total obligations.

8       But most importantly, the annual cost of those -- of

9  servicing those obligations over the next ten years will be --

10  have a high level of certainty.  And that's really an

11  important factor for the credit markets because as we believe

12  will be shown by the exit financing process, a lender to the

13  city post-bankruptcy will have a very high level of confidence

14  that because there's no refinancing requirement during the

15  first ten years or even later, its new borrowings get repaid

16  by the city in the ordinary course.

17       And that is why the appropriate discount rate should be

18  around 5%.  And even that may prove to be too generous as the

19  city's operations improve.  But we can't bank on that today.

20       Your Honor, if I could just make a comment.  I apologize.

21  Seeing this page, I -- and we talked about the two

22  seventy-five to three twenty-five.  And I believe you were

23  concerned that we were adding more debt to the city.

24       But I failed to bring this up before.  Remember the three

25  twenty-five is paying off the LTGO fifty-five.

1          THE COURT:  Uh-huh.

2  A    So in fact there's no change in the total debt of the

3  city which shows me moving it from the LT line to the exit

4  financing line.

5          THE COURT:  Right.  I got that.

6  Q    And if I could direct your attention to the line of the

7  pro forma here.  With respect to three twenty-five, what does

8  that reflect, sir?

9  A    That is the proposed exit financing.

10  Q    If we could highlight that, please.  Three twenty-five

11  down below.  Just -- just above the twelve ninety-six.

12  A    That's the exit financing number.

13  Q    Thank you, Mr. Buckfire.  Now you've -- you've mentioned

14  a number of factors that played into your analysis of the

15  appropriateness of 5%.  And what I'd like to ask you to do is

16  to tell me -- well, let's -- let's do it this way.  You've

17  mentioned revenue stability, correct?

18  A    Yes.

19  Q    You've mentioned decreased liabilities.  You've mentioned

20  stronger balance sheet.  You've mentioned no immediate need

21  for borrowing.  You've mentioned re-investment, yes?

22  A    Yes.

23  Q    I think the Court's question is directed at you put all

24  those things together --

25  A    Uh-huh.

1  Q    Why do they come out to 5 as opposed to 7 or 3?

2  A    Well, again we're dealing with a municipal borrower.

3  Let's take the counter factual of a 7 or 9% interest rate.

4      That is an extraordinarily high interest rate for a

5  municipality because the only reason people would demand that

6  rate in the market for lending for example Puerto Rico is an

7  example of that is because there is substantial doubt about

8  the ability of that entity to service its debts in the

9  ordinary course.

10      That is not the situation here.  Because we've addressed

11  all those issues because of the bankruptcy.  On the other

12  hand, a 3% rate would indicate a very high quality borrower

13  that has a relatively low level of debt relative to his tax

14  revenues and has no, and most importantly, no real risk on the

15  OPEB side or the pension side of unanticipated cash

16  requirements that might damage the city's budget or force tax

17  increases.

18      So looking between the two one can argue that it's

19  certainly not a distress situation any longer because we've

20  fixed those problems in the bankruptcy.  But the city has not

21  yet proven, I believe, and I've testified to this earlier,

22  that it deserves to borrow at 3%.  That would imply it is a

23  strong single A or AA borrower.

24      Now certainly over the next ten years because the city

25  has no reason to go back to the market to refinance existing

1  debt, it will have more than adequate time to demonstrate its

2  credit worthiness and its ability to borrow at higher quality

3  ratings, but there's immediate term to do that.

4       On the other hand one would argue that because there is

5  uncertainty over tax revenues which I believe is the

6  fundamental risk facing the city from a financial point of

7  view, the market would require greater than a 3% rate.

8       And that's why the market curves that we attached to my

9  initial expert report are very relevant here.  Because it

10 shows you directly what the market would require a highly

11 rated municipal borrower to pay.  And in every case we would

12 show that it became less than 5%.

13 Q   If I could direct your attention at -- at this point to

14 precisely that.  If we look at the initial report, Exhibit 462

15 and at Page 33.

16      First, could you tell me what this page represents and

17 how it was derived?

18 A   Well -- well, the caption actually defines it quite well.

19 This is a publicly available curve on the Moonberg data

20 service which represents as it states here, by surveying

21 leading firms what they would effectively bid to own AAA geo

22 bonds at differing maturities.

23 Q   And is -- is this -- are these curves, is this

24 amalgamation of market information something that is taken and

25 relied upon in your business?

1  A    Yes.  It's analogous to the treasury yield curve for

2  corporate borrowers.  It's the benchmark from which all other

3  credits are evaluated.

4           THE COURT:  So the maturity is the X axis?

5  A    Yes.

6  Q    So it's --

7  A    And the yields are the Y.

8  Q    The maturity is the X axis and -- and the rate is the Y

9  axis, is that correct?

10 A    Correct, that's right.

11 Q    Okay.  Tell me how to read the different colors which I

12 see as blue, red, green, and then orange.  Do you see them the

13 same way?

14 A    I do.

15 Q    Okay.

16 A    Well, I'll take the -- I'm sorry?

17 Q    No, never mind.  Go ahead.

18 A    It's quite colorful, I agree.  The -- the orange line

19 which is the MMA curve was run as of July 1, 2014 which was

20 just prior to my submitting of my original report.

21       So it's a little bit obsolete at this point.  But it

22 indicates -- and I'll pick a particular maturity if you don't

23 mind and I'll go from there.

24       Let's look at the 15 year maturity.  On the bottom you'll

25 see 15.  And if you trend up to that you'll see that at July

1  1, a AAA borrower on the GM market would be borrowing a little

2  over 3%.

3       Now that indicates a significant rally from where they

4  had been able to borrow seven months earlier which was the

5  12-12, the blue line.

6       And I'd also note although we didn't submit it here, that

7  if you had re-run this curve as of yesterday, you would have

8  seen a further decline in the curve because the markets have

9  continued to rally.

10      Therefore when you look at 15 years to this discussion,

11 today for AAA you could borrow at, you know, 3 1/4, something

12 like that.  So to say you're borrowing at 5% which is nearly

13 200 basis points more, is a very high premium to reflect the

14 fact that the credit of Detroit, even though it's been

15 substantially improved is still untested on a long term basis.

16      But on a prospective basis if one assumes that we're

17 trying to test the ability of the city to borrow over the next

18 ten years when there's no pressure to do so, 5% would seem to

19 be an appropriate rate.  Because again there's no question at

20 this point that the city would be able to meet its new debt

21 obligations when due which is not the case for a distressed

22 borrower like Puerto Rico or even Guam.

23      We've eliminated that risk unless there's a precipitous

24 decline in tax revenues.  Further, if you go to 25 for

25 example, which is another important factor, you'll see that

1   the orange line is around 4 1/4 which means that if you're

2   borrowing 25 years and you're saying 5%, you're still above

3   that.  And maybe the risk premium is not quite that high.

4        But again the whole basis of the discount rate is to

5   worry about where the city should be able to borrow if it's

6   able to execute on its new operating plan.  And because of the

7   stability of revenues, the stability of the balance sheet, 5%

8   would seem to be a very reasonable premium relative to where a

9   AAA borrower would be able to borrow according to these

10  curves.

11       THE COURT:  What's the interest rate on the exit

12  financing?

13  A   Well, we don't know yet because remember we have a short

14  term facility.  We have a short term period where it's a

15  private placement with Barclays but they -- we also have

16  negotiated with them 150 day period in which they will then go

17  out and do a public offering and because of the market flex

18  and the base rate assumptions, we actually could end up

19  borrowing more cheaply than these curves.  But it also more

20  cheaply --

21       THE COURT:  All right.  Could you repeat that last

22  part?

23  A   I'm sorry.  The --

24       THE COURT:  Wind up borrowing what?

25  A   We have -- we've -- we have a -- the city has an

1  opportunity to actually price that debt at interest rates

2  lower than would be indicated by these curves.  And I can get

3  into that later if you'd like.

4      But it's a very important factor and it helped me

5  understand why a 5% long term discount rate here would be

6  appropriate.  I'd also note that other financings the city has

7  done to date, albeit somewhat different in nature, have all

8  tended to corroborate that 5% is a reasonable discount rate.

9      The post-petition financing as you recall, I hope, was

10  done at 3 1/2%.  It was four times over subscribed.  The

11  market took it.  We had no market flex.

12      The tender offer for the water and sewer bonds, obviously

13  revenue bonds, but they were priced inside of the conservative

14  rates we had assumed as part of the plan.  So the market, I

15  believe, is now re-accepting Detroit's credit which now means

16  that the question about rate is no longer a question of the

17  viability of the city which if that was still an issue would

18  mean we'd be paying very high rates.  But rather, you know,

19  will the city be able to effectively execute its plan which

20  transmits into a yield premium over AAA.

21  Q    In this demonstration, sir, is there one -- one line or

22  one curve that you would identify as -- as most relevant to

23  the city's experience or perspective or prospects?

24  A    Well, it's really the orange line because that's the most

25  recent.  And that shows that the -- the base -- the base

1  yields that we would then contribute a premium to would be,

2  you know, at a lower level than it was at the beginning.

3  Q    Is it your opinion that the 5% discount rate for these

4  classes is a conservative rate or a -- or an aggressive rate?

5  A    I think it's conservative.

6  Q    In reaching your opinion that the discount rate for each

7  of these classes was appropriate, did you consider the fact

8  that certain of these securities will be tax exempt and

9  certain will not?

10 A    We did.

11 Q    What was the impact of that consideration on your

12 assessment of the 5% rate?

13 A    Well, it's not an easy question to answer because there's

14 very little market evidence as to what the differences would

15 be.  But I think the best indication we have of what the

16 spread difference might be is actually from the Barclays

17 financing.

18      Because Barclays is committed as part of the $325,000,000

19 exit financing commitment, that the city will be able to

20 borrow the taxes at market, 25 basis points more cheaply on

21 the taxable portion.  So I think from a market point of view,

22 we've asked a important underwriter to price the difference

23 between taxable and taxes on paper.  And they came up with 25

24 basis points as the difference.

25      So in my judgment, the difference in rate attributable to

1  taxable Detroit paper versus tax on paper would tend to be

2  around that number.  That's just a market observation.

3           MR. CULLEN:  Does the Court have questions?

4           THE COURT:  Well, one for each of you.  What is the

5  -- what is the status of Court approval of this exit

6  financing?

7           MR. CULLEN:  What's going to happen just here --

8  here this morning, is that we're going to offer his opinion on

9  this.  His opinion on access to capital.  And we will follow

10  and supplement the opinion on access to capital with a

11  detailed description of the status of all of those -- all of

12  those factors.

13      The status, the status with the city council, the status

14  with the public board, and the status with the -- the status

15  with -- with the Court.  As -- as Mr. --

16           THE COURT:  Well, but technically -- but technically

17  are you asking for approval of the exit financing as part of

18  plan confirmation?

19           MR. CULLEN:  As part of plan confirmation, yes, sir.

20           THE COURT:  Thank you.

21           MR. CULLEN:  Yes.

22           THE COURT:  My question for you is, and maybe this

23  will come out later, but it's on my mind this second.  Why is

24  any of the debt taxable?

25  A    Much of the -- most of the exit financing is secured by

1  income tax revenues.  But there's a portion that is -- and

2  also it's not -- it's not being used for city reinvestment.

3  And my understanding of the law is that unless you're

4  borrowing money for reinvestment or capital improvement you're

5  not allowed to make it tax exempt.

6          THE COURT:  Uh-huh.

7  A    And I can't give you a precise answer on that, but I

8  believe that's the distinction that's drawn and allocated

9  between taxable and tax exempt.

10         THE COURT:  All right.

11 Q    Let me ask you one more relatively simple minded question

12 with respect to the discount rate analysis.  You have several

13 different classes.  You have one discount rate.  Why?

14 A    Well, it's the same issue and in the same securities.

15 There should be no different discount rate.

16         MR. CULLEN:  That's all I have with respect to that

17 topic, Your Honor.  I was going to move on to access to

18 capital.

19         THE COURT:  Sure, all right.

20 Q    Mr. Buckfire, do you have an opinion with respect to the

21 city's ability to access the capital markets?

22 A    I do.

23 Q    And is that opinion included in both your original and

24 your supplemental report?

25 A    Yes.

1  Q    What is the central or key assumption in those reports

2  with respect to the city's access to capital markets?

3  A    That assuming that the city successfully exits bankruptcy

4  pursuant to the plan, it will be able to access capital in the

5  ordinary course.

6  Q    And with respect to the status of this proceeding, is

7  there any key assumption relating to the ability to access

8  capital markets?

9  A    Well, there are three critical assumptions.  First, that

10 the liabilities of the city are reduced from 10,000,000,00 to

11 $3,000,000,000.  That has a dramatic impact on the city's

12 ability to borrow again in the future.

13     Secondly, that it will not have a very high level of

14 certainty in terms of the annual debt service requirements of

15 its remaining $3,000,000,000.

16     And lastly, there will be a new governance mechanism put

17 in place because of the oversight commission to give creditors

18 confidence that there will be effective supervision over all

19 other new contractual obligations in the city.

20 Q    How many times have you been involved in obtaining

21 financing on behalf of a city, country, or corporation, Mr.

22 Buckfire?

23 A    Dozens of times.

24 Q    And that includes financings during bankruptcy

25 proceedings?

1   A     Yes.

2   Q     Does it include exit financing?

3   A     Yes.

4   Q     Are there any particular factors which have a -- an

5   impact on exit financing?

6   A     Well, exit financing always requires privy to the market

7   that in fact the borrower is not likely to go back into

8   bankruptcy.  That's always the core requirement of any new

9   lender to a situation.  And we have to prove that adequately

10  in order to be able to raise capital at the lowest possible

11  cost.

12  Q     Okay.  And is there an accepted method in your industry,

13  an accepted set of procedures by which investment bankers and

14  restructuring finance go out to the market to try and get the

15  financing?

16  A     Yes.

17  Q     Let's go back for a second and could you describe that

18  method first with respect to the post-petition financing, if

19  we could go back there.  Did you use that method and decide

20  the course?

21  A     Whenever we have a credit that is challenged, I mean a

22  borrower that is -- I'm sorry, Your Honor.  We have to start

23  re-educating the market as to why new capital to the situation

24  is prudent and what the rates should be.

25       We began that with the City of Detroit in June of 2013.

1  One of the objectives of the plan originally given to

2  creditors was to really show the capital markets, not just

3  those creditors who happen to already be lenders to the city,

4  but potentially new lenders.

5      What were the city's problems and what was the city going

6  to do about it so that on a reorganized basis the city would

7  be a regular borrower they could afford to lend to.  So it

8  really began with a six month period that we've already

9  discussed to generate that original proposal to creditors.  It

10  was not just about giving them a plan and what we had to do

11  with their securities, but to re-introduce the credit to the

12  capital markets which we did.

13      Immediately after that we started looking for

14  post-petition financing and we contacted every institution

15  that we could conceivably think of that would be interested in

16  lending to Detroit.  That June 13 plan called the offering

17  memorandum for lack of a better statement, was the basis on

18  which we had every discussion with potential lenders.

19  Q    Could you give me an order of magnitude on the amount of

20  discussions, the amount of contacts, the amount of phone

21  calls?

22  A    We called, you know, over 30 qualified institutions

23  beginning in July to determine whether they would provide

24  post-petition financing to the city and we began with that.

25  And that was a very important effort on our part.

1  Q    And describe for me what you mean by a qualified

2  institution in that sense?

3  A    Well, lending to a city and frankly lending to Detroit,

4  is unprecedented.  I mean this is the first city that ever

5  actually secured post-petition financing for a Chapter 9 case.

6  That's a relatively new concept for everybody, so that means

7  that the normal providers of municipal credit really had very

8  little interest in doing this because it's just not something

9  they're used to doing.

10      They don't understand bankruptcy, they were concerned

11 about the status of Detroit from an eligibility point of view,

12 and they didn't really want to be a lender.  That and that we

13 had to talk to other financial institutions that were more

14 comfortable because of their knowledge of Chapter 11 in

15 particular and DIP loans.

16      And taking that concept and extending it to the city.

17 That was a very important educational process we went through

18 in order to arrive at the post-petition financings that we

19 ultimately did secure.

20 Q    And in undertaking this educational process, were you as

21 we discussed above, dealing with new people, or people you

22 already had business history with?

23 A    I would say in almost every case they're institutions

24 that we've had many years of history with.

25 Q    Okay.  And did that have any impact on your ability to do

1  this educational process?

2  A    Yes.

3  Q    And what was that impact?

4  A    Well, we knew all these people from other transactions.

5  And when you call up a bank which has done DIP loans routinely

6  for many years and we say well, we have a new and different

7  DIP loan for you, it's not a difficult conversation to get

8  them interested because at least they understand the arena in

9  which we have to operate which is Bankruptcy Court.

10      Then they'll bring in their municipal finance experts

11 because they don't typically understand municipalities.  And

12 they had to work together to figure out well, what kind of

13 financing could they provide in a -- frankly in a new

14 situation like this.

15 Q    Okay.  And did you undertake a similar educational

16 process with respect to the exit financing?

17 A    We did.

18 Q    And did -- the results of that process, what you learned

19 in that process in any way bear on your opinion about the

20 city's ability to access capital on reasonable terms on

21 emergence from bankruptcy?

22 A    It was crucial because as part of our initial marketing

23 efforts on the post-petition financing, we contacted a lot of

24 institutions that we knew would probably not provide the

25 post-petition financing, but we wanted them to be interested

1  in following the situation to be interested in providing the

2  exit financing.

3      And in fact many institutions we contacted originally

4  said well, we won't do your DIP loan, but come back to us if

5  you want to do the exit financing. We're only interested in

6  that especially if you achieve all of your objectives.

7  Because this is back last year when we had achieved nothing.

8  We didn't even have eligibility. They were not willing to

9  take the risk.

10      But they all said if you really achieve your objectives

11  we'd be very interested in looking at the exit financing. So

12  one process built to the other.

13  Q   Okay. Let's -- if I could direct your attention to

14  Exhibit 744, Paragraph 16, Page 6 of your supplemental expert

15  report. Going back a little bit. This remains your opinion

16  about the key factors here?

17  A   Yes.

18  Q   Okay. Let's -- let's talk about the post-petition

19  financing for a moment longer. What lessons did you derive

20  from that, what evidentiary points would you point to in that

21  that underline your confidence with respect to the city's

22  ability to obtain reasonable access to capital markets post

23  emergence?

24  A   Well, there were two really important results of this

25  process. First --

1  Q    This is the post-petition financing.

2  A    Yes, I understand.

3  Q    Okay.

4  A    First, the city was able to borrow on a post-petition

5  financing at the lowest possible price.  Barclays had had

6  available to it, but some of it was market flex where if there

7  was insufficient demand, they could raise the rate and we'd

8  have to pay it.

9       In this case they did not use any of the market flex.  In

10 fact the city was able to borrow at 3 1/2% where originally we

11 had assumed 5% or even higher depending on how the market took

12 to paper.

13      And the second factor that was critical was the book

14 itself was over subscribed by their report four times.  They

15 had four times as much demand for this loan as they needed to

16 sell it which was why they didn't use market flex, that

17 related to that is most of the buyers of the loan where I

18 would characterize as normal participants in the municipal

19 finance market.

20      They were not hedge funds.  They were not people coming

21 in here to try to make a fast, you know, ten points.  They

22 liked the credit, they understood what we were trying to do,

23 and that was an important factor in my judgment that the city

24 will be able to re-enter the capital markets because even in

25 the post-petition financing, normal participants in municipal

1  finance participated in the loan.

2      And I believe likely –- it will be likely to participate

3  in any future financings the city does, including the exit

4  financing.

5  Q    When you refer in your expert report to the anticipated

6  quantitative and qualitative characteristics of the city on a

7  post emergence basis --

8  A    Uh-huh.

9  Q    What are you referring to in particular?

10  A    Well, it really comes back to what are called the -- the

11  credit positives and negatives.  And this is the fundamental

12  story we've been telling to the capital markets since last

13  June and we expect the city will continue to tell going

14  forward first, the city will have reduced its unsecured

15  liabilities from over 10,000,000,000 to a little over

16  3,000,000,000.

17      That's an enormous change in credit quality because you

18  have less debt to service.  Secondly, the cost of servicing

19  that debt over the next ten years has now been fixed with high

20  certainty.

21      So unanticipated off balance sheet liability costs are no

22  longer going to be a risk factor for a potential buyer of the

23  debt.

24      Thirdly, having an oversight commission as a kind of

25  another check and balance on city government I think it will

1  be viewed very positively by the capital markets.  It did not

2  exist prior to bankruptcy.  It will exist going forward.  I

3  believe that's a very important element.

4      And then on the investment risk side, one has to

5  acknowledge that the ability of the city to stabilize tax

6  revenues and maybe even increase tax revenues because the

7  re-investment program has not yet been proven.  And I believe

8  that will be the biggest risk factor looked at by the markets,

9  but that is mitigated by the fact that on an annual basis the

10  city's ability to manage around the re-investment budget to

11  make sure it can satisfy its fix obligations, has now been

12  enhanced.

13      It the city actually had a problem on a one year basis,

14  they could defer re-investment program cash in order to fund

15  debt service obligations.  And that's a further factor, I

16  believe, making the credit story an attractive one.

17  Q    Okay.  Did the city's treatment in the plan of pension

18  and OPEB liabilities have any impact on this aspect of your

19  analysis?

20  A    Well, it was crucial because it eliminated as I've

21  testified before, the risk that those contribution costs would

22  have to be dealt with in annual budgets and therefore have an

23  impact on the city's ability to re-invest and also its ability

24  to satisfy its fixed debt service obligations.

25  Q    If I could direct your attention to Paragraph 22 of the

1  supplemental report on Page 10.  Could you explain for the

2  Court exactly how you believe as you state here that the

3  re-investment initiatives will provide a positive to the

4  market in assessing the city as a credit?

