```
1               UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
2                     SOUTHERN DIVISION

3   IN THE MATTER OF,              Case No. 13-53846
                                   Detroit, Michigan
4   CITY OF DETROIT, MI           October 1, 2014
    _____/   8:30 a.m.
5

    IN RE: TRIAL – OBJECTIONS TO CHAPTER 9 PLAN; [#7197] OBJECTION
6    TO CLAIM NUMBER OF CLAIMANT FIFTH OMNIBUS OBJECTION TO LATE-
      FILED CLAIMS FILED BY DEBTOR IN POSSESSION CITY OF DETROIT
7   MICHIGAN; [#7198] OBJECTION TO CLAIM NUMBER OF CLAIMANT SIXTH
      OMNIBUS OBJECTION TO LATE-FILED CLAIMS FILED BY DEBTOR IN
8     POSSESSION CITY OF DETROIT, MICHIGAN; [#7200] OBJECTION TO
    CLAIM NUMBER OF CLAIMANT SEVENTH OMNIBUS OBJECTION TO WRONGLY
9      CLASSIFIED CLAIMS FILED BY DEBTOR IN POSSESSION CITY OF
          DETROIT, MICHIGAN;[#4954] OBJECTION TO CLAIM NUMBER OF
10      CLAIMANT CLAIM NUMBER 3683 FILED BY MACOMB. (CORRECTED
    OBJECTION RE: DOCKET 4880) FILED BY DEBTOR IN POSSESSION CITY
11  OF DETROIT, MICHIGAN; [#6652] MOTION FOR RELIEF FROM STAY RE:
      MOTION TO CLARIFY, OR IN THE ALTERNATIVE LIFT THE AUTOMATIC
12  STAY.  FILED BY CREDITOR MICHIGAN COUNCIL 25 OF THE AMERICAN
      FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO
13           BEFORE THE HONORABLE STEVEN W. RHODES
              TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
14
    APPEARANCES:
15
    For the City of Detroit, MI:   GREGORY SHUMAKER, ESQ.
16                                 GEOFFREY STEWART, ESQ.
                                   Jones, Day
17                                 51 Louisiana Avenue, N.W.
                                   Washington, D.C. 20001
18                                 202-879-3939

19                                 TAMAR DOLCOURT, ESQ. (P73425)
          `                        Foley & Lardner
20                                 500 Woodward Avenue
                                   Suite 2700
21                                 Detroit, MI 48226
                                   313-234-7161
22

23

24

25
```

```
 1                                  TIMOTHY FUSCO, ESQ. (P13768)
                                    JEROME WATSON, ESQ. (P27082)
 2            `                     Miller, Canfield, Paddock &
                                    Stone
 3                                  150 West Jefferson
                                    Suite 2500
 4                                  Detroit, MI 48226
                                    313-496-8435
 5
                                    ROBERT FRANZINGER, ESQ.
 6                                  (P25539)
                                    Dykema, Gossett
 7                                  400 Renaissance Center
                                    Detroit, MI 48243
 8                                  313-568-6800

 9                                  ROBERT HERTZBERG, ESQ. (P30261)
                                    Pepper, Hamilton
10                                  4000 Town Center
                                    Suite 1800
11                                  Southfield, MI 48075-1505
                                    248-359-7300
12
      For COPS:                     JONATHAN WAGNER, ESQ.
13                                  Kramer, Levin, Naftalis &
                                    Frankel
14                                  1177 Avenue of the Americas
                                    New York, NY 10036
15                                  212-715-9100

16    For MIDD:                     ALLAN BRILLIANT, ESQ.
                                    Dechert, LLP
17                                  1095 Avenue of the Americas
                                    New York, NY 10036
18                                  212-698-3500

19                                  RAECHEL BADALAMENTI, ESQ.
                                    Kirk, Huth, Lange &
20                                  Badalamenti
                                    19500 Hall Road
21                                  Suite 100
                                    Clinton Township, MI 48038
22                                  586-412-4900

23

24

25
```

```
 1  For Financial Guaranty        EDWARD SOTO, ESQ.
    Insurance Company:            EDWARD MCCARTHY, ESQ.
 2                                 Weil, Gotshal & Manges
                                   1395 Brickell Avenue
 3                                 Suite 1200
                                   Miami, FL 33131
 4                                 305-577-3100

 5                                 ALFREDO PEREZ, ESQ.
                                   700 Louisiana Street
 6                                 Suite 1600
                                   Houston, TX 77002
 7                                 713-546-5000

 8  FOR AFSCME:                    RICHARD MACK, JR., ESQ.
                                   (P58657)
 9                                 Miller, Cohen
                                   6700 West Lafayette Blvd.
10                                 4th Floor
                                   Detroit, MI 48226-3191
11                                 313-964-4454

12  For the State of Michigan:    STEVEN HOWELL, ESQ. (P28982)
                                   MATTHEW SCHNEIDER, ESQ.
13                                 (P62190)
                                   DAWN COPLEY, ESQ. (P53343)
14                                 Dickinson, Wright
                                   500 Woodward Avenue
15                                 Suite 4000
                                   Detroit, MI 48226-3425
16                                 313-223-3033

17  For George Edward:            DAVID DWORETSKY, ESQ. (P67026)
                                   Fieger Law
18                                 19390 W 10 Mile Rd
                                   Southfield, MI 48075
19                                 248-355-5555

20  PRESENT:                      RENEE JONES
                                   TOMMY BANKSTON
21

22  Court Recorder:               LaShonda Moss

23  Transcriber:                  Deborah L. Kremlick

24  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
25
```

1                              INDEX

2   WITNESSES FOR          Direct     Cross    Redirect
    THE CITY:
3
    DANIEL GILBERT            6        51,61
4   BROM STIBITZ             88         110
    KEVYN ORR              118
5
    EXHIBITS:                                        ID    ADM
6
    CX73      Blight Task Force Report               29    31
7   CX78      Print Out of Web Site                  23    23
    CX709     Chart                                 171   172

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Court in Session)

2          THE CLERK:  Calling case number 13-53846, City of

3     Detroit, Michigan.

4          THE COURT:  All right.  It appears everyone is here.

5     Let's proceed.

6          MR. SOTO:  Your Honor, consistent with your

7     request, we went through the 150 something documents. They are

8     -- they're all acceptable to us with the exception of two

9     which are probably going to be acceptable to us but we just

10    didn't have the document -- or the full document and -- and --

11    and Jones, Day is going to look those two up and we probably

12    might have a complete set.  But other than those two, which

13    we'll be able to report on later today.

14         THE COURT:  Okay.  Is that a list I can have?

15         MR. SOTO:  Yeah.  Yes.

16         THE COURT:  Or is there a list I can have?

17         MR. SOTO:  Do you have another one of these?

18         A VOICE:  Can I make a copy for you at lunch?

19         THE COURT:  Sure.

20         MR. SOTO:  Thank you, Your Honor.

21         THE COURT:  And then with that list I'll just enter

22    an order admitting them into evidence.

23         MR. SHUMAKER:  Good morning, Your Honor.  Greg

24    Shumaker of Jones, Day for the city.  The city calls Mr. Dan

25    Gilbert to the stand.  Your Honor, I have five binders if I

1 could hand them up to you?

2           THE COURT:  Sure.

3           MR. SHUMAKER:  May I approach, Your Honor?

4           THE COURT:  Yes.  Please raise your right hand.

5      (WITNESS DANIEL GILBERT WAS SWORN)

6           THE COURT:  Please sit down.

7                         DIRECT EXAMINATION

8 BY MR. SHUMAKER:

9 Q    Good morning, Mr. Gilbert.

10 A    Good morning.

11 Q    Would you please state your name for the record.

12 A    Daniel Gilbert.

13 Q    Mr. Gilbert, could you please run through your

14 educational background for the Court?

15 A    Education, I have a undergraduate degree at Michigan

16 State.  And a degree at -- a law degree at Wayne State,

17 although I don't know where my diploma is right now.

18 Q    Did you go to high school here?

19 A    Yes.

20 Q    Which high school?

21 A    Southfield Lathrup High School.

22 Q    And what -- what is your current occupation?

23 A    Businessman, I guess.

24 Q    Do you have any formal titles?

25 A    Yeah, chairman of Rock Holdings.  That would be -- the

1  main one.

2  Q    And is -- is -- Rock Holdings include Quicken Loans?

3  A    Yes.  That would be the holding company.  The Quicken

4  Loans Title Source.

5  Q    How long have you been in -- in charge of Rock Holdings

6  and Quicken Loans?

7  A    Twenty-nine years.

8  Q    Where is your business headquartered?

9  A    It's in Detroit, the Compuware building is the main piece

10  of it, I guess.  That's where I'm at anyway.

11  Q    So I presume that's where you're headquartered?

12  A    Yes.

13  Q    Where you are?

14  A    I -- I think, yes.

15  Q    How long has your headquarters been in Detroit?

16  A    Four years and two months.

17  Q    And since 2010, so --

18  A    Yeah, August 2010.

19  Q    And where were your headquarters before moving here to

20  Detroit?

21  A    In Livonia, Michigan.

22  Q    I'm sorry?

23  A    Livonia, Michigan.

24  Q    Why did you move to -- your headquarters to downtown

25  Detroit?

1  A    Well, we -- we moved for two reasons primarily.  Well,

2  first of all, all of our office space in the suburbs, the

3  leases were sort of coming due you know, towards the end of

4  the last decade.  And we had to make a decision whether we

5  were going to build a new construction, like campus somewhere,

6  some vacant piece of land or we were going to extend leases

7  and be disjointed.

8       We were in, you know, Troy, Southfield, Farmington Hills,

9  Livonia.  We're sort of all over the place.  Or the third

10  option for us was to, you know, to come downtown -- downtown

11  Detroit and -- and for us it came down to two reasons.

12      We believe that the workforce, you know, young folks

13  coming out of Michigan, Michigan State, and Wayne State, those

14  are -- are kind of the people that we hire.  We like to get

15  the -- the guys graduating at the top.  The people graduating

16  at the top who are ambitious and maybe entrepreneurial and we

17  just found that at that point they liked our company but they

18  weren't -- they started towards let's say 2006, '07, '08, '09,

19  they -- they all started -- well, we want to be an urban

20  corps., you know, we want to be in Chicago, New York, all that

21  stuff.

22      So we -- we realized that we couldn't grow and be the

23  kind of company we wanted to be if -- if we were a suburban

24  company being a sort of a technology company which really

25  that's -- that's what we are

1       And the second reason was that a lot of us, myself and

2  others were born in Detroit, you know, raised in Detroit in

3  the area.  Personally my father and grandfather both born in

4  Detroit, had businesses in Detroit.  And we felt we were in a

5  position to impact the outcome in a positive manner.

6       So put those together.  We decided in August of 2010 to

7  start moving people to Detroit.  That's the cliff notes

8  version.

9  Q    Sounds good.  How many of your -- how many of your

10 employees work downtown?

11 A    We're about 12,500 full time people downtown.

12 Q    Do you live in the Detroit area?

13 A    Yes.

14 Q    Where do you live?

15 A    I live in Franklin.

16 Q    How long have you been in this city if -- if you will?

17 A    From --

18 Q    Just I'm talking your -- your whole life.

19 A    Yeah, I'm sort of like a farmer.  I mean I haven't gone

20 out of the square mile, you know, the few square miles here.

21 I -- I did go to Michigan State for a few years, but other

22 than that I've -- I've lived in Detroit and the close by

23 suburbs.

24 Q    Could you tell the Court about your business operations

25 generally?

1  A    Well, our business is we're about 109 different

2  businesses.  There's -- there's ones clearly that are older

3  and larger and more substantial than others.  There's -- and

4  so Rock Holdings which is Quicken Loans and Title Source,

5  Quicken Loans is now the second largest residential lender in

6  America.

7      We are -- we're in the gaming business which part of our

8  operation there is Greektown which we acquired in I believe

9  April of 2013.  We're in the sports entertainment business

10 primarily in Cleveland with the Cavaliers and a couple minor

11 league teams.

12     And the rest of our -- our businesses are primarily

13 technology start up businesses.  A lot of them, most of them

14 in Detroit here.

15 Q    And the -- the Cavaliers are the NBA team, is that

16 correct?

17 A    Yes.

18 Q    Okay.  And obviously those -- the Cavaliers are in

19 Cleveland.  Which of your operations are housed here in the

20 city?

21 A    The -- well, Quicken Loans and - and almost 100% -- well,

22 I wouldn't say that.  About -- about 85% of the full time

23 employees of Quicken Loans are here in the city.  Quicken

24 Loans, Title Source, Rock Holdings.

25     All the technology -- not all of them, most of the

1  technology start up businesses are here.  The private equity

2  business is headquartered here.  Venture Capital is

3  headquartered here.

4      I mean 80 to 85% of the overall I'd say businesses and

5  employees are headquartered -- or not only headquartered but

6  reside in Detroit.

7  Q   And you refer to start up businesses.  What do you mean

8  by start up businesses here in Detroit?

9  A   So brand new businesses that are just getting going that

10 need venture capital.  Primarily technology based businesses.

11 You know the kind of businesses you read about or see about

12 that are in silicon valley.  You know, the -- the businesses

13 that are web internet based for the most part.

14 Q   Are you or your business involved in philanthropic

15 activities in Detroit?

16 A   Yes.  We -- we have a large community relations team who

17 coordinates our employees to -- to work in various you know,

18 non-profit initiatives in the city.  We -- we make significant

19 financial contributions to various non-profits in the city.

20     We're involved also in the -- the blight removal, the

21 task force which I was one of the chairs.  And I'm sure

22 there's some other ones I'm -- I'm not listing here.

23 Q   Have you had any involvement with the M-1 rail line?

24 A   Yes.  So I'm the co-chair or the vice chair, I can't give

25 you the -- give you the exact title but yeah, I was there from

1  the beginning of the M-1 rail which is probably an idea that

2  was conceived seven, eight years ago.

3      And we were pleased that that now is in the ground.  Just

4  laid our first actual rail a few days ago.  And now that's a

5  -- a light rail system that's going to run from Woodward to

6  Grand Boulevard, 3.4 miles, although it does go both ways, so

7  it's actually 6.6 or 6.8 miles.

8  Q    Do you have any idea when the M-1 will be completed?

9  A    If everything goes as scheduled probably sometime in mid

10 to late 2016.

11 Q    Do you have any involvement in a -- a company called

12 Bizdom?

13 A    Yeah, so Bizdom is a non-profit entrepreneurial sort of

14 training operation.  And what we -- what we do at Bizdom is we

15 try to focus on minorities or -- or other folks living in the

16 city who maybe otherwise -- who -- have this entrepreneurial

17 ambition, but maybe otherwise wouldn't get an at bat.

18     So what we do is we -- we accept applicants into the

19 academy and we -- we train them and -- and find mentors for

20 them and then after a period of time if their business plan is

21 something that we want to go further on, we actually have a --

22 a portfolio that will -- not a portfolio but a fund that will

23 fund their start up costs and -- and try to get other

24 investors involved as well.

25 Q    Does your business own property within the city?

1  A     Yes.  So we made, you know, substantial real estate

2  investments in the city over the last four years.  Roughly 60

3  structures, give or take.  That's with individual legal

4  descriptions.  Some of them are, you know, attached to each

5  other.

6       And, you know, we are -- we are very active with Bedrock

7  Real Estate which is another -- I guess I didn't mention them

8  earlier, Bedrock Real Estate is a commercial real estate

9  company that we formed with some very experienced

10 professionals about three years ago.

11      And what Bedrock does is they handle acquisition, they

12 handle leasing, management, renovations of buildings, and we

13 have -- including the parking, it's somewhere close to

14 9,000,000 square feet of -- of real estate in the city.  In

15 the core primarily.

16 Q    You said it's 9,000,000?

17 A    Nine million, yes.

18 Q    Approximately how much money have you invested in

19 property in the City of Detroit?

20 A    I can't give you exact numbers, but it's -- it's in the

21 neighborhood of about 1,400,000,000 to 1,500,000,000.

22 Q    Could you share with the Court why you made that kind of

23 investment in the city?

24 A    It's -- it's really the same theme as I mentioned

25 earlier.  It's really a two prong theme.  I mean we -- we --

1  A, we believe that -- that we can impact the outcome in a

2  positive manner.  So we're not just investors who are buying

3  real estate and hoping it goes up in value as you just kind of

4  wait it out as a passive investor.

5      We believe because of our high employee base and -- and

6  we can fill the buildings and we have a need for them, which

7  was one of the driving factors, we -- we can add value to the

8  buildings and we can also invest capital into the buildings

9  that can renovate them.

10     These are -- several of them are sort of iconic beautiful

11 architected old buildings with -- with known architects from

12 earlier last century.  And they just really needed, you know,

13 some capital and -- and some people.

14     And so we -- we -- we were able to provide both of those.

15 And, you know, the -- so -- so the need for the businesses,

16 our -- our love and belief of -- of Detroit, and the fact that

17 we can impact the outcome in a positive manner and are in a

18 position to do so.

19 Q   I take it you're familiar with the city's Chapter 9

20 bankruptcy case?

21 A   Yes, sir.

22 Q   And how are you familiar with it?

23 A   Well, just I think like everybody else is familiar with

24 it from the international news and, you know, talking to

25 people in the city and being involved in the city

1  Q    Have you spoken with anyone in the city government about

2  he bankruptcy case?

3  A    I'm sure I've had cursory discussions, you know, with

4  Kevyn Orr, Mike Duggan.  I can't remember but there's been a

5  couple others.  But, you know, how's it going kind of thing.

6  Q    Have you been provided with a -- with a copy of the

7  disclosure statement in these proceedings?

8  A    I don't recall if I have.  I believe I have.  I don't

9  know the exact name of every document that I've been provided.

10 Q    I'm going to show you if you -- if you would Exhibit 3.

11 Is this -- is this a document that you've been provided with

12 in the past?

13 A    Yes, it looks familiar to me.

14 Q    Okay.  Now are you familiar with the -- what is referred

15 to as the restructuring and re-investment initiatives that are

16 contained or described within this document?

17 A    Yes.

18 Q    If it's okay with you, is it all right if I refer to the

19 restructuring and re-investment initiatives as RRIs?

20 A    Sure.

21 Q    Okay.  Could we go to Page 003-176 of the document?  Blow

22 up the top.  Thank you.

23      Mr. Gilbert, have you seen this particular page of the

24 disclosure statement before?

25 A    Yes.

1  Q     And up at the top is a chart.  Do you see that?

2  A     Yes, I do.

3  Q     Are you -- you familiar with that chart?

4  A     Yes.  I mean I've seen it for sure.  I haven't spent a

5  lot of time with it, but I definitely have seen it.

6  Q     As you -- as you look at that chart are there any areas

7  addressed in that chart that you have particular familiarity

8  with?

9  A     Well, I'm very familiar with the blight remediation

10 portion of it.  I've -- I've certainly heard about and -- and

11 known about roughly the figures that -- that have been put in

12 here for the public safety aspect of it.  So I would say those

13 two are probably the most I'm familiar with.

14 Q     Okay.  And as of the date of this disclosure statement,

15 is it correct to say that 440.3 million dollars was going to

16 be dedicated to blight remediation?

17 A     According to this document?

18 Q     Yes.

19 A     Yes, it says 440.3.

20 Q     Speaking of blight, how familiar -- familiar are you with

21 the city's issues with blight?

22 A     I'm very familiar with it.  I was the co-chair and

23 probably the active managing chair of the blight task force

24 which convened for about an eight to nine month period of time

25 and issued a 380 page task force report on Detroit's blight

1 and very specific recommendations of what we should do about

2 it and how we should go about getting rid of it.

3 Q    Now, could you share with the Court what your involvement

4 in the task force was?  I know you said that you were the

5 co-chair, but what did that entail?

6 A    Well, it entailed creating a strategy around how the task

7 force was going to operate and it really was a two prong

8 strategy.  And the first was get as much information as we

9 possibly could.

10    There had been numerous reports over the last 10, 20

11 years, maybe even more written about blight.  There had been

12 articles written about blight.  There had been experts who

13 have made statements about blight and there had been

14 guesstimates and estimates of what we had in the City of

15 Detroit regarding the blight.

16    So our first prong again of our two prong strategy here

17 was to go out and just gather as much possible information and

18 try to get the real scope and depth of the issue of blight to

19 the point where we went property by property with a visual

20 inspection meaning that every single property blighted or not,

21 vacant land or with a structure on it, commercial or

22 residential, we created a visual team that went out and did

23 visual inspections with mobile devices and -- and then we took

24 that information into a data base and then we connected it

25 with 24 other data bases which is kind of a unique thing in

1 | maybe the history of large municipalities in this country.

2 | And put all that data together and we got a very very

3 | clear picture both from a -- an informational side from the

4 | data bases and from a literal visual side. So we had, you

5 | know, no guesses anymore, we had a very clear understanding of

6 | -- of what was there and what was blight.

7 | We also went ahead and tried to get a -- a very clear

8 | definition of the term blight. Because that, you know, that

9 | can be a -- a vague and foggy definition and can have a lot of

10 | differences depending on who you are and where you're coming

11 | from, what your understanding is. So we try to be very clear

12 | there.

13 | And then once we had all of that crystal clear

14 | information we made very specific recommendations as to what

15 | to do and how to go about removing it. And we did best

16 | practice visits in New Orleans and one or two other cities. I

17 | just can't recall exactly which ones right now.

18 | We -- we looked for best practices nationally as far as

19 | the legal side of blight and how you go about removing it and

20 | what kind of barriers existed in Detroit from a legal

21 | standpoint in the system itself.

22 | So we made all kinds of recommendations there. We made

23 | recommendations around prioritization because the goal of

24 | course and the mission is to remove every single piece of

25 | blight in the city of what we call residential blight or, you

1  know, neighborhood blight which I want to make a distinction

2  because it's important.

3      Our mission was all residential blight meaning anything

4  that was residential both vacant lot and had a structure on

5  it.  And also small commercial pieces of property that were

6  very close to residential.

7      So what it did not include was large massive commercial

8  structures such as the Packard plant or the train station.

9  But we still think that residential blight is, you know, the

10 vast majority of -- of blight in -- in the City of Detroit.

11 And there is a -- you know, so it was a very extensive book

12 and very clear book, a very detailed book.

13     And I can't remember what your original question was, but

14 I think it was yeah, something --

15 Q    I was asking you --

16 A    Yeah.

17 Q    -- what your involvement in the -- in the blight.

18 A    And so my involvement was to -- to chair this, and lead

19 this, and coordinate this.  And frankly I -- I literally wrote

20 myself a big chunk of that 380 page book.

21 Q    And -- and you did this over what time period?  You said

22 it was an eight or nine month period to put together the

23 report?

24 A    Correct.  I'd say nine months.

25 Q    How many people do you think know more about the blight

1  issue than you in the City of Detroit?

2  A    You know, I -- I probably would put myself in the top 1%

3  of -- of the knowledge of blight in the City of Detroit.

4  Q    Would you say that blight is one of the city's bigger

5  problems?

6  A    Yeah.  I mean my -- my vision -- or not my vision, but my

7  view of the City of Detroit is we have four major challenges,

8  four categories of challenges.

9       And that is jobs, crime, education, and blight.  And I

10 don't believe that we can fully address the other three until

11 blight is -- is completely addressed and removed out of the

12 city.  And -- and that's for various reasons I could go on and

13 on about.  But --

14 Q    Could you share with us why that is?  Why you believe

15 that why we must address blight?

16 A    Well, what we found out, you know, blight is like a

17 cancer.  I mean blight -- blight grows.  In other words, if

18 you -- just like a tumor, if we take out half the tumor, you

19 know, that's probably not a great situation.  The tumor tends

20 to grow back.

21      If you have 100 homes that are blighted let's say in a

22 300 home neighborhood -- and by the way when I say blight I

23 mean a home that has no hope of being rehabilitated.  It's

24 been stripped, it's dilapidated there's no economic

25 justification or otherwise to rehabilitate the property which

1  always would be a great first choice if that was an option.

2  So that's -- that's what I mean when I say blight.

3     And so if you have a -- a 300 home neighborhood let's say

4  and 100 homes are blighted and you remove 50 of them, well,

5  there's still 50 homes that are blighted.  And when -- when

6  neighbors who are there, you know, look left and look right

7  and still see 50 homes that are blighted, and still see

8  property values that are significantly declining and see

9  property taxes that are, you know, quadruple or more what they

10 should be, you know, their decision of whether to vacate or

11 abandon the property or be forced out of the property because

12 they haven't paid taxes or their mortgage, causes that home

13 theoretically to become blighted.

14    So the view the task force took and -- and had no

15 preconceived views before this and, you know, to answer your

16 question before the blight task force I probably -- you know,

17 I knew as much as the street guy or the typical person living

18 in the city knew about blight.

19    But just from our own experience information gathering,

20 we came to the conclusion that this is -- this is sort of one

21 of those all or nothing things.  You have to remove it all.

22 And you have to be aggressive about it and it has to be over a

23 relatively short period of time if we're ever going to tackle

24 this thing.  Otherwise it's going to continue to grow.

25 Q    Okay.  You said that there were -- that the task force

1  had a certain definition of blight.  Do you -- can you share

2  -- share with us what that definition is?

3  A    Yeah.  It's -- it's in the book of course, but I mean in

4  a nutshell it's what I stated earlier.  It -- the definition

5  of blight from the task force -- the task force standpoint was

6  a home that needed to be taken down.  So either demolished or

7  removed piece by piece depending on if there were lead or

8  other kinds of issues with the homes.  But bottom line is it

9  had to be removed and taken down.

10 Q    Have you become familiar with a web site called GooBing

11 Detroit?

12 A    I'm sorry, I didn't hear you.

13 Q    Have you -- have you become familiar with a web site

14 called GooBing Detroit?

15 A    Not specifically that name.  That name I don't recall,

16 no.

17 Q    There is a -- a web site that tracks Detroit blight.  Are

18 -- are you familiar with that?

19 A    Are you talking about the loveland, the technology that

20 we use?

21 Q    No, it's -- it's a web site that's -- that's been set up.

22 If I might, I'd like to show Exhibit 78 if you could put that

23 up.

24      And in connection with this case, Mr. Gilbert, have you

25 seen this web site before?

1  A    Now that you put it up, it looks a little familiar to me.

2  I did not spend a lot of time specifically on this web site.

3       (City's Exhibit 78 was identified)

4  Q    Okay.  I was going to ask that -- to show you a couple of

5  -- of -- of pictures from this web site.

6       MR. SHUMAKER:  But before I do that, Your Honor, I

7  would just move Exhibit 78 into evidence for demonstrative

8  purposes only.

9       MR. MCCARTHY:  Your Honor, Ed McCarthy for FGIC.  No

10 objection as a demonstrative.

11      THE COURT:  All right.  It is admitted.

12      (City's Exhibit 78 was admitted)

13 Q    Could we go to Page 7 -- oh, thank you.  Page 78 008,

14 please, Steve?  Mr. Gilbert is -- is this the kind of

15 depiction of blight that you were describing for the Court?

16      MR. MCCARTHY:  Objection, leading, Your Honor.

17 A    This --

18 Q    What is this, Mr. Gilbert?

19 A    Well, it looks like you have the same home here that's

20 shown from 2007, 2009, 2011, 2013 and June 30th, 2014.  And

21 then after the home has been removed on June 20th, 2014

22 apparently, hours later.

23 Q    Is this the kind of problem that the blight task force

24 was -- was addressing?

25 A    Yes.  I mean this would be a -- this would be a typical

1  blighted home in a residential neighborhood.

2  Q    Let's go to Page 78 011 through 012.  Do you see this,

3  Mr. Gilbert?

4  A    Yes.

5  Q    And what does this reflect?

6  A    Well, it looks like you have three pictures here of the

7  same block.  I'm not sure if it's different time frames or

8  not.  I -- I can't tell from the pictures though.  It looks --

9  actually it does look like it might be different time frames,

10 because the picture on top has nice green grass, nice lawns

11 and then you can see that the two below, you've got -- you got

12 grass and weeds and everything else growing out of control.

13 So I assume that's later in time.

14      And -- and then you have -- you have a home that's --

15 that, you know, clearly the home on the right that did not

16 look like it was blighted from at least from the exterior here

17 in the picture on top and then you can see clearly that it's

18 become a stripped down decaying property in the two below it.

19 And then the other two homes that --

20           MR. SOTO:  Your Honor, which one are we talking

21 about?  I'm -- I'm looking at the picture but I -- I'm not

22 understanding from the testimony which of the homes he's

23 talking about.

24 Q    Are you talking about any particular home, Mr. Gilbert?

25 A    Well, I was -- I was talking about all -- all three

1  pictures and all three homes.

2  Q    Okay.

3  A    Or all three -- three homes in all three pictures.  So --

4        THE COURT:  Initially you were referring to the --

5  the home on the right, is that correct?

6  A    Yeah.  I mean that's what I -- I went through the home on

7  the right which again one thing I just want to state is that

8  you can get a view exterior wise of the home and you still

9  can't always tell if the home is blighted from the exterior.

10     Sometimes homes look good on the exterior and they're

11 completely stripped and no chance of recovery once you get

12 inside of it for the record.  That's not always the case but

13 that is the case.

14     So when I'm looking at these I can only give you the --

15 obviously the exterior view here.  But -- and then -- then

16 there's ones that are just obvious and, you know, there's the

17 -- you know, you can see the home on the right, there's no

18 chance of this home being recovered when you look at the

19 bottom two pictures.

20 Q    And does that -- that home on the right fit your

21 description of blight as put forth by the blight task force?

22 A    I -- I would say those are -- those are the -- the home

23 on the right would be in the easy category of defining what

24 blight is.  Sometimes it's a -- it's a tough call and that's

25 -- that's where we did a lot of our work.

1    Is the ones that are on the borderline.  You know, are

2  they blight.  Do they meet the definition of blight.  What are

3  the factors that are in the definition of blight.  You know,

4  once it passes maybe a visual inspection and we're not

5  positive if it's blight or not.

6  Q    You -- you can take that down, please.  How did you get

7  involved in the blight task force?

8  A    Well, Labor Day 2013, or Labor Day weekend.  I think it

9  was the Friday before Labor Day weekend.  About 12 or 13 of us

10  what I -- I assume was considered leadership of Detroit, got

11  in an airplane and went to Washington and met with the

12  President's cabinet, three or four members of his cabinet.

13    Also his -- and I just -- I forgot her name, Valerie -- I

14  just forgot her last name.

