UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,          .
                  .          Detroit, Michigan
                  .          October 2, 2014
                  Debtor.          .          8:30 a.m.
. . . . . . . . . . . . . . .

TRIAL RE. OBJECTIONS TO CHAPTER 9 PLAN
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Jones Day
                  By:  GREGORY M. SHUMAKER
                  51 Louisiana Avenue, N.W.
                  Washington, DC  20001
                  (202) 879-3939

For Financial          Weil, Gotshal & Manges, LLP
Guaranty Insurance     By:  EDWARD SOTO
Company:                    EDWARD R. MCCARTHY
                  1395 Bricknell Avenue, Suite 1200
                  Miami, FL  33131
                  (305) 577-3177

For Macomb County      Dechert, LLP
Drain Drainage         By:  DEBRA O'GORMAN
District:              1095 Avenue of the Americas
                  New York, NY  10036
                  (212) 698-3600

For Ad Hoc Water       Kramer Levin Naftalis & Frankel, LLP
and Sewer              By:  JONATHAN M. WAGNER
Bondholders:           1177 Avenue of the Americas
                  New York, NY  10036
                  (212) 715-9393

```
Court Recorder:        LaShonda Moss
                       Kristel Trionfi
                       Letrice Cunningham
                       United States Bankruptcy Court
                       211 West Fort Street, 21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  Calling Case 13-53846, City of Detroit,

2    Michigan.

3          THE COURT:  Good morning.  It appears --

4          MR. SHUMAKER:  Good morning, your Honor.

5          THE COURT:  -- everyone is here.  Can we proceed?

6          MR. SHUMAKER:  Good morning, your Honor.  Greg

7    Shumaker of Jones Day for the city.  Two quick preliminary

8    items that I wanted to raise with your Honor.

9          THE COURT:  Okay.

10         MR. SHUMAKER:  One is -- I raised this a little bit

11   earlier -- there were two exhibits related -- or the Paque

12   declarations -- one is a declaration from Mr. Paque,

13   P-a-q-u-e, and a supplemental declaration from him -- he is

14   from KCC -- relating to the voting tallies from the vote.

15   The parties have stipulated to the admissibility, and I was

16   hoping I could hand this up and perhaps get them admitted

17   into the record.

18         THE COURT:  Sure.  What's the number?

19         MR. SHUMAKER:  The numbers are 764 and 765.

20         THE COURT:  Okay.

21      (City Exhibits 764 and 765 received at 8:31 a.m.)

22         MR. SHUMAKER:  And I have two copies and five hard

23   drives, updated hard drives.

24         THE COURT:  Okay.

25         MR. SHUMAKER:  May I approach, your Honor?

1          THE COURT:  Sure.

2          MR. SHUMAKER:  And then the second item, your Honor,

3    is -- I also previewed before was witness order for today and

4    tomorrow.  Mr. Orr will be another I estimate two to three

5    hours.  Again, that's an estimate.  But we have another

6    witness, Mr. Rapson, who is here, and he has -- counsel flew

7    in from out of town.  We're hoping that once Mr. Orr's direct

8    is done we could go immediately to Mr. Rapson, get him

9    wrapped up, and perhaps that'll take the rest of the day.

10   Perhaps Mr. Orr would go back on, if that's okay with your

11   Honor, with the cross.

12         THE COURT:  Any objections?

13         MR. SOTO:  No, your Honor, if that accommodates

14   everyone.

15         THE COURT:  It's fine with me.

16         MR. SHUMAKER:  Thank you, your Honor.  One other

17   thing I should raise along these -- to make sure it's okay

18   with you and the objectors is Mr. Penske is also scheduled to

19   go on first thing tomorrow morning at 8:30, so it would be

20   possible today that it would go Mr. Orr, Mr. Rapson.

21   Depending on where that is, Mr. Orr's cross would start, and

22   then we would have Mr. Penske -- and I apologize for the

23   interruption -- and then Mr. Orr would get back on if that is

24   okay with your Honor.

25         THE COURT: Any objections?

1         MR. SOTO:  Your Honor, do they really need Mr.

2  Penske?  I mean we know -- right.  Mr. Perez is just pointing

3  out to me we would love to be able to finish Mr. Orr's cross

4  and --

5         MR. PEREZ:  Before we break.

6         MR. SOTO:  -- before we break, so that's the only

7  issue.  Otherwise we would accommodate everyone.

8         THE COURT:  Before we break when?

9         MR. PEREZ:  For this week, your Honor.

10        MR. SOTO:  This week, your Honor.

11        THE COURT:  Well, all right.  Let's inquire how long

12  will Mr. Penske's direct take?

13        MR. SHUMAKER:  I think 45 minutes to an hour.

14        THE COURT:  All right.  It feels like that might be

15  possible, so I'll permit it.

16        MR. SHUMAKER:  Thank you, your Honor.

17        THE COURT:  You may proceed.

18        MR. SHUMAKER:  Thank you, your Honor.

19        KEVYN ORR, CITY'S WITNESS, PREVIOUSLY SWORN

20         DIRECT EXAMINATION (CONTINUING)

21  BY MR. SHUMAKER:

22  Q  Good morning, Mr. Orr.

23  A  Good morning, Mr. Shumaker.

24  Q  Mr. Orr, when we broke yesterday, we were discussing the

25  LTGO or the LTGO settlement, if you recall that.

1   A   Yes.

2   Q   Well, we were actually talking about the dispute, and now

3   I would like to ask you a few questions about the settlement.

4   Okay?

5   A   Yes, sir.

6   Q   You described for the Court the different aspects of the

7   dispute and who was involved and what the claims were.  Did

8   the city enter into settlement negotiations with the

9   plaintiffs with regard to the LTGO dispute?

10  A   Yes.

11  Q   Were they successful?

12  A   Yes.

13  Q   Was it a product of the mediation?

14  A   Yes.

15  Q   Were you involved in that settlement effort?

16  A   Yes.

17          MR. SHUMAKER:  Steve, could you put on Exhibit

18  1.A.232?  Please go to the next page.

19  BY MR. SHUMAKER:

20  Q   Mr. Orr, do you see the exhibit on the screen?

21  A   Yes.

22  Q   And could you identify that for the court?

23  A   This is the limited tax general obligation settlement

24  agreement between the city and Ambac and BlackRock.

25  Q   And when is that settlement agreement dated?

1   A   July 24th, 2014.

2   Q   Is that when the LTGO settlement was reached?

3   A   No.  The actual settlement was reached a little bit in

4   front of that.

5   Q   Okay.

6           MR. SHUMAKER:  Please put up 718.

7   BY MR. SHUMAKER:

8   Q   Mr. Orr, this is a slide from Mr. Malhotra's direct

9   examination.  If you would, I'd ask you what the terms were

10  of the LTGO settlement that emerged from mediation.

11  A   Yes.  The settlement was that the LTGOs for the series of

12  bonds listed in the description would -- and the amount was

13  164.  I think yesterday I said 158, but I probably excluded

14  accrued interest fees -- along the various interest rates

15  listed on that tranche and the maturity that there'd be

16  issued new LTGO bonds in the amount of $55 million.  The

17  interest rate for the first ten years would be five percent

18  payable in cash.  It also had a provision that capital

19  appreciation on the rates would be added to the principal.

20  The total rate would be 5.65.  It would extend out on the new

21  LTGO bonds for 23 years presumably, assuming the plan is

22  confirmed and the agreement is consummated, to 2037.  The B

23  notes, which were approved by the Emergency Loan Board last

24  Friday, a portion of those B notes would be provided to the

25  LTGOs in the amounts listed here.

1   Q   Let me stop you there.  I'm sorry.  You're referring to

2   the -- bless you -- underneath the settlement the far right

3   column where it says "New B Notes from COPs Reserve"?

4   A   Yes.

5   Q   Okay.  And could you explain what you mean by the B notes

6   from the COPs reserve?

7   A   Yes.  There are a series of bond issues.  I think the

8   total amount is 632 million, but a portion of those will be

9   attributed to a COPs reserve.  I think it's 162 million or

10  so.  That reserve is there to either pay the COPs in the

11  litigation in which we are involved with -- the city is

12  involved with now or will be there for additional recovery

13  for a group of claimants, I believe unsecured LTGOs and the

14  OPEBs, should the city prevail in the COPs litigation, and a

15  portion of that reserve will be allocated to the LTGO

16  claimants, the settling parties.

17  Q   Could you point your mike up a little bit?  I'm just

18  having a little bit --

19  A   Yes.  I'm sorry.

20  Q   -- more difficulty today hearing you than yesterday.

21  A   Okay.

22  Q   Were there any exculpations involved in this settlement?

23  A   Yes, there were.

24  Q   And what were they?

25  A   Well, the exculpations were mutual for the parties and

1   releases as well.  The settlement also provides for plan

2   support.  It provides for a resolution of the proofs of

3   claims that were filed by these claimants as well.

4   Q    And the recovery for the LTGO bonds was -- is it

5   reflected in this chart?

6   A    Yes.

7   Q    And what is that?

8   A    The total recovery is 34 percent.

9   Q    And, now, that's less, just to remind you, than the

10  percentage that the UTGO bonds got; correct?

11  A    Yes.

12  Q    What objective factors can you point to that justify

13  giving LTGOs a lower recovery than the UTGOs?

14  A    Well, here again the LTGOs and UTGOs made similar

15  arguments of their entitlement to special liens, special

16  revenues, segregation of liens, equitable liens.  The UTGOs

17  had a little bit more robust argument.  An unlimited tax

18  general obligation bond has the ability, literally unlimited,

19  presumably, supposedly, that a municipality has an obligation

20  to raise taxes to pay that bond should the actual tax

21  collections go down.  A limited tax general obligation bond

22  has a limit on the amount you can raise to service the bond

23  debt.  That's why one is called unlimited, one is called

24  limited.  The LTGOs tried to draft a little bit in their

25  papers on the UTGO theory.  In fact, they referenced it in

1   their papers, but it wasn't as strong.  Nonetheless, there

2   was an issue, as I said before, about the precedential nature

3   they believed of this claim, the probability that they would

4   fight it quite strongly, the fact that they were going to

5   have plan support for the plan of adjustment, the fact they

6   were going to release their proof of claim, the fact they

7   were going to release the litigation, they were going to

8   release claims against the individual defendants they had

9   named, myself, the finance director, the deputy finance

10  director, the treasurer, and the fact that it was a global

11  settlement of all those issues.

12  Q   Is it fair to say that the LTGO bond arguments were

13  weaker than the UTGO bond arguments as to its secured

14  status -- their secured status?

15  A   I thought, after consultation with counsel, that they

16  appeared to be weaker, but they were just as motivated.

17  Q   Now, Mr. Orr, you testified yesterday about the

18  importance of the OPEB settlement.  Do you recall that?

19  A   Yes.

20  Q   And, again, could you share what OPEB stands for?

21  A   Other post employee benefits, generally referring to

22  health, dental, vision, and death benefits.

23  Q   And you became familiar with the city's OPEB when you

24  became emergency manager; correct?

25  A   Yes.

1  Q   And you considered the OPEB situation a major issue for

2  the city?

3  A   Yes.

4  Q   And why was that?

5  A   Well, here again, there were promises made.  It was the

6  single largest portion of unsecured debt obligations that the

7  city had, and it was likely to grow, if unchecked, out of

8  control with regard to the city's ability to provide

9  services.

10       MR. SHUMAKER:  Could you put up Exhibit 33, please?

11  BY MR. SHUMAKER:

12  Q   Mr. Orr, this is the proposal for creditors -- it's in

13  evidence -- that you made on June 14th, 2013; correct?

14  A   Yes.

15  Q   And you're familiar with this document?

16  A   Yes.

17  Q   Let's go to page 029.

18       MR. SHUMAKER:  Can we turn that, Steve?  Thank you.

19  Steve, if you could highlight the middle section there that

20  says "off balance sheet liabilities."

21  BY MR. SHUMAKER:

22  Q   You see that paragraph, Mr. Orr?

23  A   Yes.

24  Q   And could you explain for the Court what you intended

25  with that statement?

1  A   Well, we were trying to say that these were anticipated

2  liabilities, that while they didn't show up on the current

3  balance sheet of the city as current liabilities that they

4  were going to be liabilities in the future, that as a

5  component of legacy debt they were significant, and although

6  we didn't say it here, we had no money reserved for these

7  liabilities.

8  Q   And so the unfunded OPEB liabilities at this time in June

9  of 2013 were estimated by the city to be 5.7 billion?

10 A   Yes, from roughly five billion, 5.7 billion.

11 Q   Did that estimate change?

12 A   Yes.

13 Q   Did the city's estimate change?

14 A   Yes.

15 Q   By how much?  Do you recall?

16 A   I think it changed at one point almost by two -- well, 1-

17 1/2, 1.8 billion, somewhere in there.

18 Q   Okay.

19      MR. SHUMAKER:  Let me ask you to put up Exhibit 3,

20 Steve, which is the disclosure statement, and go to page 167.

21 If you could blow up the first full paragraph under the OPEB

22 settlement, please.

23 BY MR. SHUMAKER:

24 Q   Mr. Orr, if you could take a look at this paragraph --

25 A   Yes.

1    Q    -- and if you could read for the Court the first four

2    sentences.

3    A    Okay.  "The present value of OPEB claims was the subject

4    of a dispute between the city and the Retiree Committee.

5    Using employee data as of July 30th, 2012, and retiree data

6    as of February 1, 2013, provided by the city and the

7    Retirement Systems' actuary, Gabriel, Roeder, Smith &

8    Company, parens, Gabriel, Roeder, close parens, the city's

9    actuaries estimated the aggregate amount of OPEB claims at

10   approximately 3.771 billion.  In contrast, the Retiree

11   Committee's actuaries estimated the aggregate amount of OPEB

12   claims at approximately five billion.  The cause of the

13   discrepancy between the estimated aggregated OPEB claim

14   amounts asserted by the city and the Retiree Committee

15   emanated from the limitations on the data, actuarial

16   assumptions used, and the discount rate employed by each

17   party."

18   Q    Thank you.  So the city's estimate went down from the 5.7

19   to the 3.771 billion; correct?

20   A    Yes.

21   Q    And the fourth paragraph is alluding to something about

22   the cause.  What did you understand the cause of that

23   reduction in the unfunded OPEB liabilities to be?

24   A    There were three components.  Without discussing the

25   mediation process, the three components were the data that

1  the parties were sharing back and forth.  As you might

2  imagine, actuaries are sort of like economists or

3  accountants.  Ask ten actuaries, get twenty answers.  So we

4  were going back and forth with different data based upon the

5  assumptions of the claims, the amount, mortality rates,

6  things like that.  The assumptions that the city used

7  initially in preparing the June 14th proposal included active

8  duty, the present value liability of active duty employees in

9  terms of what it would be the out years, and that accounted

10  for some of that two billion, and also the discount rates

11  that were being discussed between the parties which ranged

12  from a fairly low number that the city started with to a

13  higher number that the Retiree Committee started with.

14  Q   Okay.  I want to ask you about that, but before I do,

15  back in -- June 14, 2013, when you made the proposal to

16  creditors, did you have an understanding of how funded or

17  unfunded the OPEB liabilities were of the city?

18  A   Yes.

19  Q   What was your understanding?

20  A   They were virtually unfunded.  I think there was some

21  small amount of money -- relatively small amount of money put

22  aside.  I think the figure that sticks in my head is it was

23  99.6-percent unfunded.

24  Q   And I think you've testified earlier it's safe to say

25  that this represented the city's largest unsecured claim?

1   A   Yes.

2   Q   Now, you referred to the dispute with the Retiree

3   Committee; correct?

4   A   Yes.

5   Q   How was the Retiree Committee in a position to dispute

6   the city's valuation?

7   A   Well, there were members on the Retiree Committee who

8   also represented active duty unions and retiree associations

9   in addition to the systems' traditional actuary, Gabriel,

10  Roeder.  They had retained their own actuary, Segal -- I

11  forget the full name -- as well, and so there was a number of

12  different information floating between the traditional

13  actuary for the systems of Gabriel, Roeder, the actuary for

14  the Retiree Committee, Segal, and the city's retained

15  actuary, Milliman.

16  Q   Okay.  And is OPEB a class of creditors?

17  A   Yes.

18  Q   Do you recall which one?

19  A   Yes.  OPEB is 12.

20  Q   Now, the disclosure statement references a dispute with

21  the Retiree Committee.  Was litigation with the Retiree

22  Committee a possibility with regard to this dispute?

23  A   Yes.

24  Q   Why do you say that?

25  A   Here again, as I said before, the parties had very strong

1  feelings.  I don't mean to overemphasize this now that we
2  have agreements with the Retiree Committee, but was initially
3  quite heated.  In some of the initial meetings that I
4  attended, they struck me as particularly heartfelt.  In
5  addition, you're talking about retiree healthcare for many
6  employees who need it, some of whom injured in the line of
7  duty, and they felt very strongly about this issue.
8  Q   And I know you reached a settlement obviously, but how
9  would you characterize the litigation if it had not been
10 settled?
11 A   Oh, I think it would have been very -- I don't think
12 anybody was going to be pulling punches in any litigation
13 that was going to be filed against the city.  They certainly
14 haven't in this case.
15 Q   How would you characterize its complexity?
16 A   It was going to be -- it was going to be both factually
17 complex, but it was also going to be legally complex,
18 although the strength of the legal arguments with healthcare
19 weren't quite the same, for instance, with the strength of
20 legal arguments, in my opinion, with regard to pensions.
21 Q   Did this dispute have any risk for the city?
22 A   Yes.
23 Q   What kind of risk?
24 A   Oh, significant risk.
25 Q   Why was that?

1  A   Well, being the single largest portion of unsecured

2  claims, if even at the lower numbers that the Retiree

3  Committee's actuaries had focused on, that would have been a

4  significant liability for the city.  And as I said, there was

5  a risk that it would continue to grow at that number, so it

6  would have made trying to propose a plan at least for the

7  initial ten years very troubling.

8  Q   How would you characterize the expense of the litigation

9  with the Retiree Committee if it had moved forward?

10  A   Here again, I think the expense was going to be

11  significant.  As I said, they were represented by a competent

12  counsel who I've known for a long time.  Their attorneys were

13  very motivated.  Their financial advisor was very aggressive

14  in proposing positions for their clients.  I did not

15  anticipate it to be an easy piece of litigation.

16  Q   I'm asking you questions about a litigation, but I should

17  first ask was there a complaint ever filed by the Retiree

18  Committee?

19  A   I don't remember.  No.  No, there was not.

20  Q   And but you still --

21  A   I was trying to think of the time.

22  Q   You still believed that they might file a lawsuit?

23  A   Oh, no.  I definitely believed they might, sure.

24  Q   Is it possible to characterize how long you think such a

25  litigation might have lasted?

1   A    Yes.  I did not anticipate it to be a short piece of

2   litigation.  Just based upon the back and forth of the

3   actuarial assumptions between the various actuaries in the

4   case and the debates about those assumptions, I anticipated

5   just the factual analysis would be long.

6   Q    If the Retiree Committee would have been successful in

7   such a litigation, what would that have meant for the city?

8   A    Now, it would have meant establishing a -- presumably it

9   could have meant establishing a fairly significant liability

10  in the status quo for the city that the city would have to

11  continue to pay out of the general fund.

12  Q    Would it have had any impact on the B notes?

13  A    It might well have had an impact on the B notes, yes.

14  Q    Okay.  And, conversely, if the city had been successful

15  in the litigation, what would have happened?

16  A    I'm not sure that the city's position in the litigation

17  would have been a zero sum conclusion, but if it had been

18  successful and had characterized these claims as general

19  unsecured claims, as we initially did on June 14th, then they

20  presumably could have been put in the general unsecured claim

21  pool and would have received a like similar recovery from

22  that pool.

23  Q    Who were the B notes distributed to in Class 12?

24  A    In Class 12 the B notes will be -- well, a portion of the

25  B notes, roughly $450 million, will be -- upon effective date

1  will be distributed to two voluntary employee benefit

2  associations, VEBAs, one for the General Retirement System

3  and one for the Police and Fire Retirement System.

4  Q    So they were created as a part of this settlement?

5  A    They will be, yes.  They will be created as a part of

6  this settlement and become effective, yes.

7  Q    If it's confirmed?

8  A    Yes.

9  Q    And what did the creation of the VEBAs mean for the city?

10 A    Well, the plan is, as we showed in the bar graph chart

11 yesterday, that's the reason why the city's obligation goes

12 from in a nonrestructure scenario from 73 percent of legacy

13 costs in 2023 to roughly 2 percent of the general fund budget

14 in 2023.  The VEBAs will provide retiree healthcare going

15 forward in the future, and the city will no longer have any

16 liability for retiree healthcare.

17 Q    So the city would no longer be in the retiree healthcare

18 business?

19 A    The city would be getting out of the retiree healthcare

20 business.

21        MR. SHUMAKER:  Now, you can take that down, Steve.

22 BY MR. SHUMAKER:

23 Q    Did the city enter into settlement negotiations with the

24 Retiree Committee?

25 A    Oh, yes.

1  Q   And they were successful?

2  A   Yes.

3  Q   Was it a product of the mediation process?

4  A   Yes.

5  Q   Were you involved in those settlement discussions?

6  A   Yes.

7  Q   Okay.

8          MR. SHUMAKER:  Can we have 720 up, please?

9  BY MR. SHUMAKER:

10 Q   Mr. Orr, again, this is a demonstrative slide used with

11 Mr. Malhotra, and if you would, could you describe the

12 settlement terms?

13 A   Yes.  The claim is focused on a variety of healthcare

14 plans offered to retirees sponsored by the City of Detroit.

15 I think at one point there were as many as 23 retiree plans.

16 The total amount of the allowed claim is $4.3 billion.

17 There's a split.  PFRS gets 2.2 billion.  GRS gets roughly

18 two billion.  There's no interest on that claim.  The

19 maturity is open-ended, which means that if the VEBAs are

20 formed and they're properly funded, they are designed -- it

21 is the intent that they continue to pay retiree healthcare

22 essentially indefinitely.  A portion of the new -- I should

23 say a portion of the new B notes will be contributed to GRS

24 and the PFRS VEBAs, voluntary employee benefit associations.

25 The total amount is 450 million.  The split of that 450

1 million is a little bit more goes to police and fire VEBA,

2 and 218 million goes to the GRS VEBA. There are two tiers of

3 interest rates, four percent in the first ten years and six

4 percent in the last ten years. They have -- the notes have a

5 maturity through 2045. There's also a provision for a

6 portion of the new B notes from the COPs reserve would be

7 contributed to the VEBAs.

8 Q    Okay.  I want to focus your attention on that 4.303

9 billion.

10 A    Yes, yes.

11 Q    All right.  But is it fair to say that 4,303 million is

12 4.303 billion?

13 A    Yes.  I was just rounding it off, yes.

14 Q    And that number, is that -- that's the number that was

15 arrived at in the settlement?

16 A    Yes.

17 Q    Okay.  And that is the number that's talking about the

18 unfunded amount where you were talking about the Retiree

19 Committee was at five billion and the city was at 3.3?

20         MR. WAGNER:  Objection.  Leading.  And I think in

21 general there's just too much leading here.

22         THE COURT:  The objection is sustained.

23         THE WITNESS:  That number represents --

24         THE COURT:  Sir --

25         THE WITNESS:  Oh, I'm sorry.

```
1              THE COURT:  -- I sustained the objection --
2              THE WITNESS:  I'm sorry, your Honor.
3              THE COURT:  -- meaning it has to be redone.
4              THE WITNESS:  I apologize, your Honor.  I'm sorry.
5   BY MR. SHUMAKER:
6   Q    That 4.3033 number, how does that relate to the unfunded
7   liability numbers that you were describing before for the
8   Retiree Committee and the city?
9   A    It's a little bit hard being on this side of the podium.
10  The number represents a negotiated solution from the initial
11  number that we started out at 5.7 billion and the number that
12  the committee started out at roughly 3.7 billion.  This is
13  the outcome of those negotiations.
14  Q    What objective factors justified this settlement?
15  A    Well, here again, it was a resolution of the potential
16  litigation.  It was a resolution of plan support, which we
17  would need in the plan.  People may recall that earlier this
18  year there was a vote, and Classes 10, 11, and 12 were
19  solicited for their votes to support the plan and cuts in
20  both pension and healthcare, so resolution of any potential
21  litigation claims and a release of the city from liability,
22  its unfunded liability for pension and healthcare -- well,
23  for healthcare in this class, healthcare liability in the out
24  years.  It also resolves the issues regarding what legal
25  obligation the city might have to fund indefinitely retiree
```

1  healthcare plans.

2  Q    Did this settlement have any bearing on Classes 10 and

3  11?

4  A    Yes.

5  Q    What was that?

6  A    Well, the retiree healthcare is often looked at by active

7  duty employees as a benefit they're going to get upon

8  retirement, and in my opinion and experience and as a result

9  of having discussions with employees, it's often seen as sort

10 of a benchmark of what they should expect as a result of

11 their service to the city.

12        MR. WAGNER:  Your Honor, I ask that that answer be

13 stricken to the extent it reflects hearsay statements by out-

14 of-court declarants.

15        MR. SHUMAKER:  I don't believe it was hearsay.  It

16 was Mr. Orr's understanding of the impact.

17        MR. WAGNER:  "A," what's the relevance, and, "B,"

18 it's predicated on out-of-court statements.

19        MR. SHUMAKER:  Well, the relevance is to the overall

20 settlement position that Mr. Orr --

21        THE COURT:  Yeah.  It doesn't appear to the Court

22 that the statements are really offered for the truth of them,

23 only in support of the settlement itself, so the Court will

24 deny the motion to strike.

25        MR. SHUMAKER:  Thank you, your Honor.  Can you take

1  that down, Steve?

2  BY MR. SHUMAKER:

3  Q   Mr. Orr, are you familiar with what's been called the

4  grand bargain?

5  A   Yes.

6  Q   What is the grand bargain?

7  A   The grand bargain is a euphemism for two separate

8  settlements.  One is the DIA settlement.  That's a settlement

9  with the DIA funders and a series of foundations that are now

10  called the DIA Foundations to fund a certain percentage, and

11  a settlement with the State of Michigan embodied in the state

12  contribution agreement to fund a like amount of money which

13  together have been called the grand bargain to preserve the

14  art at the Detroit Institute of Art and keep it in the city.

15  Q   Collectively speaking, who do you consider the parties to

16  the grand bargain, to those two settlements?

17  A   The parties are the DIA Corporation, the DIA Foundations,

18  the DIA funders, the State of Michigan, the claimants on the

19  litigation, including the pension systems, retirees, and the

20  city.

21  Q   Were unions involved?

22  A   Yes.

23  Q   Was the grand bargain a product of mediation?

24  A   Yes.

25  Q   Were you personally involved in those mediation efforts?

1   A    Yes.

2   Q    About what time frame, generally speaking, were the terms

3   of the grand bargain, both the DIA and the state contribution

4   agreement, essentially finalized?

5   A    Well, the total of the grand bargain was finalized

6   towards the end of May, I believe, when the state sought --

7   the governor actually sought approval from the legislature,

8   and the legislature voted a package of bills in May.

9               MR. SHUMAKER:  Could we put up slide 724?

10  BY MR. SHUMAKER:

11  Q    Another slide, Mr. Orr, from Mr. Malhotra's and a

12  demonstrative.  Could you describe for the Court what this

13  reflects?

14  A    Yes.  The grand bargain, as I said, is really two

15  agreements.  One is the state's obligation to fund $194.8

16  million in net present value funding.  That is the amount of

17  money necessary in year one with the applied discount rate of

18  6.75 percent reduced $350 million in value over those 20

19  years.  As we mentioned yesterday, the income stabilization

20  payment that was coming from the settlement, a stub period on

21  the UTGOs would be used to fund a poverty prohibition program

22  over the next 14 years from the UTGO proceeds.  It prevents

23  pension reductions from lowering household incomes below 105

24  percent of the poverty level, and there are certain

25  conditions precedent listed in the state contribution

1  agreement.  The DIA settlement is a combination of

2  foundations and individual and smaller DIA funders, total

3  value of 366 million over 20 years.  The DIA is to contribute

4  a amount of 100 million over the next 20 years.  The

5  provision is that the assets of the DIA, both the art and the

6  physical properties, the buildings and real estate, the

7  parking garages themself, are to stay in the city and that

8  they, too, have certain conditions to be met.  The split of

9  the fundings for each of the two agreements is listed in the

10  columns under GRS and under PFRS.

11  Q   Thank you.  I want to walk you through these -- both of

12  these settlements but still focusing on the collective grand

13  bargain.  Was that an attempt to settle multiple issues, in

14  your mind?

15  A   Yes.

16  Q   Generally speaking, what claims involving the city did

17  the grand bargain resolve?

18  A   There were claims between the city, and there were

19  positions taken by the attorney general that the art could

20  not be used in this process.  There's a fancy word they use

21  in the art community called deaccession.  Normal people say

22  just sold.  The art could not be sold to help alleviate some

23  of the debt obligations of the city.  As it went through,

24  there were positions taken by both DIA regarding the

25  ownership of the art over a period of years -- there are

1  roughly 60 -- 64 to 66,000 pieces of art.  The DIA had

2  maintained that each piece of art's provenance -- that is,

3  its ownership rights and the intent of the donor or the

4  intent of the city in the case of the purchased art with the

5  city -- was going to be -- was going to be contested.

6  Q  Okay.  And so there were those claims.  Were there any

7  other claims that were resolved as a part of the grand

8  bargain?

9  A  Yes.  There were constitutional claims that were asserted

10 that under the state's 1963 Constitution -- I think it's

11 Article IX, Section 24 -- with respect to pensions that -- as

12 has been said in this case, that there was a strong feeling

13 that the state had an obligation -- it said it should not be

14 impaired, but the state had an obligation to make sure those

15 pensions remained funded.

16 Q  Okay.  And you've walked us through this chart, but in

17 total what is the value of the DIA settlement and the state

18 contribution agreement assuming a 20-year time horizon?

19 A  $816 million.

20 Q  And it broke down the way that you described for the

21 Court?

22 A  Yes.  The net present value funding is counted as 350

23 million.

24 Q  I'm sorry.  The net present value is 350 million?  Is

25 that what you --

1  A    No.  The net present value funding is counted as having a

2  value of 350 million.  The net present value funding is

3  194.8.

4  Q    Thank you.  Let's focus on the bottom half, the DIA

5  settlement.  You've talked about what claims are being

6  settled and from a global perspective in the grand bargain,

7  but what claims are being settled by the DIA settlement?

8  A    Well, the DIA, DIA Corp., and the DIA Foundation had

9  taken the position that the art was held in trust in

10 perpetuity for the benefit of the city and its residents and

11 that the city could not in any way look to the art to either

12 sell it or any other form use it to fund some money in this

13 bankruptcy process.  They had made fairly consistent and

14 strong threats that they would have -- mount a vigorous

15 defense should the city attempt to do that.

16 Q    Let me ask you that.  Their claim, when did the issue of

17 these claims arrive -- arise?  I'm sorry.

18 A    Arise?  They arose very closely to -- it was -- I think

19 it was pretty close to April 2013.

20 Q    And who was disputing -- who were the parties disputing

21 the city's ownership of the art?

22 A    Well, the city always took the position that we owned the

23 art outright.  The DIA Foundation, their benefactors, and the

24 DIA Corporation, which actually under an operating agreement

25 runs the Art Institute for the benefit of the city --

1          THE COURT:  One second, please.  Sorry.  We need to

2     take a break for technological challenges here.  Stand by.

3     Are we ready?  Okay.  You may proceed.

4          MR. SHUMAKER:  Thank you, your Honor.

5     BY MR. SHUMAKER:

6     Q    Mr. Orr, I think you were telling us that one party that

7     was disputing the ownership in the DIA assets was the DIA

8     Corp.

9     A    Yes.

10    Q    Was anyone else involved in the dispute?

11    A    Oh, sure.  The board of the DIA Foundation as well as the

12    Michigan Attorney General.

13    Q    Did you come to know of other parties that might dispute

14    the ownership of the art?

15    A    Yes.

16    Q    And who were they?

17    A    Well, there were other parties in the museum community

18    who had voiced their opposition to any plans to sell the art.

19    I think the New York Museum of Natural History took a vote

20    amongst their employees, a resolution that no one should do

21    any business with the Detroit Institute of Arts if we -- if

22    the city sold any art, and pretty much around the nation and

23    even internationally there was quite an outcry initially.

24    Q    You were talking about deaccession.  Were donors involved

25    in this?

1   A    Oh, yeah.  Oh, yes, yeah, quite --

2   Q    How did you know that?

3   A    Oh, I spoke to some donors.  I spoke to several of them,

4   Gene Gargaro.  I spoke to Richard Manoogian.  I spoke to some

5   others at social events, and while we had cordial

6   conversations and we were really quite pleasant -- Mr.

7   Manoogian was kind enough to host my wife and children at his

8   house on Mackinac Island, for instance, for an afternoon and

9   watch his trains and whatnot -- he was pretty clear that this

10  was a significant issue and that the donors, the DIA Corp.,

11  the funders were planning to fight any effort on the city to

12  try to deaccess or sell any art.

13  Q    Did any of those parties ever file a complaint?

14  A    No.

15  Q    What are the key facts supporting the city's position

16  that it owns the DIA and its assets?

17  A    Well, the city took a position that there was not a

18  restrictive trust or any particular legislative in action

19  that would prohibit the city from selling art; that the city

20  believed when we finally got the initial Christie's report

21  that for the pieces of art that had been valued in that

22  report that we had, for lack of a better word, clean title;

23  that the parties had no, in our opinion, strong -- not

24  strong -- had no definite argument regarding their trust

25  theories.

1   Q    What was the city basing its ownership argument on?

2   A    The city was basing its ownership argument on the fact

3   that throughout the years the city, in fact, had purchased

4   some of the art going abroad.  There were city residents who

5   would purchase art on the city's behalf and present an

6   invoice, and the city would pay it out of tax funds.  This is

7   back down in the, you know, turn of the century for really a

8   period of the '20s to the '30s in earnest when they did this,

9   but there were times when the city out and out either

10  commissioned city residents to go abroad and purchase art or

11  would buy it from city residents upon their return sometimes

12  sight unseen.

13  Q    How did you come to know about these facts?

14  A    Oh, we -- in addition to doing research before I came

15  here, we met with DIA officials, and two of the city's

16  professionals, Mr. Bennett and Mr. Buckfire, met with them

17  several times, I believe, in the April, May time frame.

18  Q    What was the contrary position put forth by you said the

19  Michigan AG and the --

20  A    Right.

21  Q    -- DIA Corp.?

22  A    Yeah.  They felt very strongly that it was the intent of

23  the donors that the art would be held in trust in perpetuity

24  in the city.  One of the collections, the Tannahill

25  collection -- I believe he's a Dodge heir who bought a

1   significant number of the high-value pieces -- they felt that
2   it was definitely the intent of that donor at the time of
3   making that donation that the art would be held in trust in
4   perpetuity.  They believed that some of the other donors,
5   some of the notable families in the city's gilded age, the
6   Fords, the Phelps, the Dodges and the like, who had gone
7   abroad and purchased art and donated it to the museum, that
8   their intent was to maintain the city and that the heirs of
9   those donors who are alive today would strongly express that
10  intent and would side with them on the position that the art
11  should stay in perpetuity in the city and it was, in fact,
12  held in trust.
13  Q   Now, you reached the DIA settlement, but if you had not,
14  is it possible to characterize what litigation over the DIA
15  and its assets might have looked like?
16  A   Yes.  It would have been -- well, using a vernacular, it
17  would have been a mess.  The DIA had said that they were
18  going to fight, litigate every piece of art that the city
19  sought to sell up to the 60-some-odd thousand pieces that
20  were there, particularly with regard to the ownership, the
21  intent, the provenance of the art, that they would make it a
22  very lengthy and painful piece of litigation.
23  Q   Are you able to characterize how expensive such a
24  litigation might have been?
25  A   Yes.  It would have been -- it would have been very

1   expensive for the city.

2   Q   Why is that?

3   A   Well, I believe the donors and the funders and the

4   foundation and the board were sincere.  There are certainly

5   what has been called high value net worth individuals that

6   have an interest in the Institute, and they were motivated

7   and had the wherewithal to support their motivations and that

8   the Attorney General had stated his intent to contest any

9   effort, and certainly the state has the means to pursue that

10  litigation, so I had every reason to believe that their

11  intent was sincere and they had the means to carry it out.

12  Q   How would you characterize the length of such a possible

13  litigation?

14  A   Oh, I think it's fair to say that the intent was that it

15  would be lengthy and expensive litigation.

16  Q   If the city were to prevail in this litigation, what

17  would have been the result?

18  A   Well, the city presumably would have prevailed -- if it

19  were to have prevailed, it would establish an ownership

20  interest in some of the art.  I, quite frankly, think that

21  there are probably donor restrictions that are apparent, and

22  the intent for some of the art could be proven that it was

23  not intended to ever be deaccessed or sold, but the city may

24  have prevailed on some of -- the right to deaccess or sell

25  outright some of the art.

1  Q   What would have happened if the DIA Corp. or the Michigan

2  Attorney General or any of the other parties that you listed

3  had succeeded in the litigation?

4  A   Well, if they succeeded in litigation, they would

5  establish the fact that the art was held in trust; that it

6  could not ever be used or leveraged in any fashion to

7  generate benefits to the city.  Likewise, if we had lost,

8  there were threats from the tri-county millage, which had

9  been passed a few years back, that they would have -- the

10  elected officials of those counties would have canceled that

11  millage, and I think that millage accounts for about three-

12  quarters of DIA's -- I just recall off the top of my head

13  DIA's budget is 30-some-odd million, but that millage is

14  about 23, 25 million of that.

15  Q   So if the Michigan AG or the DIA Corp. or the donors had

16  succeeded in the litigation, what would the monetary value of

17  the art have been to the city?

18  A   Zero.

19  Q   And why is that?

20  A   Well, if they had succeeded, that would have meant that

21  the city could not deaccess or even leverage in this way from

22  donors, and there would have been no motivation through

23  lengthy litigation for the art to be used for any benefit in

24  this case, and so it would not be available, in my

25  understanding, to be used in any fashion to facilitate our

1  exit from bankruptcy.

2  Q   When did you come to learn that there might be a

3  settlement of these issues?

4  A   Late 2013.  It was -- I think it was after we -- after

5  the October defaults on the UTGOs and the LTGOs.

6  Q   So -- I'm sorry.  Late 2013?

7  A   Yes.

8  Q   So about this time, had you undertaken any steps to

9  understand the value of the art at the DIA?

