# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
---------------------------------------------  x
                                               :
In re                                          :              Chapter 9
                                               :
CITY OF DETROIT, MICHIGAN,                      :              Case No. 13-53846
                                               :
                Debtor.                         :              Hon. Steven W. Rhodes
                                               x
_____
```

# DEBTOR'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 7056 SUBMITTED IN FURTHER SUPPORT OF ITS OBJECTION TO MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT'S CLAIM NO. 3683

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................... - 1 -

STATEMENT OF LEGAL PROCEEDINGS ................................... - 2 -

    The Kwame Kilpatrick Indictment Criminal Trial.................. - 3 -

    MIDDD Federal Lawsuit ...................................................... - 3 -

    MIDDD's State Court Lawsuit .............................................. - 4 -

    MIDDD's Claim in Bankruptcy ........................................... - 4 -

STATEMENT OF FACTS ........................................................... - 5 -

    A.    Chronology of Key Events........................................... - 5 -

    B.    The Acquisition Agreement ......................................... - 9 -

ARGUMENT ............................................................................ - 13 -

    I.    Applicable Legal Standard........................................... - 13 -

    II.    MIDDD's Claim Is Barred Due To Release And Waiver............ - 15 -

        A.    MIDDD's Claim is Barred by the September 2, 2010 Settlement Agreement..................................................... - 15 -

        B.    MIDDD's Claim is Barred By the Global Settlement Agreement ........................................................ - 16 -

    III.    MIDDD's Claim Is Barred by Res Judicata and Collateral Estoppel ...................................................................... - 17 -

        A.    MIDDD's Claim Is Barred by Res Judicata ...................... - 17 -

        B.    MIDDD's Claim Is Barred By Issue Preclusion................. - 19 -

    IV.    MIDDD's Breach of Contract Claim Fails as a Matter of Law.... - 20 -

        A.    MIDDD's Complaint Does Not Establish a Breach of Any Provision of the Acquisition Agreement.................... - 20 -

        B.    MIDDD Cannot Rely on Parol Evidence to Prove Its Breach of Contract Claim ................................................. - 23 -

    V.    MIDDD's Fraud Claims Fail as a Matter of Law ........................ - 28 -

        A.    MIDDD Has Failed to Plead Fraud with Particularity as Required by Federal Rule of Civil Procedure 9(b) ............ - 28 -

-i-

B.    Alternatively, even if MIDDD Had Sufficiently Stated a Claim for Fraud, MIDDD's Fraud Claims Fail as a Matter of Law ................................................................. - 29 -

i.    A Tort Claim Cannot Be Based on a Breach of Contract ................................................................. - 29 -

ii.    MIDDD Cannot Prove A Prima Facie Claim of Fraud, Fraudulent Inducement, or Innocent Misrepresentation ................................................... - 31 -

    1.    MIDDD's Fraud Claims Fail ........................ - 31 -

    2    MIDDD's Silent Fraud Claim Fails .............. - 37 -

    3    MIDDD's Fraudulent Inducement Claim Fails ............................................................ - 37 -

    4.    MIDDD's Innocent Misrepresentation Claim Fails ................................................... - 38 -

iii.    MIDDD's Fraud Claims Are Barred by Governmental Immunity ........................................ - 39 -

VI.    MIDDD's Underlying Quasi-Contractual Claim Fails as a Matter of Law .......................................................................... - 40 -

CONCLUSION ............................................................................ - 41 -

# INDEX OF AUTHORITIES

**Page(s)**

## Cases

*Abbo v. Wireless Toyz Franchise, LLC*, No. 304185, 2014 WL
1978185 (Mich. App. May 13, 2014)....................................26, 27, 28

*Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp.
484 (E.D. Mich. 1993) .........................................................................41

*Appleway Equipment Leasing, Inc. v. River City Equipment Sales,
Inc.*, No. 307784, 2012 WL 6177067 (Mich.App. 2012)....................30

*Barclae v. Zarb*, 300 Mich. App. 455 (2013) .....................................26, 27

*Battista v. Lebanon Trotting Assoc.*, 538 F.2d 111 (6th Cir. 1976)........29

*Central Transp., Inc. v. Four Phase Sys.*, 936 F.2d 256 (6th Cir. 1991) ...............19

*Cloverdale Equip. Copmany v. Simon Aerials, Inc.*, 869 F.2d 934 (6th
Cir. 1989)...........................................................................................41

*Coffey v. Foamex L.P.*, 2 F.3d 157 (6th Cir. 1993).................................29

*Diamond Computer Systems, Inc. v. SBC Communications, Inc.*, 424
F. Supp. 2d 970 (E.D. Mich. 2006) ...................................................36

*Edelman v. McMullin Orchards*, 32 B.R. 783 (Bankr. W.D. Mich.
1983) ..................................................................................................19

*Federated Capital Servs. v. Dextours, Inc.*, No. 228208, 2002 WL
868273 (Mich. App. 2002)..................................................................32

*First Nat'l Bank & Trust Co. v. Brant (In re Calumet Farm, Inc.)*, 398
F.3d 555 (6th Cir. 2005) ......................................................... 1, 14, 33

*Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008)..............................28

*Fultz v. Union-Commerce Assocs.*, 470 Mich. 460 (2004) ..............29, 30

*G. Res., Inc. v. Shelby Ins. Co.*, 84 F.3d 211 (6th Cir. 1996) .................18

iii

*Gen. Motors. Co. v. Heraud (In re Heraud)*, 410 B.R. 569 (Bankr.
    E.D. Mich. 2009) ....................................................................................14, 15

*Greenville Mfg., LLC v. NextEnergy Center*, No. 304229, 2012 WL
    3101826 ......................................................................................................38

*Hamade v. Sunoco, Inc. (R&M)*, 271 Mich. App. 145 (2006) ..........................26, 36

*Hord v. Envtl. Research Inst.*, 463 Mich. 399 (2000) .............................................37

*Huron Tool & Engineering Co. v. Precision Consulting Servs., Inc.*,
    209 Mich. App 365 (1995)...........................................................................30

*Kamalnath v. Mercy Memorial Hosp. Corp.*, 194 Mich.App. 543
    (1992) ...........................................................................................................25

*Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459 (2003)...........................24

*Lee State Bank v. McElheny*, 227 Mich. 322 (1924)...............................................24

*Local Emergency Fin. Assistance Loan Bd. v. Blackwell*, 299 Mich.
    App. 727, 832 N.W.2d 401 (2013)..............................................................40

*M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22 (Mich. App. 1998) .................31

*Macomb Interceptor Drain Drainage District v. Kilpatrick et. al.*,
    Case No. 2:11-cv-13101 ("MIDDD Federal Case"). (Ex. 6-3.)........ 3, 12, 18, 21

*Marks v. Bank of America*, No. 13-12060, 2014 WL 700478 (E.D.
    Mich. Feb. 24, 2014).....................................................................................17

*National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900 (6th Cir.
    2001) ...........................................................................................................19

*Northern Warehousing Inc. v. Michigan Dep't of Educ. (On Remand)*,
    No. 260598, 2006 WL 2419189 (Mich. App. Aug. 22, 2006) .........................40

*Northern Warehousing, Inc. v. State of Michigan*, 475 Mich. 859
    (2006) ...........................................................................................................36

*Pu v. Grubin (In re Food Mgmt. Group, LLC)*, 484 B.R. 574
    (S.D.N.Y. 2012)............................................................................................14

iv

*Rinaldo's Constr. Corp. v. Michigan Bell Telephone Co.*, 454 Mich. 65 (1997) ................................................................. 30

*Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895 (6th Cir. 2002) ....................................................................... 20

*Salzman v. Maldaver*, 315 Mich. 403 (1946) .......................................... 24

*Samuel D Begola Services, Inc v. Wild Bros,* 210 Mich.App 636 (1995) ........................................................................ 37, 38

*Schmude Oil Co. v. Omar Operating Co.,* 184 Mich. App. 574 (1990) ................ 24

*Skotak v. Vic Tanny Int'l, Inc.*, 203 Mich. App. 616 (1994) ................................ 16

*Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927 (E.D. Mich. 2005) ....................................................... 27

*Thomas v. Detroit*, No. 06-10453, 2007 WL 674593 (E.D. Mich. Feb. 28, 2007) ..................................................................... 40

*U.S. ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493 (6th Cir. 2007) ....................................................................... 28, 29

*U.S. v. City of Detroit, et al.* (Case No. 77-71100) .............................................. 16

*UAW–GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486 (1998) ................................................................. 25, 26, 36

*United States of America v. City of Detroit*, 483 F. Supp. 2d. 565 (E.D. Mich. 2007) ...................................................... 7

*United States of America v. Kilpatrick, et al.*, Case No. 10-20403. (Ex. 6-1.) ......................................................................... 3, 13

*United States Fidelity & Guaranty Co. v. Black,* 412 Mich. 99 (1981) ............ 38, 39

*United States v. City of Detroit, et al.*, Case No. 77-71100 ..................................... 7

*Vertex Dev. LLC v. Fifth Third Bank,* No. 308822, 2013 WL 85904 (Mich. App. Jan. 8, 2013) ............................................. 2, 15, 35

*Whitesell Corp. v. Whirlpool Corp.*, No. 1:05-CV-679, 2009 WL 3270265 (W.D. Mich. 2009) ..................................................... 32

*Williams v. Wayne Cnty.*,No. 09-14328, 2011 WL 479959 (E.D. Mich. Feb. 4, 2011)....................................................................................................40

*Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16 (2008) ....................................................................................................40

**Statutes**

MCL 691.1407...............................................................................................2, 39

**Court Rules**

Federal Rule of Bankruptcy Procedure 3018(a) ...........................................5, 6, 35

Federal Rule of Bankruptcy Procedure 7056.......................................................14

Federal Rule of Bankruptcy Procedure 9014(c) ..................................................14

Federal Rule of Civil Procedure 9 .............................................................2, 28, 29

Federal Rule of Civil Procedure 56 ...............................................................14, 15

## INTRODUCTION

The Macomb Interceptor Drain Drainage District ("MIDDD") asserted Claim No. 3683 against the City of Detroit (the "City" or "Debtor") in an amount not less than $26 million. Its claim lacks support from the facts or the law and is, at best, speculative. As its sole support for its proof of claims and damages, it attached a complaint against the City of Detroit filed in Macomb County Circuit Court a few weeks before the City filed for bankruptcy (the "MIDDD Complaint"). (Dkt. 4954-2.) MIDDD alleges damages arising out of the sale of Romeo Arm Interceptor from the City to MIDDD, contending that the City was aware of fraud and misrepresentation by former Mayor Kwame Kilpatrick, Victor Mercado, Bobby Ferguson, and others relating to the repair costs of the 2004 15 Mile Road Macomb Interceptor Collapse ("Project" or "Project costs"). The Complaint contains four counts: (I) Fraud, Fraud in the Inducement, and Silent Fraud; (II) Innocent Misrepresentation; (III) Breach of Contract; and (IV) Quantum Meruit/Unjust Enrichment. (*Id.*)

All of the counts fail as a matter of law. First, MIDDD's claims have been expressly released and waived twice by unambiguous contracts. Second, MIDDD's Claims are barred by *res judicata* and collateral estoppel to the extent that MIDDD is contending that it can recover damages for tort claims conveyed to it by the City through the Acquisition Agreement. Judge Cleland has already ruled

- 1 -

against MIDDD on this issue. <u>Third,</u> MIDDD's contract claims fail as a matter of law because MIDDD cannot establish a breach of any provision of the Acquisition Agreement (as defined below). The provisions upon which MIDDD relies were expressly fulfilled, do not involve duties owed by the City to MIDDD or involve situations where MIDDD has failed to provide any evidence that they were violated. <u>Fourth</u>, all of MIDDD's fraud claims fail as a matter of law because: (a) the MIDDD Complaint fails to state claims for fraud with particularity as required by Federal Rule of Civil Procedure 9(b); (b) MIDDD admits that its claim is based upon a breach of contract, and it is well settled law that a tort such as fraud cannot be based upon a breach of contract; (c) MIDDD cannot prove the prima facie elements of a fraud claim; (d) MIDDD's tort claims are statutorily barred by governmental immunity, MCL 691.1407. <u>Fifth</u>, MIDDD's quasi-contract claim fails because MIDDD admits that a contract – the Acquisition Agreement - exists.

