UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---------------------------------------------------------x
                                                  :

In re                                        :       Chapter 9

CITY OF DETROIT, MICHIGAN,       :       Case No. 13-53846

                Debtor.           :       Hon. Steven W. Rhodes

---------------------------------------------------------x

## AFFIDAVIT OF BART FOSTER

STATE OF Kansas    )
                   ) SS.
COUNTY OF Johnson  )

I, Bart Foster, being first duly sworn, depose and state as follows:

1. I am an adult and otherwise competent to testify to the facts stated below. If called as a witness, I can testify to the following facts from my own personal knowledge. I make this Affidavit based upon my own personal knowledge and my review of records kept in the ordinary course of business.

2. I offer financial and engineering management consulting services to a broad customer base, specializing in services for municipal utility clients in the United States. My principal experience includes: evaluating critical business issues impacting municipalities that provide utility services and advising principals in charge; managing financial planning, cost of service, and rate design studies for water and wastewater utilities; preparation of Consulting Engineer's and/or Feasibility Consultant Reports in conjunction with issuance of municipal revenue bonds; development of other feasibility reports; design of financial management information systems; consulting assistance regarding contractual and other relationships amongst municipalities, and expert witness services in utility litigation matters.

3. I have served as a business advisor and financial and rate expert for extensive financial planning and management consulting assistance for the Detroit Water & Sewerage Department ("DWSD") since 1986.

4. Throughout the last several years, I conducted accounting analysis associated with the transfer of the Oakland-Macomb Interceptor and related facilities ("OMI") to the Oakland Macomb Interceptor Drain Drainage District ("OMID") and to the Macomb Interceptor Drain

2

Drainage District ("MIDDD") from DWSD (collectively referred to as "Parties"), which was finalized during fiscal year 2010-2011.

5. At the request of Oakland and Macomb Counties, DWSD constructed the OMI and placed it in service in the late 1960s. Prior to transfer of OMI facilities to the OMID, it was the only Sewage Disposal System asset located outside of the City of Detroit that was owned and operated by DWSD. During the period of time that DWSD owned and operated OMI, sewer rates for Macomb County and the Clinton Oakland District were designed to recover the "cash basis" revenue requirements associated with the OMI. As such, debt service and operating costs associated with these facilities were "passed through" to customers who now make up the OMID.

6. After the 2004 break to the OMI system and resulting repairs ("2004 Repairs"), the parties determined that the best approach to resolve avoid future disputes between the Parties was to transfer ownership of the OMI to OMIDDD and MIDDD.

7. The parties then negotiated two deals that called for a purchase price based on the premise of "making DWSD whole" for any investments that it made in the OMI for which it had not passed through the revenue requirements associated with the principal payments on related bonds to the users in the respective localities. I was involved in negotiating the deals and determining the purchase price on behalf of DWSD. Further, I consulted with Victor Mercado, the DWSD Director, while he was negotiating the agreement specific to MIDDD with Macomb's Public Works Commissioner Mr. Anthony Marracco.

8. The final agreement called for a purchase price based on making Detroit whole for its investment in the system, including recovery of all outstanding debt remaining on the system. In essence, the deal called for (a) determining the book value (original cost) of all OMI

3

facilities including cost of additional projects and repairs since the system's construction ("Original Investment"); (b) determining the total value of principal payments that had been included in determining rates charged to applicable OMID customers through FY 2009-2010; and (c) deducting (b) from (a) to determine the "System Debt" envisioned by the agreement.

9. The Original Investment that DWSD paid for the OMI was $231.85 million.

10. The principal credited through FY 2009-2010 which it had passed through the revenue requirements associated with the principal payments on related bonds to Macomb users was $115.65 million.

11. The outstanding debt on the original investment was, thus, $116.20 million.

12. The original investment that DWSD paid included $60,829019 paid on CS-1368-2 and 3 for the 2004 Repairs.

13. After a series of negotiations the "System Debt" amount was adjusted, resulting in a purchase price of $89,996,704 ("Purchase Price").

14. To determine the Purchase Price, I used accounting record of DWSD that represented financial payments made, without any evaluation or representation of the reasonableness of the costs.

15. This was a negotiated acquisition and settlement of a number of issues between the Parties. At no time throughout any of the negotiations with OMIDDD or MIDDD were any representations made regarding the reasonableness of any portion of the Original Investment, including but not limited to amounts paid pursuant to CS-1368 for 2004 Repairs.

16. I was with Victor Mercado for many hours throughout the years of negotiations on this project, and Mr. Mercado never indicated, said or implied to anyone in my presence that the cost of the interceptor repairs was "fair" or "reasonable". No other person made any such

4

representations on behalf of DWSD in my presence, and I never heard through any statement or comment of any person that there had been any such representations.

17. The assets transferred to MIDDD had initially cost Detroit $231,847,508. Macomb was given credit of $112,355,536 for principal payments for 2009 and $3,291,159 for principal payments made in 2010. At that time, therefore, the outstanding System Debt was $116,200,813.

18. However, Macomb did not pay $116,200,813 for the assets. As part of the negotiations, DWSD agreed to subtract $7,367,167 for "internal costs" and $1,786,947 for interest expense and related adjustments. Thus the "Adjusted System Debt" was $107,046,704.

**19. Finally, Macomb insisted on additional deductions of $17,050,000 as part of the negotiations in the Global Settlement. Thus, the final Purchase Price of $89,996,704 was significantly less than $231M cost paid by DWSD for the asset, or the $116M outstanding System Debt.**

20. Even assuming there are excessive charges in the Macomb System Debt, which I do not concede, I do not believe that the Macomb Acquisition Agreement would have necessarily been ratified for a lesser amount. As part of the negotiation process, there were a variety of concessions and discounts given to MIDDD to expedite and close on the agreement. I do not know if those concessions would have been granted if MIDDD was also challenging the validity and/or amount of 2004-2005 Repairs.

Further Affiant sayeth not.

_____
Bart Foster

STATE OF Kansas    )

5

COUNTY OF Johnson ) SS
                                )

On 7/14, 2014, before me, the undersigned, a Notary Public in and for said state, personally appeared Bart Foster, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed it.

Subscribed and sworn to before me this 14 day of July, 2014.

_Jennifer Rowe_
Notary Public
Johnson County, KS,
Acting in Johnson County, KS.

My Commission Expires: 12/19/15

22510939.1\022765-00202

JENNIFER ROWE
Notary Public - State of Kansas
My Appt. Exp. 12/19/15

6