UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF DETROIT, a municipal corporation,
through the Detroit Water and Sewerage
Department,

                    Intervening Plaintiff,

vs.

KWAME KILPATRICK, an individual;
VICTOR M. MERCADO, an individual;
DERRICK A. MILLER, an individual; BOBBY
W. FERGUSON, an individual; FERGUSON
ENTERPRISES, INC., a Michigan corporation;
INLAND WATERS POLLUTION CONTROL,
INC., a Michigan corporation; and L.
D'AGOSTINI & SONS, INC., D/B/A LD&S, a
Michigan corporation;

                    Defendants;

                    and

MACOMB INTERCEPTOR DRAIN
DRAINAGE DISTRICT,

          Plaintiff,

vs.

KWAME KILPATRICK, et al.,

          Defendants.

Case No. 2:11-CV-13101

Judge Robert H. Cleland
Mag. Judge Mona K. Majzoub

**INTERVENING COMPLAINT OF
THE PLAINTIFF CITY OF DETROIT
THROUGH THE DETROIT WATER
AND SEWERAGE DEPARTMENT**

**JURY TRIAL DEMANDED**

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

## INTERVENING COMPLAINT OF THE PLAINTIFF CITY OF DETROIT THROUGH THE DETROIT WATER AND SEWERAGE DEPARTMENT

Intervening Plaintiff City of Detroit ("City of Detroit") through the Detroit Water and Sewerage Department ("DWSD") (collectively, "Intervening Plaintiff"), by its undersigned counsel, state for its Complaint against Defendants Kwame M. Kilpatrick, Victor M. Mercado, Derrick A. Miller, Bobby W. Ferguson, Ferguson Enterprises, Inc., Inland Waters Pollution Control, Inc., and L. D'Agostini & Sons, Inc., d/b/a LD&S, as follows:

## GENERAL PATTERN OF ILLEGAL CONDUCT

1.      The City of Detroit and DWSD seek to recover damages caused by former Mayor Kwame M. Kilpatrick and persons and entities that diverted or helped to divert roughly $58 million in City of Detroit monies for their own private gain.  Their illegal conduct involved bribery, extortion, money laundering, and unlawful contract fixing (often bid-rigging) between 2004 and 2006, with money and/or other gratuities ultimately flowing back to Kilpatrick and his friends. Kilpatrick, DWSD Director Victor Mercado, and Kilpatrick's friend Bobby Ferguson were the chief architects of and participants in the illegal conduct.  Other individual participants included Derrick Miller, a key member of Kilpatrick's mayoral administration.  The contractor and subcontractor participants included Inland Waters Pollution Control, Inc. and Ferguson Enterprises, Inc.  Each participant willingly participated in order to get a share of the ill-gotten profits at the taxpayers' expense.

2.      Defendants availed themselves of and relied upon the unlawful use by Kilpatrick of his authority and influence as Mayor and as the federal Court-appointed Special Administrator of DWSD, with the assistance of Mercado and Miller, to manipulate and amend DWSD contracts so that those contracts, amendments, and the payments made under them would be disproportionally awarded to Ferguson, Ferguson Enterprises, Inc., Inland Waters, and

subcontractors associated with these companies. These contractors and subcontractors benefited from the ability to amend their contracts without scrutiny, oversight, or competitive bidding. Once the public works projects were awarded, the contractors and subcontractors received the enhanced profits associated with water and sewerage contracts, together with excessive management and consulting fees, costly extra services, and, in some instances, padded invoices as to time, material, and equipment.

3.     To obtain these excessive and unlawful profits, fees, expenses, and costs, some participants in the illegal conduct, through known and unknown current and past owners, officers, employees, agents and representatives, made unlawful payments and/or provided unlawful gratuities to Kilpatrick, Ferguson, and Ferguson-controlled entities. Participants who may not have been actively involved in bribery, extortion, and bid rigging "turned a blind eye" to these unlawful activities but willingly facilitated and benefited from them. Moreover, all of the participants actively participated or were involved in money laundering and other unlawful activities.

4.     The illegal conduct was fraudulently concealed from disclosure to other officials of the City of Detroit, including the Detroit City Council, the DWSD Board of Water Commissioners, federal and state law enforcement, and the news media. Upon information and belief, Defendants hid their ill-gotten gains, including bribery and extortion payments by, among other things, passing invoices and costs through the City of Detroit's billing and invoicing system. By misusing this system, Defendants helped to conceal the misconduct and launder the money. The fraudulent concealment continued until the federal government, using the vast resources available to it, empanelled a grand jury and issued a First Superseding Indictment, dated December 15, 2010.

5.     Pursuant to the Court's 05/07/2012 Order (ECF No. 202), this Intervening Complaint is limited to claims that directly arise from Amendments 2 and 3 of CS-1368, one of the numerous DWSD contracts that involve misconduct by Defendants and others.[1]  The two amendments alone cost the City of Detroit about $58 million.    The Intervening Plaintiff intervenes to assert its rights to recover damages against the named Defendants, including RICO, tort-related damages, contract damages, unjust enrichment damages and disgorgement of unlawfully obtained profits.

## JURISDICTION

6.     Pursuant to 28 U.S.C. § 1331, this Court has federal question subject-matter jurisdiction over the Intervening Plaintiff's claims under the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

7.     The Court has supplemental subject-matter jurisdiction over the Intervening Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367 because those claims are so related to (a) the Intervening Plaintiff's federal claims as to form part of the same case or controversy, and (b) the federal claims of Plaintiff Macomb Interceptor Drain Drainage District as to form part of the same case or controversy.

8.     The Court has personal jurisdiction over the individual Defendants pursuant to Mich. Comp. L. § 600.701 because each of the individual Defendants either currently resides in Michigan or consented to Michigan's jurisdiction.  This Court also has personal jurisdiction over Defendants Kwame M. Kilpatrick, Victor M. Mercado, and Derrick A. Miller pursuant to Mich.

---

[1] Consistent with the Court's Order, the Intervening Plaintiff reserves the right to assert broader conspiracy claims and other claims that – although related in some manner to these two amendments – actually arise out of various other DWSD contracts and a larger and longer pattern of Defendants' misconduct.

Comp. L. § 600.715 because they transacted the business described herein within Michigan and performed or caused the tortious acts and consequences described herein within Michigan.

9. The Court has personal jurisdiction over the corporate Defendants pursuant to Mich. Comp. L. § 600.711 because they are incorporated under Michigan's laws, have consented to jurisdiction, and/or have carried on a continuous and systematic part of their general business in Michigan.

10. As discussed more fully below, each of the Defendants engaged in activity evincing sufficient minimum contacts with the State of Michigan.

**VENUE**

11. Venue is proper here pursuant to the general provisions of 18 U.S.C. § 1391(b)(2) for reasons including that a substantial part of the events or omissions giving rise to the claim occurred in this District and the water and sewer system property at issue is located here.

12. Venue is also proper here pursuant to 18 U.S.C. § 1965 as the Intervening Plaintiff is asserting civil RICO claims, and the Defendants transacted relevant business in this District.

**RELEVANT TIME PERIOD**

13. The "relevant time period" of the misconduct that forms the basis of the claims asserted herein is from approximately August 2004 to approximately 2006. The period of the fraudulent concealment of the misconduct continued until December 15, 2010.

**PARTIES**

**Intervening Plaintiff**

14. The City of Detroit is a municipal corporation located in Wayne County, Michigan. It was incorporated pursuant to the Michigan Home Rule Cities Act, Mich. Comp. L. § 117.1, and is a political subdivision of the State of Michigan. DWSD, a department of the City

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

of Detroit, provides water service and wastewater treatment services to residents of the City of Detroit and neighboring southeastern Michigan communities. In general, DWSD is governed by a Board of Water Commissioners (the "DWSD Board"). During the relevant time period, a Director was in charge of the day-to-day affairs of DWSD.

**Plaintiff**

15.     Macomb Interceptor Drain Drainage District ("MID") is a special purpose public corporation established under the Michigan Drain Code of 1956, Mich. Comp. L. 280.1 *et seq.*, operating and existing under the Michigan Constitution and the laws of Michigan.

**Defendants**

16.     Defendant Kwame M. Kilpatrick ("Kilpatrick"), an individual, is currently a resident of Texas. Kilpatrick was the elected Mayor of the City of Detroit from 2002 to 2008. In his capacity as Mayor, Kilpatrick was the chief executive officer for the City of Detroit, and his duties included supervising and directing the DWSD, which were operated and funded by the City of Detroit. From January 2002 to January 2006, Kilpatrick was also the federal Court-appointed "Special Administrator" of DWSD. In this capacity – discussed more fully below – Kilpatrick had extensive power and authority to control, manage, and operate DWSD and other departments of the City of Detroit. Kilpatrick is also the lead criminal Defendant in *United States v. Kilpatrick, et al.*, E.D. Mich. Case No. 10-CR-20403 (the "Kilpatrick Prosecution"), which concerns some of the same misconduct alleged here.

