**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MACOMB INTERCEPTOR DRAIN DRAINAGE
DISTRICT,

       Plaintiff,

and

CITY OF DETROIT and DETROIT WATER AND
SEWERAGE DEPARTMENT,

       Plaintiff-Intervenors,

v.                            Case No. 11-13101

KWAME KILPATRICK, et al.,

       Defendants.

                                  /

**OPINION AND ORDER (1) GRANTING CONCURRING DEFENDANTS' "AMENDED
MOTION FOR SUMMARY JUDGMENT"; (2) GRANTING DEFENDANTS
FUTURENET GROUP, INC., AND PERRY MEHTA'S "MOTION FOR PARTIAL
SUMMARY JUDGMENT"; (3) DIRECTING PLAINTIFF MACOMB INTERCEPTOR TO
SHOW CAUSE WHY SUMMARY JUDGMENT SHOULD NOT BE GRANTED IN
FAVOR OF NON-MOVING DEFENDANTS ON NON-CONTRACTUAL CLAIMS; (4)
DENYING PLAINTIFF MACOMB INTERCEPTOR'S "MOTION FOR LEAVE TO FILE
FIRST AMENDED COMPLAINT"; AND (5) TERMINATING AS MOOT THE
D'AGOSTINI DEFENDANTS' "MOTION TO STRIKE REPLY TO RESPONSE . . ."**

Pending before the court are Concurring Defendants' "Amended Motion for

Summary Judgment," Defendants Futurenet Group, Inc., and Perry Mehta's "Motion for

Partial Summary Judgment," and Plaintiff Macomb Interceptor Drain Drainage District's

("Macomb Interceptor's) "Motion for Leave to File First Amended Complaint."  Because

Macomb Interceptor lacks standing to assert its non-contractual claims, the court will

grant the motions for summary judgment and deny the motion for leave to amend.  The

court will also direct Macomb Interceptor, pursuant to Federal Rule of Civil Procedure 56(f), to show cause why summary judgment should not be entered in favor of the non-moving Defendants on each of the non-contractual claims.

## I. BACKGROUND

Macomb Interceptor sues forty Defendants for allegedly violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, the Clayton Antitrust Act, 15 U.S.C. §§ 12–27, and state contract and tort laws. The claims arise from Defendants' involvement in the 2004-2005 repair of a collapsed sewer interceptor at 15 Mile Road in Sterling Heights, Michigan, (hereafter, the "15 Mile Interceptor Repair Project" or "Project"). Macomb Interceptor avers that Defendant Kwame Kilpatrick, then the Mayor of the City of Detroit, along with various City of Detroit officials conspired with the principal contractor overseeing the 15 Mile Interceptor Repair Project, Defendant Inland Waters Pollution Control, Inc., and numerous subcontractors to "overcharge the Detroit Water and Sewerage Department . . . for time, labor and materials to stabilize and repair a sewer collapse at 15 Mile Road." (Pl.'s Compl. ¶ 5, Dkt. # 1.) Macomb Interceptor further alleges that the misconduct was part of a widespread corruption scheme during Defendant Kwame Kilpatrick's tenure as Mayor of Detroit. This broader scheme is alleged to have operated for nearly a decade seeking to steer public works contracts and illicit benefits to associates of Defendant Kwame Kilpatrick and officials throughout his administration. (*See* Pl.'s Compl. Ex. A, Dkt. #1-1.)

It is undisputed that the scheme as alleged was perpetrated against Plaintiff-Intervenors, the City of Detroit and the Detroit Water and Sewerage Department

2

(collectively, the "City of Detroit" or "City"), not Macomb Interceptor. Macomb Interceptor, though, maintains that it has standing to assert claims arising from the Project based on two independent grounds: (1) it obtained the right, through an assignment clause, to assert any claims, whether sounding in state tort or contract law or federal statutory law, originally possessed by the City of Detroit when, in September 2010, Macomb Interceptor and the City of Detroit entered into the Macomb Interceptor Acquisition Agreement ("Acquisition Agreement" or "Agreement"); and (2) the Project's alleged scheme-inflated cost resulted in Macomb Interceptor paying a higher price to acquire the Macomb System and users paying a higher rate for the water and sewerage system before the execution of the Agreement. The Acquisition Agreement, which is part of a larger global settlement in *United States v. City of Detroit*, No. 77-71100 (E.D. Mich.), a decades-long lawsuit related to the City of Detroit's compliance with federal environmental laws, transferred to Macomb Interceptor sewer assets located in Macomb County formerly owned by the City of Detroit and also assigned "all of [Detroit Water and Sewerage Department's] rights under all contracts, warranties, and guarantees that apply to services or goods related to the Macomb System." (Acquisition Agreement art. II, § 2.4, Dkt. # 206-2.)

On May 7, 2012, the court granted the City of Detroit's motion to intervene, recognizing that a dispute exists about who may properly assert the non-contractual claims arising from the 15 Mile Interceptor Repair Project. Since the initiation of this case, many Defendants have maintained that the City of Detroit, not Macomb Interceptor, has standing to assert the statutory and tort law claims contained in the Complaint. A large number of these Defendants (referred to hereafter as the

3

"Concurring Defendants")[1], filed a joint motion for summary judgment, seeking dismissal of Counts I, II, III, V, and VI of the Complaint on the grounds that Macomb Interceptor lacks standing to maintain these Counts.  Exhaustive briefing ensued, with Macomb Interceptor filing a response in opposition and the City of Detroit filing a response in support of Concurring Defendants' motion.  The Concurring Defendants and Macomb Interceptor replied.

