# In The Matter Of:

*In re: City of Detroit, Michigan*

---

*Anthony V. Marrocco*

*July 10, 2014*

---



**BIENENSTOCK**

NATIONWIDE COURT REPORTING & VIDEO

www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**

Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File MARROCCO_ANTHONY V_.txt*

*Min-U-Script® with Word Index*

Page 1

1      UNITED STATES BANKRUPTCY COURT
2        EASTERN DISTRICT OF MICHIGAN
3            SOUTHERN DIVISION
4
5    _____
6    In re:              )    Case No. 13-53845
7    CITY OF DETROIT, MICHIGAN )
8                        )      Chapter 9
9         Debtor         )
10   _____)    Hon. Steven W. Rhodes
11
12
13        The Deposition of ANTHONY V. MARROCCO,
14        Taken at 21777 Dunham Road,
15        Clinton Township, Michigan,
16        Commencing at 10:15 a.m.,
17        Thursday, July 10, 2014,
18        Before Melinda S. Moore, CSR-2258.
19
20
21
22
23
24
25

Page 2

1    APPEARANCES:
2
3    RAECHEL M. BADALAMENTI (P64361)
4    ROBERT W. KIRK (P35627)
5    Kirk, Huth, Lange & Badalamenti, PLC
6    19500 Hall Road
7    Suite 100
8    Clinton Township, Michigan 48038
9    586.412.4900
10   rbadalamenti@khlblaw.com
11   rkirk@khlblaw.com
12       Appearing on behalf of the Macomb Interceptor
13       Drain Drainage District.
14
15   ALBERT B. ADDIS (P31084)
16   O'Reilly Rancilio PC
17   12900 Hall Road
18   Suite 350
19   Sterling Heights, Michigan, 48313
20   586.726.1000
21   aaddis@orlaw.com
22       Appearing on behalf of the Macomb Interceptor
23       Drain Drainage District.
24
25

Page 3

1    JEROME R. WATSON (P27082)
2    M. MISBAH SHAHID (P73450)
3    Miller Canfield Paddock & Stone, PLC
4    150 W. Jefferson Avenue
5    Suite 2500
6    Detroit, Michigan 48226
7    313.963.6420
8    watson@millercanfield.com
9    shahid@millercanfield.com
10       Appearing on behalf of the City of
11       Detroit and the Witness.
12
13   ARTHUR H. RUEGGER
14   Salans FMC SNR Denton
15   1221 Avenue of the Americas
16   New York, New York 10020
17   212.768.6881
18   arthur.ruegger@dentons.com
19       Appearing on behalf of the
20       Official Committee of Retirees
21       of the City of Detroit.
22
23
24
25

Page 4

1    TABLE OF CONTENTS
2
3    WITNESS                    PAGE
4    ANTHONY V. MARROCCO
5    EXAMINATION BY MR. WATSON          5
6    EXAMINATION BY MS. BADALAMENTI        84
7
8    EXHIBIT                    PAGE
9    (Exhibits attached to transcript.)
10
11   DEPOSITION EXHIBIT 1          13
12   DEPOSITION EXHIBIT 2          17
13   DEPOSITION EXHIBIT 3          35
14   DEPOSITION EXHIBIT 4          43
15   DEPOSITION EXHIBIT 5          50
16   DEPOSITION EXHIBIT 6          55
17   DEPOSITION EXHIBIT 7          59
18   DEPOSITION EXHIBIT 8          67
19
20
21
22
23
24
25

Page 5

1 Clinton Township, Michigan
2 Thursday, July 10, 2014
3     10:15 a.m.
4     ANTHONY V. MARROCCO,
5 was thereupon called as a witness herein, and
6 after having first been duly sworn to testify to
7 the truth, the whole truth and nothing but the
8 truth, was examined and testified as follows:
9     **MR. WATSON:** Let the record reflect
10 that this will be a deposition taken pursuant to
11 Notice to be used for all purposes appropriate
12 under the applicable court rules.
13     **EXAMINATION**
14     **BY MR. WATSON:**
15 Q.  Mr. Marrocco, I'll be asking you a series of
16   questions.  If you don't understand the question,
17   want me to rephrase it or accommodate you in some
18   way, please ask that I do so and I will try to
19   accommodate.  Otherwise, I'll assume you've heard
20   the question, understand it, and are responding
21   to it, okay?
22 **A.  Okay.**
23 Q.  Have you been deposed before?
24 **A.  Probably.**
25 Q.  So you know a court reporter cannot take down a

Page 6

1   nod of the head or non-verbal gesture.  You have
2   to answer verbally.
3 **A.  So be it.**
4 Q.  Will you state your name for the record.
5 **A.  Anthony Marrocco.**
6 Q.  And, Mr. Marrocco, will you tell us your
7   educational background.
8 **A.  High school, Notre Dame High School in Harper**
9   **Woods, University of Detroit college in Detroit,**
10   **bachelor of arts degree.**
11 Q.  What was -- you're currently an employee of
12   Macomb County?
13 **A.  Yes.**
14 Q.  What was your work experience prior to Macomb
15   County?
16 **A.  Prior to Macomb County, I built houses and**
17   **developed property.**
18 Q.  Did you own your own company?
19 **A.  I worked with my father.**
20 Q.  What was the name of the company?
21 **A.  I have various companies -- Marrocco Enterprises,**
22   **Amanda Corporation, Frosinone Company,**
23   **F-r-o-s-i-n-o-n-e, partnership, Tava Investments,**
24   **commercial -- some apartments.**
25 Q.  And your father owned these companies or were you

Page 7

1   joint owners?
2 **A.  He owned some.  Other ones I was partnered with.**
3 Q.  And how long did you do that, approximately?
4 **A.  Well, when I was in high school, I helped him.  I**
5   **worked for him in the building-of-houses business**
6   **in my summers in high school.**
7 Q.  When did you graduate from high school?
8 **A.  1966.**
9 Q.  When did you start at Macomb County?
10 **A.  As commissioner?**
11 Q.  Or just any employment at the county.
12 **A.  Full-time or part-time?**
13 Q.  Full-time.
14 **A.  January 1, 1993.**
15 Q.  And I take it from the time you started working
16   with your father until '93 you were in this
17   constructing homes business?
18 **A.  Yeah.**
19 Q.  What was the position you started with at Macomb
20   County?
21 **A.  In January '93?**
22 Q.  Yes.
23 **A.  Public Works Commissioner.**
24 Q.  How long did you remain in that position?
25 **A.  I am -- up to this day, I am currently the Public**

Page 8

1   **Works Commissioner.**
2 Q.  And what are your job duties as Public Works
3   Commissioner?
4 **A.  I administer the Office of Public Works for the**
5   **County of Macomb.  And the Office of Public Works**
6   **oversees a lot of construction in the county,**
7   **whether it's sanitary sewer, storm sewer, water**
8   **main projects.  We sell bonds to finance projects.**
9   **We have a Soil Erosion Department that issues soil**
10   **erosion permits for probably 90% of the building**
11   **that goes on in Macomb County.  What else do we**
12   **do?  We review prints that come in our office.  I**
13   **don't do these individually.  I administer the**
14   **office and make sure I have the proper people**
15   **working in the proper place.**
16 Q.  Now, as I understand, there's only one Public
17   Works Commissioner?
18 **A.  For the county, yes.**
19 Q.  For the county.
20 **A.  But there are public works officials in other**
21   **communities.**
22 Q.  As part of your duty as Public Works
23   Commissioner, did you have any dealings with the
24   Detroit Water and Sewerage Department?
25 **A.  As Public Works Commissioner?**

Page 9

1  Q.  Yes.
2  A.  Yes.
3  Q.  And can you explain the nature of your business
4  dealings with DWSD?
5      MS. BADALAMENTI: What time period?
6      BY MR. WATSON:
7  Q.  Well, let's start off initially when you started,
8  and then let's go to the 2000 -- early 2000 time
9  frame.
10  A.  When I started in '93, I guess the initial
11  dealings with Detroit were basically overseeing
12  the rates that Detroit passed on to Macomb County,
13  and then we would pass the rates on to the
14  communities within the water -- excuse me, within
15  the sanitary sewer district. So we only deal with
16  Detroit on the sanitary sewer and the wastewater
17  end. We're the primary customer.
18  Q.  And as I understand it, Detroit owned the system?
19  A.  Yes.
20  Q.  How did it come about that Detroit owned the
21  Macomb County sewer system? Do you know?
22  A.  Well, I want to say probably -- hopefully my facts
23  are correct. Probably in the 70s there was a big
24  interceptor sewer brought out to Macomb County at
25  15 Mile and extended over to Oakland County, and

Page 10

1  it was all basically put in with federal grant
2  money. Detroit put that sewer in; therefore they
3  were the owner of the sewer.
4  Q.  At some point was it decided that Detroit would
5  sell the system to Macomb and Macomb would
6  purchase the system from Detroit?
7  A.  Eventually.
8  Q.  And were you involved in that decision-making
9  process?
10  A.  Which decision?
11  Q.  To -- from looking at it from Macomb's
12  perspective, for Macomb to purchase the system
13  from Detroit.
14  A.  Yes, I was involved.
15  Q.  I've heard rumors about some handshake deal
16  between you and the director of the Detroit
17  system that set the broad parameters for that
18  purchase. Do you recall that at all?
19  A.  No.
20  Q.  Okay. Can you describe the nature of the
21  negotiations or describe the negotiation process
22  that eventually resulted in Macomb purchasing the
23  system.
24      MS. BADALAMENTI: I think that's a
25  vague question that calls for a narrative. Can

Page 11

1  you narrow down the time frame?
2      BY MR. WATSON:
3  Q.  Well, when did negotiations first start with
4  regard to the purchase of the system by Macomb
5  from Detroit? Do you know?
6  A.  Oh, I would say approximately 2007.
7  Q.  Were you involved in the initial conversations
8  regarding this purchase?
9  A.  I probably was.
10  Q.  What was your involvement?
11  A.  Initially the involvement was that we wanted to
12  buy the system, from Detroit, that served Macomb
13  County so we could maintain it.
14  Q.  And who are you talking with from Detroit about
15  this?
16  A.  Probably would have been the director at the time.
17  Q.  Who was the director at the time?
18  A.  I think that was Victor Mercado.
19  Q.  In these discussions with Mercado, was it you and
20  Mercado? Were others involved in the
21  discussions?
22  A.  I don't remember.
23  Q.  Did these discussions eventually result in some
24  type of agreement to purchase the system?
25  A.  Eventually it did.

