# In The Matter Of:

## *In Re: City of Detroit, Michigan*

---

### *Ramesh C. Shukla*
### *July 09, 2014*

---



**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File SHUKLA_RAMESH C_.txt*
*Min-U-Script® with Word Index*

**Page 1**

1           UNITED STATES DISTRICT COURT
2           EASTERN DISTRICT OF MICHIGAN
3                 SOUTHERN DIVISION
4    _____
5    In re:              )    Case No. 13-53845
6    CITY OF DETROIT, MICHIGAN )
7                        )    Chapter 9
8                        )
9         Debtor         )
10   _____)   Hon. Steven W. Rhodes
11
12
13        The Deposition of RAMESH C. SHUKLA,
14      Taken at 150 W. Jefferson Avenue, Suite 2500,
15        Detroit, Michigan,
16        Commencing at 1:25 p.m.,
17        Wednesday, July 9, 2014,
18        Before Melinda S. Moore, CSR-2258.
19
20
21
22
23
24
25

**Page 2**

1    APPEARANCES:
2
3    RAECHEL M. BADALAMENTI (P64361)
4    Kirk, Huth, Lange & Badalamenti, PLC
5    19500 Hall Road
6    Suite 100
7    Clinton Township, Michigan 48038
8    586.412.4900
9    rbadalamenti@khlblaw.com
10       Appearing on behalf of the Macomb Interceptor
11        Drain Drainage District.
12
13   JEROME R. WATSON (P27082)
14   M. MISBAH SHAHID (P73450)
15   Miller Canfield Paddock & Stone, PLC
16   150 W. Jefferson Avenue
17   Suite 2500
18   Detroit, Michigan 48226
19   313.963.6420
20   watson@millercanfield.com
21   shahid@millercanfield.com
22       Appearing on behalf of the City of
23        Detroit and the Witness.
24
25

**Page 3**

1    ARTHUR H. RUEGGER
2    Salans FMC SNR Denton
3    1221 Avenue of the Americas
4    New York, New York 10020
5    212.768.6881
6    arthur.ruegger@dentons.com
7        Appearing on behalf of the
8        Official Committee of Retirees
9        of the City of Detroit.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1    TABLE OF CONTENTS
2
3    WITNESS                    PAGE
4    RAMESH C. SHUKLA
5    EXAMINATION BY MS. BADALAMENTI        5
6    EXAMINATION BY MR. WATSON        106
7    RE-EXAMINATION BY MS. BADALAMENTI    117
8
9    EXHIBIT                    PAGE
10   (Exhibits attached to transcript.)
11
12   DEPOSITION EXHIBIT 1          18
13   DEPOSITION EXHIBIT 2          53
14   DEPOSITION EXHIBIT 3          54
15   DEPOSITION EXHIBIT 4          60
16   DEPOSITION EXHIBIT 5          61
17   DEPOSITION EXHIBIT 6          76
18   DEPOSITION EXHIBIT 7          121
19
20
21
22
23
24
25

Page 5

1 Detroit, Michigan
2 Wednesday, July 9, 2014
3    1:25 p.m.
4    (Mr. Ruegger not present at 1:25
5    p.m.)
6    RAMESH C. SHUKLA,
7 was thereupon called as a witness herein, and
8 after having first been duly sworn to testify to
9 the truth, the whole truth and nothing but the
10 truth, was examined and testified as follows:
11    **EXAMINATION**
12    **BY MS. BADALAMENTI:**
13 Q.  Sir, can you state your name for the record.
14 A.  **Yeah.  My name is Ramesh Shukla, R-a-m-e-s-h.**
15  **S-h-u-k-l-a, that's my last name.**
16 Q.  And do you go by R.C. Shukla?
17 A.  **Yeah.  C is my middle initial.**
18 Q.  What does it stand for?
19 A.  **It's stands for C-h-a-n-d-e-r.**
20 Q.  Are you currently employed?
21 A.  **No.  I'm retired.**
22 Q.  When did you retire?
23 A.  **March 2012.**
24 Q.  Where did you retire from?
25 A.  **From City of Detroit Water and Sewerage**

Page 6

1  **Department.**
2 Q.  What is your educational background?  Do you hold
3  any degrees?
4 A.  **I have a bachelor's in engineering and I have got**
5  **a master's in business administration.**
6 Q.  From where did you get your bachelor's?
7 A.  **I did both of them in India.**
8 Q.  Do you hold any other certifications?
9 A.  **Professional engineer from State of Michigan.**
10 Q.  Any other certifications or licenses that you
11  hold?
12 A.  **No.**
13 Q.  Have you ever been a party to a civil lawsuit?
14 A.  **I don't understand the question.  What --**
15 Q.  Have you ever been sued or sued anybody?
16 A.  **No, I've not sued anybody, nor anybody has sued**
17  **me.**
18 Q.  Have you ever been charged with a crime?
19 A.  **No.**
20 Q.  When did you become employed with the Detroit
21  Water and Sewerage Department?
22 A.  **1988.**
23 Q.  And what was the position you took in 1988?
24 A.  **I joined as a junior mechanical engineer, the**
25  **bottom rung, the first one.**

Page 7

1 Q.  And were you promoted at some point?
2 A.  **Yeah, I got promotions in between, yeah.**
3 Q.  What other positions did you hold?
4 A.  **Ultimately I ended up as assistant director of**
5  **engineering.**
6 Q.  And when did you get that position?
7 A.  **I think it was in 2006.**
8 Q.  Who was the assistant director of engineering
9  before you?
10 A.  **His name was Gregory White -- Greg White.**
11 Q.  And where did he go when you took that position?
12 A.  **I don't know.  He just left the city.  I'm not**
13  **sure where he went.**
14 Q.  Do you know if he retired?
15 A.  **No, he just resigned and left.**
16 Q.  Prior to being employed with the Detroit Water
17  and Sewerage Department, where were you employed?
18 A.  **This is like my first job in the States.  I came**
19  **to the States in August 1988, joined the city in**
20  **November '88.  That's when I started.**
21 Q.  Have you been employed since -- in any capacity
22  since retiring from the city?
23 A.  **I worked for one company in Toledo for about**
24  **10 months.  It's a private company -- HVAC**
25  **company.**

Page 8

1 Q.  What's the name of the company?
2 A.  **Frische-Mullin, F-r-i-s-c-h-e-M-u-l-l-i-n.**
3 Q.  What would your job duties have entailed once you
4  took the assistant director of engineering
5  position in 2006?
6 A.  **The description of my job, is that what you're**
7  **saying.**
8 Q.  Yes.
9 A.  **I was in charge of engineering, which means**
10  **looking out for all the functions that were done**
11  **in the engineering department, like planning,**
12  **design, consultants -- you know, hiring of the**
13  **consultants and all that, basically getting the**
14  **work done by the consultants, bidding the projects**
15  **out for construction, managing construction,**
16  **payments, the whole thing.**
17 Q.  When you say "hiring consultants," would those be
18  engineering consultants?
19 A.  **Engineering consultants.**
20 Q.  Would you hire contractors and subcontractors to
21  actually perform the work?
22 A.  **I wouldn't hire them, but I will get the work done**
23  **from the consultants and contractors that was**
24  **hired by the city -- by the department.**
25 Q.  Did you ever sign contracts on behalf of the

Page 9

1  defendant -- or the city?

2  A. No.

3  Q. What was the process by which consultants were

4  selected by you or approved by the city during

5  that time period?

6  A. I said I did not select any consultants.

7  Q. Okay.

8  A. The process normally -- normally the process is

9  that the consultant contracts are advertised by

10  our contracting and grants department. They get

11  all the quotations; they get all the proposals,

12  are proposal type and all that, and the proposals

13  will be evaluated -- the evaluation of the

14  engineering part of the proposal, my group will be

15  involved in that. We would evaluate that and give

16  the recommendation to contracts and grants. They

17  will do all the further work. They'll select the

18  consultant, get it approved by the board and the

19  council.

20     Once the consultant is given a start

21  work order, my work starts. Then they work under

22  me.

23  Q. What was the method by which you would evaluate

24  the consultants or the proposals that were given

25  to you?

Page 10

1  A. Technical evaluation and all that.

2  Q. Was there a rating system?

3  A. There used to be a rating and weighting system --

4  yes, weight system.

5  Q. Before you answered that question, you told me

6  normally there's a bidding process. Was it ever

7  the case there was not a bidding process?

8  A. I don't remember any time when it was not done by

9  the open advertisement. And I wouldn't rule out

10  anything, but I don't remember anybody that we

11  selected that was not advertised.

12  Q. What position did you hold in -- immediately

13  prior to being the assistant director of

14  engineering?

15  A. Before that for almost 10 months I was the interim

16  general superintendent of engineering, and that

17  happened in 2005.

18  Q. And how would those job duties have been

19  different, if at all, from the position that you

20  got in 2006?

21  A. More or less the same thing.

22  Q. I'm sorry?

23  A. It's more or less similar. Because position was

24  vacant, so they gave me that position right away.

25  And they promoted me to the AD after that.

Page 11

1  Q. How about prior to being the interim general

2  superintendent?

3  A. Before that, my designation was field engineer.

4  Q. And how long did you hold that position?

5  A. From 1998 till 2005. Seven years.

6  Q. Did you have any oversight responsibilities as a

7  field engineer over the department?

8  A. Over site of what?

9  Q. Over site of the engineering department.

10  A. No. No. No. We had a specific role. My job was

11  oversight of the construction activities. That

12  was my job those days.

13  Q. Okay. Who did you report to when you were in the

14  position of field engineer?

15  A. I had a head engineer which was in charge of my

16  section. I was reporting to him.

17  Q. Who was that?

18  A. You want his name?

19  Q. Yes.

20  A. His name was K.V.; those are initials. Last name

21  is Ramachandran, R-a-m-a-c-h-a-n-d-r-a-n. He was

22  there at the time.

23  Q. How about when you held the position of interim

24  general superintendent, who did you report to?

25  A. I reported to our deputy director, which was Gary

Page 12

1  Fujita, F-u-j-i-t-a.

2  Q. Is as the assistant director of engineering, who

3  did you report to?

4  A. I reported to Gary Fujita. He was the deputy

5  director.

6  Q. Who did Fujita report to?

7  A. The director, Mr. Mercado.

8     MR. WATSON: Are you asking for any

9  specific time period here?

10     BY MS. BADALAMENTI:

11  Q. Did that change at any point?

12  A. You mean change what?

13  Q. We've talked about the time period from 1998

14  until the time that you retired. Did Mr. Fujita

15  hold the position of deputy director?

16     (Mr. Ruegger present at 1:36

17  p.m.)

18     THE WITNESS: No. No. There were

19  other people during that time. I think Gary

20  became the deputy sometime in the mid-90s or

21  something like that. There were other people

22  before that.

23     BY MS. BADALAMENTI:

24  Q. In the course of your employment with the

25  engineering department, did you become familiar

Page 13

1   with a firm known as Inland -- Inland Waters?
2   **A.  Yes.**
3   Q.  Did Inland Waters -- when you were field
4   engineer, did you oversee any project that was
5   being done by Inland Waters?
6   **A.  Yeah.  They did some work for us, yeah.**
7   Q.  What projects were you involved with as a project
8   engineer for Inland Waters?
9   **A.  One of the projects was the construction of a**
10   **water main in Ypsilanti Township.  The project**
11   **number was WS-360C.**
12   Q.  Any others you remember?
13   **A.  I don't remember a whole lot of projects.  This**
14   **was one of the major projects.**
15   Q.  How about when you were the interim general
16   superintendent, was there any project with Inland
17   Waters that you recall being involved with?
18   **A.  As part of the interim general superintendent of**
19   **engineering, all the projects that were done in**
20   **the city engineering department, they were all**
21   **under me.  Inland Waters was doing the -- what**
22   **they call the sewer repair project, CS-1368, if**
23   **that's what you mean.  That's what they were**
24   **doing.**
25   Q.  So what would your role have been with respect to

Page 14

1   oversight or involvement in CS-1368?
2   **A.  No.  As I said, I was in charge of the whole**
3   **department -- whole section.**
4   Q.  I understand that.
5   **A.  CS-1369 was being overseen by the field**
6   **engineering group and the design group, and then**
7   **they were all reporting to me.**
8   Q.  So your department would be overseeing CS-1368?
9   **A.  Right.**
10   Q.  Okay.  And that oversight, what types of things
11   would you be doing?  When you say the word
12   "oversight," what --
13   **A.  Basically issue them the task orders for work in**
14   **various locations in terms of collapse, blockage.**
15   **That was their kind of work they were doing, and**
16   **then whatever we need to do in order to repair**
17   **that.  Whether we need to dig it up, put a new**
18   **pipe in or put some kind of lining system, that**
19   **was part of the job.**
20   Q.  So would your department actually prepare the
21   task order for --
22   **A.  Yeah, we prepared the task order, yes.**
23   Q.  Who determined the price associated or the cost
24   associated with the task order?
25   **A.  There were prices in the contract and all, in the**

Page 15

1   **document, pipe sizes and footages and all that.**
2   **So they went and did the investigation and found**
3   **the size of the pipe, how deep it is, what kind of**
4   **material it is.  Based on that, based on the price**
5   **that was in the contract documents and all, they**
6   **will give us a price for that.  We approve the**
7   **price or we negotiate, whatever we need to do.**
8   Q.  The price is determined before the work is done?
9   **A.  Unit prices were there in the contract.**
10   Q.  Did you have occasion to personally speak to
11   anyone at Inland during your involvement in
12   CS-1368?
13   **A.  Actually personally -- what do you mean by**
14   **personally?**
15   Q.  A few minutes ago you told me your department
16   over saw the construction.  So my question is:
17   Did you have any one-on-one contact with anybody
18   from Inland Waters?
19   **A.  I mean, as part of the -- as in charge of the**
20   **section, no.  I knew all the contractors and**
21   **subcontractors.  I knew their project managers.  I**
22   **met them when they came for some meetings.  So I**
23   **did talk to them.**
24   Q.  Was there a time during 1368 -- the
25   implementation of 1368 where you became the

Page 16

1   person that was out at the site while the work
2   was being done?
3      **MR. WATSON:** Are you talking about once
4   we get into the sinkhole and the repairs?
5      **THE WITNESS:** The sinkhole, is that
6   what you're talking about?
7      **BY MS. BADALAMENTI:**
8   Q.  With respect to 1368, the sewer lining contract,
9   was there ever a point in time before that
10   contract had any amendments issued that you were
11   the person that was out at the job site looking
12   at work that was being done?
13   **A.  Okay.  I'll answer it this way:  I was personally**
14   **involved -- personally I was in charge of one of**
15   **the projects when I was not the assistant director**
16   **or interim general superintendent of engineering.**
17   **At that time I was field engineer.  That was the**
18   **sinkhole in 15 Mile Road between Hayes and**
19   **Schoenherr.**
20   Q.  So as the field engineer, the position that you
21   held, was that till 2005?
22   **A.  2004 and '05.**
23   Q.  So you were the field engineer and that was your
24   designated project?
25   **A.  That was my project, yes.  I was the project**

