# In The Matter Of:
*In Re: City of Detroit, Michigan*

## Bartlett D. Foster
## July 09, 2014



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File FOSTER_BARTLETT D_.txt*
*Min-U-Script® with Word Index*

## Page 1

 1      UNITED STATES DISTRICT COURT
 2      EASTERN DISTRICT OF MICHIGAN
 3            SOUTHERN DIVISION
 4
 5   _____
 6   In re:                    )   Case No. 13-53845
 7   CITY OF DETROIT, MICHIGAN )
 8                             )   Chapter 9
 9        Debtor               )
10   _____)   Hon. Steven W. Rhodes
11
12
13      The Deposition of BARLETT D. FOSTER,
14    Taken at 150 W. Jefferson Avenue, Suite 2500,
15      Detroit, Michigan,
16      Commencing at 4:30 p.m.,
17      Wednesday, July 9, 2014,
18      Before Melinda S. Moore, CSR-2258.

## Page 2

 1   APPEARANCES:
 2
 3   RAECHEL M. BADALAMENTI (P64361)
 4   Kirk, Huth, Lange & Badalamenti, PLC
 5   19500 Hall Road
 6   Suite 100
 7   Clinton Township, Michigan 48038
 8   586.412.4900
 9   rbadalamenti@khlblaw.com
10       Appearing on behalf of the Macomb Interceptor
11       Drain Drainage District.
12
13   IRENE BRUCE HATHAWAY (P32198)
14   M. MISBAH SHAHID (P73450)
15   Miller Canfield Paddock & Stone, PLC
16   150 W. Jefferson Avenue
17   Suite 2500
18   Detroit, Michigan 48226
19   313.963.6420
20   hathaway@millercanfield.com
21   shahid@millercanfield.com
22       Appearing on behalf of the City of
23       Detroit and the Witness.

## Page 3

 1   ARTHUR H. RUEGGER
 2   Salans FMC SNR Denton
 3   1221 Avenue of the Americas
 4   New York, New York 10020
 5   212.768.6881
 6   arthur.ruegger@dentons.com
 7       Appearing on behalf of the
 8       Official Committee of Retirees
 9       of the City of Detroit.

## Page 4

                   TABLE OF CONTENTS

WITNESS                                          PAGE
BARLETT D. FOSTER
    EXAMINATION BY MS. BADALAMENTI               5

EXHIBIT                                          PAGE
    (Exhibits attached to transcript.)

    DEPOSITION EXHIBIT 1                         36
    DEPOSITION EXHIBIT 2                         41
    DEPOSITION EXHIBIT 3                         41
    DEPOSITION EXHIBIT 4                         41
    DEPOSITION EXHIBIT 5                         41
    DEPOSITION EXHIBIT 6                         59
    DEPOSITION EXHIBIT 7                         64

Page 5

1  Detroit, Michigan
2  Wednesday, July 9, 2014
3    4:30 p.m.
4    BARLETT D. FOSTER,
5  was thereupon called as a witness herein, and
6  after having first been duly sworn to testify to
7  the truth, the whole truth and nothing but the
8  truth, was examined and testified as follows:
9    EXAMINATION
10   BY MS. BADALAMENTI:
11 Q. Mr. Foster, my name is Raechel Badalamenti. I
12   represent Macomb Interceptor Drainage District,
13   Macomb County, with respect to a claim that's
14   been filed against the City of Detroit. Are you
15   aware of the nature of that claim?
16 A. A bit, yes.
17 Q. What do you know about it?
18 A. It was a claim that amounts charged to Macomb for
19   purchase of the district from DWSD should be
20   adjusted for some items that I'm not entirely
21   familiar with.
22 Q. Are you aware that the City of Detroit asserted a
23   claim against certain contractors and
24   subcontractors with respect to the same contract
25   that's in issue in Macomb's claim against

Page 6

1  Detroit?
2 A. I'm aware.
3 Q. Are you aware that there was a settlement of some
4   of those claims?
5 A. I am aware.
6 Q. What information do you have about the claims
7   that Detroit asserted against contractors and
8   subcontractors?
9 A. I'm sorry. Could you ask it again.
10 Q. Sure. What is your -- the extent of your
11   knowledge about the claims that Detroit asserted
12   against contractors and subcontractors?
13 A. I don't have a great deal of knowledge about the
14   specific claims.
15 Q. What is your knowledge of the settlements?
16 A. I'm aware of the amounts of the settlements for
17   certain of the contractors. I'm not intimately
18   aware of the nature of the settlements.
19 Q. Were you involved in the negotiations of those
20   settlements?
21 A. I was not.
22 Q. Did you learn about those settlements in
23   preparation for your deposition here, or in the
24   bankruptcy proceeding, or as part of something
25   else?

Page 7

1 A. Part of something else.
2 Q. When do you think you learned about that?
3 A. First learned of the nature of the settlements
4   over a year ago probably. I don't recall specific
5   dates.
6 Q. In what context?
7 A. My role as an advisor to the Detroit Water and
8   Sewerage Department deals with events that impact
9   the financial planning for the department. I
10   became aware that there were to be receipts of
11   funds as a result of the settlements. That's how
12   I became aware of it.
13 Q. We agreed before I asked you my first question
14   that you would produce an updated CV for yourself
15   in lieu of asking about all your technical
16   expertise. So forgive me if I go backwards and I
17   ask, then, about some of your roles for DWSD.
18     Your role as an advisor to the DWSD,
19   how long have you held that position?
20 A. I have been engaged as a consultant to DWSD either
21   through my firm or through the firm I used to be
22   an officer with on a fairly regular basis since
23   1986.
24 Q. Are you an advisor in this capacity for any other
25   municipalities?

Page 8

1 A. Yes.
2 Q. Which ones?
3 A. Long list. My current principal clients include
4   DWSD, City of Kalamazoo, Michigan, water -- or
5   public utilities, City of Lee Summit, Missouri,
6   public utilities, the Village of Bedford Park,
7   Illinois. The CV will have a number of other
8   listings that there just isn't any current work
9   going on that comes to mind.
10 Q. Okay. Have you been a witness for the City of
11   Detroit with respect to any claims it's filed or
12   that have been filed against it in the last five
13   or so years?
14 A. No.
15   MS. HATHAWAY: I assume he testified as
16   a witness. I mean, he may not even know if he was
17   put on a witness list, for example.
18   BY MS. BADALAMENTI:
19 Q. Testified or prepared a report?
20 A. No.
21 Q. Who is it or what is the title of the person that
22   you interact with at the DWSD?
23   MS. HATHAWAY: Currently?
24   BY MS. BADALAMENTI:
25 Q. Currently.

Page 9

1 A. The project manager of the engagement that I have
2 with DWSD is the chief financial officer,
3 Nicolette Bateson. I would not say that that
4 limits my interaction with people at DWSD.
5 Q. Right. Your role as an advisor to the DWSD, is
6 that pursuant to contract?
7 A. It is.
8 Q. What are you paid?
9 A. The current arrangement between my firm and DWSD
10 has an annual fee of $750,000.
11 Q. Is there a provision -- is there a cap on the
12 amount of time that that covers?
13 A. Not contractually, no.
14 Q. Have you ever been paid in a one-year time frame
15 in excess of 750,000?
16 A. My firm --
17 Q. That's what I mean.
18 A. Not for the current contract. There are other
19 services that occasionally are contracted under
20 different arrangements that may have resulted in a
21 slightly higher annual fee.
22 Q. In 2004 what were you doing for DWSD?
23 A. I'd ask you to be a little more precise. 2004 was
24 a year of transition for my profession.
25 Q. Were you involved -- let me put it this way: I

Page 10

1 have a number of look-back reports that you
2 prepared for the City of Detroit. What years did
3 you do such reports?
4 A. Either through my former employer or through my
5 firm, I have been involved in preparing such
6 look-back reports for all years inclusive from
7 1985 through 2012. Those would be fiscal years by
8 the DWSD definition.
9 Q. And those reports are not something that is still
10 being prepared; is that correct?
11 A. That is correct.
12 Q. Is there a new process that's used --
13 A. There is.
14 Q. -- annual review. What is that process?
15 A. In a very simplified manner, the department and
16 its contractual customers for the sewage disposal
17 system have arrived at a new way of doing things,
18 a rate simplification initiative that was adopted
19 by the Board of Water Commissioners last December
20 that negates the need for these annual look-backs.
21 Q. Did that impact your contractual rate with DWSD?
22 A. No.
23 Q. When you told me that 2004 was a year of
24 transition, did you say for your profession?
25 A. For my firm, yes.

