# In The Matter Of:
*City of Detroit*

*Mark D. Jacobs*
*July 11, 2014*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File JACOBS_MARK D..txt*
*Min-U-Script® with Word Index*

## Page 1

1  UNITED STATES BANKRUPTCY COURT
2  EASTERN DISTRICT OF MICHIGAN
3  SOUTHERN DIVISION
4
5  _____
6  In re:                    )    Case No. 13-53845
7  CITY OF DETROIT, MICHIGAN )
8                            )    Chapter 9
9      Debtor                )
10 _____)    Hon. Steven W. Rhodes
11
12
13     The Deposition of MARK D. JACOBS,
14     Taken at 150 W. Jefferson, Suite 2500,
15     Detroit, Michigan,
16     Commencing at 3:29 p.m.,
17     Friday, July 11, 2014,
18     Before Melinda S. Moore, CSR-2258.

## Page 2

1  APPEARANCES:
2
3  RAECHEL M. BADALAMENTI (P64361)
4  SCOTT SIERZENGA (P77633)
5  Kirk, Huth, Lange & Badalamenti, PLC
6  19500 Hall Road
7  Suite 100
8  Clinton Township, Michigan 48038
9  586.412.4900
10 rbadalamenti@khlblaw.com
11 ssierzenga@khlblaw.com
12    Appearing on behalf of the Macomb Interceptor
13    Drain Drainage District.

## Page 3

1  ALBERT B. ADDIS (P31084)
2  KEITH C. JABLONSKI (P62111)
3  THOMAS D. ESORDI (P45428)
4  O'Reilly Rancilio PC
5  12900 Hall Road
6  Suite 350
7  Sterling Heights, Michigan, 48313
8  586.726.1000
9  aaddis@orlaw.com
10 kjablonski@orlaw.com
11 sesordi@orlaw.com
12    Appearing on behalf of the Macomb Interceptor
13    Drain Drainage District.
14
15 JEROME R. WATSON (P27082)
16 M. MISBAH SHAHID (P73450)
17 Miller Canfield Paddock & Stone, PLC
18 150 W. Jefferson Avenue
19 Suite 2500
20 Detroit, Michigan 48226
21 313.963.6420
22 watson@millercanfield.com
23 shahid@millercanfield.com
24    Appearing on behalf of the City of
25    Detroit.

## Page 4

1  ARTHUR H. RUEGGER
2  JOSEPH SELBY
3  Salans FMC SNR Denton
4  1221 Avenue of the Americas
5  New York, New York 10020
6  212.768.6881
7  arthur.ruegger@dentons.com
8  joseph.selby@dentons.com
9     Appearing on behalf of the
10    Official Committee of Retirees
11    of the City of Detroit.
12
13 ROBERT J FRANZINGER (P25539)
14 Dykema Gossett PLLC
15 400 Renaissance Center
16 Detroit, Michigan 48243
17 313.568.6690
18 rfranzinger@dykema.com
19    Appearing on behalf of the Witness.

Page 5

1  TABLE OF CONTENTS
2
3  WITNESS                              PAGE
4  MARK D. JACOBS
5  EXAMINATION BY MR. ADDIS               6
6
7  EXHIBIT                              PAGE
8  (Exhibits attached to transcript.)
9
10 DEPOSITION EXHIBIT 11                 15
11 DEPOSITION EXHIBIT 12                 38
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1  Detroit, Michigan
2  Friday, July 11, 2014
3     3:29 p.m.
4     MARK D. JACOBS,
5  was thereupon called as a witness herein, and
6  after having first been duly sworn to testify to
7  the truth, the whole truth and nothing but the
8  truth, was examined and testified as follows:
9     EXAMINATION
10    BY MR. ADDIS:
11 Q. Sir, can you state your name and professional
12    address for the record, please.
13 A. Mark Jacobs, 400 Renaissance Center, Detroit,
14    Michigan 48243.
15 Q. And are you affiliated with the firm Dykema
16    Gossett at that location?
17 A. Yes, I am.
18 Q. And are you a partner at Dykema Gossett?
19 A. Yes.
20 Q. You have counsel here with you; is that correct?
21 A. That's correct.
22 Q. And the identity of counsel is?
23 A. Jerome Watson --
24 Q. Okay.
25 A. -- and my partner, Robert Franzinger.

Page 7

1  Q. Is Mr. Franzinger general counsel for Dykema?
2  A. No, he is not.
3  Q. Okay. You're an attorney, sir, but I don't know
4     your past. I know that you were involved in
5     these transactions. Have you given a deposition
6     before?
7  A. No.
8  Q. God, you're a lucky one. Well, I'll give you the
9     basic rules, but I'm pretty sure you know them.
10    This young lady to the right is going to take
11    down everything you say. Since we're both
12    lawyers, we have the propensity to know where the
13    other guy is going. I'll do my best not to talk
14    over you if you could do the same for me. It
15    would make her life a lot easier. All the
16    answers have to be verbal. Uh-huh and huh-uhs
17    don't do very well. And certainly, sir, if I ask
18    you any question you don't understand -- and that
19    is bound to happen sooner or later -- just let me
20    know and I'll be happy to rephrase it. Fair
21    enough?
22 A. Fair enough. Just try to make the questions as
23    clear as possible.
24 Q. I'll do my best. Can you give us a little bit of
25    your educational background, college, law school,

Page 8

1     things likes that?
2  A. I graduated from the University of Michigan in
3     1975 with a degree in zoology and anthropology. I
4     graduated from the University of Michigan School
5     of Public Health in 1978 with a degree in
6     environmental science. I graduated from
7     University of Detroit Law School in 1988.
8  Q. Okay. And is there a special area that you
9     practice in?
10 A. I practice environmental law.
11 Q. Okay. Now, for somebody who does not practice
12    environmental law, can you explain what that
13    entails.
14 A. The practice of environmental law can involve many
15    different things depending on the individual
16    practitioner. My work involves many transactional
17    matters, mergers and acquisitions, real estate
18    transactions, and other types of transactions. It
19    also involves defending typically companies or
20    individuals who are the subject of state or
21    federal environmental enforcement actions. I
22    represent developers seeking to obtain
23    environmental permits for developments. I handle
24    water and sewer rate matters for the Detroit Water
25    and Sewer Department.

