UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

D-1  KWAME M. KILPATRICK,
D-2  BOBBY W. FERGUSON,
D-3  BERNARD N. KILPATRICK, and
D-4  VICTOR M. MERCADO,

Defendants.

_____/

CRIMINAL NO. CR-10-20403-NGE

HON. NANCY G. EDMUNDS

VIOLATIONS:
18 U.S.C. § 1962(d) (RICO conspiracy)
18 U.S.C. § 666(a) (bribery)
18 U.S.C. § 1951 (extortion)
18 U.S.C. §§ 1341, 1343 (mail/wire fraud)
18 U.S.C. § 1512(c) (obstruction of justice)
26 U.S.C. § 7206(1) (false tax return)
26 U.S.C. § 7201 (tax evasion)
18 U.S.C. §§ 1956(a)(1)(B)(i) (money laundering)
18 U.S.C. § 2 (aiding & abetting)
18 U.S.C. §§ 981(a)(1)(c), 982(a)(1) & 1963, and
28 U.S.C. § 2461(c) (forfeiture)

## FOURTH SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Fourth Superseding Indictment:

1.    Defendant KWAME M. KILPATRICK ("KWAME KILPATRICK") served as a

representative to the Michigan House of Representatives from 1996 through 2001.  He was

elected Mayor of the City of Detroit in November 2001 and re-elected in November 2005.  He

held the position of Mayor from January 1, 2002 to September 18, 2008.  During that time, his

annual salary ranged from about $158,000 to $176,000.  The City of Detroit ("City") was a unit

of local government, a municipal corporation and a political subdivision of the State of Michigan

within the Eastern District of Michigan.  The City provided services to its citizens through

departments, agencies and offices of the executive branch of the City, which was headed by

KWAME KILPATRICK.  KWAME KILPATRICK's duties and responsibilities included

FILED 2012 FEB 15 PM 3:0 U.S. DIST. COURT CLERK EAST DIST. MICHIGAN DETROIT

supervising the officers and employees of the executive departments, agencies and offices of the City. He had authority or influence over the following agencies, departments or entities, among others, which were supervised, operated, funded or influenced in whole or in part by the City: the Detroit Water and Sewerage Department; the City of Detroit Buildings & Safety Engineering Department; the Detroit Police Department; the Detroit Building Authority; the Cobo Civic Center; the City of Detroit General Retirement System; the City of Detroit Police and Fire Pension Fund; the Detroit Economic Growth Corporation; the Economic Development Corporation of the City of Detroit; and the Downtown Development Authority. KWAME KILPATRICK also controlled the Kilpatrick Civic Fund, a purported nonprofit entity.

2. Defendant BOBBY W. FERGUSON ("FERGUSON") owned, operated, controlled, and/or directed the activities of Ferguson Enterprises, Inc., Xcel Construction Services, Inc., Johnson Construction Services (also known as Johnson Consulting Services), and a joint venture known as A&F Environmental / Johnson Construction Services (also known as A&F Environmental / Johnson Consulting Services), businesses located in the City which obtained contracts or subcontracts for work to be performed for the City, its departments and agencies. FERGUSON also controlled Detroit Three Dimensional Community Development Corporation, a purported nonprofit entity.

3. Defendant BERNARD N. KILPATRICK ("BERNARD KILPATRICK"), the father of KWAME KILPATRICK, was the president and owner of Maestro Associates, LLC, a purported consulting company located within the City which was paid by clients who sought contracts, subcontracts or investments with the City and its pension funds.

-2-

4.    Defendant VICTOR M. MERCADO ("MERCADO") was the Director of the Detroit Water and Sewerage Department ("DWSD") from about June 2002 to July 2008. During that time, his annual salary ranged from about $230,000 to $240,000. During his tenure as DWSD's Director, MERCADO had supervisory authority over the administration and awarding of more than $2 billion of contracts between DWSD and private contractors.

5.    Derrick A. Miller ("Miller") was Deputy Chief of Staff to Michigan State Representative KWAME KILPATRICK from about 2000 to 2002. Between about 2002 and 2007, Miller served first as Chief Administrative Officer, then as Chief Information Officer for Detroit Mayor KWAME KILPATRICK. Among his duties at the Mayor's Office, Miller acted as a liaison between the Mayor's Office and both the Cobo Civic Center and the DWSD.

6.    The City received federal assistance in excess of $10,000 during each of calendar years 2002 through 2008. During this time period, the City contracted with and purchased goods and services from companies engaged in interstate commerce.

-3-

## COUNT ONE
(18 U.S.C. § 1962(d) – Racketeering Conspiracy)

**D-1     KWAME M. KILPATRICK**
**D-2     BOBBY W. FERGUSON**
**D-3     BERNARD N. KILPATRICK**
**D-4     VICTOR M. MERCADO**

7.     The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above as if they were set forth in full herein.

## THE ENTERPRISE

8.     At all times relevant to this Fourth Superseding Indictment, defendants KWAME KILPATRICK, BOBBY FERGUSON, BERNARD KILPATRICK, VICTOR MERCADO, and others known and unknown, were a group of individuals associated in fact which constituted an enterprise as defined by 18 U.S.C. § 1961(4). This enterprise is referred to for purposes of this count as the Kilpatrick Enterprise. The Kilpatrick Enterprise, including its members and associates, constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Kilpatrick Enterprise was engaged in, and its activities affected, interstate commerce.

## OBJECTIVES OF THE ENTERPRISE

9.     The objectives of the Kilpatrick Enterprise included the following:

a.     Financially enriching Enterprise members, associates and their families by using the power and authority of KWAME KILPATRICK's position as a member of the Michigan House of Representatives and Mayor of the City of Detroit, and *ex officio* member of the board of trustees of the General Retirement System and City of Detroit Police and Fire Pension Fund to commit extortion, bribery and fraud;

-4-

b.     Financially enriching Enterprise members, associates and their families by

defrauding donors to nonprofit entities under the control of Enterprise members,

including the Kilpatrick Civic Fund, Kilpatrick for Mayor and the Kilpatrick Inaugural

Committee; and

c.     Concealing and protecting the activities of the Enterprise from detection

by law enforcement officials and the federal judiciary, as well as from exposure by the

Detroit City Council and the news media, through means that included, among other

things, witness tampering and intimidation, perjury and obstruction of justice.

## THE RACKETEERING CONSPIRACY

10.     Beginning in or about 2000, and continuing until about 2009, in the Eastern

District of Michigan and elsewhere, defendants KWAME KILPATRICK, BOBBY FERGUSON,

BERNARD KILPATRICK, and VICTOR MERCADO, together with other persons known and

unknown, being persons employed by the City and/or associated with the Kilpatrick Enterprise,

which engaged in and the activities of which affected interstate commerce, knowingly and

intentionally conspired to violate 18 U.S.C. § 1962(c), by conducting and participating directly

and indirectly in the conduct of the Enterprise's affairs through a pattern of racketeering activity

involving multiple acts indictable or chargeable under the following provisions of federal law:

a.     18 U.S.C. § 1951 (extortion);
b.     18 U.S.C. § 1341 (mail fraud);
c.     18 U.S.C. § 1343 (wire fraud);
d.     18 U.S.C. § 1512 (obstruction of justice);

and multiple acts involving state offenses chargeable under the following provisions of state law:

e.     M.C.L. 750.213 (malicious threats to extort money);
f.     M.C.L. 750.118 (public officer accepting bribes).

-5-

11.    It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

## THE MEANS AND METHODS OF THE RACKETEERING ACTIVITY

Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the racketeering activity of the Kilpatrick Enterprise were the following:

**I.    EXTORTION AND ATTEMPTED EXTORTION OF MUNICIPAL CONTRACTORS AND RIGGING OF PUBLIC CONTRACTS**

12.    As set forth more fully in this section, below, in and between 2002 and 2008, KWAME KILPATRICK, BOBBY FERGUSON, BERNARD KILPATRICK, and VICTOR MERCADO, assisted by other members of the Enterprise, extorted municipal contractors by coercing them to include FERGUSON in public contracts and/or by rigging the award of public contracts to ensure FERGUSON obtained a portion of the revenue from those contracts. As a result of their extortion and contract rigging, FERGUSON obtained tens of millions of dollars of work and revenues from municipal contracts and municipal contractors, a portion of which FERGUSON shared with other members of the Enterprise, including KWAME KILPATRICK.

**A.    Kwame Kilpatrick, Assisted by Mercado, Miller and Bernard Kilpatrick, Held Up *Company I*'s $50 Million Sewer Lining Contract Until *Company I* Agreed to Give Ferguson Work Which Ultimately Totaled $24.7 Million After Extensions**

13.    As set forth more fully in this subsection below, between in or about early 2002 and November 2006, KWAME KILPATRICK, assisted by VICTOR MERCADO, Derrick Miller and BERNARD KILPATRICK, held up a $50 million sewer lining contract that had been

-6-

approved by the DWSD and its Board of Water Commissioners to be awarded to *Company I*. After KWAME KILPATRICK, MERCADO, Miller and FERGUSON extorted *Company I* through the fear of economic harm (i.e., losing the contract), *Company I* agreed to replace its minority subcontractor with FERGUSON, causing FERGUSON to receive sewer work and revenues totaling more than $23.7 million, following change orders and amendments which increased the total contract amount.

14. In or about early 2002, BERNARD KILPATRICK alerted KWAME KILPATRICK that *Company I* was planning to use a certain minority subcontractor on the sewer lining contract, instead of FERGUSON.

15. In or about early 2002, KWAME KILPATRICK refused to approve the lining contract between DWSD and *Company I*, although the contract already had been approved by the DWSD and its Board of Water Commissioners, because FERGUSON was not part of the contract.

16. In or about early 2002, Miller, the Chief Administrative Officer of the City, contacted a representative of *Company I* to instruct him to meet FERGUSON and give FERGUSON 5% of the lining contract.

17. In or about April 2002, KWAME KILPATRICK told a representative of *Company I* that if the company wanted KWAME KILPATRICK to sign the lining contract, FERGUSON needed to be substituted for *Company I*'s selected minority subcontractor.

18. In or about May 2002, FERGUSON met with representatives of *Company I* and demanded that they pay him a base minimum profit of about $1.5 million, unrelated to any work FERGUSON would perform.

-7-

19.     On or about June 1, 2002, Miller asked a *Company I* representative who was attending the Mackinac Island Regional Policy Conference whether *Company I* had reached an agreement with FERGUSON on the lining contract.

20.     In or about June 2002, FERGUSON entered an agreement with *Company I* where he would get at least $10 million worth of work on the lining contract, with an assured minimum profit of about $1.5 million. FERGUSON reached this deal with *Company I* by exploiting the company's fear that KWAME KILPATRICK would continue to hold up its contract or would otherwise harm its business interests if *Company I* failed to reach an agreement with FERGUSON.

**B.     Kwame Kilpatrick and Mercado Cancelled *Company L*'s $10 Million Sewer Repair Contract Because *Company L* Refused Ferguson's Demand for a 25% Share, then Awarded the Work to *Company I* after *Company I* Agreed to Give Ferguson a Portion of the Contract**

21.     As set forth more fully in this subsection, below, in and between February and July 2003, after *Company L* refused FERGUSON's extortionate demand for a 25% share of a $10 million as-needed emergency sewer repair contract, KWAME KILPATRICK and MERCADO cancelled the contract. Concurrently, after *Company I* agreed to give FERGUSON work on the as-needed emergency sewer contract if *Company I* were to receive it, MERCADO incorporated the $10 million contract into *Company I*'s existing sewer lining contract.

22.     On or about February 20, 2003, *Company L* paid BERNARD KILPATRICK $2,500.

23.     On or about February 26, 2003, MERCADO sent a memo to the Board of Water Commissioners asking it to authorize MERCADO to give the as-needed sewer repair contract to *Company L*. The Board approved MERCADO's request.

24.     On or about March 25, 2003, FERGUSON asked KWAME KILPATRICK to place a lengthy hold on the as-needed sewer repair contract so FERGUSON could determine whether *Company L* or *Company I* would give him a better deal as a subcontractor on the contract. FERGUSON asked, "YOU HAVENT RELEASED THAT CONTRACT RIGHT[?]" KWAME KILPATRICK responded, "RIGHT. THEY KNOW I'm HOLDING IT." FERGUSON replied, "ITS STILL 'COOL' WITH YOU.I NEED TO HOLD IT FOR A LONG TIME ITS KNOW [*no*] NEED FOR IT AND SOMETHING ELSE ALSO."

25.     In or about the Spring of 2003, FERGUSON went to the home of a *Company L* representative and told him that FERGUSON wanted 25% of *Company L*'s as-needed sewer repair contract. FERGUSON told the *Company L* representative that, even though the Board of Water Commissioners approved the contract, the contract could be stopped by KWAME KILPATRICK, who had yet to approve it. *Company L* refused to give FERGUSON a 25% share of the contract.

26.     In or about the Spring of 2003, a representative of *Company L* met with BERNARD KILPATRICK to seek assistance in gaining approval of the contract. BERNARD KILPATRICK advised the *Company L* representative that BERNARD KILPATRICK would arrange a meeting with FERGUSON, which he did.

-9-

27. On or about May 8, 2003, MERCADO asked a representative of *Company I* to provide DWSD with *Company I*'s unit pricing for the work contemplated by the as-needed sewer repair contract.

28. In or about May 2003, FERGUSON reached an agreement with *Company I* about the share of work FERGUSON would receive on the as-needed sewer repair contract.

29. On or about July 28, 2003, *Company L*'s as-needed sewer repair contract was cancelled by MERCADO.

30. In or about September 2003, DWSD agreed to include the as-needed sewer repair work in *Company I*'s existing sewer lining contract.

**C.     Kwame Kilpatrick Steered Work to Ferguson at a Sewer Collapse, then Held Up a $12 Million Amendment to *Company I*'s Sewer Lining Contract Until *Company I* Agreed to Give Ferguson $350,000**

31. As set forth more fully in this subsection below, in and between about September 2004 and December 2005, FERGUSON and KWAME KILPATRICK schemed together in an effort to steer work to FERGUSON at a large sewer collapse at 15 Mile Road in Sterling Heights ("the sewer collapse"). Then, from about May to December 2005, FERGUSON and KWAME KILPATRICK, assisted by Miller, threatened *Company I* and its partner that the City would hold up a $12 million amendment to *Company I*'s sewer lining contract until FERGUSON was satisfied with his financial compensation from *Company I* for work that FERGUSON wanted, but did not receive, at the sewer collapse. After *Company I* agreed to give FERGUSON an additional $350,000 for work he did not do, KWAME KILPATRICK and MERCADO approved the $12 million amendment.

-10-

32.     On or about September 1, 2004, after visiting the site of the sewer collapse,
KWAME KILPATRICK schemed with FERGUSON about how they could get FERGUSON
work at the site.  FERGUSON advised KWAME KILPATRICK that although *Company I* would
be overseeing the overall project, *Subcontractor DA* had hired all the subcontractors at the site.
KWAME KILPATRICK responded, "Perfect!  That's what I needed."  FERGUSON replied that
FERGUSON and KWAME KILPATRICK needed to meet about how FERGUSON would
"move in" given the arrangement of companies, saying, "We need to mee [*meet*] on how, I move
in, I got a great idea sir".

33.     On or about September 7, 2004, KWAME KILPATRICK asked FERGUSON
whether FERGUSON had determined his share of work at the sewer collapse.  FERGUSON
responded that *Subcontractor DA* wanted to share the work with Ferguson on 50/50 basis, but
that KWAME KILPATRICK had to instruct MERCADO about the arrangement, including that
KWAME KILPATRICK would personally review *Subcontractor DA 's* invoices to ensure that
FERGUSON was getting his share: "just let victor [*MERCADO*] know [*if Subcontractor DA*]
makes 2.00 fei [*Ferguson Enterprises, Inc.*] needs to make 2.00 also you will look at the invoices
to make sure."

34.     On or about May 3, 2005, FERGUSON told representatives of *Company I* that
people "Downtown" would not understand it if FERGUSON did not get sufficient revenue from
work on the sewer collapse, which might hurt *Company I*'s chances of obtaining a contract
amendment increasing the scope of its sewer lining contract.  The representatives understood that
FERGUSON's reference to people "Downtown" meant the Mayor's Office.

-11-

35. On or about July 27, 2005, MERCADO moved the Board of Water Commissioners for authorization to amend *Company I*'s sewer lining contract to increase its scope by $12 million (hereafter, "the amendment").

36. In or about the Summer of 2005, at various locations in Detroit, FERGUSON told representatives of *Company I* and *Company I*'s partner that DWSD would not authorize the amendment if they did not pay FERGUSON $500,000 to $700,000, representing profits FERGUSON claimed he should have received had he been given more work at the sewer collapse.

37. In or about the Fall of 2005, MERCADO asked a representative of *Company I* if the company had resolved things yet with FERGUSON.

38. In or about December 2005, at FERGUSON's office, FERGUSON told a representative of *Company I*'s partner that the amendment would sit on the Mayor's desk unapproved until FERGUSON got the compensation he wanted for the sewer collapse.

