UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .       Docket No. 13-53846
        MICHIGAN,               .
                                .       Detroit, Michigan
                                .       July 17, 2014
                    Debtor.     .       11:00 a.m.
. . . . . . . . . . . . . . . .

        HEARING RE. (#5155) MOTION TO ALLOW CLAIM(S)/NOTICE
    OF AND MOTION FOR TEMPORARY ALLOWANCE OF CLAIM OF THE
    MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT PURSUANT TO
        RULE 3018(a) OF THE FEDERAL RULES OF BANKRUPTCY
      PROCEDURE FOR PURPOSES OF ACCEPTING OR REJECTING THE
      DEBTOR'S FOURTH AMENDED PLAN OF ADJUSTMENT FILED BY
            CREDITOR COUNTY OF MACOMB, MICHIGAN
          BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:         Miller, Canfield, Paddock & Stone, PLC
                        By:  JEROME R. WATSON
                             IRENE B. HATHAWAY
                        150 West Jefferson Avenue, Suite 2500
                        Detroit, MI  48226
                        (313) 963-6420


For Macomb              Dechert, LLP
Interceptor Drain       By:  ALLAN S. BRILLIANT
Drainage District:      1095 Avenue of the Americas
                        New York, NY  10036
                        (212) 698-3600

                        Kirk, Huth, Lange & Badalamenti, PLC
                        Raechel M. Badalamenti
                        19500 Hall Road, Suite 100
                        Clinton Township, MI  48038
                        (586) 412-4900


For Official            Dentons, US, LLP
Committee of            By:  CLAUDE D. MONTGOMERY
Retirees:               670 Fifth Avenue
                        New York, NY  10020
                        (212) 632-8390

Court Recorder:      LaShonda Moss
                     United States Bankruptcy Court
                     211 West Fort Street, 21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  Case Number 13-53846, City of Detroit,

2    Michigan.

3          MR. BRILLIANT:  Good morning, your Honor.  Allan

4    Brilliant from Dechert, LLP, and I'm joined at counsel table

5    by my co-counsel, Raechel Badalamenti and Robert Morris from

6    Kirk, Huth, Lange & Badalamenti on behalf of Midland

7    Interceptor Drain Drainage District.

8          MR. WATSON:  Good morning, your Honor.  Jerome

9    Watson appearing on behalf of City of Detroit along with my

10   partner, Irene Hathaway.

11         MR. MONTGOMERY:  Good morning, your Honor.  Claude

12   Montgomery, Dentons, US, for the Retiree Committee, and I'm

13   joined today with Mr. Joe Selby.  Thank you.

14         MR. BRILLIANT:  Good morning, your Honor.

15         THE COURT:  You may proceed, sir.

16         MR. BRILLIANT:  Thank you, your Honor.  Your Honor,

17   as a preliminary matter, please --

18         THE COURT:  Well, as a preliminary matter, let me

19   apologize to all of you for not being here at our appointed

20   time.  The earlier argument took much longer than I had

21   thought it would, and so I apologize to you for that.

22         MR. BRILLIANT:  Thank you, your Honor, but it's not

23   necessary.  As it turned out, there was a big traffic jam on

24   I-94 this morning, and we would have probably had to ask you

25   for a little bit of an extension in any event --

1          THE COURT:  Okay.

2          MR. BRILLIANT:  -- but thank you for -- you know,

3    for your courtesy.  As a preliminary matter, your Honor, I

4    spoke with Mr. Watson, and we've agreed solely for purposes

5    of this hearing that all of the -- you know, the briefs, the

6    documents that are attached, the declarations both have

7    been filed in connection with the 3018 hearing as well as in

8    connection with the objection to claim will be admitted into

9    evidence subject to all the parties being able to argue with

10   respect to, you know, weight and what view your Honor should

11   give it, but given the -- you know, the nature of the

12   hearing, we didn't think that it made sense, you know, to

13   argue about what's hearsay and various other things.

14         THE COURT:  Okay.

15         MR. BRILLIANT:  Now, your Honor, we dumped a whole

16   lot of paper on your Honor, and --

17         THE COURT:  Well, let's talk about that.  I can

18   represent to you that I have read your briefs, both those

19   that were filed earlier this week and the ones that were

20   filed today and yesterday.  I skimmed through the hundreds of

21   pages of attachments.  I can't say that I studied any of them

22   in any particular detail, so that may help you in your

23   presentation here --

24         MR. BRILLIANT:  Yes.

25         THE COURT:  -- your presentations here this morning.

1        MR. BRILLIANT:  Yes.  Well, what I had thought we

2   would do, your Honor, there's a whole lot here that is

3   agreed.  I mean there are some -- there are some pretty

4   significant factual disputes, and we have some disputes

5   about, you know, some issues as a matter of law.  What I

6   thought might make some sense, your Honor, is to go through

7   some of the documents, go through the facts, highlight for

8   your Honor, you know, really what facts are pretty much

9   agreed, what's really, you know, in dispute here, talk about

10  some of the legal arguments and obviously, to the extent that

11  we can, you know, answer any questions or concerns that your

12  Honor may have having -- hearing the presentation or read the

13  briefs.

14        So, your Honor, as your Honor knows, all of this,

15  you know, relates to, you know, a giant sinkhole that

16  occurred in 2004 in connection with, you know, an

17  interceptor, part of the sewage system, you know, that was

18  then owned by the DW, you know, SD.  At that point in time,

19  your Honor, you know, the city made certain modifications to

20  existing contracts that it had to pay for the -- you know, to

21  the repair of the sinkhole, and there was an extraordinary,

22  you know, procedure that went into effect in connection with

23  the issuance of those contracts.  And, your Honor, do you

24  have the exhibits?

25        THE COURT:  I can access them here on my computer if

1   you'll just give me one moment.  Okay.  Is there an

2   exhibit -- what would it be attached to first?

3          MR. BRILLIANT:  The Marrocco affidavit, declaration,

4   I guess, to be more, you know, precise.

5          THE COURT:  Is that attached to your --

6          MR. BRILLIANT:  Our brief, attached to our --

7          THE COURT:  -- brief, 6016?

8          MR. BRILLIANT:  I believe that's correct, your

9   Honor.

10         THE COURT:  Okay.

11         MR. BRILLIANT:  I'm not as conversant in the

12   documents --

13         THE COURT:  So what page in the PDF is it,

14   approximately?

15         MR. BRILLIANT:  Well, we're going to get to, you

16   know, in a few moments 233.

17         THE COURT:  Okay.

18         MR. BRILLIANT:  So, your Honor, in two thousand, you

19   know, and four, there was a, you know -- you know, the

20   sinkhole.  Various procedures were put into place.  And

21   unbeknownst to MIDD, you know -- you know, my client, at that

22   time, there were some improprieties which ultimately led to

23   criminal convictions and investigations, prosecutions, and

24   criminal convictions of the mayor, the head of the DWSD and

25   various other co-conspirators, and the issue, your Honor, is

1   whether or not there were overcharges that -- you know, that

2   occurred in that process and whether they were

3   fraudulently -- the lack of, you know, the fact that there

4   were overcharges was misrepresented, you know, to our

5   clients, and the fact that -- the fact that there was a

6   governmental investigation, a U.S. Attorney's investigation,

7   and whether or not that was disclosed to our client.  And

8   those are the -- when they should have been disclosed to the

9   client, our clients, and whether or not -- I don't think

10   anyone disputes that they were not.  You know, the city takes

11   the position that they didn't have, you know, knowledge.

12   Well, they don't take the position they didn't have knowledge

13   of an investigation.  They take the position that they

14   weren't required to disclose it, and they didn't know -- have

15   any knowledge that there were overcharges.

16           On page 233, your Honor, this is the complaint that

17   was filed by the city in connection with the suit in front of

18   Judge Cleland where they intervened in connection with an

19   action that MIDD had brought against the -- you know, the

20   contractors and the former officials of the city who

21   perpetuated the fraud.  And in connection with that, your

22   Honor, in paragraph 23 the city says the -- which is the

23   intervening plaintiff, the intervening plaintiff's claims are

24   based upon the conduct first unveiled in the Kilpatrick

25   prosecution.  On December 15, 2010, a grand jury returned a

1    first superseding indictment in the Kilpatrick prosecution
2    naming Kilpatrick, Ferguson, Bernard Kilpatrick, Mercado and
3    Miller as defendants.  The indictment alleged criminal --
4    RICO conspiracy, bribery, extortion, obstruction of justice
5    and mail fraud, wire fraud, and money laundering in relation
6    to a number of projects entered into by DWSD, including the
7    DWSD project at issue in this case, the repair of the Macomb
8    Interceptor sewer at 15 Mile Road in Sterling Heights,
9    Michigan, under Amendments 2 and 3 to the DWSD contract, CS-
10   1368.  And that's really what this is about, your Honor, this
11   whole issue, is whether or not, you know, there were
12   overcharges in connection, you know, with CS-1368, you know,
13   2 and 3.  And on page 233 of the PDF -- actually, I'm going
14   to go to paragraph 79 of their complaint, which is
15   paragraph --
16           THE COURT:  Okay.  Hold on one second because I'm
17   not sure we're coordinated here.  I wish I could show it to
18   you.
19           MR. BRILLIANT:  Maybe page 99 may be the PDF.  Does
20   that help, your Honor?
21           THE COURT:  Let me go to that page and see what
22   comes up.
23           MR. WATSON:  I can't find it either.  Can you tell
24   me the exhibit number?
25           MR. BRILLIANT:  It's Exhibit Number 12 --

```
1              MR. WATSON:  To the Marrocco --

2              MR. BRILLIANT:  -- to the Marrocco affidavit.

3              MR. WATSON:  Okay.

4              MR. BRILLIANT:  Your complaint.

5              THE COURT:  Okay.  It's --

6              MR. BRILLIANT:  I think it might be 99, your Honor.

7   I'm sorry, your Honor.  It's 13.

8              MR. WATSON:  And what paragraph?

9              MR. BRILLIANT:  79.

10             MR. WATSON:  Thank you.

11             MR. BRILLIANT:  Do you have a hard copy?  I think we

12  gave you a hard copy.

13             THE COURT:  Did we bring that over, Carolyn?  I'm

14  sorry.  No.  I want to find it in the PDF.

15             MR. BRILLIANT:  Okay.

16             MR. WATSON:  It's actually Exhibit 15, I think, your

17  Honor.

18             THE COURT:  All right.  One more second, please.

19             MR. BRILLIANT:  Yes, your Honor.  That's right.

20  It's Exhibit 15.

21             THE COURT:  Okay.  In the entire 742-page PDF, it is

22  page 406.

23             MR. BRILLIANT:  Unfortunately, the book I have, your

24  Honor, doesn't have those same numbers, so it's going to be

25  hard for us --
```

 1          THE COURT:  Yeah.  The complaint begins on 389.

 2          MR. BRILLIANT:  Okay.  And I wanted to move to

 3   paragraph 79, your Honor --

 4          THE COURT:  All right.  Let me find that.

 5          MR. BRILLIANT:  -- which is on page 18 of the

 6   complaint.

