```
 1                    UNITED STATES BANKRUPTCY COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3   IN THE MATTER OF,            Case No. 13-53846
                                  Detroit, Michigan
 4   CITY OF DETROIT, MI          October 3, 2014
     _____/   8:30 a.m.
 5
             IN RE: TRIAL RE: OBJECTIONS TO CHAPTER 9 PLAN
 6              BEFORE THE HONORABLE STEVEN W. RHODES
                TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
 7
     For the City of Detroit, MI:  GREGORY SHUMAKER, ESQ.
 8                                  THOMAS CULLEN, ESQ.
                                    Jones, Day
 9                                  51 Louisiana Avenue, N.W.
                                    Washington, D.C. 20001
10                                  202-879-3939

11                                  HEATHER LENNOX, ESQ.
                                    Jones, Day
12                                  222 East 41st Street
                                    New York, NY 10017-2113
13                                  212-326-3939

14                                  ROBERT HERTZBERG, ESQ. (P30261)
                                    Pepper, Hamilton
15                                  4000 Town Center
                                    Suite 1800
16                                  Southfield, MI 48075-1505
                                    248-359-7300
17
     For COPS:                      DEBORAH FISH, ESQ. (P36580)
18                                  Allard & Fish
                                    2600 Buhl Building
19                                  353 Griswold
                                    Detroit, MI 48226-3687
20                                  313-961-6141

21   For MIDD:                      DEBRA O'GORMAN, ESQ.
                                    Dechert, LLP
22                                  1095 Avenue of the Americas
                                    New York, NY 10036
23                                  212-698-3500

24

25
```

```
 1   For Financial Guaranty          EDWARD SOTO, ESQ.
     Insurance Company:              EDWARD MCCARTHY, ESQ.
 2                                   Weil, Gotshal & Manges
                                     1395 Brickell Avenue
 3                                   Suite 1200
                                     Miami, FL 33131
 4                                   305-577-3100

 5   For the Retirement Systems:     JENNIFER GREEN, ESQ. (P69019)
                                     Clark, Hill
 6                                   500 Woodward Avenue
                                     Suite 3500
 7                                   Detroit, MI 48226
                                     313-965-8300
 8
     For the Official Committee of   CLAUDE MONTGOMERY, ESQ.
 9   Retirees of the City of         Dentons, LLP
     Detroit, Michigan:              620 Fifth Avenue
10                                   New York, NY 10020
                                     212-768-6700
11
     PRESENT:                        ESTELLA BALL
12
     Court Recorder:                 LaShonda Moss
13
     Transcriber:                    Deborah L. Kremlick
14
     Proceedings recorded by electronic sound recording, transcript
15   produced by transcription service.

16

17

18

19

20

21

22

23

24

25
```

INDEX

WITNESSES FOR          Direct     Cross
THE CITY:

KEVYN ORR                         28,53
ROGER PENSKE           29         52
JAMES DOAK             74         138,144

EXHIBITS:                                    ID    ADM

CX747       Expert Report                    103   103
CX753       Desmond Phase I Report           128   129
CX754       Qualifications for Monetization of  132   133
            City's Parking Assets
CX755       Rider                            133   133
CX771       James Doak C.V.                   78    78
CX772       Development Agreement            114   114
CX773       Settlement Agreement            104   104
CX774       Summary of New C Notes          127

CX12000     Expert Report                      7     7
CX12001     Supplement to Report            156   156

BX14708-    Estella Ball Exhibits                  67
14712

RX10187     Stipulation                     158   158

1        (Court in Session)

2           THE CLERK:  All rise.  Court is in session.  You may

3    be seated.  Calling case number 13-53846, City of Detroit,

4    Michigan.

5           THE COURT:  Good morning.  It appears everyone is

6    present.  Sir.

7           MR. SHUMAKER:  Good morning, Your Honor.  Greg

8    Shumaker of Jones, Day for the city.

9        Some preliminary matters I just wanted to raise with you.

10   The first is that last night the parties reached an agreement

11   with respect to Mr. Orr's testimony.  The agreement was that

12   there will be no more cross examination by the objectors and

13   the -- the city will not have any redirect.

14       That leaves Your Honor and the pro se objectors for cross

15   examination.  And just so you know, I could explain that the

16   rest of the agreement.  We've -- we've agreed that if it is

17   necessary to re -- for Mr. Orr to come back and do redirect,

18   after Your Honor's questions, or the pro se objectors'

19   questions, then his redirect questioning will be confined to

20   those issues.

21       And the other part of the agreement is that if the city

22   decides that it needs to recall Mr. Orr during its rebuttal

23   case, that Ms. O'Gorman and MIDD will not be limited to just

24   the rebuttal testimony, but could also cross on other issues.

25   With Your Honor's blessings that's how we would like to

1  proceed.

2          THE COURT:  Yes, that's fine.  Give -- give me one

3  second if you would, please.

4          MR. SHUMAKER:  Certainly.

5          THE COURT:  Okay.  Anything further?

6          MR. SHUMAKER:  Yes, two things I just wanted to make

7  Your Honor aware of.  We were just talking at the beginning of

8  -- right before you -- you came in, and we know that Your

9  Honor is going to be putting on Ms. Kopacz very soon.

10          THE COURT:  Maybe not.

11          MR. SHUMAKER:  Okay.

12          THE COURT:  She and I have conferred about this and

13  because of ongoing work she has to do, I am -- I am

14  considering putting off her testimony actually until after the

15  creditors' witnesses.

16          MR. SHUMAKER:  Okay.  Well, even -- even if Your

17  Honor goes that route, one thing we wanted to raise was that

18  we believe that Syncora was the only party objecting to the

19  admission of her expert report and it might make it a lot

20  easier for you, Your Honor, if that was now admitted.  Which I

21  think the parties are in agreement.

22          THE COURT:  Well, let's -- let's inquire about that.

23  Is there any objection to the admission into evidence of Ms.

24  Kopacz's report?

25          MR. WAGNER:  No, the objectors have no objection

1          MR. SOTO:  No, Your Honor.

2          MS. O'GORMAN:  No, Your Honor.

3          THE COURT:  All right.  The Court will admit it into

4  evidence.  That will streamline her testimony.  Thank you.

5          MR. SHUMAKER:  And then the last point we just

6  wanted to raise is that as you know, Your Honor, Mr. --

7          THE COURT:  One second before you plow ahead.  Ms.

8  Green wants to remind me of -- of her continuing objection to

9  a piece of it.  Am I right?

10          MS. GREEN:  Yes, Your Honor.  Thank you.

11          THE COURT:  All right.  Subject to that objection

12  and that issue that does have to be worked out.  The Court

13  will admit the report into evidence.  We need a number.

14  Anybody have a number?

15          MR. SHUMAKER:  Court Exhibit 1?

16          THE COURT:  I don't want duplicate numbers.  Give

17  the me -- the last number.

18          MR. SHUMAKER:  775.  Or do you want one at the very

19  end of the spectrum?

20          THE COURT:  The very very end.

21          MR. SHUMAKER:  The very end, after all the

22  objectors.  Do you know what the last one is?

23          THE COURT:  Do we have that?  Caroline, do you have

24  that number?

25          A VOICE:  No, just go with 12000.

1        THE COURT:  Exhibit 12000, excellent.  Appropriately

2   random.  Okay.

3        (Court Exhibit 12000 was identified and admitted)

4        THE COURT:  Okay.  Yes, now what else was it you

5   were going to list?

6        MR. SHUMAKER:  It's just the -- the final point was

7   Mr. Doak will be testifying today, Your Honor, after your

8   questioning of -- of Mr. Orr.  Mr. Penske, I just wanted to

9   raise for Your Honor that Mr. Oak -- Doak is expected to be

10  with Judge Rosen in mediation at noon.  And I just didn't want

11  that to come as a -- a surprise.  And I'm sure you can deal

12  with that in any way that you deem fit, but I just wanted to

13  raise that.

14       THE COURT:  Maybe.  Okay.  Well, all right.  Let's

15  see if Estella Ball is here.  She's the individual who was

16  going to be given an opportunity to examine Mr. Orr.  No?

17       All right.  Well, let me just ask my very few questions

18  of him and if she appears, she appears.  If not, then --

19       MR. SHUMAKER:  Thank you, Your Honor.

20       MR. WAGNER:  By way of scheduling, we had thought

21  based on Ms. Kopacz -- the expectation that Ms. Kopacz would

22  be here on Monday and Tuesday that we would start our case on

23  the 4th -- on Tuesday, the 14th.

24       And so with -- so our first two witnesses are Ms. Thomas

25  who is a retiree that the pension plans are going to produce.

1  And if they can produce her on Tuesday for really cross

2  examination, that's fine.

3      But with respect to an out of town witness, I think he

4  probably can't be -- Mr. Fornia, I think he probably can't be

5  here until the 14th.  So what I would ask is that we proceed

6  with Ms. Thomas probably on Tuesday and then we proceed with

7  Mr. Fornia and the rest of our case starting the 14th.

8          THE COURT:  Are there any other local witnesses we

9  can fill in on Tuesday if necessary?

10          MR. WAGNER:  So I think what we can do is we've got

11  some deposition designations which we can read those days.  We

12  could -- which --

13          MR. SOTO:  And that may leave the city to bring a

14  witness in in which case it might be more than --

15          THE COURT:  Well, for -- for deposition

16  designations, my practice is for you just to give me the

17  transcripts and not actually read them in Court.

18          MR. WAGNER:  That's fine with us, Your Honor.  So

19  let me just -- well, I just --

20          THE COURT:  All right.  Let me just ask you to -- to

21  contemplate whether there are any local witnesses who you can

22  call to fill in any available time before we break for the --

23  the -- the Judge's conference.

24          MR. WAGNER:  That's fine.  But I will -- I will

25  assume that the -- the pension plans can bring Ms. Thomas on

1 the -- on the -- I guess it's the 7th. I'm sorry, the 6th.

2        MS. GREEN: I have confirmed yesterday with Cynthia

3 for the 14th, but I can step out in the hallway and confirm

4 that she can do the 6th and 7th instead.

5        THE COURT: Yeah, if you could let us know sometime

6 today.

7        MS. GREEN: Okay.

8        THE COURT: Okay.

9        MR. WAGNER: That's fine. And we'll have Mr. Fornia

10 here on the 14th.

11        THE COURT: All right.

12        MS. O'GORMAN: Good morning, Your Honor. Debra

13 O'Gorman for MIDD.

14    I just have one issue to bring to your attention with

15 regard to the mediation you ordered with respect to MIDD. It

16 was scheduled or ordered for the 7th. That date was not good

17 for the debtor. Now a date of October 20th has been proposed

18 and we really would like to try to find a way to get an

19 earlier date for the mediation.

20        THE COURT: Why was it necessary to go to the 20th?

21        MS. O'GORMAN: You'd have to ask the city that.

22        THE COURT: Was -- was that on account of Mr. Jones?

23        MS. O'GORMAN: I -- I believe it was. Some --

24        THE COURT: Do you know, Ms. Lennox?

25        MS. LENNOX: Good morning, Your Honor. My

1  understanding is these discussions have gone on between Mr.

2  Brilliant for MIDD and Mr. Watson who is counsel for MIDD in

3  the claim objection.

4          THE COURT:  Watson.

5          MS. LENNOX:  I'm sorry?  Mr. Watson.  Mr. Watson has

6  to be at a 6th Circuit argument on the 7th.  And the other dates

7  he proposed that week were not good for Mr. Brilliant.  So

8  we're trying to just coordinate schedules.  Perfectly happy to

9  have it sooner, Your Honor, it's just the two lawyers are

10 trying to work out their own schedules.

11         THE COURT:  Well, if I can speak bluntly here.

12         MS. LENNOX:  Uh-huh.

13         THE COURT:  This $26,000,0000 claim ought to be

14 settled.

15         MS. LENNOX:  Yes, Your Honor.

16         THE COURT:  And it ought to be settled before

17 October 20th or the days that follow that because we're going

18 to be very near the end of this trial by then.  And at some

19 point in time it's just going to be too late.

20         MS. LENNOX:  Right, understood.  I -- I will -- I

21 will communicate that to the parties and suggest that perhaps

22 they need to rearrange their schedules.

23         THE COURT:  All right.  Well, I'm going to

24 communicate the same to Mr. Driker.

25         MS. LENNOX:  Thank you, Your Honor.  We will

1  continue to work on scheduling.  Thank you.

2        MS. O'GORMAN:  One question with regard to

3  deposition designations.  How will Your Honor be handling any

4  objections to designations that have been made?

5        THE COURT:  You don't mean objections to questions,

6  you mean objections to actual designations?

7        MS. O'GORMAN:  Right.  There are some objections

8  that have been raised by the city in -- in some of the

9  designations.  So do you want to rule on those?

10        THE COURT:  Well, of course, but --

11        MS. O'GORMAN:  Should they just be noted?

12        THE COURT:  But I want to be sure I understand what

13  you're concerned about.  Are you -- are there objections to

14  questions that you want me to rule on, or objections to

15  designations themselves?

16        MS. O'GORMAN:  The objections are to the questions

17  that --

18        THE COURT:  Ah, to the questions.  Do you -- do you

19  have any suggestions on how to deal with that?

20        MS. O'GORMAN:  Well, the city has very helpfully put

21  together a highlighted copy of the deposition transcript

22  noting where there's an objection.  So if you receive the

23  designation you can see that there's an objection and I guess

24  rule on it and consider whatever testimony --

25        THE COURT:  Okay.

 1          MS. O'GORMAN:  -- is appropriate.  So, you know,

 2  that should be very efficient.

 3          THE COURT:  Well, if we have time on Tuesday and

 4  there are specific evidentiary objections that you want to

 5  argue to the Court, we can perhaps fill in with that.  Not

 6  that I encourage that, but you know, otherwise it's been the

 7  Court's practice in other situations to ignore those answers

 8  to those questions when the Court concludes that it would have

 9  overruled -- or that it would have sustained the objection.

10  But if you want to argue and want a ruling on the record,

11  that's fine too.

12          MS. O'GORMAN:  Okay.

13          THE COURT:  On -- on some specific subset.

14          MS. O'GORMAN:  Great.  Thank you.

15          MR. SHUMAKER:  Your Honor, just on the suggestion

16  department.  With regard to the questions since the parties

17  don't as you know as a matter of course, they reserve the

18  explanation of their objections during the deposition.

19      You may not be able to do that just based upon the

20  transcript.  But when the parties proffer the deposition

21  designation to you, that because we don't know exactly who

22  they're going to proffer yet, we can withdraw --

23          THE COURT:  Oh, I thought that had all been worked

24  out.

25          MR. SHUMAKER:  No, well, we -- we discussed that

1  this morning.  We're waiting for the objectors' witness list.

2  And I believe they're going to file that, I hope today, but

3  that's --

4           THE COURT:  What's the plan?

5           MR. MCCARTHY:  Your Honor, we will certainly -- Ed

6  McCarthy for FGIC.  File our witness list and we -- we've

7  talked about it already so that this is not intended to be a

8  surprise.

9      But on the deposition designations that were exchanged

10 previously, we are making attempts and strong attempts to

11 streamline the number of designations --

12          THE COURT:  Uh-huh.

13          MR. MCCARTHY:  -- we will proffer.

14          THE COURT:  Great.

15          MR. MCCARTHY:  And that's what we've been doing.  So

16 I mean there is -- there is certainly a list that's already

17 been exchanged.  It's much broader than -- than the final list

18 will be.

19          THE COURT:  So when do you expect the final list?

20          MR. MCCARTHY:  We could certainly do that by Monday.

21          THE COURT:  All right.  Let's -- let's re-examine

22 this either late Monday or first thing Tuesday and see where

23 we are.

24          MR. SHUMAKER:  And just the final thing, Your Honor.

25 As to designations as a whole, the city may have objections to

1  some of the individual witnesses that the objectors want to

2  put forth.  For example we don't think that some of these

3  witnesses could bind the city with their testimony if they

4  weren't 30(b)(6) designees.  So that once we get the list, we

5  could raise that with Your Honor.

6           THE COURT:  All right.  Okay.

7           MR. SHUMAKER:  Thank you.

8           THE COURT:  Sir?

9           MR. MONTGOMERY:  Your Honor, Claude Montgomery on

10  the housekeeping front.  And we had asked the city as part of

11  our not calling either of the two committee witnesses, Mr.

12  Atkinson or Mr. Wohl that a single exhibit be stipulated into

13  evidence and the city says they're going to try to get that

14  done this morning.  Okay.  Thank you.

15           THE COURT:  What is that exhibit, sir?

16           MR. MONTGOMERY:  It's the one that talks about --

17  that shows the distribution of retirees in the surrounding

18  area -- Detroit and the surrounding areas.  That's the only

19  one.

20           THE COURT:  Oh.  Do you have a number on that?

21           MR. MONTGOMERY:  Your Honor, I don't have that

22  number by heart.

23           THE COURT:  You'll work it out.  Thank you.

24           MR. MONTGOMERY:  Thank you.

25           THE COURT:  All right.  Let me inquire one more

1  time.  Is Ms. Estella Ball in the courtroom?  All right.  Mr.

2  Orr.

3        (WITNESS KEVYN ORR WAS PREVIOUSLY SWORN)

4  A    Good morning, Your Honor.

5        THE COURT:  Are you familiar with the make up and

6  powers of the Financial Review Commission?

7  A    Yes, Your Honor.

8        THE COURT:  How familiar are you?

9  A    I'm familiar with --

10        THE COURT: Let me revise the question.  How -- how

11  familiar are you with the statutory provisions regarding the

12  make up and powers of the commission?

13  A    I'm -- I'm fairly familiar in theory because there's no

14  commission.

15        THE COURT:  Okay.

16  A    I'll hesitate as far as how it's actually going to

17  practice.

18        THE COURT:  Right, okay.  You -- do you understand

19  that there is a provision in the -- in the statute that

20  addresses the make up of the commission that states that

21  either the Mayor or the Mayor's designee shall be on the

22  commission.  And further states that the city council

23  President or his or her designee shall be on the commission?

24  A    Yes, Your Honor, I'm familiar with those provisions.

25        THE COURT:  What -- what is your understanding of

1  what the purpose and function of this commission is?

2  A    The purpose and function of the Financial Review

3  Commission as embodied in the state legislation 182 and -- 181

4  and 182 now, it's Public Act 181 and 182, is to provide a

5  level of oversight that can be flexible according to the

6  discretion of the commission itself.

7      It is modeled on other commissions, the Municipal

8  Assistance Corporation, the D.C. Control Board, Pittsburgh

9  Commission.  And the -- the purpose of having the Mayor have a

10 representative, and having the city council present have a

11 representative, is that a voice be given to the city in terms

12 of some of the analyses and questions that may arise.

13     In the current Financial Advisory Board, the FAB, there

14 are opportunities for the city to present which have occurred

15 regularly.  But there is no city membership on that body and

16 so this time around my understanding was it was a good idea

17 putting aside the -- the necessity from a political standpoint

18 of having representation.  But it was a good idea

19 substantively to have representation from city officials on

20 that commission.

21     THE COURT:  Do you have an opinion on whether the

22 independence of the commission would be unnecessarily or

23 unduly compromised if either the Mayor himself, or the city

24 council President herself, sat on the commission as opposed to

25 a designee?

1  A    Yes.

2            THE COURT:  What is your opinion?

3  A    My -- my opinion is, is it is not so much dependent upon

4  whether the Mayor or the -- or the city council President sits

5  on the commission, there are nine members, they're just two.

6  My opinion is it depends upon the opportunity for the

7  commission to have access to data and to -- to other

8  department heads and city officials so that they get an

9  unvarnished view and a true view.

10       This Mayor and this council, I have a high degree of

11  confidence in as far as them wanting to present that.  But

12  we've seen instances in the past where that has not

13  necessarily been the case.  And so I think it really depends

14  upon the ability of the commission and/or its staff to have

15  access and drill down to the raw data particularly in some of

16  the more important departments.

17       Human rights, health services, human services and the

18  like maybe not so much because they perform beneficial

19  functions that aren't directly related to necessarily the high

20  end of the budget.  But the commission would need to have

21  direct and maybe sometimes confidential access to finance

22  public safety information technology, purchasing, those sort

23  of aspects so they can get the -- the for lack of a better

24  word, the real unvarnished story.

25            THE COURT:  And do I understand correctly that the

1  statute -- well, let me rephrase it.  What is the authority

2  under the statute that the commission has over the city's

3  Chief Financial Officer or -- or the information that the

4  Chief Financial Officer is required to provide?

5  A    One of the issues that arose, Your Honor, regarding

6  city's Chief Financial Officer, I actually met with Matt

7  Morgande who was the Chief Financial Officer for D.C. and had

8  served on the D.C. Control Board.  And he has a little placard

9  that he keeps out.

10      But he also emphasized the point that one of the benefits

11  of D.C. going through its transition were two principal

12  points.  It had four years where it had to report out a

13  balanced budget before it could remove itself from oversight

14  from D.C. Control Board.

15      But also the Chief Financial Officer needed to be an

16  appointed position and independent reporting directly to that

17  body.  We don't have that here.

18          THE COURT:  Uh-huh.

19  A    And I think that's -- that's been recognized as an issue

20  that -- that while the current Chief Financial Officer is a

21  tremendous resource for the city, he does not enjoy total

22  independence.

23      That being said, there are provisions in the statute that

24  require him or her to report to the commission on a regular

25  basis and also permit the commission to inquire into the city

1   about any issue.  There are no limits as far as what the

2   commission can ask about.

3       There are also safeguards in that the budget has to be

4   approved, there has to be a quadrenial and annual budget

5   approval.  Any contracts in excess of $750,000 have to be

6   approved by the commission.

7       So there are -- there are a -- a number of safeguards

8   that provide for oversight, but this is different than another

9   commission where the CFO was independent.  That being said, I

10  don't think that is a prohibition of the commission being able

11  to get accurate information from the city.

12      Cash management, purchasing, contracting, those things, I

13  think it is -- is just one -- another door that this

14  commission has to go through that other review boards did not.

15          THE COURT:  Well, what's the -- what's the

16  commission's remedy if it concludes that for whatever reason

17  the CFO is not providing full and accurate information?

18  A   Well, I think the commission has the ability to -- I'll

19  have to go back and do my homework to be sure, but I think the

20  commission might well have the ability to request a change of

21  the CFO.

22      I -- I would say this.  I have seen no indication that

23  either the Mayor, or the council, or the CFO in this--

24          THE COURT:  Yeah.

25  A   -- iteration has any interest in not providing the

1 commission with accurate information.  I'm thinking from a

2 structural and theoretical standpoint.

