UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,        .       Docket No. 13-53846
        MICHIGAN,               .
                                .       Detroit, Michigan
                                .       October 6, 2014
                Debtor.         .       8:30 a.m.
. . . . . . . . . . . . . . .


            TRIAL RE. OBJECTIONS TO CHAPTER 9 PLAN
          BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:         Jones Day
                        By:  GREGORY M. SHUMAKER
                             THOMAS CULLEN, JR.
                             GEOFFREY S. IRWIN
                             EVAN MILLER
                             GEOFFREY S. STEWART
                        51 Louisiana Avenue, N.W.
                        Washington, DC  20001
                        (202) 879-3939

For the Official        Dentons US, LLP
Committee of            By:  CLAUDE D. MONTGOMERY
Retirees:               1221 Avenue of the Americas, 25th Floor
                        New York, NY  10020-1089
                        (212) 632-8390

For Financial           Weil, Gotshal & Manges, LLP
Guaranty Insurance      By:  EDWARD SOTO
Company:                     EDWARD R. MCCARTHY
                        1395 Bricknell Avenue, Suite 1200
                        Miami, FL  33131
                        (305) 577-3177

For Macomb County       Dechert, LLP
Drain Drainage          By:  DEBRA O'GORMAN
District:               1095 Avenue of the Americas
                        New York, NY  10036
                        (212) 698-3600

APPEARANCES (continued):

For Ad Hoc Water        Kramer Levin Naftalis & Frankel, LLP
and Sewer              By:  JONATHAN M. WAGNER
Bondholders:           1177 Avenue of the Americas
                       New York, NY  10036
                       (212) 715-9393

For the Detroit        Clark Hill, PLC
Retirement             By:  JENNIFER GREEN
Systems:               500 Woodward Avenue, Suite 3500
                       Detroit, MI  48226
                       (313) 965-8274

For Michael            MICHAEL JOSEPH KARWOSKI
Karowski:              26015 Felicity Lansing
                       Harrison Township, MI  48085
                       (313) 378-7642


Court Recorder:        LaShonda Moss
                       United States Bankruptcy Court
                       211 West Fort Street, 21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  You may

2     be seated.

3          THE COURT:  One second, please.

4          THE CLERK:  Calling Case Number 13-53846, City of

5     Detroit, Michigan.

6          THE COURT:  Sir.

7          MR. SHUMAKER:  Good morning, your Honor.  Greg

8     Shumaker of Jones Day for the city.  I just had a few

9     preliminary matters prior to calling the next witness if your

10    Honor will allow.

11         THE COURT:  Sure, go ahead.

12         MR. SHUMAKER:  The first matter is simply to give

13    your Honor a heads-up, if you will, on the city's plans for

14    this morning.  We do have the two witnesses, President Jones

15    and Mayor Duggan, and then we have a few exhibit issues that

16    we're trying to work out with the objectors, a deposition

17    designation to proffer, and then the city intends to rest.  I

18    just wanted to share that with your Honor.

19         The second issue relates to witness issues relating

20    to the objectors' case.  FGIC and the COPs holders filed

21    their witness list on Saturday night, and one of the

22    witnesses on the -- on their list is Mr. Derek Donnelly, who

23    is a FGIC employee.  I think he's a managing director.  The

24    city had three concerns about Mr. Donnelly appearing.  The

25    first one was that the parties had entered into a stipulation

1  in August in which FGIC had agreed that Mr. Donnelly would

2  not appear at the confirmation hearing.  The city is not

3  going to try to keep Mr. Donnelly from testifying,

4  nonetheless, but it was a little bit of a concern.

5       Secondly, he's listed as a may call witness.  I

6  would suggest to your Honor that we're way past the point of

7  may call witnesses considering that the objectors have heard

8  the city's entire case practically or will have done so as of

9  the end of this morning.  And then what the city had asked

10 would be for a deposition over the recess and before Mr.

11 Donnelly gets on the stand because he was not deposed

12 because -- in view of the stipulation.  FGIC has asked that

13 there be limitations placed on his deposition; that it relate

14 only to the Syncora settlement, which we're told he's going

15 to testify about.  That would be different than any of the

16 other witnesses who have been deposed in the case.  We don't

17 see any need for special treatment.  I don't see a lot of

18 examination beyond the Syncora settlement, but it's still

19 something that could come up.  And Mr. Soto shared with me

20 that Mr. Doak was deposed last week on 30(b)(6) issues, but

21 my understanding was that he was asked a number of questions

22 that were outside of the Syncora settlement both by counsel

23 for MIDDD and by counsel for FGIC, so I don't think special

24 treatment is in order in that regard.  So we would appreciate

25 your Honor's assistance and guidance on Mr. Donnelly's

1   deposition.

2          And then the third thing that I wanted to raise was

3   FGIC and the COPs holders on Saturday night identified two

4   witnesses who they would like to submit deposition

5   designations to, your Honor, Mr. Evanko, who is the city's

6   assessor, and Mr. Michael Hall, who was, I believe, the

7   interim director of human relations.  The city opposes

8   those -- that approach because both of those witnesses are

9   within the subpoena power of the Court.  They are city

10  employees.  They are not officers, directors, or managing

11  agents such that they would be able to admit things on behalf

12  of the city pursuant to 32(a), and so what the city plans on

13  doing is filing a motion today in that regard, and I wanted

14  to let your Honor know about that as well.

15          THE COURT:  Thank you.

16          MR. SOTO:  Your Honor, some of this is sort of

17  hitting me on the run, but I'll give you our side of the

18  story in each instance.  And why don't I start with the

19  issues with respect to Mr. Donnelly?  Derek Donnelly is the

20  only employee of FGIC that has been put on the may call list.

21  He was not put on the list.  The stipulation that was entered

22  into earlier in August has nothing to do with this because

23  the stipulation deals with whether or not there will be any

24  testimony by anyone, including Mr. Donnelly, about the

25  underlying COPs transactions' validity or invalidity or

1    otherwise, and we all stipulated we didn't need that in this
2    proceeding, and Mr. Donnelly was unnecessary for that.  Mr.
3    Donnelly is only listed because, as you know, two weeks ago
4    or maybe even not even that long ago Syncora settled.  The
5    city amended the plan, but, more importantly, the city also
6    added an additional expert witness, Mr. Doak.  And I've asked
7    all of my colleagues who attended the deposition of Mr.
8    Doak -- Mr. Doak's deposition was limited to the Syncora
9    settlement, and that's all we're asking for Mr. Donnelly
10   because the only reason he may testify is because we may need
11   someone to address one specific issue.
12        THE COURT:  Well, is he going to testify or not?
13        MR. SOTO:  Well, from my perspective, that's going
14   to be decided by two things.  One is what we hear in his
15   deposition and see regarding one specific issue that related
16   to the Syncora properties and what we learn about those
17   properties, which is what we're trying to do, and with our
18   expert's assistance we have been working at it all weekend.
19   My sense is that he is likely going to address one slim
20   sliver of the Syncora settlement.  He may have to address it.
21        THE COURT:  When you say it depends on what he says
22   in his deposition, whose deposition are you referring to?
23        MR. SOTO:  Mr. Donnelly.  We're looking at the
24   analysis of the settlement.  I'm sorry.  I misspoke.  It
25   depends on what we are able to determine about the

1    settlement, which we are still looking at, which, frankly, I

2    used the phrase "pulling eye teeth." It was very difficult

3    to try to get enough facts to understand the settlement as it

4    was. We have been analyzing those facts and trying to

5    determine, based on additional documentation that we got,

6    whether or not we need Mr. Donnelly to testify at all, so

7    that's why he's still a may call, and it would be solely

8    limited to a particular aspect of what we're trying to find

9    out may be a part of the Syncora settlement.

10            THE COURT: Well, when do you propose to make your

11   decision about whether you are calling him as a witness known

12   to everyone --

13            MR. SOTO: We think the work will be done today.

14   We're still working on it. We have one of the -- one of the

15   people who was working at it --

16            THE COURT: -- because I gather the city would not

17   be interested in taking the man's deposition if he's not

18   going to be testifying?

19            MR. SOTO: Agreed, your Honor.

20            THE COURT: Is that right, sir?

21            MR. SHUMAKER: That's correct, your Honor.

22            THE COURT: And there'd be no point to it.

23            MR. SOTO: We agree, and we will try to get an

24   answer --

25            THE COURT: So until we get that decision, it's

1  really not quite a ripe issue to determine what the scope of
2  his deposition will be.
3        MR. SOTO:  I agree with that as well, your Honor.
4  So if we could have a day to make that decision, we would
5  appreciate it.
6        THE COURT:  All right.  Is there any objection, Mr.
7  Shumaker, to holding this issue off until tomorrow morning?
8        MR. SHUMAKER:  No, your Honor.
9        THE COURT:  All right.  You'll let us know tomorrow
10  what your decision is.
11        MR. SOTO:  Thank you, your Honor.  So that was the
12  first issue.  I guess the second issue really is we think a
13  matter that the Eastern District of Michigan -- I'm sorry --
14  a matter that the Eastern District of Michigan has addressed.
15  We think the appropriate case -- and we offer it to the
16  Court -- is Stacey versus ZF Lemforder where the Eastern
17  District of Michigan said, and I'm quoting, "Courts generally
18  hold that whether a proposed deponent is a managing agent is
19  'dependent largely on the functions, responsibility and
20  authority of the individual involved respecting the subject
21  matter of the litigation.'  Thus," and I'm quoting from the
22  case, "whether a proposed deponent falls into a particular
23  category of employees or agents is therefore less relevant
24  than the individual's specific functions."
25        THE COURT:  Okay.  Hold on that thought for just a

1    moment, please.  Mr. Shumaker, I'm a little bit confused

2    about whether you want me to resolve this issue of whether

3    these witnesses should be subpoenaed to appear live now or

4    after you file a motion that you mentioned?

5              MR. SHUMAKER:  Your Honor, I think after we file the

6    motion.

7              MR. SOTO:  In which case we will address it then,

8    your Honor.

9              THE COURT:  Okay.

10             MR. SOTO:  Now, the last issue, your Honor, involves

11   scheduling with respect to tomorrow.  We were informed

12   earlier today that -- well, so we know William Fornia and I

13   guess our first one would be Victor Weiner were -- the Court

14   was informed by, I guess, first Mr. Wagner or maybe first

15   Alfredo Perez and then Mr. Wagner about the fact that they

16   would be available the day after Columbus Day.

17             THE COURT:  Right.

18             MR. SOTO:  We had anticipated until we heard

19   otherwise that we probably would have the half day on Tuesday

20   with the Court's witness, but, of course, that's not

21   happening, and we thought this weekend, well, maybe we will

22   try to speed up the efforts of getting Mr. Fornia ready.

23   That didn't fit a schedule that he had already set, and so we

24   are looking at a day tomorrow where we will either be arguing

25   Rule 52(b) -- a motion and not have a witness, and, frankly,

1  that is also a decision that we're going to make today as to

2  whether that motion is required, and I wanted to inform the

3  Court.

4         THE COURT:  Okay.  Thank you.  Sir.

5         MR. MONTGOMERY:  One housekeeping matter left over

6  from Friday, I did have the opportunity to confirm again with

7  Mr. Wagner that the COPs plaintiffs -- rather, objectors do,

8  in fact, consent to the admission of Exhibit 101.A.7 as a

9  demonstrative in lieu of qualified expert testimony by Mr.

10 Wohl, and so I thought I would take the opportunity to

11 confirm that to the Court with Mr. Wagner being here.

12        MR. WAGNER:  Yes.  That's correct, your Honor.

13        THE COURT:  All right.

14        MR. MONTGOMERY:  Thank you, your Honor.

15        THE COURT:  Thank you.  That exhibit is admitted.

16    (Retiree Committee Exhibit 101.A.7 received at 8:42 a.m.)

17        MR. SHUMAKER:  Thank you, your Honor.  The city

18 calls Brenda Jones to the stand.

19        THE COURT:  Step forward, please, and please raise

20 your right hand.

21            BRENDA JONES, CITY'S WITNESS, SWORN

22        THE COURT:  All right.  Please sit down over there.

23                    DIRECT EXAMINATION

24 BY MR. SHUMAKER:

25 Q   Good morning.

```
1   A    Good morning.
2   Q    Could you please state your name for the record?
3   A    Brenda Jones.
4   Q    Madam President, where do you live?
5   A    In Detroit.
6   Q    Have you lived in the same location in Detroit your
7   entire life?
8   A    Not my entire life, but I have resided in several -- on
9   several sides of town in the City of Detroit.  I now live in
10  northwest Detroit, but I've resided on the east side of
11  Detroit, far east side of Detroit, downtown Detroit, almost
12  everywhere except for southwest Detroit.
13  Q    And how long have you lived in Detroit?
14  A    Now you're making me tell me age.
15  Q    You don't need to give --
16  A    Since 1967.
17  Q    You don't need to give me a number of years.  And your
18  current employment?
19  A    Pardon me?
20  Q    Could you give us your current employment?
21  A    My --
22  Q    Current job.
23  A    My current job is president of Detroit City Council.
24  Q    And when were you first elected to city council?
25  A    In November of 2005.
```

1  Q   And when did you become president of the city council?

2  A   In January of 2014.

3  Q   Could you share with the Court your duties as city

4  council president?

5  A   My duties as city council president is to first oversee

6  the administration portion of city council as well as to look

7  at the budget, overview the budget of the city, to work with

8  my colleagues -- and several of them are here today; three of

9  them are here today -- to talk to the citizens of the City of

10 Detroit, to approve contracts, to approve the budget, and to

11 write legislation and ordinances.

12 Q   Could you do us a favor and identify the city council

13 members who are here today?

14 A   Most definitely.  Member Saunteel Jenkins, Member Andre

15 Spivey, and Member Gabe Leland, and to note that I have three

16 other council members in committee meeting, and our

17 legislative policy division is also here.

18 Q   Thank you.

19         THE COURT:  Excuse me.

20         THE WITNESS:  David Whitaker.

21         THE COURT:  Excuse me one second.  Would the council

22 members that the witness identified please stand for me?

23 Thank you.

24 BY MR. SHUMAKER:

25 Q   Now, Madam President, you were discussing your duties.

1  What sort of obligation do you have to the citizens of
2  Detroit?
3  A   My obligation to the citizens of the City of Detroit is
4  to represent them in a fair manner.  My obligation is also I
5  talk to the citizens all of the time.  I meet with the
6  citizens and to make sure that they are protected per our
7  city charter.
8  Q   And you say "all the time."  Is that on a daily basis you
9  meet with citizens?
10  A   Most definitely.
11  Q   And you consider that a part of your job duties?
12  A   Yes, it is.
13  Q   Which district do you serve?
14  A   I serve the entire City of Detroit.  I am an at large
15  council member.
16  Q   What is an at large council member?
17  A   I beg your pardon?
18  Q   What is an at large council member?
19  A   An at large council member is one that serves the entire
20  City of Detroit, and we have seven district council members
21  and two at large council members.
22  Q   Thank you.  Could you share with the Court before you
23  were elected to the city council your employment history?
24  A   Prior to being elected to the city council, I was the
25  president of the Communication Workers of America, Local

1  4004, and also an employee for many years, Michigan Bell,

2  SBC, Ameritech.

3  Q   Let me take you back.  Did you graduate from college?

4  A   Yes, I did.

5  Q   Okay.  And from the time you graduated college until

6  becoming a city council member, could you walk through that

7  briefly for the Court, your employment history?

8  A   My employment?

9  Q   I know you just shared, but I get confused.  If you could

10  do it chronologically, I think that would help.

11  A   My employment from the time that I graduated from

12  college?

13  Q   Yes, ma'am.  Yes, ma'am.  You don't have to go in detail.

14  I'm just trying to -- in a summary fashion.

15  A   Well, I worked for Michigan Bell for 33 years.  I retired

16  after 33 years of employment with Michigan Bell.

17  Q   What did you do for Michigan Bell?

18  A   I started off as an operator.  I worked in engineering,

19  and, again, I worked in repair, and I was the vice president

20  of the local and, when I retired, the president of the local.

21  Q   And that was with the union?

22  A   The union, Communication Workers of America, Local 4004.

23  Q   Thank you.  Could you explain for the Court the city's --

24  the city council's role in city government?

25  A   Again, the city council's role is the legislative body.

1  There are two co-equal branches of government, which is the
2  executive branch, which consists of the mayor and his
3  administration, and the legislative branch, which is city
4  council.  We, again, review contracts, approve contracts,
5  write ordinances, approve the budget, and approve any
6  contracts that come to us.

7  Q    Are there any functions or responsibilities that are
8  solely within the domain of the city council?

9  A    The writing of ordinances is a charter responsibility of
10 council as well as approving the budget is a charter
11 responsibility of city council.

12 Q    Does the city council interact with the mayor?

13 A    Most definitely.

14 Q    How often?

15 A    Well, this council probably interact with the mayor more
16 than we've interacted with any mayor, so I probably interact
17 with the mayor at least two or three times a week.

18 Q    And you meet with him personally, you yourself?

19 A    If I don't meet with him personally, I have a phone call
20 with him.

21 Q    And how about other city council members?  Do you know of
22 their interactions with the mayor?

23 A    Yes.  Other city council members have a great interaction
24 with the mayor as well.  I cannot tell you exactly how often
25 they meet with him, but I do know he makes himself available,

1   and I think he meets with them at least monthly with one or

2   two other council members and probably phone calls with them

3   as well.

4   Q   How would you characterize your relationship with the

5   mayor?

6   A   My relationship with the mayor is great.

7   Q   How about the city council's generally?

8   A   Beg your pardon?

9   Q   How is the city council's relationship with the mayor?

10  A   I would say the city council relationship with the mayor

11  is good as well.

12  Q   Have you met with the emergency manager?

13  A   Yes, I have.

14  Q   How would you characterize your relationship with Mr. Orr

15  during his tenure?

16  A   I am happy to say Kevyn Orr and I have a good

17  relationship now.

18  Q   Is there a time when it was less than good?

19  A   Well, I would not say that it was less than good.  I

20  would say that we did not meet as often as we meet now, and

21  we did not talk as often as we talk now, so I would not say

22  that it was less than good.  I would just say we did not have

23  a communication.

24  Q   Understood.  Now, Madam President, in your capacity as

25  city council president, what do you see as the most important

1    issues facing the city today?

2    A    Blight and public safety.

3    Q    And why do you say that?

4    A    Well, to drive down the streets of the City of Detroit

5    and the neighborhoods and to see abandoned homes is a serious

6    problem for the citizens in the City of Detroit as well as

7    for me and my colleagues.  Public safety is also a problem

8    when the response time is not where it should be.  The

9    officers, the EMS techs, and the fire fighters does not have

10    the equipment that they need to able to do the job adequately

11    that they need to do.

12    Q    How would you characterize the level of service the city

13    is providing to its residents?

14    A    Improving.

15    Q    Do you consider them adequate?

16    A    Improving.

17    Q    Is that less than adequate at the moment?

18    A    I would say, yes, less than adequate.

19    Q    And why do you say that?

20    A    Well, to see a citizen in the grocery store and the first

21    thing they're telling you about is an abandoned house that's

22    on their block that they're trying to get torn down and have

23    been trying to get torn down for awhile is a problem when

24    you're in the grocery store trying to shop.  To have someone

25    call the EMS and the response time is not where it should be

1  and their life need to be saved is a problem, and the crime

2  is not where -- the response time and the level of crime is

3  not what I would consider being adequate.

4  Q   And so you base your view on your interactions with

5  community members, local citizens?

6  A   Most definitely.

7         MR. SOTO:  Objection, your Honor.  I mean I

8  understand there may be a need for some leading, but now it's

9  getting beyond that.

10        THE COURT:  The objection is sustained.

11 BY MR. SHUMAKER:

12 Q   Have you had conversations with Detroit residents about

13 the levels of services?

14 A   Yes.  I cannot go into a grocery store to go shopping or

15 I cannot shop without a resident telling me about the level

16 of services that they have in the City of Detroit and that

17 they -- "I pay my taxes on time, so I should be able to get

18 adequate services."

19 Q   In these conversations that you have in the supermarket

20 and elsewhere, are the citizens telling you that the services

21 are adequate?

22 A   I'm sorry.  Can you repeat that?

23 Q   In these conversations that you have with local citizens

24 about services, are they telling you that the services are

25 adequate?

1   A   They are saying that the services are not adequate.

2   Q   Madam President, do you have contact with the departments

3   that provide the services to the residents and businesses of

4   Detroit?

5   A   Yes, I do, and they often come to the council table for

6   committee meetings. They come to the council table for

7   budget hearings. When there are approvals for contracts and

8   there are questions, they come to the council table then. If

9   there are complaints or concerns that I get from citizens,

10   I'll often call the department myself or my staff contact the

11   department.

12   Q   How often, say, on a weekly basis do the department heads

13   interact with city council?

14   A   Department interact with city council probably --

15   different departments four days a week. There are committee

16   meetings four days a week, and different departments come to

17   the committee meetings.

18   Q   Which departments?

19   A   All of them. We have five to six committees, and the

20   departments come to the committee meetings when necessary and

21   when needed.

22   Q   I'm going to ask you a few questions about the

23   bankruptcy, Madam President. Do you agree with the emergency

24   manager's decision to file these bankruptcy proceedings?

25   A   At this point, yes.

1  Q    So there was a point when it was no?

2  A    There was a point when I felt that the city was in crisis

3  and that we had bills, but I felt that it could have --

4  bankruptcy could have possibly been done by the city themself

5  as opposed to having an emergency manager there.

6  Q    Why do you agree with the decision now?

7  A    As we have progressed through the stage -- through the

8  stages and I've seen the progression that has taken place,

9  I'm satisfied and happy with the progression and the level of

10  services that the city's citizens are now seeing.  I think

11  it's helping to improve the city.

12  Q    Madam President, have you heard of the plan of adjustment

13  in the bankruptcy case?

14  A    Yes.

15  Q    Have you heard of the disclosure statement in the

16  bankruptcy case?

17  A    Yes.

18  Q    Were you provided with a copy of these documents?

19  A    Yes.

20  Q    Who provided them to you?

21  A    I believe it was Jones Day that provided them.

22  Q    Have you and the city council examined the plan of

23  adjustment?

24  A    Yes, we have.

25  Q    Can you share with the Court how that has occurred?

1    A    I'm sorry.

2    Q    How have you examined the plan of adjustment?

3    A    Well, we've had meetings with Jones Day, with the

4    different attorneys from Jones Day, and I'm trying to see --

5    some of the other advisors that have participated in the

6    closed sessions, Ernst & Young, Miller Canfield, several

7    advisors.

8    Q    Was Conway MacKenzie one of those advisors?

9    A    Conway MacKenzie, Miller Buckfire.

10   Q    Have you discussed the plan of adjustment with the mayor?

11   A    Most definitely.

12   Q    Now, have you considered the plan of adjustment in

13   conjunction with the city's budget process?

14   A    Yes.

15   Q    Are you aware of what's referred to in the disclosure

16   statement as the restructuring and reinvestment initiatives?

17   A    Yes.

18   Q    If it's okay with you, I'm going to refer to those as the

19   RRIs.  That's what we've been doing in these proceedings.  So

20   if I say that, you'll understand what I mean?

21   A    Yes.

22   Q    Okay.  With regard to the RRIs, I want to show you -- the

23   RRIs, what is your understanding of what they are?

24   A    They are restructuring and reinvestment dollars to help

25   the city restructure so that the citizens can receive

1  adequate services.

2  Q   I'd like to show you Exhibit Number 3, which is --

3          MR. SHUMAKER:  If we could put that up, please --

4  BY MR. SHUMAKER:

5  Q   Madam President, there's a monitor in front of you.

6  A   Yes.

7  Q   And do you see that --

8  A   Yes.

9  Q   -- document?  And have you seen that before?

10  A   Yes, I have.

11  Q   Okay.  And I'd like to turn your attention to page 176 of

12  that document.  Madam President, are these the RRIs that you

13  were talking about?

14  A   I'm sorry.

15  Q   Are these the RRIs listed here on the chart that you were

16  saying --

17  A   Yes.

18  Q   -- you've seen in the disclosure statement?

19  A   Yes.

20  Q   In the meetings that you've talked about with Jones Day

21  and Ernst & Young and Conway MacKenzie, have you had these

22  RRIs explained to you?

23  A   Yes.

24  Q   When that occurred, did you and other city council

25  members have questions about the RRIs?

1   A   Most definitely.

2   Q   Were they answered?

3   A   Yes.

4   Q   Now, looking at this list of the RRIs, do you agree with

5   the relative levels of spending for each of these

6   initiatives?

7           MR. MCCARTHY:  Your Honor, objection.  I think at

8   this point there's a lack of foundation.

9           THE COURT:  Excuse me.  Speak right into the

10  microphone.

11          MR. MCCARTHY:  Absolutely.  Sorry, your Honor.  Ed

12  McCarthy on behalf of FGIC.  There's a lack of foundation,

13  and this would call for improper lay witness opinion at this

14  point to testify as to the over 20 different RRIs here on the

15  page.  With all due respect to Madam President, I don't think

16  we've laid any foundation that her testimony on these topics

17  would come from anything other than closed door sessions

18  where the testimony came from the mouths of Jones Day.  And,

19  in fact, we've seen in other testimony that that's -- that is

20  also true, so I would say that it's not helpful to the Court

21  because this is not -- this is expert-related testimony that

22  does not come from the witness' own perception.

23          MR. WAGNER:  Your Honor, just one more point with

24  respect to anything that came from closed sessions, the

25  objectors were precluded from inquiring as to what happened

1    in those closed sessions during the deposition.

2         THE COURT:  The objections are overruled.  The

3    judgment of Ms. Jones regarding the adequacy of these

4    proposals is highly relevant here.  She is, after all,

5    president of the city council and has testified that she is

6    familiar with what is proposed here.  Please answer the

7    question.

8         THE WITNESS:  Thank you.  Can you ask the question

9    again?

10        MR. SHUMAKER:  Sure.  Before I do that, I just was

11   going to ask, your Honor, if we could do the one lawyer per

12   party rule for objections, one counsel.  We have -- Mr. Soto

13   is objecting, and Mr. McCarthy is objecting.  I'd just like

14   to know --

15        THE COURT:  Good idea.  Good idea.

16        MR. SHUMAKER:  Thank you.

17        MR. MCCARTHY:  That was an issue with where the

18   microphone was located before, and we've resolved that, so

19   apologies.

20        MR. SHUMAKER:  Good to know.

21        THE COURT:  All right.  All right.  Let's continue.

22   BY MR. SHUMAKER:

23   Q    The question was looking at the RRIs that are displayed

24   on the screen there, Madam President, do you agree with the

25   relative levels of spending for each of these initiatives?

1    A    Yes.  It's a start.

2    Q    Do you think -- and why do you say that?

3    A    Because when I look at blight -- and I know the state of

4    the city right now, and we're constantly having more

5    foreclosures, and as homes sit empty, blight expands, and so

6    I think that's just a start.  And when also you look at what

7    the blight task force has submitted, $440 million is not a

8    lot of money to spend on blight when you know how many

9    abandoned properties are in the city and the state of the

10   city as you drive through the city.

11   Q    And as you look down the list here, do you believe that

12   the money that's designated for those initiatives is needed?

13           MR. MCCARTHY:  Your Honor, just same objection, for

14   the record.

15           THE COURT:  All right.  Overruled.  Go ahead.

16           THE WITNESS:  Again, I think that it's a start

17   because, again, I also think that public safety -- although I

18   am not the commissioner or the chief and I don't know what

19   their average spendings are when they talk about replacing

20   the cars that have thousands and thousands of miles on them,

21   the EMS trucks, the fire trucks, but I think that it is a

22   good start to help the services in the City of Detroit.

23   BY MR. SHUMAKER:

24   Q    Do you agree with how the initiatives are prioritized?

25   A    Yes, I do.

1    Q    Based on what you've learned about these initiatives, do

2    you believe implementing them will allow the city to provide

3    Detroiters with adequate city services?

4    A    Yes, I do.

5    Q    Is it city council's intention if this plan of adjustment

6    is confirmed to pursue the RRIs described in the disclosure

7    statement?

8    A    Yes.  I have talked to my colleagues as well, so most

9    definitely.

10   Q    Could you describe for the Court what steps city council

11   will take to make sure these initiatives are carried out?

12   A    We will work as a team with the mayor collaboratively and

13   the departments collaboratively to make sure that the

14   services are improving and are adequate for the citizens in

15   the City of Detroit.  We will do our part with contracts and

16   with the budget to ensure that the dollars that are being

17   reinvested into the city will be spent where they should be

18   spent.

19   Q    Madam President --

20            MR. SHUMAKER:  You can take that down, please.

21   BY MR. SHUMAKER:

22   Q    Madam President, early on in the bankruptcy, did you hear

23   about the possibility of city workers having their pensions

24   cut?

25   A    Yes.

1   Q    Did the possibility of those cuts have an impact on you?

2   A    Most definitely.

3   Q    And what was that impact?

4   A    Well, when you work a job and you look forward to

5   retiring, you look forward to the dollars that you will have

6   to care for yourself and your family, and to know that your

7   pensions will be drastically cut and the money that you

8   expected to receive you will not be receiving, that

9   definitely has an effect on you.

10  Q    Affect your morale?

11  A    It can, yes.

12  Q    Do you believe it affected the morale of others?

13          MR. WAGNER:  Objection, your Honor.

14          THE WITNESS:  I have heard others say --

15          MR. WAGNER:  Objection.

16          THE WITNESS:  -- that --

17          THE COURT:  One second, Ms. Jones.  What's the

18  objection, please?

19          MR. WAGNER:  The objection is, number one, it's

20  hearsay.  Number two, to the extent that a witness is

21  testifying to the impact of some event on either the intent

22  or the state of mind of other individuals -- in this case, a

23  fairly large class -- the law sets out ways in which that

24  proof has to be put before the Court.  The way that sort of

25  proof is put before the Court is not anecdotal evidence.

1 It's put in the -- it's put before the Court in the form of

2 some survey, and that survey has to be conducted pursuant to

3 standards set by the Manual for Complex Litigation  in

4 federal cases, so to have one witness testify to the impact

5 of something on others is of no probative value in addition

6 to being hearsay.

7       MR. SHUMAKER:  Your Honor, the witness has testified

8 that she's had multiple conversations on a daily basis with

9 workers and employees of the city.  The question is whether

10 she believes it affected their morale.  It's not asking for

11 an out-of-court statement.

12       THE COURT:  The objection is overruled.  Go ahead,

13 please.

14       THE WITNESS:  Thank you.  Yes.  I have heard others

15 indicate that they have worked hard and that they look

16 forward to receiving adequate dollars when they retire from

17 the City of Detroit.

18 BY MR. SHUMAKER:

19 Q   Madam President, you're aware that if Judge Rhodes

20 confirms the plan, there will be a Financial Review

21 Commission; correct?

22 A   Yes.

23 Q   What is your understanding about what the Financial

24 Review Commission will do?

25 A   The Financial Review Commission will be there to oversee

1    the budget and contracts that exceed $750,000.  They will be

2    there as an oversight once we come out of the bankruptcy case

3    to make sure that the council and the mayor and the city is

4    doing what we should do to stay on track.

5    Q   Now, you mentioned the $750,000 and the contracts.  Could

6    you elaborate on that a little bit for the Court?  What role

7    will the Financial Review Commission have with respect to the

8    city's contracting process?

9    A   They will -- they have the -- they have the ability to

10   approve contracts that exceed $750,000.

11   Q   Now, were you in favor of this oversight by the Financial

12   Review Commission?

13   A   I was not at first in favor of it.

14   Q   Why was that?

15   A   First of all, there were some concerns with council not

16   having a role or not having a seat on the financial oversight

17   commission, and then there was concerns with the amount of

18   work that council would be doing and with them having to

19   approve contracts that exceed $750,000 because we have quite

20   a few contracts, and would it impair the day-to-day work of

21   the city.

22   Q   Now, you had these concerns.  Did you do anything about

23   them?

24   A   Yes.

25   Q   What did you do?

1  A    I, as well as my colleagues -- and I can say that we've

2  also been joined by another member of city council -- Member

3  Scott Benson has joined us.  All nine council members went up

4  to Lansing to talk to the legislators in Lansing as well as

5  to testify on the fact that we felt that council should have

6  a seat on the financial oversight review board as well as the

7  level of contracts of approval for council of the $750,000 as

8  well as the fact that we felt that the term of the financial

9  oversight commission was entirely unacceptable having someone

10  look at us and the work that we do and having to approve it

11  for 20 years, and we felt that if we were able to do our job

12  and to show that we could do our job without having a deficit

13  in three years, then the oversight commission should go

14  dormant and just come in if there was a problem where we

15  could not do our job because we felt that we could.

16          MR. SHUMAKER:  Could I ask Council Member Benson to

17  stand for the Court so he can see?

18          THE COURT:  Thank you, sir.

19  BY MR. SHUMAKER:

20  Q    And so those issues that you just described you testified

21  to the state legislature about; is that right?

22  A    Correct.

23  Q    Okay.  Did the legislature make changes to incorporate

24  the changes you suggested?

