## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                            :          Chapter 9
:
CITY OF DETROIT, MICHIGAN,   :          Case No. 13-53846
:
                Debtor.     :          Hon. Steven W. Rhodes
:
:
-----------------------------------------------------x

## JOINT MOTION OF THE CITY OF DETROIT, FGIC AND COP HOLDERS FOR A LIMITED ORDER MODIFYING THE MEDIATION ORDER

The City of Detroit, Michigan (the "City"), as the debtor in the above-captioned case, the COP parties in interest identified in footnote 1 hereto (collectively, the "COP Holders"), and Financial Guaranty Insurance Company ("FGIC," and together with the City and the COP Holders, the "Movants"), hereby jointly move the Court for the entry of a limited order modifying the Mediation Order [Docket No. 322], solely to effectuate the terms of certain Confidentiality Agreements dated October 9, 2014 among the City, FGIC and each COP Holder that permit the Movants to publically disclose information, including mediation communications by and amongst the Movants, in accordance with the terms of such agreements. In support of this Motion, the Movants respectfully state as follows:

## Introduction

1.     Contemporaneously with the filing of this Motion, the City has announced that it has reached agreement on the principal terms of settlements with FGIC, subject to definitive documentation and Court and certain other approvals. If approved, the proposed settlement transactions—which are the product of the Court-ordered mediation process—will result in the withdrawal of the objections of FGIC to the City's plan of adjustment and a dismissal of the invalidity litigation commenced by the City with respect to the COPs. The proposed settlements would not have been possible, but for the mediation process. To induce the COP Holders' participation in the mediation process, the City agreed to enter into a confidentiality agreement with the COPs Holders that only covered a very limited period of time and contained provisions compelling the City to disclose (subject to relief from the Mediation Order) all pertinent information regarding the mediation negotiations. The Movants now jointly seek relief from the Mediation Order to the extent necessary to allow the City to comply with those obligations.

## Background

2.     On August 13, 2013, the Court entered the Mediation Order providing for a facilitative mediation process for matters that the Court referred to mediation in this case. Mediation Order [Docket No. 322]. Pursuant to the Mediation Order, "all proceedings, discussions, negotiation, and writings incident

to mediation shall be privileged and confidential, and shall not be disclosed, filed or placed in evidence." *Id.* at ¶ 4. The City submits that the facilitative mediation process—and the judicial and non-judicial mediators appointed by the Court—have significantly advanced the City's chapter 9 case.

3.    On January 31, 2014, the City commenced that certain adversary proceeding, styled *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.) (the "COP Litigation"). Thereafter, FGIC and certain of the COP Holders intervened and became parties to the COP Litigation. [Docket Nos. 0073, 0086 and 0150].

4.    On September 16, 2014, the City of Detroit filed a Seventh Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 7502] (the "Plan") that has significant support among the City's creditors and other constituents. As of the date of the Plan, however, the City had not reached a consensual resolution with either FGIC or the COP Holders, and such parties remained (i) significant objectors to the Plan and (ii) adverse litigants in the COP Litigation.

5. In the interests of compromise, the City and FGIC continued discussions at various times during the case under the auspices of the Mediation Order concerning a potential consensual resolution of the issues concerning the Plan or the COP Litigation or both. To induce the COP Holders' participation in the mediation process, the City agreed to enter into a confidentiality agreement with the COP Holders that only covered a very limited period of time and contained provisions compelling the City to disclose all pertinent information regarding the mediation negotiations. As such, the City, FGIC and each COP Holder entered into a Confidentiality Agreement on October 9, 2014, the form of which is attached as Exhibit 6-A hereto (each, a "Confidentiality Agreement," and together the "Confidentiality Agreements").

6. Pursuant to the Confidentiality Agreements, and subject to obtaining relief from Mediation Order, the parties agreed to publically disclose information, including mediation communications (referred to as Disclosed Information) by and amongst the Movants, in accordance with the terms of such Confidentiality Agreements on the earlier of (i) October 31, 2014, (ii) the effective date of the Plan, (iii) the mutual agreement of the parties, or (iv) the announcement of the terms of a proposed settlement with either FGIC or the COP Holders or both (the "Disclosure Deadline"). Confidentiality Agreement, Ex. 6-A at ¶¶ 6, 27. The Confidentiality Agreements provide that, among other things, (i) the City will work

with the COP Holders to determine the scope of the Disclosed Information, (ii) the City will make a Public Disclosure, and (iii) the COP Holders shall have the right to make certain Additional Public Disclosures and Further Public Disclosures, each as set forth in the Confidentiality Agreement. *Id.* at ¶¶ 29-30.

7. The Movants also agreed that they would jointly file the instant Motion seeking relief from the Mediation Order to the extent necessary to effectuate the terms of the Confidentiality Agreements prior to the Disclosure Deadline. *Id.* at ¶ 36.

## Basis for Relief Requested

8. Section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") permits courts to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Code]." Under section 105(a) of the Bankruptcy Code, the Court has broad authority to issue and modify orders in aid of settlement and negotiation. Recognizing that creditors may be unable or unwilling to participate in confidential mediation processes if it would restrict their ability to transact in securities, courts in other cases have entered or modified mediation orders to incorporate or recognize provisions that allow for the disclosure of mediation communications to facilitate necessary creditor participation in mediation. *See In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. July 26, 2013) [Docket No. 4379]; *In re Vitro*

*S.A.B. de C.V.*, Case No. 11-33335 (Bankr. N.D. Tex.) (January 26, 2012) [Docket No. 311].

9.       As reported to the Court on October 16, 2014, the City and FGIC have made substantial progress towards a consensual resolution.   Such progress was significantly enhanced by the COP Holders' participation in mediation.   Further, such COP Holders would not have participated in the mediation, absent entry into the Confidentiality Agreements.   As set forth above, two critical components of the Confidentiality Agreements include (1) the City's agreement to publically disclose information, including mediation communications, and (2) the parties' mutual agreement to seek relief from the Mediation Order in order to effectuate the provisions of the Confidentiality Agreements, including publishing information that would otherwise be covered under the Mediation Order.

10.       With the announcement of the proposed settlement, the principal terms of which are attached hereto as Exhibits 6-B and 6-C, much of the information sought to be disclosed pursuant to the Confidentiality Agreements has already become public.   In addition, because the information sought to be disclosed concerns the Movants—who have all consented to such relief—the granting of the relief sought herein will prejudice no party.   Further, because entry into the Confidentiality Agreements was a necessary inducement for the COP Holders'

participation in the mediation, a denial of this Motion would significantly prejudice their interests.

11.     Accordingly, the Movants submit that because public disclosure in accordance with the Confidentiality Agreements will in these circumstances enhance—rather than subvert—the mediation process, relief from the Mediation Order is both necessary and appropriate.

WHEREFORE, the City respectfully requests that this Court: (i) enter an order substantially in the form attached hereto as Exhibit 1, granting the relief sought herein; and (ii) grant such further relief as the Court may deem proper.

Dated: October 16, 2014         Respectfully submitted,


/s/ Heather Lennox
Corinne Ball
Heather Lennox
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
cball@jonesday.com

Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001.2113
Telephone: (202) 879-3939

-7-

Facsimile:  (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300 - Telephone
(248) 359-7700 - Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT


/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

– and –

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

-8-

ATTORNEYS FOR FINANCIAL GUARANTY
INSURANCE COMPANY


Deborah L. Fish
ALLARD & FISH, P.C.
2600 Buhl Building
535 Griswold
Detroit, MI 48226
Telephone: (313) 961-6141
Facsimile: (313) 961-6142

- and –

/s/ Gregory Gennady Plotko
Thomas Moers Mayer
Jonathan M. Wagner
Gregory Gennady Plotko
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

ATTORNEYS FOR DEXIA CRÉDIT LOCAL
AND DEXIA HOLDINGS, INC., PANNING
CAPITAL MANAGEMENT, LP, ON BEHALF
OF FUNDS AND ACCOUNTS MANAGED BY
IT, MONARCH ALTERNATIVE CAPITAL LP,
ON BEHALF OF FUNDS AND ACCOUNTS
MANAGED BY IT, BRONZE GABLE, L.L.C.,
AURELIUS CAPITAL MANAGEMENT, LP,
ON BEHALF OF ITS MANAGED ENTITIES,
STONE LION CAPITAL PARTNERS L.P., ON
BEHALF OF FUNDS AND ACCOUNTS
MANAGED BY IT AND BLUEMOUNTAIN
CAPITAL MANAGEMENT, LLC ON BEHALF

OF FUNDS AND ACCOUNTS MANAGED BY IT

## SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None  [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None  [No Affidavits Filed Specific to This Motion] |
| Exhibit 6 | A.  Form of Confidentiality Agreement |
| | B.  JLA Development Agreement Term Sheet |
| | C.  Structure Outline |

