# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-----------------------------------------------------x
                                  :
In re                             :        Chapter 9
                                  :
CITY OF DETROIT, MICHIGAN,        :        Case No. 13-53846
                                  :
                     Debtor.      :        Hon. Steven W. Rhodes
                                  :
                                  :
                                  :
-----------------------------------------------------x
```

**SUPPLEMENTAL BRIEF OF THE CITY OF DETROIT IN
SUPPORT OF OBJECTION OF THE CITY OF DETROIT,
PURSUANT TO SECTIONS 105 AND 502(B) OF THE BANKRUPTCY
CODE, BANKRUPTCY RULE 3007 AND LOCAL RULE 3007-1,
TO PROOF OF CLAIM NUMBER 2958 FILED BY MICHIGAN
AFSCME COUNCIL 25 AND ITS AFFILIATED DETROIT LOCALS**

The City of Detroit, Michigan (the "City") hereby files this

supplemental brief (the "Brief")[1] in support of the Objection of the City of Detroit,

Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy

Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 2958 Filed by

Michigan AFSCME Council 25 and Its Affiliated Detroit Locals (Docket No. 4876)

(the "Claim Objection") and respectfully represents as follows:

---

[1] Capitalized terms not otherwise defined in this Brief have the meanings given to them in the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7502) (as it may be further supplemented, modified or amended, the "Plan").

## Background

1.      On November 21, 2013, the Court entered the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782) (the "Bar Date Order"). The Bar Date Order established February 21, 2014 at 4:00 p.m., Eastern Time (the "General Bar Date"), as the general deadline for the filing of proofs of claim in the City's chapter 9 case.

2.      On the General Bar Date, Michigan AFSCME Council 25 and Its Affiliated Detroit Locals ("AFSCME") filed proof of claim number 2958 (the "Claim"), asserting liabilities in the aggregate amount of not less than $8,718,697,854.82.  The Claim expressly provides that it consists of a number of separate claims.  Claim, at 1.  AFSCME filed the Claim for all amounts allegedly due to AFSCME and its members and former member retirees and future retirees with respect to an array of potential liabilities.  Id.  The Claim is protective in nature, identifying a series of broad categories of claims, as well as "any other claims which arise before July 18, 2014."  Id.

3.      On May 15, 2014, the City filed the Claim Objection.  By the Claim Objection, the City objected to the Claim on the ground that, among other things, the liabilities asserted therein frequently are too vague to permit the City to

evaluate them. Claim Objection, at ¶ 13. The City suggested that an efficient process be established to resolve or adjudicate the various aspects of the Claim. Id.

4.     On September 2, 2014, AFSCME filed Creditor Michigan AFSCME Council 25 and Its Affiliated Detroit Locals' Response to the Debtor's Objection to Proofs of Claim (Docket Number 2958) (Docket No. 7235) (the "AFSCME Response").

5.     By agreement of the parties, the hearing on the Claim Objection was continued to November 5, 2014 at 10:00 a.m., Eastern Time, and the Claim and the Claim Objection were referred to facilitative mediation (the "Mediation") before the Honorable Judge Victoria A. Roberts. See Order (I) Referring to Facilitative Mediation Objections to Certain Claims Filed by Michigan AFSCME Council 25 and its Affiliated Detroit Locals and the Coalition of Detroit Unions, (II) Continuing Hearing on Related Claim Objections and (III) Modifying Briefing Schedule (Docket No. 7663), at ¶¶ 2, 7.

6.     On October 14, 2014, legal issues relating to two potential theories of liability asserted by AFSCME in the Claim (together, the "Issues") were referred back to this Court for expedited adjudication. The Issues consist of the following:

> (a)     Whether the City has any additional liability to AFSCME or the parties AFSCME represents, above and beyond the treatment provided for GRS Pension Claims under the Plan, arising from the elimination of the so-called

"13th Check" program.  See Claim, at Ex. 1, row 7 (the "13th Check Claim").[2]

(b)   Whether the City has any additional liability to AFSCME or the parties AFSCME represents, above and beyond the treatment provided for OPEB Claims under the Plan, arising from modifications to retiree health care benefits made by the City in 2006.  See Claim, at Ex. 1, row 17 (the "Health Care Modification Claim").

7.   AFSCME asserts the 13th Check Claim and the Health Care

Modification Claim as Other Unsecured Claims in Class 14 under the Plan, and

seeks a recovery separate and apart from the Plan recoveries for pension and other

post-employment benefit claims.  However, with the public agreement and support

of AFSCME and other parties, the City has resolved its obligations on account of:

(a) all GRS Pension Claims, including, by definition, the liabilities asserted in the

13th Check Claim (the "Alleged 13th Check Liabilities"); and (b) all OPEB

Claims, including the liabilities asserted in the Health Care Modification Claim

(the "Alleged OPEB Liabilities").  This resolution was developed after months of

---

[2]   In support of the 13th Check Claim, attached to the AFSCME Response is a copy of the Decision and Recommended Order of Administrative Law Judge on Summary Disposition (the "ALJ Opinion") issued in the Michigan Employment Relations Commission ("MERC") proceeding In the Matter of City of Detroit and AFSCME Council 25, Case No. C12 E 092 (the "13th Check Proceeding").  See AFSCME Response at Exhibit 7.  AFSCME asserts that the ALJ Opinion establishes the 13th Check Claim "to be as high as $174,000,000."  In fact, the ALJ Opinion states that reserving any amount for this claim would be "entirely unwarranted at this stage" and that establishing an amount for this claim "would require an unwarranted degree of speculation upon speculation."  ALJ Opinion, at 18-19.

negotiations and is unambiguously reflected in the terms of the Plan by the treatment provided to Class 11 (GRS Pension Claims) and Class 12 (OPEB Claims). Accordingly, the City requests that the Court disallow the 13th Check Claim and the Health Care Modification Claim consistent with the terms of the Plan and the settlements embodied therein.

## Argument

### The 13th Check Claim Was Resolved by the Agreed-Upon Treatment of GRS Pension Claims Under the Plan

8.      Under the 13th Check program, annual earnings on GRS pension assets over and above the assumed rate of return of 7.9% were distributed, at the discretion of the GRS board of trustees (the "Board"), in the form of additional contributions to active employees' annuity savings fund accounts or additional checks to retirees in excess of the 12 monthly pension checks retirees otherwise would receive each year. ALJ Opinion, at 2. In the 13th Check Proceeding, AFSCME (a) alleged that the City failed to collectively bargain regarding the elimination of the 13th Check program in 2011 and (b) sought to recover amounts that individual retirees allegedly would have received in 2011 and 2012 had the 13th Check program remained in place during that period. Id.

9.      The 13th Check Proceeding was stayed as a result of the commencement of the Chapter 9 Case. The automatic stay of sections 362 and 922 of the Bankruptcy Code was lifted by the Court for the limited purpose of

permitting the retiring Administrative Law Judge to issue the ALJ Opinion based on an earlier bench ruling.  <u>See</u> Order Modifying the Automatic Stay to Allow Administrative Law Judge to Execute His Opinion (Docket No. 1070), at ¶ 2.

10.     Once issued on October 2013, the ALJ Opinion acknowledged that the nature of the relationship between the City and the counterparties to pending MERC proceedings would be materially changed by the Chapter 9 Case, "and the dormant pending litigation, and the relief sought therein, will all likely be moot." ALJ Opinion, at 3.  This statement is correct as to the 13th Check Proceeding.  The Plan establishes the treatment of the City's pension-related liabilities regardless of the outcome of the 13th Check Proceeding.

11.     The liabilities asserted in the 13th Check Proceeding, to the extent valid at all (which they are not, for the reasons discussed below), are classified as GRS Pension Claims under the Plan.  In particular, Section I.A.203 of the Plan provides as follows:

> "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, *arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation,*

*ordinance, statute or law* for (a) any pension, disability or other post retirement payment or distribution in respect of the employment of current or former employees or (b) *the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.*

Plan, at § I.A.203 (emphasis added).[3]

12.     This definition is broad, covering all types of GRS pension-related liabilities.  It cannot reasonably be disputed that the payments made to employees and pensioners under the 13th Check program constitute payments "by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS."  Id.  The definition includes "any Claim" of this type, without any relevant exception.  As such, the Alleged 13th Check Liabilities patently are GRS Pension Claims, as such term is defined in the Plan.

13.     The Plan provides for the clearly defined treatment of all GRS Pension Claims – in the estimated aggregate allowed amount of $1.879 billion – in Class 11 under the Plan.  See Plan, at § II.B.3.r (providing for the treatment of all

---

[3]     The Plan defines the term "Claim" with reference to section 101(5) of the Bankruptcy Code.  Plan, at § I.A.60.  Section I.A.257 of the Plan makes clear that any Claim that meets the definition of a GRS Pension Claim, among other claims, cannot also be an Other Unsecured Claim in Class 14 under the Plan.  See Plan, at § I.A.257 (providing that "'Other Unsecured Claim' means any Claim that is not . . . a GRS Pension Claim [or] an OPEB Claim" among other Claims).

GRS Pension Claims).  The express Plan provisions will govern the treatment of all claims falling within the definition of GRS Pension Claims.  The filing of proofs of claim by AFSCME with respect to such liabilities, as permitted by the Bar Date Order, does not somehow transform these liabilities into Claims that fall outside the Plan or its definition of GRS Pension Claims.[4]  It is a fundamental aspect of the bankruptcy plan process that proofs of claim are subject to the treatment specified in the Plan; the Plan is not subject to the proposed treatment of liabilities that individual claimants may include in proofs of claim.

14.     Once classified as GRS Pension Claims by the Plan, these claims cannot be asserted by the claimant in another class to obtain additional or preferred treatment.  As noted above, the Plan expressly prohibits AFSCME's preferred treatment of this alleged claim in Class 14.  See Plan, at § I.A.257 (providing that "'Other Unsecured Claim' means any Claim that is not . . . a GRS

---

[4]     By the Bar Date Order, AFSCME was permitted to file "one or more omnibus proofs of claim on behalf of AFSCME-represented employees and former employees, regardless of the nature of such claims, including, without limitation, claims for post-retirement health obligations, pension obligations (whether benefits, underfunding or otherwise) or other compensation, subject to the City's right to object to any such claims."  Bar Date Order, at ¶ 14.  Notwithstanding this general authorization, however, it is not clear to the City whether the individual retiree Holders of the Claims constituting the Alleged 13th Check Liabilities and the Alleged OPEB Liabilities are, in fact, represented by AFSCME – and, therefore, that AFSCME possesses standing to assert these portions of the Claim – because AFSCME expressly declined to represent retired employees in the Chapter 9 Case in pre-bankruptcy correspondence with the City.

Pension Claim [or] an OPEB Claim" among other Claims).  In sum, because the Alleged 13th Check Liabilities fit squarely into the Plan's definition of GRS Pension Claims, they are subsumed within the treatment provided all such Claims in Class 11 under the Plan.[5]

15.    The Plan further makes clear that Holders of Claims are entitled to no satisfaction of their Claims other than that provided in the applicable Class under the Plan.  Section III.D.4.a of the Plan, for example, provides that "the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date ….  whether or not … a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code."  Plan, at § III.D.4.a.

16.    Section III.D.4.b of the Plan similarly confirms that "the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all debts of the City … and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt …."  Plan, at § III.D.4.b.  In addition, as of the Effective Date, AFSCME and all other Holders of Claims against the City will be enjoined from

---

[5]    Among other things, AFSCME already has agreed to withdraw $8.1 billion of the Claim relating to pension liabilities.  <u>See</u> Order Dismissing Claims from Mediation (Docket No. 7877).

ATI-102623040v5
-9-
13-53846-tjt    Doc 7981    Filed 10/16/14    Entered 10/16/14 14:54:41    Page 9 of 80

taking any actions to enforce any Claim against the City pursuant to

Section III.D.5.a of the Plan. Thus, to the extent the Alleged 13th Check

Liabilities constitute a valid Claim against the City – which they do not for all of

the reasons set forth below – such Claim would be entirely subject to the treatment

provided GRS Pension Claims in Class 11 under the Plan and cannot be a Class 14

Claim. Likewise, by the terms of the Plan, the 13th Check Proceeding will be

permanently enjoined and must be "withdrawn or dismissed with prejudice." <u>See</u>

Plan, § III.D.5.a.1.[6]

***The City Has No Liability on Account of the 13th Check Claim***

17. Even if the Court were to find that the 13th Check Claim is not

subsumed by the treatment of GRS Pension Claims under the Plan (which it is),

the City has no liability with respect to the 13th Check Claim.

18. AFSCME seeks to compel the City's payment of "13th check"

distributions to retirees for 2011 and 2012 based on the ALJ Opinion, which found

that elimination of the 2011 and 2012 payments violated the Michigan Public

Employment Relations Act, MCL § 423.201, <u>et</u> <u>seq.</u> ("<u>PERA</u>"), because the

elimination of the 13th Check program was implemented by the City without first

bargaining with AFSCME.

---

[6]     This principle applies equally to the numerous other union claims and claims
filed by individuals asserting similar liabilities.

19.     In reaching its conclusion, the ALJ Opinion assumes for the purpose of its analysis that the practice of paying 13th checks was lawful under the Michigan Public Employee Retirement System Investment Act, MCL § 38.1132, et seq. ("PERSIA").  It was not.  The Board's practice of awarding additional benefits to active employees and retirees who participate in GRS, including the "13th check" distributions, was a clear breach of the Board's fiduciary duties under applicable state law, and it is beyond purview that an employer does not violate labor law by failing to bargain to continue an illegal practice.

20.     GRS was established pursuant to Article 11 of the Charter of the City of Detroit (the "Charter").  Section 11-101 of the Charter provides that "The city shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees."  Chapter 47 of the Detroit City Code of 1984 (the "Ordinance"), in effect at the times relevant for this dispute, sets forth the benefits available to participants and other terms of the GRS.  Section 47-1-3 of the Ordinance creates the Board as the responsible party for administration of the GRS as follows:

> A Board of Trustees of the General Retirement System is hereby created.  The Board is vested with the general administration, management and responsibility for the proper operation of the System, and for making effective the provisions of [this] chapter.

21.     No provision of the Charter or the Ordinance authorizes the Board to increase or decrease benefits provided by GRS, or to create benefits not otherwise described in the Ordinance.  The grant of authority to the Board is limited to administration, management and proper operation – not the creation of new benefits.

22.     The Charter and Ordinance further provide that the authority to amend GRS is vested in the City Council.  Section 47-3-14(h) of the Ordinance provides that collective bargaining agreements that accept the terms of the Ordinance are subject to the Board's power to modify or amend "*the administrative rules and procedures*" (emphasis added) governing the defined contribution benefits provided in Article III of GRS, and Section 47-3-12(b) of the Ordinance provides that the Board may amend the "Participant Loan Program," but each of these limited exceptions highlight the general rule that only the City Council had general amendment authority over GRS.

23.     Although, for many years prior to 2011, the Board took the position that it had authority to designate GRS funds as "excess earnings" for distribution to active employees and retirees pursuant to the 13th Check program, the Ordinance did not expressly authorize these additional benefits.

24.     PERSIA requires that, among other things, a fiduciary "discharge his or her duties solely in the interest of the participants and the

beneficiaries, and … (a) [a]ct with the same care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar aims."   MCL § 38.1133(13)(3)(a).

25.     This requirement is almost identical to the federal Employee Retirement Income Security Act of 1974, as amended ("ERISA") requirement that a fiduciary "act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B); see generally Bd. of Trs. of Birmingham Emps. Ret. Sys. v. Comerica Bank, 767 F. Supp. 2d 793, 798 (E.D. Mich. 2011) ("Michigan courts … look to ERISA and interpretive case law as persuasive authority in applying PERSIA …."); Estes v. Adrian Anderson & N. Point Advisors, 2012 Mich. App. LEXIS 2236 at **7-8 (Mich. Ct. App. Nov. 15, 2012) (PERSIA is analogous to ERISA with respect to fiduciary requirements);[7] accord Bd. of Trs. of Birmingham Emps. Ret. Sys., 767 F. Supp. 2d at 798.

26.     To meet ERISA's prudence standard, fiduciaries must undertake a careful and impartial investigation of all relevant facts and circumstances. The prudence requirement focuses on whether the fiduciaries, at the time they

---

[7]     Copies of all unpublished decisions cited herein are attached hereto as Exhibit A.

ATI-102623040v5

engaged in the challenged transaction, "employed the appropriate methods to investigate the merits" of the transaction. Donovan v. Mazzola, 716 F.2d 1226, 1231-32 (9th Cir. 1983); Bussian v. RJR Nabisco Inc., 223 F.3d 286, 299-300 (5th Cir. 2000) (fiduciary must conduct a thorough and impartial investigation and make an objectively reasonable decision). A showing that a plan fiduciary failed to follow reasonable procedures is sufficient to show a breach of fiduciary duty. Howard v. Shay, 100 F.3d 1484, 1488-90 (9th Cir. 1996). Prudence is an objective standard that focuses on the fiduciary's conduct. Good faith will not excuse a lack of procedural prudence. For purposes of satisfying the duty of prudence, "a pure heart and an empty head are not enough." Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983).

27.     In at least one instance, a federal district court has held that allegations that trustees continued to issue 13th checks despite their knowledge that doing so would put the plan in financial jeopardy, are sufficient to state a claim for breach of fiduciary duty. Saxton v. Central Pennsylvania Teamsters Pension Fund, 2003 U.S. Dist. LEXIS 23983 (E.D. Pa. 2003). In that case, the trustees had explicit authority to issue 13th checks so long as certain funding prerequisites were satisfied. Id. at *35. Although the plan's actuary certified that the funding prerequisites had been met, it was alleged that the plan trustees allowed the funding analysis to be performed with outdated and improper actuarial methods, all

with the knowledge that continued payments would put the plan's funding status at risk.  Id.  In those circumstances, the court held that the plaintiffs had stated a claim for breach of fiduciary duty.  Id. at *38.  The court held that ERISA's fiduciary obligations include "monitoring the plan's solvency."  Id. at *37.

28.  In the case of the City's 13th Check program, there is no indication that the Board ever thoroughly analyzed the determination of "excess earnings," or the impact of their decisions on the financial stability of GRS.  Nor is there any indication that the Board made any attempt to understand the actuarial risk associated with "13th checks" and other extra benefits, or to question the Board's actuaries regarding the basis for their projections.  If the Board had fulfilled its duty, it undeniably would have understood that the very concept of "excess earnings" in a pension system like GRS is the product of a conceptual mistake.

29.  Actuaries project pension costs and assets over the long term, and when trustees spend "excess" money from the good years, they defeat one of the fundamental aspects of actuarial models – that investment gains, rather than employer contributions or local taxpayers, will defray a significant portion of total pension costs.  The very actuarial consulting firm that GRS uses and the Board has long retained, Gabriel Roeder Smith & Company, has publicly conceded that use

of a 13th check program in public pension plans poses imprudent actuarial and financial risks to the retirement system.

30.     In a New York Times article (the "Article") published October 22, 2013, Rick Roeder, a founding member of Gabriel Roeder Smith & Company, said the following about the 13th Check program:  "There is no actuarial justification for 13th checks ….  A 7-year-old child could understand this.  *It's laughable that this could happen, but it did.*" (emphasis added).  A copy of the Article is attached hereto as Exhibit B.  To put it mildly, laughably unsound practices hardly satisfy the heightened duty of care imposed by PERSIA on the GRS Board.

31.     The Article also notes that "a study in 2011 by an outside actuary showed that the extra payouts were actually costing Detroit billions of dollars . . . .  Actuaries model pension costs over the long term, and when trustees find 'excess' money year by year and spend it, they defeat the fundamental premise of the plan — that investment gains, not local taxpayers, will pay most of the cost."  A copy of this study is attached hereto as Exhibit C.

32.     It is black-letter law that one of the common-law duties of a trustee under PERSIA and ERISA is to preserve and maintain the assets of the trust.  See Central States Pension Fund v. Central Transit., 472 U.S. 559, 559-60 (1985).  By continuing to pay benefits not required by the terms of GRS without

careful and thorough analysis of the financial impact to GRS, and without an adequate understanding of (or willful blindness to) the consequences of their actions, the Board breached its fiduciary duty to GRS and its participants.

33.     Because the Board breached its fiduciary duty by issuing 13th checks, the City could not have breached any duty to bargain under PERA over the elimination of the unlawful practice.

34.     "In construing and applying PERA, the Michigan Supreme Court has held that the Michigan legislature intended Michigan courts to rely on analogous federal precedent." <u>Rogers v. Board of Educ.</u>, 2 F.3d 163, 166 (6th Cir. 1993) (compiling authority).

35.     In this vein, the Michigan Supreme Court has held that subjects of bargaining that are mandatory, permissive or illegal have the same meaning under PERA as under the NLRA:

> Mandatory subjects of collective bargaining are those within the scope of 'wages, hours, and other terms and conditions of employment'. [MCL § 423.215; MSA § 17.455(15).]   If either party proposes a mandatory subject, both parties are obligated to bargain about it in good faith.

> Permissive subjects of collective bargaining are those which fall outside the scope of 'wages, hours, and other terms and conditions of employment', and may be negotiated only if both parties agree.

> Illegal subjects are those which even if negotiated will not be enforced because adoption would be violative of the law or of the NLRA.

Central Michigan University Faculty Assoc. v. Central Michigan University, 404 Mich. 268, 289-90 (Mich. 1978), citing Pontiac Police Officers Ass'n v Pontiac, 397 Mich 674, 679 (Mich. 1976).

36.     The City could not have violated PERA by failing to bargain over a change to the 13th Check program because any negotiated resolution other than to eliminate this illegal practice would violate PERSIA.

37.     As such, were the City to appeal the ALJ Opinion, there is virtually no doubt that the decision would be set aside.  The standard for setting aside a decision such as the ALJ Opinion requires a showing that the decision was (a) in violation of the constitution or a statute, (b) in excess of the statutory authority or jurisdiction of the agency, (c) made upon unlawful procedure resulting in material prejudice to a party, (d) not supported by competent, material and substantial evidence on the whole record, (e) arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion or (f) affected by other substantial and material error of law.  MCL § 24.306.

38.     Based on the foregoing, AFSCME's claim for any amount related to the elimination of the 13th check should be disallowed.

***The Health Care Modification Claim Was Resolved by the***
***Agreed-Upon Treatment of OPEB Claims Under the Plan***

39.     Just as with respect to the Alleged 13th Check Liabilities,

the Alleged OPEB Liabilities constitute OPEB Claims under the Plan and are

subject to the Plan treatment in Class 12.  According to AFSCME, the Alleged

OPEB Liabilities arise from the modification of retiree health-care benefits by the

City in 2006 that caused retirees to incur increased costs for such health care.

Claim, at 3.

40.     The Plan defines OPEB Claims as "any Claim against the City

for OPEB Benefits held by a retiree who retired on or before December 31, 2014

and is otherwise eligible for OPEB Benefits, and any eligible surviving

beneficiaries of such retiree."  Plan, at § I.A.255.  The Plan defines "OPEB

Benefits" as follows:

> post-retirement health, vision, dental, life and death
> benefits provided to retired employees of the City and
> their surviving beneficiaries pursuant to the Employee
> Health and Life Insurance Benefit Plan and the
> Employees Death Benefit Plan, including the members of
> the certified class in the action captioned <u>Weiler *et. al.* v.</u>
> <u>City of Detroit</u>, Case No. 06-619737-CK (Wayne County
> Circuit Court), pursuant to the "Consent Judgment and
> Order of Dismissal" entered in that action on August 26,
> 2009.

Plan, at § I.A.254.

