# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|                              |   |                        |
|------------------------------|---|------------------------|
| In re:                       | ) | Chapter 9              |
|                              | ) |                        |
| CITY OF DETROIT, MICHIGAN,   | ) | Case No. 13-53846      |
|                              | ) |                        |
| Debtor.                      | ) | Hon. Steven W. Rhodes  |
|                              | ) |                        |
| _____ | ) |                        |

## CREDITOR AFSCME COUNCIL 25'S SUPPLEMENTAL BRIEF IN SUPPORT OF PROOF OF CLAIM 2958 PURSUANT TO SECTIONS 105 AND 502(b) OF THE BANKRUPTCY CODE 3007 AND LOCAL RULE 3007-1

NOW COMES Creditor, AFSCME Council 25, by and through its attorneys, with its Supplemental Brief in Support of Proof of Claim 2958, and states as follows:

## I.    INTRODUCTION

In early November 2011, Detroit Mayor Dave Bing issued a public call to the City of Detroit's forty-seven unions, asking them to accept concessions in wages and benefits because the City was cash strapped. The City's unions responded, forming a civilian-side Coalition of approximately thirty unions, and negotiated with the City intensely for several months. On February 1, 2012, the Coalition agreed to new contractual arrangements which resulted hundreds of

millions of dollars in savings for the City; including 10% wage cuts and steep healthcare and pension cuts.

While soliciting these concessions, the City neglected to place the 13th Check issue on the table. This negotiated benefit entitled active employees to certain annuity savings fund credits, and retirees to a separate pension check each year depending on the pension system investment return. At the same time the City sought wage and benefit concessions, on November 30, 2011 the City acted unilaterally to eliminate this 13th Check benefit. The City brief spends substantial time on the wisdom of giving away "excess earnings". The City fails to address why it simply did not follow the law and negotiate-away this benefit, especially given its success in securing concessions from an unprecedented coalition of unions. Instead, the unions were forced to respond to the City's illegal conduct.

This issue was litigated before an Administrative Law Judge (ALJ) at the Michigan Employment Relations Commission (MERC). He described the context and history for why the 13th Check system was implemented at the City's request, in his October 4, 2013 Decision and Recommended Order:

> The rationale for the 2011 ordinance change was premised on what has now become a convenient public relations gambit: that the 13th checks amounted to a gift, a gratuity, or a bonus. They were not. In fact, the 13th check system is utilized by many employers as a method of giving some rough protection against inflation in deferred compensation systems. In the 1970s, it was not unusual to have formal inflation hedges in such systems tied directly to the cost of living indicators. That system became perceived as both unpredictable and prohibitively expensive by the late 1970s-early 1980s. It

13-53846-tjt   Doc 7982   Filed 10/16/14   Entered 10/16/14 15:08:02   Page 2 of 26

was replaced by concepts such as the 13th check system which created separate dedicated funding streams to provide an annual bump which, while guaranteed to be paid, was not guaranteed to actually match the rate of inflation. It might be higher than a traditional COLA payment; it would likely be lower; but eh annual receipt was assured.

The 13th check system was such a well-established part of the City's deferred compensation system in 1996 that the City conceded . . . that regardless of a Charter or ordinance change, the City could not revoke the payments without fulfilling the bargaining obligation. It is uncontestable that the 13th check system was a mutually agreed upon obligation.

(*Exhibit A*, pg 15) In other words, it was a negotiated system to slow the impact of inflation. As such, it was a violation of the Public Employment Relations Act (PERA), MCL § 423.201 *et seq.* for the City to unilaterally terminate the benefit.

Michigan AFSCME Council 25 has filed a proof of claim in this court's claims register (Claim No. 2958), consisting of this 13th Check matter, as well as a retiree healthcare grievance and litigation from changes beginning in 2006. The City seeks to disallow the 13th Check and retiree healthcare claims. The City's arguments are without merit, and should be rejected.

