# Exhibit 7

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ROSE ROOTS, MARK PHILLIPS, WILLIAM
HARPER, EARNEST JOHNSON, FELICIA
JONES, CLARENCE L. WRIGHT, JR., ANGELA       Case No. 12-12848-CV
OBEY-YOUNG, Individually and on behalf of all
others similarly situated,

      Plaintiffs,

THE CITY OF DETROIT,

      Defendant.

_____/

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Rose Roots, Mark Phillips, William Harper, Earnest Johnson, Felicia Jones,

Clarence L. Wright, Jr., and Angela Obey-Young, on behalf of themselves and all others

similarly situated, by and through their attorneys, The Miller Law Firm, P.C., state as follows for

their Class Action Complaint:

### INTRODUCTION

1.  This case is brought on behalf of the thousands of individuals who retired from their

employment with the City of Detroit ("City") with vested health benefits and who are being

denied those vested contractual benefits in breach of: (1) contract, (2) statutory, (3) common law,

(4) the City Charter, (5) the Municipal Code of the City of Detroit, (6) Resolutions of the City

Council, and (7) fundamental federal Constitutional rights.

2.  The City is balancing its budget on the backs of its former employees – retired senior

citizens – by making devastating and draconian changes to their promised health care benefits.

These seniors have worked for decades, based upon promised health care benefits, and earned

the right to these health care benefits. Moreover, the retirees made irrevocable decisions like

selecting survivorship benefits and/or benefit levels, based upon the benefits promised to them. At a time, when they are living on fixed incomes and incurring the medical expenses of old age, the City seeks to deprive them of these promised and earned benefits upon which they so justly relied.

3.    The City of Detroit adopted an Employee Health Benefit Plan ("Plan") pursuant to City Charter and the Municipal Code, and the specific terms of that Plan were subject to collective bargaining agreements ("CBAs"), with the CBAs to take precedence over the Plan.

4.    Under the terms of the CBAs, individuals, who retired from eligible employment with the City of Detroit, are entitled to fully paid hospitalization and medical insurance, based on ward service under the Michigan Variable Fee coverage (MVF-2), and subject to the benefits and premium contributions in effect at the time of retirement, and Drug Prescription coverage. The prescription drug plan was subject to a $2.00 deductible for retirees. With the May 9, 1996 execution of the 1995-1998 CBA, the prescription drug deductible was increased to $3.00 for future retirees. These benefits, co-payments, deductibles and premium contribution rates were part of the contract in force at the time of each employee's retirement from the City.

5.    After July 2006, the City began to, and continues to, unilaterally modify the retiree health insurance benefits and premium contribution rates. Health care rates were modified again in 2012. Also, the City has undertaken steps to again unilaterally modify the retiree health insurance benefits and premium contribution rates and these changes are imminent and substantial.

6.    These unlawful, unilateral modifications negatively impact retirees who are senior citizens living on fixed incomes and who are among the most vulnerable members of society and, in many instances, residents of the City.

2

7.      Plaintiffs seek a declaration that the City's unilateral changes to the retiree health insurance plan, including but not limited to, changes in covered benefits provided to retirees; increases in deductibles and co-payments assessed to retirees; and increases in premium contribution rates paid by retirees, substantially impair and breach the applicable collective bargaining agreements, and constitute a violation of Plaintiffs' constitutional rights. Plaintiffs seek injunctive relief to prevent further changes and to require the City to return the contractual benefits owed to the retirees. Plaintiffs also seek compensatory damages for all the wrongfully incurred charges caused by Defendant's unlawful policy and practice.

## THE PARTIES

8.      Plaintiff Rose Roots is a resident of the City of Detroit, County of Wayne, and State of Michigan. She worked for the City for approximately 28 years, the vast majority of that time as a member of the American Federation of State, County and Municipal Employees ("AFSCME"). She retired from employment with the City of Detroit in 1997. Plaintiff was a member of the Senior Accountants, Analysts and Appraisers Association ("SAAA") bargaining unit.

9.      Plaintiff Mark Phillips is a resident of the City of Detroit, County of Wayne, State of Michigan. He worked for the City for approximately 30 years, the vast majority of that time as a member of AFSCME. He retired from employment with the City of Detroit in 2002, at which time he was a member of the Associated Paving Foreman's Association.

10.      Plaintiff William Harper is a resident of the City of Detroit, County of Wayne, State of Michigan. He was employed by the City for approximately 31 years until he retired in 1992. For his entire employment, he was a member of AFSCME.

3

11.     Plaintiff Earnest Johnson is a resident of the City of Detroit, County of Wayne, State of Michigan. He was employed by the City for approximately 34 years until he retired in 2002. For his entire employment, he was a member of AFSCME.

12.     Plaintiff Felicia Jones is a resident of the City of Detroit, County of Wayne, and State of Michigan. She retired from employment with the City of Detroit in 2010. During her thirty-one and one-half years of employment with the City, she was a member of AFSCME.

13.     Plaintiff Clarence L. Wright, Jr. is a resident of the City of Detroit, County of Wayne, State of Michigan. He retired from employment with the City of Detroit in 2005. During his almost 31 year employment with the City, he was primarily a non-union employee. At the time of his retirement, he was employed as a non-union Manager in the Recreation Department.

14.     Plaintiff Angela Obey-Young is a resident of the City of Detroit, County of Wayne, State of Michigan. She retired from employment with the City of Detroit in 2009. During her approximately 32-year employment with the City, she was a member of AFSCME for 22 years and of SAAA for approximately two years. At the time of her retirement, she had been employed as a non-union supervisory employee for approximately eight years.

15.     Defendant the City of Detroit is a municipal corporation with its principal place of business located at The Coleman Young Municipal Center, Two Woodward Avenue, Detroit, Michigan, the County of Wayne, and State of Michigan. The City of Detroit was established pursuant to the Constitution of the State of Michigan; the Home Rule Cities Act, the Charter of the City of Detroit and governed by applicable state and federal law; the Charter and its Ordinances and the Municipal Code.

4

## JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction over the subject matter of the action pursuant to 28 U.S.C. §§ 1331 and 1343  It is a civil action alleging, inter alia, violations of the Fifth and Fourteenth Amendments and impairment of contract arising under Article X of the Constitution of the United States.  This is an action for, inter alia, declaratory, injunctive and monetary relief pursuant to 28 U.S.C. §§ 2201 and 2202 and money damages to redress the Defendant's deprivation of Plaintiffs' rights pursuant to the Contracts Clause (Article 1, Section 10, Clause 1) and the Due Process Clause (Amendments V and XIV of the United States Constitution) and violations of 42 U.S.C. § 1983.

17.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to U.S.C. § 1367.

18.     Venue is proper in this Court because the municipal corporation Defendant and Plaintiffs are located in this District and a substantial part, if not all, of the events or omissions giving rise to the claims arose in the Eastern District of Michigan.  28 U.S.C. § 1391(b).

### GENERAL ALLEGATIONS – PART I
### THE ESTABLISHMENT OF THE EMPLOYEE HEALTH BENEFIT PLAN

19.     The City adopted its first Home Rule City Charter in 1918.  That charter was amended on July 1, 1974, January 1, 1997 and January 1, 2012.

20.     The City Employee Health Benefit Plan was established by Title 9, Chapter 8 of the 1918 City Charter as amended.  *See* also Charters 1974, 1997 and 2012, Article 13-105.

