<pre>
 1              UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3  IN THE MATTER OF,          Case No. 13-53846
                               Detroit, Michigan
 4  CITY OF DETROIT, MI        October 14, 2014
    _____/  8:30 a.m.
 5
         IN RE: CONTINUED TRIAL RE: OBJECTIONS TO CHAPTER 9 PLAN
 6            BEFORE THE HONORABLE STEVEN W. RHODES
            TRANSCRIPT ORDERED BY: SHANNON DEEBY, ESQ.
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:   THOMAS CULLEN, JR., ESQ.
 9                                  EVAN MILLER, ESQ.
                                    GEOFFREY STEWART, ESQ.
10                                  MIGUEL EATON, ESQ.
                                    Jones, Day
11                                  51 Louisiana Avenue, N.W.
                                    Washington, D.C. 20001
12                                  202-879-3939

13  For COPS:                      JONATHAN WAGNER, ESQ.
                                    STEPHEN BLANK, ESQ.
14                                  Kramer, Levin, Naftalis &
                                    Frankel
15                                  1177 Avenue of the Americas
                                    New York, NY 10036
16                                  212-715-9100

17                                  DEBORAH FISH, ESQ. (P36580)
                                    Allard & Fish
18                                  2600 Buhl Building
                                    535 Griswold
19                                  Detroit, MI 48226
                                    313-961-6141
20
    For MIDD:                      DEBORAH O'GORMAN, ESQ.
21                                  Dechert, LLP
                                    1095 Avenue of the Americas
22                                  New York, NY 10036
                                    212-698-3500
23


24


25
</pre>

```
 1   For Financial Guaranty        EDWARD SOTO, ESQ.
     Insurance Company:            EDWARD MCCARTHY, ESQ.
 2                                 Weil, Gotshal & Manges
                                   1395 Brickell Avenue
 3                                 Suite 1200
                                   Miami, FL 33131
 4                                 305-577-3100

 5                                 ALFREDO PEREZ, ESQ.
                                   700 Louisiana Street
 6                                 Suite 1600
                                   Houston, TX 77002
 7                                 713-546-5000

 8   For Official Committee of     CLAUDE MONTGOMERY, ESQ.
     Retirees of the City of       Dechert, LLP
 9   Detroit, Michigan:            620 Fifth Avenue
                                   New York, NY 10010
10                                 212-768-6700

11   Court Recorder:               Letrice Calloway

12   Transcriber:                  Deborah L. Kremlick

13

14   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
15

16

17

18

19

20

21

22

23

24

25
```

1                            INDEX

2  WITNESSES FOR         Direct    Cross    Redirect    Recross
   AD HOC COPS:
3
   WILLIAM FORNIA          22      67,90    121 ,135      123
4
   EXHIBITS:                                           ID    ADM
5
   COEX1041     Slide                                  64     64
6  COEX1042     Curriculum Vitae William Fornia        25     25
   COEX1061–    Slides                                 35     35
7  1063
   COEX1064     Slide                                  35     42
8  COEX1065–    Slides                                 48     49
   1067
9  COEX1068     Slide                                  52     52
   COEX1069     Slide                                  55     61
10 COEX1070     Slide                                  60     61
   COEX1071     Slide                                  62     63
11 COEX1072     Slide                                  63     63
   COEX1073     Slide                                  64     65
12
   COMEX10995   Attachment to Report                  113    113
13 COMEX10996   ASOP 4                                 114    114

14

15

16

17

18

19

20

21

22

23

24

25

1    (Court in Session)

2        THE CLERK:  All rise.  Court is in session.  Please

3  be seated.  Case number 13-53846, City of Detroit, Michigan.

4        THE COURT:  Good morning.

5        MR. CULLEN:  Good morning, Your Honor.

6        MR. PEREZ:  Good morning, Your Honor.

7        MS. O'GORMAN:  Good morning.

8        MR. PEREZ:  Your Honor, Alfredo Perez on behalf of

9  FGIC.  Your Honor, we -- we used the week that we had off last

10  week, I think to make a lot of progress with respect to a

11  consensual deal with the city.

12      And we're still working very hard hoping to accomplish

13  that.  I would request that the Court -- we have a witness

14  here today to go forward, but then I would request that the

15  two experts that FGIC would put on be deferred until Thursday

16  to see if we can have a consensual deal by that time.

17        THE COURT:  Thank you.  What is the city's position

18  on this, please?

19        MR. CULLEN:  Good morning, Your Honor.  Thomas

20  Cullen for -- for the city.  The city concurs with Mr. Perez

21  that we have made substantial progress.  We are -- we are

22  proceeding with a firm and active faith that we will have a

23  deal to present to the Court on -- or to announce to the Court

24  on -- on -- on Thursday.

25      And in light of that, we think that this is -- this is

1  justified and -- and productive.  If -- if I may, Your Honor,

2  I -- I would like to at least put in the Court's mind a couple

3  of things, presuming -- maybe presuming success, but I think

4  durable to -- to our either outcome about our -- the schedule

5  going forward.

6      I think we have a couple of -- of pacing elements with

7  respect to that schedule.  We have the pro se day which we

8  need to schedule at some point.  We certainly have to have the

9  day for Ms. -- Ms. Kopacz and I don't know when she will be

10 ready to testify, whether or not there will be a supplemental,

11 what time she will need to address the additional --

12 additional settlements if any.

13     So those are two.  There is a third which is that being

14 presented to Ms. Kopacz and having been prepared, we have done

15 new projections by Mr. Malhotra which address several of the

16 items of continuing interest here.  His sources and uses of

17 the exit financing, the treatment of financing for the C notes

18 if you will, and how those projections come out.

19     Now if Ms. Kopacz testifies, those projections will be

20 part of her reliance materials, almost undoubtedly.  What we

21 had thought was it would perhaps be of use to the Court,

22 either before or after Ms. Kopacz testifies to bring Mr.

23 Malhotra back to address -- to present those projections and

24 to in particular address the few things that were kind of

25 balls that were left bouncing if -- if you will with respect

1 to the size of the exit financing, with respect to sources and

2 uses, with respect to various other issues there will be --

3 there will realize materials from Ms. Kopacz that we also

4 thought it might be useful again either before or after Ms.

5 Kopacz to have Mr. Malhotra come -- come forward again to

6 present those -- to present those projections.

7     The final pacing element of course is the -- is closings.

8 Even with I think -- under the worst case I would think that

9 we should be done by the end of Monday with the -- the

10 objectors' case.

11     When Ms. Kopacz would be ready would be another issue.

12 When the others would be ready when the pro se objectors would

13 be ready would be another.  But if we're doing what is left of

14 the objectors' case pro se, Ms. Kopacz, and then we only have

15 closings.

16     And we also thought it might be useful at -- at this

17 point giving ourselves enough time to do this, is to key

18 around whenever Ms. Kopacz thinks she could be available --

19 available and prepared next week Tuesday or Wednesday we would

20 think but that's -- I don't mean to presume to the Court's

21 expert.  And then to probably to have a definite day if we

22 could for closing which might then be either Wednesday or

23 Thursday of next week.

24     So we could prepare around that and everyone would know

25 what was going on.  We've discussed it with Mr. Bennett who

1 can of course speak for himself.  And we've talked about eight

2 hours before.

3     But Mr. Bennett has promised it will be more like Ben Hur

4 than the ring cycle.  People can go out for intermission, but

5 they needn't go home overnight.  So it's -- it will be more --

6 it will be more like three hours of closing we think.

7     And that seems like a lot, Your Honor, but I think it's a

8 complicated case and we -- we want to be of as much help to

9 the Court as we can.

10     THE COURT:  Well, some questions.  Might your

11 settlement, assuming there is one with FGIC by Thursday

12 morning at 8:30, require yet another round of projections from

13 Mr. Malhotra?

14     MR. CULLEN:  No, Your Honor.  The way they're being

15 constructed as of right now, these projections as previous

16 projections did not, address both the current intention of the

17 city with respect to the amount of the exit financing, and a

18 full distribution of the -- of the C notes.  Other aspects,

19 the -- not -- not speaking out of school at all, but there --

20 two of the complications with respect to between now and

21 Thursday morning are that there are development aspects for

22 the -- for the deal which don't really address the -- the --

23 the projections.

24     And there are third party ramifications to any projected

25 deal which don't do those.  But the -- the sources and uses

1  with respect to the -- the C notes are there, but they're

2  going to be folded in and there will not be a new set of

3  projections.  We're working on the -- what that grant of the

4  final set of projections.

5          THE COURT:  Well, when do you expect those to be

6  provided to Ms. Kopacz?

7          MR. CULLEN:  They -- they -- they are being provided

8  to Ms. Kopacz.  I think they -- they've been -- I think we are

9  in the process of finalizing those.  She will have those by

10 Thursday morning at the very latest.

11         THE COURT:  Okay.  Well, then and there's an element

12 that your presentation didn't cover which is evidence, the

13 witness or witnesses from Macomb County.

14         MR. CULLEN:  They have told us that they didn't have

15 any witnesses, but --

16         THE COURT:  Ms. O'Gorman, are you presenting any

17 testimony or witnesses?

18         MS. O'GORMAN:  Your Honor, we have deposition

19 designations to offer.  This is the first we've heard about

20 the -- you know, very high likelihood of settlement.  So at

21 this time we don't plan to.  However, we likely would want

22 discovery with regard to this settlement if it does occur, the

23 terms of it.  So, you know, that is something that we may need

24 to consider as well and allow time for.

25         THE COURT:  All right.  Thank you.  All right.

1  Well, I'm going to -- I'm going to ask my staff to see whether

2  we can reach out to our pro se people and have their day

3  tomorrow so that that day is made of value.

4          MR. CULLEN:  Yes, Your Honor.

5          THE COURT:  So I -- I assume one or more of the

6  remaining parties including the city will want to be here for

7  that.  So we will -- we will try to let you know how that

8  works out.

9          MR. CULLEN:  Yes.  Judge, one -- with respect to

10  that, Your Honor, if I might.

11          THE COURT:  Yes.

12          MR. CULLEN:  Some of the pro se people had asked for

13  the right to cross examine Ms. Lennox.  With respect to that

14  we filed a motion on that.  It would be good if we could know

15  whether she has to appear as a witness.

16          THE COURT:  Well, I think she should be here and

17  then we'll argue the motion when those parties are here.

18          MR. CULLEN:  All right.  Thank you, Your Honor.

19          THE COURT:  And, you know, like I say, I'll try to

20  get that set up for tomorrow.  Is she available tomorrow?

21          MR. CULLEN:  Yes, she is, Your Honor.

22          THE COURT:  Okay.  And regardless Mr. Wagner has a

23  witness to present today, is that correct?

24          MR. WAGNER:  Yes, if could just be heard.

25          THE COURT:  Sure.

1        MR. WAGNER:  We obviously concur with Mr. Perez's

2   remarks and I assume Your Honor, by your questions understands

3   the relationship between us and them and what a settlement

4   would have where, you know -- so we're -- we're hopeful as

5   well.  We're prepared to go forward with the witness.  I don't

6   think he's going to take a long time, but otherwise we'd join

7   in the remarks that have been made today.

8        THE COURT:  All right.  Thank you, sir.  All right.

9   In the circumstances the Court will accommodate the parties'

10  request for additional time here, but no more.

11      Okay.  I -- I want to resolve the motion that addressed

12  the admissibility of the deposition testimony of the -- the

13  two city witnesses because depending on how that goes we may

14  have two other live witnesses that we have to deal with.

15      MR. PEREZ:  Your Honor, may I be excused?

16      THE COURT:  Yes.

17      MR. STEWART:  Good morning, Your Honor.  Geoffrey

18  Stewart, Jones, Day for the city.

19      The motion is one under -- it's in limine under Federal

20  Rule of Civil Procedure 32.  Both of these witnesses were

21  deposed by actually Syncora and now their deposition

22  transcripts have been designated.

23      We believe they should come live.  And the reason if we

24  boil it all away really comes down to a couple of things.

25  First of all, we're not trying to exclude a witness, we're not

1  trying to exclude testimony, nor are we denying that their

2  testimony in the deposition could be admissions and used in

3  the usual way if and when they testified live.

4      The greater issue is this.  Under Rule 32 an order, and

5  by the way they're available witnesses.  They both work within

6  a few blocks of here.  The question then is do they fit within

7  the rule which speaks of directors, officers, or managing

8  agents.

9      I don't think anyone can -- argues anything other than

10  the managing agent issue.  That is of course a term of art.

11  Actually years ago I had to look it up.  When they drafted the

12  rule it was at a time where railroads and steamship companies

13  before telephones and so on would have somebody called a

14  managing agent in New York, or New Orleans, or something.

15      The term has somewhat been abused because it isn't agent,

16  it is managing agent.  As the Courts have now looked at it,

17  they've said socially it comes down to someone who has

18  independence and -- and what you'd expect.  But also -- I'm

19  sorry.

20          THE COURT:  One second.  Go ahead, sir.

21          MR. STEWART:  Has authority with respect to the

22  subject matter of this suit.  And I think that in the -- the

23  vague world of managing agents is where the ball has come to

24  rest.

25      Here, I think neither fits that definition and there's

1  two levels of analysis.  First of all, Mr. Hall was only the

2  interim head of HR.  He wasn't actually the person with the

3  permanent job.  Then I'm going to get to his deposition

4  testimony in one minute.

5      Mr. Evanko is a part time employee.  He's the city

6  assessor.  But he's also the assessor for Allen Park and

7  Romulus, and he's a contract employee.  That doesn't mean per

8  se they couldn't be managing agents, but it does strongly

9  suggest they don't have that latitude discretion one expects

10 in the normal course.

11     But if we do look at what their deposition testimony

12 spoke of, as Mr. Hall when asked what's your role versus

13 pensions.  He said, well, I don't do pensions at all.  That's

14 a different department.

15     What's your role with respect to HR and the question and

16 the answer is, I stay on top of it.  And that's all that he

17 said.  He was not asked, nor did he testify, that he had this

18 wide scope of discretion that the case law requires.

19     The burden is of course on the person calling the witness

20 to establish that Rule 32 has been met.  And I would submit

21 that when it comes to Mr. Hall, that to say I stay on top of

22 it doesn't meet the standard of a managing agent.

23     With respect to Mr. Evanko, it's a little bit -- it's not

24 more complex, it may be more puzzling and here is why.  The

25 argument is that he meets the standards of Rule 32 because

1  he's a person in the best position to predict what the city's

2  tax revenue will be.  But when he was asked that question he

3  actually said, I have no prediction of what the tax revenues

4  will be.

5      What he can talk about is property assessments.  But more

6  than once in his deposition he said, I cannot predict what

7  those will be and he was quite firm on that.

8      So first of all, he's not the person who imposes or

9  collects the taxes.  And second, on the very point from which

10 they wish to call him, he said he is -- he is not somebody who

11 is in a position to testify about it.  Your Honor, that's --

12 that's all I have.

13        MR. SOTO:  Your Honor, I think we can resolve this

14 issue if Mr. Evanko and Mr. Hall are going to be made

15 available for testimony.  We have no problem using their

16 depositions when they're here live.

17     We do take a different position if you're interested in

18 the legal analysis.  We do believe that the 6th Circuit and the

19 Eastern District of Michigan have both directed the issue

20 towards, you know, whether or not the individuals were

21 managing agents in the sense of controlling on the issues that

22 they're about to testify on.  And again although it's a very

23 interesting legal issue, I think it's one that we can bypass

24 if they're going to be made available.

25        THE COURT:  Well, thank you for that because

1   naturally as the Finder of Fact my preference is for live

2   testimony.  So let's proceed on that basis and the next

3   question becomes when, right?

4          MR. SOTO:  Right.  And we'll -- that's why I was

5   huddling up with Mr. Stewart.  We will huddle up with Mr.

6   Stewart and -- and --

7          THE COURT:  Well, let's see if we can -- let's see

8   if we can get it resolved right now.  Mr. Stewart, do you have

9   any sense of when these witnesses can be made available?

10         MR. STEWART:  I will check with Mr. Hall.  Mr.

11  Evanko is available any day except Friday.

12         THE COURT:  Can we get them this afternoon?

13         MR. STEWART:  Let me make some calls and find out.

14         MR. SOTO:  Although I think, Your Honor, given where

15  we are on other matters, it might be well worth it.  And it's

16  possible that I think this will be resolved along with

17  everything else on the schedule.

18         THE COURT:  Well, I guess if it's your -- your

19  preference and the city agrees to put even these two witnesses

20  off until Thursday, I would accommodate that.  Or we can do it

21  today or tomorrow.

22         MR. SOTO:  That -- that is our preference, Your

23  Honor.

24         MS. O'GORMAN:  Your Honor, we have no objection to

25  putting the witness off until Thursday.  We would want to call

1  Mr. Hall as a witness even if the FGIC settlement, you know,

2  is -- is completed.

3       MR. STEWART:  The city has no objection.  It is of

4  course FGIC's witness and if that's how they wish to proceed

5  that's fine with us.

6       THE COURT:  All right.  All right.  All right.  So

7  please try to make them available on Thursday if necessary.

8  And it sounds like Macomb wants Mr. Hall regardless.

9       MS. O'GORMAN:  Yes, Your Honor.

10       THE COURT:  Okay.  All right.

11       MR. WAGNER:  Just one other procedural issue, Your

12  Honor.  I had previewed for the Court on I guess it was last

13  Monday the prospect that the parties would come to agreement

14  with respect to another witness, Ms. Kermans who everyone had

15  agreed would testify by deposition but Your Honor had noted

16  that some of the pro se objectors wanted to cross examine her.

17     The parties have agreed that they will have her testimony

18  proceed by deposition designation and any cross or redirect

19  would be limited to issues raised by the pro se objector.

20       THE COURT:  Okay.

21       MR. WAGNER:  There may be issues concerning the

22  designations, but that's not our issue.

23       THE COURT:  Okay.  All right.  So do we know whether

24  -- we're getting feedback on our sound system here.  If

25  someone in authority can address that, I'd appreciate it

1  wherever you are.

2      Is this witness available tomorrow if we can get the pro

3  se people in?  Does anyone know?  Where -- where is she?

4          MR. WAGNER:  She's from Gabriel, Roeder, Smith, I

5  assume in the area.  But I don't know whether anyone's been in

6  contact with her.

7          THE COURT:  Can I ask the -- someone with the city

8  to make that contact and -- and make that determination for

9  us?

10          MR. CULLEN:  Yes, Your Honor.  The city will do so

11  as expeditiously as possible.

12          THE COURT:  All right.  All right.  And let my

13  office know.  Just call -- call the office if we're not in

14  session.

15          MS. O'GORMAN:  And, Your Honor, with respect to the

16  deposition designations I do have with me marked copies of the

17  deposition transcript.  There are some issues with respect to

18  the timeliness of some of the objections.

19      MIDD and Macomb made designations from Ms. Kermans'

20  deposition.  The DWSD parties did as well.  I'm still checking

21  to see whether Syncora did or did not make designations.  But

22  in any event, while going through the transcript and

23  determining what, you know, evidence would be appropriate to

24  put before Your Honor in light of the city's case, I did make

25  a few additional designations that the city is now objecting

1  to on timeliness grounds.

2      So those can be resolved now, they can be resolved when

3  Your Honor has a chance to see the -- the transcript.  I do

4  have the transcript and I do have the -- identified those

5  parts that are objected to, I just have the document.

6      THE COURT:  I suppose it would be good for the --

7  the record to reflect those specific designations that are at

8  issue, so why don't you go ahead and identify those.

9      MS. O'GORMAN:  Okay.  The city has objected to the

10  designation Page 31, Line 16 to Page 32, Line 3.  The city has

11  objected to the designation of Page 32, Line 19 to 33, 13.

12  They've also objected to designation Page 40, Line 5 to Page

13  42, Line 8.

14      I would note that some of that testimony was designated

15  by the DWSD parties when they were still involved in the case.

