```
 1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3  IN THE MATTER OF,           Case No. 13-53846
                                Detroit, Michigan
 4  CITY OF DETROIT, MI         October 16, 2014
    _____/  9:30 a.m.
 5
        IN RE: CONTINUED TRIAL RE: OBJECTIONS TO CHAPTER 9 PLAN
 6            BEFORE THE HONORABLE STEVEN W. RHODES
           TRANSCRIPT ORDERED BY: SHANNON DEEBY, ESQ.
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  HEATHER LENNOX, ESQ.
 9                                Jones, Day
                                  222 East 41ˢᵗ Street
10                                New York, NY 10017-6702
                                  212-326-3939
11
                                  THOMAS CULLEN, ESQ.
12                                CORINNE BALL, ESQ.
                                  Jones, Day
13                                51 Louisiana Avenue, N.W.
                                  Washington, D.C. 20001
14                                202-879-3939

15  For MIDD:                     ALLAN BRILLIANT, ESQ.
                                  Dechert, LLP
16                                1095 Avenue of the Americas
                                  New York, NY 10036
17                                212-698-3500

18  For Financial Guaranty        EDWARD SOTO, ESQ.
    Insurance Company:            EDWARD MCCARTHY, ESQ.
19                                Weil, Gotshal & Manges
                                  1395 Brickell Avenue
20                                Suite 1200
                                  Miami, FL 33131
21                                305-577-3100

22                                ALFREDO PEREZ, ESQ.
                                  700 Louisiana Street
23                                Suite 1600
                                  Houston, TX 77002
24                                713-546-5000

25
```

```
 1│  For COPS:                    THOMAS MOERS MAYER, ESQ.
   │                              Kramer, Levin, Naftalis &
 2│                              Frankel
   │                              1177 Avenue of the Americas
 3│                              New York, NY 10036
   │                              212-715-9100
 4│
   │  For Merrill Lynch Capital    DARRIN KLEIN, ESQ.
 5│  Service Corporation:          Davis, Polk & Wardwell
   │                              450 Lexington Avenue
 6│                              New York, NY 10017
   │                              212-450-4000
 7│
   │  Court Recorder:              Letrice Calloway
 8│
   │  Transcriber:                 Deborah L. Kremlick
 9│

10│
   │  Proceedings recorded by electronic sound recording, transcript
11│  produced by transcription service.

12│

13│

14│

15│

16│

17│

18│

19│

20│

21│

22│

23│

24│

25│
```

1     (Court in Session)

2          THE CLERK:  All rise.  Court is in session.  You may

3   be seated.  Case number 13-53846, City of Detroit, Michigan.

4          THE COURT:  Before we begin, I received by email

5   this very incriminating photograph which I understand was

6   taken at 2:00 this morning.  Would someone like to explain

7   this to me?

8          A VOICE:  I think Mr. Orr should explain.

9          MS. LENNOX:  Actually it might have been even later

10  than that, Judge.  But that -- that is something that I

11  believe Ms. Ball will address this morning.

12         THE COURT:  I look forward to it.

13         MS. LENNOX:  For the record, Your Honor, Heather

14  Lennox of Jones, Day on behalf of the city.  We do have a

15  couple of very positive developments to report to Your Honor

16  this morning.

17     I will be presenting one and then I will turn the podium

18  over to Ms. Ball who will present the other.  The first is, I

19  would like to inform the Court that the city has resolved all

20  of its issues with the Macomb Interceptor Drain District with

21  respect to both its claim and its objection to the plan.

22     The settlement in brief is as follows.  We will be

23  allowing a claim for MIDD in the amount of $22,000,000 as a

24  Class 14 allowed claim.  This resolves the claim objections,

25  the ancillary motions that are pending, the motions for

1  summary judgment, et cetera, et cetera.

2      In exchange MIDD's objections to the plan and to

3  confirmation will be deemed withdraw with prejudice.  We have

4  already exchanged drafts of the stipulation to memorialize

5  this settlement.  We expect to file that stipulation today

6  under a notice of presentment.  We'd like folks to have a

7  couple of days to look at it.  And we would ask -- or ask Your

8  Honor to enter an order approving that stipulation on Monday.

9  So that is -- unless Mr. Brilliant wants to add to that.

10         MR. BRILLIANT:  Good morning, Your Honor.  Ms.

11  Lennox, you know, generally had it right.  I just wanted to --

12  I has a -- a few more details.

13      Obviously the -- you know, the settlement is -- is

14  subject to our entering into a mutually agreeable stipulation

15  which as Ms. Lennox said we're working on and we hope to have

16  finalized today.  And it's subject to Your Honor approving,

17  you know, the -- you know, the settlement, you know, and

18  allowing the claim in the amount of $22,000,000.

19      You know, we as part of this, Your Honor, we would as Ms.

20  Lennox said, we'd like Your Honor, you know, to enter an order

21  you know, shortening time and -- and approving a form of

22  notice, you know, for the stipulation so that we can get a --

23  a hearing that's consistent --

24         THE COURT:  Uh-huh.

25         MR. BRILLIANT:  -- you know, with the needs of the

1  confirmation hearing.

2        THE COURT:  Uh-huh.

3        MR. BRILLIANT:  Hopefully if that works for Your

4  Honor.

5        THE COURT:  That's fine.  I'm willing to do that.

6        MR. BRILLIANT:  All right.  And then -- and then the

7  lat thing, Your Honor, is we have agreed with the, you know --

8  you know, currently there's a summary judgment motion that's

9  been -- been filed.  MIDD's response is due on Wednesday and

10  you know, we've agreed to put that off until Friday with the

11  expectation, you know, being that hopefully it will all become

12  moot on Monday if and when Your Honor approves the settlement.

13        THE COURT:  Okay.

14        MR. BRILLIANT:  And I think, Your Honor, that's --

15  other than that Ms. Lennox accurately reflected our agreement.

16        THE COURT:  Okay.  Thank you.  And thanks to you and

17  everyone for your hard work in achieving this settlement.  And

18  please extend my special thanks and appreciation to Mr.

19  Morroco.

20        MR. BRILLIANT:  Will do, Your Honor.

21        MS. LENNOX:  So with that, Your Honor, I think I'll

22  turn the podium over to Ms. Ball for the big news of the day.

23        MS. BALL:  Good morning, Your Honor.  At least we

24  think it is.  We hope you will agree.

25        Corinne Ball of Jones, Day for the city.  First, I'd like

1 to thank you for your patience, if not your perseverance.

2      After hours and hours dedicated by your chief -- our

3 chief mediator and Judge Perris non-stop and Mr. Driker as

4 they together with our emergency manager Mr. Orr, helped

5 coalesce an intense effort on the part of the city through the

6 Mayor, his staff, the Detroit Economic Growth Corporation, the

7 State Development Authorities, FGIC, and in addition to FGIC,

8 Your Honor, the holders of 1.1 billion in certificates of

9 participation which were located and became part of the

10 resolution.

11      We are happy to report that we have been able to resolve

12 what has seemed like Detroit's very own version of the Gordian

13 knot, if not Groundhog Day between the COPS and the swaps.

14 But I think we now have it done.

15      And cutting through to the major features of the proposed

16 resolutions, Your Honor, first, the resolution will resolve

17 all objections on the part of the COPS and FGIC to the plan.

18      Second, Your Honor, it will resolve, we propose resolving

19 the invalidity suit on the COPS.

20      Third, Your Honor, we will have a Class 9 vote in favor

21 of the plan.

