coming due. The City shall comply with applicable law in levying and collecting ad valorem millage levied to pay all unlimited tax general obligation bonds.

(b)     The City shall certify annually not later than June 30 in each year that it has imposed the debt millage levy as required by and in accordance with Section 2.7(a). Such annual certification shall be in the form attached hereto as Exhibit C and shall be promptly provided to the Bond Insurers.

(c)     The City shall furnish to the Bond Insurers promptly upon request such information reasonably requested by the Bond Insurers to confirm the imposition of the debt millage levy and to monitor collections. The Bond Insurers shall have the right to discuss such information with the City, and the City will use reasonable efforts to explain the collection process to the Bond Insurers, including the allocation methods used for partial property tax payments.

Section 2.8.     Plan Effectiveness and Escrowing of Payments.

(a)     If the Effective Date of the Plan does not occur on or prior to September 30, 2014 for any reason other than proximately by reason of the actions or positions taken by any of the executing Bond Insurers, or their failure to support the Plan as provided in Section 3.1 below, solely in their capacity as the insurers of the Prior UTGO Bonds and not in any other capacity (including, for the avoidance of doubt in their capacity as insurers of any other obligations of the City), the City will pay into an escrow to be established with the current paying agent for the Prior UTGO Bonds the pro rata portion of the October 2014 scheduled interest debt service payment and any pro rata payments of principal and interest due thereafter, which would otherwise be paid on the Restructured UTGO Bonds, as if the transaction contemplated by this Agreement (other than the MFA Bond issuance) had closed. Specifically, and for clarification of the City's obligation under this paragraph, the City will pay into escrow the pro rata portion of scheduled debt service payments on the $287.56 million of Restructured UTGO Bonds due after September 30, 2014 through the Effective Date of the Plan, on the same terms and schedule as set forth in the current documents governing the Prior UTGO Bonds, which, subject to Section 2.8(b) below, such escrowed funds shall be released to the Bond Insurers on the Effective Date of the Plan. Such escrow shall be pursuant to the Settlement Escrow Agreement ("**Settlement Escrow Agreement**") in the form of Exhibit D attached hereto, which will be executed and delivered on the date of the execution and delivery of this Agreement.

(b)     If the Plan is not effective by March 31, 2015, and the Bankruptcy Court has issued an Approval Order (that is not stayed pending appeal) approving the settlement embodied in this Agreement, then on [March 31, 2015] the monies in such escrow will be released to the Bond Insurers, and the City will make all subsequent debt service payments, including the payment due on April 1, 2015, directly to the paying agent for the Prior UTGO Bonds as if the Restructured UTGO Bonds transaction (other than the MFA Bond issuance) had closed. If an Approval Order is entered but is subject to a stay pending appeal, the City shall continue to pay into escrow

the scheduled debt service on the Prior UTGO Bonds for so long as such stay remains in effect, and shall release all monies in the escrow accounts as soon as such order is no longer subject to stay.

    (c)  If the Plan is not effective by September 30, 2014, then within fifteen (15) days of a request by the Bond Insurers, the City shall file an Approval Motion pursuant to Bankruptcy Rule 9019 with the Bankruptcy Court. The City and the Bond Insurers may mutually make an Approval Motion pursuant to Bankruptcy Rule 9019 at any time upon mutual agreement of the City and the Bond Insurers.

    Section 2.9. <u>Confirmation Order and Findings</u>. The Plan Confirmation Order shall include provisions substantially in the form of Exhibit E. Any material modification to such provisions shall be reasonably satisfactory to the Parties.

    Section 2.10. <u>Conditions to Plan Effectiveness.</u> The Plan shall provide that the effectiveness of the Plan is subject to the following conditions:

    (a)  The Michigan Finance Authority board shall have approved the issuance of the MFA Bonds and such bonds shall have been issued; and

    (b)  The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of this Agreement.

    Section 2.11. <u>Most Favored Nation</u>. In recognition of the unique features of the UTGO Bonds and in consideration of the settlement, the City agrees that the Bond Insurers will benefit from a "most favored nation" provision consisting of the two fundamental protections below and that such provision will be described in the Plan. Further, the City agrees that, if a class of Impaired Financial Creditors receives treatment other than the current treatment in the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4392], such class' treatment in the Plan will include the existence of this "most favored nation" provision.

    (a)  <u>Recovery Percentage Projected as of Confirmation Date</u>. Under no circumstances shall the terms of the Plan permit either of the Limited Tax General Obligation Claims or the COP Claims (each as defined in the Plan and collectively, the "**Impaired Financial Creditors**") to recover more on a percentage basis than the UTGO Claims as projected at Plan confirmation. In determining whether a Class of Impaired Financial Creditors will recover more on a percentage basis than the UTGO Claims as projected at Plan confirmation, the recovery percentage for each of the Impaired Financial Creditors' Claims will be the sum of:

    (i)  the percentage that any cash payments and the principal amount of any "hard pay" instrument, combination of instruments or any other evidences of indebtedness or payment obligations of any kind (collectively, the "**Hard Pay Instruments**") provided to such Impaired Financial Creditor Class under the Plan is

of the aggregate amount of all the Allowed Claims in such Impaired Financial Creditor Class; and

          (ii)    the percentage that the reasonably anticipated recovery (as reasonably determined by the City as of Plan confirmation and as disclosed to creditors subject to the Bond Insurers' right to contest such determination as part of the confirmation hearing) on account of any "soft pay", contingent, or similar type of instrument, combination of instruments or any other evidences of indebtedness, contracts or settlements creating payment obligations of any kind including, without limitation, payment obligations relating to a sale, lease, privatization, public private partnership or similar arrangement or the value of any assets projected to be distributed or promised revenue streams or recoveries of any kind (collectively, the "**Soft Pay Instruments**" and together with the Hard Pay Instruments, the "**Plan Instruments**") provided to such Impaired Financial Creditor Class under the Plan is of the aggregate amount of all the Allowed Claims in such Impaired Financial Creditor Class.

