UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,        .       Docket No. 13-53846
        MICHIGAN,               .
                                .       Detroit, Michigan
                                .       October 15, 2014
                      Debtor.   .       8:30 a.m.
. . . . . . . . . . . . . . . .


              TRIAL RE. OBJECTIONS TO CHAPTER 9 PLAN
             BEFORE THE HONORABLE STEVEN W. RHODES
               UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  GREGORY M. SHUMAKER
                          MIGUEL EATON
                     51 Louisiana Avenue, N.W.
                     Washington, DC  20001
                     (202) 879-3939

                     Jones Day
                     By:  HEATHER LENNOX
                     222 East 41st Street
                     New York, NY  10017
                     (212) 326-3837

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the Official     Dentons US, LLP
Committee of         By:  CLAUDE D. MONTGOMERY
Retirees:            1221 Avenue of the Americas, 25th Floor
                     New York, NY  10020-1089
                     (212) 632-8390

For Ad Hoc COPs      Kramer Levin Naftalis & Frankel, LLP
Holders:             By:  JONATHAN M. WAGNER
                     1177 Avenue of the Americas
                     New York, NY  10036
                     (212) 715-9393

APPEARANCES (continuing):

```
For County of          Dechert, LLP
Macomb, Michigan:      By:  DEBRA D. O'GORMAN
                       1095 Avenue of the Americas
                       New York, NY  10036
                       (212) 698-3593




Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street, 21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2   be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          MR. MONTGOMERY:  Your Honor, the city gave me

4   permission to do an administrative matter first if that's

5   okay with you.

6          THE COURT:  Sure.  Go ahead.

7          MR. MONTGOMERY:  Your Honor, yesterday during the

8   examination of Mr. Fornia, the Retiree Committee asked the

9   Court and the Court admitted Exhibit 10995, which was ASOP

10  27.  That number, however, had been previously used in the

11  testimony of Ms. Nicholl.  It was an admitted exhibit, so we

12  have asked the other side to consent to the replacement to

13  10484, which is ASOP 27.  If I may approach the bench, your

14  Honor --

15         THE COURT:  Sure.  Sir.

16         MR. MONTGOMERY:  And with the consent of the city

17  and the objectors, we would ask the Court to admit 10484.

18         THE COURT:  Any objections?

19         MR. WAGNER:  No, your Honor.  That's fine.

20         MR. SHUMAKER:  No objection from the city, your

21  Honor.

22         THE COURT:  It is admitted.

23      (Retiree Committee Exhibit 10484 received at 8:31 a.m.)

24         MR. MONTGOMERY:  Thank you, your Honor.

25         THE COURT:  Anything further of an administrative or

1  housekeeping nature?

2        MR. WAGNER:  Just, your Honor, as I mentioned, I

3  won't be here the next two days because of the holiday, but

4  Ms. Fish will be ably representing the COPs.

5        THE COURT:  Okay.

6        MR. SHUMAKER:  Nothing from the city, your Honor.

7        THE COURT:  Okay.  Let's begin with our proceedings

8  for today then.  I'd like to first invite Irma Industrious to

9  examine her witness, Dennis Taubitz.  Are they here?  Not

10  yet.  Okay.

11        MR. HERTZBERG:  Your Honor, Robert Hertzberg on

12  behalf of the city.  I would maybe suggest that we deal

13  with -- the motion in limine regarding Heather Lennox is out

14  there.  I'd just advise the Court we still have that on the

15  docket.

16        THE COURT:  Well, let's see.  Is Wanda Hill here?

17  You are here, ma'am?  Okay.  Can you step forward, please?

18  Yeah.  You can just stand right there at the lectern for me.

19  Thank you.  And what is your name?

20        MS. HILL:  Wanda Jan Hill.

21        THE COURT:  Okay.  Do you still wish to call as a

22  witness Ms. Lennox from Jones Day?

23        MS. HILL:  Well, I did get a document that said I

24  couldn't use her as a witness, so --

25        THE COURT:  Well, the motion has requested that I

1    not allow it, but I have not made a ruling on that yet, so

2    that's why I was asking if you still want to ask her

3    questions.

4              MS. HILL:  Yes.

5              THE COURT:  You do?

6              MS. HILL:  Um-hmm.

7              THE COURT:  Okay.  So let me hear from the attorney

8    for the city on this question, and then I'll hear from you,

9    and then I'll make a decision about whether you can ask

10   questions of Ms. Lennox.  Okay?

11             MS. HILL:  Okay.

12             THE COURT:  If you'll just step two steps to one

13   side or the other, I can let Mr. Hertzberg use that

14   microphone.

15             MR. HERTZBERG:  Thank you.

16             THE COURT:  Go ahead, sir.

17             MR. HERTZBERG:  Good morning, your Honor.  Robert

18   Hertzberg, Pepper Hamilton, on behalf of the City of Detroit.

19   Ms. Lennox is, as the Court knows, one of the lead attorneys

20   in representation of the City of Detroit in the restructuring

21   case before this Court.  She has been actively involved in

22   the crafting of the plan of adjustment and has been actively

23   involved in the trial of the confirmation of this plan, so

24   she's been involved in every aspect of the case.  If

25   Ms. Lennox testified before the Court, there would be issues

1    on almost any question dealing with attorney-client privilege

2    and would also deal with the mediation order that's in place

3    regarding negotiations with retirees.  The Court has

4    authorized Ms. Hill under its order to examine Ms. Lennox on

5    two issues, whether the 6.75-percent interest rate is

6    excessive on the ASF and whether the rate was adequately

7    disclosed in the disclosure statement.  That's what's set

8    forth in your order.  These are clearly, in my mind, legal

9    issues that would have to be addressed by the Court and not

10   factual issues that Ms. Lennox can give any insight on.  The

11   case law on calling opposing counsel as a witness, one of

12   them is the U.S. versus Ziesman case out of the Eighth

13   Circuit that clearly says that there must be a compelling

14   need -- that's the language they use, compelling need -- in

15   order to call opposing counsel as a witness.  More telling

16   even is the Nationwide versus -- Nationwide Insurance versus

17   Home Insurance case out of the Sixth Circuit, which is cited

18   in our motion in limine.  That case dealt with an affirmation

19   of an arbitration decision, and Home Insurance asked the

20   Sixth Circuit to reverse the confirmation of the decision.

21   Home Insurance wanted to take the discovery of the Nationwide

22   attorney by a deposition to show bias of one of the

23   arbitrators, and the Court held, and I quote, "The District

24   Court also denied Home's motion for discovery from

25   Nationwide's counsel because Home's failed to make the

1    requisite showing necessary to take the deposition of an

2    opposing counsel.  Discovery from an opposing counsel is,

3    quote, 'limited to where the party seeking to take the

4    deposition has shown that (1) no other means exist to obtain

5    the information and (2) the information sought is relevant

6    and nonprivileged; and (3) the information is crucial to the

7    preparation of the case.'"

8         There's been no showing that Ms. Lennox is in any

9    way the only source of relevant information on these issues.

10   In regard to the 6.75-percent rate on the ASF recoupment,

11   there were witnesses that were available to be questioned on

12   this issue.  One is Glenn Bowen, two is Cynthia Thomas, three

13   is Chuck Moore, and four is Terri Renshaw.  As to whether

14   there was adequate information disclosed on this issue within

15   the disclosure statement, Kevyn Orr, the emergency manager

16   who signed the disclosure statement, was on the stand and was

17   available to address this issue.  Ms. Lennox's testimony is

18   not, one, vital, or, two, probative on this issue.  Her

19   personal opinion as to what the 6.75-percent interest rate

20   means or what was disclosed in the disclosure statement is

21   not relevant to the findings on these issues.  One, the

22   documents speak for themselves, and, two, there were other

23   witnesses who are nonattorneys who could have testified to

24   this.

25        Under the Lolli versus Zaller case, which we cite,

1  which is also a Sixth Circuit case, they use the language

2  "extraordinary circumstances" when calling counsel to

3  testify.  I'd suggest to this Court that there are no

4  extraordinary circumstances here, and I'd ask that the Court

5  reverse its order requiring Ms. Lennox to testify.  Thank

6  you, your Honor.

7  MS. HILL:  I object to everything that he's -- that

8  he just spoke about because in his statement he did mention

9  that she was a part of all of this documentation that has

10 gone out over the last five, six months.  I think that she is

11 qualified to be a witness for that 6.75 percent.  Her name is

12 on a lot of documents.  She even stood before you the 15th

13 and the 21st of July to talk about that, so those other names

14 that he's mentioned, I'm not aware of them.  I just know that

15 Ms. Lennox was the best choice to address those concerns.  I

16 think she's well-qualified.

17 THE COURT:  Mr. Orr, may I have your attention,

18 please?

19 MR. ORR:  Your Honor, you always have my attention.

20 Yes, sir.

21 THE COURT:  Thank you.  To what extent can you

22 testify about whether the disclosure statement discloses the

23 6.75-percent interest on the ASF recoupment payments?

24 MR. ORR:  Might I have a minute to consult with my

25 attorneys?

1          THE COURT:  Yeah.  See, that tells me the answer is

2   no.

3          MS. HILL:  Can I pose a question?

4          THE COURT:  One second.  Sir.

5          MR. HERTZBERG:  Your Honor, Mr. Orr can testify to

6   his knowledge of the 6.75-percent interest rate issue.  I

7   don't know if there's -- and I'd indicate to the Court that

8   it is not addressed, specifically the number, in the

9   disclosure statement, but he can testify that there's other

10  documents that are in there.

11         THE COURT:  Well, all right.  Mr. Hertzberg, since

12  you have suggested that Mr. Orr can testify about this, I'm

13  going to test that, and if he can, so be it, but if he can't,

14  we're going to have to seriously consider asking Ms. Lennox

15  about this.  Mr. Orr, step forward, please.  And just so that

16  there's no misunderstanding about it, we'll administer the

17  oath again.

18               KEVYN ORR, WITNESS, SWORN

19         THE COURT:  All right.  Please sit down.  So, Ms.

20  Hill, let me invite you to ask the questions of Mr. Orr that

21  you were going to ask of Ms. Lennox, and if he can answer

22  them, then your goal and purpose here will have been

23  satisfied.  If he can't answer them, then I likely will have

24  Ms. Lennox testify.

25         MS. HILL:  Okay.  Because I wasn't prepared for that

1  witness and Ms. Lennox because I assumed that they were

2  off --

3          THE COURT:  Um-hmm.  Okay.

4          MS. HILL:  -- you know, under the radar, I'll

5  attempt to throw -- or provide some questioning for Mr. Orr.

6                      DIRECT EXAMINATION

7  BY MS. HILL:

8  Q   Mr. Orr, my motion was relative to the nondisclosure of

9  the 6.75 percent, and I don't know how much of the workings

10  you were involved with that information not being disclosed,

11  but can you explain to me and to the Court how much

12  involvement did you have with the 6.75-percent interest not

13  being provided in the relevant documents that the Class 11 in

14  particular needed in order to make a sound decision?

15          THE COURT:  Excuse me.  Before you answer that

16  question, the 6.75-percent interest rate that you're talking

17  about is the 6.75-percent interest on the ASF recoupment --

18          MS. HILL:  Yes.

19          THE COURT:  -- amounts?

20          MS. HILL:  On the -- and I have to say clawback

21  because I am not knowledgeable whether or not they have --

22          THE COURT:  That's fine.

23          MS. HILL:  -- fixed that.

24          THE COURT:  That's fine.  And we know what you are

25  referring to when you use the word --

1          MS. HILL:  Okay.

2          THE COURT:  -- "clawback."  Go ahead, sir.

3          THE WITNESS:  Thank you, your Honor.  Good morning,

4    ma'am.

5    BY MS. HILL:

6    Q    Good morning.

7    A    I was involved in that process.

8    Q    To what extent relative to it being a nondisclosure

9    issue?

10   A    I don't want to mislead you.  I don't look at it as a

11   nondisclosure issue.  Without getting into the discussions

12   that occurred between counsel, between the Retiree Committee,

13   and between the mediation process as far as getting to that

14   number, I think what I can say is that there was no

15   affirmative decision made necessarily not to include it in

16   the disclosure statement.  The concept generally was that

17   there was going to be communication with the Retiree

18   Committee, which we asked this Court to impanel, and so that

19   there'd be a conduit of information going back and forth to

20   retirees.  My understanding is that that information was

21   provided, I believe, specifically in at least one slide deck

22   that that committee put out to retirees.  There were a number

23   of other fliers and communications that went out prior to the

24   deadline for voting.  I don't have all of them in front of

25   me, but I'd be happy to go back and get them.  In addition, I

1 understand that there were specifically discussions with

2 members of the committee as well as members of other groups

3 to try to explain that process, so I don't think there was an

4 intent necessarily not to include it in the disclosure

5 statement. I do believe that there was every intent to make

6 sure that it was disclosed in a number of different forms.

7 Q   I beg to differ. In my research I found that the

8 words -- or the word phrase "other factors" was used --

9 A   Um-hmm.

10 Q   -- instead of being forthright and just putting all the

11 cards on the table, so, therefore, that gave me the

12 impression that it's something that you don't want us to

13 know, so when "other factors" was used in at least ten

14 different documents, it raised a red flag. As a matter of

15 fact, I do have a chart, and I did talk with the court

16 administrator, and I did ask her for the capability of

17 displaying my information, my chronology table, which backs

18 the fact that it was not disclosed. It was under the guise

19 of "other factors." My report does show --

20         THE COURT: Do you want us -- do you want us to help

21 you display that --

22         MS. HILL: Yes.

23         THE COURT: -- at this time?

24         MS. HILL: Right.

25         THE COURT: Okay. Chris, can you do that for us?

1   There you go.  Just slide it over because we can't quite see

2   the whole date.

