## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------------x
                                                             :
In re                                                        : Chapter 9
                                                             :
CITY OF DETROIT, MICHIGAN,                                   : Case No. 13-53846
                                                             :
                              Debtor.                        : Hon. Steven W. Rhodes
                                                             :
                                                             :
-------------------------------------------------------------x

## NOTICE OF FILING OF TERM SHEET AMONG FGIC AND COP HOLDERS

        Financial Guaranty Insurance Company ("**FGIC**") hereby files this Notice of the

Proposed Plan Structure Term Sheet among FGIC and the FGIC-insured COP Holders (the

"**Term Sheet**").  A copy of the Term Sheet is attached hereto as **Exhibit 1**.


Dated: October 22, 2014                Respectfully Submitted,

*/s/Alfredo R. Pérez*
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

– and –

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite
300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance
Company.*

WEIL:\95130001\1\45259.0007

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-------------------------------------------------------------x
                                               :
  In re                                        : Chapter 9
                                               :
CITY OF DETROIT, MICHIGAN,                      : Case No. 13-53846
                                               :
                    Debtor.                    : Hon. Steven W. Rhodes
                                               :
                                               :
-------------------------------------------------------------x
```

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2014 the *Notice of Filing of Term Sheet Among FGIC and COP Holders* was filed and served via the Court's electronic case filing and noticing system to all registered users that have appeared in this main Chapter 9 proceeding.

    /s/ Alfredo R. Pérez
    Alfredo R. Pérez
    WEIL, GOTSHAL & MANGES LLP
    700 Louisiana Street, Suite 1700
    Houston, TX  77002
    Telephone: (713) 546-5000
    Facsimile:  (713) 224-9511
    Email:  alfredo.perez@weil.com

Dated: October 22, 2014

*Attorney for Financial Guaranty Insurance Company.*

**EXHIBIT 1**

**Term Sheet**

**Plan Structure**
**Term Sheet**

This term sheet proposal (the "*Term Sheet*") and any and all past, present or future discussions, negotiations, conferences, meetings, telephone conferences, drafts of agreements, correspondence and writings, submissions of data, financial information, financial projections and forecasts and term sheets, whether oral, written or both, relating to the various transactions contemplated herein (the "*Discussions*") shall be considered to be communications to compromise and settle disputed matters. Nothing herein is intended to imply that Discussions prior to the date of this Term Sheet were not "compromise negotiations" as defined in the Federal R. Evid. 408 and similar state laws and rules limiting the admissibility or discoverability of evidence concerning "compromise negotiations" or other communications to compromise and settle disputed matters (the "*Rules*"). This Term Sheet and all Discussions shall be considered "compromise negotiations" pursuant to the Rules and no such Discussions shall ever be considered "otherwise discoverable" or be permitted to be discoverable or admissible or constitute evidence in connection with any legal proceeding, case, litigation or bankruptcy proceeding for any purpose, including proving bias, admission of default, prejudice, interest of a witness or a party, or negating a contention of undue delay, as provided by the Rules.

The term sheet herein is a summary and does not purport to include all terms or related documentation that would need to be required in any final agreement. Such terms and conditions will be included in definitive documentation that the parties will use commercially reasonable efforts to execute following execution of this Term Sheet, which documents shall not be inconsistent with the terms set forth herein.

| | |
|---|---|
| **Definitions** | For the purposes of this Term Sheet the following terms have the meanings provided below: |
| | "Amended Waterfall Provisions" means provisions in the Supplemental Trust Agreements ensuring that all proceeds from the Assets provided to FGIC and the COPs Holders pursuant to the Plan are distributed (i) only for the benefit of FGIC and the COPs Holders, consistent with the terms of this Term Sheet and (ii) to the COPs Holders consistent with the terms of the Plan. |
| | "Assets" means all of the consideration provided by the City under the Plan with respect to the COPs including, without limitation the New B Notes, the New C Notes, the Class 9 Settlement Credits, and the JLA Parcel together with the related development rights and economic incentives, but excluding any compensation provided by the City under the Plan with respect to the COP Swap Agreements. |
| | "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan presiding over the |

City's chapter 9 case.

"City" means the City of Detroit, Michigan.

"COPs Holders" means the holders of COPs originally insured by FGIC (including FGIC and the COPs beneficially held by FGIC).