5  A    Well, the primary -- the primary benefit of the

6  re-investment program is to enhance the city's ability to

7  stabilize tax revenues and hopefully increase revenues over

8  time.  That's why the city should be doing it and that's the

9  primary objective of the re-investment program.

10      The ability of the city to maintain tax revenue stability

11 is going to be ultimately the most crucial element of the

12 credit story.  But at the same time, and I think this goes

13 back to the page we had before where we showed the amount of

14 cash on hand and the projection periods are at $80,000,000 per

15 year.

16      That's not a lot of cash for a city with a $1,000,000,000

17 balance sheet.  It's less than one month of operating expense.

18 So if it turned out that there is a recession in the next ten

19 years and the city has a short term decline in revenues but it

20 still has to satisfy its fixed debt obligations, it could in

21 theory defer some re-investment program money from one year to

22 the next in order to maintain minimum cash which is a proxy

23 for having satisfied its required debt service obligations

24 when due.  And that's the other benefit of this program from a

25 credit perspective.

1  Q    Could you sum up for the Court the major factors that

2  lead to your conclusion that the city will have reasonable

3  access to capital markets on emergence?

4  A    Well, it's primarily because of the improvement in the

5  balance sheet.  I mean we reduced the balance sheet of

6  unsecured liabilities from 10,000,000,000 to $3,000,000,000.

7  We have fixed the costs of servicing those liabilities for ten

8  years at a fixed number of the high level of certainty.

9      There is no refinancing requirement built into the plan

10 which is unique among municipalities.  I would actually argue

11 that the credit of Detroit will be better than the credit of

12 most other major cities which I have not dealt with their

13 unfunded pension and OPEB liabilities.

14     So there's going to be a high level of certainty around

15 the city's ability to service the debt being prospectively

16 issued pursuant to this plan.  And that also means that it

17 becomes advantageous to the city to go into the capital

18 markets and borrow again to take out either debt from this

19 plan or borrow or for some other purpose, you'll be able to do

20 so assuming it's demonstrated stability about tax revenues.

21 Q    Now you've -- you've stated that a key assumption of the

22 -- the plan, a key assumption of your opinion about access to

23 capital markets, is the emergence from bankruptcy of the city

24 and the implementation of the plan of adjustment, correct?

25 A    Yes.

1  Q    Is there a flip side to that conclusion?  Will the city

2  have access to capital markets if the plan is not accepted and

3  approved?

4  A    No, quite the opposite.

5  Q    Okay.  Why -- why do you conclude that?

6  A    Well, we're back to where we were before the bankruptcy.

7  We'll have $10,000,000,000 --

8         MR. SOTO:  I was wondering where Mr. Buckfire was

9  going because the Court specifically excluded this aspect of

10  Mr. Buckfire's initial opinion in his best interest analysis.

11  It was only included in his best interest analysis and was

12  specifically excluded.

13         MR. CULLEN:  The Court as I recall ruled that his

14  expert analysis of -- of best interest did not aid the Court

15  because there wasn't sufficient density or meat in it besides

16  agreed assumptions.

17       This is a different topic.  It is an aspect of

18  consequences for the city --

19         THE COURT:  I agree.  You may proceed.  Go ahead,

20  sir.

21  A    Could you repeat the question?

22  Q    Yes.  It's is the flip side of your conclusion that the

23  city will have access to capital markets if the plan is

24  approved, also true that it will not have access if it is not

25  approved?

1  A    No.  And there are two very specific factors I'd like to

2  point to.

3      First, the city will have the obligation to start

4  repaying on the swap settlement which as we know is a

5  condition of the swap deal, if we repay them we can get rid of

6  them, but if we don't we have to start paying them again.  And

7  that obviously will soak up a lot of available cash from the

8  city.

9      Secondly, the -- the post-petition financing itself will

10 have to begin to be repaid.  And I believe that's $4,000,000 a

11 month.  So that will also put a considerable strain on the

12 city's available liquidity.

13     I don't see how the city could borrow in the markets with

14 those obligations already on the balance sheet unless we did a

15 financing that repaid those obligations in order to free up

16 access to cash.  So you're stuck in a -- in a -- in a circle

17 where you have these two obligations you have to service

18 assuming dismissal, okay.

19     But that means you can't get any more money unless you

20 take those creditors out which means you're back into the

21 financing markets to finance potentially a very difficult

22 situation.

23         MR. CULLEN:  That's the conclusion of that expert

24 opinion.  The next point I was going to go on toward was the

25 exit financing history and all of the details of the exit

1   financing solicitation and deal and this -- if the Court is

2   amenable, this might be an appropriate point for our morning

3   break.

4           THE COURT:  Yes, that's fine.  We'll take our

5   morning recess now.  But before we do --

6           MR. CULLEN:  Yes.

7           THE COURT:  Mr. Buckfire, I want to suggest a

8   question to you that I'm going to give you warning about

9   because it's an important question that may not -- that --

10  that I think it's fair to give you time to consider relating

11  to this exit financing.

12      If -- if I -- and I don't want an answer now.  If I heard

13  you correctly, I think you said that the one risk factor that

14  the market might be considering that pushes the interest rate

15  higher, is its lack of experience with I'll call it the new

16  Detroit.

17      So if -- if -- if that's correct, I want to ask what are

18  the advantages economically and non-economically and the

19  disadvantages economically and non-economically of deferring

20  financing for six months or a year.

21      All right.  We'll be in recess until 10:55 please.

22      (WITNESS KENNETH BUCKFIRE WAS TEMPORARILY EXCUSED AT

23  10:38 A.M.)

24          THE CLERK:  All rise.

25          THE COURT:  Oh, and did the -- did the city consider

 1 | that?

 2 | A     Thank you, Your Honor.

 3 |           THE CLERK:  Court is in recess.

 4 |       (Court in Recess at 10:38 a.m.; Resume at 10:56 a.m.)

 5 |           THE CLERK:  All rise.  Court is in session.  Please

 6 | be seated.

 7 |           MR. CULLEN:  Good afternoon, Your Honor.  Thomas

 8 | Cullen.  May I commence?

 9 |           THE COURT:  I'm sorry?

10 |           MR. CULLEN:  May I commence?

11 |           THE COURT:  Yes.

12 |           MR. CULLEN:  Thank you.  Thank you very much.

13 |       (WITNESS KENNETH BUCKFIRE RESUMED THE STAND AT 10:57

14 | A.M.)

15 | BY MR. CULLEN:

16 | Q    Now we're going to talk about the exit facility and the

17 | process of the considerations.  When did that process commence

18 | with respect to an exit financing facility?

19 | A     We began planning the exit financing back in the spring

20 | of this year and formally launched the process in July.

21 | Q     Who was involved?

22 | A     Myself, one of my partners, Mr. James Doak, and one of

23 | our directors, Kyle Herman as well as colleagues from Miller,

24 | Canfield and Jones, Day.

25 | Q     Why did you get involved in the process of exit -- exit

1  financing in the first place?

2  A    Well, the city has certain cash requirements pursuant to

3  the plan which will need to be funded.  Those include cash for

4  the re-investment program, retirement of the post-petition

5  financing, retirement of the LTGO plan securities, and will

6  also be requirements to pay the fees and expenses for the exit

7  financing itself.

8  Q    Can you characterize the importance --

9  A    On the swap -- the swap settlement, excuse me.

10 Q    Can you -- and so that would be the -- the Class 5 claims

11 and the Class 7 claims?  The swap and the LTGOs?

12 A    Yes.  And the post-petition financing.

13 Q    Now can you characterize for me the importance to the

14 city of being able to refinance those loans on -- on

15 emergence?

16 A    Although it's critical if we don't refinance those loans

17 although the city does have the ability to pay off the swap on

18 a post-petition basis it will be very expensive.  It will also

19 not have the incremental cash presumed by the plan available

20 for the re-investment program, we will not be able to take

21 advantage of the settlement that's been reached with the LTGOs

22 to try their debt.

23     And we will not be able to repay the post-petition

24 financing which is obviously an important factor because if we

25 don't repay them upon exit, the cost of servicing that

1  obligation will be very high.

2  Q    What -- what impact would failure to pay those

3  obligations on emergence have on the educational process that

4  you talked about this morning?

5  A    Well, it will call into question the city's ability to

6  act in a financially responsible way.  The -- the cost of not

7  repaying those existing obligations is high both from an

8  interest rate perspective and a cash flow perspective.

9            THE COURT:  And what's the total of those?

10 A    It's approximately $250,000,000.

11 Q    If --

12 A    Two hundred and fifty, I apologize.  Of that two hundred

13 and fifty I think 20,000,000 to 25,000,000 will be set aside

14 as a debt service reserve fund so the net debt being repaid by

15 the plan is approximately $225,000,000.

16 Q    How did you go about determining at the outset the amount

17 of financing that the city would seek?

18 A    Well, it was a combination of factors they'd have to

19 consider.  First, of course, is the ability of the city to

20 service its debt post emergence from bankruptcy.

21        And I've already testified to the need to calculate the

22 debt capacity of the city which primarily was used to deal

23 with I will call emerging securities being given out to

24 existing creditors of the city.

25        So that we always have to make sure that we don't over

1    borrow.  And in fact with the exit financing to impact the

2    city's ability to operate in the ordinary course.  That puts

3    an upper limit to how much we could potentially raise.

4        Then there is the requirements of the plan which means

5    there are certain obligations to the city that must be retired

6    to emerge from bankruptcy.  That sets the minimum bound.  And

7    then the difference has to be how much cash can we reasonably

8    expect to borrow for the city and not have to pay too much

9    for.

10   Q    In the process of arriving at the amount of financing

11   that would be sought in the exit financing, were there people

12   involved besides the Miller, Buckfire team?

13   A    I'm sorry, could you repeat the question?

14   Q    Who else was involved besides Miller, Buckfire on this

15   process of determining what to seek in the exit financing?

16   A    Well, because fundamentally it has an impact on the

17   city's debt capacity.  Ernst & Young, something that said

18   Conway, obviously the city's own finance people, particularly

19   the CFO, and of course the Michigan Finance Authority

20   representatives were all involved in effectively netting the

21   amount of capital we intend to seek in the exit financing

22   process.

23   Q    And what number did you arrive at initially?

24   A    We originally planned to ask for $275,000,000 from the

25   market

1  Q    Okay.  And that was the result of this process?

2  A    Correct.

3  Q    And -- and then what did you do?

4  A    In terms of the amount?  In terms of the amount we saw?

5  Q    No.  You had the amount, then what did you do in terms of

6  the process?  After -- after deciding we're going to seek this

7  amount of money --

8  A    Uh-huh.

9  Q    What was your next step?

10 A    Our next step was to call qualified institutions with

11 whom we have had relationships, many of whom had been

12 originally contacted as part of the post-petition financing

13 process.  And whom -- with whom we've been keeping in regular

14 dialogue throughout this bankruptcy.  And we gave them a

15 request for proposal back in July of this year.

16 Q    Okay.

17 A    We also published that same request for proposal on the

18 emergency manager's web site so it was publicly available in

19 case anybody else who was interested in considering this,

20 would be interested and they would contact us.

21 Q    Okay.  If we can throw up City Exhibit 639, please.

22 Which is not yet according to my notes, been admitted into

23 evidence.  And this exhibit seems to be a -- an email

24 transmittal note.  And the second page is -- if we could look

25 at it.  The third page, I'm sorry

1        A City of Detroit $300,000,000 exit financing bond

2   facility summary of certain key terms and conditions.  Do you

3   see that?

4        (City' Exhibit 639 was identified)

5   A    I do.

6   Q    Can you identify this document?

7   A    Well, this was the original term sheet that we had

8   submitted to market participants for their consideration in

9   July.

10  Q    Okay.  And was the same term sheet sent out to all of the

11  market participants?

12  A    Yes.  And it was also published on the emergency

13  manager's web site.

14  Q    And who worked on the terms reflected in the term sheet?

15  A    Well, it was the Miller, Buckfire team together with

16  colleagues from Miller, Canfield, and Jones, Day, and from the

17  city.

18  Q    And harking back to our discussion earlier this morning,

19  was -- is this an example of attempting to design a security

20  for a lender to a municipality?

21  A    Yes.

22  Q    And did you consider the same factors we went through

23  this morning in terms of putting together these terms and

24  conditions?

25  A    Yes.

1 Q    And in terms of designing the security that's reflected

2 in this initial term sheet, who took the lead on that?

3 A    Miller, Buckfire did.

4 Q    Okay.  And that was your team of -- refresh my

5 recollection who was involved in that team?

6 A    It was myself, Mr. James Doak, Mr. Kyle Herman, and --

7 and others who were doing analysis supporting this

8 transaction.

9         MR. CULLEN:  With that, Your Honor, I would like to

10 offer into evidence City Exhibit 639.

11        THE COURT:  Any objections?

12        MR. SOTO:  No, Your Honor.  Just so I understand

13 what -- all you're entering in is the term sheet, correct?

14        MR. CULLEN:  As opposed to the cover note?

15        MR. SOTO:  Right.  I -- I didn't know what you were

16 entering.  Are you doing both?

17        MR. CULLEN:  The whole packet, I would think.  It

18 would be easier because the cover note says what it is.  If

19 you could take a look at it.

20        MR. SOTO:  Yeah, I just want to --

21 A    Your Honor, I'd note this --

22        MR. SOTO:  I have no objection, Your Honor.

23 A    This cover note is to Mr. John Garbino of Barclays but we

24 sent the exact same email to everybody.  This is just

25 illustrative.

1          THE COURT:  The document is admitted.

2     (City's Exhibit 639 was admitted)

3          MR. CULLEN:  Thank you, Your Honor.

4  Q     If you look on Page 3 of the exhibit, there's a section

5  called amortization of principal.  If you could -- do you see

6  that, sir?

7  A     I do.

8  Q     What was the significance of this term to the city?

9  A     Well, this as I've testified earlier when the design

10 securities are -- one of our major considerations is not

11 designing a security which potentially could stress the city's

12 ability to operate in the ordinary course while it's trying to

13 rehabilitate itself.

14     And we regarded the protection of the ten years of

15 operations post emergence as the most important objective of

16 our financing.  We did not want the city to ask for financing

17 that would require a lot of amortization during that first ten

18 years.

19     We wanted to make sure the city's cash flows could be

20 used to support the re-investment program first.  That was our

21 primary objective.

22 Q     Okay.  And in terms of the stress on the city, what does

23 the schedule proposed here offer in terms of flexibility or

24 burden if you may characterize it in that way?

25 A     Well, this term sheet which is again the term sheet we

1 proposed in July.

2 Q    Right.

3 A    Basically assumed the city would only have to pay

4 interest on this debt for at least the first five or ten

5 years.  And that would mean that the two hundred and

6 seventy-five and 325,000,000 of borrowing, the city would not

7 under this term sheet be required to repay any of it for a

8 considerable long period of time.

9      And that would give the city adequate flexibility to fund

10 its other debt service obligations to plan parties as well as

11 meet its re-investment program requirements.

12 Q    And if we could look down the page at the section dealing

13 with collateral.

14 A    Uh-huh.

15 Q    Could you tell me what -- what that reflects?

16 A    Well, that reflects the collateral we provided the

17 post-petition financing lender.  We'd given the same

18 collateral to that lender pursuant to the original request for

19 financing.

20     And the market was well aware of the fact that collateral

21 was available to secure the post -- the exit financing and we

22 basically said you can assume for the purpose of this original

23 solicitation, that's available to you, but we are open, and we

24 told everyone this, to any other structure you can propose

25 that might be better for the city.  That would require in

1  effect no pledge of collateral.

2      But we knew we had to acknowledge that this had already

3  been offered and granted once before and therefore a new

4  lender would probably want to look at the same thing.

5  Q    Okay.  Well, with respect to -- you said that you

6  indicated to the recipients of this request for proposal that

7  you had flexibility on this term.  Did that representation of

8  flexibility apply to the other terms as well of this proposal?

9  A    Well, no.  It was only flexibility that would benefit the

10  city not a lender.

11  Q    And you may have said this already, but how many

12  potential financing sources did you send this out to?

13  A    I believe it was 19 or 20.

14  Q    And I believe you also said that you sent it out -- that

15  you filed it in the data room so it was available to the

16  public, is that correct?

17  A    Yes.

18  Q    In terms of your efforts to solicit parties or solicit

19  interest in this RFP, did you ever put together a summary of

20  those efforts to inform interested parties of the status?

21  A    Yes.

22  Q    If I could put up Exhibit 642.  Do you recognize this

23  document, Mr. Buckfire?

24  A    I do.

25  Q    Can you tell me what it is?

1  A    Well, after we had sent out the request for proposals we

2  received back proposals from ten parties.  And we summarized

3  them all in this analysis to the benefit of the policy makers

4  both in the city and the state level.

5      (City's Exhibit 642 was identified)

6  Q    And when you say we in that sentence, we summarized,

7  that's the Miller, Buckfire, correct?

8  A    Miller, Buckfire did, yes.

9          MR. CULLEN:  I'd like to offer Exhibit 642, please.

10         MR. SOTO:  No objection, Your Honor.

11         THE COURT:  It is admitted.

12     (City's Exhibit 642 was admitted)

13         MR. CULLEN:  Thank you.

14 Q    And so to whom did you present this exit financing

15 update?

16 A    Well, it was presented to the emergency manager, to the

17 chief financial officer of the city.  I believe it was also

18 presented to Michigan Finance Authority and other

19 representatives of the state.

20 Q    And if you'll look at Page 4 of this document.

21 A    Uh-huh.

22 Q    What does -- what does this page tell us?  Could you tell

23 us how to interpret this?

24 A    Well, these are all the institutions that we'd been in

25 regular contact with since trying to place the post-petition

1  financing in 2013.  And we kept in contact with all of them.

2  We have a relationship with almost all of them that dates back

3  years.

4      So when we called them and we first said would you like

5  to see the RFP, they said yes, and that's how they made it on

6  to this list.

7  Q    After this point did you set a date for the receipt of

8  indicative term sheets?

9  A    Well, yes.  This reflect -- I think the date was the

10  first week of August.  We hadn't given them very much time to

11  respond.

12  Q    Was it -- was it July 24th?

13  A    That sounds right.

14  Q    And in the -- in the interim, what did you do with

15  respect to contact with educational efforts with these

16  potential lenders?

17  A    Well, we spoke with everybody that submitted a proposal

18  to understand their thinking behind the structure of their

19  offer, to make sure they understood exactly what the city was

20  looking for to encourage them all to change their terms if

21  possible to make it more competitive from the city's point of

22  view.  And to understand that if they had any particular

23  considerations that we were not aware of that might lead them

24  to propose the financing one way and not the other.

25  Q    Now, in terms of the operation of the Buckfire team in

1  working on this, you wouldn't all be on every call of course,

2  is that correct?

3  A     No.

4  Q     Okay.  Was there a process by which you shared

5  information among each other about all of the calls that were

6  undertaken?

7  A     Yes.  I would get at least daily updates if not more

8  frequently than that from the members of my team in contact

9  with the lenders.

10  Q     And did -- did part of this effort entail the members of

11  your team reporting back to you on what they'd learned from

12  the marketplace?

13  A     Every day.

14  Q     All right.  And when did -- when you received responses,

15  how many initial proposals did you receive?

16  A     We received ten.

17  Q     Okay.  And what did you do with those ten?

18  A     Well, we -- we laid them out on a big schedule to

19  basically compare their proposals on the essential terms.

20  Like maturity, interest rate, collateral, things of that

21  nature to try to understand whether some of them were just

22  simply not worth pursuing.  And try to narrow it down to the

23  group that we thought we could seriously negotiate to a final

24  transaction with.

25  Q     If I could direct your attention to pages -- beginning on

1  Page 9 of Exhibit 642.

2  A    Uh-huh.

3  Q    And if we could look at Page 10 through -- let's look

4  through them all.  The 9, 10, 11, 12, and 13.  Does this --

5  what -- what is this?

6  A    Well, this is the side by side comparison of the critical

7  economic terms of every lender's proposal.  And we received

8  ten.

9  Q    And this was prepared by?

10  A    Miller, Buckfire.

11  Q    And communicated to?

12  A    Well, to the emergency manager.  And then to state and

13  city officials.

14  Q    And did you then -- was there then a subsequent round of

15  communication with these ten?

16  A    Yes.  We went and asked them to explain their thinking

17  behind their proposals.  We tried to understand what they --

18  where they had flexibility in improving their terms from the

19  point of view of the city.  And in particular tried to

20  understand whether they were proposing to make their proposal

21  fully committed or not as opposed to a best efforts financing.

22  Q    And what's the -- what's the importance of fully

23  committed as opposed to best efforts?

24  A    Well, fully committed means the institution is putting

25  its balance sheet behind the proposal.  They're not asking you

1  to take market risk.

2      In other words they would typically say in an

3  underwriting, well, we'll go out and raise the money for you,

4  but we don't know the price.  We'll have to place it first.

5  That's a best efforts undertaking.

6      And given that the city needs certainty, that we'll have

7  capital available upon exit to deal with certain of its

8  liabilities, a best efforts underwriting is not attractive to

9  the city.

10  Q    Did you narrow down the group of ten?

11  A    We did.

12  Q    How many?

13  A    Three.

14  Q    Which three?

15  A    Jeffries, Barclays, and JP Morgan.

16  Q    And how did you make that determination?

17  A    Well, if you go back and look at their proposals you'll

18  notice that even though they were responding to our term sheet

19  which made it relatively easy to compare, their pricing, at

20  least at that moment in time, was reasonably attractive and

21  most importantly they were proposing to provide a fully

22  backstopped and committed proposal.

23      They're putting their own balance sheets behind the

24  transaction.  And I meant to say Morgan Stanley, not JP

25  Morgan.

1  Q    Could you repeat what you just said because I couldn't

2  hear you.

3  A    I meant to say it was Barclays, Jeffries, and Morgan --

4  and Morgan Stanley not JP Morgan, so --

5  Q    Okay.  After you made this determination, narrowed it

6  down to three, what did you do next?