15  Q    Jarrett?

16  A    Jarrett, Valerie Jarrett the President's chief advisor.

17  And there were three or four cabinet secretaries at the

18  meeting as well and some other officials in Washington.

19    And we went to the White House because they had called

20  and asked to meet with leadership of Detroit and how could the

21  federal government help.  And what they stated was at the time

22  that it was politically unfeasible for any kind of bail out

23  for Detroit, but there might be some latitude or some room

24  that they had within current law or current budgets to help in

25  Detroit.

1    And what did we think.  They were just looking for our

2  feedback at the time.  And among other things that were

3  brought up at that meeting, I personally well sort of made it

4  a big point that we -- we have got to -- we've got to remove

5  blight in the city.  We've got to stop doing it in an

6  incremental manner.

7    That without doing it we're not going to get anywhere.

8  We're not going to have a -- a thriving neighborhoods -- or

9  thriving neighborhoods that we all need and want that are the

10 primary aspect of cities.  And eventually if you don't have

11 thriving neighborhoods, or neighborhoods that are starting to

12 turn and go the right way, you're also going to have a

13 business community that was even on the rise in Labor Day

14 2013, begin to decline and go the other way again.

15    So the idea that came out of that was that the President

16 would appoint a task force which he appointed and I was one of

17 them, one of three.  And there were two other local very

18 qualified very competent partners that -- that were also on

19 the task force with me and then it wasn't just us three.

20    We got folks in the foundation community, people within

21 my businesses and others to volunteer their time to work with

22 the task force and -- and go deep on the issue and -- and

23 execute.

24 Q    Who -- who -- which organization supported the blight

25 task force?  You described how you got involved.

1  A    Uh-huh.

2  Q    Who supports it?

3  A    When we were -- at the time we were going through --

4  because the task force is not really continuing.  So during

5  the nine months --

6  Q    That it was together?

7  A    Yeah.

8  Q    Putting together--

9  A    So the Kresge foundation, Hudson Webber, the city

10 supplied some people.  The emergency financial manager Kevyn

11 Orr had a couple representatives, the state, the -- I don't

12 know if it was the Detroit Land Bank or the -- yeah, there

13 were a couple land banks.

14     You know, the land banks here, there's a -- there's a --

15 almost a land bank puzzle here, but I think it's being solved.

16 So the various land banks were involved.

17     There was various areas and departments of the city

18 itself had people coming in and out.  Technology folks.  You

19 know, that's most of them right there.

20 Q    And you -- you indicated that the -- the task force

21 issued a report after the eight or nine month period, correct?

22 A    I'm sorry, the question is?

23 Q    You indicated that the task force produced a report at

24 the end of the eight or nine month period?

25 A    Yeah.  We issued -- I don't want to get this date wrong,

1  but it's -- it's right on the book there.  I think it was the

2  end of May that we issued our report.

3  Q    Okay.  Could we show Exhibit 73?  Now Mr. Gilbert, the --

4  this is the first page of this exhibit, the entire exhibit is

5  in the binder sitting up on the witness stand.  But do you --

6  do you know what this is?

7  A    This is the 380 pagish give or take a couple pages, task

8  force Detroit blight removal task force plan that we issued.

9       (City's Exhibit 73 was identified)

10 Q    Could you go to Page 004?  And what is this, Mr. Gilbert?

11 A    So this was our opening message for the report.  I wrote

12 this and worked with Glenda and Linda who are my two partners

13 chairing the task force and so we worked together to issue

14 this introductory letter in the -- in the report itself.

15      MR. SHUMAKER:  Your Honor, I would move Exhibit 73

16 into evidence.

17      THE COURT:  Any objections?

18      MR. MCCARTHY:  Your Honor, we've objected to the

19 document based on hearsay.  We haven't seen the full document

20 here today and it includes numerous statements and it's

21 lengthy.  If it's coming in simply as a demonstrative, we have

22 no objection.  But I believe there's some foundation that

23 needs to be built if it's coming in for all purposes.

24 Q    You know, Mr. Gilbert, you indicated that you drafted

25 portions of this report, is that correct?

1 A    Yes.

2 Q    Could you go to the table of contents page, Steve?  I

3 think -- there you go.

4     As you see here there are, not including the appendix,

5 the glossary, and the acknowledgments, 11 sections, is that

6 correct?

7 A    Yes.

8 Q    How many of these sections did you have involvement in?

9 A    All of them.

10 Q    Did you draft the -- the language that is -- that is

11 contained in those 11 sections?

12 A    Some of it.  There are -- there are three or four of us.

13 Really three of us, myself and two others who -- who worked to

14 -- to create and write this report.

15 Q    Did you -- and you have indicated that this is a report

16 that you issued.  Did you intend on people to rely upon it

17 when you issued it?

18 A    Oh, absolutely.

19 Q    And do you believe people have relied upon it?

20 A    Yes.  I mean right now the Detroit Land Bank is turning

21 out, you know, the recommendations of this report.  And I

22 can't testify here today that they're turning out specifically

23 every single recommendation that we made and every single

24 recommendation that we made in the exact manner that we made

25 it.

1    But I believe directionally they are carrying out the

2  blight removal of the City of Detroit in the way that we

3  recommended it here.

4  Q    Does the report contain the blight task force views with

5  respect to addressing the city's blight problem?

6  A    Yes.

7         MR. SHUMAKER:  Your Honor, with that foundation, I

8  would again move for the admission of this into evidence,

9  Exhibit 73.

10        MR. MCCARTHY:  Your Honor, it's still hearsay.  I

11 haven't heard a reason that it's coming in that's an exception

12 to the hearsay rule.  Perhaps there is, but as we sit here

13 today it's still hearsay.

14        THE COURT:  Stand by one second, please.  Sir, this

15 is the official report of the blight task force?

16 A    Yes.

17        THE COURT:  The blight task force that was appointed

18 and commissioned by the President?

19 A    Yes.

20        THE COURT:  The Court finds that it is a public

21 record under Rule 803-7 and therefore an -- an exception to

22 the hearsay rule.  It is admitted.

23    (City's Exhibit 73 was admitted)

24        MR. SHUMAKER:  Thank you, Your Honor.

25 Q    I'd like to show exhibit -- I mean Page 151, please.  Mr.

1  Gilbert what -- what does the report say about how much

2  removing the city's blight will cost?

3  A    So once again in neighborhood blight which is every

4  single piece of residential blight in the city property by

5  property.  Every single property in the city was inspected,

6  whether it was blighted or not, vacant or not.

7       So including all -- oh, by the way I wanted to make one

8  more distinction.  It's not a huge piece of this, but it's a

9  piece of it.

10      Is also there's blight on vacant lots.  So you can have

11 blighted homes, and this is something we learned substantially

12 and significantly through the process.  But you also have

13 vacant lots.

14      And so there are lots that are, you know, where -- where

15 the plants and weeds and everything have grown out of control

16 or -- or it's -- they become dumping grounds for all kinds of

17 materials.

18      And so that's also included in this.  So when you include

19 all of that neighborhood blight and -- which is inclusive of

20 small commercial parcels around the neighborhoods, the total

21 number that we came up with after doing extensive research

22 with contractors and permitting and fees and utilities and

23 everything else, it turned out to be a hundred and -- or

24 $850,000,000 in our estimation.

25 Q    That's to address the neighborhood blight?

1  A     To completely remove neighborhood blight from the City of

2  Detroit.

3  Q     Okay.  Let's go to Page 0033, please.  Mr. Gilbert,

4  you've testified about your familiarity with the blight and

5  could you describe for the Court what this particular page of

6  the report shows?

7  A     Well, this -- this page is a page that three colors,

8  pink, blue, and white, so if you're looking at the pink areas

9  those are residential structures that have been specifically

10  identified as meeting the definition of blight as the task

11  force defined blight property by property.  And then

12  non-residential structures that met that definition of blight

13  in the blue.

14  Q     And do you know how these maps were developed?  This --

15  this map was developed?

16  A     What do you mean exactly how they were developed?

17  Q     Well, how did -- how did the task -- the blight task

18  force come to put different structures in pink and different

19  structures in blue as reflected on the document?

20  A     So in the winter of 2014 roughly January, February, it

21  may have went into March.  It may have actually started around

22  Christmas in December of '13.

23      Three hundred people were hired, some volunteers.  And

24  they went in crews of three.  So there were 100 crews who

25  spent eight to ten hours per day, five days a week, with

1  mobile devices and went ahead and did visual inspections on

2  every -- all 380,000 properties in the City of Detroit with --

3  with no knowledge of whether anything was blighted or not.

4      So they took pictures, made visual observations of each

5  property, answered I can't remember exactly how many

6  questions, but very specific questions that were asked.  So

7  you're supposed to be looking at a property and then you ask

8  -- you answer the 12 or 15 questions that we developed

9  relating to information one would need to make a decision

10 whether a property met the definition of blight or not.

11     And took pictures with their mobile devices.  That was

12 then uploaded into a data base and it was combined with 24

13 other data bases from property taxes, to utilities, to the

14 post office, and you know, you go on and on and on.

15     And then we had a very clear vision with all this

16 information very -- very current information.  All these data

17 bases combined with the visual inspection to make a -- a -- a

18 determination of whether each individual property by property

19 met the definition of blight.

20 Q    And you were talking about describing for the Court

21 neighborhood blight.  Is that reflected in the -- the pink on

22 this map?

23 A    Yes.  It could be some of the blue too because as I

24 mentioned earlier, non-residential blight could include what

25 we term -- what we termed the coin neighborhood blight which

1  are -- which is also inclusive of smaller commercial pieces of

2  property around residential neighborhoods.

3  Q    And the $850,000,000 figure would be needed to eliminate

4  all of that blight, is that correct?

5  A    That's correct.  Based on our -- our research and -- and

6  work and estimation.

7  Q    Now if you recall when we were talking -- we were seeing

8  the disclosure statement, there was in that document an

9  indication that $440,000,000 was going to be devoted to blight

10  remediation.  Do you recall that?

11  A    Yes.

12  Q    What is your view of that value which is obviously below

13  $850,000,000?  What is your view of that value in terms of

14  addressing the blight?

15  Q    Well, our recommendation was a -- a four to six, or seven

16  year blight removal time frame.  So we estimated that if it

17  took -- and again I can't remember if it was four to six

18  years, four to seven years.  It's in that range depending on,

19  you know, where -- how quick you get it done.

20      It would cost $850,000,000 to do it.  To have -- what was

21  the number four thirty or four twenty-nine or --

22  Q    Four forty in the disclosure statement.

23  A    Four forty.  To have $440,000,000 at the beginning of

24  that process as far as I'm concerned is extremely positive.  I

25  mean I would think it would be -- it would great to have all

1  the money up front, but you don't need all the money up front

2  because this takes place over a four to seven year process.

3      And once -- once people start seeing and realizing that

4  this is happening -- and by the way it is happening.  The city

5  is now removing, you know, more and more homes per week and

6  per month I think than -- than maybe in its history as the

7  land bank, you know, gears up and continues to increase

8  capacity for removal of blight.

9      I -- I believe the capital for the remaining piece will

10 come.  And in fact I'm -- I'm certain that it will come from

11 foundations, business community, potential future, you know,

12 bonding capacity of a city once it's out of bankruptcy.  The

13 feds, the state, there could be numerous sources, private

14 foundations and I believe it will be such a compelling

15 situation when -- when people really begin to see the positive

16 results of what the initial money is able to accomplish that

17 we're just not going to be significantly challenged by somehow

18 sourcing the second piece of the capital.

19 Q    Was the blight task force aware of the -- the bankruptcy

20 proceedings?

21 A    Yes.

22 Q    Was it aware of the plan of adjustment that was being put

23 forth?

24 A    Yeah, I believe those numbers -- I think we incorporated

25 those numbers into the report.  Obviously with a asterisk, you

1  know, assuming that the plan of adjustment goes forward with

2  the number that was put in.

3  Q    Okay.  And Steve, could you put up Page 151 of the

4  exhibit?  Could you blow up recommendation and recommendation

5  num 2?  The whole thing, please.  It goes three paragraphs.

6  Thank you.

7       And the second to the last -- did you know what this is,

8  Mr. Gilbert?

9  A    Yeah, I have to read it, but --

10 Q    Sure, please do.

11 A    And it's recommendation 9.2, I know that.

12 Q    And perhaps you could read that -- that first sentence.

13 A    The first, okay.  So recommendation 9-2, maximize the

14 impact of the plan of adjustment blight focused re-investment

15 funds by deploying them in ways that increase the potential

16 for future revenue and by expanding the range of uses,

17 including elimination of blight for commercial structures,

18 vacant lot clearing, and rehabilitation in neighborhoods.  Do

19 you want me to --

20 Q    No.  I'd also direct your attention to the second to the

21 last sentence in the last paragraph there.  Could you read

22 that for the Court?  It will be highlighted here in a second.

23 The second to the last one.

24 A    Okay.  The plan of adjustment re-investment funds offer a

25 rate opportunity to reduce the barriers to financing

1  rehabilitation and to significantly open up private sector

2  financing.

3  Q    Do you agree with that statement, sir?

4  A    Yes.

5  Q    Is that what you were describing just now?  With how the

6  shortfall will be overcome?

7  A    Yeah.  I'm not -- I'm not sure this specific sentence is

8  exactly on point to that issue.  What I -- what I discussed is

9  definitely somewhere in this report.

10 Q    Okay.  You can take that down, Steve.  Do you believe

11 that the Detroit community cares about this effort?

12 A    Most definitely.

13 Q    Do you think the community is behind it?

14 A    Absolutely.

15 Q    And how -- why do you say that?

16 A    Well, one of the -- one or two of the chapters in this

17 report focused on communication to the neighborhoods in the

18 community.  And in fact we did significant community outreach.

19      One of the -- one of my partners on chairing this, Linda

20 Smith, she was -- her role was really -- and one of the

21 reasons she was appointed as a co-chair, her role was to be

22 the leader on the ground in all the neighborhoods.

23      Because one of the things you don't want to do, I don't

24 care how blighted the neighborhood is, you don't want to just

25 show up one day with a bunch of bulldozers and start -- and I

1  don't even care how bad the -- the homes are to start taking

2  out homes without having communicated to the residents,

3  received their feedback which they have significant feedback

4  and -- and great information that can help in the execution of

5  this plan.

6     So, you know, that was a big part of our entire process.

7  And -- and we received, you know, an incredible amount of --

8  of feedback and how to go about this and how to communicate

9  with the neighborhoods.

10    And, you know, this is one of these situations there's --

11 I don't care who you are, or where you are, there is -- nobody

12 can look a dilapidated decaying home that, you know, has

13 absolutely no use and has no chance of recovery and not agree

14 that the neighborhood and the world would not be better off

15 with that home removed.

16    So, you know, this is -- this is one of these -- these

17 rare things, you know, you could be old or young, or Democrat

18 or Republican, or from any ethnic group in the world and 100%

19 of the people if they're rational would look at it and -- and

20 agree that these homes need to be removed.

21 Q    Let me shift here with you now and -- and ask you about

22 the city's services.  Do you think that the city is currently

23 providing an -- an adequate level of services to its

24 residents?

25 A    I think is has improved in the last year or so, but I do

1  not think it's anywhere near where it -- it needs to be.

2  Q    Why do you believe that?

3  A    Seeing some of the -- the pretty much known common issues

4  that we have seen and -- and I believe other people probably

5  have testified about it and in the media, but --

6  Q    Which sort of services are you talking about?

7  A    So -- so police response time, the police capacity.  And

8  -- and let me state that I do think the police who do work are

9  doing a fantastic job.  I'm talking about the lack of -- of

10  capacity.  There's just a more overwhelming need for more

11  security and police.

12      You know, street lighting as we know has been a

13  significant issue, although that has -- has improved quite a

14  bit here in the last year.  The -- the city's ability to have

15  a -- an efficient process to deal with businesses and

16  construction and inspections and -- and those kinds of things.

17      You know, I guess the schools are not technically part of

18  the -- the city government, but we all know the issues there.

19  You know, the whole housing situation and -- and the response

20  to housing and the land bank and, you know, the ability to

21  evaluate the property tax situation and -- and implement

22  strategy and having the capacity to do so.

23      The technoloy of the city is disaster levels for lack of

24  better words.  And it needs to be addressed and is being

25  addressed to some degree.  I could go on and on.

1  Q    Let me just refer back to the chart that shows the RRIs

2  from the disclosure statement, Page 176, please.  If you'd

3  blow up that.  Thank you.

4      As you look at these different areas, Mr. Gilbert, are

5  these the kinds of services that you think need to be

6  addressed and improved?

7  A    Absolutely.

8  Q    Do you have any sense of whether this amount of money is

9  -- is needed?

10          MR. SOTO:  Objection, foundation grounds.

11          MR. MCCARTHY:  I join that objection, Your Honor.

12          MR. SHUMAKER:  Your Honor, he's testified that he's

13  -- he's examined the documents involved and he's got a

14  business here with -- requires all sorts of services.  I'm

15  just wondering -- asking whether his personal involvement as

16  reflected in these areas requires attention.

17          THE COURT:  That -- that was not your question.

18  Your question was whether the amount of money is -- is

19  necessary.  So I will sustain that objection.

20  Q    Setting aside the -- the money there, Mr. Gilbert.

21  A    Uh-huh.

22  Q    Are -- do you believe that the areas listed here, some or

23  all are ones that in your personal experience or with your

24  businesses could use some attention?

25  A    Yeah.  I mean I'd like to look at this holistically, our

1  businesses are part of that.  But I think it's pretty clear

2  the blight remediation is -- is significant.  This is over

3  half the amount that would be needed to address what many

4  consider the -- the single number one challenge of a city that

5  has significant challenges.

6      So, you know, that's -- that is extremely important.

7  Obviously public safety.  Another one -- I mean I think if you

8  were to say, you know, what are the one and two here outside,

9  you know, education I think is outside of this.

10     So, you know, the -- the -- it looks eight hundred and

11 seventish million out of 1.4 billion are targeted towards I

12 think what they should be targeted towards.  And those are

13 the, you know, number one and two issues and challenges.

14     And general services, I don't know exactly how that's --

15 you know, that's spread out and what that exactly means, but

16 clearly there is significant need in general services in -- in

17 the city.  And, you know, the rest I don't know if I can

18 specifically speak to.

19 Q   Understood, understood.  You can take that down, please.

20 Mr. Gilbert, are you familiar with what's been described as

21 the grand bargain?

22 A   Yes.

23 Q   What do you understand the grand bargain to be?

24 A   Well, I -- I think it's a -- I -- again, I don't know --

25 I don't know if I'm long on detail of this.  I do know what

1 | our participation is in it and I know this is a -- a deal

2 | between the state. I think the state and the private

3 | philanthropists, and foundations and the DIA to contribute

4 | significant amounts and remove the DIA out of the -- the

5 | city's authority, I guess and get this bankruptcy proceeding

6 | to the other side.

7 | Q    And all right. Just give me one second. Okay. Are --

8 | are -- are you or your business participating in the grand

9 | bargain, or donating to the grand bargain?

10 | A    Yes.

11 | Q    Do you know how much?

12 | A    Five million dollars.

13 | Q    Why are you donating to the grand bargain?

14 |         MR. MCCARTHY: Objection, Your Honor. This calls

15 | for a violation -- testimony which in all likelihood will

16 | violate the mediation order. At his deposition Mr. Gilbert

17 | was asked questions about his involvement in the grand bargain

18 | and about how he got involved and how that started. The

19 | mediation order was invoked there and we were prevented from

20 | asking further questions. Furthermore, why anyone was

21 | involved in donating is irrelevant for the Court per the prior

22 | instructions.

23 |         MR. SHUMAKER: I'm not asking for anything that

24 | occurred in the -- the mediation, Your Honor. Simply asking

25 | why Mr. Gilbert decided to -- to join that effort. And I

1  believe Your Honor has indicated that that would be proper.

2  That the city could call witnesses from the foundations and --

3  and ask that question.

4           MR. MCCARTHY:  Your Honor, if I could --

5           THE COURT:  What's the relevance of it to whether

6  this plan of -- plan of adjustment should be confirmed?

7           MR. SHUMAKER:  Well, it's a reflection of -- of what

8  the -- the reason that the grand bargain that came out of the

9  mediation effort is something that Mr. Gilbert wanted to

10 participate in.   I don't see how that gets into the back and

11 forth, the ying and the yang of the mediation.

12          THE COURT:  Well, my question was a slightly

13 different question.  What's the relevance of it to whether the

14 plan should be confirmed or not?

15          MR. SHUMAKER:  Well, again, I think that -- that his

16 involvement and his understanding of what -- what -- where the

17 money was going is -- is in fact relevant.  It --

18          THE COURT:  Where the money is going is set forth

19 without any ambiguity in the plan and disclosure statement.

20 I'll sustain the objection.  Please move on.

21 Q    What -- do you see any benefits to the city of the grand

22 bargain?

23 A    Well, getting through bankruptcy -- if the grand bargain

24 helps the city get through this bankruptcy any faster and is

25 able to get the pensioners more -- more of their -- what they

1  bargained for, as far as I'm concerned -- and -- and saves the

2  art, and doesn't -- doesn't you know, force the art to be sold

3  out of the DIA, I think that's a triple win for everybody

4  involved.

5  Q    Will the -- the $5,000,000 donation that you made

6  supplant other contributions to the city that you might be

7  contemplating?

8  A    No.

9  Q    And you talked about money going to the pensioners.  Was

10 this part of the deal as you understood it, the grand bargain

11 when it was presented to you?

12       MR. MCCARTHY:  Objection Your Honor.  Same

13 objection.  Frankly I think irrelevance is the key one here.

14 I also want to stress that the mediation order applies here

15 and it applies more than just to the back and forth

16 discussions.

17     This is an order.  The key word is incident to mediation.

18 That is the word that's been applied throughout this case.  It

19 was the word -- word that was applied yesterday in Mr. Doak's

20 deposition numerous times, perhaps dozens of times.  To narrow

21 that definition here would be inapplicable and prejudicial to

22 my client.

23       MR. SHUMAKER:  The issue, Your Honor, was whether

24 this was what Mr. Gilbert understood the deal that came out of

25 -- of the mediation that was presented to him.  Whether it was

1  a part of it.  I don't think that again invades the -- the

2  mediation order.

3          THE COURT:  You want to know what?

4          MR. SHUMAKER:  Was it already part of the deal?

5  Already part --

6          THE COURT:  Was what already part?

7          MR. SHUMAKER:  The -- the fact that the money was

8  going to go to the pensioners, to Classes 10 and 11.

9          THE COURT:  I'm feeling some ambiguity about your

10 question.  Can you sharpen it up first?

11 Q   Mr. Gilbert, without going into any discussions with

12 mediators, or Judge Rosen, how did the idea of the grand

13 bargain get presented to you?

14         MR. MCCARTHY:  Same objection, Your Honor.  And that

15 -- that one would violate the mediation order on its face.

16         THE COURT:  I agree.  The objection is sustained.

17 Q   Why did you -- you indicated that keeping the DIA in --

18 in Detroit was -- was important.  Why do you -- why do you

19 believe that?

20 A   I'm sorry, I had a hard time hearing exactly.

21 Q   You indicated that the grand bargain entailed the art

22 going from the city into a -- a trust.  Do you -- why do you

23 believe that's important that the -- that that happen?

24 A   Well, I -- I think that a institution that is prominent

25 as the DIA is, and that is -- is culturally relevant as the

1  DIA is, not just in Detroit, in Michigan, but my understanding

2  nationally and internationally for the assets of a museum such

3  as that to be stripped and sold in bankruptcy would probably

4  be a blow for the City of Detroit and its image that, you

5  know, is an overwhelming challenge to -- to turn and -- and

6  get positive from -- from everything that's occurred, not only

7  in the bankruptcy, but in the decades prior to that that would

8  -- would almost be like the icing on the cake.

9      And it would be very very difficult to get those images

10  and that concept past, you know, almost the public relation

11  side which -- which ultimately, you know, affects the economic

12  viability of -- of a lot of things that happen in Detroit and

13  outside investors confidence.

14      And every day we are -- we are talking to investors from

15  -- from numerous places who come to Detroit who go on tours.

16  Should they move their offices, business, open up an office,

17  build new construction neighborhoods.  Ultimately they all ask

18  about the bankruptcy and then they ask about the DIA.  Are you

19  guys really going to sell off some of that art.  So -- so --

20      MR. MCCARTHY:  Objection, Your Honor.  Move to

21  strike the testimony as hearsay.  I did not mean to interrupt

22  the witness, but I guess I did.  I'm sorry, but I move to

23  strike the testimony as hearsay.

24      MR. SHUMAKER:  He's simply providing his

25  understanding of why it's important for the -- for the -- the

1 | DIA to get the money.

2 |        THE COURT:  I'll certainly permit him to testify to

3 | that.  But our rules don't permit you to allow you to recount

4 | for us what other people have said to you.  You can give us

5 | your opinion about why the DIA is important to the city.

6 | A    To answer the question, so I'm just trying to describe I

7 | think I'm trying to answer your question as to why I believe

8 | that would affect the economic viability I guess of the city

9 | going forward.  So I'm trying to give some -- some reasoning

10 | and feedback of why that is versus --

11 |        THE COURT:  Well, you can give us your opinion, but

12 | not the feedback.

13 | A    Okay.  But why I had my -- did you want to know why I had

14 | my -- I'm just asking the Court.  Do you want to know why I

15 | have my opinion?  These are my opinions, or how I got to have

16 | my opinion I guess.  I know nothing about the hearsay rules.

17 | And I went to law school too.  I know nothing.

18 | Q    Just your -- your personal view as to why it's important.

19 | A    Okay.  So I don't know where I left off.  I -- I -- you

20 | know, again an internationally acclaimed institution such as

21 | -- such as the DIA which is probably the single biggest, you

22 | know, cultural significant attraction in the City of Detroit

23 | and -- and is prominent in national, international circles for

24 | -- for the -- the vision or image of that kind of art being

25 | stripped and sold in a bankruptcy is -- is -- is an image and

1  vision I think that would be overwhelmingly difficult to

2  overcome even post-bankruptcy for the -- for the effort of

3  trying to get investment into the city and convince others of

4  why Detroit has turned and -- and going in the positive and

5  correct and right direction.

6  Q    Just recalling the RRIs that we were talking about.

7  A    Can you -- can you remind me?  I'm sorry.  I --

8  Q    The RRIs.

9  A    Yeah.

10 Q    The blight remediation, the chart, and the disclosure

11 statement that identified the different areas.

12 A    What does that stand for again?

13 Q    The restructuring and re-investment initiatives.

14 A    Okay.  Thank you.

15 Q    The -- my question is whether you have faith that the

16 Mayor and the city council can implement those RRIs?

17         MR. MCCARTHY:  Objection Your Honor, lack of

18 foundation.

19         THE COURT:  Overruled.  Go ahead, sir.

20 A    The -- the numbers the --

21 Q    Just the -- the blight remediation, the public safety

22 initiatives, the general services.  Do you believe that the

23 Mayor and the city council are -- are capable of following

24 through on those initiatives?

25 A    I believe --

1          MR. MCCARTHY:  Objection, Your Honor.  And

2   specifically with respect to any initiatives beyond blight.

3          THE COURT:  Overruled.  Go ahead, sir.

4   A    I -- I believe the Mayor and the council is in --

5   compared to past Mayors and councils and I think they're in --

6   it's in the best possible -- not best possible, but in the

7   best position and has the best opportunity and the best -- and

8   the most capacity and resolve and motivation to -- to

9   implement the RRIs versus -- versus what I've seen in my

10  experience prior to this.

11         And I think that particularly related to blight, that the

12  land bank already has shown significant progress, you know, to

13  the tune of, I believe close to 1,000 demolitions a month

14  right now.  And -- and is making progress and -- and building

15  up capacity, operational capacity, and -- and otherwise to --

16  to execute this in a pretty good way.

17         MR. SHUMAKER:  Thank you, Mr. Gilbert.  That's all I

18  have for now, Your Honor.

19         THE COURT:  All right.

20         MR. MCCARTHY:  Your Honor, Ed McCarthy on behalf of

21  FGIC.

22         THE COURT:  Go ahead, sir.

23         MR. MCCARTHY:  Thank you.

24                       CROSS EXAMINATION

25  BY MR. MCCARTHY:

1  Q    Good morning, Mr. Gilbert.  We haven't had a chance to

2  speak before.  My name is Ed McCarthy.  I have just a few

3  questions for you.

4       Now talking about big picture, the RRIs, the

5  re-investment initiatives.  The chart you looked at today with

6  Mr. Shumaker.  You don't know if the city is required to make

7  the billions of dollars investment exactly as it's laid out in

8  those RRIs, do you?

9  A    Don't understand exactly the question.  Do I know --

10 Q    Do you know if the city is required to make, to fund the

11 amount of money that that chart indicated was -- was going to

12 be funded for the RRIs?

13 A    Required, or are you asking if there's a need for --

14 Q    I'm asking required.

15 A    I don't know who has the -- I think the Bankruptcy Court

16 has the authority to require it or not, I believe.  But I

17 don't -- I don't have knowledge of that.

18 Q    Do you know one way or the other whether the city is

19 required to fund that -- that exact amount of money?

20 A    My understanding is, is that the -- ultimately the

21 Bankruptcy Court determines what the numbers are in the plan

22 of adjustment.

23         THE COURT:  Mr. Gilbert, the question really was not

24 whether these expenditures are legally required.

25 A    Uh-huh.

 1          THE COURT:  He means whether they are required in

 2  order for the -- the city to return to a situation where it's

 3  providing adequate services to its citizens.  That's what he

 4  means.

 5  A    Oh, I think in a perfect world you probably will need

 6  more money than -- than is here is my opinion.

 7  Q    Mr. Gilbert, you were deposed previously in this case,

 8  correct?

 9  A    Yes.

10  Q    And that was on 2-29, here in Detroit, right?

11  A    Sounds -- sounds right.

12  Q    And you knew you were -- well, you did tell the truth at

13  your deposition, correct?