10  A   Yes.

11  Q   And what were they?

12  A   Well, we initially came in, and as we said at the June

13  14th proposal, we had been trying to ascertain the value of

14  the city's assets, so we initially approached Christie's in

15  April, I believe, April or May 2013.

16  Q   Let me stop you there.  Why did you approach Christie's?

17  A   Well, we wanted to value the --

18  Q   I'm sorry.  I should be clear with my question.  I

19  apologize.  Christie's you talked to about valuing the art?

20  A   Yes.

21  Q   Why would you go to Christie's as opposed to --

22  A   Oh.

23  Q   -- some other entity?

24  A   Well, there were really two major perceived and pretty

25  universally recognized notable art appraisers and auction

1    houses.  One was Sotheby's, and the other is Christie's.

2    Christie's is about two times larger than Sotheby's by

3    volume, I understand.  Sotheby's is related to one of the

4    known donors, Mr. Taubman, and benefactors of the city as

5    well as at DIA, so there appeared that it could be a conflict

6    of interest if we'd gone to Sotheby's, so to try to value

7    what is thought of as being one of the great encyclopedic art

8    museums in the United States, if not in the world, we wanted

9    to go to an evaluer -- evaluator, appraiser, that was sort of

10   that tier, and Christie's was really the only one that we

11   felt at that time would have that capacity.

12   Q   So when did you initially approach Christie's again?

13   A   It was May or -- April or May 2013.

14   Q   And did you retain them at that time?

15   A   No, no.

16   Q   Why not?

17   A   Well, we were just in the assessment period of going

18   forward, and somehow word got out that we had been talking to

19   Christie's, and the world erupted into the concept that

20   somehow I was here to sell off the DIA and that was always

21   my, you know, back pocket diabolical plan and infers, and so

22   it became a distraction from some of the other things we were

23   trying to do.  Here again, we were trying to settle the city

24   down, both, you know, either man on the street or art

25   benefactors, and there was two weeks of just total

1  distraction which we thought would distract from what we were

2  trying to lead up to in preparing the June proposal and my

3  May 3rd initial report, so we asked Christie's to stand down,

4  and we did not retain them.

5  Q   When you returned to Christie's, when was that?

6  A   Later in August.

7  Q   What did you ask them to do specifically?

8  A   At that time, we asked them to appraise the pieces of art

9  which we felt and which they would find out there was no

10  contest regarding whether or not the city owned that art.

11  Q   How many pieces of art were there?

12  A   I think that was -- I think that was 2,300 pieces,

13  somewhere in there.

14  Q   Why did you focus on those pieces?

15  A   Well, we wanted to focus on the pieces for which there

16  would be no dispute.  We didn't want to get into a gun

17  battle, and we felt by establishing a value on pieces of art

18  that we felt strongly we could prove we owned outright that

19  we wouldn't elicit this sort of hue and cry and commence

20  litigation regarding -- you know, either from the attorney

21  general or from the benefactors of the museum.  We wanted to

22  get a snapshot of what we owned that was undisputed.

23  Q   Why did you want to know the value of the art?

24  A   We felt it was our obligation both under 436 but also as

25  a debtor in bankruptcy to value our assets, and we wanted to

1    try to get that information out, and we had felt that we had

2    delayed enough from April, the four months from April to

3    August.  We were trying.  We by then were in bankruptcy July

4    18th.  We felt we had a duty to move forward irrespective of

5    sort of the consternation that it would cause.

6    Q   When did you receive an estimate from Christie's?

7    A   The initial estimate was early December, and then we

8    received the actual final estimate December 17th.

9            MR. SHUMAKER:  Put up 343.  This document is in

10   evidence.

11   BY MR. SHUMAKER:

12   Q   What is this, Mr. Orr?

13   A   This is the initial letter from Doug Woodham, president

14   of Christie's North America, to me with their estimate of

15   value.

16   Q   And this was on December 3rd, 2013?

17   A   Yes.

18   Q   Go to page 2.  Right in the middle under "aggregate

19   valuation estimate," that paragraph, Mr. Orr, is this the

20   estimate that you received from Christie's?

21   A   Yes.

22   Q   And how much did Christie's value the art at?

23   A   They gave us a range of roughly $452 million to $866

24   million.

25   Q   Was this the final estimate that you received?

1    A    Ultimately I got another one later, but for this art I

2    think it is.

3    Q    Let me put up 341.  You see this document, Mr. Orr?

4    A    Yes.

5    Q    And what is it dated?

6    A    December 17th, 2013.

7    Q    And what is it?

8    A    This is the final estimate that I remembered, a follow-on

9    from Mr. Woodham's December 3rd letter.

10   Q    And underneath part one, valuation report, that first

11   paragraph --

12   A    Yes.

13   Q    -- could you share with the Court the range of values

14   that Christie's arrived at?

15   A    Yes.  It's a revised range of -- it went a little bit

16   lower, 454 to 867 million.

17            MR. SHUMAKER:  Could you take that down?

18   BY MR. SHUMAKER:

19   Q    So you indicated that the grand bargain or the idea of it

20   arose in late 2013; correct?

21   A    Yes.

22   Q    At that time, had you heard of other parties' efforts to

23   value the DIA's art collection?

24   A    At the time of the grand bargain?

25   Q    Yeah.  Right after that, yes.

1  A    Late 2013?  Yes.

2  Q    Where did you hear about those valuations?

3  A    Oh, there were a lot of reports coming our way of folks

4  who were proposing a sale of the art or deaccession.  I would

5  get e-mails virtually daily from one particular group of

6  people -- still trying to figure out how they got my e-mail

7  address -- who still write me about the art, so they were

8  coming from a number of different sources.

9  Q    Okay.  Now, the estimate that you saw from Christie's,

10 did you -- how easy do you think it would have been to get

11 that figure if you sold the art?

12 A    My understanding was that it wouldn't have been

13 particularly easy.  The reason Christie's gave us a range is

14 that they felt, as people who do this business day-in and

15 day-out, that on any given day -- I mean at bottom art is --

16        MR. SOTO:  Objection, your Honor.  He's about to

17 testify about something that -- it's a statement out of --

18 excuse me.  I'm sorry.  He's about to testify about something

19 that's a statement out of court, and, frankly, we've already

20 got Ms. Fusco's testimony about what Christie's view was.

21        MR. SHUMAKER:  I just was asking the witness his

22 understanding of whether it would have been difficult to sell

23 the art at the estimate Christie's provided.

24        THE COURT:  I'll permit it.  Go ahead, sir.

25        THE WITNESS:  There was an understanding that it

1   would have been difficult because you don't really know the

2   value of things like art until you actually put it on the

3   market and a buyer -- willing buyer pays for it.  In

4   addition, there were concerns that if you flooded the market,

5   which is supply and demand, that you could actually drive

6   values down below what the estimated value was, so that's why

7   they gave us a range.

8   BY MR. SHUMAKER:

9   Q    Did you undertake any other efforts to monetize the art

10  or get an estimate of its valuation?

11  A    Not at that time.

12  Q    Why not?

13  A    Well, at that time we felt that we had a good appraisal

14  of the disputed -- the undisputed art that the city owned and

15  that we had discharged our duty to try to get an estimate of

16  what that value was.  And at that time, the so-called grand

17  bargain was evolving, and one of the principal concepts of

18  that bargain was that you were not going to sell the art.  If

19  you sold one piece, the grand bargain would not occur.  I

20  think at that time I had already met with certain principals

21  of the foundation funders such as Darren Walker at Ford

22  Foundation and Rip Rapson at Kresge.  I think I'd met with

23  the Kellogg Foundation's board out in Battle Creek.  I'd met

24  with the Knight Ridder Foundation's board.  So I'd met with

25  some of the actual proposed founders' principals at that

1    time, and they reiterated that concern.

2    Q    Were there other alternatives considered than simply

3    selling the art?

4    A    There were other alternatives proposed.  I believe Mr.

5    Woodham's December 17th letter gave me a list of five

6    potential alternatives, and I certainly received a lot of

7    alternatives from other people, some fanciful, but there were

8    other alternatives proposed.

9    Q    Was one of the alternatives pledging the art as

10   collateral for a loan?

11   A    Yes.

12   Q    Did you ever consider doing that?

13   A    No.

14   Q    Why not?

15   A    Well, two principal reasons.  One, if you pledge it as

16   collateral for a loan, you have to pay the loan back, and so

17   that hits on cash flow, and we're trying to get out of the

18   debt business.  We're not looking to put the city back in the

19   debt business.  We're trying to wall the city off from having

20   to go to the capital markets for a decade so they can -- it

21   can learn muscle memory and live on its own for its own cash

22   flow and develop a different sort of behavioral pattern and

23   get off of the -- I think I said at one point addiction to

24   debt.  In addition, when you pledge collateral, any

25   collateral, there's a risk that if you default on the loan,

1   the collateral will be seized based upon the debt obligation,

2   and all the issues that we had with the other museums were

3   perceived that a collateral pledge of an asset was similar to

4   deaccession and all the parade of horribles that the other

5   museums would not do business with Detroit Institute of Arts

6   would follow was my understanding.

7   Q   Let's turn to this DIA settlement itself.

8   A   Yes.

9   Q   Okay.  Again, the DIA settlement, what were its general

10  terms?

11  A   The general terms were two components in cash that DIA

12  Corp. and DIA funders would provide respectively 366 million

13  and $100 million in funding to be paid out over the next 20

14  years -- there's an option for net present value funding --

15  and that in consideration for that funding none of the art

16  would be deaccessed.  The art would be placed into a

17  charitable trust in perpetuity for the benefit of the city

18  and the residents of the state.  There are other -- certain

19  other conditions such as art shows -- the popular Inside/Out

20  program is what they called it over at the DIA -- would be

21  expanded; that they would make a certain number of shows per

22  year, I think, per quarter throughout the state and that, as

23  a condition of their funding, the state would contribute $350

24  million in value.

25  Q   You mentioned the $366 million.

1  A    Yeah.

2  Q    Who was to receive the $366 million?

3  A    The pension funds.

4  Q    You authorized the city to enter into the settlement?

5  A    Yes.

6  Q    What were the objective factors that justified entering

7  into it?

8  A    Well, the issues surrounding the potential litigation

9  that I believed and still believe to this day would have been

10 costly and lengthy.  I believe that the potential litigants

11 weren't making a hollow threat; that they were sincere.  I've

12 come to learn that art is a very emotional issue for some

13 folks and that they believe in it quite strongly.  The issue

14 of the Attorney General's position and opinion and that he

15 would litigate the issue going forward -- I met with Attorney

16 General Schuette several times on this issue, and he

17 expressed to me on no uncertain terms that he felt quite

18 strongly about it, that it was his duty to pursue it and has

19 been doing that.  The issue regarding the potential ownership

20 finally of the art and resolving that, the issue regarding

21 the intent of the parties, the donors, over all these years,

22 the individual donors, the families, the benefactors would be

23 resolved as a result of the settlement.

24 Q    Were there any objective legal factors that supported the

25 deal?

1  A   Oh, certainly.  Some of the legal factors were, as I

2  said, the ownership issues, the prohibition on sale, the

3  trust issues, and the millage.  The counties who had

4  supported the millage and had it passed had made it very

5  clear -- in fact, I'd spoken to several legislators who said

6  that, you know, as far as they were concerned, that millage

7  was going to go away and there would be no DIA.

8  Q   How about the DIA assets?  Was there anything relating to

9  them that was objectively supportive of the deal?

10  A   Yeah.  I mean the issues surrounding the operation of the

11  DIA, the status of the operating agreement with the DIA

12  Corp., whether or not the assets would stay into the city,

13  all of those things came into play.

14  Q   Now, did the DIA settlement come before the -- what you

15  referred to as the state contribution agreement?

16  A   Yes.

17  Q   Let's turn to that.

18  A   Um-hmm.

19  Q   Did you have any involvement with the state contribution

20  agreement?

21  A   Yes.

22  Q   What was that involvement?

23  A   Well, I came to find out that, without discussing the

24  mediation, the state had committed to at -- initially to

25  match the DIA funding, and that number was 350, $350 million.

1    The DIA actually raised more than the initial proffer, but

2    the state was committed at that level, so it stayed at that

3    level.  To obtain that funding, there was an effort that was

4    mounted in Lansing to convince the legislators to vote for

5    the funding along with the package of bills that Mr. Stibitz

6    talked about earlier for the city and that we, meaning my

7    team and I, my immediate team, Stacy Fox, Bill Nowling,

8    myself -- Greg Tedder was my state liaison -- had to go up to

9    Lansing, decamp from Detroit and go up to Lansing for several

10   weeks and meet essentially with every legislator in groups or

11   individually to explain the benefits of the grand bargain.

12   Q    Now, is the city a signatory to the state contribution

13   agreement?

14   A    Yes.

15   Q    And who else is?

16   A    The Retirement Systems, the state, and the city.

17   Q    Now, did you execute the state contribution agreement on

18   behalf of the city?

19   A    Yes.

20   Q    What is being addressed in the state contribution

21   agreement, the issues being addressed?

22   A    Well, the state contribution agreement, while focused on

23   art, at its core settles the constitutional claim of the

24   pension systems that the state has a constitutional

25   obligation to not impair pensions.  The litigation that was

1  brought, I believe, in this court and was on appeal -- there
2  were several cases on appeal, as a matter of fact --
3  eligibility, and that litigation is embodied in the state
4  contribution agreement settlement.
5  Q    And how about the payment of funds?  What was the --
6  you've talked a little bit about this, but, again, what were
7  the payment of funds envisioned in the state contribution
8  agreement?
9  A    Well, initially it was thought that the state was going
10 to make a series of payments for over 20 years of roughly $17
11 million with interest.  There was some concern that trying to
12 commit future gubernatorial administrations and future
13 legislatures over 20 years might be ambitious, so it evolved
14 to a net present value funding mechanism where the state
15 would fund a lump sum on the front end and would be
16 calculated out in consideration for dropping all the
17 litigation against the state and releasing the state from
18 those claims.
19 Q    I believe yesterday you testified about the income
20 stabilization fund?
21 A    Yes.
22 Q    Was that impacted in some way?
23 A    Yes.  That was built into the state contribution
24 agreement.  It took the stub period from the UTGOs and built
25 it into an income stabilization fund to be administered by

1   the state for the benefit of pensioners who might fall below

2   the poverty level.

3   Q   Are there condition precedents to consummation of the

4   state contribution agreement?

5   A   Yes.  They're listed in the agreement.

6           MR. SHUMAKER:  Can I show Exhibit 1.A.327 to the

7   seventh amended plan?

8   BY MR. SHUMAKER:

9   Q   Do you see this document, Mr. Orr?

10  A   Yes.

11  Q   Now, you're only looking at the first page on the screen,

12  and feel free to look in the binder, but are you familiar

13  with this document?

14  A   Yes.

15  Q   And let's go to -- and what is it?  I'm sorry.

16  A   This is the -- this is a form, the execution version of

17  the state contribution agreement between -- well, I said the

18  state.  The package of bills that was passed is actually

19  going to form a Michigan Settlement Administration Authority.

20  That authority will be the body that through the Michigan

21  budget stabilization fund, the rainy day fund, the money

22  would be deposited into the authority.  That money, upon

23  consummation, if we have the plan here confirmed and the

24  effective date, will be paid out to the General Retirement

25  System and to the Police and Fire Retirement System and the

1  City of Detroit as a party.

2  Q   Go to page 4, please, of this document.  Let's go -- page

3  2.  Okay.  I'm making it up.  Let's go to four.  Okay.  There

4  we go.  And you see there in paragraph 4 in the middle of the

5  page, are these the conditions that you were referring to to

6  the state contribution agreement?

7  A   Paragraph 4 is the condition precedent provision, but

8  they go on for quite awhile.  I believe they go over into

9  page 5 as well.

10 Q   Let's look at 4(c).

11         MR. SHUMAKER:  If you could blow up 4(c), please.

12 BY MR. SHUMAKER:

13 Q   And that continues onto the next page; correct?

14 A   Yes.

15         MR. SHUMAKER:  Are you able to bring that up, too,

16 Steve?  Okay.  I don't know.  Might be easier.

17 BY MR. SHUMAKER:

18 Q   Mr. Orr, you see what is shown as the condition precedent

19 number 4(c)?

20 A   Yes.

21 Q   Is this consistent with your understanding of the state

22 contribution agreement that you were just testifying about?

23 A   Yes.

24 Q   And what is it?

25 A   This is the requirement that all litigation, as listed on

1    a schedule, an exhibit to the contribution agreement, be

2    dismissed with prejudice as a condition of the funding.

3    Q   Let's go to letter 4(e), please. Mr. Orr, this is

4    another condition precedent of the state contribution

5    agreement?

6    A   Yes. This condition has been met.

7    Q   And what is that condition?

8    A   The condition that Class 10, which is PFRS, pension

9    system and Class 11, which are General Retirement retirees,

10    accept the plan.

11    Q   One final condition I wanted to focus you on is (g).

12          MR. SHUMAKER: That would be the next page, Steve.

13    BY MR. SHUMAKER:

14    Q   What is this condition, Mr. Orr?

15    A   That the pledges of the 466 million from the foundations

16    and from DIA Corp. be actually provided in an irrevocable

17    commitment form.

18    Q   Is it fair to say that the state contribution agreement

19    is dependent upon the DIA settlement?

20    A   Yes, without a doubt.

21    Q   How about vice versa?

22    A   Yes. They're mutually dependent.

23    Q   Now, who decides --

24          MR. SHUMAKER: You can take this down, Steve.

25    BY MR. SHUMAKER:

1  Q   Who decides that the conditions precedent are satisfied?

2  A   The state.

3  Q   Do you know if any of the conditions precedent have been

4  satisfied?

5  A   Yes.

6  Q   Could you share with us some of them?

7  A   Sure.  The -- let's go through them.  The Classes 10 and

8  11 have voted to accept the plan.  There was active support

9  of the plan, condition 4(d), active support of the plan.

10 There was an endorsement by the Retiree Committee, condition

11 4(b), which has been met.  There was several other conditions

12 in addition to 4(e), the Class 10 and 11.  As I go down to

13 the list, condition (f) romanette ii, the requirement that

14 the governing bodies of GRS and governance be amended to

15 include, I think they're in the process.  I meant actually

16 iii.

17 Q   I'm sorry.  Let me stop you there.  Are you referring to

18 a document as you're testifying now?

19 A   Yes.

20 Q   And what document is that?

21 A   I'm referring to the state contribution agreement.

22 Q   Okay.  I'm sorry.  And if you could just --

23 A   I'm sorry.

24 Q   -- articulate, just summarize the conditions precedent.

25 A   That there's been plan support, there's been a vote for

1    the plan, there's been approval of authority for the city to

2    enter into the UTGO settlement at the state level, meaning

3    the city and the Emergency Loan Board.  There's been approval

4    by the city and authority for the city to enter the DIA

5    settlement.

6    Q    How about as you're looking there, are any of those

7    conditions precedent not met?

8    A    Yes.

9    Q    Which ones?

10   A    The plan is not effective, which has to be before April

11   1.  The order -- a nonappealable order confirming the plan

12   needs to be entered by December 31st.  That has not been met.

13   One of the conditions may not be met, an agreement to comply

14   with transition advisory board, but the other component of

15   that one is that compliance with any new legislation

16   regarding post-effective date governance and a cessation of

17   all litigation, and litigation has been stayed at the

18   appellate level, but it has not ceased.

19   Q    That's fine.  Thank you.

20   A    Um-hmm.

21   Q    Now, returning to the funding in the -- of the

22   settlement, do you know whether the DI -- you were talking

23   about the DIA settlement before --

24   A    Yes.

25   Q    -- and the fact that the DIA has committed to paying $100

1  million as part of it.

2  A    Yes.

3  Q    Do you know whether the DIA has $100 million to

4  contribute as part of the settlement?

5  A    Last I heard, the DIA was at approximately $90 million.

6  Q    Mr. Orr, I want to show you Exhibit 352.  Mr. Orr, up on

7  the screen are some letters.  Hold on.  Can you identify for

8  the Court what these are?

9  A    Yes.  This is a letter from the president of the Ford

10  Foundation, Mr. Darren Walker, to me stating the commitment

11  of the Ford Foundation to provide -- meet their obligation of

12  125 million.

13  Q    Hold on one second.

14          MR. SHUMAKER:  Let me ask you to go to page 2,

15  Steve.

16  BY MR. SHUMAKER:

17  Q    I don't want to ask yet about the contents.  Page 2.

18  This is a composite exhibit.  Do you see this letter,

19  Mr. Orr?

20  A    Yes.

21  Q    And did you receive this letter?

22  A    Yes.

23  Q    And what is it?

24  A    It's a letter from Mr. Rip Rapson, who's president of the

25  Kresge Foundation up here on Woodward, stating their

1   commitment to make their $100 million funding.

2   Q   To expedite things, can I ask you to look at Exhibit 352

3   in your binder, not the colored one, the white one, 352?

4   A   352?  Yes.  This is the composite.

5   Q   If you could take a look at that, could you share with

6   the Court how many letters are contained within that exhibit?

7   A   About 13.

8   Q   Are all of them addressed to you?

9   A   Yes.

10  Q   What did they convey to you?

11  A   For the foundations, including Ford, Kresge, Kellogg,

12  Knight Foundation, Davidson Foundation, Community Foundation

13  of Southeast Michigan, the Erb Family Foundation, Hudson-

14  Webber Foundation, the Mott Foundation, and the McGregor Fund

15  Foundation, that they are making their irrevocable commitment

16  to meet their funding as represented in the DIA funding

17  agreement.

18          MR. SHUMAKER:  Your Honor, with that understanding,

19  the city would offer Exhibit 352 into evidence.

20          THE COURT:  Any objections?

21          MR. SOTO:  No, your Honor.

22          MR. WAGNER:  No.

23          THE COURT:  It is admitted.

24      (City Exhibit 352 received at 9:47 a.m.)

25  BY MR. SHUMAKER:

1    Q    Now, Mr. Orr, you also testified that as part of the DIA

2    settlement that the foundations have committed to donating

3    $366 million; correct?

4    A    Yes, sir.

5    Q    Did you -- do you believe that the foundations have the

6    ability to make that payment in that time frame?

7    A    Without a doubt.  These are some of the most well-founded

8    foundations, and I would never anticipate that they would not

9    meet their commitment as stated in these letters.

10   Q    Going back to the state contribution agreement, did the

11   state's $194.8 million lump sum contribution have

12   restrictions on it?

13   A    Yes.  I mean there are certain conditions that have to be

14   met, yes.

15   Q    Restrictions as to where the money could go?

16   A    Oh, yes.

17   Q    And what was that restriction?

18   A    Well, likewise, those monies -- the parties to the state

19   contribution agreement are the general service and retirement

20   pension systems.  The money can only go to those systems.

21   Q    And you approved the state contribution agreement on

22   behalf of the city knowing of this condition?

23   A    Yes.

24   Q    What objective factors justify your entering into the

25   state contribution agreement on behalf of the city?

1  A   Well, it will resolve the ongoing litigation, and that is

2  stayed on appeal.  And there's a schedule on that agreement

3  of the cases.  I think there are about six.  It will resolve

4  the dispute, ironically, between the state and the attorney

5  general regarding what the obligation is from their position,

6  will resolve that constitutional issue under Article IX,

7  Section 24, as to whether or not the state has an obligation

8  to pay pensions.  It will resolve going forward the

9  pensioners' claims against the state as well.  It will also

10  resolve for the state the potential liability of establishing

11  a precedent not just for the City of Detroit but for any

12  other municipalities in the State of Michigan that might have

13  unfunded pension liability, which could be significantly more

14  in total than the pension liability we're dealing with here.

15  Q   How about with regard to the plan?  Were there any

16  objective factors relating to the plan that emanated from

17  this agreement?

18  A   Oh, sure.  It removes a number of pieces of litigation

19  that if they remained outstanding we could not go forward

20  with the plan.  It provides funding to allow us to not

21  provide to the initial level of cuts that we had anticipated

22  to pensions to be reduced on those cuts, and it increases the

23  probability of us being able -- should the plan be confirmed,

24  of us being able to emerge from bankruptcy.

25  Q   Did you receive any support for the plan as part of this

1  agreement?

2  A    Support in what fashion?

3  Q    Of the plan of adjustment.

4  A    Oh, sure, yeah.  As a component, we get plan support from

5  the Retirement Systems, which they have done.

6  Q    And why was that important?

7  A    Well, it was necessary because we were coming up to the

8  vote for the plan for Classes 10, 11, and 12, PFRS

9  retirement, GRS, and the OPEB liability.  Without their

10 support and without their vote, it was unclear that we'd be

11 able to reach a consensual resolution with those classes that

12 would raise issues regarding cramdown in the plan and whether

13 or not the plan could be confirmable, but more importantly

14 from my perspective, it was also important to get buy-in from

15 the pensioners and from the retiree healthcare class.  As I

16 said before, we're trying to develop a consensual plan here

17 in the city.  The city has had enough sort of conflict and

18 strife, and when we, meaning this restructuring effort, and

19 the team leave, we'd like to leave the city in a position

20 that parties believe they had a voice in this process, their

21 voice was heard, they participated in the process, and in a

22 sense there's buy-in going forward.

23 Q    Let's move to the next settlement, which is the 36th

24 District Court claims.

25 A    Yes.

1   Q   Do you recall those being settled?  You listed them
2   yesterday.
3   A   Yes.
4   Q   Are you familiar with the claims asserted in -- by
5   certain individuals and AFSCME against the 36th District
6   Court?
7   A   Yes.
8   Q   What are those claims generally?
9   A   They're claims of, I believe, 14 individuals.  Some of
10  them are old.  Some of them date -- well, relatively old.
11  They date back to 2004, 2005, and 2006.  They're claims
12  related to terms and conditions of employment or alleged
13  wrongful termination at the 36th or denial of certain
14  benefits that lag for a period of time.  There are claims
15  that actually went through arbitration during the process of
16  this bankruptcy for which those claimants received an
17  arbitration award.
18  Q   Were the claims liquidated or unliquidated?
19  A   The claims are now liquidated.
20  Q   How about were they contingent or noncontingent?
21  A   They're no longer contingent.
22  Q   Did these claimants file a proof of claim against the
23  city?
24  A   Yes.  The individual claimants and the -- and I believe
25  their union, AFSCME, filed the claims against the city.

1  Q    If the claims were against the 36th District Court, why

2  did they file the claims against the city?

3  A    The 36th District Court is not in bankruptcy, but it has

4  gone through its own restructuring under Judge Talbot, who

5  was over there for a period of time and since restored it.

6  The reason, though, is that the city has a funding obligation

7  under state law.  Each municipality funds its local District

8  Court.  And it has a funding obligation under state law to

9  fund the court so that those 350-some-odd FTEs over at the

10  court actually show up on our payroll as FTEs of the city,

11  and so any liability against the court would be a liability

12  that was ultimately put to the city.

13  Q    Did the 36th District Court also file a proof of claim?

14  A    Yes.

15  Q    Do you have an understanding as to why they filed a proof

16  of claim?

17  A    Yes.  Their view -- and I've met with the chief judge of

18  that court, who at the time expressed that they were being

19  underfunded, but their view, consistent with that, was that

20  it is the city's obligation to fund them and that if these

21  claims were asserted, liquidated, and made against the court,

22  that they eventually are obligations of the city.

23  Q    What was the aggregate value of the allowed claims?

24  A    The total liquidated amount of claims was like 14.3

25  million.  I think the allowed claim was six million.

1    Q    Why isn't it the state's responsibility to pay those

2    claims?

3    A    Under state law, the states do not have the

4    responsibility for funding the District Courts.  That's the

5    responsibility of the local municipality.

6    Q    What was the city's legal argument with respect to these

7    claims?

8    A    Our legal argument was that they were claims against the

9    36th District Court and that they were not claims against the

10   city.

11   Q    Did you, on behalf of the city, have a view as to how

12   those claims should be treated?

13   A    Yes.

14   Q    What was it?

15   A    As a practical matter, it didn't matter.  Eventually they

16   would come back on the city's budget.  If the 36th District

17   Court had an arbitration award -- it is a court.  It should

18   obey the law.  If it had an arbitration award that it would

19   pay, then that means that the budget submission they would

20   submit would be net of the payment that they made, and it

21   could be as high as 14 million.

22   Q    What was the claimants' legal argument?  You talked about

23   the claims, but what legal arguments were they advancing?

24   A    They were advancing that the 36th District Court was an

25   arm of the city and that essentially it had an obligation --

1  that it had a legal obligation in the state law to fund the

2  court and that because these were obligations of the court

3  they were a pass-through obligation to the city.

4  Q   Are these indirect claimants in a particular creditor

5  class?

6  A   Yes.

7  Q   Do you recall what class that is?

8  A   Yes.  They're a new class.  They're Class 17.

9  Q   You reached a settlement, but if you had not, how would

10 you characterize any litigation against the 36th District

11 Court claimants?

12 A   Well, their claims have been liquidated in arbitration,

13 so any litigation would have been in appeal.  I think the

14 arbitrator made specific findings of fact, I think, on the

15 actual arbitration award, which I believe is attached to the

16 settlement agreement.  They go through a pretty complete list

17 and a calculation.  Once you find that there was improper

18 termination of whatever the benefit was, the calculation is

19 mathematical, so they go through a complete list and

20 calculation of what the claims are.  I think five or six of

21 the claims are fairly significant in the million dollar or

22 above range.  The majority of nine or ten are not, but once

23 you -- if you assume that the arbitrator award is binding and

24 it's a liquidated claim, then it's a legal obligation.

25 Q   How would you characterize the complexity of such a

1  litigation?

2  A   I don't think it would be particularly complex on the

3  calculation side if you do the dates.  I think they have to

4  go back in and try to litigate the factual side.  I mean this

5  has been going on since sometimes 2004, 2005.  It had been

6  lengthy already, so I don't think that there was a benefit to

7  the city of trying to pursue that avenue.

8  Q   How would you characterize it as expense?

9  A   There are 14 claimants, and although some of the claims

10  are small, I mean you still have to provide an adequate

11  defense, so it would be expensive.

12  Q   How would you characterize the litigation's potential

13  length?

14  A   I'm sorry, sir.  The potential --

15  Q   Length.  I'm sorry.

16  A   Oh, it had already been lengthy.  I didn't see any value

17  in reopening the litigation for length.  There might be ways

18  that you could, you know, pull in facts and stipulation,

19  whatnot, but it seemed to me these folks and their unions

20  were pretty motivated to follow through on the claims.  I had

21  no reason to believe they would not have the same motivation.

22  Q   If these claimants had prevailed in that litigation, what

23  would it have meant for the city?

24  A   It would have meant a $14 million obligation coming to

25  the city that we had not accounted for.

1   Q    And if the city prevailed, what would happen with regard

2   to those claims?

3   A    Presumably those claims would have been general unsecured

4   claims put in that class.

5   Q    Did the city negotiate with these claimants regarding

6   these issues?

7   A    Yes.

8   Q    Were you involved?

9   A    Yes.

10  Q    Was the settlement a result of mediation?

11  A    No.

12  Q    What was the result of the settlement negotiations?

13  A    The result of the settlement negotiations were to take

14  the $14.3 million claim and have it at an allowed $6 million

15  claim, and I think the ultimate payout is a couple of million

16  dollars of that.

17  Q    I'm going to show you 722, please, which is another

18  summary demonstrative slide, Mr. Orr.  Do you see it?

19  A    Yes.

20  Q    And could you walk the Court through the -- how the 36th

21  District Court claims were settled?

22  A    Yes.  These were claims, as I said, related to terms and

23  conditions of employment over at the 36th District Court held

24  by both individuals and local unions of American Federation

25  of State, County, and Municipal Employees, AFSCME.  The total

1  amount of the claims of all these individuals, as liquidated
2  by the arbitration, was 14.3, but the allowed claim was six
3  million, no interest, no maturity.  It was just a six million
4  lump sum.  We settled those claims for $2 million, which is
5  33 percent of the allowed claim, but it's two million over
6  fourteen, whatever that number is.  The claims for those that
7  are less than 100,000 will be paid in cash.  For those that
8  are over 100,000, their claim is going to be paid in five
9  equal annual installments.  We'll pay interest on those
10 installments, and the maturity is on the fourth anniversary
11 of the effective date.
12 Q   And what is the recovery percentage for these claimants?
13 A   Two million over six million is 33 percent.
14 Q   And what objective factors justify this settlement?
15 A   Ultimately that the claims seem to have some validity.
16 They have been ruled on by an arbitrator.  If you look at --
17 if you actually read the arbitration award, it goes into some
18 detail about the background of the claims; that ultimately
19 these claims -- the 14.3 million might make its way to the
20 city, so, relatively speaking, paying two million for a
21 liability that eventually might come to the city indirectly
22 on 14.3 million seemed like a reasonable thing to do.
23 Q   Thank you.
24          MR. SHUMAKER:  You can take that down.
25 BY MR. SHUMAKER:

1  Q   Mr. Orr, you testified yesterday about the city's

2  relationship with Syncora --

3  A   Yes.

4        THE COURT:  Excuse me.  Before we get into that,

5  let's take our morning recess now and reconvene at 10:15.

6  Before we go, I want to give you my judgment about your time

7  reductions and time remaining.  The Court has observed that

8  both sides have been very crisp and efficient in presenting

9  their cases, which the Court appreciates.  Accordingly, even

10  though the city has offered to give back four to five hours,

11  I will only impose a four-hour reduction.

12        MR. SHUMAKER:  Thank you, your Honor.

13        THE COURT:  And, similarly, although the objecting

14  parties offered to give back ten to fifteen hours, I will

15  only impose a ten-hour reduction.  Accordingly, as of this

16  very moment, the city's balance is 31 hours and 45 minutes,

17  and the objectors' is 54 hours and three minutes.

18        MR. SHUMAKER:  Thank you, your Honor.

19        THE COURT:  And now we'll be in recess.

20        THE CLERK:  All rise.  Court is in recess.

21     (Recess at 10:02 a.m., until 10:16 a.m.)

22        THE CLERK:  All rise.  Court is back in session.

23  You may be seated.

24        THE COURT:  You may begin.

25        MR. SHUMAKER:  Thank you, your Honor.

1  BY MR. SHUMAKER:

2  Q   Mr. Orr, now we're on the Syncora settlement.

3  A   Yes, sir.

4  Q   You recall that a settlement was recently reached with

5  Syncora?

6  A   Yes.

7  Q   And it settled disputes between Syncora and the city?

8  A   A number of disputes.

9  Q   And what kind of a claimant was Syncora?  I mean what was

10  the source of their claims?

11  A   Syncora's source of claims was both as a bond insurer and

12  as a holder of the certificates of participation, the COPs.

13  Q   Now, there were disputes settled in this settlement?

14  A   Yes.

15  Q   And what disputes were those?

16  A   There were a number of disputes.  Some of them played out

17  in litigation.  They filed litigation regarding eligibility.

18  They filed litigation regarding the city's ability to use its

19  casino gaming revenue.  They filed litigation regarding the

20  city's right to enter into the quality of life loan.  I think

21  they had filed litigation regarding just about everything we

22  were trying to do in the course of the bankruptcy, but there

23  were five or six pieces of litigation, I think, in which they

24  were involved.

25  Q   And so those were -- was a mediation issue one of those?

1  A   Oh, yeah.  Oh, yes, regarding the propriety of the

2  mediation and how it was conducted, and I think that's played

3  out in the court.

4  Q   And lighting?  Was there a lighting issue?

5  A   There was a lighting bond issue.  There were -- yes.

6  Q   Thank you.  Now, so that was the litigation that was

7  filed.  You were saying that there were other disputes that

8  were not a part of litigation.

9  A   Right.

10  Q   Could you explain that?

11  A   Well, the other disputes were the obligation of the city

12  to pay on the COPs and the obligation of the city's defaults

13  as well, so Syncora had been a very active litigant.

14  Q   And fair to say that they had objected to the plan of

15  adjustment?

16  A   Yes.  I think that's a fair characterization.

17  Q   And was that objection resolved as part of this -- is

18  proposed to be resolved as part of the settlement?

19  A   Yes.

20  Q   Is there anything relating to the UTGO settlement that --

21  A   Oh, yes.

22  Q   -- comes to mind?

23  A   Yeah.  They had objected to the UTGO settlement and a

24  percentage of recovery under that as well.

25  Q   With respect to that panoply of issues, what was the

1   city's position with regard to that?

2   A   Well, the city's position was that in addition to being a

3   very ardent opponent, that some of their positions were

4   unfounded, particularly with regard to the quality of life

5   loan, the gaming revenue, the eligibility appeal, the

6   mediation process.  We thought it was a little bit unfair the

7   way they characterized that and that we had been contesting

8   it up and down the line.

9   Q   Now, I want to ask you about the terms of the settlement,

10  but I want to first focus on the fact that a settlement was

11  reached --

12  A   Yes.

13  Q   -- and it resolved all the claims that you just

14  described, but if the litigation you just described had

15  proceeded, how would you -- could you characterize the claims

16  as complex or not complex?

17  A   Some of the claims were complex, but they certainly were

18  going to be intensely litigated.  We were well aware of

19  Syncora's motivation.  I met with a principal from Syncora,

20  LeBlanc.  This sort of theme with Syncora started almost

21  immediately after the June 14th proposal with the letter

22  exchanges that we've talked about previously in this

23  proceeding.

24  Q   That was back in 2013, June of 2013?

25  A   I'm sorry.  June 2013 proposal and that exchange, and

1   that continued basically throughout the past year, year and a

2   quarter now, so we expected it to be complex, lengthy, and

3   expensive.

4   Q   If the litigation had proceeded, the various litigations

5   had proceeded, how would you characterize the expense that

6   that might have been for the city?

7   A   It was significant.  At one point I became aware of their

8   run rate, and it was significant, so we were probably --

9   given the number of cases that were involved, that was a

10  matter even unto itself.

11  Q   How would you characterize the length of time it might

12  have taken to resolve all of the different litigation

13  disputes you described?

14  A   Oh, I had no -- I expected them to go all the way up

15  through appeals through the Supreme Court.  I expected it to

16  continue on for several years.

17  Q   Was this litigation and these disputes -- were they

18  having an impact on the city?

19  A   Yes.

20  Q   How?

21  A   Well, there was both an operational impact -- we kind of

22  propose a plan and go forward with some of the -- some of the

23  litigation outstanding because we can plan accordingly, and

24  also some of our credit grantors would want some finality

25  with regard to some of the allegations, the gaming revenue

1  appeal and things along those lines, but also just from a

2  expense rate, it was costing the city not an insignificant

3  sum of money to defend the city from those claims and that

4  litigation -- those litigations.

5  Q   Do you have any sense of how much?  Did you piece it out?

6  A   We ballparked it.  We did not do a specific analysis, but

7  it was -- we anticipated it was going to be over five to $10

8  million.

9  Q   You reached a settlement, but if Syncora had prevailed on

10  its claims or its appeals, what potential consequences were

11  there to the city?