Given the foregoing, MIDDD's claim cannot survive summary judgment, and Claim No. 3683 should be dismissed, disallowed and expunged.

<u>**STATEMENT OF LEGAL PROCEEDINGS**</u>

The following timeline of legal proceedings is set forth so that MIDDD's claims may be analyzed within the context of the legal history from which they arise:

- **The Kwame Kilpatrick Indictment Criminal Trial:** On December 15, 2010, the United States filed a First Superseding Criminal Indictment against

former Detroit Mayor Kwame Kilpatrick; Bobby W. Ferguson; Bernard Kilpatrick; Victor M. Mercado, the former head of the City of Detroit Water and Sewerage Department ("DWSD"); and several other persons, in *United States of America v. Kilpatrick, et al.*, Case No. 10-20403. (Ex. 6-1.) After a lengthy jury trial in federal court, a jury returned a verdict of guilty against K. Kilpatrick, Ferguson and B. Kilpatrick, on various charges. (Ex. 6-2.)

- **MIDDD Federal Lawsuit:** On July 18, 2011, MIDDD filed a lawsuit in the United States District Court for the Eastern District of Michigan against Kwame Kilpatrick, Bobby Ferguson, Victor Mercado, and various other DWSD contractors and sub-contractors alleging claims for civil RICO, antitrust violations, breach of contract, fraud, and other tort claims relating to Contract No. CS-1368. *Macomb Interceptor Drain Drainage District v. Kilpatrick et. al.*, Case No. 2:11-cv-13101 ("MIDDD Federal Case"). (Ex. 6-3.) After numerous of the contractor/vendor defendants in that case moved to dismiss MIDDD's tort claims against them on the basis that MIDDD did not have standing to assert them, the City, through DWSD, moved to intervene as a plaintiff, asserting that the tort claims belonged to the City. (Ex.6-4; Ex. 6-5.) On May 7, 2012, Judge Cleland issued an Opinion and Order granting the City leave to intervene, but only as to the tort claims related to CS-1368. (Ex. 6-6; Ex. 6-7.)[1] The issue as to which party owned the tort and federal statutory claims asserted by MIDDD was argued by the various parties in a July 25, 2012 hearing before Judge Cleland. (Ex. 4.) On September 17, 2012, Judge Cleland issued a 30-page Opinion and Order (the "Cleland Opinion") ruling that under the plain language of the September 2, 2010 Acquisition Agreement between the City of Detroit, MIDDD, and Macomb County ("Acquisition Agreement"), the City had exclusive standing to pursue the tort and federal statutory claims

---

[1] In its Intervening Complaint, the City asserted that Kwame Kilpatrick, Bobby Ferguson, Victor Mercado, and others agreed, taking advantage of their positions for their own benefit, to conceal – and were successful in fraudulently concealing – their unlawful activities from disclosure to the DWSD Board and officials; the City and City Council; and the federal judiciary, including the long-tenured federal judge who presided over the City of Detroit Environmental Case. (*Id.*) The City further asserted that its first notice of the Kilpatrick criminal conspiracy was the filing by the federal government of the First Superseding Criminal Indictment on December 15, 2010. (*Id.* at ¶117.)

(Ex. 8.)[2]

- **MIDDD's State Court Lawsuit:** A few weeks prior to the City's Chapter 9 bankruptcy filing, MIDDD filed a complaint against the City in Macomb County Circuit Court (the "MIDDD Complaint"). (MIDDD Complaint, Dkt. 4954-2.) The MIDDD Complaint contained four counts: (I) Fraud, Fraud in the Inducement, and Silent Fraud; (II) Innocent Misrepresentation; (III) Breach of Contract; and (IV) Quantum Meruit/Unjust Enrichment. (*Id.*) Attached to the MIDDD Complaint as exhibits were the Acquisition Agreement, Amendment No. 2 to Contract No. CS-1368, the Acquisition Agreement Bill of Sale, the Affidavit of R. Craig Hupp, and the jury verdicts from the criminal trial of Kwame Kilpatrick and Bobby Ferguson. (*Id.*) The relief requested in the MIDDD Complaint included a request for reformation and/or rescission of the Acquisition Agreement, and an award of damages in an amount in excess of $26 million. (*Id.*) Prior to the City filing a responsive pleading, the matter was stayed by this Court.

- **MIDDD's Claim in Bankruptcy:** On or around May 5, 2014, MIDDD filed Proof of Claim No. 3683. As "proof" of its claims and damages in the amount of $26,000,000 it attached the MIDDD Complaint (Dkt. 4954-2). The City filed an Objection to MIDDD's Proof of Claim (Dkt. 4954) and an answer and affirmative defenses to the MIDDD Complaint (Dkt. 7554).[3]

---

[2] Although MIDDD argued that it was assigned all tort and federal statutory claims pursuant to Section 2.4 of the Acquisition Agreement, Judge Cleland disagreed, finding that the tort claims belonged to the City and ruling that various pieces of extrinsic evidence brought by MIDDD were self-serving and barred by the parol evidence rule. (*Id.* at 10-15.)

[3] On June 25, 2014, after a hearing regarding MIDDD's Rule 3018 motion, the Court issued a minute entry permitting limited discovery and briefing before the Court's July 17, 2014 hearing on MIDDD's Rule 3018 motion. Since June 25, 2014, MIDDD and the City have exchanged written discovery requests and documents. MIDDD took depositions of the following witnesses: Ramesh Shukla, Darryl Latimer, Bart Foster, Marc Jacobs, and Robert Walter. The City took depositions of the following witnesses: Lyle Winn, Anthony Marrocco, William Misterovich and R. Craig Hupp. (Exhibit 6-9, Marrocco Tr.; Exhibit 6-10, Winn Tr.; Exhibit 6-11, Shukla Tr.) In support of the present Brief, the City incorporates herein and attaches the Affidavits or Declarations of Mark Foster, Robert Walter, Darryl Latimer and Mark Jacobs. (Exhibit 5-1, Foster Aff.; Exhibit 5-2, Walter

*Continued on next page.*

## STATEMENT OF FACTS

### A.    Chronology of Key Events

MIDDD's claims must be examined within the time frame in which the claims arose.  To assist in this examination, the following chronology is set forth:

- The Romeo Arm Interceptor that is the subject of this dispute is part of the Macomb Interceptor System and runs along Garfield Road from Clinton River to 15 Mile Road, in Sterling Heights, Michigan, and provides sewerage service to Macomb County residents.  (Ex. 6-12.)  During the period of time that DWSD owned and operated the Interceptor, sewer rates for Macomb County and the Clinton Oakland District were designed to recover the "cash basis" revenue requirements associated with it so that debt service and operating costs associated with those facilities were "passed through" to the users.  (Ex. 5-1, Foster Aff., ¶5.)

- August 22, 2004: 15 Mile Road Macomb Interceptor Collapse (Dkt. 6015-18; Dkt. 6015-17, Jacobs Decl., ¶4; Dkt. 6015-16, Latimer Affid., ¶4.) (Ex. 6-12; Ex. 5-4, Jacobs Decl., ¶4; Ex. 5-3, Latimer Aff., ¶4, Ex. 5-2, Walter Aff., ¶4.)  It was quickly determined that the sinkhole was caused by damage to the Romeo Arm, located beneath 15 Mile Road.  (Ex. 6-12.)  Within hours, the sinkhole expanded to a depth of 30 feet and extended a distance of approximately 245 feet in east-west direction along 15 Mile Road, requiring immediate and emergency repairs.  (*Id.*)  (Ex. 5-4, Jacobs Decl., ¶4; Ex. 5-3, Latimer Aff., ¶4.)  DWSD quickly stabilized the sinkhole and began repair. (Ex. 6-12; Ex. 5-4, Jacobs Decl., ¶4; Ex. 5-3, Latimer Aff., ¶4.)  Inland Waters Pollution Control, Inc. ("Inland"), a City contractor, provided an initial estimate of $35 million and was selected as general contractor. (MIDDD Complaint, ¶34.)