17.     Defendant Victor M. Mercado ("Mercado"), an individual, is, upon information and belief, a resident of Florida. Mercado served as the Director of DWSD from 2002 to 2008. As the Director of DWSD, Mercado was responsible for the overall direction and administration of DWSD. As alleged in indictments in the Kilpatrick Prosecution, from 2002 to 2008 Mercado had supervisory authority over the awarding of more than $2 billion of contracts between DWSD

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

and private contractors. At various times, Mercado also served as the designee (i.e., designated agent) of Special Administrator Kilpatrick and performed duties and functions on behalf of the Special Administrator. Mercado is named as a Defendant in the Kilpatrick Prosecution.

18. Defendant Derrick A. Miller ("Miller"), an individual, is currently a resident of Virginia. Miller worked in Kilpatrick's mayoral administration from 2002 to 2007, serving in various positions including as Chief Administrative Officer and Chief Information Officer for the City of Detroit. During this period, Miller became involved in the bidding and awarding of DWSD contracts. Miller is named as a Defendant in the Kilpatrick Prosecution. On August 19, 2011, Miller signed a plea agreement ("Miller Plea Agreement") admitting that he engaged in two of the crimes charged (bribery and filing a false tax return), as set forth in a Second Superseding Information in the Kilpatrick Prosecution. (Ex. 1: Miller Plea Agreement, which is incorporated by reference herein.)

19. Defendant Bobby W. Ferguson ("Ferguson"), an individual, is, upon information and belief, a resident of Wayne County, Michigan. During the relevant time period, Ferguson was Kilpatrick's close friend and confidant. Ferguson owned, operated, and/or controlled Ferguson Enterprises, Inc. Ferguson is named as a Defendant in the Kilpatrick Prosecution.

20. Defendant Ferguson Enterprises, Inc. ("FEI"), a Michigan for-profit corporation, is a Ferguson-controlled company that was primarily engaged in the business of providing construction, demolition, and/or excavation services. FEI has its principal place of business in Wayne County, Michigan. During the relevant time period, FEI entered into contracts or subcontracts to perform work for DWSD and performed work for DWSD as a contractor or subcontractor within this judicial district.

21. Defendant Inland Waters Pollution Control, Inc. ("Inland Waters"), a Michigan for-profit corporation, is primarily engaged in the business of waste collection and transportation.

Inland Waters has its principal place of business in Oakland County, Michigan. During the relevant time period, Inland Waters entered into contracts to perform work for DWSD and performed work for DWSD as a contractor or subcontractor within this judicial district.

22. Defendant L. D'Agostini & Sons, Inc., d/b/a LD&S ("LD&S"), a Michigan for-profit corporation, is primarily engaged in providing general contracting and/or construction services. LD&S has its principal place of business in Macomb County, Michigan. During the relevant time period, LD&S entered into contracts or subcontracts to perform work for DWSD and performed work for DWSD as a contractor or subcontractor within this judicial district.

### THE KILPATRICK INDICTMENT AND PROSECUTION

23. The Intervening Plaintiff's claims are based upon conduct first unveiled in the Kilpatrick Prosecution. On December 15, 2010, a grand jury returned a First Superseding Indictment in the Kilpatrick Prosecution, naming Kilpatrick, Ferguson, Bernard Kilpatrick, Mercado, and Miller as Defendants. That indictment alleged a criminal RICO conspiracy, bribery, extortion, obstruction of justice, mail fraud, wire fraud, and money laundering in relation to a number of projects entered into by DWSD, including the DWSD project at issue in this case: the repair of the Macomb Interceptor sewer at 15 Mile Road in Sterling Heights, Michigan under Amendments 2 and 3 to DWSD contract CS-1368.

24. On August 19, 2011, Miller agreed to enter a guilty plea to certain crimes in the Kilpatrick Prosecution. A Second Superseding Information was issued against Miller on September 12, 2011. As part of his plea agreement, Miller admitted that, at Kilpatrick's direction, he steered millions of dollars of City of Detroit business to Ferguson. Miller admitted that Kilpatrick with assistance from Mercado and Miller pressured contractors to add Ferguson-controlled companies to DWSD contracts they had received, or risk having the contracts held up or canceled. Miller admitted that Mercado and other City of Detroit officials influenced the

-8-

awarding of contracts to teams that included Ferguson-controlled companies, including reevaluating or fixing bids if Ferguson's companies were not part of the winning team. Miller admitted that he and other City of Detroit officials gave Ferguson inside information about contracts or bid evaluations to give Ferguson an edge over competing bidders.

25.     On November 16, 2011, the grand jury returned a Third Superseding Indictment, which essentially expanded upon some of the facts and occurrences as set forth in the First Superseding Indictment, including criminal RICO conspiracy, bribery, extortion, obstruction of justice, mail fraud, wire fraud, and money laundering. On February 15, 2012, the grand jury returned a Fourth Superseding Indictment, which essentially expanded upon the same facts and occurrences. (Ex. 2: 4th Superseding Indictment, which is incorporated by reference herein.)

<u>**GENERAL ALLEGATIONS**</u>

**I.    <u>Kilpatrick is Elected Mayor and Appointed as the Federal Court's Special Administrator</u>**

26.     Kilpatrick's term as Mayor began on January 2, 2002, following his election in November 2001.

27.     When Kilpatrick became Mayor, an environmental lawsuit was pending in the United States District Court for the Eastern District of Michigan entitled *United States v. City of Detroit, Detroit Water and Sewerage Department and State of Michigan*, E.D. Mich. Case No. 77-71100. Judge John Feikens presided over the lawsuit, which concerned the City of Detroit and DWSD's compliance with provisions of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (the "City of Detroit Environmental Case").

28.     On December 3, 2001, Judge Feikens entered an order entitled "Order Continuing Special Administratorship for the Detroit Water and Sewerage Department," in which he appointed Kilpatrick as the federal Court's Special Administrator of DWSD, effective as of

January 1, 2002. Judge Feikens' December 3, 2001 Order granted to Kilpatrick (as prior orders of the Court had granted to former Mayors Coleman Young and Dennis Archer) broad federal powers over DWSD, including authority over the contracting and procurement operations of the DWSD Board. The Order also gave Kilpatrick authority over all other departments of the City of Detroit insofar as their powers affected the City of Detroit's compliance with the Clean Water Act and related environmental laws (as set forth in a series of consent judgments entered by the Court). (Ex. 3: Packet of Court Orders, which is incorporated by reference herein.)

29. Kilpatrick's appointment as Special Administrator did not authorize him to violate federal, state or local criminal laws or render him in any manner immune from civil liability.

30. The December 3, 2001 Order required Kilpatrick to "find and hire a Director of the DWSD [who] shall be clearly and completely responsible for the overall success of the [DWSD] in achieving its mission, goals and objectives . . . ."

31. Pursuant to Kilpatrick's authority as Special Administrator, in or around June 2002, Kilpatrick appointed Mercado as the Director of DWSD.

32. Sometime in early 2002, Kilpatrick appointed Miller as Chief Administrative Officer, and Miller became involved in the bidding and awarding of DWSD contracts.

33. On November 25, 2002, Judge Feikens issued an Order in the City of Detroit Environmental Case, which authorized Kilpatrick as Special Administrator to retain Infrastructure Management Group ("IMG"), a consulting group, to advise Kilpatrick and Mercado on "potential cost containment strategies related to the operation and maintenance activities of DWSD" and on issues related to DWSD's contracting and procurement operations. The Court "note[d] that IMG is a national leader in utility services and has expertise in contract design and procurement processes . . . ." The Order required "that as to contracts which are in a monetary amount over $500,000.00, IMG shall report monthly its comments regarding those

-10-

contracts and related procurement practices to the Special Administrator and to this Court." (Ex. 4: 11/25/2002 Order, which is incorporated by reference herein.)

34. The contract at issue in this case, CS-1368 (Amendments 2 and 3), is in a monetary amount over $500,000.

## II. Background Information as to CS-1368, Amendments 2 and 3

35. In November 2001, DWSD, through the DWSD Board, approved Inland Waters to receive Contract CS-1368 and Contract CS-1362. The scope of these two contracts encompassed sewer inspection, lining, and rehabilitation services for sewers within the City of Detroit. CS-1362 pertained to smaller-diameter sewer pipes, and CS-1368 pertained to larger-diameter sewer pipes. Each contract was in the amount of $25 million.