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the court "is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "The central issue is 'whether the

---

[1]The Concurring Defendants are: Anthony Soave; D'Agostini & Sons, Inc.; L. Robert D'Agostini; James D. D'Agostini; Inland Waters Pollution Control, Inc.; Robert L. Williams; Dennis Oszust; Walter Rozycki; Merisno Dewatering, Inc.; Rodney A. Mersino; Marco Mersino; Drian Lenaghan; Patriot Pumps, Inc.; Rohrscheib Sons Caissons, Inc.; Steve Rohrscheib; O'Laughlin Construction Company; Mark E. O'Laughlin; Dubay's Landscaping Services; Lawrence R. Dubay; Victor M. Mercado; and Hayward Baker.

Defendants Futurenet Group, Inc., and Perry Mehta filed an independent motion for summary judgment, in which they join in Concurring Defendants' joint motion for summary judgment.  In their motion, these two Defendants indicate that Macomb Interceptor's counsel stated that she did not object to them joining Concurring Defendants' motion for summary judgment.  Defendants Rotor Electric Company of Michigan, LLC, and Benjamin Rosenberg also submitted an unopposed motion to join the Concurring Defendants' joint motion for summary judgment.  Accordingly, as a matter of efficiency, the court will include Defendants Futurenet Group, Inc., Perry Mehta, Rotor Electric Company of Michigan, LLC, and Benjamin Rosenberg in the group of Concurring Defendants.

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 497 (quoting *Anderson*, 477 U.S. at 251-52). "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [movant] is entitled to a verdict . . . ." *Anderson*, 477 U.S. at 252.

The party seeking summary judgment has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop. L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

5

evidence to support the fact." *Id.* 56(c)(1)(B). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan*, 342 F.3d at 497 (citing *Matsushita*, 475 U.S. at 587).

## III. DISCUSSION

Macomb Interceptor's Complaint alleges three federal claims and three state-law claims. Macomb Interceptor did not exist at the time of the alleged wrongdoing, and thus cannot be owed directly a legal duty giving rise to state-law tort claims, so its standing to assert state-law claims here is premised on its contention that the City of Detroit, through the Acquisition Agreement, assigned to it all rights to pursue claims arising from the 15 Mile Interceptor Repair Project. Macomb Interceptor also relies, in part, on this same assignment argument to establish its standing to bring the federal claims, but alternatively argues that it suffered injuries, wholly independent and distinct from the City of Detroit's, that permit it to recover under the federal antitrust statutes and RICO. In their motion for summary judgment, Concurring Defendants argue that Macomb Interceptor has standing to assert only the breach of contract claim against Defendant Inland Waters Pollution Control and has failed to establish that it has standing, whether through an assignment or based on independent injury, to maintain the Complaint's non-contractual claims.

### A. Standing Based on Assignment in Macomb Agreement

Macomb Interceptor argues that it acquired the City of Detroit's rights to pursue all claims arising from the 15 Mile Interceptor Repair Project, whether sounding in state-law or federal statutory law, through an assignment clause in the Acquisition Agreement. Specifically, in the Complaint, Macomb Interceptor points to sections 2.4

6

and 2.9(b)(8) of the Agreement, which provide, respectively, that "Detroit shall assign to [Macomb Interceptor] all of its rights under all contracts, warranties and guarantees that apply to services or goods related to the Macomb System," (Acquisition Agreement art. II, § 2.4), and that "[a]t closing, . . . Detroit shall deliver to MID . . . an assignment of all rights under any contracts, warranties, or guarantees that apply to services or goods related to the facilities comprising the Macomb System," (*id.* at art. II, § 2.9(b)(8)).

Concurring Defendants and the City of Detroit concede that these clauses assign to Macomb Interceptor state-law contract claims arising out of the 15 Mile Interceptor Repair Project, but maintain that the clauses do not assign claims sounding in tort or federal statutory law. The court agrees with Concurring Defendants and the City of Detroit. The incorporation of the clause "under all contracts, warranties and guarantees" expressly limits the preceding assignment of "all of its rights." Accordingly, the City of Detroit assigned to Macomb Interceptor the City's rights to contracts related to the 15 Mile Interceptor Repair Project, including the right to recover for damages caused by breaches of those contracts, but not the City's rights to then-unknown causes of action sounding in state tort law or federal statutory law.

Under Michigan law, "[a]n assignment is a contract between the assignor and the assignee and is interpreted according to the rules of contract construction." *Burkhart v. Lapham*, No. 291705, 2010 WL 4905568, at *2 (Mich. Ct. App. Dec. 2, 2010) (citing 6 Am. Jur. 2d Assignments § 109). "The primary goal in interpreting contracts is to determine and enforce the parties' intent." *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 666-67 (Mich. Ct. App. 2000) (citing *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994)). "In ascertaining the meaning of a contract, [the court] give[s] the words

used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 28 (Mich. 2005) (citing *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003)). Additionally, "[e]very word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." *Associated Truck Lines, Inc. v. Baer*, 77 N.W.2d 384, 386 (Mich. 1956) (quoting *Laevin v. St. Vincent de Paul Soc'y*, 36 N.W.2d 163, 164 (Mich. 1949)) (internal quotation marks omitted).