Page 12

1  Q.  Do you recall there was a long-standing federal
2  court case involving Detroit in which Judge
3  Feikens was in effect overseeing Detroit's
4  running of the sewer system? Do you recall such
5  a case?
6  A.  Yes.
7  Q.  And if I call that the sludge case, is that what
8  it was referred to?
9  A.  Not to my knowledge.
10  Q.  What did you refer to it as?
11  A.  Just an -- the EPA was forcing Detroit to make
12  improvements to the system to clean up the Detroit
13  River.
14  Q.  And was Macomb from time to time involved in that
15  case?
16  A.  Yes.
17  Q.  Do you know why Macomb would get involved?
18  A.  Not exactly sure why, because you're looking at
19  when the initial, I guess, lawsuit was filed by
20  the EPA, which I'm guessing was back in the 70s.
21  It was way before my time.
22  Q.  Did Macomb ever assert any claims against Detroit
23  for Detroit's operation or what it considered
24  faulty operation or excess charges in regard to
25  the sewer system?

1 A. When? Give me a time frame.
2 Q. Well, I'm thinking 2000 -- early 2000s. Do you
3 recall any of that?
4 A. I don't recall that.
5     MARKED FOR IDENTIFICATION:
6     DEPOSITION EXHIBIT 1
7     10:26 a.m.
8     BY MR. WATSON:
9 Q. Let me hand you, Mr. Marrocco, what's been marked
10 as Exhibit No. 1. And my question to you is:
11 Can you identify that document?
12 A. On the face it is -- United States of America is
13 the plaintiff and counter-defendant versus the
14 State of Michigan as defendant and
15 counter-plaintiff versus City of Detroit, a
16 municipal corporation, and Detroit Water and
17 Sewerage Department, defendant and
18 cross-plaintiff, and including all communities and
19 agencies under contract with the City of Detroit
20 for sewage treatment services.
21 Q. Was Macomb County one of the, I guess we could
22 say, communities under contract with the City of
23 Detroit for sewage treatment services?
24 A. Yes, at this time, I believe, whatever date this
25 is.

1 Q. In thumbing through the agreement, I'm looking at
2 page 7.
3 A. Um-hmm.
4 Q. Does that appear to be your signature on the
5 agreement?
6 A. There's another page 7. There's two page 7s.
7 Q. Yeah. The second page 7.
8 A. Yes.
9 Q. Are you familiar with this agreement?
10 A. Without having -- no, not by just looking at it.
11 I'd have to read it.
12 Q. Okay. Can you take a few minutes to look it
13 over.
14     MS. BADALAMENTI: Is there something
15 specific you want to ask him about? I mean, it's
16 a pretty lengthy agreement.
17     MR. WATSON: Yes. I'm going to ask him
18 about some of the language in the agreement.
19     THE WITNESS: I've kind of looked at
20 the first two pages.
21     BY MR. WATSON:
22 Q. Does that refresh your recollection at all?
23 A. Yeah, it does, a little bit.
24 Q. In looking at the first page of the agreement, I
25 see it says "This Settlement Agreement...is made

1 May 12, 2009," and lists various parties,
2 including Detroit and the County of Macomb. Do
3 you see that language?
4 A. Um-hmm. Yes.
5 Q. Do you remember entering into this agreement?
6 A. I remember entering into an agreement.
7 Q. And was the court involved in overseeing the
8 negotiations between Detroit and Macomb and other
9 entities that resulted in this agreement? Do you
10 recall that?
11 A. I don't think they were in this. Because there's
12 some issues here that -- I can't answer that. I
13 don't think so necessarily.
14 Q. Okay. Would you have read this agreement before
15 you signed it?
16 A. I probably would have had my legal counsel read
17 it.
18 Q. Who was your legal counsel at that time?
19 A. Well, my deputy -- chief deputy Bill Misterovich.
20 Q. Okay.
21 A. He would have been in-house, and obviously we had
22 Bodman, I believe, would have been the attorneys
23 outside that we hired.
24 Q. Okay. I want to ask you about a few of the
25 provisions. Let's go to the page that starts off

1 Settlement Agreement. I think it's actually page
2 1 of the agreement.
3 A. Okay.
4 Q. I'm looking at Background and Purpose. A-iii
5 reads in part "All disputes related to the
6 interest rate charged to Macomb related to debt
7 service associated with the cost of repairs of
8 the 2004 collapse." Do you see that language?
9 A. Yes.
10 Q. Was there a dispute between Detroit and Macomb in
11 regard to interest rate related to debt service
12 associated with the 2004 sewer collapse repairs?
13 A. Yes.
14 Q. And was that dispute settled by this agreement?
15 A. It was a global settlement.
16 Q. So it settled everything?
17 A. Yes.
18 Q. Okay. Then the next paragraph talks about "All
19 disputes and claims between the parties related
20 to costs for repairs and renovation of the
21 interceptor sewers listed in Exhibit 1." Do you
22 see that language?
23 A. Yes.
24 Q. Do you know what the interceptor sewers were?
25 Was that --

Page 17

1 A. I don't understand what you mean, do I know what
2 the interceptor sewers are.
3 Q. I guess my question is: Were the interceptor
4 sewers at least part of that system, the sewers
5 that collapsed -- the 15 Mile and Hayes sewer
6 collapse problems?
7 A. Was that part of that?
8 Q. Yes.
9 A. If it's on Exhibit 1 of Exhibit D, I guess it
10 would be.
11     MARKED FOR IDENTIFICATION:
12     DEPOSITION EXHIBIT 2
13     10:32 a.m.
14 BY MR. WATSON:
15 Q. Let me hand to you what's been marked as Marrocco
16 Exhibit 2. Are you familiar with this document
17 at all, Letter of Intent?
18 A. Not really.
19 Q. If you go back to Exhibit 1, the Settlement
20 Agreement, and thumb through about half of it,
21 you'll see a page marked Exhibit D.
22 A. Is there a page number?
23 Q. 1704 in the top right-hand corner?
24     MS. BADALAMENTI: We don't have 1704.
25     THE WITNESS: Is this the Letter of

Page 18

1 Intent that you're referring to?
2 BY MR. WATSON:
3 Q. Yes.
4 A. Okay. There's no marking.
5 Q. And unfortunately on this document, Exhibit 1,
6 the Letter of Intent -- the Exhibit 1 to the
7 Letter of Intent was not attached. That's why I
8 made Exhibit 2 the Letter of Intent with
9 Exhibit 1 attached to it, which gets a little
10 confusing.
11 A. You'll have to excuse me. I came in late last
12 night from Miami and I had to get here early
13 today, so my mind is a little foggy. What page do
14 you want me to look at here?
15 Q. Go to two pages from the end.
16 A. Of the Letter of Intent?
17 Q. Yeah.
18     MS. BADALAMENTI: You're in Exhibit 2
19 now? Because Exhibit 1 doesn't have this
20 document.
21     MR. WATSON: Right.
22 BY MR. WATSON:
23 Q. There's a list of interceptors.
24 A. It says Oakland-Macomb Interceptor System at the
25 top, Exhibit 1?

Page 19

1 Q. Yes. Is the system that collapsed -- I always
2 think of it was 15 Mile and Hayes. Is that part
3 of these?
4 A. What area were you saying, again?
5 Q. Well, what I'm thinking about is the interceptor
6 that collapsed in August 2004.
7 A. Is it listed here?
8 Q. Yes.
9 A. No.
10 Q. And what do you call the one that's listed -- the
11 one that collapsed, what do you refer to that one
12 as?
13     MS. BADALAMENTI: The one that's not
14 listed?
15 BY MR. WATSON:
16 Q. You say it's not listed.
17 A. What do we call it?
18 Q. Yeah.
19 A. It would be the interceptor -- the Macomb
20 interceptor.
21 Q. Okay. Let's go back to 1 -- Exhibit 1, and I'll
22 ask you -- let's see. Is the Macomb interceptor
23 the one referenced in 1-A-ii?
24     MS. BADALAMENTI: What page are you on?
25     MR. WATSON: It would be 1685.

Page 20

1     MR. SHAHID: On the top.
2     MR. WATSON: At the top.
3     MS. BADALAMENTI: We have different
4 page IDs. What I'm looking at page 8431, but I
5 can see where you're at.
6     MR. SHAHID: Ours says 8431.
7     MS. BADALAMENTI: So you're at sub 1-
8 A-ii.
9 BY MR. WATSON:
10 Q. 1-A-ii: "All disputes related to the allocation
11 of repair costs related to the August 4, 2004
12 collapse and the Romeo Arm of the Macomb
13 Interceptors," I take it that's the one that
14 collapsed?
15 A. Well, it's not the Romeo arm.
16 Q. Wasn't it 15 Mile and Hayes? Isn't that where
17 the collapse occurred?
18 A. Yes, in that vicinity, but it's not the Romeo arm.
19 Q. What do you call it?
20 A. It would just be the Macomb Interceptor. Romeo
21 arm extends -- goes up toward Romeo.
22 Q. Does the Romeo arm include the Macomb
23 Interceptor?
24 A. It's hard to say. I can't really answer how our
25 office designates what area, but it would have to

1   go up to Garfield and then up Garfield, and -- but
2   I guess, you know, this could be considered the
3   Romeo arm. I don't know. You see -- I mean,
4   excuse me. One thing real quick. This goes back
5   to the 70s, how they used to designate these
6   names, so you know.
7   Q.   Are you aware of any other 2004 collapse other
8        than the Macomb Interceptor?
9   A.   No.
10  Q.   Let's look at v. It mentions Infrastructure
11       Management Group, "All disputes related to the
12       continuing oversight of contracts exceeding
13       $500,000 by the Infrastructure Management Group."
14       Are you familiar with the Infrastructure
15       Management Group?
16  A.   No.
17  Q.   Can you tell us what that is?
18  A.   No.
19  Q.   Do you know if they looked at claims over
20       $500,000 or contracts over $500,000?
21  A.   No.
22  Q.   Let's turn to page ID 8433 B, which is entitled
23       2004 Collapse Claims, 2006 Interceptor Repairs,
24       Interceptor Interest Rate. Do you see that?
25  A.   Yes.