1  manager on that job.
2  Q.  Was there a team underneath you?
3  A.  Yes.
4  Q.  Who else was involved?
5  A.  I had two other engineers working for me, and then
6  two inspectors.
7  Q.  What are their names?
8  A.  The engineers are one George Rayes, R-a-y-e-s.
9  The other name was Casey Mansour, M-a-n-s-o-u-r.
10  The inspectors was Charles George -- and I'm
11  forgetting the name of the other guy.  There was
12  one more.  I don't remember his name, though.
13  Q.  So as the project manager what would your duties
14  have entailed out at the sinkhole?
15  A.  My duty was to supervise the -- not supervise --
16  yeah, that's right, supervise the day-to-day
17  construction work going on there.
18  Q.  So were you out there all day every day?
19  A.  I was there every day.
20  Q.  Who was the lead contractor who was overseeing
21  all the subs?
22  A.  Lead contractor of CS-1368 was Inland Waters.
23  That was the name of the contract, 1368.
24  Q.  Is that what you observed to be the case out
25  there?  Was Inland actually the one holding the

1  morning meetings and coordinating the work?
2  A.  Yes, we had daily meetings.
3  Q.  Inland Waters held those meetings?
4  A.  Inland Waters was in charge of the meetings, yes.
5  Q.  Who from Inland Waters would have been in charge?
6  A.  The main person was Walter Rozycki, R-o-z-y-c-k-i.
7  And then they have another project manager who
8  came from time to time, not every day.  His name
9  was Dennis Oszust, O-s-z-u-s-t.  He was not there
10  every day, but Walter was there every day.
11  Q.  Were you involved at all when the 1368 Amendment
12  2 -- when the terms and conditions of that were
13  negotiated and arrived at and the amendment was
14  actually executed?
15  A.  Amendment of the original contract?
16  Q.  Right, Amendment 2 of 1368.  Were you involved in
17  that process?
18  A.  We had quite a few amendments.  Which one are you
19  talking about?  Which year?
20  Q.  Let me pull it out for you.
21  A.  Yeah, please.
22  MS. BADALAMENTI: I'm going to mark as
23  Exhibit 1 a package of documents that the front
24  page reads Amendment No. 2, Contract No. CS-1368.
25  MARKED FOR IDENTIFICATION:

1  DEPOSITION EXHIBIT 1
2  1:45 p.m.
3  THE WITNESS: Is there a board letter
4  here?  Just the legal documents.
5  MR. WATSON: It's the same thing you're
6  looking at.
7  THE WITNESS: It's the same thing?
8  BY MS. BADALAMENTI:
9  Q.  Yes.
10  A.  This is amendment for the $35 million?  Is that --
11  Q.  I'm asking you, is this the amendment?
12  A.  I don't see --
13  Q.  Do you recognize this to be Amendment 2 to
14  CS1368?  If it's not, it's not.  I just need to
15  know that from you.
16  A.  I think I remember this amendment.  I remember
17  seeing this.  I was not the one who presented it
18  to the board, but I did go through this, yes.  35
19  million, the original --
20  Q.  The page on the top that reads page 3 of the
21  contract, there's the reference to the
22  $35 million that you asked about.
23  A.  Yeah, I saw that.
24  Q.  Is it your understanding that Amendment 2 to
25  CS-1368 was for $35 million?

1  A.  Yes, that's what it says.
2  Q.  Were you involved in the negotiation --
3  A.  No.
4  Q.  -- of --
5  A.  No, I was not involved in the negotiation.  I
6  remember this one.  I remember this one.
7  Q.  Do you know who was involved in the negotiation?
8  A.  It must be the contracts and grants group.  They
9  do all the negotiations.  And some people from
10  engineering department may be part of it, but not
11  my group, because I was field engineer those days.
12  Q.  So did anybody come to you and ask you about
13  Amendment 2 before it was entered into?
14  A.  I don't remember that.  I don't know.  I don't
15  remember that specifically.  But I know it's
16  involved in sinkhole.  I remember that.
17  Q.  When you use the term "sinkhole," what are you
18  referring to?
19  A.  15 Mile and Hayes sewer collapse.
20  Q.  And the sinkhole was repaired under the terms of
21  this Amendment 2; is that right?
22  A.  Under the terms of this amendment, yes.
23  Q.  The last six pages of this document, can you flip
24  to that.  It begins with Exhibit B-2, Costing
25  Summary.

1 A. Costing Summary, um-hmm.

2 Q. Do you recognize this document?

3 A. Yeah, I do, this page.

4 Q. This is a document that you prepared. Is that

5 your signature on the bottom of it?

6 A. That's my signature. Prepared by my engineer, but

7 my signature is on there, right.

8 Q. What engineer would have prepared it?

9 A. George Rayes, the guy that was working with me.

10 Q. And what was the purpose of this document?

11 A. Some of the item that -- like overtime, overtime

12 was not specifically specified in the contract

13 documents 1368. Since we are working 24 hours a

14 day, we had to set up some price -- not exactly

15 price, but how do we pay for the overtime and all

16 that, consultants' hours, and how we are going to

17 pay and all that. That was not specified in the

18 original document. So this document is to, you

19 know, give some direction to the contract, which

20 is 1368, how will we pay for their labor and the

21 materials if they were to do something on that.

22 That's why we did that.

23 Q. Was this something that you were requested to

24 prepare?

25 A. This is something the contractor asked for because

1 he was saying how will I pay these guys, how will

2 I pay for the overtime. We clarified that and we

3 told him this is how we are going to pay for that.

4 Q. Do you remember the date that the sinkhole

5 occurred?

6 A. Sinkhole occurred on August 24, 2004.

7 Q. This document is dated September 20th of 2004.

8 A. Right.

9 Q. How were these things being charged prior to

10 that?

11 A. When we started that, the CS-1368 contract, the

12 contractor was selected to do this job. Until

13 September 20, 2004, they had not given us any

14 estimate to pay for that. They incurred the cost.

15 It was all at their expense. Of course, they were

16 making notes of what they were doing every day.

17 When the time came to make the first invoice and

18 all that, this issue came up, and that's when we

19 clarified. If I remember, that first payment we

20 made to them was sometime the end of September or

21 early October, when we processed the first invoice

22 for them.

23 Q. So did this result in the allowance of the

24 charges that they submitted or did this result in

25 a change of what had already been submitted?

1 A. Nothing was submitted to us before that. Based on

2 this document, they prepared the first invoice as

3 to how to charge for the hours.

4 Q. Are the line items in this document something

5 that has ever been approved or implemented with

6 respect to another DWSD contract?

7 A. Yeah, there were others.

8 Q. What other contracts were there?

9 A. Every contract has the same language. It's in the

10 specification book.

11 Q. As this costing supplement?

12 A. Pardon me?

13 Q. Every DWSD contract has a costing supplement like

14 this?

15 A. They have some kind of language which says that

16 time will be paid like this. There are clauses in

17 the contract. That's what I'm trying to say.

18 DWSD.

19 Q. So there are clauses in the contract or there is

20 a costing supplement that's always used?

21 A. There are clauses in the contract.

22 Q. Okay. Do you know why there wasn't clauses in

23 this contract?

24 A. I don't know why it was omitted. It should have

25 been, but I do not know why it was not there.

1 Q. There is -- in section 2 of this letter it

2 indicates that a 15% markup on overtime for

3 direct labor would be allowed.

4 A. Um-hmm.

5 Q. Is that something that had been allowed by DWSD

6 in other contracts?

7 A. That's right.

8 Q. And the reference to contractor invoices, what

9 does that section mean? "Mobilization and

10 demobilization will be a maximum of 5%" --

11 A. "...of total invoice." See, the way this CS-1368,

12 I don't know how they -- I mean, I didn't write

13 the specifications for that contract, but

14 mobilization and demobilization was not addressed

15 as part of the contract. This is the language

16 that we have in every other contract, that 5% will

17 be the total maximum cap on the mobilization and

18 demobilization. We brought the clause into this

19 contract which wasn't there before.

20 Q. So the -- in your opinion, CS-1368 didn't have

21 any language like this. It wasn't that it had

22 different language; it was that it didn't have

23 any?

24 A. These were not there. If remember that correctly,

25 these four items were not there.

Page 25

1 Q. The next page is a correspondence from Victor
2 Mercado going to Robert Williams at Inland
3 Waters. Have you ever seen this document before?
4 A. Yeah, I've seen that.
5 Q. What is this document? What do you know it to
6 be?
7 A. I think this is a kind of a letter telling them
8 that Amendment No. 2 is going to be -- it's
9 already approved, but it's going -- April 2005 was
10 already approved, so this is giving them the
11 letter saying your amendment is approved, if you
12 agree to that, sign here and all that, and then
13 back to us. This is a letter of authority kind of
14 thing.
15 Q. So this correspondence April 4, 2005 is
16 indicating to Inland Waters, as you understand
17 it, Amendment 2 is approved?
18 A. Yeah. You know why?
19 Q. I'm not asking you why. Why does it issue in
20 April of '05?
21 A. I takes time to get the amendment approved through
22 the board and the Board of Water Commissioners and
23 the council. If we did the amendment in
24 September, then it has to go to the board and go
25 to council. It takes almost three to six months,

Page 26

1 and that's what it took. I'm not trying to be
2 over smart. I'm just telling you how the
3 system -- this is how long it takes.
4 Q. If you go back a few pages, the contract
5 Amendment 2 has a signature page, and it
6 indicates this contract was approved by City
7 Council, and there's a signature, and there's a
8 date and the date is 12/30 of '04.
9 A. Which page are we talking about?
10 Q. It looks like this.
11 A. Oh.
12 Q. It reads at the top page S-1.
13    MR. WATSON: S-1?
14    MS. BADALAMENTI: S-1, yes.
15    BY MS. BADALAMENTI:
16 Q. Do you see those dates on those signatures?
17 There's two dates actually in December of '04.
18 Do you understand that the amendment was not
19 approved in December '04? You understand that
20 the time was different?
21 A. No, this say the amendment was approved, signed by
22 the City Council 12/30/04, yeah.
23 Q. And we don't see Mr. Mercado's letter. The
24 letter we were looking at to Inland Waters, it's
25 dated April 4th of 2005.

Page 27

1 A. The letter was issued late. I don't know why, but
2 it was issued late.
3 Q. It wasn't because the Amendment 2 was waiting for
4 approval by City Council, though; is that fair to
5 say?
6    MR. WATSON: Object to foundation. The
7 witness can answer, if he can.
8    BY MS. BADALAMENTI:
9 Q. You can answer.
10 A. I'm just looking at this.
11 Q. Take your time.
12 A. I'm not sure what happened here in this case, but
13 if you look a few pages further down, it says
14 "Resolution of Corporate Authority." That was
15 signed on April 30, 2005. So I'm not sure why,
16 December 30, 2004 and April 2005, why did it take
17 four months, but the amendment did become official
18 sometime in April.
19 Q. Okay. The Resolution of Corporate Authority
20 you're referring to is for Inland Waters?
21 A. For Inland Waters.
22 Q. The one before that has a Resolution of
23 Corporate --
24 A. 2004, yeah.
25 Q. So the one April 13, 2005, specifically refers to

Page 28

1 the costing supplement that is Mr. Mercado's
2 letter dated April 4, 2005?
3 A. Yeah. That basically came off of that.
4 Q. Okay. So you don't know why is the answer?
5 A. I don't know why it took that long.
6 Q. Okay. The document that begins with
7 Mr. Mercado's letter dated April 4, 2005, is a
8 document, though, that you have seen before; is
9 that right?
10 A. I've seen that, yeah.
11 Q. Do you know who directed that this document be
12 issued?
13 A. It will be prepared by contracts and grants group,
14 and you see the name here and all that, the last
15 line? Any questions, contact Darryl Latimer. He
16 was the contracts and grants manager those days.
17 His group prepared that for Mr. Mercado's
18 signature and to be countersigned by the
19 contractor.
20 Q. The next page -- let me back up. Do you know if
21 this costing supplement was something that was
22 requested by Inland?
23 A. This was all the -- how the payment is going to be
24 done so. This was included as part of the
25 amendment.

1 Q. How far along was the work by April of 2005?
2 A. We were almost done. The sinkhole was done.
3 Q. And so what is this costing supplement supposed
4 to do, in your opinion?
5 A. This costing supplement is supposed to -- all the
6 costs and all -- how they're going to be paid,
7 they'll be as per these terms and conditions.
8 Q. What about the costing supplement that you had
9 attached as Exhibit B-2 to the contract that you
10 told me these are the standard terms that DWSD
11 used? Why was there a new costing supplement for
12 this contract?
13 A. Because if you see in these documents, the
14 supplement that you are referring to that, it does
15 not have anything for the overtime payment.
16 Q. For the what?
17 A. Overtime payment -- overtime. It does not have
18 any clause in these pages.
19 Q. Okay.
20    MR. WATSON: What pages are you
21 referring to?
22    THE WITNESS: These last five pages.
23 So we had to make some kind of a -- make it clear
24 how they're going to be paid for that. Same thing
25 with the consultants' work and all that. You

1 don't see any reference in these things -- in
2 these two pages.
3    BY MS. BADALAMENTI:
4 Q. So Mr. Mercado's costing supplement, you're
5 saying, doesn't relate to overtime or how
6 consultants will be paid?
7 A. Um-hmm.
8 Q. That was dealt with by your costing supplement?
9 A. Right.
10 Q. So what does Mr. Mercado's costing supplement do?
11 What does it deal with?
12 A. This is Mr. Mercado's cost -- if I remember this
13 correctly, this is part of CS-1368 contract --
14 original contract. They just attached that to
15 that particular letter. If you see the original
16 CS-1368 contract, if I remember that right, they
17 will have these clauses. But it does not have any
18 clause for overtime. It does not have any clause
19 for how the consultants' time will be paid. And
20 it does not have any clause for mobilization and
21 demobilization. That's how we did that, by the
22 letter I was supposed to sign, which I signed.
23 Q. Okay. So let me just make the record clear.
24 There is a letter here dated April 4, 2005 that's
25 in front of three pages that purport to be or are

1 titled CS-1368 Amendment No. 2 Costing Supplement
2 that says "Effective December 3, 2004." There's
3 a second page to that and then a Billing Rate
4 Sheets page, right?
5 A. Um-hmm.
6 Q. So when you were referring to these pages, that
7 these pages were part of the original 1368,
8 you're referring to those three pages?
9 A. Except this table.
10 Q. Let me -- I've just got to clean up the record.
11 A. Please.
12 Q. So you're referring to those three pages that I
13 just pointed out that you believe that those were
14 part of the original 1368 contract?
15 A. Not entirely.
16 Q. Okay.
17 A. The two pages were part of the original contract.
18 The table was not.
19 Q. Okay.
20 A. The table is prepared as per my letter.
21 Q. Okay. All right. So then let's start with the
22 table. The table is prepared per your letter,
23 and I note that the table gives some standard
24 overtime and double time rates.
25 A. Um-hmm.