Page 11

1 Q. How so?
2 A. In April of 2004 I left employment of Black &
3 Veatch where I was a senior vice president, and
4 started an independent consulting practice, The
5 Foster Group.
6 Q. Did DWSD go with you when you made the transition
7 or was there a time period where they stayed with
8 your former firm?
9 A. The contract with Black & Veatch was extended for
10 a period, and then was assigned to my firm.
11 Q. So what was that -- was it a period of weeks or
12 months?
13 A. I don't recall specifically.
14 Q. Was the assignment in 2004?
15 A. Yes, it was.
16 Q. In your capacity as an advisor, are you made
17 aware of contracts that are being entered into or
18 projects that are ongoing for DWSD?
19 A. In general.
20 Q. Tell me what details would you find out about as
21 a contract is being entered into, if any.
22   MS. HATHAWAY: Objection, overbroad.
23   BY MS. BADALAMENTI:
24 Q. You can answer.
25 A. I know.

Page 12

1   One of my roles is to review and advise
2 on financing of capital programs. To the extent
3 that there is a major contract as part of the
4 overall -- the department's overall capital
5 program, understanding how the cash flow -- the
6 projected cash flow of that specific contract
7 would impact the financing requirements of the
8 department would be something that I would
9 research, be made aware of, utilize in preparing
10 advice.
11 Q. Are you familiar with DWSD Contract 1368
12 involving Inland Waters?
13 A. I'm aware that that was the contract with Inland
14 Waters, yes.
15 Q. Were you made aware of that contract at the time
16 it was awarded?
17 A. No, I was not.
18 Q. Were you aware of any of the amendments to that
19 contract at the time they were awarded?
20 A. No, I was not.
21 Q. When did you first become aware of CS-1368?
22 A. Specifying that I don't know I was aware of
23 CS-1368 as being the vehicle, I was made aware
24 that when the Intercepter collapse at 15 Mile and
25 Hayes or thereabouts, that that was -- that Inland

Page 13

1 was being asked to head up the repair efforts.
2 Q. Did you find that out after work had begun or
3 after work was completed? When did you learn
4 about it?
5 A. After it had begun.
6 Q. You learned that Inland was heading up the
7 repairs. Did you learn there was any amendments
8 to the contracts related to those repairs?
9 A. No.
10 Q. In the course of doing any look-back report, did
11 you become more familiar with the terms of 1368
12 or Inland's work at the sinkhole?
13 A. Not with contract terms, no.
14 Q. You never saw 1368 or the amendments?
15 A. I did not.
16 Q. Is that standard, you would never really receive
17 the City of Detroit contract with a contractor?
18 A. As a general rule, I'm less interested in the
19 contract and the specifics of the contract than in
20 the overall cost of the project.
21 Q. So with respect to -- give me a general scenario.
22 Not talking about CS-1368 or any particular
23 project, but you're consulted because there is a
24 major undertaking by the DWSD being contemplated
25 or being performed already, and you're consulted

Page 14

1 because it's going to impact the, you know,
2 capital of DWSD. What types of things are you
3 asked to advise on?
4 A. For instance, the department generally produces a
5 five-year capital agenda. One of the tasks in my
6 agreement with them -- my arrangement with the
7 department is I help design strategic financing
8 plans to fund that capital program at large, made
9 up of a number of different projects and
10 contracts, when it's appropriate to fund projects
11 with revenues as opposed to seeking revenue bonds,
12 debt financing capital, things along those lines,
13 that's one scope item that they rely on advice
14 from my firm.
15 Q. Do you ever advise on the reasonableness or
16 unreasonableness of charges on a construction
17 project?
18 A. I do not.
19 Q. Do you ever advise on reasonableness or
20 unreasonableness of certain invoices in
21 connection with a construction project?
22 A. I do not.
23 Q. That being said, you did no such review of any of
24 the invoices or submissions by the contractors
25 with respect to the sinkhole repair; is that

Page 15

1 fair?
2 A. I'm sorry, can you repeat.
3 Q. You have never reviewed any of the invoices,
4 then, that were submitted in connection with
5 1368?
6 A. Never have.
7 Q. At some point, though, do you get involved in the
8 discussions that are ongoing about Macomb
9 County's purchase of the Macomb Intercepter
10 systems. Are you familiar with that?
11 A. Yes.
12 Q. Do you know when you were first made aware that
13 those negotiations were taking place?
14 A. Not specifically.
15 Q. Do you know if they occurred over, you know, a
16 one-year time period? A five-year time period?
17 A. My first recollection -- well, I don't know when
18 they initiated. I know that my involvement in
19 conversations with the transfer of the MID and the
20 OMID was lengthy, culminated in the final
21 agreements and the transfer. It would not
22 surprise me if that process spanned four years.
23 Q. Do you remember some of the reasons why it took
24 so long to negotiate the terms of that, or was it
25 technical disputes, debt adjustment disputes?

Page 16

1 What were the nature of the disputes?
2 A. I don't know that I would attempt to characterize
3 them.
4 Q. What things were you involved in trying to
5 resolve or advise DWSD on?
6 A. An understanding of how to research the financial
7 records of DWSD in order to arrive at the
8 calculated provisions of the original agreement
9 between Macomb and DWSD.
10 Q. The purchase price?
11 A. Yes.
12 Q. What went into that -- well, let me ask you this:
13 Did you actually go through those financial
14 records to arrive at that calculated purchase
15 price or did you advice DWSD on how to do so?
16 A. Both.
17 Q. Who at DWSD were you working with?
18 A. A number of people.
19 Q. Do you remember their names?
20 A. We relied on information provided by the
21 engineering division, which was headed by
22 Mr. Shukla at the time, I believe. We relied on
23 information provided by the accounting division --
24 various people heading up that division during
25 this period. We relied on information provided

Page 17

1  by -- in our own records, having done financial
2  analysis for the department. We relied on
3  information provided by Macomb County, and we
4  relied on information provided by other advisors
5  to DWSD who were reviewing the Macomb Intercepter
6  system. Probably others, but those are the
7  principal data sources of our initial analysis.
8  Q. Would those other advisors be NTH Consultants?
9  A. Yes.
10 Q. Anybody else?
11 A. Not that comes to mind, no.
12 Q. And in the -- you relied on that information.
13    Did you rely on documents or did you rely on
14    information from these departments? In other
15    words, did you speak with people and ask them
16    about various things or did you just get
17    documents?
18 A. Both.
19 Q. Who from engineering would be your contract?
20 A. Mr. Shukla.
21 Q. What do you remember discussing with Mr. Shukla?
22 A. Asked Mr. Shukla for -- back up -- made an inquiry
23    of the department as to what level of investment
24    did it have in the facilities that were being
25    considered for transfer.