Page 9

1  Q. If nothing else, my curiosity, when you say you
2  handle rate matters, is that disputes over rates
3  or the setting of rates, or both?
4  A. Both.
5  Q. During your practice -- have you been with Dykema
6  Gossett during your entire law practice?
7  A. Yes, I have.
8  Q. When did you first become involved with
9  representing the City of Detroit in any capacity?
10 A. To the best of my recollection, around 1989.
11 Q. And was it always the Detroit Water and Sewer
12 Department or were there other departments?
13 A. It was always the Detroit Water and Sewer
14 Department.
15 Q. Sir, I don't think it's any surprise that the --
16 we're here largely about the acquisition from the
17 Detroit Water and Sewer Department by the Macomb
18 Interceptor Drain Drainage District of the Macomb
19 portion of the Detroit sewerage system in Macomb
20 County, which I think has been described here
21 previously as north of 8 Mile. I'm sure it goes
22 in other directions also. All right?
23    Sir, when, to your knowledge, did
24 negotiations first begin for Macomb to purchase
25 the system?

Page 10

1  A. Do you mean the negotiations of the transactional
2  document or the overall deal?
3  Q. Let's start overall and then we'll go to the
4  document.
5  A. Sometime in 2005 -- I'm not real good with dates
6  -- or 2006 DWSD's former director Victor Mercado
7  and Macomb County, whatever his title is, Tony
8  Marrocco, discussed the possibility of Macomb
9  County acquiring the Macomb portion of the
10 Oakland-Macomb Interceptor.
11 Q. How did you become aware of that discussion?
12 A. I think one of the first discussions may have
13 occurred in chambers in Judge Feikens' chambers,
14 so I may have been present.
15 Q. So I can assume by that answer that you were
16 involved in the Feikens litigation -- what we'll
17 call the Feikens litigation?
18 A. I was.
19 Q. Okay. And what was your involvement in the
20 Feikens litigation?
21 A. Do you want the history back to the beginning?
22 Q. As briefly as you can state it so that we
23 understand, that would be enough for me.
24 A. When I first got involved in 1989, the State of
25 Michigan had issued a national pollutant discharge

Page 11

1  elimination system to the Detroit Water and Sewer
2  Department's wastewater treatment plant. That
3  contained a number of new and onerous requirements
4  that would have involved in excess of 4 or
5  $5 billion to comply with. We filed an
6  administrative appeal of the permit, and we also
7  filed a petition with Judge Feikens to take
8  jurisdiction over the permit. And so we spent the
9  next roughly five years fighting over that permit.
10    And then over the years, there have
11 been just multiple different assignments involving
12 everything from construction litigation to
13 disputes -- I did not -- not as a litigator --
14 rate disputes that came up almost annually with
15 wholesale customers, efforts by the Detroit Water
16 and Sewer Department to do things required by the
17 NPDS permit that were interfered with by third
18 parties that we had to deal with, notably the Army
19 Corps of Engineers, and many, many other different
20 capacities. The assignments have been more
21 numerous than I could even begin to recall.
22 Q. All right. So at some point in time, now that we
23 know what your involvement has been -- and it's
24 been broad ranged; would that be fair to say? --
25 you became aware that Macomb and Detroit were

Page 12

1  willing to talk about a purchase of the Macomb
2  portion of the system; is that correct?
3  A. I'm not sure I understand the question.
4  Q. Okay. At some point -- I think you said it was
5  about 2005 or '06 you became aware Mr. Mercado
6  and Mr. Marrocco were talking about a Macomb
7  purchase of the system, correct?
8  A. That is correct.
9  Q. Okay. Was there a time or a date in which you
10 were officially brought into or involved in those
11 discussions?
12 A. I suppose I got involved in the Macomb discussions
13 sometime after Oakland County acquired the
14 Clinton-Oakland portion -- the Clinton-Oakland and
15 the Edison Corridor portion of the Oakland-Macomb
16 Interceptor District. Actually it was the
17 Oakland-Macomb Interceptor Drain Drainage District
18 that acquired the Oakland portion.
19 Q. Okay.
20 A. After that transaction closed, we shortly
21 thereafter commenced discussions on the Macomb
22 piece.
23 Q. Okay. When you said you commenced discussions,
24 who did you commence discussions with?
25 A. It was largely the same team of people that were