39. In or about late 2005, Miller told a representative of *Company I* that *Company I* had to resolve FERGUSON's complaint about the sewer collapse.

40. On or about December 16, 2005, at a restaurant in Detroit, FERGUSON, after conferring separately in the restaurant with Miller, approached a representative of *Company I* and demanded $350,000 for the sewer collapse.

41. In or about late December 2005, *Company I* and *Company I*'s partner agreed to pay FERGUSON a total of $350,000 for the profits FERGUSON believed he should have received at the sewer collapse. FERGUSON obtained these agreed payments from *Company I*

-12-

and *Company I*'s partner by exploiting their fear that KWAME KILPATRICK would continue to hold up approval of the amendment if they did not pay FERGUSON.

42.     On or about December 23, 2005, KWAME KILPATRICK and MERCADO signed a Special Administrator Order authorizing the amendment, which called for a $12 million increase in the scope of *Company I*'s sewer lining contract.

### D.     Ferguson Extorted *Company L* out of $1.7 Million from a $27.9 Million Sewer Outfalls Contract

43.     As set forth more fully in this subsection below, in and between about January 2004 and July 2007, FERGUSON, exploiting the fear of economic harm created by previous actions of KWAME KILPATRICK and MERCADO, extorted *Company L* and its partner out of $1.7 million in proceeds from a $27.9 million sewer outfalls contract. FERGUSON and his companies did no work on the sewer outfalls contract in exchange for the $1.7 million in extorted payments.

44.     On or about January 26, 2004, while meeting with representatives of *Company L* and another company about partnering on future DWSD projects, FERGUSON sent a text message to Derrick Miller about the progress of the meeting, including the fact that *Company L* now understood that they could not win a DWSD contract without having FERGUSON on their team.  Specifically, FERGUSON advised Miller that the representative of *Company L* "is here saying the same thing you are saying and telling them no deal without me, he gotten smart, I am just sitting here listening."

45.     In or about April 2005, DWSD awarded *Company L* the outfalls contract. *Company L*'s bid identified Ferguson Enterprises as one of its subcontractors.

-13-

46. In or about July 2005, FERGUSON demanded that *Company L* pay him $1 million from the revenues of the outfalls contract, plus a profit share of more than $300,000. FERGUSON obtained these payments, despite the fact that he and his companies would not do any work to earn the money, by exploiting *Company L's* fear that if they did not pay him, FERGUSON would use his influence with KWAME KILPATRICK to harm *Company L*'s current and future City contracts, as he had done in the past.

47. In or about September 2005, after work had begun on the project, FERGUSON told a representative of *Company L* that he wanted a 5% share, or $450,000, of *Company L's* revenues arising from change orders for the following DWSD contracts: (a) $375,000 of the revenues from a change order *Company L* was seeking to rehabilitate six more outfalls; and (b) $75,000 from a change order *Company L* was seeking to abate asbestos at DWSD facilities, a contract in which FERGUSON had no previous involvement. FERGUSON was able to obtain these payments, despite the fact that he and his companies would do no work for the money, by exploiting *Company L*'s fear that FERGUSON would use his influence with KWAME KILPATRICK to reject its change orders if they did not pay him.

48. In or about September 2005, FERGUSON demanded that *Company L* immediately give him $25,000 of the $450,000 he previously demanded. Fearing that FERGUSON would use his influence to adversely impact *Company L*'s contracts, *Company L* employees collected $25,000 in cash which a *Company L* official hand delivered to FERGUSON that same evening at FERGUSON's offices in Detroit, even though *Company L* and FERGUSON understood that FERGUSON would do no work for the money.

-14-

49. On or about September 23, 2005, in order to conceal the payments he demanded, FERGUSON gave *Company L* an invoice for $450,000 from Johnson Consulting Services, a company registered to and purportedly operated by FERGUSON's wife but in truth and fact controlled by FERGUSON, describing environmental services Johnson Consulting purportedly provided to *Company L*, when FERGUSON knew Johnson Consulting had not performed, and would not perform, any of the work described in the invoice.

50. During the period from about October 7, 2005 to about July 18, 2007, *Company L* and its property management arm paid Johnson Consulting Services and a joint venture of Johnson Consulting Services/A & F Environmental Services a total of more than $1.7 million from the revenues of the outfalls contract even though FERGUSON and his affiliated companies did not perform any work for the money.

## E. Kwame Kilpatrick, Ferguson, Miller and Mercado Schemed to Increase Ferguson's Revenues on a $19.8 Million Downtown Water Main Contract Administered by *Company D*

51. As set forth more fully in this subsection below, in or about 2003 and 2004, KWAME KILPATRICK, FERGUSON, Miller and MERCADO schemed together to steer subcontracts and emergency task orders to FERGUSON in connection with a $19.8 million downtown water main replacement contract administered by *Company D*. Following the intervention into the contracting process by KWAME KILPATRICK, Miller and MERCADO, including giving FERGUSON downtown work originally assigned to the lowest bidder, FERGUSON received over $4.8 million in work on the downtown water main project through about 2007.

-15-

52.     In or about June 2003, MERCADO and KWAME KILPATRICK authorized *Company D* to perform design and construction oversight of the downtown water main project under an arrangement whereby *Company D* would evaluate bids and provide DWSD with a ranking of the contractors who bid to perform the work.

53.     On or about October 14, 2003, FERGUSON asked KWAME KILPATRICK to have Miller review and approve the water main replacement work before *Company D* did so, specifically asking: "is it ok , if zeke [*Miller*] reveiew and aprrove the watermain  replacement work priorto victor [*MERCADO*] assigning a new task to his new consultant team."

54.     On or about February 18, 2004, FERGUSON advised KWAME KILPATRICK and Miller that they needed to be part of the decision-making for the downtown water main contracts because *Company D* had stopped negotiations with FERGUSON and was trying to give the contract to one of FERGUSON's competitors.

55.     On or about March 16, 2004, KWAME KILPATRICK and FERGUSON had an urgent meeting with MERCADO regarding the downtown water main project.

56.     On or about March 18, 2004, at FERGUSON's request, MERCADO interceded with *Company D* to change the deadline of FERGUSON's emergency water main project in order to benefit FERGUSON.

57.     On March 19, 2004, a DWSD employee accepted *Company D*'s recommendation that the first round of downtown water main replacement contracts be assigned to three City contractors who submitted the lowest bids.  FERGUSON, whose bid was 45% higher than the lowest bidder, was not among these three lowest bidders.

-16-

58.     On or about March 22, 2004, at FERGUSON's urging, KWAME KILPATRICK told Miller to advise MERCADO that Miller would review recommendations of contractors for the downtown water main project before MERCADO made a final decision. Specifically, FERGUSON told KWAME KILPATRICK, "I need zeke [*Miller*] to call victor [*MERCADO*] and tell him he wonts to review recomendations for the downtown contrators prior to the final decision being made." KWAME KILPATRICK replied, "COOL." FERGUSON added, "You will tell him sir, real soon they are tring to move fast, thank you not rushing the boss just don't won't this to get by us."

59.     On or about March 30, 2004, FERGUSON told KWAME KILPATRICK and Miller that MERCADO had told FERGUSON that MERCADO could not remove the lowest bidder from the downtown water main project because the City's purchasing ordinance prohibited it.

60.     On or about April 1, 2004, MERCADO assured KWAME KILPATRICK that he was trying to look for grounds to disqualify the lowest bidder and that he might look into delaying the project.

61.     In or about the Spring of 2004, MERCADO instructed *Company D* to give FERGUSON the downtown water main work originally assigned to the lowest bidder. To compensate the lowest bidder for the loss of its downtown work, a DWSD employee instructed *Company D* to give the lowest bidder work at the northeast water plant, outside of the downtown area.

-17-

62.     In or between about 2004 and late December 2005, FERGUSON received more than $4.8 million in water main work downtown, including the emergency task orders and the downtown work originally assigned to the lowest bidder.

### F.     Kwame Kilpatrick and Mercado Rigged a Water Main Contract for the East Side of the City so Ferguson's Team Would Win, after which Ferguson Extorted more than $12.9 Million in Work from Other Members of the Winning Team

63.     As set forth more fully in this subsection, below, between in or about the Winter of 2006 and 2008, KWAME KILPATRICK and MERCADO rigged the evaluation and award of a $15 million contract to improve the City's eastside water mains so *Company D*, which had not teamed with FERGUSON, would lose and *Company L*, which was paired with FERGUSON, would win the contract. After change orders increased the scope of the contract, FERGUSON, assisted by KWAME KILPATRICK, extorted *Company L* and its affiliated company, *Company A*, into giving Ferguson Enterprises and FERGUSON's affiliated company, Xcel Construction Services, a total of more than $12.9 million in work from the contract.

64.     On or about January 25, 2006, DWSD sent out requests for proposals for the eastside water main contract as well as a contract for improvements of water mains on the west side of the City.

65.     In or about late Winter of 2006, FERGUSON told representatives of *Company L* that he would join their team's proposal for both the eastside and westside water main contracts, but they had to identify *Company E* in place of FERGUSON on their bid because FERGUSON's affiliated company, Xcel Construction Services, was already bidding on the same contracts in partnership with another company. FERGUSON recruited *Company E* to serve as his proxy on

-18-

Company *L*'s bid despite the fact that *Company E* had a single crew which was unable to perform the volume of work set forth in the proposal.

66.    On or about March 23, 2006, *Company L* submitted a proposal to DWSD for both water main contracts.  At FERGUSON's direction, *Company L* submitted a bid which intentionally concealed FERGUSON's participation by listing *Company E*, rather than FERGUSON, and falsely credited *Company E* with FERGUSON's work experience.  At the time, FERGUSON and *Company L* both knew that FERGUSON would be substantially participating in the contract if it were awarded to *Company L*.

67.    In or about the Spring of 2006, FERGUSON reassured a representative of *Company L* that he had spoken with MERCADO about the water main contracts and *Company L* was in good shape.

68.    On or about May 14, 2006, after bid evaluations revealed that *Company L* was ranked behind *Company D*, a rival bidder not aligned with FERGUSON, KWAME KILPATRICK directed an official from the City's Human Rights Division to revoke the Detroit Headquartered Certification of *Company D*, which would adversely impact *Company D*'s bid ranking.

69.    On or about May 18, 2006, pursuant to KWAME KILPATRICK's directive and with MERCADO's knowledge, the City's Human Rights Division, contrary to its policy and practice, revoked the Detroit Headquartered Certification of *Company D* without notifying *Company D* or allowing them to respond or appeal, thereby eliminating *Company D* from contention for the contract and improving *Company L*'s bid position.

-19-

70. On or about May 22, 2006, at the direction of KWAME KILPATRICK, the City's Human Rights Division awarded a Detroit Headquartered Certification to *Company A*, a partner in the *Company L* bid, thereby improving *Company L*'s bid position.

71. On or about May 23, 2006, at the direction of MERCADO, a DWSD employee credited *Company A* with Detroit Headquartered status, improving *Company L*'s bid ranking.

72. On or about May 25, 2006, DWSD recommended that *Company L* receive the eastside water main contract and Xcel Construction Services's joint venture receive the westside water main contract, thereby giving FERGUSON part of both contracts.

73. In or about the Spring of 2006, after *Company L* won the eastside contract, FERGUSON told a representative of *Company A*, which was on *Company L*'s team, to pay FERGUSON's affiliated company Xcel Construction Services a consulting fee of $200,000, even though *Company A* did not need consulting services. FERGUSON was able to make *Company A* pay the fee by exploiting *Company A*'s fear that FERGUSON would use his relationship with KWAME KILPATRICK to harm the economic interests of *Company A* and *Company L* if they refused to pay.

74. On or about August 10, 2006, MERCADO signed an acknowledgment of contract form awarding *Company L* the eastside water main contract and Xcel Construction Services's joint venture the westside water main contract.

75. On or about June 11, 2007 and January 25, 2008, in response to FERGUSON's previous demands, *Company A* paid FERGUSON's affiliated company, Xcel Construction Services, a total of more than $540,000 for purported consulting and construction management services, although Xcel did not earn this amount of money. FERGUSON was able to make

-20-

*Company A* pay this money by exploiting the company's fear that FERGUSON would harm *Company A*'s business with the City if it refused to pay.

76.    On or about August 29, 2008, in response to a demand from FERGUSON, *Company L* paid FERGUSON's affiliated company, Xcel Construction Services, a total of $200,000 for purported consulting services, although Xcel did not earn this amount of money. FERGUSON was able to make *Company L* pay this money by exploiting the company's fear that FERGUSON would use his relationship with KWAME KILPATRICK to harm the economic interests of *Company L*'s business with the City if it refused to pay.

77.    After post-award change orders increased the size of the eastside contract, *Company L* and *Company A* gave Ferguson Enterprises and Xcel Construction Services a total of more than $12.9 million in work.

### G.    Ferguson Extorted *Company L* out of $5 million in Work on a Sewer Repair Contract for East Side of City

78.    As set forth more fully in this subsection, below, between in or about June 2006 and September 2008, FERGUSON made *Company L* give FERGUSON more than $5 million in earthwork and point repair work arising out of a sewer repair contract for the east side of the City by exploiting *Company L*'s fear that FERGUSON would use his relationship with KWAME KILPATRICK to harm *Company L's* business interests if *Company L* did not give him the work.

79.    On or about June 12, 2006, DWSD sent out requests for proposals for the eastside sewer repair contract.

80.    In or about the Summer of 2006, FERGUSON told representatives of *Company L* that he was going to be part of their proposal to repair sewers, demanding 50% of the

-21-

work, including all the earthwork and point repair work on the project. FERGUSON instructed *Company L* not to list his company, Ferguson Enterprises, on the bid proposal because another of his companies, Xcel Construction Services, was on *Company I*'s competing proposal. FERGUSON convinced *Company L* to do this by exploiting *Company L*'s fear FERGUSON would use his relationship to KWAME KILPATRICK to harm *Company L*'s chances of winning the contract if they did not do so.

81.     On or about August 2, 2006, *Company L* submitted a bid to DWSD identifying *Subcontractor DC*, instead of Ferguson Enterprises, for the earthwork and point repair work. *Company L* did this, at FERGUSON's instruction, to conceal FERGUSON's role in the proposal because he also was teamed up with one of the competing bidders, *Company I*.

82.     On or about November 2, 2006, MERCADO notified *Company L* that DWSD had selected it for negotiations for the eastside sewer repair contract.

83.     On or about the Winter of 2006, *Company L* entered into a contract with *Subcontractor DC* to perform the earthwork and point repair work on the eastside sewer repair contract because Ferguson Enterprises's crews were busy on other City projects. *Subcontractor DC* provided a performance bond and performed the work from about December 2006 to about July 2007.

84.     In or about July 2007, FERGUSON had his crew bring their equipment to the job site and kick *Subcontractor DC*'s crew off. Despite the fact that FERGUSON refused to sign a contract with *Company L* or provide or pay for a performance bond for his work, *Company L* permitted FERGUSON to take over *Subcontractor DC*'s work after FERGUSON threatened to shut the job down if *Subcontractor DC* did not leave the job site.

-22-

**H.  Ferguson Extorted *Company I* out of $5 million
    in Sewer Repair Work on the West Side of City**

85.  As set forth more fully in this subsection, below, between in or about June 2006 and 2008, FERGUSON caused *Company I* to give Ferguson Enterprises more than $5 million in sewer repair work on the west side of the City by exploiting his relationship with KWAME KILPATRICK and MERCADO to cause *Company I* to believe they would not win the contract if they did not agree to FERGUSON's terms.

86.  On or about June 9, 2006, at *Company I*'s offices, FERGUSON told *Company I* representatives that *Company I* must enter into a joint venture with FERGUSON's company, Xcel Construction Services, in order to win one of DWSD's two upcoming contracts to rehabilitate sewers on the east and west side of the City.

87.  On or about June 12, 2006, DWSD sent out requests for proposals for the sewer repair contracts.

88.  On or about August 2, 2006, a joint venture of *Company I* and FERGUSON's affiliated company Xcel Construction Services submitted a proposal for the work, with Ferguson Enterprises identified as a subcontractor.

89.  On or about December 21, 2006, MERCADO sent *Company I* a letter of DWSD's intent to enter into the westside sewer repair contract with the *Company I* / Xcel joint venture and further authorized *Company I* / Xcel to begin work on the contract immediately.

90.  In or about December 2006, FERGUSON threatened *Company I* representatives that if FERGUSON did not get paid more money, FERGUSON would hold up the westside sewer repair contract just like he had done with the $12 million amendment to their previous

-23-

sewer lining contract. FERGUSON further threatened that he could make more money working with *Company L*, which the *Company I* representative interpreted to mean that FERGUSON would join *Company L* on future DWSD projects, meaning that *Company I* would not get the work, given FERGUSON's influence with KWAME KILPATRICK, MERCADO and DWSD.

91.  In or about December 2006, fearing that FERGUSON would carry out his threat to hold up the contract, *Company I* agreed to give FERGUSON nearly all of *Company I*'s profits from the point repair work, as well as an assured minimum profit for the overall project.