 7          THE COURT:  Got it.  Okay.

 8          MR. BRILLIANT:  Okay.  So --

 9          THE COURT:  Now we're good.

10          MR. BRILLIANT:  So the city alleged in connection

11   with its intervening complaint that until the 15 Mile Road

12   collapse project DWSD maintained a standard practice on its

13   other sewer and water repair projects of acquiring DWSD

14   inspectors at sewer repair sites to prepare daily engineering

15   and inspection reports which detailed, among other things,

16   the time each employee of each contract or subcontractor

17   spent on the job each day and the equipment used or stored on

18   the job site each day.  Rather than use the standard daily

19   engineering inspection reports for the 15 Mile Road collapse

20   project, Mercado instructed DWSD inspectors to use a daily

21   press report which did not contain the actual hours worked by

22   each employee each day or the equipment used on the site each

23   day.  And they go through, your Honor, and talk about, you

24   know, how -- in their complaint about how, you know, these

25   changes, you know, led to the potential for improprieties.

1  If you go to paragraph 84, it says by reducing the

2  involvement of DWSD staff in supervising the contractors'

3  work by transferring management and supervisory

4  responsibilities to outside contractors and by reducing or

5  eliminating portions of DWSD's written record of the

6  contractors' purported activity, Mercado aided, abetted,

7  participated in and furthered the pattern of racketeering,

8  you know, through which defendants conducted the Kilpatrick

9  enterprise.  And then it goes on, your Honor, to, you know --

10  you know -- you know, and talks in the complaint about how by

11  taking out these controls it made it possible for work to be,

12  you know, billed that wasn't actually performed.  And then we

13  go, your Honor, to paragraph 101, which is on page 23 of the

14  complaint, where the city says without waiver of its claims

15  and without limitation as to its damages, intervening

16  plaintiff adopts and incorporates herein plaintiff MIDD's

17  claim that as a result of inflated invoices submitted on the

18  15 Mile Road sewer collapse, the cost of the repairs of the

19  15 Mile sewer collapse was increased by at least $23 million,

20  so the city, you know, without waiving its right to say it's

21  more, says that, you know, they adopt, you know, our view

22  that was filed against the contractors that there's at least

23  damages of $23 million of overcharges in connection with

24  the -- in connection with the -- you know, the -- you know,

25  the -- you know, the repair of the sinkhole.

1    Now, your Honor, you know, they -- you know, it's
2  really hard, you know, for the city to say, you know, that
3  there -- you know, there wasn't fraud here.  There were, you
4  know, guilty pleas.  In the city's complaint they go through
5  and summarize them.  We summarize, you know, the documents,
6  you know, as well, you know, in our briefs, and I don't think
7  there's any real dispute here that the perpetrators, you
8  know, pled guilty to overcharges in connection, you know,
9  with this particular, you know, project.
10    Now, the city in their briefs over the last three
11  days, you know, say that they don't concede, you know, that
12  there were any overcharges and that they, in fact, you know,
13  deny that there were overcharges, but that's just, you know,
14  unbelievable.  There's no credibility, you know, for that
15  given the statements they've made, given the criminal
16  indictments, the guilty pleas, the jury, you know, decisions
17  with respect to, you know, the convictions that there wasn't
18  a significant overcharge here, and the fact that the city on
19  their own goes forward and talks about how the policies of
20  DWSD were changed that enabled this, you know, to happen
21  really just reaffirms the fact that there were overcharges
22  here, so I don't think there's really a big argument here or
23  issue as to the fact that there were overcharges, you know.
24  We had, you know, put in the declaration of Mr. Winn, who's
25  an engineer, who testified, you know, that he estimated how

1   much it would have cost to do this project if it was done

2   appropriately, and he estimates that the total amount of

3   overcharges exceeded, you know, $26 million.  And in the

4   complaint that the city filed, they talk about NTH's

5   estimate, you know, their expert, who they also, you know --

6   you know -- you know, say estimated that the project should

7   have cost, you know, significantly, you know, less than it

8   was ultimately charged, so I don't think there's much of an

9   issue here as to damages.  The question becomes whether or

10  not there was, you know, fraud, you know, here.

11          Now, with respect to that issue, your Honor, you

12  have the declaration of Mr. Marrocco, the public works, you

13  know, commissioner of Macomb County, who was involved to some

14  extent in the negotiations here and, in particular, in

15  connection with, you know -- you know, mediations in front of

16  Judge Feikens over some of these issues, and he, in his

17  affidavit -- declaration, makes it very clear that he was

18  told by Mr. Mercado, you know -- you know, directly in a

19  meeting after Judge Feikens had told the two of them to go

20  into a room, you know, by themselves and work things out, and

21  he expressly remembers and says that Mercado represented to

22  him that there were -- you know, that these were, you know,

23  fair and legitimate charges and that there were, you know, no

24  overcharges or any other issues in connection with the money.

25  And based upon, you know, that representation and the

1   continued representations of the city and the city's failure

2   to inform, you know -- you know, MIDD, you know, that there

3   was a governmental investigation, you know, Macomb went

4   forward and signed, you know, the settlement agreement, the

5   letter of intent, and then ultimately, you know, signed

6   the -- you know, the contract, you know, for the sale.  You

7   know, the -- your Honor, it's -- I don't know how, you know,

8   we're going to find this document, but I think -- I want to

9   turn you to the settlement agreement, you know, that was --

10  actually, let's go first, your Honor, to the letter of

11  intent, which is Exhibit 2 to the Marrocco affidavit.

12          THE COURT:  Again, can you give me a page number?

13          MR. BRILLIANT:  Page 6 of the -- page 6 of the

14  letter of intent.  I don't have -- unfortunately, I don't

15  have the same numbering system that your Honor has.

16          THE COURT:  One second, please.  Okay.  I'm on page

17  6 of his declaration.  Is that where you want me to be?

18          MR. BRILLIANT:  Okay.  And then, you know, it's

19  probably about 15 or 20 pages past that, you know.  Exhibit 2

20  to the declaration is the 2009 --

21          THE COURT:  Exhibit 2.  Okay.

22          MR. BRILLIANT:  -- letter of intent.

23          THE COURT:  Okay.  I'm there.  Thank you, sir.

24          MR. BRILLIANT:  Okay.  And then it's page 6.

25          THE COURT:  Okay.

1      MR. BRILLIANT:  Okay.  Now, this, your Honor, is the

2  letter of intent.  Now, we'll talk about the settlement

3  agreement in a minute.  This was an attachment to the

4  settlement agreement, and the settlement agreement was

5  conditioned upon the closing actually occurring.  If the

6  closing of the sale never occurred, then the releases and

7  various other things wouldn't have occurred, and we'll go

8  through that, but attached to that was a letter of intent

9  that set forth a due diligence period that would occur after

10  the settlement agreement occurred and set up a due diligence

11  period prior to the closing of the sale.  And on page -- and

12  on paragraph 9 on page 6, you know, the -- you know, the city

13  agreed during the diligence period, which is defined in the

14  document as the period from that date through the closing of

15  the sale of the interceptor, that it would promptly notify

16  the transferee of any governmental, regulatory, or third-

17  party complaints, claims, investigations, you know, or

18  hearings or communications indicating that the same may be

19  contemplated.  Promptly notify the transferee of any

20  governmental, regulatory, or third-party complaints, claims,

21  investigations, or hearings, so they agree that if there any

22  governmental investigations, they would -- during this period

23  prior to the closing, they would tell us.  And, you know,

24  your Honor, I'm sure you read from the briefs, and I'm not

25  going to go through all the testimony, but it's absolutely

1   clear that starting in 2008 the FBI showed up, you know,
2   at -- you know, at the home of various employees of the DWSD
3   and started asking questions about issues relating to the
4   sinkhole, the sinkhole repair, you know, project, the
5   contracting, you know, and Mr. Ferguson, how he got the job
6   and whether or not, you know, there were, you know -- you
7   know, issues, you know, with respect to the cost.  And that
8   started in 2008, and notwithstanding the contractual
9   obligation to inform MIDD just of the investigation, they
10  never did so.  They did not tell us at all prior to the
11  closing that there was a -- there was an ongoing, you know,
12  investigation, you know.  Mr. Marrocco, you know, in his
13  declaration and in Mr. Hupp, who is the lawyer for -- you
14  know, for MIDD in connection with the transaction, both, you
15  know, say that they would not have closed if they would have
16  known about the fact that there was an investigation or the
17  possibility, you know, of overcharges, you know, here in
18  connection with the transaction, so, you know -- you know,
19  based upon the representations that Mr. Mercado made to Mr.
20  Marrocco and the failure of the city to comply with its
21  obligation under the diligence agreement to inform the
22  parties of the fact that there was an investigation, your
23  Honor, we have a very strong, you know -- you know -- you
24  know -- you know, claim here, I mean extremely strong claim
25  here that there was actual fraud in the inducement of the

1   contract for the sale of the property which would lead -- you

2   know, outside of bankruptcy would have potentially led to,

3   you know, reformation or recision of the contract or

4   potentially, you know -- you know, damages once the

5   bankruptcy -- you know, all claims are, you know, turned

6   into, you know, cash dollar amounts.  And given all of the

7   representations, you know, the amount of the claim is, you

8   know -- I think it's very hard to argue that it could be

9   anything less than $23 million, although based on all the

10  documentary evidence, I think a $26 million, you know, number

11  at a minimum is the more appropriate, you know, claim here.

12         Now, your Honor, in their papers the -- you know,

13  the -- you know, the city says, well, there was a settlement

14  agreement, and the settlement agreement, you know, released

15  all the claims, and I have two responses to that.  One is,

16  your Honor, if -- you know, in Exhibit 3, the next exhibit,

17  so if we go up probably about, you know, six pages or so --

18         THE COURT:  To look for what, sir?

19         MR. BRILLIANT:  In the settlement agreement, you

20  know, the last page before the signature block in the

21  settlement agreement, paragraph 9, miscellaneous.