3          THE COURT:  Now you said request a change in -- in

4 CFO.

5 A    Yes.

6          THE COURT:  Can it insist on it or order it?

7 A    I'm going to go look at that to be sure, Your Honor.

8          THE COURT:  You're not sure?  Okay.

9 A    Yes.  I have the document in my folder.

10         THE COURT:  So if I understand you correctly, you're

11 not as concerned about the independence of the commission if

12 the Mayor himself is on it or if the city council President

13 herself is on it?

14 A    I am not, Your Honor.  I -- I think it really depends

15 upon the commission bodies.  And -- and my -- in discussions

16 with the state, I think they share that concern, that the

17 commission be robust and that it have representatives who --

18 who understand city government from inside out and I know I

19 can't -- I think the process of impaneling the commission is

20 still ongoing.  But I know they are looking at individuals who

21 have those qualifications.

22         THE COURT:  Okay.  In your testimony, you stated

23 your opinion that the current city leadership has the ability

24 to implement the RRIs?

25 A    Yes.

1        THE COURT:  I want to ask you a slightly deeper

2   question which is, what is your opinion on whether current

3   city leadership is actually committed to implement them?  Not

4   just able, but committed.

5   A    Right.  My -- my understanding is that current seated

6   leadership is committed to implementing the RRIs.  I think the

7   RRIs have some level of flexibility in them.

8        For instance with regard to information technology,

9   clearly that's a large component, it's one of the top four in

10  terms of spend for -- for the RRIs.

11       The Mayor in one of the orders that I had heard last

12  week, established the Department of Innovation and Information

13  Technology and made Ms. Niblock that you've heard from, the

14  new chief information officer from the city immediately.

15       So when it goes to the issue, and you've heard her

16  testimony about the city's hardware and software systems which

17  are archaic, they are already pursuing those RRIs, not

18  necessarily because the RRIs didn't define how you're going to

19  actually implement them.  They said this is a priority and

20  this is what we need to do to drive it.

21       And those FDEs that are identified in Mr. Moore's report

22  are going to be dedicated to that department.  Likewise with

23  human resources, we stood up a -- a new human resources office

24  last week and it's going to have I think five new second tier

25  directors, director of human resources, deputy director of

1 labor, director of training, the RRIs need to train.

2      So I think they're -- they're already not only committed,

3 but they're pursuing the path down that road.  So the RRIs are

4 -- are strategic, the tactical implementation I think of some

5 of those are ongoing and my impression has been that the Mayor

6 and the council, certainly the Mayor, on the executive branch

7 side, are dedicated to pursuing those RRIs.

8           THE COURT:  The Syncora development agreement

9 appears to intensify and broaden the relationship between

10 Syncora and the city.

11 A    Yes.

12           THE COURT:  Do you -- do you have a sense as to how

13 that relationship will be monitored and -- and executed from

14 or on the city's side of it?

15 A    Yes.  I'm -- I'm hopeful that the marriage was better

16 than the courtship if you will.  I think that the city in

17 development, particularly in the areas that Syncora is going

18 to be involved with, the grand circus garage for instance, is

19 in the center of the city.

20      There are a number of developments going on in that

21 particular area.  That is a -- it does require capital

22 expense, but that's a valuable asset if it's done the right

23 way, both because it can generate income.

24      So the city has an interest because developers that are

25 -- that are developing in that area, want to have parking for

1  their citizens -- for their -- their -- their customers.  And

2  certainly Syncora has an interest to get that lot up and

3  running because it generates income.

4       Likewise on the -- the East Jefferson corridor, the

5  difference between the real estate typically between the

6  riverfront to East Jefferson as far as out as Alter, there are

7  parcels that we're looking at.  Those have been prime parcels.

8  There's a lot of activity going on.

9       The new state sponsored natural resources division,

10 Dequindre Cut Park.  If you go down there you'll see a number

11 of -- of buildings that are being renovated.

12      There is every interest to think if you -- as Your Honor

13 no doubt remember, if you travel the arc from when that was a

14 working industrial waterfront, Union Carbide and others were

15 there to the point now where it's primed for waterfront

16 development.

17      It would seem to me that that's one of the more

18 attractive areas and likewise if Syncora as their stated

19 intent was in the development agreement, to become a partner

20 with the city and to actually pursue development opportunities

21 to build a new business along those lines, there's no better

22 place in the City of Detroit for them to do that and there's

23 no greater interest in the city.  Tom Lewand development

24 director for the city is very interested in this.

25      The Mayor is very interested in increasing the

1  development I that area.  I think the city's attention as well

2  as the other authorities, the Downtown Economic Development

3  Corporate, DEGC, Economic Growth Corporation, Downtown Detroit

4  Partnership and others will be focused on that area to sort of

5  keep their feet to the fire.  The agreement itself also has a

6  time frame for them to exercise the option.

7           THE COURT:  That's really what I want you to focus

8  on.  The -- the agreements set specific requirements for

9  Syncora to spend X amount of dollars on this or that.

10 A    Yes.

11          THE COURT:  And by certain deadlines?

12 A    Yes.

13          THE COURT:  So my -- my -- my question really is,

14 has it been determined who is going to watch those

15 requirements to assure that they are -- that those

16 requirements are met, that the time deadlines and the spending

17 requirements?

18 A    I don't know if a specific group has been tasked.  It

19 might be the case that by the time the Mayor testifies that

20 will be the case.

21          THE COURT:  I should ask him?

22 A    Well, I'm going to relay your questions to him.  We -- we

23 talk.  And -- and -- and I don't want to guess, but I know

24 that Tom Lewand who is economic development director was

25 intimately involved in the selection of those parcels as well.

1  So I see no reason why he would not.  The Mayor might have

2  another vision, but Mr. Lewand is charged with economic

3  development.

4           THE COURT:  All right.  Finally, I just want to ask

5  you a question that you were already asked to give you another

6  shot at it.

7  A    Okay.

8           THE COURT:  Why not monetize the art?

9  A    Your Honor, we -- some of the discussion yesterday showed

10  the evolution, in fact some of the emails between some of my

11  staffers and I showed the evolution from where we started to

12  where we are now.

13      In addition to my understanding that under 436, the state

14  statute as well as under 904 of the Federal Bankruptcy Code,

15  the debtor is not obligated to monetize anything.  I'll --

16  I'll answer this in three -- three categories.

17      One, I do believe that a one time sale of city assets,

18  even in cities in distress, is detrimental to the long term

19  benefit of the city, particularly the Detroit Institute of

20  Art.

21      That is one of the most significant cultural

22  institutions.  And I believe sincerely that it would harm it

23  irreparably.  The millage would be revoked.  I believe those

24  threats.

25      Other museums would not do business with DIA, both

1  nationally and internationally.  Maybe not forever, but

2  certainly in the immediate future.  Donors would certainly

3  hesitate.

4      In fact my understanding is that the endowment effort

5  they had undertaken has taken a bit of a -- a downfall as

6  people wait to see what's going to happen.  So there would be

7  harm from a one time sale of assets.

8      Secondly, Your Honor, in reviewing the reports and

9  talking to professionals, I do believe that the institute is

10 necessary as the city hopefully and intentionally rises.

11     New York was in dire straights in 1975.  It did not have

12 to put coops in Central Park.  It did not have to sell any of

13 its assets or museums.  It was not in bankruptcy, I

14 understand.

15     Washington, D.C. did not have to sell property or any of

16 its properties although it was not in bankruptcy.  So I

17 understand that.

18     But I think that in looking in the past at whether, and I

19 hope these crises haven't followed me.  When I went to Miami

20 in 1983, and '81, and '82 *Time* magazine had declared that

21 paradise was lost and that city came back.

22     '91 when I came to D.C. the Seventh and Ninth Street

23 corridors of D.C., Sursum Quarter, U Street, Cardoza, Shaw,

24 those areas were some of the most crime ridden and had been

25 written off.  They have come back.

1      I think Detroit has an opportunity and I think making a

2   decision for a one time deaccession of any art or the museum

3   itself would be very problematic.

4      Third, Your Honor, although there have been other

5   discussions about selling the art and other offers, in -- in

6   my judgment as I'm required to do under the statute, state

7   statute exercise discretion, the grand bargain that we've

8   pulled together through the mediation process, the benefactors

9   and others provide some value that I did not have at the

10   beginning of this.  Certainly at the time that Mr. Nowling and

11   I were exchanging emails, or at the time that I was making

12   initial statements about the art and its ownership at the

13   beginning of this case.

14      For me, that -- that changed my perception of what was

15   reasonable in terms of preserving a city asset and answering a

16   question I had always posed to the DIA and the benefactors we

17   must have a solution to this problem.  That provided the

18   solution and that to sell anything in the city, particularly

19   where in talking with Mr. Gargaro, or talking with Mr.

20   Manoogian it is their sincere belief that the people who made

21   those donations, although they did not do it with a particular

22   bequest or a charitable trust whatever, their intent was for

23   that art to stay in that museum.  Their intent was not for it

24   to be sold, otherwise they might have given cash.

25      So in -- in -- in keeping with those concerns, I do

1  believe that it is reasonable, the provision that we propose

2  and in selling any art, I think would cause a -- a maelstrom

3  of response from a number of different quarters that would be

4  problematic for the city's future.

5          THE COURT:  All right.  Any further questioning of

6  the witness?

7          MR. SOTO:  Just one, Your Honor.

8          THE WITNESS:  Mr. Soto.

9                    CROSS EXAMINATION

10  BY MR. SOTO:

11  Q    Mr. Orr.  I mean I appreciate your testimony just now.

12  Did you consider other forms of monetization in connection

13  with your analysis?  I know that you just testified that your

14  view of this has changed, but the Judge asked you about

15  monetization and you responded with the issue of sales.  There

16  are other ways to monetize the art so that it doesn't get sold

17  and it doesn't leave the city.  Did you consider those in

18  connection with your testimony just now?

19  A    Yes.  As I testified yesterday there were several I

20  talked about with Doug Woodham.

21          MR. SOTO:  No other questions, Your Honor.

22          THE COURT:  All right.  Has Ms. Ball arrived yet?

23  All right.  I -- I understand she's on her way, so I think we

24  will go on to other business and when she does arrive at some

25  point this morning we'll recall you to the stand to give her

1  an opportunity to ask her few questions of you.

2  A     Thank you, Your Honor.  Am I excused?

3          THE COURT:  Yes, you may step down.  You're not

4  excused yet, but you -- you may step down.

5      (WITNESS KEVYN ORR WAS TEMPORARILY EXCUSED AT 9:09 A.M.)

6          THE COURT:  Please raise your right hand.

7      (WITNESS ROGER PENSKE WAS SWORN)

8          THE COURT:  All right.  Please sit down.

9          MR. HERTZBERG:  Good morning, Your Honor, Robert

10  Hertzberg, Pepper, Hamilton on behalf of the city.

11                  DIRECT EXAMINATION

12  BY MR. HERTZBERG:

13  Q     Good morning, Mr. Penske.

14  A     Good morning.

15  Q     Could you state your name for the record, please?

16  A     Roger S. Penske.

17  Q     And where do you live?

18  A     I live in Birmingham, 600 Chester.

19  Q     And what is your current occupation?

20  A     I'm the chairman of Penske Corporation.

21  Q     And what is the Penske Corporation?

22  A     It's a transportation service company in leasing and

23  retail automotive.

24  Q     And how large is the Penske Corporation?

25  A     We have 40,000 employees and we manage about

1  18,000,000,000 in revenues.

2  Q    And how long have you been involved with the Penske

3  Corporation?

4  A    Since 1960.

5  Q    Does it also get involved in car racing?

6  A    Yeah.  We have a motorsports entity that's -- competes

7  not only in Nascar but also in -- in Indy car.

8  Q    And what is Indy car exactly?

9  A    It's open wheel racing at the Indianapolis 500.  There's

10 about 15 races in the U.S. annually.

11 Q    Including Belle Isle?

12 A    Including Belle Isle, yes.

13 Q    We'll go over that in a minute.  But the Indy cars race

14 at Belle Isle, correct?  Is it -- Penske Corporation a global

15 company?

16 A    Global, yes.  We have offices in Europe and also in

17 Australia and New Zealand.

18 Q    And you're not originally from Detroit area, are you?

19 A    I was born and raised in Cleveland, Ohio.

20 Q    And how long have you been in the Detroit area?

21 A    Well, this last stint I've been here since 1988 when we

22 bought Detroit Diesel from General Motors.

23 Q    And do you have a connection with Detroit at this point

24 in your life?

25 A    Well, I would say my -- my connection has been going back

1  to the Super Bowl probably in 2001 when I really got

2  interested in -- in the city.  And growth of the city and have

3  been really active ever since.

4  Q    How did you get involved with the Super Bowl and when was

5  the Super Bowl that you're talking about?

6  A    Well, the Super Bowl was Super Bowl XL in 2006.  And Bill

7  Ford contacted me in 2001 and asked if I'd become the Super

8  Bowl chairman which -- which I did accept.  And for about four

9  and a half years we worked, you know, with the leaders here in

10 the city and -- and the -- the companies to -- to build a

11 network of support for the NFL and also to provide an

12 environment where we could show off the City of Detroit in

13 2006.  And I think we had a successful Super Bowl and

14 obviously, you know, that really galvanized me personally to

15 be involved, you know, with the city going forward.

16 Q    What condition did you see the City of Detroit, the

17 downtown area when you became involved with the Super Bowl?

18 A    Well, obviously my concern was, you know, what was --

19 what were people going to think about our city when they came

20 downtown and obviously with burned out homes, derelict

21 buildings, et cetera, you know, a lot of things had to happen.

22      In fact as I sit here today I think about the Whitney

23 Building, the Broderick Tower where we painted up the windows

24 on those buildings in order to be sure they looked better for

25 the people coming to downtown Detroit.  And today we now are

1   -- have people moving in, and hotels and -- and offices.

2        So we've stayed in really a renaissance since that time.

3   And I felt that having the Super Bowl and having an event that

4   would have that kind of impact on the city from the standpoint

5   of notoriety and it also started to bring people together.

6        You know, we had 1,000 volunteers and people who cared

7   about our city.  And to me that was really the start of this

8   whole renaissance that we've seen take place over the last

9   several years.

10  Q    You brought Indy car racing, you have an Indy car racing

11  team, correct?

12  A    Yes.

13  Q    And you brought Indy car racing back to Detroit, didn't

14  you?

15  A    Well, that was a by-product of you know, after the Super

16  Bowl people saying what are we going to do next.  And there

17  had been racing here in Detroit at one point.  You know, Belle

18  Isle was a jewel we had that was under utilized.

19       And we had the opportunity to get a sanctioned agreement

20  in Detroit, ABC television for Saturday and Sunday to again

21  showcase our city.  And, you know, we've had that event

22  successfully now, you know, for the last few years.  And I

23  think that, you know, it's provided economic benefit to the

24  city and that we --

25  Q    How much economic benefit?

1  A    We have a study done, a independent study done each --

2  each year following the race.  And it's reported that the

3  region and the city receive about 45,000,000 of economic

4  impact, you know, based on this.

5      I think the key thing is that we get date equity.  And we

6  can bring this type of event back each year and with that it

7  creates tremendous momentum downtown.

8  Q    You said there was -- is it an independent study that

9  shows the economic benefit of 45,000,000?

10  A    Yes.  There is an independent study that they do at --

11  you know, during the race and after the race and it's -- it's

12  published which shows just exactly what an event like this

13  would -- impact it would have.

14      And that doesn't count what we see from the standpoint of

15  just we had seven hours of television between Saturday and

16  Sunday on national TV, you know, showing Belle Isle, showing

17  the city here this last year which was I think very positive,

18  you know, for the city.

19  Q    You put any of your own money at risk at this race to

20  support it?

21  A    Well, back in the first -- first race that we needed

22  approximately $10,000,000 worth of -- of equipment.  These are

23  barriers, safety fences and other things to -- to support the

24  event.  And, you know, we supported from a bank guarantee to a

25  local bank to provide $10,000,000 for that equipment.  And

1  that's being amortized over the -- the period of the races.

2      So, you know, that will be owned by, you know, the -- the

3  Downtown Detroit Partnership when we're through.  So we have

4  supported it that way our people, you know, we obviously have

5  been involved in our management.

6      We owned the Michigan Speedways, you know, out in

7  Brooklyn for a number of years.  So we have a certain amount

8  of expertise that we could bring in, you know, to the city to

9  run this event.  We do it for -- for the city, it's -- we're a

10  promoter, I guess you'd say, but the promoter really should

11  promote the benefit to -- to the city and the region.

12  Q    And do you have some of your own employees and personnel

13  work the race?

14  A    We have -- you know, we have some of our people that are

15  committed there.  You know, not all full time, but some, you

16  know, put a lot of their time in from the standpoint of the

17  sponsorship to connection business to business.  Those would

18  be our key guys.

19  Q    The race starts on a Friday, doesn't it, the beginning

20  part of the Belle Isle race?  Or is it on a Thursday where

21  cars start to come in to practice?

22  A    Well, we have -- Friday is a free day.  We felt that

23  anybody that lives in the region, wants to come in the City of

24  Detroit to the race, they can come on Friday for free.  And on

25  Thursday what we've done is we've worked with the Detroit

1  public schools and we bring stem students in which have an

2  opportunity to see the technology in all the cars and we

3  actually put on a -- a small review for those kids during that

4  time.

5      So we try to tie together the -- the technology of

6  racing, the speed, some of the things that we do.  And I think

7  I-- I think it ties together again trying to support, you

8  know, the -- the young people here in -- in the city.

9  Q    Approximately how many people from the beginning on

10 Thursday through the race on Sunday attend the race?

11 A    I would say there's somewhere between 75,000 and 100,000.

12 I can't give you an exact number.

13 Q    Do you personally sponsor any other activities in the

14 City of Detroit?

15 A    Well, you know, I've been involved in a number of

16 different activities.  I guess, you know, following the Super

17 Bowl, you know, one of the things that was -- I was asked what

18 are we going to do next.

19     And I said that I wanted to have a clean safe downtown.

20 And we started a project called Clean Downtown.  And many of

21 you have seen the trucks, the white trucks with the Clean

22 Downtown.

23     And we went to Goodwill and we have 50 Goodwill people

24 every day that clean 200 blocks downtown because as you came

25 out of whether a Super Bowl or a baseball game, or the auto

1  show, we just -- our city was -- was not what we wanted to

2  have it be.

3       So I initially funded that through the -- a Downtown

4  Detroit Partnership and today we have corporate sponsorships.

5  But many of these young people have had troubled lives, have

6  come through -- through Goodwill come through the Clean

7  Detroit are now are on their own feet.  So we've felt it's

8  been a -- a good project.  So I've been involved with that.

9  Q    Is there a thing called Eco Marathon that's coming to

10 Detroit?

11 A    Eco Marathon will begin next year.  This is where we

12 bring in probably 1,500 high school students and college

13 students that build small cars to show who has the best fuel

14 economy on one mile per gallon.

15      I think the best has been 3,000 miles if I'm not correct.

16 So we're expecting to have that in downtown Detroit.  And

17 that's through a partnership that we have with Shell Oil

18 Company and they'll bring that into the city.

19      So we're excited about that and that will be a project

20 that most major corporations will support.  And that will

21 bring a lot of interest and young people to -- to the city.

22 So we've -- we've been a big part of that.

23 Q    You mentioned that you were involved in Downtown Detroit

24 Partnership.  What is Downtown Detroit Partnership first?

25 A    Well, the DDP is really a group of -- of public leaders

1  of the city.  It's really the -- the institutions, the

2  philanthropy the Kresge, et cetera and -- and many of the

3  companies.

4      We're getting -- we get together and we look at projects,

5  you know, Belle Isle.  It could be the riverfront and other

6  things that take place.  And it's a -- it's kind of a melting

7  pot, you know, for people that want to -- want to support the

8  city.

9      We've seen other organizations that are more regionally

10 involved, but DDP is, you know, taking on a number of things

11 that -- that will help the city.  They were obviously involved

12 in as we've used them as a conduit, you know, for the police

13 and fire equipment that we supported the city with, you know,

14 the last 12 months.

15 Q   We'll go through that in a minute.

16 A   Okay.

17 Q   What -- what was your role?  Were you ever the chair of

18 DDP?

19 A   I was the chair of -- of the DDP for -- for a number of

20 years and Dan Leopp now is from Blue Cross/Blue Shield.

21 Q   What is 211 On The Go?

22 A   211 On The Go is -- is a project that Cindy Pasky and DDP

23 put together to help homeless people here in the city where we

24 put cars together with two or three young men and they would

25 go out and interface with young -- or people that were living

1  on the street and try to get them back.

2     We'd get them a cell phone.  We'd get a -- try to get

3  them a post office box so they could get back on their feet.

4  So it was the integration, we called it 211 where the people

5  wouldn't be afraid to come up to these vehicles and talk to

6  these young folks.

7     In fact the two young men originally actually went and

8  lived as a homeless person to try to integrate into the city.

9  So these are things that are all been by-products I think of

10  -- of the private sector working, you know, with the city and

11  with the people that live here.

12  Q    What is City Harvest and what is your role with City

13  Harvest, or what was your role?

14  A    City Harvest is -- is an organization that feeds, you

15  know, many people that are in need.  They go to companies that

16  have excess food, pick it up at night and then redistribute

17  it.  And we've provided trucks to them, you know, through our

18  organization.

19  Q    Were you involved at any point with Focus Hope?

20  A    Back in the early days, you know, we had the riots here

21  in Detroit and we're trying to -- to build some continuity in

22  -- in our city.  You had Father Cunningham and Eleanor

23  Josaitis and then we were big supporters of Focus financially.

24     And also they have the Machinist Training Institute which

25  would take young people and give them a -- a vocation where

1  they could actually work with -- with large machines.  And

2  when we owned Detroit Diesel we were one of the first

3  customers of Focus Hope and they were building parts for us.

4  Today I think they supply parts to many of the big automotive

5  OEM's and suppliers in this -- in this region.

6  Q    Are you involved in any other activities in the -- or

7  Detroit area?

8  A    Well --

9  Q    City of Detroit for example.

10 A    I think that, you know, the M-1 rail probably is --

11 Q    We'll go over that.  I'm looking at like the Thanksgiving

12 parade and stuff like that.

13 A    Well, we support, you know, as a company, you know, Bud

14 Denker, one of our key guys is you know, on the parade board

15 so what we've tried to do is -- is integrate wherever we can

16 in -- in the city with -- with our people.  You know, money is

17 one thing, but providing human capital to -- to support the

18 city is the most important thing we can do.