25  A    Most definitely.

1   Q   Do you believe that you will be able to work effectively

2   with the Financial Review Commission if the plan of

3   adjustment is approved?

4   A   Yes.  Council has a seat on the Financial Review Board --

5   Commission.  I think that it's going to be important that

6   there's some input from myself, as council president, because

7   we're doing the budget and we're working with it every day,

8   as well as from the mayor.

9   Q   Do you believe the city council will be able to work

10   effectively with the Financial Review Commission?

11   A   Yes, I do.

12   Q   Madam President, if the plan is confirmed, will you work

13   with the mayor to implement the plan of adjustment?

14   A   Most definitely.

15   Q   How?

16   A   We will continue to collaborate and talk about the things

17   that the city needs to receive adequate services.  I'm sure

18   he will continue to collaborate with my colleagues to make

19   sure that we have no deficit and that the budget criterias

20   are met.

21   Q   If the plan is confirmed, will you work with the mayor to

22   implement the RRIs?

23   A   Yes, I will --

24   Q   How?

25   A   -- and, yes, we will.

1  Q    How?

2  A    Again, we will continue to collaborate making sure that

3  the monies are spent where they are appropriated to be spent

4  and making sure that the citizens are receiving the adequate

5  services that they need to receive to be able to say, "I'm

6  happy to live in the City of Detroit."

7  Q    Do you think at the end of this process if the plan is

8  confirmed that the city will be better off?

9  A    Yes.

10  Q    Why?

11  A    Because all for so long -- and I've been on council nine

12  years -- I've watched the city fight to see do we pay Peter

13  or do we pay Paul, and now we'll be able to know who we're

14  paying and be able to have the money to pay them and to be

15  able to give the citizens, again, adequate services that they

16  deserve to have as a taxpaying citizen in the city.

17        MR. SHUMAKER:  Thank you, Madam President.  Those

18  are all the questions I have, your Honor.

19        MR. WAGNER:  Your Honor, Jonathan Wagner from Kramer

20  Levin on behalf of the holders of certificates of

21  participation.

22                      CROSS-EXAMINATION

23  BY MR. WAGNER:

24  Q    Good morning, Madam President.

25  A    Good morning.

1    MR. WAGNER:  Could I have the monitor turned so that

2  I can make sure that whatever document is being put up that

3  the right portion is being highlighted?

4         MR. SHUMAKER:  It's right there.

5         THE COURT:  Is there a screen built in there?

6         MR. WAGNER:  Oh, got it.  Okay.

7         THE COURT:  I think you're all set.

8         MR. WAGNER:  Okay.  Thank you so much.

9  BY MR. WAGNER:

10  Q    Madam President, you described the duties that you have

11  as city council president.  You have one additional duty.  Am

12  I right?

13  A    I have a lot of duties, yes.

14  Q    One of those duties is that you're the designee by the

15  city council to the board of the Police and Fire Retirement

16  Systems; correct?

17  A    I am a trustee, yes.

18  Q    And you've been a trustee for four years?

19  A    Yes.

20  Q    And am I right that one of your obligations as trustee is

21  to pick a realistic reinvestment rate assumption based on the

22  board's investment analysis recommendations?

23  A    I'm sorry.  Can you --

24  Q    Sorry.  Am I right that one of your obligations as a

25  trustee is to pick a realistic reinvest -- a realistic

```
 1   investment rate assumption for the pension fund -- for the
 2   pension fund?
 3              MR. SHUMAKER:  Objection, your Honor.  This is
 4   outside the scope of the direct.
 5              MR. WAGNER:  Your Honor, we've dealt with that issue
 6   from the outset.  We all agree that question -- that we could
 7   ask questions beyond the scope.
 8              THE COURT:  Well, plainly not everyone agrees, but
 9   the objection is overruled.
10              MR. WAGNER:  Thank you.  Well, we agreed back then.
11              THE COURT:  Oh, all right.
12              MR. WAGNER:  You can --
13              THE COURT:  The objection is overruled.  Let's
14   proceed.
15   BY MR. WAGNER:
16   Q   Do you want me to repeat the question?
17   A   Yes, please.
18   Q   Am I right that one of the obligations you have as
19   trustee is to pick a realistic investment rate for the fund?
20   A   Yes.
21   Q   And have you acted prudently as a member of board?
22   A   Yes.
23   Q   And to your knowledge, have the other board members acted
24   prudently?
25   A   Yes.
```

1   Q   And did you make any decisions on that board under

2   duress?

3   A   No.

4   Q   By the way, who's the chairman of the PFRS board today?

5   A   Who is the chairman today?

6   Q   Yes.

7   A   Mr. Diaz.

8   Q   And who was the chairman before him?  Was it Mr. Gnatek?

9   A   George --

10  Q   Was it Mr. Gnatek?

11  A   George Orzech.

12  Q   And has the -- by the way, you review your e-mails

13  concerning PFRS matters; is that correct?

14  A   Most of the time, yes.

15  Q   Has the PFRS board from time to time issued public

16  statements about the PFRS?

17  A   We have a public relations, yes.

18  Q   And when those statements are issued, are they vetted

19  with other board members?

20  A   I'm sorry.  Can you repeat that?

21  Q   When PFRS -- for example, when Mr. Gnatek issues

22  statements, does he vet those statements with other board

23  members?

24  A   Yes.

25          MR. WAGNER:  Can you put up Exhibit 1022?

1    BY MR. WAGNER:

2    Q    Actually, let me go back a step.  When PFRS issues

3    statements, public statements, those public statements are

4    accurate, are they not?

5    A    I'm sorry.  I didn't see that.

6    Q    Oh, I'm sorry.  You can look at me.  I'm right that when

7    PFRS makes public statements, it takes care to make sure

8    those statements are accurate; correct?

9    A    Correct, but I did not see what was --

10   Q    Okay.  I'm sorry.  Now we'll put up Exhibit 1022.

11              MR. WAGNER:  Your Honor, this document is in

12   evidence pursuant to your Honor's September 2nd order.

13              THE COURT:  Thank you.

14   BY MR. WAGNER:

15   Q    Is that your e-mail address at the bottom there?  Do you

16   see it, bjones@detroitmi.gov?  Is that your e-mail address?

17   I think it's the second line there.  Do you see that?

18   A    Yes.

19   Q    And who is Mr. Cetlinski?

20   A    I'm sorry.  Who was the --

21   Q    Who is Mr. Cetlinski?  You see at the top it says "From

22   David Cetlinski"?

23   A    Secretary, board secretary.

24              MR. WAGNER:  Can you turn to the fourth page of the

25   document, and can you highlight the third paragraph?

1  BY MR. WAGNER:

2  Q   Actually, do you see at the top it says, "Statement from

3  Police and Fire Retirement Systems of the City of Detroit

4  regarding pension funding levels"?  Do you see that?

5  A   Yes.

6  Q   And do you see the sentence highlighted in the middle of

7  this paragraph, "The PFRS fund is 96.1-percent funded.  With

8  respect to funded status, the PFRS fund is in the top ten

9  percentile of public pension funds with a billion dollars or

10 more in assets.  What this means is the PFRS pension fund's

11 level of funding is better than 90 percent of the public

12 pension funds in the entire nation.  The PFRS fund has nearly

13 3.1 billion in assets and is being managed with great

14 efficiency."  Do you see that in the statement by PFRS?  Do

15 you see that?  Do you see that?

16 A   Yes.

17 Q   And that was an accurate statement when this statement

18 was issued by the PFRS; correct?

19 A   Yes.

20 Q   And are you aware today the PFRS has a statement on its

21 website indicating that the PFRS is 89.1-percent funded?  Are

22 you aware of that?

23 A   No, I'm not.

24 Q   And you never voiced any disagreement with the statements

25 that I just showed you, did you?

1  A    No, I did not.

2  Q    Now, you gave some testimony about morale.  Do you recall

3  that?

4  A    Pardon me?

5  Q    You gave some testimony just before about morale;

6  correct?

7  A    Yes.

8  Q    You've not spoken to every employee in the City of

9  Detroit, have you?

10 A    Every employee?

11 Q    Yes.

12 A    No, I have not.

13 Q    And you don't know whether the city has an attrition

14 problem with respect to employees, do you?

15 A    I do not work in HR, no.

16 Q    And you don't know whether the city has a problem

17 retaining employees; correct?

18 A    Say that again.

19 Q    You don't know whether the city has a problem retaining

20 employees, do you?

21 A    I can tell you that I do know that people have said to me

22 that they have a concern with what their pensions are going

23 to be when they retire.  They have a concern with their level

24 of benefits that they are now receiving.  No, not every

25 employee has said that because I do not talk to every

1    employee, but some have said that.

2            MR. WAGNER:  Your Honor, can I have the -- can I

3    have the witness answer the question whether she knows

4    whether the city has a problem retaining employees?

5            THE COURT:  Go ahead, ma'am.

6            THE WITNESS:  No, I do not.

7    BY MR. WAGNER:

8    Q   And am I right that a job with the City of Detroit is

9    considered a good job?

10   A   Say that again.

11   Q   Am I right that a job with the City of Detroit is

12   considered a good job?

13   A   I can't answer that today.

14   Q   Okay.

15           MR. WAGNER:  Your Honor, may I approach with her

16   deposition transcript?

17           THE COURT:  Yes.

18           MR. WAGNER:  I'm sorry.  I apologize.  I didn't

19   distribute to your Honor the document that I just referenced.

20   Would you like for me to --

21           THE COURT:  Yes, please.

22           MR. WAGNER:  Okay.  I'm sorry.

23   BY MR. WAGNER:

24   Q   Can you turn to -- can you turn to your deposition, Madam

25   President?  It's page 100.

```
 1   A    I'm sorry.  Which page?

 2   Q    Page 100, line 14 to 16.  Do you have it there?

 3   A    Yes.

 4   Q    And were you asked the following question, and did you

 5   give the following response at your deposition?

 6              "Question:  Is a job with the City of Detroit

 7              considered a good job?

 8              Answer:  Yes."

 9              Did you give that testimony at your deposition in

10   August?

11   A    Yes, I did.

12   Q    Okay.  Now, you testified concerning the impact on morale

13   of changes to benefits.  Do you recall that testimony?

14   A    Yes.

15   Q    And were you including health benefits as well in your

16   testimony?

17   A    Yes.

18   Q    And you recounted for us statements that -- or your

19   impression of statements that people made to you, employees

20   made, but isn't it a fact that no one has said to you that

21   any change in benefits affected their morale?

22   A    At the time I took this deposition, that is correct, but

23   that has changed because many other people have talked to me

24   since I took this deposition.

25   Q    Did you have the opportunity to amend your deposition
```

1  transcript?

2  A    I beg your pardon?

3  Q    Did you have the opportunity to amend your deposition

4  transcript, to make any changes that you wanted to make?

5  A    On that day, yes.

6  Q    Afterwards, did you make any changes to your transcript?

7  A    No.  I didn't know I could.

8  Q    And you don't know whether active employees -- at least

9  at the time of your deposition, you didn't know whether

10  active employees expressed concern with respect to any

11  changes in retiree health benefits had any impact on them;

12  correct?

13  A    Again, on August the 4th, that was the correct answer,

14  but since then employees have talked to me.

15  Q    At least as of the time of your deposition, you had no

16  such conversations; correct?

17  A    At that point, I told you I did not know; correct.

18  Q    And am I right that you don't know whether any of these

19  changes have had any impact on employee productivity;

20  correct?

21  A    On August the 4th, you are correct.

22  Q    Okay.

23  A    Again, that has changed.

24  Q    And am I right that with respect to you, your own

25  productivity has increased since the cuts were announced;

42

1  correct?

2  A   As council president; correct.

3          MR. WAGNER:  Nothing further, your Honor.

4          MR. MCCARTHY:  Your Honor, Ed McCarthy with Weil

5  Gotshal on behalf of FGIC.

6                      CROSS-EXAMINATION

7  BY MR. MCCARTHY:

8  Q   It's nice to meet you, Madam President.

9  A   Nice to meet you as well.

10 Q   I represent one of the financial creditors, FGIC, in this

11 bankruptcy, and I have just a few questions for you.  Most of

12 them come from topics that were discussed at your deposition,

13 which you have in front of you already.

14 A   That's fine.

15 Q   If you need to refresh your memory on something, please

16 let me know.  I want to start by talking about the term of

17 the emergency manager.  It's your understanding that during

18 the term of his tenure, Kevyn Orr had the last word on

19 actions of the city council; right?

20 A   During the term of his tenure?  Right now he does not

21 have the last word, but, yes, because the duties and

22 responsibilities are now to the city council and to the mayor

23 unless it reflects the plan of adjustment or the bankruptcy.

24 Q   And I could have been more clear.  Two weeks ago before

25 the change during the --

1  A    Yes.

2  Q    During the term of his term there, Kevyn Orr had the last

3  word on city council actions; right?

4  A    Yes.

5  Q    Okay.  And at that time, you didn't think it was a good

6  idea for Mr. Orr to have the last word on actions of the city

7  council; correct?

8  A    Correct.

9  Q    And, in fact, there were several decisions that Mr. Orr

10  and his team made that you disagreed with; right?

11  A    Correct.

12  Q    In particular, for instance, you did not agree with his

13  decision regarding the privatization of garbage collection in

14  the city; right?

15  A    Correct.

16  Q    And you didn't agree with Mr. Orr's decision regarding

17  Belle Isle; right?

18  A    Correct.

19  Q    And the council actually voted against leasing Belle Isle

20  to the state; right?

21  A    Correct.

22  Q    And you also didn't believe that the 440 or so million

23  that was indicated that it should go to blight under the RRIs

24  that you looked at in talking to Mr. Shumaker -- you didn't

25  believe that that amount of money was sufficient to remedy

1    blight in the city; correct?

2    A    I believe we need more; correct.

3    Q    So you believe the amount of money that's indicated in

4    the RRIs is insufficient; right?

5    A    I believe that we need more.

6    Q    Let's move on and talk about the reinvestment initiatives

7    a little bit again.

8    A    Um-hmm.

9    Q    The plan lays out the recommended initiatives for

10   numerous city departments; right?

11   A    Correct.

12   Q    Now, you did not assist Mr. Orr in coming up with the

13   steps needed to improve each department as it's listed in the

14   initiatives; right?

15   A    I'm sorry.  Repeat that.

16   Q    You personally, you did not assist Mr. Orr in coming up

17   with the steps that are needed to improve each department as

18   it's listed in the RRIs; correct?

19   A    Correct.

20   Q    And you didn't assist any department head or Mr. Orr's

21   consultants in coming up with the steps that are needed as

22   they're listed in the RRIs; right?

23   A    Correct.

24   Q    Yet, in your view, it's up to you and the city council

25   along with the mayor to implement those reinvestment

1  initiatives; right?

2  A    Correct.

3  Q    And you talked about this a little bit.  You're familiar

4  with the Financial Review Commission Act; right?

5  A    Correct.

6  Q    And under the Financial Review Commission Act, you

7  believe the city council and the mayor retain the ability to

8  run the day-to-day operations for the city; right?

9  A    Correct.

10 Q    And you believe that as part of those day-to-day

11 operational decisions, the city council and the mayor have

12 retained the ability to decide how that $1.7 billion or so

13 under the RRIs should be spent; right?

14 A    The 1.7 under the RRI is already allocated as to how that

15 money will be spent.

16 Q    And the city council and the mayor retain the ability to

17 decide how that money in the reinvestment initiatives should

18 be spent; is that right?

19 A    The city council and the mayor will, to the best of their

20 ability, implement the allocation of the money that is in the

21 RRIs.

22 Q    Could you turn to your deposition at page 78, please?

23           MR. SHUMAKER:  I'm sorry.  Which page?

24           MR. MCCARTHY:  Page 78.

25           MR. SHUMAKER:  78.

1  BY MR. MCCARTHY:

2  Q   And once you're at page 78, I'm going to go to line 21,

3  Ms. Jones.

4  A   I'm sorry.  Line --

5  Q   21.

6  A   Yes.

7  Q   Let me know when you're there.  Are you there?

8  A   Yes, I said.

9  Q   Thank you.  And at your deposition in August of this

10 year, were you asked the following question, and did you

11 provide the following answer?

12        "Question:  And as part of those day-to-day

13         operational decisions, the city council and the

14         mayor have the ability to decide how that 1.4

15         billion" -- and, of course now it's 1.7 billion, but

16         "that 1.4 billion in the reinvestment initiatives

17         should be spent; is that right?

18         Answer:  That is correct."

19        Were you asked that question, and did you provide

20 that answer at your deposition?

21 A   On August the 4th, yes.

22 Q   Thank you.  And it was important to you as part of the

23 Financial Review Commission Act that the city council and the

24 mayor retained the ability to run the day-to-day operations

25 of the city; right?

1   A   Correct.

2   Q   Let's talk a little bit about the plan of adjustment now.

3   Now, it's your view that the -- I think we heard that the

4   plan of adjustment is feasible?

5   A   Yes.

6   Q   But to be clear, you have not gone through independently

7   and verified the numbers that are in the City of Detroit's

8   ten-year financial projections; right?

9   A   What I have done is talk to the departments that will be

10  allocating those funds.

11  Q   Okay.  And my question was a little different, so if you

12  can just try to answer my question and my question only,

13  please.

14  A   Well --

15  Q   And I'll say it again.  To be clear, you have not

16  personally gone through and independently verified the

17  numbers in the City of Detroit's ten-year financial

18  projections; right?

19  A   I answered the question to the best of my ability in

20  talking to the department heads.

21  Q   And in addition to department heads, you relied on others

22  from the bankruptcy consultants at Jones Day and Conway

23  MacKenzie and Miller Buckfire to help with that analysis of

24  the ten-year projections; is that fair?

25  A   I have talked to them as well, yes.

1  Q   And you relied on others for the analysis of the numbers

2  and figures that are also in the city's four-year

3  projections; correct?

4  A   Correct.

5  Q   In fact, you relied on others and have not independently

6  verified yourself all of the numbers that are contained in

7  the restructuring and reinvestment initiatives; right?

8  A   When you say "independently," can you please tell me what

9  you mean, "independently"?  Are you saying that I get someone

10 outside to come in to verify those numbers?

11 Q   Yes, that you personally -- you personally have not sat

12 down and verified yourself without the help of others that

13 those numbers are accurate as they show up in the plan of

14 adjustment; is that fair?  Do you agree with me on that?

15 A   Well, I don't know if that's fair because, as I

16 indicated, in talking to the department heads, I believe that

17 that is independently talking to those who allocate those

18 funds.

19 Q   Could you turn to your deposition at page 155, please?

20 And when you're at page 155, please turn to page 8.  Are you

21 there?

22 A   Yes.

23 Q   And at your deposition on August 4th, were you asked the

24 following question, and did you provide the following answer?

25           "Question:  Have you independently verified any

```
 1              of the numbers that are contained within Exhibit

 2              1 -- Exhibit I -- excuse me -- to the RRIs?

 3                  Answer:  No, I have not."

 4         Were you asked that question, and did you provide

 5    that answer?

 6    A   Yes, I did.

 7    Q   Thank you.

 8              THE COURT:  Could you give her complete answer,

 9    counsel --

10              MR. MCCARTHY:  Absolutely.

11              THE COURT:  -- after, "No, I did not" -- "No, I have

12    not"?

13              MR. MCCARTHY:  I'm sorry, your Honor.  I thought I

14    had it covered, and I believe -- I thought it was on the

15    screen.

16    BY MR. MCCARTHY:

17    Q   The answer was, "No, I have not, period.  I have a

18    financial -- a fiscal analyst department that works for the

19    city council to evaluate."  That was your full answer;

20    correct?

21    A   That was the answer, yes, and I am giving you the rest of

22    the answer now.

23    Q   Okay.  Thank you.  I want to move on, so you can put that

24    down.  At the time of your deposition -- I think we heard

25    this already, but I want to confirm -- you had not reviewed
```

1   the full amended disclosure statement page to page; right?

2   A    At the time of the deposition; correct.

3   Q    And you haven't reviewed the recommended reinvestment

4   initiatives for each department now either, have you?

5   A    Have I reviewed it now?

6   Q    Yes.

7   A    Yes, I have.

8   Q    You haven't reviewed any of the reports prepared by

9   Conway MacKenzie on the reinvestment initiatives, have you?

10  A    I'm sorry.  Repeat that?

11  Q    Have you reviewed any reports prepared by Conway

12  MacKenzie on the reinvestment initiatives?

13  A    No.

14  Q    At the time of your deposition, you hadn't walked through

15  each of the restructuring initiatives with Mr. Mayor Duggan,

16  had you?

17  A    I'm sorry.  Say that again.

18  Q    At the time of your deposition, you hadn't walked through

19  each of the restructuring initiatives with Mayor Duggan, had

20  you?

21  A    No, I had not.

22  Q    And you hadn't sat down with Mayor Duggan and gone

23  through the amount of money that had been allocated under the

24  RRIs for each of the city departments; right?

25  A    No, I had not.

1  Q   And the few times that you had talked to Mr. Orr, you

2  never talked to Mr. Orr about the specific measures in

3  spending for each of the city's departments; right?

4  A   No, I had not.

5  Q   And you didn't do any independent analysis or

6  verifications of the figures listed in the plan of adjustment

7  for spending under the reinvestment initiatives, did you?

8  A   No, I have not.

9  Q   I'm going to talk a little bit about the city assets.

10  You're familiar with certain aspects of the city charter;

11  right?

12  A   Yes.

13  Q   And the city charter sets out a process that the city

14  needs to adhere to when it attempts to sell a city asset;

15  right?

16  A   Correct.

17  Q   And the city council needs to vote on all asset sales;

18  right?

19  A   Correct.

20  Q   And the city charter requires that the city has to take a

21  certain amount of bids before it sells an asset; right?

22  A   Correct.

23  Q   And when the city attempts to sell a city asset, one

24  consideration for the council is that the city obtain the

25  best possible value for the asset; right?

1   A   Correct.

2   Q   And moving on to the grand bargain, you're familiar with

3   what the grand bargain is in this bankruptcy when it's been

4   referred to; right?

5   A   Correct.

6   Q   And you're aware that under the terms of the grand

7   bargain, the city will transfer the art that's in the DIA

8   collection to a nonprofit in return for funding from

9   foundations that will be provided to pensioners; right?

10  A   Correct.

11  Q   And the terms of the sale of the art in the DIA to the

12  nonprofit, that was presented to the city council for

13  approval; right?

14  A   Correct.

15  Q   And you and the city council voted in favor of the sale

16  of the DIA assets; right?

17  A   Correct.

18  Q   But when you voted to approve that sale of the DIA

19  assets, at that time you didn't have any idea as to how many

20  pieces of art were in the museum, did you?

21  A   Correct.

22  Q   And when you voted to approve that sale of the DIA

23  assets, you didn't know how many people visit the museum;

24  right?

25  A   Correct.

1  Q    And when you voted to approve the sale of the DIA

2  collection, you had not made any attempt to determine the

3  value of the entire collection of the art at the museum;

4  correct?

5  A    Correct.

6  Q    And when you voted to approve the sale of the DIA art

7  collection, you had not reviewed any economic analysis that

8  detailed the economic contribution of the DIA to the city;

9  right?

10  A    Correct.

11  Q    And, in fact, you don't know whether one of those

12  economic analyses exists; isn't that right?

13  A    Personally; correct.

14  Q    Now, you personally at the time -- let's keep it at that

15  time frame, the time when you voted to approve the sale of

16  the assets in the DIA to the nonprofit.  You personally at

17  that time had not analyzed whether the City of Detroit owned

18  the art at the DIA; right?

19  A    I was told that the city owned the art, yes.

20  Q    And you believe the city does own that art; right?

21  A    Yes.

22  Q    You haven't reviewed any analysis regarding restrictions

23  on the art at the DIA, have you?

24  A    No.

25  Q    Outside of the grand bargain, the city council has not

1  analyzed any other ways to monetize the art that's in the

2  collection of the DIA; right?

3  A    Correct.

4  Q    You don't know how many municipalities in this country

5  operate without an art museum within the municipality, do

6  you?

7  A    No, I do not.

8  Q    And the City of Detroit has a number of art museums;

9  isn't that right?

10 A    Correct.

11 Q    And each of those art museums provides art and culture to

12 the people of the City of Detroit; correct?

13 A    Correct.

14        MR. MCCARTHY:  I have no further questions at this

15 time.  Thank you.

16        MS. O'GORMAN:  Good morning, your Honor.

17                   CROSS-EXAMINATION

18 BY MS. O'GORMAN:

19 Q    Good morning --

20 A    Good morning.

21 Q    -- Ms. Jones.  My name is Debra O'Gorman.  I represent

22 one of the objectors to the bankruptcy plan.  Now, the

23 employees of the City of Detroit do not report to you, do

24 they?

25 A    I'm sorry.

1  Q   The employees of the city do not report to you, do they?

2  A   I have employees, yes.  I have employees.  All of the

3  employees of the city do not report to me, but I have

4  employees as city council member.

5  Q   Okay.  But other than those -- how many employees report

6  to you?

7  A   How many employees do I have?

8  Q   Right.

9  A   Five.

10  Q   Okay.  So other than those five employees, no other

11  employees of the city report to you; correct?

12  A   There are the administrative staff of the city council

13  that reports to the council president as well as the

14  legislative policy division.

15  Q   And it's not your job to monitor the staffing or

16  employment levels of various city departments; correct?

17  A   I'm sorry.  I can't hear you.

18  Q   It's not your job to monitor --

19      THE COURT:  Speak right into the microphone and slow

20  down a bit.

21      MS. O'GORMAN:  I'm not sure I can get much closer,

22  but I'll try.

23  BY MS. O'GORMAN:

24  Q   It's not your job to monitor the staffing or employment

25  levels of the city departments, is it?

1    A    That is correct.

2    Q    And it's not your job to monitor the productivity of city

3    employees; correct?

4    A    Other than the ones I just spoke of, that is correct.

5    Q    And it's not your job to monitor the morale of city

6    employees; correct?

7    A    That is correct.

8    Q    And it's not your job to monitor attrition among city

9    employees; correct?

10   A    That is correct.

11   Q    Now, you have not conducted any formal studies regarding

12   the impact of pension benefit cuts to retirees on employee

13   productivity, have you?

14   A    No, I have not.

15   Q    And you're not aware of any such studies having been

16   done, are you?

17   A    I beg your pardon?

18   Q    Are you aware of anybody else having done such studies?

19   A    No, I am not.

20   Q    And you have not conducted any studies regarding the

21   effect of the pension cuts to retirees on employee morale,

22   have you?

23   A    No, I have not.

24   Q    And you're not aware of any such studies, are you?

25   A    No, I am not.

1 Q   And you've not conducted any studies regarding the impact

2 of pension cuts to retirees on employee retention, have you?

3 A   No.

4 Q   And you're not aware of any such studies; right?

5 A   Correct.

6 Q   Now, you were elected to your position; is that correct?

7 A   Yes.

8 Q   And winning the election took time and effort; right?

9 A   I beg your pardon?

10 Q   Winning the election took time and effort on your part;

11 correct?

12 A   Correct.

13 Q   And you had to raise money for your campaign; correct?

14 A   Correct.

15 Q   And you didn't run for city council because of the salary

16 you would receive; correct?

17 A   I'm sorry.

18 Q   You did not run for city council because of your --

19          THE COURT:  What's the relevance of this?

20          MS. O'GORMAN:  Well, she has testified about

21 employee motivations and her own experience and the impact of

22 the plan on her.

23          THE COURT:  I'm going to ask you to move on.

24          THE WITNESS:  I'm sorry.

25          THE COURT:  I have sustained my own objection to the

1  question.

2  BY MS. O'GORMAN:

3  Q   You didn't run for city council because of the pension

4  benefits you would receive --

5  A   No.

6  Q   -- did you?

7         THE COURT:  Like I say, I'm going to ask you to move

8  on.

9         MS. O'GORMAN:  Okay.

10        THE COURT:  The witness' personal views on these

11  questions is not relevant.

12        MS. O'GORMAN:  Okay.  That's all I have.  Thank you.

13        MR. SHUMAKER:  No redirect, your Honor.

14        THE COURT:  If the Court does confirm the plan, are

15  you, as the president of the city council, committed to

16  implement the plan?

17        THE WITNESS:  Yes, I am.

18        THE COURT:  And is it your belief that the city

19  council is committed to implement to plan?

20        THE WITNESS:  I have talked to most of my

21  colleagues, your Honor, and yes.  And if I can add, we have

22  also been joined by President Pro Tem Cushingberry.

23        THE COURT:  Sir, would you stand for recognition,

24  please?  Thank you.  Thank you, ma'am.  As you know, the plan

25  does not provide for a public sale of the art at the Detroit

1    Institute of Arts.

2            THE WITNESS:  Yes.

3            THE COURT:  Do you have a position on whether the

4    art at the Detroit Institute of Arts should be sold to pay

5    creditors of the city?

6            THE WITNESS:  My position is, per the city charter,

7    the city should provide art and culture to the citizens of

8    the City of Detroit, and the art -- protecting the art in the

9    DIA is helping to follow the city charter of the City of

10   Detroit.

11           THE COURT:  And what is your understanding of why

12   the city charter has that provision in it?

13           THE WITNESS:  Because the citizens of Detroit need

14   culture and art provided to them.  The citizens cry all the

15   time about the taxes that they are paying, and they need

16   something outside of just paying on taxes as cultivation for

17   the city.

18           THE COURT:  Okay.  That's all I have.  Anything

19   further?

20           MR. WAGNER:  No, your Honor.

21           MR. SHUMAKER:  No, your Honor.

22           MR. MCCARTHY:  No.

23           THE COURT:  All right.  Ma'am, you are excused.

24   Thank you very much for coming today.

25           THE WITNESS:  Thank you.  Can I take my bottle of

1    water?

2            THE COURT:  Yes.

3        (Witness excused at 9:45 a.m.)

4            MR. CULLEN:  Good morning, your Honor.  Thomas

5    Cullen of Jones Day representing the city.  Mayor Duggan will

6    be our next witness, and he is being retrieved from another

7    room in the building.

8            THE COURT:  Okay.  Here he is.

9            MR. CULLEN:  If I may approach, your Honor --

10           THE COURT:  Yes.  Step forward, please, sir.

11           MR. DUGGAN:  Good morning.

12             MICHAEL DUGGAN, CITY'S WITNESS, SWORN

13           THE COURT:  All right.  Please sit down over there.

14                       DIRECT EXAMINATION

15   BY MR. CULLEN:

16   Q   Good morning, your Honor.

17   A   Good morning.

18   Q   Can you state your full name for the record, please, and

19   your address?

20   A   Michael Edward Duggan, 9240 Dwight, Detroit  48214.

21   Q   And what's your current employment?

22   A   I am the mayor of Detroit.

23   Q   Wanted to make sure we had the right guy.

24   A   That's me.

25   Q   Where were you born, sir?

1   A   The City of Detroit.

2   Q   How much of your life have you spent in or around

3   Detroit?

4   A   Well, I lived in the city for the first five years before

5   my family moved to Livonia, and then in 1981 in my first

6   summer clerkship when I was in law school I came to work

7   downtown Detroit, and I've worked in the city every day the

8   last 32 or 33 years.  And I moved back to the city in

9   February 2012.

10  Q   Do you still have family in the area?

11  A   I do.  I've got family in Livonia, and my son and

12  daughter are now living in the City of Detroit, and our roots

13  are here.

14  Q   Where did you go to high school?

15  A   Catholic Central, which was at the time on West Outer

16  Drive in Detroit.

17  Q   And where did you go to college?

18  A   Did undergrad and law school at the University of

19  Michigan.

20  Q   What did you do after law school?

21  A   I spent two years at a litigation firm in downtown

22  Detroit, then two years as an assistant Wayne County

23  corporation counsel, and then when Ed McNamara was elected

24  Wayne County executive, I became the deputy county executive

25  in January 1987.

1    Q    And how long did you serve in that position, sir?

2    A    Fourteen years.

3    Q    Over that 14 years, I'd like you to characterize first

4    what was your role as deputy county executive for Wayne

5    County?

6    A    The way County Executive McNamara set it up, I was the

7    chief operating officer for the county, so all 5,000 county

8    employees, including the department heads, reported to me,

9    and I reported to the county executive.

10   Q    And during the time -- during the time that you first

11   came in that position, are you able to characterize the state

12   of Wayne County's operations and finances in '87?

13   A    Yeah.  It was well-documented at the time, but Wayne

14   County at the time was on the verge of bankruptcy.  It was a

15   $200 million general fund budget, and there was a $130

16   million accumulated deficit when we arrived.  We had to sell

17   tax anticipation notes in May just to make payroll because we

18   were running out of cash.  The city -- the county was running

19   a huge deficit and a lot of talk of bankruptcy.

20   Q    And what did you do in your role in response to those

21   circumstances?