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
------------------------------------------------------x
                                              :
In re                                         : Chapter 9
                                              :
CITY OF DETROIT, MICHIGAN,                     : Case No. 13-53846
                                              :
                          Debtor.             : Hon. Steven W. Rhodes
                                              :
                                              :
------------------------------------------------------x
```

## <u>LIMITED ORDER MODIFYING THE MEDIATION ORDER</u>

This matter coming before the Court on the *Joint Motion Of The City Of Detroit, FGIC And COP Holders For A Limited Order Modifying The Mediation Order* (the "<u>Motion</u>"), filed by the Movants; and the Court being fully advised in the premises;

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED.

2.     The Mediation Order is hereby modified solely to the extent necessary to allow the Movants to comply with the provisions of the Confidentiality Agreements, including, but not limited to, the provisions relating to Public Disclosure, Additional Public Disclosure and Further Disclosure (as each is defined in the Confidentiality Agreements).

**EXHIBIT 2**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-------------------------------------------------x
                                                 :
In re                                            : Chapter 9
                                                 :
CITY OF DETROIT, MICHIGAN,                        : Case No. 13-53846
                                                 :
                            Debtor.              : Hon. Steven W. Rhodes
                                                 :
                                                 :
-------------------------------------------------x
```

## NOTICE OF MOTION AND OPPORTUNITY TO RESPOND

**PLEASE TAKE NOTICE** that on October 16, 2014, the City of Detroit, Michigan (the "City"), as the debtor in the above-captioned case, the COP parties in interest identified in footnote 1 hereto (collectively, the "COP Holders"), and Financial Guaranty Insurance Company ("FGIC," and together with the City and the COP Holders, the "Movants"), jointly moved for entry of a limited order modifying the Mediation Order [Docket No. 322], solely to effectuate the terms of certain Confidentiality Agreements dated October 9, 2014 among the City, FGIC and each COP Holder that permit the Movants to publically disclose information, including mediation communications by and amongst the Movants, in accordance with the terms of such agreements.

**PLEASE TAKE FURTHER NOTICE** that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the City's Motion, or you want the Bankruptcy Court to consider your views on the Motion, within 17 days[1] you or your attorney must:

---

[1]  Concurrently herewith, the Movants are seeking an ex parte motion to shorten notice of and expedite the hearing on the Motion (the "Motion to Expedite"). If the Court grants

1.     File a written objection or response to the Motion explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

Jones Day
222 East 41st Street
New York, New York 10017
Attention: Heather Lennox

-and-

Pepper Hamilton LLP
Suite 1800, 4000 Town Center
Southfield, Michigan 48075
Attn: Robert Hertzberg and Deborah Kovsky-Apap

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, TX 77002
Attn: Alfredo R. Pérez

-and-

WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009

---

the Motion to Expedite, an order will be entered setting forth the shortened deadline to respond to the Motion.

Attn: Ernest J. Essad Jr. & Mark R. James

-and-

ALLARD & FISH, P.C.
2600 Buhl Building
535 Griswold
Detroit, MI 48226
Attn:  Deborah L. Fish

- and –

KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Attn: Thomas Moers Mayer
Jonathan M. Wagner

2.      If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE** that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.

**[signature page follows]**

Dated: October 16, 2014          Respectfully submitted,

/s/ Heather Lennox
Corinne Ball
Heather Lennox
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile:  (212) 755-7306
cball@jonesday.com

Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001.2113
Telephone: (202) 879-3939
Facsimile:  (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300 - Telephone
(248) 359-7700 - Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

– and –

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

ATTORNEYS FOR FINANCIAL GUARANTY
INSURANCE COMPANY


Deborah L. Fish
ALLARD & FISH, P.C.
2600 Buhl Building
535 Griswold
Detroit, MI 48226
Telephone: (313) 961-6141
Facsimile: (313) 961-6142

- and –

/s/ Gregory Gennady Plotko
Thomas Moers Mayer
Jonathan M. Wagner
Gregory Gennady Plotko

KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

ATTORNEYS FOR DEXIA CRÉDIT LOCAL
AND DEXIA HOLDINGS, INC., PANNING
CAPITAL MANAGEMENT, LP, ON BEHALF
OF FUNDS AND ACCOUNTS MANAGED BY
IT, MONARCH ALTERNATIVE CAPITAL LP,
ON BEHALF OF FUNDS AND ACCOUNTS
MANAGED BY IT, BRONZE GABLE, L.L.C.,
AURELIUS CAPITAL MANAGEMENT, LP,
ON BEHALF OF ITS MANAGED ENTITIES,
STONE LION CAPITAL PARTNERS L.P., ON
BEHALF OF FUNDS AND ACCOUNTS
MANAGED BY IT AND BLUEMOUNTAIN
CAPITAL MANAGEMENT, LLC ON BEHALF
OF FUNDS AND ACCOUNTS MANAGED BY
IT

# **EXHIBIT 4**

## CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing *Joint Motion Of The City Of Detroit, FGIC And COP Holders For A Limited Order Modifying The Mediation Order* was filed and served via the Court's electronic case filing and noticing system on this 16th day of October, 2014.

/s/ Heather Lennox
Heather Lennox

**EXHIBIT 6-A**

<u>**CONFIDENTIALITY AGREEMENT**</u>

This Confidentiality Agreement (this "Agreement") is effective as of October 9, 2014 by and between (i) the City of Detroit (the "City"), (ii) Financial Guaranty Insurance Company ("***FGIC***") and (iii) the undersigned counterparty or counterparties (collectively, the "***Counterparty***" and, together with the City and FGIC, the "***Parties***").

**WHEREAS**, the Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation, and the Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation created each of (i) the Detroit Retirement Systems Funding Trust 2005 pursuant to the Trust Agreement, dated June 2, 2005, among the Service Corporations and U.S. Bank National Association as trustee and (ii) the Detroit Retirement Systems Funding Trust 2006 pursuant to the Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association as trustee;

**WHEREAS**, the Detroit Retirement Systems Funding Trust 2005 issued certain Taxable Certificates of Participation Series 2005 (the "***2005 Pension Funding Securities***") and the Detroit Retirement Systems Funding Trust 2006 issued certain Taxable Certificates of Participation Series 2006 (the "***2006 Pension Funding Securities***" and collectively with the 2005 Pension Funding Securities, the "***Certificates of Participation***");

**WHEREAS**, the Counterparty beneficially owns Certificates of Participation in the amounts set forth on the attached Schedule A;

**WHEREAS**, the City has proposed that certain Seventh Amended Plan for the Adjustment of Debts of the City of Detroit (September 16, 2014) [Docket No. 7502] (the "***Plan***");

**WHEREAS**, the Counterparty and FGIC have objected to or opposed confirmation of the Plan;

**WHEREAS**, the Parties and their Representatives (as defined below) wish to engage in good faith, arm's length settlement discussions regarding a consensual resolution of their disputes under or in respect of the Certificates of Participation and the Plan ("***Proposed Settlement***");

**WHEREAS**, in connection with the Proposed Settlement, the City has agreed to furnish the Counterparty with certain confidential information, subject to the execution and delivery of this Agreement.

**NOW, THEREFORE**, the Parties hereby agree as follows:

**A. Confidentiality**

1.      The City and, as may be necessary or applicable, its Representatives are furnishing the Counterparty with information solely in connection with the Proposed Settlement. The Counterparty agrees to treat as confidential, and maintain the confidentiality of, any Confidential Information, subject to the terms and conditions set forth herein.

1

2.     The term "*Confidential Information*" as used herein means any and all nonpublic information concerning the City (including, without limitation, accounting, financial and operational information) furnished to the Counterparty or its Representatives by or on behalf of the City with respect to the Proposed Settlement among the Parties, whether intentionally or unintentionally, directly or indirectly through Representatives, in any manner, including in written form, orally or through any electronic, facsimile or computer-generated means of communication, together with analyses, compilations, studies or other documents or records prepared by the Counterparty or its Representatives to the extent that such analyses, compilations, studies, documents or records contain or otherwise reflect or are generated from information provided by the City and its Representatives, subject to the exclusions set forth below.

3.     The term "*Confidential Information*" as used herein does not include information that: (a) is already in the Counterparty's or its Representatives' possession on a non-confidential basis, provided, however, that any nonpublic information previously furnished to the Counterparty's Representatives by the City or its Representatives and then provided to a Counterparty after the execution of this Agreement shall be deemed to be "Confidential Information"; (b) is or becomes generally available to the public other than through a Counterparty's breach of the terms hereof or FGIC's breach of any obligation to keep such information confidential (but solely with respect to the City's Confidential Information); (c) becomes available to the Counterparty or its Representatives on a non-confidential basis from a source other than the City or its Representatives if, insofar as is known to the Counterparty, such source is not bound by a confidentiality agreement with, or other obligation of secrecy to, the City or another party to keep such information confidential; (d) is developed by the Counterparty not in violation of this Agreement; (e) is identified as non-confidential in writing at the time of delivery or thereafter by the City or its Representatives; (f) such information that becomes non-confidential pursuant to a Public Disclosure, Additional Public Disclosure, or Further Disclosure (each, as defined below), or (g) was provided to the Counterparty (or its predecessor in interest) pursuant to any of the documents governing the Certificates of Participations as information such Counterparty (or its predecessor in interest) was entitled to under such documents in its capacity at the time of receipt as a beneficial owner (or investment advisor or manager on behalf of a beneficial owner) of such Certificates of Participation.