41.     Based on the totality of the information provided by AFSCME, the City is not aware of any basis for AFSCME to argue that the Alleged OPEB Liabilities do not arise from "post-retirement health, vision, dental, life and death benefits" or that such Claims are not held by retirees who retired on or before December 31, 2014.  The description of the Health Care Modification Claim states that it is for "retiree health care benefits" dating back to 2006, establishing that the Alleged OPEB Liabilities fit squarely within the Plan definition of "OPEB Claims."  Accordingly, the Alleged OPEB Liabilities are subsumed within the treatment provided all such Claims in Class 12 under the Plan.  See Plan, at § II.B.3.s.  As noted above, a Claim within the definition of OPEB Claim cannot also be asserted as an Other Unsecured Claim in Class 14 of the Plan.  See Plan, at § I.A.257 (providing that "'Other Unsecured Claim' means any Claim that is not . . . a GRS Pension Claim [or] an OPEB Claim" among other Claims).  Moreover, for all of the reasons set forth above with respect to the Alleged 13th Check Liabilities, the Alleged OPEB Liabilities will be discharged as of the Effective Date and are entitled to no further recovery except as set forth in Class 12 under the Plan.

## Reservation of Rights

42.     The City is filing this Brief to address certain specific arguments relating to the 13th Check Claim and the Health Care Modification

ATI-102623040v5

Claim.  The City continues to seek the relief requested in the Claim Objection with respect to the remaining liabilities asserted in the Claim, and this Brief does not constitute a waiver of any such request for relief.  The City reserves all of its rights with respect to the Claim Objection and currently expects to file its reply in support of the additional relief requested in the Claim Objection on October 17, 2014.

WHEREFORE, for the foregoing reasons, the City requests that the Court promptly disallow the 13th Check Claim and the Health Care Modification Claim and grant such other and further relief to the City as the Court determines to be appropriate.

ATI-102623040v5

Dated: October 16, 2014          Respectfully submitted,


 /s/  Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com


ATTORNEYS FOR THE CITY

# **EXHIBIT A**



COLETTA ESTES and All Others Similarly Situated, Plaintiffs-Appellees, v ADRIAN ANDERSON and NORTH POINT ADVISORS, L.L.C., Defendants, and DAVID CLARK, SUSAN GLASER, SHEILA KNEESHAW, GERALD FISCHER, RONALD GRACIA, WENDALL ANTHONY, KENNETH v. COCKREL, JR., KATHLEEN LEAVEY, JEFFREY BEASLEY, MONICA CONYERS, and DEDAN MILTON, Defendants-Appellants. COLETTA ESTES, TERRY SMITH-JACKSON, TERITTHA KINNEY, ELEANOR BENNETT, ANTHONY WHEELER, ANDREIA JOHNSON, REGINALD BRYANT, DYNITA MCCASKILL, ANTHONY SCANDOVAL, ELEANOR BENNET, MARK MAPP, and RONALD MORRING, Plaintiffs-Appellees, v DAVID CLARK, SUSAN GLASER, SHEILA KNEESHAW, GERALD FISCHER, RONALD GRACIA, WENDALL ANTHONY, KENNETH v. COCKREL, JR., KATHLEEN LEAVEY, JEFFREY BEASLEY, MONICA CONYERS, and DEDAN MILTON, Defendants-Appellants, and ADRIAN ANDERSON and NORTH POINT ADVISORS, L.L.C., Defendants. COLETTA ESTES, TERRY SMITH-JACKSON, TERITTHA KINNEY, ELEANOR BENNETT, ANTHONY WHEELER, ANDREIA JOHNSON, REGINALD BRYANT, DYNITA MCCASKILL, ANTHONY SCANDOVAL, ELEANOR BEN- NET, MARK MAPP, and RONALD MORRING, Plaintiffs-Appellees, v DAVID CLARK, SUSAN GLASER, SHEILA KNEESHAW, GERALD FISCHER, RONALD GRACIA, WENDALL ANTHONY, KENNETH v. COCKREL, JR., KATHLEEN LEAVEY, JEFFREY BEASLEY, MONICA CONYERS, and DEDAN MILTON, Defendants-Appellants, and ADRIAN ANDERSON and NORTH POINT ADVISORS, L.L.C., Defendants, and NATIONAL CONFERENCE ON PUBLIC EMPLOYEE RETIREMENT SYSTEMS, Amicus Curiae. COLETTA ESTES, TERRY SMITH-JACKSON, TERITTHA KINNEY, ELEANOR BENNETT, ANTHONY WHEELER, ANDREIA JOHNSON, REGINALD BRYANT, DYNITA MCCASKILL, ANTHONY SCANDOVAL, ELEANOR BENNET, MARK MAPP, and RONALD MORRING, Plaintiffs-Appellees, v DAVID CLARK, SUSAN GLASER, SHEILA KNEESHAW, GERALD FISCHER, RONALD GRACIA, WENDALL ANTHONY, KENNETH v. COCKREL, JR., KATHLEEN LEAVEY, JEFFREY BEASLEY, MONICA CONYERS, and DEDAN MILTON, Defendants, and ADRIAN ANDERSON and NORTH POINT ADVISORS, L.L.C., Defend- ants-Appellants. DAVID MALHALAB and All Others Similarly Situated and MARY PHELPS and All Others Similarly Situated, Plaintiffs-Appellees/Cross Ap- pellants, v MARTY BANDEMER, JEFFREY BEASLEY, GREGORY BEST, GARY CHRISTIAN, SETH DOYLE, FRANK ENGLISH, DEDAN MILTON, JAMES MOORE, TYRONE SCOTT, PAUL STEWART, ALBERTA TINSLEY-TALABI, ROGER CHEEK, BARBARA ROSE COLLINS, WILLIAM FAIRWEATHER, JOHNNY GOLDEN, LAURA ISOM, MARTY KNOWLES, SHARON MCPHAIL, JEFFREY PEGG, and CLARENCE WILLIAMS, Defend- ants-Appellants/Cross Appellees, and ADRIAN ANDERSON and NORTH POINT ADVISORS, L.L.C., Defendants. NATHAN JACK CHASE and All Others Similarly Situated, Plaintiffs-Appellees/Cross Appellants, v REV. WENDALL ANTHONY, DAVID CLARK, MONICA CONYERS, KENNETH V. COCKREL, JR., SHEILA COCKREL, CEDRIC COOK, GERALD FISCHER, RONALD GRACIA, JEFFREY BEASLEY, SUSAN GLASER, KWAME M. KILPATRICK, SHEILA KNEESHAW, KATHLEEN LEAVEY, STEPHANIE MILLEDGE, DEDAN MILTON, and TIMOTHY NGARE, Defendants-Appellants/Cross Appellees, and

ADRIAN ANDERSON and NORTH POINT ADVISORS, L.L.C., Defendants.
DAVID MALHALAB and MARY PHELPS, Plaintiffs-Appellees, v MARTY
BANDEMER, JEFFREY BEASLEY, GREGORY BEST, ROGER CHEEK, GARY
CHRISTIAN, BARBARA ROSE COLLINS, SETH DOYLE, FRANK ENGLISH,
WILLIAM FAIRWEATHER, JOHNNY GOLDEN, LAURA ISOM, MARTY
KNOWLES, SHARON MCPHAIL, DEDAN MILTON, JAMES MOORE,
JEFFREY PEGG, TYRONE SCOTT, PAUL STEWART, ALBERTA
TINSLEY-TALABI, and CLARENCE WILLIAMS, Defendants-Appellants, and
ADRIAN ANDERSON and NORTH POINT ADVISORS, L.L.C., Defendants.
NATHAN JACK CHASE and ANDREW DANIELS EL, Plaintiffs-Appellees, v REV.
WENDALL ANTHONY, JEFFREY BEASLEY, DAVID CLARK, MONICA
CONYERS, KENNETH V. COCKREL, JR., SHEILA COCKREL, CEDRIC COOK,
GERALD FISCHER, RONALD GRACIA, SUSAN GLASER, KWAME M.
KILPATRICK, SHEILA KNEESHAW, KATHLEEN LEAVY, STEPHANIE
MILLEDGE, DEDAN MILTON, and TIMOTHY NGARE, Defendants-Appellants,
and ADRIAN ANDERSON and NORTH POINT ADVISORS, L.L.C., Defendants.

No. 294515, Nos. 294537, No. 294555, No. 294559, No. 294541, No. 294543, No.
294728, No. 294729

COURT OF APPEALS OF MICHIGAN

*2012 Mich. App. LEXIS 2236*

**November 15, 2012, Decided**

**NOTICE:**     THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:**   [*1]
   Wayne Circuit Court. LC No. 09-010080-NZ. Wayne Circuit Court. LC No. 09-010080-NZ. Wayne Circuit Court. LC No. 09-010080-NZ. Wayne Circuit Court. LC No. 09-010080-NZ. Wayne Circuit Court. LC No. 09-012332-NZ. Wayne Circuit Court. LC No. 09-010940-NZ. Wayne Circuit Court. LC No. 09-012332-NZ. Wayne Circuit Court. LC No. 09-010940-NZ.

**JUDGES:** Before: MURRAY, P.J., and CAVANAGH and STEPHENS, JJ.

**OPINION**

   Per Curiam.

   These eight consolidated appeals arise from three cases filed in the Wayne Circuit Court that challenge pension fund investments made by the city of Detroit's General Retirement System (LC Nos. 09-010080-NZ and 09-010940-NZ), and the city's Police and Fire Retirement System (LC No. 09-012332-NZ). We affirm in part,

reverse in part, and remand for further proceedings consistent with this opinion.

   Four appeals derive from LC No. 09-010080-NZ. In Docket No. 294515, 11 present and former members of the General Retirement System's Board of Trustees (the trustee defendants) appeal as of right a September 2009 circuit court order denying their motion for summary disposition premised on governmental immunity. In Docket No. 294537, the trustee defendants appeal by leave granted a separate September 2009  [*2] order certifying a plaintiff class. In Docket No. 294555, the trustee defendants appeal by leave granted portions of the circuit court's September 2009 order denying summary disposition on grounds unrelated to governmental immunity. And in Docket No. 294559, Adrian Anderson and North Point Advisors, L.L.C. (the investment advisor defendants), two other defendants who advised the General Retirement System on financial matters, appeal by leave granted the circuit court's September 2009 order denying their motion for summary disposition.

   Two appeals derive from LC No. 09-010940-NZ. In Docket No. 294543, 16 current and former members of the General Retirement System's Board of Trustees (the trustee defendants) appeal as of right an October 2009 circuit court order denying their motion for summary disposition premised on governmental immunity. Plaintiffs cross-appeal, challenging the circuit court's dismis-

sal of a breach of contract claim and refusal to allow amendment of their complaint. In Docket No. 294729, the trustee defendants appeal by leave granted portions of the circuit court's October 2009 order denying summary disposition unrelated to governmental immunity.

Lastly, two of the [*3] appeals derive from LC No. 09-012332-NZ. In Docket No. 294541, 20 current and former members of the Police and Fire Retirement System's Board of Trustees (the trustee defendants) appeal as of right an October 2009 circuit court order denying summary disposition on the basis of governmental immunity. Plaintiffs cross-appeal, challenging the circuit court's dismissal of a breach of contract claim and refusal to allow amendment of their complaint. In Docket No. 294728, the trustee defendants appeal by leave granted portions of the court's October 2009 order denying summary disposition unrelated to governmental immunity.

I

In LC No. 09-010080-NZ, plaintiffs filed an eight-count second amended complaint against 11 current and former trustees of the General Retirement System and their investment advisors. Count I alleged that defendants "repeatedly and flagrantly" violated their fiduciary duties to participants in the General Retirement System as set forth in the Public Employee Retirement System Investment Act (PERSIA), *MCL 38.1132 et seq.*, and that governmental immunity did not shield the trustee defendants from their grossly negligent conduct. Count II alleged a breach of common-law fiduciary [*4] duties based on "grossly ill-advised and high risk investments." Count III, alleged a breach of common-law fiduciary duties based on the shredding and loss of Plan-related documents, i.e., "spoliation of evidence." The allegations in Count IV, entitled "gross negligence," included self-dealing, improper and extravagant travel, and approving improper investments. Count V averred a claim of "Waste," in that defendants "improperly dissipated the Plans' assets." Count VI set forth instances of common-law and statutory conversion committed by the trustee defendants, including with regard to extravagant, unnecessary, and improper travel. Count VII contained a request for "declaratory and injunctive relief." And Count VIII alleged that, because of defendants' gross negligence, the Plan suffered losses beyond normal market risk and amounted to "unconstitutional diminishment and/or impairment of accrued financial benefits of the Plan" in violation of *Const 1963, art 9, § 24.*

In LC Nos. 09-010940-NZ and 09-012332-NZ, substantially similar first amended complaints were filed against 16 current and former trustees of the General Retirement System and 20 current and former trustees of the Police [*5] and Fire Retirement System, respectively, as well as the same financial advisors. Count I of the first amended complaints alleged that defendants' investment decisions violated their statutory fiduciary responsibilities under the PERSIA, *MCL 38.1132 et seq.* Count II, captioned "City of Detroit Ordinance," asserted that Detroit ordinances "permit[] Plaintiffs to bring this civil action for relief against Defendant-Trustees" for violating their fiduciary duties under the PERSIA. Count III was a negligence claim. Count IV alleged that the trustee defendants had caused the city to breach its agreements with pension plan participants, like plaintiffs. Count V, titled "Breach of Third-Party Contract," alleged that plaintiffs were third-party beneficiaries of the contracts between the investment advisor defendants and the trustee defendants and plaintiffs were harmed by the investment advisor defendants' unreasonable performance. Count VI averred breaches of common-law fiduciary duties; Count VII alleged gross negligence; and Count VIII sought "declaratory and injunctive relief."

II

In Docket Nos. 294555, 294559, 294728, and 294729, appeals arising from each of the three circuit court actions, [*6] the trustee defendants and the investment advisor defendants assert that plaintiffs do not have standing to pursue any of the claims in their complaints. Defendants sought summary disposition pursuant to *MCR 2.116(C)(7), (8),* and *(10),* but the circuit court relied on subrule (C)(10) in denying defendants' motions pertaining to standing. Whether a party has legal standing to assert a claim constitutes a question of law that this Court considers de novo. *Heltzel v Heltzel, 248 Mich App 1, 28; 638 NW2d 123 (2001).* We also review de novo a circuit court's summary disposition ruling. *Corley v Detroit Bd of Ed, 470 Mich 274, 277; 681 NW2d 342 (2004).*

A motion brought pursuant to *MCR 2.116(C)(10)* "tests the factual support of a plaintiff's claim." *Walsh v Taylor, 263 Mich App 618, 621; 689 NW2d 506 (2004).* "Summary disposition is appropriate under *MCR 2.116(C)(10)* if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp, 469 Mich 177, 183; 665 NW2d 468 (2003).* "In reviewing a motion under *MCR 2.116(C)(10),* this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence [*7] of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh, 263 Mich App at 621.* "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West, 469 Mich at 183.*

Pursuant to longstanding Michigan jurisprudence on standing, "a litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of *MCR 2.605*, it is sufficient to establish standing to seek a declaratory judgment." *Lansing Sch Ed Ass'n v Lansing Bd of Ed, 487 Mich 349, 372; 792 NW2d 686 (2010)*.

A. STANDING UNDER THE PERSIA, LEGAL CAUSE OF ACTION

1. THE TRUSTEE DEFENDANTS

Defendants initially contend that plaintiffs cannot bring a private cause of action under the PERSIA because it does not include a civil enforcement provision.

The PERSIA is analogous to the federal Employee Retirement Income Security Act, ERISA, *29 USC 1001 et seq.* ERISA sets minimum standards for pension plans offered by private employers, but does not apply to pension plans established by governmental [*8] entities. See *29 USC 1003(b)(1)*; *Bd of Trustees of City of Birmingham Employees' Retirement Sys v Comerica Bank, 767 F Supp 2d 793, 798 (ED Mich, 2011)*. Neither ERISA nor the PERSIA requires the establishment of pension plans; however, when a pension plan is established, the PERSIA requires that certain minimum standards be met. Like ERISA, the PERSIA requires that fiduciaries of employee pension plans "act with the same care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar aims." *MCL 38.1133(3)(a)*; see, also, *29 USC 1104(a)(1)(B)*. And the PERSIA requires that fiduciaries give appropriate consideration to the facts and circumstances relevant to the particular investment or investment course of action and act accordingly. *MCL 38.1133(3)(d)*.

ERISA, however, includes a civil enforcement provision which provides that participants and beneficiaries may bring civil actions to redress violations of the Act, including violations by fiduciaries. See *29 USC 1109*; *29 USC 1132(a)(1)* and *(l)(1)*. The PERSIA does not include a civil [*9] enforcement provision. But this lack of a specific civil enforcement provision is consistent with the broad constitutional grant of powers of local self-government enjoyed by municipalities as relates to local government issues like their retirement plans. See, e.g., *Brouwer v Bronkema, 377 Mich 616, 649-650; 141 NW2d 98 (1966)*; *Dooley v City of Detroit, 370 Mich 194, 212; 121 NW2d 724 (1963)*; *Davidson v Hine, 151 Mich 294, 296; 115 NW 246 (1908)*.

The city of Detroit is a home rule city pursuant to the Home Rule City Act, *MCL 117.1 et seq.* As our Supreme Court observed in *Detroit Police Officers Ass'n v City of Detroit, 391 Mich 44, 66; 214 NW2d 803 (1974)*, the Home Rule City Act "reflect[s] the position now expressed in Const 1963, art 7, s 22 that Michigan is a strong home rule state with basic local authority." Specifically, *Const 1963, art 7, § 22*, provides that a city has the power and authority to adopt a charter, as well as resolutions and ordinances "relating to its municipal concerns, property and government, subject to the constitution and law." Accordingly, subject to the constitution and law, home rule cities are governed by their city charter. "Retirement plans are a [*10] 'permissible charter provision' adoptable under the broad grant of authority bound in [*MCL 117.4i* and *117.4j*] of the Home Rule Cities Act." *Detroit Police Officers Ass'n, 391 Mich at 66*. As our Supreme Court has held "the entire subject of pensions, including the manner of proving the right thereto, is subject to control by the people of the municipality in the adoption of their charter." *Kelly v City of Detroit, 358 Mich 290, 299; 100 NW2d 269 (1960)*. That is, "[p]ension matters . . . in a municipality operating under a home-rule or freeholders' charter are generally held to be within the exclusive control of the municipality." *Id. at 298* (citation omitted).

The Detroit City Charter provides for retirement plans in Article 11. In particular, Section 11-101 provides:

> 1. The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

> 2. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

> 3. The accrued financial benefits of active and retired city employees, being contractual obligations of the [*11] city, shall in no event be diminished or impaired.

Section 11-103 provides that two governing bodies exist to administer the city's General Retirement System and the Police and Fire Retirement System.

The Detroit Municipal Code, in Chapter 47, sets forth provisions related to the retirement system. Article 1 sets forth the common provisions of the retirement system and several provisions cite to the PERSIA as au-

thority. See, e.g., Sections 47-1-12 and 47-1-15. Article 4 of Chapter 47 sets forth miscellaneous provisions of the retirement system, and includes the following provision which appears to have been effective since 2001:

**Sec. 47-4-3. - Enforcement; civil action**.

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, 1984 Detroit City Code or the terms of this Plan, may be brought by:

(1) A Plan participant who is or may become eligible to receive a benefit;

(2) A beneficiary who is or may become eligible to receive a benefit;

(3) A Plan fiduciary, including a Trustee;

(4) The Finance Director, on behalf of the City as Plan sponsor.[1]

1 In accordance with this provision, for example, the Police and Fire Retirement System and the **[*12]** General Retirement System of the City of Detroit have brought a civil action as "pension plan[s] and trust[s] established by the Charter and Municipal Code of the City of Detroit." *Police & Fire Retirement Sys of City of Detroit v Watkins*, unreported opinion, No. 08-12582 (ED Mich, Sept 30, 2009).

In this case, plaintiffs, as plan participants or beneficiaries, alleged that defendant trustees violated a state law, in particular their fiduciary duties arising under the PERSIA, including *MCL 38.1133(3)(a)* and *(3)(d)*. "[A]pplicable general laws of the state must be read into the charters of municipal corporations." *Council of City of Saginaw v Bd of Trustees of Policemen & Firemen Retirement System of City of Saginaw, 321 Mich 641, 647; 32 NW2d 899 (1948)*. But it is a tort claim because plaintiffs alleged breach of duties imposed by law, the PERSIA. Although a municipality like Detroit has broad authority, that authority is subject to statutory limitations, *Const 1963, art 7, § 22*, including the governmental tort liability act (GTLA) which provides that a governmental agency is immune from tort liability if "engaged in the exercise or discharge of a governmental function." *MCL 691.1407(1)*.

A **[*13]** "governmental function" is activity expressly or impliedly mandated or authorized by charter or ordinance. *MCL 691.1401(f)*; *Maskery v Univ of Mich Bd of Regents, 468 Mich 609, 613-614; 664 NW2d 165 (2003)*. The focus is on the general activity, not the specific conduct involved at the time of the alleged tort. *Tate v Grand Rapids, 256 Mich App 656, 661; 671 NW2d 84 (2003)*. In this case, Article 11 of the city charter provides for the establishment of two boards of trustees as governing bodies for administering the city's retirement plans. Plaintiffs' claims arise from the trustee defendants' alleged acts related to administering the city's retirement plans, i.e., a governmental function. The Legislature has not specifically authorized a private cause of action under the PERSIA in avoidance of governmental immunity. See *Lash v Traverse City, 479 Mich 180, 194; 735 NW2d 628 (2007)*. Although the Detroit Municipal Code may appear to have authorized such a cause of action, the city could not create a cause of action against itself in contravention of the broad scope of governmental immunity. See *Mack v Detroit, 467 Mich 186, 196; 649 NW2d 47 (2002)*. Thus, contrary to the circuit court's **[*14]** conclusion that Detroit ordinances invested plaintiffs with standing to challenge investment decisions of the trustee defendants, none of the plaintiffs in these cases may pursue a legal cause of action for the alleged PERSIA violations against the trustee defendants. See *Lansing Sch Ed Ass'n, 487 Mich at 372*.

## 2. THE INVESTMENT ADVISOR DEFENDANTS

Defendant Anderson works as the president of defendant North Point Advisors, a private entity, which rendered services to the retirement system. Because the investment advisor defendants were not engaged in a "governmental function" when they rendered such services, they are not entitled to the protection of governmental immunity. See *Rambus v Wayne Co Gen Hosp, 193 Mich App 268, 273; 483 NW2d 455 (1992)*. As set forth above, the Detroit Municipal Code authorized plan participants, beneficiaries, fiduciaries, and the Plan

sponsor to bring "[a] civil action for relief against any act or practice which violates the state law." "The framers of the charter, and the people of the city in its adoption, must be presumed to have intended that the provision be construed as it reads." *Kelly, 358 Mich at 296*.

Plaintiffs, as plan participants or beneficiaries, [*15] alleged that the investment advisor defendants violated state law, in particular, the PERSIA. Pursuant to the PERSIA, the investment advisor defendants constitute "investment fiduciaries," which *MCL 38.1132c(1)(b)* defines as including a person who "[r]enders investment advice for a system for a fee or other direct or indirect compensation." Plaintiffs alleged that the investment advisor defendants violated their investment fiduciary duties as set forth in *MCL 38.1133(3)*. Accordingly, as the trial court concluded, plaintiffs have standing to pursue their cause of actions against the investment advisor defendants for violations of the PERSIA.

## B. DECLARATORY RELIEF UNDER THE PERSIA

Governmental immunity prohibits plaintiffs from pursuing tort claims against the trustee defendants, but such immunity does not prevent the enforcement of the PERSIA by declaratory judgment if the requirements of *MCR 2.605* are met. See *Lansing Sch Ed Ass'n, 487 Mich at 372*; *Lash, 479 Mich at 194-196*. According to *MCR 2.605(A)(1)*, "[i]n a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, [*16] whether or not other relief is or could be sought or granted." "An 'actual controversy' exists where a declaratory judgment or decree is necessary to guide a plaintiff's future conduct in order to preserve his legal rights." *Groves v Dep't of Corrections, 295 Mich App 1, 10; 811 NW2d 563 (2011)* (internal quotation and citation omitted). And the purpose of a declaratory judgment is "to enable the parties to obtain adjudication of rights before an actual injury occurs, to settle a matter before it ripens into a violation of the law or breach of contract, or to avoid multiplicity of actions by affording a remedy for declaring in expedient action the rights and obligations of all litigants." *Rose v State Farm Mut Auto Ins Co, 274 Mich App 291, 294; 732 NW2d 160 (2006)*.