## II. STATEMENT OF FACTS

The parties AFSCME and the City of Detroit had a prior collective bargaining agreement, which was in existence from approximately January 2011 through June 30, 2012. (*Exhibit B*, portion of AFSCME Master Agreement that was attached to the City's Response).

Certain employees have annuity plans with the City, in which either 3%, 5% or 7% of their salary is contributed into the plan. As for retirees, they receive a check each month from the Retirement System for their pension. Prior to November 30, 2011, if the market performed above 7.9%, this was considered "excess earnings." Indeed, the GRS Board actuary determined that a normal rate of return for investments to be 7.9%. If earnings in the market realized a return in excess of this percentage figure, it considers the amount by which the actual returns exceed the assumed rate of 7.9% to constitute "excess earnings."

Also, a portion of these "excess earnings" would also be distributed to retirees in the form of a 13th check. This 13th check would be distributed to retirees toward the end of the year, in addition to their normal pension check. The City acknowledges that this distribution system of excess earnings, for annuity accounts and 13th checks, has been in effect since at least the 1980s.

On or about November 30, 2011, the Detroit City Council passed an ordinance prohibiting active and retiree participants from receiving excess earnings. (*Exhibit C*, Ordinance revision) This change eliminated "excess earnings" credits being given to active employee annuity accounts. Further, the Ordinance change caused the assumed rate of investment return to be the ceiling of annuity enhancement, as opposed to the floor. Now, for instance, the annuity rate of enhancement will be no greater than 7.9%, despite how much above that rate the

investments actually perform. The change also eliminated the excess earnings being distributed to retired participants, in the form of a "13th check". This change in the City ordinance changed the City of Detroit prior language, granting such discretion to the GRS Board in paying out excess earnings.

No retiree received the check in 2011 or in 2012. The City did not seek to negotiate this change in the treatment of the excess earnings beyond 7.9% with any City union. Further, the change was made during the existence of the collective bargaining agreement.

The AFSCME bargaining agreement, in Article 47.T, indicates that "[a]ll Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133." Thus, the previous ordinance which established the past practice of the GRS Board making excess earnings distributions was incorporated into the AFSCME bargaining agreement.

By changing the Ordinance, and applying that Ordinance change to the AFSCME membership, the City was violating PERA. As a consequence, active employees are losing both their annuity account investments, as well as the right to a 13th check upon their retirement.

# III.   <u>ARGUMENT</u>

## A.   The Language of the Plan Does Not Release the 13th Check Claim

The Debtor relies almost exclusively on the definition of GRS Pension Claim to argue that the 13th Check Claim is subsumed within Class 11. AFSCME argues that the language of the GRS Pension Claim creates, at the least, an ambiguity – in light of how the definition is used throughout the Class 11. The Mediation Confidentiality Order prevents all of the material facts from being disclosed, yet the below argument will disclose certain non-confidential facts.

The City's brief fails to outline the proper context of the dispute. The question presented is whether AFSCME, in agreeing to encourage its members to vote in favor of the Plan, thereby agreed to the City's interpretation of the Plan; an interpretation releasing the City from liability with two of AFSCME's claims that were properly filed in Class 14 and never formally, or informally, withdrawn. At this juncture, the Plan has not been confirmed, and there is no contract binding AFSCME to support the City's interpretation of the Plan.

Further, there is no document or any indication whatsoever from AFSCME that it released any aspect of its Proof of Claim, filed February 21, 2014.

Even if there were a "contractual" relationship between AFSCME and the City, there must exist a meeting of the minds on all material facts. *Fisk v Fisk*, 328 Mich 570, 574, 44 NW2d 184 (1950). "A meeting of the minds is judged by an

objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Heritage Broadcasting Co v Wilson Communications*, 170 Mich App 812, 818, 428 NW2d 784 (1988); See also *Jamaica Ave, LLC v S & R Playhouse Realty Co*, 540 F3d 433, 440 (6th Cir.2008) Under Michigan law, when you have a contract provision which is ambiguous – or subject to more than one interpretation – parol or extrinsic evidence may be used "for the purpose of aiding in the interpretation or construction of a written instrument, where the language of the instrument itself taken alone is such that it does not clearly express the intention of the parties or the subject of the agreement." *Edoff v Hecht*, 270 Mich 689, 695, 260 NW 93, 96 (1935) Here, given the use of the phrase GRS Pension Plan, at the least an ambiguity exists.