21.     Further, since at least some time at around June 1, 1946, the City provided for the establishment of an Employee Health Benefit Plan "for the purpose of providing hospital, surgical and death benefits" to eligible employees and retirees.  *City of Detroit Municipal Code [Code], Chapter 13, Article VIII, Division 1, Sec. 13-8-1; (Charter of the City of Detroit*

5

*[Charter] 1918, T-IX, C-VIII, § 1). See also Charter, Art. 13, Sect. 13-10; Code, Chapter 13, Art VIII, Division 1, Sec. 13-8-6(b). (Charter 1918, T-I, C-VIII, § 11; Code 1964; 16-9-4).*

22.     A "[m]ember [of the plan] shall mean any person included in the membership of the plan" and "[s]ubscriber [of the plan] shall mean a member of the plan or his family as defined in section 13-8-7 who is receiving a retirement allowance from the city." *Code, Chapter 13, Art VIII, Division 1, Sec. 13-8-2. (Charter 1918, T-IX, -VIII, § 2; Code 1964, § 16-9-1).*

23.     An individual remains a member in the plan "[a]fter his retirement from city service with a pension or workman's compensation benefits paid in whole or in part out of funds provided by the city..." *Code, Chapter 13, Art. VIII, Division 1, Sec. 13-8-3(e) (Charter 1918, T-IX, C-VII, § 8).*

24.     A city employee who retires with a pension shall continue to be a member of the city employees benefit plan. *Code, Chapter 13, Article 8-3(e), 8-10; Charter 1918, T-IX, C-VIII, § 8, 12; Code 1964 § 16-9-7; Ord. No. 22-97 § 1, 7-2-97.*

25.     "The governing board of the city employees' benefit plan shall pay to the insurer providing the hospital and surgical, and, if applicable major medical services to the members the cost of such services, as provided by contract." *Code, Chapter 13, Article 8-5 (Code 1964 § 16-9-10)*

26.     The Code provides in pertinent part that the City shall pay "the full cost of surgical and hospitalization coverage and major medical coverage, if applicable for individual employees...." *Code, Chapter 13, Article 8-11 (Charter 1918, T-IX, C-VIII, § 13; Code 1964 § 16-9-8).*

27.     Further, effective July 1, 1976, the City Council passed a resolution providing for "Drug Prescription" coverage for active employees and retirees who had retired since July 1,

6

1974. That prescription drug coverage provided for a $2.00 deductible and payment of premiums by the City.

28.     In December, 1976, the City Council passed a resolution to provide the same Drug Prescription coverage with a $2.00 deductible to be effective January 1, 1977, for those retirees of the City who had retired prior to July 1, 1974.

## GENERAL ALLEGATIONS – PART II
## THE BENEFITS AND PROVISIONS OF THE EMPLOYEE HEALTH BENEFIT PLAN WERE SUBJECT TO COLLECTIVE BARGAINING FOR EMPLOYEES WHO WERE MEMBERS OF A UNION

29.     The Public Employment Relations Act "PERA" provides that public employees have the right to "bargain collectively with their public employers through representatives of their own free choice." Mich. Comp. Laws § 423.209, Public Act 379 of 1965.

30.     The City Charter provides that "[e]mployees of the City have the right to collective organization and collective bargaining." *Charter of 1997, Article. 6, Chapter 5, Human Resources Department, Sect. 6-507; Charter 2012, Article 6, Chapter 4, Sect. 4-407.*

31.     "The terms of any collective bargaining contract, and all rules and rulings made under it, shall take precedence over any inconsistent classifications, rules or policies of the human resources department." *Charter of 1997, Art. 6, Chapter 5, Human Resources Department, Sect. 6-508; Charter of 2012, Art. 6, Chapter 4, Human Resources Department, Sect. 4-408.*

32.     The employees of the City are represented by many different unions and bargaining units.

33.     Historically, to establish a uniform bargaining policy as to matters such as issues related to the Employee Health Benefit Plan, the City through its labor relations personnel, have

7

always bargained first with AFSCME the union which has the largest enrollment of City employees.

34.     Then, the same bargained-for provisions are applied uniformly to other collective bargaining agreements. Indeed, many of the contracts contain "me too" provisions which call for identical provisions across bargaining groups.

35.     Upon information and belief, such collective bargaining contracts have been negotiated regarding the terms of the Employee Health Benefit Plan since at least 1947. Mich. Comp. Laws § 423.201, et. seq., Act 336 of Public Act of 1947. See also Exhibit 1, Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State County and Municipal Employees, AFL-CIO, 1977-80 (Michigan District Council 77 prior to March 3, 1978), Article 1.[1] The various Master Agreements are within the City of Detroit's possession.

36.     The negotiated contractual terms of the collective bargaining contracts have consistently provided that the retiree healthcare benefits, co-payments and deductibles applicable to Plaintiffs and other similarly situated class members were established through the collectively bargained labor agreements in force at the time of their retirements.

37.     Under the terms of all contracts, including the Agreements entered into between the City and AFSCME, the retirees' health care plan, benefits, deductibles, co-payments and premium contributions were governed by the CBA in effect at the time of retirement.

---

[1]  Memorandum of Understanding Between the City of Detroit and Michigan Council 25, American Federation of State, County and Municipal Employees, dated 3-22-78, provided that AFSCME 25 was the successor in interest to AFSCME 77, and that the agreement between the City and Council 77 which was effective 9-7-77 and which expires on 6-30-80 shall be the City and Counsel 77, which was effective 9-7-77 and which expires on 6-30-80, shall be the Master Agreement between the parties for its term and otherwise in accordance with Article 47 of the adopted Master Agreement.

38.     The specific CBA under which each retiree retired established vested rights to the healthcare coverage in effect at the time of retirement and the City promised to continue these vested rights the entire period of retirement.

39.     Once the employee retires, the employee is no longer a member of the Union and is no longer subject to future CBAs.

40.     The retired employees are entitled to these benefits for life and they are vested at retirement, and not subject to unilateral modification and/or revocation.

41.     Non-union employees received the same benefits as union employees with regard to Health Care Benefits.

42.     Article 34 of each of the CBAs (Article 36 in the 1977-1980 and 1980-1983 Agreements) consistently provided that retirees would receive fully paid hospitalization and medical insurance, including prescription drug coverage.

43.     Plaintiffs set forth in Subsections A-I below the provisions in the Agreements from 1977 to 2005. To the extent that there may be retirees subject to Agreements that pre-dated the Agreements cited in Subsections A-I below, upon information and belief, those contracts are in the possession of Defendant and also provided for fully paid hospitalization and medical insurance.

## A.     The 1977-1980 Master Agreement

44.     Article 36 of the 1977-1980 Master Agreement between the City and Michigan Council 25 of AFSCME provided in pertinent part:

> The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries

9

and their legal dependents, as provided by Chapter 16, Article 9 of the
Municipal Code for the City of Detroit.

Employees shall have the option of choosing alternative hospitalization
medical coverage made available by the City. For those employees
selecting the optional Metropolitan Health Plan of Blue Cross/Blue Shield
the coverage shall be the MHP "AA" program with the City's contribution
limited to the premium cost for Blue Cross/Blue Shield health insurance,
ward service rates.

* * *

For employees who retire on or after July 1, 1977, the City will pay the
premium for regular retirees and their spouses effective as provided by
City Council in 1977-78 closing resolutions.

* * *

If, during the term of this Agreement, a Federal Health Security Act is enacted,
the City of Detroit will pay during the term of the Agreement any premium, taxes
or contributions employees may be required to pay under a Federal Health
Security Act that are specifically earmarked or designated for the purpose of the
Federal Program.