16  The city has objected to Page 43, Line 2 to Page 44, Line 15.

17  The city has objected to Page 54, Line 6 to 54, 17.

18  Fifty-seven, 24 through 58, 23.  Sixty-four, 25 through 65, 7.

19  Seventy-three, 7 through 73, 16.

20      That was all designated by the DWSD parties.  Page 75, 14

21  to 75, 16.  Also designated by the DWSD parties.

22  Seventy-five, 25 through 76, 17.  Seventy-nine, 10 through 80,

23  12.

24      Most of that was also designated by other parties.

25  Eighty-six through 82, 4.  Eighty-two, 23 to 83, 6.

1 | Ninety-three, 3 through 93, 8. One oh seven, 17 through 107,

2 | 19. One oh eight, 14 through 108, 19. One oh nine, 23,

3 | through 110, 5. And I believe that's it, Your Honor.

4 | THE COURT: All right. May I hear the city's

5 | objection? And then I'll hear your response.

6 | MR. EATON: Good morning, Your Honor. Miguel Eaton

7 | from Jones, Day on behalf of the city.

8 | Your Honor, the objections we raised and I'm not sure

9 | given the citations she just read if they all pertain to the

10 | objection we raised last night. But it's more of a timeliness

11 | issue instead of a actual subject matter issue.

12 | According to your eighth amended schedule order,

13 | designations and counter designations were supposed to be

14 | submitted by August 25th and August 27th respectively. The

15 | parties complied with that and when Mr. Wagner proposed that

16 | in lieu of Ms. Kermans testifying live, we submit designations

17 | and counter designations that was what the city understood to

18 | be those that were already submitted.

19 | So when Ms. O'Gorman submitted additional designations

20 | and counter designations that's the basis of the city's

21 | objections is that it's timeliness as opposed to the

22 | substance, Your Honor.

23 | THE COURT: Well, what prejudice does the city

24 | suffer if this -- if these designations are allowed?

25 | MR. EATON: Well, Your Honor, I think the -- the

1 prejudice is that the designations were supposed to be done by

2 August 27th.  If she makes additional designations the city

3 would request that we have the opportunity to counter

4 designate if we so desire.

5          THE COURT:  Thank you, sir.

6          MR. EATON:  Thank you.

7          MS. O'GORMAN:  Your Honor, as I mentioned before, if

8 Ms. Kermans were to come here to testify live we would not be

9 precluded in what we could ask her.  So there really is no

10 basis to preclude us in light of the agreement that we have to

11 use her deposition for her primary testimony to add, you know,

12 some additional designations that really would be helpful to

13 the Court's understanding of the case and resolution of this

14 matter.

15     You know, there is no prejudice to the city.  They, you

16 know, were at the deposition.  They're well aware of the

17 content of it.  These designations were sent to them last

18 week.  It was only last night at 10:00, but I was informed

19 that the city was objecting to this limited additional

20 designations.

21     You know, I do agree that the Court did set a date for

22 designations and counter designations.  But there was no

23 separate date by which additional designations in light of the

24 counter designations could be made.  The parties have all

25 reserved their rights to make additional designations to

1  address the testimony that has come in in this matter.  And I

2  think there's no prejudice to the city.  Your Honor, should

3  permit all the designations that are being offered.

4         THE COURT:  All right.  The Court -- was there

5  something you wanted to say, sir?

6         MR. EATON:  No.

7         THE COURT:  The Court will allow Macomb County's

8  most recent designations, but will also allow the city one

9  additional opportunity to provide further counter, counter,

10  counter designations by the time we reconvene Court on

11  Thursday.

12         MS. O'GORMAN:  Your Honor, I have with me the

13  deposition transcript.  Should I hold off on providing them to

14  Your Honor until we --

15         THE COURT:  Yeah, I want one set.

16         MS. O'GORMAN:  Okay.

17         THE COURT:  With all the designations that all of

18  you have made.

19         MS. O'GORMAN:  Okay.

20         THE COURT:  So you can submit it to me when we

21  reconvene on Thursday.

22         MS. O'GORMAN:  Great, very good.  Thank you.

23         THE COURT:  Okay.

24         MR. WAGNER:  Your Honor, Jonathan Wagner from

25  Kramer, Levin on behalf of the ad hoc COPS.  We call Mr.

1  William Fornia.

2         THE COURT:  Please raise your right hand, sir.

3      (WITNESS WILLIAM FORNIA WAS SWORN)

4         THE COURT:  All right.  Please sit down over there.

5         MR. WAGNER:  Your Honor, with me again is -- is Deb

6  Fish from Allard and Fish and also my colleague Mr. Stephen

7  Blank is here.  And can we approach with the books?

8         THE COURT:  Yes.

9         MR. WAGNER:  And, Your Honor, just to speed things

10 up, I made a list of the exhibits that I may be using with Mr.

11 Fornia and I thought I'd flag at the outset the ones that have

12 been admitted already so we don't have to stop every --

13        THE COURT:  Sure.  Go ahead.

14        MR. WAGNER:  Okay.  So the ones that -- so I'll give

15 you the list.  The ones that have been admitted by Your

16 Honor's September 2nd order that I may use this morning are

17 numbers 1, 3, 1001, 1004, 1009, 1010, 1014, 1017, 1033, 1034.

18     Then there were exhibits that were admitted during Mr.

19 Bowen's testimony City Exhibits 495, 496, and then 1036, and

20 1040.

21     There were three exhibits admitted during Mr. Perry's

22 testimony, 1021, 1030, and 10164.  And then I may reference --

23 I may reference the city's new -- new plan which is 775.

24        THE COURT:  Okay.  Thank you for that.

25                    DIRECT EXAMINATION

1 | BY MR. WAGNER:

2 | Q    Mr. Fornia, good morning.  What is your current position?

3 | A    Good morning.  I'm the President of my own firm Pension

4 | Trustee Advisors actuarial consulting on public pensions.

5 | Q    And what does Pension Trustee Advisors do?

6 | A    Yes.  Our clients are -- are entities that are concerned

7 | with issues related to public pensions.  State and local

8 | governments such as -- such as these here.

9 | Q    Uh-huh.  Can you -- can you give us your educational

10 | background?

11 | A    I have a -- a Bachelors of Arts in Mathematics from

12 | Whitman College.  And then I completed the actuarial -- the

13 | series of actuarial exams.  I'm a fully credentialed actuary,

14 | Fellow of the Society of Actuary, enrolled actuary and so on.

15 | Q    What's been your work history since college?

16 | A    Well, immediately after college -- well, I was a summer

17 | intern and then took a job with a insurance company for about

18 | a year immediately after college.  I was actuary for the

19 | Boeing Company for four years, became their chief actuary.

20 | Had a couple small jobs for about a year at Milliman in

21 | Seattle in the 1980's and then another insurance consulting

22 | firm.  Joined Towers Perrin now known as Towers Watson, one of

23 | the three largest actuarial consulting firms.  I was there for

24 | ten years.

25 | Then I was hired by Buck to build their Denver consulting

1 retirement consulting practice.  Was there for eight years.

2      Then Gabriel, Roeder, and Smith brought me over to open a

3 Denver office for them.  And I was there for three years and

4 then finally Aon Consulting, one of the other three largest

5 firms now known as Aon Hewitt asked -- asked me to try to

6 build a national public pension consulting practice.  And I

7 was there for four years.  Started my own firm in 2010.

8 Q    Do you have a particular area of specialty?

9 A    Yeah, definitely public pensions.  State and local

10 governments retirement systems.

11 Q    Can you describe for us some of your clients over the

12 years?

13 A    Yeah.  My clients are a wide variety of clients.

14 Primarily early on I was actuary for the pension systems, you

15 know, similar to what Gabriel, Roeder, and Smith does for GRS

16 and PFRS.  I was actuary for the City of Seattle retirement

17 system, Houston Firefighters retirement system, Denver police

18 and fire plans.

19      You know, dozens and dozens of systems around the

20 country.  I then when I was on -- on my own I also worked for

21 some of these systems like San Diego City retirement system in

22 their lawsuit with the city.

23      I worked in Fort Worth, I worked for both the pension

24 system and the city.  They were kind of in dispute with each

25 other and I was brought in kind of as a -- a strategic

1  planner.

2      Done a lot of work for cities too.  Philadelphia,

3  Baltimore.  I was involved in their -- their litigation on

4  pension reform.

5      New York City controller, you know, probably a dozen

6  other cities.  And then also third party but unions.  I -- I

7  worked for the union in -- the firefighters in Atlanta and in

8  Memphis,  I'm involved in their pension reform.  And then

9  finally third parties such as -- such as the COPS holders can

10  be my clients.

11 Q    Have you served as the signing actuary for any pension

12 funds, public pension funds?

13 A    Yes, yes.  Dozens like I mentioned, Seattle, Houston

14 firefighters, Oklahoma police, Oklahoma fire, a lot of teacher

15 plans, the teachers of Missouri, Oklahoma teachers, Colorado,

16 Colorado fire and police, New Mexico teachers, North Dakota

17 teachers, and probably quite -- several others too.

18 Q    So we've had actuarial testimony before in this case.

19 Some people may try to block it out, but can you tell us what

20 an -- what an actuary does in the context of public pension

21 funds?

22 A    Sure.  Basically our -- our responsibility is to quantify

23 costs or -- or liabilities.  So we -- we take the actuarial

24 data of -- of who's in the plan, we look at the provisions of

25 the pension plan and then kind of project out in the future.

 1 | you know, what's likely to occur.  And -- and from doing that

 2 | you can develop either the costs, you know, the expected

 3 | annual cost for a plan, or the  -- or the liabilities.

 4 | Q    Can you turn to Exhibit 1042 in the book?

 5 | A    Yes.

 6 | Q    What is that?

 7 | A    That's my C.V.

 8 |      (COPS Exhibit 1042 was identified)

 9 | Q    And does it accurately describe your education, your

10 | work, your publications, and your research?

11 | A    Yes, it does.

12 |         MR. WAGNER:  Your Honor, I'll move Exhibit 1042 into

13 | evidence.

14 |         THE COURT:  Any objections?

15 |         MR. MONTGOMERY:  No objection.

16 |         MR. MILLER:  No objection.

17 |         THE COURT:  It is admitted.

18 |      (COPS Exhibit 1042 was admitted)

19 | Q    Can you give us some of the highlights?

20 | A    Yeah.  As you can see I've -- I've testified a lot in

21 | state legislatures and city councils.  Testified in Federal

22 | Court once in the Baltimore case that I mentioned.

23 |      Written a decent amount, probably the most important

24 | piece of -- of -- of publication that I've written was the

25 | first report for the National Institute on Retirement Security

1  in 2008 called *Better Bang for the Buck, the Economic*

2  *Efficiencies of Defined Benefit Plans*.  It's been pretty

3  widely cited.  I heard recently that it's been cited over

4  1,500 times.  And we're in the process of -- of updating that.

5       In addition to testimony for my clients, I've -- I've

6  testified at GASB, the Government Accounting Standards Board

7  when they were considering changes.  I've done a lot of

8  presentations.

9       Federal Reserve had me out about a year ago to present at

10  their public pension conference.  National conference of state

11  legislators, GFOA, the Government Finance Officer's

12  Association.  National Association of Bond Lawyers had me on

13  their -- I was one of two actuaries on their task force to

14  review bond disclosures.

15       And then of course the common ones like the industry

16  groups, National Association of State Retirement

17  Administrators and then the actuarial groups, I've spoken for

18  them quite often too.

19  Q    Are you a member of any actuarial organizations?

20  A    Yes, I am.  I'm a member of all the key actuarial

21  organizations.  There's three.  The Society of Actuaries, more

22  the educational one.  I'm -- I'm not only a Fellow of the

23  Society of Actuaries, but I'm -- I'm on the faculty for their

24  ethics training that all actuaries have to go through before

25  they get completely credentialed.

1      The conference of consulting actuaries, I'm one of nine

2  members of a steering committee of their public pension --

3  public pension community.

4      And then I'm also active on the American Academy of

5  Actuaries public pensions group too.

6  Q    Have you done work with Milliman before?

7  A    Yes, I have.  Glenn Bowen and I -- Glenn is the expert

8  for the city, or one of the experts for the city.  We worked

9  on Puerto Rico together, we were both the designees by the

10  Governor on the Puerto Rico pension reform commission about

11  four or five years ago.  And then Glenn had me out for their

12  internal training as one of their outside speakers about two

13  years ago.

14  Q    Have you testified as an expert in Court on actuarial

15  issues?

16  A    Yes, both by deposition in maybe four or five cases and

17  then at -- at testimony in trial in the -- in Federal Court in

18  the Baltimore case.

19  Q    And were you qualified as an actuarial expert in that

20  case?

21  A    Yes.

22  Q    And have you read the transcripts of the pension

23  witnesses in this case?

24  A    Yes, I have.

25      MR. WAGNER:  Your Honor, I'd move to qualify Mr.

1   Fornia as an expert on actuarial issues.

2             THE COURT:  Any objection?

3             MR. MILLER:  No objection.

4             MR. MONTGOMERY:  No objection, Your Honor.

5             THE COURT:  All right.  You may proceed, sir.

6   Q    Mr. -- Mr. Fornia, what was your assignment in this

7   matter?

8   A    Well, my assignment was to analyze the claim and the

9   recovery that was -- was set forth in the plan of adjustment.

10  And, you know, opine on -- on its appropriateness.

11  Q    And what -- what claim was that?

12  A    I'm sorry, the pension claim.

13  Q    What did you do?

14  A    So, I reviewed, you know, dozens of letters that Milliman

15  had written for the city.  I had reviewed the Gabriel, Roeder,

16  and Smith actuarial reports.  I reviewed various participant

17  data and -- excuse me -- and investment return data that we

18  got from the city.

19        And -- and basically, you know, did -- and I'm sorry, the

20  plan of adjustment of course to -- to read the terms of all

21  this.  And basically did my own analysis, used the Milliman

22  work wherever I could to -- to kind of recast what I -- what

23  seemed to be the appropriate claim amounts.

24  Q    Did you get all the documents that you needed?

25  A    I did.

1  Q    Okay.  Now did you prepare slides to help your testimony

2  along today?

3  A    Yes.

4  Q    Can you put up 1060?  Can you tell us what your opinions

5  are here?

6  A    Yeah.  This kind of summarizes it.  Is that basically the

7  claim is overstated.  The denominator, it's overstated for --

8  for several reasons.

9       One is that it -- excuse me -- one is it includes

10 benefits that are not vested.  It includes some benefits based

11 on service that's going -- that's -- has been or will be

12 performed after the -- the bankruptcy date.

13      And it includes salary increases that are expected to

14 occur after that date.  And it also includes benefits for

15 individuals that are more invested.

16      The claim amounts include interest that's -- that's

17 excess interest on the ASF.  And then the -- by using the

18 6.75% discount rate which is you know, atypical, you know,

19 significantly less than the -- than the norm, it also -- that

20 tends to inflate the claim too.  And that's the denominator.

21      And then on the numerator side, the recovery dollars that

22 are included in the city's claim calculations are understated

23 because they exclude $20,000,000 of UTGO proceeds which is

24 what's known as income stabilization and they exclude any --

25 any concept that there could be a restoration benefit.

1          MR. MILLER:  Your Honor, the city objects to use of

2    the demonstrative in this fashion.  I mean it's one thing to

3    use a demonstrative like this that summarizes testimony

4    perhaps at closing once the testimony is in evidence.

5         But here essentially this demonstrative is -- is being

6    used to lead the witness.  It's essentially a written form of

7    -- of leading questions and so we object.

8          MR. WAGNER:  Well, no one has objected to

9    demonstratives before in this fashion.  I think they've been

10   used in this fashion before.

11        What -- Mr. Fornia said he prepared the slides.  These

12   are extracts from his report.  The retiree committee

13   introduced the entire Nicholl report.

14        The purpose of a demonstrative is to assist the Court, to

15   assist the witness.  United States --

16          THE COURT:  The Court -- the Court will permit it.

17   Go ahead, sir.

18          MR. WAGNER:  Thank you.

19   Q    Okay.  Now --

20          MR. WAGNER:  And I -- and I move the admission as a

21   demonstrative, 1060.  Okay.

22   Q    Now, there's been a lot of testimony in Court about

23   actuarial principals, so I'm only going to spend a little bit

24   of time on this.  But I wanted to get the basics in.

25        How are public pension funds -- how are public pension

1  plans funded?

2  A    So -- so essentially the actuary gathers the data, the

3  actuary reviews the plan, the plan provisions, the pension

4  plan, not the plan of adjustment, and the actuary makes

5  projections out as to what benefits or why couldn't they be

6  paid.

7       And they use what -- typically they use what I -- what's

8  known as a projected benefit cost method.  It's a cost method,

9  an actuarial cost method is a method of determining what the

10 annual cost is.

11      And in Detroit's case and in the vast majority of cases,

12 they use what's called a projected benefit cost method that

13 looks at what you expect to pay projecting out in the future.

14 Those are discounted back, they're allocated to certain years,

15 and then if you subtract out the assets, you get the unfunded

16 liability.

17 Q    What role does the investment rate play in all of this?

18 A    So the assumed rate of return also known as the discount

19 rate is -- is a pretty critical assumption because the -- the

20 more you assume you're going to return in investment return,

21 the less you think you need in contributions.

22      Now at the end of the day it all depends on what really

23 happens.  But the actuary's job is to try to predict in the --

24 in the, you know, at one point in time what's likely to happen

25 in the future.  So if the actuary is predicting 7.9% return or

 1  7.5% return, that will result in lower liabilities or lower

 2  costs than if they were assuming a -- a -- a smaller rate of

 3  return.

 4  Q    Is there -- is there a -- an actuarial convention or a

 5  standard practice with respect to the investment rate and the

 6  discount rate?

 7  A    Yeah.  For public pensions there -- there it's -- it's

 8  interchangeable, the terminology is interchangeable.  They're

 9  used for the same thing.

10  Q    And is that a convention in the -- in the industry?

11  A    Yes.

12  Q    Now do these principals apply to Detroit?

13  A    Absolutely.

14  Q    And did you -- did you -- did you review at all the

15  Detroit pension plans?

16  A    Did I review the plan statement?

17  Q    Yeah, okay.  Just -- how would you characterize public

18  pension funds as investors?  Sort of a general manner.

19  A    Well, public pension plans are definitely considered, you

20  know, the most savvy investors.  They've got a huge, you know,

21  huge clout because of -- of the size of them.  And they have

22  access to lots of different asset classes that -- that

23  individual investors don't have so they definitely tend to out

24  perform.

25  Q    And as far as you know does that apply to these plans?

1  A    It -- yes.

2  Q    Okay.  Now let's turn to start 1061 the next exhibit.

3  How -- how is -- how is the unfunded liability of a pension

4  plan calculated when a plan is ongoing?

5  A    Yeah.  So this is similar to what I said a minute ago.

6  As -- as an ongoing plan there -- it uses what's called a

7  projected benefit cost method.  It's -- it's -- it's a method

8  that looks to what's expected to be paid in the future and

9  then tries to allocate it.

10      It's much like an individual that's saving for

11  retirement.  When you're saving for retirement you try to

12  figure out how much you need and you -- you try to figure out

13  how you're going to get there.  Whereas in I believe claim

14  amount is more like what do we owe you as of bankruptcy date.

15      And that's more of a point in time calculation of an

16  accrued benefit.  And that -- for that purpose I would use

17  what I call an accrued -- or what is known as an accrued

18  benefit cost method.  And if you don't mind go to the next

19  slide.

20  Q    Yeah, can you turn to the next slide?

21  A    1062.  Yeah.  Again there's these two broad classes of

22  actuarial cost methods, projected looks at it in the future

23  what do you think and that's perfect for an ongoing plan

24  because that's what you want to do.  You want to make sure you

25  have enough money when the benefits come due.

1     But for a calculating such as a claim such as how much do

2   we owe you right now, I believe it's appropriate to use an

3   accrued benefit cost method that doesn't look at what you

4   might earn later, what you might -- salary might grow because

5   especially in this case the plan's been frozen.