22      Fourth, Your Honor, we will have an enhanced return by

23 virtue of this settlement to the VEBA class, the LTGOs, and

24 the general unsecured creditors.

25      And lastly, Your Honor, and not to mean if not the most

1  important feature, we will be jointly launching, subject to

2  your approval, a significant investment in Detroit's future.

3  And with that, Your Honor, perhaps I could go into greater

4  detail.  I have a PowerPoint if you would like it.  May I

5  approach?

6        THE COURT:  Sure.  Thank you.

7        MS. BALL:  Now, Your Honor, turning to the first

8  page.  In terms of the structure of our settlement, there's

9  two primary features and a third which I will point out.

10    The COPS holders will be opting into Class 9 treatment.

11  The Class 9 treatment, Your Honor, remains the same as you

12  heard in our discussions with Syncora.

13    We will settle the COPS invalidity litigation through a

14  stipulation and entry into a JLA development agreement.  That

15  acronym, Your Honor, JLA certainly any hockey fan would know

16  what it is.  It's the Joe Louis Arena.

17    The third feature, Your Honor, also parallel to our

18  former adversaries now colleagues at Syncora, involves a

19  settlement of their swap related claims as well.  So Your

20  Honor will see there is a strong parallel development here.

21    Perhaps we should talk about a summary, moving on to the

22  next page, please, Steve, of the opt in of the FGIC COP

23  claims.  We would enter into, Your Honor, a stipulation with

24  seeking of course Your Honor's approval which would provide

25  for the following.

1    The objections as I mentioned to the plan will be

2  withdrawn.  As a technical point, Your Honor, without

3  prejudice should the plan not be confirmed, or should you not

4  approve this settlement, to FGIC to re-file them, but we're

5  very hopeful that that technicality will never be realized.

6    The FGIC COPS holders will opt into the plan COPS

7  settlement without impairing their insurance claims against

8  FGIC.  So that tense situation has been resolved.  FGIC is

9  letting their COPS holders opt in and the city's consideration

10  in Class 9 will reach the COPS holders who will also maintain

11  their insurance claims.

12    In accordance with the plan COPS settlement, FGIC shall

13  be deemed to vote in favor of the plan and Your Honor as I

14  said, the consideration will be handled and distributed

15  between FGIC and the COPS holders.

16    Your Honor, turning to some of the more technical

17  details, the plan shall be amended to revise the definition of

18  Class 9 eligible city assets.  If I may refresh your

19  recollection, Your Honor, the key features of Class 9

20  treatment were the B notes as to which you've heard a lot

21  which are the 30 year notes issued to various unsecured

22  classes.

23    The C notes, sometimes called the parking notes.  And the

24  third feature were settlement credits.  Your Honor may recall,

25  vouchers if you will should the city decide to sell an asset,

1 these settlement credits could be used as a cash equivalent

2 for 50% of the purchase price if the holder of the settlement

3 credit were the most successful bidder.

4 Those settlement credits could be exercised against a

5 concept called eligible city assets.  Your Honor, those

6 eligible city assets include any property within 3.1 mile

7 radius of the terminal, the tunnel terminus.

8 They also include the Joe Louis Arena originally.  And

9 included the RFP should the city proceed with it for its

10 parking assets.

11 We would amend that definition to remove the Joe Louis

12 Arena and to remove the Joe Louis garage as the Joe Louis

13 garage was scheduled for demolition together with the arena,

14 it neither affects the projections nor the strength of the

15 parking revenues supporting the C notes.

16 In addition the city believes it will discharge its

17 responsibility not to amend the plan of adjustment in a way

18 that would materially -- would materially adversely affect

19 Class 9 without the consent of FGIC.  Your Honor may recall we

20 have made a similar commitment to Syncora not to amend the

21 plan in a manner that's materially adverse.

22 The parties do acknowledge and this is absolutely

23 critical to the city, that timing is of the essence and before

24 we are done this morning, Your Honor, we would like to go

25 through what remains to be done and how we would sequence

1  those events or how you would like them sequenced.

2      Your Honor, on the invalidity litigation.  COPS

3  litigation is something I think has been described to you on

4  and off since almost a year ago, almost a year ago to the day,

5  not far off.

6      The city and FGIC will enter a 9019 settlement subject to

7  your approval which will provide for the dismissal of the COP

8  litigation.  FGIC will dismiss or cause to be dismissed all

9  counter claims filed in the COPS litigation.  FGIC shall waive

10  any claims it may have against any other party related to the

11  COP litigation.

12      And by that, Your Honor, I'm referring to many of the

13  described equitable claims that might reach, were they

14  successful, the retirement systems or other city related

15  parties, however, as between the COPS and FGIC on the one

16  hand, and the swap and counter parties, all their claims

17  remain unaffected.  So that they can hopefully at some point

18  in the future, ride off into the sunset happily or take their

19  dispute somewhere else.  We are not advancing that at all.

20      And more importantly for the city, the city will enter

21  into a development agreement with FGIC.  The settlement of the

22  FGIC COPS, Your Honor, this settlement relates to the COPS

23  that have been insured by FGIC.  That approximates 1.1 billion

24  of the outstanding 1.4 billion.

25      As part of that, Your Honor, the plan will reflect an

1  exculpation for FGIC.  The FGIC COP holders, and Wilmington

2  Trust which is the trustee for all trusts.  They will be

3  included as exculpated parties subject to certain carve outs.

4  Again, Your Honor, the carve outs are designed to comply with

5  law and to preserve this balance that we've tried to respect

6  as between the swap plan counter parties, the waterfall, and

7  the COPS.

8       The settlement is going to be available to and in fact

9  with -- to every COP claimant that opts in prior to the

10  effective date.  We understand that that 1.1 billion is

11  prepared to, and FGIC will work to cause them to opt in.

12      Your Honor, this if you haven't guessed, this does

13  portend an eighth amended plan.  As part of that eighth

14  amended plan, and in full satisfaction of FGIC's claims

15  related to the swaps, FGIC shall received an allowed Class 14

16  claim in the amount of 6.11 million dollars.  I'll come back

17  to how we got to that amount.

18      But the foundation for that claim, Your Honor, is in this

19  very -- I always find it's a convoluted -- but in this complex

20  COPS swaps there is a service contract between the city and

21  the service corps which as part of the security package for

22  the COPS was assigned to the trustee for the COPS as

23  collateral.

24      That service contract is being rejected under our plan

25  and it would give rise to a rejection claim.  This allowed

1  Class 14 claim in this amount, that would be the legal

2  foundation for that claim.

3      Your Honor, we also have another class in the plan.  It's

4  Class 13 which is the Detroit Downtown Development Authority.

5  You may recognize that that is the agency that has long been

6  involved with the development of the Joe Louis Arena and the

7  new arena.

8      In that class there are 33.6 million in claims owed to

9  the Downtown Development Authority which is an arm of the city

10 working with the Mayor and his staff.  They have determined

11 that they will assign their distributions under Class 13 which

12 would be the B notes distributable on account of that claim.

13 Excuse me, Your Honor, to FGIC in satisfaction of its swap

14 related claim.

15     So at the end of the day FGIC will end up with a face

16 amount of 4.5 million in B notes.  Your Honor may note some

17 parallelism with a lesser less favorable treatment to the

18 $5,000,000 cash payment to Syncora on account of its swap

19 claim.