      (b)    <u>Actual Recovery Percentage Post-Confirmation</u>. In the event the actual recovery percentage of any Impaired Financial Creditor Class on the aggregate Plan Instruments provided to such Impaired Financial Creditor's Class would result in such Class receiving 69.5% or more of the aggregate amount of all the Allowed Claims in any such Class (the "**Trigger Event**"), then payments that contribute to the Impaired Financial Creditor Class receiving a recovery over 69.5% (the "**Trigger Payments**") shall be made under such Plan Instruments to the Bond Insurers ("**Top-Off Payments**") on account of the Bond Insurer Claims in amounts equal to the following:

          (i)    the amount of the Trigger Payment, multiplied by

          (ii)    the quotient of

              (A)    $100.5 million, divided by

              (B)    the sum of (x) 30.5% of the aggregate amount of all the Allowed Claims in the particular Impaired Financial Creditor Class, and (y) $100.5 million.

For purposes of this sub-section, all actual recoveries for Impaired Financial Creditor Classes shall be determined by discounting the payments using a 5% discount rate back to the date of Plan confirmation. Amounts payable to the Bond Insurers pursuant to the provisions of this Section 2.11 will be allocated to the Bond Insurers as set forth on Schedule 2 attached hereto.

      (c)    <u>Reporting</u>. The City shall deliver to the Bond Insurers:

          (i)    promptly after the first payment is made thereunder, a written notice of any payment under any Soft Pay Plan Instrument benefiting any Impaired Financial Creditor Class, including the amount and date of such payment;

(ii)     on each January 15 of every year beginning in the year after the first payment is made on any Soft Pay Plan Instrument benefiting any Impaired Financial Creditor Class and until the maturity date of the Soft Pay Instrument, a written report calculating the aggregate recovery percentage of each Impaired Financial Creditor Class;

(iii)     after any Impaired Financial Creditor Class achieves a recovery percentage on the aggregate amount of all the Allowed Claims in such class equal to or greater than 60%, on each January 15 and July 15, a written report calculating the aggregate recovery percentage of each Impaired Financial Creditor Class;

(iv)     after a Trigger Event occurs, a written report on each date that a payment is made under any Plan Instruments held by or benefiting an Impaired Financial Creditor Class that explains the calculation for the Trigger Payment and the Top-Off Payment and demonstrates compliance with the terms of this Agreement; and

(v)     written notice in the event any Impaired Financial Creditor challenges or disagrees in any manner with the determination of any payments related to a Trigger Payment.

The City official executing any written notice or written report described above will respond within a reasonable time to written inquiries from any Bond Insurer regarding such notice or report.  In the event any Bond Insurer or Insurers make a written request to meet with such City official, such City Official will meet within a reasonable time period with such Bond Insurer or Insurers to answer their reasonable questions regarding any such notice or report.

(d)     Dispute Resolution.  In the event any of the Bond Insurers provides a written notice to the City articulating disagreement with the City's determination of whether a Trigger Event has occurred or with the amount of shared payments after a Trigger Event pursuant to subsection 2.11(c)(iv), the City will notify all Bond Insurers and meet with the Bond Insurers within 15 business days of such written notice.  At the meeting the Parties will attempt in good faith to resolve the differences.  If the Parties are unable to reach a resolution of the differences the Bond Insurers will have the right to bring an enforcement action in the Bankruptcy Court.

Section 2.12.   Legal Opinions.

Bond counsel will provide at closing customary legal opinions relating to the validity, priority and enforceability of any MFA transaction in form and substance reasonably satisfactory to the Bond Insurers; such opinions to include standard bankruptcy opinion exceptions. Bond counsel will also provide a customary opinion in form and substance reasonably satisfactory to the Bond Insurers, on the exemption of interest from Federal and State taxation of the MFA Bonds and the Municipal Obligation.

No opinion will be provided with respect to any aspect of any lien on the UTGO Bond Tax Levy.

Section 2.13.  Stay of Litigation, Proofs of Claim.

(a)  The Assured/NPFG Action and Ambac Action (the "**UTGO Litigation**") as it relates to the Prior UTGO Bonds shall be stayed pending the issuance of an Approval Order or Plan Confirmation Order and the occurrence of the Effective Date, whereupon the Parties shall ask the Bankruptcy Court to dismiss the UTGO Litigation without prejudice until the Approval Order or the Plan Confirmation Order, as applicable, is a Final Order, when such dismissal shall be deemed to be with prejudice.

(b)  As soon as practicable subsequent to the execution and delivery of this Agreement by each of the Parties, but in no event later than five (5) business days subsequent thereto, the Parties shall take any and all action as is appropriate to (i) stay the UTGO Litigation as provided in subsection (a) above, (ii) maintain the status quo of the Parties in the UTGO Litigation as of the execution of this Agreement, and (iii) ensure that no action (including separate litigation and any objection to proofs of claim filed by the Bond Insurers relating to the Prior UTGO Bonds) is undertaken or commenced inconsistent with seeking a stay of and maintaining the status quo of the UTGO Litigation; provided, however, that any such stay shall terminate on the first (1st) business day following termination of this Agreement.

(c)  In the event (i) an Approval Motion is made by the City and denied by the Bankruptcy Court, (ii) an Approval Order is issued but is not consistent with this Agreement in any material respect or is overturned on appeal, (iii) a Plan consistent with this Agreement in all material respects is not confirmed by the Bankruptcy Court other than changes regarding payments relating to the Stub UTGO Bonds, or (iv) a Plan Confirmation Order is entered by the Bankruptcy Court but is not consistent in all material respects with this Agreement, or is overturned on appeal, then any Party (including one or more of the Bond Insurers as to such Bond Insurer or Bond Insurers) may resume the UTGO Litigation and terminate this Agreement as to such Party by written notice to the Parties.