3           MS. HILL:  Okay.

4           THE COURT:  There we go.

5           MS. HILL:  And if you slide it down, I can do it.

6   The top line, yeah.  Okay.  Okay.  I want the Court and the

7   Judge to bear with me.  This is something new --

8           THE COURT:  Yes.

9           MS. HILL:  -- but I do want to say thank you for

10   this opportunity because no one can take care of my business

11   better than I can, so I want to thank you for that.

12   BY MS. HILL:

13   Q    This table was pulled together because that 6.75-percent

14   interest was a very important number, that along with other

15   things that are totally unclear because they lack some

16   communication between the retirees and the City of Detroit

17   and all the other entities involved.  This report shows the

18   research that I did relative to life expectancy, and I'm

19   going to put it together as life expectancy and other factors

20   because every time it was mentioned in a document, this was

21   the phrase that was used.  As you see, the filing for

22   February 21st with the first plan of adjustment, nothing was

23   listed there, and I can somewhat understand that because you

24   didn't have it together at that time, but as the time went by

25   and documents after documents after documents were presented,

1  never was the "other factors" explained nor was it listed as

2  part of an official record.  Starting from February 21st all

3  the way down to the first time that it was mentioned, the

4  life expectancy and other factors, it came about in -- April

5  10th, as you all can see, but there, too, it came out as

6  "other factors."  April the 16th it also came like that, but

7  that was an opportune time for this "other factors" to be

8  mentioned, to break down "other factors," and I say that

9  because when you gave a definition of AFS distribution

10  recipient and other phrases that fit along that line, that

11  should have been a part of the distribution information, you

12  know, spelling it out, the 6.75, and not other factors.

13  Other factors could be a house, a dog, you know.  It could be

14  a lot of things, but since we're talking about the bankruptcy

15  and we're talking about money, that other factors should have

16  been mentioned.  And when you have a document as large as

17  these documents that you all have produced, it was enough

18  space, enough room to break down other factors, so I had a

19  real problem with the fact that "other factors" was not

20  explained.

21          THE COURT:  Can you slide that up?  Yes.  Thank you.

22  Good.

23          MS. HILL:  Okay.

24  BY MS. HILL:

25  Q    Once again, April 16th -- I mean April 17th it was not

1  mentioned, and we dealt with the ballots. This is when you

2  were trying to pull it together, what was going to go on the

3  ballot and what we needed to have on the ballot. I believe

4  at this time you had decided or you might have -- and you can

5  look -- can you see it?

6  A    Yes, ma'am, I can see it.

7  Q    You can let me know was the information relative to the

8  clawback or the AFS recoupment and the pension, the four and

9  a half percent and the fifteen and a half percent, was that

10  known at that time how you will -- how you're going to

11  calculate the clawback?  Did you know it April 17th?

12  A    Ma'am, sitting here right now, I don't recall.  I'd have

13  to look at my notes.

14  Q    Okay.  I'm assuming that -- I'm going to assume -- and

15  sometime, you know, those assumptions are not right -- I'm

16  going to assume that you had some idea about what you were

17  going to take from the retirees.

18  A    There were general discussions that I think are covered

19  by the mediation order, but I think it's fair to say around

20  that time there were discussions going back and forth.

21  Q    So the money was an issue at that time?

22  A    I believe there were discussions that were being had.

23  Q    And I think so, too, because the media talked a lot about

24  how much they were going to take from us.  It wasn't at that

25  point where you had decided it was going to be four and a

1  half percent or twenty-seven and a half percent, but there

2  was an idea of how much money you needed, so my concern

3  was -- especially when we got to the POA three, that you knew

4  at that time that other factors was going to be an issue, and

5  you had some idea what other factors was going to be.  I

6  don't think you would have included it in a document unless

7  you had some kind of idea of what other factors was going to

8  curtail, but --

9       THE COURT:  Is there a -- is there a second page to

10 this document?

11      MS. HILL:  Yes, it is, uh-huh.  This is the other

12 part of the chronology.

13      THE COURT:  Turn it the other way.

14      MS. HILL:  Okay.  I'm not used to this --

15      THE COURT:  There you go.

16      MS. HILL:  -- kind of machine here.  Okay.

17 BY MS. HILL:

18 Q  As you see, a couple of weeks later another document came

19 out, and, once again, you referred to -- someone referred to

20 life expectancy and other factors without explaining what

21 "other factors" was.  Again, that was an opportune time to

22 break that "other factors" down and provide that information,

23 and we go all --

24      THE COURT:  Let me just -- let me just interrupt

25 here.

1         THE WITNESS:  Um-hmm.

2         THE COURT:  Mr. Orr, I think what --

3         MS. HILL:  Mrs. Hill.

4         THE COURT:  -- Ms. Hill -- yeah -- Ms. Hill is

5    trying to get to here is whether or not any of the city's

6    filed documents explicitly disclosed that there was a 6.75-

7    percent interest rate associated with the ASF recoupment or

8    clawback.

9         THE WITNESS:  Right.

10        THE COURT:  Do you know the answer to that question?

11        THE WITNESS:  What I recall, your Honor, is that I

12   don't think it was included in the disclosure statement.

13   What I do not recall is there were other documents that were

14   distributed that were also, for instance, included on the

15   city's website.  I do not know -- the fliers that we sent out

16   to the committee, various communiques that we sent out, the

17   other information, I do not know if any of those documents

18   were ever filed as an exhibit to any pleadings filed in this

19   court by the city.  I simply don't know that, so I can't

20   be --

21        THE COURT:  All right.  Thank you.  Mr. Hertzberg,

22   in the circumstances, I think we have to have Ms. Lennox

23   testify about the extent to which she can fill in that which

24   Mr. Orr doesn't know.

25        MR. HERTZBERG:  That's fine, your Honor.

1          THE COURT:  All right.  Mr. Orr, you're excused.

2     Thank you.

3          THE WITNESS:  Thank you, your Honor.

4        (Witness excused at 8:53 a.m.)

5          THE COURT:  Let's bring Ms. Lennox in.

6          MR. HERTZBERG:  Your Honor, it might be helpful if I

7     could suggest to the Court that I ask Ms. Lennox a series of

8     questions and lay a foundation and then allow Ms. Hill to

9     examine her so that we can get the documents out at least.

10          THE COURT:  I'll let you do that on cross, but we're

11     going to follow regular trial procedure here, which gives Ms.

12     Hill the first opportunity to question the witness.  All

13     right.  Can you ask Ms. Lennox to come in?  Oh, she's here.

14     Okay.  Please raise your right hand.

15                    HEATHER LENNOX, WITNESS, SWORN

16          THE COURT:  Please sit down.

17                        DIRECT EXAMINATION

18     BY MS. HILL:

19     Q    Hi, Ms. Lennox.

20     A    Good morning, ma'am.

21     Q    I guess I want to just make my questions short and brief

22     to you, and, to coin a phrase, what did you know and when did

23     you know it relative to the other factors?

24          THE COURT:  Well, and specifically the disclosure of

25     the 6.75-

1          MS. HILL:  Right.

2          THE COURT:  -- percent interest rate on the ASF

3    recoupment.

4          MS. HILL:  And that's what disclosure mean.

5    BY MS. HILL:

6    Q    What did you know and when did you know it?

7    A    So let's start with the beginning of the process when we

8    were putting documents together that would be distributed to

9    the retiree community with respect to their voting on the

10   plan, and those documents contained many documents, as you

11   indicated.  There was the plan itself.  There was the

12   disclosure statement.  There was a document that we called in

13   the court a plain language statement, which was a separate

14   insert that was supposed to try to make very complicated

15   pension and retiree healthcare concepts and try to put

16   them -- excuse me -- as much as we could, in plain English

17   for folks to understand.  And there were also ballots, and I

18   believe there were some letters that were sent to -- sent in

19   the solicitation package as well.  Excuse me, ma'am.  I'm

20   fighting a cold.  The purpose of all those -- excuse me.  The

21   purpose of all those disclosure documents, ma'am, was to try

22   to explain to each of the pension claimants what exactly, to

23   the extent we could provide it, was going to happen with

24   respect to their pensions as a result of the plan of

25   adjustment, and so one of the things that we thought would be

1   most helpful to the pension participants was to disclose to

2   them -- and we did this in the ballots -- exactly what would

3   happen to their pension, so, therefore, each retiree -- there

4   was a line on the ballot that showed the total amount of the

5   ASF recoupment that each retiree who was subject to it would

6   be expected to pay.  It also showed each -- we also

7   calculated a monthly amount that would be deducted from the

8   retiree's check related solely to ASF recoupment, and we also

9   included the total result as a result of the other reductions

10  that would come from the plan plus the ASF recoupment.  What

11  was the total effect on each retiree's pension check?  Those

12  calculations were made by the city's financial advisors and

13  actuaries, and in some cases the Retiree Committee's

14  actuaries helped.  And that information was put on every

15  ballot that was sent to each retiree, so we thought the best

16  evidence of what would happen to retirees' pensions was to

17  give them the exact numbers, which we did on the ballots.

18          With respect to when we said -- the concept of an

19  annuity we thought was familiar to the retirees, and that is

20  because it was our understanding -- and I believe there's

21  been other testimony in this case to this effect -- that when

22  a retiree -- when an employee goes to retire from the City of

23  Detroit, the folks that deal with the retirement process

24  explain to the retirees that they can -- they have two

25  choices with respect to their annuity savings fund account.

1    They can take it in a lump sum or they can take it in
2    payments over time, and the pension systems and the pension
3    folks refer to that as an annuity, a payment over time.  And
4    when they do that, they calculate it, and they use the
5    interest rate that is the investment return assumption for
6    the pension plan.  So when we calculated the ASF annuitized
7    amounts, we also used the investment return assumption for
8    the pension plan going forward, and we believe that was a
9    familiar concept to the retirees because they had that choice
10   on retirement.
11          So in addition to that, ma'am, when it was brought
12   to our attention that some retirees had some question about
13   that -- I believe counsel to the Retiree Committee brought
14   that to our attention, and we also had to correct a
15   disclosure regarding the date for the ASF recoupment period.
16   We reached a stipulation with the Retiree Committee that
17   corrected that disclosure about the ASF recoupment period,
18   and in that stipulation that was filed with the Court on June
19   4th, we did specifically include that interest percentage
20   because people had been asking about it.  It was also in a
21   letter dated June 4th that went out to the retirees that were
22   affected by this change and correction in the ASF recoupment
23   period.  That's a publicly filed document, ma'am.
24   Q   Okay.  I want to go back to what you said that really
25   struck a chord.  You said that it was exact.  It was not

1　exact.　Nowhere in those documents did it tell you that there

2　was a 6.75-percent interest tacked onto the AFS recoupment

3　amount, so it was not exact, and that's one of the reason why

4　I'm standing here.　It was not exact.　The assumptions -- we

5　have to stop dealing with the assumptions because we can't

6　really say that retirees understand the workings and the

7　makings of their pension checks.　They know that they -- for

8　30 years they set aside spendable cash and set it aside,

9　which kept them from spending it, so that they'd be in a

10　position where they can live in comfort, as most Americans

11　want to do.　That plain language document, in my view, was

12　the ideal document for you to spell everything out, the 6.75.

13　The "other factors" should have just been -- should have just

14　fallen by the wayside, and since it was a plain language

15　document, it should be plainly explained to us what were the

16　calculations for the clawback.　I think that has a lot of the

17　retirees, including myself, all up in arms because there's

18　information where you're taking money away from us, but

19　you're not giving us the right to know what this -- you know,

20　what is all the money going for and what is -- you know, why

21　were you taking the money, and what was the calculation and

22　the reason for it?　I still say that that "other factors" was

23　used as a ruse to allow you to come back at some other time

24　to say, "Oh, that was easy.　We got that money from them, and

25　let's try to get it from them under 'other factors.'"

1   A    No, ma'am, there was no intent for that.

2   Q    Well, going to my research and seeing how long it took

3   you all to give us that information, in fact, that

4   information was not disclosed to us until we had that hearing

5   with some objectors July 15th, and there was a follow-up the

6   21st. And ironically the 6.75 showed up after we exposed the

7   fact that we were being charged 6.75. That's not a

8   coincidence at all. That was deliberate way of you easing

9   that in after it had not been there. But let me just ask you

10  this. When you said "other factors," what factors were you

11  thinking about? And please don't say gender because gender

12  is a part of the life expectancy. That statement -- that

13  word shouldn't even stand alone. It's a part of the life

14  expectancy, so that's -- to me that's not another -- that's

15  an other factor. So what were those things that you thought

16  about that you felt should be used as other factors?

17  A    Ma'am, how you calculate an annuity payment is an

18  actuarial calculation.

19  Q    I understand that, and I have to --

20          THE COURT:  Ma'am, you have to let the witness

21  finish her answer to your question.

22          MS. HILL:  Okay, because --

23          THE COURT:  You can't --

24          MS. HILL:  -- she's going to repeat what she just

25  said.

1          THE COURT:  Okay.  But you can't argue.  You can

2     just ask questions.

3          MS. HILL:  Okay.

4          THE COURT:  Okay.  So go ahead and finish your

5     answer.

6          MS. HILL:  Um-hmm.

7          THE WITNESS:  So, ma'am, I am not an actuary.  I

8     cannot myself perform the calculations.  I don't know what

9     goes into the calculations other than generally knowing that

10    longevity and an interest factor -- and I think there are

11    other factors that go into that calculation, but we asked our

12    actuaries to perform that calculation, and how they do that I

13    do not know.