"Development Proposal" means the proposal for the Development to be submitted pursuant to the Development Agreement.

"Development Agreement" means that certain Development Agreement between the City and the Joint Venture, dated October __, 2014.

"Development" means that certain mixed use facility consisting of (i) hotel and related facilities including not less than 300 hotel rooms, and (ii) such other office, retail, commercial, recreation, residential and/or condominium units as shall be determined by the Joint Venture (industrial, adult entertainment and other noxious uses excepted) given prevailing market conditions, with a height above ground not to exceed 30 floors, to be constructed upon the JLA Parcel by the Joint Venture, together with all onsite improvements, site preparation, onsite infrastructure (including, without limitation, sanitary sewer, water, storm sewer, sidewalks, street lighting, driveways, storm water detention or retention facilities), related parking facilities and landscaping, necessary or appurtenant thereto; in all instances consistent with the City's urban planning policies and the City's comprehensive development plan.

"Effective Date" means the Effective Date of the Plan.

"FGIC" means Financial Guaranty Insurance Company.

"JLA Parcel" means the real property located in the City upon which is presently situated the improvements commonly referred to as the Joe Louis Arena and the Joe Louis Arena Garage.

"JLA Rights": means the Development Agreement, the Development, any Development Proposal, the JLA Parcel and together with the related development rights and economic incentives granted by the City or the State in connection with

2

| | any of the forgoing. |
|---|---|
| | "Majority Holders" means at any time, the beneficial holders of a majority in principal amount of COPs originally insured by FGIC that remain outstanding (including FGIC and the COPs beneficially held by FGIC in such calculation); provided, however, that for the purposes of extending the milestones for selling Assets, "Majority Holders" shall mean the beneficial holders of 66-2/3% of the principal amount of COPs originally insured by FGIC that remain outstanding (including FGIC and the COPs beneficially held by FGIC in such calculation). FGIC agrees that any "control rights" it may have with respect to the COPs or the Trusts that issued the COPs shall not give FGIC control over any vote cast by COPs Holders in connection with the exercise of rights by "Majority Holders". |
| | "Members" shall mean FGIC and the Trustee on behalf of COPs Holders (including FGIC in that capacity). |
| | "Plan" the City's Eighth Amended Plan of Adjustment, as amended or supplemented. |
| | "Plan of Rehabilitation" means the First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013. |
| | "Trustee" means the trustee with respect to the COPs. |
| | Initially capitalized terms used herein, but not otherwise defined herein, shall have the meanings set forth in the Plan. |
| **Plan COP Settlement** | FGIC shall, on behalf of the COPs Holders, opt into the Plan COP Settlement set forth in the Plan. |
| **Joint Venture** | FGIC and the Trustee, on behalf of the COPs Holders, subject to the terms set forth herein, desire to form a joint venture (the "Joint Venture"), to hold, operate, manage and liquidate the Assets. |
| **Structure** | FGIC and the Trustee shall form a limited liability company for the ownership and management of the Assets. |
| | FGIC and the Trustee acknowledge that the parties will |

3

| | |
|---|---|
| | reasonably cooperate with each other to implement structures that are tax-efficient for FGIC and the COPs Holders. |
| **Term** | The term of this Joint Venture will remain effective until such time as the Trustee at the direction of the Majority Holders including FGIC to the extent it acquires COPs and FGIC, agree to dissolve the Joint Venture or it is terminated pursuant to the terms to be contained in an agreement governing the Joint Venture (the "<u>Joint Venture Agreement</u>"). |
| **Members** | FGIC will hold a membership interest in the Joint Venture to reflect its voting rights, with a zero percent economic interest.<br><br>The Trustee will hold a 100% economic interest on behalf of all COPs Holders, including FGIC to the extent it acquires COPs.<br><br>FGIC shall contribute and, as applicable, direct the Trustee to contribute to the Joint Venture all of the consideration provided by the City under the Plan in respect of COPs originally insured by FGIC including, without limitation, the New B Notes, the New C Notes, the Class 9 Settlement Credits, and the JLA Parcel together with the related development rights and economic incentives as provided in the Development Agreement and related planned unit development agreement. |
| **Additional Capital Contributions** | Future capital needs of the Joint Venture shall be specified in the business plan. The business plan (and any amendment thereto) shall be adopted by the Joint Venture with the consent of FGIC and the consent of the Majority Holders including FGIC.<br><br>Capital needs shall be funded as follows: For the purpose of funding the capital needs of the Joint Venture as provided in the business plan as proposed by FGIC and approved by the Majority Holders including FGIC, the Joint Venture may, from time to time, request that each COPs Holder fund its respective percentage of the required capital as a capital contribution to the Joint Venture. The Joint Venture shall provide not less than 30 days' notice of any such capital need included in the business plan to the Trustee for transmission to each COPs Holder (including FGIC). Each COPs Holder |