7  A    We began to actively negotiate with all three parties to

8  get them to improve their proposals.  And in particular to

9  give the city as much flexibility to achieve the lowest cost

10 of borrowing as possible.

11 Q    And when you say the lowest possible borrowing.  What

12 does that mean?

13 A    Well, clearly -- I shouldn't say that.  Asking for an

14 exit financing as part of a bankruptcy always leads the lender

15 to believe they're still taking some risk pursuant to the

16 plan.  That it has not yet been proven that the city can

17 operate in the ordinary course, there's still risk associated

18 with the case.

19      And therefore having the pricing event on this

20 transaction happened after the commitment would necessarily

21 mean that an underwriter would have to look at the city having

22 completed successfully its bankruptcy and therefore all the

23 risks and all the uncertainties associated with the bankruptcy

24 would have been dealt with.

25      And therefore the pricing will only be on a forward

1  looking basis rather than retrospectively.  And that's a very

2  important element to the pricing analysis that we went

3  through.

4  Q    And do I hear you say that that was a line you held in

5  your discussions with these prospective counter parties?

6  A    Yes.  That was an important strategic objective of the

7  city in addition to the up front costs associated with each

8  financing.  Obviously the fees are important in any

9  discussion.  But having maximum flexibility to price at an

10  appropriate time was a key objective.

11  Q    And what happened next?

12  A    Well, after discussions with all three parties, we

13  recommended Barclays to the emergency manager as the provider

14  of the exit financing.

15  Q    Was there a step of oral interviews with the three

16  parties?

17  A    Yes.  I think it was on or around August 5th and I was not

18  here in the city to participate in that, but all three

19  potential lenders came to the city for interviews with a group

20  that included our team from Miller, Buckfire as well as

21  representatives of the city.

22  Q    Could I have put up on the screen Exhibit 640, please?

23  Could you look at the -- the cover material of that and the

24  succeeding couple of pages to identify it for me?

25  A    Well, this is a -- a report --

1  Q    Let's see the next page.

2  A    Sorry.

3  Q    Okay.  So could you tell me what this packet is?

4  A    Well, this is the presentation that Morgan Stanley made

5  to our team and to the city on August 5th which was not a

6  meeting I was present for, but I did review the materials.

7       (City's Exhibit 640 was identified)

8  Q    Did -- did your teammates at Miller, Buckfire report to

9  you on the -- on that meeting?

10 A    Yes.

11 Q    And did they share with you any materials from that

12 meeting?

13 A    They shared with me all the presentations that had been

14 submitted by the potential lenders.

15      MR. CULLEN:  At this point I would like to offer

16 Exhibit 640 into evidence, Your Honor.

17      MR. SOTO:  Your Honor, it's I guess -- well, it's

18 certainly hearsay.  And unless we go through it a little bit

19 more, we're just admitting it as what, just -- just that it

20 exists but not for the truth of it?

21      MR. CULLEN:  Well, Your Honor --

22      THE COURT:  I assume it's being offered to show a

23 proposal that was received and considered.

24      MR. CULLEN:  Yes, Your Honor.

25      THE COURT:  For that purpose it is admitted.

1      (City's Exhibit 640 was admitted)

2           MR. CULLEN:  All right.

3  Q    With respect to -- what did you conclude based upon your

4  review of these proposals and the reports from your team at

5  these interviews about the prospects for the financing and how

6  to move forward?

7  A    Well firstly, I was very pleased that we had three

8  proposals from experienced lenders that were willing to fully

9  commit their balance sheets.  So there would be no funding

10 risk associated with taking any one of the transactions.  And

11 we could not afford funding risk as part of the plan process.

12 So they met that minimum condition.

13      Secondly, I was very -- I guess happy is the word I would

14 use, that the cost associated with their offers was I think in

15 the range of reasonableness.  They were not excessively high,

16 they were around the 5% discount rate and a number we'd been

17 using throughout as a reasonable cost of capital for the city.

18      And lastly, they demonstrated a real willingness to work

19 with the city to preserve the ten year period of financial

20 stability that we'd already said was an important strategic

21 objective of any financing process.

22 Q    If I could direct your attention back to City Exhibit 642

23 and Page 6.  Can you tell us what this is?

24 A    Well, this reflects the revised proposals made on August

25 5th.  As I've testified earlier they submitted earlier

1   proposals from July the 24th.  We went back and had numerous

2   conversations with all three parties about improving the

3   terms.  This reflects the results of those conversations and

4   what they re-submitted to the city on the 5th of August.

5   Q    And can you describe the process of consideration that

6   turned three into one?

7   A    Well, the first thing we did was look at the costs

8   associated with the underwriter commitment.  And on that basis

9   the underwriter's costs were clearly the lowest for Barclays.

10  And I'd note that Barclays, because they had also provided

11  post-petition financing, they had already agreed to waive

12  their exit financing fee if we had repaid the post-petition

13  financing if they were selected as the exit financing

14  provider.  So we saved more money by taking Barclays than if

15  we had gone with the other two just on a straight up fee

16  basis.

17       Secondly, the proposed spreads that they applied, you

18  know, the interest rates that they were assuming we would

19  borrow at were highly competitive.  And of course the blended

20  costs is the critical factor.  You can see that between these

21  three Morgan Stanley is going to cost us 7.1%.  Jeffries and

22  Barclays were basically the same, however the difference was

23  between the two Barclays was providing to the city a flex

24  component which could very much be in the city's interest

25  because of the way they intended to structure the offering.

1     And for the reason I've stated that in addition to being

2     very low on a cost basis, that additional ability to flex

3     final interest costs was very attractive.  And that's why we

4     recommended Barclays.

5          THE COURT:  What is that benefit?

6     A     Well, rather than having to fix the price of the credit

7     -- I'm sorry, fix the price of the loan effectively today

8     which is what the no flex would mean, Barclays was willing to

9     allow us to delay the final pricing by 150 days.

10         So we would effectively do a private placement with

11    Barclays upon exit from bankruptcy at a variable rate tied to

12    an index and then subject to the rating that we'd get from the

13    two main rating institutes here, and the final flex they need

14    to use to sell the loan in 150 days, there is both negative

15    and positive market flexing as to rates.

16         So if you -- we were to look at the term sheet that

17    Barclays submitted and that we ultimately provided to the

18    emergency manager, you'll notice that the pricing formula is a

19    function of the based rate which effectively is the risk free

20    rate for this market.

21         Then there is a base spread which is a function of the

22    credit rating.  And there's a range of rates that would apply

23    depending on the credit rating the city achieves after

24    emerging from bankruptcy.

25         And then there's a final component which is market flex

1  which is really a function of how well the city tells its

2  story to potential new lenders and how much demand there is

3  for the final investment.

4      So if you assume that the city was rated BBB by the two

5  agencies, let's assume that base spread is 225 basis points

6  over the index, the flex would be positive or minus, I'd have

7  to go back and look, but it's I think negative 175 to positive

8  175.

9      And that means if the offering was over subscribed two or

10  three times presumably Barclays would tell the city, well your

11  final rate is lower than you thought because we had so much

12  demand for the paper that we didn't have to use the

13  marketplace.  In fact you get the benefit of lower flex, so

14  the option ran both ways.

15          THE COURT:  What would the interest rate be in that

16  -- in that event?

17  A    It would have -- I have to go and look at the schedules

18  that they submitted.  There are two appendices to their

19  commitment letter which show what that could be, but -- what

20  is this.

21          MR. CULLEN:  634, is this in evidence?

22          MS. O'GORMAN: 643.

23          MR. CULLEN:  643, I'm sorry.  Is this in evidence?

24          MS. O'GORMAN:  No.

25          MR. CULLEN:  We're going to get to this, Your Honor.

1  But the --

2              THE COURT:  Okay.

3  Q    Can you tell us what --

4              MR. CULLEN:  But we can do it now.

5              THE COURT:  Whatever you want to do.

6              MR. CULLEN:  Let's -- let's put it in -- let's keep

7  it in order if I may.

8              THE COURT:  Uh-huh.

9  Q    All right.  Now let's look at Exhibit 641 if we may.

10  What is -- and look at the pages behind it if you would as

11  well, too.  One more.  Got it?  Okay.

12      Do you recognize this document, Mr. Buckfire?

13  A    I do.

14  Q    What is it?

15  A    It's our --

16  Q    Describe it generally without getting into the substance.

17  A    It's our final recommendation to the emergency manager to

18  proceed with the Barclays exit financing.

19      (City's Exhibit 641 was identified)

20  Q    And if you could look at the second page of this

21  document.  There's no signature here, but is this -- is it

22  your representation that this is nonetheless Miller,

23  Buckfire's recommendation?

24  A    Yes.

25  Q    And your recommendation?

1  A    Yes.

2         MR. CULLEN:  I'd like to move the admission of

3  Exhibit 641, please.

4         MR. SOTO:  No objection, Your Honor.

5         THE COURT:  It is admitted.

6     (City's Exhibit 641 was admitted)

7         MR. CULLEN:  Thank you, Your Honor.

8  Q    And you've already begun to go into some of the reasons

9  for the recommendation of Barclays.  Could you sum those up

10 for us again, so we can have them in -- in one place.  Why

11 Barclays?

12 A    Well, there are -- there are several factors.  First,

13 they'd already demonstrated their commitment to the city

14 relationship by providing the post-petition financing.

15     They had also, as I recollect, waived $1,000,000 of their

16 original commitment fee when their original financing

17 commitment had been reduced which they didn't have to do but

18 they did it because they valued the relationship.  They

19 provided the most competitive pricing on a transaction in

20 terms of the up front costs.

21     They gave the city the greatest amount of flexibility in

22 terms of final pricing.  Because to Your Honor's earlier

23 question to me prior to the break you asked why not delay the

24 exit financing and see if you can do better.  Well, that's

25 effectively what the Barclays financing allows the city to do.

1      So we are not having to price this financing with the

2   pressures and uncertainties of the bankruptcy.  The bankruptcy

3   will be long behind the city by the time it goes out on a road

4   show to really reintroduce the city's credit to the capital

5   markets which was a very important advantage of the Barclays

6   approach.

7      And the fact that that gives the city a real possibility

8   of being able to borrow more cheaply if it can take advantage

9   of the negative market flex provisions in the Barclays term

10  sheet.

11  Q    If I could interrupt you for a second.  Does the concept

12  of dual structure in relation to the Barclays proposal mean

13  anything to you?

14  A    Well, yes.  The Barclays commitment obviously pertains to

15  both the tax exempt portion and the taxable portion of the

16  city's borrowing capacity.

17  Q    Okay.  And are there two phases to the dual structure

18  approach?

19  A    Well, the first phase of course is the private placement

20  with Barclays itself.  Barclays is going to make the loan to

21  the city available upon consummation.  It will be Barclays

22  making the loan, it will be a private placement.  It will not

23  require a formal credit rating in order to do that.

24      But then the second part will be the final offering of

25  bonds to basically replace the private placement with new

1  bonds, both taxable and tax exempt which we estimate will

2  happen in the 150 days.

3     And that will allow the city and Barclays to go to the

4  rating agencies, get a formal rating, prepare a proper road

5  show, and really reintroduce the credit in a normal ordinary

6  course way to the widest possible number of buyers.

7  Q    And that public financing step in the -- in the Barclays

8  approach, would it be fair to characterize that as the

9  culmination of the education effort you've been talking about

10 all morning?

11 A    Yes.  You know, we tried to get everybody else to adopt

12 the same principal, but only Barclays was willing to give us

13 that optionality.  Because of their long history with the

14 city, they had made the original post-petition financing,

15 they'd seen how well the road show had gone when they placed

16 that out.

17    Barclays ended up holding none of that loan.  So they

18 were very comfortable.  They could effectively syndicate and

19 price the exit financing and get the city the best possible

20 rate.

21 Q    It says here the Barclay -- in the second last paragraph

22 beginning on the page.  The Barclay proposal had the lowest

23 fees.

24 A    Uh-huh.

25 Q    Can you explain what that means, sir?  And what -- what

1  importance it had to you?

2  A    Well, we're trying to minimize the cost to the city.   And

3  they did propose the lowest commitment fee.   That was only 15

4  basis points.

5       They also gave us the ability to extend the term of their

6  commitment if the bankruptcy case took longer than we had

7  originally expected.   I think the cost of that would be seven

8  basis points a month for every extension.

9       And the total fees therefore of 65 basis points were very

10  very low.   Certainly compared to the other proposals we had

11  received in the marketplace.

12  Q    Are there other things about Barclays that commended --

13  that commended Barclays to you as a good partner for the city

14  going forward?

15  A    Well, they're one of the most active participants in the

16  municipal finance market.   So any underwriting they bring to

17  the market will be dealt -- be appropriately given attention

18  from investors.   That's the most important factor.

19       Secondly, as I've already testified, they know the city.

20  They know the city's credit.   They know what the city has been

21  doing since they provided the post-petition financing.   And

22  they value the relationship.

23       And I think that every turn we asked them to make changes

24  to benefit the city even though they were negotiating on their

25  own behalf, they were appropriately respectful of the city's

1  legitimate needs to emerge with the financing that would

2  support its operations.  And I think at every step of the way

3  they demonstrated their sincerity in being a partner of the

4  city's.

5  Q    Do you -- was there any particular incident with respect

6  to the commitment fee on the post-petition financing to which

7  you can alert the Court?

8  A    Well, as I've originally already testified, the original

9  commitment fee was based on a much larger post-petition

10  financing than we ultimately accepted from them.  So we asked

11  them, when we asked them to reduce that commitment, if they

12  would reduce their commitment fee and return the balance to

13  the city which they did.  And I believe that was around

14  $1,000,000 which they didn't have to do.

15  Q    If I could throw up on the screen now -- if you could

16  throw up on the screen now --

17  A    As opposed to throwing up.

18  Q    Pardon?

19  A    As opposed to throwing up, right?

20  Q    Either is a possibility.  Exhibit 643, please.  Okay.

21  Can you tell me what this document is, sir?

22  A    Well, following our recommendation to the emergency

23  manager which he accepted, we filed this notice to begin to

24  seek approval of the exit financing commitment from Barclays.

25      (City's Exhibit 643 was identified)

1  Q    And this was publicly filed, was it not?

2  A    Yes.

3         MR. CULLEN:  I'd like to move the -- the admission

4  of Exhibit 643 if I might.

5         THE COURT:  Any objections?

6         MR. SOTO:  No objection, Your Honor.

7         MR. WAGNER:  No objection.

8         THE COURT:  It is admitted.

9  (City's Exhibit 643 was admitted)

10 Q    That's in your book as well, sir.  If I could direct your

11 attention to 643, Appendix B-1 at Pages 42 and 53.

12 A    It's easier if I read this.  If you don't mind I'll flip

13 through it.

14 Q    No, please, please.

15 A    What tab is this again?

16 Q    Pardon?

17 A    What tab is this?

18 Q    643, Appendix B-1, Pages 42 and 53.

19 A    I got it.

20 Q    Okay.  Do you see Page 42 there in B-1, sir?

21 A    I do.

22        MR. CULLEN:  Do -- do you have it, Your Honor?

23        THE COURT:  Yes.

24 Q    Could you tell us what this reflects with respect to the

25 discussion we were having about market flex?

1  A    Well, this reflects the success of the city in the public

2  offering road show and telling its new story about the new

3  Detroit.  And to the extent that the city's convincing that it

4  will operate pursuant to the plan on file, that it will be

5  financially prudent in its operations.

6     This allows the city to capture the benefit of that by

7  borrowing at a lower price than the base rate.  That's what

8  market flex would mean.

9     So if you actually go back to the earlier page which is

10  Appendix A, base rates, just to try to make the point.

11  Assuming the city is rated BBB which is one of the reasons the

12  150 day delay is so important because we need to convince the

13  rating agencies first what the credit is.

14     That would be a base spread of 2 1/2%, but that also

15  means that our maximum market flex if the offering is over

16  subscribed might mean we only have to pay for BBB 50 basis

17  points.  Because you have to take the base then subtract out

18  the flex to your benefit and that's what you'd pay.

19     Now the adverse is true that if the city's credit is not

20  re-accepted in the market because the market doesn't believe

21  the story, then Barclays could actually be offering paper at

22  4 1/2%.

23     So it's really up to the city to live up to what we have

24  said it can do and should do to convince the market it's a

25  viable credit.

1  Q    Once the city determined that the Barclays proposal was

2  the best financing available, did the city seek approval of

3  that proposal from other entities?

4  A    Well, the emergency manager did, yes.

5  Q    Okay.  And was there a -- was there a submission to the

6  city council?

7  A    There was.

8  Q    Were there presentations to individual city council

9  members?

10 A    Yes.  We had one on one meetings with many of the members

11 of city council prior to the city council meeting itself.

12 Q    And discussing particularly the exit financing and the

13 Barclays proposal, is that correct?

14 A    Yes.

15 Q    If I could have City Exhibit 712.  Can you tell us what

16 this exhibit is, sir?

17 A    This was the presentation of the implications of the

18 Barclays financing submitted to city council.

19      (City's Exhibit 712 was identified)

20 Q    Okay.  And was this presentation done by the Miller,

21 Buckfire team?

22 A    It was.

23 Q    Were you a participant in that team in pulling together

24 the presentation and reviewing it?

25 A    Yes.

1          MR. CULLEN:  I would like to move into evidence

2    City's Exhibit 712.

3          MR. SOTO:  No objection, Your Honor.

4          MR. WAGNER:  Same, no objection.

5          THE COURT:  It is admitted.

6    (City's Exhibit 712 was admitted)

7    Q    If you could -- let me start again if I may.  Were these

8    substantive discussions both in the full council and with the

9    individual members?

10   A    Yes.

11   Q    How would you characterize the -- the back and forth of

12   the interchange with the council and with the members?

13   A    I would say there were -- there were three main areas of

14   discussion.  And it -- I'm saying this, including the one

15   discussions and also with the city council itself.

16        First, they -- the city council members wanted to

17   understand whether or not we were over borrowing.  They did

18   not want to see the city borrow too much because they were

19   obviously concerned about the city's ability to pay that debt

20   when due.

21        At the same time they wanted to make sure that we weren't

22   borrowing too little.  Because the impact of the financing on

23   the city's ability to begin the re-investment program is

24   obviously one of their very big focuses.  So we had a lot of

25   discussion over what I would call the debt capacity

1   implications of this financing.

2        Secondly, they wanted to be convinced that we had

3   achieved the lowest possible cost of borrowing.  I've already

4   explained the elements of why we chose Barclays.  We went

5   through the exact same discussion with the council.

6        So we ended up -- why did we end up with Barclays when

7   they did the first financing.  One council member in

8   particular kind of wondered whether or not it was, you know,

9   too easy.  And I assured him it was nothing but the case.  It

10  was extremely difficult to get this done particularly, and

11  this is the final point, because they were willing uniquely to

12  give us the flexibility of delaying final pricing until after

13  exiting from bankruptcy.

14       And that was the factor that the city council took the

15  most comfort in because they recognized that having to borrow

16  at exit with all the issues of bankruptcy around that

17  financing, would be more expensive in theory that if we didn't

18  have to do it until later.

19       And that was also a very important point to get across to

20  the council.  And that's ultimately why the council approved

21  this financing.

22  Q    To the -- to the best of your knowledge, did you respond

23  to all the questions and all of the requests for information

24  that you got from the council?

25  A    To my knowledge we did.

1  Q    What happened next?

2  A    Well, after city council approved it, we then sought the

3  approval of the --

4  Q    First, stop.  The city council approved it?

5  A    They did.

6  Q    Okay.  Then what happened after that?

7  A    Well, then --

8  Q    No, no.  they approved it.  What -- what amount did they

9  approve the exit financing?

10 A    Well, they approved it up to $325,000,000 because again

11 this was two weeks ago, we -- we wanted to have the

12 flexibility of increasing the exit financing A, if Barclays

13 thought they could syndicate it, but also to take the --

14 advantage of the LTGO cash out option which had obviously not

15 been considered as part of the two seventy-five request.

16 Q    If we look at Page 6 of Exhibit 712.  Let's look at that.

17 A    Uh-huh.

18 Q    What information does this page convey, sir?

19 A    Well, this conveys the -- the process by which the city

20 together with Barclays will ultimately place public financing

21 anticipated by this commitment.

22 Q    And if we look down to formal -- in the bracket called

23 syndication process.

24 A    Uh-huh.

25 Q    Does that put together a -- well, what -- what does that

1 reflect, sir?

2 A    Well, assuming the city exits -- or strike that.  If the

3 city -- if the confirmation order is entered into say by the

4 end of October for the sake of illustration, it will then be

5 necessary for the city together with Barclays to begin to

6 draft the re-offering documents that will eventually support

7 the public financing anticipated by the commitment.

8      That will take some time to do because it will inevitably

9 have to be reviewed with the rating agencies, with the

10 Michigan Finance Authority, and again with the city itself.

11 That will take some -- several months.

12      At the same time the formal rating process will begin.

13 And that is something the city has not done for over ten

14 years.  Now clearly that's going to be a major re-education of

15 the credit agencies.

16      We have not up to this point had any interaction with the

17 agencies except very informally because our educational

18 process in the capital markets has been with the providers of

19 capital.

20      The rating agencies are obviously a very important factor

21 in public offerings, but they don't write checks.  But now

22 we're going to have to turn our attention and the city will

23 have to turn its attention to re-educating S & P and Moody's

24 about the new Detroit.  And that will not be a short term

25 process.  It will require a lot of convincing of them that the

1 city has really turned the corner, that it has different

2 prospects.

3    And that will take several months.  And that will have to

4 happen over this period of time to be prepared for the -- you

5 know, road show and investor presentations which we would like

6 to see happen in January, well within the 150 day period.  And

7 that would give the city and Barclays plenty of time to

8 re-introduce the credit to the capital markets as well as have

9 individual conversations with major holders of Detroit debt.

10 Q    And it is your anticipation part of that road show

11 process and that the culmination of that education process is

12 going to be within the scope of Miller, Buckfire's assignment,

13 correct?