14  A    Of course.

15  Q    I want to --

16          MR. MCCARTHY:  May I approach, Your Honor?

17          THE COURT:  What do you have there?

18          MR. MCCARTHY:  A copy of his deposition.

19          THE COURT: Yes.

20          MR. MCCARTHY:  Would Your Honor like a copy?

21          THE COURT:  No, that's okay.

22  Q    Mr. Gilbert, is that a copy of your deposition?  See from

23  the cover page?

24  A    Yes.  It says Dan Gilbert and the United States

25  Bankruptcy Court.  I'm not sure I like that.  For the Eastern

1  District of Michigan.

2  Q    Mr. Gilbert, could you turn to Page 96 of your

3  deposition?

4  A    Ninety -- 96?

5  Q    Ninety-six, please.  And when you're at Page 96, go to

6  Line 9, please.

7  A    So there's four Line 9's.

8  Q    Page 96 is in the top right hand -- I'm sorry, Page 96 --

9  A    Oh, I see.

10  Q    And I can help you.

11  A    No, I see.  I've got it.

12  Q    Okay.

13  A    Page 9 -- yes, I see it.

14  Q    Page 96, Line 9.  Did I ask -- not me, but did someone

15  else actually.  Were you asked this question and did you

16  provide this answer at your deposition.

17       "Do you know if the city is required to make the 1.4

18  billion in re-investment exactly as they've laid out in the

19  chart we were looking at?  Answer, I don't know".

20       Were you asked that question and did you provide that

21  answer at your deposition?

22  A    Yeah, that's what it says here, so I assume that's how I

23  answered it.

24  Q    That's how you answered it?

25  A    That's what it says here so I assume it's correct.

1  Q    Thank you.  Moving on to another topic.  And you can --

2  you can put that down if you'd like, Mr. Gilbert.  You

3  testified earlier about the importance of the DIA to the city,

4  correct?

5  A    Yes.

6  Q    And -- and it's your belief, your personal belief, that

7  the DIA is important to the city, correct?

8  A    Yes.

9  Q    You would have to guess to know how many people visit the

10 DIA each year, right?

11 A    I've -- I've heard numbers recently, but -- so would I

12 have to guess?  No, I think I have a pretty good estimate

13 ballpark figure.

14 Q    But to come up with an exact number that would be a guess

15 by you, correct?

16 A    Today right here to come up with a specific exact number

17 of how many people visit the DIA, let's say this year?  That

18 would be a guess.

19 Q    And do you know how many people from outside of Detroit

20 visit the DIA each year?

21 A    I had heard it's something like 25 to 30% of the

22 visitors.  Outside of the metropolitan area of Detroit.

23 Q    Can you turn to your deposition Page 141, please?

24 A    Yes, I'm here at 141.

25 Q    If you could go to Line 23.  And then this is going to go

1  to the next page as well, Kim too.  Were you asked this -- the

2  question and did you provide the following answers at your

3  deposition?

4      Question, do you believe that the DIA -- excuse me,

5  question, do you know how many people from outside of Detroit

6  visit the DIA each year?  Answer, outside of the city?

7  Question, outside of the City of Detroit.  Answer, like versus

8  700,000 people who live in the city?  Yeah.  Answer, no, I

9  don't know the number.

10      Were you asked that question and did you provide those

11  answers at your deposition?

12  A   Yeah, that was a different question than I just responded

13  to you if that's what you're trying to ask me.  But yes,

14  that's -- I did -- I mean that's what it says here, so I

15  assume it's correct.

16  Q   And while you believe the DIA provides economic benefits

17  to the city, you don't know exactly what those benefits are,

18  do you?

19  A   I know what they are, I couldn't tell you the dollar

20  amounts of -- of what they are.

21  Q   You couldn't tell me exactly what those benefits are,

22  could you?

23  A   Today are you asking me to tell you what benefits or --

24  Q   I'm asking you whether you could.  Yes or no.

25  A   Whether I would tell you today?

1  Q    Whether you could as you sit here.

2         THE COURT:  Well, excuse me, counsel.  But by

3  benefits do you mean the dollar amount of them, or generically

4  what they are?

5         MR. MCCARTHY:  I believe --

6         THE COURT:  Or don't you know because your

7  deposition question was too vague?

8         MR. MCCARTHY:  The deposition question, and Your

9  Honor, it wasn't my question, but I will say it was quite

10 specific.  It said the DIA provides economic benefits to the

11 city.  So let's focus on that.

12        THE COURT:  Okay.

13        MR. MCCARTHY:  And thank you for the clarification,

14 Your Honor.

15 Q    So as you sit here today could you tell me the economic

16 benefits -- actually let me rephrase the question.  As you sit

17 here today --

18 A    Uh-huh.

19 Q    -- isn't it true that you can't tell me the economic

20 benefits that the DIA provides to the City of Detroit?

21 A    I'm going to ask the same question the Judge asked.  Are

22 you asking the economic benefits in numerical terms, or in

23 categorical terms?  Because it's hard for me to answer the

24 question unless I know what that means.

25 Q    Could you tell me in numerical terms?  As you sit here

1  today yes or no, can you tell me what the economic benefits

2  are in numerical terms that the DIA provides to the City of

3  Detroit?

4           MR. SHUMAKER:  Objection, Your Honor.  He says he

5  doesn't understand the question.

6           MR. MCCARTHY:  I have rephrased the question.

7           THE COURT:  This is a -- this is a different

8  question.  Can you -- can you answer that question?

9  A    For me to predict the future in the specific exact

10 numerical number as to how that would pan out, no, that would

11 be -- that would be not a question you could answer.

12 Q    And you have not performed or had anyone else perform an

13 economic impact analysis for the DIA, have you?

14 A    That would -- I just want to be clear.  That would get to

15 a numerical response?

16 Q    Yes.

17 A    No.  I -- I haven't, no.

18 Q    And you haven't seen any studies analyzing the economic

19 impact of the DIA and the city that would as you put it, get

20 you a numerical term, have you?

21 A    No.

22 Q    And you haven't reviewed research or studied whether the

23 City of Detroit needs a museum of the size of the DIA in order

24 to provide essential services to its residents, have you?

25 A    I just need to understand the question again.  The -- one

1  more time.

2  Q    Sure, let's break it down.

3            THE COURT:  I'm going to suggest that you try to

4  speak a little slower.

5            MR. MCCARTHY:  Yes, Your Honor, I will.

6  Q    Let's break it down a little bit.  Have you personally

7  conducted any study to determine whether the City of Detroit

8  needs a museum of the size of the DIA in order to provide

9  essential services to the City of Detroit and its residents?

10 A    No, I -- I think that would be an impossible thing to

11 sell for.

12 Q    And you've conducted studies with respect to blight

13 remediation in the city, correct?

14 A    I was the chair of a task force that yes, issued a report

15 on that.

16 Q    You oversaw studies regarding -- regarding blight then,

17 right?

18 A    Oversaw studies.  I just -- I mean I don't mean to be

19 difficult, but I just don't understand what you're saying.

20 Did I read previous reports of what others had said about

21 blight in Detroit?  Is that the question?

22 Q    Let's -- yeah, answer that question.  You -- you did

23 oversee reports that others have drafted, correct?

24 A    Well, oversee -- I didn't oversee other reports.  I read

25 reports in the past that people had done that weren't nearly

1  as extensive but pieces of reports, yes.

2  Q    Did you ask any of those individuals to prepare those

3  reports?

4  A    No, no.

5  Q    Are you aware of who did ask those individuals to prepare

6  those reports for -- for blight remediation?

7  A    One more time.

8  Q    Are you aware of who did ask those individuals to prepare

9  reports regarding blight remediation --

10          THE COURT:  You guys are so on different tracks

11  here.  You're talking past each other.

12  Q    All right.  Let's move past it because I actually don't

13  want to focus on blight remediation.  I commend your efforts

14  there.

15          Did you conduct personally any studies to determine the

16  impact of selling any of the art from the DIA?

17  A    Did I personally?  No, no.  The answer is no.

18  Q    Did you conduct any studies to determine what would

19  happen to Detroit if even one of the pieces of art at the DIA

20  were sold?

21  A    No.

22  Q    What about if two of the pieces of art were sold?  Did

23  you conduct any studies to confirm the impact of that on the

24  City of Detroit?

25  A    Well, if I didn't do one for one, I think it would be

1  impossible to do it for two.

2  Q    And just a few more questions, Mr. Gilbert.

3  A    Sure.

4  Q    All of this work that you've described here today from

5  the questions from Mr. Shumaker and our brief questions

6  regarding -- regarding blight removal, that work was able to

7  begin before confirmation of the plan of adjustment, right?

8  A    I -- I need to be familiar with the dates of the plan of

9  adjustment and -- are you saying the work that we began on the

10  blight task force, did that start before the four hundred and

11  something million dollar number that was put in for the blight

12  removal?

13  Q    Let me clarify.  Confirmation of the plan of adjustment

14  will not occur until after this trial is completed or

15  otherwise.  Is that -- is that your understanding?

16  A    That's my understanding, yes.

17  Q    Okay.  And so all of the work that you described that you

18  began regarding -- that has begun regarding the blight removal

19  task force, that was able to begin before confirmation of the

20  plan of adjustment, correct?

21  A    Yes, because there's pieces of the funding that came from

22  harnessing of funds from the federal government.  So they

23  began the blight with those funds -- blight removal with those

24  funds.

25  Q    And that blight removal process has moved forward as

1  you've testified notwithstanding the fact that the Court has

2  not yet ruled on confirmation of a plan, right?

3  A    Yes.  Because it's I think like $100,000,000 plus in

4  there.  So yeah, they've got quite a runway there.

5  Q    And your commitment to this city as a businessman as part

6  of your philanthropic efforts --

7  A    Uh-huh.

8  Q    -- which I commend again.  Those began before this

9  bankruptcy even started, right?

10  A    Yes.

11  Q    And that commitment, that would continue even after this

12  bankruptcy ends, correct?

13  A    Yes.

14         MR. MCCARTHY:  I have no further questions for you

15  now, Mr. Gilbert.

16         THE COURT:  Any other questions for the witness?

17                    CROSS EXAMINATION

18  BY MR. WAGNER:

19  Q    Mr. Gilbert, Jonathan Wagner on behalf of the COPS.  I

20  think you testified earlier --

21  A    I'm sorry, on behalf of who?

22  Q    Of the COPS holders.

23  A    Okay.

24  Q    Not the policemen, but --

25  A    Okay.

1  Q    Okay.

2          MR. WAGNER:  May I proceed, Your Honor?

3          THE COURT:  Well, perhaps you ought to define for

4  the witness what you means by COPS holders.

5  Q    Holders of the certificates of participation.

6  A    Okay.

7  Q    Issued by the city.  Issued by the funding trust.  I

8  think you testified earlier you invested 1.4 billion dollars

9  in real estate in Detroit?

10 A    Yes.  That's inclusive of Greektown Casino.

11 Q    And you were asked why.

12 A    Uh-huh.  Yes.

13 Q    That's articulated yes.  I take it one of the reasons

14 though is you wanted to make money, right?

15 A    Yes.

16 Q    And I think you testified that your donation to the grand

17 bargain was $5,000,000, right?

18 A    Yes.

19         MR. WAGNER:  Nothing further.

20         THE COURT:  Any further questions -- questions for

21 the witness?  No?

22         MR. SHUMAKER:  No, Your Honor.

23         THE COURT:  All right, sir.  You are excused.  Thank

24 you very much for coming today.

25         (WITNESS DANIEL GILBERT WAS EXCUSED AT 9:51 A.M.)

1          THE COURT:  All right.  We have just a few minutes

2   until we have to break for the 10:00 matters, so I think we'll

3   take a recess at this time.  Because of those matters and a

4   federal bar lunch that I am committed to, we will reconvene at

5   2:00, please.  Mr. Hertzberg, was there something you wanted

6   to --

7          MR. HERTZBERG:  No.

8          THE COURT:  -- no, you're just eager to get out of

9   here.  Okay.  We'll be in recess.

10          MR. SHUMAKER:  Thank you, Your Honor.

11          THE CLERK:  All rise.  Court is in recess.

12      (Court in Recess at 9:52 a.m.; Resume at 10:00 a.m.)

13          THE CLERK:  All rise.  Court is in session.  All

14   cell phones power down, please.  Court is in session.  Please

15   be seated.  Recalling case number 13-53846, City of Detroit,

16   Michigan.

17          THE COURT:  Okay.  I'd like to start with the

18   objections to claims, please.

19          MS. DOLCOURT:  Tamar Dolcourt of Foley and Lardner

20   on behalf of the City of Detroit.

21          THE COURT:  One second, please.  Okay.  Ms.

22   Dolcourt, what I'd like you to do is just start in with what

23   your objections are and we'll take them one by one.

24          MS. DOLCOURT:  Okay.  Thank you, Your Honor.  I'm

25   going to start --

1           THE COURT:  I'll let you choose the order of the

2   objections.

3           MS. DOLCOURT:  I'm going to start with the fifth

4   omnibus objection to claims.

5           THE COURT:  Okay.

6           MS. DOLCOURT:  With respect to the fifth omnibus

7   objection to claims we had several responses filed.  We also

8   had informal communications with several of the claimants.

9       At this point the only two claims which will be heard

10  today are related to Lynnette Benson and George Edward Carter.

11  Everything else has either had no response filed, been

12  withdrawn, or been adjourned.  You saw yesterday there was a

13  stipulation to adjourn Mr. Gesing's hearing to the 5th.

14      So the first one on the fifth omnibus objection is

15  Lynnette Benson.  And --

16          THE COURT:  Lynnette Benson here or anyone

17  representing her?  No response.  What is your objection?

18          MS. DOLCOURT:  Our objection is that Ms. Benson

19  received notice of the bar date and filed her proof of claim

20  on March 6th.  She filed a response, but didn't say why the

21  claim was late filed or anything to support the -- the late

22  filing.  So we would ask that her claim be disallowed.

23          THE COURT:  All right.  Your objection is sustained

24  the claim is disallowed.

25          MS. DOLCOURT:  Thank you.  The next claim George

1  Edward Carter.  And --

2          THE COURT:  Is George Edward Carter here?

3          MR. DWORETSKY:  Your Honor --

4          THE COURT:  Step forward, please, sir.

5          MR. DWORETSKY:  Yes, Your Honor.

6          THE COURT:  I didn't get your name.  What is it,

7  please?

8          MR. DWORETSKY:  David Dworetsky from Fieger Law.

9          THE COURT:  Okay.  Go ahead, Ma'am.

10          MS. DOLCOURT:  So our -- you know, Mr. -- Mr. Carter

11  received notice of his -- of the bar date for his counsel at

12  the Fieger Law Firm and filed a proof of claim.  It was

13  received in California by KCC on February 24th after the bar

14  date.  And we would ask that it be disallowed.

15      The response that was filed states that they mailed it

16  before the bar date and it just didn't arrive on time and the

17  -- Mr. Carter's counsel has asked that this Court use its

18  discretion to not disallow the claim at this time.  And based

19  on the excusable neglect standards that the Supreme Court

20  outlined, we don't believe that's appropriate.

21      It's a very large claim, potentially $50,000,000.  Which

22  we believe would prejudice the other claimants who timely

23  filed their claims.  And also because the delay --

24          THE COURT:  Well, but -- but is that the question,

25  or is the question whether the fact that it was filed late

1   prejudices your ability to object to the claim on its merits?

2          MS. DOLCOURT: Well, Your Honor, we would -- we

3   would say that if the Court allows the claim to not be

4   disallowed under late filing grounds, that the city be allowed

5   to continue the litigation with respect to the claim. It had

6   actually gotten to --

7          THE COURT: Okay. So there's no prejudice to the

8   defense of the merits, or to the defense of the claim on its

9   merits by the late filing, is there?

10         MS. DOLCOURT: Assume that this Court allows us to

11  file a subsequent objection to the proof of claim, no. But we

12  also believe that the third standard under the Pioneer case in

13  the Supreme Court which is whether or not the delay was in the

14  control of the movant is also -- weighs in our favor because

15  they were the ones who had the ability to mail the proof of

16  claim. They could have insured timely filing by using a

17  different delivery method and they did not.

18         THE COURT: Sir.

19         MR. DWORETSKY: Thank you, Your Honor. Counsel is

20  correct that the --

21         THE COURT: Fifty million dollars is a lot of money

22  to trust to the mail.

23         MR. DWORETSKY: Absolutely, Your Honor.

24         THE COURT: Why did you do that?

25         MR. DWORETSKY: However --

1                    THE COURT:  Why did you do that?

2                    MR. DWORETSKY:  Proof of -- proof of claim was

3   mailed --

4                    THE COURT:  Why did you do that?

5                    MR. DWORETSKY:  The proof of claim was mailed

6   pursuant to the order to the address directed.  It was sent

7   within a reasonable time to allow for receipt.

8                    THE COURT:  Maybe.

9                    MR. DWORETSKY:  Well -- well, I suppose that's --

10                   THE COURT:  Fifty million dollars is a lot of money

11  to trust to the mail.

12                   MR. DWORETSKY:  Understood, Your Honor.  And --

13                   THE COURT:  Why did you do that?

14                   MR. DWORETSKY:  The directions on the order were --

15  were filed.  Counsel was directed --

16                   THE COURT:  Well, no, they weren't because --

17                   MR. DWORETSKY:  Counsel was directed to mail them to

18  California.

19                   THE COURT:  Because it was -- it was received in

20  California late.

21                   MR. DWORETSKY:  Well, Your Honor, I -- I don't know

22  when it -- when it was received late.  It was mailed within a

23  reasonable amount of time.  I suppose that's --

24                   THE COURT:  Do you have any evidence that it was

25  timely received, sir?

1           MR. DWORETSKY:  I -- I don't.  I don't.  But I

2    suppose that's why the Federal Courts follow -- follow the

3    mailbox rule allowing --

4           THE COURT:  Well, they do except when they don't.

5           MR. DWORETSKY:  Understood, Your Honor.  We -- we

6    simply ask for the Court's equity here.  Mr. Carter would --

7    would be greatly prejudiced when -- when his claim was mailed

8    within what we believe was a reasonable allowance of time for

9    receipt.

10      The city has known about this claim as counsel mentioned,

11   this claim was in litigation for -- for several years.  The

12   prejudice here would be to Mr. Carter when there are claims

13   that -- that might have been sent in the mail after his, that

14   are accepted.  It just -- it just wouldn't make sense to -- to

15   Mr. Carter on an equity grounds to bar his claim when it was

16   sent within what we believed was a reasonable time for receipt

17   by the bar date.

18          THE COURT:  Anything further, Ma'am?

19          MS. DOLCOURT:  Your Honor, I would just add that --

20   that we have not finished all of the late filed claim

21   objections.  The fifth and sixth omnibus objections were only

22   with respect to people who had notice of the bar date.

23      So the fact that other claims may have been received in

24   the mail, I know Mr. Fieger's firm filed other claims.  The

25   city is in the process of investigating those and has not yet

1 filed all of its late filed claim objections.

2     And we would just argue that the bar date notice was very

3 clear.  The claim had to be received in California on February

4 21ˢᵗ by 4:00 p.m. and it was not.

5          THE COURT:  Okay.  It certainly was negligent of the

6 city to put its client's claim at risk by invoking a process

7 that didn't guarantee its delivery by the -- the date that the

8 Court ordered claims to be received by.

9     On the other hand, the city obviously knew about the

10 claim before the bar date and perhaps even before the

11 bankruptcy was commenced.  Oh, I said negligent of the city, I

12 meant negligent of the claimant, sorry.

13     Was negligent of the claimant not to invoke a service

14 method that didn't guarantee receipt by the required date.

15 But the -- but the city did know of the -- of the claim and it

16 was not a surprise.  And there is no prejudice to its defense

17 of the claim from the fact that it was received a few days

18 late.

19     So in the circumstances the Court does agree that equity

20 requires the Court to overrule this objection and allow the

21 process to proceed on -- on its merits.  And you may file an

22 objection to the claim on its merits in due course.

23          MS. DOLCOURT:  Thank you, Your Honor.

24          MR. DWORETSKY:  Thank you, Your Honor.

25          THE COURT:  Next.

1          MS. DOLCOURT:  The next objection is the sixth

2    omnibus objection also to late filed claims, Your Honor.  The

3    first response that we see -- we received was by Ms. Janet

4    Peete.

5        And I believe she had contacted the Court to adjourn the

6    hearing.  She didn't contact us, but I had spoken to her a few

7    weeks ago and she had been in the hospital.  So we're willing

8    to adjourn that hearing to November 5th if that's all right for

9    the Court.

10         THE COURT:  All right.  This matter is adjourned

11   until that date then.

12         MS. DOLCOURT:  The next objection was filed by Ms.

13   Linda Lynk.  And again it is a late filed claim.  I don't know

14   if Ms. Lynk --

15         THE COURT:  One second.  Is Ms. Lynk here or anyone

16   on her behalf?  Apparently not.  What is your objection?

17         MS. DOLCOURT:  Our objection is that the claim that

18   she filed was received late.  It was sent to this Court and

19   not received at the Court until February 24th.

20       Ms. Lynk's claim is a little bit confusing for -- for the

21   city to decipher.  She does have a pension.  She received a

22   ballot as a retiree.  And to the extent that her proof of

23   claim relates to a pension, we have no objection because the

24   late -- the bar date didn't apply to pension claims.

25         But the basis of the claim as written is wrongful death.

1 And then the amount claims an arrearage and a continuing

2 pension, so the city is not clear as to what her claim relates

3 to.  We would ask that the Court disallow the late filing for

4 anything other than pension related claims for Ms. Lynk.

5          THE COURT:  The Court agrees that the objection to

6 that extent should be sustained.  You may submit an order.

7          MS. DOLCOURT:  Thank you.  And then the -- the final

8 one on the sixth omnibus objection is Marvin Seals.  Similar

9 to Mr. Carter, he also had retained the Fieger firm.  And also

10 we received a late filed claim from him.

11          THE COURT:  One second.  Are you here on that matter

12 too, sir?

13          MR. DWORETSKY:  I am, Your Honor.

14          THE COURT:  All right.  You may step forward.

15          MR. DWORETSKY:  Thank you.

16          MS. DOLCOURT:  You know, Your Honor, it's -- it's

17 almost exactly the same scenario.  They mailed the claim

18 through first class mail.  Mr. Seals received notice.  His

19 counsel received notice.

20      The response does not dispute the fact it was a known

21 case at the time.  And again, you know, we believe that it is

22 in the control of the movant and his counsel as to how they

23 file the proof of claim.

24          THE COURT:  All right.  For the same reasons, the

25 Court will overrule the objection

1           MS. DOLCOURT:  Your Honor, just to be clear, the

2  city has the right to file other objections?

3           THE COURT:  Yes.

4           MR. DWORETSKY:  Thank you, Your Honor.  Thank you.

5           MS. DOLCOURT:  And then finally, Your Honor, we have

6  the seventh omnibus objection.  And the seventh omnibus

7  objection was related to parties who appeared to indicate that

8  some or all of their claim is subject to 503(b)(9) of the

9  Bankruptcy Code.

10     It was the same claim form and we believe that some

11  people may have misunderstood that.  The objection doesn't

12  seek to disallow those claims, it only seeks to re-classify

13  them into the appropriate unsecured claim category.

14           THE COURT:  All right.  I need you to state on the

15  record the creditors who filed those claims.

16           MS. DOLCOURT:  Yes, Your Honor.  So the two

17  creditors who filed responses are Renee Jones and Tommy

18  Bankston.

19           THE COURT:  Are either of those people here today?

20  Both of you?  Please step forward.

21           MS. JONES:  Hello, sir.

22           THE COURT:  Hi, what is your name?

23           MS. JONES:  Renee Jones.

24           THE COURT:  And sir, what is your name?

25           MR. BANKSTON:  Your Honor, Tommy Bankston.

1          THE COURT:  Okay.  The city does not propose to

2  disallow your claim at all.  It -- it proposes to allow it.

3      What it objects to is your request that your claim be

4  given a priority status under this very specific provision of

5  the Bankruptcy Code that really doesn't apply to your claims

6  -- to your claims.  Oh, excuse me.

7      Is there anything you'd like to say about these matters?

8  Ma'am, I'll let you go first.

9          MS. JONES:  I just want to know are really -- they

10  sent like a big old encyclopedia.  And I really be trying to,

11  you know --

12          THE COURT:  You must be -- you must be referring to

13  the -- to the disclosure statement.

14          MS. JONES:  Yes.  And it's like the -- it's bigger

15  than the syllabus and I don't be understanding it.

16          THE COURT:  I know.

17          MS. JONES:  And so I'm just here to find out are

18  they -- are they saying that by it's unsecured does that mean

19  that I have to stop going to the doctor's.  Because I'm still

20  going to the doctor's.  So I mean do I not have the surgeries.

21  Or I'm not understanding what does this mean.

22          THE COURT:  What it means is that if the plan is

23  confirmed your claim will be treated like all other unsecured

24  claims and you will get a dividend, a certain portion of your

25  claim, not a very big portion.  But it's -- it's yet to be

1  determined exactly what it will be.

2           MS. JONES:  Okay.

3           THE COURT:  In terms of your very important

4  questions, I can't answer them for you.

5           MS. JONES:  Okay.

6           THE COURT:  I just -- I just can't.  Sir?

7           MR. BANKSTON:  So will I have a chance to speak to

8  the Court?  You're saying it's going to be changed.  We going

9  to put it into the basket.

10          THE COURT:  What I'm -- what I'm saying -- yeah,

11 what I'm saying is the city wants to treat your claim just

12 like all the other unsecured claims and not give it a special

13 priority treatment because it isn't entitled to priority

14 treatment under the bankruptcy laws.  But they don't want to

15 disallow your claim all together.

16          MR. BANKSTON:  Okay.  Well, it got jumbled up some

17 kind of way.  I'm kind of not understanding either.  So I

18 don't get to state my own --

19          THE COURT:  No, it's -- it's a little -- it's a

20 little complicated.  The -- the form you used, it had a check

21 box, right?

22          MR. BANKSTON:  Yes.

23          MS. DOLCOURT:  Yes, Your Honor.

24          THE COURT:  Yeah.  And you put a check mark by a

25 section of the Bankruptcy Code, Code 503(b)(6).  Yeah, you

1  shouldn't have done that because -- because that section of

2  the Bankruptcy Code does not apply to you or to your claim.

3      And so the city is just trying to straighten that out.

4  They don't -- they don't object to your claim, just that

5  treatment of your claim.

6          MR. BANKSTON:  So I will be able to state -- make

7  some statements later, or I'm down here because there was a

8  mistake made and --

9          THE COURT:  You're down here because the city wants

10 to allow your claim in the amount that you have requested it,

11 but not to give it special treatment.  That's all that's

12 before the Court.

13         MR. BANKSTON:  Okay.

14         THE COURT:  Okay.

15         MR. BANKSTON:  Thank you.

16         THE COURT:  All right.  You may submit an order on

17 those.

18         MS. DOLCOURT:  Thank you, Your Honor.  And that's

19 all I have on the omnibus claims objections.

20         THE COURT:  Okay.  One second, please.  Let's turn

21 our attention to the MIDD claim, please.  Appearances on that

22 one.

23         MR. WATSON:  Good morning, Your Honor.  Jerome

24 Watson appearing on behalf of the debtor, City of Detroit.

25         MR. BRILLIANT:  Good morning, Your Honor.  Allan

1  Brilliant from Dechert, LLP on behalf of -- of MIDD.  And I'm

2  joined by my co-counsel, Raechel Badalamenti from Kirk, Huth.

3          THE COURT:  Okay.

4          MR. BASHAHED:  (Phonetic)  Your Honor, Mr. Bashahed,

5  I'm an associate of Cheryl Morrissey.

6          THE COURT:  Okay.  So how -- how do you all propose

7  that this matter should be litigated?

8          MR. BRILLIANT:  Can I -- can I --

9          THE COURT:  Yes, please.

10          MR. BRILLIANT:  Thank you.  After being here for --

11  on and off for a few weeks, it's hard to talk from sitting

12  down.

13      Your Honor, we've -- we've had some discussions.  I don't

14  know -- know that we necessarily agree.  As Your Honor

15  probably remembers, we had some very expedited discovery and

16  we had the 3018 hearing.

17      As part of -- of that we did not get all the documents

18  that we had requested, nor did we ask for all the documents

19  that we would need for final allowance of -- of the claim.

20  And there was no third party discovery including, you know,

21  third party --

22          THE COURT:  Right.

23          MR. BRILLIANT:  -- depositions.  And by third

24  parties here, I'm talking about people who no longer work for

25  DWSD or the -- you know, the city, Mr. Mercado and others who

1  are actors in connection with the allegations.  But as Your

2  Honor knows, were indicted, went to prison and no longer with

3  the -- with the city.

4      So our -- our expectation is that it will probably take,

5  you know, between -- you know, six to nine months to get

6  documentary discovery, you know depositions, and then have a

7  final allowance, you know, hearing which, you know, hopefully

8  could be at the end of, you know, the summer or you know, the

9  beginning of -- of fall next year.

10      In -- in light of the fact that this doesn't have to be

11  done prior to confirmation, our expectation is that would be,

12  you know, inappropriate time frame for -- for discovery and

13  the possibility of allowance.

14      As Your Honor knows, all the parties have been called to

15  mediation in connection with the plan.  And these issues, you

16  know, potentially will be wrapped up in connection with that

17  and if there can be a resolution obviously that would be a

18  good thing.

19      But in -- but if -- if, you know, if we don't settle it,

20  our expectation is there will need to be additional discovery

21  and -- and probably -- probably at some point at the end of

22  discovery, the possibility of dispositive motions, but, you

23  know, at this point, our -- our sense is it's probably going

24  to take a fair amount of time to get this ready for trial.

25          THE COURT:  Sir

1        MR. WATSON:  Your Honor, we agree with the general

2  outline.  The six to nine months seems a bit long to us.

3  There were nine depositions taken.  We produced all the

4  documents that the city had and -- and MIDD was entitled to

5  look at those documents.

6        So the six to nine months seems a bit long.  And we also

7  want to point out, we would like to file a dispositive motion.

8  We'll look at whether or not we should file that before the

9  conclusion of discovery.  The four key individuals have

10  already been deposed so there might not need to be a reason to

11  wait a long time to file that motion.

12        But generally the outline of discovery, dispositive

13  motion, then some type of hearing, we agree to.