12  A   Well, depending upon what claims or appeals it would have

13  prevailed on, they could have been catastrophic for the city.

14  Q   Could you give some examples?

15  A   Sure.  If you were trying to unwind the mediations or

16  trying to expose the discussions in the mediations and the

17  parties' respective positions, that would have been very

18  problematic because you're unwinding a number of settlements.

19  If you were going to eligibility and the issue of how that

20  was conducted, that could hit a reset button that we go back.

21  If you're dealing with the right to gaming revenue, as I

22  think I've said before, that's somewhere in the neighborhood

23  of 20 percent of the general fund budget.  That's a

24  significant slug of the general fund budget.  If that was

25  ever imperiled or somehow ever taken away, that would have

1  been very difficult for the city to propose a reasonable plan

2  that would have been confirmable.  There are a number of

3  different positions that were taken which could have been

4  very harmful.

5  Q    Did Syncora -- was there a dispute involving the quality

6  of life loan?

7  A    Yes.

8  Q    Would there have been any impact on the city if Syncora

9  had been successful with regard to its dispute of the quality

10  of life loan?

11  A    Yes.

12  Q    What would that have been?

13  A    Well, the quality of life loan was designed to give the

14  city a head start, a jump-start, if you will, on some of the

15  restructuring initiatives, that $120 million, and we pledged

16  our income tax revenue for that loan.  If they had been

17  successful and we hadn't gotten the loan, then some of the

18  restructuring initiatives that are underway now, lighting,

19  blight, the list of initiatives that CFO Hill testified to

20  and the -- we actually have a schedule of initiatives, and

21  they have a red light, a yellow light, or a green light what

22  they are.  Those would have been stopped in their tracks.

23  Q    Now, conversely, what would have happened if the city was

24  successful with regard to all of the appeals and the

25  litigation and the disputes?

1    A    If the city had been successful in all of that, then we

2    would have continued along the path that we're on now.  We

3    would have reduced -- depending upon the time frame, we could

4    have reduced the expense, legal fees, consulting expense

5    going forward, and we presume that Syncora's position with

6    regard to Class 9 COPs claimants would be treated as

7    unsecured.

8    Q    Did the city -- and the city reached a settlement, of

9    course?

10   A    Yes, we did.

11   Q    Did it do that through the mediation process?

12   A    Oh, yes, yeah.  Mediation was central ironically.

13   Q    Could you share what are the global terms of the city's

14   settlement with Syncora?  And I'm talking high level.  We'll

15   go down.

16   A    Sure.  There are four components essentially to the

17   Syncora settlement.  There's plan treatment, which has

18   certain cash and noncash payments.  There's a option

19   agreement that's involved having to do principally with the

20   Grand Circus garage.  There's a development agreement that

21   Syncora has its operating subsidiary after taking over

22   American Roads -- I think it's called Pike Pointe -- that is

23   a potential developer.  And there's also a cash payment to

24   Syncora to assist them with resolving any potential liability

25   related to the COPs, swaps liability.

1    Q    Is there any aspect of a tunnel in the settlement?

2    A    Oh, and the tunnel lease.  I'm sorry.  I always subsume

3    the tunnel lease in with the development agreement because

4    they affiliate that with that area, but an extension of the

5    tunnel lease as well.

6    Q    Okay.

7             MR. SHUMAKER:  Could you project Exhibit 750 up,

8    please?  Thank you.

9    BY MR. SHUMAKER:

10   Q    Mr. Orr, are you familiar with this document?

11   A    Yes.

12   Q    What is it?

13   A    This is the slide deck that Ms. Ball -- Mrs. Ball used in

14   proffering to the Court last week the settlement with

15   Syncora.

16            MR. SHUMAKER:  Your Honor, the city would offer

17   Exhibit 750 into evidence for demonstrative purposes only.

18            THE COURT:  Any objections?

19            MR. WAGNER:  No objection, your Honor.

20            MR. SOTO:  No.

21            THE COURT:  It is admitted for that purpose.

22       (City Exhibit 750 received at 10:27 a.m.)

23            MR. SHUMAKER:  Thank you.

24   BY MR. SHUMAKER:

25   Q    Let's go to page 2, and this is what you were just

1  describing; correct?

2  A    Yes.

3  Q    Let's walk through the settlement.  First of all, with

4  regard to the development agreement, how would you summarize

5  what the development agreement entails for the city and for

6  Syncora?

7  A    Because Syncora has an operating company and they have

8  approximately 100 employees here in the City of Detroit and

9  are managing and operating the Windsor city side of the

10  tunnel, they also were interested in development

11  opportunities in real estate in the city to sort of grow

12  their business and become a partner with the city in

13  development, which was attractive to the city as well to have

14  another party interested in developing previously undeveloped

15  and fallow pieces of property, particularly along the

16  Jefferson Avenue corridor, so the development agreement has,

17  in my mind, sort of two components.  It has an option for

18  Syncora to have -- and this can change -- to have access for

19  a certain option price of certain pieces of property,

20  particularly along the East Jefferson Detroit River corridor,

21  but it also has an option agreement related to Grand Circus

22  tunnel.  That option agreement has a one-year trigger on it

23  where they have to exercise the option.  If they do, it gives

24  them a 30-year lease on the Grand Circus tunnel.

25  Q    Okay.  Let me hold you --

1   A   Grand Circus garage.

2   Q   First of all, before we get into the tunnel and -- let's

3   focus on that development agreement.

4   A   Okay.

5   Q   And the first option you were talking about with regards

6   to properties in certain areas, could you drill down on that

7   a little bit --

8   A   Sure.

9   Q   -- more for the Court?

10  A   They have a period of time, roughly maybe 18 months --

11  and I'm drawing from memory -- to option out certain

12  properties that were listed in the schedule to the

13  development agreement.  That schedule may change from time to

14  time depending upon availability of the properties, city-

15  owned properties that are available to them, but they do have

16  an obligation of exercising the option to develop those

17  properties within a year option, 18 months, develop the

18  properties going forward.

19  Q   Do you know how long Syncora will have that option to

20  develop these properties?

21  A   I think the -- I think it may be five years.

22  Q   Do you recall how much acreage is involved?

23  A   I do not.  I recall there was a debate regarding parcels

24  versus lots, that originally we had a discussion regarding

25  parcels, which was smaller.  Then we cleared that up to

1  include lots.  I don't know an exact number, but it's fairly

2  significant.

3  Q    Okay.  And so if Syncora exercised an option on these

4  parcels of land, what is it obligated to do?

5  A    To develop them, to build them, parking structures,

6  office buildings, apartment buildings, to improve the land.

7  Q    And is there a time period within which it must develop

8  that property if it exercises its option?

9  A    Yes.  I believe it's 18 months.

10        MR. SHUMAKER:  Could we go to the next page, please,

11  of this exhibit?  Thank you.  Go to the fourth bullet and

12  just highlight the first sentence.

13        THE WITNESS:  Fifteen months.

14  BY MR. SHUMAKER:

15  Q    Does that help you, Mr. Orr, with how long Syncora --

16  A    Yes.  Thank you.

17  Q    -- has to develop --

18  A    Yeah.  I may be recalling some initial discussions, but

19  the developer has 15 months to begin development or it comes

20  back to the city.  They must complete the construction

21  within -- I think it's three years, three months, is it, to

22  complete the development.

23  Q    Okay.  Thank you.

24  A    Um-hmm.

25  Q    Now, what happens if Syncora does not develop the

1  property within 15 months?

2  A   The property comes back to the city.

3  Q   Now, you talked about the parking garage option, and you

4  say it was a -- it's a one-year option.

5  A   It's a one-year option to exercise on the parking garage.

6  If they do, they get a 30-year concession agreement.

7  Q   Okay.  And what do you mean by "concession agreement"?

8  What does that entail?

9  A   A concession to operate the parking garage.

10 Q   And where is the Grand Circus parking garage?

11 A   Grand Circus is literally underneath Grand Circus Park,

12 which is right in the center of the city off of Woodward.

13 It's a very central location.

14 Q   If Syncora exercises the option within a year, what is it

15 obligated to do with regard to the Grand Circus parking

16 garage?

17 A   It then has an obligation to expend $13-1/2 million in

18 capital expenditures to improve and repair the garage.  It's

19 in -- the cement -- if you go in there, the cement is

20 literally falling down and the rebar is expanding, so it's --

21 it needs a lot of TLC, but they have an obligation to spend

22 $13.5 million within, I believe, the next five years.

23 Q   Are there any limits on these -- and when you say a

24 concession, does Syncora get the revenues?  Is that what you

25 mean?

1 A    Yes.  They get to run the garage.  They have to spend
2 13.5 million.  They get to recover that expense first and
3 then another 40 percent, so 140 percent of that number in
4 revenue before they have an obligation to pay the city rent,
5 and I think that rent is 25 percent of their net operating
6 income after recovering their capital costs.
7 Q    I'm a little thick.
8 A    Um-hmm.
9 Q    Could you explain again how the revenue situation
10 works --
11 A    Sure.
12 Q    -- just so I understand?
13 A    One of the things is --
14 Q    And I want to make sure the Court understands.
15 A    Okay.  One of the things the city was concerned about in
16 any of these transactions, specifically ones having to do
17 with the development, that there was an opportunity for at
18 some point the city to benefit both directly in terms of
19 potential payments but also indirectly in putting property
20 back on the tax rolls, making it performing.  So as a
21 component of this transaction, because we thought -- and I
22 think Syncora agreed -- they have an operating company.  It
23 works in tunnels, so it's used to working in subterranean
24 structures, so the Grand Circus garage seemed to be an
25 appropriate opportunity for them to expend $13-1/2 million in

1   capital expenditures to repair that garage.  That's an

2   estimate of what it would take to repair it.  They have to

3   exercise the option within a year.  They have five years to

4   complete the expenditure on the garage for capital

5   improvement.  They then have a period of time, if they're

6   operating the garage, to recover their expenditure a hundred

7   percent plus another 40 percent of that expenditure of the

8   CAPEX and profits to them.  After that, 25 percent of the net

9   operating income starts coming back to the city in the form

10  of rent.

11  Q   Thank you very much.

12  A   Um-hmm.

13      MR. SHUMAKER:  Steve, please go back to page 2.

14  BY MR. SHUMAKER:

15  Q   Let's go to the tunnel lease assumption.

16  A   All right.

17  Q   Could you explain how that's supposed to work?

18  A   Sure.  Syncora, through American Roads -- actually,

19  Syncora has two companies, Syncora Capital, Syncora

20  Assurance, but we call it Syncora -- their subsidiary,

21  American Roads, that they acquired through American Roads'

22  bankruptcy --

23  Q   And what does -- and what does American Roads do?

24  A   American Roads operates roads and tunnels.  It is a

25  contractor or an operator that operates roads and tunnels.

1  Q   And it's currently the contractor on the Detroit to

2  Windsor tunnel?

3  A   Yes.

4  Q   And Syncora owns American Roads?

5  A   And Syncora owns American Roads.

6  Q   Okay.  Please continue.

7  A   Okay.  They are currently -- Detroit owns the Detroit

8  half of the Windsor tunnel.  Windsor owns the Windsor half of

9  the Detroit tunnel.  American Roads is the operator for the

10 entire tunnel.  Previously we did not have access to good

11 information on the status of the tunnel or on the repair

12 protocols that were being used in the tunnel on the Windsor

13 side.

14 Q   Why was that?

15 A   There was a lease negotiation that occurred during the

16 Kilpatrick administration, and it was not as -- perhaps not

17 as helpful as it could have been, and so walled off in the

18 information there was concern for a long time on the Detroit

19 side that perhaps we were not getting both the information

20 but also the level of operation and maintenance for the

21 tunnel that we should.  As you might imagine, the tunnel is

22 underground.  It has membranes, I've since found out, that

23 protect it from leaking that have the tiles coming off.

24 Somewhere in the neighborhood of 5,000 commuters from Canada,

25 principally healthcare workers, commute every day during that

1  tunnel, so it's used frequently on a regular basis, and it

2  has to be maintained.  We were concerned that as a component

3  of our lease, we were not getting the appropriate amount of

4  attention and maintenance on the tunnel just because we did

5  not, as a component of our lease, have access to that

6  information, so one of the things that we wanted in the

7  tunnel lease was get access to information both about the

8  number of cars, the revenue that's coming in, but also the

9  maintenance schedule that's being exercised on the Windsor

10 side so it would match up on the Detroit side, things like

11 the filters and the blowers that have to be changed,

12 scrubbing out some of the detritus from automobiles, that

13 sort of stuff, so it actually operates well as a tunnel.

14 Q   Will Syncora have obligations in that regard,

15 maintenance --

16 A   Yes.

17 Q   -- under this assumption?

18 A    Yes.  Their obligations will be matched up so that the

19 Detroit side gets the same type of attention and maintenance

20 that it gets on the Windsor side.  In addition, that tunnel

21 lease was coming up for termination -- excuse me -- in 2020

22 net, so Syncora had a concern about the extension of the

23 lease as well as the city so that you have an operator going

24 forward in your out years, so one of the things that was

25 considered was that the city would assume the tunnel lease

1   and as a component of that assumption extend the tunnel lease

2   for another 20 years out to 2040 with American Roads

3   and/or -- as the operator.

4   Q   Okay.  I want to ask you about the third bullet, the

5   settlement of Syncora COPs, but I'd like to show you Exhibit

6   737, which is another demonstrative that Mr. Malhotra

7   testified about.  Now, could you share with the Court the

8   general terms of the settlement with regard to Syncora's

9   Class 9 claims?

10  A   Sure.  The Class 9 claims are the certificates of

11  participation, COPs claims, nominal value of roughly $1.47

12  billion.  Syncora's component at times have been thought to

13  be somewhere in the neighborhood of $480 million or so.  To

14  settle those claims we allowed a claim of $354 million.

15  There were -- on those certificates of participation they

16  held interest rates that are listed there at 4.0 to 4.95

17  percent, and it showed the maturity of the series of COPs

18  claims from 2025 to 2035.  The settlement encompasses for

19  class treatment two -- well, three principal components.  One

20  is that Syncora will get a portion of the new B notes that

21  were authorized by the Emergency Loan Board last week in a

22  total amount of $632 million.  Their portion of that would be

23  $23.5 million.

24  Q   Slow down on those numbers, please.

25  A   I'm sorry.

1   Q   Could you give those again?

2   A   I'm sorry.

3   Q   $632 million worth --

4   A   Sorry.  The new B notes will be issued provided the plan

5   is confirmed and goes effective in the total amount of $632

6   million.

7   Q   These are new B notes?

8   A   These are new B notes, new notes.  Syncora's portion of

9   those notes will be $23.5 million.  Those notes have an

10  interest rate of four percent for the first 20 years and it

11  says here six percent for the last 10 years.  They have a

12  term, a maturity of 30 years, so assuming the plan is

13  confirmed and is effective by January 1, 2015, they'll run

14  out to 2045.

15  Q   Okay.  How about the new C notes?

16  A   The new C notes are --

17  Q   What are they?

18  A   The new C notes are new bond instruments that were also

19  approved in the nominal amount of $88 million, but they will

20  be paid through parking revenue.  Syncora's portion of those

21  notes is $23.3 million.  Those notes will gain interest at

22  five percent, and they have a shorter maturity at 12 years

23  and should be ultimately satisfied by the year 2027, so there

24  are three components to the class treatment for Syncora, the

25  $23.5 million for -- of the B notes, the $21.3 million of the

1   new C notes, which is affiliated with parking revenue, and

2   then there's a voucher, a settlement credit of $6.3 million

3   that they can use to bid on any city asset such as parking

4   lots, other lots, so on and so forth, but that amount cannot

5   account for more than 50 percent of the bid amount.  So, for

6   instance, if they wanted to use it all, the bid amount would

7   have to be at least $12.6 million.

8   Q    Does the Syncora settlement end all of the litigation

9   between the city and Syncora?

10  A    Yes.  It is a global settlement.

11  Q    What dollar value did Syncora receive on account of

12  ending litigation on the various issues, in particular the

13  swaps claim?

14  A    Right.  There's litigation affiliated with the propriety

15  of Syncora's insurance obligation and potential liability

16  against them by some of the swaps counterparties.  Another

17  component to settle that litigation was $5.2 million cash

18  payment that would be paid within a certain period of time

19  should we get an effective date.

20  Q    And just so the record is clear, you said that the C

21  notes will be paid by parking revenue.  Could you expound on

22  that a little bit, explain what that means?

23  A    Right.  It means that there's -- the city has six parking

24  garages, parking structures, from which it intends -- it has

25  been studying and intends to generate a revenue stream.  That

1  revenue stream will be used to service these C notes.  The

2  total amount of the C notes is $88 million, so it'll be used

3  to service the whole stack of the C notes, but Syncora gets a

4  portion, roughly a quarter of that C note.

5        MR. SHUMAKER:  You can take that down, Steve.

6  BY MR. SHUMAKER:

7  Q    Did the settlement provide benefits to the classes of

8  creditors in the bankruptcy that are not in Class 9?

9  A    Yes.

10 Q    How did it do that?

11 A    Well, there's a portion of the COPs trust that set aside

12 roughly $162 million that will come out of that $632 million

13 funding.  It is divided between unsecured, the LTGOs, and the

14 OPEB claimants along certain percentages or certain dollar

15 values.  They will receive -- they will receive a portion of

16 that trust payment as a result of the Syncora settlement.

17 Q    Do you have any rough percentages that they'll get?

18 A    Yeah.  The initial percentages were ten for the

19 unsecured, fifteen for the LTGOs, and sixty-five for OPEB.

20 Q    Are those definitive numbers or --

21 A    Yeah, yeah.  I think they're definitive, but they may

22 have been revised in the settlement, so the percentages may

23 change a little bit based upon dollar value.

24 Q    What objective factors justify this deal with Syncora

25 from the city's perspective?

1  A    Well, it is a global settlement, and it resolves all of
2  the, I think, six pieces of litigation with which we have
3  been involved with Syncora.  It removes their opposition to
4  the plan, removes their -- I think they filed a proof of
5  claim, takes care of that.  It certainly removes risk to the
6  city and its ability to present a plan before this Court that
7  we believe is confirmable and will go effective and is
8  feasible going forward.  It requires them to stand down on
9  their opposition here in court.  It requires plan support
10 going forward that they will be classifying some of those
11 claims to vote, and it requires them to, in addition -- as a
12 now partner with the city in the development agreement, they
13 will assist the city in bringing previously undeveloped and
14 fallow pieces of land into both operation so it enhances the
15 development envelope of the city along the riverfront but
16 also helps bring those properties back in on the tax rolls to
17 the city once they are developed, and it also helps us repair
18 a garage that is central to the city that is a very prime
19 location considering the amount of development surrounding
20 the garage.  In addition, on the Grand Circus garage, there's
21 an obligation for them to make parking lot spaces available
22 to developers of surrounding buildings because their tenants
23 are going to need parking on a reasonable basis so that
24 they're able to develop the garage but aren't necessarily in
25 a position to exploit that central location at the expense of

1    some of what we hope to be the new tenants and residents in

2    that area of the city.

3    Q    How about with regard to the tunnel agreement portion of

4    the deal?  What objective factors with regard to that support

5    the settlement?

6    A    Well, here again it gives us information that we

7    previously didn't have.  It puts an obligation that the

8    repair and maintenance obligations for the tunnel will be on

9    par with those for Windsor.  It allows us for a period of

10   time to have a capital expenditure.  I think Syncora is going

11   to spend up to $8 million on CAPEX on improving that tunnel,

12   and they will not have a rent obligation until they expend

13   that comparable amount.  It gives us certainty that the

14   tunnel will be maintained and available particularly as an

15   important international crossing for local traffic because

16   the new ITC, International Trade Crossing, that Canada is

17   building from us presumably will take care of some long-term

18   interstate traffic or international traffic, but that tunnel

19   is very important to the city for local traffic.

20   Q    Unless you know of another settlement, I'm going to move

21   on to other subjects.

22   A    You pretty much got me.

23   Q    Okay.

24   A    Okay.

25   Q    Fair enough.  You testified through discussing the

1  settlement that -- and earlier that there are varying claim
2  recoveries among the city's class of creditors; right?
3  A    Yes.
4  Q    And how did you become familiar with those creditor
5  recoveries generally?
6  A    Well, during the course of negotiations and discussions,
7  obviously the recoveries are analyzed, and they're eventually
8  embodied in the issues of the plan as it evolves and amended.
9  And it states, as it's required to do, what those potential
10 recoveries could be.
11 Q    And counsel handles that part of it?
12 A    Counsel and the -- and my army of consultants.
13 Q    Now, in connection with all these deals that you've just
14 described for the Court, what was your approach to reaching
15 these deals with creditors that resulted in these varying
16 recoveries?
17 A    We understood that all creditors were taking the position
18 that their claims should be paid in full.  All of them were
19 very, very strong in that position.  We tried to approach it
20 from the standpoint of what would be affordable to the city
21 considering that one of the components of Chapter 9 is to try
22 to push out service delivery for a city that's both,
23 unfortunately, service delivery insolvent in so many areas.
24 We tried to make sure that, as I have an obligation to do,
25 whether it's called feasibility in federal law bankruptcy or

1   it's called sustainable fashion under 436, that whatever we

2   proposed would be sustainable, that it wouldn't be a flash in

3   a pan or we would create other problems down the road.  And

4   contrary to what some creditors might be, we tried to reach

5   settlements that would be fair sort of under all the

6   circumstances that we would deal with, so I would say our

7   approach generally was affordable -- whether it was

8   affordable by the city, whether it was sustainable in the out

9   years, whether it was fair under the circumstances.

10   Q   Now, were there objective justifications for the

11   percentage recoveries that each creditor class received in

12   the plan?

13   A   Yes.  I tried to talk about some of those.

14   Q   What were those objective justifications?

15   A   Well, when we go through this, we're trying to do it from

16   a standpoint of, you know, business justifications.  Syncora

17   settlement.  Does it enhance the properties that are fallow?

18   OPEB.  Do we meet our obligations?  We try to look at the

19   expectations -- relative expectations of the parties, of the

20   creditors coming into it.  You know, some may be better able

21   to have handicapped the risk that are involved than some

22   others, and we try to do it from the standpoint of the

23   totality of all the circumstances when you get through

24   affordability and everything else, you know, what can we do,

25   what's feasible, what can we end up -- what gives the city a

1  chance to have, you know, some breathing room so that it can

2  rehabilitate itself.  Those are sort of considerations that

3  we took.

4  Q   Okay.  So --

5          THE COURT:  Counsel, I've been advised you need to

6  move the mike closer to you.

7          MR. SHUMAKER:  Oh, sorry.

8          THE COURT:  Maybe even move the stand closer to you,

9  and then maybe the mike will be closer to you also.

10          MR. SHUMAKER:  Hopefully that's better.

11          THE COURT:  Yes.

12          MR. SHUMAKER:  Thank you.

13  BY MR. SHUMAKER:

14  Q   So the objective justifications were the business

15  justifications, the relative creditor expectations, and then

16  totality of the circumstances.  Am I summarizing that

17  correctly?

18  A   Yes, sir.

19  Q   Okay.  Let's talk about that first set, the business

20  justification.  Now, the plan provides higher recoveries for

21  Classes 10 and 11 as compared to the COPs holders; correct?

22  A   Yes.

23  Q   And the plan provides higher recoveries for Classes 10

24  and 11 than for the UTGOs and the LTGOs; correct?

25  A   Yes.

1    Q    And just for the record, Classes 10 and 11 are --

2    A    10 is PFRS Retirement System, and 11 is GRS Retirement

3    System.

4    Q    Thank you.  Could you share with the Court what -- the

5    business justifications for Classes 10 and 11 receiving

6    higher recoveries than Class 14?

7    A    Sure, 14 being the unsecured.

8    Q    Thank you.

9    A    Your Honor, we generally tried to look at -- well, first

10   we were getting a proposal with regard to the DIA settlement

11   where it was an all or none proposal.  Either we take the

12   $816 million that we did not have when we filed bankruptcy in

13   July of 2013 or we don't, so that was a benefit coming to us

14   which was certain, and it would inure to the benefit of those

15   classes, and it wasn't our money.  It wasn't the city's

16   money.  But in addition, we tried to look at what we're

17   trying to accomplish in the bankruptcy, and as I said,

18   roughly 6,000 of the employees of the city are on the civil

19   side, but of that 6,000 almost two-thirds are public safety,

20   so you want to incentivize both your civil workers but also

21   your public safety workers to provide the services that are

22   necessary in the city so that the citizens and hopefully new

23   residents that come into the city get the level of services

24   that they expect.  Good, bad, right, or wrong, one of the

25   things that you have to take into consideration is are you

1    meeting their needs on the pension side because it's been my

2    experience that the active employees look at how they're

3    going to be treated during their retirement as a component

4    of --

5           MR. SOTO:  Objection, your Honor.  There's

6    absolutely no foundation for this testimony.  When he says

7    "it's been my experience," we have nothing to base that on.

8           MR. SHUMAKER:  Your Honor, the witness has testified

9    about all the people that he talked about at the very

10   beginning of yesterday, and he was asked what the business

11   justifications are.  I think this is completely appropriate.

12          MR. WAGNER:  Your Honor, I'd just note my objection

13   to the extent it's being offered for the truth on hearsay

14   grounds.

15          THE COURT:  All right.  Both objections are

16   overruled.  You may continue, sir.

17          THE WITNESS:  Yes, sir.  And that certainly in

18   discussions with folks, they had expressed a very strong

19   concern.  I think it's been fairly widely reported by a

20   number of people.  There have been certainly print and --

21          MR. SOTO:  Objection, your Honor.  Hearsay.  This

22   time it's even beyond what he did -- what he was talking

23   about before.

24          THE WITNESS:  I can --

25   BY MR. SHUMAKER:

1  Q   Not specific conversations, your general understanding.

2  A   My general understanding is that certainly the issues of

3  pensions both on the general retirement side and police and

4  fire retirement side are very important to active duty

5  workers and that they were very concerned about how that was

6  going to be handled.

7  Q   When we were talking about the OPEB settlement, you

8  talked about the importance of getting support for the plan

9  from Classes 10 and 11.

10 A   Yes.  That was very important to get their vote.

11 Q   Was that one of the business justifications?

12 A   Oh, without a doubt.  You know, these were hard-fought

13 negotiations, but a component was plan support.

14 Q   So let's talk first about the impact of the higher

15 recoveries and its relationship to the civil side, as you

16 said, the public safety and other workers.  How would that

17 work?  How would that address that side, the civil side?

18 A   Well, it would certainly -- and when I say "civil," I'm

19 using civil as opposed to enterprise fund, not civil as

20 opposed to civil service versus uniform.  I just -- I wanted

21 to be clear when I say the 6,000 or so workers that are on

22 that side of the house as opposed to the enterprise fund.  It

23 was justified because those folks -- you know, they work very

24 hard.  They're represented by strong interests, and they have

25 for years made a decision that they would work in the city --

1    I think it's no surprise and it's been testified here --

2    oftentimes at fairly low rates with the expectations that

3    their pensions would be preserved, and also their view for

4    years was the Constitution protected those pensions, and they

5    relied on that protection.

6           MR. WAGNER:  Your Honor, again, I move to strike the

7    out-of-court statements to the extent they're being offered

8    for the truth.

9           MR. SOTO:  And, your Honor, I would object on

10   relevance and move to strike.  I was waiting to hear where we

11   were going with it, but it sounds to me like these are the

12   same kind of human factors that were considered irrelevant by

13   this Court previously.

14          THE COURT:  The motion to strike is denied, and the

15   objection is overruled.

16   BY MR. SHUMAKER:

17   Q   Now, these workers, the current workers that you're

18   talking about, are some of them unionized?

19   A   Yes, all of them.

20   Q   Does the --

21   A   Virtually all.

22   Q   -- relationship with those unions factor in in some way?

23   A   Yes.

24   Q   How?

25   A   Well, acutely I mean the unions were the ones that were

1    going to drive the plan support component.  I've since

2    learned that they have strong communication networks with

3    their members, and when they said they drove plan support,

4    they delivered.  They have mechanisms for robo calls and

5    outreach and e-mails and whatnot, so they came through, but

6    they also reflect the concerns of the active duty workers

7    that their pension interests are going to be preserved.  In

8    fact, some of the active duty union representatives were on

9    the Retiree Committee.

10   Q   So what is the basis for your conclusion that active

11   workers are somehow affected by possible cuts to pensioners?

12   A   Oh, my personal experience in discussions, reading, in a

13   number of different ways I've received that position.

14   Q   Could you share some of those ways?

15   A   Sure.  In straight conversations with active duty workers

16   starting with my personal assistant, Eunice, who received a

17   number of phone calls, all of a sudden she became a pension

18   expert apparently in City Hall because everybody was calling

19   her about what this meant.  And on the street as I walked

20   through City Hall or members coming in, I tried to have an

21   open door policy, and I'd talk to anyone and walk into a

22   meeting with union leaders consistently and the e-mails, the

23   deluge of e-mails I received coming up to the vote about

24   these concerns, the pleas, some very unique and sensitive in

25   terms of what we were trying to do in the plan, so I receive

1  it a number of different ways.

2      MR. WAGNER:  Your Honor, move to strike again on

3  relevance, foundation, and hearsay and in one instance

4  hearsay within hearsay.

5      MR. SOTO:  And I join that objection, your Honor.

6      THE COURT:  All right.  The motion is denied.  You

7  may proceed.

8  BY MR. SHUMAKER:

9  Q   Now, you indicated, Mr. Orr, that everyone was calling

10 Eunice.

11 A   Yeah.

12 Q   Eunice is your assistant; is that --

13 A   Yes.

14 Q   And when you say "everyone," did that include active

15 employees?

16 A   Oh, it was mostly active employees, people that she knew,

17 and she'd forward them on to me, and I'd talk to them on the

18 phone or answer e-mails.

19     MR. WAGNER:  Objection, your Honor.  No foundation.

20 I mean Eunice is not here.  We don't know who Eunice spoke

21 with, and, frankly, I don't know Eunice, but I'm sure she's

22 wonderful.  I think it's all based on hearsay.

23     THE WITNESS:  She is.

24     MR. MCCARTHY:  We can stipulate that Eunice is

25 wonderful.

1    THE COURT:  All right.  All right.  Settle down.

2  The objection is overruled.  Let's proceed.

3    MR. WAGNER:  Your Honor, just note my continuing

4  objection.  I'm not going to make the objection every time,

5  but continuing objection to this line.

6    THE COURT:  That's fine.  Would you like to join in

7  that?

8    MR. SOTO:  Yes, your Honor.

9    THE COURT:  All right.  Yes?

10    MS. O'GORMAN:  Yes.

11    THE COURT:  Okay.

12    MR. SHUMAKER:  Thank you, your Honor.

13    THE COURT:  Go ahead.

14  BY MR. SHUMAKER:

15  Q   And did you have direct communications with active

16  workers on the subject?

17  A   Yes.

18  Q   Do you recall any particular instances of active city

19  employees expressing concerns about pension cuts that were

20  proposed?

21  A   Oh, yes.  I saw -- there were demonstrations at one

22  point.  I wouldn't say daily, but they were fairly regular

23  across the street on Hart Plaza.  I can hear them from my

24  office.  And then from time to time as I drive around the

25  city I remember one incident we're out on Grand River by

1   Boston Edison, and there are fire fighters out on the trucks.

2   I wonder if they were on duty, but they were out on the

3   trucks at that time with T-shirts, red T-shirts saying,

4   "Don't touch our pensions. We're 100-percent funded," and

5   they were handing out leaflets to drivers. It was sort of

6   like a voting campaign, and there were several trucks. I

7   mean that had happened at places around the city that I saw,

8   so there was a lot of activity in that regard.

9   Q   How would you characterize their morale as you observed

10  it?

11  A   They were angry. I'd heard from some of them. Some of

12  them on Mayor Bing's detail actually expressed their concern,

13  but their morale was -- they were very concerned, very

14  concerned.

15  Q   You talked about the importance of unions. How did, you

16  know, providing higher recoveries to Classes 10 and 11 impact

17  the city's relationship with its unions?

18  A   Well, the unions have consistently expressed that they

19  view pension benefits as being protected by the Constitution.

20  They were very concerned and very agitated when any proposal

21  came out that attempted to reduce those payments in any

22  manner, whether it was the COLA, whether it was the actual

23  payments themselves, and that they had voiced a great deal of

24  concerns in meetings. Some of them were very -- some of the

25  meetings were very heated, I would say.

1  Q   And you talked about the support of Classes 10 and 11 for

2  the plan.  How will providing higher recoveries to Classes 10

3  and 11 help confirm the plan?

4  A   Well, it already has.  I mean as a component of those

5  settlements, Classes 10 and 11 were obligated to provide plan

6  support -- that is, turn out their members -- and they did.

7  Q   It's not that light, is it?

8          THE COURT:  It's below us?  All right.  It sounds

9  like we are investigating it.  One second, please.  All

10 right.  Let's see if we can proceed and make some more

11 progress here.

12         MR. SHUMAKER:  Certainly.  Excuse me.

13 BY MR. SHUMAKER:

14 Q   Mr. Orr, you were sharing with the Court before we were

15 mildly interrupted about how the -- settling the -- how

16 help -- higher recoveries for Classes 10 and 11 would help

17 confirm the plan.

18         THE COURT:  All right.  Let's pause again.  Okay.

19 Thank you.  Do you know whether they can get them to stop, or

20 is this going to continue all day?  Good.  All right.  Let's

21 take a recess.  Tim, will you let us know when it appears to

22 have stopped?  All right.  We'll be in recess.

23         THE CLERK:  All rise.  Court is in recess.

24     (Recess at 11:04 a.m., until 11:17 a.m.)

25         THE CLERK:  All rise.  Court is back in session.

1    You may be seated.

2          THE COURT:  Looks like everyone is here.  You may

3    proceed.

4          MR. SHUMAKER:  Thank you, your Honor.

5    BY MR. SHUMAKER:

6    Q    Mr. Orr, I'm going to ask the question that you were

7    trying to deal with before we broke again, but I do want to

8    just return to one point when you were talking about your

9    discussions with active workers and your interactions with

10   active workers with regard to the effect of pension cuts on

11   them.  My question is simple.  Did you consider that a part

12   of your job --

13   A    Yes, absolutely.

14   Q    -- to interact with active workers?

15   A    Yes.  The 36 mandates that I have make decisions in that

16   regard, and I have to interact with people to make those

17   decisions, yes.

18   Q    Is part of your job to do that?

19   A    Yes.

20   Q    Part of the regularly conducted business activity that

21   you did as the emergency manager?

22   A    Yes.

23   Q    Now back to my question.

24   A    Yes.

25   Q    How will providing higher recoveries to Classes 10 and 11

1  help confirm this plan?

2  A   Well, in a sense it has.  It already has.  The plan

3  support obligation was that the leadership of those classes

4  would drive the votes, and they did.  They voted on average

5  in the 80-percent range on Classes 10 and 11.

6  Q   And with respect to Classes 10 and 11, was there anything

7  about their buy-in that was particularly helpful?

8  A   Yes.  Having the buy-in of the pensioners in terms of

9  voting and going forward settles down some of the issues I

10  talked about yesterday in terms of coming into the city,

11  getting people settled, allaying their concerns that somehow

12  I was going to leave them in a city where people are very

13  concerned about compensation, leave them in a difficult

14  position.

15  Q   Did you consider the claims being advanced by Classes 10

16  and 11 somehow stronger or weaker than other classes?

17  A   Well, I thought that their claims, in particular,

18  regarding the state constitutional protections and that the

19  attorney general certainly believed that their claims were

20  entitled to different protections, that sort of direct issue,

21  because it concerned the litigation and the propriety of the

22  constitutional issue.  I felt very strongly that federal law

23  trumps state law.  I'd done that in federal government, New

24  York state rent control law and California state eschew law

25  in several instances.  We did that in the Chrysler case.  We

1   preempted state dealer's laws.  But, nonetheless, I knew that
2   they felt very strongly about those issues going forward but
3   also indirectly resolving that issue to incentivize current
4   workforce to continue working for the city seemed to me the
5   appropriate thing to do.
6   Q   Now, when you were talking -- when I mean testifying
7   earlier about the grand bargain settlement, you referenced
8   going to Lansing to talk to the state legislature.  Do you
9   recall that?
10  A   Yes.
11  Q   When you testified there, did the issue of the potential
12  impact to the state if there were cuts to the pensions come
13  up?
14  A   Well, there were two components to Lansing.  One was
15  individual meetings and caucus meetings, and another
16  component was testimony to the subcommittee, so on both of
17  those functions, both in -- and I think I met with every --
18  just I think I met with every state legislator, my team and
19  I.  In both of those components the issue came up, yes.
20  Q   And was anything expressed to you in some way about the
21  state's position on the pension claims?
22  A   Yes.  There was -- on both sides I sensed that there --
23  you know, there's a House caucus and there's a Republican
24  caucus just like national, but on both sides they were very
25  concerned about not just Detroit but setting a precedent of

1 state obligations for other municipalities in the state and

2 what that could do to the state's budget.  There was a lot of

3 concern expressed about that.

4 Q    How would the state be responsible for pension cuts?

5 A    Well, the concern was if there was ever a determination

6 established that Article IX, Section 24, was effective in a

7 bankruptcy case or even outside of a bankruptcy case, that

8 perhaps other municipalities would view that as an

9 opportunity to come to the state and, you know, reassess

10 their underfunding obligations and demand that the state fund

11 those.

12 Q    Now, the second, I believe, if I check my notes, second

13 objective justification -- sorry -- that you talked about for

14 providing higher recoveries for Classes 10 and 11 were

15 creditor expectations; correct?

16 A    Yes.

17 Q    I want to talk -- ask you a few questions about that.

18 Fair to say that the city has both financial creditors and

19 nonfinancial creditors?

20 A    Yes.  That's a fair characterization.  We have creditors

21 that are financial institutions and finance-related, and then

22 we have creditors that are more in the worker class of

23 creditors.

24 Q    So the worker class are the nonfinancial creditors?

25 A    Yes.

1  Q   So let's talk about the financial creditors.  Who are
2  they?
3  A   Well, the financial creditors are both our lenders, our
4  bond insurers, bondholders and the like.
5  Q   So could you unpack for us what you meant by saying that
6  creditor expectations entered into your thinking when putting
7  forth a plan that gave higher recoveries to Classes 10 and 11
8  than the COP holders?
9  A   Sure.  When I look at the expectations of the relative
10  parties, I'm well aware that financial creditors have
11  processes, procedures, due diligence, underwriting, analyses,
12  access to ratings agency reports and proprietary reports
13  regarding debt issuances and are able to, on average -- even
14  not on average -- I think it's reasonable to assume that they
15  have a better capacity to handicap the risk and the
16  probability of defaults and repayments as opposed to the
17  average individual or average worker on the city.