---

*Continued from previous page.*

Aff.; Exhibit 5-3, Latimer Aff.; Exhibit 5-4, Jacobs Decl.)  MIDDD and the City both filed a brief in support and in opposition to MIDDD's Rule 3018 motion for temporary allowance (Dkt. 6015 (City's Brief) and Dkt. 6016/6061 (MIDDD's Brief).  The parties also filed reply briefs (Dkt. 6093 (City's Reply) and Dkt. 6098 (MIDDD Reply).

- September 28, 2004: Kwame Kilpatrick issued Special Administrator Order Number 2004-5, authorizing Victor Mercado to enter into an emergency amendment (Amendment 2) to CS-1368 increasing the contract by $35 million and increasing the total amount of the contract to $95 Million ("CS-1368-2"). (Ex. 5-3, Latimer Aff., ¶13).

- June 16, 2005: Again, pursuant to a Special Administrator Order issued by Kwame Kilpatrick, Amendment No. 3 was added to CS-1368-3, which increased the amount of CS-1368 by another $23 million, increasing the total amount of the contract up to $118 million. (Ex. 5-3, Latimer Aff., ¶13) The two amendments (Nos. 2 and 3) in the amounts of $35 million and $23 million, respectively, set the cost of the 15 Mile Road Repair Project at $58 million (hereinafter referred to as "the Project"). (MIDDD Complaint, ¶34; Ex. 5-3, Latimer Aff., ¶14).[4]

- August 23, 2004 – March 14, 2005: 15 Mile Road Macomb Interceptor repairs are completed (Dkt. 4954-2, ¶34.) (MIDDD Complaint, ¶34.) The repairs for the Project soon became a hotly contested issue between Macomb County, Oakland County, and the City.

- 2005-2006: City allocates 100% of Project costs to Macomb County sewer rates (Exhibit 6-13, Foster Tr. at 26-27.).

- March 10, 2006: Macomb County files a Petition for an injunction in Case No. 77-71100[5] challenging DWSD's allocation of Project costs to sewer

---

[4] The original CS 1368 awarded to Inland Waters covered a variety of projects, and the original contract plus amendments  - 1, 4 and 5 - were "as needed" contracts pertaining to only sewer lining tasks and were priced on a unit pricing system. (Exhibit 5-3, Latimer Aff., ¶13.)  These amendments did not cover the Project. (Exhibit 5-3, Latimer Aff., ¶13.)  Amendments 2 and 3 to CS 1368 covered the cost of the Project and were "cost plus fees" contracts that were submitted because of the change in type of work and the emergency nature of the same.  The unit pricing model simply did not apply to these amendments.  (Exhibit 5-3, Latimer Aff., ¶14.)

[5] In 1977, Judge John Feikens presided over this landmark case, *United States v. City of Detroit, et al.*, Case No. 77-71100, which required lengthy federal oversight over DWSD.

rates (Case No. 77-71100, Dkt. 1900.) (Ex. 6-1.) (Ex. 6-15, Hupp Tr. at 17-18.) As a result, the parties began to negotiate terms whereby MIDDD would purchase the Macomb Interceptor from DWSD. (Ex. 6-16, Jacobs Tr. at 12.) (Ex. 5-1, Foster Aff., ¶6.)

- <u>Late summer/early fall 2006</u>: A purported tentative agreement is reached between Mercado and Marrocco as to cost of 15 Mile Road repairs (Ex. 6-15, Hupp Tr. at 30-32.).

- <u>January 16, 2007</u>: Settlement Conference in Case No. 77-71100 held, minute entry indicates that "[t]he parties agreed on a number and the general terms of a release of liability on the interceptor repair numbers." (Ex. 6-17, Docket Sheet.).

- <u>March 23, 2007</u>: Judge Feikens issues Opinion and Order Denying Macomb's request for an injunction regarding DWSD's allocation of repair costs to sewer rates, ruling that Macomb was responsible for the Project costs, scuttling the purported tentative agreement reached between the parties (Ex. 6-15, Hupp Tr. at 30-32.) (Ex. 6-18, Misterovich Tr. at 15.) *See United States of America v. City of Detroit*, 483 F. Supp. 2d. 565, 568-570 (E.D. Mich. 2007).

- <u>Spring 2008</u>: Court Facilitator Timothy O'Brien initiates settlement discussions between the parties (Ex. 6-18, Misterovich Tr. at 15.).

- <u>June 2008</u>: Victor Mercado resigns as Director of DWSD (Ex. 6-15, Hupp Tr. at 14-15.).

- <u>June 2008 to May 2009</u>: Arms-length settlement discussions continue primarily between Craig Hupp (Macomb's attorney), William Misterovich (MIDDD Chief Deputy and formerly Macomb in house counsel), Mark Jacobs (DWSD's attorney), and Robert Walter (then City of Detroit Counsel assigned to DWSD) (Ex. 6-18, Misterovich Tr. at 12-13, 23-24; Ex. 5-4, Jacobs Decl., ¶10; Ex. 6-19 Walter Tr. at 84-95, 101.).

- <u>May 12, 2009</u>: Global Settlement Agreement Signed by the City, DWSD, Macomb County, Oakland County, and Wayne County releasing all outstanding disputes at the time, including disputes "related to the allocation of repair costs related to the August 4, 2004 collapse on the Romeo Arm of

the Macomb Interceptors at 15 Mile and Hayes . . . [and] [a]ll Disputes and claims between the Parties related to the costs for repairs and renovation of the interceptor sewers listed in Ex. 1 of Ex. D of this Agreement…" (Dkt. 6015-20.) (the "Global Settlement Agreement"). (Ex. 6-20; Ex. 6-9, Marrocco Tr., pp. 16-17.) The Global Settlement Agreement was filed with the court on May 18, 2009. (Ex. 6-20.) The Global Settlement Agreement provided as follows:

> The Parties, in complete satisfaction of the 2004 Collapse Claims, Macomb's claims with regard to the 2006 repairs to the Macomb Interceptors, and the Interceptor Interest Rate claims, agree to principal and interest rate adjustments on charges by DWSD to Macomb in the aggregate amount of $17,050,000. These adjustments shall be implemented as described in the Implementation Outline attached to this Agreement as Ex. B.

(Ex. 6-20, §B.) The Global Settlement Agreement further provided as follows:

> As described in the Letter of Intent attached hereto as Ex. D, the City intends to transfer ownership of the Interceptors from DWSD to the Interceptor Transferees. The closing contemplated by Ex. D shall fully resolve all claims in the Action regarding the Interceptors, including but not limited to those regarding the condition and or need for repair of the Interceptors, as well as such other matters as may be stated in Ex. D.

(*Id.*, pp. 3-4) Exhibit C to the Global Settlement Agreement indicated that Macomb County's pending Motion for Reconsideration at that time, which challenged the cost of the repairs for the Project, was resolved. (*Id.*) The Global Settlement resulted in the creation of MIDDD and the Oakland Macomb Interceptor Drain Drainage District ("OMIDDD") with the express intent of finalizing the sale of certain DWSD assets to each entity respectively. (Ex. 5-4, Jacobs Decl., ¶¶5-9; Ex. 5-2, Walter Aff., ¶¶5-9.) DWSD, OMIDDD and MIDDD then negotiated two deals transferring the appropriate assets to each new entity. (Ex. 5-1, Foster Aff., ¶7.)

- September 2, 2010: Acquisition Agreement signed, along with September 2, 2010 Settlement Agreement, between MIDDD and DWSD in which the parties "waive[ed] and release[d] any claims with regard to . . . the cost of all

projects and contracts shown on Schedule 3.8 to the [Acquisition Agreement] and the calculation of all credits, charges and adjustments set forth in that Schedule." (Exs. 6-21, 6-22, 6-23.)

**B.    The Acquisition Agreement**

Further detail regarding the Acquisition Agreement is necessary. After years of negotiation and approval by DWSD and Detroit City Council, the City conveyed to MIDDD "the Macomb System" for a purchase price that was ultimately calculated as of June 30, 2010, as $89,996,704.  (Ex. 6-21, Schedule 3.8; Ex. 5-3, Latimer Aff. ¶8; Ex. 5-1, Foster Aff. ¶¶4, 5, 7, 13.)  **At the time the Acquisition Agreement was executed, neither former Mayor Kilpatrick nor former DWSD Director Mercado was employed with the City**.  (Ex. 6-24.)

The underlying premise of the Acquisition Agreement was that MIDDD would purchase the Macomb-only portions of the sewer system by paying the outstanding pro-rated principal as of the Closing Date on any bonded debt for which a portion of the debt service is allocated to certain facilities ("System Debt"), less various amounts negotiated by the parties.  (Ex. 5-3, Latimer Aff. ¶9; Ex. 5-4, Jacobs Decl. ¶9; Ex. 5-4, Jacobs Decl. ¶9; Ex. 5-1, Foster Aff. ¶7.)

The agreement called for creating Schedule 3.8, which outlined a purchase price based on the concept of making the City whole for its investment in the system, including recovery of all outstanding debt remaining on the system.  The agreement called for: (a) determining the book value (original cost) of all MIDDD

- 9 -

facilities including cost of additional projects and repairs since the system's construction ("Original Investment"); (b) determining the total value of principal payments that had been included in determining rates charged to applicable MIDDD customers through FY 2009-2010; and (c) deducting (b) from (a) to determine the "System Debt" envisioned by the agreement. (Ex. 5-1, Foster Aff., ¶8.)

The Acquisition Agreement was negotiated and finalized after the resignation of Victor Mercado. It is an adaptation of a previous agreement that was negotiated by the parties over a significant amount of time. (Jacobs Decl. ¶10; Walter Aff., ¶10.) The primary changes to the Acquisition Agreement were in Schedule 3.8. (Ex. 5-4, Jacobs Decl. ¶10; Ex. 5-2, Walter Aff., ¶10.) Schedule 3.8 was also negotiated over a lengthy period of time through arms-length negotiations. (Ex. 5-4, Jacobs Decl. ¶10; Ex. 5-2, Walter Aff., ¶10.) At the time of the tentative agreement between Director Mercado and Commissioner Marrocco (that was scuttled by the Feikens' decision), DWSD estimated that the Macomb System Debt would be over $116 million by the time the sale would conclude. (Ex. 5-4, Jacobs Decl. ¶11; Ex. 5-1, Foster Aff. ¶7; Ex. 5-2, Walter Aff., ¶11.)