36. In or around December 2001, DWSD, through the DWSD Board, approved combining CS-1362 with CS-1368 to produce a single contract for sewer inspection, lining, and rehabilitation services throughout the City of Detroit. The combined contract continued under the designation CS-1368. (Ex. 5: Contract CS-1368, which is incorporated by reference herein.) The work was to be completed on the basis of individual task orders, with the total amount paid on the contract not to exceed $50 million.

37. CS-1368 included covenants in which Inland Waters, the CONSULTANT, covenanted, warranted and agreed as follows:

> 13.01 The CONSULTANT covenants that it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of the Services under this Contract. The CONSULTANT further covenants that, in the performance of this Contract, no person having any such interest shall be employed.
>
> The CONSULTANT further covenants that no officer, member or employee of the CITY and no other public official who exercises any functions or responsibilities in the review or approval of the undertaking or carrying out of this Contract has any personal or

-11-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

financial interest, direct or indirect, in this Contract or in the proceeds thereof in accordance with Article 2, Section 2-106 "Standards of Conduct" of the Charter of the City of Detroit.

13.02 The CONSULTANT also hereby warrants that it has not and will not employ any person to solicit or secure this Contract upon any agreement or arrangement for payment of a commission, percentage, brokerage, or contingent fee, either directly or indirectly. The CONSULTANT further agrees that if this warranty is breached, the CITY may, at its option, terminate this Contract without penalty, liability or obligation, or may at its election, deduct from any amounts owed to the CONSULTANT hereunder any amounts of such commission, percentage, brokerage, or contingent fee.

\* \* \* \* \*

13.04 The CONSULTANT shall include the provisions of this article in any subcontract it enters into pursuant to this Contract.

38. CS-1368 also contained the following contractual provisions to which Inland Waters agreed:

- To "perform in a satisfactory and proper manner, as determined within the sole and reasonable discretion of the DWSD, the Services" specified in the contract (Article 2.01);

- To provide the labor, materials, and equipment to fully perform (on an as-needed basis) the inspection, cleaning, and rehabilitation/lining repairs discussed therein and to provide informational updates to DWSD about the work (Article 2.05, as set forth in 2.05a-2.05bb);

- To obtain the DWSD Director's prior approval of all subcontracts for work under CS-1368, as amended (Article 3.01);

- To "furnish 'as-built' information to DWSD . . . [o]n completion of each Task Order [under the contract]" (Article 2.01a);

- To "deliver in a timely fashion and on a regular schedule a CPM Scheduling and Monitoring Report or other presentation such as a Gantt Chart meeting the approved standards of DWSD. The CPM Report shall include detailed tasks, schedules, deliverables, decision points, and subcontractor participation, and shall be loaded to indicate scheduled personnel requirements" (Article 2.01b);

- "To submit a written Progress Status Report monthly describing progress on the work of the Contract by updating the CPM Report" detailing

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-12-

"which activities were reformed [sic] by [Inland Waters] and which were performed by Subcontractors," as well as the obligation that "[a]t regular intervals, [Inland Waters'] supervisors, higher than the Project Manager (if any) will make checks on verifications of the reports" (Article 6.07c);

- To "maintain full and complete books, ledgers, journals, accounts, or records . . . in which are kept all entries reflecting its operation pursuant to this Contract" (Article 6.09);

- To allow the City of Detroit to audit Inland Waters' books and records at any time in relation to Inland Waters' work on CS-1368 (Articles 6.09, 6.10, and 7.02);

- To submit invoices based on the work actually completed as set forth in accurate Scheduling and Monitoring reports (Article 8);

- To indemnify the City of Detroit against all attorney fees and costs incurred "by reason of . . . any negligent or tortious act, error or omission of [Inland Waters] or any of its Associates" in connection with the contract (Article 9.01);

- To tender upon request and upon the completion of the contract, all of its original work product (or copies if originals are unavailable), including documents, data, drawings, maps, photographs, files, supplies, notes, reports, and other materials related to the contract, which are the City of Detroit's property (Article 11.04);

- To deliver to DWSD an executed copy of any subcontract, within 15 days of receiving it, and to refrain from seeking payment as to a subcontractor before delivering such executed copy of that subcontractor's subcontract (Article 12.01); and

- To "comply with and [to] require its Associates to comply with (a) all applicable Federal, state and local laws, ordinances, code(s), regulations and policies, including, but not limited to, all security regulations in effect from time to time on the CITY's premises; and (b) all applicable codes and regulations for materials, belonging to the CITY or developed in relation to this contract," (Article 15.01).

39.     As part of the process in the awarding of the combined CS-1368 to Inland Waters, the DWSD Board approved the specific Detroit-based and/or small-business subcontractors who were to work with Inland Waters on CS-1368: C.J. Williams & Associates, Superior Engineering Associates, Inc., Willie McCormick & Associates, Inc., LD&S, and Superior Construction &

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-13-

Management LLC. Although all of the Ferguson-controlled companies are Detroit-based, not one Ferguson-controlled company, including FEI, was among the approved subcontractors.

40. In or about early 2002, and as alleged in the Kilpatrick Indictment, Kilpatrick's father, Bernard Kilpatrick, alerted Mayor Kilpatrick that Inland Waters' approved list of subcontractors on CS-1368 did not contain any Ferguson-controlled company.

41. As alleged in the Kilpatrick Indictment, in or about early 2002, despite the DWSD Board's decision to award CS-1368 to Inland Waters, Kilpatrick used his powers as Special Administrator to refuse to approve CS-1368 for the single reason that no Ferguson-controlled company had been retained as a subcontractor on CS-1368.

42. Apparently acting for Kilpatrick, as alleged in the Kilpatrick Indictment, in or about early 2002, Miller instructed a representative of Inland Waters to give Ferguson 5% of the work on CS-1368.

43. In furtherance of Kilpatrick's scheme to have a Ferguson-controlled company retained as a subcontractor on CS-1368, as alleged in the Kilpatrick Indictment, in or about April 2002, Kilpatrick told an Inland Waters representative that, if Inland Waters wanted to receive approval of CS-1368, a Ferguson-controlled company needed to be substituted for Inland Waters' minority contractor.

44. Inland Waters subsequently subcontracted work on CS-1368 to FEI.

45. Inland Waters did not advise the DWSD Board of the existence of its discussions relative to the awarding of subcontractor work to Ferguson on CS-1368 and, in fact, concealed this information from the DWSD Board, the Detroit City Council, and the general public.

46. In November 2004, through a first amendment to CS-1368 ("CS-1368-1"), Inland Waters received additional DWSD work projects. Amendment 1 to CS-1368, in the amount of $10 million, increased the total amount of CS-1368 to $60 million.

-14-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

47.     CS-1368-1 provides in Section IV that "[e]xcept as herein amended, the terms and conditions of the Contract, dated July 26, 2002 [CS-1368], shall remain the same and govern the relationship of the parties." CS-1368-1 did not contain any amendment that rescinded, changed, revised or affected in any manner the covenants, warranties and agreements as set forth in Articles 13.01, 13.02 or 13.04 of CS-1368. CS-1368-1 also did not contain any amendment that rescinded, changed, revised or affected in any manner the agreements as set forth in Articles 2.01, 2.01a, 2.01b, 2.05, 3.01, 6.07c, 6.09, 6.10, 7.02, 8, 9.01, 11.04, 12.01, or 15.01 of CS-1368.

48.     As alleged in the Kilpatrick Indictment, during the relevant time period, on at least 18 occasions Kilpatrick requested the use of the private jets of Inland Waters for the personal use of Kilpatrick and his friends, family, and associates, including Bernard Kilpatrick and Ferguson.

49.     As alleged in the Kilpatrick Indictment, Kilpatrick did not reimburse Inland Waters for the use of its private jets.

50.     As alleged in the Kilpatrick Indictment, and upon information and belief, Inland Waters, or persons or corporations authorized by and working in the interest of Inland Waters, provided this free private jet service, worth over $260,000, in part so Kilpatrick and the Mayor's Office would promote the business interests of Inland Waters with the City of Detroit, and Inland Waters knowingly received and accepted the benefits derived from these bribes and unlawful gratuities.

51.     As alleged in the Kilpatrick Indictment, in or about 2006, after Kilpatrick had used the private jets a number of times, a representative of Inland Waters asked Kilpatrick if he thought he should start paying for some of the flights because "it did not look good" for the representative to provide the flights for free. As alleged in the Kilpatrick Indictment, Kilpatrick said he would see about it but never otherwise responded to Inland Waters' representative.