If a court determines that "the contractual language is unambiguous, [it] must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008) (citing *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999)). Accordingly, a court may not consider extrinsic evidence of the parties' intent to vary the meaning of a contract that is clear and unambiguous. *Burkhardt v. Bailey*, 680 N.W.2d 453, 464 (Mich. Ct. App. 2004). Where a court concludes, as a matter of law, that a contract is ambiguous, extrinsic evidence may be admissible for interpretive purposes. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir. 1998). "A contract is ambiguous when two provisions 'irreconcilably conflict with each other,'" *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 543 (Mich. Ct. App. 2007) (quoting *Klapp*, 663 N.W.2d at 453), "or 'when [a term] is equally susceptible to more than a single meaning,'" *id.* (alteration in original) (quoting *Mayor of Lansing v. Mich. Pub. Serv. Comm.*, 680 N.W.2d 840, 847 (Mich. 2004)). "[I]f a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not

8

be said to be ambiguous or, indeed, fatally unclear." *Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 314 N.W.2d 440, 441 (Mich. 1982). Furthermore, "the parties' disagreement regarding the meaning of contract language does not, by itself, create an ambiguity." *Harbor Park Market, Inc. v. Gronda*, 743 N.W.2d 585, 589 n.3 (Mich. Ct. App. 2007) (citing *Gortney v. Norfolk & W. Ry. Co.*, 549 N.W.2d 612, 615 (Mich. Ct. App. 1996)).

Macomb Interceptor focuses on the use of the phrase "all of its rights" in sections 2.4 and 2.9(b)(8) in arguing that the assignment contained in section 2.4 is an absolute assignment to it to pursue all claims arising from the 15 Mile Interceptor Repair Project, and quotes *Skotak v. Vic Tanny Intern, Inc.*, 513 N.W.2d 428 (Mich. Ct. App. 1994) for the proposition that "there is no broader classification than the word 'all[,]' [and] [i]n its ordinary and natural meaning, the word 'all' leaves no room for exceptions." 513 N.W. 2d at 430. To be sure, Macomb Interceptor is correct that the use of the word "all" is unambiguous and does not permit the imposition of unenumerated exceptions or limitations. But the word "all" does not alone signal an absolute assignment of any and all rights to causes of action initially belonging to an assignor. The contractual language at issue in *Skotak*, a liability waiver contained in a gym membership contract, illustrates this point and reveals the weakness in Macomb Interceptor's reliance on *Skotak*'s declaration regarding the breadth of the word "all."

The plaintiff in that case, the wife of a gym member who suffered a fatal heart attack at the gym, argued that the liability waiver signed by her husband was ambiguous and did not extend to claims of negligent training and supervision. The Michigan Court of Appeals, rejecting the ambiguity argument and holding that the waiver covered "all"

9

claims, observed that the waiver's inclusive language, which provided for the waiver of "any and all claims, demands, damages, rights of action, or causes of action, . . . arising out of the Member's . . . use of the facility" was a clear expression of the defendant's "intention to disclaim liability for all negligence, including its own." *Id.* at 619 (ellipses in original). The unambiguous intent of the defendant in that case to waive all liability was not premised simply on the incorporation of the phrase "any and all," but instead on the relationship between that phrase and the succeeding contractual language, which provided necessary context to the phrase "any and all."

Here, Macomb Interceptor's interpretation of "all of its rights" fails to account for the contractual language that follows "all of its rights" and which provides the necessary context required to give meaning to section 2.4's assignment. Unlike the breadth of the language that followed "any and all" in *Skotak*, the assignment of "all of its rights" contained in section 2.4 is *limited*: it refers specifically to "all" those rights under "contracts, warranties and guarantees that apply to services or goods related to the Macomb System." (Acquisition Agreement art. II, § 2.4.) For the court to accept Macomb Interceptor's contention that "all" assigns any right that the City of Detroit may have had in a cause of action arising from the 15 Mile Interceptor Repair Project, it would have to effectively excise the crucial language following the invocation of the word "all" that explains what is actually being assigned. Because Michigan law provides that "[e]very word in the agreement must be taken to have been used for a purpose," *Associated Truck Lines, Inc.*, 77 N.W.2d at 386 (quoting *Laevin*, 36 N.W.2d at 164) (internal quotation marks omitted), Macomb Interceptor's argument that the use of "all of its rights" in the assignment clause constituted an absolute assignment of any and all

rights the City of Detroit had must be rejected.  Accordingly, the key to deciding whether

section 2.4 assigned the City of Detroit's rights to non-contractual claims related to the

Project is determining the proper interpretation of the unambiguous language, "rights

under all contracts, warranties and guarantees."

In spite of the parties' conflation of the two concepts, an assignment provision

incorporating the language "rights under all contracts" does not *per se* assign claims or

causes of action, but instead assigns only rights and obligations arising under a

contract.  *See* Restatement (Second) of Contracts § 328 (1981) ("[A]n assignment of

'the contract' or of 'all my rights under the contract' or an assignment in similar general

terms is an *assignment of the assignor's rights and a delegation of his unperformed*

*duties under the contract.*" (emphasis added)); Mich. Comp. Laws § 440.2210(5)

(same).  To the extent that such an assignment permits the assignee to assert claims or

causes of action, it does so on the grounds that among the rights that arise under a

contract is the right to enforce the provisions of the contract and to recover damages for

noncompliance with those provisions.  However, the ability of an assignee to enforce

contractually-created rights does not necessarily permit the assignee to also bring tort

or statutory claims that are merely related somehow to the contractual relationship but

that arose outside of the rights created by the contract.  *See Int'l Design Concepts, LLC*