1   Q.   And here the first sentence reads: "The parties,
2        in complete satisfaction of the 2004 collapse
3        claims, Macomb's claims with regard to the 2006
4        repairs to the Macomb Interceptors, and the
5        Interceptor interest rate claims, agree to
6        principal and interest rate adjustments on
7        charges by DWSD to Macomb in the aggregate amount
8        of $17,050,000." Do you see that language?
9   A.   Yes.
10  Q.   And what was that $17,050,000 for? Was that just
11       an accommodation to reduce the purchase price?
12       What was your understanding of why that was the
13       adjustment?
14  A.   That was the global settlement for all the issues
15       we had with Detroit.
16  Q.   Okay. So what I'm understanding is there were
17       negotiations going on for Macomb to purchase the
18       system, and the parties were going back and forth
19       in regard to the amount of the price?
20  A.   I'm sure there was negotiations going on, yes.
21  Q.   And Detroit agreed to reduce the cost by this 17
22       million?
23  A.   The global settlement.
24  Q.   Through the global settlement the cost was
25       reduced by 17 -- over 17 million?

1   A.   Yes.
2   Q.   Was the broad parameter of the sale that Macomb
3        would purchase the system by assuming the system
4        debt?
5   A.   Yes.
6   Q.   And were you involved in that, say, broad
7        agreement?
8        MS. BADALAMENTI: Agreement to do what?
9        BY MR. WATSON:
10  Q.   Purchase the system for the system debt. Let me
11       explain what I'm getting at.
12  A.   Yeah.
13  Q.   See, as I understand it, there was some type of
14       broad agreement in principle between Detroit and
15       Macomb, all right, that Macomb will purchase the
16       system by assuming the system debt.
17  A.   Um-hmm.
18  Q.   And that that was a certain amount at that time.
19  A.   Yes.
20  Q.   And I'm wondering who reached that broad
21       agreement to purchase the system for system debt?
22       I was thinking it was you.
23  A.   Well, we paid more than that.
24  Q.   Who all was involved in reaching that agreement?
25       Do you know?

1   A.   Well, I probably signed the papers in the end, but
2        I wasn't in the negotiating room with anybody.
3   Q.   Would they have had to run it by you, whoever was
4        on your team?
5   A.   Yes.
6   Q.   And you're thinking the attorneys, Misterovich
7        and the attorney for Bodman would have been at
8        least two of the folks?
9   A.   Yes.
10  Q.   Do you recall that the system debt at one point
11       was something like, according to Detroit,
12       $116 million?
13  A.   Say that again.
14  Q.   Do you recall that the system debt at one point,
15       according to Detroit, was something like
16       $116 million?
17  A.   I do not.
18  Q.   Do you recall what the system eventually was
19       purchased for?
20  A.   I believe it was just under $90 million.
21  Q.   And that 90 million was after the 17 million was
22       deducted that we're looking at here?
23  A.   That was a credit given.
24  Q.   And were there other credits given?
25  A.   I'm not sure.

Page 25

1 Q. Let's go to page 8436. I'm looking at paragraph
2 ii. And it talks about if the parties don't
3 reach agreement within a certain time, either
4 party could declare provisions of this agreement
5 void and without effect. Do you see that
6 language?
7 A. Yes.
8 Q. Are you aware of any provisions of this agreement
9 ever being declared void or no effect?
10 A. I'm not aware of that.
11 Q. Look at paragraph B, which reads in part "This
12 agreement, and the exhibits, contains the entire
13 agreement between the parties with regard to the
14 matters addressed in this agreement." Do you see
15 that language?
16 A. Yes.
17 Q. Was that your understanding, that this was a full
18 agreement, a comprehensive settlement between
19 Detroit, Macomb and other parties?
20 A. That's what my attorney said.
21 Q. Resolved all disputes?
22 A. At that point.
23 Q. Let's go to the next page. I see a signature.
24 It appears to be Pamela Turner. Are you familiar
25 or do you know Pamela Turner?

Page 26

1 A. At that time I did.
2 Q. And at the date this agreement was made, May 12,
3 2009, was she the interim director of DWSD?
4 A. She signed it as being the interim director.
5 Q. So you assume she was?
6 A. Yes.
7 Q. Let's skip one page and go to -- it looks like
8 the third page 7, 8439. It appears to be a
9 signature of John McCulloch. Are you familiar
10 with him?
11 A. Yes.
12 Q. And he was the commissioner for -- Water
13 Resources Commissioner for Oakland County?
14 A. Yes.
15 Q. And going to the next page 7, there appears to be
16 a signature -- I can't read it. It says
17 "Assistant County Executive, County of Wayne."
18 Do you know who that would be?
19 A. Not really.
20 Q. Thumbing through the agreement, and looking at
21 one of the attachments -- it's page 8446, Exhibit
22 C to the agreement, in fact, page 8447. At the
23 top of the page it says "Exhibit C, List of
24 Matters." Page 8447, Exhibit C lists matters
25 resolved?

Page 27

1 A. Um-hmm.
2 Q. And going to the next page, there's a 6,
3 Interceptor Interest Rate. Were there interest
4 rate disputes pending prior to this settlement
5 agreement?
6 A. I believe so.
7 Q. Were all those interest rate disputes resolved?
8 A. I don't know if all were resolved, but the ones
9 that are shown here obviously were resolved.
10 Q. And then going to Exhibit D, the Letter of
11 Intent --
12     MS. BADALAMENTI: What page?
13     MR. WATSON: 8451.
14     BY MR. WATSON:
15 Q. I'm looking at the top of the page -- well, the
16 next page, 8452, paragraph 3, which reads in part
17 "The consideration...for the acquisition of the
18 property would be an amount equal to the
19 outstanding debt (including accrued interest)
20 owed by the city that is allocated to the
21 property," then it also mentions adjusted by
22 the amount of 17,050,000 and such other
23 adjustments agreed upon by the parties. Do you
24 see that language?
25 A. Yes.

Page 28

1     MS. BADALAMENTI: I don't think that's
2 a complete quote of the language, but go ahead.
3     BY MR. WATSON:
4 Q. No, it's not a total quote. I'm trying to save a
5 little time.
6     To your understanding, was that summary
7 of the expected deal accurate?
8 A. A credit?
9 Q. Well, the expected deal was Macomb would assume
10 the debt.
11 A. Yes.
12 Q. The amount would be reduced by over 17 million
13 plus any further amounts that the parties could
14 agree upon.
15 A. On top of the 17 million.
16 Q. Right.
17 A. Yes.
18 Q. Okay. Now, this agreement was made, according to
19 the language on the first page, May 12, 2009.
20 And we'll get into the acquisition agreement, but
21 that was signed in 2010, wasn't it?
22 A. What was signed in 2010?
23 Q. The acquisition agreement, the actual sale.
24 A. Yes, before the indictment and the revelation that
25 there was some hanky-panky going on with the sewer

1  collapse.
2  Q. So this happened before any of that?
3  A. Right, before they revealed to us what was going
4  on.
5  Q. What was taking place between this May 2009 and
6  -- I think the acquisition agreement was
7  September 2010. What was going on during that
8  period?
9  A. September 2010 to --
10 Q. From when this agreement was signed, May 2009 to
11 September 2010, when the acquisition agreement
12 was signed.
13    MS. BADALAMENTI: I'm going to object
14 to this. The Letter of Intent that's here does
15 not appear to be signed, but subject to that
16 objection, you can go ahead and answer.
17    BY MR. WATSON:
18 Q. Do you know what was going on?
19 A. No, I don't know.
20 Q. Were there negotiations occurring?
21 A. I have no idea.
22 Q. Who was -- you said the attorney for Bodman and
23 Misterovich were the principal negotiators for
24 Macomb?
25 A. Yes.

1  Q. Paragraph 5 on that same page, Access and
2  Investigation, it talks about Detroit should
3  afford basically the other parties to this
4  agreement the opportunity to secure documents or
5  look at anything they wanted to. Was that your
6  understanding, that prior to actually signing the
7  agreement, Macomb had the right to get documents
8  from Detroit, to inspect things if it wanted to?
9  A. That's what that paragraph says.
10 Q. And in reality, is that what the situation was,
11 that you would have -- Macomb could have secured
12 any documents it wanted or inspected the system
13 if it wanted?
14 A. The paragraph says we could.
15 Q. Did Macomb do that?
16 A. I cannot answer that, but I did talk to Victor
17 Mercado. He said everything is proper.
18 Q. When did you talk to Mr. Mercado?
19 A. Over the years, since he was the director.
20 Q. Do you know when he left?
21 A. Well, I believe he left when the indictments came
22 down, basically. 2000 -- end of 2010.
23 Q. Well, wasn't Pam Turner the interim director when
24 this deal was signed?
25 A. Yes.

1  Q. So wouldn't Mercado have been gone before May 12,
2  2009?
3     MS. BADALAMENTI: Been gone from what,
4  his position or the negotiations?
5     MR. WATSON: Both.
6     THE WITNESS: I'm not sure.
7     BY MR. WATSON:
8  Q. Okay. So you're not certain when Mercado left?
9  A. Right.
10 Q. You say through the years you talked to him.
11 What was the discussion about?
12 A. About basically on the sewer collapse, about the
13 charges.
14 Q. What did he say about the charges? What did you
15 say about the charges?
16 A. He said everything was fair and accurate, and I
17 didn't think they were. Who was I to question?
18 Q. By everything was fair and accurate, what did you
19 take that to mean?
20 A. That Detroit was looking out for the interests of
21 Macomb County, that we weren't being overcharged.
22 Q. For the system?
23 A. For the repair.
24 Q. How did the repair pertain to the purchase price?
25 A. It was just one global settlement, you know. I

1  can't tell you how exactly the 17 million
2  pertained to.
3  Q. Do you know why Detroit reduced the amount 17
4  million?
5     MS. BADALAMENTI: Other than what's
6  stated in the agreement?
7     MR. WATSON: Yeah.
8     THE WITNESS: No. I mean --
9     BY MR. WATSON:
10 Q. Did you and Mercado talk about Detroit reducing
11 the amount?
12 A. Oh, yes.
13 Q. What did -- you wanted, I take it, further
14 reduction?
15 A. Yes.
16 Q. And I would take it Mercado didn't want to
17 reduce?
18 A. I talked to Mercado about reducing the cost of the
19 sewer collapse repair bill. The global settlement
20 took in a lot of other issues, and that 17 million
21 doesn't specify how much money goes to which of
22 those issues.
23 Q. Who negotiated the 17 million? Do you know?
24 A. On behalf of which party?
25 Q. Well, Macomb.