1 Q. Is this a table that you prepared?
2 A. No.
3 Q. Do you know who prepared it?
4 A. It was prepared by the contractor.
5 Q. I see some initials in the corner and they're
6 dated 3/17 of '05. Do you see that?
7 A. Yeah.
8 Q. Are one of those sets of initials yours?
9 A. Yeah, one of those is mine.
10 Q. Your costing supplement, Exhibit B-2 to the
11 contract, was dated in September of 2004.
12 A. Um-hmm.
13 Q. Is that right?
14 A. Yeah.
15 Q. So this billing rates sheet is not dated in 2004,
16 is it?
17 A. Yeah, dated in 2005.
18 Q. They did this one in 2005?
19 A. Um-hmm.
20 Q. Okay. They also in 2005 did the two pages that
21 precede it behind Mr. Mercado's letter, right?
22 A. Um-hmm.
23 Q. Is that a yes?
24 A. Yeah. The two pages, yeah.
25 Q. And there are some sets of signatures on those

Page 33

1 two pages as well?
2 A. Yeah, my initial is one of them.
3 Q. And they're dated, again, 3/17?
4 A. Same day.
5 Q. I've just got to make a clear record.
6 A. Okay.
7 Q. So you have to let me finish so she can get down
8 what we are both saying.
9 There are initials and dates. One of
10 those initials is yours, correct?
11 A. Um-hmm.
12 Q. Is that a yes?
13 A. Yes.
14 Q. The date 3/17/05 is the same date as on the last
15 page, correct?
16 A. That's correct.
17 Q. So these three documents were then prepared at
18 the same time; would you agree with that?
19 A. Yes, they were prepared on that particular date.
20 Q. Who prepared them?
21 A. The contractor.
22 Q. Inland?
23 A. Inland.
24 Q. And why is Inland preparing its own costing
25 supplement for how its contract is going to be

Page 34

1 paid?
2 A. They are just telling us we had been charging or
3 we are charging as per these documents. We were
4 trying to formalize it on that particular date.
5 Q. Did -- was there a costing supplement like this
6 for CS-1368, the sewer lining part of the
7 project?
8 A. Okay. Let me clarify that. These two pages which
9 says the amendment No. 2 costing supplement and
10 all that, as far as I remember, they're part of
11 the original contract, these two pages. This
12 table is not.
13 Q. Okay. When you say it's part of the original
14 contract, who prepared it?
15 A. That was prepared by contracts and grants, our
16 group.
17 Q. So Darryl Latimer?
18 A. Darryl Latimer's group.
19 Q. He would have prepared it, and he would have
20 prepared it at the time Amendment 2, back in
21 2004, was entered into? That's your opinion?
22 A. Whenever the original contract was awarded to
23 these people, yes.
24 Q. Why do your initials appear with the date of 3/17
25 of '05?

Page 35

1 A. Because the contractor initial that; I initial
2 that that we are going to use these documents.
3 That's what we said. Technically if you ask my
4 opinion, I should have initialed only the table,
5 not the other two, but since these three came
6 together and all that, I initialed the first two
7 also.
8 Q. And it's your belief that this was attached to
9 and approved by -- or attached to the original
10 contract as it was approved by council and signed
11 off on by --
12 A. That's my belief, yes.
13 Q. And this document you recall being prepared by
14 Inland?
15 A. They attached these paperwork to that particular
16 letter, yes.
17 Q. I'm sorry?
18 A. Yes.
19 Q. Inland prepared?
20 A. They just took a copy of the clauses from the
21 contract and brought this paperwork in front of
22 me.
23 Q. Have you ever seen a costing supplement like this
24 prepared for any DWSD contract?
25 A. I don't understand this question. What is that

Page 36

1 supposed to mean?
2 Q. Has another Detroit Water and Sewerage contract
3 attached a costing supplement like this here or a
4 table like this one here?
5 A. This table is special, because we did not have
6 those clauses in the contract documents. In all
7 other contracts and all that that we considered as
8 part of the DWSD, these clauses are there, so we
9 don't have to have a supplement attached. This
10 contract did not have what is in the table. I'm
11 specifically referring to the table.
12 Q. Okay. How about the clauses in the two pages?
13 A. These clauses, as far as I know -- I mean, it's so
14 long ago -- they are part of the original
15 contract. They are there. The table is not, what
16 is in the table.
17 Q. What are you doing on March 17, '05 with these
18 documents? Why are you initialing them at that
19 point in time?
20 A. I don't remember that, why did we initial that.
21 All it is that -- the amendment was going to be
22 approved or not approved by that particular time.
23 This letter was going to be issued, and then I
24 initialed that this is how the payment is made or
25 has been made or is going to be made. That's the

Page 37

1  only reason for my initial on this.
2  Q.  The costing supplement that you did in September
3  of 2004, you said, was because there were not --
4  consultants were not provided for -- how to pay
5  consultants, right?
6  A.  In CS-1368, yes.
7  Q.  I see on page 2 of these two sheets behind
8  Mr. Mercado's letter it indicates consultant and
9  professional engineers' cost will remain as per
10  the attached table.  So would it be fair to say
11  that this document, then, would have come after
12  your costing supplement in September of 2004?
13  A.  **This document did come after that, because this is**
14  **attached to the letter that Mr. Mercado signed,**
15  **which was when the amendment is approved, but we**
16  **have to make payments to the contractor before**
17  **that.**
18  Q.  So when you say --
19     MR. WATSON:  Let him finish.
20     THE WITNESS:  The contract did raise
21  some issues in September, how do we make the
22  payment to the contractor.  We made the payment as
23  per this particular letter and this letter
24  resulted in the table that is down here.
25     BY MS. BADALAMENTI:

Page 38

1  Q.  Right.
2  A.  **We were making payments to the contractor based on**
3  **my letter.**
4  Q.  Now, in April of 2005, when you say that this
5  April 2005 and the three pages behind it are part
6  of the original CS-1368, that would be because
7  you were assuming that CS-1368 Amendment 2 wasn't
8  approved prior to April of 2005?
9  A.  **Right.  That's right.**
10  Q.  But we know that City Council did approve it in
11  December of 2004; so to the extent that it was
12  approved before April of 2005, you would agree
13  with me that costing supplement, then, came
14  later?
15     MR. WATSON:  I'm going to object to the
16  form of the question.  I don't understand it.  If
17  the witness does.
18     BY MS. BADALAMENTI:
19  Q.  Let me ask it another way.  Would you agree with
20  me that this document, other than your table,
21  that the two pages behind Mr. Mercado's letter
22  were not prepared or circulated at any point
23  before March 17th of 2005?
24  A.  **Okay.**
25     MR. RUEGGER:  I'll object to the form.

Page 39

1     BY MS. BADALAMENTI:
2  Q.  Go ahead.
3     MR. WATSON:  You can answer.
4     THE WITNESS:  CS-1368, the original
5  contract for certain amount of money -- the
6  contract already had money in the contract
7  available for payment for any work that is going
8  to be done underneath that, including the sinkhole
9  work.  The sinkhole work amendment officially got
10  approved in December and formalized on April 2005
11  with this letter, but we did make payments to the
12  contractor for the work that he was doing on the
13  sinkhole before that, and that's the reason for my
14  letter, because we have to pay him sometime in
15  September.  April 2005 and this table that you see
16  with my initial on 3/17, 2005, this is basically
17  formalizing the whole thing, making it official,
18  but we are still making him payments before that
19  based on only the terms and conditions that are in
20  my letter and that are in this table, which is
21  part of this letter of April 2004 -- 2005.  Did I
22  make myself clear, please?
23     BY MS. BADALAMENTI:
24  Q.  I think I've got it.
25  A.  **Okay.**

Page 40

1  Q.  One thing that you just said that we need to
2  clarify, you said the contract was approved in
3  December of 2004, but it was not authorized until
4  April of 2005.
5  A.  **Officially authorized.**
6  Q.  And what does that mean?
7  A.  **That means that that amendment is part of the**
8  **contract officially on that particular date.**
9  Q.  And who makes it official?
10  A.  **That's by contracts and grants, and then the**
11  **director's office.  This is when they prepare an**
12  **official amendment and then it's given to the**
13  **contractor, and it becomes part of their contract.**
14  Q.  Are you familiar with the rates in this costing
15  supplement?
16  A.  **I'm familiar with the clauses, yes.**
17  Q.  Are these clauses that you had seen in any other
18  DWSD contracts?
19  A.  **That's right.**
20  Q.  What other contracts?
21  A.  **Every contract, more or less.**
22  Q.  More or less, tell me the ones that they're in.
23  A.  **You want the names of the contract?**
24  Q.  The projects, yeah.
25  A.  **I mean, if you look at WS-360C, it will have**

Page 41

1   contract clauses like this. Every contract will
2   have some clauses like this. Some have some of
3   them; some have all of them, depending on what
4   kind of work, but they are the clauses in the
5   contracts.
6   Q.   Any contracts that did not involve Inland Waters
7   have clauses like these?
8   A.   Name any contract, they should have it.
9   Q.   Okay.
10  A.   Any contract with the city -- construction
11  contract I'm talking about.
12  Q.   Um-hmm.
13  A.   Specifically you want me to name something? I
14  don't remember the names and the numbers right
15  now. But these clauses are there as part of those
16  contracts.
17       MR. WATSON: And you're referring to
18  the clauses in the document dated -- or entitled
19  CS-1368 Amendment No. 2 Costing Supplement with
20  initials in the-right-hand corner?
21       THE WITNESS: Um-hmm.
22       MR. WATSON: That two-page document?
23       THE WITNESS: That's what she's talking
24  about.
25       MR. WATSON: Okay.

Page 42

1       BY MS. BADALAMENTI:
2   Q.   In section VII there's a reference to limits on
3   fee for the work involved. Do you know what that
4   paragraph means or --
5   A.   This means the markup that we are going to pay the
6   contractor and subcontractors for the work they
7   have done.
8   Q.   It indicates here that it will include a
9   negotiated fee to cover certain costs described
10  above and a profit.
11  A.   Um-hmm.
12  Q.   And that the fee can't exceed 10% of the
13  contractor's cost.
14  A.   These are the limits on the total fees.
15  Q.   Were those standard terms in all DWSD contracts?
16  A.   The one and two are the standard terms, yes.
17  Q.   Was it the case that DWSD would issue a costing
18  supplement that would include a fee that was
19  still to be negotiated?
20  A.   It says the fee shall be negotiated, but most of
21  the -- not most. All the time we paid them 10%
22  for the main contract and 5% for the subcontract.
23  That's what the charge --
24  Q.   Well, there was a time in implementing the
25  contract that those amounts were changed. Are

Page 43

1   you aware of that?
2   A.   I don't --
3   Q.   During the first four months of the contract the
4   markups that were permitted and paid were
5   different. Were you aware of that?
6   A.   Tell me that specifically. I didn't understand it
7   fully.
8   Q.   During the first four months that the sinkhole
9   repair was invoiced and paid on, the markups were
10  different. The markups were 15 and 10.
11  A.   I'm not aware of that. I'll have to see the
12  document, what it is.
13  Q.   But it's your opinion that these rates, 10 and 5%
14  on markup, that's standard DWSD language?
15  A.   Standard DWSD conditions.
16  Q.   Was it standard for DWSD to have a term in the
17  contract that says it will include a negotiated
18  fee?
19  A.   I don't remember this word, but my feeling is that
20  this is a standard language from the contract. My
21  feeling is it should be.
22  Q.   Were you authorized by someone to put your
23  initials on this document?
24  A.   Yeah, I mean, this document should have been
25  signed by the director, but since I was there at

Page 44

1   the site on that particular date, I signed that.
2   Q.   The director's letter is dated a couple weeks
3   after the -- your initials are placed on the
4   costing supplement. Is this something that you
5   brought back to the director or deputy director
6   or is it something that he was provided by
7   someone else?
8   A.   No, this is a document that the contractor brought
9   to me. I initialed those. They initialed that.
10  He took that to the contracts and grants people.
11  They prepared this letter. Then they sent it to
12  him. I did not take it to the director.
13  Q.   Is it typical to see a contract that's being
14  performed for -- since August of 2004, is it
15  typical that a costing supplement like this would
16  not be agreed upon until March or April of 2005?
17  A.   No, it's not typical because this was a special
18  project. This is emergency project. So typically
19  this is not done.
20  Q.   Had the City of Detroit had any other emergency
21  projects -- any other emergency collapses?
22  A.   We did some emergency work, not to this magnitude.
23  Like on Jefferson, we had a 42-inch water main
24  break that was done as an emergency. Similarly,
25  some other collapses were done for the water main

13-53846-tjt    Doc 7885-21    Filed 10/08/14    Entered 10/08/14 21:38:19    Page 12 of
32

Page 45

1 sewer throughout the city and outside the city on
2 an emergency basis, not to the scale that this
3 was.
4 Q. Any other DWSD contract where the terms that are
5 in this costing supplement are not agreed upon
6 before the work begins?
7 A. It depends on the kind of work that we are doing.
8 I'll answer it this way: Most of the time we know
9 what work they're doing, and then the conditions
10 and the terms and conditions and the clauses are
11 already in the contract. This particular case,
12 for this type of a contract that CS-1368 was, it
13 did not have these clauses; so this is some kind
14 of something special.
15 Q. By September 20th of 2004, the emergency at this
16 project was over; wasn't the bypass already
17 installed?
18 A. No. September -- not emergency was over, but the
19 bypass was in service, yes.
20 Q. So why was it still considered to be an emergency
21 project at that point?
22 A. Because we still have to repair the sinkhole, and
23 then the bypass will have to be continued.
24 Something happen to the bypass, then that
25 particular bypass has to maintain all the time,

Page 46

1 all the pumps and motors and everything that needs
2 to be done. It has to be monitored on a
3 day-to-day basis. And we were still monitoring
4 the sewer levels in case, let's say, those bypass
5 pumps are not able to handle it? What will happen
6 to the flow that needs to be conveyed? So it was
7 an emergency until the main trunk sewer line get
8 into service. The bypass was a temporary, or say
9 for the time being it was a system and all that
10 that we tried to take the sewage from one point A
11 to point B around the sinkhole. That's what we
12 did.
13 Q. Was the sinkhole secure at the time that you
14 issued the September 20, 2004 cost supplement?
15 A. The sinkhole was not totally secure, no.
16 Q. What was not secure about it?
17 A. Because we still have to build the system around
18 the sinkhole so that it does not take the rest of
19 either the pavement or somebody's backyard into
20 the sinkhole. We need to secure it.
21 Q. Weren't there walls -- retaining walls that had
22 been put up to secure it?
23 A. We did what we call the piles and all that. I
24 don't think they were all finished by this time.
25 Q. Okay. When were they finished?