Page 18

1  Q. And what did Mr. Shukla tell you?
2  A. Mr. Shukla provided a document -- I can see it. I
3     don't recall specifically -- a document and a map
4     that had the engineering database -- engineering
5     division of DWSD, their database of all the
6     contracts that were used to construct that --
7     those facilities, and what their records had as
8     the contract price for those facilities.
9  Q. Did Mr. Shukla provide you the technical
10    information regarding the assets or did he just
11    provide you the contract documents?
12 A. Define technical information for me as you see it.
13 Q. The location of certain assets that would be sold
14    or acquired.
15 A. Yes. There was a map and identified -- labeled
16    map with the various contracts and assets.
17 Q. So there would be -- you can picture it so, what
18    you're picturing is a map that defined the system
19    that was going to be sold and there were, I
20    imagine, notations to parts of the system where a
21    particular contract would be related to a
22    project -- a construction project that would have
23    been undertaken?
24 A. Exactly right.
25 Q. About how many contracts would you say were

Page 19

1  delineated on that map? And you can estimate it.
2  I don't expect you to have an exact number.
3  A. 20, 25.
4  Q. And the value of those contracts, then, would
5     have gone into your analysis; is that true?
6     MS. HATHAWAY: Are you talking about
7     contracts or the asset value?
8     MS. BADALAMENTI: I'm talking about the
9     contracts.
10    THE WITNESS: The contracts -- the
11    contracts -- the reported contract value by
12    engineering was one of the aspects that went into
13    our analysis, yes.
14    BY MS. BADALAMENTI:
15 Q. You just said "the reported contract value," so
16    did you actually get the documents? Did you get
17    the contract or --
18 A. No.
19 Q. You just saw it identified on a map by contract
20    number, I assume?
21 A. Yes.
22 Q. And there was an amount associated with that
23    contract?
24 A. Yes.
25 Q. Was there a general description of what was

Page 20

1  undertaken pursuant to a particular contract?
2  A. Very general.
3  Q. Okay. Do you remember anything about the
4     notation for the 15 Mile and Hayes Contract 1368?
5  A. At the time we started this, I don't believe there
6     was anything on that map for 1368.
7  Q. At what point in time did the map get updated to
8     include --
9  A. I don't believe the map ever got included to
10    include 1368. The cost associated with the
11    repairs were not something that came with the
12    original engineering analysis, because by
13    recollection, it was an ongoing project when we
14    started the conversation and the analysis.
15 Q. Okay. So the reported contract values that are
16    on this map are used for what purpose in your
17    analysis of calculating price?
18 A. To establish the investment that DWSD had made in
19    all of the assets irrespective of -- in effect,
20    prior to the collapse at 15 and Hayes and all
21    appurtenances and whatnot.
22 Q. Are you -- are you provided with any description
23    of the actual structures by engineering?
24 A. To the extent that the actual description is
25    limited to an intercepter, a pumping station, a

Page 21

1  meter pit, a meter, that's the extent -- and size,
2  that's the extent of what would be in our records.
3  Q. Did that information go into your analysis as
4  well?
5  A. Just the general labeling of the assets. Yes,
6  general description labeling of the assets.
7  Q. Separate and apart from that map, we talked a
8  little bit about information that came later,
9  including the information about 1368. So without
10 being specific, what sorts of information came to
11 you aside from that map that went into your
12 calculation?
13 A. So we also queried, as I mentioned, the accounting
14 division to see what their records showed as being
15 investments in those assets.
16 Q. And what information did you get from accounting?
17 A. The book value of the same assets.
18 Q. Did that book value account for those
19 investments --
20 A. Yes.
21 Q. -- already?
22    So did you perform, then, an analysis
23 independent of that to come up with a value?
24 A. We used both of those sources of data and relied
25 on those sources of data to make an initial

Page 22

1  determination of what DWSD's investment in those
2  assets were.
3  Q. And what was your determination?
4  A. It's as represented in some of the exhibits. I
5  don't have it in front of me.
6  Q. Okay. I'll pull them out shortly here. Did any
7  other information other than what engineering
8  gave you and accounting gave you go into that
9  analysis?
10 A. Yes. Towards the end of the analysis, as NTH was
11 doing some inspection work, which effectively was
12 capital investment into the system, we relied on
13 information from NTH as to what those amounts
14 were.
15 Q. Anything else that went into the analysis?
16 A. With respect to determining what the DWSD
17 investment in those facilities was?
18 Q. Right.
19 A. Not that I recall.
20 Q. To determine or propose -- back up.
21    To assist DWSD in negotiating a
22 purchase price with Macomb, do you do anything
23 else besides determine the investment?
24 A. Yes.
25 Q. What else do you do?

Page 23

1     MS. HATHAWAY: Did he do or do you do?
2  You want actually what he did in this particular
3  instance, right?
4     MS. BADALAMENTI: Right.
5     THE WITNESS: We were made aware of the
6  general construct of the intended purchase price,
7  and probably consulted -- no, definitely consulted
8  on the applicability of that general construct,
9  and then were requested to complete an analysis
10 of -- additional analysis in order to kind of
11 determine the purchase price.
12    BY MS. BADALAMENTI:
13 Q. So when you said the construct of the purchase
14 price, what do you mean?
15 A. Our understanding that the original arrangement
16 for transfer of the asset was to set the purchase
17 price at a term -- a defined term in the agreement
18 of system debt. System debt was defined in the
19 agreement as the investment that DWSD has made in
20 the facilities being transferred less whatever
21 amounts that Macomb had paid in sewer rates that
22 were associated with principal -- not interest,
23 but principal on debt service that was allocated
24 to those assets. That was the general construct
25 of the deal for the purchase price.

Page 24

1  Q. At the time that you are initially consulted
2  with, has there already been a determination that
3  there are certain Macomb-only projects that will
4  be -- that were assessed in the rates a certain
5  way and that will or will not be passed along
6  with the purchase price a certain way?
7     MS. HATHAWAY: Object to the form of
8  the question. It's vague.
9     THE WITNESS: I don't understand your
10 question. I'm sorry.
11    BY MS. BADALAMENTI:
12 Q. Was there -- I guess let me ask it this way: You
13 were involved in the rate calculations at the
14 time for DWSD; is that the true?
15 A. True.
16    MS. HATHAWAY: When you say "at the
17 time," what time are we talking about now?
18    BY MS. BADALAMENTI:
19 Q. The four-year time period that -- I guess the
20 beginning of the 4-year time period that you're
21 calculating the system debt.
22    During that time period you were
23 involved in determining the rates, correct?
24 A. That's correct.
25 Q. And you would determine the rates for Macomb?

Page 25

 1  A.  The wholesale rates -- wholesale sewer rates
 2      charged by DWSD to Macomb, yes.
 3  Q.  What would go into that analysis?
 4  A.  Well, there's a rather rigorous analysis for the
 5      DWSD sewer rates that establishes wholesale
 6      charges -- cost allocations and wholesale charges
 7      for all the contract customers of DWSD, including
 8      Macomb.  Macomb and to a lesser extent the Clinton
 9      Oakland District of Oakland County were the only
10      wholesale customers that there were facilities
11      that DWSD owned, built -- financed, built, owned
12      and operated specifically for the benefit of one
13      contract customer.  All the other county contract
14      customers had built their own interceptor systems.
15      The original arrangement with Detroit and Macomb
16      and the Clinton Oakland District of Oakland County
17      was that Detroit would finance, construct, own and
18      operate what's now the Macomb Intercepter
19      District, and so in the rate design, there needed
20      to be a direct assignment of the costs associated
21      with that -- those facilities to Macomb.  That was
22      part of the rate design at the time.
23  Q.  So the -- when you say that you're going to
24      determine the investment made by DWSD less the
25      amounts Macomb paid by the rate, you would know

Page 26

 1      what Macomb was paying towards what debt; would
 2      that be a fair assessment?  You would already
 3      have that information?
 4  A.  That was part of the annual evaluation of rates,
 5      yes.
 6  Q.  So the rest of what you told me is that there
 7      would be some debt service that was allocated to
 8      Macomb.  That would be that debt service that was
 9      allocated to Macomb previously?  In other words,
10      it didn't change for purposes of this analysis?
11      It was what Macomb was already allocated?
12         MR. RUEGGER:  I'll object to the form
13      of that.
14         MS. HATHAWAY:  Me, too.
15         BY MS. BADALAMENTI:
16  Q.  Let me ask it a different way.  Your analysis of
17      the investment made by the DWSD less the amounts
18      Macomb paid by its rates didn't change the rate
19      or the allocation that Macomb was already paying;
20      it just calculated what Macomb had paid to date?
21      Is that a better way of asking it?
22  A.  I'm struggling with the way that you characterize
23      it.  I don't think I can confirm exactly what you
24      said the way that you said it.
25  Q.  Well, tell me how did you then determine at the

Page 27

 1      time that you were going to set the system debt
 2      what Macomb had paid via its rates towards
 3      principal, not interest, on the debt service that
 4      was allocated.
 5  A.  We reviewed the construct of the rates that had
 6      been charged going all the way back to the
 7      mid-80s, and did a retrospective analysis of how
 8      much of that rate was associated with principal on
 9      each one of those -- of the bonds that were
10      allocated to the Macomb-specific assets.
11  Q.  Okay.  So to answer that question, did you need
12      any additional information -- information that
13      you did not already have or get from engineering
14      or accounting to come up with that analysis?
15  A.  The only additional information we needed was
16      rate -- records of rate analyses through the
17      years, much of which was already in our
18      possession.
19  Q.  Okay.  Did you have any discussions with the
20      contract department of the City of Detroit for
21      any of the information that you need to make this
22      calculation of system debt?  Contracts and grants
23      department, to be more specific?
24  A.  I don't believe so.  I don't recall any specific
25      conversations with contracts and grants.