Page 13

 1  involved in the negotiation of the Oakland portion
 2  of the Oakland-Macomb Interceptor with the
 3  exception of the Oakland specific representatives.
 4  Q. Okay. By that I mean what people were you
 5  talking to from Macomb?
 6  A. Principal representatives of Macomb County on
 7  those discussions were Craig Hupp, their outside
 8  attorney at Bodman, and Bill Misterovich, chief
 9  deputy something something from the county who's
10  also a lawyer, and perhaps one or more of their
11  technical/engineering people. I don't recall
12  exactly who all was involved.
13  Q. Now we're to the part of the formal discussions.
14  How did the formal negotiations begin from your
15  side of the table? By that I mean, so I can make
16  my question clear, did you put together a list of
17  information that you wanted or a due diligence
18  list of some sort?
19  A. The discussions were led by Macomb County. As the
20  purchaser, they were the ones asking for
21  information. We weren't offering up information.
22  Q. Okay. So you would respond to their requests
23  when you thought it was appropriate?
24  A. Correct.
25  Q. Okay. Do you know, sir, what type of information

Page 14

 1  or can you recall what kinds of information they
 2  requested and you provided?
 3  A. The business terms of the transaction that were
 4  agreed to between Tony Marrocco and Victor Mercado
 5  was that the purchase price would be equal to the
 6  outstanding principal balance on the bonds
 7  allocated to the assets that comprise the Macomb
 8  system. And it was that financial information
 9  that Macomb County asked DWSD to provide.
10  Q. Okay. And did DWSD provide that information to
11  them?
12  A. They did.
13  Q. Okay. What time frame are we talking here?
14  A. I don't recall exactly when the Oakland-Macomb --
15  the Oakland system closed, but it was from within
16  months of that closing through the closing of the
17  Macomb transaction, which I think was
18  September 2010.
19  Q. We have an acquisition agreement signed
20  September 2, 2010. Is that --
21  A. That sounds correct.
22  Q. That sounds correct to you?
23     MR. ADDIS: Are we just continuing to
24  number the --
25     MR. WATSON: Yeah, I assume we will

Page 15

 1  for --
 2     MARKED FOR IDENTIFICATION:
 3     DEPOSITION EXHIBIT 11
 4     3:43 p.m.
 5     BY MR. ADDIS:
 6  Q. Sir, I've handed you what's entitled an
 7  Interceptor Transfer Due Diligence Information
 8  List, which says "Revision 1/23/09" on it. Do
 9  you recognize this document?
10  A. No, I don't.
11  Q. Okay. You don't believe you've seen this
12  document before?
13  A. Not that I recall.
14  Q. Okay. So this is not a document that you
15  prepared?
16  A. No, it is not. Looking at the footer on the
17  document, it appears to have been generated by Mr.
18  Hupp.
19  Q. Okay. Sir, I want to be clear. Did Mr. Hupp
20  ever sit down and discuss this document with you,
21  perhaps without giving it to you? Had you seen
22  it before in his possession?
23  A. The topics covered by this due diligence
24  information list were discussed at length between
25  the parties. It appears to be a document that

Page 16

 1  perhaps was provided to Detroit directly.
 2  Certainly I would have none of this information.
 3  Q. Sir, as I understand it, you believe you
 4  discussed, at least with this brief review of it,
 5  many of the matters contained in this list -- in
 6  this exhibit, correct?
 7  A. That's correct.
 8  Q. With Mr. Hupp?
 9  A. With Mr. Hupp and others.
10  Q. And Mr. Misterovich?
11  A. Yes.
12  Q. And representatives of DWSD, were they --
13  A. Yes.
14  Q. Discuss those matters with you?
15  A. Yes.
16  Q. When you were negotiating, for lack of a better
17  term, and communicating or doing both with
18  Mr. Misterovich and/or Mr. Hupp, who was acting
19  with you? Were there members of DWSD, either
20  Mr. Mercado or others that were involved with you
21  in those negotiations?
22  A. I don't recall exactly who participated in the
23  meetings on a day-to-day basis, but Bob Walter and
24  myself were there as the lawyers, and there may
25  have been various administrative representatives

Page 17

1 from time to time. I don't recall who was in the
2 director's seat at that time. It may have been
3 Pam Turner. I don't recall. But I don't believe
4 that Victor was in office at that point.
5 Q. Let me just interrupt, if I may, because I want
6 to keep a timeline. When the discussions first
7 start, it was Victor Mercado and Marrocco in
8 informal discussions, correct?
9 A. Correct.
10 Q. And then they made some informal agreement as to
11 how they were going to set the price attached to
12 the debt, correct?
13 A. Correct.
14 Q. So far I've got it right, okay. And then at some
15 point in time when official discussions started,
16 which included you and Mr. Misterovich and Mr.
17 Hupp and Mr. Walter -- and Mr. Mercado was not
18 ever involved in those?
19 A. I believe so, no.
20 Q. Okay.
21 A. I also omitted Bart Foster, who was DWSD's
22 financial advisor and rate consultant who was the
23 primary spokesperson for DWSD on the numbers.
24 Q. Okay. Before we go to just the acquisition
25 agreement, in your position of helping DWSD over

Page 18

1 these years providing them counsel, were you
2 aware of other issues other than just this
3 purchase -- other issues that existed between
4 Macomb and Detroit; is that correct?
5 A. What do you mean by other issues?
6 Q. Well, did they often have issues over rates?
7 A. Yes, they did.
8 Q. Okay. Over interest rates?
9 A. Interest rates, yes.
10 Q. Over 800 mega hertz radio system?
11 A. Yes, they did.
12 Q. Okay. Didn't they have -- in other words, were
13 you aware that they had a number of disputes?
14 A. I am aware of that, yes.
15 Q. All right. And these disputes were, of course,
16 subjects for Judge Feikens from time to time,
17 correct?
18 A. They were often before Judge Feikens.
19 Q. In your representation of DWSD at any time, did
20 you ever give them any advice regarding any
21 criminal matters?
22 A. No, I did not.
23 Q. Did you have somebody in your firm advise DWSD on
24 any criminal matters?
25 A. No, we did not.