### I. Ferguson, Assisted by Miller and Mercado, Extorted *Company W* out of $5 Million in Work for Ferguson on the Baby Creek / Patton Park Contract

92.  As set forth more fully in this subsection, below, in and between about February 2003 and 2008, FERGUSON, assisted by KWAME KILPATRICK, Miller and MERCADO, caused *Company W* to give Ferguson Enterprises more than $2.7 million in work at the Baby Creek combined sewer overflow facility ("Baby Creek contract"), as well as to give FERGUSON and his affiliated company, Xcel Construction Services, more than $2.4 million of construction work at the neighboring Patton Park recreational facility, which was part of the Baby Creek contract. FERGUSON obtained this work by exploiting *Company W*'s fear that FERGUSON would use his relationship with KWAME KILPATRICK and other members of the Mayor's Office to adversely impact *Company W*'s chances of winning the contract if they did not do so.

93.  On or about September 30, 2002, DWSD requested proposals for the Baby Creek contract.

94.     On or about February 6, 2003, *Company W* submitted a bid for the construction of the Baby Creek facility. *Company W* was the second lowest bidder before application of preferences given to Detroit-based and Detroit-headquartered businesses.

95.     On or about February 8, 2003, Miller told a representative from *Company W* that it should put FERGUSON on its team, even though *Company W* already had agreed to hire a different subcontractor whose quotation for excavation work was 23% lower than FERGUSON's quotation.

96.     On or about February 10, 2003, Miller gave FERGUSON non-public information about the bidding evaluation process, including the City's adjusted ranking of the bidders, so that FERGUSON could use that information to his advantage in negotiations with *Company W*. Specifically, FERGUSON told Miller, "I need for you to talk [*to the City Purchasing Director*], baby creek before she [*announces*] her decision, to give it to you first." Miller replied, "I did."

97.     On or about February 10, 2003, DWSD declared *Company W* the lowest responsive equalized bidder after giving the company preference for being a Detroit-headquartered business.

98.     On or about February 14, 2003, *Company W* agreed with FERGUSON that if it were awarded the Baby Creek contract, it would give FERGUSON $2.73 million in mass site work at Baby Creek, as well as a $10 million provisionary allowance to improve the Patton Park recreational facility.

99.     On or about February 18, 2003, DWSD declared *Company W* the lowest responsible bidder.

-25-

100.    On or about April 8, 2003, KWAME KILPATRICK, as Special Administrator of DWSD, signed an order awarding the contract to *Company W*.

101.    On or about July 1, 2003, *Company W* subcontracted about $2.7 million worth of site preparation work at the Baby Creek facility to FERGUSON.

102.    On or about August 11, 2003, FERGUSON told an upper level member of the administration that KWAME KILPATRICK had authorized DWSD and the Recreation Department to reduce *Company W*'s administrative fee for the construction of the Patton Park recreation facility, enabling FERGUSON to obtain the balance for himself.

103.    On or about July 2004, MERCADO directed *Company W* to reduce its administrative fee for the recreation facility by about $150,000.  FERGUSON or his affiliated company, Xcel Construction Services, received more than $1.3 million in administrative fees.

104.    During execution of the contract, FERGUSON threatened a representative of *Company W* that FERGUSON would take matters to the "inner circle" of the City administration if a dispute arose with *Company W*.  *Company W* thereafter gave FERGUSON a total of more than $5 million in work on the combined sewer overflow facility and the Patton Park recreational facility.

**J.      Kwame Kilpatrick and Mercado, Assisted by Miller, Rigged the Award of a $21 Million Security Contract to Ensure Ferguson's Team Won, Causing Ferguson to Receive $1.2 Million in Work**

105.    As set forth more fully in this subsection, below, in or between about August 14, 2003 and October 2004, KWAME KILPATRICK and MERCADO, assisted by Miller, rigged the evaluation and award of a contract to upgrade security systems at various DWSD facilities ("security contract") so FERGUSON's team would win the contract.

-26-

MERCADO helped conceal the scheme by funneling additional work for the contract into an unrelated contract, then misleading an inquiry authorized by a federal judge into the propriety of the security contract. FERGUSON obtained more than $1.2 million of work on the security contract.

106. In or about late September 2003, FERGUSON, in an effort to influence DWSD's evaluation of bids for the security contract, advised MERCADO that FERGUSON would be part of a joint venture that was forming to bid on the contract.

107. On or about October 15, 2003, FERGUSON became a 15% partner in a joint venture formed to bid on the security contract (hereafter, "FERGUSON's team").

108. On or about November 3, 2003, FERGUSON's team and *Company MC* submitted competing bids for the security contract.

109. In or about January 2004, DWSD's evaluation committee advised MERCADO that the committee had determined that *Company MC* was the most qualified bidder.

110. On or about January 13 and 14, 2004, shortly after the evaluation committee met for the last time, KWAME KILPATRICK, MERCADO and Miller, at FERGUSON's urging, strategized about how to prevent DWSD's evaluation committee from awarding the security contract to *Company MC* rather than FERGUSON's team. Specifically, on or about January 14, 2004, a few minutes after asking KWAME KILPATRICK whether he had spoken with MERCADO, FERGUSON asked Miller, "Zeke [*Miller*] did you talk to victor [*MERCADO*] yesterday it real important." Miller said "Yes." FERGUSON replied, "Thank you sir, we striaght." Miller clarified, "Not yet but will be." Shortly thereafter, FERGUSON warned Miller, "Zeke [*Miller*] its happen right now it had to be done yesterday, if you don't call asap its over,

-27-

and [*Company MC*] will have won again, eng [*Engineering*] is send ing the decesion right now."

Miller asked, "Call whom?" FERGUSON answered, "Victor [*MERCADO*]."

111. On or about January 27, 2004, MERCADO, contrary to DWSD practice and against the advice of DWSD's attorneys and staff, directed DWSD's evaluation committee to negotiate simultaneously with both FERGUSON's team and *Company MC* for the security contract.

112. On or about February 11, 2004, after FERGUSON met with MERCADO, a DWSD employee relayed MERCADO's directive to the evaluation committee that high-level DWSD management would be taking an active role in the negotiations.

113. On or about February 25, 2004, MERCADO asked the Board of Water Commissioners to allow him to conduct contract negotiations simultaneously with both *Company MC* and FERGUSON's team.

114. On or about April 19, 2004, MERCADO rejected a recommendation by the members of DWSD's evaluation committee to discontinue contract negotiations with FERGUSON's team and to proceed only with *Company MC* whose proposal was a better value to DWSD. MERCADO directed his staff to reject the committee's recommendation on the pretextual ground that it was contrary to the Board of Water Commissioner's intentions, and further directed his staff to continue to negotiate simultaneously with both FERGUSON's team and *Company MC*.

115. On or about August 5, 2004, MERCADO recommended that DWSD award the security contract to FERGUSON's team despite the fact that its amended proposal was over $2.4 million more than *Company MC*'s proposal.

-28-

116.     On or about September 22, 2004, MERCADO moved the Board of Water Commissioners to authorize DWSD to negotiate the terms of the security contract with FERGUSON's team.

117.     On or about October 4, 2004, KWAME KILPATRICK signed an order as Special Administrator authorizing MERCADO to enter into the security contract with FERGUSON's team.

118.     In or about January 2006, after a federal judge authorized an investigation into the appropriateness of the award of the security contract to FERGUSON's team, MERCADO directed his staff to find other contracts, besides the security contract, to fund an extension of the security system to five additional water treatment plants.

119.     In or about January 2006, MERCADO asked a City contractor to fund the extension of the security system to the water treatment plants using extra money left over from a separate project the contractor had completed.  When the representative declined to provide the funds in the manner MERCADO wanted, MERCADO ordered him out of his office, then directed a DWSD employee to place an indefinite hold on change orders requested by that contractor.

120.     In or about January 2006, MERCADO persuaded a different City contractor to submit a $3.9 million change order to DWSD for an existing pump station project, $3.1 million of which would be used as a pass-through to fund the extension of the security system to the water treatment plants.

121.     On or about February 27, 2006, KWAME KILPATRICK asked a federal judge to approve a $3.9 million change order for the pump station, the bulk of which was to be used for

-29-

the security system. Three of the other four change orders identified in KILPATRICK's letter to the judge were to pay FERGUSON on unrelated contracts.

122.    From the start of work on the security contract, until he received his last payment on or about late June 2008, FERGUSON obtained more than $1.2 million in work on the project.

### K.    Ferguson, Assisted by Kwame Kilpatrick and Mercado, Attempted to Extort Company W to Give Ferguson a Substantial Portion of a $140 Million Oakwood Pump Station Contract

123.    As set forth more fully in this subsection, below, in and between about late January and early February 2007, FERGUSON, with the assistance of KWAME KILPATRICK and MERCADO, attempted to extort *Company W* through fear of economic harm to give FERGUSON a substantial portion of a $140 million DWSD contract for work on the Oakwood pump station ("Oakwood contract"). When *Company W* refused to agree to terms with FERGUSON, the Oakwood contract was awarded instead to another team.

124.    On or about January 31, 2007, about a month after DWSD requested proposals for the Oakwood contract, FERGUSON told a *Company W* representative that the Mayor's Office wanted *Company W* to enter into a joint venture on the Oakwood contract with FERGUSON and another firm. FERGUSON added that MERCADO would be contacting *Company W* to discuss *Company W* teaming with FERGUSON.

125.    On or about the morning of February 1, 2007, MERCADO called a *Company W* representative and told that representative that their conversation was " just between you and I." MERCADO said he understood *Company W* would be taking on FERGUSON as a "mentor-partner" on the Oakwood contract, and that "if you [*Company W*] want go in that

-30-

direction [*i.e. partnering with FERGUSON*] we [*DWSD*] would approve it." The representative asked MERCADO if MERCADO's "big guy" (KWAME KILPATRICK) had authorized the approval. MERCADO answered "yes."

126.     On or about February 8, 2007, during a meeting with a *Company W* representative, FERGUSON demanded a 35% joint venture share of *Company W*'s proposal for the Oakwood contract, warning the *Company W* representative, "there's a new boy in town . . . this isn't like when you called somebody up with [*a former Detroit Mayor*] and gave him 20% and he went away."

127.     On or about February 8, 2007, KWAME KILPATRICK requested that a *Company W* representative meet with him at the Manoogian Mansion.

128.     On or about February 8, 2007, MERCADO advised a *Company W* representative that KWAME KILPATRICK asked MERCADO to contact him "to make sure there were no issues between" *Company W* and FERGUSON.

129.     On or about Saturday, February 10, 2007, a *Company W* representative met with KWAME KILPATRICK at the Manoogian Mansion. KWAME KILPATRICK told the representative he wanted *Company W* to "play fair," with respect to the Oakwood contract, which the representative understood to mean that *Company W* needed to partner with FERGUSON.

130.     In or about March 2007, FERGUSON rejected *Company W*'s offer of a 15% share of the Oakwood contract because FERGUSON refused to share a corresponding percentage of risk of loss on the project.

131.     On or about March 21, 2007, KWAME KILPATRICK instructed a DWSD employee to postpone the bid deadline by one week so that a high-level aide to KWAME

-31-

KILPATRICK could meet in person with a *Company W* representative in an effort to work out a joint venture between *Company W* and FERGUSON.

132.    In or about March 2007, *Company W* declined to partner with FERGUSON after FERGUSON again refused to share a risk of loss equaling his share of the project.

133.    In or about April 2007, DWSD awarded the Oakwood Contract to a rival bidder rather than to *Company W*.

### L.    Attempt to Find a Replacement for Mercado

134.    As set forth more fully in this subsection below, in or about the Winter of 2008, after MERCADO had announced that he was going to leave his post as DWSD Director, KWAME KILPATRICK confidentially asked an official at the Buildings & Safety Engineering Department ("B&SE") to take the job of DWSD Director, even though that official did not have the training or experience for the job. KWAME KILPATRICK made the offer in the hope that the B&SE official would take over MERCADO's role of steering DWSD contracts and funds to FERGUSON through extortion and contract rigging.

135.    In or about the Winter of 2008, shortly after KWAME KILPATRICK's confidential job offer to the B&SE official, FERGUSON invited that official to FERGUSON's offices where FERGUSON urged the official to take the job of DWSD Director, saying that if he did, FERGUSON and the official could make over a million dollars for KWAME KILPATRICK in two weeks.

### M.    Kwame Kilpatrick Attempted to Get Ferguson the Tiger Stadium Demolition

136.    As set forth more fully in this subsection, below, in or between about February to April 2008, KWAME KILPATRICK used his position as Mayor of Detroit in an

attempt to coerce an official of the Detroit Economic Growth Corporation ("DEGC") to recommend that FERGUSON get the contract to demolish Tiger Stadium in Detroit, even though FERGUSON was not the lowest bidder. When the DEGC official refused, KWAME KILPATRICK tried to retaliate against the official by causing him to resign from his position.

137.    On or about November 30, 2007, a joint venture which included Ferguson Enterprises (hereafter, "FERGUSON's joint venture") submitted a bid to the City of Detroit Economic Development Corporation ("EDC") to demolish Tiger Stadium in Detroit.

138.    In or about late February or early March 2008, KWAME KILPATRICK contacted a DEGC official who was helping the EDC evaluate the bids, telling him that KWAME KILPATRICK wanted FERGUSON's joint venture to win the demolition contract.

139.    On or about April 21, 2008, KWAME KILPATRICK expressed his concern and unhappiness to the DEGC official after learning that the EDC's staff had recommended that the EDC negotiate a contract with a different demolition team whose bid was $300,000 lower than FERGUSON's joint venture. KWAME KILPATRICK instructed the DEGC official to delay submitting the recommendation to the EDC board so KWAME KILPATRICK could have an official at the Building & Safety Engineering Department (who served at KWAME KILPATRICK's pleasure) review the recommendation. The DEGC official declined to delay the board's vote.

140.    On or about April 30, 2008, after the EDC board unanimously voted to award the contract to the lowest bidder, rather than the FERGUSON joint venture, a high-level official from the Mayor's Office, at KWAME KILPATRICK's direction, called the DEGC official to

-33-

warn him that he had made a bad decision, that he was not a team player, and that from now on the Mayor's Office would review all staff recommendations before they were given to the board.

141.     On or about April 30, 2008, KWAME KILPATRICK, who was upset with the DEGC official in part for not recommending that the FERGUSON joint venture receive the Tiger Stadium demolition contract, sent his Chief of Staff, Kandia Milton, to the office of the DEGC official to ask for his resignation. The DEGC official declined to resign.

### N.     Kwame Kilpatrick Attempted to Get Ferguson Demolition Work at the Book Cadillac Hotel

142.     As set forth more fully in this subsection below, from in or about the Spring of 2003 to the Spring of 2004, KWAME KILPATRICK and FERGUSON schemed together in an attempt to ensure that FERGUSON would receive a multi-million dollar subcontract to conduct the interior demolition and hazardous material abatement as part of the renovation of the Book Cadillac Hotel in Detroit, which was overseen and partly funded by departments and agencies affiliated with the City, including the Detroit Economic Growth Corporation ("DEGC") and the Downtown Development Authority ("DDA").

143.     On or about March 31, 2003, FERGUSON told KWAME KILPATRICK that the *Construction Management Firm* overseeing the renovation of the Book Cadillac wanted to subcontract with a demolition company other than FERGUSON for the interior demolition of the hotel. FERGUSON reassured KWAME KILPATRICK, however, that a City official had arranged for FERGUSON to accompany that official to an event attended by the *Construction Management Firm* to let the *Construction Management Firm* know how close FERGUSON was to the City Administration. KWAME KILPATRICK replied, "COOL!"

-34-

144.     On or about April 11, 2003, FERGUSON warned KWAME KILPATRICK that the *Construction Management Firm* still wanted to hire another subcontractor for the Book Cadillac demolition work. KWAME KILPATRICK replied, "Let's go to work" and they arranged to meet that afternoon to discuss the matter further.

145.     On or about April 17, 2003, FERGUSON advised KWAME KILPATRICK, "I NEED YOUR HELP" before a meeting on the Book Cadillac project.

146.     In or about the Spring of 2003, while attending a Detroit Red Wings game in a suite at the Joe Louis Arena in Detroit with representatives of the *Construction Management Firm*, KWAME KILPATRICK brought FERGUSON into the suite, introduced him to a *Construction Management Firm* representative, then explained that FERGUSON was his "friend" and would be "good" for the Book Cadillac project. The *Construction Management Firm* representative believed that KWAME KILPATRICK was pressuring his firm to hire FERGUSON or risk adverse consequences to the *Construction Management Firm*'s future business prospects in the City.

147.     On or about April 25, 2003, FERGUSON was awarded the Book Cadillac demolition subcontract.

148.     On or about May 7, 2003, the DDA board approved the selection of the developer for the Book Cadillac renovation.

149.     On or about January 13, 2004, FERGUSON told KWAME KILPATRICK that the developer had discontinued work on the Book Cadillac development, leaving FERGUSON with money in the project that he needed to recoup. FERGUSON stated, "Is over, . . . I have over $300,000.00 out of my pockets cash money tied up in this job." KWAME KILPATRICK

-35-

reassured FERGUSON that they would find another developer to take over the project, "Its not over! We WILL have a deal. If [the developer] doesn't do it, we have another Company that will." FERGUSON said, "Cool,i need to recope what I spent so far". KWAME KILPATRICK replied, "NO QUESTION!"