22         THE COURT:  Got it.

23         MR. BRILLIANT:  If you look at 9(a)(2), your Honor,

24  it says if the parties fail to reach agreement on the terms

25  of a definitive agreement regarding the transfer of the

interceptor within 180 days from the execution date or, if no
closing occurs, within 360 days of the execution date, each a
triggering date, any party within 30 days at the first
occurring triggering date may declare any provision in the
agreement void and without effect.  If any provision of this
agreement is applicable, blah, blah, blah, but the bottom
line is, your Honor, you know, they say, "Oh, well, you
waived all these claims, you know, at the time you signed the
letter, you know, of intent."  Now, the reality is it was
fraudulent inducement to enter into the settlement agreement.
They said they would tell us about any investigation.  There
was already an investigation that was ongoing that they knew
about and they didn't tell us, but more importantly than
that, it's -- the release wasn't effective because it could
have been terminated by MIDD if there wasn't a closing.  And
so the same issue here that we were fraudulently induced into
closing both is fraudulent inducement with respect to the
settlement agreement as well as the other agreement, but the
reality is it was not a final release until the sale occurred
because any party could have -- essentially any party, but to
the extent that MIDD, you know, learned about the
investigation or learned that they were, you know,
potentially going to be, you know -- you know, paying too
much and was in a position to -- you know, to terminate --
you know, terminate the agreement.  So, your Honor, I think,

1  you know, those simple,  you know -- you know, facts, I

2  think, establish, you know, the fact that we have a claim.

3          Now, the city takes the position, which is just

4  clearly wrong as a matter of Michigan law, you know, that --

5  you know, they take the position that the merger clause

6  that's contained in the agreement, you know -- you know,

7  precludes, you know, parties, you know, after a closing of a

8  transaction, you know, from bringing a claim for fraud in the

9  inducement of the agreement, and they cite the UAW-GM case.

10 You know, we cite in both our brief and in the reply briefs,

11 you know, several, you know, more recent cases.  There's

12 actually three cases that came out in 2013 and so far this

13 year in 2014 from the appellate court, you know, here in

14 Michigan, you know, that make it very clear that when there's

15 a -- when there's fraudulent representations made to induce a

16 party to contract, whether it be a direct claim or a claim

17 under Michigan law, you know, for silent, you know,

18 misrepresentation when you fail to disclose what you're

19 supposed to disclose, that the merger clause doesn't bar the

20 claim.  And, you know, we cite, you know -- you know, all

21 three of those cases.  The, you know, Retiree Committee says,

22 well, there's, you know, binding Sixth Circuit authority on

23 it, and they ask your Honor, you know, to read that case.

24 When your Honor reads that case, we cite in a footnote to our

25 reply brief that case supports our position as well.  The

1    UAW-GM case, which is cited, you know -- you know, by -- you

2    know, by the city, you know, is really limited, you know, to

3    its facts.  When your Honor reads the most recent cases out

4    of Michigan, it makes it very clear, you know, how that case

5    should be interpreted and how that case is interpreted here

6    in Michigan, and it just doesn't preclude our claim.  If

7    anything, it -- you know, it supports the fact that we

8    actually, you know -- you know, have this claim.

9           Your Honor, one other document, you know, I wanted

10   to show you is attached to our reply brief, which is Exhibit

11   C to the reply brief that we've --

12          THE COURT:  One second, please.

13          MR. BRILLIANT:  So it's page 35 of -- it's page 35

14   of 45 on the docket, your Honor.

15          THE COURT:  Okay.  That's helpful.  I have it, sir.

16          MR. BRILLIANT:  All right.  And, your Honor, this is

17   a -- you know, an e-mail, you know, cover sheet from Craig

18   Hupp, who is, you know, counsel to the -- to MIDD in

19   connection with the transaction, and he's sending an e-mail

20   to Bob Walter, you know, who's, you know, at the city, and

21   then also to Mr. Jacobs at Dykema, and, you know, the city

22   has put in his affidavit or his declaration.  You know, he

23   was the principal, you know, lawyer with respect to the city.

24   And in the e-mail Mr. Hupp, you know, asks, you know, the

25   parties to -- you know, he took minutes or notes, you know,

1    at a due diligence meeting where, you know, the city came in
2    and talked about, you know, various issues, and as you can
3    see on the date here is March 19th, 2009, well into the
4    investigation that the U.S. Attorney's Office had started and
5    well into the time period when the members of DWSD were being
6    interviewed in connection with the investigation.  And, you
7    know, he -- you know, he asked them if there were anything
8    that's in error or incomplete, and, you know, to the best of
9    our knowledge, there's never been any response.  And, your
10   Honor, the issues here -- you know, if you just go to the --
11   you know, starting on 29 -- whoops.  We were up late working
12   on the reply brief and apologize for being a little
13   unorganized this morning.
14          THE COURT:  That's okay.
15          MR. BRILLIANT:  But starting on 29 --
16          THE COURT:  Page 29?
17          MR. BRILLIANT:  No.  Question 29, page 8, or on the
18   docket it'll be 43 of 45, I believe.
19          THE COURT:  Okay.  Let me catch up to you.  Hold on.
20   Okay.
21          MR. BRILLIANT:  Okay.  And so we're just going to
22   start here.  We're going to talk about -- going to get to the
23   key one in a little bit, but, you know, basically the way
24   this works is this was a due diligence checklist they gave to
25   the city.  The city came in, had conversations, so describe

1    any regulatory complaint or notices of violations issued on

2    Detroit or DWSD in the past five years out of or related to

3    the operation of the facilities.  Jacobs and Walter, the

4    outside counsel and the person from the city, were the people

5    who were going to respond, and they responded none just to

6    give you an example as to how, you know, this -- you know,

7    this works.

8              Now, if we go down, your Honor, to 32, it says

9    describe any facts of which DWSD or Detroit is aware which

10   would give rise to or support a claim against any contractor

11   or other person arising out of or related to the facilities,

12   and state whether such claim has -- you know, such claim been

13   asserted.  You know, the word "has" probably belongs there,

14   but -- so basically asking the city, "Are you aware of any

15   claim that might exist against a contractor or subcontractor

16   and whether it's been, you know, asserted yet?"  And it's

17   even broader than that.  "Are you aware of any facts that

18   would give rise to or support a claim?"  Right?  Jacobs and

19   Walter will address, and their response was, "DWSD is not

20   aware of any known, threatened, or pending claims other than

21   those identified in Item 30, and if you go up to 30, you

22   know, 30 is, "Describe any civil claims asserted or

23   threatened in the past five years arising out of the

24   operation of the facilities," and they say three claims,

25   claims and suits arising out of the collapse.  Presumably

 1   that's, you know -- you know, tort claims, you know, arising

 2   out of that, you know, people's homes being sucked into the

 3   sinkhole or whatever may have happened.  Collins' business

 4   interruption claims because of construction delays in the

 5   Garfield suit, and that's all they disclose.  So, you know,

 6   they -- you know, to -- you know, your Honor, they had an

 7   affirmative obligation to disclose the investigation.  They

 8   didn't disclose it.  They were asked specifically about

 9   whether there were any claims against any contractors, and

10   although they were aware that the FBI and the U.S. Attorney's

11   Office was investigating the contractors in connection with

12   potential fraud in connection with, you know, this

13   particular, you know, contract, they didn't disclose that.

14   And to the extent, your Honor, that they say that this vague,

15   you know, assertion here, you know, that, you know, claims

16   arising out of, you know -- you know, the collapse somehow is

17   a disclosure, you know -- you know, the Michigan courts have

18   made it absolutely clear that when you disclose information,

19   you have to disclose it in a way that it's -- you know, that

20   it's meaningful and people can understand it.  You can't, you

21   know, be -- you know, be sneaky and tricky and, you know,

22   answer the question, you know, with a half truth, you know,

23   to lead to, you know, an inappropriate, you know -- you know,

24   impression.

25           So, your Honor, you know, based upon, you know, the

1    facts and Michigan -- you know, Michigan law, you know, it's

2    pretty clear, I think, that we have, you know, a good claim.

3    The other, you know, issues that they raise that they think

4    may, you know, bar, you know, the claim is, one, they raise

5    the issue of res judicata in connection with, you know, Judge

6    Cleland's decision.  It's just completely, you know,

7    inapplicable, you know, to this particular case.  That was a

8    suit that was brought, you know, by MIDD against the -- you

9    know, against the contractors.  It was not a suit related to

10   the city, and the city intervened initially, you know, to

11   support the claims of MIDD, you know, the theory being that

12   either MIDD would get the benefit of it or it would go to the

13   city.  They did not say in their initial intervention that

14   they thought we did not have the claim.  Ultimately, Judge

15   Cleland concluded that claims against third parties were not

16   assigned to us, and we couldn't bring those claims, but the

17   case did not involve or did he rule upon any issues that are

18   the subject of the complaint that we have, which is against

19   the -- you know, against the city, so res judicata just

20   clearly, you know, doesn't apply in this situation, and issue

21   preclusion and claim preclusion, you know, don't apply

22   either.

23          And then, your Honor, the only other, you know,

24   defense that they have, you know, come up with is a, you

25   know, defense of governmental immunity, which doesn't apply

1 in the situation, and if you would like to hear about that

2 now, Ms. Badalamenti can talk about that.

3          THE COURT:  That's fine.

4          MS. BADALAMENTI:  Yes.  Thank you, your Honor.  The

5 governmental immunity defense that's been asserted by the

6 city is premised on one case.  It's the <u>Blackmar</u> case.  And

7 they assert that the <u>Blackmar</u> case involves a claim of fraud

8 and recognizes that governmental immunity bars all fraud

9 claims.  That case does no such thing.  In fact, the problem

10 with the <u>Blackmar</u> case and the northern Michigan case that

11 they cite -- and I will say as a caveat that the rest of the

12 cases that are cited in that section have nothing to do with

13 fraud claims or governmental immunity.  But with respect to

14 those two claims, they do involve a claim of fraud, and they

15 do involve a claim of fraud against a governmental entity.