19 Q    And your people sit on boards throughout the city?  Okay.

20 Let's talk about the bankruptcy for the city.  How did you

21 become familiar with the Chapter 9 of the City of Detroit?

22 A    Well, obviously being as close as I am to the city and

23 the things we've been doing, I saw the financial strains and

24 obviously reading the paper.

25      I think counsel has -- has given me detailed information

 1  about -- about the bankruptcy being exactly Chapter 9, I'm not

 2  a lawyer, so I don't have intimate knowledge and understand

 3  all of the pieces.  But, you know, obviously I've seen it in

 4  -- in public companies and realize it's a cleansing effect

 5  that can take place as we saw with General Motors and

 6  obviously from -- from my perspective I feel it's -- it's the

 7  right thing to do and we have to do it in order to get our

 8  city back where it needs to be to be flourished and provide a

 9  place for people to live and work.

10  Q    Steve, can you bring up Exhibit 3, the disclosure

11  statement, the front cover, please?  You have a monitor in

12  front of you, Mr. Penske.  Have you seen this document before?

13  A    Yes.

14  Q    And how did you see that document?

15  A    Counsel showed this to me.

16  Q    If you could turn to Page 176.  And highlight the top box

17  for me.  Have you had an opportunity to review what we call

18  the restructuring initiatives?

19  A    Yes, I have.

20  Q    And you've seen this chart before?

21  A    Yes, sir.

22          THE COURT:  Excuse me.  Sir, would you pull the

23  microphone closer to you, please?

24  A    I'm sorry.  Apology.

25          THE COURT:  Okay.

1 Q   Do you have any familiarity with the City of Detroit's

2 police, fire, and EMS?

3 A   Well, I guess over a year and a half ago Mayor Bing

4 contacted certain business leaders for a meeting one morning

5 and talked about the need for funding of -- to clean up the

6 parks for the kids coming up in the spring and also the need

7 of police -- for police cars and EMS units.

8      And after that meeting I talked to the Mayor and said

9 that I felt that I could be a -- a catalyst to go out into the

10 private sector and -- and get the police cars, 100 police cars

11 and also the 23 EMS units which I'm happy to say with seven --

12 seven or eight phone calls people said yes.

13     And in August of last year we started delivering complete

14 the latest electronics, 100 police cars, and also 23 EMS

15 units.  So that was my involvement --

16 Q   And you funded the --

17 A   We supported -- we supported the -- with capital and we

18 also -- there's a piece that was being funded over time and --

19 and we're supporting that with guarantees to the bank.  But

20 that's just a short term period over -- over 36 months.

21 Q   Who were some of the local people that you got involved

22 in helping?

23 A   Well, the three -- the three motor companies, obviously

24 General Motors, Ford, and Chrysler.  Gilbert Gorey's, the

25 Kresge Foundation, Quicken Loans.  So it was, you know, the --

1  the people that you can pick up the phone and call that --

2  that understand how important it is to have -- have our city

3  be safe and secure.

4      So this was a great effort and they came down this

5  morning to see, you know, the police cars in action.  And one

6  thing we did do as part of our I think the vision we had in

7  the mission statement on these -- on the police cars was they

8  weren't all going to be in the city.

9      The key thing was that we needed to see these cars out in

10 the neighborhoods where we -- we felt that that was where the

11 need was.  So that's been, you know, part of the mission of

12 that -- with that involvement in that project.

13 Q    Did you ever have any contact with the fire commissioner

14 for the City of Detroit?

15 A    We were -- we were asked back in 2012 to look at the fire

16 equipment.  Because of our truck leasing company we --

17 Q    When you say we, Penske Corp.?

18 A    Penske, well Penske Leasing realistically.  Who we -- we

19 operate 220,000 vehicles, most of them heavy duty so we have

20 some understanding of -- of this type of equipment, at least

21 the maintenance side of it.

22     So two of our key people went into the fire department to

23 do a review of -- of just, you know, what was the status.  You

24 know, where were we from the standpoint of ways that we might

25 be able to cut costs and what was needed in order to be able

1  to go forward to provide the mission, the critical

2  requirements of a -- of a fire department.  And, you know, we

3  were involved in that study.

4  Q    Who in your organization went there?

5  A    You know, Russ Scaramastra was -- was the key -- key guy

6  that was involved with that.

7  Q    And what's his role with Penske leasing?

8  A    He was in charge of our specialty vehicle business.

9  Q    And did you issue or give a report to the fire

10 department?

11 A    We gave it a -- we gave a report to the fire department,

12 you know, regarding you know, what we saw and the things that

13 were going to be required in order to be able to have, you

14 know, the right mission critical capability.

15 Q    What were some of the findings that your company found

16 when looking at the fire department?

17 A    Well, there was -- there was approximately 100 vehicles

18 or 200 vehicles that were -- were in this -- in this area.

19 And half of them were really over ten years old.  And I think

20 the newest vehicle was 2000.

21      At the time either 2006 or 2008.  There was no question

22 that there was no preventative maintenance.  There was no

23 vehicle inspection reports, you know, following the use of

24 vehicles.

25      And the more troubling thing was that the way the

1 operation was set up they -- they had around 24 individual

2 people that were operating from a maintenance perspective.

3 Nine of them were on emergency.  So they only worked nine days

4 a month.  And they would be there 24 hours a day.  And half

5 the time they weren't working on vehicles.

6      You know, obviously they were -- they were just waiting.

7 And we gave them some ideas of maybe taking these people and

8 putting them on more of a normal shift to reduce the overtime,

9 provide inspection reports, and obviously you know from the

10 standpoint of the -- of the city, there is going to have to be

11 a rotation of equipment with -- with the oldest equipment that

12 they had that were having to continue to rebuild.

13      And the parts availability, there were no warranty.  They

14 hadn't gone out to the manufacturer looking for extended

15 warranty.  Things that you would normally do in a city like

16 this.

17      So to me you could see there was no funds available.  And

18 I think the management structure at that particular time could

19 be streamlined it would give -- give us a much better mission

20 critical capability.

21 Q    Are you familiar with the city bus department known as

22 DDOT?

23 A    Yes, I am.

24 Q    And how did -- did you become involved with DDOT in the

25 late nineties?

1  A      Well --

2  Q      Penske Corp.?

3  A      Well, we bought Detroit Diesel in 1988 and probably all

4  the transit buses, you know, in the U.S., I would say 85 to

5  90% were with our engines.

6        So we were asked at that point, you know, by the city, I

7  think Norm White was at that point running the bus area to

8  come over and take a look at the -- at the bus garage in

9  Warren -- on Warren Street.  And we could see that again no

10 PMs, excess parts, probably ten mechanics per bus instead of

11 ten buses.

12       There were mechanics who ran the buses in New Orleans so

13 we had some experience at that point.  But we really looked at

14 it and at that point moved on.  There was no further interest

15 for us to -- to take any action.  We don't have any contracts

16 with the city even today, but we were trying to offer our --

17 you know, our support.

18 Q    The Judge has heard about the M-1 rail project from

19 several witnesses who have appeared before you came today.

20 But why don't you describe in your -- in your words what the

21 M-1 project is.

22 A      Well, it's -- it's public private partnership that really

23 spawned itself back six or seven years ago when the thinking

24 was to run a rail line, a light rail line from New Center

25 which is the former GM site, you know, down to the river, 3.4

1  miles.

2      The thinking was to have 13 stops.  And, you know, this

3  would create a commercial benefit.  And as we got into this,

4  we said let's take a look at other cities.

5      So a group of us went to Minneapolis, we went to Denver,

6  and we went to Portland to really understand, you know, we had

7  the People Mover here.  We wanted to understand how this would

8  really impact, you know, the neighborhoods and the city.  And

9  it --

10 Q    Do they have -- do they have rail systems there?

11 A    Yeah.  This -- we looked at their similar type

12 commitments of rails that they had put in.  And particularly

13 Portland showed us that we're -- where we were able to

14 establish a station, that commercial activity started almost

15 immediately and that flowed into the neighborhood.

16     So we felt the mission of what we were trying to do there

17 was obviously, you know, we could -- we could capitalize on

18 that with a -- with a road like Woodward which was six or

19 seven lanes wide.

20     We had the commercial capability.  We had tying together

21 Wayne State and the other areas that we had, would -- would be

22 very beneficial.  So this was a project that was -- started

23 out we thought it would be 100,000,000 and today it's ended up

24 at approximately $140,000,000.

25     We've gotten some support Tiger grants.  One just

1  recently from -- from Washington.  But primarily it's been

2  private sector funding along with Kresge obviously being the

3  lead benefactor of M-1.

4  Q    Have you put any of your own money into the M-1 project?

5  A    Yeah, we've committed about $7,000,000, yes.

6  Q    Okay.  And do you think it will have an impact on the

7  turnaround the neighborhoods around the stops of the M-1?

8  A    There's no question.  I mean the by-product of the

9  station will be commerce.  It will be neighborhoods which will

10 -- will begin to grow from those stations.  And we've seen it

11 before.

12      And we've done an environmental impact study that the

13 Ford Foundation has done and it's validated that particular

14 area of M-1.  So we feel good about that also.

15 Q    Let's change subjects now.  Have you heard of what's

16 called the grand bargain?

17 A    Yes, sir.

18 Q    And what's your understanding of it?

19 A    Well, the grand bargain, you know, from my perspective

20 really is an umbrella which we've been able to take the

21 pensioners who have worked for the city and -- and take, you

22 know, our gem, the art museum, put them under one umbrella,

23 and basically find a way to be able to fund the pensioners and

24 yet keep the -- the art assets to, you know, within -- within

25 ownership and not having them sold in order to help us exit

1 from bankruptcy.

2    And we feel good about that.  I do personally.  And --

3 and we have supported that.  So to me it was -- it's a great

4 opportunity to see the unity of -- of both the art museum, our

5 assets, and also the -- the human capital assets that have

6 worked in the city before involving their pensions as we go

7 forward.  And I think it's part of a plan that helps us exit

8 the bankruptcy.

9 Q    Have you put any of your own money into the DIA?

10 A    We've committed $10,000,000 over 20 years.

11 Q    And that's part of your contribution to the grand

12 bargain?

13 A    Yes.

14 Q    Okay.  Will this contribution cause you not to make other

15 contributions to the City of Detroit?

16 A    Not at all.

17 Q    You'll continue supporting the city?

18 A    Yes.

19 Q    Do you know how many people go through the DIA annually?

20 A    No, I don't.

21 Q    Do you know the economic benefit?

22 A    I -- I don't know the economic benefit, but the cultural

23 benefit to the city and the region I guess you can't put a

24 price tag on that.

25 Q    Do you think it's an important part of the city in your

1  mind?

2  A     Absolutely.

3  Q     And why is that?

4  A     Well, I think for -- for young people from a city like

5  Detroit needs to have cultural impact, you know, in -- in the

6  region and certainly in the city.  And it's a place that our

7  young people go, people that come to our city.

8         You look at the Henry Ford Museum.  The -- the two places

9  that people have on the top of their list obviously is the art

10  museum and also, you know, Henry Ford.

11  Q     Looking at the chart that's on the -- in front of you on

12  the monitor.  An amount on the second row, public safety,

13  police, fire, EMS, 429,000,000.  Do you believe that the city

14  needs to invest a large sum of money for the police, fire, and

15  EMS?

16  A     There's no -- there's no question.  You know, I think the

17  examples that I mentioned earlier involving the equipment and

18  you think that most of the equipment is over ten years old in

19  the fire area.

20         And -- and also turning EMS units at 100,000 miles is

21  probably the right time frame where we have them running at

22  200,000 miles.  So to me, you know, that's a commitment that

23  we have to have in order to be safe and secure.

24         We can't have people moving into the city with jobs and

25  moving -- find homes and building without having -- be safe

1  and secure.  So I would say that that's obviously blight above

2  that is -- is key.

3      But -- but having fire and police is -- is obviously at

4  the base, it's the foundation.  And the costs associated with

5  that if the preventative maintenance is done and -- and the

6  proper purchases, the cap X to buy this equipment is done

7  routinely and on a plan, we -- we can provide much better

8  service than we have in the past and I think it's critical.

9  Q    You don't know the background of that number though?

10  A    No, I -- no, I don't.

11  Q    Okay.  As a leader of the Detroit business community, do

12  you believe the city is currently providing adequate levels of

13  services to its citizens?

14  A    No, I don't.

15  Q    Why not?

16  A    Well, because basically, you know, we're under armed from

17  a -- from a police protection perspective.  You know, our fire

18  and police cars obviously we have to go to the private sector

19  for 100 police cars and EMS units.  You know, it's obviously a

20  request that was made in order to -- to build a capability.

21      And -- and if we're going to continue in the future we're

22  going to have to be able to have an environment that is safe

23  and is secure.  And -- and to me, you know, we've seen that

24  this had not been the case because we had not been able to

25  even clean the streets from the standpoint we had to go to

1 something like Clean Downtown.

2 Q    Do you know the current Mayor and the President of the

3 city council?

4 A    Mayor Duggan, yes.

5 Q    And do you know the President of --

6 A    Brenda Jones, yes.

7 Q    And do you have faith in the ability of the current

8 leadership to implement the restructuring of the City of

9 Detroit?

10 A    Well, I -- I would say that I've watched from -- from

11 2001 through the current administration and -- and seeing that

12 the -- the political factors have -- have been many of the

13 barriers that have been built between the city council and the

14 Mayor's office.

15     And that had been barriers which had really stopped

16 progress.  And what I've seen with Duggan and -- and with --

17 with Jones, I've seen a collaboration and a support which to

18 me makes me feel very very positive on -- on where we'll go.

19 It's the first time I've seen that quite honestly.

20     And, you know Duggan has already just looking at the

21 blight removal and the things that he's done already and then

22 we've got the streetlights coming on and the privatizing.  I

23 think this is a real -- as we get into the proper management

24 privatizing some of these functions, you know, within the city

25 will be very important as we moved into lighting.

1    We moved into trash collection and things like this where

2  we can bid things, you know, honestly and get the right

3  product and then the right servicer to handle these things in

4  the city, we're going to see folks understand that the current

5  Mayor and city council are working together.

6         MR. HERTZBERG:  Thank you, Mr. Penske.  I have no

7  further questions, Your Honor.

8         MR. WAGNER:  We have no questions, Your Honor.

9                       CROSS EXAMINATION

10  BY MS. O'GORMAN:

11  Q    Good morning, Mr. Penske.  My name is Debra O'Gorman.

12         THE COURT:  Would you pull the microphone towards

13  you, please?

14         MS. O'GORMAN:  Yes, sorry.

15  Q    I represent one of the objectors in this case.  Now you

16  mentioned that there was some -- you had -- had done some

17  studies with respect to the economic benefit of the Indy race,

18  correct?  Are you aware of any studies that examine the

19  economic benefit of the DIA to the city?

20  A    No, I have not.

21         MS. O'GORMAN:  Thank you.

22         THE COURT:  Any further questions for the witness?

23         MR. WATSON:  No questions.

24         THE COURT:  All right.  Sir, you may step down.

25  You're excused.  Thank you for coming today.

1  A    Thank you.

2      (WITNESS ROGER PENSKE WAS EXCUSED AT 9:41 A.M.)

3          MR. CULLEN:  The city will call Mr. Doak as its next

4  witness.

5          THE COURT:  One second.  I think maybe Ms. Ball is

6  here.  Ms. Ball, are you here?

7          MS. BALL:  Yes.

8          THE COURT:  Okay.  Then let's -- let's finish that

9  up.  Ms. Ball, would you step forward, please?  Mr. Orr, would

10 you resume the witness stand, please?

11         THE WITNESS:  Yes, Your Honor.

12     (WITNESS KEVYN ORR WAS PREVIOUSLY SWORN)

13         MS. BALL:  Good morning, Your Honor.  Good morning.

14         THE COURT:  All right.  What -- what is your name,

15 please?

16         MS. BALL:  My name is Estella Ball.

17         THE COURT:  Thank you.  Ms. Ball, by my order, you

18 have ten minutes to examine Mr. Orr.

19         MS. BALL:  Okay.  I'm Estella Ball and I'm a retiree

20 of the City of Detroit and I'm a 40 year resident of the city.

21                      CROSS EXAMINATION

22 BY MS. BALL:

23 Q   Mr. Orr, do you believe in the right of every citizen to

24 vote?

25 A   Good morning, Ms. Ball.  Yes, I do.

1  Q    Okay.  And do you believe that once we vote we have an

2  expectation that those people we elect should govern our city

3  or state or whatever?

4  A    In the normal course of events, Ma'am, unless there's an

5  emergency.

6  Q    Okay.  And do you think that your appointment under

7  PA-436 takes away my right to vote and expect my elected

8  officials to -- to govern?

9  A    No, Ma'am, I do not.  In fact we had an election last

10 year where new counsel and -- and a Mayor was elected.

11 Q    Yes, but they didn't have any powers until last week,

12 correct?

13 A    Respectfully, Ma'am, one of the first orders I entered

14 last March was restoring powers back to the Mayor and the

15 council.  And I did that again after this election.  So

16 usually a lot of activities in the city were in fact run by

17 them, but I understand your concerns and I'm sympathetic to

18 them.

19 Q    Are you aware that PA-436 has only been applied to cities

20 there is a minority population?

21 A    I'm -- I'm not aware of that.  I -- I think -- well, let

22 me strike -- let me answer your question.  I think the cities

23 that PA-436 there are minorities, so called minorities

24 resident in those cities.  I'm not aware that that is the only

25 application in those cities where it's been effective.

1  Q    Okay.  And my next question is regarding the ASF

2  recoupment.

3  A    Yes, Ma'am.

4  Q    I don't know the proper -- it's not one of my exhibits,

5  but it's an exhibit that's in -- that's been submitted to the

6  Court. I think it's Exhibit B in your response to the

7  objectors on Page 151.  I don't know if you can pull that up.

8  What is the basis for the ASF recoupment?

9  A    Well, Ma'am, in the disclosure statement we state that

10 there was an ASF fund for some period of time.  That over some

11 period of time there was excess interest attributed to that

12 fund.

13      We looked back just in the past nine years or so at the

14 excess interest rate and it was roughly twice.  I think the

15 actual rate of return was 5.1 and attributed to that account

16 was roughly 11.1.

17      In the year 2009, I think the fund actually lost 18.7 --

18 19.7% but it was attributed 7.9%.  So that's almost a 28%

19 spread.  So for instance if there was -- that one year if

20 there was a 410,000 investment it was worth actually only

21 8,000, but it was attributed almost $11,000 in that year, a

22 pretty large spread of almost $2,800.

23 Q    Okay.

24 A    And so the -- the thought was the general principals of

25 receivership that you try to recoup an amount of funds that

1 | were improperly distributed to benefit -- beneficiaries.  We

2 | did not try to recoup all of the funds.  I think in disclosure

3 | statement there is an analysis of the total amount that was

4 | attributed to that.  We took a percentage of that back

5 | generally to general service employees.

6 | Q    Okay.  So you went back ten years, is that -- does

7 | Michigan allow you to go back on a debt but whether it was or

8 | wasn't a debt, but ten years?

9 | A    It -- the law might have allowed us to go back further.

10 | In the exercise of discretion we chose not to.  And we chose

11 | to limit it -- limit the recoupment amount to just a

12 | percentage and spread that out over a term of years, no more

13 | than 20%.  It's called the recoupment cap.

14 |      So I do believe the law, both the state law and the

15 | federal law of recoupment allows us to do that.  But we tried

16 | to do that in a limited way.

17 | Q    But most laws or most debts, you know, and they can go

18 | back three years and some maybe six years?

19 | A    Yes, Ma'am.  I think you're -- you're referring to what's

20 | called a statute of limitations.  Sometimes that limits the

21 | amount of claims.  But sometimes in equity and recoupment,

22 | you're allowed to go back further.

23 | Q    Okay.  You couldn't bring up the chart for this 151?  No.

24 | Anyway --

25 |           THE COURT:  We're -- we're not sure what you are

1  referring to.  Can you be a little more specific for us?

2          MS. BALL:  It was -- yes.  It was the list of the

3  interest rates.

4          THE COURT:  Hold on one second.  Ryan --

5          MS. BALL:  The actual return and the recoupment for

6  the city from 2003 through 2013 or '14.

7  A    Yes, Ma'am.

8  Q    It was on Page 151 in your response document.

9  A    Okay.

10          MS. BALL:  But we can go on.  Because what I was

11  going to say about that, I pulled out my annuity in 2005.

12  Q    And in -- so it was only two years that would have

13  affected mine.  And there was no excess paid to me in those

14  two years and I wanted to know why was I being charged money.

15  Since we don't have it, I --

16  A    Okay.

17  Q    You know, based -- there was supposed to have been excess

18  interest paid.

19  A    Right.  Ms. Ball, Ma'am, I'd be hesitant for privacy

20  reasons and others to talk about your particular case.

21  However, I'd be more than happy to sit down with you in person

22  in my office at some point in the next week or two and have a

23  discussion with you to see if I can address some of your

24  concerns.

25  Q    Okay.  All right.  My next issue was third party release

1  of the state.

2  A    Yes, Ma'am.

3  Q    I understand that --

4           THE COURT:  Okay.  Hold on one second, Ma'am.  We

5  think you might be talking about Exhibit B to -- to Exhibit

6  7303.  We're going to -- let's -- let's see if the city's

7  attorneys can track that down.  Is that right, Ryan?  Oh, to

8  docket 7303.

9           MS. BALL:  We can go on.  I don't want to waste any

10  more time.

11          THE COURT:  Are you sure?

12          MS. BALL:  I think it looks like the one.

13          THE COURT:  It looks like this?

14          MS. BALL:  Uh-huh.

15          THE COURT:  Okay.  Why don't you show Mr. Orr that

16  and then you can ask him your questions about it.

17  A    Thank you, Ma'am.

18          THE COURT:  And just so the record is clear, we're

19  talking about Exhibit B to docket number 7303.

20          MS. BALL:  Okay.

21          THE COURT:  Do you recognize that?

22  A    Yes, Your Honor.

23          THE COURT:  Okay.

24  Q    Okay.  So in the first year the actual return rate was

25  what?

1  A    You're talking about 6-30-2004?

2  Q    2003, 2004.

3  A    Yes.  The ASF interest rate was 7.9 throughout all years.

4  The ASF interest bonus did not exist in the year ending it

5  would be fiscal year 2013 ending 6-30 -- fiscal year 2003.

6  Fiscal year 2003 ending 6-30-2003.

7  Q    And what was the actual return?

8  A    The fiscal year market rate of return was 15.577.  The

9  plan of adjustment recoupment interest rate used was 7.9%.