22   A    Well, I was working for the county executive, but we did

23   a number of things, certainly the kind of management things

24   you would expect with more professional management, tighter

25   control on finances, but the county --

1   Q   Can I ask you --

2   A   Sure.

3   Q   A little slower, Mr. Mayor.

4   A   I'm sorry.  I'll slow down.  Thank you.

5   Q   Go ahead.  Proceed.

6   A   The county's situation was somewhat different in that the

7   problem was largely caused by state legislation that had made

8   the county responsible for all indigent hospital bills with

9   no ability to control the cost, and so the central issue was

10  being able to change that legislation, and ultimately we went

11  to Lansing and in December of 1987 passed a package that

12  addressed the $130 million accumulated deficit but also gave

13  us the tools to go forward and run a balanced budget.

14  Q   Was there any state oversight in that package?

15  A   There was.  There was a state senator at the time by the

16  name of John Engler who was a sponsor of the bill, and the

17  way we ended up resolving the issue was the $130 million or

18  so of back deficit, the State of Michigan levied a four-cent

19  statewide cigarette tax and sold bonds to pay off the

20  accumulated deficit.  The state set up an Emergency Loan

21  Board to oversee because the legislators who went on the hook

22  to bail out Wayne County wanted to be assured that we were

23  not going to be back in two or three years, and so we were

24  required every year to submit a balanced budget to the

25  Emergency Loan Board.  The Emergency Loan Board had

1  significant oversight responsibility, and they had a hammer
2  in that in any year in which we ran a deficit or failed to
3  pay our bills, they could assess us the full interest that
4  year on the outstanding bonds, which would have been -- I
5  don't remember the numbers now, but in the range of nine or
6  $10 million, and so it was a very effective tool because we
7  had county commissioners over the years who had a history of
8  spending money we didn't have and using revenue assumptions
9  that were overly rosy.  Each year at budget time, we were
10  able to say to the county commission, "If you do not adopt
11  this honestly balanced budget, the state Emergency Loan Board
12  is going to have the ability to take a number of steps," and
13  after two or three years, people got in the habit of running
14  a balanced budget, and ten or fifteen years later when the
15  bonds were paid off, we had run a deficit every single year,
16  and the loan board dissolved, but I don't believe there was a
17  time when they actually had to step in.
18  Q   You said, "we had run a deficit every single year."
19  A   No.  We had not run a deficit.  I'm sorry.  We had not
20  run a deficit any single year in there, and so the loan board
21  ultimately dissolved.  I don't believe there was a time when
22  the state actually had to step in and take any action.  The
23  loan board worked as intended.
24  Q   What was your role in that budgeting process and in the
25  interaction with the loan board?

1    A    Well, as the chief operating officer, the CFO reported to

2    me, and I was responsible every year on signing off on the

3    budget.  I was the person probably most directly involved in

4    working out the package with Lansing, but, you know, along

5    with the county executive and the CFO we made darn sure that

6    budget balanced.  The last 14 years that we were there, we

7    balanced the budget every single year.

8    Q    Did you derive any lessons from your experience in Wayne

9    County that you would identify as relevant to your current

10   role?

11   A    There's no question that I think that it -- I learned a

12   lot, but the first thing that you learn is one person doesn't

13   do a turnaround.  You need to recruit an extremely strong and

14   deep team to deliver services to the public on a cost-

15   effective basis, and you need to be vigilant on your

16   revenues, and you need to be vigilant on your expenses.  And

17   you've got to plan two or three years ahead because you just

18   never know what's coming up in the State of Michigan

19   economically.

20   Q    After you left as deputy county executive, what was your

21   next job?

22   A    I was elected Wayne County prosecutor in 2000 and served

23   in that position through 2003.

24   Q    And after 2003, where did you go?

25   A    I became the CEO of the Detroit Medical Center in January

1  of 2004.

2  Q   Could you tell us what the Detroit Medical Center is?

3  A   The Detroit Medical Center is a system of eight hospitals

4  largely based in the City of Detroit, approximately 14,000

5  employees, about 2,500 doctors, and it sees close to a

6  million patients a year.

7  Q   Does it have any particular mission with respect to its

8  patients or clientele?

9  A   Well, most of the other hospital systems moved out of the

10  City of Detroit over the last 20 or 30 years, but at one

11  point when I was the CEO, the Detroit Medical Center saw more

12  than one out of every five Medicaid patients in the State of

13  Michigan, but we took great pride in the fact that we treated

14  everybody regardless of ability to pay.

15  Q   How did you get the job?

16  A   The DMC board had fired the doctor who was running the

17  medical center.  The DMC had lost close to $500 million in

18  the previous five years.  The board had voted to close

19  Receiving Hospital, voted to close Hutzel Hospital, was about

20  to close Sinai Grace Hospital, and was down to 15 days cash

21  on hand.  And they made a decision that they did not want

22  somebody from the medical field, which they felt like the

23  traditional thinking was leading them down the road they were

24  on.  And so I was running for reelection as prosecutor, and

25  the leadership of the DMC board approached me and said I was

1  their choice to be the CEO of the medical center, and

2  ultimately I made the decision to go.

3  Q    What was the debt situation of DMC?

4  A    When I came in, the bankruptcy attorneys were already

5  hired, and we had 15 days of cash on hand, so it was

6  pretty -- it was pretty dire.

7  Q    And what was the status of the service delivery for DMC?

8  A    Well, the service delivery was what was driving the

9  patients away.  A lot of the doctors had left the system over

10  the years, and if you were a patient who had gone to the

11  emergency room, it probably took you three or four hours to

12  see a doctor.  And since the emergency room is our entry

13  point for the great majority of our patients, we were simply

14  driving patients away.  And when I got there, it was clear to

15  me that while we had a financial issue with a number of

16  uninsured patients, we had a far greater issue in that we

17  were delivering such poor service, we were driving the paying

18  patients away.

19  Q    And could you characterize the state of operations as

20  opposed to service?

21  A    You know, when you looked at the organizational chart, it

22  was turning over all the time.  I think they'd been through

23  three or four CFO's, two or three COO's.  Numerous hospital

24  presidents had turned over.  Basically in the previous four

25  or five years, an awful lot of people left for greener

1   pastures.  We really had to rebuild the team from scratch.

2   Q   So what did you do?

3   A   Well, I started by recruiting a really outstanding team.

4   I went and got the state treasurer, Jay Rising, to come in as

5   the chief financial officer, and I got Blue Cross' director

6   of marketing to come in as our marketing director.  And then

7   we went at the service levels.  When 300,000 people a year

8   are coming into your emergency room and it's taking them

9   three or four hours to see a doctor, every person who walked

10  out was saying bad things about the Detroit Medical Center,

11  so I got the doctors and nurses together in the emergency

12  room and said, "We're going to have the finest standard of

13  service in an emergency room anywhere."  The emergency room

14  doctors at DMC are the best in the country, but we couldn't

15  get the patients in to see them.  We set up a lean team that

16  redesigned the system, and in May of my first year we

17  launched the 29-minute guarantee.  If you did not see a

18  doctor within 29 minutes of coming into the emergency room,

19  we gave you two tickets to a Tiger game.  In 2004 the Tigers

20  lost 104 games, and so Mike Ilitch was willing to make me a

21  very reasonable deal on those tickets, but it was a very

22  empowering experience because we saw upwards of 95 percent of

23  the patients in 29 minutes, and it was the men and women at

24  DMC who had been there who redesigned the process.  And from

25  there I was able to go out and recruit top cardiologists from

1  Beaumont and other hospitals, top orthopedic surgeons, and
2  started to bring people back, and the finances turned around
3  in a hurry.
4  Q   You mentioned something called a lean team.  What did you
5  mean?
6  A   Well, the auto industry has done an extraordinary job, in
7  particular, but any large company does this well, in which
8  you have a lean process in which the men and women who
9  actually do the job work together as a team to design every
10 piece of that job to see where the waste is in the process
11 and take it out.  And so I borrowed some help from some of my
12 friends on the manufacturing side who gave us some guidance
13 until we got up to speed, although we became very skillful at
14 it ourselves by the time I was -- by the time I was gone, but
15 anybody who's been in a hospital knows you can spend a day
16 there, and they may spend an hour of that day actually
17 advancing your care.  My whole goal was squeeze that wasted
18 time out from the standpoint of the patient so that anybody
19 who interacts with us has their care delivered in the
20 shortest period of time, and we were very successful at it.
21 Q   Now, the time you were at DMC ran from what date to what
22 date?
23 A   January of 2004 till December of 2010.
24 Q   Okay.  And during that time period, could you
25 characterize for us how did DMC turn out?  How was it changed

1  during that period?

2  A   I'm sorry.  December 2011.  Time is going by on me.

3  Q   December -- I'm sorry.

4  A   Well, the system had lost, as I said, almost a hundred

5  million dollars a year for the previous five years.  In 2004

6  we made a $2 million profit, and we continued to make money.

7  We did make money all nine years that I was there.  The

8  system was growing.  It was being successful, and we were

9  looking to finance an expansion when 2008 came, and with the

10  great recession we lost all ability to access the credit

11  markets on Wall Street.  And we felt like we had a good story

12  to tell, and we felt like we could expand.  And I was very

13  fortunate to have board members like Roger Penske and Keith

14  Crain and really a very strong board of directors, and their

15  point was we're operating as a nonprofit.  The only way we

16  have to get investment is through the municipal bond market,

17  which we can't get right now.  If we were a for profit, with

18  our track record there would be investors lined up, and they

19  encouraged me to pursue the for profit option, and we ended

20  up actually making a deal with a -- one of the country's

21  largest for profit hospital systems, Vanguard, out of

22  Nashville, that not only acquired our system but as part of

23  the transaction agreed to invest $850 million into the

24  facilities of the City of Detroit, and if you've been by the

25  DMC campuses, you will see in a very dramatic way the effects

1  of those investments.

2  Q   And since that sale, has the Vanguard Health Systems

3  continued the mission of DMC?

4  A   They have, although Vanguard ultimately sold to Tenet, so

5  now DMC is part of one of the largest health systems in the

6  United States, which in this day and age is a very good thing

7  to have that kind of depth, but, yes, all patients are

8  continuing to be seen without regard to ability to pay, and

9  all Detroit hospitals were agreed to be kept open for a

10  minimum of ten years, but I haven't been there in a couple

11  years.  My understanding is that the Detroit hospitals are

12  doing very well financially, and DMC's health looks good for

13  the long run.

14  Q   Can you tell me what lessons you have learned from this

15  second turnaround that have any impact on your current

16  duties?

17  A   Well, I learned a lot in the private sector that I had

18  never seen in the public sector, including doing acquisitions

19  and a lot of the financing, but it was the same principle.

20  One person doesn't do a turnaround.  And I ended up with a

21  really outstanding team of corporate executives and hospital

22  presidents that came from several of the different systems

23  and several that we grew internally, and we built a culture

24  in which I held regular employee forums.  And any employee

25  could send me an e-mail, and I would e-mail them back, which

1    kept me in touch with the employees, who, at the end of the

2    day, are -- in a hospital system, your employees are your

3    entire service, and I think we in a very united away, the

4    management and the employees, were responsible for the

5    success of the system.

6    Q    After you -- why did you leave DMC?

7    A    When the Vanguard sale was complete at the end of 2010, I

8    had agreed to stay a minimum of two more years to do the

9    transition, which I agreed to do, and Vanguard would have

10   liked me to have stayed longer, but in 2011 -- you know, Dave

11   Bing had been on my board at the DMC and was a good friend

12   and somebody I had supported, but there was a dynamic that

13   developed in 2011 that almost on a daily basis DMC employees

14   who were residents of the City of Detroit would approach me

15   in the hallway and say, "Why don't you move to Detroit and

16   run for mayor?  You'd be elected," which is something that

17   had never been in my career plans in any way.  And then at

18   some point in 2011 Governor Snyder's administration

19   approached me and explained the dire financial circumstances,

20   including the swap transaction, which I hadn't focused on,

21   and said they were heading down a road where they didn't know

22   if there was going to be a consent agreement or an emergency

23   manager but indicated that if they were going to appoint an

24   emergency manager, I would be their choice, and would I be

25   interested.  And I told them I didn't agree with the

1  principle of emergency manager, and I would not be

2  interested, but I started to think what's the alternative?

3  And every day you drive through the city, and the

4  streetlights aren't on, the garbage isn't picked up,

5  ambulances aren't showing up, and so in late 2011 I talked to

6  my wife, who also grew up in the City of Detroit, said,

7  "Let's move back to the city.  Let's see what happens."  I

8  was still talking to Vanguard about the possibility of

9  staying at DMC, which I loved.  But after the consent

10  agreement in the spring of 2012, which, like every other

11  person in this region, I was hopeful that the state would

12  bring resources in and the consent agreement would succeed --

13  when it became obvious that the mayor was fighting with the

14  council, that the mayor was fighting with the unions,

15  everybody in Detroit was fighting with everybody in Lansing,

16  it became obvious that there was not a path for the city to

17  recover operationally, and so I made the decision to leave

18  DMC at the end of 2012 and run for mayor.

19  Q    And as you ran for mayor and formulated your plans to

20  both run and govern, what was your -- what was your vision?

21  What did you think you could accomplish?

22  A    The DMC experience was the most powerful experience in my

23  life, and if there's anyplace in this country where we are

24  truly getting past the historic racial divisions, it's in an

25  urban hospital system.  Patients come in.  It doesn't matter

1    if they're black or white.  It doesn't matter if the nurse or
2    the doctor who's working on you is whatever ethnic
3    background.  You tend to see people as people first and
4    stereotypes later, and it was just to me a very special place
5    to work.  And I started to think would it be possible if we
6    could break across those barriers across the city, and I
7    really felt like if I could meet everybody in the city, we
8    could get past those historic divisions, and I did feel like
9    I could recruit the kind of talent that would come in that
10   would get the ambulances to show up, that would get the
11   streetlights on, that would get the abandoned buildings
12   knocked down, and so I started on a campaign of going house
13   to house to anybody who would invite me in their living room
14   across the city, and the voters decided that this was the
15   direction they wanted to go.
16   Q    When were you sworn in as mayor?
17   A    January 1st of 2014.
18   Q    Okay.  You mentioned looking for a talented team.  Since
19   that time, can you identify for the Court people that you've
20   added to your team?
21   A    Well, I'm very proud of the team that we've put together,
22   and it's what I had hoped for.  We've got I think some of the
23   finest talent in the City of Detroit from the deputy mayor,
24   Ike McKinnon, and the former police chief; Alexis Wiley, the
25   chief of staff; Butch Hollowell, our corporation counsel;

1  Edsel Jenkins, our fire commissioner; lifelong Detroiters who

2  believe in the mission.  And then we have supplemented that

3  with significant national recruitments, and that's what I

4  promised to do was to blend the best of the talent in Detroit

5  and the best of the talent in the country.  And one of the

6  first things I did was work with Kevyn Orr to recruit John

7  Hill from Washington, D.C., who's doing an outstanding job as

8  the chief financial officer.  In December of 2013, the Obama

9  administration brought in a group of six or seven of the top

10 chief information officers from around the country, Chicago,

11 New Orleans, Charlotte, Louisville, and I got to meet with

12 them after they'd been here.  And I was totally impressed

13 with the chief information officer from the City of

14 Louisville, a woman by the name of Beth Niblock.  And when I

15 saw the state of the City of Detroit's IT system, which is --

16 it's hard to even describe -- I thought I can't afford the

17 second best IT director in the country, and so I went down to

18 Louisville, and I didn't leave until she signed up.  But

19 we've had a number of others.  Arthur --

20 Q   Let's --

21 A   I'm sorry.

22 Q   One of these -- you mentioned someone called -- you

23 didn't mention someone.  Do you know the name Denise Starr?

24 A   I do.

25 Q   Who's she?

1  A    Denise Starr is our new head of human resources.  She was

2  the chief administrative officer at Compuware for many years,

3  one of Detroit's largest employers, and before that was the

4  HR director at Compuware.  And when Compuware was recently

5  sold, I thought she might be available, and so I went and

6  recruited her very hard, but our human resources system is

7  completely broken.  It's going to take somebody of

8  extraordinary talent to restructure it, and I'm very pleased

9  at the fact that Ms. Starr has agreed to come in and be our

10 HR director.

11 Q    Does she replace Mr. Hall?

12 A    No.  He was originally hired as the labor relations

13 director and has been acting as the HR director, but I wanted

14 somebody who had run HR in a large organization, so Mr. Hall

15 will return to the position that he was doing as labor

16 relations director, and Ms. Starr will be his supervisor.

17 Q    Another name, Carol O'Cleireacain.

18 A    Yes.

19 Q    I'll give you the spelling afterwards.  It's not

20 intuitive.  Could you tell me who she is?

21 A    Carol O'Cleireacain is the former finance director of the

22 City of New York.  In the course of the review of the

23 finances, the Court was good enough to bring in Mr. Dick

24 Ravitch, who I spent a great deal of time with, and who

25 educated me on just how far we have to go to rebuild the

1  finance system. And I asked him -- I said, "Next to John

2  Hall, if you could hire anybody in America to come in here to

3  redo the finances, who would it be?" And he said, "There's

4  no question. The former finance director of the City of New

5  York, Carol O'Cleireacain, would be the top choice." A lot

6  of people expected Mayor de Blasio to make her the finance

7  director of the City of New York again. Mr. Ravitch was kind

8  enough to set up lunch with me, and I flew out to New York.

9  I took Ms. O'Cleireacain to lunch. She and John Hill have a

10 long relationship. She was a finance director in New York

11 with the New York oversight board as -- at the time when Mr.

12 Hill was on the Washington, D.C., board, and I showed her the

13 magnitude of the problems, and I said, "We need more talent."

14 And she said, "If John Hill wants me, I'll come." And I went

15 back, talked to Mr. Hill, and I said, "What would you think

16 about Carol O'Cleireacain coming?" And he was extremely

17 enthused. And I approached it the same way I always did. I

18 said, "I'm not going to tell you how to run your department.

19 If you and she can divide up the finance responsibilities in

20 ways that you are both comfortable with, I'd like to see

21 that." Mr. Hill promptly got on a plane and went to New

22 York, and last Monday Ms. O'Cleireacain started as the deputy

23 mayor for economic policy. She's going to take a lead in the

24 economic forecasting. The revenue forecasting of the four-

25 year plans are critical to what the state Financial Review

1  Commission is going to require, and she's going to take the

2  lead on that as well as doing a number of other things.

3  Q   So to get her aboard, you didn't have to camp out in New

4  York.  You were able to call on Mr. Hill to help you out.

5  A   In fact, I'm pretty sure Mr. Hill put Ms. O'Cleireacain

6  and her husband up at his place the first few days they were

7  here.  He was that anxious to get her here, so -- but it's

8  the way that we're recruiting.  We're blending the best of

9  America with the best of Detroit.

10 Q   Are there any other people that you would identify for

11 me?

12 A   You know, I'm proud of all of them, and I hate to leave

13 somebody out, but last week Arthur Jemison started as our

14 housing director.  He was the deputy housing and community

15 development director for the State of Massachusetts and I

16 think was pretty happy in that job, but we have not done a

17 good job in the city on the housing side.  In fact, HUD has

18 been running the Detroit Housing Commission under

19 receivership for years.  It's an embarrassing situation that

20 needs to be changed, and so in the last week or two Mr.

21 Jemison left his position in Massachusetts and has started

22 here as well.

23 Q   Are all the people that we've mentioned members of your

24 cabinet?

25 A   Yes.

1  Q   Can you tell the Court how you work with your cabinet on
2  an ongoing basis?
3  A   I believe very strongly that if you're going to get good
4  department heads, you have to let them run their departments
5  and not tell them how to run them.  On the other hand, you
6  have to have metrics to measure that performance.  So every
7  Wednesday morning we run a cabinet meeting.  Starts exactly
8  at nine, and it ends exactly at ten.  The first 15 or 20
9  minutes is a department head or director doing a presentation
10 on their operations so that everybody understands what
11 everybody else is doing, and then we go through a series of
12 metrics from the week before.  What was the response time of
13 EMS last week?  How many drug busts did the police department
14 do?  How many vacant lots did the general service department
15 get cut?  How many houses did we file suit on at the land
16 bank, and how many did we demolish?  And we work as a team
17 through all of these metrics, and if an individual department
18 is falling behind on their metrics, they talk about what
19 their problems are.  And if another member of the team can
20 come up in and help, they need help from HR, they need help
21 from IT, they pitch in together.  And, you know, we have a
22 long way to go, but service in Detroit I think is improving.
23 Q   On a slightly different note, I understand as well --
24 have there been -- have there been any recent labor deals
25 that you can identify for the Court?

1  A    Well, the emergency manager, who up until last week I've
2  been required to get delegation of authority from, has first
3  asked me to get involved in the fire fighters deal because in
4  the case of the fire fighters, the heart of the restructuring
5  and reinvestment initiatives depend upon changing the
6  seniority system and also using fire fighters as medical
7  first responders in cases of medical emergency, which is the
8  national standard for service but has been resisted in the
9  City of Detroit.  In fact, I think the city is probably --
10 Detroit is probably the last larger major city in the country
11 that has not cross-trained the employees.  And so I got
12 deeply engaged in that, and we ended up reaching an agreement
13 with the support of the union, and, in fact, I'm really
14 pleased with the fact that last week we started training our
15 first class of fire fighters as medical first responders.  So
16 we are moving forward in implementing these programs with the
17 union support.  And then more recently I got involved in the
18 police officer negotiations, and I feel really good about the
19 way that turned out.
20 Q    Can you give us an idea of the contours of that deal with
21 the police?
22 A    The police officer negotiation I think probably is a good
23 illustration of the interaction between the plan of
24 adjustment and what we're going to have to do in running city
25 government.  We are underpaying our police officers compared

1    to the market.  We pay a starting officer 28, $29,000 in

2    Detroit, but if you were to go to Dearborn or Warren or

3    Farmington, they're probably starting them at $45,000, and so

4    we had a plan of adjustment that provided for an expansion in

5    police officers in 250 additional positions.  We are running

6    academy classes to hire those positions, but the academy

7    classes take six months to complete, and so every two months

8    we start another class of 20, 25 prospective officers.  But

9    we were losing 15 to 20 officers who were retiring or

10   quitting, so we were in a situation where every two months

11   we're bringing 20 or 25 new officers on while we're losing 30

12   or 35 experienced officers the other way, and so I was in a

13   situation where I looked at the plan of adjustment and says

14   on paper it says we're going to have 250 more, but if nobody

15   will take the job, the paper doesn't mean very much.  And so

16   I went to the emergency manager, and I said, "I don't feel

17   good about the direction we're going, and I think we ought to

18   take a different approach."  And he was very supportive.  He

19   says, "I agree with you.  This isn't working."  He says, "If

20   you can work out a deal within the dollars in the plan of

21   adjustment, go ahead."  And so I sat down with the Detroit

22   Police Officers Union, and I said, "We've got to find a way

23   to raise your base pay.  You've got 17 sick days a year.  All

24   you're doing is rewarding the sick time abusers.  Why don't

25   we cut it back to 12 sick days a year and take the money and

1  put it into a pot for a base increase?"  They were going to

2  pay a one-time retention bonus, which I didn't think was

3  going to retain anybody because I was afraid people were

4  going to grab the bonus check in December and quit, and so I

5  said, "Why don't we put that into a pot?"  And then I

6  proposed to them the thing that I think is going to have the

7  most effect, which is we have about 150 positions occupied by

8  police officers that I don't consider core to law

9  enforcement.  They're officers working traffic enforcement.

10 They're officers doing transport of prisoners.  There's

11 officers doing crime stats.  And we've had huge numbers of

12 officers leave.  So what I proposed to the union was let's

13 take those 150 positions.  Let's hire retired officers at $20

14 or $22 an hour, no benefits.  They're already getting their

15 pensions.  It'll save us a huge amount of money, and when we

16 bring the retired officers back, we can move the 150 cops

17 back to the street.  And with the money we save, we can give

18 your officers a base pay increase of eight percent.  I'm

19 pleased to say the union agreed to that and ratified that

20 approach by an 80-20 margin, and we signed the new agreement.

21 So the officers now know they've got an immediate eight-

22 percent pay increase, and we've got the ability to quickly

23 bring back retired officers to fill positions.  And now I

24 think you're going to be able to see us effectuate the plan

25 of adjustment much more quickly and putting officers on the

1    street.

2    Q    Let's take a step back and talk more generally about your

3    assessment of the city at the time you came into office.  How

4    would you describe or characterize your familiarity with the

5    city's services and operations?

6    A    Well, as the CEO of the largest employer in the city, I

7    was keenly aware of the lack of support on streetlights,

8    dealing with abandoned buildings, police and EMS services.

9    We spent all of our time at DMC compensating for those

10   things.  We lit our campus ourselves to the point where you

11   could read a newspaper.  We hired our own security that

12   patrolled beyond our perimeters.  We every day had to figure

13   out -- we cut the grass in the medians because the city

14   wasn't getting to it.  Every day we compensated for the lack

15   of city services, so I was very familiar with the level of

16   services coming from the city.

17   Q    And prior to the start of the bankruptcy case, while you

18   were running for mayor, what had you identified as the city's

19   biggest problems?

20   A    Well, the way I campaigned was what we called house

21   parties.  I went to anybody's living room who invited me, and

22   I did 250 living rooms in the city where people would just

23   invite their neighbors.  And I went to the nicest

24   neighborhoods, and I went to house parties where the houses

25   on both sides of the people hosting me were vacant and the

1  streetlights didn't work.  And if you want to know what's

2  going on in the city, sit in living rooms with the residents

3  night after night and just talk to them.  And so I understood

4  what their biggest issues were.  The abandoned buildings in

5  the city that nobody seemed to be able to deal with is

6  demoralizing, the dump sites where people are illegally

7  dumping on vacant lots, the overgrown weeds, the fact that

8  the streetlights aren't out (sic), the fact they don't have

9  any confidence the police or the ambulance are going to show

10  up, and then you add in the high level of taxes, you can see

11  why the city lost a quarter of its population between 2000

12  and 2010.

13  Q    You mentioned taxes in the same breath with the -- with

14  people leaving the city.  Can you unpack that connection for

15  me?

16  A    Well, they're tied together.  I think if people were

17  getting full service for their taxes, I think they might be

18  inclined to stay.  If people had lower taxes, they might be

19  willing to accept somewhat less services.  I didn't find

20  anybody in the city who thought for the very high level of

21  taxes that they were paying, which the property taxes in

22  Detroit are dramatically higher than nearly all the

23  surrounding communities -- I didn't find anybody who thought

24  for the taxes they were paying they were getting an

25  appropriate level of service.

1  Q   Now, as you came into the job of mayor, did you address

2  any issues concerning the city's debt?

3  A   No.  The emergency manager and I, you know -- of course,

4  under Public Act 436, the emergency manager had absolute

5  control, but we reached an agreement fairly early on where we

6  had a clear division of responsibilities, which he reduced to

7  an order, but anything having to do with this bankruptcy case

8  or the debt was something that he handled exclusively.  I was

9  not engaged in that.

10 Q   Did you personally come to a judgment, nonetheless, based

11 on your experience, as to whether the city's level of debt

12 was sustainable or not?

13 A   Not with the revenues that we had.

14 Q   You talked about the neighborhood meetings you had while

15 you were running for mayor.  Is there anything similar since

16 you've become mayor?

17 A   Well, I've done -- I don't know -- ten or twelve

18 community meetings on a large scale which we've advertised

19 for everybody and then numerous smaller meetings, and I'm

20 hoping when the various legal proceedings are over with the

21 emergency manager, I'm going to have even more time to be

22 back in living rooms again.

23 Q   Okay.  And can you give me a feel for what goes on at

24 these community meetings?

25 A   We've had some that are on a specific issue, so, for

1  example, when we rolled out the new streetlighting plan, we
2  picked a targeted neighborhood on the west side and a
3  targeted neighborhood on the east side.  I went out and did
4  meetings in these communities and took the residents through
5  what was coming, explained the old plan, explained the new
6  plan, and then I did a follow-up meeting when the lights were
7  done to get feedback from them on what they liked and what
8  they didn't like about the approach before we rolled it out
9  to the rest of the city.  And if you want to know what
10 Detroiters think, all you have to do is ask them.  They're
11 pretty expressive.  We've also had a number of meetings which
12 were actually required by charter where you have a meeting in
13 each city council district and citywide meetings, and
14 typically we've gotten two, three, 400 people in these
15 meetings.  And I do about a half hour PowerPoint showing
16 people what's happened on the streetlights, what's happened
17 on abandoned buildings, what's happened on vacant lots,
18 what's happened on the water department.  I take them through
19 that, and then I stay and answer every question from every
20 person as long as they want to stay.  Usually it's two, two
21 and a half hours of questions.  And it keeps me very much in
22 touch with what people are happy about, what people are
23 unhappy about.
24 Q   And at the end of these meetings, does it ever come up
25 that somebody says, "Oh, Mike, you can quit now.  You've done

1  enough"?

2  A    Yeah.  Not so far.  They may want me to quit now but not

3  because I've done enough.

4  Q    Let's talk about some of the positive parts of the story

5  that you're able to tell about these community meetings and

6  the progress the city has been able to make while it was in

7  bankruptcy on some of the operational and service issues.

8  A    Yeah.  You know, the division of responsibilities between

9  the emergency manager and me has worked out pretty well.

10  Certainly the issue of streetlights, which is nothing, is

11  more frustrating to the people of the city, the fact that you

12  can't get lights on.  And there was a public lighting

13  authority created by a statute in late 2012 that took a

14  portion of the utility tax revenue from paying for police

15  officers and used it for streetlights.  I think in the course

16  of all of 2013 I think they managed to get 500 lights on.

17  They fought over whether it should be a sodium light or an

18  LED light, should the wire be above ground or below ground,

19  should they start on the east side or the west side.  The

20  emergency manager gave the city council and me the

21  opportunity to appoint a new public lighting authority board

22  in January.  We have five outstanding people on the

23  authority.  We've run a very disciplined process, and we have

24  now installed well over 20,000 lights since the first of the

25  year, and we're putting them up at the rate of a thousand a

1    week, and so it's been a pretty remarkable accomplishment.

2    We have an outstanding person in Otis Jones running the

3    authority, but we have a very unified approach between the

4    city council and me in backing Mr. Jones in that process, so

5    that's maybe one of the most visible examples.

6    Q    I may have missed it.  Did you have an estimate of the

7    amount of lights you've been able to --

8    A    Yeah.

9    Q    -- put in between January and September?

10   A    Yeah.  We've crossed 20,000 now, so we're almost halfway

11   through the neighborhoods in the city.

12   Q    Okay.  How about with respect to transportation?

13   A    I haven't done as well on that as I would like, and

14   probably it's the issue that the citizens complain to me the

15   most loudly about on the performance.  We carry between 90

16   and 100,000 riders in the City of Detroit in a day, and, you

17   know, only 40 percent of the households in the city have

18   automobiles regularly, so if Detroiters are going to have

19   opportunities for jobs and to go to school, we've got to have

20   a real regional transit system.  When I started, we were

21   putting out 140 buses a day.  We need 225 a day to meet the

22   schedule we've got.  Now we're up to about 180 a day, which

23   for a few months Detroiters thought that was pretty good, but

24   now they are back to actually thinking we should stick to the

25   schedule, and we are committed to getting to the schedule.

1  The problem is three-quarters of our buses are nine or more

2  years old.  You retire a bus at 12 years.  We got three-

3  quarters of our fleet is approaching the age of retirement,

4  and so, you know, I'm really pleased that with the help of

5  the Obama administration and the state two weeks ago the

6  transportation department held a national competition to

7  award a hundred million dollars in new buses across the

8  country, and Detroit was awarded 26 million, so we've got 50

9  buses that will be coming in 2015.  We had already had 30

10  buses in the works ahead of time.  We are hiring more

11  drivers.  We've hired transit police officers.  And before

12  too much longer, we're going to put out a schedule that we're

13  actually going to honor.  And when we get there, it'll be the

14  first time in 20 years the City of Detroit actually met its

15  public schedule.