4.     The Counterparty hereby agrees that the Confidential Information will be used solely in connection with its consideration and evaluation of the Proposed Settlement among the Parties and will be kept confidential by the Counterparty and will not be disclosed to any third party, except as otherwise provided herein. The Confidential Information may be disclosed:

(a) to the Counterparty's Representatives that the Counterparty reasonably determines need to know the Confidential Information, provided, however, that: (i) the Counterparty informs each such Representative of the confidential nature of the Confidential Information and directs the Representative to keep such Confidential Information confidential consistent with the terms of this Agreement; (ii) the Representative agrees to keep confidential all Confidential Information consistent with the terms of this Agreement; and (iii) the Counterparty shall be liable for any disclosure of any Confidential Information by such Representatives that is inconsistent with the terms of this Agreement;

2

(b) pursuant to subpoena, interrogatory, request for information or documents, deposition, regulatory authority, self-regulatory authority, civil investigative demand or applicable judicial or governmental order (including, to the extent required by law, in connection with a request of the Executive Branch of the United States or the Comptroller General of the United States, or a request of applicable regulators), subject to the provisions set forth below;

(c) as otherwise required by law, legal process, regulation or rule, or supervisory, regulatory (including regulatory authorities, foreign and domestic bank auditors and bank examiners, applicable securities exchanges, applicable foreign and domestic governmental insurance departments, and the Financial Industry Regulatory Authority), or self-regulatory authority (any of the foregoing, a "***Regulator***"), in each case subject to the provisions set forth below;

(d) to the extent that the City consents in writing, provided, however, that the Counterparty and its Representatives may not use any of the Confidential Information for the purposes of bringing any action, claim or proceeding against the City or the City's Representatives except to the extent that such Confidential Information would otherwise be or become discoverable pursuant to applicable rules of procedure or by court order determining the discoverability of such information and with respect to sealing of the Confidential Information;

(e) to (i) any other person who is a holder of Certificates of Participation if such person is (x) listed on Schedule A hereto or (y) has executed a confidentiality agreement with the City regarding the subject matter hereof in form and substance substantially similar to this Agreement, as well as, in each case, any Representative of any such person, provided that, with respect to any person not listed on Schedule A, the Counterparty has received written confirmation from the City or its Representatives that the applicable person has executed a confidentiality agreement with the City (which written confirmation shall be provided by the City within two business days following such request) or (ii) FGIC as well as any Representative of FGIC; and

(f) to the extent not otherwise required in accordance with Paragraph 4(c), to a Regulator upon request of such Regulator, provided that the Counterparty shall: (i) inform the Regulator of the confidential nature of the Confidential Information; (ii) to the extent reasonably practicable request in writing that the Regulator keep such Confidential Information confidential in accordance with the terms hereof; (iii) to the extent reasonably practicable provide such information orally and limit the transfer of Confidential Information to the Regulator in written form; (iv) prominently mark any written Confidential Information provided to the Regulator as "Confidential" if not previously so marked; (v) only disclose Confidential Information to the extent reasonably necessary to enable the Regulator to regulate the Counterparty or its affiliates in accordance with applicable law, rule, regulation, court order or other judicial or administrative process, including evaluating the Proposed Settlement in connection therewith; and (vi) not provide, file or submit the Confidential Information in any proceedings before any Public Body (as such term is defined below) except as permitted by and in accordance with the terms of Paragraph 8 below.

5.      If the Counterparty or any of its Representatives are requested or required by subpoena, interrogatory, request for information or documents, deposition, regulatory authority, self-regulatory authority, civil investigative demand, applicable judicial or governmental order or other request to disclose any of the Confidential Information or reasonably believes that it is legally required to disclose any of the Confidential Information to a third party, the disclosing party shall provide the City with written notice of any such requirement (to the extent permitted by law, regulation, regulatory authority or self-regulatory authority) as promptly as reasonably practicable and, to the fullest extent possible, prior to disclosure of such Confidential Information, so that the City may seek a protective order or other appropriate remedy or agree to waive compliance with this Agreement with respect to the proposed disclosure; provided, however, that no notice shall be necessary where disclosure of Confidential Information is made to any regulatory authority of competent jurisdiction during the ordinary course of its supervisory or regulatory function. If any such protective order or other remedy is not obtained, and absent an advance written waiver by the City of compliance with the provisions of this Agreement, the disclosing party shall be permitted to furnish that portion of the Confidential Information (or take such action) as is legally required, provided that the Counterparty will, upon request, reasonably cooperate with the City in its efforts to seek to limit disclosure of the Confidential Information to the fullest extent possible. In any event, the disclosing party will not oppose, and will reasonably cooperate with, any reasonable efforts by the City to obtain reliable assurance that confidential treatment shall be accorded any Confidential Information so furnished.

6.      The Counterparty shall take proper care to assure that all Confidential Information is maintained in a secure location and to avoid all unnecessary duplication or distribution of the Confidential Information.  This Agreement shall terminate as of the earliest of, as applicable: (a) the effective date of any plan for the adjustment of the City's debts under chapter 9 of title 11 of the United States Code; (b) 5:00 p.m. (local time in New York, New York, USA) on October 31, 2014; (c) upon mutual consent of the Parties; or (d) upon the Disclosure Deadline (as defined below) (any such event, the "***Termination Event***").  Upon the occurrence of any Termination Event, the Counterparty promptly will upon written request by the City deliver to the City or at Counterparty's discretion, destroy (or if such destruction or delivery is not possible or consistent with legal or regulatory policies hold subject to this Agreement) all: (a) Confidential Information provided to the Counterparty provided, that Counterparty and its Representatives shall be permitted to retain all or any portion of the Confidential Information, in accordance with the confidentiality obligations specified in this Agreement for the term hereof, to the extent such information is no longer Confidential Information or is required by any applicable law, rule, regulation, code of ethics, Counterparty's or its Representatives' internal document retention policy, or by a competent judicial, governmental, supervisory, regulatory or self-regulatory body, foreign and domestic, or as may be stored on magnetic backup disks or electronically as part of the Counterparty's or its Representatives' standard archiving process. If requested by the City, the Counterparty shall provide a certification as to the destruction of any Confidential Information in accordance with the foregoing provisions. The post-Termination Event obligations of the Counterparty contained in this paragraph will continue for a period of one year from the date of the Termination Event.  For the avoidance of doubt, the obligations set forth in paragraphs 27-31 shall survive the occurrence of the Termination Event.

4

7.      The Counterparty understands that neither the City nor its Representatives makes any representation or warranty hereunder as to the accuracy or completeness of the Confidential Information. The Counterparty further agrees that the City and the City's Representatives shall not have any liability to the Counterparty or its Representatives resulting from their use of the Confidential Information.

8.      Without limiting the generality of any provision of this Agreement, if the Counterparty determines that it is necessary to disclose or describe the substance of any Confidential Information in a motion, pleading, statement, submission, response or other document (any such document, a "*Filing*") filed with or submitted to any court, board, arbitrator, arbitration panel, other tribunal, department, agency, administrative body or other public body or entity (collectively, a "*Public Body*"), prior to such Filing, the Counterparty shall move the Public Body to make such Filing under seal or through some comparable protective mechanism. Further, if the Counterparty determines that it is necessary to disclose or describe the substance of any Confidential Information through oral disclosure in any Public Body (an "*Oral Disclosure*"), prior to such Oral Disclosure, the Counterparty shall: (a) to the extent reasonably practicable, notify the City thereof promptly upon such determination; and (b) move the Public Body for authority to make such disclosure in camera or in some other protective manner. Except as otherwise provided in this Agreement, Confidential Information shall not be disclosed absent the express written consent of the City. If the Counterparty or the City seeks a protective order or other remedy in accordance with this Agreement, the Counterparty agrees that (to the extent permitted by law) it will not publicly disclose Confidential Information until the matter has been resolved by a court of competent jurisdiction.

9.      Counterparty agrees to be responsible for any breach of this Agreement by its Representatives other than any such Representative who (a) separately enters into a confidentiality agreement with the City concerning the subject matter hereof or (b) executes a joinder to this Agreement in form and substance reasonably acceptable to the City and executed by the Parties, which obligates such Representative to abide by the terms and conditions of this Agreement.

## B. Damages

10.     The Counterparty understands and agrees that money damages will not be a sufficient remedy for its breach of any provision of this Agreement and that the City shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any breach of this Agreement (regardless of whether damages may or may not be readily quantifiable and without posting a bond or other security). Such remedy shall be in addition to all other remedies available at law or equity to the City.

## C. Miscellaneous

11.     This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without giving effect to the otherwise applicable principles of law as to conflicts or choice of law of such state.

12.     Unless and until a definitive agreement has been executed and delivered memorializing a Proposed Settlement, none of the City and its Representatives, FGIC and its Representatives, or Counterparty and its Representatives will be under any legal obligation with respect to a Proposed Settlement by virtue of this Agreement except for the matters specifically agreed to herein.

13.     The term "*person*" as used in this Agreement shall be broadly interpreted to include, without limitation, any corporation, company, partnership, the media, limited liability company, group, joint venture, union, government agency, political subdivision or individual.