In this case, an "actual controversy" does not exist because a declaratory judgment is not necessary to guide plaintiffs' "future conduct in order to preserve [their] legal rights." *Groves, 295 Mich App at 10*. And, because plaintiffs have alleged actual injury and violations of the law, the objectives of the declaratory judgment rule cannot be met. Accordingly, plaintiffs do not have standing to pursue a declaratory judgment [*17] action against either the trustee defendants or the investment advisor defendants with regard to their PERSIA-based claims.

## C. PLAINTIFFS' STANDING TO BRING OTHER CLAIMS (LC NO. 09-010080-NZ)

In their complaint, plaintiffs also alleged that the trustee defendants breached their common-law fiduciary duties. It is clear that a fiduciary relationship existed between plaintiffs as plan participants or beneficiaries and the trustee defendants. See *In re Karmey Estate, 468 Mich 68, 75 n 2; 658 NW2d 796 (2003)*, quoting Black's Law Dictionary (7th ed). Accordingly, the trustee defendants had a duty to act for the benefit of plaintiffs on matters within the scope of that relationship. *Id.* "Relief is granted when such position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Vicencio v Ramirez, 211 Mich App 501, 508; 536 NW2d 280 (1995)*.

Here, plaintiffs alleged and offered evidence[2] that the trustee defendants breached their fiduciary duties in several respects, including by making imprudent and improper investments causing losses of retirement funds, destroying evidence, and engaging in self-dealing such as spending funds on unnecessary and extravagant [*18] travel.[3] However, this state treats a breach of fiduciary duty claim as a common-law tort. *Miller v Magline, Inc, 76 Mich App 284, 313; 256 NW2d 761 (1977)*. As discussed above, the trustee defendants are entitled to immunity for tort claims. See *MCL 691.1407(1)*. But in Count IV of their complaint, plaintiffs alleged that the trustee defendants were not entitled to immunity because their conduct was grossly negligent. *MCL 691.1407(2)(c)* sets forth as a condition of immunity that "conduct [ ] not amount to gross negligence that is the proximate cause of the injury or damage." Because plaintiffs pleaded in avoidance of governmental immunity, the circuit court properly denied the trustee defendants' motion for summary disposition on the basis of standing with regard to plaintiffs' claims that the trustee defendants violated their common-law fiduciary duties.

2   The newspaper articles that plaintiffs attached to their summary disposition response qualify as hearsay. *Baker v Gen Motors Corp (After Remand), 420 Mich 463, 512; 363 NW2d 602 (1984)*. But the articles may contain at least some admissible content. *MCR 2.116(G)(5)* ("documentary evidence offered in support of or in opposition to a motion [*19] based on subrule (C)(1)-(7) or (10) shall only be considered to the extent that *the content or substance would be admissible as evidence*") (emphasis added).
3   We note that Count III (spoliation of evidence and document destruction) and Count V (spending funds on unnecessary travel) were

properly dismissed as distinct causes of action by the circuit court.

We also conclude that plaintiffs have standing to assert their claims of common-law and statutory conversion set forth in Count VI, legal causes of action grounded in the trustee defendants allegedly spending plan funds "on extravagant, unnecessary and improper trips." And plaintiffs possess standing to assert their claims set forth in Count VIII, that both the trustee defendants and investment advisor defendants violated *Const 1963, art 9, § 24*, which declares: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."

### D. PLAINTIFFS' STANDING IN LC NOS. 09-010940-NZ AND 09-012332-NZ

Unlike the plaintiffs in LC No. 09-010080-NZ, plaintiffs in LC Nos. 09-010940-NZ and 09-012332-NZ did **[*20]** not submit with their responses to the trustee defendants' motions for summary disposition an affidavit explaining how defendants' course of conduct (poor investments, self-dealing) harmed or placed at risk plaintiffs' interests in the retirement system. Nor did plaintiffs attach any affidavit, court records, or documentary evidence in admissible form; they attached copies of *Detroit Free Press* articles that reported on excessive travel by some board members and failed investments. The newspaper articles themselves do not constitute admissible evidence, *Baker v Gen Motors Corp (After Remand), 420 Mich 463, 512; 363 NW2d 602 (1984)*, but the contents of some of the articles might be admissible. *MCR 2.116(G)(5)*. Even assuming that plaintiffs in LC Nos. 09-010940-NZ and 09-012332-NZ inadequately supported their summary disposition responses, the trustee defendants' motions for summary disposition were inappropriate given the early stage of these litigations.

### E. DISCOVERY INCOMPLETE IN ALL THREE CIRCUIT COURT ACTIONS

With respect to all three circuit court actions, a basic, well-established procedural proposition supported the circuit court's denial of defendants' motions for summary disposition **[*21]** contesting plaintiffs' standing: "[I]ncomplete discovery generally precludes summary disposition, [unless] . . . further discovery does not stand a fair chance of finding factual support for the nonmoving party." *VanVorous v Burmeister, 262 Mich App 467, 476-477; 687 NW2d 132 (2004)*. The circuit court record in LC No. 09-010080-NZ contains four voluminous files, but when defendants filed their motions for summary disposition discovery remained ongoing. Plaintiffs filed their initial complaint on April 29, 2009, and the trustee

defendants filed their motion for summary disposition on July 17, 2009, just 79 days later. The Court in *VanVorous, 262 Mich App at 477*, noted that a "party opposing a motion for summary disposition because discovery is not complete must provide some independent evidence that a factual dispute exists." (Internal quotation and citation omitted). In plaintiffs' summary disposition response, they appended many exhibits tending to substantiate the allegations in their second amended complaint, including an affidavit and other documents tending to suggest that defendants had invested unwisely and squandered plan funds. In summary, plaintiffs in LC No. 09-010080-NZ **[*22]** have presented "some independent evidence that a factual dispute exists" in this case, and that further discovery "stand[s] a fair chance of finding factual support for the nonmoving party." *VanVorous, 262 Mich App at 477*. The circuit court thus correctly denied defendants' motions for summary disposition on the basis that plaintiffs lacked standing.

In LC Nos. 09-010940-NZ and 09-012332-NZ, summary disposition likewise was inappropriate because no discovery had occurred. See *VanVorous, 262 Mich App at 476-477*. The newspaper articles attached to plaintiffs' summary disposition responses in these cases comprise at least some independent evidence in support of their bad investment and self-dealing allegations. *Id. at 477*. There is a reasonable likelihood that plaintiffs could secure some admissible evidence supporting their breach of fiduciary duty and gross negligence claims, which they had standing to bring. *Lansing Sch Ed Ass'n, 487 Mich at 372*.[4] The circuit court correctly denied defendants' motions for summary disposition on the basis that plaintiffs lacked standing, even assuming that the court may have erred in premising its ruling on the Detroit retirement system ordinances and **[*23]** dismissing the declaratory relief count of the complaint. See *Klooster, 488 Mich at 313*.

> 4  In Docket Nos. 294541 and 294543, plaintiffs in LC Nos. 09-010940-NZ and 09-012332-NZ cross-appeal contesting the circuit court's summary dismissal of their breach of contract counts (Counts IV and V) pursuant to *MCR 2.116(C)(8)*. We affirm the dismissal because these counts do not reference any specific agreements and consist entirely of conclusory allegations. On remand, plaintiffs may seek leave to file more specific breach of contract counts in amended complaints. See *MCR 2.118(A)(2)*.

### F. CONCLUSIONS CONCERNING STANDING

In LC No. 09-010080-NZ, the trustee defendants' motion for summary disposition on the basis of standing with regard to Count I, the alleged PERSIA violations,

should have been granted, and summary disposition of Count VII, the request for declaratory relief, was properly granted. The investment advisor defendants' motion for summary disposition on the basis of standing with regard to Count I, the alleged PERSIA violations, was properly denied. The circuit court properly denied the trustee defendants' and the investment advisor defendants' motions for summary disposition on the basis **[*24]** of standing with regard to (1) Count II, breach of common-law fiduciary duties, (2) Count IV, gross negligence, (3) Count VI, conversion, and (4) Count VIII, the violation of *Const 1963, art 9, § 24*. The court properly dismissed Count III, spoliation, and Count V, waste, as separate counts.

In LC Nos. 09-010940-NZ and 09-012332-NZ, the trustee defendants' motion for summary disposition on the basis of standing with regard to Count I, the alleged PERSIA violations, should have been granted, and summary disposition of Count VIII, the request for declaratory relief, was properly granted. The investment advisor defendants' motion for summary disposition on the basis of standing with regard to Count I, the alleged PERSIA violations, and Count II, the ordinances under which plaintiffs sought relief, was properly denied. The circuit court properly denied defendants' motions for summary disposition of (1) Count III, negligence, (2) Count VI, breach of common-law fiduciary duties, and (3) Count VII, gross negligence. Plaintiffs' inadequately pleaded breach of contract claims, as set forth in Counts IV and V, were properly dismissed.

III

In Docket Nos. 294515, 294541, and 294543, the trustee defendants **[*25]** in each circuit court action assert that the circuit court erred in denying their motions for summary disposition premised on governmental immunity. The circuit court stated that it denied the motions for summary disposition premised on governmental immunity under MCL 2.116(C)(7).

> Under *MCR 2.116(C)(7)*, summary disposition is proper when a claim is barred by immunity granted by law. To survive such a motion, the plaintiff must allege facts justifying the application of an exception to governmental immunity. [The reviewing court] consider[s] all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them. [*Fane v Detroit Library Comm'n, 465 Mich 68, 74; 631 NW2d 678 (2001).*]

A. LC NO. 09-010080-NZ

Pursuant to *MCL 691.1407(7)(a)*, "gross negligence" is defined as "conduct so reckless as to demonstrate a substantial disregard for whether an injury results." *MCL 691.1407(7)(a)*. Accepting as true plaintiffs' allegations in LC No. 09-010080-NZ, including that the defendant trustees entered into multiple "grossly ill-advised and high-risk" pension fund investments with little investigation **[*26]** and contrary to the advice of most investment consultants, as well as spent pension funds on numerous unnecessary and extravagant trips, a reasonable inference arises that the trustee defendants engaged in "conduct so reckless as to demonstrate a substantial disregard for whether" injury resulted to the retirement system. See *MCL 691.1407(7)(a)*. The complaint also maintained that "Defendants' breaches of duty and gross negligence are the proximate cause of the injury." The trustee defendants did not submit with their motion any documentary evidence contradicting the complaint's assertions. Thus, the motion for summary disposition was properly denied.

B. LC NOS. 09-010940-NZ AND 09-012332-NZ

In LC Nos. 09-010940-NZ and 09-012332-NZ, the first amended complaints mentioned the defendant trustees' series of ill-advised and high risk pension fund investments, as well as their excessive travel that included attending numerous meetings in California, Chicago, Arizona, Florida, New York, and Singapore in a six-month period of time. The first amended complaints also contain a gross negligence count, Count VII. The first amended complaints do not as extensively describe the allegedly reckless **[*27]** conduct as the second amended complaint does in LC No. 09-010080-NZ. However, accepting as true the allegations in the first amended complaints as a whole, they at least arguably suggest that defendants engaged in "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results," *MCL 691.1407(7)(a)*, and that defendants proximately caused the injuries alleged.

C. DISCOVERY INCOMPLETE

Moreover, summary disposition on the issue of governmental immunity also is improper because discovery remains incomplete in LC No. 09-010080-NZ, and there has been little to no discovery in LC Nos. 09-010940-NZ and 09-012332-NZ. The circuit court reached the correct result in denying defendants' motions for summary disposition based on governmental immunity. However, we

caution that bad investment decisions as determined in hindsight do not constitute gross negligence.

IV

Lastly, in Docket No. 294537, the trustee defendants argue that the circuit court erred in several respects when it granted plaintiffs' motion for class certification. For the reasons discussed above, we reject the trustee defendants' first contention that the class certification was a mistake because plaintiffs [*28] lacked standing.

The trustee defendants next submit that "the record does not reveal . . . whether the trial court engaged in *any* analysis of whether the prerequisites were met, let alone a sufficient analysis to satisfy the standard set by" the Michigan Supreme Court. [Emphasis in original.]

"Pursuant to *MCR 3.501(A)(1)*, members of a class may only sue or be sued as a representative party of all class members if the prerequisites dictated by the court rule are met." *Henry v Dow Chem Co, 484 Mich 483, 496; 772 NW2d 301 (2009).* Our Supreme Court elaborated as follows, in *Henry, 484 Mich at 502-504*, concerning the quantum of information that a party seeking class certification must supply a circuit court:

> [A] certifying court may not simply "rubber stamp" a party's allegations that the class certification prerequisites are met. However, the federal "rigorous analysis" requirement does not necessarily bind state courts. . . . Given that *MCR 3.501(A)* expressly conditions a class action on satisfaction of the prerequisites, a party seeking class certification is required to provide the certifying court with information sufficient to establish that each prerequisite for class certification [*29] in *MCR 3.501(A)* is in fact satisfied. A court may base its decision on the pleadings alone *only if* the pleadings set forth sufficient information to satisfy the court that each prerequisite is in fact met. The averments in the pleadings of a party seeking class certification are only sufficient to certify a class if they satisfy the burden on the party seeking certification to prove that the prerequisites are met, such as in cases where the facts necessary to support this finding are uncontested or admitted by the opposing party.

> If the pleadings are not sufficient, the court must look to additional information beyond the pleadings to determine whether class certification is proper. However,

when considering the information provided to support class certification, courts must not abandon the well-accepted prohibition against assessing the merits of a party's underlying claims at this early stage in the proceedings. . . . [S]tate courts also have broad discretion to determine whether a class will be certified. . . . [Emphasis in original.]

In LC No. 09-010080-NZ, plaintiffs' second amended complaint recited 14 paragraphs under the heading, "Class Action Allegations," which addressed the [*30] class action prerequisites in *MCR 3.501(A)(1)*. Later, plaintiffs filed a motion and brief seeking class certification in which they summarized the facts underlying the claims of the entire proposed class, and added specific details to their complaint's class action allegations, including that:

> o approximately 9,000 active members of the Plan were damaged by defendants' conduct,

> o the claims of the proposed class members had "questions of law and fact in common," including whether defendants "violated their statutory fiduciary duties established by PERSIA," "violated common law fiduciary duties owed to the Plan and Plan participants," and "were negligent [or grossly negligent] with respect to the Plan,"

> o "the only individual issue will be that of each individual Class member's damages,"

> o plaintiffs' counsel had "particular and extensive experience in litigating complex class actions" and "[c]ertifying the Class . . . is the superior, if not only, mechanism by which to proceed" because "[a]djudication of the legality of Defendants' actions will determine most . . . liability issues for all Class members,"

> o [*31] the class members' best interests weighed in favor of certifying the proposed class,

> o the proposed class' claim for declaratory and injunctive relief "weigh[ed] heavily in favor of class certification,"

o the case did not present any disparate issues that might render the class action unmanageable,

o certification "will bring finality to the litigation on this issue and it will avoid additional litigation by other members of the plaintiff Class," and

o in light of the relatively small damages suffered by individual class members, the present case was well-suited "to the class action procedural device, because Class members may be precluded from pursuing their rights individually, due to the economics of doing so."

On September 23, 2009, the circuit court entered an order granting the motion for class certification. The order provides:

Plaintiff[s] having filed a Motion for Class Certification; Defendants having opposed Plaintiffs' Motion for Class Certification; *the Court having reviewed all of the Briefs and supporting material submitted* [emphasis added], and having heard oral argument of counsel for the Parties; and being fully advised in the premises:

IT IS . . . ORDERED that Plaintiffs' **[*32]** Motion for Class Certification is GRANTED as this Court is satisfied that:

(a) The class is so numerous that joinder of all members is impracticable as there are approximately 9,000 members;

(b) There are questions of law, breach of fiduciary duty, and gross negligence; or questions of fact, Plaintiffs lost money; common to the members of the class that predominate over questions affecting only individual members;

(c) The claims or defenses of the representative parties, as derivative Plaintiffs that lost a percentage of the Plan money, are typical of the claims or defenses of the class;

(d) The representative parties have fairly and adequately asserted the interests of the class; and

(e) The maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.

Further, this Court is satisfied:

(a) That this class action is the superior method of adjudicating because the prosecution of separate actions by or against individual members of the class could create a risk of:

i. Inconsistent or varying adjudications with respect to individual members of the class that would confront the party opposing the class **[*33]** with incompatible standards of conduct; and

ii. Adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(b) Equitable or declaratory relief might be appropriate with respect to the class;

(c) The action will be manageable as a class action;

(d) The separate claims of individual class members are insufficient to support separate actions;

(e) It is probable that the amount which may be recovered by the derivative class members justifies a class action; and

(f) Members of the class have a significant interest in controlling the prosecution and defense of all actions.

The class shall be certified as follows: all active Detroit employee and retiree participants in the Detroit General Retirement System, and all beneficiaries of a participant in the Detroit General Retirement System;

IT IS FURTHER ORDERED that the Class shall receive notice pursuant to *MCR 3.501(C)(5)*, and that the Class Notice will be published in the following newspapers, for the following time periods: The Detroit Free Press *and* The **[*34]** Detroit News, one 5.5 inch-by-5 inch display to run Monday through Friday for two consecutive weeks and on two

consecutive Sundays. Also, Plaintiffs' counsel shall receive any responses to the various forms of notice, and shall promptly inform the Court of any class members who choose to opt out of this litigation. [Emphasis in original.]

Our review of the record confirms that plaintiffs satisfied their obligation "to provide the certifying court with information sufficient to establish that each prerequisite for class certification in *MCR 3.501(A)* is in fact satisfied." *Henry, 484 Mich at 502*. The trial court considered the many class action allegations in plaintiffs' complaint, the documentation that plaintiffs submitted to substantiate their motion for class certification, and the parties' many briefs pertaining to certification. In light of the complaint's class action allegations and the evidence plaintiffs appended to their motion for class certification, which the circuit court referenced in deciding the motion, we conclude that (1) the circuit court's order adequately explains that the prerequisites for class certification existed in this case; (2) the circuit court's order **[*35]** contains no clearly erroneous findings of fact; and (3) the circuit court acted within its discretion in entering the order certifying the plaintiff class. See *Henry, 484 Mich at 495-496*.

Contrary to the trustee defendants' inadequate notice arguments, the order granting certification satisfied court rule notice requirements. "As soon as practicable, the court shall determine how, when, by whom, and to whom the notice shall be given; the content of the notice; and to whom the response to the notice is to be sent." *MCR 3.501(C)(3)*. The order granting certification makes evident that notice shall occur (1) by publication (how), a notice method specifically contemplated in *MCR 3.501(C)(4)(b)*, in the *Detroit Free Press* and the *Detroit News*; (2) "Monday through Friday for two consecutive weeks and on two consecutive Sundays" (when); (3) to "all active Detroit employee and retiree participants in the Detroit General Retirement System, and all beneficiaries of a participant in the Detroit General Retirement System" (to whom); (4) "the Class shall receive notice pursuant to *MCR 3.501(C)(5)*," which sets forth in subrules (a)-(h) mandatory notice contents (the content of the notice); (5) "Plaintiffs' **[*36]** counsel shall receive any responses to the various forms of notice, and shall promptly inform the Court of any class members who choose to opt out of this litigation" (to whom responses should be sent); and (6) the trustee defendants do not contradict plaintiffs' appellate contention that they prepared the notice.[5] Although the trustee defendants complain that the "court did not review nor make any findings with respect to the sufficiency of the form, sub-

stance or manner of class notice," the trustee defendants do not mention any specific information that the court purportedly failed to consider in formulating the notice, and they do not explain any manner in which the failure to take into account the information could have prejudiced anyone--the potential class members, plaintiffs, or defendants. *MCR 2.613(A)*. Accordingly, the circuit court's order granting plaintiffs' motion for class certification is affirmed.

5    In *MCR 3.501(C)(6)(a)*, the Supreme Court placed on the plaintiff the burden of paying for the notice to the class.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray

/s/   **[*37]** Mark J. Cavanagh

/s/ Cynthia Diane Stephens



**DRAKE SAXTON, JIMMY LITTLE, and THOMAS C. DUDLEY, individually and on behalf of all others similarly situated, Plaintiffs, v. CENTRAL PENNSYLVANIA TEAMSTERS PENSION FUND; the CENTRAL PENNSYLVANIA TEAMSTERS PENSION FUND TRUSTEES-WILLIAM SHAPPELL, KEITH NOLL, KEVIN M. CICAK, TOM J. VENTURA, THOMAS K. WOTRING, and PETER HASSLER; and the FUND ADMINISTRATOR-JOSEPH J. SAMOLEWICZ; Jointly and Severally, Defendants.**

Civil Action No. 02-CV-986

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2003 U.S. Dist. LEXIS 23983*; *32 Employee Benefits Cas. (BNA) 1126*

December 9, 2003, Decided

**PRIOR HISTORY:** *Saxton v. Cent. Pa. Teamsters Pension Fund, 2003 U.S. Dist. LEXIS 23828 (E.D. Pa., Oct. 28, 2003)*

**DISPOSITION:** Defendants' Motion to Dismiss granted in part and denied in part.

**COUNSEL:** [*1] For Drake Saxton, Jimmy Little, Thomas C Dudley, PLAINTIFFS: Alan M Sandals, Sandals & Associates PC, Philadelphia, PA USA. Ann Curry Thompson, Kelman Loria Will Harvey & Thompson, Detroit, MI USA.

For Central Pennsylvania Teamsters Pension Fund, Trustees & Administrator, Joseph J Samolewicz, Peter Hassler, Thomas K Wotring, Tom J Ventura, Kevin M Cicak, Keith Noll, William Shappell, Central Pennsylvania Teamsters Pension Fund Trustees, Central Pennsylvania Teamsters Pension Fund, DEFENDANTS: Paul C Evans, Morgan Lewis & Bockius LLP, Philadelphia, PA USA.

**JUDGES:** Van Antwerpen, J.

**OPINION BY:** Van Antwerpen

**OPINION**

OPINION AND ORDER

**I. Introduction**

We have before us Defendants' Motion to Dismiss Plaintiffs' Amended Complaint for failure to state cognizable claims pursuant to *Fed. R. Civ. P. 12(b)(6)*. Plaintiffs Drake Saxton, Jimmy Little, and Thomas C. Dudley, acting on behalf of themselves and all others similarly situated, allege that Defendants Central Pennsylvania Teamsters Pension Fund, Trustees, and Fund Administrator violated various provisions of ERISA, including breach of fiduciary duty provisions, § 404(a)(1)(A)-(D), *29 U.S.C. § 1104 (a)(1)(A)-(D)* [*2] ; unlawful reduction of accrued benefits, § 204(g), *29 U.S.C. § 1054(g)*; unlawful forfeiture of accrued benefits, § 203(a), *29 U.S.C. § 1053(a)*; illegal transfers of plan assets, § 4231, *29 U.S.C. § 1411*; and prohibited transactions, § 406(a), *29 U.S.C. § 1106(a)*. Plaintiffs also assert violations under the LMRA, § 302, *29 U.S.C. § 186*, as well as a violation of collective bargaining agreements. For the reasons set forth below, the Defendants' Motion to Dismiss is granted in part and denied in part.

**II. Jurisdiction**

This case arises under ERISA, *29 U.S.C. § 1001 et seq.*: thus, we have federal question jurisdiction under *28 U.S.C. § 1331* and *29 U.S.C. § 1132(e)*.