The use of the phrase "GRS Pension Claim" throughout makes clear that the definition is intended to include prospective payment or distribution, as distinct from credits or disbursements which should have been made in the past and are now considered contingent liability. Overall, Class 11 includes "GRS Pension Claims", defined as:

> "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other

obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) *any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.* (*emphasis* added)[1]

This is the same definition found within the initial Plan of Adjustment, filed on February 21, 2014[2] – the same day AFSCME's Proof of Claim was filed. The words "payment or distribution" are not defined in the Plan. The Fourth Disclosure Statement discusses the ASF program, and indicates that the GRS Trustees are "granted discretion to determine the annual interest to be credited on the employee contributions to the ASF accounts." (Fourth Disclosure, pg 23-24) An "interest credit" into an employee's ASF account is not a "pension, disability or other post-retirement payment or distribution", as required by subclause (a) of the GRS Pension Claim definition. When something is "credited", according to Black's Law Dictionary, it is "enter[ed] (as an amount) on the credit side of an account". The word "credit" is defined as the "availability of funds from either a financial institution or under a letter of credit." Black's Law Dictionary, Ninth Ed., 2004, pg 424. Receiving a "credit" is distinct from a "payment or distribution."

---

[1] Section 1.A.203

[2] http://www.detroitmi.gov/Portals/0/docs/EM/Bankruptcy%20Information/Plan%20for%20the%20Adjustment%20of%20Debts%20of%20the%20City%20of%20Detroit.pdf

Nor are these credits considered "payments" to persons who "at any time" participated in GRS, as per subclause (b) of the above definition. This language is a clear reference to the individuals who are currently retirees, whereas conversely persons entitled to ASF interest credits are current employees.

The treatment of Class 11 "GRS Pension Claims" is discussed in Section II.B.3.r. However, this Section makes no reference of the treatment of 13th Check distributions. Indeed, there is no language which suggests the City will attempt to recapture 13th Check payments. Nor has there been any literature or information provided to 13th Check recipients to suggest such.

Critically important is the discussion of the modification of the GRS Pension Claim in the Plan. Under the heading "Modification of Benefits for GRS Participants", the Plan explains that

> "During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment."[3]

The phrase AFS/GRS Reduction states as follows:

> "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the

---

[3] Section II.B.3.r.ii.C

Current Accrued Annual Pension amount described in Section I.A.202, plus the ASF Recoupment.[4]

Within Class 11, it is clear from the above that the intent of the Plan is to impair future pension benefits of retirees. The Plan makes adjustments in the pension benefit initially until June 30, 2023. It then lists the specific impairments that are applicable to future pension benefits. The Plan does not indicate any impairments of the ASF credits or 13th Checks owed prior to the July 18, 2013 petition.

The Fourth Amended Disclosure Statement also discusses the GRS Pension Claim phrase. *See Pg. 14 and 174.* Much like the Plan, the Disclosure Statement confirms that the pension benefit impairment is due to the "unfunded" – or future liability – of the City.

The omission of the 13th Check Claim from the language of Class 11 was intentional. As noted, the AFSCME 13th Check Claim is a pending claim before the Michigan Employment Relations Commission ("MERC"). The claim itself is one rooted in state labor law and contract law. The City unilaterally changed the terms of the collective bargaining agreement it had with its AFSCME city employees and must reimburse them. Notably, the City has been meticulous in its defining its inclusion and treatment of claims within the Plan. Presently, the Plan, which has been amended numerous times to address each inefficiency, is on its 7th amended version. Thus, the City's "void" as to these claims is not unintentional.