* * *

The City agrees to institute a Health Maintenance Organization insurance plan
prior to June 30, 1980. The employees shall have the further option of choosing
this alternative. The City's contribution to this plan shall be limited to the
premium cost for Blue Cross/Blue Shield health insurance, ward service rates.

(*See* Exhibit, Article 36, ¶¶ A,C, D and E.)

45.     The Agreement also provided for Optical Care Insurance through the Employee

Benefit Board.  (Id., ¶ B.)

## B.     The 1980-1983 Master Agreement.

46.     Article 36 of the 1980-1983 Master Agreement between the City and Michigan

Council 25 of AFSCME provided in pertinent part:

The City shall provide hospitalization and medical insurance based on the
Blue Cross/Blue Shield ward service under the Michigan Variable Fee
coverage (MVF-2) and the Prescription Drug Group Benefit Certificate

10

with two dollar ($2.00) co-pay (Certificate #87), known as the two dollar ($2.00) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 16, Article 9 of the Municipal Code for the City of Detroit.

\* \* \*

Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. The City's contribution to the alternative plans shall be limited to the premium cost for Blue Cross/Blue Shield ward service rates, excluding dental insurance. Total Health Alliance Plan shall comprise the list of alternative hospitalization plans. If at the end of any fiscal year an alternative hospitalization plan has failed to enroll 5% of the bargaining unit employees, the City shall have the option of removing that plan from the list of eligible carriers.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution. **The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.** (Emphasis added.)

(*See* Exhibit 2, Article 36, ¶¶ A, B, and C.)

47.     The CBA also provided (1) effective 7-1-81, the City would improve its BC hospitalization plan for active employees and their dependents by providing BC Master Medical insurance with a 20% copay benefit and a fifty dollar ($50) per person annual deductible ($100.00) for two or more in a family; (2) a Dental Plan effective 7-1-80; (3) the continuation of Optical Care Insurance and (4) that the City would pay the costs if a Federal Health Security Act was enacted. (*Id.*, ¶¶ D, E, F and G.)

### C.    The 1983-1986 Master Agreement

48.    Article 34 of the 1983-1986 Master Agreement between the City of Detroit and

Michigan Council 25 of AFSCME provided in pertinent part:

> Not later than January 1, 1984, for active employees and employees who
> retire on or after January 1, 1984, coverage shall be as described in the
> Memorandum of Understanding re: Health Care Cost Containment and
> Exhibit III.
>
> * * *
>
> The City shall provide hospitalization and medical insurance based on the
> Blue Cross/Blue Shield ward service under the Michigan Variable Fee
> coverage (MVF-2) and the Prescription Drug Group Benefit Certificate
> with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar
> ($2.00) deductible  Drug Rider for employees and their legal dependents,
> duty disability retirees and their legal dependents and duty death
> beneficiaries and their legal dependents, as provided by Chapter 16,
> Article 9 of the Municipal Code for the City of Detroit.
>
> * * *
>
> Employees shall have the option of choosing alternative hospitalization
> medical coverage made available by the City.  The City's contribution to
> the alternative plans shall be limited to the premium cost of Blue
> Cross/Blue Shield ward service rates, excluding dental insurance.  Total
> Health Care, Michigan Health Maintenance Organization and Health
> Alliance Plan shall comprise the list of alternative hospitalization plans.  If
> at the end of any fiscal year an alternative hospitalization plan has failed to
> enroll 5% of the bargaining unit employees, the City shall have the option
> of removing that plan from the list of eligible carriers.
>
> * * *
>
> The City will pay the premium for regular retirees and their spouses for
> hospitalization and medical insurance based on the Blue Cross/Blue Shield
> ward service under the Michigan variable Fee coverage (MVF-2) and the
> Prescription Drug Group Benefit Certificate with the two dollar ($2.00)
> co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug
> Rider as provided by City Council in the 1977-78 closing resolution. **The
> City will pay this premium for regular retirees and their spouses for
> only as long as they receive a pension from the City.** (Emphasis added)

(*See* Exhibit 3, Article 34, ¶¶ A, B, C and D.)

12

49.    The 1983-1986 Agreement also provided that (1) the hospitalization plan for active employees and their dependents would include Blue Cross Master Medical Insurance with a 20% copay benefit and a fifty dollar ($50) per person annual deductible ($100) for two or more in a family; (2) a Dental Plan for actives effective 7-1-80; (3) the continuation of Optical Care Insurance;    (4) effective 11-1-83, employees who wish to insure sponsored dependents were required to pay the premium cost of that coverage and "the City will pay the health insurance premium for dependents who are 19 to 25 as long as they are regularly attending an accredited vocational school, college...and are dependent....Employees at their own expense may provide coverage for these dependents; and (5) the City would pay the costs if a Federal Health Security Act was enacted. (*Id.,* ¶¶ E, F, G, H and I.)

50.    The 1983-1986 Contract included a Memorandum of Understanding Re: Health Care Cost Containment signed 11-28-1983 which provided:

> ....[t]he parties agree that the most effective way to control health care costs is to limit the choice of hospitals, out-patient laboratories, providers of prescription drugs and other medical services to those who deliver quality care at reasonable prices. In order to achieve this goal the parties agree to implement the following plan, in lieu of Article 36, not later than January 1, 1984:
>
> A.    The parties agree to create a Health Care Cost Containment Committee made up of an equal number of members from the City and from the Union. The committee will agree on securing the services of a health care consultant or administrator to assist the committee in designing and implementing a health care cost containment program. This committee shall review and agree to a health care cost containment plan which will cover active AFSCME employees and **future retirees** and will be implemented by the City no later than January 1, 1984. The plan will provide for quality health care and will limit the fees of physicians, hospitals, laboratories and druggists to those that charge reasonable fees including approved H.M.O.'s, health care networks and preferred drug providers.    Further cost containment alternatives such as preferred providers, generic mail order drugs, a maintenance drug program,

13

restrictive weekend admission rules, preadmission certification for elective surgery, second opinions, ambulatory surgery, control of out-patient psychiatric care, birthing centers, hospice care coverage other than hospitals, patient incentive audit of hospital bills, worksite blood pressure tests and employee health care education programs will be reviewed and implemented by the Committee. No insurance carrier shall be allowed to underwrite City Health Care insurance unless they offer coordination of benefits. Any savings realized from this effort will be disposed of in accordance with paragraph B.

B.      The Committee will review the costs of this program, on an annual basis, and will report to the Union and the City the amount of savings which the plan has generated. The accounting will be performed by a CPA mutually agreed upon by the parties if so desired to assure accuracy. A similar review and report will be made thereafter on an annual basis. The City and the Union agree that savings associated with this program will be shared equally by the employer and active AFSCME employees. The percentage of savings to be credited to the AFSCME bargaining unit employees shall be equal to one-half of the percentage of the difference in cost per employee of the active and **future retirees** of AFSCME in the general City hospitalization plan during the 1982-83 fiscal year versus the same base and equivalent accounting period in subsequent years. The general City hospitalization plan includes all active AFSCME employees **and future retirees** including those at the Department of Transportation and civilian employees of the Police and Fire Departments. Distribution of the savings attributed to the employees will be used as a bonus."

C.      In the event that the January 1 – June 30, 1984 premium cost exceeds the 1982-83 base year cost, the City will pay up to 50% over the 1982-83 base year costs. In the event that the July 1, 1984 – June 30, 1985 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost. In the event that the July 1, 1985 – June 30, 1986 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost.