6       So I believe that an accrued benefit method which looks

7   at what we do owe you now is a more appropriate calculation

8   approach.

9   Q   Does the second category have the -- is that akin to the

10  situation where we have a frozen plan?

11  A   A frozen plan would definitely use an accrued benefit

12  method as well.

13  Q   Okay.  Now you've -- you've alluded to this, but what are

14  the elements that are included in the calculation of liability

15  for an ongoing plan that would be excluded when a plan is

16  frozen when you're -- we're in the second category.  And if

17  you could turn to slide 1063.

18  A   Yeah, exactly.  Excuse me.  So for an ongoing plan you

19  would anticipate that people keep working.  You would

20  anticipate that these people will keep earning more benefits

21  as their careers go on.

22      And you would anticipate that they get some kind of

23  salary increases, that's just, you know, the way things work.

24  So if you have an ongoing plan you would -- you would include

25  some component of future salary or future service.

 1        You would also include benefits that are not vested

 2   because you think they'll probably become vested eventually.

 3   I mean the actuary discounts for them becoming vested.  And

 4   where -- and so those three pieces are in the city's claim

 5   calculations that I've taken out in -- in my analysis.

 6   Q    Did -- did Milliman calculate the size of the pension

 7   claim here?

 8   A    Yeah, Milliman did the math and you can trace it through

 9   and see how it -- it ties to the plan of adjustment.

10             MR. WAGNER:  Yes, Your Honor.  Just Ms. Fish reminds

11   me to move 1061, 1062, and 1063 into evidence as

12   demonstratives.

13             THE COURT:  Any objections?

14             MR. MILLER:  No objection as demonstratives.

15             THE COURT:  All right.  They are admitted.

16        (COPS Exhibits 1061-1063 were identified and admitted)

17   Q    Okay.  Can you -- can you turn to Exhibit 1064 in the

18   book -- I'm sorry, 1034 in the book?

19   A    I'm sorry --

20   Q    Can you -- can you --

21   A    Yes, I got it.

22   Q    Can you turn to -- can you turn to the Page 2 of the

23   document?

24   A    Yes, yes.

25        (COPS Exhibit 1064 was identified)

1  Q    And -- and can -- can you highlight aggregate claim?  Do

2  you see that paragraph?  So -- so what does that tell you?

3  A    Yeah, okay.  So this ties to the plan of adjustment.

4  Basically, you know, and again I was reviewing -- you know,

5  these Milliman letters were coming out fairly regularly and

6  every time you, you know, you see what's new.

7       But basically here if you look at the 4.285 billion --

8  I'm sorry, and this is just police and fire, PFRS.  If you

9  look at the 4.285 billion that Milliman calculated which is

10 the overall liability for the plan, and again that's on a

11 projected benefit cost method, then you subtract out the

12 assets as of June -- as of the same date of 3,000,000,000,

13 3.035, that, you know, we can probably all do that in our

14 heads.  That is 1,250,000,000 which shows up, you know, time

15 and time again in the plan of adjustment as the claim.

16 Q    And let's just note that for the record.  Can you turn to

17 Page 3 of the disclosure statement?  Page 51 of 197.

18 A    Okay.  And this is Exhibit 3?

19 Q    Yes.

20 A    Right.  So there you see in the left hand side a little

21 bit above -- a little bit below the pointer now, right there.

22 Right below that, it's a 1,250,000,000.  So that's the

23 aggregate claim that ties to the numbers I just read off the

24 Milliman report a minute ago.

25 Q    And let's just confirm it in one more place.  Can you

1   look at Exhibit 1014?  Kim, if you could turn to the third

2   page.

3   A    It's the number in the upper left.  There we go.

4   Q    Okay.

5   A    The 1,250,000,000.

6   Q    And could we do the same exercise for GRS?

7   A    Yeah, absolutely.

8   Q    Okay.

9   A    It's the same concept.

10  Q    Now what assumption did Exhibit 1034 make?

11  A    I'm sorry, is that the one we just saw, 1034?

12  Q    That's -- that's the Milliman May 5 letter.

13  A    Yes.  Oh, yeah.  Yeah.  So this is all based on an

14  ongoing plan and -- and the 6.75 discount rate.

15  Q    And do you agree with that calculation?

16  A    I agree.  I agree with the math.

17  Q    Uh-huh.

18  A    But no, I mean I think the appropriate calculation for a

19  claim is not ongoing.  People have not yet worked that service

20  as of the bankruptcy date and they haven't gotten pay

21  increases and they're not vested in some cases.

22  Q    By the way is there -- there's going to be a new plan for

23  the City of Detroit?

24  A    Right, exactly.  So this new plan, this hybrid plan will

25  -- will provide benefits after the -- after the plan -- you

1  know, the -- the bankruptcy date.

2     So that's another reason it doesn't make sense to -- to

3  have a claim that's being fulfilled partly by the new plan so

4  that's why I think it's important to take out benefits

5  accruing after the bankruptcy date.

6  Q   Now, did you select a number to use for the amount with

7  respect to future service and future salary increase, that

8  should be backed out.

9  A   Yeah.  To back that out I was able to use Milliman's

10 numbers because Milliman made those calculations.

11 Q   And can you turn to Exhibit 1009 in the book?  1009.  And

12 if you could turn to Page 3, the paragraph captioned Estimated

13 Plan Freeze Input.

14 A   Yeah, exactly.  So basically what Milliman did in this

15 report is -- is -- is calculate how much the liability would

16 decrease if the plan were frozen.  And that's the same idea as

17 what I'm talking about.

18    It's -- it's -- to me the claim amount is the frozen

19 amount and -- and so they calculate it and this -- this is --

20 this is GRS, the general retirement system, and they

21 calculated that freezing the plan would decrease the

22 liabilities by 95,000,000.  That's the roughly 95,000,000 in

23 the upper right of that box.

24    And so -- and then I did my own, you know, rough

25 calculations and that seemed about right as the amount of that

1  claim.  So for GRS, 95,000,000 I believed is the appropriate

2  amount to take out for these future salary and future service

3  benefits.  And I believe police and fire the number was

4  55,000,000.

5  Q    Okay.  Kim, can you turn to Exhibit 1010?  Page 3.  The

6  same caption Estimated Plan Freeze Impact.  Do you see that?

7  A    There is the 55,000,000 that -- that Milliman calculated.

8  And once again I -- I did a rough estimate and got -- say that

9  it looked -- looked reasonable.

10 Q    Okay.  Now you didn't -- did you also come up with a

11 number for the unvested benefits that were included?

12 A    Correct.  That was a little more complicated.

13 Q    Okay.  What did you do?

14 A    Well, for that at -- at the time we were working somewhat

15 with -- with Syncora and FTI, the advisors to Syncora has

16 actuaries on staff.  And I worked with them and they actually

17 ran the numbers just like, you know, like Segal did and like

18 -- like Milliman did.

19     And they came up with, you know, roughly 200,000,000 as

20 the difference for the two plans for the individuals that are

21 not yet vested.  And I --

22 Q    Did you do anything to validate those numbers?

23 A    Oh, yeah.  I did the same thing I'd do if it was -- if I

24 was one of the big firms with my own staff, you know.  I

25 reviewed their -- some of their test cases, I reviewed the

1  output from their actuarial evaluation system and so on.

2       And I'm -- I'm pretty comfortable with those numbers.

3  And I -- I suspect if Milliman or Segal did them they'd come

4  up with the very similar numbers.

5  Q    Okay.  Now did you bring it all together in a chart?

6  A    I did.

7  Q    Okay.  Can you look at Exhibit 1064?

8  A    That's the chart.

9  Q    Okay.  And by the way just at the bottom I see sources.

10 What's that all about?

11 A    So this is where each of these numbers came from.

12 Q    Okay.

13 A    You know, plan of adjustment, the various -- the 10 --

14 1009, the 1010, or the two Milliman letters we just looked at

15 and so on.

16 Q    All right.  Can you explain to us what you did in this

17 chart?

18 A    Okay.  So yeah, and this is a pretty, you know,

19 fundamental part of my report.  The top row is the claim

20 amounts for the two plans.  And, you know, I used DGRS and

21 DPFRS like Milliman did.

22      And so all of those four -- those six numbers on the top

23 row you can see in the plan of adjustment.  You know, they're

24 the -- the claim amounts and then the recovery percentages.

25      So but then the next row takes out the 95,000,000 and the

1    55,000,000 that Milliman said and I agreed with, is the value

2    of future service and future pay.  And by taking those out

3    that bumps up the recovery percentages.

4        And then the next row takes out, you know, roughly

5    200,000,000 of benefits for people that are not yet vested and

6    that further bumps it up.  And then we also -- we also looked

7    at ASF, excess interest.

8    Q    Okay.  Well, let me ask you what's that all about?

9    A    As -- as you recall you know, the city in its -- in its

10   plan of adjustment talked about -- let me back up.  ASF is an

11   annuity savings fund where the individuals can contribute to

12   the fund.

13       But unlike a typical 401(k) where you earn what the

14   market earns, this one has I guess you'd call it a kicker.

15   Where they're -- you know, they -- they guarantee you a higher

16   rate of interest in -- in certain years.

17       So the city had calculated that that was $387,000,000 of

18   "excess" interest.  And it's in the claim.  You know, it's in

19   the actuarial liability or the -- or the -- or it's not in the

20   assets.  And therefore I -- I pulled that 387,000,000 out

21   also.

22       So the difference between the third row and the fourth

23   row is just for GRS just $387,000,000 which again bumps up the

24   recovery percentages a little more too.

25   Q    But basically what you did was you did a calculation

1  there?

2  A    I just did the math, yeah.

3  Q    Okay.  And just for the record can you turn to Exhibit 3,

4  the disclosure statement Page 39 of 197?  If you could

5  highlight Kim, the second and third paragraphs.  What do you

6  have there?

7  A    Yeah, exactly.  So especially at the bottom.  The city

8  believes there was too much or excess interest credited to the

9  ASF, and that assets were diverted from the money available to

10  fund GRS participants' monthly defined benefit pensions.

11      The city estimated that using actual market returns

12  between zero and 7.9 for crediting purposes, over 387,000,000

13  of excess interest was credited to the ASF accounts

14  collectively from this -- for this ten year period.

15  Q    Okay.

16  A    It's the city's belief this is money that was diverted

17  and so on.  So that was the basis for me subtracting it out of

18  the claim.

19          MR. WAGNER:  Yeah.  I move Exhibit 1064 in as a

20  demonstrative.  As a demonstrative.

21          MR. MILLER:  No objection as to demonstrative.

22          THE COURT:  It is admitted.

23      (COPS Exhibit 1064 was admitted)

24  Q    Okay.  Now this is not on your -- on your chart, but if

25  you -- if you only backed out the ASF and you left the -- the

1  future salary, future increased non-vested benefits, about

2  what would you get for –– for GRS?

3  A    Oh, yeah. You'd get that –– so instead of being either 60

4  which is what the city said, or 85 which they took everything

5  out, it would be 75%.

6  Q    Okay.  Now let's move on to another topic interest rate

7  –– rate of return.  Can you describe again the role that the

8  investment rate plays in calculating pension liabilities for a

9  public fund?

10 A    Yes.  So basically the assumed rate of return impacts the

11 –– you know, the –– the short term.  It impacts the liability.

12 You know, the higher rate, the lower the liability.  And it

13 impacts the cost calculation in –– in –– in the short run.

14 Q    At what rate did the city again select in the plan?

15 A    So –– so the city in –– in November of –– of last year

16 Milliman recommended a rate of 7.2 but the city's plan of

17 adjustment has a rate of 6.75.  And then of course the plan

18 actuary Gabriel, Roeder, and Smith was using rates of 7.9 or

19 8.

20 Q    By the way how is Gabriel, Roeder situated in the market?

21 A    Gabriel Roeder is the –– the largest provider of services

22 to public pensions in the country.  They're –– they're the

23 market leader.

24 Q    Okay.  Can you turn to Exhibit 1065?  When –– when an

25 actuary ––

1  A    No.  Got it, yes.

2  Q    When an –– when an actuary determines the expected rate

3  of return, what does –– what does he or she do?

4  A    Well, there is an actuarial standard of practice and it

5  –– it recommends –– requires using what's called a building

6  block method.  And –– and under the building block method, you

7  look at the –– the asset allocation of the –– of the pension

8  fund.  This is –– this is a specific standard of practice for

9  economic assumptions for retirement systems.

10     And the idea is that you look at the assets that are

11  being invested, the different assets classes, you know,

12  equities, fixed income, high yield, real estate, whatever.

13  And for each asset –– asset class you do your own analysis of

14  what your expected return is –– expected real return and then

15  basically you add up all the asset classes and weigh them by

16  the same way the –– the city or the investor in this case the

17  pension fund is investing the assets.

18     And then you also come up with an independent inflation

19  assumption and you –– because –– because a real rate of return

20  is –– is –– is basically the return in excess of inflation.

21  So then the actuary basically adds in a baseline inflation.

22     Then in addition to that, you know, you need –– it's wise

23  to compare yourself –– excuse me, to what other –– other

24  actuaries are doing because, you know, there's hundreds of

25  pension funds in the country and, you know, probably 100

1   different actuaries each doing this same kind of analysis.

2          So it's very very worthwhile to go back and say, okay,

3   here's what I came up with, how would other professionals have

4   done this same exercise.  And by doing that you can have a

5   smell test of where your assumptions fall.

6          And then finally you periodically go back and look at

7   what the fund actually earned.  Because if your fund isn't

8   earning comparable to what you're assuming, then you've got --

9   better figure out why.

10  Q    Do you have an opinion Mr. Fornia, concerning the 6.75

11  rate?

12  A    I do.

13  Q    What's your opinion?

14  A    Well, I think it's excessively low.  It -- it's -- is

15  that on my next slide?

16  Q    Yes.  What do you have there, 1066?

17  A    Yeah.  I mean first of all, you know, and by being low it

18  causes the claim to be much higher.  The -- the -- the pension

19  funds have earned, you know, basically their assumed rate of

20  return over the last 25 years.

21         And nearly all funds which have asset distributions

22  similar to what -- what GRS and police and fire views, you

23  know, it -- it seems inconsistent that they're using rates as

24  low as 6.75.  It's certainly inconsistent with -- with common

25  practice.

1  Q     Okay.  Now you read Mr. Perry's report?

2  A     I did.

3  Q     Okay.  Do you have an opinion as to why he came up with a

4  lower rate than what -- what you appear to be suggesting?

5  A     Why or how?

6  Q     Either one.

7  A     Either one, I can't or to say why.  Well, basically

8  there's two features of Mr. Perry's report that are a little

9  bit unconventional that help support the lower rate.

10        One, is he used a inflation rate that's kind of at the

11  bottom of what actuaries typically use.  He used a 2 1/2%

12  assumed rate of inflation.  And most actuaries use 3% or more.

13        And then he also broke out -- he broke out short term to

14  long term.  He had a lower assumed real returns in the next

15  ten years and then more conventional assumed real returns

16  beyond ten years.  And that tends to -- you know, blending the

17  -- you know, the -- the -- the pessimistic short term forecast

18  with the more realistic long term forecast to help push the

19  rate down closer to the 6.75 that the city had chosen.

20  Q     Can you look at Exhibit 1036 in the book?

21  A     Yes.

22  Q     What -- what is that?

23  A     So like -- like Milliman and Segal, my firm is a -- is a

24  member -- an associate member of NASRA the National

25  Association of State Retirement Administrators.  And one of

1  the -- one of the -- the benefits of being a member of NASRA

2  is that they do a -- they keep a regular survey of 126 large

3  pension funds in the country.

4      Most of them are the NASRA members themselves, the states

5  but they have a handful of others.  And -- and they keep

6  monitoring what their -- lots of features of the plans, but

7  the one I pulled out was the actual assumptions which is their

8  assumed rates of return and -- and so on.

9      And I printed this out back in June and -- and, you know,

10  just to -- to check and -- and, you know, as of that time the

11  -- the median assumed investment return assumption was 7.9.

12  And the median assumed inflation assumption was 3.0.  And this

13  is part of the basis for my conclusion that, you know, the --

14  the city's rates are -- are unconventional.

15  Q    All the way on the right there's a column that says

16  actual evaluation date 12-31-2011.  What's that all about?

17  A    Well, so these reports have a little bit of a lag.  You

18  know, the governments aren't -- don't have to publish their

19  information until the end of the fiscal year.  And even then

20  sometimes they're using prior years' information.

21      So there is a lag here.  And rates have come down a

22  little bit.  But they've certainly not come down to the 6.75

23  level.

24  Q    Can you turn to Exhibit 1040?

25  A    Yeah.  This is the same study.  I think I sorted here by

1  inflation assumption.  And it was done a week later.  So the

2  top row it hasn't changed and -- and then you can just see

3  from this there's only three, six, seven plans that used

4  inflation as low as what Mr. Perry used in his study.

5       So again I mean he's not -- you know, he's not out of

6  line with the mainstream, but he's definitely use at the --

7  you know, at the bottom edge.

8  Q    Can you look at slide 1067, Exhibit 1067?

9  A    Yeah.  This is a summary of -- of my -- of the key -- key

10  facts from these studies.  You know, 7.9 was the median, only

11  7 used an inflation rate as low as 2 1/2 and only two used a

12  return rate any lower than the 6.75.

13       And while there has been some -- you know, I monitor --

14  you know, I probably know half these plans.  And -- and you

15  know, they -- they do tend to -- they have been moving down a

16  little bit, but certainly nowhere near down to the 6.75 level.

17       In fact I've just looked at this survey again last week

18  to see if it had changed and while there may have been changes

19  in the, you know, here and there, the -- the facts listed on

20  this 1067 would be true if -- if I -- I did that today.

21            MR. WAGNER:  Your Honor, I move as demonstratives,

22  1065, 1066, and 1067.

23       (COPS Exhibits 1065-1067 were identified)

24            THE COURT:  Any objection?

25            MR. MILLER:  No objection.

1          THE COURT:  No?  Okay.  They are admitted.

2     (COPS Exhibits 1065-1067 were admitted)

3   Q    Okay.  Can you turn in the book to Exhibit 10164?  What

4   -- what is that?

5   A    Okay.  So in addition to -- this is te same source, this

6   public fund survey.  And in addition to keeping this survey

7   regularly what this one does is -- is -- was an update as of

8   about six months ago.

9        And that piece is not -- so the back few pages of that

10  are this same fund survey stuff that you've seen before.  And

11  then --

12  Q    Kim, if you could just turn to the --

13  A    There we go.

14  Q    -- to the second to the last on the last page.

15  A    Yeah, so that's the same -- that's the same information

16  that's used that was used in the public fund survey.  But if

17  you look at the heading it says in use or announced for use as

18  of December 13.

19       So all of these systems are members of NASRA and it's --

20  and the researcher here looked to see, you know, if they had

21  announced that they were lowering their rates he put the lower

22  rate -- or changing their rates.  You know, he put the new

23  rate in here.

24       And again that has very comparable data to what we just

25  saw.  And then back on the first page if you look at the --

1   the bar charts, this is an interesting supporting information

2   too.  Is that, you know, over the last -- and again I don't

3   like to use a period any lower than 25 years.  I think that's

4   just very distorting.

5        But even if you did use the ten year period which is the

6   lowest rate here, you've still got return rates that beat the

7   6.75.  And that ten years includes 2008, one of our worst

8   years in my lifetime.

9   Q    Right.  Just why would you not go -- why -- why do you

10  use -- why do you use 25 years?  Why do you prefer 25 years?

11  A    Well, two reasons.  One, is that if you use a short --

12  let's say you used a ten year period.  If you looked at last

13  year's ten year period you probably were a lot less than 7.0.

14  And if you looked at next year's ten year period as we'll -- I

15  mean when you're using only a ten year period, the returns are

16  so volatile on a year to year basis that taking one tenth of

17  one -- of a bad year out and putting in one tenth of a good

18  year, is fabulous or vice versa.

19       So it's just too -- way too volatile.  It's what's called

20  end point bias is -- is -- is the technical term for it.  And

21  it -- you get a lot more end point bias with ten than you do

22  with 25.  You get twice -- two and a half times as much.