20     So that's how we got to the 4.5 million.  If you do your

21 math, Your Honor -- Your Honor, the 6.11 allowed claim is what

22 brings the face amount of B notes to 4.5 million.  But the

23 city again I think made a sacrifice in terms of having those

24 notes go to FGIC and reflecting once again the very

25 cooperative nature and the city's dedication to seeing

1  reinvestment in Detroit.

2       Your Honor, the next page describes the new C notes.

3  This page is almost identical, if not virtually identical to

4  the description of the C notes that we presented to you upon

5  the settlement of Syncora's claims.  These new C notes, Your

6  Honor, are the ones that are backed by the parking revenues --

7            THE COURT:  One second.  Can we go back one slide?

8            MS. BALL:  Of course.  The B notes?

9            THE COURT:  Yeah.  What is -- what is 74.2 million?

10           MS. BALL:  Your Honor, if we go back to the sixth

11 amended plan which should not strain memory, it was -- it was

12 fairly recent, we had a pre -- we had created a litigation

13 trust and a disputed COPS reserve claim.

14      In that we would have deposited 100 B notes that would be

15 attributable to 100% allowance of the claim.  The reflection

16 here, and forgive me for not being more express, is that

17 FGIC's claim is being allowed at the same percentage as

18 Syncora's.

19      That Class 9 has not moved.  So their claim again is that

20 same 60.5% as Syncora.  That's its allowance amount.  The

21 allowance would then -- the FGIC 1.1 billion in claims at that

22 amount would cause the release of 74.2 in these new B notes.

23      Your Honor, that leaves behind roughly 48,000,000 in B

24 notes which as I mentioned earlier was served to enhance the

25 VEBA class, the LTGO class, and the general unsecured class.

1        THE COURT:  Okay.

2        MS. BALL:  So it isn't -- forgive me, but it is

3   absolutely parallel and we are doing in Class 9 with FGIC

4   exactly what we did with Syncora, however, the scale is 3 to

5   1.  Which is why their number is 74 and you may recall FGIC's

6   number is 23.5 million in B notes.

7        THE COURT:  Syncora's.

8        MS. BALL:  Syncora's number.  Thank you.

9      On the new C notes, Your Honor may recall that we

10  envisioned potentially when we filed the seventh amended plan,

11  the issuance of 88,000,000 plus in new C notes, one quarter of

12  which have already been dedicated to Syncora.  This

13  sixty-seven is the remainder which will be going to FGIC's COP

14  holders.

15     They -- the exact same notes in this description, Your

16  Honor, conforms to this description in the same C notes that

17  were described in the seventh amended plan.  There is no

18  difference.  Some of the additional detail that Your Honor

19  sees here, particularly the reference to approximately

20  10,000,000 of parking revenues being set aside annually to

21  assure debt service, is a detail that was added to the C notes

22  when the EL -- the city council, the ELB actually went through

23  the financing and the terms of the notes.  So that's a bit

24  more detail, but it applies equally to the C notes that will

25  be held by Syncora.

1    They are unsecured other than this reserve racking

2  revenues each year for debt service.  They must be pre-paid

3  should the city proceed with its RFQ for parking assets and

4  sell them.  And they may be pre-paid at any time without

5  penalty or premium.

6    As to the settlement credits, Your Honor, which was the

7  third element of Class 9 treatment, B notes, C notes,

8  settlement credits. FGIC and the FGIC COP holders will receive

9  19.7 million in Class 9 settlement credits.

10    These are the vouchers which some of us that are closer

11  to the over the hill gang have referred to as S & H green

12  stamps for the City of Detroit that can be used to purchase

13  assets that the city would sell.  As I mentioned we're

14  redefining what those eligible assets are.

15    However, the owner of the credits must participate in

16  whatever the auction process or procurement process outlined

17  by the city.  And if they are the winning party they may then

18  use settlement credits, but only up to 50% of the purchase

19  price.

20    So Detroit believes that that is real money, Your Honor,

21  because they believe there will be assets worth buying in

22  Detroit as we move forward, particularly post-confirmation.

23  They are freely assignable, Your Honor.  So they would not

24  necessarily be exercised by FGIC or a COP holder, but could be

25  exercised by any purchaser.

1    Your Honor, moving to what's new and that you have not

2  heard about before.  The Joe Louis Arena.  I think most of

3  Detroit is well aware that the Red Wings will have a new

4  stadium and that new stadium is due to be completed on current

5  timing in 2017 and the Red Wings will move from the Joe Louis

6  Arena to the new stadium which would leave the city with the

7  garage and the arena to be demolished but certainly the arena

8  to be demolished and the garage is an open question but in all

9  the city projections that have been involved in this case, it

10  would have been demolished as well, that garage.

11    Until then it will continue to be operated by Olympian

12  and the revenues will flow into the parking revenues as they

13  always have.

14    The city and the to be formed entity, and that entity

15  will be a FGIC entity.  So we've just called them the

16  developer for now.  And it could include FGIC and the whole --

17  and/or the holders of COPS.  Will enter into a development

18  agreement.  Under that agreement, the developer will be

19  granted an option to acquire and develop the land on which is

20  currently situated the Joe Louis Arena and the Joe Louis Arena

21  garage.  Joe Louis Arena, Your Honor, now covers 5.3 acres at

22  19 Steve Yzerman Drive.

23    THE COURT:  Yzerman.

24    MS. BALL:  Thank you.  I knew I was not going to

25  massacre that one.

1          THE COURT:  You're not from around here, are you?

2          MS. BALL:  You know, but I'm really getting the feel

3     for it.

4          THE COURT:  Okay.

5          MS. BALL:  It's only been 30 years of here -- at

6     least -- at least a case a year.

7          THE COURT:  Well, we'll help you where necessary.

8          MS. BALL:  Oh, thank you.  I -- it's much

9     appreciated.

10         The garage is 3.3 acres at 900 West Jefferson Avenue.  So

11    those are the parcels.  Your Honor, it's very exciting because

12    in a parallel development the city and the state and the

13    conservancy have not -- have already reached an agreement,

14    Your Honor, may be aware, along the river walk.

15         So the whole area on the river side of Cobo Hall and the

16    Joe Louis Arena is already committed to development and

17    improvement and this will be hopefully another turning moment

18    for this area of Detroit in terms of its development.

19         Within 90 days after the expiration of the Joe Louis

20    Arena lease to the Red Wings, which Your Honor is floating a

21    bit because it's dependent on completion of the new arena, the

22    city will commence demolition of the Joe Louis Arena.  The

23    demolition will include remediation of existing environmental

24    contaminants on the surface or sub surface of the parcels

25    sufficient under applicable law for the developer to use the

1   parcels for its intended use which as of right now, Your

2   Honor, is a multi use hotel, condominium, office, and retail

3   development.

4       It will be the conference hotel, at least it's being

5   envisioned at the moment for Cobo Hall.  The demolition is

6   expected to commence on or about September 15th because we all

7   hope the Red Wings will start that season in their new home,

8   and will be completed within one year of commencement.

9       The state shall make available to the city certain

10  community revitalization programs, that's the acronym CRP,

11  Your Honor, as you see more of these agreements, of up to

12  $6,000,000 for the purpose of reimbursing the city for the

13  costs and expenses incurred in connection with the demolition

14  and any necessary environmental remediation.

15      If the city doesn't use the entirely of such 6,000,000

16  for the demolition, the balance shall be made available to the

17  developer to improve the project.  The money must stay in the

18  project in Detroit.

19      The developer option is within 36 months of the execution

20  of the agreement they shall identify a development partner and

21  prepare a comprehensive development plan for the parcels which

22  would anticipate the application of these state originated

23  incentives and a Brownfield plan necessary to also be the

24  beneficiary of what is known as TIFF incentives.