(d)  The Bond Insurers agree that all proofs of claims filed by any of them with respect to Prior UTGO Bonds shall be deemed resolved and fully satisfied by approval of this Agreement in the Plan Confirmation Order, which is a Final Order or an Approval Order, which is a Final Order, as applicable.

Section 2.14.  Additional Covenants.

(a)  City Will Not Contest.  The City shall not contest the validity or enforceability of any of the liens or interests granted under this Agreement or any of the obligations of the City set forth in this Agreement.

(b)     <u>Paying Agent, Master Trustee and Escrow Agent Fees.</u>
The City shall pay the reasonable and customary fees and expenses (including reasonable attorneys' fees) of (i) the paying agent with respect to the Prior UTGO Bonds (including the paying agent relating to the Prior UTGO Bonds that are not Holders Restructured UTGO Bonds) and (ii) of the paying agent, the Master Trustee, the Debt Millage Escrow Trustee and the escrow agent identified in the Settlement Escrow Agreement in respect of all transactions contemplated by this Agreement.

(c)     <u>Further Action</u>. To the extent that the City has not taken all necessary action to authorize the execution, delivery and performance of this Agreement, it will do so.

## ARTICLE III
## PLAN OF ADJUSTMENT AND PLAN SUPPORT

Section 3.1.    <u>Plan Support Commitment</u>. From and after the date hereof, and so long as the City has complied, and is complying, with its covenants and obligations under this Agreement, the Bond Insurers will each support the treatment of the Prior UTGO Bonds in the Plan by, at a hearing or in a court filing, expressing such support solely as insurers of the Prior UTGO Bonds and, if each Bond Insurer has established its right to vote, will each vote Prior UTGO Bonds and reimbursement claims in support of such Plan treatment. The Plan shall provide that such treatment, consistent with this Agreement, is the treatment for all holders of the Prior UTGO Bonds. For the absence of doubt, nothing contained in this Agreement shall require any Bond Insurer to support or vote for the treatment of any class of claims under the Plan other than the UTGO Bonds.

Section 3.2.    <u>Solicitation Required in Connection with Plan</u>. Notwithstanding anything contained in this Article III or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan. The City and the Bond Insurers acknowledge and agree that the acceptance of the Plan will not be solicited until the Bankruptcy Court has approved the Disclosure Statement and related ballots, and such Disclosure Statement and ballots have been transmitted to parties entitled to receive same.

Section 3.3.    <u>Plan Document Provisions</u>. All Plan Documents, as they relate to the settlement embodied in this Agreement must (i) be in form and substance reasonably satisfactory to the Bond Insurers and to the City and be consistent with this Agreement, (ii) provide that the Plan treatment for Prior UTGO Bonds is part of a settlement of the pending UTGO Litigation.

## ARTICLE IV
## DEFAULTS AND REMEDIES

Section 4.1. <u>Events of Default</u>. The breach by any Party of any material agreement or covenant set forth in this Agreement or the Settlement Escrow Agreement will be an event of default ("**Event of Default**") under this Agreement.

Section 4.2. <u>Remedies</u>. The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage. Therefore, the obligations of the Parties set forth in this Agreement and the Settlement Escrow Agreement shall be enforceable by an order compelling specific performance issued by the Bankruptcy Court, and appropriate injunctive relief may be applied for and granted in connection therewith. Upon an Event of Default by the City, any Bond Insurer will have the right to compel immediate payment of amounts held under the Settlement Escrow Agreement by order of the Bankruptcy Court. Such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement, the Settlement Escrow Agreement or otherwise. Any Bond Insurer may exercise its rights hereunder on its own. Consistent with Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement and the Settlement Escrow Agreement.

Section 4.3. <u>Termination</u>.

(a) This Agreement may be terminated by the mutual agreement of all of the Bond Insurers upon an Event of Default caused by the City. This Agreement may be terminated by less than all of the Bond Insurers as to such Bond Insurer or Bond Insurers upon an Event of Default caused by the City if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by one or more Bond Insurers before the Bankruptcy Court, (ii) the Bankruptcy Court, after notice and a hearing, finds that an Event of Default caused by the City has occurred <u>and</u> (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the City of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the City fails to comply with the order.

(b) This Agreement may be terminated by the City if any of the Bond Insurers fails to (i) support the Plan with respect to Class 8 – UTGO Claims or (ii) if it has the right to vote its Class 8 Claims as determined by the voting procedures process approved by the Bankruptcy Court in an order entered on March 11, 2014 (Docket No. 2984) (as such order may have been amended from time to time), vote its Class 8 Claims to accept the Plan. This Agreement may be terminated by the City upon an Event of Default caused by the Bond Insurers, or any of them, if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by the City before the Bankruptcy Court, (ii) the Bankruptcy Court finds, after

notice and a hearing, that an Event of Default caused by the applicable Bond Insurer has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the applicable Bond Insurer of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the applicable Bond Insurer fails to comply with the order.

(c)     Upon any such termination, any Party (including one or more of the Bonds Insurers as to such Bond Insurer or Bond Insurers) may resume the UTGO Litigation unless it has been previously dismissed with prejudice or has been previously deemed dismissed with prejudice.


# ARTICLE V
# REPRESENTATIONS AND WARRANTIES

Section 5.1.     Representations and Warranties of the City. The City represents and warrants to the Bond Insurers that:

(a)     It is a municipal corporation of the State of Michigan.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken or will take all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any order or judgment of any court or other agency of government applicable to it, or any material agreements specifically applicable to it or any of its assets.

(d)     Other than (i) approvals by the MFA, the State Treasurer, the execution of the Emergency Manager Order, and the approvals required by Section 19 of Act 436 to be obtained prior to delivery of the Municipal Obligation, all of which the City reasonably expects to be obtained prior to the Effective Date, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.2.     Representations and Warranties of the Bond Insurers. Each of the Bond Insurers represents to the City that:

(a)     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary corporate action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it, or any agreements specifically applicable to it or any of its assets.