14    BY MS. HILL:

15    Q    So who came up with the word phrase "other factors"?

16    Who's responsible for that?

17    A    Well, the disclosure that was included in all of the

18    documents that you received --

19    Q    Um-hmm.

20    A    -- was drafted initially by the city, but it was heavily,

21    heavily reviewed and edited by many, many people who

22    represent the retirees such as the Retirement Systems

23    counsel, the Retiree Committee counsel.  We had counsel for

24    the two largest retiree associations in the city that

25    reviewed and commented on that.  We also had counsel for the

1  four safety unions, for AFSCME, and for the UAW, who all

2  reviewed the language, who all commented on it, who all

3  redrafted it, so I would say that those wording phrases were

4  the combination of very, very many people who were trying to

5  make things clear and simple for the retirees.

6  Q   So you don't know --

7         THE COURT:  All right.  Ma'am, I can give you one

8  more question.

9         MS. HILL:  Okay.  And I'm not really done either.

10        THE COURT:  I'm sorry.

11        MS. HILL:  I won't be done after I finish talking

12  with her.

13        THE COURT:  Okay.

14        MS. HILL:  She was not --

15        THE COURT:  But let's hold on that, but let me give

16  you one more question for --

17        MS. HILL:  Okay.

18        THE COURT:  -- Ms. Lennox.

19        MS. HILL:  Well, to state -- I'm going to go back to

20  what she just said.

21  BY MS. HILL:

22  Q   So you don't know who came up with the word phrase "other

23  factors"; therefore, you don't know what "other factors"

24  entailed?

25  A   No, ma'am.  I said that language was the product of many

1  people looking at the language and negotiating the language,

2  so I would say it was a very collaborative process to put

3  that language that you referred to in these documents, so I

4  think many people had a hand in that.

5  Q    And one more question.  Were you concerned about the

6  words "other factors"?  I mean was that a concern?  Did you

7  hear or know of anyone that said, "Hey, 'other factors,' what

8  does that mean?"  I mean your colleagues.

9  A    No, ma'am, I am not.

10 Q    But anybody in your circle --

11           THE COURT:  All right.  All right.  I'm going to

12 have to --

13           MS. HILL:  I'm sorry.  Okay.

14           THE COURT:  -- ask you to step aside for a few

15 minutes while I allow Mr. Hertzberg to ask questions of

16 Ms. Lennox.

17           MS. HILL:  Okay.

18                    CROSS-EXAMINATION

19 BY MR. HERTZBERG:

20 Q    Good morning, Ms. Lennox.

21 A    Good morning.

22           THE COURT:  Can you fix that microphone for me?

23           MR. HERTZBERG:  How's that?

24           THE COURT:  Much better.  Thank you.

25           MR. HERTZBERG:  Exhibit PS14020, please.  You can

1    watch.

2            MS. HILL:  I have one question.

3            THE COURT:  What is your question?

4            MS. HILL:  Who is this gentleman?

5            THE COURT:  That's Mr. Hertzberg.  He represents the

6    city.

7            MS. HILL:  Okay.

8            THE COURT:  He's an attorney.

9            MS. HILL:  And when he makes his statements, am I in

10   a position to say something about what he's saying?

11           THE COURT:  What we're going to do is I'm going to

12   let him ask his questions and take the witness' answer, and

13   then I will give you a brief opportunity to respond.  Okay?

14           MS. HILL:  Yes.

15           THE COURT:  So let me ask you to try to make notes

16   there of what you want to say because I don't want to go back

17   and forth and back and forth and back and forth.  He'll have

18   his turn, and you'll have your turn.  Okay?

19           MS. HILL:  Okay.

20           MR. HERTZBERG:  Thank you, your Honor.

21   BY MR. HERTZBERG:

22   Q    Ms. Lennox, do you recognize that document?

23   A    I do.

24   Q    And what is that document?

25   A    This is the -- it's the cover page of a slide deck that

1  was presented by counsel for the General Retirement System at

2  a public meeting that the Retirement System had to explain

3  the pension aspects of the plan to its membership.

4  Q    And who was its membership?

5  A    The participants in the General Retirement System.

6         MR. HERTZBERG:  Could you bring up page 29, please?

7  BY MR. HERTZBERG:

8  Q    Do you know the date that this presentation was made?

9  A    I believe they made this presentation on June 5th, 2014.

10 Q    And on page 29, do you recognize that page?

11 A    I do.

12 Q    And what does it indicate on page 29?

13 A    It's a general explanation of how the ASF recoupment

14 process would work under the plan of adjustment.

15 Q    Is there any disclosure of the 6.75-percent interest rate

16 on the ASF in it?

17 A    Yes, there is.

18 Q    And what does it say?

19 A    The second bullet says, "Excess interest amount is

20 actuarially converted to a monthly lifetime annuity amount

21 based upon your life expectancy, interest at the actuarially

22 assumed rate, paren, 6.75 percent, close paren, and the type

23 of benefit selected at the time of retirement."

24         MR. HERTZBERG:  Your Honor, I'd move admission of

25 this document into evidence.  It was listed as an exhibit.

1   We objected to it as hearsay, but we were the only one who

2   objected, and we're withdrawing our objection on hearsay.

3               THE COURT:  And what did you say the number is?

4               MR. HERTZBERG:  It is PS14020.

5               THE COURT:  All right.  It is admitted.

6       (Exhibit PS14020 received at 9:08 a.m.)

7               MR. HERTZBERG:  Thank you, your Honor.

8               THE COURT:  Do you know -- were you at this

9   presentation?

10              THE WITNESS:  I was not at the presentation, your

11  Honor.  I had seen an advance copy of this before it was

12  presented, so -- to check it.  They asked the city to check

13  it for accuracy.

14              THE COURT:  Do you know how many people attended

15  this presentation?

16              THE WITNESS:  I do not, but I do know it was posted

17  on their website immediately after the presentation.

18              THE COURT:  Whose website?

19              THE WITNESS:  The General Retirement System's

20  website.

21              MR. HERTZBERG:  Your Honor, may I approach the Court

22  with a stipulation that was entered and give a copy to the

23  witness?

24              THE COURT:  Yes.

25              MR. HERTZBERG:  Your Honor, I'd ask to have this

1   marked as proposed Exhibit 777 of the City of Detroit.

2           THE COURT:  Okay.

3       (City Exhibit 777 marked at 9:09 a.m.)

4   BY MR. HERTZBERG:

5   Q   Ms. Lennox, do you recognize this document?

6   A   I do.

7   Q   What is this document?

8   A   This is a stipulation that I negotiated with counsel for

9   the Retiree Committee and counsel for the two largest

10  Retirement Systems regarding the correction on the disclosure

11  of the ASF recoupment period in the plan of adjustment.

12  Q   Can you turn to page -- was this document entered by the

13  Court?

14  A   Yes, it was.

15          MR. HERTZBERG:  Your Honor, I'd move for admission

16  of document -- City Document 777, please.

17          THE COURT:  It is admitted.

18      (City Exhibit 777 received at 9:10 a.m.)

19  BY MR. HERTZBERG:

20  Q   Can you turn to page 9 of 39 of that document, please?

21  A   Yes.

22  Q   What is that?

23  A   That is the form of a letter that, should the stipulation

24  be approved, we were intending and did send to the ASF

25  recoupment folks, who were -- where the calculations would

1  have changed a little bit based on the correction of the ASF

2  recoupment period date -- dates.

3  Q   Turn to page 2 of that letter, 10 of 39, please.  Does

4  that letter at any point mention the 6.75-percent rate on the

5  ASF recoupment?

6  A   It does.

7  Q   Whereabouts?

8  A   At the end of the first full paragraph on that page, the

9  third line up from the bottom.

10  Q   And what does it say exactly?  Could you read it, please?

11  A   The last sentence of that paragraph reads, "If you are a

12  current retiree, the estimated annuity savings fund monthly

13  recoupment amount on your ballot was calculated using

14  actuarial assumptions, including but not only life expectancy

15  and an interest component calculated at 6.75 percent, which

16  is the rate used in the plan for the valuation of pension

17  assets and the targeted rate of return."

18  Q   Was this sent out to retirees?

19  A   It was sent out to some retirees, yes.

20  Q   How many?

21  A   About 3,200.

22  Q   And what was the total universe of retirees, if you know?

23  A   Well, the total universe of pension --

24          THE COURT:  You mean GRS retirees?

25          MR. HERTZBERG:  Yes.  I'm sorry, your Honor.  GRS

1    retirees.

2            THE WITNESS:  Yeah.  The total universe of GRS

3    retirees was maybe 11 to 13,000.  I know there are about

4    11,000 subject to ASF recoupment, but some of those were

5    actives.  I think about 5,000 or so of those were retirees as

6    opposed to actives or inactives.

7    BY MR. HERTZBERG:

8    Q    You talked about a plain language document that was sent

9    out to GRS retirees.  What was that?

10   A    That was an insert that was included with the

11   solicitation materials that were sent out to Class 11 and

12   Class 10 in this case, Class 11 participants.  And the

13   purpose of it -- because we knew the disclosure statement was

14   going to be kind of an overwhelming document for folks to get

15   through, so the purpose of the plain language statement was

16   to try to pull out the relevant pension and retiree

17   healthcare information and include that in a separate

18   document that would be easier and shorter to read and to try

19   to, as much as we could, eliminate, you know, legalese and

20   defined terms and plan stuff that normally appears in a

21   disclosure statement to try to make the concepts a little

22   more understandable to the folks that were receiving the

23   documents.

24   Q    Did it mention the interest rate?

25   A    That document disclosed the concept and the annuitization

1    process.  It didn't have the exact interest rate number in

2    it, but it did provide a number of examples of how ASF might

3    be calculated.

4    Q    Did you negotiate that document prior to sending it out

5    with anyone?

6    A    Oh, yes.  That was heavily, heavily edited and

7    negotiated.

8    Q    And who did you negotiate it with?

9    A    The folks that I had mentioned before, counsel for the

10   Retiree Committee, counsel for the Retirement Systems,

11   counsel for the two largest retiree associations in the city,

12   counsel for the AFSCME, UAW, and the four safety unions.

13   Q    At any point, did they indicate to you that you needed to

14   include the 6.75 percent in the notice that went out --

15   A    No.

16   Q    -- the plain language?

17   A    No.

18   Q    You talked about the ballots.

19   A    Yes.

20   Q    You indicated to the Court, I believe, that the ballots

21   did not mention that it was 6.75 percent; is that correct?

22   A    That is correct.  That number does not appear on the

23   ballot.

24   Q    But you did indicate that there was a calculation

25   provided on the ballots; correct?

1  A   Yes.

2  Q   And what was the purpose of the calculation that was set

3  forth in the ballots sent to the retirees?

4  A   We thought that that would provide the clearest best

5  evidence to the retirees that were being asked to vote on the

6  plan of the precise effect, the exact effect that the plan of

7  adjustment, as proposed, would have on their pensions going

8  forward.

9  Q   Did it include -- if there was an ASF recoupment for the

10  GRS retirees, did it include a net amount of what their

11  payment would be and what they would receive as a retiree?

12  A   If the ASF were taken out?

13  Q   Yes.

14  A   Yes, it did.

15  Q   And did that include a calculation in it of the 6.75

16  percent?

17  A   It did.

18  Q   Was this ballot approved by any of the Retiree

19  Committees, associations, or other parties prior to sending

20  the ballot out to vote?

21  A   It was signed off by those parties and by the Court.

22  Q   The six or seven or so parties you indicated

23  previously --

24  A   Yes.

25  Q   -- on the plain notice?

1   A   Yes.

2          MR. HERTZBERG:  Your Honor, I have no further

3   questions.

4          THE COURT:  All right.  Ma'am, you may step down.

5   Thank you very much.

6      (Witness excused at 9:15 a.m.)

7          THE COURT:  I can give you a couple more minutes.

8          MS. HILL:  Now, will I have the opportunity to do a

9   testimony?

10         THE COURT:  You did not designate yourself to

11  testify.  You designated Ms. Lennox and --

12         MS. HILL:  Ms. Florence.

13         THE COURT:  -- Ms. Florence, yes.

14         MS. HILL:  And the reason why I asked, the first

15  retiree objector had Kevyn Orr as -- she was questioned by

16  him, and she also had the opportunity to express her

17  concerns.

18         THE COURT:  Well, she had asked for that, and I

19  granted that, but you didn't ask that for yourself.

20         MS. HILL:  Okay.  Well, I'd like to call upon you to

21  allow me to do that.  There's some things that I need to have

22  known that will not come from witnesses.  I prepared myself

23  to let that information be known, but I didn't prepare it as

24  something that I would have a witness to talk about.

25         THE COURT:  All right.  I'll give you three minutes,

1  ma'am.

2  MS. HILL: Okay. Well, I'd like for you to give me

3  three minutes and allow me to make some statements from the

4  gentleman here that was just here and the questions that he

5  posed to Ms. Lennox. Number one, he talked about the town

6  hall meeting that was done by the GRS June 5th. Yes, there

7  was a slide presentation, and, yes, that slide did -- or

8  might have mentioned the 6.75 percent on it, but my concern

9  is that we sat there for about an hour watching the slide

10  presentation, which was high up in the sanctuary. We sat

11  there for an hour looking at the slides. The slides went by

12  pretty fast, and nothing was really specified. It was all

13  talk and no discussion. I am yet to find someone that

14  remembers seeing that 6.75 percent. I was there. I can't

15  recall the 6.75 percent. And the kicker of it all is that we

16  did not receive a hard copy, and when the representative from

17  GRS was there, he didn't expound on the 6.75 percent. That

18  was a good opportunity for him to educate these hundreds of

19  people that were sitting in the sanctuary.