WEIL:\95118955\16\45259.0007

electing to fund its percentage of a capital call (a "<u>Funding Holder</u>") may also specify the percentage of unfunded calls, if any, that it will agree to fund. If any COPs Holder fails to contribute its respective percentage of such capital call, then those COPs Holders agreeing to fund such additional percentages of the capital call may, but shall not be required to, fund such additional amounts and such additional amounts shall be treated as additional capital contributions and distributed as set forth herein together with a preferred return (the "<u>Preferred Return</u>") thereon, compounded annually. If such additional percentages over-fund the call, the Funding Holders' additional percentages will be cut-back in accordance with their proportionate COPs holdings.

If such funding of additional percentages are insufficient to provide for full funding of such capital call as provided in the preceding paragraph, then FGIC shall have the right, but not the obligation, to make further additional capital contributions ("<u>Super Preferred Contributions</u>") in an amount not to exceed the amount of such deficiency. Super Preferred Contributions contributed by FGIC shall be distributed as set forth herein together with a super preferred return ("<u>Super Preferred Return</u>") thereon, compounded annually.

If (i) further capital contributions are required by the Joint Venture for the purpose of avoiding or curing a loan default or preserving the Development in accordance with the terms of the Development Proposal and the approved business plan with respect to which the manager determines (and FGIC agrees) that there is insufficient time to hold a capital call as set forth above, (ii) further capital contributions are required by the Joint Venture for certain necessary expenses to be specified in the Joint Venture Agreement with respect to which the manager determines (and FGIC agrees) that there is insufficient time to hold a capital call as set forth above, or (iii) further capital contributions are required by the Joint Venture that are not provided for in the approved business plan that the manager and FGIC may, from time to time, deem necessary or desirable, to construct, complete, operate or manage the Development in accordance with the Development Proposal (as defined in the Development Agreement) or to otherwise protect the value of the Development and with respect to which the manager determines (and FGIC agrees) that there is insufficient time to hold a capital call as set forth above, then FGIC and any

WEIL:\95118955\16\45259.0007

| | |
|---|---|
| | COPs Holder shall have the right, but not the obligation, to make further additional capital contributions to the Joint Venture as Super Preferred Contributions, in an amount not to exceed $5,000,000 in the aggregate to fund such amounts. Super Preferred Contributions contributed by FGIC or any such COPs Holder shall be distributed as set forth herein together with a Super Preferred Return thereon, compounded annually.<br><br>Neither FGIC nor the COP Holders, will have any obligation to make any capital contributions or additional capital contributions for any reason except as specifically provided herein. |
| **Preferred Returns** | <u>Preferred Return</u>: 10**%** cumulative annual return, compounded annually, to be paid as set forth below.<br><br><u>Super Preferred Return</u>: 15**%** cumulative annual return, compounded annually, to be paid as set forth below. |
| **Distributions** | All net cash flow from operations, including, without limitation, payments on the New B Notes and New C Notes (after debt service payments and the establishment of reasonable reserves) and any net proceeds from sales, refinancings and other capital events shall be distributed on a periodic basis to all Members as follows. All net proceeds derived from the ownership or sale of the New B Notes, the New C Notes and the Class 9 Settlement Credits (to the extent sold to third parties and not applied directly or indirectly to the purchase of real property by the Joint Venture) shall be distributed to the Trustee for disbursement by the Trustee to the COPs Holders, including FGIC, pursuant to the Amended Waterfall Provisions.<br><br>Proceeds of the JLA Rights shall be distributed as follows and in the following order of priority:<br><br>      (a)    To FGIC and any COPs Holder making Super Preferred Contributions *pari passu*, a Super Preferred Return, compounded annually, on the amount of their respective Super Preferred Contributions;<br><br>      (b)    To FGIC and any COPs Holder making Super Preferred Contributions *pari passu*, the return of |

6

| | |
|---|---|
| | their respective Super Preferred Contributions;<br><br>(c)    To FGIC and any COPs Holder making capital contributions *pari passu*, a Preferred Return, compounded annually, on the amount of their respective capital contributions (other than Super Preferred Contributions);<br><br>(d)    To FGIC and any COPs Holder making capital contributions *pari passu*, the return of their respective capital contributions (other than Super Preferred Contributions); and<br><br>(e)    The balance, if any, to the Trustee, to be applied to the payment of the Trustees reasonable unpaid fees and expenses accrued from and after the Effective Date and then to be disbursed to the COPs Holders, including FGIC, pursuant to the Amended Waterfall Provisions. |