14 A    Yes.  And in particular I would note that many of the

15 people that will likely purchase the new bonds and the exit

16 financing are already lenders to Detroit.  In fact, many of

17 the lenders to the city who we will go to for this financing,

18 are lenders to DWSD in support of the DWSD tender and exchange

19 offer quite successfully.

20    So we're not coming to them with a new story, they

21 already know Detroit.  They're going to have to now understand

22 a different part of Detroit which is the general fund side.

23 And therefore we have a base of knowledge of the city which is

24 actually quite high but it's taken us a year to get there.

25 Now we have to make sure we take full advantage of that to

1  achieve the lowest pricing.

2  Q    Let me direct you in the indicative financing timetable

3  to -- to a couple of items.  It says city to decide on LTGO

4  repayment.  Is it your understanding that that decision has

5  not yet been made?

6  A    Well, we recommended that the city repay the LTGO because

7  we believe that the -- the larger commitment will allow us to

8  do so.  So I believe that decision has been made.

9  Q    Okay.  And --

10        THE COURT:  Why do you recommend it?

11 A    Well, it's pursuant to the settlement we have with the

12 LTGOs to gain their support for the plan.  And -- and their

13 financing is, you know, not cheaper that the proposed exit

14 financing.

15 Q    And with respect to the formal rating process and the

16 amounts and things that will happen in that process, will --

17 will that have an impact on the price or the coupon price of

18 this refinancing?

19 A    Yes.  And it's already anticipated in the pricing

20 schedule we talked about a few minutes before that the base

21 rate is a function of the rates that we receive from S & P and

22 Moody's.

23 Q    Okay.  And you've said that the city council approved up

24 to three twenty-five.  Is it your -- do you have any

25 understanding as you sit here today as to what factors could

1  cause it to be less -- less than three twenty-five if it is?

2  A    There would have to be a significant change in market

3  conditions for Barclays to come back and say, look, if you

4  want us to raise that much it will cost you more than you

5  think, so maybe you should voluntarily reduce the size of the

6  offering to make sure your financing is competitive.

7       And that actually is a function of the effective cost of

8  the LTGO new debt.  I mean if the financing of the exit

9  financing costs are lower than the LTGO costs, of course

10 you're going to repay it.

11      And if it turns out because market conditions have

12 changed, nothing to do with the city of course, that it would

13 be more expensive, maybe you have the ability to rethink that.

14 Q    Okay.  And with respect to the financing time line that

15 this exhibit reflects.

16 A    Uh-huh.

17 Q    Is there any implications with respect to the overall

18 state of the market and its favorability for this offering on

19 which you have advised the city?

20 A    Well, the conditions for issuers now in the municipal

21 finance market are very favorable.  There has actually been a

22 tremendous decline in the amount of supply of new bonds in

23 this market over the last 18 months.

24      Cities simply are not issuing as much debt as buyers

25 would like.  And so coming out with a relatively high quality

 1  bond which has been rated appropriately, I believe will be

 2  very well accepted in the market.

 3      So the fundamental supply demand conditions in the

 4  municipal finance market are very very good.  But of course

 5  conditions can change.

 6      The bigger risks are really the overall risks in the

 7  financing markets about, you know, where are treasuries, will

 8  the current rally in treasuries reverse.  That will have an

 9  impact on funding costs.

10      But the ability of the city to have access municipal

11  finance market itself, I don't believe is at risk.  The cost

12  of that financing will have much more to do with overall

13  capital market conditions than the conditions in the municipal

14  finance market.

15  Q   If you look at the third note on this financing timetable

16  under city council approval, the note is complete financing

17  documentation.  Do you see that?

18  A   I do.

19  Q   Where do we stand on that?

20  A   I believe they were submitted to the Court last night.

21      MR. CULLEN:  And we'll be introducing those in -- in

22  a moment, Your Honor.

23  A   So we're ahead of schedule.

24  Q   Oh.  And what is the MFA approval process?

25  A   Well, any financing done by a Michigan city has to comply

1    with state law.  So the Michigan Finance Authority has to

2    review the offering and make sure it complies with state law

3    and it's eventually -- technically the financing will be

4    issued by the Michigan Finance Authority on behalf of the City

5    of Detroit.

6    Q    And where -- where does that stand?

7    A    That's been concluded and the Michigan Finance Authority

8    approved this transaction.

9    Q    And with respect to the next, emergency loan board

10   review.  Could you explain that one, sir?

11   A    As part of the state's oversight of the City of Detroit's

12   restructuring, the emergency loan board has the authority to

13   review and approve any contemplated transaction and they have

14   approved this one as well.

15   Q    And where does that stand?

16   A    It's been approved.

17   Q    And the -- the amount of the financing they approved?

18   A    Three hundred and twenty-five million dollars.

19   Q    Are you aware of any further approvals required under

20   applicable state law to consummate the financing?

21   A    No.

22   Q    Let's look at City Exhibit 770 if we might.  And this is

23   the -- it -- can you identify that document for me, sir,

24   please?

25   A    These are the exit financing documents that were filed

1  last night that reflect the full documentation necessary to

2  execute the exit financing.

3      (City's Exhibit 770 was identified)

4          MR. CULLEN: I'd like to move City's Exhibit 770 into

5  evidence if I could, Your Honor.

6          MR. SOTO:  No objection, Your Honor.

7          MR. WAGNER:  Same, no objection.

8          THE COURT:  This reflects the new amount?

9  A   Yes, it does.

10          THE COURT:  It is admitted.

11      (City's Exhibit 770 was admitted)

12  Q   I would like to go back for a second.  What -- to the

13  three twenty-five number here.  Your understanding of why

14  three twenty-five as opposed to two seventy-five?

15  A    Yes.

16  Q   What is it?

17  A   It reflects the ability of the city to repay the LTGOs in

18  cash rather than issuing new debt pursuant to the plan.

19  Q   Okay.  And in terms of the -- the balance sheet impact of

20  that if you will, what is it?

21  A    It has no balance sheet impact because if we didn't repay

22  -- if we didn't borrow $325,000,000 we borrowed two

23  seventy-five which means the 55,000,000 due to the LTGO class

24  would be outstanding.

25  Q   Okay.  And just to -- to make this clear, let's go back

1  to Exhibit 712 at Page 6 where there's an entry for the LTGO

2  repayment.  712, Page 6.  That's the same thing, is it not,

3  sir?

4  A    I'm sorry?

5  Q    That's the same thing, is it not?

6  A    Yes.

7  Q    All right.  And if we look at the -- the begin rating

8  service evaluation process, is that a formal process?

9  A    Well, that's an informal part of the process.  As I

10  testified earlier, it's important to begin the re-education of

11  the credit agencies about Detroit as soon as possible.

12      And this is what I would call the shadow rating process

13  and that you need to go through to get them to understand

14  what's been done, why you did what you did, what the impact

15  has on credit.  So that as part of the initial commitment by

16  Barclays because they will be the ones who initially finance

17  the city, we have a pretty good idea of where the rating

18  agencies are coming out on implied ratings.  So this is the

19  informal part of the process.

20  Q    Okay.

21  A    And then the formal part of the process will begin later

22  once we've exited bankruptcy fully.

23  Q    In sum, Mr. Buckfire, do you believe that executing this

24  financing on these terms is beneficial to the city?

25  A    I do.

1  Q     Why?

2  A    It's the lowest cost, the greatest flexibility, and it's

3  the appropriate amount of capital with no underwriting risk to

4  the city.

5  Q    And does it have any impact on the educational process

6  we've been talking about all morning?

7  A    Yes.  The fact that a respected municipal financing bank

8  is willing to extend credit again to the city on an exit

9  basis, which will support the rating agency process and the

10  ultimate reoffering process will allow the city to for the

11  first time in ten years, go out and tell its story to capital

12  markets participants and make them willing lenders to the city

13  on a prospective basis.

14  Q    And what impact if any does your experience of this exit

15  financing process have on your previously rendered opinion

16  that the city will be able to access the capital markets on

17  reasonable terms post emergence?

18  A    I think we've already proven that.  And in fact the

19  Barclays commitment itself proves we've re-entered the capital

20  markets.  Because they're proposing pricing which is in my

21  opinion appropriate and reasonable for a borrower of this

22  kind.

23         MR. CULLEN:  That's all I have, Your Honor.

24         THE COURT:  What -- what is the interest rate on the

25  Barclays interim loan if I can use that phrase?

1  A    Can I refer to the term sheet?

2         THE COURT:  Yes.

3  A    It was in the presentation we gave city council, but I

4  want to go to the commitment letter itself to make sure.

5         THE COURT:  Sure.

6  A    Okay.  This is Exhibit 643 and I'm looking at Page 27 of

7  52.  Right.  So you see they have two different pricing

8  options.  The initial rates was the private placement portion

9  and then there's a public offering.

10       So let's talk about the initial rates which I believe is

11 your question.

12        THE COURT:  That was my question, yes.

13 A    Okay.  So they're proposing to use the municipal swap

14 index rate and add 425 basis points to that.  So that's their

15 initial pricing which is a very low rate.  And obviously

16 because it's variable the city will be paying the lowest

17 possible cost during the 150 day period for that commitment

18 from Barclays.

19        THE COURT:  And when does the commitment expire?

20 The end -- the end of November?

21 A    Yes.  And we have the right to extend by paying them

22 seven basis points for every month additional that we require.

23        THE COURT:  If the -- if the loan closes at the end

24 of November what would you expect the interest rate to be on

25 the private placement?

1  A    Well, the SIFMA municipal swap index that would be

2  relevant here, okay, is I believe as of last week it's about

3  125 basis points more or less.  So if that holds, it will be

4  about 5 1/4 –– 5 1/2%.

5        THE COURT:  Okay.  All right.  Let's break for lunch

6  now and reconvene at 1:30, please.

7      (WITNESS KENNETH BUCKFIRE WAS TEMPORARILY EXCUSED AT

8  11:56 A.M.)

9        THE CLERK:  All rise.  Court is in recess.

10     (Court in Recess at 11:56 a.m.; Resume at 1:30 p.m.)

11       THE CLERK:  All rise.  Court is in session.  You may

12 be seated.  Recalling case number 13-53846, City of Detroit,

13 Michigan.

14       THE COURT:  You may proceed.

15     (WITNESS KENNETH BUCKFIRE RESUMED THE STAND AT 1:30 P.M.)

16                     CROSS EXAMINATION

17 BY MR. SOTO:

18 Q   Mr. Buckfire, we met before.  Actually several times.  My

19 name is Ed Soto and it's nice to see you again.

20     Let's start by discussing your role in something

21 different than what you testified about this morning.  I'd

22 like to discuss your role in the valuation and disposition of

23 the DIA assets.

24     And when I refer to the DIA, I'm talking about the

25 physical DIA museum and the art collection that's stored

1  inside of it, okay?

2  A    Okay.

3  Q    And when I refer to the DIA Corp., I'll be talking about

4  the non-profit organization that runs and operates the DIA,

5  okay?

6  A    Yes.

7  Q    Now, Mr. Buckfire, you realized early on in your

8  engagement with the city in the spring of 2013 that the DIA is

9  owned by the city, correct?

10  A    Yes.

11  Q    And you became aware of that fact -- you became aware of

12  the fact that the city owns the art collection at the DIA and

13  the building itself, correct?

14  A    Yes.

15  Q    And you also recognized early on that because the DIA

16  collection and the DIA building are owned by the city, those

17  assets would have to be valued as potential non-core assets

18  and dealt with appropriately if the city sought protection

19  under Chapter 9 proceedings, correct?

20  A    Yes.

21  Q    And you're aware of the fact that the City of Detroit has

22  sold assets to address its financial aids in the past,

23  correct?

24  A    I'm sorry, did you mean prior to the bankruptcy, or

25  during the bankruptcy?

1  Q    Yeah, prior to the bankruptcy.

2  A    Yes.

3  Q    And you had independently decided that it would be

4  necessary to determine the value of the DIA assets in order to

5  satisfy the requirements of Chapter 9 of the Bankruptcy Code,

6  correct?

7  A    I recommended it be reviewed for that purpose, but I did

8  not decide it.

9  Q    Fair enough.  And you were involved in the decision to

10 include the DIA and the art collection as a city asset in the

11 city's June 14th, 2013 proposal to creditors, right?

12 A    Yes.

13 Q    And you even met with Governor Snyder and spoke with him

14 about your duty -- your duty to maximize the value of assets

15 for the city in connection with the plan of adjustment under

16 Chapter 9, correct?

17 A    Well, it wasn't my duty, it was my duty to recommend the

18 appropriate ways for the city to maximize its value for the

19 benefit of its citizens and creditors.

20 Q    You're right.  It wasn't your duty, but the city's duty,

21 correct?

22 A    Correct.

23 Q    All right.  And it was your understanding that the

24 Governor knew from your statements that you were trying to

25 maximize the value of the DIA assets, right?

1  A    I indicated to him we had to review it to understand what

2  the value might be.

3  Q    And -- and you also had several meetings with

4  representatives of the DIA Corp. in the spring of 2013

5  alerting them to the fact that it might be necessary to

6  monetize or sell the art collection at the DIA, correct?

7  A    Yes.

8  Q    Mr. Buckfire, I've handed you what we will now bring up,

9  Kim.

10        MR. SOTO:  And it's in the packet, Your Honor.

11  Q    FGIC Exhibit 3298.  Take a minute to take a look at that.

12  I hid it at the bottom.

13  A    I found it.

14  Q    Now this is an email from you to Bill Nowling of the

15  emergency manager's office dated July 25th, 2013 regarding the

16  DIA and Christie's.  Do you see that?

17        (FGIC Exhibit 3298 was identified)

18  A    Well, have you previously introduced this into my

19  deposition?

20  Q    You saw it at your deposition.

21  A    Okay.  Let me just go back and look at it.

22  Q    Please absolutely.

23  A    Because I'm reading it from the bottom which is my

24  original email.  Because your first one is not -- hold on.

25  Yes, I recall this.

1  Q    Now you've seen it before, correct?

2  A    Yes.

3  Q    And in fact you're the author of this email, correct?

4  A    I am.

5  Q    And you sent it to Bill Nowling who is the emergency

6  manager -- or was the emergency manager's assistant at the

7  time, correct?

8  A    Yes.

9          MR. SOTO:  Okay.  So, Your Honor, we would offer

10  Exhibit 3298 into evidence.

11          THE COURT:  Any objections?

12          MR. CULLEN:  No objection, Your Honor.

13          THE COURT:  It is admitted.

14      (FGIC Exhibit 3298 was admitted)

15  Q    And in this email chain on the bottom of the second page

16  beginning with the phrase, this predates both of you.  Do you

17  see that?

18  A    I do.

19  Q    You relay the fact that you and Bruce Bennett had several

20  meetings with DIA trustees and the museum director to warn

21  them of the risk that creditors would focus on the value of

22  the collection, correct?

23  A    Yes.

24  Q    And in fact in April or May of 2013 you informed the DIA

25  Corp. that there was a risk that you would have to recommend

1  among other alternatives taking steps to monetize the art

2  collection, isn't that right?

3  A    Yes.

4  Q    And the DIA Corp. made clear that it would fight the city

5  if the city attempted to generate value from the art

6  collection, didn't it?

7  A    It did.

8  Q    And at the meeting you had with the representatives of

9  the DIA Corp., those representatives thought it was a good

10 idea to spend money refurbishing the DIA's dilapidated and

11 condemned parking garage suggesting that was all they needed

12 to do to raise revenues from the -- for the city from the DIA

13 asset, correct?

14 A    Not -- no, not exactly.  That's not what they actually --

15 Q    Okay.  Well, what did they actually do?

16 A    At that particular meeting, they asked myself and Bruce

17 Bennett, well, what can we do to satisfy the city that we're

18 actually adding value.  And I reminded them that there were

19 many things they could do including renovating the dilapidated

20 and closed garage that supposedly serviced the DIA which would

21 require a significant investment, but that in fact that was

22 only one element of what they needed to do potentially.

23 Q    So you explained to the folks at the DIA Corp. that

24 they'd have to propose something more substantial than just

25 renovating the parking lot, right?

1  A    At that point it was a theoretical discussion.  We had no

2  facts on which to base any kind of ask.

3  Q    And after your meeting with the representatives of the

4  DIA Corp., you told Mr. Gene Gargaro, the chairman of the

5  board of the DIA Corp. that the DIA would have to propose

6  something dramatic if it wanted to protect the art, correct?

7  A    We did.

8  Q    Now, let me hand you another exhibit that's in there and

9  that's Exhibit 3496.  And I hope we gave it to -- to you this

10  time.

11        MR. CULLEN:  Yes, I have that.

12  Q    Kim, if you'll bring it up.  You'll recognize it again

13  from your deposition.

14  A    I do, yes.

15  Q    Now this is an email from you to Mr. Gargaro dated April

16  29th, 2013 regarding the DIA visit, correct?

17  A    Yes.

18        (FGIC Exhibit 3496 was identified)

19  Q    And in fact you're the author of this email, right?

20  A    I am.

21  Q    And you sent it to Gene Gargaro at the DIA Corp., right?

22  A    Yes.

23        MR. SOTO:  Your Honor, we would offer Exhibit 3496

24  into evidence.

25        MR. CULLEN:  No objection, Your Honor.

1          THE COURT:  It is admitted.

2          (FGIC Exhibit 3496 was admitted)

3   Q     Now it's in this email at the very top that you tell Mr.

4   Gargaro, you know, and I'll call your attention to the first

5   line there.  That the DIA board of trustees, and I'm quoting

6   it, "should be proposing something dramatic, not just about

7   refurbishing the parking garage".  Do you see that?

8   A     I do.

9   Q     But at the time that you exchanged this email with Mr.

10  Gargaro which is around I guess April 29th, 2013, you didn't

11  know what the value the city should get in exchange for

12  transferring the DIA assets, right?

13  A     Correct.

14  Q     But even though you didn't know what the specific value

15  would have to be, you did know that it would have to be a big

16  number, right?

17  A     I did.

18  Q     And a big number is also what you had in mind when you

19  used the word dramatic in describing to Mr. Gargaro what the

20  DIA Corp. would have to propose with respect to the transfer

21  of -- of the DIA assets, correct?

22  A     Yes.

23  Q     So -- so you approached Christie's about conducting an

24  appraisal of certain pieces in the art collection, correct?

25  A     Yes.

1  Q    And you did that because you -- you wanted to understand

2  what the value was of -- of that artwork, correct?

3  A    Yes.

4  Q    Okay.  And the city officially engaged Christie's in

5  August of 2013, right?

6  A    That's correct.

7  Q    But that engagement with Christie's was of limited scope,

8  correct?

9  A    Yes.

10  Q    In fact you specifically told Christie's to only value

11  those pieces of art that were purchased with city funds in

12  whole or in part, correct?

13  A    That's correct.

14  Q    And you knew that by setting those parameters, Christie's

15  would only be appraising the value of a small percentage of

16  the art at the DIA, something a little over 4%, correct?

17  A    Yes.

18  Q    Now Christie's did not independently determine which

19  pieces of art were city owned versus not city owned, did it?

20  A    I don't have specific knowledge of how they decided that.

21  Q    Okay.  In fact you -- do you -- if you recall, do you

22  recall that the DIA Corp. identified what they thought was

23  city owned and not city owned at that time?

24  A    I believe that's how Christie's came up with the original

25  appraisal list.

1  Q    And this is the same DIA Corp. that prompted you to warn

2  Governor Snyder before he met with Mr. Gargaro, that the folks

3  from the DIA Corp. were going to encourage him, the Governor,

4  to tell you and your firm to back off and leave the museum

5  alone, correct?

6  A    Yes.

7  Q    And this is also the same DIA Corp. that made it clear

8  that they would fight you to the ends of the Earth if you

9  touched the art collection even though the DIA collection

10 belonged to the city, right?

11 A    I don't recall them using that phrase.  They did indicate

12 they would object.

13 Q    Okay.  Well, I mean I could go back to your deposition,

14 but that's close enough.  Now in setting the scope of

15 Christie's assignment, you never took any steps to determine

16 which of the pieces of art within the DIA collection had some

17 restrictions on alienation, or use, or transfer, did you?

18 A    Personally I did not.

19 Q    And you would agree that you never undertook to determine

20 whether the ownership of the art at the DIA was held in any

21 way that would, you know, that could be transferred or

22 monetized, right?

23 A    Correct.

24 Q    Shifting gears a little, Mr. Buckfire.  You received a

25 number of proposals for transactions involving the art at the

1  DIA, correct?

2  A    Yes.

3  Q    And one of them was a proposal made on -- on or around

4  October 11th of 2013 by Mr. Gargaro, correct?

5  A    I don't recall exactly what he gave me, but what are you

6  referring to?

7  Q    Let's see if this will help a little.  We'll move on.  He

8  proposed transferring the DIA assets to another entity or

9  vehicle to protect it from future creditor exposure.

10  A    Uh-huh.

11  Q    If you -- if you recall the beginning of that.  And the

12  proposal would have called for a special millage, the proceeds

13  of which would be used by the city in exchange for

14  transferring the DIA to an authority or similar vehicle,

15  correct?

16  A    Yes.

17          MR. CULLEN:  Objection, foundation, form.  That's a

18  long quotation for him to recall and assent to freehand.

19          MR. SOTO:  But he did recall it.

20          THE COURT:  Well, if the witness doesn't know, he

21  can say so.

22          MR. CULLEN:  All right.

23  Q    Do you recall the deal -- the transaction that Mr.

24  Gargaro was proposing with the millage?

25  A    Yes.

 1  Q    And did I describe it about as you recollect?

 2  A    It was a long time ago, but it was generally about a

 3  special millage to support the operations.

 4  Q    So –- and –- and –- and as you recall it was a special

 5  millage that would be raised, the art would be transferred to

 6  an entity, the special millage would be used by the city,

 7  correct?

 8  A    That was his suggestion, yes.

 9  Q    And this discussion with Mr. Gargaro contemplated taking

10  an asset off the table, or in other words transferring the DIA

11  assets from the city in exchange for compensation to the city.