14        THE COURT:  All right.  Stand by, please.

15        Well, totally coincidentally six months from today is

16  April 1st.  So not that you should draw any inferences but I

17  will set that as the last day for discovery.

18        With regard to dispositive motions, I -- I think the --

19  that to the extent that dispositive motions are based on the

20  legal issues that the city has raised in its objection to the

21  claim and -- and argued when we did our estimation hearing,

22  those can be done at any time.  They don't need to wait until

23  the end of discovery.  And I -- and I would encourage you to

24  pursue them promptly.

25        On the other hand to the extent that dispositive motions

1 might be based on facts that you discovered during the

2 discovery period, I think it's very unlikely that dispositive

3 motions will assist in the resolution of this matter.

4 So I'm not going to set aside time for that after the

5 discovery cut off. I think we'll just go to a final pre-trial

6 conference and a trial.

7 So the Court will set a final pre-trial conference for --

8 one second. Monday, April 13th and trial for Monday, April

9 27th. And having said that, I invite you as I have throughout

10 the case, to get me on the telephone in a conference call with

11 any discovery disputes that arise during your case rather than

12 to pursue the much more formal and expensive route of motions,

13 et cetera. Okay?

14         MR. WATSON:  Thank you, Your Honor.

15         MR. BRILLIANT:  Thank you, Judge.

16         THE COURT:  All right. And I think that's -- that's

17 all we can do today unless there's something else you'd like

18 to raise.

19         MR. BRILLIANT:  You know, there's not, Your Honor.

20 I mean there's been you know, I don't know what's appropriate

21 to tell Your Honor, in connection with the -- the mediation.

22         THE COURT:  Not much.

23         MR. BRILLIANT:  We think that was said, you know,

24 didn't -- didn't work for Mr. Watson.

25         THE COURT:  Oh, yeah, you're going to be able to

1 work that out with --

2          MR. WATSON:  We're trying to work that out, Your

3 Honor.

4          THE COURT:  With Mr. Driker, okay.

5          MR. BRILLIANT:  Thank you, Your Honor.

6          MR. WATSON:  Thank you, Your Honor.

7          THE COURT:  One more second, please.  All right.

8 Chris, go ahead and call the two adversaries.

9          THE CLERK:  Adversary number 14-04112, City of

10 Detroit, Michigan versus Detroit General Retirement System

11 Service Corporation.

12          THE COURT:  Oh, actually hold on one second.  I

13 think it would be more efficient actually if I hear next

14 AFSCME's motion regarding the automatic stay.  And then we'll

15 get to the motions to dismiss.  So let -- let's go ahead and

16 hear that next, please.

17          THE CLERK:  Recalling case number 13-53846.

18          THE COURT:  Let me ask one counsel for each side to

19 approach the lectern and put your appearance on the record,

20 please.

21          MR. MACK:  Richard Mack, Your Honor, on behalf of

22 AFSCME.

23          THE COURT:  Counsel, stay at the lectern for me.

24 Thank you.  Go ahead.

25          MR. FUSCO:  Timothy Fusco, Miller, Canfield on

1  behalf of the city and with me is Robert Faison from Dykema.

2          THE COURT:  All right.  So I just have one question,

3  the same question for each of you having read your papers.

4      It appears to the Court that the resolution of the motion

5  before it turns on whether Judge Cox's order prohibits or

6  allows AFSCME to proceed with its administrative claim.

7      If that's true, why not lift the automatic stay, grant

8  relief from the automatic stay for the purpose of filing a

9  proceeding before Cox to get an -- Judge Cox to get an answer

10  to that question.  And then we can know whether it's

11  appropriate to -- to grant relief from the automatic stay.

12          MR. MACK:  Your Honor, I -- I think most of the way

13  you're right.  We --

14          THE COURT:  You think what, sir?

15          MR. MACK:  I believe that's mostly correct.  We, as

16  a matter of fact suggested in our pleadings that we have

17  absolutely no problem notifying Judge Cox of what it is we

18  plan to file and have actually filed already with MERC and if

19  Judge Cox feels that he should be the arbitor of that issue,

20  then obviously we will direct the issue before him.  But

21  certainly I think you're correct in that whether the matter

22  should go before Cox, should be decided --

23          THE COURT:  Judge Cox.

24          MR. MACK:  Yes, Judge Cox, I'm sorry, forgive me.

25  Whether or not the matter should go before Judge Cox should be

1 decided by him.

2    But there is no reason to deny the motion to stay simply

3 because it has to be determined the appropriate tribunal for

4 the matter to be heard.

5         MR. FUSCO:  Your Honor, two things.  One with

6 respect to the unfair labor practice charge which is based on

7 a failure to bargain in good faith.  PA-436 eliminates any

8 obligation to negotiate.  And I think counsel has as much

9 admitted that in -- in his reply.

10    With respect to the specific issue, Mr. Faison who is

11 with me today was the trial counsel in all of the Cox matters

12 and -- and I --

13         THE COURT:  Judge Cox.

14         MR. FUSCO:  Judge Cox, I'm sorry.

15         THE COURT:  I'm sorry, I started that.  And I

16 apologize here on the record to Judge Cox.

17         MR. FUSCO:  It's Judge, Your Honor, so some -- but

18 Judge Cox.  I think I'd like Mr. Faison to answer that

19 specific question.

20         THE COURT:  Okay.

21         MR. FRANZINGER:  Good afternoon, Your Honor.  Mr.

22 Fusco can't keep his former partners straight.  My name is

23 Robert Franzinger.  Mr. --

24         MR. FUSCO:  Franzinger.  Mr. Faison is the chairman

25 of the board.  And as age creeps in things -- we should wear

1  name tags which include titles.

2        MR. FRANZINGER:  Your Honor, I think -- I think that

3  we -- we have indicated previously and I -- I -- we've

4  actually offered this previously, that -- and indicated we

5  would not oppose the -- the filing of that motion before Judge

6  Cox.  So I think it makes --

7        THE COURT:  Well, I think it's the most efficient

8  way to move this matter forward.  So in the circumstances, I'd

9  like to -- like to give AFSCME a period of time to file a

10  motion before Judge Cox for a ruling on this issue and then we

11  will reconvene this matter after he has a chance to either

12  rule or decide that he's not going to rule on the question.

13        MR. MACK:  Judge, given -- excuse me.

14        THE COURT:  Surely.

15        MR. MACK:  Given the -- the extreme time sensitivity

16  of this matter, may we ask Your Honor to allow the stay to be

17  lifted, a pleading to be filed with Judge Cox, and for MERC to

18  at least schedule proceedings and hearings on that matter so

19  that while we wait for Judge Cox, if Judge Cox were to

20  determine that --

21        THE COURT:  Well, but even that might violate his

22  order.  So no, the answer is no.  We need -- we need to find

23  out from -- from Judge Cox what the intention of his prior

24  order was before we do anything further.

25        MR. MACK:  Are you --

1           THE COURT:  All right.  I'll prepare an appropriate

2    order.

3           MR. MACK:  Do you have a time frame in mind, Your

4    Honor, as to --

5           THE COURT:  Well, I was going to ask you how much

6    time do you need to file your motion before Judge Cox?

7           MR. MACK:  We can file a motion by the end of the

8    week.

9           THE COURT:  All right.  I'll permit that.  And of

10   course you can request expedited consideration if you like if

11   you think that's appropriate.

12          MR. MACK:  Yes.

13          THE COURT:  And, you know, you'll process there.

14   Just keep me apprised of what the schedule is and -- and

15   ultimately what his ruling is so that we can reconvene and

16   figure out where we're going from there.

17          MR. MACK:  Would Your Honor like copies of the

18   pleadings?

19          THE COURT:  That would be nice.

20          MR. MACK:  Sure.

21          THE COURT:  Although I can tell you that if Judge

22   Cox says that what AFSCME proposes here does not violate his

23   order, it seems clear enough at that point that the stay would

24   have to be lifted.

25          MR. MACK:  Well, in his prior orders as we've laid

1 | out in our pleadings, there has actually been unit

2 | clarification proceedings filed when he said that's perfectly

3 | fine for MERC to consider those issues. So we're confident

4 | based on at least two of his prior orders --

5 |     THE COURT: Okay.

6 |     MR. MACK: -- that he'll permit this to proceed as

7 | well.

8 |     THE COURT: Excellent.

9 |     MR. FUSCO: Your Honor, just one thing. I think

10 | counsel is right on the unit clarification. That it says Your

11 | Honor says Judge Cox would find that did not violate his

12 | order. There still is the unfair labor practice which we

13 | believe under PA-436 can't go forward.

14 |     THE COURT: All right. We'll deal with that when we

15 | reconvene.

16 |     MR. FUSCO: All right. Thank you.

17 |     MR. MACK: What we would -- in our pleadings before

18 | Judge Cox, we would propose that both matters at least be

19 | addressed by him as to whether or not they can go forward

20 | within --

21 |     THE COURT: But the scope of PA-436 is not within

22 | the scope of that case, it's just not.

23 |     MR. MACK: Well, PA-436 does grant the city the

24 | right to not be subject to Section 15 of PERA. What the

25 | pleadings regarding the unfair labor practice charge, and this

1 is something which would have to be addressed by the attorneys

2 with AFSCME who filed the pleadings initially --

3          THE COURT:  Well, I'll tell you what.  I'll tell you

4 what.  You -- you can ask Judge Cox to rule on it.  If he

5 agrees to rule on it, then that's up to him.

6          MR. MACK:  Or at least whether or not it's something

7 that should be before him, or can be allowed to go before

8 MERC.  And then MERC --

9          THE COURT:  Or if it's something I should decide.

10 Let's -- let's let him figure out the scope.

11          MR. MACK:  Because obviously MERC can determine

12 whether or not there's a cause of action with -- with respect

13 to the unfair labor practice charge issue.

14          THE COURT:  Well, generally speaking of course

15 that's true.  But the stay would only be lifted if this Court

16 determines that it -- that that body or if Judge Cox

17 determines that that body has jurisdiction.

18          MR. MACK:  All right.  We'll start with Judge Cox,

19 Judge.

20          THE COURT:  I'll prepare an order.

21          MR. FUSCO:  Thank you, Your Honor.

22      (Court in Recess at 10:31 a.m.; Resume at 2:00 p.m.)

23          THE CLERK:  All rise.  Court is in session.  You may

24 be seated.  Calling case number 13-53846, City of Detroit,

25 Michigan.

1          THE COURT:  Is everyone here?  It looks like it.

2    Okay, let's begin.

3          MR. SHUMAKER:  Good afternoon, Your Honor.  Greg

4    Shumaker of Jones, Day for the city.  A preliminary matter.

5    We have consulted with FGIC's counsel and the -- their

6    concerns about the two exhibits that we reference earlier

7    today have been resolved and I believe all parties are in

8    agreement that the 144 exhibits reflect on what I'm about to

9    hand you could be admitted into evidence.

10          THE COURT:  All right.  Thank you.  Yes, we'll add

11   that to our list and enter an order.

12          MR. SHUMAKER:  Thank you, Your Honor.  And the City

13   of Detroit calls Brom Stibitz to the stand.

14          THE COURT:  Please raise your right hand.

15       (WITNESS BROM STIBITZ WAS SWORN)

16          THE COURT:  All right.  Please sit down.

17          MR. HOWELL:  Good afternoon, Your Honor.  Steven G.

18   Howell of Dickinson, Wright, special assistant Attorney

19   General appearing on behalf of the State of Michigan.  I will

20   be conducting the exam of Mr. Stibitz.  With me today is

21   Matthew Schneider, chief counsel to the -- in the Attorney

22   General's office as well as Dawn Copley of Dickinson, Wright.

23          THE COURT:  Thank you, sir.

24                    DIRECT EXAMINATION

25   BY MR. HOWELL:

1  Q    Mr. Stibitz, would you state your name for the record,

2  please?

3  A    Brom Stibitz.

4  Q    And where do you reside?

5  A    Okemos, Michigan.

6  Q    Where did you go to college?

7  A    I have an undergraduate degree from Kalamazoo College.  I

8  have a Master's in public administration from Northern

9  Michigan University.

10  Q    Mr. Stibitz, where are you currently employed?

11  A    The State of Michigan.

12  Q    How long have you been employed by the State of Michigan?

13  A    Since October 2005, about nine years.

14  Q    And could you tell us the jobs you've held and the

15  responsibilities you've held since you've been employed at the

16  State of Michigan?

17  A    Yes.  In October of 2005, I was hired by the house

18  Democratic caucus as a policy advisor.  Policy advisors serves

19  as staff to legislators on, you know, both committee and floor

20  action on legislation and provides staff support for you know,

21  passage of budget bills.

22        In 2007, I took a position as the appropriations

23  coordinator, again for the house Democratic caucus.  The

24  appropriations coordinator is responsible for insuring that

25  budget bills move through the appropriations sub committees,

1  the full appropriations committee, and the house floor in

2  order to you know, get the state budget done.  You oversee

3  budget staff to insure that that gets done.

4      In 2008, I took a position as legislative director for

5  the Speaker of the House that was Andy Dillon at the time.

6  And so for about the last two and a half years that Andy was

7  Speaker, I served as legislative director.

8      Legislative director oversees all movement of legislation

9  throughout committees in the House and then also works with

10 scheduling items for floor passage.  You're also the lead, I

11 guess staff negotiator with the Senate to work on getting

12 bills through the other chamber.

13     In early 2011, January of 2011, I moved to the Department

14 of Treasury and I took a position as senior policy advisor to

15 the Treasurer who at the same time was -- was Andy Dillon.

16 The senior policy advisor is responsible for assisting the

17 Treasurer with whatever the Treasurer needs help with.

18 Whatever issues the Treasurer is working on, you're the

19 assistant Treasurer.  So I spent about from January of 2011

20 until June of 2013 in that role.

21     Last year June, I took a position at Treasury as director

22 of the Bureau of Executive Operations.  This -- as this bureau

23 director, I'm responsible for four divisions.  It's more of an

24 operational position than a policy position.

25     The bureaus are the communications or the -- I'm sorry,

1  the divisions are the communications division, the budget

2  division, the legislative division, and the continuous

3  improvement division.

4  Q    In your position as senior policy advisor, did you have

5  any involvement with the City of Detroit?

6  A    I did.  Early on in Andy's -- Andy Dillon's tenure as

7  Treasurer, he realized that Detroit was, you know, the

8  financial condition of Detroit was getting worse and worse.

9  That issues that existed in the city were not being corrected

10  in a sustainable fashion if at all.

11      And as Andy moved his focus more than maybe previous

12  Tresurers to working with local governments in fiscal

13  distress, I did that work with him as well.  I would say

14  probably about the summer of 2011 he really started -- we

15  spent a lot of time working with the City of Detroit with the

16  Mayor's staff at that time trying to work on things that could

17  help correct the fiscal distress.

18      After some time working with the city, you know, I think

19  it became clear to Andy that progress was not being made and

20  as quickly as -- as it might otherwise have been.  And the

21  state initiated a preliminary review under PA-4 which was the

22  state's emergency manager law at the time, the previous

23  emergency manager law.

24      As part of that there's a review team appointed to make

25  -- you know, make the call on whether there is a financial

 1  emergency.  I was a member of that review team.  This was the

 2  first review team for the City of Detroit.

 3      I worked in helping negotiate and draft the consent

 4  agreement that the City of Detroit entered into with the

 5  state.  And then I was still involved after that with working

 6  with the city trying to insure that the provisions of the

 7  consent agreement were met.

 8  Q    As Director of the Bureau of Executive Operations, did

 9  you continue to have involvement with the city?

10  A    I -- I have continued some involvement.  It's been much

11  less than with the previous position.  I'd say primarily the

12  work that I've done with the city over the last year, or a

13  little over a year, the biggest part of that work has been

14  working with the city to develop a -- a city income tax

15  program, you know, we've been working on an agreement and

16  building a system, a treasury through which we could actually

17  collect city income taxes on behalf of the city.

18      So that's -- I would say that's the majority of the work

19  that I've done.  There might be a little one off things where

20  we'd have an issue in the department and someone would want to

21  leverage the relationship so the people that I know in the

22  city, so I might be involved that way, but it's not been

23  anywhere near as much as say prior to June 2013.

24  Q    In your current job did you have reason to become

25  familiar with public Act 181 of 2014?

1  A     Yeah.  Yeah, I did.  When that legislation --

2  Q     That called -- let me interrupt.  What is that called?

3  A     The Financial Review Commission Act.

4  Q     Thank you.

5  A     It's what it's commonly referred to.  So when this

6  legislation was being considered, being drafted and being

7  considered, it was provided to treasury for review and

8  comment.  And so that was I guess the first time that I --

9  that I had seen it or had started to become familiar with it.

10       As it moved through the legislative process and as it --

11 once it was passed by the legislature, signed by the Governor,

12 enacted into law, it became a matter of how do we implement

13 this legislation, you know, the -- the act authorizes the

14 creation of financial review commissions, independent

15 commissions within the Department of Treasury and it requires

16 that Treasury will staff and provide other support for those

17 commissions.

18       And so once it was enacted it became a matter of what do

19 we need to do now to insure that when we have this commission

20 we're ready to go.  We're ready to implement the provisions of

21 this act.

22 Q     From a high level, what are the main purposes of the

23 Financial Review Act?

24 A     I guess you'd say at a very high level, just maybe

25 ignoring all the details of the act, at a very high level

1  it's to provide a transition, for in this case the City of

2  Detroit from an emergency manager and from a bankruptcy

3  process, provide a -- a stable transition back to local

4  control while maintaining long term fiscal stability in the

5  city.

6       You know, if we get a little bit more details, I guess

7  the purpose of the Financial Review Commission is laid out in

8  the statute is to insure that the city complies with both the

9  terms of the act, the terms of a plan of adjustment, assuming

10  one is confirmed by the Court, and to assure that the city

11  remains in compliance with a number of other state statues

12  Uniform Budget and Accounting Act, Revised Municipal Finance

13  Act, Home Rule City Act, PA-152.  I think that might be it.

14  And -- and the plan of adjustment.

15  Q   Let's discuss and walk through the statute if we could.

16  In terms of a cycle of activity that will be called for under

17  the act.  Can you walk us through that?

18  A    Yeah, sure.  The act -- the act confers upon this

19  commission some -- some pretty robust powers.  Some powers to

20  help insure that the city stays on a firm financial footing.

21       Among those powers I guess are maybe notably among many

22  of the powers, it provides this commission with the ability to

23  approve or reject a number of -- of items from the city

24  including a four year financial plan, including operating

25  budgets of the city, including new debt issuances, including

1  contracts, contracts over $750,000 or over two years.

2      Approval or disapproval over collective bargaining

3  agreements.  So there's pretty robust powers for the Financial

4  Review Commission.

5      And I guess I'd just go back to the first one that I

6  mentioned.  Which is the approval or rejection of the four

7  year financial plan.

8  Q    Yeah, if you would.  Could you walk through that process?

9  A    Sure, yes.  So under the act the city is required 100

10 days before the city's fiscal year begins, 100 days prior to

11 that it shall submit to the Financial Review Commission, the

12 four year financial plan.

13     And so that's going to be late March or -- or earlier

14 than that.  So the Financial Review Commission receives that.

15 And it has 30 days to decide whether it's going to approve

16 that plan, or whether it's going to reject that plan.  So the

17 FRC is going to -- you know, it will have that 30 days to

18 request more information, to gather further documentation to -

19 - to look at the plan, to analyze the plan, and make that

20 decision approve or reject.

21     If it approves the plan, then, you know, that's great and

22 that plan will form the basis for the city's operating budget

23 for that year.  If the FRC rejects that plan, the statute

24 requires it to provide in writing to the city the reasons why

25 it rejected the plan.

1     So if it rejects it, it goes back to the city, and the

2   city then has 15 days to re-submit an amended plan.  The city

3   has the written documentation from the FRC that says here are

4   the things the FRC believes was lacking.  So the city can try

5   to address those items in an amended plan.

6     So the city has 15 days to submit that to the FRC.  The

7   FRC then again has 15 days to accept or reject the amended

8   plan that the city has submitted.

9     You don't want to be in that cycle forever.  One could

10  imagine re-submission, re-submission.  So the statute allows

11  at that point for the FRC to -- it's been submitted twice and

12  again it's not acceptable to the FRC.  The FRC can do a couple

13  things.

14    It can either require that the city address certain

15  things in that financial plan, or the FRC can actually go back

16  to the drawing board and adopt its own four year financial

17  plan and impose that upon the city.  That at that point would

18  be binding on the city until such time as the city submits a

19  new four year plan that the FRC finds acceptable and approves.

20    So by -- by having the review power, this power to

21  approve or reject that four year financial plan which becomes

22  the basis for the operating budgets, it's a pretty -- I would

23  say pretty remarkable power for the FRC to have.

24  Q   And does the statutory scheme provide for the detail that

25  needs to be contained within the four year plan that's

1  submitted by the city?

2  A    Yeah.  PA-181, the Financial Review Commission Act

3  doesn't have a lot of the detail, but there was another bill

4  in the same package of legislation that passed at the same

5  time which ultimately became PA-182, I believe.

6      And in that statute it lays out, you know, here -- here

7  what -- here are the things that must be contained within that

8  four year financial plan.  You know, it's going to be your

9  revenues, your budget expenditures, cash flows, things like

10 that.

11 Q    Once this four year plan is settled by whatever mechanism

12 you've just described, it is made available to the public?

13 A    Yeah.  This document along with many other documents

14 these -- these statutes, whether it's 181 or 182, require the

15 -- the -- either the Financial Review Commission or the city

16 to post on line so that it's available for all the citizens.

17 There are other requirements that require budgets and all

18 contracts, things like that to be posted on line as well.

19 Q    During the course of the year between submission of

20 budgets, are there other reports or reviews that the Financial

21 Review Commission will do?

22 A    Yeah.  Yeah, absolutely.  The statute actually requires

23 the FRC to meet monthly.  So this isn't going to be a matter

24 of meeting once and approving the budget and going home for

25 the next 11 months.

1    So the statute lays out certain things that –- that the

2  city is required to provide.  One of those things that the

3  city is actually required in this statute to -– to provide is

4  a quarterly report on upcoming debt service.

5    So the city has to provide this report that says here's

6  the debt service we're going to have for the following quarter

7  and also certifying that you have the funds budgeted and that

8  you will actually make good on those payments.

9    The statute also gives very broad authority for the FRC

10  to request any sort of documentation related to the financial

11  status of the city from the city and from the city's Chief

12  Financial Officer.

13    I would add, you know, the –- one of the powers that the

14  FRC has is if it's requesting documentation on a certain item

15  or a certain issue from the Chief Financial Officer and the

16  FRC doesn't believe that the Chief Financial Officer is coming

17  through with the information needed for the FRC to carry out

18  its duties under the act, the FRC can actually require that

19  the city terminate the Chief Financial Officer.

20    So while you have this position that reports to the

21  Mayor, this –- whoever the Chief Financial Officer is, is

22  going to have a very strong incentive to provide the FRC with

23  whatever materials whatever information the FRC requests.  It

24  also provides that all city employees, you know have to aid in

25  providing information to the FRC.

1  Q    Was the -- when -- when and how was the -- the

2  requirement to have a Chief Financial Officer created?

3  A    That requirement is actually in one of the companion

4  bills that passed in that package.  That was an amendment to

5  the Home Rule Cities Act.  And I believe that was in Public

6  Act 182, not the PA-181 that created the Financial Review

7  Commission.

8  Q    Would the Financial Review Commission have a role in the

9  appointment or acceptance of the Chief Financial Officer?

10 A    Yes.  Yeah, absolutely.  In addition to what I mentioned

11 earlier where the FRC can require that the city terminate, the

12 FRC also has approval power.  They can approve or reject a

13 candidate for the CFO position.

14 Q    Now does the -- does the commission have the power to

15 investigate the performance of the city?

16 A    Yeah.  I mean I would argue that through all these powers

17 that the FRC can request documentation, request information,

18 you know request these kind of things.  I would argue yeah,

19 it's pretty broad power to get whatever information is needed.

20 Q    Is there the power to audit?

21 A    Yes.

22 Q    Now does the commission itself have an obligation or a

23 duty to file reports?

24 A    Yeah, it does.  One of the, I guess fundamental

25 responsibilities of the FRC is to certify annually that the

1  city is in compliance with the act.  And so that requires an

2  annual certification, you know, that they're in compliance.

3      The FRC is also required to submit twice a year reports

4  to the Governor that give an update on the financial condition

5  and the status of the city.  And you know, those reports would

6  also be required to be posted on line as a transparency

7  method.

8  Q    Now let's go back if we could to the nuts and bolts of

9  the commission.  Did you have responsibility for beginning to

10 implement how this commission would be put together?

11 A    I had responsibility for implementing how Treasury would

12 do their portion of -- of putting the commission together.

13 How Treasury would, you know, provide staff, provide expert,

14 you know, contractual services, provide office space, provide

15 that kind of thing.  I was not in charge of let's say

16 appointing members to the commission.

17 Q    We'll get to that in a minute.

18 A    Okay.

19 Q    Thank you for that correction.

20 A    All right.

21 Q    In -- so did your group under your supervision put

22 together any kind of proposals, or plans, or recommendations

23 in terms of the staffing of the commission?

24 A    Yes.  Treasury put together a proposal, you know, it was

25 about the time that -- that the statutes were being passed.

1  We put together a proposal from, you know, and I -- and I

2  guess a reocmmendation for staffing and -- and budgeting for

3  the commission.

4      It's -- it's not always an easy task.  It's maybe not an

5  exact science because we have commission members that haven't

6  been appointed yet.  And so a lot of it, you know, this is an

7  independent body and you need to be able to be flexible to

8  meet their needs.

9      But we looked around and we said what are some other, you

10 know, maybe similar bodies or bodies that perform a similar

11 function, either in Michigan or in other states and we -- and

12 you know, based on a review of some of those, we did come up

13 with a recommendation.

14     You know, we looked at the control board in New York.  We

15 looked at a similar control board in Pennsylvania.  We also

16 looked at offices like the research and analysis division in

17 the City of Detroit that is, you know, arguably an independent

18 analysis arm of council.  We looked at the Grand Rapids

19 controller's office.

20     So based on that we did develop a -- a recommendation to

21 the Governor's office for how we could staff it, what the

22 budget would be, and -- and how we could provide a budget to

23 hire independent expert outside consultants.

24 Q   Was there anything similar to this previously or

25 currently in existence under state law?

1  A     Yeah.  I guess the Financial Review Commission is

2  construct of a -- of a body that would perform oversight or --

3  or try to insure compliance with a transition back to local

4  control.

5       That was not a new one for us.  When we adopted the

6  state's existing or the new emergency manager law, we actually

7  created a very similar construct within that, within PA-436 we

8  have a construct that's called a Receivership Transition

9  Advisory Board.

10      And what we found in the past is that when you have a

11 city with an emergency manager that manager can come in and

12 correct some of the immediate issues.  But then once we would

13 remove that city from receivership, pull the emergency manager

14 out, they would often end up back in, you know, financial

15 distress pretty quickly.

16      So we wanted a mechanism by which we could help support

17 that transition back to local control.  So we have -- we have

18 these R tabs as we call them that act very similar to the way

19 we believe the FRC would act.  They don't have quite as

20 extensive powers as the FRC under PA-181, but the oversight,

21 the approval of budgets, the approval of collective bargaining

22 agreements, the approval of contracts, it's a very similar

23 construct to what we're working with.  We have four of those R

24 tabs in existence today.

25 Q     And where are those?

1  A    We have R tabs in the City of Pontiac, Ecorse, Benton

2  Harbor, and Allen Park.

3  Q    Now in the -- in the course of performing your duties did

4  your group come up with a recommendation as far as a staff and

5  budget framework to recommend to the Governor and the

6  Treasurer?

7  A    Yeah, we did.  So the budget recommendation that we came

8  up with, we suggested that we thought $2,000,000 on an ongoing

9  basis and we had created a staff of eight full time

10  equivalents.  So these would be people dedicated solely to

11  working with the Financial Review Commission.

12      And then as I mentioned earlier, you know, a portion of

13  that money would be -- would pay staff salaries.  There would

14  be another portion of that funding carved out to hire expert

15  outside consultants.

16      And this is a model that we use now in Treasury with

17  other distressed communities.  We may not have specific

18  expertise on a specific type of issue and so where we don't,

19  you know, we have a list of pre-qualified contracts that we

20  use to look for specific projects, specific expertise.

21  Q    How much money is currently appropriated for use by the

22  Financial Review Commission once it's established?

23  A    Yeah.  In the -- in PA-181, it contained a statutory

24  appropriation of $900,000.  And this would have been funds in

25  the fiscal year that ended yesterday.

1      The state has a September 30 fiscal year.  So of that

2   900,000, to date we haven't spent any of it.  We have used a

3   mechanism in the state budget called a work project by which

4   we can take those funds and carry them forward to the current

5   fiscal year that starts today, so we have $900,000 currently

6   appropriated, you know, I think the thought was they're

7   appropriating it part way through FY-14.

8      They didn't -- you know, we wouldn't have needed a full

9   year of funding and that this was enough to get us up and

10  running, clearly enough to get us started hiring staff and --

11  and get some necessary contractors on board.

12  Q    Where do you stand in hiring or establishing the staff at

13  Treasury for the review commission?

14  A    Uh-huh.  To date we've -- we've established one position.

15  We've established the position that, you know, we're calling

16  the executive director.  So this would be the lead staffer for

17  the Financial Review Commission.

18      We actually created that right within the executive

19  office of Treasury.  It would report directly to the Chief

20  Deputy Treasurer on the Treasury org chart.  We thought that

21  was important so that this person could have, you know, close

22  access to the Chief Deputy Treasurer and the Treasurer.

23      So we created that position.  We haven't moved any

24  farther as far as filling that position because we want to

25  allow the FRC, these members once we know who they are, we

1   want them to have a role in both establishing the

2   qualifications that they want for this person, establishing

3   the criteria by which we'll select that person, and also

4   hopefully to have a role on that hiring panel.

5        We want the FRC involved.  We don't want to pre-suppose

6   what the FRC wants.  We want them involved so that they can be

7   involved in both in qualifications but also we think fit is

8   really important for this kind of a position.

9        That chemistry that you have between the key FRC members

10  and this executive director.  We want them to have somebody

11  that they trust and that they have confidence in.