18  Q   Again, why is that important that the financial creditors
19  have the ability to do due diligence?
20  A   Well, you're trying to understand or at least trying to
21  balance competing interests as best as you can.  There's a
22  limited -- everybody agrees, even financial creditors or
23  workers -- no one said there was an unlimited pot of money.
24  Everybody agreed that the city had limited access to pay
25  these obligations, so the parties are trying to debate, you

1  know, their priority of interest as opposed to another
2  party's priority of interest, and you're trying to make a
3  judgment call.  And when I look at it, one of the things you
4  try to look at is not just the relative sophistication of the
5  parties or the access to information in trying to balance
6  those concerns.  You look at how those parties are able to --
7  are able to price those concerns.  One of the things that
8  rating agencies and debt issuances do is it prices risk, and
9  those risks are sometimes expressed either in interest rates
10 or in fees, cost, termination fees in the case of swaps,
11 things like those.  The average worker doesn't have that kind
12 of ability to price the costs and the risk or to build into
13 their instruments certain recoveries if those risks rise up,
14 reserve funds, liens, that kind of stuff.  The average worker
15 just expects to be paid, and they're sort of given -- their
16 interests are addressed on a take it or leave it basis.
17 Here's what you get.
18 Q   So you've already testified about interacting with
19 workers and that being a part of your job.
20 A   Yes.
21 Q   What did you learn as you interacted with the workers
22 about their expectations?
23 A   Well, their expectations, many of them longstanding, was
24 that they were going to work for the city oftentimes for
25 decades and that they were going to receive their pension

1   because that's what the city had promised.  That's what the

2   Systems had promised.  That's what the state Constitution had

3   promised.  Many of them had no reason to believe that that

4   was not going to occur, and they had planned their affairs on

5   that basis.

6   Q    Did they have any particular views of their pension

7   rights?

8   A    Yes.  They felt very strongly.  They felt very strongly

9   that they had to be protected and observed.

10  Q    And can you share with the Court how you came to know

11  about these expectations of the workers or the nonfinancial

12  creditors?

13  A    Well, as I said, I interact with workers daily.  We have

14  regular meetings, some planned, some nonplanned.  Some would

15  just pull me aside on the street.  Certainly their union

16  representatives, active duty union representatives -- you

17  know, 436 has an obligation that says that collective

18  bargaining is suspended, but it, nonetheless, has an

19  obligation if you reach any collective bargaining agreements

20  that you have to send them up to the treasury, so it

21  anticipates you're going to have these kinds of discussions

22  about what rights are, and retirement plans and pensions are

23  central to collective bargaining agreements --

24  Q    Have you heard --

25  A    -- so we had that discussions -- we had those

1   discussions.

2   Q   I'm sorry.  Have you heard about those expectations in

3   these proceedings?

4   A   Oh, yeah.  Oh, sure.

5   Q   How?

6   A   Well, you hear the testimony of various parties

7   representing them, the Retirement Systems' representatives as

8   well.  I think it's fairly well-stated that that's their

9   expectation.

10          MR. WAGNER:  Your Honor, just move to strike his

11  comments on the testimony of witnesses at this trial.

12          MR. SOTO:  I join in --

13          MR. SHUMAKER:  I was saying "these proceedings."  I

14  wasn't saying "this trial."  I was talking about the -- I can

15  be sharper in my question.

16          THE COURT:  Well, but the objection --

17          MR. WAGNER:  Your Honor, just to be -- to refine the

18  objection --

19          THE COURT:  -- was not to your question.  The

20  objection was to the witness' testimony.  I agree that the

21  witness should not recount for the Court what other witnesses

22  have testified to.

23          MR. SHUMAKER:  Understood.

24          THE WITNESS:  Um-hmm.

25  BY MR. SHUMAKER:

1   Q   Mr. Orr, does the city pay Security taxes for its police

2   and fire employees?

3   A   No.

4   Q   Why not?

5   A   There's a provision in federal law where they opted out,

6   and the police and fire opted out.

7   Q   Did this fact enter into your assessment of workers'

8   expectations?

9   A   Yes.

10  Q   How?

11  A   Well, when you talk with the public safety folks and

12  public safety unions, the fact that they may not have a

13  federal safety net for Social Security, Medicare, Medicaid

14  certainly means that their pensions are very important to

15  them in their later years.  That's what they're going to rely

16  on to survive.

17  Q   Let's turn to the expectations of the financial

18  creditors.  Did they ever share their expectations with you?

19  A   Yes.

20  Q   How?

21  A   Oh, they would -- in direct one-on-one meetings, in

22  correspondence, in meetings with their representatives and

23  contractors, they expressed under no uncertain terms that

24  they expected to be paid.

25  Q   And did some, all, none of the creditors -- financial

1  creditors tell you that they were expecting payment?

2  A   I don't think there was any financial creditor that said

3  they were not expecting to be paid.

4  Q   So you've got all of these expectations.  What then

5  justifies proposing to pay nonfinancial creditors in Classes

6  10 and 11 a higher recovery than for certain of your

7  financial creditors?

8  A   I think you try to look at the reasonableness of the

9  expectations under the totality of the circumstances and just

10  try and draw a balance and also in this case the fact that

11  the DIA settlement facilitated a better recovery than

12  otherwise would have been had for some of the -- for Classes

13  10 and 11.

14  Q   Let me --

15        MR. WAGNER:  Your Honor, just move to strike that

16  last piece.  There's been no testimony about that issue, and

17  I believe it's covered by the mediation order.

18        THE COURT:  I don't perceive that.  The motion to

19  strike is denied.

20  BY MR. SHUMAKER:

21  Q   Looking at the third objective justification that you've

22  listed -- excuse me -- Mr. Orr, you were talking about the

23  totality of the circumstances.  What did you mean by that?

24  What's your overall view of the purpose of Chapter 9?

25  A   Well, you know, as you go through all of these reasons

and you're just trying to balance, I think under Chapter 9
under federal law, here again, I have to present something to
this Court that's feasible, but under 436 I have to present
something so the city can get out of receivership that moves
the city forward in a sustainable fashion.  So under both I
have competing -- I have parallel duties under competing
statutes, but under both when you look at the totality of the
circumstances, you know, you're just trying to say, look, in
Chapter -- the reason we're in Chapter 9 is we're trying to
deal with our debt obligations to put the city in a position
to start providing adequate services, and so if you put the
city in a position where all you're trying to do is address
your debt obligations but don't leave enough funds to have
the ability to push out adequate services, you're not
achieving the purposes of the filing for 9, and the issue of
services will continue to decline.  The issues we talked
about today for selling UTGOs and the LTGOs that you don't
want to keep raising rates, and you keep getting less
compliance, and you keep getting people moving out.  The city
lost 225,000 people in ten years between 2000 and 2010.
That's a city the size of Taylor, Michigan, every year, so
anyone who thinks it can't still happen, that cities can't
get smaller, they can.  They have.  Some other cities have.
So you don't want that sort of death spiral, that auguring
down just -- you know, what do sociologists call it?

1   Positive feedback loop.  You keep chasing this, but it keeps
2   causing this.  You don't want to keep raising taxes, keep
3   running people out.  You don't want to keep trying to
4   increase levies.  You keep having people nonpay.  You can't
5   provide services.  You keep reducing costs.  I mean from 2000
6   to today, city employees are down about 2,800 people, a lot
7   of those police and fire, so you've already seen what will
8   happen from 2000 to 2010.  You've already seen what will
9   happen from 2010 to 2013.  You want to stop that.  You don't
10  want to do things that are going to exacerbate or continue
11  that decline.
12  Q   You mentioned that part of what you were looking at was
13  the need to provide services to the city?
14  A   Yes.
15  Q   Another part was dealing with sort of the financial
16  aspects adjusting the debt?
17  A   Yes.
18  Q   Were those the purposes that you had in mind when you
19  asked for permission to file the Chapter 9 petition in these
20  proceedings?
21  A   Yes, among other -- I mean we were trying to deal with
22  our debt obligations.  We were trying to deal with pushing
23  out services to the city.  We're trying to deal with our
24  active duty labor relationships.  We're trying to deal with
25  our legacy pension and healthcare obligations.  All those

1    issues were the reason we asked for permission to file

2    Chapter 9.

3    Q    And are those the goals that you had for the city in

4    proposing this plan of adjustment?

5    A    Yes.

6    Q    Now, how do distributions to creditors, giving more to

7    Classes 10 and 11 than some of the other classes, factor into

8    your view of the overall purposes of Chapter 9 that you've

9    just described?

10   A    Well, here again the way we're trying to structure a plan

11   is that the city is relieved of its healthcare obligation

12   going forward essentially forever.  We're trying to relieve

13   the city of funding obligations for pensions for a period of

14   years, ten years.  We're trying to use then some of that

15   revenue to start paying our debt obligations, but at the same

16   time we have to come up with a proposal that will help us

17   provide adequate services.  We're not trying to get to gold

18   plate or platinum level services.  We're trying to meet

19   national averages that the other day -- the other day we had

20   an incident at City Hall.  It was a seizure by a journalist.

21   It was 25 minutes before the ambulance could come.  That's at

22   City Hall.  We recognize that that, in terms of the national

23   rate being somewhere between eight and twelve, is

24   unacceptable, so we're just trying -- even now when we're in

25   this process -- and that's improved from where it was --

1    we're still trying to pursue the ability of the city to push

2    out those services going forward.

3    Q    And you testified earlier about the UTGOs and the LTGOs

4    receiving higher recoveries than certain creditors; correct?

5    A    Yes.

6    Q    Now, what justifies those classes having a higher

7    recovery than other unsecured creditors?

8    A    Well, those classes, as have been much discussed in the

9    trade publications -- and I'll take them separately.  The

10   UTGOs felt very strongly that the concept of limited tax

11   general obligation bonds not only had been voter approved, so

12   essentially the people had voted that this millage, this

13   levy, would be used to pay those bonds, but the people had

14   also voted for a UTGO obligation, which meant that they would

15   have voted for the city to raise taxes or take a portion of

16   the already collected taxes, property taxes, to pay their

17   bonds, so they had a priority obligation, and it wasn't just

18   the city.  It was that concept of the importance of UTGO

19   bonds throughout municipal finance world.

20           The LTGOs, while they tried to draft on the UTGO

21   concept, had a similar argument, but their argument did not

22   have the benefit of a voter-approved levy or a dedicated

23   millage, but they did make an argument about first budget

24   priority that as a consequence the balance for having a

25   limited tax obligation -- limited tax general obligation bond

1   was that while the ability of the municipality to raise the

2   taxes was, quote, unquote, limited, their obligation to pay

3   the tax was unlimited so that if they couldn't raise taxes to

4   meet their obligation, they had to put the LTGO payment in a

5   first budget priority above operational payments.

6        So when you look at those risks that if you get an

7   adverse ruling that between the UTGO, the money goes out and

8   some of the things they're asking for, for segregated

9   accounts and trusts, that the city would not have access to

10   that money, and the LTGO, they were going to be first in the

11   stack, would mean that if they won, you were going to have to

12   calculate how paying them first would impact your ability to

13   push out services going forward and to pay for them, and so

14   those risks is what we're trying to manage and deal with.

15   Q   Let me switch topics and ask you about the restructuring

16   and reinvestment initiatives.  When I say that, do you know

17   what I'm referring to?

18   A   Yes.  Mr. Moore testified to it.  They sometimes are

19   called RRI.

20   Q   I may use the RRI abbreviation as well.

21        MR. SHUMAKER:  Could you put up Exhibit 3, Steve,

22   page 176?

23   BY MR. SHUMAKER:

24   Q   Now, this is the fourth disclosure statement.  Do you

25   recall when this was filed, Mr. Orr?

1  A    Fourth was in May.  Actually, May 5th, 2014.

2  Q    And are these the RRIs that you're talking about?

3  A    Yeah.  They're broken out by a dollar amount.  They're

4  generally a grouping of seven, as Mr. Moore testified to, but

5  these are the dollar amounts for the categories.

6  Q    Now, the amount of these RRIs back in May came to $1.4

7  billion; correct?

8  A    Yes.

9  Q    Now, there's a newer plan of adjustment since May; right?

10 A    Yes.

11 Q    And when did the seventh amended plan come out?

12 A    We filed it a few weeks ago.  I'm trying to remember the

13 specific date.

14 Q    That's okay.

15 A    Sometime in September.

16 Q    Recently?

17 A    Yeah, recently.

18 Q    So my question is is the plan now to still spend $1.4

19 billion over the next ten years on RRIs?

20 A    That number has gone up a little bit.

21 Q    What has that number gone up to?

22 A    It's about 1.7 billion.

23        MR. SHUMAKER:  Can we show the witness Exhibit 592?

24 BY MR. SHUMAKER:

25 Q    Mr. Orr, this demonstrative was used with Mr. Orr, who

1   you just referred to, and that $1.7 billion figure, is

2   that -- is it your understanding that that's the number on

3   the bottom right of that chart?

4   A   Yes.

5   Q   What accounts for the difference in the amounts between

6   those reflected in the fourth disclosure statement back in

7   May and what the city is now proposing?

8   A   Well, we have anticipated additional restructuring

9   revenue initiatives and cost savings that have increased that

10  amount a little bit more and in addition to some hopefully

11  exit financing that have assisted us with that.

12  Q   Now, you testified about Mr. Orr.  Is he the person that

13  you relied upon with regard to developing these RRIs?

14  A   Mr. Moore?

15  Q   Yes.

16  A   Yes.

17  Q   Okay.  And his colleagues at Conway MacKenzie, I take it?

18  A   Oh, yeah, yeah, yes.  Chris Gannon, Chuck Moore.  There's

19  a whole group at Conway.

20  Q   Do you personally know how Conway MacKenzie developed

21  these RRIs?

22  A   Yes.

23  Q   How did they do it?

24  A   They took a bottom up approach.  When I was in federal

25  government, sometimes we call that a desk audit where workers

1    would certify what type of work they're doing, and you'd

2    actually go to the line worker and start discussing it and go

3    up through the stack, their first-line supervisor, their

4    second-line supervisor, their section chief, a department

5    head, and then to the unit head to examine it.

6    Q    And that's -- ground up is doing it one way.  What's the

7    other way?

8    A    Well, top down.

9    Q    Okay.  What's top down?

10   A    Top down is generally a concept where you go to the

11   agency, unit, or department head, and you get from that

12   person what they think their line workers are actually doing,

13   and you try to construct the task based upon the -- based

14   upon the recollection of the leader of that unit, group,

15   department.

16   Q    So Conway MacKenzie used the ground-up analysis.

17   A    Yes.

18   Q    How involved were you in that ground-up analysis?

19   A    I did not -- I was not involved on the -- well, no.  I

20   actually -- I did have some -- it depended upon what else was

21   going on at any given time.  I participated in some initial

22   ground meetings.  Generally, the reports would come back to

23   me through either city employees or Conway MacKenzie and

24   other consultants.

25   Q    Did you think that Conway MacKenzie did a good job?

1    A    Yes, I did.

2    Q    How familiar are you with the costs associated with the

3    proposed RRIs?

4    A    Fairly familiar.

5    Q    And how will the city be able to pay for these

6    initiatives?

7    A    Well, through a combination -- and it says here

8    department cost savings, department revenue initiatives, and

9    I think Mr. Moore testified about how we're going to try to

10   drive costs down but also increase collections, say, for

11   instance, on taxes, fees, port fees, things like that, but

12   here they're out-of-pocket expenses that we're going to try

13   to make as well, and we're going to try to bridge the

14   difference of those with some financing.

15   Q    Which financing?

16   A    Exit facility financing.

17   Q    Do you believe the city can afford the proposed RRIs?

18   A    Yes.

19   Q    Why?

20   A    Well, they have been designed so that it's affordable for

21   the city, and instead of focusing on more borrowings, which

22   is what I said we're trying to get out of -- we hope that the

23   exit facility is the last borrowing that the city would have

24   to do for some period of time -- we're trying to get the city

25   to a point of realizing reasonable opportunities on the cost

1  savings side but also reasonable opportunities on the revenue
2  initiatives side.  We've had some experience with this.  For
3  instance, one of them is moving the city off of the PLD, the
4  public lighting department, into two components over to the
5  public lighting authority, which are handling lights and, for
6  instance, little things like trying to put up LEDs as opposed
7  to incandescent or fluorescent because the LEDs have a life
8  of ten to fifteen years, so we won't have to replace them as
9  much and won't have labor, but also, for instance, getting in
10 PLD, public lighting department, in specific -- getting us
11 out of the business of providing energy to the lighting grid
12 and subsidizing that by $30 million.  If over five years we
13 can wean ourselves off that process and resolve it, that is
14 both a cost savings provision that we can have just in the
15 area of lighting, for instance.  In the area of tax
16 collection, we recognize that we're collecting low, somewhere
17 in the neighborhood of 50 percent of our taxes.  As Mr.
18 Stibitz testified, we currently have ongoing negotiations
19 with the State of Michigan to try to assist us with some of
20 our income tax collections so that we drive up the revenue
21 initiatives in the finance and tax department, so some of
22 those processes are ongoing as we speak, and we think we have
23 a -- we have a reasonable expectation of achieving them.  A
24 big component of that is getting the right people in the
25 right places, and that'll be HR.

1    Q    When you were -- when you were interacting with Conway

2    MacKenzie about the RRIs, did any of the ones that they

3    proposed to you stand out as being too costly?

4    A    No.  I honestly think that they're all reasonable.  You

5    know, I wish -- there are some things I wish we could spend

6    more money on immediately, blight, for instance, but we

7    don't -- you know, we've tried to develop both cost in the

8    red and revenue and cost savings opportunities in the green

9    that appear to be reasonable.  I don't think any of them

10   strike me as particularly unreasonable or too costly.

11          MR. SHUMAKER:  And let me ask to put back up, Steve,

12   Exhibit 3 at 176 so that you are looking at some of the

13   specific RRIs.

14          THE WITNESS:  Um-hmm.

15   BY MR. SHUMAKER:

16   Q    Can you see those?

17   A    Yes.

18   Q    And you didn't think, as you interacted with Conway

19   MacKenzie, that any of those were too expensive?

20   A    No.  No, I did not.

21   Q    Did you believe any of those were unnecessary as they

22   were --

23   A    No.

24   Q    Were they explained to you?

25   A    Yes, yeah.

1    Q    Did any of them seem unnecessary to you?

2    A    No.  Let me just -- no.

3    Q    Did any of them seem improper to you?

4    A    No.

5    Q    Now, you talked about this ground-up analysis that

6    Mr. Moore and his colleagues at Conway MacKenzie undertook,

7    and you were contacted in connection with that ground-up

8    analysis; correct?

9    A    Yes.

10   Q    Do you believe that's the right -- that was the right

11   approach for the city as opposed to a top-down analysis?

12   A    Yes, without a doubt.  One of the things that was

13   important, at least, in my anticipation -- I had been a

14   supervisor.  I've been a line worker, and I've gone up the

15   line to a supervisor in federal government, and one of the

16   things that struck me about the city is -- two things.  One,

17   we do not have a performance appraisal or personal assessment

18   system.  People are doing their jobs, and there's no way for

19   us to actually test if they're doing the job that they're

20   supposed to do for the job description on a regular basis or

21   if they grieve it and want to have a review of the job, we

22   could do that, nor do we -- are we able to give them

23   feedback.

24   Q    Excuse me.  The court reporter -- I'm not even looking at

25   her, and I think you may be challenging her.

1    A    I'm sorry.

2    Q    Could you just slow down just a bit?  I'm sorry.  I

3    apologize.

4    A    No.  I'm sorry.  Nor are we able to give them or their

5    supervisor feedback as to how they're performing their job,

6    so a particular component is that the city be able to both

7    assess, train, and gauge the efficacy of a particular job or

8    function so that we can measure whether we're meeting the

9    RRIs, and these are designed to put those types of -- I think

10   Mr. Moore talked about or at least it's in his report, these

11   are designed to put those types of systems in place

12   throughout the city's roughly 36 -- 28 departments, five at

13   enterprise, throughout the city's various departments.

14   Q    Do you believe that these RRIs will permit the city to

15   provide adequate services to its residents?

16   A    Yes.

17   Q    Why?

18   A    Well, we're not providing adequate services quite yet.

19   We've made some improvement, but simple things, you know.

20   People show up in April and August to pay their taxes, and

21   some have to wait in line as much as four hours.  I've seen

22   that personally.  And that's people who want to comply.  When

23   you have a barrier to compliance like that, that means you're

24   going to get noncompliance because with some people,

25   especially if they're hourly, that means they're losing a

1  half day or more or full day of work, and that's a grocery

2  budget, so on a very granular level you want to push out

3  restructuring initiatives that help people comply, first of

4  all, those that want to.  You want them to get fair services

5  for their taxes, those that want to.  You want to make sure

6  that the city works at least in an adequate way the way it

7  should so people get both the services they're expecting but

8  they themselves are also willing to comply.

9  Q    Do you have confidence in the city's ability to implement

10 these RRIs once you're gone?

11 A    Yes.

12 Q    Why do you feel that way?

13 A    For several reasons.  I put them in three buckets.

14 First, the mayor and the city council have shown me since the

15 time I've been here in the last nine months that they are

16 working hard.  We started out a little rough, and there was

17 some concern, but we've managed to work together and push

18 some of these reforms through.  And they're working together.

19 The mayor is actually talking to the council.  They're also

20 working together to move the city forward.

21        Secondly, there's going to be a level of oversight

22 in place with the Financial Review Commission, which is

23 modeled on other commissions, the MAC, the DC Control Board,

24 others.  That commission is designed to be a robust

25 commission to make sure that after all this effort and work

1    that the city keeps fidelity with the plan going forward.

2              Third, my sense is at city hall there's a very high

3    degree of sensitivity and concern that the eyes of the

4    country, if not someplace in the world, are on them; that

5    they have an obligation to this Court; that they recognize

6    we're in a federal process, and this is going to be ordered.

7    I certainly have emphasized that to them.  And I think my

8    impression is they feel very sincerely that they have an

9    obligation to make this work.

10   Q   Now, harkening back to City Exhibit 592, you understand

11   that the RRIs are a combination of cost savings initiatives

12   and revenue generation initiatives; correct?

13   A   Yes.

14   Q   Do you believe that the projections regarding revenue

15   generation projections are achievable?

16   A   Yes.

17   Q   Why?

18   A   Well, we tried to start doing some of that to begin with,

19   but after being here over a year and testing some of them --

20   for instance, little things -- we've seen the finance

21   department restructuring module is either complete or getting

22   ready to roll out in terms of reaching those efficiencies,

23   and the -- as a companion to some of those, their plan is to

24   start -- they've modeled what they think they can collect.

25   There's a review going over in assessments.  Mr. Evanko is

1   doing the collections, so they're very thoughtful.  It's just

2   not Conway, a contractor coming into the city.  This has been

3   done with the city and with people who've done this in other

4   distressed cities.  John Hill, the CFO, was at DC.  John

5   Naglick, the budget director, was at -- was in Pontiac.  Mr.

6   Evanko, who's been in the state, has worked before.  So these

7   are people who've been involved in these areas.  Otis Jones

8   over at the lighting department was down in Cincinnati, Chief

9   Craig, who we've talked about, so between the consultants and

10  the people who are now in the city who've done this in other

11  areas, they are proposing a model which they've had some

12  experience to deal with, which is going to be pushed out into

13  the city as long as they follow it.

14  Q    How about the cost savings projections?  Are you

15  confident that they can be met --

16  A    Yes.

17  Q    -- after you're gone?

18  A    Yes.

19  Q    Why?

20  A    Well, here again, we've looked at some of the

21  opportunities and cost savings.  For instance, in the

22  enterprise funds over at DWSD, the authority that was

23  negotiated is designed to take some of those costs of running

24  the department, roughly 900, a thousand workers, and put them

25  into the authority, and 500 will stay over with DWSD, the

1  city department.  The cost of some of the projects in the

2  enterprise are designed to be recovered in part by a common

3  to all payment of $50 million from the counties for the next

4  roughly 20 years.  Well, that's, you know, somewhere in the

5  neighborhood of -- per year plus the $26 million -- $26.3

6  million payment for a rate subsidy in the city.  Now, the

7  city's component of the common to all payment is roughly $20

8  million, but the rate subsidy makes up for that, so in gross

9  that's $50 million a year on average coming to the city for

10  capital improvement, for reinvestment and others, so the

11  authority deal, the public lighting authority deal, the

12  contracting out for better solid waste collection at the same

13  price, getting off the lighting grid, we've already had

14  examples of being able to realize cost savings just in this

15  process, and that's really been in the past year.  If we

16  continue with those examples going forward, it is reasonable

17  to assume that we can meet those cost savings initiatives.

18  Q    Now, yesterday you testified that you did not consider

19  raising taxes during your tenure as the emergency manager

20  because you believe the city's taxes were too high.  Do you

21  recall that?

22  A    Yes.

23  Q    Now, have you heard of the term "tax saturated"?

24  A    Yes.

25  Q    How?

1    A    Tax saturation is a concept that -- well, one --

2    Q    Before you tell us what it is, how have you become

3    familiar with the term?

4    A    Oh, before I took the job, I was reading materials on the

5    city's tax rate and also talking with city employees.  The

6    concept of tax saturation has been discussed for a long time.

7    In fact, I think in both our proposal for creditors and in

8    the disclosure statement we discuss it.

9    Q    And you did that review and analysis in conjunction with

10   becoming the emergency manager?

11   A    Yes.

12   Q    Now, from your perspective, what does it mean to be tax

13   saturated?

14   A    The tax burden is at a rate that is essentially you can't

15   raise any more taxes.  You literally have saturated the

16   taxpaying body with so many taxes that it is unsustainable to

17   assume that they could pay more.  And if you were to try to

18   do so, you would actually drive out taxpayers and cause the

19   death spiral I talked about.  More people leave.  You keep

20   raising taxes.  It just doesn't work.

21   Q    Do you believe the City of Detroit is tax saturated?

22   A    Yes.

23   Q    How much of a problem is it here?

24   A    It's significant.  I mean part of the reason here -- here

25   again, part of the reason with taxes and blight is that

people get to a tax burden level that they can't pay, so they
abandon the home.  It's easier to walk away.  It's sort of
like a mortgage foreclosure crisis, you know.  People will
walk away, jangle mail, key mails, where people mail in their
keys.  Well, here people walk away.  Once you abandon the
home, the home starts to degrade.  It creates blight.  Blight
means that the property values have to be lowered.  You have
less residents.  It keeps feeding on itself, and it just
doesn't stop.  And as I said, we've seen that phenomenon in
this city.  How much more could you possibly see to not
believe it?  Do you want the city to be 500,000?  Would
people want the city to be 350,000?  It can't happen.
Q   You just mentioned the term "death spiral."  What do you
understand that term to mean?
A   That's a term that just describes that you start feeding
on the concept of trying to catch up by raising the burden,
reducing services, demographically driving people out of the
city so that the city cannot stop, catch itself, and start to
grow.  It just basically goes down and down and down to a
nonsustainable level.  You know, in the old days, they called
it a ghost town, but it would put the city in a position
where it just can't provide an adequate level of services.
As I said, Mayor Archer had 20,000 employees at the end of
his term in the year 2000.  We're down now to 9,000.  That's
occurred.

1  Q   When you became emergency manager, did you believe that

2  the City of Detroit was in a death spiral?

3  A   It was either in or near to.  I would like to think that

4  as a result of the exodus from 2000 to 2010 that hopefully

5  after 2010 it paused for a second, but, you know, when I came

6  in, I thought we were at 700,000.  We were actually more at

7  685, 686, and I'm hoping now that we -- with the addition of

8  some new residents coming in, as Dan Gilbert testified, he

9  helped arrest the spiral by bringing some of his workers

10 downtown to the city, tens of thousands.  Some of the

11 others -- Henry Ford Hospital has a program where they pay

12 $10,000 for people to stay.  Henry Ford Hospital has a

13 program where they pay $10,000 for people to stay in the

14 city -- that we have arrested that cycle and have given

15 ourself some breathing room to try to build.

16 Q   Okay.

17         THE COURT:  Excuse me.  We're going to stop for

18 lunch now.  Your homework assignment over lunch is to recall

19 Mr. Bennett's substitute language for the euphemism "death

20 spiral" and start using that.

21         MR. SHUMAKER:  Understood, your Honor.  Sorry about

22 that.

23         THE COURT:  That's all right.  We'll reconvene at

24 1:30.

25         THE CLERK:  All rise.  Court is in recess.

1          (Recess at 11:59 a.m., until 1:30 p.m.)

2               THE CLERK:  All rise.  Court is back in session.

3     You may be seated.

4               THE COURT:  Looks like everyone is here.  You may

5     proceed.

6               MR. SHUMAKER:  Thank you, your Honor.  Greg Shumaker

7     of Jones Day for the City of Detroit.  And the phrase is

8     "downward spiral."

9               THE COURT:  Excellent.

10              MR. SHUMAKER:  Sorry about that, your Honor.

11              THE COURT:  For the Court you're using that instead.

12              MR. SHUMAKER:  Yes.

13    BY MR. SHUMAKER:

14    Q    Good afternoon, Mr. Orr.

15    A    Good afternoon, Mr. Shumaker.

16    Q    Switching topics here, asking you whether you believe

17    that the plan of adjustment includes all the revenues that

18    the city can reasonably anticipate receiving in the future.

19    A    Yes.

20    Q    Do you believe there are any revenues that can be shifted

21    to further enhance the recoveries of the classes that voted

22    against the plan of adjustment?

23    A    Not without impacting the RRI.

24    Q    Could you explain what you mean by "impacting the RRI"?

25    A    I think we've struck a balance in terms of what we can

1  pay our creditors and what we need for restructuring and

2  reinvestment initiatives on the spin side, and we've even

3  taken a little bit away from the restructuring initiatives to

4  pay creditors, so I think we've gone about as far as we can

5  go.

6  Q   Could the city generate additional funds, revenue, by

7  selling city-owned assets?

8  A   It might.

9  Q   Have you sold any city-owned assets during your tenure as

10 emergency manager?

11 A   No.

12 Q   Why not sell the city's assets and increase creditor

13 recoveries?

14 A   Well, for several reasons.  I believe that under the

15 statute, both the state statute and the federal law, I'm not

16 required to sell assets.  We have leased assets, Belle Isle,

17 which required approval, and we have liened assets for

18 financing, which requires approval by the Emergency Loan

19 Board, but we haven't sold anything.  I believe that for the

20 city to come back, it needs the assets that it has.  It's not

21 as if the city has a great number.  Some of them are notable,

22 DIA, for instance, but I believe that we'll need those

23 assets, particularly DIA, as it's one of the most important

24 cultural institutions in the city.

25 Q   Aside from DIA, what other assets do you think of that

1   could possibly be sold off?

2   A   Oh, we have six parking garages, I believe.  I believe we

3   have other -- we have 380 parks.  At one point over 200 were

4   closed.  We have other cultural institutions, a zoo, science

5   museum, things along those lines, that we have not sold.  We

6   have -- I think the city has four golf courses, two

7   functioning.  I think we have a cemetery.  But we haven't

8   sold any of those assets.

9   Q   Thank you.  Shifting topics again, are you familiar with

10  what Mr. Malhotra referred to as the city's steady state

11  analysis?

12  A   Yes.

13  Q   What is it?

14  A   It's a ten-year projection without restructuring in

15  place.

16  Q   I'm going to show you Exhibit 593.  Can you take a look

17  at this document, Mr. Orr?

18  A   Yes.

19  Q   Are you familiar with it?

20  A   Yes.

21  Q   What does it show?

22  A   This is the city's ten-year financial projection, general

23  fund summary without restructuring for the top five

24  categories, and it would show the state of the city at the

25  end of that ten-year projection from a financial standpoint.

1   Q   So what categories or items does it include in the

2   analysis looking at the left-hand side?

3   A   Right.  Well, it includes revenues.  It includes

4   expenditures.  It includes net operating surplus.  It would

5   include deficits, including financing proceeds, total

6   surplus, accumulated unrespected general fund -- unrestricted

7   general fund deficit, and then it includes a line for

8   reinvestment in the city.

9   Q   Looking down at the last row, which says "adjusted

10  surplus, parentheses, deficit, end paren," do you see that?

11  A   Yes.

12          MR. SHUMAKER:  Could you blow that up, please?

13          THE WITNESS:  Yes, please.

14          MR. SHUMAKER:  And then if you could move it to the

15  left.

16  BY MR. SHUMAKER:

17  Q   Mr. Orr, what do you understand the row entitled

18  "adjusted surplus" --

19  A   Adjusted surplus deficit --

20  Q   -- to mean?

21          MR. SOTO:  Objection, your Honor.  There's no

22  foundation.  If he wants to build a foundation that Mr. Orr,

23  in fact, worked on this chart or understands this chart,

24  fine, but just asking him a question about the chart and what

25  he understands about it when he didn't author it and he

1    didn't submit it I think lacks foundation.

2    BY MR. SHUMAKER:

3    Q    Have you seen this before, Mr. Orr?

4    A    Yes.

5    Q    In what capacity?

6    A    I've seen it in various iterations from time to time,

7    Ernst & Young in conjunction with Miller Buckfire, and Conway

8    MacKenzie will push out ten-year projections.  I've seen it

9    as a component of the exhibits to the plan of adjustment as

10   well.

11   Q    Has it been provided to you in your capacity as emergency

12   manager?

13   A    Yes.

14   Q    That was by Ernst & Young?

15   A    Yes, principally.

16   Q    And Ernst & Young reported to you --

17   A    Yes.

18   Q    -- is that correct?

19   A    Yes.

20   Q    And you understand what this analysis is reflecting?

21   A    Yes.  It also -- it has a -- first five columns are

22   fiscal year actual results, and then the out-year columns are

23   projections.  We may be, if I can see the year -- may be in

24   part of those projections, but, yes, I understand what it

25   purports to be.

1  Q    And you saw this document during the course of your

2  duties as emergency manager?

3  A    Yes.

4  Q    In that regard, what did you understand that number at

5  the end of the row, the last row, which is 4,793.5 in

6  parentheses, to mean?

7  A    That's the adjusted deficit for the city at the end of

8  the two years, and it means $4.793 billion.

9  Q    And that includes -- and that is if the RRIs are included

10 in the analysis?

11 A    Yes.  If we maintained a steady state and tried to do the

12 RRIs, that's what the deficit would be.

13 Q    And you refer to this analysis as steady state analysis?

14 A    Yes.

15 Q    Are you familiar with what a dismissal scenario is in a

16 bankruptcy case?

17 A    Yes.

18 Q    What is it?

19 A    The dismissal scenario or dismissal analysis is an

20 analysis of what would happen if you dismiss the bankruptcy

21 case and the follow-on consequences to the debtor typically

22 in a corporate debtor.

23 Q    In your deposition in this matter, do you recall being

24 asked questions about a dismissal analysis?

25 A    Yes.

1    Q   And at that time, did you indicate that you had seen one?

2    A   I think I said that I may have seen one that I recall,

3    and I think I said it may have been prepared by Miller

4    Buckfire.

5    Q   And what were you thinking about when you gave that

6    testimony?

7    A   Well, I was thinking about this type of analysis, and it

8    was the 30(b)(6) testimony, so I was trying to be helpful.  I

9    was confused as far as who had prepared it.  I think I even

10   said Miller Buckfire prepared it, but it was -- I was

11   thinking about this document, which I believe was prepared by

12   Ernst & Young.

13   Q   Does Exhibit 593 tell you whether the city could

14   implement the RRIs in a steady state scenario?

15   A   Yes.

16   Q   Do you know what the practical difference is between a

17   dismissal analysis, as you understand it, and this steady

18   state analysis?

19   A   Yes.  I mean a dismissal analysis would be if you dismiss

20   the case and not so much dealing with the municipal RRIs

21   along those lines, but what would happen to the debtor and,

22   therefore, whether or not the case should be dismissed, sort

23   of the parade of horribles, and this tells us that, as a

24   practical matter, we could not do the restructuring and

25   reinvestment initiative if the case were dismissed.

1  Q   If this Chapter 9 case were dismissed, do you believe

2  this steady state analysis reflects what revenue would be

3  available --

4           MR. MCCARTHY:  Your Honor --

5  BY MR. SHUMAKER:

6  Q   -- available to creditors in the future?

7           MR. MCCARTHY:  Apologize.  There was a

8  miscommunication.  If we could move to strike the former

9  testimony -- perhaps there was a misstatement, but I believe

10 what we heard before is that this is not a dismissal analysis

11 but shows a steady state pre-bankruptcy.  However, Mr. Orr

12 just testified that what this shows is whether the RRIs could

13 be implemented if the case was dismissed, and so, therefore,

14 we move to strike that testimony.

15          THE COURT:  What's the grounds to dismiss it?

16          MR. MCCARTHY:  That we have stated that this is not

17 a dismissal analysis, so it doesn't show anything with

18 respect to dismissal of the case.

19          THE COURT:  Well, is it your objection that the

20 testimony is wrong?

21          MR. MCCARTHY:  My objection is based on a lack of

22 foundation with respect to whether he can proffer that

23 testimony based on this document.

24          THE COURT:  That seems to me to go more to the

25 weight than the admissibility, so I'll deny the motion.

BY MR. SHUMAKER:

1  Q   If I could direct your attention to another number here,

2  Mr. Orr.  Do you see the row in the middle of the chart of

3  Exhibit 593 that says "deficit including" -- my eyes are not

4  good either --

5  A   Right.

6  Q   -- "deficit" -- I think it's "including financial

7  proceeds"?  Am I reading that correctly?  Oh, "excluding

8  financing proceeds."  Sorry.

9  A   Yes.

10  Q   Somewhat of an important distinction.

11  A   Yeah.

12  Q   At the far right of the document is a ten-year number, a

13  cumulative number of 3,916,000,000.  Do you see that?

14  A   Yes.

15  Q   And that line is above the RRI piece of the document;

16  correct?

17  A   Yes.

18  Q   What does that $3.9167 billion deficit mean to you?

19  A   That means that without a restructuring if the city

20  continued along the lines that it was and continued to incur

21  the expenses, some of which we talked about today, the

22  retiree expenses, the legacy debt expenditures that we

23  over -- that at the end of that ten years this would be the

24  total amount of the deficit that the city would have run.

1   Q    Without the RRIs?

2   A    Without the reinvest -- yes, without the RRIs.

3   Q    And to repeat my question, if this Chapter 9 case were

4   dismissed, do you believe this steady state analysis reflects

5   what revenue would be available to creditors in the future?

6   A    Yes.

7   Q    Do you believe that the city's unsecured creditors are

8   receiving all they can reasonably expect under the

9   circumstances?