The assets transferred to MIDDD had initially cost Detroit $231,847,508. (Ex. 5-1, Foster Aff., ¶¶9, 17.) Macomb was given a credit of $112,355,536 for principal payments for 2009 and $3,291,159 for principal payments made in 2010.

(Ex. 5-1, Foster Aff., ¶¶10, 17).  Therefore, the outstanding System Debt was $116,200,813. (*Id.*, Foster Aff., ¶¶11, 17).

Macomb did not pay $116,200,813 for the assets.  The Original Investment related to CS 1368-2 and CS-1368-3 was, for example, $60,829,019.  (*Id.*, Foster Aff., ¶12.)  As part of the negotiations, DWSD agreed to subtract $7,367,167 for "internal costs" and $1,786,947 for interest expense and related adjustments. (*Id.*, Foster Aff., ¶18.)  The "Adjusted System Debt" was $107,046,704.  (*Id.*, Foster Aff. ¶18.)  Finally, Macomb insisted on additional deductions of $17,050,000 as part of the negotiations in the Global Settlement.  (*Id.*, Foster Aff., ¶19.)  Thus, the final Purchase Price of $89,996,704 was significantly less than the $231,000,000 cost paid by DWSD for the assets, or the $116,000,000 outstanding System Debt. (*Id.*, Foster Aff. ¶19; Ex. 504, Jacobs Decl. ¶11; Ex. 5-1, Foster Aff. ¶13.)  Of note, is that only $54,000,000 of costs related to CS-1368-2 and CS-1368-3 (of the nearly $61 million investment) were part of Schedule 3.8 to the Acquisition Agreement. (Ex. 6-21, referred to as "2004 Repairs.")

At no time prior to the signing of the Macomb Acquisition Agreement were any representations made that the costs associated with the Project or any other item in Schedule 3.8 were "fair and reasonable."  (Ex. 5-4, Jacobs Decl. ¶12; Ex. 5-3, Latimer Aff. ¶10; Ex. 5-2, Walter Aff. ¶ 12; Ex. 5-1, Foster Aff. ¶¶15-16).  MIDDD never claimed that the costs were fraudulent prior to the Acquisition

Agreement nor ever questioned its cost or asked for a reduction beyond normal negotiations (Ex. 5-3, Latimer Aff., ¶10) and the City was unaware of excessive charges for 2004-2005 Project costs until the December 2010 indictment. (*Id.*, Latimer Aff., ¶14). The first time DWSD's counsel heard that MIDDD was suggesting that any portion of the Project Costs reflected in Schedule 3.8 of the Acquisition Agreement was inaccurate, fraudulent, excessive, or even questioned, was immediately prior MIDDD filing its complaint in the MIDDD Federal Case, despite's MIDDD's ability to undertake due diligence prior to the Global Settlement and Acquisition Agreements. (Ex. 5-4, Jacobs Decl., ¶12, 14; Ex. 5-2, Walter Aff., ¶13).[6]

The Acquisition Agreement also contained and incorporated a September 2, 2010 Settlement Agreement through which the City, Macomb County, and MIDDD waived and released any claims regarding "The cost of all projects and contracts shown on Schedule 3.8 to the MID Agreement and the calculation of all credits, charges and adjustments set forth in that Schedule." (Ex. 6-22.) The purpose of this Settlement Agreement was to resolve and release all claims

---

[6] Given the number of concessions granted to MIDDD to the tune of tens of millions of dollars, it is not a fact that the Macomb Acquisition Agreement would have been ratified for a lesser amount even assuming there were overcharges, as it is impossible to know what would have happened if MIDDD challenged the validity of Project costs. (Ex. 5-3, Latimer Aff. ¶15; Ex. 5-2, Walter Aff. ¶16; Ex. 5-1, Foster Aff., ¶20.) The fact of the matter is that MIDDD received and the City transferred exactly what the parties agreed to.

between the parties that related in any way whatsoever to the Macomb Interceptor, any items in the Acquisition Agreement, and/or any disputes between DWSD, Macomb County or MIDDD. (Ex. 5-3, Latimer Aff., ¶11; Ex. 5-2, Walter Aff., ¶15.) The Acquisition Agreement contained a merger and integration clause (Ex. 6-21, §12.5) and a Bill of Sale. (Ex. 6-23, Bill of Sale.)[7]

## ARGUMENT

### I. Applicable Legal Standard

An objection to a claim initiates a contested matter. *Pu v. Grubin (In re Food Mgmt. Group, LLC)*, 484 B.R. 574, 582 (S.D.N.Y. 2012). Federal Rule of Bankruptcy Procedure 9014(c), which governs contested matters, makes Federal Rule of Civil Procedure 56 applicable to such matters through Federal Rule of Bankruptcy Procedure 7056. Fed. R. Bankr. P. 7056, 9014(c). Under Rule 56, "[s]ummary judgment is proper where there exists no genuine issue of material fact

---

[7] The United States Attorney's Office and Federal Bureau of Investigations interviewed City employees prior to the First Superseding Indictment. Some of these employees were also subpoenaed by a Grand Jury. At no time until the date on which the First Superseding Indictment in the *Kilpatrick* case became public was the City aware that there were any claims that were reasonably expected to become the subject of litigation affecting the Macomb System or the transactions contemplated by the Acquisition Agreement. (Exhibit 5-3, Latimer Aff., ¶¶16-18; Exhibit 5-4, Jacobs Dec., ¶17; Exhibit 5-2, Walter Aff., ¶¶17-18). There is no evidence that any of these interviews or testimony led anyone at DWSD or the City to believe that there were excessive or fraudulent charges related to CS-1368-2 or CS-1368-3. (Exhibit 5-3, Latimer Aff., ¶¶16-17; Exhibit 5-2, Walter Aff., ¶¶17-18.) The thrust of the investigation related to the City Local Economic Development Department (LED). (Exhibit 5-3, Latimer Aff., ¶16.)

and the moving party is entitled to judgment as a matter of law." *First Nat'l Bank & Trust Co. v. Brant (In re Calumet Farm, Inc.)*, 398 F.3d 555, 558 (6th Cir. 2005). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

> Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material and precludes grant of summary judgment if proof of that fact would have the effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect the application of appropriate principles of law to the rights and obligations of the parties. The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor.

*Gen. Motors. Co. v. Heraud (In re Heraud)*, 410 B.R. 569, 578 (Bankr. E.D. Mich. 2009) (citations, alterations, and internal quotation marks omitted). Federal Rule of Procedure 56(e) allows a Court to grant summary judgment if it is appropriate. Fed. R. Civ. P. 56(e). Thus, "[r]ule 56(e) places responsibility on the party against whom summary judgment is sought to demonstrate that summary judgment is improper, either by showing the existence of a material question of fact or that the underlying substantive law does not permit such a decision." *Heraud*, 410 B.R. at 578 (quoting *Jones v. Asgrow Seed Co.*, 749 F.Supp. 832, 834 (N.D. Ohio 1990)).

## II. MIDDD's Claim Is Barred Due To Release And Waiver

### A. MIDDD's Claim is Barred by the September 2, 2010 Settlement Agreement

MIDDD's alleges that the City misrepresented the value of costs for the Project. (MIDDD Complaint, ¶¶30-41, 83-91, 93-97, 99-108, 110-115.) The MIDDD Claim fails because MIDDD specifically released all claims related to "[t]he cost of all projects and contracts shown on Schedule 3.8 to the MID Agreement and the calculation of all credits, charges and adjustments set forth in that Schedule." (Ex. 6-22.) Schedule 3.8 to the Acquisition Agreement includes costs incurred for the 15 Mile Road Project under Contract No. CS-1368. (*Id.*)

Michigan law favors settlements. *Vertex Dev. LLC v. Fifth Third Bank,* No. 308822, 2013 WL 85904, at *2 (Mich. App. Jan. 8, 2013). A presumption should follow that when parties settle they intend to put to an end to their disagreements, and if they wish to preserve disputes for the future, they will do so explicitly. The September 2, 2010 Settlement Agreement states that it applies to "[t]he **cost of all projects and contracts** shown on Schedule 3.8 to the MID Agreement and the **calculation of all credits, charges and adjustments** set forth in that Schedule…" (Ex. 6-22; 6-21, emphasis added.) "[T]here is no broader classification than the word all." *Skotak v. Vic Tanny Int'l, Inc*., 203 Mich. App. 616, 619 (1994). MIDDD's purported claim for overcharges is barred covered by the broad language of the release.

- 15 -

**B.    MIDDD's Claim is Barred By the Global Settlement Agreement**

The Global Settlement Agreement was intended to "resolve all currently outstanding disputes pending under *U.S. v. City of Detroit, et al.* (Case No. 77-71100) . . . before the U.S. District Court for the Eastern District of Michigan . . . including, but not limited to:

> (ii) **All Disputes related to the allocation of repair costs related to the August 4, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes (the "2004 Collapse Claims")**;
>
> (iii) All Disputes related to the interest rate charged to Macomb related to debt service associated with the cost of repairs of the 2004 Collapse, with subsequent repairs to the Macomb Interceptors and with the construction of the Garfield Interceptor (the "Interceptor Interest Rate Claims"); [and]
>
> (iv) **All Disputes and claims between the Parties related to costs for repairs and renovation of the interceptor sewers listed in Exhibit 1 of Exhibit D of this Agreement,** including any disputes and claims between the Parties relating to the associated pump stations, meters, appurtenant facilities, related easements, as built plans and records of construction and operation, and all property otherwise described in Exhibit D (collectively, the "Interceptors")."

(Ex. 6-20, ¶1.A.(ii)-(iv).)  Further, it states that "in complete satisfaction of the 2004 Collapse Claims; Interceptor Interest Rate Claims and repairs to the Interceptor," the parties agree to principal and interest rate adjustments on charges by DWSD to Macomb in the aggregate amount of $17,050,000. (*Id.,* ¶2b) Moreover, it confirms that a closing of the future Acquisition Agreement "shall fully resolve all claims in the Action regarding the Interceptors" (*Id.*, ¶ 3.)