-15-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

52.     Upon information and belief, Inland Waters continued to provide Kilpatrick's flights for the purpose of promoting the business and profits that Inland Waters received from contracts with the City of Detroit.

53.     As alleged in the Kilpatrick Indictment, the flights had a fair market value to Kilpatrick of more than $260,000 and an added variable cost to Inland Waters (and/or its representative) of more than $120,000.

54.     As alleged in the Kilpatrick Indictment, the flights provided to Kilpatrick are as follows:

| Para. No. | Date(s) | Destination (s) | Flights | Passengers | Added Cost to Owner | Fair Market Value |
|---|---|---|---|---|---|---|
| 55. | 2/25/04 - 2/28/04 | Washington, DC | 2 | 4 | $4,473.59 | $7,750.00 |
| 56. | 4/12/04 - 4/16/04 | Orlando | 2 | 8 | $8,947.19 | $11,760.00 |
| 57. | 7/24/04 - 7/25/04 | East Hamptons, Boston | 2 | 3 | $3,890.08 | $10,466.00 |
| 58. | 10/15/04 - 10/16/04 | Houston | 2 | 6 | $10,114.20 | $14,659.00 |
| 59. | 5/19/05 | Cleveland | 2 | 9 | $1,167.02 | $2,025.00 |
| 60. | 5/27/05 - 5/28/05 | Greensboro, NC | 2 | 1 | $4,279.08 | $6,160.00 |
| 61. | 7/7/06 - 7/8/06 | Houston | 2 | 2 | $9,919.70 | $16,919.00 |
| 62. | 8/2/06 - 8/6/06 | Bermuda | 3 | 9 | $11,281.23 | $20,382.00 |
| 63. | 10/27/06 - 10/28/06 | Tallahassee | 2 | 3 | $7,974.66 | $10,480.00 |
| 64. | 4/12/07 | Naples, FL to Detroit | 1 | 5 | $4,668.10 | $13,765.00 |
| 65. | 5/1/07 | Tallahassee | 2 | 7 | $7,196.65 | $10,360.00 |
| 66. | 5/27/07 - 5/29/07 | Tallahassee | 2 | 7 | $7,391.15 | $20,625.00 |
| 67. | 6/13/07 - 6/14/07 | Tallahassee | 2 | 3 | $7,196.65 | $10,360.00 |
| 68. | 6/30/07 - 8/14/07 | Tallahassee | 2 | 7 | $7,196.6 | $22,240.00 |
| 69. | 9/16/07 - 9/17/07 | Tallahassee | 2 | 3 | $7,391.15 | $20,720.00 |

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

| | | | | | | |
|---|---|---|---|---|---|---|
| 70. | 11/2/07 - 11/5/07 | Tallahassee, Miami | 3 | 6 | $10,308.71 | $26,880.00 |
| 71. | 12/27/07 | Tallahassee | 1 | 5 | $3,890.08 | $10,360.00 |
| 72. | 1/23/08 - 1/27/08 | Tallahassee | 2 | 5 | $7,585.66 | $28,582.00 |
| | **Totals** | | | | **$124,871.55** | **$264,493.00** |

73.     In the months after Inland Waters began providing free flights to Kilpatrick (and partly as a result of those flights), Inland Waters received an additional series of amendments to CS-1368, including Amendments 2 and 3, which pertain to the repair of the Macomb Interceptor sewer at 15 Mile Road in Sterling Heights, Michigan.  Amendments 2 and 3 were in the amount of $35 million and $23 million, respectively, without any requirement that Inland Waters had to competitively bid on the amendments.

## III.     CS-1368, Amendments 2 and 3

**Kilpatrick, Mercado, Ferguson, and Inland Waters Unlawfully Steer CS-1368 Work on the 15-Mile Road Interceptor Sewer Collapse Project to Ferguson, and Allow Ferguson and Possibly Other Contractors to Submit Inaccurate and Padded Invoices**

74.     On or about August 22, 2004, a sewer collapse occurred at 15 Mile Road in the City of Sterling Heights, Michigan.

75.     DWSD immediately began a program to repair the 15 Mile Road Sewer Collapse (the "15 Mile Road Sewer Collapse Project").

76.     Within days of the sewer collapse, Mercado and/or his designee held daily morning meetings to discuss repairs at the 15 Mile Road Sewer Collapse Project.

77.     As alleged in the Kilpatrick Indictment, on or about September 1, 2004, after visiting the site of the sewer collapse, Kilpatrick discussed with Ferguson about how they could get work for a Ferguson-controlled company at the site.  As alleged in the Kilpatrick Indictment, Ferguson advised Kilpatrick that although Inland Waters would be overseeing the overall repair

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-17-

project, subcontractor LD&S hired all the subcontractors at the site. As alleged in the Kilpatrick Indictment, Kilpatrick responded, "Perfect! That's what I needed," and Ferguson replied, "We need to mee [meet] on how, I move in [to get the work], I got a great idea sir."

78.     As alleged in the Kilpatrick Indictment, on or about September 7, 2004, Kilpatrick asked Ferguson whether Ferguson had determined his share of the work on the 15 Mile Road Collapse Project. As alleged in the Kilpatrick Indictment, Ferguson responded that LD&S wanted to share the work with Ferguson on a 50/50 basis, but that Kilpatrick had to instruct Mercado about the arrangement, including that Kilpatrick would personally review LD&S's invoices to ensure that Ferguson was getting his share: "just let victor [Mercado] know [if LD&S] makes 2.00 fei [FEI] needs to make 2.00 also you will look at the invoices to make sure." Upon information and belief, a reasonable opportunity for further investigation or discovery will likely yield evidence to support that LD&S divided the available work on the 15 Mile Road Collapse Project between itself and a Ferguson-controlled company, so that both could profit.

79.     Until the 15 Mile Road Collapse Project, DWSD maintained a standard practice on its other sewer and water-repair projects of requiring DWSD inspectors at sewer repair sites to prepare "Daily Engineering Inspection Reports," which detailed, among other things, the time each employee of each contractor or subcontractor spent on the job each day and the equipment used or stored on the job site each day.

80.     Rather than use the standard "Daily Engineering Inspection Reports" for the 15 Mile Road Collapse Project, Mercado instructed DWSD inspectors to use a "Daily Press Report," which did not contain the actual hours worked by each employee each day or the equipment used on the site each day.

-18-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

81.     Use of Daily Press Reports instead of the standard Daily Engineering Inspection Reports resulted in substantially reducing the amount of accurate information as to the work being performed each day on the 15 Mile Road Sewer Collapse Project and, upon information and belief, made it much more difficult to monitor and evaluate the work activities of Inland Waters and its subcontractors, including FEI.

82.     Mercado knew that the Daily Press Reports made it substantially more difficult to monitor and evaluate the work activities on the 15 Mile Road Sewer Collapse Project.

83.     Mercado also approved and set into place a work monitoring and payment system for the 15 Mile Road Sewer Collapse Project, which relied almost entirely on Inland Waters' review of subcontractors' submitted time and equipment sheets. This system operated without effective checks and monitoring by DWSD inspectors and other officials.

84.     By reducing the involvement of DWSD staff in supervising the contractors' work, by transferring management and supervisory responsibilities to outside contractors, and by reducing or eliminating portions of DWSD's written record of the contractor's purported activities, Mercado aided, abetted, participated in and furthered the pattern of racketeering through which Defendants conducted the Kilpatrick Enterprise.

85.     As alleged in the Kilpatrick Indictment, in approximately September 2004, NTH Consultants, Ltd. ("NTH") was hired to evaluate and design the repair of the 15 Mile Road Sewer Collapse. NTH estimated that the cost of the repairs at the 15 Mile Road Sewer Collapse would be about $31 million.

**Entry into CS-1368-2**

86.     On September 28, 2004, Kilpatrick issued Special Administrator Order Number 2004-5, authorizing Mercado to enter into an emergency amendment (Amendment 2) to CS-1368 increasing the contract by $35 million and increasing the total amount of the contract to $95

Million ("CS-1368-2"). (Ex. 6: Amendment CS-1368-2, which is incorporated by reference herein.)

87. CS-1368-2 was executed for Inland Waters by Robert Williams, its President, and Renne Pricopio, Kathryn Dickey, Rechanda Cespedes and Debra Roland.