*v. Sakes Inc.*, 486 F. Supp. 2d 229, 236 (S.D.N.Y. 2007) (applying New York law, which

like Michigan has incorporated the Restatement's and Uniform Commercial Code's

construction of an assignment of "all my rights under the contract," and observing that

"an assignment of all contractual rights does not necessarily include an assignment of

all tort claims; rather whether tort claims are encompassed within the assignment is a

11

matter of contract interpretation"). This is so because rights arising under contracts, which include warrantee and guarantee rights, are fundamentally distinct from common-law tort or statutorily-created legal duties. *See Fultz v. Union-Commerce Assocs.*, 683 N.W.2d 587, 592 (Mich. 2004) ("[A] tort action stemming from misfeasance of a contractual obligation [is] the 'violation of a legal duty separate and distinct from the contractual obligation.'" (quoting *Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647 (Mich. 1997))). Accordingly, where an assignment clause does no more than assign rights arising from contracts, it cannot be read to include an assignment of non-contractual claims. *See Fox v. Hirschfeld*, 142 N.Y.S. 261, 263 (N.Y. App. Div. 1913) (holding that the contractual provision, "'I hereby sell, assign, transfer, and set over . . . all my right, title, and interest in and to the within contract' . . . was not appropriate to assign a cause of action arising, not under the contract, but for the fraudulent representations of defendant *dehors* the contract").

The inclusion of "rights under contracts, warranties and guarantees" in section 2.4 unambiguously reveals the intent of the contracting parties to assign only contractually-created rights. These do not include claims arising under tort or federal statutory law. Therefore, Macomb Interceptor lacks standing, as an assignee of the City of Detroit, to assert the claims contained in Counts I, II, III, V, and VI of the Complaint.

Macomb Interceptor's reliance on extraneous evidence is unavailing in support of its argument that section 2.4 was an absolute assignment of all claims, known or unknown at the time of contracting, related to the 15 Mile Interceptor Repair Project. Where contractual provisions are unambiguous, as sections 2.4 and 2.9(b)(8) are, extrinsic evidence to assist in interpretation of the provisions is not permitted.

12

*Burkhardt*, 680 N.W.2d at 464. Moreover, the evidence itself does not establish that section 2.4 assigns all possible claims related to the Project.

In its briefing and during oral argument, Macomb Interceptor repeatedly quotes language in the Bill of Sale, which, based on the integration clause in the Acquisition Agreement, is not a formal part of the contracting parties' Agreement. (*See* Acquisition Agreement art. XII, § 12.5 ("This Agreement constitutes the sole understanding of the parties hereto with respect to the matters provided for herein . . . . No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by Detroit and [Macomb Interceptor] and in compliance with Section 12.12.").) Specifically, it argues that the following provision of the Bill of Sale transferred to it the right to prosecute "any and all claims" arising out of the Project:

> Without limiting the prior paragraph, Detroit hereby constitutes and appoints the District the true and lawful agent and attorney-in-fact of Detroit, with full power of substitution and resubstitution, in whole or in part, in name and stead of Detroit but on behalf and for the benefit of the District and its successors and assigns, from time to time:
>
> > (a) to demand, receive and collect any and all of the Transferred Assets and to give receipts and releases for and with respect to the same, or any part thereof;
> >
> > (b) to institute and prosecute, in the name of Detroit or otherwise, any and all proceedings at law, in equity or otherwise, that the District or its successors and assigns may deem proper in order to collect or reduce to possession any of the Transferred Assets and *in order to collect or enforce any claim or right of any kind hereby assigned or transferred, or intended so to be*; and
> >
> > (c) to do all things legally permissible, required or reasonably deemed by the District to be required to recover and collect the Transferred Assets and to use Detroit's name in such manner

13

> as the District may reasonably deem necessary for the
> collection and recovery of same.

(Bill of Sale 1, Dkt. # 206-3 (emphasis added).)  Although broad in scope, this

appointment of Macomb Interceptor as a "lawful agent and attorney-in-fact of Detroit,"

does not, as Macomb Interceptor argues, transfer the right to prosecute "any and all

claims."  Subsection (b) of the above-quoted language expressly provides, with respect

to the assignment of claims and rights, that Macomb Interceptor's authority to "institute

and prosecute" legal and equitable proceedings is limited to those proceedings deemed

proper "in order to collect or enforce any claim or right of any kind *hereby assigned or*

*transferred, or intended so to be.*"  (*Id.* (emphasis added).)  Contrary to Macomb

Interceptor's argument, the Bill of Sale does not grant it the right to prosecute "any and

all claims" of every description, but only all such claims and rights transferred or

assigned in the Acquisition Agreement.  Subsection (b) strengthens the conclusion that

section 2.4 did not transfer or assign non-contractual claims arising from the Project and

strengthens the court's determination that Macomb Interceptor does not have standing

as an assignee to bring its non-contractual claims.

Furthermore, the proffered affidavit of an attorney who represented Macomb

Interceptor during the negotiation of the Acquisition Agreement is not only inadmissible

as extrinsic evidence of the parties' intent, but it is also speculative.  At most, it may

serve as evidence of Macomb Interceptor's subjective intent.  In support of its assertion

that the "expressed intent of these parties" was for Macomb Interceptor to obtain the

City of Detroit's rights to pursue non-contract based claims related to the Project,

Macomb Interceptor relies on the affidavit as its evidence:  "[b]ecause Macomb County

14

was taking on all risk and obligations (except accrued tort and a few other expressly defined liabilities), it intended to obtain all of Detroit's rights and interests of whatever kind associated with the facilities and real estate-related rights being transferred so that the County would stand in Detroit's shoes after the transaction for anything related to the facilities being transferred." (Hupp Aff. ¶ 11, Dkt. # 206-4) (*see* Pls.' Resp. to Concurring Defs.' Mot. Summ. J. 23).  The affidavit, though, says nothing of the parties' *expressed* intent, and shows only that Macomb County—presumably the entity negotiating the terms of the Acquisition Agreement before the creation of Macomb Interceptor—had a *subjective* intent to obtain any and all claims arising from the Project. It does not show that such an intent was actually expressed to the City of Detroit, that the City of Detroit had the same intent, or that such an intent was reflected in the Agreement.