1 A. It would have been, you know, Mr. Misterovich and
2 Mr. -- or a representative from Bodman.
3 Q. Was Hupp the main Bodman attorney? Do you know?
4 A. Yes.
5 Q. And who was negotiating for Detroit?
6 A. I don't know.
7 Q. And you weren't the main negotiator for Macomb?
8 A. I didn't sit in on negotiations.
9 Q. Do you know if Mercado sat in on negotiations?
10 A. I'm not sure.
11 Q. Now, how many discussions over the years do you
12 think you had with Mercado about the cost of the
13 repairs?
14 A. I don't know.
15 Q. And when he -- you say he told you the costs were
16 fair and accurate?
17 A. That's what he said.
18 Q. And by cost, we're talking about millions of
19 dollars, I take it?
20 A. Yes.
21 Q. Were the statements by Mercado ever reduced to
22 writing at all?
23 A. I'm not aware.
24 Q. Okay. Did you ever think that, gee, maybe I
25 better get this in writing?

1 A. I thought he was a man of his word.
2 Q. And did he tell you this, what you're saying, on
3 more than one occasion?
4 A. What was that?
5 Q. Did he tell you this on more than one occasion?
6 A. Tell me what?
7 Q. That the costs were fair and accurate.
8 A. Yes, he did.
9 Q. And was anyone ever there when he told you that
10 or was it just the two of you?
11 A. Maybe Mr. Misterovich might have been there.
12 Q. Do you know where that particular discussion took
13 place?
14 A. No. There's many places we've talked with
15 Mr. Mercado, so I wouldn't remember which.
16 Q. Do you know approximately when that discussion
17 when Misterovich was there took place?
18 A. Before 2010.
19 Q. Was it before this settlement agreement? Do you
20 know?
21 A. Yeah. Yes.
22 Q. You weren't shy about asking Detroit for
23 documents or information if you felt you needed
24 it, were you?
25 A. That's up to my attorneys.

1 MARKED FOR IDENTIFICATION:
2 DEPOSITION EXHIBIT 3
3 11:00 a.m.
4 BY MR. WATSON:
5 Q. Let me hand you what's been marked Exhibit No. 3,
6 Mr. Marrocco. My question is: Have you seen the
7 document attached to this fax before?
8 A. Have I seen this before?
9 Q. Yes.
10 A. I don't remember, but I see it now.
11 Q. Okay. Does that appear to be your signature on
12 the document?
13 A. Yes, it does.
14 Q. And the fax, the first page, seems to be dated
15 11/17/04.
16 A. Um-hmm.
17 Q. And it faxes to Victor Mercado a two-page letter
18 from you dated November 16, 2004; is that
19 correct?
20 A. Yes.
21 Q. And through the letter you request 15 categories
22 of documents relating to the 15 Mile Road
23 interceptor, correct?
24 A. Yes.
25 Q. Do you know if these documents were furnished?

1 Did you receive the documents?
2 A. I have no idea.
3 Q. Over the years is it accurate to say that when
4 Macomb requested documents from Detroit, Detroit
5 would generally get Macomb the documents?
6 A. I have no idea.
7 Q. You had a relationship with Mr. Mercado, did you
8 not, that if anyone who reported to you said we
9 need certain information from Detroit, we're
10 having a rough time getting it, you could pick up
11 the phone and call Mercado directly --
12 A. Yes.
13 Q. -- for the information?
14 A. Yes.
15 Q. Was he generally accommodating to you, if you
16 asked him for something?
17 A. I'm sure he was.
18 Q. Do you recall anything you asked for in
19 connection with the settlement agreement or the
20 acquisition agreement? Any information you
21 wanted prior to entering into those agreements
22 that wasn't supplied by Detroit?
23 A. You have to ask my attorneys that, if they got the
24 information they needed.
25 Q. You can't recall anything --

Page 37

1 A. No.
2 Q. -- you asked for that wasn't supplied?
3 A. No.
4 Q. I want to go back to the settlement agreement,
5 the Letter of Intent, which starts at page 8451.
6 And go to page 8453.
7 A. Okay.
8 Q. Paragraph 6, Conditions reads in part, "The
9 parties' obligations to consummate the
10 transaction would be subject to the satisfaction
11 of each of the following conditions at or prior
12 to closing, any of which may be waived in whole
13 or in part by the parties to the extent permitted
14 by applicable law." Is that what it says?
15 A. Yes.
16 Q. And then looking at the next page -- I'm looking
17 at iv. One of the conditions appears to be -- it
18 reads "The satisfactory completion in the
19 transferee's sole discretion of the transferee's
20 due diligence investigations of the property,
21 including, without limitation, with respect to
22 all operational, financial, environmental
23 engineering, legal and accounting matters." Do
24 you see that language?
25 A. Which item number would that be?

Page 38

1 Q. That was iv.
2 A. Yes, I see it.
3 Q. Was it your understanding that Macomb, prior to
4 signing the deal, was entitled to satisfy itself
5 that all operational, financial, environmental,
6 engineering, legal and accounting matters were in
7 order -- were in accord with what it wanted in
8 regard to the deal?
9 A. So your question --
10 Q. Let me rephrase it. Could you satisfy yourself
11 with regard to all these matters, get all the
12 information you wanted? You were entitled to
13 satisfy yourself in regard to all this before you
14 signed the deal, weren't you?
15 A. Yes, we were entitled to it.
16 Q. And you didn't -- if you had any questions about
17 any of these things, you didn't have to sign the
18 deal?
19 A. Well, had we known the information on the 15 Mile
20 Road sewer collapse was inaccurate and was faulty,
21 we probably would have raised an objection, but we
22 take it that what they gave to us was true and
23 accurate and fair.
24 Q. What information did they give to you wasn't true
25 and accurate and fair?

Page 39

1 A. That the sewer collapse cost $55 million to
2 repair.
3 Q. And you don't think it cost that much?
4 A. That's correct.
5 Q. What do you base that on, your conclusion it
6 didn't cost that much?
7 A. I had an engineer give me an estimate what they
8 thought it would cost to do that job.
9 Q. Who was the engineer?
10 A. Anderson, Eckstein & Westrick.
11 Q. What did they think it would cost to do the job?
12 A. They said approximately $28 million.
13 Q. And did they speak to anyone at Detroit before
14 arriving at their estimate?
15 A. I can't answer that. I don't know.
16 Q. Do you know whether or not they were aware that
17 various unforeseen difficulties were encountered
18 in repairing the system?
19 A. Well, they were not aware that someone was getting
20 paid for doing no work.
21 Q. Well, we could get into that, but let's --
22 A. That was brought out in federal court, and it's a
23 fact.
24 Q. Were they aware that unforeseen difficulties were
25 encountered in effecting the repairs? Do you

Page 40

1 know?
2 A. No, they didn't -- they just -- as an engineer,
3 they did an estimate of what it would cost to do
4 the job --
5 Q. And --
6 A. -- if it was competitively bid out.
7 Q. And you said that people were paid for not doing
8 work?
9 A. Well, that's what they said in federal court.
10 Q. Was that in regard to the interceptor collapse
11 repairs or was that in regard to other contracts?
12 A. The interceptor collapse repair.
13 Q. And the interceptor collapse repairs were part of
14 contract, I believe, CS-1368. Are you aware of
15 that?
16 A. I have no idea the numbers.
17 Q. Do you have any other reason to believe that
18 folks were paid or contractors were paid for work
19 that wasn't done other than the federal court
20 information?
21 A. I think that's pretty strong evidence.
22 Q. So the answer to my question is, yes, that's all
23 the information you got on this?
24 A. No, I have my engineer's estimate.
25 Q. So you have two things, engineer's estimate and

Page 41

1   the federal court?
2   A.   Yes.
3   Q.   Anything else?
4   A.   You know, I could say, just using my own
5   reasoning, but I'm not going to say that.  There
6   was an engineer that was qualified who's done many
7   projects, and they understand the cost.
8   Q.   When did you retain this engineer?
9   A.   I approached them right -- basically after the
10  indictment came out, so that had to be in the
11  beginning of '11, maybe -- 2011.
12  Q.   What did you ask them to do?
13  A.   I just asked him -- I got a copy of the work that
14  had been done and I asked him what his estimate to
15  do this job would cost.
16  Q.   Where did you find this engineer?
17  A.   He's an engineer that this office has used before.
18  Q.   How many times have you used them?
19  A.   Too numerous.  I can't even give you a number.
20  Q.   Is he local to Macomb County or local to
21  Michigan?  Where is he located?
22  A.   Local to Michigan.  He used to be down in Florida
23  also.
24  Q.   How do you know the guy?
25  A.   Just through his professional credentials and he's

Page 42

1   done work here.  He's represented private business
2   people who have submitted prints and drawings here
3   for approval.
4   Q.   Did you have any dealings with him prior to your
5   employment with Macomb County?
6   A.   Yes.
7   Q.   And what dealings were those?
8   A.   We hired that company -- my father did, back in,
9   I'm going to say, late -- early or mid-70s.
10  Q.   To do what?
11  A.   To do engineering for a subdivision.  But let me
12  just expound.  That was before -- that was when
13  Anderson, Eckstein & Westrick were principals at
14  the company.  At this point in 2011, they were all
15  gone and the people who own the company are not
16  the same principals.
17  Q.   Who's the key guy you use now?
18  A.   I think Roy Rose is their president.
19  Q.   Do you know what information this person utilized
20  in arriving at his opinion?
21  A.   I think just his credentials and experience, being
22  a professional engineer.
23  Q.   Did Macomb supply him with any information?
24  A.   I might have just gave him maybe some information
25  that Detroit gave me possibly, how much sewer was

Page 43

1   being replaced and --
2   Q.   So the information you gave him were documents
3   from Detroit?
4   A.   I believe so.  I'm not quite sure anymore.
5        MS. BADALAMENTI:  Is this a good time
6   to take a break?
7        MR. WATSON:  Yeah, it is.
8        (Off the record at 11:14 a.m.)
9        (Back on the record at 11:26 a.m.)
10       MARKED FOR IDENTIFICATION:
11       DEPOSITION EXHIBIT 4
12       11:26 a.m.
13  BY MR. WATSON:
14  Q.   Mr. Marrocco, you've been handed what's been
15  marked Exhibit 4, which is the debtor's witness
16  list for the July 17, 2014 hearing.  I give you
17  that because in our witness list we listed as No.
18  5 and No. 6 30(b)(6) corporate representatives, 5
19  to testify on various counts of the complaint,
20  and 6 to testify in regard to the acquisition
21  agreement.  And this question is probably for
22  your counsel and you.  Are you being designated
23  as the 30(b)(6) representative for either of
24  those two areas?
25  A.   I have no idea.