Page 47

1 A. I think sometime in October.
2 Q. When -- were you involved in any other project
3 where an interceptor had failed?
4 A. Not of this magnitude, no.
5 Q. Any other project that involved a sinkhole at
6 all, whether it was of this --
7 A. No, I was not involved. This was my first major
8 project, yes.
9 Q. Are you aware of any situations like this that
10 have occurred recently in the City of Detroit?
11 A. Recently means when, after I retired?
12 Q. After you retired.
13 A. I mean, there was something in the papers the
14 other day. That was what -- what was that? Six,
15 seven months ago there was a collapse on
16 Jefferson.
17 Q. Other than those more recent occurrences, you
18 were not involved in any --
19 A. No, I'm not involved in any DWSD since I retired.
20 My only information is based on papers and what I
21 hear on the radio and TV.
22 Q. If the city had determined that there was no
23 longer an emergency once the bypass was installed
24 and the sinkhole was secure, would the remaining
25 work then have to have been bid or how would it

Page 48

1 have been handled?
2 A. As far as I know, the emergency will be lifted
3 only once we put the main trunk line sewer back in
4 service, because anything can happen to the
5 bypass.
6 Q. And who makes the determination that it's still
7 an emergency?
8 A. The director.
9 Q. Did anyone raise that issue with him?
10 A. No. As far as -- I'm not aware of that. I didn't
11 raise that question with him. I still think that
12 it was an emergency until we put the sewer back
13 into service.
14 Q. Is the costing supplement, the overtime and the
15 markups that are in your September of 2004
16 costing supplements, that's because this is an
17 emergency project?
18 A. How do I answer that? This letter that I have --
19 that I signed in 2004 is to pay for the charges
20 that we are accumulating in the contract which is
21 being done under CS-1368.
22 Q. Is this --
23 A. Why is it -- is it something because of the
24 emergency? Not necessarily so. If I had a
25 similar project going on somewhere else also, did

Page 49

1 not have these clauses where I'm going to incur
2 costs like this, we would still issue a similar;
3 letter like this.
4 Q. My question is: Do you have overtime that is
5 allowed on other projects where you issue a
6 similar letter like this allowing overtime, or is
7 overtime not standard on DWSD contracts?
8 A. Overtime is -- some kind of a clause is there in
9 various contracts. It was not in CS-1368.
10 Q. Do you know why not?
11 A. I didn't prepare the documents. I don't know why.
12 Q. Did you ever ask anyone?
13 A. No, I never asked anybody.
14 Q. Who directed you in September of 2004 to prepare
15 that costing supplement?
16 A. As far as I'm concerned -- as far as I remember,
17 we did talk about when they were preparing the
18 invoice, the contractor represented, which is
19 Dennis Oszust -- basically he talked to me. We do
20 not have this kind of language in the contract
21 documents. I said I remember we did talk to the
22 director, and he said we need to pay for these
23 costs, how do we do that, and it was decided we
24 were going to issue a letter explaining how the
25 costs are going to be paid. And that's how the

Page 50

1 document came about.
2 Q. Was there any discussion with Kwame Kilpatrick
3 about that letter?
4 A. No.
5 MR. WATSON: Object to foundation.
6 THE WITNESS: I can answer that. No.
7 BY MS. BADALAMENTI:
8 Q. What about when Mr. Mercado issued his letter in
9 April of 2005, did he come to you to discuss it?
10 A. He's my boss. Why would he come to me for that?
11 Q. Did he come to you to compare his letter to what
12 you had issued in September of 2004?
13 A. No. I don't remember -- I mean, I got this letter
14 later on once he signed it, but he never came to
15 me or he never asked me to -- he'll never come to
16 me. He'll ask me to come. He never asked me to
17 come forward and then come to his office or look
18 at this letter. I know I did not. I only got it
19 after it's signed.
20 Q. Are you aware of Amendment 3 to CS-1368?
21 A. I mean, that was after. This should be -- if you
22 want me -- can I see the paperwork, please.
23 Q. Sure. What do you remember about Amendment 3?
24 A. Let me see the paper. Then I'll tell you. I
25 don't remember all the amendments on the documents

Page 51

1 right now.
2 Q. I'd like you to answer the question while I find
3 the document. Do you remember anything about
4 there being a third amendment to CS-1368?
5 A. There was Amendment No. 3. That, I know. I don't
6 know exactly the scope of work. I don't know the
7 amount. But I know Amendment 3 was done, and I'm
8 aware of that. But if I can see the document,
9 then I'll tell you what the scope is and what the
10 cost is.
11 Q. Do you remember if there was a costing supplement
12 done for Amendment 3?
13 A. No, I don't remember that.
14 Q. Were you ever questioned by law enforcement about
15 that costing supplement that's in front of you?
16 A. I don't remember. I did talk to the law
17 enforcement -- you're talking about FBI? Is that
18 what you're saying?
19 Q. Any law enforcement officer or agent.
20 A. I did talk to the FBI and all that regarding
21 various contracts, and sinkhole was one of them,
22 but I don't remember exactly if we talked about
23 the amendment.
24 Q. Before we move too far off what's in front of
25 you, let me ask you, do you remember any -- do

Page 52

1 you remember any circumstances that led to
2 certain costs being disallowed with him respect
3 to Amendment 2?
4 A. This is determined by our contracts and grants
5 group. After the contractor submits the invoice,
6 then we sign it. We send it to the contracts and
7 grants. They are the people who finally pay for
8 it. They will go through the various clauses and
9 all that, seeing if anything is not per the
10 documents. If they think something is not, then
11 they'll say this is not allowed. They'll take
12 that out. They determine that; we do not.
13 Q. When you say that it's given to contracts and
14 grants and contracts and grants make the
15 determination, who provides the information to
16 the contracts and grants department?
17 A. We send them all the documents from engineering.
18 Q. You personally or someone else?
19 A. No. No, I cannot by me personally. Has to be
20 the group that is basically handling. In this
21 case, the field engineering group, they will do
22 that. They will send it over there.
23 Q. Did any of the contractors or subcontractors
24 express that they were not happy with your
25 costing supplement?

Page 53

1 A. I don't remember anybody saying that.
2 Q. Did anybody contact you to express that they were
3 not happy with Mr. Mercado's April 2005 costing
4 supplement?
5 A. I don't remember that, no.
6 Q. Do you remember a circumstance where there was a
7 meeting that was requested and how to discuss the
8 changes that were referenced in those two costing
9 supplements?
10 A. It was so long ago, I don't remember if somebody
11 asked for a meeting. I don't remember that.
12     MARKED FOR IDENTIFICATION:
13     DEPOSITION EXHIBIT 2
14     2:32 p.m.
15     BY MS. BADALAMENTI:
16 Q. This is a correspondence dated January 10th of
17 2005. I've marked it as Exhibit 2. Do you
18 recognize that document?
19 A. This letter is copied to me, so obviously I must
20 have seen it, but it's something that Inland
21 Waters is trying to clarify to the director that
22 this is all they'll be able to charge.
23 Q. This is Inland Waters actually going around your
24 September 3rd, 2004 costing supplement, isn't it,
25 these rates will modify those set forth in the

Page 54

1 September 3, 2004 letter?
2 A. That's what they are saying here, that we are
3 going to change those terms and conditions.
4 That's what they're saying.
5 Q. Were you involved in the negotiations that led to
6 this letter, if there were any?
7 A. No. But they issued the letter, and later on they
8 charged us per this.
9 Q. Do you remember any discussing or meetings about
10 this letter?
11 A. I don't remember having any meetings on this. The
12 letter -- they sent the letter to the director.
13     MARKED FOR IDENTIFICATION:
14     DEPOSITION EXHIBIT 3
15     2:34 p.m.
16     MR. WATSON: Is this letter Exhibit 2.
17     MS. BADALAMENTI: 3.
18     MR. WATSON: So the January 10th letter
19 was 2. And now you've shown a letter dated --
20 looks like a memo dated March 16, 2005. That's 3.
21     BY MS. BADALAMENTI:
22 Q. Do you recognize Exhibit 3?
23 A. I recognize this one.
24 Q. Which one are you referring to, the first page?
25 A. My memo to Darryl Latimer.

Page 55

1 Q. Okay.
2 A. Which one are you talking about?
3 Q. You're right. Your intra-departmental memorandum
4 dated March 16th, 2005 to Darryl Latimer, it
5 refers to a memo dated January 20, 2005, from Ed
6 Ramey to John McGrail. And it's referring to
7 markup percentage approval letter dated
8 September 3rd, 2004. Do you see that?
9 A. Um-hmm.
10 Q. Is that markup approval letter the third page of
11 what I just handed to you, this document here?
12 A. Yeah.
13 Q. Okay. Is this something that you prepared or
14 Inland prepared?
15 A. This is the one that I prepared.
16 Q. The first page, okay.
17 A. Right.
18 Q. The memo?
19 A. Yeah. And this was something that was circulated
20 in the department claiming that this is my
21 initial. This is not my initial. And that's why
22 I'm trying to explain. Somebody complained to the
23 director that I'm trying to sign on his behalf and
24 all. I cannot sign on behalf of the contract
25 because I was too junior guy at that particular

Page 56

1 time when I was doing the sinkhole. Somebody put
2 my initials on this. And they were saying I'm
3 trying to sign for the contract and the director.
4 Darryl Latimer was creating an issue. This is my
5 memo that I showed him that I did not do that.
6 Q. So your memo says, "This memo includes the markup
7 percentage approval letter dated September 3,
8 2004, signed by me for Mr. Victor Mercado (See
9 attached). Please be informed the signature on
10 this letter is not mine..."
11 A. Is not mine.
12 Q. "...and the official letter signed by me... was
13 based on a meeting held with Inland Waters on
14 September 3, 2004." Is that correct?
15 A. Yeah.
16 Q. And that -- that letter that you're referring to
17 that was by you, it is where?
18 A. This one, September 20th letter. Ultimately it
19 resulted in this letter, not this one.
20 Q. Okay.
21 A. That's what I'm trying to say.
22     MR. WATSON: When you said "not this
23 one," you're referring to the third page of
24 Exhibit 3?
25     THE WITNESS: Third page of --

Page 57

1    whichever exhibit this is.
2        BY MS. BADALAMENTI:
3    Q.   Do you know --
4    A.   We did talk on September 3rd that we were going to
5    pay them certain things which are not in the
6    contract document that resulted in the letter of
7    September 20, 2004, which I signed, but I did not
8    initial this one.  That's what I'm trying to say.
9    Q.   Do you know who did put the initials?
10   A.   I don't remember who put these initials.  It's not
11   mine.  It's not done by me.
12   Q.   Did you ever find out who put them?
13   A.   No.
14   Q.   And when you say Darrel Latimer was making an
15   issue of it, what was he doing?
16   A.   The issue was Shukla is not authorized to sign for
17   the director.  That was the issue, which is true,
18   which is fact.  I'm not authorized to sign for the
19   director.  Even for him I cannot do that.
20   That's -- issue here was this, how can I initial
21   on behalf of the director and I cannot.
22       MR. WATSON: That last statement, you
23   were referring to the second or third page of --
24   third page again of exhibit --
25       THE WITNESS: Third page of.

Page 58

1        MR. WATSON: -- of Exhibit 3.
2        BY MS. BADALAMENTI:
3    Q.   There is some handwriting on this letter.  It
4    reads "DWSD's management reviewed and approved
5    the listed percentages then were confirmed with
6    Inland through letter dated September 3rd, 2004."
7    And then there's some handwriting.  Do you see
8    that there?
9    A.   Where?
10   Q.   On the memorandum.  "These percentages were later
11   revised for contractors" --
12   A.   Which document are you referring to?
13   Q.   The memorandum.
14   A.   You're talking about the first one?
15   Q.   Yes.
16   A.   Okay.
17   Q.   Do you see the handwriting there?  Is that your
18   handwriting?
19   A.   Yeah, this is my handwriting.
20   Q.   What does it say there?
21   A.   "These percentages were later revised for the
22   contractors based on IWPC's letter of January 10,
23   2005," which is this one.
24       MR. WATSON: By "this one," you're
25   referring to Exhibit 2?

Page 59

1        THE WITNESS: Right.  And remember that
2    this letter was done in March of 2005.
3        BY MS. BADALAMENTI:
4    Q.   So your September 20, 2004 cost supplement was
5    later revised by Exhibit 2?
6    A.   Um-hmm.
7    Q.   Which was something prepared by Inland, correct?
8    A.   Prepared by Inland.
9    Q.   And it was then revised again -- is that fair
10   statement -- by the documents that we see from --
11   beginning with Mr. Mercado's letter in April of
12   2005?
13   A.   No, that particular document has exactly the same
14   things what it has here.
15   Q.   So did you actually hold the meeting that led to
16   Inland issuing that January 10th -- did you
17   actually hold a meeting that led to the
18   January 10, 2005 letter?
19   A.   I don't remember holding a meeting for that.  I
20   had a meeting for the 20th letter, 2004, but not
21   that one.  I don't remember that.
22   Q.   Do you know what transpires between January of
23   2005 and April of 2005 when Mr. Mercado actually
24   issues the letter reflecting the changes that
25   Inland had requested in January?

Page 60

1    A.   First of all, I don't understand this question.
2    What -- transpired means what?
3    Q.   Had the invoices been being paid based on the
4    January 10 letter or were they being paid based
5    on your September 2004 costing supplement?
6    A.   As far as I remember, if I remember that, the
7    invoices that were paid before December of 2004,
8    they were according to my letter.  But once the
9    letter came up in January of 2005 and the
10   percentages were changed, then later on invoices
11   made all the corrections to them, including the
12   invoices that were paid before that.
13   Q.   And that's as of January?
14   A.   That's as of January.
15   Q.   Okay.  Do you remember any drafts that were done
16   but not approved by Inland prior to the issuance
17   of that January 2005 letter?
18   A.   You mean a draft letter, is that what you're
19   saying?
20   Q.   A draft costing supplement.
21   A.   No, I don't remember anything like that.  I don't
22   know.
23       MS. BADALAMENTI: Let me mark these
24   four pages as Exhibit 4.
25       MARKED FOR IDENTIFICATION:

Page 61

1  DEPOSITION EXHIBIT 4
2  2:43 p.m.
3  BY MS. BADALAMENTI:
4  Q.  Have you ever seen Exhibit 4?
5  A.  I'm not sure if I saw this. I'm not sure. I
6  don't remember this letter, no.
7  MARKED FOR IDENTIFICATION:
8  DEPOSITION EXHIBIT 5
9  2:43 p.m.
10  BY MS. BADALAMENTI:
11  Q.  I'm marking two pages as Exhibit 5. It appears
12  to me to be the response to that Exhibit 4. Have
13  you ever seen that document?
14  A.  I don't remember seeing this also. I don't know.
15  They may have had a meeting with the contracts and
16  grants with the director's office. I don't
17  remember. I'm not sure if I was part of this
18  meeting.
19  Q.  Okay. Do you remember having reviewed and
20  disallowed a required change to amounts that had
21  been submitted by Inland Waters?
22  A.  I don't remember disallowing anything from my
23  side.
24  Q.  Do you recall a point in time when you directed
25  Inland Waters to use certain contractors or

Page 62

1  subcontractors on the job?
2  A.  No. It's not even my job to tell the contractor
3  which subcontractor to hire, no.
4  Q.  Did you ever inform Mr. Mercado that a certain
5  subcontractor should be used on this job?
6  A.  No.
7  Q.  Are you aware that certain individuals from
8  Inland Waters have said that you did convey such
9  information to them?
10  A.  No, I did not do that. And I'm not aware if
11  anybody said that. As part of my job, I cannot
12  tell contractor to hire any sub or anybody like
13  that.
14  Q.  Were you questioned by the federal government on
15  whether or not you directed Inland Waters to
16  retain certain subcontractors?
17  A.  They did ask me and I said no there, too.
18  Q.  And you said you are aware that there was an
19  Amendment 3, but you're not aware of the details?
20  A.  There was an Amendment 3. I remember that. If
21  you can show me, I can tell you that.
22  Q.  It's not something that we need to go into great
23  detail. Do you know the circumstances that led
24  to there being a third amendment?
25  A.  The third amendment is that -- if I remember it

Page 63

1  correctly, we did Amendment No. 2 but the costs
2  were actually more than that, and then the third
3  amendment was done to cover for the additional
4  costs. I think that's in a nutshell what I
5  remember.
6  Q.  Was there something that occurred out of the
7  project site that caused there to be such a cost
8  overrun?
9  MR. WATSON: I'll object to the form of
10  the question.
11  THE WITNESS: Do you want me to answer
12  that?
13  BY MS. BADALAMENTI:
14  Q.  Yes.
15  MR. WATSON: You can go ahead and
16  answer.
17  THE WITNESS: The project turned out to
18  be much more complicated than what we had
19  anticipated when we were planning -- not
20  planning -- when we were originally thinking about
21  these are the steps that we are going to take to
22  effect the repairs. The actual details turned out
23  to be much more complicated than what we
24  anticipated, and that's how the cost overrun took
25  place.