Page 28

 1  Q.  Did you have any conversations with the director
 2      of the DWSD?
 3         MS. HATHAWAY:  At any time about
 4      anything?
 5         BY MS. BADALAMENTI:
 6  Q.  About calculating the system debt.  Did you talk
 7      to whoever was the director at the relevant time
 8      that you're calculating the system debt?
 9  A.  Yes.
10  Q.  Which director or directors would have been in
11      place?
12  A.  Victor Mercado and Pam Turner.
13  Q.  What would you have spoken to Mr. Mercado about
14      with regard to calculating the system debt?
15  A.  Initially just understanding the principles of the
16      constructs of the deal, making sure that this
17      definition of system debt was what the parties had
18      intended when they made the deal, providing
19      updates on -- as requested on the course of the
20      analysis as we went through the various aspects of
21      it.
22  Q.  Were you ever asked or did you ever perform any
23      analysis of the award of any DWSD contracts or
24      any of the projects that were identified to you
25      as part of the system debt analysis?

Page 29

1  A. No.
2  Q. Did you ever have any discussions about those
3     contracts with Mr. Mercado?
4  A. No.
5  Q. Did you have occasion to speak to Mr. Kilpatrick
6     at the time you were calculating system debt?
7  A. I'd ask you to an little more specific.
8  Q. During the four-year time frame that you were
9     calculating the system debt, did you have any
10    conversation with Mr. Kilpatrick about the DWSD
11    contracts?
12 A. No.
13 Q. Or projects?
14 A. No.
15 Q. Or the calculation or the information that was
16    given to you to calculate the system debt?
17 A. No.
18 Q. Okay. There was, as I understand it, preliminary
19    analysis that changed over time with respect to
20    that system debt calculation; is that a fair
21    statement?
22 A. That's a fair statement.
23 Q. What information were you given along the way
24    that resulted in those changes? Was it with
25    respect to ongoing projects or something else?

Page 30

1  A. With respect to the system debt portion of the
2     calculation of the purchase price, it was the
3     information that evolved through the years. One,
4     there was ongoing projects; two, there were
5     investigations into originally reported figures
6     and concerns as to whether or not those originally
7     reported figured either needed to be split out
8     into pieces that didn't apply to the Macomb
9     Intercepter or that include other contracts that
10    portions should be allocated; so it was basically
11    due diligence on both the original cost investment
12    in the system and then also in going back on some
13    of the rate calculations and recognizing some
14    unique circumstances to reallocate the principal
15    piece of it.
16 Q. Were you involved with the changes that were made
17    because there had been improvements that were
18    being charged as part of the rates that had not
19    actually been constructed and vice versa?
20 A. Yes.
21 Q. Did your analysis change as a result of that
22    information or was it going forward that rates
23    that would change as a result of that analysis?
24 A. That analysis emerged from our due diligence that
25    I described, and in effect became the first of a

Page 31

1  series of adjustments to the definition of system
2  debt and purchase price.
3  Q. Who brought to everyone's attention the fact that
4     there were these -- I think they're referred to
5     as phantom improvements in some of the documents.
6  A. I don't know that I would attribute credit per se
7     to one party. There were ongoing diligence
8     conversations between representatives of DWSD,
9     myself included, and representatives of Macomb
10    County. Mr. Craig Hupp probably coined the
11    phrase, who's an advisor to Macomb County --
12    probably coined the phase "phantom projects."
13 Q. Your second sort of category was concerns
14    regarding originally reported figures. Is this
15    the allocation of something as Macomb-only or
16    not-Macomb-only project? Is that what you're
17    referring to, or is it something different?
18 A. That's -- the way that you characterize it is
19    generally accurate. For instance -- well, for
20    example, there may have been a contract that had a
21    task -- one task which was specific to the Macomb
22    Intercepter system and another task was something
23    else, and so part of our diligence, we had to make
24    that separate on the allocation.
25 Q. With regard to the first category, the ongoing

Page 32

1  contracts, do you remember how many there were?
2  A. I would say less than five, but that's based on
3     memory.
4  Q. And to the best of your recall, 1368 was one of
5     these?
6  A. Yes.
7  Q. Was it 1368 or the 1368 sinkhole repair that was
8     ongoing?
9  A. To be honest, it was the cost of the sinkhole
10    repairs, our initial -- I don't know that -- our
11    inquiries as to the cost of the sinkhole repairs
12    did not start with 1368. It started with what are
13    the cost of sinkhole repairs, and we were getting
14    updates from accounting on what the total cost
15    was.
16 Q. So, in other words, is it your understanding the
17    costs hadn't been calculated or the work was
18    ongoing?
19 A. The latter.
20 Q. That the work was ongoing?
21 A. Yes.
22 Q. By the time that the acquisition agreement is
23    finalized, about how long before that are you
24    finally given, if ever, the indication that the
25    Contract 1368 was completed?

Page 33

1  A. The final number on 1368 sinkhole repairs was
2  established a fair amount of time -- I don't
3  know -- a year before the final agreement was
4  reached. A year at least, I would say. Any other
5  ongoing contracts did not include the sinkhole
6  repair beyond that time.
7  Q. The totals you were given for that sinkhole
8  repair are something that's specifically
9  referenced in the schedules as opposed to
10 something that went into your calculation of
11 system debt; is that a fair statement?
12 A. I don't understand the distinction you're drawing.
13 Q. You told me that you calculated system debt by a
14 specific mathematical method, right?
15 A. Okay.
16 Q. And my question is: Did the analysis of charges
17 on 1368 go into that same analysis?
18 A. The total charges on the sinkhole repair defined
19 by 1368 was an input to the calculation.
20 Q. Okay. Do you remember who provided you with the
21 information -- what that final number was?
22 A. It would have been the DWSD accounting division.
23 Q. And what did they give you when they give you a
24 total like that? Is it a sheet of paper? A
25 final pay estimate? What is it that you would

Page 34

1  receive?
2  A. The records I got -- the records we received from
3  accounting would generally indicate total amount
4  on the fixed asset books separated by contractual
5  services costs or construction contract cost, and
6  then other indirect costs such as internal labor
7  cost, allocated overheads, and capital interest --
8  capitalized interest, those type of things. There
9  would be four or five fields leading up to a total
10 investment figure.
11 Q. Are those documents you received in connection
12 with this calculation something that you still
13 have?
14 A. I don't know.
15 Q. In any event, was there anything unusual or
16 different about the calculation that you were
17 provided on 1368 different than any other time
18 you had gotten information from DWSD?
19 A. No.
20 Q. Did you question anybody about the information or
21 was it just input into your calculation?
22 A. It was input into the calculation. We did make
23 inquiries to fully understand the nature of what
24 was being reported.
25 Q. What types of inquiries?