Page 19

1 Q. Up until even today, from when you first started
2 representing them to today, have you or your firm
3 ever handled any criminal matters for DWSD?
4 A. No, we have not.
5    MR. WATSON: I'll object to foundation.
6 You can answer if you can.
7    THE WITNESS: The answer is no.
8    BY MR. ADDIS:
9 Q. I'm assuming you do not practice criminal law?
10 A. I do not.
11 Q. Okay. Now, you mentioned to me earlier that you
12 guys would meet and many times not everybody
13 would be at every meeting, so sometimes it would
14 be Misterovich by himself, sometimes Misterovich
15 with others, with Hupp. I'm assuming there would
16 be times where it would be just you and Mr. Hupp?
17 A. There were different people at different times. I
18 don't believe that Misterovich would have appeared
19 without Craig Hupp being present.
20 Q. Okay. Give me a time frame. How often did these
21 negotiations take place, these meetings, no
22 matter who was there?
23 A. I can't really recall. It was intermittent in the
24 early stages. As we got closer and closer to the
25 closing date, it was at least weekly.

Page 20

1 Q. Okay. And the early stages began, again? It's
2 been a long day.
3 A. Sometime after the closing of the Oakland portion
4 of the overall interceptor system.
5    MR. ADDIS: Does anybody know when that
6 was? Give me an approximate date.
7    MS. BADALAMENTI: Not long before ours,
8 maybe '09.
9    BY MR. ADDIS:
10 Q. About '09, she says. Would that make sense to
11 you? I won't hold you to it.
12 A. It's certainly a ballpark number that I would work
13 with.
14 Q. We can look it up, when did they close. And then
15 after that Mr. Marrocco and his crowd began to
16 pursuing buying their section of it?
17 A. That's correct.
18 Q. And it finally culminated in September 2010 with
19 an agreement, correct?
20 A. That's correct.
21 Q. Okay. Now, I don't know what we did with your
22 exhibits, but -- right here. We've had these
23 previously marked. Exhibit 5 is the acquisition
24 agreement. Can you describe to me, sir, the
25 process by which this agreement was hammered out.

Page 21

1   By that I mean did somebody --
2       MR. ADDIS: Exhibit 6. I apologize.
3       BY MR. ADDIS:
4   Q. Negotiations take place. We've established that.
5   And then eventually an acquisition agreement is
6   put together and laid on paper. What I'm
7   interested in is the process of how this
8   acquisition agreement was written and approved.
9   By that -- let me ask the first question. Did
10  someone submit a first draft?
11  A. The first draft was the Oakland transactional
12  document, because with limited exceptions, other
13  than the purchase price, the Macomb acquisition
14  agreement mirrors the Oakland acquisition
15  agreement.
16  Q. And do we know who put together the Oakland
17  acquisition agreement?
18  A. It was the same group of parties.
19  Q. Okay. That would include you?
20  A. Me.
21  Q. Was Mr. Hupp involved in that?
22  A. Yes, he was.
23  Q. Okay. And Mr. Hupp represented who? Oakland?
24  A. The Oakland Macomb Interceptor Drain Drainage
25  District, I believe. I don't believe he was there

Page 22

1   for Oakland specifically.
2   Q. I understand. Okay. Anybody else in that
3   process?
4   A. Oakland may have had its other attorneys involved.
5   Oh, Joe Colaianne from the Water Resource
6   Commissioner's Office was a lawyer. John
7   McCulloch was involved. Those were the principal
8   players for Oakland County.
9   Q. Okay. By the time we got down to the signing
10  date of this acquisition agreement, did you ever
11  compare this acquisition agreement side by side
12  to the Oakland agreement?
13  A. Not that I recall.
14  Q. Okay. Do you know whether Mr. Hupp had done
15  that?
16  A. I would have no idea.
17  Q. Okay. Or Mr. Misterovich?
18  A. I wouldn't know.
19  Q. Okay. So it's fair to say that the Oakland
20  agreement as a model was used for this agreement?
21  A. To the best of my recollection, the only things
22  that were changed were the things that were
23  specific to Macomb County that were not specific
24  to Oakland County.
25  Q. Okay. Negotiations started in, we believe, '09,

Page 23

1   consummated with this agreement in September of
2   '10. During that period of time, sir, were you
3   ever made aware of DWSD employees being
4   investigated by either federal or state
5   authorities?
6   A. I don't recall whether I had heard anything about
7   that during this period of time.
8   Q. Okay. Did any of the DWSD employees -- I always
9   forget Pam's last name.
10  A. Pam Turner.
11  Q. Did Pam Turner ever report to you that she had
12  been told by some of her employees that they had
13  been questioned by the U.S. Attorney's Office?
14  A. No, she did not.
15  Q. Had you ever been told by Mr. Walters that he was
16  made aware that some of the DWSD officials and
17  employees had been questioned by the U.S.
18  Attorney's Office?
19  A. I don't believe he ever discussed it with me.
20  Q. Okay. I'm going to jump ahead, and we may come
21  back to some other things. There comes a time
22  that everybody meets in a room and signs this
23  document. Sir, can you tell me who was in that
24  room on September 2nd, 2010.
25  A. Craig Hupp and myself, the persons who signed the