150. On or about May 17, 2004, while discussing the Book Cadillac project, FERGUSON told KWAME KILPATRICK that because of KWAME KILPATRICK, "I am famous now. just need to get some money." KWAME KILPATRICK agreed, "Lol! Right. Let's get you some [i.e., money]." FERGUSON corrected KWAME KILPATRICK, saying, "Us."

### O.    Bernard Kilpatrick Attempted to Pressure *Company J* to Hire Bernard Kilpatrick's Client to Remove Waste from the Book Cadillac Hotel

151. In about early January 2008, after BERNARD KILPATRICK learned that construction *Company J* had not hired BERNARD KILPATRICK'S client, *Company C*, to remove construction debris from the Book Cadillac Hotel renovation, BERNARD KILPATRICK made a series of telephone calls to a representative of *Company J* to pressure him to fire the waste removal company he was using and replace that company with *Company C*.

152. On about January 25, 2008, after failing to persuade *Company J* to hire *Company C*, BERNARD KILPATRICK told FERGUSON that he was going to "drop a rock on [a representative of *Company J's*] head when I find him."

153. On about February 14, 2008, a representative of *Company C* asked BERNARD KILPATRICK, "Who's like the regulatory board that could give [*Company J*] trouble? . . .

-36-

We need somebody to go in there and say, 'You know, we're gonna (expletive deleted) start writing you up for every little (expletive deleted) violation."

154. On about February 14, 2008, BERNARD KILPATRICK asked FERGUSON whether an official with the Detroit Economic Growth Corporation could "make trouble" for *Company J* at the Book Cadillac renovation project, including removing *Company J* entirely from the project. FERGUSON said he would check and get back to BERNARD KILPATRICK

155. On about February 14, 2008, BERNARD KILPATRICK told an employee of FERGUSON, "I don't like the way [*Company J* is] doin' me man," adding, "I'm gonna try to get somebody to do something to [*Company J*]."

156. On about February 21, 2008, a representative of *Company J* explained to BERNARD KILPATRICK that *Company J* could not replace the waste removal company working at the Book Cadillac Hotel with BERNARD KILPATRICK's client, *Company C*, but tried to appease BERNARD KILPATRICK by attempting to get *Company C* waste removal work at a Detroit casino and at a bank in Livonia.

### P. A City Development Official, at the Direction of Kwame Kilpatrick, Pressured *Company F* to Hire Bernard Kilpatrick for a Ford Field Development Project

157. In about the summer of 2002, KWAME KILPATRICK told a representative of *Company F* that the City would contribute about $10 million towards *Company F's* proposal to add a "House of Blues" restaurant at Ford Field.

158. On about September 3, 2002, a City development official met with representatives of *Company F* and told them they needed to hire BERNARD KILPATRICK as their minority partner. The representatives declined.

-37-

159.    In about September of 2002, after *Company F* declined to hire BERNARD KILPATRICK, KWAME KILPATRICK reversed his promise of City funding for the Ford Field project.

### Q.    Miller Directed a Theater Developer to Hire Bernard Kilpatrick For a Proposal to Purchase and Renovate Ford Auditorium

160.    In about 2003, Miller met with a *Theater Developer* who proposed purchasing and renovating the City-owned Ford Auditorium in Detroit.

161.    During the month following the meeting with Miller in 2003, the *Theater Developer* obtained artist renderings, a renovation proposal, insurance quotes and an asbestos abatement assessment for the Ford Auditorium.

162.    In about 2003, Miller met again with the *Theater Developer*, at which time Miller gave the *Theater Developer* BERNARD KILPATRICK's business card with instructions to hire BERNARD KILPATRICK to assist in the proposal. The *Theater Developer* declined, and his proposal for Ford Auditorium did not proceed further.

### R.    Kwame Kilpatrick and Ferguson Attempted to Steer to Ferguson a Share of a Contract to Renovate the Detroit Police Department Headquarters

163.    In about the fall of 2005, during a meeting to discuss a contract to renovate the Detroit Police Department's headquarters, KWAME KILPATRICK gave a representative of *Company P* the business card of an associate of FERGUSON and directed the representative to get FERGUSON's associate involved in the renovation contract.

164.    In about February 2006, during negotiations between *Company P* and FERGUSON regarding the renovation contract, FERGUSON used his relationship with

-38-

KWAME KILPATRICK in an attempt to pressure *Company P* into giving him a 40 percent share of the contract.

165.    In about April 2006, after FERGUSON refused *Company P's* offer of 30 percent of the renovation contract, *Company P* notified the City of Detroit that it no longer wanted to participate in the contract.

## II.    DEFRAUDING THE STATE OF MICHIGAN AND DONORS TO NONPROFITS OF MONIES MEANT TO HELP THE COMMUNITY OR TO FUND CAMPAIGN EXPENSES

166.    As set forth more fully in this section, below, beginning in or about 1999, and continuing until 2009, KWAME KILPATRICK, FERGUSON and BERNARD KILPATRICK, assisted by other members of the Enterprise, obtained monies from the State of Michigan, as well as from donors to nonprofit entities they controlled, including the Kilpatrick Civic Fund, Kilpatrick for Mayor and the Kilpatrick Inaugural Committee, under the false pretense that such monies would be used for purposes consistent with bettering the community or for campaign expenses when, in truth and in fact, these monies were used for personal or otherwise impermissible expenses of members of the Kilpatrick Enterprise. KWAME KILPATRICK, FERGUSON and BERNARD KILPATRICK executed their pattern of fraud, in part, by causing items to be delivered by U.S. mail or interstate carrier or by transmitting information by means of wire communication in interstate commerce. The total amount of money obtained by fraud from the State of Michigan and donors to nonprofits was over $650,000.

**A.**    **Kwame Kilpatrick and Ferguson Defrauded the State of Michigan of Over $280,000 In Grant Monies Meant to Help the Community**

167.    As set forth more fully in this subsection, below, in and between 2000 and 2002, KWAME KILPATRICK, while a member of the State House of Representatives and with the assistance of FERGUSON, committed fraud on the State of Michigan by directing over $280,000 in grant money from the State of Michigan to nonprofit entities controlled by KWAME KILPATRICK's wife and FERGUSON. The State grant money, which was supposed to help children and seniors in the Detroit area, was spent in large part by KWAME KILPATRICK or his wife on personal expenses and by FERGUSON to refurbish the offices of Ferguson Enterprises on Wyoming Avenue in Detroit.

168.    In or about 2000, KWAME KILPATRICK, using his position as Democratic Floor Leader in the Michigan House of Representatives, agreed to support a proposed budget for the State of Michigan on condition that the State Budget Office award Arts, Cultural and Quality of Life grants ("State grants"), as follows: a $500,000 grant to Detroit Three Dimensional Community Development Corporation ("Detroit 3D"), a purported non-profit entity controlled by FERGUSON; and a $300,000 grant to another Detroit-based nonprofit ("*Nonprofit V*").

169.    On or about June 22, 2000, KWAME KILPATRICK, acting as a member of the Michigan House of Representatives, sent a letter to the State Budget Office supporting the award of State grants to Detroit 3D and *Nonprofit V.*

170.    On or about June 30, 2000, KWAME KILPATRICK caused an application from Detroit 3D to be sent to the State Budget Office seeking a $500,000 State grant to help children and senior citizens. In or about August 2000, KWAME KILPATRICK asked a

-40-

representative of *Nonprofit V* to hire KWAME KILPATRICK's wife using some of the State grant funds awarded to *Nonprofit V*.

171.    On or about October 2, 2000, the State of Michigan mailed a $250,000 check to Detroit 3D and a $150,000 check to *Nonprofit V*, equaling half of their respective State grants.

172.    On or about October 12, 2000, unbeknownst to the State Budget Office or the Michigan legislature, *Nonprofit V* gave $37,500 of its State grant to a for-profit company controlled by KILPATRICK's wife called "Using Nonviolence to Influence Total Education, Inc." ("U.N.I.T.E."), for peer mediation classes for children, which services were never provided.

173.    On or about December 15, 2000, unbeknownst to the State Budget Office or the Michigan legislature, Detroit 3D gave $100,000 of its State grant to U.N.I.T.E.

174.    Between October 2000 and April 2002, most of the $137,500 in State grant money given to U.N.I.T.E. was used for personal expenses for KWAME KILPATRICK and his wife, including $91,000 in salary to his wife, which, as KWAME KILPATRICK well knew at that time, was contrary to the purpose of the grant.

175.    In or about the Spring of 2001, KWAME KILPATRICK complained to a representative of the State Budget Office that the State wanted too much detail from Detroit 3D and *Nonprofit V* about how they spent the State grant money.

176.    In or about the Spring of 2001, Miller met with a representative of the State Budget Office to help Detroit 3D and *Nonprofit V* get the second half of their State grants.

177.    In or about the Summer of 2001, FERGUSON used about $100,000 of Detroit 3D's State grant money to renovate his company offices and to repair his company's rooftop air

conditioning units, which, as FERGUSON knew at the time, was contrary to the purpose of the grant.

178.    On or about June 11, 2001, a letter signed by FERGUSON's wife was sent to the State Budget Office asking for the second half of the State grant to Detroit 3D.

179.    On or about January 15, 2002, a letter signed by FERGUSON's wife was sent to the State Budget Office claiming that Detroit 3D spent the first half of its State grant to renovate a dwelling in Detroit for displaced seniors and runaway youth, when in truth and fact, as FERGUSON knew at the time, the renovations were made at Ferguson Enterprises's facility.

**B.    Kwame Kilpatrick Defrauded Donors to Kilpatrick for Mayor, the Kilpatrick Inaugural Committee and Other Kilpatrick-Related Nonprofits by Taking Cash Kickbacks of Over $286,000 from His Fundraising Director**

180.    As set forth more fully in this subsection, below, in and between August 2003 and May 2008, KWAME KILPATRICK, assisted by a person employed to fund raise for his nonprofits (the *"Fundraiser"*), caused solicitations for donations to be sent by U.S. mail to potential donors to Kilpatrick for Mayor (KWAME KILPATRICK's campaign fund), the Kilpatrick Inaugural Committee (a fund to pay for KWAME KILPATRICK's inaugural ceremonies) and the Kilpatrick Civic Fund (KWAME KILPATRICK's social welfare nonprofit). During this same time period, KWAME KILPATRICK and the *Fundraiser* received donations to these entities by U.S. mail.  KWAME KILPATRICK and the *Fundraiser* represented to donors that their donations would be used for the purposes of these nonprofits, i.e., that the donations to Kilpatrick For Mayor would be used for KWAME KILPATRICK's mayoral campaigns, donations to the Kilpatrick Inaugural Committee would be used to pay for KWAME KILPATRICK's inaugural ceremonies and donations to the Kilpatrick Civic Fund would be used

-42-

for social welfare causes. KWAME KILPATRICK and the *Fundraiser* never told any of the donors that KWAME KILPATRICK would be taking cash kickbacks from the commissions paid to the *Fundraiser* by the nonprofit entities. The cash kickbacks taken by KWAME KILPATRICK totaled over $286,000.

181. On or about August 6, 2003, KWAME KILPATRICK told the *Fundraiser* that he wanted her to give him a portion of the commissions she received for her fund raising efforts. Thereafter, from about August 6, 2003 to about May 8, 2008, at KWAME KILPATRICK's direction, the *Fundraiser* met with KWAME KILPATRICK to give him the following amounts of cash, representing his personal "share" of her commission checks:

| Par. No. | Date | Non-Profit | Cash to Kilpatrick |
|---|---|---|---|
| 182. | 8/6/03 | Kilpatrick for Mayor | $50,000.00 |
| 183. | 12/11/03 | Kilpatrick for Mayor | $5,000.00 |
| 184. | 1/23/04 | Kilpatrick for Mayor | $7,500.00 |
| 185. | 8/26/04 | Kilpatrick for Mayor | $40,000.00 |
| 186. | 5/18/05 | Kilpatrick for Mayor | $5,000.00 |
| 187. | 8/29/05 | Kilpatrick for Mayor | $2,000.00 |
| 188. | 1/17/06 | Kilpatrick Inaugural Committee | $25,000.00 |
| 189. | 2/7/06 | Kilpatrick Inaugural Committee | $20,000.00 |
| 190. | 3/17/06 | Kilpatrick Inaugural Committee | $5,000.00 |
| 191. | 6/8/06 | Kilpatrick for Mayor | $30,000.00 |
| 192. | 5/4/07 | Kilpatrick Inaugural Committee | $20,000.00 |
| 193. | 7/6/07 | Kilpatrick Inaugural Committee | $10,000.00 |
| 194. | 9/20/07 | Kilpatrick Civic Fund | $7,000.00 |
| 195. | 12/18/07 | Kilpatrick for Mayor | $25,000.00 |

| Par. No. | Date | Non-Profit | Cash to Kilpatrick |
|----------|------|------------|--------------------|
| 196. | 12/26/07 | Kilpatrick Civic Fund | $15,000.00 |
| 197. | 4/17/08 | Kilpatrick for Mayor | $10,000.00 |
| 198. | 5/8/08 | Kilpatrick for Mayor | $10,000.00 |
| | **Total** | | **$286,500.00** |

### C. Kwame Kilpatrick, With the Assistance of Members of the Kilpatrick Enterprise, Defrauded Donors to the Kilpatrick Civic Fund by Using Civic Fund Monies for Personal and Campaign Expenses

199. Beginning in or about 1999, and continuing until at least February of 2009, as explained in further detail in Counts 18 through 30 below, which is incorporated by reference herein, KWAME KILPATRICK, assisted by other members of the Kilpatrick Enterprise, committed mail and wire fraud on donors to the Kilpatrick Civic Fund, a social welfare organization, by using donated monies for personal and political expenses. At least $159,000 in Civic Fund monies were used by KWAME KILPATRICK on personal expenses.

### III. BRIBERY AND ACQUISITION OF MONEY AND PROPERTY UNDER COLOR OF OFFICIAL RIGHT AND BY FEAR OF ECONOMIC HARM

200. As set forth more fully in this section below, during the course of the conspiracy, Enterprise members KWAME KILPATRICK, BERNARD KILPATRICK, BOBBY FERGUSON and other associates and City officials solicited and accepted payments and property from individuals seeking business with the City or its General Retirement System or Police and Fire pension funds. These items of value, which totaled more than $1.2 million, were obtained by making wrongful use of KWAME KILPATRICK's mayoral office as they were items not due to KWAME KILPATRICK or BERNARD KILPATRICK, and they knew when they received the items that they were given in return for official acts and favorable treatment by

-44-

KWAME KILPATRICK as Mayor of the City. In addition, KWAME KILPATRICK, BERNARD KILPATRICK and FERGUSON obtained and attempted to obtain money and property from these same individuals through the fear of economic harm.

### A. Kwame Kilpatrick, Bernard Kilpatrick and Miller Accepted Bribes Totaling at Least $360,000 From Cobo Contractor Karl Kado; Bernard Kilpatrick Attempted to Extort Kado

201. As set forth more fully in this subsection, below, from in or about 2001 to 2005, KWAME KILPATRICK, BERNARD KILPATRICK and Miller accepted bribes of at least $360,000 in cash from Cobo Civic Center contractor Karl Kado for favorable treatment on millions of dollars in Cobo service contracts sought or held by Kado. Moreover, in about 2008, BERNARD KILPATRICK attempted to extort Kado out of a percentage of money the City owed Kado for work performed at the City's Department of Administrative Hearings Building.

202. In and between about 2001 and 2002, KWAME KILPATRICK obtained a number of cash payments totaling at least $80,000 from Kado, knowing that, in return, Kado expected to receive favorable treatment on service contracts Kado sought or held at Cobo Hall.

203. In or about 2001, at the direction of KWAME KILPATRICK, Miller obtained $10,000 cash from Kado and delivered it to KWAME KILPATRICK.

204. In or about KWAME KILPATRICK's first term as Mayor of Detroit, at the direction of KWAME KILPATRICK, Miller on two occasions met with Kado in Kado's office in Cobo Hall and obtained between $5,000 and $10,000 in cash from Kado which Miller delivered to KWAME KILPATRICK.

205.     In or about 2001, Miller obtained $10,000 cash from Kado knowing that, in return, Kado expected to receive favorable treatment by Miller on contracts Kado sought or held at Cobo Hall.

206.     Early in the administration of Mayor Kilpatrick, Miller obtained another $10,000 cash from Kado, knowing that, in return, Kado expected to receive favorable treatment from Miller on contracts Kado sought or held at Cobo Hall.

207.     In and between about 2002 and 2005, BERNARD KILPATRICK obtained a number of cash payments totaling at least $250,000 from Kado knowing that, in return, Kado expected to receive favorable treatment from the City on contracts Kado sought or held at Cobo Hall.  The payments included a single cash payment of $100,000 in 2005.