16 And the issue and the reason why those claims are subject to

17 governmental immunity is because the fraud that is supposedly

18 perpetrated is something that is specifically contemplated by

19 statute.  In other words, it's not an ultra vires.  It's not

20 a proprietary.  It's not a -- there's no exception to

21 governmental immunity that applies to cover any wrongdoing by

22 the city, so the findings in those cases are that the

23 governmental agency is immune because there is no basis for a

24 fraud claim.  There is no holding in Michigan law -- and I've

25 spent the last two days making sure of this before I came in

1  to your Honor to tell you -- there is absolutely nothing to

2  suggest that a fraud claim, as a matter of laws, is precluded

3  by governmental immunity.  In fact, the suggestion is that a

4  fraud claim, especially a fraud in the inducement claim, is

5  to be analyzed by its damages and what the damages are sought

6  and analyzed that way, and as the Court knows, with respect

7  to contract claims, there is no governmental immunity ever

8  for contract claims asserted against governmental agencies,

9  so with respect to that defense --

10          THE COURT:  Isn't there an immunity statute?

11          MS. BADALAMENTI:  There is.  There's a section --

12  MCL 691.1407 is an immunity statute.  It provides that the

13  governmental agencies in Michigan are immune from tort claims

14  and that that tort is what the question is.  The tort

15  analysis is not the title of a tort claim.  It's not whether

16  a tort claim is traditionally viewed as a tort claim.  The

17  question for purposes of governmental immunity is what type

18  of damages are being sought when -- in the case of fraud,

19  innocent misrepresentation, fraudulent inducement, those

20  types of claims are -- the remedy that's being sought is

21  recision or reformation of the contract, so for that reason

22  fraud is -- and we cite a number of cases.  Fraud is

23  considered with respect to governmental entities, and there's

24  no immunity that applies.  In particular, we cite a Michigan

25  Supreme Court case where the -- a public contract was let,

1    and it was based specifically on a misrepresentation.  This

2    is the Valentini versus City of Adrian case.  The public

3    contract was let, and there was a misrepresentation by the

4    city to induce the contractor to get to that price.  When the

5    fraud was uncovered, the claim was allowed to proceed, first,

6    because the governmental agency has no statute.  It's not

7    engaged in a governmental function.  When it goes outside of

8    its statutory authority in order to conceal information,

9    certainly that is not a governmental function, your Honor,

10   which would be covered by immunity.  And, second, because

11   the -- what the contractor sought was the payment for actual

12   services, so the issue with fraud and a claim like fraud is

13   that there's no immunity because there's no statute.  A

14   governmental agency has to be, one, engaged in a governmental

15   function.  That's the first question.  A fraud claim -- there

16   is no statute or law that allows a governmental agency to

17   make the decision to conceal information with regard to its

18   contract processes, so the case -- the Blackmar case that was

19   cited to you by the city here involves a fraud in the

20   negotiation of an employment contract.  However, what is

21   found in Blackmar is that there was no misrepresentation,

22   and, in fact, the contract processes that were followed were

23   specifically provided for by the emergency act that was the

24   subject of that case, so there's an emergency manager statute

25   that's followed to the letter that forms that contract, and

1  they say you can't have a fraud claim in that case.  All they

2  did was follow what the statute told them to do.

3          In this case, you have a city who was entering into

4  a transaction with Macomb knowing and making a conscious

5  decision to disclose information and conceal other

6  information in order to induce to get the purchase price that

7  it wanted, so there is no governmental immunity in such a

8  circumstance.

9          Furthermore, the claim here is pled for recision,

10  reformation, in addition to damages, and for that reason it

11  would be a contract claim as opposed to the traditional tort

12  claim that is barred by governmental immunity.

13          MR. BRILLIANT:  Your Honor, there's a few more just

14  miscellaneous points.  Your Honor, in the reply, the -- you

15  know, which really is contrary to all the deposition

16  testimony, you know, the city now says that it was the

17  impression, you know, of Mr. Latimer that the DWSD wasn't

18  being investigated but instead it was an investigation even

19  though it was centered on the local economic development.  If

20  your Honor reads the deposition designations that we

21  attached, I mean it's absolutely clear from the very first

22  situation where Mr. Shukla, who was the chief engineer at

23  DWSD, was being -- you know, was interviewed by the FBI, and

24  it was absolutely clear that -- you know, that DWSD issues

25  and the sinkhole issue, in particular, were being

1  investigated by the government, and it was not -- it was not
2  disclosed.  And, you know, Mr., you know, Latimer's, you
3  know, interpretation that somehow, you know, he might have
4  thought that something else was the center the transaction,
5  it's just not -- it's just not credible, but it's not really
6  relevant either, you know.  The fact is that knowing that
7  there was an investigation here of the contracting and
8  subcontracting, you know, process, you know, would have, you
9  know, required that it be disclosed given that it was a
10 material piece of information and they had undertaken in the
11 letter of intent to disclose such events.
12         You know, next, your Honor, you know, their latest
13 argument is as well that Mr. Ferguson -- companies they
14 believe only got $3 million of the -- you know, of the, you
15 know, total amount, and that's not relevant either.  The
16 reality is that -- you know, that Inland and D'Agostini and
17 various other contractors also had inflated, you know -- you
18 know, charges here in part because they were paying, you
19 know, kickbacks and they needed to inflate their bills, but
20 the issue is not what Mr. Ferguson got.  The question is what
21 is the total amount of the overcharges.  And based upon both,
22 you know, their own expert, you know, at the time --
23 engineering firms' estimate as to what it would cost and
24 MIDD's expert's estimate as to what it would cost and based
25 upon the allegations that the city had filed in connection

1  with -- in its intervention complaint, it's clear that the

2  total amount of the overcharges, you know, is much closer to

3  $26 million than to any other number.

4      THE COURT: How do you deal with the challenge that

5  the city makes to the weight or credibility that should be

6  given to your expert's conclusion regarding the damages?

7      MR. BRILLIANT: Yes, your Honor. I think the first

8  thing is, your Honor, the expert has 26 years of experience,

9  you know, creating estimates. He had the benefit of all of

10  the information that the city had at the time that it let out

11  the contracts plus about half of the information as to when

12  the project -- you know, half the information about what had

13  happened on the project, you know, through the process, and

14  he was able to come up with a number based upon his expertise

15  as to what it would cost. And his number was very consistent

16  with the numbers of NTH, the city's, you know, expert, you

17  know, as they disclose in the complaint, and -- you know, and

18  so I think it's very credible.

19      Also, your Honor, he points out in his declaration,

20  you know, a number of the really extraordinary, you know,

21  charges that exist, which kind of gives you a sense of the

22  magnitude of the -- you know, of the fraud here, the amount

23  of fees charged, you know, for security, the amount of fees

24  charged for -- you know, for pumping and various other things

25  which were, you know, many multiples of what they would

1  ordinarily, you know, cost, so it's -- I think, your Honor,

2  their -- you know, their argument is, you know, completely,

3  you know, misplaced as to, you know, the validity of -- you

4  know, of his analysis.  I think it was an appropriately, you

5  know, done analysis, and I think it's -- you know, the result

6  of it, you know -- you know, withstands, you know, scrutiny,

7  you know, here.

8         You know, the last thing with respect to damages,

9  your Honor, is there -- you know, this was a -- you know,

10  intended to be a global settlement, which resolves not just

11  the -- you know, the issues with respect to, you know, the --

12  you know, the sinkhole, you know, collapse and the repair but

13  also with respect to certain other things that were, you

14  know, outstanding in connection with the disputes between the

15  parties at the time.  Now, it's not disputed at all that the

16  amount of the -- you know, of the repair, you know, was

17  passed along, you know, pursuant to this contract, you know,

18  to -- you know, to MIDD.  I don't think that -- that's not

19  disputed, but instead what they dispute is there was a $17

20  million credit to the ultimate, you know, total amount of,

21  you know -- you know, system debt, the amount of investment,

22  so to speak, that was -- you know, existed in the assets that

23  were transferred, you know, to MIDD, and the $17 million --

24  the evidence is pretty clear, your Honor, when you read

25  the -- you know, the -- you know, the transcripts that the

1  $17 million comes from the -- is a deduction related to

2  things unrelated, you know, to the transfer of the MIDD

3  assets.  It had to do with a dispute over interest rates, a

4  dispute regarding, you know -- you know, some radio issues

5  and various other things, so it's completely unrelated to

6  these issues, so there's no -- there's no double counting

7  here, you know, in connection with the -- you know, with the

8  issues.

9          In connection, your Honor, with, you know, other

10  issues, you know, they raise issues as to the credibility of

11  Commissioner Marrocco in connection, you know, with his, you

12  know, recollection, you know, relating to the representations

13  made by Mercado.  I would point your Honor to the deposition

14  transcript of Mr. Hupp, who, although not present at the

15  meeting where, you know, Judge, you know, Feikens asked Mr.

16  Marrocco and Mr. Mercado to go into the room and, you know,

17  resolve the issues, but -- you know, but he talks about the

18  fact that, you know, MIDD was very concerned about, you

19  know -- you know, whether there were overcharges here, and

20  that was an issue for them.  And then I'd also say that --

21  your Honor, that if you read the deposition transcript, there

22  is nothing inconsistent between the declaration and the

23  deposition transcript or between the deposition transcript at

24  various times when Mr. Watson asked questions of Mr.

25  Marrocco.  Instead he would ask him a couple questions about

1   conversations that he had about representations.  Then he'd

2   move on to something else before he, you know -- you know,

3   would tie it all down.  Then he would come back to it.  He'd

4   get a little bit more information, and then he would -- came

5   back to it a third time, you know.  You know, the problem

6   with -- you know, with depositions is -- you know, especially

7   when you hop around like that is you get whatever information

8   you ask for, and you don't get anything, you know, more than

9   that.  And when your Honor reads the transcript, it'll be

10   very clear to your Honor that Mr. Marrocco's testimony didn't

11   change.  It's just that by jumping around and getting half

12   the story here and half the story there and a little bit

13   more, you know, at the end, he just got different pieces of

14   it, but none of it is inconsistent with each other.  And the

15   fact that he didn't get -- you know, Mr. Marrocco never had

16   the opportunity to say that about -- he says he had this

17   meeting and this conversation with Mr. Mercado and what the

18   representation was because that's all that was asked.  No,

19   you know, question as to about, you know, what else, you

20   know, occurred, you know, around it.

21        So, your Honor, I think at this point I'm going to

22   sit down and reserve some time for rebuttal, but, you know,

23   from our perspective, I think we have, you know, established

24   the likelihood of success, a strong likelihood of success on

25   our claim and on the -- you know, the dollar amount that we

1   seek to have allowed for voting purposes.