10 Q    All right.  So there was no excess interest, correct?

11 A    I don't know if looking at this particular document

12 whether it was attributed.  It says interest credits.  But it

13 appears to say that your market rate of return was over the

14 7.9% attributed return.

15 Q    And then the next year which was 2004, 2005?

16 A    Yes.  Here again there was 7.9% interest rate.  The

17 interest bonus rate was 1.340%.  The fiscal year market rate

18 was 9.171%.  And the actual interest rate was 7.9 -- the

19 recoupment interest rate was 7.9%.

20 Q    Correct.  So even if you add that 1.3 bonus and the 7.9,

21 I still don't see any excess interest.  So that was my

22 question.

23 A    Yes, Ma'am.

24 Q    Okay.  And if it happened to me it probably happened to

25 some other people.

1  A    Okay.

2  Q    On third party releases I understand that there is like

3  seven requirements for a third party release.  Do you think

4  that the state meets all of those requirements?

5  A    Yes, Ma'am, I do.

6  Q    Okay.  So do you think that the state's $195,000,000

7  contribution is significant to the whole -- this whole

8  bankruptcy?

9  A    Yes, Ma'am, I do.  It's 194.8 million dollars in net

10 present value funding but over the life of the contribution it

11 has a value of $350,000,000.

12 Q    And what percentage is that of the total bankruptcy?

13 A    Percentage of the total debt being addressed in the

14 bankruptcy?

15 Q    Yes.

16 A    Yeah, if you -- if you rounded that number off to say

17 there is an adjustment of $10,000,000,000, then you'd have a

18 rough equivalent 3.5% I think would be what you're looking at.

19 Q    Okay.  Why was it decided to include the pensions as part

20 of the bankruptcy when Michigan law says they should not be

21 impaired?

22 A    Yes, Ma'am, that's -- that's in part a complex legal

23 question.  There is a -- that federal bankruptcy law which is

24 found in Article I of the U.S. Constitution, says there shall

25 be uniform laws regarding bankruptcy and as applied to the

1  states, I believe, by both the supremacy clause and equal

2  protection.

3      That the federal law writes over state law.  This theory

4  has been proven true in other circumstances and in other

5  bankruptcies.  In this case, there was a determination that

6  the debtor, the city made that the state law Article 9,

7  Section 24 of the 1963 Constitution, which says that the state

8  shall not impair vested pension rights generally.

9      That the federal law which allows any claim and the

10  unfunded portion of the pension rights is characterized as a

11  claim, allows any claim to be adjusted in federal bankruptcy.

12  And so the general concept and I think a ruling by this Court

13  held that federal law as a concept of federalism, takes over

14  the state law and so that the rights you have in bankruptcy

15  has a question of separation of powers, the difference between

16  the federal government and the state government.

17      The rights you have in bankruptcy take over any rights

18  you may have under state law.  And as a consequence the state

19  law had to yield to the federal law.  And so those issues

20  regarding state protections were overridden by the federal law

21  generally speaking.

22  Q    Did not the State Attorney -- Attorney General disagree

23  with that?

24  A    The state attorney has voiced his opinion, but a Federal

25  Court even ranks a state Attorney General.

1  Q    You had a choice not to include the pensions?

2  A    Well, Ma'am, the -- the -- I suppose that you could try

3  to do anything, but the unfunded pension liability was the

4  second largest liability when we started out of a creditor

5  class.  And to not address that, I would not be able to

6  propose a plan that would either be feasible or confirmable to

7  address the debts, adjust the debts of the city.

8  Q    Did you not testify yesterday or the day before that the

9  city only owed the pension fund like $900,000 at the time that

10  you came in?

11  A    I don't believe so.  I think the -- we -- we initially --

12  Q    Was behind in their payments about $900,000?

13  A    Well, it was several -- it was several hundred million

14  dollars they were behind.

15  Q    I believe you testified that it was about $900,000.

16  A    Okay.

17  Q    But when we started reporting it to the press, before you

18  came it was about -- the city was like three -- I believe the

19  city was about $300,000 in deficit.  And then when you came

20  and added the pension it became 9,000,000,000.  So was that

21  the reason you added the pension so it would sound worse?

22  A    No, Ma'am.  We -- we tried in our June 14th proposal for

23  creditors to give an accurate representation of the city's

24  debt.  And in the unsecured area of debt, there were three

25  main classes.

1        One was about at that time 5.7 billion dollars in health

2   care liability in the out years retiree principally.  One was

3   pension under funding which was about 3.5 billion dollars

4   which included unfunded actuarial liability which is just a

5   way of saying the money that we would need now to pay pensions

6   going forward in the future --

7   Q    How many years?

8   A    Virtually indefinitely for the anticipated remainder of

9   the lifespan of the pensioners.

10  Q    And those monies really weren't due this year?

11  A    If you didn't have the monies addressed this year you

12  would not have money in the years that come later.

13  Q    Okay.  In your fourth plan of adjustment part of the plan

14  is to that I -- is it true that if the plan is approved that

15  you will take our pension monies and give it to another entity

16  to manage?

17  A    The -- there is a fourth disclosure statement and a

18  seventh plan of adjustment.  And the -- the -- it's not

19  another entity.  There will be a restructuring of the police

20  and fire retirement system and the general service retirement

21  system.

22       There will be a requirement that there be chief

23  investment officer for both of those systems.  And that the

24  majority of the board of those systems, I think seven, five

25  out of seven are going to be independent, independent trustees

1  too will be what are called can be non-independent trustees

2  and that the vote of those systems for any major issue will

3  have to be at 70%.

4  Q    All right.  So the pension fund would no longer be

5  managed by the pension board that's set up in the city

6  charter, is that correct?

7  A    No, not as it is set up in the city charter.  The -- the

8  pension funds will be managed by a board of trustees.

9  Q    And those people will not be the same, correct?  They

10  will not be city employees.  They will not be the city elected

11  officials as they are now, right?  They will be other people

12  appointed by whom?

13  A    Two of the seven might be the same, but five should be

14  independent, some of whom might be the same.

15  Q    Appointed by whom?

16  A    The -- the structure will be appointed by the boards, but

17  there will be a mechanism for them to elect officials.  It

18  will not be the same, you're correct.  It will not be the same

19  structure that exists now.

20  Q    Okay.  And I think is that not against the city charter?

21  A    No, Ma'am.  As it is structured now, the --

22  Q    Did you re-write that one too?

23  A    No, Ma'am, I have not re-written the city charter.

24  Q    And the other thing the state -- the state oversight

25  committee, I'm not sure the exact term

1  A    Yes, Ma'am, the Financial Review Commission.

2  Q    The Financial Review Commission.  So I heard testimony

3  from the person from the Treasurer's office saying that they

4  can hire the CFO, they can fire the CFO.  They have to approve

5  the city's budgets.

6  A    Yes.

7  Q    They can decide who gets contracts and also -- doesn't

8  that look like the state is now running the city?

9  A    No, Ma'am.  In -- in other distress situations for cities

10  there have been oversight commissions.

11      In New York for instance, the New York Municipal

12  Assistance Corporation lasted from 1975 to 2008.  I would

13  hazard to say that New York seems to have done just fine with

14  some oversight of its affairs and in the day to day operations

15  of the city with the order, order 42 that I entered last week,

16  the normal course of events has been retained back to the

17  city.

18      In fact the Mayor and city council have made some changes

19  even in the past four days with regard to the city's structure

20  and regard how the city operates.

21      I -- the review commission is just to oversee the

22  operations of the city.  But the city is still to operate in

23  the ordinary course subject to review.

24  Q    Right.  But whoever can decide who gets contracts,

25  decides, you know, who gets paid, what companies get

1  contracts.  You hired a -- did you hire a number of companies

2  in your tenure?

3  A    Yes, Ma'am.

4  Q    About how many?  Was it 16?

5  A    There were some that were hired before I got here.  Some

6  that were hired during my tenure.  And I'm thinking of some of

7  the consultants such as Desmond at parking, Violia over at --

8  over the water department.  Citibank and others depending on

9  how you say contract.  But I would -- I would say that it

10  is --

11  Q    How many of them were Michigan companies?

12  A    Some of them were Michigan companies.  Mr. Hertzberg from

13  Pepper, Hamilton who I hired is based in Michigan.

14  Q    How many were Detroit companies?

15  A    Pepper does have a Detroit office.  Others, some of the

16  rate analysis and analysts have Detroit offices.  Conway,

17  MacKenzie, some of the others.

18  Q    Were those offices --

19         THE COURT:  All right.  Ms. Ball -- Ms. Ball, I am

20  going to --

21         MS. BALL:  Is my time up?

22         THE COURT:  Yes.

23         MS. BALL:  Okay.

24         THE COURT:  Way past time actually.

25         MS. BALL:  Okay.

1        THE COURT:  And so I'm going to bring this

2  examination to a conclusion at this time.  Mr. Orr, you may

3  step down.

4  A     Thank you.

5        (WITNESS KEVYN ORR WAS EXCUSED AT 10:02 A.M.)

6        THE COURT:  Now, Ms. Ball, before you go, two

7  things.  First, Ms. Ball has -- has submitted to the Court her

8  exhibits 14708 through 14712.  Is there any objection to the

9  admission into evidence of these exhibits?

10        MR. SHUMAKER:  No objection from the city, Your

11  Honor.

12        MR. WAGNER:  No objection.

13        THE COURT:  All right.  These will be admitted.

14     (Ball's Exhibits 14708-14712 were admitted)

15        MS. BALL:  Thank you for your time.

16        THE COURT:  Wait, Ms. Ball.  Don't -- don't go quite

17  yet.  I authorized you to testify yourself for five minutes.

18        MS. BALL:  Okay.

19        THE COURT:  Do you -- do you want to do that now, or

20  do you want to do it later?

21        MS. BALL:  I can do it now.

22        THE COURT:  Are you sure?  Okay.  Then what I'm

23  going to do is ask you to take the oath of office -- oath of

24  -- of  -- of being a witness, okay?

25        MS. BALL:  Okay.

1    THE COURT:  And then I'm going to ask you to sit in

2 that chair over there where Mr. Orr just sat because you're

3 going to be a witness.

4    MS. BALL:  Okay.

5    THE COURT:  Okay.  Please raise your right hand.

6    (WITNESS ESTELLA BALL WAS SWORN)

7    THE COURT:  All right.  Please sit down over there.

8 And as I said a moment ago, your testimony is limited to five

9 minutes, please.

10 A    Okay.  Give me a minute to find it.

11    THE COURT:  Okay.  Take your time.

12 A    Okay.

13    THE COURT:  Okay, go ahead.

14 A    Your Honor, my name is Estella Ball.  And I'm a retiree

15 of the City of Detroit and more importantly I'm a long time

16 resident of the City of Detroit who has paid my income tax,

17 property tax, and everything else that goes with being a

18 Detroit resident.

19    And I really feel nobody is representing the true

20 citizens of Detroit.  I object to many specifics in the plan

21 of adjustment.  There have been so many adjustments I admit

22 I'm lost sometimes.

23    But one thing I am opposed to is this third party release

24 of the State of Michigan.  I think that was collusion from the

25 start to send the City of Detroit into bankruptcy by the state

1  officials and other powers that be.

2      For a number of years it was reported that Detroit was

3  close to defaulting and it never happened.  The Governor knew

4  Detroit was at the edge of the cliff and through state

5  policies they decided to give Detroit a push over the edge

6  and --

7          THE COURT:  Okay.  Ms. Ball, I have to ask you to

8  slow down a little bit.

9  A    Oh, okay.

10         THE COURT:  Because I -- I want to -- I want to hear

11 everything you have to say, but for me to do that I need you

12 to slow down, okay?

13 A    Okay.  The Governor knew Detroit was at the edge of the

14 cliff and through state policies they decided to give Detroit

15 a push over the edge.  And when we still didn't fall over,

16 they sent Mr. Orr in to push us over the cliff.

17     I also believe that the whole process of the emergency

18 manager, the appointment of this puppet king lording over the

19 Cities of Detroit, usurping the power of the elected

20 officials, writing laws, making decrees is negating my right

21 to vote and is therefore unconstitutional.

22     And continuing the oversight of the state over every

23 aspect of the City of Detroit's finances for decades makes

24 Detroit a futile city under the control of people who do not

25 live here.  That's what the real tea party was about.

1       This process has taken every agency that had a revenue

2  source from under the control of elected city officials and

3  put it under the control of non-citizens of Detroit.

4       In this country whoever rules the money rules.  They

5  decide who gets contracts, what people are hired, what people

6  are fired.

7       Mr. Orr had over 16 consultant companies working with him

8  on this process and most are not even Michigan companies, and

9  very few if any are Detroit companies.  We have a trash

10  company that is based in Florida and whose local offices are

11  not even based in Detroit.

12       The bottom line is that this is a redistribution of the

13  resources of Detroit into the hands of persons who do not live

14  in Detroit.  So no matter who I vote for, or who wins the

15  election, it is of no effect.  And this is a violation of the

16  voting rights act.  I should have the expectation that if I

17  vote for a candidate and they win, then they will have the

18  authority to govern.

19       The recent laws that have been pushed through the state

20  legislature and truly all over this country by hook or crook

21  smacks of the same kind of Jim Crow laws that were passed

22  after reconstruction in this country.  And they will have the

23  same devastating effect on people of color as they did

24  hundreds of years ago.

25       I understand those questions are not necessary before

1  this Court, yet granting the state a third party release will

2  legitimize the conspiracy of pushing Detroit into bankruptcy.

3  The state has shortchanged Detroit on revenue sharing for

4  decades.

5      The discussion regarding contributing money to these

6  process were along the lines of giving us something we didn't

7  deserve.  News flash, it's our money too.  Detroit and Wayne

8  County are one of the top contributors to the state coffers

9  more than other communities.

10      So Your Honor, I ask you to consider the broader

11  consequences of the outcome of this case.  It is an assault on

12  the working people of this city today.  But there is an evil

13  wind in this country regarding the rights of workers and

14  retirees.

15      If they do it to us in Detroit, they will do it to

16  workers all over this country.  It took hundreds of years to

17  overturn the Dred Scott decision.  It could take just as long

18  to overturn decisions made by your Court.

19      The Detroit retirees did everything they were supposed to

20  do.  They went to school, they were trained, they got a job,

21  they worked for the determined number of years to receive a

22  pension.  They saved some money.  They bought homes, sent

23  their children to college.

24      And now through this process Governor Snyder and Mr. Orr

25  wish to negate all of their hard work and earned benefits by

1  blaming the city for the failure of the country, the state,

2  and the schemes of the financial institutions and the lawyers

3  who set up the schemings.

4      Now they want to put it on the backs of the retirees,

5  ignoring and re-writing city laws, state laws, and the

6  Constitution of the United States in an unprecendent grab of

7  power by the State of Michigan officials.

8      If they do it to us in Detroit, they will do it to anyone

9  in this country.  Thank you.

10          THE COURT:  Does anyone have any questions for the

11  witness?

12          MR. SHUMAKER:  Not from the city, Your Honor.

13          THE COURT:  All right.  You are excused as a

14  witness.  Thank you very much for coming today and

15  contributing to our process.

16  A    Thank you.

17      (WITNESS ESTELLA BALL WAS EXCUSED AT 10:10 A.M.)

18          THE COURT:  Before we hear from Mr. Doak, we'll take

19  our morning recess and reconvene at 10:25, please.

20          THE CLERK:  All rise.  Court is in recess.

21      (Court in Recess at 10:11 a.m.; Resume at 10:25 a.m.)

22          THE CLERK:  All rise.  Court is back in session.

23  You may be seated.

24          MR. CULLEN:  Good morning again, Your Honor.  The

25  city wonders if you would be interested in having Mr. Orr take

1  the stand briefly to answer the question we left open with

2  respect to the powers of the commission to hire and fire the

3  -- the CFO.  He was able to do some homework over the break.

4          THE COURT:  Sure, that would be helpful.

5      (WITNESS KEVYN ORR WAS PREVIOUSLY SWORN)

6  A    Yes, Your Honor.  I did confirm that the Financial Review

7  Commission has the authority to hire and then to if necessary,

8  fire the CFO, although the CFO reports to the Mayor.

9          THE COURT:  Okay.  Thank you.

10 A    You're welcome.

11         THE COURT:  Okay.  You're all set.

12 A    Okay.

13     (WITNESS KEVYN ORR WAS EXCUSED AT 10:26 A.M.)

14         MR. CULLEN:  The city would now like to call James

15 Doak, Your Honor.

16         THE COURT:  All right.  I will -- I wasn't sure how

17 long his testimony would take, so I -- I did take the

18 precaution of -- of letting Judge Rosen's office know that he

19 might be a few minutes late for his obligations there.

20         MR. CULLEN:  Thank you, Your Honor.

21         THE COURT:  Raise your right hand.

22     (WITNESS JAMES DOAK WAS SWORN)

23         THE COURT:  All right.  Please sit down.  And one

24 more thing.  For the record, I did contact Mr. Driker about

25 the Macomb County drain mediation and impressed upon him the

1  relative urgency of that.  And he advised me that he will

2  insist to the parties that that proceed on the date he set.

3           MR. CULLEN:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5  BY MR. CULLEN:

6  Q    Mr. Doak, could you please state your full name and

7  address for the record?

8  A    James Leland Doak.  I reside in New Canaan, Connecticut.

9  Q    Mr. Doak, where do you work?

10 A    I work at Miller, Buckfire and Co., an investment bank

11 owned by Segal Financial Corporation.

12 Q    And what do you do there?

13 A    I am a investment banker and my current title is Managing

14 Director.

15 Q    What's the nature of your functions?

16 A    I perform activities consistent with a senior investment

17 banking professional at an investment bank.  My specialization

18 is in areas surrounding restructuring finance and distressed

19 credit situations.  I supervise other bankers, interact

20 regularly with potential clients as well as clients and assist

21 them in a variety of affairs in addition to running

22 administrative aspects of the firm.

23 Q    And is -- and is Miller, Buckfire a regulated entity?

24 A    Yes, we are.  We're a registered broker dealer with FINRA

25 and registered and regulated under the rules promulgated by

1  the SEC.

2  Q    When you say under the rules promulgated by the SEC, what

3  does that mean?

4  A    Just as a -- as a broker dealer the FINRA and the SEC

5  have rules and regulations in regards to how broker dealers

6  keep records, interact with clients, sell securities, and

7  communicate with potential parties surrounding the -- the sale

8  and trading of securities.

9  Q    We've heard in these proceedings about something called

10 IRMA, or the Independent Registered Municipal Advisor.  Is

11 Buckfire regulated under that act?

12 A    Well, yes.  Miller, Buckfire is also a registered

13 municipal advisor which is a -- a new term of art that has

14 recently come to pass designed by municipal securities rule

15 making board the MSRB.

16 Q    A little slower, Mr. Doak.

17 A    Okay.  It's a -- yes.  Yes, yes, yes.  We're a municipal

18 advisor and in this particular case for the City of Detroit we

19 are the IRMA, or the Independent Registered Municipal Advisor.

20 Q    And are there special rules or regulations with respect

21 to being an Independent Registered Municipal Advisor?

22 A    Yes, there are.  There are rules in regards to how we

23 interact with clients.  The duty of care that we are required

24 to observe in advising our clients and in respect to our

25 interaction with our clients.  And record retention rules as

1  well in the ways we interact with -- with our client and other

2  entities.

3  Q    Does functioning as an Independent Registered Municipal

4  Advisor have any fiduciary implications?

5  A    Yes.  The -- the duty of care that is expected of an

6  Independent Registered Municipal Advisor is a -- is a --

7  there's a -- you're a fiduciary for your client, in this case

8  the City of Detroit.

9  Q    And do you personally hold professional licenses or

10  certifications?

11  A    Yes, I do.

12  Q    All right.  Can you tell me the numbers and what they

13  mean?

14  A    Sure.  I have several licenses from -- from FINRA.  One

15  is the Series 7, that's a broker dealer's license.  A Series

16  63, which is a supplemental broker dealer's license which

17  allows one to sell or communicate regarding an -- an expanded

18  amount of securities.  I also have a Series 24.  And a Series

19  24 is a supervisory broker dealer which entitles me to, you

20  know, supervise other bankers or I suppose, you know, run a

21  Merrill Lynch branch if I ever wanted to do that.

22      But those are the different accreditations I have from

23  FINRA.  In addition I'm a retired member of the New York Bar.

24  Q    All right.  Can you tell me within the context of Miller,

25  Buckfire's engagement in this case what you personally did or

1  took responsibility for?

2  A    I -- I've been involved in substantially all the

3  activities that Miller, Buckfire has undertaken during the

4  course of this engagement from when we were retained in

5  January 2013.

6       Either directing our activities, or conducting those

7  activities specifically interacting with the -- interacting

8  with the client and the like.  I've participated --

9  Q    Let me -- let me ask you specifically.

10 A    Yeah.

11 Q    Have you been involved with soliciting and securing

12 financing?

13 A    Yes, I have.

14 Q    Have you been involved with exploring potential asset

15 monetization or other means of realizing value from assets?

16 A    Yes, I have.

17 Q    Have you been involved with negotiating with creditors?

18 A    Yes, I have.

19 Q    How long have you been providing investment banking

20 services to clients?

21 A    Since I graduated from college in 1994.

22 Q    Let me show you Mr. Doak, City Exhibit 771.

23       MR. CULLEN:  Which is Mr. Doak's C.V. which we've

24 extracted from his report.

25 Q    Does this C.V. which is in Exhibit 771, remain true and

1  correct to the best of your knowledge?

2      (City's Exhibit 771 was identified)

3  A    Yes, it does.

4  Q    No material changes?

5  A    There are no material changes.

6          MR. CULLEN:  I'd ask to admit Exhibit 771.

7          THE COURT:  Any objections?

8          MR. MCCARTHY:  No objection, Your Honor.

9          THE COURT:  It is admitted.

10     (City's Exhibit 771 was admitted)

11 Q    Have you received -- you can take it down now.  Have you

12 received any awards for your professional work?

13 A    Yes, I have.

14 Q    Can you tell me some of them?

15 A    Sure.  In -- in 2011, I was a recipient of M & A advisors

16 40 under 40 awards for excellence in investment banking and --

17 and financial corporate finance.  In addition several --

18 Q    Pause there for a second.  Are you still under 40?

19 A    No, I'm not.

20 Q    Okay.  I just wanted to clear that up.  Go ahead.

21 A    In addition several of the transactions that I've worked

22 on over my career at Miller, Buckfire have received transact

23 -- various transactions of the year awards including the

24 restructuring of Foxwoods.  That was in 2013.