16  Q    What about parks?

17  A    There are roughly 275 parks in the City of Detroit.  In

18  2013 the city maintained 25 of them on any kind of regular

19  basis.  Anybody who drove through the city in 2013, the grass

20  in the parks was typically three or four feet high.  Nothing

21  was more heartbreaking to me when I was campaigning to see a

22  park where somebody had taken a lawn mower and cut a strip

23  from the entrance of the park to the swing set so that

24  children are walking through grass that high to swing on the

25  swings and come back out, and that was -- I just -- I mean

it's the kind of thing that just drives people out of this
community.  Again, this is an advantage of what's happening
in the plan of adjustment and in this bankruptcy.  We've
gotten head starts at implementing a number of the
initiatives that were identified by Conway MacKenzie, but
we've got a far more efficient process, and we were able to
get our general services department to maintain about 180
parks.  There was enough money to do that, and that was good,
but I didn't think it was enough.  And then I reached out to
the churches and the businesses in this community and,
another 75 parks were adopted by churches and businesses.
And we inspected them.  They had to be cut every ten to
fourteen days.  Trash had to be picked up three times a week.
We drove and inspected them.  And it was pretty interesting.
Both the city crews and our church and business crews were
around 93 to 95 percent timely cutting and cleaning, and we
had a report every week at the cabinet meeting whether the
church and business crew outperformed the city crew, but if
you would ask residents of the city if there was something
really noticeable from 2014 to 2013, I think the condition of
the parks is something they would cite.
Q    You mentioned some volunteerism by church and business
groups.  What's your understanding of the role of that and
how you got it started?
A    Well, I meet regularly with business leaders and

1   ministers, and they keep saying, "What can I do?  What can I

2   do?"  When I saw that we had enough money in the budget only

3   to maintain 180 parks, it seemed like that was maybe the

4   right size of an ask, and so some of the smaller churches

5   took some very small parks.  Some of our bigger contractors

6   like Rizzo took a very large park on the river.  Jones Day

7   was good enough to take a very large park, and I appreciate

8   that.  Hopefully you'll continue that.  And so people were

9   great.  And in some cases, we got two or three weeks into it,

10  and the church said, "Oh, my God, this park is more than I

11  can afford to cut."  We'd pair them with a business, and

12  they'd do it together, and so I did a thank you party on

13  Saturday in which I thanked the businesses and the churches

14  who volunteered as well as our own workers, and I think

15  there's great morale.  I think there's going to be a lot of

16  these sponsors are going to come back and do it again next

17  summer.

18  Q   Way to characterize the importance of this kind of

19  cooperative volunteerism going forward?

20  A   Again, the city government is never going to have the

21  resources to solve all the problems in the city.  Everybody

22  is going to have to pitch in.  And I was trying to take a

23  step toward building a culture that you don't always say,

24  "What's city government going to do for me?"  I think we've

25  got to -- we've got to balance this, and we've tried to do

1  this, for example, in the neighborhoods.  The new trash
2  removal contract that the emergency manager entered into
3  provides a new service that the vendors will pick up the bulk
4  trash in front of vacant lots, which they would never do.
5  This allows a neighborhood group to get together, clean the
6  vacant lot, put the trash out, and know somebody is going to
7  pick it up.  So now when I go to a community meeting and they
8  said, "When are you going to clean up this lot?" I can say,
9  "Wait a minute.  We can't do everything, but if you will
10  organize your neighborhood group to clean up that lot, we
11  will come through and take the garbage away."  And a lot of
12  people in this community are responding to the idea of
13  partnering with city government, not expecting city
14  government to be able to deliver all services.
15  Q   Do you have a number for the amount of debris you've been
16  able to collect on this -- under this program that you just
17  mentioned?
18  A   The DPW crews are picking up 650 tons of garbage a week
19  separate from the contracted trash removal.  Our own DPW
20  crews going to the illegal dump sites and the like are
21  picking up 650 tons a week.
22  Q   You mentioned tall grass in connection with the parks.
23  Are there any other initiatives dealing with that issue?
24  A   We have a hundred thousand vacant lots in the City of
25  Detroit, and they had not been cut since 2010, and it's

1  enormously demoralizing for people who live in these
2  neighborhoods.  If you've got neighborhoods with a couple
3  vacant lots, usually the neighbors will pitch in and cut it,
4  but when you're in a neighborhood that's got six or eight
5  vacant lots, it tends to get overgrown, and so, again, as a
6  result of some of the financial moves that the emergency
7  manager made, we had the ability to spend a couple of million
8  dollars this summer, and we cut all hundred thousand vacant
9  lots.  We cut them all once, and now we're halfway through
10 the second cut.  But, again, if you drive through the city
11 today, the vacant lots are in far better shape than they were
12 a year ago, and these kinds of things are significant factors
13 in people's decisions as to whether they want to stay.
14 Q    That's a natural segue to blight.  In the course of your
15 tenure here, can you educate the Court about progress on
16 blight?
17 A    Well, this has been probably the subject nearest to my
18 heart.  When I was the prosecutor, the issue of abandoned
19 homes was significantly contributing to the crime problem as
20 well as quality of life, and we started filing lawsuits out
21 of the prosecutor's office on a nuisance theory, a common law
22 nuisance theory, that said you cannot maintain your property
23 in a way that's a nuisance to your neighbor.  And so we would
24 go into a neighborhood and post a notice, same process we're
25 using today, and we're using the same process, so we'll go

into a neighborhood, one neighborhood a week. We're doing it
today through the Detroit Land Bank. But we will go and
poster 50, 60 abandoned houses in a neighborhood all the same
day. The poster says, "You have 72 hours to call the Land
Bank or you'll be sued. If you call the Land Bank, we'll
give you a consent agreement that says you'll give us in 30
days a contract to get the house fixed up and in six months
you'll have it up to code and occupied," which is an ideal
outcome. I don't want the house. I want them to fix it up.
"If you don't make those arrangements in 72 hours, we file
lawsuits against you saying the property is a nuisance.
Either fix it up or deed it to us." Judge Colombo, the chief
judge of the Circuit Court, has set up a very efficient
docket directive in which he is handling all these cases
himself, and so we are filing 50, 60, 70 cases a week. He is
hearing them all on Friday mornings. And so far we've won
every single disputed case. The judge is giving people a
chance to fix up their own house. We're taking it. If it
can't be saved, we're demolishing it, and we're now
demolishing well over 200 houses a week. But in a lot of
cases, these houses can be saved. There's great architecture
and great structure, particularly if you take the whole
neighborhood at once. If there's four abandoned houses on
the block and I try to sell you one of them, it doesn't
matter what shape the house is in. You don't want to be in

1   that neighborhood.  But we are finding that when we take the
2   whole neighborhood at once -- we were able to set up an
3   auction website which is at buildingdetroit.org.  We auction
4   two houses a day.  We've now sold, I think, probably 200
5   houses at well over $2 million on this auction site, and so
6   we are moving through the city neighborhood by neighborhood,
7   demolishing the houses that can't be saved, selling and
8   saving the houses that can, and in the neighborhoods where
9   we're successful, you know, I very much enjoy driving down
10  those streets because I can't get down the street without the
11  neighbors coming out and stopping and wanting to talk to me
12  about what's going on in their block.
13  Q    You talked about something called lean initiatives in
14  connection with the Detroit Medical Center.  Does that have
15  any relevance to your efforts on behalf of Detroit?
16  A    It does.  I brought a lean team here originally led by
17  the director of the lean team at DMC, but she got hired in a
18  very prominent job at the University of Michigan Hospital, so
19  now we have a new director, Aimee Cowher, who ran her own
20  lean company and chose to leave it.  And I went to the
21  private sector and said, "If you want to help, loan us people
22  for one project."  And we took 18 of the most screwed up
23  processes in the City of Detroit.  We took the employees who
24  were involved and got them involved as a team, and then we
25  brought in people from Deloitte and many other companies.

1  And so, for example, to hire a new employee in the city, it's

2  four or five months after they're identified before they get

3  hired.  We got a new process we think is going to cut it down

4  to 45 days.  We're going to change the way that we fill

5  potholes in the city.  We're changing the way we turn around

6  the ambulances at the hospitals.  So there's 18 different

7  processes, but the great thing is our own employees redesign

8  these processes.  And I went to the meetings where they were

9  reporting, and it's great to hear our employees reporting out

10  on what they've done to change them.  And we're going to

11  continue to do this over and over until we get 400, 500

12  employees lean certified so that any employee can participate

13  in a process to make their department more efficient.

14          MR. CULLEN:  I have one more question, and then I

15  think it would be appropriate, if it's appropriate for the

16  Court --

17          THE COURT:  Go ahead.

18          MR. CULLEN:  -- to take our morning break.

19          THE COURT:  Go ahead.

20  BY MR. CULLEN:

21  Q   Based on your tenure, how would you assess where we've

22  come and where we are in terms of providing adequate services

23  to the citizens of Detroit as we sit here today?

24  A   You know, we're probably about ten percent of where we

25  need to be.

1  Q   And how would you characterize the work left to be done?

2  A   Yeah.  There's a lot, but we're building in the right

3  order, and it's going to be a multi-year process before the

4  people of the city get the kind of services that people in a

5  major city deserve, but it's getting a little bit better

6  every month.

7          MR. CULLEN:  This is a logical time for a break,

8  your Honor.

9          THE COURT:  All right.  We'll take our morning

10  recess at this time, and we'll take a little shorter recess

11  this morning.  We'll reconvene at 10:50, please.

12          MR. CULLEN:  Thank you.

13          THE CLERK:  All rise.  Court is in recess.

14      (Recess at 10:40 a.m., until 10:50 a.m.)

15          THE CLERK:  All rise.  Court is back in session.

16  You may be seated.

17          MR. CULLEN:  Good morning, your Honor.  The witness

18  is being sought.

19          THE COURT:  Okay.

20          MR. CULLEN:  I'm sorry, your Honor.

21          THE COURT:  I'm sorry?

22          MR. CULLEN:  He'll be here momentarily.

23          THE COURT:  Okay.

24          MR. CULLEN:  I'm sorry.

25          THE COURT:  Perhaps we could use this time to

1    advantage, counsel.  Let's see.  There's a witness, Judith

2    Kermans -- am I pronouncing that correctly --

3              MR. CULLEN:  Yes.

4              THE COURT:  -- who you have agreed will testify by

5    deposition.

6              MR. CULLEN:  Yes, your Honor.

7              THE COURT:  Remind me who she is.

8              MR. CULLEN:  She is -- go ahead.

9              MR. WAGNER:  I think she's at Gabriel, Roeder,

10   Smith.  That's the actuary for the pension fund.

11             THE COURT:  Okay.  Is that a local firm?  Is she

12   local?

13             MR. CULLEN:  Yes, she is local.

14             THE COURT:  All right.  I think I am going to have

15   to ask her to appear regardless because I promised several

16   pro se people the opportunity to ask questions of her, so we

17   will have to arrange for that in due course --

18             MR. CULLEN:  All right.

19             THE COURT:  -- even if otherwise she testifies by

20   deposition.

21             MR. CULLEN:  That's fine, your Honor.

22             THE COURT:  So we'll have to work that out.  All

23   right.

24             MR. WAGNER:  Right.  And I think --

25             THE COURT:  Let's continue with the mayor.  I'm

1   sorry.  Go ahead, sir.

2           MR. WAGNER:  Yeah.  We may have some issues with the

3   city that might shorten what she might testify to, but we'll

4   deal with that later.

5           THE COURT:  Okay.

6   BY MR. CULLEN:

7   Q   Your Honor -- Mr. Mayor, do you recall becoming aware

8   that the Bankruptcy Court indicated that it would like to

9   hear from you on issues with respect to feasibility and

10  implementation of the RRIs?

11  A   I remember it distinctly.  It was April 17th, yes.

12  Q   All right.

13          MR. CULLEN:  If we could throw up on the screen the

14  page of Exhibit 3, City Exhibit 3 we've been using, the list

15  of the RRIs.  Blow up the top of that, please.

16  BY MR. CULLEN:

17  Q   Now, I've said RRIs.  That's the recovery and

18  reinvestment initiatives.  Is RRI okay with you?

19  A   Fine with me.

20  Q   This is in City's Exhibit 3.  Do you have a

21  recollection -- a familiarity with these RRIs in this

22  particular listing?

23  A   I thought the blight remediation number was down to 420

24  million, but, yes, I've seen this list before.

25  Q   Now, once you heard that you would have to address these

1   issues in court, what did you do?  What was your process?

2   A   Well, it was a pretty dramatic shift in my world.  Up

3   until that point, I had not been engaged in the plan of

4   adjustment process at all.  In fact, the only way I knew when

5   an updated plan of adjustment was filed was when I read about

6   it in the media, and I would have to go to one of the media

7   websites to link to it on line.  The emergency manager took

8   the position that it was his job to do the plan of

9   adjustment, and I should confine myself to running city

10  services.  After the Court indicated that it expected me to

11  testify as to whether I thought it was feasible, the

12  relationship between the emergency manager and me changed

13  dramatically.  The inclusion in analyses in the operations

14  changed.  But what I did immediately was this went from some

15  theoretical document the emergency manager was preparing to

16  the blueprint that we were going to have to operate on.  And

17  when I was at the Detroit Medical Center, we did a number of

18  acquisitions of HMOs and physician practices, and we ran a

19  very rigorous due diligence process before we would acquire

20  anything and analyzed both the upsides and the downsides and

21  the likelihoods of those business entities succeeding.  I

22  decided to adopt the same process here, that I was going to

23  conduct a review of the plan of adjustment with the kind of

24  due diligence that you would normally involve before you

25  decided whether to buy a business.  And I wanted to validate

1   every number in here and every risk so that I could be

2   comfortable in my own mind either saying to the Court I

3   believe it was feasible or I did not.  And so I put out a

4   directive to each department head to first give me a

5   preliminary analysis of how feasible they thought they were,

6   and then over a six-week period from late May to early July I

7   spent hours with the different departments -- most of them

8   came back two and three times until I was satisfied -- going

9   after every number in the assumption, every number in the

10  restructuring and reinvestment initiatives, and in that

11  process included the court-appointed expert, Marti Kopacz.

12  Q    What was her role in that process?

13  A    Well, the court appointed an expert, I presume, to advise

14  the Court, but when I saw the Court's order that said I had

15  to testify as to feasibility, I was preparing to reach out to

16  the private sector because I needed independent financial

17  advice.  I have great confidence in John Hill, but he was

18  reporting to the emergency manager and was part of the

19  process.  And when the Court appointed Marti Kopacz, she came

20  in to see me, and I took her through the due diligence

21  process that I was planning to conduct.  And she said that's

22  exactly what she needed to do.  I think we realized pretty

23  quickly we were both just trying to get to the truth of

24  whether the plan was feasible.  She asked if she could

25  piggyback on our process, and so she or her staff sat in

1 every single meeting with every department head. She was

2 invited to all cabinet meetings. She had open access to all

3 of our departments and all of their -- our numbers. And I

4 relied in reaching my conclusion both on my own assessment of

5 this but also on the report that she wrote, which was really

6 my only independent verification from a financial expert of

7 what I experienced in those interviews.

8       MR. CULLEN: If you could put on the screen City

9 Exhibit 173.

10 BY MR. CULLEN:

11 Q   Could you tell me what this is, sir?

12 A   This was the first round of meetings with the

13 departments, so the process was that at the first meeting --

14 and I gave them all written instructions as well as direction

15 at the cabinet meetings, but in the first meeting each

16 department came in, presented me with a preliminary

17 assessment of what they thought of the various restructuring

18 initiatives and the underlying assumptions in their

19 department, how achievable they were, and then after these

20 first assessments, either Ms. Kopacz or I, usually both of

21 us, would identify a number of areas that we were not

22 satisfied at the thoroughness of the answer, scheduled

23 probably a second meeting in late June, and in the case of

24 many departments scheduled a third meeting in early July, and

25 so this was the first set of meetings at the beginning of

1  that due diligence process.

2       MR. CULLEN:  I would like to offer City Exhibit 173

3  into evidence.

4       THE COURT:  Any objections?

5       MR. SOTO:  No objection, your Honor.

6       MR. WAGNER:  No.

7       MS. O'GORMAN:  No.

8       THE COURT:  It is admitted.

9     (City Exhibit 173 received at 10:59 a.m.)

10 BY MR. CULLEN:

11 Q   Now, I'd like to -- and it would probably be easiest to

12 put in front of you from your book -- I'm going to ask you

13 some questions about City Exhibits 170, 171, 172, 174, 175,

14 and 176.  Let's go to 170 first.  What is Exhibit 170?

15 A   So 170 would have been the preliminary analysis from the

16 Detroit Health Department as to how the plan of adjustment

17 would be administered by that department.  It would have been

18 accompanied by a number of detailed financial sheets relative

19 to the budgets, the Conway MacKenzie numbers, and the Ernst &

20 Young assumptions, but this would have been the document that

21 came with it that was a short summary of their preliminary

22 assessment of the plan.

23       MR. CULLEN:  I'd like to move City Exhibit 170 into

24 evidence, please.

25       THE COURT:  Any objections?

1    MR. SOTO:  No, your Honor.

2    MR. WAGNER:  Same.

3    THE COURT:  It is admitted.

4    (City Exhibit 170 received at 11:00 a.m.)

5 BY MR. CULLEN:

6 Q    If I could direct your attention -- if I could direct

7 your attention, Mayor Duggan, to City Exhibit 171.  Do you

8 have that, sir?

9 A    I do.

10 Q    Could you tell me what that is?

11 A    This would have been the preliminary assessment from the

12 municipal parking department as to the feasibility of the

13 plan of adjustment and the Conway MacKenzie restructuring and

14 reinvestment initiatives and the department head's

15 perspective on the likelihood of the success of each.

16    MR. CULLEN:  I'd like to offer City Exhibit 171 into

17 evidence.

18    THE COURT:  Any objections?

19    MR. SOTO:  No, your Honor.

20    MR. WAGNER:  No.

21    MS. O'GORMAN:  No.

22    THE COURT:  It is admitted.

23    (City Exhibit 171 received at 11:01 a.m.)

24 BY MR. CULLEN:

25 Q    If I could direct your attention to City Exhibit 172,

1  which seems to be a collection exhibit with the first page an

2  earlier version of the calendar we looked at, if you could

3  look at the rest of those memos one by one and tell me what

4  they are beginning on page 2 of the exhibit.

5  A   So you have attached the preliminary memos from several

6  departments --

7  Q   Yes.

8  A   -- relative to this due diligence process?

9  Q   Yes.  If you'd look at page 1, what department is that

10  from?

11  A   So page 1 is the public lighting department.

12  Q   And if you look at, again, page 4 of the exhibit, bottom

13  right numbering 172004.  Do you see that, sir?

14  A   Right.  That is the preliminary assessment of the general

15  services department.

16  Q   And page 006?

17  A   It would be the preliminary assessment of the department

18  of public works.

19  Q   And page 007?

20  A   It's the preliminary assessment of the department of

21  transportation.

22  Q   And page 009?

23  A   The preliminary assessment of the finance department.

24  Q   And page 011?

25  A   The preliminary assessment of the information

1  technologies department.

2  Q   And page 015?

3  A   I think you skipped 13 --

4  Q   Oh, I'm sorry.

5  A   -- which is the human resources department.

6  Q   Oh, I'm sorry.  Page 14, which is the --

7  A   Yeah.  13 and 14 were the preliminary assessment of the

8  human resources and labor relations department.

9  Q   And page 15?

10  A   Is the preliminary assessment of the recreation

11  department.

12  Q   And page 16?

13  A   The preliminary assessment of the law department.

14  Q   Page 17?

15  A   The preliminary assessment of the ethics and human rights

16  department.

17  Q   Page 19?

18  A   The preliminary assessment of the planning and

19  development department.

20          MR. CULLEN:  I'd like to offer Exhibit 172 into

21  evidence.

22          THE COURT:  Any objections?

23          MR. SOTO:  No, your Honor.

24          MR. WAGNER:  Same.

25          MS. O'GORMAN:  No.

1          THE COURT:  It is admitted.

2       (City Exhibit 172 received at 11:04 a.m.)

3   BY MR. CULLEN:

4   Q   If I could direct your attention to City Exhibit 174, can

5   you tell me what that document is?

6   A   It's the preliminary assessment of the building and

7   safety department.

8          MR. CULLEN:  I'd like to offer Exhibit 174 into

9   evidence, if I could, please.

10          MR. SOTO:  No objection, your Honor.

11          MR. WAGNER:  Same.

12          THE COURT:  It is admitted.

13       (City Exhibit 174 received at 11:04 a.m.)

14   BY MR. CULLEN:

15   Q   If I could direct your attention to Exhibit 175, could

16   you tell me what that is?

17   A   The preliminary assessment of the department of

18   administrative hearings.

19          MR. CULLEN:  I'd like to offer Exhibit 175 into

20   evidence.

21          MR. SOTO:  No objection, your Honor.

22          MR. WAGNER:  Same.

23          THE COURT:  It is admitted.

24       (City Exhibit 175 received at 11:04 a.m.)

25   BY MR. CULLEN:

1   Q   Finally, I'd like to direct your attention to City
2   Exhibit 176.
3   A   That's the preliminary assessment of the fire department.
4           MR. CULLEN:  I'd like to offer Exhibit 176 into
5   evidence.
6           MR. SOTO:  No objection, your Honor.
7           MR. WAGNER:  Same.
8           THE COURT:  It is admitted.
9       (City Exhibit 176 received at 11:05 a.m.)
10  BY MR. CULLEN:
11  Q   So you stated that you had reports, follow-up reports,
12  meetings.  Was there a culmination to this process?
13  A   There was, and, you know, Ms. Kopacz has described it --
14  the process very eloquently in her report.  As we got into
15  this, what we learned was you had two completely different
16  sets of documents, which made it difficult to complete this
17  and why it took so long.  One was the Ernst & Young base
18  assessment document, which is in one set in one format, and
19  then there was a Conway MacKenzie document for restructuring
20  and reinvestment initiatives that had a lot of money for
21  staff and other things in another document, and they had not
22  been put together in a single place.  And so a huge part of
23  our time was literally working between the two documents to
24  make sure nothing was double counted, everything was
25  accounted for, and if, in fact, there was money in the

1    restructuring initiatives, they were oftentimes based on

2    cost-cutting assumptions or based on new revenue assumptions,

3    were those cost-cutting assumptions real, were those revenue

4    assumptions real, and could you deliver city services within

5    the dollars there, and after going through this process I

6    became pretty convinced that the -- that we could deliver

7    basic city services for the dollars that was there under the

8    approach of the RRIs that were there, and then after

9    carefully reviewing Ms. Kopacz's report, which reinforced my

10   conclusion, I reached virtually the identical conclusion,

11   that this is going to be tight, that it's not without risk,

12   but that if we really work hard and put a first-class team

13   together that there are the resources here and the general

14   directions on strategies in the RRIs that I think have the

15   potential to be successful.

16   Q   Did you come to the conclusion in reviewing any of these

17   RRIs that there was too much money projected or available

18   under the plan?

19   A   No.

20   Q   In other words, that you didn't need the money?

21   A   No.

22   Q   Can you state kind of in the most declarative sentence

23   you can for the Court your final conclusion, if you will?

24   A   You know, I support this plan, and I believe it is

25   feasible.  I can't predict a national recession.  I can't

1    predict state revenue sharing cuts.  I can't predict

2    different casinos being approved.  But those are the risks I

3    signed up for as the mayor, but I believe within this plan

4    there are the resources to be successful if we're aggressive

5    and we work hard and we don't have any serious misfortune

6    that's outside of our control.

7    Q    Do you think your current team can implement the plan?

8    A    Yes.

9             MR. CULLEN:  Moving on to another question, and I'll

10   have some more questions on this later, your Honor, at the

11   conclusion of his testimony.

12   BY MR. CULLEN:

13   Q    You realize that the subject of the art and the assets of

14   the DIA have been an issue in this case?

15   A    Yes.

16   Q    Could you characterize for me your assessment of the

17   importance of the DIA in its current form to the city going

18   forward?

19   A    You know, I think it's an absolutely critical asset to

20   the city, and one of the most concerning things as I was

21   analyzing the plan of adjustment is if you look out over the

22   projections over the next ten years, there's an assumption,

23   for example, that the income tax revenues are going to grow

24   about two percent a year for the next ten years.  That's

25   certainly not been our experience the last ten years, but a

1  big part of why I believe we can make it viable is you have

2  people moving into the City of Detroit at a rate that I have

3  not seen in my lifetime.  And they're moving heavily into the

4  downtown and midtown area, and we're working very

5  aggressively to support the neighborhoods so people stop

6  moving out of the neighborhoods, but there is a feeling of

7  hope in the city.  There's a feeling that something good is

8  happening, and I think it's a big part of why we're starting

9  to see the population stabilize.  And to take the Art

10 Institute out -- it's such a centerpiece of the city -- I

11 think would be a huge negative for our image.  I think it

12 would be a huge negative for people's decisions, and I think

13 it would plunge the city into the kind of anger and turmoil

14 that we're trying to get away from.

15 Q   Slightly different subject.  You've mentioned exodus from

16 the city.  You mentioned moving back into the city.  Does the

17 M-1 project have any relationship, in your view, to these

18 issues?

19 A   There's no doubt about it.  There are -- I mean we are

20 running a 95- to 98-percent occupancy rate along that

21 corridor, and it seems like almost every week we have a new

22 developer in that's talking about adding housing or shops

23 along there.  I know there are a number of people, including

24 two of my adult children, who have recently moved into that

25 corridor in significant part because the M-1 rail is part of

1   a lifestyle that doesn't make you as reliant on cars.  And if

2   you look at how the City of Detroit competes with the

3   suburbs, one of the big advantages we have going for us is

4   the density of population and the concentration of

5   attractions and shops in a densely populated area, but, of

6   course, if you're going to have a densely populated area, you

7   got to have a means of moving people where they aren't all

8   driving cars, and so the M-1 rail I think is extremely

9   important.  And when I was the CEO of the Detroit Medical

10  Center, I was one of the first ones to sponsor to sign up the

11  stop at Woodward and Mack as a private investor.

12  Q   Now, you inherited a city with a very bad income

13  statement and a very bad debt picture.  Did you consider

14  raising taxes in order to deal with the city's financial

15  problems?

16  A   You know, you always look at all revenues -- I mean you

17  have to -- as an option.  Under the law in the State of

18  Michigan, the Headlee Amendment to the Constitution that was

19  adopted in the late 1970s, local government cannot raise

20  taxes except by a vote of the people, and so the options to

21  raise taxes would have either been to go to the voters for a

22  property tax millage or try to convince a Republican-

23  controlled legislature to vote to raise taxes, and the

24  property tax produces so little.  One mil produces only $7

25  million a year.  That was simply not a practical solution.

1  And I've spent a lot of time in Lansing in the last nine

2  months, and there's not a lot of receptivity to raising

3  taxes.

4  Q   When you say the property tax raises so little, one mil

5  raises $7 million, I believe you said, could you unpack that

6  for the Court?

7  A   Sure.  You know, one mil in the way the State of Michigan

8  works, we assess a homeowner basically on half the value of

9  your house, so if you have a house that's got a market value

10 of $100,000, the taxable value is 50,000, and one mil would

11 basically be $50.  And so there are 20 mils levied for city

12 operating, roughly 10 mils for city debt.  You've got school

13 mils.  You've got state mils.  You've got county mils.

14 You've got Huron Clinton Metro millages.  But in Detroit

15 today I think the base rate for a homeowner putting all those

16 things in is somewhere around 90 mils, which on a $100,000

17 house is like $4,500 in taxes.  It's an astonishing number.

18 If you look at the communities we're competing against for

19 residents, the Dearborns, the Farmingtons, the Northvilles,

20 they're in the 50s and 60s, so Detroiters are paying

21 dramatically higher property tax payments on their homes, as

22 are Detroit businesses, than they are in the surrounding

23 communities.

24 Q   Have you come to any conclusion as to the prudency, as a

25 public policy matter, raising taxes?

1    A    Well, what you want to try and do anytime you raise

2    revenue -- and I've raised revenues in a lot of places in my

3    life -- is you're trying to figure out how to get the most

4    revenue with the least negative impact, and we lost 20 or 25

5    percent of our population between 2000 and 2010.  Last year

6    we lost a thousand residents a month under the Census Bureau.

7    To the extent we raise property taxes, now we make it even

8    more expensive to be here, but when one mil produces $7

9    million, to begin to have any impact on the kinds of debts we

10   are talking about, you would have needed a ten- or twenty-mil

11   increase.  This year I don't know what the county treasurer

12   has.  Probably 15,000 foreclosures on people who can't pay.

13   You start to put another ten or twenty mils on, and it would

14   be devastating.  I don't believe we'd end up collecting the

15   money.  I think what we would end up doing is dramatically

16   increasing the number of foreclosures on people who couldn't

17   afford their tax bill.

18   Q    Do you have any familiarity -- do you know anything about

19   the Revised Judicature Act and judgment levies?

20   A    You know, I mean judgment levies have been levied by the

21   Circuit Court against municipalities over the years, and so,

22   you know, it could be legally possible for a court to say you

23   have this debt, put it on your tax bill, which would

24   eliminate the need of a vote of the people, but if you put

25   ten or twenty mils and you start taking somebody with a

1    hundred thousand dollar house and telling them they're paying

2    another 500 or a thousand dollars a year in taxes, it would

3    be absolutely devastating to this community.  There's no more

4    inefficient way in the City of Detroit to collect tax

5    revenues than in the property tax.

6    Q    Couple of things with regard to relations with Mr. Orr,

7    and you alluded to some of this.  What was your involvement,

8    if any, in the mediation, in the Bankruptcy Court, or in the

9    settlements that were achieved?

10   A    I had virtually no involvement in any of the settlements

11   or the mediations other than -- well, let me take it apart.

12   I certainly was involved in lobbying in Lansing for

13   legislative approval of the grand bargain, although I was not

14   in those mediations.  I was involved in signing off on the

15   recent Syncora settlement, which is part of the transitioning

16   out, and I was deeply involved in the mediation relative to

17   the regional water authority deal.  With the exception of

18   those, I've had very little involvement in the other

19   settlements.

20   Q    Did you come to a conclusion that the regional authority

21   idea was a good idea?

22   A    Yes.  I strongly support the regional water authority

23   deal.

24   Q    And what are the objective facts you could point the

25   Court to to justify that deal on behalf of the city?

1  A    You know, I think it's been pretty well publicized, but

2  this was a significant source of disagreement between Mr. Orr

3  and myself from the beginning in the way the water department

4  was being handled.  The people of the City of Detroit are

5  having trouble paying their water bills today.  The idea that

6  we were going to take a large chunk of money out of the

7  ratepayers and move it to the general fund at a time when

8  we've got 2,000 water main breaks a year in the city and

9  we've got water shutoffs made absolutely no sense to me.

10  After the national embarrassment on the water shutoff

11  process, Mr. Orr, to his credit, said, "Okay.  I'm now

12  convinced that there is a real problem with this," and

13  allowed me not only to deal with the water shutoff issue but

14  also to take the lead in the mediation with Wayne, Oakland,

15  and Macomb County that Judge Cox conducted.

16  Q    And what benefits to Detroit and the region does the

17  authority give?

18  A    I think the benefits to Detroit and the region are

19  enormous.  Number one, as I know the Court is aware, the need

20  for those who don't have income to have support in paying

21  their water bills is enormous.  We had basically $200,000 a

22  year in a voluntary fund.  Now under the new Great Lakes

23  Water Authority deal we have $4-1/2 million a year, which

24  Eric Rothstein, a consultant Judge Cox brought in, indicated

25  would meet the national standard for what should be set aside

1  for an affordability program.  Just as critically -- and I

2  keep coming back to this -- this plan of adjustment assumes

3  income tax revenues are going to grow two percent a year for

4  the next ten years.  That doesn't happen unless the

5  population is going the right away.  Had we continued to have

6  2,000 water main breaks a year and no means of paying for

7  them, all of the assumptions in the plan of adjustment are

8  meaningless.  What's come out of this deal is that the

9  regional water authority is committed to put $50 million a

10  year into the local system in the City of Detroit.  The

11  authority has agreed to sell bonds with state assistance,

12  which will allow us to finance 500 to $800 million in repair.

13  And the same outstanding construction management crew that's

14  now taking down 200 houses a week is going to take on the job

15  of rebuilding our water main system starting next year.  So

16  we now have the resources to rebuild this water main system

17  in Detroit without raising the rates on the residents of the

18  city, and I think that was absolutely essential to make the

19  plan of adjustment feasible.

20  Q    There was a vote of the city council recently with

21  respect to Mr. Orr's tenure.

22  A    Right.

23  Q    Can you describe for the Court the impact of that vote?

24  A    We were trying to find a fair balance between the

25  continuity of this process, which, in my judgment, Mr. Orr

1    has handled extremely well, and the desire of the people of

2    the City of Detroit and the elected officials of the City of

3    Detroit to take over the city services, and so the city

4    council did unanimously pass a resolution, as is their

5    right -- and I signed it, as was my right -- to remove

6    Mr. Orr as emergency manager upon the effective date of the

7    plan of adjustment, allowing him to complete that in an

8    undisturbed manner, but also returns the management of city

9    government back to the local elected officials, and I think

10   even Mr. Orr would acknowledge that city services are being

11   better run when we let the city management team run them, and

12   he's going to continue to direct the bankruptcy case, which

13   he is continuing to do today.

14   Q    Are you aware that there's a Financial Review Commission

15   in the legislation affecting the grand bargain?

16   A    I am.

17   Q    How have you made yourself familiar with that?

18   A    Well, I was deeply involved in the discussions with

19   Governor Snyder and the treasury department and the

20   legislators.  In fact, I met with nearly every member of both

21   the House and the Senate either in caucuses or individual

22   meetings in the course of the drafting of that legislation,

23   and council President Brenda Jones and I jointly testified in

24   favor of Public Act 181 that created the Financial Review

25   Commission.

1    Q    And why --

2              THE COURT:  Excuse me, Mr. Cullen.  Can I ask you to

3    mind the microphone, please?