14.     The term "*Representatives*" as used in this Agreement means employees, officers, directors, partners, members, controlled affiliates, counsel, consultants, accountants, experts, auditors, examiners, financial advisors or other agents or professionals.

15.     If any portion of this Agreement shall be declared invalid or unenforceable, the remainder of this Agreement shall be unaffected thereby and shall remain in full force and effect to the extent that the intent and purpose of this Agreement may be fulfilled.

16.     This Agreement may be signed in one or more counterparts (including by means of electronically transmitted signature pages), each of which need not contain the signature of all parties hereto, and all of such counterparts taken together shall constitute a single agreement.

17.     This Agreement represents the entire agreement of the Parties hereto with respect to the subject matter hereof. This Agreement may be modified or waived only by a separate writing executed by the City and the Counterparty. No course of dealing between the Parties shall be deemed to modify or amend any provision of this Agreement.

18.     It is agreed that no failure or delay by the City, FGIC or Counterparty in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder.

19.     Nothing herein shall alter, limit, replace or modify any existing confidentiality agreements between the City and any other party, which agreements shall remain valid in accordance with their terms.

20.     Nothing contained herein shall prejudice Counterparty's ability to obtain Confidential Information by way of discovery or other legal manner or limit Counterparty's use of any such Confidential Information obtained by way of discovery or other legal manner pursuant to applicable laws or rules of procedure.

21.     Nothing contained herein shall restrict the use by the City of Confidential Information or limit or preclude the City from raising objections to the production or disclosure of information or documents, or the terms and conditions of such disclosure.

22.     The Parties hereby irrevocably and unconditionally agree that exclusive jurisdiction with respect to any issues, actions, suits or proceedings arising out of or relating to this Agreement shall be vested in the United States Bankruptcy Court for the Eastern District of

6

Michigan (or, if the reference is withdrawn, the United States District Court for the Eastern District of Michigan).

23.     Except as otherwise provided herein, all notices and other communications to the City or the Counterparty required or permitted under this Agreement shall be in writing and shall become effective when delivered by facsimile (confirmed by mail), overnight courier service, registered or certified mail (postage prepaid), hand delivery or electronic mail, addressed as follows or to such other addresses as may be thereafter designated in writing by such party to the other parties:

> City of Detroit
> Attn: Corporation Counsel
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, Suite 500
> Detroit, Michigan 48226
>
> With copies to: Jones Day
> Attn: Corinne Ball & Benjamin Rosenblum
> 222 East 41st Street
> New York, New York 10017
> cball@JonesDay.com
> brosenblum@JonesDay.com
>
> The Counterparty:
>
> c/o Kramer Levin Naftalis & Frankel LLP
> Attn: Thomas Moers Mayer, Esq. & Gregory G. Plotko
> 1177 Avenue of the Americas
> New York, New York 10036
> tmayer@kramerlevin.com
> gplotko@kramerlevin.com

24.     This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns. This Agreement may not be assigned by the Counterparty without the prior written consent of the City, which consent shall be granted or not according to the City's sole discretion. There are no third-party beneficiaries of this Agreement.

25.     The Counterparty is aware that, subject to certain exceptions, United States securities laws restrict certain persons with material non-public information about issuers, obtained directly or indirectly from such issuers, from purchasing or selling securities of such issuers, or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities on the basis of such information. The Counterparty agrees that it and its Representatives are solely responsible for compliance with this paragraph and the United States securities or criminal laws in respect of any Confidential Information.

26.     The City acknowledges that the Counterparty (i) may, but has no obligations to, establish an information blocking device or "***Ethical Wall***" between the Counterparty's employees who receive the Confidential Information and its other employees involved in trading and investment advisory matters concerning Certificates of Participation and securities issued by the City (such other employees, "***Trading Personnel***") and (ii) reserves the right for its Trading Personnel to buy and sell Certificates of Participation and securities issued by the City without the participation of the persons who have access to the Confidential Information, provided that such Ethical Wall requires Counterparty to (a) maintain all Confidential Information in a secured location(s) inaccessible to Trading Personnel, and (b) not receive any information regarding the Counterparty's trading activity in respect of Certificates of Participation or securities issued by the City prior to the consummation of such trading activity other than such information (including customary reports) the Counterparty receives in the ordinary course.  The City acknowledges that Counterparty may, after the date hereof, buy and sell Certificates of Participation and securities issued by the City, pursuant to a procedure established by Counterparty which maintains an Ethical Wall preventing persons who have access to the Confidential Information pursuant to this Agreement from participating in such sales or purchases.  To the extent Counterparty chooses to establish such procedures and consummate such purchases or sales, Counterparty acknowledges that the City is not confirming the efficacy, appropriateness or legality of such procedures and whether such purchases or sales are appropriate or legal.

27.     On the earliest of the date and time as (a) the City publicly announces the terms of an agreement with the Counterparty or FGIC regarding the Proposed Settlement, or (b) the occurrence of a Termination Event (such earliest date and time of the immediately preceding clauses (a), and (b), the "***Disclosure Deadline***"), the City shall publicly disclose all Disclosed Information by filing a report or making a public statement in the Bankruptcy Court or an alternative public statement (such as a press release that is widely disseminated or another form consented to by the Counterparty) (such report or statement, the "***Public Disclosure***"), which Public Disclosure may include a reference to the internet address of the emergency manager or bankruptcy case website that the City may utilize as the means to publicly disclose Confidential Information in compliance with this Agreement.  At least 48 hours before the Disclosure Deadline, the City shall provide to the Counterparty and their respective Representatives for their review and comment a draft of the Public Disclosure that it intends to disclose pursuant to this paragraph.  The Counterparty shall be entitled to deliver to the City and to FGIC reasonable requests for additions or deletions to or other modifications of such draft Public Disclosure (the "***Requested Modifications***").  The City will thereafter work in good faith to incorporate the Requested Modifications into the Public Disclosure.

28.     The term "***Disclosed Information***" as used herein means: (a) the fact that negotiations between the City, FGIC and the Counterparty concerning the Proposed Settlement have taken place; (b) whether such negotiations are or are not continuing; (c) that the City has provided such Counterparty with, or has provided such Counterparty access to, Confidential Information; (d) if an agreement has been reached concerning the terms of a Proposed Settlement (including any agreement among FGIC and the holders of Certificates of Participation not involving the City), a detailed description of the terms of such agreement, to the extent known to the City; (e) if an agreement has not been reached concerning the terms of a Proposed Settlement, the fact that such an agreement has not been reached and the last term sheet(s) or similar

8

document(s) delivered by the City to the Counterparty and/or by such Counterparty to the City that memorializes the terms of a Proposed Settlement (including any verbal offers) as well as a detailed description of any failed proposals to the extent not set forth in the last term sheet(s) or similar document(s) (including any proposed agreement among FGIC and the holders of Certificates of Participation not involving the City), to the extent known to the City (the Confidential Information in this clause (e), the "***Failed Proposal Information***"), and (f) all other written or oral Confidential Information, to the extent known to the City, that is necessary to ensure that a Counterparty does not possess any Confidential Information that would prohibit such Counterparty from buying or selling Certificates of Participation, securities issued by the City or FGIC-insured securities on or after the Disclosure Deadline in accordance with United States securities laws.

29.    In the event the City fails to make public the Public Disclosure on or following the Disclosure Deadline or if such Public Disclosure fails to include all Disclosed Information identified by a Counterparty in its Requested Modifications, each such Counterparty or its Representatives shall be permitted without any liability whatsoever, to make a public disclosure of (i) all Disclosed Information in the event the City fails to make public the Public Disclosure or (ii) such Disclosed Information identified by such Counterparty in its Requested Modifications that has been excluded from the Public Disclosure in the event the City has made public the Public Disclosure, in each case, the disclosure of which, in the Counterparty's good faith belief after consultation with legal counsel (which may be in-house counsel), is necessary to ensure that the Counterparty may buy or sell Certificates of Participation and securities of the City in accordance with United States securities law (the "***Additional Public Disclosure***").

30.    If after the City makes a Public Disclosure or Counterparty or its Representatives make an Additional Public Disclosure, a Counterparty determines that it is in possession of Confidential Information the disclosure of which, in Counterparty's good faith belief after consultation with legal counsel (which may include in-house legal counsel), is necessary to enable Counterparty to buy or sell Certificates of Participation, securities issued by the City or FGIC-insured securities on or after the Disclosure Deadline in accordance with United States securities laws, Counterparty or its Representatives may make a further public disclosure of such Disclosed Information, including, but not limited to, Failed Proposal Information (each such further additional disclosure of Counterparty, a "***Further Disclosure***").

31.    For the avoidance of doubt, (i) Failed Proposal Information can be publicly disclosed whether or not the disclosure of such information would be required to enable Counterparty to buy or sell Certificates of Participation, securities issued by the City or FGIC insured securities on or after the Disclosure Deadline in accordance with United States securities laws, (ii) nothing herein shall be interpreted to be a determination or acknowledgment by any Party that any Failed Proposal Information constitutes material non-public information for purposes of United States securities laws, whether or not such information has been disclosed; (iii) any information disclosed pursuant to a Public Disclosure, Additional Public Disclosure and Further Disclosure shall be deemed to be covered by Section 3(b) & (f) of this Agreement and (iv) all confidentiality obligations herein terminate upon the Disclosure Deadline, except as set forth in paragraph 6.