**III. Background**

We present the relevant facts as Plaintiffs allege them in their brief. Defendant, the Central Pennsylvania

Page 2

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

Teamsters Fund ("Fund" or "Pension Plan") is a multi-employer pension fund governed by the Employee Retirement Income Securities Act ("ERISA"), *29 U.S.C. § 1001 et seq.* **[*3]** Plaintiffs are participants in the Fund, which is administered by three union Trustees, and three employer Trustees, as well as a Fund Administrator appointed by the Trustees. The Fund itself, a trust, is comprised of three distinct pension sub-plans, or sub-trusts, all of which qualify as separate ERISA benefit plans. These sub-plans include the Defined Benefit Plan ("DB Plan"), the Retirement Income Plan 1987 ("RIP 87 Plan"), and the Retirement Income Plan 2000 ("RIP 2000 Plan"). Each sub-plan is governed by the Central Pennsylvania Teamster Pension Fund Trust Agreement, as restated December 9, 1999 ("1999 Trust Agreement" or "Trust Agreement"), as well as by its own plan document. The DB Plan is a defined benefit plan, whereas the RIP 87 Plan and the RIP 2000 Plan are defined contribution or individual account plans, as defined by ERISA § 3(34), *29 U.S.C. § 1002(34).* [1]

> 1 Defined benefit plans generally provide for fixed benefits payments as provided by the plan's terms. See *29 U.S.C. § 1002(35).* Defined contribution, or individual account plans, create an individual account for each plan participant. The benefits paid to the participant are based entirely on the amount contributed to the participant's account, "any any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." *29 U.S.C. § 1002(34).*

**[*4]** Plaintiffs filed the instant action as a class action lawsuit. Named Plaintiffs Drake Saxton, Jimmy Little, and Thomas C. Dudley are participants in both the DB and RIP 87 Plans. In addition to asserting claims against the Fund, Plaintiffs' Amended Complaint alleges various ERISA violations against the Trustees and the Fund Administrator. Briefly, Count 1 of the Amended Complaint seeks declaratory and injunctive relief to clarify and enforce Plaintiffs' rights to future benefits under the DB Plan and the RIP 87 Plan upon this Court's resolution of Plaintiffs' remaining statutory based claims. Count II alleges that Defendant Trustees and Defendant Fund Administrator breached their fiduciary duties through various measures. Counts III and IV aver that the plan amendments adopted by Defendant Trustees in 2002 violated the "anti-cut back" rule of ERISA § 204(g)(1), *29 U.S.C. § 1054(g)(1)* and constituted unlawful forfeitures of Plaintiffs' accrued benefits under § 203(a), *29 U.S.C. § 1053(a)*, respectively. Count V contends that the Trustees flouted ERISA § 4231(a), *29 U.S.C. § 1411(a)* by causing illegal transfers **[*5]** of plan assets without meeting certain specified requirements. Count VI alleges that Defendants breached collective bargaining agreements with employers. The employers' obligations to contribute to the Fund arise from these agreements. Finally, Count VII sets forth claims pursuant to the *Labor Management Relations Act* ("LMRA") and seeks to hold Defendant Trustees and Defendant Fund Administrator personally liable for committing prohibited transactions in connection with the violations alleged throughout the Amended Complaint.

The Fund was created in 1955 by its settlors, the Transport Employers Association ("TEA") and the Teamsters, Chauffeurs, Warehouseman, and Helpers Local Union No. 429 ("Local 429"). Since then, the Fund and its sub-plans have been amended on multiple occasions. In 1986, the Fund documents were amended to phase out the DB Plan over a three year span, and establish a new "Retirement Income Plan," which, after the RIP 2000 plan was created, became known as the RIP 87 Plan. The DB Plan and RIP 87 Plan had overlapping, but not identical participation. As the collective bargaining agreements ("CBA") governing employer contributions into the DB Plan expired during **[*6]** the three-year window, 95% of future employer contributions were directed into the RIP 87 Plan, and the remaining 5% were directed into the old DB Plan. This apportionment of employer contributions between the two plans was made pursuant to a formula set forth the Trust Agreement. The DB Plan was thereafter amended in 1989, effective January 1990, to direct *all* employer contributions into the RIP 87 Plan. The amendment was implemented based on the Trustees' incorrect assumption that the DB Plan was "fully funded" and thus required no further employer contributions to meet its existing benefit obligations to beneficiaries.

By 1999, however, it became evident that the DB Plan was in danger of not meeting ERISA's minimum funding requirements. The Fund's Settlors, TEA and Local 429, therefore amended the Fund's Trust Agreement in 1999. This agreement, known as the 1999 Second Amended and Restated Central Pennsylvania Teamsters Pension Trust Agreement, contained two important amendments. First, the RIP 2000 Plan was spun off from the RIP 87 Plan. The RIP 2000 Plan was established as a separate defined contribution plan for employers who had joined the Fund since 2000 and whose employees **[*7]** had never participated in the DB Plan. Second, to ameliorate the DB Plan's funding problems, an amendment allocated a certain amount of future contributions of RIP 87 Employers from the RIP 87 Plan into the DB Plan for the years 2000 to 2005. The quantity of contributions reallocated was calculated from the total forfeitures [2] of RIP 87 Plan employees from the previous year. Significantly, the previous year's forfeitures remained in the RIP 87 Plan. The quantity of forfeitures merely

Page 3

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

served as a guide for determining the portion of future contributions from RIP 87 Employers that would be allocated to the DB Plan. Thus, while the employers' overall contribution obligations did not diminish, a portion of those contributions were directed into the DB Plan. These amendments to the Trust Agreement were signed by both TEA and Local 429, the Fund's settlors.

In another attempt to surmount the DB Plan's underfunding issue, the Trustees announced two proposals to the membership in 2001. The first involved freezing the RIP 87 Plan, and re-activating the DB Plan for receipt of future employer contributions. The second option reallocated a additional percentage of future contributions of RIP **[*8]** 87 Plan employers into the DB Plan pursuant to a formula based on the participant's age and years of service. The Trustees ultimately selected this latter option, deemed Amendment No. 4, effective March 1, 2002. [3] Amendment No. 4 also contained a second, separate amendment. The Trustees added to the amendment provisions of the Trust Agreement the statement, "nothing in this Trust Agreement shall preclude the Trustees from acting in their Settlor-capacity as appropriate by law." (1999 Trust Agreement, Art. XI, Sec. 11.1.) Amendment No. 4 was signed and issued by the Trustees, without the signatures of Local 429 and the TEA. Several months later, however, the Trustees reversed their position and adopted Amendment No. 6 to the 1999 Second Amended and Restated Trust Agreement. This amendment, effective January 2003, froze the RIP 87 Plan and allocated all future contributions of RIP 87 Plan employers into the DB Plan. [4] Plaintiffs' allegations stem primarily from these amendments.

2    A forfeiture occurs when a RIP 87 Plan participant terminates membership prior to his/her benefits becoming vested.

**[*9]**

3    Amendment No. 4 provides in relevant part:

> Section 2.3. Contributions to RIP 1987. Beginning January 1, 2000, all Contributions paid to the Fund by RIP 87 Employers shall be allocated to RIP 1987, except as otherwise provided in Section 2.4, herein.
>
> Section 2.4. Contributions to the Defined Benefit Plan. A portion of the Contributions that each RIP 1987 Employer pays to the Fund will be allocated to the Defined Benefit plan, as follows:
>
> A. Forfeitures. Effective January 1, 2000, the Contributions for

each RIP 1987 Employer that would otherwise be allocated to RIP 1987 will be reduced by the dollar value of the Forfeitures that its Employees incurred in RIP 1987 as of the first day of each Fund year. ...

> B. In addition to the Contributions allocated to the Defined Benefit Plan under subsection (A) above, a portion of the Contributions to the Fund of each RIP 1987 Employer for hours worked by Participants on and after **March 1, 2002,** will be allocated to the Defined Benefit Plan in accordance with the following formula ...

(emphasis added).

4    Amendment No. 6 provides in pertinent part:

> Section 2.3 Contributions to RIP 1987. Effective January 1, 2000 until December 31, 2002, all Contributions owed to the Fund by RIP 1987 Employers shall be allocated to RIP 1987, except as otherwise provided in Section 2.4, herein. Effective January 1, 2003, all Contributions to RIP 1987 will cease and all Contributions paid to the Fund by RIP 1987 Employers will be allocated to the Defined Benefit Plan.

**[*10]**   **IV. Standard of Review**

A motion to dismiss, pursuant to *Fed. R. Civ. P. 12(b)(6)*, tests the legal sufficiency of the complaint. *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. Accordingly, an action will be dismissed under *12(b)(6)* only when the plaintiff has failed to state a claim upon which relief can be granted. The criteria for deciding whether a plaintiff has met this standard have been clearly established. "In reviewing a motion to dismiss a complaint for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*, all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987)*. This Court need not credit, however, any conclusory allegations of law, unsubstantiated conclusions, and/or unwarranted

Page 4

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

factual inferences. *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*. In addition, a complaint should be dismissed only if it appears to a **[*11]** legal certainty that a plaintiff could prove no set of facts which would entitle him or her to relief. *D.P. Enterprises v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984)*.

Generally, a court may not take into account materials extraneous to the pleadings when considering a motion to dismiss. *Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985)*. If, however a document is "integral to or explicitly relied upon in the complaint," it may be considered "without converting the motion [to dismiss] into one for summary judgment." *Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)*, superceded by statute on other grounds, as noted in *Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st Cir. 1999)*; see also *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)* (finding district court's reliance on document provided by defendants in ruling on motion to dismiss appropriate because plaintiff's complaint was based on that document, even though complaint did not explicitly refer or cite to it); *In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368 n.9 (3d Cir. 1993)* **[*12]** ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document") (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1996)*).

Plaintiffs' allegations, as set forth in the Amended Complaint, are heavily based upon the 1999 Trust Agreement, and the February 2002 and December 2002 amendments thereto, the 1999 RIP 1987 Plan Document, the 1994 DB Plan Document, and the collective bargaining agreements governing the named Plaintiffs' employment. These documents are attached as exhibits to both Plaintiffs' and Defendants' supporting Memoranda. The authenticity of these documents is not in dispute. Thus, it is proper for this Court to consider these documents in adjudicating Defendants' Motion to Dismiss. Notably, if the plan documents are unambiguous, we may construe them as a matter of law. *Kemmerer v. ICI Americas, Inc., 70 F.3d 281, 288-89 (3d Cir. 1995)*.

## V. Discussion

### A. Count 1

Pursuant to *29 U.S.C. § 1132(a)(1)(B)*, Count 1 of the Plaintiffs' Amended Complaint **[*13]** seeks declaratory relief to clarify and enforce their rights to future benefits under the DB Plan and the RIP 87 Plan. (Am. Compl. P 59.) *§ 1132(a)(1)(B)* enables ERISA plan participants or beneficiaries to institute a civil enforcement

action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Before a federal court may entertain a claim under this provision, however, the Third Circuit requires that a plaintiff first exhaust any remedies available under the plan. *Harrow v. Prudential Ins. Co., 279 F.3d 244, 252 (3d Cir. 2002)* (citing *Zipf v. Am. Tel. & Tel., 799 F.2d 889, 891 (3d Cir. 1986))*. The exhaustion requirement applies "to ERISA benefit claims, but not to claims arising from violations of substantive statutory provisions." Id. Courts require exhaustion of administrative remedies "to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for **[*14]** all concerned." *Id. at 249* (quoting *Amato v. Bernard, 618 F.2d 559, 567 (9th Cir. 1980))*. The exhaustion requirement, however, is not absolute. If a plaintiff can provide a "clear and positive" showing that exhaustion would be futile, the requirement is excused. *Brown v. Cont'l Baking Co., 891 F. Supp. 238, 241 (E.D.Pa. 1995)*; see *Berger v. Edgewater Steel Co., 911 F.2d 911, 916 (3d Cir. 1990)* ("Although the exhaustion requirement is strictly enforced, courts have recognized an exception when resort to the administrative process would be futile").

Plaintiffs admit that they have not exhausted their claim. Because the determination and clarification of benefits under the plans depend upon this Court's resolution of Plaintiffs' remaining statutory claims [5], they allege that exhaustion under the plans' administrative claim procedures would be futile. (Am. Compl. PP 59, 60.) To support this argument, Plaintiffs characterize Count 1 as a "claim for benefits" not under the current plans' terms, but rather under the terms of the plans as ultimately determined by this Court. This distinction is unavailing because it does not overcome **[*15]** the fundamental nature of the Count as a claim for the clarification and enforcement of future benefits.

> 5    Plaintiffs' Brief explains that Count 1, seeking a declaration of their rights to benefits, becomes relevant only upon this Court's adjudication of their remaining claims: "Hence, the legality under the ERISA statute of the plan terms are first placed in issue under Counts II through VII. It is only after these statutory claims are decided that the parties and the Court can determine the consequences of these rulings for the actual benefits entitlements of plaintiffs ... " (Pls.' Br. at 20.)

In essence, Plaintiffs first seek reconstitution of the plans' terms through this Court's adjudication of their remaining statutory-based counts before any resolution

Page 5

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

of claims for benefits. Thus, in one sense, it would be futile to require Plaintiffs to exhaust any claims for benefits before these statutory issues are resolved, because the changes in the plans' terms constitute the gravamen of the Amended Complaint. **[*16]** But all this means is that Plaintiffs' claim for clarification and enforcement of future benefits is premature. It does not provide a basis to apply the futility exception. Once this Court rules on Plaintiffs' remaining counts, they are then free to exhaust claims for benefits under the reconstituted plans' internal administrative procedures. Because such a claim must first be exhausted through the plans' internal administrative procedures before being brought in federal court, and because the futility exception is inapplicable, Count 1 must be dismissed at this time, without prejudice for Plaintiffs to refile the claim if and when appropriate.

B. Count II

Count II of the Amended Complaint alleges that Defendant Trustees and Defendant Fund Administrator, acting as "fiduciaries" within the meaning of *29 U.S.C. § 1002(21)(A)(1)* [6], breached their ERISA mandated fiduciary obligations through various measures.

To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that the defendant undertook the challenged actions in a fiduciary capacity, and that the action taken constituted a breach of that duty. *29 U.S.C. §§ 1109 (a)* **[*17]** *, 1132(a)(3)*. An ERISA fiduciary, properly identified, must employ within the defined domain "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." *29 U.S.C. § 1104(a)(1)(B)*. The fiduciary should act "solely in the interest of the participants and beneficiaries," and must discharge his duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." *§§ 1104(a)(1)(A),(D). 29 U.S.C. § 1109(a)* authorizes a beneficiary to bring suit against a fiduciary who has violated any of the fiduciary obligations ERISA imposes.

6    This provision provides in relevant part:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.

**[*18]** Specifically, Plaintiffs assert nine separate violations of Defendants' fiduciary duties. (Am. Compl. PP 64(a)-(j).) For purposes of the following analysis, the alleged violations are grouped as follows: (1) inappropriately amending the 1999 Trust Agreement on several occasions in 2002 without the requisite signatures; (2) improperly issuing to retired DB Plan participants the "thirteenth check" through 2000; and (3) failing to prudently and effectively monitor the performance of investment advisors and managers responsible for the investment of plan assets.

1. *Trust Amendments*

For the reasons set forth below, Plaintiffs' claims relating to Defendants' implementation of the 2002 Amendments to the 1999 Trust Agreement are dismissed with prejudice.

i. Trustees' Failure to Abide by the Amendment Provisions Of The Trust Agreement In Undertaking Amendment 4

Plaintiffs' Amended Complaint asserts that Defendant Trustees and Defendant Fund Administrator:

failed to discharge their duties in accordance with the documents and instruments governing the plans by again purporting to amend the 1999 Trust Agreement in February 2002 to arrogate to themselves **[*19]** broad powers to act as settlors in amending the Trust Agreement, again without the authorizing signatures of Fund settlors, Local 429 and TEA, as required by the 1999 Trust Agreement.

(Am. Compl. P 64(i).) Specifically, "amendment No. 4 was signed solely by the Fund Trustees, but not by the TEA or by Local 429, as required by the 1999 Restated Trust Agreement, the document purportedly being amended." (Am. Compl. P 51.) Thus, Plaintiffs claim that Defendants' failure to comply with the appropriate Trust Agreement amendment procedures in implementing Amendment No. 4 constituted a breach of their fiduciary obligations. For the following reasons, we find that Plaintiffs have failed to state a claim upon which relief can be granted.

Article XI, section 11.1 of the 1999 Trust Agreement gives the power of amendment to the Trustees or Settlors, and explicitly sets forth the appropriate procedures to be employed when the amending party seeks to amend the Agreement:

Page 6

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

The Trustees or the Settlors may amend the Trust Agreement in any manner and at any time, subject to the provisions of the Trust Agreement, ERISA and other federal and/or state law; provided, however, that **[*20]** no amendment shall prejudice the rights of any Participant or Beneficiary with respect to claims which have been opened and are in being pursuant to the rules and regulations of the Fund; provided, further, that no amendment shall cause any of the assets of the Fund to revert to any Employer. Any amendment shall be effective as of the date set by resolution of the Trustees. Amendments shall be in written form. Notwithstanding anything to the contrary set forth herein, **any amendment to the Trust Agreement which would affect any rights or obligations of the Trustees or of TEA, as a Settlor, or of the Union, as a Settlor, shall not be effective unless approved in writing by the party or parties affected.**

(1999 Trust Agreement, Art. XI, Sec. 11.1 (emphasis added).)

*Section 402(b)(3) of ERISA* requires that every employee benefit plan provide (1) a "procedure for amending [the] plan and (2) "[a procedure] for identifying the persons who have authority to amend the plan." *Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 82, 115 S. Ct. 1223, 131 L. Ed. 2d 94 (1995).* So long as these minimal requirements are met, "ERISA [] follows standard trust **[*21]** law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Id. at 84, 115 S. Ct. 1223, 131 L. Ed. 2d 94*; see *29 U.S.C. § 1104(a)(1)(D)*. Thus, a plan sponsor's failure to act in accordance with the amendment procedures of the governing plan document when implementing an amendment constitutes a breach of fiduciary duty possibly warranting judicial annulment of the amendment. *Curtiss-Wright Corp., 514 U.S. at 84-85, 115 S. Ct. 1223, 131 L. Ed. 2d 94.* In the case at bar, Plaintiffs note that the February 2002 (and presumably December 2002) amendments to the Trust Agreement were promulgated without the signatures of TEA or Local 429. As the 1999 Trust Agreement indicates, however, the Trustees need only obtain the signatures of TEA and Local 429 if the amendment being adopted somehow impacts the rights or obligations of those parties as settlors. Thus, Defendants' adoption of the 2002 amend-ments without the signatures of either TEA or Local 429 constituted a failure to act in accordance with the Trust Agreement's amendment **[*22]** procedures only if the amendments impacted the settlors as such. Plaintiffs, however, fail to allege that the contested 2002 amendments affected the rights or obligations of TEA and Local 429 as settlors. [7] To state a claim for breach of fiduciary duty in this context, it must be alleged that the defendant neglected to administer the plan in accordance with its terms. The absence of any specific allegation that Defendants did not obtain the signatures required by the Trust Agreement *despite* the fact that the 2002 amendments implicated the rights and obligations of TEA and Union as settlors renders Plaintiffs' breach of fiduciary duty claim fatal. This claim of Count II is accordingly dismissed with prejudice for the aforementioned reasons.

7 Plaintiffs' claim that the amendments "severely reduced the accrued benefits of plaintiffs and the members of the Class and their accrual of future benefits under the pre-amendment RIP 87 Plan" (Am. Compl. P 64(h)) does not suggest that TEA or Local 429's rights or obligations as settlors were affected by the amendments.

**[*23]** ii. Plan Amendments As A Fiduciary Act

Plaintiffs allege that Defendant Trustees and Defendant Fund Administrator violated their fiduciary duties under ERISA by adopting various amendments to the 1999 Trust Agreement in 2002. ERISA, a comprehensive statutory scheme, is intended to protect employees enrolled in pension and benefit plans. The responsibility of administering a plan in the best interests of its participants and beneficiaries resides with plan trustees, who are obligated under *§ 404 of ERISA* to act in accordance with a standard of fiduciary conduct. *29 U.S.C. § 1104(A)-(D).* Specifically, Plaintiffs aver that the 2002 amendments to the 1999 Trust Agreement violated *ERISA § 404* because the amendments "severely reduced the accrued benefits of plaintiffs and the members of the class and their accrual of future benefits under the terms of the pre-amendment RIP 87 Plan." (Am. Compl. P 64(h).)

Before we may consider whether Plaintiffs have stated a claim for breach of fiduciary duty, we must first decide whether the Trustees' adoption of the 2002 amendments invoked ERISA's fiduciary duty provisions. In urging that we answer this question in the **[*24]** affirmative, Plaintiffs argue that in the context of this multi-employer Pension Plan, the Trustees' actions in implementing amendments which affected the allocation of a finite asset pool constituted administrative and fiduciary functions. Defendants, in turn, counter with the proposition that a plan sponsor acts within its power as a settlor when amending any plan. As the following dis-

Page 7

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

cussion reveals, the issue is not clear-cut. Upon careful consideration, we find that the Trustees functioned as settlors when amending the Pension Plan. [8] They were, consequently, free to amend without the restraints imposed by ERISA § 404.

> 8    We reach our decision today regardless of the November 2002 Department of Labor Bulletin.

In ascertaining whether plan sponsors act in a settlor or fiduciary capacity when amending ERISA-governed benefit plans, courts have drawn distinctions between multi-employer and single-employer plans, and between those plans that "affect the allocation of a finite plan asset pool" to which each [*25]  participating employer has contributed. *Musto v. Am. Gen. Corp., 861 F.2d 897, 912 (6th Cir. 1988)*, cert. denied, *490 U.S. 1020, 109 S. Ct. 1745, 104 L. Ed. 2d 182 (1989)*. Undoubtedly, the general rule is that the ERISA fiduciary obligations do not apply to a plan amendment. But, as the below discussion indicates, by no means has this general rule been unequivocally applied by courts.

Plaintiffs' argument is premised upon the rationale articulated by the Second Circuit in *Siskind v. Sperry Retirement Program, Unisys, 47 F.3d 498 (2d Cir. 1995)*. Former employees brought suit challenging the defendant corporation's adoption of an amendment to a single-employer pension plan. The plaintiffs argued that the plan amendment, which excluded the plaintiffs from a selective early retirement program, constituted a breach of fiduciary duty to act for the sole benefit of plan participants. *Id. at 500*. In holding that the plan trustees' amendment of the single-employer plan did not invoke ERISA's fiduciary obligations, the Second Circuit explained that "in the single-employer setting, where plan trustees are also corporate officers,  [*26]  their actions must be made in the interest of both the plan's participants and the employer." *Id. at 506*. Because the trustees have dual responsibilities in this regard, subjecting them to fiduciary obligations in their adoption of plan amendments would discourage the creation of benefit plans, a result ERISA intended to prevent. In setting forth its rationale, the Second Circuit distinguished cases where plan amendments were held to be fiduciary functions. [9]  Those cases involved multi-employer pension plans.

> The cases holding plan amendment to be an administrative and fiduciary task concern multiemployer pension plans, jointly administered by trustees representing the employers and trustees ap-

pointed by and representing the union. In the multiemployer setting, trustees amending a pension plan "affect the allocation of a finite plan asset pool" to which each participating employer has contributed. For that reason trustees administering a multiemployer plan are expected to act solely for the benefit of beneficiaries and are barred from acting on the employers' behalf.

*Id.* (internal citations omitted).

> 9    In *Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1038 (2d Cir. 1985)*, the Second Circuit recognized the existence of a fiduciary breach cause of action against the trustees of a multi-employer pension fund who amended a vested pension plan.

[*27]   In drawing a distinction between single-employer plans and multi-employer plans implicating a finite plan asset pool, the Second Circuit garnered support from the Sixth Circuit's dicta in *Musto, 861 F.2d at 912* that "in amending a *multi-employer* plan, where the level of contributions of each participant employer has generally been set by collective bargaining, the trustees 'affect the allocation of a finite plan asset pool between participants' ... and hence act as plan administrators subject to a fiduciary duty." The Sixth Circuit, however, subsequently refused to treat single-employer and multi-employer plans differently in *Pope v. Central States S.E. & S.W. Areas Health and Welfare Fund, 27 F.3d 211, 213-214 (6th Cir. 1994)*. In Pope, the Court of Appeals held that the trustees of a multiemployer welfare-benefit plan were not subject to fiduciary standards in amending a plan to reduce benefits in order to protect its financial stability. The Third Circuit recognized Pope's impact on the fine distinction drawn by Musto as well: "Pope stands for the proposition that the Sixth Circuit, despite its authorship of Musto, is  [*28]   prepared to treat single- and multi-employer plans similarly in the absence of some other salient difference." *Walling v. Brady, 125 F.3d 114, 118 (3d Cir. 1997)*.