---

[4] Section 1.A.23

The City acted as if the 13th Check Claim was a live claim, when the Fourth Amended Plan was published. As stated before, February 21st was the day AFSCME filed its Proof of Claim, and that the City filed its first Plan of Adjustment. The definition of GRS Pension Claim was the same as in the current version. In the second week of April 2014 (on or about April 12th), AFSCME reached a deal with the City concerning the pension impairments for GRS Participants. On May 5, 2014, the City filed its Fourth Amended Plan of Adjustment (Docket No 4392), which was intended to encompass the terms of the AFSCME (and other employee creditor groups') pension deals.

Importantly, on May 15, 2014, the City filed its objection to the AFSCME Proof of Claim. (Docket No. 4876) In that objection, the City addressed the specific claims within AFSCME's plan. The first claim AFSCME made in its February 21st Claim concerned the potential impairment to all City retirees regarding their pension and OPEB, valued at $8.1 billion. The City responded to that claim by indicating that

> "the Plan addresses all pension and OPEB liabilities independent of the Claim by providing for the continuation of modified post-employment benefits for the individuals that the Claimant seeks to protect by filing the Claim. See, e.g., Plan, at §§ II.B.3.r, II.B.3.s (providing for, respectively, the preservation and treatment of GRS pension and OPEB claims). Accordingly, the Claim is unnecessary to preserve these individuals' rights to payment on account of such liabilities. Subject to the confirmation of the Plan, this portion of the Claim may be disallowed."

(Claim Objection, ¶ 14) Thus, the City considered Sections II.B.3.r, II.B.3.s of the plan to "preserve" the "continuation of <u>modified</u> post-employment benefits" – in other words, the future pension and OPEB benefits were being continued but modified. Those Sections of the Plan then set out specifically the modifications of the future pension and OPEB benefits, respectively. However, the Sections never address the modification of any past-due ASF interest credit, or pension check not yet received. Thus, this language clarifies that the City did not consider the 13th Check Claim to be encompassed within Class 11.

Further, in these same objections, the City does address the 13th Check Claim. The City writes as follows:

> "the Claim identifies several alleged liabilities related to various other proceedings identified in Exhibit 1 to the Claim, *including a number of proceedings before the Michigan Employment Relations Commission. To the extent any such proceedings have not been adjudicated on a full and final basis before the applicable tribunal*, the City disputes its liability to the Claimant or the individuals it represents on account of such liabilities."

Id., at ¶ 18. This is the objection the City recorded a mere ten days after the City filed the Fourth Amended Plan of Adjustment, which embodied the retiree pension deal. It did not indicate that the 13th Check MERC charge was addressed within the May 5th Plan. Instead, it indicated as its only objection to the claim was that it had not been fully adjudicated before MERC.

Without disclosing confidential communications, the City's assertion, of the 13th Check Claim being subsumed within the Plan, is a recent one.

**B.    The Language of the Plan Does Not Release the Retiree Healthcare Claim**

The Retiree Health Care Claim within AFSCME's Proof of Claim is not substantially similar to the other claims or interests of Class 12. As discussed above, a claim can only be placed on a particular class if the "claim or interest is substantially similar to the other claims or interests of such class." 11 U.S. Code § 1122. The Retiree Health Care Claim, which does not deal with prospective payments of distributions, is not substantially similar to the other claims or interests of Class 12.

Specifically, Class 12 deals exclusively with prospective payments or distributions moving forward. The definition of OPEB Claim does not include a claim for past due health care. Instead, the OPEB Claim is clearly intended to encompass the City's future obligations to pay retiree health care. OPEB Claims are defined as:

> "OPEB Claim" means any Claim against the City for *OPEB Benefits* held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree. (*Emphasis* Added)[5]

The Plan continues by establishing the two VEBAs, followed by Section II.B.3.s.ii.C which states that:

---

[5] Section 1.A.255

"From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits."