D.      Effective July 1, 1983, the health care coverage premium for sponsored dependents must be borne by the employee.

E.      No later than January 1, 1984, the City will also implement a cost containment dental and optical insurance program. The City and the Union agree that savings associated with this program will be shared equally by the employer and the employees in accordance with the formula shown in paragraph B." (Emphasis added.)

14

51.     Exhibit III to the 1983-1986 Agreement provided "Re: HEALTH CARE PLAN"

and outlined the health care benefits under the program:

> <u>The following is a description of the City of Detroit's Basic Health
> Care Plan for employees **and retirees**</u>. They may choose to elect
> coverage under this plan or they may choose alternative coverage
> through one of the Health Maintenance Organizations offered by
> the City. The City will pay the premium for this alternative health
> care coverage up to an amount equal to the amount the City pay
> (sic) for the Basic Plan.
>
> The basic plan described herein will give member coverages,
> which are nearly the same as they currently enjoy. It does,
> however, include several cost containment features not found in
> our current program which will control costs of hospitalization and
> other medical services. Furthermore, the joint union/management
> health cost containment committee will be studying additional cost
> containment programs which shall include prescreening and
> employee awareness programs during the term of the agreement
> and will implement them if they fulfill or object of quality health
> care at reasonable prices. In the event that different optical, dental
> or prescription drug programs are less costly than the current ones
> used, they may be adopted in lieu of them." (Emphasis added.)

(*See* Exhibit 3, which lists the benefits provided by the Plan.)

### D.     The 1986-1989 Master Agreement

52.     Article 34 to the 1986-1989 Master Agreement between the City Council 25 of

AFSCME provided in pertinent part:

> The City shall provide hospitalization and medical insurance based
> on the Blue Cross/Blue Shield ward service under the Michigan
> Variable Fee coverage (MVF-2) and the Prescription Drug Group
> Benefit Certificate with two dollar ($2.00) co-pay (Certificate
> #87), known as the two-dollar ($2.00) deductible Drug Rider for
> employees and their legal dependents, duty disability retirees and
> their legal dependents and duty death beneficiaries and their legal
> dependents, as provided by Chapter 13, Article 11 of the Municipal
> Code of the City of Detroit.
>
> * * *

15

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person   $100.06
Two person      $238.29
Family          $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

* * *

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person   $100.06
Two person      $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty

16

dollar ($50.00) per person annual deductible ($100.00) for two or more in a family.

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees citywide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

\* \* \*

Effective January 1, 1987, the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 4, Article 34, ¶¶ A,B, C, D, F and L.)

53. The 1986-1989 Agreement also provided a dental plan for active employees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted and that any insurer would be required to offer coordination of benefits (*Id.,* ¶¶ G, H, I and J)

54. The parties also agreed to form a "Health Care Cost Containment Committee:

...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph "B" the City will pay

17

fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

(*Id.*, ¶ K.)

55.     Exhibit III "RE: HEALTH CARE PLANS" included as part of the 1986-1989

Agreement provided that:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 4.)

### E.     The 1989-1992 Master Agreement

56.     Article 34 to the 1989-1992 Master Agreement provided in pertinent part:

> The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar ($2.00) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 11 of the Municipal Code of the City of Detroit.

* * *

> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

| | |
|---|---|
| Single person | $100.06 |
| Two person | $238.29 |
| Family | $253.54 |

> Fifty percent (50%) of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%) shall be paid by the employer.

* * *

18

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent (50%) of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees citywide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person

19

Two persons
Family.

* * *

Effective January 1, 1987, the City shall implement a Preferred Provider
Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 5, Article 34, ¶¶ A, B, C, D, E, F and L.)

57.     The 1989-1992 Agreement provided a dental plan for active employees and their

Dependents;   continued optical care insurance; that the City would pay the costs if a Federal

Health Security Act was enacted and that any insurer would be required to offer coordination of

benefits. (*Id.*, ¶¶ G, and H, I and J.)

58.     The parties agreed to form a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union
> which will review and agree to further cost containment programs to cover
> both active employees and future retirees during the term of the Contract.
> Said cost containment programs shall not diminish the levels of benefits
> provided in the basic plans but may require the insured to follow
> procedures prescribed by the carrier in order to be eligible for benefits.  If
> premium levels remain below the amounts listed in the 1982-83 base
> premium levels for insurance listed in paragraph B the City will pay fifty
> percent (50%) of that amount to an escrow account which shall be used to
> offset health care costs or increase health care benefits. Furthermore, the
> parties agree during the term of this agreement to continue to discuss the
> City's hospitalization plans.   The parties are committed to investigate
> programs which will reduce costs and bring about a corresponding
> reduction in premium sharing by employees. Programs to be considered
> would include alternative health care providers, additional cost
> containment programs, and alternative traditional plans.  Any programs
> agreed to by the parties will be implemented during the term of this
> agreement.

(*Id.*, ¶ K.)

59.     Exhibit III "Re: HEALTH CARE PLANS" to the 1989-1992 Agreement
provides:

> [T]he City of Detroit offers a traditional hospitalization plan for
> employees and retirees plus they may choose alternative coverage through

20

one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 5.)

### F.      The 1992-1995 Master Agreement.

60.     Upon information and belief, the City imposed an Agreement for the 1992-1995

Plan year which contained the exact or substantially similar language in Article 34. It is believed

that a copy of this document is in the possession of Defendant.

### G.      The 1995-1998 Master Agreement.

61.     Article 34 of the 1995-1998 Agreement which was executed on May 9, 1996

provided in pertinent part:

> The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two-dollar ($2) deductible  Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit until such time during this agreement cost containment/reduction modifications are implemented pursuant to the Memorandum of Understanding Re; Lowered Health Care Costs dated August 31, 1995. Such modifications may impact all or part of the provisions contained, including but not limited to medical, dental and optical care coverages.
>
> * * *
>
> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:
>
> Single person $100.06
> Two person    $238.29
> Family        $253.54

21

Fifty percent (50%) of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%) shall be paid by the employer.

* * *

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent (50%) of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

* * *

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50

22

employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

\* \* \*

Effective January 1, 1995 the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 6, Article 34, ¶¶ A, B, C, D, E, F and L.)

62.     The Agreement provided a dental plan for active employees, duty disability retirees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; and that any insurer would be required to offer coordination of benefits. (Id., ¶¶ G, H, I, J and M.)

63.     The parties also agreed to form a Health Care Cost Containment Committee:

...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

23

(*Id.*, ¶ K.)

64.     The     1995-1998     Agreement     included     a     "MEMORANDUM     OF

UNDERSTANDING INITIATIVE NO. 6 RE: LOWERED HEALTH CARE COSTS" which

provided:

> The parties agree to negotiate agreements which will achieve cost savings on the following four initiatives. It is understood, however, that in addition to these mandatory cost reducing changes, the parties' Health Care Cost Reductions Committee (HCCRC) will continue to pursue potential means of further reducing costs or stunting their escalation in the future through other initiatives.
>
> A.     Health Insurance Premiums, Employee Portions Paid with "125K Pre-Tax" Dollars (This will be instituted forthwith, as soon as possible, upon ratification of the labor agreement.)
>
> B.     Prescription Drugs at $3.00
>
> C.     Mail-Order Prescription Drugs Program
>
> D.     COB Administrative Change (Verify then Pay)
>
> The following issues are **NOT AGREED TO** but are still being mutually examined by the Committee with regard to the parameters of such a rule as stated:
>
> E.     Emergency Room "Non-Admitting Usage Fee"
>
> F.     Opt-Out Payments When Alternate Coverage Exists
>
> Further, this HCCRC will endeavor to coordinate its activities with and make its efforts compatible with any beneficial outcomes from the operations between the City and the AFL-CIO Coalition of Unions Committee on Health Care Issues. In that regard, the union has already expressed at the contract bargaining table its interest in adopting the potential lower-costing "HMO/POS" program now being carefully considered by that City/Coalition Committee, subject to the Union's concerns about maintenance of the present benefits in the traditional BC/BS.
>
> The benefits of this initiative will be initially realized in Year I for initiative A and in Year II for initiatives B, C and D. For initiatives E and F, if the parties should come to agreement on them, the benefits will take

24

> effect in accordance with the understanding reached between the parties. And lastly, further benefits will be realized to the extent the HMO/POS program is adopted and saves the parties health care costs.