23       But more importantly is these are long market cycles.

24  And -- and -- and -- and the pension fund also has a very very

25  long time horizon.  You know, there were people hired in their

1  twenties that are in this plan that are not going to die until

2  their nineties.

3      So using the ten year return when you're really

4  interested in the 70 year return, it doesn't make sense to me.

5  It's just too -- too inaccurate.

6  Q    And did you also look at rates of return for pension

7  funds for which Milliman is the actuary?

8  A    I did.

9  Q    Okay.  Can you turn to slide 1068?

10         MR. WAGNER:  Ms. -- Your Honor, on -- on this slide

11  Mr. Eaton mentioned that he was not happy with the captions.

12  I'm perfectly happy to change the captions to whatever he

13  wants it to.  I think it's --

14         MR. MILLER:  Your Honor, there's no evidence and

15  there will be no evidence that these particular investment

16  rate assumptions were recommended by Milliman.  So our

17  suggestion would be to simply amend the slide to indicate that

18  these rates are the rates that are being used by the -- the

19  system to which Milliman is an actuary.

20         MR. WAGNER:  And that's perfectly fine with us.  And

21  if Your Honor wants us to, we'll -- we'll replace the slide.

22  I just logistically I only spoke to Mr. Eaton at about 10:30

23  last night.

24         THE COURT:  Okay, that's fine.

25  Q    All right.  Now what does this slide tell us?

1      (COPS Exhibit 1068 was identified)

2          MR. WAGNER:  Otherwise I'd move it in as a

3   demonstrative with that amendment.

4   Q    What is this slide to?

5          THE COURT:  All right.  Subject to that, it is

6   admitted.

7      (COPS Exhibit 1068 was admitted)

8   Q    Okay.  What does this slide tell us?

9   A    Okay.  Well, so of the surveys we've seen before, I

10  pulled out six of Milliman's clients that are in there.  And

11  basically what this indicates is that for their -- their other

12  clients, other than their Detroit clients they're -- they're

13  using assumptions that are, you know, significantly higher

14  than the Detroit assumptions.

15  Q    Let me just --

16  A    Go ahead.

17  Q    Did you exclude any Milliman clients?

18  A    Yeah, I -- I did exclude New Jersey because New Jersey

19  was the one where Milliman specifically said in their report

20  we did not recommend this assumption.

21  Q    Uh-huh.

22  A    Actuaries are obligated to opine if they disagree with

23  the assumption.  And they didn't do that for any of these

24  including New Jersey.  And, you know, each -- each system has

25  a slightly different governing law.

1    And many times they do require the actuary to make a

2  recommendation.  I don't -- I didn't go through each of these

3  six to do that.  But the actuaries are the one on the firing

4  line on these assumptions and -- and I -- I imagine if you

5  were to ask these Milliman actuaries do you support these

6  assumptions, I really really believe they would say yes.

7  Q    Uh-huh.

8  A    They -- they are required by the standard --

9         MR. MONTGOMERY:  Objection, Your Honor.  The witness

10 has been completely speculating.  No foundation.

11        THE COURT:  The objection is sustained.

12 Q    Just so the record is clear.  What was the inflation rate

13 that was used by -- by Milliman here?

14 A    For Detroit?

15 Q    Yes.  There's two.

16 A    Well, in 2013 it was 2 1/2 and Perry presumably uses it.

17 It's -- it's not completely clear that he's using 2 1/2.

18 Q    Okay.  Now can you turn to Exhibit 1030?

19 A    Yes.

20 Q    What -- what is that?

21 A    So what this is and let's go down a little bit.  There we

22 go.  So Milliman does a survey every year and what they do is

23 they look at 100 large pension systems and they look at the

24 asset allocations for those pension systems.

25        And they -- they -- they use the Milliman capital market

1 | assumptions to see what they would come up with as their

2 | actual assumption instead of the -- the plan actuary's.

3 |      And -- and the key numbers in here are the upper right

4 | hand numbers on that table is 7.75 and the 7.47.  So basically

5 | the median return rate that's reported for these -- these 100

6 | plans was 7.75.  But if Milliman put in their capital market

7 | assumptions instead of the -- the plan -- the -- the market

8 | assumptions used by the actuary, Milliman would come up with

9 | -- would have come up with 7.47 as the median rate.

10 | Q    And what does that tell us?

11 | A    It says that Milliman is, you know, 28 basis points more

12 | conservative than -- than these system -- than the other

13 | systems.

14 | Q    By the way did you do your own calculation of their

15 | return -- appropriate return rate for Detroit?

16 | A    I didn't.  I just reviewed what the other actuaries had

17 | done.

18 | Q    Can you turn to Exhibit 1017?  What is that document?

19 | A    Okay.  So this is a -- a history of the return to the two

20 | funds that we got from either the city or the systems.  I

21 | guess from the systems.  And from this I looked at the --

22 | again, I looked at the 25 year period for GRS and the average

23 | return was -- was -- average return -- assumed return was

24 | 7 1/2 and the average, you know, actually achieved return was

25 | also  7 1/2.  And then similar for police and fire.  You

1 extrapolate back to 25 years.  It's very comparable numbers.

2 Q    What impact did that have on your opinion?

3 A    It just was one more piece of confirmation that look, you

4 know, 7 1/2 is -- is a lot more reasonable than 6.75.

5 Q    All right.  Let's turn to sub topic, the risk free rate.

6 You read Ms. Nicholl's opinion concerning the risk free rate.

7 Do you -- do you agree?

8 A    I agree that I read it.

9 Q    Do you agree with her opinion?

10 A    No.  No, I -- I think there's a lot of flaws in that.

11 Q    Okay.  Can you turn to slide 1069?

12     (COPS Exhibit 1069 was identified)

13 A    Yeah.  The -- the first flaw is just that it's

14 inconsistent with prevailing practice.  No -- no pension funds

15 use a risk free rate for funding and there's very very few

16 cases where they've used it at all.

17     New York City, I know makes some disclosures on a risk

18 free rate.  Washington State I think also doesn't -- doesn't

19 use quite a risk free rate, but it uses a lower rate.  But

20 again that's just for disclosure.

21 Q    Uh-huh.

22 A    And then, you know, there's cases like in California

23 where they use a risk free rate.  Calpers if -- if one of the

24 plans is settling and terminating they would use a risk free

25 rate because Calpers can't take any risk.

1  Q    Okay.  Let me just stop you.

2  A    But no --

3  Q    Just -- just because everybody -- just because nobody or

4  very few people do it, does that make it wrong?

5  A    No.  I'm sorry.

6  Q    Does it make it -- does it make it wrong just because

7  nobody does it?

8  A    Correct.  It doesn't make it wrong, but it's pretty

9  strong evidence that's why it might be wrong.  I believe it's

10  wrong for a much more fundamental reason.

11  Q    Okay.  What is that?

12  A    Well, particularly in this claim instance, in -- in the

13  case of a claim, you know, again the claim is how much do we

14  owe you, so we can figure out how much we're paying you out of

15  what we owe you.

16       And the way the math works is if you accept this that the

17  risk free rate is the right rate for the claim, you could get

18  a case where even if there was no pension cut whatsoever,

19  okay, and using the numbers that Nicholls -- Nicholl rather,

20  came up with, even if there had been no cuts in benefits the

21  math would work out that there's only 35% recovery.

22       She would have a recovery of 1,300,000,000 and a claim of

23  3.8 and -- and demonstrate that look, these people were only

24  getting 35% recovery even if there was absolutely no pension

25  cuts whatsoever.

1    So to me when you're -- you know, this is -- when you're

2   figuring out what -- how to measure a claim and recovery, I

3   would -- I would think that one kind of boundary would be

4   look, if you don't get -- if you -- if you don't give anyone

5   any cuts that means 100% recovery.  Or if you don't give them

6   anything at all, that should mean 0% recovery.

7    And so the fact that this doesn't even come up at 100 in

8   the obvious case where it should come up with 100, kind of to

9   me proves that it's -- it's just not the right way to look at

10  it.

11  Q    By the way --

12          THE COURT:  So it was by your logic if a pension

13  plan has no assets in it, but promises to pay 100% of the --

14  of future pensions, it's not under funded?

15  A    Oh, it's absolutely under funded.  But there is -- but

16  there is --

17          THE COURT:  I'm sorry.  I thought you said as long

18  as they promise to pay 100%, there's no claim.

19  A    No, no.  There's no -- no unfulfilled -- there's no un --

20  I'm not familiar with the Court's terminology on this.  But

21  there's still a huge claim.

22          THE COURT:  I have to ask you to excuse my amateur

23  language.

24  A    No, it's the -- it's the Court's.  I don't -- the -- I --

25  I'm sorry, the legal name, it's not the Court meaning your

1 language, sir.

2      No.  There is a claim but if you're going to pay the

3 claim, if you're not impairing the claim at all, because

4 that's the language, right?  That's the language I'm confused

5 with.

6           THE COURT:  Okay.  That's good language.

7 A    Yeah, I know that.

8           THE COURT:  All right.  So as long as you're not

9 going to impair the claim --

10 A   One would think --

11          THE COURT:  If the plan says -- if the plan says

12 you're going to pay 100% of pensions --

13 A    Exactly.

14          THE COURT:  There is no claim even though --

15 A    No, no, no.

16          THE COURT:  Even though there are no assets from

17 which to pay that.

18 A    No.  There's a huge claim but there should be 100%

19 recovery.  I mean a claim is a claim.  But if you're not

20 impairing the claim one would think then the math when you're

21 doing the recovery percentage comparison --

22          THE COURT:  Uh-huh.

23 A    -- would come out with 100.  I would think that that

24 would be -- when you're measuring the amount of claim that is

25 being paid, you know, non-impaired, if you're not impairing

1  it, I would expect the numbers should come out to be 100%

2  recovery.

3          THE COURT:  The numbers.

4  A    Yeah, the numbers.

5          THE COURT:  What numbers?

6  A    The -- the percentage recovery numbers.  Like remember in

7  the plan of adjustment they show a 60% recovery?

8          THE COURT:  Uh-huh.

9  A    I believe if they weren't impairing the claim at all that

10 should come out to 100.  That just seems more common sense.

11         THE COURT:  Okay.

12 A    Yeah.  And given the -- the way the math is working in

13 this risk free rate, there would be a big claim, don't get me

14 wrong, but it's not being impaired and I would expect the

15 number to come out to 100 but using the numbers that -- that

16 Ms. Nicholl came up with it would come out to only 35.

17         THE COURT:  Okay.

18         MR. WAGNER:  And I -- I think it just -- I think

19 Your Honor might be focusing on the denominator and maybe you

20 were in this were focusing on the numerator.

21         THE COURT:  Right, right.

22         MR. WAGNER:  Okay.

23 A    Thank you.  I think that's -- but basically you're

24 playing by three sets of rules.  You got a numerator based on

25 what's going in --

1   Q      Uh-huh.

2   A      Which is not using the risk free rate.

3   Q      Uh-huh.

4   A      And you've got a denominator based on what you're saying

5   the claim is which is being based on a risk free rate.  And

6   therefore you can't get to 100 even if you don't cut benefits.

7   Q      Okay.  Now what -- what's an appropriate period of time

8   for us to be assessing the right interest rate?

9   A      Well, as I mentioned, there is people in their twenties

10  that are not retiring until their nineties -- or not dying

11  until their nineties.  So certainly a period of, you know --

12  you know, at least 25 or 30 years is appropriate.

13  Q      Okay.  Now did you bring all these interest rate points

14  together in a slide?

15  A      I did.

16  Q      Can you turn to 1070, Exhibit 1070?  What is that?

17  A      Okay.  So 1070 it has -- the top two rows are what we saw

18  before which is based on the 6.75 discount rate.  And then the

19  next two rows, the shaded row I -- I used Milliman's initial

20  assumption recommendation of 7.2.

21         And then the bottom row I used 7.5 which is still a

22  conservative assumption, but more on the mainstream.  And as

23  you can see it causes the recovery to get, you know, pushed up

24  in the 100% range.

25         (COPS Exhibit 1070 was identified)

1  Q    What does that mean 100%?

2  A    Well, it would mean the plan would be over funded.

3          MR. WAGNER:  Your Honor, I move Exhibit 1070 into

4  evidence as a demonstrative.

5          MR. MONTGOMERY:  No objection.

6          MR. MILLER:  No objection.

7          THE COURT:  It is admitted.

8      (COPS Exhibit 1070 was admitted)

9  Q    Okay.  Now one more -- one more --

10          MR. WAGNER:  Oh, and 1069 as well as a

11  demonstrative.

12          MR. MILLER:  No objection.

13          MR. WAGNER:  Okay.

14          THE COURT:  It is admitted.

15      (COPS Exhibit 1069 was admitted)

16          MR. WAGNER:  Thank you.

17  Q    Now let's turn to the numerator.  Are there calculations

18  that are relevant to your opinion with respect to the

19  numerator?

20  A    Yes.

21  Q    Okay.  What are they?

22  A    And they're shown in 1071.

23  Q    Okay. What do you have there?

24  A    So here I used the same rows as before but -- okay, so

25  the city in the plan of adjustment, you know, included city

1 | contributions, grand bargain contributions as the numerator.

2 | But they did not include anything for the income stabilization

3 | coming from the UTGO settlement, and they did not include

4 | anything from restoration.

5 |     There is provisions in the plan of adjustment that if the

6 | returns, you know, exceed the 6.75 and the funded levels meet

7 | certain thresholds, there will be restoration -- there will be

8 | additional benefits paid in restoration of those.

9 |     And so that is the -- in the -- the shaded column that

10 | starts with 8.79.  So whereas the city plan of adjustment had

11 | the numbers on the left starting with 7.35.  So -- so this is

12 | basically the numerator.

13 |     You know, if they do earn 7 1/2% then police and fire

14 | would hit these thresholds and there would be restoration.

15 | And I calculated that they would in this case would cause the

16 | numerator to jump to 8.79 which again causes each of these

17 | recovery amounts to increase as well.

18 |     This chart also put in income stabilization.  It did --

19 | it did some analysis just taking out the grand bargain, taking

20 | out the state, some other options so to speak of what might be

21 | considered in the numerator.

22 |     (COPS Exhibit 1071 was identified)

23 | Q   When you took out the -- when you took out the state

24 | contribution and the grand bargain are you expressing any

25 | opinion as to whether that's appropriate or not?

1  A    No.  I just did the math, the arithmetic.

2  Q    Did you do the same math with respect to GRS?

3  A    Yes.  And the next slide is -- is -- is the general

4  retirement system.

5       (COPS Exhibit 1072 was identified)

6  Q    Okay.  And just there is -- is there any ASF issue with

7  respect to PFRS?

8  A    No, not really.

9  Q    Okay.  And just one more clean up point.  When you do

10 your calculation, when -- when the actuary does his

11 calculation of benefits, do you -- who do you include in the

12 calculation?

13 A    Well, the idea when you're doing these calculations is

14 you include the benefits expected to be paid and you look at

15 only at people in the plan.

16 Q    Any type of plan?

17 A    Any type of -- of plan.

18 Q    Okay.  Now just one last topic.

19       MR. WAGNER:  Your Honor, I move in 1071 and 1072.

20       MR. MONTGOMERY:  No objection.

21       MR. MILLER:  No objection.

22       THE COURT:  It is admitted.

23       (COPS Exhibit 1071 and 1072 were admitted)

24 Q    Okay.  Can you turn to slide 1073, the last slide?

25 A    Yes.

1      (COPS Exhibit 1073 was identified)

2  Q    And what -- what is that?

3  A    So this is real simple.  I have got a big data file of

4  all the retirees and surviving beneficiaries and it has what

5  city they lived in.  And I think that's Exhibit 1041 which is

6  the reason it's so thick.  And basically I counted up the ones

7  that are in Detroit.  And only about a third of them are --

8  are in Detroit.

9  Q    Can you turn to Exhibit 1041?

10  A    Yes.

11  Q    What is that?

12  A    That's -- there's several hundred pages of this.  Of

13  different people, I don't know their names, but I know that

14  they're in Warren, Grosse Pointe Woods, and so on.

15      (COPS Exhibit 1041 was identified)

16          MR. WAGNER:  Your Honor, I move Exhibit 1041 into

17  evidence.

18          MR. MONTGOMERY:  No objection.

19          MR. MILLER:  No objection.

20          THE COURT:  It is admitted.  No objection.

21      (COPS Exhibit 1041 was admitted)

22  Q    All right.  Can you just --

23          MR. WAGNER:  Yes.  And I move Exhibit 1073 as --

24  into evidence as a demonstrative.

25          MR. MILLER:  No objection as a demonstrative.

1        MR. MONTGOMERY:  No objection.

2        THE COURT:  It is admitted.

3     (COPS Exhibit 1073 was admitted)

4  Q    Okay.  Can you just sum up your opinion for us?

5  A    Yeah.  So basically my opinion is that the claim the --

6  the recovery -- the claim amounts are -- are -- excuse me,

7  overstated and the recovery, the new so-called numerator is

8  understated and it causes the recovery percentages to be, you

9  know, much higher than is -- is listed in the plan of

10  adjustment.

11        MR. WAGNER:  Nothing further.  Thank you.

12        THE COURT:  Thank you.  Let me ask you to just stand

13  by for one moment, sir.  I want to make a record regarding the

14  pro se participation in this trial.

15      You can go ahead and have a seat.  But I -- and I want to

16  do this before the cross examination in case any of these

17  people are here, or listening in, or otherwise have access to

18  our proceedings.

19      I'm showing that Gloria Williams has been granted 15

20  minutes to examine the city's balloting agent by telephone.

21  So I would ask counsel for the city to make a representative

22  of the balloting agent available by telephone tomorrow in case

23  that works out.

24      Only investors will examined Dennis Taubitz for 20

25  minutes.  Freda Butler -- or Fredia Butler will testify herself

1   for 20 minutes.  Wanda Hill subject to the pending motion will

2   testify -- will examine Ms. Lennox and her own witness Belinda

3   Florence for a total of 20 minutes.  Elaine Thayer will

4   testify herself for 20 minutes.  Yvonne Williams Jones and

5   Cecily McClellan jointly were granted 20 minutes to examine

6   Judith Kermans and David Kausch also from Gabriel, Roeder.  Is

7   that a local person that's available, does anyone know?

8            MR. KAUSCH:  Yes.

9            THE COURT:  The witness says yes.

10           MR. KAUSCH:  And it's --

11           THE COURT:  Thank you, sir.  So if that person can

12  be made available tomorrow here in Court that would be good

13  also.

14      Mr. Karwoski and Mr. Quinn have additional time to

15  examine witnesses as well.  Walter Gary Knall will testify

16  himself for 15 minutes as will Joann Watson for 15 minutes.

17      Okay.  Cross examination.

18           MR. MILLER:  Good morning, Your Honor.  Evan Miller

19  for the City of Detroit.  May I approach?

20           THE COURT:  Yes.

21           MR. MILLER:  And may I approach the witness, Your

22  Honor?

23           THE COURT:  Yes.

24                    CROSS EXAMINATION

25  BY MR. MILLER:

1  Q    Good morning, Mr. Fornia.

2  A    Good morning, Mr. Miller.

3  Q    You are not an attorney, correct?

4  A    Correct.

5  Q    And you're not offering any legal opinions in this case,

6  correct?

7  A    Correct.

8  Q    But you are an actuary, correct?

9  A    Yes.

10 Q    And as an actuary you routinely perform math

11 calculations, correct?

12 A    Well, among other things, yes.

13 Q    Okay.  We're going to begin this examination with a

14 series of some math calculations.  Okay.  We're first going to

15 do some investment return calculations.

16     If an investor has a 10% gain on a portfolio in year one,

17 and a 10% loss on that portfolio in year two, at the end of

18 year two is the investor better or worse off than when he

19 started?

20 A    Yeah.  A 10% gain would give you 110.  Let's say you

21 start with 100.  And then a 10% loss would lose you 11, so

22 you'd be at 99.  So that would make you worse off, right.