25      Upon the request of the developer, the city may extend

1  that deadline that it's required to submit its proposal by up

2  to 24 months.  The city will also cause the parcels to be

3  zoned B-5 which would permit the parcels to be used as a mixed

4  use development subject to the city's review and its normal

5  process regarding site plans.

6       The city's approval of the proposal will be separate from

7  the approval of general municipal approvals or permits,

8  however, the developer may proceed with securing these

9  approvals after the city has its first approval.  The city is

10 retaining approval of the site plan in accordance with its

11 normal process.

12      The developer will have 180 days before the proposed

13 submission deadline to notify the city that it wishes to

14 inspect the parcels during which time they may conduct due

15 diligence, environmental studies, for use surveys, and in

16 essence diligence and complete their proposal to the city.

17      Should the developer determine the parcels are

18 unsatisfactory, there is an objection process to resolve

19 those.  The city has 60 days to cure it.  And we're all

20 hopeful and everyone I think, Your Honor, based on what they

21 know today, believes that there shouldn't be any show stopping

22 issues.

23      The developer will indemnify the city against any loss or

24 expense if they're going in and boring holes or take other

25 samples, they'll be responsible for that.  If those conditions

1  are met, the developer may proceed with its plan and the city

2  and the developer will close on the later of two years from

3  approval of the proposal and six months -- or six months from

4  completion of dismissal -- demolition, forgive me, Your Honor.

5      So, Your Honor, this is a look forward deal.  We're

6  really talking about it not occurring until 2017.

7  Post-demolition, post-judgments, and during that time we

8  anticipate the developer will be working through their site

9  plan, their development, and what they would like to do.  But

10  it really is a look forward to 2017 and what might happen

11  then.  Not quite a future draft choice, but in some respects

12  hard to totally quantify for your benefit accurately.

13      The economic development incentives if the proposal is

14  approved by the city, the state's agreed to reimburse for

15  certain project costs through community re-development --

16  community revitalization program and TIFF incentives.

17      Your Honor, the numbers are 4,000,000 in community

18  revitalization program credits, and 14,000,000 in TIFFs

19  incentives which will accrue at a 3% per annum interest on any

20  outstanding balance.  These, Your Honor, benefits come to this

21  project from the state.

22      The city will use good faith efforts to re-evaluate its

23  use of these incentive programs, Your Honor, as between TIFF

24  incentives and CRP such that we might in essence shift the

25  4,000,000 in CRP into TIFF.  That really is a function of how

1  much of the development project involves what are eligible

2  costs for a TIFF Brownfield program.

3     And if we can all agree that they have 18,000,000 of

4  those, they would proceed solely with TIFF.  But as I said

5  three years from now, some of these details are rolling

6  forward and will be developed.

7     And the state has also agreed to designate the

8  development of neighborhood empowerment zone.  If the

9  development includes residential development as the city

10  currently anticipates will.

11     For those of you who don't know what that is, Your Honor,

12  that is a program for buyers of homes in the City of Detroit

13  to have a break on their taxes.  So it is meaningful to a

14  developer because obviously it will help them market the

15  condominiums because their purchaser will have the benefit of

16  this prolonged tax advantage.

17     So we will -- the city has agreed to do that in the event

18  they do develop residential development as we hope they will.

19  The city has agreed to declare part of the commercial

20  re-development zone or commercial rehabilitation zone.  Your

21  Honor, that designation which are under local Michigan laws

22  210 and 255, would enable the developer to take advantage of

23  certain tax abatements of city oriented tax -- city and other

24  taxes.

25     Your Honor, that is done not as a matter of routine for

1  developers, but it is not uncommon in reaching development

2  agreements between the city and other developers.

3      The other terms of the agreement really go to the timing.

4  Once the developer commences or commences, breaks ground,

5  we're asking them to commence the development within one year

6  of closing.  And then we're asking them to substantially

7  complete the development within three years.

8      If the developer fails to achieve the commencement of

9  construction which Your Honor I am told is a highly technical

10 real estate term.  Personally I think it's a shovel broken

11 ground, but it might be a little bit more complex.  The

12 parcels would automatically revert to the city.  But there is

13 a very detailed definition of what commencement of

14 construction means.  So that we don't take away the property

15 if it is a minor deal.

16     The developer will accept the parcels on an as is where

17 is basis subject to the city's environmental obligations.  And

18 for any general municipal approvals or permits, the city and

19 state agree to process such requests promptly and in no more

20 than 30 days and shall use reasonable efforts to facilitate

21 such requests.

22     Prior to closing the city will maintain the parcels in at

23 least the same condition and repairs during the date of the

24 agreement.  Your Honor, this agreement is subject to Your

25 Honor's approval and as it is ongoing we would anticipate

1 | asking Your Honor to retain jurisdiction over any disputes

2 | relating to this agreement.

3 | Your Honor, there are also details which would enforce

4 | the existing obligation to improve on the part of Olympian

5 | which is the existing tenant of the Joe Louis Arena and garage

6 | to maintain and improve that garage during its continued

7 | tenure. And obviously that obligation would enure to the

8 | benefit of FGIC as well.

9 | Your Honor, while it is not carved in stone, we have

10 | tried to pull together a time line that would help us

11 | visualize and certainly we are hoping it helps you visualize

12 | what we anticipate happening under this development agreement.

13 | As you can see even if we start in October of 2014 which would

14 | be the development signing agreement, in fact Your Honor we'll

15 | get to that timing and we have a date in mind. We assume

16 | you'll give us a deadline for that agreement as well. It has

17 | to be done.

18 | Moving ahead to August in anticipation of the Red Wings

19 | move to their new stadium, April and August we'll be moving

20 | ahead with the diligence notice. December the city, assuming

21 | the Red Wings are able to move into their new home, would

22 | begin demolition of the stadium.

23 | They'd have to complete it within a year. But

24 | interestingly below the line, before demolition, we want to

25 | see the development proposal and there is a deadline. And I

1 think, Your Honor, that's been slotted in at least in this

2 illustration for October.

3      At the end of the day, Your Honor, this is anticipated to

4 be completed by October 2022 which given everything that we

5 have tried to accomplish here, it seems like a lifetime but I

6 am told in revitalizing and developing the city, something of

7 this size, it is not.  It is rather an expedited time line.

8      Your Honor, this is also being done in cooperation with

9 the Cobo Hall Regional Authority.  And we anticipate that this

10 developer and the city will work very closely with Cobo Hall.

11 As you know they are doing a refinancing and have been very

12 successful.  And we anticipate that this development will also

13 enjoy the benefits of the improvements along the river walk,

14 the improvements and refinancing at Cobo Hall.

15      And I think the city and the state do hope that there

16 would be a lot of development around it and great benefit to

17 the city from this agreement.  Your Honor, as a -- a detail I

18 would -- not a detail, there are two other matters.

19      One is a housekeeping, the other I need your guidance.

20 We would anticipate four more documents.  I have signed term

21 sheets, the development agreement that are executed by the

22 state, the city, and FGIC.  I have signed term sheets for the

23 outline of the settlement, remainder Class 9 portions of the

24 settlement, also signed by the same three parties.

25      We anticipate, Your Honor, they will mature into a full

1  blown stipulation of the invalidity suit, a development

2  agreement, a settlement agreement, and Your Honor, an eighth

3  amended plan.  Although we are not changing the treatment of

4  any classes, the exculpated parties are changing, the eligible

5  properties are changing so there is a need to do that.