(d)     All corporate or governmental consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

(e)     Each of the respective Bond Insurers had and has standing to bring and resolve the UTGO Litigation related to the Prior UTGO Bonds that it insures (Assured and NPFG represent that each had and has standing to bring and resolve the Assured/NPFG Action, and Ambac represents that it had and has standing to bring and resolve the Ambac Action).

Section 5.3.     Mutual Representations and Warranties.  Unless otherwise noted, each Party makes the following representations, warranties and covenants (on a several basis, with respect to such Party only) to each of the other Parties:

(a)     Each person signing this Agreement warrants that he or she is legally competent and authorized to execute this Agreement on behalf of the Party whose name is subscripted at or above such person's signature.

(b)     The Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation or promise of the other Parties hereto or any other person in entering into this Agreement, except as expressly stated herein or in the exhibits hereto.  Each party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

(c)     The Parties and their respective attorneys have made such investigation of the facts pertaining to this Agreement and all of the matters pertaining thereto as they deem necessary.

## ARTICLE VI
## EXCULPATION

Section 6.1.     Exculpation.  The Plan will include the Bond Insurer Exculpated Parties as exculpated parties for acts and omissions (other than those

constituting gross negligence or willful misconduct) in connection with (i) the Plan as it relates to this Agreement and (ii) this Agreement.

Section 6.2.   Releases.  Upon the dismissal with prejudice or deemed dismissal with prejudice of the applicable UTGO Litigation, the Parties to the applicable UTGO Litigation shall be deemed to have released each other, and the Parties' officials, officers, directors, employees and representatives, of and from any and all claims and causes of action related to the applicable UTGO Litigation and the Prior UTGO Bonds.

Section 6.3.   Defense Against Challenges.  (a) Subject to the terms of Section 6.3(b) below, if, after the issuance of the Plan Confirmation Order or the Approval Order, the validity or enforceability of any term or provision of this Agreement or the Settlement-Related Documents (as they relate to the settlement set forth in this Agreement) is challenged in any action, suit or proceeding, each of the named Parties in such action, suit or proceeding shall assume its own defense of such action, suit or proceeding.

(b) If, after the issuance of the Plan Confirmation Order or the Approval Order, an action, suit or proceeding is brought, an issue in which is the validity or enforceability of the Stub UTGO Bonds, including, without limitation, a challenge to the Assigned UTGO Bond Tax Proceeds (a "**Stub UTGO Challenge**"), the City shall assume the defense of such issue in any such action, suit or proceeding.  If any of the Bond Insurers are named as a party in a Stub UTGO Challenge, the City will appoint counsel to the named Bond Insurers, which may or may not be counsel to the City.  In all events, such counsel must be reasonably acceptable to the named Bond Insurers, and the City will pay the reasonable costs of such counsel.

## ARTICLE VII
## DISMISSAL OF CASE AND TERMINATION

Section 7.1.   Effect of Dismissal of the Bankruptcy Case.  In the event the Bankruptcy Case is dismissed, any Party may at any time within 60 days after such dismissal immediately terminate this Agreement by written notice to the other Parties.

Section 7.2.   Effect of Termination.  In the event of the termination of this Agreement by any Party pursuant to any provisions of this Agreement, this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of any Party hereto (or of any of its elected or appointed officials, directors, officers, employees, consultants, contractors, agents, legal and financial advisors or other representatives) arising from such termination, and no Party shall have any obligations to any other Party arising out of this Agreement.  Upon termination, neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were as a result of negotiations and compromises of the respective positions of the Parties.  If this

Agreement is terminated, then no Party hereto may (i) use this Agreement, any of its terms or any discussions or negotiations conducted in respect of this Agreement, or any part of the foregoing, in the UTGO Litigation; (ii) seek discovery with respect to any of the matters described in subsection (i) in the UTGO Litigation; or (iii) seek to admit any of the matters described in subsection (i) into evidence in the UTGO Litigation.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1.   <u>Amendments</u>.  This Agreement may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected by such modification, amendment or supplement.

Section 8.2.   <u>No Admission of Liability</u>.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement (including, without limitation, the recitals and exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement:  (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or of any wrongdoing or liability of any Party; or (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement, and except that any Party may file this Agreement in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

Section 8.3.   <u>Good Faith Negotiations</u>.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement.  Each of the Parties acknowledges that the negotiations leading up to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; that each knows all of the relevant facts and his or its rights in connection therewith, and that he or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this

Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.

Section 8.4.    Rights and Remedies.  Nothing in this Agreement is intended to augment or impair any rights, remedies and interests, including without limitation, liens, of any of the Parties hereto other than with respect to the Prior UTGO Bonds.

Section 8.5.    Third Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6.    Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan, without giving effect to any principles of conflicts of law and applicable federal law.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof. The City agrees that the Bankruptcy Court will have exclusive post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and to hear and adjudicate any challenge, action, suit or proceeding brought by any third party challenging the validity or enforceability of any provision of this Agreement, until all UTGO Bonds have been paid in full and all Plan Instruments are no longer outstanding.  Pursuant to Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement and the Settlement Escrow Agreement.

Section 8.7.    Headings.  The headings of the Articles and Sections of this Agreement are inserted for convenience only and are not part of this Agreement and do

not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8. <u>Binding Agreement Successors and Assigns; Joint and Several Obligations</u>. This Agreement shall be binding upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another.