20  THE COURT: Well, okay, but let me ask you this

21  question, ma'am.

22  MS. HILL: Um-hmm.

23  THE COURT: Why wasn't it sufficient to properly

24  decide whether to vote for or against the plan to have right

25  on the ballot the dollar amount that was involved in this

1    issue?

2           MS. HILL:  Why wasn't it sufficient?

3           THE COURT:  Right.  That's the city's position,

4    so --

5           MS. HILL:  Okay.

6           THE COURT:  -- I want to hear you tell me why --

7           MS. HILL:  Okay.

8           THE COURT:  -- I should not accept that position.

9           MS. HILL:  My concern is that had we known that that

10   was a part of the calculation, perhaps in my wildest dreams

11   or something that's really possible, we could have gone back

12   to the table to talk about that.  If you're taking these

13   hundreds and thousands of dollars from retirees, I think the

14   least you can do is let us know what that money entails.  The

15   report that Ms. Lennox talked about on the ballot, it did not

16   break down what that money was for.  Yeah, it said we're

17   going to take thousands from you, but it did not say the

18   thousands also include 6.75 percent.  I think we should have

19   known that.  And just as the bondholders were able to bring

20   something back to the table, we could have been in the

21   position to bring something back to the table.

22          THE COURT:  Did you go on the website --

23          MS. HILL:  Um-hmm.

24          THE COURT:  -- to see about this at all?

25          MS. HILL:  About the 6.75?

1          THE COURT:  Yeah.

2          MS. HILL:  Yes, I did, and I combed through a lot

3   of -- combed through a lot of documents.  I just have this

4   problem with the fact that it was not exposed, and I still in

5   my heart of hearts believe that that was something that could

6   have been put on the table.  And in my research -- I don't

7   want to say this, but I'm going to say it anyway -- that 6.75

8   percent could have been one of the factors where people would

9   not have voted because that 6.75 is there.  That amount of

10  interest is excessive.  The creditors for the City of Detroit

11  like Bank of America and U.S. Bank and USB, they don't even

12  charge that much for 15- and 30-year mortgage rates.  They're

13  below five percent.  So my understanding -- what I can't wrap

14  my arms around is why is this so excessive, and why is it

15  that we're paying this money back for so long?

16         THE COURT:  All right.  Let me ask you to wrap up,

17  please.

18         MS. HILL:  Okay.  I did have a witness that --

19         THE COURT:  Well, I'm afraid we've used up all your

20  time at this point.

21         MS. HILL:  Okay.  And I really didn't want to talk

22  to Ms. Lennox nor did I want to talk to Orr.  They were not

23  on my list to be talked to.  What I want to do -- and I'm

24  going to send --

25         THE COURT:  I'm not sure what you mean by that.  I

1    agree with you that Mr. Orr was not on your list, but you

2    specifically asked to question Ms. Lennox, and I granted

3    that.

4           MS. HILL:  And I had a letter that said that I

5    couldn't because of who she was, so I had resolved --

6           THE COURT:  All right.  Let's move past that --

7           MS. HILL:  Okay.

8           THE COURT:  -- and just let me ask to wrap up.

9           MS. HILL:  Okay.  Let me summarize my statement

10   here, and I'll just get straight to the -- to my conclusion.

11   Okay.  I want to ask, Judge, that you -- wait one second.  I

12   want you to be patient with me, please.

13          THE COURT:  Uh-huh.

14          MS. HILL:  Okay.  Murphy's law.  Let me just say

15   that I'd like to ask, your Honor, that you would strike that

16   6.75 percent from the clawback.  Just as deals or adjustments

17   were made for Syncora and FGIC and I can sort of say the

18   police and fire, I'd like for you to strike it among the deal

19   with the retirees.  I'd like for you to allow Mr. Orr or

20   someone in his camp to provide us with information about the

21   makeup of this clawback.  We need to know what comprises that

22   money that they're taking from us.  We need to know that

23   information.  We need to know it on an individual basis

24   especially when this life expectancy was done as individuals.

25   I think we should get individual information about it.

1    I also need to understand why the reports are saying

2    that the calculation was based on life expectancy.  If it was

3    based on life expectancy, then that means that money should

4    not be withheld from the retirees until death, but that also

5    raises another issue.  It's nowhere written that we're

6    supposed to pay until we die and beyond, and I guess that's

7    the part where I need to have some clarity.  Are we to pay

8    this until we die and beyond, or is it a cutoff period which

9    would satisfy the life expectancy?  There are a lot of

10    questions that are not answered that we need to know, but

11    mainly I'd like for you to consider to strike that 6.75

12    percent.

13         THE COURT:  I think the -- I'll ask the city to

14    confirm this, but I think the city did agree that the

15    recoupment or clawback payments would terminate when the

16    retiree reaches the life expectancy.  Hold on.  We'll get

17    that confirmed.

18         MS. HILL:  Yeah.  And we need to have --

19         THE COURT:  Am I right about that?  Ms. Lennox, you

20    can just answer.  That's okay.

21         MS. LENNOX:  That is true, your Honor.  I believe

22    Mr. Moore testified that once the full calculation using the

23    life expectancy and the interest rate is satisfied, then the

24    payments will terminate -- or the recoupment will terminate.

25         THE COURT:  Yeah.  I thought I recalled that.  Thank

1   you.

2           MS. HILL:  And that's another "other factor" that

3   needs to be put in writing, and I think that'll dispel some

4   of the distrust that we have with what's going on relative to

5   these bankruptcies.

6           THE COURT:  All right.  Thank you.

7           MS. HILL:  Okay.  Now, will I get an answer from

8   someone to the 6.75, or will it be in a document, to strike

9   that down?

10          THE COURT:  Well, I will rule on it as part of my

11  ruling on the confirmation of the city's plan.

12          MS. HILL:  Okay.

13          THE COURT:  Right.

14          MS. HILL:  Okay.

15      (Witness excused at 9:25 a.m.)

16          THE COURT:  Okay.  Let's see again if Ms.

17  Industrious is here with her witness, Mr. Taubitz.  No.

18  Okay.  We'll move on.  The next person on my list is Fredia

19  or Fredia Butler, who's going to testify on her own behalf

20  for 20 minutes.  Is she here?  Let me ask you to step

21  forward, please, ma'am, because I'm going to have you testify

22  as a witness in the witness stand.  And before you sit down,

23  please raise your right hand.

24              FREDIA M. BUTLER, WITNESS, SWORN

25          THE COURT:  All right.  Please sit down in the chair

1    there.

2              MS. BUTLER:  Good morning, your Honor.

3              THE COURT:  Good morning.

4                    DIRECT TESTIMONY

5              MS. BUTLER:  As a citizen of the City of Detroit, I

6    file an objection to the plan of adjustment that would send

7    many retirees into poverty.  I believe that it is an unjust

8    plan to impose on people who have worked many years with the

9    promise and hope that they will be able to survive on funds

10   that they expected to receive in their retirement years.

11   When Mr. Kevyn Orr was asked what he would say to the

12   retirees on the program "60 Minutes" about the money that

13   would be taken from them, he stated, quote, "I am sorry."

14   Judge Rhodes, I am an African-American, and I believe from

15   our history it has always been someone who looks like us to

16   be put in place to do work against us.  Mr. Orr is the

17   overseer, and Governor Snyder is the master who is really

18   behind all the decisions being made.  I have been to many

19   meetings and have learned that Detroit did not have to be

20   placed in bankruptcy.  This was and is a power grab by

21   withholding funds and destroying our educational system.  The

22   method used is so bold that they are taking our tax dollars

23   and giving them to profit-making corporations at the expense

24   of missing educating our children and the well-being of us.

25             Judge Rhodes, I call this a planned racist act.

1   With the stroke of a pen, the pensioners' lives would be
2   changed from the presented plan, a reduction in pensions,
3   healthcare benefits, and the unjust clawback.

4           Your Honor, I believe that you are not pleased with
5   what has been presented to you.  My reason is when you asked
6   questions of Mr. Orr, he would go back and make changes to
7   try to get your approval.  I pray daily for our leaders to be
8   just and for them to make wise and right decisions.  It has
9   been stated by some on Wall Street that the inequality of
10  income is not sustainable.  There are some who never get
11  enough.

12          Judge Rhodes, the changes that have already been
13  made have changed many lives, not only for the people who
14  worked for the city but for each citizen in the City of
15  Detroit.  What is happening in our city and throughout the
16  United States, I believe, is that our county is moving toward
17  becoming an oligarchy rather than a democracy.  We were
18  ignored when we collected thousands of signatures against
19  having an emergency manager.  Belle Isle was taken.  Many
20  city services have been privatized.  Land reported valued at
21  more than $2.9 million was given away for one dollar.  Our
22  water and the DIA all belong to the citizens of Detroit, are
23  being threatened to be sold or privatized.

24          Judge Rhodes, my nephew, Jerry Cartwright, gave me a
25  T-shirt that I proudly wear.  He was a proud United States

1  Marine who served in Vietnam.  He lost a leg and the full use

2  of his left arm while serving.  On my T-shirt is a quote by

3  Ms. Marion Wright Edelman.  It says, quote, "Democracy is not

4  a spectator sport."  I am praying for justice.  Judge Rhodes,

5  you have the power to render justice.  Thank you.

6          THE COURT:  Thank you, ma'am.  Any questions for the

7  witness?

8          MR. SHUMAKER:  None from the city, your Honor.

9          THE COURT:  All right.  Ma'am, thank you again.  You

10  may step down.

11      (Witness excused at 9:30 a.m.)

12          THE COURT:  Next on my list is Elaine Thayer.  Ms.

13  Thayer, are you here?  Ms. Thayer will be testifying on her

14  own behalf for up to 20 minutes.

15          MS. THAYER:  Good morning, your Honor.

16          THE COURT:  I'm going to ask you to step to the

17  witness box also because you are a witness.  Please raise

18  your right hand.

19                ELAINE THAYER, WITNESS, SWORN

20          THE COURT:  All right.  Please sit down.  You may

21  proceed.

22                     DIRECT TESTIMONY

23          MS. THAYER:   My name is Elaine Thayer, and I'm

24  representing my mother, Ona Labutte, who receives a pension

25  as a beneficiary, and my significant other, Greg Penney, who

1    retired in 2012 and receives a City of Detroit pension.

2         If you would reference Exhibit PS14003, page 11, in

3    the notice regarding proposed changes to pensions in the

4    city's plan of adjustment and your right to vote on the plan

5    on page 11 under GRS pension reductions and the GRS adjusted

6    pension amount, it states, and I quote, "If you are a current

7    retiree or surviving beneficiary who currently receives a

8    monthly pension that as soon as practicable following the

9    effective date of the plan your monthly pension will be

10   reduced by either 4.5 percent or 27 percent," and further

11   down, quote, "In addition, you will not receive any future

12   COLA as to your pension payments."  Neither the notice nor

13   your right to vote on the plan address the effect that the

14   plan of adjustment with regard to pension reductions and

15   discontinuing COLA will have on ex-spouses under court-

16   ordered EDROs.

17        If you'd reference Exhibit PS14004, the summary

18   information provided in the letter from the Official

19   Committee of Retirees to all retirees regarding the

20   reductions in pension does not mention any reduction to

21   survivors, beneficiaries, nor ex-spouses.  Further, the

22   summary information under COLA states that 100 percent of

23   COLA will be eliminated for the retiree and, if applicable, a

24   survivor or beneficiary but still no mention of ex-spouses

25   under court-ordered EDROs.  The information in all of the

1 proposed plans' documents that have been sent to retirees and
2 employees needed to be complete with accurate information and
3 have the same language throughout, and that is not the case.
4 This is just one of many such examples throughout this entire
5 process.

6       There is still the issue of reducing the pensions of
7 defined benefit employees and retirees, reference PS14005.
8 Under the defined benefit pension plan, and I quote, "The
9 federal government required the City of Detroit to contribute
10 to this plan, the defined benefit plan, and pay you, the
11 retiree, an amount by a set formula no matter what," unquote.
12 The city stopped contributing their required amount in 2010
13 or prior.  The smoothing method for recognizing gains and
14 losses was adjusted in 2010 and in 2011 reducing the city's
15 required pension contribution by approximately $19 million,
16 yet the city still did not comply with making their
17 contributions as required, and the city has continued to
18 ignore their responsibility when it comes to the
19 contributions to the pension funds.  Instead of forcing the
20 city to come up with their necessary share of contributions
21 due since at least 2010, the current retirees and future
22 retirees under defined benefit are being told that they have
23 to take reductions in their pension checks.  These employees
24 contributed what they were required to under union contract
25 and worked until they were eligible to retire and earned

1    every dime of the pensions that are determined by their AFC

2    and years of service.  The employees didn't fail the city.

3    The city has failed the employees and the retirees.

4         It has been determined that the employees that

5    participated in the annuity savings fund accounts were paid

6    excess interest during the period of July 1st, 2003, through

7    June 30th, 2013.  If you would reference Exhibit PS14006,

8    page 2, in the information distributed to employees to assist

9    them in understanding the differences between the 1973

10   defined benefit plan and the 1973 defined contribution plan,

11   otherwise known as the annuity savings fund, and the new 1998

12   defined contribution, it states under the 1973 defined

13   contribution plan, and I quote, "The board invests all the

14   money contributed and pays you a guaranteed rate of return,

15   currently 7.9 percent.  Some years it may pay you a bonus.