| **Supplemental Trust Agreements** | FGIC shall direct the Trustee to distribute the Assets in a manner consistent with the "Distributions" Section above, and shall direct the Trustee to enter into Supplemental Trust Agreements that include the Amended Waterfall Provisions and any and all other amendments necessary to effectuate the terms of this Term Sheet. |
| **Joint Venture Management** | FGIC shall designate a manager of the Joint Venture with the consent of the Majority Holders (not to be unreasonably withheld) to be in charge of the day-to-day operations of the Joint Venture and the Development, subject to the "Major Decisions" provision below. The designation shall include the fees to be paid to the manager, which shall be (i) paid solely for services actually performed or to be performed for the Joint Venture, and (ii) based on fees payable to arms-length managers of comparable projects involving comparable amounts of work. The designation and fees shall be subject to the consent of the Majority Holders, not to be unreasonably withheld. The Majority Holders' consent shall be deemed given with respect to the manager if the manager is FGIC. With respect to the designation of another manager, and with respect to the fees payable to FGIC or such other manager, the Majority Holders' consent shall be deemed given unless the Majority Holders object to the designee or the proposed fees in writing, specifying the reasons for such objection within 10 |

7

| | |
|---|---|
| | days of receiving notice thereof, in which case FGIC may submit either a new designee or a new fee schedule or its own written rebuttal of the objection, in which case an acceptable neutral third party will decide based solely on the written submissions whether the objection is reasonable; provided, however that FGIC may designate itself as the manager, without consent of the Majority Holders so long as FGIC, in its capacity as the manager, causes the Joint Venture to retain a construction manager, consultant or development partner with the consent of the Majority Holders not to be unreasonably withheld, upon terms reasonably satisfactory to the Majority Holders. |
| **Major Decisions** | Major decisions shall require (a) the consent of FGIC and (b) consent of the Majority Holders, provided, however, that the failure of the Majority Holders to object to a request to consent to any such major decision within 15 days of notice thereof shall be deemed consent. Such major decisions shall include (A) the initial business plan, (B) material amendments to the business plan, (C) the Developer Proposal, (D) sale of (i) New B Notes in excess of $5 million face value per transaction or $15 million face value in the aggregate, (ii) New C Notes in excess of $5 million face value per transaction or $15 million face value in the aggregate, (iii) Class 9 Settlement Credits in excess of $5 million in the aggregate, (E) application of Class 9 Settlement Credits to the purchase of real property, and (F) financings in excess of $1 million. The Joint Venture shall not sell the JLA Rights other than in whole, unless the Majority Holders consent. In any event, neither Member shall be allowed to engage in self-dealing, entering into contracts that are not arms-length, third-party for full consideration, or amending or modifying the Joint Venture Agreement to the economic detriment of other Member.[1] |

---

[1] The business plan will include, among other things, an undertaking by the Joint Venture to use commercially reasonable efforts to liquidate (i) the New B Notes within 12-18 months of the Effective Date at a price acceptable to FGIC and the Majority Holders and (ii) the New C Notes within 24 months of the Effective Date at a price at or near (as determined by FGIC) nominal par plus interest accrued through the date of sale.

8

| | |
|---|---|
| **JLA And Class 9 Settlement Credits** | Within six (6) months following the Joint Venture's acquisition of title to the JLA Parcel, FGIC will consult with the Majority Holders concerning the Joint Venture's plans for the Development, and thereafter, at the request and direction of the Majority Holders, upon reasonable notice to the Trustee and COPs Holders, FGIC shall commence a process to either (i) cause the Joint Venture to sell or otherwise monetize, in whole, but not in part, the JLA Rights and any unused Class 9 Settlement Credits then held by the Joint Venture at a price mutually acceptable to FGIC and the Majority Holders, or (ii) use reasonable efforts to otherwise recapitalize or restructure the Joint Venture in order to buy out the indirect interests in the Joint Venture of those COPs Holders electing not to participate in future capital calls for the development of the JLA Parcel in accordance with the Development Proposal and the then current approved business plan. |
| **Fees** | The manager of the Joint Venture may, and if FGIC is acting as manager shall, select appropriate firms to manage, construct and/or lease property. The selection of such firms and the fees payable to such firms shall be "Major Decisions". The fees and costs of any such asset or construction manager shall be paid by the Joint Venture. |
| **Cost Reimbursement** | FGIC and the manager shall be reimbursed by the Joint Venture for all costs and expenses incurred by FGIC and the Manager (without duplication) after the Effective Date of the Plan in connection with the administration and operation of the Joint Venture, including, without limitation, all reasonably allocated employee costs and related overhead, and all in-house and reasonable third party costs and expenses.<br><br>FGIC shall also have the right to retain a person or entity to act as FGIC's asset or construction manager with respect to the Development. The costs of such asset or construction manager shall be paid by the Joint Venture. |