12  Do you recall that?

13  A    Yes.

14  Q    Okay.  And when you were speaking with Mr. Gargaro are

15  you aware of the fact that Mr. Nowling, again I think he's an

16  assistant or spokesman for the emergency manager, in the

17  emergency manager's office.  Do you remember Bill Nowling?

18  A    I do.

19  Q    Okay.  That he had indicated that the city hadn't

20  proposed selling any asset but that it also hadn't taken any

21  asset off the table because the city couldn't negotiate in

22  good faith with creditors by taking assets off the table.  Do

23  you remember that?

24  A    Vaguely.

25  Q    Well, you know what, let's look at your deposition, it

1    might help you.  Turn in your deposition there in front of you

2    July 16th.  Let's look at Page 115.  We'll start at Line 6.

3    A    Uh-huh.

4    Q    It says question, okay.  If I'm reading this correctly,

5    there's a statement here, the office of the state appointed

6    emergency manager Kevyn Orr says it did not initiate the

7    proposal but spokesman Bill Nowling offered these words and

8    then it says, do you see that?  Answer, I do.

9         Question, and he says and I quote, and I am reading the

10   quote that you have here.  "Let's assume it's correct.  We

11   haven't proposed selling any asset, but we haven't taken any

12   asset off the table.  We can't.  We cannot negotiate in good

13   faith with creditors by taking assets off the table and all

14   our creditors have asked about the worth of the DIA and we've

15   told them they're welcome to find out".

16        And then if you drop down on Line 4 in the end.

17   Question, do you agree with that statement there?  Answer from

18   you, I do.

19        Does that refresh your recollection?

20   A    Yes, but --

21   Q    And when you testified to that effect --

22            THE COURT:  Pardon me, counsel.

23   Q    -- you were telling the truth, correct?

24            MR. SOTO:  Oh, I'm sorry.

25            MR. CULLEN:  The statement by Mr. Nowling, is that

1  what you're referring to?

2        MR. SOTO:   Yeah.

3  Q    And -- and when you were -- when you were testifying that

4  you agreed with it you were telling the truth, correct?

5  A    Yes.

6  Q    And you agreed with Mr. Nowling that you -- you -- that

7  the city could not negotiate in good faith with creditors by

8  taking assets off the table, correct?

9  A    Yes.

10  Q    Back at the ranch.  You never responded to Mr. Gargaro's

11  proposal about the millage, did you?

12  A    I don't think we did.  No, we didn't have any -- any

13  information from Christie's yet as to what the value might be.

14  And we also didn't believe that he could deliver on a special

15  millage which would have required the votes of the affected

16  counties.

17  Q    So now you -- there were also other proposals that were

18  made regarding the art, correct?

19  A    At various times, yes.

20  Q    And one of those proposals you discussed with the DIA

21  Corp. would involve raising enough money --

22  A    Uh-huh.

23  Q    -- from their trustees and other community members to

24  justify conveying the art collection to an authority, correct?

25  A    Yes.

1  Q    Okay.  But at the time that you discussed that proposal

2  in October of 2013, that's the time frame you gave --

3  A    Uh-huh.

4  Q    -- you had not done an analysis of the value of what the

5  city would need to receive to justify taking that kind of

6  asset off the table because again you hadn't -- you hadn't

7  gotten Christie's analysis yet, correct?

8  A    Correct.

9  Q    And Miller, Buckfire was relying on Christie's to value

10 the art at the DIA because neither you nor anyone else at

11 Miller, Buckfire is an expert in valuing art, correct?

12 A    Correct.

13 Q    And on December 18th of 2013, Christie's issued its final

14 fair market value estimate for the limited works of art that

15 it appraised.  Do you remember that?

16 A    I do.

17 Q    And it said that those works were worth between

18 454,000,000 and 867,000,000, right?

19 A    Yes.

20 Q    Now more recently the city retained Artvest to value the

21 DIA art collection.  Were you involved in that?

22 A    No.

23 Q    Okay.  Were you aware that they were retaining another

24 entity?

25 A    Yes.

1  Q    Okay.  And that happened sometime around June of 2014.

2  Now -- and more recently Artvest issued a report sometime in

3  July of 2014 estimating that the entire collection had a gross

4  value of between 2.7 billion and 4.7 billion.  Were you aware

5  of that?

6  A    Yes.

7  Q    Okay.  So now even before you got the Christie's and

8  Artvest report, you knew you had an obligation to identify the

9  value of any asset that might be available to the city

10  pursuant to the plan of adjustment, correct?

11  A    Yes.

12  Q    Okay.  And you found it very important that any

13  settlement would provide amounts over time that were

14  consistent with the valuation range of the analysis that you

15  had gotten from Christie's, correct?

16  A    Yes.

17  Q    Okay.  Now, Mr. Buckfire, you understand that certain

18  settlements have been struck in this bankruptcy, right?

19  A    I am.

20  Q    And Miller, Buckfire had a role on behalf of the city in

21  virtually all of these settlements, correct?

22  A    Yes.

23  Q    Okay.  And that role was to provide the emergency manager

24  and the city with the analysis of the relative value of each

25  claim that needed to be settled, correct?

1  A     That was one element of our advice, yes.

2  Q     And also as a second element the manner in which the

3  negotiations should be handled.  That was part of what you

4  provided to the emergency manager and the city, correct?

5  A     Yes.

6  Q     And thirdly, you -- you provided assistance in the

7  construction or creation of various offers to creditors,

8  correct?

9  A     Yes.

10  Q    And then fourthly you provided consulting services to

11  provide assistance for the emergency manager in negotiations

12  with creditors to arrive at acceptable transactions, correct?

13  A     Yes.

14  Q     Okay.  And you also did substantial analysis of all the

15  proposals that were provided to you by different

16  constituencies in this bankruptcy, correct?

17  A     Yes.

18  Q     Okay.  And one of those settlements includes what is

19  referred to as the grand bargain, correct?

20  A     Yes.

21  Q     And that contains a pledge of at least 366,000,000 in

22  foundation funds and 100,000,000 of DIA Corp. funds over a 20

23  year period, correct?

24  A     In addition to a contribution from the State of Michigan,

25  that's correct.

1  Q    Yes.  Am I stepping on something?  No.

2         THE COURT:  No, I can't imagine you're the cause of

3  this.

4         MR. SOTO:  Thanks, Your Honor.

5         THE COURT:  But -- but we should take a pause and

6  ask for help.

7         MR. SOTO:  Yeah.

8         THE COURT:  So let's just stand down for a moment.

9  And hopefully who's ever listening in will rush up here and

10 fix the problem for us.  If you want to have a seat in the

11 meantime, that's fine with me.

12      I hope that's not someone's cell phone.  There's

13 something wrong with the camera?  I hear it more from the left

14 side of the courtroom.  Is there someone you can contact

15 LaShonda?  I'm sorry?  Okay.

16      I have a message that someone will be right here.  We

17 have a buzz in the speaker.  I'm sorry.  You mean we have to

18 tolerate this the rest of the afternoon?  I'll take a break

19 right now.

20      Okay.  It -- it does appear that we do have to take a

21 break from our proceedings to see if we can get GSA's

22 attention.  Good luck with that, right?  But I don't think we

23 can proceed with that buzzing.  So with apologies we will be

24 in recess for an undetermined amount of time here.  I just

25 need one more second here.  All right.  I'm just going to

1  leave it.  Okay.  We're in recess.

2      (WITNESS KENNETH BUCKFIRE WAS TEMPORARILY EXCUSED AT 1:54

3  P.M.)

4          THE CLERK:  All rise.  Court is in recess.

5      (Court in Recess at 1:54 p.m.; Resume at 2:33 p.m.)

6          THE CLERK:  All rise.  Court is back in session.

7  You may be seated.

8          THE COURT:  Oh, did it just start buzzing again?

9          MR. CULLEN:  No, I think it's all right.  I can't

10  hear it.

11          THE COURT:  Not so much.  This is -- this remains

12  intolerable so we're -- we're going to have to continue our

13  recess and not proceed.  My apologies to you.  Did the people

14  from -- they're still here.  What can you do to fix this for

15  us?

16          A VOICE:  We're going to have to bring in a lift to

17  get up here and change out the ballast.

18          THE COURT:  How long will that take?

19          A VOICE:  I don't know.  At least an hour, probably

20  more.  We have to move most of this equipment and the lift is

21  on the third floor right now.  It's got to come down.

22  Probably at least an hour.

23          MR. CULLEN:  If you've got a ladder, I'll sign a

24  waiver and go get it.

25          THE COURT:  The city is going to waive your

1  liability.  Okay.  Well, all right.  Let's --

2          A VOICE:  About an hour.

3          THE COURT:  Yeah, let's -- let's see if we can

4  reconvene at 2:30 ad if it has to be longer, it will have to

5  be longer.  I'm sorry, 3:30.  3:30 and we'll see if we can

6  reconvene then.  I don't know what else to do.  So that's what

7  we'll do.

8          MR. SOTO:  Thank you, Your Honor.

9          THE CLERK:  All rise.  Court is in recess.

10     (Court in Recess at 2:35 p.m.; Resume at 3:24 p.m.)

11          THE CLERK:  All rise.  Court is back in session.

12  You may be seated.

13          THE COURT:  Is everyone here?

14          MR. WAGNER:  I think we're missing --

15          THE COURT:  Okay, we'll -- we'll stand by.  No

16  apology needed.  Take your time getting organized.

17     (WITNESS KENNETH BUCKFIRE RESUMED THE STAND AT 3:26 P.M.)

18  BY MR. SOTO:

19  Q   Mr. Buckfire, when we last met I think I asked the

20  following question.  I was asking you about the settlement

21  that was called the grand bargain.  Do you recall?

22  A   I do.

23  Q   And I believe it contains and I -- and you corrected me

24  appropriately, a lump sum payment by the State of Michigan of

25  $194.8 million dollars, correct?

1  A    Yes.

2  Q    A pledge of at least 366,000,000 in foundation funds,

3  correct?

4  A    Yes.

5  Q    And a pledge of 100,000,000 of DIA Corp. funds to be paid

6  over a period of 20 years, correct?

7  A    Yes.

8  Q    Okay.  But the city at the time that it entered the grand

9  bargain had -- it had already entered into the grand bargain

10  in January of 2014 before it received the Artvest report,

11  correct?  The Artvest -- just to give you a context, the

12  Artvest report was dated July of 2014.

13  A    That's correct.

14  Q    And since the date Artvest's expert report was received

15  by the city, and again that's in July 8th of 2014, at least

16  that's what's it's dated, as far as you know, you nor anyone

17  else at Miller, Buckfire has made an effort to increase the

18  value obtained for the DIA assets, correct?

19  A    That's correct.

20  Q    Now you concluded that the amount of the settlement

21  offered for the artwork in the grand bargain was fair because

22  it was in the high end of the range of the Christie's report,

23  correct?

24  A    Yes.

25  Q    But at the time the grand bargain was announced, again

1  just a few weeks after the December 18th, 2013 Christie's

2  report, you knew that even if an offer for the art was at the

3  high end of the Christie's report, that appraisal was only for

4  a small percentage of the art collection at the DIA, correct?

5  A    Yes.

6  Q    Now I think in the packet that I handed you earlier

7  should be City Exhibit 343 that was entered earlier in these

8  proceedings and I'll have it up on the board for everyone

9  else.  And that's a letter dated December 3rd, 2013.  It's --

10 you can't see it.  It's -- you certainly can see that it's to

11 Kevyn Orr here.  Let's go to the last page, Kim.  It's signed

12 by Doug Woodham who is the President.  The date would be

13 there. There you go.  Maybe you can blow that up a little.

14     So it's signed by Doug Woodham who is the President of

15 Christie's.  And again it shows as a carbon copy, you and

16 Bruce Bennett, correct?

17 A    That's correct.

18 Q    And do you remember receiving this letter?

19 A    I do.

20 Q    Okay.  Now certainly take the time to look at all of it

21 if you want, but we're going to be asking about something

22 starting on Page 3 if you want to start there.

23     If you look back on Page 3 of 5.  Do you see under the

24 heading alternatives to sale?

25 A    Uh-huh.

1  Q    Do you recall reviewing the alternatives to sale that are

2  there?  They start on Page 3, and they go to Page 4, and then

3  they end on Page 5.

4  A    Yes.

5  Q    And so you knew about these alternatives, correct?

6  A    Potential alternatives, yes.

7  Q    Fair enough, potential alternatives.  But you didn't

8  discuss them with any -- anyone at Christie's, did you?

9  A    I had discussed these concepts in general with them over

10  a period of time, but not after receiving this letter.

11  Q    But not after receiving the letter?

12  A    That's right.

13  Q    Okay.  Do you recall a Mr. Provost?  Do you recall

14  meeting a guy named Paul Provost in New York in September of

15  2014 -- of 2013?  September 3rd or September 4th, 2013?

16  A    I'm sorry, could you -- what are you asking about him?

17  Q    Do you recall meeting Mr. Paul Provost of Christie's in

18  New York on September -- I think I have the date here, give me

19  a second.  September 4th, 2013.

20  A    I can't recall the exact date, but I met with a lot of

21  people at that period of time.

22  Q    And you don't remember that?

23  A    I don't.

24  Q    Saves some questions.  Let's move on.  Now Mr. Buckfire,

25  you were aware that Houlihan Lokey received four indications

1  of interest regarding the art at the DIA dated around April

2  4th, 2014, correct?

3  A    Yes.

4  Q    And you never called any of the four parties that were

5  listed that had indicated that interest, did you?

6  A    That's correct.

7  Q    And you never called anyone at Houlihan Lokey about them

8  either, correct?

9  A    Correct.

10  Q    Okay.  And you never tried to contact anybody who might

11  be involved in the art monetization world to see if they would

12  be interested in helping the city monetize the DIA art without

13  selling it, correct?

14  A    Aside from Christie's, that's correct.

15  Q    Now let's switch gears for a second.  Tell me if this is

16  correct.  If it's not, I'd like to know.  You never did a

17  present value calculation of the 466,000,000 that is paid by

18  the foundations and the DIA Corp. over the 20 year period

19  under the terms of the grand bargain, did you?

20  A    No.

21  Q    Okay.  And nobody else at Miller, Buckfire did a present

22  value calculation of that -- those sums either, correct?

23  A    Not that I'm aware of.

24  Q    Let's talk a little more about the grand bargain.  You

25  pointed out that another part of it is the state contribution,

 1 right?

 2 A    Yes.

 3 Q    And in your view the consideration the state is receiving

 4 in exchange for the payment of 194.8 million is not just the

 5 elimination of litigation, but also the ability to help

 6 maintain an important cultural asset to the southeast Michigan

 7 region in the form of the DIA museum, correct?

 8         MR. CULLEN:  Objection, foundation.  Asking for the

 9 state's motivation.

10         MR. SOTO:  I'm asking for his view.

11         THE COURT:  Would you rephrase the question then,

12 please?

13         MR. SOTO:  Sure.

14 Q    Is it your view Mr. Buckfire, that the -- that the

15 consideration the state is receiving --

16 A    Uh-huh.

17 Q    -- in exchange for the payment of a 194.8 one time lump

18 sum payment, is not just the elimination of litigation --

19 A    Uh-huh.

20 Q    -- but also the ability to maintain an important cultural

21 asset to the southeast Michigan region?

22 A    Yes.  And I would modify that by pointing out the value

23 of maintaining the DIA to the citizens of Detroit.

24 Q    Also a fair point.  And before the state agreed to pay

25 the state contribution, you had a discussion with Dennis

1  Muchmore in the spring of 2013, correct?

2  A    I've had many conversations with Mr. Muchmore.  Which one

3  are you referring to?

4  Q    We'll get to it.  I'm going to identify --

5              MR. CULLEN:  I would only object and direct the

6  witness to be very careful about conversations which have had

7  with representatives of the state in the presence of either

8  lawyers for the state, or the city pursuant to the common

9  interest privilege.

10  Q    Mr. Muchmore is the Governor's Chief of Staff, correct?

11  A    Yes.

12  Q    And -- and you had many conversations with him, correct?

13  A    Yes.

14  Q    Now the one I'm referring to is the one we discussed at

15  your deposition.  And if you will -- if it will refresh your

16  recollection, I'll call your attention to Page 153 of your

17  deposition, Lines 7 through 23.

18              MR. CULLEN:  Object.  There is no -- there is no

19  indication that his recollection needs refreshing.

20              MR. SOTO:  Well, he said he had many conversations

21  and couldn't remember every single one.  I'm trying to refresh

22  his recollection.

23              THE COURT:  I'll permit it.  Go ahead, sir.

24  Q    Now do you see where I asked and were -- were all those

25  conversations, conversations that you understood to be part of

1  the mediation process and covered by the Judge's mediation

2  order?

3           THE COURT:  Excuse me, it's actually not proper to

4  read into the record the materials being used to refresh the

5  witness' recollection.

6           MR. SOTO:  Okay.  I'll let him.

7           THE COURT:  In fact I'm going to ask you to take it

8  off the screen.

9           MR. SOTO:  Please do.  Go ahead and --

10          THE COURT:  The procedure is for you to just read it

11 to yourself and then let us know if that refreshes your

12 recollection on the question.

13 A    Thank you, Your Honor.

14          THE COURT:  And then if it does, you can answer.

15 A    Thank you.

16          THE COURT:  Without reading it.

17 A    Yes, I recall this.

18 Q    And so do you recall having one conversation prior to any

19 of the mediation with Mr. Muchmore, correct?

20 A    Yes.

21 Q    And you shared with him a copy of the term sheet that you

22 were negotiating with the DIA Corp. for the -- for the

23 transfer -- for the -- or rather in connection with the DIA

24 settlement, correct?

25 A    I wouldn't use the word negotiate to describe that term

1 sheet.

2 Q    Well, how would you describe it?

3 A    Well, at that point we were trying to explain to them

4 that if they really wanted to protect the museum and put it in

5 the permanent and in viable position, there would have to be a

6 transfer of consideration to the city and they asked well, how

7 would you structure that.

8     So we came up with a term sheet that would explain how we

9 would do it and we provided that to them.  But there was never

10 any negotiation around the terms.

11 Q    Okay.  And that's the term sheet that you shared with Mr.

12 Muchmore?

13 A    I describe it to him.  I'm not sure I ever shared it with

14 him, but I -- I described the terms to him, but I'm not sure I

15 actually gave it to him.

16 Q    And the reason you were sharing this with Mr. Muchmore is

17 because you believed that politically active board members of

18 the DIA Corp. would call the Governor to complain about your

19 team because it was daring to ask for money for the transfer

20 of the DIA art collection, correct?

21 A    Correct.

22 Q    And your purpose for having this discussion was to make

23 the Governor's office aware of an alternative in which value

24 would be paid to the city in exchange for protecting the art

25 collection from sale risk, correct?

1  A    I would modify that with the word potentially, but

2  otherwise you're correct.

3  Q    Okay.  And one last question about the DIA.  When you

4  first addressed the issue of the potential transfer of the art

5  at the DIA with the Governor, you didn't discuss pensions with

6  him, did you?

7  A    Not specifically in that context, no.

8  Q    Okay.  Let's switch gears, Mr. Buckfire.  You understand

9  that the plan -- that under the plan of adjustment, recoveries

10  for the pension claims are being funded by a few sources over

11  the next 20 years, right?

12  A    Yes.

13  Q    And they include payments from the DWSD, right?

14  A    Yes.

15  Q    Payments from the foundations that are contributing to

16  the grand bargain, correct?

17  A    Yes.

18  Q    Payments from the DIA funders, correct?

19  A    Correct.

20  Q    Payments from the state, correct?

21  A    Yes.

22  Q    And payments from the city?

23  A    That's correct.

24  Q    Okay.  And you understand that if you want to evaluate

25  the present value of a future stream of income, you need to

1  apply a discount rate so that the future stream of income can

2  be identified, correct?  If you want to know what today's

3  value is.

4  A    That's correct.

5  Q    Okay.  And again you're someone who's done a lot of

6  present value calculations in your careers, right?

7  A    Yes.

8  Q    And so if we put the future city payments to one side --

9  A    Uh-huh.

10 Q    -- and address only the relative risk of the charitable

11 and state contributions.

12 A    Uh-huh.

13 Q    Have you got the context?

14 A    I do.

15 Q    You would agree that those are not very risky and

16 therefore you would apply a low discount rate to those payment

17 streams.  You said that in the vicinity of 2 to 4%, correct?

18 A    Yes.

19 Q    And that's because the State of Michigan is a AA rated

20 credit, correct?

21 A    Actually I was referring in that part of my deposition to

22 the contributions by the foundations themselves as well as the

23 State of Michigan.

24 Q    Okay.  But in fact the -- the State of Michigan is a AA

25 credit rating, right?

1   A     Yes.

2   Q     Okay.  And the foundations in the DIA Corp. that you were

3   referring to are also --

4   A     Uh-huh.

5   Q     -- well funded and wealthy donors and have no external

6   debt and all of which imply less risk, correct?

7   A     Correct.

8   Q     And given all that, a lower discount rate should be

9   applied to present value those grand bargain funds, the ones

10  we've just identified.  Then you would use on a more risky

11  stream of payments, correct?

12  A     Yes.

13  Q     And the bulk of what the pensioners are receiving under

14  the plan, including the grand bargain funds that we just

15  discussed, are payment streams from less risky well funded

16  contributors and that's why you believe a discount rate of 2

17  to 4% is appropriate in that instance, correct?

18  A     But we didn't do a present value, so I don't understand

19  why you're asking what the discount rate would be.  We didn't

20  do one here.

21  Q     But -- but because I'm asking you to hypothesize as if

22  you were an expert which indeed you are.

23  A     I would use a low discount rate to evaluate the present

24  value of those payments, yes.

25  Q     And you would agree that pensioners are unsecured

1 | creditors of the city, correct?

2 | A    Yes.

3 | Q    And you'd also agree that Class 9 and Class 14 creditors

4 | are also unsecured creditors of the city, correct?

5 | A    Yes.