12       So it would be our hope that -- you know, it would be our

13  hope that we find out who the members of the FRC will be

14  before the FRC actually takes effect.  And before it actually

15  begins its -- its oversight role so that we could bring those

16  people into this process and we could have that executive

17  director hired, you know, well in advance of the FRC actually

18  coming into existence formally and -- and -- and taking

19  effect.

20  Q   All right.  Well, let's -- let's follow that then into

21  the commission itself.  How will the commission be constituted

22  and how -- who will have the responsibility for appointing the

23  members of the commission itself?

24  A   Okay.  The statute lays out, it's a nine member

25  commission.  And some of those members are laid out in the

1  statute and others are appointed.

2      So we have the state Treasurer or his or her designee is

3  one member.  The director of the state Department of

4  Technology Management and Budget, or his or her designee is

5  another member.

6      The Governor has three appointments.  The Governor will

7  appoint one person from a list of three provided to him by the

8  Speaker of the House.  He will also appoint one from a list of

9  three provided by the Senate majority leader.

10      And then we have the City of Detroit Mayor or his or her

11  designee on the commission.  And the City of Detroit council

12  President or his or her designee on the commission.

13  Q    Does the statute provide for what kind of qualifications

14  a review commission appointee should have?

15  A    Yeah.  It provides -- it provides hireable requirements.

16  They wanted people that are going to have the technical skills

17  to be able to be to, you know, provide valuable insight in

18  this. So it looks for people with -- with backgrounds in, you

19  know, business operations. or budgeting. or finance, things

20  like this.  You know, skills that would actually be helpful to

21  have on a -- for a FRC member.

22  Q    Would there be any additional reporting requirements that

23  would be established for operational type budgets or anything

24  of that sort?

25  A    I don't know.  As I mentioned earlier the statute has

1  you know, broad powers for the FRC to request.  I guess I

2  don't want to pre-suppose what the FRC is going to request,

3  but as I mentioned they're going to meet monthly.

4      And so I'm thinking they're going to want to have

5  something to do every month.  I think the Treasury

6  recommendation would be that they follow procedures similar to

7  what we do with our R tabs under PA-436.

8      So the R tabs meet monthly.  And let's say two weeks or

9  ten days before every R tab meeting the city is required to

10  provide certain updates.  They provide a budget updates.  You

11  have budget actuals.  Here's where -- here's where we thought

12  we would be in spending, here's where we actually are.

13      They provide cash flow updates.  They provide updates on

14  outstanding accounts payable, those kind of things.  And so by

15  receiving those in advance of the meeting, you have time for

16  that staff and for the FRC members to review that information

17  before they do it.

18      So that would be our recommendation.  Again, I don't --

19  you know, it's the -- it's an independent body.  We staff it

20  for them, but they're the ones that are going to have to make

21  that decision.  That would be our recommendation.

22      I would -- you know, you can also look to the way that

23  the current Financial Advisory Board for the City of Detroit

24  operates.  And, you know, I think when you -- when they have

25  their meetings, you'll see it might be the emergency manager,

1  It might be the CFO.  It might be the Mayor.  You know, I

2  would expect that those people and especially the CFO with

3  this type role that he has with the FRC, I -- you know, I

4  think Treasury's recommendation again would be that the CFO

5  comes every month and provides a -- an update to the FRC.

6  Q    Follow up to an earlier discussion.  You mentioned the

7  financial -- financial advisory group -- board?

8  A    Yes.

9  Q    Did you consult with any members of the Financial

10 Advisory Board when you were looking to structure the Treasury

11 side of the staffing and so forth?

12 A    Yeah.  We've talked with them a little bit.  I think the

13 conversation with the Financial Advisory Board has really

14 focused more on how do we get these new members, these

15 financial -- the FRC members, how do we get them up to speed.

16     And so one of the other things I -- I should have

17 mentioned was we were planning essentially an orientation for

18 the FRC members.  You know, Treasury has been putting this

19 together.

20     And we would take, you know, we've envisioned a couple

21 full day sessions.  And in those sessions, and again this

22 would hopefully be before this board even comes into

23 existence.  Before it's even officially created.

24     And -- and during those sessions they would have time to

25 sit down with key city staff.  So it might be the Mayor, it

1  might be the Chief Financial Officer, it might be the IT

2  director, it might be the HR director, to give briefings on --

3  on, you know, those different areas of the city and -- and big

4  initiatives.

5      But we've also talked with the Financial Advisory Board,

6  some of those members.  And a couple of those members have

7  also agreed to do some briefings and to sit down with FRC

8  members to talk with them about how -- you know, what's the

9  experience been like on the Financial Advisory Board for the

10  last couple years.

11      You know, we think that's important to help with the

12  continuity and just help with this transition from one board

13  to another to help provide that stability from one board to

14  the next.

15  Q   Just jumping back for a moment.  With respect to the

16  recommendations you've made as to the budget and the staffing

17  of the review commission.

18  A   Uh-huh.

19  Q   Has that been reviewed and approved by anyone else so far

20  in state government?

21  A   We -- so we developed the staff recommendation.  You

22  know, we've -- we've talked about it, reviewed it with the

23  Treasurer.  The Treasurer is supportive of our -- you know,

24  our recommendation that we came up with.

25      He's talked about it with the Governor and the state

1  budget office.  And so both the Governor and the state budget

2  office are supportive of that.

3      And they've had discussions with the legislature about

4  approving a supplemental appropriations bill.  So we're

5  hopeful that we'll see that supplemental appropriations bill

6  yet this fall.

7  Q    Do you know where the process stands in terms of actually

8  -- actually selecting members of the Financial Review

9  Commission?

10 A    Yeah.  Through my interactions and conversations with the

11 Governor's office, the staff of the Governor's office, I know

12 that the -- this process is well underway.  I wouldn't say

13 it's finished, but I know they've spent a lot of time and a

14 lot of effort in reaching out, identifying, recruiting, and --

15 and getting close to having, you know, finalized

16 recommendations for the Governor on that -- on that

17 membership.

18 Q    When do you anticipate the commission will become

19 operational?

20 A    So the statute provides that the oversight starts on the

21 day that a plan of adjustment is effective.  So if we assume

22 that this Court would approve the plan of adjustment under the

23 statute, the commission I guess becomes operational or takes

24 effect on that effective date.

25     We would also plan operationally as far as having that

1  director in place, you know, having orientation done, having

2  -- take a number of these steps.  I mean operationally

3  Treasury as far as our support we're going to be ready to go

4  on day one, or before day one.

5  Q    And I may have asked this earlier, but I want to make

6  sure.  Does the statute provide for the qualifications or the

7  type of member that should be appointed to the Financial

8  Review Commission?

9  A    Yeah.  The statute provides, you know, certain -- certain

10  requirements for those members.  So they want people with

11  business experience, finance experience, budget experience,

12  that kind of thing, yes.

13          MR. HOWELL:  Okay.  One moment, Your Honor, please.

14  Your Honor, that's all the questions I have for this witness.

15  Thank you.

16          MR. MCCARTHY:  Your Honor, Ed McCarthy on behalf of

17  FGIC.

18          THE COURT:  Sir, you may proceed.

19                    CROSS EXAMINATION

20  BY MR. MCCARTHY:

21  Q    Mr. Stibitz, it's nice to see you again.

22  A    How are you?

23  Q    You're familiar with the terms of the state contribution

24  agreement, correct?

25  A    To some extent.

1  Q    In the state contribution agreement that makes up a part

2  of the overall grand bargain as it's been called, right?

3  A    That's my understanding.

4  Q    And is it your understanding that the state contribution

5  agreement contains several conditions precedent that must be

6  satisfied in order to trigger the state's obligation to

7  provide funds to the retirement systems?

8         MR. HOWELL:  Your Honor, if I may I'd like to object

9  at this time.  Those questions are beyond the scope of the

10  direct and would object on that basis.

11         MR. MCCARTHY:  I don't disagree, Your Honor, with

12  the objection.  I do disagree though with the way the trial

13  has been conducted.  We could call Mr. Stibitz during our

14  direct on this or for the sake of time, actually my questions

15  are fairly brief.  We are taking the opportunity to do that

16  now.  Mr. Stibitz did sit as a 30(b)(6) deponent for the

17  state.

18         THE COURT:  In the Court's discretion, the Court

19  will permit it.  Go ahead.

20  Q    And I'm sorry, I can't remember if the question was

21  answered, but it probably wasn't because --

22  A    It was not.

23  Q    Do you remember the question or would you like me to read

24  it back?

25  A    Please -- please restate it.

1  Q    The state contribution agreement contains several

2  conditions precedent that must be satisfied in order to

3  trigger the state's obligation to provide funds to the

4  retirement systems, correct?

5  A    That's my understanding, yes.

6  Q    And if any of those conditions precedent are not met by

7  December 31st, 2014, the Michigan Settlement Administration

8  Authority will not provide funds set forth in the state

9  contribution agreement to the retirement systems, is that

10 right?

11 A    Yes, I believe so.

12 Q    And you've testified as a 30(b)(6) witness on behalf of

13 the state regarding the funding that the city has received

14 from the state, isn't that true?

15 A    Yes.

16 Q    And prior to August 2013, the mediation, the city never

17 requested that the state provide it with funds to assist with

18 its unfunded pension obligations, isn't that right?

19          MR. HOWELL:  Your Honor, I'd like to object at this

20 time.  I don't know that qualifying someone as a 30(b)(6) for

21 deposition purposes qualifies them to testify outside of their

22 personal knowledge at the trial.

23     They could have identified people that would have that

24 underlying information and pursued that.  But I'm not aware

25 that a 30(b)(6) witness can testify at trial to things outside

1   of their personal knowledge.

2          MR. MCCARTHY:  Mr. Stibitz -- and I could establish

3   this if you'd like, Your Honor, but he did prepare -- he did

4   sit for that topic, the specific topic, at his deposition on

5   behalf of the state.  He did prepare for those topics.  He

6   stated that at his deposition.

7          THE COURT:  What's the relevance to it?

8          MR. MCCARTHY:  The relevance of these questions is

9   that the --

10          THE COURT:  No, I want to know the relevance of this

11   question.

12          MR. MCCARTHY:  Absolutely.  This question will --

13          THE COURT:  Okay.

14          MR. MCCARTHY:  Let me take it just this question.

15   Goes to the city's argument that the state's contribution to

16   the grand bargain is made solely to settle pension obligations

17   and not -- and therefore it falls outside of the plan.

18      We vigorously dispute that argument.  And --

19          THE COURT:  Okay, fair enough.  But how does this

20   question relate to that?

21          MR. MCCARTHY:  Because this question -- and it is a

22   bit of a lead into a series of about five other questions,

23   maybe a few more, that goes to the state's vigorous dispute

24   that there are any contested claims, any claims at all from

25   pensioners that the state believes --

1          THE COURT:  All right.  I'll permit you to ask about

2    that, but I don't see the relevance of this question.

3          MR. MCCARTHY:  Okay.  I will move on then.  Thank

4    you.

5    Q    Prior to the August 2013 mediation, the state never

6    considered providing any funds to the city solely for the

7    benefit of the pensioners, isn't that right?

8    A    Not to my knowledge.

9    Q    And I want to make sure I understand your question --

10   your answer, I'm sorry.

11   A    I think I agree with you.

12   Q    Okay.  Thank you.  And you also sat, and this is my last

13   line of questions as a 30(b)(6) witness for the state with

14   respect to the topic of any and all claims or potential claims

15   against the state by the retirement systems.  Do you remember

16   that?

17   A    Yes.

18   Q    And the state's position is that the retirees have no

19   claims against the state related to the city's unfunded

20   pension liabilities, isn't that right?

21   A    Yes.

22   Q    And if we could actually pull up FGIC Exhibit 3554,

23   please.

24          MR. MCCARTHY:  One moment, Your Honor.

25          THE COURT:  Okay.

 1          MR. MCCARTHY:  Your Honor, may I approach?

 2          THE COURT:  Yes.

 3          MR. MCCARTHY:  May I approach the witness?

 4          THE COURT:  Yes.

 5   Q    Mr. Stibitz, what's before you and what's on the screen

 6   is the State of Michigan's answers and objections to

 7   interrogatories that were served in this case.  It's FGIC

 8   Exhibit 3554.  Have you seen this document before?

 9   A    Yes.

10   Q    And turning to interrogatory 1, number 1 on the first

11   page, the state was asked to "describe with particularity the

12   known claims against the state that are proposed to be

13   compromised by the state contribution agreement".  Do you see

14   that?

15   A    Yes.

16   Q    And moving to the state's answer if we could actually

17   move to the second paragraph where it says to its knowledge.

18   To its knowledge the state responded, "there are no claims

19   that can be or have been asserted against the state" --

20          THE COURT:  Whoa, whoa, whoa.

21          MR. HOWELL:  Whoa, whoa, I object, Your Honor.

22          MR. MCCARTHY:  Skipping --

23          THE COURT:  So do I.

24          MR. MCCARTHY:  Okay.

25          THE COURT:  Start that over

1          MR. MCCARTHY:  I will start from the beginning of

2    the paragraph if that solves any of the objection.

3          MR. HOWELL:  No, I think the word you skipped was

4    valid.

5          THE COURT:  Yeah, you can begin -- you can begin

6    with 2, but you got to read all the words.

7          MR. MCCARTHY:  My apology.  That wasn't my

8    intention, Your Honor.

9          THE COURT:  Okay.

10   Q    Mr. Stibitz, actually this would be a lot easier.  Could

11   you please read the state response starting at the state?

12   A    The state responds that to its knowledge there are no

13   valid claims that can be or have been asserted against the

14   state, the state entities, or the state related entities.

15   Q    And please continue on the next page.

16   A    By any person including but not limited to persons in

17   Class 10, persons in Class 11, holders of pension claims,

18   holders of OPEB -- OPEB claims, the public safety unions, the

19   public safety unions members, or any person or entity

20   asserting claims by, through, or on behalf of such persons or

21   organizations relating in any way to the state contribution

22   agreement or that would be compromised or released by the

23   state contribution agreement, the amended plan, or the state

24   release.

25   Q    Thank you.  You can stop there.  Thank you, Mr. Stibitz.

1  And the state contribution agreement -- we can take this down.

2  Moving on.  The state contribution agreement also provides

3  that the state vigorously disputes any suggestion that it is

4  obligated to pay a portion of the under funding of pension

5  benefits payable to retirees, isn't that right?

6  A    Yes.

7  Q    And finally you're not aware of any discussions among

8  state officials regarding obtaining a release of claims by the

9  pensioners prior to the August 2013 mediation, correct?

10  A    That's correct.

11        MR. MCCARTHY:  I have no further questions at this

12  time, Your Honor.

13        THE COURT:  Any other cross examination?  Redirect.

14        MR. HOWELL:  No, Your Honor.

15        THE COURT:  All right.

16        MR. HOWELL:  We are concluded.

17        THE COURT:  Sir, you're excused.  Thank you very

18  much for coming today.

19     (WITNESS BROM STIBITZ WAS EXCUSED AT 2:44 P.M.)

20        MR. SHUMAKER:  Your Honor, the City of Detroit calls

21  Mr. Kevyn Orr to the stand.

22        THE COURT:  Okay.  Please raise your hand.

23     (WITNESS KEVYN ORR WAS SWORN)

24        THE COURT:  Please sit down.

25        MR. SHUMAKER:  Your Honor, I have a couple of -- of

1  binders to hand up for you.  Your Honor, may I approach?

2           THE COURT:  Yes, please.

3           MR. SHUMAKER:  Is two enough?  I could give you

4  another one.  One more?  These are exhibit binders, Your

5  Honor.  May I approach?

6           THE COURT:  Okay.

7           MR. SHUMAKER:  Your Honor, may I approach the

8  witness?

9           THE COURT:  I'm sorry?

10          MR. SHUMAKER:  May I approach the witness?

11          THE COURT:  Yes.  One second, please.  Everybody

12  ready?  Okay.  You may proceed.

13          MR. SHUMAKER:  Thank you, Your Honor.

14                   DIRECT EXAMINATION

15  BY MR. SHUMAKER:

16  Q    Mr. Orr, would you please state your name for the record?

17  A    Kevyn Orr.

18  Q    Mr. Orr, did you do anything to prepare for your

19  testimony today?

20  A    Yes.

21  Q    What did you do?

22  A    I read a number of binders.  I read the exhibit binders.

23  I read the reading materials that were presented in the case,

24  in particular the city's trial brief.  I read my deposition

25  testimony.  And perhaps looked over some additional

1  information on the internet.

2  Q    So you did some homework?

3  A    I did some homework.

4  Q    What is your current occupation?

5  A    I'm -- I'm currently the emergency manager for the City

6  of Detroit as recently revised.

7  Q    And we'll come to that a little bit later.

8  A    All right.

9  Q    And you were appointed to this position?

10 A    Yes.

11 Q    When was that?

12 A    I was originally appointed under Public Act 72, I believe

13 on the 26th and reappointed under Public Act 436 on the 28th,

14 effective the 28th -- 27th.  March 27th, 2013, sorry.

15 Q    Thank you.

16 A    Uh-huh.

17 Q    And who appointed you to that position?

18 A    The Governor of the State of Michigan, Richard Snyder.

19 Q    Is there a Michigan statute that outlines your powers and

20 responsibilities as emergency manager?

21 A    Yes.

22 Q    Which one is that?

23 A    Public Act 436, financial stability and choice act I

24 believe there's a formal name for it.

25 Q    Taking you back to March of 2013 when you first became

1  emergency manager, what did you view your job responsibiities

2  as at that time?

3  A    At that time under the terms of the act it was to assess

4  the status of the City of Detroit, determine whether or not

5  the financial emergency that had been declared by the Governor

6  on March 1st, 2013 could be rectified in the ordinary course,

7  try to develop a financial and operating plan for the City of

8  Detroit and to develop a long term plan in a way that the city

9  could revise or resolve the financial emergency in a way that

10 was in a sense affordable, sustainable, and fair under the

11 circumstances.

12 Q    How about with regard to the city's operations?  Did you

13 have any responsibilities in that regard?

14 A    Yes.  The act requires the emergency manager to assess

15 not just say the financial issues affecting the city, but city

16 operations as well to make them more efficient and to put the

17 city in a position where it could provide adequate services.

18 Q    Now you have testified in these proceedings before,

19 correct?

20 A    Yes.

21 Q    And you have testified at that time about the condition

22 of the city when you took over as emergency manager, correct?

23 A    Yes.

24 Q    So with that in mind, if you could summarize for the

25 Court what the condition of the city was when you were first

1  appointed.

2  A    Yes.  As has been testified by me and others here in

3  Court and widely reported, the city's core provision of

4  services were substandard.

5      And the city's financial situation was obviously in dire

6  straights, could not meet its bills as it became due.  But

7  also the provision of providing just basic services of public

8  works, public safety, and health, finance tax administration,

9  planning and development, parks and recreation, were in poor

10  shape.

11  Q    How about the city's cash flow at the time you took over

12  as emergency manager?

13  A    The city was in dire straights also at that respect as

14  far as cash flow.  It had a inability to meet its bills as it

15  became due.  Bills as simple as payroll.

16      I think I've testified before that we bounced a couple of

17  checks last year.  And paying our vendors ranged anywhere from

18  on average 90 to 180 days net.

19  Q    Let's talk first -- let's talk first about the services

20  that the city was providing at that time.  And you described a

21  little bit about what their status was.  What -- what did you

22  do to address the issues that you just described?

23  A    Well, we spent several weeks if not months trying to

24  assess the true state of affairs.  As have been testified,

25  there have been a long string of analyses about the state of

1  the city starting back as far as 2011 with the Detroit review

2  team, the consent agreement in April 2013.

3  Q    Well, let me stop you there.  I'm sorry.  That's sort of

4  the financial side and I do want to ask you about that.  But

5  I'm talking right now about the services that the city was

6  providing.  Could you share with the Court what you were doing

7  to deal with that side of the house?

8  A    Oh, sure.  I had a number of different meetings with --

9  with the heads of the various departments with interested

10 stakeholders in the city, with civic leaders, other persons

11 such as -- as the heads of the various community

12 organizations, the heads of the chambers of commerce, and the

13 city management and leadership, the senior members of city

14 management and leadership.

15 Q    What sorts of actions were you considering taking at that

16 time with regard to the city's assets or its services?

17 A    Well, initially we were just trying to get, I and my

18 team, were trying to get an assessment of the status of the

19 city so we had not formed any specific belief initially.  What

20 we were trying to focus on is how we could develop a plan that

21 could push out better service delivery to the citizens.

22 Q    Were there any particular services that you dealt with

23 early on in your tenure?

24 A    Yes.

25 Q    Which ones?

1  A    Well, the first ones that we really wanted to look at

2  were the ones concerning public safety and health for

3  instance.  If you look at the general fund budget, there are

4  9,000 on average city employees, but about 3,000 of those are

5  in enterprise funds about somewhere in the neighborhood of

6  1,500 over at DWSD, the water department and 1,000 at the

7  Department of Transportation.

8       There are about another 400 over at the 36th District

9  Court which is non-departmental.  And there are other

10 departments in parking so on and so forth.  So if you took out

11 approximately 300 there would be 6,000 employees on the

12 general fund and services.

13      Of that 6,000 almost two-thirds are dedicated to public

14 safety.  Twenty-seven hundred at the police department, an

15 average of 1,000 to 1,100 at fire, and another 300 or so over

16 at EMTs.

17      So the general fund is generally focused on almost

18 two-thirds, 60% or more on public safety.  And that's what we

19 began looking at immediately.

20 Q    And if I could ask you to be more granular.  What sorts

21 of issues in the public safety were you dealing with upon your

22 arrival?

23 A    There -- there were many.  Let's -- let's take for

24 instance the top three police, fire, and EMS.  At the police

25 we had the well publicized very slow response time.  Citizens

1  have been very frustrated, not just with response times, but

2  also with the -- the actual access to the police.

3      We had closed a number of precincts, there are 12 in the

4  city.  We had actually closed another and went to a virtual

5  precinct model where at dark you would roll to a building and

6  no one would be in sight.  There would be a blue light where

7  you could phone in a call.

8      Imagine the residents' frustration if they were being

9  attacked or their -- their pursuer were right behind them and

10 they had to phone it in.  We had issues with clearance rates

11 on a number of calls.

12     And -- and incident reports in terms of actually

13 investigating and preparing a package to go over to the

14 prosecutor.  Our equipment was in very poor shape.  Our fleet

15 was well worn and beat down.

16     On the fire department for instance side, 60% of the fire

17 department's calls are to blighted and abandoned buildings and

18 therefore unnecessary.  So we were running our equipment into

19 the ground going to calls, the majority of which were not Tier

20 1 urgent, but were Tier 1 from the sense of getting a fire out

21 before it spread to an adjacent building.  It wasn't occupied.

22     On our EMT calls I was told by the President of the

23 union, Joe Blarney early on, that most of our vehicles for the

24 ambulance service were out by 7:00 in the morning and

25 consequently trying to achieve the national average of

1 somewhere between 8 to 12 minutes for an EMT call was

2 virtually impossible after the morning and that sometimes our

3 calls on best were as late as 20, 25 minutes.

4      So on the public safety side there was a great deal of

5 concern in both getting to calls, addressing issues, preparing

6 reports, having the right equipment and clearing on the police

7 side, clearing those calls once we get there.

8 Q    So let me ask you outside of that panoply of issues and

9 I'll refer to them as non-public safety issues.

10 A    Uh-huh.

11 Q    What kind -- those issues, what -- the outside of -- the

12 public safety context were you dealing with?

13 A    Well, we're also dealing with issues on the civil side,

14 Your Honor.  On the civil side we had no means in our

15 technology, our -- our communication system was at least 12

16 years old.

17      There was no way for the parties to communicate across

18 departments.  There's no way for finance department for

19 instance to run an actual budget report against budgeted on a

20 regular basis.

21      There was no -- our cash management reports were poor.

22 In terms of our planning and zoning, sometimes it took a long

23 time, upwards of six months to get a plan approved going

24 through that cycle.

25      There were a number of different issues which I could go

1  into detail, but just suffice to say on the public safety side

2  services were -- were severely substandard.  And then on the

3  civil side, service, just ordinary services that you'd expect

4  a municipality able to do were substandard.

5  Q    Were you dealing with any lighting issues at that time?

6  A    Yes.  Clearly the public lighting department which ran

7  both the lighting and the power grid, was -- was in a very

8  unfortunate state.  We at that time had been paying -- the

9  city had been paying $30,000,000 in subsidies for lighting for

10  115 rate payers.  Only five of those rate payers were

11  residential.

12      A hundred and ten were commercial, large commercial

13  entities say up and down Woodward Boulevard.  We were

14  subsidizing their light bill.

15      Our lighting department as has been widely publicized,

16  40% of our lights were down but we were still using in some

17  cases incandescent or -- or those types of lights which burn

18  out quickly.  So we -- we could not keep up on it.

19      The repairs to the department -- lighting department were

20  well beyond -- behind the regularly scheduled.  And so both in

21  lighting -- another area obviously was blight.  We had no

22  specific plan for blight.

23      Mayor Bing much to his credit, had set a standard at his

24  administration to try to take down 10,000 blighted structures,

25  mostly residential.  And I think he just about got to it, or

1  hit it.  But as has been discussed in Court today by Mr.

2  Gilbert, the problem with blight is if you don't get ahead of

3  it, it just keeps increasing.

4      Because every time you take down a structure more

5  structures come on line to become dilapidated and blighted.

6  Some I've seen since I've been here.  So both here again on

7  the public safety side, on the civil side we were -- we were

8  in bad shape.

9  Q    How about trash?  What was the status of the trash

10 services at that time?

11 A    Our -- our trash services were poor.  The city was trying

12 to deal with solid waste on a regular basis but we -- we did

13 not have the capacity to deal with them throughout the city.

14     In addition our -- if you divide solid waste collection

15 into regular collection, but also in the bulk collection if

16 you drive around the city you may see mounds of trash or -- or

17 lots of garbage out on a -- on a sidewalk.

18     Those are bulk items.  We did not have a regularly

19 scheduled bulk pick up except for say on a -- on a monthly

20 basis and sometimes we would not make that schedule.  So trash

21 would accumulate in the city.

22     In addition to the blight you would actually see garbage

23 in the streets.  And our schedule for making trash wasn't

24 being met.  So we -- we focused pretty quickly on trying to

25 get a solution to the solid waste problem and were eventually

1  able to get two contractors come in, Rison Advance, one on the

2  west side, one on the east side which have regularly scheduled

3  pick ups.

4      We now have an automation system that we do not pay for

5  capital expenditures that they're going to make over the next

6  two years bring in -- bring in new trucks.  The new type of

7  single operator bins that can use with a swing arm as opposed

8  to three people on a truck, so you reduce your costs of

9  actually moving garbage.  And we have regular bulk pick ups.

10     In addition I've -- I've heard from residents that the

11  quality of service has increased so much that even when trash

12  spills over from the automated arm pick up, the operator will

13  actually get off the truck, sweep it up, and put it back in.

14  People have come up to me on the street and -- and thanked us

15  for dealing with trash.

16  Q    Did you do anything with regard to the city's assets?

17  A    Yes.  We started at a meeting assessment of the city's

18  assets.  There are roughly 14 buckets of assets.

19  Q    Did -- when you took the job, did -- did anything

20  surprise you?

21  A    Yes.  A lot of things surprised me.

22  Q    What do you recall surprising you the most?

23  A    I -- I guess before taking the job I had not appreciated

24  the age of our technology systems.  Just simple things,

25  communicating or sending an email took an excessive amount of

1  time in my opinion compared to what I was used to, either in

2  federal government where I worked before, or in the private

3  sector.

4       In fact sometimes I'd use my own personal computer to --

5  to transact business.  The condition of the city and the

6  condition of our fleet surprised me quite a bit.  The

7  condition of city hall, Coleman A. Young municipal center you

8  may recall last summer we had a rain storm and the power went

9  out in the center.  That's because a transformer in -- in the

10 basement of the center itself had blown and it took us several

11 days to get back on line with that.  And that's in city hall.

12      The condition of services up and down the line throughout

13 the city.  The -- the level of -- if I would say a lack of

14 superiority moral at the police force.  The time it took to

15 get calls in the city, the incident reports that weren't being

16 taken as explained to me.

17      The incidences where officers would actually be assigned

18 a call and would report back, would roll to the call once the

19 perpetrators had left the site from the victim was -- was very

20 disconcerting.

21 Q    How about with regard to people who were dealing with the

22 city?

23 A    Yes.

24 Q    Did anything surprise you in connection with that

25 interaction?

1  A    Yes.  When I -- and within the first -- well, actually

2  before I started the job, starting in the middle of March, I

3  had a number of stakeholder meetings that were arranged for me

4  by the state and by the city.

5      And I think within the first from March 15th to about the

6  22nd, I met with over 200 stakeholders.  These are city

7  business owners, civic activists, legislators, members of the

8  chamber, union heads, elected officials, so on and so forth

9  who relayed their concerns about the city and many of them --

10 in fact many of the business people are very upset, some had

11 said they would no longer do business with the city because

12 our purchasing and payment systems were so late that it was

13 better for them to never have had the business and to do

14 business with the city because they weren't getting their

15 invoices paid until six months later.

16 Q    So I take it you -- you did deal with creditors of the

17 city at that time?

18 A    Oh, yes.  I heard from quite a few creditors of the city.

19 Q    Did anything surprise you with regard to your dealings

20 with the city's creditors?

21 A    Yeah.  I guess with the city's creditors it was the

22 concept of how many were unwilling to -- to come in and do

23 business with the city and therefore in terms of the city

24 getting adequate competition from a number of different

25 bidders coming on any -- any circumstances, that it struck me

1  that -- that we weren't getting as robust responses from RFQ

2  or requests for qualifications, or requests for proposals

3  RFQ's or RFI's from time to time.

4      And that could actually have a dileterious effect on the

5  city's ability to either contract appropriately or produce

6  services because we weren't getting robust competition so we

7  were sort of stuck with the prices we might get.

8  Q    Did you engage in any sorts of negotiations with those

9  creditors?

10 A    Yes, we tried to.  And specifically with some of the --

11 initially additionally some of the financial creditors we

12 tried to engage and -- and discuss the city's state of

13 affairs.

14 Q    Could you describe for the Court what your dealings with

15 those financial creditors were like?