10  A    Yes.

11  Q    Why is that?

12  A    Well, I think we've tried to strike a balance between

13  what the city can reasonably expect to pay based upon

14  anticipated revenue streams as tested out against actuals,

15  what we can -- what we would need -- some of it has been

16  slimmed down a little bit -- what we would need to meet some

17  of the reinvestment initiatives that we've talked about both

18  on the cost side, revenue generation and expense side of

19  that, and I believe that without that balance going forward,

20  the city would not generate enough momentum, for instance, in

21  blight -- as we saw with Mr. Gilbert's testimony, it's

22  roughly half of what we need.  We wouldn't generate enough

23  critical momentum to stem the tide of some of the decline

24  we've seen in the city and to push out the services, which is

25  what I think we're supposed to be doing in this case, and at

1  the end of the day we would not be achieving those

2  objectives, and under the state statute I want to be

3  achieving the objective of pushing out a proposal that would

4  put the city on a path to a sustainable future.

5  Q  I'm going to switch gears again and focus you on a part

6  of the plan.  Do you understand that the plan provides a

7  nonconsensual release to the state?

8  A  Yes.

9  Q  What claims is it intended to release?

10  A  Well, it's to release all of the claims regarding for

11  consenting and nonconsenting members who voted and did not

12  vote for the plan for the string of litigation that's

13  attached as an exhibit to the consent agreement against the

14  state based upon a number of theories but principally the

15  alleged state constitutional obligation to fund pensions.

16        MR. SHUMAKER:  Could you show the witness Exhibit

17  1.A.327 to the seventh amended plan?

18        THE WITNESS:  Can I correct my testimony?

19  BY MR. SHUMAKER:

20  Q  Please do.

21  A  The state Constitution says "shall not be impaired."  It

22  does not say that they have to be funded.

23  Q  Thank you.

24  A  Um-hmm.

25  Q  Now, Mr. Orr, I believe you indicated you had seen this

1  document before; correct?

2  A    Yes.

3  Q    And what is it?

4  A    This is the execution copy of the contribution agreement

5  for the state settlement authority.

6         MR. SHUMAKER:  Can we go to page 5, please, of the

7  document itself?  Thank you.  And please blow up item

8  4.F.1 -- yes, I think that's it -- please.

9  BY MR. SHUMAKER:

10 Q    Now, Mr. Orr, is this what you were referring to when you

11 just testified about the nonconsensual releases?

12 A    Yes.

13 Q    Let me ask you why is such a -- why is such a release

14 justified in this case?

15 A    Well, I know that such releases are extraordinary, but it

16 would not make rational sense for the state to fund a

17 settlement that essentially takes money out of the rainy day

18 fund to true up, if you will, the pensions in this case and

19 then allow those potential claimants, those that did not

20 consent, to go forward with any claims that may allow them to

21 get another recovery.

22 Q    Do you believe this release is essential to the city's

23 restructuring effort?

24 A    Oh, yes.  We don't get the state funding, and, therefore,

25 the DIA so-called grand bargain falls apart.

1  Q    That's what I was going to ask you is what would happen

2  if this release was not given?  And when I say "this" -- let

3  me back up.  You say the state contribution agreement is part

4  of the grand bargain; correct?

5  A    Yes.

6  Q    What would happen to the grand bargain if this release

7  was not given?

8  A    If this release is not given, the state does not have to

9  meet its obligation under the state contribution agreement to

10 fund the $350 million in value.  If the state does not fund

11 that value, then a condition of the DIA settlement with the

12 DIA foundations and the DIA funders is not met, and that

13 obligation falls away as well.

14          MR. SHUMAKER:  You can take that down.  Thank you.

15 BY MR. SHUMAKER:

16 Q    Mr. Orr, last week the city council and the mayor of

17 Detroit acted with respect to your tenure as emergency

18 manager; correct?

19 A    Yes.

20 Q    What did they do?

21 A    They fired me but not immediately.

22 Q    Let me show you Exhibit 748, please.  That is a filing in

23 this case.  I'd like to direct your attention to Exhibit C,

24 which is on page 748-014.  And, Mr. Orr, are you familiar

25 with this document?

1   A    Yes, I am.

2   Q    Okay.

3           MR. SHUMAKER:  Before I ask you any questions about

4   it, I'm going to move for this exhibit's admission into

5   evidence.

6           MR. SOTO:  No objection, your Honor.

7           MR. WAGNER:  No objection.

8           THE COURT:  It is admitted.

9       (City Exhibit 748 received at 1:47 p.m.)

10  BY MR. SHUMAKER:

11  Q    I'm sorry.  Mr. Orr, what is this?

12  A    This is Order Number 42, which is an order that is

13  designed to address the conclusion of my appointment as

14  emergency manager and create a framework for the transition

15  of city operations back to the mayor and city council of

16  Detroit in the normal course.

17  Q    Can you summarize for the Court what your understanding

18  is of what it does?

19  A    Yes.  It has several provisions.  Generally, there are

20  like five provisions in it.  One is there's a paragraph that

21  provides for the transition of ordinary course authority back

22  to the mayor and city council for all city operations,

23  including finance department and the police department, which

24  have been carved out in a prior order.  There's a provision

25  that carves out of that transition back my remaining

1   authority to drive to conclusion several of the settlements

2   and the bankruptcy restructuring herein.  That provision has

3   12 decretal paragraphs that specify particular settlements

4   and also some catch-all authority.  It has a provision that

5   the mayor has the authority do an executive office

6   restructuring.

7   Q   Okay.  Just want you to slow down for the court reporter.

8   I apologize for interrupting --

9   A   I'm sorry.

10  Q   -- but this is important.  I want to make sure this --

11  A   I'm sorry.

12  Q   -- comes out.

13  A   I'm sorry.

14  Q   Please continue.

15  A   It has a provision giving the mayor authority to

16  restructure the executive branch without further order of the

17  emergency manager and provided that the council has a period

18  of time -- I think 45 days -- to review any proposals and

19  that if they're not approved by council, they self-actuate.

20  It has a provision creating -- restoring powers to the police

21  commission to a degree while at the same time permitting the

22  mayor and the chief of police some latitude to continue with

23  the restructuring of the police department that has been

24  ongoing and allow the mayor to negotiate directly with the

25  police chief regarding his continued tenure.  And I think it

1   also has a provision regarding some ongoing restructuring

2   initiatives at the finance department.

3   Q    So this order removed a number of your powers as

4   emergency manager; is that right?

5   A    Yes.

6   Q    When do your remaining powers end?

7   A    On the effective date assuming that we get confirmation

8   and there is an effective date.

9   Q    Mr. Orr, how is your -- I think you talked about this a

10  little bit, but how is your working relationship with the

11  mayor?

12  A    I'd like to think that it's quite good now.

13  Q    Has it changed since this order came out?

14  A    No.  We still have a good working relationship.  He

15  doesn't call me as much, but, yeah.

16  Q    How is your working relationship with the city council?

17  A    With most of the council members, I'd like to think it's

18  quite good and personable.

19  Q    Has that relationship changed at all since this order

20  came out?

21  A    No.  I think we still have a good relationship.  They,

22  too, don't call me quite as much.

23  Q    Do you believe that Emergency Manager Order 42

24  jeopardizes the plan of adjustment in any way?

25  A    No.  Emergency Order 42 is designed to make sure that we

1   can continue with closure of the settlements in the plan of

2   adjustment and eventually consummate those on an effective --

3   on or before an effective date.

4   Q   Assuming the plan is confirmed, what transition efforts

5   with the mayor and city council are you engaged in?

6   A   We have already -- as a practical matter, when the mayor

7   took office, we had a long series of discussions about

8   transition, and, frankly, for the most part, throughout the

9   past nine months he has supported me on the restructuring

10  side, and I'd like to think I've tried to support him on city

11  operations side.  I can't think of one instance where we have

12  not agreed on a solution or a process.  Companion to this

13  order, there are actually five orders, including this one.

14  There are four others that we entered on that Friday that

15  establish an office of the chief investment officer for the

16  department of innovation and technology -- chief information

17  officer.  I was thinking about the state contribution.  It

18  also establishes further authority to restructure the finance

19  department.  That is ongoing.  It establishes a department --

20  there's another order that establishes a department of

21  housing and of revitalization to sort of supercharge the

22  blight efforts we're dealing with, and there's an order that

23  deals with human resources, establishes a new structure in

24  the human resources department which includes human

25  resources, labor relations, appraisal and assessment of city

1    employees as well as training.  Each one of those are a

2    department or a subdepartment head to specifically drive the

3    RRI reforms we've had on the workers' side.

4    Q    Are you familiar with the proposed oversight for the city

5    if the plan is confirmed?

6    A    Yes.

7    Q    What is your understanding of that oversight?

8    A    Well, as Mr. Stibitz testified, the original bill

9    packages were House Bills 5566 and 5567, which eventually

10   became Public Act 181 and Public Act 182.  To just state it

11   briefly, they require that -- the city charter does not have

12   a provision for a CFO, so the state acts require the

13   creation -- I created -- well, my office created the position

14   of a CFO during my tenure, but these acts now create a CFO

15   within the city that reports to the mayor but has an

16   obligation to report and provide reports to the Financial

17   Review Commission.  It also creates the Financial Review

18   Commission, as was discussed yesterday, which is to perform

19   oversight of the city and meet on a regular basis, I believe,

20   initially at least monthly.

21   Q    Do you have any view as to whether the oversight that

22   you've just described will be sufficient if the Court

23   confirms the plan to keep the city on track with the plan?

24   A    Yes.  I believe that the parties -- it has been my

25   experience that the parties, meaning the city, the council,

1    the state, and I would have no reason to believe that the

2    Review Commission, once it is stood up and created, have been

3    working forward in good faith to try to pursue the further

4    revitalization of the city and to provide services to

5    citizens.  There is no reason for me to believe that that

6    trajectory would change and that the structure is

7    insufficient to meet those obligations and continue those

8    efforts.

9    Q    Yesterday you described for the Court the fact that there

10   were multiple versions of the plan of adjustment.  Do you

11   recall that?

12   A    Yes.

13   Q    Do you recall the fifth amended plan of adjustment?

14   A    Oh, yes.  Yes, I do.

15   Q    Now, do you recall that there was a component of that

16   plan regarding a plan monitor?

17   A    Yes.

18   Q    Do you recall a corrected fifth amended plan of

19   adjustment?

20   A    Yes, within the next day or two.

21   Q    Did that include the plan monitor provision?

22   A    No.  The corrected version took out the plan monitor

23   provision.

24   Q    And why was the plan monitor provision removed?

25   A    It was a mistake to include it in the first one.  To be

candid, the mayor and I have been talking about the necessary
level of oversight, and the mayor was receptive to some level
of oversight.  We had also been talking about the reporting
requirements that would be needed to the city both to the
state and to the Court, the Bankruptcy Court, as a component
of monitors.  The mayor expressed concerns remembering that
the city had gone through several monitors at the police
department and others that, in his experience, the city
monitors sometimes had mission creep and took on a life of
their own, and I had pledged to him in those discussions that
we would consult before a version of the plan containing the
plan monitor was put out to public view.  Unfortunately, that
week we had been busy, and I think the plan was filed that
Wednesday or Thursday.  I had seen the draft.  I'd seen the
monitor provision, but I had not actually approved it or
spoken with -- or decided whether it should be included.  It
was filed.  The mayor called me, expressed concern that I may
have been going back -- the working relationship we had, I
may have been going back on some of the things we discussed.
I assured him I had not, that it was inadvertent that it was
filed that way, that I believed the provisions in the
Financial Review Commission would be sufficient both for his
reporting as well as for providing those same reports to the
Court and that he would not suffer the risk of having to
answer to two oversight structures that might give him

1  competing instruction with regard to what he was doing, which
2  he felt would be unfortunate, and so I instructed my team to
3  file an amended plan I think within a day or two of the
4  filing.
5  Q   Shifting to the seventh amended plan of adjustment, do
6  you have faith in the plan that has been submitted -- that
7  plan that has been submitted to the Court for confirmation?
8  A   Yes.
9  Q   Do you think that plan is fair?
10 A   Yes, I do.
11 Q   Did you submit that plan to this Court in good faith?
12 A   Yes, I did.
13 Q   Do you think the plan allows Detroit to return and
14 provide adequate services to its residents in the future?
15 A   I think the plan provides a framework and some initial
16 resources to assist the city in continuing to pursue the
17 opportunity to provide services to the city and to meet its
18 restructured debt obligations.  I recognize that the plan
19 will require that all of the relevant stakeholders continue
20 on an appropriate course in due time so that that realization
21 occurs.  I have no reason to believe that anyone is not
22 highly motivated to do that.
23 Q   When you were appointed as emergency manager, do you
24 recall telling the public that even though the City of
25 Detroit was in the midst of a financial emergency, that the

1  city would rise from the ashes?

2  A   Yes, I do.

3  Q   Does this plan allow Detroit to do that?

4  A   I believe so.  I was alluding to Father Gabriel Richard's

5  much known statement.  It's in the seal of the great City of

6  Detroit that we dream of better things and it shall rise from

7  the ashes.  This is yet another renaissance from the fire of

8  Detroit from post-war, from the War of 1812 that we will come

9  back from, and I sincerely believe that we do dream of better

10  things and that will happen.

11          MR. SHUMAKER:  Thank you, Mr. Orr.  That's all I

12  have, your Honor.  Is it possible, your Honor, to put

13  Mr. Rapson on now?

14          THE COURT:  Is that okay?

15          MR. SOTO:  Sure.

16          THE COURT:  Okay.  Sir, you may step down.

17          THE WITNESS:  Yes, your Honor.

18      (Witness excused at 1:59 p.m.)

19          THE COURT:  You may call your witness.

20          MR. SHUMAKER:  Thank you, your Honor.  The city

21  calls Mr. Rip  Rapson to the stand.

22          THE COURT:  Now raise your right hand please.

23              RIP RAPSON, CITY'S WITNESS, SWORN

24          THE COURT:  Please sit down.

25                      DIRECT EXAMINATION

1    BY MR. SHUMAKER:

2    Q    Good afternoon, Mr. Rapson.

3    A    Good afternoon.

4    Q    Could you please state your full name for the record?

5    A    Richard Rip Rapson.

6    Q    And what is your current occupation?

7    A    I'm the president and chief executive at the Kresge

8    Foundation in Troy, Michigan.

9    Q    How long have you been with the Kresge Foundation?

10   A    About eight years.

11   Q    I'd like to just have you go through a few questions to

12   describe your background for the Court.  Okay?

13   A    Sure.

14   Q    Did you attend college?

15   A    I did.

16   Q    Where was that?

17   A    I went to Pomona College in Southern California.

18   Q    And when did you graduate from there?

19   A    1974.

20   Q    What did you do upon graduation?

21   A    I went to Washington, D.C., to work with the

22   representative in the House of Representatives of the City of

23   Minneapolis, a man named Don Fraser, and I was a legislative

24   aide for him for about four years.

25   Q    Did you receive any degrees after your undergraduate

1   degree from Pomona?

2   A   I went on from Washington to get a law degree from

3   Columbia University in New York City.

4   Q   And did you do this at the same time that you were with

5   the Congressman?

6   A   No.  I spent four years in Washington.  He chose to run

7   for the Senate.  I thought that was a good time to pick up

8   and make a life change, so I went to school after that.

9   Q   What did you do for Congressman Fraser?

10  A   First couple of years I essentially was the liaison

11  between the District of Columbia's office and the Minneapolis

12  office on issues of education, human services, and the like.

13  The last two years I worked on a piece of legislation

14  affecting something called the Boundary Waters Canoe Area,

15  which is a large wilderness area in northern Minnesota, and

16  we spent almost the entirety of two years trying to give it

17  full wilderness protection.

18  Q   Okay.  And I just wanted to just -- the court reporter is

19  going to beat me up about -- after Mr. Orr, I just want to

20  make sure you go as slow as possible --

21  A   Oh, sorry.

22  Q   -- so that she can get it all down.

23  A   Is that okay?

24  Q   Okay.  So after you -- so then you went from the

25  Congressman's office to law school; correct?

1    A    That's correct.

2    Q    What did you do after you graduated from law school?

3    A    I went back to Minneapolis and practiced for about eight

4    years with a local firm called Leonard, Street & Deinard.

5    Q    And what areas did you practice in?

6    A    Sort of divided into three.  I did -- I was in the

7    general litigation department, but I also did a little bit of

8    intellectual property work, construction law, and a lot of

9    pro bono work for local nonprofit organizations.

10   Q    What did you do after you left the firm?

11   A    Well, I was actually at the firm when I got a call from

12   the same man I had worked with in Washington, Don Fraser.  He

13   had since become the mayor of Minneapolis, and he asked if I

14   would be willing to come over to city hall at least for a

15   little while and serve as his deputy, so I served for four

16   years as deputy mayor of Minneapolis.

17   Q    What years were those?

18   A    That was from 19 -- oh, my -- 1989 to 1993.

19   Q    What were your job responsibilities as deputy mayor?

20   A    There was a -- part of it was sort of the mayor when the

21   mayor wasn't there, just attending to sort of all of the

22   functions of the office, but more particularly I had

23   responsibility for the budget.  I was the one who conducted

24   the hearings on behalf of the mayor's office among the

25   departments to put the budget in order.  We did special

1    projects, including a large $400 million project to help

2    revitalize the neighborhoods of Minneapolis and just sort of

3    other duties as assigned.

4    Q    What was wrong with the neighborhoods of Minneapolis?

5    A    There was a sense in Minneapolis that the neighborhoods

6    were being neglected at the expense of the center city, and

7    so the plan was essentially to take revenue that was being

8    generated by the downtown development and spread it into the

9    neighborhoods because, as in many urban neighborhoods, there

10   was the deterioration of housing stock, sort of the crumbling

11   of basic support services, and we wanted to create plans in

12   each of 81 neighborhoods in Minneapolis to try to correct the

13   course and get the neighborhoods back into a healthy place.

14   Q    So this was sort of an urban affairs aspect of your job?

15   A    Absolutely.  We did everything from housing policy to

16   social services policy to transit policy to health policy,

17   kind of everything in between.

18   Q    And when did you leave that position?

19   A    I left that position in 1993.  Mayor Fraser indicated

20   that he was going to step down.  I ran for mayor.

21   Fortunately for the City of Minneapolis, I wasn't successful

22   and then had to sort of figure out what to do next.

23   Q    And what did you do?

24   A    I was asked by the University of Minnesota to come and

25   coordinate, run a large policy project that involved

1   geographers and architects and economists and other wings of

2   the University of Minnesota to try to help aging suburbs

3   figure out how they were going to increasingly deal with some

4   of the pressures they were feeling.

5   Q    What happened to that project eventually?

6   A    This project went on for the better part of five or six

7   years, and after I left we had issued a report.  We had

8   worked with four or five communities to try to problem smash

9   particular issues that were important to them, and it sort of

10  ran its course.  So after I left the university, it sort of

11  closed up shop and was subsumed under some other work at the

12  university.

13  Q    What position did you take after the University of

14  Minnesota job?

15  A    When I was -- while I was working at the university, I

16  was approached by the McKnight Foundation, which is a private

17  foundation in Minneapolis.  It is the descendants of the

18  founder of 3M, William McKnight.  It was a large private

19  family foundation, and they needed a new executive and asked

20  if I would come on board, and so I did that in 1999.

21  Q    How long were you with the McKnight Foundation?

22  A    Six years.

23  Q    And what sort of projects did you undertake during that

24  time?

25  A    McKnight really focused on the State of Minnesota, and so

1  it had three or four broad topic touchdown areas.  It worked

2  on rural economic development.  It worked on kids and

3  families issues.  It worked on the enhancement of the

4  Mississippi River.  And it also had a couple of large

5  international research programs, one in neuroscience, one in

6  crop research, so in many ways it was sort of both a local

7  foundation and an international foundation.

8          THE COURT:  Let me take this opportunity to second

9  the suggestion that you slow down.

10          THE WITNESS:  Oh, I'm sorry.  Sorry.  Sorry.

11  Breathe, huh?  Breathe.

12  BY MR. SHUMAKER:

13  Q   That's right.  Thank you.  And so after the McKnight

14  Foundation, where did you -- where did you go?

15  A   I was approached by a search firm to talk to the Kresge

16  Foundation in Detroit about the possibility of taking over

17  the presidency of the Kresge Foundation.

18  Q   And you got that job?

19  A   I did.

20  Q   And what year was that again?

21  A   That was 2006.

22  Q   Could you describe for the Court what the Kresge

23  Foundation does?

24  A   The Kresge Foundation, a little bit unlike McKnight, is a

25  large national foundation, has about $3-1/2 billion of

1    assets.  If focuses on six broad areas of work from human

2    services to the environment to health and a number of others.

3    And it sends out into the community grants totaling about

4    $150 million a year, and we also make loans to nonprofit

5    organizations to help them accomplish their mission.

6    Q    Where is Kresge headquartered?

7    A    We're in Troy right outside the city.

8    Q    Do you have offices in Detroit?

9    A    We do have an office in Detroit.  In 2012 we established

10   an office right in the middle of the city on Woodward Avenue.

11   Q    Mr. Rapson, do you currently serve on any boards?

12   A    Yes.

13   Q    Which ones?

14   A    In Detroit I serve on the M-1 Rail Board, the Detroit

15   Riverfront Conservancy Board, the Downtown Detroit

16   Partnership.  Nationally I serve on the board of something

17   called the Local Initiative Support Corporation, which is a

18   large national intermediary that does community development

19   work.  I serve on something called Living Cities Board, which

20   is a consortium of the largest banks and foundations in

21   America working together to try to help improve life

22   conditions in America's cities, and I work -- I serve on the

23   board of something called ArtPlace, which is also a

24   consortium of about a dozen foundations focused on arts and

25   culture and the role they can play in the revitalization of

1  American cities.

2  Q    What is the Downtown Detroit Partnership?

3  A    The Downtown Detroit Partnership is a collection of

4  business CEOs who touch Detroit in one way or another, either

5  are located there or do substantial business there.

6  Q    How about the Detroit Riverfront Conservancy?  What does

7  it do?

8  A    This is a large broad-based civic board focused on the

9  management of the riverwalk, essentially both the parts that

10  have been built and the parts that are yet to be built.

11  Q    And the M-1 rail project, what is that?

12  A    Good question.  The M-1 project is the light rail project

13  that has just broken ground last month to run between the

14  river and midtown and to serve as a connector into a larger

15  regional transportation system.

16  Q    What is the Living Cities entity that you described?

17  A    Living Cities is about eight national foundations, the

18  Gates Foundation, the Ford Foundation, the MacArthur

19  Foundation, Kresge and others, together with national banks,

20  Citibank, Bank of America and others, that pool funds to try

21  to help communities take on challenges that they otherwise

22  couldn't.

23  Q    I want to talk to you a little about the Kresge

24  Foundation.  Focus on that one.  Is it fair to describe the

25  Kresge Foundation as part of Detroit's philanthropic

1   community?

2   A    Yes.

3   Q    Could you describe how the -- Kresge fits into Detroit's

4   philanthropic community?

5   A    Kresge is probably -- is the largest foundation based in

6   Detroit, but there is quite an extraordinary ecology of

7   foundations working in the city.  You have private

8   foundations working on children's welfare.  You have other

9   private foundations working on human service issues, other

10  foundations working on environmental issues, and then you

11  have a number of foundations that, although they're not based

12  in Detroit, work extensively in Detroit, so, for example, the

13  Knight Foundation from Miami does a lot of work on journalism

14  and public engagement, and they -- because they once had a

15  paper -- I don't know if they still have a paper -- they have

16  a paper in Detroit.  They continue to be actively engaged, or

17  the Ford Foundation, which is based in New York City, that

18  because of its roots has spent a lot of its time and energy

19  figuring out how it can be most helpful to the city.

20  Q    Do you spend much time interacting with other members of

21  the philanthropic community?

22  A    Yes, a large amount of time.

23  Q    How do you do that?

24  A    There are always projects that you work on together, so

25  most often what happens is you simply get on the phone and

1   compare notes and realize that there's some common purpose

2   that you can join in, but there's also a vehicle that we

3   created almost right after I came to Detroit, which is called

4   the Detroit Neighborhood Forum.  Every month all of the

5   foundations in the city and all of the banks in the city

6   together with a lot of the nonprofits in the city sit in the

7   same room and talk through issues of common concern about the

8   future of Detroit's neighborhoods.

9   Q   Have you ever tried to depict visually the interactions

10  that you just described with other members of the

11  philanthropic community?

12  A   Yes, I have.

13          MR. SHUMAKER:  I'd like to show the witness Exhibit

14  67, please.  You know, I forgot to give out binders.  Your

15  Honor, may I approach?  I'm sorry.

16          THE COURT:  Yes, sir.

17          MR. SHUMAKER:  Your Honor, may I approach the

18  witness?

19          THE COURT:  Yes.

20  BY MR. SHUMAKER:

21  Q   Mr. Rapson, do you see Exhibit 67?

22  A   I do.

23  Q   Did you draw this?

24  A   I did.

25  Q   When did you draw it?

1  A    I drew it earlier this year, I think, in -- well, I think

2  it's dated.  I think that's the correct date.  I think I drew

3  it in February of this year.

4  Q    Did anyone ask you to draw it?

5  A    No.  This was something I drew.  I did draw it in

6  anticipation of giving a speech at Duke University to try to

7  help the folks in the audience understand how philanthropy

8  was working in Detroit.

9  Q    Who was -- so the individuals at Duke, who generally was

10 the intended audience of this drawing?

11 A    The members of the audience there were a broad range of

12 people from academics to other foundation residents to civic

13 leaders.  I've since shown this and talked this through with

14 other audiences of business folks, other municipal leaders

15 across the country.

16 Q    Do you believe it fairly and accurately portrays the role

17 philanthropy is playing in the City of Detroit?

18 A    I do.  I mean it's not a description of everything that

19 philanthropy does or could do, but I think it's a fairly

20 comprehensive look at how we work.

21          MR. SHUMAKER:  Your Honor, I would move Exhibit 67

22 into evidence.

23          MR. MCCARTHY:  Your Honor, for clarification, if

24 this is coming in for demonstrative purposes, we don't have

25 an objection.

1      MR. SHUMAKER:  Thank you.  For demonstrative

2  purposes.

3      THE COURT:  All right.  It is admitted for that

4  purpose.

5      (City Exhibit 67 received at 2:15 p.m.)

6  BY MR. SHUMAKER:

7  Q   Mr. Rapson, could you -- do you see your boxes that

8  encircle this drawing?

9  A   I do.

10 Q   What are they intended to convey?

11 A   These are broad functions that philanthropy is playing

12 out as it helps revitalize the City of Detroit.

13 Q   Is that today?

14 A   Yes, today.  And one of the reasons I did it was to

15 suggest that these are the kinds of functions that I think

16 philanthropy will continue to play into to future.

17 Q   Okay.

18      THE COURT:  Steve, can you blow up the first box in

19 the upper left-hand corner?

20 BY MR. SHUMAKER:

21 Q   And this box, Mr. Rapson, says, quote, "Help set long-

22 term vision and broaden the civic alliance"; correct?

23 A   Yes.  That's correct.

24 Q   What did you intend to convey to your audience with that

25 box?

1  A   One of the functions of private philanthropy, in my view,

2  is that it can take a long-term perspective.  It doesn't have

3  to run for reelection.  It doesn't have to report quarterly

4  to shareholders.  And so I was simply trying to suggest that

5  occasionally there are times when a community can benefit

6  from having an entity like a foundation help sort of set the

7  table for longer-term conversations that are otherwise

8  difficult to have in the normal course.

9          MR. SHUMAKER:  Could you pull up the second box,

10  Steve?

11  BY MR. SHUMAKER:

12  Q   Mr. Rapson, what did you intend to convey with this box

13  about the philanthropy in New York -- I mean in Detroit?

14  A   In a circumstance like the current circumstance in

15  Detroit, it's very difficult to get things done unless you

16  have an infusion from both residents and folks outside the

17  city who have a long-term commitment and sort of creative

18  basis to really help break through tough problems, and so one

19  of the things that this was trying to signify is that

20  occasionally you have to go out and help encourage people who

21  want to be helpful to come to Detroit and make a real

22  contribution, so just as an example, one of the clouds there

23  suggests the Detroit Neighborhood Revitalization Fellows --

24  this is a group of 30 fellows that we were able to attract to

25  the city a number of years ago who are early career economic

1  development specialists, planners, architects, or other kinds

2  of civic workers -- pay their salary for a couple of years --

3  it's almost like a Teach for America model -- and then push

4  them into key city agencies.  And it's been an extraordinary

5  infusion of energy and talent.  We're actually in our second

6  cohort, and of the first 30, I would suspect 28 have remained

7  in the city, and we now are working on the second cohort.

8  And when you combine that with German Marshall Fellows, White

9  House Fellows, you begin sort of reenergizing the base of

10  talent and commitment that the city needs in order to move

11  forward.

12  Q   Have you been able to attract competent civic talent in

13  your efforts?

14  A   It's actually been quite extraordinary.  When we first

15  announced the fellows program, we weren't quite sure what we

16  would get.  We had 700 applicants for 30 positions from all

17  50 states and a number of countries around the world.  We

18  ended up choosing ten Detroiters, ten folks who had moved

19  away from Detroit and wanted to come back, and ten folks who

20  had absolutely no connection to the city, and they have been

21  absolutely spectacular.  As I said, many of them have stayed.

22  A lot of them are in key decision-making positions all

23  throughout the city.

24  Q   The third box down that's in green is captioned "provide

25  high-risk early stage capital."  Could you describe for the

1  Court what you meant by that?

2  A    Philanthropy in many ways is society's social venture

3  capital.  It's able to take risks where the market simply

4  won't take risks, and so philanthropy can often just sort of

5  peel away the first layer of risk and make a deal, a

6  transaction, a set of ideas more palatable for the market.

7  So a couple of the examples, again, on the -- in the clouds

8  are -- one would be something called the New Economy

9  Initiative where philanthropy put together a $135 million

10 pool to help create the environment that would permit small

11 businesses to get up and going and to thrive.  That's not

12 something that the market would have come and done, and it's

13 been enormously successful in sort of jump-starting a set of

14 activities around entrepreneurialism that you see manifesting

15 now in midtown.

16      Second quick example would be something like what we

17 call the Woodward Corridor Investment Fund.  This is a $30

18 million fund where Kresge took the first layer of risk that

19 no bank would take, and in return for removing that risk, we

20 were able to get Prudential, MetLife and a number of other

21 investors into the fund to make loans for the revitalization

22 of residential and commercial property on Woodward Avenue.

23      MR. SHUMAKER:  Let me ask you to blow up box four,

24 Steve.

25 BY MR. SHUMAKER:

1  Q   What did you intend with this box, Mr. Rapson?

2  A   You know, it's one thing for philanthropy to sort of take

3  the first layer of risk in a transaction.  It's another to

4  invest in the kind of public infrastructure that markets are

5  going to want to see if they're going to invest in a place,

6  so the examples I've listed here are good examples of trying

7  to create sort of a public commons that people recognize as

8  safe, vital, and engaging, so the M-1 project is a perfect

9  example.  I've had conversations with Dan Gilbert, for

10  example, to the effect that he probably would not have moved

11  his folks downtown if there wasn't a light rail system and

12  there wasn't a riverfront development.  These are public

13  amenity structures that businesses want for their talent

14  base.  You just can't get young people or not even not so

15  young people to work for the company and end up feeling like

16  this is a place they want to live in.

17  Q   Let's go to the right side of the exhibit, the fifth box

18  up in the upper right.  It says, "function as a seller."

19  What did you mean there, Mr. Rapson?

20  A   A philanthropy like Kresge has the enormous advantage of

21  sort of understanding both what's going on in the ground and

22  being able to connect to national resources.  And what we are

23  finding ourselves doing more and more is trying to convince

24  people that Detroit is a place they want to do business,

25  where they can invest, where they might want to move, where

1  there's sort of an energy about the place that will enable

2  them to feel like they want to really put down roots.  An

3  example here is the Living Cities Group I talked about

4  earlier.  This is this consortium of foundations and banks.

5  We were able to convince Living Cities to get their

6  membership to invest here in Detroit even though those

7  investments would not have been part of what they would

8  normally have done, so a number of the members of Living

9  Cities have never invested in Detroit before.  And we were

10  able to get them to invest in the midtown area both in terms

11  of lending into bricks and mortar projects but also into

12  increasing the capacity of the community development

13  infrastructure in midtown.  A woman named Sue Mosey runs

14  Midtown, Inc., and she's developed an enormous pipeline of

15  projects.  Because of the Living Cities intervention, we

16  quadrupled the size of her staff and increased her capacity

17  to work effectively in the city.

18  Q   And then on the bottom side of that part of the exhibit,

19  describe for the Court what you intended to convey there.

20  A   This in many ways is sort of philanthropy's classic

21  function that I think we can never kind of turn our back on,

22  which is there are just activities and organizations that

23  aren't going to be able to get market investments, so arts

24  organizations, human service organizations, something like

25  the Eastern Market.  Philanthropy in Detroit has been very

1    good at making sure that there is a sort of a safety net of

2    support for those kinds of organizations that wouldn't

3    otherwise be viable but for philanthropic investment.

4            MR. SHUMAKER:  You can keep that up, Steve, please,

5    but push back the -- thank you.

6    BY MR. SHUMAKER:

7    Q    A lot of numbers I see on this drawing, Mr. Rapson, by

8    your estimation, how much money have the philanthropic -- the

9    various philanthropic entities depicted on this drawing --

10   how much have they invested in Detroit over the past ten

11   years?

12   A    You know, I keep wishing we actually could put a precise

13   pin in that, but I've done that calculation just on the back

14   of an envelope a number of times, and I think that if you

15   push back ten years, you would find that just the private

16   philanthropies, not the corporate philanthropies, not Ford

17   Motor, not Chrysler, just the private philanthropies, have

18   probably invested north of $1.5 billion in the City of

19   Detroit over the last decade.

20   Q    Where does the Kresge Foundation fit into this

21   philanthropic picture?

22   A    We do all six of these functions.  Some foundations do

23   some.  Others don't do others.  So there are foundations, for

24   example, that do nothing except support human service

25   organizations.  I think one of the defining qualities of

1  Kresge is that we touch each one of these boxes, and these

2  clouds that I've drawn on the schematic are all examples of

3  how Kresge has actually invested in each one of these six

4  boxes.

5  Q   The clouds in pink?

6  A   The things that kind of look like clouds -- they're all

7  different colors -- that are sort of more in the middle,

8  those things.

9  Q   It's quite a drawing.  So did all these projects that

10  you're -- listed on the chart, which ones has Kresge

11  supported?

12  A   Each one of them.

13  Q   And what's your opinion of how this sort of investment

14  has impacted the City of Detroit?

15  A   I don't mean to be immodest, but I think it's been

16  transformative.  When we came out of the 2008-2009 era when

17  Mayor Kilpatrick was indicted, when the recession set in,

18  when the foreclosure crisis set in, you know, there was

19  really no one at the table.  The city government was, you

20  know, essentially dysfunctional.  Private sector was sort of

21  in a bunker, and Kresge and I think the other philanthropies

22  in Detroit really had no choice but to sort of step up and

23  get on the same page and really get something done.  So from

24  2009 to the present, what we have tried to do very

25  intentionally is sort of create a scaffolding, a structure of

1  supports and programs and forms of progress that was firm

2  enough so that when the private sector got back into the

3  game, you know, a la Dan Gilbert, when the public sector got

4  back into the game, that there would be lots for them to work

5  with, whether it's a rail project, whether it's a set of

6  neighborhood projects, whether it's an economic development

7  project, and I think that it has had enormous impact.  I

8  actually shudder to think where we would be if philanthropy

9  hadn't been in a position to step up during this period when

10 others simply weren't able to do what they normally would do.

11         MR. SHUMAKER:  You can take that down, please.

12 BY MR. SHUMAKER:

13 Q   Mr. Rapson, have you heard of the Detroit Future City

14 project?

15 A   I have.

16 Q   And could you share with the Court what the Detroit

17 Future City project is?

18 A   This was a project that was begun in 2010 to try to

19 reimagine the way Detroit uses its land.  In short form, it

20 essentially tried to -- its aspiration was to identify

21 strategies that would reinforce nodes of strength in the city

22 and that would convert to the positive side of the ledger

23 those sort of vast tracks that were abandoned, blighted, or

24 otherwise underutilized.

25 Q   And what do you mean by identifying strategies for nodes

1  of strength?  What does that mean?

2  A    Well, so if you take an area like midtown with strong

3  powerful anchor institutions like the Henry Ford Hospital

4  system, like Metropolitan -- Wayne State University, Detroit

5  Medical Center, the cultural institutions, there are ways in

6  which you can sort of enhance their environment.  There are

7  ways in which you can help them be even more effective

8  members of the community.  There are just ways of doubling

9  down to make sure that those investments are the kinds of

10  investments that will stay in the city and that will

11  ultimately sort of propel the city forward.

12  Q    What prompted the creation of the Detroit Future City

13  project?

14  A    I received a call from the administration of Mayor Bing

15  asking if I would visit with their planning director, brand

16  new.  He said that he -- that the mayor was really interested

17  in trying to figure out land use for the City of Detroit,

18  and -- I should keep going?

19  Q    No.

20  A    Yeah.

21  Q    Hold on one second.

22          THE COURT:  You can go.  You can go ahead, sir.

23          THE WITNESS:  Go ahead?  Sorry.  Mayor Bing had said

24  that they were really interested in trying to get a handle on

25  land usages.  With all of the blight, all of the vacant

property, they really needed a path forward, and so he said,
"We want to" -- the planning director said to me, "We want to
go out and hire the guy who did the plan for Singapore and
bring him in and have him do a plan here."  And I said,
"Before you do that, would you be willing to just stop for a
moment and have us suggest something of an alternative?"  And
he said, "Well, what do you mean?"  I said, "I think we
need -- what we need is both that kind of high-level
technical expertise, but you also need a community engagement
process that is robust to make sure that the citizens of the
community both have a say and feel ownership in whatever you
create," because that was sort of the lessons of New --
lesson of New Orleans that if you're just going to --
BY MR. SHUMAKER:
Q    I just want to slow you down just a little --
A    Slow down?
Q    -- bit so that the Judge can hear you.
          THE WITNESS:  So sorry, your Honor.
          THE COURT:  I know.  You're so excited about what
you're talking about, and --
          THE WITNESS:  Can't help myself.
          THE COURT:  -- your excitement is wonderful, and
it's contagious, but I do need to hear and understand what
you're saying.
          THE WITNESS:  Pardon me.