Anthony Marrocco, William Misterovich, and MIDDD's attorney, Craig

Hupp, admit that the Global Settlement Agreement waived all of the claims related to the Project and its costs. (Ex. 6-15, Hupp Tr. at 50; Ex. 6-18, Misterovich Tr. at 18, 23-24, 30-32; Ex. 6-9, Marrocco Tr. at 16-17, 22 ("it settled everything")). Hupp, MIDDD's attorney, also testified that the Global Settlement Agreement and the 2010 Settlement and Release Agreement released any claims related to the costs of the repairs of the Project. (Ex. 6-15, Hupp Tr. at 18, 23, 24, 54.) MIDDD's claims are barred.

## III.    MIDDD's Claim Is Barred by *Res Judicata* and Collateral Estoppel

### A.    MIDDD's Claim Is Barred by *Res Judicata*

"[R]es judicata bars the same parties from relitigating issues that either were actually litigated or that could have been raised in an earlier action." *Marks v. Bank of America*, No. 13-12060, 2014 WL 700478, at *3 (E.D. Mich. Feb. 24, 2014). *Res judicata* extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *G. Res., Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 215 (6th Cir. 1996). To the extent that MIDDD is contending that it can recover damages for tort claims conveyed to it by the City through the Acquisition Agreement, the Cleland Opinion bars the MIDDD Claim. Pertinent to the identity of the causes of action, Judge Cleland stated:

> The claims arise from Defendants' involvement in the 2004-2005 repair of a collapsed sewer interceptor at 15 Mile Road in Sterling

Heights, Michigan, (hereafter, the "15 Mile Interceptor Repair Project" or "Project"). Macomb Interceptor avers that Defendant Kwame Kilpatrick, then the Mayor of the City of Detroit, along with various City of Detroit officials conspired with the principal contractor overseeing the 15 Mile Interceptor Repair Project, Defendant Inland Waters Pollution Control, Inc., and numerous subcontractors to "overcharge the Detroit Water and Sewerage Department . . . for time, labor and materials to stabilize and repair a sewer collapse at 15 Mile Road." Macomb Interceptor further alleges that the misconduct was part of a widespread corruption scheme during Defendant Kwame Kilpatrick's tenure as Mayor of Detroit.
*********

Macomb Interceptor argues that the following two alleged injuries maintain its federal claims: (1) paying an inflated price for the Macomb System as a result of 15 Mile Interceptor Repair Project's cost overruns caused by Concurring Defendants' actions and (2) paying higher system usage charges during the time between the 15 Mile Interceptor Repair Project and the execution of the Acquisition Agreement.

(Ex. 6-8, at 2, 16.)

It is clear that the same transactions and the same damages were at issue in the MIDDD Federal Case where it asserted standing by virtue of an alleged assignment of rights under the Acquisition Agreement – the very same contract MIDDD now relies on to support its breach of contract claim against the City. (*See* Ex. 6-8, at 6-16; MIDDD Complaint, ¶¶ 98-108.)

The identities of the parties are the same as well. While the City was an intervening plaintiff in the MIDDD case, undoubtedly, the City was adverse to MIDDD in that case. The City argued that MIDDD lacked legal standing to assert tort and federal statutory claims pertaining to the Macomb Interceptor System and

argued in support of the contractor defendants' motion for summary judgment, in opposition to MIDDD's claim – making the parties adverse. (Ex. 6-8, at 3-4.) What matters for *res judicata* purposes is whether the City and MIDDD were adverse, even if they are co-parties. *Edelman v. McMullin Orchards*, 32 B.R. 783, 785 (Bankr. W.D. Mich. 1983). The Cleland Opinion was a final resolution of the issue of MIDDD's right and standing to bring tort and federal statutory claims relating to the alleged overcharges. MIDDD's claims could have and should have been raised in the MIDDD Case. MIDDD did not do so.

### B. MIDDD's Claim Is Barred By Issue Preclusion

Collateral estoppel – *i.e.*, issue preclusion – also bars MIDDD from relitigating any issue that another court has actually and necessarily determined against MIDDD when issuing a final decision. *Central Transp., Inc. v. Four Phase Sys.*, 936 F.2d 256, 260 (6th Cir. 1991). "[S]ummary judgment is recognized as a final judgment for the purpose of issue preclusion." *National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 910 (6th Cir. 2001). The same is true under Michigan law. *Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 905 (6th Cir. 2002) ("[I]t is clear Michigan law permits preclusion of issues decided by a judge as part of a summary disposition."). Judge Cleland's ruling that the City owned all tort claims relating to the 15 Mile Road Sewer Project based on the unambiguous contractual language in the Acquisition Agreement (Ex. 6-8 at 10-

15.) precludes MIDDD from protesting any of the findings of the Cleland Opinion in a different forum.

## IV. MIDDD's Breach of Contract Claim Fails as a Matter of Law

### A. MIDDD's Complaint Does Not Establish a Breach of Any Provision of the Acquisition Agreement

In Count III of the MIDDD Complaint, MIDDD asserts a general claim for breach of the Acquisition Agreement. It is difficult to argue against MIDDD's vague and scattered claims without reviewing each of the relevant complaint paragraphs in turn to demonstrate how the City did not breach the Acquisition Agreement.

- First, MIDDD alleges that the City breached Section 2.4 of the Acquisition Agreement, which states that "Detroit shall assign to the [MIDDD] all of its rights under all contracts, warranties and guarantees that apply to services or goods related to the Macomb System." (MIDDD Complaint, ¶100(a).) MIDDD makes a similar allegation regarding Section 2.9(b)(8) of the Acquisition Agreement, which states that the City is to provide "[a]n assignment of all rights under any contracts, warranties or guarantees that apply to services or goods related to the facilities comprising the Macomb System…." (Complaint, ¶100(d).) MIDDD fails to allege any actions by the City in breach of Sections 2.4 or 2.9(b)(8) of the Acquisition Agreement so this claim is moot. It is presumed, however, that MIDDD will claim these provisions of the Acquisition Agreement were breached (1) when the City did not transfer tort and federal statutory claims to MIDDD in connection with the Acquisition Agreement; or (2) when the City intervened in the MIDDD Federal Case to assert its rights to the tort and federal statutory claims. As to the first point, the affidavit of R. Craig Hupp, relied upon by MIDDD, indicates that the City's right to assert tort and federal statutory claims was not considered or discussed during negotiations of the Acquisition Agreement. (Dkt. 4954-2, Pg. ID 88, Affidavit of R. Craig Hupp, ¶13.) As to the second point, Judge Cleland ruled that the incorporation of the Acquisition Agreement expressly limits the assignment of "all of its rights." As such, the City did not breach the

Acquisition Agreement by intervening in the MIDD Federal Claim to assert its rights. (Ex. 6-8, at 11.)

- Second, MIDDD alleges that the City breached Section 2.6(b) of the Acquisition Agreement, which states that "Detroit shall in no way retain, the obligation to pay, discharge, perform or defend, as applicable and when due, any and all of the Assumed Liabilities." (Complaint, ¶100(b).) "Assumed Liabilities" is specifically defined as "any and all Liabilities excluding: (i) the retained Liabilities, and (ii) Claims by and among any or all of Detroit, the District, Macomb County or Oakland County and the [MIDDD]." (Ex. 6-21, §1.3.) There is nothing in this paragraph that sets forth <u>any</u> duty owed by the City – only MIDDD can breach this provision because it defines the liabilities that <u>MIDDD assumed</u>.

- Third, MIDDD alleges that the City breached Section 2.9(b)(4) of the Acquisition Agreement, which states that the City must deliver to MIDDD "[a]n executed assignment of all of the Macomb System that is intangible personal property in form and substance satisfactory to [MIDDD] and its counsel and executed by Detroit." (MIDDD Complaint, ¶100(c).) A Bill of Sale was executed, which identified and transferred certain intangible personal property. (Ex. 6-23, attachment B.) MIDDD signed off on the deal.

- Fourth, MIDDD alleges that the City breached Paragraph 2.9(b)(9) of the Acquisition Agreement requiring the City to provide a certificate as to the accuracy of its representations and warrantees in the Acquisition Agreement and as to its compliance with covenants and obligations to be complied with at or before closing. (MIDDD Complaint, ¶¶100(e)-(f).) MIDDD fails to allege that the certificate was not provided, and does not state what provision, if any, of the certificate was breached by the City.

- Fifth, MIDDD alleges that the City breached Section 3.3 of the Acquisition Agreement (MIDDD Complaint, ¶100(h).) but fails to allege any facts suggesting a violation of the Charter, ordinances, or any other applicable law in the "execution, delivery and performance by Detroit" of the Acquisition Agreement. This provision is a promise that the execution, delivery, and performance of the Acquisition Agreement does not conflict with any law, and MIDDD has not alleged that the Acquisition Agreement violated the law.

- Sixth, MIDDD alleges that the City breached Section 3.7 of the Acquisition

Agreement. (MIDDD Complaint, ¶100(g).) MIDDD has failed to allege or identify an "action, suit or proceeding threatened against or effecting Detroit" pending at the time the Acquisition Agreement was signed, in which there was "a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under the Agreement or which . . . questions the validity of the Agreement." At best, the only action, suit, or proceeding which MIDDD may claim was not disclosed by Detroit was the Kilpatrick criminal case, the first notice of which came with the filing of the First Superseding Criminal Indictment on December 15, 2010. Regardless, that matter did not have a materially adverse effect upon the ability of the City to perform its obligations under the Acquisition Agreement, nor did it question the validity of it.

- Seventh, MIDDD alleges that the City breached Section 3.8, which "sets forth all System Debt…." (MIDDD Complaint, ¶100(h).) It is undisputed that Schedule 3.8 of the Acquisition Agreement sets forth the agreed upon "System Debt." That MIDDD now disagrees with the amount of the System Debt, although it did not do so at the time Schedule 3.8 was agreed upon by the parties, does not afford a basis for a breach of that provision. Schedule 3.8 merely lays out what the parties agreed the system debt was as of June 30, 2013 – there is no way to "breach" it.