88. CS-1368-2 provides in Section VI that "[e]xcept as herein amended, the terms and conditions of the Contract, dated July 26, 2002 [CS-1368], and as previously amended, shall remain the same and govern the relationship of the parties." CS-1368-2 did not contain any amendment that rescinded, changed, revised or affected in any manner the covenants, warranties and agreements as set forth in Articles 13.01, 13.02 or 13.04 of CS-1368. CS-1368-2 also did not contain any amendment that rescinded, changed, revised or affected in any manner the agreements as set forth in Articles 2.01a, 2.01b, 2.05, 3.01, 6.07c, 6.09, 6.10, 7.02, 8, 9.01, 11.04, 12.01 or 15.01 of CS-1368. Although CS-1368-2 expanded the scope of services in Article 2.01, it did not contain any amendment that rescinded, changed, revised or affected in any manner Inland Waters' agreement in that Article to "perform in a satisfactory and proper manner, as determined within the sole and reasonable discretion of the DWSD," the services required under the contract.

89. The $35 million increase was $4 million more than NTH's estimate of the cost for repairs at the 15 Mile Road Sewer Collapse.

90. During the Winter of 2004 and Spring of 2005, Inland Waters exceeded its budget on the work on the 15 Mile Road Sewer Collapse.

91. As alleged in the Kilpatrick Indictment, on or about May 3, 2005, Ferguson told representatives from Inland Waters that people "Downtown" would not understand if he did not get sufficient revenue from work on the sewer collapse, which could hurt Inland Waters' chances of getting another amendment increasing the scope of CS-1368. As alleged in the Kilpatrick

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

Indictment, Inland Waters' representatives understood that Ferguson's reference to people "Downtown" meant the Mayor's Office.

**Entry into CS-1368-3**

92.     On May 18, 2005, Kilpatrick issued Special Administrator Order Number 2005-7, authorizing Mercado to enter into Amendment 3 to CS-1368 with Inland Waters "to add funding to complete the repairs and restoration of the Romeo Arm [at 15 Mile Road] ("CS-1368-3"). (Ex. 7: Amendment CS-1368-3, which is incorporated by reference herein.)

93.     On or about June 16, 2005, DWSD approved CS-1368-3, which increased the amount of CS-1368 by another $23 million, increasing the new total amount of the contract up to $118 million.

94.     At this point, the $58 million amount that was allocated to the 15 Mile Road Sewer Collapse was $27 million more than NTH's estimate of $31 million.

95.     Victor Mercado (by authorization) signed CS-1368-3 as Special Administrator. On behalf of Inland Waters, the following officers executed CS-1368-3: President Robert Williams, Kathryn Dickey, Carrie Pendolino, Rechanda Cespedes and Debra Roland.

96.     CS-1368-3 provides that "[e]xcept as herein amended, the terms and conditions of the Contract, dated July 26, 2002 [CS-1368], and as previously amended, shall remain the same and govern the relationship of the parties."  CS-1368-3 did not contain any amendment that rescinded, changed, revised or affected in any manner the covenants, warranties and agreements as set forth in Articles 13.01, 13.02 or 13.04 of CS-1368.  CS-1368-3 also did not contain any amendment that rescinded, changed, revised or affected in any manner the agreements as set forth in Articles 2.01 (as amended by CS-1368-2), 2.01a, 2.01b, 2.05, 3.01, 6.07c, 6.09, 6.10, 7.02, 8, 9.01, 11.04, 12.01 or 15.01 of CS-1368.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-21-

### Additional Wrongful Conduct Related to CS-1368-3

97.     Upon information and belief, a reasonable opportunity for further investigation or discovery will likely yield evidence to support that during the repair of the 15 Mile Road Sewer Collapse, Inland Waters, FEI, LD&S, and the other subcontractors knew that Ferguson had a close personal relationship with Kilpatrick, that a by-product of this close personal relationship was that Kilpatrick wanted Ferguson to get whatever work Ferguson wanted on the 15 Mile Road Sewer Collapse Project, and that Ferguson took advantage of this relationship to secure payment for work which was not done and/or for equipment that was not used.

98.     Upon information and belief, a reasonable opportunity for further investigation or discovery will likely yield evidence to support that Inland Waters knew that FEI's requests for payment included work which was not done and/or equipment that was not used but nonetheless submitted FEI's payment requests to the City of Detroit representing that they were accurate and complete and later representing that they had been audited and found to be accurate and complete.

99.     Relying upon the representations of Inland Waters as to the accuracy and completeness of FEI's and all other subcontractor invoices, as well as the accuracy and completeness of its own invoices, the City of Detroit paid the invoices submitted by Inland Waters.

100.    During the period of the repairs to the 15 Mile Road Sewer Collapse, Inland Waters and FEI knew that Inland Waters' process of paying FEI's invoices and passing on FEI's costs to the City of Detroit was intended to conceal and did conceal the unlawful nature, source, ownership, and/or control of proceeds that FEI, Ferguson, Kilpatrick, and/or others gained through bribery, extortion, and other unlawful conduct in connection with the repair work.

-22-

101. Without waiver of its claims and without limitation as to its damages, Intervening Plaintiff adopts and incorporates herein Plaintiff MID's claim that as a result of inflated invoices submitted on the 15 Mile Road Sewer Collapse, the cost of the repairs of the 15 Mile Road Sewer Collapse was increased by at least $23 million.

## IV. Aftermath and Consequences of CS-1368, Amendments 2 and 3

102. As alleged in the Kilpatrick Indictment, in July 2005, Mercado asked the DWSD Board for authorization to amend CS-1368 for the fourth time, in the amount of $12 million to fund the original sewer-inspection project until two new sewer rehabilitation contracts could be formulated ("CS-1368-4"). (Ex. 8: Amendment CS-1368-4, which is incorporated by reference herein.)

103. As alleged in the Kilpatrick Indictment, in or about the Summer of 2005, Ferguson told representatives of Inland Waters and its partner (who is not named in the Indictment) that DWSD would not authorize the $12 million sewer-lining amendment if they did not pay him $500,000 to $700,000, representing profits Ferguson claimed he should have received had he been given more work on the 15 Mile Road Sewer Collapse Project.

104. As alleged in the Kilpatrick Indictment, in or about the Fall of 2005, Mercado asked a representative of Inland Waters if the company had resolved things yet with Ferguson. Mercado's inquiry reveals that he was aware of and supported Ferguson's attempt to condition Mercado's and/or Kilpatrick's approval of CS-1368-4 on Inland Waters' payment of these additional monies.

105. As alleged in the Kilpatrick Indictment, in or about December 2005, at Ferguson's office, Ferguson told a representative of Inland Waters' partner that the $12 million sewer-lining amendment would sit on the Mayor's desk unapproved until Ferguson got the compensation he wanted for the sewer collapse.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-23-

106. As alleged in the Kilpatrick Indictment, in or about late 2005, Miller told a representative of Inland Waters that Inland Waters must resolve Ferguson's complaint about the 15-Mile sewer collapse. Miller's statement reveals that he was aware of and supported Ferguson's attempt to condition Kilpatrick and Mercado's approval of CS-1368-4 on Inland Waters' payment of the additional monies to Ferguson.

107. As alleged in the Kilpatrick Indictment, on or about December 16, 2005, at a restaurant in the City of Detroit, Ferguson, after conferring separately in the restaurant with Miller, approached a representative of Inland Waters and demanded $350,000 on the 15 Mile Road Sewer Collapse Project.

108. As alleged in the Kilpatrick Indictment, in or about late December 2005, Inland Waters and its partner agreed to pay Ferguson a total of $350,000 for alleged profits that Ferguson demanded on the 15 Mile Road Collapse Project.

109. Inland Waters was aware that Ferguson was not lawfully entitled to $350,000 in profits on the 15 Mile Road Collapse Project.

110. Upon information or belief, Inland Waters agreed to pay $350,000 to Ferguson with the expectation and for the purpose of making substantial profits on CS-1368, further amendments to CS-1368, and certain future DWSD contracts.

111. Upon information and belief, Inland Waters directly or indirectly paid the $350,000 that Ferguson demanded.

-24-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

**V.** **Kilpatrick, Mercado, Ferguson, Miller, FEI, Inland Waters, and LD&S Fraudulently Conceal their Activities in Connection with (a) the Manipulation and Fixing of the Awarding of DWSD Contracts and the Profits from those Contracts, (b) the Submission of Invalid and Inaccurate Invoices and Other Payment-Related Documents on DWSD contracts, and/or (c) the Participating in Other Tortious or Unlawful Activity Including Bribery, Extortion, and/or Money Laundering**

112.    Kilpatrick, Mercado, Ferguson, Miller, FEI, and Inland Waters agreed to conceal – and were successful in fraudulently concealing – their unlawful activities from disclosure to the DWSD Board and other DWSD officials; the City of Detroit, including the City Council; the federal judiciary, including the long-tenured federal judge who presided over the City of Detroit Environmental Case; IMG, the consulting group approved by the Court to assist Mayor Kilpatrick and Mercado on matters related to DWSD contracting and procurement operations and to report monthly to the Court on contracts valued at over $500,000; federal, state, and city law enforcement officials; and the inquiring and investigatory efforts of the media.  Upon information and belief, a reasonable opportunity for further investigation or discovery will likely yield evidence to support that LD&S participated in these efforts in order to fraudulently conceal its own wrongdoing.