Finally, the affidavit's concluding paragraph, also cited by Macomb Interceptor, is likely inadmissible, irrespective of the prohibition against extrinsic evidence, as speculative.  The affiant states:

> [A]t the time the acquisition agreement was negotiated and at the time the Macomb transaction closed, Macomb County was completely unaware of the alleged fraudulent and tortious acts set forth in the Kilpatrick indictment or any other tort or other claims Detroit might have had associated with the facilities being transferred.  Accordingly, no reference to such claims was made in the acquisition agreement nor was the possibility of such claims expressly considered when the terms of the transaction were negotiated. However, any rights Detroit might have had to assert a tort or other claim associated with the facilities being transferred would likewise have been regarded by Macomb County as being part and parcel of what it was acquiring from Detroit.  I have no doubt that had possible tort or other claims against third parties related to a Macomb County sewer been known at the time of the transaction, they would have been specifically listed among the assets transferred to Macomb County.

15

(*Id.* ¶ 13.)  That Macomb Interceptor's attorney who negotiated the terms of the Acquisition Agreement *now* "has no doubt" that the non-contractual claims would have been expressly included in the Agreement had the parties known of the claims at the time of contracting does not demonstrate that the parties intended, at the time of contracting, to transfer such claims to Macomb Interceptor.  The statement is, in fact, not much more than conjecture as to how two contracting parties may have acted if they had additional information.

Accordingly, section 2.4's unambiguous language expresses an intent to transfer only the City of Detroit's "rights under all contracts, warranties and guarantees" and does not operate as a transfer or assignment of claims arising out of state tort law or federal statutory law.  Therefore, Macomb Interceptor lacks standing as an assignee.

### B.  Standing Based on Injury Suffered as Purchaser of the Macomb System and as Ratepayer

Concurring Defendants' motion also challenges the Complaint's assertion that Macomb Interceptor has standing, independent of any assignment by the City of Detroit, to bring the federal antitrust and RICO claims, because Macomb Interceptor has suffered independent injuries redressable under these federal statutes.  Macomb Interceptor argues that the following two alleged injuries maintain its federal claims: (1) paying an inflated price for the Macomb System as a result of 15 Mile Interceptor Repair Project's cost overruns caused by Concurring Defendants' actions and (2) paying higher system usage charges during the time between the 15 Mile Interceptor Repair Project and the execution of the Acquisition Agreement.

16

Although Macomb Interceptor focuses on constitutional standing principles to establish its right to bring its federal claims, Concurring Defendants challenge Macomb Interceptor's standing on an analytically distinct ground: the more stringent requirements a plaintiff must satisfy to demonstrate that his particular alleged injury permits him to bring a claim under the antitrust statutes and RICO. *See Cnty. of Oakland v. City of Detroit*, 866 F.2d 839, 845-51 (6th 1989) (acknowledging the distinction between constitutional standing requirements and those requirements judicially imposed for RICO and federal antitrust claims). The question, therefore, is not simply whether Macomb Interceptor suffered a concrete, particularized injury, traceable to the challenged actions, and redressable by a favorable ruling—indeed, Concurring Defendants and the City of Detroit appear to concede that Macomb Interceptor can, on satisfactory proofs, establish that it suffered an "injury-in-fact," by showing that the 15 Mile Interceptor Repair Project's cost overrun, allegedly caused by anticompetitive conduct and a RICO conspiracy, was a but-for cause of its paying a higher price to acquire the Macomb System through the Acquisition Agreement—but instead whether the claimed injuries suffered by Macomb Interceptor permit it to maintain causes of action under the antitrust statutes and RICO.

Concurring Defendants contend that Macomb Interceptor, an entity not in existence during the alleged injurious conduct, is an "indirect purchaser" barred from maintaining claims under the federal statutes. Macomb Interceptor argues that the indirect purchaser doctrine cited by Concurring Defendants bars only claims brought by plaintiffs who suffer "damages other than those resulting from the alleged misconduct," (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 26), and argues

that the doctrine does not apply here because it "is the only entity having actually paid the fixed amount of $54,467,200.00 for the repair project to have been completed by the named-Defendants," (*id.* at 27).