Page 44

1        MS. BADALAMENTI:  Good answer.
2        MR. WATSON:  Is there going to be a
3   30(b)(6) rep, though?  If it's he, I need to know
4   that now so I can --
5        MS. BADALAMENTI:  We've had those
6   discussions with you.  We've designated our
7   30(b)(6) representative.  I think we told you for
8   6 it would be Greg Hupp and for 5 it would be
9   either Greg Hupp or Mr. Misterovich.  I think for
10  5 it was Mr. Misterovich.  And you know
11  Mr. Misterovich had a very serious surgery about a
12  week ago.  And we have tried our best to get you
13  information from him.  He did come in after hours
14  despite his condition to get you documents you
15  requested, and he has been made available for
16  deposition on Monday, the 14th, despite his
17  doctor's recommendations that he doesn't do so.
18  We've more than accommodated this request.
19  BY MR. WATSON:
20  Q.   Mr. Marrocco, we spent some time before the break
21  discussing your conversations with Mr. Mercado in
22  which he said everything was fair and accurate.
23  I want to make sure that we've gotten your full
24  recollection as to when the conversations took
25  place, what was discussed in regard to this "fair

1 and accurate" statement, if anything else was
2 discussed in regard to that, who might have been
3 present, where it took place, when. Anything
4 else that you recall in regard to these Mercado
5 conversations?
6    MS. BADALAMENTI: That's about six
7 questions in one. Why don't you ask him if he
8 recalls any more information about the
9 conversations with respect to one of those
10 parameters so that he can actually answer you.
11    BY MR. WATSON:
12 Q. Well, I can go through each one. Do you recall
13 anything else about the conversations with
14 Mercado in regard to when they took place other
15 than what you've said?
16 A. Well, if you're talking about the sewer
17 collapse --
18 Q. The sewer collapse and you said Mr. Mercado said
19 the repair --
20 A. That's what I mean. You're talking about the
21 sewer collapse? Because I had talked to
22 Mr. Mercado before the sewer collapse ever
23 happened. Because he became director -- I don't
24 even know what year it was.
25 Q. I'm specifically talking about your testimony

1 regarding Mercado's statement pertaining to the
2 sewer collapse repairs in which you say Mercado
3 said the repair costs were fair and accurate.
4 A. That's correct.
5 Q. So can you recall anything else about when those
6 conversations took place?
7 A. Well, let's see now. August 2004, about
8 mid-August -- end of August is when the collapse,
9 I believe, occurred, and I'm going to say probably
10 six weeks after that maybe I was questioning, you
11 know, why so much equipment was on the job site,
12 and then, again, in the spring of 2005.
13 Q. Where did the August 2004 conversation take
14 place?
15 A. I'm not sure on that, where it was, but I remember
16 2005 very accurately. We were all on the street
17 where the collapse was, and I told him, you've got
18 all this equipment here and --
19 Q. In spring 2005?
20 A. Yeah. And I said, I don't want these contractors
21 charging for this equipment that's parked here.
22 Q. And what did he say?
23 A. He said, no, no, they're not going to. They're
24 not. They don't use it, they're not going to get
25 paid.

1 Q. Anything else you recall from that conversation?
2 A. You know, to be real specific, no, but in general,
3 just the fact that I thought the job was taking a
4 little bit long to get completed, and I thought it
5 was at too high a cost, and I expected that the
6 road would be paved, and he said, no, it's -- the
7 road won't be paved until next spring. Well, why
8 not? Well, you now, dah, dah, dah. To them it
9 kind of benefitted them that they dragged the job
10 on. It's time and material -- time and material,
11 you know. If it was competitively bid out, the
12 contractor would want to get done as soon as
13 possible to make more money. These guys, the
14 longer they're there, the more they're going to
15 make.
16 Q. Do you know how long the job took?
17 A. Gee, I don't remember anymore. From the time the
18 sewer collapse happened, oh, probably close to two
19 years, I guess.
20 Q. For the August 2004 conversation -- I didn't ask
21 you -- was anybody else there or was it just you
22 and Mr. Mercado?
23 A. When is this?
24 Q. When -- the August 2004 collapse -- well, no, you
25 said the collapse occurred in August 2004.

1 Probably about six weeks after that you had a
2 conversation with Mercado and pointed out you've
3 got all this equipment on the job. Is all that
4 necessary? And he told you it was?
5 A. Yes.
6 Q. Was anyone else there for that conversation?
7 A. Might have been people around, but I don't
8 remember who they were.
9 Q. Did you discuss anything else in that
10 conversation?
11 A. No, I think that's all Macomb County cared about,
12 that they get the sewer working and it's done at a
13 reasonably fair price.
14 Q. How long did you think the job should have taken?
15 A. I would say that that job should have been done
16 within a year at most.
17 Q. Wasn't it completed within a year?
18 A. No, it wasn't. We were getting bills in '06.
19 That's two years out.
20 Q. Weren't there amendments to the contract that
21 didn't have anything to do with the sewer repair,
22 thought?
23    MS. BADALAMENTI: I'm going to object
24 to foundation.
25    BY MR. WATSON:

Page 49

1 Q. If you know.
2 A. I don't know.
3 Q. Any other conversations with Mercado in which he
4 made representations that the repair costs were
5 fair and accurate or something to that effect?
6 A. I'm sure there were along the way.
7 Q. Can you recall the nature of those?
8 A. It's a long time ago. I have a lot of other
9 things that this office does that I can't remember
10 just that incident.
11 Q. Did you have such conversations with anyone else
12 at DWSD?
13 A. Give me a time frame.
14 Q. Well, any time after the collapse. From the time
15 of the collapse to, I guess, up to the time you
16 purchased.
17 A. Anybody else from DWSD? I think Pam Turner was in
18 charge at that time, so --
19 Q. You didn't have any discussions about this with
20 her?
21 A. No.
22 Q. What about with Latimer -- Darryl Latimer? Ever
23 talk to that guy?
24 A. No.
25 Q. Do you recall that there was a major sewer

Page 50

1 collapse way back in 1977?
2 A. Yes.
3 Q. In the same area?
4 A. Yes.
5 Q. Do you know how long that took to repair?
6 A. No.
7    MARKED FOR IDENTIFICATION:
8    DEPOSITION EXHIBIT 5
9    11:35 a.m.
10    BY MR. WATSON:
11 Q. Mr. Marrocco, I'll hand you what's been marked as
12 Exhibit 5. And at the top it's entitled
13 Acquisition Agreement; is that correct?
14 A. Yes.
15 Q. Are you familiar with this document?
16 A. Not really.
17 Q. Will you go to the last page. At the bottom it's
18 25 of 25.
19 A. Yes.
20 Q. It appears to be signed by Darryl Latimer and
21 William Misterovich. Do you see that?
22 A. Yes.
23 Q. And Misterovich is your chief deputy?
24 A. Yes.
25 Q. Did he have authority to sign this document?

Page 51

1 A. I would say he did.
2 Q. Going to the first page, it indicates the
3 acquisition agreement is made the 2nd day of
4 September 2010.
5 A. Um-hmm. Yes.
6 Q. Do you recall that being the approximate period
7 when the sale of the Macomb Interceptor system
8 from Detroit to Macomb was effected?
9 A. As to the other document we were looking at
10 before?
11 Q. Well, no, just -- was the sale completed on or
12 about September 2nd, 2010, if you recall?
13 A. Just what this document says. And my chief deputy
14 signed this. I guess that's what it is. I can't
15 say other than that.
16 Q. All right. Looking at the second page, it has a
17 paragraph 1.5, "'Macomb's County's Knowledge'
18 shall mean the actual knowledge of the Macomb
19 County Public Works Commissioner." That was you
20 at the time, right?
21 A. Yes.
22 Q. And legal counsel, and you told me about
23 Misterovich and Bodman --
24 A. Yes.
25 Q. -- attorneys being legal counsel. It says "legal

Page 52

1 counsel assigned." That would probably be
2 Misterovich. "Or retained," that would be Bodman
3 folks, right?
4 A. Okay.
5 Q. Then I'm looking at paragraph 1.10. It says
6 "'Detroit's knowledge' shall mean the knowledge
7 of its director." Do you know who the director
8 was September 2nd, 2010?
9 A. I think you said it was Pam Turner at that time?
10 Q. 2009 it was Turner. I'm thinking 2010 she had
11 gone and Latimer was serving as interim, but --
12 A. I had never heard of Darryl Latimer ever being the
13 director.
14 Q. Okay.
15 A. So I think it had to be Pam Turner.
16 Q. Okay. All right. So your understanding is that
17 would be Turner. "...its assistant corporate
18 counsel assigned to DWSD matters," do you know
19 who that was?
20 A. I have no idea.
21 Q. "...its assistant chief of engineering," do you
22 know who that was?
23 A. I have no idea.
24 Q. Do you know Shukla -- Ramesh Shukla?
25 A. Yeah, I know who Shukla is.

Page 53

1 Q. Have you had dealings with him over the years?
2 Brief dealings, maybe?
3 A. Minor dealings.
4 Q. Any problem with Shukla at all?
5 A. No, a very nice man.
6 Q. You haven't seen or heard anything that leads to
7 you believe he was dishonest or would commit
8 fraudulent acts or anything like that, have you?
9 A. No, I don't know him well enough.
10 Q. Okay. Then 1.13 says "'Global Settlement
11 Agreement' means the settlement agreement between
12 Detroit and Macomb, Oakland and Wayne counties
13 executed by the parties to that agreement" -- I'm
14 skipping some language -- "May 12, 2009." That's
15 the agreement we just covered, isn't it, the one
16 entitled Settlement Agreement?
17 A. I believe so.
18 Q. Okay. Turning to page 6 of 25, I'm looking at
19 2.5. It says "Macomb System." Did you read this
20 document, by the way? Have you ever really --
21 A. This document?
22 Q. Have you ever read this thing?
23 A. No. Mr. Misterovich signed it.
24 Q. Did you authorize him to sign it or did he say it
25 seems okay and -- or the attorney said it's okay?

Page 54

1 A. I would have no idea. It's a long time ago.
2 Q. All right. All right. Was it your understanding
3 that the system was sold as is?
4 A. Yes.
5 Q. Okay. I'm turning to page 11 of 25. It talks
6 about litigation. Were you aware of any
7 litigation impacting the system?
8 A. Which one? Which number?
9 Q. 3.7.
10 A. Okay. Was I aware of what?
11 Q. Any litigation that could impact the system.
12 MS. BADALAMENTI: It's an ambiguous
13 term. What is the term "litigation" being defined
14 as here? It calls for a legal conclusion, unless
15 you want to specify.
16 BY MR. WATSON:
17 Q. Are you aware of any major litigation or any
18 litigation Detroit was involved in regarding the
19 Macomb Interceptor system?
20 MS. BADALAMENTI: Same objections.
21 It's unclear whether this paragraph includes
22 criminal, civil, claims not brought. It's
23 unclear.
24 THE WITNESS: You're talking at that
25 time, right, September of 2010?