Page 64

1  BY MS. BADALAMENTI:
2  Q.  How so? Can you give me some examples.
3  A.  Okay. One example is that we thought that when we
4  dig up all the way down, we'll find the original
5  pipe down there. We'll take it out, and then
6  we'll replace it with the a new pipe. When we
7  went down there, we found out that the sinkhole,
8  which was supposed to be 70 feet deep, it was
9  actually another 25 feet deeper than that. We had
10  to make allowance for that. We had to do some
11  extra digging. Then we had to do some bulkheads
12  basically to stop the flow on either side when we
13  did the bypass. It became very difficult to
14  install the bulkheads when the water is flowing
15  through, even though it's basically blocked by the
16  sinkhole in the middle. So we had to take some
17  additional steps in terms of how do we temporarily
18  block it upstream and all that, what can we do,
19  what kind of bulkhead is going to be suitable for
20  that. That became an issue.
21  Third thing is that the equipment that
22  we had over there, the pumps and motors, they're
23  supposed to run continually, 24 hours a day, for
24  almost eight to nine months and all that. They
25  kept on breaking down. We had to bring some

13-53846-tjt    Doc 7885-21    Filed 10/08/14    Entered 10/08/14 21:38:19    Page 17 of
32

Page 65

1  additional equipment on the site.
2     Then there were some issues with the
3  conveyance of the bypass from one side to the
4  other. It's not that you take the pump, do it
5  over there, transport to the pipe and take it to
6  the other side. Sometimes the sewage does not
7  flow through. It blocks it. Then you have to
8  clean that up and all. You have to take some
9  additional measures so that this thing does not
10 occur again.
11    Then the amount of water in the ground,
12 even though we had all the solubles and all that
13 from the previous years and all that, the water
14 table was very high. It took us a lot longer time
15 and all that to dewater the site so that we can
16 dig up and then do it in as dry a condition as
17 possible.
18    So these are some of the examples that
19 I can tell you that happened along the way.
20 Q.  The original contract was for $35 million. Do
21 you know what the project ultimately cost?
22 A.  I don't remember the amount, but it was in excess
23 of $53 million.
24 Q.  Would it be your opinion that it was these
25 unexpected issues that you just told me about

Page 66

1  here --
2  A.  That's my opinion, yeah.
3  Q.  -- that caused the difference from 35 to 53?
4  A.  That's right.
5  Q.  Did Darryl Latimer, to the best of your
6  knowledge, disapprove certain amounts that had
7  been submitted by Inland?
8  A.  I'm not aware of anything, but he might have done
9  that, because they're the people who finally look
10 at the invoice and they pay for it. They
11 recommend the payment to the council department.
12 They may have done that.
13 Q.  Did you ever get involved when Darryl Latimer or
14 the contracting and grants department disallowed
15 something?
16 A.  No, I was not involved in those. I may have been
17 copied on the letter finally what they issued on
18 that, but I was not involved in the process.
19    MR. WATSON: Let's take a break now.
20    MS. BADALAMENTI: Okay.
21    (Off the record at 2:51 p.m.)
22    (Back on the record at 3:09 p.m.)
23    MS. BADALAMENTI: This deposition was
24 to be limited, so I'm going to try and skip over
25 some of the issues, of course reserving my right

Page 67

1  to come back to Mr. Shukla.
2     MR. WATSON: We are not going to agree
3  to any further depositions of this witness.
4     MS. BADALAMENTI: I understand that.
5  But we are reserving our right to finish the
6  deposition when discovery actually opens in our
7  case. We understand there's no agreement in that
8  regard.
9     BY MS. BADALAMENTI:
10 Q.  Mr. Shukla, I was asking you whether you were
11 involved in any of the -- in getting approval of
12 any amount that had been disallowed from Inland's
13 invoices by the contracts department or Darryl
14 Latimer.
15 A.  No, I'm not involved in the approval or
16 disapproval of the total amount. I may be
17 informed after they have done that, that this is
18 what we paid.
19 Q.  Were you involved in recommending the amendments
20 to CS-1368?
21 A.  Am I involved in recommending? Recommending means
22 what?
23 Q.  Did you ever recommend that an amendment to 1368
24 be executed by the City of Detroit?
25 A.  Which one, No. 3?

Page 68

1  Q.  Any of them.
2  A.  Okay. Let me put -- let me -- Amendment No. 2, I
3  did not recommend that.
4  Q.  Okay.
5  A.  That's a fact of life. I'm not sure if Amendment
6  No. 3 was at a time when I became the interim
7  general superintendent of engineering. If it is
8  that particular -- I don't know the dates on
9  those. If it became at that particular time, then
10 the amendment will be prepared by my section. It
11 will be presented to the board by me. Then the
12 recommendation is by me, if that's how it is.
13 Q.  So during the time that you were interim director
14 and assistant director, those recommendations
15 would have been by you?
16 A.  On paper, the recommendation is by me.
17 Q.  Okay.
18 A.  That's how the board letter is prepared.
19 Q.  In making those recommendations, what sort of
20 review would you undertake?
21 A.  Review in terms of what? Please explain that.
22 Q.  What did you do as the interim director or
23 assistant director to be in a position to make a
24 recommendation that an amendment to 1368 be
25 entered into?

13-53846-tjt    Doc 7885-21    Filed 10/08/14    Entered 10/08/14 21:38:19    Page 18 of
32

Page 69

1 A. Okay. Now, the amount of work that needs to be
2 done as part of that amendment and then the
3 costing for that, that will be prepared by people
4 who will be working under me. They'll prepare
5 some kind of what's called board letter. I'm
6 going to look at that board letter. I'm going to
7 review that, just make sure all the language is
8 okay and they have covered all the things that was
9 asked for; so that's the kind of review that I'm
10 going to do.
11 Q. Was it -- when you were in that position and
12 making those recommendations, would you recommend
13 an amendment after the work's already done, so
14 after the costs have already been incurred, would
15 you then make a recommendation?
16 A. It can happen, too. If it's an emergency that
17 happened, that we are to start the work right
18 away. Then the amendment can happen after the
19 work is done.
20 Q. What contracts were you involved with in those
21 positions from 2005 until your retirement where
22 that was the case where you were recommending a
23 contract amendment?
24 A. CS-1368 is one of them.
25 Q. Any others?

Page 70

1 A. I don't remember any other one. I'm not sure.
2 Q. And just to be clear, when we say CS-1368 is one
3 of them, which amendments were recommended for
4 approval after the work was done?
5 A. Like that Amendment No. 3, if you're talking about
6 that. Work was already either wholly done or
7 mostly done.
8 Q. And what about 4 and 5, do you know whether they
9 were recommended after work was done?
10 A. You'll have to show me 4 and 5, what they are.
11 Q. Sitting here now, you don't know?
12 A. I don't remember exactly, but on 1368, most of the
13 amendments were done after the work was already
14 done.
15 Q. Amendment 2 and Amendment 3 you would agree were
16 for the sinkhole; is that correct?
17 A. I think so.
18 Q. Do you know what Amendment 4 related to?
19 A. I don't know. You'd have to tell me. I don't
20 remember all those things now.
21 Q. Okay. Same answer for Amendment 5?
22 A. Yeah. If you show me the document, then I'll be
23 able to tell you.
24 Q. At some point in time did you become involved
25 with the negotiations of the Macomb or Oakland

Page 71

1 County purchase of the interceptor system?
2 A. I was not involved in the negotiation with Oakland
3 Macomb, if you're talking OMID. Is that what
4 you're talking about?
5 Q. Either Oakland County's purchase or acquisition
6 of the interceptors or Macomb's.
7 A. No. I did attend some meetings which were called
8 for, and my role specifically was related to the
9 sewer station we have on 8 Mile Road. My input
10 was needed for those things. So I attended some
11 of those meetings, but I was not involved in the
12 overall project or overall agreement that Macomb
13 County and DWSD agreed to.
14 Q. Do you remember when you first learned that there
15 was a criminal investigation of contracts that
16 were let by the DWSD?
17 A. Please explain that question again. Contract that
18 was let by DWSD?
19 Q. When did you first become aware that there was a
20 criminal investigation of any DWSD contract?
21 A. Any DWSD contract?
22 Q. Any.
23 A. Criminal investigation by who?
24 Q. By any law enforcement agency that was
25 investigating the -- any illegal practice in the

Page 72

1 Detroit Water and Sewerage Department or with
2 respect to any contract that it had entered into
3 with a contractor.
4 A. I remember that I was contacted by FBI sometime in
5 2008 -- October or November of 2008, that they
6 want -- they left a message on my office phone
7 saying that they want to come and talk to me, so I
8 called them back and they came back and talked to
9 me.
10 Q. What did they talk to you about?
11 A. Basically they were talking about the various
12 contracts that we are doing, and was --
13 specifically the thrust was did Ferguson -- was
14 Ferguson -- how do I put it? Did Ferguson take
15 advantage of his position with the mayor's office
16 to get contracts from City of Detroit DWSD.
17 That's what they were trying to talk to me about.
18 Q. Was 1368, Amendments 2, 3, 4, 5 the subject of
19 any of the discussions?
20 A. I don't remember if they talked -- at that
21 particular time in 2008 if they talked
22 specifically of any amendment, but they did talk
23 about the sinkhole, yes. That was talked about.
24 Q. Do you remember what they asked you about the
25 sinkhole project?

13-53846-tjt    Doc 7885-21    Filed 10/08/14    Entered 10/08/14 21:38:19    Page 19 of
32

Page 73

1  A.   Same issue, that did Ferguson use his position to
2  get himself on the contract, who appointed him and
3  all that, how did they get on the job and all that
4  kind of questions.  And I told them I didn't hire
5  him, it was a decision of CS-1368 contractor.  My
6  job was to make sure that the work gets done.
7  That's what my job was.
8  Q.   Were you -- was Victor Mercado on site at the
9  sinkhole every day that you were on site?
10  A.   Mr. Mercado was on the sinkhole every day till the
11  bypass was done and the houses were secure on
12  either side of the sinkhole, mainly on the south
13  side.  He was there every day in every meeting.
14  Q.   When do you think that work was done?
15  A.   That was -- I don't remember the exact dates and
16  all that.  It was sometime end of September/early
17  October, around that time.
18  Q.   Why is it, to the best of your knowledge, that
19  Mr. Mercado stopped being on site every day after
20  that?
21  A.   I don't know exactly reason why he stopped, but
22  then his number two guy, my boss -- direct boss,
23  Gary Fujita -- Gary was there every day and day in
24  and out like me almost till January until we
25  stabilized the sinkhole.  So he was there every

Page 74

1  day.  Mercado stopped coming on a daily basis.  He
2  did come off and on, but on a daily basis stopped
3  coming after that.
4  Q.   And do you know why the switch?
5  A.   He probably had other things to do.  I don't know.
6  Q.   Did you ever speak to Inland about why Mr.
7  Mercado wasn't going to be on the site?
8  A.   I didn't talk to Inland about that, no.
9  Q.   Did you know that 1368 -- that the work
10  contemplated by CS-1368 was originally given to a
11  contractor other than Inland?
12  A.   1368?  You mean -- are you talking about the
13  sinkhole?
14  Q.   I'm talking about the sewer lining contract,
15  1368.
16  A.   Was given to somebody else?
17  Q.   Did you know that it was given to Lakeshore
18  initially under contract 1372?
19     MR. WATSON: I'll object to foundation
20  and as to relevance.  I don't think this case
21  involves that at all.
22     THE WITNESS: I don't think 1368 was
23  given to anybody else.
24     BY MS. BADALAMENTI:
25  Q.   Okay.

Page 75

1  A.   I'm not sure about that.
2  Q.   Do you know whether there was a bidding process
3  for 1368, how it was awarded to Inland?
4  A.   There's a proposal which they asked from the
5  various contractors, which is a form of bidding,
6  because this is a hybrid consultant construction
7  contract.  That's what 1368 is.  So we asked
8  people to submit a proposal based on the contract
9  documents, and they had to do the unit prices --
10  quote the unit prices, you know, the repairs that
11  would be anticipated.
12  Q.   And to the best of your knowledge, that occurred
13  with respect to 1368?
14  A.   That's right.
15     MR. WATSON: I'm going to object to the
16  form of the question because 1368 had so many
17  facets and I'm not sure which one the witness is
18  testifying to or if his testimony covers them all.
19     BY MS. BADALAMENTI:
20  Q.   Do you know what CS-1361 was?
21  A.   Yes.  CS-1361, if I remember it now correctly, is
22  for the emergency repairs of sewers and water
23  mains in the City of Detroit.  I don't know
24  exactly the scope of the work but that was the
25  smaller contract that they wanted to do in

Page 76

1  addition to 1368 or it was before 1368.  I'm not
2  sure about the timeline.
3  Q.   Do you remember that that contract was cancelled?
4  A.   I remember that was cancelled.
5  Q.   Do you know why?
6  A.   I don't know why.  I was too junior in the
7  department to know anything like that.
8  Q.   Do you know whether 1361 was the product of that
9  typical process where you received requests for
10  proposals and they're rated and the contractors
11  are rated?
12  A.   I don't know how they did that.  Maybe that's the
13  process they went through.  I'm not sure about
14  that.
15  Q.   And was it your testimony that you didn't know if
16  1368 was done that way or you thought it was?
17  A.   I'm not sure about that.
18     MR. WATSON: I'll object to the form of
19  that question.
20     MARKED FOR IDENTIFICATION:
21  DEPOSITION EXHIBIT 6
22  3:24 p.m.
23     BY MS. BADALAMENTI:
24  Q.   The document that we've marked as Exhibit 6
25  begins with a transmittal record for Amendment 4

Page 77

1  for 1368. Do you recognize that document?
2  A. I'm not sure if recognize it fully or not, because
3  for me to recognize any of these documents, this
4  paperwork is not the right amount of paperwork.
5  You need to show me the board letter and then I'll
6  be able to tell you whether I know it or not, but
7  I know that amendment No. 4 was done to this
8  contract. I know that.
9  Q. Is your signature any of those that are contained
10  on that first page?
11  A. No, there's not my signature on this one -- on the
12  first page, no.
13  Q. Given the date of Amendment 4, would that have
14  been something that you recommended?
15  A. I may have done that. I'm not sure if I -- this
16  is 8/12/05. I'm not sure if I got the interim
17  position, if I became in charge of engineering by
18  that time. I'm not sure about that, August time,
19  so --
20  Q. What was that amendment for, to the best of your
21  knowledge?
22  A. I don't know. You need to tell me the scope of
23  work.
24  Q. You can't tell from --
25  A. I really do not know the exact scope of work right

Page 78

1  now.
2  Q. On that first page there's a description, and
3  it's to -- related to the emergency repairs?
4  A. 15 Mile and Hayes, that's what it says.
5  Q. Do you have any reason to believe that Amendment
6  4 was not related to 15 Mile and Hayes?
7  MR. WATSON: I'm going to --
8  THE WITNESS: It's related to 15 Mile
9  and Hayes. That's what was part of the contract,
10  but it's not necessarily that I would see all the
11  board letters, if it was not prepared by me.
12  BY MS. BADALAMENTI:
13  Q. I understand. The board letters are what will
14  tell you if you've seen a document before?
15  A. Exactly.
16  Q. I understand.
17  A. That will tell me that.
18  (Off the record at 3:28 p.m.)
19  (Back on the record at 3:28 p.m)
20  BY MS. BADALAMENTI:
21  Q. I was asking you earlier about your involvement
22  in the criminal investigation, and I think you
23  told me that you were first contacted
24  October/November of 2008. Did you speak with law
25  enforcement on a number of occasions or was it

Page 79

1  just once?
2  A. No, I think I did talk to them quite at few times
3  after that. That was the first time they talked
4  to me.
5  Q. Did you go somewhere and speak to them or did
6  they come to you?
7  A. I think first time they came to my office, when
8  they contacted me, and then later on I met them in
9  our main office, which is Water Board Building,
10  and I've gone to their office also, which is in
11  the federal building. I have been there, too --
12  both the places.
13  Q. Did you sign any statements in any of those
14  meetings?
15  A. I don't remember signing any statements.
16  Q. Did you testify before a grand jury?
17  A. I did testify before the first grand jury, yeah.
18  Q. Did you provide any documents?
19  A. I did not provide any. I don't think I
20  provided -- they had all the documents. All they
21  were questioning me was based on the documents
22  that came from the department. I don't remember
23  giving them any from my side.
24  Q. Did they ever tell you that you were the target
25  of the investigation?