Page 35

1  A. We wanted to make sure we understood the
2  capitalized interest piece and what went into the
3  internal cost piece.
4  Q. Do you remember what the internal cost was?
5  A. I can picture a schedule, but my recollection is
6  that the total book value for the repairs was in
7  the low $60 million range, and that of that --
8  roughly $3 million was internal cost and roughly
9  $4 million was capitalized interest, which left a
10 net of $56 million or so as being the contractual
11 amounts for that project. That's just from
12 memory. I haven't looked at it for a while.
13 Q. That's pretty good. You're pretty close. The
14 documents -- the actual acquisition agreement
15 references a $54 million number. Do you know how
16 it went from 56 to 54?
17 A. Not without looking back at things, no.
18 Q. Okay. What is it that you would need to look at
19 so I don't put a bunch of things in front of you
20 that you don't need to see, because I know you
21 have a plane to catch.
22 A. There are Exhibit 3.8 and I'm sure that there are
23 somewhere in your records additional calculations
24 that support that.
25 Q. Were you ever questioned as part of a criminal

Page 36

1  investigation in connection with the work you
2  performed for DWSD?
3  A. Can you repeat the question.
4  Q. Were you ever questioned by federal investigators
5  in connection with your work?
6  A. I was not.
7     MS. BADALAMENTI: Let's mark this as 1.
8     MARKED FOR IDENTIFICATION:
9     DEPOSITION EXHIBIT 1
10    5:18 p.m.
11    BY MS. BADALAMENTI:
12 Q. I've put in front of you -- and we'll just go
13 through them as quickly as possible, but I put in
14 front of you what appears to be a report dated
15 February 6, 2007 from The Foster Group. Do you
16 recognize the document?
17 A. Yes.
18 Q. What was this document prepared for?
19 A. This document was related to negotiations on the
20 transfer of the Macomb Intercepter District to
21 Macomb County that I would characterize were part
22 of negotiations for adjustments to the system debt
23 as defined by the original construct of the deal.
24 Q. So I see in here as Exhibit 3 15 Mile and Hayes
25 Repairs. I see that $56,861,900 as a total. Is

Page 37

1  that the total you were provided?
2  A. That is the -- this is 2007. My belief is that
3  that is the net contractual cost of the repairs
4  which would not include the capitalized interest
5  nor the internal cost that we mentioned a few
6  minutes ago, yes.
7  Q. Okay. So -- and the footer on the bottom is
8  dated 1/29 of 2007. So by that time you would
9  have had the total project cost?
10 A. I believe so. I would not want to be definitive
11 about that without looking through records, but I
12 believe so.
13 Q. Okay. So then the negotiations surrounding
14 Macomb's purchase would have begun prior to -- at
15 least prior to this February 6, 2007 letter?
16 A. Correct.
17 Q. Do you know how much prior to this letter?
18 A. I do not. I could speculate, but I could not be
19 precise.
20 Q. What would you approximate? If you can
21 approximate --
22 A. 2005 at the earliest, likely 2006.
23 Q. Were you involved at all in the litigation case
24 that was ongoing before Judge Feikens with
25 respect to some of these issues?

Page 38

1  A. Yes.
2  Q. Did you ever appear in court?
3  A. Yes.
4  Q. Did you give testimony in that case?
5  A. I did not give sworn testimony in that case.
6  Q. What was your purpose for appearing in court?
7  A. Less formal status conferences, asked questions of
8  progress on negotiations that were being overseen
9  by the judge on various matters, participated in
10 work groups that the judge effectively
11 established.
12 Q. Did you ever have occasion to discuss the ongoing
13 projects like 1368 with anyone from Macomb,
14 including Greg Hupp?
15 A. Yes.
16 Q. What did those discussions entail?
17 A. Mr. Hupp was the lead negotiator and analyst on
18 behalf of Macomb County into determining system
19 debt and the purchase price.
20 Q. And so you would have conversations with him that
21 were in relation to calculating the system debt
22 or something else?
23 A. Yes, to the system debt, and yes to other things
24 as well.
25 Q. Were you ever questioned by anybody from Macomb,

Page 39

1  including Mr. Hupp, on the arm's-length nature of
2  any of the underlying contracts or transactions?
3  A. I don't understand the question. I'm sorry.
4  Q. Were you ever asked about the legitimacy of any
5  of the projects undertaken by DWSD?
6  A. No.
7  Q. Did you overhear Macomb and anyone from Detroit
8  have a conversation about the legitimacy or
9  arm's-length nature of those contracts?
10 A. I don't recall ever remember hearing anything of
11 the sort.
12 Q. Okay. I was produced a stack of documents that I
13 was pointed to for purposes of this deposition
14 last night, and I'm going to walk through some of
15 those documents.
16    MS. HATHAWAY: Can we go through some
17 of the documents. Some of the ones that he gave
18 us, I wasn't sure whether or not they were
19 privileged. So I think you have them all, but
20 just on the off chance you don't, we should
21 probably go through the others later. We don't
22 have to do it now.
23    MS. BADALAMENTI: If there are
24 documents that --
25    MS. HATHAWAY: I don't know if you have

Page 40

1  them or not is the problem because this was done
2  at the same time as things were being Bated, so --
3     MS. BADALAMENTI: I'd rather have them
4  now while he's here.
5     MS. HATHAWAY: I've just handed you a
6  stack. They are not Bated. Some of them you may
7  have. Some of them I didn't have. Some of them
8  we weren't sure whether or not they were
9  privileged because the way they were addressed.
10    BY MS. BADALAMENTI:
11 Q. Mr. Foster, have you prepared a declaration in
12 connection with these proceedings?
13 A. I believe so.
14    MS. HATHAWAY: Let me take -- I am
15 preparing a declaration. I haven't asked him to
16 sign anything.
17    THE WITNESS: I'm sorry. I may have
18 misspoke. Please define these proceedings.
19    BY MS. BADALAMENTI:
20 Q. Have you been provided with any document that
21 constitutes a draft declaration by you, whether
22 you signed it or not, in connection with the
23 claim by Macomb or the bankruptcy proceeding?
24 A. No. I misspoke earlier. I thought you were
25 referring to the negotiations on the purchase

Page 41

1 price.
2 Q. Okay. You did in that context provide some sort
3   of declaration or affidavit?
4 A. I did.
5 Q. Do you remember who asked you to do that?
6 A. Dykema Gossett, either Marilyn Peters or Mark
7   Jacobs.
8     MARKED FOR IDENTIFICATION:
9     DEPOSITION EXHIBITS 2-5
10    5:27 p.m.
11    BY MS. BADALAMENTI:
12 Q. I've marked a document that was just handed to me
13   as Exhibit 2. I'm going to probably need to walk
14   through it here with you. Do you recognize this
15   document?
16    MS. HATHAWAY: There's a whole bunch of
17   things in here, so -- it isn't just one document.
18    MS. BADALAMENTI: I mean, it's stapled.
19   The court reporter has marked it. Do you want me
20   to identify it a different way?
21    MS. HATHAWAY: They're documents I
22   produced to you now. It is not a document.
23    THE WITNESS: I recognize the
24   compilation that is stapled here, yes.
25    BY MS. BADALAMENTI:

Page 42

1 Q. Okay. The document is a memorandum with a number
2   of schedules and tables attached to it. Would
3   you agree with that characterization?
4    MS. HATHAWAY: I'm just going to object
5   because --
6    MS. BADALAMENTI: I don't need to argue
7   with you. Object. Put it on the record. Let's
8   go. We don't have a lot of time.
9    MS. HATHAWAY: Objection. You've
10   mischaracterized the statement what the document
11   is. It is a multitude of documents, not one.
12    MS. BADALAMENTI: Okay.
13    THE WITNESS: Is there a question?
14    BY MS. BADALAMENTI:
15 Q. Yes. Do you agree with me that what you're
16   looking at is a memorandum with a number of
17   schedules and tables attached?
18 A. Yes.
19 Q. Have you ever seen the memorandum section, not
20   the schedules and tables?
21 A. Yes.
22 Q. When do you believe you had a occasion to see the
23   memorandum?
24 A. It's dated July 27, 2009. My suspicion is that I
25   had the opportunity to review it then or shortly

Page 43

1   thereafter.
2 Q. Okay. Do you recall the tables and schedules
3   that are attached to it having been attached to
4   the memorandum when you received or reviewed it?
5 A. I have seen these before.
6 Q. Do you remember them being attached or part of
7   what you received?
8    MS. HATHAWAY: Which ones?
9    MS. BADALAMENTI: All of them.
10    THE WITNESS: The -- I cannot answer
11   that as definitively because some of these tables
12   that are attached are work product of Bodman LLP
13   and so marked. Some of the tables that are
14   attached are work product originally of my firm
15   and so marked with handwritten notes on them that
16   I suspect to be Mr. Hupp's as he prepared his
17   commentary.
18    BY MS. BADALAMENTI:
19 Q. So that was going to lead me to my next question.
20   When you say "work product" and "so marked," is
21   the marking that you're referring to near the
22   bottom of the page -- it has your logo and it
23   says The Foster Group?
24 A. Yes.
25 Q. Okay. And similarly, where we see a Bodman LLP