Page 24

1   document. There were several Bodman lawyers who
2   prepared many of the business-related documents,
3   assistants of various types from Bodman who were
4   helping assemble exhibits, myself, Bob Walter.
5   Q. Okay.
6   A. And possibly others.
7   Q. All right. At some point in time we know that
8   Victor Mercado left and then we know that Pam --
9   I forgot her name again.
10  A. Pam Turner.
11  Q. Pam Turner left, and Darryl Latimer, the deputy
12  director, if you agree with this, was pretty much
13  left in charge. Would that be an accurate
14  statement?
15  A. You know, I don't recall who was in the driver's
16  seat after Pam stepped down, but he would probably
17  have been the most senior man standing.
18  Q. Okay. Same term he used. Had you worked with
19  Mr. Latimer before?
20  A. Yes.
21  Q. Okay. Had you worked with him extensively or
22  just a few matters? How would you describe it?
23  A. Intermittently on miscellaneous minor items over
24  the years.
25  Q. Okay. There came a time when Mr. Latimer was in

Page 25

 1  that room with you to sign that document. Before
 2  he signed that document, did you sit down with
 3  him and go over that document paragraph by
 4  paragraph?
 5  A.  I did not.
 6  Q.  Okay. Did you give him a general explanation of
 7  what this document was about?
 8  A.  Yes.
 9  Q.  Okay.
10  A.  At least I let him know what the business -- what
11  the purchase price was.
12  Q.  Okay.
13      MR. WATSON: Can I -- hold on. Let me
14  talk to my counsel here for a second.
15      MR. ADDIS: Okay.
16      (Off the record at 3:57 p.m.)
17      (Back on the record at 4:00 p.m.)
18      MR. WATSON: Brief statement: We
19  didn't assert any privilege the last couple of
20  questions. I think we got right to the edge,
21  maybe even a little bit over, but that's as far as
22  I'm going to let him go in regard to the
23  discussions he had with Mr. Latimer where Macomb
24  County wasn't present.
25      MR. ADDIS: Well, I think -- and I

Page 26

 1  understand your position. But I think the
 2  backdrop of that question was they were all in the
 3  room to sign these documents, okay, and so I'm not
 4  sure privilege would attach when everybody was in
 5  the room.
 6      MR. WATSON: To the extent you're
 7  asking questions of what he told Latimer in
 8  general discussions with everyone at the table, I
 9  think you're right. One-on-one discussions with
10  Latimer or with Latimer and other Detroit
11  officials, I plan to assert the privilege.
12      MR. ADDIS: Okay. I understand,
13  Jerome. Thanks.
14      BY MR. ADDIS:
15  Q.  Sir, you understand that your counsel has
16  asserted the privilege for any private
17  conversations that you had with your clients?
18  A.  I do.
19  Q.  Okay. And so we're going to honor that. I may
20  not agree, but we're going to a honor it and move
21  forward with those ground rules. If I come close
22  to stepping on them, you can feel free to stop
23  me. I'm sure Jerome will beat you to it, but in
24  case he doesn't.
25      However, let's go back to where we're

Page 27

 1  all in the room, okay? While everybody is in that
 2  room, did Mr. Latimer express any questions or
 3  comments regarding the contents of the agreement?
 4  A.  I don't recall any conversation specifically with
 5  or from Darryl Latimer.
 6  Q.  Okay. Generally?
 7  A.  I don't recall anything.
 8  Q.  Okay. Did you witness or did you see Mr. Latimer
 9  reading the document?
10  A.  I don't remember.
11  Q.  Do you know whether your co-counsel at the time,
12  Mr. Walters, or brother counsel, Mr. Walters,
13  spent any time with Mr. Latimer away from that
14  meeting room?
15  A.  I wouldn't know.
16  Q.  But on the day the signing took place -- let's
17  talk about that day. Where did the signing take
18  place?
19  A.  In a conference room at Bodman's offices at Ford
20  Field.
21  Q.  Okay. And about what -- do you remember what
22  time of day?
23  A.  Sometime during that September 2nd, whatever. I
24  don't remember what time of day it was.
25  Q.  Okay. How long did the process take?

Page 28

 1  A.  I don't really recall. I could guess three or
 2  four hours.
 3  Q.  Okay. During that three or four hours what was
 4  discussed at the table?
 5  A.  We were trying to just assemble all the documents
 6  that went into this package.
 7  Q.  Which means not only the agreement which had
 8  pretty much been -- I'm assuming the agreement
 9  had already been provided, correct -- an
10  agreement without attachments?
11  A.  On the day of closing no negotiations were taking
12  place.
13  Q.  So an agreement was there, but there were a
14  number of exhibits and attachments that had to be
15  added to it, correct?
16  A.  That's correct.
17  Q.  All right. And so you and Mr. Walters and Mr.
18  Hupp and Mr. Misterovich and whoever else was
19  there. You mentioned another couple gentlemen.
20  You were assembling and may I assume agreeing on
21  which documents should be properly attached?
22  A.  We were just making sure they were already there.
23  It was already understood what was going to be
24  attached.
25  Q.  It had all been agreed up, but putting it