208.     In or about April 2002, KWAME KILPATRICK and Miller agreed to assign the exclusive Cobo Hall cleaning contract to Kado's company, Metro Services Organization, Inc. ("MSO").

209.     On or about April 17, 2002, BERNARD KILPATRICK told Miller to instruct Lou Pavledes, director of the Cobo Civic Center, to award the Cobo Hall electrical contract to Kado, saying, "LAST THING (FOR TODAY) YOU HAVE TO CALL LOU [*Pavledes*] AND GIVE O.K.FOR KARL [*Kado*] TO DEAL WITH THE ELECTRICAL CONTRACT IN JUNE."

210.     On or about April 24, 2002, BERNARD KILPATRICK reminded Miller to call Pavledes to award the Cobo electrical contract to Kado, adding that Miller should do it exactly like they did it for Kado's cleaning/maintenance contract at Cobo: "ITS TIME TO CALL LOU [*Pavledes*] ON THE CARL [*Kado*] DEAL..EXACTLY LIKE THE MAINTENANCE."

-46-

211.     On or about January 25 and 28, 2003, and February 2, 2003, BERNARD KILPATRICK prodded Miller to complete the Cobo Hall electrical services contract with Kado.

212.     On or about February 5, 2003, KWAME KILPATRICK and Miller agreed to assign the exclusive electrical contract for Cobo Hall to MSO. KWAME KILPATRICK and Miller later agreed to extend MSO's electrical contract until December 20, 2006.

213.     In or about mid and late January 2004, KWAME KILPATRICK called Kado on the telephone.

214.     On or about February 4, 2004, KWAME KILPATRICK and Miller agreed to a $600,000 annual increase of MSO's cleaning contract at Cobo Hall.

215.     On or about July 18, 2005, KWAME KILPATRICK and Miller agreed to a $1.75 million increase of MSO's cleaning contract at Cobo Hall.

216.     In or about September 2005, shortly after Kado showed BERNARD KILPATRICK a letter indicating that Kado was the target of a federal investigation, BERNARD KILPATRICK told Kado that the Kilpatrick Administration was ready to give Kado ten more years of Cobo service contracts if Kado agreed to "work with" the Administration.

217.     On or about January 11, 2006, KWAME KILPATRICK and Miller agreed to extend MSO's cleaning contract at Cobo Hall until December 20, 2006.

218.     On about February 27, 2008, an official of the Building Safety & Engineering Department ("BS&E") told Kado to contact BERNARD KILPATRICK to ask KWAME KILPATRICK to order BS&E to pay Kado for refurbishing the City's Department of Administrative Hearings building.

-47-

219.    On about March 1, 2008, BERNARD KILPATRICK told Kado that if Kado paid him 10 percent of the money the City owed Kado, then BERNARD KILPATRICK would get the Mayor's Chief of Staff or Deputy Mayor to instruct BS&E to pay Kado. When Kado declined to pay BERNARD KILPATRICK, BERNARD KILPATRICK warned him that it would take Kado two years to be reimbursed by the City otherwise, saying, "You don't even wanna pay me, huh? . . . It would take you two years to go through lawyers to get your money, man."

**B.    Kwame Kilpatrick and Bernard Kilpatrick Solicited and Took Bribes of Over $500,000 From Jon Rutherford, Who Sought a Casino Development**

220.    As set forth more fully in this subsection below, KWAME KILPATRICK and BERNARD KILPATRICK solicited and took more than $500,000 in cash, non-profit donations and campaign-related payments from Jon Rutherford in return for the support of KWAME KILPATRICK, Miller and other officials in the Mayor's Office for Rutherford's riverfront casino development plan.

221.    On or about September 19 and 27, 2000, Rutherford gave checks totaling about $100,000 to an entity associated with the Michigan Democratic Party to assist KWAME KILPATRICK in becoming the Democratic leader in the State House of Representatives.

222.    In or about October 2000, Rutherford gave $23,000 to a television and radio political analyst to support KWAME KILPATRICK's mayoral campaign.

223.    On or about October 19, 2000, Rutherford gave $40,000 to the Kilpatrick Civic Fund as a way to fund KWAME KILPATRICK's mayoral campaign.

224.    On or about May 2, 2001, Rutherford gave $20,000 to the Kilpatrick Civic Fund as a way to fund KWAME KILPATRICK's mayoral campaign.

-48-

225. On or about June 6, 2001, Rutherford gave $34,000 to Next Generation Detroit, a political action committee controlled by KWAME KILPATRICK.

226. On or about July 2, 2001, Rutherford gave $30,000 to the Kilpatrick Civic Fund as a way to fund KWAME KILPATRICK's mayoral campaign.

227. On or about October 25, 2001, Rutherford gave $3,000 to Kilpatrick for Mayor.

228. Between October 26, 2001 and November 6, 2001 (election day), Rutherford provided four checks totaling $97,275 to Community Coalition to pay for costs associated with KWAME KILPATRICK's mayoral campaign.

229. On or about November 6, 2001, at the request of BERNARD KILPATRICK, Rutherford gave $20,000 to BERNARD KILPATRICK for KWAME KILPATRICK's campaign expenses, including paying poll workers.

230. In or about 2001, during KWAME KILPATRICK's campaign for mayor and after KWAME KILPATRICK was elected mayor, Rutherford told KWAME KILPATRICK about his plan to develop a casino on the Detroit river front. KWAME KILPATRICK agreed to support this plan.

231. On or about November 17, 2001, in Las Vegas, Rutherford gave KWAME and BERNARD KILPATRICK tickets worth $2,400 to a heavyweight boxing match.

232. Between about June 4, 2002 and March 7, 2003, as KWAME KILPATRICK well knew, Rutherford paid BERNARD KILPATRICK between $5,000 and $15,000 per month for purported consulting services, almost none of which BERNARD KILPATRICK actually

-49-

performed. The total amount Rutherford paid BERNARD KILPATRICK during this time period was more than $130,000.

233. In or about the Spring of 2002, in Las Vegas, KWAME KILPATRICK asked Rutherford for $5,000 cash, which Rutherford gave to him.

234. In or about May 2002, KWAME KILPATRICK asked Rutherford for $10,000 cash so that KWAME KILPATRICK would have spending money when he visited the United Arab Emirates. Rutherford provided the cash to KWAME KILPATRICK.

235. On or about October 22, 2002, at BERNARD KILPATRICK's request, Rutherford gave $5,000 to the Next Vision Foundation, a nonprofit run by KWAME KILPATRICK's sister. BERNARD KILPATRICK advised KWAME KILPATRICK of this contribution.

236. In or about 2004, Rutherford gave KWAME KILPATRICK at least $10,000 in cash, which KWAME KILPATRICK said he needed to support a plan to elect City Council members by geographic districts.

237. Between about 2002 and 2005, KWAME KILPATRICK took a number of official actions to further Rutherford's river front casino development deal, either personally or through other representatives of the KILPATRICK administration, including attending meetings with architects, casino executives and members of the Detroit City Council and the Detroit/Wayne County Port Authority, at which KILPATRICK or other mayoral representatives discussed the logistics of Rutherford's river front casino plan and expressed that the Mayor's Office supported the plan.

-50-

**C. Kwame Kilpatrick and Bernard Kilpatrick Solicited and Took Money, Private Jet Flights and Entertainment Expenses Worth at least $100,000 from James Rosendall; Bernard Kilpatrick Attempted to Extort $5,000 from Rosendall**

238. As set forth more fully in this subsection below, from about 2001 to about 2008, KWAME KILPATRICK and BERNARD KILPATRICK solicited and took money, private jet flights, entertainment expenses and donations to KWAME KILPATRICK's non-profits and political entities worth more than $100,000 from James Rosendall, an executive of *Company S*, in exchange for the support of KWAME KILPATRICK and other members of the Mayor's Office for a $47 million per year sewage sludge disposal contract (the "sludge contract"). In about 2008, BERNARD KILPATRICK attempted to extort $5,000 from Rosendall by threatening to "kill" the sludge contract if he was not paid.

239. In or about mid-2001, in a house near the State Capital in Lansing, Rosendall told KWAME KILPATRICK that *Company S* wanted to take over the contract the City had entered with another company to handle its wastewater sludge, then gave KWAME KILPATRICK and an aide three bundled campaign checks totaling more than $10,000 for KWAME KILPATRICK's campaign for Mayor.

240. In about late 2002, KWAME KILPATRICK met Rosendall in a hotel suite in Grand Rapids, Michigan and instructed Rosendall to work with KILPATRICK's aide, Miller, on the sludge contract.

241. In or about March 2003, *Company S* submitted a proposal to DWSD to revise an existing waste disposal and hauling contract between DWSD and another company with the intent that *Company S* would take over the sludge contract.

-51-

242. In or about early 2003, at a fund raiser at the Manoogian Mansion, KWAME KILPATRICK introduced Rosendall to BERNARD KILPATRICK, telling Rosendall he wanted Rosendall to work with BERNARD KILPATRICK on the sludge contract. Rosendall understood this to mean that KWAME KILPATRICK wanted Rosendall to hire BERNARD KILPATRICK.

243. In or about early 2003, shortly after the fund raiser at the Manoogian Mansion, BERNARD KILPATRICK introduced Rosendall to Rayford Jackson, explaining that Jackson would be Rosendall's point of contact in the sludge deal. Thereafter, BERNARD KILPATRICK spent little time helping to obtain the approval of the DWSD or the Detroit City Council for the sludge contract, although he periodically would ask Rosendall for money, including requests for "loans," totaling at least $25,000, which were never repaid.

244. From about 2003 to 2007, acting on the instructions of KWAME KILPATRICK, City officials including Kandia Milton lobbied the DWSD and the Detroit City Council to support the sludge contract. This included resolving financial, liability, environmental and regulatory issues.

245. In or about 2003 or 2004, MERCADO declined to open the sludge contract to competitive bidding despite a request to do so by DWSD staff involved in the negotiation of the contract.

246. In or about the Fall of 2003, Rosendall chartered a private jet costing more than $19,000 to take KWAME KILPATRICK, Miller and several of their associates to Las Vegas over the weekend of September 12, 2003. Rosendall spent more than $2,000 entertaining the group while in Las Vegas. Neither KILPATRICK, Miller, nor their associates reimbursed Rosendall for the flight or the other expenses.

-52-

247.     In or about the Spring of 2004, Rosendall chartered a private jet costing more than $15,000 to take Miller and several of his associates to Las Vegas over the weekend of April 2, 2004.  Rosendall spent more than $4,000 for food, lodging and entertainment for the group while in Las Vegas.  Neither Miller nor his associates reimbursed Rosendall for the flight or the other expenses.

248.     On or about October 31, 2005, Rosendall wrote a check for $7,500 to the Kilpatrick Civic Fund.

249.     On or about November 11, 2005, Rosendall wrote a check for $10,000 to Generations PAC, KWAME KILPATRICK's political action committee.

250.     On or about January 3, 2006, Rosendall wrote a check for $5,000 to the Kilpatrick Inaugural Committee.

251.     On or about February 13, 2006, at BERNARD KILPATRICK's request, Rosendall gave BERNARD KILPATRICK $5,000 as a purported loan, which was never repaid.

252.     On or about August 18, 2006, at BERNARD KILPATRICK's request, Rosendall gave BERNARD KILPATRICK a $5,000 check, labeled as a loan, which was never repaid.

253.     In or about 2006, BERNARD KILPATRICK advised Rosendall that BERNARD KILPATRICK had an agreement with Rayford Jackson giving BERNARD KILPATRICK 50% of all proceeds Jackson received from the sludge contract, totaling about $1 million over three years.

254.     In or about 2006, BERNARD KILPATRICK introduced Rosendall to BERNARD KILPATRICK's girlfriend, saying she would be in charge of recruiting and hiring

-53-

minority contractors to help build and operate the sludge processing facility. BERNARD KILPATRICK instructed Rosendall that his girlfriend, rather than BERNARD KILPATRICK, should be named in any *Company S* contracts involving BERNARD KILPATRICK to conceal BERNARD KILPATRICK's role.

255.    On or about May 19, 2007, Rosendall wrote a check for $3,400 to Kilpatrick for Mayor.

256.    In or about June 2007, Rosendall chartered a private plane to return KWAME KILPATRICK and BERNARD KILPATRICK to Detroit from Mackinac Island. Rosendall was not reimbursed for the flight.

257.    In or about June 2007, DWSD approved the contract with *Company S*.

258.    On or about September 26, 2007, BERNARD KILPATRICK told Kandia Milton that he would see if he could make it MERCADO's "urgency" to complete the sludge deal.

259.    On or about November 27, 2007, KWAME KILPATRICK signed a resolution approving the sludge contract, valued at about $47 million per year, with a 25-year term.

260.    On or about December 4, 2007, BERNARD KILPATRICK and his girlfriend met Rosendall at a restaurant in Birmingham, at which time BERNARD KILPATRICK explained that he had an unwritten agreement with Rayford Jackson that any profits Jackson derived from the sludge contract would be split as follows: 45% to BERNARD KILPATRICK, 45% to Jackson and 10% to BERNARD KILPATRICK's girlfriend, with the payment to BERNARD KILPATRICK structured through his girlfriend to conceal BERNARD KILPATRICK's interest.

-54-

261.    On or about December 20, 2007, in a parking lot in Detroit, BERNARD KILPATRICK attempted to extort Rosendall, threatening him that "we" would "kill" the sludge contract if BERNARD KILPATRICK was not compensated to his satisfaction. Rosendall gave BERNARD KILPATRICK about $300 in cash, hidden in a pack of chewing gum, in an effort to temporarily pacify him.

262.    On or about March 5, 2008, outside BERNARD KILPATRICK's residence in Detroit, BERNARD KILPATRICK held up five fingers, indicating he wanted Rosendall to give him $5,000. Later that day, BERNARD KILPATRICK took $2,500 in cash from Rosendall, saying he was "the one guy that made [*the sludge contract*] happen" and confirming that if he had not been paid, he would have told KWAME KILPATRICK, "Do what you can to stop it [*the sludge contract*] for a year. Stop it for two years."

263.    On or about April 16, 2008, in a restaurant parking lot in Southfield, BERNARD KILPATRICK took $2,500 in cash from Rosendall in connection with the sludge contract.

### D.    Kwame Kilpatrick Solicited and Took Private Jet Flights Worth Over $300,000 From a Representative of *Company I*

264.    As set forth more fully in this subsection, below, from about August 2003 to January 2008, KWAME KILPATRICK requested the use of the private jets of a representative of *Company I* on at least eighteen occasions for the personal use of KWAME KILPATRICK and his friends and family, including BOBBY FERGUSON and BERNARD KILPATRICK, without reimbursing the representative. The representative provided this free private jet service, worth

-55-

over $260,000, in part so KWAME KILPATRICK and the Mayor's Office would not harm the representative's business interests in the City, including *Company I*.

265. In or about 2006, after KWAME KILPATRICK had used the private jets a number of times, the representative of *Company I* asked KILPATRICK if he thought he should start paying for some of the flights because "it did not look good" for the representative to provide the flights for free. KILPATRICK said he would see about it but never otherwise responded to the representative of *Company I*.

266. In or about 2006, one of the representative's employees suggested to a high-level member of the Mayor's administration that they consider setting up a nonprofit entity which could receive donations to pay for KWAME KILPATRICK's flights. The City official said they were not interested in doing this.