2            THE COURT:  Thank you, sir.

3            MR. WATSON:  Good morning, your Honor.  Jerome

4   Watson appearing on behalf of the debtor, City of Detroit.  I

5   got involved in this matter about three weeks ago, and my

6   partner, Mr. LaPlante, at that time told me, "Well, this is

7   sort of litigation light, this bankruptcy litigation."

8   Judge, I haven't seen anything light about this over the last

9   three weeks, and I thank you for reading all the paper we've

10  submitted.

11           Macomb's claim, we submit, is woefully weak, and I

12  agree with virtually nothing they said, but I would like to

13  start off with a timeline because I think that's important

14  for our arguments.  In August 2004 the 15 Mile Road sewer

15  collapsed.  Nine months later, March 2005, the repairs were

16  completed.  In 2005 and 2006, the city allocated the full

17  cost of those repairs to Macomb.  In March 2006, Macomb filed

18  a petition before Judge Feikens charging that allocation and

19  also discussing costs that were incurred.  In the summer of

20  2006, the parties started negotiating a potential resolution

21  of their claims against each other.  Late summer, early fall

22  2006, according to Mr. Hupp, Macomb's attorney, a tentative

23  settlement was reached between Mercado and Marrocco as to the

24  cost of the 15 Mile Road repairs.

25           In March 2007, Judge Feikens issued an opinion

1   deciding for Detroit saying Macomb was responsible for all

2   the repairs, and that scuttled that tentative decision that

3   Macomb and Detroit reached, so they had to start all over.

4        In the spring of 2008, Feikens arranged for a

5   facilitation.  Judge Feikens arranged for a facilitation

6   before Mr. O'Brien, and settlement discussions were commenced

7   spring 2008 for the resolution of all complaints in the sale

8   of the Macomb Interceptor system from Detroit to Macomb.

9        In June -- and this is an important date -- June

10   2008 Mercado resigns.  He's gone by June 2008.  According to

11   Attorney Hupp, Mr. Mercado wasn't a part of the negotiations

12   that eventually resulted in the sale.

13        May 2009 the global settlement agreement was entered

14   into, and that agreement specifically resolved all disputes,

15   all disputes related to the costs for repairs of the

16   interceptor system.

17        A year, four months later, September 2010, the

18   acquisition agreement was entered into.  Under that

19   agreement, the system is sold to Macomb, and the parties

20   waived and released all claims regarding the costs of the

21   sewer collapse and any other projects.  The settlement and

22   the release agreement was separately entered into at that

23   time.  Three months after that, 12-2010, Kilpatrick and

24   Ferguson were indicted along with others.

25        First, I want to talk about MIDD's fraud claims.

1   They fail as a factual proposition, number one. MIDD bases

2   its fraud claims on two contingents. First, according to

3   MIDD, Mr. Mercado on more than one occasion told Mr. Marrocco

4   that the 1368 repair costs were fair and accurate. 1368 was

5   the sewer system -- was the number of the contract for the

6   sewer system that collapsed, so that's number one.

7   Representations from Mercado to Marrocco that the repair

8   costs were fair and accurate, and Marrocco said Mercado told

9   him this on more than one occasion.

10       Secondly, they say that the city knew that the FBI

11   and U.S. Attorney were investigating 1368 excessive charges,

12   and Detroit violated at least the acquisition agreement, and

13   they say the letter of intent as well, by not apprising

14   Macomb prior to the September 2010 closing on the acquisition

15   agreement that this investigation was proceeding forward.

16       There are four witnesses that negotiated the deal in

17   question. Those witnesses are all experienced attorneys.

18   For Macomb it was Mr. Misterovich, who was a Macomb employee

19   but an attorney as well, and Mr. Hupp, a Bodman attorney

20   who's very experienced. For Detroit the primary negotiators

21   were Mr. Jacobs, a Dykema attorney, and Mr. Walter, who's now

22   retired, but a very experienced attorney for Detroit. There

23   was some assistance given by a rate consultant, Bart Foster,

24   but those were the key guys in the negotiations. As I

25   mentioned, Mercado wasn't a part of the negotiations. They

1 really started right about the time he left.

2      The Detroit witnesses, including the two who

3 negotiated, all testified very clearly that the

4 reasonableness of the cost for the repair charges was never

5 discussed, didn't come up at all.  I asked both Mr. Hupp and

6 Mr. Misterovich about that, and they gave testimony which was

7 kind of evasive.  Neither of them clearly said that the

8 reasonableness of the charges for the repair costs was

9 negotiated or discussed during those negotiations.  So what

10 does Macomb base its claim on then?  It bases its claim

11 almost entirely on the alleged statements made by Mercado to

12 Marrocco.  And I examined at some length Mr. Marrocco about

13 this.  In fact, there were three separate times it came up.

14 Contrary to what Macomb's attorney says, the first two times

15 I clearly pinned the guy down, clearly pinned him down.  It's

16 right there in the record.  He said there was all there was.

17 The first time he said, "Well, there was a discussion in

18 2007, and Mercado said that the charges for these repairs was

19 fair and accurate."  And then there were other discussions,

20 but he couldn't recall the date of those nor could he recall

21 other details.  Well, later on in the deposition I asked him

22 could he recall some of the other details, and that time he

23 said, yeah, I can recall two discussions.  There were two

24 discussions.  One occurred during 2004 while the repairs were

25 being made about six weeks after the collapse.  And I asked

1   about trucks on the scene, and there seemed to be too much

2   stuff out there, and were we paying for all that.  Marrocco

3   said, "Oh, no, we're not."  And then the next discussion was

4   the spring of 2005 when I asked about pretty much the same

5   thing, all this cost we're incurring, and Marrocco said,

6   "Well, I'm checking everything.  This is a fair and accurate

7   cost that's being charged for this system."  I asked him if

8   there was any other discussions.  No, that's all there was.

9        Then at the close of the deposition, I wanted to

10  confirm that he told me that was all there was, that there

11  wasn't anything else, and at first he said yes, but then he

12  came up with two other discussions.  He said there was a

13  discussion in his office where basically Mercado said, "Well,

14  if there's any problem, we'll give you a credit," and then he

15  said -- didn't say what the time period was.  Then he said

16  there was a discussion in Mercado's office where about the

17  same thing was said, so one in his office, one in Mercado's

18  office, no time frame.  So I had three separate versions of

19  the statements, alleged commitments that Mercado made to

20  Marrocco.  So I'm waiting, Judge, to try to -- thinking,

21  well, what will he say in his declaration because a

22  declaration will be filed.  The declaration was filed, and

23  there was yet another story, and I would like to pull out

24  that declaration.  That was Exhibit 1 to Macomb's brief.  And

25  in that declaration, he says something way more specific than

1  anything he ever said in his testimony.  He says that he knew
2  Mercado -- paragraph 12 of his declaration, "I knew Mercado
3  to be the director of the Detroit Water and Sewerage
4  Department at the time that the work on the 15 Mile and Hayes
5  Road repair project occurred and, thus, inquired of him
6  whether there had been any irregularities on the repair
7  project to cause the total charges to exceed 52 million."
8  Paragraph 13, "Mercado responded in the negative and
9  represented on behalf of the city that the amounts in Exhibit
10  1 in Schedule 3.8 at Exhibit 3, page 48, were legitimately
11  incurred and paid," and then he goes on to say, "In reliance
12  on these representations, we entered into the contract."
13  We've got a problem with that testimony, Judge.  If you look
14  at Schedule 3.8 at Exhibit 3, page 48 -- and, unfortunately,
15  I don't think in Macomb's brief they attached all the pages,
16  so 48 isn't there, so I have to go to our brief and go to --
17  I believe it's Exhibit 20.  No.  Exhibit -- maybe it is
18  Exhibit 20.  Exhibit 20 and go to page 48.  I go to Exhibit
19  20, page 48, and I don't know if the Court has it.  It says
20  "Schedule 3.8" at the top.
21       THE COURT:  One moment.  Oh, this is attached to
22  your reply brief or your original brief?
23       MR. WATSON:  Original brief, Exhibit 20.
24       THE COURT:  Do you have a PDF page number for me?
25       MR. WATSON:  I really don't.

1        THE COURT:  What's the name of the document?

2        MR. WATSON:  It's Schedule 3.8.  It's one of the --

3   it's behind -- in Exhibit 20, almost to the end, about three

4   or four pages, maybe five pages from the end.  It's a one-

5   page document that lists all the charges for the sale of the

6   system.

7        THE COURT:  Hold on.  I'm getting there.  I have it,

8   sir.

9        MR. WATSON:  Okay.  If you look at the top, it says

10  "Schedule 3.8, Computation of Purchase Price as of June 30,

11  2010."  I think the parties admit that Mr. Foster prepared

12  this in conjunction with the acquisition agreement.  The

13  point, Judge, is this document is a computation which would

14  have been made no sooner than June of 2010.  Mr. Mercado left

15  the City of Detroit's employ in June 2008, two years before.

16  There is no way this document was discussed by Mercado and

17  Marrocco in 2008, so Marrocco's affidavit is just wrong, to

18  put it mildly.  Though we have four versions of what

19  happened, one of which -- the most specific version which was

20  relied on in this courtroom -- that's what they mentioned.

21  They were relying on the stuff in the affidavit -- is just

22  dead wrong.  We submit that Marrocco's testimony is not

23  credible and should not form the basis of a fraud claim, and

24  for that reason alone, their claim should be dismissed.

25           They also claim fraud stating that numerous Detroit

1    witnesses who were interviewed by the FBI or the U.S.

2    Attorney's Office knew about these excessive costs, and these

3    excessive costs were being evaluated, these alleged excessive

4    costs.  As a factual matter, all of our witnesses have denied

5    that when they were interviewed or when they testified before

6    the grand jury the issue of excessive costs even came up.

7    Mr. Latimer was the witness who was interviewed the most.  He

8    was interviewed three or four times, testified twice before

9    the grand jury.  He was the head of the DWSD contracts and

10   grants department.  He said that the investigation from what

11   he could tell entailed was focused on whether there was

12   favoritism shown by Mr. Ferguson -- to Mr. Ferguson in the

13   awarding of contracts.  And specifically he said he was asked

14   a lot of questions about the local economic development

15   department which could give credit to small businesses and

16   Detroit-based businesses, and that credit was used in

17   determining who might get contracts.  Mr. Shukla did say when

18   he was interviewed 1368 came up, but there was nothing that

19   came up about excessive costs.  The city's attorney, Mr.