25     The restructuring of Keystone Automotive.  That award was

1  in 2011.

2        The turnaround of the Lennox Group, that was in 2009.

3  And the restructuring and refinancing of Horizon Natural

4  Resources.  And that was 2005.

5        As a result of these activities and others, the firm has

6  also been the recipient from time to time of restructuring

7  firm of the year awards including such an award that it

8  received from the M & A advisor in 2012.

9  Q    Who -- who gives out these awards?

10 A    Several different industry media groups and industry

11 trade associations effectively.

12 Q    Do you participate in any professional associations?

13 A    I do.  I'm a member of the Turnaround Management

14 Association, and a member of the ABI, the American Bankruptcy

15 Institute.

16 Q    And have you testified before in Bankruptcy Court?

17 A    Yes, I have.

18 Q    Do you know approximately how many times?

19 A    Approximately five times.

20 Q    Okay.  Can you characterize for me the scope and depth of

21 your experience in financial restructuring?

22 A    Yes.  The -- my -- my career at Miller, Buckfire and its

23 predecessor organizations starting in 2000 through today has

24 always been in -- in and around restructuring finance working

25 with debtors in Court, but also out of Court distressed

1  issuers approaching restructuring needs, negotiating with

2  creditors, sourcing finance, selling assets.

3      And then in those contexts from time to time I've also

4  worked with the other stakeholders around the process, the

5  statutory committees, the ad hoc lending groups, and

6  occasionally the -- the would be buyers of these assets and

7  organizations.

8  Q    Have you been accepted by Courts as an expert with

9  respect to restructuring finance?

10 A    Yes, I have.

11 Q    How many times?

12 A    On three or four occasions.

13 Q    And was one of those occasions in connection with the

14 post-petition financing phase of this case?

15 A    Yes, it was.

16 Q    Is one aspect of restructuring finance designing

17 securities?

18 A    Yes, it is.

19 Q    And do you have experience in that field?

20 A    Yes, I do.

21 Q    Could you describe it for me, please?

22 A    Designing securities and negotiating securities either to

23 provide back to creditors as a recovery on their claim, or to

24 provide to new money lenders in exchange for their proceeds is

25 a core task in restructuring finance.

1        It involves -- or it necessitates having a deep

2    understanding of the context of the situation, the capability

3    of the issuer to service the debt, the pro forma debt

4    capacity, pro forma valuation in many circumstances as well

5    as, you know, a knowledge of the -- the capital markets and --

6    and how they function regularly.

7    Q    In the course of your restructuring representations, do

8    you have occasion to address the -- the compromising of

9    liabilities in those situations?

10   A    Yes, we do.

11   Q    Have you had occasion to negotiate settlements in the --

12   in that process?

13   A    Yes, I have.

14   Q    Either of these things can be characterized the frequency

15   of their occurrence in your assignments?

16   A    The -- those type of elements are at the core of

17   restructuring finance.  The compromise of liabilities is why

18   any restructuring starts.

19       The -- the issuer or the debtor cannot service its

20   obligations as it comes due.  So one needs to fashion a

21   compromise.

22       Ideally that is achieved via consensual solutions.  Those

23   -- those solutions are whether they're for funded debt or for

24   other sorts of liabilities or obligations.  Those solutions

25   are settlement agreements in effect.

1  Q    Does the -- does the process of monetizing or otherwise

2  realizing value from the disposition of assets come up in your

3  work?

4  A    Yes, it does.

5  Q    Can you characterize how it comes up and the frequency of

6  it coming up?

7  A    It -- it comes up very frequently.  Not as frequently as

8  the compromise of -- of liabilities because every situation

9  may not have a -- an asset sale in it.  There may not be

10 non-core assets.

11       However even in a normal corporate process when it's a

12 restructuring, one has to examine whether all of the operating

13 -- all the operations can be monetized for a greater value and

14 a preferred outcome for the creditors than some form of

15 compromise of liabilities and restructuring.

16 Q    And do you have experience exploring and advising on the

17 options for companies that want to dispose of or monetize

18 assets?

19 A    Yes, I do.

20 Q    Can you tell me the scope of that experience?

21 A    Many of my assignments by my last recollection at least

22 ten over the course of my career at Miller, Buckfire have

23 involved processes in which we have analyzed non-core assets

24 or even core assets that could be monetized or otherwise

25 transaction -- transacted upon during the course of the

1  restructuring.

2      And in each of those situations, you know, we assisted

3  the -- the issuer in determining whether the -- whether the

4  asset was marketable, how it could be best marketed.  We

5  assisted them in creating the information necessary to market

6  it if we proceeded forward and conducted all the necessary

7  activities from there all along the time advising the decision

8  makers, the executives and -- and the boards or the other

9  decision makers depending on the nature of the entity on the

10  status of the process and the decisions that they would have

11  to make about moving the process from its inception through

12  its execution.

13  Q    Have you personally given testimony with respect to asset

14  sales or recoveries to stakeholders?

15  A    Yes, I have.

16  Q    In what instance?

17  A    One particular instance was the restructuring in Chapter

18  11 of the Lennox Group.  In that particular instance I

19  provided testimony in regards to the value creation and

20  recoveries associated with two competing bids for the assets

21  of the company in seeking to advise the Court as to which pack

22  to pursue.

23  Q    Is the process of realizing value from selling monetizing

24  assets different when you're working on behalf of a distressed

25  entity as part of a financial restructuring?

1  A    Yes, it is.

2  Q    In -- in what way?

3  A    Much like when you encounter a normal restructuring

4  finance situation, the -- the challenge of monetizing assets

5  in distress circumstances are that you -- you have to do that

6  much more understand -- that much more due diligence to

7  understand the nature of the asset and the context in which

8  you're going to be marketing the asset.

9      You know, frequently you -- you can't have the assumption

10 of this is a regular way going concern that -- that is

11 operating fluidly.  That you -- that you normally can in

12 regular way investment banking.

13 Q    How do you -- you said the due diligence process.

14 Explain for me a little bit more how the due diligence process

15 works when you're dealing with the assets of a distressed

16 entity?

17 A    Well, the -- the due diligence process for the assets of

18 a distressed entity can be substantially more challenging than

19 a -- than a normal process because normally what has been

20 occurring in the overall restructuring has -- has impacted the

21 particular assets.

22     And that goes from everything to its relationships with

23 its customers, and its vendors, and its employees to

24 potentially whether some of the assets now have liens or other

25 encumbrances on them.

1    In addition, you know, normally in distress situations,

2  financial information is -- is of poor quality.  It may not be

3  available.  It certainly is not available in the way one would

4  want it to be.

5    And that lack of quality information systems and data

6  normally spills down into the assets as well.  And so you're

7  working with, you know, less than -- less than full accurate

8  information.

9    Similarly, the -- the prospects of the asset depending on

10  the nature of the business, you know, probably has equally

11  uncertain prospects as the rest of the business.

12  Q    Let me -- let me stop you right there for just a second.

13  What about the condition of the asset itself, its physical

14  condition?

15  A    Well, depends on the circumstance, but -- but frequently

16  another way that the distress at the larger organization ends

17  up impacting any particular asset is there has been, you know,

18  a -- a lack of care, a lack of maintenance, and perhaps

19  inadequate re-investment in the asset itself.

20    Inadequate maintenance, inadequate upgrades, you know,

21  failure to purchase additional software.  All -- you encounter

22  all sorts of those -- those different things.

23  Q    How do you go about identifying the market for particular

24  assets of a distressed entity?

25  A    Well, in -- in some ways it's similar to a regular way

1  process in that you have to identify what the -- what line of

2  business the underlying assets can be utilized in and best

3  utilized in.  But then once you identify almost the regular

4  way buyer pool, you have to put another filter over the

5  process because typically the -- the universe of parties that

6  will interact with a distressed entity as well as consider a

7  distressed asset, is substantially smaller than that that

8  larger theoretical group.

9  Q    You've mentioned the word process several times.  Do you

10 interact with clients over the issue of what's an appropriate

11 process to sell a particular asset in a particular

12 circumstance?

13 A    Yes, we do.  We -- we advise clients based on our due

14 diligence and our examination of the market.  All -- all the

15 time in regards to what nature of process is best suited for

16 the -- for the circumstances at hand to -- to monetize an

17 asset.

18 Q    Can you give the Court an idea of the range of processes

19 you might recommend in such a circumstance to a client seeking

20 to realize value from an asset?

21 A    The -- the processes can range everywhere from a public

22 style auction where as many parties are invited to review

23 information as possible, as large a group is -- is as can be

24 put together is assembled and then over time winners are --

25 are filtered through different stages of the process until an

1  end open, almost even an open cry auction occurs.

2      If -- if time and -- and resources don't allow something

3  like that there's limited auctions that you can conduct with a

4  more targeted buyer pool.  And then there's the concept of if

5  you have less parties that can actually realistically be

6  expected in a situation you may have a series of bilateral

7  negotiations that you would enter in with parties.

8      And -- and then, you know, quite frankly you look at some

9  non-core assets that would be great if you could find a buyer,

10 but sometimes you say hey, this isn't the right time.

11 Q    What are you trying to achieve when you run a process to

12 realize value, sell, monetize an asset as part of

13 restructuring?

14 A    Well, you're -- you're really trying to achieve and

15 balance a -- a mix of competing goals I would say.  One is

16 clearly value maximization.  Another one given the nature of

17 the restructuring is -- is certainty.  Knowing you have what

18 you have.

19     Because you're going to be -- that's going to be counted

20 on as you think about how you address the creditors.  Another

21 one is risk reduction, removing liabilities and contingent

22 liabilities monetizable and otherwise from the prospects of

23 the restructuring company.

24     And then also you have this -- another goal of making

25 sure that what you're doing is, you know, is promoting and --

1  and pushing forward the -- the overall goal of the -- the

2  restructuring process.

3  Q    When you say the overall goal of the restructuring

4  process, what do -- what do you mean?

5  A    Well, typically if we're talking about a non-core asset,

6  there may be an idealized way to approach that particular

7  asset and maximize value with that particular asset, but

8  pursuing that avenue may actually be detrimental to what the

9  most important thing is to do to, you know, to maximize the

10  value for all parties, create more value and create a recovery

11  for creditors or whatever the goal is.

12      If a process is going to take too long when the

13  restructuring has to take half that time, the -- the tail

14  can't wag the dog.  You have to look at what the -- what the

15  greater goal is.

16  Q    Okay.  Can you give a -- give me a sense of how the

17  market for this kind of services works?  For instance would a

18  client typically engage a restructuring finance professional

19  one to sell land, a different one to sell operating assets, a

20  different one to do something else?  Is that the way it works?

21  A    Most often it -- it does not work in that manner.  Most

22  of the time a debtor or an issuer outside of bankruptcy will

23  be working with one particular investment bank and financial

24  advisor that has general -- generalist capabilities and that's

25  done because the context of the overall restructuring is

1  normally the most important or one of the critical dynamics in

2  what is taking place in the process and in the due diligence

3  that would be buyers and counter parties are engaged in.

4      So bringing in additional parties would create some

5  confusion.  Now that being said, there's specialized areas

6  where a generalist investment banker doesn't necessary --

7  doesn't have the -- the best eyes on how the market thinks and

8  the market values assets.

9      And in those circumstances in a -- a supplemental advisor

10  can be brought on to -- to augment the -- the advice and the

11  execution capabilities that the -- that the issuer needs.

12  Q   Are you called upon in the course of the kind of asset

13  monetizations or divestitures that we've talked about to give

14  advice to your clients about reasonable business judgment

15  issues?

16  A   Yes, we are, very frequently.

17  Q   Can you describe how that comes up?

18  A   Because these -- these companies or these issuers, you

19  know, are in distress, something has gone wrong.  And they --

20  there is a need to, you know, fundamentally re-think not only

21  their capital structure sometimes.

22  Q   Uh-huh.

23  A   And not only what particular transactions they should

24  engage in, but how their economic relationship should be

25  structured.  What their labor agreements should look like,

1  What their real estate portfolio should look like.

2      And in -- in those situations, as well as in deciding

3  particular transaction paths to start on and to conclude,

4  Miller, Buckfire as a financial advisor and investment banker

5  is -- is almost constantly is providing advice on an ongoing

6  basis to the decision makers of these organizations in regards

7  to what paths would be superior and what paths would be

8  reasonable.  So in effect what -- what reasonable business

9  judgment constitutes.

10 Q    Okay.  And in this process of value realization from

11 assets, can you -- you've talked about a range of activities

12 in a number of different settings.  Can you give me just a

13 summary of the range of activities that you and Miller,

14 Buckfire would provide to a client when they're seeking to

15 realize value from an asset?

16 A    Sure.  In that context our role would go from engaging in

17 our own due diligence and the assembling of information to

18 assisting the -- the client in re-thinking and re-stating and

19 communicating the -- the business plan.  Thinking about what

20 the prospects look like and providing advice to them in

21 regards to what the market looks like.

22     We would then assist the client in determining the --

23 considering the range of outcomes that were possible for the

24 asset.  Whether that's a sale, a restructuring and delivering

25 to the creditors, or a -- a financing that generates money.

1       We would -- we would examine those and we would advise

2    the -- the client depending on the circumstance as to which

3    were reasonable to pursue and prioritize.  And then as we

4    proceeded into execution of -- of some set of those

5    prioritized processes, we would execute those processes,

6    interact with the client, and the -- and the market.

7       And all the while, you know, advise the client as to how

8    the process was progressing, how to negotiate and who to

9    negotiate with as the process went forward.  And eventually we

10   would be providing advice in regards to where -- where or what

11   to execute and in some circumstances where -- where required

12   by the client, we may be delivering opinions as well as to,

13   you know, valuation, or -- or other matters.

14   Q    Is this -- this set of functions, can anyone do this?

15   Can the company do it for itself?

16   A    No.  Anyone can't do it or -- or probably shouldn't do it

17   would be the better way to say.  It wouldn't be prudent for --

18   for a client to rely on -- on anyone, just anyone.

19       And it really is a -- is a set of skills that comes from

20   -- from teams of bankers who have multiple years of working on

21   dozens of transactions around this space.  And with the

22   exception of just a -- a few highly intelligent complex

23   organizations that -- like the General Electrics of the world,

24   that maybe have their own in house bankers, parties rely upon

25   investment bankers.

 1      When it comes to the distressed space, given the

 2   complicated and conflicting motivations of parties, you know,

 3   no one performs self surgery on themselves in the

 4   restructuring world.

 5   Q    Is it your judgment that performing these functions in

 6   the context of distress requires specialized training or

 7   experience?

 8   A    Yes.

 9   Q    Do you have it?

10   A    Yes, I -- I believe I do.

11   Q    Okay.  Can you provide the Court with a couple of -- an

12   example of a divestiture process that you ran?

13   A    Sure.  In 2006, 2007, I assisted a competitive telephony

14   company, an upstart called ITC DeltaCom in monetizing its --

15   its data center property called eDeltaCom.  It was a very

16   difficult monetization transaction that had to occur on a very

17   tight time frame to generate the -- the money that the parent

18   telecom company needed.

19      It was a transaction that was also difficult because

20   there was basically a glut of data centers and data sites out

21   there that other telecom companies had built.  Made further

22   difficult because we were looking for an acquirer that would

23   operate the asset.  And most of the market at that time for

24   these assets was being picked up by owners that just wanted

25   kind of a triple net lease, just wanted the cash flow, someone

1  else has to operate it.

2       So I had to find the -- the few operators that would

3  actually have those capabilities.  And then -- and then

4  negotiate with them a very complex agreement where

5  telecommunication services were provided to the data center by

6  DeltaCom while DeltaCom was able to keep some of its assets in

7  the data site at the -- at the same time.

8       So it -- in an interesting outcome we were -- we were

9  able to find a real estate developer who runs a -- a

10  nationwide portfolio of technology assets and government

11  tenanted real estate projects and negotiate in rapid fashion a

12  -- a series of agreements that delivered proceeds to -- to ITC

13  DeltaCom on time and -- and kept the company liquid in

14  continuing on its business plan.

15  Q    Just could you give me just one more example?

16  A    Sure.

17  Q    Of the divestiture process you ran, Mr. Doak?

18  A    Another good set of divestiture processes was our -- our

19  advisory assignment with Magna Entertainment which was a

20  nationwide portfolio of horse tracks, racing tracks, racinos

21  and other businesses affiliated with horse racing.

22       In that circumstance a -- you know, one of the really

23  unique cases there, or really unique assets was the Lone Star

24  racing track outside of Dallas, Texas.  It was one that itself

25  did not have significant prospects at the -- significant

1  positive prospects at the time, but there was a potential that

2  Texas could allow slots at race tracks.

3      And what that meant is we identified early on that one

4  likely buyer, Global Gaming which was the casino operating

5  affiliate of the Chickasaw nation up in Oklahoma, would pay --

6  most likely pay an amount that was significantly above what

7  the natural business prospects of Lone Star was because they

8  would want to engage in basically a defensive acquisition of

9  the asset.

10     So we -- we worked with that party to -- to structure a

11  process where we -- we achieved a superior outcome because

12  they were in a very unique position compared to -- compared to

13  others.

14 Q   Mr. Doak, we've been primarily discussing asset

15  divestitures and corporate restructurings.  Can you identify

16  for me any particular differences or similarities from the

17  restructurings in the corporate world and the restructurings

18  in the municipal world?

19 A   Sorry, the restructurings or -- or asset --

20 Q   Asset sales, asset sales in the context of that

21  restructuring, sorry.

22 A   That -- I think that the process that one undertakes and

23  the -- the degree of -- of care is very similar.  The -- the

24  different steps in the process and staging is important.  When

25  it -- when --- when and where it's achievable.

1    And the -- the difference I think in municipal context is

2    the -- you know, overall the -- the entity itself, the

3    municipality unlike a corporation, is not one that will be

4    liquidated.  There is not an alternative out there of -- of

5    sell everything, right.  Or -- or deliver equity to -- to

6    creditors.

7    And that -- that changes the -- the dynamic.  And I think

8    that when one thinks about value creation and what value is

9    and how risk reduction, certainty, value enhancement, overall

10   goals play all out, you know, there's an element in municipal

11   restructuring and municipal divestitures that is different

12   than, you know, a corporation with Delaware law duties to its

13   stakeholders.

14   You know, there's an element of public safety and an

15   element of general welfare and the ongoing responsibilities

16   that the municipality -- municipality has in regards to what

17   -- how it conducts it processes and how it, you know, divests

18   itself of interest in the assets.

19   Q    Mr. Doak, did you have a role in the City of Detroit's

20   efforts to decide whether it could realize value from certain

21   of its assets?

22   A    Yes, I did.

23   Q    What was that role generally?

24   A    Well, the -- I and the Miller, Buckfire team have advised

25   the -- the city throughout its restructuring process on

1  considering opportunities associated with the monetization of

2  assets.  And that started with the identification of

3  opportunities in early 2013 through the -- the exploration and

4  prioritization of those processes and then eventually, you

5  know, the execution of selected processes.

6  Q    Let's throw up Exhibit 33.  Are you familiar with this

7  document, Mr. Doak?

8  A    Yes, I am.

9  Q    What is it?

10  A    This is the City of Detroit's proposal for creditors.

11  This was the comprehensive dec that the city and its advisors

12  constructed for the full range of the city's creditors laying

13  out the -- the -- the context and the current situation of the

14  city as well as presenting a preliminary path forward, or at

15  least explaining how the city was thinking about the path

16  forward.

17  Q    If I could direct your attention to Exhibit 33 at Pages

18  89 through 95.  It's in the -- it's in the big book.  But

19  let's look at Page 89.  Let's look at it sideways, yes.

20      If you'll look through that, does this set out a

21  beginning with DWSD, a -- a range of -- well, what -- what

22  does it set forth?

23  A    This sets forth a range of assets or the -- the -- a

24  preliminary list of assets that the city wanted to indicate to

25  the creditors it was willing to explore monetization and value

1 enhancement solutions, right.  In effect it's a -- it puts the

2 shingle out on many of these as -- as best it could be within

3 the context.

4 Q    All right.  Let's -- and let's just flip through this to

5 see -- let's see what ones we have.  Next page.  Keep going.

6 Keep going.  The Coleman Young Airport is one?

7 A    Right.

8 Q    And you have the book in front of you.  I don't think we

9 need to do this the hard way.  Let's -- let's just talk about

10 the ones that are listed as you look through there.

11      Coleman Young Airport, the Detroit Windsor Tunnel, city

12 owned land, parking operations, Joe Louis Arena.  They're all

13 -- were all of these properties or operations included within

14 your writ to examine as of that time for potential value

15 enhancement opportunities?

16 A    Yes, they were.

17 Q    And did you do your due diligence as you've described it

18 with respect to all of these?

19 A    Yes.  As -- as best we could within the information that

20 was available, yes.

21 Q    And in particular did you do your due diligence beginning

22 at that -- beginning at or around that time with respect to

23 the Detroit Windsor Tunnel, city owned land, and parking

24 operations?

25 A    Yes.  Yes, we did.  And we continued to do that over the

1  -- the course of the assignment.

2  Q    And you're -- I take it that you're familiar with the

3  so-called Syncora settlement?

4  A    Yes, I am.

5  Q    And does it involve any of the assets that are listed

6  here?

7  A    Yes, it does.

8  Q    Which ones?

9  A    Well, the -- the Syncora settlement involves the Detroit

10 Windsor Tunnel, it involves city owned land, it involves the

11 parking assets of the city really in -- in two separate ways.

12 In the -- the option agreement affects one particular garage,

13 and then the notes that have been delivered to the Class 9,

14 affect really the remainder of the parking assets.

15      And then the -- the settlement credits that have also

16 been delivered to Class 9 affect I would say that -- that's

17 what going to happen with the spot of the Joe Louis Arena when

18 the arena is no longer used as well as city owned land as

19 well.

20 Q    At a high level, could you tell the Court the process you

21 undertook to determine the value that the city might achieve

22 from any -- from these assets that are reflected in the

23 Syncora settlement?  What -- what was your due diligence with

24 respect to those particular assets?

25 A    Well, the -- the due diligence that we performed on each

1   of those assets well, it varied widely depending on the

2   available information that the city had for each one of these

3   assets.  But with each, we -- we gathered all publicly

4   available and city record information associated with the

5   assets.

6        We interviewed and -- and spoke with city employees.  We

7   worked in multi-advisor teams with E & Y individuals and

8   Conway, MacKenzie individuals as well as Jones, Day

9   specialists.