4              MR. CULLEN:  Oh, sorry.  I'm sorry.

5    BY MR. CULLEN:

6    Q    Why were you in favor of the Financial Review Commission?

7    A    You know, my experience in Wayne County reflected that I

8    think there is significant value in having an outside entity

9    that you can rely on for good suggestions as well as review.

10   It was obvious to me that the legislators, particularly the

11   outstate legislators, were taking what appeared to be a very

12   politically risky vote to put $195 million into the City of

13   Detroit in a grand bargain, very legitimately wanted to make

14   darn sure that they didn't put the money in and then have the

15   city start to run a deficit again, and so there was no way

16   the grand bargain legislation was going to pass without a

17   Financial Review Commission.  And so both the governor and I

18   and the legislature closely studied the New York and

19   Washington, D.C., models and ended up in a place that I think

20   we felt very good about.  There is a commission that has very

21   strong powers that it can exert onerously or supportively,

22   depending upon how the city administration is performing.

23   Q    How do you feel about your role as a member or the

24   appointing authority for a member of that commission?

25   A    Yeah.  You know, again, it goes back to my own

1   experience.  I'm one, and the city council president is one

2   out of nine, but when I was the CEO of the Detroit Medical

3   Center, I was a voting member of the DMC board.  And I was

4   not confused about who had the authority.  Roger Penske and

5   the like sitting on that board were very clear, but I would

6   have to come in, present the budget.  If I wanted an idea for

7   a new acquisition, I had to present the business plan.  Times

8   they would be supportive; times they would improve it with

9   good ideas.  A number of times they'd say your numbers aren't

10  good enough or we don't do this, and that's -- that is not an

11  unusual corporate structure in this company to have the CEO

12  sit as a member of the board but still have the board have

13  vigorous oversight, and in this case you have seven of the

14  nine members appointed by state officials, and I am going to

15  be in the room at the meetings so that they understand

16  firsthand from each of these board members exactly what

17  they're happy about with the city, what they're unhappy

18  about, what information they want, what their expectations

19  are, and I am going to do what I did in the Detroit Medical

20  Center and make darn sure I deliver on every request for

21  information and every revision to a plan that they ask for.

22  I think it will make me more effective in making sure I'm

23  complying with their direction by being there than if I had

24  sent a representative, and certainly in the early stages I

25  intend to sit myself to make darn sure we comply with

1  everything they ask.

2  Q   Somewhat like April 17th, you are aware that the Court

3  has wanted your views on how you're going to enforce the

4  Syncora -- or how the city is going to enforce the Syncora

5  obligations under the Syncora settlement agreement.

6  A   Yes.

7  Q   Have you had a chance to address that issue?

8  A   Yes, and it's, you know, an important question.  If you

9  look at the settlement, there are time limits within which

10 Syncora has a right to exercise options.  They have

11 responsibilities in some cases like the Grand Circus garage

12 to put money in.  But Tom Lewand and the department of jobs

13 and economic development are responsible today for enforcing

14 post-agreement covenants with developers.  We have a huge

15 development called Hantz Farm on the east side of Detroit in

16 which there are significant responsibilities of the

17 developer, and Mr. Lewand and his team -- Jeb Howbert, his

18 number two, came out of the Bloomberg administration -- they

19 will be responsible, as they are with our other development

20 agreements with private partners, making sure that Syncora

21 follows every obligation in that settlement.

22 Q   And is Mr. Lewand a cabinet member who's at the weekly

23 meetings?

24 A   Mr. Lewand is a cabinet member who was a real estate and

25 economic development attorney in private practice at Bodman

1  and is very sophisticated in these issues, and, yes, he's at

2  the cabinet meetings.

3  Q    Finally, I'd like to ask you a couple of questions about

4  moving forward under the plan in the event that the plan is

5  confirmed.  What do you regard as the chief challenges or

6  risks to implementation of the plan by the City of Detroit

7  government?

8  A    You know, for the most part I worry about things that are

9  outside our control.  We have almost $170 million in revenue

10 coming from casino gaming.  There is a proposal in front of

11 the U.S. Interior Department right now for new Indian casinos

12 in the western suburbs.  I mean you would not have to lose a

13 very significant percentage of 170 million a year before you

14 have difficulties.  We have about $200 million a year in

15 state revenue sharing payments.  Just a few years ago that

16 was 260.  Our plan of adjustment projects out that those

17 revenue sharing payments won't be cut for the next ten years.

18 It's going to be really hard work to make sure that that

19 happens, and so -- but those are things that I signed up for,

20 and I'm going to work really hard at them every day.

21         MR. CULLEN:  That's all I have, your Honor.

22         MR. SOTO:  May I approach?

23         THE COURT:  Yes, sir.

24         MR. SOTO:  And may I approach Mayor Duggan?

25         THE COURT:  Yes.

1      THE WITNESS:  Thank you.  Thank you.

2                  CROSS-EXAMINATION

3  BY MR. SOTO:

4  Q   Mayor Duggan, my name is Ed Soto.  I'm from Weil, Gotshal

5  & Manges, and I represent FGIC.  I know we haven't met

6  before.  It's nice to meet you now.

7  A   Good morning.

8  Q   And what I'll be doing is going over some of the items

9  that you've testified about, not all of them, but some of the

10  items you testified about today and in your deposition.  And

11  I'll try to give you sort of the topics we're going through

12  so that you get some context just the way Mr. Cullen did.  So

13  first I want to talk to you a little bit about when you were

14  initially elected as mayor.  And when you first met with the

15  emergency manager, you told him that you would like full

16  operational control of the city at the earliest possible

17  date; correct?

18  A   That's correct.

19  Q   And you thought it was in the best interest of the city

20  for you to oversee its day-to-day operations because you

21  believed you had a background and experience that could make

22  the government work better; correct?

23  A   That's correct.

24  Q   And you believed that the people in the city expected you

25  to get control of the city's operations at the earliest

1   possible date as the elected mayor?

2   A   I do think that was the expectation.

3   Q   I'm going to show you a story I just highlighted --

4   A   That's okay.

5   Q   -- that'll actually be easier for you to read, and

6   everybody else will -- I will actually give you one that's

7   not highlighted, and --

8   A   Okay.

9   Q   -- that way I'll be able to read it.  So this is Exhibit

10  4664.  It's an article from Crain's Detroit Business that's

11  dated February 12th -- it's actually February 12th, 2013,

12  again, when you were running.  Please take a look at it if

13  you have a second or two.  It's hard to read.

14  A   Yeah.  Okay.

15  Q   Have you seen this before?

16  A   Yes.

17  Q   Okay.  So the article asks a question about maybe six,

18  seven lines down.  You see where it says, "If you are elected

19  mayor of Detroit and an emergency manager is put in place,

20  would you then try to work with him?"  And then it lists some

21  purported answers; correct?

22  A   That's right.  It looks like they quoted me accurately.

23  Q   Okay.  Very good.  So I'm going to ask you about one of

24  the -- one of the answers is, "No.  Again, my intention would

25  be to push the manager out on the first day.  I don't think

1  anyone has a stronger municipal turnaround record than I do,

2  and I can recruit great -- a great deal of talent from this

3  community to turn the city around."  Do you see that answer?

4  A    I do.

5  Q    And do you remember saying those things?

6  A    I did.

7  Q    And then it goes on following that, and it says,

8  "Hopefully I can convince the governor that the city is

9  better off being run by people who will be here long term

10 than someone appointed temporarily by the governor."  Do you

11 see that?

12 A    That's correct.

13 Q    And do you recall making that statement?

14 A    I do.

15 Q    Now, are you aware that the restructuring and

16 reinvestment initiatives or RRIs included -- in the plan of

17 adjustment that you talked about today were also included in

18 the very first plan that was submitted on -- really it was

19 called Proposal to Creditors --

20 A    Right.

21 Q    -- submitted on June 14th, 2013?

22 A    I'm aware of that.

23 Q    And so by the time you came into office, the emergency

24 manager had already retained consultants and come up with the

25 reinvestment and restructuring initiatives that he thought

1  addressed the needs of the city; correct?

2  A    That's correct.

3  Q    And you had nothing to do with those consultants at that

4  time; correct?

5  A    I did not.

6  Q    But it's your belief, Mayor Duggan, that consultants are

7  not as effective as people who engage with employees and

8  allow those employees to work together to redesign and

9  organize themselves; correct?

10 A    That's correct.

11 Q    And that's in part what you were talking about during

12 your testimony earlier; correct?

13 A    That's right.

14 Q    So you went out and you talked to the city employees to

15 figure out what was going on in the city's operations;

16 correct?

17 A    Right.

18 Q    You did it personally, as you testified earlier?

19 A    That's correct.

20 Q    And you also sat down with your team of people that you

21 had put together, a little bit different than the consultants

22 that had been put together by the emergency manager, and you

23 went to see the various department heads to evaluate these

24 restructuring and reinvestment initiatives; correct?

25 A    That's correct.

1  Q    And you and your team thought that some of the RRIs were

2  practical but some of them were not; correct?

3  A    I think that's correct.

4  Q    Now, the RRIs allocate certain funds for each department;

5  correct?

6  A    Right.

7  Q    And when you were elected, you reviewed each department

8  and how much money Conway MacKenzie specifically had

9  allocated to each department in the RRIs; correct?

10  A    That's correct.

11  Q    And despite the fact that Conway MacKenzie had already

12  allocated funds, you had the city's department heads reassess

13  those allocations to determine if in their mind they could

14  meet them; correct?

15  A    That's correct.

16  Q    And the city's department heads reassessed the

17  appropriateness of the proposed RRIs; correct?

18  A    They did.

19  Q    Okay.  And you asked the city's departments to decide

20  whether they could or could not get to the dollar amounts by

21  following the existing RRIs or if they had to adjust them and

22  modify them to get that done; correct?

23  A    That's correct.

24  Q    And the department heads told you their assessment of

25  which initiatives from the plan of adjustment were valuable

1   and which they wanted to modify and substitute with something

2   else or which they would go forward with; correct?

3   A   That's correct.

4   Q   And that's despite the fact that there was already a plan

5   of adjustment and other consultants had already come up with

6   what they thought was right; correct?

7   A   That's correct.

8   Q   And there were lots of times when your team came in and

9   said -- and I'm quoting -- "Here's what Conway MacKenzie

10  recommended.  We disagree with X, Y, and Z, and we think we

11  should do this differently."  Do you recall that?

12  A   Right.

13  Q   Okay.  So, for example, you reviewed Conway MacKenzie's

14  initial proposal and recognized that they had proposed

15  keeping only open the parks that were open.  I think you said

16  there were about 35 -- maybe 25 to 35 that were open when you

17  reviewed it; right?

18  A   Okay.  I don't remember that one specifically, but it

19  sounds right.

20  Q   Yeah.  And you reviewed them, and you said, "Well, look,

21  I think the parks have to be open.  I think that's an

22  important part of revitalizing Detroit and revitalizing

23  neighborhoods and making residents feel good about their

24  neighborhoods."  And you were the one who, indeed, went and

25  said, "Look, I want to -- I want to open the other parks,"

1   which was almost like 175 other parks or so.

2   A    Yeah.   The emergency manager had the money in the budget

3   at the time I arrived to maintain about 175 parks, so that

4   was not a change that I made.

5   Q    Okay.

6   A    The change that I made was recruiting the additional 75

7   businesses and churches to cut the parks.

8   Q    So you would disagree with somebody like, oh, say, Chuck

9   Moore at Conway who said, "Look, we were only going to open a

10  few, but the mayor had an initiative, and we wanted to change

11  it."

12          MR. CULLEN:  Objection.  Objection, counsel.

13          THE COURT:  The objection is sustained.

14          THE WITNESS:  What I know is the budget --

15          THE COURT:  Mr. Mayor, I sustained the objection.

16          THE WITNESS:  I'm sorry, your Honor.

17  BY MR. SOTO:

18  Q    Now, in fact, don't you intend to modify the reinvestment

19  and restructuring recommendations that were made by Conway

20  MacKenzie?

21  A    I think within the intentions of what is there and within

22  the amounts that are in there, will there be details that

23  change, yes, but the general direction and the general

24  amounts I support.

25  Q    So in your deposition which is before you, if you look at

1  page 76, we're going to be starting at line 20 and going to

2  24. This deposition took place on August the 1st of 2014,

3  just more recently. You there?

4  A    I'm with you.

5  Q    Were you asked the question,

6         "But when it came to the exact services and how

7          that money would be spent that Conway MacKenzie came

8          up with, in many instances that was modified by you

9          and the department heads?

10         We do intend to modify it, yes."

11         That's consistent with your deposition?

12  A    I think that's what I just said.

13  Q    Yeah. And you still believe that; correct?

14  A    Yes.

15  Q    And the exact modifications could change from week to

16  week; correct?

17  A    I don't know that it would change from week to week, but

18  as -- again, I can explain it if you like, but --

19  Q    No. Please explain it.

20  A    So I'll give you an example. Conway MacKenzie had at one

21  point $500 million in blight, now $420 million in blight, in

22  which the plan was just demolish all the vacant houses. We

23  are still spending that money, but we added in a program

24  where we are filing lawsuits and taking those houses that can

25  be saved, getting them renovated, getting them sold. It was

1  not the detail that Conway MacKenzie had laid out, doing the
2  auctions and saving the houses, but we're still going to
3  spend the same dollar amount demolishing those that can't be
4  saved.  So when I say I'm going to modify them, I think there
5  are going to be a number of instances where the dollar
6  amounts and the directions are what's in the plan of
7  adjustment, but Conway MacKenzie didn't expect that they had
8  solved every single detail of every initiative.
9  Q   And you come up with -- thank you, your Honor.  And -- or
10  Mayor.  And you come up with -- let's see.  Your Honor,
11  Mayor.  I got it.  And you come up with new initiatives every
12  single day; correct?
13  A   I try.
14  Q   And so you don't limit your thinking or anybody else's
15  thinking to what was written down in a document like the RRI
16  plan; correct?
17  A   I try to not limit my thinking to my thinking yesterday.
18  Q   Okay.  Good.  Then you're ahead of me already.  Let me go
19  into the issue if feasibility that you touched on.  I'd like
20  to ask you a few questions about the post-effective date
21  governance under the plan.  The state and state legislatures
22  came to you with the idea of a Financial Review Commission;
23  correct?
24  A   I think the governor did originally, but yes.
25  Q   Okay.  Fair enough.  And at that time, they had done a

1   lot of work on this and had prepared a draft legislation;

2   correct?

3   A    That's right.

4   Q    And you shared your reaction to those drafts with the

5   governor and with the legislatures; correct?

6   A    I did.

7   Q    And you indicated that you were supportive of oversight

8   that had strict requirements relating to balanced budget,

9   cash management, procurement processes, and access to capital

10  markets; correct?

11  A    That's right.

12  Q    But you didn't support oversight that had a checklist of

13  whether you were pursuing every restructuring initiative in

14  the plan; correct?

15  A    That's correct.

16  Q    And you ended up coming up with an agreement along those

17  lines in connection with the Financial Oversight Commission

18  Act; correct?

19  A    You're not characterizing it exactly right, but you're

20  about 80 percent correct.

21  Q    Well, maybe for the judge, what's the other 20 percent?

22  A    So there is no independence.  The legislation requires

23  both a two-year budget and a four-year financial plan, which

24  is going to have to be consistent with the plan of

25  adjustment.  To the extent that my better thinking in the

1    future is to move money from one area to another, I don't

2    have any freedom to do that.  I would have to go to the

3    Financial Review Commission and say, "Here is the basis for

4    our thinking," and then they would independently review

5    whether that was a reasonable approach or not.

6    Q    And you actually went to Lansing and you testified in

7    favor of a bill like that, a bill that didn't limit you to

8    checklists of what had to be done like even the checklist in

9    the RRIs; correct?

10   A    That's correct.

11   Q    Now, Mayor Duggan, one of the things that you focused on

12   is employee productivity; correct?

13   A    That's true.

14   Q    In fact, you described yourself as obsessed with employee

15   productivity; correct?

16   A    It's the only way to improve services.

17   Q    And I sense that in hearing your testimony today that you

18   are obsessed with it, and I think it's a good thing.  Now,

19   you are aware that the city proposed a plan in February of

20   2014 that included greater pension cuts than the current plan

21   of adjustment; correct?

22   A    That's right.

23   Q    And you didn't objectively measure whether the decision

24   to cut pension benefits at the level suggested in February of

25   this year impacted employee productivity, did you?

1  A   I didn't do any objective measurement besides listening

2  to people.

3  Q   And you also are aware that the city intends to provide

4  new pension benefits on a go forward basis for active

5  employees; correct?

6  A   I do.

7  Q   But you don't know if the city's decision to provide new

8  pension benefits on a go forward basis for active employees

9  has had any effect on employee productivity either; right?

10  A   Only from conversations.

11  Q   And let me ask you then to look at your deposition again.

12  A   Okay.  What page are we on?

13  Q   I think we're going to be on page 126 this time, and

14  we'll start at line 4, and we'll go to line 8.  I tried to

15  get smaller print for you, but it was impossible.

16  A   Yeah.  Thanks.

17  Q   You see that?

18  A   I remember this.

19  Q   Okay.  And so starting on line 4,

20          "Question:  So you don't know if the city's

21          decision to utilize a new pension system has any

22          effect on productivity either.  Would that be fair?

23          Answer:  Again, I haven't -- I haven't segmented

24          out one thing and surveyed what effect it had, no."

25          Correct?

1    A    Right.

2    Q    And that was truthful then, and it's truthful now?

3    A    Yes.

4    Q    And you don't know whether the city's subsequent decision

5    to reduce cuts to pension benefits in the current plan has

6    had an impact on employee morale either; correct?

7    A    I know reaction from individual conversations.  I have

8    not done an objective survey.

9    Q    So you have sort of episodic one-off conversations?

10   A    The employees talk to me all day every day.

11   Q    So in March of this year, the city held a citywide

12   recruiting fair; correct?

13   A    Right.

14   Q    And you were recruiting bus drivers and bus mechanics and

15   police officers and fire fighters; right?

16   A    Among others, yes.

17   Q    Oh, good.  And the city had about 90 openings for fire

18   fighters.  Remember?

19   A    Right.

20   Q    And 4,500 applicants appeared for those positions;

21   correct?

22   A    Right.

23   Q    You had hundreds and hundreds more applicants for all of

24   the positions that were available at the time; correct?

25   A    That's correct.

1  Q    We're almost there.

2  A    All right.

3  Q    Let's switch to another topic.  You believe that the plan

4  of adjustment's favorable treatment of Classes 10 and 11, the

5  pensioners, is fair and reasonable; correct?

6  A    I do.

7  Q    And as far as deciding which creditors would receive what

8  recoveries under the plan, that's not something you had any

9  input on; correct?

10  A    I did not.

11  Q    But you believe that there is a moral difference between

12  the pensioners and the financial creditors; right?

13  A    I do.

14  Q    And the moral difference is that the financial creditors

15  were making a business decision when they decided to risk

16  their money; right?

17  A    Right.

18  Q    And that's your view of that; right?

19  A    That is my view.

20  Q    And you don't think that even if both groups are

21  unsecured creditors that the financial creditors should be

22  treated the same as people who spent 20 or 30 years working

23  in the city; right?

24  A    That sounds like me, yes.

25  Q    It was you.

1   A   Okay.  Good.

2   Q   But you don't know what type of due diligence the COP

3   holders performed at the time that the COPs transactions were

4   entered into, do you?

5   A   I was not engaged in any of those issues.

6   Q   And you don't know what statements the city made to the

7   COP holders before they invested; correct?

8   A   I do not.

9   Q   Switching to one of the last topics you touched, I'll ask

10  you some questions on the grand bargain.  You understand that

11  the grand bargain both protects the art and helps fund

12  pensions; correct?

13  A   That's correct.

14  Q   And the only analysis that you've reviewed regarding the

15  city's ownership of the art at the DIA and the building

16  itself was the Attorney General Schuette's opinion; right?

17  A   That's correct.

18  Q   But you don't have enough information to know whether the

19  attorney general's opinion is right or wrong; correct?

20  A   I don't have any information other than reading it.

21  Q   And you haven't reviewed Christie's valuation with

22  respect to the value of the art; correct?

23  A   I have not been engaged in any of that, no.

24  Q   And you haven't reviewed Artvest's valuation of the art

25  either?

1   A    I have not seen any of that.

2   Q    And you don't know how much the entire DIA collection is

3   worth; correct?

4   A    I do not.

5   Q    And you haven't done any independent economic impact

6   study of the DIA, have you?

7   A    No.   There's a division of responsibility between Mr. Orr

8   and me, and that was not something I was assigned.

9   Q    Now, you said something which I find interesting.   I can

10  relate to the fact that you have children moving into the

11  cities.   I have four that are moving into cities, and I --

12  A    Glad to hear it.

13  Q    -- just came back this weekend from moving one.   And you

14  said, look, if you take the Art Institute out, it'll have a

15  huge negative impact.   It'll have a negative image.   That's

16  what you were saying; correct?

17  A    I do believe that.

18  Q    Okay.   What about if you monetize the art?   If you knew

19  you could monetize the art, keep the art in Detroit, and keep

20  pensioners paid and continue to do RRIs, would you consider

21  monetizing the art in a way that allowed you to have, oh, a

22  billion extra dollars to work with in your city?

23  A    You know, I haven't looked at --

24           MR. CULLEN:  Objection.

25           THE COURT:  Excuse me.

1    MR. CULLEN:  Objection.  Foundation, form,
2  speculation.
3    THE COURT:  Well, if you define "monetize" for us,
4  I'll overrule those objections.
5  BY MR. SOTO:
6  Q   And what I mean by "monetize" is -- monetization can be
7  done in a number of ways, but the one I'm thinking about is
8  if you took a loan on the art so that the art didn't have to
9  go anywhere and if it was paid could be one.  Another way
10  would be to raise money by using the art's collection in a
11  way that -- possibly a loaning collection, a leasing
12  collection, a traveling collection that raised funds.  Those
13  are different ways of monetization.  Actually, there was a
14  study that listed five of them, but let's concentrate on the
15  first two.  One is loaning, and the other one is possibly,
16  you know, sort of a traveling lease.
17  A   I'd have to study each option carefully.  I can't react,
18  but I would look at each of those options carefully.
19  Q   I appreciate your honesty, and I thank you very much for
20  coming, sir.
21  A   Thank you.
22    MR. SOTO:  I have no further questions.
23    MS. O'GORMAN:  No questions.
24    MR. WAGNER:  No questions, your Honor.
25    THE COURT:  Any further redirect?

1          MR. CULLEN:  Just one.

2                    REDIRECT EXAMINATION

3    BY MR. CULLEN:

4    Q    You were asked several questions about whether you had

5    done a study with respect to productivity or morale of

6    employees; correct?

7    A    Yes.

8    Q    Do you remember?

9    A    I do.

10   Q    Do you have an impression or a judgment as to whether the

11   way pensioners are treated has an impact on the city's

12   dealings with its current employees?

13   A    There's no question that the morale of the employees that

14   I interact with at least got better when the cuts were

15   reduced and ultimately the hybrid plan came out which

16   apparently expectations had been lowered so far, I think that

17   people had a pretty bleak outlook, but in my interaction with

18   them, people feel better than they did six months ago.

19         MR. WAGNER:  Your Honor, I move to strike for the

20   reasons I noted earlier.

21         THE COURT:  All right.  The motion is denied.  You

22   may continue.

23   BY MR. CULLEN:

24   Q    And do you have an opinion -- or do you have a judgment

25   based upon your experience as a CEO as to what role a sense

1  of fundamental fairness and how you're being treated impacts
2  an employee workforce?

3            MR. WAGNER:  Your Honor, also object.  This is
4  beyond the scope of the cross.

5            THE COURT:  Overruled.  Go ahead.

6            THE WITNESS:  You know, city government is its
7  employees.  They're the ones that deliver the service, and
8  they're interacting with the public every day.  You try to
9  motivate them with pay and incentives and supervision, but
10 nothing motivates them better than feeling good about their
11 job, and so there's no question that people who feel like
12 they're being treated fairly tend to do a better job than
13 people who are treated unfairly.  I think that's probably
14 true everywhere.

15           MR. CULLEN:  That's all I have, your Honor.

16           MR. SOTO:  Your Honor, one last question --

17           THE COURT:  Go ahead, sir.

18           MR. SOTO:  -- following up on -- following up on Mr.
19 Cullen's.

20                     RECROSS-EXAMINATION

21 BY MR. SOTO:

22 Q   Let me ask you to take a look at your deposition.  We're
23 talking now page 125.  We'll be looking at line 23 to page
24 126, line 3.

25 A   Right.

1   Q   Now, you were asked at your deposition,

2           "Has the city's decision to utilize a new

3           pension system had any impact on active employees'

4           morale?"

5   A   Right.

6   Q   I didn't ask this one before I asked about productivity

7   before.

8           "Answer:  You know, I have not canvassed the

9           employees to see.  Of all the things that they're

10          stressed about, whether the hybrid system is the

11          thing that bothers them the most I don't know.

12          Question:  So you don't know if the city's

13          decision to utilize a new pension system has any

14          effect on productivity either?"

15          And that's what we read earlier.

16  A   Right.

17  Q   Now, that was, I guess, on August 1st.

18  A   Right.

19  Q   So the anecdotal stories you're talking about now

20  happened between August 1st and I guess -- what's today --

21  September 6th?

22  A   I think the employees --

23          THE COURT:  October.

24          MR. SOTO:  October 6th?  Time is flying, Judge.

25          THE WITNESS:  I think the employees' anxiety I

1  believe has settled down in the last two months as more
2  uncertainty has moved out of this case.
3  BY MR. SOTO:
4  Q   Just one last point, Mayor.  I think that Jones Day can
5  double what they're doing.  I just want you to know that.
6  A    Thank you.  We'll sign them up for two parks next year.
7         THE COURT:  Yeah.  I was going to -- I was almost
8  going to ask whether any of the creditors' lawyers are
9  participating in this program but decided not to.
10        MR. WAGNER:  Your Honor, nobody asked us.
11        THE COURT:  Well, consider yourself asked.  You are
12 aware that the plan of adjustment proposes a pretty
13 significant level of what we call exit financing.
14        THE WITNESS:  Yes.
15        THE COURT:  I think the latest number is 320 million
16 or something like that.
17        THE WITNESS:  The last number I was given was 275
18 million.
19        THE COURT:  Yike.
20        MR. CULLEN:  Your Honor -- your Honor, may I
21 inquire?
22        THE COURT:  Yes.
23                    REDIRECT EXAMINATION
24 BY MR. CULLEN:
25 Q   Do you remember a vote by the city council endorsing the

1   exit facility of up to 325 million?

2   A   Yeah, but I didn't think we were going that high.

3   Q   Yes.  And subsequent to that, did you have discussions

4   about that number and the need for exit financing with Mr.

5   Hill?

6   A   Yes.

7   Q   And did you make a decision at that point as to what

8   amount of financing you would actually draw down?

9   A   I thought it was 275.

10          MR. CULLEN:  That's all I have, your Honor.

11          THE COURT:  All right.  Well, I'll leave it to those

12  in charge to actually figure out what the number is because

13  that's of less concern to me than a different question, which

14  is a certain portion -- a substantial portion of that

15  borrowing is for purposes of paying the obligations to

16  creditors under the plan.  You understand that?

17          THE WITNESS:  I do.

18          THE COURT:  There is, however, a piece of that

19  that's not for that purpose.  It's for other purposes in

20  relation to city operations and these reinvestment

21  initiatives.  You understand that?

22          THE WITNESS:  Yes, I do, your Honor.

23          THE COURT:  Okay.  And what my question is, what is

24  your judgment on the need for that financing for these

25  purposes in this second group, the city operation purposes

1    and reinvestment purposes?

2          THE WITNESS:  Your Honor, I'm probably going to get

3    myself in trouble with the people I have to go back to the

4    office with, but I had extensive conversations with Dick

5    Ravitch about this and extensive conversations with John Hill

6    about this, and I believe we need to keep the exit financing

7    to the lowest possible amount.  One of the troubling things

8    is that we have seen in this last plan of adjustment a $50

9    million overrun in the consultant fees, and I don't think

10   it's a coincidence we're talking about going up $50 million

11   in the exit financing at the same time we're showing a $50

12   million overrun in these consultant fees.  And I would be,

13   you know, I guess very disturbed if we ended up having to

14   borrow an extra $50 million because the consultant fees did

15   not stay on budget.  I would ultimately defer to Mr. Hill on

16   his judgment, but at least my last conversation with him on

17   Friday was he still thought 275 million was a reasonable

18   number.  I don't know if he's changed his mind over the

19   weekend.

20         THE COURT:  It was explained to me that the reason

21   for the increase was the settlement with the limited tax

22   general obligation bond creditors that involved a cash

23   payment to them of approximately this amount.  Do you know

24   anything about that?

25         THE WITNESS:  This is the first I'm hearing about

1  it.

2          THE COURT:  Am I right that that's what was

3  explained to me?

4          MR. CULLEN:  Yes, your Honor.  It was explained that

5  that was part of it, the decision to retire that note.

6          THE COURT:  Right.  Well, I don't want to put you on

7  the spot, and if you're not able to answer this question,

8  that's fine with me, but if that's the purpose of this

9  additional borrowing, to fulfill a settlement obligation, is

10  that something you could support?

11          THE WITNESS:  Your Honor, you're beyond my expertise

12  on this.  I would defer to John Hill's judgment as to whether

13  that extra --

14          THE COURT:  Okay.

15          THE WITNESS:  -- 50 million in borrowing is needed

16  or not.  I know he philosophically believes, as I do, we

17  should keep this borrowing down as low as we can.

18          THE COURT:  Okay.  Which segues nicely into my next

19  question, which has to do with this issue of monetizing the

20  art.  And as you heard, one of the definitions of "monetize"

21  is use the art as collateral to borrow money.  What would be

22  your position on that knowing that whatever money is borrowed

23  with the art as collateral has to be paid back at some point

24  somehow?

25          THE WITNESS:  Right.  I am not a fan of borrowing at

1  all.  It's a big part of how we got here.  And if there is

2  not a dedicated or identified source of revenue to repay it,

3  I would not be in favor of that.

4      THE COURT:  In your testimony, you mentioned some

5  risk with the future of state revenue sharing.  Would you

6  recount for me again what those risks are as you assess them?

7      THE WITNESS:  I have been -- I was one of the people

8  who fought the revenue sharing fight on behalf of counties

9  for many years, and any time there is budget pressure at the

10  state level, state legislators tend not to get political

11  credit for general revenue sharing contributions to local

12  government.  They tend to perceive the local officials as

13  getting the credit for delivering those services.  And if you

14  look at the last ten or fifteen years, there have been a

15  whole series of cuts to general revenue sharing in this

16  state.  If I remember correctly, I think as recently as 2010

17  the City of Detroit got $260 million a year in revenue

18  sharing, and now we're at 200 million.  So if you look at the

19  history, revenue sharing is not normally something that has a

20  strong constituency in Lansing when it comes time to budget

21  cuts, and when I look at a ten-year projection saying no cuts

22  to revenue sharing, it says to me that I'm going to have to

23  be very diligent at building coalitions across this state to

24  build a stronger constituency for revenue sharing in the next

25  downturn.

1          THE COURT:  Do you have any familiarity with

2    generally what the income brackets of the residents of the

3    City of Detroit are?

4          THE WITNESS:  A little bit.

5          THE COURT:  Do you know enough, for example, to tell

6    me what percentage of incomes are at or below federal poverty

7    levels?

8          THE WITNESS:  I could get you the precise number,

9    but I'm going to guess somewhere around a third of the city.

10          THE COURT:  Well, unfortunately, our rules don't

11    permit you to guess, so I have to ask you what that's based

12    on.

13          THE WITNESS:  You know, I've looked at the numbers.

14    I just can't call the exact percentage up, but I know -- it's

15    not half, but I know it's a substantial amount.

16          THE COURT:  Okay.  Would you be able to give me your

17    best understanding of what percentage of earners have income

18    between the federal poverty level and, say, twice that or the

19    median income?  Can you break out the brackets for me in any

20    way?

21          THE WITNESS:  You know, the U.S. Census Bureau has

22    done this, and when I was at DMC I knew it intimately because

23    it determined Medicaid eligibility.  I just -- I'd rather not

24    guess at the percentages --

25          THE COURT:  Okay.

1           THE WITNESS:  -- and get them wrong.

2           THE COURT:  Thank you.  All right.  That's all I

3    have.  Anything further?

4           MR. SOTO:  No, your Honor.

5           THE COURT:  Mr. Cullen?

6           MR. CULLEN:  No.

7           THE COURT:  Anything further?

8           MR. CULLEN:  No, your Honor.

9           THE COURT:  All right.

10          THE WITNESS:  Thank you.

11          THE COURT:  You are excused.

12          THE WITNESS:  Thank you, your Honor.

13          THE COURT:  Thank you very much for coming today.

14       (Witness excused at 12:05 p.m.)

15          THE COURT:  Is there anything else to do before we

16   break for lunch?

17          MR. CULLEN:  No, your Honor.

18          MAYOR DUGGAN:  We'll sign you up next year.

19          THE COURT:  Did I miss something, Mr. Soto,

20   something that needs to be put on the record here?