32.     The City acknowledges and agrees that neither Counterparty nor any of its Representatives shall have any liability at law or equity to the City for the disclosure of Disclosed Information, an Additional Public Disclosure or a Further Disclosure by it or its Representatives made in compliance with the requirements of the paragraphs 29 and 30.

33.     The City and Counterparty acknowledge and agree that FGIC has no obligations or liabilities under this Agreement. FGIC is a Party to this Agreement for the sole purpose of acknowledging that Disclosed Information may, to the extent required by this Agreement, include information concerning FGIC's negotiations, offers and agreements, if any, concerning a Proposed Settlement.

34.     Nothing herein shall be construed to (a) limit, impair or otherwise affect the Counterparty's right to exercise or enforce its contractual rights under the documents governing the Certificates of Participation or (b) otherwise limit, impair or otherwise affect the Counterparty's or its Representatives' ability to (1) discuss, analyze, confer or otherwise interact or engage with other holders of Certificates of Participation that execute substantially similar confidentiality agreements with the City, the City and its Representatives on matters regarding the City or the Confidential Information, (2) exercise remedies and otherwise enforce rights as holders of Certificates of Participation, (3) take actions pursuant to, or in consideration of, a Proposed Settlement, including, without limitation, discussing, conferring, or otherwise interacting or engaging with other holders of Certificates of Participation or affiliates of holders of Certificates of Participation (it being understood that Counterparty shall not disclose Confidential Information with any person unless such disclosure by such person has been expressly authorized by the City), and (4) engage in discussions with third-party investors and their respective Representatives in connection with a Proposed Settlement (it being understood that Counterparty will not share Confidential Information with any person unless the Counterparty receives written confirmation from the City, prior to sharing the Confidential Information, that such person has entered into a confidentiality agreement with the City).

35.     Notwithstanding anything in this Agreement to the contrary, the Counterparty represents and the City accepts such representation that the businesses of the Counterparty and their respective affiliates and Representatives includes the analysis of, and investment in, entities and bodies and that the Confidential Information may influence the views of the Counterparty on investments in other entities and bodies, and, as such, although the Counterparty is subject to the obligations set forth in this Agreement, any investment by a Counterparty or any of its affiliates or Representatives in any such entity or body shall not, standing alone, be cause for the institution of legal action by the City alleging that such Counterparty failed to observe the obligations set forth herein.

36.     Notwithstanding anything herein to the contrary, nothing herein shall require or permit any Party to violate that certain Mediation Order [Docket No. 322] entered by the Bankruptcy Court, as the same has been amended and supplemented, provided, however, that the City agrees to use commercially reasonable efforts to move the Bankruptcy Court, jointly with the parties for an order entered prior to the Disclosure Deadline granting relief from the Mediation Order to the extent necessary to effectuate the provisions hereof, including the provisions relating to Public Disclosure, Additional Public Disclosure and Further Disclosure.

37.     The "WHEREAS" provisions of this Agreement do not constitute an admission of fact by any Party to any other party, person, or entity.

**EXHIBIT 6-B**

# JLA Development Agreement
## Term Sheet

This term sheet proposal (the "*Term Sheet*") and any and all past, present or future discussions, negotiations, conferences, meetings, telephone conferences, drafts of agreements, correspondence and writings, submissions of data, financial information, financial projections and forecasts and term sheets, whether oral, written or both, relating to the various transactions contemplated herein (the "*Discussions*") shall be considered to be communications to compromise and settle disputed matters. Nothing herein is intended to imply that Discussions prior to the date of this Term Sheet were not "compromise negotiations" as defined in the Federal R. Evid. 408 and similar state laws and rules limiting the admissibility or discoverability of evidence concerning "compromise negotiations" or other communications to compromise and settle disputed matters (the "*Rules*"). This Term Sheet and all Discussions shall be considered "compromise negotiations" pursuant to the Rules and no such Discussions shall ever be considered "otherwise discoverable" or be permitted to be discoverable or admissible or constitute evidence in connection with any legal proceeding, case, litigation or bankruptcy proceeding for any purpose, including proving bias, admission of default, prejudice, interest of a witness or a party, or negating a contention of undue delay, as provided by the Rules.

The term sheet herein is a summary and does not purport to include all terms or related documentation that would need to be required in any final agreement. Such terms and conditions will be included in definitive documentation that the parties will use commercially reasonable efforts to execute following execution of this Term Sheet, which documents shall not be inconsistent with the terms set forth herein.

| | |
|---|---|
| **Definitions** | For the purposes of this Term Sheet the following terms have the meanings provided below: |
| | "City" means the City of Detroit, Michigan. |
| | "City Parties" means any department, subdivision or agency of the City and/or any governmental authority within the direct or indirect control or supervision of the City. |
| | "Commercial Redevelopment Act" means the Public Act 255 of 1978, MCL § 207.651 *et seq.* |
| | "Commercial Rehabilitation Act" means the Public Act 210 of 2005, MCL § 207.841 *et seq.* |
| | "CRP Incentives" means incentives available from the Michigan Strategic Fund, in cooperation with MEDC, through the Community Revitalization Program under Public Act 252 of 2011. |
| | "Demolition Completion Date" means the date upon which |

Demolition at the JLA Demolition Parcel is complete.

"<u>Developer</u>" means FGIC or its designee (and any permitted successor or assignee thereof).

"<u>Development</u>" means that certain mixed use facility consisting of (i) a first-class hotel and related facilities including not less than 300 hotel rooms, and (ii) such other office, retail, commercial, recreation, residential and/or condominium units as shall be determined by the Developer (industrial, adult entertainment and other noxious uses excepted) given prevailing market conditions, with a height above ground not to exceed 30 floors, to be constructed upon the JLA Parcel by the Developer, together with all onsite improvements, site preparation, onsite infrastructure (including, without limitation, sanitary sewer, water, storm sewer, sidewalks, street lighting, driveways, storm water detention or retention facilities), related parking facilities and landscaping, necessary or appurtenant thereto; in all instances as approved by the City in accordance herewith, which approval shall not be unreasonably withheld, conditioned or delayed to the extent consistent with the City's urban planning policies and the City's comprehensive development plan as existing on the date any applicable Required Approvals (as defined below) are obtained by the Developer.

"<u>FGIC</u>" means Financial Guaranty Insurance Company

"<u>Force Majeure Delay</u>" means an event, casualty, occurrence, condition, or circumstance of any kind or nature reasonably beyond the control of the applicable party hereto which renders such party unable to perform any of its obligations contemplated hereunder, in full or in part, including, without limitation, (i) acts of declared or undeclared war by a foreign enemy; (ii) civil commotion, insurrection or riots; (iii) fire or casualty or condemnation; (iv) floods, hurricanes or other materially adverse weather conditions; (v) earthquakes; (vi) acts of God; (vii) governmental preemption in the case of emergency; (viii) unavailability of materials to the extent not within the reasonable control of the applicable party (other than shortage of funds); (ix) strikes, lockouts or other labor trouble; (x) inability to secure labor or access to the JLA Parcel including, without limitation, holdover of the tenant under the JLA Lease (as defined below) beyond any stated expiration date (inclusive of all renewal options thereunder);

(xi) acts of terrorism; (xii) the suspension of government operations; (xiii) any act, omission, rule, order or regulation of any governmental authority or any department or subdivision thereof (other than, with respect to the City, the City, any department, subdivision or agency of the City or any governmental authority within the direct or indirect control or supervision of the City and other than, with respect to the Developer, the failure of the Developer to secure the Required Approvals if the Developer does not apply for and diligently prosecute the applications for such Required Approvals); (ix) the presence of hazardous materials on the JLA Parcel and any related remedial action; and (x) any other cause, event or circumstance not within the reasonable control of the applicable party (other than shortage of funds).

"JLA Demolition Parcel" means the real property located in the City upon which is presently situated the improvements commonly referred to as the Joe Louis Arena (not including the parcel upon which the Joe Louis Arena Garage is situated).

"JLA Lease" means that certain Sublease of Riverfront Arena between the City, Olympia Entertainment, Inc. and the Detroit Red Wings, Inc., dated June 15, 2014, as may be amended, restated or modified.

"JLA Parcel" means the real property located in the City upon which is presently situated the improvements commonly referred to as the Joe Louis Arena and the Joe Louis Arena Garage.

"MEDC" means the Michigan Economic Development Corporation.

"POA" means that certain Plan for the Adjustment of Debts of the City of Detroit, as amended.

"State" means the State of Michigan, acting by and through the MEDC, or otherwise.

"TIF Incentives" means certain redevelopment incentives awarded by the Michigan Strategic Fund (MSF) under the Brownfield Tax Increment Financing Program (Act 381 of 1996), as administered by MEDC.