In the aftermath of these decisions, the Supreme Court has had occasion to address the issue of whether ERISA's fiduciary obligations apply to plan sponsors who amend plan agreements. These decisions, however, arose in the context of single-employer plans. See, e.g., *Lockheed Corp. v. Spink, 517 U.S. 882, 116 S. Ct. 1783, 135 L. Ed. 2d 153 (1996)*. In Lockheed, the Court counseled that:

Page 8

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. As we said with respect to the amendment of welfare benefit plans ... "employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust.

*Id. at 890, 116 S. Ct. 1783, 135 L. Ed. 2d 153* (citations omitted). This is because "'only when fulfilling certain defined functions, including the exercise [*29] of discretionary authority or control over plan management or administration,' does a person become a fiduciary under § 3(21)(A)," and ERISA's definition of fiduciary does not include plan design. *Id.* (quoting *Siskind, 47 F.3d at 505*). The Court stated that this reasoning applied to both pension and welfare benefit plans. *Id.* Despite the categorical language characterizing the Supreme Court's pronouncement, the Third Circuit expressly refused to recognize that the rule would apply in all situations.

*Lockheed* speaks of "plan sponsors," a term that applies to both single-employer sponsors and multi-employer sponsors under ERISA, and the opinion lacks any hint that single- and multi-employer plans should be analyzed differently. At the same time, the silence of *Lockheed* on this topic could arguably be a result of its subject matter, a single-employer plan. The Court did not mention multiemployer plans nor state that its decision was intended to reach them or to address their particular characteristics. ... We do not read *Lockheed* to be the definitive word that there are never valid occasions on which to distinguish between the two types [*30] of plans....

*Walling, 125 F.3d at 117*. Walling involved an amendment to a multi-employer pension fund that lacked a finite asset pool. In no uncertain terms, the Court of Appeals held that "the simple fact that the plan at issue is a multiemployer plan is insufficient to cause the fiduciary duty to attach to the Trustees' actions." *Id. at 120*. Nevertheless, the Third Circuit took notice that "the plan feature (a finite asset pool) on which Siskind based its deviation from this bright-line rule is not present here" and concluded that "the rationale for having the fiduciary duty of loyalty apply is therefore absent, because the Trustees have the power to incur unfunded liabilities." *Id. at 118*. Thus, while the Third Circuit's refusal to impose fiduciary burdens on the trustees before it was grounded in the logic of Lockheed, the underlying analysis reveals the court's reluctance to consider the principle articulated in Lockheed to be unequivocally independent of the type of plan involved.

Following the Walling decision, however, the Supreme Court reaffirmed the general principle that a plan sponsor's decision [*31] to amend a plan concerns the composition or design of the plan itself and thus does not implicate ERISA's fiduciary obligations in *Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)*. Hughes clarified that the prior holding in Lockheed does not turn on "the type of plan being amended for the simple reason that the plain language of the statute defining fiduciary makes no distinction." *Id.* Notably, the issue arose before the Supreme Court once again in the context of a single-employer benefit plan. Id. Thus, while it does not necessarily diminish the import of Walling, it does undermine the notion that the type of plan at issue informs the decision of whether a plan sponsor acts as a fiduciary in undertaking a plan amendment. The Court's textual approach places emphasis on ERISA's definition of fiduciary. Because the term fails to distinguish between various plan permutations, and because it fails to include plan design as a defined function, a plan sponsor is free to amend any employee benefit plan without being subject to fiduciary review. *Lockheed, 517 U.S. at 890, 116 S. Ct. 1783, 135 L. Ed. 2d 153.* [*32] Indeed, the Hughes Court stressed that "our conclusion applies with equal force to persons exercising authority over a contributory plan, a noncontributory plan, or any other type of plan." *525 U.S. at 444-45, 119 S. Ct. 755, 142 L. Ed. 2d 881.* Thus, the Court held that the plaintiffs' fiduciary claims are directly foreclosed "by Spink's holding that, *without exception*, 'plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries.'" *Id. at 445, 119 S. Ct. 755, 142 L. Ed. 2d 881* (emphasis added). Admittedly, the Court's decision in *Hughes* does not directly dispose of the issue facing this Court, because the Pension Plan *sub judice* is a multi-employer plan involving the allocation of finite asset pools. But the reasons underpinning the Court's decision appear to preclude imposition of fiduciary duties on the Trustees in this instance. To prevail, Plaintiffs must address the definition of "fiduciary" set forth in the statute. Yet it appears that under any

Page 9

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

plausible reading of the term, a plan sponsor's amendments to ERISA governed plans do not fall within its purview. Moreover, the Court's analysis appears [*33] to foreclose consideration of any policy driven distinctions premised upon the unique features of the particular plan under review. Therefore, we cannot recognize a legal claim for breach of fiduciary duty stemming from Defendants' promulgation of the 2002 amendments. [10]

10    We are aware that a strong argument can be made that specific plan features should inform the fiduciary inquiry, and thus that fiduciary obligations should be imposed on plan sponsors who implement amendments to multi-employer pension funds implicating a finite asset pool. What we do learn from the Supreme Court's pronouncements on this issue is that the critical inquiry lies in determining whether the plan sponsors exercised discretionary authority or control over plan management or administration. While tinkering with plan design does not fall within this definition, the thrust of Plaintiffs' complaint is not simply that the Trustees amended the "form or structure" of the Pension Plan, *Hughes Aircraft, 525 U.S. at 444, 119 S. Ct. 755, 142 L. Ed. 2d 881*, but rather that the plan was amended to the detriment of Plaintiffs' present and future accrued benefits. Unlike in the former scenario, a rationale for having fiduciary duties apply in the latter case is present. Unquestionably, ERISA is intended to promote the creation of employee benefit plans, and its provisions should be read with this goal in mind. This explains the Supreme Court's reluctance to inflict on single-employer sponsors the burden of fiduciary obligations when such employers undertake to amend a plan that they have no obligation to provide in the first instance. There is, of course, another important competing goal: "to make sure that if a worker has been promised a defined pension benefit upon retirement-and if he has fulfilled whatever conditions are required to obtain a vested benefit-he actually will receive it." *Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 375, 100 S. Ct. 1723, 64 L. Ed. 2d 354 (1980)*; see generally, *29 U.S.C. § 1001*. It is important that employees enrolled in a benefit plan not be deprived of compensation that they *reasonably* anticipate under the plan's purported coverage. Indeed, this competing element may at times run up against ERISA's first purpose. As explicated above, the Pension Fund under review is a multi-employer plan that involves a finite asset pool. The fact that a multi-employer pension plan involves a finite asset pool could justify the imposition of fiduci-

ary obligations on trustees that adopt plan amendments because, in this setting, trustees are charged with *administering* allocation of the finite plan asset pool. Consequently, the trustees' decision to amend a plan in such manner as to alter the benefits could be interpreted as a fiduciary exercise of their administrative discretion under ERISA.

Plaintiffs contend that, through various purported amendments, Defendants reallocated employer contributions among several distinct, protected plans, to the immediate disadvantage of plan participants, who partake in the RIP 87 defined contribution plan. Although Defendants diverted *future* RIP 87 employer contributions to the defined benefit plan, Plaintiffs' reasonably anticipated receipt of benefits from these contributions plus their investment returns. This scenario may pose conflicting choices on the part of the Trustee Defendants as to each class of participants in the separate plans, who do not have identical economic interests. An argument can be made that these actions involve administering the allocation of employer contributions and plan assets, and justify imposition of fiduciary obligations. On the other hand, it is the job of sponsors to make difficult choices, not the courts, and as explicated above the Supreme Court's pronouncements on the subject do not leave room for this type of policy-based analysis.

[*34]    Neither the Third Circuit's decision in *Walling* or the Supreme Court's opinions analyzing this matter directly control the situation where trustees of a multiemployer pension fund reallocate a finite asset pool among various sub-plans through an amendment. Yet an examination of the rationales espoused by the Supreme Court in its teachings on the matter support the view that plan sponsors act as settlors in such setting. [11] Thus, we find that the Trustees' promulgation of the 2002 amendments to the Trust Agreement constitutes settlor conduct unrestrained by the obligations set forth in *29 U.S.C. §§ 1104(a)(1)(A)-(D)*. Accordingly, we grant Defendants' Motion on this issue, and dismiss this claim of Count II with prejudice.

11    As settlors, the Trustees are "free to make any amendment that [does] not run afoul of relevant ERISA regulations." *Walling, 125 F.3d at 120*. In Hozier v. Midwest Fasteners, Inc., the Third Circuit explained that "an employer's decision to amend or terminate an employee benefit plan is unconstrained by the fiduciary duties that ERISA imposes on plan administration. Our conclusion does not imply that an employer has un-

Page 10

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

fettered discretion to amend or terminate plans at will. In the case of pension plans, ERISA's detailed accrual and vesting provisions substantially limit this power." *908 F.2d 1155, 1162 (3d Cir. 1990).* Thus, the Court of Appeals determined that although the defendant could have effected an invalid amendment, he could not have breached any fiduciary duties in deciding to amend the plan because he was simply not acting as an ERISA fiduciary. *Id.*

[*35]   2. *The Thirteenth Check*

Plaintiffs assert that, in contrast to the explicit terms of the Trust Agreement, Defendant Trustees and Defendant Fund Administrator paid to DB Plan retirees a "thirteenth check" from 1987 through 2000. (See Am. Compl. P 64(a)-(f).) Defendants move to dismiss this allegation on the ground that it fails to state a claim for breach of fiduciary duties. For the following reasons, we find that Plaintiffs have stated a claim for breach of fiduciary duties in this context.

The DB Plan required that its participants be issued an additional benefit check, known as the "thirteenth check" so long as certain funding prerequisites were met. Specifically, the DB Plan provided that:

> For certain retired participants and their Beneficiaries, an additional retirement benefit check in the form of a bonus check shall be paid ... [This benefit] is payable only to those retired pants ... who are entitled to receive a monthly benefit check for each month of the calendar year with respect to which the thirteenth check is being paid. **Notwithstanding the preceding, the "thirteenth check" shall only be payable if the Fund Actuary certifies that [*36] the unfunded vested liability of the Fund, as calculated for MPPAA purposes as of the last day of the calendar year preceding distribution of the Additional Retirement Benefit check, does not exceed $ 85,000,000.**

(1994 DB Plan, Art. IV, Sec. I(1)(j).) (emphasis added).

Plaintiffs, who were not members of the DB Plan at the time and thus never received any of the additional benefits, do not claim that the Fund Actuary failed to make the requisite certifications. Rather, they aver that the Defendant Trustees and Defendant Fund Administrator encouraged and permitted the Fund Actuary "to use outdated and improper 1951 mortality tables to cal-

culate the funding liability of the DB Plan, thereby distorting and concealing the true funding status of the Plan, depriving it of needed and legally required funding, and jeopardizing the security of the accrued pension benefits of plaintiffs and the members of the Class." (Am. Compl. P 64(e).) In response, Defendants argue that their decision to issue the check was a settlor decision not falling within the ambit of ERISA's fiduciary duty provisions. (Defs.' Reply Mem. at 22.) Because the Fund Actuary made the requisite certifications, [*37] Defendants assert that the DB Plan term afforded them no choice but to pay to DB participants the additional benefits. (Id.)

As noted above, ERISA deems a person to be a fiduciary with respect to a plan "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. ..." *29 U.S.C. § 1002(21)(A)(1).* Thus, "fiduciary obligations can apply to managing, advising, and administering an ERISA plan." *Pegram v. Herdrich, 530 U.S. 211, 223, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000).* ERISA Section 404(a)(1)(D), *29 U.S.C. § 1104(a)(1)(D)* imposes upon fiduciaries the requirement that they discharge their duties solely in the interest of plan participants and beneficiaries and in accordance with plan documents insofar as such documents are consistent with ERISA. These obligations further include monitoring the plan's solvency and adjusting benefit levels if and when appropriate. See *Dippel v. Joint Bd. of Trustees, 1982 U.S. Dist. LEXIS 10134, No. 80-0271, 1982 WL 2085, at *7 (D.D.C. May 6, 1982)* [*38] ("The Board obviously retains the discretionary authority and indeed the fiduciary obligation to alter existing types and levels of medical benefits available under the Plan when the financial solvency of the Fund so requires.") (dicta); cf. *Baum v. Nolan, 853 F.2d 1071, 1074-75 n.2 (2d Cir. 1988)* (possibility that payment of pension benefits may affect fund's solvency is a matter of fiduciary duty) (dicta).

We find that Plaintiffs' claim passes muster under *Rule 12(b)(6).* Because Plaintiffs do not allege that Defendants paid out thirteenth checks in the absence of the Fund Actuary's certification, Defendants have technically adhered to a DB Plan term that affords them no discretion. They have complied with a term that demands issuance of the check upon meeting a specified prerequisite--the actuary's certification. Nevertheless we must at this point take as true Plaintiffs' factual allegations in the Amended Complaint that Defendants did exercise improper discretion, and thus acted in a fiduciary capacity, in their effort to ensure that the term's prerequisite was met, despite knowledge that the actual circumstances reflected otherwise. [*39]   Cf. *Fechter v. Conn. Gen. Life Ins. Co., 798 F. Supp. 1120, 1124 (E.D.Pa. 1991)*

Page 11

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

("Plaintiffs allege that Connecticut General transcended their usual role as an actuary and became a fiduciary by purposely using an allocation formula that, contrary to the plain language of the Plan, would permit most of the surplus assets to revert to the Company so that the Company would not question Connecticut General's excessively high premium. We have no doubt that if plaintiffs can prove their allegations, then as a matter of law, Connecticut General is an ERISA fiduciary"). Defendants have a fiduciary duty to faithfully administer the terms of the DB Plan, and to act prudently in determining whether the payment of a benefit was in fact authorized. See *Gruby v. Brady, 838 F. Supp. 820, 829 (S.D.N.Y. 1993)* (denying motion to dismiss fiduciary breach claim that trustees maintained benefits at excessive levels in plan that was in financial difficulty despite trustees following dictates of plan documents because "if the benefits levels as set forth in the Fund's governing plan documents are excessive, the Trustee Defendants may not avoid their fiduciary duties to Members [*40] by hiding behind documents which are inconsistent with ERISA"). Permitting or encouraging the Fund Actuary to use an improper assumption in calculating the unfunded vested liability of the DB Plan in order to satisfy the term's prerequisite which subsequently necessitates a certain result, all with the knowledge that continued payments were imprudent and would put the entire Fund in financial jeopardy, states a claim for breach of fiduciary duty. [12]

12   Dicta contained in *Concrete Pipe and Products of California v. Construction Laborers Pension Trust For Southern California, 508 U.S. 602, 633 n.19, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993)* buttresses our finding that Plaintiffs' allegations state a cognizable breach of fiduciary duty claim. In the context of holding that the MPPAA's presumptions in favor of multi-employer plans did not deny employer access to an impartial decision maker and thus did not violate due process rights, the Supreme Court noted that:

we know of no [case] in which a plan sponsor was found to have replaced an actuary's actuarial methods or assumptions with different ones of its own. Although we express no view on the question whether a plan sponsor must adopt the assumptions used by the actuary, we note that the legislative history of *§ 1082*, which was enacted as part of ERISA in 1974,

suggests that the actuarial [sic] assumptions must be "independently determined by an actuary," and that it is "inappropriate for an employer to substitute his judgment ... for that of a qualified actuary" with respect to these assumptions.

*Id.* (quoting S.Rep. No. 93-383, p. 70 (1973)).

[*41]   Defendants may not avoid their fiduciary obligations by circumventing a term that purportedly provides them with no discretion. Accordingly, Defendants' Motion to Dismiss this claim of Count II is denied.

### 3. *Imprudent Investment of Plan Assets*

Plaintiffs' last breach of fiduciary duty claim is premised on the allegation that Defendant Trustees and Defendant Fund Administrator:

failed to prudently and effectively monitor and oversee the performance of the investment advisors and managers who were responsible for the investment of plan assets, and instead continued to employ the services of the same investment advisors and managers despite their unusually poor results from 1998-2000, thereby causing a significant loss of assets to the plans, further jeopardizing the funding of the DB Plan and diminishing the values of the individual accounts of plaintiffs and the members of the Class in the RIP 87 Plan itself and as transferred into the reformulated DB Plan.

(Am. Compl. P 64(g).) As explained below, we find that Plaintiffs have adequately alleged a breach of fiduciary duty claim.

Specifically, Plaintiffs assert that the DB Plan and RIP 87 Plan performed [*42] poorly because of mismanagement of plan assets by the Trustee appointed investment managers. During this same period, however, other similar multi-employer pension funds experienced a rapid growth in the values of assets held and invested. (Am. Compl. P 41.) Although "this sub-par performance and mismanagement was either known to the Trustees and Fund Administrator, or would have been discovered by them had they made prudent and proper efforts to monitor and supervise the performance of the managers who had been engaged to invest plan assets," (Id.), De-

Page 12

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

fendants "did not investigate, consider pursuing, or pursue a legal cause of action or other remedies either against the plans' investment advisors or managers ... or against the current and former Trustees who failed to take prudent action. ..." (Am. Compl. P 42.) Defendants' Motion to Dismiss challenges whether Plaintiffs have met the liberal pleading requirements of *Fed. R. Civ. P. 8(a)(2)*, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that "contains only conclusory allegations and lacks any factual assertions for support [*43] fails even the liberal standard of *Federal Rule of Civil Procedure 12(b)(6)*." *Crowley v. Corning, Inc., 234 F. Supp. 2d 222, 230 (W.D.N.Y. 2002).*

Few cases discuss the adequacy of pleading a breach of fiduciary duty claim in this specific context. Indisputably, Defendants' investment conduct is governed by ERISA's fiduciary provisions. See *29 U.S.C. §§ 1104(a)(1)(B)-(C).* [13] With respect to the Defendants' fiduciary duties when they retain outside professional assistance, the Third Circuit has stated:

> While we would encourage fiduciaries to retain the services of consultants when they need outside assistance to make prudent investments and do not expect fiduciaries to duplicate their advisers' investigative efforts, we believe that ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary.

*Meinhardt v. Unisys Corp. (In re Unisys Sav. Plan Litig.), 74 F.3d 420, 435 (3d Cir. 1996).*

13   *29 U.S.C. §§ 1104(a)(1)(B)-(C)* provide in pertinent part:

> (1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to

> minimize the risk of large losses, unless under the circumstances if is clearly prudent not to do so.

[*44] We find that Plaintiffs' breach of fiduciary duty claim, as alleged in the Amended Complaint, satisfies the pleading requirements of *Fed. R. Civ. P. 8.* The essential elements of the claim are alleged. In addition to alleging the fiduciary status of Defendants, the Amended Complaint sets forth Defendants' fiduciary duties and specifies the Defendants' involvement in breaching those duties. (See Am. Compl. PP 41-42, 64(g).) As summarized above, the Amended Complaint rests on more than mere conclusory allegations. Defendants' reliance on *Crowley* is inapposite. Unlike the situation confronting the district court in *Crowley*, the crux of Plaintiffs' claim here is that if Defendants were actually unaware of the Fund's poor investment performance, they would have been aware had they done the type of investigation and oversight that the Third Circuit demands of fiduciaries who employ outside consultants. If, on the other hand, Defendants did possess knowledge of the Fund's inadequate performance, and yet failed to take any remedial measures, this too constitutes a breach of fiduciary duty. Because Plaintiffs set forth sufficient facts under [*45] which relief could be granted, Defendants' Motion to Dismiss this claim of Count II is denied. [14]

14   Defendants further argue that, as a matter of law, a breach of fiduciary duty claim cannot arise from a fund's poor investment performance over a short period of time. Defendants' Reply Memorandum references two cases in support of this proposition. (See Defs.' Reply Mem. at 23 (citing *Lalonde v. Textron, Inc., 270 F. Supp. 2d 272, 280 (D.R.I. 2003)*; *Wright v. Or. Metallurgical Corp., 222 F. Supp. 2d 1224, 1234 (D.Or. 2002)*).) Defendants, however, fail to note that both decisions adjudicated the validity of plaintiffs' breach of fiduciary duty claims in the context of an ESOP plan. These plans, unlike other ERISA benefit plans, involve unique considerations. Indeed, "ESOPs are unlike other benefit plans, because they have competing purposes which, at times, can be in tension with one another. Any allegation of breach of a fiduciary duty must be considered in light of the special natures of ESOPs." *Textron, 270 F. Supp. 2d at 278.*

[*46] Accordingly, we find with respect to Count II that Plaintiffs (1) have failed to state a claim for breach of fiduciary duty for Defendants' alleged inappropriate amendments to the 1999 Trust Agreement; and (2) have successfully stated a claim for breach of fiduciary duty

Page 13

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

for (a) Defendants' alleged improper issuance of the "thirteenth check," and (b) Defendants' alleged failure to prudently and effectively monitor the performance of investment advisors and managers responsible for the investment of plan assets.

C. Count III

Count III of Plaintiffs' Amended Complaint alleges that Defendants unlawfully reduced accrued benefits in the RIP 87 Plan through their amendment of the 1999 Trust Agreement. For this claim, Plaintiffs rely on *§ 204(g)(1) of the ERISA* statute, which prohibits the reduction of accrued benefits by amendment of an employee pension plan. See *29 U.S.C. § 1054(g)(1)*. Defendants counter that while the amendments to the RIP 87 Plan impact future employer contributions, they do not in any way affect accrued benefits. Thus the issue before us in Count III is whether the amendments to the plan constituted a reduction in "accrued **[*47]** benefits."

ERISA defines "accrued benefit" in an individual account plan as "the balance of the individual's account." *29 U.S.C. § 1002(23)(B)*. Neither party here has identified cases that are particularly helpful in establishing how the term "accrued benefit" has been interpreted in practice. However, we believe the Third Circuit's discussion of an "accrued benefit" in *Hoover v. Cumberland, Maryland Area Teamsters Pension Fund, 756 F.2d 977 (3d Cir. 1985)*, though written in the context of a defined benefit plan dispute, is instructive. Hoover contains an extensive discussion of ERISA's legislative history. Of particular note is the court's citation of language in the Congressional Report accompanying the ERISA bill, which highlights the purpose behind its accrued benefit and vesting protections. The Report states:

> Unless an employee's rights to his accrued pension benefits are nonforfeitable, he has no assurance that he will ultimately receive a pension. Thus, pension rights which have slowly been stockpiled over many years may suddenly be lost if the employee leaves or loses his job prior to retirement. Quite apart from the **[*48]** resulting hardships, . . . such losses of pension rights are inequitable, since the pension contributions previously made on behalf of the employee may have been made in lieu of additional compensation or some other benefit which he would have received.

*Hoover at 985*, citing S.Rep. No. 383, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Ad. News 4890, 4930.

This language indicates that when Congress included *§ 204(g)(1) in ERISA*, it intended to ensure that employees would receive the funds that employers had already set aside for their retirement, not to guarantee a certain amount of future employer contributions. Such a provision reflects the balance Congress undoubtedly sought to achieve between protecting employees' retirement funds and maintaining private pension plans as an attractive option for employers. That ERISA was meant to protect contributions that had already been made on behalf of employees is further substantiated in the Act's "Congressional findings and declaration of policy." See *29 U.S.C. § 1001*. This Section establishes the means by which Congress intended to protect employees' retirement income. Specifically, **[*49]** it sought to do so

> by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

*29 U.S.C. § 1001(b)*.

Nowhere in this section or in subsequent portions does the Act *require* employers to make contributions on behalf of employees. Rather, it simply seeks to make employee benefit plans more transparent and predictable and to preserve their integrity and financial well-being when employers *choose* to contribute to them. This goal has been realized through the decisions of courts which have focused on enforcing the terms of pension plan documents, as can be seen from the cases discussed below.