The Effective Date is defined as a date following Plan Confirmation.[6] Thus, the clear intent is to impair the provision of retiree healthcare benefits following the Effective Date of the Plan. The Disclosure Statement further addresses the definition of OPEB Claim stating:

> *If you are a retiree or a surviving beneficiary and are receiving retiree health benefits, or are entitled to retiree death benefits from the City, you are a holder of what the Plan calls an "OPEB Claim" and your OPEB Claim is included in Class 12 of the Plan.* (*emphasis* in original)

> The estimated amount of all OPEB Claims for purposes of voting on the Plan is $4,095,000,000. *This amount represents the estimated present value of the cost of the City's future obligations*, as of June 30, 2013*, for the City to continue to provide retiree health* benefits (including dental and vision) and death benefits *into the future under the programs that were in effect at the time the City filed its chapter 9 petition.*" (*emphasis* added)

The Plan clearly contemplates that the Plan intends to impair future liability of the City, not past due debts.

## C.    AFSCME Did Not Withdraw Its Proof of Claim

Federal Rule of Bankruptcy Procedure ("FRBP"), Rule 3006 speaks to the withdrawal or release of a proof of claim:

> A creditor may withdraw a claim as of right by filing a notice of withdrawal, except as provided in this rule. *If after a creditor has filed a proof of claim an objection is filed thereto or a complaint is filed against*

---

[6] "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived. Section 1.A.168

> *that creditor in an adversary proceeding, or the creditor has accepted or rejected the plan or otherwise has participated significantly in the case, the creditor may not withdraw the claim except on order of the court after a hearing on notice to the trustee or debtor in possession, and any creditors' committee elected pursuant to § 705(a) or appointed pursuant to § 1102 of the Code*. The order of the court shall contain such terms and conditions as the court deems proper. Unless the court orders otherwise, an authorized withdrawal of a claim shall constitute withdrawal of any related acceptance or rejection of a plan.

FRBP 3006. (*Emphasis added*) *See also In re County of Orange,* 203 BR 977 (BankrCDCal1996*)*. Federal Rules of Civil Procedure ("FRCP") Rule 41 governs the interpretation of this Rule, concerning the withdrawal of a proof of claim. *In re Empire Coal Sales Corp,* 45 FSupp 974, 976 (S.C.N.Y.), aff'd sub nom. *Kleid v Ruthbell Coal Co,* 131 F2d 372, 373 (2d Cir1942); *Kelso v MacLaren*, 122 F2d 867, 870 (8th Cir.1941). After an objection has been filed a proof of claim may be withdrawn <u>only subject to approval by the court.</u> *Id.*

Similar to FRCP Rule 41(a), it is the filing of an objection to the claim which initiates a contest that must be disposed of by the court. Thus, a leave of court is required in order for a party to obtain dismissal over the objection of a defendant. *See* Rule FRCP 41(a)(2). On May 15, 2014, the City filed its objection to AFSCME's Proof of Claim. Therefore, AFSCME is unable to release or withdraw its claim following this point without an order of this Court.

**D.** **The City Unilaterally Changed a Mandatory Subject of Bargaining**

The City argues the merits of AFSCME's charge inaccurately. Pursuant to the Michigan Public Employment Relations Act (PERA), it is unlawful for a public sector employer to fail to bargain collectively in good faith with a labor organization over mandatory subjects of bargaining like wages, hours, and other terms and conditions of employment. MCL § 425.215(1). A public sector employer may not unilaterally change a mandatory subject of bargaining without providing the labor organization with notice and opportunity to bargain. *Central Michigan Univ Faculty Ass'n v Central Michigan Univ*, 404 Mich 268, 277 (1978); *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974). Both refusal to bargain and unilateral changes are unlawful under MCL § 425.215(1). A mandatory subject of bargaining is defined as wages, hours, and other terms and conditions of employment. All other subjects are either permissive or illegal. As noted by ALJ O'Connor, retirement benefits are mandatory subjects of bargaining regardless of city charter provisions on ordinances to the contrary:

> It's particularly notable that one of the earliest cases interpreting and enforcing PERA involved the City of Detroit and the DPOA [Detroit Police Officers Association], and an assertion by the City that, "*We don't have to bargain about pensions because they're controlled by our charter, and our pension ordinance*," and the Michigan Supreme Court said, "You're wrong". [See, *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974).]