*(See* Exhibit 6.)

65.     The 1995-1998 Agreement included A Memorandum of Understanding between the parties applied to National Health Care, "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits."*(See* Exhibit 6.)

66.     Exhibit II "RE: HEALTH CARE PLANS" to the 1995-1998 Agreement provides:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

*(See* Exhibit 6.)

## H.     The 1998-2001 Master Agreement.

67.     Article 34 to the 1998-2001 Master Agreement executed on March 8, 2000 provided in pertinent part:

> The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1], known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.
>
> fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3.

25

Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person $100.06
Two person   $238.29
Family       $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person $100.06
Two person   $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1: the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3.

26

Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

* * *

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

> Single Person
> Two persons
> Family.

(*See* Exhibit 7, Article 34, ¶¶ A, B, C, D, E, and F.)

68.     The 1998-2001 Agreement also provided a dental plan for active employees, their dependents and duty disability retirees; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (Id., ¶¶ G, H, I, J and L.)

69.     The parties also agreed to form a Health Care Cost Containment Committee:

...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits

provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

(*Id.*, ¶ K.)

70.     A Memorandum of Understanding between the parties applied to National Health Care provided that "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits." (*See* Exhibit 7.)

71.     Exhibit II "RE: HEALTH CARE PLANS" to the 1998-2001 Agreement provides that:

[T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 7.)

28

## I.   The 2001-2005 Master Agreement.

72.    Article 34 of the 2001-2005 Master Agreement, which was executed on July 1, 2003, provided in pertinent part:

> 34. Hospitalization, Medical, Dental and Optical Care insurance Status quo of existing hospitalization, medical dental and optical care benefits will be maintained while the parties work cooperatively to institute mutually agreeable changes.
>
> The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1], known as the two dollar ($2) deductible  Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.
>
> fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)
>
> * * *
>
> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:
>
> Single person  $100.06
> Two person     $238.29
> Family         $253.54
>
> Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer. When the City's payroll system has the capability of allowing employees to pay these amount (sic) through the pre-tax IRS code 1225K mechanism, all bargaining unit members shall be entitled to participate.
>
> * * *
>
> Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City. For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

* * *

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges

30

without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

*(See* Exhibit 8, Article 34, ¶¶ A, B, C, D, E, and F.)

73.    The 2001-2005 Agreement also provided a dental plan for active employees and duty disability retirees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (I. (Id., ¶¶ G, H, I and J.)

74.    The parties agreed to form a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

*(Id.,* ¶ K.)

75.    The Agreement included a Memorandum of Understanding between the parties

31

which applied to National Health Care, "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits." (*Id.,* ¶ I.)

76.     Exhibit II "Re: Health Care Plans" to the 2001-2005 Agreement provides that:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 8.)

**J.      In 2006, the City Unilaterally Modified the Retirees' Health Care Plan.**

77.     Subsequent to the 2001-2005 CBA, when it came time to negotiate the terms of the 2005-2008 CBA, the collective bargaining representatives for AFSCME engaged in negotiations with the City's labor relations personnel. The City unilaterally imposed contract terms for the 2005-2008 CBA, effective September 2006.

78.     Notwithstanding the absence of a contract, in 2006, the City unilaterally and improperly modified the terms of the Employee Health Care Plan for union and non-union active employees and retirees although such a move was illegal.

79.     The new plan changed the contribution rates, deductibles and benefits for retirees who had retired under prior collective bargaining agreements and had vested benefits in effect prior to July 2006.

32

80.     Notwithstanding that the City had no right to change the terms of the Health Care plan as to those retirees who had retired with vested rights to retiree health care, the City unilaterally changed the terms of the health care plan.

81.     The terms of the health care plan were mandatory subjects of collective bargaining under the state labor law, past practice and the agreements between the parties.

82.     Yet, after the imposition of the contract, which was accepted by the Union as to the active employees only, the City impermissibly continued to make changes to the imposed contract, including unlawful changes as to retiree health care.

83.     Under the City's new unilateral health care plan, co-payments and contributions were changed for retirees. By way of example and not limitation, changes to the Blue Cross traditional plan included the following:

| BLUE CROSS TRADITIONAL | Prior to change | Post change |
| --- | --- | --- |
| Annual Deductible/Individual | $50 | $175 |
| Annual Deductible/Family | $100 | $350 |
| Urgent care | 100% | 80% after deductible co-payment |
| Prescription Drug Co-pay Generic | $2 | $5 |
| Prescription Brand | $2 | $15 |
| Mail Order Generic (90 days) | $2 | $10 copay |
| Mail Order Brand (90 days) | $2 | $30 copay |

(*See* Exhibit 9.)

84.     These changes were effective in the latter half of 2006.

85.     The City continued to make unilateral, illegal and improper changes to the terms of the health care plan, adversely affecting the retirees.

86.     Thereafter, the City prepared a draft of the Master Agreement dated October 24, 2006 which provided in Article 33:

33

*The parties have reached an agreement in regard to health care plan changes in accordance with MOU Re: Concession Agreement. However, the hospitalization, medical, dental and optical care benefits as of June 30, 2005, will be maintained until the new care design plan changes are implemented. That implementation is to occur on or after July 17, 2006. Changes to this article are reflected in the Memorandum of Understanding RE: Alternative Health Care Plan.*

\* \* \*

The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible  Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.

fn 1:  The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

| | |
|---|---|
| Single person | $100.06 |
| Two person | $238.29 |
| Family | $253.54 |

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer. When the City's payroll system has the capability of allowing employees to pay these amounts through the pre-tax IRS code 125K mechanism, all bargaining unit members shall be entitled to participate.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

34

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution.  The city will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1:  The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

* * *

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City.  The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable.  If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs.  Effective with the 1987-88

35

fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family. (Emphasis added)

(See Exhibit 10, Article 33, ¶¶ A, B, C, D, E and F.)

87.    The October 24, 2006 draft agreement provided a dental plan for active employees and duty disability retirees; continued optical coverage; that the City would pay the costs if a Federal Health Security Act was enacted; and that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (Id., ¶¶ G, H, I, J and L.)

88.    The October 24, 2006 draft agreement included a provision for a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agreed during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

(Id., ¶ K.)

89.     The October 24, 2006 draft included Exhibit II, "RE: HEALTH ARE PLANS." which added "SECTION VIII, City Alternative Health Care Plan." In pertinent part, it provided that "Currently, all retirees and their dependents who are eligible for Medicare regardless of age must enroll in Medicare Parts A and B at their own expense to be eligible for continued coverage, and this provision shall remain unchanged and applicable to all persons who retire in the future." (*Id.,* § 8, ¶E at p 154.)

90.     The City did not have the right to unilaterally change the terms of the Employee Health Care Plan for these retirees who had retired with vested benefits.