23 Q    Let me switch it around.  If an investor has a 10% loss

24 in year one, and then 10% gain in year two, at the end of year

25 two is the investor better or worse off than where he started?

1 A    It's the same math.  A hundred to 90, 90 to 99.  So yes,

2 worse off.

3 Q    Do you understand the concept of compound annual returns?

4 A    Yes.

5 Q    And what is the concept of compound annual returns?

6 A    Well, 10% one year and 10% the next year is similar

7 concept to the math.  It's better off than 10 plus 10.  It's

8 -- you get 110 and then you get 11, you got 121.  So the

9 compounding effect is the reason you have 121 instead of 120.

10 Q    And in the example that I gave, the compounded annual

11 return after year two would be less than zero?

12 A    Correct.  You mean the plus 10 minus 10 example?

13 Q    Correct.

14 A    Yes.

15 Q    Correct.  What's the arithmetic return?

16 A    That's -- that would be the number that's -- that's 10 --

17 10 minus 10 or zero.

18 Q    Right.

19 A    And the geometric return is the -- is the -- the one

20 that's less than zero.

21 Q    The geometric return is the compounded annual return,

22 correct?

23 A    Essentially, yes.

24 Q    And in the example that I gave of an investor having a

25 10% loss in year one, and then a 10% gain in year two, the

1  arithmetic return would be zero, correct?

2  A    Yes.

3  Q    What was the compound annual return for the GRS plan in

4  the last 15 years?

5  A    In 15 I didn't calculate it.  Or I don't recall

6  calculating it.  It might be in my report, I don't think so.

7  Q    Okay.  Do you recall calculating?

8  A    Do I recall calculating a 15 year annualized return?

9  Q    Correct.

10  A    No.

11  Q    Did you calculate the compound annual return for GRS over

12  the last ten years?

13  A    Ten, no.  I don't believe so.  I may have, but I don't

14  recall.

15  Q    What about the PFRS?  Did you calculate the compound

16  annual return for PFRS over the last 15 years?

17  A    I'm sorry, repeat the question please.

18  Q    Sure.  Did you calculate the compound annual return for

19  PFRS over the last 15 years?

20  A    I may have as part of my step to -- to figure out the

21  compound rate of return over 25.  Because we only had 15 years

22  of data on PFRS.

23  Q    But you don't know for sure one way or the other?

24  A    I -- I -- I -- I don't know for sure, but I probably did.

25  It's probably part of a piece of a calculation that's in my

1  report.

2  Q    And you did prepare a -- a compound annual return

3  calculation over 25 years, is that right?

4  A    For which?

5  Q    For PFRS?

6  A    We don't have the returns.  We weren't given the returns

7  for the provider.  The 15 -- we have 15 year returns.  We

8  don't have the ten year returns before that.  So I, in my

9  report, I calculated what the GRS returns were in that first

10 ten year period.  And tacked them on to the 25 -- to the 15

11 PFRS returns we did have to see what that would have been.

12 Q    So let me make sure I understand.  Let's focus on PFRS.

13 A    Okay.

14 Q    Did you have the actual return information for PFRS over

15 a 25 year period?

16 A    No, only 15.

17 Q    Okay.  So you did not calculate the compounded annual

18 return for PFRS over a 25 year period?

19 A    I calculated what it would have been if the first ten of

20 those 15 -- those 25 were the same as GRS.  I don't know why I

21 wasn't given the first ten years of PFRS's 25 year.  You know,

22 we saw the exhibit a few minutes ago.

23     I made a -- a calculation as if for the first ten years

24 they had the same returns that GRS had for those ten years.

25 And then I calculated that compound annual return over 25

1 years.

2 Q    So you made an assumption about what the returns would be

3 in years one through ten of the 25 year period?

4 A    You could call it an assumption, but it's basically --

5 it's as stated in my report.  I -- I added ten years of GRS

6 returns because I didn't have those ten years of PFRS returns.

7 Perhaps the plans were -- were merged back then, I don't know.

8 Q    I want to move on to calculation of accrued pensions and

9 ask you some questions about calculating accrued pensions.

10 Employees who participate in pension plans they sometimes

11 terminate their employment prior to retirement, correct?

12 A    Yes.

13 Q    And one way for an employee to terminate employment prior

14 to retirement is to voluntarily quit, correct?

15 A    Yes.

16 Q    And another way is for the employee to be fired, correct?

17 A    Yes.

18 Q    And sometimes when an employer fires an employee it does

19 so with good cause, correct?

20 A    I presume so.

21 Q    And sometimes when an employer fires an employee it may

22 fire the employee without good cause in violation of the law,

23 correct?

24 A    I -- I assume so.

25 Q    Okay.  Assume for a moment that an employee who

1  participates in a pension plan and is not yet vested, is

2  wrongfully terminated by his or her employer.  And the

3  terminated employee successfully sues.  How would you

4  calculate that person's pension in that event?

5  A    It would depend on what the provisions of the pension

6  plan were.  If they sued and -- and won the pension, then

7  you'd calculate if the pension -- I mean, it's real simple.

8  It's whatever the pension is.

9  Q    It would be -- it would include the accrued pension even

10  though the employee was not vested at the time of the wrongful

11  termination?

12  A    It depends on the terms of the lawsuit.  I mean if the

13  lawsuit requires reinstatement of the pension, then you'd --

14  you'd reinstatement it.  If the lawsuit doesn't it would be --

15  I suppose it would be zero.

16  Q    Thank you.  In a traditional defined benefit pension plan

17  active employees accrue and grow their pensions annually

18  during the course of their employment, correct?

19  A    Yes.

20  Q    And then other pension plans, plan terms may provide that

21  after a certain fixed date active employees will no longer

22  accrue and no longer build a pension, correct?

23  A    I'm sorry, repeat that please.

24  Q    Sure.  In -- in other pension plans, the plan terms might

25  provide that after a certain fixed date, active employees will

1 no longer accrue and no longer build a pension, correct?

2 A    In certain plans that could happen, yes.

3 Q    And these latter plans are generally called frozen

4 pension plans, correct?

5 A    Okay.  The plans where -- I mean they could be because

6 there's plenty of other plans.  I mean there's plans that have

7 a 30 year of service limit.  That would also apply in your

8 first premise.  Those aren't frozen.  It's just -- you know,

9 that you could have a plan that doesn't accrue after a certain

10 point in time.

11 Q    But assume that a plan had a -- a hard and fast rule that

12 as of a certain date under no circumstances will it -- a -- an

13 employee continue to accrue or build a -- a pension.  Would

14 that kind of pension plan be deemed a -- a frozen plan, a plan

15 that prohibits future accrual?

16 A    Yeah, it could be.  The word frozen is not really crisply

17 defined.  There's different ways that plans can be "frozen".

18 But yes, I -- if someone called that a frozen plan I wouldn't

19 be correcting them.

20 Q    But in a plan where the employee continues to accrue and

21 build a pension year after year, that type of plan is

22 generally known as an ongoing pension plan, correct?

23 A    That would be one way to describe it, yes.

24 Q    Now you testified earlier that there were two different

25 types of actuarial cost methods to calculate liabilities in a

1 pension plan.  And one of which was the projected benefits

2 method, correct?

3 A    Yeah, the projected benefit methods.  There's a multitude

4 of projected benefit methods, but yes.

5 Q    And in an ongoing plan the projected benefit method is

6 customarily used by actuaries to calculate liabilities,

7 correct?

8 A    Yes.  If you're -- yes, depending on the purpose.  But

9 assuming you're trying to do something considering that --

10 that reflects the plan is ongoing then you would use a

11 projected benefit method.

12 Q    As of June 30, 2013, was the GRS plan an ongoing plan?

13 A    Well, I don't remember the precise date of when the plan

14 was -- when the bankruptcy filing was and when you changed the

15 terms of the plan.

16 Q    The plan's terms have not yet been changed, is that

17 correct?

18 A    I -- I don't recall.  I don't know exactly what -- what

19 the legal status is of all of these -- of these -- all these

20 changes you're implementing.

21 Q    And -- and the changes that you have in mind are changes

22 that are set forth in the plan of adjustment, correct?

23 A    Yes.

24 Q    Okay.  And then as of June 30, 2013, shortly before the

25 bankruptcy, was the GRS plan an ongoing plan?

1 A    I -- I assume based on your line of questioning, I assume

2 the answer is yes.

3 Q    Okay.  Can we pull up exhibit -- Exhibit 1023 which is

4 the June 30, 2013 actuarial valuation report for GRS.  And

5 let's turn to Page A-6 which is shown on the right bottom.

6 And let's highlight the first sentence of the -- in the top of

7 the page.

8       So let me read this sentence into the record.  The

9 purpose of this report is to measure the funding progress and

10 establish the computed employer contribution rate for fiscal

11 year 2015 in an ongoing pension plan.  Do you see that?

12 A    I do.

13       THE COURT:  Excuse me one second, please.  I have

14 been requested to participate in a conference call regarding

15 this case at this moment, so we need to take about a -- well,

16 we'll make it a 20 minute break and we'll reconvene at 10:30,

17 please.

18       (WITNESS WILLIAM FORNIA WAS TEMPORARILY EXCUSED AT 10:09

19 A.M.)

20       THE CLERK:  All rise.  Court is in recess.

21       (Court in Recess at 10:09 a.m.; Resume at 10:31 a.m.)

22       THE CLERK:  All rise.  Court is back in session.

23 Please be seated.

24       THE COURT:  My apologies to you, sir, for that

25 abrupt interruption, but let's proceed if you would.

1          MR. MILLER:  Thank you, Your Honor.

2          (WITNESS WILLIAM FORNIA RESUMED THE STAND AT 10:31 A.M.)

3     BY MR. MILLER:

4     Q     So when we took the break we were looking at the Gabriel,

5     Roeder actuarial valuation report for the year ending June 30,

6     2013 for the GRS pension fund.  And we noted that Gabriel,

7     Roeder noted on Page A-6 that the fund was an ongoing pension

8     plan as they've described it.  Do you have any reason to

9     believe that Gabriel, Roeder's characterization of the plan as

10    an ongoing pension plan in connection with its June 30, 2013

11    valuation was inaccurate?

12    A     No.

13    Q     Let's turn to the issue of investment return assumptions

14    and the 6.75% assumption that's part of the pension

15    settlement.  You're aware in addition to a 6.75% investment

16    return assumption that the pension settlement in this case

17    also provides that contributions to both the GRS and PFRS

18    systems will be fixed through June 30, 2023, correct?

19    A     Yes.

20    Q     And are you aware that based on the 6.75% return

21    assumption, the amount of fixed contributions and the

22    projected benefit cuts that GRS and PFRS are intended to

23    achieve certain funding levels by 2023?

24    A     Correct.

25    Q     And the intended 2023 funding level for GRS is 70%,

1  correct?

2  A    That sounds right.

3  Q    Okay.  And the intended funding level for PFRS is 75%,

4  correct?

5  A    That sounds right.

6  Q    Mr. Fornia, I'd now like you to assume for a moment that

7  the city recasts and restructures its pension settlement.  And

8  establishes as an investment return assumption through 2023,

9  7.5% instead of 6.75%.  Are you with me so far?

10  A    Okay.

11  Q    I'd like you in addition to assume that instead of PFRS

12  and GRS assets achieving an investment return of 7.5%

13  compounded annually through 2023 the assets return only 6.75%

14  compounded annually through 2023.

15  A    Okay.

16  Q    Are you with me?

17  A    Yes.

18  Q    Okay.  Assuming all demographic assumptions have been

19  satisfied, that would mean there would be less assets in GRS

20  and PFRS as of 2023 than anticipated, correct?

21  A    Than anticipated today, or than anticipated under your

22  hypothetical?

23  Q    Anticipate under my hypothetical.

24  A    Correct.  They would have anticipated assets growing at

25  7 1/2 and they would have only grown at 6.75

1  Q    Correct.

2  A    Right.

3  Q    And there would be as a consequence investment loss,

4  correct?

5  A    There would be -- well, there would be investment return

6  of 8, 6.75.  There would be an actuarial --

7  Q    Actuarial investment loss as a result of not meeting that

8  objective, correct?

9  A    Yes.

10  Q    At that point in 2023, again assuming all demographic

11  assumptions have been satisfied, if the city wanted to

12  amortize the then under funding of the plans over 30 years, it

13  would need to contribute more money than it otherwise had

14  anticipated, correct?

15  A    Well, more money than under today's anticipation, or more

16  money than in your hypothetical?

17  Q    On my hypothetical, stick with my hypothetical.

18  A    Correct, yes.

19  Q    Right.  And again sticking with my hypothetical, if the

20  city amortizes that actuarial investment loss as of 2023, it

21  would have to do so with interest, correct?

22  A    Well, an amortization has interest built into the

23  assumption, yes.

24  Q    Right.  And in my hypothetical where there would be a

25  7.5% investment return assumption, if the city were to

1  amortize this hypothetical loss, they would have to make

2  interest payments at a 7.5% interest rate, correct?

3  A    But those payments would be below what the plan of

4  adjustment calls for.

5  Q    I know.  Stick with my hypothetical.

6  A    So if we assume we're going to earn 7 1/2 and find out we

7  only earned 6 1/2 like we're assuming now, then yes, we'd have

8  to make additional -- we, the city would have to make higher

9  payments than if we had made the 7 1/2.

10  Q    Right.  And we'd have to amortize with interest, correct?

11  A    Yeah.

12  Q    At 7.5% under that hypothetical, correct?

13  A    Yes.

14  Q    And assuming that all demographic assumptions are

15  otherwise met, the only other alternative to make up for the

16  investment loss in this hypothetical would be to hope for

17  stronger than expected investment returns in the years after

18  2023, correct?

19  A    I'm sorry, repeat that, please.

20  Q    Sure.  Under the hypothetical again assuming all

21  demographic assumptions are met, the only other alternative to

22  amortizing the actuarial investment loss would be to hope for

23  stronger than expected investment returns in the years after

24  2023, correct?

25  A    Well, no.  I think -- I mean there's lots of different

1  alternatives, I suppose.  I wouldn't limit it to that as the

2  only alternative.

3  Q    Well, what would the other alternatives be?

4  A    Do another pension obligation bond.  You could cut

5  benefits.  You could make lots of different changes.  You

6  could re -- do an actual experience study to see if there's

7  other things that need to be changed.  And I think limiting it

8  to want wishful thinking as the only alternative I think is a

9  little naive.

10  Q    Would the better actuarial practice in connection with an

11  actual investment loss be to recommend that the plan fund that

12  loss over a reasonable period of time with additional

13  contributions?

14  A    That's certainly the starting point.  But -- but keep in

15  mind these additional contributions are still less than the

16  additional contributions under the plan of adjustment.  I mean

17  your -- your hypothetical is assuming we earn 7 1/2, but

18  earning 6.75.  And that's different than assuming and earning

19  6.75.

20  Q    But under the hypothetical as structured, there is an

21  investment loss that would have to be amortized among other

22  options.

23  A    Yeah.

24  Q    Beginning in 2023, correct?

25  A    Yeah.  I don't know if I'd use the word have to.  But in

1  general practice would be that it would be amortized.  That

2  would be the -- the assumed methodology.

3  Q    Let's stick for a moment with our discussion of the 6.75

4  investment return assumption.  I think you testified that you

5  think the 6.75% return assumption that is in the pension

6  settlement is too low, correct?

7  A    Yes.

8  Q    And do you think it is a unnecessarily conservative

9  assumption?

10  A    That would be a good way to articulate it, yes.

11  Q    Okay.  And you've examined the current asset allocation

12  guidelines for GRS and PFRS, correct?

13  A    Yes.

14  Q    And you believe that these asset allocation guidelines so

15  for example the percentage of assets that are invested in

16  equities, the percentage that are invested in bonds, these

17  allocations in GRS and PFRS are similar to what other public

18  pension plans use?

19  A    Yeah, I'd say reasonably consistent.  I didn't study them

20  rigorously, but yes, they look --

21  Q    And it's your opinion that these current asset allocation

22  guidelines for PFRS and GRS will over time produce asset

23  returns in excess of 6.75%, correct?

24  A    That would be my best estimate, yes.

25  Q    Okay.  Did you review Mr. Perry's expert report?  I think

1   you previously testified with Mr. Wagner you had?

2   A    Correct.

3   Q    Okay.  And you're aware that he calculated a -- a best

4   estimate range of returns for GRS and PFRS, correct?

5   A    Yes.

6   Q    And did you review the process by which Mr. Perry

7   calculated his best estimate range of returns for GRS and

8   PFRS?

9   A    Yes.

10  Q    And do you have an opinion on whether Mr. Perry followed

11  actuarial standards of practice in calculating his best

12  estimate range of returns?

13  A    I do and he did.

14  Q    And you're aware that Mr. Perry and Milliman in

15  conducting that best estimate range calculation used a

16  proprietary capital markets model, correct?

17  A    Yes.  Well, I'm not familiar that's proprietary, but yes.

18  Q    And Mr. Perry employed that capital markets model to

19  predict the estimated range of future PFRS and GRS returns

20  under the current asset allocation guidelines, correct?

21  A    He used the model to predict the range, yes.

22  Q    And just to make clear, your firm does not have its own

23  capital markets model, correct?

24  A    No.  I mean I've used similar processes before but no,

25  there's no propriety capital markets model.

1  Q    So your opinion that the current asset allocations for

2  PFRS and GRS will yield returns over time in excess of 6.75%

3  is not based on your own independent capital markets analysis,

4  correct?

5  A    Correct.

6  Q    You also previously testified that Mr. Perry had applied

7  a 2.5% inflation rate in projecting future GRS and PFRS

8  returns, correct?

9  A    Yes.

10 Q    And did you review the process by which Mr. Perry reached

11 his conclusion to apply a 2.5% inflation rate?

12 A    Yes.

13 Q    And do you believe the process that Mr. Perry employed

14 was consistent with actuarial standards and practices?

15 A    Yeah, I don't see any evidence that it was not.

16 Q    Is it your opinion that future inflation will be higher

17 than 2.5%?

18 A    You know, it's certainly the conventional opinion of

19 actuaries.  I haven't issued an opinion on that, but you know,

20 as I stated earlier, the vast majority of pension systems

21 actuaries assume it's going to be higher than 2.5%.

22 Q    But you don't have -- I'm sorry.  Go ahead.

23 A    I'll answer your question.

24 Q    Okay.  But you have not undertaken your own independent

25 capital markets analysis to conclude what the future inflation

1 | rate should be in assembling an investment return assumption

2 | for PFRS and GRS?

3 | A    Correct.

4 | Q    I now want to turn to the issue of discount rates.  And I

5 | -- I think you previously testified that it's a universal

6 | custom among public pension plans to use as the discount rate

7 | to present value liabilities, the same rate that they use as

8 | their investment return assumption for assets, correct?

9 | A    I didn't use the word universal custom.  But it's common

10 | practice, universal practice.

11 | Q    Okay.  And so if for example a public pension plan that

12 | uses 7.5% investment return assumption also is likely to use a

13 | 7.5% discount rate to value its liabilities for funding and

14 | contribution purposes?

15 | A    For funding and contribution purposes, certainly.

16 | Q    Okay.  Now I want to turn your attention to COPS

17 | demonstrative Exhibit 1036 which you've testified about

18 | earlier today which is the public fund survey.

19 |          MR. WAGNER:  Not -- not -- I think that's actually

20 | in -- in evidence, not as a demonstrative, but as an actual

21 | exhibit.

22 |          MR. MILLER:  That's right.  Thank you.

23 | A    Yes, I found it.

24 | Q    Yeah.  So this public fund survey identifies

25 | approximately 126 public pension funds, correct?

 1  A     Yeah, exactly 126.

 2  Q     Okay.  And there is a -- a vertical column entitled

 3  investment return assumption.  Do you see that column?

 4  A     Yes.

 5  Q     And consistent with your previous testimony, the

 6  percentages that are shown in that column under investment

 7  return assumption, those would be the same percentages that

 8  these pension plans would use to apply as a discount rate to

 9  value the pension plans' liabilities, correct?