6      We are keenly aware of Your Honor's schedule for the

7  remaining witnesses.  And in speaking with Mr. Perez, we would

8  think we could get all those documents done by --

9          MR. PEREZ:  I think three of the documents are

10  easily done quickly, Your Honor.  Which is the stipulation,

11  the --

12          THE COURT:  Are you by a microphone?

13          MR. PEREZ:  Yes, I'm sorry.  Your Honor, I think

14  that three of the documents can be done relatively -- Alfredo

15  Perez, Your Honor, on behalf of FGIC.

16      I think three of the documents can be done rather quickly

17  which is the -- the settlement agreement, the stipulation, and

18  the third document which I forgot what it was.  The one that

19  may take a little bit longer is the development agreement as

20  -- as -- just from the papers on the -- you know, the

21  description.

22      It is a -- not an easy thing to pull together overnight.

23  It's something we're going to have to live with for the next

24  30 years.  So I -- I really don't want to anticipate what my

25  real estate partners are going to say about, you know, what's

1 | a reasonable time to put that together.

2 | But as it relates to the settlement agreement, the

3 | stipulation, I think those things --

4 | MS. BALL:  And the plan.

5 | MR. PEREZ:  And the plan.  That's in their control.

6 | But the stipulation and the settlement agreement, I think that

7 | can certainly be done by next week.

8 | MS. BALL:  Your Honor, I am advised by my esteemed

9 | colleague Ms. Lennox, that if she and I put our shoulder to

10 | the wheel, we could have the plan done by Monday.  I think it

11 | is the other agreements that might take till Wednesday, at

12 | least that's what we're thinking.

13 | In addition, Your Honor, I may have mentioned that one of

14 | the reasons we were able to break through the invalidity suit,

15 | the COPS, the history, where we were successful through the

16 | intervention of Mr. Mayer and his assistants of getting the

17 | actual investors and the COPS to participate.

18 | Development will take resources as I'm sure is no

19 | surprise to Your Honor.  Construction funding, equity funding.

20 | So it was really a good thing to do to have them in the room

21 | and it was necessary.

22 | And as part of that, they had to sign non-disclosure

23 | agreements because Your Honor they were participating in our

24 | mediation process and were subject to your mediate -- Your

25 | Honor's mediation order.

1    In connection with that we agreed in the NDA to present

2   to Your Honor jointly, and this would be the motion by the

3   city, the COPS holders themselves through Mr. Mayer, and FGIC,

4   a motion that we just filed which will have as exhibits both

5   the signed development agreement term sheet and the settlement

6   term sheet to allow these COP holders to disclose the elements

7   of this deal and be relieved from the mediation order to that

8   extent as these are trading securities.

9    We have filed that motion.  I have copies with me, Your

10   Honor, if I may approach.

11            THE COURT:  That's all right.  I'm looking at it on

12   line now.  All right.  I just have a couple of questions for

13   you and then I'll see if others want to make any statement to

14   the Court.

15    To what extent does this process foresee involvement by

16   or approval by city council?

17            MS. BALL:  Your Honor, I have consulted with the

18   emergency manager, Mr. Orr.  There are two subsequent

19   processes.

20    Mr. Orr intends to take this to the city council as soon

21   as possible.  Today is Thursday, so whether it's Friday or

22   Monday, I think is more logistics.  But he has committed to

23   get it done as quickly as possible.

24    In addition, I would defer to Mr. Perez, but FGIC is

25   subject to the regulation of the Department of Financial

1  Services in New York.  And I think he can share with you what

2  he thinks that approval process would require.

3      But I am very happy to report in good faith they started

4  that process yesterday because we have been absolutely

5  insistent if not bludgeoning that there is a calendar we have

6  to meet here and they must move.

7      I think Mr. Perez could give you more detail, but we are

8  encouraged that they started that process even before we

9  finished.  But those are the only two --

10          THE COURT:  Well, does Mr. Orr have a schedule for

11  that city council presentation?  Mr. Orr?

12          MR. ORR:  Good morning, Your Honor.  Kevyn Orr,

13  emergency manager, City of Detroit.  I'm not acting as an

14  attorney since I'm not licensed in the State of Michigan.

15      We would like to get it in front of council as soon as

16  possible so that the terms -- I think this still fits under

17  order 42 of my order which allows me under Paragraph 3(b)(xii)

18  to submit settlements to city council and have them approve it

19  under the normal order of 436.

20      So we're trying to get it to them as soon as possible.  I

21  would hope that I could appeal to their good graces and have

22  them hear it perhaps next week.  So either they would approve

23  it, or if they don't approve it, we could get it to the

24  emergency loan board as soon as possible as well.

25          THE COURT:  Thank you, sir.

 1          MR. ORR:  Yes, sir.

 2          THE COURT:  Do these two settlements mean from a

 3 technical bankruptcy perspective that all impaired classes

 4 will have approved, accepted the plan?

 5          MS. BALL:  No, sir.  Class 14 which is the class of

 6 general unsecured creditors and remarkably Class 15 which is

 7 the convenience class, Your Honor.  Neither of those classes

 8 have accepted the plan.

 9          THE COURT:  Okay.

10          MS. BALL:  But all others have, Your Honor.

11          THE COURT:  So what schedule of Court process would

12 you see or suggest to the Court?

13          MS. BALL:  Well, Your Honor, as soon -- I think the

14 issue is one for Mr. Perez as he has not yet rested.  We are

15 aware, and maybe Mr. Mayer would like to be aware of Your

16 Honor's desire to have the Court's financial expert testify on

17 Tuesday which seems perfectly fine in light of this

18 settlement, that would not change.

19      We would anticipate that going forward, particularly if

20 we have the plan done before then and we would and to Ms.

21 Kopacz.  She already has the projections revised to reflect

22 FGIC's opting into the settlement.  So I --

23          THE COURT:  So there won't be any further revisions

24 to projections as a result of this settlement?

25          MS. BALL:  No, sir.  They have been -- they have

1  been delivered.  They were anticipated.  Your Honor, you may

2  recall that we amended Class 9.

3      The issue was when you do projections do you do it just

4  assuming Syncora opted in, or that everyone opted in.  So the

5  projections have now gone to Ms. Kopacz with the assumption

6  that all COP holders opt in and the full amount of the parking

7  notes are issued.

8      There have also been Mr. Orr, as our emergency manager

9  has had some success in other non-recurring transactions such

10  as legal settlements, reclamation of copper from demolition,

11  and those extraordinary non-recurring cash items that we now

12  know will be available to the city are also reflected.

13      As well as Your Honor, Mr. Orr has asked for, and it is

14  in the projections, yet to be allocated, a contribution from

15  the professionals working for the city in those projections.

16          THE COURT:  Will there be evidence of that from Mr.

17  Orr, or Mr. Malhotra, or any other witness?

18          MS. BALL:  I would defer to Mr. Cullen on that, Your

19  Honor, but it is my understanding that there will be evidence

20  regarding the revised projections and that that would be it as

21  well as Your Honor's expert Ms. Kopacz.

22          THE COURT:  That evidence should come in before Ms.

23  Kopacz, don't you think?

24          MR. CULLEN:  Thomas Cullen for the city.  Yes --

25  yes, Your Honor.

1      And that -- we've discussed that with Ms. Kopacz and

2  that's her preference as well.  And we think that we could get

3  both of those things done on -- on -- on Tuesday of next week,

4  Your Honor.

5           THE COURT:  One second, please.  Well, when would

6  you propose -- propose to submit this further evidence

7  regarding new sources of cash?