Section 8.9. <u>Entire Agreement</u>. This Agreement shall constitute the full and entire agreement among the Parties with regard to the subject hereof, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof. No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 8.10. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11. <u>Notices</u>. All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (a), when personally delivered by courier service or messenger, (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (c) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the City, to:

Chief Financial Officer
City of Detroit
1126 Coleman A. Young Municipal Center
Two Woodward Avenue
Detroit MI 48226
Phone: (313) 224-3382
Fax: (313) 224-2827

with a copy given in like manner to:

        Corporation Counsel
        City of Detroit Law Department
        Coleman A. Young Municipal Center
        2 Woodward Avenue
        Detroit MI 48226
        Phone: (313) 237-3018
        Fax: (313) 224-5505

        Miller, Canfield, Paddock and Stone, PLC
        150 West Jefferson, Suite 2500
        Detroit, MI 48226
        Attention: Jonathan Green
        Email: green@millercanfield.com
        Attention: Amanda Van Dusen
        Email: vandusen@millercanfield.com

If to the Bond Insurers, to:

        Ambac Assurance Corporation
        One State Street Plaza
        New York, New York 10004
        Attention: Surveillance Department and General Counsel's Office
        Fax: (212) 208-3384

with a copy given in like manner to:

        Arent Fox LLP
        1675 Broadway
        New York, New York 10019
        Attention: David L. Dubrow, Esq.
        Telecopy: (212) 484-3990
        Email: david.dubrow@arentfox.com

        Assured Guaranty Municipal Corp and Assured Guaranty Corp.
        31 West 52nd Street
        New York, NY 10019
        Attention: Kevin J. Lyons
        Email: klyons@assuredguaranty.com
        Attention: Terence Workman
        Email: tworkman@assuredguaranty.com

with a copy given in like manner to:

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
Attention: Lawrence A. Larose
Fax: (212) 541-5369
Email: llarose@chadbourne.com
Attention: Samuel S. Kohn
Fax: (212) 541-5369
Email: skohn@chadbourne.com

National Public Finance Guarantee Corporation
113 King Street
Armonk, NY 10504
Attention: Kenneth Epstein and William J. Rizzo
Telecopy: (914) 765-3259
Email: kenneth.epstein@optinuityar.com
Email: bill.rizzo@nationalpfg.com

with a copy given in like manner to:

Sidley Austin LLP
555 West 5th Street
40th Floor
Los Angeles, CA 90013
Attention: Jeffrey E. Bjork
Telecopy: (213) 896-6600
Email: jbjork@sidley.com

Sidley Austin LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Attention: Eric D. Tashman
Telecopy: (415) 772-7400
Email: etashman@sidley.com

Section 8.12.  Further Assurances.  Each of the Parties hereto agrees to
execute and deliver, or to cause to be executed and delivered, all such instruments, and to
take all such action as the other Parties may reasonably request in order to effectuate the
intent and purposes of, and to carry out the terms of, this Agreement.

Section 8.13.  Non-Severability of Agreement.  This Agreement is to be
construed as a whole, and all provisions of it are to be read and construed together.
Notwithstanding anything in this Agreement, the Approval Order (if applicable)  or the
Plan Confirmation Order to the contrary, and in light of the integrated nature of the
settlements and compromises embodied in this Agreement, in the event that (i) a court of

competent jurisdiction enters a Final Order ruling that any of the transactions contemplated in this Agreement are void, invalid, illegal or unenforceable in any material respect, (ii) any of the transactions contemplated by this Agreement are reversed, vacated, overturned, voided or unwound in any material respect, or (iii) the Approval Order or Plan Confirmation Order as it relates to the transactions contemplated in this Agreement is reversed, vacated, overturned or amended in any material respect, then in each case, the entirety of this Agreement (other than this Section 8.13) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel or any similar defense in respect of rights and claims of the Parties that were the subject of this Agreement prior to this Agreement being of no force or effect.

(Signature page follows)

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE CITY OF DETROIT, as Debtor

By: _____
      Name:
      Title:

AMBAC ASSURANCE CORPORATION

By: _____
      Name:
      Title:

ASSURED GUARANTY CORP.

By: _____
      Name:
      Title:

ASSURED GUARANTY MUNICIPAL CORP.

By: _____
      Name:
      Title:

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION

By: _____
      Name:
      Title:

Schedule 1

**(Pro Rata Allowed Claims for Restructured UTGO Bonds and Stub UTGO Bonds)**

## Schedule 1a - Holders Restructured UTGO Bonds

| Series | Outstanding UTGO Bond Principal | Restructured % | Holders Restructured UTGO Bond Principal |
|---|---|---|---|
| UTGO1999A (Assured) | $15,765,000 | 84.50% | $13,321,425 |
| UTGO2001A1 (National) | 74,800,000 | 84.50% | 63,206,000 |
| UTGO2001B (National) | - | - | - |
| UTGO2002 (National) | 6,645,000 | 84.50% | 5,615,025 |
| UTGO2003A (Syncora) | 31,675,000 | 84.50% | 26,765,375 |
| UTGO2004A1 (Ambac) | 39,270,000 | 84.50% | 33,183,150 |
| UTGO2004B1 (Ambac) | 29,365,000 | 84.50% | 24,813,425 |
| UTGO2004B2 (Ambac) | 575,000 | 84.50% | 485,875 |
| UTGO2005B (Assured) | 42,615,000 | 84.50% | 36,009,675 |
| UTGO2005C (Assured) | 15,525,000 | 84.50% | 13,118,625 |
| UTGO2008A (Assured) | 55,895,000 | 84.50% | 47,231,275 |
| UTGO2008B1 (Assured) | 18,780,000 | 84.50% | 15,869,100 |
| Total | $330,910,000 | | $279,618,950 |