16   It's good to know that the average rate of return on the

17   defined contribution plan or annuity savings fund has

18   exceeded 15 percent since 1982," unquote.  The wording here

19   is guaranteed rate, not variable.  If times called for a

20   change from the guaranteed rate of 7.9 percent, that should

21   have been handled through the proper channels at the time,

22   not in the City of Detroit's bankruptcy case.  When the AFC

23   accounts earned an average of 15 percent from 1982 through

24   1998, the employees who participated in this program

25   continued to receive the 7.9 percent, yet when the ASF

1   accounts were recently investigated and it was found that the

2   participants were paid a higher percentage than the actual

3   earnings during July 1st of 2003 through June 30th of 2013,

4   the participating employees are expected to pay back portions

5   of what they received.

6         If you'd reference Exhibit PS14007, in reading the

7   active or terminated employee recoupment on page 17 and 18 of

8   the notice regarding proposed changes to pensions in the

9   city's plan of adjustment and your right to vote on a plan,

10  it states, and I quote, "The actual return means the actual

11  net percentage on invested General Retirement System assets

12  for each year from July 1st, 2003, through June 30th, 2013,

13  unless the return is greater than 7.9 percent, in which case

14  7.9 percent will be used, or less than zero percent, in which

15  case zero percent will be used.  The difference between the

16  value of your recalculated annuity savings fund account using

17  the actual return and the actual value of your annuity

18  savings fund account as of June 30th, 2013, is your actual

19  savings fund excess amount," unquote.  Excuse me, but

20  "actual" is not a term that can or should be applied to any

21  of these calculations.

22        Reference Exhibit PS14008, in a letter dated 6-28,

23  dear holder of a Class 11 GRS pension claim who is subject to

24  ASF recoupment, employees and retirees are offered a cash

25  option which, quote, "Is a one-time opportunity for

participants subject to ASF recoupment through pension
reduction to avoid that pension reduction by instead paying
in a single lump sum the amount of their ASF recoupment,"
unquote.  Please explain to me how there can be a fixed
amount due for those who choose the cash option and lifetime
payments for those who choose pension deductions.  The start
of the ASF goes back to 1973, and now due to the city's dire
circumstances, it's looking in every possible place to grab
money.  The very employees you are trying to recoup funds
from are the employees who voluntarily contributed to the ASF
and made it possible to have investment returns.  It is my
understanding that the ASF investment funds were combined
with the GRS investments and that the GRS board of trustees
had the authority to make decisions, even ones that were
inappropriate and in violation of their fiduciary duties, to
transfer funds to the ASF accounts to maintain a guaranteed
7.9-percent rate of return.  These investments were overseen
by the trustees themselves, Gabriel, Roeder, Smith, the
city's actuary, and Plante Moran, the auditors for the
General Retirement System, which includes the ASF, and they
were aware of the transfers and the results of these
transfers, and they should be the ones held accountable for
any misappropriation of the investment funds, not the current
and future retirees.  Further, this excess transfer of funds
from the GRS to ASF obviously came to someone's attention in

1  2011 or prior for the city to pass Section 47-1-18C of the

2  city code in 2011 with the intention of restricting excess

3  transfers of interest from the GRS pension plan to the ASF

4  with a cap of 7.9 percent and a base of zero percent. Mind

5  you, this is the same method that the city intends to use, as

6  I stated above, to determine your annuity savings fund

7  excess. Assuming this section of the city code was

8  implemented and the same methodology is being applied in

9  calculating the recoupments, why are the years 2011 through

10  2013 included in the ASF recoupment? I personally feel that

11  this investigation arbitrarily decided to review only the

12  interest payments made to the ASF accounts for July 1st,

13  2003, through June 30th, 2013, and included that -- and

14  concluded that the participants have to refund up to 15.5

15  percent of their pensions to cover these excess interest

16  payments. The ASF was established for the employees and

17  funded by their after tax money, and those funds plus their

18  earnings should have been held in a separate investment fund

19  so that the crisis facing retirees today could have been

20  avoided. Isn't it enough for the plan of adjustment to

21  reduce a retiree's pension by at least 4.5 percent, eliminate

22  future COLA, and skyrocket their healthcare costs?

23         Reference Exhibit PS14009, per an interview with

24  Carole Neville, who serves as counsel for the Detroit

25  retirees, on March 20th, 2014, she stated that the

1  elimination of any future COLA could equate to an average
2  additional cut to general pensions of at least 19 percent or,
3  in plain language, thousands of dollars depending on the
4  retiree's age and life expectancy.  To further show that the
5  ASF recoupment should be removed from the bankruptcy
6  settlement, let me remind the Court that at the hearing held
7  on 7-15, there was mention of the ongoing reimbursements with
8  no stop indicated even when the recoupment amount was reached
9  as well as an additional interest charge of 6.75 percent on
10 the amount of the recoupment.  That was never stated in any
11 material that we received.

12        Reference Exhibit PS14010, let me quote the
13 important document, letter from the Official Committee of
14 Retirees to all retirees, and I quote, "If Classes 10 and 11
15 vote in favor of the plan and the plan is approved, the
16 amount recouped will not exceed 15.5 percent.  Once the
17 reduction is determined, it will continue for the rest of
18 your life and, if applicable, the life of your survivor
19 beneficiary," unquote.  This is not a misunderstanding on our
20 parts.  It is the information we were provided.

21        Reference Exhibit PS14011, how can the ballots show,
22 quote, "the total estimated amount of your annual annuity
23 savings plan recoupment is a specific amount," yet your
24 recoupment deduction will never stop until you and any of
25 your beneficiaries are deceased?  Let me give you an example.

1   A current retiree, age 64, has been told the total estimated

2   value of your ASF recoupment is $20,999.81.  Your

3   estimated -- and not as Ms. Lennox stated, exact -- it's

4   stated as estimated -- ASF monthly recoupment is 169.85.  At

5   that rate of deduction, his total recoupment would be repaid

6   in ten years, four months.  However, if this same retiree who

7   is currently 64 lives to be 90, he will have paid the city a

8   total of $52,993.20.  This is absolutely ridiculous.  And

9   once again, which wording in which document are we to take as

10  being the correct wording for the proposed ASF recoupment,

11  its implementation and controls?  First and foremost, if it

12  is determined that there will be any recoupment, every

13  employee and retiree needs to be provided all of the

14  calculations on a year-by-year breakdown that are done to

15  arrive at the total recoupment amount.  Second, if the

16  recoupment plan is approved, the deductions need to include a

17  start date, end date, and dollar cap amount.

18          Reference Exhibit PS14012, at the hearing on 7-15,

19  one of the individuals, Steven Wojtowicz, who spoke without

20  counsel, brought up the subject of there being an additional

21  6.75-percent interest added to the recoupment cap.  That has

22  never been mentioned in any of the bankruptcy documents.  Let

23  me refer the Court to the transcript from the July 15th,

24  2014, afternoon session for his complete statement as well as

25  my typed copy of the statement from that hearing.

1          Reference Exhibit PS14013, at the same hearing, it
2  was mentioned that ballots had been sent out containing
3  errors, and in a statement in <u>USA Today</u> dated May 28th, 2014,
4  Bill Nowling, Detroit emergency manager Kevyn Orr's
5  spokesman, stated, and I quote, "Of the erroneous ballots,
6  1,100 were sent to active employees and 1,100 sent to
7  retirees," he said, "they will all get new ballots and their
8  old ballots will be canceled," unquote.  I can only speak on
9  behalf of my mother, Ona Labutte, and Gregory Penney that
10 they, in fact, never received any corrected ballots.  How
11 many more did not receive corrected ballots?  I'm sure the
12 corrected ballots weren't sent out with return receipt, so
13 what proof is there other than a list of names that these
14 corrected ballots were ever sent out?  In my opinion and I'm
15 sure the opinions of anyone who has carefully reviewed the
16 contents of the proposed recoupment, the entire issue of
17 annuity savings fund recoupments needs to be withdrawn from
18 the bankruptcy proceedings before this Court.  The
19 information in the court documents and to the retirees and
20 employees has been confusing and misleading by stating what
21 an individual's total estimated recoupment is when, in fact,
22 that is not the case due to having no end date as well as
23 having a hidden agenda to add 6.75-percent interest to the
24 recoupment caps without ever divulging that in writing to
25 this Court or the individuals who would be subject to the

1    recoupment.

2         Reference Exhibit PS14014, the ballot with respect

3    to pensions included a statement regarding the ASF which

4    stated, and I quote, "If the plan is confirmed, you will not

5    be able to challenge the annuity savings fund recoupment that

6    will be deducted from your monthly pension check," unquote.

7    That statement alone throws up a red flag.  The plan isn't

8    even in its final stages and your approval, but they make it

9    very clear that if and when the plan does get confirmed, you

10   won't be able to challenge your annuity savings fund

11   deduction.  I believe everyone's first concern in voting on

12   this ballot was to preserve their earned pension.  To tack on

13   decisions regarding an annuity savings fund recoupment

14   without having disclosed all the facts surrounding this

15   recoupment and to state that if the plan is approved you

16   can't challenge your recoupment was, in my opinion, not a

17   mistake but intentional.  Separate ballots were issued for

18   pension votes and healthcare votes.  Why not a separate

19   ballot for the ASF recoupment?  And, further, the attempt to

20   clarify the 6.75-percent interest on the recoupment at this

21   late date is too little too late for all involved.

22        Reference Exhibit PS14015, quite frankly, the whole

23   matter of the annuity savings fund recoupment appears to me

24   to fall under perpetrating fraud.  For one thing, a false

25   representation, actual or implied, or the concealment of a

1  matter of the facts material to the transaction, including

2  the ballot errors and the fact that there was an additional

3  6.75-percent interest rate.  Second, the fact that someone

4  had to have known they were lying or hiding the truth by not

5  revealing all the facts about the annuity savings fund in the

6  bankruptcy documents and to the individuals involved.  Third,

7  the lack of providing this information shows the intent to

8  mislead another into relying on misrepresentation so that

9  individuals voted to accept the pension reductions of 4.5

10  percent as well as the tacked on agenda of the ASF

11  recoupment.  Fourth, reliance, but with a right to rely on

12  what we were told as everyone has had to rely on the

13  information and rather -- or, rather, misinformation

14  presented to them by this Court, the bankruptcy documents and

15  the Retirement System, which lacked information and

16  consistency.  And last but not least, this would prove to be

17  a legal injury which would cost everyone additional money as

18  well as additional pain and suffering.  And it is my

19  understanding that these five circumstances are what are used

20  to establish fraud in a court of law.

21          The City of Detroit along with many other cities

22  made promises to their employees with regards to pensions for

23  their retirees not knowing whether they would be able to meet

24  the demands or not.

25          Reference Exhibit PS14016, yet in 1963 the state

1   Constitution of Michigan, Section 24, public pension plans

2   and Retirement Systems' obligation was put to a vote, and the

3   residents of the state approved the following language, and I

4   quote, "The accrued financial benefits of each pension plan

5   and retirement system of the state and its political

6   subdivisions shall be a contractual obligation thereof which

7   shall not be diminished or impaired thereby," unquote.

8   Section 24 that was voted on to become part of our state

9   Constitution of Michigan didn't say only in good times.

10  Governor Rick Snyder took office on January 1st, 2011, and

11  part of his oath of office was to uphold that Michigan

12  Constitution.  I realize that these are different times from

13  1963 when Section 24 was approved and made part of our state

14  Constitution, but there have been many down times since then,

15  and the defined benefit pension benefits were never under

16  fire as they are today.

17         Reference Exhibit PS14017, for current employees the

18  pension that they have accrued under the defined benefit

19  pension plan was to have been frozen as of June 30th, 2014,

20  and the new GRS plan implemented.  In the question and answer

21  document Detroit General Retirement System under the plan of

22  adjustment it states that, and I quote, "The benefit formula

23  under the new GRS pension plan is 1.5 percent of your average

24  final compensation per year of credited service," unquote.

25  Without hearing or reading anything further, I can tell you

1    that this new GRS pension plan is another defined benefit

2    plan.  If the city was changing over to a defined

3    contribution pension plan, there would be no AFC calculations

4    because when the employee is paid weekly or biweekly, his

5    and/or the city's pension contributions are deposited into an

6    account set up in the employee's name at most likely Great

7    West Retirement Services.  I question why the city is

8    retaining a defined benefit pension plan under the new

9    General Retirement System pension instead of changing over to

10   defined contribution pension funded solely by the employees

11   to relieve the city of future liability.  Has the city --

12             THE COURT:  I'm going to ask you to wrap up in one

13   more minute, please.

14             MS. THAYER:  Okay.  Has the city not learned

15   anything throughout this process?  Who can or will be trusted

16   to oversee this new plan?  Some of the same individuals who

17   got here this time?  Who is going to set up -- who's going to

18   be set up to cover all of the debts the next time around?

19   Even though a current employee's pension will be calculated

20   and frozen, the future years of employment will be

21   calculated, and a liability remains with the city and the

22   Retirement System to honor those payments.  After what the

23   retirees and employees are seeing happen to all the written

24   promises regarding pensions, COLA, and healthcare, why would

25   anyone ever expect this new Retirement System plan to ever be

1  upheld?

2       Reference Exhibit PS14018, in a letter that I

3  drafted to all of the major parties, I stated that along with

4  other issues, the city pays all of their employees pension on

5  not just the regular hours but all overtime hours and double

6  time hours, and that should have been curtailed long ago.  I

7  have a document.  It's a master agreement between the City of

8  Detroit from 2005 to 2008, and nowhere in there does it state

9  how the pension should be applied, whether to regular hours

10  or to overtime or not, but it should be curtailed.

11       On behalf of the current retirees and the future

12  retirees of the City of Detroit, I respectfully request that

13  you reconsider recouping any funds from any retirees and

14  employees with regard to the annuity savings fund by removing

15  this item from the proposed plan of adjustment for the City

16  of Detroit.  Thank you.

17       THE COURT:  Thank you.  Any questions for the

18  witness?