| **Indebtedness** | The Joint Venture shall exercise commercially reasonable efforts to obtain construction and permanent financing from an institutional lender or such other lender as FGIC or any of the COPs Holders may suggest ("Lender") in an amount or amounts not to exceed an amount approved by FGIC and the Majority Holders (the "Loan"). Any indebtedness in excess |

9

| | |
|---|---|
| | of $1 million shall have no principal installment due or maturity date prior to 36 Months after the Effective Date, shall pay interest for the first 36 Months out of a reserve pre-funded for such purpose, and shall have recourse solely to the JLA Rights. FGIC may, but shall have no obligation to, provide all guarantees and other credit enhancements as the Lender may require, including, without limitation, any limited or springing recourse guarantee, environmental indemnity and, if applicable, completion guarantee on terms to be negotiated with the Lender and the Joint Venture (including any compensation for FGIC in connection therewith), subject to the consent of the Majority Holders not to be unreasonably withheld (and deemed given if no objection is received within 15 days). Under no circumstances shall the Trustee or any of the COPs Holders be required to give any guaranty or other credit enhancement, including, without limitation, any limited or springing recourse guarantee, environmental indemnity or completion guarantee. It shall be a requirement of any Loan that the loan documents permit (i) the Trustee or any COPs Holders to have the right, but not the obligation, to cure any default by the Joint Venture or FGIC; (ii) transfers between FGIC, the Trustee and the COPs Holders as permitted by the organizational documents (as may be amended or supplemented from time to time); (iii) transfers by any COPs Holders of their interests in the COPs; and (iv) transfers of any direct or indirect equity interest in FGIC. If FGIC or any affiliate of FGIC arranges for or provides financing, the Trustee and all COPs Holders must acknowledge the separate nature of the interests of FGIC in the Joint Venture and debt interests (including interests in any mezzanine loan, if any) of FGIC and/or its affiliates in the capacity as lender. |
| **Reporting** | The Joint Venture shall provide to the Trustee quarterly operating and financial reports and annual financial reports on the Development and the Joint Venture, and the Trustee shall post those reports on a publicly accessible web site. Any third-party accounting fees for preparing such reports shall be borne by the Joint Venture. Without limiting the generality of the Cost Reimbursement provisions above, if FGIC is acting as manager, then FGIG shall also be reimbursed for its overhead at market rates for its in-house accountants for customary bookkeeping and reports customarily performed by asset and property managers to the extent such work has actually been done for the benefit of the Joint Venture. |

10

| | |
|---|---|
| **Tax/Financial** | FGIC shall select legal counsel for the Joint Venture, which may be Weil, Gotshal and Manges, LLP. The costs of such counsel shall be paid by the Joint Venture; provided, however, that in the event of any conflict between the Joint Venture and FGIC (as identified by the Majority Holders), Weil Gotshal shall resign from representing the Joint Venture and may continue to represent FGIC in connection therewith and in all other matters. |
| **Consents** | Except as otherwise provided herein, to the extent that an action or decision requires the consent of Majority Holders, if no response is received from the requisite threshold of COPs Holders constituting Majority Holders within 10 calendar days of the date such consent is requested, Majority Holders will be deemed to have consented to such action or decision.<br><br>The COPs Holders have the right, but not the obligation, to appoint a restricted representative, on behalf of one or more of such holders, with the power to exercise such holders' consent rights for purposes of determining the consent of Majority Holders. The costs and fees of any such representative(s) shall be paid by the Joint Venture in an amount approved by FGIC with the consent of the Majority Holders not to exceed $100,000 per year in the aggregate. |
| **Dispute Resolution** | In connection with the negotiation of the definitive documentation to effect the various settlements of claims provided for in this Term Sheet, the parties shall use good faith efforts to identify and agree upon alternative dispute resolution mechanisms that provide a process for resolution of disputes. |
| **Jurisdiction/Venue/Choice of Law** | The parties agree that, except as provided in the "Dispute Resolution" section of the Term Sheet, jurisdiction shall be exercised by courts located in New York City for all disputes relating hereto arising after the consummation of the Plan. The parties agree that this Term Sheet is to be interpreted by and governed accordance with New York law without regard to the principles of conflicts of law. Each COPs Holder is a third party beneficiary of this Term Sheet (and will be a third party beneficiary of final documentation implementing this Term Sheet) entitled to enforce rights granted hereunder (or such documentation) to any COPs Holder against FGIC. |

WEIL:\95118955\16\45259.0007