6 | Q    Now by contrast so you can set the context, the

7 | recoveries of Class 9 and Class 14 under the plan are not

8 | being funded by the State of Michigan or the foundations,

9 | correct?

10 | A    No.

11 | Q    For example the COPS reserve is being funded by the --

12 | the new B notes which will be issued with a total face amount

13 | of about $650,000,000, correct?

14 | A    Yes.

15 | Q    And those new B notes are going to be serviced solely by

16 | payments from the City of Detroit, correct?

17 | A    That's correct.

18 | Q    In fact the new B notes will be unsecured obligations of

19 | the city, right?

20 | A    Yes.

21 | Q    And so the new B notes are backed by nothing more than

22 | the city's promise to pay, correct?

23 | A    Yes.  It's the same situation with the contributions of

24 | the foundations and the state.  Those are unsecured promises

25 | also.

1  Q    Right.  The foundation -- I agree.  I'm -- I think --

2  A    Though they're not any different.

3  Q    And there is no dedicated revenue stream or tax revenues

4  supporting the new B notes, right?

5  A    That's correct.

6  Q    In fact the new B notes will be serviced again solely by

7  the city's general fund cash flow assuming there is any,

8  right?

9  A    That's correct.

10 Q    And so it's your view as to those new B notes that you

11 would apply a 5% discount rate for purposes of determining

12 their present value, correct?

13 A    Yes.

14 Q    Okay.  And you would agree that the payment stream coming

15 from a AA rated institution like the State of Michigan would

16 be viewed by the market as less risky than payment streams

17 from the City of Detroit, correct?

18 A    Yes.

19 Q    In arriving at your opinion that 5% is the appropriate

20 discount rate in valuing the new B notes, you relied on

21 materials appended to your expert report, correct?

22 A    Yes.

23 Q    And that's really the only reason why I put that in that

24 stack.  You may not have to look at it, but we'll see.  And

25 that included various yield curves, right?

1  A    Yes.

2  Q    And that included the MMA yield curve which is part of

3  the Attachment 3 to your expert report.  It's the one we

4  looked at this morning and I think the Judge asked you a

5  question about it, correct?

6  A    That's correct.

7  Q    But the MMA yield curve attached as -- in Attachment 3 is

8  for AAA general obligation bonds, right?

9  A    That's correct.

10  Q    And you would agree with me that Detroit is -- is not a

11  AAA rated credit?

12  A    Not today.

13  Q    Probably won't be that when it emerges from bankruptcy,

14  correct?

15  A    It's unlikely.

16  Q    In fact and you don't even believe Detroit will be a

17  single A rated municipality after it exits bankruptcy,

18  correct?

19  A    That's correct.

20  Q    And that's because in your view it won't deserve it at

21  that time, correct?

22  A    It will be premature for it to get an A rating.

23  Q    And the MMA yield curve attached in that Attachment 3, is

24  for a ten year call bond, correct?

25  A    Ten year part call, yes, that's right.

1  Q    But the new B notes that FGIC is set to receive under the

2  plan are not ten year call bonds, are they?

3  A    No.

4  Q    In fact the new B notes mature in 30 years and are not

5  callable, correct?

6  A    They're callable.

7  Q    Oh, they are?

8  A    The city can call those bonds if it wishes to.  It's a 4%

9  coupon for --

10 Q    Well, that's true, okay.  Right, we got that.  But

11 regardless of that again, it's your view that the appropriate

12 rate to discount the new B notes which mature in 30 years, is

13 still 5%, correct?

14 A    Yes.  The structure of the B note supports the conclusion

15 that 5% is the appropriate discount rate.

16 Q    Okay.  And the interest rate on the new B notes is 4% for

17 the first 20 years, and then 6% for the ten years following

18 that, correct?

19 A    Correct.

20 Q    But the new B notes will only pay interest and they won't

21 pay principal for the first ten years, correct?

22 A    That's correct.

23 Q    And you would agree that in general if a debt security

24 does not amortize principal beginning at issuance, that

25 security has a greater risk of principal not being repaid than

1  a security that does amortize principal from the beginning of

2  issuance, correct?

3  A    Are you asking me that in general, or specific to the

4  City of Detroit?

5  Q    I'm asking you in general.

6  A    Well, in general that's true, but that's not the facts we

7  have here, so I don't see the relevance.

8  Q    And why is that not the facts we have here?

9  A    Okay.  Because the city's own plan and the governance

10 mechanisms that will be put in place do not assume the city

11 has any refinancing requirement for 40 years.  And therefore

12 the city's ability to pay this debt when due is very high.

13      As opposed to the general case where cities rely on

14 refinancing debt rather than repaying it from cash flow.  So

15 the general case does not indicate in any way how the market

16 received this paper by the City of Detroit.

17 Q    So despite the fact that in this case there will be no

18 amortization for a ten year period and therefore there will be

19 a balloon amount that's due at the end of that ten years, or

20 that will be payable at the end of that ten years --

21 A    That's not correct.  It's amortization beginning on a

22 level basis beginning in year 11.

23 Q    That's right.  For the first ten years there will no --

24 A    It's not --

25 Q    -- amortization.

1  A     And it's not a balloon payment.

2  Q     And no amortization at all would begin until year 11,

3  correct?

4  A     That's correct.

5  Q     So the fact that you have paid interest for ten years and

6  you don't begin amortization until year 11, in your opinion

7  doesn't affect your decision about the 5% interest rate,

8  correct?

9  A     No.  In this case if you look at the balance sheet of the

10  city over that period of time, the city will have paid down a

11  substantial amount of the exit financing contemplated raised

12  pursuant to this plan, it will have paid down other debt and

13  will have less debt in year ten.  And therefore the city's

14  ability to service the remainder of the B notes will be higher

15  than it is today.

16  Q     Using your term potentially, correct?

17  A     When you're talking about projections it's all potential.

18  Q     That's right.  And the new B notes are taxable, correct?

19  A     That's correct.

20  Q     And in general investors in the market for municipal

21  bonds will demand higher yields for taxable bonds as opposed

22  to tax exempt bonds, correct?

23  A     Yes.

24  Q     And so it would be reasonable to assume that the market

25  may demand a discount on taxable new B notes to account for

1  the taxes that must be paid on those notes, correct?

2  A    You -- you confused me.  I don't understand your

3  question.

4  Q    So it would be reasonable to assume that the market may

5  demand a discount rate on the taxable new B notes that is

6  different than the -- than would be a non-taxable debt,

7  correct?

8  A    It's possible.

9  Q    And again despite the fact that that is possible, it's

10  still your view that the appropriate rate to discount the new

11  B notes which are taxable is 5%, correct?

12  A    Yes.

13  Q    And the new B notes are not general obligation bonds,

14  right?

15  A    That's correct.

16  Q    And to be clear there is no dedicated revenue stream or

17  dedicated tax revenues supporting the new B notes, correct?

18  A    Correct.

19  Q    And again the holders will be exposed to the credit risk

20  of the city, correct?

21  A    Correct.

22  Q    But again even taking all this into account, it's still

23  your view that the appropriate discount rate for the new B

24  notes is 5%, correct?

25  A    Yes.

1  Q    Now it's your view that the city will be able to access

2  and obtain and close on exit financing on reasonable terms,

3  correct?  That's one of the opinions you gave today, correct?

4  A    Yes.

5  Q    And that was true both in your initial expert report

6  which was July 8th, 2014, and in the supplemental expert report

7  you filed just last Wednesday on September 24th, correct?

8  A    Yes.

9  Q    And the process of obtaining exit financing, I believe I

10 was listening today correctly, took about two months, correct?

11 A    Yes, officially.

12 Q    And you contacted over 20 commercial lending

13 institutions.  You testified about the -- the process this

14 morning, correct?

15 A    Yes.

16 Q    Okay.  And as of today in your view the city has secured

17 the best exit financing that it could obtain at this point,

18 correct?

19 A    Correct.

20 Q    And as you testified this morning you ultimately selected

21 Barclays to provide that exit financing, correct?

22 A    We recommended to the emergency manager.  He approved the

23 commitment from Barclays.

24 Q    Fair enough, good correction.  And in your view Barclays

25 proposal offered an optimal structure for the exit financing,

1  correct?

2  A    Yes.

3  Q    And it's also your view that Barclays proposal offered

4  the best economic terms or pricing available in the market for

5  the exit financing for the City of Detroit, correct?

6  A    Yes.

7  Q    Okay.  And finally it's your view that the city's strong

8  relationship with Barclays was a valuable factor in

9  recommending them and in them supplying the exit financing,

10 correct?

11 A    Yes.

12 Q    Now the interest rate for this exit financing is not

13 fixed, is it?

14 A    Not yet.

15 Q    In fact the interest rate is floating right now and will

16 not switch from floating to fixed rate until after the

17 syndication process is completed and the city obtains a credit

18 rating, assuming the plan of adjustment is confirmed, correct?

19 A    Correct.

20 Q    And as you testified earlier, you don't believe the city

21 will obtain a single A credit rating at the point -- at the

22 point that it does exit this proceeding, correct?

23 A    No.

24 Q    And in general while you -- while we don't know what the

25 exact interest rate for the exit financing will ultimately be

1  because it's not fixed, you would agree that it's likely to be

2  higher than the rate charged to those municipalities which do

3  receive single A credit ratings, correct?

4  A    No.

5  Q    And why not?

6  A    Because the credit of Detroit is a cost of capital to be

7  set by the bars of this debt, not by the rating agencies.

8  Rating agencies don't buy debt.  The ratings are interesting,

9  but they're not necessarily determinative on the cost of the

10  financing.

11  Q    They're not determinative, I agree.  But they are a

12  factor that's considered, correct?

13  A    That will be a factor.

14  Q    Okay.  So now Mr. Buckfire, you would also agree that in

15  general secured debt is less risky than unsecured debt?

16  A    Usually that's the case.

17  Q    And the pricing of debt is heavily dependent on this,

18  correct?

19  A    Yes.

20  Q    And you would agree with me that it costs more to finance

21  unsecured debt than it does to finance secured debt generally?

22  A    Yes.

23  Q    And the Barclays exit financing the city was able to

24  obtain is secured by a lien on the income tax revenues of the

25  city, correct?

1  A    Yes.

2  Q    And so because of that collateral the risk of non-payment

3  by the city on the exit financing it obtained from Barclays is

4  low compared to a city -- it would be lower compared to a

5  facility without such collateral, correct?

6  A    That was a complicated question.  Would you mind --

7  Q    No, no, no.  Let me rephrase it.  I would say strike

8  that, but I don't think it works in Court.

9       And so because of the collateral that the city has with

10 its exit financing, the risk of non-payment by the city on

11 that exit financing is lower as compared to a facility without

12 such collateral, correct?

13 A    Yes.

14 Q    And so the city obtained exit financing with a floating

15 interest rate that has not yet been set.  But the city assumed

16 in its September 2014 projections that it would be about 5.75%

17 interest and you testified earlier today that you think it

18 could be approximately 5.5%, correct?

19 A    Could be that.

20 Q    Okay.  And even though the best interest rate the city

21 could negotiate for a long term secured debt was about 5.5% to

22 5.75%, it's still your belief that a 5% discount rate is both

23 appropriate and a reasonable to value the recoveries to

24 unsecured creditors who will receive the unsecured new B

25 notes, correct?

1  A    You're mischaracterizing my testimony.

2  Q    Well, I'm asking it.

3  A    I was very clear this morning.  5 1/2% is the rate the

4  city would be paying on a private placement basis to Barclays

5  given the current index rate and spread anticipated by their

6  term sheet.

7     It's a variable rate.  That's approximately the rate it

8  would be upon consummation.  It has nothing at all to do with

9  the long term cost of the debt when placed at the end of the

10 150 day marketing process.

11 Q    But you testified earlier, and I believe it was very

12 early in your testimony, that the discount rate is a proxy for

13 the costs the city should expect today to borrow new capital

14 in the market, correct?

15 A    On a long term basis.

16 Q    That's right.

17 A    This financing is being done pursuant to the exit from

18 bankruptcy.  There are -- it has not been re-underwritten yet.

19 It has not been but we have not gone to credit agencies.

20    So effectively I would think about the "50 basis point

21 differential" which I'm not conceding to you is the right

22 number.  Think about that as the premium one has to pay to get

23 the support for a major underwriter to finance an exit.  It

24 has nothing to do with the long term cost of capital.

25 Q    Now, is it your view that the 20 year payment of the new

1  B notes is not long term?

2  A    Of course it's long term.

3  Q    Thanks.  I think I have very little left.  And I promised

4  you I wouldn't ask you questions repetitively as has happened

5  in your deposition.  But I do have one to ask you that's from

6  your deposition.

7      I think at your deposition I counted that you were asked

8  11 times not by me, I want to say, Judge.

9          THE COURT:  Okay.

10 Q    The same question in a number of different forms.  But

11 let me ask it here.  Mr. Buckfire, you did not prepare a

12 dismissal analysis, did you?

13 A    No.

14 Q    Okay.  Now one other question.  You didn't study the

15 problems that the city may have either retaining active

16 employees or attracting new ones either, did you?

17 A    No.

18          MR. SOTO:  Thank you very much.

19                  CROSS EXAMINATION

20 BY MS. O'GORMAN:

21 Q    Good afternoon, Mr. Buckfire.  My name is Debra O'Gorman.

22 I represent one of the claimants MIDD.  I want to ask you

23 about recoveries to creditors under the plan.

24      The recovery percentage listed in the disclosure

25 statement to the PFRS and the GRS are 59 and 60%, correct?

1  A    I believe that's correct, yes.

2  Q    And you were involved in putting together the -- the

3  disclosure statement, correct?

4  A    I don't have it in front of me.  I believe your numbers

5  are correct, but I don't have it in front of me.

6  Q    Okay.  Could we pull up Exhibit 3, Pages 51 and 52?  The

7  number is on the bottom 003.  And if you could go to the next

8  page.  And this shows that the estimated recovery percentage

9  to the PFRS is 59% in the disclosure statement, correct?

10  A    That's correct.

11  Q    And if you'd go to Page 54.  And this shows that the

12  estimated percentage recovery for the GRS is 60%, correct?

13  A    Yes.

14  Q    And you were involved in putting the disclosure statement

15  together, correct?

16  A    Yes.

17  Q    And you did your best to insure that the information in

18  the disclosure statement was accurate, correct?

19  A    When requested to do so I did.

20  Q    And that's because you were aware that the disclosure

21  statement would be disseminated to parties entitled to vote on

22  the plan such as the Class 10 and 11 pension claimants,

23  correct?

24  A    Yes.

25  Q    And the disclosure statement was intended to provide them

1  with adequate information, to make an informed decision with

2  respect to voting on the plan, correct?

3  A    Yes.

4  Q    Now I'd like to show you Attachment 1 to your original

5  report which is Exhibit 462 017.  And this is a chart that was

6  attached to your expert report, correct?  It's the first

7  document in your binder if it's easier for you to look at it

8  there.

9  A    I just want to look a the hard copy for a minute.  It's

10 kind of hard to read this.  What's -- what's -- what's the tab

11 number?

12 Q    462.

13 A    462, okay.  Okay.

14 Q    I want to focus your attention on the column that reads

15 reduction of claims.

16 A    Yes.

17 Q    And there's percentages listed there.  For example under

18 COPS swap, 71%.  That means the percentage reduction of the

19 claim, so if you subtracted that number from 100 you'd get the

20 percentage recovery for the claimants, correct?

21 A    That's correct.

22 Q    And other than the COPS swaps the secured portion of the

23 UTGO and secured portion of the LTGO, each of the claims

24 listed here are unsecured claims, correct?

25 A    Well, the GO are all unsecured as well, so I'm not quite

1  sure I understand your question.

2  Q    Okay.  So which claims are secured?

3  A    Well, the swap -- frankly none of these claims are

4  secured.  They have tax -- they have tax requirements, but

5  they're not secured.

6  Q    Okay.

7  A    So I'm not sure I understand your question.

8  Q    Okay.  If you look at the chart there's a row that reads

9  pension UAL.  Do you see that?

10  A    I do.

11  Q    On the retiree obligations?

12  A    Yes.

13  Q    And the percentage -- percentage reduction is 54%.  Do

14  you see that?

15  A    I do.

16  Q    And does that translate to a recovery estimation of 46%

17  for those pension classes?

18  A    On this page, yes.

19  Q    Now is that -- and that combined number is lower than the

20  59 and 60% listed in the disclosure statement.  Is that

21  because it doesn't include the outside financed -- outside

22  funding that goes to those classes?

23  A    I'd have to go back and check the calculation.  I haven't

24  looked at this since July.

25  Q    Well, did you perform these calculations to get to these

1 reduction of claim percentages?

2 A    My team did along with Ernst & Young.  But I haven't

3 looked at this since July, so I can't answer your question.

4 Q    Okay.  Well, a similar chart is attached to your -- your

5 most recent amended --

6 A    Uh-huh.

7 Q    -- or supplemental expert report.

8 A    Uh-huh.

9 Q    You can put that one back up.  Did you look at the

10 numbers again when you prepared your supplemental report just

11 a few weeks ago?

12 A    Yes.

13 Q    Do you have any reason to believe that the city will not

14 receive the outside funding it's expecting?

15 A    Well, it's contingent upon the approval of this plan.  So

16 until the plan is approved, you know, one can't assume that

17 that bargain will survive.

18 Q    Were you aware that the city has taken the position that

19 outside funding should not be included in the recovery

20 percentage to compare it to recovery to other classes?

21 A    I am.

22 Q    And is that because the city doesn't believe those -- the

23 outside funding sources are city contributions?

24 A    That's my understanding.

25 Q    But the question of whether it's appropriate for outside

1  funding to be considered for purposes of comparing percentages

2  among various classes is really a legal question, right?

3  A    It's certainly not a financial one.

4  Q    Right.  So you're not a lawyer so you're not able to

5  really speak to that, correct?

6  A    Correct.

7  Q    And are you familiar with the pension restoration

8  mechanism under the plan?

9  A    In general but not specifically.

10 Q    So generally do -- do you understand that pension cuts to

11 retirees can be restored if investment returns exceed the

12 target, right?

13 A    Yes.

14 Q    And do the numbers on this chart reflect any -- or take

15 into account any pension restorations to the Class 10 and 11

16 claimants?

17 A    Not to my knowledge.

18 Q    Were you involved in the negotiations of the DIA

19 settlement?

20 A    Only in the initial stages.

21 Q    But you're familiar with the terms because we discussed

22 that earlier today, correct?

23 A    Yes.

24 Q    And the DIA settlement is dependent upon the transfer of

25 the DIA art collection as well as real estate to a charitable

1  trust, correct?

2  A    Correct.

3  Q    And the DIA art collection and the real estate is owned

4  by the city, correct?

5  A    Correct.

6  Q    And the city won't receive the proceeds of the DIA

7  settlement unless city owned assets are transferred to the

8  charitable trust, right?

9  A    Correct.

10  Q    And you're familiar with the terms of the state

11  contribution?

12  A    I know they're making a significant contribution to the

13  trust.

14  Q    Well, you were involved in securing the state

15  contribution, right?

16  A    Only at the early stages.

17  Q    Okay.  And the state contribution is conditioned on the

18  funding commitments in the DIA settlement and Court approval

19  of the DIA settlement, right?

20  A    Correct.

21  Q    So the conditions to the funding commitment for the DIA

22  settlement are also conditioned to the state contribution?

23  A    Correct.

24  Q    And because the DIA settlement is dependent on the

25  transfer of the DIA art and real estate in the city, the state

1  contribution is also dependent on the transfer of those

2  assets, right?

3  A    It's conditioned upon the approval of this plan of

4  adjustment.

5  Q    But the state contribution won't occur if the art and the

6  real estate isn't transferred from the city, correct?

7  A    If the plan is not confirmed there will be no transfer.

8  There will be no contribution by the state.  That's the

9  predicate condition.  That's the bargain I believe the state

10  made as a condition of making its investment into the trust it

11  formed.

12  Q    Okay.  So then the answer to my question is yes.  The --

13  there will be no state contribution if the art and the real

14  estate are not transferred from the city, correct?

15  A    Pursuant to this plan of adjustment.  We can't separate

16  one from the other.

17  Q    Are you aware that the city has argued that the actual

18  percentage recovery to Class 10 and 11 claimants is actually

19  lower than the percentages that we've just looked at in the

20  disclosure statement?

21  A    No.

22  Q    Now if we can go back and look again at this attachment

23  to your report.  This is the line that says other unsecured

24  liabilities.  And then 89% percentage reduction.  Yes, do you

25  see that?

1  A    I see that.

2  Q    Okay.  So this -- and does this correspond to the Class

3  14 general unsecured claimants in the plan, that line?

4  A    I believe so.

5  Q    And it shows the reduction in those claims at 89% which

6  means a recovery of 11% to those -- that class, correct?

7  A    Correct.

8  Q    And there's also a row for notes/loans payable.  Does

9  that correspond to the Class 13 Downtown Development Authority

10 claims?

11 A    I believe so.

12 Q    And the Downtown Development Authority was created by the

13 Detroit city council, correct?

14 A    Yes.

15 Q    And it funds its activities through ad valorem taxes,

16 correct?

17 A    I don't know.

18 Q    It's considered a component unit of the city, correct?

19 A    I don't know.

20 Q    But you would agree that Class 13 is made up of insider

21 claims, correct?

22 A    I don't recall exactly what those claims really were and

23 what gave rise to them.  It's been a long time since I looked

24 at Class 13.

25 Q    So you don't know, you can't tell the Court whether Class

1  13 claims are Downtown Development Authority claims?

2  A    I haven't looked at that class in a long time, so I don't

3  have any recollection right now what those claims really are

4  and what gave rise to them.

5  Q    Well, do you know what class Downtown Development

6  Authority claims are included within?

7  A    I'd have to go back and review the plan to answer that

8  question accurately.  I haven't looked at it in a long time.

9  Q    Would you agree that the Class 13 claims, or the Downtown

10 Development Authority claims are insider claims?

11 A    No.

12 Q    Well, the Downtown Development Authority was established

13 by the Detroit city council, correct?