16 A    Sure.  Everybody wanted to get paid in full, I think it's

17 fair to say.  Initial discussions were not very productive.

18 Each of the creditor groups that we would meet with had a

19 particular view that their situation was special and that they

20 were -- would not be required to make an adjustment or take a

21 haircut.

22     That it -- I guess its what some people NIMBY, not in my

23 backyard.  That it should occur to someone else.  And that was

24 pretty consistent for weeks.

25 Q    Share with us dealing with some of the city's operational

1 issues, its services issues.  Who did you work with on those

2 types of issues?  You referred to a team.  Who was that?

3 A    Right.  Well, there -- there were two areas that we

4 worked with.  One was the -- the core what I call the core

5 restructuring team.

6      There are four members of that team.  Ernst & Young,

7 Conway, MacKenzie, and Miller, Buckfire who are retained

8 before got here.  And then with my appointment and

9 subsequently although I recused myself from it, Jones, Day as

10 the attorneys were retained.

11      Conway, MacKenzie and Ernst & Young in particular had

12 already inserted themselves into the operations of the city at

13 a granular level and have been working with city employees and

14 city staff on understanding the -- the city's operations and

15 the benefits and efficiencies that were engaged there that

16 were in the process already of developing an assessment and

17 also the initial stages of a plan to improve those operations.

18 Q    How about non-outside parties?  Did you deal with anyone

19 within the city government on these service issues?

20 A    Yes.  And in addition to people in the Mayor's office and

21 administration and -- and the others, we actually dealt with

22 and met with department heads.  The city has roughly 36

23 departments.

24      And I think I met with at one point or another most of

25 them.  We would interact and get their views on -- on what

1  could be done.  They oftentimes have very helpful views and in

2  some cases were very forthcoming with their own perception of

3  -- of things that needed to be adjusted.

4      But we spent a lot of time both with the shall we say

5  contract professionals as well as the actual city department

6  heads and employees.

7  Q    How about senior city officials?  Did you deal with any

8  of those?

9  A    Sure.  I met with Mayor Bing initially on a -- my office

10  is actually the deputy Mayor's office which is right across

11  from the Mayor's office so I see the Mayor as Mayor Bing and

12  now Mayor Duggan virtually regularly on a daily basis.

13  Q    How about from a personnel standpoint?  Did you -- were

14  you involved in any hiring efforts at that time?

15  A    Yes.

16  Q    Who did you -- you hire in -- in that time period when

17  you took over as emergency manager which is, you know,

18  March --

19  A    Right.

20  Q    -- extending into the -- into the summer time.

21  A    Yeah, there were -- there were some initial hires that we

22  had to make for my immediate office staff.  We call it the

23  office of the emergency manager.

24      I initially hired a special assistant, Shawny Pinn, a

25  senior advisor, Sandra Mays.  I then hired a public relations

1  director, Bill Nowling.  I also managed to prevail upon Gary

2  Brown who had been a dedicated and decorated police officer

3  who was shot in the line of duty.

4      He had been a whistle blower in the Kilpatrick

5  administration.  He was the one that filed the lawsuit.  He

6  had also been a city council President.  He was President pro

7  tem in the council.  So I was able to prevail upon him to

8  become our Chief Operating Office when we were brought in.

9      And as we rolled along we added additional people to the

10  team throughout that summer, fall year.  We had met John Hill

11  who originally came in as a contractor to examine our grants

12  administration program.

13      And I was so impressed by his qualifications having been

14  the ex-executive director of the D.C. control board, but he

15  actually had been a GAO and I had known that since living in

16  D.C. prior to that and called blue whistling on D.C.

17      So we -- we asked him if he would join us as Chief

18  Financial Officer.  And after some work we were able to get

19  that done.

20  Q    I'm sorry, Mr. Brown.  So you hired him into what

21  position?

22  A    As the city's Chief Operations Officer.

23  Q    Okay.  And Mr. Hill you hired as --

24  A    The Chief Financial Officer.

25  Q    Any other departments where you were involved with

1  hiring?

2  A    Yes.  During the course of the year Chief Logan which had

3  come back from retirement twice under Mayor Bing's

4  administration, had spent a lot of time in the city.  In fact

5  he worked in the city even at the -- his wife was very ill and

6  at her demise.

7      And it became time for us to look for a new police chief.

8  We were fortunate in that we had gone out and recruited Chief

9  Craig from Cincinnati and they made a pretty valiant effort to

10  try to keep him.

11      But he had started his career actually here in the city

12  of Detroit as a rookie officer along, I think it was in the

13  same class as Gary Brown.  And -- and we convinced him that it

14  was time for him to come home.  And so we hired him as Chief

15  of Police.

16  Q    Why did you believe he was the right guy?

17  A    He -- Chief Craig had after being in Detroit for a number

18  of years and having worked in Los Angeles, having been head of

19  the rampart district, having gone through some of the troubles

20  out there in the Bratton administration, having worked with

21  some of the prior chiefs, including Darryl Gates, having been

22  head of the black officers association out there, had

23  traversed over to Portland, Maine where he had been a chief in

24  a small town, had gone to Cincinnati in a very short time and

25  turned that department around.

1    He was pretty widely recognized as a notable change agent

2   for police chief.  And in Detroit at that time given the

3   relative levels of crime, we felt we needed someone who had a

4   broad range of experience at a large city police force like --

5   like L.A.  I think their -- their force is somewhere in the

6   neighborhood of almost five times as large as Detroit's.

7    It had dealt with and gone through the transit of some

8   very troubling times with that force and had come out and had

9   been recognized pretty much nationally as a -- as a

10  significant change agent.  We were lucky to get him.

11  Q    How would you characterize your working relationship with

12  these individuals that you hired, Mr. Hill, Mr. Brown, Chief

13  Craig?

14  A    Well, I'd like to think that we have a -- have had or had

15  since I've ceded authority back to the council on Friday, had

16  a very close and regular working relationship.  We had

17  standing staff meetings every Monday, but we had an open door

18  policy where regular meetings, regular calls.

19   If there was an incident that the chief would call me if

20  there was a problem with -- with the finances.  So it would be

21  John Hill would call me.

22   So I'd like to think that at least during the time that I

23  acted as emergency manager under the full panoply of powers of

24  436 we had a very close relationship.  We subsequently hired

25  Stacy Fox, a classmate of mine and Mayor Duggan's class of '83

1  of Michigan to come in and be my deputy emergency manager.

2       She had been general counsel at Visteon and I think at

3  Sunoco as well.  And she was just a tremendous help.  In

4  addition she knew members of the state, she knew the Mayor,

5  having been a lifelong Detroit or career long Detroit resident

6  during the time, she knew many people that --

7  Q    Which Mayor, Mr. Orr, which Mayor?

8  A    Mayor Duggan.

9  Q    Did Ms. Fox know?  Okay.

10 A    Yeah, she knew Mayor Duggan.  She knew Mayor Bing.  She

11 -- she had stayed in Detroit since we graduated in '83 and so

12 she knew most of the actors here.  She had been involved both

13 as an attorney and a developer in the city with the downtown

14 Detroit partnership, Downtown Development Authority.

15      So she was also another person who had close ties to the

16 community and was really very helpful in her role as deputy

17 emergency manager.

18 Q    How about your working relationship with Mayor Duggan?

19 How would you characterize that?

20 A    That is -- that has evolved from one that was initially a

21 little standoffish by both of us.  I think we were trying to

22 develop a level of trust at the beginning to one I'd like to

23 think of as very professional and very respectful of each

24 other.  Our interests were -- are aligned and were aligned

25 when I was there and we ended up working closely together

1  Q     Could you share with the Court what a typical work week

2  would look like for you during that, you know, initial period

3  when you took over?  And I'm talking now about -- still about

4  the services.

5  A     Sure.  On -- on any given work week there were typically

6  meetings with existing city staff and leadership.  I'd divide

7  the work week on a regular basis into three levels.

8        There were the ordinary course meeting, the standing

9  staff meetings, the weekly meetings we'd have with the

10 Governor, Governor's oversight meeting, Detroit review team

11 that we had to report on the status of operations as well as

12 any negotiations.

13       Then we have the meetings that would have to deal with

14 projects.  Ernst & Young were going through financial analyses

15 and reporting out projections.  We'd have regular meetings to

16 go through those.

17       We were developing for instance the fiscal and operating

18 plan that I think are reported out in May, May 3rd.  We'd work

19 on those.  If we were preparing for the June 10th public

20 meeting, the June 14th proposal of creditors we'd be working

21 together with all of the contract professionals as well as the

22 city officials on those.

23       And then there were the ad hoc meetings if any particular

24 thing would arise.  On July 4th, 2013, the dispatch tower went

25 out.  And -- and we'd have to rally around what our plan was

1 for getting the tower back up on a holiday weekend. I believe

2 it was Friday, the 4th on a holiday weekend.

3      If -- if we had a power outage, we'd -- Gary Brown would

4 take the lead on that and we'd talk about the process we're

5 going to and working with contractors for instance DTE to get

6 that back up.

7      If there was a fire, if unfortunately there was a

8 shooting, or a criminal incident, the chief would call and

9 talk about his plan for that. Fortunately for some of the

10 more notable ones, Mr. Utash, the shooting at CBS and others.

11 The missing young woman who's alleged perpetrator was found in

12 Atlanta. We were able to resolve those within 48 hours.

13 Q    Let me -- okay. And so -- so you're obviously -- you're

14 meeting with a lot of people and did you -- did you meet with

15 business leaders during those initial months?

16 A    Oh, we -- we -- yes. We'd have regular meetings with

17 business leaders.

18 Q    How often?

19 A    Sometimes there would be daily meetings having to do with

20 projects, either developmental projects, something going on.

21 The Detroit Economic Growth Corporation, DEGC. Sometime

22 meetings regarding blight for instance with Mr. Gilbert with

23 -- with his colleague Mr. Cullen, some of those proposals.

24      Some of the meetings would be with the community

25 foundations. The community foundation of southeast Michigan

1  with Miriam Nowland and the like.  We'd have those types of

2  meetings.

3  Q    How about what was your -- what were your interactions

4  like with city residents?  I assume that you talked to them?

5  A    Yes.  We -- well, there -- we -- we -- the -- the formal

6  meeting was the June 10th public meeting, but I would interact

7  -- I'd try to get out in the city with my detail at least --

8  at least one afternoon a week if not two.  And I try to go to

9  different pockets in the city to know the city better.

10     And I'd typically ask Gary, tell me about this area, Gary

11  Brown.  And I'd go for instance where the hole was over on the

12  east side off East Jefferson, or go over to the west side to

13  see the community center.

14     Go up to Marygrove.  Have an understanding of Seven Mile.

15  See some of the other city property so I'd have a feel for the

16  city.

17  Q    And did you engage in conversations with residents --

18  A    Yes.

19  Q    -- during those trips?

20  A    Yes.

21  Q    What -- what kinds of interactions were those like?

22  A    Initially those -- those interactions were not

23  particularly favorable or comfortable.  There was a high --

24  Q    Why?

25  A    There is a -- you know, the thing I don't think I

1  appreciated in thinking about it coming into the city is the

2  -- the week I came in I think was the week that Mayor

3  Kilpatrick had been sentenced.  And so that was the

4  culmination of his trial.

5      And so the city had gone through a lot of trauma and

6  concern.  There were the review teams about the financial

7  emergency.

8      There were a lot of rumors about what I was going to do.

9  Everyone felt I was going to come in and try to sell off

10 everything I could get my hands on.  I didn't respect the

11 people of the city or the uniqueness of the City of Detroit.

12     A lot of people thought I was just here to, you know,

13 carry out the ill will of Governor Snyder with regard to the

14 city.  So there was a lot of anxiety.  There's some hostility.

15 Q    Uh-huh.

16 A    Some people would tell me pretty straightforward using

17 vernacular.  They didn't appreciate the fact that I was in

18 town.  And -- and that -- that was maybe I should have --

19 there were people who met -- people who met every day and

20 would bring me in a -- for a while there, demonstrators at

21 city hall would bring me a package of Oreo cookies, that sort

22 of thing.

23     And my last name is Orr, I've heard that before.  But

24 they'd march up to the eleventh floor and try to get it to me

25 and I'd say hey, if you brought milk we'd have a snack.

1   So there was -- there was a lot of that anxiety.  But

2  over time as I tried to reach out, and I tried to get people

3  to feel where that wasn't who I was, or predisposition, that I

4  did care about the city sincerely and I was trying to work

5  with the citizens and work with the elected officials.

6   Some of the elected officials had a great deal of anxiety

7  when I first came in.  I believe city council President said I

8  didn't know where Six Mile was.  I did.

9   But that was the initial.  But after we started working

10  together and I would actually solicit their input and with my

11  first order restoring salary, and second one restoring

12  authority at city council and say I -- I need to work with

13  you.  I don't -- I'm not the answer to everything.  I don't

14  know everything about the city.

15   I don't think it's appropriate for me to be involved in

16  everything.  I need your help.  I think after a while people

17  began to -- to think I was sincere about that and so it

18  evolved.

19  Q   At this -- at this time did you interact with -- with any

20  union leaders?

21  A   Oh, yes.  In my --

22  Q   Who?

23  A   Well, I -- I initially had already met with the public

24  safety unions, Detroit Police Officers Association, Detroit

25  Police Lieutenants and Sergeants Association, the Detroit

1 | Firefighters Association.  Mr. Taylor who is in the room, I

2 | believe today, retired Detroit Police and Firefighters

3 | Association, Mrs. Lightsey, Detroit Retired Civil Employees

4 | Association and others.  I also met with some of the civil

5 | union heads as well.

6 | Q    And why did you meet with them, the union leaders?

7 | A    Here again I was trying to -- when I initially came in I

8 | was trying to tamp down fears of the city and there was a very

9 | real concern that things could get -- civil unrest could

10 | arise.

11 |      Certainly there were some agents out there in the city

12 | who were trying to format that.  And I was trying to tamp that

13 | down and get to a level of normalcy that just because an

14 | emergency manager had been appointed that it was not going to

15 | be a drastic change hopefully in the ordinary course of the

16 | city, but we were trying to do things for the better.

17 |      And so I was trying to meet with these folks and say I

18 | want to work with you.  I -- I want to hear your side of it.

19 | I want to understand your concerns.  I want to negotiate, but

20 | I was also trying to make an assessment of finding a

21 | negotiation partner for hopefully developing some out of Court

22 | resolutions of what had to be done with both the finance side

23 | and the labor side.

24 | Q    Now focusing on the unions, is it in your meetings with

25 | Mr. Taylor and Ms. Lightsey and the other union leaders, did

1  you gain an understanding of the city's relationship with its

2  unions?

3  A    Yes.  Obviously I'd -- I'd -- I'd known that since I had

4  come to southeast Michigan in 1976.  I had studied labor law

5  in law school and labor history in undergrad.

6       And the birthplace of it in a sense of the organized

7  labor union movement to a degree you put aside farm workers

8  out in California to agree to organize civil rights movement

9  was here in Detroit.  Walter Reuther, Henry Ford's $5.00 a day

10 wage, Hart Plaza across from city hall has a number of

11 statutes, labor's legacy, labor rising.  Joe Louis' fist in

12 the statute.

13      So the city had a strong labor relationship vein that I

14 -- I felt I had to both understand and -- and reach out to to

15 let them know I was not in a -- I was not a doctrinaire

16 opponent of labor, I was trying to be a partner with labor as

17 had been the course throughout the city.  And I wanted to let

18 them know from -- from the start that hopefully that would be

19 our approach and we could work together to get to a

20 resolution.

21 Q    What sorts of subjects did you deal with in talking with

22 the union leaders?  What was -- what were they bringing up?

23 A    Well, they -- they -- they brought up obviously the wage

24 cuts they had given back the 10% in 2009 and 2010.  They

25 brought up very strong concerns about their pensions and

1  particularly in the public safety unions there were concerns

2  about retiree health care.  But those concerns were pretty

3  strong throughout the whole labor stack, both on the civil

4  side and the public safety side.

5       That there was a general consensus that they -- they had

6  given back to the city under Mayor Cockrel and under Mayor

7  Bing previously that the city had made pledges to them about

8  their retirement and their retiree health care and indeed some

9  of them had taken their jobs because of those pledges and had

10 expected them to be realized upon their retirement that some

11 of the public safety union officials had -- had personally

12 explained to me how they had been injured in the line of

13 duty --

14           MS. O'GORMAN:  Objection, this is hearsay.

15           THE COURT:  Overruled, go ahead, sir.

16 A    Okay.  How they had been injured in the line of duty.

17 And they were relying on -- on having both a pension and a

18 health care to provide for them in their dependence in their

19 retirement.

20 Q    Now you -- you indicated that you were dealing with the

21 services of the city and then also the finances.  Can you

22 share with the Court what percentage of your time you devoted

23 to either side of -- of the house and did that change at all?

24 A    Yeah.  Initially on the front end I was -- I was trying

25 to do an assessment period of -- of what we were dealing with

1  in the city so that we could accurately -- we were working

2  towards three things.

3       One was I had under the 436 the report out the financial

4  and operating plan.  That was an obligation under the state

5  statute.

6       I wanted to build off of that a presentation for the June

7  10th meeting for the public because I wanted to have a -- a --

8  a realistic representation of the city.  I don't think

9  everybody had heard that for a while.

10      In fact I was a little surprised that many city employees

11  inside of CAYMC, Coleman A. Young Municipal Center, we call it

12  CAYMC.  Inside of CAYMC didn't understand some of the issues

13  addressing the city in terms of the unfunded liabilities and

14  the deferred payments.

15      And I also wanted to work on -- we were working on the

16  proposal for creditors which we wanted to be sort of a

17  template of a true representation of the state of affairs of

18  the city at that time broadly.

19      So it -- it varied from time to time.  Sometimes we were

20  working on operational issues but we were also as a team

21  simultaneously working on the financial issues and while it

22  would ebb and flow there were -- there were some -- there were

23  some long days.

24  Q    Now I want to ask you a few questions about the financial

25  side of the job.  And you've shared a little bit about what

1  was required of you under the statute.  Could you share with

2  the Court what sort of the financial issues were when you --

3  when you first came on board and how they progressed perhaps

4  up until July of 2013?

5  A     Uh-huh.  Well, yeah, we -- we -- because some of the

6  other contract professionals had already been in the city and

7  it was clear that if the city maintained on the ordinary

8  course both the long term prognoses, the drivers because the

9  city paid retiree health care out of pocket.

10     We did not have one dime -- well, it was 99.6% was paid

11  out of pocket.  We -- we had very little money to pay retiree

12  health care.  And I think in 20 -- 2013, 40% of the city

13  budget, 400,000,000 of 1,000,000,000 roughly was dedicated to

14  legacy expenses both debt service and half of that to 100 plus

15  was retiree health.

16     But we knew that the current rate of increase that in the

17  next nine years legacy costs were going to grow to 73% on

18  average of the $1,000,000,000 budget and retiree health was

19  going to be somewhere in the neighborhood of over 50% of that

20  over $500,000,000 of a $1,000,000,000 budget.

21     So we -- we knew that -- that the trajectory of where the

22  city was was not sustainable and the statute required me to

23  work to put the -- in a sustainable fashion upon the end of my

24  appointment.  So we had to get a -- get a grip on -- on that

25  issue in terms of the finances.

1    We had to get a grip on the pension on funding.  The city

2 had been in the practice of deferring its funding obligations

3 on the pension funds and -- and giving back IOU's essentially

4 at 8%.  It was several hundred million dollars at that point.

5    It varied or varied estimates between six hundred, eight

6 hundred, but it was significant.  We were never going to make

7 it -- make that kind of payment.

8    And we knew that our cash flows at that point based upon

9 our debt service obligations and our funding obligations with

10 regard to labor were -- were not -- they weren't -- they

11 weren't balancing, they weren't going to match up.

12    In fact we had a large payment coming up, the $40,000,000

13 payment on the swaps that we had to make.  And I believe that

14 was in June.  And we were debating whether or not we'd be able

15 to make that payment.

16 Q    Let me stop you there.  You refer to we.

17 A    Uh-huh.

18 Q    Who was your -- who was the we with regard to the

19 financial aspects of -- of the job of EM?

20 A    Well, it was the whole team, but it -- it was principally

21 Ernst & Young, Conway, MacKenzie, Jack Martin initially was

22 the -- the Chief Financial Officer but later in the year when

23 -- when we were fortunate enough to get John Hill in, it

24 became John.

25    So it was a combination of the contract professionals

1   working along with the city professionals who were advising me

2   as to what our status was and what we could and couldn't do.

3   Q    Did you have -- you mentioned Conway, MacKenzie.  Did you

4   have any other outside consultants who were helping you on the

5   financial side of the house?

6   A    Oh, sure.  We -- we -- we had a lot of consultants in

7   addition to Conway, MacKenzie and Ernst & Young, Miller,

8   Buckfire, I mentioned Jones, Day.

9        But also we started doing an analysis on the pension

10  side.  Initially we were looking at the pension systems

11  traditional actuary Gabriel, Roeder but we reached out to

12  Milliman to assist us with that as well.  Later Segal came in

13  on behalf of the retiree committee, I believe, to assist us

14  with that also.

15  Q    Before the Chapter 9 petition was filed, what did a

16  typical work week look like to you with regard to the

17  financial aspects of the job?

18  A    Well, initially it was trying to get a grip on the

19  financial aspects and understand the city's both revenue

20  stream as well as its expenditures.  We had four -- well, five

21  main revenue drivers.

22       We had income tax, state revenue share, property tax,

23  casino revenue, and other fees.  And those accounted for

24  almost 80% of the budget I think typically during a year.  So

25  we -- we were looking at, you know, the -- the ebb and flow of

1 those numbers.

2     But then on the expenditure side we were looking at both

3 current expenditures, payroll, active duty health care and the

4 like.  But also legacy expenditures debt service.

5     That eventually began to evolve when we started focusing

6 more on the first proposal for creditors and looking at what

7 we could provide as an initial offer if you will and an

8 invitation to engage in a discussion with creditors in that

9 June 14th proposal.

10 Q    You -- you mentioned the outside consultants.  Did you

11 interact with city officials in connection with the finances

12 of the city?

13 A     Yes, on a regular -- as I said, initially with the SCVO

14 office but also with program directors at that time under the

15 memorandum of Detroit reform there was program director.  We

16 also interacted with our labor negotiator at that time with HR

17 and with the Mayor.

18 Q    Do you recall when the Chapter 9 petition was filed in

19 this case?

20 A     Yes.  It was July 18th, 2013.

21 Q    After that date did things change at all for you with

22 regard to the -- to the financial aspects of the city?

23 A     Well, they -- they -- yes.  They actually began to change

24 a little bit prior to that date, after the June 14th meeting of

25 -- proposal meeting for creditors.  We had elected not to make

1  the payment on the swaps and we started engaging in -- in a

2  discussion and debate with one of our creditors, Syncora under

3  principal.

4       And I testified before about there was a little letter

5  exchange going back and forth with that.  Some of our other

6  creditors and the ratings agencies began to get a little -- a

7  little anxious and there started to be reports as to whether

8  or not the city would make another default.  Whether or not

9  the city was going to declare bankruptcy.  That was -- how

10 that was going to harm the city and we'd never be eligible for

11 credit again.  That the financial community might actually

12 punish the city.

13      So leading up to the bankruptcy filing, there was a lot

14 of chatter after the bankruptcy filing that seemed to amplify

15 a little bit.

16 Q    And but how did your duties change after the filing of

17 the bankruptcy?

18 A    Well, after the filing under -- under federal law in

19 Chapter 9, I had a -- I had a specific duty now both under

20 436, I perceived under 436 in Chapter 9, to be forthcoming

21 about the condition of the city and to interact with our

22 creditors in trying to negotiate settlements with their

23 claims.

24 Q    Okay.  Did you get involved in mediation sessions?

25 A    Yes.  Regular meetings in the --

1  Q    All right.  Just let me caution you.  I don't want you to

2  say anything about what was -- what was going on in those

3  mediations, I just am wondering whether you participated in

4  them.

5  A    Yes, I did.

6  Q    Okay.  Were you at all of the mediation sessions?

7  A    No.

8  Q    Were you kept informed of what was happening in them?

9  A    Yes, on a regular basis.  Sometimes there would be calls

10 actually during the process of the mediation from either the

11 mediators and/or my -- my team members.

12 Q    Okay.  How about were there negotiations going on with

13 your -- your creditors at that time, the city's creditors?

14 A    Yes.

15 Q    You indicated that there was a cash flow issue, a low

16 cash flow issue when you took over, correct?

17 A    Yes.

18 Q    What is PA-436?

19 A    Public Act 436 is the state law by which I operate under.

20 It is a law designed to restore financial and fiscal stability

21 to -- to communities, municipalities in the State of Michigan

22 that are in financial distress and/or financial emergency.

23 Q    Thank you.  Does that statute enumerate your powers as --

24 A    Yes, it does.

25 Q    Were there powers in PA-436 that you decided not to

1  exercise?

2  A    Yes.

3  Q    Like what?

4  A    There were the powers depending upon the funding levels

5  of the pension systems to replace their boards essentially

6  take them over.  There is a power, I think Section 28 to tax.

7  But that -- that requires a vote of the people.  There are

8  powers to, I think actually --

9  Q    Well, let me stop you there on that -- on that Section

10  28.  Did you -- did you ever -- that allows you to raise

11  taxes?

12  A    Well, it doesn't permit me to raise taxes.  It permits me

13  to seek approval with an election process to raise taxes.  I

14  do not have the unilateral authority to raise taxes.

15  Q    Did -- did you ever consider doing that when you took

16  over as emergency manager?

17  A    Just briefly.  I -- I had done research before about the

18  tax rate of the city.  We're at the maximum rate and millage.

19       We -- we -- we are at 40 to 50% of -- of the poverty rate

20  of low and moderate income.  Our -- our unemployment rate I

21  think in 2013 was 18.2.  That's dropped down to 14.2 or 14.3

22  or so.  So we look at different cohorts, particularly young

23  black men.  It's -- it's as high as 40% in some cohorts.

24       The concept of -- of raising taxes in a city where 40% at

25  least of the residents are poor, didn't strike me as something

1  that was particularly reasonable.

2  Q    Okay.  Could -- could we put up on the screen Exhibit 33,

3  Steve?  Mr. Orr, this -- this document is in evidence.  Do you

4  recognize the cover page?

5  A    Yes.

6  Q    And what is it?

7  A    It is the June 14th proposal for creditors that we

8  presented out of a request.

9  Q    And you testified that you assisted in putting it

10  together?

11  A    Yes.

12  Q    And it was issued by your -- your office?

13  A    Yes.

14  Q    Okay.  Could you put up Page 010 of this?  Okay.  Can you

15  highlight, Steve, the middle orange and then down to the first

16  bullet point after that?  Could you take a look at that, Mr.

17  Orr?

18  A    Yes.

19  Q    Does that accurately reflect your views on the tax

20  situation in the city when you took over?

21  A    Yes.  This is exactly what I was talking about.

22  Q    Could you read those two sentences, please?

23  A    The title and the sentences?

24  Q    Sure, okay.

25  A    Residents and businesses are leaving Detroit to escape

1  high taxes and insurance costs.  Comparative tax burden.  Per

2  capita tax burden.  Per capita tax burden on city residents is

3  the highest in Michigan.  This tax burden is particularly

4  severe because it is imposed upon a population that has

5  relatively low levels of per capita income.

6  Q    And you agree with that statement?

7  A    Yes.

8  Q    You believe it's an accurate one?

9  A    Yes.

10 Q    You can take that down, please.  Mr. Orr, you were -- are

11 you familiar with this Court's opinion on eligibility?

12 A    Yes.

13 Q    Do you recall when that opinion came out?

14 A    December 3rd and I believe followed by the written opinion

15 within a week or so thereafter.

16 Q    Okay.  Do you recall its determination that the city was

17 service delivery insolvent?

18 A    Yes.

19 Q    And that was in -- in December 2013.  Looking at -- at

20 things now, do you have a view as the city's state of service

21 delivery to its residents nine months later?

22 A    I think it has improved, but I think it still has a long

23 way to go.  I think for instance in solid waste we've made

24 significant improvements.

25          And solid waste isn't just a question of solid waste,

1   it's a question of public health.  Because you want to get

2   refuse out of the city otherwise you get vermin.

3       This is something that Mayor Coleman Young talked about

4   back in the late seventies.  And so I think that's an

5   important component.  I think in terms of public safety the --

6   Chief Craig has done a phenomenal job given the fact that he's

7   been here a little bit over a year, crime is down in every

8   category.  Violent crime and -- and property crime.

9       And we have reports to demonstrate that.  We're tracking

10  that by comp stat which had not been done before in the city.

11  So we -- we have accurate reports relative to other

12  municipalities and per capita.

13      The only area where there is an uptick I believe is in

14  domestic violence.  Because officers are rolling to incidents

15  now and actually taking incident reports as opposed to having

16  perhaps some street administration of the incident when that

17  occurs.

18      I think the movement to get the Public Lighting Authority

19  both funded last year but now with the plan to go forward is

20  very important.  We are hanging lights, I think almost in

21  excess of 1,000 a week.  At this rate we're very hopeful --

22  the city is very hopeful that that will be the lighting plan

23  for the 40% of lights that are out.  Could be completed as

24  early as late next year.

25      I think it has been very important to focus on the fire

1  department getting them new equipment.  The -- the so-called

2  Penske group that gave us the new ambulances and heavy

3  equipment was excellent, but we were running those trucks into

4  the ground.

5      We're now going to find something more appropriate since

6  60% of our calls on EMT side aren't urgent.  They're more or

7  less calls to provide taxi ambulance services to and from

8  facilities.

9      I think at the -- the blight department putting

10 properties into the Detroit Land Bank Authority to facilitate

11 both the Mayor's plan, Mayor Duggan's plan to do the nuisance

12 abatement but as well as the revitalization and blight removal

13 is moving forward at a pace.  We have spooled up to the point

14 I think our stand at this point in terms of blight removal is

15 almost two and a half million dollars per week.

16     We have exhausted all the clean fill in the State of

17 Michigan, so we're trying to find some additional fill for

18 buildings that are being knocked down to bring in.  I think

19 there are a number of different service delivery areas that

20 have increased.