1  BY MR. SHUMAKER:

2  Q    I'm sorry.  Please continue.

3  A    Yeah, yeah.  Fat chance.  That lesson really was in many

4  ways the lesson of New Orleans, and in some ways Detroit was

5  like New Orleans.  We weren't ravished by a natural disaster,

6  but we were in many ways the same situation of decline and

7  difficulty.  So, at any rate, we brought back a plan that

8  would hire a project director who would, in turn, oversee six

9  or eight working groups on things like economic development

10  strategy, land use strategy, housing strategy, public systems

11  strategy, and oversee as well a community-based engagement

12  process.  And over the next three or four years, those played

13  out in a fairly remarkable way.  She, in fact, assembled this

14  extraordinary team of international consultants to figure out

15  all of these sort of technical issues of planning and

16  economic development, and we worked with the University of

17  Detroit Mercy to conduct what I think is probably the most

18  extensive, comprehensive, and sophisticated community

19  engagement process any city in America has ever done.  It

20  ended touching 50,000 Detroiters.  And so the art was pulling

21  those two things together.  How do you get the technical

22  analysis to merge with the community-based analysis and

23  create something that was coherent and implementable?  And

24  that was in a word what the Detroit Future City Strategic

25  Framework was.

1    Q    What was your personal involvement?

2    A    When Warren Palmer, the city planning director, asked me

3    to take this on, his second question was, "Who can we get to

4    run it?"  So I got on an airplane and had dinner with a woman

5    who had just finished a stint as the planning director for

6    the City of Newark under Cory Booker and before that had been

7    the assistant planning director in the District of Columbia,

8    extraordinary woman who actually had ties to Detroit,

9    convinced her to take the job, and so we essentially

10   contracted with her to run the project.  We actually ran the

11   money through the Detroit Economic Growth Association, but

12   essentially we paid for her time.  We paid for the time of

13   all of the consultants, and we underwrote much of the

14   community development, community engagement process as well.

15   We did have partners.  The Ford Foundation and the Kellogg

16   Foundation both chipped in.

17   Q    So the Kresge Foundation was a primary sponsor of this

18   effort?

19   A    We were.

20   Q    And, again, I may have just missed it.  Your personal

21   involvement -- where did you fit into the picture that you

22   just described?  What did you do?

23   A    Well, because I had made the first call on the director

24   of this program -- her name is Toni Griffin -- because I had

25   made the first call with Toni, I tried to make sure that she

1   was staying on the page and that we were being informed on a

2   regular basis of her progress.  She was an independent

3   contractor.  She needed to do her work in her best

4   professional judgment, but I assigned Laura Trudeau, who

5   directs our Detroit program at Kresge, to really work hand in

6   glove with Toni, and I was briefed regularly, more often than

7   once a month, on the progress of the plan, what the obstacles

8   were, and there were times when we needed to troubleshoot.

9   There were times when it hit road bumps, and I needed to get

10  on the phone to the mayor or to someone else to try to make

11  sure that this effort kept going.

12  Q   And is Toni -- is it Toni --

13  A   Toni Griffin.

14  Q   Toni Griffin.  Does she still head up the project?

15  A   When the plan was reduced to written form in 2012, that

16  in many ways concluded her work.  The Duggan administration

17  has indicated an interest in bringing Toni back and helping

18  advise on the implementation of the plan, but her formal role

19  in the development of the plan ended when it was published.

20  Q   So who is the current leader of the Detroit Future City

21  project?

22  A   A man named Ken Cockrel, Jr., formerly of the city

23  council and formerly mayor of the city.

24  Q   Has the Detroit Future City project issued a report?

25  A   It has.

1  Q   Do you recall what that report is called?

2  A   To the best of my recollection, it's the Detroit Future

3  City Strategic Framework.

4  Q   I'd like to show you Exhibit Number 63, please.

5  Mr. Rapson, you should feel free to look at the binder that I

6  provided to you because this is obviously just the cover

7  page, but after you flip through the actual document, could

8  you share with the Court what Exhibit 63 is?

9  A   This is the Detroit Future City Strategic Framework plan.

10  Q   And this is the report that you were talking about?

11  A   It is.

12  Q   Is it publicly available?

13  A   Yes, it is.

14  Q   How?

15  A   When we announced the plan, we distributed it widely.  We

16  announced it in its release in 2013.  We had a major public

17  event with a couple of hundred people.  We made sure that it

18  was made available to everyone who came, and then we put it

19  in all of libraries of the city, and it's also available from

20  the Detroit Future City project office, which was created

21  subsequently.

22  Q   Did you draft any portions of that report?

23  A   No, I did not.

24  Q   Did you have any involvement with the drafting of the

25  report?

1   A    Not in the -- no, not in the drafting.  As I mentioned,

2   Toni and her staff consulted regularly with us about the

3   content, but I didn't put pen to paper.

4   Q    What was your involvement in the report's creation?

5   A    I and our staff not only met with Toni on a regular basis

6   but were often called into meetings on the substance, whether

7   it was economic development or housing policy or something

8   else, so there was a lot of push-in from our office, and

9   there was also an advisory committee that was set up to help

10  guide the plan making sure that we were touching all of our

11  bases, and, again, Laura Trudeau, our senior program officer

12  at Kresge, served on that advisory committee.

13  Q    Are you aware of whether the report was created in order

14  for the public to rely on it?

15  A    That was certainly our intention that we would create a

16  document that would help guide all of the sectors in their

17  decision-making, public sector, private sector, nonprofit

18  sector.

19  Q    I was going to ask you would that include the city

20  government?

21  A    Yes, it would.

22  Q    Do you know whether the city government has relied on it?

23  A    I have a number of indications that they take it very

24  seriously and they are relying on it.

25  Q    What are those indications?

1  A    Well, first, Ken Cockrel, the head of the implementation

2  office, is a regular attender of the mayor's cabinet

3  meetings.

4  Q    Mayor Duggan's?

5  A    Mayor -- pardon me -- Mayor Duggan's cabinet meetings.

6  Mayor Duggan's chief economic development officer, Tom

7  Lewand, sits on the advisory team for the Detroit Future City

8  plan, and interestingly the woman who crafted the first

9  section of the document related to economic development has

10  been retained by the city to essentially help shape the

11  city's economic development strategy.

12  Q    Let me show you Exhibit 3, please, and, Mr. Rapson, this

13  is just a cover page, but have you seen this document before?

14  A    Yes, I have.

15  Q    Has a copy of it been provided to you?

16  A    Yes, it has.

17  Q    I'd like to show -- it's in evidence.  I'd like to show

18  you page 1 -- no -- 003177.

19       MR. SHUMAKER:  I'm sorry.  Go one page before that,

20  please, one more page.  Thank you.

21  BY MR. SHUMAKER:

22  Q    Mr. Rapson, this section of the disclosure statement is

23  Section 9 entitled "Reinvestment Initiatives."  Do you see

24  that?

25  A    I do.

1  Q   Have you seen this portion of the disclosure statement

2  before?

3  A   Yes, I have.

4  Q   And did you become familiar with the reinvestment

5  initiatives that are listed in this disclosure statement?

6  A   Yes, I did.

7  Q   I want to show you --

8          MR. SHUMAKER:  Now please move to page 177.  Yes.

9  And the last sentence of the carry-over paragraph at the top,

10  please highlight -- or blow it up and then highlight it,

11  please.  Starts, "In developing."

12  BY MR. SHUMAKER:

13  Q   Could you read that sentence to the Court, please,

14  Mr. Rapson?

15  A   "In developing its blight removal initiative, the city

16  has taken into account the proposals set forth in the Detroit

17  Future City's Strategic Framework, paren, the strategic

18  framework, and the city believes that its strategies for

19  blight removal are consistent with the goals set forth in the

20  strategic framework."

21          MR. SHUMAKER:  Your Honor, the city would move

22  Exhibit 63 into evidence.

23          THE COURT:  Any objections?

24          MR. MCCARTHY:  Your Honor, we have no objection to

25  this document being in evidence, and for clarification of the

1  record, I actually think this document is in evidence.

2  Pursuant to my notes, it's in the Court's order.  It's 3573.

3          MR. SHUMAKER:  Thank you.  I apologize if that's the

4  case, but --

5          THE COURT:  All right.

6          MR. MCCARTHY:  But no objection, your Honor.

7          THE COURT:  Well, do we need it in twice?

8          MR. SHUMAKER:  No, your Honor, assuming it's in

9  once.

10         THE COURT:  Right.  Assuming it is, then I will

11  assume it's withdrawn.

12         MR. MCCARTHY:  And, again, it's 3573 if we need

13  to --

14         THE COURT:  Thank you.

15 BY MR. SHUMAKER:

16 Q   Now, focusing on that --

17         THE COURT:  Hold on one second.  Is there a problem?

18         ATTORNEY:  Confusion.

19         THE COURT:  Okay.

20         MR. SHUMAKER:  I think it's in, your Honor.

21         THE COURT:  Okay.

22 BY MR. SHUMAKER:

23 Q   I'm sorry.  Now, focusing on the highlighted sentence,

24 Mr. Rapson, could you share with the Court your views on

25 whether the plan of adjustment's reference to the Detroit

1  Future City Strategic Framework makes sense?

2  A    Makes complete sense.

3  Q    And why is that?

4  A    In many ways the Detroit Future City framework is a

5  strategy at large for dealing with blight.  It's very

6  difficult for a city to know where to go when it has this

7  amount of blight.  It's very difficult for a city to know how

8  to go about taking it down, but it's even more difficult for

9  a city then to know how do you deal with what comes after.

10 And one of the major purposes of the Detroit Future City

11 framework is to create a roadmap for the kinds of decisions

12 and the kinds of investments that will create a city that has

13 both these nodes of strength and that increasingly uses its

14 underutilized land in a more productive way, so my sense is

15 that the Detroit Future City plan is really in many ways the

16 way by which the city will operationalize its approach to

17 blight.

18 Q    Have you heard of the blight task force project?

19 A    Yes.

20 Q    And what is that?

21 A    This was a task force that was created at the request of

22 Secretary of HUD, Shaun Donovan, a little bit more than a

23 year ago.  Dan Gilbert and two community representatives

24 headed it up, and I think you've heard about -- I understand

25 that you've heard a little bit about what it seeks to do, but

essentially the blight task force's genius, which no city in
America, to my knowledge, has done, was to create an
inventory of every single parcel in the city so that at the
end of the day you had a decision-making platform about which
properties need to be demolished, which need to be
rehabilitated, and which could be recycled and reused, so the
task force in many ways is a blueprint within a blueprint.
It's how do you get these houses down in some sort of orderly
way, and then I think this complements that by suggesting
ways that you could use that land.

Q   I was going to ask that.  How does the blight task force
report interface, if you will, with the Detroit Future City's
Strategic Framework?

A   Yeah.  I think the blight task force is nested within
this broader decision-making framework.

Q   And what's the status of the Detroit Future City project
today?

A   It is alive and well.  We launched it in 2013, and when
we did that we did three things.  We said you have a plan,
but the city has lots of plans, so you need three or four
other pieces.  You need a governance structure, so we carried
over from our community process a community-based advisory
group that now constitutes the advisory group to the plan.
You need a project management office.  This is a big plan.
It's got 400 pages, 1,200 appendices pages.  You need a group

of people waking up every morning trying to figure out how to
make it real.  What do you do?  What's first?  What's 13th?
What's 110th?  And finally you need a sense of seriousness
that there will be capital available to carry this out, and
so when we announced this plan, I announced on behalf of
Kresge that over the next five years, every single dollar of
the $150 million that we would spend in Detroit would be
consistent with this plan.  So what you have today, I think,
is the aggregation of those things.  You have a plan.  You
have a governance committee from the community.  You have a
project management office, and you have some capital to get
going.

Q    Do you have any understanding as to whether the Detroit
Future City Strategic Framework is to work with the plan of
adjustment in these proceedings?

A    I'm not sure I fully understand the question.

Q    Well, I'm referencing, if you will, the highlighted
sentence.  Do you have any understanding of how the city is
going to take into account the proposals set forth in the
Detroit Future City Strategic Framework?

A    Every assurance I've been given by the mayor and his
staff is that this is a foundational document, that how the
city moves forward under the plan of adjustment will have
everything to do with the kinds of strategies that the
Detroit city plan has articulated.

1          THE COURT:  Could you take that down, please?

2          THE WITNESS:  Excuse me.

3    BY MR. SHUMAKER:

4    Q    Is it fair to say that the Kresge Foundation has a

5    special interest in Detroit?

6    A    Yes.

7    Q    Why would you say that?

8    A    We have been -- the Kresge family, which is the mother

9    lode of the Kresge trust, has been working in Detroit since

10   1924 when Sebastian Kresge founded the first five and dime,

11   later went on to become Kmart.  And when the money was turned

12   over to trust, it was turned over with the explicit intention

13   that it would be used to improve mankind.  It's a fairly

14   general mandate, but there has always been an understanding

15   that the family made its money here, the family is still

16   rooted here, and that the foundation needs to have a very

17   special relationship to its hometown.

18   Q    Now, you indicated --

19          MR. SHUMAKER:  Steve, I asked you to bring it down,

20   and now I ask you to bring it back up, Exhibit Number 3 at

21   003176.  Could you please blow up the top chart?

22   BY MR. SHUMAKER:

23   Q    Now, Mr. Rapson, you indicated that you reviewed this

24   portion of the disclosure statement; correct?

25   A    Yes.

1  Q   And have you come to some understanding about these

2  revitalization and restructuring initiatives?

3  A   At a broad level.  I don't recall the details of each

4  one.

5  Q   Now, with regard to the areas identified there, has the

6  disclosure statement been the only source of information

7  about those initiatives?

8  A   No.

9  Q   What other --

10  A   I mean I --

11  Q   What other sources of materials have you reviewed in

12  order to gain an understanding --

13  A   Oh, I see.

14  Q   -- of those initiatives?

15  A   Well, mostly news accounts.  I mean I just think that

16  this has been taken apart and put back together a number of

17  times, and I --

18  Q   I'm sorry.  I --

19  A   News accounts.

20  Q   News accounts.  Okay.  I'm sorry.

21  A   From newspapers largely.

22  Q   Okay.  Now, you see blight remediation and public safety

23  at the top of that list in the upper left-hand corner.  Do

24  you believe that those initiatives are important?

25  A   I think they're beyond important.  I think that they are

1  absolutely essential for the city to regain its footing.  All
2  of the work that you walked me through earlier on that
3  philanthropy does with rail projects and neighborhood
4  projects and economic development projects is built on sand
5  unless the city can get a firmer grip on its land use issues,
6  on its safety issues, and on a number of the other things
7  that are listed in the disclosure statement, so my sense is
8  that these aren't adequate, that these -- this is a start,
9  but that it's an absolutely essential start to kind of
10  rebuilding the kind of public undergirding that you need in
11  order to rebuild a city that works.
12  Q   What's your personal view of the city's blight situation?
13  A   Oh, it's horrendous.
14  Q   Has Kresge undertaken any efforts to address the blight
15  issue in Detroit?
16  A   Yes.  We --
17  Q   What are they --
18  A   Pardon me.  We together with Dan Gilbert and with the
19  Skillman Foundation have helped bear some of the costs of the
20  blight removal task force.  We also underwrote an earlier
21  attempt by another organization to try to do blight removal
22  at scale, and it ended up not working as people had hoped,
23  but we have committed ourselves to trying to think through
24  how it is that we can contribute to whatever strategies Mayor
25  Duggan's administration comes up with to accelerate the

1    remediation process.

2    Q   Do you have a view as to the impact on the city that

3    these RRIs, to the extent that you've become familiar with

4    them, will have?

5            MR. MCCARTHY:  Your Honor, objection.  The question

6    calls for improper lay witness opinion.  Mr. Rapson has

7    certainly talked about blight remediation.  There's more than

8    25 line items on these RRIs.  Mr. Rapson also testified that

9    for the majority of those his impression as to these have

10   come about through news reports, and I think his deposition

11   may support that as well.  If that question is intended to be

12   as broad as I think I heard it, it certainly calls for

13   improper lay witness opinion.  Furthermore, I'd state that

14   the city has retained experts to testify on this topic, and I

15   don't think it would be informative for this Court or helpful

16   to have Mr. Rapson also testify as a lay witness about things

17   that he's learned about in news reports.

18           MR. SHUMAKER:  I'll limit the question to blight

19   remediation then.

20           THE COURT:  Restate your question then.

21   BY MR. SHUMAKER:

22   Q   Do you have a view as to the impact on the city of the

23   blight remediation initiative and what its effect will be?

24   A   My sense is that the scope of the blight in Detroit

25   has -- carries with it, as I mentioned earlier, a couple of

1    different components.  One, you've got to make sure that this

2    is sequenced properly.  You can't knock down every house.

3    That's not appropriate.  Some need to be rehabbed.  Some need

4    to be treated differently.  So what I think this does is

5    create a down-payment on developing the kind of strategies

6    that the city is going to need in order to move

7    systematically through where do you tear stuff down, where do

8    you rehabilitate stuff, what do you do after the houses are

9    down, and I can't imagine a more pressing priority for the

10   City of Detroit than getting those blighted structures

11   disposed of in a way that makes sense.

12   Q   If the $440.3 million is not enough or whatever the city

13   commits under the plan of adjustment, do you think the

14   philanthropic community will assist in making up the

15   difference?  Well, I just -- do you have any understanding of

16   whether $440 million is enough to remediate the blight within

17   the city?

18   A   That's a little easier to answer, yeah.  The idea of

19   making up the other $500 million was a little bit daunting,

20   but --

21   Q   Let me ask you about the other $500 million.  Where do

22   you get that figure?

23   A   When the blight task force came in with its

24   recommendations, it seemed to scope out an order of magnitude

25   challenge of somewhere between 750 and a billion dollars.

1   I've heard that from the Secretary of HUD.  I've heard that

2   from other people.  I don't know how precise that is.  I

3   think, if I understand your question, this is, again, a

4   start.  You've got to get started.  And if this becomes sort

5   of a first serious set of gestures, you're well on your way,

6   and I think it accelerates the ability of other people to

7   sort of see their way to this work.  Will philanthropy

8   contribute?  Yes.  Will the federal government put more money

9   on the table?  Almost certainly.  Will other people figure

10  out interesting and inventive ways to do this?  Yeah.  I mean

11  we've had conversations -- I don't know how productive they

12  are -- about issuing a private bond to help with the blight

13  remediation.  You could get up to pretty big numbers pretty

14  quickly.

15  Q    Thank you.

16          MR. SHUMAKER:  You can take that down now, please.

17  BY MR. SHUMAKER:

18  Q    Mr. Rapson, are you familiar with what's referred to as

19  the grand bargain?

20  A    Yes, I am.

21  Q    What do you understand the grand bargain to be?

22  A    It is a package of investments intended to accelerate the

23  resolution of the bankruptcy by both limiting the amount of

24  pain and suffering that pensioners will have to take under

25  any resolution as well as taking the Detroit Institute of Art

1 out of public ownership and placing it into a trust that

2 would be independent of city control.

3 Q   Is the Kresge Foundation participating in any way in the

4 grand bargain?

5 A   Yes, we are.

6 Q   How is it?

7 A   We've made a hundred million dollar commitment to this

8 trust over a 20-year period.

9 Q   Is that a significant amount of money for the Kresge

10 Foundation?

11 A   It's a very significant amount of money for the Kresge

12 Foundation and was a decision that we took extremely

13 seriously because it was extraordinary for our institution.

14       MR. SHUMAKER:  Let me ask you to take a look at an

15 exhibit, 609, which has been admitted.  It's in the record.

16 And I ask you to blow up the second paragraph that's entitled

17 "grant."  Yes, that one.  Thank you.  And now -- I'm sorry.

18 I should take that back.  Could you take that part down?

19 Sorry.

20 BY MR. SHUMAKER:

21 Q   Do you know what this is, Mr. Rapson?

22 A   These are the terms governing our making of the grant to

23 the grand bargain.

24 Q   And it reflects the hundred million dollar figure that

25 you just mentioned?

1  A   Yes, it does.

2         MR. SHUMAKER:  Now please blow up the second

3  paragraph there.

4  BY MR. SHUMAKER:

5  Q   And the second full sentence there, could you please read

6  that to the Court?  It starts out with, "The grant."

7  A   "The grant and the payment of the grant installments will

8  be conditioned upon the City of Detroit and the City of

9  Detroit General Retirement System and Police and Fire

10  Retirement System, parens, pension funds, being in compliance

11  with the conditions precedent for closing found in the" --

12  should I keep going --

13  Q   Yes, please, to the end.

14  A   -- sorry -- "found in the plan of adjustment, and, two,

15  certain material grant conditions of both an initial and

16  ongoing nature that are memorialized in the omnibus

17  transaction agreement, the OTA, to be entered into between

18  the City of Detroit, the Detroit Institute of Arts, and the

19  grantee substantially in the form attached to this terms of

20  grant agreement as Exhibit A and incorporated herein by this

21  reference, a copy of which will be provided to the foundation

22  promptly following its execution."

23  Q   Okay.  And you see that notion of conditions precedent;

24  correct?

25  A   Yes.

1  Q   Okay.  I'd like to show you another document, Exhibit

2  352.  And could we go to the second page of that, please?

3  And this is also in the record already, and I'd like to ask

4  you to direct your attention -- first of all, let me ask you

5  again what is this?

6  A   This is a letter that I wrote to the emergency manager

7  confirming our commitment of a hundred million dollars to the

8  grand bargain.

9        MR. SHUMAKER:  And looking at the second paragraph,

10  if you could blow it up, please --

11  BY MR. SHUMAKER:

12  Q   The second sentence of that paragraph, could you read

13  that for the Court?

14  A   "The grant and the payment of the grant installments will

15  be conditioned upon the City of Detroit, the City of Detroit

16  pension funds, and others being in compliance with the grant

17  conditions of both an initial and ongoing nature that are

18  stated in the plan of adjustment and a term sheet attached as

19  an exhibit to same which are to be further memorialized in

20  definitive documents between the parties."

21  Q   And you signed that letter; is that correct?

22  A   I did.

23  Q   Do you have an understanding of what those conditions

24  precedent are to your grant?

25  A   I do.

1    Q    What are they?

2    A    Well, they're --

3              MR. SOTO:  Your Honor, I'm sorry to interrupt.

4    Excuse me.  Objection.  If this is going to be a way to try

5    to get information that has been withheld from us under the

6    mediation order, that would be inappropriate.

7              THE COURT:  Is that what you're trying to do?

8              MR. SHUMAKER:  Well, your Honor, these are documents

9    in the record.  They're talking about conditions to the

10   grants.  Mr. Rapson knows what those conditions are.  I think

11   he's completely competent to testify to the question.

12             MR. SOTO:  But every time we asked what the --

13             MR. SHUMAKER:  It's not about the mediation.  This

14   is all out in the open.

15             MR. SOTO:  But every time we asked what those

16   conditions might be, the other side would tell us that we

17   couldn't get it because they couldn't violate your order, and

18   I agree that they couldn't violate your order, but now is not

19   the time to do it.

20             MR. SHUMAKER:  The grant conditions are public.

21             THE COURT:  Hold on one second.

22             MR. SHUMAKER:  Sorry.

23             THE COURT:  Can you point to me a specific instance

24   where this information was withheld from you?

25             MR. MCCARTHY:  I will, your Honor, because I was at

1    Mr. Rapson's deposition, and we had a chance to chat there,

2    so in this specific instance, while, yes, I agree with Mr.

3    Shumaker --

4         THE COURT:  Have you got the -- have you got the

5    deposition there that you can show me?

6         MR. MCCARTHY:  I do.  My point was, though -- and I

7    will show you that, but the -- it's not these conditions.

8    These conditions can be read into the record --

9         THE COURT:  Oh, all right.

10        MR. MCCARTHY:  -- and they have been, but --

11        THE COURT:  The objection is overruled.  Let's

12   proceed.

13   BY MR. SHUMAKER:

14   Q   What are those conditions precedent, Mr. Rapson?

15        THE COURT:  Go ahead.

16        THE WITNESS:  Sorry.  Pardon me.  One condition is

17   that the grant would be used to -- for the relief of

18   pensioners.  A second --

19        MR. MCCARTHY:  Your Honor, I object to that

20   statement.  That is not reading this into the record.  This

21   goes to -- and we object for two reasons.  This goes directly

22   to the why and to the benefits and the structure of it, which

23   was withheld from us from Mr. Rapson's deposition and others

24   under the mediation order which uses the term --

25        THE COURT:  All right.  All right.  Let's go about

1  this a different way then.  Instead of asking the witness

2  what his understanding of the conditions are, let's get the

3  documents out and show them to him and then have him affirm

4  them from the documentation.

5          MR. SHUMAKER:  Okay.

6          THE COURT:  I assume that would not be

7  objectionable.

8          MR. MCCARTHY:  If he's reading a document that's in

9  evidence, absolutely not, your Honor.

10          MR. SHUMAKER:  Excuse me one second, your Honor.

11          THE COURT:  Otherwise I will sustain your objection

12  to that last testimony since we're going to do this a

13  different way.  You know what?  Let's just take our afternoon

14  recess now, and you can use this opportunity to get organized

15  to present the evidence in this different way.

16          MR. SHUMAKER:  Will do, your Honor.

17          THE COURT:  We'll reconvene at 3:15.

18          MR. SHUMAKER:  Thank you.

19          THE CLERK:  All rise.  Court is in recess.

20      (Recess at 3:01 p.m., until 3:15 p.m.)

21          THE CLERK:  All rise.  Court is back in session.

22  Please be seated.

23          THE COURT:  Okay.  Let's proceed.

24          MR. SHUMAKER:  Thank you, your Honor.  If I could

25  just -- before I go into this, if -- I would just ask if we

1    get one lawyer handling a witness.  It gets a little bit

2    difficult to follow the multiple arguments.

3             MR. MCCARTHY:  It's not a problem, your Honor.

4    We'll happily attempt to do that.  And certainly there's

5    numerous parties here, but --

6             THE COURT:  And you're the nominee.

7             MR. MCCARTHY:  I have been appointed.

8             MR. SHUMAKER:  Thank you.

9    BY MR. SHUMAKER:

10   Q   I'll take you to Exhibit 609, which you previously saw.

11            MR. SHUMAKER:  And blow up, if you will, that second

12   paragraph again, please, and, again, if you could highlight

13   the second sentence.  Thank you.  Your Honor, if I'm just

14   making a proffer to you, is that how this -- or do you want

15   me to ask the witness questions?

16            THE COURT:  I'm sorry.

17            MR. SHUMAKER:  Well, I just -- whether you want me

18   to walk you through it so that you can deal with the

19   objection --

20            THE COURT:  It's up to you --

21            MR. SHUMAKER:  Okay.

22            THE COURT:  -- how you proceed.

23            MR. SHUMAKER:  Okay.  You see here on Exhibit 609,

24   which is in evidence, it states that the grant -- quote, "The

25   grant and the payment of the grant installments will be

conditioned upon the City of Detroit and the City of Detroit
General Retirement System and Police and Fire Retirement
System pension funds in parens, end quotation marks, being in
compliance with, one, the conditions precedent for closing
found in the plan of adjustment, and, two, certain material
grant conditions of both an initial and ongoing nature that
are memorialized in the omnibus transaction agreement, OTA,
to be entered into between the City of Detroit, the Detroit
Institute of Arts, and the grantee substantially in the form
attached to this terms of grant agreement as Exhibit A and
incorporated herein by this reference, copy of which will be
provided to foundation promptly following its execution."
And this grant agreement is not complete because it does not
have the Exhibit A, but the Exhibit A is in evidence, which
is the omnibus transaction agreement, and that is at Exhibit
1.A.126, page 2.

        MR. SHUMAKER:  If we could go to that, Steve,
please.  And if you could go to -- so that's the omnibus
transaction agreement by and among the City of Detroit, the
Detroit Institute of Arts, and Foundation for Detroit's
Future.  And the Foundation for Detroit's Future was -- were
the foundations that participated.  That was the entity
created.

        Now, if you go to page 5, and in the third paragraph
there states, "Whereas the city and the DIA are willing on

the terms and conditions set forth herein to enter into a
settlement, the DIA settlement, pursuant to which the city
will convey all of its right, title, and interest, including
legal title it may hold as trustee and legal title and
beneficial interest it otherwise holds, to the museum and the
museum assets as defined in the charitable trust agreement to
the DIA in exchange for fair value by the virtue of, one, the
settlement of any dispute regarding the ownership of the
museum assets; two, the commitment of the DIA to hold the DIA
assets in perpetual charitable trust and to operate the
museum primarily for the benefit of the residents of the city
and the tri-counties and the citizens the state; and,
three, the contributions through the supporting organization
by the DIA and through it DIA indirect funders, DIA direct
funders, and special foundation funders of $100 million," so
that's the DIA portion, "by foundation funders, excluding
special foundation funders, of $366 million," which is the
$366 million from the foundations, "and an additional
contribution by the State of Michigan, the state, of $350
million, which total $816 million in each case and in the
aggregate before applying any discount for early payment the,
quote, payment amount, unquote."

Then I would ask you to go to the definition of --
no, no -- I'm sorry -- of foundation funder just so that
we're clear.  Thank you.  No, no.  One up, please.  Thank

1   you.  "Foundation funder means a business affiliated

2   foundation or other foundation that has entered into a

3   foundation FDF agreement," and that is the -- FDF, again, is

4   the Foundation for Detroit's Future, and the Kresge

5   Foundation was one of those foundations, as we know.  Then

6   back to page 5, please.  Thank you.  Go all the way down,

7   yes.  The next "whereas" clause says, "Whereas, the payment

8   amount will be paid for the benefit of pension claims of the

9   city," and now let's go see the definition of "pension

10  claims," which is on page 9.  "Pension claims means the

11  claims in Classes 10 and 11 of the plan of adjustment as such

12  terms are defined in the plan of adjustment."  We would

13  submit, your Honor, that it is public that the foundation's

14  money is to be directed to the pension funds.

15          MR. MCCARTHY:  Your Honor, we have -- although we

16  disagree with the terms of the agreement perhaps, we have no

17  objection to the terms of the agreement as stated being in

18  the record.

19          THE COURT:  All right.  Thank you.  You may proceed.

20          MR. SHUMAKER:  Okay.

21  BY MR. SHUMAKER:

22  Q   Mr. Rapson, referring back to the conditions precedent

23  that we saw in Exhibits 609 and 352, do you have an

24  understanding of those conditions?

25  A   Yes.

1    Q    And what are they?

2    A    What are the conditions?

3    Q    Yes.

4    A    A first condition is that the funds contributed by the

5    foundations would be used to support the pensioners; second,

6    that the -- that there would be created a trust, a vehicle to

7    hold the money that would enable the DIA's collection to be

8    transferred into a trust for perpetuity -- in perpetuity.

9    Q    Are you aware of any other conditions?

10   A    There was a condition that there be a contribution from

11   the State of Michigan.  There was a condition, the precise

12   form of which I don't recall, related to the improved

13   oversight of the pension funds themselves.  I think there

14   were 27 conditions in all, and I --

15   Q    I don't want you to go through all 27.  I think you've

16   hit the ones that we wanted you to describe for the Court.

17   Thank you.  So let me move on.  Do you think that the DIA

18   contributes to the Detroit community?

19   A    Yes.

20   Q    How?

21   A    It is an inseparable part of the city's history.  It

22   essentially is the cultural patrimony of the city.  There are

23   a lot of contributors to that, but I would argue that the DIA

24   is probably foremost among them.  It clearly generates

25   enormous international attention to the city's standing as a

1   place of cultural importance.  It drives economic energy.  It

2   is an anchor within midtown.  It draws people to the museum.

3   It pushes people out into the community to spend and walk and

4   otherwise participate in community life, and it is one of

5   those sort of defining institutions of Detroit life.

6   Q    Will the Kresge Foundation's hundred million dollar

7   donation to the grand bargain affect the foundation's overall

8   commitment to the city otherwise?

9   A    No.  The contribution we made to the grand bargain is

10  above and beyond what we would normally spend.  We viewed it

11  as an extraordinary expenditure that should not eat into the

12  normal investments we would make in the City of Detroit.

13  Q    Do you believe the City of Detroit is currently providing

14  adequate levels of services to its residents?

15  A    No, I do not.

16  Q    Based upon your understanding of the plan and the RRIs,

17  do you believe the plan will help the city return to

18  providing adequate services?

19        MR. MCCARTHY:  Your Honor, objection.  This goes

20  right back to the former objection we made regarding the

21  RRIs.  I believe the scope of the question is far too wide

22  and encompasses a request for lay witness opinion that would

23  be improper at this time.

24        MR. SHUMAKER:  The witness has an understanding of

25  what the RRIs are and how much is going to be spent on them.

1   Based upon his background and understanding of the Detroit

2   community, I think it's fair to ask whether he has some

3   appreciation for what that kind of investment and what its

4   impact would be.

5           THE COURT:  Well, I think the witness testified that

6   he was much more familiar with the first two than with any of

7   the others, so if you limit your question to those two, I'll

8   permit it.

9           MR. SHUMAKER:  I will do that.

10  BY MR. SHUMAKER:

11  Q   Limiting it to the question of blight remediation and

12  public safety, do you believe the plan will help the city

13  return to providing adequate services?

14  A   I do.  I think in both cases of blight remediation and

15  public safety, these expenditures, these investments in city

16  services represent a return to the kind of investments that

17  are going to be necessary for us to make progress on blight

18  remediation and to improve the kind of public service and

19  emergency services that any city depends on for its long-term

20  health.

21  Q   What impact do you believe that those initiatives, blight

22  and public safety, will have on Detroit's revitalization

23  efforts?

24  A   I think they will both help stabilize the environment for

25  us to build these other investments on top of an environment

1   that is safe and that is not characterized by massive swaths

2   of blighted land, but I think it will also serve as an

3   accelerant.  My sense is that what the plan of adjustment in

4   these two instances does is to really accelerate the kind of

5   progress that we need to make as a community if we're going

6   to return to health, and from our perspective as a

7   foundation, unless you can stabilize the land, unless you can

8   return to some sense of normalcy in the public safety sphere,

9   you can't create the kind of long-term moves that you need to

10  economically revitalize, improve transit, improve the health

11  and welfare of the citizenry, so my sense is that this is an

12  enormously important accelerant of progress.

13          MR. SHUMAKER:  That's all the questions I have, your

14  Honor.

15          MR. MCCARTHY:  Your Honor, Ed McCarthy on behalf of

16  FGIC.

17                      CROSS-EXAMINATION

18  BY MR. MCCARTHY:

19  Q   Hello, Mr. Rapson.  We've met before.  My name is Ed

20  McCarthy.  It's nice to see you again.

21  A   Nice to see you.

22  Q   Mr. Rapson, I want to ask some questions about your

23  background, then get into a few areas of testimony that you

24  talked about with Mr. Shumaker.  You're an attorney by

25  education; correct?

A    By education, yes.

Q    But you're not admitted to practice law in Michigan at
this time; right?

A    I am not.

Q    And you're not an expert in public trusts, are you?

A    I am not.

Q    And you're not an expert in any legal issues that relate
to public trusts, are you?

A    I am not.

Q    And neither you or anybody at the Kresge Foundation has
conducted any independent analysis or research regarding
whether the collection at the DIA is held in a trust;
correct?

A    Was the question have we done research on that topic?

Q    My question is have you done any independent analysis or
research regarding whether the collection at the --

A    No.

Q    Thank you.  Talking about the Detroit Future City project
you talked about, you're familiar with that project, of
course?

A    I am.

Q    And Kresge was one of the key drivers that started that
project; right?

A    We were.

Q    And you still are one of the key drivers for that

1  project; is that right?

2  A    Yes.

3  Q    And Kresge has invested millions of dollars in the

4  Detroit Future City project; right?

5  A    That's correct.

6  Q    And that's even before the city bankruptcy we're here for

7  today; right?

8  A    Yes.

9  Q    And Kresge has put considerable time into that project as

10  early as 2009 and 2010; right?

11  A    I think we began in 2010, but, yes, um-hmm.

12  Q    Part of that project, the Detroit Future City project,

13  was to look at the essential services that the City of

14  Detroit should be providing to its residents; right?

15  A    Yes.

16  Q    And one of those essential services you looked at for

17  that project was public transportation; right?

18  A    That's correct.

19  Q    And you looked at the topic of decent housing; right?

20  A    That's correct.

21  Q    And as we discussed, Kresge looked at the issue of

22  blight; right?

23  A    Yes.  That's correct.

24  Q    But neither you nor anyone at Kresge has conducted a

25  study on whether and to what extent the City of Detroit needs

1   a museum in order to provide essential services to residents,

2   have you?

3   A    We have not conducted a study, no.

4   Q    And you're not aware of any specific study of the forms

5   of contribution that the DIA makes to the City of Detroit;

6   right?

7   A    I'm hesitating because a number of years ago an analysis

8   was done, but it was before -- I couldn't direct you to it,

9   but we -- I'm sorry.  To answer your question, we have not

10  done that kind of study, and I'm not aware of a specific

11  study that sort of has the outlines that you've described.

12  Q    Moving on to the grand bargain that you talked about, and

13  we saw the terms of that grand bargain that were read into

14  the record; right?  The Kresge Foundation's proposed

15  contribution under that agreement would be the most direct

16  way that Kresge has ever contributed funds to any city's

17  pensioners; right?

18  A    Yes.

19         MR. MCCARTHY:  And if we could bring up Exhibit 67,

20  which was the drawing, although I hesitate to call it a

21  drawing.

22  BY MR. MCCARTHY:

23  Q    I think it's much more intricate than that, but we've

24  looked at this from the table is the first time I saw it, but

25  in your view, looking at this document, do any of the -- the

1   word "pension" isn't mentioned anywhere on this document, is

2   it?

3   A    No, it is not.

4   Q    And in this document, none of the different types of

5   foundation giving that -- given that's giving -- that's

6   listed in this document, none of that giving indicates funds

7   that are going directly to fund the city's pension funds, do

8   they?

9   A    That's correct.

10          MR. MCCARTHY:  If we could bring up Exhibit 3573,

11  please.

12  BY MR. MCCARTHY:

13  Q    And we looked at this document, the Detroit Future City

14  Strategic Framework; right?

15  A    Yes.

16  Q    This is a lengthy document, isn't it?

17  A    It is, indeed.

18  Q    And we've looked through this document.  It certainly

19  speaks for itself.  But this document does not reference

20  providing any funds going directly to fund the city pensions,

21  does it?

22  A    No, it does not.

23  Q    Mr. Rapson, I want to briefly talk to you about some of

24  the cultural organizations that are here in the City of

25  Detroit.  Okay?  Detroit has dozens of cultural

1  organizations, doesn't it?

2  A    It does.

3  Q    Detroit has many different art museums; correct?

4  A    Yes.

5  Q    And, for example, Detroit is home to the Charles H.

6  Wright Museum of African American History; right?

7  A    That's correct.

8  Q    And that's an important cultural museum in the city?

9  A    Very.

10  Q    And Detroit is home to the Detroit Symphony Orchestra;

11  right?