- Eighth, MIDDD alleges that the City breached Section 5.3, which states that "Detroit shall promptly inform the Macomb County and [MIDDD] in writing of any Claims of which Detroit is or becomes aware of that are or might reasonably be expected to become the subject of litigation <u>affecting the Macomb System or the transactions contemplated by this Agreement</u>." (MIDDD Complaint, ¶100(i).) (emphasis added). The plain language of Section 1.6 makes clear that a "Claim" that must be disclosed by the City is only an investigation or litigation to which Detroit, Macomb County, or MIDDD "may become legally and/or contractually obligated to defend against . . . which are related in any way to the Macomb System." (Ex. 6-21, §1.6.) The Kilpatrick criminal case does not constitute a "Claim" because it did not involve any matter in which Detroit, Macomb County, or MIDDD could become legally or contractually obligated to defend against. It was a criminal matter brought by the United States. In addition, the City did not receive notice of the Kilpatrick criminal case until the filing of the First Superseding Indictment on December 15, 2010.

- Ninth, MIDDD alleges the City breached Section 5.4, which provides that the City shall inform MIDDD if it "becomes aware that any representation or warranty made by Detroit in [the Acquisition Agreement] has ceased to be accurate or if Detroit becomes aware of the occurrence of any breach of any covenant or other agreement required by [the Acquisition Agreement]." (MIDDD Complaint, ¶100(j).) To the extent the filing of the First Superseding Indictment in the Kilpatrick criminal case forms the basis for MIDDD's claim for breach of Section 5.4, no breach occurred on September 2, 2010, as the filing of the First Superseding Indictment became public knowledge on the date of its filing. Further, MIDDD has not identified the alleged representation or breach upon which it relies.

- Finally, MIDDD alleges that the City breached Section 8.1 of the Acquisition Agreement, which states that the City's representations and warranties in the Acquisition Agreement were "true and correct." (MIDDD Complaint, ¶100(k).) Again, MIDDD has not identified a single representation or warranty made in the Acquisition Agreement that was untrue.

Given the foregoing, MIDDD's contract claim should be dismissed outright.

### B. MIDDD Cannot Rely on Parol Evidence to Prove Its Breach of Contract Claim

It is expected that MIDDD will rely upon parol evidence (*i.e.* evidence from outside the four corners of the Acquisition Agreement and the Global Settlement Agreement) to form the basis of its breach of contract claim – despite the fact that the Acquisition Agreement and Global Settlement Agreement both contain a merger and integration clause. (Dkt. 6061 at 28-30.). In reality, MIDDD's claim is nothing but a thinly veiled attempt to have the Court re-write and enforce an entirely different contract using parol evidence.

MIDDD has not identified any ambiguous portion of the Acquisition

Agreement that would require the use of parol evidence to aid in its interpretation. The plain language of each of the provisions outlined by MIDDD demonstrates that they were not breached. MIDDD readily admits that, in general, parol evidence is not permitted to alter or vary the terms of a contract. *Salzman v. Maldaver*, 315 Mich. 403, 413 (1946).[8] MIDDD further admits that it is seeking to introduce parol evidence regarding purported representations made by Mercado to MIDDD. (Dkt. 6061 at 28.) Specifically, MIDDD's entire argument is based on its allegation that while the Acquisition Agreement contains a detailed calculation of the purchase price for the Macomb Interceptor System based on a calculation of "System Debt," that the real agreement was that MIDDD would pay a "fair" and "reasonable" amount for the 15 Mile Road repairs. This would constitute a different agreement.

Parol evidence of contract negotiations, or of prior or contemporaneous

---

[8] Parol evidence is not admissible to prove the terms of an unambiguous contract. "Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *Schmude Oil Co. v. Omar Operating Co.,* 184 Mich. App. 574, 580 (1990). Behind "nearly every written instrument lies a parol agreement, merged therein." *Lee State Bank v. McElheny,* 227 Mich. 322, 327 (1924). "The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing." 4 Williston, Contracts, § 631. Only when a contract is ambiguous may the court consider extrinsic evidence. *See Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 469 (2003).

agreements that contradict or vary the written contract, are not admissible to vary the terms of a contract. *UAW–GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486, 492 (1998). Merger clauses, such as those MIDDD admits it agreed to, prevent one party to a contract from introducing parol evidence to prove an agreement other than the one actually signed. *Kamalnath v. Mercy Memorial Hosp. Corp.,* 194 Mich.App. 543, 554-555 (1992) ("The reasoning behind [the parol evidence rule] is clear: a party may not complain that they relied on oral promises regarding additional or contrary contract terms when there is written proof, signed by both parties, to the contrary.") MIDDD cannot use any prior alleged representations made by Mercado to vary the terms of the Acquisition Agreement and Global Settlement Agreement.

The Acquisition Agreement's integration clause states that the agreement "constitutes the sole understanding of the parties hereto with respect to the matters provided for herein and supersedes any previous agreements and understandings between the Parties with respect to the subject matter hereof." (Ex. 6-21, §12.5.) The merger and integration clauses from these agreements nullify "all prior and contemporaneous agreements, understandings, representations and warranties" made by a party. *Hamade v. Sunoco, Inc. (R&M)*, 271 Mich. App. 145, 171 (2006). Because any pre-contractual statements were "collateral agreements or understandings between two parties that [were] not expressed in a written

contract," they are "eviscerated by [the] merger clause[.]"  *Barclae v. Zarb*, 300

Mich. App. 455, 481 (2013).[9]

In its brief in support of its Rule 3018(a) Motion, MIDDD sought to avoid

the parol evidence rule, relying on *Barclae v. Zarb*, 300 Mich. App. 455 (2013)

and *Abbo v. Wireless Toyz Franchise, LLC*, No. 304185, 2014 WL 1978185 (Mich.

App. May 13, 2014), claiming that the purported representations of Mercado are

not being used to vary the terms of the contract, but instead, are representations of

fact which support its fraud claim.  (Dkt. 6061 at p. 29)  MIDDD's argument fails

for three reasons:

- First, MIDDD cannot rely on extraneous statements because the purported
  representations are covered by the express terms of the Global Settlement
  Agreement.  In *Barclae*, the Court of Appeals held that a merger clause
  undermines this kind of reliance on extraneous statements, when they relate to
  matters covered by the contract.  *Barclae*, 300 Mich. App. at 481.  "The
  reasoning behind this is clear, one should not be heard to complain that they
  relied on oral promises regarding additional or contrary terms when there is
  written proof signed by both parties, to the contrary."  *Star Ins. Co. v. United
  Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 930 (E.D. Mich. 2005).
  Here, MIDDD admits that the Global Settlement Agreement contains a

---

[9] MIDDD's various fraud allegations do not change the fact that the integration
clause is binding, and that MIDDD cannot rely on any statement made outside of
the four corners of the Acquisition Agreement.  In *UAW-GM Human Resource
Center v. KSL Recreation Corp.*, the court held that "the only fraud that could
vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud
relating to the merger clause or fraud that invalidates the entire contract including
the merger clause."  *Id.*  Here, as in *UAW-GM*, MIDDD made no allegations of
fraud that would invalidate the contract or the merger clause itself.  The written
agreement is detailed and complete on its face, (*see* 3 Corbin, Contracts, § 57), and
its words are unambiguous.  The integration clause is not void.

provision resolving "[a]ll Disputes and claims between the Parties related to costs for repairs and renovation of the interceptor sewers…" (Ex. 6-20.) The alleged representations are covered by the Global Settlement Agreement.

- Second, MIDDD cannot prevail because MIDDD's reliance on the purported representations by Mercado was not reasonable. The alleged statements of Mercado were made years before the Acquisition Agreement was signed and Mercado was not involved in the negotiations of the Acquisition Agreement as he left DWSD over two years before it was executed. Any reliance on Mercado's alleged statement about the reasonableness of the repair costs was unreasonable because the Global Settlement Agreement expressly resolved any repair cost claims and the two Macomb attorneys negotiating the agreement should have known that any repair cost disputes could not be raised later.

- Third, the merger and integration clause contained in the Global Settlement Agreement expressly covers all pre-contractual representations. MIDDD's reliance on *Abbo v. Wireless Toyz Franchise, LLC*, No. 304185, 2014 WL 1978185 (Mich. App. May 13, 2014) is completely misplaced. In *Abbo*, the court noted that the merger clause at issue did not make reference to prior "representations" or "inducements," and enforced the plain language of the contract. *Id.* at *6. Here, the Global Settlement Agreement merger clause states that:

> This Agreement, and the Exhibits, contains the entire agreement between the Parties with regard to the matters addressed in this Agreement. No Party has made any representations except those expressly set forth in this Agreement, and no rights or remedies are, or shall be, acquired by any Party by implication or otherwise unless expressly set forth in this Agreement.

(6-20, §9(B).) The Global Settlement Agreement resolved "(ii) [a]ll Disputes related to the allocation of repair costs related to the August 15, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes . . . [and] (iv) [a]ll Disputes and claims between the Parties related to costs for repairs and renovation of the interceptor sewers listed in Exhibit 1 of Exhibit D of this Agreement…" (*Id.*, §1.) Thus, unlike *Abbo*, the merger clause at issue expressly disclaimed <u>all</u> representations except those set forth in the Global Settlement Agreement, and the Global Settlement Agreement expressly dealt with any claims pertaining to the costs for the repairs.

- 27 -

For all these reasons, MIDDD cannot rely on parol evidence to support its claim.

## V. MIDDD's Fraud Claims Fail as a Matter of Law

### A. MIDDD Has Failed to Plead Fraud with Particularity as Required by Federal Rule of Civil Procedure 9(b)

The MIDDD Complaint asserts two fraud claims: fraud/fraud in the inducement/silent fraud (Count I) and innocent misrepresentation (Count II). The Federal Rules of Civil Procedure provide heightened pleading requirements for claims of fraud. Fed. R. Civ. P. 9(b). To meet the heightened standards of Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 569-70 (6th Cir. 2008). "A plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007); *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993) (allegations must support an inference that they were knowingly made).

The MIDDD Complaint does not allege any specific misrepresentations by the City; and thus does not satisfy the "minimum" requirement in fraud cases that it "allege the time, place, and content of the alleged misrepresentation on which [it]

relied." *Bledsoe*, 501 F.3d at 504. At best, MIDDD alleges that the City (without specifying who, what or when), made (1) misrepresentations with respect to whether "all" of Detroit's tangible and intangible rights, including the right to assert "any and all" claims regarding the Project were being acquired by Plaintiff, (2) that its public officials abided by all state, federal and local laws a regulations, and (3) that no claims existed regarding the Macomb system. (MIDDD Complaint, ¶¶83, 84, 94, 95.) MIDDD's threadbare, non-specific allegations are plainly insufficient to meet the particularity requirements of Rule 9(b).