113.    Defendants' concealment efforts were made impregnable by virtue of (a) Kilpatrick's positions as Mayor and DWSD Special Administrator; (b) Mercado's positions as Director of DWSD and sometimes special-designee of the Special Administrator, with the ultimate authority with respect to day-to-day operations at DWSD; and (c) Miller's position as a trusted fiduciary and confidant of Mayor Kilpatrick.

114.    Kilpatrick and Mercado developed practices and procedures with respect to the awarding and implementation of DWSD contracts which obscured the unlawful activities in relation to the rigging of bids and contracts; the use of amendments to expand the contract amounts without the scrutiny competitive bidding process; the submission of invalid and padded

-25-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

invoices as to the time, material, and equipment used; the positioning of DWSD officials, such as engineers and inspectors, on projects in such a way that they were not aware of the unlawful activities; and the effective limiting of oversight, review, and approval of invoices to just the prime contractor on a project.

115.    For the purpose of concealing unlawful activities, Mercado's practices and procedures included (a) reducing the DWSD staff who had been responsible for reviewing and overseeing outside contractors' work; (b) reducing the DWSD's internal documentation relating to the work performed on a contract; and (c) using Defendants (who were outside companies) to perform the review and oversight tasks that DWSD employees previously performed.    For example, with respect to the 15 Mile Road Sewer Collapse Project, Mercado (a) used Daily Press Reports instead of the standard Daily Engineering Inspection Reports; (b) decreased the authority and opportunity of the DWSD inspectors to inspect and evaluate the daily activities of the contractors on site; and (c) allowed Inland Waters effectively to become the sole arbiter of the validity and correctness of the invoices submitted by its contractors.

116.    Through express and implied threats, Kilpatrick, Mercado, and Ferguson were able to create an environment where non-Defendant contractors who may have known of or suspected unlawful conduct refused to come forward and disclose such information to persons who were not a part of the unlawful conduct.

117.    The Intervening Plaintiff did not learn of Defendants' wrongful conduct or realize that it had been injured or damaged as a result of this wrongful conduct until the United States unveiled the First Superseding Indictment in the Kilpatrick Prosecution on December 15, 2010.

118.    Defendants conducted their bribery, extortion, other racketeering crimes, and other tortious misconduct in secret and only between the participants.    Defendants' wrongful conduct – and the deciphering, interpretation, and revealing of its tortious, injurious, and

-26-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

potentially criminal nature – came to light only through law enforcement use of wire taps and the disclosure of email and text messages.

119. Between the time of Defendants' conduct and December 15, 2010, the Intervening Plaintiff acted in a reasonably diligent manner when it:

- Reviewed and relied upon the contracts that were presented to it, including the covenants Defendants made about the lack of conflicts of interest in relation to the contracts;

- Relied upon the City of Detroit's published ordinances, rules, and formal written Standards of Conduct, which prohibited – among other things – public officials from performing official acts for private gain, disclosing confidential information to third-parties for private gain, and using municipal resources for commercial gain;

- Relied upon the oversight and supervision of DWSD and its operations by Judge Feikens, the presiding judge in the City of Detroit Environmental Case;

- Relied on the review and analysis of contracts in excess of $500,000 by IMG, the consulting firm approved and appointed in the City of Detroit Environmental Case;

- Relied upon Kilpatrick's authority as Special Administrator, which essentially preempted any conflicting efforts or authority of the DWSD Board and other City of Detroit officials;

- Relied upon the provisions of the City of Detroit Charter which vested the authority to investigate and/or initiate a lawsuit in the Mayor's Office; and

- Relied upon Kilpatrick, Mercado, and Miller to fulfill their fiduciary duties under federal and state law and the City of Detroit Charter, including disclosing any breaches of fiduciary duties committed by themselves or others.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-27-

## INTERVENING PLAINTIFF'S CLAIMS

### COUNT 1: Civil RICO – Conducting an Enterprise Through Racketeering Under 18 U.S.C. § 1962(c)
### (All Defendants except LD&S)

120.    For purposes of the Intervening Plaintiff's civil RICO claim, the City of Detroit is a person within the meaning of 18 U.S.C. §§ 1961(3).

### THE KILPATRICK ENTERPRISE:  MEMBERS AND ASSOCIATES

121.    For purposes of the Intervening Plaintiff's civil RICO claim, each of the following Defendants is a person within the meaning of 18 U.S.C. §§ 1961(3), who, during the relevant time period, was a member and associate of and a participant in the Kilpatrick Enterprise:

- Former Mayor Kwame Kilpatrick

- Bobby W. Ferguson

- Victor M. Mercado

- Derrick A. Miller

- Inland Waters Pollution Control, Inc.

- Ferguson Enterprises, Inc.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-28-

122.    As set forth in detail below, each of the above Defendants engaged in conduct as a member or associate of and a participant in the Kilpatrick Enterprise, which conduct included a pattern of racketeering activity.

123.    As set forth in detail above and below, the pattern of racketeering activity, which included numerous related and repeated predicate acts, took place over a period of four (4) years or more and was part of a longer pattern of racketeering activity that partly falls outside of the scope of this initial Intervention Complaint (as limited by the Court's 05/07/2012 Order).

124.    As set forth in detail below, the predicate acts included bribery, extortion, and money laundering.

125.    As set forth in detail below, the pattern of racketeering activity caused injury to the business and property of the City of Detroit and DWSD.

THE KILPATRICK ENTERPRISE:  OBJECTIVES

126.    Based upon information and belief, and as set forth in the Kilpatrick Indictment, Defendants Kilpatrick, Ferguson, Mercado, Miller, Inland Waters, and FEI and other participants known and unknown, associated together in an ongoing organization for the common purpose of financially enriching themselves and their friends and associates in connection with work performed for DWSD.  They operated as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Kilpatrick Enterprise" or "Enterprise").

127.    The Kilpatrick Enterprise engaged in, and its affairs substantially affected and involved, interstate commerce as a result of its members and their agents procuring contracts with out-of-state companies for the goods and services involved in performing work for DWSD, and using interstate wires to transmit funds, to send and receive billing and payment-related documents and for other communications.

-29-

128. The members of the Kilpatrick Enterprise hid, disguised, and fraudulently concealed their unlawful activities from disclosure to the City of Detroit officials, including the Detroit City Council, the DWSD Board, the federal court, law enforcement and the media. The concealment was made possible as Kilpatrick and Mercado -- in their positions of authority, including Kilpatrick's position as the federal Court-appointed Special Administrator for DWSD -- essentially controlled the actions of DWSD.

### THE KILPATRICK ENTERPRISE: MEANS AND METHODS OF CONDUCTING THE KILPATRICK ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY

129. The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint, including the sections entitled "General Pattern of Illegal Conduct," "The Kilpatrick Indictment and Prosecution," "Jurisdiction," "Venue," "Parties" and "General Allegations," including specifically the sections pertaining to the repair of the Macomb Interceptor sewer at 15 Mile Road in Sterling Heights, Michigan:

I.      Kilpatrick is Elected Mayor and Appointed the Federal Court's Special Administrator;

II.     Background Information as to CS-1368, Amendments 2 and 3, which includes allegations concerning the manipulating and fixing of the contract to award subcontractor work to Ferguson and his company and the payment of bribes by Inland Waters;

III.    CS-1368, Amendments 2 and 3, which includes allegations concerning the continued steering of subcontractor work to Ferguson and his company, the submission of inaccurate and padded invoices, the awarding of exorbitant amendments to the contract, and the cover-up of unlawful activity;

IV.     Aftermath and Consequences of CS-1368, Amendments 2 and 3, which includes allegations concerning the continued unlawful activity of the contractors involved in CS-1368, Amendments 2 and 3; and

V.      Kilpatrick, Mercado, Ferguson, Miller, FEI, Inland Waters, and LD&S Fraudulently Concealed their Activities in Connection with (a) the Manipulation and Fixing of the Awarding of DWSD Contracts and the Profits from those Contracts, (b) the Submission of Invalid and Inaccurate Invoices and Other Payment-Related Documents on

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

DWSD contracts, and/or (c) the Participating in Other Tortious or Unlawful Activity Including Bribery, Extortion, and/or Money Laundering;

which are referred to herein collectively as the "Intervening Plaintiff's Allegations."