### 1. Antitrust Standing

Section 4 of the Clayton Act defines the class of persons entitled to seek damages under the antitrust statutes and provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States." 15 U.S.C. § 15. Although broad on its face, the language "has of necessity been judicially confined to limit the remed[ies] available . . . to particular classes of persons and for redress of particular forms of injury." *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1081 (6th Cir. 1983). Specifically, the United States Supreme Court has limited the scope of § 4 by identifying several factors a court must consider before finding that a plaintiff has standing under the antitrust statutes, *see Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) (establishing five factors courts should consider when deciding whether a plaintiff has standing to assert antitrust claims), and by establishing the indirect purchaser doctrine, which bars individuals who are not direct purchasers from seeking relief under the statutes, *see Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

Under the indirect purchaser doctrine, a plaintiff who does not purchase directly from an alleged antitrust violator generally lacks standing to sue under the antitrust statutes. *See id.* at 729; *Jewish Hosp. Assoc. v. Stewart Mech. Enters., Inc.*, 628 F.2d 971, 973 (6th Cir. 1980). The genesis of the doctrine can be found in *Hanover Shoe,*

18

*Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), in which the Supreme Court "rejected an antitrust defendant's argument that [a] plaintiff could have suffered no legally cognizable injury from illegal overcharges that were reflected, in turn, in the prices charged by the plaintiff to its own customers." *Cnty. of Oakland v. City of Detroit*, 866 F.2d 839, 847 (6th Cir. 1989) (citing *Hanover Shoe*, 392 U.S. at 489). Later, in *Illinois Brick*, the Supreme Court extended the reasoning of *Hanover Shoe* to bar the *offensive* use of what it called the pass-on theory, holding that an "overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning" of § 4 of the Clayton Act. *Illinois Brick*, 431 U.S. at 729.

In *Illinois Brick*, various governmental entities sued concrete brick manufacturers for conspiring to raise the cost of concrete bricks. The governmental entities, though, did not purchase the bricks directly from the defendants, and could only demonstrate injury by invoking the pass-on theory of injury, *i.e.*, by proving "that the overcharge was passed on to them through intervening links in the distribution chain." *Id.* at 727-28. The bricks at issue in that case were first purchased directly from the manufacturers "by masonry contractors and used by them to build masonry structures." *Id.* at 726. General contractors then incorporated these structures into buildings, which were ultimately sold to the governmental entities. *Id.* In concluding that the governmental entities did not suffer cognizable antitrust injuries because the defendants had not

19

directly sold any concrete bricks to them, the Supreme Court established a near-categorical bar against the offensive use of a pass-on theory by indirect purchasers.[2]

*Illinois Brick* identified two principal concerns underlying the bar against indirect-purchaser claims. First, it observed that "allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants." *Id.* at 730. A one-sided application of *Hanover Shoe's* bar against the defensive use of pass-on "substantially increases the possibility of inconsistent adjudications and therefore of unwarranted multiple liability for the defendant by presuming that one plaintiff (the direct purchaser) is entitled to full recovery while preventing the defendant from using that presumption against the plaintiff." *Id.* Simply put, the Supreme Court said that it was "unwilling to 'open the door to duplicative recoveries' under § 4." *Id.* at 731 (quoting *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972)).

Second, it reasoned that the "principal basis for the decision in *Hanover Shoe* was the Court's perception of the uncertainties and difficulties" associated with applying the pass-on concept, including the need to analyze economic decisions in the real world as opposed to an "economist's hypothetical model," and that "the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom" applied with equal, if not greater, force to cases involving the offensive pass-on theory. *Id.* at 731-32. Because "[e]fforts to apportion the recovery among everyone who could have absorbed part of the overcharge 'would

---

[2] There are two narrow exceptions not relevant in this case: (1) cases involving "cost-plus" contracts between the direct and indirect purchasers and (2) cases alleging that "the direct purchaser is owned or controlled by its customer." *Illinois Brick*, 431 U.S. 720, 736 n.16.

20

add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness[,]'" *Cnty. of Oakland*, 866 F.2d at 848 (quoting *Illinois Brick*, 431 U.S. at 737), the Supreme Court reaffirmed its conclusion in *Hanover Shoe* "that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick*, 431 U.S. at 735.

The Supreme Court, while acknowledging that the difficulties and uncertainties associated with applying the pass-on theory may "be less substantial in some contexts than in others," *id.* at 743, has resisted calls to carve out exceptions (other than the two already recognized, *see* n.2, above) to the categorical bar on the offensive and defensive use of the pass-on concept, *see id.* at 743-745; *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216-17 (1990) ("[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions. Having stated the rule in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation of § 4.").

Addressing the second claimed injury first—paying higher system usage charges—Macomb Interceptor has proffered no evidence in support of its allegation that as an "end user of the Detroit sewer system" it was "damaged by the scheme because DWSD amortized the inflated costs for the Project into usage charges for the system in the years before the Macomb Agreement." (Compl. ¶ 47). Having been created only in 2009 for the express purpose of purchasing the Macomb System, Macomb Interceptor

(as opposed to Macomb County—not a party to this suit) apparently never purchased water and sewerage services from the City of Detroit. Nor is there any evidence that the City of Detroit passed on the inflated repair costs by incorporating those costs in the usage charges for the system.

In any event, this type of injury is precisely the type that the indirect purchaser doctrine says is not cognizable under the antitrust statutes. Macomb Interceptor's reliance on *County of Oakland*, to argue otherwise is misplaced. In that case, the counties were suing both the bid-rigging contractors and the City of Detroit, alleging that the City of Detroit was a constituent part of the alleged anticompetitive scheme and RICO conspiracy. Accordingly, the Sixth Circuit concluded that the counties were direct buyers, who purchased sewerage services directly from a member of the alleged scheme and who then themselves passed on the overcharges to end-users of the sewerage system. Here, the City of Detroit is neither named as a defendant nor alleged to have been a part of the scheme. Macomb Interceptor, instead, argues that its alleged injury of paying higher usage rates was the result of the City of Detroit incorporating the Project's inflated costs and passing them on to users further down the sewerage distribution line. Thus, Macomb Interceptor stands in the position of an indirect purchaser who has not suffered an "injury" under the antitrust statutes.