Page 55

1 BY MR. WATSON:
2 Q. Yeah. Do you know of any suits, whether criminal
3 or civil, involving that system?
4 A. I have no idea what Detroit does.
5 Q. Then 3.8 is "Disclosure of System Debt. Do you
6 see that?
7 A. Um-hmm.
8 Q. And then it starts off "Schedule 3.8 sets forth
9 all system debt." Do you see that language?
10 A. Just a second. Which part of that 3.8 were you
11 referring to?
12 Q. Under paragraph 3.8 it says "Disclosure of System
13 Debt. Schedule 3.8 sets forth all system debt."
14 And my question is: Do you see that language?
15 A. Yes, I see that.
16 MARKED FOR IDENTIFICATION:
17 DEPOSITION EXHIBIT 6
18 11:43 a.m.
19 BY MR. WATSON:
20 Q. Okay. Let me hand you what's been marked as
21 Marrocco Exhibit 6. And I'll ask, are you
22 familiar with that document? Have you seen that
23 before?
24 A. Yes, I've seen this.
25 Q. Is that the schedule, as far as you know, that

Page 56

1 delineates the various debt on the system?
2 A. That's what it says at the top of the page, system
3 debt.
4 Q. Okay. And I'm looking at, under A, Projects
5 Covered By Global Settlement. Do you see that?
6 A. On this page you gave me?
7 Q. Yes.
8 A. Under A?
9 Q. Right. A. Projects Covered By Global
10 Settlement.
11 A. Projects Covered By Global Settlement, okay.
12 Q. One of the projects is CS-1368 2004 repairs,
13 correct?
14 A. Yes.
15 Q. And the number attributed to that is the 54
16 million plus number, right?
17 A. Yes. Um-hmm.
18 Q. And that's where the dispute is primarily?
19 A. Yes.
20 Q. Okay. But there are a number of other projects
21 listed, correct?
22 A. Yes.
23 Q. And you're not disputing these other ones, are
24 you?
25 A. Not the lawsuit that we filed against Detroit.

Page 57

1 Q. Are you aware of any claims in regard to any
2 other claims against Detroit on any of these
3 other matters?
4 A. I'm not sure.
5 Q. Okay. And then I'm looking down three-fourths of
6 the way down where it says "Global Settlement."
7 We see that 17,050,000?
8 A. Yes. Um-hmm.
9 Q. That was a reduction on the price, right?
10 A. On the global settlement.
11 Q. Right.
12 A. On everything.
13 Q. Okay.
14 A. But it doesn't specify how much of the 17 million
15 is applied to one particular project or the other.
16 Q. Correct. Right. But the amount was reduced by
17 17 million?
18 A. Yes, according to this.
19 Q. And there are various other items, additions,
20 subtractions, so forth, correct?
21 A. Correct.
22 Q. Now, you indicated you weren't the principal
23 negotiator of all this stuff?
24 A. Correct.
25 Q. You had folks doing it for you, and Detroit had a

Page 58

1 team doing it for it, correct?
2 A. Yes. Um-hmm.
3 Q. And this was going back and forth for -- was it
4 years that it took before you could reach this?
5 A. Yeah, I'm sure it did.
6 Q. Why do you think it took so long?
7 A. Because there's more than one person in a room --
8 many minds, many people. The mayor never was at
9 any of them, either, and he just sent his minions
10 there to negotiate.
11 Q. You had sophisticated counsel on each side?
12 A. Yes.
13 Q. And at least one high-ranking official on each
14 side?
15 A. I can't speak for the other side.
16 Q. Okay. But Misterovich is a pretty high-ranking
17 official?
18 A. On my side.
19 Q. He's right under you, right?
20 A. That's correct.
21 Q. And you're the top guy in this public works area
22 in Macomb County?
23 A. I am.
24 Q. We were going through the acquisition agreement.
25 Let's go to page 17 of 25.

Page 59

1 A. Okay.
2 Q. Paragraph 8.9 "Resolution of all Certain
3 Disputes," that's odd language, but that's what
4 it says, correct?
5 A. Yes.
6 Q. It says "Macomb County and Detroit shall have
7 executed an agreement acknowledging that all
8 pending disputes between such parties with
9 respect to rates and all other matters have been
10 resolved." Do you see that?
11 A. Yes.
12 Q. Do you know if in conjunction with this
13 acquisition agreement such additional agreement
14 was executed?
15 A. At the time this was?
16 Q. Yeah.
17 A. I have no idea if there was another agreement.
18 MARKED FOR IDENTIFICATION:
19 DEPOSITION EXHIBIT 7
20 11:48 a.m.
21 BY MR. WATSON:
22 Q. Let me hand you, Mr. Marrocco, what's been
23 labeled Exhibit No. 7 --
24 A. Um-hmm.
25 Q. -- which says at the top "Macomb Interceptor

Page 60

1 Acquisition Settlement and Release of Certain
2 Rate Disputes," correct?
3 A. Yes.
4 Q. And then on the last page there appears to be the
5 signature of Misterovich and Latimer again?
6 A. There appears to be.
7 Q. And they're the same two guys who signed the
8 acquisition agreement, correct?
9 A. Yes, they are.
10 Q. And then the first paragraph of the document
11 references a date, September 2nd, 2010, does it
12 not?
13 A. Yes.
14 Q. And that's the date of the acquisition agreement,
15 isn't it?
16 A. Yes.
17 Q. Okay. I'm looking at -- well, first, let me ask
18 this: Have you seen this before?
19 A. I don't -- I don't think I have.
20 Q. Looking at paragraph 1 on the first page --
21 MS. BADALAMENTI: Let's give him a
22 chance to review the beginning before you get to
23 paragraph 1. He's just told you he hasn't seen
24 it.
25 BY MR. WATSON:

Page 61

1 Q. Take whatever time you need.
2 A. Okay. I've looked at it. I just read the
3 beginning page.
4 Q. Are you ready?
5 A. I'm ready.
6 Q. Okay. Page 1 of 7, where it says "1. Waiver and
7 Release of Claims" reads "Detroit and Macomb
8 County waive and release any claims with regard
9 to the following matters," and then it says "a.
10 The cost of all projects and contracts shown on
11 Schedule 3.8 of the MID agreement and the
12 calculation of all credits, charges and
13 adjustments set forth in that schedule." Do you
14 see that language?
15 A. Um-hmm. Yes.
16 Q. Was that your understanding of the agreement
17 between Macomb and Detroit, that all these claims
18 would be released?
19 A. I didn't sign this agreement.
20 Q. So you don't know?
21 A. Well, I can't speak on behalf of Mr. Misterovich.
22 I don't know when this -- when was this thing
23 signed, anyways? I don't see a date.
24 Q. Looking at page 3 of 7, it talks about waiving
25 and releasing.

Page 62

1     MS. BADALAMENTI: Where are you?
2     MR. WATSON: Paragraph F.
3     BY MR. WATSON:
4 Q. Let me just read the pertinent part: "Except as
5 provided in Section below and rights arising
6 under this agreement, Macomb County waives and
7 releases its claims against Detroit and Detroit
8 waives and releases its claims against Macomb
9 County with regard to all other known or unknown
10 claims or disputes with regard to rates charged
11 to the MCWDD as a separate user class for all
12 rate years up to and including the FY20009/10."
13 Do you see that language?
14 A. Yes.
15 Q. Let me ask it this way: Does that fit with your
16 understanding of an agreement reached between
17 Macomb and Detroit?
18 A. That's what it says.
19 Q. I'm looking at page 6 of 7, Adjustment to Resolve
20 Disputes, paragraph 5. And that talks about a
21 $3 million adjustment to resolve disputes, almost
22 2.2 -- well, 2.179 million applied to the OMI
23 purchase price and 870,000 to the Macomb
24 Interceptor purchase price. That's an accurate
25 kind of summary of what that says, correct, that

Page 63

1 paragraph?
2 A. That's an accurate summary? I don't know.
3     MS. BADALAMENTI: I mean, those are
4 defined terms in the agreement and you're not
5 referencing them. You're just referencing the
6 paragraph they're used.
7     THE WITNESS: I don't know if those
8 numbers are true or not, so --
9     BY MR. WATSON:
10 Q. Okay. But let me ask it this way: Were you
11 aware of a $3 million adjustment to the purchase
12 price in regard to the OMI agreement and in
13 regard to the Macomb Interceptor purchase price?
14 A. I can't remember all that.
15 Q. But it is true that Detroit at some point agreed
16 to reduce the purchase price, sort of clinch the
17 deal? Do you recall that?
18 A. When was this?
19     MS. BADALAMENTI: Hold on. I'm going
20 to object to that question. That's an overbroad
21 question and it's certainly not what's being
22 referred to in this agreement. If you have a
23 question about a time frame that's unrelated to
24 this question, I think you need to clarify.
25     BY MR. WATSON:

Page 64

1 Q. I don't think it's overbroad, but let me break it
2 down this way: Do you recall an OMI agreement
3 reached between Detroit, Macomb, Oakland
4 counties? Yes.
5 A. An agreement?
6 Q. Yes.
7 A. Yes.
8 Q. And that agreement was reached in 2009?
9 A. Exact date, I don't remember.
10 Q. Okay. But that agreement was reached before the
11 acquisition agreement?
12     MS. BADALAMENTI: With Macomb?
13     BY MR. WATSON:
14 Q. Do you recall that?
15 A. No.
16 Q. Okay. Do you recall that Detroit, to speed the
17 negotiations along and try to get the deal
18 concluded, agreed to reduce the purchase price on
19 both the OMI system and the Macomb Interceptor
20 system? Do you --
21 A. There was something --
22 Q. -- remember that all?
23 A. All I know, there was a $17 million global
24 settlement credit.
25 Q. Okay.