Page 80

1  A. No, they told me that I was not the target of the
2  investigation. They were trying to take my
3  deposition for whatever they were investigating.
4  I was specifically told that I was not the target
5  of the investigation.
6  Q. Were you told who was the target of the
7  investigation?
8  A. The first agent who called me sometime in 2008,
9  they said the same thing, and then the other
10  agents who I talked to when I talked to them in
11  our office -- not my office, but in the DWSD
12  office or their building those agents.
13  Q. They said someone different?
14  A. Pardon me?
15  Q. They told you there were different targets?
16  A. All of them told me I was not a target of the
17  investigation. All of them.
18  Q. Okay. My question was: Did they ever tell you
19  who the target was?
20  A. They never told me who the target was, no.
21  Q. Did they ask you questions about Mr. Mercado?
22  A. Yeah, they did ask me some kind of questions about
23  Mr. Mercado.
24  Q. Were you aware of anybody else at DWSD who had
25  been speaking with law enforcement or received a

13-53846-tjt    Doc 7885-21    Filed 10/08/14    Entered 10/08/14 21:38:19    Page 21 of
32

Page 81

1  subpoena to speak with them?
2  A.  I believe they talked to a lot of people in my
3  department and in other departments.
4  Q.  Who do you know of from your department?
5  A.  I know they talked to Darryl Latimer, if I
6  remember right, contracts and grants manager.  I'm
7  pretty sure they talked to Gary Fujita, the
8  director.  They talked to one my head engineers,
9  Dennis Green; they talked to him.  He was under
10  me.  They talked to some of my inspectors.  I
11  don't remember all the names.  They talked to a
12  lot of people.
13  Q.  When did you first become aware of Macomb
14  County's discussions with Detroit about
15  purchasing the Macomb interceptor system?
16  A.  I don't remember the date.  I was aware of that
17  that they're going to purchase that.  I don't
18  remember the date.
19  Q.  Do you remember the year?
20  A.  I don't remember the year also.  I don't want to
21  guess on that.
22  Q.  Do you know if it was something that was
23  negotiated over several years or something
24  negotiated within one year?
25  A.  I don't know exactly how many years it took, but

Page 82

1  it took some time.  That, I know.
2  Q.  More than one?
3  A.  I couldn't give you the number of years.  I did
4  attend some meetings, like I told you that.  The
5  meetings did take place over probably more than
6  one year.
7  Q.  Okay.  The meetings that you attended, do you
8  remember if Macomb representatives were at those
9  meetings?
10  A.  Yeah, they were present, at least -- all the
11  meetings that I attended, they were present.
12  Q.  And there were Detroit people as well, correct?
13  A.  They were DWSD people as well.
14  Q.  Were there Oakland County people?
15  A.  I didn't know all of them, so I'm not sure if they
16  were there or not.
17  Q.  And what was your role?  Why were you at these
18  meetings?
19  A.  Like I said, my role was basically to talk about
20  the 8 Mile sewer station that we have south of 8
21  Mile Road right on -- you know, what we call the
22  Northeast Water Treatment Plant.  At one time the
23  recommendation was that when we -- when they buy
24  the sewer system north of 8 Mile Road, they will
25  buy the sewer station, too.  And we were objecting

Page 83

1  from the engineering side saying this is not a
2  good idea.  So my role was that, to talk about the
3  8 Mile sewer station.
4  Q.  There was a calculation of system debt that was
5  prepared by the city and provided to Macomb.  Did
6  you play any role in --
7  A.  No.
8  Q.  -- calculating that?
9  A.  No.
10  Q.  Did you provide information to an individual
11  named Bart Foster so that he could prepare that
12  information?
13  A.  I don't know if I provided him any information on
14  anything.  I'm not sure about that.
15  Q.  Do you recall having provided Macomb with
16  information about work that DWSD had did?
17  A.  Which work are you talking about?
18  Q.  Any work on projects to portions of the Macomb
19  system.
20  A.  Yeah, we -- they did ask for some kind of as-built
21  drawings and all that kind of work we have done on
22  various locations.  We did give them some
23  documents -- I remember that -- the drawings and
24  specifications.
25  Q.  Invoices, pay estimates?

Page 84

1  A.  No, I'm not aware of that, no.
2  Q.  You didn't get them?
3  A.  As far as I know, no.  They gave them technical
4  documents.  That's what I remember giving them.
5  Q.  Do you know whether anyone in your office
6  provided pay estimates or invoices so that the
7  system debt could be calculated?
8  A.  I'm not sure about that.  I don't know.  It didn't
9  go through me.
10  Q.  What about on pending contracts -- pending
11  engineering contracts that would relate to the
12  Macomb system, were you asked to provide that?
13  A.  Pending contracts, what pending -- we had some
14  work at Clintondale to be done and some meters.
15  We did them -- we gave them the technical
16  documents.  That's what we did.
17  Q.  Did you keep any records of what was provided at
18  the DWSD offices or your own personal records?
19  A.  No, I don't think I kept any records.  I'm not
20  sure.  I don't think so.
21  Q.  If --
22  A.  We provided the information, whatever we had when
23  they asked for that, but that's all.
24  Q.  Who did you provide it to?
25  A.  I thought I sent it to Mark Jacobs, I believe.  I

13-53846-tjt    Doc 7885-21    Filed 10/08/14    Entered 10/08/14 21:38:19    Page 22 of
32

Page 85

1   don't remember the name of his company, but I
2   think we gave it to him.
3   Q.  Were you aware of any change in DWSD
4   record-keeping practices during the time of
5   CS-1368?
6       MR. WATSON: Object to foundation.  The
7   witness can testify, if he can.
8       THE WITNESS: I don't even understand
9   that question.  I don't know what you mean by
10  that.
11      BY MS. BADALAMENTI:
12  Q.  In DWSD contracts would the contractor be
13  required to keep daily reports?
14  A.  The contract -- in every construction contract,
15  the daily reports are part of the contract.
16  Q.  Do you know if in 1368 they were required to
17  provide daily reports?
18  A.  1368 being a time-and-material contract, yeah,
19  they were required to provide daily reports.
20  Q.  Who would receive those daily reports?
21  A.  The daily reports will come to engineering, yes.
22  Yeah.  My group will get those.
23  Q.  So did you see daily reports for the sinkhole
24  repairs?
25  A.  I saw most of them, yes.

Page 86

1   Q.  They came from Inland?
2   A.  They came from Inland.
3   Q.  Do you recall a time when there was a directive
4   that said there should not be any more daily
5   reports coming for the sinkhole project?
6   A.  I don't remember that.  I don't remember anybody
7   giving a directive like this.
8   Q.  Was there a point in time when daily reports
9   stopped coming from Inland for that project or on
10  that contract, I should say?
11  A.  I don't remember that.
12  Q.  So as far as you know, there should be daily
13  reports for all of 1368?
14  A.  I don't know what you are trying to get at.
15  Q.  I'm just asking you if you recall there being
16  daily reports provided for 1368's performance of
17  work.
18  A.  I understand the question this way:  Daily
19  report -- I'm trying to understand what daily
20  report means.  Daily report means they have to
21  give us details of what actually got done on a
22  daily basis in terms of manpower, materials,
23  timesheets and all that.  Yes, they were done.  If
24  some daily report was generated saying that, okay,
25  this inspector saw this and what he did, that was

Page 87

1   done by my people.
2   Q.  You told me in every construction project at DWSD
3   the contractor has to provide daily reports.  Do
4   you remember saying that a moment ago?
5   A.  Yeah, I said that, but the daily report is
6   prepared by our inspection group.  I correct that
7   now.
8   Q.  Okay.
9   A.  Not the contractor.
10  Q.  So there were no daily reports provided by Inland
11  on 1368?
12  A.  Inland did give us daily timesheets.
13  Q.  Daily timesheets?
14  A.  Yeah, in terms of manpower, equipment and
15  materials.
16  Q.  Had the submission of timesheets been something
17  that was done always at DWSD or was it something
18  new?
19  A.  No, this was a time-and-material contract.  They
20  have to give it to us.
21  Q.  The daily reports that were prepared by
22  engineering, is that something that was always
23  done?
24  A.  The engineering department always did daily
25  reports.

Page 88

1   Q.  And somewhere in the DWSD or in the city we would
2   find those daily reports that were done by your
3   department?
4   A.  Sure.
5   Q.  Were those something that were done by you
6   personally?
7   A.  No, not me.  It's one of the inspector who worked
8   under me or engineer who works under me; he does
9   that.  The daily records will be there somewhere.
10  Q.  You were a field engineer with respect to the
11  sinkhole, right?
12  A.  Um-hmm.
13  Q.  But you still would not have done the daily,
14  right?
15  A.  I don't write the daily reports, no.
16  Q.  Do you know who did for the sinkhole?
17  A.  As far as I remember correctly, it was done by two
18  people, done by George Rayes, who was the
19  engineering guy, and then he was helped by Charles
20  George, who was the head inspector on job.  These
21  two people did most of the daily reports.  What
22  I'm saying, most of it.  There may some days even
23  they may not have done a report.  That's why I'm
24  saying, most of.
25  Q.  And the Inland time-and-material sheets, those

Page 89

1 are something that would be retained in the DWSD
2 files?
3 A. Right, because they will be part of the invoice.
4 Q. Would those have come to you or would they have
5 gone to someone else?
6 A. They would come to us first, and then we will send
7 it to contracts and grants.
8 Q. By "us," I'm asking, does it come to you
9 personally or come to your department?
10 A. It comes to the department.
11 Q. So do you know personally that Inland provided
12 those time-and-material sheets every day?
13 A. Did they give it to us on daily basis? I'm not
14 sure about that, but they gave it to us at a time
15 when we were preparing the invoice.
16 Q. For every day?
17 A. For every day.
18 Q. Right. Okay. Were you the person at DWSD who
19 signed off on invoices or who approved charges,
20 designated them to be reasonable or unreasonable,
21 things like that?
22 A. I think the first one or two signed by
23 Mr. Mercado, if I remember that. And then he told
24 me, okay, you start doing that. And then I signed
25 those. I don't know if he signed one or signed

Page 90

1 two. Later on I signed them.
2 Q. Why the change?
3 A. He was too busy and all. He said why don't you
4 handle it right there.
5 Q. Do you know whether Mr. Mercado or Mr. Ferguson
6 had a relationship at the time of the sinkhole?
7 A. I'm not aware of anything like that.
8 Q. Did Mr. Mercado ever tell you that he didn't want
9 Ferguson at the site?
10 A. He never -- I'm too junior to ask him anything, or
11 he doesn't talk to me like that. So we never
12 talked like that.
13 Q. Did you have a relationship with Mr. Ferguson?
14 A. No, except that he's a contractor for us.
15 Q. How many jobs have been involved with where you
16 were a DWSD engineer prior to the sinkhole?
17 A. I don't know exactly the number, but maybe five or
18 six contracts. I don't remember the exact number.
19 Q. Was he involved in any contracts when you were
20 the engineer prior to Mr. Kilpatrick?
21 A. Yeah, he had one contract before that, yes.
22 Q. What was that?
23 A. I think that was the contract -- I remember the
24 contract number, WS-623. That's replacing the
25 water mains in the City of Detroit. He had that

Page 91

1 contract before 2000.
2 Q. Did you have any discussion with Mr. Ferguson
3 regarding invoices submitted for the sinkhole
4 repair?
5 A. No. I didn't have any discussions with him. I
6 had discussion was Inland Waters, but not with
7 him.
8 Q. Did you have discussions with Inland Waters about
9 Ferguson's submission of bills on the sinkhole
10 repairs?
11 A. I mean, not every invoice Ferguson submitted. We
12 did have discussion about some invoices, yes.
13 Q. What was the nature of those discussions?
14 A. At one point in all that the amount that Ferguson
15 was charging for the equipment that is on the site
16 was not as per the approved documents. That's
17 what Inland Waters brought to my attention. And
18 ultimately we ended up paying him as per the
19 documents. So we did some corrections based on --
20 Inland Waters did some correction based on our
21 discussions.
22 Q. Was there a point in time when Ferguson became
23 upset that its charges were being reduced and you
24 had to step in and be an intermediary between
25 them and Inland?