Page 44

1   notation in the bottom right corner of the page,
2   that would be an indication that Bodman prepared
3   what we're looking at?
4 A. Yes.
5 Q. Do you know how you received this document?
6 A. This document?
7 Q. I'm sorry, the memorandum.
8 A. The table -- I can answer with respect -- I am
9   fairly confident that Mr. Hupp would have shared
10   his tables with me via e-mail and sought my
11   opinion on whether his calculations as he was
12   putting them together for his diligence were
13   accurate.
14 Q. Okay. How about the memorandum? Do you know how
15   you received that? The same way or some other
16   way?
17 A. I couldn't tell you.
18 Q. Okay.
19 A. I don't know. I do recall seeing it. Whether or
20   not it was handed in a meeting, shared by
21   e-mail --
22 Q. The calculations that Craig Hupp and Bodman
23   prepared and shared with you, did you agree with
24   his analysis or not?
25 A. I don't believe the answer to that question is as

Page 45

1 simple as you make it out to be.
2 Q. I doubt that it is, actually. So let me ask you:
3 Can you -- is there a general answer to what you
4 disagree with? And then we can talk about some
5 of the things maybe you didn't disagree with or
6 vice versa.
7 A. Mr. Hupp is a very analytical and inquisitive
8 gentleman in addition to being a lawyer. He took
9 the principal role in performing diligence on
10 behalf of Macomb County the original calculations
11 that were made regarding system debt. As part of
12 his diligence he brought to the table observations
13 on different ways to look at certain of these
14 items, some of which through the negotiation
15 process we ultimately agreed with and made, if not
16 absolute adjustments, adjustments in our
17 calculations, others of which we convinced Mr.
18 Hupp that the original calculations were the most
19 appropriate way to reflect things.
20 Q. And that would be with respect to what we called
21 phantom improvements? What else would be
22 included? Or, I'm sorry, would that be part of
23 what we talked about as phantom improvements?
24 A. The answer is yes, but the timing of this
25 particular volley, if you will, and other

Page 46

1 conversations, I don't know that I could represent
2 this memorandum as being definitive as to what led
3 to that. There were constant conversations going
4 on looking at some of this information through the
5 negotiation process.
6 Q. Okay. I am looking at a page in that. The top
7 of it reads "Table B Debt Reconciliation Table."
8 Line item 10 has the 54,577,052 total contract
9 cost per Foster 2009 as one of the items in the
10 schedule. Do you see that there? It would be
11 10-F?
12 A. I'm sorry, 10-F? I'm -- oh, the 54,500,000, I see
13 that number, yes.
14 Q. And that column F is total contract cost per
15 Foster 2009. Do you know what that is referring
16 to?
17    MS. HATHAWAY: Is that 9 or 8.
18    THE WITNESS: It's 2009. So later on
19 in this package, the first page after something
20 handwritten tab 2, there is an exhibit entitled
21 Table 1 - Investment Costs of DWSD OMI Assets.
22    BY MS. BADALAMENTI:
23 Q. I found tab 3 but I can't find tab 2: Okay.
24 Table 1, okay.
25 A. Line 30, CS-1358 15/Hayes repairs, the 54 million

Page 47

1 number that Mr. Hupp refers to in this schedule is
2 showing up under the Contract Cost column.
3 Q. Okay. So this is the 2009 -- looks like there's
4 two pages. Would that be right, this page here
5 that's Bates marked DET Claim No. 3683-267?
6    MS. HATHAWAY: He's not looking at the
7 Bates number copy.
8    THE WITNESS: That's fine.
9    BY MS. BADALAMENTI:
10 Q. And another one that's marked 268. Do those two
11 pages go together?
12 A. If you're talking about Table 1, page 1 of 2 and
13 page 2 of 2, yes, they go together.
14 Q. Okay. And then in the next -- on that Table B,
15 the next in column I, we see total asset costs
16 per Foster of over 60 million. Does that come
17 from a particular place within this package?
18 A. Same exhibit I pointed you to previously with
19 total cost in the far right-hand column.
20 Q. Okay. Is this -- this is marked preliminary --
21 your Table 1 investment cost schedule is marked
22 preliminary. Did that 15 Mile and Hayes repair
23 number change?
24 A. I don't recall.
25 Q. If it did, would we expect to see a different

Page 48

1 investment cost table like this?
2 A. Yes.
3 Q. Do you recall DWSD giving you a different number
4 originally than what you ended up with?
5 A. I don't recall.
6 Q. The accounting department is what it would appear
7 to be referring to?
8 A. I don't recall.
9 Q. Table 2-A, which is Bates stamped Detroit's page
10 270, this is something that you prepared,
11 correct?
12 A. I'm trying to catch up to you. I'm sorry.
13    MR. SHADID: I don't think he's looking
14 at a Bates-stamped copy.
15    MS. HATHAWAY: He's not.
16    MS. BADALAMENTI: Actually you're -- so
17 you're right. I'm looking at a different package.
18 Do you have another package like that so I can
19 stop losing him?
20    MS. HATHAWAY: That's what I handed
21 you.
22    MS. BADALAMENTI: I marked it.
23    MS. HATHAWAY: I have four copies.
24 Sorry. Everybody gets a copy.
25    MS. BADALAMENTI: Sorry about that.

Page 49

1  MR. SHADID: Parts of this have been
2  previously produced to you.
3  MS. BADALAMENTI: I agree.
4  MS. HATHAWAY: That's why I kept saying
5  this document, we're looking at something
6  different. That's not all one thing.
7  BY MS. BADALAMENTI:
8  Q. Okay. So you are -- okay. Going back to Table
9  1, the page 1 of 2 and 2 of 2 that we were
10  talking about --
11  A. Right.
12  Q. -- there's handwriting on the document that was
13  marked. Is that your handwriting?
14  A. It is not.
15  Q. Do you know whose handwriting it is?
16  A. I don't know. I would suspect that it's
17  Mr. Hupp's since it's included as part of his
18  commentary.
19  MR. SHADID: Can I add something? In
20  the produced copy, that handwriting was redacted
21  because we believed it was Mr. Jacobs', so if you
22  don't see it on the Bates-labeled copy, that's
23  why.
24  MS. BADALAMENTI: And it's not
25  Mr. Jacobs'?

Page 50

1  MR. SHADID: According to the
2  witness -- we believed it was, as we were rushing
3  to get you stuff yesterday, but --
4  MS. BADALAMENTI: Based on Mr. Foster,
5  do you --
6  MR. SHADID: It may not be.
7  MS. BADALAMENTI: Okay.
8  BY MS. BADALAMENTI:
9  Q. On page 2 of 2 there's the same handwriting
10  again. That's not yours?
11  A. No, it's not.
12  Q. Do you remember receiving the documents with this
13  handwriting?
14  A. No, I do not.
15  Q. Was this a package that you provided to counsel
16  in this case?
17  A. These tables were provided to -- not -- no. These
18  were not -- I don't recall providing these tables
19  to counsel in this case, no.
20  Q. Do you recall providing this memorandum to
21  counsel in this case?
22  A. No. Mr. Hupp's memorandum, no, I do not.
23  Q. You had indicated that there was also information
24  that came from DWSD's other consultants, being
25  NTH. What types of information did NTH provide

Page 51

1  to you?
2  A. I'll refer you back to the second page of Table 1.
3  Q. Okay.
4  A. The last three line items, 56, 57, 58, the contract
5  costs there, shown up in that column, I believe
6  those amounts were provided by NTH, my suspicion
7  is confirmed by whoever's note this is as noting
8  NTH work, need clarification, some other note I
9  can't read.
10  Q. Did NTH provide anything else with respect to the
11  due diligence performed as part of the
12  acquisition?
13  A. Anything beyond -- to my knowledge, NTH provided
14  nothing other than estimated costs of their
15  ongoing work on the OMI.
16  Q. The package of schedules that are attached here,
17  how would those have been given by you to DWSD
18  separate and apart from Mr. Hupp having attached
19  them here? Do you recall how you provided or who
20  you provided them to?
21  A. I do not recall.
22  Q. As I understand it, there were several meetings
23  where you and Mr. Jacobs and Mr. Walters and Mr.
24  Hupp all discussed these issues?
25  A. Yes.