| Page 29 | Page 31 |
|---|---|
| 1  together was a matter that took some time? | 1  sign it? |
| 2  A. Yes. | 2  A. I have no idea. |
| 3  Q. Okay. And I take it, then, that the agreement | 3  Q. Okay. Did you tell him he had the authority to |
| 4  was not signed until all of the exhibits were | 4  sign it? |
| 5  attached or was it signed first by Mr. Latimer, | 5  A. I wouldn't have the knowledge to tell him that. |
| 6  who then left, and the rest of the work was done, | 6  Q. Okay. Do you know whether Mr. Hupp issued an |
| 7  if you recall? | 7  opinion to him as to whether he had the authority |
| 8  A. I don't recall. | 8  to sign? |
| 9  Q. Do you recall if Mr. Latimer ever was shown the | 9  A. I doubt it. |
| 10 exhibits or attachments? | 10 Q. Okay. You don't recall him saying -- |
| 11 A. I don't remember. I know the only things he saw | 11 A. I don't recall. |
| 12 were the things that he had to sign. Otherwise, | 12 Q. Okay. I want to take you to certain paragraphs, |
| 13 it wouldn't have been presented to him. | 13 and you may or may not have knowledge of this, so |
| 14 Q. Was there ever any discussion -- prior to the | 14 we'll find out. On the acquisition agreement, |
| 15 execution of this agreement, was there ever any | 15 page 2 of 25, paragraph 1.10, do you know who |
| 16 discussion as to whether or not Mr. Latimer had | 16 authored this paragraph? |
| 17 the authority to sign it? | 17 A. I don't know who authored it. I know that Macomb |
| 18 A. I don't recall any discussions on that subject. | 18 County wanted knowledge to be based on knowledge |
| 19 Q. Okay. Do you know whether your office or Mr. | 19 of people who would presumably have some actual |
| 20 Hupp's office or Mr. Misterovich's office or any | 20 knowledge about the physical condition of the |
| 21 of the lawyers' offices had contact with either | 21 assets that were being conveyed. |
| 22 the mayor's office or, if Judge Feikens was still | 22 Q. Okay. |
| 23 in charge, either Judge Feikens or Judge Cox's | 23 A. And so these were the people that DWSD designated |
| 24 office as to whether or not that gentleman had | 24 as having such knowledge. |
| 25 the authority to sign that agreement? | 25 Q. Okay. DWSD said that these people here, meaning |

| Page 30 | Page 32 |
|---|---|
| 1     MR. FRANZINGER: You should only answer | 1  -- and I'll quote. One is the director, correct? |
| 2  that question with respect to non-clients. | 2  A. Yes. |
| 3     MR. ADDIS: I agree. I understand. | 3  Q. Okay. At that time, however, DWSD didn't have a |
| 4     THE WITNESS: Could you rephrase that | 4  director, did it? |
| 5  question. | 5  A. I'm not sure. |
| 6     BY MR. ADDIS: | 6     MR. WATSON: I'm going to object to the |
| 7  Q. Yeah, I wish I could. Let me try it again. | 7  form of the question. We're not really sure when |
| 8  That's fair enough. We're all sitting around | 8  this language was drafted. |
| 9  and, was there ever any discussion between the | 9     MR. ADDIS: Well, I'm not sure that was |
| 10 lawyers, not with clients, between the lawyers as | 10 the testimony. Let me ask it. If I'm lacking |
| 11 to whether or not Mr. Latimer had the requisite | 11 foundation, I'll try to build one. |
| 12 authority to sign this contract and make it | 12    BY MR. ADDIS: |
| 13 binding? | 13 Q. Do you know when this language was drafted and |
| 14    MR. FRANZINGER: Between the lawyers | 14 when did all the parties assent to it prior to |
| 15 for the respective parties -- | 15 signature? |
| 16    MR. ADDIS: Yes. | 16 A. I do not. This could have been a carryover from |
| 17    MR. FRANZINGER: -- as opposed to, for | 17 the prior transaction. It most likely was. |
| 18 example, Mr. Jacobs and Mr. Walter? | 18 Q. Okay. Do you know who supplied the -- I notice |
| 19    MR. ADDIS: Between the respective | 19 that in this paragraph regarding Detroit's |
| 20 parties. | 20 knowledge it lists director, assistant |
| 21    THE WITNESS: I don't recall any such | 21 corporation counsel assigned to DWSD matters, and |
| 22 discussion. Quite frankly, he showed up; I | 22 assistant chief of engineering or engineering |
| 23 assumed he had the authority to sign it. | 23 support manager, Craig Stanley. I know that |
| 24    BY MR. ADDIS: | 24 Mr. Stanley is the only guy directly named in |
| 25 Q. Okay. Do you know who told him to show up and | 25 this thing. Do you know the genesis of that? |

Page 33

1 A. I do not recall.
2 Q. Okay. So it would be fair to say you don't know
3  if Macomb requested that it be Craig Stanley or
4  DWSD offered him up?
5 A. Correct.
6 Q. Do you know who Craig Stanley is?
7 A. I do not.
8 Q. Had you ever worked with him before?
9 A. Never met the man.
10 Q. Do you know whether anybody ever talked to
11  Mr. Stanley about whether he wanted the
12  responsibility of being the keeper of Detroit's
13  knowledge?
14 A. I do not.
15 Q. I want to take you to page 11 of 25, paragraph
16  3.7, entitled Litigation. And I'm going to just
17  read it for the record. "Except as set forth in
18  Schedule 3.7 hereto, there is no action, suit or
19  proceeding pending or, to Detroit's knowledge,
20  threatened against or affecting Detroit before
21  any governmental entity in which there is a
22  reasonable possibility of an adverse decision
23  which could have a material adverse effect upon
24  the ability of Detroit to perform its obligations
25  under this agreement or which in any manner