267. The representative of *Company I* continued to pay for KWAME KILPATRICK's flights in part because he knew KWAME KILPATRICK could adversely impact his businesses in the City if he refused. The flights, having a fair market value to KWAME KILPATRICK of more than $260,000 and an added variable cost to the representative of more than $120,000, were as follows:

| Par. No. | Date(s) | Destination(s) | Flights | Passen-gers | Added Cost to Owner | Fair Market Value |
|---|---|---|---|---|---|---|
| 268. | 2/25/04 to 2/28/04 | Washington, D.C. | 2 | 4 | $4,473.59 | $7,750.00 |
| 269. | 4/12/04 to 4/16/04 | Orlando | 2 | 8 | $8,947.19 | $11,760.00 |

| Par. No. | Date(s) | Destination(s) | Flights | Passengers | Added Cost to Owner | Fair Market Value |
|----------|---------|----------------|---------|------------|---------------------|-------------------|
| 270. | 7/24/04 to 7/25/04 | East Hamptons Boston | 2 | 3 | $3,890.08 | $10,466.00 |
| 271. | 10/15/04 to 10/16/04 | Houston | 2 | 6 | $10,114.20 | $14,659.00 |
| 272. | 5/19/05 | Cleveland | 2 | 9 | $1,167.02 | $2,025.00 |
| 273. | 5/27/05 to 5/28/05 | Greensboro, NC | 2 | 1 | $4,279.08 | $6,160.00 |
| 274. | 7/7/06 to 7/8/06 | Houston | 2 | 2 | $9,919.70 | $16,919.00 |
| 275. | 8/2/06 to 8/6/06 | Bermuda | 3 | 9 | $11,281.23 | $20,382.00 |
| 276. | 10/27/06 to 10/28/06 | Tallahassee | 2 | 3 | $7,974.66 | $10,480.00 |
| 277. | 4/12/07 | Naples, FL to Detroit | 1 | 5 | $4,668.10 | $13,765.00 |
| 278. | 5/1/07 | Tallahassee | 2 | 7 | $7,196.65 | $10,360.00 |
| 279. | 5/27/07 to 5/29/07 | Tallahassee | 2 | 7 | $7,391.15 | $20,625.00 |
| 280. | 6/13/07 to 6/14/07 | Tallahassee | 2 | 3 | $7,196.65 | $10,360.00 |
| 281. | 6/30/07 to 8/14/07 | Tallahassee | 2 | 7 | $7,196.65 | $22,240.00 |
| 282. | 9/16/07 to 9/17/07 | Tallahassee | 2 | 3 | $7,391.15 | $20,720.00 |

| Par. No. | Date(s) | Destination(s) | Flights | Passengers | Added Cost to Owner | Fair Market Value |
|---|---|---|---|---|---|---|
| 283. | 11/2/07 to 11/5/07 | Tallahassee Miami | 3 | 6 | $10,308.71 | $26,880.00 |
| 284. | 12/27/07 | Tallahassee | 1 | 5 | $3,890.08 | $10,360.00 |
| 285. | 1/23/08 to 1/27/08 | Tallahassee | 2 | 5 | $7,585.66 | $28,582.00 |
| | Totals | | | | $124,871.55 | $264,493.00 |

**E.    Kwame Kilpatrick Obtained More than $75,000 in Free Private Jet Flights and Entertainment From A Representative of *Company M* And Attempted to Extort a $100,000 Donation to the Kilpatrick Civic Fund**

286.    As set forth more fully in this subsection, below, in or between 2006 and 2007, KWAME KILPATRICK and others acting on his behalf obtained free private jet service and entertainment expenses worth more than $74,000 from *Company M*. In addition, KWAME KILPATRICK and others acting on his behalf attempted to extort from *Company M* a $100,000 payment to the Kilpatrick Civic Fund by exploiting *Company M*'s fear that if it did not do so, KWAME KILPATRICK and his *ex officio* representatives and allies on the City of Detroit Police and Fire ("P&F") pension fund and the City of Detroit General Retirement System ("GRS") would financially harm *Company M*'s business managing over $150 million in properties owned by the P&F and a $10 million GRS investment.

287.    In or about 2006, at the direction of KWAME KILPATRICK, two upper-level officials in the Mayor's Office, including one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, told a representative of *Company M* that KWAME

-58-

KILPATRICK was upset with the representative for supporting KWAME KILPATRICK's opponent in the November 2005 election for mayor.

288.    In or about April 2007, in an attempt to reconcile with KWAME KILPATRICK, *Company M*, at the request of one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, permitted KWAME KILPATRICK and five of his associates to fly on a private jet *Company M* chartered to Las Vegas over the weekend of April 13, 2007, for a golfing trip. *Company M* paid for greens fees, lodging, meals, limousine service, concert tickets and massages for KWAME KILPATRICK and his group at a cost of more than $16,000, which was never reimbursed.

289.    In or about mid-July 2007, *Company M*, at the request of one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, chartered a private plane for KWAME KILPATRICK at a cost of more than $24,000 so KWAME KILPATRICK could go on a trip to Tallahassee, Florida over the weekend of July 20, 2007. No one from *Company M* went on this trip nor was *Company M* reimbursed by KWAME KILPATRICK.

290.    In or about mid-September 2007, *Company M*, at the request of one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, chartered a private plane for KWAME KILPATRICK at a cost of more than $34,000 so KWAME KILPATRICK could fly to Bermuda over the weekend of October 4, 2007 with KWAME KILPATRICK's wife, BERNARD KILPATRICK and BERNARD KILPATRICK's companion. No one from *Company M* went on this trip nor was *Company M* reimbursed by KWAME KILPATRICK.

291. In about 2008, one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds told a representative of *Company M* that *Company M* had to "step up" by making a $100,000 donation to the Kilpatrick Civic Fund. The representative of *Company M* declined, telling KWAME KILPATRICK's representative, "do what you have to do."

### F. Kwame Kilpatrick Accepted Cash Kickbacks in Connection with the Lease and Sale of City Properties

292. In about the Fall of 2003, after learning that his Chief Administrative Officer, Derrick Miller, would financially benefit from a City contract to manage the City's real estate, KWAME KILPATRICK approved a contract with a *Real Estate Company*.

293. Between about October 2003 to 2007, Miller and KWAME KILPATRICK split cash kickbacks from a consultant to the *Real Estate Company,* totaling about $115,000, which were funded from commissions the consultant received for property transactions for the City.

### G. Kwame Kilpatrick Directed Miller to Obtain Money from a Restaurant Developer Who was Seeking a Loan From City Pension Funds

294. In about the fall of 2007, KWAME KILPATRICK asked Miller to try to obtain money from a *Restaurant Developer* who was seeking a loan from the City's pension funds for the Asian Village restaurant development.

295. In about the fall of 2007, Miller obtained $10,000 cash from the *Restaurant Developer*, which Miller gave to KWAME KILPATRICK in a restroom in the developer's Detroit restaurant.

**H.    Kwame Kilpatrick Directed Marc Andre Cunningham to Pay Bernard Kilpatrick Part of Cunningham's Commission for Pension Fund Investments**

296.    As set forth more fully in this subsection, below, in or between about 2006 and 2007, at the direction of KWAME KILPATRICK, the Mayor's executive assistant, Marc Andre Cunningham, paid BERNARD KILPATRICK at least $15,000 of Cunningham's commission on a pension fund consulting deal, in return for KWAME KILPATRICK's support of investments by the City of Detroit's General Retirement System ("GRS") and Police and Fire ("P&F") pension funds to a firm Cunningham represented.

297.    In or about the Summer of 2006, at a restaurant in Detroit, KWAME KILPATRICK, through one of his high-level aides, directed Cunningham to pay BERNARD KILPATRICK a portion of the commissions Cunningham received from a venture capital firm ("the Firm") for Cunningham's assistance obtaining a $30 million investment from the GRS and the P&F pension funds. KWAME KILPATRICK was present when Cunningham was told to make these payments.

298.    On or about October 4, 2006, at the direction of KWAME KILPATRICK, Cunningham met with BERNARD KILPATRICK at the Coleman A. Young Municipal Center and provided BERNARD KILPATRICK at least $4,000 in cash. It was understood between Cunningham and KWAME KILPATRICK that this and future payments were to be made to BERNARD KILPATRICK to reward KWAME KILPATRICK for his support of the GRS and P&F investments and to obtain favorable treatment by KWAME KILPATRICK in any future business that might arise between Cunningham and the City of Detroit.

-61-

299.    On or about January 29, 2007, at the direction of KWAME KILPATRICK, Cunningham met with BERNARD KILPATRICK at the Coleman A. Young Municipal Center and provided BERNARD KILPATRICK at least $4,000 in cash.

300.    On or about June 27, 2007, at the direction of KWAME KILPATRICK, Cunningham met with BERNARD KILPATRICK at the Coleman A. Young Municipal Center and provided BERNARD KILPATRICK at least $4,000 in cash.

301.    Between about October 2006 and June 2007, KWAME KILPATRICK asked Cunningham when he was going to be paid his commission, as a way to remind Cunningham to pay BERNARD KILPATRICK when he received the commission payment.

302.    In or about the Fall of 2007, following a media report of an FBI undercover corruption investigation that implicated Cunningham, KWAME KILPATRICK told Cunningham to stop paying BERNARD KILPATRICK.

## I.    Ferguson Directed Owner of *Company E* to Pay Bernard Kilpatrick $40,000

303.    In or about January 2005, FERGUSON directed the owner of *Company E* to pay BERNARD KILPATRICK $40,000 so *Company E* could obtain business with the City.

304.    On or about January 21, 2005, the owner of *Company E* paid BERNARD KILPATRICK $40,000.

305.    Following the payment, BERNARD KILPATRICK did not help *Company E* obtain any City business.

### J. Ferguson and Kwame Kilpatrick Obtained More than $90,000 from a *Towing Contractor*

306.     As Mayor of Detroit, KWAME KILPATRICK had responsibility over the Detroit Police Department and its towing contracts, including towing contracts belonging to the *Towing Contractor*.

307.     In or about February 2003, at the direction of members of the Kilpatrick Enterprise, an associate of KWAME KILPATRICK obtained about $9,000 cash from the *Towing Contractor*.

308.     In or about July 2004, the *Towing Contractor* gave $25,000 to a Political Action Committee ("PAC"), with instructions that the PAC give the money to KWAME KILPATRICK's campaign; the PAC gave the *Towing Contractor's* $25,000 to KILPATRICK's campaign that same month.

309.     In or about 2005, FERGUSON directed the *Towing Contractor* to give $9,500 cash to FERGUSON; the *Towing Contractor* complied in order to prevent FERGUSON from using his influence with KWAME KILPATRICK to adversely affect the *Towing Contractor's* business with the Detroit Police Department.

310.     On or about May 25, 2005, KWAME KILPATRICK directed a high level member of the Detroit Police Department to meet with the *Towing Contractor* to review the *Towing Contractor's* proposal to manage all the towing for the Police Department.

311.     In or about October 2005, KWAME KILPATRICK, through his subordinates, directed high level members of the Detroit Police Department to add several of the *Towing*

*Contractor's* companies to Police Department tow lists, resulting in increased business for the *Towing Contractor*.

312.    In about May 2008, FERGUSON directed the *Towing Contractor* to give him $100,000; the *Towing Contractor,* fearing that FERGUSON might use his influence with KWAME KILPATRICK to adversely affect the *Towing Contractor's* business with the Detroit Police Department, gave FERGUSON $50,000 in about June 2008, which FERGUSON shared with KWAME KILPATRICK.

## IV.    WITNESS TAMPERING, WITNESS INTIMIDATION, PERJURY, AND OBSTRUCTION OF JUSTICE

313.    As set forth more fully in this subsection, between about 2001 and 2006, BOBBY FERGUSON, VICTOR MERCADO and other members of the Kilpatrick Enterprise promoted and preserved the Kilpatrick Enterprise and its objectives by tampering with and intimidating witnesses, committing perjury and obstructing justice in both state and federal proceedings.

### A.    Ferguson, Assisted by Members of Kwame Kilpatrick's Executive Projection Unit, Intimidated a Detroit Police Officer into Dropping Illegal Dumping Charges Against Ferguson Enterprises

314.    In about September and October of 2001, *Officer A*, a 10th Precinct Detroit Police Officer assigned to enforce environmental compliance by commercial businesses, issued citations to BOBBY FERGUSON for environmental ordinance violations, including illegally dumping waste on property owned by the City of Detroit.

315.    On or about November 26, 2001, *Officer A* attended BOBBY FERGUSON's arraignment on the ordinance violations at 36th District Court. FERGUSON asked *Officer A* if he

-64-

knew who FERGUSON was, then questioned whether *Officer A* still wanted to proceed with the prosecution of the ordinance violations. *Officer A* indicated that he intended to proceed and the case was set for trial.

316. On about February 5, 2002, following KWAME KILPATRICK's inauguration as Mayor, FERGUSON appeared in 36th District Court for trial on the ordinance violations accompanied by two Detroit Police Officers assigned to KWAME KILPATRICK's Executive Protection Unit ("EPU"). FERGUSON and one of the EPU officers approached *Officer A* in the hallway outside the courtroom and the EPU Officer told *Officer A* that it would be in the best interest of *Officer A* and everyone concerned if *Officer A* dropped the prosecution of the ordinance violations. Shortly thereafter, *Officer A*, fearing for the safety of his family, caused the ordinance violations against Ferguson Enterprises to be dismissed.

**B.  Ferguson Attempted to Cause "Straw Donors" to Lie to Federal Investigators and a Federal Grand Jury**

317. From about June to July 2005, FERGUSON and his associates instructed some of the "straw donors" identified in paragraph 314, below, whom FERGUSON had used to give $40,000 to the Kilpatrick for Mayor campaign ("Kilpatrick for Mayor") in violation of state law, to lie to federal investigators and a federal grand jury about the fact that FERGUSON had funded their donations to Kilpatrick for Mayor, including the following:

a. In about June 2005, FERGUSON told *Straw Donor A* to tell FBI agents that she had paid for the money orders she signed for Kilpatrick for Mayor, when in truth and fact, as they both well knew, FERGUSON had funded the donations. After *Straw Donor A* reported back to FERGUSON that she had told the FBI agents that she paid for

-65-

the money orders, FERGUSON told her to stick to that story because otherwise they both could go to jail. FERGUSON further instructed *Straw Donor A* to tell one of her family members, who also made a straw donation to Kilpatrick for Mayor, to claim that the family member had paid for her donation, when in truth and fact, as they both well knew, FERGUSON had funded it.

b.      In about July 2005, shortly before *Straw Donor B* was to testify before a federal grand jury, FERGUSON showed up unannounced at her house and instructed her to deny to the grand jury that the money orders she signed for Kilpatrick for Mayor came from FERGUSON, when in truth and fact, as they both well knew, FERGUSON paid for the money orders. FERGUSON warned *Straw Donor B* that if she told the grand jury that FERGUSON had paid for the money orders, she would get one of her family members in trouble.

c.      In about June 2005, an associate of FERGUSON told *Straw Donor C* to tell investigators that he paid for his money order to Kilpatrick for Mayor, when in truth and fact as they both well knew, FERGUSON paid for the donation.

## C.      Victor Mercado Committed Perjury in an Investigation of the Awarding of a DWSD Security Contract Authorized by a Federal Judge

318.      On about February 10, 2006, MERCADO testified at a deposition authorized by a federal judge investigating the appropriateness of the award of a DWSD security contract to FERGUSON's team, given FERGUSON's purported relationship to Mayor KWAME KILPATRICK and the fact that FERGUSON's team's bid was higher. MERCADO falsely testified that the security contract was completed on time and on budget without extras or

-66-

change orders. When asked whether he had any conversations with FERGUSON, MERCADO testified, "Absolutely not. I don't talk to bidders when they're bidding." MERCADO further denied having any contact with members of the Mayor's Office during the negotiations over the security contract. As MERCADO well knew at that time, however, the security contract would require more time and money before it was completed. In order to obscure any additional security system costs, MERCADO, in the weeks leading up to his deposition, authorized that additional security system work at DWSD facilities be funded out of an unrelated pump station contract, rather than the security contract. Moreover, contrary to his deposition testimony, MERCADO had a number of meetings and conversations with FERGUSON and Miller at critical stages during DWSD's evaluation of the security contract, including with Miller on January 13, 2004 and with FERGUSON on February 11, 2004.

## V.    PROCEEDS FROM THE RACKETEERING ACTIVITY

### A.    Ferguson Shared Proceeds of the
###    Racketeering Activity With Kwame Kilpatrick

319.    In or about early July 2003, FERGUSON gave KWAME KILPATRICK about $7,000 in cash. In or about late July 2003, FERGUSON collected more than $200,000 in campaign donations for KWAME KILPATRICK's campaign fund, with KWAME KILPATRICK's knowledge, although FERGUSON was not among the identified donors.

320.    In or about late May 2004, FERGUSON gave KWAME KILPATRICK at least $12,500 in cash on consecutive dates, consisting of at least $8,500 cash on one day and at least $4,000 cash the next day.

-67-

321.    In or about mid July 2004, in violation of State campaign finance laws, FERGUSON caused the purchase of more than $40,000 in money orders using funds from Ferguson Enterprises, which were then given to employees, friends, relatives and associates of FERGUSON to sign and endorse to Kilpatrick for Mayor in order to conceal that FERGUSON and his company were the true source of the donations.

322.    In or about late March 2008, FERGUSON gave $75,000 to the Kilpatrick Civic Fund.

323.    In or about the Summer of 2008, FERGUSON went to *Courier A*'s room at the Athenium Hotel in Detroit and gave him a bag containing $90,000 in cash with instructions to hold the money for KWAME KILPATRICK.  At KWAME KILPATRICK's direction, *Courier A* delivered the cash to KWAME KILPATRICK in two installments, giving him $50,000 cash at the Hilton Hotel in Southlake, Texas in or about mid-September 2008, and $40,000 cash at the Park Shelton Apartments in Detroit in or about late October 2008.