20   Walter, testified that he couldn't recall 1368 even coming

21   up, and certainly there was nothing about excessive costs.

22   Not one of our witnesses could remember anything, any

23   questions about excessive costs, and most said that 1368 did

24   not even come up.

25              The other thing they claim in regard to the fraud

1  claim is that, well, the city knew about an investigation,
2  and that investigation should have been reported.  The city
3  had to disclose that investigation, and I saw that Mr.
4  Brilliant in his argument pointed to the letter of intent
5  that was attached to the May 2009 settlement agreement.  I
6  think we pointed it out in our brief, Judge, that letter of
7  intent is not even -- the letter of intent clause he cited is
8  not even applicable.

9      Too many documents here, but Exhibit 19 to our brief
10  is the settlement agreement, and Exhibit D to Exhibit 19 is
11  the letter of intent.  Mr. Brilliant referred to paragraph 9
12  of the letter of intent, the obligations under paragraph 9,
13  and says based on paragraph 9 we had to apprise him of any
14  claims.  However, looking at paragraph 14 of the letter of
15  intent -- perhaps I could read it in appropriate part.
16  Paragraph 14 is binding effect.  "Except for paragraphs 5 and
17  10 through 13 hereof, the provisions of which the parties
18  acknowledge and agree are legally binding upon them, this
19  letter of intent is not contractual in nature and will not
20  give rise to any legally binding obligation on the part of
21  any of the parties hereto."  Thus, the paragraph they're
22  relying on, paragraph 9, isn't binding on the parties, and,
23  therefore, the claim could not be premised on paragraph 9.

24      The other problem they've got is that none of the
25  witnesses who were deposed testified about any information

that would necessarily lead to a claim that impacted the system. Under the acquisition agreement, to the extent the city had an obligation to report, it only had to report claims that conceivably could impact the sale of the system. The investigation, as far as the city was aware, was an investigation of Mr. Ferguson, being given advantage in getting contracts. On the 1368 system, Mr. Ferguson didn't even have a contract with the city. His contract was with Inland. He was a subcontractor, and just because Ferguson was a subcontractor on 1368 did not mean that the sale to Macomb was somehow impacted.

The bottom line, we feel, Judge, is that all of our witnesses, Latimer, Walter, Shukla, had no idea they say from the investigation of the FBI and the questions they answered of excessive charges, nor did they know that there was any potential claim that could impact the system.

Macomb also says, well, but what about the due diligence list. There's this due diligence list with a lot of questions, and Detroit had an obligation to respond to that. Mr. Jacobs in his testimony talked about that. He said, "Well, I hadn't seen the list. We think it was something that was created by Mr. Hupp, Macomb's attorney, probably as hearsay, but we've agreed that it could be admitted," but that list, that due diligence list, came up in Mr. Hupp's deposition. It was made an exhibit to his

deposition, Exhibit 7 to his deposition. And in the
deposition actually Macomb questioned him about this due
diligence list and asked him about three questions, 29, 30,
and 32, which Mr. Brilliant, in effect, covered as he was
arguing the matter. And so I followed up with him, and I
asked him did he -- was he aware of any misstatement by
Detroit in answering those three questions when they gave to
him their answers. He admitted that he was not aware of any
of the responses being wrong when they were made by Detroit,
so he's admitted that, as far as he's concerned, he can't say
when Detroit made these representations that any of them were
wrong.

Based on that, we submit as a factual matter Macomb
has not proven fraud. A fraud claim has to be proven with
specificity, concrete evidence. There's nothing here even
approaching fraud that they've proven on this record.

Next, I want to move to damages. The first point we
would like to -- I would like to discuss is MIDD's reliance
on the Kilpatrick jury verdict in the complaint filed by
Detroit. As far as the jury verdict, they rely on the
indictment allegations which indicate that Detroit overpaid
Ferguson by $23.7 million. That's what the indictment said.
The jury -- under the jury verdict, Ferguson was found guilty
of extortion, meaning that he got some work improperly,
probably at the expense of other contractors, but the

1  extortion jury verdict doesn't mention anything about the

2  $23.7 million, and it doesn't establish that there was a

3  $23.7 million overpayment.  It doesn't even establish that

4  Ferguson did not do the work, and it doesn't establish that

5  Ferguson overcharged or anyone else overcharged for the work

6  they did.

7          There's also some confusion I would like to

8  straighten out now about that $23.7 million and 1368.  1368

9  was a regular contract at DWSD for $50 million, a unit price

10 contract given to Inland.  That means for the lining work and

11 point repair work Inland would do in working on sewers, they

12 would pay -- be paid a certain amount per unit of work they

13 did.  That contract was for $50 million.  There was an

14 amendment to that contract for $10 million, which brought it

15 up to 60 million.  Ferguson was an Inland subcontractor on

16 that contract.  Now, when the collapse occurred -- and that

17 was an emergency -- the City of Detroit couldn't wait four or

18 five months to go through the regular process and get another

19 contract.  They had to do it on an emergency basis.  Macomb

20 tries to make a lot out of that, but you couldn't follow the

21 regular practice to do this.  And Judge Feikens had given

22 Mayor Kilpatrick authority to enter into contracts to do

23 things on an emergency basis to get the job done.  So there

24 was an emergency contract which was called Amendment 2 to

25 1368.  That was 35 million.  Then there was another one,

1   Amendment 3 to 1368, that was 23 million, so 58 million was
2   the contract amount for the repairs to the Macomb Interceptor
3   system.  There were two other amendments to 1368, 4 was 12
4   million, 5 was 8 million, so overall 1368 was 138 million, 58
5   of which was for the emergency sewer repairs.  Of that 58
6   million on the emergency sewer repairs, we've established
7   through the affidavit of Mr. Latimer that Ferguson was paid a
8   total of $3,017,000.  The emergency sewer repairs was a --
9   the ledge is short here, and I can't keep my notes.  They
10  keep slipping off.  The emergency sewer repairs was a huge
11  job.  It was an immense project.  The sewer was 11 feet in
12  diameter, and there was no way a guy like Ferguson could
13  handle most of the costs, so he got the $3 million.  The rest
14  of his $20 million was on the other parts of 1368, and
15  there's just no evidence that Ferguson didn't earn the $3
16  million.  In fact, the only person who really knows about the
17  repairs that was on the scene every day was Remesh Shukla,
18  who ran the operation.  He was there 12 hours a day, seven
19  days a week.  He said Inland was not paid for any
20  subcontractors unless they submitted certified audited signed
21  invoices, and he said there was absolutely no overcharges.
22  That was his testimony.  We don't think Macomb has
23  established that there were 23 million of overcharges.  They
24  haven't established there were any.
25          The testimony of Lyle Winn doesn't help them out.

1   What Winn did is he took the initial estimate and got 20,000

2   pages of documents from Macomb, looked at the estimate and

3   said, "Well, gee, that 35 or 33 is too high.  It should be

4   28."  And so he said the repairs should have been 28.  It

5   cost 54 in total.  The difference is 26.  That's your

6   damages.  That analysis is flawed.  Mr. Shukla testified that

7   once they got out there, that project was much larger -- a

8   much bigger project than they thought it was with the initial

9   estimate by NTH.  As I said, NTH was our expert.  NTH helped

10   to work out the initial 33 or $35 million estimate.  The

11   project was more immense.  Shukla testified that they thought

12   they would have to go down 75 feet.  They had to go down 100

13   feet.  There was way more water than they thought of.  The

14   sinkhole kept growing larger and larger, and my favorite,

15   which didn't come out in our brief at all, was to plug that

16   sinkhole.  You got two 11-foot in diameter ends that broke

17   sort of in the middle.  You got to plug this end.  You got to

18   plug that end because you can't do anything until you stop

19   that flow, and so first they tried to use a bulkhead.  That

20   didn't work on each end.  Then they tried to use sandbags.

21   That didn't work.  So finally -- and this is all in Shukla's

22   deposition -- they sunk down 2,000 bags of cement on both

23   sides, 2,000 this side, 2,000 that side.  That stopped the

24   flow, but then that cement hardened.  They couldn't dynamite

25   it out.  They had to pick it out, and so that was an immense

1  cost.  None of these things were taken into account by Winn.
2  He admitted he didn't take anything into account.  He didn't
3  even consider the reasons why the costs might have been
4  greater.  We don't think his opinion is worth much of
5  anything.

6        THE COURT:  How do you deal with Macomb's assertion
7  that in a legal proceeding -- I can't now recall which one,
8  but in a legal proceeding the city itself did assert
9  overcharges on this project?

10       MR. WATSON:  Probably with a bit of embarrassment,
11  Judge, but legally we're right.  What the rule of law
12  there -- is there, if you assert something in one case, even
13  if it's in a pleading -- and this was in our complaint, the
14  initial pleading -- it can't be used against you in another
15  case.  We cited that in our brief.  And the fact of the
16  matter is after we got into the case and did more analysis of
17  what was going on, the 23 or $26 million was too much, and
18  the 23 came from Inland -- or came from Macomb.  We just
19  incorporated that into our brief, so that doesn't bind us.
20  And based on the discovery in this case, certainly that 23
21  million or 26 million is way too much.  In fact, our position
22  is that, if anything, Inland underpaid for the system because
23  the basic deal was they would pay system debt to purchase it.
24  That system debt was, in effect, 110 million, not 90 million.
25  They negotiated down at least 20 million.

1          I'm talking too long.  I want to mention the merger

2     clauses because that's a pretty good legal issue in this

3     case.  It's our position that the merger clauses of the

4     settlement agreement and the acquisition agreement totally

5     refute MIDD's claim.  This is a case in which the settlement

6     and then the acquisition agreement were negotiated by four

7     experienced attorneys.  Those were the guys doing the

8     negotiation, and the agreements reflect exactly what they

9     decided upon.  The merger clause in the settlement agreement

10    expressly states that it settles any and all claims,

11    representations.  It's a very broad merger clause, and it

12    also -- the settlement agreement also indicates that it

13    settles all claims for the costs of repairs.  It directly

14    covers what they're claiming.  All claims for the cost of

15    repairs are expressly covered by the settlement agreement,

16    and then there's a merger clause saying there's nothing else,

17    no other agreements, representations, anything, and this is

18    by four experienced attorneys, Bodman and -- a Bodman

19    attorney and a Dykema attorney were the two lead attorneys,

20    and they're trying to get around that.  We don't think they

21    can.  What they try to say is, well, fraudulent inducement

22    can get around it.  A fraud can get around it.  Well, in this

23    case, it can't.  For both a contract claim and a fraud claim,

24    you can't use parol evidence to vary the terms of the

25    agreement.  You might be able to use parol evidence for a

1    fact that might impact the agreement or what they're saying,

2    we wouldn't have entered into it had we known these facts.