10       When it came to, you know, particular assets, that they

11  were involved with on an operating level, or had particular

12  legal expertise in regards to.  Further -- and you know, and

13  in regards to -- to due diligence that, you know, we in some

14  circumstances spoke to counter parties associated with the

15  assets.

16  Q    Now, on the basis of this due diligence process what did

17  you do next?

18  A    On the basis of this due diligence process, we -- we

19  assembled preliminary recommendations to the client in regards

20  to -- excuse me, which assets would be best suited for

21  processes and what type of processes they could be suited for

22  in order to attain value and, you know, promulgate or push

23  forward the city's overall restructuring goals.

24  Q    And in this prioritization I take it that there's some

25  were a higher priority and some that were lower priority?

1  A    Yes, yeah.  A significant part of our advice and then the

2  decisions that we came to with the client involved what was

3  worth devoting time and resources to in the context of this

4  overall extremely complicated multi-faceted restructuring.

5  Q    And what did you put in the low priority bin?

6  A    The low priority bin included city owned -- much the city

7  owned real estate.  It included the -- the Joe Louis Arena as

8  it was not yet available to do something.

9        It included as we found quickly the -- the Coleman A.

10  Young Airport as we performed our due diligence and -- and

11  found that it probably was more of a liability than something

12  we could realize value from.  And -- and many other assets we

13  -- we thought we could find some way to try to -- to pursue in

14  some shape or form.

15  Q    With respect to the city owned land, why did you say that

16  that was low priority at the time?

17  A    We came to the conclusion that it was low priority for --

18  for several reasons.  First, the -- the valuations that we

19  were seeing in the market were such that compared to their --

20  their resources and administration of marketing that land,

21  Miller, Buckfire was not going to generate and the other

22  restructuring advisors were not going to generate, you know,

23  superior value from prioritizing that -- that process.

24        There was a ubiquity of land.  In addition, the city and

25  other authorities around this area, you know, already had

1  operating means to determine how best to re-purpose or divest

2  and organize land on a go forward basis.

3       You know, there was the land bank, there was the EDC,

4  there was PDD.  And they were better suited for the process at

5  hand than -- than Miller, Buckfire.  You know, if there was a

6  -- we had -- if we had a square -- a square block in somehow

7  in New York that somehow that was part of Detroit's assets, we

8  would have taken a different approach here.

9  Q    Right.

10 A    But all we had was abandoned -- chiefly abandoned land in

11 -- in Detroit.

12 Q    Now did you consider who'd be interested in purchasing or

13 otherwise utilizing particular assets?

14 A    Yes, we did.

15 Q    Describe that for me.

16 A    Well, for each one of the assets we -- we conducted a --

17 a process where we -- we analyzed and evaluated the potential

18 buyer pool or natural buyer pool that could be expected to

19 engage with the city and come to a conclusion, a successful

20 conclusion in regards to a transaction.  Depending on the

21 asset, you know, we -- we arrived at very different

22 conclusions as to what the potential set of parties were.

23 Q    Were the parties who were in litigation with the city

24 ruled in or ruled out?

25 A    They were not ruled out.  So effectively they were --

1  they were ruled in.  We were prepared to discuss solutions

2  involving these assets with all of the -- the creditors and --

3  and others who were litigating with the city.

4      You know, at -- at -- at times we -- we attempted to

5  attempt to augment their recovery by providing them ownership

6  or other economic relationships with the assets.  So that --

7  that was part of our concern -- part of our overall structure.

8  Q    Okay.  And in connection with your work did you

9  ultimately recommend to the city various avenues with respect

10 to these various categories of assets in order to realize

11 value?

12 A    Yes, we did.

13 Q    Okay.  And was your -- was your judgment and your advice

14 accepted by the city?

15 A    Yes, it was.

16          MR. CULLEN:  I'd like to now offer Mr. Doak as an

17 expert in the -- in restructuring finance and the sale of

18 assets by distressed entities.

19          THE COURT:  Any objections?

20          MR. MCCARTHY:  No objection, Your Honor.

21          MS. FISH:  No objection, Your Honor.

22          THE COURT:  You may proceed.

23 Q    Mr. Doak, did you prepare an expert report in this

24 matter?

25 A    Yes, I did.

1  Q    Let's put up City Exhibit 747.  Is this that report, sir?

2  A    Yes, this is my expert report.

3       (City's Exhibit 747 was identified)

4  Q    Does this report set forth your opinions in this case in

5  connection with the city's efforts to realize value from

6  various assets and its efforts to confirm its plan?

7  A    Yes, it does.

8  Q    Does it set forth the information you relied upon in

9  reaching those conclusions?

10 A    Yes, it does.

11 Q    And does it set forth the method and diligence that you

12 followed in order to reach those conclusions?

13 A    Yes, it does.

14      MR. CULLEN:  I'd like to offer City Exhibit 747 into

15 evidence, Your Honor, as a demonstrative.

16      THE COURT:  Any objection?

17      MR. MCCARTHY:  As a demonstrative, no objection at

18 all.

19      MS. FISH:  Same.

20      THE COURT:  All right.  For that purpose it is

21 admitted.

22      (City's Exhibit 747 was admitted)

23 Q    Mr. Doak, have you reached an opinion as to the

24 appropriateness of the extension, amendment, and assumption of

25 the tunnel lease by the city?  And if I could show Exhibit

1  773.

2  A     Yes.  Yes, I have.

3  Q     At 01-1-13 is -- is this that -- is this the -- a

4  settlement agreement between Syncora and the city?

5  A     Yes, it is.

6      (City's Exhibit 773 was identified)

7  Q     And if we look at Page 13 of this Exhibit 1, first

8  amendment to lease.  Is this the tunnel lease amendment?

9  A     Yes.  This is the -- this is the tunnel lease amendment.

10          MR. CULLEN:  And I'd like to offer Exhibit 773 into

11  -- into evidence as a whole, Your Honor.

12          MR. MCCARTHY:  No objection, Your Honor.

13          MS. FISH:  No objection, Your Honor.

14          THE COURT:  It is admitted.

15      (City's Exhibit 773 was admitted)

16  Q     Now if you'll look back at your expert report which is

17  747, and you look at is it page -- is it Page 6 of the report

18  where we have the opinion?

19  A     Yes.

20  Q     Blow up the summary of opinions if you would, please.

21  Okay.  And we'll be coming back to this periodically.  Can you

22  tell the Court what is your opinion 1 with respect to the

23  extension and assumption of the tunnel lease?

24  A     Yes.  My -- my opinion with regards to the assumption

25  amendment and extension of the tunnel lease is that it is a --

1 entering into it is a reasonable exercise of the city's

2 business judgment.

3 Q     First, tell me what the tunnel is.

4 A     The -- the tunnel is an international border crossing

5 tunnel that spans from downtown Detroit to downtown Windsor

6 constructed originally in the 1920's.  And the City of Detroit

7 owns half of the tunnel and the City of Windsor owns the other

8 half of the tunnel.

9 Q     Who operates the tunnel as of now?

10 A     The Detroit Windsor Tunnel Corporation, LLC operates the

11 tunnel currently.  They do so as a tenant on our half under

12 the tunnel lease complex and they do so as an operator under

13 an operating agreement on the City of Windsor side.

14 Q     What's -- what's the significance of that distinction?

15 A     The significance of the distinction is there is the --

16 the agreements are for different terms right now and the

17 economic relationship on the two sides of the tunnel is -- is

18 very different.  On our side they're a -- a tenant.  On the

19 other side they're an operator pursuant to an operator

20 contract.

21 Q     Under the plan of adjustment as now constituted and under

22 these settlements, what does the city propose to do with

23 respect to the tunnel lease?

24 A     The city is proposing to assume the tunnel leases, amend

25 them to the -- to the terms that we all -- that we all have in

1  the exhibit.  And extend the tunnel leases from 2020 which is

2  when the current leases expire, through to -- for another 20

3  years, so through 2040.

4  Q    When did you first do any work in connection with the

5  tunnel?

6  A    We began our due diligence on the tunnel asset in early

7  2013, you know, February, March time frame.

8  Q    Okay.  And what did your due diligence -- your initial

9  diligence with respect to the tunnel involve?

10  A    Our initial diligence with regards to the tunnel involved

11  the collection of whatever information was available at the

12  city, whatever information was publicly available on the

13  tunnel in the tunnel leases, communications with the tenant,

14  and at some point communications with the City of Windsor

15  representatives as well.

16  Q    Okay.  What were your preliminary conclusions regarding

17  realizing value from the tunnel as an asset?

18  A    Our -- our preliminary conclusions were that realizing

19  value -- well, first executing any sort of process on the

20  tunnel and the tunnel leases would be extremely difficult and

21  that as we're realizing any value on the tunnel or the tunnel

22  leases would be very difficult as well.

23  Q    Why is that?

24  A    Well, there were several reasons why we came to that

25  conclusion.  First, it's a very -- it's a very unusual and

1  irregular asset.  You know, it's a -- it's an international

2  border crossing tunnel that's effectively privately operated.

3      There's -- there's no good parallels and it's a very

4  specific aging asset that has a very specific aging

5  infrastructure.  We also immediately encountered a tremendous

6  absence of information at the city.

7      The city was only entitled to receive summary audited

8  financials from the company and the lease calculation on an

9  annual basis.  And the tenant had no obligation to provide

10  carbon copies once it had already sent those materials on.

11      Unfortunately many of the city employees that had

12  received those materials had no longer had possession of those

13  materials.  And or were no longer working for the city.

14      In fact it wasn't until we were able to engage in

15  additional due diligence with the tenant, where we found full

16  copies of the leases in our overall process.

17  Q    So and we -- we talked about the -- the term of the

18  lease.  At the time you did the initial -- the initial due

19  diligence and looked into that, can you characterize what were

20  the limits of the -- what the city had to sell or to realize

21  value on?

22  A    Right.  The -- the -- the limits of what the city had to

23  sell was it -- it could only monetize its -- effectively its

24  half of the tunnel.  And it could only do so after the

25  existing tenants' leases expired.

1    So, you know, it was some form of -- it would have to be

2  some form of future interest in operating a tunnel that --

3  operating half of a -- operating a tunnel of which we only

4  really could convey half.  Six years from now under conditions

5  that we were not able to control in the interim.

6    And we -- and we determined that based on that, so it was

7  based on the fact that we were not -- we did not have

8  possession of the basic finance, engineering, and traffic data

9  that we would have a very difficult time monetizing the asset.

10 Q    Did you ever in fact get any serious inquiries from

11 anyone outside and before the mediation process from anyone

12 interested in monetizing this asset of the city?

13 A    No, we did not.

14 Q    Based on your due diligence and analysis, what path

15 forward did you take, again prior to anything involving

16 mediation with respect to this asset?

17 A    We advised the city that the most probable successful

18 paths forward for the asset were engaging in bilateral

19 negotiations with the only two parties that had sufficient

20 information and knowledge to discuss a potential transaction.

21 So a series of bilateral negotiations, competing bilateral

22 negotiations.

23    And those two parties would be the -- the current tenant,

24 which at the time was American Roads, and the City of Windsor

25 which knew more about its half of the tunnel than we did

1  because they were the owner and they just had an operating

2  contract with the Detroit Windsor Tunnel Corp.

3  Q    Now we've talked about American Roads and we've talked

4  about Syncora.  What was your understanding of the process by

5  which American Roads became subsumed in Syncora?

6  A    Well, American Roads after we began our initial

7  discussions went through its own Chapter 11 process.  It had

8  significantly over levered based on highly optimistic

9  expectations as to potential tunnel performance in a '06, '07

10  time transaction.

11      And it had entered into default and was unable to service

12  its debt as it came due.  That debt was insured by Syncora in

13  a ironic twist as only Detroit could provide.  And as a result

14  over the course of its restructuring, which occurred in -- in

15  New York Bankruptcy Court, Syncora via its Pike Point Holdings

16  subsidiary, became the tenant effectively of -- of the tunnel

17  on a go forward basis.  And -- and that occurred and that was

18  completed in September of '13.

19  Q    And there came a time when the issue of a extension and

20  assumption of the tunnel lease became part of the -- the

21  mediation in this case, correct?

22  A    That's correct.

23  Q    All right.  Now I'm not going to ask you anything about

24  that mediation, but I'm going to ask you to address the deal

25  that came out of it.  And to function -- to focus on the

1  objective factors which you identified to support your opinion

2  that extension and assumption of the tunnel lease is a

3  reasonable exercise of the city's business judgment.  Do you

4  understand what I'm asking you?

5  A    Yes.

6  Q    Have you -- could you tell me those objective factors,

7  please?

8  A    The objective factors that I would focus on begin with

9  the context of the situation for the city, the limited amount

10  of information the city was able to possess and get.  The

11  limited amount of potential parties that could be interested

12  in a potential transaction.

13      And then also the objective factors then turn to what the

14  city got out of this particular set of extensions.  And what

15  the city receives is an amended lease that provides it with

16  significantly more information in regards to not only the

17  finances of the tunnel and the financial performance of the

18  tunnel, but also the engineering and engineering status of the

19  tunnel and the maintenance of the tunnel.

20      In addition the city has aligned itself with the operator

21  to incentivize the operator to invest accelerated cap X.

22  Q    Stop right there for a second.  Tell me what that means,

23  aligned itself with the operator to allow the operator to

24  invest more cap X in the tunnel.  What does that mean?

25  A    Well, the -- this -- there are two forms of rent

1  abatement in the lease as it's amended right now.  Up until

2  2020 the tenant can effectively abate its rent if it shows

3  that the amounts that were going to go to the rent actually go

4  to, you know, tunnel cap X spending.

5      And then subsequent to 2020, or after 2020, up to 75% of

6  the amounts that would be owned -- owed for rent, are

7  potentially eligible for abatement if there's adequate cap X.

8  And this was important because while we didn't know much, our

9  dialogue with Windsor indicated that the City of Windsor was

10  -- was very concerned about the manner in which the, you know,

11  American Roads pre its bankruptcy was maintaining the Detroit

12  half of the tunnel and whether, you know, adequate spending on

13  maintaining a safe asset was -- was taking place.

14      And they could cite some clear discrepancies in cap X

15  decisions that had occurred between American Roads and the

16  City of Windsor.  And we -- well, the -- we and the city found

17  -- the City of Detroit found that distressing.

18  Q    What was your information about the state, the physical

19  state of the tunnel?

20  A    Well, we had -- we have limited information in regards to

21  the -- the state of the tunnel.  The city was not entitled to

22  any engineering reports which is one reason why we've

23  incorporated that into the amended lease.

24      And we have very limited provisions in the existing lease

25  in regards to what operating order the tunnel is kept in and

1  how it must be turned over to the city in 2010.  So --

2  Q    2020, sir?

3  A    Sorry, 2020.  So, you know, aside from using the -- the

4  tunnel ourselves and -- and taking a look and seeing how it

5  looks, there -- there is very little that -- that we have.

6  Windsor knows -- Windsor knows substantially more we think

7  about the tunnel than -- than we do.

8  Q    You mentioned using the tunnel yourself.  Did it leak

9  that day?

10  A    Not that -- not materially, not that I could see.

11  Q    All right.

12  A    But -- well, the -- the --

13        THE COURT:  I didn't know there was such a thing as

14  an immaterial leak.

15  A    According to the customs officer that I discussed this

16  with, it -- it leaks -- it leaks occasionally.  The status of

17  the membrane which would be expected for a tunnel this age, is

18  one that must be constantly maintained and examined.  And it's

19  -- and it's reasonable to expect and we're -- we're aware of

20  that that will continue to be something that the parties focus

21  on as well as the condition of some of the other elements of

22  the tunnel including the -- the ceiling element.  But I -- I

23  -- I agree with your sentiment.

24  Q    What are the downsides of this deal for the city?  The

25  objective facts which would indicate downsides of this deal?

1  A    I think there's a -- well, objectively there's a near

2  term liquidity hit that the general fund takes when the

3  general fund is effectively taking the lease payments it would

4  have received, the rent it would have received and allowing

5  the tenant to place that into cap X.

6       The benefit of course is there is a better and -- better

7  safer aligned, you know, tunnel that will arrive back to the

8  city in 2040.  The -- the other, you know, objective fact is

9  there's at some point I suppose there's an opportunity lost,

10 right.

11      In 2020, or approaching 2020, the -- the city could have

12 gone through or attempted to go through whatever process it

13 could go through at that point.  That would have had all the

14 complexity that we had now with Windsor having its half, the

15 city having its half, current tenant only required to give

16 minimal information and it -- it might have worked out.  But

17 it -- it could -- it had risk associated it too.

18 Q    With the Court's permission, I'll go into opinion number

19 two.  Mr. Doak, have you formed an opinion with respect to the

20 city's decision to enter into the development agreement?

21 A    Yes, I have.

22 Q    And what is that opinion?

23 A    My opinion is that entry into the development agreement

24 is a reasonable exercise of the city's business judgment.

25 Q    Let's show City's Exhibit 772 which is the form of the

1 | development agreement which is also Exhibit 1A115 to the plan.

2 | Is this the development agreement to which you have –– had

3 | reference, sir?

4 | A    Yes, it is.

5 |      (City's Exhibit 772 was identified)

6 |           MR. CULLEN:  I would like to offer Exhibit 772 into

7 | evidence, please.

8 |           MR. MCCARTHY:  No objection.

9 |           THE COURT:  It is admitted.

10 |      (City's Exhibit 772 was admitted)

11 | Q    Who are the relevant parties to the development

12 | agreement?

13 | A    The relevant parties are the City of Detroit acting via

14 | the PDD, the Planning and Development Department.  And –– and

15 | Pike Point Holdings which is a wholly owned subsidiary of

16 | Syncora.

17 | Q    Is there a mechanism that you can point me to which is

18 | central to the operation of the development agreement?

19 | A    Yes.  At its core the development agreement is the –– is

20 | –– it's an option or it's the –– it is –– conveys a series of

21 | –– of five year options on particular parcels of unused and

22 | under utilized city land to Pike Point, conveys that option

23 | for them to then decide to exercise upon a –– upon for five

24 | years.  And then it –– it ––

25 | Q    What happens ––

1  A    Yeah.

2  Q    What happens when the option is exercised?

3  A    When the option is exercised, Pike Point takes ownership

4  of the property and they have a fixed amount of time to start

5  development on the property and a fixed amount of time to

6  conclude development on the property.

7  Q    Had -- had Miller, Buckfire looked at the -- the city

8  owned land generally prior to the onset of this mediation?

9  A    Yes, we had.

10 Q    And what were your general conclusions with respect to

11 that property?

12 A    Generally our conclusions were that, you know, city owned

13 land was -- was not going to produce material value in the

14 restructuring process in a way that would materially affect

15 the outcome of the restructuring process.

16      The values were insufficient for Miller, Buckfire to

17 devote restructuring energies to marketing this land in small

18 or large swaths as it would be.  And that -- that existing

19 infrastructure, or infrastructure that was getting designed to

20 monetize or otherwise push land back into the private market,

21 would be better suited for the task at hand.  You know, things

22 like the land bank, and the EDC, and working with the DEGC.

23 Q    Prior -- prior to the -- the mediation did anyone present

24 to Miller, Buckfire any offers for the city's under utilized

25 real estate assets?

1  A    No.  We didn't receive any -- any offers.

2  Q    Are there any particular data points to which you can

3  refer the Court regarding the -- the market value of this land

4  if I may call it that?

5  A    Right.  Well, the -- the -- the data points that sort of

6  support the concept that there is a significant glut of unused

7  and under utilized land really include everything from, you

8  know, the -- the nature of nearby development agreements on

9  this property like the McCormick barren development agreement

10 which was conveyed for -- the option was conveyed for no

11 value.

12     The -- the -- when you think about the city's real estate

13 portfolio, much of the residential parcels and commercial

14 parcels have ended up in the city's hands because they failed

15 to attract the minimum bid at the Wayne County property tax

16 foreclosure option which is $500.00.

17     You can -- you can think about the Hantz Woodland project

18 which was 1,400 parcels over, you know, 150 acres roughly

19 being conveyed for $400,000.

20     You can focus on the Packard plant.  And the on line

21 auction that occurred for that.  And after several failed

22 bids, I believe the -- you know, the 40 some odd acres of

23 contiguous land are -- you know, are being conveyed whenever

24 title can be cleared up, which still hasn't occurred for forty

25 -- for $400,000.

1  Q    Prior to the -- the mediation at issue here, what was

2  your advice to the city about these under utilized assets?

3  A    Our advice was that the -- you know, the city should

4  continue to use its regular way mechanisms as well as invest

5  the time and the energy in creating what it would need going

6  forward like the land bank.  But that Miller, Buckfire led,

7  you know, auction processes or monetization processes for this

8  land was not a wise use of the limited restructuring assets

9  and time that we had.

10 Q    Addressing the development agreement which emerged from

11 the mediation, can you point the Court to the objective facts

12 which underlie your judgment that this development agreement

13 is a reasonable exercise of the city's business judgment?

14 A    Yes, I can.

15 Q    This -- this agreement conveys options on a series of

16 contiguous properties that are otherwise unutilized or under

17 utilized that, you know, other parties, you know, have not

18 spoken for chiefly and that it would be in the city's best

19 interest to convey stewardship in these properties to have --

20 to have private actors thinking about how to develop and how

21 to create economic activity on them.

22      And given that this is the type of agreement generally

23 that is consistent with other types -- of the other

24 development agreements that the city has entered in from time

25 to time --

1  Q    When you say consistent with others that the city has

2  entered into from time to time, what are you referring to?

3  A    I'm -- I'm referring to other development agreements that

4  the City of Detroit enters into with other developers that

5  convey options free of charge to developers so that they can

6  begin to do the work that they need to do to develop and they

7  can do the activities on the properties that we've allowed

8  Pike Point to do, the due diligence, environmental

9  remediation, you know, title investigation.  The -- the -- the

10 terminology and the provisions in this agreement were -- were

11 structured by the city's advisors and the city with the

12 assistance and with the active involvement of -- of

13 individuals who had structured other development agreements

14 for the city.

15 Q    So the -- the form of this agreement is -- is not a one

16 off kind of form?

17 A    Yeah, every development agreement is unique but there's

18 no -- there's no sweetheart deals in this, right.  This is a

19 regular way play by the rules, observe the zoning, build

20 something that works with the city's overall plan type

21 agreement.

22 Q    Okay.  Now what is -- is there anything about Syncora as

23 a counter party which bears upon your consideration of the

24 city's business judgment in entering into this arrangement?

25 A    Yes, there is.

1  Q     What is it?

2  A     And the Syncora through its lease extension has become,

3  you know, a -- a long term business institution in downtown

4  Detroit.  And its economic prospects on that asset are very

5  much linked to the revitalization and economic activity of the

6  downtown area.