21          MAYOR DUGGAN:  He volunteered to take a park.

22          THE COURT:  Excellent.  Okay.  Let's break for lunch

23   now and reconvene -- I have a commitment here at lunch, so

24   I'm going to make it 1:45, please.

25          THE CLERK:  All rise.  Court is in recess.

1      (Recess at 12:05 p.m., until 1:45 p.m.)

2           THE CLERK:  All rise.  Court is in session.  You may

3      be seated.  Recalling Case Number 13-53846, City of Detroit,

4      Michigan.

5           THE COURT:  All right.  It appears that everyone is

6      here.  Sir.

7           MR. IRWIN:  Good afternoon, your Honor.  Geoff

8      Irwin, Jones Day, for the City of Detroit.  Before the city

9      rests -- Mayor Duggan was, in fact, our last witness -- we do

10     have the testimony of one additional witness that we wish to

11     put in through deposition designations.  I've got that color-

12     coded and ready to hand up, and I'll get to that in just a

13     moment, but I also wanted to address a few outstanding

14     document or exhibit issues.  We've been doing this in stages.

15     We've been trying to get out front on this so that we don't

16     have a document day at the end of the city's case where we

17     argue the admissibility of dozens and dozens of documents.

18     We've tried to introduce those in installments, which we've

19     done to date, and so we're left with just a few outstanding

20     exhibits.  And we've been working with objectors over the

21     last 24 hours or so to reduce that, and I think we can do

22     this by agreement, so I have a very small number of exhibits

23     that I just wish to bring to the Court's attention and move

24     into evidence, and, again, I think we have agreement on

25     these.  So those exhibits, your Honor -- one very small

1 category of exhibits and a few individual exhibits. We wish

2 to introduce the emergency manager quarterly reports from

3 2013 to 2014. For the record, those are City Exhibits 16,

4 17, 18, 19, 20, 21, and 31. They were on the city's exhibit

5 list. They did not come in through the pretrial order, but,

6 again, I think we have agreement that those can come in at

7 this time.

8          THE COURT: Any objections?

9          MR. SOTO: No, your Honor.

10          MR. WAGNER: No.

11          THE COURT: They are admitted.

12     (City Exhibits 16, 17, 18, 19, 20, 21, 31 received at

13     1:47 p.m.)

14          MR. IRWIN: The second document, your Honor, is a

15 document we've heard reference to a number of times. It's

16 the attorney general opinion, the written opinion from

17 Attorney General Schuette. It has not formally been moved

18 into the record. It is City Exhibit 324. The Court has

19 indicated previously that it will give weight to this opinion

20 as if it were a legal brief that will rise and fall based on

21 the strength of the analysis. It was not, however, briefed

22 in connection with the plan of adjustment. It is a

23 historical document. Mr. Orr indicated that he relied upon

24 it in connection with his decision-making process, so for

25 that purpose we offer it. And, again, I think we have

1    agreement on that.

2            THE COURT:  Any objections?

3            MR. SOTO:  For that limited purpose, we have no

4    objection.

5            THE COURT:  All right.  For that limited purpose, it

6    is admitted.

7        (City Exhibit 324 received at 1:48 p.m.)

8            MR. IRWIN:  Thank you, your Honor.  The third

9    document is -- we thought long and hard about this.  We would

10   like to have the most recent version of the plan in the

11   record as opposed to an earlier version, so we have the

12   seventh amended plan.  We think it's been provided already,

13   but we have assigned it City Exhibit 775.

14           THE COURT:  I'm not sure it needs to be in evidence,

15   but if you want, okay.  Any objections?

16           MR. SOTO:  I mean it's just being presented just to

17   have like the filing.

18           THE COURT:  As the plan.

19           MR. IRWIN:  As the plan.

20           THE COURT:  All right.

21           MR. SOTO:  No objection.

22           THE COURT:  It is admitted.

23       (City Exhibit 775 received at 1:48 p.m.)

24           MR. IRWIN:  And then lastly, your Honor, we have --

25           THE COURT:  And while you're talking about this

1   amended plan, let me state for the benefit of all concerned

2   again here that I hope there is at least one more amended

3   plan with more settlements soon.

4           MR. IRWIN:  We understand, your Honor.  The last

5   exhibit that I have, your Honor, is, in fact, the deposition

6   transcript that I mentioned.  I have the deposition

7   transcript of Mr. Paul Provost.  Mr. Provost's name has come

8   up before.  He is a Christie's employee.  He was deposed in

9   connection with that portion of the letters that Christie's

10  delivered to the city that contemplated alternatives,

11  monetization alternatives in connection with the Christie's

12  analysis.  Both the city and FGIC designated affirmatively at

13  the same time -- the pretrial order contemplated a

14  simultaneous exchange of designations.  We have color-coded

15  it appropriately and where there are common designations we

16  have indicated as well.  I've provided a copy to counsel to

17  FGIC.  I have copies to hand up.  We have marked it as I

18  think the Court requested we mark deposition transcripts as

19  City 776.

20          THE COURT:  Any objection?

21          MR. SOTO:  No objection, your Honor.

22          MR. WAGNER:  No, your Honor.

23          THE COURT:  All right.  That is admitted.

24      (City Exhibit 776 received at 1:50 p.m.)

25          MR. IRWIN:  Would the Court wish that I --

1          THE COURT:  Yes.

2          MR. IRWIN:  -- approach again?

3          THE COURT:  Yes, please.

4          MR. IRWIN:  And then lastly, your Honor, we are --

5    the Court had requested at one point a map of the parcels for

6    the Syncora settlement, the parcels that are at issue.  We

7    don't have that yet, but we're working on that.  We're very

8    close.  We'll either reach some stipulation and if necessary

9    submit it as a city exhibit, but we don't have it just yet.

10   We expect to have it soon.

11         THE COURT:  Okay.

12         MR. IRWIN:  All right.  With that, your Honor,

13   the -- subject to rights of rebuttal, the city rests.

14         THE COURT:  Okay.

15         MR. SOTO:  I found a pen.  The objectors would like

16   to inform the Court that Derek Donnelly will be called as a

17   witness for a very limited purpose, the limited purpose of

18   addressing the Syncora settlement, actually even part of it,

19   but, in any event, you'd asked, and we have decided.  Our

20   people came back with that.  And I've informed Mr. Shumaker

21   we then have the issue of whether he would be subject to what

22   I consider to be the same accommodation that we made for Mr

23   Doak.  That's it.

24         THE COURT:  All right.  Let's discuss that.  I guess

25   it would be helpful to me in resolving this to know what

1   issues beyond the Syncora settlement the city wishes to

2   question this witness about.

3        MR. SHUMAKER:  Your Honor, I don't think we have

4   anything in particular in mind.  It's a question of the

5   limitation of the settlement.  And as with Mr. Doak's

6   deposition, there were subjects that went outside of that,

7   including questions answered -- asked by MIDDD, so I think

8   the parties are going to be able to work through this, and I

9   don't think this is going to be a big issue.

10        THE COURT:  Well, all right.  Let me just say that

11  as a general sort of conceptual matter, I think that the

12  deposition of the witness ought to be limited to the subject

13  on which he is proposed to testify, and I can also, depending

14  on the timing of it, offer to you my assistance in resolving

15  any issues by telephone if that will help you.

16        MR. SHUMAKER:  That would be helpful, your Honor.

17  And I think we're looking Thursday or Friday for the

18  deposition.  That's what Mr. Soto told me.

19        MR. SOTO:  Mr. Donnelly is involved in the mediation

20  process, and so those are the days that work this week

21  because they're going to --

22        THE COURT:  Okay.  I can tell you that I will be

23  available after 11 o'clock eastern time on Thursday.

24        MR. SHUMAKER:  On Thursday.  Thank you.

25        THE COURT:  And anytime Friday.

1      MR. SOTO:  Your Honor, the objectors have discussed

2  the possibility of a Rule 52(c) motion.  We would like to be

3  able to reserve the right to do that following the completion

4  of the testimony of Ms. Kopacz, which is not going to come

5  till later.

6           THE COURT:  Oh, okay.  That's a good idea.

7           MR. SOTO:  Thank you.

8           THE COURT:  All right.  So what's up next?

9           MR. WAGNER:  Your Honor, the objectors, pursuant to

10  Rule 611, call Cynthia Thomas.

11           THE COURT:  Okay.  Step forward, please, all the way

12  up here.  Raise your right hand.

13           CYNTHIA THOMAS, OBJECTOR'S WITNESS, SWORN

14           THE COURT:  All right.  Please sit down over there.

15                     DIRECT EXAMINATION

16  BY MR. WAGNER:

17  Q   Good afternoon, Ms. Thomas.  Jonathan Wagner of Kramer

18  Levin on behalf of the holders of certificates of

19  participation.

20           MR. WAGNER:  Your Honor, may I approach with the

21  small binders for your Honor?

22           THE COURT:  Yes.  Yes, please.

23           MR. WAGNER:  And with me is Deb Fish of Allard &

24  Fish.

25  BY MR. WAGNER:

1  Q   Ms. Thomas, nice to see you again.  Other than at your

2  deposition, you and I have never spoken; is that right?

3  A   That's correct.

4  Q   What is your position?

5  A   The executive director of the Retirement Systems for the

6  City of Detroit.

7  Q   And what are the Retirement Systems?

8  A   They are two separate Retirement Systems that are set up

9  for the employees of the City of Detroit.

10  Q   And what are the names of those Systems?

11  A   The General Retirement System of the City of Detroit and

12  the Police and Fire Retirement System of the City of Detroit.

13  Q   Are you the executive director of both Systems?

14  A   I am.

15  Q   And for how long have you held that position?

16  A   Since the fall of 2012.

17  Q   Can you tell us what your duties and responsibilities

18  are?

19  A   To summarize, I am the administrator of the Systems.  I

20  implement the directives of the trustees.  I don't vote on

21  resolutions, but I implement the directives of those that do.

22  Q   Do some of those resolutions relate to the investment

23  policies of the two Systems?

24  A   Yes.

25  Q   And do some of those resolutions relate to the asset

1  allocations of those two Systems?

2  A    Yes.

3  Q    And do some of those resolutions relate to the investment

4  assumptions of the two Systems?

5  A    Yes.

6  Q    Can you give us your -- a brief biographical sketch

7  beginning with your education?

8  A    After graduating from Hampton Institute with a degree in

9  accounting, I started working for the City of Detroit in

10  1986.

11  Q    And can you briefly take us through the positions that

12  you've held?

13  A    Yes.  I started as a technical aide in accounting, and I

14  moved up various accounting positions until I became a

15  manager one in the Retirement Systems.  And in 2004 I was the

16  assistant director of Police and Fire Retirement System.

17  Q    Now, how long have you been with the Retirement Systems?

18  A    For 26 years.

19  Q    And are you among the longest tenured employees of the

20  Retirement Systems?

21  A    Yes.

22  Q    And is there anyone at the Retirement Systems who has a

23  higher position than you?

24  A    No.

25  Q    And is there anyone at the Retirement Systems who has

1 more overall knowledge than you do with respect to those

2 Systems?

3 A    No.

4 Q    Now, who is the actuary for the two Systems?

5 A    Gabriel, Roeder, Smith & Company.

6 Q    And for how long, to your knowledge, have they served in

7 that role?

8 A    I believe 1930-something.

9 Q    That's about 70 years?

10 A    Correct.

11 Q    Do you believe that Gabriel, Roeder is a qualified

12 actuary?

13 A    I do.

14 Q    Do you have a good opinion of Gabriel, Roeder's work for

15 the Retirement Systems?

16 A    I do.

17 Q    Do you believe they are a prestigious firm?

18 A    Yes.

19 Q    Have you ever had any serious concerns with Gabriel,

20 Roeder's work?

21 A    No.

22 Q    And are you satisfied with their work?

23 A    Yes.

24 Q    And would it be fair to say that Gabriel, Roeder would

25 not have been retained as the actuary for the system -- for

1  the Retirement Systems all these years unless you thought

2  that Gabriel, Roeder's work was first rate?

3  A    That's a fair assumption.

4  Q    And to your knowledge, does anyone know these funds

5  better than Gabriel, Roeder?

6  A    Not to my knowledge.

7  Q    And do you believe Gabriel, Roeder has selected

8  appropriate investment targets for the two funds?

9  A    That Gabriel, Roeder has --

10  Q    Yes.

11  A    -- selected targets?

12  Q    Yes.

13        MR. MILLER:  Objection.  Foundation.

14  BY MR. WAGNER:

15  Q    Has Gabriel, Roeder recommended targets from time to

16  time?

17  A    Yes.

18  Q    And are you satisfied with the -- actually, let me go

19  back.  Do you believe that Gabriel, Roeder has selected

20  reasonable targets?

21        MS. GREEN:  Same objection, your Honor.

22  BY MR. WAGNER:

23  Q    I'm sorry.  Are you satisfied that they've made

24  reasonable recommendations?

25  A    Yes.

1    Q    And do you believe that Gabriel, Roeder has made

2    reasonable assumptions in dealing with the two Retirement

3    Systems?

4    A    Based on the information that they've received from us,

5    yes.

6    Q    Now, when was the last change in asset allocation for

7    PFRS?

8    A    I believe it was January 2013.

9    Q    And when was the last change for GRS?

10   A    The same year, maybe February.

11   Q    Um-hmm.  And do you believe the asset allocations for the

12   two Systems are prudent allocations?

13        MR. MILLER:  Objection.  Calls for a legal

14   conclusion.

15        MR. WAGNER:  I don't think it calls for a legal

16   conclusion.  She's the executive director of the two Systems.

17   I think she's -- she said nobody is more knowledgeable than

18   she is.

19        MS. GREEN:  I'll join in that to the extent there's

20   been no foundation laid that this witness would be able to

21   opine on these issues and that she's --

22        THE COURT:  I'll permit it and overrule the

23   objections.  Please answer the question.

24        THE WITNESS:  Can you repeat the question, please?

25        MR. WAGNER:  Can I ask the reporter to read it back?

1    No.  Okay.

2    BY MR. WAGNER:

3    Q    Do you believe -- you're challenging my memory.  Do you

4    believe the current asset allocations for the two Systems are

5    prudent?

6    A    Sure, yes.

7    Q    And since January of 2013, has the board of either System

8    felt the need to change the asset allocations?

9    A    Have they felt the need to change --

10   Q    Yeah.

11   A    -- to make a change to the allocations?  They may have

12   discussed changing it, but there have been no changes.

13   Q    Now, you're familiar with Milliman & Company?

14   A    Yes.

15   Q    Has Milliman suggested any changes to the asset

16   allocations?

17   A    Not to my knowledge.

18   Q    Now, can you look in your book at -- I have a -- oh, did

19   I give you a book?

20   A    You did not.

21   Q    You're the most important person here.

22   A    Thank you.

23   Q    Can you look in your book at Exhibit 4043?  It's towards

24   the back.  What is Exhibit 4043?

25   A    It's the -- it's a NEPC document for the General

1    Retirement Systems.

2    Q   And is this sort of a roadmap for the board as to how

3    funds should be invested?

4    A   Yes.  It's the investment policy review.

5            MR. WAGNER:  Your Honor, the document is in evidence

6    pursuant to your Honor's September 2 order.

7            THE COURT:  Thank you, sir.

8    BY MR. WAGNER:

9    Q   Can you look at page 626449?  I think it's the -- it's

10   captioned "March 2013 Investment Objectives and Guidelines."

11   Do you see that page?

12   A   I do.

13   Q   Okay.  And do you see -- one, two -- these are the --

14   this is an investment policy statement for the fund, GRS?

15   A   Correct.

16   Q   Okay.  And can you look at the third bullet?  Can you

17   read that?

18   A   The third bullet --

19   Q   Yes.

20   A   -- establishes formal yet flexible investment guidelines

21   incorporating prudent asset allocation and realistic total

22   return goals.

23   Q   Okay.  And can you look under "responsibilities, board of

24   trustees"?  Do you see that right under that?

25   A   I do.

1  Q   Can you read the paragraph right underneath?

2  A   The board of trustees acknowledges its responsibility as

3  a pension plan fiduciary.  In this regard, it must act

4  prudently and for the exclusive interest of plan participants

5  and beneficiaries.

6  Q   And to your knowledge, during your tenure as executive

7  director, have the plans followed those guidelines?

8  A   Yes.

9  Q   Now, am I right that the current investment return

10 objective for GRS is 7.9 percent?

11 A   That's correct.

12 Q   And I believe that was set in March of 2013?

13 A   Yes.

14 Q   And at the time that 7.9 was set, did you believe that

15 was a realistic goal for GRS?

16 A   At the time, yes.

17 Q   And am I right since March 2013, you've not changed your

18 opinion as to whether 7.9 is a realistic total return goal?

19 A   Realistic for the -- are you asking me is it realistic

20 for the time that it was set?

21 Q   No.  Yes.

22 A   Yes.

23 Q   And PFRS has an investment goal of eight percent?

24 A   That's correct.

25 Q   And you believe that's a realistic goal?

1  A    It is realistic.

2  Q    Can you turn in your book to Exhibit 1025?  And don't put

3  this -- don't put this up yet.  That's an article captioned

4  "Five Questions with Cynthia Thomas"; right?

5  A    Correct.

6  Q    And was that an article about an interview you gave with

7  an investment on line magazine in the summer of 2013?

8  A    It is.

9  Q    And did you make those statements in your capacity as

10  executive director of the pension funds?

11  A    I did.

12  Q    And you were authorized to make these statements?

13  A    Yes.

14  Q    And the article accurately transcribed your answers;

15  right?

16  A    Yes.

17  Q    And your answers were accurate; correct?

18  A    Correct.

19          MR. WAGNER:  Your Honor, I'd move the document into

20  evidence.

21          THE COURT:  Any objections?

22          MS. GREEN:  No objection.

23          MR. MILLER:  No objection.

24          THE COURT:  It is admitted.

25      (COPs Exhibit 1035 received at 2:06 p.m.)

1  BY MR. WAGNER:

2  Q   Now, if you turn to the second page sort of towards the

3  middle, the question, "Right now can you disclose some

4  investment returns, funded ratios, and liability numbers that

5  the two pension funds are maintaining?  What are some goals

6  you achieved during your tenure as the systems leaders?"  And

7  can you read your response there?

8  A   "The most recent actuarial valuations, June 30th, 2012,

9  show the General Retirement System as 77-percent funded and

10  the Police and Fire Retirement System as 96-percent funded.

11  Preliminary returns as of March 31st, 2013, show the GRS

12  returns as 4.5 percent and 9.6 percent for the quarter and

13  year, the PFRS returns as 5.7 percent and 7.1 percent for the

14  quarter and year."

15  Q   And were those answers accurate as of the time you gave

16  them?

17  A   They were.

18  Q   And were those figures based on targets of 7.9 and eight

19  percent?

20  A   Yes.

21  Q   Now, you're aware that in the plan the city set a rate of

22  return of 6.75 percent; right?

23  A   Yes.

24  Q   And Gabriel, Roeder's returns are 7.9 and eight; right?

25  A   The Retirement Systems plans --

1  Q  Yes.  I'm sorry.

2  A  -- are, yes, 7.9 and eight; correct.

3  Q  And you understand the 6.75 came from Milliman?

4  A  It's my understanding --

5          MR. MILLER:  Objection.

6          MS. GREEN:  Objection.

7          MR. MILLER:  Foundation.

8  BY MR. WAGNER:

9  Q  Do you --

10          THE COURT:  Overruled.  Please answer the question.

11          THE WITNESS:  It's my understanding that the 6.75 is

12  a negotiated return, and it was a term -- it was a rate that

13  was set with information from our actuary and asset

14  consultants, our attorneys, restructuring counsel, trustees.

15  BY MR. WAGNER:

16  Q  Do you understand that Milliman has done actuarial work

17  for the city in connection with this proceeding?

18  A  I am.

19  Q  Okay.  And if you had to pick between Gabriel, Roeder and

20  Milliman with respect to actuarial work as to these two

21  systems, who would you choose?

22  A  The most familiar, which would be Gabriel, Roeder.

23  Q  And is that because of Gabriel, Roeder's historic

24  knowledge with respect to the systems?

25  A  That's correct.

1          MR. WAGNER:  Your Honor, may I approach?  May I

2     approach?

3          THE COURT:  Yes.

4          MR. WAGNER:  I just have another exhibit.

5          THE COURT:  Okay.

6          THE WITNESS:  Thank you.

7     BY MR. WAGNER:

8     Q   Ms. Thomas, what is this document?

9     A   This is the Police and Fire Retirement System annual

10    actuarial valuation for June 30th, 2013.

11         MR. WAGNER:  Your Honor, this document, Exhibit

12    1024, is already in evidence.

13         THE COURT:  Thank you.

14    BY MR. WAGNER:

15    Q   Now, is this document posted today at the PFRS website?

16    A   It should be.

17    Q   Okay.  Can you turn to page 6 of the document?  Do you

18    see on the bottom right there's a -- all the way over -- a

19    total?  There's a section that says "portion of accrued

20    liabilities covered by assets," and do you see the numbers

21    there?

22    A   I do.

23    Q   And do you see the number for 2009 was 93 percent?

24    A   Yes.

25    Q   And for 2010 was 102 percent?

1    A    Yes.

2    Q    2011 was 100 percent?  Do you see that?

3    A    I do.

4    Q    And 2012 was 96 percent?  Do you see that?

5    A    Yes.

6    Q    And that's the number you quoted in the article; right?

7    A    It is.

8    Q    And then for 2013 89 percent?  Do you see that?

9    A    Yes.

10   Q    And those numbers are accurate; right?

11   A    Correct.

12   Q    And is it the -- let me just make sure I understand how

13   this works.  Gabriel, Roeder makes a recommendation, and then

14   the trustees vote, right, on the target?

15        MS. GREEN:  Objection.  Foundation.

16        THE COURT:  No.  I'll permit it.

17        THE WITNESS:  Gabriel, Roeder normally gives the

18   trustees certain scenarios or targets for modeling purposes,

19   and then there's, of course, discussion with the fund's asset

20   managers, and then the trustees vote.

21   BY MR. WAGNER:

22   Q    And based on your observations as executive director,

23   have the trustees properly discharged their duties in setting

24   those rates?

25   A    Yes.

1   Q   Now, in working to determine a projected rate of return,

2   could a useful data point be historical rates of return for

3   the two systems?

4   A   Yes.

5           THE COURT:  Excuse me.  Counsel, I just had a

6   technical question about that chart.  Could I just ask that?

7   Could you put that back up?

8           MR. WAGNER:  Sure.

9           THE COURT:  Ma'am, in the -- you see the chart that

10  was just on the screen there?

11          THE WITNESS:  Yes.

12          THE COURT:  On the very right-hand side there are

13  the four columns under "portion of accrued liabilities

14  covered by assets."  You see the four columns?

15          THE WITNESS:  Yes.

16          THE COURT:  And the one is paren one, then paren

17  two, and paren three.  What are paren one, paren two, and

18  paren three?

19          THE WITNESS:  Number one represents active members,

20  ASF, annuity savings fund, so a hundred percent of -- if you

21  go to -- we'll say 2013 --

22          THE COURT:  Okay.  So the one, two, and three on the

23  right are the same as the one --

24          THE WITNESS:  Right.

25          THE COURT:  -- two, and three on the left?  All

1   right.

2           THE WITNESS:  Correct.

3           THE COURT:  That answers my question.  Thank you.

4           THE WITNESS:  Okay.

5           MR. WAGNER:  May I proceed?

6           THE COURT:  Yes.

7   BY MR. WAGNER:

8   Q   Okay.  Can you turn to Exhibit 1017?  It's in the binder.

9           MR. WAGNER:  Your Honor, this document is also in

10  evidence already.

11          THE COURT:  Thank you.

12  BY MR. WAGNER:

13  Q   Now, this document is a list of assumed rates of return

14  and actual rates of return for the two systems; right?

15  A   Yes.

16  Q   And I could ask you a series of questions, but, in

17  general, are these -- are the numbers here correct?

18  A   Yes.

19  Q   Okay.  And by my count -- and you'll tell me if I'm

20  right -- for 16 out of -- for GRS 16 out of the 25 years the

21  rate of -- the actual rate of return exceeded the assumed

22  rate of return; correct?

23  A   That sounds correct.

24  Q   Okay.  And for PFRS, though, we don't have the rates --

25  or we don't have the returns for the first part of the -- '89

1  through '98, but by my count nine out of fifteen years the
2  actual rate of return outperformed the assumed rate of
3  return; right?
4  A   Correct.
5  Q   And do you know what the returns have been for the past
6  year?
7  A   No.  I can't tell you for certain.
8  Q   Would it refresh your recollection if I told you the
9  rates have exceeded 11 point --
10          MS. GREEN:  Objection, your Honor.  It's an improper
11  use of refreshing the witness' recollection.
12          THE COURT:  Sustained.
13  BY MR. WAGNER:
14  Q   Do you remember that the rates of return have exceeded
15  11.3 percent?
16  A   I know that they have exceeded ten percent, yes.
17  Q   Just to refresh your recollection, I have in your binder
18  your deposition.  Can you look at page 205, line 22, through
19  206, line 1?  And do you see you were asked -- do you have it
20  there, Ms. Thomas?
21  A   I believe I do.  Page 206, line --
22  Q   205, line 22.
23          "Question:  Do you" --
24  A   Yes.
25  Q          -- know whether it is more or less than 11.3

```
 1          percent?"
 2   A    Um-hmm.
 3   Q          "Answer:   I believe it's more.
 4                Question:  You believe it's more than 11.3
 5          percent?
 6                Answer:  I do."
 7          Do you see that?
 8   A    Yes.
 9   Q    And does that refresh your recollection that the returns
10   exceeded 11.3 percent?
11   A    It does.
12   Q    Now, can you turn to Exhibit 1022 in the book?  And can
13   you turn to page -- the fourth page of the document,
14   statement from Police and Fire Retirement System of the City
15   of Detroit?  Do you see that?
16   A    I do.
17   Q    Okay.  And you can put that up.  And you've seen this --
18   you've seen this document before?
19   A    I have.
20   Q    I'm right it was issued on a very historic day in your
21   life, right, March 21st?
22   A    Yes.
23   Q    That's your daughter's birthday?
24   A    Yes, it is.
25   Q    Now, the middle paragraph says -- can you read the middle
```

1  paragraph, the third paragraph?

2  A   "The Police and Fire Retirement System and its 12,000

3  active and retired first responders, their families and

4  beneficiaries, deserve better than this shoddy report and

5  shallow one-sided media reporting.  Let me state emphatically

6  that the pension fund is on solid ground and is projected to

7  do very well by any reliable measure well into the next

8  decade and beyond.  The PFRS fund is 96.1-percent funded.

9  With respect to funded status, the PFRS pension fund is in

10  the top ten percentile of public pension funds with one

11  billion or more in assets.  What this means is the PFRS

12  pension fund's level of funding is better than 90 percent of

13  public pension funds in the entire nation.  The PFRS fund has

14  nearly 3.1 billion in assets and is being managed with great

15  efficiency."

16  Q   And do you agree with those statements?

17  A   I do.

18  Q   And can you turn to the right side of the last page?  Do

19  you see the statement says -- this is in the paragraph, but

20  let's go back about four lines from the bottom.  It says,

21  quote, "It seems clear that the Milliman report resembles a

22  desired result and clearly is not an objective evaluation of

23  the actuarial status of the pension funds."  Do you see that?

24  Do you see that?  It's the paragraph -- the next page that

25  starts, "But let's go back."

1  A   Ah, I do.

2  Q   Okay.  And you agreed with that statement at the time?

3        MR. MILLER:  Objection.  Lack of foundation.  What

4  Milliman report?

5        THE COURT:  Overruled.  Did you agree with that

6  statement at the time, ma'am?

7        THE WITNESS:  I'm sorry.  Can you read that again?

8  I was on the wrong paragraph when you read it.

9  BY MR. WAGNER:

10 Q   Sorry.  The statement, quote, "It seems clear that the

11 Milliman report resembles a desired result and clearly is not

12 an objective evaluation of the actuarial status of the

13 pension funds."  Do you see that?

14 A   I do.

15 Q   And you agreed with that statement at the time; right?

16 A   Yes, I did, at the time.

17 Q   Okay.  You could put that aside.  Now, just a few more

18 questions.  Is one of the goals of the Retirement Systems to

19 provide excellent service to participants?

20 A   Yes.

21 Q   And is that one of the main purposes of your job?

22 A   Yes.

23 Q   And do you work hard to provide excellent service to the

24 participants?

25 A   I do.

```
1   Q    And one element of that service is transparency?
2   A    Yes.
3   Q    And do both funds provide transparency to members?
4   A    Yes.  We try to do that.
5   Q    And from time to time do the funds solicit input from
6   members, from participants?
7   A    I'm not sure I can say that we actually solicit input.
8   We welcome it.
9   Q    You won't refuse it?
10  A    No.
11  Q    Okay.
12  A    We certainly won't refuse it.
13  Q    And we saw from the investment objectives PFRS and GRS
14  have in place rules and parameters about what investments can
15  and cannot be made; right?
16  A    That is correct.
17  Q    And am I right the Retirement Systems try to listen to
18  the concerns of their members -- of the members?
19  A    They do.
20  Q    Now, did you have any input into the development of the
21  plan of adjustment?
22  A    I did not.
23  Q    Has the city asked for your advice with respect to the
24  plan?
25  A    No.
```

1  Q   Have you done any work with Milliman in connection with

2  the plan?

3  A   No.

4  Q   Has Milliman asked for your input?

5  A   No.

6  Q   Has Milliman asked for your advice?

7  A   No.

8  Q   Just to go back, you are the most knowledgeable person at

9  the Retirement Systems who works for the Retirement Systems,

10 right, about those systems?

11 A   Yes.

12 Q   Were you asked to provide any input into the expert

13 reports that were provided by the city in this case?

14 A   No.

15 Q   Were you asked for any advice in connection with the

16 bankruptcy process?

17 A   Yes.

18 Q   What advice was that?

19 A   As it pertains to certain procedures within the

20 Retirement Systems.

21 Q   So just procedural input?

22 A   Yes.

23 Q   And at the time of your deposition, you were not aware

24 that the city had set up a pension task force; right?

25 A   That's correct.

1    Q   And you're not on the pension task force, are you?

2    A   I am not.

3    Q   No one at the city bothered to tell you that they had set

4    up this task force; right?

5    A   That's correct.

6    Q   The first you heard of it was when I raised it; right?

7    A   That's correct.

8    Q   And to your knowledge, no member of your staff is on that

9    pension task force, are they?

10   A   No.

11   Q   Now, I think you said the city set a rate of return of

12   6.75 percent in the plan; right?

13   A   Yes.

14   Q   And the city didn't solicit your advice when it set --

15   when that rate was set; correct?

16   A   That's correct.

17   Q   And if you were asked for input with respect to the plan,

18   am I right that you would have given it?

19   A   Yes.

20   Q   And in your view, would it have been prudent for the city

21   to ask?

22   A   It would not have hurt.

23   Q   And as executive director, have you made every effort to

24   discharge your fiduciary duties to participants?

25   A   Yes.

1   Q   And do you try your level best on behalf of the retirees
2   and the participants?
3   A   I do.
4   Q   And do you believe you've done your job properly?
5   A   Yes.
6   Q   And do you believe your staff has done its job properly?
7   A   Yes.
8   Q   Now, during your tenure at the Retirement Systems, am I
9   right that the two systems have made a number of decisions
10  over the years?
11  A   Absolutely.
12  Q   And to your observation, did they do so -- did they do so
13  in a sound and prudent fashion?
14  A   That one brings me pause because you're talking about a
15  lot of decisions there.
16  Q   Okay.  Let's pass on that since --
17  A   Okay.
18          MR. WAGNER:  Unless your Honor would like the
19  witness to expand.
20          THE COURT:  For now it's your examination.
21          MR. WAGNER:  Okay.  Thank you.
22  BY MR. WAGNER:
23  Q   Let me ask it slightly differently.  To your knowledge,
24  since you've been executive director, have any of the
25  decisions made by the two systems been rash decisions?

1    MS. GREEN:  I'm going to object to the form of the
2    question.  It seems awfully vague.
3    MR. WAGNER:  I think the witness can understand
4    what --
5    THE COURT:  Can you answer the question?
6    THE WITNESS:  That's really just -- I'm sorry.  It's
7    a hard question.  If you understand the Retirement -- both
8    boards meet practically every week for at least six hours a
9    meeting day, and that's a --
10    THE COURT:  All right.
11    THE WITNESS:  -- lot of decisions, so --
12    THE COURT:  Can you answer the question or not?
13    THE WITNESS:  No.
14    BY MR. WAGNER:
15    Q    You cannot answer the question?
16    A    Not truthfully I cannot.
17    Q    Okay.  Let me try a different way.  Have any of the
18    decisions since -- under your tenure as executive director
19    been made under duress?
20    A    No.
21    Q    And do you believe you faithfully perform your duties as
22    executive director of the PFRS and GRS?
23    A    I do.
24    MR. WAGNER:  Thank you.  No more questions.
25    THE COURT:  Any further questions for the witness?