Other capitalized terms are defined elsewhere in this Term

| | |
|---|---|
| | Sheet. |
| **Development Agreement Terms** | In consideration of FGIC and the City entering into that certain Settlement Agreement, dated as of [●], contemplating, without limitation, withdrawal by FGIC of its objections to the POA, the City and Developer agree to enter into a development agreement (the "<u>Agreement</u>") as follows:<br><br>1. *Developer Option*.<br><br>    On or before a date which is thirty-six (36) months following full and complete execution of the Agreement (the "<u>Development Proposal Deadline</u>"), the Developer shall identify a developer or a development partner (either as an equity partner or as a construction or development manager) and prepare a comprehensive development plan for the Development, and shall submit such information along with such plan (in form and substance reasonably acceptable to the City) to the City for its prompt review and approval (the "<u>Development Proposal</u>"), which approval shall not be unreasonably withheld, conditioned or delayed, including, without limitation, any condition in such approval that would interfere with the eligibility of the Development for CRP Incentives and TIF Incentives as contemplated hereby. The Development Proposal does not need to disclose any additional equity partners, provided that the Developer will not partner with any third party that is prohibited from doing business with the City, and the Development Proposal does not need to identify a development partner if the rights under the Agreement have been transferred to a developer, which has previously been approved by the City, which approval shall not be unreasonably withheld, conditioned or delayed. Upon request of the Developer, the City may approve an extension of the Development Proposal Deadline by up to twenty-four (24) additional months, which approval shall not be unreasonably withheld, delayed or conditioned. The City agrees that it would be unreasonable to withhold its approval if (i) the Developer requested the extension because development in the immediate vicinity of the JLA Parcel has materially decreased or the general economic condition of the City has deteriorated to such a level that it would not be economically feasible for the Developer to pursue development of the JLA Parcel or (ii) it is reasonable given the complexity of the development |

contemplated by the Developer.

The City will review the Development Proposal and within ninety (90) days after receipt either (i) approve the Development Proposal or (ii) provide the Developer with the specific reasons why the Development Proposal is not acceptable, which may include unacceptability of the proposed development partner (if required). If the City does not approve the Development Proposal, the Developer may provide a revised Development Proposal to the City for its approval pursuant to the process herein, which shall continue until the Development Proposal is approved.

Without limiting the Developer's ability to identify and receive approval of a different development partner, the Detroit Regional Convention Facility Authority is deemed an approved development partner for purposes hereof. The Development Proposal shall include an application for the CRP Incentives and the brownfield plan necessary for the application for TIF Incentives, and it shall also identify which components of the Development Proposal are eligible for the CRP Incentives and TIF Incentives, disbursement of which shall be governed by the Economic Incentive Agreements (as defined in Section 3 below), and the City shall use its commercially reasonable efforts to cause the State to grant any approvals necessary for those CRP Incentives and TIF Incentives no later than 120 days after the date of approval of the Development Proposal, subject to the terms hereof.

The Developer shall have until a date which is one hundred eighty (180) days prior to the Development Proposal Deadline to give the City written notice of its intent to inspect the JLA Parcel (the "Diligence Notice"), which inspection may include, without limitation, (i) conducting physical inspections of the JLA Parcel, (ii) performing environmental studies of the JLA Parcel, which studies shall be of a scope acceptable to Developer in its sole discretion, and shall include the right to do invasive soil and groundwater testing, provided, however, the methodology of any such study shall be subject to the City's reasonable approval, and (iii) obtaining surveys of the JLA Parcel (the "Diligence Activities"). The City shall order a title commitment and

survey for the JLA Parcel (the "<u>Title Commitment and Survey</u>") promptly following execution of this Term Sheet and shall deliver the Title Commitment and Survey to the Developer. Within twenty (20) business days after the Developer's receipt of the Title Commitment and Survey (in form reasonably acceptable to the Developer) and copies of each of the title exceptions referenced in the Title Commitment and Survey, the Developer shall have examined the Title Commitment and Survey and shall make any objections to any items therein that would cause title to the JLA Parcel to not be marketable or that would unreasonably interfere with the construction of the Development ("<u>Title Defects</u>") by written notice to the City (the "<u>Title Objection Notice</u>"). The Title Objection Notice shall state with specificity the reasons for Developer's objection(s) and the curative steps requested by the Developer which would remove the basis for the Developer's objection(s). The City shall cure any Title Defects prior to the Closing Date. If the Developer orders an update to the Title Commitment and Survey prior to Closing, and such update shows an additional Title Defect not caused by the Developer, the City shall cause such Title Defect to be cured prior to Closing.

To the extent within the possession of the City and the City Parties, as reasonably determined by the City's corporation counsel upon due inquiry, and not otherwise in the public record, the City shall, promptly upon the request of the Developer, provide, and shall cause all City Parties to provide, to the Developer (i) copies of all environmental studies, asbestos reports or other environmental reports on the JLA Parcel, (ii) copies of all title reports and the underlying documents referenced therein, (iii) copies of all surveys of the JLA Parcel, (iv) copies of any other records, documents, instruments, agreements or files with respect to the use or ownership of the JLA Parcel, to the extent materially relevant after Closing, (v) to the extent not included in the above, copies of the correspondence to or from the City or any City Parties related to the use or ownership of the JLA Parcel, to the extent materially relevant after Closing and (vi) such other documentation as is reasonably requested by Developer with respect to the JLA Parcel. The City shall use its commercially reasonable efforts during the Diligence Period (as defined below) to provide the Developer and its contractors, consultants and their

respective agents with such access to the JLA Parcel as may be reasonably requested by the Developer from time to time, subject to any access limitation of the JLA Lease. Prior to conducting any of the Diligence Activities, the Developer and its contractors and consultants performing any of the Diligence Activities shall maintain the insurance coverage and comply with the insurance requirements specified in the City's form of Right of Entry.

The Developer shall notify the City in writing, no later than one hundred twenty (120) days following the Diligence Notice (the "Diligence Period"), that either (i) the Developer intends to proceed to Closing (as defined below) on the JLA Parcel (the "Notice to Proceed"), or (ii) the condition of the JLA Parcel is such that, in Developer's reasonable judgment, the condition adversely affects Developer's ability to timely complete the development or adversely affects the value of the JLA Parcel (the "Objection Notice"), which Objection Notice shall state with reasonable specificity the particular diligence matter unacceptable to the Developer, including Title Defects ("Objections"). The City, in its sole discretion, shall have the option to cure or remove such Objections within sixty (60) days following the Objection Notice (the "Cure Period"), provided that the City must cure such Objections that are encumbrances for the benefit of the City or the City Parties. Without limiting the generality of the foregoing, the City shall be obligated to cause to be removed of record: (i) mechanics' liens; (ii) judgment liens against the City or any City Parties; (iii) mortgages, similar loan documents and voluntary liens with respect to indebtedness of the City or any City Party; (iv) delinquent taxes, charges, impositions or assessments; (v) fines issued by any governmental or quasi-governmental authority or other liens encumbering the JLA Parcel or any portion thereof which are in liquidated amounted; and (vi) any other monetary liens against the property. To the extent the Developer issues an Objection Notice and Objections are cured to Developer's reasonable satisfaction during the Cure Period or the Developer desires to waive the Objections and proceed to Closing, the Developer shall provide a Notice to Proceed to the City within fifteen (15) days after expiration of the Cure Period.

To the extent the Developer issues a Notice to Proceed prior to the later of (i) expiration of the Diligence Period, and (ii) fifteen (15) days after the expiration of the Cure Period, if applicable, the City and the Developer shall proceed to closing on the JLA Parcel on a mutually agreed upon date which is the later of (i) two (2) years following approval by the City of the Development Proposal, and (ii) six (6) months following completion of Demolition (as defined below) (the "Closing Date"). On the Closing Date, the City shall, subject to satisfaction of commercially reasonable conditions precedent and Developer's satisfaction of the requirements of any title company insuring title to the JLA Parcel, convey the JLA Parcel to the Developer by quit-claim deed (the "Closing"). Developer shall pay all costs associated with Closing, including, without limitation, all title charges, escrow, closing and recording fees associated with any conveyance hereunder, with the exception of transfer taxes, if any, and any other costs normally paid by the seller of property under applicable law.

The Developer shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City as a result of the Diligence Activities other than any such loss, liability, cost or expense resulting from the negligence or willful misconduct of the City or any City Parties.

The City represents that the City or an instrumentality of the City has the right, power and authority to transfer the JLA Parcel or will have such right, power and authority as of the Closing.

2. _JLA Demolition_.

Promptly upon expiration of the JLA Lease, but in no event more than ninety (90) days after expiration of the JLA Lease, the City shall commence or cause to be commenced the demolition of the JLA Demolition Parcel (the "Demolition Commencement Date"), which demolition shall include (i) removal and disposal of all building improvements and materials located thereon and (ii) certain excavation work to be completed at the JLA Demolition Parcel, which excavation work shall include, without limitation, clearing and grubbing, soil erosion and control, and site excavation and embankment

on the JLA Demolition Parcel, all in accordance with plans and specifications reasonably acceptable to the Developer and all applicable laws ("Demolition"). For the avoidance of doubt, if the City commences staging for the Demolition by the Demolition Commencement Date, the City will be deemed to have commenced the Demolition.