Hoover illustrates how ERISA's protections work in practice when applied to a defined benefit pension plan, where the employer agrees to make regular payments to participants of a fixed amount upon reaching retirement. In Hoover, the court held that the employer reduced **[*50]** employees' accrued benefits when it lowered the "unit multiplier" it used to calculate the amount of benefits that employees accrued each year. *Id. at 980*. Under the Internal Revenue Code, *26 U.S.C. § 411(a)*, an employer is required to state the formula by which accrued benefits are calculated in a defined benefit plan each year. Id. Since this formula "represents the interest in a retirement benefit that a participant earns each year," it "enables a

Page 14

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

worker to mark his or her progress toward the full pension benefit due at retirement." *Id.* Thus when the employer in Hoover lowered the multiplier from $ 25.00 to $ 6.00, it diminished by seventy-five percent the amount of funds that had already been theoretically set aside by the employer under the formula it created. *Id. at 986.* By finding the employer in violation of ERISA, the court held it liable for the level of funds it had voluntarily agreed to set aside for employees. In keeping with the purposes and principles of ERISA, the court's decision turned on the terms of the Plan documents, which obligated the employer to utilize a certain formula for calculating the **[*51]** benefits accrued thus far. In so doing, it effectively defined "accrued benefits" as the product of the formula set out by the employer in Plan documents, which is dependant on the amount of time *thus* served by employees. Courts have offered a comparable analysis when protecting accrued benefits in defined contribution plans by similarly focusing on the terms of Plan documents. In *Izzarelli v. Rexene Products Corp., 24 F.3d 1506 (5th Cir. 1994)*, the plaintiffs argued that their accrued benefits were unlawfully reduced when their employer initially contributed 101,794 shares of stock to the Plan one year, but, after amending the Plan, ultimately allocated a much smaller amount to the individual accounts of Plan participants. *Izzarelli, 24 F.3d at 1509-16.* While the district court held that the act of contributing the shares to the Plan created an accrued benefit, the Fifth Circuit reversed, drawing a distinction between contributions to the Plan and allocations to individual accounts. *Id. at 1515.* The court drew this distinction from the Plan document itself, which stated that "contributions initially are held in the 'Unprorated **[*52]** Fund,' i.e. 'that portion of the assets or property in the [Plan] . . . which at any particular time, has not been allocated to a particular Member's Account." *Id. at 1516.* Additionally, the court noted that the Plan gave the employer "'complete discretion' to control the 'time and manner of allocating Stock among [participants'] Accounts.'" Id. Thus the court held that the district court had clearly erred in finding the 101,794 share contribution an accrued benefit because the Plan specified that contributions were not the same as allocations. *Id. at 1518.* In so doing, the court declined to protect what it deemed were *expected* contributions to the individual accounts.

The First Circuit's approach to defining "accrued benefits" comports with those of the Third and Fifth Circuits. In *Campbell v. BankBoston, 327 F.3d 1 (1st Cir. 2003)*, the plaintiff sued his former employer for making amendments that converted its defined benefit plan to a cash balance system because they ultimately resulted in a reduction in his retirement benefits. *Campbell, 326 F.3d at 2.* In implementing the amendments, the employer placed **[*53]** participants' accrued benefits, in other words, the amount that had been earned up until the conversion, into an account which was guaranteed a certain level of interest under the new cash balance plan. *Id. at 4-5.* In exchange for the guaranteed level of interest under the cash balance plan, the accounts ceased to accrue benefits under the old defined benefit plan. Id. Had the plaintiff been able to continue accruing benefits under the old plan, he would have eventually been entitled to an annual retirement benefit of $ 31,882.12. Id. However, as a result of the conversion, his benefits were reduced by approximately $ 3,000 per year. Id. The court held that this was not a reduction in the plaintiff's *accrued* benefits, but a reduction in his *expected* benefits. *Id. at 8-9.* The employer had not reduced the amount of benefits accrued by the employee, it simply chose to guarantee a certain interest rate, in lieu of future accruals. The court concluded that the employer was within its rights under the Plan and the law to modify or eliminate future benefits, since ERISA does not offer protection for "expected benefits." *Id.*

Plaintiffs' **[*54]** reliance on *John Blair Communications, Inc. v. Telemundo Group, Inc., 26 F.3d 360, 367 (2d Cir. 1994)*, is not particularly helpful to this discussion or even applicable when determining when an accrued benefit has been reduced. We discuss it merely to explain why we do not rely on it here. The case concerned an alleged violation of *ERISA § 208*, which states that assets cannot be transferred to a new plan unless participants are entitled to receive a benefit that is equal to or greater to what they were entitled to under the old plan. *29 U.S.C. § 1058.* The plaintiff argued that it received decreased benefits under the new plan because there was a three and a half month delay between the valuation of benefits under the old plan and when the benefits were actually transferred to the new plan. *John Blair, 26 F.3d at 363-64.* In spite of the fact that the funds under the old plan were appreciating and earning interest during the three and a half month period before they were actually transferred, the plaintiff's account was never credited for this increase in value. Id. The court held that the trustee had violated *§ 208* because **[*55]** the individuals' accounts post-transfer of plan assets "did not reflect the gains occurring during the interim period before the actual transfer." *Id. at 366.*

As stated above, we believe that the holding in this case is too abstract to be applied to the instant case, particularly since it concerns an unrelated section of ERISA. However, even if we were to attempt to apply it to this analysis, it would not be inconsistent with our discussion of accrued benefits thus far. John Blair stands for the proposition that trustees must acknowledge and credit appreciation and interest earned in defined contribution accounts. As in Hoover, Izarelli, and Campbell, the court interpreted ERISA to protect benefits as they existed prior to any alteration of the plan. Thus the participants

Page 15

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

in the plan in John Blair were entitled to any gains (and losses) that occurred up until the point of the actual transfer. We fail to see then how the holding in John Blair can be interpreted as offering protection for anything beyond the appreciation and interest earned on funds in a defined contribution plan. Since this case does not concern appreciation and interest earned [*56] in a defined contribution plan, we do not find it is an appropriate precedent.

Applying the foregoing discussion to the case at hand, we find that the Defendants did not reduce accrued benefits in the RIP 87 Plan. Accepting Plaintiffs' facts as true, Defendants made several amendments to the RIP 87 Plan which adversely affected its future growth. The first amendment, effective January 1, 2000, caused a portion of employer contributions intended for the RIP 87, in the amount of forfeitures incurred by employees in that fund year, to be invested into the DB Plan. The second amendment resulted in an additional portion of the funds intended for the RIP 87 Plan by employers to be diverted to the DB Plan, according to a formula based on the number of hours worked by participants after March 1, 2002. The final amendment, Amendment No. 6, caused all contributions intended for the RIP 87 to be made to the DB Plan, of which all RIP 87 Plan participants became members.

Although these amendments undeniably reduced and eventually stopped future employer contributions to the RIP 87 Plan, they did not reduce the existing balances of members' individual accounts. Plaintiffs' own brief supports this [*57] conclusion. Plaintiffs described the initial reduction in contributions as a "derogation of the *expectation* [emphasis added] and agreement that contributions on their behalf would be made to the defined contribution RIP Plan and used to earn income to increase their individual account balances." (Pls' Br. at 11.) As to the final amendment, in Plaintiffs' own words, it "froze the RIP 87 Plan for all future accruals of benefits after January 1, 2003 (other than those gains or losses from future investment performance), and directed all employer contributions made on behalf of all RIP 87 Plan participants on and after January 1, 2003 into the DB Plan." (Id. at 12.) These characterizations of the amendments strongly support Defendants' claim that Plaintiffs have failed to state a claim upon which relief can be granted. However, even if Plaintiffs had not made these apparent admissions, the foregoing discussion of relevant case law leads us to the same conclusion. In each of the cases discussed above, the court looked to see if the alterations or amendments to the employers' pension plans impacted benefits retroactively or just future benefits. In *Hoover*, the application of [*58] a new formula to benefits already earned by employees was considered a reduction of accrued benefits. In*Izzarelli*,

however, a decision not to allocate the full amount of stock contributed to a plan was not considered a reduction in accrued benefits because the stock had not actually been applied to members' accounts and thus there was no deduction of benefits from participants' existing balances. Nor did the court in *Campbell* consider it a reduction in benefits when the employer decided to stop benefits from continuing to accrue, and instead replaced accruals with a guaranteed interest rate. In each of these cases, the court determined whether the amendments impacted benefits retroactively or prospectively. Only where the amendments were considered retroactive did the court find them in violation of ERISA because, as the court found in Campbell, ERISA does not protect *expected* benefits.

The Defendants here made a decision to reduce employer contributions to the RIP 87 Plan and eventually eliminate them altogether. However, it did not in any way alter the balances of the individual accounts that had accrued in the RIP 87 Plan. Plaintiffs' facts do not dispute this. [*59] Nor did the Defendants act inconsistently with Plan documents by diverting employer contributions to the DB plan, which Plaintiffs allege, had already accrued to the RIP 87 Plan. Plaintiffs argue that since Plan documents mandate direct contribution to the RIP 87 Plan, any diversion of contributions to the DB Plan is a reduction in accrued benefit. However, as correctly quoted in Plaintiffs' own brief, the Second Amended and Restated Central Pennsylvania Teamsters Pension Trust Agreement counters the notion that RIP 87 Employers contributions are deposited directly and fully to the RIP 87 Plan. Specifically, it states that "Contributions paid to the Fund by RIP 1987 Employers shall be paid to RIP 1987, **except as otherwise provided in Section 2.4, herein** [emphasis added]." (See Art. II, Sec. 2.3.) In other words, contributions made by RIP 87 employers to the Fund are to be paid to the RIP 87 Plan, but only in accordance with the terms of Section 2.4, which initially reduced contributions to RIP 87 and then, as amended, stopped them altogether.

Other portions of the Second Amended Trust Agreement controvert Plaintiffs' contention that RIP 87 employer contributions directly [*60] accrued to the RIP 87 Plan, rather than the Fund. For example, the preamble to the Second Amended Trust Agreement makes it clear that employers make contributions to the "Fund," not to individual pension plans or individual accounts. It notes that employers "pay contributions to the Fund on behalf of their employees who were participants of the Fund." Furthermore, Section 7.1 of Article VII states that "No Employer, Employee, Union, Local Union or other party shall have any right, title or interest in or to the Fund or any part thereof." The relevant collective bargaining agreements conform to this principal

Page 16

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

by stating that employers obligate themselves to contribute to the Fund and not specific plans under the Fund. (See Art. 65 of the National Master United Parcel Service Agreement and Art. 50 of the National Master Freight Agreement.) Thus we find as a matter of law that employer contributions were to the Fund and not directly to the RIP 87 Plan. As such, the diversion of employer contributions to the DB Plan prior to their allocation to the RIP 87 Plan cannot be considered a reduction of accrued benefits in the RIP 87 Plan.

The only way in which we could conceive of Plaintiffs [*61] making a claim upon which relief could be granted here is if Plaintiffs had alleged that the balances in participants' accounts were reduced so that they no longer reflected the rate of accrual set out in Plan documents as of the time they were amended. For example, if the balance at the time of amendment was recalculated using a monthly contribution amount for the year 1997 that was less than the amount promised under the case of the National Master United Parcel Service Agreement ($ 737.52), that would seem to constitute a reduction in accrued benefits. However, Plaintiffs have not made such an allegation. As such, we must conclude that with regard to Count III, Plaintiffs have failed to state a claim upon which relief can be granted and the Motion to Dismiss Count III must therefore be granted. Plaintiffs' Count III claim is dismissed with prejudice.

D. Count IV

Plaintiffs' Count IV claim appears to be a variation of Count III, though we confess we had some difficulty understanding the basis for the claim. It relies on section § 203(a) of ERISA, which states that "each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable [*62] upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Plaintiffs appear to argue from this, and their collective bargaining agreements, that they are entitled to "a nonforfeitable right to accrue and to ultimately receive payment of the pension benefits purchased by these employer contributions on their behalf."

We do not believe that Plaintiffs have stated a claim upon which relief can be granted in Count IV. A claim under § 203(a) of ERISA is only valid if accrued benefits have been withdrawn from participants' accounts. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 441, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999). It is not a guarantee that employers will make future contributions to pension plans. Since we have already found in Count III that Defendants' amendments to the pension plan did not reduce Plaintiffs' accrued benefits, we find that none of Plaintiffs' accrued benefits have been forfeited under § 203(a). Therefore Count IV must be dismissed with prejudice.

E. Count V

Count V of the Amended Complaint, asserted against Defendant Trustees and Defendant Fund Administrator, alleges illegal transfers of plan [*63] assets in violation of ERISA § 4231, 29 U.S.C. § 1411(a). [15] Specifically, Plaintiffs claim that the following five transactions constituted unlawful transfers of assets:

> Defendant Trustees and Defendant Fund Administrator did not comply with the notice requirements of *Section 4231(b)(1)* or the valuation requirements of *Section 4231(b)(4)* when they (a) diverted employer contributions to and plan assets of the RIP 87 Plan to the DB Plan; (b) diverted participant forfeitures and plan assets of the RIP 87 Plan to the DB Plan; (c) transferred the RIP 2000 participants and associated assets out of the RIP 87 Plan; (d) diverted assets of the RIP 87 Plan into the DB Plan in March 2002 under Option 2; or (e) transferred all RIP 87 Plan participants and associated assets into the DB Plan in January 2003.

(Am. Compl. P 79.) As a result, "the accrued benefits of RIP 87 Plan participants were lower immediately following each of these transfers and diversions of plan assets, in violation of *Section 4231(b)(2)*." (Am. Compl. P 80.) Significantly, all of Plaintiffs' contentions arise out of transfers from a defined contribution plan into either a defined benefit [*64] or a second defined contribution plan. Because we determine that *§ 4231 of ERISA* does not apply to transfers of assets to or from a defined contribution plan, Plaintiffs cannot prove any set of facts warranting relief.

15    *29 U.S.C. § 1411* is part of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), *29 U.S.C. §§ 1381-1461*. The MPPAA was enacted as an amendment to ERISA, and is referenced as "Subtitle E-Special Provisions for Multiemployer Plans."

> *29 U.S.C. § 1411(a)* provides that:

> Unless otherwise provided in regulations prescribed by the corporation, a plan sponsor may not cause a multiemployer plan to merge with one or more multiemployer plans, or engage in a transfer of assets and liabilities to or from another multiemployer plan, unless such merger or transfer sat-

Page 17

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

isfies the requirements of subsection (b) of this section.

*29 U.S.C. § 1411(b)* provides in pertinent part:

> A merger or transfer satisfies the requirements of this section if-
>
> (1) in accordance with the regulations of the corporation, the plan sponsor of a multiemployer plan notifies the corporation of a merger with or transfer of plan assets or liabilities to another multiemployer plan at least 120 days before the effective date of the merger or transfer;
>
> (2) no participant's or beneficiary's accrued benefit will be lower immediately after the effective date of the merger or transfer than the benefit immediately before that date;
>
> (4) an actuarial valuation of the assets and liabilities of each of the affected plans has been performed during the plan year preceding the effective date of the merger or transfer, based upon the most recent data available as of the day before the start of that plan year, or other valuation of such assets and liabilities performed under such standards and procedures as the corporation may prescribe by regulation.

**[*65]** *Section 4231 of ERISA* is contained within title IV of the statute, *29 U.S.C. § 1301 et seq. 29 U.S.C. § 1321(a)*, located in title IV, subchapter III, subtitle B, enumerates the specific plan types that title IV does and does not encompass:

"(a) Plans covered

Except as provided in subsection (b) of this section, this subchapter applies to any plan...."

Subsection (b) of *§ 1321* then states:

> "This section does not apply to any plan (1) which is an individual account

plan, as defined in *paragraph (34) of section 1002* of this title...."

Plaintiffs do not dispute that the RIP 87 and RIP 2000 Plans are defined contribution plans, as that term is delineated by *§ 1002(34)*:

> The term, "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participants's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

Defendants correctly posit that these definitions **[*66]** govern *29 U.S.C. § 1411*, because this section is set forth in title IV, subchapter III, subtitle E of ERISA. Consequently, as title IV expressly excludes defined contribution plans from its domain, *§ 1411* does not regulate transfers of assets and liabilities between defined contribution plans, or between a defined contribution and a defined benefit plan. Bolstering this interpretation is a regulation promulgated by the Pension Benefit Guarantee Corporation ("PBGC"), an administrative agency within the United States Department of Labor charged with interpreting the MPPAA. The following regulation is applicable to part 2 of subsection E of ERISA, which includes *29 U.S.C. §§ 1411-1415*:

> (a) Purpose. The purpose of this part is to prescribe notice requirements under section 4231 of ERISA for mergers and transfers of assets or liabilities among multiemployer pension plans....
>
> (b) Scope. This part applies to mergers and transfers among multiemployer plans where **all** of the plans immediately before and immediately after the transaction are multiemployer plans covered by title IV of ERISA.

*29 C.F.R. § 4231.1* **[*67]** (emphasis added). The PBGC's interpretations of MPPAA provisions, while not binding, are entitled to substantial deference. *Bd. of Trs. v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 2002)*. We believe that the PBGC's reading of these interrelated statutory provisions represents sound statutory interpretation. See *Local 1115 Pension Fund v. Local 144 Hosp.*

Page 18

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

*Pension Fund, 876 F. Supp. 39, 40-41 (S.D.N.Y. 1994)* (deferring to analogous PBGC regulation in holding that subtitle E of title IV of ERISA does not apply to multiemployer plans that are defined contribution plans). Accordingly, we defer to it. Plaintiffs do not allege that unlawful transfers of assets occurred between defined benefit plans. Instead, they allege unlawful asset transfers from a defined contribution plan into either a defined benefit or second defined contribution plan. *Section 4231* is simply not implicated in the latter scenario because, "all of the plans immediately before and immediately after the transaction" are not "multiemployer plans covered by title IV of ERISA." *29 C.F.R. § 4231.1.* Plaintiffs can adduce no set [*68] of facts to substantiate a claim under *§ 4231 of ERISA.* Defendants' Motion to Dismiss this claim is thus granted, and Plaintiffs' Count V claim is dismissed with prejudice.

F. Prohibited Transaction Claims

In Counts II, V, and VII of the Amended Complaint, Plaintiffs have alleged that Defendant Trustees and Defendant Fund Administrator engaged in various transactions in violation of ERISA § 406(a)(1)(D), *29 U.S.C. § 1106(a)(1)(D).* [16] Congress enacted this section "to bar categorically a transaction that [is] likely to injure the pension plan." *Comm'r v. Keystone Consol. Indus., Inc., 508 U.S. 152, 160, 113 S. Ct. 2006, 124 L. Ed. 2d 71 (1993).* To effectuate this purpose, *§ 406(a)(1)* "places certain transactions outside the scope of their [plan fiduciaries'] lawful authority." *Lockheed v. Spink, 517 U.S. 882, 888, 116 S. Ct. 1783, 135 L. Ed. 2d 153 (1996).*

16   *29 U.S.C. § 1106(a)(1)(D)* states in pertinent part that:

(a) Transactions between plan and party in interest

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect-

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

[*69]   To sustain an alleged transgression of *§ 406(a)(1)(D),* [17] the Third Circuit requires that five elements be satisfied:

(1) the person or entity is "[a] fiduciary with respect to [the] plan"; (2) the fiduciary "causes" the plan to engage in the transaction at issue; (3) the transaction "uses" plan assets; (4) the transaction's use of the assets is "for the benefit of" a party in interest; and (5) the fiduciary "knows or should know" that elements three and four are satisfied.

*Reich v. Compton, 57 F.3d 270, 278 (3d Cir. 1995)* (quoting *29 U.S.C. § 1106(a)(1)(D)*). When a fiduciary runs afoul of the rules promulgated in *§ 406(a)(1),* ERISA § 409, *29 U.S.C. § 1109(a)* [18] renders him/her personally liable for, *inter alia,* any losses the plan incurred as a result of the breach.

17   *ERISA § 408* lists specific exceptions to the per se prohibitions in *§ 406.* See *29 U.S.C. § 1108(b).* Plaintiffs do not allege that any of these exceptions apply.

18   *Section 409(a)* provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which has been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

[*70]   Specifically, Count II of the Amended Complaint states that the Defendants:

Entered into, or enabled or allowed, a series of per se prohibited transactions using plan assets, as more fully specified in this Complaint, including paying to the DB Plan retirees a "thirteenth check" in violation of the established minimum funding requirements for such payments and the terms of the Plan, and diverting contributions which had been allocated to and/or received by the RIP 87 Plan and hence were assets of that plan into the separate DB Plan.

Page 19

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

(Am. Compl. P 64(d).)

Although we found that Plaintiffs have successfully alleged a breach of fiduciary duty claim stemming from Defendants' issuance of the "thirteenth check," see discussion infra Part V.B., we find that they have failed to adequately plead a claim for breach of *§ 406(a)(1)(D)*. The Amended Complaint does allege elements one, two and three of the *§ 406(a)(1)(D)* claim- namely that Defendants acted in a fiduciary capacity when they issued the thirteenth check, that Defendants, as fiduciaries, caused the challenged transaction to occur, and that the transaction used plan assets. (Am. Compl. PP 37, 38, 62, 64(a). **[*71]** ) As noted above, however, element four of the five element test requires that the challenged transaction employ plan assets "for the benefit of" a party in interest. The Third Circuit has held that this factor requires manifestation of a subjective intent to benefit a party in interest. *Compton, 57 F.3d at 279*. In other words, it encompasses more than merely having "the *effect* of benefitting" a party in interest. Id. (emphasis added). Plaintiffs do assert that the Trustees

> on a continuing basis encouraged and allowed the Fund actuaries to improperly use outdated 1951 mortality tables ... to calculate the unfunded vested liability of the DB Plan in order to justify their conclusion that the DB Plan was 'fully funded," that it required no additional employer contributions to satisfy its benefits obligations to participants and their beneficiaries, and that the continued payment of the 'thirteenth check' to retirees of the DB Plan was permissible under the terms of the DB Plan.

(Am. Compl. P 38.) We fail to recognize how this allegation can be construed as identifying the party in interest that was benefitted by the Defendants' issuance of the **[*72]** thirteenth check--a benefit paid to DB Plan participants. Certainly the allegation suggests that the employers benefitted as a result of Defendants' actions in ensuring that the Fund appeared to be fully funded. It does not allege or even insinuate, however, that a party in interest benefitted through the Defendants' decision to continue to pay bonus benefits to the DB Plan participants. Plaintiffs' failure to allege this element of a *§ 406(a)(1)(D)* renders their claim fatal. As such, this prohibited transaction claim of Count II is dismissed without prejudice to Plaintiffs' right to file a Second Amended Complaint.

The second portion of the above quoted Amended Complaint also fails to state a claim warranting relief. (See Am. Compl. P 64(d).) Plaintiffs contend that the 2002 amendments to the 1999 Trust Agreement, that "diverted contributions which had been allocated to and/or received by the RIP 87 Plan ... into the separate DB Plan," (Id.), constituted a prohibited transaction under ERISA § 406(a)(1)(D). *29 U.S.C. § 1106(a)(1)(D)* mandates that fiduciary status must exist for a transaction to constitute a prohibited one. See *29 U.S.C. § 1106 (a)(1)(D)* **[*73]** . As explicated in Part V.B.2. of this opinion, the 2002 amendments to the 1999 Trust Agreement were instituted by Defendants in their settlor capacity. See discussion infra Part V.B.2. Thus, *§ 406(a)(1)*'s requirement of fiduciary status is not met. See *Lockheed, 517 U.S. at 891, 116 S. Ct. 1783, 135 L. Ed. 2d 153*. As a matter of law then, Plaintiffs cannot prove any set of facts with respect to the challenged plan amendments that would justify relief under *§ 406(a)(1)(D)*. This prohibited transaction claim of Count II is thus dismissed with prejudice.

Next, Count V of the Amended Complaint alleges that:

> Inasmuch as defendant Trustees and defendant Fund Administrator did not comply with the requirements of *Section 4231(a)and (b)*, the transfers constitute prohibited transactions under ERISA Section 406(a), *29 U.S.C. § 1106(a)*, pursuant to *Section 4231(c)*.