*****

The change directly affected an existing and fundamental condition of employment. Again, *DPOA v Detroit* held that pension plans and promises made under them were a fundamental condition of employment such that the City of Detroit had to bargain over them in the DPOA case, notwithstanding a preexisting charter provision which set terms different than the DPOA was seeking.

(*Exhibit A*, pg 9-10) The credits into the ASF accounts and the 13th check was a mandatory subject of bargaining.

Indeed, the City has previously acknowledged that a change in the "excess earnings" calculation would be a mandatory subject of bargaining that could not be changed without first bargaining with the union. *AFSCME et al v Detroit*, 218 Mich App 263 (1996). ALJ O'Connor spent a large portion of his Decision and Recommended Order discussing the relevance of that case and the acknowledgement that the City could not implement changes to the pension ordinance without bargaining:

The City, in the 1996 dispute [*AFSCME et al v Detroit*, 218 Mich App 263 (1996)], sought to change by charter amendment this very issue, or at least part of the very underlying issue at stake here today, and that is the Pension Board's allocation of excess earnings. In 1996, the City sought to change [the handling of excess earnings] by charter amendment. In 2011, the City sought to change [the handling of excess earnings] by pension ordinance change.

*****

In the 1996 decision, which is a published decision binding on the parties and binding on me, the Court recounts that the City in response to AFSCME's challenge, "Agrees that the challenged provision cannot be legally implemented even if enacted by the voters without first bargaining". [The 1996 decision further found that the City did not dispute "plaintiffs'

contention that these challenged provisions may not be legally implemented as to the city's union employees without bargaining".]

ALJ O'Connor then noted:

> Then and now there was no factual dispute; there is no factual dispute. The excess earnings have always been allocated at the discretion of the Pension Board. The Union has argued that that's a binding past practice. The City asserts that it wasn't mutual—an assertion I find frivolous given the prior litigation, given the City's concession in prior litigation that it was an established prior practice. It's also—I also find it frivolous based on the exhibits produced by the City in this case. The Corley letter, which was an advice letter to City Council by its own staff which recounts in very specific terms that there was an existing prior practice that was well recognized, but the City did not like that prior practice and wanted to change it. [The advice letter] acknowledged with incredible specificity the prior practice that existed for over 20 years, spelling out year by year the amount of money allocate by the Pension Board over the City's concern about how it was being allocated, but with the City's acquiescence in collective bargaining agreement after collective bargaining agreement, and the City repeatedly re-adopted collective bargaining agreements [with the same language]. . . . It was more than a tacit agreement. It was an express agreement with full understanding by both parties.

(*Exhibit A*, pg 7-9)

The City has argued that the financial emergency dramatically changes the situation, but this emergency is nothing new. There were other legal mechanisms that the City could have utilized. Judge O'Connor mentioned a few possibilities in his Decision and Recommended Order:

> Notwithstanding the *DPOA v Detroit* and *AFSCME v Detroit* decisions, the City was not locked in perpetuity to the continued payment of the 13th checks. It could have forthrightly bargained the obligation away. It could have traded it away. It could have in good faith exhausted its bargaining obligations and then, under controlling labor law, taken the entitlement away. It did none of those things. Instead, it continued over the years to re-

commit itself to the system. In 2010, the parties had been in bargaining and reached what appeared to be, and what the City asserted to be, a good faith impasse in bargaining. In November 2010, the City imposed new conditions of bargaining in place of a 2008-2012 collective bargaining agreement, which the parties had been unable to resolve. The imposed terms altered many conditions of employment for AFSCME members and wrung significant financial concessions from the workforce. In January of 2011, AFSCME conceded the City's position that the parties had reached a lawful impasse and AFSCME expressly acquiesced in treating the City-imposed terms as the 2008-2012 collective bargaining agreement governing the relationship of the parties.