91.     Even more improperly, the City reduced the health care plan in 2008 from what it unilaterally imposed in 2006.

92.     The City specifically promised the retirees that they would enjoy the medical benefits and contribution rates applicable at the time of their retirements.[2]

93.     Retiree medical benefits are vested lifetime benefits. Once the City of Detroit received the benefit of the retirees' completed service, it could not unilaterally alter or revoke the terms.

94.     The health benefits that are at issue had remained the same until the City of Detroit unilaterally and improperly modified the health care benefits.

## K.      In 2009, 2010, 2011 and 2012 the City Again
## Unilaterally Changed the Retirees' Health Care Plan.

95.     In 2009, 2010, 2011 and 2012 the City continued to unilaterally raise premiums and make other improper changes to the retirees' health care benefits.

---

[2] For example, the website for the General Retirement System City of Detroit provides that the benefits applicable to a retiree are those that were in effect at the time of the retiree's retirement. Other documents published by the City of Detroit and provided to the retirees set forth this same information to retirees.

37

**L.      The City Imminently Plans to Implement Substantial Modifications to the Retirees' Health Care Plan to the Detriment of Retirees.**

96.      The City imminently plans to unilaterally and wrongfully further modify the employee benefit plan applicable to these retirees including increasing premiums and changing the value of the contracted for benefits.

**GENERAL ALLEGATIONS – PART III**
**THE NON-UNION RETIREES HAVE THE SAME VESTED BENEFITS AS THOSE**
**RETIREES WHO WERE COVERED BY A COLLECTIVE BARGAINING**
**AGREEMENT**

97.      The City agreed to provide non-Union employees with the same Employee Benefit Plan and same terms and provisions as employees who were members of a Union and subject to collective bargaining agreements.  In fact, the Code and Charter make no distinction.

98.      The non-Union employees who retired with vested benefits were unlawfully subject to modifications in July, 2006 and thereafter.  Further, additional unlawful changes were made in 2012.

99.      The City promised these non-Union retirees that they would enjoy the medical benefits and contribution rates applicable at the time of their retirements.

100.      The City as a matter of practice provided the non-Union retirees with the same benefits as the Union retirees and represented that they would continue to obtain the same benefits as Union retirees.

**CLASS ACTION ALLEGATIONS**

101.      This is a class action suit which seeks injunctive and declaratory relief and damages in the amount of wrongfully incurred sums paid by retirees for contributions to both

38

premiums and deductibles and other health care costs due to Defendant's unilateral breaches of

the contracts and violations of Plaintiffs' constitutional rights.

102.    Plaintiffs bring this action on behalf of themselves and all other similarly situated

individuals and seek to represent a class comprised of all persons who have been or will be

subject to Defendant's unlawful policy, practice, procedure of breaching the contracts between

the parties and also depriving them of their constitutional rights.

103.    During the periods at issue, Plaintiffs were retirees covered under the City of

Detroit Employee Health Care Plan.

104.    Plaintiffs bring this action on their own behalf and on behalf of the following

proposed class:

> All persons who retired from the City of Detroit with vested health care
> benefits and whose health care plan, including, premium contributions,
> benefits and deductibles, were unilaterally changed by the City of the
> Detroit.

105.    The class is so numerous that joinder of all members is impracticable. Class

members number in the thousands. The precise number of Class members and their addresses

are unknown to the Plaintiffs, but can be obtained from the records of the City of Detroit.

106.    There are questions of law or fact common to the Class, including at least the

following:

a.      Whether the City's retirees had vested health care benefits that could not

retroactively changed by the City.

b.      Whether the City unilaterally modified the health care plan, including health care

benefits, prescription drug benefits, deductibles and premium contributions applicable to the

benefit program for retirees;

39

c.      Whether such unilateral modification of the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees breached the vested rights of the retirees;

d.      Whether such unilateral modification of the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees, violated the retirees' constitutional rights under the Contract Clause of the U.S. Constitution and the 5th and 14th Amendments of the U.S. Constitution;

e.      Whether Plaintiffs were harmed as a result of the City's wrongful conduct; and

f.       What relief should be imposed in favor of the Plaintiffs and the Class, including declaratory and injunctive relief.

107.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs have the same interests in this matter as all other members of the Class, and their claims are substantially identical to and typical of the claims of all members of the Class. Plaintiffs do not have interests antagonistic to or in conflict with those of the other members of the Class.

108.    Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in class actions. Plaintiffs will fairly and adequately represent the interests of the Class members.

109.    The prosecution of separate actions by members of the Class could create a risk of establishing incompatible standards of conduct for Defendant.

110.    Overall, the claims of the individual class members may be too small to warrant individual litigation, especially as to a group of retirees on fixed incomes, but cumulatively the

amount of potential damage is significant and injunctive relief is required to preclude the City's on-going wrongful conduct.

111.    The prosecution of individual actions may, as a practical matter, be dispositive of the interests of the Class.

112.    Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia,* equitable remedies with respect to the Class as a whole.

113. The common questions of law and fact at issue here, some of which have been enumerated above, predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.

114.    The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation, particularly when Plaintiffs are retirees living on fixed incomes.

115.    Plaintiffs are not likely to be able to vindicate and enforce their constitutional and contractual and statutory rights unless this action is maintained as a class action.

116.    The issues raised can be more fairly and efficiently resolved in the context of a single action rather than piece-meal litigation in the context of separate actions.

117.    The resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations

118.    Defendant has acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate.

119.    To Plaintiffs' knowledge, no similar litigation is currently pending by other members of the Class.

120.   Plaintiffs' counsel, who is highly experienced in class actions, foresees little difficulty in the management of this case as a class action.

## COUNT I --BREACH OF CONTRACT

121.   Plaintiffs repeat and re-allege all of the preceding paragraphs as if full set forth herein.

122.   Plaintiffs rendered services to the City of Detroit and performed their duties pursuant to the applicable Agreements.

123.   The maintenance of the contribution rate, employee health insurance benefits, and coverage for medical and prescription drugs is a bargained for part of the compensation for services rendered by these Plaintiffs and the Class Members to the City.

124.   Each of the Agreements under which these Plaintiffs and the Class Members retired is a binding and enforceable agreement between them and the City to provide health insurance and prescription drug benefits and coverage at the benefit and contribution levels during the term of the Contract then in effect when each Plaintiff and Class Member retired.

125.   The City is thereby obligated to maintain the same health insurance and prescription drug benefits and coverage at the same contribution levels as in effect when each Plaintiff and Class Member retired.

126.   For decades, the City engaged in the practice of providing health insurance to all of its retirees, union and non-union, at the benefit levels and contribution rates applicable at the time of their retirements.

127.   This practice was based on mutual agreement and was a term and condition of employment that cannot be changed without the consent of the parties.

128.   The retirees did not consent to the change.

129.    The City has violated its promise to the retirees to provide these benefits for life as applicable at the time of retirement.

130.    Plaintiffs and the Class Members relied on the CBAs in good faith and fully performed all of their obligations under them.

131.    The Plaintiffs and Class Members relied on Defendant's past practice and promises.

132.    The City breached its contractual obligations to Plaintiffs and the Class Members by failing to maintain the required contribution levels for health insurance and the same benefit levels in effect at the time of retirement, when the City unilaterally changed same benefits effective first in July 2006 and each time thereafter.

133.    Plaintiffs and the Class Members have each been damaged by Defendant's breaches of the referenced CBAs and past practice and will continue to sustain injury and further damage if Defendant is allowed to continue to breach the terms and conditions of the CBAs.