10  A     Well, you said for funding and contributions before.  But

11  yeah, there could be some minor exceptions here and there like

12  I mentioned New York does for disclosure, but yes.

13  Q     But for funding and contribution purposes these same

14  percentages that you see is the investment return assumption

15  are also used by these plans as the discount rate to value

16  liabilities for funding?

17  A     Yeah, that's the pretty much universal practice.

18  Q     Okay.  Now none of the governmental entities that are

19  listed in this public plan survey have filed for Chapter 9,

20  correct?

21  A     They're states.

22  Q     Right.

23  A     And states I don't believe are eligible to file for

24  Chapter 9.

25  Q     And I believe if we move to additional pages there may be

1   some other entities beyond states.  Even on Page 1.

2   A    Yes.

3   Q    Such as L.A. County.

4   A    Yeah.  There are a few cities here and counties.

5   Q    And San Francisco, right.

6   A    Yeah.  I guess Chapter 9 is eligible in California.  But

7   no, the answer to your question is none of them have filed for

8   Chapter 9 and perhaps a few of them could.  But I don't think

9   very many of them could.

10  Q    Right.  And -- and therefore these investment return

11  assumptions and discount rates that are shown on this survey

12  are largely if not exclusively to develop funding and

13  contribution policies, correct?

14  A    Yes.

15  Q    I now want to turn to the issue of pension restoration.

16  You had testified with Mr. Wagner briefly about pension

17  restoration.  So I assume you're generally familiar with the

18  pension restoration program that's part of the pension

19  settlement?

20  A    Yes.

21  Q    Okay.  And under that program retirees will receive

22  pension restoration if the funding levels in the retirement

23  systems exceed a certain percentage in the future, correct?

24  A    Yes.

25  Q    Okay.  And whether these funding level percentages are

1 achieved depends on several factors, correct?

2 A    Yes.

3 Q    And one factor is the investment returns, actual

4 investment returns in the future, correct?

5 A    Yeah, that's the biggest factor.

6 Q    But another factor may be mortality, correct?

7 A    Yes.

8 Q    Okay.  So if Detroit PFRS and GRS retirees outlive their

9 expected mortality that would mean that GRS and PFRS would pay

10 out more in assets than expected, correct?

11 A    That would be pretty trivial because most of these people

12 will live for the next ten years.  So I can't see how having a

13 few extra people live for ten years has a material impact on

14 the -- on the restoration.

15 Q    What's your understanding of the term of the pension

16 restoration program under the plan of adjustment?

17 A    I don't recall.  But it's -- I'm sure it's longer than

18 ten years.  But -- but even so, you know, just -- you just

19 don't get that much mortality in -- in -- now the more likely

20 case I suppose is if the actuary changes the assumptions.

21     If national trends cause them to believe people are going

22 to continue to live even longer.  That would hurt the

23 restoration.

24 Q    Correct.  By reducing the funding levels?

25 A    Correct.

1  Q    Do you know whether the terms of the pension restoration

2  program require the city to make any contributions

3  specifically for pension restoration?

4  A    No, I don't -- I don't know.  And I suspect they don't.

5  Because the whole point of restoration is that if things turn

6  out better than expected.

7  Q    Thank you.  Now I want to turn to the income

8  stabilization fund.  The income stabilization fund is part of

9  GRS and PFRS, correct?

10 A    I'm sorry.  The income stabilization fund.

11 Q    Right.

12 A    Well, yeah, it will be.

13 Q    Right.  Because you had previously testified with Mr.

14 Wagner about income stabilization fund and -- and taking into

15 account or not taking into account the income stabilization

16 fund and the recovery.  Do you remember that testimony?

17 A    Yeah, correct.  But you -- you asked the question is it

18 part of GRS.  I mean I don't believe it's in effect yet.

19 Q    Right.  But it will be in connection with the plan of

20 adjustment if confirmed, correct?

21 A    Yeah.  There will be assets given to GRS and PFRS.

22 Q    Right.  And do you know what the source of those assets

23 will be for the income stabilization fund?

24 A    It's related to a UTGO settlement.

25 Q    Okay.

 1  A    But precisely, no.

 2  Q    And are you aware whether the city included the amount to

 3  be used to pay for income stabilization from certain UTGO

 4  proceeds, do you -- are you aware whether the city included

 5  those amounts in calculating the dollar recovery on the Class

 6  10 and Class 11 claims?

 7  A    Yeah.  It appears that they did not.

 8  Q    Now I want to turn to ASF and annuity savings fund.  Do

 9  you know whether at the time the city filed for bankruptcy the

10  GRS system had filed a legal claim against any retiree seeking

11  reimbursement of ASF money previously paid to such retiree?

12  A    I don't know.

13  Q    Are you familiar with the annual reports that are

14  prepared by GRS trustees?  Have you reviewed any of those

15  reports?

16  A    You mean the CAFRs, the financial reports of the --

17  Q    Yes, I do.

18  A    Yes.

19  Q    Okay.  And do you know whether such reports list and

20  identify the various assets of the GRS trust?

21  A    They should, yeah.

22  Q    Are -- are you aware whether in any of its annual reports

23  GRS had identified as an asset of the GRS trust -- excuse me,

24  the value of claims to recover ASF payments from retirees?

25  A    I'm sorry, repeat the question.

1  Q    Sure, I'm sorry.  Are you aware whether in any of the GRS

2  annual reports, the GRS trustees had identified as an asset of

3  the trust the value of claims to recover ASF payments from

4  retirees?

5  A    No.

6  Q    Do you know whether at the time the city filed for

7  bankruptcy that GRS had filed any legal claim against any

8  active employee seeking to reduce the size of his or her ASF

9  account?

10 A    No.

11          MR. MILLER:  No further questions.

12          MR. MONTGOMERY:  May I approach the witness, Your

13 Honor?

14          THE COURT:  Yes, sir.

15 A    Thanks.

16          MR. MONTGOMERY:  May I approach?

17          THE COURT:  Yes.

18          MR. MILLER:  Your Honor, can I get a -- a book?

19          THE COURT:  Do you have one more?

20          MR. MONTGOMERY:  I'm sure I do.

21          THE COURT:  Otherwise we can let you have back one

22 of ours if necessary.  I think your associate has one.

23                    CROSS EXAMINATION

24 BY MR. MONTGOMERY:

25 Q    Good afternoon, Mr. Fornia.  Claude Montgomery.  I

1  believe we met at your deposition?

2  A    Yes.  Nice to see you.

3  Q    A few weeks ago.  I have a -- a few questions that will

4  try to clarify my understanding of your testimony today.  And

5  I'd like to start with the question of volatility.

6  A    Volatility?

7  Q    Yes, volatility of the plans.  Now, you're aware that

8  under the global settlement and the plan of adjustment the

9  city's responsible for the long term funding of the city's

10  defined benefit plans as adjusted on the POA, right?

11  A    Yes.

12  Q    Okay.  And you're aware that the POA targets GRS to be

13  70% funded following a ten year period from 2014 to 2023,

14  correct?

15  A    Repeat the question.

16  Q    A period to 2023, it's 70% funded is the target?

17  A    Yeah, that sounds about right, yeah.

18  Q    All right.  And in fact you told Mr. Miller that?

19  A    I told him that sounds about right, yeah.

20  Q    Okay.

21  A    And I believe it is.

22  Q    And that the plan of adjustment projects that GRS can

23  meet this target with an assumed investment rate or discount

24  rate of 6.75%, is that correct?

25  A    That the plan of adjustment -- I believe so.  I don't

1  recall precisely if it --

2  Q   Okay.  Now, in -- in your report did you suggest that the

3  city should be more aggressive in its planning for its ability

4  to achieve a higher rate of return under the plans?

5  A   I don't think I used the word should be aggressive.  The

6  point in my report was that you know maintaining the current

7  asset allocation which -- which the other actuaries believed

8  would return more than 6.75 is prudent.

9  Q   I think you said, did you not, sir, that Detroit does not

10  have a short term volatility problem because it's not making

11  contributions for the first ten years?

12  A   Exactly.

13  Q   Okay.  And that this means the City of Detroit actually

14  has a higher risk tolerance.  Did you say that in your report?

15  A   Something along those lines, yes.

16  Q   And do you believe that?

17  A   Absolutely.

18  Q   Okay.

19  A   I mean most -- most pension funds have to deal with

20  returns every year and it's -- it's ever racking.  They --

21  every -- every year they get their reports of what their

22  returns were and it changes the number and changes the budget.

23  Detroit doesn't have to worry about that.  They've got a fixed

24  contribution for ten years and they get to, you know, they get

25  to ride out highs and lows as long as they're within the ten

1  years.

2  Q     So they can be more aggressive in their planning?

3  A     They could.  I'm -- I'm not sure I'd recommend they

4  become more aggressive, but they could certainly be more

5  aggressive than -- they don't need to be more conservative

6  currently.

7  Q     In certain terms you want them to assume a higher

8  interest rate, correct?

9  A     I want them -- I -- I believe it's prudent to continue to

10 assert the interest rate that's being assumed now.

11 Q     For simple questions I'd like you to give me a simple

12 answer.

13 A     Okay.  Give me the simple question then, please.

14 Q     Okay.  You want the city to be more aggressive in its

15 interest rate assumptions, is that not correct?

16 A     More aggressive than 6.75?

17 Q     Yes, sir.

18 A     Yes.

19 Q     Thank you.  Okay.  Now you studied the returns for the

20 systems for 15 and 25 year periods prior to 2013, is that

21 correct?

22 A     Yes.

23 Q     Okay.  Now if you just think about what's happened in

24 this century 2000 and forward, am I not correct that the GRS

25 pension plans have either lost money or made less than 1% for

1  five different years in this century?

2  A    I'm sorry, repeat that please.

3  Q    Sure.  Am I not correct, sir, that in this century the

4  GRS plan has either lost money --

5  A    Okay.

6  Q    -- or made less than 1% in five out of the 14 years of

7  this century, is that correct?

8  A    It may be correct.  I don't have the numbers at my

9  fingertips.

10  Q    Should we look at your report to see?

11  A    It's up to you.

12  Q    Okay.  Can we look at Exhibit 1017?  Have you seen this

13  document?  I'll wait for you to get to it.

14  A    Yes, yes.

15  Q    That should be in your book.  Have you seen this before?

16  A    Yes, I have.

17  Q    In fact you actually relied on it, didn't you?

18  A    I did.

19  Q    Okay.  So if we look at the year 2000 for GRS that's on

20  the left hand side, the third column from the -- from the --

21  from the left.  You'll see that in year 2000 the general

22  retirement system lost 0.8%?

23  A    You're --- yeah, you're counting that as this century?

24  Q    Yeah.

25  A    Because actually that was last century but --

 1 | Q     Oh, okay.

 2 | A     But that's fine, yeah, sure.

 3 | Q     So --

 4 |          THE COURT:  He's right.

 5 |          MR. MONTGOMERY:  He's right?

 6 |          MR. WAGNER:  Your Honor, we certainly agree with

 7 | that.

 8 | A     And some people actually think the entire year 2000 was

 9 | the last century, but I don't care.  But yeah, clearly you can

10 | see there's the very very volatile returns here.

11 | Q     So if you bear with my inaccurate proposition as to when

12 | life began, the year 2000 being the first year, it lost money,

13 | correct?

14 | A     Yes.

15 | Q     And it lost money again 2001?

16 | A     Yes.

17 | Q     And it lost money again in 2002?

18 | A     Yes.

19 | Q     Okay.  And then it lost a lot of money in 2008?

20 | A     You got it.

21 | Q     And then it made less than 1% in 2011?

22 | A     Yes.

23 | Q     Now something very similar happened in PFRS, did it not?

24 | A     Yes, it looks like it.

25 | Q     So in the year 2000 the pension plan lost money?

1  A    Yes.

2  Q    And it lost money in 2001?

3  A    Yes.

4  Q    And it lost money in 2002?

5  A    Yes.

6  Q    And it lost money in 2008?

7  A    Yes.

8  Q    And it lost money in 2011?

9  A    Yes.

10  Q    So about a third of the time in this century the pension

11  plans have been losing money or making less than 1%, is that

12  correct?

13  A    That's exactly why you want to have a long time.

14  Q    All right.  So that's -- but that shows does it not a

15  certain amount of volatility in the returns that face the City

16  of Detroit, is that correct?

17  A    Yes.

18  Q    Okay.

19  A    Especially short term volatility.

20  Q    Okay.  And am I correct that you agree that a

21  governmental entity in financial difficulties will generally

22  be -- generally be less able to assume the risk of investment

23  loss than an entity that is financially strong?

24  A    Less risk of an investment loss?

25  Q    Yeah.

1  A    Yeah.

2  Q    Do you agree that a governmental entity in financial

3  difficulties will be generally less able to assume the risk of

4  investment loss than an entity that is financially strong?

5  A    Yes, of course.

6  Q    Okay.  In fact it's obvious?

7  A    Right.

8  Q    Sir, do you agree that a plan with a higher investment

9  rate of return assumption will necessarily be weighted in

10 asset classes that increase investment return volatility?

11 A    Generally they should go hand in hand.  When setting the

12 asset allocation, or setting the assumed rate of return, you

13 should consider the other factors so, yes.

14 Q    So higher investment -- higher assumed investment rate of

15 return generally leads to higher volatility?

16 A    I wouldn't say leads to, but there -- there -- ideally

17 they're formulated together.  In other words you -- you pick

18 an investment return that matches your asset allocation and

19 you pick an asset allocation that matches your investment

20 return.  There -- there -- one doesn't lead to the other.

21 Q    Okay.  Is it true that a pension plan that has a high

22 investment return assumption will necessarily be weighted in

23 asset classes that increase its volatility?

24 A    It -- it should -- it should be that's the whole idea.

25 The higher the expected return, you know, risk --

1          THE COURT:  Is your answer yes?

2   A    Can you repeat the question, please?

3   Q    Yes.  My question to you, sir, was do you agree that a

4   pension plan that has a high investment return assumption will

5   necessarily be weighted I asset classes that increase its

6   volatility?

7   A    With the word necessarily in there, I think that's way

8   too strong.

9   Q    Could you look at your deposition, please?  And if you'd

10  turn to Page 112.  Do you have your deposition there?

11  A    I think so.

12  Q    If you don't have it in your book, let me give it to you.

13  A    I said I -- I do think so.

14  Q    Okay.  And if you can turn to Page 112 of your

15  deposition.  And are you there?  And would you look at Lines

16  12 through 17 on Page 112 and can you tell me if you remember

17  being asked the question, a pension plan that has a high

18  investment return assumption will necessarily be weighted in

19  asset classes that increase its volatility, correct?  And you

20  answered, it should be yes.  Yeah, they go hand in hand.  Were

21  you asked that question and did you give that answer?

22  A    Exactly.

23  Q    Okay.  And you also agree that if a plan is heavily

24  invested in asset classes with high volatility there's a

25  greater risk that the plan will incur an investment loss?

1   A     Certainly.

2   Q     Okay.  I'd like to switch gears if you would and turn

3   your focus to ASF.  In your testimony today, I believe you've

4   indicated to the Court that in your view the allowed claim

5   should be reduced by $387,000,000 on account of your

6   understanding of the city's position with respect to excess

7   interest, am I correct?

8   A     Well, I did the calculations and the city's statements

9   indicate that it is improper use of money.  That's really a

10  legal decision.

11  Q     Oh, so you are not testifying that it should happen,

12  you're just saying what the math is?

13  A     Yeah.  If -- if the -- if the excess interest on the

14  asset should not be included as a pension benefit, then I'm

15  taking it out of the claim too.

16  Q     Okay.  When you say it should not be included as a

17  pension benefit, are you talking about a defined contribution

18  then?

19  A     I'm talking about either.  I mean it's -- some of them

20  have been converted to annuities, some of them have been paid

21  out.

22  Q     Well, let's focus on these GRS.  You're aware that the

23  contributions are taken from employee paychecks for ASF, is

24  that correct?

25  A     Yeah.  My analysis is it's not a contribution, okay.

1  Q    And first is that correct?

2  A    Yes, it is.

3  Q    Okay.  And that it's maintained in the form of individual

4  accounts at GRS, is that correct?

5  A    Well, it's accounted for as if it were individual

6  accounts, yes.

7  Q    In individual names and individual accounts, is that

8  correct?

9  A    Yeah.  From an accounting purpose, yes.

10 Q    Okay.  And from the employee's perspective as well, sir,

11 is that also not correct?

12 A    I didn't analyze the employee's perspective.

13 Q    Now you believe that the claim should be reduced by the

14 amount of the alleged excess interest, is that correct?

15 A    I made calculations assuming that it is, yes.

16 Q    Okay.  Now --

17 A    Based on my reading of the -- of the city's plan of

18 adjustment.

19 Q    But you're opining to the Court that it should be

20 removed?

21 A    If the ASF excess interest as the city said was an

22 improper calculation, then it doesn't make sense to me why it

23 would also be considered claim.

24 Q    So if there were no legal basis for recouping ASF, you

25 would be indifferent as to whether or not it was inner and not

1 out of the claim, is that correct?

2 A    I'm sorry, repeat that please.

3 Q    Sure.  Assume for the moment there was no legal basis for

4 ASF.

5 A    For recoupment or for ASF?

6 Q    For ASF recoupment.  Just assume for the moment.

7 A    Okay.

8 Q    If that is a valid assumption, then the claim would not

9 be reduced by $387,000,000 in your analysis, is that correct?

10 A    I guess I -- I'm not a lawyer and I don't know exactly

11 how the interplay between recoupment -- recoupment litigation

12 and the claim is.

13 Q    Well, sir, you -- you're going to have to help me since

14 you're the one who said in your testimony that the claim

15 should be reduced.  So I'm asking you a simple question.

16 A    Yes.

17 Q    Assume for the moment that there is no legal basis for

18 the city to undertake ASF recoupment, just assume it.

19 A    Okay.

20 Q    Working with that assumption, does that change your

21 opinion as to whether or not the $387,000,000 would be removed

22 from the claim?

23 A    Okay.  If -- if the individual --

24 Q    That's a yes or a no, sir.

25 A    Then you have to repeat the question because I am not a

1  lawyer.

2  Q     I understand.

3  A     And I don't understand this idea about a legal basis.  I

4  mean what does that mean a legal basis?

5  Q     Okay.

6  A     I mean --

7  Q     What's a claim, sir?

8  A     A claim is what somebody owes somebody else.

9  Q     All right.  Does that -- is it something that has a legal

10  basis?

11  A     You tell me.  I would assume so.

12  Q     All right.  I think we're going to go to a different line

13  of questioning, sir.  In your mathematics, you both removed

14  $387,000,000 from the claim and added money to recovery, did

15  you not?

16          MR. MILLER:  Objection to form.  Do you mean added

17  with respect to ASF?  Does --

18  Q     Do you understand my question, sir?

19  A     Well, I -- I agree that I subtracted 387,000,000.  What

20  did I add to recovery on -- with respect to ASF excess

21  interest?

22  Q     Okay.  Do you recall -- do you have recall in your charts

23  something called 7.5% excess interest on the right hand side

24  of one of your exhibits?

25  A     Yeah, that's -- that's restoration.

1  Q    Right, okay.

2  A    That's a different excess interest, yes.

3  Q    And -- and it just happens to be 7 1/2% of $387,000,000

4  that appears in that column, is that correct, sir?

5  A    That would be a complete coincidence.

6  Q    A complete coincidence?

7  A    Yes.

8  Q    Okay.  And so if we did the math and we discovered that

9  your so-called restoration number was just 7 1/2% of the ASF

10 number, that would be complete coincidence?

11 A    Yes.

12 Q    All right.  But sir, you will recall that you told Mr.

13 Miller you weren't sure whether or not ASF was a claim

14 reduction or an asset issue, did you not?

15 A    I'm sorry, repeat the question, please.

16 Q    Did you not tell Mr. Miller that you were uncertain as to

17 whether or not ASF was a claim issue or an asset issue?