8           MS. BALL:  It's in the projections.

9           MR. CULLEN:  It's in the projections, Your Honor.

10  And that -- the projections would be -- we will serve the --

11  we provided the projections to Ms. Kopacz and we'll serve the

12  projections this week.

13           THE COURT:  Right.  But I thought -- I thought I

14  heard you say that you intend to submit evidence of them as

15  well to the Court.

16           MR. CULLEN:  Yes, yes.  That -- that would be the

17  testimony on Tuesday.

18           THE COURT:  And from whom?

19           MR. CULLEN:  From Mr. Malhotra.

20           THE COURT:  Well, all right.  I'm going to have to

21  confer with Ms. Kopacz given these developments to -- to see

22  what makes sense in -- in terms of when her testimony should

23  -- should be presented.

24      I think that for the sake of a -- of a straightforward

25  and clean record, it's probably advisable for her to submit a

 1  supplemental report.

 2          MR. CULLEN:  Yes, Your Honor.

 3          THE COURT:  And -- and obviously she'll need time to

 4  do that and to -- and to prepare for her testimony.

 5          MR. CULLEN:  Yes.

 6          THE COURT:  So Tuesday may be a little bit

 7  aggressive, but I will -- I will confer with her about that

 8  and let everybody know.  But I think we should plan on Tuesday

 9  for this additional testimony.  How much time do you think it

10  will take?

11          MR. CULLEN:  I think probably 45 minutes on direct,

12  Your Honor.

13          THE COURT:  Okay.  All right.  Thank you.

14          MS. BALL:  Your Honor, as a technical matter I know

15  that Mr. Mayer would like to share with you his views of what

16  I've presented to you as would Mr. Perez.  But Mr. Mayer has a

17  mediation order to share his position.  And I would ask Your

18  Honor if you are inclined to enter the order requested so that

19  he would be free to speak.

20          THE COURT:  Yes, yes, absolutely.

21          MS. BALL:  Thank you, Your Honor.

22          THE COURT:  That order will be entered.

23          MS. BALL:  With that, Your Honor, I would defer it

24  to Mr. Perez.

25          MR. PEREZ:  Your Honor, Alfredo Perez.  She did part

1  of my work because I was -- the first thing I was going to do

2  was ask you to enter the order.

3          THE COURT:  Yes.

4          MR. PEREZ:  But, Your Honor, I'm happy to be here

5  this morning talking to you about a settlement as opposed to

6  cross examining a witness.  And I want -- I do want to thank

7  the mediators, Judge Rosen, Judge Perris, Mr. Driker, for

8  their work, especially in the last two or three weeks which

9  have been quite intensive.

10      I think FGIC is very happy to be in this position.  I

11 think that it's a win win situation for both the city and --

12 and for FGIC.  And I -- I anticipate that going forward it

13 will be a mutually beneficial relationship.

14      As the Court may be aware, FGIC is in its own

15 rehabilitation proceeding.  They're -- they're operating

16 pursuant to a confirmed plan that was confirmed in August of

17 last year.

18      As a result, anything outside the ordinary course of

19 business is subject to DSF approval.  In the course of this

20 case, we've had one occasion to get DSF approval.  We were

21 able to get it very quickly.

22      We -- I don't have a particular time line.  We're going

23 to submit this on Monday, if not tomorrow.  And we're at --

24 you know, we will actively try to get the approval as quickly

25 as possible.  And I'll be certainly in a position to report

1  next week, you know, the steps that we're -- that we're

2  taking.

3      We don't anticipate and, you know, obviously the

4  regulator is going to do what the regulator is going to do.

5  We think that it's a -- a very substantial settlement for us.

6  We think it's in the interest of our policy holders which are

7  obviously -- we have no shareholders, it's -- it's only our

8  policy holders.

9      So we are very confident that this is a good proposal for

10 them.  But I did want to put that on the record just -- just

11 to make sure.

12     Your Honor, in connection with the -- the order that the

13 Court is inclined to enter, there are certain aspects of the

14 discussions that we had which are probably more important than

15 others.  And in connection, and I'm sure the Court is aware of

16 the WaMu case where there were issues that arose as not just

17 of the deals that were made, but the deals that -- that were

18 offered that weren't necessarily made.

19     And in connection with that, we do have a -- we did in --

20 in -- in discussing the various options with the COPS holders

21 who by the way have been extremely -- I mean they all got

22 restricted in -- in -- in the course of one day which is

23 amazing, seven different groups.

24     We did offer to accelerate the bonds and the policies,

25 but unfortunately we weren't able to -- to -- to implement

1  that.  But that was one of the things that was on the table

2  that -- that we're discussing.  And we're continuing to have

3  general discussions with the COPS.  And we're -- very hopeful

4  that we can have a -- a resolution in the future.

5      But I want to thank the Court as well.  Thank you.  And

6  Mr. Mayer would like to say a few things.

7          THE COURT:  Certainly.

8          MR. MAYER:  Good morning, Your Honor.  For the

9  record Thomas Moers Mayer of Kramer, Levin, Naftalis, and

10 Frankel.

11     I represent seven institutions that hold over 90% of the

12 1,100,000,000 in COPS that are insured by FGIC.  And I need to

13 put a reservation on the record.

14     Ms. Ball and Mr. Perez referred to several term sheets

15 embodying the deal.  We have not actually seen those.  That's

16 not a criticism, it's a fact.  I'll tell you why that

17 happened.

18     So my clients have not actually seen the documents they

19 are being asked to agree to.  We have a pretty good idea of

20 what's in them, but for reasons I'll get into, we have not

21 actually seen these documents.

22     Every client will have the opportunity to opt in.  People

23 that don't opt in will retain whatever rights they have to

24 object.  It is my hope that after people see the documents,

25 everybody will opt in, but I cannot commit in advance.  People

1 | need to see the documents.

2 |         THE COURT:  What's your timing on that?

3 |         MR. MAYER:  A few days.  I do not anticipate it's

4 | going to take that long.  And when I tell you how this came to

5 | be you'll understand why that time table is reasonable.

6 |     The round of negotiation that is -- that has culminated

7 | today and what's before you started from our perspective a

8 | week ago Monday.  And clients got restricted Thursday.  And we

9 | worked around the clock Thursday, Friday, Saturday, Sunday,

10 | Monday over the Columbus Day weekend.

11 |     And we failed.  The failure may not mean anything, but I

12 | need to describe to you what happened.  The certificates of

13 | participation are COPS don't accelerate.  The bankruptcy does

14 | not accelerate them.

15 |     They are claims against a trust, the trust has claims

16 | against the city.  Those are the claims that are being settled

17 | today.  And I am not objecting to the settlement of those

18 | claims.

19 |     But the COPS don't accelerate.  Every payment of interest

20 | gets paid when it gets paid, every payment of principal gets

21 | paid when it gets paid.  Interest gets paid before principal.

22 | So that if cash doesn't come into the trust, the interest

23 | accumulates, the people with principal never see anything.

24 |     One of the elements of what was under discussion was an

25 | acceleration of the COPS so that everything would be

1   distributed as bankruptcy lawyers are comfortable seeing.

2   Which is that everything gets whacked up in accordance with

3   principal amount.

4       At the same time the COPS are insured by FGIC.  FGIC

5   right now pays about 17 cents of every payment that comes due.