## Schedule 1b - Insurer Owned Restructured UTGO Bonds

| Series | UTGO Bond Principal | Restructured % | Insurer Owned Restructured UTGO Bond Principal | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Ambac | Assured | National | Syncora | Total |
| UTGO1999A (Assured) | $15,765,000 | 2.4% | - | 378,360 | - | - | $378,360 |
| UTGO2001A1 (National) | 74,800,000 | 2.4% | 249,977 | 1,545,223 | - | - | 1,795,200 |
| UTGO2001B (National) | - | 2.4% | - | - | - | - | - |
| UTGO2002 (National) | 6,645,000 | 2.4% | 22,207 | 137,273 | - | - | 159,480 |
| UTGO2003A (Syncora) | 31,675,000 | 2.4% | 99,245 | 613,476 | - | 47,479 | 760,200 |
| UTGO2004A1 (Ambac) | 39,270,000 | 2.4% | 942,480 | - | - | - | 942,480 |
| UTGO2004B1 (Ambac) | 29,365,000 | 2.4% | 704,760 | - | - | - | 704,760 |
| UTGO2004B2 (Ambac) | 575,000 | 2.4% | 13,800 | - | - | - | 13,800 |
| UTGO2005B (Assured) | 42,615,000 | 2.4% | - | 1,022,760 | - | - | 1,022,760 |
| UTGO2005C (Assured) | 15,525,000 | 2.4% | - | 372,600 | - | - | 372,600 |
| UTGO2008A (Assured) | 55,895,000 | 2.4% | - | 1,341,480 | - | - | 1,341,480 |
| UTGO2008B1 (Assured) | 18,780,000 | 2.4% | - | 450,720 | - | - | 450,720 |
| Total | $330,910,000 | | $2,032,469 | $5,861,892 | $ - | $47,479 | $7,941,840 |

## Schedule 2

### (Pro Rata Payments to Bond Insurers)

## Schedule 2 - Allocation of Amount Payable to Bond Insurers

| Insurer | Pro Rata Share |
|---------|---------------:|
| Ambac | 23.209% |
| Assured | 50.400% |
| National | 26.391% |
| Total | 100.000% |

## Exhibit A

## FORM OF DEBT MILLAGE ESCROW AGREEMENT

A-1

CLI-2220387v14

# DEBT MILLAGE DEPOSIT ESCROW AGREEMENT
## CITY OF DETROIT, COUNTY OF WAYNE
## STATE OF MICHIGAN

THIS ESCROW AGREEMENT (the "Agreement") dated as of the ___ day of _____, 2014, made by and between the City of Detroit, County of Wayne, State of Michigan (the "City") and U. S. Bank National Association, Detroit, Michigan (the "Escrow Trustee").

### WITNESSETH:

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; and

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $369.115 million in outstanding principal amount of unlimited tax general obligation bonds, excluding the 2010A UTGO Bonds hereinafter mentioned (the "Prior UTGO Bonds"); and

WHEREAS the City has previously issued and delivered its Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation) Series 2010A (Taxable Recovery Zone Economic Development Bonds Direct Payment) (the "2010A UTGO Bonds") which, together

with the Prior UTGO Bonds, are outstanding in the amounts, bear interest at the rates, are payable on such dates and have the redemption provisions shown on Exhibit A hereto; and

WHEREAS, more than 90% of the Prior UTGO Bonds are insured by either Ambac Assurance Corporation, Assured Guaranty Municipal Corp. or National Public Finance Guarantee Corporation (each a "Bond Insurer" and collectively, the "Bond Insurers"), as shown on Exhibit A; and

WHEREAS, the City and the Bond Insurers have entered into a settlement agreement entered into as of July ___, 2014 (the "UTGO Settlement Agreement"); and

WHEREAS, the City intends to restructure $287,560,790 of the Prior UTGO Bonds which mature on or after April 1, 2015 (the "Restructured UTGO Bonds") as described below; and

WHEREAS, on _____, 2014, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City (the "City Council") his Order No. ___ Approval of _____ (Order No. ___"), in part, to accomplish the restructuring of the Restructured UTGO Bonds as the Distributable State Aid Fourth Lien Restructured Bonds (Unlimited Tax General Obligation), Series 2014 (the "Bonds" or the "Municipal Obligation") in the amounts shown on Exhibit B attached hereto; and

WHEREAS, on _____, 2014, in accordance with Section 19(1) of Act 436, the City Council adopted a resolution entitled ["Resolution of the City Council of the City of Detroit, County of Wayne, State of Michigan Approving the Emergency Manager of the City of Detroit Order No. ___ Approval of UTGO _____"] (the "Council Resolution") under which the City Council approved the issuance and delivery of the Municipal Obligation to the Michigan Finance Authority ("MFA"); and

WHEREAS, the Restructured UTGO Bonds will be restructured as described in Section 2.2 of the UTGO Settlement Agreement: and

WHEREAS, on _____, 2014, the Bankruptcy Court issued an order approving the UTGO Settlement Agreement (the "Confirmation Order"); and

WHEREAS, the portion of the Prior UTGO Bonds not restructured through the issuance of the Municipal Obligation, which mature on or after April 1, 2015, in the principal amount of $43,410,000 (the "Stub UTGO Bonds" and together with the 2010A UTGO Bonds, the Municipal Obligation and any Additional Bonds (defined below), the "UTGO Bonds") will be reinstated and shall remain Outstanding in the amounts and will remain payable as shown on Exhibit C hereto and as provided in Order No. _____; and

WHEREAS, pursuant to the Prior UTGO Bonds and the 2010A UTGO Bonds and Order No. ___ and Section 4a of Act 279, the City has pledged, and to the extent permitted by applicable law, including without limitation Section 12(1)(x) of Act 436, in Order No. __, has created a lien upon the Debt Millage Revenues (as hereinafter defined) to pay the debt service on the UTGO Bonds; and

2

WHEREAS, pursuant to Section 4a of Act 279, and Section 701 of the Revised Municipal Finance Act, Act No. 34, Public Acts of Michigan, 2001, as amended, Order No. ___ provides for the deposit of the Debt Millage Revenues into a separate escrow account to be used for the sole purpose of paying principal of and interest on the UTGO Bonds and the administrative costs related to the deposit and escrow of Debt Millage Revenues; and