19       MR. SHUMAKER:  No questions from the city, your

20  Honor.

21       THE COURT:  All right.  Thank you again.  You may

22  step down.  Next we have either Yvonne Cecily -- I'm sorry --

23  Yvonne Williams-Jones or Cecily McClellan examining either --

24  excuse me -- either David Kausch or Judith Kermans for 20

25  minutes.  Both is fine, sure.  Good morning.

1            MS. JONES:  Good morning.

2            THE COURT:  What are your names, please?

3            MS. JONES:  Yvonne Williams-Jones.

4            MS. MCCLELLAN:  Cecily McClellan.

5            THE COURT:  Okay.  Now, do you want to ask questions

6    of Mr. Kausch or Ms. Kermans or both?

7            MS. JONES:  I think Mr. Kausch.  He actually did the

8    report, I think, the one who actually did the actuary

9    valuation report.

10           THE COURT:  You'd like to ask questions of Mr.

11   Kausch?

12           MS. JONES:  Yes.

13           THE COURT:  Okay.  Is Mr. Kausch here?  So, ladies,

14   can we excuse Ms. Kermans, or do you want to save the

15   opportunity to question her, too?

16           MS. JONES:  We'd like to save it --

17           THE COURT:  Okay.

18           MS. JONES:  -- your Honor.

19           THE COURT:  You understand you have 20 minutes for

20   both of them?

21           MS. JONES:  Yes.

22           THE COURT:  Okay.  Mr. Kausch, would you step

23   forward, please, and raise your right hand?

24                    DAVID KAUSCH, WITNESS, SWORN

25           THE COURT:  All right.  Please sit down over there.

1  And you may proceed.

2          MS. JONES:  Thank you.  Thank you for this

3  opportunity.  Thank you.

4          THE COURT:  You're welcome.

5                      DIRECT EXAMINATION

6  BY MS. JONES:

7  Q   I'd like to start off -- would you just state your name

8  again so everybody --

9  A   Yes.  My name is David Kausch.  I'm the chief actuary of

10  Gabriel, Roeder, Smith.

11  Q   And could you tell us how long Gabriel, Roeder, Smith &

12  Company have been in business?

13  A   We've been in business over 75 years.

14  Q   And how long has your company been providing actuary

15  valuations for the City of Detroit's Retirement Systems?

16  A   As I understand it, about the same length of time.

17  Q   About the same?

18  A   Yes.

19  Q   Okay.  The questions that we have were referenced to the

20  75th annual actuary valuation report as of June 30th, 2013.

21  I'd like to reference our Exhibit PS14700 of the actuarial

22  report as of June 30th, 2013, pages A-8, entitled "Comments,

23  Conclusions" -- concluded --

24  A   Yes.

25  Q   And it starts off talking about the GASB, the

1  Governmental Accounting Standard Board, changes.  For the
2  plan year beginning in 2013, new reporting standards would be
3  required. The new reporting standards will be substantially
4  different from the current standards.  The question I have on
5  that, will these changes have an effect on the General
6  Retirement System's ability to meet its obligations to the
7  fund's members?
8  A   I think the short answer to that is no.  Those new
9  accounting standards are just the way the numbers are
10  presented for accounting.  They don't change how the plan is
11  actually funded.
12  Q   Okay.  Thank you.  Next I would like to talk about in
13  that exhibit the solvency of the General Retirement System,
14  Exhibit P414700, the annual actuary valuation report of June
15  30th, 2013, on page A-9.  In the report it states that the
16  funding objective of the General Retirement System is to meet
17  long-term benefits promised through contributions made during
18  members' working careers which, combined with investment
19  income on System assets, would be sufficient to pay benefits
20  throughout their retired lives.  Is this the ultimate test of
21  financial soundness for the Detroit Retirement System fund?
22  A   That is the financing objectives, that they will build up
23  assets to pay the benefits for the life of the members, yes.
24  Q   Is this what you described in your report as the long-
25  term solvency test?

1  A    Let me see.  The long-term solvency test is to track the

2  progress towards that objective, yes.

3  Q    Which this is the objective of the System, per that

4  statement?  Shall I read it again, the objective of the

5  System, or would you like to read it?

6  A    The objective of the system -- I'm not sure where you

7  were.  So the objective is --

8          THE COURT:  What she wants to know is whether the

9  long-term objective of the System, the Retirement System, is

10  to invest its assets in a way that will allow it to meet its

11  obligations to pay pensions.

12          THE WITNESS:  Right.  It's to -- and it is also to

13  fund that through employer and member contributions over time

14  so that the assets are sufficient to pay those benefits, and

15  this is the test to determine that.  This test compares the

16  assets on hand versus the liability, if you will, or the

17  present value of all those benefits out there to see how the

18  System is tracking.  It's a test that we prepare every

19  valuation, and those numbers fluctuate over time.

20  BY MS. JONES:

21  Q    In terms of the long-term solvency test, how is the

22  General Retirement System doing?

23  A    As of this valuation date on page A-9, you can see June

24  30, 2013, the last row, the very last percent at the far

25  right shows a total percent of accrued liability covered by

1　assets of 70 percent.　That's what we would refer to as 70-

2　percent funded, so there is an unfunded that needs to be

3　funded essentially.

4　Q　Okay.　The funding level that you quoted is part of your

5　short-term solvency test, correct, because you describe two

6　in the report --

7　A　Yes.

8　Q　-- the long-term and the short-term?　I haven't got to

9　the short-term yet.

10　A　I'm sorry.

11　Q　I just wanted to kind of clarify the definition of the

12　long-term solvency test per your statement in the report.

13　A　Correct.　The long-term solvency test really has more to

14　do with the contributions necessary to maintain the long-term

15　solvency.　We track that with the short-term solvency test.

16　I apologize for getting ahead of myself.

17　Q　That's okay.

18　A　So part of our role as the actuary is to determine how

19　much the city needs to contribute in order to meet the long-

20　term solvency, and that information is not actually presented

21　on this page.

22　Q　Yes.　I understand.　But just going by the statement --

23　A　Yes.

24　Q　Yes.　Okay.　So can we say then it's true that the

25　city -- per the statement, the city is meeting its long-term

1  solvency test per your statement?

2  A    At that point in time, prior to the bankruptcy, the city

3  was contributing towards that objective on that long-term

4  solvency basis.

5  Q    Okay.  Okay.  And then is it true that the GRS has

6  followed the discipline of level percent of payroll

7  financing, liabilities for active members, contributions on

8  deposit, and liabilities for future benefits to present

9  retired lives -- to present -- retired lives will be fully

10 covered by present assets and then in parentheses except in

11 rare circumstances?  You say it, and I wanted to ask what

12 would be those rare circumstances, if you know?

13 A    One example of a rare circumstance would be the severe

14 market downturn at the beginning of the great recession which

15 caused a significant amount of an asset loss in all pension

16 plans across the country.

17 Q    Is there anything else you can think of other than the

18 downturn of the market?

19 A    That's the most significant one that comes to mind.

20 BY MS. MCCLELLAN:

21 Q    It's often mentioned about the great recession and

22 particularly in 2009.  Did the pension plan -- I mean the

23 annuity recoup itself after that beginning in 2010 up to

24 today?

25 A    Since the downturn, the System has had rates of return on

1  the market value of assets in excess of our annual

2  expectations.  That said, I don't believe they have fully

3  recovered everything that they have lost since that point in

4  time.

5  Q    Is it correct that in 2011 the rate of return was at 20

6  percent?

7  A    I don't have the actual figures in front of me that --

8  Q    Okay.  So you don't know that answer?

9  A    I don't know the answer to that specifically, no.

10  Q    Okay.  Do you know the answer to -- if you took the

11  period that is -- of the annuity clawback from 2003 up

12  until -- I think -- well, they started at 2004 actually

13  through 2013, would the pension plan have a negative rate of

14  return, or would there have been a smoothing at this point

15  that it would have been a positive rate of return?

16  A    Again, I don't have that information with me.  I don't

17  really have enough information to answer that question.

18         MS. MCCLELLAN:  Thank you.

19  BY MS. JONES:

20  Q    The liabilities for service already rendered by active

21  members are partially covered by the remaining assets, and is

22  it true that as long as contributions to the System are

23  received in a timely manner, the System will pay all promised

24  benefits when due?

25  A    That is the financing objective, yes.

1   Q   Once the city makes its pension contributions current,

2   what effect will this have on the underfunded liabilities?

3   A   It depends on what you mean by "makes its contributions

4   current."  The unfunded liability is anticipated to be

5   financed over a number of years, so even -- it's a bit of a

6   hypothetical since we're, you know, in the bankruptcy.

7   Q   Again -- okay.  That kind of gets to the short-term

8   solvency test.  The report also mentions the short-term

9   solvency test as the means of checking the progress under its

10  funding plan, and then Exhibit PS14700 at the bottom of the

11  page of A-9 is the short-term solvency test year comparison

12  statement.  Can you explain why the rates of fundings are

13  decreasing under the columns that states "Portion of accrued

14  liabilities covered by assets"?

15  A   Yes.  I mentioned that with the downturn in 2009, the

16  great recession brought down the assets very quickly on a

17  market basis.  For purposes of the valuation and for the

18  purposes of this short-term solvency test, we smoothed the

19  assets, which means, you know, the market value of assets is

20  going to fluctuate a lot every single year, so we draw a

21  smooth line over time that recognizes those losses and gains,

22  if you will, more slowly, so the fact that it's dropped over

23  the five years shown here is really a recognition of the

24  market losses in 2009 slowly being phased in.  It allows the

25  system to -- we're also during that time phasing in the gains

1    that are coming back in basically to smooth out the highs and

2    lows of the market.

3    Q    So as the market recovers, we can expect for the

4    pension's funding level to also increase?

5    A    Yes.

6    Q    Okay.  Each year the board of trustees publish their

7    annual report that they send to its members showing the

8    condition of the Retirement System.  Is the information from

9    the actuary report that's prepared by GRS & Company used to

10   prepare the annual report for the General Retirement System

11   members?

12   A    We submit our report to the board in part so that they

13   can base their information and their financials on it, yes.

14   Q    Okay.  Exhibit PS14702, board of trustees letter, page 2,

15   from the annual report from Susan Glaser, chairperson of the

16   board of trustee, years 2010 to 2011, fiscal year ending June

17   30th, 2011, and Exhibit PS14701, fiscal year 2011 to 2012

18   ending June 30th, 2012, states, "Your board of trustees is

19   pleased to report that the Retirement System is in a sound

20   actuary condition."  Can you explain what is meant by "sound

21   actuary condition"?

22   A    I don't believe that's a term that we used in our report.

23   The actuarial standards of practice say if we use that term,

24   we have to define it, so I'm not sure what Susan Glaser had

25   in mind, but our -- I would defer back to those prior pages

1    about the actuarial solvency and the solvency test combined

2    with the city's -- at that point the city's ability to

3    continue contributing.  No matter where you are in the

4    solvency test with your funded ratio, the important linkage

5    is making sure the city -- the board adopts a contribution

6    rate for the city, and the city then makes those

7    contributions on a timely basis.  And that's the objective

8    that we ultimately test.  We don't necessarily call it a

9    sound actuarial condition.  That's not a word that I would --

10   Q    What words would you use?

11   A    I would phrase it like I just did, that they are meeting

12   the financial objectives as set forth in the board's funding

13   policy.

14   Q    So as long as the city makes its contributions, the fund

15   is sound?

16   A    In accordance with the board's funding policy, yes.

17   Q    Thank you.  On page 3 of the board of trustees' letter

18   for fiscal year ending June 30th, 2011 and 2012, the board of

19   trustees' chair states, "The General Retirement System is

20   stable and secure and expects to meet all future retirement

21   obligations to its members."  Would you say that's a true

22   statement?

23   A    Again, back to the financing objective, which she refers

24   to the funded status of 77 percent in that statement --

25   Q    Um-hmm.

1   A   -- combined with at that point in time the city's ability

2   to continue funding the contributions, I would say the

3   financial objectives of the system were met.

4   Q   And able to meet the obligations to its members?

5   A   On that basis, yes.

6   Q   So that's a -- I mean because as of June 30th, 2011, the

7   ratio of the System's assets to its liabilities to pay future

8   benefits, like you stated, was 83 percent, and then in 2012

9   it's 77 percent, and this is per the General Retirement

10  System annual report.  Now, this information is consistent

11  with the actuary valuation report of June 30th, 2013, per

12  Exhibit PS14700, page A-9, the column with the portion of

13  accrued liabilities covered by asset information.

14  A   In the 2013 report?

15  Q   Well, that's the --

16  A   By the time we got to the 2013 report, the city had -- my

17  recollection is that the city had stopped making

18  contributions, and I believe elsewhere in that report we had

19  considerable language to that effect.

20  Q   Right.  So that would have a direct effect on the level

21  of funding --

22  A   Yes.

23  Q   -- at this time?

24          THE COURT:  One more minute, ma'am.

25          MS. JONES:  Okay.

1  BY MS. MCCLELLAN:

2  Q    In terms of the change of the return rate and adjusting

3  it down to 6.75, what impact does that have on the pension as

4  a whole?

5  A    If you lower the assumption, that means you're assuming

6  your assets are not going to get as -- grow as fast, so that

7  actually increases the liability.  It will ultimately lower

8  the plan's funded ratio on that basis, and it will increase

9  the city's required contribution.

10 Q    Would it also have a -- I mean by that, can you give the

11 appearance of the plan being underfunded?  Would it increase

12 the --

13 A    Yes.  By lowering the funded ratio, even if a

14 hypothetical plan were a hundred percent funded at 7.9

15 percent, if you lower the return to 6.75, it would no longer

16 be a hundred percent.  It would be lower than a hundred

17 percent funded.  Because the liability would increase, that

18 ratio would drop.