14 A    I'll take your word for it.  I don't recall the nature of

15 these claims.  I haven't looked at this in a long time and I'm

16 sorry I can't answer your question directly.

17 Q    Okay.  Well, why don't we look at the disclosure

18 statement at Page 41.  I believe that's Page 41 of the

19 document.  Page 41.  That's not it.

20      MR. CULLEN:  What page of the document do you want

21 to look at?

22      MS. O'GORMAN:  It's Page 41 I think on the bottom of

23 the document.

24      MR. CULLEN:  Page 41.  It's 56 --

25      THE COURT:  Do we have what you want on the screen

1  now, Ma'am?

2          MS. O'GORMAN:  I don't believe so.

3          THE COURT:  Okay.

4  Q    Can I read you something from the disclosure statement?

5  It says in July 2013, Olympia proposed a project to build a

6  new arena in downtown Detroit which would replace Joe Louis

7  Arena as the home of the Red Wings along with a mixed use

8  residential retail and entertainment district.  The proposed

9  project involved a cooperative arrangement Olympia and the

10 City of Detroit Downtown Development Authority, the DDA.  The

11 DDA was created by the Detroit city council by ordinance

12 number of 119H on May 20th,1976.

13          MR. CULLEN:  Objection, for just a moment.  Is -- is

14 this meant to refresh the witness' recollection?  How -- what

15 -- what is happening here?

16          MS. O'GORMAN:  Well, I'd like to --

17          THE COURT:  Good question.

18          MS. O'GORMAN:  He said he didn't recall what the DDA

19 was and what the question --

20          THE COURT:  What -- what are you trying to

21 accomplish here?

22          MS. O'GORMAN:  I'm just trying to question him about

23 the DDA.  He says it doesn't --

24          THE COURT:  Well, but you're -- you're just reading.

25 What -- why are you reading?

1          MS. O'GORMAN:  To refresh his recollection.

2          THE COURT:  Okay.  That's not the proper way to do

3    that.  The way to do it is to show him -- hand him the

4    document, let him read it and then ask him if that refreshes

5    his recollection.

6          MS. O'GORMAN:  It seems to be I've disconnected my

7    notes.  I will just move on for now.

8    Q    If we can look back at the chart that was -- we were

9    looking at before.  Okay.  Okay.  I'd like to show the witness

10   the disclosure statement, Page 99.

11         Do you see at the top of the page there is a discussion

12   about the Downtown Development Authority?

13   A    Yes.

14   Q    And does that refresh your recollection about the

15   Downtown Development Authority?

16   A    No.

17   Q    Does it refresh your recollection as to whether the

18   Downtown Development Authority is the Class 13 claimant?

19   A    No.

20   Q    Okay.  So going back to this chart, under the notes loans

21   payable class.  There is a reduction of 89% for those claims,

22   so 11% recovery, correct?

23   A    Yes.

24   Q    And that's the same as the Class 14 general unsecured

25   claims, correct?

1  A     Yes.

2  Q     And under the UTGO, the chart shows a reduction of 26%,

3  correct?

4  A     Yes.

5  Q     So that means a recovery of 74% for that class, correct?

6  A     Correct.

7  Q     And under LTGO it shows a reduction of 66%, correct?

8  A     Correct.

9  Q     And that's a recovery of 34%, correct?

10  A     Correct.

11  Q     Now for the COPS it shows a reduction of 89%.  That means

12  a recovery of 11%, correct?

13  A     Correct.

14  Q     Of the recovery percentage is that different for COPS

15  holders, correct in light of the Syncora settlement?

16  A     Well, I'd have to go back to check the page of my

17  supplement that shows what the differences would be.

18  Q     Okay.  So why don't we do that?  Let's look at Exhibit A

19  to your supplemental declaration.  That's Exhibit 744 023 and

20  024.  And looking at the percentage recovery for the COPS, it

21  now has an 83% reduction in claims, correct?

22  A     What's the -- is this the -- both Syncora and FGIC

23  settling or just Syncora?

24  Q     This is the Syncora and FGIC settlement, the first page.

25  A     Okay.  Because there are two pages.

1  Q    Right.  Then we'll talk about the second page in a

2  moment.  So there's an 83% reduction that translates to a 17%

3  recovery to COPS class, correct?

4  A    Correct.

5  Q    And that recovery percentage is derived from the

6  consideration offered to all the claimants in the COPS class

7  which would include the B notes, the C notes, and the

8  settlement credits, correct?

9  A    Correct.

10 Q    Are you familiar with the consideration to Syncora under

11 the plan in the form of the tunnel lease, the development

12 agreement, and the grand circus option?

13 A    Yes.

14 Q    And the chart doesn't take that into consideration in

15 calculating the COPS recovery, correct?

16 A    Correct.

17 Q    Now if we could look at the next page which is the

18 Syncora only settlement.  Under their scenario it shows an 88%

19 reduction to the COPS which would mean a 12% recovery,

20 correct?

21 A    That's correct.

22 Q    And that 12% takes into account that the non-settling

23 COPS parties will only get the 11% originally offered and

24 Syncora will get some higher amount, correct?

25 A    Well, they'll get their pro rata share of the B notes and

1  C notes and the other settlement assets.

2  Q    Who will?

3  A    Syncora will.  I'm sorry, this is the Syncora settlement

4  page.

5  Q    Right.  This is the Syncora only settlement page.

6  A    Right.  So this includes what they would receive pursuant

7  to the settlement.

8  Q    But the COPS the 12% here is a combination of the Syncora

9  COPS claim and other COPS claims, correct?

10  A    That's right.

11  Q    So the 12% is the average that all of the COPS holders

12  will receive, right?

13  A    That's correct.  That's why the earlier page shows the

14  recovery would be 17% or rather 83% comparing it to this

15  because we were seeing both Syncora and FGIC have opted in.

16  This only includes Syncora and therefore the reduction is 88%

17  not 83%.

18  Q    Right.  So even under this scenario Syncora would still

19  receive the 17% because they've settled, correct?

20  A    Well, this is an average across the entire class.  If

21  you're asking me what Syncora is receiving relative to its

22  claim, I'd have to go back and check the math, but for this

23  purpose we can stipulate they would receive a 17 cent

24  distribution as a settling claim holder.

25  Q    Okay.  So 17% of their claims?

1  A    Correct.

2  Q    Now in June 2013 you participated in putting together a

3  restructuring proposal for creditors, correct?

4  A    Yes.

5  Q    And if we could just put up the cover page of Exhibit 33.

6  That's the proposal, correct?

7  A    Correct.

8  Q    And -- and under that proposal all unsecured claims were

9  pooled together and given the same -- or the proposal was that

10 they would all receive the same 12% recovery, correct?

11 A    That was our initial proposal, that's correct.

12 Q    And in that proposal you assume that all unsecured claims

13 would be in the same pool, right?

14 A    Correct.

15 Q    And that included the pension claims, the LTGO, and UTGO

16 claims, the COPS claims, and the general unsecured claims,

17 right?

18 A    You're omitting the OPEB claims.  They would also be

19 included.

20 Q    Okay.  All at 12%.  And in fact you're of the view that

21 outside of the Chapter 9 proceeding pension claims have the

22 same remedy and rights as any unsecured creditor, correct?

23 A    I'm sorry, could you repeat the question?

24 Q    Outside of a Chapter 9, pension claims would have the

25 same priority as any other unsecured claim, correct?

1  A    That's my understanding.

2  Q    And so it's purely a financial matter Class 14 unsecured

3  claims have the same status as the Class 10 and 11 pension

4  claims and the Class 12 OPEB claims, right?

5  A    You're referring again to the DDA claims, the convenience

6  claims class?  Just be specific what Class 14 are you

7  referring to?

8  Q    Class 14 of the general unsecured claims.

9  A    Thank you.  Yes, that's correct.

10  Q    But that's not -- the proposal to creditors is different

11  than what is now reflected in the plan, correct?

12  A    After individual negotiations with our respective

13  creditors we have different settlements with each, that's

14  correct.

15  Q    Right.  So -- so things changed materially, correct?

16  A    Yes.

17  Q    And that's because certain unsecured creditors felt that

18  they should get more than everybody else, right?

19  A    At the beginning of the case, all of the unsecured

20  creditors felt they should get more than everybody else.

21  Q    Right because -- some -- some felt they were more special

22  than others I think you said at your deposition, right?

23  A    It's like well be gone for creditors, that's right.

24  Q    And the pension recoveries to the plan as we looked at

25  before are higher than the 12% set forth in June 2013, right?

1  A     Correct.

2  Q     And they're 59 and 60%, right?

3  A     Including the contributions of the grand bargain, that's

4  correct.

5  Q     And the LTGO and UTGO recoveries are also higher than set

6  forth in your June proposal, right?

7  A     Yes.

8  Q     And those increased recoveries are the result of

9  negotiations and settlements, right?

10 A     Yes.

11 Q     And until the filing of the most recent plan, the COPS

12 percentage recovery in the disclosure statement was –– was

13 listed as 0 to 10%, do recall that?

14 A     Yes.

15 Q     And you believe that was justified because you felt that

16 the COPS claims had a lesser status than other claims because

17 they were indirect obligations of the city, right?

18 A     That wasn't the only reason.

19 Q     Excuse me?

20 A     That wasn't the only reason.

21 Q     But that was one of the reasons, right?

22 A     Yes.

23 Q     Now the –– but the general unsecured claims in Class 14

24 are made up of claims that are direct obligations of the city,

25 right?

1  A    That's my understanding.

2  Q    So the same rationale for providing a lesser recovery to

3  the COPS claims wouldn't apply to the general unsecured

4  claims, right?

5  A    No.  I already testified there were other reasons why the

6  COPS claims were viewed to have a lower recovery status than

7  the other claims.

8  Q    Well, what were those other reasons?

9  A    Well, there were serious questions about whether the

10 original transactions that gave rise to COPS were in fact

11 legal.  And therefore the allowed claim we provided in the

12 plan for those claims addressed that factor in -- in terms of

13 arriving at the estimated recovery percentage.

14 Q    Okay.  And those factors didn't apply to general

15 unsecured claims, correct?

16 A    Not to my knowledge.

17 Q    You don't consider Class 14 to be subordinated claims,

18 correct?

19 A    No.

20 Q    And if we compared the charts attached to your original

21 report, you know, the first chart that you looked at, Exhibit

22 462, and then the charts attached to the amended report,

23 Exhibit 744, the only changes between the two are the

24 recoveries to the COPS class, correct?

25 A    I believe so.

1  Q    And the change reflects the enhancements that are offered

2  to the COPS class under the new plan, correct?

3  A    Yes.

4  Q    And that's the result of a settlement with Syncora,

5  right?

6  A    Yes.

7  Q    So out of all of the categories of unsecured claims the

8  Class 14 general unsecured claims will see the -- receive the

9  lowest percentage of recovery, correct?

10 A    Yes.

11 Q    And there's no official committee to advocate for the

12 interest of unsecured creditors, is there?

13 A    No.

14 Q    I'd like to talk to you about the -- the new B notes.

15 And the -- and then the exit financing.  The exit financing

16 has a taxable and a tax exempt piece, right?  We talked about

17 that?

18 A    Yes.

19 Q    And both of those pieces are secured by a lien on the

20 income tax revenue of the city, correct?

21 A    Yes.

22 Q    And those tax revenues will be segregated into an account

23 dedicated solely to that debt service, correct?

24 A    Yes.

25 Q    So the risk of non-payment on the exit financing is very

1  low, right?

2  A    It's low.

3  Q    And the pre-syndication short term interest rate you

4  estimated to be about 5 1/2%, correct?

5  A    Correct.

6  Q    And then the syndication will be at a fixed rate when

7  that occurs, right?

8  A    Correct.

9  Q    And short term rates are generally lower than long term

10 rates, correct, as a general market principal?

11 A    Yes.

12 Q    So the post-syndication rate is likely to be higher than

13 the pre-syndication rate which is a short term rate, correct?

14 A    No.

15 Q    Why is that?

16 A    We're paying Barclays for the option to price the long

17 term debt 150 days after the city emerges from bankruptcy.

18 Think of it as a bridge loan.

19      So the price of the bridge loan which is 150 days long is

20 really a function of the service we were receiving from

21 Barclays to facilitate the emergence from bankruptcy.  Then

22 that financing will be replaced with long term permanent

23 financing in a publicly placed transaction after syndication

24 and credit review by the agencies.

25      So the rate on a short term basis is a bridge loan.  It's

1  a different product, a different purpose than the long term

2  financing.

3  Q    Well, in your report you say that the post-syndication

4  rate is projected to be 5.75%, correct?

5  A    That is a assumption which is conservative in my

6  judgment.

7  Q    And 5.75 is higher than 5.5, correct?

8  A    Yes.

9  Q    Now under the plan Class 14 claimants will receive a pro

10  rata share of the new B notes to be issued by the city,

11  correct?

12  A    That's right.

13  Q    And you have not done an analysis of the value of the B

14  notes from a market point of view, correct?

15  A    No.

16  Q    But you did do an analysis using a 5% discount rate to

17  value the B notes for purposes of estimating percentage

18  recoveries to classes receiving the new B notes under the

19  plan, right?

20  A    I'm not sure I understand your question.

21  Q    Well, we talked before about the 5% discount rate that

22  you used to value the recoveries to the -- to the claimants,

23  correct?

24  A    We didn't value recoveries to claimants.  The 5% discount

25  rate is the discount rate that we believe the city should be

1  able to borrow capital for at on a long term basis after

2  emergence from bankruptcy.  That's the discount rate.

3      I'd also further point out I testified that 5% should be

4  thought of as the mid-point of a range around where the city

5  should be able to borrow and it could be higher or lower than

6  that in a range.

7  Q   But you used the 5% discount rate to value the plan

8  recoveries, correct?

9  A   That 5% discount rate has been used consistently since

10  the beginning of this process last year by E & Y after

11  consultation with us for us for the purpose you've described.

12  Q   Okay.  And the -- the B notes have a 30 year maturity,

13  correct?

14  A   Correct.

15  Q   And longer maturities generally lead to higher discount

16  rates, correct?

17  A   The discount rate is applied across this payment stream

18  through maturity, but the repayment stream relative to the B

19  notes include amortization which begins in year 11.  So in

20  fact the discount rate is the same discount rate across all of

21  those payments.

22      Think of it as an average cost of debt.  If you were to

23  separate out the separate payments of the B note into one year

24  increments, payments due in ten years should have a much lower

25  discount rate than payments in 30 years.  That's just basic

1  corporate finance.

2  Q    So the --

3  A    So the same 5% will apply across the instrument.

4  Q    So the interest rate on the B notes is 4% for 20 years,

5  and 6% for years 21 through 30, right?

6  A    Correct.

7  Q    And that's a lesser interest rate than the rate at which

8  the city expects to obtain exit financing, correct?  Currently

9  the 4% is, right?

10 A    It's -- it was a negotiated interest rate structure with

11 creditors.  They understood the city's desire to minimize debt

12 service payments during the first ten years after emergence

13 and we agreed that we would set a lower coupon for the first

14 period and then let it go up to a higher number to compensate

15 them for having giving us a below market rate for the first

16 ten years.

17      So the coupon rate is somewhat independent from the

18 discount rate.  It's just a way of managing the city's

19 feasability requirements along with the creditors' legitimate

20 rights to have an instrument that is worth, you know,

21 effectively near par.

22 Q    All right.  But you would agree that the 4% rate for the

23 first 20 years is a below market rate, right?

24 A    Today.  But it may not be that way in a year or two.

25 Q    Okay.  And it's true that even though the exit financing

1  carries with it a lower payment -- that the exit financing

2  carries a lower payment risk on the new B notes, right?

3  A    Yes.  And a large part of that is due to the shorter

4  tenure of the exit financing.

5  Q    And also the secured nature of the exit financing, right?

6  A    Right.

7  Q    Now you didn't perform any analysis of the post emergence

8  credit rating of the new B notes based on frameworks that are

9  used by credit rating agencies, did you?

10  A    No.

11  Q    And would you be surprised to learn that an analysis

12  using those frameworks results in a rating of BA3 under the

13  Moody's framework and BB under the S & P framework?

14          MR. CULLEN:  Objection, foundation.

15  Q    Well, are you aware of anybody performing that analysis?

16  A    No.

17  Q    Have you seen Mr. Spencer's report in this case?

18  A    Yes.

19  Q    Are you aware of Mr. Spencer performing that analysis?

20  A    No.

21  Q    You didn't read that part of his report?

22  A    No.

23  Q    Okay.  And I'd like to ask you about the new C notes.

24  Under the plan the city will issue C notes to settling COPS

25  claimants, right?

1  A    Yes.

2  Q    And the C notes have different terms than the B notes,

3  right?

4  A    Yes.

5  Q    And the C notes mature in 12 years as opposed to 30 years

6  for the B notes, right?

7  A    Correct.

8  Q    And notes with shorter maturities would have less payment

9  risk, right?

10  A    Yes.

11  Q    And the new C notes amortize principal with the first

12  annual payment, correct?

13  A    Correct.

14  Q    And the B notes are interest only, right?

15  A    Correct.

16  Q    So the amortization schedule under the new B notes

17  presents less of a risk of non-payment of principal than the

18  amortization -- amortization schedule under the new B notes,

19  right?

20  A    I'm not sure I understand your question.

21  Q    Well, the -- the C notes are -- the principal is being

22  paid or part of it immediately and for the B notes it's not

23  being paid for the first ten years, right?

24  A    Yeah.  But you have to take into account the source of

25  the revenues being used to repay both obligations.

1  Q    Well, the C notes are paid from parking revenues, right?

2  A    That's right.

3  Q    So a segregated fund for payment of the C notes exists,

4  right?

5  A    And the notes can also be repaid by the sale of the

6  parking garages and the Joe Louis Arena which would mean it's

7  no longer a burden on the city.

8  Q    So the B notes are just general obligations of the city,

9  right?

10  A    They're unsecured obligations of the city, that's

11  correct.

12  Q    And the C notes are tax exempt notes, right?

13  A    I'm -- I'm sorry, could you --

14  Q    The C notes are tax exempt notes, correct?

15  A    I believe so, but I have to go back and check.

16  Q    And the B notes we know are taxable, right?

17  A    That's right.

18  Q    And so all in all you would agree that the C notes are

19  significantly less risky than the B notes, right?

20  A    I'd stipulate they're less risky.  I'm not sure what

21  significant means.

22  Q    And the interest rates on the C notes is 5%, right?

23  A    Correct.

24  Q    And on the B notes it's 4% for 20 years, right?

25  A    Going to 6%.

1  Q    But 4% for the first 20 years, a below -- what you said

2  was a below market rate, right?

3  A    But that's irrelevant.  The question is going to be what

4  is the average cost of the debt.  If it's 4% for the first

5  period, going to 6%, the right way to think about it is what's

6  the average cost of capital.  Whether you pay a low rate at

7  the beginning and a high rate later, it's the blended cost

8  that matters, not the initial rate.

9  Q    Have you calculated the blended cost of the B notes?

10  A    I think it's around -- a little under 5%.

11  Q    Well, it would have to be.  It's a 30 year note and 20

12  years were 4%.

13  A    But it's more complicated than that because the sinking

14  fund payments begin in year 11.  So you're -- for those

15  payments you're not getting the benefit of the higher interest

16  rate.  So it's a little bit more complicated than the simple

17  arithmetic average.

18  Q    Okay.  But we can certainly agree that the 5% rate paid

19  by the new C notes is higher than the blended rate on the B

20  notes?

21  A    Again, taking into account the impact of the sinking

22  fund, yes.

23  Q    Okay.  And the Class 14 claimants won't receive any of

24  the C notes, right?

25  A    Correct.

1  Q    Now you mentioned that there were negotiations with

2  certain creditors regarding the interest rates on the B notes?

3  A    Yes.

4  Q    Who did you have those discussions with?

5           MR. CULLEN:  Objection to the extent it's calling

6  for something under the mediation privilege, Your Honor.  The

7  mediation order.

8           THE COURT:  That objection is sustained.  But please

9  answer the question other than as it pertains to mediation.

10  A    I -- I can't answer the question other than in mediation,

11  Your Honor.

12           THE COURT:  All right.

13           MS. O'GORMAN:  Okay.  That's all I have.  Thank you.

14           THE COURT:  Okay.

15           MR. WAGNER:  Your Honor, I have no cross.

16           THE COURT:  All right.  Any other cross examination?

17  All right, sir.

18                    REDIRECT EXAMINATION

19  BY MR. CULLEN:

20  Q    I just have one.  Mr. Soto asked you probably for the

21  twelfth time, to affirm that you didn't do a dismissal

22  analysis.  Why?

23  A    Well, the condition of the city prior to bankruptcy, I --

24  I thought addressed very well what would happen if the case

25  had been dismissed, we'd be back to what we had before plus

1 we'd have the further burden of having to finance the run off

2 of the swap settlement and find a way to pay the post-petition

3 financing off.

4 Q    And what relationship does that have to a dismissal

5 analysis?

6 A    Well, I think the answer is how would the -- how would

7 the city be structured if we had a dismissal of the case.  All

8 of a sudden the 10,000,000,000 in claims that we had before

9 would come back on.  We'd have to service those somehow plus

10 we'd have the obligation to be incurred during the case to

11 pay.

12        MR. CULLEN:  That's all I have, Your Honor

13        THE COURT:  What is the disadvantage to the city of

14 granting a security interest in the income tax revenues in

15 this exit financing?

16 A    There are two, Your Honor.  The first one is -- and again

17 in a theoretical sense.  If there is a future default by the

18 city under the terms of this new financing, in theory the

19 secured creditors could block the receipt of income tax

20 revenues over and above their debt service going into the

21 general fund.  That is risk.  That's why they want the

22 security interest of course.

23        The second is a more general issue that those income tax

24 revenues are not directly available to the city for other

25 borrowings.  So if there was in fact a surplus of income tax

1  revenues over and above what we currently project, that

2  surplus would not be available to service other debt directly

3  because it would have been pledged to these creditors.