21     We're paying our bills on time.  The finance module

22 proposal to restructure, it is -- is ongoing.  We have good

23 control over cash management now.  I get daily report, it's

24 called a daily cash pack.

25     And it tracks what our actual cash burdens are as well as

1  what's going to be coming up in the coming weeks so we know

2  what cash we have in the city and what payments are coming.

3  This is particularly important in April and August time frame

4  when tax bills are being paid because you get peaks and

5  valleys so you want to harmonize that and make sure that the

6  cash flow is consistent, you can meet your bills as they

7  become due.

8      So there are a number of different areas that whether

9  it's lighting, blight, public safety, cash management, solid

10 waste, that we've -- we've made improvement on but we still

11 have some way to go.

12 Q    Thank you.  I'd like to -- to switch gears if we can and

13 talk a little bit about the -- the plan of adjustment, okay?

14 A    Yes, sir.

15 Q    What was your role in the bankruptcy filing on July 18th,

16 2013?

17 A    Well, my -- my role began, I think I testified before at

18 eligibility, before that, the week or so before.  But we were

19 -- I was integral in preparing the request to the Governor for

20 the authority to file.

21 Q    And did you request the Governor to -- to file the

22 bankruptcy, is that -- am I -- am I recalling correctly?

23 A    We -- I requested -- I wrote a request to the Governor on

24 the 16th or 17th of July, I believe, to grant us the authority

25 to put the City of Detroit into bankruptcy.  And I requested

1 that that authority be given unconditionally.

2     436 permits the Governor to make certain stated

3 conditions on it.  We were a little bit concerned about that

4 because we -- we had been in negotiations with some of our

5 creditors and we wanted pretty -- we wanted to have the

6 flexibility to try to reach agreements if we could without

7 limitation.  And we received that approval, I believe on the

8 18th of July 2013.

9 Q    So starting then, July 18th, 2013, what was -- did you

10 have any approach that you wanted to adopt to the bankruptcy

11 process?

12 A    Yes.  Under 436 -- I believe under 436 my -- my mandate

13 was to pursue proposals either in bankruptcy, or out of

14 bankruptcy that were affordable.  I think the statute's

15 language is sustainable in a sustainable fashion.

16     We tried to do that in a way that was fair and balanced.

17 But I had to do that in a way that I -- I understood was

18 reasonable under the circumstances.  But also within the time

19 frame that I would have to act within net 18 months that I

20 would have because I recognized that if we could not put some

21 of these into a framework that made sense, into a plan that we

22 would present in the Court with -- with an attempt to try to

23 get out before my authority expired under 436, then some of --

24 some of the authority that was necessary to reach some of the

25 settlements would go away.

1    And that -- that was -- that would be unfortunate because

2   we would revert -- we couldn't revert back to the ordinary

3   course and then we wouldn't need to have the ability to

4   negotiation settlements and/or implement them.

5   Q    So it -- was it important to you to get it done in that

6   time frame?

7   A    Yes.

8   Q    And why was it important to do it quickly?

9   A    Well, I'd like to think it wasn't so much quickly, but --

10  but from my perspective, this process had been going on since

11  2011.  There had been two Detroit review teams, two reports of

12  financial emergency, a consent agreement that had seven

13  exhibits to it and over 31 decretal paragraphs, a memorandum

14  of Detroit reform, the Michigan Finance Authority had floated

15  stabilization bonds in November 2012.

16      Another Detroit review team reported at the end of 2012

17  -- no, it came out in January 2013 of the Governor's 21 page

18  finding of a financial emergency.  The work that had been done

19  by the contract professionals in April, in January, February,

20  March of 2013, all of that my -- my view was that July 18th was

21  sort of a culmination of a -- of a number of events that have

22  been coming this way.

23      I -- I didn't think it took anyone by surprise that

24  Detroit was in a financial crisis.  I didn't think it took

25  anyone by surprise that there was endemic blight around the

1  city.  I didn't think it took anyone by surprise that the

2  city's lights were down.

3      Certainly there have been legions of reports written

4  about crime in the city and the need to interdict.  So from my

5  view on July 18th all of those had already been firmly

6  established certainly by the people that live here and -- and

7  work here.

8      And that it was important to complete not just within my

9  term from -- from a personal standpoint, but because the

10 financial emergency had been in existence almost for two

11 years.  It was important to get out of the financial emergency

12 so the city could emerge and start to rise and re-invent

13 itself.

14     In addition the cost to the city for staying in a

15 financial emergency, both direct in terms of out of pocket

16 expenses for professionals and others for instance, but also

17 indirectly.  The cost that was built in to our interest rates

18 on some of our debt.

19     Interest rates to our enterprise funds at Detroit Water

20 and Sewer Authority.  In 2010, 2011, I think they paid

21 $562,000,000 in a swap termination fee.

22     So there -- there have been a lot of costs to the city.

23 The -- the -- the issue was ripe.  And it was time to move

24 forward to a reasonable plan so that we could get out of this

25 period and restore some normalcy to the city because it had

1  been in trauma for a long time.

2  Q     Were you aware --

3          THE COURT:  Excuse me one second.  I'd like to pause

4  now and take our afternoon recess and reconvene at 4:00,

5  please.

6          (WITNESS KEVYN ORR WAS TEMPORARILY EXCUSED AT 3:45 P.M.)

7          THE CLERK:  All rise.  Court is in recess.

8          (Court in Recess at 3:45 p.m.; Resume at 4:01 p.m.)

9          THE CLERK:  All rise.  Court is back in session.

10  You may be seated.

11          THE COURT:  Okay.  You may proceed.

12          MR. SHUMAKER:  Thank you, Your Honor.

13  BY MR. SHUMAKER:

14  Q     Mr. Orr, at -- at the break you were sharing with the

15  Court your approach to the bankruptcy process after the filing

16  of the petition.  At that time were you aware of any other

17  Chapter 9 bankruptcies?

18  A     Yes.

19  Q     Which ones were those?

20  A     There were at least two out in California, Vallejo.  And

21  then there was Jefferson County down in Alabama.

22  Q     Did that -- did those bankruptcies inform you in any way

23  about how this one should proceed?

24  A     Yes.

25  Q     And how was that?

1  A    I was concerned that we'd get bogged down and delayed.

2  Those have been going on for several years, some in excess of

3  three years, three or four years.  And given what I thought

4  were the facts on the ground that were pretty apparent, no one

5  has really disputed the city's cash assumptions, the amount of

6  debt we have to pay.

7      No one's disputed the state of the city.  The fact that a

8  50% response time of police is appropriate.  In a -- in a

9  relatively difficult large city.  It just didn't make sense to

10 me to have that kind of delay.

11 Q    Okay.  You're aware of the plans of adjustment that have

12 been filed in these proceedings, correct?

13 A    Yes.

14 Q    Were you generally involved in the development of these

15 plans of adjustment?

16 A    Yes.

17 Q    And what was your involvement?

18 A    In -- in some cases quite granular.  Leading up to the

19 time and days before they're filed we'd be going through the

20 underlying assumptions.  I mean the plans are essentially a

21 culmination of a number of settlements that have been brought

22 together.

23     I have been intimately involved and have approved those

24 settlements.  Some of the projections and assumptions as well

25 as some of the restructuring and re-investment initiatives, I

1  was involved with from day one.

2       For instance at the police department you had a number of

3  different consultants.  You had the Bratton Group, you had

4  Manhattan Institute, you had a police monitor at the time I

5  was there, both for the two consent decrees, the use of force,

6  and the confinement decree.  So we were getting a lot of data

7  that were being built in for a suitable proposal and then to

8  development of the plans.

9  Q    You said we worked on the plans of adjustment.  Who --

10  who was the we?

11  A    Oh, the we is -- is a, I suppose it's a royal we.  I mean

12  it includes the contract professionals, Ernst & Young, Conway,

13  MacKenzie, Jones, Day, Miller, Buckfire, but it also includes

14  the city employees and other departmental professionals.

15      At various departments we would have professionals

16  involved, Desmond on parking.  As I sat over at DPD, Detroit

17  Police Department we had at least three professionals.  Over

18  at DWSD you had professionals and consultants on everything

19  from rates, to operations, to improvements.

20      So we get all that information, try to digest and

21  synthesize it and put it out into proposed plans.

22  Q    Now there were seven plans of adjustment, is that right?

23  A    Yeah, there's seven.  There's one that was corrected, but

24  there are seven.

25  Q    I want to -- I want to ask you about that a little bit

1  later.  But did you approve each version of the plans of

2  adjustment that were filed?

3  A    Yes.

4  Q    Did you think that each of the versions, one through six,

5  were confirmable?

6  A    Yes.

7  Q    Why then were so many different versions of the plans of

8  adjustment necessary?

9  A    As I said each -- each version of the plan incorporates

10  -- typically incorporates different !settlements as we go

11  along.  So while our assumptions regarding settlements for

12  instance initially on June 14th our assumption was that all

13  unsecured were going to be treated the same across the board,

14  but as those settlements evolved, with the help of the

15  mediation process we try to incorporate those settlements into

16  the plan.

17  Q    Did you view -- have a view as to whether one plan of

18  adjustment was more confirmable than another?

19  A    I -- I certainly thought they were all confirmable but as

20  they evolved particularly after the plan vote, my -- my hope

21  of confirmability probably got a little bit better.

22  Q    And what -- why was that?

23  A    Well, the -- the impaired parties that were necessary to

24  vote for the plan as opposed -- I'm aware of the concept of

25  concept of cramming something down in a Bankruptcy Court.

1       The impaired parties that were voting for the plan would

2   typically also have an obligation for plan support.  That's

3   both an obligation to vote for the plan, but also to in some

4   cases go out and actively solicit their membership for

5   instance on the union side to vote in favor of the plan.

6       To come forward to assist us with other negotiations to

7   make deals.  So as we rolled up into more agreements with

8   impaired parties, it seemed to me that that was a good thing

9   because our overall goal in -- in terms of trying to reach

10  things that were both reasonable and confirmable within the

11  time frame, was ultimately get something that was consensual.

12  And there were legal reasons for that, but there are also

13  operational reasons for that.

14  Q    Did -- did the first plan of adjustment have the support

15  of all the creditor classes?

16  A    No.

17  Q    Which did not support it?

18  A    Almost all.

19  Q    Were -- were Classes 10 and 11 a part of those that did

20  not approve of it?

21  A    Yes.

22  Q    Was their support important for purposes of

23  confirmability?

24  A    Yes.

25  Q    And why was that?

1  A    Well, not just in terms of counting the vote which at the

2  end of the day for Class 11 and 12 came in in excess of 80%,

3  but also important of when -- when we're doing with this

4  process which is just a -- you know, I'd like to think of it

5  as a snapshot in the history of the city, you know, that --

6  that many of the people that are making these votes are active

7  employees that we're trying to incentivize to perform some of

8  the RRIs that we're building into the plan.

9      It's important that there be a consensual resolution

10 having recognized that the city had a long history with

11 negotiations and resolutions that there be buy in.

12     So both just from accounting purposes under the terms of

13 the Bankruptcy Code, but also from an operational standpoint

14 to make sure that the affected parties going forward and also

15 on the financial side, to make sure that the financial

16 creditors and all the prognostications in the financial

17 community that the city was going to be punished and harmed as

18 a result of this effort, would -- would hopefully be resolved.

19 Q    So the seventh amended plan contains all of the

20 settlements that you were referring to?

21 A    It contains all of the settlements that I was referring

22 to, yes.

23 Q    And why are they important?  Why are the settlements

24 important to the plan of adjustment process?

25 A    Well, for the plan of adjustment process, you know, you

1  -- you have to have the support of the impact of parties.  You

2  know, I often say is it's relatively easier to get into

3  bankruptcy than it is to get out of it.

4      And we needed to have their support for the affected

5  parties here again both on the -- the worker side so they work

6  for the city, but also on the financial creditors side so that

7  we could actually model reasonably what we could afford to do

8  so the concern about affordability and sustainability that's

9  required in the statute would actually be reflected in the

10 plan both at the state statute level but as well as at the

11 bankruptcy federal level.

12 Q    How many settlements are outlined in the seventh amended

13 plan?

14 A    There are -- well, there's 17 classes, but if you break

15 it down in the general classes, there are probably a total of

16 -- of eight.  I'm not breaking out the sub groups of -- of --

17 of say the VEBA settlements for instance where there are two

18 VEBAs, that type of thing.  So I'd say there's about eight.

19 Q    Okay.  I want to ask you some questions about those

20 settlements, but first again with the mediation order in mind,

21 I just ask were -- were any of those settlements the result of

22 the mediation process?

23 A    All of them except one.

24 Q    Which one was that?

25 A    The settlement regarding the 36th District Court

1  plaintiffs I don't believe was a mediation.

2  Q    Do you recall when the -- the Court's mediation order

3  went into effect?

4  A    August 13th, 2013, I believe.

5  Q    Since that point in time, assuming the accuracy of that

6  which I think is correct, what issues has the Court sent to

7  mediation?

8  A    All of them.

9  Q    Then we talked about you -- you participated in those

10  mediation sessions, correct?

11  A    Yes.

12  Q    Do you believe the mediation process assisted in the

13  development of the plan now before the Court?

14  A    In retrospect I think it was crucial.  Given the

15  positions of the parties when we started out, you know, a lot

16  of parties are saying we're not going to settle, we'd rather

17  fight.

18      A lot of the labor parties were -- were making threats.

19  In January of this year we had a little bit of a kerfuffle

20  over at the Department of Transportation and a bus slow down.

21  Some of the drivers felt they weren't being adequately

22  protected.

23      And because our school children ride our buses, it's

24  important, particularly in winter that that bus department

25  makes -- that the Transportation Department make schedule.  We

1  have kids on -- on the sidewalks.

2      So I think dealing with those issues through mediation to

3  be honest with you wouldn't bank on it.  I'm still somewhat

4  amazed that -- that we've reached some of the settlements we

5  have, but I don't think we would have reached them without

6  mediation.

7  Q   Did any of the settlements that were achieved through

8  mediation stand out to you more than the others?

9  A   I mean I -- from -- from my perspective all of them are

10  important.  They all have unique characteristics that are

11  necessary, but I believe probably the -- let's call other post

12  employee benefits, the OPEB or retiree health care settlement

13  is pretty significant.

14  Q   And why do you say that?  Again, keeping in mind the

15  mediation order.

16  A   Okay.  Of the unsecured creditor cohort, the -- the

17  retiree health care obligation was the largest.  And here

18  again this is an obligation for which the city had not set

19  aside any -- any money.  We were paying retiree health care

20  out of pocket year after year going forward.

21      Looking at the -- the trajectory of that -- that

22  obligation in the out years, it was simply unsustainable.  It

23  would get to the point where the city's general fund would

24  have been nothing more than a conduit from the taxpayer for

25  retiree health by the -- in the next 20 -- the next ten years

1  really.  So that -- that was pretty significant.

2  Q    Let me show you demonstrative Exhibit 709, please.  Now

3  Mr. Orr, can you identify -- were -- were you involved in

4  putting this chart together?

5  A    Yes, intimately.

6  Q    And what was this a part of, this chart?

7       (City's Exhibit 709 was identified)

8  A    This -- this chart depicts the legacy costs and with and

9  without --

10 Q    No, I'm sorry, before you go there, I want to talk about

11 what this was a part of.

12 A    Oh, this was a part of a slide deck, a presentation that

13 we used in May of this year when we were up in Lansing asking

14 the legislators to fund the state contribution agreement.

15 Q    What -- what was its purpose, the -- the document that it

16 came from?

17 A    The document came from was a slide deck that we used with

18 those legislators that we handed out both on the Senate side

19 and the House side, and on the majority, minority side to

20 explain to them what the city's legacy costs as a percentage

21 of general fund would look like with restructuring and what it

22 would look like without restructuring.

23 Q    And did you intend for the state legislature to rely on

24 this?

25 A    Yes.

1  Q    And was this a document that came from your office?

2  A    Yes.  Yes, it says office of the emergency manager

3  somewhere on it.

4         MR. SHUMAKER:  Your Honor, we'd move Exhibit 709

5  into evidence.

6         THE COURT:  Any objections?

7         MR. SOTO:  Is it as a demonstrative?

8         MR. SHUMAKER:  As a demonstrative.

9         MR. SOTO:  No objection.

10         THE COURT:  All right.  For that purpose it is

11  admitted -- it is admitted.

12      (City's Exhibit 709 was admitted)

13  Q    Now getting to this -- this chart, Mr. Orr, could you --

14  could you share again, and I'm sorry if I -- because I

15  interrupted you, share with the Court what this -- what this

16  shows?

17  A    Yes.  It shows the trajectory of legacy costs including

18  both debt service, but really health care span although it's

19  not broken out here from the state of the city in fiscal year

20  2013 which ended last year where it was 40%.

21         And as you see the bars, the dark blue bars show if -- if

22  we do nothing what will happen.  So that legacy costs as a

23  percentage of the budget that 73%, I think at least 50% of

24  that is for retiree health care.

25         If we do nothing and it shows in fiscal year 14, which I

1  think is an actual, the decrease in legacy spin because we

2  started implementing the changes to retiree health care,

3  although we paid a portion of the state health care that is

4  what was going on in the city for January and February this

5  year, that's about $15,000,000 a month.

6  Q    Let me stop you there.  Just a couple things.  I know

7  that the Court Reporter is having a little bit of trouble.

8  A    I'm sorry.  I'm sorry.

9  Q    Getting down some of what you're saying.

10  A    Okay.

11  Q    And so -- and I'm having a little bit of hearing you.

12  A    Okay.

13  Q    So I just want -- I just want to walk through this

14  because I -- I think this is important.

15  A    Okay.

16  Q    Let's just take a year.  I'm going to pick fiscal year

17  18.

18  A    Yes.

19  Q    Do you see that?

20  A    Yes.

21  Q    Could you explain to the Court what the dark blue and the

22  light blue bars mean?

23  A    Right.  The fiscal year 18 in dark blue, the dark blue

24  bar, shows if nothing is done without a restructuring in this

25  -- in this process, that the legacy cost to the city's general

1  fund which is roughly $1,000,000,000 would be 67%.  So that

2  means that the legacy cost would be about $670,000,000.

3  That's not for funding services, no potholes, none of the

4  things the general fund does would be captured in that bar.

5  That would be all past cost debt service and retiree health

6  care principally.

7       The light blue bar shows what our legacy costs will be

8  which will be principally legacy debt obligations because as

9  of fiscal -- well, as of hopefully the effective date of the

10 plan and -- and January 1, the city will stand up to voluntary

11 employee benefit associations, one for general service and one

12 for police and fire to provide retiree health care and fund

13 those with a note.  And so that the cost then instead of being

14 67% in the dark blue bar for legacy costs will be only 15%,

15 and over 75% reduction.

16 Q    Thank you.  And when you use the term legacy costs, what

17 did you mean by that?

18 A    Well, I meant costs that were incurred as a result of

19 past obligations.  So when I say retiree health that's for

20 employees that are already retired for whom we have to

21 continue providing health care for those who are vested in

22 their health care retirement.  And then --

23 Q    Sorry, is that -- is that OPEB?  Is that --

24 A    That's other -- yes.  Other post employee benefits,

25 retiree health care.  Well, I should say retiree health care

1  includes health, dental, vision, and death benefit.  So other

2  post employee benefits are four categories.

3  Q    So OPEB is a part of the legacy costs?

4  A    OPEB is a -- is a very large part and a -- and it grows

5  at a higher rate than debt service.  So it's a very large part

6  of that.

7  Q    When you say very large, do you know whether it's over

8  50% or under 50%?

9  A    I -- I don't know for fiscal year 18.  We -- we have

10 research back at the office I could break it out.  I just do

11 know that the trajectory from 2013 when it was half or 20% of

12 the overall budget to 2023 when it was in excess of 50%, I do

13 remember those numbers.

14 Q    Okay.  And so you were telling us about the OPEB

15 settlement and --

16 A    Right.

17 Q    And why that was important to you.  How does that feed

18 into this chart?

19 A    Well, the OPEB settlement is represented essentially to a

20 large degree by this chart.  The OPEB settlement shows that

21 with the settlement of OPEB and some of our debt service to

22 the -- general fund debt service, we go from the dark blue bar

23 to the light blue bar.

24 Q    Thank you.  You can take that down.  So Mr. Orr, what are

25 the -- the overarching benefits of this seventh amended plan

1  in your mind?

2  A    Well, at a high level the seventh amended plan allows us

3  to resolve some of our legacy debt obligations.  It

4  facilitates our ability to put out a plan that we think is

5  feasible, confirmable, and reasonable and allows us to meet

6  both the obligations of the emergency manager under the state

7  statute to lead the city in a sustainable fashion.  But also

8  under the federal bankruptcy law for a plan that's both

9  confirmable and feasible going forward.

10 Q    And what is your view of those settlements that are

11 contained within that plan?

12 A    Crucial.

13 Q    And why is that?

14 A    Well, here again to be consensual but also to be -- make

15 sure that the city can afford it.  That the state statute says

16 has to be sustainable.  That it's fair under the

17 circumstances.

18      That it provides consensual resolution.  That it also

19 allows us to move through this process at what is a relatively

20 quick process from my understanding of municipal bankruptcies.

21 And gets us to a position that is reasonable within that time

22 frame.

23 Q    Okay.  I'd like to focus on those settlements for --

24 A    Yes, sir.

25 Q    -- for a little white.  And you -- maybe I didn't ask you

1  this.  Which -- which settlements do you recall being in the

2  seventh amended plan?

3  A    I'll --

4  Q    If you can list them.

5  A    Yeah.  Well --

6  Q    I'll help you if you can't.

7  A    No, I think I -- I think it got it.  We -- we have the

8  unlimited tax general obligation settlement.  We have the

9  limited tax general obligation settlement.  We have the 36th

10 District Court settlement in the seventh plan.

11        We now have a settlement with the other post employee

12 benefits, the OPEB settlement.  We now have the settlement

13 with Syncora.  Hope to have a settlement with FGIC.  And how

14 many did I -- LTGO, UTGO, OPEB.

15 Q    I've got you at five right now.

16 A    Syncora.  Who am I -- oh, 36th District Court because

17 that's -- that's non-plan.  I left that one out.  And then we

18 also have the -- the so-called grand bargain which in my mind

19 is broken out into two separate components.

20        One is the DIA foundations and funders contribution.

21 Another is the state contribution agreement.  People might

22 count that as one settlement.  I sort of think of it as two.

23 Q    Great, okay.  I'd like to ask you about those

24 settlements.

25        Let's -- let's start with -- I think the first one you

1  mentioned which was the unlimited tax general obligation bond

2  settlement.

3  A     Yes.

4  Q     And is it okay if I refer to that as the UTGO settlement?

5  A     UTGO or UTGO is fine, sure.

6  Q     Okay.

7  A     Uh-huh.

8  Q     If I slip into both, I mean this settlement.

9  A     Yes.  I -- I -- I'll remember.

10  Q    Are you familiar with that settlement?

11  A    Yes.

12  Q    Okay.  And do you know what your -- if you could share

13  with the Court what the UTGO bonds are.

14  A    Yes.  The -- the so-called UTGO bonds were a series of

15  bonds that have been issued by the city in some cases over a

16  long period of time for which a dedicated millage on their --

17  in the bond holders' view, a dedicated millage at bid assessed

18  voted on by the city and assessed and for which the city had

19  been collecting I think the term of that millage was somewhere

20  between the next 12 to 14 years.  That the total amount of the

21  bonds outstanding was at one point $388,000,000 or

22  thereabouts.

23  Q    Three hundred and eighty-eight million dollars?

24  A    Million.

25  Q    Million.

1   A    Dollars.  So it's a significant sum of money.

2   Q    Were -- were the UTGOs a particular class of creditor?

3   A    Yes.

4   Q    Do you recall which ones?

5   A    The UTGO settlement was in Class 7.  I'm trying to

6   recall --

7   Q    Does Class 8 sound right?

8   A    Class 8, Class 8, there you go.

9   Q    Now you were telling us about things, but did a dispute

10  arise relating to the UTGOs when you were assessing the

11  financial condition of the city as emergency manager?

12  A    Yes.

13  Q    And who was it with?

14  A    Well, it was with the insurers.  Ambac, Assured, and

15  National, I believe were the three insurance groups

16  principally.

17  Q    And did those insurers ever file a complaint --

18  A    Yes.

19  Q    -- relating to this dispute about the bonds?

20  A    Yes.  Well, actually the -- the chatter regarding the

21  UTGOs began actually before the dispute when the -- the bond

22  rating agency and the bond reporting papers were trying to

23  handicap whether or not the city was going to pay its

24  obligations on the UTGOs.

25       They seemed, the entire bond community was making the

1  argument that they were in a special class, semi secured class

2  and therefore should be unimpaired.  We -- we eventually

3  defaulted on our payment.  It was 9.3 million dollars in

4  October.

5  Q    In October of 2013?

6  A    October 2013.

7  Q    What -- what happened then?

8  A    They sued us thereafter the following month.

9  Q    So the complaint was filed at the end of 2013.  Do you

10 recall when?

11 A    Yeah.  I think they sued us in -- in November.  There was

12 a whole lot of chatter back and letters back and forth,

13 demands for performance.  But they eventually sued us in

14 November.

15 Q    Do you recall whether that was the only complaint?

16 A    For the UTGOs?

17 Q    For the UTGOs?

18 A    No, there was -- I think there were -- they sued us then

19 they amended a complaint, I believe.

20 Q    Yeah.  I'm going to do your homework a little bit.

21 A    Okay.

22 Q    Okay.  I'll get my binder.

23 A    Okay.

24 Q    Did you -- did you -- did you review the papers from that

25 dispute with the UTGOs?

1  A    Yes.  My team would -- would normally send me papers

2  whenever there were demand letters.  Sometimes they were

3  actually sent directly to me or I was served.

4      But they -- eventually I would get the papers one way or

5  the other.  And I looked at the complaints, both the original

6  one and the amended one.

7  Q    And I should be clear.  I said with the UTGOs.  I meant

8  with the bond insurers of the UTGO bonds.

9  A    Yeah, that was after the default in October.  I think the

10 bond insurers paid and they were surrogated to the rights and

11 they were the ones that were the real parties in interest.

12 Q    Do you recall who the defendants were in the complaint,

13 the eighth amended that was filed?

14 A    Yes.  Yes.

15 Q    And who were they?

16 A    It was me, it was the prior budget director and the

17 subsequent budget director John Naglick and other members in

18 the city.

19 Q    Did the city take any action in response to the filing of

20 those complaints?

21 A    Yes.

22 Q    What did it do?

23 A    We filed a motion to dismiss.

24 Q    And did the plaintiffs respond to that motion to dismiss?

25 A    They most --

1  Q     To that motion to dismiss?

2  A     They most certainly did.

3  Q     Did you review that exchange of motions?

4  A     Yes.

5  Q     Now could you describe for the Court what the key issues

6  in those complaints were?

7  A     Yes.  In the -- in the UTGO complaints as I said, they

8  were taking a position that it was ad valorem tax revenue.

9  And that as a consequence the millage which was voted in to

10 pay that obligation, these were ordinary bond issues for

11 ordinary city.  They weren't enterprise category bonds.

12      And they were taking the position that because the

13 millage had been assessed to pay their particular bonds that

14 they had a security interest, or a lien, or a trust on the

15 millage and I think their complaint had six different counts.

16      The addendum clause had a number of different counts for

17 relief that we had to impose a trust or they had special

18 revenue liens pursuant to either state law or sometimes

19 bankruptcy law.  There are a number of different claims that

20 they made that this was special revenue liens for them.

21 Q     Okay.  But you used two terms there that I'd like to get

22 clarification on.  One, and I may butcher this, ad valorem

23 taxes?

24 A     Yes.

25 Q     Is that right?

1  A    Yes.

2  Q    And then you also -- you referred to millage?

3  A    Yes.

4  Q    How do those terms relate?

5  A    Oh, the -- the ad valorem is -- is just a phrase for --

6  for value.  It's a Latin phrase for the value.  And that the

7  millage which the city actually voted on assessed a certain

8  millage rate based upon the value of the property and that the

9  city would collect that and would use that revenue source to

10 pay the bonds.

11 Q    Okay.  And what was -- what was the plaintiff's positions

12 with regard to -- to that -- to those taxes being collected?

13 A    Oh, the -- the plaintiff's position and they -- they were

14 fairly robust about it, was that these were special revenues

15 and that they had a special lien and that the city either had

16 to pay them, or it could not collect the taxes.  So it was

17 very binary either/or.

18 Q    I'm sorry, could you -- the -- now you used a couple

19 terms there.  The bankruptcy related ones that I want to get

20 clear.  One was the -- the special revenues?

21 A    Yes.

22 Q    Could you explain what their allegation was in that

23 regard?

24 A    Yeah, generally speaking there -- there is a provision in

25 the Code that if you have a special revenue that you're a

1  secured party and you're entitled to that revenue stream

2  speaking generally.

3  And their position was that the UTGOs should be treated

4  in that fashion.  In addition there were a bunch of other

5  theories that they were asserting based upon trust in state

6  law that we, meaning the city, disputed.

7  Q  Okay.  And you also used the term lien.  What was their

8  position on a lien?

9  A  Well, their -- their position was that the revenue from

10  the -- from the millage was dedicated to them and that they

11  had a lien arising on that revenue stream even though it came

12  in through the general fund.

13  And that while that money was -- was commingled perhaps

14  in a general fund, theirs should be segregated or that portion

15  should be segregated and it should be theirs only.

16  Q  And was that a lien under bankruptcy law?

17  A  They -- they were asserting -- to some degree they were,

18  yeah.

19  Q  Would you share with the Court what facts the plaintiffs

20  pointed to that support for the claims you just described?

21  A  Yeah.  They -- they pointed to the fact that =- well, one

22  that wasn't paid that there was a dedicated millage

23  specifically for them.  That the city had passed resolutions

24  supporting that, I believe.

25  I can read actually their -- their specific theories if

1  you'd like.  But that the -- they were different than other

2  what we perceived to be unsecured creditors as a result of

3  this millage.

4  Q    Okay.  And was there any specific position they took with

5  regard to that millage?  And then you said it was -- was

6  theirs.  But was the -- was the city doing everything proper

7  with that millage?