12  A    That's correct.

13  Q    And it's home to the Detroit Zoological Society; right?

14  A    Actually that sits outside the city limits, but --

15  Q    The metropolitan area of Detroit?

16  A    Yes, yes.

17  Q    Thank you.

18  A    Um-hmm.

19  Q    Detroit is home to the Michigan Opera Theater; right?

20  A    Yes.

21  Q    And the Music Hall Center for Performing Arts; right?

22  A    Right.

23  Q    Thank you.  And it's home to the Holocaust Memorial

24  Center; right?

25  A    Yeah, yes.

1  Q   And the Detroit Historical Society; correct?

2  A   Yes.

3  Q   And Detroit is home to the Motown Historical Museum;

4  correct?

5  A   Yes.

6  Q   And, Mr. Rapson, the Kresge Foundation has donated money

7  to each of these different cultural organizations in the

8  past; correct?

9  A   I think almost all of them.  I'm not sure about the

10  Motown Museum, but I think all the others, yes.

11  Q   And to pinpoint one point of it -- and I could give you a

12  document to refresh your recollection if this doesn't help,

13  so let me know.  But in 2002 alone, Kresge provided millions

14  of dollars in grants to no less than 66 arts and cultural

15  institutions in the Detroit metropolitan area.  Does that

16  ring a bell?

17  A   In two thousand --

18  Q   2012.

19  A   '12, yes.  That's correct.

20  Q   And, Mr. Rapson, each of those different organizations,

21  those cultural organizations that Kresge donated to, provides

22  value and programming to Detroit's children, adults,

23  families, and communities; right?

24  A   Yes.

25  Q   Mr. Rapson, Kresge's commitment to the City of Detroit

1   began long before the city's bankruptcy; right?

2   A   Yes, it did.

3   Q   And Kresge's long-term commitment, as you've discussed,

4   would continue in Detroit even after this bankruptcy; right?

5   A   Yes.

6   Q   Even if this bankruptcy is dismissed; correct?

7   A   That's a complicated question.  The consequences of a

8   dismissal of the bankruptcy could be quite severe, I assume,

9   and so we would have to, as we always do, assess whether our

10  continued investment made sense.

11  Q   Have you studied that question at this point?

12  A   Which question?

13  Q   Whether Kresge would continue giving to the City of

14  Detroit after a potential dismissal of this case.  As you sit

15  here today, have you studied that question?

16  A   I'm not sure what I -- studied the question?

17  Q   Has Kresge conducted any analysis or study of whether it

18  would continue providing support and funding to the City of

19  Detroit if this bankruptcy case was dismissed?

20  A   No.

21  Q   And as you sit here today, is it your belief that the

22  Kresge Foundation would continue providing funding and

23  support as it's done in the past for the City of Detroit?

24  A   Yes, although it might take very different form.

25          MR. MCCARTHY:  Mr. Rapson, right now I have no

1    further questions for you.  Thank you.

2            THE WITNESS:  Thank you.

3            MR. WAGNER:  I have no questions, your Honor.

4            MS. O'GORMAN:  No questions.

5            THE COURT:  Any redirect?

6            MR. SHUMAKER:  No redirect, your Honor.

7            THE COURT:  All right, sir.  You are excused.

8            THE WITNESS:  Thank you.

9            THE COURT:  Thank you very much for coming today.

10           THE WITNESS:  Thank you.  Should I leave this here?

11       (Witness excused at 3:35 p.m.)

12           MR. SHUMAKER:  Your Honor, I think we'd ask that the

13   cross of Mr. Orr begin.

14           THE COURT:  All right.

15           MR. SOTO:  May I approach the bench, your Honor?

16           THE COURT:  Yes.

17           MR. SOTO:  May I approach the witness, your Honor?

18           THE COURT:  Yes.

19           KEVYN ORR, CITY'S WITNESS, PREVIOUSLY SWORN

20                    CROSS-EXAMINATION

21   BY MR. SOTO:

22   Q   Mr. Orr, it's good to see you again.  You know my name.

23   It's Ed Soto.

24   A   It's been 30-plus years, but it's good to see you again,

25   too.

1          MR. SOTO:  We know each other from Miami, your

2     Honor.

3     BY MR. SOTO:

4     Q    It's been a long time.  And I will add that as soon as my

5     four sons figured out that I couldn't write a check, they

6     quit calling me, too.

7     A    Touche.

8     Q    Let's see if we can start with some basics.

9     A    Yes, sir.

10    Q    You would agree that the claims in Classes 10 and 11 are

11    unsecured claims; correct?

12    A    Yes, sir.

13    Q    And the claims in Classes 9 and 14 are also unsecured

14    claims?

15    A    Yes.

16    Q    And you understand that the disclosure statement provides

17    the creditors in a Class 10, the PFRS class, I think it's

18    called, it says that they will receive 59 cents on the dollar

19    for their claims; correct?

20    A    Yes.

21    Q    And the disclosure statement provides that creditors in

22    Class 11, which is the GRS class, will receive 60 cents on

23    the dollar for their claims; correct?

24    A    Yes.

25    Q    And these 59-percent and 60-percent recoveries for Class

1  10 and 11 respectively don't take into account the potential

2  for restoration of pension benefits that are provided by the

3  plan, do they?

4  A    I think that's true.

5  Q    And most -- the most that the nonsettling creditors in

6  Class 9 -- that's the COPs class or FGIC -- and Class 14,

7  which is the class for other unsecured claims, the most they

8  can recover under the plan of adjustment is about ten cents

9  on a dollar; right?

10  A    I believe the plan says ten to thirteen, but that's

11  correct.

12  Q    Okay.  And this ten -- or you say ten to thirteen and we

13  say ten-percent recovery assumes that the new B notes are

14  worth par; correct?

15  A    Yes.

16  Q    But you would agree that there is a chance that the new B

17  notes may trade for less than par; correct?

18  A    Yes.  There's a chance.

19  Q    And the rates of recovery for creditors in Class 10 and

20  11 are significantly higher than the rate of recovery for the

21  nonsettling creditors in Classes 9 and Class 14; correct?

22  A    They are higher.

23  Q    Now, you understand that you were designated as the Rule

24  30(b)(6) witness in this case for a number of different

25  topics; correct?

215

1    A    Yes.

2              MR. SOTO:  And if we could get the city's response

3    to our 30(b)(6) notice up --

4    BY MR. SOTO:

5    Q    That's Tab 1 in your binder, but it'll also be up there.

6    Take a look at topic Number 28, which is on page 9 of 16.

7              MR. SOTO:  Let's blow up Topic Number 28.

8    BY MR. SOTO:

9    Q    And here's the topic that you were designated for:  the

10   basis for the city providing a higher percentage of recovery

11   to holders of GRS pension claims and PFRS pension claims than

12   to other holders of unsecured claims.  You see that?

13   A    Yes.

14   Q    And do you remember being designated for that topic?

15   A    Yes.

16   Q    And as the emergency manager, you were the one who

17   decided to discriminate in favor of Classes 10 and 11 -- and,

18   again, by "discriminate," I mean only that you paid them

19   higher recoveries -- as compared to Class 9; correct?

20   A    I decided to present an amended plan that provides for

21   higher recoveries to Class 10 and 11 than it does to the

22   bookend classes of 9 or 14.

23   Q    Fair enough.  That's a more accurate way of saying it.

24   And as the emergency manager, you had to decide what level of

25   discrimination was appropriate; correct?

13-53846-tjt   Doc 7878   Filed 10/08/14   Entered 10/08/14 14:24:52   Page 215 of 281

1  A  I had to decide what level of recovery we were able to

2  provide to Classes 9 through 14.

3  Q  Yeah.  And that included whether or not -- in this

4  instance that includes a level that essentially pays Classes

5  10 and 11 more than Class 9 and 14 and thereby discriminates

6  against them; correct?

7  A  It's a level that provides a higher rate of recovery to

8  10 and 11 than it does to 9 and 14.

9  Q  Fair enough again.  Now, let me ask you some questions

10  about the evolution of the city's proposed treatment of

11  pension claims during your tenure as emergency manager.  You

12  were appointed as the emergency manager on March -- sometime

13  in March of 2013; correct?

14  A  Yes.  Originally I believe on or about the 26th under the

15  prior statute and then pursuant to 436 on the 27th.

16  Q  And your initial term as emergency manager was for 18

17  months; correct?

18  A  Yes.

19  Q  And from the start it was important to you that the city

20  move swiftly through the restructuring process; correct?

21  A  It was important to me that the city move swiftly through

22  my potential appointment to complete what had been, in my

23  estimation, an ongoing restructuring process, yes.

24  Q  Good.  In fact, the day after the city filed for

25  bankruptcy, you told the press that 15 months was not a lot

1  of time to fulfill your promise of restructuring the city;

2  right?

3  A    Yes, I probably said that.

4  Q    And you also told the press that you were looking for

5  shortcuts to help you speed the process along; right?

6  A    Yes, I probably said that.

7  Q    Now, you presented a proposal to creditors on June 14th,

8  2013; correct?

9  A    Yes.

10  Q    And that proposal suggested that all unsecured creditors

11  would be treated on a pari passu basis; right?

12  A    Yes.  We said that this was a proposal.  We were looking

13  for negotiations.  I believe I said that it might change, but

14  this was our starting overture.

15        THE COURT:  All right.  Mr. Orr, in the past I have

16  asked you just to answer the question, and I want -- I need

17  to remind you again just answer the question.

18        THE WITNESS:  Yes, your Honor.

19  BY MR. SOTO:

20  Q    And so the question was and that proposal suggested that

21  all unsecured creditors would be treated on a pari passu

22  basis; right?

23  A    Yes.

24  Q    Now, Mr. Orr, just to clarify something before we move

25  on, yesterday when you testified that in June of 2013 the

1    city missed a $40 million swap payment, did you mean that the

2    city missed a $40 million payment owed with respect to

3    principal and interest on the COPs?

4    A    Yes.  I should have --

5    Q    I just wanted the record clear.

6    A    -- spoke more correctly.  Yes, sir.

7    Q    And on December 8th, 2013, you were interviewed on a show

8    here in Detroit called "Flashpoint."  Do you remember that?

9    A    Give me the date again.

10   Q    It was -- I'm about to show it to you, but it's --

11   A    Okay.

12   Q    -- December 8th, 2013.

13   A    I vaguely remember it.

14   Q    Well, don't strain yourself.

15   A    Okay.

16   Q    Let me show you what has been marked as Exhibit 4447.

17        (Video played as follows:)

18             "INTERVIEWER:  Can you say with any kind of

19        degree of certainty yet what pensioners ought to be

20        expecting?

21             MR. ORR:  I cannot.  There are a number of

22        different things that we need to go through.  What I

23        can say for pensioners is nothing is imminent as in

24        the next month or two.  Let me explain the process a

25        little bit, and this should give some small comfort

1    because I know people are very anxious about it.

2        INTERVIEWER:  No doubt.

3        MR. ORR:  Right now we have an eligibility

4    determination, and as I said some time ago, you

5    know, we've been packed and have our suitcase in the

6    car.  It was full of gas.  We had our map, but we

7    hadn't pulled out of the driveway yet.  Now we're

8    out of the driveway.  We may hit some potholes.  We

9    may have to take a detour or two, but we're going to

10   go on our course, on our tour, and we're going to

11   get to the end of it.  We have to.  The one thing in

12   that process now is more directly for pensioners,

13   for instance, is we have to negotiate and put out a

14   plan of adjustment, which we intend to do sometime

15   later this month or early in January.  The plan of

16   adjustment will be a template for the treatment --

17       INTERVIEWER:  Just a couple of weeks away,

18   though.

19       MR. ORR:  Just a couple of weeks away --

20       INTERVIEWER:  Yeah.

21       MR. ORR:  -- we're moving -- will be a template

22   for how we intend to treat people, and

23   interestingly, in that decision, the Judge said you

24   have to observe, you know, fair and equitable

25   treatment.  That's a term of art in bankruptcy.

1    That means people in the same class of creditors

2    have to be treated equally.  Now, in this case the

3    pension interests are unsecured creditors.  They're

4    contracts.  Every bankruptcy I've been involved in

5    for 30 years contracts have been adjusted.

6    Unsecured creditors have had to take less.  That's

7    what bankruptcy is about.

8         INTERVIEWER:  The central point of the Judge's

9    opinion.

10        MR. ORR:  That's why it's called a plan of

11   adjustment.  Corporate plans are called plans of

12   reorganization.  Municipal plans are called plans of

13   adjustment because you have to adjust the debt.

14        INTERVIEWER:  I thought, though -- I don't

15   remember what this" --

16        MR. SHUMAKER:  Your Honor, objection.

17        "INTERVIEWER:  -- deadline this past week" --

18   (Video stopped)

19        MR. SHUMAKER:  Objection.  I don't see -- this is

20   not a movie.  I don't see a question here for the witness.

21   We're just going to sit here and watch video?

22        MR. SOTO:  No.  We're going to watch a video, and

23   I'm going to ask him questions directed to the video.

24        THE COURT:  Hold on one second.  Is the video in

25   evidence?

1    MR. SOTO:  Yes, it is.  It is about to be in

2  evidence when I ask him the foundation question.

3    THE COURT:  Well, wait a minute.  Is it in evidence

4  or is it not in evidence?

5    MR. SOTO:  No, it is not in evidence.

6    THE COURT:  All right.  Then it's not proper to show

7  the witness the video or show the Court the video until it's

8  in evidence, so the objection is sustained.

9    MR. SOTO:  Okay.  Now, well then let me get it into

10  evidence.

11  BY MR. SOTO:

12  Q   Mr. Orr, do you recall making these statements on

13  December 8th, 2013?

14  A   Yes.

15  Q   So you don't deny saying these things, do you?

16  A   It looks like me.

17  Q   Okay.

18    MR. SOTO:  Your Honor, we move to have it into

19  evidence.

20    MR. SHUMAKER:  Your Honor, same objection.  If we're

21  going to sit here and watch video for multiple hours, I don't

22  see how that's effective or proper cross-examination.  If

23  there's a question that he has related to the five minutes of

24  video clip --

25    THE COURT:  Well, that's not the question before the

1    Court right now.  The question is do you object to the

2    admission into evidence of this video?

3              MR. SHUMAKER:  I object to it as hearsay.

4              MR. SOTO:  Your Honor, it's not hearsay if he,

5    indeed, admits that he said it.

6              THE COURT:  All right.  If that's the objection, it

7    is overruled.  What is the exhibit number again?

8              MR. SOTO:  It's Exhibit Number 4447, your Honor.

9              THE COURT:  All right.  The video, I guess, is

10   admitted into evidence, and you may continue to show it.

11        (FGIC Exhibit 4447 received at 3:47 p.m.)

12        (Video played as follows:)

13              "INTERVIEWER:  To say that we should treat

14              pensioners and financial institutions the same and

15              that they should take the same hit is preposterous.

16              I mean do we really treat them all the same?  A

17              person who maybe is just barely surviving on their

18              current pension, barely able to afford their

19              medication" --

20              MR. SHUMAKER:  Your Honor, I'm going to object

21   again.

22              -- "versus a bank"

23        (Video stopped)

24              THE COURT:  Let's stop the video.

25              MR. SHUMAKER:  There's no question here.  This is

1    just video watching.  What is the impeachment or the cross --

2            THE COURT:  It's functionally the equivalent of you

3    reading a document that's already in evidence, so the

4    objection is overruled.  Let's crank it up again.

5        (Video played as follows:)

6                "INTERVIEWER:  Just write it off as a loss.  Are

7            those two the same?

8            MR. ORR:  Well, the only difference in this

9            case, in municipal bankruptcies, is the human

10           dimension.  The concepts -- and that's what the

11           Judge said -- the concepts of contract, of

12           adjustments, of taking adjustments to your debt,

13           that happens in every -- every case.  Here it has a

14           human dimension, but the reality is that is the

15           dictate of federal law.  That is fair and equitable

16           treatment.  Now, there's another concept in

17           bankruptcy called absolute priority.  People with a

18           higher level of a security interest get paid first

19           before people underneath them do.  It's very

20           common."

21       (Video stopped)

22   BY MR. SOTO:

23   Q   Now, Mr. Orr, you said three things in that interview

24   that stood out to me.  I want to ask you some questions about

25   them.  First, you said that people in the same class of

1   creditors have to be treated equally; correct?

2   A    Yes.

3   Q    And then you used the term "human dimension"; correct?

4   A    Yes.

5   Q    You said that the only difference between financial

6   creditors and pensioners is the human dimension.  Did I hear

7   that right?

8   A    I believe so.

9   Q    And by "human dimension," you meant you were concerned

10  with the personal hardship pensioners would suffer as a

11  result of pension cuts; isn't that correct?

12  A    I may have meant more than that, but, yes, that's part of

13  it.

14  Q    And another thing you said was that the notion of

15  treating creditors equally was, and I'm quoting from it,

16  "well-established in federal law"; correct?

17  A    Yes.  I believe I said that.

18  Q    Now, I'd like to ask you some questions about how you got

19  from the notion of treating unsecured creditors equally in

20  June 2013 and December 2013 to treating the creditors of

21  Class 10 and 11 significantly better than the creditors in

22  Class 9 and 14 pursuant to the seventh amended plan.  Let's

23  flash forward from your December interview where you talked

24  about treating creditors equally to February 21st, 2014.

25  That's the date you filed the city's first plan of

1  adjustment; correct?

2  A   I believe so.

3  Q   And that plan proposed cuts of approximately 26 percent

4  to the face amount of GRS pensions and 6 percent to the face

5  amount of PFRS pensions assuming the grand bargain was

6  approved; correct?

7  A   Yes.

8  Q   And that plan provided a higher level of recovery, using

9  the terms that you were using with me, for unsecured pension

10  creditors as compared to unsecured financial creditors,

11  didn't it?

12  A   Yes.

13  Q   And in February of 2014, you said that plan was feasible;

14  correct?

15  A   Yes.

16  Q   And you believed that statement was true last February,

17  and you continue to believe it today; right?

18  A   Yes.

19  Q   Now, as of February 21, 2014, you had just over seven

20  months left in your term as the emergency manager; correct?

21  A   Yes.

22  Q   And at the time the city proposed the first plan, the

23  city didn't have an agreement with any of the associations or

24  committees representing retirees; correct?

25  A   I believe that's true.

1  Q   And you said in the press at the time the first plan was

2  filed that it was -- recall this was in your deposition --

3  crucial that the city reach an agreement with its creditors

4  and that we really do not have time for a lot of acrimonial

5  litigation.  Do you remember that?

6  A   Yes.

7  Q   And one of the things that you did after the announcement

8  of your first plan is that you went around and gave media

9  interviews in an effort to persuade pensioners to accept

10 these cut levels; correct?

11 A   Among other things, yes, I gave interviews.

12 Q   And one of the interviews that you gave about the first

13 plan -- and I want to do this the way the judge has directed

14 us -- was on March 13, 2014, with the Michigan Citizen;

15 correct?

16 A   I don't recall it off the top of my head.

17 Q   So that's going to make it difficult for me to refresh

18 your recollection with the video before I show you the video.

19         THE COURT:  I'll permit you to show a piece of it to

20 see if it refreshes the witness' recollection, sure.

21         MR. SOTO:  And this video is, by the way, your

22 Honor, Exhibit 4674.

23         THE COURT:  4674?

24         MR. SOTO:  Yes.

25     (Video played as follows:)

1          "MR. ORR:  The majority -- no.  The majority of

2          pensioners don't live in the City of Detroit.  In

3          fact, many of them live outside the State of

4          Michigan, first of all.  So I heard on a radio show

5          the other day" --

6          THE COURT:  All right.  Let's stop it now.

7          "MR. ORR:  -- someone said, 'Oh, we're going to

8          cut 200,000'" --

9       (Video stopped)

10          THE COURT:  Sir, let's stop it now.  Go ahead and

11      ask him if that refreshes his recollection.

12      BY MR. SOTO:

13      Q   Now, does that refresh your recollection of giving this

14      interview?  I think you're -- it looks like you're in some

15      kind of a dining place.

16      A   That's me, but I don't recall giving that particular

17      interview.  I'm not trying to be flippant.  I don't.

18      Q   So maybe if I give you some context, you spoke at length

19      about the majority of pensioners living outside of the City

20      of Detroit.  Does that refresh your recollection at all?  You

21      said you had heard on a radio show that, you know, we're

22      going to get -- we're going to cut 200 pensioners, that

23      people were afraid of that, and that you were addressing

24      those fears.  There were fears that 9,300 employees, you

25      know, and also 20,000 retirees were being affected by your

1  plan?

2         THE COURT:  The question is does that refresh your
3  recollection regarding --

4         THE WITNESS:  No.

5         THE COURT:  -- regarding this specific interview?

6         THE WITNESS:  No, your Honor.

7         THE COURT:  Okay.

8  BY MR. SOTO:

9  Q   Okay.  So let me try to see if there's a way that I can
10 refresh your recollection another way, and we'll come back to
11 that.  We'll come back to that.

12 A   Yeah.

13 Q   Excuse me.  So these are -- let me see if there's another
14 way I can get this in.

15 A   Okay.

16        MR. SOTO:  So, your Honor, this is a statement by an
17 agent of the city.  He clearly recognized himself there.  And
18 under Rule 801(d)(2) it provides that an out-of-court
19 statement -- and that was clearly out of court -- is not
20 hearsay if it's offered against an opposing party and the
21 statement was made by the party in an individual and
22 representative capacity, was made by a person by whom -- by a
23 person whom the party authorized to make a statement on the
24 subject, and was made by a -- or was made by a party's agent
25 or employee on the matter.

1      THE COURT:  Any objection to the admission of the

2  video on that basis?

3      MR. SHUMAKER:  I still don't think that the witness

4  has indicated that it -- that he knows or remembers giving

5  the interview, so I think the impeachment is improper

6  notwithstanding.

7      MR. SOTO:  I'm not using it as impeachment.

8      THE COURT:  Well, the witness recognized himself.

9  What we still don't have authenticating evidence of is where

10  and when it occurred.

11      MR. SOTO:  Right, yeah.  Actually, the only

12  authenticating evidence I have of where and when it occurred

13  is what I had on the clip when it came, which was, of course,

14  marked.  And, again, I think I already indicated it to

15  Mr. Orr, and he might not have remembered, but it was marked

16  as an interview to an individual of the Michigan Citizen.

17      THE COURT:  Well, let me just ask this question.

18  Based on the piece of it that you heard, can you testify that

19  that interview or those statements that you made were made

20  after your appointment as emergency manager and in that

21  capacity?

22      THE WITNESS:  Yes.

23      THE COURT:  All right.  The Court will admit it.

24    (FGIC Exhibit 4674 received at 3:56 p.m.)

25      MR. SOTO:  Can we play it?  And maybe do something

1  with the sound because I can't -- well, I'm the one with the

2  worst ears.  All right.  We're fine.

3        THE COURT:  Yeah.  It's so loud that it's a little

4  muffled.

5        MR. SOTO:  Oh, okay.  Make it less loud then.

6    (Video played as follows:)

7        "MR. ORR:   The majority -- no.  The majority of

8         pensioners don't live in the City of Detroit.  In

9         fact, many of them live outside the State of

10        Michigan, first of all>  So I heard on a radio show

11        the other day someone said, 'Oh, they're going to

12        cut 200,000 pensioners.'  There are 10,000 city --

13        9,300 employees, and there are 20,000 retirees, and

14        there's 700,000 residents, so let's just -- let's

15        just deal with the facts.  There's not 200,000

16        pensioners.  Secondly, the majority don't live here.

17        The majority of people in the city, when asked, it's

18        crime, public transportation and services.  Okay.

19        We've tried -- even against that backdrop, we have

20        tried to be very, very careful with pensions.  My

21        plan could have said we're going to assess the fair

22        market value of both the general services pension

23        fund and police and fire pension fund and that

24        everybody's pension will be dependent upon that fair

25        market value.  There are a lot of people in other

1    quarters who say that's what's fair because that's

2    what it depends -- if they'd taken that 1.5 billion

3    in 2005 and put it in Standard and Poor's index over

4    the past 'X' number of years, they would have more

5    than enough money to pay those pensions out, but

6    they didn't.  Thirty percent of the funds that were

7    invested in GRS were invested in private equity,

8    real estate, direct investment, for which they

9    received no professional pension advice.  Hundreds

10   of millions of dollars, tens of millions, if not

11   hundreds of millions of dollars has gone missing.

12   So when Judge Rosen came in with his funds, that

13   helped us rationalize the fund.  What we propose in

14   police and fire is that we will pay 94 percent of

15   what they're owed.  I've never been involved in any

16   restructuring, bankruptcy, out of court where any

17   claimant gets 94 percent.  And for the general

18   services fund, what we propose is two things.  One,

19   to pay them 72 percent of what they're owed, but

20   also to have part of the state's contribution act as

21   a social safety net so that 138 percent of the

22   poverty level will be the cutoff for any pensions.

23   So when people hear pensions are going to drive

24   people into poverty, we tried very carefully not to

25   do that.  I've done that at some risk.  As I said

1          before, my plan has a differential between what

2          we're paying unsecured creditors -- everyone says

3          you're not hitting the banks.  I'm taking away 80

4          percent of their -- I'm paying them 20 cents on the

5          dollar, and they're livid, and they're going to sue,

6          and they're going to appeal.  They're going to go to

7          the Supreme Court.  They're going to talk about

8          impairment of contract.  They're going to talk about

9          Fifth Amendment constitutional taking.  I'll tell

10         you what they're going to do.  They're going to try

11         to defeat this plan because their view is they'd

12         rather take that money, and I've tried to restore

13         it."

14     (Video stopped)

15  BY MR. SOTO:

16  Q   Now, Mr. Orr, you don't deny saying these things on or

17  about March 13, 2014, do you?

18  A   No.

19  Q   You also said some things in this interview I'd like to

20  follow up on.  You said that more than half the retirees

21  don't live in the City of Detroit.  As you sit here today,

22  you still think that's a true statement?

23  A   I'm not sure that's a true statement.  We did some

24  analysis awhile back.  I don't know.

25  Q   And you also said that many of the pensioners live out of

1  state; correct?

2  A    Yes.

3  Q    And you believe that's a true statement; correct?

4  A    Yes.

5  Q    And you also said that being careful with pensions was

6  something you had done at some risk; correct?

7  A    Yes.

8  Q    And the risk you talked about was that the banks were

9  livid and were going to sue.  They were going to appeal, and

10 they were going to take the case to the Supreme Court; right?

11 A    Yes.

12 Q    And those banks you were talking about, you were really

13 talking about creditors like FGIC; correct?

14 A    I was talking about all financial creditors, including

15 FGIC.

16 Q    Okay.  Now, let's flash forward to mid-April of 2014.  At

17 that time, you publicly announced that you had reached an

18 agreement with certain of the retiree associations; correct?

19 A    I don't recall the exact date, but I believe that's the

20 right time.

21 Q    And as of that time, you had just over five months left

22 on your term as emergency manager; correct?

23 A    If that's the date, yes.

24 Q    And that represented -- the deal that you announced in

25 April or thereabouts of 2014, that represented a substantial

1    improvement over the previous proposed cuts of 26 percent and

2    6 percent to the pensioners; correct?

3    A    I believe it represented a higher rate of recovery than

4    we had previously proposed.

5    Q    And the way the plan is structured, Class 10 and 11 have

6    the opportunity to see the restoration of their pension cuts

7    if the Retirement System outperforms the 6.75 investment rate

8    of return that is applied under the plan; correct?

9    A    Yes, after nine years.

10   Q    And, in fact, you agree that there's a good chance that

11   the pensioners will achieve that restoration; correct?

12   A    We are -- I don't know.

13   Q    Fair enough.  And you are aware that for the first ten

14   years after the effective date recoveries to Class 10 and 11

15   will be funded primarily by certain charitable foundations,

16   the DIA funders and the State of Michigan; correct?

17   A    Yes.

18   Q    You would agree that the risk that any of this funding

19   will not occur is probably very low; correct?

20   A    Yes.

21   Q    And in contrast, you would agree that there is a higher

22   level of risk associated with the city's ability to make good

23   on its payment obligations under the plan; correct?

24   A    I don't know.

25   Q    Now, at your Rule 30(b)(6) deposition on July 22nd of

1    2014, you explained why you decided to discriminate against

2    Class 9 in favor of Classes 10 and 11 under the plan;

3    correct?

4    A    I remember the deposition, yes.

5    Q    Let's listen to your testimony, so then we'll ask some

6    questions about it.

7    A    Sure.

8         MR. SOTO:  Can you play the clip?

9         (Video deposition played as follows:)

10             "Question:  Okay.  So with respect to the plan

11             that is on file and that you're seeking to confirm,

12             with respect to Classes 10 and 11 on the one hand

13             and the COPs holder class on the other hand, why did

14             you decide to discriminate" --

15         MR. SHUMAKER:  Your Honor, I'm going to object

16    again.  I'm going to object again.

17             "-- in favor of Classes 10 and 11" --

18         (Video stopped)

19         THE COURT:  Stop the video, please.  Thank you.

20    What is your objection?

21         MR. SHUMAKER:  There is no reason to be showing the

22    video now for impeachment because it is not an inconsistent

23    statement.  Nothing has been established.  Mr. Soto can ask

24    the witness to authenticate the video, and he can play it

25    during his case, but he can't just start playing videos

1  because that's not proper impeachment.

2          MR. SOTO:  But, in fact --

3          MR. SHUMAKER:  There's no inconsistent statement.

4          MR. SOTO:  Your Honor, this is not a process of

5  impeachment.  Under Federal Rule of Civil Procedure 32(a)(3),

6  which is made applicable to these proceedings by 7032, an

7  adverse party may use for any purpose the deposition of a

8  party or anyone who when deposed was the party's officer,

9  director, managing agent, or designee under Rule 30(b)(6),

10  and this, of course, is a Rule 30(b)(6) deposition.

11          THE COURT:  Yeah.  I agree.  You can use the video

12  for any purpose.  I do think just for purposes of maintaining

13  a proper record we ought to have an exhibit number on it and

14  admit it into evidence, so just technically I would ask -- I

15  would ask that that be done.  Have you got a number?

16          MR. SOTO:  We'll give it the next succeeding number,

17  your Honor.

18          THE COURT:  Okay.

19          MR. SOTO:  We have to find it.

20          MR. SHUMAKER:  Is there an exhibit number for this?

21          THE COURT:  We're getting it.

22          MR. SOTO:  Your Honor, we will label this Exhibit

23  1894, and we move it into evidence.

24          THE COURT:  Any objections?

25          MR. SHUMAKER:  Nothing other than the one I

1    maintained.

2            THE COURT:  All right.  The objection is overruled,

3    and 1894 is admitted into evidence.

4        (FGIC Exhibit 1894 received at 4:04 p.m.)

5            THE COURT:  And you can continue with the playing of

6    the video now.

7        (Video deposition played as follows:)

8            "Question:  11 as compared to the COPs holders.

9            And by discriminate, I mean pay them more recovery

10           than you've paid to the COPs holder class.

11           Answer:  Right.  As we said earlier this

12           morning, in addition to, you know, the assets that

13           the retirement funds had in them, which would mean

14           we'd have less ground to make up as opposed to the

15           liability of the certificates, which is an ongoing

16           liability, as between the concerns that the

17           obligations, the human dimension, the responsibility

18           the city had to try to keep its covenant with its

19           employees and retirees as opposed to legal arguments

20           that have been made in the papers regarding the

21           COPs, that we believe they are void ab initio and

22           that we have no obligation and probably a number of

23           other factors that I'm just not recalling as I sit

24           here today, that resulted in us proposing in the

25           plan that the GRS and PFRS beneficiaries receive a

1          higher recovery than the COPs."

2     (Video stooped)

3 BY MR. SOTO:

4 Q   Okay.  Mr. Orr, so the first reason you gave was that

5 there were assets in the pension trust.  Do you remember

6 that?

7 A   Yes.

8 Q   But you understand that the Class 10 and 11 pension

9 claims represent unfunded accrued actuarial liabilities --

10 say that five times fast --

11 A   Yes.

12 Q   -- or UAAL of the two pension systems; right?

13 A   Yes.

14 Q   And you understand that the UAAL is the difference

15 between the amount the assets -- the amount of the assets

16 that are held in the systems and what is needed to fully fund

17 the pensions based on some actuarial assumptions; correct?

18 A   Yes.

19 Q   And just to be clear, the existence of assets in the

20 Retirement Systems was something that you considered in your

21 decision to provide different payout levels -- recovery

22 levels for creditors; is that correct?

23 A   I believe so.

24 Q   And the second reason you mentioned was the human

25 dimension; correct?

1  A    Yes.

2  Q    And by that you meant you considered the personal

3  hardship people will endure if steeper cuts to their pensions

4  were imposed; correct?

5  A    In part, yes.

6  Q    And the third reason you mentioned was what you called

7  the city covenant.  Do you remember that?

8  A    Yes.

9  Q    Okay.  And by "city covenant" -- excuse me -- you meant

10  the city's promise that it would pay retired city employees

11  their pension benefits; correct?

12  A    In part, yes.

13  Q    Okay.  And it's fair to say that this covenant is another

14  element of the human dimension, meaning that it's unfair to

15  cut pensions of people who relied on the city's promise or

16  covenant in making decisions about how to allocate their work

17  and their time, things you said earlier today; correct?

18  A    In part, yes.

19  Q    But it isn't true that the city made promises or

20  covenants -- well, let me say it this way.  Isn't it true

21  that the city made promises and covenants to all of its

22  unsecured creditors?

23  A    Yes.

24  Q    And the fourth reason that you gave was the alleged

25  invalidity of the COPs transactions; correct?

1   A    Yes.

2   Q    But you understand that the seventh amended plan creates

3   a disputed COP claim reserve and provides for the city to

4   distribute to such reserve a pro rata share of new B notes

5   calculated based on the assumption that all disputed COP

6   claims are valid and allowed in the full amount of principal

7   and accrued pre-petition interest; correct?

8   A    Yes, the disputed COPs claim reserve.

9   Q    Yes.  Now, you didn't attempt to undertake a systematic

10  analysis of what the creditors thought that they were going

11  to get when they made their initial respective investment

12  decisions in the City of Detroit; correct?

13  A    What do you mean?

14  Q    What I mean is all these unsecured creditors who, you

15  know, got promises, you didn't attempt to undertake any

16  systematic analysis of what those creditors thought they were

17  going to get when they made their initial investments and got

18  their promises from the city?

19  A    I think I testified that all creditors expected to be

20  paid.

21  Q    That's even better.  Okay.  Thanks.  And you didn't

22  factor creditors' expectations -- did you factor -- not you

23  didn't.  Did you factor creditors' expectations in your

24  decision to favor Class 10 and 11 -- 10 and 11 over Class 9,

25  for example?

1   A    I think I testified that all the creditors expected to be

2   paid.

3   Q    So in that respect you saw that as an equal across the

4   board; correct?

5   A    Yes.

6   Q    And the settlements you reached with the retiree

7   representatives regarding the appeals of the eligibility

8   decision, that didn't factor into your decision to

9   discriminate in favor of Class 10 and 11, did it?  The

10  settlement you reached with the retiree representatives

11  regarding their appeals of the eligibility decision --

12  A    Um-hmm.

13  Q    -- that you settled --

14  A    Um-hmm.

15  Q    -- it didn't factor into your decision to discriminate in

16  favor of Class 10 and 11; correct?

17  A    I don't recall.

18  Q    So somewhere in the binder in front of you is your

19  deposition.

20  A    Yes.

21  Q    And in it, if you'd turn to page 262 -- and she'll blow

22  it up for you as well if it's easier -- starting on line --

23  we'll be going to --

24        MR. SOTO:  By the way, Geoff, we'll be going -- yes.

25  Okay.  Thanks.  And, Mr. Shumaker, it'll be line 262 -- we'll

1    be reading 6 through 11, 18 through 25, and then 263, 2

2    through 8.

3              MR. SHUMAKER:  Thank you.

4              MR. SOTO:  It's just the same question.

5    BY MR. SOTO:

6    Q   You see where it says, "Question:  What is your

7    understanding about the current status of the eligibility

8    appeal that is up in the Sixth Circuit?  And what I mean by

9    that is what is your understanding about whether the proposed

10   pension cuts that you settled upon in the current plan would

11   eliminate the eligibility appeal?"  Then the question is

12   asked, "Do you understand my question?"  Answer, of course,

13   "Yeah.  I think I understand your question."

14             THE COURT:  Hold on.  We didn't have the right

15   section that was expanded for us.

16             MR. SOTO:  Page -- huh?

17             MR. SHUMAKER:  What page do you want to go to?

18             MR. SOTO:  262, 6 through 11.  Actually it goes 262,

19   6, all the way through the end, and then it'll be the next

20   page, 2 through 8.

21             THE COURT:  Okay.

22             MR. SOTO:  Got it?  And it's only because the

23   question kept getting befuddled.

24   BY MR. SOTO:

25   Q   So then it says,

1        "Question:  Do you understand the question?

2        Answer:  Whether -- yeah, I think I understand

3       your question as to whether or not -- well, no.  I'm

4       not sure I understand the question, which is

5       perfectly honest.

6        Question:  I guess did you think that in the

7       proposing the four-and-a-half-percent and zero-

8       percent cuts and getting the classes to vote in

9       favor of it, that that would eliminate the

10      eligibility appeal?

11       Answer:  No.  That -- no.  That -- we certainly

12      hope that getting consensual agreements would drop

13      any claims or any litigation like any settlement,

14      but that wasn't necessarily -- proposing cuts to get

15      the elimination of the eligibility appeal wasn't the

16      driver."

17      Does that refresh your recollection?

18 A   Yes.

19 Q  And you would agree with me that the issue of where

20 pensioners live was not something that factored into your

21 decision to discriminate in their favor; correct?

22 A   Not necessarily alone.

23 Q  And you would also agree with me that the percentage of

24 the Class 10 and 11 recovery that was going to active

25 employees was also not a factor in your decision to

1  discriminate against financial unsecured creditors in favor

2  of pensioner creditors; correct?

3  A    Repeat the question again.

4  Q    You would agree with me that the percentage of Class 10

5  and 11 recovery that was going to active employees was also

6  not a factor in your decision to discriminate against

7  financial unsecured creditors in favor of pensioner

8  creditors?

9  A    I don't know if that's true.

10 Q    And, again, let me ask you to turn then to your

11 deposition, see if this refreshes your recollection.

12        MR. SOTO:  On page 249 through 250, we'll be looking

13 at, Mr. Shumaker, 249 starting in -- at 5 going to 250, 1,

14 250, line 1, and again -- then again on page 251, line 7

15 through 10.