## B. Alternatively, even if MIDDD Had Sufficiently Stated a Claim for Fraud, MIDDD's Fraud Claims Fail as a Matter of Law

### i. *A Tort Claim Cannot Be Based on a Breach of Contract*

In Count I and II of the MIDDD Complaint, MIDDD pleads fraud, innocent misrepresentation and silent fraud. These are tort claims under Michigan law – and common sense dictates that "it is no tort to breach [or not perform] a contract." *Battista v. Lebanon Trotting Assoc.*, 538 F.2d 111, 117 (6th Cir. 1976); *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 466 (2004). Misrepresentations relating to the performance of a contract do not give rise to an independent cause of action in tort. *Huron Tool & Engineering Co. v. Precision Consulting Servs., Inc.,* 209 Mich. App 365, 373 (1995). As such, a party may bring a tort claim (such as fraud) against another party with whom it has a contract **only** when it alleges the "violation of a legal duty *separate and distinct* from the contractual obligation and

- 29 -

when the fraud is extraneous to the contract that causes a harm distinct from the harm caused by a breach of the contract. *Fultz*, 470 Mich. at 466; *Rinaldo's Constr. Corp. v. Michigan Bell Telephone Co.*, 454 Mich. 65, 83 (1997) ("the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation"). No cognizable cause of action in tort exists when the plaintiff fails to allege violation of an independent duty. *Appleway Equipment Leasing, Inc. v. River City Equipment Sales, Inc*., No. 307784, 2012 WL 6177067, at *2 (Mich.App. 2012).

Here, MIDDD's "fraud" claims are plainly based on an alleged breach of the Acquisition Agreement – they are not extraneous to, nor independent of it. MIDDD's fraud claims are merely restatements of their claims for breach of contract: the subject matter of the allegedly fraudulent statements outlined in the complaint relate to alleged breaches of Sections 3.7, 3.8, 5.3, 5.4, and 8.1 of the Acquisition Agreement. (MIDDD Complaint, ¶¶83, 84, 94, 95; Exhibit 20, §3.7, 3.8, 5.3, 5.4, 8.1.) MIDDD even acknowledges that the subject of its fraud claims are covered by the Acquisition Agreement: it re-pleads all of its fraud claims as breaches of the Acquisition Agreement. (MIDDD Complaint, ¶¶100-101.) MIDDD's counsel admits that while MIDDD alleges a variety of fraud claims – ultimately "the claim here is pled for revision, reformation, in addition to damages, and for that reason **it would be a contract claim as opposed to the traditional**

**tort [fraud] claim that is barred by governmental immunity"** (Ex. 6-25, July 17, 2014 Hearing Transcript, p. 28) (emphasis added).

### ii. *MIDDD Cannot Prove A Prima Facie Claim of Fraud, Fraudulent Inducement, or Innocent Misrepresentation*

#### 1. *MIDDD's Fraud Claims Fail*

A plaintiff alleging fraud must prove that: "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 27 (Mich. App. 1998). MIDDD cannot prove these elements.

First, MIDDD cannot establish the necessary element of reliance for any fraud claims that are based upon pre-agreement statements because they expressly and affirmatively stated in the Acquisition Agreement that the *only* representations that were made by the City were those in the Acquisition Agreement and that there are no others. (Ex. 6-21, Article III.) MIDDD confirmed that the Acquisition Agreement represented the entire understanding of the parties, and that Article III of the Agreement represented the only representations made by Detroit. That acknowledgment precludes MIDDD from establishing that it, in fact, relied upon

- 31 -

any pre-contractual understandings as to the value of the property purchased by MIDDD. *See Federated Capital Servs. v. Dextours, Inc.*, No. 228208, 2002 WL 868273, *1 (Mich. App. 2002).

Second, even if MIDDD could establish that it, in fact, relied upon the allegedly fraudulent pre-Agreement statements, it could not establish that such reliance was reasonable under Michigan law. Indeed, the language in the Agreement "directly and explicitly makes reliance on [alleged pre-Agreement] statements unreasonable." *Whitesell Corp. v. Whirlpool Corp.*, No. 1:05-CV-679, 2009 WL 3270265, at *4 (W.D. Mich. 2009); *see also Federated Capital*, 2002 WL 868273 at *1. The Acquisition Agreement is fully enforceable against MIDDD—and thus precludes a finding of reasonable reliance—because MIDDD is a "sophisticated" entity which enlisted sophisticated counsel in drafting the Agreement. *See Whitesell*, 2009 WL 3270265 at *4 (listing criteria for enforceability of no-reliance clauses).

Despite these obvious facts, MIDDD, claiming that the City made fraudulent misrepresentations regarding the Acquisition Agreement related to the purchase price of the Acquisition Agreement, relies on: (1) the testimony and affidavits of MIDDD witnesses regarding representations made to it during negotiations and/or prior to closing the Acquisition Agreement; (2) testimony of City witnesses that purport to demonstrate the "actual knowledge" of City witnesses when the

- 32 -

Acquisition Agreement was signed; (3) the alleged fact that top ranking officials were at the head of the criminal enterprise affecting the Project and pled guilty and that other individuals were interviewed by the United States Attorney and/or the FBI; and (4) the fact that the City should have provided information pursuant to the "due diligence reports." These factors are irrelevant as a matter of law for the following reasons:

- <u>First</u>, the MIDDD witnesses admit that the City never made any representations regarding the reasonableness of any amounts included in the Acquisition Agreement and Anthony Marrocco's testimony and affidavit are contradictory. There were five people principally involved in negotiating the Acquisition Agreement: Misterovich and Hupp for MIDDD, and Jacobs, Walter and Foster for the City. (*see,* Ex. 6-16, Jacobs Tr., p. 12-13; Ex. 6-18, Misterovich Tr., pp. 12-13, 23-24.). Marrocco was not involved. (Ex. 6-9, Marrocco Tr. at 23-24, 29, 32-33.). Misterovich and Hupp admitted that there were never any representations regarding the reasonableness or propriety of the Project costs. (Ex. 6-15, Hupp Tr. at 34, 49; Ex. 6-18, Misterovich Tr. at 20-21, 24-25).[10] As such, the five individuals actually negotiating the Acquisition Agreement all testified that there were no such representations made. (*Id.; see also Ex. 5-4,* Jacobs Decl. ¶12; Ex. 5-3, Latimer Aff. ¶10; Ex. 5-4, Walter Aff. ¶ 12; Ex. 5-1, Foster Aff. ¶¶15-16)).[11] Furthermore, MIDDD witnesses admit that Director Victor Mercado left DWSD in June 2008 and was not even present for the finalization of the Global Settlement Agreement or the Acquisition Agreement, including the Project costs included in Schedule 3.8. (Ex. 6-15, Hupp Tr. at 14-15). Anthony Marrocco testified that the only person who ever made

---

[10] MIDDD repeatedly refers to the Project as "emergency" in quotation marks, suggesting that the Project was not an emergency that threatened the health and safety of the public. This was refuted by several witnesses. (Ex. 6-19, Walter Tr. at 44, 46; Ex. 6-10, Winn Tr. at 12, 57; Ex. 6-11, Shukla Tr. at 25.)

[11] Hupp also testified that there were a lot of compromises on a lot of different issues to arrive at an agreeable number – this was only one. (Ex. 6-15, Hupp Tr. at 47).

- 33 -

representations regarding the reasonableness of the Project costs was Victor Mercado. (Ex. 6-9, Marrocco Tr at 49.) Thus, the crux of MIDDD's claim is its reliance upon statements allegedly made by a *former* employee of the City who was not part of the negotiation team and who allegedly made the statements years before the date of the Acquisition Agreement.[12] Even if Mercado had made such a representation, which the City denies, MIDDD's argument that it relied on the City's alleged representations is further belied by the fact that Macomb County (and specifically, Anthony Marrocco) had a representative who was at the 15 Mile Road repair site daily, and was "keeping an eye" on the project and making "sure it was moving along." (Ex. 6-9, Marrocco Tr. at 72-73). As such, MIDDD's reliance is not reasonable. Beyond these facts, the testimony and affidavits of Marrocco and Misterovich contradict themselves and one another as demonstrated clearly in Dkt. 6093 (City's Reply Brief).

- <u>Second</u>, MIDDD's claims as to the knowledge of City witnesses grossly mischaracterize the record.[13] There is no evidence that the investigation by the federal government, including City employee interviews and Grand Jury testimony, led anyone at DWSD or the City to believe that there were excessive or fraudulent charges related to CS-1368-2 or CS-1368-3. (Ex. 5-3, Latimer Aff., ¶¶16-17; Ex. 5-2, Walter Aff., ¶¶17-18.) The thrust of the investigation seemed to be on the City Local Economic Development Department (LED), not DWSD. (Ex. 5-3, Latimer Aff., ¶16.)[14] Robert Walter also testified that the

---

[12] Furthermore, to the extent the City relies on Section 1.10 of the Acquisition Agreement, which defines "Detroit's Knowledge" to include the knowledge of the DWSD "Director", Victor Mercado had left the City over two years prior to the signing of the Acquisition Agreement.

[13] In some cases, MIDDD purports to state what Corporation Counsel Mr. Ed Keelean knew or should have known without any record citation; there is no record because MIDDD elected not to depose him after the City produced him pursuant their request.

Further, to the extent that MIDDD argues that these individuals constituted those who defined "Detroit's Knowledge" in Section 1.10 of the Acquisition Agreement, MIDDD conflates its breach of contract claim with its fraud claim. Dkt. 6015, Section V.B.i, pp. 38-40.

[14] In their affidavits, City Witnesses testified as follows:

- At no time prior to the signing of the Macomb Acquisition Agreement were any
*Continued on next page.*

only item ever discussed with him was the City's contracting procedures. (Ex. 5-2, Walter Aff., ¶17). In support of their Rule 3018 Motion (Dkt. 6061), MIDDD severely mischaracterizes the deposition testimony of Darryl Latimer, Mark Jacobs and Bob Walter as outlined in Dkt. 6093 (City's Reply Brief).