130. The Kilpatrick Enterprise was conducted through an overall pattern of misconduct, racketeering activity, and fraudulent concealment, which encompassed and weaved its way through a number of DWSD contracts for the period from approximately January 1, 2002 to approximately December 31, 2008. The contract at issue in the present action is CS-1368, Amendments 2 and 3, which pertains to repair of the Macomb Interceptor sewer at 15 Mile Road in Sterling Heights, Michigan.

131. During the relevant time period, known and unknown current and past owners, officers, employees, agents and representatives of some or all of the corporate entities that were part of the Kilpatrick Enterprise were authorized to act and did act for the benefit of their affiliated corporate entity in furtherance of the Kilpatrick Enterprise.

132. During the relevant time period, at various times, known and unknown persons or entities were authorized to act and did act for the benefit of one or more of the corporate entities that were part of the Kilpatrick Enterprise.

133. During the relevant time period, the corporate entities that were part of the Kilpatrick Enterprise knowingly accepted and received the benefit from the acts of the persons and entities set forth above.

134. By their actions as specifically set forth in the Intervening Plaintiff's Allegations, Defendants Kilpatrick, Mercado, and Miller willingly committed the following acts while participating in and conducting the affairs of the Kilpatrick Enterprise:

- participated in bribery in violation of 18 U.S.C. § 201;

- acted as willing associates of the Kilpatrick Enterprise; and

-31-

- participated in the activity of the Kilpatrick Enterprise in manipulating and fixing the unlawful awarding of DWSD contracts and profits.

135. By their actions as specifically set forth in the Intervening Plaintiff's Allegations, Defendants Ferguson, and FEI willingly committed the following acts while participating in and conducting the affairs of the Kilpatrick Enterprise:

- participated in, aided, and abetted bribery in violation of 18 U.S.C. § 201;

- participated in money laundering in violation of 18 U.S.C. § 1956;

- participated in extortion in violation of 18 U.S.C. § 1951;

- acted as a willing associate of the Kilpatrick Enterprise; and

- participated in the activity of the Kilpatrick Enterprise in manipulating and fixing the unlawful awarding of DWSD contracts and profits.

136. By its actions as specifically set forth in the Intervening Plaintiff's Allegations, Defendant Inland Waters willingly committed the following acts while participating in and conducting the affairs of the Kilpatrick Enterprise:

- paid a bribe in violation of 18 U.S.C. § 201;

- engaged in money laundering in violation of 18 U.S.C. § 1956;

- acted as a willing associate of the Kilpatrick Enterprise; and

- participated in the activity of the Kilpatrick Enterprise in manipulating and fixing the unlawful awarding of DWSD contracts and profits.

137. By their actions as specifically set forth in the Intervening Plaintiff's Allegations, Defendants' racketeering activities directly, legally, and proximately caused millions of dollars in injury to the City of Detroit and DWSD and their business and property.

138. Defendants FEI and Inland Waters would not have been awarded or allowed to participate as contractors or subcontractors in CS-1368, Amendments 2 and 3, if these Defendants had not engaged in the racketeering activities specified in this Complaint. As a result

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-32-

of their racketeering activities, Defendants FEI and Inland Waters obtained gross receipts of about $58 million on CS-1368, Amendments 2 and 3.

139. The damages to the City of Detroit and DWSD include:

    (1) increased contract costs and lost savings due to non-competitive bidding, bid-rigging, extortion, and money laundering;

    (2) lost value and excess costs due to bribery;

    (3) payments made pursuant to excessive and unnecessary contract, consulting, and other fees, expenses, and costs; and

    (4) any and all other appropriate damages.

140. As a result of Defendants' violations of 18 U.S.C. § 1962, the City of Detroit and DWSD are entitled under 18 U.S.C. 1961, *et seq.*, to recover an amount equal to the total gross receipts obtained by these Defendants on CS-1368, Amendments 2 and 3, which are approximately $58 million.

141. Alternatively, as a result of Defendants' violations of 18 U.S.C. § 1962, the City of Detroit and DWSD are entitled under 18 U.S.C. 1961, *et seq.*, to recover an amount equal to all profits received by these Defendants on CS-1368, Amendments 2 and 3, which, upon information and belief, exceeds $10 million.

142. As a result of Defendants' violations of 18 U.S.C. § 1962, the City of Detroit and DWSD are entitled under 18 U.S.C. § 1964(c) to recover treble damages, attorney fees, and costs.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against these Defendants (except LD&S) in an amount and manner to be determined at trial together with gross receipts or profits, treble damages, interest, costs, and attorneys' fees.

-33-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

## COUNT 2: Breach of Fiduciary Duty
### (Defendants Kilpatrick, Mercado, and Miller)

143.    The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

144.    Defendant Kilpatrick, as Mayor and the federal Court's appointed Special Administrator, was a fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

145.    Defendant Mercado, as the Director of DWSD and the sometimes-designated agent acting on behalf of the Special Administrator, was a fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

146.    Defendant Miller, as a member of Kilpatrick's mayoral administration who served as Chief Administrative Officer and Chief Information Officer for the City of Detroit, was a fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

147.    Kilpatrick, Mercado, and Miller owed fiduciary duties to the City of Detroit, DWSD, and the citizens of the City of Detroit, including the duties of loyalty, honesty, good faith, fair dealing, prudence, and competency.

148.    Moreover, as the public officers who were in charge of the administration and operation of DWSD, Kilpatrick and Mercado were charged and entrusted with the fiduciary duty and obligation to manage and operate DWSD so as to protect, promote, and advance the interests of the City of Detroit, DWSD, and the public, including ensuring that the public funds of the City of Detroit and DWSD were lawfully spent in the best interests of the City of Detroit, DWSD and the citizens of the City of Detroit.

149.    Also, as the public officers who were in charge of the administration and operation of DWSD, Kilpatrick and Mercado had the fiduciary duty to make certain that the

-34-

public funds of the City of Detroit and DWSD were not spent for or diverted to the personal gain of themselves or their friends and associates, or unlawfully paid, transferred or delivered to entities and individuals who did business with DWSD as contractors or subcontractors.

150.     In his position as the federal Court's appointed Special Administrator of DWSD, although entrusted with extensive power and authority to control, manage, and operate DWSD, Kilpatrick nonetheless could not exercise that power and authority (or delegate that power and authority to be used) in his self-interest or in the pecuniary interest of his friends, associates, and business partners, or exercise that power and authority (or delegate that power and authority to be used) against the interest of the City of Detroit, DWSD, and the citizens of the City of Detroit and for the benefit of particular entities or individuals who did business with DWSD as contractors or subcontractors. As Special Administrator, neither Kilpatrick nor anyone to whom he delegated his power and authority was authorized to violate federal, state, or local criminal laws or was immune from civil liability, restitution, equitable remedies, or civil retribution.

151.     By their acts as specifically set forth in the "General Allegations" section of this Complaint, including engaging in bribery, extortion, money laundering, and contract-rigging or bid-rigging, Defendants Kilpatrick, Mercado, and Miller breached their fiduciary duties to the City of Detroit, DWSD, and the citizens of the City of Detroit. These breaches legally, proximately, and actually caused damage to the City of Detroit and DWSD.

152.     The damages to the City of Detroit and DWSD include:

> (1)     increased contract costs and lost savings due to non-competitive bidding, bid-rigging, extortion, and money laundering;
>
> (2)     lost value and excess costs due to bribery;
>
> (3)     payments made pursuant to excessive and unnecessary contract, consulting, and other fees, expenses, and costs; and
>
> (4)     any and all other appropriate damages.

-35-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against Defendants Kilpatrick, Mercado, and Miller, jointly and severally, in an amount to be determined at trial, including exemplary, enterprise, and unjust enrichment damages and disgorgement of profits, together with interest, costs and attorneys' fees.

## COUNT 3: Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duties (All Defendants)

153.   The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

154.   Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, Inland Waters, and LD&S knew that Kilpatrick, Mercado, and Miller had the fiduciary duties identified in the preceding Count.

155.   Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, Inland Waters, and LD&S knew that when Defendants Kilpatrick, Mercado, and Miller engaged in the actions specifically set forth in the "General Allegations" section of this Complaint, including engaging in bribery, extortion, money laundering, and contract-rigging or bid-rigging, Kilpatrick, Mercado, and Miller breached their fiduciary duties to the City of Detroit, DWSD, and the citizens of the City of Detroit.