Macomb Interceptor's other asserted injury, the paying of an inflated acquisition price for the Macomb System, is premised on facts that are in some respects different from the facts in a typical indirect-purchaser action. For example, unlike the alleged overcharge at issue in *Illinois Brick*, which was passed on through traditional channels of manufacturing and distribution, Macomb Interceptor alleges that the overcharge from

22

the 15 Mile Interceptor Repair Project was passed on to it through the Acquisition Agreement, the terms of which were extensively negotiated and which was a part of a larger global settlement in a lawsuit related to municipal water and sewerage services in southeastern Michigan. Nevertheless, the concerns animating the doctrine and the Supreme Court's resistence to carving out exceptions to the near-categorical rule convince this court that the doctrine applies with equal force to bar Macomb Interceptor's antitrust claims.

First, Macomb Interceptor's contention that the doctrine operates only to bar claims brought by individuals who suffer "damages other than those resulting from the alleged misconduct," (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 26), is inconsistent with the Supreme Court's statement that an indirect purchaser is anyone who is not the "immediate buyer from the alleged antitrust violators." *UtiliCorp United*, 497 U.S. at 207. Here, Macomb Interceptor neither purchased any services from Concurring Defendants nor signed any contract related to the 15 Mile Interceptor Repair Project. Indeed, it would be logically impossible for Macomb Interceptor to claim as much because it was not created until 2009, four years after the completion of the Project. The direct purchaser of such services was the City of Detroit, or more accurately, the DWSD, which entered into Contract No. CS-1368 and subsequent amendments with Defendant Inland Waters Pollution Control for consulting services, (Compl. ¶ 8), and which, upon being presented with allegedly "grossly inflated and inaccurate invoices" related to the Project, paid the demanded amounts.

Macomb Interceptor's purported injuries—paying a higher price to the City of Detroit to acquire the Macomb System and paying a higher sewerage system usage fee

as a result of Concurring Defendants' alleged conduct—parallels the harm suffered by the governmental entities in *Illinois Brick*. Even if satisfactorily proven, these injuries are necessarily predicated on an initial injury suffered by the City of Detroit, the direct purchaser, and then passed on to Macomb Interceptor. As much has been admitted by Macomb Interceptor when it alleges in the Complaint that "[t]he primary cause of this action is a *widespread scheme to overcharge the Detroit Water and Sewerage Department* . . . for time, labor and materials to stabilize and repair a sewer collapse." (Compl. ¶ 5 (emphasis added).) Accordingly, Macomb Interceptor is an indirect purchaser, whose alleged injuries were a result of the City of Detroit's purportedly passing on the cost of the Project through the Acquisition Agreement and usage rates.

Moreover, as the court suggests above, the two primary concerns underlying the indirect purchaser doctrine are present in this case and support the court's conclusion that Macomb Interceptor, as an indirect purchaser, has not suffered a cognizable antitrust injury. First, contrary to Macomb Interceptor's repeated assertions to the effect that "[it] is undisputed that Detroit cannot recover the overcharges being sought by [Macomb Interceptor]," (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 24), *Hanover Shoe*, *Illinois Brick*, and *County of Oakland* make clear that a direct purchaser, such as the City of Detroit, has standing to bring antitrust claims, irrespective of the fact that the relevant overcharge may have been entirely passed on to indirect purchasers. Thus, given the City of Detroit's standing to seek recovery of treble damages on the entire overcharge, allowing Macomb Interceptor to seek the same damages would expose Concurring Defendants to duplicative liability, a result the Supreme Court in *Illinois Brick* foreclosed when it held that it was "unwilling to 'open the

24

door to duplicative recoveries' under § 4." 431 U.S. at 731 (quoting *Standard Oil Co. Of Cal.*, 405 U.S. at 264).

Additionally, to avoid the bar against duplicative recoveries while also allowing Macomb Interceptor to establish standing as an indirect purchaser, the court would need to address the "difficulties and uncertainties" that accompany an attempt to apportion damages between direct and indirect purchasers. Macomb Interceptor's own conflicting assertions illustrate this point. On the one hand, Macomb Interceptor avers that the entire price of the 15 Mile Interceptor Repair Project was passed on to it through the Acquisition Agreement, and thus, it "paid in full for the 15 Mile Interceptor repair." (Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 24; *see also* Compl. ¶ 44.) But Macomb Interceptor also maintains that the City of Detroit passed on the cost of the Project to users of water and sewerage services in southeast Michigan for at least four years prior to the Acquisition Agreement. (*See* Compl. ¶ 47; Pl. Macomb Interceptor's Resp. to Concurring Defs.' Mot. Summ. J. 29.) The court would therefore be tasked with analyzing usage rates charged to counties, municipalities, and end users over the course of four years to determine what amount was passed on through usage rates and what amount was passed on to Macomb Interceptor through the Acquisition Agreement. Even if this were possible, a dubious assumption to say the least, the court would still be required to analyze the Acquisition Agreement, which was the product of a global settlement in a much larger case involving a decades-long legal battle amongst the federal government, the City of Detroit, and several counties in southeast Michigan, to determine what portion of the price paid by Macomb Interceptor to acquire the entire Macomb System is attributable

25

to the 15 Mile Interceptor Repair Project's cost.  And, if these Gordian calculations were not enough, the court, having permitted Macomb Interceptor to establish standing based on a pass-on theory of injury, would have to decide whether any other indirect purchasers of water and sewerage services, such as other counties, municipalities, or individual users, could also establish standing as an indirect purchaser.  These complex and unwieldy determinations are the very thing the Supreme Court has said "would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings."  *Illinois Brick*, 431 U.S. at 732.