1 A. How that was broken out, I don't know.
2 Q. Do you recall there were other reductions in the
3 purchase price on top of the 17 million?
4 A. I know there's -- and I'm not sure whether this
5 happened before, after, whenever, but there was
6 $7 million that Detroit received back from
7 contractors on the job, which they've never sent
8 to Macomb County.
9 Q. 7 million?
10 A. Yeah.
11 Q. On what job?
12 A. On the collapse -- sewer collapse.
13 Q. That Detroit -- are you referring to the
14 settlement Detroit had with Inland?
15 A. I believe so, yeah.
16 Q. And your position is Macomb should have gotten
17 that money or some of that money?
18 A. Well, we paid it. We paid it to Inland. Why is
19 Inland giving it to Detroit?
20 Q. Well, didn't Inland -- Detroit pay Inland and
21 then --
22 A. No.
23 Q. -- the system was sold and you paid Detroit?
24 A. Absolutely wrong. Macomb County paid Detroit, who
25 paid Inland. Inland refunded 7 million back to

1 Detroit, and that money was never sent to Macomb
2 County.
3 Q. Do you know what Detroit --
4 A. And then you want to ask me why things aren't fair
5 and square here, right?
6 Q. Do you know what claims Detroit asserted in that
7 lawsuit against Inland?
8 A. I don't know.
9 Q. Are you familiar that eventually Macomb County
10 sued Detroit in Macomb Circuit Court?
11 A. Yes.
12 Q. Did you authorize that suit?
13 A. Yes, I did.
14 Q. Why?
15 A. Because I believe Macomb County rate payors were
16 overcharged for the sewer collapse repair bill.
17 Q. And have you told us in this deposition all the
18 reasons why you believe Macomb was overcharged?
19 Any other statements? Facts?
20 A. I have an engineer's estimate what it would cost
21 to do it. I have statements from federal court
22 that admit to overcharging. I think those are two
23 pretty good reasons.
24 Q. Is there anything else you have?
25 A. I think those are pretty good. Some people went

1 to jail. Maybe they shouldn't have gone to jail.
2 Maybe they weren't lying, huh?
3 MR. WATSON: Let me take a short break
4 and we'll come back.
5 (Off the record at 11:59 a.m.)
6 MARKED FOR IDENTIFICATION:
7 DEPOSITION EXHIBIT 8
8 12:12 a.m.
9 (Back on the record at 12:12 p.m.)
10 BY MR. WATSON:
11 Q. Mr. Marrocco, you've been handed what's been
12 marked as Exhibit 8 --
13 A. Yes.
14 Q. -- which appears to be the Summons and Complaint
15 filed by Macomb Interceptor Drainage District
16 against City of Detroit in Macomb Circuit Court,
17 correct?
18 A. Yes.
19 Q. Did you see this Complaint prior to the time it
20 was filed?
21 A. I'm sure I did, but I can't be --
22 Q. And you did authorize this suit?
23 A. Yes, I did.
24 Q. Going to page 3, under General and Factual
25 Background, it reads "The primary cause of this

1 action is a breach of contract/fraudulent
2 inducement to contract by Detroit relating to the
3 sale of assets, including, but not limited to,
4 the Macomb Interceptor System." Do you see that
5 language?
6 A. Yes, I do.
7 Q. Is that your understanding, that that's the
8 primary claim, is breach of contract/fraudulent
9 inducement?
10 A. That's what my attorney put there. I guess it's
11 legalese.
12 Q. Now, with the fraud claim, is it your
13 understanding that Macomb takes the position that
14 Detroit, prior to the sale, should have disclosed
15 certain information that it had?
16 A. Yes.
17 Q. So it's the actions of Detroit before the sale
18 that you're focused on?
19 A. Yes.
20 Q. In looking at paragraph -- look at paragraph 14.
21 A. Um-hmm.
22 Q. It talks about the superseding indictment in
23 Ferguson and Inland Waters entering into side
24 agreements. Do you see that paragraph?
25 A. I see 14, yes.

1  Q.  Did you ever meet Bobby Ferguson?
2  A.  Never.
3  Q.  Has he ever done any work for Macomb County?
4  A.  Not to my knowledge.
5  Q.  Have you ever testified before the grand jury?
6  A.  Never.
7  Q.  Do you know if any Macomb County employees were
8  interviewed in regard to the grand jury
9  investigation, interviewed by the FBI or
10  testified before the grand jury?
11  A.  Regarding what?
12  Q.  The 15 Mile Road sewer collapse.
13  A.  So regarding that again, what's the question?
14  Q.  Any Macomb County employees or attorneys testify
15  before the grand jury or get interviewed by the
16  FBI in regard to the matter?
17  A.  No, I'm not aware of anybody.
18  Q.  Do you have any personal knowledge of the
19  dealings between Inland and Ferguson?
20  A.  Only what I read.
21  Q.  Have you ever done business -- Macomb done
22  business with Inland?
23  A.  Just recently.
24  Q.  When did you do business with Inland?
25  A.  It was in conjunction with Oakland County under

1  the OMID drain district we formed with them, and
2  they were awarded a contract this past year to do
3  some repair work on the interceptor.
4  Q.  Okay.  Looking at paragraph 16, it talks about
5  "in or about the spring of 2003, the DWSD and
6  Inland agreed to set fixed unit prices for
7  subcontractor work on CS-1368."  Do you see that?
8  A.  Yes.
9  Q.  That's something you don't have any personal
10  knowledge of, I take it?
11  A.  I have no idea what CS-1368 is.
12  Q.  Okay.  As far as the various factual allegations,
13  what D'Agostini did and Ferguson did and Inland
14  did and Detroit did, is it fair to say you don't
15  have personal knowledge of any of that stuff?
16  A.  Only what I read.
17  Q.  Okay.  Did you consider the 15 Mile Road sewer
18  collapse an emergency?
19  A.  The only emergency was to restore the flow of the
20  sewage.
21  Q.  Do you know how long it took to restore that
22  flow?
23  A.  Exactly, I can't tell you, but it was a short
24  period of time.  I think it was Mersino -- the
25  contractor went out there and put a bypass line in

1  so the sewage could flow.  At that point, the
2  emergency was over.
3  Q.  Do you know whether or not the bypass was
4  something that was unstable and had to be
5  monitored constantly?
6  A.  Of course it would have to be.  It's a temporary
7  fix.
8  Q.  Do you know whether or not the sinkhole was
9  expanding?
10  A.  I have no idea if it were or not.
11  Q.  Did you consider it to be an emergency -- let me
12  rephrase it.
13      Did you believe that DWSD had to take
14  actions to prevent houses from falling into the
15  sinkhole immediately?
16  A.  So start your question again.
17  Q.  Okay.  I'm trying to find out what was and was
18  not an emergency.  Was it an emergency to prevent
19  homes from falling into the sinkhole?  Should
20  that action have been taken on an emergency
21  basis, in your opinion?
22  A.  Of course, if homes would have fallen into the
23  sinkhole, but there's no proof of that.  The homes
24  were far enough away from the sinkhole.
25  Q.  In regard to air pollution or water or polluting

1  the water or backing up in basements, should
2  actions have been taken to address those
3  situations on an emergency basis?
4  A.  There was none of that.
5  Q.  Could that have happened if the repairs weren't
6  effected quickly enough, though?
7  A.  No, they had the emergency bypass and that was the
8  main concern.  Road was down.  Road got
9  barricaded, detour down to 14 Mile or detour up to
10  16 Mile, that didn't create nothing.  Like I say,
11  once the sewage was flowing again, there was no
12  emergency.
13  Q.  Did you ever go out to the project?
14  A.  Yes, I did.
15  Q.  How many times did you go out there?
16  A.  From the day of the sinkhole until it was final,
17  opened up the road?
18  Q.  Yeah.
19  A.  Oh, my God, so many times I couldn't count, but I
20  can tell you I was there the first day it was
21  down.  I was there.
22  Q.  Was it a huge project?
23  A.  Of course it was a huge project.  I'm not saying
24  it wasn't.
25  Q.  Did Macomb have a representative assigned to

Page 73

1  monitor the progress on that project?
2  A.  Yes.
3  Q.  Who was that?
4  A.  I believe it was Tom Stockel.
5  Q.  Are you familiar with a Mr. Penrod?  Was he there
6  as well?
7  A.  Don Penrod, sure, he might have been there, but I
8  think Stockel might have been more on top of it.
9  Penrod would have been his supervisor.
10  Q.  What were they supposed to be doing out there,
11  drinking coffee?
12  A.  Just keeping an eye on the project, I guess, make
13  sure it was moving along.  I'm not sure.  You kind
14  of do that.  City of Sterling Heights had someone
15  there, too, an inspector, so --
16  Q.  Did you expect them to look at documents to the
17  extent there are contracts with contractors to
18  fix things?  Was part of their job to look at
19  those agreements?
20  A.  It was the City of Detroit's project.  We had no
21  say in what went on over there.
22  Q.  Could they, to your knowledge, ask to see
23  anything they wanted to see?
24  A.  Could they ask?
25  Q.  Yeah.

Page 74

1  A.  I don't know.  But, again, the City of Detroit.
2  Q.  Are you aware of Detroit ever denying any Macomb
3  request as far as inspecting areas, viewing
4  documents, attending meetings?
5  A.  I'm not aware of that.  No one ever made mention
6  to me about it.  It could have happened, but I'm
7  not sure.
8  Q.  Were the Macomb and Sterling Heights
9  representatives allowed to go to the daily
10  meetings?
11  A.  I have no idea.
12  Q.  Did you ever go to any of the daily meetings?
13  A.  No, I never went to a daily meeting.
14  Q.  When you were out there, was Mercado out there a
15  lot as well?
16  A.  On occasion.  I seen him a couple times.
17  Q.  Was Shukla the top guy on the scene day to day?
18  A.  During the day there?  No, I don't think I seen
19  Shukla there.
20  Q.  I'm looking at paragraph 33.  Just to confirm,
21  the last sentence reads "In return for these
22  unlawful and excessive contract awards, profits,
23  fees, expenses, and costs, the contractors and
24  subcontractors made unlawful payments and/or
25  provided unlawful gratuities to Kilpatrick,

Page 75

1  Ferguson and Miller."  And you based that on the
2  indictment?
3     MS. BADALAMENTI:  The paragraph
4  expressly bases it on the indictment.
5     BY MR. WATSON:
6  Q.  Do you have any additional knowledge in that
7  regard?  Anything outside of the indictment?
8  A.  Myself?
9  Q.  Yeah.
10  A.  No.
11  Q.  And then paragraph 35 starts off "The scheme
12  resulted in excessive overcharges on the
13  project."  Do you see that?
14  A.  Yes.
15  Q.  And are you basing that on the indictment as
16  well?
17  A.  Not just the indictment.  I'm also basing that on
18  the engineer's estimate that we had prepared.
19  Q.  Anything else?
20  A.  I think that's sufficient.
21  Q.  Anything else, though, whether or not it's
22  sufficient?  Is that all you can recall as we sit
23  here today?
24  A.  I had our engineer do an estimate, and I've also
25  seen what the indictment says.  Is there anything