Page 92

1 A. Intermediary -- I mean, I've had some meetings
2 with all three of them, not at the sinkhole time,
3 but later on when I became the assistant director,
4 and then if they have some issues among them, they
5 came and talked to me and I told them come to my
6 office and we can talk about that.
7 Q. Are you aware that Inland -- representatives from
8 Inland testified that their amendments to the
9 contract and their pay estimates were being
10 withheld because of disputes they were having
11 with Ferguson?
12 A. No, I don't remember. I've heard that, but I'm
13 not fully sure and all of that if it was true. I
14 heard that statement.
15 Q. So is it your testimony that you were not
16 involved at all in getting those contracts
17 approved once Inland and Ferguson worked out
18 their differences?
19 A. That's up to them, yes.
20 Q. Who is Terry King?
21 A. Terry King -- are you talking about the sinkhole
22 days? Is that what you're talking about?
23 Q. Terry King was a former inspector and he became a
24 deputy director?
25 A. Not deputy director. He became an assistant

Page 93

1  director. He was the inspector working in field
2  engineer in the same group that I was but not
3  under me. He was under a different engineer. And
4  then he became the assistant director of
5  maintenance.
6  Q.  Do you know if he had a relationship with
7  Mr. Ferguson?
8  A.  I'm not sure about that. I don't know.
9  Q.  Do you believe that the charges on the 15 Mile
10  Road sinkhole repairs were reasonable?
11  A.  I believe they were reasonable.
12  Q.  You base that belief on the documents you
13  received from Inland or your own personal
14  knowledge?
15  A.  Documents received from Inland and my knowledge,
16  too.
17  Q.  Are you aware of the fact that the City of
18  Detroit asserted a claim that there were
19  overcharges in connection with that project?
20  A.  Repeat that question, please.
21  Q.  Are you aware of the fact that the City of
22  Detroit had asserted a claim in a federal case
23  that there were overcharges by Inland and the
24  subcontractors on the sinkhole project?
25  A.  I'm not aware. Have they done that? I'm not sure

Page 94

1  about that. I don't know.
2  Q.  I just want to know what you know.
3  A.  No.
4  Q.  Are you aware of the -- we refer to them as
5  layers of markups where subcontractors are
6  marking up, subcontractors are marking up,
7  subcontractors, and ultimately Inland then marks
8  up the whole bill and sends it for payment. Were
9  you aware that that was --
10  A.  That's how the system works.
11  Q.  That's something permitted in DWSD?
12  A.  Something permitted.
13  Q.  What are those, the markups that are permitted at
14  each layer?
15  A.  Standard contract language will be the general
16  contractor will get 10%, if they perform the work
17  themselves. If the subcontractors perform the
18  work, the first tier subcontractor, if they
19  perform the work, they get 10%, but the second
20  layer gets only 5%, and the general contractor
21  gets 5% on top of all of that. That's what I
22  remember. Don't remember exactly the language,
23  but there is language like that in the contract
24  documents.
25  Q.  Do you believe that that standard language or

Page 95

1  standard practice is what was followed in the
2  1368 sinkhole repair?
3  A.  Mostly except some of those changes that we made
4  to the overtimes and all that, yeah. They were
5  done.
6  Q.  The changes to the overtime on the documents that
7  we marked as exhibits?
8  A.  Right.
9  Q.  The amount of the markups that were approved are
10  dealt with in these documents that we marked as
11  exhibits?
12  A.  Yeah. One of those is there, yeah.
13  Q.  Would you agree with me that that is not the same
14  percentage of markups that you just described to
15  me? This is a different -- permits a different
16  rate of markup at the different layers?
17  A.  I don't know if they are different from that, but
18  there's always language in the contract. We were
19  going to follow that. 1368 had all the language.
20  I'm not sure about that, but this was the language
21  that was incorporated into that.
22  Q.  Okay. So you're not sure if it's standard
23  language or different language?
24  A.  I'm not sure about that, no. But there are some
25  percentages like that.

Page 96

1  Q.  In the course of -- your only role with respect
2  to Macomb's purchase was to provide technical
3  documents, correct?
4  A.  You mean the agreement later on?
5  Q.  Yeah, the agreement.
6  A.  I gave them the technical documents.
7  Q.  Did you ever review the Macomb acquisition
8  agreement or any of the exhibits to that
9  agreement?
10  A.  No.
11  Q.  Did you participate in any way in the due
12  diligence other than providing the technical
13  documents?
14  A.  I mean as part of the meetings and all that,
15  that's what I did.
16  Q.  How many meetings do you think you attended? I
17  don't expect you to know exactly, but was it one
18  or --
19  A.  It was more than one.
20  Q.  Was it three? Four? More than ten?
21  A.  Not ten.
22  Q.  Between one and ten?
23  A.  Maybe three or four.
24  Q.  Okay. Do you know who Bart Foster is?
25  A.  Yeah, I know who Bart Foster is.

Page 97

1 Q. Who is he?
2 A. He's a consultant who used to determine -- we used
3   to call him rates consultant, how do we set up the
4   rates and all that. He's the guy who used to do
5   all the calculations. He's an expert in all
6   those.
7 Q. By "we," do you mean the engineering department
8   used to use him?
9 A. When I say "we," I represent engineering
10  department.
11 Q. Did you use Bart Foster for anything else?
12 A. I don't remember using him for anything else. I
13  attended meetings which he organized and all that
14  He gave some presentations every year how the
15  rates are going to be for the next year. I
16  attended all those meetings.
17 Q. The information that he would get to calculate
18  those rates, where would that information come
19  from?
20 A. Some of that information will be the total amount
21  of the contracts that we have done and all.
22  99 percent of that information will come from
23  contracts and grants group because they're the
24  people who keep all the records, total money paid
25  on any contract and what is the total value of the

Page 98

1   contract, whether it's done or going to be done.
2   If they need any backup information and all that
3   which we have, we might give that. Like some of
4   the estimates we pay on the contract documents, if
5   they need a copy, we give them a copy.
6 Q. So if money has been paid, that would go into his
7   rate analysis, and that would come from contract
8   and grants?
9 A. I don't know what else he uses in the rate
10  analysis, but the value of the contract does go
11  into the rate. That's what I think.
12 Q. Do you believe that estimates go into the rate
13  analysis?
14    MR. WATSON: I'm going to object to the
15  foundation of the question. We're far afield, I
16  think, from this witness's expertise, and I don't
17  want him to guess.
18    MS. BADALAMENTI: He just told me
19  sometimes he gave estimates when the amount
20  paid --
21    THE WITNESS: Estimated monthly invoice
22  that we paid the contractor, if it is requested by
23  contracts and grants that they want to give to
24  Bart Foster, we gave it to them. I don't remember
25  I gave exactly anything to Bart Foster and I don't

Page 99

1   profess to know Bart Foster's job description.
2   I'm not sure about that, but I provide information
3   if somebody asks for it.
4    BY MS. BADALAMENTI:
5 Q. So let me say this: Is it fair to say that if
6   you were asked for any information that went into
7   a rate analysis, it was from contract and grants,
8   and that's who you gave it to?
9 A. We gave it to them.
10 Q. All right. Would you ever give any of the
11  invoices or daily reports or anything like that
12  to go towards that rate analysis?
13 A. I don't think we provided any daily reports to
14  anybody for this particular task.
15 Q. Did you ever provide an opinion on whether or not
16  you thought charges that you were estimating were
17  reasonable or appropriate or within the scope of
18  the contract?
19 A. The opinion to who?
20 Q. To the contract and grants department when you
21  gave them an estimate.
22 A. We signed it and basically told them this is what
23  we plan to pay.
24 Q. The original Amendment 2 was for $35 million, and
25  you said you thought that was reasonable that the

Page 100

1   amount went up so high because of all the changed
2   conditions that you encountered.
3 A. And complications.
4 Q. And you listed some things for me that you
5   thought were related to that. Was there anything
6   that you thought about as we've been sitting here
7   that you didn't tell me about that would be
8   within that scope of change conditions?
9 A. Okay. Another thing which I think is worth
10  mentioning is that in the original $35 million, if
11  I remember that correctly, it was anticipated that
12  we will block the sewer on either side of the
13  sinkhole by some either wooden bulkhead or a metal
14  bulkhead. Bulkhead means stop -- going to put a
15  stop on that. That particular method was found to
16  be unfeasible because the water flowing. You
17  could not even control the amount of water that we
18  had through the sewer. You have to have the sewer
19  as dry a condition as possible to install that.
20  We couldn't do that. Ultimately we ended up
21  putting sandbags, and sandbags were not feasible
22  because they float away. We ended up putting
23  concrete bags in there, and if I remember it
24  correctly, on the two side -- the two locations
25  either side of that, we ended up putting close to

Page 101

1  2,000 concrete bags. And that's how we built up
2  the bulkhead. And once it became -- so we were
3  able to stop the flow that way.
4     Now, the question -- the concrete bags
5  sat in there for almost nine months, and it became
6  like a rock. And now you're almost 70 feet deep
7  under the ground, and how do you take it out from
8  the pipe? It became a massive task to break it up
9  slowly one by one. We couldn't dynamite it.
10  Couldn't do anything like that. So it became a
11  manual labor and all that to take it out. We
12  don't damage the rest of the pipe. That was one
13  of the major expenses in all that we incurred, how
14  to bulkhead that, how to debulkhead it.
15  Q.  Who did that work?
16  A.  Inland Waters and their subcontractors also they
17  had.
18  Q.  Do you know in particular who did that work?
19  A.  I don't remember that, but they brought some
20  concrete-breaking company. I don't remember who
21  did it.
22     MR. WATSON: Let me interrupt. Foster
23  has got to leave at 5:45. Are you just about done
24  with this?
25     MS. BADALAMENTI: Are you good?

Page 102

1     MR. WATSON: I was waiting for your
2  answer.
3     MS. BADALAMENTI: Yeah, I am.
4     MR. WATSON: Okay. The other question
5  is -- I probably have about 20 minutes of
6  questions to ask him. I guess I can submit a
7  declaration for him, but I don't want to submit a
8  declaration and then you all object to it. Are
9  you -- will you consent to my submitting a
10  declaration for the witness?
11     MS. BADALAMENTI: I'm not going to
12  consent to that. That's a change from the
13  position that you took, so, no. I can stay here
14  as long as you need me. We can break with this
15  witness and do Foster and come back.
16     MR. WATSON: Well, finish up. Then
17  I'll ask a few questions to this witness. I might
18  choose to submit a declaration anyway without your
19  consent, but we can argue about that.
20     BY MS. BADALAMENTI:
21  Q.  You don't know who the concrete-breaking company
22  is?
23  A.  I don't remember that.
24  Q.  With respect to the discussions that you had
25  where Inland and Ferguson were both present, do

Page 103

1  you remember suggesting that certain Ferguson
2  charges be changed into tool truck charges or gas
3  or fuel surcharges so they could get approved?
4  A.  Yeah, because they have to do that as per the
5  rates that are allowed as per the contract
6  documents. Some of the rates were high, and we
7  asked them to change it.
8  Q.  To change it to a different category?
9  A.  No, not a category. To change it to what is
10  allowed in the document, like a truck. A truck is
11  a rental, allow daily rental rate based on certain
12  documents in the contract it cannot be more. If
13  the subcontractor or main contractor charges us
14  more than that, we are going to bring it down. In
15  this case, Ferguson was a subcontractor to Inland
16  Waters. My recommendation to Inland Waters was,
17  revise your estimate, and they did.
18  Q.  Revise their estimate or revise their pay
19  request?
20  A.  Estimate -- in our engineering parlance we call
21  estimate as the pay request.
22  Q.  Okay. So you told them to revise their pay
23  request to get Ferguson paid?
24  A.  To get Inland Waters paid because Ferguson will be
25  paid by Inland Waters.

Page 104

1  Q.  Did you have that same circumstance come up with
2  respect to bills that were submitted by
3  L.D'Agostini?
4  A.  I don't remember anything from L.D'Agostini. In
5  Ferguson's invoices, I think it was once or twice.
6  I remember that, more than once.
7  Q.  Do you remember having any meetings like that
8  where you talked about revising the invoices with
9  any other of Inland's subcontractors?
10  A.  I did not have any meetings with Inland
11  subcontractors regarding the pay invoices.
12  Q.  Other than Ferguson?
13  A.  I did not have any meetings with any
14  subcontractors regarding payment period. I'm
15  making that statement. DWSD does not talk to the
16  subcontractors for payments. We talk to only
17  general contractor.
18  Q.  My question was: Did you have any meetings with
19  Inland and any of Inland's subcontractors?
20  A.  I don't remember that. I don't think so.
21  Q.  Other than Ferguson?
22  A.  Ferguson was the only one that we had.
23  Q.  That was my question. Do you remember the
24  amount -- the dollar amount of the dispute
25  regarding Ferguson?

1 A. I don't remember the dollar amount, but the unit
2 rate was high. We needed to bring it down.
3 Q. Was it over $600,000?
4 A. I don't remember the amount.
5 Q. In any event, you did not tell anyone at Macomb
6 County anything about 1368? You didn't have
7 anything to do with Macomb County's purchase of
8 the system other than what you told me here
9 today?
10 A. Yeah, that's true.
11 Q. Did you inform anybody at Macomb County of the
12 investigation that was being done by the FBI?
13 A. Anybody in Macomb County?
14 Q. Yes.
15 A. I don't think so, no.
16 Q. Did you discuss the investigation with anybody
17 from the Detroit Legal Department?
18 A. Our Law Department?
19 Q. Yes.
20 A. Yeah, the Law Department was with me quite a few
21 times. They were present, too, when the
22 investigation was going on.
23 Q. Who from the Law Department would go?
24 A. I think it was Ed Keelean most of the time.
25     MS. BADALAMENTI: I don't think I have

1 anything else.
2     EXAMINATION
3     BY MR. WATSON:
4 Q. Mr. Shukla, were you involved in the original
5 1368 project?
6 A. The original 1368, no, I was not involved in that.
7 Q. So you got involved at the time of Amendment No.
8 2?
9 A. Before Amendment No. 2, when the sinkhole
10 happened, so I got involved with when the sinkhole
11 happened.
12 Q. And you indicated that you were working every
13 day. Do you mean five days a week, seven days a
14 week?
15 A. Seven days a week.
16 Q. How many hours a day did you typically work out
17 there?
18 A. Average about 16 hours a day.
19 Q. You mentioned that 1368 was a task order project.
20 Then you talked about a time-and-materials
21 project. Was it both? Was it one or the other?
22 Can you explain that.
23 A. This particular task was a time-and-material.
24 Q. How does that work?
25 A. Time-and-material is we do not know exactly what

1 the scope of work is, but we are telling them that
2 a sewer has to be repaired from this location to
3 this location. So what they do is whatever they
4 do on a daily basis, they submit us the timesheets
5 for the number of hours that each of the people
6 spent on that in terms of various categories.
7 They can be laborer; can be operator, the
8 equipment that they use that particular day, the
9 number of hours they use for each equipment, and
10 the material that they purchased and all the
11 invoices for those. So they submit to us on,
12 day-to-day basis, at the time of the invoice, when
13 they're submitting that, and then we total them
14 and all that, and we look over them for the
15 payment.
16 Q. How do you try to make sure that the time and
17 material submitted are reasonable?
18 A. There are two things we were looking at that. The
19 total number of hours in the day for the manpower
20 cannot exceed 24 hours. If somebody charges more
21 than 24 hours for a particular employee and all
22 that, that's not right. So -- and then nobody
23 works 24 hours a day and all -- various names, how
24 many hours they worked. Equipment hours goes the
25 same way. You can work only certain number of

1 hours in a day. And the material is the actual
2 invoice what they're paying for it. So that's how
3 we make sure they're charging us for that.
4 Q. Does anyone look over that stuff?
5 A. We review them and all that. We go over them, not
6 all of them all the time, but we do that. But
7 what was decided in this case was -- with
8 Mr. Mercado is Inland Waters submit us the CPA
9 audited invoices. So it was audited by their own
10 people, submitted to us, and we took that as
11 saying, okay, this is already audited by somebody
12 in the accounting department.
13 Q. So Inland Waters' own people had to audit the
14 invoices?
15 A. Right. Um-hmm.
16 Q. Were these audits signed?
17 A. Yeah, the audits were signed.
18 Q. That was for all time, all material, all
19 equipment?
20 A. All timesheets, all the equipment, all invoices.
21 Q. And was that done before they could get any
22 payment?
23 A. That's true.
24 Q. Did you ever see or hear anything that leads you
25 to believe that Inland Waters was charging

Page 109

1  excessive amounts for the work they were doing?
2  A.  No.  I don't think so, no.
3  Q.  Did DWSD have anyone who would look into what was
4  being done on the project and whether it was
5  being done?
6  A.  My engineers and inspectors would look at the
7  timesheets and all that they submit to us with the
8  invoice, but I'm not sure if they went through all
9  of them.  We depended on the audited statement
10  that the contractor submitted.  I didn't have time
11  to go through each one of them one by one, page by
12  page.
13  Q.  You talked some about Ferguson and there were
14  certain issues with Ferguson.  Were those
15  resolved to your satisfaction?
16  A.  Those issues that came up regarding overcharges,
17  they were resolved to my satisfaction.  I'm
18  positive about that.
19  Q.  Were the amounts charged by Ferguson as a result
20  of your actions increased, decreased, stayed the
21  same?
22  A.  No, they decreased.
23  Q.  And how much money are we talking about?  Are we
24  talking about hundreds of thousands, millions,
25  tens of millions?