Page 52

1  Q. And the purchase price?
2  A. Yes.
3  Q. What sort of things did you provide other than
4  these tables to Mr. Hupp?
5  MS. HATHAWAY: Did he personally?
6  MS. BADALAMENTI: Yeah.
7  THE WITNESS: There would have been
8  similar analytical work product.
9  BY MS. BADALAMENTI:
10  Q. Was -- did Mr. Hupp ask for anything in
11  particular to be done or analyzed by you?
12  A. Through the negotiation process, the folks that
13  were working on the negotiations, including Mr.
14  Hupp, all asked for additional understanding,
15  review of the calculations and the data that went
16  into the calculations.
17  Q. Did you speak with anyone on behalf of Macomb
18  other than Craig Hupp?
19  A. There were other parties that were involved from
20  time to time. There were also parties from
21  Oakland County that were involved from time to
22  time.
23  Q. Other than anyone from Craig Hupp's office is
24  what I probably should have said. Did you speak
25  to anyone on the Macomb side of things?

## Page 53

1  A. My recollection is that Mr. Misterovich -- Bill
2  Misterovich was occasionally involved in the
3  conversations. Early on Mr. Ken Bonnin would have
4  been involved in the conversations, although I
5  think he retired very early on. Mr. Marrocco was
6  in a couple meetings where the overall topic was
7  being discussed. Beyond that, I don't recall
8  anybody specifically from Macomb County that was
9  involved in meetings that I attended.
10 Q. Would those meetings have been at the courthouse
11  or somewhere else, or both?
12 A. The vast majority of those meetings would have
13  been either in Mr. Hupp's office or DWSD.
14 Q. Okay.
15 A. Or Mr. Jacobs' office. Excuse me.
16 Q. And who attended those meetings on behalf of
17  Detroit, or DWSD?
18 A. For the bulk of the negotiation discussions,
19  Mr. Jacobs and I represented DWSD.
20 Q. Did Mr. Walters attend?
21 A. Mr. Walter would have been a regular but not
22  always participant on behalf of the city Law
23  Department.
24 Q. Anyone else from DWSD?
25 A. Not as a core group, no.

## Page 54

1  Q. Did Mr. Mercado have occasion to attend any of
2  those meetings?
3  A. Mr. Mercado did not attend any of the detail
4  meetings, no --
5  Q. Okay.
6  A. -- to my recollection.
7  Q. The document that I've marked as Exhibit 3 is a
8  document entitled Schedule 3.8. Do you recognize
9  that document?
10 A. I do.
11 Q. What do you recognize that to be?
12 A. This is the summary exhibit included in the
13  Oakland Macomb Intercepter portion of the transfer
14  of that part of the asset to the Oakland Macomb
15  Intercepter District.
16 Q. Was there a separate agreement with respect to
17  the Oakland versus the Macomb acquisitions?
18 A. Yes.
19 Q. Do you know which one was accomplished first?
20 A. The Oakland.
21 Q. Was the same formula used to calculate the OMI
22  purchase price?
23 A. The same general principle was used to calculate
24  the system debt portion of the purchase price.
25 Q. What else went into the calculation on the OMI

## Page 55

1  end of things?
2  A. There were a number of adjustments to the system
3  debt purchase price for both the OMI piece and the
4  Macomb piece that were negotiated towards the tail
5  end of the process.
6  Q. And the document that we've marked as Exhibit 4
7  would deal with the due diligence in connection
8  with the OMI purchase?
9    MS. HATHAWAY: Do you have extra copies
10  of that one?
11   MS. BADALAMENTI: Yes. You gave me the
12  whole package. You gave me the package.
13   THE WITNESS: This is what was --
14   MS. BADALAMENTI: I did the same thing.
15  I was looking for another one from you, but I've
16  got it.
17   THE WITNESS: Yeah, I recognize the
18  memo. Is there a question?
19   BY MS. BADALAMENTI:
20 Q. I see the 15 Mile and Hayes 2004 repair costs in
21  some of the tables that are attached.
22 A. Right.
23 Q. Why is that referenced as part of the OMI
24  transaction or due diligence?
25 A. The core analysis was.

## Page 56

1    MS. HATHAWAY: I have to stop you for a
2  second. This was my mistake. The tables were
3  supposed to be included but the memo was
4  privileged. Could I get that back.
5    MS. BADALAMENTI: From Foster to
6  Jacobs?
7    MS. HATHAWAY: Yeah.
8    MS. BADALAMENTI: Is privileged?
9    MS. HATHAWAY: Yeah.
10   MS. BADALAMENTI: Two pages?
11   MS. HATHAWAY: Yeah. These were
12  supposed to be removed. There may be another one
13  like that. It was a copying mistake. I
14  apologize.
15   MR. RUEGGER: March 12, 2009?
16   MS. HATHAWAY: Yeah. It's the same
17  with the February 27th. That was supposed to come
18  out, too. If you could take that out, too, I
19  would appreciate it.
20   MR. RUEGGER: Just the memo?
21   MS. HATHAWAY: Just the memo.
22   MR. RUEGGER: Not the schedules?
23   MS. HATHAWAY: Not the schedules.
24   MS. BADALAMENTI: Do we have them all?
25  You have four pages from me?

Page 57

 1    MS. HATHAWAY: Right. That's what
 2 happens when you're in a hurry.
 3    MS. BADALAMENTI: We're in a hurry, all
 4 right. No doubt about that.
 5    MS. HATHAWAY: I apologize. My fault.
 6 I lost the question.
 7    BY MS. BADALAMENTI:
 8 Q. The was: Why is the 15 Mile and Hayes repairs
 9 referenced in the OMI analysis?
10 A. The OMI -- the Oakland portion of the OMI closing
11 had an allocated share of the common portion of
12 the OMI going to Oakland -- the Oakland element,
13 so in order to understand that allocation, we
14 needed to have all these projects listed to just
15 summarize the entire calculations. The repairs as
16 noted on Schedule 3.8 were not the repairs to the
17 Macomb Intercepter, 1368 costs. 1368 costs were
18 not included anywhere in the OMI purchase price.
19 Q. And what schedule would I see that at?
20 A. Schedule 3.8, Exhibit 3.
21 Q. Okay. The document that we've marked as
22 Exhibit 5, which I think -- do you have it now?
23 Exhibit 5 appears to me to be another description
24 of the OMI allocation?
25 A. Yes.

Page 58

 1 Q. And Exhibit A is Summary of Assets Allocated to
 2 Macomb County?
 3 A. Yes.
 4 Q. Who gave you the information to determine whether
 5 or not 1368 went to Macomb County or the OMI?
 6 A. This exhibit which carries a date of
 7 February 2006, I believe, is the first summary of
 8 the analysis towards getting to system debt. Your
 9 question about -- so, I'm sorry, can you please
10 reask your question.
11 Q. So my question is: Who gave you the information
12 from which you determined the 15 Mile and Hayes
13 repairs are a Macomb-only versus an OMI project?
14 A. I don't know who gave me that information. The
15 premise of the entire operating scenario for the
16 Oakland Macomb Interceptor when DWSD owned and
17 operated it was all costs east of the connection
18 to the corridor Intercepter were Macomb only, and
19 all other costs were combined Macomb and the
20 Clinton Oakland District; so by definition, since
21 the collapse was east of the connection on the
22 corridor, it had always been treated as a
23 Macomb-only responsibility.
24 Q. Okay. There is included in the documents that
25 were provided to me a listing of Intercepter

Page 59

 1 sewer contracts. It was marked as Detroit's
 2 pages 281 through 286.
 3    **MARKED FOR IDENTIFICATION:**
 4    **DEPOSITION EXHIBIT 6**
 5    **5:56 p.m.**
 6    BY MS. BADALAMENTI:
 7 Q. I'm going to go back and include page 287,
 8 because I think it goes with it. So I'm looking
 9 at Detroit pages 281 to 287. I wonder if you've
10 seen those pages before?
11 A. Yes.
12 Q. What are -- how did you come across those pages?
13 A. This -- I don't know that I recognize the last
14 page, but the -- and I may. The first six pages
15 are the report that was provided to me by DWSD
16 engineering as a -- along with a map that we
17 talked about earlier that identified each of the
18 contracts and projects that were constructed by
19 DWSD for the Macomb Intercepter system.
20 Q. At some point during the negotiations there is --
21 there's a global settlement discussion -- is the
22 term, I think, used throughout documents. Do you
23 know what I'm referring to when I talk about a
24 global settlement?
25 A. I do.