Page 34

1  questions the validity of this agreement."
2      Sir, at the time -- either prior to or
3  at the actual time of signing this, did anybody in
4  the room ask Mr. Latimer if he had any such
5  knowledge?
6 A. I don't believe anybody asked them that.
7 Q. As of the date of this signing, were you aware --
8  strike that.
9      Was Mr. Latimer the only DWSD employee
10  at that meeting?
11 A. At which meeting?
12 Q. At the signing itself.
13 A. I don't recall.
14 Q. Can you tell me which -- can you tell me whether
15  anybody within the City of Detroit other than
16  their counsel did a full review of this
17  acquisition agreement before signing?
18 A. I'm not sure who reviewed it.
19 Q. Did anybody ever communicate to you that they
20  reviewed it?
21     MR. FRANZINGER: Objection. You
22  shouldn't disclose any discussions you had with
23  your client.
24     THE WITNESS: I don't recall. My --
25  for what it's worth, I believe that this

Page 35

1  acquisition had to be approved by the Detroit
2  Water Board, so there presumably was some review
3  at that level, but I want -- I didn't appear
4  before them. I don't know how they -- how or
5  where or when they addressed this.
6     BY MR. ADDIS:
7 Q. Okay. I want to take you to paragraph 5.3, sir,
8  Litigation and Claims. And this is on 14 of 25.
9  I'm sorry. I should have told you that first.
10  And, again, reading for the record, "Detroit
11  shall promptly inform the Macomb County and MID
12  in writing of any claims of which Detroit is or
13  becomes aware that are or might reasonably be
14  expected to become the subject of litigation
15  affecting the Macomb system or the transactions
16  contemplated by this agreement."
17     Now, sir, using that as a foundation,
18  did there come a time, sir, when you became aware
19  that DWSD employees were being questioned by the
20  FBI, a grand jury, or the U.S. Attorney's Office
21  regarding the practices of DWSD?
22     MR. FRANZINGER: Again, you should not
23  disclose any conversations that you had with the
24  client or that are based upon knowledge that you
25  had based on discussions you had with your client.

Page 36

1     MR. WATSON: And I'll object to the
2  foundation of the question, too.
3     THE WITNESS: In any event, I don't
4  recall any specific conversations with anybody
5  about those activities. I heard rumors just like
6  everybody else. I don't know where I heard them,
7  how I heard them, but I just heard scuttlebutt.
8  There was no one-on-one conversations with anybody
9  about that subject.
10     BY MR. ADDIS:
11 Q. Okay. When you heard these rumors or
12  scuttlebutt, okay, as you call it -- and I
13  understand how that goes through any office --
14  did you consider whether or not a written
15  notification of at least these rumors should have
16  been sent to Macomb County under paragraph 5.3?
17 A. The knowledge I had about the scope of that
18  investigation was so vague and general there was
19  no way it could have alerted me to that -- any
20  connection between that investigation and this
21  transaction.
22 Q. So the answer is you did not?
23 A. I suppose that's the answer. I can't remember the
24  question exactly.
25 Q. 1.13 on page 2 of 25, Global Settlement

Page 37

1  Agreement, were you familiar, sir, with the
2  Global Settlement Agreement?
3  A. Yes, I was.
4  Q. Were you familiar with what subjects that Global
5  Settlement Agreement applied to?
6  A. Yes.
7  Q. What were those subjects that it applied to?
8  A. Well, at the time I was very familiar with it,
9  even though it had been a few years, but today
10  sitting here today, I could only try to remember.
11  Interest rates, 800 megahertz radio, and a
12  gentleman's agreement, the Letter of Intent to
13  consummate these transactions.
14  Q. And was that Global Settlement Agreement, sir,
15  something that was reached in conjunction with
16  the Feikens case?
17  A. Yes.
18  Q. Were you part of those negotiations in front of
19  Judge Feikens -- or might not have been in front
20  of him, but under the control of Judge Feikens
21  that led to that Global Settlement Agreement?
22  A. Yes.
23  Q. And as a result of that Global Settlement
24  Agreement, certain actions were applied to the
25  pricing of this acquisition agreement; is that

Page 38

1  correct?
2  A. One of the issues addressed in the Global
3  Settlement Agreement was carried forward as a
4  credit on the purchase price.
5  Q. Okay. And which one do you believe that was?
6  A. That was the roughly $17 million interest rate
7  dispute resolution.
8  Q. So the $17 million that I've seen on that
9  sheet --
10  A. Yes.
11  Q. -- and now that you've seen is for that interest
12  rate dispute resolution, correct?
13  A. Correct.
14  Q. Thank you.
15     (Mr. Ruegger not present at 4:18
16  p.m.)
17  MARKED FOR IDENTIFICATION:
18  DEPOSITION EXHIBIT 12
19  4:18 p.m.
20  BY MR. ADDIS:
21  Q. Sir, I'm showing you what has been now marked as
22  Exhibit 12, and I believe that that is from that
23  agreement that we talked about, the Global
24  Settlement Agreement. What I mean is what is in
25  there under the term "global settlement," about

Page 39

1  three-quarters of the way down, says, as you can
2  see, $17,050,000, correct?
3  A. I see that, yes.
4  Q. Yes. And that is a recording, so to speak -- a
5  written recording of what you just testified to
6  as the settlement money for the interest rate
7  dispute, correct?
8  A. That's correct.
9  Q. And that's what that reflects?
10  A. That's correct.
11  Q. Thank you. When did you first become aware of an
12  investigation into Mr. Kilpatrick, Ferguson
13  and/or Mercado?
14  A. You know, I really don't remember when I first
15  heard about it. Like I said, it was just stuff I
16  heard on the street. When it happened, I really
17  couldn't tell you.
18  Q. Were you ever contacted by either the Department
19  of Justice, U.S. Attorney's Office, the FBI or
20  anybody regarding any knowledge you might have of
21  the operations of DWSD?
22  A. No.
23  Q. And to this day you have not been?
24  A. I have not been.
25  Q. Did any of the employees of the city -- of DWSD