**B.    Kwame Kilpatrick Used Cash Proceeds from the Racketeering Activity**

324.    In or about the following years, KWAME KILPATRICK used the following amounts of cash, derived from the racketeering activity, to make deposits into his bank accounts, pay his credit card and other bills, purchase cashier's checks and clothing and repay loans:

| Par. No. | Year | Type of Cash Transactions | Total Cash Amount |
|----------|------|---------------------------|-------------------|
| 325. | 2002 | cash bank deposits and cash payments for credit card and clothing | $29,314.00 |
| 326. | 2003 | cash bank deposits and cash payments for credit card and clothing | $80,070.00 |

-68-

| Par. No. | Year | Type of Cash Transactions | Total Cash Amount |
|---|---|---|---|
| 327. | 2004 | cash bank deposits and cash payments for credit card and clothing | $68,548.00 |
| 328. | 2005 | cash bank deposits, cash payments for credit card and clothing, cash purchases of cashier's checks | $80,200.00 |
| 329. | 2006 | cash bank deposits and cash payments for credit card and clothing | $92,474.00 |
| 330. | 2007 | cash bank deposits, cash payments for credit card and clothing, cash purchase of cashier's check | $105,961.00 |
| 331. | 2008 | cash bank deposits, cash payments for credit card, clothing and crisis manager, cash purchases of cashier's checks, cash loan repayments | $124,379.00 |
| 332. | 2009 | cash payments on credit card and cash loan repayments | $13,913.00 |
| | Total | | $594,859.00 |

## C.    Bernard Kilpatrick Used Cash Proceeds From the Racketeering Activity

333.    In or about the following years, BERNARD KILPATRICK deposited the following amounts of cash from the racketeering activity into his personal bank accounts:

| Par. No. | Year | Type of Cash Transactions | Yearly Total Amount of Cash Deposits |
|---|---|---|---|
| 334. | 2002 | cash bank deposits | $122,810.00 |
| 335. | 2003 | cash bank deposits | $134,240.00 |
| 336. | 2004 | cash bank deposits | $123,700.00 |

| Par. No. | Year | Type of Cash Transactions | Yearly Total Amount of Cash Deposits |
|---|---|---|---|
| 337. | 2005 | cash bank deposits | $88,300.00 |
| 338. | 2006 | cash bank deposits | $59,905.00 |
| 339. | 2007 | cash bank deposits | $50,200.00 |
| 340. | 2008 | cash bank deposits | $23,900.00 |
| | Total | | $603,055.00 |

**All in violation of Title 18, United States Code, Section 1962(d).**

## COUNT TWO
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Sewer Lining Contract)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**
**D-3    BERNARD N. KILPATRICK**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about April 2002 to November 2006, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, and BERNARD N. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from *Company I* consisting of contract revenues of more than $23.7 million, with the consent of *Company I* induced by wrongful fear of economic harm and under color of official right. That is, KWAME KILPATRICK, aided and abetted by FERGUSON and BERNARD KILPATRICK, held up a $50 million sewer lining contract that previously had been awarded to *Company I* until the company

-70-

agreed to replace its minority subcontractor with FERGUSON on terms acceptable to

FERGUSON.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT THREE**
(18 U.S.C. § 1951 – Interference with Commerce by Extortion
Amendment to Sewer Lining Contract)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General

Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in and between September 2004 and December 23, 2005, in the Eastern

District of Michigan, defendants KWAME M. KILPATRICK and BOBBY W. FERGUSON,

aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate

commerce through extortion, in that they obtained payments from *Company I* of about $175,000

in connection with an amendment to a sewer lining contract, with the consent of *Company I*

induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT FOUR**
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Baby Creek/Patton Park)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**
**D-4    VICTOR M. MERCADO**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General

Allegations" above, as well as Count One above, as if they were set forth in full herein.

-71-

2.    From in and between February 2003 and 2008, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, and VICTOR M. MERCADO, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained from *Company W* more than $5 million in work for FERGUSON and his affiliated companies at Baby Creek and Patton Park, with the consent of *Company W* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

### COUNT FIVE
(18 U.S.C. § 1951 – Attempted Interference with Commerce by Extortion
Oakwood Pump Station)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**
**D-4    VICTOR M. MERCADO**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about January 2007 to about April 2007, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON and VICTOR M. MERCADO, aiding and abetting each other, did knowingly and unlawfully attempt to obstruct, delay and affect interstate commerce through extortion, in that defendants KWAME KILPATRICK, FERGUSON and MERCADO pressured *Company W* to consent to partner with FERGUSON in a $140 million construction project at the Oakwood pump station, and attempted to induce that consent by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

-72-

## COUNT SIX
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds
Downtown Water Main Repairs)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    In or between about 2003 and 2007, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during each of the calendar years of 2003 through 2007, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept a stream of gratuities totaling more than $5,000 from defendant BOBBY W. FERGUSON, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit.  That is, in exchange for items of value from FERGUSON, KWAME KILPATRICK, with the assistance of other City officials, steered subcontracts and emergency task orders to FERGUSON in connection with a $19.8 million downtown water main replacement contract administered by *Company D*. Following their intervention into the contracting process, including giving FERGUSON downtown work originally assigned to the lowest bidder, FERGUSON, from the start of the contract through the Spring of 2007, obtained more than $4 million in work on the downtown water main project.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

-73-

## COUNT SEVEN
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Outfalls Contract)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about the Summer of 2005 to about the Summer of 2007, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from *Company L* and *Company A* of more than $1.7 million from a sewer outfalls contract for no services rendered, with the consent of *Company L* and *Company A* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

## COUNT EIGHT
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Asbestos Abatement)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about October 2005 to about February 2007 in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce

-74-

through extortion, in that they obtained payments from *Company L* of about $75,000 in relation to an asbestos contract for no services rendered, with the consent of *Company L* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT NINE**
(18 U.S.C. § 1951 – Interference with Commerce by Extortion
Repair of Eastside Water Mains)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about the Spring of 2006 to about August 2008, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that FERGUSON and his affiliated company, Xcel Construction Services, obtained payments and subcontracts from *Company L* and *Company A* worth more than $12.9 million from a contract to repair water mains on the east side of the City, with the consent of *Company L* and *Company A* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

-75-

## COUNT TEN
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Eastside Sewer Repairs)

**D-1   KWAME M. KILPATRICK**
**D-2   BOBBY W. FERGUSON**

1.     The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.     From in or about the Summer of 2006 to about 2008, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained more than $5 million in earthwork and point repair work from *Company L* and *Company A* arising out of a sewer repair contract for the east side of the City, with the consent of *Company L* and *Company A* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

## COUNT ELEVEN
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Westside Sewer Repairs)

**D-1   KWAME M. KILPATRICK**
**D-2   BOBBY W. FERGUSON**

1.     The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.     From in or about June 2006 to about 2008, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through

-76-

extortion, in that FERGUSON obtained more than $5 million in sewer repair work on the

westside of the City from *Company I*, with the consent of *Company I* induced by wrongful fear of

economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT TWELVE**
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Towing Contractor)

**D-1     KWAME M. KILPATRICK**
**D-2     BOBBY W. FERGUSON**

      1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General

Allegations" above, as well as Count One above, as if they were set forth in full herein.

      2.    From about February 2003 until about June 2008, in the Eastern District of

Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and

abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce

through extortion, in that FERGUSON and KILPATRICK obtained more than $90,000 from a

*Towing Contractor*, with the consent of the *Towing Contractor* induced by wrongful fear of

economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT THIRTEEN**
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds
Security Systems Contract)

**D-1     KWAME M. KILPATRICK**
**D-2     BOBBY W. FERGUSON**

      1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General

Allegations" above, as well as Count One above, as if they were set forth in full herein.

-77-

2.     In or between about 2003 and 2008, in the Eastern District of Michigan,

defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that

received more than $10,000 in federal funding during each of the calendar years of 2003 to 2008,

did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept

a stream of gratuities totaling more than $5,000 from defendant BOBBY W. FERGUSON,

intending to be influenced and rewarded in connection with business and transactions of a value

of $5,000 or more with the City of Detroit.  That is, in exchange for items of value from

FERGUSON, KWAME KILPATRICK, with the assistance of other City officials, rigged the

evaluation and award of a contract to upgrade security systems at various DWSD facilities

("security contract") so FERGUSON's team would win the contract.  From the start of the work

to about June 2008, FERGUSON obtained more than $1.2 million of work on the security

contract.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

## COUNT FOURTEEN
(18 U.S.C. § 1512(c) – Obstruction of Justice – Mercado Deposition)

## D-4     VICTOR M. MERCADO

1.     The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General

Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.     In or about January and February 2006, in the Eastern District of Michigan,

defendant VICTOR M. MERCADO did corruptly obstruct, influence and impede an official

proceeding, that is an investigation authorized by a federal judge into the appropriateness of the

award of a security contract by the Detroit Water and Sewerage Department.  In particular, on or

-78-

about February 10, 2006, during a deposition authorized by a federal judge investigating the appropriateness of a security contract awarded to a team including defendant BOBBY W. FERGUSON, MERCADO testified that the contract was completed on time and on budget without extras or change orders. When asked whether he had any conversations with FERGUSON, MERCADO testified, "Absolutely not. I don't talk to bidders when they're bidding." MERCADO further denied having any contact with members of the Mayor's Office regarding the negotiations over the security contract. In truth and in fact, as MERCADO well knew at that time, the contract would require more time and money before it was completed. In order to obscure any additional security system costs, MERCADO, in the weeks leading up to his deposition, authorized that additional security system work at DWSD facilities be funded out of an unrelated pump station contract, rather than the security contract. Moreover, MERCADO, as he well knew and contrary to his deposition testimony, had a number of meetings and conversations with FERGUSON and Miller at critical stages during DWSD's evaluation of the security contract, including with Miller on January 13, 2004 and with FERGUSON on February 11, 2004.

**All in violation of Title 18, United States Code, Sections 1512(c).**

### COUNT FIFTEEN
(18 U.S.C. § 1951 – Attempted Interference with Commerce by Extortion – Sludge Contract)

**D-3    BERNARD N. KILPATRICK**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

-79-

2.     From in or about December 20, 2007 to about April 18, 2008, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK did knowingly and unlawfully attempt to obstruct, delay and affect interstate commerce through extortion, namely, demanding payments from James Rosendall, including a payment of about $5,000 for no services rendered, and attempted to induce the consent of Rosendall by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951.**

## COUNT SIXTEEN
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds – $90,000 Bribe)

**D-1     KWAME M. KILPATRICK**
**D-2     BOBBY W. FERGUSON**

1.     The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.     On or between about mid September 2008 and late October 2008, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during the calendar year 2008, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept about $90,000 in cash from defendant BOBBY W. FERGUSON, which was delivered in installments on or about mid September 2008, in Southlake, Texas, and on or about late October 2008, in Detroit, Michigan, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit, that is, KWAME

-80-

KILPATRICK's assistance in steering City contracts to FERGUSON and pressuring persons with City contracts to hire or pay FERGUSON.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

**COUNT SEVENTEEN**
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds – $75,000 Bribe)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    On or about mid March 2008, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during the calendar year 2008, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept $75,000 from defendant BOBBY W. FERGUSON's company, Ferguson Enterprises, Inc., which was deposited into the Kilpatrick Civic Fund, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit, that is, KWAME KILPATRICK's assistance in steering City contracts to FERGUSON and pressuring persons with City contracts to hire or pay FERGUSON.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

-81-

(18 U.S.C. §§ 1341, 1343: Mail and Wire Fraud)

**D-1 KWAME M. KILPATRICK**

### General Allegations As to Counts Eighteen Through Thirty

1.    On or about July 8, 1999, the Kilpatrick Civic Fund, Inc. ("the Civic Fund"), controlled by KWAME KILPATRICK, received federal tax exempt status as a social welfare organization pursuant to Section 501(c)(4) of the Internal Revenue Code after KWAME KILPATRICK caused an application to be submitted to the United States Department of the Treasury ("the Treasury Department") ("the application"), which contained the following representations:

    a.    The application claimed that the Civic Fund's purposes were the following:

        i.    Promoting community activities that enhance the neighborhoods in which the citizens of Detroit reside as well as those activities that contribute to the betterment of the lives of the youth of Detroit and its surrounding communities;

        ii.    Providing information to the citizens of the City of Detroit and the State of Michigan about legislative issues affecting their lives and promoting the importance of voting and related activities; and

        iii.    Participating in those activities that contribute to the redevelopment of a positive image of the City of Detroit and benefit the community at large.

    b.    The application further claimed that the Civic Fund had not spent and did

-82-

not plan to spend any money attempting to influence the selection, nomination, election or appointment of any person to any federal, state, or local public office.

    c.      The application further claimed that, "[*the Civic Fund*] shall not participate or intervene in ... any political campaign on behalf of or against any candidate for public office."

    d.      The application further claimed that the Civic Fund would operate exclusively for charitable and educational purposes and that it would receive and administer its assets exclusively for charitable, educational, religious or scientific purposes.

    e.      The application further claimed that, "in the event of the dissolution [*of the Civic Fund*], all of [*the Civic Fund's*] assets ... shall be distributed to a 501(c)(4) organization with a similar purpose by majority vote of the Board of Director[*s*]."

### The Scheme and Artifice to Defraud

    2.      Beginning In or about 1999, KWAME KILPATRICK devised a scheme and artifice to defraud donors to the Civic Fund of monies they donated to it.

    3.      It was part of the scheme and artifice to defraud that KWAME KILPATRICK would claim to the Internal Revenue Service, the public and potential donors that the Civic Fund was a social welfare organization that spent its funds in ways consistent with the purposes stated in its application for tax exempt status. In truth and in fact, as he well knew, KWAME KILPATRICK used monies donated to the Civic Fund for personal expenses and for his political campaigns, neither of which was identified as one of the purposes of the Civic Fund.

-83-

4.    It was part of the scheme and artifice to defraud that KWAME KILPATRICK would hold events to raise money for the Civic Fund, at which he and others would claim to potential donors that the Civic Fund spent its funds in ways consistent with the purposes stated in its application for tax exempt status.

5.    It was part of the scheme and artifice to defraud that KWAME KILPATRICK would falsely claim to the news media that the Civic Fund was not used for his political campaigns.

6.    It was part of the scheme and artifice to defraud that KWAME KILPATRICK would send and cause to be sent letters to donors and potential donors which claimed that the Civic Fund used its funds consistent with the purposes outlined in its application for tax exempt status and specifically stated that "No funds of the Civic Fund are donated to a political campaign."

7.    It was part of the scheme and artifice to defraud that KWAME KILPATRICK caused Civic Fund Returns of Organization Exempt from Income Tax, Forms 990, to be submitted to the Department of the Treasury, Internal Revenue Service, for tax years 2003 through 2008, which misrepresented how the Civic Fund spent its funds.

8.    Contrary to the representations KWAME KILPATRICK made and caused to be made to the IRS, the public and donors to the Civic Fund, KWAME KILPATRICK used monies donated to the Civic Fund for the following personal expenses, among others:

a.    Cash kickbacks to KWAME KILPATRICK from an individual who worked for the Civic Fund, consisting of nearly half of the money the Civic Fund paid to that individual;

-84-

b.      Money to friends and relatives, including BERNARD KILPATRICK, disguised as payments for purported services rendered to the Civic Fund;

c.      Counter-surveillance and anti-bugging equipment;

d.      Yoga lessons for KWAME KILPATRICK;

e.      Golf-related expenses for KWAME KILPATRICK and others, including lessons, a set of Nike golf clubs and a personalized golf bag;

f.      Summer camp for KWAME KILPATRICK's children;

g.      College tuition for relatives of KWAME KILPATRICK;

h.      A birthday party for a relative of KWAME KILPATRICK;

i.      A video documenting KWAME KILPATRICK's family history;

j.      A crisis manager to manage KWAME KILPATRICK's public image following the public disclosure of text messages sent to and received by KWAME KILPATRICK on a city-owned paging device;

k.      Personal moving costs for KWAME KILPATRICK and his family after he left office;

l.      Lease of a personal residence for KWAME KILPATRICK and his family after they departed from the mayoral residence;

m.      Personal travel, including hotel costs and airfare for KWAME KILPATRICK and his relatives and friends;

n.      Lease of a Cadillac DeVille for KWAME KILPATRICK; and

o.      Rental cars.

-85-

9.     KWAME KILPATRICK used monies donated to the Civic Fund for his campaigns for election and reelection to the office of Mayor of the City of Detroit, including, among other things, polling, focus groups, public relations and political consulting.

10.     It was also part of the scheme and artifice to defraud that KWAME KILPATRICK, when he resigned as Mayor of Detroit in September 2008, attempted to purchase furniture from the Manoogian Mansion Restoration Society with money from the Civic Fund.