3    In this case, what they're saying, Judge, is that the

4    agreement they entered into, which was we'll pay all the

5    system debt less credits we negotiate for the purchase of

6    this system -- they're trying to make a new agreement.  What

7    they're saying is, okay, we'll pay all system debt plus the

8    reasonable cost of the repairs for 1368 two and three and

9    then take into account credits, and that's the deal.  That's

10   not the deal.  That's a new deal.  The deal was you pay the

11   debt less credits, and that was it.  Even if the Court is

12   inclined to buy their argument that, well, these are just

13   some facts which, in effect, defeat the agreement, that

14   doesn't work in this case because you can't bring in parol

15   evidence if your reliance on the evidence is not reasonable

16   and if the evidence directly contrasts the -- or contradicts

17   the terms of the merger clause in the agreement.  Here it was

18   not justifiable for them to rely on something Mercado

19   allegedly told Marrocco years before and before the

20   negotiations even started.  Further, it was not reasonable or

21   justifiable for Macomb to sign a deal in which they're

22   claiming that, well, we knew Detroit had promised that the

23   repair costs were reasonable when the deal had an express

24   provision that says it totally settles any claims in regard

25   to repair costs.  Why would you sign that deal if there's

1  some provision out there or you want a provision or you've

2  gotten a promise saying you only pay reasonable costs, not

3  the total costs?  It wasn't reasonable, and -- for them to

4  rely on the Mercado statements, and that defeats the claim,

5  and plus the agreements totally defeat the claim.  Quantum

6  meruit -- their claims were quantum meruit.  When there's a

7  contract in place, quantum meruit won't lie.  There's a

8  contract in place here.

9         And, finally, I want to have Ms. Hathaway talk about

10  the governmental immunity.  Their fraud claims fail as a

11  matter of law because the contract basically covers all the

12  fraud claims they assert.  If you're alleging fraud based on

13  provisions which are covered by contract, your fraud claims

14  cannot lie.  Thank you, your Honor.

15         THE COURT:  Thank you, sir.

16         MS. HATHAWAY:  Thank you, your Honor.  There's

17  some -- I don't completely understand Ms. Badalamenti's

18  argument, so I'm afraid I'm going to have to back up a little

19  bit.  There is a Michigan statute that provides that the

20  governmental entity is immune from tort liability.  She

21  talked a little bit about issues about whether or not this

22  was a governmental function.  I don't really think there's

23  any question that transferring a government asset to another

24  government entity is a government function, so the issue

25  becomes whether -- what are tort claims and what are contract

1  claims, and we've covered this a little bit in our brief, but
2  it's become a little mucked up, so let me just briefly
3  indicate a fraud claim involving a contract can only arise if
4  there is something external to the contract that creates a
5  duty independent of the contract.  They've tried to sort of
6  say, well, there's fraud, the contract was a fraud, there was
7  fraud in the inducement, but you have to -- you have to back
8  up and assess it intellectually.  There's a contract, and
9  there's an issue of whether the contract was breached.  There
10 are claims extrinsic to the contract, fraud, fraud in the
11 inducement, innocent misrepresentation.  Those are all torts,
12 and they are extrinsic to the contract.  We've cited an awful
13 lot of cases in our brief on point, you know.  The big case
14 in Michigan is the <u>Fultz</u> versus <u>Commercial Union</u>, I think it
15 is, case, but -- so we have -- clearly all of the fraud parts
16 are tort, and they're barred by governmental immunity.
17      THE COURT:  So your position is a city can commit
18 fraud and not have to pay damages for it?
19      MS. HATHAWAY:  They can commit fraud and they cannot
20 be sued in tort for it.  You know, it may be unfair.  There's
21 case law directly on point.
22      THE COURT:  What else is there?
23      MS. HATHAWAY:  Contract.  They can still bring a
24 contract claim against the city claiming a breach of
25 contract, but you cannot -- if, in fact, the contract was

 1  breached, you can seek damages.  Now, the case that they

 2  relied on in their reply brief, this Valentini case, is a

 3  contract case, and, in fact, I think that Ms. Badalamenti

 4  even admitted --

 5      THE COURT:  What do you mean when you say "it's a

 6  contract case"?

 7      MS. HATHAWAY:  The case they cite, Valentini, is a

 8  case brought in contract claiming that they are entitled to

 9  more money under the contract because of a misunderstanding

10  or a misrepresentation of the amount that was due, and in

11  that case it was based on the terms of the contract.  If you

12  look at Valentini, there is no discussion of governmental

13  immunity in the case.  It is a case purely talking about the

14  terms of the contract.  I looked, your Honor, and I couldn't

15  find any cases where a fraud claim had been allowed against

16  any government entity outside of a contract because it is

17  barred by governmental immunity.  It may not seem fair, but

18  that's what governmental immunity is.  And we actually cited

19  cases in our brief that say fraud is still a governmental

20  immunity case, so that brings it down to what are their

21  contract claims.  And in our brief, I went through what the

22  contract claims were in some detail, and --

23      THE COURT:  Well, but pause there.  Claimant argues

24  that although it's a fraud claim nominally, the damages are

25  contract damages because the way they're calculated is what

1  was paid versus what should have been paid under the

2  contract.

3       MS. HATHAWAY: And damages is not -- under a

4  contract, you can only get economic loss. That is true. But

5  the issue about whether or not it's within the contract or

6  without the contract, outside of the contract to which

7  governmental immunity applied would be duty. It's not

8  damages. It's duty. And if you look at the Fultz case or

9  Hart or Rinaldo, the threshold inquiry is whether plaintiff's

10  allegations of a violation of a legal duty, separate and

11  distinct from the contract obligation. They allege there is

12  a -- there is an obligation outside of the contract not to

13  commit fraud. Outside the contract it's a tort. If it's

14  inside the contract, it's not barred by governmental

15  immunity. So their contract claims aren't barred by

16  governmental immunity, but their allegations of fraud, fraud

17  in the inducement, all of those things are barred by

18  governmental immunity because they are extrinsic to the

19  contract and set up by a duty outside of the contract, and

20  it's a duty issue, not a damages issue. It is true in

21  contract you can only get your economic loss, whereas in tort

22  theoretically you can get other things, but that's not what

23  sets it in and out of the contract. It's the duty, and the

24  duty --

25       THE COURT: Well, in this case, didn't the city

1    represent in a contract context that there were no such

2    investigations, as the claimant asserts, which gave rise to

3    its claim?

4          MS. HATHAWAY:  No.  What they cite is the letter of

5    intent that was signed long ago -- well, actually, to tell

6    you the truth, your Honor, we've never found a signed copy.

7    I don't think anybody has found a signed copy.  The letter of

8    intent has that statement in it, but, as Mr. Watson

9    indicated, the letter of intent itself says that these are

10    not binding provisions, so it's -- the letter of intent is --

11          THE COURT:  Well, what's the point if it's not

12    binding?

13          MS. HATHAWAY:  Because it was intent that was later

14    put into a settlement agreement and later put into an

15    acquisition agreement.  The letter of intent here, an

16    unsigned letter of intent that contains a provision that says

17    it doesn't survive after the expiration of the letter of

18    intent can't be used to void or increase what's in the

19    settlement agreement and what is in the acquisition

20    agreement, both of which contain specific statements that

21    there are no other integration clauses and statements that

22    there are no other statements outside of it and, you know,

23    the settlement agreement relating the rates which was all,

24    you know -- specifically says -- and this was entered into

25    after all of that -- Detroit and Macomb waive and release any

1  claims with regard to the following matters:  the cost of all

2  projects and contracts shown on 3.8 to the MIDD agreement --

3  that's what we're talking about here -- and the calculation

4  of all credits, charges, and adjustments set forth in that

5  schedule.

6          THE COURT:  And your contention is that waives a

7  concealed fraud claim?

8          MS. HATHAWAY:  Concealed fraud claim is a -- a

9  concealed fraud claim is a tort, but, yes, there was nothing

10  in the settlement agreement.  There was nothing in the

11  acquisition agreement that said that there were no

12  investigations.  And remember the --

13          THE COURT:  That's a different question.  Your

14  argument is that what you just read me waives a concealed

15  fraud claim.

16          MS. HATHAWAY:  It waives all claims.

17          THE COURT:  So the answer to my question is yes?

18          MS. HATHAWAY:  Yes.  There were two other releases,

19  and --

20          THE COURT:  All right.  I can give you one more

21  minute.

22          MS. HATHAWAY:  No.  I'm essentially done.

23          THE COURT:  Oh, all right.

24          MS. HATHAWAY:  There were two other releases as

25  well.  Mr. Watson may have something to add.

1         MR. MONTGOMERY:  I believe that I would have

2  something, yes.

3         MR. WATSON:  Yeah, yeah.

4         THE COURT:  Time is up.

5         MR. MONTGOMERY:  Forty-five minutes up, your Honor?

6         THE COURT:  It is.  In fact, Mr. Montgomery, I have

7  to ask you why you're here at all.

8         MR. MONTGOMERY:  Oh, yes, your Honor, of course.

9         THE COURT:  I can't help but feel some distress that

10  the city is paying for two sets of lawyers to defend this

11  claim or --

12         MR. MONTGOMERY:  Well, your Honor --

13         THE COURT:  -- defend this objection to claim.

14         MR. MONTGOMERY:  Of course.  Your Honor, you may

15  recall that when we first appeared on this matter, we said

16  the significance of it to us was that we wanted to make sure

17  that our issues as retirees in the plan process were not

18  unduly affected by what we thought was a false and

19  inappropriate claim that might affect the voting in Class 14.

20  That was the reason why we were joining the objection on

21  behalf of the city.  We continue to believe that that is a

22  potentially material issue.  We won't know if we were right

23  or we were wrong until next Monday, but that is why this

24  assertion of a $26 million claim is potentially quite

25  important to the way issues of both best interest and unfair

1  discrimination are fought.

2      THE COURT: Fair enough, but isn't it the fact that

3  your briefs raise virtually identical issues?