7        So they are incented to get moving on these development

8  agreements or get others to assist them in get moving on these

9  development agreements.  They also have a critical mass of

10 employees and operations now at that tunnel point that conduct

11 the tunnel activities which includes a couple other building

12 leases like they lease a building to U.S. Customs.

13       And so they -- they've got some economies of scale here.

14 I mean they are -- they are well situated to be a party that

15 can attempt to propel these assets which are within, you know,

16 a couple -- a couple miles of their -- of their headquarters

17 into development.

18 Q     What if anything does the apparent lack of previous

19 interest in these parties tell you about what their future

20 would be absent this development agreement?

21 A     Well, I think you meant not parties, but parcels?

22 Q     Parcels, parcels.

23 A     Yeah.  You know, these -- these parcels will without a --

24 without a steward and will continue to sit unutilized and

25 under developed until, you know, until another party comes

1  along.

2      They'll sit on the city's balance sheet or books.  They

3  will not be secured.  They will not be -- they will be

4  maintained as the city maintains these properties.  They'll

5  continue to have derelict buildings on them or around them as

6  they -- as they do right now.

7  Q    What are the downsides for the city of this development

8  agreement?

9  A    You know, the -- the downsides of the -- of the agreement

10  are that, you know, the -- the city is foregoing the -- the

11  opportunity that could have been out there, right.  The -- the

12  opportunity that some other party may have come along and may

13  have been interested in providing something for the option.

14      I think the good thing for the city however, is if that

15  person is really out there, they don't need to call the city

16  anymore, they can call Syncora.  And if the result of that is

17  that someone still puts a building on these dirt lots, the

18  city is still a winner.

19  Q    And did you advise the city on the exercise of its

20  business judgment with respect to entering into this

21  development agreement?

22  A    Yes, I did.

23  Q    And what was your advice?

24  A    My advice was that entering into this agreement was a

25  reasonable exercise of business judgment.

1  Q    Let's go back to your -- your -- your report again, Page

2  6.  With respect to the -- the option agreement as we've

3  called it here.  First, let's -- let's make it clear.  What --

4  what is the option agreement?

5  A    The -- the option agreement is a -- an agreement between

6  the city and Pike Point, so Syncora, that provides Pike Point

7  with a year to negotiate the form of a 30 year concession on

8  grand circus garage and within that year we -- we negotiate

9  the concession, we have some headline points already ironed

10 out, but then also enter into it.  So it's an -- it's an

11 option on a 30 year concession on the grand circus garage.

12 Q    All right.  And have you -- have you developed an opinion

13 on that transaction?

14 A    Yes, I have.

15 Q    And what is that opinion?

16 A    That entry into the option agreement is a reasonable

17 exercise of the city's business judgment.

18 Q    Who are the parties to the option agreement?

19 A    The City of Detroit and Pike Point Holdings, so Syncora.

20 Q    What happens if Pike Point decides to exercise the

21 option?

22 A    If they decide to exercise the option they will have a 30

23 year concession on the grand circus garage.  So during that

24 time they will collect -- they will -- they will operate and

25 collect -- collect the revenues, pay the expenses, engage in

1  the cap X associated with running and maintaining the grand

2  circus garage.  At the conclusion of the concession, the asset

3  and all its improvements revert to the city.

4  Q    Does the city get any financial consideration if the

5  option is exercised other than indirectly via cap X?

6  A    Yes, it does.

7  Q    Could you explain that, please?

8  A    Well, in -- in addition to the considerable cap X which

9  I'm sure you'll get to, there is a -- a cash flow sharing

10  provision associated with the lease.

11      If the garage substantially performs its current

12  trajectory, after Syncora earns back in capital its 140% of

13  the enormous initial cap X they need to put into the garage,

14  there's a -- a net cash flow sharing.  So 25% of the cash

15  flows come to the city.

16  Q    Prior to the mediation what diligence did Miller,

17  Buckfire do on the garage?

18  A    Miller, Buckfire's diligence on this particular garage

19  has been conducted really in the context of the larger amount

20  of due diligence that we've conducted on the parking systems.

21  We've been working since the first part of our assignment on

22  understanding the garages, meters, violations, and boot and

23  tow.

24      What they -- how those operations work, what their

25  profitability really is, what the agreements look like, what

1  the condition of the assets really look like.  Because we've

2  always thought about these assets as being some of the most

3  monetizable that the city owns.

4       So in -- in that context, you know, we have -- we have

5  done work on --

6  Q    Let me stop -- stop you --

7  A    -- city -- on this garage as well.

8  Q    Did you get -- did you get a specialized consultant to

9  look at the garage specifically?

10 A    Yes.  Yes, we did.

11 Q    Who are they?

12 A    In October of '13, the city retained Desmond Associates

13 which is a nationally recognized parking consultant.  And the

14 city retained them to assist on analyzing the parking system

15 assets and the operations, assist in creating necessary

16 reports to understand the assets and reports that are ordinary

17 course essentials in any sort of monetization process.  It's

18 -- it's what municipals do if they're examining these sort of

19 transaction opportunities.

20 Q    What were your preliminary conclusions with regard to

21 prospects for the garage?

22 A    I think our -- our preliminary conclusions with regards

23 -- with regards to this garage is it's -- it's one of the

24 worst cases in the -- one of the poorer cases, poorer garages

25 as far as its current circumstances.

1    It -- it clears only half a million dollars a year.  And

2  it has been sorely under maintained.  And we estimate based on

3  Desmond's work that it will require over $13,000,000 of

4  remediation over the next five years to fix the structure of

5  the facility.

6  Q    All right.  Now, help me with the -- the math here.  Five

7  hundred thousand dollars of cash flow a year.  And thirteen --

8  A    And a half million dollars of cap X.

9  Q    And a half million of cap X be done within the next five

10  years.  How does that strike you as a financial proposition?

11  A    Well, it's a -- it's definitely a money -- it's a money

12  losing proposition as it -- as it currently stands.

13    The -- the inclusion of this garage and the rest of the

14  other garages, if you look at some of the information we have,

15  just makes the -- you know, the initial real price tag that

16  anybody would have to pay, including the city, you know, that

17  much higher.

18    This is the -- this is the garage that requires the most

19  cap X over the next five years.  And it's not one of the more

20  profitable garages.

21  Q    Can you point to -- you've -- you've discussed this to

22  some degree already.  Can you point to any other objective

23  factor, any objective factors which support the city's

24  business judgment in entering into this option agreement?

25  A    I think in -- in addition to the -- the current poor

1  prospects and the high cap X, there's -- there's another

2  aspect of the -- the situation which is, you know, there --

3  there has been building and development around the area.

4      But what the city needs, whether it's the city or someone

5  else, is someone to coordinate the remediation of the garage,

6  the operation of the garage, the negotiation of long term

7  parking deals with the surrounding new developers and the, you

8  know, the borrowing and financing of whatever money is

9  required to get the garage up and running, you know, in this

10  critical core and where the city should be revitalizing.

11      And I guess the -- the objective factor that I would cite

12  in that -- that level is, everything we've seen to date does

13  not suggest the parking department can do that.  We've --

14  we've had tremendous difficulties trying to get adequate due

15  diligence information from the department, get necessary

16  contracts, get projections, get historical financials.

17      So this if it's -- this option if exercised makes --

18  makes potential transactions with the rest of the parking

19  department much easier, makes the prospects of the rest of the

20  parking assets much better, and, you know, the city gets, you

21  know, a further investment from -- from private sources in the

22  -- to -- to revitalize the city.

23  Q    And so in conclusion, did you advise the city with

24  respect to the exercise of its business judgment on that rule

25  -- on this option agreement?

1  A    Yes, I did.

2  Q    And what was your advice?

3  A    That -- my advice was that entering into the option

4  agreement was a reasonable exercise of the city's business

5  judgment.

6  Q    Let's turn now to opinion number four.  And if you could

7  -- did you reach an opinion with respect to the new C notes

8  and the city parking assets, Mr. Doak?

9  A    Yes, I did.

10  Q    And what is that opinion?

11  A    The -- the opinion is that a -- a transaction with

12  respect to the city's parking assets can be structured to

13  retire all or a material portion of the C notes and -- and/or

14  assure that the general fund would have adequate incremental

15  liquidity to address the scheduled remaining debt service.

16      At its core we saw enough cash flows from the potential,

17  the parking assets to service this Class 9 recovery vehicle,

18  the C notes.

19  Q    All right.  Can -- can you describe for me the C notes?

20  How do they -- how do they work?

21  A    Sure.  The -- the C notes are a limited tax guarantee

22  obligation of the City of Detroit.  They will be issued at the

23  emergence and they will have, while not a secured interest,

24  there will be a set aside of parking related revenues to fund

25  the debt service of the C notes.

1      The C notes are 12 year obligations.  They have a 5% cash

2  coupon.  And they have leveled debt service throughout the 12

3  years.

4  Q    If I could have Exhibit 774, please.  Do you see this --

5  is this a -- a summary of the principal terms of the new C

6  notes?

7  A    Yes, it is.

8      (City's Exhibit 774 was identified)

9  Q    And does this correctly reflect those terms as -- as you

10  understand them?

11  A    Yes, it does.

12  Q    It says in the middle C notes not to exceed $88,430,000.

13  Where does that come from?

14  A    Well, that -- that's a product of the mediation.

15  Q    Okay.  That's --

16  A    But that -- that -- that number --

17  Q    What does it relate to in the outer world?

18  A    Yeah, that's the total amount -- that's the maximum

19  amount of C notes that will be issued under the plan.  And

20  that amount is issued if all of the COPS Class 9 accept the

21  plan or opt into the plan as it's currently formulated.

22  Q    All right.  Now can you describe the -- the diligence you

23  conducted with respect to the parking assets which underlie

24  the C notes?

25  A    Okay.  Miller, Buckfire's really been engaged at this

1 point in a 18 month diligence process on the -- the city's

2 parking assets that's involved interacting with the other --

3 other advisors to the -- to the city. Many city employees,

4 other particular specialized consultants assisting the -- the

5 city and Miller, Buckfire in regards to the prospects of the

6 -- the assets.

7      You know, we've -- we've gathered the necessary -- we've

8 gathered the legal documents that exist. We've examined

9 historical financials, examined the projections. And that has

10 all culminated over the -- the summer into the issuance of an

11 RFQ, a request for qualifications, that went out to parties

12 seeking potential interest in a -- you know, a wide range of

13 potential transactions on the parking assets.

14 Q    Focusing here on the -- on the prospects of these parking

15 assets and the prospects of their monetization, if I can

16 direct your attention -- you've mentioned consultants. Can I

17 direct your attention to City Exhibit 753 which is the Desmond

18 Phase I report. Do you see that -- that first document, Mr.

19 Doak and can you tell me what it is?

20      (City's Exhibit 753 was identified)

21 A    Yes,  can. This is a report that was delivered mid-July

22 and was constructed over a period of months by Desmond with

23 the assistance of Miller, Buckfire and the city providing a

24 comprehensive preliminary assessment of the City of Detroit's

25 parking operations, what their current state is. And what

1  their -- what their -- what their summary prospects are.

2  Q    Is -- is this report part of the reliance materials that

3  you used in forming your opinion in this case?

4  A    Yes, it is.

5         MR. CULLEN:  I would like to offer Exhibit 753 as

6  reliance materials for the witness' opinion.

7         THE COURT:  Any objections for that purpose?

8         MR. MCCARTHY:  No objection.

9         MS. FISH:  No objection, Your Honor.

10        THE COURT:  All right.  For that purpose it is

11  admitted.

12     (City's Exhibit 753 was admitted)

13  Q    If you'll look at Pages 10 to 16 of the report, Mr. Doak.

14  Can you tell me what is -- are there various scenarios for the

15  parking prospects laid out in the report, sir?

16  A    Yes, there are.  Desmond working with the parking

17  department and Miller, Buckfire prepared several potential

18  modeling or economic prospect scenarios for the parking

19  operations.  Starting with a status quo scenario and then

20  going to -- to several other scenarios that assumed changes in

21  operating procedures as well as potentially in some cases

22  ownership.  But really just operating procedures in how the

23  parking system is operated.

24  Q    And what conclusions if any did you draw based upon these

25  different scenarios and the financial results that they

1 modeled?

2 A    I drew the conclusion that the city had the prospective

3 capacity to either run the parking operations more efficiently

4 and more economically generating more cash flow, or seek a

5 private partner or other form of private oriented solution

6 that could generate sufficient cash flows that could -- that

7 then could provide the value necessary to service the C notes,

8 or retire the C notes, depending on the -- depending on the

9 structure that -- of the deal and the amount of the C notes.

10 Q    And can you call into mind the ultimate conclusions

11 reached in this report with respect to the levels of return

12 under the various scenarios?  If you can find it there.

13 A    Yeah.  At the -- the conclusion of the report presents in

14 -- in summary at the -- the Page 21 of 21 it -- it -- it does

15 indicate that the anticipated cash flows of the parking system

16 over a 40 year projection -- projection horizon could vary

17 dramatically depending on whether we're working under status

18 quo assumptions, or the city was running the operations better

19 or had -- was running it as a private operator would, or the

20 city had monetized.

21     These conclusions as you can see there show that

22 significant cash flow could be potentially available.  It's a

23 preliminary projection though.  You know, it still has to do

24 -- everything still has to due diligence out.  Private

25 operators still have to be negotiated with.

1      This is -- it is preliminary.  But this is the

2   information that we had available at the time and it indicated

3   to us that we were appropriately proceeding with the

4   construction of the C notes at the size we said we were

5   comfortable with.

6   Q    And in -- and calling our mind back to the size of the C

7   note offering, in any of these scenarios the cash flows

8   projected are a multiple, and in some cases a large multiple

9   of that amount, correct?

10  A    Yes.  Yeah, they -- they could be.

11  Q    Okay.  When you -- after you received this report on

12  various values for this parking -- these parking dollars, what

13  did you do next?  Did you proceed with a parking RFQ?

14  A    Oh, okay, thanks, sorry.  Yeah.  The -- this was the --

15  one of the final steps before we proceeded with an RFQ going

16  out to the market.

17      I -- I -- I would note, however, in your question that

18  these are not values, right.  This is just -- this is just

19  nominal cash flow dollars.  So --

20  Q    Okay.  Thanks for the correction.

21  A    No -- no problem.

22  Q    Could I show you City Exhibit 754?  And what is -- what

23  is this, sir?

24  A    This is the request for qualifications that the city

25  advertised mid-August seeking potential interested parties in

1 transactions involving the monetization of the city's parking

2 assets.

3      (City's Exhibit 754 was identified)

4 Q    And if you'll look at Page 3 in the fourth paragraph of

5 this exhibit, please.  And if you'll look at the last sentence

6 of that paragraph, the city may in its sole discretion.

7 A    Yes.  The -- the city may in its sole discretion as we

8 move forward determine that it's appropriate to break the

9 parking assets into separate elements in effect.  So separate

10 the garages from the -- the meters and the like.

11      And/or separate individual parking garages.  And, you

12 know, conduct processes and sign concession agreements on

13 those individual aspects.

14 Q    And what's the benefit of that to the city?

15 A    Well, the -- the benefit there is potentially that --

16 that allows for greater value to -- to be achieved by the

17 city.  There may be more interest in some particular assets

18 while others may actually be ones that the city determines are

19 best continued to be publicly run and/or improved upon at this

20 time before any transaction is undertaken or no transaction is

21 undertaken.

22 Q    Can I show you now Exhibit 755?  What is this, sir?

23 A    This is the --

24      MR. CULLEN:  I'm sorry for this.  I -- I don't think

25 I offered 754.  I'd like to offer 754 into evidence if I

1  might, Your Honor.

2            THE COURT:  Any objections?

3            MR. MCCARTHY:  No objection, Your Honor.

4            MS. FISH:  No objection.

5            THE COURT:  It is admitted.

6       (City's Exhibit 754 was admitted)

7            MR. CULLEN:  On to 755.  Thank you very much, Your

8  Honor.

9  A    755 is a rider to the RFQ where we provided to all of the

10  potential parties who had received the materials as well as

11  others who wanted the information, additional Q and A

12  responses, so responses to questions we had received from

13  interested parties as well as some additional historical and

14  pro forma financial information so that they could understand

15  the performance of the assets better.

16      (City's Exhibit 755 was identified)

17  Q`   If I could direct you to the last -- oh, before that.

18            MR. CULLEN:  May I offer 755 into evidence?

19            THE COURT:  Any objections?

20            MR. MCCARTHY:  No objection, Your Honor.

21            MS. FISH:  No objection.

22            THE COURT:  It is admitted.

23      (City's Exhibit 755 was admitted)

24  Q    If I can direct your attention to the last page of this

25  exhibit.  What does -- what does this reflect?

1  A    This reflects a snapshot of 2013 performance by asset,

2  asset by asset.  So it breaks down the individual garage's

3  performance.  And shows that performance against the

4  anticipated required capital expenditures over the next five

5  years for each one of the assets.

6  Q    What can -- what could you, did you conclude with respect

7  to this information about the relative strength of these

8  assets in term of generating -- generating value?

9  A    Right.  Well, if -- if one compares the pro forma fiscal

10 year 2013 cash flows of each individual garage against the

11 estimated required cap X expenditures for these garages, one

12 quickly comes to the conclusion that grand circus garage is a

13 drag on the overall system and potentially on the economic

14 proposal that we're offering parties.

15 Q    Having done this work on -- having done this work on the

16 parking assets and their cash flows and -- and capital needs,

17 what impact did that work have on your opinion that -- let's

18 put it back up again.  Because my ability to reproduce that

19 sentence faithfully is dubious.

20 A    As is mine.

21 Q    A transaction -- your opinion number four about a

22 transaction can be structured to retire all or a material

23 portion of the C notes and/or assure that the general fund

24 will have adequate incremental liquidity to address the

25 scheduled remaining debt service.

1  A     Yes.  A -- a review of that information as well as an

2  awareness of the city's overall pro forma capitalization

3  allowed me to come to the conclusion that a transaction with

4  respect to the parking assets could be structured to retire

5  all or a portion of the new C notes and/or assure that the

6  general fund would have adequate incremental liquidity to

7  address the scheduled C note debt service.

8  Q     Can you tell me what your -- what is the annual interest

9  rate and amortization schedule on the proposed C notes?

10 A     The proposed C notes have a 5% cash interest rate.  And

11 they have a level that serve as term.  So if the only

12 accepting Class 9 party is Syncora, the level debt service

13 including cash interest and principal repayment will be

14 approximately 2.4 million dollars a year.

15       And if all of the Class 9 parties join and opt into the

16 Class 9 settlement, then the annual debt service cash interest

17 and principal will be approximately $10,000,000 a year.

18 Q     And do you have an opinion over the -- or whether the --

19 these revenues can support issuance of C notes in either the

20 amount of 22,000,000 or $88,000,000?

21 A     Yes, I do.

22 Q     And what's that opinion?

23 A     In -- in both circumstances a transaction can be designed

24 to support all or materially all of the debt service required

25 by the C notes.  I -- I would say it's not going to be the

1  same transaction, right, because you've got 2.4 here and

2  you've got 10,000,000 over here.

3      But knowing what we know of the prospects of the parking

4  garage as well the pro forma capitalization of the city, the

5  -- the debt can be serviced.

6  Q    Is it possible that revenues could fall short?

7  A    Yes.

8  Q    What happens then?

9  A    If that happens then the city will have to use other cash

10  resources to -- to fund this debt service.

11  Q    What happens if the assets are monetized pursuant to the

12  RFP after -- after this transaction is entered into?

13  A    Depending on how many C notes are outstanding, and which

14  revenue streams from parking have -- are getting set aside,

15  that will affect how the proceeds are applied against the

16  debt.  But basically if there's a monetization transaction and

17  a large -- and a lump sum payment up front, those amounts

18  would go to retiring some or all of the parking debt.

19  Q    Do you regard it as a material risk that the parking --

20  that the parking cash flow will be insufficient to cover these

21  C notes?

22  A    The -- yes.  I mean there -- there is -- yeah.  There is

23  -- there is a risk that if the -- if you look at -- simply

24  look at status quo and the city continues to run the parking

25  system as its run the parking system Desmond tells you point

1  blank that the cash is not -- the cash is not being generated

2  to fund this -- this debt service.

3  Q    Okay.  But if -- if it's better -- if the city undertakes

4  any of the other scenarios?

5  A    Yes.  If the city undertakes the other scenarios then

6  there's significant incremental cash flow that can be made

7  available to service this debt.  And what the Desmond report

8  tells you and what the -- the RFQ has told us which is still

9  continuing and we're working on with the city, is -- is that

10 the transaction can be structured and that's how I've -- I've

11 come to my opinion.

12            MR. CULLEN:  That's all I have, Your Honor.

13            THE COURT:  Okay.  Actually, sir, before you sit

14 down, Mr. Cullen.  Is there a map of the area where the

15 development agreement applies that would show the specific

16 parcels that are involved it?

17            MR. CULLEN:  We are at work -- we are at work on

18 putting a definitive map together with respect to that.  There

19 has been some -- there has been some trading in and out of

20 those parcels and that's why I didn't have a map to show you

21 this morning.

22            THE COURT:  All right.  So at some point we'll have

23 a look at that?

24            MR. CULLEN:  Absolutely, Your Honor.

25            THE COURT:  All right.

1                    CROSS EXAMINATION

2  BY MS. O'GORMAN:

3  Q    Good afternoon, Your Honor, Mr. Doak.  My name is Debra

4  O'Gorman.  I represent MIDD, one of the claimants in this

5  action.

6       So the -- the Class 9 COPS claimants that opt into the

7  plan COPS settlement will receive the new C notes, correct?

8  A    Yes.

9  Q    And if all of the eligible COPS claimants opt into the

10 plan COPS settlements, they'll receive a share of the 88.4

11 million dollar face amount of the C notes, right?

12 A    Yes.

13 Q    And if Syncora is the only COPS claimant that

14 participates in that settlement they'll receive about 21.2

15 million dollars in face amount of new C notes, right?

16 A    Yes.

17 Q    And the COPS creditors that opt in will also receive

18 these Class 9 settlement credits, correct?

19 A    Yes.

20 Q    And those settlement credits will allow the holders to

21 apply them for up to 50% of the purchase price of certain

22 eligible parking and real estate assets, correct?

23 A    If -- if those processes are conducted, yes.

24 Q    And these settlement credits are assignable and

25 transferrable so they can be sold by the holders that receive

 1  them, correct?

 2  A    Yes.

 3  Q    And the available Class 9 settlement credits are in the

 4  aggregate amount of $25,000,000, correct?