1          MS. GREEN:  Your Honor, I believe that there are

2    individual objectors in the court today to ask --

3          THE COURT:  Um-hmm.

4          MS. GREEN:  -- questions, so --

5          THE COURT:  Okay.  We can do that now if you like.

6    Step forward please, sir.

7          MR. KARWOSKI:  Good afternoon, your Honor.  Michael

8    Karwoski.  I'm one of the individual objectors.  Ms. Green is

9    right.  I have some questions for Ms. Thomas.

10          THE COURT:  Okay.  Go ahead.

11                        CROSS-EXAMINATION

12   BY MR. KARWOSKI:

13   Q   Ms. Thomas, I retired two years ago after 15 years with

14   the city law department.  I had a good experience going

15   through the process with your office.  I don't think we've

16   met, have we?

17   A   No.

18   Q   You first moved into a management role with both systems

19   around 2002?

20   A   With the Police and Fire System in 2002.

21   Q   And your title then -- your first management title was

22   manager one?

23   A   Correct.

24   Q   In that position, among other duties, you were

25   responsible, I believe, for the annual reports for both

1  Systems?

2  A   Yes.

3  Q   Are you familiar with -- you mentioned the annuity

4  savings program with reference to one of the exhibits that

5  was up in your direct.  You're familiar with the annuity

6  savings fund in the General Retirement System?

7  A   I am.

8  Q   And you're familiar with the -- I'll call it ASF.  You'll

9  know what I'm talking about.  You're familiar with the ASF

10 recoupment proposal as it's in the plan of adjustment?

11 A   Yes, I am.

12 Q   The ASF recoupment applies only to GRS members, not PFRS;

13 is that correct?

14 A   That's correct.

15 Q   And you know the ASF recoupment period is July 1, 2003,

16 through June 30th, 2013?

17 A   That's my understanding.

18 Q   And those are fiscal years 2004 through 2013?

19 A   Correct.

20 Q   As executive director, you're familiar with the policies

21 and procedures of the GRS?

22 A   That's correct.

23 Q   And you've testified that you place a high value on

24 excellent customer service; is that right?

25 A   That's right.

Q   One of the services GRS offers to city employees who are considering retirement is providing them with a benefit estimate; is that correct?

A   Yes.

Q   And would you explain what a benefit estimate is?

A   A benefit estimate is -- it's a spreadsheet that will provide for a member the information that allows them to make a decision about their retirement, and depending on what information you ask to put in the estimate, that's what the -- that's what the report will show, so if you want to see how much you are entitled to make tomorrow, it can show you that, but if, on the other hand, you want to know how much you will make at a certain time in the future, it can show you that information also.

Q   So the person can request a benefit estimate for multiple possible retirement dates in the future?

A   Correct.

Q   And that benefit estimate also provides some information about the various retirement options?

A   Yes.

Q   And what are some of those options?

A   Some of the options are leave 100 percent for your beneficiary or 75 or 25.  There's an option for equated on the GRS side if -- depending on how close you are to receiving Social Security, you can coordinate your benefits

1  with Social Security.  And there's also a program where you

2  can opt to pop up should you predecease your beneficiary.

3  Q   And, for instance, in the straight life option, the

4  benefit estimate provides an estimate of what that person's

5  monthly defined benefit pension payment would be?

6  A   Correct.

7  Q   And if a person participated in the annuity savings fund

8  program, the benefit estimate would also give a projected

9  monthly annuity payment if the person chose to roll over the

10 ASF account?

11 A   Yes.  If a person chooses to annuitize; correct.

12 Q   And both the DB monthly pension part and the optional

13 annuity payment if the person rolls the ASF over are

14 projected to last throughout the lifetime of the retirent?

15 A   That's correct.

16 Q   Except for a caveat that the numbers are only estimates

17 and that the final numbers would be calculated at the time of

18 retirement, it's expected that city employees may rely on the

19 benefit estimate in planning their retirement; is that

20 correct?

21 A   That's the intent, yes.

22 Q   Currently, since the bankruptcy has been pending, when a

23 city employee is going through the retirement process, is any

24 advice given to them now about the effect of ASF recoupment?

25 A   Yes.  What happens now is we advise those who are

1  anticipating retiring that there will be a recoupment of the
2  annuity, and although we don't have the final plans or
3  details for how that would be effectuated, we make them aware
4  that this is going to occur.
5  Q   And no such advice about ASF recoupment was given to
6  employees who retired prior to the city filing for
7  bankruptcy; is that correct?
8  A   Correct.
9  Q   Another service that GRS provides to city employees who
10  are ASF participants is an annual annuity statement; is that
11  correct?
12  A   Yes.
13  Q   And would you explain what the annual annuity statement
14  includes?
15  A   The annual annuity statement includes your balance, the
16  amount of interest that you've earned from the previous
17  fiscal year.
18  Q   And you said "the balance."  There are really two
19  balances, aren't there?  There's the tax --
20  A   There's the --
21  Q   Go ahead.
22  A   Yeah.  It should break down between taxable and non.
23  Q   And the nontaxable balance is the total of the member's
24  contributions while they were employed, which have been
25  already taxed?

1  A    Correct.

2  Q    The taxable balance is the total of the interest that's

3  been awarded on the member's ASF account which haven't

4  been -- the total which hasn't been taxed yet?

5  A    Correct.

6  Q    And upon retirement a member who has participated in ASF

7  can choose to either convert all or part of the ASF balance

8  or balances to an annuity or cash out one or both balances;

9  is that right?

10  A    That's correct.

11  Q    The taxable balance can be rolled into another tax

12  deferred retirement account?

13  A    Yes.

14  Q    Where the taxable balance -- or the retirent can choose

15  to cash out the taxable balance at the time of retirement?  A

16  person could take a cash payment?

17  A    Yes.

18  Q    And where the taxable balance is paid directly to the

19  retirent, that payment is reported to the IRS by the GRS as

20  taxable income; is that right?

21  A    Yes.

22  Q    And taxes are either withheld or owed by the retirent to

23  the IRS?

24  A    Correct.

25  Q    Do you withhold?

1   A    We withhold 20 percent.

2   Q    Where taxes have been paid and the retirent is later

3   subject to ASF recoupment, it would be up to the retirent to

4   attempt to get a refund of taxes paid; is that right?

5   A    In that scenario, yes.

6   Q    I mean the GRS wouldn't do anything to help them in terms

7   of getting their taxes back?

8   A    No.

9   Q    Where an ASF participant chooses to roll all or part of

10  the ASF account into an annuity with the GRS, the amount

11  rolled into the annuity from an accounting standpoint is

12  transferred from the ASF, the annuity savings fund, into the

13  annuity reserve fund; is that correct?

14  A    That's correct.

15  Q    And the annuity reserve fund is the fund from which

16  monthly annuity payments are made?

17  A    Correct.

18  Q    Monthly annuity payments are made by GRS, not by the

19  city?

20  A    Correct.

21  Q    And monthly defined benefit pensions are made by GRS, not

22  by the city?

23  A    That's correct.

24  Q    The ASF annuity statement, the annual statement, does not

25  indicate the rate of return earned on GRS funds for that

1    year, does it?  Do you recall?

2    A    The annual statement?  It should, yes.  The annual

3    statement should -- there should be a line that says the

4    interest rate for fiscal year, and then it gives the amount.

5    Q    Are you sure you're not thinking about the statement

6    about the rate that's projected for the coming year, that the

7    rate for the following fiscal year is let's say 7.9 percent,

8    not the rate for the year that just passed?

9    A    You could be correct because the statement that you get

10   is after the fiscal year has passed, and then it's an

11   announcement for what the current rate is.

12   Q    The annuity's statement gives only a dollar amount of the

13   interest that was credited to the participant's ASF account

14   during the previous fiscal year?

15   A    Can you repeat that?

16   Q    The annuity statement --

17   A    Yes.

18   Q    -- only gives the dollar -- well, it gives the dollar

19   amount of contributions that the member made during the year,

20   and it also gives the --

21   A    And interest.

22   Q    -- dollar -- the interest awarded as a dollar amount

23   that's added to that person's account --

24   A    That's correct.

25   Q    -- for the previous fiscal year.  And in years when the

1    annuity savings fund has been credited with so-called bonus

2    interest, that's also reported on the annuity statement,

3    isn't it?

4    A    Yes.

5    Q    When that happens, the member is not told whether that

6    bonus interest is more or less or the same as the rate of

7    return earned on the GRS funds overall?

8    A    No.  I believe it's just one percentage that's shown.

9    Q    So there's nothing on the annuity statement that gives

10   the member information about how much money was -- what the

11   rate of return was that was earned on the GRS funds for that

12   fiscal year?

13   A    Not on the annuity statement, no.

14   Q    And there's no cautionary note on the annuity statement

15   that monthly pension payments may be reduced in the future

16   because of ASF recoupment if the plan is approved, is there?

17   A    No.

18   Q    You supervise the staff of both the GRS and PFRS; is that

19   correct?

20   A    I do.

21   Q    And among the people you supervise are interviewers?

22   A    Yes.

23   Q    And tell us what the duty of an interviewer is?

24   A    It's the interviewer's job to make the members aware of

25   what they need to do to retire, the eligibility,

1    documentation that's required.  They give the member the

2    correct amount, not just from the estimate but the actual

3    amount that they will earn in retirement.  They give them

4    information about their options so that the member can make a

5    wise decision when retiring.

6    Q    And with respect to ASF participants, they would -- the

7    interviewer would advise the person that their options

8    include either cashing out their ASF balance or rolling all

9    or part of it into an annuity?

10    A    Yes.

11    Q    When an ASF participant elects an annuity, the amount of

12    the monthly annuity payment that's projected is shown on the

13    benefit estimate; is that correct?

14    A    Yes.

15    Q    And it's also provided in a more official way by the

16    interviewers in that process that you just described?

17    A    Yes, it is.

18    Q    And several factors go into calculating the amount of the

19    annuity payment?

20    A    Yes.

21    Q    And one of the factors is the projected rate of return

22    for the GRS which is in effect at the time the member is

23    retiring; is that correct?

24    A    That's correct.

25    Q    And you've testified that that rate is currently 7.9

1  percent.  The projected rate of return for the GRS funds is
2  currently 7.9 percent?
3  A    As of June 30th, 2014.
4  Q    And that's been the projected rate for several years,
5  hasn't it?
6  A    That's correct.
7  Q    When the member chooses the annuity option and converts
8  part of the ASF to an annuity, the funds that were converted
9  are moved from the ASF account to the annuity reserve fund;
10  is that correct?
11  A    That's correct.
12  Q    And if those funds -- the balance of the participant's
13  annuity fund while the annuity is being paid out, if those
14  funds earn more than the 7.9-percent rate of return, the
15  amount of the monthly annuity doesn't increase, does it?
16  A    No.
17  Q    It stays the same because those are the agreed-upon terms
18  of the annuity?
19  A    That's correct.
20  Q    Any amounts earned on the member's remaining balance
21  that's been converted to the annuity above the 7.9 percent
22  agreed upon are not credited to the member?
23  A    No.
24  Q    And those additional amounts earned on the member's
25  balance in the annuity reserve fund remain within the system?

1  A    That's correct.

2  Q    When a prospective retiree receives the final calculation

3  at the -- in the interview process of their projected pension

4  in retirement, both the defined benefit part and the annuity

5  part, they should be able to rely on that estimate in

6  planning for their retirement; is that correct?

7  A    That's what the report is intended for, sir, yes.

8  Q    Okay.  And although you're the executive director of both

9  systems, from this point we're going to be talking only about

10 the GRS annual reports --

11 A    Okay.

12 Q    -- or at least a few of them.  And you're familiar with

13 the annual reports of the board of trustees?

14 A    Yes.

15 Q    And you had participated in preparing these reports at

16 various times during your employment with GRS?

17 A    Yes.

18 Q    And now you oversee the work of the Retirement Systems

19 staff that prepares these reports; is that correct?

20 A    That's correct.

21         MR. KARWOSKI:  George, can we get Retirement System

22 Exhibit 2006?

23 BY MR. KARWOSKI:

24 Q    Do you recognize that document?

25 A    I do.

1  Q   And what is it?

2  A   It's the General Retirement System annual report for

3  2011.

4  Q   And that covers the fiscal year that ended June 30th,

5  2011?

6  A   June 30th, 2011.

7        MR. KARWOSKI:  Your Honor, I believe this report --

8  this exhibit has been admitted into evidence without

9  objection.  In case it's not, I move its admission now.

10       THE COURT:  All right.  Thank you, sir.

11       MR. KARWOSKI:  In addition, there are -- your Honor,

12  there are eight other annual reports for the -- within the

13  ASF recoupment period, fiscal years 2004 through 2010, and

14  the 2004 annual report is FGIC Exhibit 3000.  The 2005

15  through 2010 reports are Retirement Systems' Exhibits 2000

16  through 2005 sequentially.

17       THE COURT:  Um-hmm.

18       MR. KARWOSKI:  And I believe those exhibits have

19  also been admitted without objection.  If not, I move their

20  admission.

21       THE COURT:  All right.  Thank you, sir.

22       MR. KARWOSKI:  The 2012 annual report has not been

23  offered into evidence.

24  BY MR. KARWOSKI:

25  Q   Ms. Thomas, the 2013 annual report hasn't been published,

1  has it?

2  A    That's correct.

3         MR. KARWOSKI:  Your Honor, there are audited

4  financial reports for the GRS for fiscal year 2012 and 2013,

5  which are Retiree Committee exhibits 10148 and 10149

6  respectively, and I believe those have also been admitted

7  without objection.

8         THE COURT:  Okay.  Thank you.

9  BY MR. KARWOSKI:

10  Q    Ms. Thomas, calling your attention to page 2 of the 2011

11  report, what is the first item in the introductory section?

12  A    A letter from the board of trustees from the chairperson.

13  Q    And who is that letter addressed to?

14  A    The members.

15  Q    And who are the members?

16  A    The members are the active members, retirees, and

17  beneficiaries of the Retirement System.

18  Q    And the letter is signed by the chairperson of the board

19  of trustees?

20  A    Yes.

21  Q    In that year that was Ms. Susan Glaser?

22  A    Glaser; correct.

23  Q    And how is the annual report distributed to -- is it

24  distributed to members?

25  A    It is.  It is mailed.  It's on the Retirement System

1    website, and it's also mailed.

2    Q    And when it -- typically when is the hard copy of the

3    annual report mailed to members?

4    A    Typically it is mailed in the late spring of each year

5    typically.

6    Q    That would be the spring following the --

7    A    Following --

8    Q    -- fiscal year that ended the previous June 30th?

9    A    Correct.

10   Q    So it's more than six months after the close of the

11   fiscal year?

12   A    Yes.

13   Q    And why does it take that long to distribute the hard

14   copy?

15   A    First is the audit.  Our audit takes place -- starts in

16   July and usually completes in November or December, and then

17   once the audit is complete, there's certain information that

18   goes to the actuary and information that we receive in return

19   from the actuary that is used in the book, and so depending

20   on changes, that can put us pretty far behind.

21   Q    So the annual report is not published until you have the

22   most accurate and complete information available for that

23   fiscal year; is that correct?

24   A    That's correct.

25   Q    And this report includes audited financial data?

1    A    Yes.

2    Q    And what are the main sources of information in the

3    annual report?

4    A    The main sources would be Retirement Systems' staff, our

5    auditors, and our actuary, and the Retirement Systems' asset

6    managers.

7    Q    And you expect that members will rely on the information

8    provided to them in the annual reports?

9    A    Yes.

10   Q    Information concerning the overall financial condition of

11   the GRS is not regularly provided to members by the GRS in

12   any other way, is it?

13   A    Other than on line and in this book, no.  These are the

14   two main sources that we use.

15   Q    And on line is an electronic version of the printed book?

16   A    Correct.

17   Q    So it's still the annual report?

18   A    Correct.

19           MR. KARWOSKI:  George, can we go to the first

20   sentence, last paragraph at the bottom of the third column

21   that begins, "The board's asset allocation delivered"?

22   BY MR. KARWOSKI:

23   Q    Ms. Thomas, would you read that statement?  It's part of

24   the chairperson's letter to members.

25   A    "The board's asset allocation delivered an overall market

value rate of return for the current year net of all expenses
equal to 20.9 percent.  The board has adopted the policy of
computing the recognized rate of return by using a smoothing
formula to average the market value rate of return over seven
years.  For the current year, the recognized rate of return
was 3.5 percent."

Q   And what do you understand by the reference to the
smoothing formula?

A   I'm not certain I understand your question.  Are you
asking me do I understand what smoothing --

Q   Yes.

A   Smoothing is a -- smoothing is a mechanism used by the
actuary to deliver more consistency to -- for funding
purposes from the plan sponsor.

Q   Does the actuary decide what the smoothing formula --
what the smoothing term of years is?

A   No.

Q   And who makes that decision?

A   The board of trustees.

Q   The smoothing period -- and the smoothing period for 2011
was seven years according to this letter?

A   Yes.

Q   The smoothing period hasn't always been seven years, has
it?

A   No.

1  Q  Do you know when it was that the smoothing period went to

2  seven years?

3  A  I can't say for sure on the GRS side because I was with

4  police and fire until the fall of 2012, but I believe it

5  was -- it was either -- I believe it was in the fiscal year

6  of '09, 2010.  I believe that's -- that was when it was

7  changed.

8  Q  And that was a year of large market losses in financial

9  markets; is that correct?

10  A  That's correct.

11  Q  A longer smoothing period works to the benefit of the

12  city, doesn't it?

13      MS. GREEN:  Objection, your Honor.  Again, she's

14  been proffered as a lay witness.  I'm not sure that a proper

15  foundation has been laid that she can answer that question.

16      MR. KARWOSKI:  She has a --

17      THE COURT:  No.  I'll permit it.  Go ahead, ma'am.

18  Answer the question if you can.

19      THE WITNESS:  And your --

20  BY MR. KARWOSKI:

21  Q  A longer smoothing period works to the benefit of the

22  city in higher loss years, doesn't it?

23  A  So a longer smoother period would allow for the plan

24  sponsor, which is the city, to -- their contributions would

25  be less in a --

1   Q   Thank you.

2   A   -- longer smoothing period.

3   Q   Turning your attention back to page 2, the first sentence

4   at the top of the second column, the sentence that begins,

5   "Your board of trustees is pleased to report," would you read

6   that paragraph?

7   A   "Your board of trustees is pleased to report that the

8   Retirement System is in sound actuarial condition.  The board

9   invests all available funds in a diversified portfolio of

10   investments with the objective of maximizing the overall

11   long-term appreciation of the Retirement System's assets

12   while generating sufficient current income to pay the

13   benefits which the members of the System have earned."

14   Q   Thank you.  So the board's -- based on that statement,

15   the board's investment policy is a long-term policy; is that

16   correct?

17   A   Yes.

18   Q   Has the board followed a long-term investment policy for

19   as long as you can remember?

20   A   Yes.

21   Q   And your experience goes back some 26 years?

22   A   It does.

23   Q   Can we go to the top of page 3, the first column

24   beginning, "The General Retirement System," and could you

25   read that paragraph?

1    A    "The General Retirement System is stable and secure and

2    expects to meet all future retirement obligations to its

3    members.  As of June 30th, 2011, the ratio of the System's

4    assets to its liabilities to pay future benefits was 83

5    percent.  When comparing the Retirement System with other

6    public employee retirement plans, the Retirement System ranks

7    very favorably against other such plans as measured by its

8    solvency and ability to meet all future retirement

9    obligations to its members."

10           MR. KARWOSKI:  Can we turn to page 11 of this

11   report?  If you could highlight in the first column under the

12   heading "Annuity Reserves, Annuity Savings Fund" down on the

13   left side under "Revenues" to the third line, which has the

14   caption "Members' Contributions."  And can we focus on that

15   dollar amount?

16   BY MR. KARWOSKI:

17   Q    Ms. Thomas, do you understand what that's reporting?

18   A    The members' contributions into the annuity savings fund.

19   Q    Yes.  Thank you.  And these are voluntary contributions

20   that participants in the ASF made during the fiscal year

21   2011?

22   A    That's correct.

23   Q    Could we go to the fifth column under the heading

24   "Pension Reserves, Pension Accumulation Fund," and the first

25   line under "Revenues, City Contributions," and what is that

1  figure for city contributions under "Pension Accumulation

2  Fund"?

3  A   The city's contributions to the Retirement Systems for

4  the active members.

5  Q   So in 2011 the ASF employee voluntary contributions were

6  about $18 million; is that correct?

7  A   That's correct.

8  Q   The city contributions were a little over $55 million.

9  Just doing the math roughly, the voluntary ASF contributions

10  amounted to almost one-third of the amount contributed by the

11  city to the pension fund; is that correct?

12  A   Yes.

13       MR. KARWOSKI:  Can we put Retiree Committee Exhibit

14  10149 on the screen?

15  BY MR. KARWOSKI:

16  Q   Do you recognize that document?

17  A   Yes, I do.

18  Q   And what is that?

19  A   This is a part of our annual audit statement.

20  Q   And who prepares the annual audit statement?

21  A   Plante Moran.

22  Q   And they're the auditors for the GRS?

23  A   Yes, they are.

24       MR. KARWOSKI:  And if you would go to page 2 under

25  the heading "Emphasis of Matter" -- I guess the next page --

1  BY MR. KARWOSKI:

2  Q    Would you read the first sentence under "Emphasis of

3  Matter"?

4  A    "As described in note one to the financial statements,

5  the City of Detroit has filed for bankruptcy calling into

6  question the collectability of approximately 36 million of

7  contributions receivable due from the city to the plan."

8          MR. KARWOSKI:  And could we go to page 4, "Condensed

9  Financial Information, Contributions," in the first column

10  under the heading "June 30, 2013," "Contributions, Employee,

11  Employer"?

12  BY MR. KARWOSKI:

13  Q    This is the most recent published financial information

14  that's -- that we have today, is that correct, fiscal year

15  through 2013?

16  A    Correct.

17  Q    For the fiscal year 2013, what is the number shown for

18  employee contributions?

19  A    13,395,701.

20  Q    And what is the number shown for employer contributions

21  for 2013?

22  A    26,515,782.

23  Q    So for 2013 the voluntary employee contributions were

24  approximately one-half of the supposedly mandatory city

25  contributions?

1   A   Correct.

2   Q   And the city had not made contributions of approximately

3   $36 million; is that correct?

4   A   The city had not made --

5   Q   Had not made contributions of about 36 million for that

6   year.

7   A   Correct.

8   Q   Can we go to page 29?  What is described on that page,

9   Ms. Thomas?

10  A   The description of funds for the Retirement Systems.

11  Q   And those are the six major funds of the GRS?

12  A   Correct.

13  Q   And would you read the description of the first one, the

14  annuity savings fund?

15  A   "Annuity savings fund.  This fund represents cumulative

16  required and voluntary contributions made by the active

17  employees plus accumulated interest."

18  Q   Why does it refer to required and voluntary contributions

19  for employee contributions?

20  A   I don't know.

21  Q   You're not aware that ASF contributions were required by

22  the city at one time?

23  A   For the General Retirement System?

24  Q   Yes.

25  A   No.

1    Q    And the second fund that's listed there, the annuity

2    reserve fund, you don't have to read that, but that's the

3    fund that we mentioned before.  When a member retires, the

4    actuarial value of their DB pension and the annuity, the DC

5    portion, if they roll it over, are transferred on an

6    accounting basis to the annuity reserve fund?

7    A    That's correct.

8    Q    And the other four funds on that page are not -- well,

9    let me rephrase that.  The first two funds are the annuity --

10    are annuity savings funds.  The annuity savings -- annuity

11    funds, annuity savings and annuity reserve; is that correct?

12    A    Yes.

13    Q    And the other four funds are related to the DB pension;

14    is that correct?

15    A    More to the pension, yes.

16    Q    Although the annuity funds are separate funds for

17    accounting purposes, the money in those funds is commingled

18    with other GRS funds; is that right?

19    A    That's correct.

20    Q    And that includes the various DB pension funds for

21    investment purposes?

22    A    Yes.

23    Q    They're all invested together?

24    A    That's correct.

25    Q    There's no separate set of investments for the ASF that's

1  different from the DB pension funds?

2  A    That's correct.

3        MR. KARWOSKI:  Would you put up City Exhibit 633?

4  Your Honor, I believe this has been admitted for

5  demonstrative purposes.

6  BY MR. KARWOSKI:

7  Q    Ms. Thomas, you have -- I don't think you've seen this,

8  have you?

9  A    Yes.

10 Q    You have?

11 A    I've seen several charts that maybe the picture is

12 different, but the C plus I equals B plus E.

13 Q    Okay.  So you know what that formula means and what those

14 letters stand for?

15 A    Correct.

16 Q    In relation to this diagram, as far as GRS investments

17 are concerned, there's one big blue pot.  There are not

18 several smaller pots for each of the different GRS funds?

19 A    No.

20 Q    Can we go back to Retirement System Exhibit 2006, the

21 2011 annual report, page 11?  I think we were on that page

22 before.  In the first -- make sure we're in the right -- in

23 the first column under "Annuity Reserves," under "Annuity

24 Savings Fund" all the way at the bottom, fund balances at the

25 end of the year, there's a -- what is that figure, the bottom

1  line in the first column?

2  A    Right.  It gives the contributions, the -- and the

3  interest earned less refunds over the year, looks like

4  various transfers that could have occurred and expenses, the

5  balance of the annuity savings fund at the end of the year.

6  Q    So that's the net balance in the annuity savings fund at

7  the end of fiscal year 2011?

8  A    Yes.

9  Q    And just immediately -- the next column to the right, the

10 bottom line, $75,220,724, what is that?  Can you see at the

11 top?

12 A    Yes.  That's the balance of the -- the net balance of the

13 reserve fund.

14 Q    So if you add those two annuity funds together, at the

15 end of fiscal year 2011, it's a total, if my math is correct,

16 of more than $671 million in annuity funds.  If you just --

17 if you rounded it to 600 million plus 75 million, that would

18 be 675 million, so that's approximately two-thirds of a

19 billion dollars that was on deposit as part of the overall

20 GRS funds attributable to annuity funds.

21 A    Correct.

22 Q    And if we go all the way to the lower right-hand -- not

23 all the way, to the second column from the right, the "Total"

24 column, for the year 2011, the 2011 total, the bottom line

25 number is $2,421,000,000, roughly?

1  A    Yes.

2  Q    So at the end of 2011 the two annuity funds together

3  represented more than 27 percent of the total GRS fund

4  balance?

5  A    Yes.  That's what it appears, yes.

6  Q    The annuity savings fund is an important way the city

7  enables employees to supplement their pensions with a defined

8  contribution annuity?

9  A    That's correct.

10 Q    And having --

11          THE COURT:  I'm sorry.  What was your answer?

12          THE WITNESS:  That's correct.

13          THE COURT:  Pull the mike a little closer to you, if

14 you can.  Thank you.

15 BY MR. KARWOSKI:

16 Q    And having two-thirds of a billion dollars more to invest

17 works to the advantage of all GRS members, doesn't it?

18 A    It does.

19 Q    Combining all GRS funds into a single pool for investment

20 purposes has the advantage of spreading the expenses incurred

21 to invest over a large base, doesn't it?

22 A    It does.

23 Q    It also opens up a broader range of investment

24 possibilities?

25 A    Yes, I would agree.

1    Q    It allows greater diversification of investments?

2    A    Yes.

3    Q    So we could say in summary that adding the ASF funds to

4    the city's contributions to GRS works to the benefit of GRS,

5    its members, and the city; is that correct?

6    A    I would agree with that.

7    Q    And the ASF -- the annuity funds, which are part of that

8    total, earn income or suffer losses the same as all of the

9    commingled GRS funds.  The annuity funds share the rise or

10   fall of the total invested pot of money.

11   A    Correct.

12   Q    And 7.9 percent was the targeted rate of return on GRS

13   funds throughout the ASF recoupment period, 2004 through

14   2013; correct?

15   A    That's correct.

16   Q    And the targeted rate of return for individual ASF

17   accounts was also 7.9 percent through those years in the

18   recoupment period; right?

19   A    Yes.

20   Q    An asset allocation mix was selected by the GRS trustees

21   in consultation with your staff and financial advisors to

22   achieve the 7.9-percent rate of return on GRS funds for that

23   year?

24   A    Yes.

25   Q    And that means that if the assets performed as expected,

1  the rate of return on overall GRS funds should average 7.9

2  percent?

3  A    Yes.

4  Q    And ASF money, which are invested as part of the overall

5  pot, should also average 7.9 percent; correct?

6  A    Yes.

7  Q    Can we go to FGIC Exhibit 3000?  Do you recognize that?

8  A    Yes.

9  Q    This exhibit doesn't have the cover page, but what is on

10  page 2?

11  A    The trustee's letter from the chairman to the members.

12            THE COURT:  And what year is this for?

13            THE WITNESS:  This is for the year June 30th, 2004.

14            MR. KARWOSKI:  The fiscal year 2004, the first year

15  of the ASF recoupment period.  And can we go to page 3, the

16  next page to the right?  Would you highlight the first

17  sentence at the top of the first column?

18  BY MR. KARWOSKI:

19  Q    Ms. Thomas, would you read that first sentence?

20  A    "The board's asset allocation delivered an overall market

21  value rate of return for the year net of all expenses equal

22  to 14.8 percent, which is nearly twice the System's actuarial

23  rate of 7.9 percent."

24            MR. KARWOSKI:  And could we go to the second column

25  on page 3, the sentence -- the second sentence beginning,

1  "For the 16 years ended June 30th"?

2  BY MR. KARWOSKI:

3  Q   And would you read that statement?

4  A   "For the 16 years ended June 30th, 2004, the rate of

5  return for the Retirement System was 8.6 percent, which

6  exceeds the system's long-term rate of return objective of

7  7.9 percent despite the difficult financial markets which

8  have held back total fund performance for four of the five

9  years -- four of the past five years."

10 Q   So based on this statement in the 2004 annual report, for

11 the 16 years preceding the ASF recoupment period and through

12 fiscal year 2004, the overall GRS investment policy

13 significantly exceeded its target rate of return of 7.9

14 percent; is that correct?

15 A   Yes.

16 Q   And the annuity fund --

17         THE COURT:  Excuse me.  Is this something you have

18 personal knowledge of, or you're just reading this?

19         THE WITNESS:  I'm assuming -- I'm sorry.  I am

20 assuming that what's in the report is correct.  I do not

21 have --

22         THE COURT:  Please answer my question.

23         THE WITNESS:  -- personal knowledge.

24         THE COURT:  Okay.  You're just reading this?

25         THE WITNESS:  Yes.  I do not have personal

1 | knowledge.

2 |       MR. KARWOSKI: The report speaks for itself, your

3 | Honor.

4 |       THE COURT: Precisely. We don't need the witness to

5 | be reading it to us.

6 |       MR. KARWOSKI: Okay.

7 | BY MR. KARWOSKI:

8 | Q   Given the performance history of the GRS fund, it wasn't

9 | unreasonable for the trustees in 2004 to award 7.9 percent to

10 | ASF accounts, is it?

11 | A   Given the --

12 | Q   The performance history in general. It wasn't

13 | unreasonable to award 7.9 percent on ASF accounts for 2004,

14 | was it?

15 | A   I don't think it was --

16 |       THE COURT: Well, hold on. Did you have anything to

17 | do with that decision?

18 |       THE WITNESS: I was -- no.

19 |       THE COURT: All right.

20 |       THE WITNESS: I don't make any -- I don't give

21 | advice, any financial advice whatsoever to the trustees.

22 |       MR. KARWOSKI: I will move on, your Honor.

23 | BY MR. KARWOSKI:

24 | Q   The trustees are not required to award a particular rate

25 | of interest on ASF accounts, are they?

1          MS. GREEN:  Objection again, your Honor.  As you

2   pointed out a moment ago, she was not employed by the GRS

3   prior to the fall of 2012.  I'm not sure that this witness

4   would be able to testify on personal knowledge.

5          MR. WAGNER:  And I join the objection.

6   BY MR. KARWOSKI:

7   Q   Based on your personal experience as an employee of the

8   Retirement Systems, both PFRS and GRS, for 26 years, is it

9   your understanding that the trustees are required to award

10  interest on ASF accounts?

11         MR. WAGNER:  Objection.

12         THE COURT:  Well, I'll permit the witness to answer

13  as it pertains to the time period for which she was employed.

14         MR. KARWOSKI:  Yes.

15         THE COURT:  With that limitation, ma'am, can you

16  answer the question?

17         THE WITNESS:  Yes.  It's my understanding that one

18  of the requirements of the trustees is to grant interest,

19  yes.

20  BY MR. KARWOSKI:

21  Q   But they can choose --

22         THE COURT:  Right, but any particular interest?

23         THE WITNESS:  Yes.  At times it's been zero.

24         THE COURT:  No, but are they required to award any

25  particular interest?

1          THE WITNESS:  No, no particular interest.

2          THE COURT:  Okay.

3          THE WITNESS:  No.

4    BY MR. KARWOSKI:

5    Q    If no interest were awarded, city employees would be less

6    likely to invest in the annuity savings fund program; is that

7    correct?