The Demolition shall include (i) remediation or removal of materials, substances or wastes classified or regulated as hazardous, toxic, or a pollutant or contaminant ("Regulated Hazardous Substances") (including, but not limited to, asbestos-containing materials) related to the removal and disposal of materials from the JLA Demolition Parcel to the extent required by or necessary to comply with applicable laws or is customary for demolition projects of a similar scope and nature and (ii) the investigation, control or removal of any Regulated Hazardous Substances at, on or below the surface of the JLA Parcel that is sufficient under and otherwise causes the JLA Parcel to comply with applicable law for Developer to develop and use the JLA Parcel site consistent with the Development Proposal for its intended purposes as a multiuse hotel, residential condominium, office or retail development ("Sufficient Environmental Remediation"). Sufficient Environmental Remediation may, at the City's election, include controls that do not unreasonably interfere with the Development Proposal; provided such are acceptable to the governmental authorities with jurisdiction over the JLA Parcel. Developer agrees that, in conjunction with Developer, the City may have prepared and submitted to the Michigan Department of Environmental Quality a Baseline Environmental Assessment (Phase II) and associated Due Care Plans approved by and for the benefit of Developer, which approval shall not be unreasonably withheld, delayed or conditioned; however, the submission of such shall not alleviate the City's obligation to undertake such other actions necessary to perform Sufficient Environmental Remediation to allow for the implementation of the Development Proposal. The Developer agrees that in conducting Sufficient Environmental Remediation, the City may rely on protective barriers to prevent contact with affected soil and deed restrictions to limit groundwater use and other due care requirements

approved by the governmental authorities and reasonably acceptable to Developer. Sufficient Environmental Remediation shall not include the construction of measures adopted as controls to the extent that they are otherwise specifically part of the Development Proposal, in which case Developer shall construct them as part of the Development; however, if the costs to do so are increased as a result of government approved controls, the City shall reimburse Developer for the increased costs to satisfy any government imposed controls. Developer or any future owner will be responsible for maintaining any reasonable controls or due care measures adopted as part of the Sufficient Environmental Remediation.

The Demolition Commencement Date is expected to occur on or before September 15, 2017. Demolition shall be completed within one (1) year following the Demolition Commencement Date. The State shall make available to the City certain CRP Incentives set forth below, of which up to $6,000,000 will be for the purpose of reimbursing the City for the costs and expenses incurred in connection with the Demolition (the "Demolition CRP Incentives"). If there are any remaining Demolition CRP Incentives following the Demolition and the Sufficient Environmental Remediation, such funds shall be made available to reimburse the Developer for other eligible costs for the Development.

3. *Economic Development Incentives*.

In order to facilitate construction of the Development on the JLA Parcel, the State has agreed to reimburse the Developer for certain eligible project costs through CRP Incentives and TIF Incentives, as more particularly set forth in this Section 3, below.

To the extent that the Development Proposal, as approved by the City pursuant to Section 1 above, meets the eligibility requirements for CRP Incentives and TIF Incentives, the Developer shall be provided up to $4,000,000 in CRP Incentives, and up to $14,000,000 in TIF Incentives, which TIF Incentives will accrue interest at 3% per annum on any outstanding balance thereof, pursuant to one or more subsequent final written grants and loans (forgivable or otherwise), as applicable, and a

development agreement or other economic assistance agreement, as applicable, shall be entered into by the Developer and the State no later than 120 days after approval of the Development Proposal (which may be increased by 60 days if the CRP Incentives or TIF Incentives require review by the Michigan Department of Environmental Quality), which shall include (i) a schedule of performance- based project milestones for construction of the Development, and (ii) a pro-forma budget for the Development, as agreed upon between the City, the State and the Developer (collectively, the "Economic Incentive Agreements"). The City will use good faith efforts to cause the cap on the TIF Incentives to be increased to $18,000,000 in exchange for eliminating the $4,000,000 in CRP Incentives that are to be provided to the Developer. The Economic Incentive Agreements will be executed in accordance with the standard process, including the filing of any necessary applications.

The Economic Incentive Agreements shall govern disbursement of the CRP Incentives and TIF Incentives, including those project costs related to the Development that are eligible for CRP Incentives and TIF Incentives, as well as conditions precedent, milestones and timing for such disbursement, and shall include customary periodic reporting requirements of the Developer for data related to the Development both during and after construction.

To the extent the Development includes residential uses, the Economic Incentive Agreement shall also provide for designation of the Development as a Neighborhood Enterprise Zone ("NEZ"), and the City and each of the City Parties shall cooperate with and assist the Developer in applying for the NEZ certificate.

The City and each of the City Parties shall establish either a Commercial Redevelopment Zone (as defined in the Commercial Redevelopment Act) or a Commercial Rehabilitation Zone (as defined in the Commercial Rehabilitation Act), as requested by the Developer, such that the JLA Parcels will be eligible for the property tax abatements available for properties in the applicable zone. The City and each of the City Parties shall cooperate with and assist the Developer in applying for the tax abatements for which the Development is eligible under the Commercial Rehabilitation Act or the

Commercial Redevelopment Act.

Until title to the Joe Louis Arena Garage is transferred to the Developer, the City shall also fund or cause to be funded all costs and expenses for the repairs specified on page 15 "Opinion of Expected Construction Costs – July 2014" in the Physical Conditions Due Diligence Review and Evaluation dated September 2014 prepared by Desman Associates, except for Item #3 identified therein.

The City shall use its commercially reasonable efforts to assist the Developer in obtaining any additional sources of developer financings and grants not already provided for herein that are identified in writing to the City by the Developer.

4. *Further Terms and Conditions*.

Subject to Force Majeure Delays, the Developer shall commence the Development within twelve (12) months following the Closing Date (the "Commencement Milestone") and shall achieve substantial completion of the Development within thirty-six (36) months following the Closing Date. For these purposes, commencing the Development on the JLA Parcel shall be deemed to have occurred when the Developer shall have commenced site preparation work on the JLA Parcel, which site preparation work may include renovation or demolition of existing structures located on the JLA Parcel by the Developer, as applicable. In the event the Developer shall fail to achieve the Commencement Milestone, the JLA Parcel will automatically revert to the City. As part of the Closing, the Developer shall provide the City with a commercially reasonable completion guarantee.

To the extent the Developer proceeds to Closing, it shall accept the JLA Parcel on an "as-is, where-is" basis, subject to the City's obligations to perform the Sufficient Environmental Remediation. Other than with respect to the Sufficient Environmental Remediation, the City makes no implied or express representations or warranties of any kind as to its condition that may adversely affect the development, or its fitness for absolutely any purpose whatsoever. By proceeding to Closing after completion of the Diligence Activities, Developer will acknowledge that it is satisfied with the

condition of the JLA Parcel. By accepting title to the JLA Parcel at Closing, Developer shall be deemed to have waived any right to object to the status of title or to the condition of the JLA Parcel, regardless of the result of any Diligence Activities, and shall be deemed to have declared its full satisfaction with the status of title to and condition of the JLA Parcel, except as otherwise provided in this Agreement.

Upon Closing and subject to the City's obligation to perform the Sufficient Environmental Remediation, the Developer shall release the City and the State, and their respective officials, employees, and agents (but not any third party) from any and all claims or causes of action the Developer may have against the City for any liability, injury or loss as a result of any physical defects in or physical conditions of the JLA Parcel, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party.

Prior to the Closing, the City will (i) subject to the Demolition, maintain the JLA Parcel in at least the same condition and repair (except for environmental condition and repair thereof, which is addressed in sub-clause (ii) below) as of the date of the Agreement, (ii) not, through its own action (or the action of any agency, department, employee, agent, or contractor), alter the environmental condition of the JLA Parcel, as such exists on the date of the Agreement, in a material and adverse manner, (iii) not take zoning or land use action on the JLA Parcel without Developer's written consent, and (iv) not execute or grant any lease, contract, agreement, lien, security interest, encumbrance, easement, or restriction with respect to the JLA Parcel, or amend, modify, renew, extend or terminate any of the foregoing, without prior written consent of the Developer, which consent shall not be unreasonably withheld, conditioned or delayed.

Time is of the essence with respect to the deadlines set forth herein.