(Am. Compl. P 81.) As Part V.E. of this opinion explains, *ERISA § 4231* is not applicable to the circumstances presently confronting this Court. Moreover, as described above, the purported transfers were the product of Trust Amendments that we found the Defendants **[*74]** to have instituted in their settlor capacity. In addition, we found as a matter of law in Part V.C. of this opinion that the Trust documents provide for employer contributions into the Fund, as opposed to any of the individual plans that comprise the Fund. The Fund then distributes these employer contributions-plan assets-among the participating plans pursuant to the allocation formula set forth in the Trust Agreement. The various amendments to this Agreement reallocated a percentage of *future* RIP 87 employer contributions into the Fund to the DB Plan. Consequently, we determined that the existing assets of the RIP 87 Plan, a defined contribution plan, were never transferred to another plan. As discussed above, a prohibited transaction claim under *§ 406(a)(1)(D)* requires there to be a transfer of plan assets. The unambiguous language of the plan documents precludes a finding that, by virtue of the Trust Amendments, plan assets were

Page 20

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

transferred out of the RIP 87 Plan. Accordingly, Plaintiffs have failed to state a prohibited transaction claim with respect to the supposed illegal transfer of plan assets. As such, this prohibited transaction claim of Count V is dismissed with prejudice.

[*75] Finally, Plaintiffs allege in Count VII of the Amended Complaint that:

> Defendant Trustees and defendant Fund Administrator engaged in a series of prohibited transactions by, inter alia, paying the DB retirees a "thirteenth check" in violation of the established minimum funding requirements for such benefit.

(Am. Compl. P 87.) For the reasons set forth in the above discussion regarding the "thirteenth check,", we find that Plaintiffs have failed to successfully state a claim for violation of *ERISA § 406(a)(1)(D)*. Count VII continues:

> In addition, defendant Trustees' and defendant Fund Administrator's agreement to accept, and their acceptance of, employer contributions made on behalf of RIP 87 Plan participants but then to divert those plan assets into the different DB Plan, for the benefit of the DB Plan, violates ... *ERISA Section 406*, because such payments are not for the sole and exclusive benefit of the employees for whom such contributions were made and received.... Such payments and diversions are also prohibited transactions under ERISA Section 406(a)(1)(D), *29 U.S.C. § 1106(a)(1)(D)*, because they constitute a direct or indirect [*76] use and transfer of assets of one plan (the RIP 87 Plan) to benefit employees who are parties in interest to that plan by reducing their independent funding obligations to another plan (the DB Plan).

(Am. Compl. P 88.) Once again, for the reasons reiterated above, this claim must be dismissed with prejudice.

For the foregoing reasons, Plaintiffs' prohibited transaction claims are dismissed.

G. Count VI

Count VI of Plaintiffs' Amended Complaint advances the claim that Defendant Trustees and Defendant Fund Administrator breached relevant Collective Bargaining Agreements by amending the Trust Agreement so as to reallocate employer contributions from the RIP 87 Plan to the DB Plan. Specifically, Plaintiffs aver that:

> Plaintiffs and other similarly situated Class members have contractual rights under their respective CBA's to employer contributions, which are made on their behalf in consideration of their current services to the employers, to be directed into their RIP 87 Plan accounts. Insofar as the CBA's define the employees' rights to pension benefits and contributions with respect to the RIP 87 Plan, the CBA's constitute documents and instruments governing [*77] the RIP 87 Plan. In violation of those rights under the Plan, defendant Trustees have purported to amend the Trust Agreement, and defendant Trustees and defendant Fund Administrator have acted, so as to divert all employer contributions from the RIP 87 Plan to the DB Plan without obtaining the necessary and corollary amendments of the relevant CBA's. In so doing, these defendants have violated the CBA instruments governing the RIP 87 Plan and breached their strict fiduciary duty to act in accordance with the CBA's.

(Am. Compl. P 83.) The CBAs relevant to the named Plaintiffs' participation in the Fund include the National Master Freight and Central Pennsylvania Supplemental Agreement, and the 1997 and 2002 National Master United Parcel Service agreement and Central Pennsylvania Supplemental Agreement. (See Defs.' Mem. at 29.) These CBAs unequivocally provide that employer contributions be made to the Central Pennsylvania Teamsters Pension Fund in accordance with the terms of the Trust Agreement and Pension Plan. [19] Although it thus appears that the relevant CBAs do not require that participating employers' contributions be allocated specifically to the RIP 87 Plan, nonetheless [*78] we accept as true at this stage of litigation Plaintiffs' assertion that "at all times following 1989, the CBA's pursuant to which employer contributions are owed to the Fund and the plan have directed that these employer contributions in varying amounts must be made into plaintiffs' and other Class members' accounts in the RIP 87 Plan." (Am. Compl. P 54.) We hesitate to construe the CBAs as a matter of law despite the unambiguous language of the above-referenced CBAs only because Plaintiffs allude to other possibly relevant CBAs and employer participation agreements that they claim support their allegation, but which they have not yet received through discovery.

Page 21

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

19    Article 50(a) of the National Master Freight Agreement provides in relevant part:

> "The Employer agrees to make the following contributions to the Central Pennsylvania Teamsters Pension Fund for each eligible employee, probationary and casual covered by this Agreement, *in accordance with the terms of the Trust Agreement*."

(emphasis added).

> In addition, Article 50(c) states that "all contributions shall be made at such a time and in such a manner as the Trustees require..."

Similarly, Article 65(1)(a) of the relevant UPS Agreements provided:

> The Employer hereby agrees to contribute to the Central Pennsylvania Teamsters Pension Fund the following monthly contributions, in accordance with the terms of the Trust Agreement and Pension Plan executed by the Employer, subject to the qualifications hereinafter specified: ... In addition, allocations between the Defined Benefit Plan and the Retirement Income Plan shall be made by the Joint Supplemental Area Committee in the manner determined by the Settlers [sic] of the Central Pennsylvania Teamster Pension Fund, or, to the extent lawful, the Trustees of the Central Pennsylvania Teamsters Pension Fund.

[*79]    Significantly, Plaintiffs' claim rests on the presupposition that the Trust Agreement does not conflict with the provisions in the CBAs that allegedly require employer contributions to be routed directly into the RIP 87 Plan. (See Pls.' Br. at 54 ("nothing in the provisions of the CBA's *in this case*, which expressly require that the employer contributions be paid to the RIP '87 or to the RIP 2000, in any way conflicts with the terms of the Trust Agreement.... In total, they require direction of employer contributions into particular plans and the Trustees do not have the discretion to do otherwise").) We found as a matter of law, however, that the Trust Agreement has at all times explicitly mandated that employer contributions be paid to the Fund, and then allocated to the various sub-plans comprising the Fund as provided by the Trust Agreement's allocation formula. See discussion infra Part V.C. Thus, contrary to Plaintiffs' assumption, there exists an apparent conflict between the Trust Agreement and the CBAs, as interpreted by Plaintiffs.

This conflict is pertinent because, in the absence of any provision in the Trust Agreement to the contrary, the Trust Agreement [*80]    term will prevail over the conflicting CBA term. See *Sinai Hosp. of Balt. v. Nat'l Benefit Fund for Hosp. & Health Care Employees, 697 F.2d 562, 567 (4th Cir. 1982)* (holding that "labor-management contracting parties ... cannot control expenditures from funds already vested in a trust entity where the trust instrument reposes that authority solely with the trustees. Likewise, neither an employer nor a union, singly or together, can alter the terms of a trust instrument such as the one involved in this case unless the power to do so was reserved when the trust was created or properly amended"); see also *Hale v. Trustees of United Mine Workers Health & Ret. Funds, 23 F.3d 899, 902 (4th Cir. 1994)* (holding that collective bargaining agreement is not enforceable against trustees of pension fund); *Cent. States, Southeast and Southwest Areas Pension Fund v. Tank Transport, Inc., 779 F. Supp. 947, 951 (N.D.Ill. 1991)* (noting that trustees of multiemployer pension fund are not bound to arbitration provision in a collective bargaining agreement of a participating employer and its union). In short, the Trustees are bound only by the terms of [*81]    the Trust Agreement. Consequently, they cannot be held liable for breaching a conflicting term in a CBA.

Nothing in the 1999 Trust Agreement indicates that the provisions of any CBA prevail over the terms of the Trust. As this Court has previously noted, "'the provisions of the trust agreement provide the framework with which a court should analyze an employer's obligation to a ... fund.'" *Cent. Pa. Teamsters Pension Fund v. W&L Sales, Inc., 778 F. Supp. 820, 829 (E.D.Pa. 1991)* (quoting *Ind. State Council of Roofers v. Adams Roofing, 753 F.2d 561, 564 (7th Cir. 1985))*. The Trust Agreement itself belies Plaintiffs' argument that the Trust Agreement obligates the Trustees to comply with the terms of the CBAs insofar as the employers' contribution obligations are concerned. Indeed, the Trust Agreement sets forth the exact opposite proposition:

Page 22

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

Each Employer shall make prompt contributions or payments to the Fund in such amount and pursuant to the terms and conditions set forth in this Agreement and the Collective Bargaining Agreement in effect from time to time between the Employer or his bargaining representative and the Local Union.... A Collective [*82] Bargaining Agreement or other written document that provides for Contributions to the Fund in an amount or in a manner that is not in accord with or does not comply with the Trust Agreement or with any rules promulgated by the Trustees ... is null and void to the extent of such inconsistency.

(1999 Trust Agreement, Art IV, Sec. 4.1(A).) This Court employed a similar analysis in W&L Sales to reach the same conclusion that the trust agreement, rather than the conflicting CBA, controlled determination of pension eligibility. *778 F. Supp. at 829-30*.

Unless the Trust Agreement expresses otherwise, and we find that it does not, Defendants cannot be held liable for breaching a CBA term that conflicts with the unambiguous provisions of Trust Agreement. Accordingly, Count VI which contains Plaintiffs' claim for violation of collective bargaining documents must be dismissed with prejudice.

## H. Count VII

Defendants move to dismiss Plaintiffs' claim for violation of § 302 of the Labor Management Relations Act ("LMRA"), *29 U.S.C. § 186*. [20] Specifically, Plaintiffs contend that the Fund provisions providing for the allocation of contributions [*83] from participating RIP 87 Plan employers into the DB Plan violated *§§ 302(b)and (c)(5)* of the LMRA because such payments were not undertaken for the "sole and exclusive benefit of the [RIP 87 Plan] employees for whom such contributions were made and received." (Am. Compl. P 88.) In response, Defendants assert that *§ 302(e) of the LMRA* does not create a private cause of action for purported violations of *§§ 302(b)and (c)(5)*. [21] Additionally, Defendants argue that even if this Court had jurisdiction, no such transgression occurred because employer contributions to a multi-employer pension plan need only be used to benefit the Fund's beneficiaries, as opposed to the particular employee on whose behalf the employer contributed. (See Defs.' Mem. at 41-42.)

20    *§ 302(a)* prohibits an employer, or association of employers, from, *inter alia*, rendering payments to any representative of its employees. This provision provides in part:

"(a) ... It shall be unlawful for any employer or association of employers ... to pay, lend, or deliver ... any money or other thing of value-

(1) to any representative of any of his employees, who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer ...;"

*§ 302(b)(1)* prohibits employee representatives from receiving the payments proscribed by *subsection (a)*. This provision provides:

"(b) ... (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section."

*§ 302 (c)* then enumerates exceptions to the broad prohibitions contained in *subsections (a)* and *(b)*. This provision provides in pertinent part:

"(c) ... The provisions of this section shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided*, That (A) such payments are held in trust for the purpose of paying, either from principal or

Page 23

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, ...; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund ...; and (c) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; ... "

[*84]

21    § 302(e) states:

"(e) The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of title 28 (relating to notice to opposing party) to restrain violations of this section, without regard to the provisions of section 17 of title 15 and section 52 of this title, and the provisions of chapter 6 of this title."

Plaintiffs failed to adequately reply to this part of Defendants' Motion to Dismiss. [22] Therefore, we dismiss Plaintiffs' LMRA claim against Defendants pursuant to *Local Rule of Civil Procedure 7.1(c)*. See *Toth v. Bristol Township, 215 F. Supp. 2d 595, 598 (E.D.Pa. 2002)* (dismissing plaintiff's claim on Motion to Dismiss under *Local Rule 7.1* because plaintiff did not respond to portion of defendants' motion discussing claim); *Smith v. Nat'l Flood Ins. Program, 156 F. Supp. 2d 520, 522 (E.D.Pa. 2001)* ("Because plaintiffs failed to address defendants' motion to dismiss with respect to defendants' argument that [*85] costs, interest, and attorneys' fees are not recoverable under the *National Flood Insurance Act*, the court will grant this aspect of the defendants' motion to dismiss as unopposed"). We suppose that,

given their lack of response, Plaintiffs do not challenge this dismissal.

22    Plaintiffs' Brief In Opposition discusses the prohibited transaction claims comprising Count VII, but fails to assert any arguments in support of Count VII's LMRA claims. Plaintiffs merely state that, "this [prohibited transaction claim] is true whether or not LMRA Section 302(b), *29 U.S.C. § 186(b)*, confers an independent basis of jurisdiction." (Pls.' Br. at 58.)

Even if we were to undertake a cursory examination of the claim, however, we would find that we do not have jurisdiction to adjudicate it. Plaintiffs' claim contests Defendant Trustees and Defendant Fund Administrator's administration of the Fund's assets. (See Am. Compl. P 88.) Such a claim is permissibly brought, and indeed has been brought, under, [*86] *inter alia*, the fiduciary duty provisions of ERISA. (See generally Am. Compl.) The Supreme Court has made clear that an attack on the actual administration of trust funds cannot be properly brought under §§ 302(b) and (c)(5) of the LMRA, because these provisions are directed towards policing the *purposes* for which a trust fund is established.

We hold today that § 302(e) does not provide authority for a federal court to issue an injunction against a trust fund or its trustees requiring the trust funds to be administered in the manner described in § 302(c)(5). By its unmistakable language, § 302(e) provides district courts with jurisdiction "to restrain violations of this section." A "violation" of § 302 occurs when the substantive restrictions in §§ 302(a) and (b) are disobeyed, which happens, not when funds are administered by the trust fund, but when they are "paid, lent, or delivered" to the trust fund, § 302(a), or when they are "received, or accepted" by the trust fund, or "requested, [or] demanded" for the trust fund, § 302(b)(1). And the exception to violation set forth in *paragraph (c)(5)* relates, not to the purpose for which the trust fund is in [*87] fact used (an unrestricted fund that happens to be used "for the sole and exclusive benefit of the employees" does not qualify); but rather to the purpose for which the trust fund is "established," § 302(c)(5), and for which the payments are "held in trust," § 302(c)(5)(A). The trustees' failure to *comply* with these latter purposes may be a breach of their con-

Page 24

2003 U.S. Dist. LEXIS 23983, *; 32 Employee Benefits Cas. (BNA) 1126

tractual or fiduciary obligations and may subject them to suit for such breach; but it is no violation of *§ 302*.

*Local 144 Nursing Home Pension Fund v. Demisay, 508 U.S. 581, 587-89, 113 S. Ct. 2252, 124 L. Ed. 2d 522 (1993)*. Accordingly, Count VII which contains Plaintiffs' allegation under the LMRA would be dismissed with prejudice pursuant to *Fed. R. Civ. P. 12(b)(6)* had we not already dismissed this claim under *Local Rule of Civil Procedure 7.1(c)*.

**VI. Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. An appropriate order follows.

# **EXHIBIT B**

**The New York Times**

# Case in Detroit Highlights Costs of 'Extra' Pension Payments

**By Mary Williams Walsh**

October 22, 2013 7:49 pm

The constitutions of some states, including Michigan, explicitly bar the cutting of public pensions. But what about extra payments promised to Detroit's workers and retirees?

The city's pension system made extra payments for decades to thousands of people, on the thinking that the base pensions were too small. The pension board thought it found the money for the extra payments by skimming off "the excess" when returns on investments exceeded the plan's target — 7.9 percent in Detroit.

But the pension fund also had years when its investments fell short of the target. And with millions of dollars being paid out each year in the extras, the fund missed out on all the investment income that money would have brought in. So the extra payments fundamentally undercut the health of the pension plan.

Nor is Detroit alone in making the extra payments — known variously as "the 13th check," "the skim fund," "the bump up," "the waterfall" and so on. New York City; Phoenix; San Jose, Calif.; and Tampa, Fla., along with some of the public plans in Illinois, Indiana, Texas and Mississippi also have the add-ons.

The problems with the extra payments have long been known. San Diego ran into a financial quagmire in the early 2000s after years of removing "excess earnings" from its pension fund to sweeten benefits. The city finally had to bring in a forensic team led by Arthur Levitt Jr., a former chairman of the Securities and Exchange Commission, to sort out the mess. Mr. Levitt found "not mere negligence, but deliberate disregard for the law" in San Diego's pension practices.

Unlike company pension plans, which are tightly regulated by the federal government, public plans are largely governed by their boards of trustees. And officials outside San Diego seem not to have thought that Mr. Levitt's message applied to them.

The federal judge dealing with the Detroit bankruptcy is left, then, with a conundrum: The pension extras have cost Detroit billions of dollars over the years, hastening the city's downfall, yet state laws say the extra payments must continue.

Earlier this month, a state labor judge ruled that Detroit illegally interfered with its pension system two years ago, when it stopped the extra payments in a last-ditch effort to save money and avoid bankruptcy. (The base pensions are still being paid.)

"The city's conduct was unlawful and constitutes a refusal to bargain in good faith," wrote Doyle O'Connor, a state administrative law judge. Unions are likely to cite his finding in bankruptcy court this week to bolster their arguments that Detroit should not even be in federal bankruptcy court. Bankruptcy law requires that Detroit show that it bargained in good faith with its creditors, to no avail, before seeking relief in federal bankruptcy court.

Judge O'Connor said he was not ruling on the wisdom of the add-ons, only on whether the City Council could unilaterally stop them. He ordered that the add-ons for 2011 and 2012 be paid retroactively. But, given Detroit's bankruptcy, he likened his order to a ticket refund for passengers on the deck of the Titanic.

If Detroit does qualify for protection under Chapter 9 of the bankruptcy code, the presiding federal judge, Steven Rhodes, may override Michigan's constitution and cut the pensions.

Cities and states around the country are watching Detroit's case closely. Many of them are struggling with pension plans that are overwhelming their finances, and a surprising number also make the extra payments.

Detroit's pension trustees distributed the extra payments not only to retirees and active workers, but also effectively gave some to the city in the form of reduced annual pension contributions.

"We were saving the city money," said Tina Bassett, a spokeswoman for Detroit's pension trustees.

But a study in 2011 by an outside actuary showed that the extra payouts were actually costing Detroit billions of dollars, although it was hard to see because the city's disclosures were sketchy. Actuaries model pension costs over the long term, and when trustees find "excess" money year by year and spend it, they defeat the fundamental premise of the plan — that investment gains, not local taxpayers, will pay most of the cost.

"This sounds like San Diego," Mr. Levitt said when told about Detroit's program. "It appears to lack transparency, and it appears deceptive, in terms of not defining the true cost of the pension."

In San Diego, officials also decided that the "excess earnings" of the pension fund allowed the city to reduce its required annual contributions. In fact, that worsened the damage because after making all the extra payments, the pension fund needed more money from the city, not less.

The San Diego pension fund seemed to doing fine for a while, but under the surface it grew shakier and shakier, and finally broke down after the technology stock crash in 2001. The resulting scandal led to a shake-up of the city government, indictments, civil lawsuits and a federal charge of securities fraud — the first against an American city for pension malfeasance.

Auditors called the notion of excess earnings "the snake in the garden," and San Diego lost vital access to the municipal bond market for a time. Its pension fund was found to have a huge shortfall, and officials openly discussed declaring bankruptcy.

For all that, San Diego's retirees still receive their extra checks — about $4.7 million worth last year. The add-ons remain contentious, though. Last year, city

residents voted overwhelmingly to close the existing pension plan to new hires. Savings from that change will take many years to appear.

The actuary advising San Diego's pension trustees at the time, Rick Roeder, said the disaster was caused by faulty thinking about pension math.

"There is no actuarial justification for 13th checks," he said in a telephone interview from his home in La Mesa, Calif. "A 7-year-old child could understand this. It's laughable that this could happen, but it did."

Mr. Roeder and his firm, Gabriel Roeder Smith & Company, were both sued by San Diego's city attorney during the pension scandal there, but he was soon dropped as an individual defendant. When his contract with the San Diego pension board expired, he did not seek to have it renewed. Gabriel Roeder Smith settled with San Diego for undisclosed terms.

The firm has also advised Detroit's pension trustees and has been subpoenaed in that city's bankruptcy case, but the documents it provided are not in the public record. The firm said in a statement that its role was limited, that it did not determine the payment of benefits, that decisions were made by the trustees and that it was not a fiduciary, with the associated higher duties to the plan and its members.

"Gabriel Roeder Smith & Company has consistently performed its work for the Retirement Systems professionally and in keeping with industry standards," the firm said.

In San Diego, Mr. Levitt wrote: "Of all of the board's advisers, Mr. Roeder was most qualified to understand, and explain to the board, the basic conceptual mistake" it was making in removing "excess earnings" from the pension fund. By failing to do so, and giving the pension fund "sound" annual valuations, "Mr. Roeder facilitated the perpetuation of the underfunding scheme and breached his professional obligations."

Mr. Roeder said in the interview that he thought "the actuarial community, in general," had not been "as explicit as we could have been" about unsustainable

pension costs. He said many places in California had granted rich benefits, then sought relief when they found they could not afford the contributions. When he tried to warn clients, they dismissed him, he said. He is now semiretired.

"Many entities in California are watching the Detroit situation like a hawk," he said. "There will be a number of entities, in my opinion not a small number, that will be willing to put up with the expense and stigma of bankruptcy if the judge says, 'Look, federal bankruptcy law supersedes the state law protections of pensions.' "

A version of this article appears in print on 10/23/2013, on page B1 of the NewYork edition with the headline: Pensions' 'Extra' Payouts.

© 2014 The New York Times Company

# **EXHIBIT C**

# City of Detroit

## CITY COUNCIL

**IRVIN CORLEY, JR.**
DIRECTOR
(313) 224-1076

FISCAL ANALYSIS DIVISION
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 218
Detroit, Michigan 48226
FAX: (313) 224-2783
E-Mail: irvin@cncl.ci.detroit.mi.us

**ANNE MARIE LANGAN**
DEPUTY DIRECTOR
(313) 224-1078

TO: COUNCIL MEMBERS

FROM: Irvin Corley Jr., Director *IC)*.

DATE: November 21, 2011

RE: Proposed Pension Ordinance Amendment – Codifying the Distribution of Investment Earnings for the Detroit General Retirement System

In connection with the pension ordinance amendment introduced by Council Member Jenkins and under consideration by your Honorable Body I am submitting as Attachment I the preliminary report from Mr. Joseph Esuchanko, MAAA, ASA, MSPA, FCA, EA of Actuary Services Company. His services were utilized by the Pension Reform Working Group to present an independent analysis on the past practice of the Detroit General Retirement System (DGRS) concerning the distribution of earnings. I believe each member has received this preliminary report through your representative on the Pension Reform Working Group.

Adoption of the pension ordinance amendment will result in reduced pension contribution requirements from the city because contributions from the city for pensions and the accumulated interest on these contributions, or assets in the funds of the retirement system for pension payments will be protected from being used for other purposes. The reduction or savings will not be immediate, that is cannot address the current cash crisis, but will begin next fiscal year when the percentage of payroll pension contribution rate is determined by the next annual valuation report.

**Actuary Services Company information and Mr. Esuchanko's credentials include:**

"Since 1984, Actuarial Service Company, P.C. has provided actuarial consulting and full-service retirement plan administration to clients ranging from small, closely held companies to large corporations and government entities.

The company is owned and managed by Joseph Esuchanko, an Enrolled Actuary with more than 35 years of experience in the actuarial profession. Mr. Esuchanko is an associate of the Society of Actuaries and a member of the American Academy of Actuaries and the American Society of Pension Actuaries. His professional expertise has been cited in articles published by *The Houston Chronicle, New York Times, Christian Science Monitor, and Fortune.*"

**Accumulated Cost to the City:**

Mr. Esuchanko's report provides a comprehensive discussion on the information and methods he used to determine "The approximate accumulated cost to the City, due to excess earnings being distributed

to DGRS members, rather than being applied to the contractual DGRS benefits, is $1.9212 billion." This statement is found at the bottom of page 9 of the attached report.