Although the City could have, in November 2010, included in the post-bargaining impasse imposed terms a cut-off of the 13th check obligations, it did not. The resulting agreement, drafted by and initially unilaterally imposed by the City, left intact the 13th check system and expressly re-committed the parties, in Article 47(T) of the Contract, to compliance with the terms of the pension ordinance as it then existed. One year later, without bargaining and during the unexpired terms of that Contract, the City Council voted to materially change the pension ordinance and the Employer followed up by unilaterally implementing the change, in derogation of the City's obligations under PERA, the mandate of *DPOA v Detroit*, and the City's own admission of unalterable obligations as set forth in *AFSCME v Detroit*. The ordinance maneuver by the City administration was a unilateral do-over in the midst of the 2008-2012 contract term which materially, and necessarily unlawfully, and adversely altered existing conditions of employment.

(*Exhibit A*, pg 16)

MERC found that the City violated the law on a number of fronts, as detailed in the opinion.

### E. There is No Violation of the Pension Board's Fiduciary Duty in this Case

The statute of limitations prohibits the City's claim that the Pension Board Trustees violated the Michigan Public Employee Retirement System Act

(PERSIA), MCLA § 38.1132, et seq. The City is complaining about fiduciary breaches that occurred continuously for decades, which would have been known at the time for purposes of accrual. The statute of limitations for breach of a fiduciary duty is three years. MCL 600.5805(10); *The Meyer & Anna Prentis Family Foundation, Inc. v Barbara Ann Karmanos Cancer Institute,* 266 Mich App 39, 47, 698 NW2d 900 (2005); *Miller v Magline, Inc,* 76 Mich App 284, 313, 256 NW2d 761 (1977). This City's claims should be rejected as untimely.

Moreover the City does not have standing to complain about violations of PERSIA. MCL 38.1133(3) provides that "[a]n investment fiduciary shall discharge his or her duties solely in the interest of the participants and the beneficiaries[.]" Since the City is not a participant or beneficiary, it may not challenge the discharge of the Board's fiduciary duties. In *Wayne County Employees Retirement System v Wayne County*, 301 Mich App 1 (2013), the County contended that the 13th-checks were issued despite the underfunded status of benefit plans, that ineligible recipients received 13th-checks, and there were no written policies with respect to financial losses. *Id.* at 67. The court found that "[t]he appropriate party for pursuing a claim based on imprudent 13th-check disbursements would be a retiree or survivor beneficiary concerned with the solvency of the IEF program and the availability of future 13th checks." *Id.* at 68. Thus the court held that the County

did not have standing to bring the claims because the fiduciary duties were owed to retirees and surviving beneficiaries, not the County.

In *Wayne County Employees Retirement System v Wayne County*, 301 Mich App 1 (2013), Wayne County argued that the Wayne County Employees Retirement System breached its fiduciary duties under MCL § 38.1133(3). The court held that that the Retirement Commission had not breached its fiduciary duties. And for a number of the claims, the court held that Wayne County did not have standing to enforce the fiduciary duties. Wayne County's first claim was that the Retirement Commission had failed to allocate losses in proportion to and in correlation with IEF's percentage of the investment pool. Although the court assumed that the County had standing for purposes of the argument, it still held that the Retirement Commission had no fiduciary duty to make IEF loss allocations. Wayne County's second argument was that setting rates of return for purposes of funding the IEF during unfunded years breached the Retirement Commission's duty of care. The court assumed standing for purposes of the argument for this claim as well but held that the Retirement Commission's actions were not financially imprudent from the position that it owed the duty of care to the retirees and surviving beneficiaries.