134.    Plaintiffs and the Class Members are entitled to relief because of Defendant's breaches of the CBAs, and breaches of past practice, including the modification of benefits and contribution rates.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargaining agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT II – BREACH OF IMPLIED CONTRACT

Plaintiffs repeat and re-allege all of the preceding paragraphs as if full set forth herein.

135.    Plaintiffs rendered services to the City of Detroit and performed their duties pursuant to the applicable agreements.

136.    The maintenance of the contribution rate, employee health insurance benefits, and coverage for medical and prescription drugs is an agreed upon part of the compensation for services rendered by these Plaintiffs and the Class Members to the City.

137.    For decades, the City engaged in the practice of providing health insurance to all of its retirees, union and non-union, at the benefit levels and contribution rates applicable at the time of their retirements.

138.    This practice was based on mutual agreement and was a term and condition of employment that cannot be changed without the consent of the parties.

139.    The retirees did not consent to the change.

140.    The retirees relied on these agreements and past practices in good faith and fully performed all of their obligations under these agreements.

141.    The City has violated its promise to the retirees to provide these benefits for life as applicable at the time of retirement.

142.    The City breached its contractual obligations to Plaintiffs and the Class Members by failing to maintain the required contribution levels for health insurance and the same benefit levels in effect at the time of retirement, when the City unilaterally changed same benefits effective first in July, 2006 and each time thereafter.

44

143. Plaintiffs and the Class Members have each been damaged by Defendant's breaches of these promises and will continue to sustain injury and further damage if Defendant is allowed to continue to breach the terms and conditions of the agreement between the parties.

144. Plaintiffs and the Class Members are entitled to relief because of Defendant's breaches of the agreements and breaches of past practice, including the modification of benefits and contribution rates.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargaining agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT III --VIOLATION OF THE CONTRACTS CLAUSE OF THE UNITED STATES CONSTITUTION (U.S. CONST. ART I, SEC. 10, CL. 1)

145. Plaintiffs repeat and re-allege all the preceding paragraphs as if fully set forth herein.

146. At all times relevant hereto, Defendant and its agents and employees were individuals acting under color of State and Municipal law.

147. At all times relevant hereto, Plaintiffs and the putative Class Members were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit pursuant to 42 U.S.C. § 1983.

45

148.     The Constitution of the United States provides that "[n]o State shall....pass any...law impairing the obligation of contracts." U.S. Const. Article I, Sec. 10, Cl. 1

149.     Defendant violated the contract clause of the United States Constitution when it took actions impairing its contractual obligations to vested retirees by unilaterally increasing the contribution rates for premiums, the co-payments and deductibles, and other modifications to the health care plan to which it was contractually bound.

150.     Under the collective bargaining agreements, Defendant is contractually obligated to provide health insurance and ancillary benefits at the same levels as the effective date of the CBAs under which the retirees retired.

151.     Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance prescription drug benefits for retired union and non-union members and their dependents substantially impaired the contractual obligations under the parties' CBAs, and violated past practice and federal, state and municipal law.

152.     Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance and prescription drug coverage for retired union and non-union members and their dependents contravened the **reasonable expectations** of Plaintiffs and the Class of retired individuals and their dependents under the CBAs, past practice, and federal, state and municipal law.

153.     Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance and prescription drug coverage for retired union and non-union members and their dependents violated essential terms and conditions under the CBAs, past practice and federal, state and municipal law upon which Plaintiffs and the Class of retired individuals they seek to represent reasonably and materially relied.

46

154.   Defendant's unilateral increase and modification of contribution rates, co-payments and deductibles diminish the benefit coverage and the contracts with these retirees and has no legitimate public purpose and/or constitutes an abuse of power.

155.   The actions at issue substantially impair the provisions in Plaintiffs' contractual agreements.

156.   As a direct and proximate result of Defendant's actions, Plaintiffs sustained and will continue to sustain injury and damages, including but not limited, to the deprivation of their rights under the U.S. Constitution.

157.   Defendant's substantial impairment of these contractual obligations has proximately caused, and will continue to cause Plaintiffs and their dependents and the putative Class Members irreparable injury and damage, including (1) denial of their **reasonable expectations** under the CBAs, past practice and Municipal and State law, that Defendant would continue to comply with its contractual obligations; (2) interference with the protections under Municipal and State law to collectively bargain under the procedures provided under state law and municipal law; and (3) denial of their constitutional rights under the U.S. Constitution.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT IV -- VIOLATION OF THE PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAUSES OF THE 5TH AND 14TH AMENDMENTS.

158.    Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

159.    At all times relevant hereto, Defendant and its agents and employees were individuals acting under color of State and Municipal law.

160.    At all times relevant hereto, Plaintiffs and the putative Class Members were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit pursuant to 42 U.S.C. § 1983.

161.    The Constitution of the United States provides that no person "shall be deprived of life, liberty, or property, without due process of law…" U.S. Const. Amendment V.

162.    The rights and protections of the Fifth Amendment are fully applicable to state action. U.S. Const. Amendment XIV.

163.    Plaintiffs have a vested contractual and constitutionally protected property interest in Defendant's compliance with its contractual obligations; to wit, to continue providing the same retiree contribution rate, co-payments, deductible and benefits under the CBAs and past practice; to return the retiree contribution rate, co-payments, deductible and benefits under the CBAs and past practice to the agreed upon rates and benefits; and to refrain from unilaterally altering and modifying the contribution rates, deductibles, benefits and financial obligations under the collective bargaining agreements and past practice as provided to retired employees.

164.    Under the collective bargaining agreement and past practice, Defendant is contractually obligated to provide health insurance and ancillary benefits at the same levels as the effective date of the CBAs under which the retirees retired.

165.    Plaintiffs vested contractual and constitutionally protected interests derive from, inter alia, the CBA's, the past practice, municipal, state and federal law.

166.    Defendant does not have the right to unilaterally modify the contractual obligations.

167.    Defendant deprived Plaintiffs and the retired Class Members of these vested contractual and constitutionally protected interests without notice and without an opportunity to be heard before the deprivation took place, thus, causing a forfeiture of property without due process in violation of the due process clause.

168.    Plaintiffs did not waive their right to adequate notice or the reasonable opportunity to be heard before being deprived of their vested contractual and constitutionally protected interest.

169.    The risks of depriving Plaintiffs and retired Class members of these vested contractual and constitutionally protected interests without first providing notice and a reasonable opportunity to be heard are high.

170.    Defendant's interest to deprive Plaintiffs without first providing notice and a reasonable opportunity to be heard are non-existent or minimal.

171.    The actions at issue substantially impair the provisions in Plaintiffs' contractual agreements and deprive them of a constitutionally protected property interest.

172.    As a direct and proximate result of Defendant's actions, Plaintiffs sustained and will sustain injury and damages, including but not limited, to the deprivation of their rights under the US Constitution.

173.    Defendant's substantial impairment of these contractual obligations has proximately caused, and will continue to cause Plaintiffs and their dependents and the putative Class Members irreparable injury and damage, including (1) denial of their reasonable expectations under the CBAs, past practice and State law, that Defendant would continue to

49

comply with its contractual obligations; (2) interference with the protections under the law to collectively bargain under the procedures provided under state law and municipal law; and (3) denial of their constitutional rights under the U.S. Constitution.

174.   Plaintiffs have a Constitutionally-protected property interest in the health care benefits and contribution rates that they are entitled to receive.