18 A    I don't recall using those words or -- you mean today

19 or --

20 Q    Yes, today.

21 A    I don't recall exactly what you're -- what that question

22 was and what I replied.

23 Q    Okay.

24 A    A claim issue or an asset issue?

25 Q    Yes.  That you were uncertain as to whether it should be

1  a claim issue or an asset issue.  Do you recall --

2  A    Yeah, I -- I don't remember those words at all.

3  Q    All right, all right.  We will find out what the record

4  says at the end.

5  A    Yeah, I'd be -- I'd be happy to clarify.

6  Q    Now, sir, I think you told Mr. Miller that you weren't

7  aware of any legal actions relating to ASF, is that correct?

8  A    Yes.

9  Q    And you're therefore not aware of any judgments in favor

10  of the city with respect to ASF recoupment, is that also

11  correct?

12  A    It's correct I'm not aware of any judgments, yes.

13  Q    Okay.  And you -- I believe you told Mr. Miller, and I

14  just want to confirm that, that ASF recoupment is not listed

15  as an asset of the GRS pension plan, is that correct?

16  A    It's correct that I'm not familiar that it's listed as an

17  asset.  And I suspect it's not.

18  Q    Well, you've actually read the valuations did you not?

19  A    I've read the actuarial valuations.

20  Q    Yes.  And there is no indication in the June 30, 2013

21  valuation that a claim for ASF recoupment is an asset?

22  A    No.  I certainly didn't see one that would surprise me if

23  there were one.

24  Q    And you've read the audit reports for GRS, have you not?

25  A    Yeah, same answer.  I didn't see one and I'd be surprised

1 | if there was one.

2 | Q    Thank you.  I'm doing my best not to repeat questions

3 | that Mr. Miller has -- has asked.  Now, sir, you indicated

4 | that you thought that use of the risk free rate resulted in a

5 | logical fallacy.  Did I understand that correctly?

6 | A    Yes.

7 | Q    Okay.  Now, sir, that you agree that one way to eliminate

8 | a plan's under funding calculated a given discount rate is to

9 | reduce benefits, is that correct?  Is that one way of doing

10 | it?

11 | A    Certainly.

12 | Q    And another way is to increase plan sponsor

13 | contributions, is that correct?

14 | A    Well, in -- in the long run that would -- that would

15 | reduce the end fund liability, yes.

16 | Q    And the third way is earn more on existing or future

17 | asset fund balances, is that also correct?

18 | A    Yeah, in the -- in the long run that would work too, yes.

19 | Q    And do you agree that if a hypothetical plan sponsor

20 | appears to have a fully funded defined pension -- pension plan

21 | based on expected asset returns and benefit cuts, the plan

22 | sponsor simply stops contributing, is that correct?

23 | A    Well, not if it's an ongoing plan.

24 | Q    Well, in my hypothetical a plan sponsor believes that the

25 | plan is fully funded based upon expected asset returns and

```
 1  benefit cuts two of the three methods of --

 2  A     Right.

 3  Q     Okay.  Under that scenario, a plan sponsor would simply

 4  stop contributing to the plan?

 5  A     Only if they've frozen the plan, there's no more benefits

 6  accruing.

 7  Q     Sir, I asked you to assume that the plan was fully

 8  funded.

 9  A     Right.

10  Q     And that based on the combination of expected asset

11  returns and benefit cuts.

12  A     Yeah.  Well, fully funded means you're caught up for

13  today.

14  Q     Okay.

15  A     And if you continue to provide benefits after that point

16  you need to continue to fund to maintain fully funded.

17  Q     You'd have to add normal costs, correct?

18  A     Essentially yes, yes.

19  Q     But with respect to the historical liabilities for

20  retirees and for employees already accrued to date, you would

21  simply stop funding?

22  A     Yeah.  You would have no -- you'd have no funding of an

23  unfunded liability because there would be no unfunded

24  liability.

25  Q     And that's true no matter what interest rate you assume,
```

1  is that also not correct?

2  A    Well, if you assume a different interest rate then all of

3  a sudden you would have either a surplus or unfunded

4  liability.

5  Q    If you assume that the plan is fully funded at 6.75%.

6  A    Yes.

7  Q    Then you would stop making contributions except for

8  normal costs, is that correct?

9  A    Correct.

10  Q    Okay.  And if you had a claim, an unfunded liability,

11  calculated at 6.75%, you would have to amortize that

12  liability, is that correct?

13  A    Well, unless you -- unless you didn't pay the claim. I

14  mean it --

15  Q    Or you reduced benefits?

16  A    Correct.  Unless you reduced benefits to the -- yes,

17  exactly.

18  Q    So now let's assume that you're using a risk free rate.

19  A    Right.

20  Q    Same thing happens, doesn't it?  You either are fully

21  funded and you don't pay any more, or you're under funded and

22  you either assume increase rates of return on your assets, or

23  you have higher benefit cuts, isn't that the way you solved

24  the math?

25  A    If you were to fund on the risk free rate, yes.

1  Q    Okay.  So if you have a claim that's based on the

2  methodology of a risk free rate, somebody has to fund on that

3  risk free rate either the marketplace does, the employees have

4  to give up benefit cuts, or the city has to make

5  contributions, is that not correct?

6  A    Explain what you mean by either the marketplace does.

7  What do you mean by that?

8  Q    Investment returns, sir.

9  A    Okay.

10 Q    Is that basically the marketplace?

11 A    I'm sorry?

12 Q    Are not increased rates of return basically the

13 marketplace making contributions to the plans?  Isn't that

14 basically what's happening?

15 A    Okay.

16          MR. WAGNER:  Objection to form.

17          THE COURT:  Overruled.  Please answer the question,

18 sir.

19 A    Okay.  Isn't the marketplace, I mean the -- I don't

20 understand what you mean by the -- I mean --

21 Q    What's a market rate of return?

22 A    A market rate of return is what the -- what -- is the

23 fair rate of a given asset.

24          THE COURT:  Counsel wants to know when -- whether

25 when the market pays a rate of return that contributes to the

1 pension plan and to the pension plan's ability to meet its

2 obligations to pensioners?

3 A    Well, of course it does.

4 Q    Thank you.  Now, sir, you have testified to the Court

5 that it is your judgment that the claims are being funded in

6 excess of 100%.  Do I understand that to be your fundamental

7 testimony?

8 A    The -- the -- the recovery calculation based on what I

9 believe the proper claim amount is, generates numbers that

10 exceed 100% in some cases, yes.

11 Q    Okay.  And you believe that you can tell the Court that

12 claim was being funded more than 100% even though there are

13 benefit cuts, is that correct?

14 A    Yeah, under these certain scenarios, yes.

15 Q    Okay.  And even though their active employees have lost

16 the right to earn future salary, or to earn future accruals,

17 is that correct?

18 A    Those are being paid for by the hybrid plan.

19 Q    No.  I'm asking you is it not correct that with respect

20 to the existing defined benefit pension plan, employees are

21 losing benefits through the freeze?

22 A    They're losing benefits that have not yet accrued.

23 Q    But they are losing promised benefits under the plan, is

24 that not correct?

25 A    But when you say promised benefit under the plan, you

1  mean benefits under the pension plan?

2  Q    Yes, sir.

3  A    Yeah.  They're -- they're losing benefits that they would

4  have expected to earn in the future under the pension plan.

5  Q    Yeah, and notwithstanding that you believe that the plans

6  can be regarded as being funded in excess of 100%?

7  A    Well, some of my numbers exceed 100%.

8  Q    Okay.  Now, sir, it's also true that retirees are losing

9  their annual escalator, is that correct?

10  A    The police and fire are losing about half of their

11  escalator and the general retirement systems are losing all of

12  their escalator unless it's restored.

13  Q    Okay.  And is it not true that if restoration doesn't

14  occur in year one, any annual escalations lost in year one are

15  gone forever?

16  A    That sounds right.

17  Q    And that's true in year two, is that correct?

18  A    Yes.

19  Q    And so on?

20  A    Correct.

21  Q    Just a couple of questions that sort of amplify the

22  Court's record generally.  You indicated that the entry age

23  normal method was a projected benefit method, cost method, did

24  I understand that correctly?

25  A    Yes, exactly.  Okay.

1  Q    And is that also not true for the projected unit credit

2  cost method?

3  A    Correct.

4  Q    And is the projected unit credit cost method also known

5  as the projected unit cost method?

6  A    Say that again?  I don't think so, but say that --

7  Q    PUC is the projected unit credit cost method also known

8  as PUC?

9  A    Right.

10 Q    Okay.

11 A    Yeah, PUC, projected unit cost.

12 Q    And the projected value of future accrued benefits is

13 also a projected benefit methodology, is that correct?

14 A    Again, I had never heard of that method before.  Based on

15 what I read from your expert yes, it seems to be a projected

16 benefit cost method.  And it seems to be the same as PUC.

17 Q    Okay.  Thank you.  And PUC is a pretty standard

18 methodology, is that correct?

19 A    Well, it's the second most common method behind entry

20 age.  In the corporate world it's very common.  Public

21 pensions it's much less common.

22 Q    So the second most common sounds pretty standard.

23 A    No.  I mean -- no, 90% of them use entry age.

24 Q    No?

25 A    And maybe 10 -- or maybe more like 80/20.

1  Q     Well, hang on a second.  Could you bring up Exhibit 10998

2  which is your pension terminology exhibit attached to your

3  report?

4  A     I see it.

5  Q     Okay.  And could you turn to the definition of projected

6  unit credit or PUC funding method?

7  A     Yes.

8  Q     Could you read that first sentence, please?

9  A     Yes.  It's the standard actuarial funding method but it's

10 for corporate plans.

11 Q     Thank you.  Now in your report -- let me start at the

12 beginning.  What is an ASOP?

13 A     An actuarial standard of practice.

14 Q     And are you familiar with ASOP 27?

15 A     Yes.

16 Q     And are you familiar with ASOP 4?

17 A     Yes.

18 Q     And did you cite and rely on both -- both of those in

19 your report?

20 A     Yes.

21 Q     Okay.  Could you turn to Exhibit 10995 for

22 identification, please?

23 A     Found it, yes.

24 Q     And is that the version of ASOP 27 that you attached to

25 your report?

1  A    Yes.

2       (Committee Exhibit 10995 was identified)

3  Q    And upon which you relied?

4  A    Yes.  There's -- there's two versions, yes.

5  Q    But is -- okay.  Is this the one that was attached to

6  your report?

7  A    This is probably the one that was attached to my report.

8            MR. MONTGOMERY:  Okay.  I'd like to move that into

9  evidence, Your Honor.

10           MR. WAGNER:  No objection.

11           MR. MONTGOMERY:  Okay.

12           THE COURT:  It is admitted.

13      (Committee Exhibit 10995 was admitted)

14  Q    Now, sir, is it true that in the event of a conflict

15  between ASOP 27 and ASOP 4 under the actuarial standards of

16  practice ASOP 4 governs?

17  A    That -- that could be, I don't recall.

18  Q    Okay.  Could you look at 10995 again on Page 9?  And go

19  to the last paragraph on Page 9.  There it is next to the last

20  paragraph.  And is it not correct that ASOP 27 says, to the

21  extent that the guidance in this standard may conflict with

22  ASOP numbers 4 or 6?  ASOP numbers 4 or 6 will govern?

23  A    Yes, it does.

24  Q    Okay.  Now is it not correct that ASOP 4 permits a

25  governmental entity to set a discount rate as a prescribed

1  assumption?

2  A    Wouldn't surprise me.  That sounds -- makes sense.

3  Q    If you could bring up Exhibit 10995 again and go to the

4  section -- strike that.  Yeah, Exhibit 10995, the internet

5  version of ASOP 4.

6         MR. WAGNER:  I'm sorry, 10996.

7         MR. MONTGOMERY:  That is correct.  My apologies.

8  For the record, I've asked the electronic display to show

9  Exhibit 10996.

10  Q    Have you seen this ASOP 4, sir?

11  A    Yes, I have.

12  Q    And is this the most recent ASOP 4?

13  A    Yes.

14     (Committee Exhibit 10996 was identified)

15  Q    And you can tell that because it says December 2013 on

16  the front page?

17  A    Correct.

18         MR. MONTGOMERY:  Okay.  And I would like to move

19  into evidence ASOP 4 in the form of Committee Exhibit 10996.

20         MR. WAGNER:  That's fine.  No objection.

21         THE COURT:  It is admitted.

22     (Committee Exhibit 10996 was admitted)

23         MR. MONTGOMERY:  Thank you.

24  Q    Now, is it not correct, sir, that even as to ASOP 4 that

25  it explicitly permits a governmental entity to set a discount

1  rate as a prescribed assumption?

2  A    I think it defines what prescribed assumption is.  It

3  doesn't permit the entry to do it.  They have no governance

4  over what an entity does.

5  Q    Could you turn to Section 220 on Page 11 of Exhibit

6  10996?

7  A    Yes.

8  Q    And -- and if you could read that for the Court, please,

9  that would be appreciated.

10  A    Yes.  This is a definition of prescribed method.  And a

11  prescribed method is a specific assumption or method that's

12  selected by another party to the extent that the law,

13  regulation, or accounting standards, gives the other party

14  responsibility for selecting such an assumption or method.

15  For this purpose an assumption or method set by a governmental

16  entity for a plan that such governmental entity or a political

17  subdivision of that entity directly or indirectly sponsors is

18  deemed to be a prescribed method or methods set by another

19  party.

20  Q    Okay.  And is not the selection of a discount rate a

21  prescribed assumption, sir?

22  A    In -- in your case the -- since the city specified the

23  rate, that means it's a prescribed method.

24  Q    Okay.  Thank you.  And it's also true, is it not, that

25  under ASOP -- you can take that down.  Under ASOP 27 that if a

1  standard -- if a conflict exists between ASOP 27 as a standard

2  and applicable law, the actuary must comply with applicable

3  law?

4  A    Yes.

5  Q    Okay.  Now, sir, is it not correct that the City of

6  Detroit requires the use of the entry age normal method in

7  valuing its plans?

8  A    I don't recall.  It wouldn't surprise me, but I don't

9  know.

10  Q    If you would for a moment, I'd just like to again for

11  clarity of the record, understand what you include in this

12  definition of future benefits that should be excluded from the

13  claim computation.

14  A    Okay.

15  Q    Now, first you don't like the inclusion of accrued but

16  not yet vested benefits, is that correct?

17  A    Yeah, I don't know if I used the word don't like, but

18  yes, I pulled them out.

19  Q    You pulled them out.  And you've done so because you

20  believe that it's the correct thing to do?

21  A    I think that's up to the Court to decide.  But clearly

22  it's a -- it's a benefit that's not vested.  If that's part of

23  a claim, then it should be included.  If it's not part of the

24  claim, then I did the math to show how to exclude it.

25  Q    So you're not opining as to whether it is or is not part

1  of the claim?

2  A     Based on my reading of, you know, one paragraph

3  definition of claim, it doesn't seem like it belongs, but

4  you're the lawyers.

5  Q     And you're the one who is trying to help the Court?

6  A     Yes.

7  Q     Are you telling the Court that you should or should not

8  exclude accrued but not yet vested benefits from the

9  computation of the claim?

10 A     I'm telling you what an accrued but non-vested benefit

11 is.  It's a benefit that has not yet been vested.  They've

12 accrued it, there's a formula that shows what they have, but

13 they haven't performed the service to -- to be vested if that

14 needs to be -- if that -- if that -- if they're entitled to

15 that benefit, and it fits the definition of a claim, then

16 leave it in.  If they're not entitled to the benefit, then I

17 showed you how to take it out.

18 Q     Now does accrued but not yet vested benefit include an

19 employee's right to voluntary terminate employment and still

20 receive a pension at a deferred age?

21 A     Well, the benefit doesn't include the right.  Can you

22 repeat the question, please?

23 Q     Sure.  Does an accrued but not yet vested benefit

24 entitlement include the right of an employee to terminate his

25 employment and receive a pension at a later age?

1  A    I'm sorry.  Does an accrued right --

2  Q    Yes.

3  A    Include the --

4  Q    Does an accrued benefit include an employee's right to

5  voluntarily terminate and receive a pension at a later age?

6  A    Does an accrued benefit?  No.  A vested benefit does.  A

7  vested benefit means you have the right to terminate and

8  receive it at a later age.  If it's just accrued, but not yet

9  vested, you don't have the right to terminate and receive it

10  at a later age.

11  Q    Okay.  So what about an earlier retirement benefit, sir?

12  Is that an accrued but not yet vested right?

13  A    No.  Those are generally vested.  I didn't pull those out

14  in my non-vested calculation.

15  Q    So it would be perfectly appropriate then for the claim

16  computation to include projection of early retirements?

17  A    No.  I think I said the opposite.  I -- the only

18  non-vested benefit that I took out was benefits for people

19  that haven't met the vesting requirement, the eight year

20  vesting requirement.

21      There's also you can earn the ability to retire early.

22  And I didn't -- to pull that out.  I -- I suppose I could have

23  taken that out since people haven't yet earned it until they

24  reach that age.

25  Q    You didn't regard that as a future benefit that had not

1  yet been vested?

2  A    Correct.

3  Q    Okay.  So there are some future benefits that are capable

4  of being included but not all?

5  A    Yeah.  There's -- I'm sorry.  The -- but the technical

6  definition of vesting means eight years.  It doesn't -- I mean

7  in theory there is a -- a -- a parallel argument why an early

8  retirement benefit may not be vested yet.  But I did not make

9  an adjustment to take those out.

10       Similar to like COLA.  You know, there's places where

11  COLA has not been approved and I didn't take that out.

12  Q    So you picked and chose which future benefits to include

13  and which to exclude?

14  A    Well, all future benefits I exclude.  I -- there are

15  certain benefits that -- that -- that the rights have been

16  under dispute.  There is cases where plans have changed and

17  taken away certain things absent bankruptcy.

18       I didn't take all of those out.  You know, I -- but I

19  just -- I -- the obvious ones to me were future service,

20  future salary, and non-vested people.

21  Q    Did you make that judgment based on your understanding of

22  the law?

23  A    Well, my simple understanding.

24  Q    This is a yes or no.  Did I understand you to testify

25  that the word frozen in the pension context is not crisply

 1 | defined?

 2 | A    Correct.  I mean yes.

 3 |           THE COURT:  Thank you.

 4 | Q    Could we look at your Exhibit 1073 for just a moment?

 5 | This is your pie chart on the -- the allocation of where

 6 | retirees live, is that -- did I understand that correctly?

 7 | A    I think I --

 8 | Q    It's a very simple question.

 9 | A    I'm sorry.  Yes.

10 | Q    This doesn't include any actives, does it?

11 | A    I'm sorry?

12 | Q    This does not include any data regarding actives, does

13 | it?

14 | A    Correct.

15 | Q    Okay.  So whether actives live in or out of the City of

16 | Detroit is not being addressed by this demonstrative?

17 | A    Correct.

18 | Q    Oh, and one last question.  Did I understand it correctly

19 | that you told Mr. -- Mr. Wagner that Mr. Perry's use of the

20 | inflation rate of 2.5% was not out of line of the mainstream?

21 | A    It's -- it's at the borderline of the mainstream.  I

22 | don't remember my exact words.

23 |           MR. MONTGOMERY:  Okay.  No further questions, Your

24 | Honor.

25 |           MR. WAGNER:  Your Honor, just a -- just a couple of

1  questions.

2                    REDIRECT EXAMINATION

3  BY MR. WAGNER:

4  Q    Mr. Fornia, you were shown the Gabriel, Roeder, Smith

5  report for GRS for June 2013 indicating that the plan was an

6  ongoing plan at as of that time.  Does that have any impact on

7  your opinion?

8  A    Well, I think the important part of that was that this is

9  a report for funding of an ongoing plan, funding and

10 contributions of an ongoing plan.  But no, the -- the claim in

11 my opinion is based on a point.  It is based on the benefits

12 accrued at a point in time.

13      So whether the actuary is doing another independent

14 calculation to see what it costs if it's an ongoing plan, is

15 different than figuring out what the value of -- of what we

16 owe you is.