6   And again the COPS don't accelerate.  Under the current

7   policies FGIC pays 17 cents of every interest payment that

8   comes due, then it pays every -- 17 cents for every principal

9   payment that comes due when it comes due, nothing accelerates.

10      This year it's a few million dollars, it's very little.

11  This round of negotiation started off with FGIC offering to

12  accelerate payments such that $170,000,000 would be paid

13  shortly after the effective date of the plan.

14      This was of interest to FGIC for reasons that are theirs.

15  It was obviously of interest to my clients for reasons that

16  are obvious.

17      Based on that element we negotiated around the clock over

18  Columbus Day weekend.  It turns out that FGIC's ability to pay

19  that 170,000,000 was dependent on the acts of a third party

20  who we are informed, and we have no reason to believe this is

21  not true, has its own self interest in seeing that -- that

22  $170,000,000 paid, but for reasons best known to itself,

23  yesterday yanked the rug out of everybody.

24      At 4:00 we had a term sheet we were prepared to sign.  At

25  7:30 acceleration was no longer on the table.  As you might

1  imagine, the disappearance of $170,000,000 of payment up front

2  by our insurer was a material change.

3      So I cannot tell you today that we're on board with this

4  deal because that came out of nowhere.  Now I have had

5  conversations with my clients from 9:00 p.m. last night to

6  2:30 in the morning, we're not in that picture as you notice.

7  Again, it's a fact it's not a complaint.

8          THE COURT:  I did notice.

9          MR. MAYER:  Not a complaint.  And again at 9:00 a.m.

10  this morning.  They're going to look at the documents.  It is

11  our hope that people will opt in and we will be able to

12  withdraw our own objections to the plan.  So I'm hopeful, but

13  I can't commit to you today that that will happen because

14  there was this very big change.

15      Now, we're working with FGIC.  We got very far down in

16  the detailed term sheet.  My understanding is that the term

17  sheet that I will see won't have the acceleration language in

18  it, but it will have everything else that we negotiated.  And

19  by everything I'm not trying to, you know, create a trick.

20      I was on the phone with Mr. Perez's partner, Richard

21  Morris and we were working through what Richard Morris had

22  said to me after things blew up, he really thought we were

23  just going to sign.

24      And he was right.  We had gotten down to extreme levels

25  of regularity, the last -- literally to the email saying,

1  these are the last two points and we're on board with these

2  numbers, and we're on board with this, and you're on board

3  with that and we're done.

4      So I do not anticipate that a decision up or down on this

5  is going to take more than two days.  Because I anticipate the

6  term sheet that I see is going to be exactly the same or

7  virtually the same as the term sheets that we negotiated with

8  the exception of the acceleration language.

9      Now FGIC is going to continue to work on the acceleration

10  and who knows in the final final documentations maybe this

11  third party will see reason and the acceleration of claims in

12  the COPS structure, and the acceleration of claims in FGIC

13  will be part of the opt in package, but we don't know.  That's

14  -- that's under -- under discussion.  And it will happen or it

15  won't.

16      There are various other things we do expect to see --

17          THE COURT:  It sounds like you are making the

18  conscious choice here not to identify that party.

19          MR. MAYER:  That is correct.  I talked to Mr. Perez

20  about this.  I think it is important to represent the

21  financial wherewithal of this party to fund is beyond

22  question.

23      This was not in any way, shape, or form said third party

24  saying oops, we don't have the money.  It was this third party

25  saying, and I wasn't there, I get this third hand.  We just

1 won't say yes now.  And maybe they were trying to do a hold

2 up.  Maybe they had their own agenda, I don't know.

3      So from our perspective technically the mediation failed

4 which is not a comment on the mediators.  This part of the

5 process they tried to help very late at night, but they were

6 not really involved in our discussions with FGIC.

7      On -- so when we see the final documents, I'll be able to

8 inform the Court that we're done.  We don't have any more

9 witnesses to call.  There is no need for us to take Court

10 time.

11      There is some chance I'll -- may have to come back and

12 make some oral argument if my guys see the final documents and

13 there's an unexpected problem.  I hope that won't happen, but

14 it could.

15      As Ms. Ball mentioned, we spent a lot of time on these

16 documents.  They do involve for example the investment of

17 capital in the development of the Joe Louis Arena.  That was a

18 complicated matter.  We have certain consent rights in those

19 documents.  I understand that we're going to see them in the

20 term sheet that comes out.

21      There are mechanics for making the capital calls.  There

22 are some timing elements in terms of when things happen.  We

23 expect to see all of that.  It's a detailed document.  I think

24 that is all I need to put on the record today unless the Court

25 has any questions.

1              THE COURT:  Thank you, sir.

2              MR. KLEIN:  Your Honor, Darrin Klein of Davis, Polk,

3    and Wardwell on behalf of Merrill Lynch Capital Service

4    Corporation who is not the third party that Mr. Mayer is

5    referring to.

6         Merrill Lynch is one of the swap counter parties and one

7    of the earliest supporters of the city's plan of adjustment.

8    And we are extremely supportive in principal with the city

9    settling with FGIC and the COP holders.

10        As Ms. Ball noted, however, the swaps and the COPS are

11   very related in very complex ways and since I've only learned

12   about the details of the settlement this morning, we're not

13   yet sure whether this settlement kind of has unintended

14   impacts on the delicate balance between the COPS and the

15   swaps.  So I noted that Ms. Ball says that none of that is

16   intended.

17        Ms. Ball did note that the FGIC settlement agreement and

18   the Syncora settlement agreement contained provisions that

19   they will not materially amend the plan adversely to Syncora

20   and FGIC.  She didn't mention, though I'm sure the oversight

21   was not intentional, that our settlement agreement, the swap

22   settlement agreement, has a similar provision that the city

23   will not propose or support a plan that has a material adverse

24   impact on the swap counter parties as compared to our

25   settlement related to the swaps or the COPS.

1        And our settlement agreement with the city was very

2   heavily negotiated to make sure that the swap counter parties'

3   claims and defenses against the COPS, FGIC, and Syncora were

4   fully preserved.

5        When the settlement with Syncora happened and we had a

6   chance to review it, we thought that there might be some

7   issues that impacted the relationship between Syncora and the

8   city.  But we were able to work very productively and quickly

9   with the city and Syncora to negotiate a stipulation and we

10  provided that.  The swap counter parties' rights claims, and

11  defenses against Syncora were not in any way prejudiced or

12  affected by the Syncora settlement.

13       And that stipulation fully reserved our issues there.  To

14  the extent we have some particular issue once we were -- had a

15  chance to review the FGIC settlement, we expect we would

16  likewise be able to work very quickly and consensually with

17  FGIC, the COP holders, and the city to resolve them.

18       I immediately rise to note for Your Honor that we're not

19  yet sure whether this FGIC settlement raises any of the

20  similar issues that the Syncora one raised.  But it's always

21  our preference to resolve any issues consensually and we'll

22  certainly endeavor to do so here.

23            THE COURT:  Thank you, sir.

24            MS. BALL:  Your Honor, just as a matter of what I

25  hope is clarity for your benefit.  The term sheets that have

1 been signed by FGIC, the state, and the city, are exhibits to

2 the motion for relief from the mediator's order.  So they are

3 available at the moment, they're on the record to everyone.

4      That is distinct, however, Your Honor, from whatever

5 arrangements inter se may have been the subject of term sheets

6 between FGIC and its COPS holders which I believe is what Mr.