WHEREAS, in order to effectuate the pledge of the Debt Millage Revenues in favor of the owners of the UTGO Bonds, it is necessary for the City to provide for the deposit with the Escrow Trustee of the proceeds of 100% of its debt millage levy to satisfy the Debt Service Requirements to be held by the Escrow Trustee in trust, to further secure payment of the debt service on the UTGO Bonds;

NOW, THEREFORE, in consideration of the mutual undertakings, provisions and agreements herein contained, the sufficiency of which are hereby acknowledged, that in order to provide for the payment of the UTGO Bonds, for the benefit of the owners thereof and the Bond Insurers, and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Escrow Trustee for the benefit of the respective owners from time to time of the UTGO Bonds and the Bond Insurers as follows:

## ARTICLE I
## DEFINITIONS

Section 101.  Definitions.  In addition to the terms defined in the preambles to this Escrow Agreement , the following terms shall have, unless the context otherwise requires, the meanings herein specified:

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Additional Bonds" means any series of unlimited tax general obligation bonds issued by the City on a parity as to Debt Millage Revenue levies with the 2010A UTGO Bonds, the Municipal Obligation and the Stub UTGO Bonds.

"Business Day" means a day which is not (i) a Saturday, Sunday or legal holiday on which banks located in either the State of Michigan or the state or states in which the principal corporate trust office of the Escrow Trustee, is located are authorized or required by law to be closed, or (ii) a day on which the New York Stock Exchange is closed.

"Debt Millage Deposit" or "Debt Millage Deposits" means whenever used herein singularly, each payment of Debt Millage Revenues, and collectively all payments of Debt Millage Revenues by the City to the Escrow Trustee for deposit in the UTGO Debt Millage Fund in accordance with Section 204 hereof.

"Debt Millage Revenues" means the proceeds of the debt millage levies, including interest subsidy payments received by the City in respect of the 2010A UTGO Bonds, delinquent millage payments received from Wayne County, Michigan or otherwise, pledged to and on

3

account of unlimited tax general obligation bonds of the City for the payment of debt service on the Prior UTGO Bonds, or after the Effective Date of the UTGO Bonds, and the 2010A UTGO Bonds and any Additional Bonds.

"Debt Retirement Schedule" means the table attached as Exhibit D hereto, showing the dates Debt Service Requirements are due and payable on each series of the UTGO Bonds.

"Debt Service Requirement" means an amount equal to the principal of and/or interest due on any series of UTGO Bonds (including the Stub UTGO Bonds) semi-annually on each payment date as set forth in Exhibit D.

"Effective Date" mean the effective date of the City's chapter 9 plan of adjustment.

"Escrow Trustee" means initially, U.S. Bank National Association, Detroit, Michigan, or any successor in trust or assignees, as Escrow Trustee hereunder.

"Event of Default" means the breach by the City of any material agreement or covenant set forth in the UTGO Settlement Agreement or this Agreement, written notice of which has been provided by a Bond Insurer to the City and the Escrow Trustee.

"Fiscal Year" means the City's fiscal year, commencing July 1 and ending June 30.

"General Retirement System" means the General Retirement System of the City of Detroit, _____ Fund.

"Income Stabilization Funds" means the Police & Fire Retirement System of the City of Detroit, Income Stabilization Fund, and the General Retirement System of the City of Detroit, Income Stabilization Fund.

"Master Trustee" means U. S. Bank National Association, Detroit, Michigan, as trustee under the Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented, between the City and the Master Trustee.

"Outstanding" when used with respect to the UTGO Bonds, means, as of the date of determination, the UTGO Bonds theretofore authenticated and delivered pursuant to the resolution, indenture and/or order for that series, except:

    (a)    UTGO Bonds theretofore canceled by the trustee or paying agent for such UTGO Bonds or delivered to such trustee or paying agent for cancellation;

    (b)    UTGO Bonds for whose payment money in the necessary amount, without the need for reinvestment thereof, has been theretofore deposited with the trustee or paying agent for such UTGO Bonds in trust for the registered owners of such UTGO Bonds;

    (c)    UTGO Bonds delivered to the trustee or paying agent for such UTGO Bonds for cancellation in connection with (i) the exchange of such UTGO

4

Bonds for other bonds or (ii) the transfer of the registration of such UTGO Bonds;

(d)    UTGO Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the resolution, indenture or order for that series or otherwise pursuant to law; and

(e)    UTGO Bonds deemed paid as provided in the resolution, indenture or order for that series.

"Permitted Investments" means those investments specified in Article III of this Escrow Agreement.

"Plan Assignees" means the Income Stabilization Funds and the General Retirement System.

"Set Aside Ledger" means the table attached as Exhibit D hereto, showing the allocation of each Debt Millage Deposit to the UTGO Debt Millage Fund in such fractional amounts determined in accordance with Section 204(a) herein.

"Stub UTGO Bonds Paying Agent" means U. S. Bank National Association, Detroit, Michigan.

"UTGO Debt Millage Fund" means the City of Detroit UTGO Debt Millage Fund created and described in Section 201 of this Agreement.

## ARTICLE II
## ESTABLISHMENT OF FUNDS AND ACCOUNTS

Section 201.    Establishment of UTGO Debt Millage Fund.  There is hereby created and established with the Escrow Trustee, pursuant to Order No. ___ and this Escrow Agreement, a single and common trust fund designated the  "UTGO Debt Millage Fund."

Section 202.    Establishment of Accounts and Subaccounts.  (a) There are hereby created within the UTGO Debt Millage Fund three (3) separate and segregated accounts, designated as follows:

1.    "2010A UTGO Bonds Debt Millage Account" ("2010A UTGO Account").  The Escrow Trustee shall deposit Debt Millage Revenues allocable to the Debt Service Requirements on the 2010A UTGO Bonds, as set forth on Exhibit D, in the 2010A UTGO Account.

2.    "2014 UTGO Bonds Debt Millage Account" ("2014 UTGO Bonds Account").  The Escrow Trustee shall deposit Debt Millage Revenues allocable to the Debt Service Requirements on the Municipal Obligation and the Stub UTGO Bonds, as set forth on Exhibit D, in the 2014 UTGO Bonds Account.