19 Q    Was that one of the things that did occur, you know,

20 after Mr. Orr became the emergency manager?

21 A    We have not performed a valuation using the 6.75 percent.

22           MS. MCCLELLAN:  Okay.  Thank you.

23           THE COURT:  All right.

24           MS. JONES:  Thank you.  Thank you, sir.

25           THE COURT:  Any questions for the witness?  Yes.

1    Yes.  Thank you.

2                              CROSS-EXAMINATION

3    BY MS. O'GORMAN:

4    Q    Good morning, Mr. Kausch.  My name is Debbie O'Gorman.  I

5    represent one of the objectors.  And you were one of the

6    signing actuaries for the June 2013 valuations of the PFRS

7    and GRS --

8    A    That's correct.

9    Q    -- correct?

10   A    Yes.

11   Q    And you're a member of actuarial societies; correct?

12   A    Yes.

13   Q    You're a member of the Society of Actuaries; correct?

14   A    I'm a fellow of the Society of Actuaries.  I'm member of

15   the American Academy of Actuaries, and I could go on if you

16   want me to.  Got more.

17   Q    Go ahead.

18   A    I'm a fellow of the Conference of Consulting Actuaries

19   and a member of the American Society of Pension Professionals

20   and Actuaries.

21   Q    And you have significant experience valuing public

22   sector --

23   A    Yes.

24   Q    -- pension funds; correct?  And the valuations you signed

25   off on for the PFRS and GRS were done in accordance with

1   actuarial standards; correct?

2   A   Absolutely.

3   Q   And you worked with a team at Gabriel, Roeder, Smith?

4   A   Yes.

5   Q   And you would agree that that was a competent team that

6   you worked with?

7   A   Yes, absolutely.

8   Q   And you have not been asked to revise the June 13th

9   valuations in any respect, have you?

10  A   No, we have not.

11  Q   You have not received any complaints from the PFRS or GRS

12  about the valuations, have you?

13  A   No, we have not.

14  Q   And as the signing actuary, it's one of your jobs to make

15  sure that the assumptions used in the valuation reports are

16  reasonable; correct?

17  A   Correct.

18  Q   And you have to get comfortable with assumptions such as

19  the investment return assumption; correct?

20  A   Correct.

21  Q   And if the assumptions aren't reasonable, you would be

22  obligated to disclose that in the valuation report; correct?

23  A   The obligation is -- essentially that's correct.  It's

24  not a --

25          MR. EATON:  Your Honor, the city objects to the line

1   of questioning.  This was not brought up on the direct by the

2   pro se participants, and the agreement was that Ms. Kermans

3   would be the representative from Gabriel, Roeder, and we

4   would submit counter-designations and designations to satisfy

5   the testimony from Gabriel, Roeder, your Honor.

6           MS. O'GORMAN:  And it's my understanding that that

7   will be done, but this witness is here, and I really just

8   have one more question for him.

9           THE COURT:  All right.  I'll permit one more

10  question.  Go ahead.

11  BY MS. O'GORMAN:

12  Q   And there are no disclosures in the June 13th valuation

13  regarding any concerns that Gabriel, Roeder had regarding the

14  reasonableness of assumptions; correct?

15  A   I believe we affirmed that the assumptions are

16  reasonable.

17          MS. O'GORMAN:  All right.  Thank you.

18          THE COURT:  All right.  Any further questions for

19  the witness?

20          MR. SHUMAKER:  No.

21          THE COURT:  All right.  You may step down, sir.

22  Thank you for coming today.

23      (Witness excused at 10:15 a.m.)

24          THE COURT:  We're going to take our morning break at

25  this time, and when we resume -- is Gloria Williams here?

1  No.  Okay.  If she does arrive, I'd like to ask her to

2  question the balloting agent as she had requested, Chris, so

3  if she does appear, we'll have to get the balloting agent on

4  the telephone.  Okay?  All right.  And we'll reconvene at

5  10:35, please.

6          THE CLERK:  All rise.  Court is in recess.

7      (Recess at 10:16 a.m., until 10:35 a.m.)

8          THE CLERK:  All rise.  Court is in session.  Please

9  be seated.  Recalling Case Number 13-53846, City of Detroit,

10  Michigan.

11          THE COURT:  Has Gloria Williams appeared?  No.

12  Okay.  How about Irma Industrious and Dennis Taubitz?  No.

13  Okay.  Next we would have then Walter Gary Knall, who will

14  testify for himself for 15 minutes.  Mr. Knall, are you here?

15  Step forward, please.  Over here, please, and please raise

16  your right hand.

17              WALTER GARY KNALL, WITNESS, SWORN

18          THE COURT:  Please sit down.  And you may proceed

19  when you're ready.

20                      DIRECT TESTIMONY

21          MR. KNALL:  My name is Walter Gary Knall.  I'm a

22  retired analytical chemist from the City of Detroit Health

23  Department.  I am reading from my exhibit, PS14704.  One, I

24  received a ballot to vote as a holder of a Class 11 pension

25  claim.  Two, the ballot stated that my pension was subject to

1   an annuity savings fund recoupment of $42,421.64 under

2   Alternative A and $85,201.67 under Alternative B. That was

3   taken from my ballot on the fourth page, which is Exhibit

4   PS14705. My whole ballot did not mention anything about the

5   6.75-percent interest. Three, there was no explanation as

6   the basis for the claim that I owed either of these amounts,

7   and certainly I engaged in no fraud or deceit with regards to

8   my annuity, which I subscribed to with my own money and on

9   terms that were presented to me by the pension board. I

10   concur in the objections of Michael Karwoski, Document 5923,

11   to the legality of this annuity recoupment. That's also in

12   my Exhibit PS14706. Four, the ballot made no mention of the

13   6.75-percent interest that I subsequently learned is being

14   claimed as part of the monthly, quote, annuity repayment,

15   unquote. Five, the ballot had no -- the ballot had no

16   amortization schedule attached to it outlining what

17   percentage of the monthly payment being deducted from my

18   ballot was for interest and what percentage was being applied

19   to the principal allegedly owed. Six, the ballot did not

20   spell out whether the total estimated amount of the annuity

21   savings plan recoupment under either Alternative A or

22   Alternative B included the 6.75-percent interest rate or how

23   it was calculated. Seven, I subsequently received the letter

24   dated June 28th, 2014, informing me of the right pay off the

25   annuity recoupment in a single lump sum. This is my Exhibit

1    PS14707.  This letter only added to the confusion by not

2    specifying the amount of the lump sum payment, especially in

3    the light of the different payback amounts asserted under

4    Alternative A and Alternative B.  Eight, the inadequacy of

5    the disclosure in the ballot provided and subsequently letter

6    violates both consumer rights as enumerated in the Truth in

7    Lending Act and under regulations formulated by the Consumer

8    Finance Protection Bureau.  Nine, the idea that I and my

9    fellow retirees subject -- I mean retirees should be asked to

10   vote on a plan requiring us to pay tens of thousands dollars

11   back out of our meager pension on interest earned from our

12   own contributions in a plan for which the city solicited our

13   participation without knowing the precise terms under which

14   the payback is being calculated is outrageous and illegal.

15   Eleven, I will be asking the Court to strike the annuity

16   recoupment plan or to -- or, in the alternative, to write

17   into the plan of adjustment the city to be -- provide each

18   retiree an accounting of how the amount was calculated and an

19   interest-free method of recoupment.  I also want to go to my

20   exhibit of the PS14706, which is from the -- Michael

21   Karwoski's report, starting at page 7 at the top.  The plan

22   also failed to -- failed the requirements of Sections 1129,

23   parentheses A, parentheses 3, in that it failed to disclose

24   that the proposed monthly recoupment amount presented on the

25   ballot of each Class 11 retiree subject to annuity savings

1   fund recoupment includes the charging of interest at the rate
2   of 6.75 percent.  The failure to disclose the charging of
3   interest and the rate of such interest violates both Michigan
4   and federal lending and consumer protection laws.  Because
5   the plan proposed continuing to collect monthly recoupment
6   payments through pension reduction even when -- even where a
7   retiree outlives his or her actual life expectancy at such
8   time the effective interest rate goes to a hundred percent
9   because the full amount of, quote, excess interest, unquote,
10  principal will have been collected, and the further
11  collection is all interest.  Even with the cash buyout
12  option, the city still proposed to impose a 6.75-percent
13  interest on any remaining balance where an annuity savings
14  fund recoupment participant is not allowed to pay off the
15  full amount if the $30 million collective cap is exceeded
16  and, of course, for those who do not choose or cannot afford
17  the lump sum buyout.
18          The next paragraph, the plan does not provide equal
19  treatment for each interest group in Class 11.  Dropping down
20  to the fourth line, the last part, that the violation of
21  Section 1123, parentheses A, parentheses four, is at least as
22  troublesome with respect of the two distinct retiree groups
23  that are lumped together in Class 11, those subject to the
24  annuity savings fund recoupment and those not subject to it,
25  because the number of those subject to the annuity savings

1   fund is slightly less than half the total number in the class

2   on a numerical vote basis, they could not defeat the plan

3   treatment of Class 11 even if a hundred percent of them voted

4   against it.  Conversely, those not subject to the annuity

5   savings fund recoupment numerically impose a yes -- quote, a

6   yes, unquote, outcome on the annuity savings fund recoupment

7   minority.  Combining these two groups who are treated as

8   significantly differently to the detriment of one group and

9   to the advantage of the other is the same measure of $230

10  million collectively violates the Section 1123, parentheses

11  A, parentheses four, requirement that the plan provide the

12  same treatment for each claim or interest of the particular

13  class unless the holder of a particular class -- a holder of

14  a particular claim or interest agrees to less favorable

15  treatment of such particular claim or interest.  I call the

16  Court's attention, a detailed analysis of this issue in John

17  P. Quinn objections to the fourth amendment plan of

18  adjustment, parentheses, document Number 5723, close

19  parentheses, and incorporate his argument, particularly those

20  in items two and three, pages 1 to 9, of his written -- of

21  his writings here and reference.

22              I also want to go to page 5, the last two paragraphs

23  of page 5 and the last two paragraphs of page 6.  Any annuity

24  recoupment is limited to a maximum of six years.  If the city

25  alleged basis for annuity savings fund recoupment is

1  unjust -- I mean if the -- I'll start over.  If the city's
2  alleged basis for annuity savings fund recoupment is unjust
3  enrichment, the longest argument -- arguable applicable
4  statute of limitation is six years.  The plan proceeds a
5  clawback period for annuity savings fund recoupment of ten
6  years from July 1st of 2003 through June 30th, 2013, exceed
7  the longest statute of limitation by four years.  The federal
8  court is required to follow the statute of limitation of the
9  forum's state.  Mackey versus Judy's Flood Incorporation
10  (sic), 867 capital F dot 2nd 325, 328, parentheses, 6th
11  capital CIR dot 1989, close parentheses.  Under the theory of
12  liability proposed by the city, if the annuity savings fund
13  recoupment is permitted to remain in the plan at all, the
14  recoupment period should be limited to no longer than six
15  years.  And on page 6, the last two paragraphs, the statute
16  of limitation for enforcing a contract under Michigan law is
17  six years.  Capital MCL 600.5807(8).  Therefore, even if
18  annuity savings fund recoupment is allowed as part of the
19  plan, the period for which the city may attempt to recoup
20  overpayment to annuity saving fund accounts is six, not ten
21  years.  To do this, the city must prove that the annuity
22  savings fund active and retiree participants, not the GRS
23  trustees, breached the contract.  Also under Michigan law,
24  actions to cover money wrongfully paid for -- paid that are
25  not based on breach of contract are governed by a six-year

1   statute of limitation in capital MCL 600.5813.  Borman's

2   Incorporated versus Lake State Development Company, 60

3   Michigan App 175, 189; 230 capital N, capital W, N-D 363

4   (1975).  The city claim for unjust enrichment or restitution

5   of just funds is subject to the six-year statute of

6   limitation provided by MCL 600.5813, which applies whether

7   the claim is legal or equitable, MCL 600.5815.  I want to go

8   back to --

9           THE COURT:  Can you wrap up in one more minute,

10  please, sir?

11          MR. KNALL:  Yes, yes.  I want to go back to my

12  Exhibit PS57 -- PS14704, Number 11.  I will be asking the

13  Court to strike the annuity recoupment plan or, in the

14  alternative, write into the plan of adjustment the city to

15  be -- provide each retiree an accounting of how the amount

16  was calculated and an interest-free method of recoupment.

17          Also, I want to say that because the two groups

18  that's in Class 11 are being treated -- are not being treated

19  the same is illegal.  That's my conclusion.

20          THE COURT:  Thank you very much, sir, and you may

21  step down.  I should ask are there any questions for the

22  witness?

23          MR. SHUMAKER:  No questions, your Honor.

24          THE COURT:  Okay.  You may step down, sir.

25          MR. KNALL:  Okay.

1     (Witness excused at 10:53 a.m.)

2          THE COURT:  And our next witness on my list is JoAnn

3     Watson, who will testify for herself for 15 minutes.  Raise

4     your right hand.

5                    JOANN WATSON, WITNESS, SWORN

6          THE COURT:  All right.  Please sit down, and you may

7     proceed when you are ready.

8          MS. WATSON:  Thank you, your Honor, and good

9     morning.