4       THE COURT:  And -- and why did you decide that those

5  risks were worth taking on the part of the city here?

6  A    Well, when you look at the pro forma balance sheet of the

7  city after hopefully the emergence from bankruptcy, the credit

8  quality of the city will be dramatically improved from what it

9  had been before and therefore the prospective risk of default

10  which would lead to the worse case scenario of losing access

11  to those revenues, I regarded and so advised the emergency

12  manager it would be very very low.

13       In particular because the city's ability to use the

14  re-investment budget on a short term basis to deal with any

15  short term issues would mean that the city under almost any

16  scenario would never have a default under the terms of this

17  new debt.  And therefore even though there's a theoretical

18  risk it could lose access to those revenues, as a practical

19  matter unless there was truly substantial and permanent

20  impairment of the city's tax base, it was a risk worth taking

21  in order to achieve the lowest possible cost of financing.

22       THE COURT:  What impact might the granting of this

23  security interest have on the city's ability to access credit

24  markets in the future on an unsecured basis?

25  A    Well, we took that into account, Your Honor, in our --

1  the design of the balance sheet at the beginning of last year.

2  We wanted to put the city in a position where it would not

3  have to go back to the markets for at least ten or 20 years.

4  That's very unique among large American cities.

5      So even though we believe that having the secured

6  financing eliminates a potential source of revenue to support

7  unsecured credit potentially, the city is not anticipated to

8  be a borrower for a very long time.

9      Now that means that the time when the city should want to

10 get rid of the security interest is when the quality of the

11 city has so improved, call it now a single A borrower that as

12 soon as it can call those bonds and refund them it should.

13         THE COURT:  When is that?

14 A    I believe under this financing we have five years.  I

15 remember there are two different pieces.  The taxable portion

16 as I recall, matures in year eight.  But it's supposed to be

17 the smaller part of the facility.  And then the taxes portion

18 matures in 2015 -- I'm sorry, 15 years, excuse me.

19     So that means that the city in a relatively short amount

20 of time for a city that is, should be able to redeem or call

21 that debt if it deems it appropriate and replace it with

22 unsecured bonds.  And it doesn't have to do anything for the

23 first ten years which is one of the reasons we're confident

24 that this is the right financing for the city.

25         THE COURT:  Did you solicit requests -- I should say

1 proposals, did you solicit proposals for unsecured financing?

2 A    We did.  In our original request for proposal we actually

3 had a sentence that said and we are interested in any other

4 proposals you may wish to have on an unsecured basis.  We did

5 ask the market for that.

6        THE COURT:  But that request for proposals did

7 specifically offer this security interest, didn't it?

8 A    It did.

9        THE COURT:  Well, why would any creditor offer you

10 unsecured credit if you were offering to give them a secured

11 -- a security interest?

12 A    They wouldn't because we had already given the swaps and

13 they knew that.  We'd given it to the post -- post-petition

14 financing source.  So they knew we already granted it, they

15 weren't willing to let us give it up in exchange for this plus

16 the facts and circumstances of this offering are that we had

17 to raise this money while we're still in bankruptcy.

18     So we don't have the benefit of a prospective and formal

19 credit rating process which is now anticipated as part of this

20 exit financing.  We had to have certainty of financing to exit

21 bankruptcy.  But again we mitigated that by the fact that

22 within a relatively short period of time if the city's

23 condition has improved, it will have the right to call these

24 bonds and eliminate the security feature and replace it with

25 unsecured borrowings if it's appropriate.

1          THE COURT:  Okay.  But what -- what is your judgment

2  on whether exit financing is available on an unsecured basis?

3  I need an answer to that question because of the operation of

4  Section 364 of the Bankruptcy Code as -- as you undoubtedly

5  know.

6  A    I do understand that, Your Honor.  Unsecured financing I

7  believe would be available to the city but at a higher cost

8  than we've been able to obtain from this process.

9          THE COURT:  Do you have an opinion on how much

10  higher cost?

11  A    Yes.  I think based on this structure of this debt, if

12  you'd let me stipulate to that.

13          THE COURT:  Uh-huh.

14  A    And without the security feature, we -- the city might

15  have had to pay anywhere from 100 to 150 basis points more for

16  unsecured financing.  Again, based on these specific facts.

17          THE COURT:  Uh-huh.  And what does that translate to

18  in terms of dollars?

19  A    Well, assuming the exit financing is $325,000,000 and

20  let's assume, if you don't mind, that the cost of the debt on

21  a long -- on a short term basis because starting with the

22  variable piece is 7%.  Because remember I indicated before

23  5 1/2 is where they were on a secured basis, add that.  So

24  that would be an incremental cost of 150 basis points of call

25  it $6,000,000 a year.

1          THE COURT:  How much, sir?

2    A    Six million dollars a year.  Three hundred and

3    twenty-five million times 150 basis points.  It's actually

4    less, I'm sorry.

5          THE COURT:  I'm sorry?

6    A    It's less, I'm sorry.  I did that too fast.

7          THE COURT:  What is -- what is your best judgment on

8    the dollar amount then?

9    A    It would around -- a little under $5,000,000.  If one had

10   to do that.  But remember that's a short term bridge facility

11   rate.  I'm not stipulating what the rate would be paid by the

12   city to place public unsecured debt given the facts and

13   circumstances of the case.

14         THE COURT:  Well, do you have an opinion on that

15   question?

16   A    I do.  I think that a -- a properly organized road show,

17   presentation of the city's credit by the responsible officers

18   of the city supported by an effective credit rating agency

19   approval process, I believe will allow the Detroit to borrow

20   at below those rates.

21        I believe this credit will be well accepted by the

22   marketplace because when you look at the balance sheet of the

23   city and the prospective financial condition of the city, I

24   think it's actually a much better credit on the numbers than

25   many other cities that might even have a higher credit rating

1  to have not dealt with their unfunded pension and OPEB

2  problems the way Detroit has done.

3      And that plus the fact that Detroit uniquely does not

4  have to go back into the market to borrow to repay maturing

5  debt which every other city routinely has to do.  There's

6  another important element that supports the credit story.

7      And therefore despite the fact that the new Detroit story

8  has not yet been vetted by experience, the fact that we are

9  emerging from a very difficult process, I believe that those

10 factors are very important plus the fact that Detroit will

11 have an oversight commission which is something it has not had

12 before.

13     The fact that market conditions in the municipal market

14 today are very favorable for issuers.  There's a lack of good

15 quality investment opportunities for municipal buyers.  I

16 believe all those factors would lead one to conclude that the

17 exit financing will be priced below the levels indicated in

18 our projections, but I can't tell you exactly what it will be.

19 But I believe it will be lower.  This is a much higher credit

20 than the agencies would recognize.

21         THE COURT:  The opinion you just gave me assumes a

22 security interest in the public financing?

23 A    No.  You asked me not to.

24         THE COURT:  Okay.  I just wanted to clarify that.

25 But -- but again to -- to be sure about this --

1  A    Uh-huh.

2         THE COURT:  The exit financing that the city wants

3  me to approve for the public piece of it, does include

4  security?

5  A    Yes.

6         THE COURT:  So then the question becomes why should

7  the Court approve that longer term exit financing with

8  security when it appears from your testimony it's not

9  necessary for the city to get a good interest rate?

10  A    Well, Your Honor, offering security always -- well most

11  of the time allows the issuer to borrow at the lowest possible

12  cost.  So in order to minimize the borrowing costs, adding

13  that security feature which I've also testified does not have

14  any immediate consequences for the city's long term ability to

15  sustain itself, to us seems like a reasonable thing to do.

16         THE COURT:  All right.  So what -- what is your

17  judgment about what the additional borrowing cost would be on

18  the public offering without security?

19  A    If I could draw an analogy, Your Honor.  In the --

20         THE COURT:  Well, I'd just like you to give me a

21  number.

22  A    I'm sorry.  This is on the public place pricing.

23         THE COURT:  Yes, please.  Then I'll let you give me

24  an analogy.  But I want to start with your number.

25  A    Sorry.  This is such a unique situation, I'm -- okay.

1        THE COURT:  Right.  But you're the city's witness.

2   A    I believe that if the public market were offered the

3   opportunity to price the exit financing on a secured versus

4   unsecured basis and that's the only difference.

5        THE COURT:  Uh-huh.

6   A    And everything else is as we've stipulated.

7        THE COURT:  Uh-huh.

8   A    The difference would be anywhere from 25 to 50 basis

9   points and no more.  And that's drawing an analogy if I may be

10  permitted to point this out in the corporate market, the

11  normal spread from secured to unsecured senior paper is around

12  the same range.

13       THE COURT:  Uh-huh.

14  A    And I'd also stipulate that the short duration of this

15  financing, the importance of the oversight commission to

16  insure the credit will sustain itself are very important

17  factors that would have to be considered by the market.

18       THE COURT:  Uh-huh.  So again I ask what the dollar

19  savings is approximately.

20  A    Uh-huh.

21       THE COURT:  By the offer of security.

22  A    Well, 50 basis points if you could just assume that's the

23  end of that spread.

24       THE COURT:  Okay.

25  A    That would be not an immaterial note.  That would be 1.13

1  million dollars a year for on an average of ten years.  That's

2  a lot of money.

3         THE COURT:  So that's one tenth of 1% of the city's

4  $1,000,000,000 annual budget?

5  A    Everything we can save matters, Your Honor, yes.

6         THE COURT:  But the answer to my question -- my math

7  is right?

8  A    Yes, your math is right.

9         THE COURT:  I need confirmation of that, you know,

10  I'm -- I'm not an accountant.  And your judgment is that that

11  $1,000,000 a year approximate savings to the city --

12  A    Uh-huh

13         THE COURT:  -- is worth it because the city doesn't

14  give up anything that it might need later by granting this

15  security interest?

16  A    Yes.

17         THE COURT:  If the spread between secured and

18  unsecured were 25 basis points instead of the 50 that we

19  hypothesized here --

20  A    Uh-huh.

21         THE COURT:  -- the savings would drop to 500,000 a

22  year?

23  A    That's correct.

24         THE COURT:  All right.  That's all the questions I

25  have.  Any follow up on either side?

 1          MR. CULLEN:  Briefly, Your Honor.

 2          THE COURT:  Sure, go ahead.

 3   BY MR. CULLEN:

 4   Q    In response to this topic we were just discussing, if I

 5   could see Page 12 of City's Exhibit 642.  That's 11.  Twelve

 6   if I could, please.

 7        All right.  In the first column there it says, Barclays

 8   alternative 2, unsecured.  What -- what does that reflect,

 9   sir?

10   A    Well, as I've already testified, we did ask people to

11   give us alternatives that might be unsecured and Barclays

12   provided this one as part of their submission.

13   Q    And if you'll -- if you could look down that list of

14   factors, could you tell me or do you recall why you didn't --

15   in addition to anything you told the Judge, why you didn't

16   pursue this one at that time?

17   A    It was too expensive.

18   Q    And could you --

19          THE COURT:  Can you be more specific about that?

20   A    I'm sorry.  If you look at the third box from the top

21   which is pricing.

22          THE COURT:  Uh-huh.

23   A    You'll note that they were proposing -- again, this is

24   the initial responses we received back.  That they would price

25   taxes and bonds at 7 1/4, assuming an 11 year maturity.  And

1 if you go back to the other prior page which shows alternative

2 1 -- no, you went the other way.  Right, right.  No, there you

3 go.

4      You'll see that the pricing they're reflecting on taxes

5 and paper was much lower.  They were effectively proposing

6 5.75 for ten year paper.  So the spread that they were looking

7 to was called 150 basis points.

8      Which is again, I testified earlier that the spread might

9 be 150 basis points, the unsecured and secured and that's

10 where that came from.  Because they're proposing 7 1/4.

11           THE COURT:  No, but is this on -- is this on the

12 private placement, or is this on the subsequent public

13 placement?

14 A    Well, this was their public placement idea.  And remember

15 this is before we went back to negotiate with them on the

16 structured delayed offering.  So this was just indicative

17 pricing in July.

18           THE COURT:  Uh-huh.

19 A    When we received initial proposals back.

20           THE COURT:  Okay.

21 A    And the only interesting about this is --

22           THE COURT:  All right.  So your -- your testimony is

23 that what Barclays -- Barclays offered in terms of secured

24 versus unsecured, the pricing difference is 200 basis points

25 approximately.

1 | A    At that point, yes.

2 |          THE COURT:  At that point.

3 | A    Yes.

4 |          THE COURT:  But here today your thought is that if

5 | you actually were to go in the market --

6 | A    Uh-huh.

7 |          THE COURT:  The differential would be more like 25

8 | to 50?

9 | A    Yes.  Assuming a properly conducted road show and credit

10 | process, yes.

11 |          THE COURT:  Well, is there any reason to suspect

12 | that assumption?

13 | A    No.

14 |          MR. CULLEN:  Thank you, Your Honor.  That's all.

15 |          THE COURT:  All right.  I think that's all we'll do

16 | for today.  Sir, you are excused.

17 |          MS. O'GORMAN:  Your Honor, could I ask a question

18 | about --

19 |          THE COURT:  Yes.  Yes, of course.

20 |                    RECROSS EXAMINATION

21 | BY MR. SOTO:

22 | Q    Just so I understand it, if you could put --

23 |          THE COURT:  Just get -- get to the microphone and

24 | then start your question.

25 |          MR. SOTO:  Sure.  Ed Soto.

1  Q    I just want to understand what we're looking at.  In the

2  -- what you'd call the unsecured one, can you explain -- I

3  mean -- and I'm sure you can, Mr. Buckfire, but I'm trying to

4  -- that's the secured one.  Now you're going to go the one you

5  first testified about which you said was the unsecured

6  alternative.

7          MR. CULLEN:  Page 12.

8  Q    Which is city -- which is City Exhibit 642.  There it is.

9  So -- so as I'm looking at it the difference between the

10 secured and the unsecured, the secured was directed tax

11 revenue was securing it, correct?

12 A    Correct.

13 Q    And what you're calling the unsecured would be a limited

14 tax obligation bond so that there would be a limitation on

15 what taxes were obligated to pay it.

16 A    That's right.

17 Q    But it still wouldn't be a generally -- it wouldn't be in

18 the same form as the new B notes, a general fund bond,

19 correct?

20 A    Correct.

21          MR. SOTO:  Thanks.  Thank you, Your Honor.  No other

22 questions.

23          THE COURT:  Okay.  You are excused, sir.

24 A    Thank you, Your Honor.

25          (WITNESS KENNETH BUCKFIRE WAS EXCUSED AT 4:57 P.M.)

1          THE COURT:  Is there something you wanted to bring

2   up?

3          MR. SHUMAKER:  Your Honor, I know we've been through

4   this afternoon I'm sorry to bring up some housekeeping, but I

5   do think it's important for -- for notice reasons --

6          THE COURT:  Sure, go ahead.

7          MR. SHUMAKER:  -- to give you where we are on the

8   witness order.  The -- the UAW day going away and then today's

9   mysterious lighting snafu has kind of wreaked a little bit of

10  havoc with our schedule.

11      We were actually thinking that Mr. Orr would have spent

12  most of today on the stand.  We have a couple of witnesses

13  tomorrow that with your indulgence, we would put on before Mr.

14  Orr took the stand.  And we wanted to again ask your blessing

15  and then notify the objectors of that.

16      The two individuals are -- are Mr. Gilbert which we would

17  hope to do first.  And then we know that there are two

18  arguments tomorrow.  The -- the motion to dismiss the -- the

19  counter claims in the -- in the swaps, and then the MIDD

20  motion perhaps those --

21          THE COURT:  Well, there's a little more than that.

22  There are a series of objections to claims.  Now I don't

23  expect them to take very long, but we do have them scheduled.

24          MR. SHUMAKER:  Right.  And -- and then what we were

25  hoping to do is -- is Mr. Stibitz the state witness --

1        THE COURT:  We also have a motion for relief from

2   stay by AFSCME for tomorrow.

3        MR. SHUMAKER:  So that's a lot of arguments.  So

4   that's -- so however --

5        THE COURT:  That's scheduled for -- for 10:00.  I

6   actually thought I could make my way through all of those and

7   do lunch between 10:00 and 2:00.  So we were going from 8:30

8   to 10:00 and then pick it back up at 2:00.

9        MR. SHUMAKER:  And I'm sure Mr. Gilbert could get on

10  between 8:30 and 10:00.

11       THE COURT:  Okay.

12       MR. SHUMAKER:  And then if we -- if Your Honor was

13  going to do those arguments, then Mr. Stibitz who goes out of

14  town on Thursday and Friday, if we could slot him in before

15  Mr. Orr took the stand.  And then Mr. Orr would perhaps

16  complete tomorrow, roll into Thursday, and then Mr. Rapson who

17  also needs to go Thursday we'd do that.

18       And in part we're doing this because the objectors are

19  not in a position to take Mr. Doak's -- or to cross examine

20  Mr. Doak because he was being deposed today.  So we were going

21  to shift him to Friday, but start Friday with Mr. Penske who

22  also is hoping to go at -- at the beginning of that day.

23       As you know, it's the half day.  And then the -- as it

24  currently looks, Monday the 6th, Madame President Jones and --

25  and Mayor Duggan would go on -- on Monday and then that would

1    again, subject to all the usual reservations, that would be

2    when the city would rest its case.

3            THE COURT:  Okay.

4            MR. SHUMAKER:  And then I --

5            THE COURT:  That's fine with me.  Any comments from

6    the creditors on that order of proceeding?  Sir?

7            MR. WAGNER:  Yes, Your Honor.  Just looking at the

8    schedule aside from the fact that the 14th is twice.  I assumed

9    this --

10           THE COURT:  Aside from -- aside from what fact, sir?

11           MR. WAGNER:  He's got the 14th day on twice.  I know

12   we've been here so long it feels like Groundhog Day, but I'd

13   prefer not to -- I'd prefer not to repeat a trial day.

14       The 7th -- if this schedule holds, I assume Ms. Kopacz

15   would testify as Your Honor indicated at the close of the

16   city's case.  I assume that would be on the 7th.

17           THE COURT:  It -- it would.  And I have -- I have

18   notified her of the possibility that her testimony might be on

19   Monday or Tuesday.

20       Tuesday we need to conclude at 1:00 so I can get to the

21   NCBJ conference.  By the way someone told Ms. Kopacz that we

22   are not in session the 14th through the 17th.  That -- we need

23   to quash that rumor right now.  We are in session.  The 13th is

24   Columbus Day and a federal holiday.  But the rest of the week

25   we're working.

1          MR. SHUMAKER:  Yeah, that's fine.  I -- I should

2    probably note now that the 16th and the 17th, I will be out for

3    the last of the Jewish holidays.  But I'm hoping that the two

4    witnesses who I would have to cover Ms. Thomas and Mr. Fornia

5    would go on the 14th.

6          THE COURT:  Okay.

7          MR. SHUMAKER:  Or the latest on the 15th.

8          THE COURT:  All right.  Any other comments?  Yes,

9    please.  Okay.  No -- no apologies.

10          MR. PEREZ:  So, Your Honor, since I'm the person who

11    is going to be putting on most of our affirmative case, should

12    I plan -- and -- and Mr. Wagner is going to go first.  His --

13    his two witnesses will go first.  Mine will be the third,

14    fourth, and fifth witnesses.

15       Should -- should we plan then for the 14th, to start on

16    the 14th and tell them not to be here for the 7th since we -- I

17    didn't realize the 7th would --

18          THE COURT:  I think that's -- I think that's safe at

19    this point.  Absolutely.

20          MR. PEREZ:  Okay.  So we'll plan that.  Thank you,

21    Your Honor.

22          MR. SHUMAKER:  Your Honor, two wild cards.  One is

23    UAW day continues to sort of float out there.  And I don't

24    know when that might be slotted.  And obviously that -- that

25    continues.  And then the pro se objectors, are they going

1  after the city's case or at the end of --

2       THE COURT:  The end.  The end of everything, yes.

3  Did you all get your evidence stipulation worked out?

4       MR. SHUMAKER:  I had that same question but I

5  haven't heard back from the objectors yet.  The 144.

6       MR. SOTO:  Right.  We -- remember we had till

7  tonight to finish it, Your Honor.

8       MR. SHUMAKER:  Oh, yeah, I wasn't --

9       THE COURT:  All right.  So you'll report to me

10  tomorrow, please.

11       MR. SHUMAKER:  Yes.

12       THE COURT:  Okay.  I had promised you the difficult

13  discussion on reducing your time allocations, but in light of

14  the hour we will adjourn that until tomorrow.

15       MR. SHUMAKER:  Sure.  Thank you, Your Honor.

16       THE COURT:  For some reason I just made Mr. Soto

17  very happy.

18       THE COURT:  All right.  We'll be in recess.

19       MR. WAGNER:  Your Honor, actually just one more

20  point.

21       THE COURT:  Yes, sir.

22       MR. WAGNER:  I assume from this schedule that

23  there's now no one from the may call list who is going to be

24  called by the city.

25       MR. SHUMAKER:  We'll be making that decision this

1  week.  So we would know.  If it would be, it would be somebody

2  on that Monday.

3          THE COURT:  The sooner the better because it's my

4  witness that would be most impacted by that decision.

5          MR. SHUMAKER:  Understood, Your Honor.

6          THE COURT:  All right.  All right.  Now we'll be in

7  recess.

8          MR. SHUMAKER:  Thank you, Your Honor.

9          MS. O'GORMAN:  Thank you, Your Honor.

10          THE CLERK:  All rise.  Court is adjourned.

11          MR. CULLEN:  Thank you, Your Honor.

12      (Court Adjourned at 5:04 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8   We certify that the foregoing is a correct transcript from the

9   electronic sound recording of the proceedings in the

10  above-entitled matter.

11

12  /s/Deborah L. Kremlick, CER-4872          Dated: 10-5-14
    LaShonda Moss
13  Kristel Trionfi

14

15

16

17

18

19

20

21

22

23

24

25