8  A    Our -- our view was that we were.  Their view was that we

9  were not.  Their view was that if you collect it we had to pay

10  it over to them and them only.  And that if we weren't doing

11  that we were in violation in their belief in a number of

12  different theories.

13  Q    Now you said that the city filed motions to dismiss.

14  What -- what were the city's defenses to the plaintiff's

15  claims?

16  A    Generally speaking the city under -- asserted defenses

17  under state law and federal law.  And under state you could

18  not attach a lien against city property.  That it wasn't

19  dedicated revenue.  That their theories were unfounded, that

20  they had, I think, there was that they did not have standing,

21  I believe was one defense.

22      They were not the proper parties to bring the claim.  And

23  that also they could not assert -- I think one of the defenses

24  was that I and John Naglick had immunity.  That they were

25  trying to assert some theory of tort liability.  That they

1  could not do that.

2  Q    How about with regard to the bankruptcy terms you were

3  sharing about --

4  A    Right.

5  Q    -- special revenues and statutory liens.

6  A    Right.  It's been a while since I looked at the Code, but

7  that they under the definitional section, I don't recall, I

8  can look at it maybe 107.

9       That they did not have -- now, that's too low.  But that

10  they did not have -- they did not have special liens in that

11  regard.  And that therefore their claims were unfounded.

12  Q    Okay.  Now you've -- you've reached a settlement but --

13  but if you had not, how would you characterize the litigation

14  that would have ensued had the complaint gone forward and

15  there had been no settlement?

16  A    The -- the litigation was just even out of the box was --

17  was pretty vigorous.  There was -- there was -- there was a

18  lot of paper flying back and forth.  Their complaint, amended

19  complaint, our response, motion to dismiss, their response to

20  our motion.  I think we filed a reply.  There was -- there was

21  -- it was a pretty heated -- heated contested piece of

22  litigation.

23  Q    Okay.  Would -- how would you characterize its

24  complexity?

25  A    Somewhat complex.  The -- the legal issues were novel

 1  It was my understanding, I -- I did not do any independent

 2  research but without discussing discussions with counsel, it

 3  was my understanding that these were novel issues, certainly

 4  had not been resolved in a Chapter 9 bankruptcy of a

 5  municipality.

 6       And that there was risk.  There was risk to us, the city

 7  that if they proved it right that a portion of our general

 8  fund revenue could perhaps be liened in some fashion.  That

 9  certainly there was a risk we'd incur costs in the litigation

10  going forward.

11       And that if we could not reach a settlement where the

12  city could perhaps get a portion of this millage, that we

13  would lose access to the entirety.

14  Q    How would you characterize the discovery that could be

15  expected in the litigation had it proceeded?

16  A    Oh, I -- I -- based upon what I've seen in -- in this

17  case I had no reason to believe that the parties were

18  represented by competent counsel.  Would -- would pursue a

19  very vigorous course of litigation and discovery.  Then it

20  would be the city likewise would have to defend itself.  And

21  it could get very expensive.

22  Q    Now you said that the -- the litigation, the back and

23  forth of paper was, I think you said vigorous.  Did you -- why

24  did -- did you have any understanding of why it was so

25  vigorous?

1  A    Well, as I said before this -- we defaulted in October,

2  there had already been a lot of discussion in the financial

3  community in the -- in the bond reporting community in

4  particular about the need to protect the UTGO form of

5  financing, bond financing.

6      There was certainly a lot of support in that community

7  that these should be treated as special and not just general

8  unsecured obligations.  And between that community and the

9  litigants as well, particular the insurance companies Ambac,

10 National, I think it was FDIC, that they were concerned not

11 just with Detroit in terms of our default, but the precedent

12 it might set for the treatment of UTGOs in other communities.

13 Q    How would you characterize the expected length of the

14 litigation had it moved forward?

15 A    My -- my expectation was that this -- nobody was going to

16 stand down.  I assumed that it would be a multi-year piece of

17 litigation going forward.

18     I saw no reason from -- we were just at the preliminary

19 -- excuse me, the preliminary motion stage.  And that was

20 already just several months into it.  I -- I had no reason to

21 believe that that was either going to be quick, inexpensive,

22 or an easy resolution.

23 Q    Now you indicate in your interactions with the UTGO bond

24 insurers that they were not just focused on Detroit, is that

25 -- that correct?

1  A     That is correct.

2  Q     And why was that?

3  A     Well, as I said, a lot of the trade publications as I

4  mentioned before were quite up in arms that the city had

5  crossed the line in terms of treating UTGOs defaulting us

6  openly and that they had to draw the line here lest there be a

7  form of financial contagion in their opinion that other

8  communities, not just in the state, but other communities

9  across the country would see this as an unsecured form of

10  financing and that that would treat them in a position that

11  they believe was less than where they thought they were.

12  Q     Okay.  Was that focus on other communities by the UTGO

13  bond insurers common or uncommon in your dealing with

14  creditors generally?

15  A     Oh, in -- on the financial creditors side?

16  Q     Right.

17  A     It was very common.  Everybody as had been reported in a

18  lot of the publications, everybody seemed to me was trying to

19  use Detroit as a metaphor for municipal ills.

20      I generally tried to say that's not true.  It's -- each

21  situation has to be judged on its own.  But certainly from

22  reading the trade publications and some of the editorials

23  which were -- had a very angry tone, and -- and about what was

24  going to happen to the city as a result of this action, felt

25  that was the case.

1  Q    If the UTGO bond insurers had prevailed in that action,

2  how would the city have paid off the judgment?

3  A    Well, there -- there -- if they -- if they had gotten a

4  judgment there is a risk that under the revised Judicature

5  Act, they could put that judgment to the city and the city

6  would have to raise taxes to pay it.

7  Q    What would happen if the city prevailed?

8  A    Well, a range of alternatives, but presumably they would

9  be treated as general unsecured creditors and would have been

10 left in the general unsecured class.

11 Q    So what was the range of outcomes for the city?

12 A    Range of outcomes from the city was having a -- a tax

13 obligation at 100% to an obligation to pay them whatever

14 general unsecured class would get in roughly 10% range.

15 Q    Looking back on that period in November, December of --

16 of last year when the complaints were filed, what kind of

17 impact did there -- the filing of those complaints have on the

18 city?

19 A    Well, we -- we -- you know, I had -- I had failed to

20 mention something and I -- I -- at the time that we didn't

21 make the UTGO payment we also didn't make the LTGO payment,

22 limited tax general obligation bond.  So at that point in the

23 city we had defaulted on the swap payment, $40,000,000 or so

24 back in June, and then we followed up with a default in

25 October.

1      So there was a lot of discussion about the city's

2  strategic defaults as they called it.  We didn't think it was

3  strategic, we just couldn't afford to pay it.

4      A lot of discussions.  So there was -- there was a lot of

5  discussion about how important it was for the -- for the bond

6  community as a whole to hold the line here in the city and to

7  make sure the city understood what kind of hazard it was going

8  into.

9  Q    And you indicated that the amount of their claims was

10 388,000,000, is that correct?

11 A    Yes.  On the UTGOs, yes.

12 Q    Did the city enter into settlement negotiations with the

13 plaintiffs?

14 A    Yes.

15 Q    Were they successful?

16 A    Ultimately, yes.

17 Q    Was that settlement generated through the mediation

18 process?

19 A    Yes.

20 Q    Were you involved in that settlement effort?

21 A    Yes.

22 Q    I'd like to show you Exhibit 1A355 to the seventh amended

23 plan.  One page, that's right.  Mr. Orr, do you recognize this

24 document?  I realize I've just put up the second page of -- of

25 the document, but do you recognize that?

1  A    Yes.

2  Q    And what is it?

3  A    This is the settlement agreement with the insurers for

4  the unlimited tax general obligation bonds.

5  Q    Okay.  When was this settlement reached?

6  A    Well, it was reached July 18th, 2014 as -- as by the

7  agreement but it was actually discussed prior to that.

8  Q    Okay.  Can you put up Exhibit 719?  This is a slide

9  that's already been admitted.

10  A    Yes.

11  Q    Do you -- and you were here, this is a slide that Mr.

12  Malhotra was -- was talking about, correct?

13  A    Yes.

14  Q    What does this slide reflect?

15  A    The slide reflects that it's one, Class 8 which I should

16  have remembered.  And that in the left hand column it reflects

17  the claim -- the amount of the claim three eighty-eight, the

18  series of bonds, the amount that I said three hundred and

19  eighty-eight, the interest rate of the various bonds and the

20  maturity of the various bonds.  And in the right hand column

21  under settlement reflects what the bonds will be restructured

22  UTGO bonds.  The amount, face amount that the bonds will be

23  let.

24      The interest rate will be essentially at par, be

25  unchanged.  It will carry through and the maturity will remain

1  unchanged as -- as well.

2  Q    I'm sure we could go into excruciating detail in this

3  settlement, but I do want to ask you in general terms what was

4  this settlement?

5  A    Essentially on the UTGO settlement it was a reduction of

6  the face amount of the bonds from three eighty-eight to --

7         THE COURT:  Excuse me one second.  Whoever has an

8  electronic device in the back of the courtroom, please turn it

9  off.  Yeah, just go ahead and turn it off.  All set?

10         A VOICE:  Yes, sir.

11         THE COURT:  Okay, let's proceed.

12         MR. SHUMAKER:  Thank you.

13  Q    I'm sorry, Mr. Orr, the -- the -- the terms of the UTGO

14  settlement in -- from a general -- a general description.

15  A    Yeah, generally speaking the UTGO settlement is broken

16  out into -- into two parts.  In addition to having the amount

17  of the bonds we cited two hundred and eighty-eight, the

18  interest rate remains unchanged, the maturity remains

19  unchanged.

20  Q    Now I just need to slow you down because we start to get

21  into this technical stuff and I know the Court Reporter is

22  going to jump.

23  A    I'm sorry.  I'm sorry.

24  Q    If you could just take your time and -- and walk through

25  this that would be great.

1    A    I'm sorry.  Okay.

2    Q    Not to blame the Court Reporter.

3    A    I -- I do apologize, I'm sorry.  The -- the settlement

4    amount is broken down -- is split, 74% of the proceeds are

5    paid to the bond holders and the city gets 26% of the

6    proceeds, roughly somewhere in the neighborhood of

7    $55,000,000, I believe comes in.

8    Q    Okay.  And let me ask you about the 26 -- the 26%.

9    A    Yes.

10   Q    Where does that go?

11   A    Well, those -- those funds are going to be dedicated to

12   an income stabilization fund for the city's pensioners.

13   Q    Okay.  Let me ask you there.  What is the income

14   stabilization fund?

15   A    Yes.  As a component of the state contribution agreement,

16   it was very important to the Governor and other members at the

17   state that as a result of this effort, meaning the bankruptcy

18   effort, and some of these settlements that were reached on the

19   pensions, that no retiree or pensioner be pushed into poverty.

20        So we took a portion of this settlement and dedicated be

21   used for an income stabilization fund that if anybody fell

22   below 130% of the poverty level pursuant to the state

23   contribution agreement, they could petition to the state to

24   have their pension restored to keep them above that level,

25   130%.  So no one as a result of pension cuts would be pushed

1  down into poverty.

2  Q    Okay.  On that last row on Exhibit 719, on the right hand

3  column under settlement, it says stub UTGO bonds reinstated.

4  Holders retain ownership assign proceeds to fund income

5  stabilization fund.  Is that what you're describing?

6  A    Yes.  That's -- there is a stub period on those bonds.

7  Q    And let me ask you, what -- what is stub UTGO bonds mean

8  -- refer to?

9  A    It -- it refers to a -- a portion of the bonds that are

10  not included in this overall amount that were remaining and

11  had a different period.  And that those bonds are going to be

12  simply reinstated instead of having new restructured bonds.

13  But that while the -- the owners of those bonds remain the

14  same, they will assign proceeds to fund the income

15  stabilization fund.

16  Q    Do you agree with the -- this exhibit that the recovery

17  for Class 8 creditors is 74%?

18  A    Yes.

19  Q    What objective factors justified this deal?

20  A    Well, here again we -- we had the litigation which was

21  going at a pace and was quite robust.  We had novel legal

22  theories that were being involved in that litigation which had

23  not been resolved, not just for the city, but presumably

24  around the nation.

25        We had the risk that if we lost we would not be able to

1  get any portion of in terms of the settlement.  We had the

2  costs that were outstanding.

3      In addition as a result of this settlement, we got plan

4  support is one of the early ones.  That is that the settlers

5  would agree to support us in voting for and supporting the

6  plan of adjustment.

7  Q    But you said were they one of the first settlers?

8  A    Yes.

9  Q    And why is that important?

10  A    Well, we -- we had -- we had reached a settlement with

11  the swap counter parties but we had not to date reached a

12  settlement with some of our other financial creditors at that

13  time.  And I believe this one was reached in the -- I don't

14  remember the exact time, but it -- it was one of the first

15  ones that demonstrated both to other creditors that we were

16  serious about negotiating.  Even those who had fairly strong

17  and novel legal theories.

18      We wanted to demonstrate to the financial community that

19  we were in the business of negotiating, we were reasonable.

20  We weren't as some of them had said, ignorant of the

21  consequences of financial falling and some of that over the

22  top stuff.

23      And that we were serious when we had said at the

24  beginning that we would do a transaction with any claimant

25  that made sense that this one demonstrated that fact.  And it

1  was also --

2          THE COURT:  Can you -- yeah, can you identify

3  specifically the creditors that you negotiated this settlement

4  with?

5  A    Yes.  It's -- it's the -- it's the bond insurers Ambac,

6  National, and Assured.

7          THE COURT:  Those two?

8  A    Those three.  There were three of them.

9          THE COURT:  Three.

10 A    Yes.

11 Q    And do -- do you know whether the state had a view on the

12 propriety of this settlement?

13 A    Yes.

14 Q    How was that communicated to you?

15 A    Well, obviously as I said the state had a strong interest

16 in the income stabilization fund.  We -- we didn't want to

17 harm anyone.  They felt that this was, generally speaking,

18 this was an appropriate settlement because it met that need as

19 well.

20     And it also addressed from the state's view and from the

21 bonding concerns that everyone had, that, you know, perhaps

22 some of the over the top concerns about the damage to the city

23 if not other municipalities in the State of Michigan, or the

24 state itself, was -- was a little bit overstated.

25 Q    Thank you.  You can take that down.  A related acronym

1    settlement that you testified to was the -- the LTGO?

2    A    Yes.

3    Q    Settlement, correct?

4    A    Yes, yes.

5    Q    What does LTGO stand for?

6    A    Limited tax general obligation bonds.

7    Q    And what are they?

8    A    Well, those are supposedly bonds that are focused on as I

9    say a limited tax obligation.  They --

10   Q    What does that mean, limited tax?

11   A    Well, the UTGO is unlimited.  Meaning you're going to

12   have pay them without limitation.  The LTGOs have presumably

13   in terms of their language, a little bit of -- in terms of

14   what the obligation of the obligor in other words the issuer

15   of the bonds is.

16   Q    Okay.  And do you recall what the principal amount of the

17   LTGOs outstanding was?

18   A    Yeah.  They were a little bit lower.  It was one

19   fifty-five or one fifty-eight somewhere in there.

20   Q    And do you recall what class the LTGO bonds were in?

21   A    Yeah, they followed on --

22   Q    In the plan of adjustment, I'm sorry.

23   A    Yeah, they followed on.  I think they were Class 9.

24   Q    Okay.  I'll show you something later.  I'm sure we'll

25   revisit that.  But --

1  A     Okay.  Seven or 9, it's one or the other.

2  Q     Okay.

3             THE COURT:  Let's just -- let's just pin it down.

4  What class are we talking about?

5             MR. SHUMAKER:  Class 7.

6  A     Class 7.  I get them -- I know 10, 11, 12, I got 13, 14,

7  15.  I get -- sometimes I transpose UTGOs and LTGOs.

8  Q     A lot of numbers, a lot of letters.

9  A     Yeah, I should know that.

10 Q     Did a --

11 A     Yeah, they're Class 7 because the 9 were the -- yes,

12 they're Class 7.

13 Q     We have agreement there.  Did a -- did a dispute related

14 to the LTGOs arise such as the one that you described with the

15 UTGOs?

16 A     Yes, very similar.

17 Q     Let me stop you there.  Who -- who was it with?

18 A     Well, this was one was in the back and -- and BlackRock.

19 So it was a similar plaintiff on the UTGO one of the insurers

20 with BlackRock was the plaintiff here.

21 Q     And could you describe for the Court what the dispute

22 was?

23 A     Here again very similar theories, but LTGOs didn't have a

24 dedicated millage, or they didn't -- they weren't able to

25 allege a dedicated millage.

1    So their theories were very similar that they had special

2  liens, special revenue that we held it in trust.  I think they

3  made a little bit different theory that we were a -- the city

4  was merely a conduit for the tax payments and that we had

5  commingled it and consequently we needed to segregate it.

6  Very similar defendants.  I was sued, the budget director was

7  sued and others.

8  Q    I'm going to ask you about that.  But just staying on the

9  -- on the claims themselves, were the bankruptcy concepts that

10  you shared earlier about the UTGOs I believe it was the

11  statutory lien special revenues, were they asserted in this

12  claim?

13  A    Yes, they were.

14  Q    Okay.  The complaint filed in connection with this

15  dispute.

16  A    Yes.

17  Q    And Ambac filed it?

18  A    Ambac and I think pretty close to the city UTGO claimed

19  complaint.

20  Q    In terms of timing?

21  A    Yes, yes.  We -- we -- they were both -- both of their

22  payments were due October and April of each year and I think

23  we defaulted on both the UTGOs and the LTGOs in October.

24  Q    Okay.

25  A    There were the -- the UTGOs were 9.3 and the LTGOs were

1   4. some odd.

2   Q    You indicated that with the -- the UTGOs that an amended

3   complaint was filed.  Did that occur with the LTGOs as well?

4   A    Yes.

5   Q    Who were the defendants in the -- the case bought by the

6   LTGOs?

7   A    Very similar defendants.  Myself, the budget director, I

8   believe the prior budget director and other city employees.

9   Q    But you personally?

10  A    Yes, oh yeah.

11  Q    Did -- did -- and I said -- I said LTGOs.  When I said

12  LTGOs I meant LTGO bond insurers.

13  A    Yes, yeah.  It was -- it was not the bond holders they

14  had been substituted in the same way for the insurers -- by

15  the insurers.

16  Q    And did you review the complaints that were filed?

17  A    Yes.

18  Q    Did the city take any action in response to those

19  complaints?

20  A    Yes.

21  Q    And what was that action?

22  A    We filed -- the city filed a motion to dismiss.

23  Q    Did the plaintiffs respond to that motion to dismiss?

24  A    Yes.

25  Q    Did you review those papers?

1   A    Yes.

2   Q    You shared with us a little bit.  What -- what were the

3   key issues in the complaint as you saw it?

4   A    Well, here again they were asserting that they had --

5   they were not to be treated as general unsecured creditors.

6   They didn't have the millage to look to, but they were arguing

7   that they had special liens as limited tax general obligation

8   bond holders.

9       That the theories and they're in the complaints which are

10  here, I can go through them, but generally that the city had

11  an obligation to segregate and treat their -- their liens as

12  special.  That we were merely -- I believe they asserted a

13  conduit theory which I -- which is a novel theory.

14      That I think there was an assertion of some tort

15  liability against me and some of the other city employees for

16  failing -- for causing the default.

17  Q    Were there any specific theories advanced under Michigan

18  law?

19  A    Yeah, here again they -- they advanced the theories that

20  they could assert liens against city owned property.  That

21  they had special revenues under state law and enjoyed a

22  special status.

23  Q    Have you heard of the phrase first budget obligation?

24  A    Yes.  That --

25  Q    Did you hear of that in connection with the LTGOs?

1  A    Yes.

2  Q    And what was the first budget obligation?

3  A    That -- that their -- their assertion, first budget

4  obligation means in the waterfall of city payments that this

5  is a high priority payment above all others, even above some

6  operating expenses.

7  Q    Share the theories, what claims did the plaintiffs point

8  to in those complaints to support their theories?

9  A    They -- they -- they -- there were legal claims or -- or

10  claims --

11  Q    Well, the facts supporting the claims.

12  A    Oh, oh, the claims, okay, okay.  Yeah, the facts they

13  supported was that these were in their view special bonds that

14  had been issued.  That there was an understanding by the city

15  that they would be treated.  That in their approval the city

16  had recognized they enjoyed a special status.  That the city

17  had an obligation that commingled and improperly commingled

18  their funds and had an obligation to segregate out from the

19  city's general fund a payment stream for them that we should

20  -- we were holding that in trust.

21       I think they even asked -- I'm trying to recall.  I can

22  look, but they may have even asked for a lock box that should

23  be set to a segregated account to be paid.

24  Q    Okay.  And what defenses did the city assert?

25  A    The city asserted similar defenses to the UTGO litigation

1  that they were not allowed to have -- they were not special

2  revenues either under federal or state law.  They were not

3  treated in a special way.  They did not have standing to bring

4  those claims.  They could not assert liens against city

5  property under state law or special revenues, very similar

6  defenses.

7  Q    As with the UTGOs you reached a settlement here.  But if

8  you had not, how would you characterize the complexity of the

9  litigation over the LTGOs?

10  A    The -- the LTGOs likewise were asserting novel theories.

11  So there were risks.  Likewise I remember that there was a

12  human cry in the financial community in the financial trade

13  press that this was here again an abomination for treating the

14  LTGOs and this was a broader issue than just Detroit.

15      This was an issue that could affect the state.  It could

16  affect the nation, other municipalities and here again they

17  had to draw a line in the sand on this particular issue and

18  that it would result in severe harm to the city if not the

19  state if this were to go forward.

20  Q    How would you describe or characterize the discovery that

21  would be expected in such a litigation had it moved forward?

22  A    The discovery here again was going to be -- I had no

23  reason to believe that anyone was going to throttle back or

24  hold back in the litigation.  These were well financed parties

25  on both pieces of litigation the UTGO and the LTGO.

1      They were sophisticated litigants and had excellent

2  counsel, competent counsel who would pursue those claims.

3  They -- they know how to litigate.  This is what they do.  And

4  -- and that they were fully prepared and motivated not just

5  for Detroit, they viewed this as a much broader issue than

6  just Detroit, so you -- you couldn't look at it as just, you

7  know, it's -- it's only 155,000,000 here.  Their view was no,

8  this is an issue that's across the nation and they have to nip

9  it in the bud right here.

10  Q    Did you consider them a motivated litigant?

11  A    Yes.  I considered them highly motivated.

12  Q    How would you characterize the expense that would have

13  been associated with that litigation had it proceeded?

14  A    It -- it was going to be costly.  I mean they -- part of

15  the being an ex-litigator, I recognize that part of the

16  strategy is to make the process as painful as possible for

17  everyone and to leave no stone unturned.

18      They have an ethical obligation on litigators to

19  represent their clients zealously.  I get that.  But in this

20  case they -- they surely recognize the city was sort of in a

21  difficult position and they were going to make that litigation

22  intense and costly.

23  Q    How would you characterize the expected -- expected

24  length of that litigation?

25  A    I have no reason to believe that they were not going to

1  pursue that litigation to its conclusion at the trial level

2  and at appellate levels.  They seemed in conversations with

3  some of their representatives in particular as highly

4  motivated to go beyond just the issue here, but to drive that

5  home throughout what they perceived to be the precedential

6  value of addressing these issues in this case.

7  Q    If the LTGO bond insurers had prevailed, what would have

8  happened to the city?

9  A    Well, the city would have had that -- that full

10  obligation to pay the entire amount of those bonds.

11  Q    What would happen if the city prevailed in the

12  litigation?

13  A    Well, presumably we would have prevailed and they would

14  have been classified as general unsecured creditors and put in

15  the general unsecured class.

16  Q    So what was the range of possible outcomes in that case?

17  A    A hundred and fifty-five to a hundred and fifty-eight

18  some odd million liability to whatever percentage was in the

19  general unsecured class at 10%.

20  Q    Well, what impact did the filing of this -- the filing of

21  this litigation have on the city?

22  A    Well, certainly it -- it gave us some concern.  Here

23  again we were in the process -- we recognize that we had

24  defaulted in October.  But we were in the process of trying to

25  design even at that stage a plan of adjustment.

1     And if we couldn't resolve these claims it -- it appeared

2   to us that it was going to be very difficult to propose a plan

3   of adjustment in final eventually because there -- it's

4   iterative and the plans evolve.  But a plan of adjustment that

5   would be confirmable and feasible.

6   Q    Did the city enter into settlement negotiations with the

7   plaintiffs in that case?

8   A    Yes.

9   Q    Were they successful --

10          THE COURT:  Before -- before we jump into that I'd

11  like to pause for the day.  Sir, you may step down.  I want to

12  have a conversation with the lawyers.

13  A    Thank you, sir.

14      (WITNESS KEVYN ORR WAS EXCUSED AT 5:00 P.M.)

15          THE COURT:  According to my records here, counsel,

16  the city has 36 hours and 11 minutes left and the objectors 64

17  hours and 3 minutes left.  Who wants to be heard on why those

18  should not be reduced and substantially reduced in light of

19  the Syncora settlement?

20          MR. SHUMAKER:  Can I go first, Your Honor?

21          THE COURT:  Yes.

22          MR. SHUMAKER:  Okay.  The -- the city now has -- has

23  36 remaining.  And we have given this a lot of thought.  I --

24  I actually harken back to August when you were pressing the

25  parties on how long would it take to do this case and we were

1 in the 95's and then we brought -- Your Honor brought it down

2 to -- to 85.  I --

3         THE COURT:  I was just going to point out you all

4 started much higher than that.

5         MR. SHUMAKER:  That's true.  We were  -- we were

6 higher than that.  But I'm -- I'm forced to reiterate sort of

7 the -- the same argument.

8     I feel badly about this, but -- but here it is.  Is that

9 the -- the -- the Syncora settlement really hasn't changed

10 much for the city.  We still have the -- the burden of proof.

11 We've got the same witnesses that we had before.  And in fact

12 we've had to add one.

13     And Mr. Orr tomorrow will testify for example, about the

14 Syncora settlement.  So it hasn't really reduced the number of

15 witnesses that are coming forward.

16     Now, that said, Mr. Orr is probably the last witness who

17 is going to go more than two hours.  And I think depending on

18 how tomorrow goes, as I calculate, as I ballpark this with,

19 you know, Mr. Doak coming, council President Jones, Mr.

20 Rapson, Mayor Duggan, that we are probably in the 15 to 20

21 range, probably at 15 after today for our witnesses.

22     We'll also have to carve out eight because Mr. Bennett

23 says he needs some time with you at the end of the day, the

24 end of the proceedings.  And then they'll have plan supporters

25 for closing argument.

1      Obviously, Your Honor, hasn't shared that with us, but as

2  I do the calculus.  So I've got 15, I've got 8, that's at 23.

3  Where were we at.  So we are at 36.

4      Then trying to anticipate where we are with -- with the

5  crosses is -- I think we've got --

6          THE COURT:  You're going to launch Mr. Bennett for

7  closing argument for eight hours?

8          MR. SHUMAKER:  No, no, no.  I'm not -- I would not

9  suggest he do that or we inflict that kind of punishment on

10  the Court.  But, you know, I am talking -- I am talking that

11  there are, you know, the retiree committee will -- will want

12  to share its thoughts with Your Honor.  The retirement systems

13  want to do that.  The state wants to do that.

14          THE COURT:  Uh-huh.

15          MR. SHUMAKER:  Mr. Hackney will probably be back

16  asking for time and I won't share with you what I'm going to

17  say.  But in any event that's where I'm trying to ballpark

18  that.

19          THE COURT:  Okay.

20          MR. SHUMAKER:  So that gets us to sort of 23, the --

21  the objectors have said they've got five or six witnesses.  I

22  don't frankly know how much cross at the moment, but if you

23  give that an hour and it may be a little bit more because we

24  haven't even deposed one of their witnesses, then you get into

25  the low thirties pretty -- pretty quick.

1   And then you wanted this answer too as well, Your Honor.

2   We -- we are not going to have any more witnesses from our may

3   call list in the case in chief, but we -- we may have a

4   rebuttal witness.

5   So adding in the possibility and that might be Mr. -- Mr.

6   Diaz.  But we're not sure.  And so if you factor that in,

7   we're in the low thirties compared with 36.  You know, to --

8   to give back to Your Honor four or five hours would seem fair,

9   but that's -- that's how I -- I deem it out.

10          THE COURT:  Thank you, sir.

11          MR. SOTO:  Your Honor, Mr. Perez has made it clear

12  that if Mr. Bennett is going to take eight that he wants ten,

13  but he will offer CLE credits.

14          THE COURT:  Well, thank you, but we here in Michigan

15  don't need that.

16          MR. SOTO:  Listening to it, Your Honor, we have 64

17  hours.  We could certainly and we talked among ourselves,

18  we've tried to be efficient, but we could certainly give back

19  10 to 15 hours we think.  That should give you a picture of

20  where we're going and you know, I can't dispute, you know,

21  what Mr. Shumaker said.  I -- I think it would be hard for him

22  given where he is right now to do much more than he proposed

23  because he has to cross examine our people.

24          THE COURT:  Right.

25          MR. SOTO:  And I think he's being not -- maybe a

1 | little bit too excited about just one hour cross examinations,

2 | so --

3 |        MR. PEREZ:  Could I just say one more thing, Your

4 | Honor?

5 |        THE COURT:  Yes, sir.

6 |        MR. PEREZ:  Alfredo Perez.  The fact that Syncora

7 | has settled has actually made the case more complicated.

8 | Because we have an additional objection as a result of that

9 | and we're going to need to present evidence as a result of

10 | that as well.

11 |    So while -- while we may be more focused, there are

12 | additional issues -- there aren't any less issues and there

13 | are -- and there is at least one additional issue that will

14 | need to be developed.

15 |        THE COURT:  All right.  I will contemplate this

16 | overnight and get back to you in the morning on this.

17 | Anything further to bring up at this time?  No?  All right.

18 | We're in recess until 8:30 tomorrow morning.

19 |        THE CLERK:  All rise.  Court is adjourned.

20 |    (Court Adjourned at 5:06 p.m.)

21 |

22 |

23 |

24 |

25 |

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 10-7-14
    LaShonda Moss

12

13

14

15

16

17

18

19

20

21

22

23

24

25