16 BY MR. SOTO:

17 Q    Do you see the question before you?

18        "Question:  Now, do you know the percentage of

19        the dollar amount of recovery under the plan to

20        Classes 10 and 11 that is going into the pockets of

21        active employees bearing in mind that the percentage

22        of the class is not the same as the dollar size --

23        Answer:  Yeah.

24        Question:  -- of the class?

25        Answer:  I'm not sure we know that.  I know the

1          percentage.  I know the -- I don't know the

2          percentage of the class, and I probably know the

3          percentage of the claim that voted.  I don't know

4          the dollar amount because it depends upon the

5          obligation of any particular pension.

6              Question:  Right; right.

7              Answer:  Right.

8              Question:  As you sit here today, you don't know

9          the percentage of the dollars in the Class 10 and 11

10         recoveries that are flowing to active employees;

11         correct?

12             Answer:  That is correct.  Percentage of

13         dollars.

14             Question:  The percentage sitting here today.

15             I don't know what it is, what that percentage

16         is.

17             Question:  And similarly with the active

18         employees percentage of the classes, I take it you

19         did not rely on that data?

20             Answer:  No."

21         It just goes to the next page now.  Do you see that?

22   A    Yes.

23   Q    And does that refresh your recollection that you didn't

24   take that into account?

25   A    Yes.

1    Q    Now, Mr. Orr, the city's director of labor relations and

2    interim director of human resources is Mr. Hall; correct?

3    A    Yes.

4    Q    And he was hired by you sometime in October of 2013;

5    right?

6    A    Yes.

7    Q    And Mr. Hall was someone who's experienced and qualified

8    in the areas of human resources and labor relations; correct?

9    A    Yes.

10   Q    Now, one of the functions of the human resources and

11   labor relations department is to monitor issues affecting the

12   retention and hiring of employees; correct?

13   A    I don't know.

14   Q    Okay.  And you don't -- you don't recall discussing the

15   different levels of proposed pension cuts with Mr. Hall; is

16   that correct?

17   A    I don't recall.

18   Q    And, in fact, Mr. Hall didn't have any participation in

19   the retiree negotiations that took place that led to the

20   settlement; correct?

21   A    No direct participation.

22   Q    But he did have involvement in the negotiations regarding

23   the collective bargaining agreements; correct?

24   A    I believe so.

25   Q    And the collective bargaining negotiations were conducted

1   separately from the retiree negotiations; correct?

2   A    Without getting into the mediation --

3           MR. SHUMAKER:  Objection, your Honor.  This may be

4   subject to the mediation order.

5           MR. SOTO:  Well, if it is, then we can move on.  I'm

6   sorry.

7           THE WITNESS:  Yeah.  I don't --

8           THE COURT:  Okay.

9           THE WITNESS:  Okay.

10          THE COURT:  Sounds like you should.

11  BY MR. SOTO:

12  Q    Moving on to the next question, and when exercising your

13  judgment regarding what the city needed to do to retain its

14  employees, the principal drivers were the go forward wages,

15  the go forward healthcare benefits, the go forward pension

16  plan, and the go forward working conditions; is that correct?

17  A    Were those my words?

18  Q    Yes, but I'm asking --

19          THE COURT:  He's just asking you that question.

20          THE WITNESS:  Oh, yes.  Among others, yes.

21  BY MR. SOTO:

22  Q    And it's also true that the City of Detroit has an

23  unemployment rate that is higher than the national average;

24  correct?

25  A    Yes.

1    Q    And when the city has held job fairs during the

2    bankruptcy and during your time as emergency manager, it has

3    received significant interest from thousands of people; is

4    that correct?

5    A    Yes.

6    Q    And the city has received a large number of applications

7    for open positions; correct?

8    A    Yes.

9    Q    Now, Mr. Orr, I'd like to discuss one of our favorite

10   topics, art, and we'll talk about the city's art collection.

11   A    Sure.

12   Q    Now, it's fair to say that one of the reasons you decided

13   to proceed with the grand bargain -- and, again, if this goes

14   into mediation stuff, you don't have to answer.  In fact,

15   you're ordered not to answer.  It's fair to say that one of

16   the reasons that you decided to proceed with the grand

17   bargain was that you feared that an attempt to sell the art

18   outright might generate litigation; correct?

19   A    Yes.

20   Q    And, in your view, that litigation was likely to come

21   from three principal groups, the attorney general, the DIA,

22   and heirs of persons who had donated art to the DIA; correct?

23   A    There were more, but yes.

24   Q    Okay.  And I'd like to talk about each of those three

25   groups, and if there are more, we can talk about them as

1  well, but let's first talk about those that were mentioned.

2  You're aware, Mr. Orr, that the attorney general -- I guess

3  you pronounce it Schuette --

4  A    Schuette.

5  Q    -- Schuette -- Mr. Bill Schuette, issued an opinion

6  indicating that the DIA art collection could not be sold to

7  satisfy the city's debts.  You're aware of that; correct?

8  A    Yes.

9  Q    And prior to receiving that opinion, you were not aware

10 that the DIA and its counsel were communicating with the

11 attorney general on the subject of the AG's ultimate opinion,

12 were you?

13 A    That's correct.

14 Q    And the DIA operates pursuant to an operating agreement

15 with the city; correct?

16 A    Yes.

17 Q    And it's fair to say that you didn't authorize the DIA to

18 communicate on the subject of the art with the attorney

19 general; correct?

20 A    That's correct.

21 Q    Now, the city does not agree with the attorney general's

22 opinion that the entire art collection is held in charitable

23 trust, does it?

24 A    There's a dispute, yes.

25 Q    And the city's position is that it has the right to sell

1  the art that it owns; correct?

2  A   Yes.

3       MR. SOTO:  If you could please pull up Exhibit 254.

4  BY MR. SOTO:

5  Q   This should be in the binder.  It should be Tab 2 in your

6  binder.  Mr. Orr, this is the operating agreement for the

7  Detroit Institute of Arts.

8  A   Yes.

9  Q   Have you seen this before?

10  A   Yes.

11  Q   Now, this agreement outlines the relationship between the

12  City of Detroit and the DIA Corp.; correct?

13  A   Yes.

14  Q   Let's look at page 1, which is City -- it's already

15  entered -- City Exhibit 254-008, and I'm looking at recital

16  five about halfway down the page.

17       MR. SOTO:  And if you could blow that up --

18  BY MR. SOTO:

19  Q   The operating agreement states, reading it, that the city

20  will continue to own the city art collection, including works

21  of art required -- acquired prior to or subsequent to the

22  effective date, as well as the DIA building.  Do you see

23  that?

24  A   Yes.

25  Q   Okay.  And as you testified earlier, the city has

1  consistently taken the position that it owns the art

2  collection at the DIA; correct?

3  A    Yes.

4  Q    And you understand that the attorney general has opined

5  that the art cannot be sold or transferred for purposes of

6  satisfying debts or obligations of the city; correct?

7  A    Yes.

8  Q    But, again, the city has not taken any steps to verify

9  the facts that are in the attorney general's opinion; is that

10  correct?

11  A    I don't know.

12  Q    Okay.  And you understand that the crux of the attorney

13  general's opinion is that the city holds the art in a

14  charitable trust; correct?

15  A    Yes.

16  Q    But you don't know whether the city has ever registered

17  the art collection on the registry of charitable trusts that

18  is maintained by the attorney general, do you?

19  A    That is correct.

20  Q    And you don't know whether the city has ever filed

21  financial accountings with the charitable trust section of

22  the attorney general's office within six months of the end of

23  each fiscal year as would be required of a charitable trust;

24  correct?

25  A    That's correct.

1  Q   Now, Mr. Orr, the DIA building and the land on which it

2  sits were conveyed to the city by way of a deed; correct?

3  A   Yes.

4  Q   And the city has never found any evidence of an intention

5  to create a trust between the City of Detroit and the DIA or

6  the DIA Corp.; right?

7  A   I don't know.

8  Q   And the city has never entered into a written trust

9  agreement relating to the art collection; correct?

10 A   That is correct.

11 Q   Let's move on a little.  The city was also concerned that

12 it might see litigation from heirs of the people who donated

13 art to the city; correct?

14 A   Yes.

15 Q   And I wanted to separate the heirs from the folks at the

16 DIA who we're going to talk about in a moment.  You never

17 received a direct threat from any heir to initiate

18 litigation; correct?

19 A   A direct threat?

20 Q   Right.

21 A   Correct.

22 Q   And, in fact, you haven't reviewed any audit of the

23 collection assessing which pieces at the DIA had been

24 purchased and which had been donated; correct?

25 A   A comprehensive audit?

1  Q   Right.

2  A   Correct.

3  Q   And you don't know whether such an audit has ever been

4  conducted; correct?

5  A   Correct.

6  Q   And you don't know whether the city has ever conducted an

7  audit to determine which specific pieces of art were subject

8  to restrictions on alienation, if any; correct?

9  A   A comprehensive audit?

10 Q   Yes.

11 A   Correct.

12 Q   But you know that you have certainly never seen any audit

13 like that; right?

14 A   I believe that's true.

15 Q   So you were -- you would agree with me that the city

16 hasn't determined what donor-imposed restrictions, if any,

17 exist on the art collection at the DIA; correct?

18 A   On the entire collection?

19 Q   Yes.

20 A   Correct.

21 Q   And at one point you were told that any attempt by the

22 city to take any step towards selling the art, even including

23 determining which pieces were subject to limitations, might

24 generate litigation; correct?

25 A   Yes.

1   Q   But the city's June 2013 proposal to creditors included
2   the art in a realization of value of assets section; correct?
3   A   Yes.
4   Q   And no donor or heir filed suit; correct?
5   A   Correct.
6   Q   And you didn't get the consent of any donors or heirs
7   prior to including the art in the realization of value of
8   assets section in your proposal to creditors; correct?
9   A   Correct.
10  Q   And after that in August of 2013 the city engaged
11  Christie's to value the art; correct?
12  A   Yes.
13  Q   And still no donor or heir filed suit; correct?
14  A   Correct.
15  Q   And you didn't get the consent of any of the donors or
16  heirs to perform that valuation; right?
17  A   No, we did not get any consent.
18  Q   And subsequent to that, in June 2014, the city had
19  Artvest value the entire collection; correct?
20  A   Yes.
21  Q   And you didn't get the consent of the donors or heirs to
22  perform that valuation either, did you?
23  A   Correct.
24  Q   And yet no donor or heir has filed suit; correct?
25  A   Correct.

1 Q   And you understood that once the bankruptcy case was

2 filed, there was an automatic stay that applied to efforts to

3 sue the city; correct?

4 A   Yes.

5 Q   So, again, the city has never heard from any donor or

6 heir regarding an intention to sue the city; correct?

7 A   I have never heard from any donor or heir directly.

8 Q   Okay.  Let's talk about the DIA Corp.'s threat to sue

9 that city.

10 A   Yes.

11 Q   You believed at the time of your deposition that the DIA

12 Corp. might initiate litigation against the city if the city

13 tried to sell the art; isn't that correct?

14 A   Yes.

15 Q   But the DIA Corp. didn't sue the city; right?

16 A   No.

17 Q   And the only basis of your concern that the DIA Corp.

18 might sue the city were rumors that you had heard from people

19 at the DIA; right?

20 A   No.

21 Q   Did you hear rumors from people at the DIA that they

22 might sue the city?  Well, if it violates the mediation,

23 well, then don't say.

24         THE COURT:  Can you answer the question outside of

25 mediation process?

1          THE WITNESS:  I think I can, your Honor.  I spoke to

2    members of the board of DIA that expressed that threat in a

3    collegial manner, but there were other reasons for me to

4    believe that threat.

5    BY MR. SOTO:

6    Q    And, again -- thank you for your care in that.  And,

7    again, the city had Christie's value the art; correct?

8    A    Yes.

9    Q    But the DIA didn't file a suit; correct?

10   A    No.

11   Q    And you didn't get the consent of the DIA Corp. to

12   perform that valuation, did you?

13   A    No.

14   Q    And the city had Artvest value the entire collection,

15   but, again, the DIA didn't file suit; correct?

16   A    Correct.

17   Q    And you didn't get the consent from the DIA Corp. to

18   perform Artvest's valuation either; correct?

19   A    Correct.

20   Q    Now, Mr. Orr, you have described yourself as a fiduciary

21   in your role as emergency manager; correct?

22   A    Yes.

23   Q    And you agree that one of your duties as a fiduciary is

24   to look at all options with respect to all of the city's

25   assets; correct?

1   A    Yes, all reasonable options.

2   Q    All reasonable options.  And you promised that the city

3   would look at every transaction that, quote, "makes sense and

4   that provides the city with greater net present value";

5   correct?

6   A    Net positive value, I believe.

7   Q    Net positive value?

8   A    Yes.

9   Q    Okay.  For example, when it came to studying the city's

10  parking rates, you said that raising the parking rates was

11  prudent municipal management based on objective studies and

12  data; right?

13  A    Yes.

14  Q    I'd like to talk about the extent to which you examined

15  all options with respect to the art collection at the DIA.

16  A    Yes.

17  Q    Now, you're familiar with the term "the grand bargain";

18  right?

19  A    Yes.

20  Q    And I think you called it a euphemism for a number of

21  settlements that have been bunched together; correct?

22  A    Yes.

23  Q    And that term refers to the city's agreement to transfer

24  the art collection at the DIA to a charitable trust in return

25  for the contributions from various foundations, from the DIA

1  Corp., and from the State of Michigan; correct?

2  A    Yes.  The DIA settlement and the state contribution

3  agreement are called the grand bargain; correct.

4  Q    And again, you understand that the first plan that was

5  filed on February 21, 2014, contained the elements of the

6  grand bargain; correct?

7  A    I believe so.

8  Q    And it's fair to say that you had agreed to the grand

9  bargain on behalf of the city prior to filing the February

10  21, 2014, version of the plan; is that correct?

11  A    I think it's fair to say that we had agreed to the

12  concept of the grand bargain, yes.

13  Q    And prior to agreeing to the grand bargain, the city had

14  never prepared its own inventory of the art; correct?

15  A    Yes.

16  Q    And as of the time you agreed to the grand bargain, you'd

17  seen a listing of the art, but you don't know whether it was

18  comprehensive or not; right?

19  A    Correct.

20  Q    Now, as of the time you agreed to the grand bargain, the

21  city didn't know the value of the entire art collection;

22  correct?

23  A    I believe that's true.

24  Q    In fact, as of the time you agreed to the grand bargain,

25  you didn't even know what the city believed the value of the

1   entire art collection could be; correct?  And if it goes to
2   the mediation, again --
3   A   Without discussing anything in the mediation, we had not
4   performed a comprehensive valuation.
5   Q   Okay.  Let's move on then.  And as of the time you agreed
6   to the grand bargain, you didn't know whether the city had
7   even identified which pieces in the collection were worth
8   more than a million dollars; correct?
9   A   I don't recall.
10  Q   In fact, as of the time of the first plan back in
11  February 21, 2014, the only available substantive information
12  you had regarding the potential value of the collection was
13  embodied in Christie's assessment; right?
14  A   Without implicating the mediation, I believe that's true.
15  Q   And the Christie's valuation involved less than five
16  percent of the collection; isn't that correct?
17  A   By amount, 2,300 over 66,000, yes.
18  Q   Less than five percent, and my math is not as good as
19  yours is.  Now, as we discussed, as for the time -- as of the
20  time you entered into the grand bargain, you had not seen or
21  conducted an audit that sought to determine which pieces were
22  subject to individual limitations on alienation or transfer;
23  correct?
24  A   I think that's correct.
25  Q   And similarly, as of the time you agreed to the grand

1 bargain, you don't know if the city had conducted an audit to

2 determine which pieces of art had been purchased and which

3 had been donated; correct?

4 A    Yes.

5 Q    And you didn't conduct such an audit because your

6 understanding was that the number of pieces that could be

7 sold was relatively low; correct?

8 A    In part, yes.

9 Q    And that understanding was based on communications you

10 had with the DIA Corp. and Founders Society, correct,

11 communications outside of the mediation?

12 A    Outside of mediation; correct?

13 Q    And those were parties who were strongly opposed to any

14 sale of the art; correct?

15 A    Yes.

16 Q    But the city didn't undertake any effort to independently

17 assess whether what it was being told by the DIA was, in

18 fact, correct; isn't that true?

19 A    Correct.

20 Q    Now, from your appointment in March of 2013 until the

21 fall of 2013, you continued to say that everything was on the

22 table with respect to the DIA; correct?

23 A    Yes.

24        MR. SOTO:  Kim, if you could put up Exhibit 3038.

25 BY MR. SOTO:

1    Q   Mr. Orr, when you received this e-mail from Mr. Nowling
2    back in May of -- it's up on your screen as well -- back in
3    May of 2013, you didn't consider the work you were doing --
4    well, let me just ask you.  Did you consider the work you
5    were doing as a emergency matter -- a matter of dealing with
6    a financial emergency?
7    A   Did I consider it was a matter --
8    Q   Yes.
9    A   Yes, yes.
10   Q   And did you agree with Mr. Nowling's statement that
11   financial emergencies require extraordinary measures?
12   A   Yes.
13   Q   Maybe selling art?
14   A   Yes, generally speaking, in May 2013.
15   Q   But the city didn't actually engage in any steps to
16   monetize the art apart from the grand bargain; correct?
17   A   Correct.
18   Q   And the city never attempted to conduct a market test for
19   the art to allow potential buyers to assert their views of
20   potential value; right?
21   A   Yes.  We never conducted an auction or a pre-show.
22   Q   Okay.  And you never engaged other museums to see what
23   they might pay for the art collection or for any pieces of
24   the art collection; correct?
25   A   Correct.

1  Q   And, Mr. Orr, please take a look at what has been

2  marked -- and you're probably going to get sick of this

3  exhibit, but I think it's Exhibit 343.

4         MR. SOTO:  Oh, okay.  Your Honor, I didn't -- I did

5  something you tell us not to do, and I'm sorry.  I would like

6  to move Exhibit 3038 into evidence.

7         THE COURT:  Which one is that, sir?

8         MR. SOTO:  The e-mail that we just went over.

9         THE COURT:  Any objections?

10        MR. SHUMAKER:  I believe it's already in, your

11 Honor, but no objections.

12        THE COURT:  All right.  If it's not, it is admitted.

13     (FGIC Exhibit 3038 received at 4:36 p.m.)

14 BY MR. SOTO:

15 Q   Now we're looking at Exhibit 343, which I know is in

16 evidence.  This is a letter dated December 3rd, 2013, from

17 Doug Woodham, president of Christie's, to you as emergency

18 manager, and you testified about this earlier today; correct?

19 A   Yes.

20 Q   So you remember receiving this letter; correct?

21 A   Yes.

22 Q   Now, looking back on page 3 of 5, you see under the

23 heading "Alternatives to Sale" --

24 A   Yes.

25 Q   Do you recall reviewing the alternatives to sale on pages

1    3, 4, and 5 of this letter?

2    A    Yes.

3    Q    So you knew about these alternatives; correct?

4    A    Yes.

5    Q    But it's true that you didn't discuss them with anyone at

6    Christie's, did you?

7    A    No.  That's not true.

8    Q    Oh, you did?

9    A    Yeah.  I believe prior to receiving this letter we had

10   discussed some of them.

11   Q    And do you recall who that was with?

12   A    I believe in the initial meeting with Mr. Woodham and an

13   assistant of his we discussed not -- I don't recall

14   discussing all of them, but I believe we did discuss some of

15   them.

16   Q    We may get to that through another fellow.  Maybe we can

17   get that through Paul Provost's designations if that was the

18   guy.

19   A    Okay.

20   Q    But going back to these monetization alternatives, you

21   never followed through with any of the monetization

22   alternatives that Christie outlined, did you?

23   A    Correct.

24   Q    And one of those alternatives is using the art as

25   collateral for a loan; correct?

1   A   Correct.

2   Q   But, again, if I ask you this question about all of

3   them -- and I won't if you answer it now -- you never took

4   steps to explore any of these alternatives; is that correct?

5   Go ahead and take a look at them.

6   A   I believe that Mr. Woodham and I discussed in August

7   items two --

8   Q   And by that you mean leasing the art to a partner?

9   A   Yes.  I'm going to go by the subparagraphs here, the

10  clauses.  Items two, four, and five.

11  Q   Okay.  And you determined that you wouldn't go forward

12  with either of those items that you discussed; correct?

13  A   That is correct.

14  Q   Now, at some point you became aware that Houlihan Lokey

15  had gone out to market and sometime in April, early April of

16  2014, received indications of interest regarding the art;

17  correct?

18  A   Yes.

19  Q   But you didn't reach out to any of those four parties to

20  learn more about those proposals; correct?

21  A   Correct.

22  Q   Nor did anyone working for you, as far as you know, reach

23  out to any of those parties?

24  A   Correct.

25  Q   And you remember that one of the indications of interest

1   offered to buy only the Chinese art in the collection for
2   more than a billion dollars; correct?
3   A    Yes.  I remember there was a representation that there
4   was an offer for that.
5   Q    But even that one you didn't follow up on; correct?
6   A    Correct.
7   Q    But at the time you learned of the four indications of
8   interest that Houlihan had received, the city hadn't received
9   any analysis of the value of the entire collection of art at
10  that point, had it?  It hadn't gotten the Artvest analysis.
11  A    I believe that's correct.
12  Q    Now, a group of creditors filed a motion asking the city
13  and the DIA to give the four potential bidders that had
14  contacted Houlihan Lokey access to the DIA so they could do
15  some due diligence to formulate more formal bids.  Do you
16  recall that?
17  A    I recall hearing of it, yes.
18  Q    Okay.  And the city objected to that motion; correct?
19  A    I believe so.
20  Q    Were you ever made aware that one of the potential
21  bidders reached out to the city with further refined
22  information?
23  A    I recall -- I don't recall which one, but I recall that
24  there was an overture from one of them, I believe.
25  Q    But, again, the city didn't engage that bidder either,

1  did it?

2  A   That's correct.

3  Q   Now, Mr. Orr, you believe that the DIA is critical to the

4  cultural history and economic revitalization of the city;

5  correct?

6  A   Yes.

7  Q   In fact, you testified about it this morning; correct?

8  A   Yes.

9  Q   And you also believe that every museum in Detroit is

10 critical to the city's economic revitalization; right?

11 A   Yes.

12 Q   And you and your advisors have not conducted an economic

13 analysis to determine the economic contribution of the DIA to

14 the city; correct?

15 A   I believe that's true.

16 Q   And you don't know the average amount spent in the City

17 of Detroit by each visitor to the DIA; correct?

18 A   No, I do not.

19 Q   And, in fact, you've never even visited the DIA prior to

20 agreeing to enter into the grand bargain; correct?

21 A   I never visited it since I was appointed emergency

22 manager --

23 Q   Ah, okay.

24 A   -- prior to entering into the grand bargain.

25 Q   Well, that makes me feel better.

1  A   Okay.

2  Q   Now, Mr. Orr, you're aware of the fact that the DIA has

3  approximately 62,000 works of art; correct?

4  A   Sixty-six, somewhere in there, yes.

5  Q   And you're aware of the fact that over 55,000 works of

6  art are in storage, you know.  They only show about 2,700;

7  correct?

8  A   Yes.  I'm aware they rotate the shows.

9  Q   But it's still your view that the 55,000-plus works of

10 art that are in storage are necessary and essential to the

11 City of Detroit; correct?

12 A   It's my view that the grand bargain is necessary and

13 essential to preserve the art at DIA, yes.  I don't know if

14 every piece and every shard is necessary.

15 Q   And you don't know what the value of the art is that's in

16 storage; correct?

17 A   I know that Artvest performed a valuation, which I

18 thought was comprehensive, of all the pieces.  I have not

19 determined which is actually on the floor and which is in

20 storage.

21 Q   And now I'm going to ask you some questions that you

22 might know more than I since you live here.

23 A   Sure, yeah.

24 Q   As far as you know, none of the schoolchildren visiting

25 the DIA have seen the art that's in storage, have they?

1  A    I don't know.

2  Q    Okay.  As far as you know, none of the families visiting

3  the DIA have seen the art that's in storage, have they?

4  A    I don't know.

5  Q    You've also never studied how many municipalities in this

6  country operate effectively without an art museum, have you?

7  A    No.

8  Q    And you've never studied data on the average value of

9  municipal art collections; correct?

10  A    I saw a -- no.

11  Q    Okay.  And you haven't decided for yourself whether it

12  would be sufficient or not for the City of Detroit to try to

13  get by with an art collection that was worth maybe only $2

14  billion; correct?

15  A    No.  I haven't parsed what would be sufficient for the

16  city.  I'm committed to protecting the so-called grand

17  bargain.

18  Q    Now, let's switch gears.  You understand that pursuant to

19  the so-called grand bargain the state, the DIA Corp., and,

20  again, certain foundations are contributing money to pension

21  creditors in connection with the transfer of the city's art

22  collection; right?

23  A    Yes.

24  Q    In fact, each of those contributions is specifically

25  conditioned upon the city transferring away the valuable art

1  collection; correct?

2  A    They're conditioned upon preserving the art in a

3  charitable trust, yes.

4  Q    And transferring it away from the city's ownership;

5  correct?

6  A    Yes.

7  Q    Focusing specifically on the state contribution, it's

8  your understanding that it is being given in part in exchange

9  for the art being put in trust; correct?

10 A    Yes.

11 Q    And the purpose of the transfer of the art to a public

12 trust is to ensure that it would never be sold to satisfy the

13 claims of the city's creditors; correct?

14 A    Yes.

15 Q    Let's switch to the LTGO settlement.  I say it LTGO.

16 That LTGO thing just doesn't hit me.  Mr. Orr, you understand

17 that there's been a settlement with the holders of limited

18 tax general obligation bonds; correct?

19 A    Yes.

20 Q    And you understand that under the terms of that

21 settlement, the LTGO holders get at least 34 cents on a

22 dollar; isn't that correct?

23 A    I believe so.

24 Q    And as we've discussed before, the best the nonsettling

25 COPs holders and other unsecured creditors can do under the

1   plan is to recover, you know, ten cents on a dollar; correct?

2   A   Ten to thirteen.

3   Q   That's true.  You said that.  Okay.  Ten to thirteen.

4   And you also understand that the city has classified the

5   LTGO, the COPs, and the Class 14 creditors as unsecured

6   creditors; correct?

7   A   Yes.

8   Q   And the LTGO holders are financial creditors just like

9   the COPs holders in Class 9; correct?

10  A   Not just like, but they are financial creditors.

11  Q   Fair enough.  And the LTGO bondholders are not granted a

12  lien in any city property; isn't that correct?

13  A   We don't believe so.

14  Q   And like the COPs holders, many of the LTGO holders have

15  monoline insurers standing behind them; correct?

16  A   Yes.

17  Q   But the COPs and the LTGO creditors are not being treated

18  equally, are they?

19  A   There are different levels of recoveries proposed under

20  the plan.

21  Q   And your reasons for this disparate treatment are, one,

22  that the COPs claims are disputed, and, two, that the LTGO

23  have made an argument that they aren't unsecured creditors;

24  correct?

25  A   Well, there are other reasons that I testified to this

1   morning, but generally, yes.

2   Q   Okay.  Now we're going to go to something that you

3   discussed at the very last of your testimony.

4   A   Um-hmm.

5   Q   Mr. Orr, you've heard of something called the best

6   interest of creditors test; correct?

7   A   Yes.

8   Q   And before you allowed the current plan to be filed, you

9   made a determination that the plan satisfies the best

10  interest test; right?

11  A   Yes.

12  Q   And you understand that in Chapter 9 the best interest

13  test compares what creditors are receiving under the plan to

14  what they would receive if the plan -- if the petition were

15  dismissed; correct?

16  A   Yes.

17  Q   And in the dismissal scenario, you agree that any

18  judgments that creditors would receive would give rise to

19  judgment levies of equal priority; correct?

20  A   I agree that any judgments would give rise to judgment

21  claims.  I'm not sure if they would give rise to levies.

22  Q   Okay.  And another word for claims of equal priority is

23  pari passu; right?

24  A   Yes.  That generally means on the same level.

25  Q   But as you testified before, the best the nonsettling COP

1  holders and Class 14 creditors can get under the plan is, as

2  you put it, ten to thirteen cents; right?

3  A    Yes.

4  Q    Now, historically you understand that the city has

5  allocated a share of the UAAL to the DWSD enterprise fund;

6  correct?

7  A    Yes.

8  Q    And that's because part of the UAAL the city owes is

9  attributable in some portion to current or former DWSD

10  workers; correct?

11  A    Correct.

12  Q    And the city figured out what percentage of the UAAL is

13  attributable to DWSD workers and then charged that percentage

14  against the DWSD enterprise fund; correct?

15  A    Correct.

16  Q    Now, back in 2005 and 2006 when the COPs were issued and

17  the funds were provided to the Retirement Systems to fund the

18  UAAL as it existed back at that time, the city used the same

19  sharing mechanism with respect to the principal and interest

20  expense on the COPs that was attributable to the DWSD

21  employees who participated in the General Retirement System;

22  correct?

23  A    I don't know.

24  Q    And the reason the city charged the DWSD -- see if this

25  refreshes your recollection -- actually, this may be a time

1   to refresh your recollection.  Turn in your deposition --

2   this time it's page 370, and we'll be looking at 370, line

3   18, to 371, line 2.  And so just looking at line 18, tell me

4   when you got there.

5   A   I'm there.  Thank you, sir.

6   Q   The question on line 18, question --

7          MR. SHUMAKER:  Objection, your Honor.  If he's

8   trying to refresh recollection --

9          MR. SOTO:  Oh, yeah; right.

10  BY MR. SOTO:

11  Q   Go ahead and read it.  Sorry.  Thank you.

12  A   Yes.

13  Q   Okay.  Now, does this refresh your recollection about an

14  allocation to the COPs?

15  A   Yes, it does.

16  Q   And the reason the city can charge the DWSD for its share

17  of the COPs principal and interest is because those are

18  fairly considered overhead expenses of the system; correct?

19  A   Among other things but expenses, yes.

20  Q   And you also understand that when the city charges the

21  DWSD for its share of COPs principal and interest, it

22  actually has to use the money in the way it tells the DWSD

23  it's going to use it; correct?

24  A   I don't recall.

25  Q   Now, let's go back to this notion of the best interest

1  test and thinking about what would happen in a dismissal

2  scenario.  You know, and before we go there and only to

3  refresh your recollection again, see if you will turn to page

4  373 of your deposition -- this is as to the last question.  I

5  didn't realize it was here, but here it is.  Page 373, line

6  17 to 21.

7  A    Yes.

8  Q    Does that refresh your recollection?

9  A    Yes.

10  Q    So I'll ask it -- and you also understand that when the

11  city charges the DWSD for its share of COPs principal and

12  interest, it actually has to use the money in the way that it

13  tells the DWSD it's going to; correct?

14  A    Generally speaking, yes.

15  Q    Now let's go back to the notion of the best interest test

16  and thinking about what would happen in a dismissal scenario.

17  You would agree that if the bankruptcy petition were

18  dismissed, at a minimum, the city could continue to get from

19  the DWSD its proportionate share of the COPs principal and

20  interest service; correct?

21  A    I don't know.

22  Q    Okay.  Now, you have -- and, again, let me see if we can

23  refresh your recollection on that one.  I know you've been

24  busy these days.

25  A    Yeah.

1  Q   Look at page -- this is the same deposition, this time

2  page 374.  We'll be looking at lines 2 to 7.

3  A   Yes.

4  Q   Okay.  And so you would agree that if the bankruptcy

5  petition were not dismissed, at a minimum, the city could

6  continue to get from the DWSD its proportionate share of the

7  COPs principal and interest; correct?

8  A   I have no reason to believe that's not true.

9       MR. SHUMAKER:  Objection, your Honor.  I don't think

10 it says "proportionate."

11      MR. SOTO:  All right.

12 BY MR. SOTO:

13 Q   Its share of the COPs principal and interest service?  I

14 said the word "proportionate," but it just says "share."  Is

15 that -- and you have no reason to believe otherwise; correct?

16 A   I have no reason to believe otherwise.

17 Q   Now that we have that record as clear as mud, let's go on

18 to the next issue.  You have not independently assessed what

19 the nonsettling unsecured creditors would get in a dismissal

20 scenario; correct?

21 A   No.

22 Q   And it's your understanding that a dismissal analysis

23 evaluates what claims would be chasing what dollars if the

24 case were dismissed; correct?

25 A   Generally speaking.

1    Q    Now, in your deposition on July 22nd, 2014, you testified

2    that you relied on a dismissal analysis conducted by

3    Mr. Buckfire; correct?

4    A    I believe my testimony was I think I saw something in a

5    steady state that may have been prepared by Mr. Buckfire in

6    summary, but I'm happy to refresh my recollection.

7    Q    Okay.  Sure enough.  Looking at your deposition, it would

8    be same deposition, page 486, lines 9 through 19, and then

9    you addressed the topic again in page 489, lines 11 through

10   17.  And I'm --

11            MR. SHUMAKER:  I'm sorry.  Can I have that one

12   again?

13            MR. SOTO:  Yeah.  486, lines 9 through 19, and 489,

14   lines 11 through 17.

15            MR. SHUMAKER:  Thank you.

16            MR. SOTO:  Yeah.

17   BY MR. SOTO:

18   Q    And I'm not concerned about Mr. Hackney's questions about

19   whether you ever saw anything.  What I'm concerned about is

20   whether you ever did anything.

21   A    Okay.

22   Q    Okay.

23   A    And your question, sir?

24   Q    So in your deposition you testified that you relied on a

25   dismissal analysis conducted by Mr. Buckfire; correct?

1  A    I said, yes, I prefer to think I'm relying on whatever

2  city expert had been designated but also on my other advisors

3  and counsel.

4  Q    Okay.  Sure enough.  And that's your answer today;

5  correct?

6  A    Yes.

7  Q    Now, you were in court earlier this week when Mr.

8  Buckfire testified; correct?

9  A    Yes.

10  Q    That was last Tuesday.  And so you heard Mr. Buckfire

11  testify that he did not do a dismissal analysis; correct?

12  A    Yes.

13  Q    Let me ask you were you in court when Mr. Malhotra was

14  here?

15  A    For -- yes, for most of it.

16  Q    So then you heard Mr. Malhotra testify that he hasn't

17  done a dismissal analysis either; correct?

18  A    I believe so.

19  Q    Okay.  Now, earlier today you were asked some questions

20  about Exhibit 593.

21          MR. SOTO:  Could we get that up?

22          THE WITNESS:  Yes.

23          MR. SOTO:  And we're just about to close here.

24  Yeah.  Yeah.  I can't even see that, so --

25  BY MR. SOTO:

1    Q    Now, you testified that this shows a -- I think you

2    called it steady state scenario; correct?

3    A    Yes.

4    Q    And Mr. Malhotra called it a baseline scenario or a base

5    case scenario.  Have you heard that before?

6    A    Yes.

7    Q    So we're talking about the same thing; correct?

8    A    Yes.

9    Q    And this scenario was meant to illustrate the state of

10   the city's finances assuming no restructuring of its

11   obligations; correct?

12   A    Yes.

13   Q    And this scenario was first created prior to the Chapter

14   9 case; correct?

15   A    Versions of this scenario have been created all along.

16   The first one was probably -- well, versions have been

17   created all along.  I don't recall if the first one was prior

18   to the Chapter 9.

19   Q    I can tell you it was prior to it because we have all the

20   versions, but that's not the --

21   A    Right; right.

22   Q    That's not the gut of the question here.

23   A    Right.

24   Q    So the baseline model was not put together to reflect

25   what would happen upon a dismissal of the Chapter 9 case, was

1   it?

2   A   I don't think -- I don't recall that being the case.

3           MR. SOTO:  Okay.  I have no further questions, your

4   Honor.

5           THE COURT:  All right.  Thank you.  Do you have

6   questions?

7           MR. WAGNER:  Yes, if I may.

8                       CROSS-EXAMINATION

9   BY MR. WAGNER:

10  Q   Good afternoon, Mr. Orr.  Nice to meet you again.

11  Jonathan Wager on behalf of --

12  A   Hello, Mr. Wagner.

13  Q   -- the ad hoc COPs.  Just a couple of questions.  You

14  testified concerning the grand bargain.  Do you recall that?

15  A   Yes, sir.

16  Q   I'm right that the contributions from the state and the

17  DIA parties are part of the bankruptcy plan; correct?

18  A   Yes.  The state contribution agreement is incorporated

19  into the plan.

20  Q   And those parties did not settle outside the context of

21  the plan; is that correct?

22  A   Can you give me a little bit more of your meaning?

23  Q   Well, those settlements are part of the plan; right?

24  A   Yes.

25  Q   And that's part of what we're being asked -- the Court is

1  being asked to approve; correct?

2  A   Yes.

3  Q   You gave some testimony about the reasons Classes 10 and

4  11 got certain sums, and you testified about conversations

5  you had with members of that class.  I'm right the city did

6  not conduct any formal survey concerning the impact of

7  pension changes on members of that class, did it?

8  A   You mean the active employees?

9  Q   Yes.

10  A   Correct.

11  Q   And I'm right that the city has conducted no formal

12  survey concerning employee morale issues; is that correct?

13  A   That is correct.

14         MR. WAGNER:  Nothing further.

15         THE COURT:  All right.  Thank you.  Will there be

16  redirect?

17         MS. O'GORMAN:  Your Honor, I have --

18         THE COURT:  Oh, do you have questions?

19         MS. O'GORMAN:  -- some cross-examination, about ten

20  minutes.  Did you want me to do it?

21         THE COURT:  No.  I think we need to stop now.  We'll

22  reconvene tomorrow at 8:30.  We will be in this courtroom

23  tomorrow, but on Monday and Tuesday we're going to be in

24  Courtroom 242, so tomorrow I do have to ask you to take

25  everything out of this courtroom.  Anything else to be raised

1  at this time?  All right.  We're in recess.

2        THE CLERK:  All rise.  Court is adjourned.

3     (Proceedings concluded at 4:59 p.m.)

4                      * * *


                      INDEX


WITNESSES:              Direct  Cross  Redirect  Recross

Kevyn Orr                 5    212/279
Rip Rapson              151     204

EXHIBITS:                              Received

City Exhibit 67 (demonstrative)          163
City Exhibit 352                          54
City Exhibit 748                         143
City Exhibit 750 (demonstrative)          73
City Exhibit 764                           3
City Exhibit 765                           3

FGIC Exhibit 1894                        237
FGIC Exhibit 3038                        262
FGIC Exhibit 4447                        222
FGIC Exhibit 4674                        229


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    October 8, 2014
_____    _____
Lois Garrett