- Third, the Mercado guilty plea and Kilpatrick's conviction do not establish that the City defrauded MIDDD. These were high ranking officials who used their power to conceal their criminal activities. Even if the City knew about portions of the alleged criminal conspiracy prior to the First Superseding Indictment and conclusion of the Acquisition Agreement, there is no evidence that such knowledge translated into knowledge that there were overcharges or fraud related to CS-1368 or the Project. (Ex. 5-3, Latimer Aff., ¶¶16-18; Ex. 5-4, Jacobs Decl., ¶17; Ex. 5-2, Walter Aff., ¶¶17-18). Contrary to the gross misrepresentations of City witness testimony by MIDDD, none of the City's witnesses testified that they were aware that there were excessive or fraudulent charges related to CS 1368-2 or CS 1368-3 prior to release of the First Superseding Indictment. In fact, MIDDD admits that "**the criminal enterprise was only uncovered by the federal government using the vast resources and powers available to it during several years of investigation**." (Dkt. 6016, p. 27) (emphasis added).

- Fourth, as to MIDDD's use of Jacobs Deposition Exhibit 11, the so called Interceptor Due Diligence Information List, Jacobs testified that he had not seen the document before and it appears to be something generated by Mr. Hupp. It could have been provided to Detroit directly, however. (Ex. 6-16, Jacobs Tr. at 15-16). In any event, this document is inadmissible hearsay.

MIDDD's claim that the City made false representations or that they know

---

*Continued from previous page.*

representations ever made that the costs associated with the Project or any other item in Schedule 3.8 were fair and reasonable. (Ex. 5-4, Jacobs Dec. ¶12; Ex. 5-3, Latimer Aff. ¶10; Ex. 5-2, Walter Aff. ¶ 12; Ex. 5-1, Foster Aff. ¶¶15-16).

- MIDDD never claimed that the costs were fraudulently excessive prior to the Acquisition Agreement, nor ever questioned its cost or asked for a reduction beyond normal negotiations (Ex. 5-3, Latimer Aff., ¶10) and the City was unaware of excessive charges for 2004-2005 Project costs. (*Id.*, Latimer Aff., ¶14).

or should have known of their falsity fails.  The integration clause of the Acquisition Agreement (Ex. 6-21, § 12.5) renders unreasonable any claimed reliance by MIDDD on pre-Agreement statement.  Indeed, "[r]eliance on pre-contractual representations is unreasonable as a matter of law when the contract contains an integration clause." *Northern Warehousing, Inc. v. State of Michigan*, 475 Mich. 859, 859 (2006); *Hamade* 271 Mich. App. at 171.[15]

The only exception to the rule is when a party alleges fraud that "would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause." *UAW-GM Human Res. Ctr. v. KSL Rec. Corp.*, 228 Mich. App. 486, 503 (1998).  MIDDD does not allege that the City engaged in misconduct with respect to the merger clause itself, nor has it alleged fraud that would invalidate the entire contract.  Instead of seeking to void the Acquisition Agreement, MIDDD expressly *affirmed* the Acquisition Agreement and seeks damages for alleged breaches of it.  (MIDDD Complaint.) The integration clause renders MIDDD's alleged reliance unreasonable.

Finally, MIDDD has failed to plead and prove a material misstatement by the City prior to the Acquisition Agreement, or that the City knew it was making a

---

[15] *Northern Warehousing* and *Hamade* superseded a line of cases, including the Court's decision in *Diamond Computer Systems, Inc. v. SBC Communications, Inc.*, 424 F. Supp. 2d 970 (E.D. Mich. 2006), holding that Michigan did not have a per se rule rendering reliance unreasonable in the face of an integration clause.

false statement at the time it made any representation to MIDDD – with the intention that MIDDD rely on the misstatement.

### 2. MIDDD's Silent Fraud Claim Fails

MIDDD'S claim of silent fraud also fails. A claim of silent fraud exists only where a defendant is under a legal duty to disclose. *Hord v. Envtl. Research Inst.*, 463 Mich. 399, 412 (2000). Such a duty may arise when a defendant receives a specific inquiry and where the defendant responds by providing incomplete or untruthful information. *Id.* MIDDD has not alleged or proven specific facts to show that the City had any legal duty to make additional disclosures to MIDDD.

### 3. MIDDD's Fraudulent Inducement Claim Fails

Generally, "actionable fraud must be predicated on a statement relating to a past or existing fact." *Samuel D Begola Services, Inc v. Wild Bros,* 210 Mich.App 636, 639 (1995). "Fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Id.* Fraud in the inducement renders the contract on which it was based voidable "at the option of the defrauded party." *Id.* at 640. Generally, future promises are contractual and do not constitute fraud unless the promises were made in bad faith without the present intention to perform. *Greenville Mfg., LLC v. NextEnergy Center*, No. 304229, 2012 WL 3101826 at *2.

- 37 -

Here, MIDDD is not seeking to void this contract, but instead seeks to enforce it. MIDDD also fails to allege a misstatement relating to future conduct. Commissioner Marrocco admits that MIDDD's claim is solely based upon actions or disclosures that the City allegedly made or should have made *prior to* the Acquisition Agreement, not after – as is required for a fraudulent inducement claim. (Ex. 6-9, Marrocco Tr., at 68, 81.)

### 4. *MIDDD's Innocent Misrepresentation Claim Fails*

A claim of innocent misrepresentation is shown if a party detrimentally relies upon a false representation in such a manner that the injury suffered by that party inures to the benefit of the party who made the representation. *United States Fidelity & Guaranty Co. v. Black,* 412 Mich. 99, 118 (1981). The innocent misrepresentation rule represents a species of fraudulent misrepresentation but has, as its distinguishing characteristics, the elimination of the need to prove a *fraudulent purpose* or an intent on the part of the defendant that the misrepresentation be acted upon by the plaintiff, and has, as added elements, the necessity that it be shown that an unintendedly false representation was made in connection with the making of a contract and that the injury suffered as a consequence of the misrepresentation inures to the benefit of the party making the misrepresentation. *United States Fidelity & Guarant. Co.*, 412 Mich. at 118. In light of the Acquisition Agreement integration clause and the fact that MIDDD

cannot establish that the City made any misrepresentation on which MIDDD relied, MIDDD's innocent misrepresentation claim has no merit.

### iii. *MIDDD's Fraud Claims Are Barred by Governmental Immunity*

MIDDD's fraud claims are also barred by governmental immunity. In Michigan, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." Mich. Comp. L. § 691.1407(1). The City is a "[g]overnmental agency," *see* Mich. Comp. L. § 691.1401(a),(d),(e), and "[g]overnmental functions" include the activity related to asset-sales here.

A "governmental function" includes any "activity that is expressly or impliedly mandated or authorized by ... statute ... or other law." MCL § 691.1401(b). There is no question that the City, through DWSD, was legally authorized to sell the property and assets sold to MIDDD. Allegations of fraud do not take government conduct outside the statutory immunity. *Local Emergency Fin. Assistance Loan Bd. v. Blackwell*, 299 Mich. App. 727, 736, 832 N.W.2d 401, 405 (2013).[16] Instead, the Michigan governmental immunity statute bars claims – like MIDDD's – that fraud induced the plaintiff to enter a contract. *Id.* at 735

---

[16] "In assessing whether an activity is a governmental function, the focus is on the general activity, not the specific conduct giving rise to the tort claim." *Williams v. Wayne Cnty.*,No. 09-14328, 2011 WL 479959 (E.D. Mich. Feb. 4, 2011) (citing *Herman v. Detroit,* 261 Mich. App. 141, 680 N.W.2d 71, 75 (Mich. App. 2004)).

(plaintiff claimed that fraud about city's finances and actual affairs caused him to agree to serve as emergency financial manager). The statute also bars claims for silent fraud, innocent misrepresentation and all fraud claims in general. *See Northern Warehousing Inc. v. Michigan Dep't of Educ. (On Remand)*, No. 260598, 2006 WL 2419189, at *4 (Mich. App. Aug. 22, 2006); *Williams v. Wayne Cnty.*, No. 09-14328, 2011 WL 479959, at *7 (E.D. Mich. Feb. 4, 2011); *Thomas v. Detroit*, No. 06-10453, 2007 WL 674593, at *6 (E.D. Mich. Feb. 28, 2007); *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 40 (2008). MIDDD's counsel also admits that governmental immunity would defeat a fraud claim, but that is irrelevant because MIDDD's claim is a **"contract claim as opposed to the traditional tort [fraud] claim that is barred by governmental immunity"** (Ex. 6-25, July 17, 2014 Hearing Transcript, p. 28) (emphasis added).

## VI. MIDDD's Underlying Quasi-Contractual Claim Fails as a Matter of Law

MIDDD's claim for quantum meruit/unjust enrichment (Count IV) also fails as a matter of law. "A quasi-contractual theory of recovery is inapplicable when the parties are bound by an express contract." *Cloverdale Equip. Company v. Simon Aerials, Inc.*, 869 F.2d 934, 939 (6th Cir. 1989). "If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract…" *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 491 (E.D. Mich. 1993). Here, the parties do not

dispute the existence of a contract – the Acquisition Agreement – but instead disagree on its scope, terms, and effect. Therefore, MIDDD's quasi-contractual claims are meritless.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, the City respectfully requests that the Court dismiss, disallow and expunge MIDDD's Claim No. 3683.

Dated: October 8, 2014        Respectfully submitted,

> By: /s/ Stephen S. LaPlante
> Jonathan S. Green (MI P33140)
> Stephen S. LaPlante (MI P48063)
> Jerome R. Watson (MI P27082)
> MILLER, CANFIELD, PADDOCK AND
> STONE, P.L.C.
> 150 West Jefferson, Suite 2500
> Detroit, Michigan 48226
> Telephone: (313) 963-6420
> Facsimile: (313) 496-7500
>
> David G. Heiman (OH 0038271)
> Heather Lennox (OH 0059649)
> JONES DAY
> 901 Lakeside Avenue
> Cleveland, Ohio 44114
> Telephone: (216) 586-3939
> Facsimile: (216) 579-0212
>
> ATTORNEYS FOR THE CITY OF DETROIT

22922984.6\022765-00202