156.   By their actions as specifically set forth in the "General Allegations" section of this Complaint, including engaging in bribery, extortion, money laundering, and contract-rigging or bid-rigging, Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, Inland Waters, and LD&S substantially assisted in, aided, abetted and facilitated Kilpatrick, Mercado, and Miller's above-described breaches of their fiduciary duties.  Such assistance legally, proximately, and actually caused damage to the City of Detroit and DWSD.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-36-

157. The damages to the City of Detroit and DWSD include:

    (1)    increased contract costs and lost savings due to non-competitive bidding, bid-rigging, extortion, and money laundering;

    (2)    lost value and excess costs due to bribery;

    (3)    payments made pursuant to excessive and unnecessary contract, consulting, and other fees, expenses, and costs; and

    (4)    any and all other appropriate damages.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, Inland Waters, and LD&S, jointly and severally, in an amount to be determined at trial, including exemplary, enterprise, and unjust enrichment damages and disgorgement of profits, together with interest, costs and attorneys' fees.

## COUNT 4: Civil Bribery
## (Defendants Kilpatrick, Mercado, Miller, Ferguson, FEI, and Inland Waters)

158. The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

159. Defendant Kilpatrick, as Mayor and the federal Court's appointed Special Administrator, was a public governmental official, agent and fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

160. Defendant Mercado, as the Director of DWSD and the sometimes-designated agent acting on behalf of the Special Administrator, was a public governmental official, agent and fiduciary of the City of Detroit, DWSD, and the citizens of the City of Detroit.

161. As detailed in the Complaint, including the "General Allegations" section, Kilpatrick and Mercado solicited and/or demanded that:

- they personally be given cash, and/or plane rides, and/or other valuable consideration; and/or

- Ferguson and/or Ferguson-controlled companies be given cash, valuable contracts, and/or other valuable consideration;

-37-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

in exchange for their willingness to be influenced in the performance of their official acts and/or to be induced to do, or to omit to do, one or more acts in violation of their official duties.

162.    As detailed in the Complaint, including the "General Allegations" section, Ferguson, FEI, and Inland Waters corruptly and voluntarily made unlawful promises or agreed to the solicitations and/or demands of Kilpatrick and Mercado that:

- they personally be given cash, and/or plane rides, and/or other valuable consideration; and/or

- Ferguson and/or Ferguson-controlled companies be given cash, valuable contracts, and/or other valuable consideration;

in exchange for their willingness to be influenced in the performance of their official acts and/or to be induced to do, or to omit to do, one or more acts in violation of their official duties.

163.    Kilpatrick, Mercado, and possibly other public officials acting at the direction of Kilpatrick and Mercado accepted the valuable consideration and promises offered by Ferguson, FEI, and Inland Waters.

164.    It was the intent of Ferguson, FEI, and Inland Waters that the valuable consideration or promises provided by them to Kilpatrick, Mercado, and possibly other public officials influence Kilpatrick, Mercado and possibly other public officials in the performance of their official acts and/or induce them to do, or to omit to do, one or more acts in violation of their official duties.

165.    As stated in previous counts, Ferguson, FEI, and Inland Waters knew that Kilpatrick, Mercado, and possibly other public officials had the fiduciary duties identified in the preceding counts.

166.    It was the intent of Ferguson, FEI, and Inland Waters that the valuable consideration provided by them to Kilpatrick, Mercado, and possibly other public officials including Miller caused them to breach their fiduciary duties.

-38-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

167. The solicitations, demands, gifts, offerings, promises, and/or agreements to give the above-described bribes legally, proximately, and actually caused the City of Detroit and DWSD to suffer substantial economic and other injuries.

WHEREFORE, Intervening Plaintiff requests entry of a judgment against Kilpatrick, Mercado, Miller, Ferguson, FEI, and Inland Waters, jointly and severally, in an amount to be determined at trial together with interest, costs and attorneys' fees.

### COUNT 5: Fraudulent Inducement
### (Inland Waters)

168. The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

169. As set forth more specifically above, in order to induce DWSD to enter into CS-1368, and specifically Amendments 2 and 3 of CS-1368, Defendant Inland Waters made the material representations that (a) it has no interest and would not acquire any interest that would conflict with the performance of its services and duties under Amendments 2 and 3 of CS-1368; (b) no city official who has the responsibility for overseeing the awarding or the review of Amendments 2 and 3 of CS-1368 has any personal or financial interest in Amendments 2 and 3 of CS-1368; and (c) it will not employ any person to secure or assist in the securing of Amendments 2 and 3 of CS-1368 upon agreement or arrangement for payment or payments made to that person. (*See* Compl. ¶¶ 37-38, *supra*.)

170. As set forth more specifically above, the representations in the preceding paragraph were false when Inland Waters made them.

171. When Inland Waters made the above representations, it either (a) knew that Kilpatrick, Mercado, Ferguson, and FEI had conflicts of interest and yet were involved in

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

soliciting or obtaining the contract; or (b) made the representations recklessly without knowledge of their truth.

172. When Inland Waters made the above representations, it intended that DWSD would rely upon those representations in awarding Amendments 2 and 3 of CS-1368 to Inland Waters.

173. DWSD actually did rely upon the Defendants' above representations.

174. As a result of the DWSD's reliance upon Defendant's above misrepresentations, Inland Waters directly harmed and damaged the City of Detroit and DWSD.

175. The damages to the City of Detroit and DWSD include:

(1) increased contract costs and lost savings due to non-competitive bidding, bid-rigging, extortion, and money laundering;

(2) lost value and excess costs due to bribery;

(3) payments made pursuant to excessive and unnecessary contract, consulting, and other fees, expenses, and costs; and

(4) any and all other appropriate damages.

176. The City of Detroit's and DWSD's injuries were also enhanced by the pattern of amending (rather than competitively bidding) contracts. This pattern provided Defendants opportunities for even more excessive profits and other fees, expenses, and costs.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against Inland Waters in an amount to be determined at trial together with interest, costs and attorneys' fees.

## COUNT 6: Unjust Enrichment
### (All Defendants Except LD&S)

177. The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-40-

178.    Defendants Kilpatrick, Mercado, and Miller have been unjustly enriched through the corrupt allocation of public contracts by the receipt of kickbacks, portions of profits, and other monies to which they were not legally entitled, with an inequity resulting to the City of Detroit from the retention of the benefits by these Defendants.

179.    Defendants Ferguson, FEI, and Inland/Xcel have been unjustly enriched by the receipt of profits and/or benefits attributable to fraud, dishonest services, and/or to purported work not performed and/or services not provided, with an inequity resulting to the City of Detroit from the retention of the benefits by these Defendants.  As set forth more specifically above, the value of the services each Defendant provided was inadequate in relation to the payments the City of Detroit rendered for such services.

180.    All the Defendants (except LD&S) have received and retained benefits from the City of Detroit by virtue of their above described fraudulent, inequitable, or otherwise improper actions.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment, including but not limited to the disgorgement of profits, against all Defendants except LD&S in an amount to be determined at trial, together with interest, costs and attorneys' fees.

### COUNT 7: Constructive Trust
### (All Defendants Except LD&S)

181.    The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

182.    As set forth in this Complaint, the Defendants (except LD&S) obtained the Intervening Plaintiff's money, property, and/or valuable consideration through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of a weakness in the Intervening Plaintiff's standard practices or personnel, or taking undue advantage of the

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-41-

Intervening Plaintiff's necessities, and/or other similar conduct which render it unconscionable for these Defendants to hold that money, property, and/or valuable consideration.

183. The money, property, and/or valuable consideration referenced in the preceding paragraph – together with any interest, profits, or additional consideration that Defendants received on the money, property, and/or valuable consideration referenced in the preceding paragraph – should be deemed to be held in constructive trust for the benefit of the Intervening Plaintiff.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment against all Defendants (except LD&S), which includes but is not limited to the imposition of a constructive trust on the money, property, profits, interest, and other items of value described above.

### COUNT 8: Action for Accounting
### (All Defendants)

184. The Intervening Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

185. As a result and consequence of the claims which have been asserted by the Intervening Plaintiff in this action, Defendants have a duty to account to the Intervening Plaintiff because they received the Intervening Plaintiff's monies under circumstances that on their face appear to be the result of fraud, unjust enrichment, concealment or other improper or inequitable conduct.

186. Each of the Defendants has failed to account to the Intervening Plaintiff for the monies they received.

WHEREFORE, the Intervening Plaintiff requests entry of a judgment compelling all Defendants to render an accounting, including all evidence of the services they provided for the monies they received.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-42-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Jerome R. Watson (P27082)
W. Mack Faison (P13274)
Irene Bruce Hathaway (P32198)
Saura J. Sahu (P69627)


By: /s/ Jerome R. Watson
       Jerome R. Watson
Attorneys for the Intervening Plaintiff
150 West Jefferson, Suite 2500
Detroit, MI  48226
(313) 963-6420
watson@millercanfield.com

Dated:  May 21, 2012

20,155,373.3\022765-00197