As Macomb Interceptor's purported injuries are premised entirely on the theory that the City of Detroit passed on to it overcharges caused by a corruption scheme, *Illinois Brick* forecloses recovery and Macomb Interceptor is barred from asserting claims under the federal antitrust statutes.

## 2.  RICO Standing

The antitrust-standing analysis also bars Macomb Interceptor from establishing standing to assert its RICO claim.  *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("[I]ndirect purchasers lack standing under RICO and the antitrust laws to sue for overcharges passed on to them by middlemen." (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268-69 (1992); *Illinois Brick*, 431 U.S. at 729)); *Cnty. of Oakland*, 866 F.2d at 851 (after determining that the plaintiffs, as direct purchasers, were the proper party to bring antitrust claims, observing that "[a]lthough we have focused primarily on the antitrust laws in the foregoing discussion, most of what we have said is applicable also to the treble damage provision of RICO").  Patterned after § 4 of the Clayton Act, the civil action provision of RICO provides that

26

"[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).  And consistent with judicial interpretation of § 4's language, courts have held that "mere allegation and/or evidence that an injury to the plaintiff would not have occurred "but for" the defendant's alleged RICO violation (that is, that the plaintiff sustained a mere "injury in fact") is insufficient to establish" a right to sue under RICO.  *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 889 (6th Cir. 2000) (citing *Holmes*, 503 U.S. at 265-68)).  In *Holmes*, the Supreme Court adopted its § 4 jurisprudence and held that a plaintiff establishes a right to sue under RICO only by showing that a defendant's alleged violation was also the proximate cause of his injury, and noted that at common law "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover."  503 U.S. at 268-69.  The Court explained why "directness of relationship" was an imperative part of standing to sue under both the antitrust statutes and RICO:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.  Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries.  And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 269-70 (citations omitted).

27

In the instant case, Macomb Interceptor's alleged injuries do not flow directly from the alleged acts of Concurring Defendants, but indirectly, from "the misfortunes visited upon a third person," *i.e.*, the City of Detroit. Accordingly, consistent with the conclusion that Macomb Interceptor lacks standing to bring its antitrust claims, it likewise is unable to sue under RICO.

### C. Macomb Interceptor's State-law Breach of Contract Claim Against Defendant Inland Water Pollution Control

Generally, when all federal claims are dismissed before trial, pendant state-law claims should be dismissed or remanded to the state court. *See Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir.1996). However, "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial." *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991). In light of the scope of this action and the fact that the case will proceed on the City of Detroit's Intervening Complaint, the court finds this to be a rare instance in which judicial economy dictates the exercise of supplemental jurisdiction over a remaining state-law claim.

### D. Macomb Interceptor's Pending Motion for Leave to Amend Complaint

Because Macomb Interceptor lacks standing to assert its non-contractual claims, its motion for leave to amend the complaint must be denied as futile. While leave to amend under Federal Rule of Civil Procedure 15 is generally freely granted, the presence of factors "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue

prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment" counsel in favor of denying leave. *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 425 (6th Cir. 1999). In the case of futility, "[a]mendment of a complaint is futile when the proposed amendment would not permit the complaint to survive a motion to dismiss." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817.

Macomb Interceptor's proposed amended complaint incorporates a large number of additional factual allegations related to the underlying corruption scheme and adds three additional state-law claims, for fraudulent concealment, civil conspiracy, and aiding and abetting. Because standing to assert the non-contractual claims in the proposed amended complaint remains predicated on the assignment in the Acquisition Agreement and the alleged independent injuries discussed above, the proposed amendment would not withstand a motion to dismiss. Therefore, the motion for leave will be denied.

## IV. CONCLUSION

For the reasons stated above, IT IS ORDERED that Concurring Defendants' "Amended Motion for Summary Judgment" [Dkt. # 190] and Defendants Futurenet Group, Inc., and Perry Mehta's "Motion for Partial Summary Judgment" [Dkt. # 209] are GRANTED. Summary Judgment will be entered in favor of Concurring Defendants and Defendants Futurenet Group, Inc., Perry Mehta, Rotor Electric Company of Michigan, LLC, and Benjamin Rosenberg on Counts I, II, III, V, and VI.

IT IS FURTHER ORDERED that Plaintiff Macomb Interceptor is DIRECTED TO SHOW CAUSE, in writing, on or before **September 24, 2012**, why summary judgment

should not be entered in favor of all remaining non-moving Defendants on the non-

contractual claims.

     IT IS FURTHER ORDERED that Plaintiff Macomb Interceptor's "Motion for Leave

to File First Amended Complaint" [Dkt. # 176] is DENIED.

     IT IS FURTHER ORDERED that the D'Agostini Defendants' "Motion to Strike

Reply to Response . . ." [Dkt. # 191] is TERMINATED AS MOOT.


      s/Robert H. Cleland                   
     ROBERT H. CLELAND
     UNITED STATES DISTRICT JUDGE


Dated:  September 17, 2012


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, September 17, 2012, by electronic and/or ordinary mail.


      s/Lisa Wagner                       
     Case Manager and Deputy Clerk
     (313) 234-5522

S:\Cleland\JUDGE'S DESK\C2 ORDERS\11-13101.KILPATRICK.Grant.Summ.J.Standing.jrc.FINAL.RHC.ckb.3.wpd