Page 76

1  else?  I mean, how else would you know?  There was
2  an admission in court.  They admitted in court
3  what they did.
4  Q.  Looking at paragraph 40, it starts off "The
5  grossly inflated project total became the
6  plaintiff's direct responsibility for order of
7  Judge Feikens dated December 18, 2008."  Do you
8  see that?
9  A.  Yes.
10  Q.  Do you understand what that means?  I'm not
11  sure -- I'm not familiar with Judge Feikens'
12  order, December 18, 2008.  Are you familiar with
13  that at all?
14  A.  No.  I don't remember what he ordered on that
15  date.
16  Q.  And the -- pursuant to the settlement agreement
17  or really the acquisition agreement, Macomb was
18  obligated to pay Detroit, wasn't it, once you
19  signed that acquisition agreement?
20  A.  Okay.  Now I understand what this December 18th
21  might be.  That may be when we -- I don't know --
22  sued Detroit over -- we went to Feikens and said,
23  hey, this is not Macomb County's bill to pay in
24  total.  It should be part of the system.  And
25  Feikens ruled against us and said no, Macomb has

Page 77

1  to pay the total of the sewer collapse.
2  Q.  Oh, okay.  Thank you.  That's what that's about.
3      Okay.  Paragraph 41 says "At the time
4  of this ruling, the scheme and its production of
5  grossly inflated overcharges was concealed from
6  Judge Feikens and MIDDD."  Do you see that
7  language?
8  A.  Yes.
9  Q.  And we've already talked about why you believe it
10  was concealed, what you base the conclusion of
11  fraud and concealment on, haven't we?  The
12  Mercado conversations?  What I'm trying to say,
13  is there anything else you base this allegation
14  on other than what we've already covered in your
15  deposition?
16  A.  Which allegation?
17  Q.  The allegation that the scheme and its production
18  of grossly inflated overcharges was concealed
19  from Judge Feikens and MIDDD.
20  A.  Yes.
21  Q.  And is there anything else you base that on other
22  than what you've testified to today?
23  A.  No.  That's it, I think.
24  Q.  Okay.
25  A.  Do you want me to make up something for you?

Page 78

1  Q.  No, I absolutely don't.
2      I take it you disagree with Judge
3  Cleland's deposition that the tort claims belong
4  to Detroit?
5  A.  Of course, anything that's ruled against us, I'm
6  against.  If it was in my favor, I'd like it.
7  Q.  In regard to the Ferguson indictment, you
8  mentioned a few times what you read in the paper,
9  indictment, Ferguson, Miller, Mercado,
10  Kilpatrick.  Weren't the articles in the paper
11  primarily focused on favoritism shown to Ferguson
12  by Kilpatrick?
13  A.  Is that what they focused on?
14  Q.  Yeah.
15      MS. BADALAMENTI: What time frame are
16  you referring to?
17      BY MR. WATSON:
18  Q.  I'm referring to 2010 -- December 2010 and years
19  thereafter when they talked about the
20  indictments.  Weren't they primarily focused on
21  Ferguson being unfairly favored in getting all
22  these contracts and --
23      MS. BADALAMENTI: I'm going to object
24  to foundation.  He doesn't know what articles
25  you're talking about.  It's an overbroad and

Page 79

1  objectionable question, but you can go ahead.
2      BY MR. WATSON:
3  Q.  The articles you read, what were they focused on?
4  A.  What were they focused on?
5  Q.  Yeah.  You said you read articles about the
6  indictment.
7  A.  They were focused on criminal enterprise that they
8  had going on, and how they overcharged for the
9  sewer collapse.
10  Q.  So you've seen articles about overcharging for
11  the sewer collapse?
12  A.  Um-hmm.
13  Q.  Do you recall what publication these articles
14  were in?
15  A.  Local papers.
16  Q.  Macomb or --
17  A.  Daily.
18  Q.  -- Detroit?
19  A.  Detroit.  I think I also read some of the
20  transcripts.
21  Q.  Trial transcript?
22  A.  Yes.
23  Q.  Did you ever see anything about favoritism in any
24  of the articles?
25  A.  Criminal activity, I did.

Page 80

1  Q.  Don't recall favoritism?
2  A.  No, I don't.  There's a lot of words in the
3  English language to specify one or the other.  I
4  don't know, but --
5  Q.  Look at paragraph 83.  It reads "Defendant
6  knowingly and intentionally made
7  misrepresentations leading up to and in the
8  Macomb acquisition agreement."  Do you see that
9  language?
10  A.  Not yet.  Paragraph 83?
11  Q.  Yeah.
12  A.  Okay.  I'm on it now.
13  Q.  And by defendant, defendant is?
14  A.  Detroit.
15  Q.  Detroit.  The individuals you're aware of -- or
16  individual who made these misrepresentations is
17  Mercado?  Is that to you personally are aware of?
18      MS. BADALAMENTI: I'm going to object.
19  It calls for a legal conclusion, Mr. Marrocco
20  didn't draft this document.  He doesn't know what
21  the paragraph is referring to.  He couldn't
22  possibly answer that question.  But you can go
23  ahead.  Do the best you can.
24      BY MR. WATSON:
25  Q.  Well, who from your personal knowledge, not what

13-53846-tjt   Doc 7885-13   Filed 10/08/14   Entered 10/08/14 21:38:19   Page 21 of
23

Page 81

1   you read in the papers or -- just what you know,
2   who made the misrepresentations? Anyone other
3   than Mercado and the misrepresentations that have
4   been fully discussed?
5 A.  As far as the purchase price for the system? Is
6   that what you're talking about?
7 Q.  Yeah, the purchase --
8 A.  I don't think there was a full disclosure, whether
9   it's Mercado or the legal department of Detroit.
10 Q.  Did you speak to anyone in the legal department?
11 A.  No. There's so many people. I ain't going to set
12   there and speak to everybody. You just expect in
13   a business relationship, you bring forward
14   everything you have, all the information you have.
15 Q.  The one you personally spoke to was Mercado?
16 A.  Yes.
17 Q.  And we fully covered those conversations, haven't
18   we?
19 A.  Yes. I spoke to him more than the occasions we
20   talked about. We talked -- he came to my office
21   one day and I spoke to him in my office.
22 Q.  We haven't talked about that one, have we?
23 A.  No.
24 Q.  What was discussed?
25 A.  I told you about on the project site. I said a

Page 82

1   few times over there, but also the time he came to
2   my office.
3 Q.  What was discussed then?
4 A.  Well, that he was going to give credit back or
5   something on jobs.
6 Q.  Anything else you recall?
7 A.  No. That was the main -- main point of it, but
8   then that never materialized, so --
9 Q.  Any other time you talked to him where he made
10   some type of misrepresentation?
11 A.  Yeah, in his office down in Detroit. I talked to
12   him in his office.
13 Q.  What did he say then?
14 A.  Basically the same thing all the time, we'll make
15   adjustments, we'll make adjustments, or
16   everything's fair. If there's anything wrong,
17   we'll give you an adjustment back, this and that.
18 Q.  Is Macomb County willing to give the system back
19   to Detroit if Detroit refunds the purchase price?
20   Do you want to rescind this whole deal?
21     MS. BADALAMENTI: I'm going to object
22   again. You're talking about something that's been
23   pled, a legal term of recision as a remedy, and
24   he's not a lawyer. He's not in a position to
25   answer that question. But you can go ahead, to

Page 83

1   the best you're able.
2     BY MR. WATSON:
3 Q.  Do you want to rescind the deal?
4 A.  If I can get a cheaper price than the $90 million,
5   I guess I would. I think, you know, there's more
6   evidence out there now.
7 Q.  While the project was going on and Macomb had at
8   least one representative on the project, are you
9   aware of any complaint Macomb ever registered
10   about the project and the cost other than the
11   testimony you've given?
12 A.  Anybody we had out on the job --
13 Q.  Yeah.
14 A.  -- was not there -- was not there to contain cost.
15 Q.  Did they ever complain about the costs, to your
16   knowledge?
17 A.  They would not -- that was -- they're not
18   experienced in that, and that was not their job.
19 Q.  Do you know of anyone complaining about the costs
20   other than what you testified to when you
21   complained to Mercado?
22 A.  Oh, I think I'm the person who should complain
23   about the cost.
24 Q.  Are you aware of anyone else complaining?
25 A.  I don't think I should have to be aware.

Page 84

1 Q.  Well, whether or not you --
2 A.  The buck stops here. I made the decision. And
3   they overcharged.
4 Q.  Okay. Did Misterovich ever complain, to your
5   knowledge?
6 A.  Misterovich is an attorney.
7 Q.  What does that mean?
8 A.  He's not a contractor. He's not in the
9   construction industry.
10 Q.  Can you answer my question? Other than what
11   you've testified to, are you aware of any other
12   complaints about the costs?
13 A.  You know, I probably had rumblings. If you want
14   me to specify the name of a person, I can't do
15   that, but just there were rumblings. There were
16   rumblings.
17     MR. WATSON: All right. That's all
18   I've got.
19     EXAMINATION
20     BY MS. BADALAMENTI:
21 Q.  I just have a couple of questions.
22     Commissioner, if you had known about
23   these overcharges, would Macomb have entered into
24   the acquisition agreement on these terms?
25 A.  Absolutely not. We would have wanted more than

Page 85

1  that 17 million -- 17 million?  We would have
2  asked for more than $17 million credit.
3  Q.  If the -- if you had known that there was an
4  ongoing criminal investigation by the FBI that
5  preceded the acquisition agreement, that had that
6  information been disclosed to you by Detroit
7  prior to September 2nd, 2010, would you have
8  entered into the acquisition agreement?
9  A.  No.  That's for sure not.
10    MS. BADALAMENTI: No further questions.
11    MR. WATSON: Nothing further.
12    (The deposition was concluded at 12:37 p.m.
13  Signature of the witness was not requested by
14  counsel for the respective parties hereto.)
15
16
17
18
19
20
21
22
23
24
25

Page 86

1                    CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN      )
3                         ) SS
4  COUNTY OF MACOMB       )
5
6          I, MELINDA S. MOORE, certify that this
7      deposition was taken before me on the date
8      hereinbefore set forth; that the foregoing
9      questions and answers were recorded by me
10     stenographically and reduced to computer
11     transcription; that this is a true, full and
12     correct transcript of my stenographic notes so
13     taken; and that I am not related to, nor of
14     counsel to, either party nor interested in the
15      event of this cause.
16
17
18
19
20
21
22         MELINDA S. MOORE, CSR-2258
23              Notary Public,
24              Macomb County, Michigan
25     My Commission expires:  September 6, 2016