Page 110

1  A.  No, it's not in the millions and all that.  I'm
2  not sure if it went over 100,000.  I don't know
3  exactly the amount, but it's not that high.  But
4  even if it's $10, we have to go per the document.
5  We cannot pay more than that to anybody.
6  Q.  You indicated that this was an emergency repair.
7  A.  Um-hmm.
8  Q.  Why did you think it was an emergency?
9  A.  The emergency is -- okay.  Let me put it this way.
10  I can draw a little sketch for you.
11  Q.  Draw it on a separate page and we'll make it an
12  exhibit.
13  A.  This is all areas of Macomb County and all that.
14  They have sewers and all coming through this and
15  come through this 15 Mile Road sewer which we
16  called the Oakland Macomb Interceptor.  The reason
17  it's called Oakland Macomb is because some part of
18  Oakland County sewers also tie in Macomb sewers
19  and then discharge into this.  And this goes
20  through the Edison corridor, 15 Mile Road south,
21  and goes to 8 Mile Road sewer station.  This is
22  the only sewer that brings the whole of all
23  sewers' flow from Macomb County into DWSD.  It
24  cannot go to any other sewer because there's no
25  other sewer existing.

Page 111

1  Q.  So that takes all the Macomb County sewage?
2  A.  To the Detroit system and ultimately ends up at
3  the sewage treatment plant on Jefferson.  We had
4  the break somewhere in this area, between Hayes
5  and Schoenherr.
6      Now, this becomes a health care
7  emergency.  If this sewer system is not conveyed,
8  it doesn't flow through and all, then all this
9  area will see flooded basements, everybody, and
10  then it becomes a much bigger crisis than what we
11  have to do in order to bypass it and let it flow
12  through.  That's why it's an emergency, because
13  the sewage has to go -- it cannot stop.  It has to
14  go somewhere.  And in this particular case, we
15  don't even have an outlet where we can basically
16  throw it into the river it's so far away from the
17  Detroit river.  This is the only way it can go.
18  You've got to provide some kind of alternative
19  way.  There was no alternative in this case, and
20  got to repair it on an emergency basis.
21  Q.  How long did you work for DWSD?
22  A.  Total service?
23  Q.  Yes.
24  A.  About 23 and a half years.
25  Q.  Had you ever seen an emergency of this magnitude?

Page 112

1  A.  No, not this magnitude.  This was really big.
2  Q.  You testified the original estimate was 35
3  million, but the total price paid was over 54
4  million, I think you said.  How can you justify
5  that type of increase?
6  A.  I think total price that we paid, if I remember,
7  was around 53.5, if I remember that.  I don't
8  remember the $54 million figure, how it came
9  about.  But when this happened, Inland Waters came
10  on board, and then hired a consultant, which was
11  NTH Consultants in this case.  They prepared an
12  estimate based on the way they are going to repair
13  this sewer, based on the conditions which are
14  going to be exactly as they anticipated, that
15  we'll dig a shaft here, bypass it, bypass that
16  one, and ultimately we'll dig up in place.  We'll
17  find the sewer exactly where we think it is, that
18  deep and all that, put some shafts around this.
19  Secure this place, and repair this, and ultimately
20  get the system through.
21      When we actually did that, it became a
22  lot more complicated than the design concept that
23  we are talking about.
24  Q.  And you mentioned several factors.  Let me --
25  we've got those on the record.  I don't want to

13-53846-tjt   Doc 7885-21   Filed 10/08/14   Entered 10/08/14 21:38:19   Page 29 of
32

Page 113

1 talk about that. Let me ask you about a couple
2 more. Was there any expense involved in water
3 and air monitoring?
4 A. Yeah, we had to do the water and air monitoring on
5 both sides of this because, one, we are next to
6 the residential area now. Secondly, there are
7 some water mains in the area and all. We don't
8 want them to be contaminated, because the water
9 mains are old. Who knows where they may be
10 leaking. We had to monitor the water. And
11 ultimately the drain running around 15 Mile Road
12 and Schoenherr, we just want make sure that none
13 of the sewage flow goes into -- in case there's a
14 breakage and all that. So we are monitoring the
15 water system. The water samples were taken from
16 this on a daily basis, until this sinkhole was
17 repaired to make sure that no sewage is getting
18 into that.
19 Q. Was there any issue in regard to that sinkhole
20 expanding and additional work as a result of
21 that?
22 A. At the time when we were bypassing the sewer and
23 all, the sinkhole is getting bigger and bigger and
24 it was becoming a threat to houses, especially on
25 the south side. So we had to stabilize the ground

Page 114

1 on the south side and make sure these houses don't
2 get sucked into that like, if you remember
3 happened three years ago in Florida. There was a
4 news item where the house got sucked into a
5 sinkhole. We didn't want the same thing to happen
6 here.
7 Q. You indicated there were daily meetings on the
8 project. Who attended those meetings?
9 A. I attended all those meeting. Mercado attended
10 those meetings until the bypass was done and the
11 sinkhole was basically secure. Gary Fujita was
12 there all meetings until December. Then it was my
13 inspectors, my engineers, Inland -- representative
14 of Inland Waters, and all subcontractors who
15 happened to be working at that time. And a
16 representative from Macomb County was there for, I
17 think, the first two months.
18 Q. What was his name?
19 A. He was an inspector, Donald Penrod. And
20 representative from Sterling Heights, name of Joe
21 Ross, he was there with us right from day one
22 until the date we repaired the hole.
23 Q. Could the representatives from Sterling Heights
24 and Macomb County ask any questions they wanted
25 to at those meetings?

Page 115

1 A. They can ask any questions they want.
2 Q. Could they get any documents that they wanted?
3 A. They could get any documents they wanted.
4 Q. Did any of them ever complain about excessive
5 cost or wrongdoing?
6 A. None of them did that.
7 Q. I'm not sure I asked you. Do emergency repairs
8 typically cost more? Are they more expensive
9 than regular repairs?
10 A. Yeah, usually they cost more.
11 Q. We'd get into it, but let's skip that.
12 You indicated that you believed all the
13 charges were reasonable.
14 A. I still believe that.
15 Q. Well, do you think that at least some of these
16 might have been overcharges and DWSD was
17 excessively charged for this stuff?
18 A. I don't think so.
19 Q. Why not?
20 A. Because we looked at all the documents. We paid
21 them what they actually worked on and the rates
22 and all that were as per the documents. They were
23 audited statements. And I was there on day-to-day
24 basis and all. I knew what was going -- work was
25 going on.

Page 116

1 Q. Did you ever recommend approval of any payment or
2 pass any payment through that you had questions
3 about or felt was excessive?
4 A. Like I said, I had a question about one of the
5 invoices we found out that his rates -- one of the
6 subcontractors were high for some equipment, so we
7 asked Inland Waters to revise that one.
8 Q. Ms. Badalamenti asked you about your testimony
9 before the grand jury and your interviews by the
10 federal government. What did you tell them?
11 A. Okay. Their main questioning was did Ferguson
12 take advantage of his position to get some
13 contracts with the City of Detroit. And my
14 response to all of them was, no, because sinkhole
15 was the only one where he was involved as a
16 subcontractor to Inland Waters, and Inland Waters
17 selected him to do that. The rest of them were
18 all bid contracts. We bid
19 them outside. They were all low bid contracts.
20 He was the low bidder. He didn't get all of them,
21 but low bidder on some. The ones that he got,
22 then we got work done as per the document. We
23 didn't pay him until the work is done.
24 Q. Did they ask you about excessive charges?
25 A. No, they didn't ask me about excessive charges.

Page 117

1 Q. Was the thrust of their questions to you whether
2 or not there was favoritism shown to Ferguson?
3 A. That's basically what it was. I was engineering
4 part. I told them engineering was not part of
5 that.
6   MR. WATSON: That's all. Thank you.
7   RE-EXAMINATION
8   BY MS. BADALAMENTI:
9 Q. I just have a couple follow-ups. You referred to
10 this now a couple different ways. And Mr. Watson
11 asked you is it a task order or
12 time-and-materials contract. In the documents
13 that are in front of you, I would note that DWSD
14 Contract No. CS-1368 Task ER 37 is referenced.
15 Is it your belief, though, that this was not a
16 task order contract?
17 A. No, CS-1368 is a task order contract. Now, this
18 particular task underneath, that became a
19 time-and-material. Most of the task orders that
20 we gave them are not time and material. But
21 sinkhole was a time-and-material task order.
22 Q. And how did that come to be the case?
23 A. Because it's an emergency. And we don't know the
24 scope of work, what is to be done.
25 Q. So in that regard, Mr. Watson asked you do

Page 118

1 emergency repairs cost more, and you said yes?
2 A. Yeah.
3 Q. Why?
4 A. Because when you are going for a bid contract,
5 where you're asking other people to bid on
6 something, too, you know, there's a competition
7 and all that. People search for various things
8 around and all that, and ultimately they give you
9 the price. Here he's going to get all that we're
10 looking for. Say I need this pump on this site by
11 tomorrow -- because that's what we needed in this
12 case in order to convey this one. I needed pump
13 and motor on the site by tomorrow. He's going to
14 get one that is available right now. If he had
15 waited two months and all that, he can get a lower
16 price from somewhere else, but today he is going
17 to get what is available in the market today, so
18 that price may be higher; it usually is. So is
19 for the piping, so is for the valves, and so is
20 for the labor. Some labor is not available
21 straightaway and all that. He has to lure
22 people -- hire people from other subcontractors,
23 other contractors by paying them a little bit
24 more. That's how it goes.
25 Q. So the swiftness is one issue and the

Page 119

1 competitiveness is another?
2 A. Another issue.
3 Q. Okay. In that regard, Mr. Watson asked you what
4 did you tell the federal investigators, and you
5 told them, as I understand it, that you did
6 not -- you were unaware of any wrongdoing by Mr.
7 Ferguson because all the projects he was involved
8 in except this one he had bid on?
9 A. He bid on those.
10 Q. But he didn't bid on this one, did he?
11 A. No, because this was task order given to Inland
12 Waters, and Inland hired him to do the work for
13 them. So there's no bidding on that.
14 Q. Did Inland bid for this work or for 1368, the
15 original work?
16 A. This work, Inland got the subcontractors to do it
17 right away because we needed people to work on
18 that tomorrow. If I remember that correctly, any
19 other task order that they got other than
20 sinkhole, they did get some quotations from other
21 subcontractors, too. We didn't tell them who to
22 go to, but they did have some competition. There
23 was no time for competition on this job.
24 Q. With respect to the original 1368, was it bid?
25 Was it awarded based on bids?

Page 120

1 A. You mean the original contract?
2 Q. Yes.
3 A. Original contract was advertised in the
4 document -- in the papers and whatever. It was an
5 open contract. There were other bidders. The
6 contract was evaluated and ultimately Inland
7 Waters was chosen as the most responsive to the
8 contract.
9 Q. Your understanding is that Inland was selected as
10 a result of the bid process for 1368?
11 A. That's true.
12 Q. I have just a couple. Let me go back to that.
13 You indicated that there was -- there were a
14 number of changes -- we talked a lot about
15 them -- that resulted in the $35 million estimate
16 changing to be, you know, in excess of 50
17 million -- whatever the number ended up being.
18 The estimate, though, you would agree with me, of
19 35 million or somewhere in that frame was after
20 September 30th -- on or after September 30th of
21 2004; isn't that true?
22 A. I don't remember the amount -- the exact date when
23 the estimate was prepared, but it was definitely
24 after the sinkhole -- we started working on that.
25 Sometime in September, I think so.

Page 121

1 Q.  In fact, the contract was not approved by City
2 Council, we saw, until December of 2004, correct?
3 So by that time would you have known of those
4 changed conditions?
5 A.  No, I wouldn't have known.
6 Q.  Which changed conditions would have come up after
7 December of 2004?
8 A.  Like I told you, one where the bulkhead issue and
9 all that, and the second one is amount of work we
10 did for stabilizing the houses and all, in
11 addition to doing the additional sheet piling and
12 all that.  Then the situation with the pumps and
13 motors and all that, how long they going to last
14 because most of the pumps and motors are not
15 designed for continuous duty 24 hours a day.
16 Q.  Okay.
17 A.  The amount of breakage and maintenance and repairs
18 and replacements that you get.  Then the issue of
19 the piping getting blocked and all that.  Nobody
20 anticipated those.  All that happened after that.
21 Q.  After that, okay.  The last thing I want to show
22 you -- and we'll mark it.
23    MARKED FOR IDENTIFICATION:
24    DEPOSITION EXHIBIT 7
25    4:23 p.m.

Page 122

1 BY MR. WATSON:
2 Q.  This is Exhibit 7.  This is referring to
3 Amendment 3, and it has a date of May 18th of
4 2005.  Is that the time frame that you recall
5 Amendment 3 being proposed?
6 A.  I don't know about the dates when this happened,
7 because I was still in field engineering those
8 days.  So -- if this is what it says, then this is
9 what it says.  It happened in May 2005.
10 Q.  You don't know one way or the other?
11 A.  I don't know.
12    MS. BADALAMENTI: I don't have anything
13 else.
14    MR. WATSON: Okay.
15    (The deposition was concluded at 4:26 p.m.
16 Signature of the witness was not requested by
17 counsel for the respective parties hereto.)
18
19
20
21
22
23
24
25

Page 123

1    CERTIFICATE OF NOTARY
2 STATE OF MICHIGAN    )
3    ) SS
4 COUNTY OF MACOMB    )
5
6    I, MELINDA S. MOORE, certify that this
7 deposition was taken before me on the date
8 hereinbefore set forth; that the foregoing
9 questions and answers were recorded by me
10 stenographically and reduced to computer
11 transcription; that this is a true, full and
12 correct transcript of my stenographic notes so
13 taken; and that I am not related to, nor of
14 counsel to, either party nor interested in the
15 event of this cause.
16
17
18
19
20
21
22    MELINDA S. MOORE, CSR-2258
23    Notary Public,
24    Macomb County, Michigan
25 My Commission expires:  September 6, 2016