Page 60

 1 Q. What is your understanding of the basis for the
 2 parties to discuss a global settlement? Let me
 3 ask it a different way. That's a terrible
 4 question.
 5    Did you understand there to be some
 6 open disputes between the parties at the time
 7 after which you calculated the system debt?
 8 A. I'm aware of the negotiations between DWSD and
 9 principally the three counties, Macomb, Oakland
10 and Wayne on several items of dispute that led to
11 the global settlement.
12 Q. And what was the global settlement, as you
13 understood?
14 A. There were a number of disputes that were
15 effectively -- I suppose if it was done today it
16 would be called a grand bargain -- that the
17 parties under Judge Feikens' leadership decided it
18 was a good idea to resolve several lingering
19 disputes in one document which became the 2008
20 global settlement, and I don't recall all the
21 specifics, but part of the claim was the radio
22 system that Detroit had built and DWSD used, and
23 there was an aspect of cost that Macomb had paid
24 for the Macomb Intercepter over the years through
25 the rates.

Page 61

1 Q. Did you review that settlement agreement before
2 it was entered into?
3 A. Yes, I did.
4 Q. Did you help prepare it?
5 A. I did.
6 Q. There was a letter of intent that was executed in
7 connection with the purchase or the settlement
8 agreement. Did you help prepare that?
9 A. I don't recall.
10 Q. What new information, if any, went into your
11 preparation of the settlement agreement?
12   MS. HATHAWAY: Object to the form of
13 the question. He didn't prepare the settlement
14 agreement. He said he helped.
15   THE WITNESS: I'd ask you to define new
16 information.
17   BY MS. BADALAMENTI:
18 Q. Did you need any new information about the
19 contracts, the projects? Did you recalculate the
20 system debt? Or did you simply look at the
21 tables and schedules that you had already
22 calculated and incorporate that information?
23 A. My recollection is that we did not make any
24 material changes to the system debt portion of the
25 purchase price, but rather the global settlement

Page 62

1 affected adjustments to the system debt that then
2 became part of the purchase price. That had
3 nothing to do with the original premise of system
4 debt.
5 Q. Okay. Was it an agreed upon calculation of that
6 amount? First of all, what was that amount? Do
7 you remember -- the global settlement amount?
8 A. The global settlement had several facets to it. I
9 believe on recollection that the effect to the
10 Macomb Intercepter purchase price was an offset
11 from system debt in the neighborhood of $17
12 million dollars.
13 Q. And what was the total of system debt, if you can
14 remember?
15 A. Approximate figures, I think the system debt
16 cost -- system debt calculation was $107 million,
17 and after an offset of roughly $17 million, got
18 down to 91 million -- $90 million and change.
19 Q. Was that calculated price agreed upon by
20 everybody? In other words, at the point in time
21 that that is the total debt you're calculating,
22 does Macomb dispute that that's the total? Or
23 does the global settlement or the offset of 17
24 million go to something else?
25   MS. HATHAWAY: Object to the form of

Page 63

1 the question.
2   THE WITNESS: I don't understand the
3 question.
4   BY MS. BADALAMENTI:
5 Q. Was there a dispute with your calculation of
6 system debt by Macomb that you know of?
7 A. During the negotiations for the global settlement
8 agreement?
9 Q. Yes.
10 A. Not that I recall.
11 Q. Did you assist in preparing the letter of intent?
12 I think you said you don't recall.
13 A. I don't recall.
14 Q. Do you know if it was ever executed, the letter
15 of intent?
16 A. I don't know what the letter of intent is that
17 you're referring to.
18 Q. Okay. Did you assist in preparing the Macomb
19 acquisition agreement that's dated September 2nd,
20 2010?
21 A. I was asked to review and comment on certain
22 aspects of it.
23 Q. Did you prepare any portions of the schedules or
24 tables that get attached to that acquisition
25 agreement?

Page 64

1 A. Yes, I did.
2 Q. Which ones? And I'll give you a copy here that I
3 think is the complete document.
4 A. There's a Schedule 3.8 that I prepared, and I
5 believe there are -- there are a couple of
6 exhibits that are -- there are schedules in
7 Exhibit A to this agreement that I prepared.
8 Q. All of them or some of them?
9 A. All of them. And I believe that there is one
10 other schedule -- I'm sorry, Exhibit A is the
11 whole thing. There's a -- the last four pages of
12 this document -- last four pages are work product
13 that I prepared, and I believe there's one other
14 exhibit in here that I prepared but I'm not
15 finding it right now. Apparently I'm mistaken.
16   MS. BADALAMENTI: Let's mark that since
17 he referred to some of the pages.
18   MARKED FOR IDENTIFICATION:
19   DEPOSITION EXHIBIT 7
20   6:05 p.m.
21   BY MS. BADALAMENTI:
22 Q. In Exhibit 7, the acquisition agreement, did you
23 have any input into the language of the agreement
24 itself other than your contribution with the
25 tables?

In Re: City of Detroit, Michigan                                                         Bartlett D. Foster
                                                                                         July 09, 2014

Page 65

1  A. Yes.
2  Q. What section did you contribute to?
3  A. Likely the definitions of system debt, the
4  language describing the purchase price, the
5  adjustment of sewage disposal -- sewer disposal
6  rates after acquisition. Those implementation
7  issues that related to how rates would be
8  computed.
9  Q. What is the nature of the -- what have you been
10 asked about with respect to the preparation of a
11 declaration in this case? In other words, what
12 is the subject matter of the declaration that
13 you're preparing?
14    MS. HATHAWAY: I think any discussions
15 we had with him I'm going to insert a privilege.
16    MS. BADALAMENTI: I think I asked that
17 so as to give rise to privilege.
18    BY MS. BADALAMENTI:
19 Q. Have you provided any documents to counsel in
20 support of a declaration?
21 A. I have not.
22 Q. In the course of these negotiations and the
23 computation of the system debt, did you provide
24 any documents to Macomb or Craig Hupp other than
25 the schedules that we see attached to some of the

Page 66

1  documents that were marked as exhibits today?
2  A. Most likely I did that were different versions of
3  the same documents that would not have been
4  anything materially different other than -- we
5  went through this for three years trying to
6  calculate the system debt; so I'm quite confident
7  Mr. Hupp and I shared tables of similar nature
8  with evolving numbers in them.
9  Q. Okay. Would those be something that when
10 discovery opens in this case you would have in a
11 file somewhere that we could obtain?
12 A. I don't -- it's possible.
13 Q. Okay.
14 A. It was seven years ago.
15 Q. Okay.
16    MS. BADALAMENTI: I don't think I have
17 anything else.
18    MS. HATHAWAY: No questions.
19    (The deposition was concluded at 6:07 p.m.
20 Signature of the witness was not requested by
21 counsel for the respective parties hereto.)
22
23
24
25

Page 67

1           CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN    )
3                       ) SS
4  COUNTY OF MACOMB     )
5
6        I, MELINDA S. MOORE, certify that this
7  deposition was taken before me on the date
8  hereinbefore set forth; that the foregoing
9  questions and answers were recorded by me
10 stenographically and reduced to computer
11 transcription; that this is a true, full and
12 correct transcript of my stenographic notes so
13 taken; and that I am not related to, nor of
14 counsel to, either party nor interested in the
15 event of this cause.
16
17
18
19
20            *Melinda S. Moore* (signature)
21
22        MELINDA S. MOORE, CSR-2258
23             Notary Public,
24        Macomb County, Michigan
25 My Commission expires:  September 6, 2016

Min-U-Script®                Bienenstock Court Reporting & Video             (17) Pages 65 - 67
                             Ph: 248.644.8888   Toll Free: 888.644.8080
13-53846-tjt   Doc 7885-22   Filed 10/08/14   Entered 10/08/14 21:38:19   Page 18 of 18