Page 40

1  ever supply you with copies of their subpoenas to
2  appear before grand juries?
3  A. They did not. As I said, I never spoke to anybody
4  about it.
5  Q. Okay. So basically what you're telling me is you
6  have had absolutely no contact with DWSD
7  employees regarding the investigation of DWSD and
8  the subsequent prosecution of Kilpatrick, et al.?
9  A. Well, that's two different questions.
10  Q. Okay.
11  A. I never talked to anybody at DWSD about the
12  investigation. Once the trial started, yeah,
13  everybody was talking about it.
14  Q. I agree with that. My point was this: Were you
15  ever asked, approached or offer anybody any
16  advice or counsel regarding those issues raised
17  in U.S. vs. Kilpatrick regarding contracts of
18  DWSD?
19  A. Absolutely not.
20  Q. Okay. That takes care of a large number.
21     Going back to the $17 million
22  settlement, were you involved in those
23  negotiations?
24  A. I was involved in the negotiation of the 800
25  global settlement -- what was called the Global

Page 41

1 Settlement Agreement. The $17 million, as with
2 all the numbers, are numbers that were generated
3 by financial people. It was what it was.
4 Q. All right. I want to take you to paragraph --
5 page 6 of 25, paragraph 2.4, under Article II,
6 the Purchase and Sale. Were you, sir, involved
7 in the negotiation of that particular paragraph,
8 which talks about assignment of warranty and
9 guarantee rights?
10 A. I was around when this topic was discussed.
11 Q. Okay. Was it -- did your firm author the first
12 draft of paragraph 2.4 or was it Mr. Bodman or
13 Mr. Misterovich?
14  MR. WATSON: Object to the form of the
15 question. You can answer, if you can.
16  MR. ADDIS: If he know.
17  THE WITNESS: Just to make this easy,
18 all the provisions of this agreement, like this
19 one, were things addressed -- subjects that Macomb
20 County wanted, so they originated with Macomb
21 County. They said they wanted all these things.
22 They proposed language. There may have been some
23 negotiation, but all of these sorts of provisions
24 originated with Macomb.
25  BY MR. ADDIS:

Page 42

1 Q. Okay. And I'll accept that as your answer, sir,
2 but do you remember any specific discussion about
3 2.4? Was there any warranty or guarantee or
4 right that Detroit specifically refused to give
5 up?
6 A. I'm not aware there was anything we refused to
7 give up.
8 Q. Okay. Thank you. I'm taking my time moving
9 through this so we can limit our time at this
10 table.
11  There has been, sir, I believe -- are
12 you aware, sir, that there has been litigation
13 commenced by MIDD against Inland?
14 A. I've heard that there was some claims against the
15 contractors. I didn't know who in particular the
16 claims were against.
17 Q. In the course of your representation of the City
18 of Detroit, did you have cause to interact with
19 Inland?
20 A. I only had one interaction with Inland in my
21 professional career working for DWSD. I went out
22 to the site of the sewer collapse and there were
23 some Inland guys there, who I may have met. That
24 was the one and only time I ever had contact with
25 anyone from Inland.

Page 43

1 Q. What caused you to go to the DWSD -- to the site
2 of the sewer collapse?
3 A. I don't remember what took us out there. I think
4 it was just to see it.
5 Q. Okay. That was long before this negotiation
6 process of this agreement, correct?
7 A. When was the collapse? '04? '03?
8 Q. '04.
9 A. I think I just wanted to see it.
10 Q. Okay.
11 A. It was quite a sight.
12 Q. Those of us who lived near it tried to avoid it.
13 A. Then you know it was quite a sight.
14 Q. It was quite a sight.
15  MR. ADDIS: If you give me five minutes
16 here, please.
17  (Off the record at 4:29 p.m.)
18  (Back on the record at 4:42 p.m.)
19  BY MR. ADDIS:
20 Q. When I tell you that I have just one question for
21 you, I mean it. All right. I started to tell
22 you about some ongoing litigation outside of this
23 particular litigation. Have you been asked by
24 any party to provide information regarding or
25 testimony -- information or testimony regarding

Page 44

1 MIDD vs. Inland pending in U.S. federal court?
2 A. I have not.
3  MR. ADDIS: I'm all done.
4  MR. WATSON: No questions.
5  (The deposition was concluded at 4:43 p.m.
6 Signature of the witness was not requested by
7 counsel for the respective parties hereto.)

```
 1                  CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN      )
 3                          ) SS
 4   COUNTY OF MACOMB       )
 5
 6            I, MELINDA S. MOORE, certify that this
 7   deposition was taken before me on the date
 8   hereinbefore set forth; that the foregoing
 9   questions and answers were recorded by me
10   stenographically and reduced to computer
11   transcription; that this is a true, full and
12   correct transcript of my stenographic notes so
13   taken; and that I am not related to, nor of
14   counsel to, either party nor interested in the
15    event of this cause.
16
17
18
19            [signature: Melinda S. Moore]
20
21
22            MELINDA S. MOORE, CSR-2258
23            Notary Public,
24            Macomb County, Michigan
25   My Commission expires:  September 6, 2016
```