**Execution of the Scheme and Artifice to Defraud**

11.     On or about each of the dates set forth below, in the Eastern District of Michigan, Southern Division, defendant KWAME KILPATRICK did, for the purposes of executing the scheme and artifice to defraud described above, and attempting to do so, knowingly caused the items described below to be delivered by U.S. mail or commercial interstate carrier (Federal Express), such items being delivered according to the directions thereon, each such mailing constituting a separate count of this Fourth Superseding Indictment:

| Count | Date and Item Sent via U.S. Mail or Federal Express |
|---|---|
| 18 | June 22, 2006, donor check for $10,000 payable to the Civic Fund sent via Federal Express. |
| 19 | February 13, 2007, letter explaining the Civic Fund to donor sent via U.S. mail. |
| 20 | September 26, 2007, donor check for $5,000 payable to the Civic Fund sent via U.S. mail. |
| 21 | April 3, 2008, Civic Fund check in the amount of $4,500 for summer camp sent via Federal Express. |
| 22 | May 23, 2008, letter soliciting a donation and explaining the Civic Fund to donor sent via U.S. mail |
| 23 | June 4, 2008, Civic Fund check in the amount of $2,640 for summer camp sent via Federal Express. |

-86-

| Count | Date and Item Sent via U.S. Mail or Federal Express |
|-------|-----------------------------------------------------|
| 24 | June 4, 2008, donor check for $10,000 payable to the Civic Fund sent via Federal Express. |
| 25 | June 25, 2008, donor check for $1,000 payable to the Civic Fund sent via U.S. mail. |
| 26 | June 30, 2008, donor check for $4,000 payable to the Civic Fund sent via Federal Express. |
| 27 | July 23, 2008, letter explaining the Civic Fund to donor sent via U.S. mail. |

**All in violation of Title 18, United States Code, Section 1341.**

12.    On or about each of the dates set forth below, in the Eastern District of Michigan, Southern Division, KWAME KILPATRICK did, for the purposes of executing the scheme and artifice to defraud described above, and attempting to do so, knowingly caused to be transmitted by means of wire communication (fax) in interstate and foreign commerce certain documents, as listed below, each wire communication constituting a separate count of this indictment:

| Count | Date and Description of Wire Communication |
|-------|--------------------------------------------|
| 28 | August 24, 2007, letter soliciting a donation and explaining the Civic Fund sent to donor via fax. |
| 29 | April 3, 2008, letter explaining the Civic Fund sent to donor via fax. |
| 30 | June 20, 2008, letter soliciting a donation and explaining the Civic Fund sent to donor via fax. |

**All in violation of Title 18, United States Code, Section 1343.**

## COUNT THIRTY-ONE
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1     KWAME M. KILPATRICK**

1.     On or about April 11, 2004, in the Eastern District of Michigan, KWAME

KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S.

Individual Income Tax Return, Form 1040, for calendar year 2003, which was verified by a

written declaration that it was made under the penalties of perjury, and which KWAME

KILPATRICK did not believe to be true and correct as to every material matter.  Specifically,

KWAME KILPATRICK did not believe the tax return to be true and correct as to every material

matter in that: (a) it failed to disclose that he had additional income in the form of cash, private

jet flights and personal expenses paid for by the Civic Fund, amounting to at least $67,181,

which he well knew at that time he was required by law and regulation to disclose; and (b) it

stated on line 22 that his total income was $188,227, whereas, as he well knew at that time, his

total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-TWO
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1     KWAME M. KILPATRICK**

1.     On or about April 15, 2005, in the Eastern District of Michigan, defendant

KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a

joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2004, which was verified

by a written declaration that it was made under the penalties of perjury, and which KWAME

KILPATRICK did not believe to be true and correct as to every material matter.  Specifically,

-88-

KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash and private jet flights, amounting to at least $74,925, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $167,940, whereas, as he well knew at that time, his total income was in excess of that amount.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT THIRTY-THREE
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

### D-1  KWAME M. KILPATRICK

1.     On or about April 17, 2006, in the Eastern District of Michigan, defendant KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2005, which was verified by a written declaration that it was made under the penalties of perjury, and which KILPATRICK did not believe to be true and correct as to every material matter.  Specifically, KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash and private jet flights, amounting to at least $11,279, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $156,329, whereas, as he well knew at that time, his total income was in excess of that amount.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT THIRTY-FOUR
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.     On or about April 16, 2007, in the Eastern District of Michigan, defendant

KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a

joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2006, which was verified

by a written declaration that it was made under the penalties of perjury and which KWAME

KILPATRICK did not believe to be true and correct as to every material matter.  Specifically,

KWAME KILPATRICK did not believe the tax return to be true and correct as to every material

matter in that: (a) it failed to disclose that he had additional income in the form of cash, private

jet flights and personal expenses paid for by the Civic Fund, amounting to at least $122,997,

which he well knew at that time he was required by law and regulation to disclose; and (b) it

stated on line 22 that his total income was $153,024, whereas, as he well knew at that time, his

total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-FIVE
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.     On or about April 15, 2008, in the Eastern District of Michigan, defendant

KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a

joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2007, which was verified

by a written declaration that it was made under the penalties of perjury and which KWAME

KILPATRICK did not believe to be true and correct as to every material matter.  Specifically,

KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash, private jet flights and personal expenses paid for by the Civic Fund, amounting to at least $194,569, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $167,005, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

**COUNT THIRTY-SIX**
(26 U.S.C. § 7201 – Income Tax Evasion)

**D-1    KWAME M. KILPATRICK**

1.    During the calendar year 2008, defendant KWAME KILPATRICK had and received unreported taxable income in the form of cash, private jet flights and personal expenses paid for by the Civic Fund, amounting to at least $261,751.

2.    KWAME KILPATRICK owed the United States of America an income tax of $85,397 for this unreported taxable income.

3.    Well-knowing and believing the foregoing facts, KWAME KILPATRICK, in and between January 1, 2008 and April 13, 2009, in the Eastern District of Michigan, Southern Division, and elsewhere, did willfully attempt to evade and defeat a large part of the income tax due and owing by him and his spouse to the United States of America for the calendar year 2008 and did take affirmative action to evade these taxes.  Specifically, he concealed income from the Internal Revenue Service in the following ways: (a) he caused to be filed a false joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2008; (b) he caused an individual employed by his mayoral campaign and associated non-profits to kick cash back to him from

-91-

wages paid to the individual by the campaign and non-profits; and (c) he caused the Civic Fund to pay for certain of his personal expenses and concealed such payments; and (d) he accepted a $90,000 cash payment from FERGUSON.

**All in violation of Title 26, United States Code, Section 7201.**

**COUNT THIRTY-SEVEN**
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-3     BERNARD N. KILPATRICK**

1.     On or about October 5, 2005, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for calendar year 2004, which was verified by a written declaration that it was made under the penalties of perjury, and which BERNARD N. KILPATRICK did not believe to be true and correct as to every material matter. Specifically, BERNARD N. KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income amounting to at least $35,632, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $336,625, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

**COUNT THIRTY-EIGHT**
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-3     BERNARD N. KILPATRICK**

1.     On or about October 10, 2006, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe

-92-

a U.S. Individual Income Tax Return, Form 1040, for calendar year 2005, which was verified by a written declaration that it was made under the penalties of perjury, and which BERNARD N. KILPATRICK did not believe to be true and correct as to every material matter. Specifically, BERNARD N. KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income amounting to at least $150,329, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $220,259, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

**COUNT THIRTY-NINE**
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-3    BERNARD N. KILPATRICK**

1.    On or about October 15, 2008, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for calendar year 2007, which was verified by a written declaration that it was made under the penalties of perjury, and which BERNARD N. KILPATRICK did not believe to be true and correct as to every material matter. Specifically, BERNARD N. KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income amounting to at least $172,655, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $70,529, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNTS FORTY TO FORTY-FIVE
### (18 U.S.C. §§ 1956(a)(i)(B)(i), 2 -- Money Laundering)

**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Counts One and Seven above, as if they were set forth in full herein.

2.    On or about the following dates, within the Eastern District of Michigan, Southern Division, and elsewhere, defendant BOBBY W. FERGUSON did knowingly and willfully conduct and attempt to conduct, and cause others to conduct, a financial transaction affecting interstate and foreign commerce, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity – that is, the extortion of *Company L* and *Company A* as alleged in Count Seven – knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity. Specifically, FERGUSON caused the following checks, which he obtained by the extortion of *Company L* and *Company A*, as alleged in Count Seven, to be endorsed, then deposited into the following third-party accounts for FERGUSON's benefit:

| Count | Date | Transaction | Amount |
|-------|------|-------------|--------|
| 40 | 02/12/07 | Citizens Bank check no. 1429, payable to "A&F Environmental / Johnson Consulting," was endorsed and given to *Law Firm P,* then deposited into *Law Firm P's* client trust account | $200,000 |
| 41 | 05/23/07 | Citizens Bank check no. 1363, payable to "A&F Environmental / Johnson Consulting," was endorsed and given to *Law Firm P,* then deposited into *Law Firm P's* client trust account | $120,000 |

-94-

| Count | Date | Transaction | Amount |
|-------|------|-------------|--------|
| 42 | 06/15/07 | Citizens Bank check no. 1436, payable to "A&F Environmental / Johnson Consulting," was endorsed to Ferguson Enterprises, Inc., then deposited into Ferguson Enterprise's bank account | $147,500 |
| 43 | 06/15/07 | Citizens Bank check no. 1486, payable to "A&F Environmental / Johnson Consulting," was endorsed to Ferguson Enterprises, Inc., then deposited into Ferguson Enterprise's bank account | $203,800 |
| 44 | 08/21/07 | Citizens Bank check no. 1832, payable to "Johnson Consultants Services, Inc.," was endorsed and given to *Company U*, then deposited into *Company U's* bank account | $100,000 |
| 45 | 12/12/07 | Citizens Bank check no. 1744, payable to A&F Environmental / Johnson Consulting," was endorsed and given to *Company U*, then deposited into *Company U's* bank account | $150,000 |

**All in violation of Title 18, United States Codes, Sections 1956(a)(1)(B)(i) and 2.**

## COUNT FORTY-SIX
(18 U.S.C. §§ 1956(a)(1)(B)(i), 2 – Money Laundering)

**D-2   BOBBY W. FERGUSON**

1.      The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Counts One and Seven above, as if they were set forth in full herein.

2.      As set forth below, in the Eastern District of Michigan, Southern Division, defendant BOBBY W. FERGUSON did knowingly and willfully conduct and attempt to conduct, and cause others to conduct, a financial transaction affecting interstate and foreign commerce, knowing that the property involved in the financial transaction represented the proceeds of some

-95-

form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity – that is, the extortion of *Company L* and *Company A* as alleged in Count Seven – knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity.

3. Specifically, on or about February 17, 2010, defendant BOBBY W. FERGUSON negotiated, and caused to be negotiated, eleven First Independence Bank Cashier's Checks, listed below, and used $451,304.00 derived from these cashier's checks to (a) open Paramount Bank Account Number xxxxx1749, with an opening balance of $301,304.00, and (b) purchase Paramount Bank Certificate of Deposit No. 2010004568, in the amount of $150,000.00.

| Cashier's Check No. | Amount |
|---|---|
| 17746 | $25,000.00 |
| 17747 | $25,000.00 |
| 17748 | $15,000.00 |
| 17749 | $20,000.00 |
| 17750 | $10,000.00 |
| 17751 | $ 5,000.00 |
| 17752 | $ 9,384.87 |
| 27812 | $85,500.00 |
| 27813 | $85,500.00 |
| 27814 | $85,500.00 |
| 27815 | $85,500.00 |
| **Total** | **$451,384.87** |

**All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.**

## CRIMINAL FORFEITURE ALLEGATIONS
### (18 U.S.C. §§ 981(a)(1)(c), 982(a)(1) & 1963, and 28 U.S.C. § 2461(c))

1.      The allegations contained in Paragraphs 1 through 6 of the "General Allegations,"
above, as well as Counts One through Four and Six through Thirty above, are hereby
incorporated by reference as if they were set forth in full herein for the purpose of alleging
forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(c), 982(a)(1), 1963 and
Title 28, United States Code, Section 2461(c).

2.      Upon conviction of racketeering conspiracy, in violation of Title 18, United States
Code, Section 1962(d), as alleged in Count One of this Fourth Superseding Indictment,
defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD N.
KILPATRICK and VICTOR M. MERCADO shall forfeit to the United States, pursuant to
18 U.S.C. § 1963(a)(1)-(3):

    a.      any and all interest defendants have acquired or maintained in violation of
18 U.S.C. § 1962;

    b.      any and all interest in, security of, claim against, or property or contractual right of
any kind affording a source of influence over any Enterprise named and described
herein which defendants established, operated, controlled, conducted or
participated in the conduct of, in violation of 18 U.S.C. § 1962; and

    c.      any and all property constituting, or derived from, any proceeds obtained, directly
or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962.

3.      Property subject to forfeiture to the United States pursuant to Title 18, United
States Code, Section 1963(a)(1), (a)(2) and (a)(3), includes all money and property which
represents the value of the interests acquired and the gross proceeds obtained through the

violation of Title 18, United States Code, Section 1962 as alleged in Count One of this Fourth Superseding Indictment.

4.     Upon conviction of one or more counts of bribery as alleged in this Fourth Superseding Indictment, defendants KWAME M. KILPATRICK and BOBBY W. FERGUSON shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 666.

5.     Upon conviction of one or more counts of interference with commerce by extortion as alleged in this Fourth Superseding Indictment, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD N. KILPATRICK and VICTOR M. MERCADO shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1951.

6.     Upon conviction of obstruction of official proceeding as alleged in this Fourth Superseding Indictment, defendant VICTOR M. MERCADO shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1512.

7.     Upon conviction of one or more counts of wire fraud or mail fraud as alleged in this Fourth Superseding Indictment, defendant KWAME M. KILPATRICK shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §§ 1341 or 1343.

-98-

8.    Upon conviction of one or more counts of money laundering in violation of 18 U.S.C. §§ 1956 or 1957, as alleged in this Fourth Superseding Indictment, defendant BOBBY W. FERGUSON shall forfeit to the United States (a) any property, real or personal, involved in such offense(s), or any property traceable to such property, and (b) any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses, pursuant to 18 U.S.C. § 982(a)(1).

9.    <u>Substitute Assets</u>:  Pursuant to Title 18, United States Code, Section 1963(m), Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and Title 28, United States Code, Section 2461(c), defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD N. KILPATRICK and VICTOR M. MERCADO shall forfeit any of their other property, real or personal, up to the value of property described in Paragraphs 2 through 8 above, if, by any act or omission of the defendant, the property subject to forfeiture:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred, sold to or deposited with a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty.

All in accordance with Title 18, United States Code, Section 1963; Title 21, United States Code, Section 853(p); Title 18, United States Code, Section 982(b); Title 28, United States Code, Section 2461(c); and Rule 32.2, Federal Rules of Criminal Procedure.

10. _Money Judgment_. Upon conviction of one or more violations alleged in this Fourth Superseding Indictment, the Government will seek a forfeiture money judgment against defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD N. KILPATRICK and VICTOR M. MERCADO in an amount as is proved at trial in this matter representing the total amount of proceeds obtained as a result of defendants' offenses, for which defendants shall be jointly and severally liable.

THIS IS A TRUE BILL

s/Grand Jury Foreperson
FOREPERSON

BARBARA L. McQUADE
United States Attorney

s/Mark Chutkow
MARK CHUTKOW
Assistant United States Attorney

s/R. Michael Bullotta
R. MICHAEL BULLOTTA
Assistant United States Attorney

s/Linda Aouate
LINDA AOUATE
Assistant United States Attorney

Date:   February 15, 2012

| **Criminal Case Cover Sheet** | **Case Number**<br>**10-CR-20403** |

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

**Reassignment/Recusal Information** This matter was opened in the USAO prior to August 15, 2008   **[Yes]**

| **Companion Case Information** | **Companion Case Numbers:**<br>**U.S. v. Karl Kado**<br>**08-CR-20418; Hon. Marianne O. Battani**<br><br>**U.S. v. James Rosendall, Jr.,**<br>**09-CR-20025; Hon. Avern Cohn** |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | |
| ■ **Yes**      □ **No** | **AUSA's Initials:** _RMB_ |

Case Title: USA v.   D-1   **KWAME M. KILPATRICK**
                      D-2   **BOBBY W. FERGUSON**
                      D-3   **BERNARD N. KILPATRICK**
                      D-4   **VICTOR M. MERCADO**

County where offense occurred :   **Wayne**

**FILED**
2012 FEB 15  P 3:50
U.S. DIST. COURT CLERK
EAST DIST. MICHIGAN
DETROIT

Check One:   ■ **Felony**        □ **Misdemeanor**    □ Petty

_____Indictment/_____Information --- **no prior complaint.**
_____Indictment/_____Information --- based upon prior complaint [Case number:_____]
  _X_ **Indictment based upon** LCrR 57.10 (d) [Complete Superseding section below].

**Superseding Case Information**

Superseding to Case No:   _10-CR-20403_            Judge:  **NANCY G. EDMUNDS**
    □   Original case was terminated; no additional charges or defendants.
    □   Corrects errors; no additional charges or defendants.
    □   Involves, for plea purposes, different charges or adds counts.
    ■   **Embraces same subject matter but adds the additional charges below:**

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| **See attached** | | |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

February 15, 2012
Date

R. MICHAEL BULLOTTA
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9507
Michael.Bullotta@usdoj.gov

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.
10/13/09

**Superseding to Case No:** ___10-CR-20403_____ **Judge:** _NANCY G. EDMUNDS_

      ☐      Original case was terminated; no additional charges or defendants.
      ☐      Corrects errors; no additional charges or defendants.
      ☐      Involves, for plea purposes, different charges or adds counts.
      ■      **Embraces same subject matter but adds the additional charges below:**

| Defendant name | Charges | Prior Complaint |
|---|---|---|
| **D-1**   **KWAME M. KILPATRICK** | **Count 12:** <br> **18 USC §§ 1951 and 2** | **N/A** |
| **D-2**   **BOBBY W. FERGUSON** | **Count 12:** <br> **18 USC §§ 1951 and 2** | **N/A** |