4      MR. MONTGOMERY: Actually, if you will recall, your

5  Honor, Macomb protested that we were being more aggressive on

6  the res judicata issue than the city was. In fact, were I be

7  arguing in front of you, I would be arguing the gates, not

8  the evidence, that I believe block Macomb from being able to

9  go forward, and so, your Honor, just in extreme summary form,

10 we think that if you look at the transcript of the hearing

11 before Judge Feikens in which the settlement was announced,

12 it is perfectly clear from that settlement that the cost of

13 repairs was part of the 2009 settlement; that both

14 experienced counsel was there and experienced clients were

15 there. It was not just an interest issue. It was a cost of

16 repair issue. There's two settlement agreements and a

17 determination by Judge Cleland that any damages that might

18 arise out of these facts and circumstances were speculative,

19 and we think that was concluded by -- or conclusively proven

20 by the use of their expert witness, who didn't rely on his

21 own work, who was forced to concede that he didn't know the

22 competing facts and circumstances that might give rise to a

23 different conclusion, and, therefore, your Honor, we think

24 everything boils down to the narrow question, since the

25 contracts block the basic claims, whether or not a fraud

1   claim can survive a governmental immunity assertion where the
2   basic business that was being undertaken was one of operating
3   a utility.  It wasn't the commission of the fraud that was
4   the business just like the <u>Blackwell</u> case, your Honor, you
5   know.  You can hire somebody.  Whether you fail to disclose
6   city finances in an improper manner, you're still barred by
7   governmental immunity because the community was entitled to
8   hire you as a governmental function.  So, your Honor, in the
9   shortest form, that is what I would have said in more words,
10  and I think --

11          THE COURT:  All right.  Thank you.

12          MR. MONTGOMERY:  Thank you.

13          MR. BRILLIANT:  Your Honor, we just have a very
14  short amount in rebuttal.  Ms. Badalamenti will have some
15  issues as well.  I'm just going to tick off some things
16  pretty quickly.  I think generally, your Honor, the city's
17  argument is just, you know, too cute by half, you know, all
18  across the board starting with respect to the Marrocco, you
19  know, testimony.  As I said, you know, in our opening, your
20  Honor should look at it.  There's nothing inconsistent.  With
21  respect to the particular paragraph that -- you know, that
22  counsel complains about, he's just basically taking it out
23  of -- you know, out of context.  You know, I suspect, your
24  Honor, this is what happens when you do a declaration that's
25  written by lawyers.  All he says -- he's not saying that --

1  he's not saying that he reviewed the schedule that was
2  created in 2010 with Mr. Mercado and that Mr. Mercado agreed
3  to it.  What he says is Mercado responded in the negative and
4  represented on behalf of the city that the amounts that are
5  in Exhibit 1 -- that the amount, the amount that they paid,
6  you know, as being, you know -- you know -- you know, the
7  amount for the costs were legitimately incurred and paid, so
8  it's not that this somehow dates the -- you know, the -- you
9  know, the conversation after the schedule was met.  All he
10 was saying was that that amount that showed up in --
11 ultimately showed up in the schedule was represented by Mr.
12 Mercado as being legitimate.

13         Your Honor, you know, the issue with respect to the
14 letter of intent, you know, they say, you know, well, it
15 wasn't binding on them.  As your Honor points out, well, then
16 what was the purpose for it?  Of course they had this
17 obligation during the diligence period to provide the
18 information.  They didn't.  Even if, you know, their view is
19 that they weren't required to do it, that just falls into a
20 different category of -- you know, of fraud under Michigan
21 law, and it just becomes silent fraud.  When you know that
22 the other party is interested in the information, that they
23 view it as material, and you don't fully, you know, disclose
24 it, you're still liable as if you, you know, made a
25 fraudulent, you know, statement, so it doesn't really -- you

1 know, their difference is without, you know, any legal

2 significance.

3       With respect to the diligence checklist that Mr.

4 Hupp pointed out, they say that it's hearsay. It's not

5 hearsay, Judge. We're not giving it to you for the proof of

6 what's asserted as being true. We know it's not true.

7 That's the point. We're giving it to you to show that they

8 made a misrepresentation here, so it's not being offered for

9 purposes of whether or not Mr. Jacobs and Mr. Walter were

10 telling the truth when they said this. It's being offered

11 for the fact that this is what they told us, that it's the

12 representation, you know, that they made is clearly not

13 hearsay and should be given the weight that it's entitled to.

14       As for the issue of Mr. Hupp saying that -- you

15 know, that he wasn't aware at the time that they made

16 representations that they made any wrongful representations,

17 well, of course, that's right. If we would have known that

18 they were misrepresenting the fact that there were, you know,

19 overcharges or, you know, that there wasn't a governmental

20 investigation, the deal wouldn't have closed. And the fact

21 that he doesn't know today whether or not there were any

22 misrepresentations is the fact that he's not the counsel

23 that's involved in investigating and prosecuting, you know,

24 these issues.

25       Now, your Honor, the best one is this issue about

1  the case that takes place next door in front of Judge

2  Cleland. Now, counsel tells you, well, things have changed.

3  Well, your Honor, I ask you to take judicial notice and go on

4  the docket sheet, and what you're going to find out is that

5  case is still ongoing. It hasn't ended. Certain parties

6  have settled and given, you know, the city, you know, notes

7  and -- you know, and money, which they're keeping even

8  though, you know -- you know, basically double -- getting

9  double paid, but more importantly, the case is ongoing. And

10  has counsel filed an amended complaint to say they no longer

11  believe these things or anything of that sort? No. He's

12  still moving forward with the same pleadings, and he's making

13  exact contradictory arguments to the arguments that he's

14  making, you know, here today in front of your Honor.

15          Now, again, they say, well, you know -- you know, in

16  order for it to be, you know, legally -- you can say whatever

17  you want in one case and something different in another case,

18  but that's not quite right, you know. Rule 11 applies.

19  There's good faith obligations to the various courts. More

20  importantly than that, judicial estoppel prohibits you from

21  staying in one court and getting some kind of advantage.

22  Here they filed a motion to intervene in the case based upon,

23  you know, this complaint. They were successful in that.

24  Maybe it creates judicial estoppel. Maybe it doesn't. But

25  the point is, your Honor, because we're only at a summary

1    hearing here, it just shows that we have a likelihood of

2    success here on this issue because they are in another court

3    making representations to another court against other third

4    parties.  They're continuing to do it, and they're asserting

5    the very opposite of what they're saying, you know, here

6    today.

7         Your Honor, you know, I would just ask you to read

8    these cases about the integration.  I guess the one case I

9    would say that may be of particular interest to you is the --

10   I think it's pronounced Abbo case.  I'm not going to waste a

11   lot of your time here.  I hope your Honor would read it.

12   But, you know, what's interesting here, party says, "You want

13   to buy this property?  It's got five" -- you know, five -- I

14   think it's five acres of lakefront property, sign a contract,

15   contract doesn't, you know, require that it be, you know,

16   lakefront property, sign the agreement, close the

17   transaction.  He then finds out that he doesn't have five

18   acres of lakefront property.  It was misrepresented to him.

19   He sues for fraud.  They say, "Whoa, you got a merger

20   integration agreement," only representations contained in the

21   agreement, didn't represent, you know, that it's got five

22   pages -- five acres of lakefront property in the actual

23   purchase agreement.  Court below throws out the case, goes up

24   to the Michigan appellate court.  The Michigan appellate

25   court says this is ridiculous.  The person was given a

1   representation as to what he was -- what he was -- what he

2   was buying.  Turned out to be false.  Therefore, it was

3   fraudulent in the inducement.  The merger clause does not,

4   you know, bar him from bringing a claim even though that

5   representation wasn't in the -- you know, wasn't in the case.

6   This whole concept that they raise about, you know -- you

7   know, reasonable notice makes no sense.

8         The reason, your Honor, I started you in -- when I

9   talked about their complaint with the issue of what it is

10   that they were intervening on -- and I don't know if your

11   Honor remembers, but it basically said that they were

12   intervening on, you know, the sewer contract with respect to

13   items two and three, amendments two and three, you know.  And

14   the reason I did that was because now they say, oh, you know,

15   all the damage claims, all this other stuff, involved the

16   other part of the contract.  Well, that's just not right,

17   your Honor.  You know, the -- you know, the issue here is

18   with respect to, you know, the alleged 23 million with

19   respect to two and three.

20         Your Honor, you know, they breached the contract.

21   They acted in bad -- undoubtedly acted in bad faith.  They

22   knew about the investigation.  They knew it was relevant to

23   DWSD.  They didn't disclose it.  They contractually agreed to

24   disclose these types of things.  They misrepresented the fact

25   that there weren't claims against subcontractors.  Mr.

1 Marrocco's testimony is basically unrefuted. Nobody says

2 that he didn't have this conversation, you know, with Mr.

3 Mercado nor could they other than, you know, Mr. Mercado, who

4 we would have had testify here today if he wasn't,

5 unfortunately, you know, unavailable as he is no longer in

6 prison, but he's in a halfway house and has, you know -- you

7 know, left the state and we were not able to subpoena him.

8 But the bottom line here is, your Honor, what the city, you

9 know, did was wrong, you know. You know, the good news is,

10 you know, the wrongdoers are gone, but, you know, their

11 actions cost other parties significant amount of money which

12 needs to be -- needs to be recouped and should be, you know,

13 compensated. And what's really, in my mind, you know, most

14 upsetting about this situation is although the wrongdoers,

15 you know, seem to be gone, the people that are still there,

16 you know, try to justify everything that happened and to

17 pretend that, you know, what was done, you know, wasn't wrong

18 and didn't take advantage of people in an unlawful, you know,

19 and fraudulent manner. I think Ms. Badalamenti has a few

20 quick comments, and then we'll be done, your Honor. No, your

21 Honor. Actually, she says that we're done. We thank you --

22          THE COURT: Okay.

23          MR. BRILLIANT: -- your Honor, for, you know,

24 your --

25          THE COURT: Right.

1          MR. BRILLIANT:  -- diligence to this and --

2          MS. BADALAMENTI:  Thank you, Judge.

3          THE COURT:  Okay.  My intent is to give you an

4    estimate of the claim, little more, and to do that at

5    Monday's status conference at ten o'clock.  All right.  So we

6    will continue this matter until then.

7          MR. BRILLIANT:  Thank you, your Honor.

8        (Proceedings concluded at 12:46 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

    I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett           July 22, 2014
_____      _____
Lois Garrett