 5  A    If all the Class 9 claimants opt in, yes.

 6  Q    Okay.  So that full 25,000,000 would be distributed if

 7  all the claimants opt in, is that right?

 8  A    Yes.

 9  Q    And if only Syncora participates in the plan COPS

10  settlement, Syncora will receive a pro rata share of that

11  $25,000,000 Class 9 settlement credits, right?

12  A    Yeah.  Yes.

13  Q    And the COPS -- COPS holders that opt into the plan COPS

14  settlement will also receive a share of the new B notes,

15  correct?

16  A    They -- yes.  They receive an -- a portion of the B notes

17  that otherwise were in the disputed claim reserve.

18  Q    Okay.  And in addition Syncora is getting some other

19  consideration such as the tunnel lease, the development

20  agreement, the grand circus option, and also a cash payment,

21  right?

22  A    Well, pursuant to the settlement agreement but not

23  pursuant to their Class 9 interest.  There are other disputes,

24  litigation, and claims that are being resolved with Syncora as

25  covered in the form of settlement agreement.

1    Q    Okay.  So the recovery to Syncora under the plan doesn't

2    include these additional elements, correct?  The tunnel, the

3    parking option, development agreement?

4    A    I -- I don't -- I don't understand your question.  I mean

5    those are all things that Syncora is getting under the plan,

6    but --

7    Q    But not -

8    A    -- some of those things are not related to their Class 9

9    interest.

10   Q    Right, okay.  That's what I was asking.  Now you did not

11   provide an -- an opinion in your expert report on the value of

12   the new C notes, correct?

13   A    That's correct.

14   Q    And you have not performed a market valuation of the new

15   C notes, correct?

16   A    No, I have not.

17   Q    So you're not offering an opinion regarding whether the

18   new C notes are worth the face amount, or some other amount,

19   correct?

20   A    I have not offered that opinion.

21   Q    And you didn't provide an opinion in your expert report

22   as to the value of the Class 9 settlement credits, correct?

23   A    No, I did not.

24   Q    And you did not perform a market valuation of the Class 9

25   settlement credits, did you?

1  A    No, I did not.

2  Q    And you didn't provide an opinion in your expert report

3  on the market value of the new B notes, correct?

4  A    No.  That -- that's not in my report.

5  Q    Well, you haven't performed a market valuation on the new

6  B notes, right?

7  A    No, I have not.

8  Q    And your colleagues at Miller, Buckfire haven't performed

9  a market valuation of the new B notes, right?

10  A    That's correct.  There is a -- it's in the plan though.

11  Q    And you haven't done a valuation of the tunnel lease, the

12  parking, or the development agreement as to a monetary value?

13  A    No, I have not produced a valuation on those agreements.

14  Q    So you're not offering an opinion on the aggregate market

15  value of all of the components of the consideration offered to

16  the Class 9 COPS holders pursuant to the Syncora settlement,

17  right?

18  A    You've kind of mixed and matched there in that last

19  question.  But the clear answer is -- is no, I have not

20  provided any valuation reports on that matter.

21  Q    And to calculate a percentage recovery to a class of

22  claims, you'd have to know the value of the consideration

23  being distributed and then compare it to the outstanding

24  claims, right?

25  A    That would be the way you would conduct that sort of

1  analysis.

2  Q    And in your report you didn't provide an opinion on the

3  Class 9's recovery percentage, correct?

4  A    I did not provide a report on -- yeah, on Class 9

5  recovery.  I did not provide that.

6  Q    And you couldn't do that because you didn't form an

7  opinion on the aggregate market value of the consideration

8  offered to the Class 9 COPS holders, correct?

9  A    Well, I -- I didn't do that.  I was not asked to do that

10 by my client.

11 Q    You're aware that under previous versions of the plan the

12 Class 9 COPS holders were offered a settlement in which they

13 would receive a pro rata share of the new B notes, right?

14 A    Yes.

15 Q    And you're aware that the city's view was that if the

16 COPS holders opted into that settlement, the distribution

17 would provide a 10% recovery to that class, right?

18 A    Yes.

19 Q    And you're aware that under both the prior and current

20 plans, the city proposes to distribute a pro rata share of the

21 new B notes to the Class 14 general unsecured creditors?  Are

22 you aware of that?

23 A    Yes.

24 Q    And the city's view is that that will -- that share of

25 the B notes will provide approximately 10% recovery to the

1 | Class 14 claimants, correct?

2 | A    Yes.  That component of the B notes that the Class 14 is

3 | getting.  Because Class 14 is going to get more B notes now.

4 | Q    So the settling --

5 |         MR. CULLEN:  I don't mean to interrupt, but if I

6 | may, this is completely beyond the scope of direct.

7 |         MS. O'GORMAN:  I just have a few more questions.

8 |         THE COURT:  I'll permit it, go ahead.

9 | Q    Now the settling COPS holders are getting 10 cents in B

10 | notes just like the Class 14 creditors, but they're also

11 | getting a share of the C notes, and they're also getting Class

12 | 9 settlement credits, right?

13 | A    Well, they're -- you left out a critical step, right.

14 | You left out the fact that they are going from a 100 cent

15 | claim down to a 60.3% allowance.  And then it's on that that

16 | they would get the 10 cents.  So you're -- you're -- you're

17 | kind of jumping steps as you think through the numbers.

18 | Q    Okay.  But you haven't calculated a percentage recovery

19 | to the Class 9 COPS holders.  You told us that before, right?

20 | A    That's correct.

21 |         MS. O'GORMAN:  That's all I have, thank you.

22 |         MR. MCCARTHY:  Your Honor, Ed McCarthy on behalf of

23 | FGIC.  I'll attempt to be quick.

24 |         THE COURT:  Okay.

25 |         MR. MCCARTHY:  If I may approach the witness with

1  his deposition, Your Honor.

2          THE COURT:  Yes.

3          MR. MCCARTHY:  Thank you.

4                    CROSS EXAMINATION

5  BY MR. MCCARTHY:

6  Q    Mr. Doak, we met at your deposition Tuesday.  It's nice

7  to see you again.

8  A    It's good to see you as well.

9  Q    That deposition transcript is what I handed you.  You

10 don't need to look at that now, but we may refer to it later

11 so for convenience I gave it to you.

12         Now at that deposition you served as a 30(b)(6)

13 representative on behalf of the city, right?

14 A    Yes, I did.

15 Q    And the topics that you sat for were five topics that

16 related to the Syncora settlement, right?

17 A    Yes.

18 Q    I want to talk a little bit about the preparation of your

19 report.  You began preparing your expert report last week,

20 Wednesday, September 24th, right?

21 A    Yes.

22 Q    And you concluded preparing your report the -- the next

23 day?

24 A    Yes.

25 Q    Thursday, September 25th, right?

1  A    Yes.

2  Q    And moving on a bit.  I want to talk about how this

3  settlement came about.  You personally participated in the

4  mediation negotiations that led to the Syncora settlement,

5  right?

6  A    Yes.

7  Q    And you participated in many settlement negotiations and

8  mediations on behalf of the city, right?

9  A    Yes, I have.

10  Q    And other than Syncora and the city, no other parties

11  participated in the negotiations that led to this Syncora

12  settlement you're testifying about today, right?

13        MR. CULLEN:  Objection, Your Honor.  I don't think

14  that -- I think that that bears on the mediation order.

15        MR. MCCARTHY:  Your Honor, this was -- we could pull

16  up the deposition transcript as a statement by a party

17  opponent if you'd like.  But this comes right out of the --

18  the answer is no and it come right out of the deposition

19  without an objection by the way.

20        THE COURT:  I'm going to sustain the objection.  You

21  can try to narrow it if you like, but it feels like it does

22  invade the mediation and the fact that the witness may have

23  improperly violated -- may have improperly answered the

24  question before doesn't justify --

25        MR. MCCARTHY:  Understand, Your Honor.

1          THE COURT:  -- violation now if it is.

2          MR. MCCARTHY:  I'll move on.  I'll move on.

3  Q    Outside of mediation, nobody has provided you with an

4  opinion that Syncora was in a unique position to assume an

5  extended tunnel lease, right?

6  A    I -- I don't think that's an accurate statement because

7  American Roads --

8  Q    Just answer my question yes or no.  I think it's a no,

9  right?

10  A    Well, then it's a -- it's a -- it's -- well, please ask,

11  sorry, ask the question again.

12  Q    Sure.  Outside of mediation nobody has provided you with

13  an opinion that Syncora was in a unique position to assume an

14  extended tunnel lease, right?

15  A    Well, American Roads outside of mediation --

16          THE COURT:  Please answer the question yes or no.

17  A    I'm -- I'd -- sorry, it's just a negative -- it's a

18  negative -- I got -- I get flipped up on it.

19          THE COURT:  If you can't answer it yes or no, you

20  can say that.

21  A    Okay.  I -- I am -- I lost -- sorry, I lost track of the

22  question.  Others have provided --

23          THE COURT:  Sir, if you haven't got the question --

24  A    Okay.

25          THE COURT:  We will present it to you again.

1  A     Okay.  Sorry.

2  Q     Do you need the question again, or --

3  A     Yeah, I do.

4  Q     Okay.  One more time.  Outside of the mediation Mr. Doak,

5  nobody has provided you with an opinion that Syncora is in a

6  unique position to assume an extended tunnel lease, right?

7  A     No.

8  Q     Thank you.  Now to your knowledge outside of the one

9  meeting you had with representatives of Windsor in October

10  2013 and again outside of any discussions you had with Syncora

11  in mediation, the city has not approached any other entities

12  or individuals to offer them a buy out or assumption of the

13  tunnel lease, right?

14  A     That is correct.

15  Q     And the city never began a formal marketing process to

16  determine whether anyone had an interest in purchasing the --

17  or leasing the tunnel, right?

18  A     That is correct.

19  Q     And you personally never sent out formal -- a formal

20  request for a proposal for other creditors outside of Syncora

21  to purchase the lease for the tunnel, right?

22  A     Can you ask that one again?

23  Q     Yeah.  Actually let me broaden it.  Miller, Buckfire has

24  never sent out a formal request for proposal for other

25  creditors outside of Syncora to purchase the lease of the

1 tunnel, right?

2 A    That's correct.

3 Q    And regarding value, I think you testified about it here

4 already.  But you have an extremely difficult time valuing the

5 tunnel because of lack of information from the lessee, right?

6 A    Yes.

7 Q    And outside of mediation your view is that the city did

8 not have any access to engineering related information

9 regarding the tunnel, right?

10 A    That's correct.

11 Q    And your view is that the city also did not have, again

12 outside of mediation, access to information with respect to

13 the physical condition regarding the tunnel, right?

14 A    That -- that's correct.

15 Q    And even after Syncora gained an ownership interest in

16 American Roads just last year, the leadership, the CEO and the

17 CFO of that company, American Roads has not changed, right?

18 A    That's correct.

19 Q    So American Roads has the same exact CEO and CFO that you

20 and the city previously interacted with when you wished to

21 improve reporting and operations, right?

22 A    It's the -- it's the same individuals.

23 Q    Thank you.  Let's turn to your report.  Actually we can

24 do it without doing that I think because in your report you

25 discuss -- you opined on the difficulty of valuing the tunnel

1 because in your view there is some uncertainty about the

2 tunnel's future because of a new bridge that's scheduled to be

3 built, right?

4 A    Yes.

5 Q    But you personally didn't conduct an investigation into

6 the expected level of traffic that the new bridge will

7 experience when it's built assuming it is, right?

8 A    No, I didn't -- I did not engage in any traffic study.

9 Q    And you don't know if the city has conducted such an

10 investigation either, right?

11 A    I'm not aware of such a study.

12 Q    And you personally didn't do any investigation into the

13 impact of a bridge assuming it's built with respect to future

14 tolls on the tunnel, right?

15 A    I -- I did not.

16 Q    And you don't know if the city has conducted any such

17 analysis either, right?

18 A    That is correct.

19 Q    In your report also and if you need to refer to it or

20 have me bring it up, I can.  But you discuss a concept or a

21 scenario regarding the tunnel where the tenant might become

22 what you referred to a lame duck, raising the possibility that

23 the tenant could be less inclined to work with the city moving

24 forward.  Do you remember that?

25 A    Yes, I do.

1  Q    But you did not conduct any investigation or study to

2  determine whether the current tenant -- tenant would be less

3  inclined to work with the city, assuming that there was.  You

4  voted a lame duck, right?

5  A    I -- I can't answer that question because of the

6  mediation order.

7  Q    Outside of mediation, did you conduct any such study?

8  A    No, I did not.

9  Q    Let me try to word this one so perhaps we can avoid the

10 mediation.  Outside of mediation you haven't had any

11 correspondence with anybody on behalf of Syncora or American

12 Roads regarding the statement in your report that the tenant

13 would become a lame duck or less inclined to work with the

14 city, right?

15 A    That's correct.

16 Q    Let's switch gears a little bit, Mr. Doak and talk about

17 the development agreement.

18 A    Okay.

19 Q    Regarding the development agreement, you haven't

20 conducted any formal marketing process to determine whether

21 there was anyone interested in purchasing the real estate

22 assets listed in the development agreement, correct?

23 A    That is correct.

24 Q    And you haven't conducted or sent out any formal requests

25 for a proposal with respect to those real estate assets

1  subject to the development agreement, right?

2  A    That is correct.

3  Q    And I think I heard you mention on your direct testimony

4  contiguous properties.  You would agree with me, wouldn't you,

5  that as a general proposition real estate developers view

6  contiguous properties as more valuable than properties that

7  had the same nominal value but maybe spread out, correct?

8  A    Well, same -- maybe same nominal size but spread out.  If

9  they have the same -- if they have the same value then they

10 have the same value.

11 Q    Same size.

12 A    Yeah.

13 Q    Thank you.  Regarding the option agreement.

14 A    Okay.

15 Q    The option agreement in your view is a benefit to the

16 city because it was part of the overall settlement with

17 Syncora, right?

18 A    Yes.

19 Q    And it's true that you have no opinion on whether Syncora

20 is in a unique position as compared to other creditors with

21 respect to the grand circus parking garage which is part of

22 the option agreement, right?

23 A    No, that's inaccurate.

24 Q    So it's true that you wouldn't be able to express an

25 opinion on whether Syncora is in a unique position as compared

1  to other creditors with respect to the grand circus parking

2  garage, right?

3  A    I can't discuss that because as I indicated at the

4  deposition, they're a member of a bidding party in the RFQ.

5  Q    That's my misunderstanding then.  So when you answered

6  no, I wouldn't be able to express an opinion on that you

7  weren't saying you didn't have an opinion.  You were saying

8  that it's covered by a privilege, or of this order?

9  A    I guess I -- I guess I have an opinion that they are in a

10 unique position, but I can't discuss it in detail because it's

11 based on their -- their -- you know, their proposal and the

12 proposals are confidential.  But it's an active competitive

13 process the city is currently engaged in.

14 Q    So you weren't able to share information with me about

15 that opinion at the deposition, correct?

16 A    That -- that's correct.

17 Q    You're not aware outside of mediation of any offer by the

18 city to any creditor with respect to an option agreement to

19 purchase or operate the grand circus parking garage, right?

20 A    That's correct.  I'm not aware.

21 Q    Now you were involved in the selection of the properties

22 that were included in the eventual development agreement,

23 right?

24 A    Yes.

25 Q    But based on the mediation order you weren't able to tell

1  me how properties were selected to be included in that

2  development agreement, right?

3  A     That's correct.

4  Q     Okay.  I just have a few more questions.  And the same is

5  true with respect to whether Syncora's relationship with the

6  tunnel impacted the city's decision to select the parcels it

7  listed in the development agreement, correct?  That was also

8  subject to the mediation order so you couldn't tell me about

9  that, right?

10 A     Well --

11 Q     I don't want to get into the mediation but --

12 A     No, no.  I understand.  But when you asked that question

13 before I think the way you asked it in the deposition, I was

14 able to say that outside of the mediation, you know, the whole

15 concept that they have this core asset and they have

16 professionals there and assets there meant that they have a

17 unique relationship.

18 Q     Let's turn to the -- the question I was asking.  And --

19 or I could ask it again and then we could go to the deposition

20 because we might be talking about two different things.

21 A     Okay.  Yeah, sure.

22 Q     If you could turn to your deposition it says September

23 30th, 2014 deposition.  And that's Page 164, Line 25.  And I'm

24 going to have to skip to the next page, too and go to Line 9

25 of 165.

1    Were you asked the following question and did you give

2   the following answer at your deposition.  Question.  Sure.

3   Does Syncora's relationship with the tunnel, did that

4   relationship impact in any way the city's decision to -- to

5   select these parcels listed in Exhibit A as the parcels that

6   are listed in the development agreement?  Answer, I guess I'm

7   not supposed to answer that pursuant to the mediation order.

8    And you go on from that.  Did I ask that question and did

9   you give that answer at the deposition?

10  A   Yeah, I did.  I guess I was thinking about 167.

11  Q   Thank you -- thank you, Mr. Doak.  And finally, on the

12  same topic -- you can take that down, please, Richard.  Thank

13  you.  On the same topic, the same is true with respect to

14  evidence that the city had seen with respect to Syncora's

15  desire and ability to become a developer in the City of

16  Detroit.  You believe those communications regarding that were

17  covered by the mediation order, right?

18  A   Well, some communications are, but it goes back to my

19  knowledge outside of the mediation of their participation in

20  the parking.

21  Q   I'm asking you about those communications.  And if you

22  can't --

23  A   Well, if you're asking -- sorry, go ahead.

24  Q   That's okay.  And I'm -- and I'm not asking for an

25  explanation.  I'm looking --

 1  A    No, no, I'm okay.  You're asking whether I can talk about

 2  communications that occurred in the mediation and the answer

 3  is no, I can't talk about communications that occurred in the

 4  mediation.

 5  Q    And there's certainly communications I assume because you

 6  brought that up that occurred in the mediation regarding

 7  evidence that supports an opinion that Syncora may have a

 8  desirability to become a developer in the city, right?

 9            MR. CULLEN:  Objection.

10  A    That one I can't actually --

11            MR. CULLEN:  Objection.

12  A    -- that's the one I can't answer, right?  Yeah.

13            MR. MCCARTHY:  Understood.  Actually that was

14  inadvertent, Your Honor.  Thank you.

15  Q    Now moving on, moving off that topic.  If we could bring

16  up your opinion Exhibit 747, please, Page 5.  One page back.

17  Thank you.  And under statement of compensation F, if you

18  could highlight the second sentence, please.  That's fine.

19  Thank you.

20       It states here, it's true that a portion of Miller,

21  Buckfire's fee is due upon recapitalization and restructuring

22  of the city's debt services, right?

23  A    That's correct.

24            MR. MCCARTHY:  Thank you, Mr. Doak.  I have no

25  further questions.

1          THE COURT:  Any further cross examination?

2          MS. O'GORMAN:  No, Your Honor.

3          THE COURT:  Redirect.

4          MR. CULLEN:  No, Your Honor.

5          THE COURT:  All right.  Sir, you may step down.

6   Thank you.

7      (WITNESS JAMES DOAK WAS EXCUSED AT 12:37 P.M.)

8          THE COURT:  All right.  Let's not call any more

9   witnesses today.  Is that okay?

10         MR. CULLEN:  Yes, Your Honor.

11         THE COURT:  Okay.  A couple of things I need to

12  clear up with you or discuss with you.

13     This morning we admitted Ms. Kopacz's expert report into

14  evidence.  I neglected to ask you about the supplement to her

15  report which she submitted on August 27th and which I would

16  like to number 12001.  Is there any objection to the admission

17  of that into evidence?

18         MR. CULLEN:  No objection, Your Honor.

19         MR. MCCARTHY:  No objection, Your Honor.

20         MS. FISH:  No objection, Your Honor.

21         MS. O'GORMAN:  No objection, Your Honor.

22         THE COURT:  All right.  That is admitted.

23     (Court Exhibit 12001 was identified and admitted)

24         THE COURT:  Finally, I have been advised that you

25  can remove your property, your boxes or whatever to the next

1  courtroom that we are moving to.  And you can do that right

2  after Court today.  It's courtroom 242 to remind you so that

3  should be a convenience to you.

4      I have been advised that it is either open or will be

5  momentarily.  And we will meet there 8:30 Monday morning.

6  Anything further?

7          MS. GREEN:  Jennifer Green on behalf of the

8  retirement systems.  I was able to confirm that Ms. Thomas can

9  be here.  And I spoke to the city, they think that they will

10  complete their case on Monday, therefore she can be here

11  Monday the afternoon or at 1:30, I assume is where we'll break

12  for lunch.  So --

13          THE COURT:  Okay.

14          MS. GREEN:  She can be here and I've already spoken

15  to Mr. Wagner --

16          THE COURT: Thank you.

17          MS. GREEN:  And he agrees that's fine.

18          THE COURT:  Thank you.

19          MS. GREEN:  Also the retirement systems would

20  maintain their objection to the supplemental report.

21          THE COURT:  All right.  Now we'll -- we'll deal with

22  that when she testifies.  Thank you for reminding me of that

23  again.  Sir?

24          MR. MONTGOMERY:  I just wanted to identify for the

25  Court the document that was going to be the subject of a

1  stipulation 10187.  And that's the demonstrative from the Wohl

2  report, sir.

3           THE COURT:  And what was that stipulation again?

4           MR. MONTGOMERY:  That was that we would not call Mr.

5  Wohl as supporters or Mr. Atkinson -- document into evidence.

6  And it was Exhibit 10187.

7           THE COURT:  All right.  Is that your agreement?  Is

8  that everyone's agreement?

9           MR. CULLEN:  Yes, Your Honor.

10          MR. WAGNER:  Yes, Your Honor.

11          THE COURT:  All right.  That document --

12          MR. MONTGOMERY:  That's fine with us, Your Honor.

13          THE COURT:  All right.  That exhibit is admitted

14  then.

15      (Retiree Exhibit 10187 was identified and admitted)

16          MR. MONTGOMERY:  Thank you, sir.

17          THE COURT:  Anything further?  All right.  We're in

18  recess till 8:30 Monday morning.

19          THE CLERK:  All rise.  Court is adjourned.

20      (Court Adjourned at 12:40 p.m.)

21

22

23

24

25

1

2

3

4

5

6

7 We certify that the foregoing is a correct transcript from the

8 electronic sound recording of the proceedings in the

9 above-entitled matter.

10

11 /s/Deborah L. Kremlick, CER-4872          Dated: 10-9-14
LaShonda Moss

12

13

14

15

16

17

18

19

20

21

22

23

24

25