8          MR. WAGNER:  Objection.

9          MS. GREEN:  Objection, your Honor.

10         MR. WAGNER:  Foundation.

11         THE COURT:  Sustained.

12   BY MR. KARWOSKI:

13   Q    ASF participants have no control over how funds in the

14   ASF account are invested, do they?

15   A    No.

16   Q    They can't pick and choose among a variety of investment

17   options?

18   A    No.

19   Q    They can't choose a more aggressive or more conservative

20   investment strategy?

21   A    No.

22   Q    Those investment choices are made for them; is that

23   correct?

24   A    That's correct.

25   Q    Once funds have been contributed to an ASF account, they

1  can't be withdrawn until either the member retires or has

2  reached 25 years of service; is that right?

3  A   Or resigns.

4  Q   Or resigns?

5  A   That's correct.

6  Q   So in exchange for the current time period that you're

7  familiar with, the targeted rate of return on the ASF

8  accounts has been 7.9 percent; is that right?

9  A   That's correct.

10  Q   In exchange for that targeted rate of return, ASF

11  participants give up control over their money from the time

12  they first begin contributing until they serve at least 25

13  years, retire, or leave the system; is that right?

14  A   That's correct.

15  Q   So their fate in terms of how their investments do is

16  tied to the fate of the overall GRS funds?

17  A   That's correct.

18          THE COURT:  Of course, that's also true of the city,

19  isn't it; ma'am?

20          THE WITNESS:  That's correct.

21  BY MR. KARWOSKI:

22  Q   Let's look at the highest earnings year within the ASF

23  recoupment period.

24          MR. KARWOSKI:  Could you put up Retirement System

25  Exhibit 2002, please?

1   BY MR. KARWOSKI:

2   Q   Do you recognize that document, Ms. Thomas?

3   A   I do.

4   Q   And what is it?

5   A   This is the GRS annual report for the year ended June

6   30th, 2007.

7   Q   And can we go to page 2?  What are the numbers again?

8          MR. KARWOSKI:  In the third column, would you

9   highlight the sentence following the two bullet points

10  beginning, "The board's asset allocation delivered," or the

11  statement is, "The board's asset allocation delivered an

12  overall market value rate of return for the current year net

13  of all expenses equal to 18.1 percent, which outperformed the

14  system's actuarial rate of 7.9 percent by a factor of 2.3 to

15  one."

16  BY MR. KARWOSKI:

17  Q   Is that what that statement says?

18  A   Yes.

19  Q   Do you know if that was accurate?

20  A   I believe it was accurate.

21  Q   And --

22          THE COURT:  Were you employed by GRS at that time?

23          THE WITNESS:  I was not working with the GRS at that

24  time.

25          THE COURT:  Why do you believe it was accurate?

1          THE WITNESS:  I worked on the annual report.  That

2     was one of my duties.  And I believe that --

3          THE COURT:  You worked on this annual report?

4          THE WITNESS:  This was two thousand and --

5          MR. KARWOSKI:  Seven.

6          THE WITNESS:  -- seven?  I would have -- I would

7     have been asked to review it.  I did not put it together.  I

8     would have been asked to review it.

9          THE COURT:  So someone gave you these figures, and

10    you put it into the report?

11         THE WITNESS:  That's correct.

12    BY MR. KARWOSKI:

13    Q    If that statement of the performance for the year is

14    correct, it doesn't appear unreasonable for the trustees to

15    have decided to award 7.9 percent to the annuity savings fund

16    accounts for that year?

17         MR. WAGNER:  Objection.

18         THE COURT:  Don't answer that question, ma'am.

19    BY MR. KARWOSKI:

20    Q    As executive director, you strive to manage the GRS

21    pension system in compliance with the city charter and city

22    ordinances; is that correct?

23    A    That's correct.

24    Q    And you have the advice of legal counsel, both on staff

25    and outside counsel, to make sure that GRS is in compliance

1  with legal requirements?

2  A    When you say "on staff," are you speaking of --

3  Q    You have a -- you have an attorney on staff for the GRS

4  most of the time, don't you?

5  A    We have general counsel.

6  Q    Yes.  So you have --

7  A    Yes.

8  Q    -- in-house counsel, and you have outside -- at least at

9  some times you have outside counsel, too --

10  A    Correct.

11  Q    -- to assist with legal -- making sure you follow legal

12  requirements?

13  A    That's correct.

14  Q    And you're aware of the 2011 ordinance that amended the

15  city code with respect to the board's -- that limited the

16  board's discretion in awarding ASF interest?

17  A    Yes.

18  Q    And those limits did not exist prior to the effective

19  date of the 2011 ordinance, did they?

20  A    They did not.

21          MR. KARWOSKI:  Could you put up Exhibit -- marked

22  PS --

23          THE COURT:  How much longer will you be, sir?

24          MR. KARWOSKI:  Twenty minutes, your Honor.

25          THE COURT:  All right.  We'll take our afternoon

1  recess at this time and reconvene at 3:35, please.

2         THE CLERK:  All rise.  Court is in recess.

3     (Recess at 3:16 p.m., until 3:35 p.m.)

4         THE CLERK:  All rise.  Court is back in session.

5  You may be seated.

6         THE COURT:  And you may proceed, sir.

7         MR. KARWOSKI:  Would you put Exhibit PS 14020 on the

8  screen, please?

9  BY MR. KARWOSKI:

10 Q   Ms. Thomas, do you recognize that?

11 A   I do.

12 Q   And what is that?

13 A   This was a document given out at one of the informational

14 meetings that the GRS trustees gave for their members.

15 Q   And who is Michael Van Overbeke?

16 A   He's general counsel for the General Retirement System.

17 Q   Is he on your staff?

18 A   He is not on my staff.

19 Q   Is he outside counsel?

20 A   Yes.

21 Q   And he presented this report as part of his presentation

22 at one of the informational -- one or more of the

23 informational meetings?

24 A   Yes.

25 Q   And this report is also on the GRS website; is that

1  correct?

2  A   It is.

3  Q   And Mr. Van Overbeke was authorized to present this

4  material on behalf of GRS?

5  A   That's correct.

6  Q   And the subject matter of this presentation was within

7  the scope of his relationship with GRS at the time he

8  presented it; is that right?

9  A   That's correct.

10        MR. KARWOSKI:  Your Honor, Mr. Quinn and I offered

11  this exhibit in its entirety for admission into evidence, and

12  the city objected to it on the grounds of hearsay and

13  relevance.  And the entire document is 41 pages, the

14  PowerPoint presentation.

15        THE COURT:  You offer it now?  Is that what --

16        MR. KARWOSKI:  I would offer it now, yes, your

17  Honor.

18        THE COURT:  Is there any objection now?

19        MR. MILLER:  Yes, your Honor.  Objection on the part

20  of the city.  It remains irrelevant and hearsay.

21        MR. KARWOSKI:  Your Honor, under --

22        THE COURT:  I get the relevance of it.  Why isn't it

23  hearsay?

24        MR. KARWOSKI:  It's not hearsay under FRE 801,

25  statements that are not hearsay.  801(2)(c) --

1          THE COURT:  Well, why do you offer it?

2          MR. KARWOSKI:  For the -- actually, there are only

3     three pages within it that are relevant to my issue on ASF.

4          THE COURT:  Why do you offer it?

5          MR. KARWOSKI:  To show the manner in which the

6     Retirement System understood the ASF recoupment program and

7     how the ASF recoupment amounts were calculated, to show the

8     methodology.

9          THE COURT:  In other words, you offer it to show the

10    truth of what it says; right?

11         MR. KARWOSKI:  Not necessarily the specific numbers

12    in the chart, your Honor.  There are two pages of bullet

13    points that talk about the -- they're in outline form, and

14    there's one page which is a chart for the ten years in the

15    ASF recoupment period that shows the various interest rates

16    that were awarded over the period --

17         THE COURT:  Okay.  I'll ask it one more time.

18    What's the relevance of it if it isn't to show the truth of

19    what was stated in it?

20         MR. KARWOSKI:  Well, the relevance is to show the

21    truth of what is stated in those two pages.

22         THE COURT:  Okay.  So that's the essence of hearsay,

23    isn't it?

24         MR. KARWOSKI:  Well, it's -- I mean the rule that I

25    reference says it's not hearsay if it's offered against an

1  opposing party, it was made by a person whom the party

2  authorized to make a statement on the subject or was --

3          THE COURT:  Who's the opposing party?

4          MR. KARWOSKI:  The Retirement System.  The

5  Retirement System is a supporter of the plan.  I'm an

6  objector.

7          THE COURT:  The Retirement Systems is --

8          MR. KARWOSKI:  The Retirement System is supporting

9  the plan of adjustment.

10         THE COURT:  So you want to offer it against them,

11 but it's not their plan.

12         MR. KARWOSKI:  They are --

13         THE COURT:  All right.  The objection is sustained.

14 Let's move on.

15 BY MR. KARWOSKI:

16 Q   If you take -- Ms. Thomas, if you take the long-term view

17 as the GR -- you testified the GRS trustees have done;

18 correct?

19 A   Correct.

20 Q   If you take the long-term view, the annuity savings fund

21 program is a net benefit to the General Retirement System,

22 isn't it?

23 A   Yes.

24         MR. MILLER:  Object.  I'm sorry.  Objection, your

25 Honor.  Lack of foundation and -- lack of foundation.

1        MR. KARWOSKI:  The foundation is the testimony that
2    all of the ASF funds are invested together with all the GRS
3    funds, that they're in one big pot.
4        THE COURT:  Well, you've already established that or
5    at least the witness has already testified to that.
6        MR. KARWOSKI:  And the only point I'm making now is
7    that the ASF program adds to the assets of the overall GRS
8    funds and makes the GRS system more sound.
9        MR. WAGNER:  Your Honor, I'll object then because I
10   don't think that that concept is conveyed by the question.
11       THE COURT:  Yeah.  The term -- the phrase "net
12   benefit" is a little bit vague.  Maybe you can sharpen the
13   question, and we'll see if we can get it past these
14   objections.
15   BY MR. KARWOSKI:
16   Q   Ms. Thomas, you testified with respect to a couple of the
17   years that we looked at that the ASF accounts represented --
18       THE COURT:  Just ask a question, please.
19   BY MR. KARWOSKI:
20   Q   Are the ASF accounts a significant part of the total
21   balance in the GRS funds?
22       THE COURT:  All right.  You've already established
23   that it was, what, a third?
24       MR. KARWOSKI:  A third and up to a half in the year
25   in which the city --

1          THE COURT:  All right.

2          MR. KARWOSKI:  -- didn't make its contribution.

3          THE COURT:  All right.  So you've asked this

4    question.

5          MR. KARWOSKI:  Yes, your Honor.

6          THE COURT:  Ask a question you haven't already

7    asked.

8    BY MR. KARWOSKI:

9    Q    The big blue pot in the diagram is bigger as a result of

10   the ASF program, isn't it?

11   A    Yes.

12   Q    And that's a benefit to everybody, is it not?

13         MR. WAGNER:  Objection.

14         MR. MILLER:  Objection.

15         THE COURT:  I'll permit that.  Go ahead.

16         THE WITNESS:  Yes.

17         MR. KARWOSKI:  I have nothing further, your Honor.

18         THE COURT:  All right.  Thank you, sir.  Okay.  Hold

19   on one second.  Is Frenchie Williamson here?  Okay.  This is

20   a pro se person whom the Court granted the opportunity to

21   question Ms. Thomas for 15 minutes, but if he's not here,

22   then we'll have to move on.  Any other questions for the

23   witness?

24         MS. GREEN:  We have some short redirect, your Honor.

25         THE COURT:  Go ahead.

| | |
|---|---|
| 1 | MR. MILLER: City does as well. |
| 2 | THE COURT: Okay. |
| 3 | CROSS-EXAMINATION |
| 4 | BY MS. GREEN: |
| 5 | Q   Good afternoon, Ms. Thomas. |
| 6 | A   Good afternoon. |
| 7 | Q   Jennifer Green on behalf of the Retirement Systems.  I |
| 8 | believe you testified your background was in accounting.  Do |
| 9 | you have any formal education or training in actuarial |
| 10 | science? |
| 11 | A   I do not. |
| 12 | Q   Do you consider yourself an expert in actuarial science? |
| 13 | A   No. |
| 14 | Q   Do you have any formal education or training in |
| 15 | investment advising or consulting for public pensions? |
| 16 | A   I do not. |
| 17 | Q   And would you consider yourself an expert in investment |
| 18 | consulting for a public pension system? |
| 19 | A   No. |
| 20 | Q   Do the systems have independent professional investment |
| 21 | consultants? |
| 22 | A   We do. |
| 23 | Q   And do you also have investment consultants on staff? |
| 24 | A   Yes, we do. |
| 25 | Q   And who is that? |

1  A    Ryan Bigelow is our investment consultant -- our
2  investment officer.
3  Q    And what is his precise title?
4  A    Chief investment officer.
5  Q    Would it be within your role to vote on the investment
6  portfolio asset allocations?
7  A    No.
8  Q    And would it be within your role to oversee the
9  investment portfolios?
10 A    No.
11 Q    Would that be Ryan's job?
12 A    Yes.  That's Ryan's job.
13 Q    How many assets, roughly, are in the GRS and PFRS
14 combined?
15 A    About six billion.
16 Q    How complicated is it to move investments around in a
17 portfolio of that size?
18 A    Tremendously complicated.
19 Q    And the last time the board made certain investment asset
20 allocation changes was in 2013?
21 A    Correct.
22 Q    Have you had an opportunity yet to gauge how these new
23 investments are performing?
24 A    Somewhat with the traditional assets, but it -- we have
25 not had a full cycle yet.

1  Q   And why haven't the Retirement Systems changed the asset

2  allocation yet as far as the negotiated terms of the

3  settlement with the City of Detroit?

4  A   There will be no changes until the plan is actually

5  confirmed.  There have been some discussions and -- you know,

6  discussions with the investment consultants taking into

7  consideration changes that the POA will bring, but they

8  aren't going to make any changes prior to that.  To do it

9  efficiently you really have to plan to move assets, to

10 transfer assets of that size.

11 Q   Let's talk about how the assumed rate of return that you

12 testified was negotiated as part of the bankruptcy process.

13 Were you personally involved in the mediation?

14 A   No.

15 Q   Did the Systems have representation during those

16 negotiations?

17 A   Yes, we did.

18 Q   And who would that include?

19 A   We had special legal counsel, restructuring counsel.  A

20 few of the trustees participated.  Our investment consultants

21 weighed in, and our actuaries participated pretty heavily.

22 Q   And were you briefed by these advisors throughout the

23 negotiations?

24 A   Yes, we were.

25         MR. WAGNER:  Objection, your Honor, to any inference

1  that's being drawn on account of what happened in the

2  mediation.

3          MS. GREEN:  Your Honor, I'm asking outside the

4  mediation as far as was she briefed as to the status of

5  negotiations, whether -- I'm sorry -- whether debriefing

6  occurred at all.

7          THE COURT:  Why is that relevant?

8          MS. GREEN:  I was just going to ask the next

9  question, which was, "And then you -- there was a vote by the

10 board."  It was just a foundational question, but --

11         THE COURT:  The objection is sustained.  You can ask

12 that question.

13         MS. GREEN:  I will.

14 BY MS. GREEN:

15 Q   Did there come a time when the board voted on whether to

16 support the terms of the treatment afforded to Classes 10 and

17 11?

18 A   Yes.

19 Q   And were you present for that vote?

20 A   I was.

21 Q   And the board -- did they vote to support the economic

22 terms contained in the plan of adjustment for Classes 10 and

23 11?

24 A   They did.

25 Q   And do you understand that this includes a 6.75 assumed

1  rate of return?

2  A   I do.

3          MS. GREEN:  Can we pull up Exhibit 483, please?  Oh,

4  I'm sorry.  It's the investment policy.

5          MR. WAGNER:  One second.

6          MS. GREEN:  Is it 10 --

7          MR. WAGNER:  Just give me a second.  40 --

8          MR. MILLER:  4043.

9          MS. GREEN:  4043.  I'm sorry.  And it's -- the page

10  is POA 00626449.

11  BY MS. GREEN:

12  Q   This page was raised with you earlier.  The second bullet

13  point down, I believe, was one that was raised during your

14  cross-examination.  It states, "One of the policies is to

15  address the funding liquidity needs of the plans recognizing

16  current actuarial data, preliminary estimates of future

17  characteristics of the plan and the provisions of state law."

18  Do you recall discussing that during your cross-exam?

19  A   I do.

20          MR. WAGNER:  Your Honor, just for the record, I

21  didn't -- actually did not raise that bullet point, but --

22          MS. GREEN:  Oh, perhaps it was the one below it.

23  I'm sorry.

24          MR. WAGNER:  -- Ms. Green can proceed.

25  BY MS. GREEN:

1   Q   And the one below it, do you recall being asked about

2   that bullet point?

3   A   Yes.

4   Q   So flexibility is one of the purposes behind the

5   investment decisions made by the board?

6   A   Yes.

7   Q   And in a normal situation, who provides the funding for

8   the Systems?

9   A   Can you be more specific?  Who provides the funding?

10  Q   Who's the plan sponsor?

11  A   I'm sorry.  The City of Detroit is the plan sponsor.

12  Q   And a moment ago we reviewed the 2013 annual report in

13  which the systems noted the bankruptcy situation for the City

14  of Detroit.  The bullet point that states funding and

15  liquidity concerns may be considered by the board, do you see

16  that bullet point?

17  A   I do.

18  Q   Has the bankruptcy case raised funding concerns for the

19  Systems?

20  A   Yes, it has.

21  Q   Has the city's financial situation raised funding

22  concerns for the Systems?

23  A   Yes.

24  Q   And why is that?

25  A   The uncertainty of receiving contributions.

1  Q   Has the proposed plan of adjustment raised liquidity

2  concerns as well?

3  A   Yes.

4  Q   And were some of the board's considerations in agreeing

5  to the 6.75 rate of return these funding and liquidity

6  concerns?

7       MR. WAGNER:  Objection.  I think that question goes

8  to mediation issues.

9       MS. GREEN:  No.  I asked about the board's -- the

10 vote, the --

11      THE COURT:  You didn't participate in the mediation

12 at all, did you?

13      THE WITNESS:  No.

14      THE COURT:  All right.  The objection is overruled.

15 Go ahead and answer as best you can.

16      THE WITNESS:  Yes.

17 BY MS. GREEN:

18 Q   And you testified earlier that the 7.9 and eight percent

19 were reasonable at the time they were selected and for the

20 time period they were selected for.  Do you recall that?

21 A   Yes.

22 Q   Did the Systems also believe that 6.75 is a reasonable

23 rate given the current circumstances?

24 A   Yes.

25 Q   And the last time the Systems undertook an analysis of an

1  appropriate asset allocation in 2013, was the city in

2  bankruptcy?

3  A    No.

4           MS. GREEN:  Your Honor, that's all I have.

5           MR. MILLER:  Your Honor, Evan Miller for the City of

6  Detroit, Jones Day.

7                        CROSS-EXAMINATION

8  BY MR. MILLER:

9  Q    Good afternoon.

10  A    Good afternoon.

11  Q    I just have a couple of questions.  During your cross-

12  examination, you were questioned about investment return

13  assumptions.  Just to clarify for the record, who selects the

14  investment return assumption for PFRS and GRS?

15  A    The board of trustees.

16  Q    Okay.  Did you ever select the investment return

17  assumption?

18  A    No.

19  Q    Okay.  Did you ever participate in the selection of the

20  investment return assumption?

21  A    No.

22  Q    You were also questioned about the investment policy

23  statement or investment policy guidelines.  Do you remember

24  that testimony?

25  A    I do.

1  Q   Yeah.  Who selects the investment policy statement for

2  PFRS and GRS?

3  A   The trustees.

4  Q   Did you ever select the investment policy statement --

5  A   No.

6  Q   -- for either PFRS or GRS?

7  A   For neither.

8  Q   Did you ever participate in the selection of the

9  investment policy statement for PFRS or GRS?

10  A   No.

11  Q   The investment policy statement contains asset allocation

12  guidelines; is that right?

13  A   That's correct.

14  Q   I want to ask you a question about the sequence of

15  selection of investment policy statements and asset

16  allocation guidelines.  Customarily did the trustees select

17  the investment return assumption first or the asset

18  allocation guidelines first?

19  A   In a normal situation?  In a normal situation they would

20  select the rate.

21  Q   The investment return assumption?

22  A   The investment return assumption.

23  Q   And then the asset allocation guidelines?

24  A   And then the asset allocation, yes.

25  Q   Are you familiar with concepts to measure pension

1   investment risk?

2   A   Yes.

3   Q   Okay.  Are you familiar with the concept of standard

4   deviation?

5   A   I am -- not well enough to speak on it, no.

6   Q   Okay.  Are you familiar with the concept of value at risk

7   measurement?

8   A   No.

9   Q   Are you familiar with the concept of beta?

10  A   Alpha and beta, not well enough to speak on it.

11  Q   Are you familiar with the term "compound annual return"?

12  A   Yes.

13  Q   Do you know what the compound annual returns are for each

14  of PFRS and GRS over the last 20 years?

15  A   I do not.

16  Q   What about over the last 15 years?

17  A   No, I do not.

18  Q   Were you ever asked to calculate the compound annual

19  returns for either of GRS or PFRS?

20  A   No.

21  Q   Finally, I want to question you regarding the annuity

22  savings funds and particularly the annuity savings fund as it

23  relates to the General Retirement System.  In years in which

24  the General Retirement System return on assets was less than

25  7.9 percent, did the trustees credit interest at the actual

1  return?

2  A    No.

3          MR. MILLER:  No further questions.

4          THE COURT:  Any further questions for the witness?

5          MR. WAGNER:  I have none.

6          THE COURT:  Anything further?  All right.  I'd like

7  to have put on our screens Exhibit 633, please.  And can

8  someone arrange for that for me, please?  Thank you.  You say

9  you've seen this or a version of it before?

10          THE WITNESS:  Yes.

11          THE COURT:  You see that formula at the top?

12          THE WITNESS:  Yes, I do.

13          THE COURT:  Is that an accurate formula for all

14  dates and all times?

15          THE WITNESS:  Yes.  It's just -- it's a general

16  actuarial equation, very basic.

17          THE COURT:  Contributions plus investments equals

18  benefits and expenses?

19          THE WITNESS:  Correct.

20          THE COURT:  If that were true, there wouldn't be any

21  unfunded actuarial liability; right?

22          THE WITNESS:  Well, you'd have a -- you'd have a

23  negative.  It wouldn't be balanced.

24          THE COURT:  Am I right?

25          THE WITNESS:  That's correct.

1        THE COURT:  But we do have an unfunded liability --

2   actuarial liability here, don't we?

3        THE WITNESS:  Yes.

4        THE COURT:  Why do we have an unfunded liability in

5   the City of Detroit for its two pension plans?

6        THE WITNESS:  There are a number of factors that

7   come into play.  I believe the biggest contributing factor is

8   2008, the crisis, the tremendous losses we suffered on our

9   investments.  We have an aging workforce, what we're called,

10  a mature plan, where at this point the retirees are like

11  twice as many as the active employees, so you have less

12  contributions coming in and more benefits going out.  On the

13  police and fire side, you have the -- the plan was frozen.

14  Those are the contributing factors, but I really believe 2008

15  is probably the factor that contributed the most.

16       THE COURT:  Um-hmm.  Is it fair to say that in the

17  years of that recession, whatever they were, the actual

18  returns were less and in some years significantly less than

19  the assumed rate of return?

20       THE WITNESS:  Yes, that's fair.

21       THE COURT:  And is it also fair to say that it's the

22  city that bears the risk and the responsibility when that

23  happens?

24       THE WITNESS:  That's a fair statement.

25       THE COURT:  Now, the risk of the city incurring that

1  kind of liability, is it -- is that risk lower or higher when

2  the assumed rate of return is lower?

3         THE WITNESS:  The risk of the city incurring the --

4  is it higher or lower based on the assumed rate of return if

5  there's --

6         THE COURT:  Well, let me rephrase it for you.  If

7  the assumed rate of return is lower, like, for example, 6.75

8  compared to 7.9, is the city's risk that it will incur an

9  unfunded liability lower or higher all other things being

10  equal?

11         THE WITNESS:  All other things being equal, it's

12  higher.

13         THE COURT:  The city's risk is higher if there's a

14  lower rate of return?

15         THE WITNESS:  Yes.

16         THE COURT:  Explain that to me --

17         THE WITNESS:  The funding --

18         THE COURT:  -- because I thought it was the

19  opposite.

20         THE WITNESS:  The funding -- if the rate of return

21  is lower --

22         THE COURT:  The assumed rate of return.

23         THE WITNESS:  -- the assumed rate of return -- then

24  the city's risk of having to contribute more is more.

25         THE COURT:  Um-hmm.  Okay.  So it's higher.  Yes?

1          THE WITNESS:  Yes.

2          THE COURT:  Yes.  Okay.  Based on your experience

3    with these two pension plans, do you feel that you are

4    qualified to judge the reasonableness of the rates of return

5    of a pension plan?

6          THE WITNESS:  No.

7          THE COURT:  Okay.  That's all I have.  Any follow-up

8    questions?

9          MR. WAGNER:  Yes, your Honor, just --

10                    REDIRECT EXAMINATION

11   BY MR. WAGNER:

12   Q    Ms. Thomas, just a couple of questions occasioned by your

13   Honor's questions.  I'm right that the Retirement Systems

14   rely on professionals to provide advice; right?

15   A    That's correct.

16   Q    And in general, you're satisfied with the advice you've

17   been given by the professionals?

18   A    That's correct.

19          MR. WAGNER:  Nothing further.

20          THE COURT:  One second, please.  Okay.  Anything

21   further for the witness?

22          MS. GREEN:  Nothing further, your Honor.

23          MR. MILLER:  Nothing.

24          THE COURT:  Okay.  And we still do not have Frenchie

25   Williamson here?  You are here, sir?  No.  That's not --

1          MS. GREEN:  That's not Frenchie Williamson.

2          THE COURT:  -- Mr. Williamson.  Okay.  Okay.  So,

3    ma'am, you are excused.  Thank you --

4          THE WITNESS:  Thank you.

5          THE COURT:  -- very much for coming today.

6        (Witness excused at 4:01 p.m.)

7          THE COURT:  Okay.  So is there anything -- any other

8    business before the Court for this afternoon?

9          MR. WAGNER:  Your Honor, just one point with respect

10   to Ms. Kermans from Gabriel, Roeder.  The parties are

11   discussing an arrangement, but we didn't want to go down this

12   road unless it was okay with your Honor.  And, again, we're

13   trying to move the case along as expeditiously as possible,

14   so it may be that the principal parties would agree -- again,

15   we haven't agreed yet but would agree to allow her testimony

16   to come in by way of deposition, allow the individual

17   objector to conduct whatever examination he or she wants, and

18   then the parties would -- might limit their examination to

19   either redirect or cross, but before we went down that road,

20   we wanted to make sure that was okay with your Honor.

21         THE COURT:  That road is fine with me.

22         MR. WAGNER:  Okay.

23         THE COURT:  Absolutely.

24         MR. WAGNER:  So we'll let you know.

25         THE COURT:  Okay.  Anything else for today?  Yes,

1  sir.

2        MR. SOTO:  Your Honor, it appears that the next

3  witness that is up is Mr. Fornia, who will be coming up on

4  the Tuesday after Columbus Day.

5        THE COURT:  Um-hmm.

6        MR. SOTO:  So I don't know that we have any other

7  witnesses for the Court tomorrow.

8        THE COURT:  Okay.  That was going to be my next

9  question.  Do we have any business for tomorrow, or should we

10  take tomorrow off?  Anybody have an opinion on this subject?

11        MR. MILLER:  No business.

12        MR. WAGNER:  No one would refuse a day off having

13  been here 19 days.

14        THE COURT:  Especially on a travel day.  Okay.  So

15  we'll be in recess until 8:30 on Tuesday, October 14th, in

16  this room.  Now, I have been advised that you are allowed to

17  keep your things in this room if that's what you'd like to

18  do, but you are forewarned that there will be other people in

19  this room in the meantime, and so you assume any risk

20  associated with leaving your property here.

21        MS. GREEN:  I don't want to stand between us and the

22  break, but is there a date yet for the individual objectors?

23  Mr. Wagner raised the idea that they could come in and we

24  would do the dep designations for Judy Kermans, and the

25  individual objectors could cross-examine her.  Does the Court

1  have a date in mind before we break?

2          THE COURT:  Well, I thought we would do that after

3  the creditors rest with --

4          MS. GREEN:  Okay.

5          THE COURT:  -- their witnesses, so I guess it

6  wouldn't be unfair to at least ask how long the objectors

7  think their case will take.  If we start on Tuesday, when do

8  you foresee you might be concluded with your case?

9          MR. SOTO:  We would -- we think we'll be done by

10 Thursday, your Honor.

11         THE COURT:  And does that include Macomb County or

12 not include Macomb?

13         MS. O'GORMAN:  We don't expect to have any separate

14 witnesses, your Honor, so --

15         THE COURT:  Okay.

16         MS. O'GORMAN:  -- it would include us, yes.

17         THE COURT:  All right.  So that would be Friday if

18 this schedule holds and then closing argument right after

19 that.  I don't actually foresee that the individual objecting

20 parties who will either testify or examine other witnesses

21 will take that long.  Okay.

22         MR. WAGNER:  Your Honor, just --

23         MR. STEWART:  Your Honor --

24         THE COURT:  Yes.  Couple more things?

25         MR. STEWART:  Sorry.  Geoffrey Stewart of Jones Day.

1    What about the scheduling for the testimony of Ms. Kopacz?

2            THE COURT:  Oh, yes.  I forgot about that.  How

3    could I do that?  Well, that will be -- I want to do that

4    after the objectors put their case in but before we do the

5    pro se objections, so that would be presumably that Friday,

6    so --

7            MR. STEWART:  I'm sure --

8            THE COURT:  -- I guess later that day we would have

9    the objectors -- the pro se objectors' cases --

10           MR. STEWART:  Um-hmm.

11           THE COURT:  -- because I wouldn't foresee Ms. Kopacz

12   taking more than the morning at that point.

13           MR. STEWART:  Right.  Okay.

14           THE COURT:  And then we would move to closing

15   argument perhaps the week after that.

16           MR. STEWART:  Thank you.

17           THE COURT:  All right.  Anything further?

18           MR. MILLER:  Yes, your Honor.  May I approach?

19           THE COURT:  Yes.

20           MR. MILLER:  If the United Auto Workers and the

21   library have not settled out and the --

22           THE COURT:  I thought they had.

23           MR. MILLER:  It is the city's understanding at this

24   juncture that they have not, and so I wanted to confirm that

25   if there is no settlement --

THE COURT: Does Judge Rosen know that?

MR. MILLER: I do not know. I believe he does.

THE COURT: One does not want to surprise Judge Rosen especially with that kind of news.

MR. MILLER: Yeah. I believe he is aware of that --

THE COURT: All right.

MR. MILLER: -- aware of the fact that there is at this juncture apparently no settlement, so I wanted to so advise the Court and ask whether in the unhelpful event that during the next several days no settlement is reached, when would the United Auto Workers --

THE COURT: Well, I have to say I wish I had known that because I would have insisted on doing that tomorrow.

MR. MILLER: Your Honor, I believe there is further mediation scheduled for tomorrow.

THE COURT: All right. So we'll have to figure how to slot that in, and I'll tell you what. If it isn't settled by next Tuesday, we'll have to do that. Will you remind me --

MR. MILLER: I will.

THE COURT: -- or have someone remind me if you're not here?

MR. WAGNER: Your Honor, just one more item. I will be out next Thursday and Friday for the last of the Jewish holidays. I was supposed to be cross-examining Ms. Kopacz,

1   but we'll somehow deal with this.

2           THE COURT:  All right.  Thank you very much.

3           MR. MILLER:  Thank you, your Honor.

4           THE COURT:  All right.  Anything else?  All right.

5   We're in recess.

6           THE CLERK:  All rise.

7       (Proceedings concluded at 4:07 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Brenda Jones | 10 | 32/42/54 | | |
| Michael Duggan | 60 | 123 | 140/143 | 141 |
| Cynthia Thomas | 156 | 181/224/231 | 237 | |

| EXHIBITS: | Received |
|---|---|
| Retiree Committee Exhibit 101.A.7 | 10 |
| City Exhibits 16, 17, 18, 19, 20, 21, 31 | 151 |
| City Exhibit 170 | 104 |
| City Exhibit 171 | 104 |
| City Exhibit 172 | 107 |
| City Exhibit 173 | 103 |
| City Exhibit 174 | 107 |
| City Exhibit 175 | 107 |
| City Exhibit 176 | 108 |
| City Exhibit 324 | 152 |
| City Exhibit 775 | 152 |
| City Exhibit 776 | 153 |
| COPs Exhibit 1035 | 165 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    October 12, 2014
_____          _____
Lois Garrett