The City shall pass no charter, ordinance or other provision that solely affects or primarily targets the Developer or its rights under the Development Agreement which charter, ordinance or other provision

| | |
|---|---|
| | has a material adverse impact on the Developer or its rights under this Agreement (it being understood that a "material adverse impact" shall include any adverse financial impact or any contradiction, or adverse impact on the enforceability, of the terms of this Agreement or the Economic Incentive Agreements). |
| **Zoning and Required Approvals** | The City shall change the zoning requirement for the JLA Parcel to be designated "B-5", which will permit the Developer to develop the JLA Parcel as a mixed-use development, provided that the City administratively approves the site plans, which approval will not be unreasonably withheld, delayed or conditioned. Approval by the City of the Development Proposal shall not be deemed approval with respect to any site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required for the Development (the "<u>Required Approvals</u>"); provided, however, upon approval by the City of the Development Proposal and prior to Closing (as defined below), the Developer may proceed with securing the Required Approvals at its sole cost and expense.<br><br>With respect to any formal requests made by Developer or its designee to the City or State for any Required Approvals, the City or State, as applicable: (a) agrees to process such requests promptly and to use commercially reasonable efforts to process them within 30 days of submission by the Developer, (b) shall not unreasonably withhold, condition or delay approvals of the applicable requests, provided that the City or State have the legal authority to grant such approval and that such approval does not violate any applicable law, rule or regulation of general application, (c) shall not unreasonably impede or interfere with the Development, (d) shall not discriminate against Developer in the consideration or approval of such Required Approvals on account of the circumstances surrounding the Settlement Agreement and this Agreement and the events leading up thereto, and (e) shall use reasonable efforts to facilitate such requests, taking into consideration other similar requests for approvals or inducements, as applicable, of third parties granted thereby for similarly situated developments and uses as those contemplated for the Development; provided, however, the City or State, as applicable, shall process such requests for all Required Approvals pursuant to all then applicable rules, |

| | |
|---|---|
| | regulations, statutes and similar requirements. |
| **JLA Lease** | The City shall not renew or otherwise extend the JLA Lease beyond the date currently set forth in such lease, subject to the right of the existing tenant under the JLA Lease to extend the JLA Lease. |
| **Transferability** | Developer shall be entitled to freely transfer or assign its rights hereunder at any time, as long as it provides the City written notice thereof and it does not transfer its rights hereunder to a party that is prohibited from doing business with the City. |
| **Costs and Expenses** | The parties hereto shall bear their own costs and attorneys' fees with respect to the matter set forth herein. |
| **PA 436 Approval** | The Agreement described above upon the material terms and conditions set forth herein is subject to the approval required pursuant to the State's Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541 – 1575 in a manner acceptable to the parties hereto, which the City shall seek promptly after the signing of definitive documentation for the Agreement. |
| **Bankruptcy Court Approval Process** | The Agreement described above upon the material terms and conditions set forth herein is subject to the Bankruptcy Court's approval in a manner acceptable to the parties hereto, which the City shall seek promptly after the signing of definitive documentation for the Agreement. |
| **Dispute Resolution** | In connection with the negotiation of the definitive documentation to effect the various settlements of claims provided for in this Term Sheet, the parties shall use good faith efforts to identify and agree upon alternative dispute resolution mechanisms that provide a process for resolution of disputes. |
| **Jurisdiction/Venue/Choice of Law** | The parties agree that, except as provided in the "Dispute Resolution" section of the Term Sheet, jurisdiction shall be retained by the Bankruptcy Court for all matters related hereto and venue shall be in Detroit. The parties agree that this Term Sheet is to be governed by Michigan law. |

IN WITNESS WHEREOF, the Parties have duly caused this term sheet to be executed as of the day and year provided for below.

**CITY:**

CITY OF DETROIT, a Michigan
municipal corporation

By: _____

Name: _____

Title: _____

Dated: October __, 2014

**DEVELOPER:**

Financial Guaranty Insurance Company

By: _____
Name: _____
Title: _____
Dated: October __, 2014

**STATE:**

STATE OF MICHIGAN, solely with respect to its obligation to provide the CRP Incentives and the TIF Incentives

By: _____
Name: _____
Title: _____
Dated: October __, 2014

**EXHIBIT 6-C**

## Structure Outline

This structure outline (the "*Outline*") and any and all past, present or future discussions, negotiations, conferences, meetings, telephone conferences, drafts of agreements, correspondence and writings, submissions of data, financial information, financial projections and forecasts, term sheets and outlines, whether oral, written or both, relating to the various transactions contemplated herein (the "*Discussions*") shall be considered to be communications to compromise and settle disputed matters. Nothing herein is intended to imply that Discussions prior to the date of this Outline were not "compromise negotiations" as defined in the Federal R. Evid. 408 and similar state laws and rules limiting the admissibility or discoverability of evidence concerning "compromise negotiations" or other communications to compromise and settle disputed matters (the "*Rules*"). This Outline and all Discussions shall be considered "compromise negotiations" pursuant to the Rules and no such Discussions shall ever be considered "otherwise discoverable" or be permitted to be discoverable or admissible or constitute evidence in connection with any legal proceeding, case, litigation or bankruptcy proceeding for any purpose, including proving bias, admission of default, prejudice, interest of a witness or a party, or negating a contention of undue delay, as provided by the Rules.

| | |
|---|---|
| **Definitions** | "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan presiding over the City's chapter 9 case.<br><br>"City" means the City of Detroit, Michigan.<br><br>"COPs Holders" means the holders of COPs originally insured by FGIC with a claim for principal or interest.<br><br>"Developer" means FGIC and/or its designee(s).<br><br>"Excluded Actions" shall mean any claims against the COP Swap Counterparties, COP Holders not party hereto, or affiliates or related parties of the foregoing.<br><br>"FGIC" means Financial Guaranty Insurance Company.<br><br>"Plan" means the City's Seventh Amended Plan of Adjustment, as amended or supplemented.<br><br>Capitalized terms used herein, but not otherwise defined, have the meanings set forth in the Plan. |
| **Stipulation** | The City and FGIC shall enter into a stipulation, which shall be so ordered by the Bankruptcy Court, and which shall provide: |

| | |
|---|---|
| | 1. All objections by FGIC to the City's Plan shall be withdrawn, without prejudice to FGIC refiling such objections in the event that (i) the Plan is not confirmed, (ii) the Stipulation (described herein) is not approved, or (iii) the 9019 Settlement (described herein) is not approved. |
| | 2. FGIC shall, on behalf of the COPs Holders, opt-into the Plan COP Settlement with respect to the COPs originally insured by FGIC without impairing the COPs Holders' insurance claims against FGIC. |
| | 3. In accordance with the Plan COP Settlement, FGIC shall be deemed to vote in favor of the Plan. |
| | 4. The Plan shall be amended to revise the definition of "Class 9 Eligible City Assets" to exclude Joe Louis Arena and the Joe Louis Parking Garage shall be excluded from the City's RFQ. |
| | 5. The consideration provided under the Stipulation and the Plan COP Settlement set forth herein is solely for the benefit of FGIC and the COPs Holders, and such consideration shall be administered and distributed to COPs Holders in a manner consistent herewith. |
| | 6. The parties acknowledge that time is of the essence. |
| | 7. Pending approval of the Stipulation, FGIC shall take no action in furtherance of any objection, joinder, reservation of rights, or opposition to the Plan. For the avoidance of doubt, while approval for the Stipulation is pending, FGIC shall refrain from calling or examining any witnesses, introducing other evidence or advancing legal argument in connection with the confirmation trial on the City's Plan. |
| | 8. The Plan shall be amended to provide for FGIC, the Trustee, and the COPs Holders as Exculpated Parties, subject to agreed carve-outs. |
| | 9. The City shall not amend the POA in a way that would have a materially adverse effect on Class 9 without the consent of FGIC. |
| **9019 Settlement** | The City and FGIC shall enter into a settlement, which |

| | |
|---|---|
| | shall be approved by the Bankruptcy Court, and which shall provide:<br><br>1. The City shall dismiss the COP Litigation.<br><br>2. FGIC shall dismiss or cause to be dismissed all counterclaims filed in the COP Litigation.<br><br>3. Except for Excluded Actions, FGIC shall waive any claims it may have against any other party related to the COP Litigation, including any claims against the retirement systems or any City-related party arising in connection with the COPs.<br><br>4. The City shall enter into the Development Agreement with the Developer.<br><br>5. FGIC shall take appropriate steps to direct Wilmington Trust to effectuate the Stipulation, the 9019 Settlement and the Plan COP Settlement.<br><br>6. The order approving the 9019 Settlement shall contain a finding that the Development Agreement is legal and the City can legally comply with its obligations thereunder.<br><br>7. The consideration provided under the 9019 Settlement set forth herein is solely for the benefit of FGIC and the COPs Holders, and such consideration shall be administered and distributed to COPs Holders in a manner consistent herewith. |
| **Swap Claim Settlement** | In full satisfaction and discharge of FGIC's swap insurance and related claims against the City, FGIC shall receive: (a) an Allowed Class 14 claim in the amount of $6.11 million, and (b) the Downtown Development Authority shall assign to FGIC all of the Downtown Development Authority's right, title and interest to its distribution of New B Notes under the plan on account of its $33.6 million Class 13 claim. This consideration is solely for FGIC's benefit. |
| **Development Agreement** | The City and Developer will enter into a Development Agreement on the terms and conditions set forth in the |

3

| | Development Agreement Term Sheet dated October 16, 2014. |
|---|---|
| **FGIC Approval Process** | The Stipulation, 9019 Settlement and Development Agreement described above are subject to the approval, consents or waivers that FGIC determines are necessary or desirable from FGIC's Board of Directors and the New York State Department of Financial Services, which FGIC shall seek promptly after the signing of this Term Sheet. |

**CITY:**

CITY OF DETROIT, a Michigan
municipal corporation

By: _____
Name: _____
Title: _____
Dated: October __, 2014

**FGIC:**

Financial Guaranty Insurance Company

By: _____
Name: _____
Title: _____
Dated: October ___, 2014