The excess earnings include bonus interest payments to active employees' annuity accounts and "13th checks to retirees. For active employees the bonus interest represents interest above the amount declared by the trustees which has generally matched the actuarial assumed interest rate as set by the trustees.

**Intent of Proposed Ordinance Amendment**

In the past the trustees of the DGRS have exercised total discretion on how investment earnings are distributed within the retirement system. The trustees have granted bonus interest to active employee annuity accounts and additional pension payments to retirees commonly known as 13th checks. The decision by the trustees on distribution of investment earnings has substantially increased the cost to the city of funding the pension system as shown by Mr. Esuchanko's analysis.

The proposed pension ordinance will codify how investment earnings will be distributed within the system. As such this ordinance amendment does not change pension benefits and does not require an actuarial study. The amendment requires that active employees' annuity accounts will be credited with the actual rate of return that the investments of the system earn for the year, with a cap of the actuarial assumed investment rate of return, currently 7.9% per the last retirement system valuation for June 30, 2010, and a floor of zero that protects the employees' annuity from losses.

In any year that the system experiences a loss, since the employees' accounts will not be reduced, the city will incur increased funding requirements. However to offset this, in years when investment earnings exceed the actuarially assumed rate of return the city will incur a reduction in funding requirements, as the employees' annuity accounts will be capped. In theory the assumed actuarial rate of return should approach the actual performance of the system over time.

**Simplified Example of Past Practice**

In reality the DGRS has five funds, excluding funds required for pension obligation certificates. For this discussion I will limit the example to two funds as this reduces the complexity and highlights the way the city has lost in the past. The two funds are the pension fund and the annuity fund. The balance in the pension fund consists of the contributions from the city to fund pensions and the interest the contributions have accumulated. The annuity fund consists of voluntary employee payroll deductions, a savings account of sorts, and the interest the account has accumulated. The annuity fund is maintained by individual employee.

For this example each fund will have a beginning balance of $1.0 million. For investment purposes the funds are combined for a total investment of $2.0 million. The board of trustees establishes the assumed rate of return and sets a percentage that the annuity fund is "guaranteed" and for the following examples will be 5% in both cases.

For the first case the actual earnings on the invested pool of pension and annuity funds will be 0%, the funds will neither make or loss money on the investments. Since the annuity fund has a "guaranteed" return of 5%, the annuity fund must be increased by $50,000 ($1.0 million times 5% equals $50,000). The only place the $50,000 to increase the annuity fund can come from is the pension fund. So the pension fund is reduced by $50,000 and the annuity fund is increased by $50,000. Or the pension fund

13-53846-swr    Doc 7984-1  Filed 10/06/14  Entered 10/06/14 16:45:54  Page 68 of 80

now has a balance of $950,000, and the annuity fund has a balance of $1,050,000. This results in the creation of an unfunded actuarial accrued liability (UAAL) in the pension fund which causes future contributions by the city for pensions to increase.

For the second case let's assume the $2.0 million earns exactly 5%, or $100,000. If the $100,000 was split evenly between the pension fund and the annuity fund there would not be a problem. Each fund would increase by $50,000, to $1,050,000 each. A UAAL would not be created and the city's contributions for pensions have increased by the exact amount of the assumption.

For the third case the assumption for earnings will be 7%, or $140,000. If the $140,000 is split equally again there would not be a problem. In fact, since the earnings exceed the assumed rate of return the pension system would be slightly over funded. The overfunding could reduce future contributions required by the city to fund pensions. However, since the split of the investment earnings has been at the sole discretion of the trustees, an equal split has not always taken place. If the split of the earnings is made so that the pension fund does not receive at least $50,000, again a UAAL would be created and future city pension contributions would have to increase.

In order to show how easily it is for the pension fund not to get credit for at least the $50,000 required to match the assumed rate of return and not create a UAAL, let's bring in the retirees 13th check. So now there are three funds/groups involved and the decision is made to split the earnings three ways, or take the $140,000 divide by 3 equals $46,666. Since the pension fund would not receive the $50,000 required to meet the assumed rate of return a UAAL is created, increasing future funding required from the city.

Unfortunately over time the third case or variations of it have taken place leading to the city having to make additional contributions to the retirement system.

**Summary**

The proposed ordinance amendment will address most of the situations where pension fund balances or assets can be diverted to the annuity fund or used to pay 13th checks to retirees increasing future contributions to pension by the city. The only situation where this will happen in the future if the amendment is adopted will be in years when the system loses money on investments. Since the ordinance contains a floor of zero for the annuity fund to prevent losses to the annuity fund, the losses of both the pension and annuity funds will have to be fully absorbed by the pension fund, similar to case one above. To offset this, in years when investment earnings exceed the actuarially assumed rate, the pension fund will gain, reducing pension contribution requirements. Hopefully over time will the two will balance out for the city.

Attachment

cc:    Council Divisions
       Auditor General Office
       Chris Brown, Chief Operating Officer
       Cheryl Johnson, Finance Director
       Pamela Scales, Budget Director
       Walter Stampor, Executive Secretary
       Denise Gardner, Mayor's Office

**Contributions That Should Have Been Paid by the City of Detroit
To the General Retirement System
Assuming No Distribution of "Excess" Earnings**

## Objective

I have prepared an analysis of the City of Detroit (City) contributions to the City of Detroit General Retirement System (DGRS) from July 1, 1987 through June 30, 2008. My review included determination of the following values for all periods between July 1, 1985 and June 30, 2008:

A.  The contributions that were paid by the City to the DGRS retirement fund.

B.  The total contribution that would have been paid by the City to the DGRS retirement fund if the excess earnings had not been distributed.

C.  The difference between A and B, which I will refer to as the overage.

D.  The accumulation of C, including the investment returns that would have been earned on that difference.

The contributions paid by the City during this period were higher than the contributions determined using the increased assets which would have resulted if the distributed excess earnings had been applied to the funding of contractual retirement benefits. This is the result of a reduction in the unfunded actuarial accrued liability (UAAL) and a corresponding decrease in the annual amortization payments.[1]

## Information Used

This section summarizes the information I used to assist me in determining the amount that the City would have contributed. The fiscal years run from July 1 to the next June 30. Thus, I show, for example, the fiscal year from July 1, 2003 through June 30, 2004 as the 2003/2004 fiscal year.

I received a list of distributed excess contributions from July 1, 1985 through June 30, 2008. The list of the distributed excess earnings is in Table 1. The City makes contributions annually to fund the liabilities of the DGRS retirement fund. I have assumed that such contributions are made in equal monthly installments throughout the fiscal year. The actuarial valuations showed total contributions, including both City contributions and Employee contributions. The City share of contributions was accounted for separately from the Employee share. The list of City contributions is in Table 2.

---

[1] Excess earnings distribution amounts for the July 1, 2008 through June 30, 2010 fiscal year were not provided to me.

## Table 1
## Amount of Distributed Excess Earnings

| Fiscal Year | Amount of Distributed Excess Earnings (In Millions) |
|---|---|
| 1985/1986 | $ 19.4 |
| 1986/1987 | $ 36.3 |
| 1987/1988 | $ 41.3 |
| 1988/1999 | $ 51.5 |
| 1989/1990 | $ 34.7 |
| 1990/1991 | $ 34.4 |
| 1991/1992 | $ 2.9 |
| 1992/1993 | $ 33.5 |
| 1993/1994 | $ 20.5 |
| 1994/1995 | $ 11.6 |
| 1995/1996 | $ 0.0 |
| 1996/1997 | $ 57.3 |
| 1997/1998 | $ 101.3 |
| 1998/1999 | $ 120.4 |
| 1999/2000 | $ 92.1 |
| 2000/2001 | $ 55.6 |
| 2001/2002 | $ 0.0 |
| 2002/2003 | $ 0.0 |
| 2003/2004 | $ 0.0 |
| 2004/2005 | $ 0.0 |
| 2005/2006 | $ 16.3 |
| 2006/2007 | $ 101.0 |
| 2007/2008 | $ 121.1 |

## Table 2
## Amount of City Contributions

| Fiscal Year | Amount of Contribution (In Millions) |
|---|---|
| 1987/1988 | $ 64.2 |
| 1988/1989 | $ 53.5 |
| 1989/1990 | $ 54.5 |
| 1990/1991 | $ 52.1 |
| 1991/1992 | $ 54.2 |
| 1992/1993 | $ 33.5 |
| 1993/1994 | $ 35.8 |
| 1994/1995 | $ 36.6 |
| 1995/1996 | $ 42.5 |
| 1996/1997 | $ 54.7 |

Table 2 (continued)
Amount of City Contributions

| Fiscal Year | Amount of Contribution (in Millions) |
|---|---|
| 1997/1998 | $ 52.7 |
| 1998/1999 | $ 55.7 |
| 1999/2000 | $ 66.7 |
| 2000/2001 | $ 68.1 |
| 2001/2002 | $ 67.8 |
| 2002/2003 | $ 72.9 |
| 2003/2004 | $ 95.9 |
| 2004/2005 | $ 41.7 |
| 2005/2006 | $ 58.2 |
| 2006/2007 | $ 41.4 |
| 2007/2008 | $ 43.5 |

The investment return rates which I used (listed in Table 3) were gotten from three different sources, as follows:

1. Fiscal years 1987/1988 through 1993/1994 from the actuarial assumed rates in the annual actuarial valuations[2]
2. Fiscal years 1994/1995 through 1997/1998 from the July 13, 2010 report of Edward G. Rago
3. Fiscal years 1998/1999 through 2007/2008 from the calculated rates in the annual actuarial valuations[3]

Table 3
Annual Investment Return on the DGRS
Retirement Fund

| Fiscal Year | Investment Return |
|---|---|
| 1987/1988 | 6.00% |
| 1988/1989 | 6.00% |
| 1989/1990 | 6.00% |
| 1990/1991 | 6.00% |
| 1991/1992 | 7.50% |
| 1992/1993 | 7.50% |
| 1993/1994 | 7.50% |
| 1994/1995 | 8.86% |

[2] Annual actuarial valuations did not show rates of investment return for fiscal years 1987/1988 through 1997/1998

[3] Rates in the annual actuarial valuations differed from those shown in Mr. Rago's report

Table 3 (continued)
Annual Investment Return on the DGRS
Retirement Fund

| | |
|---|---|
| 1995/1996 | 5.81% |
| 1996/1997 | 11.44% |
| 1997/1998 | 12.51% |
| 1998/1999 | 9.20% |
| 1999/2000 | 9.20% |
| 2000/2001 | -4.50% |
| 2001/2002 | -6.10% |
| 2002/2003 | 3.40% |
| 2003/2004 | 14.80% |
| 2004/2005 | 9.80% |
| 2005/2006 | 11.60% |
| 2006/2007 | 18.10% |
| 2007/2008 | -5.80% |

## The Actuarially Redetermined Contributions

The contributions made by the City prior to July 1, 1987 were determined using asset amounts exclusive of the distribution of any excess earnings. Beginning with the City contribution for 1987/1988[4], the City actuarially redetermined contributions were determined using assets increased by the hypothetical inclusion of distributed excess earnings. The actual City contributions were greater than would have been required using the hypothetically increased assets.

The actuarially determined contributions, as reported by the DGRS actuary in each fiscal year, were calculated through the following procedure:

1. Calculate the normal cost, which is the cost associated with the current fiscal year of additional service covered by DGRS.

2. Calculate the actuarial accrued liability (AAL), which is the present value of costs associated with all prior fiscal years of service covered by DGRS.

3. Obtain the value of plan assets.

4. Determine the unfunded actuarial accrued liability (UAAL), which is line 2 decreased by line 3.

5. Amortize the UAAL from line 4.

---

[4] June 30, 1988 actuarial valuation.

6. The contribution is the sum of the normal cost (line 1) and the amortization of the UAAL (line 5).

The process used to determine the overage for fiscal years after June 30, 1987 is different from the process above. If the distributed excess earnings had instead been included in the actuarial value of assets, the actuarially redetermined contribution amounts, beginning with the 1987/1988 fiscal year, would have been smaller after June 30, 1987. The inclusion of the distributed excess earnings, combined with the smaller City contributions, would have increased the fund value used in the actuarial reports beginning with the June 30, 1986 report. Therefore, I had to take into account the increase in the fund value in the determination of contribution rates applied to fiscal years beginning on or after July 1, 1987.

Beginning with the June 30, 1986 actuarial valuation, the normal cost from line 1 above and the AAL from line 2 above would have been unchanged, because there was no change in actuarial assumptions. However, the actuarial value of assets would have been higher These higher amounts would first increase contributions in the 1987/1988 fiscal year, since contribution rates are determined two fiscal years in advance. Therefore, I had to take into account the increase in the contribution rate in the determination of contribution rates applied to fiscal years beginning on or after July 1, 1987.

For June 30, 1986 and later valuations, I replaced the reported assets in the above equation (item 3) with the sum of (1) the reported assets and (2) the increase in fund value which would have resulted if the distributed excess earnings had been allocated instead for contractual DGRS benefits. The increased fund is the accumulated shortfall in assets, with investment return. I assumed that the full investment return would be included in the actuarial value of assets. In fact, the assets were valued at cost in the early years of this study and after that the investment gains and losses were smoothed over a period of years and added to the prior year's actuarial value of assets. My approach generally results in a slightly lower redetermined contribution amount than would have actually occurred.

The 1986/1987 contribution was based on the June 30, 1985 actuarial valuation and, therefore, it would not have been affected by the 1985 distribution of excess earnings. The 1987/1988 contribution was based on the June 30, 1986 actuarial valuation. Since the June 30, 1986 actuarial valuation would have included the 1985 distribution of excess earnings, it, and all subsequent actuarial valuations, would have produced lower City contributions.

In redetermining the contribution rates for the June 30, 1986 and later actuarial valuations, I replaced the reported assets in the above equation (item 3) with the sum of (a) the reported assets and (b) the increase in the fund value which would have resulted if the City had contributed the actuarially redetermined contribution. The increased fund is the accumulated shortfall in assets, with investment return.

The accumulated shortfall, with investment return, at the end of each fiscal year beginning with June 30, 1986 was determined using the following method:

1. Obtain the shortfall at the beginning of the fiscal year.

2. Calculate the additional shortfall in the City contribution during the fiscal year.

3. Determine the additional investment return that would have been earned by the increased fund during the fiscal year.

4. The shortfall at the end of the fiscal year is then the sum of the three amounts.

The investment return was composed of two parts. The first part was the investment return on the shortfall at the beginning of the fiscal year. This is the investment return during the fiscal year as shown in Table 3 times the fund at the beginning of the fiscal year. The second part was the investment return on the lower contributions. For this, I assumed that the lower contributions would have been made in equal monthly installments throughout the fiscal year.

Table 4 shows the overage in contributions for each fiscal year and the accumulation of the overage, using the earnings rates from Table 3, through June 30, 2008.

Table 4
Determination of Lower City Contributions
If the Distributed Excess Earnings Had Been Allocated to DGRS Contractual Benefits
(Amounts in Millions)[5]

| Fiscal Year | Actual Contributions | Contributions that Should have been made | Excess Contributions | Accumulated Excess Contributions |
|---|---|---|---|---|
| 1987/1988 | $ 64.2 | $ 62.1 | $ 2.1 | $ 2.1 |
| 1988/1989 | $ 53.5 | $ 48.5 | $ 5.0 | $ 7.2 |
| 1989/1990 | $ 54.5 | $ 45.4 | $ 9.0 | $ 16.6 |
| 1990/1991 | $ 52.1 | $ 37.7 | $ 14.5 | $ 32.1 |
| 1991/1992 | $ 54.2 | $ 36.6 | $ 17.7 | $ 52.2 |
| 1992/1993 | $ 33.5 | $ 19.9 | $ 13.6 | $ 69.7 |
| 1993/1994 | $ 35.8 | $ 21.9 | $ 13.9 | $ 88.8 |
| 1994/1995 | $ 36.6 | $ 21.3 | $ 15.2 | $ 111.9 |
| 1995/1996 | $ 42.5 | $ 21.8 | $ 20.7 | $ 139.0 |
| 1996/1997 | $ 54.7 | $ 27.3 | $ 27.4 | $ 182.3 |
| 1997/1998 | $ 52.7 | $ 27.2 | $ 25.5 | $ 230.6 |
| 1998/1999 | $ 55.7 | $ 20.1 | $ 35.6 | $ 287.5 |
| 1999/2000 | $ 66.7 | $ 20.0 | $ 46.7 | $ 360.6 |

[5] Numbers may not add due to rounding.

| Fiscal Year | Actual Contributions | Contributions that Should have been made | Excess Contributions | Accumulated Excess Contributions |
|---|---|---|---|---|
| 2000/2001 | $ 68.1 | $ 0.0 | $ 68.1 | $ 412.5 |
| 2001/2002 | $ 67.8 | $ 0.0 | $ 67.8 | $ 455.1 |
| 2002/2003 | $ 72.9 | $ 5.5 | $ 67.4 | $ 538.0 |
| 2003/2004 | $ 95.9 | $ 36.2 | $ 59.7 | $ 677.3 |
| 2004/2005 | $ 41.7 | $ 22.8 | $ 18.9 | $ 762.6 |
| 2005/2006 | $ 58.2 | $ 38.5 | $ 19.6 | $ 870.7 |
| 2006/2007 | $ 41.4 | $ 9.4 | $ 32.0 | $ 1,060.3 |
| 2008/2008 | $ 43.5 | $ 0.0 | $ 43.5 | $ 1,042.3 |
| Total | $ 1,146.1 | $ 522.2 | $ 623.9 | $ 1,042.3 |

Table 5 shows the increase in assets if the distributed excess earnings had been allocated to DGRS contractual benefits, using earnings rates from Table 3, through June 30, 2008. In fiscal year 1989/1990, for instance, the amount that should have been contributed was $46.8 million compared to the $56.1 million actually contributed. Thus there was a preliminary annual decrease in assets of $9.3 million. Then, $35.7 million was added to that, since distributed excess earnings were assumed to be allocated to contractual DGRS benefits. Therefore, the total annual increase in assets was $26.4 million. The accumulated increase in assets through June 30, 1989 was $156.6 million and the accumulated increase in assets as of June 30, 1990 was $192.4 million.

Table 5
Determination of Increase in Assets
If the Distributed Excess Earnings Had Been Allocated to DGRS Contractual Benefits
(Amounts in Millions)[6]

| Fiscal Year | Value of Distributed Excess Earnings at the End of the Fiscal Year | Value of Amount That Should Have Been Contributed at the End of the Fiscal Year | Value of Amount That Was Contributed at the End of the Fiscal Year | Annual Increase in Assets | Accumulated Increase in Assets |
|---|---|---|---|---|---|
| 1985/1986 | $ 20.0 | $ 66.0 | $ 66.0 | $ 20.0 | $ 20.0 |
| 1986/1987 | $ 37.4 | $ 65.7 | $ 65.7 | $ 37.4 | $ 58.6 |
| 1987/1988 | $ 42.5 | $ 64.0 | $ 66.1 | $ 40.4 | $ 102.5 |
| 1988/1989 | $ 53.0 | $ 50.0 | $ 55.1 | $ 47.9 | $ 156.6 |
| 1989/1990 | $ 35.7 | $ 46.8 | $ 56.1 | $ 26.4 | $ 192.4 |
| 1990/1991 | $ 35.4 | $ 38.8 | $ 53.7 | $ 20.5 | $ 224.5 |
| 1991/1992 | $ 3.0 | $ 37.9 | $ 56.2 | $ -15.3 | $ 226.0 |
| 1992/1993 | $ 34.8 | $ 20.6 | $ 34.8 | $ 20.6 | $ 263.6 |
| 1993/1994 | $ 21.3 | $ 22.7 | $ 37.1 | $ 6.9 | $ 290.2 |
| 1994/1995 | $ 12.1 | $ 22.3 | $ 38.2 | $ -3.8 | $ 312.1 |
| 1995/1996 | $ 0.0 | $ 22.4 | $ 43.7 | $ -21.3 | $ 309.0 |
| 1996/1997 | $ 60.6 | $ 28.9 | $ 57.8 | $ 31.6 | $ 376.0 |
| 1997/1998 | $ 107.6 | $ 28.9 | $ 56.0 | $ 80.5 | $ 503.6 |
| 1998/1999 | $ 125.9 | $ 21.0 | $ 58.2 | $ 88.7 | $ 638.6 |
| 1999/2000 | $ 96.3 | $ 20.9 | $ 69.7 | $ 47.5 | $ 744.8 |
| 2000/2001 | $ 54.3 | $ 0.0 | $ 66.6 | $ -12.3 | $ 699.1 |
| 2001/2002 | $ 0.0 | $ 0.0 | $ 65.7 | $ -65.7 | $ 590.7 |
| 2002/2003 | $ 0.0 | $ 5.6 | $ 74.1 | $ -68.5 | $ 542.2 |
| 2003/2004 | $ 0.0 | $ 38.9 | $ 103.0 | $ -64.1 | $ 558.4 |
| 2004/2005 | $ 0.0 | $ 23.9 | $ 43.7 | $ -19.8 | $ 593.3 |
| 2005/2006 | $ 17.2 | $ 40.8 | $ 61.5 | $ -3.5 | $ 658.6 |
| 2006/2007 | $ 110.1 | $ 10.3 | $ 45.2 | $ 75.2 | $ 853.0 |
| 2008/2008 | $ 117.6 | $ 0.0 | $ 42.3 | $ 75.3 | $ 878.9 |
| Total | $ 985.1 | $ 740.4 | $1,380.7 | $ 344.7 | $ 878.9 |

---

[6] Numbers may not add due to rounding.

Table 5 summarizes the sources of the contribution overage. Item (1) is the sum of the contributions that should have been made, which is objective B stated at the beginning of my report. Item (2) is the contributions which were made, which is objective A. Item (3) is the total overage which is objective C. Item (4) is the total investment return that would have been earned on the shortfall. Item (5) is the total accumulated shortfall including the investment return, which is objective D.

### Table 5
### Source of Contribution Overage as of June 30, 2008
### (Amounts in Millions)[7]

|  | Amount |
|---|---|
| (1) Contributions that should have been | $ 522.2 |
| (2) Contributions that were made | $1,146.1 |
| (3) Overage [(2) minus (1)] | $ 623.9 |
| (4) Investment return on overage | $ 418.4 |
| (5) Total accumulated overage plus investment return [(3) plus (4)] | $1,042.3 |

Table 5 summarizes the sources of the asset shortfall.

### Table 6
### Source of Asset Shortfall as of June 30, 2008
### (Amounts in Millions)[8]

|  | Amount |
|---|---|
| (1) Value of contributions that should have | $ 740.4 |
| (2) Value of contributions that were made | $1,380.7 |
| (3) Value of distributed excess earnings | $ 985.1 |
| (4) Shortfall [(1) minus (2) plus (3)] | $ 344.7 |
| (5) Investment return on shortfall | $ 534.2 |
| (6) Total accumulated shortfall plus investment return [(4) plus (5)] | $ 878.9 |

The approximate accumulated cost to the City, due to excess earnings being distributed to DGRS members, rather than being applied to contractual DGRS benefits, is $1.9212 billion[9]

The work done in developing the above conclusions was performed directly by me. I have based this statement on information available to me as of March 8, 2011. I reserve the

---

[7] Numbers may not add due to rounding.

[8] Numbers may not add due to rounding.

[9] Sum of Table 5, Line (5) plus Table 6, Line (6)

13-53846-swr  Doc 7986-1  Filed 10/04/1  Entered 10/04/14 54:41:54  Page 78 of 80
13-53846-swr  Doc 7986-1  Filed 10/04/14  Entered 10/04/14 16:15:54  Page 93 of
124

right to revise and extend my report if and when additional information becomes available that would affect my opinion.


_Joseph Esuchanko_

Joseph Esuchanko, MAAA, ASA, MSPA, FCA, EA
March 8, 2011

## CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Supplemental Brief of the City of Detroit in Support of Objection of the City of Detroit, Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 2958 Filed by Michigan AFSCME Council 25 and Its Affiliated Detroit Locals was filed and served via the Court's electronic case filing and noticing system on this 16th day of October, 2014.


/s/  Heather Lennox