In terms of the Detroit City Charter, the City adopted a retirement ordinance as Chapter 47 of the Code. AFSCME's charge at MERC related to the City's

adoption of a new City ordinance, which prohibited certain actions by the General Retirement System Pension Board. This change in the City ordinance changed the City of Detroit's prior language, granting such discretion to the GRS Board in paying out excess earnings. It is well established that a public employer, under PERA, cannot change a mandatory subject of bargaining by passing a law or ordinance. *AFSCME et al, supra.* at (finding that "[n]either the city nor the commission disputes plaintiff's contention that these challenged provisions [of the city charter] may not be legally implemented as to the city's union employees without bargaining."); See *DPOA v City of Detroit*, 212 Mich App 383, 389 (1995)

Contrary to the City's claim, the Board did not violate its fiduciary duties under PERSIA. MCL 38.1133(3) does provide that "[a]n investment fiduciary shall discharge his or her duties solely in the interest of the participants and the beneficiaries[.]" Its distribution of excess earnings was done solely in the interest of participants and beneficiaries. The 13th check was designed to maintain the value of benefits that would otherwise be wiped out by inflation.

The City provides no evidence of the Board's alleged breaches of fiduciary duties. There is no evidence that the Board failed to investigate or to follow reasonable procedures. The only evidence on which the City relies consists of newspaper articles, which should be rejected as hearsay. *See* Fed.R.Evid. 801(c).

*See also Turner v City of* Taylor, 412 F3d 629, 652 (6th Cir 2005) (finding newspaper article to be inadmissible hearsay).

The evidence is lacking regarding the Board's attempts to understand the actuarial risk associated with 13th checks and other benefits. In *Jurva v Attorney General of State of Michigan*, 419 Mich 209, 351 NW2d 813 (1984) the court considered a hypothetical burden on the actuarial basis of the pension system. The court first found that the school board had authority under the school code to provide early retirement incentives. It then held that "[t]he presumed adverse effect on the actuarial soundness of the plan cannot defeat a clear delegation of broad authority to provide fringe benefits of an economic nature." *Id*. at 223. Similarly here, a hypothetical burden on the actuarial basis of the pension system cannot defeat a clear statutory mandate, such as the duty to bargain under PERA.

The City inappropriately cites to cases under ERISA. But ERISA does not apply to the City's retirement system. See *Wayne County Employees Retirement System*, 301 Mich App at 44 n26 (holding "ERISA has no application to the Wayne County Employees Retirement System because it is a governmental pension plan.")

The City simply could have bargained the desired change in the retirement benefits. That is the only issue in this case, not the alleged breach of a fiduciary duty. Nor does MERC have jurisdiction to consider the issue. Indeed MERC's

jurisdiction is limited to interpretation of PERA. But even if the court were to consider the City's untimely fiduciary duty claim, the *Wayne County* decision, supra, 301 Mich App 1, should persuade this Court that no such breach occurred.

## IV. CONCLUSION

WHEREFORE, the Coalition of Detroit Unions respectfully requests that this Honorable Court overrule the City of Detroit's Objections.

Dated: October 16, 2014

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Blvd., 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 964-4454
Facsimile: (313) 964-4490
richardmack@millercohen.com

Sharon L. Levine
Philip J. Gross
LOWENSTEIN SANDLER LLP
65 Livingston Ave.
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-6247
slevine@lowenstein.com
pgross@lowenstein.com

Herbert A. Sanders
THE SANDERS LAW FIRM PC
615 Griswold St., Ste. 913
Detroit, MI 48226
Telephone: (313) 962-0099
Facsimile: (313) 962-0044
hsanders@miafscme.org

*Counsel to Michigan Council 25 of the*
*American Federation of State, County and*
*Municipal Employees (AFSCME), AFL-CIO*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|                                    |   |                         |
|------------------------------------|---|-------------------------|
| In re                              | ) | Chapter 9               |
|                                    | ) |                         |
| CITY OF DETROIT, MICHIGAN,         | ) | Case No. 13-53846       |
|                                    | ) |                         |
|                                    | ) | Hon. Steven W. Rhodes   |
|                                    | ) |                         |
| _____  | ) |                         |

## PROOF OF SERVICE

The undersigned certifies that on August 1, 2014, the American Federation of State, County and Municipal Employees Council 25 (AFSCME) filed Objections to the Fifth Amended Plan of Adjustment of Debts, Due to Impairment of Non-City Employees/Retirees were electronically filed with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Boulevard, 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 566-4787
Facsimile: (313) 964-4490
richardmack@millercohen.com

1