175.   Defendant has denied Plaintiffs the health care benefits and contribution rates without any cognizable procedure whatsoever.

176.   The Charter for the City of Detroit recognizes that these retirees are entitled to representation, to wit, "[r]etired general city employees are entitled to be represented in the city legislative and budgetary proceedings on issues affecting their interest by persons elected by them," but such representation was not given. *Charter, Article 9, Chapter 6.*

177.   Defendant's actions in unilaterally modifying the retirees' health care benefits and contributions, as set forth herein, deprives and continues to deprive Plaintiffs of their constitutionally protected right to equal protection of the laws and substantive due process as secured by the Fourteenth Amendment of the United States Constitution.

178.   Plaintiffs have been subject to adverse treatment by Defendant as set forth and described herein.

179.   As a direct and proximate result of the Defendant's unfair treatment, Plaintiffs have suffered and will continue to suffer substantial injury, including but not limited to irreparable harm.

180.   As a direct and proximate result of Defendant's failure to provide adequate due process, Plaintiffs have suffered and will continue to suffer substantial injury, including but not

limited to irreparable harm by the City's continued implementation of unilateral changes to the retirees' property interest in their health care benefits.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT V -- VIOLATION OF 42 U.S.C. § 1983

181.    Plaintiffs repeat and re-allege all the preceding paragraphs as if fully set forth herein.

182.    The City through its actions and decisions has deprived Plaintiffs and the Class Members of their federally protected rights, provided by federal law and the United States Constitution.

183.    The policies, decisions and actions of the City were based on considerations other than those proper to the good faith administration of justice.

184.    The City's actions constitute a deliberate denial, under color of law, of Plaintiffs' federal rights guaranteed under the 5th Amendment Due Process and Equal Protection Clauses of the 14th Amendment of the United States Constitution, as well in violation of 42 U.S.C. § 1983.

185.    Plaintiffs have, as a direct and proximate result of the City of Detroit's action, suffered and will continue to suffer substantial and irreparable harm and injury.

186.   Defendant's actions have substantially harmed Plaintiffs and the putative Class Members and the City has announced future actions which will irreparably harm Plaintiffs and the putative Class Members. Thus, injunctive relief is required.

187.   The City acted in an arbitrary, capricious and discriminatory manner and their actions show a reckless disregard and callous indifference for Plaintiffs' federally protected rights. Plaintiffs are therefore entitled to exemplary damages, costs and attorney fees pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT VI - INJUNCTIVE RELIEF AND IRREPARABLE HARM

188.   Defendant has undertaken steps to increase the rates of contribution and increase the o-payments and deductibles and otherwise unilaterally modify the agreed upon contractual terms of the retirees health care. Upon information and belief, such changes are scheduled to be implemented in July 2012 or some time shortly thereafter to union retirees and have already been implemented as to non-union retirees.

189.   The City Administration, Labor Relations and City Council have authorized these changes.

52

190.    These changes impair the obligation of contract as to Plaintiffs and the proposed class members.

191.    It is also an unconstitutional impairment of obligation of contract in violation of Section 10 of the United States Constitution.

192.    It is also an unconstitutional impairment of obligation in violation of the City Charter.

193.    It is also an unconstitutional impairment of obligation in violation of the Municipal Code.

194.    The retirees will be forced to make choices to allocate sparse resources, including foregoing health care coverage, prescriptions and medical care which will result in irreparable harm, and a permanent detrimental impact on health and well-being.

195.    The imposition of additional insurance costs on retirees constitutes irreparable harm because of the financial hardship on retirees on fixed incomes, emotional distress and possible deprivation of life's necessities by reallocating scant resources to pay for needed healthcare. They will have to choose between medical care, food or other life essentials.

196.    These retirees cannot afford to contribute the increased amounts, thus, they may have to reduce their health insurance or lose their level of coverage.

197.    Even if the retirees prevail, reimbursing them at the end of the litigation will not compensate them for the impact on their health in the interim.

198.    The balance of hardships weigh in favor of granting Plaintiffs injunctive relief because the harm to Plaintiffs cannot be undone.

199.    Despite the manifest illegality, invalidity and unconstitutionality of these actions, Defendant, its officials, agents, and employees, unless restrained by order of this Court, will

enforce these changes against Plaintiffs, causing them irreparable injury, including the fact that they will be deprived of the ability to afford adequate health care and by reason of which Plaintiffs do not have an adequate remedy at law.

200.   The Plaintiffs are likely to succeed on the merits as Plaintiffs have vested contractual rights to the health care benefits at issue.

201.   A preliminary injunction is not contrary to the public interest.

WHEREFORE, Plaintiffs respectfully request the Court to issue a temporary injunction restraining Defendant from enforcing its resolution and these changes in the Employee Health Benefit Plan as to retirees and restore the non -union retirees to the status quo prior to the 2012 changes.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.   Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Declare that the actions of Defendant described constitute violations of the Contracts Clause of the United States Constitution and the 5th and 14th Amendments to the Constitution;

C.   Enter a permanent injunction prohibiting Defendant from engaging in the violations of the Contracts Clause of the United States Constitution and the 5th and 14th Amendments;

D.   Enter a Judgment finding that Defendant's actions in unilaterally changing the retirees' health care plan, modifying the contribution rate, benefits, deductibles and other terms of the plan constitutes a breach of the parties' CBAs;

54

E.   Award Plaintiffs and the Class they seek to represent compensatory damages in an amount to be determined at trial to fully compensate them for their injuries;

F.   Award any other damages that are permissible;

G.   Award attorneys' fees and costs; and

H.   Award such other relief as the Court deems appropriate and just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Ann L. Miller (P43578)
Sharon S. Almonrode (P33938)
950 West University Dr. Ste. 300
Rochester, MI 48307
(248) 841-2200

Dated: June 27, 2012

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROSE ROOTS, MARK PHILLIPS, WILLIAM
HARPER, EARNEST JOHNSON, FELICIA
JONES, CLARENCE L. WRIGHT, JR., ANGELA          Case No. 12-12848-CV
OBEY-YOUNG, Individually and on behalf of all
others similarly situated,

       Plaintiffs,

THE CITY OF DETROIT,

       Defendant.

_____/

THE MILLER LAW FIRM, P.C.
E. Powell Miller (P39487)
Ann L. Miller (P43578)
Sharon S. Almonrode (P33938)
950 West University Dr. Ste. 300
Rochester, MI 48307
(248) 841-2200
(248) 652-2852 fax

**INDEX OF EXHIBITS**

Exhibit 1-     Master Agreement between the City of Detroit and Michigan Council 25 of the
              American Federation of State, County and Municipal Employees 1977-1980

Exhibit 2-     Master Agreement between the City of Detroit and Michigan Council 25 of the
              American Federation of State, County and Municipal Employees 1980-1983

Exhibit 3-     Master Agreement between the City of Detroit and Michigan Council 25 of the
              American Federation of State, County and Municipal Employees 1983-1986

Exhibit 4-     Master Agreement between the City of Detroit and Michigan Council 25 of the
              American Federation of State, County and Municipal Employees 1986-1989

Exhibit 5-     Master Agreement between the City of Detroit and Michigan Council 25 of the
              American Federation of State, County and Municipal Employees 1989-1992

Exhibit 6-     Master Agreement between the City of Detroit and Michigan Council 25 of the
              American Federation of State, County and Municipal Employees 1995-1996

Exhibit 7-    Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 1998-2001

Exhibit 8-    Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 2001-2005

Exhibit 9-    City of Detroit health care plan options 2006

Exhibit 10-   Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 2005-2008