17 Q    You were also asked some questions about Mr. Perry's

18 report.  Do you remember the -- the median rate of return that

19 Mr. Perry selected for the two funds for the 30 year period?

20 A    Do I remember the number?

21 Q    Yes.

22 A    No, I don't off the top of my head.  It was a little bit

23 higher than the one that was for the -- for the shorter

24 period.

25 Q    Would it refresh your recollection if I told you it was a

 1 | range of 7.05 to 7.12?

 2 |          MR. MONTGOMERY:  Objection, Your Honor.

 3 |          MR. WAGNER:  I'm just asking whether it --

 4 |          THE COURT:  Hold on one second.  What is the

 5 | objection?

 6 |          MR. MONTGOMERY:  The objection is if he wants to

 7 | refresh the witness' recollection he should show him something

 8 | and inquire as opposed to telling him what the answer is.

 9 |          THE COURT:  It is a leading question.  The objection

10 | is sustained.

11 |          MR. WAGNER:  Okay.

12 | Q    You -- you were shown Exhibit 1017 which were the returns

13 | for GRS and PFRS and Mr. Montgomery picked out a -- a few

14 | years.  Does that have any impact on your opinion?

15 | A    Well, those years are certainly important, but I believe

16 | it's much more important to use an entire 25 year period.  You

17 | can -- in the 1990's I was getting the exact same questions

18 | from the other side, why aren't you using a 12% return, why

19 | aren't you using -- why are we making the cities put so much

20 | money in.

21 |     We've had, you know, five or six great years in a row.

22 | It doesn't seem appropriate to pick a period as short as ten

23 | or even 15 years.

24 |          MR. WAGNER:  Nothing further.

25 |          THE COURT:  Anything further for the witness?

1        MR. MONTGOMERY:  No, Your Honor.

2        MR. MILLER:  Yes, Your Honor, just a couple of brief

3   questions.

4                    RECROSS EXAMINATION

5   BY MR. MILLER:

6   Q    Can we pull up COPS Exhibit 1069 again?  Mr. Fornia, you

7   testified about the risk free rate and the recovery numerator

8   earlier this morning.  This demonstrative indicates a

9   calculation of a recovery numerator of 1.319 billion.  Do you

10  see that?

11  A    Yes.

12  Q    Can you unpack that number for me and explain its

13  elements?

14  A    It's in my expert report.  I need to refer to that to do

15  it.  I don't remember them off the top of my head.

16  Q    Can we pull up the expert report?

17  A    If you'd give me a minute I'll find the proper paragraph.

18  Okay.  It's Paragraph 39 which is on Page 16.

19  Q    And can you go through the math for the Court?

20  A    Sure.  So the -- so Nicholl in her report -- hang on a

21  second.  Okay.  So she had 3.871 as the actual value of the

22  claim and that's basically using this risk free rate.

23       And then in my hypothetical I said, you know, suppose

24  that -- and I just did police and fire.  That they were not

25  given any benefit cuts.  So Nicholl figured out that the value

1  of the reduction due to COLAs was six eighty-eight.  So that

2  means that if you put back in -- in other words in the real

3  world there was a six eighty-eight reduction in the plan of

4  adjustment, but in my hypothetical we -- we gave it back.  We

5  didn't give them a six eighty-eight reduction.

6      So the city contributions would basically have to be six

7  eighty-eight higher.  And there's a little bit of an interest

8  adjustment here.

9      And then she also had six eighty-one as the -- the

10  present value of the city contribution that she calculated.

11  So I said if you had no cuts then in addition that six

12  eighty-one, the city would have to fund another six eighty-

13  eight.  And that would -- that generates that 1,300,000,000 I

14  believe was the number that was on my slide which when you

15  divide -- so in other words the city would only be putting in

16  1,300,000,000 but yet the alleged claim is still 3.8 which

17  means -- which is the way we'd get to that 35% number.

18  Q    So the 3. -- the 1.319 when you back out the 6.88, leaves

19  approximately --

20  A    Six eighty-one.

21  Q    Six eighty-one.  And -- and that's the contributions that

22  will be made into the pension plan?

23  A    That's what Nicholl said the contribution would be under

24  her methodology, right.

25          MR. MILLER:  Okay, okay.  That's fine.  I have

1  nothing else, Your Honor.

2          THE COURT:  Anything further?

3          MR. WAGNER:  Nothing else, Your Honor.

4          THE COURT:  Sir, are you familiar with the acronym

5  UAAL?

6  A    Yes, Your Honor.

7          THE COURT:  What does that stand for?

8  A    Unfunded actuarial accrued liability.

9          THE COURT:  What does it mean?

10 A    It basically means the excess of the actual accrued

11 liability over the assets.  So it's kind of like a shortfall.

12         THE COURT:  Well, why do you say it's only kind of

13 like a shortfall?

14 A    Okay.  I'll give you that.  It's a shortfall.  It's how

15 much --

16         THE COURT:  It was a question, sir, not an argument.

17 A    No, I appreciate it, Your Honor.  It's a --

18         THE COURT:  What is the total UAAL of all municipal

19 plans in this country?

20 A    I don't recall.  It's probably pushing a

21 $1,000,000,000,000.

22         THE COURT:  Do you have --

23 A    Well, probably not that high.  But again I don't recall.

24         THE COURT:  Do you have an opinion on what the

25 substantial contributing factors are to more than

1  1,000,000,000,000 or about $1,000,000,000,000 UAAL in this

2  country?

3  A    Yeah.  I mean it's basically, you know, a benefits -- the

4  contributions going in haven't funded the benefits being

5  promised.  And -- and in particular with, you know, bad

6  investment year five years ago.

7          THE COURT:  Uh-huh.

8  A    That's certainly part of the problem.

9          THE COURT:  Okay.  So if I heard you correctly,

10  correct me if I'm wrong, you've got two answers there.  One is

11  insufficient contributions by pension plan sponsors, and the

12  other is market rates of return that were other than the

13  assumed rates of return?

14  A    Yeah.  Recent market returns, yes.  Particularly in the

15  decade that Mr. Montgomery pointed out.

16          THE COURT:  Okay.  So was there a relatively

17  immaterial UAAL in this country a decade ago?

18  A    In 1999, I would say the number would be close to zero.

19          THE COURT:  Uh-huh.

20  A    If not flipped.  And -- and that's part of the problem is

21  that we had --

22          THE COURT:  Okay.  You've answered my question.

23  A    Thank you.

24          THE COURT:  Thank you.  Are you familiar with a

25  report called the Blinken report strengthening the security of

1  public sector defined benefit plans dated January of this

2  year?

3  A    Yes.

4        THE COURT:  What do you think of that report?

5  A    Well, I -- I -- I don't -- I mean I think the math is

6  right.  I -- I think it paints a much more pessimistic vision

7  of -- of public pensions than I think is -- is the real world.

8        THE COURT:  Uh-huh.  Okay.  There's a -- was there

9  something more to your answer?  Well, there's a specific

10  passage in that report that again I'd like to get your

11  reaction to.

12  A    Thank you.

13        THE COURT:  I'm going to actually hand it to you.

14  It happens to be -- to have been quoted in the expert report

15  of the Court's feasibility expert, Ms. Kopacz.  By the way,

16  have you seen that report?

17  A    Yes.

18        THE COURT:  Okay.  So I'm going to hand it to you.

19  It's Pages 145 and 146 for the record.  And just so we are all

20  on the same page, I'm actually going to read it also.

21  A    Thank you.

22        THE COURT:  So follow along with me.  Are you ready?

23  A    Yes.  Yes, Your Honor.

24        THE COURT:  This report states, it's a lengthy

25  quote, so bear with me.  And I will tell you when I'm done

1    reading.

2        "The problem begins with the measurement of liabilities

3    and the cost of funding them securely, for financial reporting

4    purposes.  The proper way to value future cash flows such as a

5    pension benefit -- such as pension benefit payments is with

6    discount rates that reflect the risk of the payments.

7        This is separate from the question of rate pension

8    funds -- the rate pension funds will earn on their

9    investments.  This bears repeating, the proper rate for -- for

10   valuing pension liabilities on financial statements is

11   separate from the question of what pension funds will earn on

12   their investments.

13       Different rates may be appropriate for valuing

14   liabilities than for assumed investment returns.  We recommend

15   later, that different rates be used,  The major significance

16   of valuing liabilities incorrectly is that it leads to

17   inadequate funding policies, and encourages the mistaken

18   belief that benefits can be greater, services can be greater,

19   or taxes lower while still funding benefits securely.  Because

20   pensions are promises that should be kept, and have

21   strong legal protections, they should be valued using discount

22   rates that reflect the riskiness of expected benefit payments.

23       Unfortunately, the longstanding practice for public

24   pension plans in the United States, developed before modern

25   financial theory, is to use the expected return on pension

1  fund assets to -- to value liabilities, even though there is

2  no logical connection between how much is owed to workers and

3  what assets will earn.

4      This practice is not used by public pension plans in

5  other countries, or by private plans in the United States, or

6  by economists or financial analysts valuing other cash flows.

7  Our nation's public pension plans stand virtually alone, and

8  recent accounting rule changes by the Governmental Accounting

9  Standards Board (GASB) have not addressed this properly.

10      Rates that reflect the expected risk of

11  benefit payments ordinarily are much lower than the rates

12  public pension funds use to value liabilities, and as a

13  result, public pension liabilities are underestimated by at

14  least 1,000,000,000,000 to $2,000,000,000,000 and the annual

15  costs of funding them securely are underestimated by at least

16  100,000,000,00 to $200,000,000,000".

17      What is your reaction to that, sir?

18  A    Yeah.  This is -- this is a big debate.  And in fact I

19  testified to the Government Accounting Standards Board as to,

20  you know, the appropriateness of -- of this issue.

21      And I -- I presented it at Wharton about five years ago

22  on this issue.  It's --

23          THE COURT:  What is your reaction to this?

24  A    My reaction is I -- I disagree.  I mean first of all --

25          THE COURT:  What is it you disagree with and why?

1   A    Okay.  These funds really are invested in -- public

2   pensions have a very -- public entities of all investors have

3   one of the longest time horizons.  And to pretend that they

4   can't invest in equities when -- when, you know, ads on TV are

5   encouraging me to invest in equities, to me just seems kind of

6   absurd.

7       A public pension, if any investor should be investing in

8   equities it's a public pension.  And if you are going to

9   invest in equities, then it doesn't make sense to overcharge

10  taxpayers in early years, pretending you're not going to

11  invest in equities and then undercharge them later.

12      And -- and particularly this debate is -- is -- has a lot

13  of implications on Wall Street and driving out public pensions

14  to -- to get individuals to do 401(k)'s.  Wall Street makes a

15  lot more money on 401(k)'s.  And if they can use this analysis

16  to undermine public pensions, they're going to make a lot of

17  money on 401(k)'s.

18      So there is lots and lots of organizations like this that

19  are really bashing public pensions and trying to get them

20  undermined.  And -- and with -- see because the end result is,

21  you could give the workers a 401(k) and now all of a sudden

22  magically they can earn 10 or 12% like in the nineties on

23  their investments because they can invest in equities.

24      So to not let a pension invest in equities, but to

25  pretend that individuals on their own can invest in equities,

1  to me is the exact wrong way to do it.  And this just -- this

2  is just one -- you know, this and their ilk are one major push

3  to undermine public pensions in my opinion.

4          THE COURT:  What would your answer be to the around

5  $1,000,000,000,000 UAAL that you think exists, or the one --

6  the $2,000,000,000,000 UAAL that the authors here assert?

7  A    Yeah.  And just -- just to clarify.  They're -- they're

8  doing all public funds so my 1,000,000,000,000 is probably way

9  high because most of these plans are state not municipal.

10  Most of these liabilities are statewide plans, not municipal.

11  But either way there is --

12          THE COURT:  Yeah, and I failed to account for that

13  distinction.

14  A    Yeah.  But anyway, it's a big problem, don't get me

15  wrong.  One or two trillion dollars --

16          THE COURT:  And so what's the answer to it?

17  A    The answer is we need to fund more properly.  We need to

18  actually --

19          THE COURT:  We need to what?

20  A    We need to actually fund these plans.  I mean much of

21  this problem is the fact there is New Jerseys and Illinois,

22  and lots of places that just aren't funding the plans even at

23  this, you know, so-called optimistic rate.  So that's the

24  first step is to get everyone to fund at least as much as like

25  a Detroit has.

1    THE COURT: All right. Let's pause there. Do you

2  have an opinion on whether Detroit's UAAL, assuming there is

3  any, was caused by under funding, or under performing compared

4  to its assumed rate of returns?

5  A    I think it's -- it's both. But it's also ASF is probably

6  contributing a little bit. There's no -- no advanced funding

7  for anticipated ASF for example which probably should have

8  been there. I'm sorry, for anticipated excess interest on

9  ASF.

10    Certainly the bad years of investment return are a key

11  factor. So that -- in Detroit's case that's probably the

12  biggest factor.

13    THE COURT: Does the math work out that if these

14  funds had used a lower assumed rate of return, the city would

15  have been required to contribute more in these years and

16  therefore the UAAL would be lower now if the city had made

17  those payments?

18  A    Yeah, except for accounting for the big loss. I mean if

19  it -- the city would have had to contribute a lot more in --

20  in many many years. I'm not sure what that would have done in

21  the whole bankruptcy environment. And but yeah, in general if

22  you do contribute a lot more, your liability is going to be

23  less.

24    THE COURT: Well, but that contribution -- that

25  higher contribution would have been required if -- well, let

1 me ask instead of assert.

2     How does the math work?  If -- if there is a lower

3 assumed rate of return does the plan sponsor have to

4 contribute more in order to maintain steady state and maintain

5 the plan's obligations?

6 A    Yes, Your Honor.

7     THE COURT:  Do you agree with the proposition that

8 the -- the standard practices of the accounting of the

9 actuarial profession in recommending the rates of return that

10 it has, has been a substantial contributing factor in the

11 current UAAL for public pensions in this country?

12 A   Well, I -- I think only if you agree to the same thing in

13 1999.  That our conservatism was contributing to the over

14 funding.

15     THE COURT:  So the answer to my question is yes?

16 A    In the short run, yes.  In the last ten years, yes.

17     THE COURT:  Well, since you agree with that, I have

18 to ask you why I should rely on the standard practices of the

19 industry in determining whether the assumed rate of return in

20 this case is a reasonable rate of return.

21 A    You're valuing a claim now.  And -- and you're not --

22 you're not --

23     THE COURT:  I'm not valuing a claim.  I'm

24 determining whether to confirm a plan that imposes a 6.75

25 assumed rate of return for ten years.

1  A    It imposes that for purposes of the claim determination.

2  And -- and the claim is basically how much the city owes the

3  workers.

4      It's to how much the city owes the workers minus what the

5  pension fund is going to give the workers.  And so by minusing

6  what the pension fund is giving the workers at 6.75 instead of

7  7.5, 7.9, what -- what have you, it -- it creates what's --

8  what most actuaries would -- would expect to be an

9  overstatement of the claim.  And most pension funds think

10  they're going to earn more than 6.75.

11          THE COURT:  But they haven't been right in the last

12  ten years.

13  A    They haven't been right in the last ten years, but they

14  have been pretty right over the last 25, 30 years.  That's the

15  problem.  We -- we'll know by --

16          THE COURT:  So the issue is horizon?

17  A    I'm sorry.

18          THE COURT:  The issue is the time horizon.

19  A    Exactly.

20          THE COURT:  Okay.  That's all I have.  Any further

21  questions?

22          MR. WAGNER:  I have a few.

23          THE COURT:  Go ahead, sir.

24                  REDIRECT EXAMINATION

25  BY MR. WAGNER:

1  Q    Mr. Fornia, thanks for your patience today -- this

2  morning.  I just have a couple of questions occasioned by Your

3  Honor's questions.

4          THE COURT:  Sure, go ahead.

5  Q    In terms of the UAAL, is one factor, is one based on the

6  level of benefits that are provided under the plans?

7  A    Correct, under the pension plans.

8  Q    Okay.  Now, you were asked some questions about the

9  Blinken report.  What's been the reaction by the public

10 pension community to that report?

11 A    It's somewhat similar to mine.  I mean basically, you

12 know, this is one more of these reports that is, you know,

13 making public pensions look bad.

14 Q    And does the Blinken report elsewhere make clear that

15 what it's advocating is disclosure of a calculation -- the

16 risk free rate calculation should be disclosed?

17 A    That's part of it.  I don't remember exactly all the

18 implications of it.

19 Q    And does -- I think this is implicit in some of your

20 questions.  Does -- but does the report have a bearing on the

21 calculation of a claim for purposes -- for bankruptcy purposes

22 or for purposes of an unfair discrimination analysis?

23 A    Yeah, I don't --

24          MR. MONTGOMERY:  Objection, leading.

25          THE COURT:  No, that's okay.  Go ahead, sir.

1  A    No, I don't believe it does.

2            MR. WAGNER:  Nothing further.

3            THE COURT:  You said the Blinken report is one more

4  of these reports that make public pensions look bad?

5  A    Yes.

6            THE COURT:  Can you cite to me one or two other such

7  reports?

8  A    Let's see.  Well, did you read Monday's *Wall Street*

9  *Journal*?  Or Sunday's *Wall Street Journal*?  Or, I'm sorry, *The*

10 *New York Times*?

11           THE COURT:  See this is where I -- I --

12 A    You missed a lot of good stuff.

13           THE COURT:  This is where I get to say, I ask the

14 questions, you give the answers.

15 A    Excuse me, Your Honor.  And I also want to apologize for

16 misusing the word court a while ago.  I didn't realize that

17 meant you.

18           THE COURT:  Well --

19 A    But that's your question.

20           THE COURT:  You mentioned Moody's this past Monday

21 there was an article?

22 A    I'm sorry.  Well, Moody's, there you go.  No you -- you -

23 - you --

24           THE COURT:  I'm asking you.

25 A    No, I mentioned the Sunday *New York Times*.

1          THE COURT:  Sunday -- this past Sunday?

2  A     Yeah, like three days ago.

3          THE COURT:  Okay.

4  A    Or I guess that would be two days ago, I'm not that good

5  at this kind of math.  The --

6          THE COURT:  Okay.

7  A    The lead article was on how wonderful the Dutch pension

8  system is because they followed the Blinken report model.

9          THE COURT:  Uh-huh, uh-huh.

10  A    Moody's has -- they -- there's a lot of backlash to GASB.

11  When GASB agreed --

12          THE COURT:  I'm just asking you to cite one or two

13  leading --

14  A     Okay.

15          THE COURT:  -- reports to me.

16  A    Moody's, Sunday *New York Times*.

17          THE COURT:  And do you know approximately the date

18  for this Moody's piece that you're thinking about?

19  A     If you Googled Moody's -- Moody's pension you'll probably

20  get a lot of hits.  The Wilshire report even is a little bit

21  like that that Alan Perry cited.  Not -- not quite as -- as --

22          THE COURT:  Okay.

23  A    As -- as low rate.  What else?

24          THE COURT:  But you've given me three, so that's

25  good.

1  A     Cal -- Cal Pensions is one of -- is a organization in

2  California that's trying to undermine the California pensions.

3  They will -- they will have a web site with lots of these

4  reports.

5          THE COURT:  Any further questions for the witness?

6  All right.  Sir, you are excused.

7      (WITNESS WILLIAM FORNIA WAS EXCUSED AT 11:59 A.M.)

8          THE COURT:  Are we done for today?  I guess so.  We

9  are going to try to put together our pro se day tomorrow and

10 let you know whether that's a go or a no go as soon as -- as

11 we can.

12         MR. MILLER:  You want to -- will we assume 8:30

13 tomorrow morning?

14         THE COURT:  Yes, yes.  If we go it will be at 8:30.

15 And we'll be in recess then.

16         THE CLERK:  All rise.  Court is adjourned.

17     (Court Adjourned at 12:00 p.m.)

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 10-18-14
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25