7 Mayer was describing.

8           MR. MAYER:  Yes, Your Honor.  We anticipate filing

9 those as well publicly so that everybody can see what -- what

10 that deal is.  And we will probably file something that shows

11 what the deal would have been.

12           THE COURT:  Okay.

13           MS. BALL:  Your Honor, the -- the issues that remain

14 on FGIC's side of the house we still have settled with FGIC.

15 The city will see that the consideration for Class 9 and the

16 development agreement are done.

17      We wish them great luck and speedy resolution of their

18 issues inter se.  And, Your Honor, thank you very much for

19 your patience with us.

20           THE COURT:  Well, a couple of more questions,

21 please.  You mentioned contributions by the city's

22 professionals.  Can -- are you in a position to expound on

23 that?

24           MS. BALL:  Your Honor, I believe that will be the

25 subject of Mr. Malhotra's testimony.  I have only a very high

1  level knowledge of it and I would defer to Mr. Orr.  But I do

2  think it is in the seven figures.  And I do not believe it's

3  been allocated.  I don't know if Mr. Orr would care to

4  elaborate.

5          MR. ORR:  Yes, Your Honor.  As you might imagine in

6  trying to pull this transaction together, and trying to get to

7  the final version of the projections, we scraped the cupboards

8  pretty bare.

9      I thought it was fair to ask the professionals, at least

10  the immediate city restructuring professionals to put a little

11  money in the pot.  So I asked for a $5,000,000 contribution.

12  There is no contractual obligation for them to make that

13  contribution, but I think it's generally understood by all

14  professionals that it's necessary to get us over the finish

15  line.

16          THE COURT:  All right.  So it sounds like the right

17  thing to do here from my perspective is to schedule us to

18  reconvene next Tuesday morning for Mr. Malhotra's testimony at

19  least and in the meantime as I indicated earlier, I will work

20  with Ms. Kopacz to see what makes sense in terms of the work

21  she needs to do and -- and when she can be prepared to present

22  her testimony.  And perhaps next Tuesday morning we can also

23  get an update on your further preparations of the necessary

24  documents.

25          MS. BALL:  Your Honor, I would hope for that as well

1 as a report from Mr. Perez on their regulatory schedule and

2 when he believes he is comfortable resting so that Your Honor

3 can move on to closing arguments.

4        THE COURT:  Yes.  And perhaps we'll also get a

5 report on -- regarding city council's consideration here.

6        MS. BALL:  We would hope by Tuesday to have that.

7        THE COURT:  Yes.  And if city council approves it,

8 does the loan board also have to approve it, or is this --

9 does that become unnecessary at that point?

10        MS. BALL:  That's unnecessary.

11        THE COURT:  Unnecessary, okay.  So is it the city's

12 intention to ask the Court for its approval of this settlement

13 under 9019?

14        MS. BALL:  Yes, Your Honor, in two contexts.

15        THE COURT:  So how will that -- how will that

16 request be manifested?

17        MS. BALL:  It will be manifested in a stipulation of

18 settlement in the adversary proceeding which will include the

19 development agreement under 9019 in that procedural posture.

20 And it will also include Your Honor, a settlement agreement

21 which would be part of the plan, the confirmation.

22        THE COURT:  Okay.  Well, does the city plan to

23 submit evidence either from Mr. Orr or otherwise in support of

24 the settlement as it has in the past?

25        MS. BALL:  Your Honor, the Class 9 settlement has --

1  it has not varied from the evidence previously provided by Mr.

2  Doak.  We did not think it was necessary.

3       The only additional plan item is the allowance of

4  unsecured claims in the amount -- in the amount of six one one

5  and the assignment of distributions there.  If Your Honor

6  would like evidence, it would seem to me the -- that perhaps

7  we should do it in the context of the invalidity suit which is

8  where the development agreement is.  That's where the changes

9  are, Your Honor.  You've really heard --

10            THE COURT:  Well, I -- I -- I leave it to you --

11            MS. BALL:  All right.

12            THE COURT:  -- if you're asking for my approval of

13  the settlement, to create whatever record you think is

14  necessary to do that.

15            MS. BALL:  Thank you, Your Honor.

16            THE COURT:  Okay.  I just have one other very

17  unrelated matter.  So are we done with these matters of

18  settlement?

19            MR. BRILLIANT:  Your Honor, Allan Brilliant on

20  behalf of MIDD.  Just -- just a technical scheduling matter.

21  You know, we talked, you know, earlier about the possibility

22  of having, you know -- you know, a hearing on the 9019 with

23  respect to the MIDD settlement on Monday.

24       You know -- you know, I don't know if Your Honor wants to

25  do it on Monday or Tuesday if the hearing is going to be

1  continued to Tuesday.  Obviously from our perspective, you

2  know, we haven't rested in our case.  Our expectation is that

3  will become moot when, you know, the settlement is approved.

4  But we just want to make sure that, you know, we get some

5  understanding as to when the next hearing will be.

6          THE COURT:  Uh-huh, yes, yes, good idea.

7          MS. LENNOX:  Your Honor, I just rise because I don't

8  think we intended a hearing under 9019 on the MIDD

9  stipulation.  We're sending the stipulation out on notice and

10  if somebody objects to the stipulation, we'll have a hearing

11  on the objection.  But that's all we're -- the city is

12  intending to do.

13          THE COURT:  Uh-huh.  With shortened notice?

14          MS. LENNOX:  Yes.

15          THE COURT:  How short?

16          MS. LENNOX:  Well, normally, Your Honor, if the

17  parties stipulate, we present a stipulation to Your Honor, and

18  Your Honor enters the order with no notice.

19          THE COURT:  Uh-huh.

20          MS. LENNOX:  So it seems to me that at MIDD's

21  request, we are taking sort of extraordinary steps here and I

22  would argue that no real notice is necessary, nevertheless,

23  we're giving it anyway.  The procedural posture in which we

24  would do that is we would file a stipulation today under a

25  notice of presentment of a stipulation to -- to the Court

1      That notice would indicate to parties that if -- if they

2  have some objection to the stipulation, they should file it by

3  10:00 a.m. on -- on Monday morning.  And if no objections --

4           THE COURT:  Okay.

5           MS. LENNOX:  -- are filed, we would submit the

6  order.

7           THE COURT:  All right.  The only thing I would ask

8  then is that your stipulation contain some kind of a recital

9  of the factors that you all believe supports a finding of the

10  reasonableness of the settlement.

11           MS. LENNOX:  Thank you, Your Honor, we'll do that.

12           THE COURT:  Okay, sir?

13           MR. BRILLIANT:  Yes, Your Honor.  Thank you.

14           THE COURT:  All right.  On -- on an unrelated

15  matter, in connection with yesterday's hearing at which pro se

16  objectors testified or examined witnesses, there were several

17  documents or exhibits that were discussed but of course were

18  not moved into evidence.

19      So I'd like to ask if the city has any -- or really any

20  party, has any objection to the admission into evidence of the

21  documents, the exhibits that were discussed or -- or testified

22  about yesterday?

23           MR. CULLEN:  No, Your Honor.  No objection.

24           MR. SOTO:  No objection, Your Honor.

25           THE COURT:  All right.  The Court will enter an

1  order admitting those into evidence.  Anything further for

2  today then?  All right.  Next Tuesday morning at 8:30 we will

3  reconvene.

4           THE CLERK:  All rise.

5           THE COURT:  Oh, I'd like to see Ms. Ball and Mr.

6  Perez over here, please.

7           THE CLERK:  Court is adjourned.

8       (Court Adjourned at 10:41 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 10-18-14
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25