3. "Additional Bonds Debt Millage Account" ("Additional Bonds Account"). The Escrow Trustee shall deposit Debt Millage Revenues allocable to the Debt Service Requirements (to be reflected in a supplement to Exhibit D) on any series of Additional Bonds in a subaccount established for such series in the Additional Bonds Account pursuant to a supplement to this Agreement.

(b) There are hereby created within the 2014 UTGO Bonds Account two separate and segregated subaccounts, designated as follows:

1. The 2014 UTGO Municipal Obligation Subaccount ("2014 Municipal Obligation Subaccount").

2. The Stub UTGO Bonds Subaccount ("Stub UTGO Bonds Subaccount").

The Escrow Trustee shall allocate and deposit Debt Millage Revenues deposited in the 2014 UTGO Bonds Account among the 2014 Municipal Obligation Subaccount and the Stub UTGO Bonds Subaccount as provided in Section 204(a).

Section 203.  Deposits to the UTGO Debt Millage Fund.  Commencing on the Effective Date, and thereafter in accordance with the distribution schedule published by the Michigan Department of Treasury, and in any event, no less often than (x) bi-monthly during the period beginning each July 1 and ending the following March 31, and (y) monthly during the period beginning April 1 and ending the following June 30 of each year, the City shall remit the Debt Millage Revenues to the Escrow Trustee for deposit in the UTGO Debt Millage Fund. In the Order, the City has covenanted that it shall cause to be deposited with the Escrow Trustee, in accordance with the terms of this Escrow Agreement, 100% of the Debt Millage Revenues received by the City for as long as the Municipal Obligation and the Stub UTGO Bonds remain outstanding. The Escrow Trustee shall deposit any Debt Millage Revenues received by it from the City into the UTGO Debt Millage Fund and allocate such deposits in accordance with the provisions of Section 204 below.

Section 204.  Allocation and Deposit.  (a) Each Fiscal Year, commencing with the Effective Date and for as long as any UTGO Bonds remain outstanding, within one (1) Business Day of receipt by the Escrow Trustee of each Debt Millage Deposit, the Escrow Trustee shall set aside in the UTGO Debt Millage Fund each Debt Millage Deposit received, and make transfers from the UTGO Debt Millage Fund, as follows:

1. FIRST, a percentage of each Debt Millage Deposit received shall be allocated and set aside in each of the 2010A UTGO Account, the 2014 UTGO Bonds Account and any Additional Bonds Account that corresponds to the percentage that the Debt Service Requirement payable on the related series of UTGO Bonds as shown on Exhibit D bears to the Debt Service Requirement payable (or past due) on all UTGO Bonds on or before May 1 of each Fiscal Year until the sum of the aggregate Debt Millage Deposits (when taken together with any investment earnings on deposit) equals the Debt Service Requirement on all UTGO Bonds for such Fiscal Year. Once the Debt Service Requirement has been satisfied for all UTGO Bonds for payments due on or before May 1 of each Fiscal Year, any excess shall be allocated to the same accounts in

6

proportion to the Debt Service Requirements payable on such UTGO Bonds in the next Fiscal Year.

2.      SECOND, the Escrow Trustee shall allocate deposits made to the 2014 UTGO Bonds Account (i) first to the 2014 Municipal Obligation Subaccount until the Debt Service Requirement payable (or past due) on the Municipal Obligation as shown on Exhibit D on or before April 1 of the then current Fiscal Year has been satisfied and (ii) second, to the Stub UTGO Bonds Subaccount until the Debt Service Requirement payable (or past due) on the Stub UTGO Bonds on or before April 1 of the then current Fiscal Year has been satisfied. Once the Debt Service Requirement for all Prior UTGO Bonds has been satisfied for the then current Fiscal Year, any excess shall be allocated first to the 2014 Municipal Obligation Subaccount for application to the next Fiscal Year's Debt Service Requirements for the Municipal Obligation and then to the next Fiscal Year's Debt Service Requirements for the Stub UTGO Bonds.

3.      THIRD, within three Business Days after a deposit is made to any account or subaccount in the UTGO Debt Millage Fund the Escrow Trustee shall transfer the funds in such account or subaccount as follows:

(a) Funds on deposit in the 2010A UTGO Debt Millage Account shall be transferred to the Master Trustee for application to Debt Service Requirements for the 2010A UTGO Bonds.

(b) Funds on deposit in the 2014 Municipal Obligation Subaccount shall be transferred to the Master Trustee for deposit in the Series 2014 Tax Levy Account for application to Debt Service Requirements for the Municipal Obligation.

(c) Funds on deposit in the Stub UTGO Bonds Subaccount shall be transferred to the Plan Assignees pursuant to the direction and in the amounts shown on Exhibit F. In the event insufficient funds are on deposit in the Stub UTGO Bonds Subaccount on the date set for any transfer, the Escrow Trustee shall allocate and transfer the funds then on deposit in the Stub UTGO Bonds Subaccount to the Plan Assignees pro rata, in proportion to the amount due to each Plan Assignee on such date.

(d) Funds on deposit in the Additional Bonds Account shall be transferred to the paying agent or trustee for the related series of Additional Bonds.

(b)      The Escrow Trustee shall keep and maintain a ledger on its books and records showing each Debt Millage Deposit into the Debt Millage Fund of the UTGO Debt Millage Fund, all transfers of funds from one account to another or from the UTGO Debt Millage Fund to the Master Trustee or the Income Stabilization Funds or the paying agent or trustee for any Additional Bonds, which ledger shall be substantially in the form attached hereto as Exhibit D-2 (the "Set Aside Ledger"). Not later than one (1) Business Days after the receipt of each Debt Millage Deposit, the Escrow Trustee shall promptly confirm electronically or in writing to the

7