10          THE COURT:  Good morning.

11                         DIRECT TESTIMONY

12          MS. WATSON:  It's a privilege to speak to you today,

13     and I'd like to concentrate on two points with respect to my

14     objection to the plan of adjustment.  One is centered on the

15     role of the state having a conflict in this procedure, and

16     the second point has to do with the democratic process being

17     bypassed as part of this procedure.  So going back to point

18     one, the State of Michigan has played a role in declaring the

19     city in a state of emergency, financial emergency, and the

20     State of Michigan, quite frankly, has shepherded this process

21     of bankruptcy.  It interviewed and selected an attorney known

22     for bankruptcy procedures as the emergency manager, but the

23     state is a debtor to the city.  As was put forth by the

24     Michigan Municipal League in the spring of this year, just

25     during the term of Governor Snyder the state has withheld

1   $732 million in state revenue sharing that could have been

2   provided to the City of Detroit just during the past four

3   years along with millions and millions to other cities as

4   well.  It amounts to billions, and that was publicly

5   announced in a verbal and a print format by the Michigan

6   Municipal League.

7          In addition, in 1998 the governor of the State of

8   Michigan and the mayor of the City of Detroit at that point,

9   Governor Engler, Mayor Dennis W. Archer, they agreed to a

10  nine-year plan that would have provided $333.9 million per

11  year for the city and a base level of revenue sharing in

12  addition to the city giving up half a percentage rate of its

13  income tax charged to nonresidents.  That was a signed

14  agreement via two legislative acts, but the city lived up to

15  its agreement in not charging nonresidents the income tax.

16  The state only paid for two of the nine years amounting to

17  $224 million never paid.  The amount of income tax from

18  nonresidents that the city lost during that period was 600

19  million.  So when you add up the 732 million, based on the

20  Michigan Municipal League's report, during the Snyder era,

21  add that to the 224 million that was defaulted in that

22  agreement of 1998 and the 600 million we lost in the income

23  tax not paid by the nonresidents, that's a billion and a half

24  dollars that the state has played a role in the city not

25  receiving, yet playing a role in declaring the city in

1   financial emergency and shepherding the bankruptcy process.

2   I see that that is a conflict, your Honor.

3          The second point, the City of Detroit has been

4   declared all over the world as having filed for bankruptcy,

5   but the city is defined by the U.S. Justice Department as

6   executive branch and the legislative branch.  The executive

7   branch nor the legislative branch ever saw -- we never saw

8   the bankruptcy filing.  We read about it in the paper.  It

9   never came before the body.  Now, I know that the legislative

10  body has approved the plan of adjustment and the grand

11  bargain and many other things, many contracts, the $180

12  million contracts that have gone along with this

13  restructuring and bankruptcy process.  Many have been

14  approved by the legislative body and by the executive branch

15  but not the filing of the most historic bankruptcy in the

16  history of the United States of America.  None of that came

17  before the legislative and executive branch, which bypassed

18  the democratic process.

19          In addition, 2.3 million citizens in the State of

20  Michigan repealed the emergency manager law in 2012.  That

21  democratic process was bypassed by the State of Michigan,

22  which reenacted basically the same law that the citizens had

23  said no to, so given that the State of Michigan has had a

24  conflict in its role, on the one hand shepherding the

25  bankruptcy process and on the other hand being a debtor to

1  the city and, secondly, the fact that the democratic process

2  has been bypassed as part of these proceedings, those are

3  among the two reasons that I stand in opposition to this plan

4  of adjustment.  Thank you, your Honor.

5        THE COURT:  Well, let me ask you to articulate why

6  you think that all happened.

7        MS. WATSON:  Well, if, in fact, the legislative body

8  and the executive branch had had an opportunity to deliberate

9  on a recommendation for bankruptcy, for example, there might

10  have been a decision made by one or more parties to litigate

11  the much flawed and much talked about swap plan, which could

12  have recouped hundreds of millions of dollars for the city

13  coffers and negated any need for bankruptcy.  That process

14  was not allowed because the filing was done without the

15  input, the advice and consent --

16        THE COURT:  Well, in the case that litigation was

17  filed and is before me now.

18        MS. WATSON:  Given that that might have been an

19  option sought --

20        THE COURT:  Given what, ma'am?

21        MS. WATSON:  -- prior to the filing.

22        THE COURT:  I'm sorry.

23        MS. WATSON:  If, in fact, the elected leadership of

24  the city had decided to file a legal challenge to the --

25  those parties who benefitted from that swap agreement, that

 1  could have recouped hundreds of millions of dollars, which

 2  would not have necessitated a filing at all, sir.

 3          THE COURT:  Um-hmm.  Okay.  Thank you.

 4          MS. WATSON:  Thank you, your Honor.

 5      (Witness excused at 10:59 a.m.)

 6          THE COURT:  Next we have Steven Wojtowicz, who will

 7  testify for himself for five minutes, and I apologize to you

 8  for I'm sure mispronouncing your name.

 9          MR. WOJTOWICZ:  Close enough.

10          THE COURT:  Close enough.  Well, thank you for that.

11  Raise your right hand.

12              STEVEN WOJTOWICZ, WITNESS, SWORN

13          THE COURT:  All right.  You may sit there.  Now, you

14  presented to me last July, didn't you?

15          MR. WOJTOWICZ:  Yes.

16          THE COURT:  Okay.

17          MR. WOJTOWICZ:  Yes, I did.

18          THE COURT:  And I'm allowing you to testify here

19  again but with the suggestion to you that you don't need to

20  repeat anything you said back then.

21          MR. WOJTOWICZ:  Yes, of course.

22          THE COURT:  You may proceed.

23          MR. WOJTOWICZ:  Okay.  No problem.

24                  DIRECT TESTIMONY

25          MR. WOJTOWICZ:  I guess I'd like to briefly

1   address -- this is concerning the 3,200 ballots, the

2   corrected ballots, when they -- because there was an error in

3   the calculation of ASF's recoupment fiscal year.  One of the

4   things is that once they did that correction that they

5   eliminated two years so that retired people -- it only

6   affects now the people who retired on June 30th of 2005 or

7   later, so it only affects eight of the ten years now of those

8   people.  It eliminated the first two years, so this means

9   that recoupment now is being burdened by a fewer number of

10  people.

11          Also, in the first ASF document, the original amount

12  quoted -- this is for the -- the amount for the ten-year

13  average -- this was done in the presentation at Cobo Hall --

14  that the original average interest rate was 5.5 percent

15  earned, but now with the change noted above for the -- you

16  know, for the fiscal year, now that the interest rates has

17  increased to 6.87 percent for that ten-year period,

18  therefore, at the original negotiation the situation was much

19  dire then than it is now.  This represents an improvement of

20  1.3 percent, which was earned by the Pension Bureau.

21          Now, the next thing, too, I'd like to mention is

22  that they always bring up the bad year.  That was 2009 where

23  the pension lost 19.7 percent and gave out 7.9, but they

24  always fail to mention like fiscal year 2004.  The pension

25  made 15.6 percent and only gave out 7.9 percent to the ASF.

1    They kept 7.6 percent for the -- in the Pension Bureau, so

2    that was able to earn more interest.  Another year was 2011.

3    The pension made 20.2 percent.  Again, they only gave out 7.9

4    percent.  They kept 12.3 percent in the GRS that was not

5    given to ASF.

6             Now, my next comment, this is concerning -- this is

7    concerning a docket.  This is response to my docket

8    originally from July 15th.  This is Docket 7303.  This is the

9    response to my objection, and I'll just quote this.  It says,

10   "Moreover, once annuity savings fund excess amounts are

11   annuitized using a 6.75-percent interest rate as previously

12   disclosed in Class 11 ballots equaling an ASF distribution to

13   the recipients, ASF recovery cap, having recovered from the

14   ASF's distribution recipient no further ASF recoupment will

15   be required from a specific ASF distribution recipient.

16   Exact amounts have been disclosed on Class 11 ballots."

17   Here's my response to that.  The interest rate was never

18   disclosed on the ballot, ballots 11.  It's only on the ones

19   that were reissued, and those were only put out to 3,200

20   people of the 14,000 GRS retirees who were affected by the

21   cut.  Only after the vote the City of Detroit added the 6.75

22   percent to the fifth amended bankruptcy document clarifying

23   the interest rate.

24            The City of Detroit also indicates that the 6.75

25   percent was disclosed at the GRS presentation meetings;

1  however, few people attended these meetings.  It is also --

2          THE COURT:  I need to interrupt you for one

3  second --

4          MR. WOJTOWICZ:  Sure.

5          THE COURT:  -- and ask you to pull the microphone a

6  little bit closer to you --

7          MR. WOJTOWICZ:  Sure.

8          THE COURT:  -- and speak right into it.

9          MR. WOJTOWICZ:  Is that better?

10          THE COURT:  Yes.  Thank you.

11          MR. WOJTOWICZ:  Let me go back here.  However, few

12  people attended these meetings.  It was only indicated that

13  these -- also indicated that these presentations were

14  immediately posted to the GRS website, but no communication

15  was made to anyone that this was -- to the retirees that this

16  was being posted on the GRS website.  Also, which I'm not

17  going to repeat because they've already brought this up, that

18  it goes on for your life.  That's in two of the documents.

19  It's in the presentation that it goes on for your lifetime.

20  It also was in the ballot.  So if it's possible, could we get

21  some type of clarification put in the bankruptcy documents

22  that specifies that it ends at the certain point, whatever

23  your longevity is?  At this point, it seems like everyone

24  understands that it is going to -- it's going to go on until

25  you die or until your wife dies, so if we could do some kind

1  of clarification there on that.

2          THE COURT:  I thought perhaps that was in the latest

3  plan, but I will get that clarified.

4          MR. WOJTOWICZ:  I could not find it.

5          THE COURT:  I will get that clarified --

6          MR. WOJTOWICZ:  Yeah, because I --

7          THE COURT:  -- in the proceeding.

8          MR. WOJTOWICZ:  Yeah.  I looked at the bulletin.  I

9  looked at -- a lot of times it'll just show you the

10 corrections and the amendments.  I did not see --

11         THE COURT:  Right.

12         MR. WOJTOWICZ:  -- any type of clarification.

13         THE COURT:  Okay.

14         MR. WOJTOWICZ:  And that needs to be done so that

15 when we do get --

16         THE COURT:  Of course.

17         MR. WOJTOWICZ:  Yeah.  Okay.  Appreciate that.  Then

18 finally the thing that I submitted for this evidence, one of

19 the -- one of the -- this is quoted in the bankruptcy

20 documents.  It says here -- this is concerning the ASF --

21 "However, in no event shall the total amount deducted from an

22 ASF distribution recipient's monthly pension check exceed the

23 ASF recoupment cap."  The cap is the 20 percent of your

24 highest rate or the interest rate or 15.5 percent of your

25 pension.  Doesn't this mean that once they add the 6.75

1   percent, you're going above the recoupment cap in your

2   monthly deductions?  That's my question.  Again, it says,

3   "However, in no event."

4          THE COURT:  Again, we'll clarify this, but my

5   understanding is that the 6.75 percent is already included in

6   that monthly amount.

7          MR. WOJTOWICZ:  But the definition of the ASF

8   recoupment cap is 20 percent of your highest amount during

9   that ten-year period or the 15.5 or the interest --

10         THE COURT:  Okay.  I see your issue.

11         MR. WOJTOWICZ:  So they've added one thing.  Now

12  they're calling it recover -- they're calling it a -- forgot

13  what they -- a recovery cap, not a recoupment cap, but in the

14  documents it says "ASF recoupment cap."  Again, my question

15  is -- and actually if you look at Exhibit -- the one I sent

16  in -- yeah -- PS14001, I did send to Heather Lennox and

17  Carole Neville if they could clarify this for me, and I never

18  got a response back, but --

19         THE COURT:  Okay.

20         MR. WOJTOWICZ:  -- again, in my understanding of

21  reading this, it says they can't take more than the

22  recoupment cap, and that's my --

23         THE COURT:  Okay.

24         MR. WOJTOWICZ:  That's my question.

25         THE COURT:  All right.  I won't ask them to do that

1  today, but I will ask them to do that tomorrow.

2          MR. WOJTOWICZ:  Okay.  Appreciate it.  Thank you

3  very much.

4          THE COURT:  Okay.  Thank you, sir.

5          MR. WOJTOWICZ:  Okay.

6      (Witness excused at 11:07 a.m.)

7          THE COURT:  Okay.  One more time, is Gloria Williams

8  here or Irma Industrious?  Mr. Karwoski or Mr. Quinn, is

9  there any further presentation that either of you would like

10  to make at this time?

11          MR. QUINN:  Good morning, your Honor.  John Quinn.

12  Mr. Karwoski and I have no further evidence to present, but

13  we do wish to participate in closing arguments at the

14  appropriate time.

15          THE COURT:  Okay.  That'll be probably Tuesday and

16  Wednesday of next week.

17          MR. QUINN:  Thank you, your Honor.

18          THE COURT:  That's how I foresee this.  You're

19  welcome.  All right.  Any other business before the Court

20  this morning or today?  All right.  We'll be in recess until

21  8:30 tomorrow morning.  At that time, I expect the city will

22  announce that it has settled with FGIC or, in the

23  alternative, that FGIC will proceed with its proofs; right?

24          MR. SHUMAKER:  Understood, your Honor.

25          THE COURT:  All right.

1          THE CLERK:  All rise.  Court is adjourned.

2      (Proceedings concluded at 11:08 a.m.)

3                          * * *


                            INDEX


| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kevyn Orr | 10 | | | |
| Heather Lennox | 18 | 26 | | |
| Fredia M. Butler | 42 | | | |
| Elaine Thayer | 44 | | | |
| David Kausch | 60 | 71 | | |
| Walter Gary Knall | 74 | | | |
| JoAnn Watson | 81 | | | |
| Steven Wojtowicz | 85 | | | |

| EXHIBITS: | Marked | Received |
|---|---|---|
| City Exhibit 777 | 30 | 30 |
| Retiree Committee Exhibit 10484 | | 3 |
| Exhibit PS14020 | | 29 |


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.



/s/ Lois Garrett                    October 21, 2014
_____       _____
Lois Garrett