## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

----------------------------------------------------x
                :

In re                        :        Chapter 9
                :

CITY OF DETROIT, MICHIGAN,   :        Case No. 13-53846
                :

           Debtor.      :        Hon. Steven W. Rhodes
                :
                :

----------------------------------------------------x

## NOTICE OF FILING OF REDLINED
## VERSION OF EIGHTH AMENDED PLAN FOR THE
## <u>ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT</u>

### PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On May 5, 2014, the City of Detroit (the "<u>City</u>") filed the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4392) (the "<u>Fourth Amended Plan</u>").

2.      Solicitation of votes to accept or reject the Fourth Amended Plan was completed on May 12, 2014, and the deadline for such voting was July 11, 2014.  On July 21, 2014, the City filed the Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes on, And the Results of Voting with Respect to, Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6179).  On August 12, 2014, the City filed the Supplemental Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of

Votes on, And the Results of Voting with Respect to, Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6665).

3.   On September 16, 2014, the City filed the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7502) (the "Seventh Amended Plan").[1]

4.   Contemporaneously herewith, the City has filed the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (the "Eighth Amended Plan").[2]

5.   Attached hereto as Exhibit A is a redline of the Seventh Amended Plan against the Eighth Amended Plan.  Attached hereto as Exhibit B is a redline of the Fourth Amended Plan against the Eighth Amended Plan.  Attached hereto as Exhibit C is a redline showing changes made to certain exhibits to the Eighth Amended Plan since the filing of such exhibits with the Seventh Amended Plan.

---

[1]   On September 19, 2014, the City filed City of Detroit's Errata Sheet and Notice of Amended Exhibits I.A.112 and I.A.327 to Seventh Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7610), which corrected certain portions of, and added certain exhibits to, the as-filed Seventh Amended Plan.

[2]   Capitalized terms not otherwise defined herein have the meanings given to them in the Eighth Amended Plan.

6. Exhibits that are not included in <u>Exhibit C</u> have not changed since their filing with the Seventh Amended Plan.

7. Pursuant to section 942 of the Bankruptcy Code, the City "may modify the [P]lan at any time before confirmation," and "after the [City] files a modification, the [P]lan as modified becomes the [P]lan." 11 U.S.C. § 942. At the Confirmation Hearing, the City will seek a ruling that the amendments to the Fourth Amended Plan, as reflected in the Eighth Amended Plan, do not adversely affect any Holder of any Claim such that no re-solicitation of votes is required as a result of such amendments.

8. In particular, amendments affecting the treatment of Class 9 Claims under the Plan reflect a negotiated settlement and a holder of Class 9 Claims becoming a Settling COP Claimant pursuant to the Plan COP Settlement. Classes 7, 12 and 14 are not adversely affected by the amendments affecting the treatment of Class 9 Claims.

9. Additionally, amendments with respect to Class 12 reflect an agreement between the City, the UAW and AFSCME to resolve the latter's objections to the Plan. These amendments do not adversely affect Class 12 Claimants because the resolution reached among these parties was already contemplated by the OPEB Settlement originally negotiated and reflected in the Fourth Amended Plan.

CHI-181945779v1

10.     Accordingly, the City submits that re-solicitation of votes is not required as a result of such amendments.

[The remainder of this page is intentionally blank]

CHI-181945779v1

Dated: October 22, 2014

Respectfully submitted,

/s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
---------------------------------------------------------- x
                                      :
In re                                 :        Chapter 9
                                      :
CITY OF DETROIT, MICHIGAN,            :        Case No. 13-53846
                                      :
                   Debtor.            :        Hon. Steven W. Rhodes
                                      :
                                      :
---------------------------------------------------------- x
```

---

**~~SEVENTH~~EIGHTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**
(~~September 16~~October 22, 2014)

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

**TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND
      COMPUTATION OF TIME .................................................... 1

    A.    Defined Terms. .................................................................. 1

    B.    Rules of Interpretation and Computation of Time. ............... ~~29~~30

        1.    Rules of Interpretation. ........................................... ~~29~~30

        2.    Computation of Time. .............................................. 30

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY
      CONTRACTS AND UNEXPIRED LEASES ........................... 30

    A.    Unclassified Claims. .......................................................... ~~30~~31

        1.    Payment of Administrative Claims. ........................... ~~30~~31

        2.    Bar Dates for Administrative Claims. ........................ ~~30~~31

    B.    Classified Claims. ............................................................. ~~31~~32

        1.    Designation of Classes. ............................................ ~~31~~32

        2.    Subordination; Reservation of Rights to Reclassify Claims. ... ~~32~~33

        3.    Treatment of Claims. ............................................... ~~32~~33

    C.    Confirmation Without Acceptance by All Impaired Classes. ... ~~44~~45

    D.    Treatment of Executory Contracts and Unexpired Leases. ...... 45

        1.    Assumption. .......................................................... 45

        2.    Assumption of Ancillary Agreements. ....................... 45

        3.    Approval of Assumptions and Assignments. ............... 45

        4.    Payments Related to the Assumption of Executory Contracts and
            Unexpired Leases. .................................................. ~~45~~46

        5.    Contracts and Leases Entered Into After the Petition Date. ... 46

        6.    Rejection of Executory Contracts and Unexpired Leases. ...... 46

        7.    Rejection Damages Bar Date. .................................... 46

        8.    Preexisting Obligations to the City Under Rejected Executory
            Contracts and Unexpired Leases. ............................... ~~46~~47

        9.    Insurance Policies. .................................................. ~~46~~47

ARTICLE III CONFIRMATION OF THE PLAN .............................. 47

    A.    Conditions Precedent to the Effective Date. ......................... 47

    B.    Waiver of Conditions to the Effective Date. ......................... 48

C.    Effect of Nonoccurrence of Conditions to the Effective Date. ............ 4849

D.    Effect of Confirmation of the Plan. ............ 4849

    1.    Dissolution of Retiree Committee. ............ 4849

    2.    Preservation of Rights of Action by the City. ............ 4849

    3.    Comprehensive Settlement of Claims and Controversies. ............ 4849

    4.    Discharge of Claims. ............ 4950

    5.    Injunction. ............ 4950

    6.    Exculpation. ............ 5051

    7.    Releases ............ 5152

E.    No Diminution of State Power ............ 5253

F.    Effectiveness of the Plan. ............ 5253

G.    Binding Effect of Plan. ............ 53

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ............ 5354

A.    DWSD. ............ 5354

    1.    Rates and Revenues. ............ 5354

    2.    DWSD CBAs. ............ 5354

    3.    Potential DWSD Authority Transaction. ............ 5354

B.    The New B Notes, New C Notes and New LTGO Bonds. ............ 5455

C.    The UTGO Settlement. ............ 5455

D.    The State Contribution Agreement. ............ 5455

    1.    State Contribution. ............ 5455

    2.    Income Stabilization Payments. ............ 55

    3.    Conditions to State's Participation. ............ 5556

    4.    Release of Claims Against the State and State Related Entities. ............ 56

E.    The DIA Settlement. ............ 5657

    1.    Funding Contributions. ............ 5657

    2.    Transfer of DIA Assets. ............ 5657

    3.    Conditions to the DIA Funding Parties' Participation. ............ 5657

F.    Contingent Payment Rights ............ 5758

    1.    Special Restoration ............ 5758

    2.    General Restoration ............ 5758

G.    The OPEB Settlement. ............ 58

H.    The LTGO Settlement. ....................................................... 58 59

I.    Prosecution of COP Litigation. ....................................... 58

    1.    Creation of Litigation Trust. ................................ 58

    2.    Direction of COP Litigation. .............................. 58

    3.    Payment of Fees and Expenses. ......................... 58

4I.    The Syncora Settlement of COP Litigation. .................. 59

    5.    Distributions to Settling COP Claimants. ............. 59

J.    The Syncora FGIC/COP Settlement ................................ 59

K.    Issuance of the New Securities. ....................................... 60 59

L.    Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents. ........................................................ 60

M.    Release of Liens. ............................................................ 60

N.    Professional Fees ............................................................ 61

    1.    Professional Fee Reserve .................................... 61

    2.    Fee Review Order ............................................... 61

    3.    Dismissal of the Fee Examiner ........................... 61

    4.    Potential Review of Fees Not Subject to Fee Review Order ..................................................... 61

    5.    Court-Appointed Expert ...................................... 61 62

O.    Assumption of Indemnification Obligations. .................. 62

P.    Incorporation of Retiree Health Care Settlement Agreement. ...... 62

Q.    Payment of Workers' Compensation Claims. .................. 62

R.    36th District Court Settlement. ....................................... 62

S.    Payment of Certain Claims Relating to the Operation of City Motor Vehicles. ................................................... 62

T.    Payment of Tax Refund Claims. ..................................... 63

U.    Utility Deposits. ............................................................. 63

V.    Pass-Through Obligations. .............................................. 63

W.    Exit Facility. .................................................................. 63

X.    Post-Effective Date Governance. .................................... 63

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN .......... 63 64

A.    Appointment of Disbursing Agent. ................................. 63 64

B.    Distributions on Account of Allowed Claims. ................. 64

C.      Certain Claims to Be Expunged. ⸺⸺⸺⸺⸺⸺ 64

D.      Record Date for Distributions; Exception for Bond Claims. ⸺⸺ 64

E.      Means of Cash Payments. ⸺⸺⸺⸺⸺⸺⸺⸺ 64

F.      Selection of Distribution Dates for Allowed Claims. ⸺⸺⸺ ~~64~~65

G.      Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. ⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺ 65

H.      City's Rights of Setoff Preserved. ⸺⸺⸺⸺⸺⸺⸺ 65

I.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺ 65

      1.      Delivery of Distributions Generally. ⸺⸺⸺⸺⸺ 65

      2.      Delivery of Distributions on Account of Bond Claims. ⸺ 65

      ~~3.~~      ~~Delivery of Distributions on Account of COP Claims.~~ ⸺ ~~65~~

      ~~4~~3.      De Minimis Distributions / No Fractional New Securities. ⸺ 66

      ~~5~~4.      Undeliverable or Unclaimed Distributions. ⸺⸺⸺ 66

      ~~6~~5.      Time Bar to Cash Payment Rights. ⸺⸺⸺⸺⸺ 66

J.      Other Provisions Applicable to Distributions in All Classes. ⸺⸺ 66

      1.      No Postpetition Interest. ⸺⸺⸺⸺⸺⸺⸺ 66

      2.      Compliance with Tax Requirements. ⸺⸺⸺⸺⸺ 66

      3.      Allocation of Distributions. ⸺⸺⸺⸺⸺⸺⸺ 67

      4.      Surrender of Instruments. ⸺⸺⸺⸺⸺⸺⸺ 67

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ⸺⸺ ~~68~~67

A.      Treatment of Disputed Claims. ⸺⸺⸺⸺⸺⸺⸺ ~~68~~67

      1.      General. ⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺ ~~68~~67

      2.      ADR Procedures. ⸺⸺⸺⸺⸺⸺⸺⸺⸺ 68

      3.      Tort Claims. ⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺ 68

B.      Disputed Claims Reserve. ⸺⸺⸺⸺⸺⸺⸺⸺ ~~69~~68

C.      Objections to Claims. ⸺⸺⸺⸺⸺⸺⸺⸺⸺ 69

      1.      Authority to Prosecute, Settle and Compromise. ⸺⸺⸺ 69

      2.      Expungement or Adjustment of Claims Without Objection. ⸺ 69

      3.      Extension of Claims Objection Bar Date. ⸺⸺⸺⸺ 69

      4.      Authority to Amend List of Creditors. ⸺⸺⸺⸺⸺ 69

ARTICLE VII RETENTION OF JURISDICTION ⸺⸺⸺⸺⸺⸺ ~~70~~69

ARTICLE VIII MISCELLANEOUS PROVISIONS ⸺⸺⸺⸺⸺⸺ 71

A.   Plan Supplements. ................................................................................ 71

B.   Modification of the Plan. ...................................................................... 71

C.   Revocation of the Plan. ......................................................................... 71

D.   Severability of Plan Provisions. ........................................................... 71

E.   Effectuating Documents and Transactions. ...................................... 7271

F.   Successors and Assigns. ........................................................................ 72

G.   Plan Controls. ......................................................................................... 72

H.   Notice of the Effective Date. ................................................................ 72

I.   Governing Law. ....................................................................................... 72

J.   Request for Waiver of Automatic Stay of Confirmation Order. ...... 72

K.   Term of Existing Injunctions and Stays. ............................................ 72

L.   Service of Documents ........................................................................... 7372

     1.   The City ........................................................................................ 73

     2.   The Retiree Committee .............................................................. 73

**TABLE OF EXHIBITS**

Exhibit I.A.9      Principal Terms of 36th District Court Settlement

Exhibit I.A.66      Schedule of Class 9 Eligible City Assets

Exhibit I.A.~~89~~88      Schedule of COP Swap Agreements

Exhibit I.A.108      Form of Detroit General VEBA Trust Agreement

Exhibit I.A.112      Form of Detroit Police and Fire VEBA Trust Agreement

~~Exhibit I.A.115~~      ~~Form of Development Agreement~~

Exhibit I.A.~~125~~126      Principal Terms of DIA Settlement

Exhibit I.A.~~126~~127      Form of DIA Settlement Documents

Exhibit I.A.~~131~~132      Dismissed ~~Syncora~~FGIC/COP Litigation

Exhibit I.A.133      Dismissed Syncora Litigation

Exhibit I.A.~~147~~148      Schedule of DWSD Bond Documents & Related DWSD Bonds

Exhibit I.A.~~155~~156      Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds

Exhibit I.A.~~158~~159      Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds

Exhibit I.A.~~181~~183      Principal Terms of Exit Facility

Exhibit I.A.197      Form of FGIC/COP Settlement Documents

Exhibit I.A.198      Form of FGIC Development Agreement

Exhibit I.A.~~207~~216      Schedule of HUD Installment Note Documents & Related HUD Installment Notes

Exhibit I.A.~~221~~230      Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds

Exhibit I.A.~~232~~237      Form of LTGO Settlement Agreement

Exhibit I.A.~~240~~246      Principal Terms of New B Notes

Exhibit I.A.~~241~~247      Form of New B Notes Documents

Exhibit I.A.~~242~~248      Principal Terms of New C Notes

Exhibit I.A.~~243~~249      Form of New C Notes Documents

Exhibit I.A.~~244~~250.a      Form of New GRS Active Pension Plan

Exhibit I.A.~~244~~250.b      Principal Terms of New GRS Active Pension Plan

Exhibit I.A.~~248~~254.a      Form of New PFRS Active Pension Plan

Exhibit I.A.~~248~~254.b      Principal Terms of New PFRS Active Pension Plan

~~Exhibit I.A.252~~      ~~Notice of COP Settlement Acceptance~~

Exhibit I.A.~~275~~280      Prior GRS Pension Plan

Exhibit I.A.~~276~~281      Prior PFRS Pension Plan

Exhibit I.A.~~287~~292      Restoration Trust Agreement

Exhibit I.A.~~293~~298      Retiree Health Care Settlement Agreement

Exhibit I.A.~~300~~305      Schedule of Secured GO Bond Documents

Exhibit I.A.~~327~~332      State Contribution Agreement

Exhibit I.A.340      Form of Syncora Development Agreement

Exhibit I.A.~~338~~344      Form of Syncora Settlement Documents

Exhibit I.A.~~348~~354      Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds

Exhibit I.A.~~355~~360      Form of UTGO Settlement Agreement

Exhibit II.B.3.q.ii.A      Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits

Exhibit II.B.3.q.ii.C      Terms of PFRS Pension Restoration

Exhibit II.B.3.r.ii.A      Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits

Exhibit II.B.3.r.ii.C      Terms of GRS Pension Restoration

Exhibit II.D.5      Schedule of Postpetition Collective Bargaining Agreements

Exhibit II.D.6      Executory Contracts and Unexpired Leases to Be Rejected

Exhibit III.D.2      Retained Causes of Action

## INTRODUCTION

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

A.    **Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.    "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.    "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3.    "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.    "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5.    "2014 DWSD Refinancing Obligations" means, collectively, the (i) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D, (ii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014E, (iii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F, (iv) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding

Second Lien Bonds, Series 2014G, (v) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A, (vi) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B, (vii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C, and (viii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D.

6.  "2014 Revenue and Revenue Refinancing Bonds" means, collectively, one or more series of Sewage Disposal System Revenue and Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds.

7.  "2014 Revenue Refinancing Bonds" means, collectively, the Michigan Finance Authority's (i) Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (ii) Local Government Loan Program Revenue Bonds, Series 2014C-5 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iii) Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iv) Local Government Loan Program Revenue Bonds, Series 2014C-7 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (v) Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vi) Local Government Loan Program Revenue Bonds, Series 2014D-2 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vii) Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, and (viii) Local Government Loan Program Revenue Bonds, Series 2014D-4 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds.

8.  "36th District Court" means the district court for the thirty-sixth judicial district of the State.

9.  "36th District Court Settlement" means the settlement between the City and the Settling 36th District Court Claimants, substantially on the terms set forth on Exhibit I.A.9.

10.  "Active Employee" means an active employee of the City on and after the Confirmation Date.

11.  "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

12.  "Ad Hoc Committee of DWSD Bondholders" means, collectively, Blackrock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

13.  "Adjusted Pension Amount" means the GRS Adjusted Pension Amount or the PFRS Adjusted Pension Amount, as applicable.

-2-

14. "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee or any member thereof shall be considered an Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

15. "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

16. "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

17. "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

18. "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

19. "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City. "Allow" and "Allowing" shall have correlative meanings.

20. "Ambac" means Ambac Assurance Corporation.

21. "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

22. "Annuity Savings Fund Excess Amount" means the following: (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual Return through such date; and (c) for an

ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

23. "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.~~202~~211, plus the ASF Recoupment.

24. "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

25. "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

26. "ASF Election Date" means the date that is 35 days after the date on which the ASF Election Form is mailed.

27. "ASF Election Form" means a form to be mailed to each ASF Distribution Recipient with the ASF Election Notice to allow such ASF Distribution Recipient to elect the ASF Recoupment Cash Option.

28. "ASF Election Notice" means a notice to be mailed to each ASF Distribution Recipient notifying such ASF Distribution Recipient of the ASF Recoupment Cash Option and providing such recipient with an ASF Election Form.

29. "ASF Final Cash Payment Date" means the later of (a) 90 days after the Effective Date or (b) 50 days after the date of mailing of an ASF Final Cash Payment Notice.

30. "ASF Final Cash Payment Notice" means a notice to be provided by GRS to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option indicating the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.

31. "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

32. "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period _plus an interest component of 6.75% if the amount recouped is amortized over time_. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

33. "ASF Recoupment Cash Option" means an election that may be exercised by an ASF Distribution Recipient to pay the total amount of such ASF Distribution Recipient's ASF Recoupment in a single lump sum.

34. "ASF Recoupment Cash Payment" means the amount of the cash payment that an ASF Distribution Recipient who elects the ASF Recoupment Cash Option will be required to pay on account of such ASF Distribution Recipient's ASF Recoupment.

35. "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

36. "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation), which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement Agreement, substantially on the terms set forth on Exhibit I.A.355360.

37. "Assured" means, together, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc., and Assured Guaranty Corp.

38. "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

39. "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

40. "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

41. "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

42. "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

43. "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

44. "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

45. "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims and the Secured GO Bond Claims.

46. "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents and the Secured GO Bond Documents.

47.     "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes or the Secured GO Bonds.

48.     "Bondholder" means any beneficial or record holder of a Bond.

49.     "Bond Insurance Policies" means those policies, surety policies or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

50.     "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

51.     "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

52.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

53.     "Cash" means legal tender of the United States of America and equivalents thereof.

54.     "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

55.     "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

56.     "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

57.     "City" means the City of Detroit, Michigan.

58.     "City Council" means the duly-elected City Council of the City.

59.     "City Parking Assets" means, collectively, the City's right, title and interest in (a) the Parking Garages, (b) operating revenue received by the City generated by the Parking Garages, (c) revenues collected from fines received by the City related to tickets issued for parking violations (other than any such revenue that would otherwise be paid to the 36th District Court), (d) revenue received by the City generated by parking meters owned by the City and (e) revenue received by the City generated by "boot and tow" operations conducted by the City.

60.     "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

61. "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

62. "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the latest of (a) 180 days after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court, which other period may be set without notice to Holders of Claims.

63. "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

64. "Class" means a class of Claims, as described in Section II.B.

65. "Class 9 Settlement Asset Pool" means (a) either: (i) the New C Notes or (ii) in the event of a disposition or monetization of the City Parking Assets prior to distribution of the New C Notes, the proceeds from such disposition or monetization, in an amount not less than $80 million; and (b) the Class 9 Settlement Credits.

66. "Class 9 Eligible City Asset" means those assets identified on Exhibit I.A.66.

67. "Class 9 Settlement Credits" means assignable, transferable settlement credits in the aggregate amount of $25 million that may be applied to offset not more than 50% of the purchase price of a Class 9 Eligible City Asset; provided that, in all cases, to apply a Class 9 Settlement Credit, the owner thereof must (a) be the final party selected in a procurement process or auction conducted by the City and (b) otherwise satisfy all other elements of the procurement or auction process applicable to a particular Class 9 Eligible City Asset (in each of (a) and (b), without regard to such owner's offsetting any portion of the purchase price with such Class 9 Settlement Credit and irrespective of such owner's ability to apply any Class 9 Settlement Credit).

68. "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements, other contracts or ordinances.

69. "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

70. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

71. "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

72. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

73. "Contract Administration Agreement 2005" means the Contract Administration Agreement dated June 2, 2005, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2005, the COP Contact Administrator and the COP Swap Counterparties.

74. "Contract Administration Agreement 2006" means the Contract Administration Agreement dated June 12, 2006, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2006, the COP Contact Administrator and the COP Swap Counterparties.

75. "Contract Administration Agreements" means, together, the Contract Administration Agreement 2005 and the Contract Administration Agreement 2006.

76. "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

77. "COP Agent" means a contract administrator, trustee, paying agent or similar Entity, as applicable, under the COP Documents.

78. "COP Agent Fees" means reasonable, actual and documented fees payable to the COP Agent for services rendered or expenses incurred in accordance with and pursuant to the terms of the COPs Documents.

79. "COP Claim" means a Claim under or evidenced by the COP Service Contracts. For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to: (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

80. "COP Contract Administrator" means Wilmington Trust, National Association, as successor to U.S. Bank, N.A.

81. "COP Documents" means, collectively, the COP Service Contracts, the 2005 COPs Agreement, the 2006 COPs Agreement and the Contract Administration Agreements.

82. "COP Insurance Policies" means those certain polices or other instruments insuring the 2005 COPs issued under the 2005 COPs Agreement and the 2006 COPs issued under the 2006 COPs Agreement, including all ancillary and related documents that may obligate the City to pay any amount to a COP Insurer for any reason.

83. "COP Insurance Policies Claim" means a Claim held by a COP Insurer arising under or in connection with a COP Insurance Policy.

84. "COP Insurer" means any party, other than the City, that has issued a COP Insurance Policy.

85. "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service*

*Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

86.    "COP Litigation Counsel" means counsel to the Litigation Trust in the COP Litigation.

8786.    "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

8887.    "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

8988.    "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.8988, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

9089.    "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

9190.    "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

9291.    "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

9392.    "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

9493.    "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

9594.    "COP Swap Exculpated Parties" means the COP Swap Counterparties and their affiliates and each of their respective present and former (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

9695.    "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

9796.    "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

9897.    "COP Syncora Swap Insurance Policies" shall mean policy numbers CA03049E, CA03049D, CA3049C and CA03049B issued by XL Capital Assurance Inc.

9998.    "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

99.    "COP Trustee" means Wilmington Trust, National Association, as Successor Trustee for the Detroit Retirement Systems Funding Trust 2005 and the Detroit Retirement Systems Funding Trust 2006, or any successor thereto.

100.    "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

101.    "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

102.    "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

103.    "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension (including an interest component of 6.75% on the ASF Recoupment portion of the ASF/GRS Reduction if the ASF Recoupment is amortized over time) of a person who was a current retiree as of June 30, 2014.

104.    "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

105.    "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OPEB Claim.

106.    "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

107.    "Detroit General VEBA Beneficiary" means either (a) a Holder of an Allowed OPEB Claim who is a Detroit General Retiree or (b) a retired employee (or surviving beneficiary of a retired employee) of the Detroit Public Library or the Detroit Regional Convention Facility Authority who (i) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (ii) holds a valid claim for OPEB Benefits against the Detroit Public Library or the Detroit Regional Convention Facility Authority.

108.    "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.108.

109.    "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the

Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

110. "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

111. "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

112. "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.112.

113. "Detroit Retirement Systems Funding Trust 2005" means the funding trust established pursuant to the 2005 COPs Agreement.

114. "Detroit Retirement Systems Funding Trust 2006" means the funding trust established pursuant to the 2006 COPs Agreement.

115. "Development Agreement" means that certain development agreement by and between the City and Pike Point Holdings, LLC, a wholly owned indirect subsidiary of Syncora, in substantially the form attached hereto as Exhibit I.A.115, including all exhibits thereto, and in any case in form and substance reasonably acceptable to the City and Syncora.

115. "Developer" means FGIC or its designee(s) under the FGIC Development Agreement.

116. "DDA" means the City of Detroit Downtown Development Authority.

116117. "DIA" means The Detroit Institute of Arts, a museum and cultural institution located at 5200 Woodward Avenue, Detroit, Michigan 48202.

117118. "DIA Assets" means the "Museum Assets" as defined in the DIA Settlement Documents.

118119. "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

119120. "DIA Direct Funders" means DIA Corp. and those DIA Funders whose commitments to contribute monies in furtherance of the DIA Settlement are made directly to the CFSEM Supporting Organization.

120121. "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations from which DIA Corp. secures commitments, whether before or after the Effective Date, to contribute monies or otherwise secures contributions of monies in support of DIA Corp.'s payment obligations under the DIA Settlement, whether paid directly to the CFSEM Supporting Organization or to DIA Corp. for the purpose of supporting DIA Corp.'s payments to the CFSEM Supporting Organization.

121122. "DIA Funding Parties" means the Foundations and the DIA Direct Funders.

-11-

122123.     "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.E.1.

123124.     "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

124125.     "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

125126.     "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.E and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.125126.

126127.     "DIA Settlement Documents" means the definitive documentation to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.126127, which documents substantially conform to the term sheet attached hereto as Exhibit I.A.125126.

127128.     "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

128129.     "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court in the Disclosure Statement Order, as the same may be amended, supplemented or otherwise modified.

129130.     "Disclosure Statement Order" means the Order Approving the Proposed Disclosure Statement (Docket No. 4401), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on May 5, 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

130131.     "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

132.     "Dismissed FGIC/COP Litigation" means all litigation pending between the City and FGIC (including all appeals) arising out of or related to, and all motions or objections pending in, the Chapter 9 Case, including the litigation set forth on Exhibit I.A.132, which litigation shall be dismissed or withdrawn as set forth in the FGIC/COP Settlement Documents.

131133.     "Dismissed Syncora Litigation" means all litigation pending between the City and Syncora (including all appeals) arising out of or related to, and withdraw all motions or objections pending in, the Chapter 9 Case, including the litigation set forth on Exhibit I.A.131133, which litigation shall be dismissed or withdrawn as set forth in the Syncora Settlement AgreementDocuments.

132134.     "Disputed Claim" means any Claim that is not Allowed.

133.     "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.p.iii.B.1.

134135.    "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

135136.    "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

136137.    "Distribution Date" means any date on which a Distribution is made.

137138.    "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

138139.    "District Court" means the United States District Court for the Eastern District of Michigan.

139140.    "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

140141.    "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

141142.    "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown Development AuthorityDDA, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

142143.    "DRCEA" means the Detroit Retired City Employees Association.

143144.    "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

144145.    "DWSD Authority" means an authority that may be formed pursuant to a DWSD Authority Transaction to conduct many or all of the operations currently conducted by DWSD as described in Section IV.A.3.

145146.    "DWSD Authority Transaction" means the potential formation (including the potential transfer of certain assets owned by DWSD) and operation of the DWSD Authority, as described in Section IV.A.3.

146147.    "DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

147148.    "DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.147148, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

148149.    "DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.147148.

149150. "DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

150151. "DWSD Exculpated Parties" means, collectively, the DWSD Settlement Parties and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

151152. "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

152153. "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

153154. "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

154155. "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

155156. "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.155156, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

156157. "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.155156.

157158. "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

158159. "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.158159, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

159160. "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.158159.

160161. "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

161162. "DWSD Settlement Date" means the date prior to the Effective Date upon which each of (i) consummation of the purchase of the DWSD Tendered Bonds, (ii) issuance of the 2014 DWSD Refinancing Obligations and (iii) issuance of the 2014 Revenue Refinancing Bonds occurs, which date is identified as September 4, 2014 in the DWSD Tender Invitations (subject to rescheduling to a date earlier or later than that date by the City in its sole discretion).

-14-

162163.    "DWSD Settlement Parties" means, collectively, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc., Berkshire Hathaway Assurance Corp., Financial Guaranty Insurance CompanyFGIC (solely in its capacity as a DWSD Bond Insurer and solely if it provides any consents required to effectuate the DWSD Tender), NPFG, the Ad Hoc Committee of DWSD Bondholders and U.S. Bank National Association, as trustee for the DWSD Bonds.

163164.    "DWSD Tender" means the offers, subject to acceptance at the City's election and in its sole discretion, to purchase for cancellation some or all of the DWSD Bonds that have been tendered and accepted in connection with, and on the terms provided in, the DWSD Tender Invitations.

164165.    "DWSD Tendered Bonds" means the DWSD Bonds that have been tendered for purchase or cancellation pursuant to the DWSD Tender.

165166.    "DWSD Tender Invitations" means the invitations and accompanying disclosure statements sent by the City to holders of DWSD Bonds on August 7, 2014, in the form of those collectively attached as Exhibits 8A and 8B to the DWSD Tender Motion.

166167.    "DWSD Tender Motion" means the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 6644), Filed by the City on August 11, 2014.

167168.    "DWSD Tender Order" means the Order, Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 7028), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 25, 2014.

168169.    "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

169170.    "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

170171.    "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

171172.    "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continue to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

172173.    "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

-15-

173174.        "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

174175.        "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

175176.        "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

176177.        "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

177178.        "Excess New B Notes" means, collectively:  (a) the Syncora Excess New B Notes and (b) New B Notes in the aggregate face amount of $15.44approximately $48.71 million, representing the difference between (ai) the New B Notes that would have been distributed to SyncoraFGIC or the FGIC COP Holders had itstheir respective asserted COP ClaimClaims for principal and interest in Class 9 been Allowed in full and (bii) the New B Notes to be provided to SyncoraFGIC and the FGIC COP Holders as partial consideration pursuant to the terms of the SyncoraFGIC/COP Settlement.

179.        "Excluded Actions" means (a) any claims with respect to enforcement of the FGIC/COP Settlement Documents or the FGIC Development Agreement, (b) any claims with respect to the New B Notes, the New C Notes or the Class 9 Settlement Credits, (c) any claims held by FGIC against the (i) COP Swap Counterparties or (ii) Related Entities of any of the foregoing, or (d) any claims asserted against the City in the proofs of claim filed by FGIC and the COP Trustee; provided that, with respect to the claims described in clause (d), notwithstanding any other provision of the Plan, such claims shall be subject to the treatment, discharge and injunction provisions set forth herein.

178180.        "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties, (j) the UTGO Exculpated Parties, (k) the DWSD Exculpated Parties, (l) the RDPMA Exculpated Parties and, (m) the Syncora Exculpated Parties, (n) the COP Agent and (o) the FGIC/COP Exculpated Parties.  For the avoidance of doubt, Exculpated Parties shall not include the COP Service Corporations.

179181.        "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

180182.        "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed.  The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

181183.        "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.181183.

182184.    "Exit Facility Agent" means the agent under the Exit Facility.

183185.    "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

184186.    "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

185187.    "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

186188.    "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

187189.    "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

188190.    "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified, including pursuant to the Order Amending and Clarifying Fee Review Order of September 11, 2013 (Docket No. 5150), entered on May 29, 2014.

189191.    "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, and (b) those additional professionals retained by third parties to provide services in connection with the Chapter 9 Case that seek reimbursement by or payment from the City or any of its departments and are, or are determined (by Bankruptcy Court order or otherwise) to be, subject to the Fee Review Order or the terms of this Plan and (c) the Fee Examiner Parties.  For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

190192.    "Fee Review Professional Fees" means, collectively, (a) the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date and (b) the fees and expenses of the Fee Examiner Parties through the projected date of dismissal of the Fee Examiner pursuant to Section IV.N.3.

193.    "FGIC" means Financial Guaranty Insurance Company.

194.    "FGIC/COP Exculpated Parties" means (a) FGIC and its Related Entities, (b) the FGIC COP Holders and their respective Related Entities and (c) the COP Agent and its Related Entities, in each case solely

in their respective capacities as holders of, insurer of or administrator, trustee, or paying agent with respect to COP Claims.

195. "FGIC COP Holders" means the registered and beneficial holders of COPs originally insured by FGIC.

196. "FGIC/COP Settlement" means the comprehensive settlement with FGIC and the FGIC COP Holders, as described at Section IV.J and as definitively set forth in the FGIC/COP Settlement Documents.

197. "FGIC/COP Settlement Documents" means the definitive documentation to be executed in connection with the FGIC/COP Settlement, in substantially the form attached hereto as Exhibit I.A.197, and in any case in form and substance reasonably acceptable to the City, FGIC and the FGIC COP Holders. Whenever the consent of the FGIC COP Holders is required hereunder, or any document is required to be reasonably satisfactory to the FGIC COP Holders, such consent shall be deemed given and such document shall be deemed reasonably satisfactory unless within the period of time specified for such consent or document (which shall be reasonable under the circumstances and in any event not less than 48 hours after the request for such consent or proposed document shall have been filed with the court) unless beneficial holders of a majority of the COPs originally insured by FGIC shall have objected in writing to the action or document.

198. "FGIC Development Agreement" means that certain development agreement to be entered into by the City and the Developer, in substantially the form attached hereto as Exhibit I.A.198.

199. "FGIC Settlement Consideration" means the share of the Class 9 Settlement Asset Pool and New B Notes to be distributed for the benefit of FGIC and the FGIC COP Holders pursuant to Section II.B.3.p.i.A in respect of COPs originally insured by FGIC.

191200. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

192201. "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

193202. "Financial Review Commission" means the financial review commission appointed under Section 4 of the Financial Review Commission Act.

194203. "Financial Review Commission Act" means Public Act 181 of 2014 of the State, also known as the Michigan Financial Review Commission Act, Michigan Compiled Laws §§ 141.1631, et seq.

195204. "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year. A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

-18-

~~196~~205.		"Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.~~125~~126.

~~197~~206.		"General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

~~198~~207.		"General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

~~199~~208.		"General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

~~200~~209.		"General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

~~201~~210.		"GRS" means the General Retirement System of the City of Detroit.

~~202~~211.		"GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

~~203~~212.		"GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

204213.        "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

205214.        "Holder" means an Entity holding a Claim.  With respect to any COP originally insured by FGIC, "Holder" includes the beneficial holders of any such COP.

206215.        "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

207216.        "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.207216, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

208217.        "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.207216.

209218.        "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

210219.        "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

211220.        "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

212221.        "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

213222.        "Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners.  The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

214223.        "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the 36th District Court Settlement.

215224.        "Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification or payment or advancement of defense costs based upon, arising under or related to any

agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

216225.	"Insured LTGO Bonds" means those Limited Tax General Obligation Bonds that are insured by the LTGO Insurer.

217226.	"Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

218227.	"Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

219228.	"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

220229.	"Limited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

221230.	"Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.221230, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

222231.	"Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.221230.

223232.	"Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing as set forth therein, but is nonetheless unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

224233.	"List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries or schedules may be amended, restated, supplemented or otherwise modified.

225.	"Litigation Trust" means a trust to be established on the Effective Date to which the City will transfer all of its rights and interest in the COP Litigation.

226.	"Litigation Trustee" means the trustee of the Litigation Trust, which shall be selected by the LTGO Insurer and the Retiree Committee and must be acceptable to the City.

227234.	"LTGO Distribution Agent" means U.S. Bank National Association, in its capacity as agent under a distribution agreement to be entered into in connection with the LTGO Settlement Agreement or such other entity as may be agreed to among the parties to the LTGO Settlement Agreement.

228235.        "LTGO Exculpated Parties" means (a) the LTGO Insurer, (b) BlackRock Financial Management, solely in its capacity as a Holder of Limited Tax General Obligation Bonds, and (c) their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

229.        "LTGO Independent Party" means an entity chosen by the Retiree Committee, the LTGO Insurer and the City to resolve certain disputes regarding the COP Litigation involving the City, VEBA Trust Representatives or the LTGO Insurer pursuant to the LTGO Settlement Agreement.

230236.        "LTGO Insurer" means Ambac, solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

231.        "LTGO Litigation Parties" means, collectively, the LTGO Insurer, the VEBA Trust Representatives and the City.

232237.        "LTGO Settlement Agreement" means the comprehensive settlement regarding Limited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, substantially in the form attached hereto as Exhibit I.A.232237.

238.        "LTGO Settlement Parties" means (a) the LTGO Insurer and (b) BlackRock Financial Management, on behalf of certain managed funds and accounts set forth in the LTGO Settlement Agreement.

233239.        "Macomb County" means the County of Macomb, Michigan.

234240.        "Mayor" means the duly-elected mayor of the City.

235241.        "MFA" means the Michigan Finance Authority.

236242.        "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the MFA in accordance with the UTGO Settlement Agreement and applicable law.

237243.        "NPFG" means National Public Finance Guarantee Corporation.

238244.        "Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

239245.        "Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction.  In applying this definition, the City and the Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

240246.        "New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.240246.

241247.        "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.241247.

242248.        "New C Notes" means the unsecured bonds to be issued by the City pursuant to the New C Notes Documents, substantially on the terms set forth on Exhibit I.A.242248 and in any case in form and substance reasonably acceptable to the City and Syncora.

243249.        "New C Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New C Notes, in substantially the form attached hereto as Exhibit I.A.243249 and in any case in form and substance reasonably acceptable to the City and Syncora.

244250.        "New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City or another entity that participates in GRS in connection with employment service performed on and after July 1, 2014, in substantially the form documentation of which is attached hereto as Exhibit I.A.244250.a and the material terms of which are attached hereto as Exhibit I.A.244250.b.

245251.        "New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

246252.        "New LTGO Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New LTGO Bonds, in substantially the form attached as an exhibit to the LTGO Settlement Agreement.

247253.        "New LTGO Bonds" means the bonds to be issued by the City pursuant to the New LTGO Bond Documents, substantially on the terms set forth on Schedule 1 of the LTGO Settlement Agreement.

248254.        "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, in substantially the form documentation of which is attached hereto as Exhibit I.A.248254.a and the material terms of which are set forth at attached hereto as Exhibit I.A.248254.b.

249255.        "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final five or ten years of service, as set forth on Exhibit I.A.248254.b, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

250256.        "New Securities" means, collectively, the New B Notes, the New C Notes, the New LTGO Bonds and the Municipal Obligation.

251257.        "Non-Settling UTGO Bond Insurer" means, together, Syncora Capital Assurance Inc. and Syncora Guarantee Inc., solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

252.        "Notice of COP Settlement Acceptance" means a notice substantially in the form attached hereto as Exhibit I.A.252 that has been submitted prior to the Effective Date.

253258.        "Oakland County" means the County of Oakland, Michigan.

254259.        "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City, the Detroit Public Library or the Detroit Regional Convention Facility Authority and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan and, the Employees Death Benefit Plan or any comparable plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

255260.        "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

256261.        "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim or a Secured GO Bond Claim.

257262.        "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim, an Indirect 36th District Court Claim or a Subordinated Claim.  For the avoidance of doubt, Section 1983 Claims and Indirect Employee Indemnity Claims are included within the definition of Other Unsecured Claim.

258263.        "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

259264.        "Parking Garages" means, collectively, parking garages owned by the City other than (a) that certain underground parking garage, commonly known as the "Grand Circus Parking Garage," located at 1600-01 Woodward Avenue, Detroit, Michigan, (b) that certain underground parking garage, commonly known as the "Cultural Center Garage," located at 41 Farnsworth Street, Detroit, Michigan and (c) that certain multi-story parking structure near the Riverfront Arena with an address of 900 W. Jefferson Avenue, Detroit, Michigan having a capacity of approximately 3,200 car spaces commonly known as "Joe Louis Arena Garage." For the avoidance of doubt, (a) that certain parking lot located at 5200 Woodward Avenue, Detroit, Michigan and (b) that certain parking lot, commonly known as the "Frederick Lot," located at 318 Frederick Street, Detroit, Michigan, shall not be considered Parking Garages.

260265.        "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

261266.        "Pass-Through Recipients" means, collectively, the (a) City of Detroit Downtown Development AuthorityDDA, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment Authority and (d) City of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

262267.        "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

263268.        "Petition Date" means July 18, 2013.

264269.        "PFRS" means the Police and Fire Retirement System of the City of Detroit.

265270.        "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

266271.        "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any  other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

267272.        "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

268273.        "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

269274.        "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.p.iiii.A.

270275.        "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order.

271276.        "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement or Ordinance No. 05-09 of the City.

272277.        "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

273278.        "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

274279.        "Postpetition Financing Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

275280.        "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.275280.

276281.        "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.276281.

277282.        "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Disputed Claims in such Class or group of Claims. Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

278283.        "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.N.1.

279284.        "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

280285.        "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

281286.        "RDPMA" means the Retired Detroit Police Members Association.

282287.        "RDPMA Exculpated Parties" means the RDPMA and its board of trustees/directors, attorneys, advisors and professionals, solely in their capacity as such.

283288.        "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder.  "Reinstate" and "Reinstatement" shall have correlative meanings.

284289.        "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise) and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

285290.        "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the Foundations, DIA Corp., the DIA Funders and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

286291.        "Restoration Trust" means a trust to be established pursuant to the Restoration Trust Agreement to (a) hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and the Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

287292.        "Restoration Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Restoration Trust, in substantially the form attached hereto as Exhibit I.A.287292.

288293.        "Restructured UTGO Bonds" means the bonds to be issued by the MFA to the current Holders of Unlimited Tax General Obligation Bond Claims, the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer in the amount of $287,560,790 pursuant to the UTGO Settlement Agreement, which bonds shall be limited obligations of the MFA and shall be secured as more particularly described in the UTGO Settlement Agreement.

289294.        "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

290295.        "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

291296.        "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

292297.     "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

293298.     "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.293298.

294299.     "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

295300.     "Retirement Systems" means, collectively, the GRS and the PFRS.

296301.     "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

297302.     "Section 1983 Claim" means any Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

298303.     "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

299304.     "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

300305.     "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

301306.     "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

302307.     "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.300305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

303308.     "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

304309.        "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

305310.        "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.300305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

306311.        "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

307312.        "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

308313.        "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.300305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

309314.        "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

310315.        "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

311316.        "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.300305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

312317.        "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

313318.        "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

314319.        "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.300305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

315320.     "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

316321.     "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

317322.     "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.300305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

318323.     "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

319324.     "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

320325.     "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

321326.     "Settling 36th District Court Claimants" means (a) the 36th District Court, (b) Local 917 of the American Federation of State, County and Municipal Employees, (c) Local 3308 of the American Federation of State, County and Municipal Employees and (d) those individuals identified as "Individual Claimants" on the term sheet attached hereto as Exhibit I.A.9.

322327.     "Settling COP Claimant" means (a~~holder of a COP Claim that elects prior to the~~ ~~Effective Date to participate in the Plan COP Settlement as to all COP Claims held by it and its Affiliates.  For~~ ~~the avoidance of doubt, Settling COP Claimants include~~) those holders of COP Claims that are the subject of ~~either (a) a Notice of COP Settlement Acceptance or (b)~~ the Syncora Settlement Documents or (b) those Holders of COP Claims that are the subject of the FGIC/COP Settlement Documents.

323328.     "Settling UTGO Bond Insurers" means, collectively, Ambac, Assured and NPFG and each of their respective successors and assigns, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

324329.     "Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.F.

325330.     "State" means the state of Michigan.

326331.     "State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement.

-30-

327332.     "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.D, in substantially the form attached hereto as Exhibit I.A.327332.

328333.     "State Related Entities" means, collectively:  (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

329334.     "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

330335.     "Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,349,210 that, from and after the Effective Date, will (a) be reinstated, (b) remain outstanding and (c) be payable from the UTGO Bond Tax Levy, as more particularly described in the UTGO Settlement Agreement.

331.     "Subject COP Litigation Action" means any of the following actions, if proposed to be taken by the Litigation Trustee: (a) replacing the COP Litigation Counsel with new counsel to the Litigation Trust in the COP Litigation; (b) a determination not to appeal an adverse decision on any claim or defense related to the COP Litigation; or (c) the voluntary dismissal of a substantive claim or counterclaim in the COP Litigation or termination by any other means of the COP Litigation.

332.     "Subject COP Litigation Settlement" means any settlement with a Holder or Holders of COP Claims that proposes to release from the Disputed COP Claims Reserve to such Holder(s) a Pro Rata share of New B Notes (or equivalent currency) based on 40% or more of the face amount of COP Claims held by such Holder(s).

333336.     "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

337.     "Supplemental Trust Agreements" means, collectively, (a) one or more supplemental trust agreements between the COP Trustee and COP Service Corporations, entered into with the consent of FGIC and (b) one or more supplemental trust agreements between the COP Trustee and COP Service Corporations, entered into with the consent of Syncora, in each case to be executed prior to the Effective Date, which agreements shall, among other things, for purposes of distributions of trust assets explicitly supersede the 2005 COPs Agreement and the 2006 COPs Agreement, which incorporates by reference Sections 6.5 and 9.1 of each Contract Administration Agreement and Section 8.03 of each COP Service Contract.

334338.     "Swap Insurance Policies" means those policies or other instruments insuring the COP Swap Agreements and obligations related thereto.

335339.     "Syncora" means, collectively, Syncora Guarantee, Inc. and Syncora Capital Assurance Inc.

340.     "Syncora Development Agreement" means that certain development agreement by and between the City and Pike Point Holdings, LLC, a wholly owned indirect subsidiary of Syncora, in substantially the form

-31-

attached hereto as Exhibit I.A.340, including all exhibits thereto, and in any case in form and substance reasonably acceptable to the City and Syncora.

341. "Syncora Excess New B Notes" means New B Notes in the aggregate face amount of approximately $15.43 million, representing the difference between (a) the New B Notes that would have been distributed to Syncora had its asserted COP Claim for principal and interest in Class 9 been Allowed in full and (b) the New B Notes to be provided to Syncora as partial consideration pursuant to the terms of the Syncora Settlement.

336342. "Syncora Exculpated Parties" means Syncora and their Related Entities, solely with respect to issues arising in connection with Syncora's capacity as holder or insurer of Class 8Unlimited Tax General Obligation Bond Claims and Class 9COP Claims.

337343. "Syncora Settlement" means the comprehensive settlement with Syncora, as described at Section IV.JI and as definitively set forth in the Syncora Settlement Documents.

338344. "Syncora Settlement Documents" means the definitive documentation to be executed in connection with the Syncora Settlement, in substantially the form attached hereto as Exhibit I.A.338344, and in any case in form and substance reasonably acceptable to the City and Syncora.

339345. "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

340346. "Top-Off Payments" means the payments to be made to the Settling UTGO Bond Insurers pursuant to the UTGO Settlement Agreement if a Trigger Event occurs in amounts equal to the product of: (a) the amount by which the recovery received by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, under the Plan exceeds 69.5% of the aggregate amount of all such Allowed Claims in such Class, multiplied by (b) the quotient of (i) $100.5 million, divided by (ii) the sum of (x) 30.5% of the aggregate amount of all Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as the case may be, and (y) $100.5 million.

341347. "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

342348. "Trigger Event" means the receipt by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, of consideration pursuant to the Plan of 69.5% or more of the aggregate amount of all of the Allowed Claims in such Class. For purposes of determining whether a Trigger Event has occurred, all actual recoveries for Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed COP Claims shall be determined by discounting the payments made to such Classes using a 5% discount rate back to the date of Confirmation.

343349. "Tunnel Lease" means, collectively, (a) that certain lease agreementTube Lease, dated March 20, 1978, by and between the City, as landlord, and the Detroit Windsor Tunnel LLC (as successor, as successor-in-interest to Detroit & Canada Tunnel Corporation), as tenant, and (b) that certain Sublease, dated as of March 20, 1978, as itby and between the City, as landlord, as successor-in-interest to Ford Motor Properties, Inc. as sublandlord, and Detroit Windsor Tunnel LLC, as successor-in-interest to Detroit & Canada Tunnel

Corporation, as subtenant, each as may be amended, restated, supplemented or otherwise modified, in any case in form and substance reasonably acceptable to the City and Syncora.

344350.    "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

345351.    "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

346352.    "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

347353.    "Unlimited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

348354.    "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.348354, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

349355.    "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.348354.

350356.    "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

351.    "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

352357.    "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

353358.    "UTGO Exculpated Parties" means, collectively, Ambac, Assured and NPFG, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds, and each of their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

354359.    "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

355360.    "UTGO Settlement Agreement" means that certain Settlement Agreement, dated as of July 18, 2014, among the City and the Settling UTGO Bond Insurers, substantially in the form attached hereto as Exhibit I.A.355360.

356361.        "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

357.    "VEBA Trust Representatives" means (a) the chair of the board of trustees of the Detroit General VEBA and (b) the chair of the board of trustees of the Detroit Police and Fire VEBA.

358362.        "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

359363.        "Wayne County" means the Charter County of Wayne, Michigan.

**B.    Rules of Interpretation and Computation of Time.**

    **1.    Rules of Interpretation.**

        For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

    **2.    Computation of Time.**

        In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II
CLASSIFICATION OF CLAIMS; CRAMDOWN;
EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

        Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class.  Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

A.    **Unclassified Claims.**

    1.    **Payment of Administrative Claims.**

        a.    **Administrative Claims in General.**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

        b.    **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Financing Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

    2.    **Bar Dates for Administrative Claims.**

        a.    **General Bar Date Provisions.**

Except as otherwise provided in Section II.A.2.b, Section II.A.2.c or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.  The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

        b.    **Ordinary Course Claims**

Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

        c.    **Claims Under the Postpetition Financing Agreement.**

Holders of Administrative Claims that are Postpetition Financing Claims will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

### d. No Modification of Bar Date Order.

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

## B. Classified Claims.

### 1. Designation of Classes.

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| | *Secured Claims* | |
| 1A | All Classes of DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.~~147~~148) | Unimpaired |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.~~155~~156) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.~~158~~159) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Claims Previously Classified in Class 6 Paid in Full | N/A |
| | *Unsecured Claims* | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |

-36-

| CLASS | NAME | IMPAIRMENT |
|-------|------|------------|
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |
| 17 | Indirect 36th District Court Claims | Impaired/Voting |

**2.     Subordination; Reservation of Rights to Reclassify Claims.**

Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  Except as expressly set forth herein, consistent with section 510(a) of the Bankruptcy Code, nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of a Holder of a Claim to enforce a subordination agreement against any Entity other than the City to the same extent that such agreement is enforceable under applicable nonbankruptcy law.  Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to reclassify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination.  For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

**3.     Treatment of Claims.**

**a.     Class 1A – DWSD Bond Claims.**

**i.     Classification and Allowance.**

DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.~~147~~148, with each Class receiving the treatment set forth below.  On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.~~147~~148.

**ii.     Treatment.**

Each Holder of an Allowed DWSD Bond Claim shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim.  All votes and elections previously delivered in Class 1A shall not be counted and shall be of no force and effect.  Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents arising in connection with such Allowed DWSD Bond Claims shall be paid in full in Cash once Allowed pursuant to the DWSD Tender Order, by agreement of the parties or by order of the Bankruptcy Court.  In addition, all claims for fees, costs and expenses authorized pursuant to or in accordance with the DWSD Tender Order shall be paid as provided therein.

**b.     Class 1B – DWSD Revolving Sewer Bond Claims**

**i.     Classification and Allowance.**

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.~~155~~156, with each Class receiving the

treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.~~155~~156.

### ii.    Treatment.

On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### c.    Class 1C – DWSD Revolving Water Bond Claims

### i.    Classification and Allowance.

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.~~158~~159, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.~~158~~159.

### ii.    Treatment.

On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### d.    Class 2A – Secured GO Series 2010 Claims.

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### e.    Class 2B – Secured GO Series 2010(A) Claims.

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### f.    Class 2C – Secured GO Series 2012(A)(2) Claims.

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### g.    Class 2D – Secured GO Series 2012(A2-B) Claims.

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### h. Class 2E - Secured GO Series 2012(B) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### i. Class 2F – Secured GO Series 2012(B2) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### j. Class 3 – Other Secured Claims.

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### k. Class 4 – HUD Installment Note Claims.

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### l. Class 5 – COP Swap Claims.

#### i. Allowance.

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

#### ii. Treatment.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either:  (A) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

### m. Class 6.

[Claims previously classified in Class 6 paid in full – Paragraph intentionally left blank]

    **n.**    **Class 7 – Limited Tax General Obligation Bond Claims.**

    **i.**    **Allowance.**

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,544,770.

    **ii.**    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, (A) each Holder of an Allowed Limited Tax General Obligation Bond Claim that is not attributable to the Insured LTGO Bonds and (B) the LTGO Insurer with respect to those Allowed Limited Tax General Obligation Bond Claims attributable to the Insured LTGO Bonds, in full satisfaction of such Allowed Claim(s), shall receive, on or as soon as reasonably practicable after the Effective Date, (X) a Pro Rata share of, at the City's option, (1) $55,000,000 in Cash or (2) the New LTGO Bonds and (Y) distributions ~~from the Disputed COP Claims Reserve~~ in accordance with Section II.B.3.p.~~iiii.B~~<u>A</u>.

The City will use its best efforts to prepay the New LTGO Bonds on the Effective Date or as soon as reasonably practicable thereafter from the proceeds of the Exit Facility. If the City cannot prepay all of the New LTGO Bonds on the Effective Date or as soon as reasonably practicable thereafter, the City will use its best efforts to prepay as much of the New LTGO Bonds as reasonably possible, and the LTGO Settlement Parties will accept such partial prepayment. Upon a partial prepayment of the New LTGO Bonds, such New LTGO Bonds will be redeemed by lot.

    **iii.**    **Impact of UTGO Settlement.**

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed Limited Tax General Obligation Bond Claims to recover more on a percentage basis on account of such Allowed Limited Tax General Obligation Bond Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

    **o.**    **Class 8 – Unlimited Tax General Obligation Bond Claims.**

    **i.**    **Allowance.**

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

    **ii.**    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds as set forth in Schedules 1a and 1b to the UTGO Settlement Agreement. Those Holders identified on Schedule 1a of the UTGO Settlement Agreement shall retain ownership of the Stub UTGO Bonds, subject to Sections I.A.36 and IV.C, which Stub UTGO Bonds shall be reinstated.

p.     **Class 9 – COP Claims.**

i.     ~~Disputed~~<u>Treatment</u>.

~~Except with respect to the COP Claims of the Settling COP Claimants, the COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Litigation Trust. If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement.~~

~~ii.     **Assignment.**~~

~~Those COP Claims or portions thereof that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis on and as of the Effective Date, solely for purposes of facilitating Distributions under this Plan and for no other purpose. Each beneficial holder shall be deemed to receive such COP Claims or portions thereof in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs.~~

~~iii.     **Treatment.**~~

A.     **Plan COP Settlement Option.**

~~Each holder of a COP Claim may settle issues related to the allowance and treatment thereof and become a Settling COP Claimant as to all of the COP Claims held by such holder and its Affiliates by submitting to the City a Notice of COP Settlement Acceptance prior to the Effective Date.~~ On the Effective Date, ~~(1) each Settling COP Claimant shall sell all, but not less than all, of such Settling COP Claimant's COP Claims to the Litigation~~<u>the City shall deliver to the COP Trustee, solely for the benefit of, and for distribution to, the COP Insurers and the Settling COPs Claimants in accordance with (1) the Supplemental Trust Agreements</u> and (2) the ~~Litigation Trust shall provide to each such Settling COP Claimant its Pro Rata share of (a~~<u>instructions of the applicable COP Insurer, (x)</u> the Class 9 Settlement Asset Pool and ~~(b~~<u>y)</u> New B Notes in the face amount of $~~97,690,000, such that its~~<u>97,692,787, based upon each Settling COP Claimant's</u> Pro Rata share ~~shall be~~ calculated as an amount equal to the proportion that the unpaid principal amount plus accrued prepetition interest of COPs held by such Settling COP Claimant bears to the aggregate unpaid principal amount of all COPs plus all accrued prepetition interest thereon. ~~On the Effective Date, any assets not subject~~<u>; provided, that the allocation of distributions among FGIC COP Holdesr shall be determined in accordance with agreements among FGIC and the FGIC COP Holders disclosed in a term sheet filed in court on October 22, 2014, as the same may be subsequently amended and more fully documented. For the avoidance of doubt, a Settling COP Claimant shall not be required to transfer (1) any claim against a COP Insurer or (2) the COPs it holds to the City pursuant</u> to the Plan COP Settlement ~~remaining in the Class 9 Settlement Asset Pool will revert to the City.~~<u>or otherwise pursuant to the Plan, the Syncora Settlement Documents or the FGIC/COP Settlement Documents. The COP Service Corporations shall enter into such Supplemental Trust Agreements as FGIC and Syncora may reasonably request with respect to their respective insured COPs as long as such Supplemental Trust Agreements do not impose any additional obligations or liability on the COP Service Corporations.</u>

The City has granted the LTGO Settlement Parties, on behalf of the holders of Allowed Limited Tax General Obligation Bond Claims in Class 7, and the Retiree Committee consent rights regarding pre-Effective Date settlements of the COP Litigation if and as permitted under applicable non-bankruptcy law. <u>The LTGO Settlement Parties have consented to the Syncora Settlement and FGIC/COP Settlement.</u> On the Effective Date, on account of such consent rights, the Excess New B Notes shall be distributed as follows: (1) $~~11.03~~<u>approximately $42.68</u> million to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; (2)

-41-

$4.19approximately $17.34 million to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in Class 7; and (3) $0.22approximately $4.12 million to be distributed Pro Rata among holders of Allowed Other Unsecured Claims in Class 14. With respect to the distribution of the Syncora Excess New B Notes, on April 1, 2015, the City shall pay the interest then due on the Syncora Excess New B Notes and shall also prepay the October 1, 2015 interest payment on the Syncora Excess New B Notes (as a consequence of which, no interest payment shall be made on the Syncora Excess New B Notes on October 1, 2015). The VEBAs may not sell or otherwise transfer their right, title or interest in the Syncora Excess New B Notes prior to the October 2, 2015.

The LTGO Settlement Parties have consented to the Syncora Settlement, including the adjustment of the LTGO Settlement Parties' share of the residual interests in the Disputed COP Claims Reserve by $1.1 million (corresponding to a distribution on account of COP Claims held by Syncora allowed or purchased at 60.358%). The LTGO Settlement Parties' recovery on the residual interest in the Disputed COP Claim Reserve on account of a pre-Effective Date settlement shall be 27% of the Disputed COP Claim Reserve in New B Notes or other equivalent value reasonably acceptable to Ambac, without affecting the 65% share allocable to Holders of Claims in Class 12.

The LTGO Settlement Parties have consented to any pre-Effective Date settlement of any Class 9 Claim held or insured by Financial Guaranty Insurance Company (1) if the settlement does not cause a Distribution of New B Notes from the Disputed COP Claims Reserve on account of such settled claims being allowed or purchased at more than 60.358% (or equivalent value) or (2) if such settlement exceeds 60.358%, the settlement otherwise adjusts commensurately the LTGO Settlement Parties' residual interest in the Disputed COP Claims Reserve (or otherwise provides commensurate equivalent value reasonably acceptable to Ambac) to reflect any increase from 60.358%, in each case without affecting the 65% share allocable to Holders of Allowed Class 12 Claims.

As part of the Plan COP Settlement, each Settling COP Claimant shall payon or as soon as reasonably practicable after the Effective Date, Syncora shall cause to be paid $500,126.94 in cash to the COP Agent such claimant's Pro Rata share of any Allowed Claim for COP Agent Fees held by the COP Agent with such Pro Rata share calculated as an amount equal to the proportion that the unpaid principal amount plus accrued prepetition interest of COPs held by such Settling COP Claimant bears to the aggregate unpaid principal amount of all COPs plus all accrued prepetition interest thereon; provided that Syncora and any Settling COP Claimant not participating in the COP Litigation shall pay to the COP Agent only its respective Pro Rata share of that portionon account of COP Agent Fees that does not include any fees for services rendered or expenses incurred in connection with the COP Litigation. As part of the Plan COP Settlement, FGIC shall cause to be paid to the COP Agent 75.945% of the reasonable COP Agent Fees in cash out of the first proceeds of the distributions to or for the benefit of the FGIC COP Holders.

Nothing in this Section II.B.3.p.i.A shall, or shall be asserted or construed to, affect or prejudice any rights, claims or defenses between the COP Swap Counterparties on the one hand and any Settling COP Claimant (including Syncora, FGIC and the FGIC COP Holders) on the other hand.

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Settling COP Claimant shall, to the fullest extent permitted under law, be deemed to forever release, waive and discharge all Liabilities relating to COP Documents such Settling COP Claimant has, had or may have against the (1) GRS, (2) PFRS or (3) Related Entities of either GRS or PFRS. At the direction of FGIC, which shall be deemed given on the Effective Date, the COP Contract Administrator shall have irrevocably agreed (on behalf of itself, any successors and each FGIC COP Holder) to release and not to sue any COP Holder or any COP Insurer on behalf of any FGIC COP Holder, COP Insurer, the Detroit Retirement Systems Funding Trust 2005 or the Detroit Retirement Systems Funding Trust 2006 in connection with any liability arising in connection with or related to (1) Sections 6.5 and 9.1 of the Contract Administration Agreements, (2) Section 8.03 of the COP Service Contracts, (3) distributions made pursuant to or in connection with this Section II.B.3.p.i.A, (4) the FGIC Settlement or (5) the Syncora Settlement. On the Effective Date, Syncora and

FGIC shall, to the fullest extent permitted under law, be deemed to forever mutually release, waive and discharge all liabilities against each other relating to distributions made pursuant to or in connection with this Section II.B.3.p.i.A, Sections 6.5 and 9.1 of the Contract Administration Agreements or Section 8.03 of the COP Service Contracts.

B. Non Settling Holders.

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

1. Disputed COP Claims Reserve.

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain: (a) an Unsecured Pro Rata Share of New B Notes calculated as if such Disputed COP Claims were Allowed in an amount equal to the aggregate amount of unpaid principal and interest as of the Petition Date for the COPs not subject to the Plan COP Settlement (or such other amount as may be required by an order of the Bankruptcy Court) and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.

2. Distributions From The Disputed COP Claims Reserve.

If and to the extent that Disputed COP Claims become Allowed Claims after the Effective Date (either through resolution of an objection to a Disputed COP Claim or through a settlement thereof) and except as set forth in the Syncora Settlement Documents, the COP Agent shall be sent a Distribution on behalf of the Holders of such Allowed Claims from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of a Final Order resolving any objection to, or approving a settlement related to, any Disputed COP Claim and after all Distributions to the holders of such resolved or settled Disputed COP Claims have been made or provided for: (a) an amount of New B Notes or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred by the Litigation Trust from and after the Effective Date shall be distributed to the City, on the terms set forth in Section IV.I; and (b) following such distribution, the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (i) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; (ii) 20% to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in Class 7; and (iii) 15% to be distributed Pro Rata among holders of Allowed Other Unsecured Claims in Class 14.

ivii. **Impact of UTGO Settlement.**

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed COP Claims to recover more on a percentage basis on account of such Allowed COP Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

q. **Class 10 – PFRS Pension Claims.**

    i. **Allowance.**

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

    ii. **Treatment.**

        A. **Contributions to PFRS.**

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

        B. **Investment Return Assumption.**

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

        C. **Modification of Benefits for PFRS Participants.**

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

        D. **Contingent Payment Rights.**

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

        E. **Accrual of Future Benefits.**

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

-44-

F.      Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement.  The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.  The initial independent members of the Investment Committee established by PFRS shall be (1) Woodrow S. Tyler, (2) McCullough Williams III, (3) Robert C. Smith, (4) Joseph Bogdahn and (5) Rebecca Sorenson.

G.      No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

H.      State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms:  (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

r.      Class 11 – GRS Pension Claims.

i.      Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

ii.      Treatment.

A.      Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A.  The exclusive sources for such contributions shall be certain ~~pension-related~~pension related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments ~~and~~, the Detroit Public Library and the Detroit Regional Convention Facility Authority.  After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified

-45-

by the terms and conditions contained in the Plan and the Prior GRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D. Annuity Savings Fund Recoupment.

#### 1. ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

#### 2. ASF Distribution Recipients.

##### i. Monthly Deduction

For each ASF Distribution Recipient that~~who~~ does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the Annuity Savings Fund Excess Amount will: (A) be calculated and converted into monthly annuity amounts based on common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, ~~gender~~ and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (B) then be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension ~~checks~~check exceed the ASF Recoupment Cap or~~, if applicable,~~ the Current GRS Retiree Adjustment Cap~~.~~, if applicable. The total ASF Recoupment from the ASF Distribution Recipient's monthly pension checks over time shall not exceed the amount necessary to amortize the applicable Annuity Savings Fund Excess Amount at 6.75% interest.

-46-

## ii. Single Lump Sum Payment

Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.

No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (A) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (B) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.

An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i. The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

## E. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

## F. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

## G. Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under GRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date. The initial independent members of the Investment Committee established by GRS shall be (1) Kerrie VandenBosch, (2) Doris Ewing, (3) Robert Rietz, (4) David Sowerby and (5) Ken Whipple.

## H. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the**

-47-

**GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### I.      State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms:  (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### s.      Class 12 – OPEB Claims.

#### i.      Allowance.

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

#### ii.      Treatment.

##### A.      Detroit General VEBA.

Establishment of Detroit General VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.  The Detroit General VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries.  The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.108.  With respect to the initial appointment of the board of trustees, the Mayor will appoint one member, and the DRCEA and the Retiree Committee will each appoint three board members.  The DRCEA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the DRCEA, and the Mayor will fill a board member vacancy created by the departure of the member appointed by the Mayor.  The initial members of the Detroit General VEBA board of trustees shall be (1) Floyd Allen, (2) Roger Cheek, (3) Suzanne Daniels Paranjpe, (4) Doris Ewing, (5) Barbara Wise-Johnson, (6) Shirley Lightsey and (7) Thomas Sheehan.  Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA:  On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries.  The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.

### B. Detroit Police and Fire VEBA.

        **Establishment of Detroit Police and Fire VEBA**:  On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.  The Detroit Police and Fire VEBA will be governed by a seven member board of trustees and, for the first four years, one additional non-voting, ex-officio member.  The board of trustees will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries.  The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.112.  With respect to the initial appointment of the board of trustees, the Mayor will appoint one member, and the RDPFFA and the Retiree Committee will each appoint three board members.  The RDPMA will appoint the non-voting, ex-officio member.  The RDPFFA will fill board member vacancies created by the departure of voting members initially appointed by the Retiree Committee or the RDPFFA, and the Mayor will fill a board member vacancy created by the departure of the member appointed by the Mayor.  The RDPMA will fill a non-voting, ex-officio board member vacancy created by the departure of the member initially appointed by the RDPMA, but such non-voting, ex-officio member position shall expire on December 31, 2018.  The initial members of the Detroit Police and Fire VEBA board of trustees shall be (1) Floyd Allen, (2) Gregory Best, (3) John Clark, (4) Andrew Dillon, (5) Allan Grant, (6) Thomas Sheehan, (7) Greg Trozak and (8) Shirley Berger (*ex officio*).  Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

        **Distributions to Detroit Police and Fire VEBA**:  On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries.  The Detroit Police and Fire VEBA shall also be entitled to ~~contingent~~ additional distributions ~~from the Disputed COP Claims Reserve~~ as set forth in Section II.B.3.p.~~iii~~.BA.

### C. No Further Responsibility.

        From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits.  The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to ~~current or~~ former employees.  On the Effective Date, the Employees Death Benefit Plan will be frozen for former employees, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary.  ~~The Employees Death Benefit Plan will be self-liquidating, and existing~~ who is a former employee.  Existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding.  For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA.  The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

        Retirees (and active employees that retire prior to December 31, 2014) of the Detroit Public Library and the Detroit Regional Convention Facility Authority are Detroit General VEBA Beneficiaries and will receive the treatment set forth above.  However, the collective bargaining and other legal rights and obligations of the Detroit Public Library and the Detroit Regional Convention Facility Authority, on one hand, and their respective unions and former and current employees, on the other hand, are not affected by the Plan.  These parties retain the right to negotiate further or additional benefits; provided, however, that the City shall not be responsible for, or have any obligation with respect to, any such further or additional benefits or the administration thereof.  In addition, in consideration of the eligible retirees of the Detroit Public Library and the Detroit Regional Convention Facility Authority participating in the Detroit General VEBA, the Detroit Public

Library and the Detroit Regional Convention Facility Authority shall reimburse the City for their allocable share of the New B Note debt service related to the Detroit General VEBA.

t.     **Class 13 – Downtown Development Authority Claims.**

i.     **Allowance.**

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

ii.     **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured~~a~~ Pro Rata ~~Share of~~share of approximately $3.69 million in New B Notes.

u.     **Class 14 – Other Unsecured Claims.**

i.     **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive (A) on or as soon as reasonably practicable after the Effective Date, an Unsecured~~a~~ Pro Rata ~~Share of~~share of approximately $16.48 million in New B Notes and (B) distributions ~~from the Disputed COP Claims Reserve~~ in accordance with Section II.B.3.p.~~iii~~.B A.

v.     **Class 15 – Convenience Claims.**

i.     **Treatment.**

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.76) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

w.     **Class 16 – Subordinated Claims.**

i.     **Treatment.**

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims.  Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

x.     **Class 17 – Indirect 36th District Court Claims.**

i.     **Treatment.**

Unless such Holder agrees to a different treatment of its Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive:  (A) if the Allowed amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed amount of such Allowed Indirect 36th District Court Claim; or (B) if the Allowed amount of such Indirect 36th District Court Claim is

-50-

equal to or more than $100,000.00, Cash equal to 33% of the Allowed amount of such Indirect 36th District Court Claim, plus simple interest on outstanding amounts at a rate of five percent per annum, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a Business Day, on the first Business Day thereafter.

### ii. Further Obligation of City, State and 36th District Court.

Subject to the terms of the 36th District Court Settlement, the treatment of Allowed Indirect 36th District Court Claims set forth in Section II.B.3.x.i shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims. Nothing in Section II.B.3.x.i prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.

## C. Confirmation Without Acceptance by All Impaired Classes.

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Plan shall constitute a motion for such relief.

## D. Treatment of Executory Contracts and Unexpired Leases.

### 1. Assumption.

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, the City shall assume the Tunnel Lease pursuant to this Section II.D.1.

### 2. Assumption of Ancillary Agreements.

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

### 3. Approval of Assumptions and Assignments.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or

-51-

Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

4.      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases.**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5.      **Contracts and Leases Entered Into After the Petition Date.**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6.      **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

7.      **Rejection Damages Bar Date.**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims

not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

### 8. Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases.

Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

### 9. Insurance Policies.

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

## ARTICLE III
## CONFIRMATION OF THE PLAN

### A. Conditions Precedent to the Effective Date.

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1. The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2. The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

3. The Confirmation Order shall not be stayed in any respect.

4. The Confirmation Order shall contain (a) a finding that the FGIC Settlement Consideration and the FGIC Development Agreement are solely for the benefit of FGIC and the FGIC COP Holders (subject to any provision set forth herein for payment of COP Agent Fees), and (b) an ordered provision that such consideration be administered and distributed to FGIC and the FGIC COP Holders in a manner consistent therewith and with the Plan.

5. The Confirmation Order shall contain (a) a finding that the Syncora Development Agreement is solely for the benefit of Syncora (subject to any provision set forth herein for payment of COP Agent Fees), and

(b) an ordered provision that such consideration be administered and distributed to Syncora in a manner consistent therewith and with the Plan.

~~4~~6. All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

~~5~~7. All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the LTGO Settlement Agreement.

~~6~~8. Any legislation that must be passed by the State legislature to effect any term of the Plan shall have been enacted.

~~7~~9. The MFA board shall have approved the issuance of the Restructured UTGO Bonds and the Restructured UTGO Bonds shall have been issued.

~~8~~10. The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

~~9~~11. The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.B.

~~10~~12. If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

~~11~~13. The Syncora Settlement and the Syncora Settlement Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and Syncora, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

~~12~~14. The Syncora Development Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and Syncora, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

15. The FGIC/COP Settlement Documents and the FGIC Development Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and FGIC, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

16. The New York State Department of Financial Services shall have waived in writing the notice requirement under FGIC's plan of rehabilitation with respect to the settlement contemplated by the FGIC/COP Settlement Documents and the FGIC Development Agreement in form and substance reasonably acceptable to FGIC, and such waiver shall not have been vacated or otherwise modified.

~~13~~17. The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

**B.      Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion, except for those conditions set forth in (1) Section III.A.~~7~~9 and Section III.A.~~8~~10, which conditions cannot be waived, ~~and except for those conditions set forth~~

-54-

in(2) Sections III.A.115, III.A.13 and III.A.1214, which may only be waived by the City with the prior written consent of Syncora, (3) Sections III.A.4 and III.A.15, which may only be waived by the City with the prior written consent of FGIC and (4) Section III.A.16, which may be waived by the City at any time on or after November 4, 2014 at 5:00 p.m. (Eastern Time) with the prior written consent of FGIC.

## C. Effect of Nonoccurrence of Conditions to the Effective Date.

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the City may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section III.C: (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

## D. Effect of Confirmation of the Plan.

### 1. Dissolution of Retiree Committee.

On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case.

### 2. Preservation of Rights of Action by the City.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans or assets), to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court. A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2. The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

### 3. Comprehensive Settlement of Claims and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and

reasonable. For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

### 4. Discharge of Claims.

#### a. Complete Satisfaction, Discharge and Release.

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

#### b. Discharge.

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; provided that such discharge will not apply to (i) debts specifically exempted from discharge under the Plan; and (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

### 5. Injunction.

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

**a.  all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

**1.  commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims);**

**2.  enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

**3.  creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

**4.  asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;**

-56-

**5.** proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

**6.** taking any actions to interfere with the implementation or consummation of the Plan.

**b.** All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

**6.** **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement), (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order, (d) the Syncora Exculpated Parties solely ~~to the extent permitted by law and solely~~ in connection with acts or omissions taken in connection with the Syncora Settlement Documents and any actions or litigation positions taken by the Syncora Exculpated Parties in the Chapter 9 Case, (e) the FGIC/COP Exculpated Parties solely in connection with acts or omissions taken in connection with the FGIC/COP Settlement Documents and any actions or litigation positions taken by the FGIC/COP Exculpated Parties in the Chapter 9 Case, (f) the RDPMA Exculpated Parties and (fg) the COP Agent, solely in its capacity as such and solely in connection with any Distributions made pursuant to the terms of the Plan; provided, further, that the foregoing provisions in this Section III.D.6 shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the

Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan. This Section III.D.6 shall not affect any liability of (a) any of the COP Swap Exculpated Parties to the Syncora Exculpated Parties or ~~Financial Guaranty Insurance Company~~FGIC or (b) the Syncora Exculpated Parties or ~~Financial Guaranty Insurance Company~~FGIC/COP Exculpated Parties to any of the COP Swap Exculpated Parties.

### 7.    Releases

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

a.    each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i.    all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); provided further, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

ii.    all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided, however, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing, which conditions may not be waived) are

-58-

not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

b.  if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order. For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds. For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds.

## E.   No Diminution of State Power

No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the State's exercise of such rights.

F.      **Effectiveness of the Plan.**

             The Plan shall become effective on the Effective Date.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

G.      **Binding Effect of Plan.**

             Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      **DWSD.**

        1.      **Rates and Revenues.**

             DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues.  Rates will be determined by the Board of Water Commissioners or, if a DWSD Authority is formed and approved by the incorporating units' governing bodies, by the board of any such DWSD Authority.  The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

        2.      **DWSD CBAs.**

             Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

        3.      **Potential DWSD Authority Transaction.**

             As a result of mediation or otherwise, it is possible that the City may enter into a DWSD Authority Transaction that includes the formation of the DWSD Authority to conduct many or all of the operations currently conducted by DWSD.  Any such transaction would be subject to the approval of incorporating units and numerous other conditions.  The timing of any such transaction, if it occurs at all, is not known.  If any such transaction could occur, unless waived by the City in its sole discretion, the City will enter into such transaction only if Macomb County, Oakland County and Wayne County, and each of their municipal affiliates or related public corporations, withdraw with prejudice or shall have withdrawn with prejudice their objections to the Confirmation of the Plan.  Any DWSD Authority Transaction shall be on terms that are consistent with all other provisions of the Plan, applicable law and orders of the Bankruptcy Court.  The City shall not enter into any binding agreement with respect to or consummate any DWSD Authority Transaction prior to the Effective Date without first obtaining an order of the Bankruptcy Court approving and authorizing such DWSD Authority Transaction.

All terms and conditions in respect of any DWSD Authority Transaction set forth in (a) any DWSD Bond Document or (b) any transaction document in respect of such a DWSD Authority Transaction shall in any case include: (i) no material modifications to the source of payment and security for any DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (ii) an opinion of tax counsel that such transfer shall have no material adverse effect on the tax exempt status of the interest on the DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (iii) that the City could issue at least $1 of additional new money DWSD Bonds in compliance with the additional bonds test set forth in the applicable DWSD Bond Documents; and (iv) ratings confirmation of any rating agency then rating the DWSD Bonds and 2014 Revenue and Revenue Refinancing Bonds. A DWSD Authority Transaction shall not affect, impair, modify or otherwise alter the rights of any party under the DWSD Tender Order, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the 2014 DWSD Refinancing Obligations, the 2014 Revenue and Revenue Refinancing Bonds or the 2014 Revenue Refinancing Bonds or any Bond Insurance Policy related to or issued in connection with any of the foregoing.

**B.     The New B Notes, New C Notes and New LTGO Bonds.**

On or before the Effective Date, the City shall (a) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.~~240~~246, and distribute the New B Notes as set forth in the Plan; (b) execute the New C Notes Documents, issue the New C Notes, substantially on the terms set forth on Exhibit I.A.~~242~~248 (and in any case in form and substance reasonably acceptable to the City and Syncora), and distribute the New C Notes as set forth in the Plan; and (c) execute the New LTGO Bond Documents, issue the New LTGO Bonds, substantially on the terms set forth on Exhibit I.A.~~232~~237, and distribute the New LTGO Bonds as set forth in the Plan.

**C.     The UTGO Settlement.**

On the Effective Date, the City and the Settling UTGO Bond Insurers shall consummate the UTGO Settlement Agreement, a copy of which is attached hereto as Exhibit I.A.~~355~~360. The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement Agreement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the UTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement Agreement, among other things: (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the MFA, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of $279,618,950 of the Restructured UTGO Bonds as set forth in Schedule 1a of the UTGO Settlement Agreement; (4) the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer shall be entitled to receive $7,941,840 of the Restructured UTGO Bonds as set forth in Schedule 1b to the UTGO Settlement Agreement; and (5) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

Each Settling UTGO Bond Insurer shall receive, as soon as reasonably practicable after the occurrence of a Trigger Event, its allocable share of the Top-Off Payments in accordance with the terms of the UTGO Settlement Agreement.

**D.     The State Contribution Agreement.**

Prior to or on the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City, GRS, PFRS and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.~~327~~332.

1. **State Contribution.**

   The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

2. **Income Stabilization Payments.**

   The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State. Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus. The Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner. In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

   In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System. In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

3. **Conditions to State's Participation.**

   The payment of the State Contribution by the State or the State's authorized agent is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following: (a) the Confirmation Order becoming a Final Order no later than December 31, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement, including a requirement that the governing documents of GRS and PFRS be amended to include (i) the governance terms and conditions set forth in the State Contribution Agreement and (ii) the Income Stabilization Funds and Income Stabilization Payments; (b) the occurrence of the Effective Date no later than April 1, 2015; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, or equivalent assurances of finality of such litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City, (i) challenging PA 436 or any actions taken pursuant to PA 436 or (ii) seeking to enforce Article IX, Section 24 of the Michigan Constitution; (g) evidence satisfactory to the State of an irrevocable commitment by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents) to fund $366 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1; and (h) evidence satisfactory to the State of an irrevocable commitment by DIA Corp. to fund $100 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1.

The State shall File and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

4. **Release of Claims Against the State and State Related Entities.**

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

E. **The DIA Settlement.**

On the Effective Date, the City and the DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties that are such as of the Effective Date have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA to remain in the City in perpetuity, as described in and subject to the terms and conditions of the DIA Settlement Documents, and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The DIA Settlement Documents attached hereto as Exhibit I.A.~~126~~127 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.~~125~~126. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019.

1. **Funding Contributions.**

The DIA Settlement will be funded as follows: (a) irrevocable commitments in an aggregate amount of at least $366 million by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents); and (b) in addition to its continuing commitments outside of the DIA Settlement, irrevocable commitments in an aggregate amount of $100 million from the DIA Direct Funders (including the commitment of the Special Foundation Funders, as that term is defined in the DIA Settlement Documents, and subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20 year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to the "Agreed Required Minimum Schedule" and subject to the option at any time for the "Present Value Discount," as set forth in the DIA Settlement Documents. Amounts committed by the Foundations and the DIA Direct Funders will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

2. **Transfer of DIA Assets.**

On the Effective Date, the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

3. **Conditions to the DIA Funding Parties' Participation.**

The DIA Funding Parties' participation in the DIA Settlement is conditioned upon, among other things, the following: (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.E.2; (e) approval by the DIA's Board of Directors and the taking effect of the recommendation of the governance committee as described

-63-

in Exhibit I.A.~~125~~126; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the adoption of prospective governance and financial oversight mechanisms for the Retirement Systems that are reasonably satisfactory to the DIA Funding Parties; (h) the amendment by DIA Corp. and the art institute authority for each of Macomb County, Oakland County and Wayne County, Michigan of each art institute authority's respective service agreement so that the termination of the 1997 Operating Agreement between the City and DIA Corp. will not affect the art institute authorities' obligations under such agreements to pay millage proceeds to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution; and (k) the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

## F.  Contingent Payment Rights

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust.  The City shall issue the DWSD CVR to the Restoration Trust.  If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire.  The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities:  (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS.  If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made.  The DWSD CVR may not be transferred.

### 1.  Special Restoration

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; underlined provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration.  In such case, the City will perform a Value Determination and arrive at the Discounted Value.  The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable.  In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.  In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored.  In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate.  In the event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction.  Neither the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

-64-

2. **General Restoration**

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

## G. The OPEB Settlement.

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims, the terms of which settlement are reflected in the Plan. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

## H. The LTGO Settlement.

The City, the LTGO Insurer and BlackRock Financial Management have reached a settlement related to the treatment of Allowed Limited Tax General Obligation Bond Claims, the terms of which settlement are reflected in the Plan. Pursuant to the LTGO Settlement Agreement, Distributions attributable to the Insured LTGO Bonds shall be made to the LTGO Distribution Agent (as opposed to directly to the record owners of the Insured LTGO Bonds or to the LTGO Insurer) for the benefit of the record owners of the Insured LTGO Bonds in accordance with the LTGO Settlement Agreement. In the event that the City intends to redeem the principal amount of New LTGO Notes during any time that the Insured LTGO Bonds are outstanding, the City and the LTGO Distribution Agent shall be required to take certain actions as described in the LTGO Settlement Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the LTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

## I. Prosecution of COP Litigation.

### 1. Creation of Litigation Trust.

From and after the Effective Date, the City will remain a named plaintiff and defendant in the COP Litigation, but shall transfer all of its rights and interests in the COP Litigation to the Litigation Trust. The beneficiaries of the Litigation Trust, for the purpose of the COP Litigation, shall be the LTGO Litigation Parties and the Holders of Allowed Other Unsecured Claims. The document creating the Litigation Trust shall include indemnification of the Litigation Trustee by the City and will contain such other terms satisfactory to the Retiree Committee, the LTGO Insurer and the City.

### 2. Direction of COP Litigation.

The Litigation Trustee shall follow the day-to-day direction of the VEBA Trust Representatives in prosecuting and defending the COP Litigation, including defending any counterclaims and third party claims therein. The Litigation Trustee and VEBA Trust Representatives shall meet, in person or by phone at reasonable times and with reasonable advance notice, with all or any of the LTGO Litigation Parties, as requested, to discuss the COP Litigation. The Litigation Trustee shall provide copies of all court filings by any party in the COP Litigation and such other documents relating to the COP Litigation as may be reasonably requested by the LTGO Litigation Parties. Upon request from a LTGO Litigation Party, the Litigation Trustee will provide to such LTGO Litigation Party drafts of court papers that will be Filed by the Litigation Trustee as early as practicable under the circumstances.

-65-

### 3. Payment of Fees and Expenses.

The cost of all fees and expenses incurred by the Litigation Trustee in connection with the COP Litigation and distributions set forth in Section II.B.3.p.iii.B shall be borne by the Disputed COP Claims Reserve, subject to the funding of the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.B.1. The Litigation Trustee's fees shall be fixed and consented to by the LTGO Insurer and the VEBA Trustee Representatives.

The Litigation Trustee shall submit to the City on a monthly basis invoices for its fees and expenses incurred in connection with the COP Litigation and distributions set forth in Section II.B.3.p.iii.B, including for the Litigation Trustee's professional fees. The City shall pay such invoices within 30 days of receipt of such invoices, pending reimbursement from the Disputed COP Claims Reserve. Reimbursement of the City from the Disputed COP Claims Reserve will be effected by an offset in the amount of fees and expenses paid to the date of such reimbursement against the amount to be paid by the City to the Disputed COP Claims Reserve on that date.

In the event that a Final Order is entered against the City or the Litigation Trust, as successor in interest to the City, in the COP Litigation such that the New B Notes in the Disputed COP Claims Reserve are subject to Distribution to the Holders of Allowed COP Claims in accordance with the Plan, the City will reimburse the Disputed COP Claims Reserve for any amounts withdrawn from the Disputed COP Claims Reserve prior to the date of such Final Order becoming a Final Order.

### 4. Settlement of COP Litigation.

The Litigation Trustee shall consult with the LTGO Litigation Parties in connection with any potential settlement of the COP Litigation. The Litigation Trustee shall provide the LTGO Litigation Parties with advance notice, as early as practicable under the circumstances, of any COP Litigation settlement negotiations, and the LTGO Litigation Parties and their counsel shall have the right to participate in such negotiations. Any potential settlement of the COP Litigation must resolve the settled claims in their entirety, including the release by the settling party of all counterclaims and third party claims relating to the settled claims that it made or could have made against any party. The Litigation Trustee will not take any Subject COP Litigation Actions without the consent of the LTGO Litigation Parties. The Litigation Trustee will not enter into a Subject COP Litigation Settlement without the consent of the LTGO Insurer.

In the event that, after consultation with the Litigation Trustee, (i) the LTGO Insurer does not consent to the Litigation Trustee entering into a Subject COP Litigation Settlement or (ii) the LTGO Litigation Parties do not consent to the Litigation Trustee taking a Subject COP Litigation Action, the Litigation Trustee or any LTGO Litigation Party may present the issue to the LTGO Independent Party for mediation and resolution. The LTGO Independent Party shall conduct a mediation to attempt to consensually resolve the issue. If a consensual resolution cannot be reached, the LTGO Independent Party shall resolve the issue or issues, which resolution will be binding on the LTGO Insurer or the LTGO Litigation Parties, as the case may be, and the Litigation Trustee. Subject to such mediation, the Litigation Trustee shall have the authority to take whatever action may be required to avoid potentially adverse or prejudicial consequences of inaction in the COP Litigation. The City, the COP Litigation Counsel, the VEBA Trust Representatives and the LTGO Insurer shall take any steps that may be required to preserve applicable privileges of the City and the COP Litigation Counsel with regard to the COP Litigation.

### 5. Distributions to Settling COP Claimants.

The Litigation Trustee shall provide the distributions to the Settling COP Claimants as set forth in Section II.B.3.p.iii.B.

**~~J~~I.**     **The Syncora Settlement**

The City and Syncora have reached a settlement effecting a global resolution of all matters and litigation between the parties related to the Chapter 9 Case, as set forth in the Syncora Settlement Documents (the terms of which qualify and control over any description of the Syncora Settlement contained herein). Pursuant to the Syncora Settlement, and in accordance with the Plan, among other things: (1) the City shall, pursuant to Section II.D.1, assume the Tunnel Lease; (2) the parties shall enter into the Syncora Development Agreement; (3) the parties shall dismiss or withdraw the Dismissed Syncora Litigation as set forth in the Syncora Settlement Agreement; (4) any vote cast by Syncora to reject the Plan shall be deemed a vote to accept the Plan; (5) Syncora shall support Confirmation; and (6) on the Effective Date or as soon thereafter as practical, the City shall pay the sum of $5 million in full satisfaction of all of Claims filed or asserted against the City by Syncora relating to the COP Swap Agreements and any agreements related thereto, including the COP Syncora Swap Insurance Policies and the COP Swap Collateral Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving and authorizing the parties to enter into, (1) the Syncora Settlement pursuant to Bankruptcy Rule 9019 and (2) the related Syncora Development Agreement (including the garage option) and the Tunnel Lease. The City shall not amend the Plan in any way that adversely affects Syncora without Syncora's prior written consent.

**J.**     **The FGIC/COP Settlement**

The City and FGIC have reached a settlement effecting a global resolution of all matters and litigation between the parties related to the Chapter 9 Case, as set forth in the FGIC/COP Settlement Documents (the terms of which qualify and control over any description of the FGIC/COP Settlement contained herein). Pursuant to the FGIC/COP Settlement, and in accordance with the Plan, among other things: (1) the City and the Developer, for the benefit of FGIC and the FGIC COP Holders, shall enter into the FGIC Development Agreement; (2) FGIC shall, on behalf of the FGIC COP Holders, become a Settling COP Claimant with respect to all COPs and COP Claims associated with COPs originally insured by FGIC; (3) the parties shall dismiss or withdraw the Dismissed FGIC/COP Litigation as set forth in the FGIC/COP Settlement Documents; (4) except for Excluded Actions, FGIC shall waive any claims it may have against any other party related to the Dismissed FGIC/COP Litigation as set forth in the FGIC/COP Settlement Documents; (5) any vote cast by FGIC to reject the Plan shall be deemed a vote to accept the Plan; and (6) in full satisfaction and discharge of FGIC's claims against the City related to FGIC's Swap Insurance Policies, (a) FGIC shall receive an Allowed Class 14 Claim in the amount of $6.15 million, entitling FGIC to receive the Distributions provided pursuant to Section II.B.3.u.i and (b) the DDA shall assign to FGIC all of its right, title and interest to the New B Notes to be distributed to the DDA pursuant to Section II.B.3.t.ii. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving and authorizing the parties to enter into, (1) the FGIC/COP Settlement pursuant to Bankruptcy Rule 9019 and (2) the related FGIC Development Agreement. The City shall not amend the Plan in any way that adversely affects FGIC without FGIC's prior written consent.

**K.**     **Issuance of the New Securities.**

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities as contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. The New Securities (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the City or applicable issuer as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

**L.      Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents.**

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts pursuant to Section II.D), on the Effective Date, the Bonds, the Bond Documents, the COPs and the COP Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the parties to the City, as applicable, under the Bonds, the Bond Documents, the COPs and the COP Documents shall be discharged; provided, however, that the Bonds, the Bond Documents, the COPs and the COP Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent, contract administrator or similar entity under the Bond Documents or COP Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents or COP Documents, as applicable, and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution, (iii) to set forth the terms and conditions applicable to parties to the Bond Documents and COP Documents other than the City, (iv) as may be necessary to preserve any claim by (1) a Bondholder or Bond Agent under a Bond Insurance Policy or against any Bond Insurer, (2) a COPs Holder or COP Agent under a COP Insurance Policy or against any COP Insurer or (3) a COP Swap Counterparty under a Swap Insurance Policy or against any insurer thereunder and (v) with respect to any obligation of any party (other than the City, except to the extent provided in the COP Swap Settlement or the COP Swap Settlement Approval Order) under any COP Document related to such party's obligations owed in respect of the COP Swap Documents or the COP Swap Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan (or the COP Swap Settlement or the COP Swap Settlement Approval Order), such Bonds, Bond Documents, COPs or COP Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers, (b) COPs Holders or COP Agent with respect to claims under COP Insurance Policies and obligations related thereto or (c) COP Swap Counterparties with respect to claims under Swap Insurance Policies and obligations related thereto. For the avoidance of doubt, except for the immediately preceding sentence, this Section IV.L shall not apply to any Bonds that are Reinstated pursuant to Section II.B.3.a.ii. As of the Effective Date, the principal amounts of the COPs originally insured by FGIC shall be deemed accelerated and due and payable, and no interest on the COPs originally insured by FGIC shall accrue thereafter, solely for the purposes of determining distributions from the COP Trustee to holders of COPs originally insured by FGIC. The foregoing acceleration of principal and cessation of interest shall affect only the rights of each holder of COPs originally insured by FGIC to the receipt of proceeds of distributions under the Plan and not the rights of each such COPs holder against FGIC or shall not in any way modify payments currently required of FGIC under its existing insurance policies or FGIC's Plan of Rehabilitation.

**M.      Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.M.

-68-

**N. Professional Fees**

    **1. Professional Fee Reserve**

On the Effective Date, the City shall establish and fund the Professional Fee Reserve from the General Fund or, where applicable, the DWSD's funds, in an amount determined by the City to be sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds. The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals and the Fee Examiner Parties as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks) and; (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve; and (c) an estimate of the Fee Examiner Parties' unbilled fees and expenses through the projected date of dismissal of the Fee Examiner under Section IV.N.3, as determined by the City in consultation with the Fee Examiner. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund or the DWSD's funds, as applicable. If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

    **2. Fee Review Order**

The Fee Examiner shall review all fees and expenses of the Fee Review Professionals for the period from the Petition Date and ending on the Effective Date in accordance with the terms of the Fee Review Order. For the avoidance of doubt, the Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses; provided, however, that all fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Bankruptcy Court pursuant to the terms of the Fee Review Order.

    **3. Dismissal of the Fee Examiner**

Once the Fee Examiner completes his review of all Fee Review Professional Fees and submits or Files all reports related thereto as required by the Fee Review Order, the Fee Examiner shall be dismissed of all duties and obligations under the Fee Examiner Order and the Fee Review Order, other than any obligations of confidentiality thereunder. The confidentiality obligations of the Fee Examiner and the other Fee Examiner Parties, including the confidentiality obligations set forth in paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date.

    **4. Potential Review of Fees Not Subject to Fee Review Order**

The City shall have the right to bring before the Bankruptcy Court a request to review and determine the reasonableness of the fees and expenses of any Fee Review Professional retained by a creditor of the City or any of its departments to the extent that such fees and expenses have not been either (a) approved pursuant to or in accordance with the DWSD Tender Order, (b) subject to court review or (c) subject to a Bankruptcy Court-approved or agreed upon process for binding arbitration.

5. **Court-Appointed Expert**

The Court-appointed expert, Martha E. M. Kopacz of Phoenix Management Services, and her counsel shall be compensated for any reasonable fees and expenses incurred through the Confirmation Date in accordance with the terms of the Court's Order Appointing Expert Witness (Docket No. 4215), entered on April 22, 2014, as amended.

O. **Assumption of Indemnification Obligations.**

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that this Section IV.O shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.O.

P. **Incorporation of Retiree Health Care Settlement Agreement.**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.293298, are incorporated herein by reference and shall be binding upon the parties thereto.

Q. **Payment of Workers' Compensation Claims.**

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law. The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

R. **36th District Court Settlement.**

The City and the Settling 36th District Court Claimants have reached a settlement related to (1) the allowance of certain of the Settling 36th District Court Claimants' Claims and (2) the treatment of Allowed Indirect 36th District Court Claims under the Plan substantially on the terms attached hereto as Exhibit I.A.9. The 36th District Court Settlement is incorporated into the Plan, which shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

S. **Payment of Certain Claims Relating to the Operation of City Motor Vehicles.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows: (1) Claims for personal protection benefits as provided by MCL § 500.3107

-70-

and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable). Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1). The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.S, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

**T.      Payment of Tax Refund Claims.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures. The City expressly reserves the right to challenge the validity of any claim for an income tax refund or property tax refund.

**U.      Utility Deposits.**

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

**V.      Pass-Through Obligations.**

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**W.      Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

**X.      Post-Effective Date Governance.**

Prior to or on the Effective Date, the Financial Review Commission shall be established pursuant to and in accordance with the Financial Review Commission Act. The Financial Review Commission shall provide oversight as set forth in the Financial Review Commission Act, including to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that promote more efficient and effective delivery of services to City residents. The City shall promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission. Nothing herein shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

# ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**A.**      **Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.**      **Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent, the Bond Agent or the COP Agent, as applicable, the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**C.**      **Certain Claims to Be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.**      **Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.**      **Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be

made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**F.     Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process.  Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

**G.     Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage.  To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court.  Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City.  For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

**H.     City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

**I.     Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.     Delivery of Distributions Generally.**

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

**2.     Delivery of Distributions on Account of Bond Claims.**

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims.  The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery or reimbursement of their fees, costs and expenses (including the fees, costs and

-73-

expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

3. ~~Delivery of Distributions on Account of COP Claims.~~

~~Except as otherwise provided herein, Distributions on account of the COP Claims shall (a) be made by the Disbursing Agent to the COP Agent under the applicable COP Documents for the benefit of Holders of COP Claims and (b) be deemed completed when made by the Disbursing Agent to the COP Agent as if such Distributions were made directly to the Holders of such Claims. The applicable COP Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable COP Documents and subject to the respective rights, claims and interests, if any, that the COP Agent may have under the applicable COP Documents or otherwise to the recovery or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The COP Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.~~

4~~3~~. **De Minimis Distributions / No Fractional New Securities.**

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

5~~4~~. **Undeliverable or Unclaimed Distributions.**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

6~~5~~. **Time Bar to Cash Payment Rights.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

J. **Other Provisions Applicable to Distributions in All Classes.**

1. **No Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an

-74-

Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

2.        **Compliance with Tax Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

3.        **Allocation of Distributions.**

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

4.        **Surrender of Instruments.**

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, there shall be no requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the

avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make or preserve a claim under any applicable policies or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs. Notwithstanding the foregoing, such Bonds or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

<h1 style="text-align:center">ARTICLE VI<br>PROCEDURES FOR RESOLVING DISPUTED CLAIMS</h1>

**A.      Treatment of Disputed Claims.**

**1.      General.**

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

**2.      ADR Procedures.**

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

**3.      Tort Claims.**

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court no later than 30 days after the Claims Objection Bar Date seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to

liquidate and determine its Claim, which right and the deadline for exercising such right shall be set forth in the notice of entry of the Confirmation Order.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan and subject to the terms of the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

**B.      Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. ~~Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.p.iii.~~

**C.      Objections to Claims.**

**1.      Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. ~~Except as otherwise provided in Section II.B.3.p.i with respect to Disputed COP Claims, as~~As of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

**2.      Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

3. **Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

4. **Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.      Confirm the maturity date and the terms as written of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, which agreements are incorporated as part of the Plan (it being understood that the enforcement, interpretation and resolution of disputes of the terms of the contracts shall proceed under applicable state law);

C.      Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.      Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.      Adjudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

K.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

L.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

M.      Resolve any matters, cases, controversies, suits or disputes that may arise in connection with the FGIC Development Agreement;

N.      Resolve any matters, cases, controversies, suits or disputes that may arise in connection with the Syncora Development Agreement

MO.      Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

NP.      Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

OQ.      Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**A.      Plan Supplements.**

All Plan Supplements not previously filed will be Filed no later than ten days before the Confirmation Hearing.

**B.      Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted

-79-

the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**C.      Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

**D.      Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

**E.      Effectuating Documents and Transactions.**

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City.  On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

**F.      Successors and Assigns.**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

**G.      Plan Controls.**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

**H.      Notice of the Effective Date.**

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and

Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

## I. Governing Law.

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

## J. Request for Waiver of Automatic Stay of Confirmation Order.

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

## K. Term of Existing Injunctions and Stays.

**All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

## L. Service of Documents

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

### 1. The City

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

(Counsel to the City)

2.     **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone:  (202) 408-6400
Facsimile:  (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone:  (248) 971-1711
Facsimile:  (248) 971-1801

(Counsel to the Retiree Committee)

Dated:  ~~September 16,~~ October 22, 2014          Respectfully submitted,

The City of Detroit, Michigan


By:     /s/  Kevyn D. Orr
Name:  Kevyn D. Orr
Title:   Emergency Manager for the City of Detroit, Michigan

-82-

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

# EXHIBIT B

**THE BANKRUPTCY COURT HAS NOT APPROVED THE PROPOSED DISCLOSURE STATEMENT TO ACCOMPANY THIS PLAN. THE DISTRIBUTION OF THIS PLAN AND THE DISCLOSURE STATEMENT IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE CITY OF DETROIT, MICHIGAN RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE DISCLOSURE STATEMENT AND ALL ANCILLARY DOCUMENTS AT ANY TIME.**

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

```
-------------------------------------------------------- x
                                          :
In re                                     :        Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                 :        Case No. 13-53846
                                          :
           Debtor.                        :        Hon. Steven W. Rhodes
                                          :
                                          :
                                          :
-------------------------------------------------------- x
```

## ~~FOURTH~~EIGHTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT
### (~~May 5~~October 22, 2014)

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

**TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND
    COMPUTATION OF TIME .................................................................... 1

    A.    Defined Terms. ................................................................................ 1

    B.    Rules of Interpretation and Computation of Time. ............... ~~24~~30

        1.    Rules of Interpretation. ..................................................... ~~24~~30

        2.    Computation of Time. ....................................................... ~~24~~30

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY
    CONTRACTS AND UNEXPIRED LEASES .................................... ~~24~~30

    A.    Unclassified Claims. ................................................................... ~~25~~31

        1.    Payment of Administrative Claims. ................................. ~~25~~31

        2.    Bar Dates for Administrative Claims. ............................. ~~25~~31

    B.    Classified Claims. ...................................................................... ~~26~~32

        1.    Designation of Classes. ..................................................... ~~26~~32

        2.    Subordination; Reservation of Rights to Reclassify Claims. ..... ~~27~~33

        3.    Treatment of Claims. ........................................................ ~~27~~33

    C.    Confirmation Without Acceptance by All Impaired Classes. ..... ~~37~~45

    D.    Treatment of Executory Contracts and Unexpired Leases. ..... ~~37~~45

        1.    Assumption. ....................................................................... ~~37~~45

        2.    Assumption of Ancillary Agreements. ............................. ~~37~~45

        3.    Approval of Assumptions and Assignments. ................... ~~37~~45

        4.    Payments Related to the Assumption of Executory Contracts and
            Unexpired Leases. ............................................................ ~~38~~46

        5.    Contracts and Leases Entered Into After the Petition Date. ..... ~~38~~46

        6.    Rejection of Executory Contracts and Unexpired Leases. ..... ~~38~~46

        7.    Rejection Damages Bar Date. ........................................... ~~38~~46

        8.    Preexisting Obligations to the City Under Rejected Executory
            Contracts and Unexpired Leases. ..................................... ~~39~~47

        9.    Insurance Policies. ............................................................ ~~39~~47

ARTICLE III CONFIRMATION OF THE PLAN ........................................ ~~39~~47

    A.    Conditions Precedent to the Effective Date. ........................... ~~39~~47

    B.    Waiver of Conditions to the Effective Date. ........................... ~~40~~48

C.      Effect of Nonoccurrence of Conditions to the Effective Date. ............ 4049

D.      Effect of Confirmation of the Plan. ............................................... 4049

    1.      Dissolution of Retiree Committee. ........................................ 4049

    2.      Preservation of Rights of Action by the City. ........................ 4049

    3.      Comprehensive Settlement of Claims and Controversies. ....... 4149

    4.      Discharge of Claims. ........................................................... 4150

    5.      Injunction. .......................................................................... 4150

    6.      Exculpation. ........................................................................ 4251

    7.      Releases ............................................................................. 4352

E.      No Diminution of State Power ....................................................... 4353

F.      Effectiveness of the Plan. ............................................................. 4453

G.      Binding Effect of Plan. ................................................................. 4453

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ..................... 4454

A.      DWSD. ........................................................................................ 4454

    1.      Rates and Revenues. ............................................................ 4454

    2.      DWSD CBAs. ...................................................................... 4454

    3.      The NewPotential DWSD Bonds and New Existing Rate DWSD BondsAuthority Transaction ............................................. 4454

B.      The New B Notes, New C Notes and New LTGO Bonds. ................ 4455

C.      The Plan COPUTGO Settlement. ................................................... 4555

D.      The UTGO Settlement. .................................................................. 45

ED.     The State Contribution Agreement. ............................................... 4555

    1.      State Contribution. ............................................................... 4555

    2.      Income Stabilization Payments. ............................................ 4555

    3.      Conditions to State's Participation. ....................................... 4656

    4.      Release of Claims Against the State and State Related Entities. 4656

FE.     The DIA Settlement. ..................................................................... 4657

    1.      Funding Contributions. ........................................................ 4657

    2.      Transfer of DIA Assets. ....................................................... 4757

    3.      Conditions to the FoundationsDIA Funding Parties' Participation. 4757

GF.     Contingent Payment Rights ........................................................... 4758

| | | | |
|---|---|---|---|
| | 1. | Special Restoration | ~~47~~58 |
| | 2. | General Restoration | ~~48~~58 |
| ~~H~~G. | | The OPEB Settlement. | ~~48~~58 |
| H. | | The LTGO Settlement. | 59 |
| I. | | The Syncora Settlement | 59 |
| J. | | The FGIC/COP Settlement | 59 |
| ~~I~~K. | | Issuance of the New Securities. | ~~48~~59 |
| ~~J~~L. | | Cancellation of Existing Bonds ~~and~~, Bond Documents, COPs and COP Documents. | ~~48~~60 |
| ~~K~~M. | | Release of Liens. | ~~49~~60 |
| N. | | Professional Fees | 61 |
| | ~~L~~1. | Professional Fee Reserve | ~~49~~61 |
| | 2. | Fee Review Order | 61 |
| | 3. | Dismissal of the Fee Examiner | 61 |
| | 4. | Potential Review of Fees Not Subject to Fee Review Order | 61 |
| | 5. | Court-Appointed Expert | 62 |
| ~~M~~O. | | Assumption of Indemnification Obligations. | ~~49~~62 |
| ~~N~~P. | | Incorporation of Retiree Health Care Settlement Agreement. | ~~49~~62 |
| ~~O~~Q. | | Payment of Workers' Compensation Claims. | ~~49~~62 |
| R. | | 36th District Court Settlement. | 62 |
| ~~P~~S. | | Payment of Certain Claims Relating to the Operation of City Motor Vehicles. | ~~50~~62 |
| ~~Q~~T. | | Payment of Tax Refund Claims. | ~~50~~63 |
| ~~R~~U. | | Utility Deposits. | ~~50~~63 |
| ~~S~~V. | | Pass-Through Obligations. | ~~50~~63 |
| ~~T~~W. | | Exit Facility. | ~~50~~63 |
| ~~U~~X. | | Post-Effective Date Governance. | ~~51~~63 |
| ARTICLE V | | PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN | ~~51~~64 |
| A. | | Appointment of Disbursing Agent. | ~~51~~64 |
| B. | | Distributions on Account of Allowed Claims. | ~~51~~64 |
| C. | | Certain Claims to Be Expunged. | ~~51~~64 |
| D. | | Record Date for Distributions; Exception for Bond Claims. | ~~51~~64 |

E.    Means of Cash Payments. .................................................................... 52 64

F.    Selection of Distribution Dates for Allowed Claims. ........................... 52 65

G.    Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. ............................................................................. 52 65

H.    City's Rights of Setoff Preserved. ...................................................... 52 65

I.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. .................................................................................... 52 65

    1.    Delivery of Distributions Generally. ...................................... 52 65

    2.    Delivery of Distributions on Account of Bond Claims. ........... 52 65

    3.    De Minimis Distributions / No Fractional New Securities. ...... 53 66

    4.    Undeliverable or Unclaimed Distributions. ............................ 53 66

    5.    Time Bar to Cash Payment Rights. ........................................ 53 66

J.    Other Provisions Applicable to Distributions in All Classes. .............. 53 66

    1.    No Postpetition Interest. ........................................................ 53 66

    2.    Compliance with Tax Requirements. ..................................... 54 66

    3.    Allocation of Distributions. ................................................... 54 67

    4.    Surrender of Instruments. ...................................................... 54 67

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ................... 55 67

A.    Treatment of Disputed Claims. .......................................................... 55 67

    1.    General. ................................................................................ 55 67

    2.    ADR Procedures. .................................................................. 55 68

    3.    Tort Claims. ......................................................................... 55 68

B.    Disputed Claims Reserve. .................................................................. 56 68

C.    Objections to Claims. ........................................................................ 56 69

    1.    Authority to Prosecute, Settle and Compromise. ................... 56 69

    2.    Application of Bankruptcy Rules. .......................................... 56

    3 2.    Expungement or Adjustment of Claims Without Objection. .... 56 69

    4 3.    Extension of Claims Objection Bar Date. ............................... 56 69

    5 4.    Authority to Amend List of Creditors. ................................... 56 69

ARTICLE VII RETENTION OF JURISDICTION ................................................ 57 69

ARTICLE VIII MISCELLANEOUS PROVISIONS .............................................. 58 71

A.    Plan Supplements. ............................................................................. 71

A B.    Modification of the Plan. ................................................................... 58 71

~~B~~C.     Revocation of the Plan. ....................................................... ~~58~~71

C.     ~~Disclosure of Amounts to Be Paid for Chapter 9 Case Services.~~ .......... ~~58~~

D.     Severability of Plan Provisions. ....................................... ~~58~~71

E.     Effectuating Documents and Transactions. ................... ~~59~~71

F.     Successors and Assigns. ................................................. ~~59~~72

G.     Plan Controls. ................................................................ ~~59~~72

H.     Notice of the Effective Date. ........................................ ~~59~~72

I.     Governing Law. ............................................................. ~~59~~72

J.     Request for Waiver of Automatic Stay of Confirmation Order. ....... ~~59~~72

K.     Term of Existing Injunctions and Stays. ....................... ~~59~~72

L.     Service of Documents .................................................... ~~60~~72

       1.     The City ............................................................. ~~60~~73

       2.     The Retiree Committee ..................................... ~~60~~73

**TABLE OF EXHIBITS**

Exhibit I.A.9            Principal Terms of 36th District Court Settlement

Exhibit I.A.66          Schedule of Class 9 Eligible City Assets

Exhibit I.A.~~61~~88          Schedule of COP Swap Agreements

Exhibit I.A.~~78~~108         Form of Detroit General VEBA Trust Agreement

Exhibit I.A.~~82~~112         Form of Detroit Police and Fire VEBA Trust Agreement

Exhibit I.A.~~91~~126         Principal Terms of DIA Settlement

Exhibit I.A.~~92~~127         Form of DIA Settlement Documents

Exhibit I.A.132          Dismissed FGIC/COP Litigation

Exhibit I.A.133          Dismissed Syncora Litigation

Exhibit I.A.~~110~~148       Schedule of DWSD Bond Documents & Related DWSD Bonds

Exhibit I.A.~~117~~156       Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds

Exhibit I.A.~~120~~159       Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds

Exhibit I.A.~~135~~183       Principal Terms of Exit Facility

Exhibit I.A.197          Form of FGIC/COP Settlement Documents

Exhibit I.A.198          Form of FGIC Development Agreement

Exhibit I.A.~~159~~216       Schedule of HUD Installment Note Documents & Related HUD Installment Notes

~~Exhibit I.A.168~~         ~~Interest Rate Reset Chart~~

Exhibit I.A.~~173~~230       Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds

Exhibit I.A.237          Form of LTGO Settlement Agreement

Exhibit I.A.~~183~~246       Principal Terms of New B Notes

Exhibit I.A.~~184~~247       Form of New B Notes Documents

Exhibit I.A.~~186~~248       Principal Terms of New ~~DWSD Bonds~~C Notes

Exhibit I.A.~~188~~       ~~Principal Terms~~249   Form of New ~~Existing Rate DWSD Bonds~~C Notes Documents

Exhibit I.A.~~189~~250.a     Form of New GRS Active Pension Plan

Exhibit I.A.~~189~~250.b     Principal Terms of New GRS Active Pension Plan

Exhibit I.A.~~191~~254.a     Form of New PFRS Active Pension Plan

Exhibit I.A.~~191~~254.b     Principal Terms of New PFRS Active Pension Plan

~~Exhibit I.A.214~~     ~~Form of Plan COP Settlement Documents~~

Exhibit I.A.~~220~~280     Prior GRS Pension Plan

Exhibit I.A.~~221~~281     Prior PFRS Pension Plan

Exhibit I.A.292     Restoration Trust Agreement

Exhibit I.A.~~236~~298     Retiree Health Care Settlement Agreement

Exhibit I.A.~~244~~305     Schedule of Secured GO Bond Documents

Exhibit I.A.~~268~~332     State Contribution Agreement

Exhibit I.A.340     Form of Syncora Development Agreement

Exhibit I.A.344     Form of Syncora Settlement Documents

Exhibit I.A.~~279~~354     Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds

Exhibit I.A.~~285~~     ~~Principal Terms~~360   Form of UTGO Settlement ~~Agreement~~

Exhibit II.B.3.q.ii.A     Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits

Exhibit II.B.3.q.ii.C     Terms of PFRS Pension Restoration

Exhibit II.B.3.r.ii.A     Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits

Exhibit II.B.3.r.ii.C     Terms of GRS Pension Restoration

Exhibit II.D.5     Schedule of Postpetition Collective Bargaining Agreements

Exhibit II.D.6     Executory Contracts and Unexpired Leases to Be Rejected

Exhibit III.D.2     Retained Causes of Action

## INTRODUCTION

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

**A.     Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.     "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.     "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3.     "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.     "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5.     "2014 DWSD Refinancing Obligations" means, collectively, the (i) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D, (ii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014E, (iii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F, (iv) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding

Second Lien Bonds, Series 2014G, (v) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A, (vi) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B, (vii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C, and (viii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D.

6. "2014 Revenue and Revenue Refinancing Bonds" means, collectively, one or more series of Sewage Disposal System Revenue and Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds.

7. "2014 Revenue Refinancing Bonds" means, collectively, the Michigan Finance Authority's (i) Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (ii) Local Government Loan Program Revenue Bonds, Series 2014C-5 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iii) Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iv) Local Government Loan Program Revenue Bonds, Series 2014C-7 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (v) Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vi) Local Government Loan Program Revenue Bonds, Series 2014D-2 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vii) Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, and (viii) Local Government Loan Program Revenue Bonds, Series 2014D-4 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds.

58. "36th District Court" means the district court for the thirty-sixth judicial district of the State.

9. "36th District Court Settlement" means the settlement between the City and the Settling 36th District Court Claimants, substantially on the terms set forth on Exhibit I.A.9.

610. "Active Employee" means an active employee of the City on and after the Confirmation Date.

711. "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

12. "Ad Hoc Committee of DWSD Bondholders" means, collectively, Blackrock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

813. "Adjusted Pension Amount" means the GRS Adjusted Pension Amount and/or the PFRS Adjusted Pension Amount, as applicable.

914. "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code and/or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof shall be considered an Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

1015. "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

1116. "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

1217. "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

1318. "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

1419. "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City. "Allow" and "Allowing" shall have correlative meanings.

20. "Ambac" means Ambac Assurance Corporation.

1521. "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

1622. "Annuity Savings Fund Excess Amount" means the following: (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual Return through such date; and (c) for an

ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return.  For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

~~17~~23.    "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.~~154~~211, plus the ASF Recoupment.

~~18~~24.    "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

~~19~~25.    "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

26.    "ASF Election Date" means the date that is 35 days after the date on which the ASF Election Form is mailed.

27.    "ASF Election Form" means a form to be mailed to each ASF Distribution Recipient with the ASF Election Notice to allow such ASF Distribution Recipient to elect the ASF Recoupment Cash Option.

28.    "ASF Election Notice" means a notice to be mailed to each ASF Distribution Recipient notifying such ASF Distribution Recipient of the ASF Recoupment Cash Option and providing such recipient with an ASF Election Form.

29.    "ASF Final Cash Payment Date" means the later of (a) 90 days after the Effective Date or (b) 50 days after the date of mailing of an ASF Final Cash Payment Notice.

30.    "ASF Final Cash Payment Notice" means a notice to be provided by GRS to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option indicating the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.

~~20~~31.    "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

~~21~~32.    "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period plus an interest component of 6.75% if the amount recouped is amortized over time.  For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

33.    "ASF Recoupment Cash Option" means an election that may be exercised by an ASF Distribution Recipient to pay the total amount of such ASF Distribution Recipient's ASF Recoupment in a single lump sum.

-4-

34. "ASF Recoupment Cash Payment" means the amount of the cash payment that an ASF Distribution Recipient who elects the ASF Recoupment Cash Option will be required to pay on account of such ASF Distribution Recipient's ASF Recoupment.

~~22~~35. "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

~~23~~36. "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the ~~Reinstated~~ Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation), which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement Agreement, substantially on the terms set forth on Exhibit I.A.~~285~~360.

37. "Assured" means, together, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc., and Assured Guaranty Corp.

~~24~~38. "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

~~25~~39. "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

~~26~~40. "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 ~~and/~~or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

~~27~~41. "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

~~28~~42. "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

~~29~~43. "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

~~30~~44. "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

~~31~~45. "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims~~, the Parking Bond Claims~~ and the Secured GO Bond Claims.

~~32~~46. "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents~~, the Parking Bond Documents~~ and the Secured GO Bond Documents.

33**47**. "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds and/ or the Secured GO Bonds.

34**48**. "Bondholder" means any beneficial or record holder of a Bond.

35**49**. "Bond Insurance Policies" means those policies, surety policies and/or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

36**50**. "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

37**51**. "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

38**52**. "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

39**53**. "Cash" means legal tender of the United States of America and equivalents thereof.

40**54**. "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

41**55**. "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

42**56**. "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

43**57**. "City" means the City of Detroit, Michigan.

44**58**. "City Council" means the duly-elected City Council of the City.

**59.** "City Parking Assets" means, collectively, the City's right, title and interest in (a) the Parking Garages, (b) operating revenue received by the City generated by the Parking Garages, (c) revenues collected from fines received by the City related to tickets issued for parking violations (other than any such revenue that would otherwise be paid to the 36th District Court), (d) revenue received by the City generated by parking meters owned by the City and (e) revenue received by the City generated by "boot and tow" operations conducted by the City.

45**60**. "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

46 61.    "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

47 62.    "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the later latest of (a) one year 180 days after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court, which other period may be set without notice to Holders of Claims.

48 63.    "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

49 64.    "Class" means a class of Claims, as described in Section II.B.

65.    "Class 9 Settlement Asset Pool" means (a) either: (i) the New C Notes or (ii) in the event of a disposition or monetization of the City Parking Assets prior to distribution of the New C Notes, the proceeds from such disposition or monetization, in an amount not less than $80 million; and (b) the Class 9 Settlement Credits.

66.    "Class 9 Eligible City Asset" means those assets identified on Exhibit I.A.66.

67.    "Class 9 Settlement Credits" means assignable, transferable settlement credits in the aggregate amount of $25 million that may be applied to offset not more than 50% of the purchase price of a Class 9 Eligible City Asset; provided that, in all cases, to apply a Class 9 Settlement Credit, the owner thereof must (a) be the final party selected in a procurement process or auction conducted by the City and (b) otherwise satisfy all other elements of the procurement or auction process applicable to a particular Class 9 Eligible City Asset (in each of (a) and (b), without regard to such owner's offsetting any portion of the purchase price with such Class 9 Settlement Credit and irrespective of such owner's ability to apply any Class 9 Settlement Credit).

50 68.    "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements, other contracts or ordinances.

51 69.    "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

52 70.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

53 71.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

54 72.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

73.    "Contract Administration Agreement 2005" means the Contract Administration Agreement dated June 2, 2005, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2005, the COP Contact Administrator and the COP Swap Counterparties.

74. "Contract Administration Agreement 2006" means the Contract Administration Agreement dated June 12, 2006, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2006, the COP Contact Administrator and the COP Swap Counterparties.

75. "Contract Administration Agreements" means, together, the Contract Administration Agreement 2005 and the Contract Administration Agreement 2006.

55 76. "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

77. "COP Agent" means a contract administrator, trustee, paying agent or similar Entity, as applicable, under the COP Documents.

78. "COP Agent Fees" means reasonable, actual and documented fees payable to the COP Agent for services rendered or expenses incurred in accordance with and pursuant to the terms of the COPs Documents.

79. "COP Claim" means a Claim under or evidenced by the COP Service Contracts. For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to: (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

80. "COP Contract Administrator" means Wilmington Trust, National Association, as successor to U.S. Bank, N.A.

56 81. "COPs COP Documents" means, collectively, the COP Service Contracts, the 2005 COPs and Agreement, the 2006 COPs Agreement and the Contract Administration Agreements.

82. "COP Insurance Policies" means those certain polices or other instruments insuring the 2005 COPs issued under the 2005 COPs Agreement and the 2006 COPs issued under the 2006 COPs Agreement, including all ancillary and related documents that may obligate the City to pay any amount to a COP Insurer for any reason.

57 83. "COP Insurance Policies Claim" means a Claim held by a COP Insurer arising under or evidenced by the in connection with a COP Service Contracts Insurance Policy.

84. "COP Insurer" means any party, other than the City, that has issued a COP Insurance Policy.

58 85. "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service*

-8-

*Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

~~59~~86. "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

~~60~~87. "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

~~61~~88. "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.~~61~~88, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

~~62~~89. "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

~~63~~90. "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

~~64~~91. "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

~~65~~92. "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

~~66~~93. "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

94. "COP Swap Exculpated Parties" means the COP Swap Counterparties and their affiliates and each of their respective present and former (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

~~67~~95. "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

~~68~~96. "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

97. "COP Syncora Swap Insurance Policies" shall mean policy numbers CA03049E, CA03049D, CA3049C and CA03049B issued by XL Capital Assurance Inc.

98. "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

-9-

99. "COP Trustee" means Wilmington Trust, National Association, as Successor Trustee for the Detroit Retirement Systems Funding Trust 2005 and the Detroit Retirement Systems Funding Trust 2006, or any successor thereto.

69100. "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

70. "Creditor Representative" means (a) if all Retiree Classes accept the Plan and the Retiree Committee supports the Plan, the Retiree Committee, (b) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 accepts the Plan, a person or committee of persons appointed by the five largest beneficial holders of Class 7 Claims other than the LTGO Insurer and (c) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 rejects the Plan, a person or committee of persons appointed by the Emergency Manager.

71101. "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

72102. "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

73103. "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension (including an interest component of 6.75% on the ASF Recoupment portion of the ASF/GRS Reduction if the ASF Recoupment is amortized over time) of a person who was a current retiree as of June 30, 2014.

74104. "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

75105. "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OBEBOPEB Claim.

76106. "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

77107. "Detroit General VEBA Beneficiary" means either (a) a Holder of an Allowed OPEB Claim who is a Detroit General Retiree- or (b) a retired employee (or surviving beneficiary of a retired employee) of the Detroit Public Library or the Detroit Regional Convention Facility Authority who (i) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (ii) holds a valid claim for OPEB Benefits against the Detroit Public Library or the Detroit Regional Convention Facility Authority.

-10-

78108. "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.78108.

79109. "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

80110. "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

81111. "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

82112. "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.82112.

113. "Detroit Retirement Systems Funding Trust 2005" means the funding trust established pursuant to the 2005 COPs Agreement.

114. "Detroit Retirement Systems Funding Trust 2006" means the funding trust established pursuant to the 2006 COPs Agreement.

115. "Developer" means FGIC or its designee(s) under the FGIC Development Agreement.

116. "DDA" means the City of Detroit Downtown Development Authority.

83117. "DIA" means The Detroit Institute of Arts, a museum and cultural facilityinstitution located at 5200 Woodward Avenue, Detroit, Michigan 48202.

84118. "DIA Assets" means the assets identified on Exhibit A to the summary of the material terms of "Museum Assets" as defined in the DIA Settlement, which is attached hereto as Exhibit I.A.91, to the extent that the City holds title to any such assets as of the Effective Date Documents.

85119. "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

120. "DIA Direct Funders" means DIA Corp. and those DIA Funders whose commitments to contribute monies in furtherance of the DIA Settlement are made directly to the CFSEM Supporting Organization.

86121. "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations listed on Exhibit C to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, and all additional persons, businesses, business-affiliated foundations and any other foundations from which DIA Corp. secures commitments, whether before or after the Effective Date, to contribute monies in furtherance ofor otherwise secures contributions of monies in support of DIA Corp.'s payment obligations under the DIA Settlement, whether paid directly to the CFSEM Supporting Organization or to DIA Corp. for the purpose of supporting DIA Corp.'s payments to the CFSEM Supporting Organization.

87122. "DIA Funding Parties" means the Foundations, and the DIA Direct Funders and DIA Corp.

88123. "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.FE.1.

89124. "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

90125. "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

91126. "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.FE and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.91126.

92127. "DIA Settlement Documents" means the definitive documentation, including grant award letters, to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.92127, which documents will substantially conform to the term sheet attached hereto as Exhibit I.A.91126.

93128. "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

94129. "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code in the Disclosure Statement Order, as the same may be amended, supplemented or otherwise modified.

95130. "Disclosure Statement Order" means the [_____]Order Approving the Proposed Disclosure Statement (Docket No. [____]4401), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on [____]May 5, 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

96131. "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

132. "Dismissed FGIC/COP Litigation" means all litigation pending between the City and FGIC (including all appeals) arising out of or related to, and all motions or objections pending in, the Chapter 9 Case, including the litigation set forth on Exhibit I.A.132, which litigation shall be dismissed or withdrawn as set forth in the FGIC/COP Settlement Documents.

133. "Dismissed Syncora Litigation" means all litigation pending between the City and Syncora (including all appeals) arising out of or related to, and all motions or objections pending in, the Chapter 9 Case, including the litigation set forth on Exhibit I.A.133, which litigation shall be dismissed or withdrawn as set forth in the Syncora Settlement Documents.

97134. "Disputed Claim" means any Claim that is not Allowed.

98. "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.p.iii.B.1.

~~99~~135. "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

~~100~~136. "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

~~101~~137. "Distribution Date" means any date on which a Distribution is made.

~~102~~138. "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

~~103~~139. "District Court" means the United States District Court for the Eastern District of Michigan.

~~104~~140. "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

~~105~~141. "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

~~106~~142. "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the ~~City of Detroit Downtown Development Authority~~DDA, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

~~107~~143. "DRCEA" means the Detroit Retired City Employees Association.

~~108~~144. "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

145. "DWSD Authority" means an authority that may be formed pursuant to a DWSD Authority Transaction to conduct many or all of the operations currently conducted by DWSD as described in Section IV.A.3.

146. "DWSD Authority Transaction" means the potential formation (including the potential transfer of certain assets owned by DWSD) and operation of the DWSD Authority, as described in Section IV.A.3.

~~109~~147. "DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

~~110~~148. "DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued ~~and/~~or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.~~110~~148, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

111149.        "DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.110148.

112150.        "DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

151.        "DWSD Exculpated Parties" means, collectively, the DWSD Settlement Parties and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

113152.        "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

114153.        "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

115154.        "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

116155.        "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

117156.        "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.117156, as the same may be subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

118157.        "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.117156.

119158.        "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

120159.        "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.120159, as the same may be subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

121160.        "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.120159.

122161.        "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

162.        "DWSD Settlement Date" means the date prior to the Effective Date upon which each of (i) consummation of the purchase of the DWSD Tendered Bonds, (ii) issuance of the 2014 DWSD Refinancing Obligations and (iii) issuance of the 2014 Revenue Refinancing Bonds occurs, which date is identified as

-14-

September 4, 2014 in the DWSD Tender Invitations (subject to rescheduling to a date earlier or later than that date by the City in its sole discretion).

163. "DWSD Settlement Parties" means, collectively, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc., Berkshire Hathaway Assurance Corp., FGIC (solely in its capacity as a DWSD Bond Insurer), NPFG, the Ad Hoc Committee of DWSD Bondholders and U.S. Bank National Association, as trustee for the DWSD Bonds.

164. "DWSD Tender" means the offers, subject to acceptance at the City's election and in its sole discretion, to purchase for cancellation some or all of the DWSD Bonds that have been tendered and accepted in connection with, and on the terms provided in, the DWSD Tender Invitations.

165. "DWSD Tendered Bonds" means the DWSD Bonds that have been tendered for purchase or cancellation pursuant to the DWSD Tender.

166. "DWSD Tender Invitations" means the invitations and accompanying disclosure statements sent by the City to holders of DWSD Bonds on August 7, 2014, in the form of those collectively attached as Exhibits 8A and 8B to the DWSD Tender Motion.

167. "DWSD Tender Motion" means the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 6644), Filed by the City on August 11, 2014.

168. "DWSD Tender Order" means the Order, Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 7028), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 25, 2014.

123169. "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

124170. "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

125171. "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

126172. "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continuedcontinue to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

-15-

127173.        "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

128174.        "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

129175.        "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

130176.        "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

131177.        "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

178.        "Excess New B Notes" means, collectively:  (a) the Syncora Excess New B Notes and (b) New B Notes in the aggregate face amount of approximately $48.71 million, representing the difference between (i) the New B Notes that would have been distributed to FGIC or the FGIC COP Holders had their respective asserted COP Claims for principal and interest in Class 9 been Allowed in full and (ii) the New B Notes to be provided to FGIC and the FGIC COP Holders as partial consideration pursuant to the terms of the FGIC/COP Settlement.

179.        "Excluded Actions" means (a) any claims with respect to enforcement of the FGIC/COP Settlement Documents or the FGIC Development Agreement, (b) any claims with respect to the New B Notes, the New C Notes or the Class 9 Settlement Credits, (c) any claims held by FGIC against the (i) COP Swap Counterparties or (ii) Related Entities of any of the foregoing, or (d) any claims asserted against the City in the proofs of claim filed by FGIC and the COP Trustee; provided that, with respect to the claims described in clause (d), notwithstanding any other provision of the Plan, such claims shall be subject to the treatment, discharge and injunction provisions set forth herein.

132180.        "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors and, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties, (j) the UTGO Exculpated Parties, (k) the DWSD Exculpated Parties, (l) the RDPMA Exculpated Parties, (m) the Syncora Exculpated Parties, (n) the COP Agent and (o) the FGIC/COP Exculpated Parties.  For the avoidance of doubt, Exculpated Parties shall not include the COP Service Corporations.

133181.        "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

134182.        "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed.  The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

-16-

~~For the avoidance of doubt, Exhibits I.A.92 and I.A.135 will be Filed only if the transactions related to and/or underlying such Exhibits are to be consummated by the City.~~

~~135~~183.     "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.~~135~~183.

~~136~~184.     "Exit Facility Agent" means the agent under the Exit Facility.

~~137~~185.     "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

~~138~~186.     "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

~~139~~187.     "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

~~140~~188.     "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

~~141~~189.     "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

~~142~~190.     "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified, including pursuant to the Order Amending and Clarifying Fee Review Order of September 11, 2013 (Docket No. 5150), entered on May 29, 2014.

~~143~~191.     "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order and (b) ~~the Fee Examiner Parties~~those additional professionals retained by third parties to provide services in connection with the Chapter 9 Case that seek reimbursement by or payment from the City or any of its departments and are, or are determined (by Bankruptcy Court order or otherwise) to be, subject to the Fee Review Order or the terms of this Plan.  For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

~~144~~192.     "Fee Review Professional Fees" means, collectively, (a) the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective

Date and (b) the fees and expenses of the Fee Examiner Parties through the projected date of dismissal of the Fee Examiner pursuant to Section IV.N.3.

193.    "FGIC" means Financial Guaranty Insurance Company.

194.    "FGIC/COP Exculpated Parties" means (a) FGIC and its Related Entities, (b) the FGIC COP Holders and their respective Related Entities and (c) the COP Agent and its Related Entities, in each case solely in their respective capacities as holders of, insurer of or administrator, trustee, or paying agent with respect to COP Claims.

195.    "FGIC COP Holders" means the registered and beneficial holders of COPs originally insured by FGIC.

196.    "FGIC/COP Settlement" means the comprehensive settlement with FGIC and the FGIC COP Holders, as described at Section IV.J and as definitively set forth in the FGIC/COP Settlement Documents.

197.    "FGIC/COP Settlement Documents" means the definitive documentation to be executed in connection with the FGIC/COP Settlement, in substantially the form attached hereto as Exhibit I.A.197, and in any case in form and substance reasonably acceptable to the City, FGIC and the FGIC COP Holders.  Whenever the consent of the FGIC COP Holders is required hereunder, or any document is required to be reasonably satisfactory to the FGIC COP Holders, such consent shall be deemed given and such document shall be deemed reasonably satisfactory unless within the period of time specified for such consent or document (which shall be reasonable under the circumstances and in any event not less than 48 hours after the request for such consent or proposed document shall have been filed with the court) unless beneficial holders of a majority of the COPs originally insured by FGIC shall have objected in writing to the action or document.

198.    "FGIC Development Agreement" means that certain development agreement to be entered into by the City and the Developer, in substantially the form attached hereto as Exhibit I.A.198.

199.    "FGIC Settlement Consideration" means the share of the Class 9 Settlement Asset Pool and New B Notes to be distributed for the benefit of FGIC and the FGIC COP Holders pursuant to Section II.B.3.p.i.A in respect of COPs originally insured by FGIC.

145200.    "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

146201.    "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 and/or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

202.    "Financial Review Commission" means the financial review commission appointed under Section 4 of the Financial Review Commission Act.

203. "Financial Review Commission Act" means Public Act 181 of 2014 of the State, also known as the Michigan Financial Review Commission Act, Michigan Compiled Laws §§ 141.1631, *et seq.*

~~147~~204. "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year. A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

~~148~~205. "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.~~91, solely in their capacity as participants in the DIA Settlement~~126.

~~149~~206. "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

~~150~~207. "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

~~151~~208. "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

~~152~~209. "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

~~153~~210. "GRS" means the General Retirement System ~~for~~of the City of Detroit.

~~154~~211. "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a) If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

(b) If Classes 10 and 11 do **not** vote to accept the Plan ~~and/~~or funding is **not** received from the DIA Settlement and the State Contribution Agreement: for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

155212.    "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

156213.    "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

157214.    "Holder" means an Entity holding a Claim.  With respect to any COP originally insured by FGIC, "Holder" includes the beneficial holders of any such COP.

158215.    "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

159216.    "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.159216, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

160217.    "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.159216.

161218.    "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

162219.    "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

163220.    "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

164221.    "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

165222.    "Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners.  The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and

-20-

PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

166223.　　　"Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the treatment accorded to any Allowed Other Unsecured Claims held by the 36th District Court pursuant to Section II.B.3.u.Settlement.

167224.　　　"Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification and/or payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

168.　　　"Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds, attached as Exhibit I.A.168.

225.　　　"Insured LTGO Bonds" means those Limited Tax General Obligation Bonds that are insured by the LTGO Insurer.

169226.　　　"Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees and/or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

170227.　　　"Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

171228.　　　"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

172229.　　　"Limited Tax General Obligation Bond ClaimsClaim" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

173230.　　　"Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.173230, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

174231.　　　"Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.173230.

232.　　　"Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing as set forth therein, but is nonetheless unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

175233.　　　"List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto),

attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries and/or schedules may be amended, restated, supplemented or otherwise modified.

176.    "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date, and failing that, as soon thereafter as possible, but, notwithstanding such compliance, is unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

234.    "LTGO Distribution Agent" means U.S. Bank National Association, in its capacity as agent under a distribution agreement to be entered into in connection with the LTGO Settlement Agreement or such other entity as may be agreed to among the parties to the LTGO Settlement Agreement.

235.    "LTGO Exculpated Parties" means (a) the LTGO Insurer, (b) BlackRock Financial Management, solely in its capacity as a Holder of Limited Tax General Obligation Bonds, and (c) their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

177236.    "LTGO Insurer" means Ambac Assurance Corp., solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

237.    "LTGO Settlement Agreement" means the comprehensive settlement regarding Limited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, substantially in the form attached hereto as Exhibit I.A.237.

238.    "LTGO Settlement Parties" means (a) the LTGO Insurer and (b) BlackRock Financial Management, on behalf of certain managed funds and accounts set forth in the LTGO Settlement Agreement.

178239.    "Macomb County" means the County of Macomb, Michigan.

179240.    "Mayor" means the duly-elected mayor of the City.

241.    "MFA" means the Michigan Finance Authority.

180242.    "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the Michigan Finance AuthorityMFA in accordance with the UTGO Settlement Agreement and applicable law.

243.    "NPFG" means National Public Finance Guarantee Corporation.

181244.    "Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

182245.    "Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction.  In applying

-22-

this definition, the City and the Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

~~183~~246.        "New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.~~183~~246.

~~184~~247.        "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued ~~and/~~or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.~~184~~247.

~~185.        "New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued and/or indentures to be executed with respect to the New DWSD Bonds.~~

~~186~~248.        "New ~~DWSD Bonds~~C Notes" means the ~~secured~~unsecured bonds to be issued by the City pursuant to the New ~~DWSD Bond~~C Notes Documents, substantially on the terms set forth on Exhibit I.A.~~186~~248 and in any case in form and substance reasonably acceptable to the City and Syncora.

~~187~~249.        "New ~~Existing Rate DWSD Bond~~C Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued ~~and/~~or indentures ~~to be executed~~ to be executed with respect to the New ~~Existing Rate DWSD Bonds~~C Notes, in substantially the form attached hereto as Exhibit I.A.249 and in any case in form and substance reasonably acceptable to the City and Syncora.

~~188.        "New Existing Rate DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.188.~~

~~189~~250.        "New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City or another entity that participates in GRS in connection with employment service performed on and after July 1, 2014, in substantially the form ~~documentation of which is~~ attached hereto as Exhibit I.A.~~189~~250.a and the material terms of which are attached hereto as Exhibit I.A.~~189~~250.b.

~~190~~251.        "New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

252.        "New LTGO Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New LTGO Bonds, in substantially the form attached as an exhibit to the LTGO Settlement Agreement.

253.        "New LTGO Bonds" means the bonds to be issued by the City pursuant to the New LTGO Bond Documents, substantially on the terms set forth on Schedule 1 of the LTGO Settlement Agreement.

~~191~~254.        "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service

performed on and after July 1, 2014, in substantially the form ~~documentation of which is~~ attached hereto as Exhibit I.A.~~191~~254.a and the material terms of which are ~~set forth at~~attached hereto as Exhibit I.A.~~191~~254.b.

~~192~~255.     "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final ~~10~~five years of service, as set forth on Exhibit I.A.254.b, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

~~193~~256.     "New Securities" means, collectively, the New ~~DWSD Bonds~~B Notes, the New ~~Existing Rate DWSD Bonds~~C Notes, the New ~~B Notes~~LTGO Bonds and the Municipal Obligation.

257.     "Non-Settling UTGO Bond Insurer" means, together, Syncora Capital Assurance Inc. and Syncora Guarantee Inc., solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

~~194~~258.     "Oakland County" means the County of Oakland, Michigan.

~~195~~259.     "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City, the Detroit Public Library or the Detroit Regional Convention Facility Authority and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan ~~and~~, the Employees Death Benefit Plan or any comparable plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

~~196~~260.     "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

~~197~~261.     "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim~~, a Parking Bond Claim~~ or a Secured GO Bond Claim.

~~198~~262.     "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim, an Indirect 36th District Court Claim or a Subordinated Claim. For the avoidance of doubt, Section 1983 Claims~~,~~ and Indirect Employee Indemnity ~~Claims and Indirect 36th District Court~~ Claims are included within the definition of Other Unsecured Claim.

~~199~~263.     "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

264.     "Parking Garages" means, collectively, parking garages owned by the City other than (a) that certain underground parking garage, commonly known as the "Grand Circus Parking Garage," located at 1600-01 Woodward Avenue, Detroit, Michigan, (b) that certain underground parking garage, commonly known as the "Cultural Center Garage," located at 41 Farnsworth Street, Detroit, Michigan and (c) that certain multi-story parking structure near the Riverfront Arena with an address of 900 W. Jefferson Avenue, Detroit, Michigan having a capacity of approximately 3,200 car spaces commonly known as "Joe Louis Arena Garage." For the

-24-

avoidance of doubt, (a) that certain parking lot located at 5200 Woodward Avenue, Detroit, Michigan and (b) that certain parking lot, commonly known as the "Frederick Lot," located at 318 Frederick Street, Detroit, Michigan, shall not be considered Parking Garages.

200. "Parking Bond Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

201. "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

202. "Parking Bonds" means the secured $27,000,000 City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents in the outstanding principal amount of $8,080,000 as of the Petition Date.

203265. "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

204266. "Pass-Through Recipients" means, collectively, the (a) City of Detroit Downtown Development AuthorityDDA, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment Authority and (d) City of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

205. "Patient Protection and Affordable Care Act" means Public Law 111-148, 111th Congress, 42 U.S.C. §§ 18001, et seq.

206267. "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

207268. "Petition Date" means July 18, 2013.

208269. "PFRS" means the Police and Fire Retirement System forof the City of Detroit.

209270. "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan and/or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in

-25-

the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

210271.     "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any  other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

211272.     "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

212273.     "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

213274.     "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.p.iiiij.A and more definitively set forth in the Plan COP Settlement Documents.

214.     "Plan COP Settlement Documents" means the definitive documentation to be executed in connection with the Plan COP Settlement, in substantially the form attached hereto as Exhibit I.A.214.

215275.     "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order.  A Plan Supplement or Plan Supplements containing Exhibits 189.a, 191.a, 220, 221 and II.D.6 will be Filed no later than five Business Days prior to the Voting Deadline.  All other Plan Supplements will be Filed no later than ten days before the Confirmation Hearing.

216276.     "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement and/or Ordinance No. 05-09 of the City.

217277.     "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

218278.     "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

219279.     "Postpetition PurchaserFinancing Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

-26-

220280.      "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.220280.

221281.      "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.221281.

222282.      "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

223283.      "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.L̶N.1.

224284.      "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water a̶n̶d̶/or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

225285.      "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

286.      "RDPMA" means the Retired Detroit Police Members Association.

287.      "RDPMA Exculpated Parties" means the RDPMA and its board of trustees/directors, attorneys, advisors and professionals, solely in their capacity as such.

226288.      "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder.  "Reinstate" and "Reinstatement" shall have correlative meanings.

227.      "Reinstated Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,410,000 that, from and after the Effective Date, will remain outstanding and will be payable from the UTGO Bond Tax Levy, as more particularly described on Exhibit I.A.285.

228289.      "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the

-27-

foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

229290.        "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the Foundations, DIA Funding PartiesCorp., the DIA Funders and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

230291.        "Restoration Trust" means a trust to be established pursuant to the Restoration Trust Agreement to (a) to hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and the Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

292.        "Restoration Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Restoration Trust, in substantially the form attached hereto as Exhibit I.A.292.

231293.        "Restructured UTGO Bonds" means the bonds to be issued by the Michigan Finance AuthorityMFA to the current Holders of Unlimited Tax General Obligation BondsBond Claims, the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer in the amount of $287,500,000287,560,790 pursuant to the UTGO Settlement Agreement, which bonds shall be limited obligations of the Michigan Finance AuthorityMFA and shall be secured as more particularly described on Exhibit I.A.285in the UTGO Settlement Agreement.

232294.        "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

233295.        "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

234296.        "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

235297.        "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

236298.        "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.236298.

237.        "Retiree Health Plan" means the City of Detroit Retiree Health Plan, a welfare benefit plan sponsored and administered by the City, which, effective for the period beginning March 1, 2014 and ending

-28-

December 31, 2014, provides health, dental and vision care benefits to retired officers and employees of the City who enrolled in the plan as of March 1, 2014.

238299.    "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS and/or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

239300.    "Retirement Systems" means, collectively, the GRS and the PFRS.

240301.    "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

241302.    "Section 1983 Claim" means any claimClaim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

242303.    "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

243304.    "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

244305.    "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

245306.    "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

246307.    "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.244305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

247308.    "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

248309.    "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

249310.    "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit

-29-

I.A.~~244~~305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~250~~311.        "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

~~251~~312.        "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

~~252~~313.        "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.~~244~~305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~253~~314.        "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

~~254~~315.        "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

~~255~~316.        "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.~~244~~305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~256~~317.        "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

~~257~~318.        "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

~~258~~319.        "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.~~244~~305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~259~~320.        "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

~~260~~321.        "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

261322.    "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.244305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

262323.    "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

263324.    "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

325.    "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

326.    "Settling 36th District Court Claimants" means (a) the 36th District Court, (b) Local 917 of the American Federation of State, County and Municipal Employees, (c) Local 3308 of the American Federation of State, County and Municipal Employees and (d) those individuals identified as "Individual Claimants" on the term sheet attached hereto as Exhibit I.A.9.

264327.    "Settling COP Claimant" means (a beneficial holder) those holders of a COP Claim that elects to participate in the Plan COP Settlement as to some or all COP Claims held by or assigned to it and its Affiliates by so indicating on a timely returned Ballot. Claims that are the subject of the Syncora Settlement Documents or (b) those Holders of COP Claims that are the subject of the FGIC/COP Settlement Documents.

328.    "Settling UTGO Bond Insurers" means, collectively, Ambac, Assured and NPFG and each of their respective successors and assigns, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

265329.    "Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.GF.

266330.    "State" means the state of Michigan.

267331.    "State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement. References to the "disbursement of the State Contribution" in the Plan shall be construed to refer to either the distribution of the discrete lump sum payments to GRS and PFRS or the payment of the first installment of the State Contribution to GRS and PFRS, as the case may be.

268332.    "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.ED, in substantially the form attached hereto as Exhibit I.A.268332.

269333.    "State Related Entities" means, collectively:  (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act,

Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

270334. "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

335. "Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,349,210 that, from and after the Effective Date, will (a) be reinstated, (b) remain outstanding and (c) be payable from the UTGO Bond Tax Levy, as more particularly described in the UTGO Settlement Agreement.

271336. "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and/or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

337. "Supplemental Trust Agreements" means, collectively, (a) one or more supplemental trust agreements between the COP Trustee and COP Service Corporations, entered into with the consent of FGIC and (b) one or more supplemental trust agreements between the COP Trustee and COP Service Corporations, entered into with the consent of Syncora, in each case to be executed prior to the Effective Date, which agreements shall, among other things, for purposes of distributions of trust assets explicitly supersede the 2005 COPs Agreement and the 2006 COPs Agreement, which incorporates by reference Sections 6.5 and 9.1 of each Contract Administration Agreement and Section 8.03 of each COP Service Contract.

272338. "Swap Insurance Policies" means those policies and/or other instruments insuring the COP Swap Agreements and obligations related thereto.

339. "Syncora" means, collectively, Syncora Guarantee, Inc. and Syncora Capital Assurance Inc.

340. "Syncora Development Agreement" means that certain development agreement by and between the City and Pike Point Holdings, LLC, a wholly owned indirect subsidiary of Syncora, in substantially the form attached hereto as Exhibit I.A.340, including all exhibits thereto, and in any case in form and substance reasonably acceptable to the City and Syncora.

341. "Syncora Excess New B Notes" means New B Notes in the aggregate face amount of approximately $15.43 million, representing the difference between (a) the New B Notes that would have been distributed to Syncora had its asserted COP Claim for principal and interest in Class 9 been Allowed in full and (b) the New B Notes to be provided to Syncora as partial consideration pursuant to the terms of the Syncora Settlement.

342. "Syncora Exculpated Parties" means Syncora and their Related Entities, solely with respect to issues arising in connection with Syncora's capacity as holder or insurer of Unlimited Tax General Obligation Bond Claims and COP Claims.

343. "Syncora Settlement" means the comprehensive settlement with Syncora, as described at Section IV.I and as definitively set forth in the Syncora Settlement Documents.

344. "Syncora Settlement Documents" means the definitive documentation to be executed in connection with the Syncora Settlement, in substantially the form attached hereto as Exhibit I.A.344, and in any case in form and substance reasonably acceptable to the City and Syncora.

273345. "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added,

transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

346. "Top-Off Payments" means the payments to be made to the Settling UTGO Bond Insurers pursuant to the UTGO Settlement Agreement if a Trigger Event occurs in amounts equal to the product of: (a) the amount by which the recovery received by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, under the Plan exceeds 69.5% of the aggregate amount of all such Allowed Claims in such Class, multiplied by (b) the quotient of (i) $100.5 million, divided by (ii) the sum of (x) 30.5% of the aggregate amount of all Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as the case may be, and (y) $100.5 million.

274347. "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

348. "Trigger Event" means the receipt by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, of consideration of 69.5% or more of the aggregate amount of all of the Allowed Claims in such Class. For purposes of determining whether a Trigger Event has occurred, all actual recoveries for Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed COP Claims shall be determined by discounting the payments made to such Classes using a 5% discount rate back to the date of Confirmation.

349. "Tunnel Lease" means, collectively, (a) that certain Tube Lease, dated March 20, 1978, by and between the City, as landlord, and Detroit Windsor Tunnel LLC, as successor-in-interest to Detroit & Canada Tunnel Corporation, as tenant, and (b) that certain Sublease, dated March 20, 1978, by and between the City, as landlord, as successor-in-interest to Ford Motor Properties, Inc. as sublandlord, and Detroit Windsor Tunnel LLC, as successor-in-interest to Detroit & Canada Tunnel Corporation, as subtenant, each as may be amended, restated, supplemented or otherwise modified, in any case in form and substance reasonably acceptable to the City and Syncora.

275350. "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

276351. "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

277352. "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

278353. "Unlimited Tax General Obligation Bond ClaimsClaim" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

279354. "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.279354, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related theretoBond Insurance Policies.

-33-

280355.        "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.279354.

281356.        "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

282.        "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 7, 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes.  Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

283357.        "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

358.        "UTGO Exculpated Parties" means, collectively, Ambac, Assured and NPFG, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds, and each of their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

284359.        "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

285360.        "UTGO Settlement" means the comprehensive settlement regarding Unlimited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, the principal terms of which are Agreement" means that certain Settlement Agreement, dated as of July 18, 2014, among the City and the Settling UTGO Bond Insurers, substantially in the form attached hereto as Exhibit I.A.285 and described in Section IV.D360.

286361.        "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

287362.        "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

288.        "Voting Record Date" means the record date fixed by the Bankruptcy Court in the Disclosure Statement Order establishing the Holders of Claims entitled to vote to accept or reject the Plan.

289363.        "Wayne County" means the Charter County of Wayne, Michigan.

**B.        Rules of Interpretation and Computation of Time.**

**1.        Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter

-34-

gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

       **2.**      **Computation of Time.**

       In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS; CRAMDOWN;**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

       Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class.  Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

**A.**      **Unclassified Claims.**

       **1.**      **Payment of Administrative Claims.**

              **a.**      **Administrative Claims in General.**

       Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee ~~(other than the Retiree Committee)~~ or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

-35-

b.    **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition ~~Purchaser~~Financing Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

2.    **Bar Dates for Administrative Claims.**

a.    **General Bar Date Provisions,**

Except as otherwise provided in Section II.A.2.b, Section II.A.2.c or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City ~~pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order,~~ no later than ~~30~~45 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims. The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

b.    **Ordinary Course Claims**

Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to File or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

~~b~~c.    **Claims Under the Postpetition Financing Agreement.**

Holders of Administrative Claims that are Postpetition ~~Purchaser~~Financing Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

~~c~~d.    **No Modification of Bar Date Order.**

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

**B.** **Classified Claims.**

**1.** **Designation of Classes.**

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|-------|------|------------|
| | *Secured Claims* | |
| 1A | All Classes of DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.~~110~~148) | ~~Unimpaired/Nonvoting or Impaired/Voting, as set forth on Exhibit I.A.110~~ Unimpaired |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.~~117~~156) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.~~120~~159) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | ~~Parking Bond~~ Claims Previously Classified in Class 6 Paid in Full | ~~Unimpaired~~N/~~Nonvoting~~A |
| | *Unsecured Claims* | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |

-37-

| CLASS | NAME | IMPAIRMENT |
|-------|------|------------|
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |
| 17 | Indirect 36th District Court Claims | Impaired/Voting |

## 2. Subordination; Reservation of Rights to Reclassify Claims.

Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Except as expressly set forth herein, consistent with section 510(a) of the Bankruptcy Code, nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of a Holder of a Claim to enforce a subordination agreement against any Entity other than the City to the same extent that such agreement is enforceable under applicable nonbankruptcy law. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to re-classifyreclassify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination. For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

## 3. Treatment of Claims.

### a. Class 1A – DWSD Bond Claims.

#### i. Classification and Allowance.

DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.110148, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.110148.

#### ii. Treatment.

##### A. Unimpaired Classes.

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as unimpaired on Exhibit I.A.110 shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim. All votes and elections previously delivered in Class 1A shall not be counted and shall be of no force and effect. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents arising in connection with such Allowed DWSD Bond Claims shall be paid in full in Cash once Allowed. pursuant to the DWSD Tender Order, by agreement of the parties or by order of the Bankruptcy Court. In addition, all claims for fees, costs and expenses authorized pursuant to or in accordance with the DWSD Tender Order shall be paid as provided therein.

##### B. Impaired Classes.

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as impaired on Exhibit I.A.110 shall receive on or as soon as reasonably practicable after the Effective Date, in full satisfaction of such Allowed Claim, at the option of the City, either (1) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder; or (2) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim, unless such Holder agrees

~~to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.~~

~~Treatment Option for Classes that Accept the Plan: Each Holder of an Allowed DWSD Bond Claim in an impaired Class of DWSD Bond Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder in lieu of New DWSD Bonds.~~

~~Accrued and unpaid interest as of the Distribution Date with respect to those DWSD Bonds for which a Holder of an Allowed DWSD Bond Claim receives New DWSD Bonds or New Existing Rate DWSD Bonds pursuant to the Plan shall be, at the option of the City, either (1) paid in Cash on the first Distribution Date following the date on which such DWSD Bond Claim is Allowed or (2) added to the principal amount of the New DWSD Bonds or New Existing Rate DWSD Bonds, as applicable, distributed to such Holder pursuant to the Plan.~~

  **b.**   **Class 1B – DWSD Revolving Sewer Bond Claims**

    **i.**   **Classification and Allowance.**

    DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.~~117~~156, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.~~117~~156.

    **ii.**   **Treatment.**

    On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

  **c.**   **Class 1C – DWSD Revolving Water Bond Claims**

    **i.**   **Classification and Allowance.**

    DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.~~120~~159, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.~~120~~159.

    **ii.**   **Treatment.**

    On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

  **d.**   **Class 2A – Secured GO Series 2010 Claims.**

    On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

#### e. Class 2B – Secured GO Series 2010(A) Claims.

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

#### f. Class 2C – Secured GO Series 2012(A)(2) Claims.

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

#### g. Class 2D – Secured GO Series 2012(A2-B) Claims.

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

#### h. Class 2E - Secured GO Series 2012(B) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

#### i. Class 2F – Secured GO Series 2012(B2) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

#### j. Class 3 – Other Secured Claims.

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

#### k. Class 4 – HUD Installment Note Claims.

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

#### l. Class 5 – COP Swap Claims.

##### i. Allowance.

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

ii.     **Treatment.**

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either: (A) within thirty days following the Effective Date, the Net Amount in full in cash, <u>provided</u> that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, <u>provided</u> that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

m.     **Class 6 — Parking Bond Claims.**

~~On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.~~

[Claims previously classified in Class 6 paid in full – Paragraph intentionally left blank]

n.     **Class 7 – Limited Tax General Obligation Bond Claims.**

i.     **Allowance.**

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $~~163,543,187.86~~163,544,770.

ii.     **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, (A) each Holder of an Allowed Limited Tax General Obligation Bond Claim that is not attributable to the Insured LTGO Bonds and (B) the LTGO Insurer with respect to those Allowed Limited Tax General Obligation Bond Claims attributable to the Insured LTGO Bonds, in full satisfaction of such Allowed ~~Claim~~Claim(s), shall receive, on or as soon as reasonably practicable after the Effective Date, ~~an Unsecured~~(X) a Pro Rata ~~Share of New~~share of, at the City's option, (1) $55,000,000 in Cash or (2) the New LTGO Bonds and (Y) distributions in accordance with Section II.B ~~Notes.~~3.p.i.A.

The City will use its best efforts to prepay the New LTGO Bonds on the Effective Date or as soon as reasonably practicable thereafter from the proceeds of the Exit Facility. If the City cannot prepay all of the New LTGO Bonds on the Effective Date or as soon as reasonably practicable thereafter, the City will use its best efforts to prepay as much of the New LTGO Bonds as reasonably possible, and the LTGO Settlement Parties will accept such partial prepayment. Upon a partial prepayment of the New LTGO Bonds, such New LTGO Bonds will be redeemed by lot.

iii.     **Impact of UTGO Settlement.**

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed Limited Tax General Obligation Bond Claims to recover more on a percentage

-41-

basis on account of such Allowed Limited Tax General Obligation Bond Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

o. **Class 8 – Unlimited Tax General Obligation Bond Claims.**

i. **Allowance.**

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

ii. **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds. Such as set forth in Schedules 1a and 1b to the UTGO Settlement Agreement. Those Holders identified on Schedule 1a of the UTGO Settlement Agreement shall retain ownership of the Reinstated Stub UTGO Bonds, subject to Sections I.A.2336 and IV.DC, which Stub UTGO Bonds shall be reinstated.

p. **Class 9 – COP Claims.**

i. **Disputed.**

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Creditor Representative. If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement.

ii. **Assignment.**

Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of COP Claims that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis, with each beneficial holder deemed to receive such portions of COP Claims in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs. Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.

iiij. **Treatment.**

A. **Plan COP Settlement Option.**

Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to

-42-

~~40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.~~

~~**B.   Non-Settling Holders.**~~

~~Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:~~

~~**1.   Disputed COP Claims Reserve.**~~

On the Effective Date, the City shall ~~establish~~deliver to the ~~Disputed~~ COP ~~Claims Reserve.~~ ~~The Disputed COP Claims Reserve shall contain no less than (a) an Unsecured Pro Rata Share of~~Trustee, solely for the benefit of, and for distribution to, the COP Insurers and the Settling COPs Claimants in accordance with (1) the Supplemental Trust Agreements and (2) the instructions of the applicable COP Insurer, (x) the Class 9 Settlement Asset Pool and (y) New B Notes~~,~~ in the face amount of $97,692,787, based upon each Settling COP Claimant's Pro Rata share calculated as ~~if such Disputed COP Claims were Allowed (i) in~~an amount equal to the proportion that the unpaid principal amount plus accrued prepetition interest of COPs held by such Settling COP Claimant bears to the aggregate unpaid principal amount ~~as of the Petition Date for~~of all COPs plus all accrued prepetition interest thereon; provided, that the allocation of distributions among FGIC COP Holdesr shall be determined in accordance with agreements among FGIC and the FGIC COP Holders disclosed in a term sheet filed in court on October 22, 2014, as the same may be subsequently amended and more fully documented.  For the avoidance of doubt, a Settling COP Claimant shall not be required to transfer (1) any claim against a COP Insurer or (2) the COPs ~~not subject~~it holds to the City pursuant to the Plan COP Settlement or ~~(ii) in such lesser amount as may be required by an order of the Bankruptcy Court, and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.~~otherwise pursuant to the Plan, the Syncora Settlement Documents or the FGIC/COP Settlement Documents.  The COP Service Corporations shall enter into such Supplemental Trust Agreements as FGIC and Syncora may reasonably request with respect to their respective insured COPs as long as such Supplemental Trust Agreements do not impose any additional obligations or liability on the COP Service Corporations.

~~**2.   Distributions From The Disputed COP Claims Reserve.**~~

~~If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve~~The City has granted the LTGO Settlement Parties the right of the holders of Allowed Limited Tax General Obligation Bond Claims in Class 7, and the Retiree Committee consent rights regarding pre-Effective Date settlements of the COP Litigation if and as permitted under applicable non-bankruptcy law.  The LTGO Settlement Parties have consented to the Syncora Settlement and FGIC/COP Settlement.  On the Effective Date, on account of such ~~portion of~~consent rights, the Excess New B Notes.~~  Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve~~ shall be distributed as follows:  ~~(a) an amount of New B Notes and/or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred from and after the Effective Date shall be distributed to the City; (b) following such distribution, 65% of the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed~~1) approximately $42.68 million to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; ~~and (c) following such distribution, the remaining New B Notes and distributions thereon shall revert to the City, provided that the City, in its sole discretion, may choose to distribute such remaining property~~(2) approximately $17.34 million to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in ~~Classes~~Class 7~~, 13 and/or 14.~~; and (3) approximately $4.12 million to be distributed Pro Rata among holders of Allowed Other Unsecured Claims

-43-

in Class 14. With respect to the distribution of the Syncora Excess New B Notes, on April 1, 2015, the City shall pay the interest then due on the Syncora Excess New B Notes and shall also prepay the October 1, 2015 interest payment on the Syncora Excess New B Notes (as a consequence of which, no interest payment shall be made on the Syncora Excess New B Notes on October 1, 2015). The VEBAs may not sell or otherwise transfer their right, title or interest in the Syncora Excess New B Notes prior to October 2, 2015.

As part of the Plan COP Settlement, on or as soon as reasonably practicable after the Effective Date, Syncora shall cause to be paid $500,126.94 in cash to the COP Agent on account of COP Agent Fees. As part of the Plan COP Settlement, FGIC shall cause to be paid to the COP Agent 75.945% of the reasonable COP Agent Fees in cash out of the first proceeds of the distributions to or for the benefit of the FGIC COP Holders.

Nothing in this Section II.B.3.p.i.A shall, or shall be asserted or construed to, affect or prejudice any rights, claims or defenses between the COP Swap Counterparties on the one hand and any Settling COP Claimant (including Syncora, FGIC and the FGIC COP Holders) on the other hand.

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Settling COP Claimant shall, to the fullest extent permitted under law, be deemed to forever release, waive and discharge all Liabilities relating to COP Documents such Settling COP Claimant has, had or may have against the (1) GRS, (2) PFRS or (3) Related Entities of either GRS or PFRS. At the direction of FGIC, which shall be deemed given on the Effective Date, the COP Contract Administrator shall have irrevocably agreed (on behalf of itself, any successors and each FGIC COP Holder) to release and not to sue any COP Holder or any COP Insurer on behalf of any FGIC COP Holder, COP Insurer, the Detroit Retirement Systems Funding Trust 2005 or the Detroit Retirement Systems Funding Trust 2006 in connection with any liability arising in connection with or related to (1) Sections 6.5 and 9.1 of the Contract Administration Agreements, (2) Section 8.03 of the COP Service Contracts, (3) distributions made pursuant to or in connection with this Section II.B.3.p.i.A, (4) the FGIC Settlement or (5) the Syncora Settlement. On the Effective Date, Syncora and FGIC shall, to the fullest extent permitted under law, be deemed to forever mutually release, waive and discharge all liabilities against each other relating to distributions made pursuant to or in connection with this Section II.B.3.p.i.A, Sections 6.5 and 9.1 of the Contract Administration Agreements or Section 8.03 of the COP Service Contracts.

**ii.    Impact of UTGO Settlement.**

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed COP Claims to recover more on a percentage basis on account of such Allowed COP Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

q.    **Class 10 – PFRS Pension Claims.**

i.    **Allowance.**

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

-44-

### ii. Treatment.

#### A. Contributions to PFRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

#### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

#### C. Modification of Benefits for PFRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

#### D. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G F.

#### E. Accrual of Future Benefits.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

#### F. Governance.

On or as soon as reasonably practicable after the Effective Date, PFRS shall establish an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date. The initial independent members

of the Investment Committee established by PFRS shall be (1) Woodrow S. Tyler, (2) McCullough Williams III, (3) Robert C. Smith, (4) Joseph Bogdahn and (5) Rebecca Sorenson.

### G. No Changes in Terms for Ten Years.

Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### H. State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r. Class 11 – GRS Pension Claims.

#### i. Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

#### ii. Treatment.

#### A. Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain City sources, pension-related pension related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution and, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments, the Detroit Public Library and the Detroit Regional Convention Facility Authority. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

-46-

### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.FE.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D. Annuity Savings Fund Recoupment.

#### 1. ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

#### 2. ASF Distribution Recipients.

##### i. Monthly Deduction

TheFor each ASF Distribution Recipient who does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the Annuity Savings Fund Excess Amount will: (A) be calculated for each ASF Distribution Recipient, will then beand converted into monthly annuity amounts based on eachcommon actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, and other factors and will, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (B) then be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checkscheck exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap., if applicable. The total ASF Recoupment from the ASF Distribution Recipient's monthly pension checks over time shall not exceed the amount necessary to amortize the applicable Annuity Savings Fund Excess Amount at 6.75% interest.

##### ii. Single Lump Sum Payment

Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.

No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient.  The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (A) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (B) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.

An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date.  ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check.  If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.  The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

### E.  Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.GF.

### F.  Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

### G.  Governance.

On or as soon as reasonably practicable after the Effective Date, GRS shall establish an Investment Committee shall be established under GRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.  The initial independent members of the Investment Committee established by GRS shall be (1) Kerrie VandenBosch, (2) Doris Ewing, (3) Robert Rietz, (4) David Sowerby and (5) Ken Whipple.

### H.  No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the**

-48-

calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### I.  State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms:  (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### s.  Class 12 – OPEB Claims.

#### i.  Allowance.

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

#### ii.  Treatment.

##### A.  Detroit General VEBA.

Establishment of Detroit General VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.  The Detroit General VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries.  The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.78, and shall, among other things, identify the members of the Detroit General VEBA's initial 108.  With respect to the initial appointment of the board of trustees.  The, the Mayor will appoint one member, and the DRCEA and the Retiree Committee will each be able to appoint three board members in equal numbers, and such appointees will constitute a majority of the.  The DRCEA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the DRCEA, and the Mayor will fill a board member vacancy created by the departure of the member appointed by the Mayor.  The initial members of the Detroit General VEBA board; the City will appoint the remaining members of trustees shall be (1) Floyd Allen, (2) Roger Cheek, (3) Suzanne Daniels Paranjpe, (4) Doris Ewing, (5) Barbara Wise-Johnson, (6) Shirley Lightsey and (7) Thomas Sheehan.  Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA:  On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries.  The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii i.B.2A.

**B. Detroit Police and Fire VEBA.**

Establishment of Detroit Police and Fire VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents. The Detroit Police and Fire VEBA will be governed by a seven member board of trustees that~~and, for the first four years, one additional non-voting, ex-officio member. The board of trustees~~ will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.~~82, and shall, among other things, identify the~~112. With respect to the initial appointment of the board of trustees, the Mayor will appoint one member, and the RDPFFA and the Retiree Committee will each appoint three board members. The RDPMA will appoint the non-voting, ex-officio member. The RDPFFA will fill board member vacancies created by the departure of voting members initially appointed by the Retiree Committee or the RDPFFA, and the Mayor will fill a board member vacancy created by the departure of the member appointed by the Mayor. The RDPMA will fill a non-voting, ex-officio board member vacancy created by the departure of the member initially appointed by the RDPMA, but such non-voting, ex-officio member position shall expire on December 31, 2018. The initial members of the Detroit Police and Fire ~~VEBA's initial~~VEBA board of trustees~~. The initial board members will be appointed by the City, the Retiree Committee and the RDPFFA~~ shall be (1) Floyd Allen, (2) Gregory Best, (3) John Clark, (4) Andrew Dillon, (5) Allan Grant, (6) Thomas Sheehan, (7) Greg Trozak and (8) Shirley Berger (*ex officio*). Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit Police and Fire VEBA: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to ~~contingent~~ additional distributions ~~from the Disputed COP Claims Reserve~~ as set forth in Section II.B.3.p.~~iii~~iii.~~B.2~~A.

**C. No Further Responsibility.**

From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to ~~current or~~ former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen for former employees, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. ~~The Employees Death Benefit Plan will be self liquidating, and existing~~ who is a former employee. Existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

Retirees (and active employees that retire prior to December 31, 2014) of the Detroit Public Library and the Detroit Regional Convention Facility Authority are Detroit General VEBA Beneficiaries and will receive the treatment set forth above. However, the collective bargaining and other legal rights and obligations of the Detroit Public Library and the Detroit Regional Convention Facility Authority, on one hand, and their respective unions and former and current employees, on the other hand, are not affected by the Plan. These parties retain the right to negotiate further or additional benefits; provided, however, that the City shall not be responsible for, or have any obligation with respect to, any such further or additional benefits or the administration thereof. In addition, in consideration of the eligible retirees of the Detroit Public Library and the Detroit Regional Convention Facility Authority participating in the Detroit General VEBA, the Detroit Public

Library and the Detroit Regional Convention Facility Authority shall reimburse the City for their allocable share of the New B Note debt service related to the Detroit General VEBA.

       **t.**       **Class 13 – Downtown Development Authority Claims.**

           **i.**       **Allowance.**

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

           **ii.**       **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, ~~an Unsecured~~a Pro Rata ~~Share of~~share of approximately $3.69 million in New B Notes.

       **u.**       **Class 14 – Other Unsecured Claims.**

           **i.**       **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive: (A) on or as soon as reasonably practicable after the Effective Date, ~~an Unsecured~~a Pro Rata ~~Share of~~share of approximately $16.48 million in New B Notes~~.~~ and (B) distributions in accordance with Section II.B.3.p.i.A.

       **v.**       **Class 15 – Convenience Claims.**

           **i.**       **Treatment.**

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.~~55~~76) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

       **w.**       **Class 16 – Subordinated Claims.**

           **i.**       **Treatment.**

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

       **x.**       **Class 17 – Indirect 36th District Court Claims.**

           **i.**       **Treatment.**

Unless such Holder agrees to a different treatment of its Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive:  (A) if the Allowed amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed amount of such Allowed Indirect 36th District Court Claim; or (B) if the Allowed amount of such Indirect 36th District Court Claim is equal to or more than $100,000.00, Cash equal to 33% of the Allowed amount of such Indirect 36th District

Court Claim, plus simple interest on outstanding amounts at a rate of five percent per annum, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a Business Day, on the first Business Day thereafter.

### ii. Further Obligation of City, State and 36th District Court.

Subject to the terms of the 36th District Court Settlement, the treatment of Allowed Indirect 36th District Court Claims set forth in Section II.B.3.x.i shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims. Nothing in Section II.B.3.x.i prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.

## C. Confirmation Without Acceptance by All Impaired Classes.

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Plan shall constitute a motion for such relief.

## D. Treatment of Executory Contracts and Unexpired Leases.

### 1. Assumption.

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, the City shall assume the Tunnel Lease pursuant to this Section II.D.1.

### 2. Assumption of Ancillary Agreements.

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

### 3. Approval of Assumptions and Assignments.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory

Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

4.      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases.**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5.      **Contracts and Leases Entered Into After the Petition Date.**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6.      **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

7.      **Rejection Damages Bar Date.**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) ~~30~~45 days after the Effective Date; or (b) ~~30~~45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

8. **Preexisting Obligations to the City Under
Rejected Executory Contracts and Unexpired Leases.**

~~Rejection~~Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall ~~not~~ constitute a breach of such contract or lease and not a termination ~~of preexisting~~thereof, and all obligations ~~owed~~owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection.  Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

9. **Insurance Policies.**

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1.  Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies.  For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

## ARTICLE III
## CONFIRMATION OF THE PLAN

A. **Conditions Precedent to the Effective Date.**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1. The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2. The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

3. The Confirmation Order shall not be stayed in any respect.

4. The Confirmation Order shall contain (a) a finding that the FGIC Settlement Consideration and the FGIC Development Agreement are solely for the benefit of FGIC and the FGIC COP Holders (subject to any provision set forth herein for payment of COP Agent Fees), and (b) an ordered provision that such consideration be administered and distributed to FGIC and the FGIC COP Holders in a manner consistent therewith and with the Plan.

5. The Confirmation Order shall contain (a) a finding that the Syncora Development Agreement is solely for the benefit of Syncora (subject to any provision set forth herein for payment of COP Agent Fees), and (b) an ordered provision that such consideration be administered and distributed to Syncora in a manner consistent therewith and with the Plan.

46. All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

57. All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the ~~UTGO~~LTGO Settlement Agreement.

68. Any legislation that must be passed by the ~~Michigan Legislature~~State legislature to effect any term of the Plan shall have been enacted.

79. The ~~Michigan Finance Authority~~MFA board shall have approved the issuance of the Restructured UTGO Bonds and the Restructured UTGO Bonds shall have been issued.

10. The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

811. The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.~~A~~B.

912. If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

13. The Syncora Settlement and the Syncora Settlement Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and Syncora, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

14. The Syncora Development Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and Syncora, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

15. The FGIC/COP Settlement Documents and the FGIC Development Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and FGIC, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

16. The New York State Department of Financial Services shall have waived in writing the notice requirement under FGIC's plan of rehabilitation with respect to the settlement contemplated by the FGIC/COP Settlement Documents and the FGIC Development Agreement in form and substance reasonably acceptable to FGIC, and such waiver shall not have been vacated or otherwise modified.

1017. The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

**B. Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion, except for those conditions set forth in (1) Section III.A.9 and Section III.A.10, which conditions cannot be waived, (2) Sections III.A.5, III.A.13 and III.A.14, which may only be waived by the City with the prior written consent of Syncora, (3) Sections III.A.4 and III.A.15, which may only be waived by the City with the prior written consent of FGIC and (4) Section III.A.16,

-55-

which may be waived by the City at any time on or after November 4, 2014 at 5:00 p.m. (Eastern Time) with the prior written consent of FGIC.

**C.  Effect of Nonoccurrence of Conditions to the Effective Date.**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then ~~upon motion by the City made~~, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the ~~Confirmation Order will be vacated by~~City may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.C:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

**D.  Effect of Confirmation of the Plan.**

**1.  Dissolution of Retiree Committee.**

~~Following~~On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case~~, provided, however, that, if and only if the Retiree Committee is the Creditor Representative under the Plan, the Retiree Committee shall continue to exist solely for the purposes of objecting to or otherwise asserting the City's or its creditors' rights with respect to Disputed COP Claims pursuant to Section II.B.3.p.i.  If the Retiree Committee is the Creditor Representative, it shall be disbanded upon the final resolution of all Disputed COP Claims or pursuant to an order of the Bankruptcy Court, which order may be sought by the City for good cause shown.  All fees and expenses of the Creditor Representative shall be subject to the approval of the City.  All disputes relating to the approval of fees and expenses shall be determined by the Bankruptcy Court.  No party to any such dispute shall have any right to appeal an order of the Bankruptcy Court resolving any such dispute.~~.

**2.  Preservation of Rights of Action by the City.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans ~~and~~/or assets), to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court.  A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2.  The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

**3.  Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all

-56-

claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable. For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

4. **Discharge of Claims.**

a. **Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

b. **Discharge.**

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all ~~Claims and other~~ debts ~~and Liabilities against~~of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged ~~Claim~~debt; provided that such discharge will not apply to (i) ~~Claims~~debts specifically exempted from discharge under the Plan; and (ii) ~~Claims~~debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

5. **Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

a. **all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

1. **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims~~,~~ and (C) Indirect Employee Indemnity Claims);**

2. **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

-57-

**3.** creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;

**4.** asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;

**5.** proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

**6.** taking any actions to interfere with the implementation or consummation of the Plan.

**b.** All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.  Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

**6.** **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided, however that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement), (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order, (d) the Syncora Exculpated Parties solely in connection with acts or omissions taken in connection with the Syncora Settlement Documents and any actions or litigation positions taken by the Syncora Exculpated Parties in the Chapter 9 Case, (e) the FGIC/COP Exculpated Parties solely in connection with acts or omissions taken in connection with the FGIC/COP Settlement Documents and any actions or litigation positions taken by the FGIC/COP Exculpated Parties in the Chapter 9 Case, (f) the RDPMA Exculpated Parties and (g) the COP Agent, solely in its capacity as such and solely in connection with any Distributions made pursuant to the terms of the Plan; provided,

further, that the foregoing provisions in this Section III.D.6 shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date.  The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan.  This Section III.D.6 shall not affect any liability of (a) any of the COP Swap Exculpated Parties to the Syncora Exculpated Parties or FGIC or (b) the Syncora Exculpated Parties or FGIC/COP Exculpated Parties to any of the COP Swap Exculpated Parties.

> **7.**    **Releases**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

> > a.    each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

> > > i.    all Liabilities in any way relating to the City, the Chapter 9 Case, (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such entityholder has, had or may have against the City, its Related Entities, the State, the State Related Entities and the Released Parties (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code), or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); provided further, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

> > > ii.    all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided, however, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; provided further that this Section III.D.7.a shall not apply to any Exculpated Party; and provided further,

however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; andprovided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

b.      if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees and/or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law and/or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order. For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds. For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds.

E.      **No Diminution of State Power**

No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the

federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the ~~State's~~State's exercise of such rights.

## F.    Effectiveness of the Plan.

The Plan shall become effective on the Effective Date.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## G.    Binding Effect of Plan.

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

## A.    DWSD.

### 1.    Rates and Revenues.

DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues.  Rates will be determined by the Board of Water Commissioners or, if a DWSD Authority is formed and approved by the incorporating units' governing bodies, by the board of any such DWSD Authority.  The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

### 2.    DWSD CBAs.

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

### 3.    Potential DWSD Authority Transaction.

As a result of mediation or otherwise, it is possible that the City may enter into a DWSD Authority Transaction that includes the formation of the DWSD Authority to conduct many or all of the operations currently conducted by DWSD.  Any such transaction would be subject to the approval of incorporating units and numerous other conditions.  The timing of any such transaction, if it occurs at all, is not known.  If any such transaction could occur, unless waived by the City in its sole discretion, the City will enter into such transaction only if Macomb County, Oakland County and Wayne County, and each of their municipal affiliates or related public corporations, withdraw with prejudice or shall have withdrawn with prejudice their objections to the Confirmation of the Plan.  Any DWSD Authority Transaction shall be on terms that are consistent with all other provisions of the Plan, applicable law and orders of the Bankruptcy Court.  The City

shall not enter into any binding agreement with respect to or consummate any DWSD Authority Transaction prior to the Effective Date without first obtaining an order of the Bankruptcy Court approving and authorizing such DWSD Authority Transaction.

All terms and conditions in respect of any DWSD Authority Transaction set forth in (a) any DWSD Bond Document or (b) any transaction document in respect of such a DWSD Authority Transaction shall in any case include: (i) no material modifications to the source of payment and security for any DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (ii) an opinion of tax counsel that such transfer shall have no material adverse effect on the tax exempt status of the interest on the DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (iii) that the City could issue at least $1 of additional new money DWSD Bonds in compliance with the additional bonds test set forth in the applicable DWSD Bond Documents; and (iv) ratings confirmation of any rating agency then rating the DWSD Bonds and 2014 Revenue and Revenue Refinancing Bonds.  A DWSD Authority Transaction shall not affect, impair, modify or otherwise alter the rights of any party under the DWSD Tender Order, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the 2014 DWSD Refinancing Obligations, the 2014 Revenue and Revenue Refinancing Bonds or the 2014 Revenue Refinancing Bonds or any Bond Insurance Policy related to or issued in connection with any of the foregoing.

**~~3~~B.** **The New ~~DWSD Bonds~~B Notes, New C Notes and New ~~Existing Rate DWSD~~LTGO Bonds.**

~~DWSD~~On or before the Effective Date, the City shall~~, as necessary:~~ (a) execute the New ~~DWSD Bond~~B Notes Documents, issue the New ~~DWSD Bonds~~B Notes, substantially on the terms set forth on Exhibit I.A.~~186~~246, and distribute the New ~~DWSD Bonds~~B Notes as set forth in the Plan; ~~and~~ (b) execute the New ~~Existing Rate DWSD Bond~~C Notes Documents, issue the New ~~Existing Rate DWSD Bonds~~C Notes, substantially on the terms set forth on Exhibit I.A.~~188~~248 (and in any case in form and substance reasonably acceptable to the City and Syncora), and distribute the New ~~Existing Rate DWSD Bonds~~C Notes as set forth in the Plan.

; and (c) ~~B.~~ ~~The New B Notes.~~

~~On the Effective Date, the City shall~~ execute the New ~~B Notes~~LTGO Bond Documents, issue the New ~~B Notes~~LTGO Bonds, substantially on the terms set forth on Exhibit I.A.~~183~~237, and distribute the New ~~B Notes~~LTGO Bonds as set forth in the Plan.

**C.** **The ~~Plan COP~~UTGO Settlement.**

~~The City shall consummate the Plan COP Settlement on the Effective Date, substantially on the terms set forth on Exhibit I.A.214.  Settling COP Claimants shall receive the treatment described in Section II.B.3.p.iii.A.~~

~~D.~~ ~~The UTGO Settlement.~~

~~The~~On the Effective Date, the City and the Settling UTGO Bond Insurers shall consummate the UTGO Settlement ~~on the Effective Date, substantially on the terms set forth on~~Agreement, a copy of which is attached hereto as Exhibit I.A.~~285~~360.  The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement Agreement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019.  The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the UTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement Agreement, among other things:  (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the ~~Municipal Finance Authority~~MFA, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of $279,618,950 of the Restructured UTGO Bonds as set forth in Schedule 1a of the UTGO Settlement Agreement; (4) the Settling UTGO Bond Insurers and the Non-Settling

UTGO Bond Insurer shall be entitled to receive $7,941,840 of the Restructured UTGO Bonds as set forth in Schedule 1b to the UTGO Settlement Agreement; and (45) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

Each Settling UTGO Bond Insurer shall receive, as soon as reasonably practicable after the occurrence of a Trigger Event, its allocable share of the Top-Off Payments in accordance with the terms of the UTGO Settlement Agreement.

**ED.     The State Contribution Agreement.**

OnPrior to or on the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City, GRS, PFRS and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.268332.

**1.     State Contribution.**

The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

**2.     Income Stabilization Payments.**

The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State. Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus. The Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner. In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System. In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

**3.     Conditions to State's Participation.**

The State's payment of the State Contribution by the State or the State's authorized agent is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following: (a) the Confirmation Order becoming a Final Order no later than September 30December 31, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement, including a requirement that the governing documents of GRS and PFRS be amended to include (i) the governance terms and conditions set forth in the State Contribution Agreement and

(ii) the Income Stabilization Funds and Income Stabilization Payments; (b) the occurrence of the Effective Date no later than ~~December 31~~April 1, ~~2014~~2015; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, or equivalent assurances of finality of such litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City, (i) challenging PA 436 or any actions taken pursuant to PA 436 ~~as it relates to the City~~ or (ii) seeking to enforce Article IX, Section 24 of the Michigan Constitution, ~~or equivalent assurances of finality of such litigation~~; (g) ~~a firm~~evidence satisfactory to the State of an irrevocable commitment by the Foundations ~~to contribute an aggregate amount of not less than $366 million to fund~~(excluding the Special Foundation Funders, as that term is defined in the DIA Settlement~~; (h) a firm~~ Documents) to fund $366 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1; and (h) evidence satisfactory to the State of an irrevocable commitment by DIA Corp. to ~~raise at least~~fund $100 million ~~from its donors to fund~~(or the net present value thereof) as part of the DIA Settlement~~; (i) assurances that the State Contribution may only be used to fund payments to Holders of Pension Claims in accordance with the terms of the State Contribution Agreement; (j) assurances that the Retirement Systems must at all times during the 20 years following the Effective Date maintain an Investment Committee for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees and/or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement; (k) assurances that an income stabilization program will be operated; (l) assurances that the provisions of the State Contribution Agreement regarding governance of the Retirement Systems will be approved; (m) the execution of the State Contribution Agreement acceptable in form and substance to the City and the State; and (n) the passage of legislation prior to Confirmation authorizing the State Contribution~~, as provided in Section IV.E.1.

The State shall File and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

4.        Release of Claims Against the State and State Related Entities.

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

~~F~~E.        The DIA Settlement.

On the Effective Date, the City~~,~~ and the ~~Foundations and~~ DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties that are such as of the Effective Date have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA ~~Assets~~ to remain in the City in perpetuity, as described in and subject to the terms and conditions of the DIA Settlement Documents, and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The DIA Settlement Documents attached hereto as Exhibit I.A.~~92~~127 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.~~91~~126. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019.

-64-

1.     **Funding Contributions.**

The DIA Settlement will be funded as follows:  (a) ~~an~~ irrevocable ~~commitment~~commitments in an aggregate amount of at least $366 million by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents); and (b) in addition to its continuing commitments outside of the DIA Settlement, ~~an~~ irrevocable ~~commitment from DIA Corp. to raise at least~~commitments in an aggregate amount of $100 million from ~~its donors~~ (the DIA Direct Funders (including the commitment of the Special Foundation Funders, as that term is defined in the DIA Settlement Documents, and subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents.  The foregoing commitments shall be funded over the course of the 20- year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to ~~an~~the "Agreed Required Minimum Schedule" and subject to the option at any time for the "Present Value Discount," as set forth in ~~Exhibit I.A.9‑1~~the DIA Settlement Documents.  Amounts committed by the Foundations and the DIA Direct Funders will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

2.     **Transfer of DIA Assets.**

On the Effective Date, the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

3.     **Conditions to the ~~Foundations~~DIA Funding Parties' Participation.**

The DIA Funding Parties' participation in the DIA Settlement is conditioned upon, among other things, the following:  (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.~~F~~E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.~~F~~E.2; (e) ~~the existence of appropriate governance and oversight structures at DIA Corp. that include representation of the City, the DIA Funding Parties and other stakeholders~~approval by the DIA's Board of Directors and the taking effect of the recommendation of the governance committee as described in Exhibit I.A.12~~6~~; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the ~~existence of appropriate~~adoption of prospective governance and financial oversight mechanisms for the Retirement Systems that are reasonably satisfactory to the DIA Funding Parties; (h) the ~~affirmation by County~~amendment by DIA Corp. and the art institute authority for each of Macomb County, Oakland County and Wayne County, Michigan of each art institute authority's respective service agreement so that the termination of the 1997 Operating Agreement between the City and DIA Corp. will not affect the art institute authorities ~~of certain existing funding~~' obligations ~~with respect~~under such agreements to pay millage proceeds to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution ~~in an aggregate amount of $350 million;~~ ~~(k) the occurrence of the Effective Date no later than December 31, 2014;~~ and (~~l~~k) the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

~~G~~F.     **Contingent Payment Rights**

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust.  The City shall issue the DWSD CVR to the Restoration Trust.  If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire.  The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities:  (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA

benefits restored; and (3) third, 53% to GRS and 47% to PFRS. If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made. The DWSD CVR may not be transferred.

### 1. Special Restoration

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration. In such case, the City will perform a Value Determination and arrive at the Discounted Value. The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable. In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C. In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored. In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate. In the event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction. Neither the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

### 2. General Restoration

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

### ~~H~~G. The OPEB Settlement~~.~~

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims~~. The Plan reflects~~, the terms of ~~that~~which settlement are reflected in the Plan. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

### H. The LTGO Settlement.

The City, the LTGO Insurer and BlackRock Financial Management have reached a settlement related to the treatment of Allowed Limited Tax General Obligation Bond Claims, the terms of which settlement are reflected in the Plan. Pursuant to the LTGO Settlement Agreement, Distributions attributable to the Insured LTGO Bonds shall be made to the LTGO Distribution Agent (as opposed to directly to the record owners of the

Insured LTGO Bonds or to the LTGO Insurer) for the benefit of the record owners of the Insured LTGO Bonds in accordance with the LTGO Settlement Agreement. In the event that the City intends to redeem the principal amount of New LTGO Notes during any time that the Insured LTGO Bonds are outstanding, the City and the LTGO Distribution Agent shall be required to take certain actions as described in the LTGO Settlement Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the LTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

## I.     The Syncora Settlement

The City and Syncora have reached a settlement effecting a global resolution of all matters and litigation between the parties related to the Chapter 9 Case, as set forth in the Syncora Settlement Documents (the terms of which qualify and control over any description of the Syncora Settlement contained herein). Pursuant to the Syncora Settlement, and in accordance with the Plan, among other things: (1) the City shall, pursuant to Section II.D.1, assume the Tunnel Lease; (2) the parties shall enter into the Syncora Development Agreement; (3) the parties shall dismiss or withdraw the Dismissed Syncora Litigation as set forth in the Syncora Settlement Agreement; (4) any vote cast by Syncora to reject the Plan shall be deemed a vote to accept the Plan; (5) Syncora shall support Confirmation; and (6) on the Effective Date or as soon thereafter as practical, the City shall pay the sum of $5 million in full satisfaction of all of Claims filed or asserted against the City by Syncora relating to the COP Swap Agreements and any agreements related thereto, including the COP Syncora Swap Insurance Policies and the COP Swap Collateral Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving and authorizing the parties to enter into, (1) the Syncora Settlement pursuant to Bankruptcy Rule 9019 and (2) the related Syncora Development Agreement (including the garage option) and the Tunnel Lease. The City shall not amend the Plan in any way that adversely affects Syncora without Syncora's prior written consent.

## J.     The FGIC/COP Settlement

The City and FGIC have reached a settlement effecting a global resolution of all matters and litigation between the parties related to the Chapter 9 Case, as set forth in the FGIC/COP Settlement Documents (the terms of which qualify and control over any description of the FGIC/COP Settlement contained herein). Pursuant to the FGIC/COP Settlement, and in accordance with the Plan, among other things: (1) the City and the Developer, for the benefit of FGIC and the FGIC COP Holders, shall enter into the FGIC Development Agreement; (2) FGIC shall, on behalf of the FGIC COP Holders, become a Settling COP Claimant with respect to all COPs and COP Claims associated with COPs originally insured by FGIC; (3) the parties shall dismiss or withdraw the Dismissed FGIC/COP Litigation as set forth in the FGIC/COP Settlement Documents; (4) except for Excluded Actions, FGIC shall waive any claims it may have against any other party related to the Dismissed FGIC/COP Litigation as set forth in the FGIC/COP Settlement Documents; (5) any vote cast by FGIC to reject the Plan shall be deemed a vote to accept the Plan; and (6) in full satisfaction and discharge of FGIC's claims against the City related to FGIC's Swap Insurance Policies, (a) FGIC shall receive an Allowed Class 14 Claim in the amount of $6.15 million, entitling FGIC to receive the Distributions provided pursuant to Section II.B.3.u.i and (b) the DDA shall assign to FGIC all of its right, title and interest to the New B Notes to be distributed to the DDA pursuant to Section II.B.3.t.ii. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving and authorizing the parties to enter into, (1) the FGIC/COP Settlement pursuant to Bankruptcy Rule 9019 and (2) the related FGIC Development Agreement. The City shall not amend the Plan in any way that adversely affects FGIC without FGIC's prior written consent.

## 1K.    Issuance of the New Securities.

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities will beas contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. The New Securities (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation., and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate"

-67-

of the City or applicable issuer as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

**J̶L.** **Cancellation of Existing Bonds ̶a̶n̶d̶, Bond Documents, COPs and COP Documents.**

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts pursuant to Section II.D), on the Effective Date, the Bonds ̶a̶n̶d̶, the Bond Documents, the COPs and the COP Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the parties to the City, as applicable, under the Bonds ̶a̶n̶d̶, the Bond Documents, the COPs and the COP Documents shall be discharged; provided, however, that the Bonds ̶a̶n̶d̶, the Bond Documents, the COPs and the COP Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent, contract administrator or similar entity under the Bond Documents or COP Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents or COP Documents, as applicable, and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution ̶a̶n̶d̶, (iii) to set forth the terms and conditions applicable to parties to the Bond Documents and COP Documents other than the City, (iv) as may be necessary to preserve any claim by (1) a Bondholder ̶a̶n̶d̶/or Bond Agent under a Bond Insurance Policy or against any Bond Insurer, (2) a COPs Holder or COP Agent under a COP Insurance Policy or against any COP Insurer or (3) a COP Swap Counterparty under a Swap Insurance Policy or against any insurer thereunder and (v) with respect to any obligation of any party (other than the City, except to the extent provided in the COP Swap Settlement or the COP Swap Settlement Approval Order) under any COP Document related to such party's obligations owed in respect of the COP Swap Documents or the COP Swap Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan (or the COP Swap Settlement or the COP Swap Settlement Approval Order), such Bonds ̶a̶n̶d̶/̶o̶r̶, Bond Documents, COPs or COP Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders ̶a̶n̶d̶/or Bond Agents with respect to claims under applicable Bond Insurance Policies ̶a̶n̶d̶/or against the Bond Insurers ̶o̶r̶, (b) COPs Holders ̶o̶for COP ̶C̶l̶a̶i̶m̶s̶Agent with respect to claims under ̶a̶p̶p̶l̶i̶c̶a̶b̶l̶e̶ ̶p̶o̶l̶i̶c̶i̶e̶s̶ ̶a̶n̶d̶/̶o̶r̶ ̶o̶t̶h̶e̶r̶ ̶i̶n̶s̶t̶r̶u̶m̶e̶n̶t̶s̶ ̶i̶n̶s̶u̶r̶i̶n̶g̶ ̶t̶h̶e̶ ̶C̶O̶P̶s̶COP Insurance Policies and obligations related thereto or (c) COP Swap Counterparties with respect to claims under Swap Insurance Policies and obligations related thereto. For the avoidance of doubt, except for the immediately preceding sentence, this Section IV.L shall not apply to any Bonds that are Reinstated pursuant to Section II.B.3.a.ii. As of the Effective Date, the principal amounts of the COPs originally insured by FGIC shall be deemed accelerated and due and payable, and no interest on the COPs originally insured by FGIC shall accrue thereafter, solely for the purposes of determining distributions from the COP Trustee to holders of COPs originally insured by FGIC. The foregoing acceleration of principal and cessation of interest shall affect only the rights of each holder of COPs originally insured by FGIC to the receipt of proceeds of distributions under the Plan and not the rights of each such COPs holder against FGIC or shall not in any way modify payments currently required of FGIC under its existing insurance policies or FGIC's Plan of Rehabilitation.

**K̶M.** **Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be

authorized to execute and file on behalf of creditors Form UCC-3 ~~Termination Statements~~termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.~~K~~M.

**N.    Professional Fees**

    **~~L~~1.**    **Professional Fee Reserve**

        On the Effective Date, the City shall establish and fund the Professional Fee Reserve. ~~The Professional Fee Reserve shall be funded~~ from the General Fund or, where applicable, the DWSD's funds, in an amount determined by the City to be sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds.  The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals and the Fee Examiner Parties as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks); (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve; and (c) an estimate of the Fee Examiner Parties' unbilled fees and expenses through the projected date of dismissal of the Fee Examiner under Section IV.N.3, as determined by the City in consultation with the Fee Examiner.  The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties.  Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund~~.~~ or the DWSD's funds, as applicable.  If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

    **2.**    **Fee Review Order**

        The Fee Examiner shall review all fees and expenses of the Fee Review Professionals for the period from the Petition Date and ending on the Effective Date in accordance with the terms of the Fee Review Order.  For the avoidance of doubt, the Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses; provided, however, that all fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Bankruptcy Court pursuant to the terms of the Fee Review Order.

    **3.**    **Dismissal of the Fee Examiner**

        Once the Fee Examiner completes his review of all Fee Review Professional Fees and submits or Files all reports related thereto as required by the Fee Review Order, the Fee Examiner shall be dismissed of all duties and obligations under the Fee Examiner Order and the Fee Review Order, other than any obligations of confidentiality thereunder.  The confidentiality obligations of the Fee Examiner and the other Fee Examiner Parties, including the confidentiality obligations set forth in paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date.

    **4.**    **Potential Review of Fees Not Subject to Fee Review Order**

        The City shall have the right to bring before the Bankruptcy Court a request to review and determine the reasonableness of the fees and expenses of any Fee Review Professional retained by a creditor of the City or any of its departments to the extent that such fees and expenses have not been either (a) approved

pursuant to or in accordance with the DWSD Tender Order, (b) subject to court review or (c) subject to a Bankruptcy Court-approved or agreed upon process for binding arbitration.

**5.     Court-Appointed Expert**

The Court-appointed expert, Martha E. M. Kopacz of Phoenix Management Services, and her counsel shall be compensated for any reasonable fees and expenses incurred through the Confirmation Date in accordance with the terms of the Court's Order Appointing Expert Witness (Docket No. 4215), entered on April 22, 2014, as amended.

**~~M~~O.     Assumption of Indemnification Obligations.**

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that this Section IV.~~M~~O shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5.  Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.  For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.~~M~~O.

**~~N~~P.     Incorporation of Retiree Health Care Settlement Agreement.**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.~~236~~298, are incorporated herein by reference and shall be binding upon the parties thereto.

**~~O~~Q.     Payment of Workers' Compensation Claims.**

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law.  The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

**R.     36th District Court Settlement.**

The City and the Settling 36th District Court Claimants have reached a settlement related to (1) the allowance of certain of the Settling 36th District Court Claimants' Claims and (2) the treatment of Allowed Indirect 36th District Court Claims under the Plan substantially on the terms attached hereto as Exhibit I.A.9.  The 36th District Court Settlement is incorporated into the Plan, which shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

**P̶S.**     **Payment of Certain Claims Relating to the Operation of City Motor Vehicles.**

~~If the City determines to maintain self-insurance with respect to the operation of its motor vehicles in a notice Filed not less than ten days before the Confirmation Hearing, this Section IV.P will apply. Subject to the foregoing, from~~From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows:  (1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable).  ~~If this Section IV.P becomes effective, nothing~~Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1).  The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.P̶S, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

**Q̶T.**     **Payment of Tax Refund Claims.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures.  The City expressly reserves the right to challenge the validity of any claim for an income tax refund ~~and/~~or property tax refund.

**R̶U.**     **Utility Deposits.**

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

**S̶V.**     **Pass-Through Obligations.**

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**T̶W.**     **Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

**U̶X.**     **Post-Effective Date Governance.**

Prior to or on the Effective Date, ~~a financial oversight board~~the Financial Review Commission shall be established pursuant to and in accordance with ~~State law now in effect or hereafter enacted~~the Financial

Review Commission Act. The Financial Review Commission shall provide oversight as set forth in the Financial Review Commission Act, including to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that ~~should result in~~promote more efficient and effective delivery of services to City residents. The ~~financial oversight board shall be composed of individuals with recognized financial competence and experience and shall have the authority to, among other things, impose limits on City borrowing and expenditures and require the use of financial best practices.~~City shall promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission. Nothing herein shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

# ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**A.  Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.  Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent, the Bond Agent or the COP Agent, as applicable, the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**C.  Certain Claims to Be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.  Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set

forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.      Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**F.      Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

**G.      Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City. For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

**H.      City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

**I.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.      Delivery of Distributions Generally.**

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

-73-

2.    **Delivery of Distributions on Account of Bond Claims.**

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery ~~and/~~or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

3.    **De Minimis Distributions / No Fractional New Securities.**

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

4.    **Undeliverable or Unclaimed Distributions.**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5.    **Time Bar to Cash Payment Rights.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

J.    **Other Provisions Applicable to Distributions in All Classes.**

1.    **No Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been

accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

## 2. Compliance with Tax Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 and/or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

## 3. Allocation of Distributions.

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

## 4. Surrender of Instruments.

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, there shall be no requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make and/or preserve a claim under any applicable policies and/or other instruments insuring the COPs and obligations related thereto or against any

-75-

party, other than the City, that insures the COPs. Notwithstanding the foregoing, such Bonds ~~and/~~or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

# ARTICLE VI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### A. Treatment of Disputed Claims.

#### 1. General.

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

#### 2. ADR Procedures.

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

#### 3. Tort Claims.

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction ~~selected by the City~~ that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court no later than 30 days after the Claims Objection Bar Date seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim, which right and the deadline for exercising such right shall be set forth in the notice of entry of the Confirmation Order.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from

-76-

proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan and subject to the terms of the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

**B.      Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. ~~Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.p.iii.~~

**C.      Objections to Claims.**

**1.      Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. ~~Except as otherwise provided in Section II.B.3.p.i with respect to Disputed COP Claims, as~~As of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

**~~2.      Application of Bankruptcy Rules.~~**

~~To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to claims notwithstanding Bankruptcy Rule 3007(c).~~

**~~3~~2.      Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

-77-

**43.**      **Extension of Claims Objection Bar Date.**

     Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

**54.**      **Authority to Amend List of Creditors.**

     The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

     Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

     A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

     B.      ~~Enforce~~Confirm the ~~term (~~maturity~~)~~ date and the terms as written of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, ~~notwithstanding any~~which agreements are incorporated as part of the Plan (it being understood that the enforcement, interpretation and resolution of disputes of the terms of the contracts shall proceed under applicable state law ~~to the contrary~~);

     C.      Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

     D.      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

     E.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

     F.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

     G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

-78-

H.     Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.     Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.     Adjudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

JK.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

KL.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

M.     Resolve any matters, cases, controversies, suits or disputes that may arise in connection with the FGIC Development Agreement;

N.     Resolve any matters, cases, controversies, suits or disputes that may arise in connection with the Syncora Development Agreement

LO.     Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

MP.     Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

NQ.     Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

**ARTICLE VIII**
**MISCELLANEOUS PROVISIONS**

**A.     Plan Supplements.**

All Plan Supplements not previously filed will be Filed no later than ten days before the Confirmation Hearing.

**AB.     Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted

-79-

the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**BC.** **Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be: (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

**C.** **Disclosure of Amounts to Be Paid for Chapter 9 Case Services.**

No later than five days before the Confirmation Hearing, (1) the City shall File a statement of all amounts to be paid by it for services or expenses in the Chapter 9 Case or incident to the Plan; and (2) as applicable, all other persons shall File statements of all amounts to be paid by them for services or expenses in the Chapter 9 Case or incident to the Plan. Pursuant to section 943(b)(3) of the Bankruptcy Code, the Bankruptcy Court must approve such amounts as reasonable as a condition to Confirmation.

**D.** **Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

**E.** **Effectuating Documents and Transactions.**

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City. On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

**F.** **Successors and Assigns.**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

-80-

**G.     Plan Controls.**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

**H.     Notice of the Effective Date.**

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

**I.     Governing Law.**

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

**J.     Request for Waiver of Automatic Stay of Confirmation Order.**

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

**K.     Term of Existing Injunctions and Stays.**

**All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**L.     Service of Documents**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

**1.     The City**

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

(Counsel to the City)

2.      **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone:  (202) 408-6400
Facsimile:  (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone:  (248) 971-1711
Facsimile:  (248) 971-1801

(Counsel to the Retiree Committee)

Dated: ~~May 5~~October 22, 2014          Respectfully submitted,

The City of Detroit, Michigan


By:      /s/  Kevyn D. Orr
Name:  Kevyn D. Orr
Title:    Emergency Manager for the City of Detroit, Michigan

COUNSEL:


 /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

# EXHIBIT C

**EXHIBIT I.A.66**

SCHEDULE OF CLASS 9 ELIGIBLE CITY ASSETS

**Schedule of Class 9 Eligible City Assets**

1.  Joe Louis Arena - 600 Civic Center Dr, 48226.

21.        RFP for City Parking Assets.

32.        Any City-owned real property asset within a 3-mile radius of the terminus of the
           Detroit Windsor Tunnel in Detroit, Michigan; excluding all real property assets subject to
           the Development Agreement.

**EXHIBIT I.A.108**

FORM OF DETROIT GENERAL VEBA TRUST AGREEMENT

## CITY OF DETROIT GENERAL RETIREE HEALTH CARE TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among the City of Detroit ("Detroit" or the "City"), [_____ Bank] (the "Bank"), and the undersigned individual trustees ("Individual Trustees").

W I T N E S S E T H:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (the "Plan of Adjustment"), the City agreed to establish a voluntary employees beneficiary association ("VEBA") to provide health care benefits to certain retirees and their Eligible Dependents;

WHEREAS, Detroit hereby establishes this City of Detroit General Retiree Health Care Trust (the "Trust");

WHEREAS, the undersigned Individual Trustees constituting the Board of Trustees shall be responsible for: (i) managing the property held by, and administration of, this Trust; and (ii) designing, adopting, maintaining and administering the "Health Care Plan for General Retirees of the City of Detroit" (the "Plan"), through which all health care benefits to the Trust's beneficiaries shall be provided;

WHEREAS, the Board of Trustees is willing to exercise the authority granted to it herein with regard to the Trust and Plan;

WHEREAS, through this Trust Agreement, Detroit intends to designate the Bank to serve in the capacity of the institutional trustee with respect to the Trust and to maintain custody of the Trust assets;

WHEREAS, the Bank is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement; and

WHEREAS, the Trust and the interdependent Plan are intended to comply with the requirements of section 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), and are together intended to constitute a "governmental plan" within the meaning of section 3(32) of the Employee Retirement Income Security Act of 1974;

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the Bank agree as follows:

<strong>ARTICLE I<br>DEFINITIONS</strong>

Section 1.1  <u>Bank</u>. The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed

by the Board in accordance with Section 7.3. Any corporation continuing as the result of any merger or consolidation to which the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed automatically to be continuing as the Bank.

Section 1.2    Board of Trustees or Board. The Board of Trustees is the body described in Article VIII to which Detroit has delegated responsibility for: (i) managing the property held by, and administering, this Trust; and (ii) designing, adopting, maintaining and administering the Plan, through which all benefits to the Trust's beneficiaries shall be provided. It shall be constituted and operated in accordance with Article IX.

Section 1.3    Code. The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.4    Detroit General VEBA Beneficiary. Has the meaning given to that term in the Plan of Adjustment.

Section 1.5    Eligible Dependent. An Eligible Retiree Member's dependent, within the meaning of Code section 501(c)(9) and the regulations promulgated thereunder, who is eligible to receive benefits under the Plan in accordance with its terms.

Section 1.6    Eligible Retiree Member. A former employee of Detroit, the Detroit Public Library, or the Detroit Regional Convention Facility Authority who is a Detroit General VEBA Beneficiary.

~~Section 1.7    Investment Act. Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws, as amended, which governs the investment of assets of public employee retirement systems or plans.~~

Section ~~1.8~~1.7 Investment Manager. An investment manager appointed by the Board or its successor in accordance with the provisions of Section 9.4 hereof

Section ~~1.9~~1.8 New B Notes. Has the meaning given to that term in the Plan of Adjustment.

Section ~~1.10~~1.9    OPEB Claims Notes. The New B Notes the City is required to contribute to the Trust pursuant to the Plan of Adjustment.

Section ~~1.11~~1.10    Other Supporting Organization. An organization other than the City, the Rate Stabilization Fund, or the Supporting Organization, having voluntarily contributed funds in excess of **[$500,000]** to the Trust on or after the Effective Date.

Section ~~1.12~~1.11    Participant. An Eligible Retiree Member or Eligible Dependent who is entitled to health care benefits pursuant to the terms of the Plan.

Section ~~1.13~~1.12    Plan. The Health Care Plan for Retirees of the City of Detroit, to be adopted and thereafter amended from time to time by the Board, as specified herein, and which will provide health care benefits permitted to be provided by a VEBA under Code section 501(c)(9).

Section ~~1.14~~1.13  <u>Plan of Adjustment</u>.  The Plan for the Adjustment of Debts of the City of Detroit.

Section ~~1.15~~1.14  <u>Rate Stabilization Fund</u>.  The Rate Stabilization Reserves Fund maintained under the control of the Governing Board of the City of Detroit Employee Benefits Plan established pursuant to Title 9, Chapter VIII of the Charter of the City of Detroit for the exclusive purpose of providing hospital, surgical, and death benefits for current or former employees of the City.

Section ~~1.16~~1.15  <u>Supporting Organization</u>.  The Foundation for Detroit's Future, a not for profit that is created to collect certain contributions and make an annual contribution to an escrow account as described in Section 3.2, or the successor to such not for profit.  The Supporting Organization was created to receive funds from organizations, including those listed in Exhibit B, and allocate such funds in the amounts described in Exhibit B, to, among other entities, this Trust Fund.

Section ~~1.17~~1.16  <u>Trust Agreement</u>.  This agreement as it may be amended thereafter from time to time by the parties hereto in accordance with the terms hereof.

Section ~~1.18~~1.17  <u>Trust or Trust Fund</u>.  The City of Detroit General Retiree Health Care Trust established by this Trust Agreement, comprising all property or interests in property held by the Bank from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1  <u>Purpose</u>.  The Trust is established for the purpose of providing life, sickness, accident, and other similar benefits, directly, through the purchase of insurance, or by reimbursement of expenses, to the Participants in accordance with the Plan and consistent with Section 501(c)(9) of the Code and the regulations and other guidance promulgated thereunder.  The Trust, together with the Plan, is intended to constitute a VEBA under Section 501(c)(9) of the Code.

Section 2.2  <u>Receipt of Funds</u>.  The Bank shall accept all sums of money and other property contributed to the Trust pursuant to Article III.  The Bank shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Bank shall be accountable for the contributions or transfers it receives, but shall not be responsible for the collection of any contributions or transfers to the Trust or enforcement of the terms of the OPEB Claims Notes.

Section 2.3  <u>Inurement and Reversion Prohibited</u>.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than sponsoring, operating and administering the Plan and Trust to provide benefits that are permitted under Code section 501(c)(9) to Participants.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the use of assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining, administering and investing the Trust Fund or in sponsoring, administering and operating the Plan in accordance with the provisions of this Trust Agreement.  At no time shall any part of the net earnings inure to the benefit of any individual other than through the provision of benefits as permitted under Code

section 501(c)(9) and the regulations promulgated thereunder.  In no event will the assets held in the Trust Fund revert to Detroit.  Upon termination of the Trust Fund, any assets remaining upon satisfaction of all liabilities to existing Participants shall be applied, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits under Code section 501(c)(9) and the rules and regulations promulgated thereunder, pursuant to criteria consistent with such rules and regulations.

Section 2.4    No Guarantee.  Nothing contained in the Trust or the Plan shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay any benefit to any person or make any other payment.  The obligation of the Plan to pay any benefit provided under the Plan is expressly conditioned on the availability of cash in the Trust to pay the benefit, and no plan fiduciary or any other person shall be required to liquidate the OPEB Claims Notes or any other Plan asset in order to generate cash to pay benefits.  Detroit shall not have any obligation to contribute any amount to the Trust except as provided in Article III.  Except for payments of benefits under the Plan, no Participant shall receive any distribution of cash or other thing of current or exchangeable value, either from the Board or the Bank, on account of or as a result of the Trust Fund created hereunder.

Section 2.5    No Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1    Detroit Contributions.  The Bank will accept the City's contribution of the OPEB Claims Notes to the Trust Fund pursuant to the Plan of Adjustment.  Apart from the contribution of the OPEB Claims Notes, contributions to the Trust Fund made within sixty (60) days of the Effective Date by the Rate Stabilization Fund in the amount of $**[4.0]** million, or from Other Supporting Organizations, and as otherwise provided in Section 3.2, Detroit shall have no further obligation to contribute to the Trust or otherwise fund the Plan.  In connection with monies contributed by the Employee Benefit Plan of the City of Detroit, the General VEBA trustees shall establish a catastrophic illness fund within the General VEBA to be used to provide limited assistance to those participants who are otherwise unable to afford the cost of necessary and immediate life-threatening health care costs. The catastrophic illness fund shall operate pursuant to the criteria established in consultation with the Detroit Retired City Employees Association and approved by the VEBA Trustees.

Section 3.2    Other Contributions.  The Bank will accept other contributions to the Trust Fund from Participants, from funds held in escrow by an escrow agent on behalf of the City that are received from the Supporting Organization, or from Other Supporting Organizations whether or not contributed through an escrow on behalf of the City.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    Payments from the Trust Fund.

(a)    Subject to paragraph (b) below, the Bank shall make payments from the Trust Fund to provide, directly or through the purchase of insurance, benefits under the Plan as directed by the Board.

(b)    To the extent permitted by law, the Bank shall be fully protected in making payments out of the Trust Fund, and shall have no responsibility to see to the application of such payments or to ascertain whether such payments comply with the terms of the Plan, and shall not be liable for any payment made by it in good faith and in the exercise of reasonable care without actual notice or knowledge of the impropriety of such payments hereunder.  The Bank may withhold all or any part of any payment as the Bank in the exercise of its reasonable discretion may deem proper, to protect the Bank and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so withheld, may discharge any such liability.  Any part of any such payment so withheld by the Bank that may be determined by the Bank to be in excess of any such liability will upon such determination by the Bank be paid to the person or entity from whom or which it was withheld.

Section 4.2    Method of Payments.  The Bank may make any payment required to be made by it hereunder, unless directed otherwise by the Board, by direct electronic deposit of the amount thereof to the financial institution where the person or entity to whom or to which such payment is to be made maintains an account, or by mailing a check in the amount thereof by first class mail in a sealed envelope addressed to such person or entity to whom or to which such payment is to be made, according to the direction of the Board.  If any dispute arises as to the identity or rights of persons who may be entitled to benefits hereunder, the Bank may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at the discretion of the Board pursuant to written instructions.

Section 4.3    Excessive Payments.  If the payment of any benefit under the Plan is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Bank or an administrator chosen by the Board of such excessive or improper payment upon the Bank's or administrator's request, the Bank shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Bank or Bank's agent, the amount of said excessive or improper payment shall not be included in any report by the auditor, the Bank, or the administrator as an asset of the Plan or the Trust Fund.

## ARTICLE V
## BANK POWERS AND DUTIES

Section 5.1    Powers of the Bank Generally.  The Bank has whatever powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Bank under other provisions of this Trust Agreement.  The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Bank.

Section 5.2    Powers Exercisable by the Bank in Its Discretion.  The Bank is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a)     To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement.  Any indicia of ownership of any Trust Fund assets, however, shall not be maintained outside the jurisdiction of the district courts of the United States.  Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b)     To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c)     To cause any investment in the Trust Fund to be registered in, or transferred into, its name as the institutional trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Bank shall at all times show that all such investments are part of the Trust Fund, and the Bank shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States.

(d)     To deliver to the Board, or the person or persons identified by the Board, on a timely basis as required under Section 5.5, proxies and powers of attorney and related informational material, for any shares or other property held in the Trust.

Section 5.3     Powers Exercisable by the Bank Only Upon the Direction of the Board. The Bank shall exercise the following powers only upon the direction of the Board (or, in the case of subparagraphs (a) and (b)), a duly appointed Investment Manager who has been conferred such power by the Board):

(a)     To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article IX.

(b)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets.

(c)     To make payments from the Trust Fund for the provision of benefits in accordance with Article IV and for the payment of expenses as provided in Section 5.8.

(d)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, enrolled actuaries, and legal counsel as shall be reasonably necessary and appropriate to fulfill its obligations under this Trust Agreement and to comply with the lawful instructions of the Board, and to pay their reasonable expenses and compensation.

(e)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund.

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund.

(g)     To accept, compromise or otherwise settle any obligations or liability due to or from them as the Bank hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

(h)     To act as the sole trustee in the event that the Board, by reason of death, resignation, or failure to appoint successor Individual Trustees, has fewer than three (3) members.

Section 5.4     <u>Title to Trust Fund</u>.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Bank or any institutional successor trustee under this Trust Agreement.

Section 5.5     <u>General Duties and Obligations of Bank</u>.

(a)     In accordance with Article II, the Bank shall hold all property received by it and any income and gains thereupon.  In accordance with this Article and Article IX, the Bank shall manage, invest and reinvest the Trust Fund following the directions of the Board or a duly appointed Investment Manager (who has been conferred such power by the Board), shall collect the income therefrom, and shall make payments or disbursements as directed by the Board.

(b)     Subject to the provisions of Articles VII and X, the Bank shall comply with any directive issued by the Board to withdraw and transfer all or any part of the Trust Fund to another institutional trustee, custodian or a funding agent.

(c)     The Board shall have responsibility for directing the Bank as to the voting (by proxy or in person) of any shares or other property held in the Trust.  Accordingly, the Bank shall deliver to the Board (or the person or persons identified by the Board), on a timely basis, proxies, powers of attorney and related informational material that are necessary for the Board to fulfill its responsibility.

The Bank may use agents to effect such delivery to the Board (or the person or persons identified by the Board).

(d)     The Bank shall discharge its duties in the interests of Participants and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Trust and the Plan and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.  The Bank will be under no liability or obligation to anyone with respect to any failure of the Board to perform any of its obligations under the Plan or Trust Agreement or for any error or omission of the Board.

Section 5.6    Determination of Rights.  The Bank shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person to coverage under the Plan, or the entitlement of any person to any benefit payments under the Plan.

Section 5.7    Continuance of Plan; Availability of Funds.  Neither the Board, the Bank nor Detroit assumes any contractual obligation as to the continuance of the Plan and shall not be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plan, and the Bank's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment.

Section 5.8    Payment of Expenses.  The Bank shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Bank or the Board in connection with establishing, sponsoring, administering or operating the Trust or Plan.  The Board shall by written certificate provided to the Bank request payment for any expenses related to the administration of the Trust and/or the Plan.  Upon receipt of the written certificate, the Bank may make the payment requested by the Board.  The expenses of the Bank shall constitute a lien on the Trust Fund.

Section 5.9    Bank Compensation.  The Bank will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates set forth in Exhibit A.  The Bank's compensation shall constitute a lien on the Trust Fund.

Section 5.10    Reliance on Written Instruments.  The Bank shall be fully protected in acting upon any instrument, certificate or paper believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

## ARTICLE VI
## BANK ACCOUNTS

Section 6.1    Records.  The Bank shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Board or such person or persons as the Board may designate.

Section 6.2    Annual Audit.  The Trust Fund shall be audited annually by a firm of certified public accountants independent of the Bank, the members of the Board, and the City, and a statement of the results of such audit shall be provided to the Bank and the Board and also made available for inspection by interested persons at the principal office of the Trust.  Such audit must be completed no later than 120 days after the expiration of the calendar year, or after expiration of the fiscal year if the Trust Fund is on a fiscal year other than a calendar year.  The Board shall provide a copy of this statement to the Supporting Organization and any Other

Supporting Organization no later than the May 15th immediately succeeding the last day of the year covered by such audited financial statements.

Section 6.3    No Interest by Participants.  In no event shall any Participant or beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Participant, beneficiary, or class of Participants or beneficiaries, and no Participant or beneficiary shall have any right to any particular asset which the Board or Bank may have allocated to any account or separate fund for accounting purposes.

Section 6.4    Furnishing Written Accounts.  The Bank shall file with the Board a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during the accounting period to which the Board and the Bank have agreed, and showing the securities and other properties held, and their fair market values at such times and as of such dates as may be agreed by the Board and the Bank in writing.  Such written account shall be filed with the Board within thirty (30) days after the close of each calendar quarter.

Section 6.5    Accounting Year, Cash Basis.  The accounting year of the Trust shall be the calendar year.  All accounts of the Bank shall be kept on a cash basis.

Section 6.6    Judicial Proceedings.  If the Bank and the Board cannot agree with respect to any act or transaction reported in any statement, the Bank shall have the right to have its accounts settled by judicial proceedings in which only the Bank and the Board shall be necessary parties.  No Participant shall have any right to compel an accounting, judicial or otherwise, by the Bank.

**ARTICLE VII**
**PROCEDURES FOR THE BANK**

Section 7.1    Removal.  The Bank may be removed by the Board at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Bank of the appointment of a successor institutional trustee or custodian in the manner set forth in Section 7.3 below.

Section 7.2    Resignation.  The Bank may resign by filing with the Board a written resignation that shall take effect ninety (90) days after the date of such filing, unless prior thereto a successor institutional trustee or custodian has been appointed by the Board.  In no event may the Bank's resignation take effect before a successor institutional trustee or custodian has been appointed by the Board and such successor trustee has accepted the appointment.  If the Board fails to appoint a successor institutional trustee or custodian, the retiring Bank may seek the appointment of a successor entity in the manner set forth in Section 7.3.

Section 7.3    Successor Bank.

(a)    The Board may appoint a successor institutional trustee or custodian by delivering to such successor an instrument in writing, executed by an authorized representative of the Board, appointing such successor entity, and by delivering to the removed or resigning

Bank an acceptance in writing, executed by the successor so appointed. Such appointment shall take effect upon the date specified in Section 7.1 or 7.2 above, as applicable.

(b) Alternatively, the Board may appoint a successor institutional trustee or custodian by securing from such successor an amendment to this Trust Agreement, executed by both the successor and an authorized representative of the Board, which replaces the current Bank with the successor institutional trustee or custodian, appointing such successor institutional trustee or custodian, and by delivering to the removed or resigning Bank an executed copy of the amendment. Such appointment shall take effect upon the date specified in the amendment.

(c) If no appointment of a successor institutional trustee or custodian is made by the Board within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the retiring Bank, appoint a successor institutional trustee or custodian after such notice to the Board and the retiring Bank, as such court may deem suitable and proper.

Section 7.4    Effect of Removal or Resignation of Bank.  Upon the removal or resignation of the Bank in accordance with Section 7.1 or 7.2 above, the Bank shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law.

Section 7.5    Merger or Consolidation of the Bank.  Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed to be continuing as the Bank.

## ARTICLE VIII
## COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES

Section 8.1    Number and Appointment of Members.  The Board of Trustees shall consist of seven (7) Individual Trustees as voting members, who are selected as provided below.

(a) The Mayor of Detroit shall appoint one (1) voting member, who may not be an employee or employed by an affiliate of the City (for such purposes, a contractor of the City shall not be deemed an affiliate), or of any labor union representing employees of the City, or a member of any such labor union, or a Participant. Such member shall have expert knowledge or extensive experience with respect to economics, finance, institutional investments, administration of public or private health and welfare benefit plans, executive management, benefits administration or actuarial science. The Board member selected by the Mayor to begin serving as of the Effective Date shall be Floyd Allen.

(b) The remaining six (6) voting members shall be appointed as follows: three (3) such voting members shall initially be designated by the Official Committee of Retirees of the City of Detroit, Michigan, and three (3) such voting members shall initially be designated by the Detroit Retired City Employees Association. The members initially selected by the Official Committee of Retirees of the City of Detroit, Michigan shall be: [_____, _____ Suzanne Daniels Paranjpe, Roger Cheek,] and Thomas Sheehan.  The members initially selected by the Detroit Retired City

Employees Association shall be: [~~_____, _____,~~ ~~and _____.~~]Doris Ewing, Barbara Wise-Johnson, and Shirley Lightsey.

Each Board member shall acknowledge his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement in writing.

Section 8.2    Term of Office.  Each member of the Board shall serve a period of four (4) years, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  A Board member whose term has ended due to the passage of time may be reappointed to serve an additional four (4) year term pursuant to the procedures set forth in Section 8.4 below.

Section 8.3    Resignation.  A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to the Board (and in the case of a Board member selected by the Mayor, to the Mayor, and in the case of a Board member selected by the Official Committee of Retirees or the Detroit Retired City Employees Association, to the Detroit Retired City Employees Association), which notice shall state the date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 8.4    Vacancies.  In the event of a vacancy, either by resignation, death, incapacity, expiration of term of office, or other reasons, the replacement Board member shall be appointed as provided below.

(a)    In the event of a vacancy of the seat previously filled by the appointee of the Mayor of Detroit, the replacement Board member shall be appointed as provided in Section 8.1(a).

(b)    In the event of a vacancy of a seat previously filled by an appointee of the Official Committee of Retirees or the Detroit Retired City Employees Association, the replacement Board member shall be appointed by the Detroit Retired City Employees Association.

Section 8.5    Fees and Expenses.  Board members shall each be paid a stipend.  For the 2015 and 2016 calendar year, this stipend shall be in the amount of $12,000 per year (payable ratably on a monthly basis).  Beginning with the 2017 calendar year and for each year thereafter, this stipend shall be in the amount of $6,000 per year (payable ratably on a monthly basis); provided, however, that the Board, by a vote of not less than six (6) out of seven (7) Board members, shall have the power to provide for a different amount for the stipend; and provided, further, that in no event shall such annual stipend exceed $12,000.  Each Board member may be reimbursed for reasonable expenses properly and actually incurred in the performance of his or her duties.  Compensation payable to the Board members and all reimbursed expenses shall be payable out of the Trust.

Section 8.6    Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.  The Board shall hold regular meetings, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board member shall be entitled to one vote on each question before the Board.  Five (5) members shall constitute a quorum at any meeting.  Except as provided in Section 8.5 and Article X, a majority vote of the seven (7) members of the Board, at

a meeting in which a quorum exists, shall be necessary for a decision by the Board. Notwithstanding the foregoing, the voting members of the Board may act by unanimous written consent in lieu of a meeting.

## ARTICLE IX
## POWERS AND DUTIES OF THE BOARD OF TRUSTEES

Section 9.1     General.  The Board shall be responsible for designing, adopting, maintaining and administering the Plan, as well as administering the Trust and managing the Trust assets as provided herein.  Subject to the provisions of this Trust Agreement, the Plan documents and applicable laws, the Board shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Plan and Trust, and to interpret the terms of the Plan and Trust.  The decisions of the Board will be final and binding on all Participants and all other parties to the maximum extent allowed by law.  In performing its duties hereunder, the members of the Board shall comply with the terms of the Trust, and shall discharge their duties for the exclusive purposes of providing benefits to participants and beneficiaries of the Plan and Trust and defraying reasonable expenses of the Plan and Trust, and with the care, skill, prudence, and diligence then prevailing that a prudent person acting in a like capacity – and familiar with such matters – would use in the conduct of an enterprise of like character and with like aims.

Section 9.2     Plan Design and Administration.

(a)     Adoption of Plan.  The Board shall adopt a Plan to offer life, sickness, accident or other similar benefits to Participants.  All terms of the Plan shall be determined by the Board; provided that such terms shall be consistent with this Trust Agreement, Code section 501(c)(9) and the regulations promulgated thereunder.  The Board shall be under no obligation to design the Plan to assure that the assets of the Trust Fund are sufficient to provide benefits to all potential Participants of the Plan in subsequent years.

(b)     Benefits.  The Plan shall include benefits and any other features including, without limitation, premium-sharing or other cost-sharing or reimbursements, that the Board from time to time determines appropriate or desirable in its sole discretion.  The Plan may provide for different benefit structures or programs for different groups of Participants, as determined by the Board in its sole discretion.  In designing the Plan and the benefits to be provided thereunder, the Board may take into account relevant circumstances, including, without limitation, the degree to which Participants may have alternative resources or coverage sources, as well as the resources of the Trust Fund.  Benefits provided under the Plan shall be limited to those health care benefits permitted by Code Section 501(c)(9), and any Plan eligibility restrictions established by the Board shall conform with the requirements set forth in Treasury Regulation Section 1.501(c)(9)-2.  Notwithstanding the foregoing or any authority granted trustees herein, and for the duration of this Trust, for purposes of determining benefit levels and determination of benefits under this Trust, including but not limited to any coordination of benefits, any amounts paid into or from any Library or Cobo Hall health reimbursement account for Detroit General VEBA Beneficiaries who are Library or Cobo Hall retirees (and their spouses) shall not be taken into account.

(c)     Method of Providing Benefits.  Benefits under the Plan may be fully insured, partially insured or self-insured, as determined by the Board from time to time in its sole

discretion.  The expected cost of benefits under the Plan shall not exceed the amount expected to be available under the Trust.

(d)  <u>Plan Documentation</u>.  The Board shall be responsible for creating, adopting and/or executing any documents necessary to set forth the Plan's governing terms, and shall be responsible for communicating the terms of the Plan to the Eligible Retiree Members and Eligible Dependents in accordance with applicable law.

Section 9.3  <u>Investment of the Trust</u>.  The Board, <u>with the same care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar means,</u> shall have full power and authority to manage, control, invest and reinvest the money and other assets of the Trust Fund ~~subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by the Investment Act~~, and the Bank shall comply with the proper written direction of the Board concerning those assets.  The Board may employ outside advisors, including investment advisors, to advise it with regard to the investment of the assets of the Trust Fund.  Any outside advisors ~~who are investment fiduciaries (as defined in the Investment Act) shall satisfy any applicable requirements of the Investment Act~~<u>shall acknowledge a fiduciary relationship to the Board and the Trust Fund</u>.

<u>In investing and managing the assets of the Trust, the Board:</u>

<u>shall consider among other circumstances: the general economic conditions; the possible effect of inflation or deflation; the role that each investment or course of action plays within the overall portfolio; the expected total return from income and the appreciation of capital; needs for liquidity, regularity of income, and preservation or appreciation of capital; and the adequacy of funding for the plan based on reasonable actuarial factors;</u>

<u>(b)  shall diversify the investments of the Trust unless the Board reasonably determines that because of special circumstances, it is clearly prudent not to do so;</u>

<u>(c)  shall make a reasonable effort to verify facts relevant to the investment and management of assets of the Trust; and</u>

<u>(d)  may consider benefits created by an investment in addition to investment return only if the Board determines that the investment providing these collateral benefits would be prudent even without the collateral benefits.</u>

Section 9.4  <u>Appointment of Investment Managers</u>.  The Board, from time to time, may appoint one or more independent Investment Managers, pursuant to a written investment management agreement describing the powers and duties of the Investment Manager, to direct the investment and reinvestment of all or a portion of the Trust (hereinafter referred to as an "Investment Account").  The Board shall determine that each Investment Manager ~~satisfies the requirements of section 38.1133(11) of the Investment Act~~<u>is a fiduciary to the Board and Trust with demonstrated expertise in the type of investments authorized by the Board</u> and, is entitled (under its investment management agreement) to direct the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Board determines shall

modify the scope of such authority. If an Investment Manager is appointed, it shall have the authority of the Bank specified in Section 5.1 hereof with respect to the Investment Account over which it has investment discretion and the Bank's duties with respect to such Investment Account shall be limited to following the instructions of the Investment Manager. Provided that an Investment Manager is prudently selected and monitored by the Board, the Board shall have no liability (a) for the acts or omissions of such Investment Manager; (b) for following directions of such Investment Manager which are given in accordance with this Trust Agreement; or (c) for any loss of any kind which may result by reason of the manner of division of the Trust into Investment Accounts.

Section 9.5    <u>Government Reports and Returns</u>.  The Board shall file all reports and returns that are required to be made with respect to the Trust and the Plan.

Section 9.6    <u>Compromise or Settle Claims</u>.  The Board may compromise, settle and release claims or demands in favor of or against the Trust or the Board on such terms and conditions as the Board may deem advisable.  The Board may at all times rely upon the advice of independent counsel in reaching such decisions.

Section 9.7    <u>Appointment of Administrator</u>.  The Board may appoint one or more third parties to perform any administrative functions it has with regard to the Trust or Plan.

Section 9.8    <u>Employment of Assistance</u>.  The Board has the exclusive authority to employ, contract and pay for all professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation and administration of the Plan and Trust.  The powers granted to the Board in this subparagraph include complete control of the procurement process, including contracts for office space, computer hardware and software, and human resource services.  In accordance with the provisions of Section 5.3 hereof, the Board may direct the Bank to pay reasonable compensation therefor from the Trust Fund.  The Board may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 9.9    <u>Reliance on Written Instruments</u>.  The Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 9.10    <u>No Individual Liability on Contracts</u>.  The Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that neither the Board nor any of its members shall be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence or fraud, and the Trust shall not indemnify the Board for such liabilities to the extent that such indemnification would violate the provisions of Section 9.13 herein, or to the extent that application of this sentence would violate any law.

Section 9.11    <u>Detroit Not Liable for Conduct of Board</u>.  The Board is not in its capacity as Board an officer, agent, employee, or representative of Detroit.  In its capacity as Board, the

Board is a principal acting independently of Detroit, which shall not be liable for any act, omission, contract, obligation, liability, debt, or undertaking of the Board or its officers, agents, or representatives.

Section 9.12    Liability Insurance.  The Board ~~may~~shall obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 9.13    Reimbursement for Defense of Claims.

(a)    To the extent permitted by applicable law, and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, its individual trustees, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation to the extent such written delegation provides for indemnification (each separately, the "Indemnified Party") shall be ~~reimbursed~~indemnified and held harmless by the Trust Fund for all reasonable costs and expenses, including without limitation ~~attorneys fees,~~attorney's fees, judgments, settlements, liabilities, fines, or penalties, incurred or suffered in defense of any claim demand, cause of action or administrative proceeding that seeks ~~a recovery of~~to hold the Indemnified Party personally liable for any loss to the Plan or Trust Fund or for ~~any~~ damages suffered by any party to, or beneficiary of this Trust Agreement ~~(a) for which~~arising out of conduct reasonably believed to be good faith acts within the scope and powers and duties of the Indemnified Party ~~is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board — or, where required by applicable law, an independent fiduciary — determines that the settling Indemnified Party was not responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary)~~, provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be ~~reimbursed~~paid by the Trust Fund, but such approval shall not be withheld unreasonably.  In the event that indemnification is made by the Trust pursuant hereto, the Indemnified Party shall agree to reimburse the Trust for all fees, costs and expenses to the extent that it is determined that the Indemnified Party's acts or omissions constituted fraud, bad faith, willful misconduct, negligence, or breach of fiduciary duty, and an independent fiduciary shall take all reasonable steps to ensure reimbursement at the time the Trust Fund agrees to indemnify pursuant to this Section; provided further that in the case of a final judicial determination of negligence or breach of fiduciary duty the Indemnified Party's reimbursement obligation shall be limited to the lesser of $50,000 or the deductible on any non-recourse commercial liability insurance policy.

(b)    The Board may make, execute, record and file on its own behalf and on behalf of the Trust, all instruments and other documentation (including one or more separate indemnification agreements between the Trust and individual Indemnified Parties) that the Board deems necessary and appropriate in order to extend the benefit of the provisions of this Section to any Indemnified Party.

Section 9.14    Subrogation and Reimbursement.  If the Plan is self-insured, the following provisions regarding subrogation and third-party reimbursement will apply.

(a)    If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of an individual ("Benefit Recipient"), the Trust Fund shall be subrogated as provided in this Section 9.14 to all the Benefit Recipient's rights of recovery with respect to the illness or injury for which the payment of benefits is made by the Trust Fund.  The right of recovery referred to in the preceding sentence shall include the right to make a claim, sue, and recover against any person or entity from the first dollars of any funds which are paid or payable as a result of a personal injury claim or any reimbursement of health care expenses.  If requested in writing by the Board, the Benefit Recipient shall take, through any representative designated by the Board, such action as may be necessary or appropriate to recover such payment from any person or entity, said action to be taken in the name of the Benefit Recipient.  In the event of a recovery or settlement, the Trust Fund shall be reimbursed in full on a first priority basis out of such recovery or settlement for expenses, costs, and attorneys' fees incurred by it in connection therewith.

(b)    If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of a Benefit Recipient for an illness or injury, the Trust Fund shall be entitled to, and shall have a first priority equitable lien on, the proceeds of any recovery, by judgment, settlement or otherwise, with respect to the illness or injury, and if paid to the Benefit Recipient, the Benefit Recipient shall immediately pay any such proceeds to the Trust Fund.  If the Benefit Recipient fails to pay such proceeds, or does not cause such proceeds to be paid, to the Trust Fund, the Board may, in addition to any other remedy to which it may be entitled, recover the proceeds directly or by offset against claims for benefits under the Plan and Trust made with respect to the affected Benefit Recipient (or such Benefit Recipient's beneficiaries, heirs, attorneys, agents, representatives, or estate).

(c)    The Trust Fund shall have the right of subrogation and reimbursement set forth in this Section 9.14 regardless of whether the Benefit Recipient is made whole and regardless of whether the recovery, or any part thereof, is designated as payment for health care expenses, pain and suffering, loss of income or any other specified or unspecified damages or reason, and without regard to whether recovery is designated as including or excluding the health care expenses covered by the Plan and Trust.  Any recovery by a Benefit Recipient, an attorney or other third party shall be deemed to be for the benefit of the Plan and Trust and shall be held in constructive trust for the Trust Fund until the Trust Fund is reimbursed in full for all amounts paid by the Trust Fund.  The subrogation and reimbursement rights of the Trust Fund described in this Section 9.14 include all rights against, and include all rights with respect to, proceeds from or held by any attorney, third party, insurance carrier or payer of medical benefits, including an uninsured or under-insured motorist carrier, a no-fault carrier and a school insurance carrier, even if such coverage was purchased by the Benefit Recipient, and without regard to whether the proceeds have been paid or are payable.

(d)    By participating in the Plan, each Benefit Recipient agrees to cooperate fully with the Plan and Trust and to execute and deliver agreements, liens and other documents and do whatever else the Board deems necessary to enable and assist the Trust Fund in exercising its rights under this Section 9.14, but the Trust Fund's rights under this Section 9.14 shall be effective regardless of whether the Benefit Recipient actually signs any agreements, liens or other documents.  By participating in the Plan, each Benefit Recipient also agrees (i) that

he or she will not make or maintain any make whole, common trust fund or apportionment action or claim in contravention of the subrogation and reimbursement provisions of this Section 9.14; and (ii) that he or she will not oppose any proceeding by the Trust Fund to obtain reimbursement on procedural grounds. The Benefit Recipient, directly or through his or her representatives, shall not do anything to impair the Trust Fund's rights. If the Board determines that any Trust Fund recovery rights under Section 9.14 have been impaired by any action of the Benefit Recipient or his or her representatives or by the Benefit Recipient's or such other person's failure to comply with the Benefit Recipient's obligations under Section 9.14, the Board may, in addition to any other remedy to which it may be entitled, determine the amount by which the Trust Fund's recovery rights have been impaired and recover such amount directly or by offset against claims for benefits under the Trust Fund made with respect to the affected Benefit Recipient.

(e) This Section 9.14 entitles the Trust Fund to subrogation and reimbursement equal to the entire amount paid by the Trust Fund for the illness or injury to which the subrogation or reimbursement relates, including related expenses, costs and attorneys' fees, which shall be from the first dollars payable to or received by the Benefit Recipient, his representatives, heirs, legal counsel, estate or any other third party from any settlement, judgment or other payment, without reduction for attorneys' fees or for any other reason. The common fund, make-whole, apportionment or any similar doctrines shall not apply to any amounts received. Any attorneys' fees shall be the responsibility solely of the Benefit Recipient, and the Trust Fund shall not pay any attorneys' fees or costs associated with a Benefit Recipient's claim or lawsuit without the Board's prior written authorization.

(f) The intention of this Section 9.14 is to give the Trust Fund the first right of subrogation and reimbursement in full with respect to the first dollars paid or payable, even though the Benefit Recipient is not made whole. Each Benefit Recipient agrees that as a condition to receiving benefits under the Plan and from the Trust Fund, the Benefit Recipient shall comply with the requirements of this Section 9.14.

## ARTICLE X
## AMENDMENT, TERMINATION AND MERGER

Section 10.1  Amendment. The Trust Agreement may be amended at any time in writing by the Board, by a vote of not less than six (6) out of seven (7) Board members, or by Court order upon proper motion, provided, however, that no amendment may impose a contribution obligation on Detroit; provided further that no amendment shall in any way conflict with the terms of the Plan of Adjustment or a Court order confirming the Plan of Adjustment; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plan under Section 501(c)(9) of the Code. No amendment to the Trust Agreement shall modify the responsibilities of the Bank hereunder unless the Bank has first consented to such amendment.

Section 10.2  Termination.

(a) The Trust and this Trust Agreement may be terminated at any time in writing by action of the Board, acting by a vote of not less than six (6) out of seven (7) Board members, with a copy of such written instrument to be provided to the Bank, or by Court order upon proper motion. Upon termination of this Trust Agreement, the assets of the Trust Fund

shall be paid out at the direction of the Board in the following order of priority: (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of benefits to Participants entitled to payments for claims arising prior to such termination; and (iii) upon satisfaction of all liabilities to existing Participants, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits in accordance with Code section 501(c)(9) and the rules and regulations promulgated thereunder. Neither Detroit nor any member of the Board shall have any beneficial interest in the Trust Fund, except to the extent an Individual Trustee is also a Participant in the Plan. Any determination by the Board or an administrator to distribute assets of the Trust upon termination to an Individual Trustee who is also a Participant must have the written concurrence of the Bank. The Trust Fund shall remain in existence until all assets have been distributed.

(b) Upon termination, the Bank and the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 10.3 <u>Transfer of Assets and/or Liabilities</u>. To the extent permitted by Code section 501(c)(9) and other applicable law, some or all of the assets and/or liabilities of the Trust Fund may at the discretion of the Board be transferred directly to another trust for the purpose of providing health or welfare benefits to some or all of the Participants on such terms and conditions as the Board may determine.

## ARTICLE XI
## MISCELLANEOUS

Section 11.1 <u>Rights in Trust Fund</u>. No Participant or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Bank, the Board, or Detroit, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

Section 11.2 <u>Non-Alienation</u>. Except to the extent required by applicable law, the rights or interest of any Participant to any benefits or future payments hereunder or under the provisions of the Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant, nor shall any such Participant have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under this Trust Agreement.

Section 11.3 <u>Controlling Laws</u>. The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 11.4 <u>Counterparts</u>. This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 11.5 <u>Headings</u>. The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 11.6 <u>Notices</u>. All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the

date of receipt if served personally or by confirmed facsimile or other similar communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

If to the Bank:

**[insert name and address]**

If to the Board:

**[insert 7 names and addresses]**

If to the Mayor:

**[insert name and address]**

If to the Supporting Organization:

**[insert name and address]**

If to the Other Supporting Organization:

**[insert name and address]**

If to the Detroit Retired City Employees Association:

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**BANK**

By: _____

    Print Name: _____

    Title: _____

    Date: _____

**CITY OF DETROIT**

By: _____

    Print Name: _____

    Title: _____

    Date: _____

**INDIVIDUAL TRUSTEES**

By: _____      By: _____

    Name: _____    Name: _____

    Date: _____    Date: _____

By: _____      By: _____

    Name: _____    Name: _____

    Date: _____    Date: _____

By: _____      By: _____

    Name: _____    Name: _____

    Date: _____    Date: _____

By: _____

    Name: _____

    Date: _____

**EXHIBIT A**

**Bank Compensation**

**EXHIBIT B**

**Supporting Organization Funding**

| Contributing Organization | Contribution Amount |
|---------------------------|---------------------|
| Skillman Foundation       |                     |
|                           |                     |
|                           |                     |
|                           |                     |

**EXHIBIT I.A.112**

FORM OF DETROIT POLICE AND FIRE VEBA TRUST AGREEMENT

# CITY OF DETROIT POLICE AND FIRE RETIREE HEALTH CARE TRUST

THIS TRUST AGREEMENT, entered into effective_____, 2014, by and among the City of Detroit ("Detroit" or the "City"), [_____ Bank] (the "Bank"), and the undersigned individual trustees ("Individual Trustees").

## WITNESSETH:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (the "Plan of Adjustment"), the City agreed to establish a voluntary employees beneficiary association ("VEBA") to provide health care benefits to certain retirees and their Eligible Dependents;

WHEREAS, Detroit hereby establishes this City of Detroit Police and Fire Retiree Health Care Trust (the "Trust");

WHEREAS, the undersigned Individual Trustees constituting the Board of Trustees shall be responsible for: (i) managing the property held by, and administration of, this Trust; and (ii) designing, adopting, maintaining and administering the "Health Care Plan for Police and Fire Retirees of the City of Detroit" (the "Plan"), through which all health care benefits to the Trust's beneficiaries shall be provided;

WHEREAS, the Board of Trustees is willing to exercise the authority granted to it herein with regard to the Trust and Plan;

WHEREAS, through this Trust Agreement, Detroit intends to designate the Bank to serve in the capacity of the institutional trustee with respect to the Trust and to maintain custody of the Trust assets;

WHEREAS, the Bank is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement; and

WHEREAS, the Trust and the interdependent Plan are intended to comply with the requirements of section 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), and are together intended to constitute a "governmental plan" within the meaning of section 3(32) of the Employee Retirement Income Security Act of 1974;

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the Bank agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Bank.  The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed

by the Board in accordance with Section 7.3.  Any corporation continuing as the result of any merger or consolidation to which the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed automatically to be continuing as the Bank.

Section 1.2     <u>Board of Trustees or Board</u>.  The Board of Trustees is the body described in Article VIII to which Detroit has delegated responsibility for:  (i) managing the property held by, and administering, this Trust; and (ii) designing, adopting, maintaining and administering the Plan, through which all benefits to the Trust's beneficiaries shall be provided.  It shall be constituted and operated in accordance with Article IX.

Section 1.3     <u>Code</u>.  The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.4     <u>Detroit Police and Fire VEBA Beneficiary</u>.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.5     <u>Eligible Dependent</u>.  An Eligible Retiree Member's dependent, within the meaning of Code section 501(c)(9) and the regulations promulgated thereunder, who is eligible to receive benefits under the Plan in accordance with its terms.

Section 1.6     <u>Eligible Retiree Member</u>.  A former employee of Detroit who is a Detroit Police and Fire VEBA Beneficiary.

~~Section 1.7     Investment Act.  Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws, as amended, which governs the investment of assets of public employee retirement systems or plans.~~

Section ~~1.8~~1.7 <u>Investment Manager</u>.  An investment manager appointed by the Board or its successor in accordance with the provisions of Section 9.4 hereof

Section ~~1.9~~1.8 <u>New B Notes</u>.  Has the meaning given to that term in the Plan of Adjustment.

Section ~~1.10~~1.9     <u>OPEB Claims Notes</u>.  The New B Notes the City is required to contribute to the Trust pursuant to the Plan of Adjustment.

Section ~~1.11~~1.10     <u>Other Supporting Organization</u>.  An organization other than the City, the Rate Stabilization Fund, or the Supporting Organization, having voluntarily contributed funds in excess of **[$500,000]** to the Trust on or after the Effective Date.

Section ~~1.12~~1.11     <u>Participant</u>.  An Eligible Retiree Member or Eligible Dependent who is entitled to health care benefits pursuant to the terms of the Plan.

Section ~~1.13~~1.12     <u>Plan</u>.  The Health Care Plan for Retirees of the City of Detroit, to be adopted and thereafter amended from time to time by the Board, as specified herein, and which will provide health care benefits permitted to be provided by a VEBA under Code section 501(c)(9).

LAI-3221058v4

Section ~~1.14~~1.13     Plan of Adjustment.  The Plan for the Adjustment of Debts of the City of Detroit.

Section ~~1.15~~1.14     Rate Stabilization Fund.  The Rate Stabilization Reserves Fund maintained under the control of the Governing Board of the City of Detroit Employee Benefits Plan established pursuant to Title 9, Chapter VIII of the Charter of the City of Detroit for the exclusive purpose of providing hospital, surgical, and death benefits for current or former employees of the City.

Section ~~1.16~~1.15     Supporting Organization.  The Foundation for Detroit's Future, a not for profit that is created to collect certain contributions and make an annual contribution to an escrow account as described in Section 3.2, or the successor to such not for profit.  The Supporting Organization was created to receive funds from organizations, including those listed in Exhibit B, and allocate such funds, in the amounts described in Exhibit B, to, among other entities, this Trust Fund.

Section ~~1.17~~1.16     Trust Agreement.  This agreement as it may be amended thereafter from time to time by the parties hereto in accordance with the terms hereof.

Section ~~1.18~~1.17     Trust or Trust Fund.  The City of Detroit Police and Fire Retiree Health Care Trust established by this Trust Agreement, comprising all property or interests in property held by the Bank from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1     Purpose.  The Trust is established for the purpose of providing life, sickness, accident, and other similar benefits, directly, through the purchase of insurance, or by reimbursement of expenses, to the Participants in accordance with the Plan and consistent with Section 501(c)(9) of the Code and the regulations and other guidance promulgated thereunder.  The Trust, together with the Plan, is intended to constitute a VEBA under Section 501(c)(9) of the Code.

Section 2.2     Receipt of Funds.  The Bank shall accept all sums of money and other property contributed to the Trust pursuant to Article III.  The Bank shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Bank shall be accountable for the contributions or transfers it receives, but shall not be responsible for the collection of any contributions or transfers to the Trust or enforcement of the terms of the OPEB Claims Notes.

Section 2.3     Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than sponsoring, operating and administering the Plan and Trust to provide benefits that are permitted under Code section 501(c)(9) to Participants.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the use of assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining, administering and investing the Trust Fund or in sponsoring, administering and operating the Plan in accordance with the provisions of this Trust Agreement.  At no time shall any part of the net earnings inure to the benefit of any individual other than through the provision of benefits as permitted under Code

~~LAI 3221058v4~~

section 501(c)(9) and the regulations promulgated thereunder. In no event will the assets held in the Trust Fund revert to Detroit. Upon termination of the Trust Fund, any assets remaining upon satisfaction of all liabilities to existing Participants shall be applied, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits under Code section 501(c)(9) and the rules and regulations promulgated thereunder, pursuant to criteria consistent with such rules and regulations.

Section 2.4    No Guarantee.  Nothing contained in the Trust or the Plan shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay any benefit to any person or make any other payment.  The obligation of the Plan to pay any benefit provided under the Plan is expressly conditioned on the availability of cash in the Trust to pay the benefit, and no plan fiduciary or any other person shall be required to liquidate the OPEB Claims Notes or any other Plan asset in order to generate cash to pay benefits.  Detroit shall not have any obligation to contribute any amount to the Trust except as provided in Article III.  Except for payments of benefits under the Plan, no Participant shall receive any distribution of cash or other thing of current or exchangeable value, either from the Board or the Bank, on account of or as a result of the Trust Fund created hereunder.

Section 2.5    No Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1    Detroit Contributions.  The Bank will accept the City's contribution of the OPEB Claims Notes to the Trust Fund pursuant to the Plan of Adjustment.  Apart from the contribution of the OPEB Claims Notes, contributions to the Trust Fund made within sixty (60) days of the Effective Date by the Rate Stabilization Fund in the amount of $[**1.5**] million, or from Other Supporting Organizations, and as otherwise provided in Section 3.2, Detroit shall have no further obligation to contribute to the Trust or otherwise fund the Plan.

Section 3.2    Other Contributions.  The Bank will accept other contributions to the Trust Fund from Participants, from funds held in escrow by an escrow agent on behalf of the City that are received from the Supporting Organization, or from Other Supporting Organizations whether or not contributed through an escrow on behalf of the City.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    Payments from the Trust Fund.

(a)    Subject to paragraph (b) below, the Bank shall make payments from the Trust Fund to provide, directly or through the purchase of insurance, benefits under the Plan as directed by the Board.

(b)    To the extent permitted by law, the Bank shall be fully protected in making payments out of the Trust Fund, and shall have no responsibility to see to the application of such payments or to ascertain whether such payments comply with the terms of the Plan, and shall not be liable for any payment made by it in good faith and in the exercise of reasonable care

without actual notice or knowledge of the impropriety of such payments hereunder. The Bank may withhold all or any part of any payment as the Bank in the exercise of its reasonable discretion may deem proper, to protect the Bank and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so withheld, may discharge any such liability. Any part of any such payment so withheld by the Bank that may be determined by the Bank to be in excess of any such liability will upon such determination by the Bank be paid to the person or entity from whom or which it was withheld.

Section 4.2  Method of Payments. The Bank may make any payment required to be made by it hereunder, unless directed otherwise by the Board, by direct electronic deposit of the amount thereof to the financial institution where the person or entity to whom or to which such payment is to be made maintains an account, or by mailing a check in the amount thereof by first class mail in a sealed envelope addressed to such person or entity to whom or to which such payment is to be made, according to the direction of the Board. If any dispute arises as to the identity or rights of persons who may be entitled to benefits hereunder, the Bank may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at the discretion of the Board pursuant to written instructions.

Section 4.3  Excessive Payments. If the payment of any benefit under the Plan is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Bank or an administrator chosen by the Board of such excessive or improper payment upon the Bank's or administrator's request, the Bank shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person. Until repaid to the Bank or Bank's agent, the amount of said excessive or improper payment shall not be included in any report by the auditor, the Bank, or the administrator as an asset of the Plan or the Trust Fund.

**ARTICLE V**
**BANK POWERS AND DUTIES**

Section 5.1  Powers of the Bank Generally. The Bank has whatever powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Bank under other provisions of this Trust Agreement. The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Bank.

Section 5.2  Powers Exercisable by the Bank in Its Discretion. The Bank is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a)  To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement. Any indicia of ownership of any Trust Fund assets, however, shall not be maintained outside the jurisdiction of the district courts of the United States. Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b)     To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c)     To cause any investment in the Trust Fund to be registered in, or transferred into, its name as the institutional trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Bank shall at all times show that all such investments are part of the Trust Fund, and the Bank shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States.

(d)     To deliver to the Board, or the person or persons identified by the Board, on a timely basis as required under Section 5.5, proxies and powers of attorney and related informational material, for any shares or other property held in the Trust.

Section 5.3     <u>Powers Exercisable by the Bank Only Upon the Direction of the Board</u>. The Bank shall exercise the following powers only upon the direction of the Board (or, in the case of subparagraphs (a) and (b)), a duly appointed Investment Manager who has been conferred such power by the Board):

(a)     To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article IX.

(b)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets.

(c)     To make payments from the Trust Fund for the provision of benefits in accordance with Article IV and for the payment of expenses as provided in Section 5.8.

(d)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, enrolled actuaries, and legal counsel as shall be reasonably necessary and appropriate to fulfill its obligations under this Trust Agreement and to comply with the lawful instructions of the Board, and to pay their reasonable expenses and compensation.

(e)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund.

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund.

(g)     To accept, compromise or otherwise settle any obligations or liability due to or from them as the Bank hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

LAI 3221058v4

(h)     To act as the sole trustee in the event that the Board, by reason of death, resignation, or failure to appoint successor Individual Trustees, has fewer than three (3) members.

Section 5.4     Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Bank or any institutional successor trustee under this Trust Agreement.

Section 5.5     General Duties and Obligations of Bank.

(a)     In accordance with Article II, the Bank shall hold all property received by it and any income and gains thereupon.  In accordance with this Article and Article IX, the Bank shall manage, invest and reinvest the Trust Fund following the directions of the Board or a duly appointed Investment Manager (who has been conferred such power by the Board), shall collect the income therefrom, and shall make payments or disbursements as directed by the Board.

(b)     Subject to the provisions of Articles VII and X, the Bank shall comply with any directive issued by the Board to withdraw and transfer all or any part of the Trust Fund to another institutional trustee, custodian or a funding agent.

(c)     The Board shall have responsibility for directing the Bank as to the voting (by proxy or in person) of any shares or other property held in the Trust.  Accordingly, the Bank shall deliver to the Board (or the person or persons identified by the Board), on a timely basis, proxies, powers of attorney and related informational material that are necessary for the Board to fulfill its responsibility.

The Bank may use agents to effect such delivery to the Board (or the person or persons identified by the Board).

(d)     The Bank shall discharge its duties in the interests of Participants and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Trust and the Plan and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.  The Bank will be under no liability or obligation to anyone with respect to any failure of the Board to perform any of its obligations under the Plan or Trust Agreement or for any error or omission of the Board.

Section 5.6     Determination of Rights.  The Bank shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person to coverage under the Plan, or the entitlement of any person to any benefit payments under the Plan.

Section 5.7     Continuance of Plan; Availability of Funds.  Neither the Board, the Bank nor Detroit assumes any contractual obligation as to the continuance of the Plan and shall not be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plan, and the Bank's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment.

LAI 3221058v4

Section 5.8    Payment of Expenses.  The Bank shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Bank or the Board in connection with establishing, sponsoring, administering or operating the Trust or Plan. The Board shall by written certificate provided to the Bank request payment for any expenses related to the administration of the Trust and/or the Plan.  Upon receipt of the written certificate, the Bank may make the payment requested by the Board.  The expenses of the Bank shall constitute a lien on the Trust Fund.

Section 5.9    Bank Compensation.  The Bank will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates set forth in Exhibit A.  The Bank's compensation shall constitute a lien on the Trust Fund.

Section 5.10   Reliance on Written Instruments.  The Bank shall be fully protected in acting upon any instrument, certificate or paper believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

# ARTICLE VI
# BANK ACCOUNTS

Section 6.1    Records.  The Bank shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Board or such person or persons as the Board may designate.

Section 6.2    Annual Audit.  The Trust Fund shall be audited annually by a firm of certified public accountants independent of the Bank, the members of the Board, and the City, and a statement of the results of such audit shall be provided to the Bank and the Board and also made available for inspection by interested persons at the principal office of the Trust.  Such audit must be completed no later than 120 days after the expiration of the calendar year, or after expiration of the fiscal year if the Trust Fund is on a fiscal year other than a calendar year.  The Board shall provide a copy of this statement to the Supporting Organization and any Other Supporting Organization no later than the May 15th immediately succeeding the last day of the year covered by such audited financial statements.

Section 6.3    No Interest by Participants.  In no event shall any Participant or beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Participant, beneficiary, or class of Participants or beneficiaries, and no Participant or beneficiary shall have any right to any particular asset which the Board or Bank may have allocated to any account or separate fund for accounting purposes.

Section 6.4    Furnishing Written Accounts.  The Bank shall file with the Board a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during the accounting period to which the Board and the Bank have agreed, and showing the securities and other properties held, and their fair market values at such times and as of such dates as may be agreed by the Board and the Bank in writing.  Such written account shall be filed with the Board within thirty (30) days after the close of each calendar quarter.

Section 6.5    Accounting Year, Cash Basis.  The accounting year of the Trust shall be the calendar year.  All accounts of the Bank shall be kept on a cash basis.

Section 6.6    Judicial Proceedings.  If the Bank and the Board cannot agree with respect to any act or transaction reported in any statement, the Bank shall have the right to have its accounts settled by judicial proceedings in which only the Bank and the Board shall be necessary parties.  No Participant shall have any right to compel an accounting, judicial or otherwise, by the Bank.

## ARTICLE VII
## PROCEDURES FOR THE BANK

Section 7.1    Removal.  The Bank may be removed by the Board at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Bank of the appointment of a successor institutional trustee or custodian in the manner set forth in Section 7.3 below.

Section 7.2    Resignation.  The Bank may resign by filing with the Board a written resignation that shall take effect ninety (90) days after the date of such filing, unless prior thereto a successor institutional trustee or custodian has been appointed by the Board.  In no event may the Bank's resignation take effect before a successor institutional trustee or custodian has been appointed by the Board and such successor trustee has accepted the appointment.  If the Board fails to appoint a successor institutional trustee or custodian, the retiring Bank may seek the appointment of a successor entity in the manner set forth in Section 7.3.

Section 7.3    Successor Bank.

(a)    The Board may appoint a successor institutional trustee or custodian by delivering to such successor an instrument in writing, executed by an authorized representative of the Board, appointing such successor entity, and by delivering to the removed or resigning Bank an acceptance in writing, executed by the successor so appointed.  Such appointment shall take effect upon the date specified in Section 7.1 or 7.2 above, as applicable.

(b)    Alternatively, the Board may appoint a successor institutional trustee or custodian by securing from such successor an amendment to this Trust Agreement, executed by both the successor and an authorized representative of the Board, which replaces the current Bank with the successor institutional trustee or custodian, appointing such successor institutional trustee or custodian, and by delivering to the removed or resigning Bank an executed copy of the amendment.  Such appointment shall take effect upon the date specified in the amendment.

LAI-3221058v4

(c)     If no appointment of a successor institutional trustee or custodian is made by the Board within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the retiring Bank, appoint a successor institutional trustee or custodian after such notice to the Board and the retiring Bank, as such court may deem suitable and proper.

Section 7.4     <u>Effect of Removal or Resignation of Bank</u>.  Upon the removal or resignation of the Bank in accordance with Section 7.1 or 7.2 above, the Bank shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law.

Section 7.5     <u>Merger or Consolidation of the Bank</u>.  Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed to be continuing as the Bank.

## ARTICLE VIII
## COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES

Section 8.1     <u>Number and Appointment of Members</u>.  The Board of Trustees shall consist of seven (7) Individual Trustees as voting members and for the first four (4) years, one (1) non-voting, ex-officio member, who are selected as provided below.

(a)     The Mayor of Detroit shall appoint one (1) voting member, who may not be an employee or employed by an affiliate of the City (for such purposes, a contractor of the City shall not be deemed an affiliate), or of any labor union representing employees of the City, or a member of any such labor union, or a Participant.  Such member shall have expert knowledge or extensive experience with respect to economics, finance, institutional investments, administration of public or private health and welfare benefit plans, executive management, benefits administration or actuarial science.  The Board member selected by the Mayor to begin serving as of the Effective Date shall be Floyd Allen.

(b)     The remaining six (6) voting members shall be appointed as follows: three (3) such voting members shall initially be designated by the Official Committee of Retirees of the City of Detroit, Michigan, and three (3) such voting members shall initially be designated by the Retired Detroit Police and Fire Fighters Association.  The members initially selected by the Official Committee of Retirees of the City of Detroit, Michigan shall be: [_____], _____ Gregory Best, John Clark, and Thomas Sheehan.  The members initially selected by the Retired Detroit Police and Fire Fighters Association shall be:  Al Allan Grant, Greg Trozak, and Andrew Dillon.

(c)     The Retired Detroit Police Members Association shall appoint one (1) non-voting, ex-officio member who shall initially be:  [_____] Shirley Berger.  The non-voting member may attend any meeting of the Board, provide whatever opinion and recommendations he or she deems warranted, and receive all written product received by the full Board.  To the extent the Board appoints any committee or subcommittee, such non-voting member is also eligible to be appointed, in the full voting Board's discretion, as an ex-officio member of such committee/subcommittee, but if appointed would not vote as a committee/subcommittee member.

Each voting Board member shall acknowledge his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement in writing.

Section 8.2     Term of Office.  Each member of the Board shall serve a period of four (4) years, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  A voting Board member whose term has ended due to the passage of time may be reappointed to serve an additional four (4) year term pursuant to the procedures set forth in Section 8.4 below.

Section 8.3     Resignation.  A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to the Board (and in the case of a Board member selected by the Mayor, to the Mayor; and in the case of a Board member selected by the Official Committee of Retirees or the Retired Detroit Police and Fire Fighters Association, to the Retired Detroit Police and Fire Fighters Association), which notice shall state the date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 8.4     Vacancies.  In the event of a vacancy, either by resignation, death, incapacity, expiration of term of office, or other reasons, the replacement Board member shall be appointed as provided below.

(a)     In the event of a vacancy of the seat previously filled by the appointee of the Mayor of Detroit, the replacement Board member shall be appointed as provided in Section 8.1(a).

(b)     In the event of a vacancy of a seat previously filled by an appointee of the Official Committee of Retirees or the Retired Detroit Police and Fire Fighters Association, the replacement Board member shall be appointed by the Retired Detroit Police and Fire Fighters Association.

(c)     In the event of a vacancy of the non-voting, ex-officio seat previously filled by the appointee of the Retired Detroit Police Members Association, the replacement Board member shall be appointed by the Retired Detroit Police Members Association; provided, however, that such seat shall terminate on December 31, 2018, and in no event shall a vacancy in this seat after December 31, 2018 be filled.

Section 8.5     Fees and Expenses.  Voting Board members shall each be paid a stipend. For the 2015 and 2016 calendar year, this stipend shall be in the amount of $12,000 per year (payable ratably on a monthly basis).  Beginning with the 2017 calendar year and for each year thereafter, this stipend shall be in the amount of $6,000 per year (payable ratably on a monthly basis); provided, however, that the Board, by a vote of not less than six (6) out of seven (7) voting Board members, shall have the power to provide for a different amount for the stipend; and provided, further, that in no event shall such annual stipend exceed $12,000.  The ex-officio member appointed by the Retired Detroit Police Members Association shall be paid a stipend of $4,800 per year (payable ratably on a monthly basis) for the 2015 and 2016 calendar years, and shall be paid an amount equal to 50% of the stipend of a voting Board member for the 2017 and 2018 calendar years.  Each voting Board member may be reimbursed for reasonable expenses properly and actually incurred in the performance of his or her duties, and in the case of the non-voting member, he or she may be reimbursed for reasonable expenses properly and actually

LAI 3221058v4

incurred in connection with attendance at Board or Board committee meetings. Compensation payable to the Board members and all reimbursed expenses shall be payable out of the Trust.

Section 8.6    Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.  The Board shall hold regular meetings, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board member shall be entitled to one vote on each question before the Board.  Five (5) voting members shall constitute a quorum at any meeting.  Except as provided in Section 8.5 and Article X, a majority vote of the seven (7) voting members of the Board at a meeting in which a quorum exists shall be necessary for a decision by the Board.  Notwithstanding the foregoing, the voting members of the Board may act by unanimous written consent in lieu of a meeting.

## ARTICLE IX
## POWERS AND DUTIES OF THE BOARD OF TRUSTEES

Section 9.1    General.  The Board shall be responsible for designing, adopting, maintaining and administering the Plan, as well as administering the Trust and managing the Trust assets as provided herein.  Subject to the provisions of this Trust Agreement, the Plan documents and applicable laws, the Board shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Plan and Trust, and to interpret the terms of the Plan and Trust.  The decisions of the Board will be final and binding on all Participants and all other parties to the maximum extent allowed by law.  In performing its duties hereunder, the voting members of the Board shall comply with the terms of the Trust, and shall discharge their duties for the exclusive purposes of providing benefits to participants and beneficiaries of the Plan and Trust and defraying reasonable expenses of the Plan and Trust, and with the care, skill, prudence, and diligence then prevailing that a prudent person acting in a like capacity – and familiar with such matters – would use in the conduct of an enterprise of like character and with like aims.

Section 9.2    Plan Design and Administration.

(a)    Adoption of Plan.  The Board shall adopt a Plan to offer life, sickness, accident or other similar benefits to Participants.  All terms of the Plan shall be determined by the Board; provided that such terms shall be consistent with this Trust Agreement, Code section 501(c)(9) and the regulations promulgated thereunder.  The Board shall be under no obligation to design the Plan to assure that the assets of the Trust Fund are sufficient to provide benefits to all potential Participants of the Plan in subsequent years.

(b)    Benefits.  The Plan shall include benefits and any other features including, without limitation, premium-sharing or other cost-sharing or reimbursements, that the Board from time to time determines appropriate or desirable in its sole discretion.  The Plan may provide for different benefit structures or programs for different groups of Participants, as determined by the Board in its sole discretion.  In designing the Plan and the benefits to be provided thereunder, the Board may take into account relevant circumstances, including, without limitation, the degree to which Participants may have alternative resources or coverage sources, as well as the resources of the Trust Fund.  Benefits provided under the Plan shall be limited to those health care benefits permitted by Code Section 501(c)(9), and any Plan eligibility

LAI-3221058v4

restrictions established by the Board shall conform with the requirements set forth in Treasury Regulation Section 1.501(c)(9)-2.

(c)    Method of Providing Benefits.  Benefits under the Plan may be fully insured, partially insured or self-insured, as determined by the Board from time to time in its sole discretion.  The expected cost of benefits under the Plan shall not exceed the amount expected to be available under the Trust.

(d)    Plan Documentation.  The Board shall be responsible for creating, adopting and/or executing any documents necessary to set forth the Plan's governing terms, and shall be responsible for communicating the terms of the Plan to the Eligible Retiree Members and Eligible Dependents in accordance with applicable law.

Section 9.3    Investment of the Trust.  The Board, with the same care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar means, shall have full power and authority to manage, control, invest and reinvest the money and other assets of the Trust Fund subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by the Investment Act, and the Bank shall comply with the proper written direction of the Board concerning those assets.  The Board may employ outside advisors, including investment advisors, to advise it with regard to the investment of the assets of the Trust Fund.  Any outside advisors who are investment fiduciaries (as defined in the Investment Act) shall satisfy any applicable requirements of the Investment Act shall acknowledge a fiduciary relationship to the Board and the Trust Fund.

In investing and managing the assets of the Trust, the Board:

shall consider among other circumstances: the general economic conditions; the possible effect of inflation or deflation; the role that each investment or course of action plays within the overall portfolio; the expected total return from income and the appreciation of capital; needs for liquidity, regularity of income, and preservation or appreciation of capital; and the adequacy of funding for the plan based on reasonable actuarial factors;

(b)    shall diversify the investments of the Trust unless the Board reasonably determines that because of special circumstances, it is clearly prudent not to do so;

(c)    shall make a reasonable effort to verify facts relevant to the investment and management of assets of the Trust; and

(d)    may consider benefits created by an investment in addition to investment return only if the Board determines that the investment providing these collateral benefits would be prudent even without the collateral benefits.

Section 9.4    Appointment of Investment Managers.  The Board, from time to time, may appoint one or more independent Investment Managers, pursuant to a written investment management agreement describing the powers and duties of the Investment Manager, to direct the investment and reinvestment of all or a portion of the Trust (hereinafter referred to as an "Investment Account").  The Board shall determine that each Investment Manager satisfies the

LAI 3221058v4

requirements of section 38.1133(11) of the Investment Act is a fiduciary to the Board and Trust with demonstrated expertise in the type of investments authorized by the Board and, is entitled (under its investment management agreement) to direct the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Board determines shall modify the scope of such authority.  If an Investment Manager is appointed, it shall have the authority of the Bank specified in Section 5.1 hereof with respect to the Investment Account over which it has investment discretion and the Bank's duties with respect to such Investment Account shall be limited to following the instructions of the Investment Manager.  Provided that an Investment Manager is prudently selected and monitored by the Board, the Board shall have no liability (a) for the acts or omissions of such Investment Manager; (b) for following directions of such Investment Manager which are given in accordance with this Trust Agreement; or (c) for any loss of any kind which may result by reason of the manner of division of the Trust into Investment Accounts.

Section 9.5    Government Reports and Returns.  The Board shall file all reports and returns that are required to be made with respect to the Trust and the Plan.

Section 9.6    Compromise or Settle Claims.  The Board may compromise, settle and release claims or demands in favor of or against the Trust or the Board on such terms and conditions as the Board may deem advisable.  The Board may at all times rely upon the advice of independent counsel in reaching such decisions.

Section 9.7    Appointment of Administrator.  The Board may appoint one or more third parties to perform any administrative functions it has with regard to the Trust or Plan.

Section 9.8    Employment of Assistance.  The Board has the exclusive authority to employ, contract and pay for all professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation and administration of the Plan and Trust.  The powers granted to the Board in this subparagraph include complete control of the procurement process, including contracts for office space, computer hardware and software, and human resource services.  In accordance with the provisions of Section 5.3 hereof, the Board may direct the Bank to pay reasonable compensation therefor from the Trust Fund.  The Board may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 9.9    Reliance on Written Instruments.  The Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 9.10    No Individual Liability on Contracts.  The Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that neither the Board nor any of its members shall be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence, or fraud, and the Trust shall not indemnify the Board for such liabilities to the extent that such

indemnification would violate the provisions of Section 9.13 herein, or to the extent that application of this sentence would violate any law.

Section 9.11    Detroit Not Liable for Conduct of Board.  The Board is not in its capacity as Board an officer, agent, employee, or representative of Detroit.  In its capacity as Board, the Board is a principal acting independently of Detroit, which shall not be liable for any act, omission, contract, obligation, liability, debt, or undertaking of the Board or its officers, agents, or representatives.

Section 9.12    Liability Insurance.  The Board ~~may~~shall obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 9.13    Reimbursement for Defense of Claims.

(a)    To the extent permitted by applicable law, and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, its individual trustees, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation to the extent such written delegation provides for indemnification (each separately, the "Indemnified Party") shall be ~~reimbursed~~indemnified and held harmless by the Trust Fund for all reasonable costs and expenses, including without limitation ~~attorneys fees,~~attorney's fees, judgments, settlements, liabilities, fines, or penalties, incurred or suffered in defense of any claim demand, cause of action or administrative proceeding that seeks ~~a recovery of~~to hold the Indemnified Party personally liable for any loss to the Plan or Trust Fund or for ~~any~~ damages suffered by any party to, or beneficiary of this Trust Agreement ~~(a) for which~~arising out of conduct reasonably believed to be good faith acts within the scope and powers and duties of the Indemnified Party ~~is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board   or, where required by applicable law, an independent fiduciary   determines that the settling Indemnified Party was not responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary)~~, provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be ~~reimbursed~~paid by the Trust Fund, but such approval shall not be withheld unreasonably.  In the event that indemnification is made by the Trust pursuant hereto, the Indemnified Party shall agree to reimburse the Trust for all fees, costs and expenses to the extent that it is determined that the Indemnified Party's acts or omissions constituted fraud, bad faith, willful misconduct, negligence, or breach of fiduciary duty, and an independent fiduciary shall take all reasonable steps to ensure reimbursement at the time the Trust Fund agrees to indemnify pursuant to this Section; provided further that in the case of a final judicial determination of negligence or breach of fiduciary duty the Indemnified Party's reimbursement obligation shall be limited to the lesser of $50,000 or the deductible on any non-recourse commercial liability insurance policy.

(b)    The Board may make, execute, record and file on its own behalf and on behalf of the Trust, all instruments and other documentation (including one or more separate

LAI 3221058v4

indemnification agreements between the Trust and individual Indemnified Parties) that the Board deems necessary and appropriate in order to extend the benefit of the provisions of this Section to any Indemnified Party.

Section 9.14 <u>Subrogation and Reimbursement</u>. If the Plan is self-insured, the following provisions regarding subrogation and third-party reimbursement will apply.

(a)     If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of an individual ("Benefit Recipient"), the Trust Fund shall be subrogated as provided in this Section 9.14 to all the Benefit Recipient's rights of recovery with respect to the illness or injury for which the payment of benefits is made by the Trust Fund.  The right of recovery referred to in the preceding sentence shall include the right to make a claim, sue, and recover against any person or entity from the first dollars of any funds which are paid or payable as a result of a personal injury claim or any reimbursement of health care expenses.  If requested in writing by the Board, the Benefit Recipient shall take, through any representative designated by the Board, such action as may be necessary or appropriate to recover such payment from any person or entity, said action to be taken in the name of the Benefit Recipient.  In the event of a recovery or settlement, the Trust Fund shall be reimbursed in full on a first priority basis out of such recovery or settlement for expenses, costs, and attorneys' fees incurred by it in connection therewith.

(b)     If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of a Benefit Recipient for an illness or injury, the Trust Fund shall be entitled to, and shall have a first priority equitable lien on, the proceeds of any recovery, by judgment, settlement or otherwise, with respect to the illness or injury, and if paid to the Benefit Recipient, the Benefit Recipient shall immediately pay any such proceeds to the Trust Fund.  If the Benefit Recipient fails to pay such proceeds, or does not cause such proceeds to be paid, to the Trust Fund, the Board may, in addition to any other remedy to which it may be entitled, recover the proceeds directly or by offset against claims for benefits under the Plan and Trust made with respect to the affected Benefit Recipient (or such Benefit Recipient's beneficiaries, heirs, attorneys, agents, representatives, or estate).

(c)     The Trust Fund shall have the right of subrogation and reimbursement set forth in this Section 9.14 regardless of whether the Benefit Recipient is made whole and regardless of whether the recovery, or any part thereof, is designated as payment for health care expenses, pain and suffering, loss of income or any other specified or unspecified damages or reason, and without regard to whether recovery is designated as including or excluding the health care expenses covered by the Plan and Trust.  Any recovery by a Benefit Recipient, an attorney or other third party shall be deemed to be for the benefit of the Plan and Trust and shall be held in constructive trust for the Trust Fund until the Trust Fund is reimbursed in full for all amounts paid by the Trust Fund.  The subrogation and reimbursement rights of the Trust Fund described in this Section 9.14 include all rights against, and include all rights with respect to, proceeds from or held by any attorney, third party, insurance carrier or payer of medical benefits, including an uninsured or under-insured motorist carrier, a no-fault carrier and a school insurance carrier, even if such coverage was purchased by the Benefit Recipient, and without regard to whether the proceeds have been paid or are payable.

(d)     By participating in the Plan, each Benefit Recipient agrees to cooperate fully with the Plan and Trust and to execute and deliver agreements, liens and other documents

LAI-3221058v4

and do whatever else the Board deems necessary to enable and assist the Trust Fund in exercising its rights under this Section 9.14, but the Trust Fund's rights under this Section 9.14 shall be effective regardless of whether the Benefit Recipient actually signs any agreements, liens or other documents.  By participating in the Plan, each Benefit Recipient also agrees (i) that he or she will not make or maintain any make whole, common trust fund or apportionment action or claim in contravention of the subrogation and reimbursement provisions of this Section 9.14; and (ii) that he or she will not oppose any proceeding by the Trust Fund to obtain reimbursement on procedural grounds.  The Benefit Recipient, directly or through his or her representatives, shall not do anything to impair the Trust Fund's rights.  If the Board determines that any Trust Fund recovery rights under Section 9.14 have been impaired by any action of the Benefit Recipient or his or her representatives or by the Benefit Recipient's or such other person's failure to comply with the Benefit Recipient's obligations under Section 9.14, the Board may, in addition to any other remedy to which it may be entitled, determine the amount by which the Trust Fund's recovery rights have been impaired and recover such amount directly or by offset against claims for benefits under the Trust Fund made with respect to the affected Benefit Recipient.

(e)     This Section 9.14 entitles the Trust Fund to subrogation and reimbursement equal to the entire amount paid by the Trust Fund for the illness or injury to which the subrogation or reimbursement relates, including related expenses, costs and attorneys' fees, which shall be from the first dollars payable to or received by the Benefit Recipient, his representatives, heirs, legal counsel, estate or any other third party from any settlement, judgment or other payment, without reduction for attorneys' fees or for any other reason. The common fund, make-whole, apportionment or any similar doctrines shall not apply to any amounts received.  Any attorneys' fees shall be the responsibility solely of the Benefit Recipient, and the Trust Fund shall not pay any attorneys' fees or costs associated with a Benefit Recipient's claim or lawsuit without the Board's prior written authorization.

(f)     The intention of this Section 9.14 is to give the Trust Fund the first right of subrogation and reimbursement in full with respect to the first dollars paid or payable, even though the Benefit Recipient is not made whole.  Each Benefit Recipient agrees that as a condition to receiving benefits under the Plan and from the Trust Fund, the Benefit Recipient shall comply with the requirements of this Section 9.14.

## ARTICLE X
## AMENDMENT, TERMINATION AND MERGER

Section 10.1     <u>Amendment</u>.  The Trust Agreement may be amended at any time in writing by the Board, by a vote of not less than six (6) out of seven (7) voting Board members, or by Court order upon proper motion, provided, however, that no amendment may impose a contribution obligation on Detroit; provided further that no amendment shall in any way conflict with the terms of the Plan of Adjustment or a Court order confirming the Plan of Adjustment; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plan under Section 501(c)(9) of the Code.  No amendment to the Trust Agreement shall modify the responsibilities of the Bank hereunder unless the Bank has first consented to such amendment.

LAI-3221058v4

Section 10.2    Termination.

(a)    The Trust and this Trust Agreement may be terminated at any time in writing by action of the Board, acting by a vote of not less than six (6) out of seven (7) voting Board members, with a copy of such written instrument to be provided to the Bank, or by Court order upon proper motion.  Upon termination of this Trust Agreement, the assets of the Trust Fund shall be paid out at the direction of the Board in the following order of priority:  (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of benefits to Participants entitled to payments for claims arising prior to such termination; and (iii) upon satisfaction of all liabilities to existing Participants, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits in accordance with Code section 501(c)(9) and the rules and regulations promulgated thereunder. Neither Detroit nor any member of the Board shall have any beneficial interest in the Trust Fund, except to the extent an Individual Trustee is also a Participant in the Plan.  Any determination by the Board or an administrator to distribute assets of the Trust upon termination to an Individual Trustee who is also a Participant must have the written concurrence of the Bank.  The Trust Fund shall remain in existence until all assets have been distributed.

(b)    Upon termination, the Bank and the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 10.3    Transfer of Assets and/or Liabilities.  To the extent permitted by Code section 501(c)(9) and other applicable law, some or all of the assets and/or liabilities of the Trust Fund may at the discretion of the Board be transferred directly to another trust for the purpose of providing health or welfare benefits to some or all of the Participants on such terms and conditions as the Board may determine.

**ARTICLE XI**
**MISCELLANEOUS**

Section 11.1    Rights in Trust Fund.  No Participant or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Bank, the Board, or Detroit, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

Section 11.2    Non-Alienation.  Except to the extent required by applicable law, the rights or interest of any Participant to any benefits or future payments hereunder or under the provisions of the Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant, nor shall any such Participant have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under this Trust Agreement.

Section 11.3    Controlling Laws.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 11.4    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 11.5    Headings.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 11.6    Notices.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

If to the Bank:

[**insert name and address**]

If to the Board:

[**insert 8 names and addresses**]

If to the Mayor:

**[insert name and address]**

If to the Supporting Organization:

**[insert name and address]**

If to the Other Supporting Organization:

**[insert name and address]**

If to the Retired Detroit Police and Fire Fighters Association:

**[insert name and address]**

If to the Retired Detroit Police Members Association

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**BANK**

By: _____
    Print Name: _____
    Title: _____
    Date: _____

**CITY OF DETROIT**

By: _____
    Print Name: _____
    Title: _____
    Date: _____

**INDIVIDUAL TRUSTEES**

By: _____    By: _____
    Name: _____    Name: _____
    Date: _____    Date: _____

By: _____    By: _____
    Name: _____    Name: _____
    Date: _____    Date: _____

By: _____    By: _____
    Name: _____    Name: _____
    Date: _____    Date: _____

By: _____
    Name: _____
    Date: _____

**EXHIBIT A**

**Bank Compensation**

**EXHIBIT B**

**Supporting Organization Funding**

| Contributing Organization | Contribution Amount |
|---|---|
| Skillman Foundation | |
| | |
| | |
| | |

**EXHIBIT I.A.183**

PRINCIPAL TERMS OF EXIT FACILITY

# EXIT FACILITY
## SUMMARY OF PRINCIPAL TERMS[1]

The definitive documentation governing the Exit Facility shall provide generally for the following terms:

| | |
|---|---|
| Issuer | City of Detroit. |
| Initial Bond Purchaser | The bonds will initially be sold to the Michigan Finance Authority (the "MFA").  The MFA will issue bonds secured by the City's bonds. |
| Amount and Type | ~~Approximately $250-$300~~$325 million, consisting of Financial Recovery Bonds issued pursuant to section 36a(7) of the Michigan Home Rule City Act, excluding any amounts raised to fund (if required) debt service reserve funds consistent with municipal markets practice. |
| Taxation | ~~Approximately~~An amount up to $200 million is contemplated to be tax-exempt financing. |
| Use of Proceeds | As approved by the Local Emergency Financial Assistance Loan Board, proceeds of the exit facility will be used to fund:  (i) the retirement of the City's $120,000,000 post-petition financing, (ii) certain of the City's reinvestment and revitalization initiatives and (iii) the retirement of the City's obligations with respect to holders of Class 5 Claims (COP Swap Claims) and potentially holders of Class 7 Claims (Limited Tax General Obligation Bond Claims) under the City's ~~Corrected Fifth~~Seventh Amended Plan of Adjustment. |
| Pricing on Sale to Purchaser | ~~To be determined.~~Tax-Exempt Bonds:  SIFMA Municipal Swap Index + 4.25%<br><br>Taxable Bonds: 1-month USD-LIBOR + 4.75% |
| ~~Maturity~~Pricing on Public Offering | ~~11-15 years.~~Tax-Exempt Bonds:  The sum of (i) the yield on Thomson Reuters Municipal Market Data 15-year AAA Index, plus (ii) the Base Spread (as set forth in the Commitment Letter, dated September 17, 2014), plus (iii) the applicable Market Flex (as set forth in the Commitment Letter, dated September 17, 2014).<br><br>Taxable Bonds:  The sum of (i) the yield on 7-year US Treasury Notes, plus (ii) the Base Spread (as set forth in the Commitment Letter, dated September 17, 2014), plus (iii) the applicable Market Flex (as set forth in the Commitment Letter, dated September 17, 2014). |
| Maturity | No longer than 15 years on Tax-Exempt Bonds; no longer than 8 years on Taxable Bonds. |
| Security | The obligations owing by the City with respect to the Exit Facility will be secured by a first priority lien on certain income tax revenues of the City. |

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Plan.

**EXHIBIT I.A.250.a**

FORM OF NEW GRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Amendment and Restatement** **Effective July 1, 2014**

**TABLE OF CONTENTS**

**Page**

COMPONENT I ...................................................................................................................... 1

~~ARTICLE~~ARTICLE 1. ....................................................................~~—~~GENERAL PROVISIONS ~~1~~2

Sec. 1.1.     General Retirement System Established; Adoption of 2014
              Combined Plan Document~~1~~; Amendment and Restatement of 2014 Combined Plan Docur

Sec. 1.2.     Retirement System Intended to be Tax-Qualified .................................. ~~1~~2

Sec. 1.3.     Compliance With Plan of Adjustment ...................................................... 2

Sec. ~~1.3~~1.4.     Board of Trustees............................................................................. ~~1~~3

Sec. ~~1.4~~1.5.     Board of Trustees – Membership; Appointment ................................... ~~1~~3

Sec. ~~1.5~~1.6.     Board of Trustees; Retiree Member Election ........................................ ~~2~~3

Sec. ~~1.6~~1.7.     Board of Trustees; Oath; Term; Vacancies........................................... ~~2~~4

Sec. ~~1.7~~1.8.     Board of Trustees; Officers and Employees .......................................... ~~3~~4

Sec. ~~1.8~~1.9.     Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum ....... ~~3~~5

Sec. ~~1.9~~1.10.    Board of Trustees; Compensation; Expenses ........................................ ~~3~~5

Sec. ~~1.10~~1.11.   Rules for Administration of Funds ....................................................... ~~3~~5

Sec. ~~1.11~~1.12.   Board of Trustees; Certain Data to be Kept........................................... ~~4~~5

Sec. ~~1.12~~1.13.   Board of Trustees; Annual Audit Report ............................................... ~~4~~6

Sec. ~~1.13~~1.14.   Board of Trustees; Legal Advisors ....................................................... ~~4~~6

Sec. ~~1.14~~1.15.   Designation of Actuary; Authority to Engage Additional Actuaries....... ~~4~~6

Sec. ~~1.15~~1.16.   Board of Trustees; Adoption of Mortality and Other Tables of
              Experience and Rates of Interest; Limitations on Payments by the
              Retirement System ............................................................................. ~~5~~7

Sec. ~~1.16~~1.17.   Board of Trustees; Annual Actuarial Valuation of Assets and
              Liabilities .......................................................................................... ~~5~~7

Sec. ~~1.17~~1.18.   Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary
              Duties ................................................................................................ ~~5~~7

Sec. ~~1.18~~1.19.   Investment Committee; Establishment; Purpose; Fiduciary Status;
              Fiduciary Duties................................................................................. ~~5~~8

Sec. ~~1.19~~1.20.   Investment Committee; Membership; Appointment .............................. ~~6~~8

Sec. ~~1.20~~1.21.   Investment Committee; Term; Resignation and Removal;
              Vacancies .......................................................................................... ~~6~~9

Sec. ~~1.21~~1.22.   Investment Committee; Operation; Meetings; Quorum; Voting ........... ~~8~~10

Sec. ~~1.22~~1.23.   Investment Committee; Compensation; Expenses~~8~~; Employment of Advisors     11

Sec. ~~1.23~~1.24.   Investment Committee; Special Reporting ~~Obligation~~Obligations........ ~~8~~11

-i-

ARTICLEARTICLE 2. .................................................................... —DEFINITIONS 1113

Sec. 2.1.    Definitions ................................................................. 1113

ARTICLEARTICLE 3. .............................................................. —MEMBERSHIP 1721

Sec. 3.1.    Eligible Employees ..................................................... 1721

Sec. 3.2.    Cessation of Membership; Re-Employment by the Employer ........... 1721

Sec. 3.3.    Report of the Employer .............................................. 1822

ARTICLEARTICLE 4. ........................................................... —SERVICE CREDIT 1923

Sec. 4.1.    Credited Service ....................................................... 1923

Sec. 4.2.    Vesting Service ........................................................ 1923

Sec. 4.3.    Service Credit; Military Service ................................... 1923

Sec. 4.4.    Service Credit; Qualified Military Service ....................... 1924

ARTICLEARTICLE 5. .................................—ELIGIBILITY FOR RETIREMENT BENEFITS 2125

Sec. 5.1.    Eligibility for Unreduced Normal Retirement Benefit ...................... 2125

Sec. 5.2.    Eligibility for Reduced Early Retirement Benefit ............................ 2125

Sec. 5.3.    Eligibility for Deferred Vested Retirement Benefit......................... 2125

Sec. 5.4.    Eligibility for Retirement Benefit – Disabled Members...................... 2125

Sec. 5.5.    Return of Accumulated Mandatory Contributions to Non-Vested
             Member .................................................................. 2125

ARTICLEARTICLE 6.—RETIREMENT ALLOWANCE; VARIABLE PENSION  IMPROVEMENT FACTOR

Sec. 6.1.    Retirement Allowance .................................................. 2227

Sec. 6.2.    Variable Pension Improvement Factor (Escalator)............................ 2227

ARTICLEARTICLE 7. ..................................................... —DEATH BENEFITS 2328

Sec. 7.1.    Accidental Death Benefit; Performance of Duty ................................ 2328

Sec. 7.2.    Death Benefits for Surviving Spouses Generally .............................. 2328

Sec. 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of
             Member ................................................................... 2328

Sec. 7.4.    Benefits Offset by Compensation Benefits; Subrogation ................... 2328

ARTICLEARTICLE 8. .............................................. —FORMS OF PAYMENT 2530

Sec. 8.1.    Retirement Allowance Options......................................... 2530

13-53846-tjt    Doc 8046    Filed 10/22/14    Entered 10/22/14 03:50:41    Page 246 of 725

Sec. 8.2. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ........................................................................ 2631

~~ARTICLE~~ARTICLE 9. .......................................................—FUNDING AND RESERVES 2732

Sec. 9.1. Funding Objective of the Retirement System ..................................... 2732

Sec. 9.2. Funds ............................................................................................... 2732

Sec. 9.3. Method of Financing Retirement System Benefits ............................ 2833

Sec. 9.4. Member Contributions Picked-Up .................................................... 2834

Sec. 9.5. Fiscal Responsibility: Increased Funding Obligations and Benefit Reductions ..................................................................................... 2834

~~ARTICLE~~ARTICLE 10. ...........................—VOLUNTARY EMPLOYEE CONTRIBUTIONS 3036

Sec. 10.1. Voluntary Employee Contributions; Amount; Vesting ...................... 3036

Sec. 10.2. Changing an Election to Contribute ................................................. 3036

Sec. 10.3. Individual Member Accounting; Crediting of Earnings ..................... 3036

Sec. 10.4. Distribution of Accumulated Voluntary Employee Contributions ...... 3036

~~ARTICLE~~ARTICLE 11.—LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS 3238

Sec. 11.1. The Loan Program ......................................................................... 3238

Sec. 11.2. Eligibility for Loan ........................................................................ 3238

Sec. 11.3. Amount of Loan ............................................................................. 3238

Sec. 11.4. Terms and Conditions .................................................................... 3238

Sec. 11.5. Loan Balance ................................................................................. 3339

Sec. 11.6. Default ........................................................................................... 3339

Sec. 11.7. Distribution .................................................................................... 3340

Sec. 11.8. Annual Report ................................................................................ 40

~~ARTICLE~~ARTICLE 12. ...................—LIMITATION ON BENEFITS AND CONTRIBUTIONS 3441

Sec. 12.1. Compliance With Code Section 415(b) And Regulations .................. 3441

Sec. 12.2. Compliance with Code Section 415(c) and Regulations ................... 3643

~~ARTICLE~~ARTICLE 13. ...................—RETIREMENT SYSTEM ADMINISTRATION 3745

Sec. 13.1. Board of Trustees as Retirement System Administrator .................... 3745

Sec. 13.2. Powers and Duties of Board ............................................................ 3745

Sec. 13.3. Executive Director; Employees ....................................................... 3847

Sec. 13.4.    Discretionary Authority ................................................................. ~~39~~47

Sec. 13.5.    Administrator's Decision Binding .................................................. ~~39~~48

~~ARTICLE~~ARTICLE 14. ...................................... ~~—~~MANAGEMENT OF FUNDS ~~40~~49

Sec. 14.1.    Board as Trustee of Retirement System Assets ............................... ~~40~~49

Sec. 14.2.    Maintenance of Segregated Funds .................................................. ~~40~~49

Sec. 14.3.    Custodian of Funds ...................................................................... ~~40~~49

Sec. 14.4.    Exclusive Purpose ....................................................................... ~~40~~49

Sec. 14.5.    Prohibited Conduct ...................................................................... ~~40~~49

~~ARTICLE~~ARTICLE 15. ................... ~~—~~INVESTMENT OF RETIREMENT SYSTEM ASSETS ~~42~~51

Sec. 15.1.    Investment Powers of the Board and the Investment Committee ........ ~~42~~51

Sec. 15.2.    Investment Management ................................................................ ~~42~~52

Sec. 15.3.    Best Practices .............................................................................. ~~44~~53

Sec. 15.4.    Chief Investment Officer .............................................................. ~~44~~53

Sec. 15.5.    Investment Consultants ................................................................. ~~44~~54

~~ARTICLE~~ARTICLE 16. .................................... ~~—~~RETIREE MEDICAL ACCOUNT ~~46~~56

Sec. 16.1.    Establishment of Account .............................................................. ~~46~~56

~~A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board of Trustees shall pay the cost, which would otherwise be borne by the Employers, for certain medical and related benefits provided under the plans or programs maintained by the Employers to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries~~.................................................................. ~~46~~

Sec. 16.2.    Effective Date ........................................... ~~46~~ of Retiree Medical Account 56

~~Medical Benefits shall be paid from the Medical Benefits Account beginning (i) January 1, 20___ n the case of Medical Beneficiaries who retired prior to _____ and whose employment was subject to a collective bargaining agreement prior to retirement, and the spouses and dependents of such Medical Beneficiaries and (ii) January 1, 20___, in the case of all Medical Beneficiaries whose employment was not subject to a collective bargaining agreement prior to retirement, or such other date recommended by an enrolled actuary (within the meaning of section 7701 (a)(35) of the Code) and approved by the Board and Investment Committee~~.............. ~~46~~

Sec. 16.3.    Funding of Benefits ...................................................................... ~~46~~56

Subject to the right reserved to the City to amend or terminate the provision of
Medical Benefits after June 30, 2023 under its general power to
amend the Plan under Section 17.5, the City expects and intends
to make actuarially determined contributions under the Retirement
System from time to time to fund the Medical Benefits Account .............46

Sec. 16.4.    Limitation on Contributions.............................................................46 56

Sec. 16.5.    Impossibility of Diversion ...............................................................47 57

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits
shall the Medical Benefits Account be used for, or diverted to, any
purpose other than the payment of such benefits and any
necessary or appropriate expenses of administration associated
therewith..................................................................................................47

Sec. 16.6.    Administration ................................................................................47 57

The Medical Plans shall continue to be administered, and claims processed,
under their respective terms ...................................................................47

Sec. 16.7.    Right to Amend or Terminate Medical Plans ...................................47 57

The Employers expressly reserve the exclusive right, retroactively to the extent
permitted by law, to amend, modify, change, terminate or revoke
any medical or other welfare plan or policy maintained by any
such Employer that provides medical or other welfare benefits,
including but not limited to Medical Benefits, and to require
Members, former Members, their eligible spouses and dependents
to pay all or any portion of the cost of such medical benefits ................47

Sec. 16.8.    Reversion .......................................................................................47 57

At any time prior to the satisfaction of all liabilities under the Retirement System
to provide Medical Benefits, no part of the Medical Benefits
Account may be used for any purpose other than providing
Medical Benefits, and any necessary or appropriate expenses
attributable to the administration of the Medical Benefits Account ........47

Sec. 16.9.    Limitation of Rights........................................................................47 57

A Medical Beneficiary shall have no right, title or claim in any specific asset of the
Medical Benefits Account, but shall have the right only to the
Medical Benefits provided from time to time under the Medical
Benefits Account ...................................................................................47

ARTICLE ARTICLE 17. ....................................................................... MISCELLANEOUS 48 58

Sec. 17.1.    Nonduplication of Benefits............................................................48 58

Sec. 17.2.    Assignments Prohibited .................................................................48 58

Sec. 17.3.    Protection Against Fraud ................................................................48 58

Sec. 17.4.   Errors..................................................................................... ~~48~~58

Sec. 17.5.   Amendment; Termination; Exclusive Benefit ................................... ~~48~~58

Sec. 17.6.   Forfeitures Not to Increase Benefits ...................................... ~~49~~59

Sec. 17.7.   Required Distributions - Compliance with Code Section 401(a)(9) and Regulations........................................................................ ~~49~~59

Sec. 17.8.   Direct Rollovers ........................................................... ~~49~~59

Sec. 17.9.   Construction ................................................................. ~~50~~61

Sec. 17.10.  Severability ................................................................. ~~51~~61

# COMPONENT I

# ARTICLE 1 — GENERAL PROVISIONS

**Sec. 1.1.    General Retirement System Established; Adoption of 2014 Combined Plan Document; Amendment and Restatement of 2014 Combined Plan Document**

Effective July 1, 1938, a General Retirement System for the employees of the City of Detroit was established for the purpose of providing retirement and survivor benefits for eligible City employees and their beneficiaries.   The provisions of the Detroit General Retirement System, as in effect July 1, 2014, ~~are~~were set forth in a Combined Plan Document.  As provided in Ordinance 19-14 and Ordinance 20-14 and Section 47-1-1 of the Detroit City Code, this Combined Plan Document. ~~Component I of the Combined Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Detroit General Retirement System on and after July 1, 2014.  Component II of the Combined Plan Document applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Combined Plan Document are frozen effective June 30, 2014.~~

replaced in ~~This Combined Plan Document shall replace in~~ its entirety Chapter 47 of the Detroit City Code as in effect on June 30, 2014 and any conflicting provisions in any collective bargaining agreements covering Members (including, without limitation, the City Employment Terms that applied to Members effective July 18, 2012).   All resolutions and policies of the Retirement Board previously adopted which ~~are~~were inconsistent with the provisions of ~~this~~the Combined Plan Document ~~are also hereby~~were also repealed to the extent of such inconsistency.

The Combined Plan Document is hereby amended and restated effective July 1, 2014, in the form of this instrument.  Component I of the Combined Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Detroit General Retirement System on and after July 1, 2014.  Component II of the Combined Plan Document applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Combined Plan Document are frozen effective June 30, 2014.

**Sec. 1.2.    Retirement System Intended to be Tax-Qualified**

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code.   The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

**Sec. 1.3.    Compliance With Plan of Adjustment**

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment").  Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment.  To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the

Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

**Sec. ~~1.3~~1.4. Board of Trustees**

Effective July 1, 1938, a Board of Trustees of the Detroit General Retirement System was created. The Board is vested with responsibility for the general administration, management and operation of the Detroit General Retirement System and with the trust and investment powers conferred in this Combined Plan Document.

**Sec. ~~1.4~~1.5. Board of Trustees – Membership; Appointment**

The Board of Trustees of the Detroit General Retirement System shall consist of ten Trustees, as follows:

(1) The Mayor, *ex officio*, or the ~~Mayor's~~Mayor's designee;

(2) One City Council ~~Member~~member, *ex officio*, who is selected by ~~that body~~the City Council;

(3) The City Treasurer, *ex officio*;

(4) Five active employee ~~members~~Members of the Retirement System to be elected by the Members in accordance with such rules and regulations as may be adopted by the Board. No more than one Trustee shall be elected from any one City Department;

(5) One ~~Detroit resident~~individual, appointed by the Mayor subject to the approval of the Board, who is neither an employee of the City nor is eligible to receive benefits under the Retirement System; and

(6) One retiree who is receiving benefits under the Retirement System and who is elected by Retirees in accordance with procedures described in Section ~~1.5~~1.6.

**Sec. ~~1.5~~1.6. Board of Trustees; Retiree Member Election**

The procedures for the election of the Retiree member of the Board of Trustees shall be as follows:

(1) *Notice.* Notice of a primary election shall be sent to each Retiree by United States Mail.

(2) *Nominating petitions.* No candidate's name shall be placed on the primary election ballot unless a nominating petition containing the signatures of at least one hundred and twenty-five Retirees is filed with the ~~secretary~~executive director of the ~~Board~~Retirement System. The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board. Notwithstanding the foregoing, an incumbent Retiree Trustee shall not be required to submit a nominating petition but instead shall submit a written communication indicating his or her intention to seek an additional term.

(3)     *Ballot*.  Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position held by the Retiree at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election.  No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4)     *Voting*.  Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)     *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)     *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section ~~1.5~~1.6 shall be handled in accordance with such rules and regulations as the Board may adopt.

## Sec. ~~1.6~~1.7. Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the Detroit City Clerk.

The regular term of office for the elected Member Trustees and the ~~appointed Detroit resident~~ Trustee appointed by the Mayor under Section 1.5(5) shall be for a period of six years, one such Trustee to be elected or appointed, as the case may be, each year.  The term of office for the Retiree Trustee shall be two years.

If an active employee Trustee leaves the employ of the City, or if an elected or appointed Trustee fails to attend four consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  By resolution, the Board shall declare the office vacated as of the date of adoption of such resolution.  If a vacancy occurs in the office of Trustee, the vacancy shall be filled at the next regular election held by the Board, or at any special election ordered by resolution adopted by the Board.

## Sec. ~~1.7~~1.8. Board of Trustees; Officers and Employees

The Board shall elect a chair and vice-chair from its members.  The executive director of the Retirement System or its designee shall serve as secretary of the Board.  The Board may employ such actuarial, medical and other contractors and employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.

**Sec. ~~1.8~~1.9.** **Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum**

(1)     The Board shall hold regular ~~weekly~~ meetings, at least one in each month, and <u>shall hold special meetings as necessary.  The Board</u> shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.*<u>  All Board meetings shall be held within the City of Detroit.</u>

(2)     Each Trustee shall be entitled to one vote on each question before the Board.  A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Five Trustees shall constitute a quorum.

**Sec. ~~1.9~~1.10.**   **Board of Trustees; Compensation; Expenses**

Members of the Board of Trustees shall serve without additional compensation from the Employer, but they shall be compensated by the Retirement System as follows:

(1)     *Stipend.*  Trustees are eligible for a meeting stipend, provided the Trustee attends one or more regular or special Board meetings during a month.  The stipend amount shall be a minimum of sixty-seven dollars ($67.00) per week multiplied by the Trustee's years of service.  Eligibility rules and the amount of the stipend shall be set by Board resolution.  However, the amount of the weekly meeting stipend shall not exceed two hundred dollars ($200.00).

(2)     *Ex Officio Trustees*.  Ex Officio Trustees are not eligible for a stipend payment.

(3)     *Attendance*.  For purposes of this Section ~~1.9~~1.10, attendance at a Board meeting shall include actual attendance at a meeting or being otherwise available to attend a Board meeting canceled for lack of a quorum.

Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

**Sec. ~~1.10~~1.11.**  **Rules for Administration of Funds~~.~~**

Subject to the limitations contained in this <u>Combined</u> Plan ~~document~~<u>Document</u>, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Plan document and for the transaction of its business.

**Sec. ~~1.11~~1.12.** **Board of Trustees; Certain Data to be Kept**

The Board shall keep or cause to be kept, in convenient form, such data as shall be necessary for an actuarial valuation of the Retirement System and for checking and compiling

the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

### Sec. ~~1.12~~1.13. Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. ~~1.13~~1.14. Board of Trustees; Legal Advisors

(1)     The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)     Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)     Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec. ~~1.14.~~1.15. Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board. In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary. The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing ~~its~~their actuarial duties and shall comply with all requests for information or modeling requested by the Board or the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Board and Investment Committee to perform satisfactorily the rights and duties set forth ~~in~~in the Combined Plan, the term sheet regarding Investment Committee Governance for General Retirement System, attached to that certain agreement by and between the Michigan Settlement Administration Authority, a Michigan body public corporation (the "Authority"), the Retirement System, the Police and Fire Retirement System for the City of Detroit, Michigan ("PFRS") and the City (the "State Contribution Agreement") as Exhibit A (the "Governance Term Sheet") and the Plan of Adjustment. Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

### Sec. 1.151.16. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsectionsubsection (2) or (3) of this section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

### Sec. 1.161.17. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.151.16, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. 1.171.18. Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee.  To the extent the Board exercises discretion with respect to investment of Retirement System assets, each member of the Board of Trustees shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*., and shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose.  Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

**Sec. ~~1.18.~~1.19.** **Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties**

As of the effective date of the Plan of Adjustment, but subject to consummation of ~~that certain~~the State Contribution Agreement ~~by and between the Retirement System and the State of Michigan as provided in the Plan of Adjustment~~, an Investment Committee is hereby created for the purpose of making recommendations to the Board of Trustees with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment Committee is controlled by the ~~term sheet regarding Investment Committee~~ Governance ~~for General Retirement System, as attached to the Plan of Adjustment ("~~Term Sheet~~")~~. The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6)*. The Investment Committee shall ~~service~~serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or ~~conflicts~~conflict with the provisions set forth in the Governance Term Sheet.

**Sec. ~~1.19.~~1.20.** **Investment Committee; Membership; Appointment**

The Investment Committee shall consist of seven (7) members, determined as follows:

(1)     Five independent members, two of whom must be residents of the State of Michigan, and none of whom may be a ~~party in interest~~party-in-interest with respect to the Retirement System, ~~as defined in~~ as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern

District of Michigan shall designate such number of independent Investment Committee members as is necessary to bring the number of independent Investment Committee members to five (5);

(2)     One Retiree who is a Retiree member of the Board of Trustees who shall be appointed by the Board; and

(3)     One ~~Employee Member~~employee who is an active employee member of the Board of Trustees who shall be appointed by the Board.

**Sec. ~~1.20.~~1.21. Investment Committee; Term; Resignation and Removal; Vacancies**

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|:---:|:---:|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees.  Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier.  Notwithstanding any provision of this Combined Plan Document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee.   An Investment Committee member may be removed from office by majority vote of the ~~other~~remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in according with the voting procedure set forth in Section ~~1.21~~1.22; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government.  A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining ~~Members~~members attending such meetings.

In the event of any such removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

An Investment Committee member Committee may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("State Treasurer"), in consultation with the Foundation for Detroit's Future, pursuant to such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the State Treasurer of the State of Michigan cannot agree on thea successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, successorsa successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee, (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

**Sec. 1.21.1.22.          Investment Committee; Operation; Meetings; Quorum; Voting**

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of its proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be public and subject to the *Michigan Open Meetings Act, MCL 15.261 et seq*. All Investment Committee meeting shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. ~~Each~~Except as otherwise provided in the Governance Term Sheet, each Investment Committee member shall be entitled to one vote on each question before the Committee. ~~Except as otherwise provided in the Term Sheet,~~ and at least four concurring votes shall be necessary for a decision by the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

### Sec. ~~1.22.~~1.23. Investment Committee; Compensation; Expenses; Employment of Advisors

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System. The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Retirement System. Such engagements shall not be subject to approval of the Board.

~~Investment Committee members shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.~~

### Sec. ~~1.23.~~1.24. Investment Committee; Special Reporting ~~Obligation~~Obligations

(1)  Beginning in 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the State Treasurer on a semi-annual basis and at such other times as the State Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)  In the event the Retirement System receives a written notice from the State Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the State Treasurer a written certification that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)　Beginning in 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)　Beginning in calendar year 2015 and for each calendar year thereafter, ~~the Investment Committee shall provide to the Foundation for Detroit's Future (the "Foundation") the following information~~ as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

(a)　a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the ~~fiscal year~~Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

(b)　a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to the Foundation ~~("Pension Certificate")~~that, as of the date of the annual report required to be provided by the City to the Foundation ~~that~~under the Omnibus Transaction Agreement by and among the City, The Detroit Institute of Arts and Foundation For Detroit's Future ("Annual Report"):

(i)　the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

(ii)　the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan ~~document~~Document; and

(iii)　~~the City has complied and continues to comply with the following requirements:~~

(A)　~~for the twenty (20) year period following the effective date of the Plan of Adjustment,~~iii) the City ~~shall~~continues to maintain the pension governance terms reflected in ~~the~~ this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c)　a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the State Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the State Treasurer; and (iv) in the event that the State Treasurer issued a Default Notice, the Cure Certification,

within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee.  Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

      (B) ~~all funds remitted by the Foundation to the City's account shall be used solely for the payment of contributions to the Retirement System and the Police and Fire Retirement System of the City of Detroit, Michigan ("PFRS"), shall have been transferred to the Retirement System not later than three business days after such funds are deposited into the City account to which Foundation assets are transferred, and shall have been allocated as provided in the Plan of Adjustment in satisfaction of the City's obligation to contribute to Component II of the Retirement System and Component II of the PFRS in accordance with the Plan of Adjustment, except to the extent such funds are used to indemnify a party as permitted under the Plan of Adjustment or to pay reasonable expenses of maintaining the City account to which Foundation assets are transferred; and~~

      (C) ~~the City shall provide to the Foundation in writing prior to the selection of the initial and successor independent Investment Committee members a notice which includes information regarding the identity and qualifications of the candidates under consideration by the nominating party(ies) and, if requested by the Foundation, shall provide to the State and the Board any written comments or observations about the candidates that the Foundation elects to provide to the City, provided that the City receives such comments or observations no later than three days after the City provides such notice to the Foundation; and~~

(~~c~~d)    any ~~other~~additional information that ~~is deemed necessary~~may be reasonably requested by the Foundation ~~to evidence that the City is in compliance with the terms of the Omnibus Transaction Agreement by and among the City of Detroit, the Detroit Institute of Arts and Foundation for Detroit's Future, as provided in the Plan of Adjustment.~~from time to time.

~~In addition, beginning~~(5)    Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

# ARTICLE 2 — DEFINITIONS

## Sec. 2.1. Definitions

Unless a different meaning is plainly required by context, ~~for purposes of Component I of this Combined Plan Document~~ the following words and phrases have the meanings respectively ascribed to them by this section:

(1) *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2) *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System representing after-tax amounts deducted from the compensation of the Member, together with earning on such contributions.

(3) *Actuarial Equivalent* or *Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit. The rates of interest, tables and factors adopted by the Board from time to time to determine Actuarial Equivalence shall not violate the terms of the Plan of Adjustment.

(4) *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5) *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6) *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7) *Average Final Compensation* means the average Compensation received by a Member during the ten consecutive years of Credited Service under the Retirement System (for this purpose, both before and after July 1, 2014) which immediately precede the date of the Member's last termination of employment with the Employer. If a Member has less than ten years of Credited Service, the Member's Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service. If a Member is absent from service with the City for a period of not less than two consecutive months during his last two years of employment because of an unpaid leave under the Family and Medical Leave Act, such Member's Average Final Compensation will mean the average Compensation received by the Member during the ten consecutive year period out of the last twelve years of Credited Service which produces the highest average.

(8) *Beneficiary* means any person ~~who is~~ or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance

or pension payable from funds of the Retirement System due to the participation of a Member.

(9) *Board of Trustees* or *Board* or *Retirement Board* means the Board of Trustees of the ~~Detroit General~~ Retirement System.

(10) *City* means the City of Detroit, Michigan, a municipal corporation.

(11) *City Council* or *Council* means the legislative body of the City.

(12) *Combined Plan* means the Combined Plan for the General Retirement System of the City of Detroit, Michigan, effective July 1, 2014 and as amended thereafter.

(~~12~~13) *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the taxable income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which are contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the Employer on and after July 1, 2014.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the

numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(13) *Combined Plan* means the Combined Plan for the General Retirement System of the City of Detroit, effective July 1, 2014 and amended and restated effective July 1, 2014.

(14) *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of the *2014 Defined Benefit Plan*.:

    (a) the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (b) the 2014 Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15) *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

    (1) The 1973 Defined Benefit Plan, which plan is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (2) Thethe 1973 Defined Contribution Plan, which Plan is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16) *Credited Service* means service credited to a Member to the extent provided in SectionArticle 4 of Component I of this Combined Plan Document and, solely for purposes of Section 2.1(7), service credited to a Member prior to July 1, 2014 pursuant to Component II of this Combined Plan.

(17) *Detroit General Retirement System or Retirement System* means the General Retirement System of the City of Detroit created and established by Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code and this Combined Plan Document, as amended from time to time, which consists of:

    (a) The *2014 Defined Benefit Plan,* the terms of which are described in Component I hereof;

    (b) The *Defined Contribution Plan,* consisting of the Voluntary Employee Contribution Account, the terms of which are described in Component I hereof;

    (c) The *Frozen 1973 Defined Benefit Plan,* the terms of which are described in Component II hereof;

    (d) The *Frozen 1973 Defined Contribution Plan,* the terms of which are described in Component II hereof; and

    (e) The *Frozen 1998 Defined Contribution Plan*, the terms of which are described in Component II hereof, which was never implemented by the City.

~~References to the words *Retirement System* in Component I of the Combined Plan Document shall mean the provisions of the *Defined Benefit Plan and Defined Contribution Plan* described in Component I, unless a different meaning is plainly required by the context.~~

(~~18~~17) *Disability* or *Disabled* means that a Member ~~is mentally or physically totally incapacitated for the further performance of duty for the Employer and that such incapacity is likely to be permanent, provided that the Member shall~~ has been determined to be eligible to receive long term disability benefits under a policy or plan of insurance or self-insurance maintained by the Employer ~~for the period of such incapacity~~.

(~~19~~18) *Employee* means any regular and/or permanent officer, agent, or person in the employ of the Employer, but does not include:

    (a)    individuals whose services for the Employer are compensated on a contractual or fee basis;

    (b)    persons who are not employed as Full-time Employees; ~~or~~

    (c)    any person during any period when such person is classified by the Employer as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the Employer; ~~or~~

    (d)    the medical director of the Retirement System; or

    (e)    any ~~sworn~~ Police or Fire employee ~~included in~~ covered by the Police and Fire Retirement System of the City of Detroit, Michigan by virtue of such employment.

If a person described in (c) above is reclassified by the Employer as a common-law employee of the Employer and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(~~20~~19) *Employer* means the City, or any board, commission, or court serving the City, to the extent that both the City, through the action of City Council, and the governing authority of such board, commission or court, shall mutually agree to include the employees of such board, commission, or court, as Employees under the provisions of this Retirement System at such time as they are eligible.  To the extent that any employees of a board, commission, or court are considered Employees for this purpose, all employees of such board, commission, or court, shall be so included.  However, only City board members and commissioners who are also Employees are eligible to participate in the Retirement System, unless otherwise specifically provided for in the Combined Plan Document.  In all cases of doubt, the Board of Trustees shall decide who is an Employee.

(2120) *Family and Medical Leave Act* means the federal Family and Medical Leave Act of 1993, as amended, and regulations issued thereunder.

(22) ~~*Full-time Employee*  means an Employee who is employed in a position normally requiring six hundred hours of work or more per year.~~

(21) *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(22) *Full-time Employee* means an Employee who is employed in a position normally requiring six hundred hours of work or more per calendar year; provided, however, that an employee who is hired by an Employer as a part-time transit operator to work less than twenty-five hours per week shall not be a full-time employee under the Retirement System.  Notwithstanding the general rule, a special service employee of the City shall be considered a full-time employee under the Retirement System upon completion of fourteen hundred and forty (1440) hours or more in a Fiscal Year.  For purposes of Component I, once a special service employee has worked 1440 hours in a Fiscal Year, the employee will be deemed to be a full-time employee under the Retirement System for all subsequent Fiscal Years.

(23) *General Retirement System* or *Retirement System* means the General Retirement System of the City of Detroit created and established by Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code and this Combined Plan Document, as amended from time to time, which consists of:

(a) The 2014 Defined Benefit Plan, the terms of which are described in Component I hereof;

(b) The 2014 Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, the terms of which are described in Component I hereof;

(c) The Frozen 1973 Defined Benefit Plan, the terms of which are described in Component II hereof; and

(d) The Frozen 1973 Defined Contribution Plan, the terms of which are described in Component II hereof.

References to the words Retirement System in Component I of the Combined Plan Document shall mean the provisions of the 2014 Defined Benefit Plan and/or the 2014 Defined Contribution Plan described in Component I, unless a different meaning is plainly required by the context.

(2324) *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the Employer for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the Employer for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(2425) *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(2526) *Investment Committee* means the committee established pursuant to Section 1.181.19 which shall have the powers and duties described herein.

(2627) *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(2728) *Medical Beneficiary* means a memberMember who has retired from employment with the Employers and the spouses and dependants of such memberMember who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by an Employer.

(2829) *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(2930) *Medical Benefits Account* means the bookkeeping account established under Section 16.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(3031) *Member* means any Employee who is included in the membership of the Retirement System and who has not retired or died.

(3132) *Normal Retirement Age* means age sixty-two (62). Notwithstanding the foregoing, the Normal Retirement Age of a Member who is an active Employee as of June 30, 2014 and who has 10 or more years of Vesting Service as of such date shall be as follows solely for purposes of this Component I:

| Age as of July 1, 2014 | Normal Retirement Agee |
|---|---|
| 61 years | 60 years and 0 months |
| 60 years | 60 years and 0 months |
| 59 years | 60 years and 3 months |
| 58 years | 60 years and 6 months |
| 57 years | 60 years and 9 months |
| 56 years | 61 years and 0 months |
| 55 years | 61 years and 3 months |
| 54 years | 61 years and 6 months |
| 53 years | 61 years and 9 months |

(3233) *Normal Retirement Date* means for any Member the later of the date the Member (i) the Member attains 10 years of Vesting Service, or (ii) attains Normal Retirement Age.

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon attainment of his or her Normal Retirement Date while ~~in Service~~employed by an Employer.

(~~33~~34) *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(~~34~~35) *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance payable under Component I of the Combined Plan. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(~~35~~36) *Plan Actuary* or *Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section ~~1.14~~1.15 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Board or the Investment Committee may direct.

(~~36~~37) *Plan Document* or *Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(~~37~~38) *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846*.

(~~38~~39) *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(~~39~~40) *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of Component II of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(~~40~~41) *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(~~41~~42) *Retirement* means a Member's withdrawal from the employ of the Employer with a Retirement Allowance paid by the Retirement System.

(~~42~~43) *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(~~43~~44) *Service* means personal services rendered to the Employer by a person as an Employee, provided such person is compensated by the Employer for such personal services.

(~~44~~45) *Spouse* means the person to whom a Member is legally married under applicable law at the time ~~a~~the determination is made.

(45<u>46</u>) *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(46<u>47</u>) *Vesting Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(47<u>48</u>) *Voluntary Employee Contributions* mean the after-tax contributions made by a Member to the Retirement System pursuant to Section 10.1.

(48<u>49</u>) *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for a Member who elects to make Voluntary Employee Contributions.

<u>The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:</u>

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 12.2(1) |
| Annual Report | Section 1.24(4)(b) |
| Authority | Section 1.19 |
| compensation | Section 12.1(11) |
| Compliance Report | Section 1.24(1) |
| Cure Certification | Section 1.24(2) |
| Default Notice | Section 1.24(2) |
| Direct Rollover | Section 17.8(2)(a) |
| Distributee | Section 17.8(2)(b) |
| Dollar Limit | Section 12.1(3)(b) |
| Eligible retirement plan | Section 17.8(2)(c) |
| Eligible rollover distribution | Section 17.8(2)(d) |
| Expense Fund | Section 9.2(6) |
| Foundation | Section 1.20(1) |
| funding level | Section 9.5 |
| Governance Term Sheet | Section 1.15 |
| Income Fund | Section 9.2(7) |
| Investment management decision/investment management matter | Section 15.2 |
| limitation year | Section 12.1(2) |
| Medical Benefit Fund | Section 9.2(5) |
| Medical Plans | Section 16.1 |
| Option "A".  Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(c) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option One.  Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three.  Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two.  Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |

Pension Accumulation Fund                    Section 9.2(3)
Pension Certificate                          Section 1.24(4)(b)
Pension Improvement Factor (Escalator)       Section 6.2
PFRS                                         Section 1.19
Plan of Adjustment                           Section 1.3
Pop-up Form                                  Section 8.1(2)(b)
Rate Stabilization Fund                      Section 9.2(4)
Standard Form                                Section 8.1(2)(a)
State Contribution Agreement                 Section 1.15
State Treasurer                              Section 1.21
Straight Life Retirement Allowance           Section 8.1(1)

## ARTICLE 3 ~~—~~, MEMBERSHIP

### Sec. 3.1.    Eligible Employees

The membership of the Retirement System shall consist of all persons who are Full-time Employees, except:

(a)     persons who are members of the Police and Fire Retirement System of the City of Detroit, Michigan established under Title IX, Chapter VII of the 1918 Detroit City Charter, continued in the 1974, 1997 and 2012 Detroit City Charters, and continued in the form of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan; and

(b)     Any person who is a member of any other public employee pension or retirement plan or retirement system adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of the State of Michigan.

~~Notwithstanding the foregoing, a special service employee will be eligible to become a member upon completion of fourteen hundred forty (1440) hours or more in a fiscal year.~~

### Sec. 3.2.    Cessation of Membership; Re-Employment by the Employer

(1)    The following provisions shall apply to a non-vested Member who terminates employment with the Employer and is re-employed:

(a)     Except as otherwise provided in this Article 3, if any non-vested Member leaves the employment of the Employer for any reason other than ~~retirement~~Retirement or death, such person shall continue to be a Member until such time as the Member receives a total distribution of his Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.  Upon receipt of his Accumulated Mandatory Employee Contributions, the Member's Credited Service and Vesting Service at that time shall be forfeited.

(b)     If ~~re-employment occurs~~the Member is re-employed by an Employer (other than as a part-time transit operator) within a period of six years from and after the date employment with the Employer last terminated, any forfeited Credited Service and Vesting Service rendered on and after July 1, 2014 shall be restored for purposes of determining the Member's Retirement Allowance after re-employment, provided that within the two year period beginning on the Member's re-employment date, the Member re-contributes to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5.

(c)     If ~~re-employment of~~ a non-vested Member ~~does not occur within a period of~~is re-employed (other than as a part-time transit operator) more than six years from and

after the date employment with the Employer last terminated, the Member shall not be permitted to re-contribute to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5 and any forfeited Credited Service and Vesting Service shall not be restored at the time of the Member's re-employment.

(2)     A former Employee who is vested but has not yet begun to receive a Retirement Allowance and who is rehired (other than as a part-time transit operator) prior to being separated for six years shall have his benefit pertaining to his total Credited Service earned on and after July 1, 2014 calculated in accordance with the terms of Component I of the Retirement System in effect at the time of his last ~~termination of employment~~separation from service.

(3)     A former Employee who is vested but has not begun to receive a Retirement Allowance and who is rehired (other than as a part-time transit operator) after being separated for more than six years shall be entitled to two separate and distinct ~~pensions~~pension benefits under Component I, each to be calculated in accordance with the provisions of Component I of the Retirement System in effect at the time of each separation from service.

(4)     Retirement benefits for a Retiree who returns to active full time employment with an Employer shall be subject to the following provisions:

(a)     A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment.  The variable pension improvement factor (escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

(b)     A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

(c)     A Retiree's Average Final Compensation for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation earned by the Retiree after he returns to work.

(d)     An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance.  However, the individual may select a separate payment option with respect to his second Retirement Allowance.

(e)     The Coordination of Benefits (Equaled Social Security) option will not be available with respect to payment of the second Retirement Allowance.

**Sec. 3.3.     Report of the Employer**

It shall be the duty of the Employer to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of

each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

# ARTICLE 4. SERVICE CREDIT

## Sec. 4.1.  Credited Service

(1)  The Board shall keep an accurate record of each Employee's accumulated Service credit from the date of commencement of employment with the Employer to the date of termination of employment with the Employer.

(2)  A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the Employer as an Employee, beginning on the later of July 1, 2014 or his date of hire with the Employer and ending on the date his employment with the Employer is terminated. Service shall be credited in years and twelfths $(1/12^{th})$ of a year. Not more than one-twelfth $(1/12^{th})$ of a year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in a calendar month. Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in any period of 12 consecutive months.

(3)  A Member who does not perform Service for the Employer by reason of a Disability which begins on or after July 1, 2014 shall be credited with Credited Service for the period of his Disability during which he is entitled to receive long-term disability benefits under the Employer's plan or policy.

(4)  Solely for purposes of determining eligibility for a retirement benefit under Section 5.2, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).

## Sec. 4.2.  Vesting Service

(1)  A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the Employer.

(2)  A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

## Sec. 4.3.  Service Credit; Military Service

An Employee who enters the military service of the United States while employed by an Employer shall have the period of such military service credited as Service in the same manner as if the Employee had served the Employer without interruption, provided that (1) the Employee's entry into such military service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the Employer, (2) he or she is re-employed by the Employer upon completion of such military service; and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service.  The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder.  During the period of military service and until return to employment with the

Employer, the Employee's Mandatory Employee Contributions to the Retirement System shall be suspended.

### Sec. 4.4.     Service Credit; Qualified Military Service

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u).   Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

## ARTICLE 5. ELIGIBILITY FOR RETIREMENT BENEFITS

**Sec. 5.1.    Eligibility for Unreduced Normal Retirement Benefit**

Any Member who attains his Normal Retirement Date while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

**Sec. 5.2.    Eligibility for Reduced Early Retirement Benefit**

Any Member who has attained Age fifty-five, who is credited with thirty or more years of Credited Service, and who has not attained his Normal Retirement Date, shall have the option of retiring upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The Retirement Allowance payable to a Member who retires early shall be the Actuarial Equivalent of the Retirement Allowance that would be payable to the Member at his Normal Retirement Date pursuant to Section 6.1, as determined by the Plan Actuary.  A Member's early retirement benefit shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

**Sec. 5.3.    Eligibility for Deferred Vested Retirement Benefit**

Any Member who ceases to be an employee before satisfying the requirements for receipt of a retirement benefit under Section 5.1 or Section 5.2 and who is credited with ten or more years of Vesting Service upon his or her termination of employment (regardless of age), shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his attainment of Age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

**Sec. 5.4.    Eligibility for Retirement Benefit – Disabled Members**

Any Member who becomes Disabled prior to his Normal Retirement Date shall be entitled to receive an unreduced Retirement Allowance commencing at any time following the Member's attainment of Age sixty-two.  Disability retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

**Sec. 5.5.    Return of Accumulated Mandatory Contributions to Non-Vested Member**

If a Member ceases to be an Employee before becoming eligible for a deferred vested Retirement Allowance under Section 5.3 or a disability Retirement Allowance under Section 5.4, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member

in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

## ARTICLE 6—. RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec. 6.1.    Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Date or his actual retirement from employment with the Employer in the form of a Straight Life Retirement Allowance shall be equal to one and one-half percent (1.5%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth (1/12th) year) of Credited Service earned on and after July 1 June 30, 2014.

### Sec. 6.2.    Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2018 and effective the first day of each Plan Year thereafter, the Trustee Board may determine that a Retiree's annual Retirement Allowance shall be increased by a factor of two percent (2.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement; provided, that the recipient of said Retirement Allowance shall have attained Age sixty-two and shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year. The Pension Improvement Factor (Escalator) shall not be compounded.

# ARTICLE 7—. DEATH BENEFITS

## Sec. 7.1.     Accidental Death Benefit; Performance of Duty

(1)     If a Member is killed in the performance of duty in the service of the Employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the Employer, and such death, illness, or ~~injuries~~injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the Employer, the Member's surviving Spouse shall be entitled to a monthly annuity benefit equal to the Member's Retirement Allowance at the time of his death, unreduced for early payment.  Such benefit shall be payable until the surviving Spouse's death.

(2)     The minimum annual Retirement Allowance payable to a surviving Spouse under this Section 7.1 shall be equal to ten percent (10%) of the Member's Average Final Compensation determined as of ~~his~~the date of the Member's death.

## Sec. 7.2.     Death Benefits for Surviving Spouses Generally

If any Member dies while in the employ of the Employer (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, the Member's surviving Spouse shall receive a Retirement Allowance.  The Retirement Allowance payable to the Spouse shall be computed in the same manner in all respects as if said Member had (i) retired effective the day preceding the Member's death, notwithstanding that the Member had not attained his or her Normal Retirement Date, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving Spouse as Beneficiary.

## Sec. 7.3.     Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member dies while employed by the City or following termination of employment ~~but prior to commencement of a Retirement Allowance~~and the Member is not eligible for a benefit under Section 7.1 or 7.2, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the  Beneficiary nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate.  If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose.  Such expenses shall not exceed a reasonable amount as determined by the Board.

## Sec. 7.4.     Benefits Offset by Compensation Benefits; Subrogation

(1)     Any amounts which may be paid or payable to a  Beneficiary on account of a Member's death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' benefits, shall be an offset against any amounts payable from funds of the Retirement System on account of the Member's death.  If the present value of the benefits payable under said Workers' Compensation,

pension, or similar law, is less than the Pension Reserve for the Retirement Allowance payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System, and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2)     In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

# ARTICLE 8. FORMS OF PAYMENT

## Sec. 8.1.    Retirement Allowance Options

(1)    Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a  Beneficiary to receive benefit payments following the Member's death, in accordance with the options set forth below:

   (a)    *Option One.  Cash Refund Annuity*.  If a Retiree who elected a Cash Refund Annuity dies before payment of the Accumulated Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

   (b)    *Option Two.  Joint and One Hundred Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the reduced Retirement Allowance shall be paid to and continued throughout the life of the  Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

   (c)    *Option "A".  Joint and Seventy-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

   (d)    *Option Three.  Joint and Fifty Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the  Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

   (e)    *Option "B".  Joint and Twenty-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the reduced Retirement Allowance shall be paid throughout the life of the  Beneficiary nominated by written designation duly executed and

filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2) *Joint and Survivor Optional Forms of Payment*. The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

    (a) *Standard Form*. Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

    (b) *Pop-up Form*. Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

(3) *Coordination of Benefits*. According to such rules and regulations as the Board shall adopt, until the first payment of a Retirement Allowance becomes due, but not thereafter, a Member under Age sixty-five may elect to have the Member's Straight Life Retirement Allowance provided for ~~in this Retirement System~~ under Component I equated on an Actuarial Equivalent basis to provide an increased Retirement Allowance payable to Age sixty-two or Age sixty-five, and to provide a decreased Retirement Allowance thereafter. The increased Retirement Allowance payable to such Age shall approximate the total of the decreased Retirement Allowance payable thereafter and the estimated social security benefit. If a Member elects to receive increased and then decreased Retirement Allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (1) of this Section 8.1. This coordination of benefits option shall not create any additional actuarial costs to the City.

## Sec. 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1(1), both a Retiree and his Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board. If there are no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the second to die of the Retiree or Beneficiary.

# ARTICLE 9 — FUNDING AND RESERVES

## Sec. 9.1.    Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive Employer and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of Component I of the Retirement System).

## Sec. 9.2.    Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Employee Contribution Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Medical Benefit Fund, the Expense Fund, and the Income Fund, as follows:

(1)    The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the Retirement, termination, or death of a Member with a vested Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's Retirement Allowance.

(2)    The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members together with earnings thereon.

(3)    The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the Employer's annual contribution that is not credited to the Rate Stabilization Fund and amounts transferred to Component I as provided in Section E-16(c) of Component II, and from which shall be paid Retirement Allowances and other benefits on account of Members.

(4)    The Rate Stabilization Fund shall be the Fund to which shall be credited Employer annual contributions in excess of the amount of the Employer's contribution which is credited to the Pension Accumulation Fund and amounts transferred to Component I as provided in Section E-16(c) of Component II.

(5)    The Medical Benefit Fund shall be the Fund to which shall be credited contributions made for the purpose of funding Medical Benefits.

(56)    The Expense Fund shall be the fund to which shall be credited any money provided by the EmployerEmployers to pay the administrative expenses of the Retirement System, and

from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(~~6~~7) The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of Component I of the Retirement System and any earnings thereon, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9. There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document. Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

### Sec. 9.3. Method of Financing Retirement System Benefits

(1) The pension liabilities for Members shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2) The Employer's annual contribution to finance the prospective pension liabilities for the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be five percent (5%) of the base Compensation of active Members for the applicable Plan Year. A portion of the Employer's annual contribution for each Plan Year as determined by the City shall be credited to the Rate Stabilization Fund. The remainder of the City's annual contribution shall be ~~shall be~~ allocated to the Pension Accumulation Fund.

(3) Except as provided in Section 9.5, for each Plan Year, a Member shall contribute to the Retirement System an amount equal to four percent (4%) of his or her base Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of ~~July 14,~~the Member's first payroll date occurring in August 2014. The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the ~~date of his participation in the Retirement System~~later of (i) the Member's first payroll date occurring in August 2014, and (ii) the Member's date of hire to the date he ceases to be a ~~Member~~an Employee. The contribution shall be deducted from ~~the Members'~~a Member's Compensation, notwithstanding that the minimum compensation provided by law for ~~any~~the Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment. Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

### Sec. 9.4.    Member Contributions Picked-Up

(1)    The Employer shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)    The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code.  The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)    The Employer shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both.  The Employer shall designate Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

### Sec. 9.5.    Fiscal Responsibility: Increased Funding Obligations and Benefit Reductions

(1)    To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below one hundred percent (100%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than one hundred percent (100%):

(a)    the Trustee may not award the variable pension improvement factor (escalator) described in Section 6.2 to any Retiree;

(b)    all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under Component I of the Retirement System; and

(c)    Member Mandatory Employee Contributions shall be increased from four percent (4%) of Compensation to five percent (5%) of Compensation for up to the next following five Plan Years.

(2)    In the event the funding level of Component I of the Retirement System determined as provided in Section 9.5(1) is projected to fall below eighty percent (80%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than eighty percent (80%):

(a)    the remedial action required in Section 9.5(1) shall be implemented or continued;

(b)     the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for a Plan Year;

(c)     Member Mandatory Employee Contributions shall be increased from five percent (5%) of Compensation to six percent (6%) of Compensation for up to the next following five Plan Years;

(d)     the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (b) above; and

(e)     the Retirement Allowance accrued by Members for up to a̶the next five Plan-Year-period shall be determined as provided in Section 6.1, except that one percent (1%) shall be substituted for one and one-half percent (1.5%) wherever it appears in said Section 6.1.

In determining whether the eighty percent (80%) funding level under this Section 9.5(2) has been achieved, the Plan's Actuary shall calculate the funding percentage of the Retirement System after taking into account the elimination of the variable pension improvement factor (escalator) pursuant to Section 9.5(1)(a) but prior to taking into account the remedial steps provided in Sections 9.5(1)(b) and (c).

(3)     For purposes of this Section 9.5, the "funding level" of Component I of the Retirement System shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System.  The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee.  The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

## ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec. 10.1.   Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member may elect to reduce his Compensation for any Plan Year by a whole percentage equal to three percent (3%), five percent (5%) or seven percent (7%) and have such amount contributed by the Employer to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

### Sec. 10.2.   Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the ~~Board~~City shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

### Sec. 10.3.   Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second ~~fiscal year~~Plan Year immediately preceding the ~~fiscal year~~Plan Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

### Sec. 10.4.   Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases to be an Employee other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)     In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the actuarial equivalent value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)     If a Member dies while employed by the Employer or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's ~~Accumulated~~ Voluntary

Employee Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving the Member, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

## ARTICLE 11—. LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec. 11.1.   The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account under Component I of the Retirement System.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

### Sec. 11.2.   Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve (12) months or more.  Former Members, Spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.  No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time.   A Member who has previously defaulted on a loan (under either Component I or Component II) shall not be eligible for a loan from the Retirement System.

### Sec. 11.3.   Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount, which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Ten Thousand Dollars ($10,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be One Thousand Dollars ($1,000.00).

### Sec. 11.4.   Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)   Each loan application shall be made in writing.

(b)   All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c)     Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five ~~(5)~~ years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen ~~(15)~~ years.  In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period.  A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d)     An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the <u>Defined Contribution Plans of the</u> Retirement System) will be designated as collateral for guaranteeing the loan.

(e)     Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among Members in its determination of interest rates on loans.  However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan.  The loan interest rate shall be calculated in a manner that will not negatively affect either the ~~Employer's~~<u>Employers'</u> costs with respect to the Retirement System or the investment return allocated to Members.

(f)     Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code.  A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec. 11.5.   Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the ~~Employer's~~<u>Employers'</u> costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec. 11.6.   Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last

payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

**Sec. 11.7.  Distribution**

No distribution shall be made to a Member, former Member, Spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the ~~Member~~individual from the Retirement System.

**Sec. 11.8.    Annual Report**

The Retirement System shall include, in its annual report to all Members, an accounting of the Loan Program established by this Article 11, which contains the number and amount of loans made, the costs of administering the Loan Program maintained under this Component I, the amount of payments made including interest received by Component I of the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that Fiscal Year covered the costs of administering the Loan Program under Component I.

# ARTICLE 12. LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec. 12.1.  Compliance With Code Section 415(b) And Regulations

(1)    Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)    The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)    Notwithstanding the foregoing:

   (a)    if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 12.1(2) has been satisfied shall be made, in accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 12.1(8) or (9);

   (b)    if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 12.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System, commencing at Age sixty-two; and

   (c)    if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an annual benefit payable in the form of a straight life annuity, commencing when

the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age ~~65~~sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)     Notwithstanding the foregoing provisions of this Section 12.1, except as provided in Section 12.1(5), the maximum annual benefit specified in Section 12.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by ~~the~~an Employer, does not exceed $10,000 for the Plan Year or any prior Plan Year and (b) the Member was not at any time a participant in a defined contribution plan maintained by ~~the~~an Employer.

(5)     In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 12.1(2) shall be such limitation (without regard to this Section 12.1(5)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten.  In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 12.1(2) and in Section 12.1(4) shall be such limitations (determined without regard to this Section 12.1(5)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.

(6)     Notwithstanding anything in this Section 12.1 to the contrary, if the annual benefit of a Member who has terminated employment with the Employer is limited pursuant to the limitations set forth in Section 12.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(7)     For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 12.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(8)     The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 12.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has

the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 12.1(7).

(9)    The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 12.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(10)   For purposes of applying the limitations set forth in this Section 12.1, all qualified defined benefit plans (whether or not terminated) ever maintained by ~~the~~an Employer shall be treated as one defined benefit plan.

(11)   For purposes of this Section 12.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year.  The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with ~~the~~an Employer or (b) the end of the limitation year that includes the date of the Member's severance from employment with ~~the~~an Employer, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the Employer and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(12)   This Section 12.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to, any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

## Sec. 12.2.   Compliance with Code Section 415(c) and Regulations

(1)    The "~~annual addition~~Annual Addition" with respect to a Member for a limitation year (which shall be the Plan Year) shall in no event exceed the lesser of:

(a)  $40,000 (adjusted as provided in Code Section 415(d)); or

(b)  One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)  The ~~"annual addition"~~ Annual Addition with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions

for such limitation year ~~(3)~~  to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified defined contribution plan (whether or not terminated) maintained by ~~the~~ an Employer, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(~~4~~ 3)  In the event the ~~"annual addition"~~ Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 12.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

# ARTICLE 13. RETIREMENT SYSTEM ADMINISTRATION

## Sec. 13.1.  Board of Trustees as Retirement System Administrator

(1)  The Retirement Board shall have the power and authority to manage and administer the Retirement System in accordance with the provisions of the Combined Plan Document.

(2)  The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 13.2.

(3)  The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document.  This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

## Sec. 13.2.  Powers and Duties of Board

(1)  The Board shall have the following powers and duties:

(a)  exclusive authority regarding the administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)  to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)  to determine the contributions to the Retirement System required of the Employer and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)  to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)  to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)  except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

(g)     except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h)     to prepare an annual report for the Retirement System for each ~~fiscal year~~Fiscal Year in compliance with generally accepted accounting principles. The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the ~~fiscal year~~Fiscal Year. The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and to the Investment Committee. The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)     to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and ~~accumulated contributions~~Accumulated Contributions of each Member who has made contributions to the Retirement System;

(j)     to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the Employer or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System. In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual, in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System. The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)     except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec. 13.3.   Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)     manage and administer the Retirement System under the supervision and direction of the Board;

(b)     annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement ~~System's~~System's expenses for the following ~~fiscal year~~Fiscal Year; and

(c)     perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board; and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may, but need not, be an employee of the City.

## Sec. 13.4.   Discretionary Authority

The Board shall have discretion to:

(a)     interpret the provisions of the Retirement System;

(b)     make factual findings with respect to any and all issues arising under the Retirement System;

(c)     determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)     decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)     make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

**Sec. 13.5.   Administrator's Decision Binding**

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

# ARTICLE 14—. MANAGEMENT OF FUNDS

### Sec. 14.1.   Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City and, subject to the terms of Article 15, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq*. of the *Michigan Compiled Laws, as amended*.

### Sec. 14.2.   Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan Document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan Document.  Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan Document may be commingled for investment purposes, and transferred as provided in Section E-16(c) of Component II.

### Sec. 14.3.   Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System.   The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

### Sec. 14.4.   Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose other than payment of the reasonable expenses of maintaining the Retirement System.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

### Sec. 14.5.   Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)      Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)      Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)      Except as provided in Article ~~10~~11, borrowing any money or other assets of the Retirement System; and

(4)      Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

# ARTICLE 15. INVESTMENT OF RETIREMENT SYSTEM ASSETS

## Sec. 15.1.  Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 15, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq.* of the *Michigan Compiled Laws, as amended.*  Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 15.

All investment management decisions made by the Board, as more fully described in Section 15.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has advisory responsibility and authority, including the investment management matters described in Section 15.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If the Board (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee  and the Chief Investment Officer are authorized to implement the decision.

If the Board disapproves an  Investment Committee recommendation investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended Investment Management investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not sooner less than five business days, of the request to discuss the alternative proposal from the Board, unless a later date is agreed to in writing by the Board and by the Investment Committee to discuss the disapproval as set forth by the Board described in the Board's written response.  Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended Investment Management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended Investment Management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision.

Any action taken by the Board or the Investment Committee in violation of the terms of this Article 15 shall constitute an *ultra vires* act and the Investment Committee or the Board is granted the express right to seek to preliminarily enjoin such violation without the need to show irreparable harm.

**Sec. 15.2. Investment Management**

(1)     For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

(a)     development of an investment policy statement with sound and consistent investment goals, objectives, ~~asset allocation and rebalancing guidelines,~~and performance ~~benchmarks for strategic asset allocation and such other aspects of investment policy as~~measurement standards which are consistent with the needs of the Retirement System;

(b)     within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

(c)     evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

(d)     review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the ~~Retirement System actuary~~Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article G of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after ~~fiscal year~~Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

(e)     in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the ~~Retirement System's actuary~~Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of all or a portion of the ~~reduction in~~reduced base monthly pension amounts and the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

(f)     communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

(g)     determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

(h)     ~~periodic review and evaluation of the performance of the investment managers in context with established standards of performance, including restoration of benefits pursuant to Component II of the Retirement System;~~

(~~i~~h)    the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(~~j~~i)    interpretation of Retirement System governing documents, existing law, the Plan of Adjustment and other financial information that could affect funding or benefit levels;

(~~k~~j)    review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the ~~Retirement System's auditor~~Auditor or other professional advisors, as necessary, prior to approval of the annual audit or other financial reports;

(~~l~~k)    determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(~~m~~l)    ~~causing~~performance of an asset/liability valuation study ~~to be performed~~ for the Retirement System every three years or, more often, as ~~deemed necessary or prudent~~requested by the Investment Committee or ~~as requested by~~ the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act No. 314* ~~and *Plan Investment Guidelines*~~*of the Public Acts of 1965, being Sections 38.1132 et seq. of the Michigan Compiled Laws, as amended, and the Retirement System's investment guidelines*.

### Sec. 15.3.   Best Practices

Prior to adopting ~~an~~ investment ~~policy~~guidelines and asset allocation ~~policy~~policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

### Sec. 15.4.   Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.   The chief investment officer shall report directly to the Investment Committee and the ~~Executive Director~~executive director of the Board.   The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.  The chief investment officer shall provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

### Sec. 15.5.   Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Board and the Investment Committee ~~and the Board~~ with oversight of the Retirement System's investment portfolio.  Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.  Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.  The duties of an investment consultant may include, but shall not be limited to:

(a)     providing an asset/liability valuation study for the Retirement System;

(b)     reviewing the Retirement System's asset allocation based on current market assumptions;

(c)     identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)     implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)     monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)     recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations, in the event of a deviation from expectations;

(g)     communicating the investment policies of the Retirement System to the investment managers;

(h)     reviewing the investment policies with the appropriate employees of the Retirement System;

(i)      aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

(j)      attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)     meeting with the Investment Committee and the Board to provide detailed quarterly performance reports and executive summaries of performance;

(l)      meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)    meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and ~~manger~~manager selections.

# ARTICLE 16~~—,~~ RETIREE MEDICAL ACCOUNT

## Sec. 16.1.   Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board ~~of Trustees~~ shall pay the cost, which would otherwise be borne by the Employers, for certain medical and related benefits provided under the plans or programs maintained by the Employers to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 16 are intended to comply with ~~section~~Section 401(h) of the Code and shall be construed to comply therewith.

## Sec. 16.2.   Effective Date of Retiree Medical Account

Medical Benefits ~~shall~~may be paid from the Medical Benefits Account beginning ~~(i) January 1, 20__ n the case of Medical Beneficiaries who retired prior to _____ and whose employment was subject to a collective bargaining agreement prior to retirement, and the spouses and dependents of such Medical Beneficiaries and (ii) January 1, 20__, in the case of all Medical Beneficiaries whose employment was not subject to a collective bargaining agreement prior to retirement~~October ____, 2014, or such other date recommended by an enrolled actuary (within the meaning of ~~section~~Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec. 16.3.   Funding of Benefits

Subject to the Plan of Adjustment and the right reserved to the City to amend or terminate the provision of Medical Benefits ~~after June 30, 2023~~ under its general power to amend the Plan under Section 17.5, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis, or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year by the Employers pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time any Employer makes a contribution to the Trustee, the Employer shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec. 16.4.   Limitation on Contributions

At all times the aggregate of the contributions made by the Employers to provide Medical Benefits shall not exceed ~~25~~twenty-five percent (25%) of the sum of the aggregate contributions made by the Employers to the Plan under ~~Section 4.1~~Sections 9.3, 9.4 and 9.5 other than the

contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account. In the event that a contribution under Section 16.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount. [Does this apply to governmental plans?]

### Sec. 16.5.  Impossibility of Diversion

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits, shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the Employers.

### Sec. 16.6.  Administration

The Medical Plans shall continue to be administered, and claims processed, under their respective terms. Notwithstanding, the The interpretation and administration of the terms of this Article 16 shall be pursuant subject to the provisions of the Combined Plan document Document.

### Sec. 16.7.  Right to Amend or Terminate Medical Plans

The Employers expressly reserve the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by any such Employer that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible spouses Spouses and dependents to pay all or any portion of the cost of such medical benefits.

### Sec. 16.8.  Reversion

At any no time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, no shall any part of the Medical Benefits Account may be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account. If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the Employers to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the Employers. In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the Employers' contributions to the Medical Benefits Account.

### Sec. 16.9.  Limitation of Rights

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

# ARTICLE 17. MISCELLANEOUS

## Sec. 17.1. Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by ~~the City~~an Employer (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec. 17.2. Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of payment, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec. 17.3. Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec. 17.4. Errors

If any change or error in the records results in any person receiving from the Retirement System more or less than the person would have been entitled to receive from the Retirement System had the records been correct, the Board shall correct such error~~,~~ and, as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such person was correctly entitled shall be paid.

## Sec. 17.5. Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan Document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments ~~required to comply with applicable federal law or~~permitted under the terms of the Plan of Adjustment ~~may be made effective prior to July 1~~(including amendments contemplated in Section G-4(5) of Component II) may be made to the terms, conditions and rules of operation of the Retirement System, or any successor plan or trust, that govern the calculation of pension benefits during the period ending June 30, 2023, nor may any amendment or termination deprive

any Member, former Member or Beneficiary of any then vested benefit under the Retirement System, except as provided in ~~a~~the Plan of Adjustment. Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan Document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code. The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Retirement System by the City must be approved by the Council or person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

### Sec. 17.6. Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

### Sec. 17.7. Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan Document to the contrary. Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year ~~that~~in which he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires. Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section ~~16.7~~17.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

### Sec. 17.8. Direct Rollovers

(1) For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the ~~board~~Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(2) For purposes of this Section ~~16.8~~17.8, the following terms shall have the following meanings:

(a) "Direct rollover" means a payment by the retirement system to an eligible retirement plan specified by a distributee.

(b)     "Distributee" means a Member or former Member.  It also includes the Member's or former Member's surviving ~~spouse~~Spouse, a ~~spouse~~Spouse or former spouse who is the alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E).  However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an ~~"~~"inherited~~"~~" individual retirement account or annuity.

(c)     "Eligible retirement plan" means any of the following that accepts a distributee's eligible rollover distribution:

(i)      a qualified trust described in Code Section 401(a);

(ii)     an annuity plan described in Code Section 403(a);

(iii)    an annuity contract described in Code Section 403(b);

(iv)    an individual retirement account described in Code Section 408(a);

(v)     an individual retirement annuity described in Code Section 408(b);

(vi)    a Roth IRA described in Code Section 408A; or

(vii)   a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the ~~retirement system~~Retirement System.

(d)     "Eligible rollover distribution" means any distribution of all or any portion of the balance to the credit of a distribute under the ~~retirement system~~Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year.  Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the ~~retirement system~~Retirement System.  However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a

qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec. 17.9.  Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate.  The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I and/or Component II of this Combined Plan Document or to the Combined Plan Document in its entirety, as the context may require, and not to any particular provision or section thereof.  The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan Document or the Retirement System created hereunder.

## Sec. 17.10.  Severability

If any section or part of a section of this Combined Plan Document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan Document or Retirement System or of the Combined Plan Document or Retirement System in its entirety.

**EXHIBIT I.A.254.a**

FORM OF NEW PFRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Amendment and Restatement** **Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT I  ..................................................................................................................... 1

ARTICLE 1. —GENERAL PROVISIONS ........................................................... 1

Sec. 1.1.    Police and Fire Retirement System Established; Adoption of 2014
             Plan Document ........................................................................... 1

Sec. 1.2.    Retirement System Intended to be Tax-Qualified; Governmental
             Plan .......................................................................................... 1

Sec. 1.3.    ~~Board of Trustees~~Compliance With Plan of Adjustment ......................... 1

Sec 1.4.     Board of Trustees .................................................................... 2

Sec. ~~1.4~~ 1.5.   Board of Trustees – Membership; Appointment ....................... ~~1~~2

Sec. ~~1.5~~ 1.6.   Board of Trustees; Scheduling of Elections for Active and Retiree
             Trustees .................................................................................. ~~2~~3

Sec. ~~1.6~~ 1.7.   Procedures for election of Retiree Trustees ............................. 3

Sec. ~~1.7~~ 1.8.   Board of Trustees; Oath; Term; Vacancies .............................. ~~3~~4

Sec. ~~1.8~~ 1.9.   Board of Trustees; Officers and Employees ............................. 4

Sec. ~~1.9~~ 1.10.  Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum .......... 4

Sec. ~~1.10~~ 1.11.  Board of Trustees; Compensation; Expenses ........................... ~~4~~5

Sec. ~~1.11~~ 1.12.  Rules for Administration of Funds ...................................... ~~4~~5

Sec. ~~1.12~~ 1.13.  Board of Trustees; Certain Data to be Kept ........................... ~~4~~5

Sec. ~~1.13~~ 1.14.  Board of Trustees; Annual Audit Report ................................ 5

Sec. ~~1.14~~ 1.15.  Board of Trustees; Legal Advisors ..................................... 5

Sec 1.16.    Board of Trustees; Medical Director .................................... 6

Sec. ~~1.15~~ 1.17.  Designation of Actuary; Authority to Engage Additional Actuaries ....... ~~5~~6

Sec. ~~1.16~~ 1.18.  Board of Trustees; Adoption of Mortality and Other Tables of
             Experience and Rates of Interest; Limitations on Payments by the
             Retirement System ................................................................... ~~5~~6

Sec. ~~1.17~~ 1.19.  Board of Trustees; Annual Actuarial Valuation of Assets and
             Liabilities .............................................................................. ~~6~~7

Sec. ~~1.18~~ 1.20.  Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary
             Duties ..................................................................................... ~~6~~7

Sec. ~~1.19~~ 1.21.  Investment Committee; Establishment; Purpose; Fiduciary Status;
             Fiduciary Duties ..................................................................... ~~6~~7

Sec. ~~1.20~~ 1.22.  Investment Committee; Membership; Appointment ............................. ~~7~~8

-i-

Sec. ~~1.21~~ 1.23. Investment Committee; Term; Resignation and Removal; Vacancies ................................................................................ ~~7~~9

Sec. ~~1.22~~ 1.24. Investment Committee; Operation; Meetings; Quorum; Voting ........... ~~9~~10

Sec. ~~1.23~~ 1.25. Investment Committee; Compensation; Expenses~~9~~; Employment of Advisors ... 12

Sec 1.26. Investment Committee; Special Reporting Obligation ........................... 12

ARTICLE 2. — DEFINITIONS ................................................................. ~~10~~14

Sec. 2.1. Definitions ..................................................................... ~~10~~14

ARTICLE 3. — MEMBERSHIP .................................................................. ~~16~~22

Sec. 3.1. Eligible Employees .............................................................. ~~16~~22

Sec. 3.2. Cessation of Membership; Re-Employment ...................................... ~~16~~22

Sec. 3.3. Report From City ................................................................ ~~17~~23

ARTICLE 4. — SERVICE CREDIT ............................................................. ~~18~~24

Sec. 4.1. Credited Service ................................................................ ~~18~~24

Sec. 4.2. Vesting Service ................................................................. ~~18~~24

Sec. 4.3. Service Credit; Military Service ................................................ ~~18~~24

Sec. 4.4. Service Credit; Qualified Military Service ..................................... ~~19~~25

ARTICLE 5. — ELIGIBILITY FOR RETIREMENT ................................................ ~~20~~26

Sec. 5.1. Eligibility for Unreduced Normal Retirement Benefit ........................... ~~20~~26

Sec. 5.2. Eligibility for Deferred Vested Retirement Benefit ............................. ~~20~~26

Sec. 5.3. Eligibility for Disability Retirement Benefit – Duty Disability ............... ~~20~~26

Sec. 5.4. Eligibility for Disability Retirement Benefit – Non-Duty Disability .. ~~22~~28

Sec. 5.5. Disability Retirees; Reexamination .............................................. ~~22~~28

Sec 5.6. Disability Benefits; Procedures for Determination of Disability ............ 29

Sec. ~~5.6~~ 5.7. Return of Accumulated Mandatory Contributions to Non-Vested Member ................................................................................... ~~23~~31

Sec. ~~5.7~~ 5.8. Benefits Offset by Compensation Benefits; Subrogation ................... ~~23~~31

ARTICLE 6. — RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) ........................................... ~~24~~33

Sec. 6.1. Retirement Allowance .......................................................... ~~24~~33

Sec. 6.2. Variable Pension Improvement Factor (Escalator) ............................. ~~24~~33

ARTICLE 7. —DEATH BENEFITS ........................................................................................ 2534

Sec. 7.1.    Accidental Death Benefit; Performance of Duty ................................ 2534

Sec. 7.2.    Non-Duty Death Benefits ............................................................... 2635

Sec. 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of
Member .................................................................................................. 2635

ARTICLE 8. —FORMS OF PAYMENT ............................................................................ 2736

Sec. 8.1.    Retirement Allowance Options ........................................................ 2736

Sec. 8.2.    Disposition of Surplus Benefits upon Death of Retiree and
Beneficiary ............................................................................................ 2837

ARTICLE 9. —FUNDING AND RESERVES .................................................................... 2938

Sec. 9.1.    Funding Objective of the Retirement System .................................... 2938

Sec. 9.2.    Funds .................................................................................................. 2938

Sec. 9.3.    Method of Financing Retirement System Benefits ............................ 3039

Sec. 9.4.    Member Contributions Picked-Up ..................................................... 3040

Sec. 9.5.    Fiscal Responsibility: Benefit Reductions and Increased Funding
Obligations ........................................................................................... 3140

ARTICLE 10. —VOLUNTARY EMPLOYEE CONTRIBUTIONS .................................. 3342

Sec. 10.1.    Voluntary Employee Contributions; Amount; Vesting ..................... 3342

Sec. 10.2.    Changing an Election to Contribute ................................................. 3342

Sec. 10.3.    Individual Member Accounting; Crediting of Earnings ................... 3342

Sec. 10.4.    Distribution of Accumulated Voluntary Employee Contributions ...... 3342

ARTICLE 11. —LOAN PROGRAM FOR VOLUNTARY EMPLOYEE
CONTRIBUTIONS ................................................................................ 3544

Sec. 11.1.    The Loan Program .............................................................................. 3544

Sec. 11.2.    Eligibility for Loan ............................................................................ 3544

Sec. 11.3.    Amount of Loan .................................................................................. 3544

Sec. 11.4.    Terms and Conditions ........................................................................ 3544

Sec. 11.5.    Loan Balance ...................................................................................... 3645

Sec. 11.6.    Default ................................................................................................ 3645

Sec. 11.7.    Distribution ........................................................................................ 3646

ARTICLE 12.    DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM ... 3747

| | | | |
|---|---|---|---|
| Sec. 12.1. | General Provisions | | 3747 |
| Sec. 12.2. | Conversion to Retirement Allowance | | 3747 |
| Sec 12.3. | Investment of DROP Assets | | 47 |
| Sec 12.4. | Distribution of Amounts Credited to DROP Account | | 48 |
| Sec. 12.3 12.5. | Death of Member While Participating in the DROP Program | | 3848 |
| Sec. 12.4 12.6. | Disability of Member While Participating in the DROP Program | | 3848 |
| Sec. 12.5 12.7. | Cost Neutrality | | 3849 |
| ARTICLE 13. | —LIMITATION ON BENEFITS AND CONTRIBUTIONS | | 4050 |
| Sec. 13.1. | Compliance With Code Section 415(b) And Regulations | | 4050 |
| Sec. 13.2. | Compliance with Code Section 415(c) and Regulations | | 4253 |
| ARTICLE 14. | —RETIREMENT SYSTEM ADMINISTRATION | | 4454 |
| Sec. 14.1. | Board of Trustees as Retirement System Administrator | | 4454 |
| Sec. 14.2. | Powers and Duties of Board | | 4454 |
| Sec. 14.3. | Executive Director; Employees | | 4556 |
| Sec. 14.4. | Discretionary Authority | | 4656 |
| Sec. 14.5. | Administrator's Decision Binding | | 4657 |
| ARTICLE 15. | —MANAGEMENT OF FUNDS | | 4758 |
| Sec. 15.1. | Board as Trustee of Retirement System Assets | | 4758 |
| Sec. 15.2. | Maintenance of Segregated Funds | | 4758 |
| Sec. 15.3. | Custodian of Funds | | 4758 |
| Sec. 15.4. | Exclusive Purpose | | 4758 |
| Sec. 15.5. | Prohibited Conduct | | 4758 |
| ARTICLE 16. | —INVESTMENT OF RETIREMENT SYSTEM ASSETS | | 4960 |
| Sec. 16.1. | Investment Powers of the Board and the Investment Committee | | 4960 |
| Sec. 16.2. | Investment Management | | 5061 |
| Sec. 16.3. | Best Practices | | 5162 |
| Sec. 16.4. | Chief Investment Officer | | 5162 |
| Sec. 16.5. | Investment Consultants | | 5163 |
| Sec. 16.6. | Consistency With Plan of Adjustment | | 5364 |

13-53846-tjt   Doc 8046   Filed 10/22/14   Entered 10/22/14 03:50:41   Page 322 of 725

ARTICLE 17.        RETIREE MEDICAL ACCOUNT ................................................... 65

    Sec 17.1.        Establishment of Account ............................................... 65

    Sec 17.2.        Effective Date ................................................................ 65

    Sec 17.3.        Funding of Benefits ....................................................... 65

    Sec 17.4.        Limitation on Contributions ......................................... 65

    Sec 17.5.        Impossibility of Diversion ............................................ 65

    Sec 17.6.        Administration ............................................................... 66

    Sec 17.7.        Right to Amend or Terminate Medical Plans ............... 66

    Sec 17.8.        Reversion ....................................................................... 66

    Sec 17.9.        Limitation of Rights ...................................................... 66

ARTICLE ~~17~~18.    MISCELLANEOUS ..................................................... ~~54~~67

    Sec. ~~17.1~~ 18.1. Nonduplication of Benefits ......................................... ~~54~~67

    Sec. ~~17.2~~ 18.2. Assignments Prohibited ............................................. ~~54~~67

    Sec. ~~17.3~~ 18.3. Protection Against Fraud ........................................... ~~54~~67

    Sec. ~~17.4~~ 18.4. Conviction of Felony; Forfeiture of Rights ............... ~~54~~67

    Sec. ~~17.5~~ 18.5. Amendment; Termination; Exclusive Benefit ................... ~~54~~67

    Sec. ~~17.6~~ 18.6. Forfeitures Not to Increase Benefits ........................... ~~55~~68

    Sec. ~~17.7~~ 18.7. Required Distributions - Compliance with Code Section 401(a)(9) and Regulations ........................................................... ~~55~~68

    Sec. ~~17.8~~ 18.8. Direct Rollovers ......................................................... ~~55~~68

    Sec. ~~17.9~~ 18.9. Construction ............................................................... ~~56~~70

    Sec. ~~17.10~~ 18.10 ................................................................................ Severability ~~57~~70

13-53846-tjt    Doc 8046    Filed 10/22/14    Entered 10/22/14 03:50:41    Page 323 of 725

# COMPONENT I

# ARTICLE 1 — . GENERAL PROVISIONS

## Sec. 1.1. Police and Fire Retirement System Established; Adoption of 2014 Plan Document

Effective July 1, 1941, a Pension System for Policemen and Firemen of the City of Detroit was established for the purpose of providing retirement allowances and death benefits for Policemen and Firemen and their beneficiaries by amendment to the Charter of the City of Detroit. That Pension System was amended on numerous occasions after July 1, 1941, including an amendment renaming the Retirement System as the "Police and Fire Retirement System of the City of Detroit." The provisions of the Police and Fire Retirement System of the City of Detroit, as in effect July 1, 2014, are set forth in this Plan Document (including Appendix A attached hereto). Component I of the Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Police and Fire Retirement System of the City of Detroit on and after July 1, 2014. Component II of the Plan Document generally applies to benefits accrued by Members prior to July 1, 2014. Except as specifically provided in Component II, benefits provided under Component II of the Plan Document are frozen effective June 30, 2014.

This Pursuant to Section 47-1-2 of the Detroit City Code, this Combined Plan Document shall replace the provisions of the Police and Fire Retirement System of the City of Detroit as set forth in the City of Detroit Charter, the Detroit City Code and any conflicting provisions in any collective bargaining agreements, rulings or opinions covering Members (including, without limitation, City Employment Terms). All resolutions and policies of the Retirement Board previously enacted which are inconsistent with the provisions of this Plan Document are also hereby repealed to the extent of such inconsistency.

## Sec. 1.2. Retirement System Intended to be Tax-Qualified; Governmental Plan

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code. The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

## Sec 1.3. Compliance With Plan of Adjustment

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment"). Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment. To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

**Sec. ~~1.3.~~ 1.4.   Board of Trustees**

Effective July 1, 1941, a Board of Trustees of the Police and Fire Retirement System of the City of Detroit was created.  The Board is vested with responsibility for the general administration, management and operation of the Police and Fire Retirement System of the City of Detroit and with the trust and investment powers conferred in this Combined Plan Document.

**Sec. ~~1.4.~~ 1.5.   Board of Trustees – Membership; Appointment**

The Board of Trustees of the Police and Fire Retirement System of the City of Detroit shall consist of seventeen Trustees, as follows:

(1)     The Mayor, *ex-officio*, or the Mayor's designee;

(2)     The President of City Council or a member thereof elected by the City Council, *ex-officio*;

(3)     The City Treasurer or Deputy City Treasurer, *ex-officio*;

(4)     The City Finance Director, or a designated representative, *ex-officio*;

(5)     The City Budget Director, or a designated representative, *ex-officio*;

(6)     The Corporation Counsel of the City, or a designated representative, *ex-officio*;

(7)     Three Fire Members of the Retirement System to be elected by the Fire Members under such rules and regulations as may be established by the Board of Fire Commissioners to govern such elections, as follows:

   (a)     Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

   (b)     One to be elected by and from Members holding ranks above the rank of lieutenant (or its equivalent);

(8)     Three Police Members of the Retirement System to be elected by the Police Members under the rules and regulations as may be established by the Commissioner of Police to govern such elections, as follows:

   (a)     Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

   (b)     One to be elected by and from Members holding a rank above lieutenant (or its equivalent); and

(9)     One individual who neither is a Member of the Retirement System nor an employee of the City in any capacity to be selected by the Board;

(10)     Two ~~retirees~~Retirees receiving benefits under the Retirement System, one of whom shall be elected by Retired Police Members and one of whom will be elected by Retired Fire Members pursuant to ~~Section 1.5~~Sections 1.6 and 1.7 below;

(11)     One Trustee appointed by the Mayor upon election of a Retiree Police Trustee; and

(12)     One Trustee appointed by the Mayor upon election of a Retiree Fire Trustee.

**Sec. ~~1.5.~~ 1.6.   Board of Trustees; Scheduling of Elections for Active and Retiree Trustees**

(1)     Annual elections for active Police Officers and ~~Firefighters~~Fire Fighters shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(2)     Elections to fill vacancies created by the expiration of a term for a Retiree Trustee shall be held every three years during the month of May.

(3)     A special election for Retiree Trustees shall be held as soon as practicable after the Plan of Adjustment is confirmed.  Unless a Retiree Trustee elected by reason of this special election resigns or is removed from the position of Trustee in accordance with the terms of the Combined Plan Document, a Retiree elected to the office of Trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the last day of June that follows the third anniversary of the special election, at which time an election for Retiree Trustees shall be held in accordance with Section ~~1.6~~1.7.

**Sec. ~~1.6.~~ 1.7.   Procedures for election of Retiree Trustees**

The procedures for the election of the Retiree Trustees shall be as follows:

(1)     *Notice*.  Notice of a primary election shall be sent to each Retiree by United States Mail.

(2)     *Notice of Candidacy*.   A proposed candidate shall submit a notarized letter to the executive director notifying the Retirement System of his or her candidacy.

(3)     *Ballot*.  Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position the Retiree held at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election.  No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4)     *Voting*.  Procedures regarding mailing ~~of ballots, poll lists, custody of ballots, marking of ballots, return~~ of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)     *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)     *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section ~~1.6~~1.7 shall be handled in accordance with such rules and regulations as the Board may adopt and Michigan law.

## Sec. ~~1.7.~~ **1.8.**   Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the City Clerk.

The term of office for each elected Trustee under Sections ~~1.4~~1.5(7), (8) and (10) shall be three years.  The term of office for the Trustee who is selected by the Board under Section ~~1.4~~1.5(9) shall be two years.  The term of office for the Trustees appointed by the Mayor under Sections ~~1.4~~1.5(11) and (12) shall be three years.  Except as provided in Section ~~1.5~~1.6(3), elected Trustees holding office on June 30, 2014 shall serve the remainder of their terms.

If a Trustee resigns or is removed by the other Trustees for cause, or if an elected or appointed Trustee fails to attend three consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled.  No vacancy shall result by reason of a change in the rank or grade of a Trustee during the term of office.

## Sec. ~~1.8.~~ **1.9.**   Board of Trustees; Officers and Employees

The Board of Trustees shall elect from its membership a chairman and a vice chairman. The executive director of the Retirement System or his or her representative shall serve as ~~Secretary~~secretary of the Board of Trustees.  The Board may employ such special actuarial, medical and other employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

## Sec. ~~1.9.~~ **1.10.**  Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)     The Board shall hold regular meetings, at least one in each month, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.*  All Board meetings shall be held within the City of Detroit.

(2)     Each Trustee shall be entitled to one vote on each question before the Board. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Eight members of the Board, four of whom must be elected members, shall constitute a quorum.

**Sec. 1.10. 1.11.          Board of Trustees; Compensation; Expenses**

All members of the Board of Trustees shall serve without additional compensation from the City or the Retirement System; however Retiree Trustees shall receive a hourly stipend from the Retirement System equal to the lowest rate of pay received by an active employee Trustee for attending Board meetings, educational time and travel out of the City on official business of the Retirement System. All Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

**Sec. 1.11. 1.12.          Rules for Administration of Funds.**

Subject to the limitations contained in this Combined Plan document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Combined Plan document and for the transaction of its business.

**Sec. 1.12. 1.13.          Board of Trustees; Certain Data to be Kept**

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the Retirement System and for checking and compiling the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

**Sec. 1.13. 1.14.          Board of Trustees; Annual Audit Report**

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

**Sec. 1.14. 1.15.          Board of Trustees; Legal Advisors**

(1)     The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)      Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)      Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

**Sec 1.16.   Board of Trustees; Medical Director**

(1)      The Board shall appoint a Medical Director who is directly responsible to and shall hold office at the pleasure of the Board. The Medical Director shall be a physician who has not at any time been regularly or permanently employed by any department, board, or commission of the City, county, or state, has not held an elective, appointive, or salaried office in any city, county, or state government at any time, and is not eligible to participate in a retirement system maintained by the City. However, service as an intern in any city, county, or state hospital or sanitarium and service in any state military body shall not disqualify a physician for appointment as Medical Director.

(2)      The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of the Combined Plan, and shall report in writing to the Board of Trustees his or her conclusions and recommendations on medical matters referred to it.

**Sec. ~~1.15.~~ 1.17.     Designation of Actuary; Authority to Engage Additional Actuaries**

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board.  In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary.  The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing its actuarial duties and shall comply with all requests for information or modeling requested by the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the governance terms attached to the that certain Agreement by and between the Michigan Settlement Administration Authority, the Retirement System, the General Retirement system for the City of Detroit, Michigan ("GRS"), and the City (the "State Contribution Agreement") as Exhibit B (the "Governance Term Sheet"), and the Plan of Adjustment.  Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

**Sec. ~~1.16.~~ 1.18.     Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System**

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this ~~section~~Section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsection (2) or (3) of this ~~section~~Section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System.  This prohibition applies to all payments that are not authorized by this ~~Code~~Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

## Sec. ~~4.17.~~ 1.19.     Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section ~~1.16~~1.18, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

## Sec. ~~4.18.~~ 1.20.     Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee.  To the extent the Board exercises discretion with respect to investment of Retirement System assets, the Board shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*, and a Board member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose.  Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

## Sec. ~~4.19.~~ 1.21.     Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties

As of the effective date the Plan of Adjustment, but subject to consummation of ~~that certain~~the State Contribution Agreement ~~by and between the Retirement System and the State of Michigan as provided in the Plan of Adjustment~~, an Investment Committee is hereby created

for the purpose of making recommendations to, and approving certain actions by, the Board of Trustees and/or making determinations and taking action under and with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment Committee is controlled by the term sheet regarding Investment Committee Governance for General Retirement System, as attached to the Plan of Adjustment ("Term Sheet"). The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6)*. The Investment Committee shall serviceserve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflictsconflict with the provisions set forth in the Governance Term Sheet.

### Sec. 1.20. 1.22.　　　Investment Committee; Membership; Appointment

The Investment Committee shall consist of nine (9) members, determined as follows:

(1)　　　Five independent members, at least two of whom must be residents of the State of Michigan, and none of whom may be a party in interest with respect to the Retirement System, as defined in as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as necessary to bring the number of independent Investment Committee members to five (5);

(2)     Two Retirees who shall be appointed by the Board consisting of one ~~elected~~ retired Police Member and one ~~elected~~ retired Fire Member who are serving on the Board and who are receiving ~~benefits~~benefit payments under the Retirement System;  and

(3)     Two Employee ~~Members~~members who shall be appointed by the Board consisting of one ~~elected~~ Fire Department ~~employee~~Employee and one ~~elected~~ Police Department ~~employee~~Employee who are active members of the Board.


**Sec. ~~1.21.~~ 1.23.**          **Investment Committee; Term; Resignation and Removal; Vacancies**

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the ~~first~~initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|---|---|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

| ~~Independent Member~~ | ~~Term of Office~~ |
|---|---|
| ~~(1)~~ | ~~2 years~~ |
| ~~(2)~~ | ~~3 years~~ |
| ~~(3)~~ | ~~4 years~~ |
| ~~(4)~~ | ~~5 years~~ |
| ~~(5)~~ | ~~6 years~~ |

The term of office for a Retiree or ~~employee~~Employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees.  Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier.  Notwithstanding any provision of this Combined Plan document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee.  An Investment Committee member may be removed from office by majority vote of the ~~other~~remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted

of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in ~~according~~accordance with the voting procedure set forth in Section ~~1.22~~1.24; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government.  A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining ~~Members~~members attending such meetings.  In the event of ~~such~~any removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

~~An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.~~  Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("Treasurer"), in consultation with the Foundation ~~for Detroit's Future~~, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment).  In the event the Board and the Treasurer ~~of the State of Michigan~~ cannot agree on ~~the~~a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, ~~successors~~a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

**Sec. ~~1.22.~~ 1.24.**        **Investment Committee; Operation; Meetings; Quorum; Voting**

The Investment Committee members shall select from among the independent members a chair and a vice chair.  The Investment Committee members shall select from among themselves a secretary.  The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary.  The Investment Committee shall designate the time and place thereof in advance.  The secretary or his or her

designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be ~~public and~~ subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.* All Investment Committee ~~meeting~~meetings shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Each independent Investment Committee member shall be entitled to one vote on each question before the Investment Committee. Each Retiree and Employee member shall be entitled to one-half vote on each question before the Investment Committee. Except as otherwise provided in the Governance Term Sheet, at least four concurring votes shall be necessary for a decision by the Investment Committee and each Investment Committee member shall be entitled to one vote on each question before the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a state or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

**Sec. 1.23. 1.25.** Investment Committee; Compensation; Expenses: Employment of Advisors

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System. The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions, and such parties or persons may be reasonably compensated from the assets of the Retirement System. Such engagements shall not be subject to approval of the Board.

Investment Committee members shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.

**Sec 1.26.    Investment Committee; Special Reporting Obligation**

(1)    Beginning in calendar year 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)    In the event the Retirement System receives a written notice from the Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the Treasurer a written certification that (i) the default has been cured, and (ii) no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)    Beginning in calendar year 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)    Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

(a)    a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30

of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

(b) a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to the Foundation that, as of the date of the annual report ("Annual Report") required to be provided by the City to the Foundation:

  (i) the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

  (ii) the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan document; and

  (iii) the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c) a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the Treasurer; and (iv) in the event that the Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee. Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d) any additional information that may be reasonably requested by the Foundation from time to time.

(e) Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

# ARTICLE 2. DEFINITIONS

**Sec. 2.1. Definitions**

Unless a different definition is contained within this Combined Plan Document, or a different meaning is plainly required by context, for purposes of this Combined Plan Document the following words and phrases have the meanings respectively ascribed to them by this section:

(1) *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the ~~compensation~~Compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2) *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System.

(3) *Actuarial Equivalent or Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit. The rates of interest adopted by the Board from time to time shall not violate the terms of the Plan of Adjustment.

(4) *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5) *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6) *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7) *Average Final Compensation* means the average Compensation received by a Member during the ~~ten consecutive years of Credited Service (~~five consecutive years of Credited Service ~~for members of the Detroit Police Command Officers Association and the Detroit Police Lieutenants and Sergeants Association)~~ which immediately precede the date of the Member's last termination of City employment as an employee of the Police Department or the Fire Department. If a Member has less than ~~ten years (or~~ five years) of Credited Service, the Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.

(8) *Beneficiary* means any person ~~who is~~or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance or ~~pension~~Pension payable from funds of the Retirement System due to the participation of a Member.

(9) *Board of Trustees or Board or Retirement Board* means the Board of Trustees of the Police and Fire Retirement System of the City of Detroit.

(10)     *City* means the City of Detroit, Michigan, a municipal corporation.

(11)     *City Council or Council* means the legislative body of the City.

(12)     *Combined Plan* means the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan, effective July 1, 2014, and as amended thereafter.

(~~12~~13)     *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind.  Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which is contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City.  In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the ~~Employer~~City.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014).  Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code.  The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year.  If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period.  If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14)     *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a) the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b) the 2014 Defined Contribution Plan which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15) *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a) the Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b) the Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(~~13~~16) *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(~~14~~17) *Disability or Disabled*: see Total Disability or Totally Disabled.

(18) *DFFA* means the Detroit Fire Fighters Association.

(19) *DPCOA* means the Detroit Police Command Officers Association.

(20) *DPLSA* means the Detroit Police Lieutenants and Sergeants Association.

(21) *DPOA* means the Detroit Police Officers Association.

(~~15~~22) *DROP Account* means the account established by the Board for a Member who is eligible for and who elects to participate in the DROP Program.

(~~16~~23) *DROP Program* means a program established for eligible Members pursuant to Article 12.

(~~17~~24) *Employee* means an employee of the City's Police Department who has taken an oath of office or a ~~Firefighter~~Fire Fighter providing services to the City, but does not include:

(a) individuals whose City services are compensated on a contractual or fee basis; ~~or~~

(b) any person during any period when such person is classified by the City as a ~~non~~non- common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the City~~.~~;

(c) the Medical Director of the Retirement System.

If a person described in (b) above is reclassified by the City as a common-law employee of the City and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(~~18~~25) *Employer* means the City.

(~~19~~26) *Final Compensation* means the annual ~~Compensation~~compensation of a Member at the time of his or her termination of employment.

(~~20~~) *~~Firefighter~~*27) *Fire Fighter* means the rank in the Fire Department currently or formerly classified by the civil service commission as ~~firefighter~~Fire Fighter.

(~~21~~28) *Fire Member* means ~~a sworn~~an employee of the Fire Department of the City of Detroit who is a participant in the Retirement System.

(29) *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(~~22~~30) *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the City for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the City for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(~~23~~31) *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(~~24~~32) *Investment Committee* means the committee established pursuant to Section ~~1.19~~1.22 which shall have the powers and duties described herein.

(~~25~~33) *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(34) *Medical Beneficiary* means a Member who has retired from employment with the Employers and the spouses and dependents of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by an Employer.

(35) *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(36) *Medical Benefits Account* means the bookkeeping account established under Section 17.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(37) *Medical Director* means the physician appointed by the Board pursuant to Section 1.16.

(26̶38) *Member* means any Police Member or Fire Member who has not retired or died.

(27̶39) *Normal Retirement Age* means for any ~~member of the Detroit Fire Fighters Association and the Detroit Police Officers Association, age fifty two with twenty-five years of Credited Service. For any member of the Detroit Police Command Officers Association or the Detroit Police Lieutenants and Sergeants Association, Normal Retirement~~Member Age ~~is age~~ fifty with twenty-five years of Credited Service, with the following transition period regarding payment of Component I benefits only:

| Fiscal Year | Age and Service |
| --- | --- |
| 2015 | Age 43 and 20 years |
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |
| 2021 and thereafter | Age 50 and 25 years |

| ~~Fiscal Year~~ | ~~Age and Service~~ |
| --- | --- |
| ~~2015~~ | ~~Age 43 and 20 years~~ |
| ~~2016~~ | ~~Age 43 and 20 years~~ |
| ~~2017~~ | ~~Age 44 and 21 years~~ |
| ~~2018~~ | ~~Age 45 and 22 years~~ |
| ~~2019~~ | ~~Age 46 and 23 years~~ |
| ~~2020~~ | ~~Age 47 and 24 years~~ |
| ~~2021 and thereafter~~ | ~~Age 50 and 25 years~~ |

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon ~~attainment~~Attainment of Normal Retirement Age while in Service.

(28̶40) *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(29̶41) *Patrolman* means the rank in the Police Department currently or formerly known as patrolman.

(30̶42) *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience, and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(31~~31~~43) *Plan Actuary or Actuary* means the enrolled actuary or actuarial firm appointed ~~prior to~~as provided in Section ~~1.15~~1.17 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Investment Committee or the Board may direct.

(~~32~~44) *Plan Document or Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(~~33~~45) *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan,* Case No. 13-53846.

(~~34~~46) *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(~~35~~47) *Police and Fire Retirement System of the City of Detroit or Retirement System* means the Police and Fire Retirement System of the City of Detroit created and, prior to July 1, 2014, memorialized in Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code, Article 54 of the Detroit City Code of 1964, and collective bargaining agreements and, on and after July 1, 2014, pursuant to Section 47-1-2 of the Detroit City Code, memorialized in this Combined Plan Document, as amended from time to time.

The Retirement System consists of:

(a)     The 2014 Defined Benefit Plan, which is described in Component I hereof;

(b)     ~~The~~the Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account ~~and the DROP Account~~, which are described in Component I hereof;

(c)     ~~The~~the Frozen Defined Benefit Plan, which is described in Component II hereof; and

(d)     ~~The~~the Frozen Defined Contribution Plan, which is described in Component II hereof.

References to the words Retirement System in Component I of the Plan Document shall mean the provisions of the Defined Benefit Plan and Defined Contribution Plan described in Component I, unless a different meaning is plainly required by context.

(~~36~~48) *Police Member* means a Police Officer who has taken the oath of office as prescribed in the Detroit City Charter, excluding patrolmen of other City departments, privately employed patrolmen and special patrolmen, who is a participant in the Retirement System.

(~~37~~49) *Police Officer* means the rank in the Police Department currently or formerly known as Police Officer.

(~~38~~50) *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(~~39~~51) *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(~~40~~52) *Retirement* means a Member's withdrawal from the employ of the City with a Retirement Allowance paid by the Retirement System.

(~~41~~53) *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(~~42~~54) *Service* means personal services rendered to the City by an employee of the Police Department or Fire Department, provided such person is compensated by the City for such personal services.

(~~43~~55) *Spouse* means the person to whom a Member is legally married under applicable law at the time a determination is made.

(~~44~~56) *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(~~45~~57) *Total Disability or Totally Disabled* means:

    (a)    during the first twenty-four (24) months that a Member receives benefits from the Retirement System due to injury, illness or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of the Member's occupation; and

    (b)    during all subsequent months that a Member receives benefits from the Retirement System due to illness, injury or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the Member is suited, based on education, training and experience.

(~~46~~58) *Vesting Service* means service credited to a Member to the extent provided in Section 4 of Component I of this Combined Plan Document.

(~~47~~59) *Voluntary Employee Contributions* mean the after-tax contributions made by an eligible Member to the Retirement System pursuant to Section 10.1.

(~~48~~60) *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for an eligible Member who elects to make Voluntary Employee Contributions.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 13.2(2) |
| Annual Report | Section 1.26(4)(b) |
| Authority | Section 1.26(1) |
| compensation | Section 13.1(12) |
| Compliance Report | Section 1.26(1) |
| Cure Certification | Section 1.26(2) |
| current active | Section 9.3(3) |
| Default Notice | Section 1.26(2) |
| Deferred Retirement Option Plan Fund | Section 9.2(3) |
| Deferred Retirement Option Plan Program (DROP) | Section 12.1 |
| Differential Wage Payment | Section 4.4 |
| Direct rollover | Section 18.8(1)(b) |
| Distributee | Section 18.8(1)(c) |
| Dollar Limit | Section 13.1(3)(b) |
| DRRB | Section 5.6 |
| Eligible retirement plan | Section 18.8(1)(d) |
| Eligible rollover distribution | Section 18.8(1)(e) |
| Expense Fund | Section 9.2(7) |
| Foundation | Section 1.22 |
| funding level | Section 9.5(3) |
| Governance Term Sheet | Section 1.17 |
| Income Fund | Section 9.2(8) |
| ING | Section 12.3(1) |
| investment management decision or investment management matter | Section 16.2 |
| limitation year | Section 13.1(2) |
| Medical Benefits Account Fund | Section 9.2(4) |
| Medical Plans | Section 17.1 |
| new employee | Section 9.3(3) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(c) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option One. Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |
| Pension Accumulation Fund | Section 9.2(5) |
| Pension Certificate | Section 1.26(4)(b) |
| Pension Improvement Factor (Escalator) | Section 6.2 |
| Plan of Adjustment | Section 1.3 |
| Police and Fire Retirement System of the City of Detroit | Section 1.1 |
| Pop-up Form | Section 8.1(2)(b) |

Rate Stabilization Fund                    Section 9.2(6)
Standard Form                              Section 8.1(2)(a)
State Contribution Agreement               Section 1.17
Straight Life Retirement Allowance         Section 8.1(1)
Treasurer                                  Section 1.23

## ARTICLE 3 -- MEMBERSHIP

### Sec. 3.1. Eligible Employees

(1) ~~The~~Except as provided in Section 3.2, the membership of the Retirement System shall consist of all persons who are employed with the Police and Fire Departments of the City and who are ~~confirmed~~employed as Police Officers or ~~Firefighters~~Fire Fighters according to the rules and regulations of the respective Departments. An eligible Employee's membership in the Retirement System shall be automatic; no eligible Employee shall have the option to elect to become a Member of the Retirement System.

(2) Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3) Any Police Officer or ~~Firefighter~~Fire Fighter who, prior to being confirmed, shall be killed or ~~totally incapacitated~~Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member as of his or her date of death.

(4) Any Member who shall be transferred to a civilian position in his ~~department~~Department shall continue as a Member, subject to all the obligations of a Member.

### Sec. 3.2. Cessation of Membership; Re-Employment

(1) If a Member dies, or is separated from service with the City by resignation, dismissal, retirement or disability, he shall cease to be a Member. A Member who elects to participate in the DROP Program under Component I, Component II or both shall be considered to have separated from service with the City by reason of retirement and shall neither accrue a benefit under the Retirement System nor be required to make Mandatory Employee Contributions to the Retirement System pursuant to Section 9.3(3) or 9.5 or permitted to make Voluntary Employee Contributions pursuant to Section 10.1.

(2) If a Member ceases to be a Member under paragraph (1) other than by reason of participation in the DROP Program and later becomes a Police Officer or ~~Firefighter~~Fire Fighter other than in the position of Police Assistant, he shall again become a Member, subject to the obligations of a Member.

(3) If a Member ceases to be a Member under paragraph (1) and later becomes employed as a Police Assistant, such Member shall not become a Member upon reemployment. If such Member was receiving a Retirement Allowance from the Retirement System prior to his or her date of rehire, such Retirement Allowance shall not be suspended during the period of the Member's reemployment as a Police Assistant.

(3~~4~~) Retirement benefits for a Retiree who returns to active full time employment other than as a Police Assistant shall be subject to the following:

(a)     A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment. The variable ~~pension improvement factor (escalator~~<u>Pension Improvement Factor (Escalator</u>) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

(b)     A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

(c)     A Retiree's Average Final Compensation <u>and Credited Service</u> for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation <u>and Credited Service</u> earned by the Retiree after he returns to work.

(d)     An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance. However, the individual may select a separate payment option with respect to his second Retirement Allowance.

## Sec. 3.3.   Report From City

It shall be the duty of the City to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

# ARTICLE 4 – SERVICE CREDIT

**Sec. 4.1.    Credited Service**

(1)    The Board shall keep an accurate record of each Member's accumulated Service credit from the date of commencement of employment with the City to the date of termination of employment with the City.

(2)    A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the City as a Police Officer or ~~Firefighter~~Fire Fighter beginning on the later of (i) July 1, 2014 or (ii) his date of hire with the City as a Police Officer or ~~Firefighter~~Fire Fighter and ending on the date his employment with the City as a Police Officer or ~~Firefighter~~Fire Fighter is terminated.  Service shall be credited in years and twelfths (1/12th) of a year.  Not more than one-twelfth (1/12th) of a year of Credited Service shall be credited to a Member on account of all Service rendered to the City in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the City in any period of 12 consecutive months.

(3)    Not more than one month of Credited Service shall be granted for any period of more than one month during which the Member is absent without pay; notwithstanding the foregoing, any Member who shall  be suspended from duty and subsequently reinstated to duty without further disciplinary action shall receive credit for the time of such period of suspension.

(4)    Solely for purposes of determining eligibility for a retirement benefit under Sections 5.1 and 5.4, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).  The period of time during which a Member is on layoff from the service of the City shall be included in the Member's Credited Service solely for the purposes of determining whether the Member has attained ~~twenty-five years of Credited Service~~his Normal Retirement Age for purposes of Section 5.1.

**Sec. 4.2.    Vesting Service**

(1)    A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the City.

(2)    A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

**Sec. 4.3.    Service Credit; Military Service**

A Member who enters the military service of the United States while employed with the City shall have the period of such military service credited as City Service in the same manner as if the Member had served the City without interruption, provided that (1) the Member's entry into such military service and re-employment thereafter shall be in accordance with applicable

laws, ordinances, and regulations of the State of Michigan and the City, (2) he or she is re-employed by the City ~~as a Police Officer or Firefighter~~ upon completion of such military service, and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service. The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder. During the period of military service and until return to City employment, the Member's Mandatory Employee Contributions to the Retirement System shall be suspended.

**Sec. 4.4.    Service Credit; Qualified Military Service**

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u). Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than thirty ~~(30)~~ days, such Differential Wage Payment will be treated as compensation under the Code Section 415(c)(3) limits, but not for purposes of benefit accruals under the Retirement System. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the City to an individual who is performing service in the uniformed services while on active duty for a period of more than thirty ~~(30)~~ days.

# ARTICLE 5 – ELIGIBILITY FOR RETIREMENT

### Sec. 5.1.  Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his Normal Retirement Age while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

### Sec. 5.2.  Eligibility for Deferred Vested Retirement Benefit

Any Member who terminates employment with the City prior to satisfying the requirements for receipt of a retirement benefit under Section 5.1 and who is credited with ten (10) or more years of Vesting Service upon his or her termination of employment (regardless of ~~age~~Age) shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his ~~attainment~~Attainment of Age sixty-two.  At a Member's election, the Member may begin receiving ~~an immediate~~a Retirement Allowance following his ~~attainment~~Attainment of Age fifty-five, actuarially reduced for early commencement, in lieu of an unreduced Retirement Allowance beginning at age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

### Sec. 5.3.  Eligibility for Disability Retirement Benefit – Duty Disability

(1)  If ~~the Board shall find that~~, prior to attainment of his Normal Retirement Date, a Member ~~has~~shall become Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty~~, upon~~ and if, pursuant to Section 5.6, the Board shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board by or on behalf of such Member or by the head of his ~~department,~~Department such Member shall be retired~~,~~; notwithstanding that during such period of notification he or she may have separated from ~~Service with the City.  In making such determination, the Board may require that such Member undergo a medical examination to be made by a qualified physician or surgeon in the appropriate specialty at Detroit Receiving Hospital or other medical facility as may be selected by the Board~~service and provided further that the Medical Director, after examination of such Member shall certify to the Board the Member's Total Disability.  A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

   (a)  a basic benefit equal to fifty percent (50%) of his Final Compensation at the time his duty disability retirement begins, and

   (b)  a supplemental benefit equal to sixteen and two-thirds percent (16-2/3%) of his Final Compensation at the time his duty disability retirement begins.

Subject to Section 9.5, on the first day of each Plan Year, a Member's duty disability benefit will be increased as provided in Section 6.2.

(2)    After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation. If the Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (1)(a) and (1)(b) until such time as the Member would have attained twenty-five years of Credited Service had he continued in active Service with the City. At that time, the Member shall continue to receive the benefit described in paragraph 1(a) above; however, benefits described in paragraph 1(b) above will cease. If the Member is not disabled from any occupation, he shall continue to receive the benefit described in paragraph (1)(a) above; benefits described in paragraph 1(b) will cease.

(3)    In the event a Member receiving duty disability benefits has attained twenty-five years of Credited Service, duty disability benefits shall continue to be paid to the Member until the earlier of (i) the Member's ~~attainment of age~~ Attainment of Age sixty-five, or (ii) the date the Member ceases to be Totally Disabled as determined by the Board. Upon termination of disability or ~~attainment of age~~ Attainment of Age sixty-five, a ~~member~~ Member with twenty-five years of Credited Service shall be eligible to receive a Retirement Allowance as provided in Section 6.1. The amount of such Retirement Allowance shall be equal to the amount which would have been payable to the Member if the Member's conversion from duty disability retirement to a Retirement Allowance had occurred on the date the Member attained twenty-five years of Credited Service ~~Credit~~.

(4)    If a Member on duty disability retirement returns to active Service with the City and shall re-qualify for duty disability retirement for the same or related reasons within twenty-four months of his return to active Service, then the disability shall be deemed a continuation of the prior Total Disability and the period of the Member's active Service following the return to work will not qualify the Member to be entitled to a new initial determination of disability for purposes of determining the benefit payable to the Member. Instead, such Member will return to duty disability retirement benefits based on the number of months of disability with which the Member was credited at the time of his return to active Service, as if there had not been a break in his period of duty disability retirement.

(5)    During the period a Member is eligible to receive duty disability benefits under this Section 5.3, the Member shall continue to be credited with Credited Service until the Member accrues twenty-five years of Credited Service, at which time accrual of Credited Service shall cease.

(6)    In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Plan Year will be adjusted so it does not exceed the difference between (i) the Member's base salary at the date of duty disability, increased by the variable ~~pension improvement factor (escalator~~ Pension Improvement Factor (Escalator) (if any) applicable to such benefit pursuant to Section 6.2 ~~times~~ multiplied by the number of full Plan Years from the date of the Member's duty

disability to the year in which the earnings offset is applied, and (ii) the amount of the Member's remuneration from gainful employment during the prior calendar year. The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources. Furnishing such information to the Board at such times as the Board shall require shall be a condition for the Member's continued eligibility for duty disability benefits.

(7) The Board shall not act upon or grant the application for duty disability benefits filed by a Member who, although not capable of performing the full duties of his prior position, has not suffered any diminishment of his base wages or benefits because he is either (i) regularly assigned to a position, the full duties of which he is capable of performing; or (ii) assigned to a restricted duty position, unless the Member's Department advises the Board that it intends to seek a duty disability retirement for the Member in the foreseeable future. The provisions of this paragraph shall not affect a Member's right to seek a duty disability retirement benefit when no restricted duty position is available or restrict the authority of the Police Department of Fire Department (as applicable) to apply for a duty disability retirement benefit for such Member.

**Sec. 5.4. Eligibility for Disability Retirement Benefit – Non-Duty Disability**

(1) Upon the application of a Member or the Member's ~~department~~Department head, a Member who becomes totally and permanently disabled prior to his or her Normal Retirement Date in the employ of the City not resulting from the performance of duty shall be retired by the Board; provided that ~~a qualified physician or surgeon in the appropriate specialty at Detroit Receiving Hospital or other medical facility as may be selected by the Board,~~the Medical Director shall certify to the Board after a medical examination, that such Member is mentally or physically totally and permanently disabled for the further performance of duty to the City. Such a Member shall receive the following applicable benefits:

(a) If such Member has less than five years of Credited Service at the time of his disability retirement, his Accumulated Mandatory Employee Contributions standing to his credit in the Accumulated Mandatory Employee Contributions Fund shall be returned to him, or at his option he shall receive a cash refund annuity which shall be the actuarial equivalent of his Accumulated Mandatory Employee Contributions.

(b) If such Member has five or more years of Credited Service at the time of his disability retirement, he shall receive a disability Retirement Allowance computed in accordance with the provisions of Section 6.1 payable in any of the optional forms provided in Section 8.1 hereof. His annual ~~straight life retirement allowance~~Straight Life Retirement Allowance shall not be less than twenty per cent (20%) of his Average Final Compensation.

(2) The Board shall not act upon or grant the application for non-duty disability benefits filed by a Member who, although not capable of performing his full duties, has not suffered any diminishment of his base wages or benefits because he is either (i) regularly

~~assigned to a position, the full duties of which he is capable of performing; or (ii) assigned to a restricted duty position, unless the Member's employer advises the Board that it intends to seek a non-duty disability retirement for the Member in the foreseeable future. The provisions of this paragraph shall not affect a Member's right to seek a non-duty disability retirement benefit when no restricted duty position is available or restrict the authority of the Police Department or Fire Department (as applicable) to apply for a non-duty disability retirement benefit for such Member.~~

(~~3~~2)     If a ~~Retiree~~Member receiving non-duty disability retirement benefits is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the disabled ~~Retiree~~Member's Retirement Allowance and Average Final Compensation, the ~~Retiree~~Member's Retirement Allowance shall be reduced by the amount of such difference. If the amount of the Retiree's earnings changes, the Retirement Allowance may be adjusted accordingly. The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources. Furnishing such information to the Board at such times as the Board shall require shall be a condition for the Member's continued eligibility for non-duty disability benefits.

## Sec~~.~~ 5.5.     Disability Retirees; Reexamination

(1)     At least once each year during ~~the first five years~~each year following the retirement of a Member under Section 5.3 or Section 5.4, ~~and at least once in every three year period thereafter,~~ the Board ~~may~~shall require that such disability Retiree who has not attained his Normal Retirement Age undergo a medical examination, to be made by, or under the direction of~~, a qualified physician or surgeon in the appropriate specialty at Detroit Receiving Hospital or other medical facility as may be selected by the Board~~ the Medical Director; provided, however, that medical examinations shall not be required if the Medical Director determines that the Retiree's condition is permanent and there is no need for further reexamination. Retirees shall be reimbursed for reasonable costs actually incurred by the Retirees in connection with such examinations. Should any such Retiree who has not attained Normal Retirement Age fail to submit to ~~at least one such~~a required medical examination ~~in any such period~~, the Retiree's Retirement Allowance may be suspended by the Board until the examination is completed. Should such failure continue for one year, all of the disability Retiree's rights in and to the duty or non-duty disability Retirement Allowance may be revoked by the Board. If upon such examination of a Retiree, the examiner reports that the Retiree is no longer Totally Disabled, and such report is concurred in by the Board, the Retiree shall be restored to active service with the City and the Retirement Allowance paid pursuant to Section 5.3 or Section 5.4 shall be suspended until the Retiree terminates active ~~service~~Service with the City.

(2)     A disabled Retiree who has been, or shall be, reinstated to active ~~service~~Service in the employ of the City shall again become a Member. All Credited Service at the time of the disability retirement shall be restored to the Member.

## Sec 5.6.     Disability Benefits; Procedures for Determination of Disability

(1)     The Board shall establish procedures for determining whether a Member is Totally Disabled.  Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(2)     If a Member is determined to be Totally Disabled under Section 5.3(1) or 5.4(1), the Board or its designee will examine the pension file, including the submissions of the Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the Combined Plan.  If it is undisputed that the disability did result from the performance of duty, the Board will grant duty disability retirement benefits.  If it is undisputed that the disability did not result from the performance of duty, the Board will grant non-duty disability retirement benefits, provided the Member meets the other conditions of eligibility.  If the performance of duty issue is in dispute, the Board will refer the matter to arbitration by a member of the Disability Retirement Review Board ("DRRB"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon the Member, the Department and the Board. The DRRB shall consist of three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board.  The three members of the DRRB shall be disinterested persons qualified as labor arbitrators and shall be selected in accordance with agreements between the City and the unions representing Members.  The procedure for the termination of DRRB members and the selection of new DRRB members also shall be carried out in accordance with the agreements between the City and the unions representing Members.

(3)     The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

        (a)     The Member and the City will have the right to appear in person or otherwise may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

        (b)     A court reporter will be present and make a stenographic record of the proceedings;

        (c)     The hearing will be closed to the public, except that the Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

        (d)     The witnesses will be sequestered;

        (e)     The witnesses will be sworn by the court reporter and testify under oath;

        (f)     The Member may not be called by the City as an adverse witness;

        (g)     The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

(h)     If the Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the Member may so inform the Board in writing which, in turn, will submit a written request to the appropriate Department executive for the release of the employee for the purpose of so testifying;

(i)     The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

(j)     The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute;

(k)     The authority of the DRRB member is limited to deciding whether or not the Member's disability "resulted from the performance of duty" within the meaning of the Combined Plan.  The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Combined Plan: and

(l)     The costs associated with the hearing, including the arbitrator's fees and expenses and the court reporter's fees and expenses, will be paid by the Retirement System.

(4)     If a disability Retiree is determined by the Board to no longer be Totally Disabled, he or she may appeal that determination within seven (7) days thereof by filing a written request with the Board for a re-examination.  The Board shall promptly arrange for such re-examination.  The Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the Member is no longer Totally Disabled, his or her disability benefits will be further continued while the Police or Fire Department conducts such examinations and/or investigations as necessary to determine whether the Member is qualified for reappointment to active duty.  In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a Member represented by DPLSA is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.

(5)     The Board shall not act upon or grant the application filed by a Member who, although he or she is not capable of performing the full duties of a Police Employee or Fire Employee, has not suffered any diminishment of his or her base wages or benefits because he or she is either:

(a)     regularly assigned to a position, the full duties of which he or she is capable of performing; or

(b)     assigned to a restricted duty position, unless the Member's Department advises that it intends to seek a disability retirement for the Member in the foreseeable future.

(6)     The provisions in paragraph (5) above are not intended to and will not:

(a)     affect the right of a Member to seek a disability retirement when no restricted duty position is available; or

(b)     restrict in any way the existing authority of the Chief of Police or the Fire Commissioner to seek a duty or non-duty disability retirement for a Member for that Member at that time to request a duty or non-duty disability retirement.

**Sec. ~~5.6.~~ 5.7.    Return of Accumulated Mandatory Contributions to Non-Vested Member**

If a Member ceases ~~to be an Employee~~employment with the City before becoming eligible for a ~~deferred vested~~ Retirement Allowance under Section 5.1 or 5.2 or a disability Retirement Allowance pursuant to Section 5.3 or 5.4 ~~or 5.5~~, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

**Sec. ~~5.7.~~ 5.8.    Benefits Offset by Compensation Benefits; Subrogation**

(1)     Any amounts which may be paid or payable to a Member, Retiree, or Beneficiary on account of disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be an offset against any amounts payable from funds of the Retirement System (Component I and Component II combined) on account of the same disability or death.  If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance payable by the Retirement System (under both Component I and Component II), the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System (under both Component I and Component II), and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2)     In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

## ARTICLE 6 — RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec. 6.1.   Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Age or his actual retirement from employment with the City in the form of a Straight Life Retirement Allowance shall be equal to two percent (2%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth $(1/12^{th}$ year) of Credited Service earned ~~on and~~ after ~~July 1~~June 30, 2014.

### Sec. 6.2.   Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2015 and effective the first day of each Plan Year thereafter, the Board may determine that the annual Retirement Allowance of a ~~member of the Detroit Police Command Officers Association or the Detroit Police Lieutenants and Sergeants Association~~Member shall be increased by a factor of one percent (1.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement ("Pension Improvement Factor (Escalator)"); provided, that the recipient of said Retirement Allowance shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.  The Pension Improvement Factor (Escalator) shall be compounded.

# ARTICLE 7. DEATH BENEFITS

## Sec. 7.1.  Accidental Death Benefit; Performance of Duty

(1)     If a Member is killed in the performance of duty in the service of the City, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the City, and such death, illness, or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the City, the following benefits shall be paid:

    (a)     ~~His~~the Accumulated Mandatory Employee Contributions standing to his or her credit in the Accumulated Mandatory Employee Contributions Fund at the time of his or her death shall be paid to such person or persons as ~~he~~the Member shall have nominated by written designation duly executed and filed with the Board.  If no such designated person survives the Member, ~~his~~the said Accumulated Mandatory Employee Contributions shall be paid to ~~his~~the Member's legal representative, subject to paragraph (e) of this Section 7.1(1).

    (b)     ~~His~~the surviving ~~Spouse~~spouse shall receive a pension of five-elevenths of the Member's Final Compensation payable for the ~~Spouse~~spouse's lifetime.  If the Member's child or children under age eighteen years also survive the deceased Member, each such child shall receive a pension of one-tenth of such Final Compensation; provided, that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of seven thirty-thirds of such Final Compensation.  Upon the death, marriage, adoption, or ~~attainment of age~~Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution of the benefit by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of the Member's Final Compensation.  In no case shall the total of the ~~pensions~~benefits provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the Member's Final Compensation.

    (c)     ~~If~~if no surviving ~~Spouse~~spouse survives the deceased Member or if the Member's surviving ~~Spouse~~spouse dies before his youngest unmarried surviving child attains ~~age~~Age eighteen years, his unmarried child or children under ~~age~~Age eighteen years shall each receive a pension of one-fourth of the Member's Final Compensation; provided that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of one-half of such Final Compensation.  Upon the death, marriage, adoption, or ~~attainment of age~~Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the Member's Final Compensation.

(d)     ~~If~~if the Member has no surviving ~~Spouse~~spouse or surviving children under ~~age~~Age eighteen years and if the Member leaves surviving ~~him~~ either a father or mother or both ~~a father and mother~~, whom the Board shall find to be actually dependent upon such Member for financial support, such dependent father and mother shall each receive a pension of one-sixth of the Member's Final Compensation.

(e)     If a Member dies intestate, without having designated a person or persons, as provided in paragraph (a) of this Section 7.1(1), and without heirs, the amount of his Accumulated Mandatory Employee Contributions in the Accumulated Mandatory Employee Contribution Fund, not to exceed a reasonable sum, to be determined by the Board, shall be used to pay his burial expenses, provided ~~he~~the Member leaves no other estate sufficient for such purpose.  Any balance credited to such Member in the Accumulated Mandatory Employee Contribution Fund, and not used for burial expenses shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

## Sec. 7.2.    Non-Duty Death Benefits

The surviving ~~Spouse~~spouse of any Member who dies while in the employ of the City (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, shall receive a Retirement Allowance computed in the same manner in all respects as if said Member had (i) retired effective on the day preceding the Member's death, notwithstanding that the Member had not attained Normal Retirement Age, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving ~~Spouse~~spouse as Beneficiary.

## Sec. 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member who is not covered by Section 7.1 dies while employed by the City or following termination of employment but prior to commencement of a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate.  If a Member  who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 8 — FORMS OF PAYMENT

**Sec. 8.1.    Retirement Allowance Options**

(1)    Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a Beneficiary, in accordance with the options set forth below:

   (a)    *Option One.  Cash Refund Annuity.*  A Retiree will receive a reduced Retirement Allowance for as long as he or she lives, provided that if the Retiree dies before payment of the Accumulated Mandatory Employee Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

   (b)    *Option Two.  Joint and One Hundred Percent Survivor Allowance.*  Upon the death of a Retiree  who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the Member's reduced Retirement Allowance shall be paid to and continued throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

   (c)    *Option "A".  Joint and Seventy-Five Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

   (d)    *Option Three.  Joint and Fifty Percent Survivor Allowance.*  Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

   (e)    *Option "B".  Joint and Twenty-Five Percent Survivor Allowance.  Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the Member's reduced Retirement Allowance shall be*

continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2) *Joint and Survivor Optional Forms of Payment*. The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

(a) *Standard Form*. Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

(b) *Pop-up Form*. Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance payable to the Retiree shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

## Sec. 8.2. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, or a Joint and Fifty Percent Survivor allowance or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1, both a Retiree and Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions (and if the Retiree makes an election pursuant to Section 10.4(2), his Accumulated Voluntary Employee Contributions) at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions (and Accumulated Voluntary Employee Contributions, if applicable) and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board. If there are is no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the last survivor of the Retiree or the Beneficiary, whichever is the last to die.

# ARTICLE 9 — FUNDING AND RESERVES

## Sec. 9.1.    Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive City and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of the Retirement System).

## Sec. 9.2.    Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Contribution Fund, the Deferred Retirement Option Program Fund (if applicable), the Medical Benefits Account Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Expense Fund and the Income Fund, as follows:

(1)    The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.   Upon the Retirement retirement, termination, disability or death of a Member with a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's or Beneficiary's Retirement Allowance.

(2)    The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members, together with earnings thereon.

(3)    The Deferred Retirement Option Plan Fund shall be the fund in which shall be accumulated the amounts credited to the DROP Accounts of Members who have elected to participate in the DROP Program pursuant to Article 11 12, together with earnings thereon, provided that the DROP Accounts are held and invested within the Retirement System.

(4)    The Medical Benefits Account Fund shall be the fund in which shall be accumulated the amounts contributed to the Retirement System for the purposes of paying Medical Benefits.

(4 5)    The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the City's annual contribution that is not credited to the Rate Stabilization Fund and amounts transferred to Component I as provided in Section G-2(f) of Component II and from which shall be paid Retirement Allowances and other benefits on account of Members.

(5<u>6</u>)  The Rate Stabilization Fund shall be the Fund to which shall be credited City contributions in excess of the amount of the City's contribution which is credited to the Pension Accumulation Fund <u>and amounts transferred to Component I as provided in Section G-2(f) of Component II</u>.

(6<u>7</u>)  The Expense Fund shall be the fund to which shall be credited any money provided by the City<u>, if any,</u> to pay the administrative expenses of the Retirement System, and from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(7<u>8</u>)  The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the assets of Component I of the Retirement System, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9. There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document. <u>Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.</u>

### Sec. 9.3.    Method of Financing Retirement System Benefits

(1)  The pension liabilities for Members <u>under this Component I</u> shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2)  The City's annual contribution to finance the prospective pension liabilities ~~for~~<u>during</u> the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be (a) eleven and two-tenths percent (11.2%) of the ~~payroll~~<u>base Compensation</u> of active employees who are members of the ~~Detroit Fire Fighters Association and the Detroit Police Officers Association,~~<u>DFFA (for pay periods ending on or before the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA) and members of DPOA (for pay periods ending on or before October 3, 2014)</u> and (b) twelve and one-quarter percent (12.25%) of the ~~payroll~~<u>base Compensation</u> of active employees who are members of the ~~Detroit Police Command Officers Association and the Detroit Police Lieutenants and Sergeants Association, for the applicable Plan Year~~<u>DPCOA, the DPLSA, the DPOA (for pay periods beginning on or after October 3, 2014) and the DFFA (for pay periods beginning on or after the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA)</u>. A portion of the City's annual contribution for each Plan Year shall be credited to the Rate Stabilization Fund. The remainder of the City's annual contribution shall be ~~shall be~~allocated to the Pension Accumulation Fund.

(3)  Except as provided in Section 9.5, for each Plan Year, a Member who was an active employee as of June 30, 2014 ("current active") shall contribute to the Retirement System

an amount equal to six percent (6%) of his or her ~~base~~ Compensation for such Plan Year and a Member who is hired or rehired by the City on or after July 1, 2014 ("new employee") shall contribute to the Retirement System an amount equal to eight percent (8%) of his or her ~~base~~ Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of ~~July 14,~~the Member's first payroll date occurring in August 2014. The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the ~~date of his participation in the Retirement System~~later of (i) the Member's first payroll date occurring in August 2014 and (ii) the Member's date of hire, to the date he ceases to be a Member. The contribution shall be deducted from the Members' Compensation, notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment. Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

## Sec. 9.4. Member Contributions Picked-Up

(1)     The City shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)     The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code. The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)     The City shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both. The City shall designate the Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

## Sec. 9.5. Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations

(1)     To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below ~~one hundred~~ninety percent (~~100~~90%), the Trustee may not award the variable ~~pension improvement factor (escalator~~Pension Improvement Factor (Escalator) described in Section 6.2 to any individual beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than ~~one hundred~~ninety percent (~~100~~90%).

(2)     In the event the funding level of the Retirement System projected over a five year period falls below ninety percent (90%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is ~~restored to not less than ninety~~ projected to be one hundred percent (~~90%)~~ 100%) on a market value basis within the next five years:

(a)     the remedial action required in Section 9.5(1) shall be implemented or continued;

(b)     all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under the Retirement System;

(c)     Mandatory Employee Contributions for active and new employees shall be increased by one percent (1%) for up to the next following five Plan Years;

(d)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(e)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(f)     the Retirement Allowance payable to a Retiree shall not include the variable ~~pension improvement factor (escalator~~ Pension Improvement Factor (Escalator) that was most recently paid to the Retiree on the date the funding level is projected to fall below ninety percent (90%);

(g)     the Retirement Allowance payable to a Retiree shall not include the variable ~~pension improvement factor (escalator~~ Pension Improvement Factor (Escalator) that was most recently added to the Member's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (f) above;

(h)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year; and

(i)     contributions made to the Retirement System by the City shall be increased, consistent with applicable actuarial principles and the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

(3)     For purposes of this Section 9.5, the "funding level" shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System. The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee. The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

# ARTICLE 10 – VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec. 10.1. Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member who is covered by a collective bargaining agreement with the City that permits the Member to make ~~voluntary employee contributions~~Voluntary Employee Contributions to Component I of the Retirement System may elect to reduce his Compensation for any Plan Year by a whole percentage not less than one percent (1%) nor more than ten percent (10%) and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System. A Member represented by the DPOA may elect to reduce the amount paid to him or her by the City for accumulated sick leave in excess of 400 hours by a whole percentage not less than one percent (1%) nor more than one hundred percent (100%) of such amount and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System. Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis. Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

## Sec. 10.2. Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the ~~Board~~City shall determine. Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

## Sec. 10.3. Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System. Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second ~~fiscal year~~Fiscal Year immediately preceding the ~~fiscal year~~Fiscal Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

## Sec. 10.4. Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases ~~to be an Employee~~employment with the City other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member. If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)      In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the ~~actuarial equivalent value~~Actuarial Equivalent Value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)      If a Member dies while employed by the City or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's ~~Accumulated~~ Voluntary Employee Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

## ARTICLE 11 — LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec. 11.1.  The Loan Program

A loan program shall be available to ~~members of the Detroit Police Lieutenants and Sergeants Association and the Detroit Police Command Officers Association~~Members who have amounts credited to a Voluntary Employee Contributions Account.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

### Sec. 11.2.  Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve (12) months or more.  Former Members, ~~Spouses~~spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.  No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan under either Component I or Component II of the Combined Plan shall not be eligible for a loan from the Retirement System.

### Sec. 11.3.  Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount, which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Fifteen Thousand Dollars ($15,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be One Thousand Dollars ($1,000.00).

### Sec. 11.4.  Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)     Each loan application shall be made in writing.

(b)     All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c)     Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d)     An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Defined Contribution Plans of the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)     Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan. The loan interest rate shall be calculated in a manner that will not negatively affect either the City's costs with respect to the Retirement System or the investment return allocated to Members.

(f)     Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec. 11.5.  Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec. 11.6.  Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last

payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

**Sec. 11.7.  Distribution**

No distribution shall be made to a Member, former Member, ~~Spouse~~spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the Member from the Retirement System.

**ARTICLE 12.  DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM**

**Sec. 12.1.  General Provisions**

The following provisions are hereby established as the Deferred Retirement Option Plan ("DROP") Program under Component I, which shall be available to ~~members of the Detroit Police Lieutenants and Sergeants Association and the Detroit Police Command Officers Association.~~Members who are covered by collective bargaining agreements with the City that permit such Members to participate in the DROP program and those non-union executives of the Police Department and the Fire Department.

(1)   In lieu of terminating employment and accepting a Retirement Allowance under the ~~Retirement System~~Component I, any Member of the Retirement System who is eligible for the DROP ~~Program~~program and who is eligible to immediately retire and receive an unreduced Retirement Allowance under Section 5.1 may elect to participate in the DROP ~~Program~~program and defer the receipt of his or her Retirement Allowance in accordance with the provisions of this Article 12.  Any such election shall be irrevocable.

(2)   A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years.  At the end of such five year period of participation in the DROP program, the Member shall be retired from employment.

**Sec 12.2.   Conversion to Retirement Allowance**

~~(2)~~   Upon the effective date of a Member's participation in the DROP ~~Program~~program, the Member shall cease to accrue a Retirement Allowance pursuant to Section 6.1 and shall elect a form of payment for his Retirement Allowance pursuant to Section 8.1. Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable ~~pension improvement factor (escalator~~Pension Improvement Factor (Escalator) increases) that would have been payable, had ~~a~~the Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the ~~City~~Board.

**Sec 12.3.   Investment of DROP Assets**

(1)   ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program.  ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (4) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(2)   As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts invested under the Retirement System.  If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(3)     If amounts credited to a DROP Account are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees.  ~~The~~A Member's DROP Account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP Account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(4)     ~~If amounts credited to a DROP Account are paid into an entity managed outside of the Retirement System, amounts credited to a Member's DROP Account shall be invested as directed by the Member within the investment choices provided by such entity.~~

(4)     The Board of Trustees entered into an administrative services agreement with ING.  Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(5)     The Board of Trustees may replace ING with a trust type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(~~5~~6)     Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from ~~the~~their DROP ~~Account~~Accounts.

## Sec 12.4.     Distribution of Amounts Credited to DROP Account

~~Sec. 12.2.  Conversion to Retirement Allowance~~

(~~1~~)     ~~A Member shall be entitled to participate in the DROP Program for a maximum of five years.  At the end of such five year period of participation in the DROP Program, the Member shall be retired from employment with the City.~~

(~~2~~)     A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City.   Upon termination of employment, a Member who is a participant in the DROP ~~Program~~program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his DROP Account.  In addition, one hundred percent (100%) of the Member's ~~full~~ monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP ~~Program~~program (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP ~~Program~~program.  Termination of employment includes termination of any kind, such as~~,~~ resignation, retirement, discharge or disability.

## Sec. ~~12.3.~~ 12.5.        Death of Member While Participating in the DROP Program

(1)     If a Member dies while participating in the DROP ~~Program~~program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate.  In addition, ~~the Member's Retirement Allowance, together with any applicable variable pension improvement factor (escalator) increases, will be restored to~~ one hundred percent (100%) of the ~~amount~~Member's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid to the Member but for the Member's decision to participate in the DROP ~~Program~~program will be restored.  Survivor benefits, if any, shall be paid in accordance with the payment ~~Option~~option elected by the deceased Member at the time the Member elected to participate in the DROP program.

## Sec. ~~12.4.~~ 12.6.          Disability of Member While Participating in the DROP Program

~~(1)     If a Member becomes Totally Disabled due to a duty disability while participating in the DROP Program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, he shall be immediately retired with one hundred percent (100%) of his Retirement Allowance payable in the form of payment selected by the Member at the commencement of the DROP Program, plus any applicable variable pension improvement factor (escalator) increases.~~

~~(2)~~     If a Member becomes Totally Disabled ~~due to a non-duty disability~~ while participating in the DROP ~~Program~~program and while still an Employee ~~of the City~~ and his employment with the City is terminated because he is Totally Disabled, ~~the~~such Member (a) shall be immediately retired and ~~his full~~one hundred percent (100%) of the Retirement Allowance~~,~~) that would have been paid to the Member but for the Member's decision to participate in the DROP program (together with any applicable variable ~~pension improvement factor (escalator~~Pension Improvement Factor (Escalator) increases~~,~~) will commence in accordance with the ~~form of~~payment option selected by the Member at the commencement of the Member's participation in the DROP ~~Program~~program as provided in Section 12.1(2), and (b) shall be entitled to receive payment of the funds in his DROP Account (~~as~~in the form of a lump sum or other form of payment described in Section 8.1).  Such Member shall not be entitled to disability retirement benefits under Section 5.3 or Section 5.4 hereof.

## Sec. ~~12.5.~~ 12.7.          Cost Neutrality

(1)     The DROP ~~Program~~program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP ~~Program~~program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(2)     If the City contends that the DROP ~~Program is costing it money~~program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP ~~Program~~program was not in effect, the ~~Retirement System's actuary~~Board and the City, along with the Plan Actuary as well as an actuary appointed by the City~~,~~ (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost.  If the ~~actuaries~~Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent,

actuary, chosen or agreed upon by the ~~Retirement System's actuary~~Plan Actuary and the City's actuary ~~who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries~~.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP ~~Program cost neutral~~program cost-neutral.  Upon the implementation of changes necessary to make the DROP ~~Program cost neutral~~program cost-neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City or (b) withdraw from the DROP ~~Program~~program and resume active participation in Component I of the Retirement System.  The Board shall notify ~~the Member~~DROP participants of these changes prior to implementation.  Those ~~Members~~DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP ~~Program~~program (under either Component I or Component II).  Those not making either election shall ~~resume active participation in the Retirement System~~remain participants in the DROP program.

(3)     In the event the DROP program cannot be changed to restore cost neutrality, it shall be discontinued and Members participating in the DROP program at that time shall have the option to either (i) retire or (ii) continue active employment with the City and resume active participation in Component I of the Retirement System.  DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under Component I or Component II).

# ARTICLE 13. LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec. 13.1.  Compliance With Code Section 415(b) And Regulations

(1)     Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)     The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)     Notwithstanding the foregoing:

    (a)     if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 13.1(2) has been satisfied shall be made, in  accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 13.1(89) or (910);

    (b)     if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 13.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two (adjusted for participation of fewer than 10 years, if applicable); provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System,  commencing at Age sixty-two; and

    (c)     if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an

annual benefit payable in the form of a straight life annuity, commencing when the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)     The adjustments in Sections 13.1(3)(b) shall not apply to a Member with at least 15 years of Credited Service as a Police Member or a Fire Member within the meaning of Code Section 415(b)(2)(H).  In addition, the adjustments in Sections 13.1(3)(b) and 13.1(6) shall not apply to benefits payable on account of the disability or the death of a Member.

(~~4~~5)     Notwithstanding the foregoing provisions of this Section 13.1, except as provided in Section 13.1(~~5~~6), the maximum annual benefit specified in Section 13.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by the City, does not exceed $10,000 for the Plan Year or any prior Plan Year, and (b) the Member was not at any time a participant in a ~~defined contribution plan~~Defined Contribution Plan maintained by the City.

(~~5~~6)     In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 13.1(2) shall be such limitation (without regard to this Section 13.1(~~5~~6)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten.  In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 13.1(2) and in Section 13.1(~~4~~5) shall be such limitations (determined without regard to this Section 13.1(~~5~~6)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.  The adjustment in this Section 13.1(6) shall not apply to benefits paid on account of the disability or death of a Member.

(~~6~~7)     Notwithstanding anything in this Section 13.1 to the contrary, if the annual benefit of a Member who has terminated employment with the City is limited pursuant to the limitations set forth in Section 13.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(~~7~~8)     For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 13.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(~~8~~9)     The ~~actuarially equivalent~~Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 13.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 13.1(~~7~~8).

(~~9~~10)     The ~~actuarially equivalent~~Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 13.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(~~10~~11)   For purposes of applying the limitations set forth in this Section 13.1, all qualified defined benefit plans (whether or not terminated) ever maintained by the City shall be treated as one defined benefit plan.

(~~11~~12)   For purposes of this Section 13.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year.  The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with the City or (b) the end of the limitation year that includes the date of the Member's severance from employment with the City, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the City and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(~~12~~13)   This Section 13.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to~~,~~ those interpreting Section 415(b)(2)(H), and any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

**Sec. 13.2.  Compliance with Code Section 415(c) and Regulations**

(1)     The "~~annual addition~~Annual Addition" with respect to a Member for a limitation year shall in no event exceed the lesser of:

    (a)     $40,000 (adjusted as provided in Code Section 415(d)); or

    (b)     One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)     The ~~"annual addition"~~Annual Addition with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions made to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified ~~defined contribution plan~~Defined Contribution Plan (whether or not terminated) maintained by the City, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(3)     In the event the ~~"annual addition"~~Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 13.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

# ARTICLE 14 – RETIREMENT SYSTEM ADMINISTRATION

## Sec. 14.1.  Board of Trustees as Retirement System Administrator

(1)     The Retirement Board shall have the power and authority to manage and administer  the Retirement System in accordance with the provisions of this Combined Plan Document.

(2)     The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 14.2.

(3)     The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document.  This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

## Sec. 14.2.  Powers and Duties of Board

(1)     The Board shall have the following powers and duties:

(a)     exclusive authority regarding the  administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Retirement System required of the City and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)     to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)     except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

(g)     except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h)     to prepare an annual report for the Retirement System for each ~~fiscal year~~Fiscal Year in compliance with generally accepted accounting principles. The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the ~~fiscal year~~Fiscal Year. The Board shall furnish a copy of the annual report to the ~~mayor~~Mayor and finance director of the City, to the chair of the City Council and the Investment Committee. The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)     to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and ~~accumulated~~ contributions of each Member who has made contributions to the Retirement System;

(j)     to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the City or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System. In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System. The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)     except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec. 14.3.  Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)     manage and administer the Retirement System under the supervision and direction of the Board;

(b)     annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System'sSystem's expenses for the following fiscal yearFiscal Year; and

(c)     perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may but need not be an employee of the City.

## Sec. 14.4.  Discretionary Authority

The Board shall have sole and absolute discretion to:

(a)     interpret the provisions of the Retirement System;

(b)     make factual findings with respect to any and all issues arising under the Retirement System;

(c)     determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)     decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)     make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

### Sec. 14.5.  Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

# ARTICLE 15 – MANAGEMENT OF FUNDS

**Sec. 15.1.  Board as Trustee of Retirement System Assets**

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City, and subject to the terms of Article 16, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.

**Sec. 15.2.  Maintenance of Segregated Funds**

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan ~~Document~~document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan ~~Document~~document. Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan ~~Document~~document may be commingled for investment purposes and transferred as provided in Section G-2(f) of Component II.

**Sec. 15.3.  Custodian of Funds**

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System.  The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

**Sec. 15.4.  Exclusive Purpose**

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

**Sec. 15.5.  Prohibited Conduct**

Members of the Board and employees of the Retirement System are prohibited from:

(1)    Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

(4)     Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

# ARTICLE 16 — INVESTMENT OF RETIREMENT SYSTEM ASSETS

**Sec. 16.1.  Investment Powers of the Board and the Investment Committee**

Subject to the requirements set forth in this Article 16, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.  Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 16.

All investment management decisions made by the Board, as more fully described in Section 16.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has ~~advisory~~ responsibility and authority, including the investment management matters described in Section 16.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If ~~the Board~~ (a) the Board fails to approve or disapprove an ~~Investment Management~~investment management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an ~~Investment Management~~investment management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee and the ~~Chief Investment Officer~~chief investment officer are authorized to implement the decision.

If the Board disapproves an ~~Investment Committee recommendation~~investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended ~~Investment Management~~investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not ~~sooner~~less than five business days, of the request ~~to discuss the alternative proposal from the Board, unless a later date is agreed to in writing by the Board and~~by the Investment Committee to discuss the disapproval ~~as set forth~~by the Board described in the ~~Board's~~ written response.  Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended ~~Investment Management~~investment management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended ~~Investment Management~~investment management decision.  After

delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision.  Any action taken by the Board or the Investment Committee in violation of the terms of this Article 16 shall constitute an *ultra vires* act and the Investment Committee or the Board is granted the express right to seek to preliminarily enjoin such ~~violation~~action without the need to show irreparable harm.

### Sec. 16.2.  Investment Management

(1)     For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

(a)     development of an investment policy statement with sound and consistent investment goals, objectives, ~~asset allocation and rebalancing guidelines,~~and performance ~~benchmarks for strategic asset allocation and such other aspects of investment policy as~~measurement standards which are consistent with the needs of the Retirement System;

(b)     within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

(c)     evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

(d)     review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the ~~Retirement System actuary~~Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article K of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after ~~fiscal year~~Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

(e)     in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the ~~Retirement System's actuary~~Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

(f)     communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

(g)     determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

(h)     ~~periodic review and evaluation of the performance of the investment managers in context with established standards of performance, including restoration of benefits pursuant to Component II of the Retirement System;~~

(~~i~~h)     the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(~~j~~i)     interpretation of Retirement System governing documents, existing law, the Plan of Adjustment ~~and~~or other financial ~~information~~determination that could affect funding or benefit levels;

(~~k~~j)     review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the ~~Retirement System's auditor~~Auditor or other professional advisors as necessary prior to approval of the annual audit or other financial reports;

(~~l~~k)     determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(~~m~~l)     causing an asset/liability valuation study to be performed for the Retirement System every three years or, more often, as ~~deemed necessary or prudent~~requested by the Investment Committee or ~~as requested by~~ the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act 314* and *Plan Investment Guidelines*.

### Sec~~.~~ 16.3.  Best Practices

Prior to adopting ~~an~~ investment ~~policy~~guidelines and asset allocation ~~policy~~policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

**Sec. 16.4.  Chief Investment Officer**

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.   The chief investment officer shall report directly to the Investment Committee and the Executive Director of the Board.  The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.  The chief investment officer shall provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

**Sec. 16.5.  Investment Consultants**

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Investment Committee and the Board with oversight of the Retirement System's investment portfolio.   Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.   Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.   The duties of an investment consultant may include, but shall not be limited to:

(a)     providing an asset/liability valuation study for the Retirement System;

(b)     reviewing the Retirement System's asset allocation based on current market assumptions;

(c)     identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)     implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)     monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)     recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations in the event of a deviation from expectations;

(g)     communicating the investment policies of the Retirement System to the investment managers;

(h)     reviewing the investment policies with the appropriate employees of the Retirement System;

(i)      aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

(j)      attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)     meeting with the Investment Committee to provide  detailed quarterly performance reports and executive summaries of performance;

(l)      meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)    meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and  ~~manger~~manager selections.

## Sec. 16.6.  Consistency With Plan of Adjustment

Nothing herein shall be interpreted as permitting the Investment Committee or the Board to alter or depart from the requirements set forth in the Plan of Adjustment.

# ARTICLE 17.  RETIREE MEDICAL ACCOUNT

## Sec 17.1.   Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board of Trustees shall pay the cost, which would otherwise be borne by the City, for certain medical and related benefits provided under the plans or programs maintained by the City to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 17 are intended to comply with Section 401(h) of the Code and shall be construed to comply therewith.

## Sec 17.2.   Effective Date

Medical Benefits shall be paid from the Medical Benefits Account beginning October __, 2014 or such other date recommended by an enrolled actuary (within the meaning of Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec 17.3.   Funding of Benefits

Subject to the right reserved to the City to amend or terminate the provision of Medical Benefits under its general power to amend the Combined Plan document under Section 18.5, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time the City makes a contribution to the Trustee, the City shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec 17.4.   Limitation on Contributions

At all times the aggregate of the contributions made by the City to provide Medical Benefits shall not exceed twenty-five percent (25%) of the sum of the aggregate contributions made by the City to the Plan under Sections 9.3 and 9.5, other than the contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account.  In the event that a contribution under Section 17.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount.

## Sec 17.5.   Impossibility of Diversion

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the City.

**Sec 17.6.    Administration**

The Medical Plans shall continue to be administered, and claims processed, under their respective terms.  Notwithstanding, the interpretation and administration of the terms of this Article 17 shall be pursuant to the provisions of the Combined Plan document.

**Sec 17.7.    Right to Amend or Terminate Medical Plans**

The City expressly reserves the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by the City that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible spouses and dependents to pay all or any portion of the cost of such medical benefits.

**Sec 17.8.    Reversion**

At any time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, no part of the Medical Benefits Account may be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account.  If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the City to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the City.  In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the City's contributions.

**Sec 17.9.    Limitation of Rights**

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

# ARTICLE ~~17~~18.  MISCELLANEOUS

**Sec. ~~17.1.~~ 18.1.** **Nonduplication of Benefits**

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by the City (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

**Sec. ~~17.2.~~ 18.2.** **Assignments Prohibited**

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of benefit, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

**Sec. ~~17.3.~~ 18.3.** **Protection Against Fraud**

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

**Sec. ~~17.4.~~ 18.4.** **Conviction of Felony; Forfeiture of Rights**

If a Member or Beneficiary shall be convicted by a court of competent jurisdiction of a felony or high misdemeanor involving moral turpitude committed during active Service, the Board shall have the power to order the forfeiture of all rights of the Member or Beneficiary to benefits hereunder, except the return of the Member's Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.

**Sec. ~~17.5.~~ 18.5.** **Amendment; Termination; Exclusive Benefit**

The City reserves the right to amend the Combined Plan ~~Document~~document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments ~~required to comply with applicable federal law or~~permitted under the terms of the Plan of Adjustment ~~may be made effective prior to July 1, 2023~~(including amendments contemplated in Section K-4(5) of Component II) may be made to the terms, conditions and rules of operation of the Combined Plan or any successors plan or trust that govern the calculation of pension benefits, nor may any amendment or termination deprive any

Member, former Member or Beneficiary of any then vested benefit under the Retirement System, except as provided in ~~a~~the Plan of Adjustment. Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan ~~Document~~document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code. The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Retirement System by the City must be approved by the Council or a person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

### Sec. ~~17.6.~~ 18.6.     Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

### Sec. ~~17.7.~~ 18.7.     Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan ~~Document~~document to the contrary. Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year that he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires. Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section ~~17.7~~18.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

### Sec. ~~17.8.~~ 18.8.     Direct Rollovers

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the ~~board~~Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(~~2~~a)     For purposes of this Section ~~17.8~~18.8, the following terms shall have the following meanings:

(~~a~~b)     *"Direct rollover"* means a payment by the ~~retirement system~~Retirement System to an eligible retirement plan specified by a distributee.

(b~~b~~c) *"Distributee"* means a Member or former Member. It also includes the Member's or former Member's surviving spouse, a spouse or former spouse who is the alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E). However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "~~"~~"inherited~~"~~" individual retirement account or annuity.

(~~c~~d) *"Eligible retirement plan"* means any of the following that accepts a distributee's eligible rollover distribution:

    (i)      a qualified trust described in Code Section 401(a);

    (ii)     an annuity plan described in Code Section 403(a);

    (iii)    an annuity contract described in Code Section 403(b);

    (iv)    an individual retirement account described in Code Section 408(a);

    (v)     an individual retirement annuity described in Code Section 408(b);

    (vi)    a Roth IRA described in Code Section 408A; or

    (vii)   a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the ~~retirement system~~Retirement System.

(~~d~~e) *"Eligible rollover distribution"* means any distribution of all or any portion of the balance to the credit of a ~~distribute~~distributee under the ~~retirement system~~Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year. Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the ~~retirement system~~Retirement System. However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a)

that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

**Sec. ~~17.9.~~ 18.9.** **Construction**

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate. The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I of this Combined Plan ~~Document~~document and not to any particular provision or section thereof. The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan ~~Document~~document or the Retirement System created hereunder.

**Sec. ~~17.10.~~ 18.10.** **Severability**

If any section or part of a section of this Combined Plan ~~Document~~document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan ~~Document~~document or Retirement System or of the Combined Plan ~~Document~~document or Retirement System in its entirety.

## EXHIBIT I.A.254.b

PRINCIPAL TERMS OF NEW PFRS ACTIVE PENSION PLAN

## <u>NEW PFRS ACTIVE PENSION PLAN -- MATERIAL TERMS</u>

1.   Benefit Formula:
     a.   Detroit Fire Fighters Association Employees
          i.   FAC (average base compensation over last 10 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.
     b.   Detroit Police Command Officers Association Employees

1.   ~~FAC~~<u>Benefit Formula for all employees is Final Average Compensation</u> (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%.  Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

     c.   Detroit Police Officers Association Employees
          i.   FAC (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.
     d.   Detroit Police Lieutenants and Sergeants Association Employees
          i.   FAC (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

2.   Actual time for benefit accrual is actual time served.  For vesting service, 1,000 hours in a 12 month period to earn a year of service.

3.   Normal Retirement Age
      <u>for all employees is a</u>.   Detroit Fire Fighters Association Employees
          i.   age 52 with 25 years of service
     b.   Detroit Police Command Officers Association Employees
i.   age 50 with 25 years of service, with the following 7 year transition period:

|              | Fiscal Year            | Age and Service       |
|--------------|------------------------|-----------------------|
|              | 2015                   | Age 43 and 20 years   |
|              | 2016                   | Age 43 and 20 years   |
|              | 2017                   | Age 44 and 21 years   |
|              | 2018                   | Age 45 and 22 years   |
|              | 2019                   | Age 46 and 23 years   |
|              | 2020                   | Age 47 and 24 years   |
|              | 2021 and thereafter    | Age 50 and 25 years   |

     c.   Detroit Police Officers Association Employees
          i.   age 50 with 25 years of service with the 7 year transition period described in paragraph 3b

~~d.  Detroit Police Lieutenants and Sergeants Association Employees~~
~~age 50 with 25 years of service, with the 7 year transition period described in paragraph 3b~~

4.  10 Years of Service for vesting.

5.  Deferred vested  pension -- 10 years of service and age 55 _for reduced benefit; 10 years of service and age 62 for unreduced benefit_.

6.  Duty Disability  - consistent with current PFRS

7.  Non-Duty Disability – consistent with current PFRS

8.  Non-Duty Death Benefit for Surviving Spouse – consistent with current PFRS

9.  Duty Death Benefit for Surviving Spouse – consistent with current PFRS

10.  COLA
_:_ ~~a.  Detroit Fire Fighters Association Employees~~
         ~~i.  no COLA~~
     ~~b.  Detroit Police Command Officers Association Employees~~
~~i.~~  1% compounded, variable

     ~~c.  Detroit Police Officers Association Employees~~
         ~~i. 1% compounded, variable~~
     ~~d.  Detroit Police Lieutenants and Sergeants Association Employees~~
         ~~i. 1% compounded, variable~~
~~11.~~  ~~DROP Accounts~~
     ~~a.  Detroit Fire Fighters Association Employees~~
         ~~i.  no future payments into DROP.~~
     ~~b.  Detroit Police Command Officers Association Employees~~
~~i~~11.  _DROP Accounts will be_ available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements.  No more than 5 years of DROP participation _(both for Old PFRS and New PFRS)_ for employees not already in DROP.  DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible.  If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.

     ~~c.  Detroit Police Officers Association Employees~~
         ~~i. available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements.  No more than 5 years of DROP participation for employees not already in DROP.  DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible.  If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.~~
     ~~d.  Detroit Police Lieutenants and Sergeants Association Employees~~

~~i. available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements. No more than 5 years of DROP participation for employees not already in DROP. DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible. If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.~~

12. Annuity Savings Fund
   <u>– employees may make</u> ~~a. Detroit Fire Fighters Association Employees~~
      ~~i. no future Annuity Savings Fund contributions.~~
   ~~b. Detroit Police Command Officers Association Employees~~
      i. voluntary Annuity Savings Fund contributions up to 10% of <u>total</u> after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted.

<u>An employee represented by the</u> ~~e. Detroit Police Officers Association Employees~~ <u>may elect to contribute up to 100% of the amount paid to him or her by the City for accumulated sick leave in excess of 400 hours.</u>
      ~~i. voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted.~~

   ~~d. Detroit Police Lieutenants and Sergeants Association Employees~~
      ~~i. voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted.~~

13. Investment Return/Discount rate – 6.75%

14. City Contributions

   a. Detroit Fire Fighters Association Employees
      i. 11.2% of the base compensation of eligible employees <u>for payroll periods beginning prior to the effective date of the collective bargaining agreement and 12.25% of the base compensation of eligible employees for payroll periods beginning after the effective date of the collective bargaining agreement</u>. A portion of such contribution ~~(not less than 1% of base compensation)~~ will be credited to a rate stabilization fund.

   b. Detroit Police Command Officers Association Employees
      i. 12.25% of the base compensation of eligible employees. A portion of such contribution will be credited to a rate stabilization fund.

c. Detroit Police Officers Association Employees
   i. 11.2% of the base compensation of eligible employees for payroll periods beginning prior to the effective date of the collective bargaining agreement and 12.25% of the base compensation of eligible employees for payroll periods beginning after the effective date of the collective bargaining agreement. A portion of such contribution will be credited to a rate stabilization fund.

d. Detroit Police Lieutenants and Sergeants Association Employees
   i. 12.25% of the base compensation of eligible employees. A portion of such contribution will be credited to a rate stabilization fund.

15. Employee Contributions – Employees hired before July 1, 2014 (current actives) will contribute 6% of base compensation (pre-risk shifting); employees hired on or after July 1, 2014 (new employees) will contribute 8% of base compensation (pre-risk shifting). Maximum employee contributions of 10% (current actives) and 12% (new employees).

16. Risk Shifting:

   a. If the funding level is less than 90% (using the fair market value of assets), COLAs will be eliminated (to the extent applicable).

   b. If the funding level is 90% or lower (using the fair market value of assets and a 3-year look back period), the following corrective actions will be taken in the order listed below, until the actuary can state that by virtue of the use of corrective action, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years:

      i. eliminate COLAs (if applicable);
      ii. use amounts credited to the rate stabilization fund to fund accrued benefits;
      iii. increase employee contributions by 1% per year (6% to 7% for current actives and 8% to 9% for new employees) for up to 5 years;
      iv. increase employee contributions (active and new employees) by an additional 1% per year;
      v. increase employee contributions (active and new employees) by an additional 1% per year;
      vi. implement a 1 year COLA fallback;
      vii. implement a second 1 year COLA fallback;
      viii. increase employee contributions by an additional 1% per year; and
      ix. increase City contributions consistent with applicable actuarial principles and PERSIA.

**EXHIBIT I.A.280**

PRIOR GRS PENSION PLAN

# ~~COMPONENT II~~
# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

### Amendment and Restatement Effective July 1, 2014
~~This Component II of the Combined Plan For the General Retirement System of the City of Detroit, Michigan is intended to memorialize the documentation for the General Retirement System of the City of Detroit as it existed on June 30, 2014.~~

# TABLE OF CONTENTS

**Page**

COMPONENT II ........................................................................................... 1

ARTICLE A.  **[Formerly ARTICLE I.** COMMON PROVISIONS OF THE GENERAL
RETIREMENT SYSTEM.**] [*]**.................................................. ~~1~~2

    Sec. A-1.  ~~[Formerly Sec. 47-1-1. Certain ordinances and Charter provisions saved from repeal.]~~Common Provisions................................... ~~1~~2

ARTICLE B.  FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30, 2014................................................................................................. 4

    Sec. ~~A-2.~~  ~~[Formerly Sec. 47-1-2.~~B-1.Freeze of Eligibility and Benefits Under General Retirement Sy

ARTICLE C.  DEFINITIONS ........................................................................ 6

    ~~Sec. A-3.~~  ~~[Formerly Sec. 47-1-3. Board of trustees; created.4]~~................... 1

    ~~Sec. A-4.~~  ~~[Formerly Sec. 47-1-4. Board of Trustees; Membership; Appointment; Election.5]~~....................................................... 1

    ~~Sec. A-5.~~  ~~[Formerly Sec. 47-1-5. Board of Trustees; Retiree Member Election.7]~~ ........ 3

    ~~Sec. A-6.~~  ~~[Formerly Sec. 47-1-6. Board of Trustees; term.8]~~ ...................... 3

    ~~Sec. A-7.~~  ~~[Formerly Sec. 47-1-7. Board of Trustees; vacancies.9]~~............................ 3

    ~~Sec. A-8.~~  ~~[Formerly Sec. 47-1-8. Board of Trustees; meeting attendance; compensation.10]~~.................................................... 4

    ~~Sec. A-9.~~  ~~[Formerly Sec. 47-1-9. Board of Trustees; Oath of Office.11]~~ ...................... 4

    ~~Sec. A-10.~~  ~~[Formerly Sec. 47-1-10. Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum.12]~~.................................... 4

    ~~Sec. A-11.~~  ~~[Formerly Sec. 47-1-11. Board of Trustees; Rules for Administration of the Pension System.13]~~................................. 4

    ~~Sec. A-12.~~  ~~[Formerly Sec. 47-1-12. Board of Trustees; Officers and Employees.14]~~............................................................ 5

    ~~Sec. A-13.~~  ~~[Formerly Sec. 47-1-13. Board of Trustees; certain data to be kept.15]~~ ........ 5

    ~~Sec. A-14.~~  ~~[Formerly Sec. 47-1-14. Board of Trustees; Record of Proceedings; Annual Report.16]~~................................................. 5

    ~~Sec. A-15.~~  ~~[Formerly Sec. 47-1-15. Board of Trustees; Legal Counsel.17]~~..................... 5

    ~~Sec. A-16.~~  ~~[Formerly Sec. 47-1-16. Board of Trustees; Medical Director.18]~~................. 5

    ~~Sec. A-17.~~  ~~[Formerly Sec. 47-1-17. Board of Trustees; Designation of Actuary.19]~~
................................................................................. 6

    ~~Sec. A-18.~~  ~~[Formerly Sec. 47-1-18. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments By Retirement System.20]~~.................................... 6

    ~~Sec. A-19.~~  ~~[Formerly Sec. 47-1-19. Board of Trustees; Periodic Actuarial Experience Study.21]~~.................................................... 7

Sec. A-20.    [Formerly Sec. 47-1-20. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities.22] ........................................................... 7

Sec. A-21.    [Formerly Sec. 47-1-21.C-1.............................................. Definitions.23] 76

ARTICLE D.    SERVICE CREDIT ........................................................................ 11

Sec. A-22.    [Formerly Sec. 47-1-22.D-1............................................ Service Credit.60] 1011

Sec. A-23.    [Formerly Sec. 47-1-23.D-2.Service Credit; Former Employees of the Founder's Society—

Sec. A-24.    [Formerly Sec. 47-1-24.D-3.Service Credit; Transfer to Other Governmental Service.64]

Sec. A-25.    [Formerly Sec. 47-1-25.D-4................. Service Credit; Military Service.65] 11

Sec. A-26.    [Formerly Sec. 47-1-26.D-5.Service Credit; Qualified Military Service (Pre-Employment S

Sec. A-27.    [Formerly Sec. 47-1-27. Freeze of General Retirement System as of June 30, 2014.]............................................................................ 12

ARTICLE B E.[FORMERLY ARTICLE II. DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) F

Sec. B-E-1.    [Formerly Sec. 47-2-1. Membership.70]............................................ 1413

Sec. B-E-2.    [Formerly Sec. 47-2-2. Cessation of Membership; Re-Employment by the Employer.71]............................................................ 1413

Sec. B-E-3.    [Formerly Sec. 47-2-3. Election to Transfer to 1998 Defined Contribution Plan.79]Service Retirement ........................................ 16

Sec. B-4.    [Formerly Sec. 47-2-4. Service Retirement.80] .......................................... 16

Sec. B-5.    [Formerly Sec. 47-2-5.E-4. ...................... Service Retirement Allowance.91] 19

Sec. B-6.    [Formerly Sec. 47-2-6.E-5. .................................Disability Retirement.95] 2120

Sec. B-7.    [Formerly Sec. 47-2-7.E-6.Accidental Death Benefit; Performance of Duty.107]    2423

Sec. B-8.    [Formerly Sec. 47-2-8.E-7.Accumulated Contributions; Return of 1973 Defined Contributi

Sec. B-9.    [Formerly Sec. 47-2-9.E-8. ...................Retirement Allowance Options.115] 2625

Sec. B-10.    [Formerly Sec. 47-2-10.E-9.Benefits for Surviving Spouses; Generally.118] 27

Sec. B-11.    [Formerly Sec. 47-2-11.E-10.Benefits for Surviving Spouses; Disability Retirees.120]

Sec. B-12.    [Formerly Sec. 47-2-12.E-11.Disposition of Surplus Benefits upon Death of Retiree and Be

Sec. B-13.    [Formerly Sec. 47-2-13.E-12.Pensions Offset by Compensation Benefits; Subrogation.122]

Sec. B-14.    [Formerly Sec. 47-2-14.E-13.Disability Retirees; Reexamination; Authority of the Board.1

Sec. B-15.    [Formerly Sec. 47-2-15.E-14.Transfer of department or department functionsDepartment or

Sec. E-15.    Pension Improvement Factor (Escalator)................................................ 30

Sec. B E-16. [Formerly Sec. 47-2-16. Pension improvement factor.126]Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate ............................................................................... 31

Sec. B E-17. [Formerly Sec. 47-2-17. Funds-] ............................................ 31 32

Sec. B E-18. [Formerly Sec. 47-2-18. Method of financing.129]Financing ............... 31 32

Sec. B E-19. [Formerly Sec. 47-2-19. Determination of City's annual contribution.137]Annual Contribution ................ 38 35

ARTICLE F. PARTICIPANT LOAN PROGRAM ............................................. 36

Sec. B-20. [Formerly Sec. 47-2-20. Management of Funds.140] .................... 39

Sec. B-21. [Formerly Sec. 47-2-21. Detroit Housing Commission Employees; Transfer of Pension Accumulation Funds to the Municipal Employees Retirement System.] ........................................................ 39

Sec. B-22. [Formerly Sec. 47-2-22. Participant loan program.] .................. 40

ARTICLE C. [Formerly ARTICLE III. 1998 DEFINED CONTRIBUTION PLAN OF THE GENERAL RETIREMENT SYSTEM.] ..................... 43

Sec. C F-1. [Formerly Sec. 47-3-1. Funds.]Established ........................................... 43 36

Sec. C F-2. [Formerly Sec. 47-3-2. Definitions.]The Loan Program ....................... 43 36

Sec. C F-3. [Formerly Sec. 47-3-3. Participation.]Eligibility .................................. 45 36

Sec. C F-4. [Formerly Sec. 47-3-4. Employer Contribution Account.]Amount of Loan ................................................................................. 48 37

Sec. C F-5. [Formerly Sec. 47-3-5. Employee Contribution Account.]Terms and Conditions ........................................................................ 49 37

Sec. C F-6. [Formerly Sec. 47-3-6. Maximum additions.]Renewal of Loan ........... 50 38

Sec. C F-7. [Formerly Sec. 47-3-7. 1998 Defined Contribution Plan; Employee Rollover Account.]Loan Balance ........................................... 50 38

Sec. C F-8. [Formerly Sec. 47-3-8. 1998 Defined Contribution Plan; vesting.]Distributions ........................................................... 50 38

Sec. C F-9. [Formerly Sec. 47-3-9. Participant directed Investments.]Annual Report ...................................................................... 51 38

ARTICLE G. SPECIAL PLAN OF ADJUSTMENT PROVISIONS ..................................... 39

Sec. G-1. Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment ......................................................... 39

Sec. G-2. Annuity Savings Fund Recoupment ..................................... 40

Sec. C-10. [Formerly Sec. 47-3-10-G-3. Income Stabilization Benefits.] 52 43

Sec. C-11. [Formerly Sec. 47-3-11. Plan Administration.] .............................................. 55

Sec. C-12. [Formerly Sec. 47-3-12. Participant Loan Program.] .................................. 56

Sec. C-13. [Formerly Sec. 47-3-13. Trust Fund.].......................................................... 58

Sec. C-14. [Formerly Sec. 47-3-14. Miscellaneous.]G-4.Restoration of Pension Benefits5946

ARTICLE DH [Formerly ARTICLE IV. MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREM

Sec. D-H-1. [Formerly Sec. 47-4-1. Assignments prohibited.]Enforcement; Civil
Action............................................................................................... 6156

Sec. D-H-2. [Formerly Sec. 47-4-2. Protection against fraud.]Limitation of Other
Statutes ............................................................................................. 6156

# COMPONENT II

Sec. D-3.     [Formerly Sec. 47-4-3. Enforcement; civil action.] ...................................... 61

Sec. D-4.     [Formerly Sec. 47-4-4. Amendments; termination.] .................................... 61

Sec. D-5.     [Formerly Sec. 47-4-5. Errors.] ..................................................................... 62

Sec. D-6.     [Formerly Sec. 47-4-6. Limitation of other statutes.] ................................ 62

Sec. D-7.     [Formerly Sec. 47-4-7. Construction.] ........................................................... 62

**ENDNOTES TO ARTICLES A, B, C, AND D [Formerly NOTES TO CHAPTER 47] .............................................................................................................. 63**

**LEGEND TO FOOTNOTES TO ARTICLES A, B, C, AND D ...................................... 70**

**ARTICLE A.** ~~[FORMERLY ARTICLE I.~~  **COMMON PROVISIONS OF THE GENERAL RETIREMENT SYSTEM.**[1] ~~[*]  [#]~~[1]

**Sec. A-1.** ~~[Formerly Sec. 47-1-1. Certain ordinances and Charter provisions saved from repeal.]~~ **Common Provisions**

~~Nothing in this Code or in Ordinance No. 593-H[1] shall be deemed to repeal the General Retirement System of the City of Detroit as provided by ordinance or Charter, or to contradict the provisions of Article IX, Section 24 of the 1963 Michigan Constitution.[2] All existing sections of the 1918, 1974 and 1997 Detroit City Charters and the 1964 Detroit City Code, as amended, relating to the General Retirement System shall remain in full force and effect, until specifically amended or repealed by ordinance.~~

~~(Ord. No. 29-01, § 1, 11-30-01)~~

Certain provisions of the Combined Plan for the General Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014.  Those provisions are set forth in the following Sections of Component I:

(a)       Article I (General Provisions);

(b)       Article II (Definitions):

          Actuarial Equivalent or Actuarially Equivalent

          Actuarially Equivalent Value

          Administrative Rules and Regulations

          Age; Attainment of

          Board of Trustees or Board or Retirement Board

          City

          City Council or Council

          Combined Plan

          Component I

          Component II

          Employer

          Fiscal Year

          General Retirement System or Retirement System

          Internal Revenue Code or Code

Investment Committee

Member

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse; and

Straight Life Retirement Allowance;

(c)     Article 12 (Limitation on Benefits and Contributions);

(d)     Article 13 (Retirement System Administration);

(e)     Article 14 (Management of Funds);

(f)     Article 15 (Investment of Retirement System Assets); and

(g)     Article 17 (Miscellaneous).

## ARTICLE B.  FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30, 2014

**Sec. A-2.   [Formerly Sec. 47-1-2.B-1.   Freeze of Eligibility and Benefits Under** General Retirement System Established.[3]**]**

Notwithstanding anything in Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code or this Combined Plan for the General Retirement System of the City of Detroit, Michigan to the contrary, effective as of June 30, 2014 (the "Freeze Date"):

A General Retirement System for the employees of the City of Detroit is hereby established for the purpose of providing retirement and survivor benefits for eligible City employees and their beneficiaries. The effective date of this system is July 1, 1938.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-3.  [Formerly Sec. 47-1-3. Board of trustees; created.[4]]**

A Board of Trustees of the General Retirement System is hereby created. The Board is vested with the general administration, management and responsibility for the proper operation of the System, and for making effective the provisions of chapter.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-4.  [Formerly Sec. 47-1-4. Board of Trustees; Membership; Appointment; Election.[5]]**

The Board of the General Retirement System shall consist of ten Trustees, as follows:

(1)   The Mayor, ex officio, or the Mayor's alternate;

(2)   One City Council Member, *ex officio,* who is selected by that body[6]

(3)   The City Treasurer, *ex officio;*

(4)   Five members of the Retirement System to be elected by the members of the Retirement System in accordance with such rules and regulations as may be adopted by the Board. No more than one Trustee shall be elected from any one City Department;

(5)   One Detroit resident, appointed by the Mayor subject to the approval of the Board, who is neither an employee of the City nor is eligible to receive benefits under the Retirement System; and

(6)   One retiree who is receiving benefits under the Retirement System and who is elected by retired City employees in accordance with procedures established by Section 47-1-5

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 28-06, § 1, 9-13-06)

**By Agreement**

(a)      No new employee hired ~~by the City~~ on or after July 1, 2014 shall become a Member who is eligible to accrue a benefit under the terms of the General Retirement System in effect as of the Freeze Date;

The membership of the Board of Trustees of the General Retirement System (GRS) shall be changed to consist of 11 trustees as follows:

(1)   The Mayor, ex officio or designee.

(2)   The President of the City Council, ex officio.

(3)   The City Treasurer, ex officio.

(4)   The Budget Director, ex officio.

(5)   The Finance Director, ex officio.

(6)   The Human Resources Director, ex officio.

(7)   Three members of the retirement system to be elected by the members of the retirement system, under such rules and regulations as may be from time to time adopted by City Council; except that no more than one trustee shall be from any one department.

(8)   The Mayor shall appoint, subject to the approval of City Council, as a trustee, an individual with a background in investment and/or municipal finance.

(9)   The Mayor shall appoint, subject to the approval of City Council, a retiree who is receiving benefits under the retirement system.

The City reserves the right to change the composition, structure and decision making procedures of the Board.[a]

---

Effective August 1, 1999, or the earliest date thereafter when all required agreements are reached between the City and other parties **[or Effective July 1, 2003[b]]**, the membership of the General Retirement System, Board of Trustees (Article II, Section 2, Subjection (1)) shall be modified to provide that one of the trustees is: "The Mayor of the City or his/her designated representative, ex-officio.  Such designated person shall be a full time appointive or classified City employee."[c]  **[or "The Mayor of the City or his/her designated representative, ex-officio."[d]]**

---

DWSD and the Union acknowledge that they do not control the Retirement Board composition.[e]

---

**Sec. A-5.   [Formerly Sec. 47-1-5. Board of Trustees; Retiree Member Election.[7]]**

The procedures for the election of the Retiree Member of the Board of Trustees shall be as follows:

(1)   *Notice*.  Notice of a primary election shall be sent to each retiree of the System by United States Mail.

---

[a]     CBA-1 (§ 43.Q.), CBA-2 (§ 35.S.), CET-1 (§ 49), CET-2 (§ 47.Q.), CET-3 (§40).

[b]     CBA-11 (§ 39.S.).

[c]     CBA-3 (§ 46.P.), CBA-4 (§ 15.Q.), CBA-5 (§ 20.R.), CBA-6 (§ 26.R.), CBA-7 (§ 26.Q.), CBA-8 (§ 25.P.), CBA-10 (§ 33.Q.), CBA-11 (§ 39.S.), Reopener 2 (§ 25.P.), Reopener 3 (§ 39.R.), Reopener 4 (§ 20.R.).

[d]     CBA-9 (§ 31.S.), Reopener 1 (§ 31.S.).

[e]     CBA-10 (§ 33.V.).

(2) *Nominating petitions.* No candidate's name shall be placed on the primary election ballot unless a nominating petition containing the signatures of at least one hundred and twenty-five retirees of the Retirement System is filed with the Secretary of the Board. The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board.

(3) *Ballot.* Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position held at the time of retirement and the word "incumbent" if the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark. Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4) *Voting.* Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an Active Employee Trustee.

(5) *Procedures.* Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an Active Employee Trustee.

(6) Any matters relative to the election of the Retiree Member of the Board not covered by this Section shall be according to such rules and regulations as the Board may adopt.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-6. [Formerly Sec. 47-1-6. Board of Trustees; term.[8]]

The regular term of office for the Elected Member Trustees and the Appointed Detroit Resident Trustee shall be for a period of six years, one such Trustee to be elected or appointed, as the case may be, each year. The term of office for the Retiree Trustee shall be two years.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-7. [Formerly Sec. 47-1-7. Board of Trustees; vacancies.[9]]

If a Trustee leaves the employ of the City, or if an elected or appointed Trustee fails to attend four consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board. By resolution, the Board shall declare the office vacated as of the date of adoption of such resolution. If a vacancy occurs in the office of Trustee, the vacancy shall be filled at the next regular election held by the Board, or at any special election ordered by resolution adopted by the Board.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-8. [Formerly Sec. 47-1-8. Board of Trustees; meeting attendance; compensation.[10]]

(a) *Attendance at a Board meeting* shall include conducting Board business on a meeting date or being otherwise available to attend a Board meeting canceled for lack of a quorum.

(b) *Elected and Appointed Citizen Trustees.* Effective July 1, 2000, elected and Appointed Citizen Trustees are eligible for a weekly meeting stipend, provided the Trustee attends one or more

~~regular or special Board meetings during a week. The stipend amount shall be a minimum of sixty seven dollars ($67.00) per week multiplied by the Trustee's years of service. Eligibility rules and the amount of the stipend shall be set by Board resolution. However, the amount of the weekly meeting stipend shall not exceed two hundred dollars ($200.00).~~ No employee who is rehired by an Employer on or after July 1, 2014 shall become a Member who is eligible to accrue either a benefit or service credit for any purpose under the terms of the General Retirement System in effect as of the Freeze Date; provided, however, that a Member who is entitled to a Frozen Accrued Benefit as defined in subsection (c) of this Section B-1 and who is rehired by an Employer on or after July 1, 2014 but prior to the date the Member incurs a six-year break in service shall be eligible to accrue service credit following rehire solely for the purpose of determining the Member's vesting in and eligibility for payment of his Frozen Accrued Benefit;

(c)     ~~*Elected Active Employee Trustees.* Effective July 1, 2000, elected active employee Trustees are eligible for a quarterly service stipend if such Trustee attends a minimum of nine meetings in a quarter. The stipend amount shall be a minimum of eight hundred and thirty three dollars ($833.00) per quarter multiplied by the Trustee~~ Benefit accruals for Members with respect to service rendered prior to July 1, 2014 will be frozen based on a Member's years of service~~. Eligibility rules and the amount of the stipend shall be set by Board resolution. However, the amount of the quarterly service stipend shall not exceed twenty-five hundred dollars ($2,500.00) per quarter~~, Average Final Compensation, and the pension multiplier formulae in effect as of such Freeze Date under the terms of the General Retirement System ("Frozen Accrued Benefit");

(d)     Except as otherwise provided in subsection (e) of this Section B-1, compensation of a Member shall be frozen effective as of the Freeze Date for purposes of determining the Member's Frozen Accrued Benefit.  No compensation of any type earned by a Member after the Freeze Date shall be taken into consideration for purposes of determining the Member's Frozen Accrued Benefit under the General Retirement System;

(e)     Any Member who, as of June 30, 2014, would have been eligible to elect to use a portion of his unused accrued sick leave to increase his Average Final Compensation ("Sick Leave Rollover") if the Member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election ("Special Election") to add the value of twenty-five percent (25%) of the Member's unused sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance to the earnings used in computing Average Final Compensation for purposes of determining the Member's Frozen Accrued Benefit; provided, however, that at least twenty-five percent (25%) of the Member's sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance remains in the Member's sick leave bank at the time the completed Special Election form is received by the Retirement System and, provided further that the completed Special Election form is received by the Retirement System no later than August 22, 2014 or, if later, the date set forth in a collective bargaining agreement between the City and a union whose members are eligible to make a Special Election.  A Member's Special Election shall be made in the manner set forth by the Board of Trustees and the Retirement System.  A Member may revoke a Special Election,

as long as such revocation occurs on or before the latest date upon which such Member is permitted to make a Special Election. Notwithstanding anything in this subsection (e) to the contrary, a Member's Special Election will be void and the determination of the Member's Average Final Compensation for purposes of calculating the Member's Frozen Accrued Benefit will not take into account any of the Member's unused sick leave, if (i) the electing Member would not have been eligible to receive an immediate service retirement if he retired as of June 30, 2014, and (ii) the electing Member's employment with an Employer is terminated before the electing Member becomes eligible for an immediate service retirement under the Retirement System;

(f)     Service earned after the Freeze Date shall be credited to a Member solely for purposes of determining the Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all Members for benefit accrual purposes under the terms of the General Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no Member shall earn service credit with respect to benefits payable under the terms of the General Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(g)     No Member shall make contributions to the Annuity Savings Fund under the General Retirement System in effect as of June 30, 2014 with respect to wages earned on or after the earliest date following June 30, 2014 that the City's payroll department can implement the freeze. All after tax contributions made on or after the date referenced in the preceding sentence shall be made to and in accordance with the terms of Component I of the Combined Plan.

The foregoing terms shall be referred to as the "Freeze" of the provisions of the General Retirement System as in effect on the Freeze Date and the provisions of Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code and this Component II of the Combined Plan shall be interpreted and construed by the Board of Trustees and the Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section B-1, the provisions in Chapter 47, or any collective bargaining agreement or other document governing the terms of employment of any employee, the Board of Trustees and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

# ARTICLE C.  DEFINITIONS

(d)   Stipends paid under this Section 47-1-8 of this Code shall be considered as ordinary income for tax and pension purposes.

(e)   *Ex Officio Trustees* are not eligible for a stipend payment.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-9.  [Formerly Sec. 47-1-9. Board of Trustees; Oath of Office.[11]]**

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the Detroit City Clerk.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-10.  [Formerly Sec. 47-1-10. Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum.[12]]**

(a)   The Board shall hold regular weekly meetings, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure and shall keep a record of proceedings. All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act,* MCL 15.261 *et seq.*

(b)   Each Trustee shall be entitled to one vote on each question before the Board. Five Trustees shall constitute a quorum. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-11.  [Formerly Sec. 47-1-11. Board of Trustees; Rules for Administration of the Pension System.[13]]**

In accordance with the provisions of this Article, the Board shall establish rules and regulations for the administration of the system and for the transaction of its business.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-12.  [Formerly Sec. 47-1-12. Board of Trustees; Officers and Employees.[14]]**

The Board shall elect a chair and vice-chair from its members. The finance director or the director's designee shall be the *ex officio* secretary of the Board. The Board may employ such special actuarial, medical and other employees as shall be required, subject to the *Public Employee Retirement System Investment Act,* as amended, being MCL 38.1132 *et seq.*

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-13.  [Formerly Sec. 47-1-13. Board of Trustees; certain data to be kept.[16]]**

The Board shall keep or cause to be kept such data as is necessary for an actuarial valuation of the System and for checking and compiling the experience of the System.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-14. [Formerly Sec. 47-1-14. Board of Trustees; Record of Proceedings; Annual Report.[16]]**

The Board shall keep a record of its proceedings which shall be open to public inspection. On or before January fifteenth of each year, the Board shall send a report to the mayor and to the council showing the system's fiscal transactions for the year ending the preceding June thirtieth, and the balances in the various funds of the System. The Board shall produce or cause to be produced an annual actuarial valuation of the System's assets and liabilities.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-15. [Formerly Sec. 47-1-15. Board of Trustees; Legal Counsel.[17]]**

(a)    The Board shall appoint a Legal Counsel who shall be directly responsible to and hold office at the pleasure of the Board. The Legal Counsel to the Board shall be an attorney licensed to practice in Michigan who is experienced in matters relating to pension systems.

(b)    The Legal Counsel to the Board shall have such duties relative to pension matters as are assigned by the Board.

(c)    Costs and expenses relative to the position of Legal Counsel to the Board shall be payable out of the earnings of the system, subject to the provisions of the *Public Employee Retirement System Investment Act,* as amended, being MCL 38.1132 *et seq.*

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-16. [Formerly Sec. 47-1-16. Board of Trustees; Medical Director.[18]]**

(a)    The Board shall appoint a Medical Director who is directly responsible to and shall hold office at the pleasure of the Board. The Medical Director shall be a physician who has not at any time been regularly or permanently employed by any department, board, or commission of the City, county, or state, has not held an elective, appointive, or salaried office in any city, county, or state government at any time, and is not eligible to participate in the City Pension System. However, service as an intern in any city, county, or state hospital or sanitarium and service in any state military body shall not disqualify a physician for appointment as Medical Director.

(b)    The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of this article, and shall report in writing to the Board of Trustees his or her conclusions and recommendations on medical matters referred.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-17. [Formerly Sec. 47-1-17. Board of Trustees; Designation of Actuary.[19]]**

The Board shall designate an actuary who shall be the technical advisor to the Board on matters regarding the operation of the system, and who shall perform such other duties as are required.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-18. [Formerly Sec. 47-1-18. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments By Retirement System.[20]]**

(a) The Board shall adopt such mortality and other tables of experience, and a rate or rates of regular interest, as shall be necessary for the operation of the System on an actuarial basis, provided that the authority granted by this section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsections (b) and (c) of this section or the plan for the adjustment of debts of the City of Detroit, as confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846).

(b) The Retirement System and the trustees charged with management of the System shall not make any payment to active or retired participants other than payments that are required by the Retirement System plan as established by this Code to govern the System or the plan for the adjustment of debts of the City of Detroit, as confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846). This prohibition applies to all payments that are not authorized by this Code, whether such payments be those commonly referred to as a "thirteenth check" or by any other name.

(c) The Retirement System and the trustees charged with management of the System shall not provide any savings plan, annuity plan, or other participant investment or savings vehicle that provides an annual return to investing participants which in any year is greater than the actual investment return net of expenses of the Retirement System invested reserves for the year in which the return is earned and accrued, *provided that* such return shall neither be greater than the assumed annual return as expressed in the Retirement System's valuation for that year nor less than zero. This prohibition shall apply to all annual returns credited to accounts of investing members in the Annuity Savings Fund of the Defined Contribution Plan of 1973 from the effective date of Ordinance 37-11 to June 30, 2014. Notwithstanding anything in this section to the contrary, effective for plan years beginning on and after July 1, 2014, the annual rate of return credited to a member's account in the Annuity Savings Fund of the 1973 Defined Contribution Plan shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second fiscal year immediately preceding the fiscal year in which the annual return is credited.

(Ord. No. 18-14, Sec. 47-1-18; Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-11, § 1, 11-29-11)

**Sec. A-19. [Formerly Sec. 47-1-19. Board of Trustees; Periodic Actuarial Experience Study.[21]]**

At least once every five years, the Board shall cause an actuarial experience study to be made of the mortality, service, and compensation experience of the System's members, retirees and beneficiaries.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-20. [Formerly Sec. 47-1-20. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities.[22]]**

Each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the System.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. ~~A-21.   [Formerly Sec. 47-1-21~~C-1.   Definitions.[23]~~]~~**

Unless ~~a different definition is contained within Section 47-3-2 of this Code, or~~ a different meaning is plainly required by context, for purposes of this ~~Chapter~~Component II the following words and phrases have the meanings respectively ascribed to them by this ~~section~~Section C-1:

(1)     *Accrued Service*[24] means a ~~member~~Member's credited service for employment rendered before ~~the date of an actuarial valuation of the Retirement System~~July 1, 2014.

(2)     *Accumulated Contributions*[25] means the sum of all amounts deducted from the compensation of a ~~member~~Member and credited to the ~~member~~Member's individual account in the Annuity~~'s~~ Savings Fund, together with regular interest thereon.

~~Administrative Board of Trustees[26] means the Board of Trustees of the General Retirement System.~~

~~Administrative Rules and Regulations[27] means rules and regulations promulgated by the Administrative Board of Trustees pursuant to Section 47-1-11[28] of this Code for the administration of the System and for the transaction of its business.~~

~~Age, Attainment of[29] means the age an individual reaches on the day of his or her birthday.~~

(3)     *Annuity*[30] means the portion of the retirement allowance which is paid for by a ~~member~~Member's accumulated contributions.

(4)     *Annuity Reserve*[31] means the present value of all payments to be made on account of any annuity or benefit in lieu of any annuity.   Such annuity reserve shall be computed upon the basis of such mortality ~~table~~tables and regular interest as shall be adopted by the Board.

(5)     *Average Final Compensation*[32] means:

~~(1)~~a.     On or before June 30, 1992.  For those ~~members~~Members who retired or separated from active service with vested pension rights on or before June 30, 1992, the highest average compensation received by a ~~member~~Member during any period of five consecutive years of credited service selected by the ~~member~~Member from the ten years of credited service which immediately ~~precede~~preceded the date of the ~~member~~Member's last termination of City employment.  If a ~~member~~Member has less than five years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the ~~members~~Member's total years of credited service.

~~(2)~~b.     On or after July 1, 1992 but before July 1, 1998.  For those ~~members~~Members who retired or separated from active service with vested pension rights on or after July 1, 1992 but before July 1, 1998, the highest average compensation received by a ~~member~~Member during any period of four consecutive years of credited service ~~selected by the member from~~during the ten years of credited service which immediately

~~precede~~<u>preceded</u> the date of the ~~member~~<u>Member</u>'s last termination of City employment.  If a ~~member~~<u>Member</u> has less than four years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the ~~member~~<u>Member</u>'s total years of credited service.

~~(3)~~<u>c.</u>   On or after July 1, 1998.  For those ~~members~~<u>Members</u> who retire or separate from active service with vested pension rights on or after July 1, 1998, the highest average compensation received by a ~~member~~<u>Member</u> during any period of three consecutive years of credited service ~~selected by the member from the~~<u>during</u> ten years of credited service which immediately precede the date of the ~~member~~<u>Member</u>'s last termination of City employment.  If a ~~member~~<u>Member</u> has less than three years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the ~~member~~<u>Member</u>'s total years of credited service.

~~(4)~~<u>d.</u>   ~~*On or after July 1, 1999*~~<u>Sick Leave Election</u>.  For those ~~members~~<u>nonunion Members</u> with a regular or early service retirement who retire on or after July 1, 1999, in computing the highest average compensation received by a ~~member~~<u>Member</u>, the ~~member~~<u>Member</u> shall have the option of adding the value of twenty-five percent (25%) of the ~~member~~<u>Member</u>'s unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation. ~~Any member choosing to exercise this option shall be entitled to receive a lump sum payment of the value of twenty-five percent (25%) of the member's unused accrued sick leave at the time of retirement.~~

<u>Bargaining</u>                                                   ~~**By Agreement**~~

~~Effective for bargaining~~ unit members who retire on or after July 1, 1999~~, they~~ <u>and prior to July 1, 2014</u> shall have ~~the option to (1) select~~ the Unused Sick Leave On Retirement ~~payment~~ <u>benefit</u> provided for in the <u>applicable</u> bargaining agreement~~, or (2) choose to receive payment of one-quarter (1/4) of their unused sick time and have that sum included in the average final compensation calculation used to compute the membership service pension portion of their retirement allowance.[f] **[For any member**~~.  <u>For any Member</u> choosing to exercise this option<u>,</u> the lump sum payment the ~~member~~<u>Member</u> will receive will be the remaining value of the unused accrued sick leave bank as provided in the bargaining agreement.[g]~~]~~

[f]   ~~CBA 3 (§ 46.G.), CBA 4 (§ 15.I.), CBA 5 (§ 20.I.), CBA 6 (§ 26.I.), CBA 7 (§ 26.H.), CBA 8 (§ 25.G.), CBA 9 (§ 31.I.), CBA 10 (§ 33.I.), CBA 11 (§ 39.I.), Reopener 1 (§ 31.I.), Reopener 2 (§ 25.G.), Reopener 3 (§ 39.I.), Reopener 4 (§ 20.I.).~~

[g]   ~~CBA 4 (§ 15.I.), CBA 5 (§ 20.I.), CBA 6 (§ 26.I.), CBA 7 (§ 26.H.), CBA 9 (§ 31.I.), CBA 10 (§ 33.I.), Reopener 1 (§ 31.I.), Reopener 3 (§ 39.I.), Reopener 4 (§ 20.I.).~~

Effective for bargaining unit members who retire on or after July 1, 2012 **[or July 1, 1999[h]]**, they shall have the Unused Sick Leave On Retirement payment benefit provided for in the bargaining agreement.[i]

---

(6)    *Beneficiary[33]* means any person ~~who is~~or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a retirement allowance or pension payable from funds of the General Retirement System.[34] due to the participation of a Member.

*Board of Trustees or Board[35]* means the Board of Trustees of the General Retirement System as provided in Section 47-1-4.[36] of this Code.

*City[37]* means the City of Detroit, Michigan, a municipal corporation.

*City Council or Council[38]* means the legislative body of the City.

(7)    *Compensation[39]* means:

(1)a.    On or before June 30, 1992.  For those ~~members~~Members retired or separated from active service with vested pension rights, on or before June 30, 1992, all remuneration, excluding longevity payments, paid to a ~~member~~Member because of personal services rendered by the ~~member~~Member to the ~~employer~~Employer.  Compensation in excess of the limitations set forth in Section 401(a)(17)[40] of the Internal Revenue Code shall be disregarded.

(2)b.    On or after July 1, 1992.  For those ~~members~~Members who retire on or after July 1, 1992, all remuneration, including longevity payments, paid to a ~~member~~Member because of personal services rendered by the ~~member~~Member to the ~~employer~~Employer.  Compensation in excess of the limitations set forth in Section 401(a)(17)[41] of the Internal Revenue Code shall be disregarded.

(8)    *Conversion* means that date on which a ~~member~~Member's benefits change from disability retirement benefits to normal retirement benefits.

(9)    *Credited Service[42]* means membership service credited to a ~~member~~Member to the extent provided in this ~~Article~~Component II.

*1998 Defined Contribution Plan Implementation Date[43]* means that date after the Plan is established on which it is open for participation by eligible members.

*Detroit General Retirement System or DGRS[44]* means the General Retirement System of the City of Detroit established under Section 47-1-2 of this Code which consists of:

(1)    The *Defined Benefit Plan,* which plan is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code;

---

[h]    CET-1 (§ 48.I.).

[i]    CBA-1 (§ 43.H.), CBA-2 (§ 35.J.), CET-1 (§ 48.I.), CET-2 (§ 47.H.).

(2) The *1973 Defined Contribution Plan*, which Plan is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(3) The 1998 Defined Contribution Plan. A Defined Contribution Plan, which is hereby designated the 1998 Defined Contribution Plan, the components of which are the

    a. Employee Contribution Account,

    b. The Employee Rollover Account,

    c. The Employer Contribution Account, and

    d. The Annuity Savings Account,

all of which constitute the 1998 Defined Contribution Plan Retirement Trust, which Plan is intended to be a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

*Employee*[45] means any regular and/or permanent officer, agent, or person in the employ of the employer, as defined in this section, but does not include:

(1) Individuals whose City services are compensated on a contractual or fee basis;

(2) Persons who are employed in positions normally requiring less than six hundred hours of work per annum; or

(3) The medical director of the pension system.

*Employer*[46] means the City, or any board, commission, or court serving the City, to the extent that both the City, through the action of City Council, and the governing authority of such board, commission or court, shall mutually agree to include the employees of such board, commission, or court, as City employees under the provisions of this Chapter at such time as they are eligible. To the extent that any employees of a board, commission, or court are considered City employees for this purpose, all employees of such board, commission, or court, shall be so included. However, only City board members and commissioners who are also employees of the City are eligible to be included, unless otherwise specifically provided for by an ordinance passed or a resolution adopted by the Council. In all cases of doubt, the Board of Trustees shall decide who is an employee within the meaning of the provisions of this Article.

(10) *Final Compensation*[47] means a ~~member~~Member's annual rate of compensation at the time ~~City~~ employment with all Employers is last terminated.

*Member*[48] means any employee who has not retired.

*Notice to Members, Beneficiaries, and Retirees*[49] means a mailing using First Class United States Mail to the members, beneficiaries, and retirees at their last known address.

(11) *Pension*[50] means, for purposes of this Component II, the portion of a retirement allowance which is paid for by appropriations made by the ~~City~~Employers into the appropriate funds.

(12) *Pension Reserve*[51] means the present value of all payments to be made on account of any pension, or benefit in lieu of any pension. Such pension reserve shall be computed upon the basis of such mortality and other tables of experience, and regular interest, as shall be adopted by the Board.

(13)  *Regular Interest[52]* means such rate or rates per annum, compounded annually, as the Board of Trustees shall determine in accordance with the limitations contained in Section ~~47-1-18~~E-16 of this ~~Code~~Component II.

(14)  *Retiree[53]* means a former ~~member~~Member who is receiving a retirement allowance from ~~the *DGRS Article II* plan or is eligible to receive fringe benefits from the *DGRS Article III* Plan~~Component II of the Retirement System.

(15)  *Retirement[54]* means a ~~member~~Member's withdrawal from the employ of the ~~City~~Employers with a retirement allowance or pension paid by Component II of the ~~system~~Retirement System.

(16)  *Retirement Allowance[55]* means the sum of the annuity and the pension.

~~*Retirement System or System*[56] means the general employees retirement system of the City created and established by Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended,[57] continued in effect through the 1974 and 1997 Detroit City Charters and codified in this Article. *See DGRS*.~~

(17)  *Service[58]* means personal services rendered to the ~~City~~Employer by a person as an employee of the ~~City as defined in Section 47-1-21 of this Code, who~~Employer, provided such person is compensated by the ~~City~~Employer for such personal services.

(18)  *Service credit for purposes of the 1973 Defined Benefit/Defined Contribution (Annuity) Plan[59]* means that, in accordance with such rules and regulations as the Board shall adopt, each ~~member~~Member shall be credited with service as follows: (1) One month of service credit is earned when the ~~member~~Member is paid for eighty hours of work during the month; (2) A full year of credit is earned for nine months of credit in any calendar year, except the ~~member~~Member's last year of work, which service credit shall be determined as of the Member's last day on the Employer's payroll.  Less than nine months of service rendered in a calendar year shall neither be credited as a full year of service, nor shall more than one year of service be credited to any ~~member~~Member for service rendered in any one calendar year.  Service credit is used to determine eligibility for service retirement, vesting, non-duty disability and survivor benefits.  Service credit is also earned by a ~~member~~Member while retired on a duty disability or while receiving Workers' Compensation benefits.

The following terms shall have the meanings given to them in the Sections of this Component II set forth opposite such term:

| | |
|---|---|
| 2023 UAAL Amortization | Section G-4(3)a |
| Accrued Liability Fund | Section E-18(d) |
| Actual Return | Section G-2(5) |
| Adjusted Accrued Benefit | Section G-1(1)a |
| Adjusted Deferred Accrued Benefit | Section G-1(1)b |
| Annuity Reserve Fund | Section E-18(b) |
| Annuity Savings Fund Excess Amount | Section G-2(1) |

| | |
|---|---|
| Annuity Savings Fund of the 1973 Defined Contribution Plan | Section E-18(a) |
| ASF | Section G-2 |
| ASF account | Section G-2(1) |
| ASF Recalculation Period | Section G-2 |
| ASF Excess Return | Section E-16(c) |
| ASF Recoupment | Section G-1(1)(c) |
| Cash Option Cap | Section G-2(4) |
| Cash Repayment Option | Section G-2(4) |
| Certificate of Default | Section G-3(7) |
| COLA | Section G-4 |
| Determination Date | Section E-18 |
| Eligible Pensioner | Section G-3(5) |
| Estimated Adjusted Annual Household Income | Section G-3(3)b |
| Excess Assets | Section G-3(7) |
| Expense Fund | Section E-18(f) |
| Extra Contribution Account | Section G-4(3)b |
| Federal Poverty Level | Section G-3(6) |
| Final Payment Notice | Section G-2(4) |
| Freeze | Section B-1 |
| Freeze Date | Section B-1 |
| Frozen Accrued Benefit | Section B-1(c) |
| Funded Level | Section G-4(2) |
| Funding Conditions | Section G-1(1)a |
| Funding Proceeds | Section E-18(d) |
| Funding Target | Sections G-4(2)a, G-4(3)a, G-4(4)a |
| Governor | Section G-4(5) |
| IME | Section E-5(a) |
| Income Fund | Section E-18(g) |
| Income Stabilization Benefit | Section G-3(2) |
| Income Stabilization Benefit Plus | Section G-3(3) |
| Income Stabilization Fund | Section G-3(4) |
| Monthly Annuity Savings Fund Excess Amount | Section G-2(2) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section E-8(a) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section E-8(a) |
| Option One. Cash Refund Annuity | Section E-8(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section E-8(a) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section E-8(a) |
| Participant Loan Program | Section F-1 |
| Pension Accumulation Fund | Section E-18(c) |
| Pension Funding Transaction | Section E-18(d) |
| Pension Improvement Factor (Escalator) | Sections E-15, G-1(2) |

Pension Reserve Fund  Section E-18(e)
Pension Restoration Agreement  Section G-4
Permanent Restoration Target  Section G-4(2)g,  G-4(3)a, G-4(4)a

Pop-up Form  Section E-8(b)(2)
Restoration Reserve Account  Section G-4(2)a
Restoration Reserve Suspension Trigger  Sections G-4(2)g, G-4(3)a, G-4(4)a

Restoration Target  Sections G-4(2)a, G-4(3)a, G-4(4)a

Sick Leave Rollover  Section B-1(e)
Special Election  Section B-1(e)
Standard Form  Section E-8(b)(1)
Straight Life Retirement Allowance  Section E-8(a)
Transition Cost  Section E-16(c)
UAAL  Sections E-18(d), G-4
Waterfall Classes  Section G-4(1)
(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-11, § 1, 11-29-11)

# ARTICLE D.  SERVICE CREDIT

**Sec. ~~A-22.  [Formerly Sec. 47-1-22~~D-1.  Service Credit.[60]~~]~~**

The Board shall keep an accurate record of each employee's ~~Accumulated Service~~<u>accumulated service</u> credit[61] from the date of commencement of employment with the ~~employer~~<u>Employers</u>.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

**Sec. ~~A-23.  [Formerly Sec. 47-1-23~~D-2.  Service Credit; Former Employees of the Founder's Society—Detroit Institute of Arts.[62]~~]~~**

Pursuant to Section 6-~~519~~[63]<u>519</u> of the 1974 Detroit City Charter, and for the sole purpose of computing service credit to determine eligibility for a retirement allowance from the General Retirement System, a person who was inducted into the classified service of the City ~~of Detroit~~ during the calendar year 1984 as a result of the transfer of certain functions at the Detroit Institute of Arts from The Founder's Society/Detroit Institute of Arts to the City ~~of Detroit~~, shall be credited with service credit equivalent to continuous time worked as a full time employee of the Founder's Society/Detroit Institute of Arts retroactive to January 1, 1984.  Such Founder's Society/Detroit Institute of Arts service credit shall have no effect upon the amount of retirement benefits paid by the General Retirement System.  Such Founder's Society/Detroit Institute of Arts service credit shall be added to the service credit earned as a City ~~of Detroit~~ employee only for purposes of meeting service credit eligibility requirements under the General Retirement System.  The Board of Trustees of the General Retirement System shall make all determinations of crediting of such Founder's Society/Detroit Institute of Arts service credit in accordance with the ~~pension plan~~ provisions <u>of this Component II of the Combined Plan</u>.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

**Sec. ~~A-24.  [Formerly Sec. 47-1-24~~D-3.  Service Credit; Transfer to Other Governmental Service.[64]~~]~~**

A ~~member~~<u>Member</u> transferred from the City payroll by his or her department head to the payroll of any City, county, state, or federal government to serve the ~~Interests~~<u>interests</u> of the City during peace time shall continue to be a ~~member~~<u>Member</u> of the ~~retirement system~~<u>Retirement System</u> for purposes of service credit in accordance with the ordinance or resolution passed to implement such transfer.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

**Sec. ~~A-25.  [Formerly Sec. 47-1-25~~D-4.  Service Credit; Military Service.[65]~~]~~**

An ~~employee~~<u>Employee</u> of the ~~employer~~<u>Employer</u> who enters the military service of the United States while so employed shall have such service credited as City service <u>for purposes of this Component II</u> in the same manner as if the employee had served the employer without interruption, provided that <u>(</u>1) the employee's entry into such service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the City, and <u>(</u>2) he or she is re-employed by the ~~employer~~<u>Employer</u> upon completion of such service.  During the period of service and until return to City employment,

his or her contributions to the fund shall be suspended and the fund balance shall be accumulated at regular interest.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-26. [Formerly Sec. 47-1-26D-5. Service Credit; Qualified Military Service (Pre-Employment Service).[66]]

(a) Notwithstanding any provision of this ChapterComponent II to the contrary, contributions, benefits, and service credit with respect to qualified military service, shall be provided in accordance with Section 414(u)[67] of the Internal Revenue Code. Up to three years of pre-employment service credit may be purchased prior to June 30, 2014 for the following periods: service for a period of not less than ninety days between (1) the date of declaration of war by Congress and the recognized date of cessation of military hostilities; (2) the onset of World War II on December 8, 1941 to its conclusion on July 1, 1946; (3) the onset of the Korean Conflict on June 27, 1950 to its conclusion on December 31, 1953; (4) the onset of the Vietnam Conflict on February 28, 1961 to its conclusion on May 7, 1975, or (5) beginning on the date of the recognition of an emergency condition by the issuance of a presidential proclamation or a presidential executive order, during which emergency condition the memberMember received the Armed Forces Expeditionary or other Campaign Service Medal authorized by the Federal Government for the Expedition or Campaign.[68]

(b) This time may be applied toward a memberMember's credited service and may be used in meeting the minimum time needed for an automatic Option Two or automatic Option Three pension.[69]

(c) This time shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability pension, or for a service pension.

(Ord. No. 29-01, 11-30-01)

### Sec. A-27. [Formerly Sec. 47-1-27. Freeze of General Retirement System as of June 30, 2014.]

Notwithstanding anything in Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code to the contrary, effective as of June 30, 2014 (the "Freeze Date") –

(a) No new employee hired by an Employer on or after July 1, 2014 shall become a member who is eligible to accrue a benefit under the terms of the General Retirement System in effect as of the Freeze Date;

(b) No employee who is rehired by an Employer on or after July 1, 2014 shall become a member who is eligible to accrue either a benefit or service credit for any purpose under the terms of the General Retirement System in effect as of the Freeze Date; *provided, however,* that a member who is entitled to a Frozen Accrued Benefit as defined in subsection (c) of this Section 47-1-27 and who is rehired by an Employer on or after July 1, 2014 but prior to the date the member incurs a six-year break in service shall be eligible to accrue service credit following rehire solely for the purpose of determining the member's eligibility for payment of his Frozen Accrued Benefit;

(c)   Benefit accruals for members with respect to service rendered prior to July 1, 2014 will be frozen based on a member's years of service, Average Final Compensation, and the pension multiplier formulae as of such Freeze Date ("Frozen Accrued Benefit");

(d)   Except as otherwise provided in subsection (e) of this Section 47-1-27, compensation of a member shall be frozen effective as of the Freeze Date for purposes of determining the member's Frozen Accrued Benefit.  No compensation of any type earned by a member after the Freeze Date shall be taken into consideration for purposes of determining the member's Frozen Accrued Benefit under the General Retirement System;

(e)   Any member who, as of June 30, 2014, would have been eligible to elect to use a portion of his unused accrued sick leave to increase his Average Final Compensation ("Sick Leave Rollover") if the member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election as of June 30, 2014 ("Special Election") to add the value of twenty-five percent (25%) of the member's unused sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance to the earnings used in computing Average Final Compensation for purposes of determining the member's Frozen Accrued Benefit; *provided, however,* that at least twenty-five percent (25%) of the member's sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance remains in the member's sick leave bank at the time the completed Special Election form is received by the Retirement System and, *provided further* that the completed Special Election form is received by the Retirement System no later than August 15, 2014.  A member's Special Election shall be made in the manner set forth by the Board of Trustees and the Retirement System.  Notwithstanding anything in this subsection (e) to the contrary, a member's Special Election will be void and the determination of the member's Average Final Compensation for purposes of calculating the member's Frozen Accrued Benefit will not take into account any of the member's unused sick leave, if (i) the electing member would not have been eligible to receive an immediate service retirement if he retired as of June 30, 2014, and (ii) the electing member's employment with an Employer is terminated before the electing member becomes eligible for an immediate service retirement under the Retirement System;

(f)   Service earned after the Freeze Date shall be credited to a member solely for purposes of determining the member's vesting in and eligibility for payment of his or her Frozen Accrued Benefits.   Service credit for all members for benefit accrual purposes under the terms of the General Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no member shall earn service credit with respect to benefits payable under the terms of the General Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date;

(g)   No member shall make contributions to the Annuity Savings Fund under the General Retirement System in effect as of June 30, 2014 with respect to wages earned on or after July 14, 2014, and all Annuity Savings Fund contributions made on or after July 14, 2014 shall be made to and in accordance with the terms of the Combined Plan for the General Retirement System of the City of Detroit, Michigan; and

(h)   The 1998 Defined Contribution Plan will be closed to all employees hired or rehired by an Employer on or after July 1, 2014.  On or after July 1, 2014, no person may make an election to participate in the 1998 Defined Contribution Plan, and no future contributions will be made to or accepted by the 1998 Defined Contribution Plan with respect to wages earned on or after July 1, 2014.

        The foregoing terms of Section 47-1-27 shall be referred to as the "Freeze" of the provisions of the General Retirement System as in effect on the Freeze Date and the provisions of Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code shall be interpreted and construed by the Board of Trustees and the Retirement System to give full effect to the Freeze.  To the extent that a conflict arises between this Section 47-1-27 and other provisions in Chapter 47, or any collective bargaining agreement or other

document governing the terms of employment of any employee, the Board of Trustees and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

(Ord. No. 17-14, Sec. 47-1-27.)

**By Agreement**

Effective July 1, 1995, all members of the bargaining unit have the option of purchasing pre-employment military time for pension purposes in accordance with the 1995-1998 arbitration award.[j]

---

[j]    CBA-1 (§ 43.P.), CBA-2 (§ 35.R.), CET-2 (§ 47.O.).

[Secs. 47-1-28—47-1-30. Reserved.]

**ARTICLE ~~B.  [FORMERLY ARTICLE II~~E.  DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN OF THE GENERAL RETIREMENT SYSTEM.~~]~~**

**Sec. ~~B~~E-1.  ~~[Formerly Sec. 47-2-1.~~ Membership.[70]~~]~~**

The membership of the General Retirement System 1973 Defined Benefit/Defined Contribution (Annuity) Plan – Component II of the Combined Plan - shall consist of all persons who are full time employees of the ~~employer as defined in Section 47-1-21 of this Code.~~Employer except:

(a)     persons who are members of the ~~*Policemen*~~Police and ~~*Firemen*~~Fire Retirement System of the City of Detroit, Michigan, established under Title IX, Chapter VII of the 1918 Detroit City Charter and continued in the 1974 ~~and~~, 1997 and 2012 Detroit City Charters and as continued in the form of the Combined Plan for the Police and Fire Retirement System for the City of Detroit, Michigan, effective July 1, 2014 and as thereafter amended;

(b)     persons who ~~make an election to become a participant in the Retirement System *1998 Defined Contribution Plan* pursuant to Section 47-3-3 of this Code~~are hired or rehired by an Employer on or after July 1, 2014; and

(c)     Any person who is a member of any other public employee pension or retirement plan adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of ~~this state~~the State of Michigan.

**By Agreement**

Special Service employees who ~~work~~worked more than fourteen hundred forty (1440) hours per ~~fiscal year~~Fiscal Year ending on or before June 30, 2014 will be eligible ~~for Pension Plan (General~~to participate in Component II of the Retirement System~~)~~.[k]

**Sec. ~~B~~E-2.  ~~[Formerly Sec. 47-2-2.~~  Cessation of Membership; Re-Employment by the Employer.[71]~~]~~**

(a)     Any ~~member~~Member who retires under Section ~~47-2-4~~E-3(a), (b), or (c),[72] or dies, shall have a non-forfeitable right to a benefit.

(b)     With respect to persons not on the active payroll prior to October 1, 2005, the following provisions of this subsection shall apply:

(1)     Except as otherwise provided for in this ~~Article~~Component II, if any non-vested ~~member~~Member leaves City employment for any reason other than retirement or death, such person shall thereupon cease to be a ~~member~~Member and his or her credited service at that time shall be forfeited.  In the event of re-employment by

---

[k]     ~~CET-3 (§ 39.C.).~~

~~24~~

the City prior to July 1, 2014, such person shall again become a ~~member~~Member of the Retirement System and shall accrue benefits pursuant to Component II of the Combined Plan.  In the event of reemployment by the employer on or after July 1, 2014, such person shall again become a Member of the Retirement System and shall accrue benefits pursuant to Component I of the Combined Plan.  If re-employment occurs prior to July 1, 2014 and within a period of six (6) years[73] from and after the date City employment last terminated, credited service last forfeited shall be restored to ~~his or her~~the employee's credit for purposes of accruing a benefit after re-employment.

(2)     With respect to persons on the active payroll on or after October 1, 2005, re-employment prior to July 1, 2014 shall restore any previously forfeited service credit notwithstanding the time of re-employment.

(c)     Vested former employees rehired prior to receiving pension benefits.[74] and prior to July 1, 2014.

(1)     Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to July 1, 2014 and prior to being separated for six (6) years shall have their ~~pension~~pensions calculated in accordance with the rules in effect at the earlier of (i) the time of their last termination of active service or retirement and (ii) June 30, 2014.

(2)     Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 1992 but prior to July 1, 2014 and after being separated for more than six (6) years who accumulate enough service credit to be eligible for a second pension shall be entitled to two (2) separate and distinct pensions, each to be calculated in accordance with the rules in effect at the earlier of (i) the time of each separation from service and (ii) June 30, 2014.

(3)     An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor earned through June 30, 2014 added to the vested amount of the original pension for payment when the employee eventually retires.  The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(d)     Vested former employees rehired prior to receiving pension benefits and on or after July 1, 2014.

(1)     Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to being separated for six (6) years and on or after July 1, 2014 shall have their Component II pension calculated in accordance with the rules in effect on June 30, 2014 and their Component I pension calculated in accordance with the rules in effect at the time of their last termination of active service or retirement.

25

(4)    ~~Members who have separated from city service with vested rights under Article II and return to work after a separation of~~2)    Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 2014 after being separated for more than six (6) years~~, prior to the receipt of a vested pension benefit, may elect to be a member of either the Article II or Article III Fund during their new period of service. Such election must be made within ninety (90) days of re-employment with the city. If the member elects the Article III Fund for the new period of service and~~ who accumulate enough service credit to be eligible for a Component I pension shall be entitled to two (2) separate and distinct pensions under Component I and Component II, each to be calculated in accordance with the rules in effect at the time of each separation from service.

(3)    An employee who becomes eligible to collect ~~their~~his or her previously vested pension while still working, ~~they may begin to collect their vested pension on their eligibility date.~~shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor added to the vested amount of the original pension for payment when the employee eventually retires.  The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(~~d~~e)    Retirement benefits for retirees who return to active full time employment~~.[75]~~ prior to July 1, 2014.

(1)    Retirees who return to work will have their ~~Defined Benefit Plan~~ pension benefit amount suspended upon re-employment.  However, retirees who have not withdrawn the amounts credited to their defined contribution ~~amounts~~account shall be entitled to continue to receive the monthly annuity from the 1973 Defined Contribution Plan.  The pension improvement factor shall continue to be added to the vested amount of the original pension but shall not be paid on the defined benefit amount until the employee again separates from service.

(2)    Retirees who return to work prior to July 1, 2014 will be entitled to receive a second pension benefit in accordance with the rules in effect at the ~~time~~earlier of (1) their final separation, or (ii) June 30, 2014, with respect to service credit earned after the retiree returns to active employment.  Previous service credit will be used to determine ~~what~~the retirement factors that will be credited to service time earned after return to active employment and used to calculate the new pension amount.[76]

(3)    Average ~~final compensation~~Final Compensation will be based upon the amounts earned after the retiree returns to work.~~[77]~~ through the earlier of (1) their final separation and (ii) June 30, 2014.

(4)    Employees who retire under this Section ~~47-2-2~~E-2(~~d~~e) for a second time will not be allowed to change the original option selection with respect to the original pension benefit.  However, employees may make a separate option selection on their second pension benefit amount.

26

(5)     The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will be included only on the employee's original pension.

(6)     The coordination of benefits (equated Social Security) option will not be available on a second pension amount.

(7)     If a retiree who returns to work and dies while working, had an accumulated combined total service time of at least twenty years, the employee's ~~spouse~~Spouse will be eligible for automatic Option Two benefits,[78] ~~Notwithstanding~~ notwithstanding the option form of retirement originally elected.

(8)     If a retiree who returns to work and dies while working had an accumulated combined total service time of at least fifteen years but less than twenty years, the employee's ~~spouse~~Spouse will be eligible for automatic Option Three benefits, notwithstanding the option form of retirement originally elected.

(9)     If the employee returns to work and dies prior to accumulating a combined total of fifteen years of service credit, the original pension and benefit option chosen shall resume unless the employee had chosen the Straight Life Option which would result in no survivor pension benefits.

(10)    The Board of Trustees will determine all entitlements for re-employed individuals on a case by case basis consistent with this section and will resolve all issues based upon special circumstances or unique situations.~~]~~

~~(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 08-03, § 1, 4-9-03; Ord. No. 29-01, § 1, 11-30-01; Ord. No. 38-05, § 1, 12-14-05)~~

### ~~Sec. B-3.   [Formerly Sec. 47-2-3. Election to Transfer to 1998 Defined Contribution Plan.[79]]~~

~~Any employee member who is also a member of the Coverage Group as defined in Section 47-3-2 of this Code who makes an election to transfer to the *1998 Defined Contribution Plan* pursuant to Section 47-3-3 of this Code, shall transfer to the Trust of that Plan both the *1973 Defined Contribution Plan* (Annuity Savings Fund) balance and the actuarial present value of the *1973 Defined Benefit Plan* credited benefits of such individual under the *DGRS* in accordance with Section 47-3-3 of this Code and the rules and procedures established by the Board.~~

~~(Ord. No. 29-01, § 1, 11-30-01)~~

### Sec. ~~B-4.   [Formerly Sec. 47-2-4~~E-3.  Service Retirement.~~[80]]~~

(a)     *Retirement after thirty years of service.*[81]  Any ~~member~~Member hired prior to January 1, 1996 who has accumulated at least thirty or more years of credited service regardless of age, or, for any ~~members hired under a collective bargaining agreement, any member~~Member who was hired on or after ~~the date specified in the applicable collective bargaining agreement~~January 1, 1996 and who has accumulated at least thirty or more years of credited service and has attained age fifty-five, may retire upon written application filed with the Board setting forth the date on which the ~~member~~Member desires to be retired. The date of retirement shall be effective ~~not less than thirty, nor more than ninety, days~~

27

subsequent to the execution and filing of the application for retirement. On the specified date, the member shall be retired notwithstanding age or the fact that during such period of notification the member may have separated from on the first day following the Member's last day on City service payroll.  Upon retirement, the member Member shall receive a retirement allowance as provided in Section 47-2-5 E-4 of this Code Component II of the Combined Plan.

(b)     *Retirement after twenty-five years of service.*  Any Employee who is covered by the provisions of this Component II and who is a member of the International Union of Operating Engineers IUOE Local 324 (Principal Clerks), the International Brotherhood of Teamsters Teamster Local 214, the Police Officers Association of Michigan, or the Emergency Medical Service Officers Association, who on July 1, 1995, or later has twenty-five (25) or more years of credited service may retire upon his or her written application filed with the Board of Trustees setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement the Member shall receive a Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan.

Any Employee who is covered by the provisions of this Agreement and who is a member of the General Retirement System of the City of Detroit who on July 1, 1995, or later has twenty-five (25) or more years of credited service may retire upon his/her written application filed with the Board of Trustees setting forth the date, which shall not be less than thirty (30) nor more than ninety (90) days, subsequent to the execution and filing of said written application, he/she desires to be retired.  On the date so specified for his/her retirement he/she shall be retired notwithstanding that pending such period of notification he/she may have separated from City service.  Upon his/her retirement he/she shall receive a Retirement Allowance as provided by the City Charter and Municipal Code.[l]

**[Retirees who began receiving a Duty Disability Pension after July 1, 1995 may choose to convert to a service retirement at the time they would have had twenty-five (25) years with the City.[m]]**

(b c)     *Retirement at age sixty-five with eight years of service; at age sixty with ten years of service.*

(1)     Sixty-five and eight.  Any member Member who has attained sixty-five years of age and has at least eight years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

(2)     Sixty and ten.  Any member Member who has attained sixty years of age and has at least ten years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

(3)     Any such anticipated retirement date shall not be less than thirty nor more than ninety days subsequent to the filing of the application. On the specified date, the member shall be retired, notwithstanding that during such period of notification he or she may have separated from City

---

[l]     CBA-1 (§ 43.A.), CBA-2 (§ 35.A.), CET-2 (§ 47.A.)
[m]     CBA-2 (§ 35.A.), CET-2 (§ 47.A.)

28

~~service. Upon retirement, the former member shall receive the retirement allowance provided for in Section 47-2-5 [82] of this Code.~~

The date of retirement shall be effective on the first day following the Member's last day on City payroll. Upon retirement, the former Member shall receive the retirement allowance provided for in Section E-4 of this Component II of the Combined Plan.

(d) *Conversion of Duty-Disability benefit to Retirement Allowance.*

(1) Retirees who are members of the Emergency Medical Service Officers Association or the Police Officers Association of Michigan and who began receiving a Duty Disability Pension after July 1, 1995 may choose to convert to a service retirement at the time they would have had twenty-five (25) years of service with the City.

(~~c~~e) *Retirement after twenty-five years of service without attaining age sixty years; reduced pension.*

(1) Early retirement. Any ~~member~~Member of the Retirement System who is on the payroll on or after July 1, 1992, and who has twenty-five years of credited service and has not attained sixty years of age[n], shall have the option of early retirement by accepting an actuarially reduced retirement allowance as determined by the Board ~~of Trustees~~ after consultation with the ~~Board's~~Plan Actuary, notwithstanding the age of the ~~member~~Member who elects early retirement; provided however that any Member hired by an Employer on or after January 1, 1996 must have twenty-five years of credited service and have attained age fifty-five to have such early retirement option. Said option **By Agreement** made within ninety days of separation from City service. Actuarial tables provided by the ~~Board's~~Plan Actuary shall always provide this actuarially reduced retirement allowance at no cost to the employee.

Notwithstanding the foregoing, any Member hired by an Employer on or after January 1, 1996 who has twenty-five years of credited service and has attained age fifty-five shall have the option of early retirement by accepting

~~Employees who have resigned with 25 or more years of service since July 1, 1992, shall have ninety (90) days to submit an application for this option from the date they are officially notified by the Pension Bureau that said application can be processed.~~

~~After the initial enrollment of applicants by the Pension Bureau, employees who subsequently leave City employment shall have ninety (90) days from their last paid date on the City payroll to select this option.~~

~~Retirees who began receiving a Duty or Non-Duty Disability Pension after July 1, 1992, may convert to this option no later than (90) days after they would have had twenty-five (25) years with the City and have been notified by the Pension Bureau of the availability of this option.~~

---

[n] ~~Not limited to those under sixty in the following agreements: CBA 3 (§ 46.A.), CBA 4 (§ 15.A.), CBA 5 (§ 20.A.), CBA-6 (§ 26.A.), CBA-7 (§ 26.A.), CBA-8 (§ 25.A.), CBA-9 (§ 31.A.), CBA-10 (§ 33.A.), CBA-11 (§ 39.A.), CET-1 (§ 48.A.), Reopener 1 (§ 31.A.), Reopener 2 (§ 25.A.), Reopener 3 (§ 39.A.), Reopener 4 (§ 20.A.).~~

~~29~~

~~Employees who began receiving Income Protection Benefits after July 1, 1992 may convert to this option anytime after they have had twenty-five (25) years of service with the City.~~

~~The above paragraphs notwithstanding, employees hired after January 1, 1996, shall not be eligible for a Service Retirement until they shall have attained fifty-five (55) years of age. This requirement shall apply to both the regular service retirement with thirty (30) years of service and for pension calculation purposes to the early service retirement (actuarially reduced) with twenty-five (25) or more years of service.[o]~~

---

(2)    <u>Fringe benefits.</u>  Employees utilizing the early retirement provision in ~~this~~ Section ~~47-2-4~~E-3(~~ee~~)(1) will not be entitled to the fringe benefits, if any, accruing to employees who qualify for a normal service retirement until such time as they would have qualified for a normal service retirement under ~~47-2-4~~<u>Section E-3</u>(a) or (b) of this ~~Code. However, employees may maintain health care benefits, if any, through the City's *COBRA* program, or its equivalent, until that time~~<u>Component II of the Combined Plan</u>.

(~~d~~f)    ~~Retirement~~*<u>Vested retirement</u> allowance; age forty and eight years of service; ten years of service regardless of age.*[83]

(1)    Eligibility.

a.    Any ~~*member*~~<u>Member</u> hired before July 1, 1980 who has reached forty years of age and has acquired eight or more years of credited service shall be eligible to receive benefits provided by Section ~~47-2-4~~E-3(~~d~~f)(2) of this ~~Code~~<u>Component II of the Combined Plan</u>.

b.    Any ~~*member*~~<u>Member</u> hired on or after July 1, 1980 who has acquired ten years of credited service shall be eligible to receive the benefits provided by Section ~~47-2-4~~E-3(~~d~~f)(2) of this ~~Code~~<u>Component II of the Combined Plan,</u> regardless of age.

c.    Any non-union ~~*member*~~<u>Member</u> hired on or after July 1, 1980 but before March 31, 1992 who has acquired ten years of credited service regardless of age or has reached age forty with eight or more years of credited service, whichever is earlier, shall be eligible to receive benefits provided by Section ~~47-2-4~~E-3(~~d~~f)(2) of this ~~Code~~<u>Component II of the Combined Plan</u>.

(2)    *Benefits*.

a.    Any ~~*member*~~<u>Member</u> described in Section ~~47-2-4~~E-3(~~d~~f)(1)[84] of this ~~Code~~<u>Component II</u> who ~~*leaves*~~<u>left</u> City employment on or before June 30, 1992 but prior to the date the ~~member~~<u>Member</u> would have first become eligible to retire as provided in Section ~~47-2-4~~E-3(a),[85] (b)[86] or (c)[87] of this

[o]    ~~CBA-3 (§ 46.A.), CBA-4 (§ 15.A.), CBA-5 (§ 20.A.), CBA-6 (§ 26.A.), CBA-7 (§ 26.A.), CBA-8 (§ 25.A.), CBA-9 (§ 31.A.), CBA-10 (§ 33.A.), CBA-11 (§ 39.A.), CET-1 (§ 48.A.), Reopener-1 (§ 31.A.), Reopener-2 (§ 25.A.), Reopener-3 (§ 39.A.), Reopener-4 (§ 20.A.).~~

~~30~~

CodeComponent II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law,[88] retirement or death, shall be entitled to a retirement allowance based upon one point five percent (1.5%) of average final compensationAverage Final Compensation for the first ten years of service and one point six three percent (1.63%) for service in excess of ten years. There shall be no change to the base pension upon which future increases are based.

b.    Any memberMember described in Section 47-2-4E-3(df)(1) of this CodeComponent II of the Combined Plan who leaves City employment on or after July 1, 1992, but prior to the date the memberMember would have first become eligible to retire as provided in Section 47-2-4E-3(a), (b) or (c) of this CodeComponent II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law,[89] retirement or death, shall be entitled to a retirement allowance computed according to Section 47-2-5.[90]E-4 of this CodeComponent II of the Combined Plan.

c.(3)    *Commencement of retirement allowance.* The retirement allowance shall begin on the first day of the calendar month following the month in which thea retirement application is filed with the Board, on or after that date on which the memberMember would have been eligible to retire with an unreduced service retirement under Section 47-2-4E-3(a) or (b) of this CodeComponent II of the Combined Plan, had City employment continued or on the date when age sixty is reached, whichever is earlier. Unless otherwise provided in this Article, no service credit shall be earned for the period of absence from City employment and such person's beneficiary shall not be entitled to any other benefit afforded in this Article except those benefits afforded either in Section 47-2-4E-3 or in Section 47-2-5 of this CodeE-4 of this Component II of the Combined Plan notwithstanding termination of membership.

(34)    *Withdrawal of accumulated contributions.* Upon separation from City employment, membersMembers who qualify for benefits pursuant to Section 47-2-4E-3(df)(1) of this CodeComponent II of the Combined Plan may withdraw their 1973 Defined Contribution Plan accumulated contributions and all other funds standing to their credit in the Annuity Savings Fund at that time without affecting their benefits under Section 47-2-4E-3(df)(2) or 47-2-5E-4 of this CodeComponent II of the Combined Plan.

(Ord. No. 29-01, § 1, 11-30-01)

---

**By Agreement**

---

For employees hired on or after July 1, 1980, the vesting provisions of the City Retirement Plan shall require ten (10) years of service regardless of age in lieu of the "40 and 8" age and service requirements.[p]

---

[p]    CBA-1 (§ 43.D.), CBA-2 (§ 35.D.), CBA-3 (§ 46.C.), CBA-4 (§ 15.C.), CBA-5 (§ 20.C.), CBA-6 (§ 26.C.), CBA-7 (§ 26.C.), CBA-8 (§ 25.C.), CBA-9 (§ 31.C.), CBA-10 (§ 33.C.), CBA-11 (§ 39.C.), CET-1 (§ 48.C.), CET-2 (§ 47.D.), Reopener-1 (§ 31.C.), Reopener-2 (§ 25.C.), Reopener-3 (§ 39.C.), Reopener-4 (§ 20.C.).

31

In the event that any law, State or Federal, is passed during the term of the collective bargaining agreement or City Employment Terms agreement which permits Employees to vest their pension prior to meeting the vesting requirements set forth in this ~~contract~~Component II, any Employee who vests his~~/~~ or her pension in such a manner shall not be eligible for any pension benefits until his~~/~~ or her sixty-second (62nd) birthday.  This provision will not affect the current practice governing disabled Employees.[q]

## Sec. ~~B-5.  [Formerly Sec. 47-2-5~~E-4.  Service Retirement Allowance.[91]~~]~~

Upon retirement, a ~~member~~Member who meets the qualifications set forth in section ~~47-2-4~~E-3(a), (b) or (c) of this ~~Code~~Component II of the Combined Plan, shall receive a Straight Life Retirement Allowance, and shall have the right to elect to receive in lieu of the Straight Life Retirement Allowance, a reduced retirement allowance under an option provided for in ~~Section 47-2-9~~[92]E-8 of this ~~Code~~Component II of the Combined Plan.

The Straight Life Retirement Allowance shall consist of:

(a)  An Annuity which shall be the actuarial equivalent of the ~~members~~Member's accumulated contributions in the 1973 Defined Contribution Annuity Savings Fund at the time of retirement; and

(b)  ~~(~~A Basic Pension of twelve dollars ($12.00) per annum multiplied by the number of years, and fractions of years of credited service, not to exceed ten (10) years; and

(c)  A Membership Service Pension.

(1)  For ~~members~~Members who retire on or before June 30, 1992, a membership service pension of one point five percent (1.5%) of Average Final Compensation for the first ten (10) years of service and one point six three percent (1.63%) for service in excess of ten (10) years.

(2)  For ~~members~~Members who retire on or after July 1, 1992 but prior to July 1, 1998, a membership service pension of one point five percent (1.5%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point seven percent (1.7%) of Average Final Compensation for each year of service in excess of ten (10) years up to twenty (20) years of service, plus one point nine percent (1.9%) of Average Final Compensation for each year of service in excess of twenty years.  In no event shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

[q]  CBA-1 (§ 43.D.), CBA-2 (§ 35.D.), CBA-3 (§ 46.D.), CBA-4 (§ 15.D.), CBA-5 (§ 20.D.), CBA-6 (§26.D.), CBA-7 (§ 26.D.), CBA-8 (§ 25.D.), CBA-9 (§ 31.D.), CBA-10 (§ 33.D.), CBA-11 (§ 39.D.), CET-1 (§ 48.D.), CET-2 (§ 47.D.), Reopener-1 (§31.D.), Reopener 2 (§25.D.), Reopener 3 (§ 39.D.), Reopener 4 (§ 20.D.).
32

13-53846-tjt    Doc 8046    Filed 10/22/14    Entered 10/22/14 03:50:41    Page 440 of 725

(3)  For ~~members~~Members who retire on or after July 1, 1998 **[or July 1, 1992ʳ], [using the highest paid 36 consecutive months out of the last 120 including longevity payments [received,** a membership service pension for service rendered prior to July 1, 2012 ˢ**] as Average Final Compensation[**] ~~a membership service pension~~ of one point six percent (1.6%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point eight percent (1.8%) of Average Final Compensation for each year of service in excess of ten (10) years, up to twenty (20) years of service, ~~and~~plus two percent (2%) of Average Final Compensation for each year of service in excess of twenty (20) years up to twenty-five (25) years, plus two point two percent (2.2%) of Average Final Compensation for each year of service in excess of twenty-five (25) years. ~~In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation **[except in the case where a higher pension amount has been earned in accordance with the provisions in effect prior to July 1, 1992ᵗ].**~~

; plus, for service rendered                **By Agreement**

---

~~Employees who retire on or~~ after July 1, 2012 **[or after July 1, 1998 but before July 1, 2012ᵘ],** ~~shall have their pensions computed according to the following formula. Using the highest paid thirty six (36) consecutive months out of the last one hundred twenty (120), including longevity payments, as Average Final Compensation; two percent (2%) **[or**~~and prior to July 1, 2014, one and one-half percent (1.5%) ᵛ**]** of Average Final Compensation for each year of service; plus twelve dollars ($12) for each year of City service not to exceed one hundred twenty dollars ($120). Notwithstanding the foregoing, for members of the Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920 and the Detroit Senior Water Systems Chemists Association bargaining units, the effective date of the one and one-half percent multiplier was April 1, 2013 for all years of service rendered after that date. In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation ~~except in the case where a higher pension amount has been earned in accordance with the provisions in effect prior to July 1, 1992.ˣ~~

---

ʳ  ~~CBA 9 (§ 31.H.), Reopener 1 (§ 31.H.).~~

ˢ  ~~CBA 3 (§ 46.F.), CBA 8 (§ 25.F.), Reopener 2 (§ 25.F.).~~

ᵗ  ~~CBA 3 (§ 46.F.), CBA 4 (§ 15.H.), CBA 5 (§ 20.H.), CBA 6 (§ 26.H.), CBA 7 (§ 26.G.), CBA 8 (§ 25.F.), CBA 9 (§ 31.H.), CBA 10 (§ 33.H.), CBA 11 (§ 39.H.), CET 1 (§ 43.H.), Reopener 1 (§ 31.H.), Reopener 2 (§ 25.F.), Reopener 3 (§ 39.H.), Reopener 4 (§ 20.H.).~~

ᵘ  ~~CBA 3 (§ 46.F.), CBA 4 (§ 15.H.), CBA 5 (§ 20.H.), CBA 6 (§ 26.H.), CBA 7 (§ 26.G.), CBA 8 (§ 25.F.), CBA 9 (§ 31.H.), CBA 10 (§ 33.H.), CBA 11 (§ 39.H.), CET 1 (§ 43.H.), Reopener 1 (§ 31.H.), Reopener 2 (§ 25.F.), Reopener 3 (§ 39.H.), Reopener 4 (§ 20.H.).~~

ᵛ  ~~CBA 2 (§ 35.G.).~~

ʷ  ~~CET 2 (§47.G.).~~

ˣ  ~~CBA 1 (§ 43.G.), CBA 2 (§ 35.G.), CET 2 (§ 47.G.).~~

~~33~~

For all years of credited service accrued by bargaining unit members after July 1, 2012, the multiplier as set forth previously in this section shall be reduced to one and one-half percent (1.5%) of Average Final Compensation per year.[y]

---

Effective April 1, 2013 **[or Effective on the first month after ratification[z]]**, the pension multiplier shall be 1.5% for all years of service after that date.[aa]

---

(d)    With respect to regular service retirees under Section 47-2-4E-3(a) and (b) [93] of this CodeComponent II of the Combined Plan only and excluding persons who receive vested benefits under Section 47-2-4E-3(c) and (d) of this CodeComponent II of the Combined Plan, in no case shall the total of the annual Straight Life Pension be less than three hundred sixty dollars ($360.00) times each of the first ten (10) years of service at retirement, plus one hundred twenty dollars ($120.00) for each year of service in excess of ten (10) years. Effective July 1, 2007, each year of service in excess of ten (10) years earned prior to July 1, 2014 shall be calculated using two hundred twenty-five dollars ($225.00).

(e)    The recalculation of the pension benefit shall include previous pension improvement factors but shall not include special increases granted by prior separate ordinances.[94]

(f)    If a retiree dies before receipt of Straight Life Retirement allowance payments in an aggregate amount equal to, but not exceeding, the retireesretiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between these accumulated contributions and the aggregate amount of Straight Life Retirement allowance payments received, shall be paid to such person or persons nominated by written designation duly executed by the retiree and filed with the Board. If there is no such designated person or persons surviving the retiree, such difference shall be paid to his or her estate. In no case shall any benefits be paid under this section because of the death of a retiree if the retiree had elected any of the Options provided for in Section 47-2-9E-8 of this CodeComponent II of the Combined Plan.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 02-08, § 1, 1-23-08)

## Sec. B-6.  [Formerly Sec. 47-2-6E-5.  Disability Retirement.[95]]

(a)    *Duty Disability; Eligibility.*    Upon the application of a memberMember or the memberMember's department head, a memberMember who becomes totally and permanently incapacitated for duty in the employ of the employerEmployer shall be retired by the Board; provided, such incapacity is found by the Board to be the natural and proximate result of the actual performance of duty, without willful negligence on the part of the memberMember; provided further, that the Retirement System Medical Director shall certify to the Board after a medical examination, that such member is mentally or physically totally

---

[y]      CBA 1 (§ 43.G.), CBA 2 (§ 35.H.), CET 1 (§ 48.H.), CET 2 (§ 47.G.).

[z]      CBA 10 (§ 33.U.).

[aa]     CBA 3 (§ 46.V.), CBA 10 (§ 33.U.).

and permanently incapacitated for the further performance of duty to the employer, and that such member should be retired from City service.

---

**By Agreement**

---

Effective September 28, 2010 **[or Effective February 11, 2010**bb **or upon approval of Board of Water Commissioners**cc **or Effective February 16, 2020 (Local 531) and effective March 9, 2010 (Local 488)**dd **or Effective March 30, 2010**ee**],** any employee **[or any employee covered by this agreement**ff**]** who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner ("IME"). If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City of Detroit, the employee shall not be eligible for the duty disability retirement.99

---

(b)     *Duty disability; Benefits.* 96 Upon retirement for disability as provided in Section 47-2-6E-5(a) of this CodeComponent II of the Combined Plan, a retiree shall receive the following benefits:

(1)     Any memberMember who is eligible for a Service Retirement under Section 47-2-4E-3(a) or (b) of this CodeComponent II of the Combined Plan shall receive a Service Retirement Allowance as provided in Section 47-2-5 97E-4 of this CodeComponent II of the Combined Plan and shall have the right to elect an option provided for in Section 47-2-9 98E-8 of this CodeComponent II of the Combined Plan.

(2)     Any memberMember prior to eligibility for a Service Retirement under Section 47-2-4E-3(a) or (b) of this CodeComponent II of the Combined Plan shall receive a Disability Retirement Allowance to begin as of the date of disability. In no case shall the Disability Retirement Allowance be retroactive to more than six months before the date the application for Disability Retirement is filed with the Board, or prior to the date the memberMember's name last appeared on a City payroll with pay, whichever is later. The Disability Retirement Allowance shall continue until the memberMember reaches eligibility for Service Retirement or recovers prior to that event. Upon reaching eligibility for Service Retirement, he or she shall receive a pension as provided in Sections 47-2-5E-4(b) (e) of this CodeComponent II of the Combined Plan, together with an annuity which shall be the equivalent of the annuity which would have been received had contributions

---

bb     CBA 3 (§ 46.K.), CBA 8 (§ 25.K.), CBA 9 (§ 31.K.), Reopener 1 (§ 31.K.), Reopener 2 (§ 25.K.), Reopener 3 (§ 39.K.).

cc     CBA 5 (§ 20.K.), Reopener 4 (§ 20.K.).

dd     CBA 6 (§ 26.K.).

ee     CBA 7 (§ 26.K.).

ff     CBA 3 (§ 46.K.), CBA 5 (§ 20.K.), CBA 6 (§ 26.K.), CBA 7 (§ 26.K.), CBA 9 (§ 31.K.), CBA 11 (§ 39.K.), CET 1 (§ 48.K.), Reopener 1 (§ 31.K.), Reopener 2 (§ 25.K.), Reopener 3 (§ 39.K.), Reopener 4 (§ 20.K.).

99     CBA 3 (§ 46.K.), CBA 5 (§ 20.K.), CBA 6 (§ 26.K.), CBA 7 (§ 26.K.), CBA 9 (§ 31.K.), CBA 11 (§ 39.K.), CET 1 (§ 48.K.), Reopener 1 (§ 31.K.), Reopener 2 (§ 25.K.), Reopener 3 (§ 39.K.), Reopener 4 (§ 20.K.).

35

to the Annuity Savings Fund continued. Said contributions are to be based on the final compensation at the date of duty disability and the annuity percentage in effect for the employee on the July first prior to the effective date on which the employee is added to the disability retirement payroll, provided said July first is at least six months prior to the effective date that the employee is added to the regular retirement payroll. In computing the pension, membership service credit shall be given for the period a Duty Disability Retirement Allowance is received. The Disability Retirement Allowance shall consist of:

aa.(i) Cash Refund Annuity[99] which shall be the actuarial equivalent of the memberMember's accumulated contributions in the Annuity Savings Fund at the time of retirement. If a retiree dies before receipt of annuity payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions, the difference between the accumulated contributions and the aggregate amount of annuity payments received shall be paid in a single lump sum to such person or persons nominated by written designation duly executed and filed with the Board. If there is no such designated person surviving the retiree, such difference shall be paid to the retiree's estate.

bb.(ii) In addition to the Annuity, a Disability Pension [100] of sixty-six and two-thirds percent (66-2/3%) of the memberMember's Average Final Compensation at the time of duty disability, subject to the provisions of Sections 47-2-13E-12 and 47-2-14E-13 of this CodeComponent II of the Combined Plan. This Disability Pension shall in no event exceed fifty-seven hundred dollars ($5,700.00) per annum.

cc.(iii) For membersMembers who retired on disability on or after January 1, 1999, a pension or on or after July 1, 2012 for members of the Emergency Medical Service Officers Association and Police Officers Association of Michigan bargaining units, in addition to the Annuity, a Disability Pension of sixty-six and two-thirds percent (66-2/3%) of the memberMember's average compensation at the time of duty disability, subject to the provisions of Sections 47-2-13E-12 and 47-2-14E-13 of this CodeComponent II of the Combined Plan. This Disability Pension shall in no event exceed nine thousand dollars ($9000.009,000.00) per annum.

---

**By Agreement**

---

Effective January 1, 1999 **[or July 1, 2012[hh]]**, the maximum annual amount payable to an individual on a Duty Disability pension shall be increased to $9,000 and for Non-Duty Disability pension to $6,000.[ii]

---

[hh] CET 2 (§ 47.I.)

[ii] CBA 1 (§ 43.I.), CBA 2 (§ 35.K.), CBA 3 (§ 26.H.), CBA 4 (§ 15.J.), CBA 5 (§ 20.J.), CBA 6 (§ 26.J.), CBA 7 (§ 26.I.), CBA 8 (§ 25.H.), CBA 9 (§ 31.J.), CBA 10 (§ 33.J.), CBA 11 (§ 39.J.), CET 2 (§ 47.I.), Reopener-1 (§ 31.J.), Reopener-2 (§ 25.H.), Reopener 3 (§ 39.J.), Reopener-4 (§ 20.J.).

36

(c)    *Non-Duty Disability; Eligibility.* [101] Upon the application of a ~~member~~Member or the ~~member~~Member's department head, a ~~member~~Member who has at least ten years of credited service who becomes totally and permanently incapacitated for duty as a result of causes which do not occur in the actual performance of duty to the employer, may be retired by the Board if the ~~Medical Director~~IME certifies to the Board after examination that such ~~member~~Member is mentally or physically totally incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such ~~member~~Member should be retired.

(d)    *Non-Duty Disability; Benefits.* [102] Upon retirement for <u>non-duty</u> disability as provided in Section ~~47-2-6~~E-5(c) of this ~~Code, a member~~<u>Component II of the Combined Plan, a Member</u> shall receive the following benefits:

   (1)    After attaining sixty years of age, a ~~member~~Member shall receive a Service Retirement Allowance as provided in Section ~~47-2-5~~E-4 of this ~~Code~~<u>Component II of the Combined Plan</u> and shall have the right to elect an Option as provided in Section ~~47-2-9~~[103]E-8 of this ~~Code~~<u>Component II</u>.

   (2)    Prior to age sixty, a ~~member~~Member shall receive benefits as provided in Section ~~47-2-6~~E-5(d)(2)~~aa—dd~~[104]<u>(i)-(iv)</u> of this ~~Code~~<u>Component II of the Combined Plan</u>:

      ~~aa~~<u>i</u>.    A Cash Refund Annuity [105] which shall be the actuarial equivalent of the ~~member~~Member's accumulated contributions in the Annuity Savings Fund at the time of retirement. In the event a retiree dies before the total of the Cash Refund Annuity payments received equals or exceeds the amount of his or her accumulated contributions at the time of retirement, the remainder shall be paid in a single lump sum to such person or persons nominated by written designation duly executed by the ~~member~~Member and filed with the Board. If there is no such designated person or persons surviving, any such remainder shall be paid to the retiree's estate.

      ~~bb~~<u>ii</u>.    In addition to the Annuity, a Disability Pension [106] which shall be based on the Service Retirement factors in effect on the effective date of disability. The service retirement factors shall be multiplied by the Average Final Annual Compensation multiplied by the number of years and fractions of years of service credited to the retiree. In addition, a basic pension of twelve dollars ($12.00) per annum for a maximum of ten years of credited service shall be added for a total not to exceed one hundred twenty dollars ($120.00) and adjustments thereto, as calculated pursuant to applicable provisions of ~~the Detroit City Charter, as amended, and the Detroit City Code, as amended~~<u>this Component II of the Combined Plan</u>. Said Disability Pension shall begin as of the date of the disability. However, in no case shall the ~~pension~~<u>Disability Pension</u> begin more than six months before the date the application for disability retirement was filed with the Board, or prior to the date his or her name last appeared on a City payroll with pay, whichever is later. Payment of the Disability Pension shall continue to age sixty. Said Disability Pension shall not exceed thirty-nine hundred

37

dollars (~~$3900.00~~$3,900.00) per annum, and shall be subject to the provisions of Sections ~~47-2-13~~E-12 and ~~47-2-14~~E-13 of this ~~Code~~Component II of the Combined Plan.

~~cc~~iii. A ~~member~~Member who retired on disability on or after January 1, 1999 shall receive a Disability *~~pension~~*Pension as provided for in Section ~~47-2-6~~E-5(d)(2)~~bb~~(ii) of this ~~Code~~Component II of the Combined Plan. Said Disability Pension shall not exceed six thousand dollars ($6,000.00) per annum, and shall be subject to the provisions of Sections ~~47-2-13~~E-12 and ~~47-2-14~~E-13 of this ~~Code~~Component II of the Combined Plan.

~~dd~~iv. Effective July 1, 1967, notwithstanding the limitations contained in Section ~~47-2-6~~E-5(d)(2)~~bb~~(ii) of this ~~Code~~Component II of the Combined Plan, disability retirees under Section ~~47-2-6~~E-5(c) of this ~~Code~~Component II of the Combined Plan, who retired (1) prior to August 13, 1953, shall receive a supplementary Disability Pension of forty dollars ($40.00) per month; or (2) after August 13, 1956 and prior to July 1, 1966, shall receive a supplementary ~~pension~~Disability Pension of twenty dollars ($20.00) per month.

~~ee~~v. Upon Attaining Age Sixty, the retiree shall receive a Pension computed according to the provisions of Section ~~47-2-5~~E-4(b)-(e) of this ~~Code~~Component II of the Combined Plan; provided, that no service credit shall be given for the time a Disability Pension provided for in Section ~~47-2-6~~E-5(d)(2)~~b~~(ii) of this ~~Code~~Component II of the Combined Plan was received. Upon attaining age sixty, the retiree shall have the right to make an election under Section ~~47-2-9~~E-8 of this ~~Code~~Component II of the Combined Plan.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

## Sec. ~~B-7.~~ [Formerly Sec. 47-2-7E-6. Accidental Death Benefit; Performance of Duty.[107]]

If a ~~member~~Member is killed in the performance of duty in the service of the employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the employer, and such death, illness, or injuries resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the employer, the following benefits shall be paid, subject to Section ~~47-2-13~~E-12 of this ~~Code~~Component II of the Combined Plan:

(a) *Annuity Savings Fund.*[108] ~~accumulated~~ Accumulated savings in the ~~members~~Member's Annuity Savings Fund at the time of death shall be paid in a single lump sum to such person or persons as the ~~member~~Member nominated in a writing duly executed and filed with the Board. In the event there is no designated person or persons surviving the ~~member~~Member, the accumulated contributions shall be paid to the ~~member~~Member's estate.

38

(b)     *A Pension* [109] of one-third of the final compensation of said ~~member~~Member shall be paid to the surviving ~~spouse~~Spouse to continue until remarriage.  If an unmarried child, or children under age eighteen also survive the deceased ~~member~~Member, each surviving child shall receive a pension of one-fourth of said final compensation, to be divided equally.  Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, such child's pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen.  In no event shall any child receive a pension of more than one-fourth of said final compensation.

(c)     *No Surviving Spouse; Children.* [110] If there is no surviving ~~spouse~~Spouse, or if such surviving ~~spouse~~Spouse dies or remarries before the youngest surviving child of a deceased ~~member~~Member shall have attained the age of eighteen, any unmarried child or children under age eighteen, if any, shall receive a Pension equal to one-fourth of the deceased ~~member~~Member's final compensation; provided, that if there are more than two such surviving children, each shall receive a pension of an equal share of one-half of said final compensation.  Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, the child's Pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen.  In no case shall any such child's Pension be more than one-fourth of the deceased ~~member~~Member's final compensation.

(d)     *Annual Limit.* [111] The total amount payable under Section ~~47-2-7~~E-6(b) and (c) of this ~~Code~~Component II of the Combined Plan on account of the death of a ~~member~~Member, shall not exceed nine thousand ~~dollars ($9,000)~~ **By Agreement** per annum.

~~The maximum amount of the Accidental Death Benefit as found in Chapter VI, Article VI, Part C, Section 1, Paragraphs B and C of the City Charter shall be increased from $2,400 to $5,700~~ **[or $9,000**[jj]**]** ~~per annum.~~[kk]

(e)     *Dependent Father and/or Mother.* [112] If the deceased ~~member~~Member has no surviving ~~spouse~~Spouse or children eligible for ~~pension~~a Pension under this section, a Pension equal to one-sixth of the deceased ~~member~~Member's final compensation shall be paid to the ~~member~~Member's surviving dependent father and/or mother; provided that in no case shall either parent's Pension exceed fifty dollars ($50.00) per month.  Payment to a dependent parent or parents shall be contingent upon a finding by the Board of Trustees after investigation that such parent or parents were actually dependent upon said deceased ~~member~~Member through a lack of earning power resulting from physical or mental disability.

[jj]     ~~CBA-2 (§ 35.L.), CBA-3 (§ 46.H.), CBA-6 (§ 26.J.), CBA-8 (§ 25.H.), CBA-9 (§ 31.L.), CBA-10 (§ 33.J.), CBA-11 (§ 39.J.), CET-2 (§ 47.J.), Reopener-1 (§ 31.L.), Reopener-2 (§ 25.H.).~~

[kk]     ~~CBA-2 (§ 35.L.), CBA-3 (§ 46.H.), CBA-5 (§ 20.J.), CBA-6 (§ 26.J.), CBA-7 (§ 26.I.), CBA-8 (§ 25.H.), CBA-9 (§ 31.L.), CBA-10 (§ 33.J.), CBA-11 (§ 39.J.), CET-1 (§ 48.J.), CET-2 (§ 47.J.), Reopener-1 (§ 31.L.), Reopener-2 (§ 25.H.), Reopener-3 (§ 39.J.), Reopener-4 (§ 20.J.).~~

~~39~~

(f)     *Section ~~47-2-13 of this Code~~E-12 of Component II of the Combined Plan Applicable.* [113] The benefits provided in Section ~~47-7~~E-6 of this ~~Code~~Component II shall be subject to Section ~~47-2-13~~E-12 of this ~~Code~~Component II.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

## Sec. ~~B-8.   [Formerly Sec. 47-2-8~~E-7.  Accumulated Contributions; Return of 1973 Defined Contribution Plan Amount.[114]~~]~~

(a)     *Cessation of Employment.*

(1)     If a ~~member~~Member ceases to be an employee of the employer before becoming eligible for a Pension paid out of City contributions to the Retirement System, such ~~member~~Member shall be paid all or part of the ~~member~~Member's Annuity Savings Fund, being the 1973 Defined Contribution Plan amount, as the ~~member~~Member shall demand by written application filed with the Board.

(2)     Except as otherwise provided in this Article, upon the death of a ~~member~~Member, the Member's Annuity Savings Fund shall be paid to such person or persons nominated in a written designation duly executed by the ~~member~~Member and filed with the Board.  In the event there is no such designated person or persons surviving, the ~~member~~Member's said accumulated contributions shall be paid to the ~~member~~Member's estate.

(3)     If a ~~member~~Member who dies without a legal will is not survived by a Spouse and has not nominated a beneficiary as provided in Section ~~47-2-8~~E-7(a)(2) of this ~~Code~~Component II, the ~~member~~Member's accumulated Annuity Savings Fund contributions at the time of death may be used to pay burial expenses, if the ~~member~~Member leaves no other estate sufficient for such purpose.  Such expenses shall not exceed a reasonable amount as determined by the Board.

(4)     Accumulated contributions to be returned as provided in this section may be paid in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.  After a ~~member~~Member ceases to be a ~~member~~Member, any balance in the Annuity Savings ~~fund~~Fund which is unclaimed by the said ~~member~~Member or the ~~member~~Member's heirs, shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

(b)     *~~One Time~~One-Time Withdrawal; Twenty-Five Years.*  Prior to the receipt of the first retirement benefit check, ~~employees~~an employee with twenty-five or more years of service shall be allowed to withdraw either a partial or full amount of ~~their~~his or her accumulated contributions, one time only.

(c)     *~~One Time~~One-Time Withdrawal; Duty and Non-Duty Disability Retirees.*  Duty and non-duty disability retirees shall be allowed to withdraw either a partial or full amount of their accumulated contributions, one time only.

~~40~~

(d)     *One Time**One-Time* *Withdrawal*.  Withdrawal by a ~~member~~Member under either (b) or (c) of this Section ~~47-2-8~~E-7 constitutes the one time withdrawal allowed.

    (Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-9.  [Formerly Sec. 47-2-9E-8.  Retirement Allowance Options.[115]]

(a)     *Election by Member*.  Until the earlier of the first time a retirement allowance payment check is cashed, or six months after the first payment check is issued, but not thereafter, any ~~member~~Member may elect to receive a ~~straight life retirement allowance~~Straight Life Retirement Allowance payable throughout life, or the ~~member~~Member may elect to receive the actuarial equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced retirement allowance payable throughout life, with the exception that there will be no reduction in the benefits received pursuant to Section ~~47-2-5~~E-4(e) of this ~~Code:~~Component II of the Combined Plan, and nominate a beneficiary to receive benefits following the Member's death, in accordance with the options set forth below:

    *Option One.  Cash Refund Annuity.[116]*  If a retiree who elected a Cash Refund Annuity dies before payment of the annuity portion of the reduced retirement allowance has been received in an aggregate amount equal to, but not ~~exceeds~~exceeding the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between said accumulated contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to such person or person nominated by written designation duly executed by the ~~member~~Member and filed with the Board.  If ~~there are~~ no such designated person or persons ~~surviving said~~survive the retiree, any such difference shall be paid to the retiree's estate.

    *Option Two.  Joint and One Hundred Percent Survivor Allowance.*[117]  Upon the death of a retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the reduced retirement allowance shall be paid to and continued throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

    *Option "A".  Joint and Seventy-Five Percent Survivor Allowance.*  Upon the death of a retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the ~~member~~Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

    *Option Three.  Joint and Fifty Percent Survivor Allowance.*  Upon the death of a retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the ~~member~~Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

41

*Option "B". Joint and Twenty-Five Percent Survivor Allowance.* Upon the death of a retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the reduced retirement allowance shall be paid throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

(b)　*Joint and Survivor Optional Forms of Payment.* The Joint and Survivor Optional Forms of Payment provided under Section 47-2-9E-8(a) of this CodeComponent II of the Combined Plan shall be made available in either the standard form or the pop-up form, as follows:

　　(1)　*Standard Form.* Under the Standard Form, the reduced retirement allowance shall be paid throughout the lifetime of the retiree.

　　(2)　*Pop-up Form.* Under the Pop-up Form, the reduced allowance shall be paid throughout the lifetime of the retiree and the designated beneficiary. In the event of the death of the designated beneficiary during the lifetime of the retiree, the amount of the allowance shall be changed to the amount that would have been payable had the retiree elected the Straight Life *Form of Payment*Retirement Allowance form of payment.

(c)　*Coordination of Benefits.* According to such rules and regulations as the Board shall adopt, until the first payment of a retirement allowance becomes due, but not thereafter, a memberMember under age sixty-five may elect to have the memberMember's Straight Life Retirement Allowance provided for in Section 47-2-5 of this CodeE-4 of this Component II of the Combined Plan equated on an actuarial equivalent basis to provide an increased retirement allowance payable to age sixty-two or age sixty-five, and to provide a decreased retirement allowance thereafter. The increased retirement allowance payable to such age shall approximate the total of the decreased retirement allowance payable thereafter and the estimated social security benefit. If a memberMember elects to receive increased and then decreased retirement allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (a) of this section. This coordination of benefits option shall not create any additional actuarial costs. **[This provision shall include all Employees who retire on or after July 1, 1974, and shall be retroactive to that date."]**

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-10. [Formerly Sec. 47-2-10E-9. Benefits for Surviving Spouses; Generally.[118]]

(a)　The surviving spouseSpouse of any memberMember who dies while in the employ of the City or in the employ of a second governmental unit as provided in Section 47-2-15E-14 of this CodeComponent II after the date such memberMember either (1) has earned twenty years of credited service regardless of age, or (2) has earned eight years of credited service and has attained age sixty-five, or (3) has earned ten or more years of

---

ⁱⁱ　　CBA 1 (§ 43.B.), CBA 2 (§ 35.B.), CET 2 (§ 47.B.).

42

credited service and has attained age sixty, shall receive a retirement allowance. The ~~spouse~~Spouse's retirement allowance shall be computed according to Section ~~47-2-5~~E-4 of this ~~Code~~Component II of the Combined Plan in the same manner in all respects as if the said ~~member~~Member had retired effective the day preceding the ~~member~~Member's death, notwithstanding that the ~~member~~Member had not attained age sixty, elected a Joint and One Hundred Percent Survivor Allowance as provided for in Section ~~47-2-9~~E-8 of this ~~Code~~Component II, and nominated the surviving ~~spouse~~Spouse as beneficiary. ~~Prior to the date the first payment of the retirement allowance provided hereunder becomes due, the said beneficiary may elect to receive the deceased member's accumulated contributions in the Annuity Savings Fund.~~ No payments shall be made under this ~~section~~Section E-9 on account of the death of a ~~member~~Member if any benefits are paid under Section ~~47-2-7 [119] of this Code. If there is no eligible~~E-6 of this Component II. If an Employee dies with twenty (20) years of service and without a surviving ~~spouse~~Spouse, dependent children shall be paid a total of nine thousand dollars ($9,000.00) per year which shall be divided equally among all eligible ~~dependents~~dependent children until the youngest child reaches age nineteen, or for life, if a child is permanently physically or mentally impaired and such impairment occurred prior to the child's attainment of age nineteen. There shall be no retirement escalator for this payment.

---

**By Agreement**

~~Effective January 1, 1999, minor dependents under age nineteen (19) or permanently mentally or physically impaired dependent children who become impaired prior to age nineteen (19) of Employees who die with twenty (20) years of service without a surviving spouse shall receive a payment of nine thousand dollars ($9,000) per year which shall be divided equally amongst all eligible dependents. The payment will cease when the last minor attains age nineteen (19) or for mentally or physically impaired children at death. There shall be no retirement escalator for this payment.[mm]~~

---

(b)    In addition to in-service death benefits which existed prior to July 1, 1998 for ~~members~~Members with twenty or more years of service, if a ~~member~~Member dies on or after July 1, 1998 [or ~~January 1, 1999[nn] or July 1, 1999[oo]~~]such later date as provided in a collective bargaining agreement, after having attained fifteen or more but less than twenty years of creditable service at any age below sixty, the surviving ~~spouse~~Spouse will be paid a Fifty Percent Joint and Survivor ~~election~~benefit. If there is no eligible surviving ~~spouse~~Spouse, dependent children shall be paid a total of six thousand dollars ($6,000.00) which shall be divided equally among all eligible ~~dependents~~dependent children until the youngest child reaches age nineteen, or for life if a child is permanently physically or mentally impaired.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

---

~~[mm]        CBA-1 (§ 43.K.), CBA-2 (§ 35.M.), CBA-3 (§ 46.I.), CBA-4 (§ 15.K.), CBA-5 (§ 20.L.), CBA-6 (§ 26.L.), CBA-7 (§ 26.J.), CBA-8 (§ 25.I.), CBA-9 (§ 31.L.), CBA-10 (§ 33.K.), CBA-11 (§ 39.L.), CET-1 (§ 48.L.), CET-2 (§ 47.K.), Reopener-1 (§ 31.L.), Reopener-2 (§ 25.I.), Reopener-3 (§ 39.L.), Reopener-4 (§ 20.L.).~~

~~[nn]        CBA-1 (§ 43.L.), CBA-2 (§ 35.N.), CBA-3 (§ 46.J.), CBA-8 (§ 25.J.), CET-2 (§ 47.L.), Reopener-2 (§ 25.J.).~~

~~[oo]        CBA-6 (§ 26.M.).~~

~~43~~

Sec. ~~B-11.   [Formerly Sec. 47-2-11~~E-10.   **Benefits for Surviving Spouses; Disability Retirees.**[120]~~]~~

The surviving ~~spouse~~Spouse of a disability retiree who retired under the provisions of Section ~~47-2-6~~E-5 of this ~~Code~~Component II of the Combined Plan and who died before the age of sixty shall receive a retirement allowance computed in the same manner as if the disability retiree had been a ~~member~~Member who became eligible for death benefits under Section ~~47-2-10 of this Code~~E-9 of Component II of the Combined Plan, provided the disability retiree had earned fifteen or more years of credited service.  In the case of a non-duty disability retiree, credited service shall be determined on the effective date of the non-duty disability retirement.  In the case of a duty disability retiree, credited service shall be determined on the date of death of the disability retiree assuming City employment had continued until the date of death.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

Sec. ~~B-12.   [Formerly Sec. 47-2-12~~E-11.   **Disposition of Surplus Benefits upon Death of Retiree and Beneficiary.**[121]~~]~~

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint Twenty-Five Percent Survivor allowance as provided for under Section ~~47-2-9~~E-8 of this ~~Code~~Component II of the Combined Plan, both a retiree and beneficiary die before they have received in retirement allowance payments, an aggregate amount equal to the retiree's accumulated contributions in the ~~annuity savings fund~~Annuity Savings Fund at the time of retirement, less withdrawals, the difference between the said accumulated contributions and the said aggregate amount of retirement allowances paid the retiree and beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the retiree duly executed and filed with the Board.  If there are no person or persons surviving retiree and beneficiary, any such difference shall be paid to the retiree's estate.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

Sec. ~~B-13.   [Formerly Sec. 47-2-13~~E-12.   **Pensions Offset by Compensation Benefits; Subrogation.**[122]~~]~~

(a)     <u>Generally</u>.  Any amounts which may be paid or payable to a ~~member~~Member, retiree, or to the dependents of a ~~member~~Member or retiree on account of any disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be offset against any pensions payable from funds of the Retirement System on account of the same disability or death.  If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the ~~pension reserve~~Pension Reserve for said pension payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the Pension Reserve, and such pensions as may be provided by the Pension Reserve so reduced shall be payable as provided in this Article E.

(b)     <u>The City's right of subrogation</u>. [123] In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a

~~44~~

third party, the City shall be subrogated to the rights of said person against such third party to the extent of the benefit which the City or the Retirement System pays or becomes liable to pay.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. B-14. [Formerly Sec. 47-2-14E-13.  Disability Retirees; Reexamination; Authority of the Board.[124]]

(a)  *Medical examination*.  At least once each year during the first five years following the retirement of a memberMember with a Disability Retirement Allowance or Disability Pension, and at least once in every three year period thereafter, the Board may, and upon the retiree's application shall, require that any disability retiree who has not attained age sixty undergo a medical examination, to be made by, or under the direction of, the Medical Director.  Should any such disability retiree who has not attained age sixty refuse to submit to at least one such medical examination in any such period, the retiree's retirement allowance or pension may be discontinued by the Board until withdrawal of such refusal.  Should such refusal continue for one year, all of the disability retiree's rights in and to the Pension portion of the Retirement Allowance may be revoked by the Board.  If upon such examination of a disability retiree, the Medical Director reports that the retiree is physically able and capable of resuming employment, and such report is concurred in by the Board, the retiree shall be restored to active service with the City and the Disability Retirement Allowance shall terminate.

(b)  *Other employment*.  If such disability retiree is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the retiree's Disability Retirement Allowance and final compensation, the Pension portion of the Disability Retirement Allowance shall be reduced by the amount of such difference. If the amount of the earnings changes, the Pension may be adjusted accordingly.

(c)  *Reinstatement to active service*.  A disability retiree who has been, or shall be, reinstated to active service in the employ of the City as provided in this Section, shall again become a memberMember of the Retirement System.  All credited service at the time of the retirement shall be restored to full force and effect and a duty disability retiree shall be given membership service credit for the period said retiree was out of service due to such duty disability.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. B-15. [Formerly Sec. 47-2-15E-14.  Transfer of department or department functionsDepartment or Department Functions; Generally.[125]]

In the event a function or functions of a City Department or the Department itself is transferred to the federal or state government, or to a political subdivision of the stateState of Michigan (second governmental unit), a memberMember of the Retirement System whose employment is transferred from the City to the second governmental unit shall be entitled to a retirement allowance payable by the Retirement System subject to the following conditions:

45

(a)  *Employment within sixty days of transfer*.  The employee enters the employment of the second governmental unit within sixty days from and after the effective date of the transfer of the function or functions of a City Department or the Department itself to the second governmental unit.

(b)  *Credited service combined; ten year minimum*.  The employee's ~~credit~~credited service as a ~~member~~Member of the Retirement System plus any credited service acquired in the employ of the second governmental unit totals at least ten years~~;~~.

(c)  *Retirement; second governmental unit*.  If the employee retires from ~~the~~ employment ~~in~~with the second governmental unit on account of age and service, the employee's Retirement Allowance shall be computed in accordance with Section ~~47-2-4~~E-3(b) or Section ~~47-2-5~~E-4 of this ~~Code~~Component II of the Combined Plan, whichever is applicable.  If the employee retires from employment in the second governmental unit because of total and permanent disability arising from non-service connected causes, the Retirement Allowance shall be computed in accordance with Section ~~47-2-6~~E-5(d) of this ~~Code~~Component II of the Combined Plan.  In computing the Retirement Allowance, the basic pension shall not exceed twelve dollars ($12.00) per year for a maximum of ten years for a total amount to not exceed one hundred twenty dollars ($120.00), and the membership service pension shall be based only upon City-credited service existing at the time of transfer.  In determining the Average Final Compensation defined in Section ~~47-1-21~~C-1 of this ~~Code~~Component II of the Combined Plan, the compensation received as an employee of the second governmental unit shall be regarded as compensation paid by the City.  If the employee leaves the employ of the second governmental unit with a deferred retirement allowance, no City retirement allowance shall be paid unless the employee has met the requirements of Section ~~47-2-4~~E-3(d)(1) of this ~~Code.~~ Component II of the Combined Plan.  Notwithstanding the foregoing, effective as of the Freeze Date, for purposes of calculating a Retirement Allowance for a Member whose employment was transferred prior to July 1, 2014 from the City to a second governmental unit, Average Final Compensation for the transferred Member shall be compensation received by such transferred Member prior to July 1, 2014 as an employee of the second governmental unit.

(d)  *Allowance starting date*.  The retirement allowance shall begin upon retirement from the employment of the second governmental unit, but in no event prior to the date the employee would have become eligible for retirement had the employee continued in City employment.  If retirement is because of total and permanent disability arising from non-service-connected causes, the retirement allowance shall begin upon the approval of retirement by the Board.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

**Sec. ~~B-16.~~  [Formerly Sec. ~~47-2-16~~E-15.  Pension ~~improvement factor.¹²⁶]~~Improvement Factor (Escalator)**

(a)  *Increase of pension*. [127] On or after July 1, 1992~~,~~ and prior to the effective date of the Plan of Adjustment, effective as of the first day of July of each year ~~thereafter~~, the pension portion of any Retirement Allowance or ~~Accidental~~Duty Death Benefit which is paid or

~~46~~

payable under this Article shall be increased by a factor of two ~~point twenty-five~~and one quarter percent (2.25%), computed on the basis of the amount of the original pension received at the time of retirement, including, if applicable, any supplemental pensions provided under this Article; provided, that the recipient of said pension shall have been on the retirement rolls at least one year prior to said July first date.  If the recipient has been on the retirement payroll less than one year prior to said July first date, the amount of the increase shall be prorated accordingly.

(b)     *Payment*. [128] Except as provided in paragraph (c) below, the pension improvement factor of two ~~point twenty-five~~and one quarter percent (2.25%) provided for in Section ~~47-2-16~~E-15(a) of this ~~Code~~Component II, shall be payable notwithstanding any Retirement Allowance or pension amount limitation provisions in this Article to the contrary.

~~(Ord. No. 29-01, § 1, 11-30-01)~~

---

**~~By Agreement~~**

---

(c)     After the effective date of the City Employment Terms between the City of Detroit and Police Officers Association of Michigan presented to the ~~Union~~union on July 18, 2012, employees represented by the union will no longer receive the two and one-quarter percent (2.25%) per annum escalation.[pp]

---

(d)     Effective April 1, 2013, the post-retirement escalator factor for all service after that date shall be eliminated~~.~~ [qq]for any employee who is a member of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920.

---

**Sec. E-16.     Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate**

~~Effective on the first month after ratification, the cost of living allowance for all service after that date shall be eliminated.[rr]~~

(a)     The Retirement System and the Board of Trustees shall not make any payment to active or retired Members other than payments that are required by the Retirement System as established by this Combined Plan to govern the Retirement System or the Plan of Adjustment.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(b)     The Retirement System and the Board of Trustees shall not provide any savings plan, annuity plan, or other Member investment or savings vehicle that provides an annual

---

[pp]     ~~CBA-1 (§ 43.M.), CBA-2 (§ 35.O.), CET-1 (§ 48.N.)(referencing the effective date of their own CET), CET-2 (§ 47.P(1)( referencing the effective date of their own CET).~~

[qq]     ~~CBA-3 (§ 46.V.).~~

[rr]     ~~CBA-10 (§ 33.U.).~~

~~47~~

return to investing Members which in any year is greater than the actual investment return net of expenses of the Retirement System's invested reserves for the year in which the return is earned and accrued, provided that such return shall neither be greater than the assumed annual return as expressed in the Retirement System's valuation for that year nor less than zero. This prohibition shall apply to all annual returns credited to accounts of investing Members in the Annuity Savings Fund of the 1973 Defined Contribution Plan from the effective date of Ordinance 37-11 to June 30, 2013. Notwithstanding anything in this Section E-16 to the contrary, effective for Plan Years beginning on and after July 1, 2013, the annual rate of return credited to a Member's account in the Annuity Savings Fund of the 1973 Defined Contribution Plan shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second Plan Year immediately preceding the Plan Year in which the annual return is credited.

(c)     In any Plan Year during the period beginning on or after July 1, 2014 and ending June 30, 2023 in which the annual rate of return credited to the accounts of Members investing in the Annuity Savings Fund as provided in paragraph (b) is less than the actual rate of return net of expenses of the Retirement System's invested assets for the second Plan Year immediately preceding the Plan Year in which the annual rate of return is credited ("ASF Return Excess"), an amount equal to the value of the ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component I of the Combined Plan and shall be used to fund the Transition Cost relating to Component I. The Transition Cost is a measure of the liability that Component I of the Retirement System has at its inception; due to the fact that at its inception, Members in Component I of the Retirement System receive vesting and eligibility credit under Component I for service that was earned prior to July 1, 2014 and is otherwise credited to Members under Component II of the Retirement System, as such Transition Cost is calculated by the Plan Actuary. In the event there is an ASF Return Excess for a Plan Year following the Plan Year in which such transfers have fully funded the Transition Costs relating to Component I, fifty percent (50%) of such ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component II and the remaining fifty percent (50%) of such ASF Return Excess shall be transferred to Component I and credited to the Rate Stabilization Fund maintained under Component I. "Transition Cost" shall be determined by the Plan Actuary.

**Sec. B E-17. [Formerly Sec. 47-2-17. Funds.]**

The 1973 Defined Benefit/Defined Contribution (Annuity) Plan shall consist of the Annuity Savings Fund, the Annuity Reserve Fund, the Pension Accumulation Fund, the Pension Reserve Fund, and the Income Fund.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. B E-18. [Formerly Sec. 47-2-18.  Method of financing.[129]]Financing**

(a)     *Annuity Savings Fund of the 1973 Defined Contribution Plan.*[130]

48

(1)     The Annuity Savings Fund of the 1973 Defined Contribution Plan shall be the fund in which shall be accumulated at regular interest, in accordance with the limitations that are contained in Section 47-1-18E-16 of this CodeComponent II of the Combined Plan, the contributions of Members made prior to the first payroll date occurring in August 2014 to provide their annuities.  At the election of the Member, the amount of the basic contribution of a Member to the Retirement System may beprior to the first payroll date occurring in August 2014 were zero percent (0%), three percent (3%), five percent (5%), or seven percent (7%) of annual compensation.  If a Member electselected three percent (3%), his or her contribution shall be that amount which is subject to taxation under the provisions of the *Federal Insurance Contribution Act, 26 USC 3101 et seq. (Act)*, plus five percent (5%) of the portion of annual compensation, if any, which exceeds the amount subject to taxation under that *Act*.

(2)     The contribution rate elected by the Member under Section 47-2-18E-18(a)(1) of this Code shall beComponent II of the Combined Plan were deducted from the Members'Member's compensation notwithstanding that the minimum compensation provided by law for any Member shall bewere reduced thereby. Payment of compensation, less said deductions, shall beconstituted a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment, except as to benefits provided under this Article E.

(3)     Upon retirement of a Member with a Retirement Allowance, the Member's accumulated contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund, refunded to the Member, or a combination thereof.

**By Agreement**

**Pension – Employer Contribution (414h Plan):**

Upon notification by the Union to the City of its desire to activate a 414(h) Plan, the City will take steps to implement the provisions contained in the following paragraphs.  The Union initated the discussions and proposed the provisions contained in the paragraphs and the parties recognize and agree that it will take some time before this program can become operational due to the necessity of making changes in the City's computerized payroll system.

It is hereby agreed that every member of this bargaining unit shall be required to make contributions in the amount of 5% of their annual compensation to the Annuity Savings Fund of the General Retirement System.  The said 5% employee contribution to the Retirement system Annuity Fund, although designated as employee contributions, shall be paid by the City of Detroit in lieu of contributions by the employee.  The employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the employer to the annuity fund.  There shall be no additional contribution expense to the City of Detroit, and the amounts so contributed by the employer on behalf of the employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the employee until these amounts are distributed or made available to the employee.

49

~~These provisions shall not affect the amount or benefits level of the retirement allowance, or the City of Detroit's obligation thereto.~~ [55]

---

(b) *Annuity Reserve Fund*. [131] The Annuity Reserve Fund shall be the fund, from which all annuities and benefits in lieu of annuities payable as provided in this Article E, shall be paid. If a disability retiree is reinstated to active City service, the retiree's Annuity Reserve at that time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his or her individual account therein.

(c) *Pension Accumulation Fund*. [132] The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from the contributions made by the City, including various departments thereof, the Detroit Public Library, and certain third parties pursuant to the Plan of Adjustment and from which shall be paid pensions and other benefits on account of Members with prior service credit, and transfers as provided in this Section, E-18. Contributions to and payments from the Pension Accumulation Fund shall be made as follows:from the effective date of the Plan of Adjustment through Fiscal Year 2023, shall be made only in the amounts and from the sources identified in the Plan of Adjustment.

For Fiscal Years beginning after June 30, 2023, contributions to fund pension benefits (adjusted as provided in the Plan of Adjustment) shall be made as follows:

(1) Certain amounts shall be contributed by certain third parties as provided in the Plan of Adjustment.

(2) The City's annual contribution shall be calculated by the Actuary as provided in Section E-19.

(13) ~~Upon the basis of such mortality and other tables of experience and Regular Interest, as the Board shall adopt from time to time, the Actuary shall annually compute the amount of contributions, which, when made annually by the City during the entire prospective City service of Members without prior service credit, will be sufficient to provide the pension reserves required at the time the Members leave City employment, to cover the pensions to which they might be entitled or which might be payable because of their City employment.~~ Upon the retirement of a Member without prior service credit, or upon a Member's death in the performance of duty, the Pension Reserve Fund for the pension or pensions to be paid on the Member's account shall be transferred from the Pension Accumulation Fund to the Pension Reserve Fund.

(24) Upon the basis of such mortality and other tables of experience and ~~regular~~ interest as the Board shall adopt from time to time consistent with Section 1.16(d) of Component I, the Actuary shall compute annually the pension reserve liabilities for ~~pensions~~pension benefits being paid to ~~Retirees~~retirees and ~~Beneficiaries~~beneficiaries.

---

[55] ~~CET 1 (§ 48.O.), CBA 11 (§ 39.S.).~~

~~50~~

(3̶5) On an annual basis, the Board shall ascertain and report to the Mayor and the Council the amount of City contributions due to the Retirement System. The Council shall appropriate and the City shall pay such contributions during the ~~ensuing~~appropriate Fiscal ~~year~~Year. When paid, such contributions shall be credited to the Pension Accumulation Fund.

(4̶6) If the amount appropriated by the City and paid to the Retirement System for any Fiscal ~~year~~Year is insufficient to make the transfers and pay the pensions, as adjusted in the Plan of Adjustment, from the Pension Accumulation Fund as provided in this Section E-18, the amount of such insufficiency shall be provided by the appropriating authorities of the City.

(d) *Accrued Liability Fund.* Pursuant to *Ordinance No. 5-05*, which ~~authorizes~~authorized the creation of the Detroit General Retirement Service Corporation, the City ~~has~~previously entered into a transaction (the "Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described above in Subsection (c). The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transactions, as described below) that ~~will be~~were deposited into the System ~~will be~~are termed the "Funding Proceeds." The Funding Proceeds ~~will be~~were deposited into a new fund in the System to be called the Accrued Liability Fund. The purpose of the Funding Proceeds ~~will be~~was to fund all or part of the heretofore unfunded actuarial accrued liability ("UAAL") of the Retirement System, as determined as of a date certain, that is, the "Determination Date," pursuant to the Retirement System's actuarial valuation as of that date. The Funding Proceeds ~~will be~~are assets of the Retirement System and will be applied, together with all other assets of the Retirement System, to fund the Retirement System's obligation to pay ~~accrued~~pension benefits, as adjusted in the Plan of Adjustment.

This Accrued Liability Fund shall contain only the Funding Proceeds of this Pension Funding Transaction, and any earnings thereon. ~~Should the City, by future ordinance, choose to raise additional moneys by additional pension funding transactions ("Additional Pension Funding Transactions") in order to fund the then existing UAAL of the System as of a future date certain, a new and separate~~ Prior to Fiscal Year 2013, funds were transferred each Fiscal Year (or monthly portion thereof) from the Accrued Liability Fund ~~shall be created within the System to contain the proceeds, and any earnings thereon, of any Additional Pension Funding Transactions, and a new *Accrued Liability Fund* will be created for each successive Additional Pension Funding Transaction undertaken by the City, if any. The treatment of any Additional *Accrued Liability Fund* shall be the same as described below:~~to the Pension Accumulation Fund as provided in *Chapter 47 of the 1984 Detroit City Code and Ordinance No. 5-05.*

As soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.

(1̶) ~~The Funding Proceeds deposited in the *Accrued Liability Fund* will be subject to the oversight and investment direction of the Board of Trustees of the General Retirement System, consistent with the Board's obligations under Section 47-2-20 (Management of Funds). The Board will~~

5̶1

invest the Funding Proceeds as part of the System's overall assets, and will not differentiate the Funding Proceeds from other System assets for investment purposes.

(2) All interest, dividends and other income derived from the investment of the Funding Proceeds shall be credited annually to the applicable *Accrued Liability Fund* on a total System rate of return basis determined by crediting the applicable *Accrued Liability Fund* with the investment return experienced by the System in total for all of its investments for the year. This shall be done by first determining the rate of return for the total assets in the System for the fiscal year, and then crediting back to each *Accrued Liability Fund* an amount that is determined by multiplying that rate of return times the balance in the *Accrued Liability Fund* as of the beginning of the fiscal year, less an amount obtained by multiplying one half of the System's rate of return times the amount transferred to the *Pension Accumulation Fund* for that year. As provided in Section 47-2-18(g)of this Code, the interest, dividends and other income derived from the investment of the Funding Proceeds deposited in any *Accrued Liability Fund* are "other moneys" the disposition of which is specifically provided for in this Article, and these moneys will not be credited to the *Income Fund*. The interest, dividends and other income derived from the investment of the Funding Proceeds deposited in any *Accrued Liability Fund* will not be credited to any Funds other than the *Pension Accumulation Fund*.

(3) Upon the creation of the *Accrued Liability Fund* and the deposit of the Funding Proceeds into the applicable *Accrued Liability Fund*, there shall be established a schedule for transferring assets of the *Accrued Liability Fund* by crediting them to the *Pension Accumulation Fund* on a regular basis over the period required to fully amortize that portion of the System's UAAL determined as of the applicable Determination Date.

The System's UAAL determined as of the applicable Determination Date shall be the "Determined Accrued Liability." The period over which the Determined Accrued Liability is to be fully amortized, as specified in the System's actuarial valuation as of the applicable Determination Date, is the "Amortizing Period." The amount to be transferred each fiscal year (or monthly portion thereof) to the *Pension Accumulation Fund* from the *Accrued Liability Fund* is the "Scheduled Amortizing Amount."

With respect to the Pension Funding Transaction and any Additional Pension Funding Transactions, the Scheduled Amortizing Amount will equal a level percentage of the City's monthly payroll during the fiscal year, as determined by the City's weekly payroll reports made available to the Board. The level percentage of the City's monthly payroll that will be used to determine the Scheduled Amortizing Amount will be a level percentage that is equal to the level percentage that is specified in the actuarial valuation as of the applicable Determination Date as being the percentage of the City's monthly payroll required to amortize the Determined Accrued Liability over the Amortizing Period multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the Determined Accrued Liability as of the Determination Date. The denominator of the fraction shall be the System's Determined Accrued Liability on that date.

**Commentary:** By way of example only, the Scheduled Amortizing Amount would be determined as follows: (1) the Determination Date is June 30, 2004, (2) the Funding Proceeds are deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2004 actuarial valuation produced a UAAL of $800 million, (4) the City's contribution required to amortize that UAAL is 16% of the City's payroll, and (5) the Funding Proceeds were $600 million, then the Scheduled Amortizing Amount for Fiscal Year 2005-06 would be 16% times ($600 million/$800 million) times the City's payroll for 2005-2006. This would be 12% times the City's payroll for that fiscal year.

With respect to the Pension Funding Transaction, or any Additional Pension Funding Transactions, where the applicable Determination Date occurs after the date of the actuarial

52

valuation that determines the City's contribution for the fiscal year during which the applicable Funding Proceeds are deposited into the System, for such fiscal year, there will be transferred from the applicable *Accrued Liability Fund* to the *Pension Accumulation Fund* an amount that is specified in such actuarial valuation as being the City's required contribution needed to amortize the System's UAAL as of the date of such actuarial valuation, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the UAAL specified in such actuarial valuation, and the denominator of the fraction shall be the System's total UAAL as set forth in that same actuarial valuation.

**Commentary:** By way of example only, the Scheduled Amortizing Amount in this case would be determined as follows: (1) the Determination Date is June 30, 2004, (2) the Funding Proceeds had been deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2003 actuarial valuation produced a UAAL of $733 million, (4) the City's contribution required to amortize that UAAL is 13.9% of the City's payroll, and (5) the Funding Proceeds are $600 million, then the Scheduled Amortizing Amount for Fiscal Year 2004-05 would be 13.9% times ($600 million/$733 million) times the City's payroll for 2004-2005. This would be 11.4% times the City's payroll for that fiscal year.

Should the Board at some future time adopt a different period for amortizing the System's UAAL (a "Revised Amortizing Period"), the Scheduled Amortizing Amount for ensuing years may change. If the Revised Amortizing Period provides for a longer period during which to amortize the System's UAAL (that is, an "Extended Amortizing Period"), then the Amortizing Period initially used to amortize the applicable Determined Accrued Liability will also be revised. There will then be established a new schedule for amortizing the Determined Accrued Liability, and the Scheduled Amortizing Amount will be based on the level percentage of the City's monthly payroll being equal to what it would be if the then unamortized balance of the Determined Accrued Liability were re-amortized over the Extended Amortizing Period. If the Revised Amortizing Period is changed so that the System's UAAL is to be amortized over a shorter period than the one initially used to amortize the applicable Determined Accrued Liability, then that Scheduled Amortizing Amount will not be changed.

(4) Each year (or monthly portion thereof), when the City is required to make its regular contribution to the System — the amount of which is to be determined pursuant to Subsection (c) and the timing of which is set forth in Section 47-2-19(b) — the Board will transfer the Scheduled Amortizing Amount from the *Accrued Liability Fund* and credit it to the *Pension Accumulation Fund;* provided, however, that this transfer cannot occur unless and the until the Board has been notified pursuant to the Pension Funding Transaction, or any Additional Pension Funding Transaction, if applicable, that the City is current on the service payments required under the applicable Pension Funding Transaction.

(5) Should the Scheduled Amortizing Amount not be available for transfer because of the City's failure to make a timely service payment pursuant to the applicable Pension Funding Transaction, the Board will take any permitted action, including the filing of a civil action against the City, as contemplated in Section 47-4-3(3), to effectuate the transfer of the Scheduled Amortizing Amount.

Should the City's Finance Director certify to the Board by a duly attested notice that the City has no available funds to make the service payments required by the applicable Pension Funding Transaction, in that specific circumstance, the Board shall be authorized to transfer the Scheduled Amortizing Amount for that fiscal year (or monthly portion thereof) to the *Pension Accumulation Fund,* absent the notice requirement set forth in Section 47-2-18(d)(4).

(6) Since the Funding Proceeds are to be considered assets of the System and are intended to fund the applicable Determined Accrued Liability, the City shall be required to make only a proportional contribution for any fiscal year (or monthly portion thereof) ending after the date the

53

Funding Proceeds are deposited into the applicable Accrued Liability Fund, but prior to a fiscal year whose corresponding actuarial valuation includes the Funding Proceeds in the System's total assets. The proportional contribution to fund the System's then existing UAAL, if any, shall be the level percentage of the City's payroll specified in the actuarial valuation for the applicable fiscal year as the City's required contribution needed to amortize the System's then existing UAAL, multiplied by a fraction. The numerator of the fraction shall be the amount of the System's total UAAL as determined in such actuarial valuation minus the amount of the applicable Funding Proceeds, but not less than zero. The denominator of the fraction shall be the amount of the System's total UAAL in such valuation. Actuarial valuations following the deposit of the applicable Funding Proceeds into the System shall include the Funding Proceeds in the total assets of the System to determine any ensuing UAAL of the System, and the Funding Proceeds shall offset any such actuarial liability accordingly.

**Commentary**: By way of example only, the following indicates how the procedure described above would operate. Assume the following facts — (1) the Determination Date is June 30, 2004; (2) the June 30, 2004 actuarial valuation produced a UAAL of $800 million and a contribution toward the UAAL of 16% of the City's payroll; (3) the Funding Proceeds were $600 million and were deposited in the System during the 2004-2005 Fiscal Year; (4) the first actuarial valuation which included the Funding Proceeds in the System's assets was as of June 30, 2005 and (5) the June 30, 2003 valuation which determines the City's required contribution for fiscal 2004-05 produced a total UAAL of $733 million and a contribution toward that UAAL of 13.9% of the City's payroll. Then:

- The fiscal year ending after the date of deposit would be the year ending June 30, 2005, or the 2004-2005 Fiscal Year.

- The first fiscal year whose corresponding valuation reflected the Funding Proceeds in its assets would be the 2006-2007 year.

- Thus, the City's required UAAL contribution for fiscal 2004-2005 would be 13.9% of the City's payroll times ($733 million — $600 million) divided by $733 million, or 2.5% of payroll. The City's required UAAL contribution for fiscal 2005-06 would be 16% of the City's payroll times ($800 million — $600 million) divided by $800 million, or 4% of the City's payroll.

- Beginning with the Fiscal Year 2006-2007, whose contribution is determined by the June 30, 2005 actuarial valuation, the City's required UAAL contribution would be the percentage of its payroll developed in the corresponding actuarial valuation that included the Funding Proceeds as being part of the System's assets.

(7) Any contribution the City has made to the System for any fiscal year during which the Funding Proceeds from any applicable Pension Funding Transaction have become assets of the System. Where the amount of the contribution is equal to or less than the normal cost of that fiscal year, the City's contribution shall be deemed to have been made in satisfaction of its obligation to contribute an amount equal to the System's normal cost for that fiscal year, and not as payment towards any portion of its obligation to pay an amortized portion of the System's UAAL due in that fiscal year. The term "normal cost" as used in this Section 47-2-18(d)(6), shall be given its generally accepted actuarial meaning.

To the extent the City's contribution for that fiscal year exceeds its required contribution for normal cost owed in that fiscal year, its excess contributions shall be deemed as having been made for the immediately following fiscal year, and shall offset the City's normal cost contribution obligation for the immediately following fiscal year.

**Commentary**: By way of example only, the following indicates how the procedure described in the preceding paragraphs would operate. Assuming the same facts as in the prior *Commentary*, and the City contributed $40 million for the 2004-2005 Fiscal Year and the total normal cost for that year was $40 million:

54

- The entire $40 million would be deemed as payment of the required normal cost for 2004-2005, and

- No part of the $40 million contribution would be deemed payment toward UAAL.

Now assume that the facts remain the same, but that the City had contributed a total of $45 million for 2004-2005:

- The City's total required contribution for 2004-2005 would be deemed paid in full, and

- $5 million, that is, $45 million minus $40 million, would be deemed prepayment of the City's required normal cost for 2005-2006 and its required normal cost contribution for 2005-2006 would be reduced accordingly.

(8) The System's auditor shall verify that (a) the assets credited to the *Pension Accumulation Fund* and any *Accrued Liability Fund* at the beginning and end of each fiscal year, (b) that each Fund had been properly credited, and (c) that transfers from the *Accrued Liability Fund(s)* to the *Pension Accumulation Fund* had occurred as intended under this Section 47-2-18(d) of this Code.

(9) Should the System's auditor certify that the total assets then existing in the System, not including the assets in any *Accrued Liability Fund*, together are insufficient to pay the benefits then due under the System, the System's auditor will then determine and certify the minimum amount needed to fund the benefits then due and owing (the "Minimum Necessary Amount"). In this limited circumstance, the Board is authorized to transfer the Minimum Necessary Amount from the *Accrued Liability Fund* to the *Pension Accumulation Fund* absent the notification required pursuant to Section 47-2-18(d)(4) of this Code.

(10) At the end of the Amortizing Period, or the end of the Extended Amortizing Period, if applicable, should there be any moneys that remain credited to the *Accrued Liability Fund,* the Board may transfer, at its discretion, any such remaining moneys, in whole or in part, by crediting them to the *Pension Accumulation Fund. The Pension Accumulation Fund* is the only Fund into which the remaining moneys credited to any *Accrued Liability Fund* may be transferred.

(e)  *Pension Reserve Fund.[133]*  The Pension Reserve Fund shall be the fund from which pensions shall be paid to ~~retirees and~~ beneficiaries.  Should a ~~Disability Retiree~~disability retiree be reinstated to active service, the ~~Retiree~~retiree's ~~pension reserve~~Pension Reserve at that time, shall be transferred from the Pension Reserve Fund to the Pension Accumulation Fund.

(f)  *Expense Fund.[134]*  The Expense Fund shall be the fund to which shall be credited all money provided by the City to pay the administrative expenses of the Retirement System, and from which shall be paid all the expenses necessary in connection with the administration and operation of the Retirement System.

(g)  *Income Fund.[135]*  The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the Retirement System (other than those derived from the investments credited to any Accrued Liability Fund), all gifts and bequests received by the Retirement System, and all other moneys the disposition of which is not specifically provided for in this Article E.  There shall be paid or transferred from the Income Fund, all amounts required to credit ~~Regular Interest~~regular interest to the various Funds of the Retirement System, except for the Accrued Liability Fund which is to be credited with interest, dividends and other earnings pursuant to Section ~~47-2-18~~E-18(d)(2) of this ~~Code~~Component II of the Combined Plan in accordance

55

with the limitations that are contained in Section 47-1-18E-18 of this CodeComponent II of the Combined Plan.

(h)     *Maintenance of Reserves.*[136]

(1)     The maintenance of proper reserves in the various Charter-based fundsFunds of the Retirement System within this *Article II* except the Expense Fund are hereby made obligations of the Pension Accumulation Fund.

(2)     City contributions to the Retirement System to the extent necessary to provide pensions on account of membersMembers who are employees of a revenue-supported division of the City shall be made from the revenues of the said division.  Any City contribution to the Retirement System from any Fund by law with a certain and definite purpose shall, at the direction of the Finance Director, be accounted for separately.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 03-05, § 1, 2-4-05; Ord. No. 37-11, § 1, 11-29-11)

**Sec.     B-E-19.     [Formerly     Sec.     47-2-19.     Determination     of     City's     annual contribution.[137]]Annual Contribution**

(a)     For the period ending June 30, 2023, the City shall make only those contributions to the Retirement System as are set forth in the Plan of Adjustment.

The(b)     For Fiscal Years beginning on and after July 1, 2023, the annuity and pension reserve liabilities for membersMembers, retirees, and beneficiaries, shall be actuarially evaluated as set forth in this Article for each division as is accounted for separately pursuant to Section 47-2-18E-18(gh)(2) of this CodeComponent II of the Combined Plan.

(a1)     *Pension Liabilities.*[138]

(1)a.     The pension liabilities for membersMembers shall be determined by the Actuary using the entry age normal cost method ofreasonable and appropriate actuarial valuationassumptions approved by the Board and the Investment Committee.

(2)     The City's annual contribution, expressed as a percentage of active member compensation, to finance the prospective pension liabilities shall be determined by dividing the total cost of the individual annual normal costs of the active members by the active members' annual compensation used in the valuation.

(3)b.     The City's annual contribution to finance any unfunded accrued pension liabilities, expressed as a percentage of active memberemployees' compensation, shall be determined by amortizing such unfunded accrued pension liabilities as a level percentage of covered payrollsuch compensation over a period or periods of future years as established by the Board and approved by the Investment Committee.

56

(b2)   *Pension Accumulation Fund.*[139]   Based upon the provisions of this Article E including any amendments, the Board of Trustees shall compute the City's annual contributions to the Retirement System, expressed as a percentage of active member Member compensation each fiscal year Fiscal Year, using actuarial valuation data as of the June thirtieth date which date is a year and a day before the first day of such fiscal year Fiscal Year.  The Board shall report to the Mayor and Council the contribution percentages so computed.  Such contribution percentages shall be used in determining the contribution dollars to be appropriated by Council and paid to the Retirement System.  Such contribution dollars shall be determined by multiplying the applicable contribution percentage for such fiscal year Fiscal Year by the member Member compensation paid for such fiscal year Fiscal Year.  Such contribution dollars for each fiscal year Fiscal Year shall be paid to the Retirement System in such fiscal year Fiscal Year in a manner to be agreed upon from time to time by the Board and the City, provided, for any fiscal year Fiscal Year for which the an agreement has not been reached before the first day of such fiscal year Fiscal Year, such contribution dollars shall be paid in equal monthly installments at the end of each calendar month in such fiscal year Fiscal Year.

## ARTICLE F. PARTICIPANT LOAN PROGRAM

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-11, § 1, 11-29-11)

### Sec. B-20. [Formerly Sec. 47-2-20. Management of Funds.[140]]

(a) *Board Named Trustee for Various Funds.[141]* The Board shall be the Trustee of the funds of the *1973 Defined Benefit/Defined Contribution (Annuity) Plan* of the Retirement System, the Board shall have the full power to invest and reinvest such funds subject to all terms, conditions, limitations, fiduciary duties, and restrictions imposed by *The Public Employee Retirement System Investment Act,* as amended[142], provided, that notes, bonds, or obligations of the City shall not be subject to said restrictions or limitations. The Board shall have the power to purchase notes, bonds, or obligations of the City before or after the same are offered to the public and with or without advertising for bids.

(b) *Purchase, sale, etc., of securities and investments.[143]* The Board shall have full power to hold, purchase, sell, assign, transfer, and dispose of any of the securities and investments of the Retirement System, as well as the proceeds of said investments and any moneys belonging to the System.

(c) *Annual interest.[144]* The Board annually shall allow Regular Interest on the mean balance in each of the Funds of the Retirement System, except the *Income Fund* and the *Expense Fund.* The amounts so allowed shall be due and payable to said Funds, and shall be annually credited thereto from interest and other earnings on the moneys and investments of the System; provided, however, that moneys, including all investment earnings, credited to any *Accrued Liability Fund* shall not be credited to other Funds in the System, unless and until such moneys have been transferred from the applicable *Accrued Liability Fund* to the *Pension Accumulation Fund.*

(d) *Custodian of Funds.[145]* The City Treasurer or other person or entity designated by the Board of Trustees of the General Retirement System shall be the custodian of the Funds of the Retirement System. All payments from such Funds shall be made by the Treasurer or other designated custodian. Payments made by the *General Retirement System* shall be based upon vouchers signed by two persons designated by the Board. A duly attested copy of a resolution of the Board designating such persons and bearing upon its face specimen signatures of such persons, shall be filed with the Finance Director and the custodian of the Funds as their authority for making payments upon such vouchers. No voucher shall be drawn unless it shall have been previously authorized by a specific or continuing resolution adopted by the Board.

(e) *Available Funds shall be kept upon deposit.[146]* Available funds shall be kept on deposit for the purpose of meeting disbursements for pensions, annuities, and other payments.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 03-05, § 1, 2-4-05)

### Sec. B-21. [Formerly Sec. 47-2-21. Detroit Housing Commission Employees; Transfer of Pension Accumulation Funds to the Municipal Employees Retirement System.]

(a) Pursuant to MCL 125.651, and action by the City of Detroit as interpreted by the Michigan Courts,[162] the "City of Detroit Housing Commission" has been reconstituted as a separate and distinct legal entity, the "Detroit Housing Commission" ("new entity");

(b) City employees previously assigned to the "City of Detroit Housing Commission" ("old entity") had a right to make an election whether to remain as a City of Detroit employee or leave City employment for employment with the separate and distinct legal entity "Detroit Housing Commission" ("new entity");

58

(c) Former City employees previously assigned to the "City of Detroit Housing Commission" ("old entity") who have made an election to remain with the new entity "Detroit Housing Commission" terminated their employment with the City of Detroit upon becoming an employee of the new independent entity "Detroit Housing Commission;"

(d) Those former City of Detroit Housing Commission employees were participants in the City of Detroit *1973 Defined Benefit Plan* and were eligible to participate in the *Defined Contribution (Annuity) Plan* of the *General Retirement System* (DGRS);

(e) Each former City of Detroit Housing Commission employee as a participant in the City of Detroit *1973 Defined Benefit Plan* accrued certain potential rights to *Defined Benefit Plan* benefits;

(f) The "Detroit Housing Commission" ("new entity") has arranged for the Municipal Employees Retirement System ("MERS") to be the provider of a pension system for its employees;

(g) The current Detroit Housing Commission ("new entity") employees, including former City employees, are now participants in the Municipal Employees Retirement System ("MERS");

(h) The City of Detroit, subject to certain conditions, has agreed to the transfer of the actuarial value of the accrued *Defined Benefit* of each such former City employee who elected to become an employee of the new independent "Detroit Housing Commission" to the Municipal Employees Retirement System.

(i) The conditions of such transfer of funds contemplated in paragraph (h) above are:

(1) The benefits for such employees have been 100% funded in the *1973 Defined Benefit Plan* of the General Retirement System of the City of Detroit.

(2) Upon the transfer of said funds to the MERS from the *1973 Defined Benefit Plan* of the City of Detroit, such former City employees will have no claims whatsoever to pension benefits from the General Retirement System of the City of Detroit or the City of Detroit.

(3) Each such former employee must sign a Waiver and Acknowledgment (the content of which is subject to approval of the Board of Trustees of the General Retirement System of the City of Detroit) consistent with the terms of this ordinance.

(4) Present value calculations and methodology shall be approved by the Board of Trustees of the General Retirement System after consultation with its actuary.

(5) All questions/issues related to the implementation of this ordinance shall be determined by the Board of Trustees of the General Retirement System of the City of Detroit consistent with the terms of this ordinance.

(Ord. No. 06-06, § 1, 2-17-06)

## Sec. B-22. [Formerly Sec. 47-2-22. Participant loan program.]F-1. Established.

(a) *Established.* Any loans granted or renewed shall be made pursuant to a Participant Loan Program which shall conform with the requirements of Section 72(p) of the Internal Revenue Code, 26 U.S.C. 1 et seq. Such loan program shall be established in writing by the Board of Trustees, and must include, but need not be limited to the following:

(1) The identity of the administrator of the Participant Loan Program;

59

(2) A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

(3) The procedures under the program for determining a reasonable rate of interest; and

(4) The events constituting default and the steps that will be taken to preserve plan assets.

(b) **Sec. F-2.** **The Loan Program.**

(1) This Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the ~~City of Detroit General~~ Retirement System for prospective participants in the ~~program~~Loan Program. The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program. Copies of the rules shall also be made available to prospective ~~participating members of the system~~Members in the offices of the ~~General~~ Retirement System; and

(2) All collective bargaining agreements which accept the terms of this section are specifically agreeing to be subject to the ~~Boards~~Board's authority to modify or amend the Participant Loan Program from time to time, including during the effective terms of the applicable labor agreement and no such modification or amendment shall be deemed a violation of said labor agreement and no grievance or other form of action shall be effective to overturn or alter the ~~Boards~~Board's decision.

**Sec. F-3. Eligibility.**

(c) *Eligibility.* Subject to rules and procedures established by the Board, loans will initially be made only to non-union ~~participants~~Members of the ~~General~~ Retirement System. Union employees will be eligible when their respective bargaining unit has accepted the ~~program.~~[ii]Loan Program. Former ~~participants~~Members, spouses of ~~participants~~Members, and beneficiaries are not eligible to receive any loans from the ~~Plan~~Retirement System. Subject to rules and procedures established by the Board, a ~~participant~~Member who has been in the ~~plan~~Combined Plan for twelve (12) months or more is eligible to apply for a loan ~~from this plan.~~under this Component II. No Member shall have more than two outstanding loans from the Retirement System (Component I and/or Component II) at any time. A Member who has previously defaulted on a loan (under either Component I or Component II) shall not be eligible for a loan from the Retirement System.

**Sec. F-4. Amount of Loan.**

(d) *Amount of Loan.* A ~~participant~~Member who has satisfied applicable rules and procedures may borrow from his or her account an amount, which does not exceed fifty percent (50%) of the ~~participants~~Member's vested accumulated balance, or ten thousand dollars ($10,000.00) reduced by the excess, if any, of: 1) the highest outstanding balance of loans from the ~~trust~~Retirement System (both Component I and Component II) during the one (1) year period

---

[ii] ~~The following bargaining units have accepted the annuity loan program: CBA-3 (§ 53.), CBA-6 (§ 44.), CBA-7 (§ 44.), CBA-8 (§ 40.), CBA 9 (§ 43.), CBA 10 (§ 48.).~~

~~60~~

ending on the day before the date on which the loan is made, or 2) the outstanding balance of loans from the ~~trust~~Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be one thousand dollars ($1,000.00).

## Sec. F-5.  Terms and Conditions.

~~(e)~~ *~~Terms and Conditions.~~* In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(1)  Loan applications shall be in writing;

(2)  Loans shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period;

(3)  Each loan shall be made against the assignment of the ~~participants~~Member's entire right, title, and interest in and to the ~~trust~~Retirement System, supported by the ~~participants~~Member's collateral promissory note for the amount of the loan, including interest payable to the order of the ~~trustee~~Board of Trustees;

(4)  Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among ~~participants~~Members in its determination of interest rates on loans. Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the ~~pension systems~~Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the ~~pension trust~~Retirement System of administering the ~~trust~~Combined Plan.  The loan interest rate shall be calculated in a manner that will not negatively affect the ~~City's~~Employers' costs with respect to the ~~trust~~Retirement System or the investment return ~~to trust members~~allocated to Members;

(5)  Loan repayments shall be suspended under this plan as permitted by Section 414(u)(4) of the Internal Revenue Code~~, 26 U.S.C. 414(u)(4)~~.  A participant who has an outstanding loan balance from the plan who is absent from employment with the employer, and who has satisfied the requirements of ~~26 USC~~Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the ~~fund~~Retirement System during said periods of absence.

## Sec. F-6.  Renewal of Loan.

(f)        *Renewal of Loan.* Any loans granted or renewed shall be made pursuant to the participant loan program Participant Loan Program and Section 72(p) of the Internal Revenue Code, 26 U.S.C. 72(p) and the regulations thereunder.

## Sec. F-7.  Loan Balance.

(g)        *Loan Balance.* A participants Member's outstanding loan balance shall be considered a directed investment by the participant Member and interest payments, shall be credited to the participants Member's account balance, and shall not be part of net investment income or part of the participants Member's account balance for the purpose of allocation of net investment income under Section 47-2-18 of this Code the Retirement System.

## Sec. F-8.  Distributions.

(h)        *Distributions.* No distributions shall be made to a participant Member, former participant Member, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

## Sec. F-9.  Annual Report.

(i)        *Annual Report.* The General Retirement System shall include, in their its annual report to all members Members, an accounting of the loan program Loan Program established by this section Article F, which contains the number and amount of loans made under this Component II, the costs of administering the program Loan Program under Component II, the amount of payments made including interest received by Component II of the trust Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that fiscal year Fiscal Year covered the costs of administering the program Loan Program maintained under this Component II.

62

## ARTICLE G.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS

### Sec. G-1.  Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment

Notwithstanding anything in Articles A, C, D or E of Component II to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following provisions to comply with the terms of the Plan of Adjustment shall be implemented:

(Ord. No. 17-08, § 1, 7-29-08))  *Reduction in monthly pension payments.*

    a.    For a retiree or a surviving beneficiary who is receiving a monthly pension benefit as of the effective date of the Plan of Adjustment, as soon as practicable following such effective date such retiree's or surviving beneficiary's monthly pension benefit will be reduced to an amount that is equal to 95.5% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment ("Adjusted Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then such retiree's or surviving beneficiary's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment.

    b.    The Frozen Accrued Benefit that will be paid as a monthly Retirement Allowance upon the retirement or death of an active employee Member or a vested former employee Member on or after the Effective Date, will be reduced to an amount that is equal to 95.5% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1 ("Adjusted Deferred Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on an annual basis that the "Funding Conditions" as defined herein have been satisfied, and in the event such Funding Conditions have not been satisfied then such active employee Member's or vested former employee Member's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1.

63

c. *Cap on Benefit Reductions for Certain Retirees.* With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, such retiree's or surviving beneficiary's Adjusted Accrued Benefit, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

For purposes of this Sec. G-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2) *Elimination of Pension Improvement Factor.* For all pension benefits payable after the Effective Date, the Pension Improvement Factor (Escalator) that will be applied to the monthly Adjusted Accrued Benefit or Adjusted Deferred Accrued Benefit of a Member, retiree, surviving beneficiary or vested former employee will be equal to 0%.

(3) *Recoupment of Excess Returns on Annuity Savings Fund Account.* The terms of Section G-2 Annuity Savings Fund Recoupment shall apply to the Annuity Savings Fund account of Members, retirees and vested former employees as provided in Section G-2.

(4) *Future Disability Pensions Eliminated.* The Duty Disability Retirement Allowance and Non-Duty Disability Retirement Allowance are eliminated with respect to Members who become disabled on or after July 1, 2014.

(5) *Effect of Payment Default.* In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall automatically reduce the monthly pension benefits payable to Members, retirees, surviving beneficiaries, and former employees to the extent of such default.

**Sec. G-2. Annuity Savings Fund Recoupment**

Notwithstanding anything in Articles A, B, C, D or E to the contrary, upon the effective date of the Plan of Adjustment, Members, retirees or vested former employees who were identified by the City as a Class 11 Holder under the Plan of Adjustment and who participated in the Annuity Savings Fund ("ASF") at any time during the period that began on July 1, 2003 and ended on June 30, 2013 ("ASF Recalculation Period") are subject to the following provisions:

(1) *Recoupment from Members, retirees and vested former employees who maintain an Annuity Savings Fund account ("ASF account") as of the Effective Date.* For

64

each Member, retiree or vested former employee who maintains an ASF account in the Retirement System as of the effective date of the Plan of Adjustment, such individual's ASF account balance will be reduced by such individual's Annuity Savings Fund Excess Amount, as determined by the City in accordance with this Section G-2 (1).

    a.    For a Member, retiree or former vested employee who did not receive any distribution or loan from such individual's ASF account during the ASF Recalculation Period, the Annuity Savings Fund Excess Amount means the difference between the value of such individual's ASF account as recalculated using the Actual Return (as defined in paragraph (3) below) and the actual value of such individual's ASF account as of June 30, 2013; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance relating to the ASF account) during the ASF Recalculation Period.

    b.    For a Member, retiree or vested former employee who during the ASF Recalculation Period has received a distribution (other than a total distribution) or loan from the ASF, the Annuity Savings Fund Excess Amount means the difference between (i) the sum of (A) the value of such individual's ASF account as of June 30, 2013 and (B) all distributions (including any unpaid loans) received by such individual from his or her ASF account during the ASF Recalculation Period, and (ii) the value of such individual's ASF account as of June 30, 2013 as recalculated using the Actual Return; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loans made to the individual) during the ASF Recalculation Period.

(2)    *Recoupment from Members, retirees and former employees who previously took total Annuity Savings Fund account distributions.*  Except as provided in paragraph (4) below, for each Member, retiree or vested former employee who has received a total distribution of the individual's ASF account during the ASF Recalculation Period, the individual's monthly pension benefit (and the survivor monthly pension benefit payable to the Member's survivor, if any) will be reduced by the individual's "Monthly Annuity Savings Fund Excess Amount" as determined by the City in accordance with this Section G-2(2).

    **[Formerly Secs. 47-2-23—47-2-30. Reserved.]**

**ARTICLE C.  [FORMERLY ARTICLE III. 1998 DEFINED CONTRIBUTION PLAN OF THE GENERAL RETIREMENT SYSTEM.] [##]**

**Sec. C-1.  [Formerly Sec. 47-3-1. Funds.]**

The Funds of the Retirement System *1998 Defined Contribution Plan* shall be the *Employee Contribution Account,* the *Employee Rollover Account,* the *Employer Contribution Account,* the *Annuity Savings Account,* and such other accounts as may become necessary from time to time.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. C-2.  [Formerly Sec. 47-3-2. Definitions.]**

Definitions contained in this Article shall not be construed as amending or repealing existing definitions contained in Section 47-1-21 of this Code unless specified herein. For purposes of this *Article III* only, the following words and phrases shall have the meanings respectively ascribed to them by this Section 47-3-2 of this Code.

*Accumulated balance* means the total of all accounts maintained on behalf of a participant, former participant, or beneficiary.

*Actuarial present value of credited benefits* means the present value of pension benefits determined as if the member had terminated *DGRS* membership on the measurement date. The calculation of the actuarial present value of benefits shall be based solely on interest and mortality assumptions approved by the Board after consideration of the advice of the System's Actuary.

*Administrative Rules of the plan* means the rules and regulations established and adopted from time to time by the Board of Trustees to govern the administration and the operation of this plan and the trust.

*Annual additions* means for each limitation year, which is the calendar year, all employer or employee contributions to the plan (including after-tax employee contributions but excluding rollover contributions), forfeitures, contributions, allocated to an individual medical account described in Section 415(l)(2)[147] of the Internal Revenue Code and amounts described in Section 419A(d)(2)[148] of the Internal Revenue Code.

*Annuity Savings Account* means the account established for a participant with respect to such participant's interest, in the plan as a result of the participant's election to transfer his annuity savings fund balance from the *1973 Defined Benefit/Defined Contribution Plan* to this plan pursuant to Section 47-3-3 of this Code.

*Beneficiary* means a person or persons designated by a participant or former participant in a writing filled with the Board to receive distribution of the accumulated balance in the event of the death of the participant or former participant, subject to the terms and conditions of Section 47-3-9(b) of this Code.

*Coverage group* means all elected and appointed officials of the employer as defined in Section 47-3-21 of this Code, all non-union employees as defined in Section 47-1-21 of this Code, as well as any other employees who are members of a bargaining unit represented by a union or association if such union or association has agreed to offer its members the option of belonging to the current *Article II* Plan or the *1998 Defined Contribution Plan* established under this Article III.

*Defined Contribution Plan Implementation Date* means that date after the *1998 Defined Contribution Plan* is established on which the Plan is open for participation by eligible members.

*Designated Component Funds* means asset allocation funds set up by the trustee which invests participant funds, until the participant elects specific investment funds.

**##  The 1998 Defined Contribution Plan of the General Retirement System was never implemented by the City of Detroit.**

*Effective Date of the 1998 Defined Contribution Plan* means July 1, 1998, *See, Defined Contribution Plan Implementation Date.*

*Employee Contribution Account* means the account established for a participant with respect to such participant's interest in the Plan resulting from the participant's contributions made pursuant to Section 47-3-5 of this Code.

*Employee Contributions—"Picked Up" by the Employer.* Employee contributions are "picked up" by the employer if: (1) the employer specifies that the contributions, although designated as employee contributions, are being paid by the employer in lieu of contributions by the employee, and (2) the employee cannot be given the option of choosing to receive the contributed amounts directly instead of having them paid by the employer to the plan.

*Employee Rollover Account* means the account established for a participant with respect to such participant's interest in the Plan resulting from transfers from other qualified plans pursuant to Section 47-3-7 of this Code.

*Employer,* for the purposes of the provisions of this *Article III* Plan, means the City, or any board, commission, or court serving the City, to the extent that both the City through action of its council and the governing authority of such Board, commission, or court, shall mutually agree to include the employees of such Board, commission, or court, in the Coverage Group for this plan. To the extent that any employees of a Board, commission, or court, are included as members of the Coverage Group for this Plan, all employees of such board, commission, or court, shall be so included. However, only City board members and commissioners who are also employees of the City are eligible to be included in the coverage group of this plan, unless otherwise specifically provided for by ordinance or resolution adopted by the Council.

*Employer Contribution Account* means the account established for a participant with respect to such participant's interest in the Plan resulting from employer contributions made pursuant to Section 47-3-4 of this Code and from the participant's election to transfer the actuarial present value of credited benefits of such individual from the *1973 Defined Benefit/Defined Contribution Plan* to this Plan pursuant to Section 47-3-3 of this Code.

*Fiduciary* means the Board of Trustees or the Fund Financial Investment Trustee.

*Financial Investment Trustee* means the Trustee approved by the Board of Trustees, or such successor Trustee as selected by that Board, which shall be responsible for the investment, management and control of the assets of the trust.

*Former Participant* means an individual who is no longer eligible to be a participant.

*Measurement date* means the date of the member's termination or transfer from the *1973 Defined Benefit Plan* to the *1998 Defined Contribution Plan.*

*Participant* means an employee who is a member of the coverage group and who has satisfied the requirements of Section 47-3-3 of this Code.

*Plan* means the *1998 Defined Contribution Plan* of the City of Detroit General Retirement System.

*Plan Year* means the City's fiscal year.

*Resignation* means, for all purposes in this *Article III,* in the case of an elected or appointed official, resignation from office, or the expiration of the term of office or of the appointment.

*Termination of employment* means, for all purposes in this *Article III,* in the case of an elected or appointed official, any circumstance which results in separation of the official from the elected or appointed office, whether voluntary or involuntary, including voluntary resignation, expiration of the term of office or of the appointment, involuntary termination of employment or office or forfeiture of office.

*Trust* means the City *Defined Contribution Retirement Trust* maintained in accordance with the terms of the Trust Agreement, as amended, which constitutes part of this plan.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. C-3. [Formerly Sec. 47-3-3. Participation.]**

(a)   Election of the Plan. Current DGRS members.

(1)   Any member of the *DGRS* who is also a member of the Coverage Group and who continues to be a member of the Coverage Group may become a participant in the *1998 Defined Contribution Plan* if such individual elects to transfer to the Trust of the Plan, both the A Monthly Annuity Savings Fund balance and the actuarial present value of credited benefits of such individual under the *1973 Defined Benefit/Defined Contribution (Annuity)* Plan. Such irrevocable election must be made within twenty-four months of the implementation date of the *1998 Defined Contribution Plan.* The Annuity Savings Fund balance and the actuarial present value of credited benefits of an individual under the 1973 Defined Benefit/Defined Contribution Plan who elects to make a transfer to this Plan shall be transferred to this Plan on a date which shall in no event be later than one hundred and twenty days after receipt Excess Amount means the difference between (i) the value of the ASF account of a Member, retiree or vested former employee as of the date of distribution to such individual from the ASF, provided such date falls within the ASF Recalculation Period, and (ii) the value of the individual's written election by the Board ASF account as of such date, as recalculated using the Actual Return; provided, however, that such individual shall become a participant in this Plan as soon as administratively feasible following receipt of the Individual's written election by the Board such difference shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance) during the ASF Recalculation Period; provided, further, such amount will be converted into a monthly annuity amount based on the individual's life expectancy, gender and, if the Member has not already retired, the expected date of retirement.

(23)   The actuarial present value of credited benefits shall be calculated based upon the interest and mortality assumptions utilized at the date of such transfer upon the advice of the System's Actuary for purposes of determining the employer's annual contribution to the *1973 Defined Benefit/Defined Contribution Plan.* The actuarial present value of the participant's credited benefits under the *1973 Defined Benefit/Defined Contribution Plan* shall be transferred to the participant's Employer Contribution Account under this Plan and the participant's *Recoupment from Members, retirees and former employees who received partial* Annuity Savings Fund balance under the *1973 Defined Benefit/Defined Contribution Plan* shall be transferred to the participant *account distributions.* A Member, retiree or vested former employee who previously received a distribution of a portion but not the entirety of the Member's Annuity Savings Account under this Plan. After any such transfer to this Plan, the participant's account balances shall be subject to the vesting schedules set forth in Section 47-3-8 paragraph (1) to the extent of any funds then credited to the Member's Annuity Savings Fund account and shall be subject to paragraph (2) to the extent of any Excess Amount that cannot be recovered pursuant to paragraph (1).

(4)   *Cash repayment option.* Notwithstanding paragraphs (2) and (3) above and subject to the Cash Option Cap described below, a Member, retiree, employee or former employee whose monthly pension benefit will be reduced pursuant to paragraph (2) or (3) may elect to make a single lump sum cash payment to the Retirement System of the Annuity Savings Fund Excess Amount by cashier's

68

check or wire transfer ("Cash Repayment Option"). Each individual eligible for the Cash Repayment Option shall be provided by first-class U.S. mail an election notice and an election form no later than seven days following the Effective Date. The individual shall have thirty-five days from the date on which the election form is mailed to return the election form as directed on the form. An election of the Cash Repayment Option shall be effective only if it is received by the deadline set forth on the election form.

No later than fourteen days following the election deadline, the Board shall notify each individual who timely elects the Cash Repayment Option of the amount to be repaid to the Retirement System ("Final Payment Notice"). Such amount must be paid to the Retirement System on or before the later of (i) ninety days after the Effective Date, or (ii) fifty days following the date on which the Final Payment Notice is mailed to the individual.

If payment is not timely received, the monthly pension benefit of an individual who elects the Cash Repayment Option shall be reduced as provided in paragraph (2) or (3).

The Cash Repayment Option shall be limited to an aggregate amount of $30 million (the "Cash Option Cap"). In the event the Retirement System receives timely and properly completed election forms representing an aggregate recovery amount in excess of the Cash Option Cap, then each individual who made a timely election of the Cash Repayment Option shall be permitted to repay an amount equal to his pro rata share of the Cash Option Cap. Any Annuity Savings Fund Excess Amount that is not repaid under the Cash Repayment Option shall be repaid as provided in paragraph (2) or (3).

(5) *Definition of Actual Return.* "Actual Return" means the actual net return percentage on the Retirement System's invested assets for each Fiscal Year during the ASF Recalculation Period; provided, however, that for any such Fiscal Year the net return shall not be greater than 7.9% nor less than 0%.

(6) *Limitation on recoupment.* Notwithstanding anything in this Section G-2 to the contrary:

    a. a Member's ASF account value after recoupment of the Member's Annuity Savings Fund Excess Amount will never be less than the contributions made to the ASF by such Member and will reflect all interest credited by the Board to the Member's ASF account for the Fiscal Years ending prior to July 1, 2002; and

    b. in no event shall the amount recovered from a Member described in Section G-2(2) (or G-2(3), with respect to amounts that may not be recovered pursuant to Section G-2(1)) exceed the Member's Annuity Savings Fund Excess Amount plus interest on such amount at a rate of 6.75%. Upon the Member's repayment of such amount in full, the

69

Member's monthly pension benefit in effect immediately prior to adjustment as provided in Section G-2(2) (adjustment as provided in Section G-1), increased as provided in Section G-4, if applicable, shall be fully restored.

(7) *Cap on benefit reductions for certain retirees.* With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, the Adjusted Accrued Benefit of such retiree or surviving beneficiary, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

Annuity Savings Fund Excess Amounts of Members described in paragraphs (1) and (3) shall be transferred from the Annuity Savings Fund to the Pension Accumulation Fund and shall be used to pay pensions and other benefits to Members as provided in Component II of the Combined Plan.

## Sec. G-3.  Income Stabilization Benefits

(1) The provisions of this Section G-3 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer.

(2) Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section G-3, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i)  the amount needed to restore an Eligible Pensioner's reduced annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013.  The Income Stabilization Benefit as determined under this Section G-3(2) will not increase after the date on which the Income Stabilization Benefit is determined.  The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3) To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section G-3) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section G-3 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

70

a. The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

b. An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the pension benefit paid to the Eligible Pensioner from the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Accrued Benefit that is payable to the Eligible Pensioner for that year as determined under Section G-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section G-4; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4) A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners. Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section G-3 (7).

(5) For purposes of this Section G-3, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section G-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

a. An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such

substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

b.    The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion.  The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board.  The Board, with the assistance of the Investment Committee, shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

c.    After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

d.    An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death, or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6)    For purposes of this Section G-3, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

(7)    In the event that in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System.  The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8)    In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System.

**Sec. G-4.  Restoration of Pension Benefits**

72

The following rules shall govern how accrued pensions, including Pension Improvement Factor ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re. City of Detroit, Michigan*, Case No. 13-53846. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1)     *Waterfall Classes.*

There will be three Waterfall Classes:

    a.     Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries.

    b.     Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

    c.     Waterfall Class 3 – All other Members who as of June 30, 2014 are not in retirement benefit pay status.

(2)     *Restoration of Benefits Through June 30, 2023.*

    a.     Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (investment and administrative), future Employer contributions as set forth in the Plan of Adjustment (subject to the conditions in the Plan of Adjustment) and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 70% funded ratio, the Restoration Target will be a 75% funded ratio, and the Restoration Reserve Suspension Trigger will be a 71% funded ratio, all projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Actuary projects that the projected Funded Level as of June 30, 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 75%), a credit of assets for bookkeeping purposes will be made into a new notional "Restoration Reserve Account". The notional credit will be in an amount equal to the excess of

73

assets above the amount projected to be needed to satisfy the Restoration Target.  Once the Restoration Reserve Account is established, each year thereafter, Restoration Reserve Account assets will be credited with interest in an amount equal to the net return on Retirement System investments, but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the Pension Reserve Fund.

b.  To the extent that the City's (including DWSD or a successor authority) actual contributions in any of the Fiscal Years 2015 through 2023 are less than the contributions provided for in the Plan of Adjustment, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c.  Actual restoration payments and credits will work as follows: each year in conjunction with preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore a portion of the 4.5% across the board pension cuts in one or more minimum incremental amounts equal to ½% of the monthly benefit for each member of Waterfall Class 1 (i.e. reducing the initial across the board cut to 4.0%).  This restoration only occurs if the funding level in the Restoration Reserve Account can fund 100% of each incremental increase over the remaining actuarially projected lives of the eligible recipients in Waterfall Class 1.  If the Restoration Reserve Account satisfies the required funding level, then in the next Fiscal Year, actual restoration payments will be made to Waterfall Class 1 members in amounts equal to the benefit associated with each increment that have been fully funded in the Restoration Reserve Account.  Once Waterfall Class 1 has sufficient assets in the Restoration Reserve Account to fully fund and restore the 4.5% cut in their monthly benefits, and to the extent that additional assets in the Restoration Reserve Account remain and will fully fund at least ½% of the monthly benefit for each member of Waterfall Class 2 over their remaining actuarially projected lives, then Waterfall Class 2 members will receive pension restoration in minimum ½% benefit increments until an amount equal to the 4.5% cuts in their monthly benefits has been fully funded.  At that juncture, and to the extent that additional assets in the Restoration Reserve Account remain and will fund at least a minimum ½% of the monthly benefit of each member in Waterfall Class 3 over their remaining actuarially projected lives, then each such member of Waterfall Class 3 shall receive a credit granting them a right upon retirement to receive pension restoration equal to the benefit increments that are fully funded.  Restoration payments will be calculated and paid on a prospective basis only.

74

d.     After the full 4.5% across the board pension cuts are restored for all three Waterfall Classes, and to the extent there are additional assets in the Restoration Reserve Account to fully fund COLA benefits over the actuarially-projected lives of the eligible recipient Waterfall Class, such assets will be used to fully fund and restore a portion of the COLA values that were eliminated as part of the Plan of Adjustment. COLA will be restored in minimum 10% COLA value increments up to 50% of the future COLA values for each member of Waterfall Class 1 (i.e., a 50% future COLA value will constitute a 1.25% simple COLA), then up to 50% of the future COLA values for each member of Waterfall Class 2, and then up to 50% of the future COLA values for each member of Waterfall Class 3 until all members of the three Waterfall Classes have had 50% of the value of their COLAs fully funded and restored. After 50% of the future values of COLA have been fully funded and restored, and to the extent there are additional assets in the Restoration Reserve Account for each of the three Waterfall Classes, then a second 50% COLA restoration will be made, first to members of Waterfall Class 1, then Waterfall Class 2, and then Waterfall Class 3. Classes will be restored in minimum 10% COLA value increments. Restoration payments will be calculated and paid on a prospective basis only.

e.     If the amounts in the Restoration Reserve Account are sufficient to fully-fund the 4.5% across the board pension cuts for all three Waterfall Classes and 100% COLA restoration for all three Waterfall Classes, then any additional assets in the Restoration Reserve Account shall be used to increase the frozen accrued benefits of active and other Members whose Annuity Savings Fund accounts were diminished as part of the Annuity Savings Fund Recoupment (described in Section G-2), such that they receive treatment equal to the 20%/20% ceiling applied to retirees in pay status under the Plan of Adjustment. If after such pension restoration there are additional assets in the Restoration Reserve Account to fully fund benefit increments over their remaining actuarially projected lives, Waterfall Class 1 members will receive pension restoration in ½% benefit increments of the reductions to their monthly pension due to Annuity Savings Fund Recoupment, and once such pension benefits are restored, Waterfall Class 2 members will receive pension restoration in ½% benefit increments in connection with the reductions to their monthly pensions due to Annuity Savings Fund Recoupment. Restoration payments will be calculated and paid on a prospective basis only

f.     Once restoration payments to applicable retirees and restoration credits to active employees begin, as long as the Restoration Reserve Account continues to have assets sufficient to fund 100% of an incremental pension restoration amount for such Waterfall Class members for their actuarially projected lives, such restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments

(over their actuarially projected lives), falls below 100% for the second or greater increment, the annual amounts to pay such second or other additional increment can continue until the Restoration Reserve Account lacks any assets to fund it.  For example, assume a ½% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019, (i.e., a 1% pension increase).  Assume further that in the following Fiscal Year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment of ½% would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid).  For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

g.　　In the event the Funded Level (not including the assets in the Restoration Reserve Account) falls below 71% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 71% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net investment returns for the Retirement System for the Fiscal Year in question.  Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 70%) then restoration payments and credits in the following year will be modified in the following manner: (1) funds previously credited  to the Restoration Reserve Account will be notionally transferred and credited to the Pension  Reserve Account in sufficient amounts to restore the projected Funded Level in 2023 to 70%; (2) following such transfer, the remaining assets in the Restoration Reserve Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph f.

h.　　Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level as of 2023 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at

76

a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 71%.

(3)  *Restoration of Benefits from July 1, 2023 to June 30, 2033.*

a.  During this period, the Funding Target, the Restoration Target, the Permanent Restoration Targets and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |
| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2033 Permanent Restoration Target
75%, or if greater, 1% more  than 2033 Restoration Target

2033 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for variable restoration payments and credits that applied during the period ending June 30, 2023 shall apply during the period ending June 30, 2033 (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Reserve Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows.  For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 at the then current investment return assumption which is assumed to be net of expenses (administrative and investment) and the applicable actuarial assumptions as utilized in the annual actuarial valuation.  Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL at market value over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the Funding Target set forth above as of 2033.  (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the

77

restoration calculation process.). For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded.

b.     To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account.  In determining pension restoration during the period from Fiscal Year 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Targets.  To the extent that the City's (including for this purpose DWSD or a successor authority) actual contributions in any of the Fiscal Years 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c.     Each year, in addition to the credit of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account assets will be credited with interest  equal to the net return on Retirement System investments, but capped at the then investment return assumption.  In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

d.     In connection with preparation of the actuarial report for Fiscal Year 2028, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, which shall be 75%.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2028 has satisfied  the Permanent Restoration Target (75%), then the amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.  Variable restoration payments will continue to be paid or credited during the period from July 1, 2028 through June 30, 2033 based on the applicable Restoration Target set forth in paragraph a and otherwise in accordance with this Section G-4, notwithstanding whether the Restoration Target during this period is less than the Permanent Restoration Target as of June 30, 2028 of 75%.

78

e.    In connection with preparation of the annual actuarial valuation report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target for 2033, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the amounts in the Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension  Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.    Following receipt of the actuarial reports for 2028, and in the event that the projected Funded Level of the Retirement System as of 2033 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual normal course administrative expenses until 2033 equal to the average annual administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 71%.

(4)    *Restoration of Benefits from July 1, 2033 to June 30, 2043.*

a.    During this period,  the Funding Target,  the Restoration Target , the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
| --- | --- |
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |

79

| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2043 Permanent Restoration Target
75% ,or if greater, 1% more  than 2043 Restoration Target

2043 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Target). For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining  whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

b.    In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the amounts in the Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension  Reserve Account and the applicable payments for the applicable Waterfall Class shall be permanently restored and shall no longer be variable.

(5)    *Modification of the Pension Restoration Program.*

If any time after July 1, 2026, the Investment Committee (by vote of 5 of its 7 members), or the Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement, such that the continued operation of the Pension Restoration Agreement without amendment will: (a) materially harm the long-term economic interests of the City, or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the

80

restoration program, if as of that juncture (and for purposes of applying this subsection 5) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section G-4 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund the Retirement System's frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Pension Restoration Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor of the State of Michigan ("Governor") in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, inter alia, whether or in what manner to amend the Pension Restoration Agreement and this Section G-4.

(b) *Current DGRS Members; Annual election period.* Each calendar year following the implementation date of the *1998 Defined Contribution Plan,* the Board of Trustees shall establish at least one election period for that year during which any member of the *DGRS* who is also a member of the Coverage Group may elect to become a participant in the *1998 Defined Contribution Plan;* such election must be made within twenty-four (24) months of the implementation date.

(c) Election of the Plan. Members who separated from City service on or after July 1, 1998 with vested Article II pension rights. Any person who separated from City service with vested Article II pension rights on or after July 1, 1998, but prior to the implementation of the Plan, may become a participant

81

in this Plan if such individual elects to transfer to the Trust of this Plan, both the Annuity Savings Fund Balance on the date of transfer, and the actuarial present value of the 1973 Defined Benefit Plan credited benefits as of the date of the member's transfer to this Plan, as if such individual were a member of the Coverage Group under (a) above. The Pension Board shall notify each former member of his or her eligibility for the Plan by certified mail. A former member's election to become a participant in the Plan must be made within six months after verification of the receipt of notice by the former member. Such election shall be irrevocable.

(d)    Election of the Plan. Members who separated from City service on or after July 1, 1998, but prior to the implementation of the Plan, without vested pension rights under Article II. Any person who separated from City service on or after July 1, 1998, but prior to the implementation of the Plan, without vested pension rights under Article II, may become a participant in this plan if such individual elects to transfer to the trust of this Plan, both the Annuity Savings Fund balance on the date of transfer and the actuarial present value of the 1973 Defined Benefit Plan credited benefits, as of the date of the member's transfer to this Plan as if such individual were a member of the Coverage Group under (a) above. The Pension Board shall notify each former member of his or her eligibility for the Plan by certified mail. A former member's election to become a participant in the Plan must be made within six months after verification of the receipt of notice by the former member. Such election shall be irrevocable.

(e)    Employees hired on or after the date of implementation of the Plan.

       *"Election period."* A person who becomes or again becomes a member of the Coverage Group on or after the date of the implementation of the *1998 Defined Contribution Plan* may elect to participate in the *1973 Defined Benefit/Defined Contribution (Annuity) Plan* or the *1998 Defined Contribution Plan.* Such election to participate in the 1998 Defined Contribution Plan may be made at date of hire or during enrollment periods held during the participant's first two years of employment with the City ("Election Period"). Such election shall be irrevocable.

       Participant shall be a member of the 1973 Defined Benefit/Defined Contribution (Annuity) Plan until or unless an election is made to participate in the 1998 Defined Contribution Plan during the enrollment period.

       *Employer* and employee contributions made on the participant's behalf to the *1998 Defined Contribution Plan* shall be invested in the designated component fund(s) until such participant has chosen the investment vehicles in which his or her contributions will be invested. If no such choice is made within six months after the effective date of the participant's participation in the *1998 Defined Contribution Plan,* such contributions shall remain invested in the designated component fund(s) until an appropriate change is processed by the member.

(f)    *Non-eligibility for participation in the Plan.* The following individuals shall not be eligible for participation in the Plan:

       (1)    *Contractual services.* Individuals whose services are compensated pursuant to a personal services contract or on another contractual or fee basis, and who are not members of the Classified Service[449] or elected or appointed to City positions as provided for in the 1997 Detroit City Charter.

       (2)    *Insufficient annual hours worked.* Individuals who are employed in positions normally requiring less than six hundred (600) hours of work per annum[150] or any other minimum hour requirement provided by collective bargaining agreements, as appropriate.

       (3)    *Retirees.* Individuals who are retirees of the City of Detroit General Retirement *Article II* Pension Plan who return to employment with the City after a break in service of less than six years. However, vested *Article II* retirees returning to work after a break of more than six years of service, may enroll in this *Article III* Pension Plan with no loss of *Article II* Pension Plan benefits.

82

(4) *Members of other public employee plans.* Individuals who are members of any other public employee pension or retirement plan adopted by the State of Michigan, other than the Michigan National Guard, or any of its political sub-divisions, unless there is a reciprocity agreement between the city and such entities.

(g) *Simultaneous participation in other plans prohibited.* On or after the date of implementation of the *1998 Defined Contribution Plan,* a participant shall not take part in any other retirement plan for simultaneous service rendered to the employer unless otherwise provided for in an applicable collective bargaining agreement. This prohibition does not apply to deferred compensation plans established pursuant to Section 457 of the Internal Revenue Code.

(h) Termination of participation in Plan.

(1) *Retirement, death, or termination of employment.* A participant who retires from active service, is terminated from city employment, dies, or becomes ineligible to participate, shall become a former participant beginning on the day immediately following the event that caused the ineligibility.

(2) *Termination for reasons other than duty disability; Re-employment.* Subject to the provisions hereinafter stated in this subpart, if an employee terminates employment and ceases to be a participant for any reason other than duty disability, any service previously credited to the employee for purposes of vesting shall be disregarded. In the event of re-employment by the City as a member of the coverage group, such person shall again become a participant. If such re-employment occurs within a period of six years from and after the date city employment was terminated, prior service shall be restored for vesting purposes during the period of such re-employment. However, such vesting service shall only apply to employer contributions made on behalf of such employee subsequent to the date of re-employment. Vesting service credited after the employee's re-employment shall not be applied to increase his or her vested percentage in his or her pre-break *Employer Contribution Account*.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-03, § 1, 11-7-03)

---

**By Agreement**

Members of the bargaining unit shall have the option of belonging to the City's current defined benefit/defined contribution retirement plan or a new defined contribution retirement plan in accordance with the rules the City will issue for a defined contribution plan. **[All employees hired on or after February 16, 2010 (Local 531) and March 9, 2010 (Local 488) shall be enrolled in the General City Retirement System Defined Contribution Plan (DCP).uu]** The parties agree that the defined contribution plan the Executive Branch will propose for acceptance by the City Council, although not specifically detailed at this time, is intended to be primarily in accordance with the provisions which were last advocated by the Executive Branch in November December, 1997.vv

To the extent that employees in the bargaining unit participate in any supplemental retirement plans other than the General City Retirement System, the City reserves the right to withdraw from such supplemental plans at any time and in accordance with applicable law.ww

---

uu    CBA 6 (§ 26.Q.).

vv    CBA 3 (§ 26.O.), CBA 4 (§ 15.P.), CBA 5 (§ 20.Q.), CBA 6 (§ 26.Q.), CBA 7 (§ 26.P.), CBA 8 (§ 25.O.), CBA 9 (§ 31.Q.), CBA 10 (§ 33. P.), CBA 11 (§ 39.Q.), CET 1 (§ 48.R.), Reopener 1 (§ 31.Q.), Reopener 2 (§ 25.O.), Reopener 4 (§ 20.Q.).

ww    CET 1 (§ 48.T.).

Members of the bargaining unit shall have the option of belonging to the City's 1998 defined contribution retirement plan until such time as the City discontinues that option or establishes a replacement defined contribution plan in accordance with the rules of the City.[xx]

Employees hired prior to July 1, 2012 may remain in the City's defined benefit program as described in the bargaining agreement. Effective July 1, 2012 **[or Effective the first payroll after ratification of this agreement[yy]]**, the employee, if he/she elects to remain in the defined benefit program shall make a pre-tax contribution of five percent (5%) to the defined benefit plan.

The employee may elect a voluntary, irrevocable conversion to the defined contribution plan described in the collective bargaining agreement. Existing vested employer and employee contributions shall be converted to the employee's account in the defined contribution plan. The conversion shall be calculated based upon the actuarial standard described in the 1998 Ordinance.

DWSD's contribution shall be six percent (6%) of the employee's base salary. The employee's contribution shall be voluntary. If the employee elects to make a contribution, it shall be matched by DWSD dollar for dollar up to a maximum of three percent (3%) of the employee's base salary. This matching contribution by DWSD shall be in addition to its contribution of six percent (6%).[zz]

Employees hired on or after July 1, 2012 shall not be enrolled in the City's defined benefit plan, but shall be enrolled in a defined contribution plan **[established by the 1998 ordinance[aaa]]**.[bbb] **[DWSD's contribution and the employee's contribution shall each be five percent (5%) of the employee's base salary.[ccc]]**

**[DWSD's contribution shall be six percent (6%) of the employee's base salary. The employee's contribution shall be voluntary. If the employee elects to make a contribution, it shall be matched by DWSD dollar for dollar up to a maximum of three percent (3%) of the employee's base salary. This matching contribution by DWSD shall be in addition to its contribution of six percent (6%).[ddd]]**

## Sec. C-4. [Formerly Sec. 47-3-4. Employer Contribution Account.]

(a) *Basic Employer Contributions.* The employer shall contribute an amount equal to six percent (6%) of the participant's compensation to each participant's *Employer Contribution Account* each pay period. For members on duty disability, the amount contributed shall be equal to six percent (6%) of the participant's final compensation on the date of disability. For members receiving Workers' Compensation who are not on an approved disability retirement, the amount contributed shall be equal to six percent (6%) of the participant's base pay. Such contributions shall continue until the participant would have been eligible to convert to normal retirement benefits under Section 47-2-4

---

[xx] CBA 1 (§ 43.O.), CBA 2 (§ 35.Q.), CET 2 (§ 47.N.).

[yy] CBA 10 (§ 33.U.), Reopener 3 (§ 39.T.).

[zz] CBA 3 (§ 46.T.), CBA 4 (§ 15.S.), CBA 5 (§ 20.V.), CBA 6 (§ 26.U.), CBA 7 (§ 26.T.), CBA 8 (§ 25.T.), CBA 9 (§§ 31.W., 31.X., & 31.Y.), CBA 10 (§ 33.U.), Reopener 2 (§ 25.T.), Reopener 3 (§§ 39.T. & 39.Q.), Reopener 4 (§ 20.V.).

[aaa] CBA 4 (§ 15.T.), CBA 5 (§ 20.U.), CBA 6 (§ 26.T.), CBA 7 (§ 26.S.), CBA 8 (§ 25.S.), CBA 9 (§ 31.U), Reopener 2 (§ 25.S.), Reopener 3 (§ 39.X.), Reopener 4 (§ 20.U.).

[bbb] CBA 4 (§ 15.T.), CBA 5 (§ 20.U.), CBA 6 (§ 26.T.), CBA 7 (§ 26.S.), CBA 8 (§ 25.S.), CBA 9 (§ 31.U), CBA 10 (§ 33.T.), Reopener 2 (§ 25.S.), Reopener 3 (§ 39.X.), Reopener 4 (§ 20.U.).

[ccc] CBA 10 (§ 33.T.).

[ddd] CBA 4 (§ 15.T.), CBA 5 (§ 20.U.), CBA 6 (§ 26.T.), CBA 7 (§ 26.S.), CBA 8 (§ 25.S.), CBA 9 (§ 31.V.), Reopener 2 (§ 25.S.), Reopener 3 (§ 39.X.), Reopener 4 (§ 20.U.).

of this Code. City contributions to participants who are employees of a revenue supported division of the City shall be made from the revenues of such division.

(b) *Matching contributions.* On behalf of each participant who makes a basic employee contribution as described in Section 47-3-5(a) of this Code, the employer shall make a matching contribution of one hundred percent of such participant's basic employee contribution to a maximum of three percent (3%) of compensation contributed to the plan by the participant. The matching contribution shall be made in accordance with the rules and procedures established by the Board.

(c) *Periods of absence due to non-duty disability.* The employer shall not make any basic employee contributions for persons on non-duty disability.

(d) *Forfeiture.* Except in the event of retirement under Section 47-3-10(A)(1) of this Code, duty disability or death, to the extent a participant, former participant or beneficiary is not vested in any part of his or her *Employer Contribution Account* under Section 47-3-8 of this Code, the right of a participant, former participant, or beneficiary to a distribution of some or all of the *Employer Contribution Account* balance is subject to forfeiture pursuant to the *Public Employee Retirement Benefits Forfeiture Act,* as amended, MCL 38.2701 *et seq.* In the event that any account balances are forfeited, the amounts so forfeited shall be used to offset past or future expenses of the Plan. To the extent that forfeitures exceed the expenses to be settled for a given Plan Year, such excess forfeitures shall be used to offset the City's contribution to the Plan for the Plan Year. To the extent excess forfeitures are available after offsetting the City's contribution for the Plan Year, the Board shall allocate such excess to the participant accounts in proportion to the compensation of each participant for that Plan Year.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-03, § 1, 11-7-03)

### Sec. C-5. [Formerly Sec. 47-3-5. Employee Contribution Account.]

(a) *Basic employee contributions which are matched by the employer.* At the time the Participant elects to participate in the 1998 Defined Contribution Plan pursuant to Section 47-3-3(a) or (d), a participant may elect to make a basic pre-tax contribution of zero, one, two or three percent (0%, 1%, 2%, 3%) of compensation. Such election shall be irrevocable and the basic employee contribution shall be made each year to such participant's *Employee Contribution Account* under the *1998 Defined Contribution Plan.* Subject to the approval of the Internal Revenue Service, basic employee contributions will be made on a pre-tax basis.

(b) *Additional voluntary employee contributions which are not matched by the employer.* To the extent permitted by the Internal Revenue Service, the Plan will accept additional pre-tax voluntary contributions from the participants as follows: at the time the Participant elects to participate in the 1998 Defined Contribution Plan pursuant to Section 47-3-3(a) or (d), a participant may elect to make an additional voluntary employee contribution of zero, one, two or three percent (0%, 1%, 2%, 3%) of such participant's compensation. Such election shall be irrevocable and the additional voluntary employee contribution shall be made each year to such participant's *Employee Contribution Account* under the *1998 Defined Contribution Plan.* Such additional voluntary contributions shall not be matched by the employer, and are in addition to the basic employee contributions described in Section 47-3-5(a) of this Code.

(c) Contributions "picked up" by the employer.

(1) Effective as of the adoption and approval of the *1998 Defined Contribution Plan* by City Council or the implementation date, if later, no participant may elect to receive such participant's basic employee contributions or additional voluntary employee contributions that have been "picked up" by the employer directly instead of having them paid by the employer to the participant's *Employee Contribution Account* under the *1998 Defined Contribution Plan.* If a participant

85

irrevocably elects to have such participant's basic employee contributions and additional voluntary employee contributions "picked up" by the employer, such employee contributions shall be paid by the employer to the *1998 Defined Contribution Plan* and not paid to the participant.

(2) *Election to Make After-Tax Contributions.* A participant who does not utilize the maximum participant's contributions, as detailed in Section 47-3-5(a) and (b), "picked up" by the employer, may elect to make employee contributions on an after tax basis and change his or her contribution percentage in accordance with procedures established by the Board, provided utilizing Sections 47-3-5(a), 47-3-5(b), and 47-3-5(c)(2) does not exceed the three percent (3%) maximums of Sections 47-3-5(a) and 47-3-5(b).

(d) Conversion of unused leave; Post-tax basis.

(1) *Vacation time.* In accordance with the rules and procedures established by the Board, a participant who at the end of a Plan Year has accrued, but not used, an amount of vacation time, may make an irrevocable election to convert the value of some or all of such vacation time, in an amount not to exceed fifteen vacation days, as an additional contribution to such participant's *Annuity Savings Account* on an after tax basis. The value of such additional contribution shall be one-half of the number of vacation hours converted multiplied by the hourly rate of pay applicable on each September thirtieth or such other date as approved by the Board.

(2) *Sick time.* In accordance with rules and procedures established by the Board, a participant who is one hundred percent (100%) vested in the *Employer Contribution Account* pursuant to Section 47-3-8(b) of this Code, who has accrued but not used an amount of sick time, and who ceases to be a participant on or after the effective date of the Plan due to retirement or resignation, may make an irrevocable election to convert the value of some or all of such employee's unused accrued sick time as an additional contribution to such participant's *Annuity Savings Account* on an after tax basis. The value of such additional contribution shall be the value of one half the number of sick time hours converted, using both current and reserve banks, by the hourly rate of pay applicable on the effective date of retirement or resignation.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-03, § 1, 11-7-03)

## Sec. C-6. [Formerly Sec. 47-3-6. Maximum additions.]

(a) Notwithstanding anything contained herein to the contrary, total annual additions for a participant in any calendar year, shall not exceed the limits set forth in Section 415 of the Internal Revenue Code and regulations thereunder, the terms of which are specifically incorporated herein by reference. For the purpose of complying with Section 415 of the Internal Revenue Code, compensation shall have the same meaning as set forth in Section 415(c)(3)[151] of that Code.

(b) Notwithstanding the foregoing, otherwise permissible annual additions under this Plan may be reduced to the extent necessary as permitted by United States Department of Treasury Regulations, to prevent disqualification of the Plan under Section 415 of the Internal Revenue Code.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. C-7. [Formerly Sec. 47-3-7. 1998 Defined Contribution Plan; Employee Rollover Account.]

A participant may transfer to his or her *Employee Rollover Account,* an "eligible rollover distribution," as defined in Section 402(c)(4)[152] of the Internal Revenue Code, provided the transfer is made in accordance with Section 402(c)(5)(c)[153] of the Internal Revenue Code and applicable regulation.

86

*Employee Rollover Accounts* are not considered "annual additions" within the meaning of Section 47-3-2(3) of this Code.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. C-8.  [Formerly Sec. 47-3-8. 1998 Defined Contribution Plan; vesting.]**

All account balances are subject to the following vesting schedules:

(a)    *Employee Contribution Account.* A participant shall always be one hundred percent (100% vested in such participant's *Employee Contribution Account.*

(b)    *Employer Contribution Account.* A participant shall be vested in the balance of such participant's *Employer Contribution Account* as follows:

| Years of Service | Percentage vested |
|---|---|
| Less than two | 0% |
| At least two, but less than four | 50% |
| Four or more | 100% |

Service for vesting purposes shall include prior service under the 1973 Defined Benefit/Defined Contribution (Annuity) Plan of the DGRS.

(c)    *Employee Rollover Account.* A participant shall always be one hundred percent vested in the balance of such participant's *Employee Rollover Account.*

(d)    *Annuity Savings Account.* A participant shall always be one hundred percent (100%) vested in the balance of such participant's *Annuity Savings Account.*

(Ord. No. 29-01, § 1, 11-30-01)

**By Agreement**

For employees who separate from City service with a vested pension prior to reaching eligibility for a regular service retirement, time earned after July 1, 1986 **[or July 1, 1988[eee]]**, shall not be factored into the formula for determining their pension benefit until they shall have attained age 62.  This provision will not affect the current practice governing disabled employees.[fff]

**Sec. C-9.  [Formerly Sec. 47-3-9. Participant-directed Investments.]**

(a)    *Participant-directed Investments; Type.* Each participant and former participant may direct the investment of such participant's or former participant's account balances in specific types of investments made available by the Board. Such investments shall include:

---

[eee]    CBA-4 (§ 15.D.), CBA-5 (§ 20.D.), CBA-6 (§ 26.D.), CBA-7 (§ 26.D.), Reopener-4 (§ 20.D.).

[fff]    CBA-3 (§ 46.D.), CBA-4 (§ 15.D.), CBA-5 (§ 20.D.), CBA-6 (§ 26.D.), CBA-7 (§ 26.D.), CBA-8 (§ 25.D.), CBA-9 (§ 31.D.), CBA-10 (§33.D.), CBA-11 (§ 39.D.), CET-1 (§ 48.D.), Reopener-1 (§ 31.D.), Reopener-2 (§ 25.D.), Reopener-3 (§ 39.D.), Reopener-4 (§ 20.D.).

Short term securities, fixed income securities, equity securities, and any other investment category the Board considers appropriate.

(b) *Participant-directed Investments; Annual Review.* Each participant, former participant, and, following the death of a participant or former participant, the beneficiary of such participant or former participant, to the extent allowed by law, shall be given the opportunity, at least annually, to:

    (1) Elect to direct the investment of such participants, former participant's, or beneficiary's account balances;

    (2) Change the investment allocation; or

    (3) Cease to direct the investments.

    All such elections shall be in accordance with procedures promulgated by the Board. The account balances of any participant, former participant, or beneficiary who elects not to direct the investment of such account balances, shall be invested in the designated component fund(s). If the law does not allow a beneficiary, following the death of a participant or former participant, to direct the participant's or former participant's account balances, then the account balances shall be liquidated and paid to the beneficiary.

(c) *Participant-directed investments; income.* The income earned on each participant's investments shall be credited directly to such participant's account or accounts, except as provided in Section 47-3-12(g) of this Code.

(d) *Expenses; Forfeitures.* In the event that any account balances are forfeited under Section 47-3-4(d) of this Code, the amounts so forfeited shall be used to offset past or future expenses of the Plan incurred during that Plan Year Such expenses shall be settled in the following order: administrative, investment, legal, accounting, actuarial, and then all others as determined by the Board. To the extent that forfeitures exceed the expenses to be settled for a given Plan Year, such excess forfeitures shall be used to offset the City's contribution to the Plan for that Plan Year. To the extent excess forfeitures are available after offsetting the City's contribution for that Plan Year, the Board shall allocate such excess to the participant accounts in proportion to the compensation of each participant for the Plan Year. The employer shall cover the cost of all expenditures which exceed forfeitures.

    (Ord. No. 29-01, § 1, 11-30-01)

### Sec. C-10. [Formerly Sec. 47-3-10. Benefits.]

(a) Eligibility for Benefits.

    (1) *Retirement.* In the event of the participant's retirement under Section 47-2-4(a), (b), or (c) of this Code, the eligible former participant shall be paid the total balance of the participant's accounts in accordance with Section 47-3-10(c) of this Code.

    (2) *Death.* In the event of a participant's death, the beneficiary of the participant shall be paid the total balance of each of the participant's accounts in accordance with Section 47-3-10(c) of this Code. Designation of a participant's or former participant's beneficiary shall be made in accordance with Section 47-3-10(b) of this Code. Upon death, the deceased former participant shall be one hundred percent (100%) vested in the balance of all of his or her accounts.

    (3) *Duty disability; eligibility.* Upon the written application of a participant or of the participant's department head, a participant who becomes totally incapacited for duty in the employe of the City, shall be retired by the Board; provided that such incapacity is found by the Board to be the natural and approximate result of the actual performance of duty, without willful negligence on

88

the participant's part; and provided further, that the Board Medical Director, after a medical examination of such participant, certifies in writing to the Board that such participant is mentally or physically totally incapacitated from further performance of duty to the City, and that such participant should be retired. Upon such duty disability retirement, such former participant shall be one hundred percent (100%) vested in the balance of all of the former participant's accounts.

(4) *Duty Disability; Benefits.* In the event of the duty disability of a participant, the eligible former participant shall be paid the total balance of each of his or her accounts in accordance with Section 47-3-10(c) of this Code.

(5) *Non-duty Disability; Eligibility.* Upon the written application of a participant or of the participant's department head, a participant who becomes totally and permanently incapacitated, as the result of causes not occurring in the actual performance of duty to the City, may be retired by the Board, provided that the Medical Director, after a medical examination of such participant, certifies in writing that such participant is mentally or physically incapacitated for further performance of duty to the City, and such incapacity is likely to be permanent and that such participant should be retired.

(6) *Non-duty Disability; Benefits.* In the event of the non duty disability of a participant, the eligible former participant shall be paid the vested portion of each of his or her accounts in accordance with Section 47-3-10(c) of this Code.

(7) *Other termination.* If a participant's employment is terminated for any reason other than the participant's retirement under Section 47-3-10(a)(1) of this Code, duty disability, or death, the participant shall immediately become a former participant and shall be entitled to receive the vested portion of each of such participant's accounts. A participant's vested portion of such participant's accounts shall be determined in accordance with the provisions of Section 47-3-8 of this Code. Payments under this Section shall be made in accordance with Section 47-3-10(c) of this code.

(8) *Forfeiture.* Any participant who terminates employment for reasons other than retirement under Section 47-3-10(a)(1) of this Code, duty disability or death, shall forfeit the non-vested portion of such participant's *Employer contribution Account,* if any. Such forfeiture shall become effective upon the participant's termination of employment with the employer, other than by retirement, duty disability, or death.

(b)  Designation of Beneficiary.

(1) *Participant's spouse, if any.* For the purpose of receiving survivor benefits under this Plan, the beneficiary of a participant or former participant shall be the participant's or former participant's spouse, subject to Section 47-3-10(b)(2) of this Code.

(2) *Non-spousal Beneficiary; Designation.* A participant or former participant may designate a non-spousal beneficiary on a form satisfactory to the Board.

(3) *Revocation of Designation.* A participant may revoke a previous designation of beneficiary or change the designation of a beneficiary at any time, by filing written change of beneficiary on a form satisfactory to the Board.

(4) *Absence of Valid Designation of Beneficiary.* If a valid designation of beneficiary pursuant to Section 47-3-10(b) of this Code is not on file, the Board shall direct the Trustee to distribute the vested portion of the accumulated balance in a lump sum to the surviving spouse of the deceased participant or former participant, if any, or, if none survives the participant, to the estate of the deceased participant or former participant.

(c) Payment of benefits.

(1) *Method of Distribution.* A former participant or beneficiary may elect one or a combination of several of the following methods of distribution of the vested portion of such participant's accumulated balance:

a. A lump sum distribution to the recipient; or

b. A lump sum direct rollover to another qualified pension Plan, or to an Individual Retirement Account or Annuity (IRA); or

c. The purchase of an annuity from the Investment Trustee or another qualified annuity provider, the form of which shall be selected by the former participant or beneficiary, or required under the terms of an order issued pursuant to *The Eligible Domestic Relations Order Act,* MCL 38.1701 *et seq.*

d. Regular installments over a period certain.

e. No distribution, in which case the accumulated balance shall remain in the Plan until distributed at the election of the participant pursuant to Section 47-3-10(c)(2) below to the extent allowed by Federal Law.[154]

(2) *Commencement of Payment of Benefits.* [155] All benefit payments under the Plan shall be made, or shall commence to be made, as soon as is practicable after written election by the participant designating the time and method of distribution following entitlement thereto.

(3) *Required Distribution.* Lifetime of the participant or beneficiary. In accordance with Section 401(a)(9)[156] of the Internal Revenue Code the entire interest of each participant shall be distributed to such participant over the lifetime of the participant or beneficiary, beginning no later than the later of the April first of the calendar year following (1) the calendar year in which the employee attains age seventy and one-half or (2) the calendar year in which the employee retires.[157]

(4) *Upon the Death of the Participant.* Upon the death of the participant, the following restrictions shall apply to the distribution of the participant's interest under the Plan:

a. If the participant dies after starting to receive benefits but before the participant's entire interest under the Plan has been distributed, the remaining portion of such interest must be distributed at least as rapidly as under the method of distribution selected by the participant in effect at the date of the participant's death.

b. If the participant dies before receiving any of his or her interest under the Plan, the entire interest shall be distributed to the participant's beneficiary by December thirty-first of the calendar year in which the fifth anniversary of the participant's death falls, with the following exceptions:

1. If any portion of such interest is payable to or for the benefit of a designated beneficiary, such portion shall be distributed in accordance with applicable treasury regulations over a period not extending beyond the life expectancy of such beneficiary. The payments to such beneficiary shall begin not later than December thirty-first of the calendar year after the calendar year of such participant's death.

2. If the participant's surviving spouse is the designated beneficiary, payments to such spouse shall begin not later than December Thirty-first of the calendar year in which the participant would have attained age seventy and one-half or by the date specified

90

in 1. above, whichever is later. If such surviving spouse dies before payments have begun to be made to such spouse, then payments to the person or persons entitled to the same shall be subject to the distribution restrictions under this subparagraph b. which would have applied had the spouse been an unmarried participant.

3. The amount required to be distributed under 1. and 2. above for each calendar year beginning with the distribution for the first calendar year for which a minimum distribution is required must be at least equal to the quotient obtained by dividing the participant's interest in the Plan by the life expectancy of the beneficiary. The participant's interest in the Plan for purposes of this paragraph 3. shall be the participant's account balance as of the last valuation date in the calendar year immediately preceding the first calendar year for which the distribution is required, adjusted as provided in treasury regulations for allocations of contributions, forfeitures and distributions, if any, after such valuation date.

4. For purposes of subparagraphs 1. and 3. above, life expectancy shall be computed by use of the return multiples included in Tables V and VI of Section 1.72-9 of the Federal Income Tax Regulations. For purposes of subparagraphs 1. and 3. above, the life expectancy of the participant's spouse may be recalculated annually. The life expectancy of a beneficiary other than the participant's spouse may not be recalculated.

c. Subject to applicable regulations, for purposes of a. and b. above, any amount paid to a child of the participant shall be treated as if it had been paid to the surviving spouse of the participant if such amount will become payable to the surviving spouse upon such child reaching the age of majority or other designated event permitted under applicable treasury regulations.

d. If, prior to January 1, 1984, such participant had made a valid, unrevoked, written designation pursuant to Section 242(b) of the *Tax Equity and Fiscal Responsibility Act of 1982* as in effect prior to amendments made by the *Tax Reform Act of 1984*, then distributions to such participant and his or her beneficiary shall be made according to such designation.

e. Subject to subparagraph d. above, all distributions under the Plan shall be made in accordance with Section 401(a)(9)[158] of the Internal Revenue Code and the regulations thereunder, including but not limited to regulations Section 1.401(a)(9)-2.[159]

f. With respect to distributions under Plan made for calendar years beginning on or after January 1, 2001, the Plan will apply the minimum distribution requirement of Section 401(a)(9) of the Internal Revenue Code in accordance with the Regulations under Section 401(a)(9) that were proposed on January 17, 2001, notwithstanding any provision of the Plan to the contrary. This Section f. shall continue in effect until the end of the last calendar year beginning before the effective date of final regulations under Section 401(a)(9) or such other date as may be specified in guidance published by the Internal Revenue Service.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. C-11. [Formerly Sec. 47-3-11. Plan Administration.]

(a) *Powers and Duties.* The Board shall administer the Plan and shall have such powers and duties as may be necessary to discharge the responsibilities of the Board, including, but not limited to, the following:

91

(1) To construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner, and time of payments of any benefits hereunder;

(2) To prescribe procedures to be followed by participants, former participants, and beneficiaries filing, applications for benefits;

(3) To distribute information explaining the Plan, in such manner as it deems appropriate;

(4) To receive from the employer and participants, such information as shall be necessary for the proper administration of the Plan;

(5) To prepare a written annual report with respect to the administration of the Plan;

(6) To appoint or employ individuals to assist in the administration of the Plan and any other agents the Board deems advisable.

(b) *Limitation on Powers.* The Board shall have no power to add to, subtract from, or modify, any of the terms of the Plan, or to change or add to any benefits provided by the Plan, or to waive, or fail to apply any requirements of eligibility for a benefit under the Plan. This Section 47-3-11(b) does not apply to the Administrative Board of Trustee's Administrative Rules and Regulations promulgated pursuant to Section 47-1-11 of this code.

(c) Denial of claims; hearing by Board; written decision.

(1) Any participant, former participant, or beneficiary who has been denied a benefit by a decision of the Board shall be entitled to request that the Board give further consideration to his or her claim, by filing a written request with the Board within sixty days after notice of denial by the Board, together with a written statement of the reasons why the claimant believes such claim should be allowed.

(2) The Board shall then conduct a hearing at which the claimant may be represented by an attorney or any other representative of the claimant's choosing, and at which the claimant shall have an opportunity to submit written and oral evidence and arguments in support of the claimant's claim. At the hearing, or prior thereto upon five business days written notice to the Board, the claimant or other claimant's representative shall have an opportunity to review all documents in the possession of the Board which are pertinent to the claim at issue and its disallowance.

(3) A final decision as to the allowance of the claim shall be made by the Board within sixty days of the close of the hearing, unless there has been an extension due to special circumstances, provided that the delay and the special circumstances causing it, are explained to the claimant. The Board's decision shall include specific reasons for the decision and specific references to the pertinent Plan provisions on which the decision is based.

(4) By resolution, the Board may designate a person or persons to serve as a hearing officer for the hearing of claims filed under Section 47-3-10(a)(3) of this Code. The Hearing Officer shall make written findings and a recommended disposition of such claims to the Board.

(d) *Public Meeting.* The Board shall conduct a public meeting of participants, beneficiaries, and former participants, at least once each Plan Year and shall meet at such additional time as it deems necessary.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. C-12.  [Formerly Sec. 47-3-12. Participant Loan Program.]**

(a)   *Participant Loan Program established.* Any loans granted or renewed shall be made pursuant to a Participant Loan Program which shall conform with the requirements of Section 72(p) of the Internal Revenue Code. Such loan program shall be established in writing by the Board of Trustees, and must include, but need not be limited to, the following:

  (1)   The identity of the administrator of the Participant Loan Program;

  (2)   A procedure for applying for loans; the amount of loan that will be approved or denied, limitations, if any, on the types and amounts of loans offered;

  (3)   The procedures under the Program for determining a reasonable rate of interest; and

  (4)   The events constituting default and the steps that will be taken to preserve Plan assets.

(b)   Amendment of Loan Program.

  (1)   This Loan Program shall be contained in a separate written document which, when properly executed, shall be incorporated by reference and made a part of the Plan. Such Participant Loan Program may be modified or amended by action of the Board, in willing, without the necessity of amending the Plan or this ordinance. The Board shall communicate any such modification or amendments, in writing, to all participants.

  (2)   All collective bargaining agreements which accept the terms of this ordinance are specifically agreeing to be subject to the Board's power to modify or amend the Participant Loan Program from time to time, including during the effective term of the applicable labor agreement, and no such modification or amendment shall be deemed a violation of said labor agreement and no grievance or other form of action shall be effective to overturn or alter the Board's decision.

(c)   *Eligibility.* Loans shall be made only to participants, former participants, spouses of participants, and beneficiaries are not eligible to receive any loans from the Plan. Subject to rules and procedures established by the Board, a participant who has been in the Plan for twelve months or more is eligible to apply for a loan from this Plan.

(d)   *Amount of Loan.* A participant who has satisfied applicable rules and procedures may borrow from the participant's accounts an amount which does not exceed fifty percent (50%) of the participant's vested accumulated balance, or fifty thousand dollars ($50,000.00) reduced by the excess; if any, of (1) the highest outstanding balance of loans from the Trust during the one-year period ending on the day before the date on which the loan is made, or (2) the outstanding balance of loans from the Trust on the date on which the loan is made, whichever is less. The minimum loan amount shall be one thousand dollars ($1,000.00).

(e)   *Terms and Conditions.* In addition to such rules and procedures as established by the Board, all loans shall comply with the following terms and conditions:

  (1)   Loan applications shall be in writing.

  (2)   Loans shall be repaid by equal payroll deductions over a period not to exceed five years, or if the loan is for the purpose of buying a principal residence, a period not to exceed ten years. In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two week period;

(3)  Each loan shall be made against the assignment of the participant's entire right, title and interest in and to the Trust, supported by the participant's collateral promissory note for the amount of the loan, including interest, payable to the order of the Trustee;

(4)  Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among participants in its determination of interest rates on loans. Loans initiated at different times may bear different interest rates if, in the opinion of the Board, the difference in rates is supported by a change in market interest rates. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration.

(5)  Loan repayments shall be suspended under this Plan as permitted by Section 414(u)(4) of the Internal Revenue Code. A participant who has an outstanding loan balance from the Plan who is absent from employment with the employer, and who has satisfied the requirements of 26 USC 414(a),[160] of the Internal Revenue Code shall not be required to make loan repayments to the fund during said periods of absence.

(f)  *Renewal of Loan.* Any loans granted or renewed shall be made pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

(g)  *Loan Balance.* A participant's outstanding loan balance shall be considered a directed investment by the participant and interest payments shall be credited to the participant's account balance and shall not be part of net investment income nor part of the participant's account balance for the purpose of allocation of net investment income under Section 47-3-9(c) of this Code.

(h)  *Distributions.* No distribution shall be made to a participant, former participant, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

### Sec. C-13.  [Formerly Sec. 47-3-13. Trust Fund.]

(a)  *Establishment of Trust fund; selection of financial investment Trustee.* The Board shall establish a Trust fund by a Trust agreement with a financial investment Trustee to carry out the purposes of the Plan.

(b)  *Financial Investment Trustee.* The Financial Investment Trustee shall be the Trustee selected by the Administrative Board of Trustees, or such successor Financial Investment Trustee as selected by the Administrative Board of Trustees.

(1)  *Employer and participant contributions to the Financial Investment Trustee.* All contributions by the employer, and any contributions by participants, shall be paid to the Financial Investment Trustee of the fund.

(2)  *Financial Investment Trustee; Investment of funds.* The fund(s) shall be invested in such investments as are permissible under state law for governmental Plans, made available by the Administrative Board of Trustees, and as specified by the participant, former participant or beneficiary.

(3)  *Duties of the Financial Investment Trustee.* The Trustee shall have the powers, rights and duties as specified in the Trust agreement with the Board, in addition to those specified elsewhere in the Plan or prescribed by law. The Trustee shall receive the contributions to the fund and, subject to the directed investments of participants, shall hold, invest and reinvest fund assets, and shall distribute fund assets plus any earnings thereon, pursuant to the provisions of the Plan and of the Trust agreement with the Administrative Board of Trustees. The Financial Investment Trustee shall determine all questions relating to accounting and to the financial position of the fund and the shares and interest of the participants in accordance with

94

information supplied by the employer and the Board, and, in general, shall discharge all of the duties and functions imposed by the terms of the Plan, either expressly or by implication.

(4) *Financial Investment Trustee expenses.* The reasonable expenses of the Financial Investment Trustee relating to the fund, including such compensation for the Financial Investment Trustee as may be agreed to in writing by the Board and the Financial Investment Trustee, shall be paid to the Financial Investment Trustee and shall be deducted from the fund. Such expenses shall include training of prospective Plan participants, whether conducted by the Financial Investment Trustee or a third party on its behalf.

(5) *Accounting.* At the request of the employer or the Administrative Board of Trustees, the Financial Investment Trustee shall prepare and submit an accounting of the fund as of any date specified, but the Financial Investment Trustee shall not be required to render accounting more frequently than monthly during any Plan Year. The Financial Investment Trustee shall prepare and render to the employer, the Administrative Board of Trustees, and Council an accounting of the total fund as of the last day of each Plan Year. The Financial Investment Trustee shall not be required to render an accounting of the total fund to individual participants but only to the employer and Board, which may submit reports of the fund to the participants from time to time, provided, however, that the Financial Investment Trustee shall render periodic reports to each participant on all of his or her individual accounts and shall provide copies of such reports to the Board.

(c) *Taxes.* After reasonable notice to the Board, any taxes assessed against the fund or any of its assets, including income, property, transfer, and other taxes, shall be paid by the Financial Investment Trustee and deducted from the fund. Whenever possible, these amounts shall be paid from forfeiture funds.

(d) *Limitation of liability to assets of fund.* Except as required under applicable law, the benefits of the Plan shall be only such as can be provided by the assets of the fund, and there shall be no further liability or obligation on the part of the Board or the employer after its mandated contributions have been once paid to make any contributions or payments to establish or maintain the Plan, whether in the event of termination of the Plan or otherwise. No liability for the payment of benefits under the Plan shall be imposed on the Board or the employer.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. C-14. [Formerly Sec. 47-3-14. Miscellaneous.]

(a) *Amendments; Termination. Subject to the Terms of the Collective Bargaining Agreements,* the City reserves the right to amend this *Article III* and this Plan at any time. Such amendments may include termination of the Plan; provided, however, that no such amendment or termination shall deprive any participant, former participant or beneficiary of any then vested benefit under the Plan. The City shall make no amendment or amendments to the Plan and this ordinance which causes any part of the Trust fund to be used for, or diverted to, any purpose other than the exclusive benefit of participants, former participants or their beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Plan which alters any terms of this *Article III* requires an amendment of this ordinance approved by the Council.

(b) *Non-guarantee of employment.* Nothing contained in the Plan or this ordinance shall be construed as a contract of employment between the employer and any employee, or as a right of any employee to be continued in the employment of the employer, or as a limitation of the right of the employer to discharge any of its employees, with or without cause.

95

(c) *No right to trust assets.* No participant, former participant or beneficiary shall have any right to, or interest in, any assets of the Trust Fund upon termination of employment or otherwise, except as provided under this Plan, as amended, and then only to the extent of the benefits payable under the Plan to such participant, former participant, or beneficiary out of, the assets of the Trust Fund. All payments of benefits as provided for in this Plan shall be made solely out of the assets of the Trust Fund and the fiduciary shall not be liable therefore in any manner.

(d) *Non forfeitability of benefits.* Subject only to the specific provisions of this ordinance, nothing shall be deemed to divest a participant, former participant, or beneficiary, of the right to the non-forfeitable benefit which such participant, former participant, or beneficiary, becomes entitled to in accordance with the provisions of this ordinance.

(e) *Non-alienation of benefits.* Except as otherwise provided in this subsection, the right of a person to an accumulated balance or any other benefit from the Plan is unassignable and is not subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or other process of law. The right of a person to an accumulated balance or any other benefit from the Plan is subject to award by a court pursuant to MCL 552.18,[161] and to any other order of a court pertaining to alimony or child support. The right of a person to an accumulated balance or other benefit from the Plan is subject to an order issued pursuant to the *Eligible Domestic Relations Order Act,* MCL 38.1701 *et seq.*

(f) *Right of set-off.* The Plan has the right of set off to recover any overpayment made by the Plan and to satisfy any claim arising from embezzlement or fraud committed in their capaCity as an employee of the employer by a participant, former participant, beneficiary, or other person who has a claim to an accumulated balance or any other benefit under this Plan.

(g) *Collective bargaining agreements; conflict.* This ordinance shall not modify any provision of a collective bargaining agreement. In the event of a conflict between this ordinance and a collective bargaining agreement, the agreement shall control.

(h) *Collective bargaining agreements; acceptance of ordinance terms.* All collective bargaining agreements which accept the terms of this ordinance are specifically agreeing to be subject to the Board's power to modify or amend the administrative rules and procedures governing this *Article III* Plan from time to time, including during the effective term of the applicable labor agreement, and no such modification or amendment shall be deemed a violation of said labor agreement and to grievance or other form of action shall be effective to overturn or alter the Board's decision.

(i) Enforcement against any act or practice which violates state law, the 1997 Detroit City Charter, the 1984 Detroit City Code or the terms of this Plan. A civil action may be brought by:

(1) A Plan participant who is or may become eligible to receive a benefit;

(2) A beneficiary, who is or may become eligible to receive a benefit;

(3) A Plan fiduciary, including a Trustee;

(4) The Finance Director, on behalf of the City as Plan sponsor.

(Ord. No. 29-01, § 1, 11-30-01)

**[Formerly Secs. 47-3-15—47-3-20. Reserved.]**

ARTICLE D. [FORMERLY ARTICLE IV]I. MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM]

Sec. D-1. [Formerly Sec. 47-4-1. Assignments prohibited.]

The right of a person to a pension, annuity, or retirement allowance, the return of accumulated contributions, the pension, annuity, or retirement allowance itself, to any optional benefit, to any other right accrued or accruing to any person under the provisions of this Code, and to the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this chapter of the Code or by an Eligible Domestic Relations Order of a lawful court.

(Ord. No. 29-01, § 1, 11-30-01)

Sec. D-2. [Formerly Sec. 47-4-2. Protection against fraud.]

A person who, with intent to deceive, makes any statements or reports required under this chapter of the Code that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of this chapter of the code, shall be subject to prosecution under applicable law.

(Ord. No. 29-01, § 1, 11-30-01)

Sec. D-3. [Formerly Sec. 47-4-3]I-1. Enforcement; civil action.]Civil Action.

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, 1984 Detroit City Code or the terms of this Plan, may be brought by:

 (1) A Plan participant who is or may become eligible to receive benefit;

 (2) A beneficiary who is or may become eligible to receive a benefit;

 (3) A Plan fiduciary, including a Trustee;

 (4) The Finance Director, on behalf of the City as Plan sponsor.

(Ord. No. 29-01, § 1, 11-30-01)

Sec. D-4. [Formerly Sec. 47-4-4. Amendments; termination.]

The City reserves the right to amend this Chapter 47 and the Plans created hereunder at any time; such amendments may include termination of the Plan; provided, however, that no such amendment or termination shall deprive any participant, former participant or beneficiary of any then vested benefit under the Plan. The City shall make no amendment or amendments to the Plan and this ordinance which causes any part of the Trust fund to be used for, or diverted to, any purpose other than the exclusive benefit of participants, former participants or their beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Plan which alters any term in this Chapter 47, requires an amendment of this ordinance approved by the Council.

(Ord. No. 29-01, § 1, 11-30-01)

98

**Sec. D-5. [Formerly Sec. 47-4-5. Errors.]**

If any change or error in the records results in any person receiving from the Retirement System more or less than the person would have been entitled to receive from the system had the records been correct, the Board shall correct such error, and as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such person was correctly entitled shall be paid.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. D-6. [Formerly Sec. 47-4-6H-2. Limitation of other statutes.]Other Statutes.**

No other provision of law, charter, or ordinance, which provides pensions or retirement benefits wholly or partly at the City expense, exclusive of federal Social Security old-age and survivors' insurance benefits for City employees, their surviving spouses and other dependents, shall apply to membersMembers, retirees or beneficiaries of the Retirement System, their surviving spouses or other dependents.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. D-7. [Formerly Sec. 47-4-7. Construction.]**

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate. The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to the entire ordinance and not to any particular provision or section thereof. Article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Plans created hereunder.

**[Formerly Secs. 47-4-8—47-4-10. Reserved. ]**

---

**ENDNOTES TO ARTICLES A, B, C, AND D [FORMERLY NOTES TO CHAPTER 47]**

* Editor's note— Ord. No. 29-01, § 1, adopted Nov. 30, 2001, amended the general retirement system of the city and enacted a new Ch. 47 to this Code as herein set out. Previously provisions relating to the retirement systems of the system had been incorporated by reference.Ord. No. 1-02, adopted Jan. 9, 2002, repealed certain previously uncodified provisions relating to city retirement systems. Ord. No. 1-02 provides, in part, as follows: IT IS HEREBY ORDAINED BY THE PEOPLE OF THE CITY OF DETROIT THAT: Section 1. Chapter 47 of the 1984 Detroit City Code, Code, titled 'Retirement Systems,' be amended by repealing uncodified Sections 47-2-1 (Ordinance No. 15-87), 47-2-2 (Ordinance No. 5-92), 47-2-3 (Ordinance No. 5-92), 47-10-2 (Ordinance No. 10-86), 47-10-5 (Ordinance No. 3-87), 47-10-6.1 (Ordinance No. 2-93), 47-10-7 (Ordinance No. 6-91), 47-10-8, 47-10-9, 47-10-10, 47-10-11, 47-10-12, 47-10-13, 47-10-14, 47-10-15, 47-10-16 (Ordinance No. 2-93), all of which have now been codified in Sections 47-1-1 through 47-2-20, as follows: (Back)

| | |
|---|---|
| **Sec. 47-2-1** Repealed. | **Sec. 47-10-7.** Repealed. |
| **Sec. 47-2-2** Repealed. | **Sec. 47-10-8.** Repealed. |
| (2) After attaining age forty with eight or more years | **Sec. 47-l0-9.** Repealed. |
| of credited service, whichever is earlier. | **Sec. 47-10-10.** Repealed. |
| **Sec. 47-2-3** Repealed. | **Sec. 47-10-11.** Repealed. |

99

| | |
|---|---|
| ~~Section 47-3-1 through 47-3-11 Repealed.~~ | ~~Sec. 47-10-12. Repealed.~~ |
| ~~Sec. 47-10-2. Repealed.~~ | ~~Sec. 47-10-13. Repealed.~~ |
| ~~Sec. 47-10-5. Repealed.~~ | ~~Sec. 47-10-14. Repealed.~~ |
| ~~Sec. 47-10-6(1),(2). Repealed.~~ | ~~Sec. 47-10-15. Repealed.~~ |
| ~~Sec. 47-10-6.1. Repealed.~~ | ~~Sec. 47-10-16. Repealed.~~ |

~~[1] Ordinance No. 593-H is the re-codification ordinance, 1984 JCC pp 1292-93.~~

~~[2] "The accrued financial benefits of each pension Plan and Retirement System of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."~~

~~[3] 1918 Detroit City Charter, T.9, C. VI, A. 1, as amended effective September 15, 1964.~~

~~[4] 1918 Detroit City Charter, T.9, C. VI, A. 2, §1, as amended effective September 15, 1964.~~

~~[5] 1918 Detroit City Charter, T.9, C. VI, A. 2, §2, as amended effective September 15, 1964; current language is contained in the 1997 Detroit City Charter Section 11-103.~~

~~[6] Originally the Council Trustee was the Council President; as amended by Ordinance 173-H, effective December 22, 1976; amended by Ordinance 338-H, effective September 5, 1979. [Ord. Nos. 173-H and 338-H were repealed by Ord. Nos. 24-01.]~~

~~[7] 1964 Detroit City Code Section 54-3-1, as amended by Ordinance 56-H, effective August 8, 1975. [Ord. No. 56-H was repealed by Ord. No. 24-01]~~

~~[8] 1918 Detroit City Charter, T.9, C. VI, A. 2, §2.1, as amended effective September 15, 1964.~~

~~[9] 1918 Detroit City Charter, T.9, C. VI, A. 2, §3, as amended effective September 15, 1964.~~

~~[10] 1918 Detroit City Charter, T.9, C. VI, A. 2, §4 "shall be fixed by ordinance," as amended effective September 15, 1964. See, Ordinance 297-G, §1; Ordinance 715-G, §1, and Ordinance 494-H, effective April 22, 1982. This section is a revision of Ordinance 494-H, which has been in place for over twenty years. [Ord. No. 494-H was repealed by Ord. No. 24-01.]~~

~~[11] 1918 Detroit City Charter, T.9, C. VI, A. 2, §5, as amended effective September 15, 1964.~~

~~[12] 1918 Detroit City Charter, T.9, C. VI, A. 2, §6, as amended effective September 15, 1964; new language added to reflect changes in the law.~~

~~[13] 1918 Detroit City Charter, T.9, C. VI, A. 2, §7, as amended effective September 15, 1964.~~

~~[14] 1918 Detroit City Charter, T.9, C. VI, A. 2, §8, as amended effective September 15, 1964. Before the passage of the Public Employee Retirement System Investment Act, MCL 38.1132 et seq., the selection of Board employees was subject to City Council approval.~~

~~[15] 1918 Detroit City Charter, T.9, C. VI, A. 2, §9, as amended effective September 15, 1964.~~

~~[16] 1918 Detroit City Charter, T.9, C. VI, A. 2, §10, as amended effective September 15, 1964.~~

~~[17] 1918 Detroit City Charter, T.9, C. VI, A. 2, §11, as amended effective September 15, 1964. Before the Board established the right to its own counsel, it was represented by the Corporation Counsel. See, 1964 Detroit City Code Section 54-2-10, as amended by Ordinance 65-H, effective October 17, 1975.~~

~~[18] 1918 Detroit City Charter, T.9, C. VI, A. 2, §12, as amended effective September 15, 1964.~~

~~[19] 1918 Detroit City Charter, T.9, C. VI, A. 2, §13, as amended effective September 15, 1964.~~

~~[20] 1918 Detroit City Charter, T.9, C. VI, A. 2, §14, as amended effective September 15, 1964.~~

~~[21] 1918 Detroit City Charter, T.9, C. VI, A. 2, §15, as amended effective September 15, 1964.~~

~~100~~

[22] 1918 Detroit City Charter, T.9, C. VI, A. 2, §16, as amended effective September 15, 1964.

[23] 1918 Detroit City Charter, T.9, C. VI, A. 3. §1, 1.1-1.23, as amended effective September 15, 1964, as amended effective July 1, 1973.

[24] 1964 Detroit City Code, Section 54-1-1, as amended by Ordinance 83-H, effective February 10, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[25] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.2.

[26] This is a new definition.

[27] This is a new definition.

[28] Section 47-1-11 gives the Board of Trustees the authority to establish rules and regulations for the administration of the pension system.

[29] This is a new definition.

[30] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.15, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[31] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.19.

[32] 1918 Detroit City Charter T.9, C. VI, A. 3, §1, 1.13, as amended.

[33] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.10, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[34] A retiree is also a "beneficiary."

[35] 1918 Detroit City Charter, T.9, C. VI, A. 2, §1, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[36] Section 47-1-4 lists membership of the Board.

[37] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.4.

[38] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.5.

[39] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.6.

[40] 26 USC 401(a)(17). The current maximum compensation is $200,000.00, Pub. L. 99-514, Title XI, §1106(d)(1), (i)(5), October 22, 1986, 100 Stat 2423, 2425, applicable to years beginning after December 31, 1988 (as adjusted for inflation).

[41] *Ibid.*

[42] This is a new definition.

[43] This is a new definition.

[44] 1918 Detroit City Charter, T.9, C. VI, A. 1, as amended by 1964 Detroit City Code Section 54-1-1.

[45] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.2.

[46] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.2(d)(e).

[47] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.14.

[48] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.3, as amended by 1964 Detroit City Code Section 54-1-1.

[49] This is a new definition.

101

[50] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.16, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[51] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.20.

[52] This is a new definition.

[53] Formerly referred to as "retirant," 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.23, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. A "retiree" is also a beneficiary. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[54] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.18.

[55] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.17.

[56] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.1, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[57] 1918 Detroit City Charter, T.9, C. VI, A. 1, as amended by 1964 Detroit City Code Section 54-1-1.

[58] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.7.

[59] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.22.

[60] *See,* 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.22.

[61] *"Service credit"* is defined in Section 47-1-21.

[62] Ordinance No. 15-87, effective 5/22/87; retroactive to January 1, 1984; uncodified Section 47-2-1.

[63] *Consolidation of entities.*

[64] 1918 Detroit City Charter, T.9, C. VI, A. 5, §2, as amended effective September 15, 1964.

[65] 1918 Detroit City Charter, T.9, C. VI, A. 5, §3, as amended effective September 15, 1964, as amended by Ordinance 357-H, effective December 30, 1979, retroactive to January 1, 1979. [Ord. No. 357-H was repealed by Ord. No. 24-01.]

[66] 1918 Detroit City Charter, T.9, C. VI, A. 5, §3, as amended effective September 15, 1964.

[67] *See,* 26 USC 414(u) "Special Rules Relating to Veterans' Re-employment Rights Under USERRA," P.L. 104-183, 110 Stat 1883 (104th Congress, 2d Session 1996) (2 U.S. Code Congressional and Administrative News, p. 1883).

[68] This is consistent with Chapter 18, Article VI, of the 1984 Detroit City Code; as amended.

[69] *See,* Section 47-2-5, this ordinance.

[70] 1918 Detroit City Charter, T.9, C. VI, A. 2, §1, as amended effective September 15, 1964.

[71] 1918 Detroit City Charter, T.9, C. VI, A. 2, §2, as amended effective September 15, 1964.

[72] Those provisions outline the age and service requirements for normal service retirement, this is, after thirty years, at sixty-five with eight years, at sixty with ten years or twenty-five years of service.

[73] The "six-year rule" was upheld in *Weeks* v *Board of Trustees,* 160 Mich App 81; 408 NW2d 109 (1987).

[74] Policy Resolution of the Board of Trustees, Meeting No. 2952, October 6, 1993.

[75] *Ibid.*

[76] *Ibid.* For example, if the retired employee had more than twenty-five years of service for his/her initial retirement, his/her factor for all new service would be two point two percent (2.2%).

102

[77] *Ibid.* For example, if the retiree works three years, the divisor would be three, with the highest three consecutive years out of the last ten years used whenever possible.

[78] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E., §1(a), as amended by the 1964 Detroit City Code Section 54-11-1(1) as amended by Ordinance 50-H, effective June 25, 1975, retroactive to July 1, 1974. [Ord. No. 50-H was repealed by Ord. No. 24-01.]

[79] This section is new.

[80] 1918 Detroit City Charter, T.9, C. VI, A. 6, §1.1, as amended effective September 15, 1964, as amended effective August 16, 1966. In summary, a member may retire (a) with thirty years of credited service; (b) if hired after January 1, 1996, with thirty years of credited service and age fifty-five; (c) if sixty or older with ten years of credited service; or, (d) if sixty five or older with eights years of credit service. A member may elect an actuarially reduced service retirement at any age with twenty-five or more years of service.

[81] 1964 Detroit City Code Section 54-7-1.1, as amended effective September 15, 1964, as amended effective August 16, 1966.

[82] Service retirement allowance.

[83] 1984 Detroit City Code Section 47-2-2 and 47-2-3 (uncodified), effective March 30, 1992, retroactive to July 1, 1980. In summary, an employee is vested if; (a) hired before July 1, 1980 with eight years of service and are at least forty years of age; (b) hired before July 1, 1980 or after, after ten years of service regardless of age. Non-union employees hired between July 1, 1980 and March 20, 1992; vest under either the "forty and eight" or the "ten year" rule.

[84] Vested pension — Forty years of age with eight years of service or ten years of service.

[85] Thirty years of service.

[86] Sixty-five years of age with eight years of service, sixty years of age with ten years of service.

[87] Under sixty years of age with twenty-five years of service.

[88] *The Public Employee Retirement Benefits Forfeiture Act,* MCL 38.2701 *et seq.*

[89] *Public Employee Retirement Benefits Forfeiture Act,* MCL 38.2701 *et seq.*

[90] *Service retirement allowance.*

[91] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.A., §2, as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1969, as amended effective July 1, 1973, as amended effective July 1, 1996 (Ordinance 2-97), as amended effective July 1, 1992 (Ordinance 1-98), as amended effective July 1, 1992 (Ordinance 3-98), as amended effective July 1, 1992 (Ordinance 9-99).

[92] Retirement allowance options.

[93] Service retirement Plan.

[94] For example, but not limited to, Ordinance No. 85-H, effective February 19, 1976, retroactive to July 1, 1975; Ordinance No. 165-H, effective December 3, 1976, retroactive to July 1, 1976. [Ord. Nos. 85-H and 165-H were repealed by Ord. No. 24-01.]

[95] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §1, as amended effective September 15, 1964.

[96] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §2, as amended effective September 15, 1964.

[97] Service retirement benefits.

[98] Retirement allowance options.

[99] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §2(b)(1), as amended effective September 15, 1964, as amended effective August 15, 1966, as amended effective July 1, 1973.

103

[100] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §2(b)(2), as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1973.

[101] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B. §3, as amended effective September 15, 1964. A member must have at least ten years of credited service to be eligible for a non duty related disability benefit.

[102] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §4, as amended effective September 15, 1964, as amended effective August 16, 1966.

[103] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §4(a), as amended effective September 15, 1964, as amended effective August 16, 1966.

[104] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B. §4(b), as amended effective September 15, 1964, as amended effective August 16, 1966.

[105] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §4(b)(1), as amended effective September 15, 1964, as amended effective August 16, 1966.

[106] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §4(b)(2), as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1973.

[107] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1, as amended effective September 15, 1964, as amended effective August 16, 1966.

[108] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §1(a), as amended effective September 15, 1964, as amended effective August 16, 1966.

[109] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1(b), as amended effective September 15, 1964, as amended effective August 16, 1966.

[110] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1(c), as amended effective September 15, 1964, as amended effective August 16, 1966.

[111] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1(e), as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1996 (Ordinance 29-96).

[112] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1(d), as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1996 (Ordinance 29-96).

[113] *Pensions offset by compensation benefits; subrogation.*

[114] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.D, §1, as amended effective September 15, 1964, as amended effective July 1, 1973.

[115] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §1(a), as amended by 1964 Detroit City Code Section 54-11-1; as amended by Ordinance 50-H, effective June 25, 1975, retroactive to July 1, 1974, as amended by Ordinance 6-91, effective April 5, 1991, extends pop-up option to employees who retired before the option was available. [Ord. No. 50-H was repealed by Ord. No. 24-01.]

[116] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §1(a), as amended by 1964 Detroit City Code Section 54-11-1; as amended by Ordinance 50-H, effective May 25, 1975, retroactive to July 1, 1974, (Option 1). [Ord. No. 50-H was repealed by Ord. No. 24-01.]

[117] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §1(a), as amended by 1964 Detroit City Code Section 54-11-1(2); as amended by Ordinance 50-H, effective June 25, 1975, retroactive to July 1, 1974, (Option 2). [Ord. No. 50-H was repealed by Ord. No. 24-01.]

[118] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §2.

[119] Accidental death benefit.

[120] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §2.1, as amended.

[121] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §3, as amended.

104

[122] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.F, §1.

[123] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.F. §2.

[124] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.G, §1.

[125] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.H, §1.

[126] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.H, as amended by Ordinance 2-93, effective February 8, 1993, retroactive to July 1, 1992

[127] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.H, §1.

[128] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.H, §2.

[129] 1918 Detroit City Charter, T.9, C. VI, A. 7.

[130] 1918 Detroit City Charter, T.9, C. VI, A. 7, §1.

[131] 1918 Detroit City Charter, T.9, C. VI, A. 7, §2.

[132] 1918 Detroit City Charter, T.9, C. VI, A. 7, §3, as amended by Ordinance 84-7, effective February 10, 1976, retroactive to July 1, 1975.

[133] 1918 Detroit City Charter, T.9, C. VI, A. 7, §4.

[134] 1918 Detroit City Charter, T.9, C. VI, A. 7, §5.

[135] 1918 Detroit City Charter, T.9, C. VI, A. 7, §6.

[136] 1918 Detroit City Charter, T.9, C. VI, A. 7, §7.

[137] 1964 Detroit City Code Sections 54-1-7 to 54-1-9.

[138] 1964 Detroit City Code Section 54-1-8.

[139] 1964 Detroit City Code Section 54-1-9.

[140] 1918 Detroit City Charter, T.9, C. VI, A. 8.

[141] 1918 Detroit City Charter, T.9, C. VI, A. 8, §1.

[142] MCL 38.1132 *et seq.*

[143] 1918 Detroit City Charter, T.9, C. VI, A. 8., §2.

[144] 1918 Detroit City Charter, T.9, C. VI, A. 8., §3.

[145] 1918 Detroit City Charter, T.9, C. VI, A. 8., §4.

[146] 1918 Detroit City Charter, T.9, C. VI, A. 8., §5.

[147] 26 USC 415(l)(2).

[148] 26 USC 419A(d)(2).

[149] The classified service of the City consists of all employment in the City service except: (1) elected officers; (2) persons holding appointments under the Charter; (3) persons employed to make or conduct a temporary or special inquiry, investigation, or examination on behalf of the City, and (4) others exempted by the Charter, 1997 Detroit City Charter, Section 6-517.

[150] Six hundred (600) hours is the minimum. *See,* definition of *"employee"* found in Section 47-1-21.

[151] The term "participant's compensation" means the compensation of the participant from the employer for the year, 26 USC 415(c)(3)(A).

[152] The term "eligible rollover distribution" means any portion of which may be excluded from gross income under subsection (a)(5) of this section [rollover amounts — beneficiaries of an exempt employees' Trust] or subsection (a)(4) of section 403 [rollover amounts — beneficiaries of a qualified annuity Plan] if

105

transferred to an eligible retirement Plan in accordance with the requirements of such subsection. 26 USC 402(c)(4).

[153]26 USC 402(c)(5)(C).

[154] *See,* 26 USC 401(a)(9).

[155]Source: 26 USC 401(a)(9)(C)(i)(ii).

[156]Correct citation is Section 401(a)(9).

[157]Title 26, Section 401(a)(9)(C) defines the "required beginning date" for purposes of distributions as the later of (1) the calendar year in which the employee attains age 70 ½, or the (2) calendar year in which the employee retires.

[158]26 USC 401(a)(9).

[159]Correct citation is Section 1.401(a)(9)-2. Capitalization in text is for printing purposes only.

[160]Special rules relating to veterans' preemployment rights under USERRA.

[161]MCL 552.18(2) provides that unvested retirement benefits may be considered as part of the marital estate.

[162] *American Federation of State, County and Municipal Emoloyees* vs. *City of Detroit,* 252 Mich App 293; 652 NW2d 240 (2002); *aff'd* 468 Mich 388; 662 NW2d 695 (2003.)


## LEGEND TO FOOTNOTES TO ARTICLES A, B, C, AND D

The retirement plan provisions of a number of bargaining agreements contain identical language. The agreements that share the same provisions are consolidated into the following groups and designated with random numbers to distinguish each group from the others. Following the group name is a list of all collective bargaining agreements or city employment term agreements that contain identical language, and that apply the changes for the group as annotated in the plan document above. Unless otherwise indicated, the effective dates apply uniformly to all agreements within a group.


**CBA-1:**

- Master Agreement Between the City of Detroit and the International Union of Operating Engineers IUOE Local 324 (Principal Clerks) 2013-2018 (effective December 18, 2013 through December 31, 2018)

- Master Agreement Between the City of Detroit and the International Brotherhood of Teamsters Teamster Local 214 2013-2018 (effective December, 2013 through December 31, 2018)

**CBA-2** (effective November 12, 2014 through December 31, 2018)**:**

- Master Agreement Between the City of Detroit and the Police Officers Association of Michigan POAM 2013-2018

**CBA-3** (effective 2013 through June 30, 2018)**:**

- Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920 (2013 – 2018 Collective Bargaining Agreement)

**CBA-4** (effective 2013 through June 30, 2016)**:**

- Building Trades Foremen Unit of Michigan Building and Construction Trades Council, AFL-CIO (2013 – 2016 Collective Bargaining Agreement) *(Please Note: The retirement provisions in this agreement apply only to those employees covered under this agreement, and hired prior to July 1, 2012.)*

106

**CBA-5** (effective 2013 through June 30, 2016):

- Michigan Building and Construction Trades Council, AFL-CIO (2013 – 2016 Collective Bargaining Agreement)

**CBA-6** (effective March 26, 2013 through June 30, 2016):

- Utility Workers Union of America Local 488 and Local 531 (2012 – 2016 Collective Bargaining Agreement Extension)

**CBA-7** (effective 2013 through June 30, 2016):

- Utility Workers Union of America Local 504 (2013 – 2016 Collective Bargaining Agreement)

**CBA-8** (effective March 26, 2013 through June 30, 2020):

- Association of Professional Construction Inspectors (2012 – 2020 Collective Bargaining Agreement Extension)

**CBA-9** (effective March 25, 2013 through June 30, 2022):

- I.U.O.E. Local 324 – Operating Engineers, Detroit Principal Clerks & Park Management Units (2012 – 2022 Collective Bargaining Agreement Extension) *(Please Note: The retirement provisions in this agreement apply only to those employees hired prior to July 1, 2012.)*

**CBA-10** (effective 2014 through June 30, 2016):

- Detroit Senior Water Systems Chemists Association (2014 – 2016 Collective Bargaining Agreement)

**CBA-11:**

- Master Agreement Between the City of Detroit and Michigan Council 25 Local 1023 of the American Federation of State, County and Municipal Employees, AFL-CIO Emergency Services Operators Chapter (2009 – 2013). This agreement expired by its terms on June 30, 2013. A letter from the Labor Relations Director dated August 23, 2013 ("Re: Terms and Condition of Employment") implemented certain changes to the employment terms (none affecting the retirement provisions), and kept all other terms the same as in this agreement.

**CET-1** (effective July 18, 2012 until modified by a collective bargaining agreement):

- City Employment Terms Between the City of Detroit and Association of Professional Construction Inspectors

- City Employment Terms Between the City of Detroit and Assistant Supervisors of Street Maintenance & Construction

- City Employment Terms Between the City of Detroit and Building & Safety Inspectors – Tripartite

- City Employment Terms Between the City of Detroit and Building & Construction Trades – Foreman

- City Employment Terms Between the City of Detroit and Building & Construction Trades - Non-Supervisory

- City Employment Terms Between the City of Detroit and Detroit Income Tax Investigators Association

- City Employment Terms Between the City of Detroit and International Union of Operating Engineers Local 324

- City Employment Terms Between the City of Detroit and Association of City of Detroit Supervisors

- City Employment Terms Between the City of Detroit and Association of Detroit Engineers

- City Employment Terms Between the City of Detroit and AFSCME, Local 2394 Michigan Council 25 Supervisory Unit

107

- City Employment Terms Between the City of Detroit and AFSCME Forestry and Landscape Foreman

- City Employment Terms Between the City of Detroit and AFSCME Non Supervisory

- City Employment Terms Between the City of Detroit and AFSCME, Paving Foreperson's

- City Employment Terms Between the City of Detroit and Association of Municipal Engineers

- City Employment Terms Between the City of Detroit and Association of Municipal Inspectors

- City Employment Terms Between the City of Detroit and Association of Professional & Technical Employees

- City Employment Terms Between the City of Detroit and International Union of Operating Engineers Local 324 – Principal Clerks Unit

- City Employment Terms Between the City of Detroit and International Union of Operating Engineers Local 324 - Park Management Association

- City Employment Terms Between the City of Detroit and Police Officers Labor Council Detention Facility Officers

- City Employment Terms Between the City of Detroit and Police Officers Labor Council - Health Department

- City Employment Terms Between the City of Detroit and Senior Accountants, Analysts, & Appraisers Association

- City Employment Terms Between the City of Detroit and Service Employees International Union Local 517M Non Supervisory Unit

- City Employment Terms Between the City of Detroit and Service Employees International Union Local 517M Professional & Technical Unit

- City Employment Terms Between the City of Detroit and Service Employees International Union Local 517M Supervisory Unit

- City Employment Terms Between the City of Detroit and Teamsters Local 214

- City Employment Terms Between the City of Detroit and United Auto Workers Local 212 - Civilian Police Investigators

- City Employment Terms Between the City of Detroit and United Auto Workers Local 412 – Paralegals

- City Employment Terms Between the City of Detroit and United Auto Workers Local 2211 - Public Attorney's Association

**CET-2** (effective July 18, 2012 until modified by a collective bargaining agreement):

- City Employment Terms Between the City of Detroit and Emergency Medical Service Officers Association

- City Employment Terms Between the City of Detroit and Police Officers Association of Michigan

**CET-3** (effective July 18, 2012 until modified by a collective bargaining agreement):

- City Employment Terms Between the City of Detroit and AFSCME Motor City Seasonals

**Reopener-1** (executed March 12, 2014):

- International Union of Operating Engineers *(Please note: §§ 39.A. through 39.S. apply to employees hired prior to July 1, 2012.)*

**Reopener-2** (executed March 21, 2014):

108

- Association of Professional Construction Inspectors *(Please note: §§ 25.A. through 25.Q. only apply to employees hired prior to July 1, 2012.)*

**Reopener 3** (executed March 25, 2014 and effective until June 30, 2019):

- Teamsters

**Reopener 4** (executed March 26, 2014):

- Building & Construction Trades Council / Building Trades Council ("BTC") *(Please note: §§ 20.A. through 20.S. apply to employees hired prior to July 1, 2012 unless modified by any plan of adjustment approved by the United States Bankruptcy Court.)*

LA1 3210845v9

109

**EXHIBIT I.A.281**

PRIOR PFRS PENSION PLAN

# COMPONENT II

**This Component II of the Combined Plan For the Police and Fire Retirement System of the City of Detroit, Michigan is intended to memorialize the documentation for the Police and Fire Retirement System of the City of Detroit as it existed on June 30, 2014.**

~~COMPILATION~~

~~OF~~

# <span style="color:blue">COMBINED</span> PLAN ~~PROVISIONS~~

## ~~OF THE~~ <span style="color:blue">FOR THE</span>
## POLICE AND FIRE
## RETIREMENT SYSTEM OF
## THE CITY OF DETROIT<span style="color:blue">, MICHIGAN</span>

~~JULY~~<span style="color:blue">**Amendment and Restatement Effective July**</span> **1, 2014**

~~Including~~


~~Article IX, Section 24~~
~~of the~~
~~1963 State of Michigan Constitution~~


~~Article 11~~
~~of the~~
~~2012 Home Rule Charter~~
~~of the~~
~~City of Detroit~~
~~effective January 1, 2012~~


~~Chapter VII of Title IX~~
~~of the~~
~~1918 City of Detroit Charter~~
~~as amended and supplemented from time to time~~
~~by amendments to the Charter, City Ordinance and by Agreement~~


~~Chapter 54, Article II~~
~~of the~~
~~1964 Detroit City Code~~
~~as amended and supplemented from time to time~~
~~by City Ordinance~~
~~which was saved from repeal by~~
~~Section 11-102 of the 1974, 1997, and 2012 Detroit City Charters~~
~~and incorporated by reference into, but not codified in,~~
~~Chapter 47 of the 1984 Detroit City Code~~
~~Collective Bargaining Agreements~~

# TABLE OF CONTENTS

**Page**

COMPONENT II ................................................................................................ 1

ARTICLE A.        COMMON PROVISIONS OF THE POLICE AND FIRE
                  RETIREMENT SYSTEM ......................................................... 2

Article IX, Section 24 of 1963 State of Michigan Constitution .................................. ix

Article 11 of January 1, 2012 City of Detroit Charter ............................................... x

Chapter VII of Title IX of the 1918 City of Detroit Charter, as amended and supplemented from
                  time to time by amendments to the Charter, City Ordinance and by Agreement
                  (Retirement System of the Policemen and Firemen Retirement System of the
                  City of Detroit) ...................................................................................... 1

        Special Sec. A-1. ........................................................... Common Provisions 2

ARTICLE B.        FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM AS OF
                  JUNE 30, 2014 ....................................................................... 4

        Sec. B-1.        Freeze of Police and Fire Retirement System as of June 30, 2014 ......... 24

        Sec. 2.          Limitation on Interest Crediting Rate for Police and Fire Retirement
                         System Annuity Savings Fund; Rates of Regular Interest Adopted by
                         Board for Actuarial Purposes ................................................................ 4

ARTICLE I.        Name and Date of Establishment ................................................ 5

ARTICLE IIC.      Definitions DEFINITIONS .......................................................... 6

        Sec. C-1.        'System' Definitions ...................................................... 6

        Sec. 2.          'Policemen' .................................................................. 6
        Sec. 3.          'Firemen' ..................................................................... 6
        Sec. 4.          'Member' ...................................................................... 6
        Sec. 5.          'City' ............................................................................ 6
        Sec. 6.          'The Council' ............................................................... 6
        Sec. 7.          'The Medical Director' .................................................. 6
        Sec. 8.          'Service' ........................................................................ 6
        Sec. 9.          'Prior service' ............................................................... 6
        Sec. 10.         'Membership service' ................................................... 7
        Sec. 11.         'Beneficiary' ................................................................ 7
        Sec. 12.         'Regular Interest' ........................................................ 7
        Sec. 13.         'Accumulated contributions' ....................................... 7
        Sec. 14.         'Average Final Compensation' ................................... 7
        Sec. 15.         'Final compensation' ................................................... 9
        Sec. 16.         'Annuity' ...................................................................... 10
        Sec. 17.         'Accrued Service' ........................................................ 10
        Sec. 18.         'Pension' ....................................................................... 10

| | | |
|---|---|---|
| Sec. 19. | 'Retirement allowance' | 10 |
| Sec. 20. | 'Retirement' | 10 |
| Sec. 21. | 'Annuity reserve' | 10 |
| Sec. 22. | 'Pension Reserve' | 10 |
| Sec. 23. | 'Merit Board' | 10 |
| Sec. 24. | 'Patrolman' | 10 |
| Sec. 25. | 'Fire-fighter' | 10 |
| Sec. 26. | 'Board of trustees or board' | 10 |
| Sec. 27. | 'Decrement probabilities' | 10 |
| Sec. 28. | 'Salary factors' | 10 |
| ARTICLE III. | Administration; Board of Trustees | 12 |
| Sec. 1. | Board created | 12 |
| Sec. 2. | Membership of Board | 12 |
| Sec. 3. | Terms of Active Trustees, Trustee Selected by Board, Retirant Trustees, and Trustees Designated by Mayor | 15 |
| Sec. 4. | Scheduling of Elections for Active and Retirant Trustees | 15 |
| Sec. 5. | Procedures for Election of Retiree Trustees | 16 |
| Sec. 6. | Vacancies | 16 |
| Sec. 7. | Compensation | 17 |
| Sec. 8. | Oath | 17 |
| Sec. 9. | Meetings | 17 |
| Sec. 10. | Rules for administration of funds | 17 |
| Sec. 11. | Officers | 17 |
| Sec. 12. | Data for actuarial valuation of funds | 18 |
| Sec. 13. | Record of proceedings; annual report | 18 |
| Sec. 14. | Legal advisor | 18 |
| Sec. 15. | Medical Director | 18 |
| Sec. 16. | Actuary of Retirement System technical advisor to Board | 19 |
| Sec. 17. | Investigation of mortality, service and compensation experience of members | 19 |
| Sec. 18. | Regular actuarial investigations | 20 |
| Sec. 19. | Actuarial valuations of assets and liabilities | 20 |
| ARTICLE IVD. | MembershipMEMBERSHIP | 2213 |
| Sec. D-1. | Generally | 2213 |
| Sec. D-2. | Membership election option prior to July 1, 2014 | 2414 |
| Sec. D-3. | Cessation of membership | 2415 |
| Sec. 4. | Report on employees | 24 |
| ARTICLE VE. | Service Creditable | 26SERVICE CREDITABLE 16 |
| Sec. E-1. | Members to file statement of service, etc | 2616 |

Sec. E-2.     Credit for service................................................................26 16

Sec. E-3.     Employees in military service commencing prior to July 1, 2014 ...... 26 16

Sec. E-4.     Verification of service claimed .........................................29 19

Sec. E-5.     Prior service Service certificates.....................................30 19

Sec. E-6.     Creditable service at retirement .......................................30 19

ARTICLE VI F.     31 BENEFITS PROVIDED TO MEMBERS..................... 20

Part A     Service Retirement Allowance ..................................................31

Sec. F-1.     Petition for retirement, mandatory age ...............................31 20

Sec. F-2.     Amount of allowance—Old Plan Members.........................34 /New Plan 22

Sec. 2.1.     Amount of allowance—New Plan Members ...............................35

Sec. 2.2 F-3.     Pension Multiplier...................................................35 23

Sec. 3 F-4.     Disposition of surplus benefits upon death of beneficiary retired member ..............................................................................36 24

Sec. 4 F-5.     Retirement allowance for certain persons leaving city City employment after eight years service (40 & 8)................................37 24

Part B     Total Disability Pension and Retirement Allowances ...................................39

Sec. F-6.     Reduced Early Pension Benefits (40 & 8 Vesting Retirees)...................25

Sec. 1 F-7.     Duty disability.........................................................39 26

Sec. 2 F-8.     Duty disability benefits; members in service on or after July 1, 1941 but prior to January 1, 1969 .......................................40 26

Sec. 2.1 F-9.     Duty disability benefits; members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10 ....................................................................41 28

Sec. F-10.     Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below .........................................29

Sec. 3 F-11.     Non-duty disability ........................................................50 31

Sec. 4.     Benefits ..............................................................................50 F-12. Disability retire

Part C     Application, Escalation and Change in Compensation, Rank .......................51

Sec. 1 F-13.     Generally.................................................................51 34

Sec. 2 F-14.     Increase of Benefits.............. 52 ; Pension Improvement Factor (Escalator) 35

Sec. 3 F-15.     Payment......................................................................54 36

# TABLE OF CONTENTS
(continued)

Part D — Death Benefits ........................................................................... 54

    Sec. 1F-16.    Generally ................................................................. 5436

Part E — Nonduty Death ............................................................................ 56

    Sec. 1F-17.    Payment of accumulated contributionsAccumulated Contributions .... 5638

    Sec. 2F-18.    Allowances to widows, etcsurviving spouses ........... 5738

Part F — Termination of Membership Otherwise than by Retirement, Death or Becoming a Beneficiary .................................................................. 59

    Sec. 1F-19.    Payment of benefits .................................................. 5940

    Sec. 2F-20.    Payment of benefits .................................................. 6040

    Sec. 3F-21.    Deferred vested benefits .......................................... 6040

Part G — Conviction of Felony ................................................................... 60

    Sec. 1F-22.    Forfeiture of rights .................................................. 6041

Part H — Option Elections ......................................................................... 60

    Sec. 1F-23.    Generally ................................................................. 6041

    Sec. 2F-24.    Disposition of surplus benefits upon death of memberMember and beneficiaryBeneficiary .............................. 6343

Part I — Pension Offset by Compensation Benefits .................................. 63

    Sec. F-25.    Generally ................................................................. 43

    Sec. 1F-26.    Generally ................................................................. 6343

Part J — Monthly Payments ....................................................................... 63

Part K — Re-Examination of Beneficiaries ............................................... 63

    Sec. 1F-27.    Authority of Board .................................................. 6344

Part L — Medical Board of Review ............................................................ 65

Part M — Benefit Limitations .................................................................... 65

Part N — Withdrawal of Accumulated Contributions ............................... 65

    Sec. 1F-28.    Member With Twenty or Twenty-Five Years of Service ................... 6545

    Sec. 2F-29.    Disabled Member ................................................... 6545

ARTICLE VII.   Method of Financing ....................................................... 69

    Sec. F-30.    Optional Annuity Withdrawal ............................... 45

ARTICLE G.    METHOD OF FINANCING ........................................ 48

Sec. G-1.     General ................................................................. 48

Sec. ~~1~~G-2.     Annuity Savings Fund ....................................... ~~69~~48

Sec. ~~2~~G-3.     Annuity Reserve Fund ...................................... ~~70~~49

Sec. ~~3~~G-4.     Alternative Financing Method ......................... ~~70~~49

Sec. ~~4~~G-5.     Contributions to and payments from ~~pension accumulation fund~~Pension Accumulation Fund ............... ~~76~~50

Sec. ~~5~~G-6.     Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service .................................... ~~77~~51

Sec. ~~6~~G-7.     Expense Fund .................................................... ~~77~~51

Sec. ~~7~~G-8.     Appropriations ........................... ~~77~~ prior to July 1, 2014 51

Sec. ~~8~~G-9.     Maintenance of reserves ................................... ~~77~~51

Sec. ~~9~~G-10.     Survivors Benefit Fund .................................... ~~78~~51

Sec. ~~10~~G-11.     Computation of ~~annuity and pension reserve~~Annuity and Pension Reserve liabilities of ~~members, retirants and beneficiaries~~Members, Retirees and Beneficiaries ........................... ~~79~~53

Sec. ~~11~~G-12.     Determination of ~~city~~City's annual contribution — Disability ~~pension~~Pension liabilities .......................................... ~~82~~56

Sec. ~~12~~G-13.     Determination of ~~city~~City's annual contribution — Death ~~pension~~Pension liabilities ................................... ~~82~~56

Sec. ~~13~~G-14.     Determination of ~~city~~City's annual contribution — Actuarial evaluation of annuity and ~~pension reserve~~Pension Reserve liabilities ................................ ~~82~~57

Sec. ~~14~~G-15.     Determination of ~~city~~City's annual contribution — Service ~~pension~~Pension liabilities for Fiscal Years commencing prior to July 1, 2014 ............................... ~~82~~57

Sec. ~~15~~G-16.     Board of trustees to compute ~~city~~City's annual contribution ............. ~~83~~57

~~Sec. 16.     Repealed.................................................................... 83~~

Sec. G-17.     Refunds for certain ~~members~~Members ............................................... ~~83~~58

~~ARTICLE VIII.     Management of Funds~~ ........................................ ~~85~~

Sec. G-18.     Employer Contribution ....................................... 58

ARTICLE H.     MISCELLANEOUS ................................................ 59

Sec. H-1.     ~~Board named Trustees for various funds~~Recall of Retirees during emergencies ................................ ~~85~~59

Sec. 2. Purchase, sale, etc., of securities and investments ........................................... 85

Sec. 3. Annual interest ........................................................................................... 85

Sec. 4. Custodian of funds ..................................................................................... 85

Sec. 5. Available funds shall be kept upon deposit ..................................................... 86

Sec. 6. Prohibition against reversion of funds to the City ............................................ 86

Sec. 7. Enforcement; Civil Action ........................................................................... 86

ARTICLE IXI. Miscellaneous .................... 87DEFERRED RETIREMENT OPTION PLAN 60

Sec. I-1. Assignments prohibitedGeneral provisions ............................................ 8760

Sec. I-2. Protection against fraudConversion to Retirement Allowance ........... 8760

Sec. I-3. Errors ......................................................... 87Investment of DROP assets 60

Sec. I-4. Recall of beneficiaries during emergenciesDistribution of amounts credited to DROP Account ................................................................. 8761

Sec. I-5. Limitation of other statutesDeath of Member while participating in the DROP program ................................................................... 8861

Sec. I-6. Tax Qualified Plan89Disability of Member While Participating in the DROP Program

Sec. I-7. Definition of Compensation ........................................... 89Cost Neutrality 62

Sec. 8. Limitation of Compensation ........................................................................ 90

Sec. 9. Limitation of Benefits ............................................................................... 91

Sec. 10. Direct Rollovers ...................................................................................... 92

ARTICLE XJ. Collective Bargaining Agreements94PARTICIPANT ANNUITY SAVINGS FUND LOAN P

ARTICLE XI. Compliance With USERRA ................................................................. 95

ARTICLE XII. Deferred Retirement Option Plan ...................................................... 96

ARTICLE XIIISec. J-1. ........................ Participant Annuity Savings Fund Loan Program 10164

ARTICLE K. SPECIAL PLAN OF ADJUSTMENT PROVISIONS ................................ 67

Sec. K-1. Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment ................................................................... 67

Sec. K-2. Income Stabilization Benefits ............................................................. 67

Sec. K-3. Restoration of Pension Benefits ........................................................... 70

APPENDIX A ................................................................................................ 79

ARTICLE IX, SECTION 24 OF STATE OF MICHIGAN CONSTITUTION ................... 79

CITY OF DETROIT CHARTER ........................................................................... 80

DETROIT CITY CODE ...................................................................................... 81

# **COMPONENT II**

**§ 24. Public pension plans and retirement systems, obligation.**

Sec. 24. The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

ARTICLE 11.
RETIREMENT PLANS

**Sec. 11-101.    City's Duties.**

1.    The city shall provide, by ordinance for the establishment and maintenance of retirement plan coverage for city employees.

2.    Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3.    The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

**Sec. 11-102.    Continuation of Existing Plans.**

The retirement plans of the city existing when this Charter takes effect, including the existing governing bodies for administering those plans, the benefit schedules for those plans and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before unless changed by this Charter or an ordinance adopted in accordance with this article.

**Sec. 11-103.    Principles Applicable In Administering Plans.**

Not more than two (2) governing bodies for administering the city's retirement plans may be established.

1.    The board of trustees of the general retirement system shall consist of:

A.    The mayor;

B.    A city council member selected by that body;

C.    The city treasurer;

D.    Five (5) members of the retirement system, to be elected by the members of the retirement system under rules and regulations as may be adopted by the board;  except that not more than one (1) trustee shall be elected from any department;

E.    A citizen of the city who is neither an employee of the city nor eligible to receive benefits under the retirement system, appointed by the mayor, subject to approval of the Board; and

iii

F. One (1) retirant, receiving benefits under the retirement system and elected by retired city employees under procedures established by ordinance.

2. The board of trustees of the police and fire retirement system shall consist of:

A. The mayor or in the absence of the mayor, a designee;

B. A city council member selected by that body;

C. The city treasurer;

D. The chief of police;

E. The fire commissioner;

F. Three (3) firefighters who are members of the retirement system elected by the firefighter members under the rules and regulations as may be adopted by the board. Trustees shall be:

1. Two (2) to be elected by and from members holding the rank of lieutenant (or equivalent) and lower ranks;

2. One (1) to be elected by and from members holding a rank above lieutenant (or equivalent);

G. Three (3) police officers who are members of the retirement system elected by police officer members under the rules and regulations as may be adopted by the board. Trustees shall be:

1. Two (2) to be elected by and from members holding the rank of lieutenant (or equivalent) and lower ranks;

2. One (1) to be elected by and from members holding a rank above lieutenant (or equivalent); and

H. Two retirants, receiving benefits under the retirement system, who shall be residents of the city, one elected by retired firefighters and one elected by retired police officers under procedures established by ordinance.

Staff services required by a governing body shall be provided as determined by the finance director.

**Sec. 11-104. Information Required Before Benefit Increase.**

Before final action on any proposed change in future retirement benefits is taken, the city council shall obtain a report as to the immediate and long-term costs of the change from an independent actuary of its choosing and may not take final action until at least three (3) months after the report of the actuary is made public at a meeting of the city council.

-

**Sec. 11-105.   Audits.**

The board of trustees for the city retirement plans shall contract for annual independent audits.

**CHAPTER VII OF TITLE IX**
**OF THE**
**1918 CITY OF DETROIT CHARTER**
**as amended and supplemented from time to time**
**by amendments to the Charter, City Ordinance and by Agreement**


Including


**CHAPTER 54, ARTICLE II**
**OF THE**
**1964 DETROIT CITY CODE**
**as amended and supplemented from time to time**
**by City Ordinance**
**which was saved from repeal by**
**Section 11-102 of the 1974, 1997, and 2012 Detroit City Charters**
**and incorporated by reference into, but not codified in,**
**Chapter 47 of the 1984 Detroit City Code**

1

## ARTICLE A.  COMMON PROVISIONS OF THE POLICE AND FIRE RETIREMENT SYSTEM

### Sec. A-1.        Common Provisions

Certain provisions of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014.  Those provisions are set forth in the following Sections of Component I:

(a)        Article I (General Provisions);

(b)        Article II (Definitions):

Actuarial Equivalent or Actuarially Equivalent

Actuarially Equivalent Value

Administrative Board of Trustees

Administrative Rules and Regulations

Age; Attainment of

Board of Trustees or Board or Retirement Board

City

City Council or Council

Combined Plan

Component I

Component II

~~Special Provisions~~DFFA

DPLSA

DPCOA

DPOA

Detroit Police and Fire Retirement System or Retirement System

Fiscal Year

Internal Revenue Code or Code

Investment Committee

Medical Director

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse;

Straight Life Retirement Allowance; and

Total Disability or Totally Disabled;

(c)    Article 13 (Limitation on Benefits and Contributions);

(d)    Article 14 (Retirement System Administration);

(e)    Article 15 (Management of Funds);

(f)    Article 16 (Investment of Retirement System Assets); and

(g)    Article 18 (Miscellaneous).

## ARTICLE B.  FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM AS OF JUNE 30, 2014

**Sec. B-1.**　　　　**Freeze of Police and Fire Retirement System as of June 30, 2014.**

Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code, or in Chapter 54, Article II of the 1964 Detroit City Code, or any ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 (the "Freeze Date")~~—~~:

(a)　　No new employee hired by the City on or after July 1, 2014 shall become a ~~member~~Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date;

(b)　　No employee who is rehired by the City on or after July 1, 2014 and who received a distribution of his accumulated employee contributions prior to July 1, 2014, shall become a ~~member~~Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date; provided, however, that if a ~~member~~Member who is entitled to a Frozen Accrued Benefit as defined in subsection (d) of this Section ~~54-2-15~~B-1 and who is rehired by the City on or after July 1, 2014 repays to the Police and Fire Retirement System in accordance with a payment schedule approved by the Board of Trustees the amount of accumulated employee contributions that he withdrew, then such ~~member~~Member shall be eligible to accrue service credit under this Component II following rehire solely for the purpose of determining the ~~member~~Member's eligibility for payment of his Frozen Accrued Benefit;

(c)　　No ~~member~~Member shall make contributions to the Annuity Savings Fund under the Police and Fire Retirement System in effect as of June 30, 2014 with respect to ~~wages earned~~payroll dates occurring on or after ~~July 14~~August 1, 2014 and all ~~member~~Member contributions made with respect to payroll dates occurring on or after ~~July 14~~August 1, 2014 shall be made to and in accordance with the terms of Component I of the Combined Plan ~~for the Police and Fire Retirement System of the City of Detroit, Michigan~~;

(d)　　Benefit accruals for ~~members~~Members with respect to service rendered prior to July 1, 2014 will be frozen based on a ~~member~~Member's years of service and Average Final Compensation and the pension multiplier formulae as of such Freeze Date ("Frozen Accrued Benefit");

(e)　　Except as otherwise provided in this Section ~~54-2-15~~B-1, compensation of a ~~member~~Member shall be frozen effective as of the Freeze Date for purposes of determining the ~~member~~Member's Frozen Accrued Benefit.  No compensation of any type earned by a ~~member~~Member after the Freeze Date shall be taken into consideration for purposes of determining the ~~member~~Member's Frozen Accrued Benefit under the Police and Fire Retirement System;

(f)     Any ~~member~~Member who, as of June 30, 2014, would have been eligible to elect to use a portion of the unused accrued sick leave that he could have received in cash upon retirement ("Cashable Sick Leave") to increase his Average Final Compensation if the ~~member~~Member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election to have the value of twenty-five percent (25%) of the ~~member~~Member's Cashable Sick Leave as of June 30, 2014 included in the computation of the ~~member~~Member's Average Final Compensation for purposes of determining the ~~member~~Member's Frozen Accrued Benefit ("Sick Leave Election"); provided, however, that the amount of the member's Cashable Sick Leave at the time the completed election form is received by the Retirement System is at least equal to the value of twenty-five percent (25%) of the ~~member~~Member's Cashable Sick Leave as of June 30, 2014 and, provided further that the completed election form is received by the Retirement System no later than ~~August 15, 2014~~the dates established by the City. A ~~member~~Member's Sick Leave Election shall be made in the manner set forth by the Board of Trustees and the Police and Fire Retirement System. Notwithstanding anything in this subsection (f) to the contrary, a ~~member~~Member's Sick Leave Election will be void and the determination of the ~~member~~Member's Average Final Compensation for purposes of calculating the ~~member~~Member's Frozen Accrued Benefit will not take into account any of the ~~member~~Member's Cashable Sick Leave, if (i) the electing ~~member~~Member would not have been eligible to receive an immediate service retirement benefit if he retired as of June 30, 2014, and (ii) the electing ~~member~~Member's employment with the City is terminated before the electing ~~member~~Member becomes eligible for an immediate service retirement benefit under the Police and Fire Retirement System;

(g)     Service earned after the Freeze Date shall be credited to a ~~member~~Member under this Component II solely for purposes of determining a ~~member~~Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit and to a rehired ~~member~~Member solely for purposes of determining the ~~member~~Member's eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all ~~members~~Members for benefit accrual purposes under the terms of the Police and Fire Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no ~~member~~Member shall earn service credit with respect to benefits payable under the terms of the Police and Fire Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(h)     ~~Effective as of July 1, 2014, the~~The Deferred Retirement Option Plan ("DROP") shall ~~be closed to, and no longer a distribution option with respect the Frozen Accrued Benefit of, members who are represented by the Detroit Fire Fighters Association or the Detroit Police Officers Association and who, as of June 30, 2014, have not elected to participate in the DROP. The DROP shall~~ remain in effect for all ~~members~~Members who have either ~~have~~ enrolled in or elected to participate in the DROP as of June 30, 2014. ~~Further, for members who are represented by the Detroit Police Command Officers Association and the Detroit Police Lieutenants and Sergeants Association who~~Members also may elect to participate in the DROP after June 30, 2014 with respect to their Frozen Accrued Benefits; however, participation

in DROP with respect to ~~their~~such Frozen Accrued ~~Benefit~~Benefits shall be limited to five years.

The foregoing terms of Section ~~54-2-15~~B-1 shall be referred to as the "Freeze" of the provisions of the Police and Fire Retirement System as in effect on the Freeze Date and the provisions of Component II of the Police and Fire Retirement System shall be interpreted and construed by the Board of Trustees and the Police and Fire Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section ~~54-2-15~~B-1 and ~~other~~the provisions ~~in~~of Chapter 54 of the 1964 Detroit City Code, or any Charter, ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other document governing terms of employment of an employee, the Board of Trustees and the Police and Fire Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

~~(Ord. No. 12-14, Sec. 54-2-15.)~~

~~**Sec. 2.     Limitation on Interest Crediting Rate for Police and Fire Retirement System Annuity Savings Fund; Rates of Regular Interest Adopted by Board for Actuarial Purposes.**~~

~~Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code or in Chapter 54, Article II of the 1964 Detroit City Code, or any City Charter provision, ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 for plan years beginning on and after July 1, 2014;~~

~~(a)     the annual rate of return credited to a member's account in the Annuity Savings Fund of the Police and Fire Retirement System of the City of Detroit shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the System's invested reserves for the second fiscal year immediately preceding the fiscal year in which the annual return is credited; and~~

~~(b)     the rate(s) of regular interest adopted by the Board from time to time as necessary for the operation of the system on an actuarial basis shall not violate the plan for the adjustment of debts of the City of Detroit, as confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846).~~

~~(Ord. No. 13-14, Sec. 54-2-16.)~~

# ~~ARTI~~

## ~~Name and Date of Establishment.~~

~~A Pension System for Policemen and Firemen of the City of Detroit Police and Fire Departments is hereby established for the purpose of providing retirement allowances, death and survivor benefits for eligible police and fire employees and their beneficiaries. The effective date of this System is July 1, 1941. Upon the effective date of this Ordinance, the former *Policemen and Firemen Retirement System* shall be called the *Police and Fire Retirement System*. (Ord. No. 04-05, Sec. 54-43-1.)~~

**~~By Agreement~~**

~~Defined Contribution Plan for Current and New Hires – The City reserves the right to design, establish, manage, amend, and implement a Defined Contribution Plan and related duty disability retirement provisions for current employees and new hires, which may include a Defined Contribution Retirement health care plan.~~

~~The City reserves the right to modify, amend, and/or eliminate any and all aspects of its pension/retirement plan(s), unless prohibited by law.~~

# ARTICLE ~~II.~~C.  DEFINITIONS

## Sec. C-1.    Definitions.

~~The following words and phrases as used in this amendment, unless~~Unless a different meaning is plainly required by ~~the~~ context, ~~shall have~~for purposes of this Component II the following words and phrases have the meanings respectively ascribed to them by this Section C-1:

(1)    *Accrued Service* shall mean a Member's credited service for employment rendered before the date of an actuarial valuation of the Retirement System and before July 1, 2014.

~~Sec. 1. "System" shall mean the Police and Fire Retirement System of the City of Detroit created and established by Title IX, Chapter VII of the 1918 charter of the city as amended through June 30, 1974 and continued in effect by the provisions of the July 1, 1974 city charter. (Ord. No. 77-H, Sec. 54-2-1.)~~

~~The system consists of a defined benefit plan (having a pension accumulation fund and pension reserve fund) and a defined contribution plan (having an annuity savings fund and annuity reserve fund) and income and expense funds applicable to each of the plans.~~

~~Sec. 2. "Policemen" shall mean all employees of the Police Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter, and who shall be in the employ of the Police Department of the City of Detroit on the effective date of this amendment and all persons who shall take the said oath of office and become members of the Police Force thereafter, excluding Patrolmen of either departments, privately employed patrolmen and special patrolmen.~~

~~Sec. 3. "Firemen" shall mean all employees of the Fire Department employed therein prior to November 10, 1937, and all future employees whom the Board of Trustees shall designate as Firemen; provided, however, that employees inducted subsequent to November 10, 1937, and excluded from the provisions hereof by reason of their classification as civilian employees, shall become eligible for membership in the Retirement System for employees of the City of Detroit under Title IX, Chapter VI of the 1918 Detroit City Charter, and their inclusion under such System shall not affect the rights of any other member of the Fire Department.~~

~~Sec. 4. "Member" shall mean any member of the retirement system who has not retired. (Ord. No. 77-H, Sec. 54-2-1.)~~

~~Sec. 5. "City" shall mean the City of Detroit, State of Michigan.~~

~~Sec. 6. "The Council" shall mean the City Council of the City of Detroit.~~

~~(Per July 1, 1974 Charter, "The Council" means City Council of the City of Detroit.)~~

~~Sec. 7. "The Medical Director" shall mean the physician provided for in Article III, Section 12 (a) of this amendment.~~

~~Sec. 8. "Service" shall mean service as a Policeman or Fireman.~~

~~Sec. 9. "Prior service" shall mean service as an employee of the Police Department or Fire Department prior to the effective date of this amendment.~~

~~Sec. 10. "Membership service" shall mean the total service rendered as a Policeman or Fireman after the effective date of this amendment.~~

~~Sec. 11. "Beneficiary" shall mean any person, except a retirant, who is in receipt of a retirement allowance or pension payable from funds of the system. (Ord. No. 77-H, Sec. 54-2-1.)~~

~~Sec. 12. "Regular Interest" shall mean, for a period of five years from the effective date of the system interest at four per centum per annum, compounded annually. For the subsequent five year period, and each five year period thereafter "regular interest" shall be such rate of interest as the Board of Trustees, in its discretion, may determine and adopt.~~

~~Sec. 13. "~~*(2) Accumulated* ~~contributions"~~ *Contributions* shall mean the sum of all amounts deducted from the compensation of a ~~member~~Member and credited to his individual account in the Annuity Savings Fund, together with ~~regular interest~~Regular Interest, as provided in ~~Article VII and VIII of this amendment~~this Component II of the Combined Plan.

*(3) Annuity shall mean payments derived from the Accumulated Contributions of a Member.*

*(4) Annuity Reserve shall mean the present value of all payments to be made on account of any Annuity, or benefits in lieu of any Annuity, computed on the basis of such mortality tables and Regular Interest as shall be adopted by the Board of Trustees.*

~~Sec. 14.~~*(5)* "*Average Final Compensation*" shall mean:

~~(a).~~ With respect to an "~~old plan member~~Old Plan Member" (an employee described in Section F-2(a)) the current maximum salary for the rank(s), grade(s) or position(s) held by the ~~member~~Member over the sixty (60) months immediately preceding the earlier of: (i) the date his employment with the ~~city~~City last terminated and (ii) June 30, 2014. The salary shall be obtained from the official compensation schedule for the ~~fiscal year of the member's elective date of retirement~~ [Fiscal Year of the earlier of the dates described in (i) or (ii) and an average ~~is~~shall be determined]. A ~~member~~Member who retires on or after July 1, ~~1998~~2000 (for DPCOA and DFFA members) or July 1, 1998 (for all other Members) shall have the ~~member~~Member's most recent full longevity payment included in his ~~average final compensation~~Average Final Compensation.

(b)~~.~~.  With respect to a "~~new plan member~~" **[retiring on or after July 1, 1992]**New Plan Member" (an employee described in Section F-2(b)) the current maximum salary for the rank(s), grade(s) or position(s) held by the ~~member~~Member over the sixty (60) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.  The salary shall be obtained from the official compensation schedule for the ~~fiscal year of the member's elective date of retirement~~ **[**Fiscal Year of the earlier of the dates described in (i) or (ii) and an average ~~is~~shall be determined**]**.  If more than one (1) rank, grade or position has been held over the sixty (60) month period, a weighted average is determined based on time spent in each rank, grade or position during this sixty (60) ~~months~~month period.

> (~~Ord. No. 18-93, Sec. 47-12.2-14(C).)~~i)  A ~~member~~Member who retires on or after July 1, ~~1998~~2000 (for DPCOA and fire equivalents) or July 1, 1998 (for all other Members) shall have the ~~member~~Member's most recent full longevity payment included in his ~~average final compensation.~~Average Final Compensation.

> (ii)  Effective July 1, 2000, ~~the average final compensation~~Average Final Compensation shall be calculated for members of the DPCOA, Executive members and their fire equivalents by using the current maximum salary for the rank(s), grade(s) or position(s) held by the ~~member~~Member over the thirty-six (36) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.

~~Effective July 1, 1992, with~~c.  With respect to reduced duty disability retirements~~,~~ occurring on or after July 1, 1992, notwithstanding the provisions of Article ~~VI~~F, Part B, Section ~~2.1~~F-8, for those ~~members~~Members who receive benefits under Article ~~VI~~F, Part B, Section ~~2.1~~F-9(a), the ~~average final compensation~~Average Final Compensation used in the computation of the reduced duty disability allowance shall mean the maximum salary at the date of conversion to reduced duty disability retirement for the rank(s), grade(s), or positions(s) which were held by the ~~member~~Member over the sixty (60) months prior to his or her duty disability retirement.  ~~(Ord. No. 18-93, Sec. 47-12.2-14(E).)~~

~~For~~d.  Subject to Section B-1(f), for purposes of computing the ~~average final compensation~~Average Final Compensation received by a ~~member~~Member who retires on or after July 1, 2008 and prior to July 1, 2014, the ~~member~~Member shall have the option of adding the value of the three year average of twenty-five percent (25%) of the ~~member's~~Member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation.

9

**By Agreement**

Definition ofe.     The Average Final Compensation

The average final compensation for "old plan" and "new plan" members [or for "old plan" members and for "new plan" membersfor "Old Plan" and "New Plan" Members represented by DFFA retiring on or after [July 1, 1992 or on or after July 1, 2000] for Members represented by DPOA is calculated by using the current maximum salary for the rank(s), grade(s) or position(s) held by the member over the sixty (60) months just prior to the member's elective date of retirement [plus the amount of their most recent full longevity paymentpursuant to paragraph (b) above.     The salary is obtained from the Official Compensation Schedule for the fiscal yearFiscal Year prior to the memberMember's elective date of retirement and an average isshall be determined].

**DFFA**

f.     Effective July 1, 2000, for membersMembers represented by DFFA with a parity relationship with the DPCOA Inspector, the average final compensationAverage Final Compensation shall be calculated by using the current maximum salary for the ranks(s), grade(s), or position(s) held by the member over the thirty six (36) months just prior to the member's elective date of retirementpursuant to paragraph (b)(ii) above.  The salary is obtained from the Official Compensation Schedule for the fiscal yearFiscal Year prior to the memberMember's elective date of retirement and an average isshall be determined.

g.     For members havingMembers represented by DFFA who have a parity relationship with the DPLSA and the DPCOA Inspector, who retire on or after July 1, 1998 and for those having a parity relationship with the DPOA who retire on or after July 1, 2000 and prior to July 1, 2014, the amount of the memberMember's most recent full longevity payment shall be included in the definition of average final compensationAverage Final Compensation.

All membersh.     Subject to Section B-1(f), all Members represented by DFFA who retire on or after July 1, 2008 and prior to July 1, 2014, may choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank and have that sum included in the average compensation used to compute the membersMembers' service pensionPension of their retirement allowanceRetirement Allowance.

**DPCOA**

Retirement and Death Sick Leave Payment

(i.    Subject to Section B-1(f) ~~Effective January 15, 2010~~, non-union uniformed Police and Fire executives ~~shall receive full pay for one hundred percent (100%) of the unused accumulated sick bank amounts, or~~

represented by DPCOA who retire on or after January 15, 2010 and prior to July 1, 2014 may ~~(2)~~ choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank ~~as provided in (1) above~~, and have that sum included in the ~~average final compensation~~Average Final Compensation used to compute the ~~member~~Member's service ~~pension~~Pension of their ~~retirement allowance. For any member choosing to exercise this option, the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in (1) above.~~Retirement Allowance.

---

> **~~DPLSA~~**

---

~~(1)  Effective July 1, 2008, a member shall receive full pay for eighty-five percent (85%) of the unused accumulated sick bank amounts, or~~

j.    Subject to Section B-1(~~2~~f), a Member represented by DPLSA who retires on or after July 1, 2008 and prior to July 1, 2014 choose to receive the 3-year average of twenty-five percent (25%) of ~~the~~the eighty-five percent (85%) of his or her unused accrued sick leave bank ~~as provided in 1) above~~, and have that sum included in the ~~average final compensation~~Average Final Compensation used to compute the ~~member~~Member's service ~~pension~~Pension of their ~~retirement allowance. For any member choosing to exercise this option, the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in 1) above.~~Retirement Allowance.

(6)    *Beneficiary* shall mean any person or persons (designated by a Member pursuant to procedures established by the Board) who are in receipt of a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

---

(7)    *Decrement Probabilities* shall mean the probabilities of a Member's withdrawal from City employment, death while in the employ of the City, retirement from City employment with a Pension payable from funds of the Retirement System, and death after retirement.

~~Sec. 15.  "~~(8)  *Final ~~compensation~~*Compensation* shall mean the annual rate of earnable compensation of a ~~member at~~Member at the earlier of (i) the time of termination of employment or (ii) June 30, 2014. Effective July 1, 1992 and prior to July 1, 2014, compensation shall also include the value of the percentage reduction in compensation for non-union employees, pursuant to ordinance, resolution or executive order. In cases of any doubt regarding these values, the decisions of the Board of Trustees ~~of the Policemen and Firemen Retirement System of the City of Detroit~~ shall be controlling to implement the intention that no non-union

employee will suffer a diminution of ~~pension~~Pension benefits computation due to reduction in compensation because of fiscal emergency and that ~~pension~~Pension benefits with respect to ~~fiscal years~~Fiscal Years beginning July 1, 1992 and ~~thereafter~~ending June 30, 2014 should always be computed as if no reduction in compensation occurred due to ordinance, resolution or executive order or directive. ~~(Ord. No. 18-93, Sec. 47-12.2-14(D).)~~

(9) *Fire Employees* (formerly referred to as "Firemen") shall mean all employees of the Fire Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter employed therein prior to November 10, 1937, and who shall be in the employ of the Fire Department of the City of Detroit prior to the effective date of this amendment and restatement and, where the context requires, all persons who shall take the said oath of office and become members of the Fire Department thereafter.

(10) *Fire Fighter* shall mean the rank in the Fire Department currently or previously classified by the civil service commission as Fire Fighter.

(11) *Member* shall mean any member of the Retirement System who has not retired.

(12) *Membership Service* shall mean the total service rendered as a Police Employee or Fire Employee prior to July 1, 2014.

~~Sec. 16. "Annuity" shall mean payments derived from the accumulated contributions of a member. (Ord. No. 77-H, Sec. 54-2-1.)~~

~~Sec. 17. "Accrued Service" shall mean a member's credited service for employment rendered before the date of an actuarial valuation of the retirement system. (Ord. No. 77-H, Sec. 54-2-1.)~~

~~Sec. 18. "Pension" shall mean the portion of a retirement allowance which is paid for by appropriations made by the City. (Ord. No. 77-H, Sec. 54-2-1.)~~

~~Sec. 19. "Retirement allowance" shall mean the sum of the annuity and the pension.~~

~~Sec. 20. "Retirement" shall mean for any member that such member has retired, with a pension payable from the funds of the retirement system.~~

~~Sec. 21. "Annuity reserve" shall mean the present value of all payments to be made on account of any annuity, or benefits in lieu of any annuity, computed on the basis of such mortality tables and regular interest as shall be adopted by the Board of Trustees.~~

~~Sec. 22. "Pension Reserve" shall mean the present value of all payments to be made on account of any pension, or benefit in lieu of any pension, computed upon the basis of such mortality tables and regular interest as shall be adopted by the Board of Trustees.~~

~~Sec. 23. "Merit Board" shall mean the Police Merit Board established by section 14, of Chapter XXI, of Title IV, of the 1918 Detroit City Charter, as amended.~~

Sec. 24. "Patrolman" shall mean the rank in the Police Department currently known as patrolman. (As amended November 5, 1968. In effect January 1, 1969.)

Sec. 25. "Fire-fighter" shall mean the rank in the Fire Department currently classified by the civil service commission as fire-fighter. (As amended November 5, 1968. In effect January 1, 1969.)

Sec. 26. "Board of trustees" or "board" shall mean the board of trustees of the City of Detroit police and fire retirement system. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 27. "Decrement probabilities" shall mean the probabilities of a member's withdrawal from City employment, death while in the employ of the City, retirement from City employment with a pension payable from funds of the retirement system, and death after retirement. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 28. "Salary factors" shall mean the ratio between a member's rate of compensation as of the date of an actuarial valuation of the retirement system and his rate of compensation as of the date of his retirement. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 29. "Retirant" shall mean any member who has retired with a pension payable from funds of the retirement system. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 30. "Old plan" (13) *New Plan* shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(A) and (BD) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect through June 30, 2014 by Article 11, Section 102 of the July 1, 1974 City of Detroit Charter. (Ord. No. 18-93, Sec. 47-12.6A-2.3.)

Sec. 31. "New plan" (14) *Old Plan* shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(DA) and (B) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect through June 30, 2014 by Article 11, Section 102 of the July 1, 1974 City of Detroit Charter. (Ord. No. 18-93, Sec. 47-12.6A-2.3.)

(15) *Patrolman* shall mean the rank in the Police Department currently or previously known as patrolman.

(16) *Pension* shall mean the portion of a Retirement Allowance which is paid for by appropriations made by the City.

(17) *Pension Reserve* shall mean the present value of all payments to be made on account of any Pension, or benefit in lieu of any Pension, computed upon the basis of such mortality tables and Regular Interest as shall be adopted by the Board of Trustees.

(18) *Police Employees* (formerly referred to as "Policemen") shall mean all employees of the Police Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter, and who

13

shall be in the employ of the Police Department of the City of Detroit prior to the effective date of this amendment and restatement and, where the context requires, all persons who shall take the said oath of office and become members of the Police Department thereafter.

(19)   *Prior Service* shall mean service in the military rendered prior to July 1, 2014 as provided in Section E-3.

(20)   *Regular Interest* shall mean, for a period of five years from the effective date of the Retirement System interest at four per centum per annum, compounded annually.   For the subsequent five year period, and each five year period beginning thereafter but prior to July 1, 2013, Regular Interest shall be such rate of interest as the Board of Trustees, in its discretion, may determine and adopt. For Fiscal Years beginning on and after July 1, 2013:

    a.   the annual rate of return for purposes of determining the Regular Interest to be credited to a Member's account in the Annuity Savings Fund shall not be less than zero and shall not be greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second Fiscal Year immediately preceding the Fiscal Year in which the Regular Interest is credited; and

    b.   the rate(s) of Regular Interest adopted by the Board from time to time as necessary for the operation of the Retirement System on an actuarial basis shall not violate the Plan of Adjustment.

(21)   *Retiree* shall mean any Member who has retired with a Pension payable from funds of the Retirement System.

(22)   *Retirement* shall mean for any Member that such Member has retired, with a Pension payable from the funds of the Retirement System.

(23)   *Retirement Allowance* shall mean the sum of the Annuity and the Pension.

(24)   *Retirement System or System* shall mean the Police and Fire Retirement System of the City of Detroit created and established by Title IX, Chapter VII of the 1918 Charter of the City as amended through June 30, 1974 and continued in effect by the provisions of the July 1, 1974 City Charter, and as set forth in the Combined Plan effective as of July 1, 2014 and this amendment and restatement of the Combined Plan.

(25)   *Salary Factors* shall mean the ratio between a Member's rate of compensation as of the date of an actuarial valuation of the Retirement System and his rate of compensation as of the earlier of (i) the date of his Retirement and (ii) June 30, 2014.

(26)   *Service* shall mean service with the City as a Police Employee or Fire Employee.

14

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accrued Liability Fund | Section G-4(a) |
| additional years | Section F-9(a)(3) |
| Adjusted Pension Benefit | Section K-1(1) |
| Annuity Reserve Fund | Section G-3 |
| Annuity Savings Fund | Section G-2(a) |
| ASF Excess Return | Section G-2(f) |
| Authority | Section K-2(1) |
| Cashable Sick Leave | Section B-1(f) |
| COLA | Section K-3 |
| Deferred Retirement Option Plan (DROP) | Section B-1(h), Article I |
| Determination Date | Section G-4(a) |
| Disability Retirement Review Board | Section F-12(b) |
| Eligible Pensioner | Section K-2(5) |
| Estimated Adjusted Annual Household Income | Section K-2(3)b |
| Expense Fund | Section G-7 |
| Federal Poverty Level | Section K-2(6) |
| Freeze | Section B-1 |
| Freeze Date | Section B-1 |
| Frozen Accrued Benefit | Section B-1(d) |
| Funding Conditions | Section K-1(1) |
| Funding Proceeds | Section G-4(a) |
| Funding Target | Section K-3(2)(a) |
| GRS | Section K-2(1) |
| Income Stabilization Benefit | Section K-2(2) |
| Income Stabilization Benefit Plus | Section K-2(3) |
| Income Stabilization Fund | Section K-2(4) |
| New Plan Member | Section F-2(b) |
| Old Plan Member | Section F-2(a) |
| Optional Forms | Section F-23 |
| Option 1. Cash Refund Annuity | Section F-23(a)(1) |
| Option 2. Joint and Last Survivorship Retirement Allowance | Section F-23(a)(2) |
| Option 3. Joint and Seventy-Five Percent Survivor Allowance | Section F-23(a)(3) |
| Option 3(A). Modified Joint and Last Survivorship Allowance | Section F-23(a)(4) |
| Option 3(B). Joint and Twenty-Five Percent Survivor Allowance | Section F-23(a)(5) |
| Participant Loan Program | Section J-1 |
| Pension Accumulation Fund | Section G-5 |
| Pension Funding Transaction | Section G-4(a) |
| Pension Improvement (Escalator) | Section F-14 |
| Pension Reserve Fund | Section G-6 |
| Pop-up Form | Section F-23(b)(ii) |

15

Sick Leave Election                          Section B-1(f)
Standard Form                                Section F-23(b)(i)
State Treasurer                              Section K-2(1)
Straight Life Retirement Allowance           Section F-23
Survivors Benefit Fund                       Section G-10
Transition Cost                              Section G-2(f)
UAAL                                         Section G-4(a)
Waterfall Classes                            Section K-3(1)

Sec. 32.  The masculine pronoun shall include the feminine pronoun.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. II.)

17

## ARTICLE III.

### Administration; Board of Trustees.

**Sec. 1.    Board created.**

There is hereby created a Board of Trustees of the System, in which is vested the general administration, management and responsibility for the proper operation of the System and for making effective the provisions of this amendment. The Board of Trustees shall be organized immediately after five of the Trustees, provided for in this article, shall have qualified and taken the oath of office. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 1.)

**Sec. 2.    Membership of Board.**

The Board of Trustees shall consist of seventeen (17) Trustees as follows:

(1)    The Mayor of the City or his delegate, or his or her designated representative, ex-officio;

(2)    The President of the City Council or another member of the Body elected by the City Council, ex-officio;

(3)    The City Treasurer, or Deputy City Treasurer, ex-officio;

(4)    The Finance  Director, or a designated representative, ex-officio;

(5)    The Budget Director, or a designated representative, ex-officio;

(6)    The Corporation Counsel, or a designated representative, ex-officio;

(7)    Three (3) firefighters who are members of the System to be elected by the Firemen members as follows:

(a)    Two (2) to be elected by and from the members holding the rank of lieutenant, or its equivalent, and lower ranks; and

(b)    One (1) to be elected by and from the members holding ranks above the rank of lieutenant, or its equivalent;

(8)    Three (3) police officers who are members of the System to be elected by the Policemen members, as follows:

(a)    Two (2) to be elected by and from the members holding the rank of lieutenant, or its equivalent, and lower ranks; and

(b)    One (1) to be elected by and from the members holding a rank above the rank of lieutenant, or its equivalent;

(9)     One (1) trustee who neither is a participant in the plan nor employed by the City in any capacity and is selected by the Board;

(10)    Two (2) retirees who are receiving benefits under the System, are residents of the City of Detroit, and are elected in accordance with Section 5 of this Article, as follows:

    (a)     One (1) to be elected by retiree police officers; and

    (b)     One (1) to be elected by retiree firefighters;

(11)    Upon election of a retiree police officer trustee, the Mayor shall designate one (1) non-participating trustee; and

(12)    Upon election of a retiree firefighter trustee, the Mayor shall designate one (1) non-participating trustee.

(Ord. No. 07-12, Sec. 54-2-8.1; Ord. No. 19-93, Sec. 47-9-1; Ord. No. 339-H, Sec. 54-2-9.)

---

## **By Agreement**

---

(a)     The Board of Trustees shall consist of twelve (12) trustees, as follows:

(1)     The Mayor of the City or his/her designated representative, ex-officio.

(2)     The President of the City Council, or another member thereof elected by the City Council, ex-officio.

(3)     The City Treasurer or Deputy City Treasurer, ex-officio.

(4)     The Finance Director or designated representative, ex-officio.

(5)     The Budget Director or designated representative, ex-officio.

(6)     The Corporation Counsel or designated representative, ex-officio.

(7)     Three (3) Firefighters who are members of the system to be elected by the Firefighter members under such rules and regulations as may be established by the Fire Commissioner to govern such elections. Such trustees shall consist of:

    a.     Two (2) to be elected by and from members holding the rank of Lieutenant (or its equivalent) and lower ranks.

    b.     One (1) to be elected by and from the members holding rank above the rank of Lieutenant (or its equivalent).

(8)    Three (3) Police Officers who are members of the system to be elected by the Police Officer members under such rules and regulations as may be established by the Police Chief to govern such elections.  Such trustees shall consist of:

    a.    Two (2) to be elected by and from the members holding the rank of Lieutenant (or its equivalent) and lower ranks.

    b.    One (1) to be elected by and from the members holding ranks above the rank of Lieutenant (or its equivalent).

(b)    Annual elections shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

In each such election the members entitled to vote shall be those of classes provided above, the term of whose representative is about to expire.  The terms of office for all elected trustees shall be three (3) years.  Elected trustees holding office on the effective date of this provision shall serve the remainder of their term.

(c)    Deadlock and thirteenth trustee: **[Effective September 1, 2011,]** an additional thirteenth trustee, who may not be a participant in the plan or employed by the City in any capacity, shall be selected by the Board of Trustees. Such trustee shall serve as a full member of the Board of Trustees and vote on any and all matters considered by the Board.  This thirteenth member of the Board of Trustees, and successors, shall serve as a member for two (2) years from the date of selection.

(d)    Equal number of participant trustees and non-participant trustees: **[Effective September 1, 2011,]** under no circumstances shall the number of trustees on the Board of Trustees who are participants in the plan exceed the number of non-participant trustees named in paragraphs A.1 through A.6 herein.  The Mayor of the City shall designate an additional trustee or trustees pursuant to subparagraph A.1 as necessary to maintain compliance with these provisions.

---

**DPCOA**

---

The City reserves the right to change the composition, structure and decision making procedures of the Pension Board.

**Sec. 3.    Terms of Active Trustees, Trustee Selected by Board, Retirant Trustees, and Trustees Designated by Mayor.**

    (a)    The term of office for elected active trustees under Sections 2(7) and (8) of this Article shall be three (3) years.  Elected trustees holding office on the effective date of this section shall serve the remainder of their term.

    (b)    The term of office for the trustee who is selected by the Board under Section 2(9) of this Code shall be two (2) years from the date of selection.

20

(c)    Except as otherwise provided in Section 4(c), the term of office for elected retirant trustees under Section 2(10) of this Article shall be three (3) years.

(d)    The term of office for trustees who are designated by the Mayor under Sections 2(11) and 2(12) of this Article shall be three (3) years.

(Ord. No. 14-14, Sec. 54-2-8.2; Ord. No. 07-12, Sec. 54-2-8.2)

**Sec. 4.**    **Scheduling of Elections for Active and Retirant Trustees.**

(a)    For active police and firefighters, annual elections shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(b)    For retirants;

    (1)    The first election to elect the two (2) retirant trustees shall be held sixty (60) days after the effective date of this section; and

    (2)    After the first election, an election shall be conducted every three (3) years during the Month of May to fill vacancies created by the expiration of a term.

(c)    A special election for retirant trustees shall be held as soon as practicable after the plan for the adjustment of debts of the City of Detroit is confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846). Notwithstanding anything in Section 3(c) to the contrary, unless a retirant trustee elected by reason of this special election resigns or is removed from the position of trustee in accordance with the terms of the governing documents for the retirement system, a retirant elected to the office of trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the first month of May that follows the third anniversary of the special election, at which time an election for retirant trustees shall be held in accordance with Section 5.

(Ord. No. 14-14, Sec. 54-2-8.3; Ord. No. 07-12, Sec. 54-2-8.3)

**Sec. 5.**    **Procedures for Election of Retiree Trustees.**

The procedures for the election of the retiree trustees shall be as follows:

(a)    *Notice*. A notice of a primary election shall be sent to each retiree of the System by Unites States mail;

(b)    *Nominating petitions*. No candidate's name shall be placed on the primary election ballot, unless a nominating petition containing the signatures of at

21

least one hundred and twenty-five (125) retirees of the System is filed with the Secretary of the Board. The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board;

(c)    *Ballot*. Each candidate whose name appears on the ballot at any election held for the Office of Retiree Trustee shall be identified by the title of the position held at the time of retirement and the word "incumbent" where the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark. Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board;

(d)    *Voting*. Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an active employee trustee;

(e)    *Procedures*. Procedures regarding the selection and certification of successful candidates for nomination, the selection of trustees from nominees, the votes, and the destruction of ballots shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an active employee trustee; and

(f)    Any matters relative to election of the retiree members of the Board not covered by this section shall be according to such rules and regulations as the Board may adopt.

(Ord. No. 07-12, Sec. 54-2-8.4; Ord. 56-H, Sec. 54-3-3.1.)

**Sec. 6.    Vacancies.**

If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled. No vacancy shall result by reason of change in rank or grade of a Trustee during his term of office. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 3.)

**Sec. 7.    Compensation.**

All members of the Board of Trustees shall serve without additional compensation from the City, but they shall be reimbursed from the Expense Fund for all necessary expenses incurred through service on the Board of Trustees. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 4.)

## Sec. 8.    Oath.

Each Trustee shall, within ten days after his appointment or election, take an oath of office to be administered by the City Clerk.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 5.)

## Sec. 9.    Meetings.

(a)    The Board of Trustees shall hold meetings regularly, at least one in each month, and shall designate the time and place thereof.  It shall adopt its own rules of procedure, including provisions for special meetings and notice thereof and shall keep a record of its proceedings.  All meetings of the Board of Trustees shall be public.

(b)    Each Trustee shall be entitled to one vote in the meetings of the Board of Trustees.  Five members of the Board of Trustees, three of whom must be elected members, shall constitute a quorum and a majority of concurring votes shall be necessary for a decision by the Trustees at any meeting of the Board of Trustees.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 6.)

## Sec. 10.    Rules for administration of funds.

Subject to the limitations contained in this amendment, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this amendment and for the transaction of its business.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 7.)

## Sec. 11.    Officers.

The Board of Trustees shall elect from its membership a Chairman and a Vice Chairman.  The City Controller or his representative, shall be ex-officio Secretary of the Board of Trustees. The Board of Trustees may employ, and fix the compensation of such special actuarial, medical and other employees as shall be required.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 8.) (Historical Reference:  the words "and subject to the approval of the Common Council" after the word "employ" in the last sentence were deleted pursuant to Public Act 55 of 1982 effective April 6, 1982.)

## Sec. 12.    Data for actuarial valuation of funds.

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the System and for checking and compiling the experience of the System.  The ordinary actuarial, accounting and clerical services for the operation of the System shall be performed by the employees of the Retirement System provided for by Chapter VI of Title IX of the 1918 Detroit City Charter.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 9.)

23

**Sec. 13.    Record of proceedings; annual report.**

The Board of Trustees shall keep a record of all its proceedings, which shall be open to public inspection.  It shall render a report to the Mayor and the City Council on or before the fifteenth day of July, showing the fiscal transactions of the System for the year ending on the preceding thirty-first day of December, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the System by means of an actuarial valuation of the assets and liabilities of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 10.)

**Sec. 14.    Legal advisor.**

(a)    The Board of Trustees shall appoint a legal counsel who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. The appointment shall be made jointly with the Board of Trustees of the General City Retirement System.

(b)    The legal counsel to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems.   The qualifications of candidates for the position shall be examined by the Board of Trustees.

(c)    The legal counsel to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(d)    Costs and expenses relative to the position of legal counsel to the Board of Trustees shall be payable out of the earnings of the system, subject to approval of the City Council.

(Ord. No. 65-H, Sec. 54-2-10.)

**Sec. 15.    Medical Director.**

(a)    The Board of Trustees shall appoint as Medical Director the Medical Director of the Retirement System provided for by Chapter VI of Title IX of the 1918 Detroit City Charter.

(b)    The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of this amendment; shall investigate all essential statements and certificates by or on behalf of a member in connection with application for disability retirement and in connection with all applications for death benefits, and shall report in writing to the Board of Trustees his conclusions and recommendations on matters referred to him.

(c)    If the Board of Trustees, any member, any beneficiary or any other person claiming, benefits hereunder, shall disagree with any medical finding of the Medical Director, the Board of Trustees on its own motion may or on

24

petition of any such member, beneficiary or person claiming benefits hereunder, shall refer the matter in dispute to a Medical Board of Review consisting of three physicians or surgeons, of whom one shall be named by the Board of Trustees, one by the affected member, beneficiary, or other person claiming benefits, and the third by the two so named.  The Medical Director shall in no case be a member of the Board of Review.  Such Board of Review shall be named within ten days after the filing of such petition.  The Board of Review shall promptly examine the medical findings in dispute and shall within sixty days from its appointment file with the Board of Trustees a written report of its findings, which shall be final and binding as to the medical findings.  The reasonable expenses of such Board of Review shall be paid from the Expense Fund.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 12.)

**Sec. 16.    Actuary of Retirement System technical advisor to Board.**

The actuary of the Retirement System shall be selected by the Board of Trustees and, shall be the technical advisor to the Board of Trustees on matters regarding the operation of the funds created by the provisions of this amendment and shall perform such other duties as are required in connection therewith.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 13.)

**Sec. 17.    Investigation of mortality, service and compensation experience of members.**

Immediately after the establishment of the System, the Board of Trustees shall authorize such investigation of the mortality, service and compensation experience of the members as the actuary shall recommend and, on the basis of such investigation, the actuary shall recommend for adoption by, the Board of Trustees such tables and such rates as are required in Section 18, Paragraphs (a) and (b) of this Article.  The Board of Trustees shall adopt tables and certify rates, and, as soon as practicable thereafter, the actuary shall make a valuation, based on such tables and rates, of the assets and liabilities of the various funds of the Retirement System created by this Charter amendment.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 14.)

Effective as of July 1, 1984, for purposes of determining a benefit which is actuarially equivalent to any other benefit, the actuarial reserve required to provide the benefit must be equal to the actuarial reserve required to provide such other benefit computed on the basis of the actuarial rates, tables and procedures outlined below:

| | |
|---|---|
| interest rate: | 6 ½% for joint and survivor benefits, and 5% for all other benefits |
| mortality table: | 1971 group annuity mortality table assuming a 90% male and 10% female mix |

No adjustment in a determination of an actuarially equivalent value or amount shall be made if such tables, rates and procedures are changed subsequent to such determination.  (Historical reference:  de facto operation July 1, 1984.  See also:  June 26, 1986 Board resolution.)

**Sec. 18. Regular actuarial investigations.**

At least once in each five year period, the Board of Trustees shall cause an actuarial investigation to be made into the mortality, service, and compensation experience of the members and beneficiaries of the Retirement System, and shall make a valuation of the assets and liabilities of the funds of the Retirement System, and on the basis of such investigation and valuation, the Board of Trustees shall:

    (a)    Certify the rates of contributions payable by the members under the provisions of this Charter amendment;

    (b)    Certify the rates of contribution payable by the City on account of new entrants into the retirement system at various ages;

    (c)    Adopt for the Retirement System a regular rate of interest as defined in Article II, Section 12 of this Charter amendment.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 15.)

**Sec. 19. Actuarial valuations of assets and liabilities.**

On the basis of such tables, adopted by the Board of Trustees under the provisions of Section 18 of this Article, the Board of Trustees shall cause to be made an actuarial valuation of the assets and liabilities of the funds of the System created by this amendment. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 16.)

---

**By Agreement**

---

Within fifteen (15) days of the effective date of this CET, the Pension Board shall provide to the Mayor and City Council all pension plan documents, including but not limited to: Plan Documents, Plan Amendments, Favorable Determination Letters (Pension Only), Summary Plan Descriptions, All Summaries of Material Modifications, Model Enrollment Forms, Insurance Contracts, All Funding/Actuarial Reports, All Explanations provided to Participants/Employees such as "Benefits at a Glance" and/or other summaries. The Pension Board shall provide to the Mayor and City Council all future amendments to any such documents within five (5) days of the amendment.

---

# ARTICLE ~~IV.~~D.  MEMBERSHIP

**Membership.**

Sec. **D-**1.      **Generally.**

~~The~~Subject to Section B-1, the membership of Component II of the Retirement System shall consist of the following:

(a)      All ~~Policemen and Firemen, as defined in sections 2 and 3 of Article II, who are in service~~Police Employees and Fire Employees who were in Service on or after July 1, 1941, but prior to January 1, 1969; provided, however, that any ~~Policeman or Fireman~~Police Employee or Fire Employee who, on or before July 1, 1941, shall have been in the employ of the Police or Fire Department for a period of twenty years, or who shall have a total of twenty years of creditable ~~service~~Service, shall be excluded from the provisions hereof and shall retain for himself~~,~~ or herself, his or her wife, children, dependent mother and dependent sister all rights and privileges provided by Chapters XV and XXI of title IV of the 1918 Detroit City Charter, unless ~~such Policemen or Firemen~~any such Police Employee or Fire Employee, on or before June 1, 1941, shall file with the City Controller his or her written election to become a ~~member~~Member of the Retirement System, in which event he or she shall be a ~~member~~Member; such excluded ~~Policeman~~Police Employee not electing to become ~~members~~a Member, from and after July 1, 1941, while ~~they remain~~he or she remains an active ~~members~~member of the Police Department, shall pay five per cent of each salary payment into the fund for retired ~~Policemen~~Police Employees, and any such excluded ~~Firemen~~Fire Employee not electing to become ~~members~~a Member, from and after July 1, 1941, while ~~they remain~~he or she remains an active ~~members~~member of the Fire Department, shall pay five per cent of each salary payment into the Fire Department Pension and Retirement Fund, and such salary contributions shall hereafter be used toward the payments of ~~retirement allowances~~Retirement Allowances provided for under Chapter XV ~~section~~, Section 14, subsections (1), (2), and (3) thereof.  On retirement, the contributions of such excluded members shall cease.

(b)      All persons who ~~become Policemen or Firemen~~became Police Employees or Fire Employees on or after July 1, 1941, but prior to January 1, 1969, and who are confirmed as ~~Policemen or Firemen~~Police Employees or Fire Employees according to the rules and regulations of the respective Departments shall thereupon become ~~members~~Members of the Retirement System~~;~~, subject, however, to the following provisions:

(~~1~~i)      Any person who shall become a ~~Policeman or Fireman~~Police Employee or Fire Employee at an attained age of thirty-one years or more may become a ~~member~~Member of the Retirement System only by vote of the Board of Trustees who shall fix the rate of contribution of such ~~member~~Member on a basis recommended by the Actuary for the attained age of such ~~member~~Member.

(~~2~~ii) Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a ~~member~~Member of the Retirement System, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(~~3~~iii) Any ~~Policeman or Fireman~~Police Employee or Fire Employee who, prior to being confirmed, shall be killed or ~~totally incapacitated~~Totally Disabled as the result of the performance of active duty, shall ~~he~~be deemed to have been a ~~member~~Member of the Retirement System.

(c) Any ~~member~~Member as defined in paragraph (a) or (b) of this ~~section~~Section D-1 who shall be transferred to a civilian position in his ~~department~~Department shall continue as a ~~member~~Member, subject to all the obligations of a ~~member~~Member.

(d) All persons who ~~become Policemen or Firemen~~became Police Employees or Fire Employees on~~,~~ or after January 1, 1969 and prior to July 1, 2014 and who are not individuals re-employed with the ~~police~~Police and ~~fire departments~~Fire Departments on or after January 1, 1969 and prior to July 1, 2014, and who are confirmed as ~~policemen or firemen~~Police Employees or Fire Employees according to the rules and regulations of the respective ~~departments~~Departments shall thereupon become ~~members~~Members of the ~~system~~Retirement System subject, however, to the following provisions:

(~~1~~i) Any person who shall become a ~~Policeman or Fireman~~Police Employee or Fire Employee at an attained age of thirty-one years or more may become a ~~member~~Member of the ~~system~~Retirement System only by vote of the Board of Trustees who shall fix the rate of contribution of such ~~member~~Member on a basis recommended by the actuary for the attained ~~age~~Age of such ~~member~~Member.

(~~2~~ii) Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a ~~member~~Member of the ~~system~~Retirement System, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(~~3~~iii) Any ~~Policeman or Fireman~~Police Employee or Fire Employee who, prior to being confirmed, shall be killed or ~~totally incapacitated~~Totally Disabled as the result of the performance of active duty, shall be deemed to have been a ~~member~~Member of the ~~system~~Retirement System.

(~~4~~iv) Any ~~member~~Member as defined in ~~section~~Section D-1(a), (b), or (c) ~~of this article~~ who was separated from ~~service~~Service by resignation or dismissal or discharge who subsequently again becomes a ~~member~~Member shall be considered a ~~member~~Member for all purposes under this ~~chapter~~Component II under ~~section~~Section D-1(a), (b), or (c) ~~of this article~~ and shall not be considered a ~~member~~Member under ~~section~~Section D-1(d) ~~of this article~~.

(~~5~~v) Any ~~member~~Member as defined in ~~section~~Section D-1(d) ~~of this article~~ who shall be transferred to a civilian position in his ~~department~~Department shall continue as a ~~member~~Member, subject to all the obligations of a ~~member.  (As amended November 5, 1968.  In effect January 1, 1969.)~~Member.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 1.)

## Sec. D-2.    Membership election option prior to July 1, 2014.

Any person who is a ~~member~~Member as defined in ~~section~~Section D-1(a), (b), or (c) ~~of this article~~ who ~~is~~was in active service on January 1, 1969, shall have had the option to elect to become a ~~member~~Member of the ~~system~~Retirement System as defined in ~~section~~Section D-1(d) ~~of this article~~ by filing his written election with the ~~board~~Board of ~~trustees~~Trustees on or before January 31, 1969, or any ~~retirant~~Retiree who retired on or before December 31, 1968, under the provisions of ~~article VI, part~~Article F, Part B, ~~section 2~~Section F-8, who ~~later~~ returns to active service prior to July 1, 2014 shall have the option to elect to become a ~~member~~Member of this ~~system~~Retirement System as defined in ~~section~~Section D-1(d)~~of this article~~, by filing his written election with the ~~board~~Board of ~~trustees~~Trustees on or before the earlier of (i) thirty days after his return to active service and (ii) June 30, 2014.  The election shall be effective on the date that it is filed with the Board of Trustees. ~~ (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 2.)~~

## Sec. D-3.    Cessation of membership.

(a)    Should a ~~member~~Member die or become a ~~beneficiary~~Retiree or be separated from service by resignation, dismissal, or disability, he shall thereupon cease to be a ~~member~~Member.

(b)    Any person who became a ~~member~~Member under ~~section~~Section D-1(a), (b), or (c) ~~of this article~~ and ceases to be a ~~member~~Member, as provided in ~~section~~Section D-3(a) ~~of this article~~, and who ~~later~~ becomes a ~~policeman or fireman~~Police Employee or Fire Employee prior to July 1, 2014, shall again become a ~~member~~Member of Component II of the ~~system~~Retirement System, under section D-1(a), (b), or (c) ~~of this article~~ subject to the provisions of ~~article VII, section 1~~Article G, Section G-2(d).

(c)    Any person who became a ~~member~~Member under ~~section~~Section D-1(d) ~~of this article~~ and ceases to be a ~~member~~Member, as provided in ~~section~~Section D-3(a) ~~of this article~~, and who ~~later~~ becomes a ~~policeman or fireman~~Police Employee or Fire Employee prior to July 1, 2014, shall again become a ~~member~~Member of Component II of the ~~system~~Retirement System under ~~section~~Section D-1(d) ~~of this article~~, subject to the provisions of ~~article VII, section 1~~Article G, Section G-2(d). ~~ (As amended November 5, 1968.  In effect January 1, 1969.)~~

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 3.)

(d) Any Member of the Ret [ By Agreement ] m the Fire Department who retires as a Member of the Retirement System and who is rehired prior to July 1, 2014 as a

civilian Member of the Fire Department may elect on or before June 30, 2014 to again become a Member of Component II of the Retirement System.

Any member of the Policemen and Firemen Retirement System from the Fire Department who retires as a member of that System and who later is rehired as a civilian member of the Fire Department may elect to again become a member of the System.

---

**Sec. 4.     Report on employees.**

It shall be the duty of the City Controller to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, and length of service of each member, and such other information as the board of trustees may require.   (As amended November 5, 1968. In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 4.)

**ARTICLE** ~~V.~~
**E.  SERVICE CREDITABLE**
~~Service Creditable~~.

### Sec. **E-**1.  Members to file statement of service, etc.

Under such rules and regulations as the Board of Trustees shall adopt, each ~~Policeman~~Police Employee and ~~Fireman~~Fire Employee who shall become a ~~member on the effective date of this amendment~~Member prior to July 1, 2014 shall file a detailed statement of all prior service rendered by him as an employee of the Police Department or Fire Department, for which he claims credit, and of such other facts as the Board of Trustees may require, for the proper operation of the Retirement System. ~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 1.)~~

### Sec. **E-**2.  Credit for service.

The Board of Trustees shall fix and determine by appropriate rules and regulations how much service in any year is equivalent to a year of service, but in no case shall less than six months' service constitute one year, nor shall more than one year of service be creditable for all service in one calendar year.  The Board of Trustees shall not allow credit as service for any period of more than one month during which the ~~member~~Member was or shall be absent without pay provided that if a ~~member~~Member shall be transferred from his Department payroll to the payroll of any ~~City, County or State~~city, county or state government or the ~~Federal Government~~federal government, by his Department ~~Head~~head, during peace times, then such ~~member~~Member shall continue to be a ~~member~~Member of the System and shall he required to make regular contributions into the Annuity Savings Fund; and provided further, that if a ~~member~~Member, so transferred, shall fail to make such contributions for three consecutive months, he shall cease to be a ~~member~~Member of the System four months (of 31 days each) after the due date of his first defaulted ~~annuity~~Annuity contribution; and provided further, that any ~~member~~Member who was or shall be suspended from duty and subsequently reinstated to duty without further disciplinary action, shall receive total credit for the time of such period or periods of suspension. ~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 2.)~~

### Sec. **E-**3.  Employees in military service commencing prior to July 1, 2014.

(a)     If a ~~member~~Member of the Retirement System was or shall be drafted, or enlisted or shall enlist into military, naval, marine, or other service of the United States ~~Government~~government during time of war, or if a ~~member~~Member shall be drafted into such service during time of peace, and ~~within~~prior to the earlier of (i) ninety days from the date of his separation from such government service or from the date peace was or shall be established by treaty, whichever date was or shall be earlier, and (ii) June 30, 2014 resumed or shall resume employment as a ~~Policeman or Fireman~~Police Employee or Fire Employee, then such government service rendered prior to July 1, 2014 shall be credited to him as a ~~member~~Member of the Retirement System.  During the period of such government service of a ~~member~~Member, his contributions to the Annuity Savings Fund shall be suspended and the balance in the Annuity Savings Fund, standing to his credit as of the last payroll date preceding his leave of absence

from the service of his Department shall be accumulated at ~~regular interest. Even~~Regular Interest. Prior to July 1, 2014, even though the applicant may ~~be~~have ~~been~~ unable to satisfy all the foregoing requirements, the Board of Trustees ~~shall have~~had the power to grant the privileges provided for by this section in exceptional or extraordinary cases.

(b)    A ~~member~~Member on the City payroll on or after January 1, 1979 and prior to July 1, 2014 who, prior to employment in the ~~city~~City service, was called to or entered or is called to or enters any full time military service of the United States during time of war, period of compulsory military service, or period of unusual emergency as defined in this ordinance, shall have the required period of active duty credited him as ~~membership service~~Membership Service, subject to the following conditions and limitations:

    (1)    The ~~member~~Member files a written election with the Board of Trustees, ~~within~~before the earlier of (i) 180 days following the effective date of this ~~ordinance~~provision or 180 days from the date of his first employment in the ~~city~~City service, whichever is most recent, and (ii) June 30, 2014, to claim military service credit under the provisions of this section. A ~~member~~Member who is included in a collective bargaining unit shall file a written election to claim military service credit with the Board of Trustees within 180 days following the date of a negotiated approval and acceptance of this section by his duly authorized bargaining agent as transmitted to the Board of Trustees by the Labor Relations Director or, in the case of ~~members~~Members hired subsequent to the transmittal of approval and acceptance by his duly authorized bargaining agent, within 180 days from the date of his first employment in the ~~city~~City service; provided that any such election is required to be filed prior to July 1, 2014.

    (2)    The ~~member~~Member furnishes the Board of Trustees such information as the Board of Trustees determines necessary to verify the amount of military service claimed.

    (3)    The ~~member~~Member pays to the Pension Accumulation Fund of the Retirement System an amount of five (5) percent of the ~~member~~Member's annual rate of compensation at the time of payment multiplied by the years or parts of years of military service claimed.

    (4)    The required payment shall be made under one of the following options:

    a.    Payment in full within 30 days of the election to claim military service.

    b.    Payment in equal bi-weekly installments by payroll deduction over a 36 month period starting 30 days following the election to claim military service. Interest shall accrue during the period of installment payments at the compound rate of 5 percent per annum. Payments must be completed prior to application for retirement.

c. If a ~~member~~Member has sufficient funds in the principal portion of his ~~annuity~~Annuity, he may authorize the ~~Pension Bureau~~Board to transfer such funds to the Pension Accumulation Fund to meet the required payment.

(5) In the event a ~~member~~Member, who has filed the required election of this benefit, and who would be eligible for a ~~pension~~Pension in all respects except for paying the full amount, dies prior to completion of the payment required in ~~Item~~paragraph (4) preceding, the person otherwise entitled to a ~~retirement allowance~~Retirement Allowance may pay the full amount due within 30 days of the ~~member~~Member's death to become eligible for ~~on~~an additional ~~pension~~Pension credit under this section.

(6) Military service credited under the provisions of Section 54-30-3(c) of the 1964 Detroit City Code shall not be claimed or credited under the provisions of this section.

(7) Military service which is or will be the basis of service credit under any other public employee retirement program shall not be claimed or credited under the provisions of this section.

(8) In no case shall more than 3 years of pre-employment military service be credited a ~~member~~Member on account of military service. For the purpose of this limitation, military service credited pursuant to Section 54-30-3(a) of the 1964 Detroit City Code shall be combined with military service created pursuant to this section.

(9) The required payments made to the Pension Accumulation Fund for military service credit pursuant to this section shall, upon application by the ~~member~~Member or his estate, be returned without interest to any ~~member~~Member who dies or leaves City employment prior to being eligible for a ~~pension~~Pension.

(10) Only honorable military service during the following periods shall be covered by this Section E-3(b):

World War II — December 8, 1941 to July 1, 1946.

Korean Conflict — June 27, 1950 to December 31, 1953.

Vietnam Conflict — August 5, 1964 to May 7, 1975~~, are applicable to this section~~.

(11) The military service credit pursuant to this section shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability ~~pension~~Pension or for a service ~~pension~~Pension. Such service credit may be used in meeting the minimum time needed for an automatic Option Two Pension in case of death of a ~~member~~Member.

(12)  In no case shall benefits be based on the military service credit provided by this section unless the ~~member~~Member shall have been credited a minimum of eight years of service credit not including military service credit.

(13)  Special service, contractual, part time, seasonal and summer camp employees are not eligible for the military service credit.

(14)  In cases of doubt, the Board of Trustees will determine whether a ~~member~~Member is entitled to the benefits of this section consistent with the requirements and limitations herein.

~~(Ord. No. 356-H, Sec. 54-30-3(b).)~~

---

**By Agreement**

---

**Military Service Credit**

(15)  Any member of ~~the bargaining unit~~DFFA, DPCOA or DPLSA who performed military service prior to employment by the City ~~of Detroit and inclusion in the pension systems may~~and membership in the Retirement System may, prior to July 1 2014, claim service credit as a ~~member~~Member of the ~~retirement systems~~Retirement System for time spent in the military service ~~in accordance with Ordinances 356-H and 357-H of the Ordinances of the City of Detroit~~.

**[This provision will be retroactive to July 1, 1983.]**

(16)  Effective December 15, 2008, any member of DFFA, DPCOA or DPLSA who has performed any honorable military service may, prior to July 1, 2014, claim up to thirty-six (36) months service in the ~~pension~~Pension time for time spent in the military. However, ~~those provisions in Ordinance 356-H of the Ordinance of the City of Detroit that~~the Member will be required ~~the member~~ to purchase this military service credit ~~are not modified by this change~~as provided above.

---

**DPOA**

---

(17)  Effective March 8, 2007, all DPOA bargaining unit members who have served in the military may, prior to July 1, 2014, purchase a maximum of three (3) years ~~pension~~Pension time.

---

## Sec. E-4.  Verification of service claimed.

Subject to the above restrictions and to such other rules and regulations as the Board of Trustees may adopt, the Board of Trustees shall verify, as soon as practicable after the filing of such statements of service, the service therein claimed. ~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 4.)~~

**Sec. E-5.**      **Prior ~~service~~Service certificates.**

Upon verification of the statements of service, the Board of Trustees shall issue ~~prior service~~Prior Service certificates, certifying to each ~~member~~Member the length of ~~prior service~~Prior Service rendered, with which he is credited. A ~~prior service~~Prior Service certificate shall be final and conclusive for retirement purposes as to such service; provided, however, that within one year from the date of issuance or modification of such certificate the Board of Trustees on its own motion or on the request of a ~~member~~Member may modify or correct ~~his prior service~~the Prior Service certificate. ~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 5.)~~

**Sec. E-6.**      **Creditable service at retirement.**

Creditable service at retirement, on which the ~~retirement allowance of a member shall be based.~~Retirement Allowance of a Member shall consist of the ~~membership service~~Membership Service rendered by him prior to July 1, 2014 and~~,~~ if he has a ~~prior service~~Prior Service certificate~~,~~ in full force and effect as of July 1, 2014, the amount of service certified thereon. ~~(As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 6.)~~

**ARTICLE VI.**

**ARTICLE F.  BENEFITS PROVIDED TO MEMBERS**

### Part A — Service Retirement Allowance

**Sec. F-1.    Petition for retirement, mandatory age.**

(a)    Any ~~member~~Member as defined in ~~article IV, section~~Article D, Section D-1 (a), (b), or (c) in service may file with the Board of Trustees his written application for retirement setting forth ~~on what~~the date not less than fifteen days nor more than ninety days subsequent to the filing thereof, on which he or she desires to be retired; and provided the Board of Trustees shall determine that the ~~member~~Member, at the date so specified ~~or~~for his retirement will have a total of twenty-five years or more of creditable service he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that in the case of any ~~fireman~~Fire Fighter as defined in ~~article IV~~Article D, section D-1 (a), (b) or (c) having served twenty-five years or more of creditable service, upon recommendation of the Board of Fire Commissioners, the ~~fireman~~Fire Fighter shall be retired forthwith, by the Board of Trustees.

(b)    Any ~~members~~Members as defined in ~~article IV, section~~Article D, Section D-1 (d) in service may file with the Board of Trustees his written application for retirement setting forth ~~on what~~the date not less than fifteen days nor more than ninety days subsequent to the filing thereof, on which he or she desires to be retired; and provided the Board of Trustees shall determine that the ~~member~~Member, at the date so specified for his retirement, will have a total of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service and has attained ~~age~~Age fifty-five, he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that, effective July 1, 1983 for members of DPOA and ~~Fire~~fire equivalents and ~~July 1~~June 30, 1986 for ~~LSA~~DPLSA and fire equivalents and new ~~members, a member~~Members, a Member described in ~~article IV, section~~Article D, Section D-1(d) shall be eligible to retire upon attainment of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service, regardless of ~~age~~Age.  Effective July 1, 1998 (June 30, 2001 for DPOA members and their fire equivalents), the time a ~~member~~Member is on layoff from service of the City shall be included in actual service rendered to the City for purposes of determining whether a ~~member~~Member has twenty-five years or twenty years of creditable service.  The ~~pension~~Pension benefit to which such ~~member~~Member is entitled shall be based only on his actual years of creditable service.  Effective July 1, 1989, the minimum Age requirement for deferred Pensions payable for post 1969 Members represented by DPOA and hired before June 30, 1985 shall be eliminated.

Pursuant to IRC 411(e), as in effect in 1974, an employee shall be 100 percent vested in their System accrued benefit upon attaining normal retirement hereunder while in service.

---

**By Agreement**

Notwithstanding the foregoing provisions, effective October 15, 2014, a DPLSA member shall be eligible to terminate employment with the City and commence receipt of a Retirement Allowance (or make a DROP election as provided in Article I) under this Component II provided the Member satisfies the following requirements:

| Fiscal Year | Age and Service |
|---|---|
| 2015 | Age 45 and 24 years |
| 2016 | Age 46 and 23 years |
| 2017 | Age 47 and 23 years |
| 2018 | Age 48 and 22 years |
| 2019 | Age 49 and 23 years |

**[Effective June 30, 1986, or July 1, 1983,]** the requirement that a member as defined in Article IV, Section 1(d) of the Policemen and Firemen Retirement System shall attain age 55 to be eligible for retirement shall be eliminated.  **[Effective March 8, 2007,]** such members will be eligible to retire after 2020 and thereafter 25 **[or twenty (20)]** years of service regardless of age.

**[(c)** Effective June 30, 2001, any **member**Member represented by DPOA and fire equivalents who has been laid off shall be eligible to retire at what would have been the **member**Member's 25th anniversary.  To determine eligibility for retirement, the **member**Member's actual service time and time on lay off shall be combined.**] [** To calculate the **member**Member's **retirement allowance**Retirement Allowance for members of DFFA, however, only actual service time shall be used.  For DFFA members having a parity relationship with the DPLSA and the DPCOA Inspector, only lay off time which occurred between July 1, 1973 and July 1, 1998 will be credited.**]**

Effective

---

**DFFA**

---

**Service Retirement**

1.   For employees in ranks or classifications with a parity relationship to employees represented by the Detroit Police Lieutenants and Sergeants Association and employees in higher ranks or classification, the requirement that a member as defined in Article IV, Section 1(d) of the Policemen and Firemen Retirement System shall attain age 55 to be eligible for retirement shall be eliminated.  Such members will be eligible to retire after 25 years of service regardless of age.

2.   For employees in ranks or classifications with a parity relationship to the employees represented by the Detroit Police Officers Association, the requirement that a member as defined in Article IV, Section 1(d) of the Policemen and Firemen Retirement System shall attain age 55 to be eligible for retirement shall be eliminated.  Effective March 8, 2007,

–38–

~~such members will be eligible to retire after twenty (20) years of service regardless of age.~~ ~~Effective July 1, 1989, the minimum age 55 requirement for deferred pensions payable for~~ ~~post 1969 members hired before June 30, 1985, shall be eliminated.~~

**DPCOA**

~~Reduction in Force Time: Effective~~ in accordance with the specific date and terms of the ~~Detroit Police Lieutenants and Sergeants Association (~~DPLSA~~)~~ award in Act 312 No. D98 F-0944, ~~the membership of this bargaining unit~~Members represented by DPCOA shall have the right to retire on their 25th ~~Anniversary Date~~anniversary date, notwithstanding any service time they may have lost due to any layoffs, as provided ~~therein~~in such award.

**DPOA**

~~Effective July 1, 1989, the minimum age 55 requirement for deferred pensions payable for post~~ ~~1969 members hired before June 30, 1985 shall be eliminated.~~

~~Employees~~(d)  Any Member represented by DPOA who was hired on or after July 1, 1985 and who ~~leave~~leaves City employment after being vested shall not be eligible for ~~pension~~Pension benefits until said individual reaches his or her sixty-second birthday.

(~~c~~e)  Any ~~member~~Member of the ~~system~~Retirement System as defined in ~~article IV,~~ ~~section~~Article D, Section D-1(a), (b), (c), and (d) who shall reach the ~~age~~Age of sixty years shall be retired forthwith, or on the first day of the calendar month next succeeding that in which the ~~member~~Member shall have reached Age sixty. On the written request of the ~~member~~Member and of the Commissioner of Police or the Board of Fire Commissioners, as the case may be, the Board of Trustees may continue such ~~member~~Member in active service for a period of two years beyond his sixtieth birthday, and on the expiration of such period, on like request, may continue such ~~member~~Member for a further period of two years. ~~(As amended November 5,~~ ~~1963. In effect January 1, 1969.)~~

(~~d~~f)  Any ~~member~~Member of the ~~system~~Retirement System who satisfies the requirements for a ~~pension~~Pension as defined in ~~article VI, section 4~~Article F, Section F-5 shall be eligible upon ninety days notice to make an irrevocable election to receive an immediate ~~retirement allowance~~Retirement Allowance, actuarially reduced for early commencement, in lieu of a deferred ~~retirement allowance~~Retirement Allowance.

(~~e~~g)  Any ~~member~~Member of the ~~retirement system~~Retirement System who was in the service of the City on or after July 1, 1941 but prior to January 1, 1969 and who was still an active ~~member~~Member on July 1, 1983 for ~~LSA~~DPLSA and fire equivalents and July 1, 1986 for DPOA members and fire equivalents shall have the option of retiring under the ~~old plan~~Old Plan or the ~~new plan~~New Plan.

~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 1.)~~

(h) Pursuant to IRC 411(e)74, an employee shall be 100 percent vested in his or her Retirement System accrued benefit upon attaining normal retirement hereunder while in service.

**Sec. F-2.** **Old Plan/New Plan**

Effective July 1, 1986, Members of the ~~Policemen and Firemen~~ Retirement System as defined ~~in the previous charter of the City of Detroit — Chapter VII of Title IX, Section 2 of Article II as adopted by Article 11, Section 11-102 of the present charter of the City of Detroit as previously amended to~~ under the terms of the Retirement System in effect on July 1, 1977, who were in the ~~the~~ service on or after July 1, 1941 but prior to January 1, 1969, and are ~~still~~ active ~~members~~ Members on July 1, 1986 shall have the option of retiring under ~~any existing plan of the pension system (i.e., amendment of November 5, 1969, or previous plan) commonly known as new plan and old plan~~ the Old Plan or the New Plan.

~~[This provision shall be effective July 1, 1986.]~~

~~Sec. 2.~~ (a) *Amount of allowance – Old Plan Members.*

Upon his or her retirement from service, a ~~member~~ Member as defined in ~~article IV, section~~ Article D, Section D-1(a), (b), or (c) ("~~old plan member~~ Old Plan Member") shall receive a straight life ~~retirement allowance~~ Retirement Allowance which shall consist of the benefits provided in paragraphs (~~a~~1) and (~~b~~2) below; and he or she shall have the right to elect an option provided for in ~~part~~ Part H of this ~~article~~ Article F:

> (a) ~~An annuity which shall be the actuarial equivalent of his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement; and~~

> (1) An Annuity which shall be the Actuarial Equivalent of the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement; and

> (~~b~~2) A ~~pension,~~ Pension which, when added to ~~his annuity~~ the Member's Annuity, will provide a straight life ~~retirement allowance~~ Retirement Allowance equal to two percent (2.0%) of his ~~average final compensation~~ or her Average Final Compensation, multiplied by the number of years, and fraction of a year, of his or her creditable service, not to exceed twenty-five years; provided, that the ~~pension~~ Retirement Allowance of a ~~policeman~~ Police Employee shall in no case exceed fifteen twenty-seconds of the maximum earnable compensation of a ~~patrolman~~ Patrolman and the ~~pension~~ Retirement Allowance of a ~~fireman~~ Fire Fighter shall not exceed fifteen twenty-seconds of the maximum earnable compensation of a ~~fire fighter~~ Fire Fighter (and if either or both of the said ranks shall be hereafter abolished, the equivalent thereof). The foregoing ~~pension~~ Pension limitation shall not apply to any ~~policeman or fireman~~ Police Employee or Fire Employee who on July 1, 1941, shall be entitled to a certificate

for twenty years or more of prior service and who remains under the provisions of ~~chapter~~Chapter XV or ~~chapter~~Chapter XXI of Title IV of the 1918 Detroit City Charter. ~~(As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)~~

~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 2.)~~

~~Sec.~~(b) *Amount of allowance – New Plan Members.*

Upon his retirement from service, a ~~member~~Member as defined in ~~article IV, section~~Article D, Section D-1(d) ("~~new plan member~~New Plan Member") shall receive a straight life ~~retirement allowance~~Retirement Allowance which shall consist of the benefits provided in paragraphs (~~a~~1) and (~~b~~2) below; and he shall have the right to elect an option provided for in ~~part~~Part H of this ~~article~~Article F:

> (~~a~~1)  An ~~annuity~~Annuity which shall be the ~~actuarial equivalent of his accumulated contributions~~Actuarial Equivalent of the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his retirement; and

> (~~b~~2)  A ~~pension~~Pension which, when added to his ~~annuity~~or her Annuity, will provide a straight life ~~retirement allowance~~Retirement Allowance equal to:

>> (~~i~~a.  two and one-half percent (2.5%) of ~~his average final compensation~~the Member's Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service, for the first twenty-five (25) years of such service; and

>> (~~ii~~b.  two and one-tenths percent (2.1%) of ~~his average final compensation~~the Member's Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service in excess of twenty-five (25) years, subject to a maximum of thirty-five (35) years.

## Sec. F-3.    Pension Multiplier

~~Effective~~(a)    Notwithstanding Section F-2(a)(2) and F-2(b)(2), effective July 1, 1992 each ~~member~~Member who retires on or after ~~said~~that date shall be entitled to a ~~pension~~Pension which, when added to the ~~annuity~~Annuity, will provide a straight life ~~retirement allowance~~Retirement Allowance equal to 2.1% of his/ or her ~~average final compensation~~Average Final Compensation, multiplied by the number of years and fraction of a year, of his/ or her creditable service, not to exceed thirty-five (35) years of service for ~~new plan members~~New Plan Members and twenty-five (25) years of service for ~~old plan members. (Ord. No. 18-93, Sec. 47-12.6A-2.3.)~~Old Plan Members.

(b) Effective July 1, 1997 ___embers the effective date of the CET-

DPCOA, each Member who retires shall be entitled to a Pension which when added to the Annuity will provide a straight life Retirement Allowance equal to 2.5% (or 2.1% for DPCOA members) of his or her Average Final Compensation multiplied by the number of years and fraction of year of his or her creditable service for the first twenty-five (25) years or, in the case of a DPCOA member of his or her creditable service earned or accrued on or after the effective date of the CET-DPCOA. For Members represented by DFFA, DPCOA and DPLSA, the multiplier shall be 2.1% for each year of service over twenty-five (25) years. Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members.

[(c)    Effective September 1, ~~2012~~2011, each ~~member~~Member represented by DPOA who retires shall only be entitled to a ~~pension~~Pension which, when added to the ~~annuity~~Annuity, will provide a straight life ~~retirement allowance~~Retirement Allowance equal to 2.1% of his~~/~~ or her ~~average final compensation~~Average Final Compensation multiplied by the number of years and fraction of a year of his~~/~~ or her creditable service earned or accrued on or after September 1, 2011. Hence, for the first twenty-five (25) years of service accrued on or after September 1, 2011, the multiplier shall no longer be 2.5%; rather, 2.1%. Maximum years of service for ~~pension~~Pension credit shall be thirty-five (35) years for ~~new plan members~~New Plan Members and twenty-five (25) years for ~~old plan members~~Old Plan Members. Service credit accrued prior to September 1, 2011 will be unaffected by this ~~modification.]~~Section F-3(c).

~~Effective July 1, 1997 [or following the effective date of the CET-DPCOA], each member who retires shall be entitled to a pension which when added to the annuity will provide a straight life retirement allowance equal to 2.5% [or 2.1%] of his average final compensation multiplied by the number of years and fraction of year of his creditable service for the first twenty-five (25) years [or of his creditable service earned or accrued on or after the effective date of the CET-DPCOA].~~
~~For years of service over twenty-five (25) years the multiplier shall be 2.1%. Maximum years of service for pension credit shall be thirty-five (35) years for new plan members and twenty-five (25) years for old plan members.~~

[(d)    Each DPLSA member who retires shall only be entitled to a ~~pension~~Pension which, when added to the ~~annuity~~Annuity, will provide a straight life ~~retirement allowance~~Retirement Allowance equal to 2.1% of his or her ~~average final compensation~~Average Final Compensation multiplied by the number of years and fraction of a year of his~~/~~ or her creditable service earned or accrued following the date of the Act 312 Award in D09 G-0786. Hence, for the first twenty-five (25) years of service accrued after the date of the Act 312 Award, the multiplier shall no longer be 2.5% as stated in ~~the~~ paragraph (b) above~~; rather, as stated in this paragraph, 2.1%~~. Maximum years of service for ~~pension~~Pension credit shall be thirty-five (35) years for ~~new plan members~~New Plan Members and twenty-five (25) years for ~~old plan members.]~~Old Plan Members.

**Sec. 3F-4.** **Disposition of surplus benefits upon death of ~~beneficiary~~retired member.**

In the event a ~~beneficiary, who was a member,~~retired Member dies before he ~~or she~~ has received in straight life ~~retirement allowance~~Retirement Allowance payments an aggregate amount equal to his ~~accumulated contributions~~ or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his ~~or her~~ retirement, the difference between his or her said ~~accumulated contributions~~Accumulated Contributions and the said aggregate amount of straight life ~~retirement allowance~~Retirement Allowance payments received by him or her shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the ~~board~~Board of ~~trustees~~Trustees. If there ~~be~~is no such designated person or persons surviving the said deceased ~~beneficiary (who was a member)~~Retiree such difference, if any, shall be paid to his or her legal representative. No benefits shall be paid under this ~~section~~Section F-4 on account of the death of such a ~~beneficiary~~retired member if he or she had elected Option 1, 2, 3, 3A or 3B provided for in ~~part~~Part H of this ~~article. (As amended September 1, 1964. In effect September 15, 1964.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 3.)~~Article F.

**Sec. 4F-5.** **Retirement allowance for certain persons leaving ~~city~~City employment after eight years service (40 & 8).**

(a)     Should any ~~LSA~~DPLSA member or any fire equivalent who (1) has attained age forty years of ~~age~~Age, and (2) has acquired eight or more years of credited service, or any ~~member~~Member who terminates employment with the City on or after August 29, 2003 with ten or more years of credited service leave the employ of the ~~police department or fire department of the City of Detroit~~Police Department or Fire Department prior to the date he or she would have first become eligible to retire as provided in this ~~part~~Part A, for any reason except his or her retirement or death, he or she shall be entitled to a ~~retirement allowance~~Retirement Allowance computed according to ~~section~~Section F-2 (a) or ~~2.1~~(b) of this ~~article~~Article F, whichever is applicable, as said ~~section~~Section was in force as of the earlier of (i) the date ~~of~~his or her employment with the ~~city~~City last terminated or (ii) June 30, 2014; provided, that he or she does not withdraw his ~~accumulated contributions~~or her Accumulated Contributions from the Annuity Savings Fund. ~~His retirement allowance~~The Member's Retirement Allowance shall begin the first day of the calendar month next following the month in which his or her application for same is filed with the Board of Trustees, on or after the date he or she would have been eligible to retire had he or she continued in ~~city~~City employment. Notwithstanding the foregoing, prior to March 3, 2008 the ~~retirement allowance~~Retirement Allowance of a DPOA member or a fire equivalent hired on or after July 1, 1985 shall not begin prior to the date on which the ~~member~~Member reaches his or her sixty-second birthday. Unless otherwise provided in this ~~chapter~~Component II, such person shall not receive service credit for the period of his or her absence from the City Police Department and/or Fire Department employ, nor shall ~~he or his beneficiary~~his or her Beneficiary be entitled to any other benefit afforded in this ~~chapter~~Component II, except the benefits provided in ~~part~~Part A, ~~section~~Section F-2(a) or ~~2.1~~(b) or ~~part~~Part F of this ~~article VI~~Article F, whichever is applicable, subject to the above provisions, notwithstanding, his or her membership has terminated. ~~(As amended September 1, 1964. In effect September 15, 1964. As~~

amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 4.)

**By Agreement**

(b) Effective August 28, 2003, for DPOA members and fire equivalents who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to 40 & 8 Retirees.

**Sec. F-6.** **Reduced Early Pension Benefits (40 & 8 Vesting Retirees)**

1.(a) Members who terminate employment and who are eligible for a ~~pension~~Pension pursuant to Article ~~VI~~F, Part A, ~~Sec. 4 of the Policemen and Firemen Retirement System~~Section F-5 of Component II (40 & 8) ~~provision~~ shall have the option of receiving an immediate, but reduced early ~~pension~~Pension benefit in lieu of a deferred ~~pension~~Pension.

2.(b) This reduced early ~~pension~~Pension benefit shall not result in an increase in employer contribution rates; therefore, the value of the Reduced Early Pension Benefit shall be the ~~actuarial equivalent~~Actuarial Equivalent of the 40 & 8 ~~pension~~Pension.

3. ~~No other benefits or amounts payable pursuant to the Policemen and Firemen Retirement System including benefits available to persons who retire under Article VI, Sec. 4 shall be affected by this contractual provision. Health insurance benefits payable under this provision will commence when the member would have been eligible to retire with a service retirement under Article 22 B 14 (d) of the collective bargaining agreement [or Article VI of the Pension Plan].~~

4.(c) **[**For employees represented by DFFA in ranks or classifications with a parity relationship to employees represented by the ~~Detroit Police Lieutenants and Sergeants Association~~DPLSA and employees in higher ranks or classifications,**]** upon termination, ~~an~~a vested employee ~~vesting his pension~~ must within 90 calendar days make an irrevocable election as to whether or not to take this option.

5.(d) **[**Individuals represented by DFFA, DPOA or DPLSA, who terminated employment prior to July 1, 1986, are not eligible for this **[new]** option.**]**

6.(e) An employee who receives a lump sum payment for accumulated time upon termination is not allowed to have that time count towards his retirement service.

7.(f) Since ~~members **[or all DFFA members, except those members in ranks or classifications with a parity relationship to employees represented by the Detroit Police Officers Association,]**~~Members (other than DPOA and fire equivalents) are eligible to begin collecting their vested ~~pension~~Pension as soon as they would have been eligible to retire had they continued their City employment, minimum retirement age (i.e. ~~age,~~ Age 55) shall not be a factor in computing the actuarially reduced ~~pension~~Pension benefit.

(g)    All DFFA members, except those members in ranks or classifications with a parity relationship to employees represented by the ~~Detroit Police Officers Association~~DPOA, electing to receive the ~~Reduced Early~~reduced early Pension ~~Benefits~~benefits shall receive upon separation full pay for fifty percent (50%) ~~percent~~ of the unused sick bank amounts.  This provision shall have no effect on a ~~member~~Member electing to receive the deferred 40 & 8 vested ~~pension~~Pension who shall continue to be reimbursed for unused sick time in accordance with ~~the formula in Article 22.B.9(e).~~an applicable collective bargaining agreement.

~~Employees hired on or after July 1, 1985, with a parity relationship to employees represented by the DPOA, who leave City employment after being vested shall not be eligible for pension benefits until said individual reaches his or her sixty-second birthday.~~

(h)    Effective August 28, 2003, DPOA ~~allied~~ members and fire equivalents who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to ~~current~~ 40 & 8 retirees.

~~**Reduced Early Pension Benefits.**  Members who terminate employment who are eligible for a pension pursuant to Article VI, Part A, Section 4 of the Policemen and Firemen Retirement System (40 & 8) provision shall have the option of receiving an immediate, but reduced early pension benefit in lieu of a deferred pension.~~

~~This reduced early pension benefit shall not result in an increase in Employer contribution rates, therefore, the value of the Reduced Early Pension Benefit shall be the actuarial equivalent of the 40 & 8 pension.~~

~~Effective August 28, 2003, members who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to current 40 & 8 retirees.~~

~~No other benefits or amounts payable pursuant to the Policemen and Firemen Retirement System, including benefits available to persons who retire under Article VI, Section 4, shall be affected by this contractual provision.  Health insurance benefits payable under this provision will commence when the member would have been eligible to receive a regular service retirement under Article 33.F. of the collective bargaining agreement.~~

~~This provision shall be retroactive to July 1, 1986.~~

**Part B — Total Disability Pension and Retirement Allowances~~.~~**

**Sec. ~~1~~F-7~~.~~** **Duty disability.**

If a ~~member~~Member shall become ~~totally incapacitated~~Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty and if the Board of Trustees shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board of Trustees by or on behalf of such ~~member~~Member or by the head of his Department such ~~member~~Member be retired; notwithstanding that during such period of notification he or she may have separated from service; provided, the Medical Director, after examination of such ~~member~~Member shall certify to the Board of Trustees his ~~total incapacity~~or her Total Disability. If said ~~member~~Member was separated from service after filing of the written application, and he or she had attained twenty-five ~~(25)~~ years or more of service prior to the date of separation, the Board of Trustees, shall retire said ~~member~~Member, under this ~~part~~Part B. ~~(Ord. No. 5-00, Sec. 54-2-11; Ord. No. 4-00, Sec. 54-2-11.)~~

**Sec. ~~2~~F-8~~.~~** **Duty disability benefits; members in service on or after July 1, 1941 but prior to January 1, 1969.**

(a) A ~~member~~Member, as defined under Article ~~IV~~D, Section D-1(a), (b), or (c), shall receive the following benefits:

(1) Each such ~~member~~Member shall receive a disability ~~pension~~Pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such ~~member~~Member, of the ~~member~~Member's ~~average final compensation~~Average Final Compensation at the time of disability retirement. On the date that a ~~member~~Member, who retired under Section ~~1 of this Part~~F-7 and who receives benefits under this Section F-8, would have accrued twenty-five ~~(25)~~ years of creditable service had the ~~member~~Member continued in active service, or on the date that the ~~member~~Member reaches age sixty ~~(60)~~, whichever comes first, the ~~member~~Member shall be eligible for optional benefits as provided Part H of this Article F.

(2) In addition to the disability ~~pension~~Pension provided for in Section ~~2~~F-8(a)(1), any ~~member~~Member who receives a disability ~~pension~~Pension pursuant to Section ~~2~~F-8(a)(1) and has not accrued a total of twenty-five (25) years of creditable service~~,~~ as of the date of the ~~member~~Member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the ~~member~~Member's ~~average final compensation at~~Average Final Compensation at the earlier of (i) the time of disability retirement or (ii) June 30, 2014. This supplemental payment shall terminate upon the expiration of the period when a ~~member~~Member who retired under Section ~~1~~F-7 of this Part B and who receives benefits under Section ~~2~~F-8(a)(1) would have accrued twenty-five ~~(25)~~ years of creditable service ~~and~~had the ~~member~~Member continued in active service, or on the date that the ~~member~~Member reaches ~~age (60)~~Age sixty, whichever comes first.

Effective July 1, 1992 for DPLSA members, the Average Final Compensation used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the Member over the sixty months prior to the earlier of (i) the date of retirement (reduced disability/service retirement when the Member would have attained a total of twenty-five years of credited service) had he or she continued working in that classification which he or she held at the time of his or her disability or (ii) June 30, 2014.  For Members who begin receiving such benefits on or after July 1, 1998 and before July 1, 2014, the amount of the Member's most recent full longevity payment shall be included in the definition of Average Final Compensation.

Effective July 1, 1992 for DFFA and DPOA members, the Average Final Compensation used in this computation shall be the highest average annual compensation that would have been received by such a Member had he or she continued working in the classification he or she held at the time of his or her disability, during any period of five consecutive years, selected by the Member, contained within the last ten years immediately preceding the earlier of (i) expiration of the period when the Member would have attained a total twenty-five years of creditable service and (ii) June 30, 2014.

Effective July 1, 2000, the Average Final Compensation used in this computation shall mean the current maximum salary, including the annual longevity payment provided above, for the rank(s), grade(s) or position(s) which would have been held by the Member over the thirty-six (36) months prior to the earlier of (i) retirement or (ii) June 30, 2014.

(3)     In the case of a ~~member~~Member retired under Section ~~1 of this Part~~F-8 who receives benefits under ~~2~~F-8(a)(1) and ~~2~~F-8(a)(2), the ~~accumulated contributions~~Accumulated Contributions standing to the ~~member~~Member's credit at the date of retirement shall continue to be held in the ~~defined contribution plan and regular interest~~Annuity Savings Fund and Regular Interest shall be credited thereto. If such ~~member~~Member dies before the date upon which the ~~member~~Member would have achieved a total of twenty-five ~~(25)~~ years of creditable service had the ~~member~~Member continued in active service and before such ~~age~~Age sixty ~~(60)~~, the balance of the member's ~~defined contribution plan~~Annuity Savings Account including interest thereon shall be paid as provided in Part D and Part E of this Article F.

(b)     This Section shall be applicable to those ~~members~~Members receiving benefits on the date of adoption of this Section who are not covered by the arbitration decision regarding the ~~Detroit Police Officers Association~~DPOA which became effective July 1, 1995, or the arbitration decision regarding the ~~Detroit Police Lieutenant's and Sergeant's Association~~DPLSA which became effective June 30, 1998.

(c)     This Section does not rescind any substantive rights of disability retirees from the ~~Policemen and Firemen~~ Retirement System who retired prior to the July ~~1,1995~~1, 1995 arbitration award, or the substantive rights of disability retirees from the ~~Detroit~~

–47–

~~Police Lieutenant's and Sergeant's Association~~DPLSA who retired prior to the June 30, 1998 arbitration award.

(d)   This Section does not amend any computations used to determine disability benefits payable under this Section ~~2~~F-8, or result in an increase or decrease in such disability benefits.

   (e)   ~~Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.~~

~~(Ord. No. 05-00, Sec. 54-2-12; Ord. No. 04-00, Sec. 54-2-12.)~~

### Sec. F-9.   Duty disability benefits; members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10.

(a)   A ~~member~~Member, as defined under Article ~~IV~~D, Section D-1(d), who retired under Section ~~1 of this Part~~F-7, shall receive the following benefits:

   (1)   Each such ~~member~~Member shall receive a disability ~~pension~~Pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such ~~member~~Member, of the ~~member~~Member's ~~average final compensation at~~Average Final Compensation at the earlier of (i) the time of disability retirement or (ii) June 30, 2014. On the date that a ~~member~~Member who retired under Section ~~1~~F-7 of this Part B and who receives benefits under this Section would have accrued twenty-five ~~(25)~~ years of creditable service had the ~~member~~Member continued in active service, or on the date that the ~~member~~Member reaches ~~age~~Age sixty ~~(60)~~, whichever comes first, the ~~member~~Member shall be eligible for optional benefits as provided Part H of this Article F.

   (2)   In addition to the disability ~~pension~~Pension provided for in Section ~~2.1~~F-8(a)(1) of this Part B, any ~~member~~Member who receives a disability ~~pension~~Pension pursuant to Section ~~2.1~~F-8(a)(1) of this Part B and who has not accrued a total of twenty-five ~~(25)~~ years or more of creditable service as of the date of the ~~member~~Member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the ~~member~~Member's ~~average final compensation at~~Average Final Compensation at the earlier of (i) the time of the ~~member~~Member's disability retirement and (ii) June 30, 2014. This supplemental payment shall terminate when a ~~member~~Member who retires under Section ~~1 of this Part~~F-7 and who receives benefits under Section ~~2.1~~F-8(a)(1) ~~of this Part~~ would have accrued twenty-five ~~(25)~~ years of creditable service had he or she continued in active service or on the date that the ~~member~~Member reaches ~~age~~Age sixty ~~(60)~~, whichever comes first.

**By Agreement**

**Disability Conversion**

**[Effective July 1, 1992,]** add to the Policemen and Firemen Retirement System, Article VI, Part B, [Section 2.1(a)(2)] the following:

". . . with the specific exception that for those members who receive benefits under [Section 2.1(a)(1)], above, the 'average final compensation' used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the member over the sixty (60) months prior to retirement (reduced disability/service retirement when the member would have attained a total of twenty-five (25) years of credited service) had he/she continued working in that classification which he/she held at the time of his/her disability.["]  For members who begin receiving such benefits on or after July 1, 1998, the amount of the member's most recent full longevity payment shall be included in the definition of average final compensation.

**DFFA / DPOA**

Add to the Policemen and Firemen Retirement System, Article VI, Part B, [Section 2.1(a)(2)] the following:

". . . with the specific exception that for those members who receive benefits under [Section 2.1(a)(1)], above, the 'average final compensation' used in this computation shall be the highest average annual compensation that would have been received by such a member had he/she continued working in the classification he/she held at the time of his disability, during any period of five consecutive years, selected by the member, contained within the last ten years immediately preceding the expiration of the period when the member would have attained a total twenty five years of creditable service."

**DPCOA**

Effective July 1, 2000, the "average final compensation" used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the member over the thirty-six (36) months prior to retirement, including the annual longevity payment provided above.

(3)  In addition to the disability pensionPension provided for in Section 2.1F-8, any Member who receives a disability Pension pursuant to Section F-8(a)(1) of this Part, any member who receives a disability pension pursuant to Section 2.1(a)(1) of this Part and who has accrued more than twenty-five (25) years ("additional years") of creditable service as of the earlier of (i) the date of the memberMember's disability retirement and (ii) June 30, 2014 shall receive another supplemental disability payment equal to two percent (2%), or such other higher percentage that is in effect and applies to such memberMember, of the memberMember's average final compensationAverage Final Compensation as of the earlier of such dates, multiplied by the number of additional years of creditable service the memberMember has accrued; provided, however, that such supplemental disability payment shall not

exceed twenty percent (20%), or such other higher percentage that is in effect and applies to such ~~member~~Member, of the ~~member~~Member's ~~average final compensation~~Average Final Compensation.

(4)     In the case of a ~~member~~Member who ~~retired~~retires under Section ~~1 of this Part~~F-7 and who receives benefits described under Section ~~2.1~~F-8(a)(1) through (3) ~~of this Part, the accumulated contributions~~, the Accumulated Contributions standing to the ~~member~~Member's credit at the date of disability retirement shall continue to be held in a separate fund in the ~~annuity savings fund and regular interest~~Annuity Savings Fund and Regular Interest shall be credited thereto. If such ~~member~~Member dies prior to the time when the ~~member~~Member would have achieved a total of twenty-five ~~(25)~~ years of creditable service had the ~~member~~Member continued in active service and before such ~~member~~Member reaches ~~age~~Age sixty ~~(60)~~, the amount of the ~~member~~Member's ~~accumulated contributions~~Accumulated Contributions so set aside and interest thereon shall be paid as provided in Part D and Part E~~,~~ of this Article. F

(5)     The amendment of Section ~~2.1~~F-8(a)(1) ~~of this Part~~ shall not result in an increase or decrease in the amount of disability benefits payable to ~~members~~Members.

(b)     This Section shall be applicable to those ~~members~~Members receiving benefits on the effective date of this Section F who are not covered by the arbitration decision regarding the ~~Detroit Police Officers Association~~DPOA which became effective July 1, 1995, or the arbitration decision regarding the ~~Detroit Police Lieutenant's and Sergeant's Association arbitration decision~~DPLSA which became effective June 30, 1998.

(~~c~~)     This Section does not rescind any substantive rights of disability retirees from the ~~Policemen and Firemen~~ Retirement System who retired prior to the July 1, 1995 arbitration award, or the substantive rights of disability retirees from ~~the Detroit Police Lieutenant's and Sergeant's Association~~DPLSA who retired prior to the June 30, 1998 arbitration award.

(~~d~~c)     This Section does not amend any computations used to determine benefits under Section ~~2.1~~F-8 of this Part, or result in an increase or decrease ~~In~~in such benefits.

**Sec. F-10.     Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below.**

(~~e~~)     ~~Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.~~

~~(Ord. No. 5-00, Sec. 54-2-13; Ord. No. 4-00; Sec. 54-2-13.)~~

(a) This Section F-10 shall ~~By Agreement~~

**~~Duty Disability Retirement Provisions~~**

(1~~.~~) ~~**[As applicable to all current**~~DFFA employees who file applications for disability retirement on or after July 1, 1995~~**,] [for employees with**~~ and who have a parity relationship with the DPOA~~,~~ and on or after June 30, 1998, for DFFA employees with a parity relationship with the DPLSA and the DPCOA Inspector~~**, and to**~~;

(2) all ~~**future employees] [As applicable to all current**~~DPLSA employees who file applications for disability retirement on or after June 30, 1998~~,~~; and ~~**to all future employees,] [and to all future employees,]**~~ ~~the definition of "total disability" and "total incapacity" in the Policemen and Firemen Retirement System pension plan will be changed to read as follows:~~

(3) all DPOA members who file applications for disability retirement on or after July 1, 1995.

~~Own Occupation: During the first 24 months of benefits, total disability exists when, due to injury, illness or disease, an employee is unable to perform, for wage or profit, the material and substantial duties of the employee's occupation.~~

~~Any Occupation: After the first 24 months of benefits, total disability exists when, due to illness, injury or disease, an employee is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the employee is suited, based on education, training and experience.~~

~~2.~~ ~~a.~~ ~~The duty disability retirement benefits payable to an eligible member shall consist of the amount derived from the sum of the applicable following factors and annual escalators in accordance with the definitions of "own occupation" and "any occupation" as set forth in paragraph 1 above.~~

(1~~b~~) ~~Part~~ A~~.~~ ~~A basic~~ Member who retires as a result of duty disability ~~benefit amount which is 50% of the member's final compensation at the time his duty disability retirement began.~~ shall receive for a period of twenty-four months the sum of:

(i) a basic benefit equal to 50% of the Member's Final Compensation at the earlier of (i) the time his or her duty disability retirement begins or (ii) June 30, 2014; and

(2~~ii~~) ~~Part B. A~~a supplemental ~~duty disability~~ benefit ~~which is 16 2/3~~equal to 16-2/3% of the ~~member~~Member's ~~final compensation at~~Final Compensation at the earlier of (i) the time his ~~or her~~ duty disability retirement ~~began~~begins or (ii) June 30, 2014

(3) ~~**[Escalators.**~~ On July 1st of each year, the ~~**amounts of Parts A and B**~~benefits determined under paragraphs (i) and (ii) above then payable will each be increased by

adding to said amounts the product of ~~2.25% times~~ the initial amount of said ~~Part A and B~~ benefit which was computed at the time the duty disability retirement began~~.]~~ and the applicable Pension Improvement Factor (Escalator).

b.    ~~For the first 24 months that a member is on duty disability retirement his benefit shall be the sum of Parts A and B plus applicable escalators.~~

(c~~.~~)    After ~~24~~a Member receives benefits hereunder for a period of twenty-four months, ~~a member who~~the Board will determine whether the Member is disabled from any occupation.  If the Member is disabled from any occupation, the Member shall continue to receive ~~a duty disability retirement~~the benefit ~~which is the sum of Parts A and B plus applicable escalators.  After the expiration of the period when the member~~provided in paragraphs (b)(i) and (b)(ii) until such time as the Member would have attained ~~25~~twenty-five years of creditable service had ~~he/she~~ continued in active ~~service, payment of Part B~~Service with the City.  At that time, the Member shall continue to receive the benefit described in paragraph (b)(i) above; however, benefits described in paragraph (b)(ii) above will cease.

If the Member ~~d.  After 24 months, a member who~~ is not disabled from any occupation, he shall ~~only~~continue to receive ~~Part A plus applicable escalators as his duty disability retirement~~the benefit  described in paragraph (b)(i) above; benefits described in paragraph (b)(ii) will cease.

~~e.~~(d)    ~~Conversion.~~  Duty disability retirement benefits shall continue to be paid to a ~~member~~Member on duty disability retirement after the ~~member~~Member has attained ~~25~~twenty-five years of ~~credited~~creditable service, to the earlier of (i) the ~~member~~Member's attainment of ~~age 65~~Age sixty-five, or (ii) termination of disability as determined by the ~~third party administrator (TPA)~~Board.  Upon termination of disability or attainment of ~~age 65~~Age sixty-five, a ~~member~~Member with ~~25~~twenty-five years of ~~credited~~creditable service shall be eligible to receive a service retirement benefit.  The amount of such service retirement benefit shall be the same amount which would have been payable if the conversion from duty disability retirement to service retirement had occurred at the date of attaining ~~25~~twenty-five years of creditable service~~.~~ ~~credit.  [ In the event that the examinations and/or investigations conducted by the Police Department result in a determination that the member~~a DPOA Member is not qualified for reappointment as a ~~police officer~~Police Employee, for medical reasons, disability benefits will be continued.]

~~f.~~(e)    If a ~~member~~Member on duty disability retirement returns to active service and within a ~~24~~twenty-four month period re-qualifies for duty disability retirement for the same or related reasons ~~he/~~ or she had been retired, then the disability shall be deemed a continuation of the prior disabling condition and the period of the return to work will not have caused the ~~employee~~Member to be entitled to a new initial determination of ~~Part A and B~~benefit amounts as set forth in ~~sub-paragraphs 2.a.(1) and 2.a.(2~~paragraph (b) above.  Instead, such ~~employee~~Member will return to retirement at the point ~~he/~~ or she had reached in sub-paragraphs ~~2.~~(b~~.~~), ~~2.~~(c~~.~~) or ~~2.~~(d~~.~~) above as if

there had not been a break in his or her period of placement on duty disability retirement.

g. Non-duty disability benefits will continue to be calculated as provided by the City Charter.

h.(f) **[As in the past,]** disabilityDisability retirement benefits shall continue to be considered Charter benefits provided by the City pursuant to the 1918 Detroit City Charter, as amended, which are paid instead of and not in addition to any benefits under the State Workers' Disability Compensation Act.

i.(g) Survivor Benefits. Survivor benefit coverage applicable to active membersMembers shall be continued during the period a memberMember is eligible for a duty disability benefit. Upon conversion to a service retirement benefit as provided in 2.e.paragraph (d), automatic survivor benefit coverage shall terminate. At that time, the memberMember shall have the right to elect an optional form of payment in the same manner as if he/ or she had retired from active membership on the conversion date.

3.(h) Pension Credit While on Duty Disability Status.

a.(1) While eligible to receive duty disability benefits, regular defined pensionPension service credit shall continue to accrue, but not beyond June 30, 2014.

b.(2) The accrual of regular defined benefit pensionPension service credit will cease when the member has 25on the earlier of (i) the date the Member has twenty-five years of creditedcreditable service, or (ii) June 30, 2014.

4.(i) Earnings Offset.

a.(1) In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the memberMember's disability benefit payable during the next subsequent fiscal yearFiscal Year will be adjusted so it does not exceed the difference between (i) the memberMember's base salary at the date of disability, increased by 2.25% times the number of full years from the date of disability to the year in which the earnings offset is applied, and (ii) the amount of remuneration from gainful employment during the prior calendar year.

b.(2) The earnings test shall be based on information the TPABoard may periodically require from a duty disability benefit recipient or havehas secured from other reliable sources. Furnishing such information shall be a condition for a Member's continued eligibility for a duty disability benefit.

5.(j) Annuity Withdrawal. The current withdrawal provision of the retirement systemRetirement System will continue to apply to Members on duty disability. If a duty disability recipient elects annuity withdrawal after attaining 25twenty-five years of creditedcreditable service, the applicable benefit reduction will offset the duty

—53—

disability benefit until the conversion date, after which it will offset the converted service retirement benefit.

6.    ~~The disability retirement procedure will be revised as follows:~~

a.    **~~[Medical Boards of Review will no longer be used.]~~**  ~~The function now performed by Medical Boards of Review with respect to the determination of whether an applicant is disabled will be performed by a qualified physician or surgeon in the appropriate specialty at Detroit Receiving Hospital or such other medical facility as may subsequently be mutually determined by the Union and the City.  If either the Union or the City desires to terminate the services of the medical facility, it shall give notice in writing to that effect to the other party, specifying the date of termination.  The parties shall then send a joint written notice to the medical facility of its termination.  Neither party may terminate the services of a medical facility unless it has heard at least one case.  Once the medical facility has received written notice that its services are terminated, it shall hear no further cases.  However, the medical facility shall render decisions on all cases where the applicant has been examined and evaluated prior to receiving such notice.  The medical facility will select the doctor who will perform the examination and evaluation.  The medical finding of this physician or surgeon as to whether the applicant in disabled shall be final and binding on all interested parties.~~

### Sec. F-11.    Non-duty disability.

(a)    On written application to the Board by or on behalf of a Member or by the head of his Department, a Member, who becomes Totally Disabled for duty by reason of injury, illness or disease not resulting from the performance of duty as determined by the Board of Trustees, shall be retired by the Board of Trustees.  If said Member was separated from service after the filing of the written application and had attained twenty-five years or more of creditable service prior to the date of separation, the Board shall retire said Member, under this Part B.

(b)    A Member retired under paragraph (a) above shall receive the following applicable benefits:

(1)    If such Member has less than five years of creditable service at the time of his or her disability retirement, his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund shall be returned to the Member, or at his or her option, he or she shall receive a cash refund annuity which shall be the Actuarial Equivalent of his or her Accumulated Contributions.

(2)    If such Member has five or more years of creditable service at the time of his or her disability retirement, he or she shall receive a disability Retirement Allowance computed in accordance with the provisions of this Article F, Part A, Section F-2(a) or (b), whichever is applicable, and he or she shall have the right to elect an Option provided for in Part H of this Article F.  The

– 54 –

Member's Straight Life Retirement Allowance shall not be less than twenty per cent of his or her Average Final Compensation.  Such Retirement Allowance shall be subject to Parts I and K of this Article F.

(3)     If a Member receiving non-duty disability benefits has any Accumulated Contributions standing to his or her credit in the Annuity Savings Fund when the Member would have attained twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service, such Member may withdraw the balance of such contributions at that time.

## Sec. F-12.     Disability retirement procedures.

(a)     The Board shall establish procedures for determining whether a Member is disabled.  Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(b-)     If ~~the applicant~~a Member is determined to be disabled, the Board ~~of Trustees~~ or its designee will examine the pension file, including the submissions of the ~~applicant~~Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the ~~pension plan~~Combined Plan.  If it is undisputed that the disability did result from the performance of duty, the Board ~~of Trustees~~ will grant duty disability retirement benefits.  If it is undisputed that the disability did not result from the performance of duty, the Board ~~of Trustees~~ will grant non-duty disability retirement benefits, provided the ~~applicant~~Member meets the other conditions of eligibility~~, e.g., five years of creditable service~~.  If the performance of duty issue is in dispute, the Board ~~of Trustees~~will refer the matter to arbitration by a member of the Disability Retirement Review Board (~~"~~"DRRB~~"~~"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon ~~all interested parties~~the Member, the Department and the Board.  The DRRB shall consist of ~~3~~three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board ~~of Trustees. [[By March 1, 1998, or within thirty (30) days after the issuance of the Act 312 Award (Case No. D92 C-554),] the Union and the City shall convene and select 3~~.  The three members of the DRRB shall be disinterested persons qualified as labor arbitrators ~~to serve as members of the DRRB.]~~and shall be selected in accordance with agreements between the City and the unions representing Members.   The procedure for the termination of ~~umpires and the selection of new umpires [currently in use by the Union and the Police or Fire Department or found in Article 8]~~ ~~shall apply to the termination~~DRRB members and the selection of new DRRB ~~arbitrators~~members also shall be carried out in accordance with the agreements between the City and the unions representing Members.

(c-)     The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

(1-)The ~~applicant~~Member and the City will have the right to appear in person or otherwise~~,~~ may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

(2-)A court reporter will be present and make a stenographic record of the proceedings;

(3-)The hearing will be closed to the public, except that the ~~applicant~~Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

(4-)The witnesses will be sequestered;

(5-)The witnesses will be sworn by the court reporter and testify under oath;

(6-)The ~~applicant~~Member may not be called by the City as an adverse witness;

(7-)The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

(8-)If the ~~applicant~~Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the ~~applicant~~Member may so inform the Board ~~of Trustees~~ in writing which, in turn, will submit a written request to the appropriate Department ~~executive~~ for the release of the employee for the purpose of so testifying;

(9-)The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

(10-)   The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute.  ~~The decision of the DRRB member shall be final and binding on all interested parties~~;

(11-)   The authority of the DRRB member is limited to deciding whether or not the ~~applicant~~Member's disability "resulted from the performance of duty" within the meaning of the ~~Pension~~Combined Plan.  The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the ~~Pension~~Combined Plan; and

(12-)   The costs associated with the hearing, including the arbitrator's fees and expenses~~,~~ and the court reporter's fees and expenses, ~~shall~~will be paid by the ~~Board of Trustees~~Retirement System.

~~d.     A Third Party Administrator (TPA) mutually selected by the Union and the City shall provide all ongoing duties of administering the disability benefits after initial eligibility has been determined.  These duties shall include:~~

~~–56–~~

1. ~~Monthly payment of benefits;~~

2. ~~The former duties of the Medical Director for conducting investigations to assure continuing eligibility for disability retirement benefits, including the annual re-examination of disability beneficiaries;~~

3. ~~Conducting investigations to determine any earnings the disability beneficiary may have for offset to system benefits; and~~

4. ~~The TPA shall have reasonable powers to insure compliance with re-examination and proof of earnings requirements including the withholding of monthly payments until compliance is achieved.~~

~~c.~~(d)    If a disability ~~beneficiary~~retiree is determined by the ~~TPA~~Board or its delegate to no longer be disabled, he~~/~~ or she may appeal that determination within seven (7) days thereof by filing a written request with the ~~TPA~~Board for a re-examination ~~by a qualified physician or surgeon at and selected by the medical facility identified in paragraph 6.a. above whose medical finding will be final and binding. The TPA~~. The Board or its delegate shall promptly arrange for such re-examination. The ~~applicant~~Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the ~~applicant~~Member is no longer disabled, his or her disability benefits will be further continued while the Police or Fire Department ~~is conducting~~conducts such examinations and/or investigations as necessary to determine whether the ~~applicant~~Member is qualified for reappointment to active duty. **[** In the event that the examinations and/or investigations conducted by the Police Department result in a determination that ~~the member~~a Member represented by DPLSA is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.**]**

~~f.      In the event that the Union and the City are unable to reach agreement upon the medical facility to perform the functions described in paragraph 6.a. or the TPA to perform the functions described in paragraph 6.d. of this section, within thirty (30) days after a vacancy occurs, each shall nominate one choice as its selection and after reviewing any materials submitted and considering any arguments advanced by the parties in support of their respective nominations, a member of the DRRB shall decide which of the two nominees shall serve as the medical facility or the TPA.~~

~~7.~~(e)    **[**The Board of Trustees shall not act upon or grant the application filed by ~~an officer~~a Police Employee or Fire Employee who, although he~~/~~ or she is not capable of performing the full duties of a **~~police officer~~**Police Employee or Fire Employee, has not suffered any diminishment of his~~/~~ or her base wages or benefits because he~~/~~ or she is either:

~~a.~~(1)    regularly assigned to a position, the full duties of which he~~/~~ or she is capable of performing; or

**b.(2)** assigned to a restricted duty position, unless the Police Department ~~or Fire Department~~ advises that it intends to seek a disability retirement for the ~~officer~~Police Employee or Fire Employee in the foreseeable future.

**8.(f)** The provisions in paragraph ~~7~~(e) above are not intended to and will not:

    **a.(1)** affect the ~~officer's~~ right of a Member to seek a disability retirement when no restricted duty position is available; or

    **b.(2)** restrict in any way the existing authority of the Chief of Police or the Fire Commissioners to seek a duty or non-duty disability retirement for ~~an officer~~a Member or for that ~~officer~~Member at that time to request a duty or non-duty disability retirement.~~]~~

---

~~**Sec. 3.**~~ ~~**Non-duty disability.**~~

~~On written application to the Board of Trustees by or on behalf of a member or by the Head of his Department, a member, who becomes totally incapacitated for duty by reason of injury, illness or disease not resulting from the performance of duty, shall be retired by the Board of Trustees; provided, the Medical Director, after an examination of such member, shall certify to the Board of Trustees his total incapacity. If said member was separated from service after the filing of the written application and had attained 25 years or more of service prior to the date of separation, the Board of Trustees shall retire said member, under this Part B. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part B, § 3.)~~

~~**Sec. 4.**~~ ~~**Benefits.**~~

~~A member retired under section 3 above shall receive the following applicable benefits:~~

    ~~(a)~~ ~~If such member has less than five years of creditable service at the time of his retirement, his accumulated contributions standing to his credit in the Annuity Savings Fund shall be returned to him, or at his option he shall receive a cash refund annuity which shall be the actuarial equivalent of his accumulated contributions. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part B, § 4(a).)~~

    ~~(b)~~ ~~If such member has five or more years of creditable service at the time of his retirement, he shall receive a disability retirement allowance computed in accordance with the provisions of this article, part A, section 2 or 2.1, whichever is applicable, and he shall have the right to elect an option provided for in Part H of this Article. His straight life retirement allowance shall not be less than twenty per cent of his average final compensation. Such retirement allowance shall be subject to Parts I and K of this Article. (As amended September 1, 1964. In effect September 15,~~

~~1964. As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part B, § 4(b).)~~

(c) ~~If a member receiving non-duty disability benefits has any accumulated contributions standing to his credit in the Annuity Savings Fund upon attainment of twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service, such member may withdraw the balance of such contributions at that time.~~

---

**By Agreement**

---

~~Persons~~(g) DPCOA and DPLSA members who are retired on disability ~~pensions~~Pensions pursuant to ~~Article VI~~this Part B ~~of the Policemen and Firemen Retirement System~~ shall be entitled to lump sum payments of all accumulated time from the date that the Board of Trustees determines that they are entitled to such a ~~pension.~~ ~~Members~~Pension. These members shall not be required to utilize such time delaying their retirement ~~date~~dates.

---

### Part C — ~~Application,~~ Escalation and Change in Compensation, Rank

~~All applications for retirement shall be subject to the provisions of section 14, as amended, of Chapter XXI, Title IV of the 1918 Detroit City Charter, insofar as the same are applicable. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C.)~~

**Sec. ~~1~~F-13.** **Generally.**

~~If~~Subject to the Plan of Adjustment, if hereafter the rate of compensation of the rank, grade or position on which the service ~~retirement allowance~~Retirement Allowance, disability ~~pension~~Pension or disability ~~retirement allowance of a beneficiary who was a member or is a beneficiary of member~~Retirement Allowance of a Member who was hired prior to July 1, 1969 or is a Beneficiary of such a Member as defined in ~~article IV, section~~Article D, Section D-1(a), (b), or (c) is based shall be changed, his or her service ~~retirement allowance~~Retirement Allowance, disability ~~pension~~Pension, or disability ~~retirement allowance~~Retirement Allowance shall be changed proportionately, and if such rank, grade, or position shall have been abolished, his or her service ~~retirement allowance~~Retirement Allowance, disability ~~pension~~Pension, or disability ~~retirement allowance~~Retirement Allowance shall be changed in proportion to the change made in the compensation of the existing rank, grade, or position most nearly approximating the rank, grade, or position so abolished. ~~(As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C, § 1.)~~

**Sec. ~~2~~F-14.** **Increase of Benefits; Pension Improvement Factor (Escalator).**

~~The retirement allowance or death benefit of a member who was hired prior to July 1, 1969 shall be increased proportionally with the increases in the pay of active employees of the rank on which the retirement allowance was computed.~~

On and after July 1, 1969, and the first of July of each year thereafter until July 1, 1992, the ~~pension~~Pension portion of any ~~retirement allowance~~Retirement Allowance or death benefit of a ~~member or beneficiary of a member~~Member or Beneficiary of a Member as defined in ~~article IV, section~~Article D, Section D-1(d), which is paid or payable under this ~~chapter~~Component II shall be increased at the rate of two per cent (2.0%) per annum computed on the basis of the amount of the ~~pension~~Pension received at the time of retirement. ~~(As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C, § 2.)~~

On or after July 1, 1992 and the first of July each year thereafter until July 1, 2014, the ~~pension~~Pension portion of any ~~retirement allowance~~Retirement Allowance or death benefit of a ~~member or beneficiary of a member~~Member or Beneficiary of a Member as defined in ~~article IV, section~~Article D, Section D-1(d), (including those Members who opt to retire under the New Plan provisions) shall be increased at the rate of two and twenty-five one-hundredths per cent (2.25%) per annum computed on the basis of the amount of the ~~pension~~Pension received at the time of retirement. ~~(Ord. No. 18-93, Sec. 47-12.6C-2.1.)~~

Effective for ~~members~~Members who retire on or after July 1, 1997 (July 1, 1998 for ~~DPOA~~DPCOA members, DPLSA members and ~~their fire equivalents), the pension escalator described in this section shall be compounded annually.~~

DFFA

~~**By Agreement**~~

---

~~**Post Retirement Escalator**~~

~~For persons [or~~ members with a parity relationship with ~~the DPLSA and the~~ DPCOA ~~Inspector],~~ retiring on or after July 1, 1998 [or~~and July 1, 2001~~], under the new plan provisions, the 2.25% per annum escalation amount~~ for DPOA members and their fire equivalents), the Pension Improvement Factor (Escalator) described in this Section shall be re-computed each ~~fiscal year~~Fiscal Year ending before July 1, 2014 on the basis of the amount of ~~pension~~Pension received in the previous ~~fiscal year~~Fiscal Year (i.e., the 2.25% per annum escalation amount shall be compounded).

~~**DFFA**~~

~~For members with a parity relationship with the DPOA, retiring on or after July 1, 2001, under the new plan provisions, the 2.25% per annum escalation amount shall be re-computed each fiscal year on the basis of the amount of pension received in the previous year.~~

~~**DPCOA**~~

Pension benefits for DPCOA members under Component II based on service rendered after ~~the effective date of this CET DPCOA~~November 30, 2012 shall not be subject to any escalation amounts.

~~**DPLSA / DPOA**~~

~~On or after July 1, 1992, and the first of July each year thereafter, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in Article VI, Section 1(d) of the plan provisions, and [Article 51.G. of the DPLSA CBA or~~

~~Article 33.K. of the CPOA CBA]~~ ~~(to include those members who opt to retire under the new~~ ~~plan provisions) shall be increased at the rate of 2.25% per annum computed on the basis of the~~ ~~amount of the pension received at the time of retirement by all new plan members who are~~ ~~currently retired or who retire on or after July 1, 1992.~~

The ~~pension~~Pension portion of any ~~retirement allowance~~Retirement Allowance or death benefit of a ~~member~~Member, or ~~beneficiary~~Beneficiary of a ~~member~~Member as defined in Article ~~IV~~D, Section D-1(d) of the ~~plan~~Combined Plan provisions, and ~~[~~Article 51.G. of the DPLSA ~~CBA~~collective bargaining agreement or Article 3.K. of the DPOA ~~CBA]~~collective bargaining agreement (to include those ~~members~~Members who opt out to retire under the ~~new plan~~New Plan provisions) earned after ~~[the date of the Act 312 Award in D09 G-0786~~April 1, 2011 (for DPLSA members) or September 1, 2011~~]~~ (for DPOA members), shall not be increased whatsoever, per annum or otherwise. The ~~pension~~Pension portion of any ~~retirement allowance~~Retirement Allowance or death benefit of a ~~member~~Member, or ~~beneficiary~~Beneficiary of a ~~member~~Member as defined herein, accrued prior to ~~[the date of the Act 312 Award in D09 G-0786~~April 1, 2011 (for DPLSA members) or September 1, 2011~~]~~ (for DPOA members), shall still be increased as provided herein. Hence, ~~pension~~Pension benefits earned based on service rendered after ~~[the date of this Award~~April 1, 2011 (for DPLSA members) or September 1, 2011~~] is issued~~ (for DPOA members) will no longer receive the 2.25% per annum escalation amount. The 2.25% per annum escalation amount shall continue to apply to ~~pension~~Pension benefits earned based on service rendered before ~~[the date this Award was issued~~April 1, 2011 (for DPLSA members) or September 1, 2011~~]~~ (for DPOA members).

~~[Pension benefits based on service rendered after the effective date of this Agreement shall~~ ~~continue to not be subject to any escalation amounts.]~~

---

**Sec. ~~3~~F-15.** **Payment.**

~~The escalation factor contained in section 2 above shall be payable to the member or~~ ~~beneficiary of a member as defined in article IV, section 1 (d), notwithstanding any retirement~~ ~~allowance or pension amount limitation provisions in this chapter to the contrary. (As amended~~ ~~November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art.~~ ~~VI, Part C, § 3.)~~

Except as provided in the Plan of Adjustment, the escalation factor contained in Section F-14 above shall be payable to the Member or Beneficiary of a Member as defined in Article D, Section D-1(d), notwithstanding any Retirement Allowance or Pension amount limitation provisions in this Component II to the contrary.

## Part D — Death Benefits.

**Sec. ~~1~~F-16.** **Generally.**

If a ~~member~~Member, or a ~~beneficiary~~Retiree who was a ~~member~~Member, is killed in the performance of his or her duty or dies as the result of illness contracted or injuries received while in the performance of his or her duty and such death, illness or injuries resulting in death, ~~be~~is found by the ~~board~~Board of ~~trustees~~Trustees to have resulted from the performance of his or her

duty, the following applicable benefits shall be paid, subject to ~~part~~Part I, ~~section 1~~Section F-25, of this ~~article~~Article F.

(a) ~~His accumulated contributions~~The Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her death shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the ~~board~~Board of ~~trustees~~Trustees. If there ~~be~~is no such designated person surviving, his or her said ~~accumulated contributions~~Accumulated Contributions shall be paid to his or her legal representative, subject to ~~subsection~~paragraph (e) of this ~~section~~Section F-16.

(b) ~~His widow~~A Member's surviving spouse shall receive a ~~pension~~Pension of five-elevenths of the maximum earnable compensation for the rank of ~~patrolman or fire fighter~~Patrolman or Fire Fighter as the case may be, ~~to continue during her widowhood. If his~~ determined as of the earlier of (i) the date of death or (ii) June 30, 2014. If his or her child or children under ~~age~~Age eighteen years also survive the deceased ~~member~~Member each such child shall receive a ~~pension~~Pension of one-tenth of such maximum earnable compensation as of the earlier of (i) the date of death or (ii) June 30, 2014; provided, that if there ~~be~~are more than two such surviving children under ~~age~~Age eighteen years, each such child's ~~pension~~Pension shall be an equal share of seven thirty-thirds of such maximum earnable compensation. Upon the death, marriage, adoption, or ~~attainment of age~~Attainment of Age eighteen years of any such child his ~~pension~~or her Pension shall terminate and there shall be a redistribution by the ~~board~~Board of ~~trustees~~Trustees to the deceased ~~member~~Member's remaining eligible children, if any; provided, that in no case shall any such child's ~~pension~~Pension exceed one-tenth of such maximum earnable compensation. In no case shall the total of the ~~pensions~~Pensions, provided for in this ~~sub-section~~paragraph (b), payable on account of the death of a ~~member~~Member exceed two-thirds of the maximum earnable compensation for the rank of ~~patrolman or fire fighter~~Patrolman or Fire Fighter, as the case may be, determined as of the earlier of (i) the date of the Member's death or (ii) June 30, 2014.

~~Effective July 1, 1986, widows of Fire Department employees who have been receiving a flat monthly benefit of $300.00 pursuant to the authority of Title IV, Chapter 15, Section 16 of the 1918 City of Detroit Charter, and Section 13-107 of the July 1, 1974 Charter should receive an increase of $500.00 per month thereby making the flat monthly benefit $800.00. (Ord. No. 11-86, Sec. 47-10-3; Ord. No. 348-H, Sec. 54-100-3.)~~

Effective July ~~1,1986~~1, 1986, widows of Police Department or Fire Department employees who have been receiving a flat monthly benefit of $300.00 ~~pursuant to the authority of Title IV, Chapter 21, Section 19 of the 1918 City of Detroit Charter, and Section 13-107 of the July 1, 1974 Charter,~~ should receive an ~~Increase~~increase of $500.00 per month thereby making the flat monthly benefit $800.00. ~~(Ord. No. 11-86, Sec. 47-10-4; Ord. No. 349-H, Sec. 54-100-4.)~~

(c)     If no ~~widow~~spouse survives the deceased ~~member~~Member or if his ~~widow~~or her surviving spouse dies or remarries before his or her youngest unmarried surviving child attains ~~age~~Age eighteen years, his or her unmarried child or children under age eighteen years shall each receive a ~~pension~~Pension of one-fourth of the maximum earnable compensation for the rank of ~~patrolman or fire fighter~~Police Employee or Fire Employee, as the case may be as of the earlier of (i) the date of the Member's death or (ii) June 30, 2014; provided that if there ~~be~~are more than two such surviving children under ~~age 18~~Age eighteen years, each such child's ~~pension~~Pension shall be an equal share of one-half of such maximum earnable compensation.  Upon the death, marriage, adoption, or ~~attainment of age~~Attainment of Age eighteen years of any such child his ~~pension~~or her Pension shall terminate and there shall be a redistribution by the ~~board~~Board of ~~trustees~~Trustees to the deceased ~~member~~Member's remaining eligible children, if any; provided, that in no case shall any such child's ~~pension~~Pension exceed one-fourth of the maximum earnable compensation for the rank of ~~patrolman or fire fighter~~Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

(d)     If there ~~be~~is no ~~widow~~surviving spouse and if there ~~be~~are no children under ~~age~~Age eighteen years surviving such deceased ~~member~~Member and if he or she leaves surviving ~~him~~either a father or mother or both~~a father and mother~~, whom the ~~board of trustees~~Board of Trustees shall find to be actually dependent upon such ~~member~~Member for financial support, such dependent father and mother shall each receive a ~~pension~~Pension of one-sixth of the maximum earnable compensation for the rank of ~~patrolman or fire fighter~~Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

(e)     If a ~~member~~Member dies intestate, without having designated a person or persons, as provided in sub-section (a) of this section, and without heirs, the amount of his ~~accumulated contributions~~or her Accumulated Contributions in the Annuity Savings Fund, not to exceed a reasonable sum, to be determined by the ~~board~~Board of ~~trustees~~Trustees, shall be used to pay his or her burial expenses, provided he or she leave no other estate sufficient for such purpose; any balance credited to such ~~member~~Member in the Annuity Savings Fund, and not used for burial expenses shall remain a part of the funds of the ~~retirement system~~Retirement System and shall be credited to the Pension Accumulation Fund.

(f)     If the maximum earnable compensation for the rank of ~~patrolman or fire fighter~~Patrolman or Fire Fighter, as the case may be, is subsequently changed, the ~~pensions~~Pensions provided in this ~~section~~Section F-16 for beneficiaries of ~~members~~Members as defined in ~~article IV, section~~Article D, Section D-1(a), (b), or (c) shall be proportionately changed; provided, however, that no increases shall be made after June 30, 2014.

(g)     The maximum earnable compensation for the rank of ~~patrolman or fire fighter~~Patrolman or Fire Fighter, as the case may be, to be used in computing the

~~pensions~~Pensions provided in this ~~section~~Section for beneficiaries of ~~members~~Members as defined in ~~article IV, section~~Article D, Section D-1(d) shall be the maximum earnable compensation of the rank of ~~patrolman or fire-fighter~~Patrolman or Fire Fighter as established by the ~~city~~City's budget for the ~~fiscal year of the member~~Fiscal Year in which occurs the earlier of (i) the date of the Member's death. ~~(As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.~~), or (ii) June 30, 2014.

~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part D.)~~

---

### ~~By Agreement~~

~~The City agrees that in the Policemen and Firemen Retirement System Article VI, D and Article VI, E, all references to "widow" shall include "widower" and in Article VI, E, Section 2(a), the disability and dependency restrictions on widowers shall be removed.~~

---

### ~~DPOA~~

~~Duty and non-duty death benefits under the City of Detroit Policemen and Firemen Retirement System shall be payable to widowers in the same manner as they are now payable to widows. Widowers seeking non-duty death benefits under the system shall not be required to demonstrate any degree of dependency on their wives.~~

---

### ~~DFFA / DPOA~~

~~Effective July 1, 2001, **[for DPOA allied members,]** the re-marriage penalty on any pension shall be removed.~~

---

## Part E — Nonduty Death.

### Sec. ~~1~~F-17. Payment of ~~accumulated contributions~~Accumulated Contributions.

If a ~~member~~Member, or a ~~member~~Member who retires after June 30, 1965, under ~~part~~Part B, ~~section 1~~Section F-7 of this ~~article~~Article F, dies and no ~~pension or pensions~~Pension or Pensions become payable under this ~~chapter~~Component II on account of his ~~or her~~ death, ~~his accumulated contributions~~the Accumulated Contributions standing to his ~~or her~~ credit in the Annuity Savings Fund at the time of ~~his~~ death shall be paid to such person or persons as he ~~or she~~ shall have nominated by written designation duly executed and filed with the ~~board~~Board of ~~trustees~~Trustees. If there ~~be~~is no such designated person or persons surviving the said ~~member~~Member, his ~~or her~~ said ~~accumulated contributions~~Accumulated Contributions shall be paid to his ~~or her~~ legal representative. If such ~~member~~Member dies intestate, without having designated a person as above provided, and without heirs, his ~~or her~~ said ~~accumulated contributions~~Accumulated Contributions not to exceed a reasonable sum to be determined by the ~~board~~Board of ~~trustees~~Trustees, shall be used to pay his ~~or her~~ burial expenses, provided he ~~or she~~ leaves no other estate sufficient for such purpose; and any balance credited to such

~~member~~Member in the Annuity Savings Fund not so used for burial expenses shall be transferred to the Survivors Benefit Fund. ~~(As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part E, § 1.)~~

**Sec. ~~2~~F-18.** **Allowances to ~~widows, etc~~surviving spouses.**

Upon the death of a ~~member~~Member, or a ~~member~~Member who retires after June 30, 1965, under ~~part~~Part B, ~~section 1~~Section F-7 of this ~~article~~Article F, and such death ~~was~~is found by the ~~board of trustees~~Board of Trustees not to have resulted from the performance of his or her duty, the applicable ~~retirement allowances~~Retirement Allowances provided in paragraphs (a), (b), (c) and (d) of ~~this section~~Section F-1 shall be paid from the Survivors Benefit Fund, to the extent of available funding, and shall be subject to paragraphs (e), (f) and (g) of ~~this section~~Section F-1.

(a)   His ~~widow, or in the case of a female member, her widower, whom the board of trustees finds to be totally and permanently disabled and to have been dependent upon the said female member for at least fifty per cent of his financial support,~~or her surviving spouse shall receive a ~~retirement allowance~~Retirement Allowance computed in the same manner in all respects as if the said ~~member~~Member had (1) regularly retired on the earlier of (i) the day preceding the date of his or her death, or (ii) June 30, 2014, notwithstanding that he or she might not have acquired twenty-five years of creditable service, in the case of a ~~member~~Member as defined in ~~article IV, section~~Article D, Section D-1(a), (b), or (c), or notwithstanding that he or she might not have acquired twenty-five years of service or more and had not attained age fifty-five, in the case of a ~~member~~Member as defined in ~~article IV, section~~Article D, Section D-1(d)~~,~~; (2) elected ~~option~~Option 2 provided for in ~~part~~Part H of this ~~article,~~Article F; and (3) nominated his ~~said widow or widower~~or her surviving spouse as joint ~~beneficiary~~Beneficiary; provided, that in no case shall the ~~retirement allowance~~Retirement Allowance payable to such joint ~~beneficiary~~Beneficiary be less than twenty per cent of said ~~member~~Member's ~~average final compensation. If a member~~Average Final Compensation as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014. If a Member who had less than twenty-five years of creditable service dies prior to July 1, 2001, the ~~retirement allowance~~Retirement Allowance payable to the ~~widow/widower~~surviving spouse shall be terminated in the event the ~~widow/widower~~surviving spouse remarries.

(b)   His or her unmarried child or children under ~~age~~Age eighteen years shall each receive a ~~retirement allowance~~Retirement Allowance of one-seventh of the annual maximum earnable compensation of the rank of a ~~patrolman~~Patrolman or a ~~fire fighter~~Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014; provided, that if there ~~be~~are more than two such children, each child shall receive a ~~retirement allowance~~Retirement Allowance of an equal share of two-sevenths of said annual maximum earnable compensation~~ of a patrolman or a fire fighter~~. Upon any such child's adoption, marriage, death or ~~attainment of age~~Attainment of Age eighteen years, whichever occurs first, his ~~retirement allowance~~or her Retirement Allowance shall terminate, and there shall be a

redistribution by the ~~board~~Board of ~~trustees~~Trustees to the deceased ~~member~~Member's remaining eligible children under ~~age~~Age eighteen years; provided, that in no case shall the ~~retirement allowance~~Retirement Allowance payable to any such child exceed one-seventh of the said annual maximum earnable compensation ~~of a patrolman or a fire fighter~~.

(c)    If, at the time of the said ~~member~~Member's death, there shall be neither a ~~widow~~surviving spouse nor children eligible for a ~~retirement allowance~~Retirement Allowance provided for in this ~~section~~Section F-18, each of his or her parents shall receive a ~~retirement allowance~~Retirement Allowance of one-seventh of the annual maximum earnable compensation of a ~~patrolman~~Patrolman, or a ~~fire fighter~~Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014; provided, that the ~~board of trustees~~Board of Trustees finds that such parent was dependent upon the said ~~member~~Member for at least fifty per cent of his or her financial support.  Upon the remarriage of any such parent, his ~~retirement allowance~~or her Retirement Allowance shall thereupon terminate.

(d)    In the event all the ~~retirement allowances~~Retirement Allowances, provided for in this ~~section~~Section F-18, payable on account of the death of a ~~member~~Member, terminate before there has been paid an aggregate amount equal to the said ~~member~~Member's ~~accumulated contributions~~Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of ~~his~~ death, the difference between his or her said ~~accumulated contributions~~Accumulated Contributions and the said aggregate amount of ~~retirement allowances~~Retirement Allowances shall be paid to such ~~person or~~ persons as the said ~~member~~Member shall have nominated by written designation duly executed and filed with the ~~board~~Board of ~~trustees~~Trustees.  If there ~~be~~are no such designated person or persons surviving the said ~~member~~Member such difference, if any, shall be paid to his or her legal representative.

(e)    In no case shall any ~~retirement allowance~~Retirement Allowance be paid under this ~~section~~Section F-18 on account of the death of a ~~member~~Member if any benefits are paid under ~~part~~Part D of this ~~article~~Article F on account of his or her death.  The ~~retirement allowance~~Retirement Allowance provided for in this ~~section~~Section F-18 shall be subject to ~~part~~Part I of this ~~article~~Article F.

(f)    All benefits provided in this ~~part~~Part E for ~~beneficiaries of members~~Beneficiaries of Members as defined in ~~article IV, section~~Article D, Section D-1(a), (b), or (c) shall be based on the maximum earnable compensation of the rank of ~~patrolman or fire fighter~~Patrolman or Fire Fighter, as the case may be.  ~~If hereafter~~ determined as of the earlier of (i) the Member's date of death, or (ii) June 30, 2014.  If a Member died before July 1, 2014 and the compensation of such rank shall be changed prior to July 1, 2014, the benefits provided shall be changed proportionately.  All benefits provided in this ~~part~~Part E for ~~beneficiaries of members~~Beneficiaries of Members as defined in ~~article VI, section~~Article D, Section D-1(d) shall be based on the maximum earnable compensation of the rank of ~~patrolman or fire-fighter~~Patrolman or Fire Fighter as established in the ~~city~~City's budget for the ~~fiscal~~ year of the ~~member~~earlier of (i) the Member's death or (ii) June 30, 2014.

(g)    In the event a ~~member~~Member has withdrawn his ~~accumulated contributions~~or her Accumulated Contributions from the Annuity Savings Fund and has not returned in full all amounts due the fund by him or her, the survivors benefits provided in paragraphs (a), (b), (c) and (d) of this ~~section~~Section shall be reduced to the proportion that the ~~member~~Member's ~~accumulated contributions~~Accumulated Contributions standing to his or her credit in the Annuity Savings Fund, at the time of his or her death bears to the amount his ~~accumulated contributions~~Accumulated Contributions would have been had he or she not made a withdrawal from the Annuity Savings Fund. ~~(As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)~~

~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part E, § 2.)~~

**~~By Agreement~~**

~~The City agrees that in the Policemen and Firemen Retirement System Article VI, D and Article VI, E, all references to "widow" shall include "widower" and in Article VI, E, Section 2(a), the disability and dependency restrictions on widowers shall be removed.~~

**~~DPOA~~**

~~Duty and non-duty death benefits under the City of Detroit Policemen and Firemen Retirement System shall be payable to widowers in the same manner as they are now payable to widows. Widowers seeking non-duty death benefits under the system shall not be required to demonstrate any degree of dependency on their wives.~~

**~~DFFA / DPOA~~**

~~Effective July 1, 2001, [for DPOA allied members,] the re-marriage penalty on any pension shall be removed.~~

### Part F — Termination of Membership Otherwise than by Retirement, Death or Becoming a Beneficiary.

**Sec. ~~1~~F-19.    Payment of benefits.**

If the membership of a ~~member~~Member as defined in ~~article IV, section~~Article D, Section D-1(a), (b), or (c) shall terminate for any reason other than ~~his~~retirement, his or her becoming a ~~beneficiary~~Beneficiary, or ~~his~~death, ~~he~~the Member shall be paid the ~~accumulated contributions~~Accumulated Contributions standing to the credit of his or her individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a ~~member~~Member eligible for retirement shall resign or be dismissed from ~~the~~service, the Board of Trustees, on the written petition of such ~~member~~Member filed within one year from his or her separation from service and prior to the withdrawal of his ~~accumulated contributions~~or her Accumulated Contributions in the Annuity Savings Fund, shall grant such ~~member~~Member service retirement benefits computed in

accordance with ~~article VI, part~~Article F, Part A, ~~section~~Section F-2(a), subject to the provisions of ~~part~~Part G of this ~~article. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part~~Article F~~, § 1.).~~

## Sec. ~~2~~F-20. Payment of benefits.

If the membership of a ~~member~~Member as defined in ~~article IV, section~~Article D, Section D-1(d) shall terminate for any reason other than ~~his~~ retirement, his or her becoming a ~~beneficiary or his~~Beneficiary or death, he or she shall be paid the ~~accumulated contributions~~Accumulated Contributions standing to the credit of his or her individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a ~~member~~Member having twenty-five or more years of service and having attained age fifty-five shall resign or be dismissed from ~~the~~ service, the Board of Trustees, on the written petition of such ~~member~~Member filed within one year from his or her separation from service and prior to the withdrawal of his ~~accumulated contributions~~Accumulated Contributions in the Annuity Savings Fund, shall grant such ~~members~~Member service retirement benefits computed in accordance with ~~article VI, part~~Article F, Part A, ~~section 2.1~~Section F-2(b), subject to the provisions of ~~part~~Part G of this ~~article. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part~~Article F~~, § 2.).~~

## Sec. ~~3~~F-21. Deferred vested benefits.

A ~~member~~Member (i) whose employment is terminated before August 28, 2003 and who is credited with eight or more years of creditable service and has attained ~~age~~Age forty, or (ii) whose employment is terminated after August 27, 2008 and who is credited with ten or more years of creditable service, but in each case less than twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service shall be eligible to receive a full ~~retirement allowance~~Retirement Allowance under Component II beginning on the date upon which the ~~member~~Member would have been eligible to commence a full ~~retirement allowance~~Retirement Allowance had he or she continued in the service of the City until such date. Alternatively, such ~~member~~Member may elect to receive an actuarially reduced early ~~retirement allowance~~Retirement Allowance at any time following his or her termination of employment with the City.

## Part G — Conviction of Felony.

## Sec. ~~1~~F-22. Forfeiture of rights.

If a ~~member or beneficiary~~Member or retiree as defined in Article ~~IV~~D, ~~section~~Section D-1(a), (b), (c) or (d) shall be convicted ~~of~~ by a court of competent jurisdiction ~~of~~or enters a nolo contendere plea accepted by a court for a felony ~~or high misdemeanor involving moral turpitude committed during active~~against the City arising out of his or her service~~, the Board of Trustees shall have the power to~~ as an employee of the City and while a Member of the Retirement System, the court may order the forfeiture of all or a portion of the rights of the ~~member or beneficiary~~Member to benefits hereunder, except the return of his ~~accumulated contributions. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title~~

IX, Ch. VII, Art. VI, Part G, § 1.)or her Accumulated Contributions, as provided in the *Public Employee Retirement Benefits Forfeiture Act, MCL 38.2701, et. seq.* In such case, the Retirement System shall pay to an individual, if any, who would otherwise be a Beneficiary of the Member or retiree whose retirement benefit is being forfeited under this Section F-22 an Actuarially Equivalent monthly retirement allowance at the Age that the Member or Retiree would have become eligible for unreduced retirement benefits under the Retirement System.

### Part H — Option Elections.

**Sec. 1F-23.    Generally.**

(a)    Prior to the first payment of any ~~retirement allowance~~Retirement Allowance normally due, except a disability ~~pension~~Pension payable under Part B, Sections ~~2~~F-8 and ~~2.1~~F-11 of this article, a ~~member~~Member may elect to receive his or her ~~retirement allowance as a straight life retirement allowance~~Retirement Allowance as a Straight Life Retirement Allowance payable throughout the ~~member~~Member's life; or the ~~member~~Member may elect to receive the ~~actuarial equivalent~~Actuarial Equivalent, as of the date of the ~~member~~Member's retirement, of his or her ~~straight life retirement allowance~~Straight Life Retirement Allowance in a reduced ~~retirement allowance~~Retirement Allowance payable throughout the ~~member~~Member's life and nominate a joint ~~beneficiary~~Beneficiary, in accordance with the provisions of Options 1, 2, 3, 3(A) or 3(B) as follows:

   (1)    OPTION 1.  *Cash Refund Annuity.*  Under Option 1, a ~~member~~Member will receive a reduced ~~retirement allowance.  If a member~~Retirement Allowance. If a Member who selected Option 1 dies before full payment of the ~~annuity~~Annuity has been received, the person or persons nominated by that ~~member~~Member's written designation duly executed by the ~~member~~Member and filed with the Board of Trustees shall receive in a single payment the difference between the present value of the ~~member~~Member's ~~annuity~~Annuity on the date the ~~member~~Member retired, minus the amount of ~~annuity~~Annuity payments already paid to the ~~member~~Member.  If there is no such designated person(s) surviving the retired deceased ~~member~~Member, such difference, if any, shall be paid to the ~~member~~Member's legal representative~~; or~~.

   (2)    OPTION 2.  *Joint and Last Survivorship Retirement Allowance.*  Under Option 2, upon a ~~member~~Member's death, payment of a reduced ~~retirement allowance~~Retirement Allowance shall be continued through the life and paid the person having an insurable interest in the ~~member~~Member's life and nominated by written designation duly executed by the ~~member~~Member and filed with the Board of Trustees prior to the first payment of the ~~member~~Member's ~~retirement allowance~~Retirement Allowance is due~~; or~~.

   (3)    OPTION 3.  *Joint and Seventy-Five Percent Survivor Allowance.*  Under Option 3, upon a Member's death, payment of seventy-five percent (75%) of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's

life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(3~~4~~) OPTION 3(A). *Modified Joint and Last Survivorship Allowance*. Under Option 3(A), upon a ~~member~~Member's death, payment of one-half (50%) of the ~~member~~Member's reduced ~~retirement allowance~~Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the ~~member~~Member's life and nominated by that ~~member~~Member's written designation duly executed by the ~~member~~Member and filed with the Board of Trustees prior to the date the first payment of the ~~retirement allowance~~Retirement Allowance is due.

(5) OPTION 3(B). *Joint and Twenty-Five Percent Survivor Allowance*. Under Option 3(B), upon a Member's death, payment of twenty-five percent (25%) of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(b) ~~This Section shall be applicable to those members receiving benefits on the effective date of this Section who are not covered by the arbitration decision regarding the Detroit Police Officers Association which became effective July 1, 1995, or the arbitration decision regarding the Detroit Police Lieutenant's and Sergeant's Association arbitration decision which became effective June 30, 1998.~~

(c) ~~This Section does not rescind any substantive rights of disability retirees from the Policemen and Firemen Retirement System who retired prior to the July 1,1995 arbitration award, or the substantive rights of disability retirees from the Detroit Police Lieutenant's and Sergeant's Association who retired prior to the June 30,1998 arbitration award.~~

(d) ~~This Section does not amend any computations used to determine benefits under Part B, Sections 2 and 2.1 of this Code, or result in an increase or decrease in such benefits.~~

(e) ~~Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.~~

~~(Ord. 5-00, Sec. 54-2-14; Ord. 4-00, Sec. 54-2-14.)~~

*~~Joint and Survivor Optional Forms of Payment.~~*(b)    The Joint and Survivor Optional Forms of Payment provided under ~~the retirement system~~Options 2, 3, 3(A) and 3(B) shall be made available in either the standard form or the pop-up form, as follows:

(~~1~~i) *Standard Form*. Under the Standard Form, the reduced ~~retirement allowance~~Retirement Allowance shall be paid throughout the lifetime of the ~~retiree~~Retiree.

(~~2~~ii) *Pop-up Form*. Under the Pop-up Form, the reduced allowance shall be paid throughout the lifetime of the ~~retiree~~Retiree and the designated ~~beneficiary~~Beneficiary. In the event of the death of the designated ~~beneficiary~~Beneficiary during the lifetime of the ~~retiree~~Retiree, the amount of the allowance shall be changed to the amount that would have been payable had the ~~retiree~~Retiree elected the Straight Life Form of Payment. The actuarial cost of the change in benefit shall be borne by the Member who seeks change in his or her election.

In addition, a ~~member~~Member may elect to have all or part of his ~~accumulated contributions~~Accumulated Contributions paid to the ~~member~~Member in a single sum or used to purchase an annuity contract from an insurance company of his or her choice in which case, any annuity payments attributable to such amount under the ~~retirement system~~Retirement System shall not be payable from the ~~annuity reserve~~Annuity Reserve fund but shall be the responsibility of the insurance company. A ~~member~~Member's ~~retirement allowance~~Retirement Allowance shall be reduced by the actuarial equivalent of the amount so paid or used.

(c) This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the arbitration decision regarding DPOA members that became effective on July 1, 1995, or the arbitration decision regarding DPLSA members that became effective on June 30, 1998.

(d) This Section does not amend any computations used to determine benefits under Part B, Sections F-8 and F-11 of this Component II, or result in an increase or decrease in such benefits.

~~Effective July 1, 1992, retirees~~(e)Retirees of the ~~Policemen and Firemen~~ Retirement System shall be entitled to change their ~~pension~~Pension option from either Option 2, Option 3, Option 3(A) or Option 3 ~~[or effective July 1, 2000, Option A]~~ ~~to a straight life pension~~(B) to a Straight Life Retirement Allowance after they have commenced collection of the ~~pension~~Pension if the ~~member~~Member's ~~beneficiary~~Beneficiary predeceases the ~~member~~Member. The actuarial cost of the change in benefit shall be borne by the ~~member~~Member who seeks change in his option election. The pop-up option shall be based upon the investment return assumption as recommended by the ~~Board's actuary~~Plan Actuary and adopted by the Board of Trustees. ~~[This provision shall be effective July 1, 1986.]~~ (Ord. No. 18-93, Sec. 47-12.6H-1(A).)

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
**~~By Agreement~~**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

~~Effective July 1, 2000, members shall have the option of selecting a 75% surviving beneficiary option.~~
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**Sec. ~~2~~F-24.** **Disposition of surplus benefits upon death of ~~member~~Member and ~~beneficiary~~Beneficiary.**

In the event a ~~member~~Member elected Option 2, 3, 3(A) or 3(B) provided for in ~~section 1~~Section F-23 of this ~~part~~Part H and both the Member and his or her designated joint ~~beneficiary~~Beneficiary die before there has been paid in ~~retirement allowances~~Retirement Allowances an aggregate amount equal to his ~~accumulated contributions~~or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement, the difference between his or her said ~~accumulated contributions~~Accumulated Contributions and the said aggregate amount of ~~retirement allowances~~Retirement Allowances paid shall be paid to the said retired ~~member~~Member's legal representative. ~~(As amended September 1, 1964. In effect September 15, 1964.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part H, § 2.)~~

## Part I — Pension Offset by Compensation Benefits.

**Sec. ~~1~~F-25.** **Generally.**

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a ~~member~~Member, or to the dependents of a ~~member~~Member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the ~~system~~Retirement System on account of the same disability or death. In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the ~~pension reserve on~~Pension Reserve or benefits otherwise payable from the funds provided by the City under this Retirement System, then the present value of the commuted payments shall be deducted from the ~~pension reserve~~Pension Reserve, and such benefits as may be provided by the ~~pension reserve~~Pension Reserve, so reduced, shall be payable under the provisions of the Retirement System. ~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part I, § 1.)~~

## Part J — Monthly Payments.

**Sec. F-26.** **Generally.**

Unless otherwise herein provided, all benefits payable under this ~~system~~Retirement System shall be paid in equal monthly installments. ~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part J.)~~

## Part K — Re-Examination of Beneficiaries.

**Sec. ~~1~~F-27.** **Authority of Board.**

(a)     Once each year during the ~~first five years following~~ retirement of a ~~member~~Member on a disability ~~pension~~Pension or a disability ~~retirement allowance~~Retirement Allowance and at least once in every three year period thereafter the Board of Trustees ~~may, and upon his application,~~ shall require any disability ~~beneficiary~~retiree, if he or she would not then be eligible for a service ~~retirement allowance~~Retirement Allowance had he or she remained in active service~~,~~ to undergo a medical

examination: such examination shall be made by, or under the direction of the Medical Director at a place to be fixed by the Board of Trustees. Except when the examination is on the application of the beneficiary, if the beneficiaryIf the retiree shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his or her reasonable traveling expenses. Should such disability beneficiaryretiree refuse to submit to such examination, his or her disability pensionPension or disability retirement allowanceRetirement Allowance may be discontinued until he or she shall submit to such examination and should such refusal continue for one year, all hisof the Member's rights in and to a pensionPension may be revoked by the Board of Trustees. If, on medical examination of a beneficiary, the Medical Director reports, and the report is concurred in byBeneficiary, the Board of Trustees, determines that the beneficiaryretiree is physically able and capable of resuming active duty as a Policeman or Fireman, he or she shall be restored to such duty and his or her other disability pensionPension or disability retirement allowanceRetirement Allowance shall cease. Such memberMember so restored to active duty shall be returned to duty in a rank or grade equivalent to or higher than the rank or grade in which he or she was serving at the time of his or her last retirement and his or her compensation shall be that provided for the rank or grade in which he or she is restored to service. It shall be the duty of the Commissioner of Police or the Board of Fire Commissioners to restore such memberMember to duty forthwith.

(b)     If the Medical Director reports and certifies to the Board of Trustees determines that a disabled old plan memberOld Plan Member is engaged in a gainful occupation, paying more than the difference between his final compensation and hisor her Final Compensation as of the earlier of (i) the date of disability or (ii) June 30, 2014 and his or her disability pensionPension, or disability retirement allowance, and if the Board of Trustees concursRetirement Allowance, the amount of his pensionor her Pension shall be reduced to an amount, which together with the amount earned by himthe Member, shall equal the amount of his final compensation. If the Medical Director reports and certifies tosuch Final Compensation. If the Board of Trustees determines that a disabled new plan memberNew Plan Member is engaged in a gainful occupation, paying more than the difference between his or her base salary at the earlier of (i) the time of disability or (ii) June 30, 2014, increased by two and twenty-five one hundredths percent (2.25%) for each full year from the date of disability and his or her disability pensionPension, or disability retirement allowance, and if the Board of Trustees concursRetirement Allowance, the amount of his pensionor her Pension shall be reduced to an amount, which together with the amount earned by him or her, shall equal the amount of hissuch final compensation. Should his or her earnings be later changed, the amount of his pensionor her Pension may be further modified in like manner.

(c)     A disability beneficiary,retiree who shall be reinstated to active service prior to July 1, 2014 as provided in this sectionSection, shall from the date of such restoration again become a memberMember of the Retirement System;, and he or she shall contribute to the Retirement System thereafter in the same manner and at the same rate as he or she paid prior to his or her disability retirement. Any prior service and membership serviceA disability retiree who shall be reinstated to active service after

June 30, 2014, shall from the date of such restoration become an active Member of the Retirement System and shall accrue future benefits pursuant to Component I.  He or she shall contribute to the Retirement System at the rate required of active Members pursuant to Component I.  Any Prior Service and Membership Service on the basis of which his ~~services were~~or her service was computed at the time of his or her disability retirement shall be restored to full force and effect, and he or she shall be given service credit under Component I or Component II, as applicable, for the period of time he or she was in retirement due to such disability, except in the case of nonservice connected disability.

~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part K, § 1.)~~

### ~~Part L — Medical Board of Review~~

~~As to all applications under this Article, the medical findings of the Medical Board of Review shall be binding on the Board of Trustees.  (1918 Detroit City Charter, Title IX, Art. VI, Part L.)~~

### ~~Part M — Benefit Limitations~~

~~The Defined Benefit Plan of the Retirement System is subject to Section 415 of the Internal Revenue Code.  The Retirement System shall be administered, operated and limited consistent with all applicable Sections of the Internal Revenue Code (IRC) including Section 415, as described in Article IX, Section 8.~~

### Part ~~N~~L — Withdrawal of Accumulated Contributions

**Sec. ~~1~~F-28.**        **Member With Twenty or Twenty-Five Years of Service.**

Effective July 1, 1982, a ~~member~~Member with twenty-five years or more of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) shall be allowed to withdraw either a ~~partial~~portion or the full amount of his ~~accumulated contributions~~or her Accumulated Contributions, one time only, whether or not the ~~member~~Member retires.  A ~~member~~Member shall make such election prior to the receipt of his or her first retirement benefit check.

**Sec. ~~2~~F-29.**        **Disabled Member**

A ~~member~~Member who is receiving disability benefits (duty or non-duty) from the Retirement System and who has twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) or more of creditable service shall have the right to withdraw the full amount of his ~~accumulated contributions~~or her Accumulated Contributions.  If such ~~member~~Member withdraws his ~~accumulated contributions, his~~or her Accumulated Contributions, his or her retirement benefit shall be actuarially reduced to reflect such withdrawal.

**By Agreement**

**(a)Sec. F-30.**  **Optional Annuity Withdrawal**

1.      **[Effective for those retiring on or after July 1, 1974;]** a member(a)   A   Member shall have the right to elect to receive on the effective date of his or her service retirement a partial or total refund of his accumulated contributions.  If a memberor her Accumulated Contributions.   If a Member makes such an election, an annuityAnnuity payable under any retirement allowanceRetirement Allowance or reduced retirement allowanceRetirement Allowance shall be reduced proportionally. If the total accumulated contributionsAccumulated Contributions are withdrawn, no annuityAnnuity shall be payable.

The limitation of fifteen twenty-seconds of the maximum earnable compensation of a patrolman and firemanPolice Employee and Fire Employee continues in effect.  For purposes of determining the fifteen twenty-seconds limitation, a computation based on the annuity which is an actuarial equivalent of the accumulated contributionsAnnuity which is an Actuarial Equivalent of the Accumulated Contributions standing to a memberMember's credit in the Annuity Savings Fund prior to any partial or total refund will be used.

This provision affords the members of this collective bargaining unit a similar option available to members of the General Retirement System pursuant to 1973 Amendment K.   The parties agree that no other benefits or amounts payable pursuant to the Policemen and Firemen Retirement System are affected by this contractual provision.

[On or after July 1, 1974, membersMembers or former membersMembers who are entitled to begin to receive the "40 & 8" benefit provided under Section F-6 will be entitled to the annuity refund withdrawal option.

On or after July 1, 1974, non-duty disability retirantsretirees represented by DFFA, DPCOA and DPLSA who retired pursuant to Title IX, Chapter VII, Article IVD, Section D-1,(a), (b) or (c) prior to having twenty-five years of service credit, shall be entitled to the annuity refund withdrawal option on the date he/ or she would have had twenty-five years of service credit had he/ or she continued as an active memberemployee.   Said option shall only apply to the balance of accumulated contributionsAccumulated Contributions, if any, remaining into such retirantretiree's credit in accordance with the existing annuity refund provisions.

Survivor benefit beneficiaries as defined in Title IX, Chapter VII, Article VI, Part E, Section 2, parts (a), (b) and (c) of the 1918 City Charter in effect as of June 30, 1974, and continued in effect by Section 11-102 of the July 1, 1974, City Charter shall be entitled to the annuity withdrawal refund option subject to the same rules that would have been applicable to the deceased memberMember or membersMembers had he/ or she not died.   Said option shall only apply to the balance of accumulated contributionsAccumulated Contributions, if any, remaining into the applicable former memberMember's credit.

In any case of doubt, the Board of Trustees shall decide whether a ~~member or beneficiary~~Member or Beneficiary is entitled to an annuity refund withdrawal option.]

~~2.~~ ~~In addition to the provisions of the current CET or collective bargaining agreement, pension charter and ordinance provisions and all other pension rights of members, a member~~(b)A Member shall have the right on or after the effective date of his becoming eligible for a full service ~~retirement allowance (members~~Retirement Allowance (Members who have either twenty or twenty-five ~~(25)~~ years of creditable service depending upon the applicable bargaining unit) to elect to receive a partial or total refund of his ~~accumulated contributions~~or her Accumulated Contributions to the Annuity Savings Fund. If a ~~member~~Member makes such an election, an ~~annuity~~Annuity payable under any ~~retirement allowance~~Retirement Allowance or reduced ~~retirement allowance~~Retirement Allowance shall be reduced proportionally. If the total ~~accumulated contributions~~Accumulated Contributions are withdrawn, no ~~annuity~~Annuity shall be payable.

If a ~~member~~Member makes such an election, the ~~retirement allowance~~Retirement Allowance shall be reduced to reflect the value of the ~~annuity~~Annuity withdrawn. The amount of the ~~annuity~~Annuity at the time of such election shall be the amount used at the time of retirement for purposes of computing the ~~retirement allowance~~Retirement Allowance.

~~[Beginning~~All members (except DPOA members retiring prior to July 1, 1982~~, and thereafter,] all members~~) who complete their required years of service, shall have the right to withdraw all or part of their ~~accumulated contributions~~Accumulated Contributions whether they choose to retire or not.

~~[For~~Effective July 21, 2000 for DFFA and for the DPCOA Inspector ~~beginning~~, and effective July 1, 2003 for DPLSA members, and effective July 21, 2000~~,] [Effective July 1, 2003,] [Beginning July 21, 2000,] [a member~~ for DPOA members, a Member who has elected to retire and elected to withdraw his~~/~~ or her ~~annuity~~Annuity for the purposes of calculating his~~/~~ or her ~~retirement allowance~~Retirement Allowance (thereby lowering the ~~retirement allowance~~Retirement Allowance), may nevertheless choose to leave the ~~annuity~~Annuity in the Retirement System collecting regular annuity interest with the option of a one-time withdrawal of the ~~annuity~~Annuity funds at a later date.]

~~[For members [or employees~~a DPCOA, DPLSA or DFFA member or an employee with a parity relationship with the DPLSA and for the DPCOA Inspector~~]~~ who ~~retire~~retires on or after July 1, 1990, and who ~~have~~has made or ~~make~~makes an election to receive a total or partial refund of his~~/~~ or her accumulated contribution to the ~~Defined Contribution Plan~~Annuity Savings Fund, there shall be no reduction of ~~retirement allowances~~Retirement Allowances due to the portion of withdrawal representing interest credits.] ~~[This subsection~~ For members of DFFA and DPLSA, this Subsection shall be controlled by the requirements of the Act 312 arbitration

award issued June 25, 1990 (MERC Case No. B89 C-0622, page numbers 22 and 23~~).]~~

~~[~~Effective January 15, 2010 for members of DPCOA and fire equivalents, or December 15, 2008 for DPLSA and fire equivalents, or March 8, 2007~~,] a member [or a~~ for DPOA~~, DPLSA, or DPCOA allied member of DFFA]~~ members and fire equivalents, a Member who retires and elects to leave a balance in the ~~Defined Contribution Plan (~~Annuity Savings Fund~~) would~~ shall have the option of receiving a quarterly payment of interest earnings only or to ~~allow~~take periodic ~~withdraws~~withdrawals of principal, in addition to a one time complete withdrawal. ~~[~~Members of DPCOA and DPLSA and their fire equivalents must make their ~~selection~~elections a minimum of thirty ~~(30)~~ days before the beginning of a quarter; quarter defined as beginning March 1, June 1, September 1, and December 1.~~]~~

~~[~~An employee represented by DFFA, DPCOA or DPLSA who is entitled to a ~~retirement allowance~~Retirement Allowance under Article ~~VI~~F, Part A, Section ~~4~~F-5 of the ~~Policemen and Firemen~~ Retirement System and who leaves the employ of the Police or Fire Department of the City ~~of Detroit~~ on or after July 1, 1982 shall have the right to elect to receive on the effective date of termination a partial or total refund of his ~~accumulated contributions. The pension~~Accumulated Contributions. The Pension portion of his ~~retirement allowance~~Retirement Allowance shall be computed as if the ~~member~~Member had not withdrawn his~~/~~ or her ~~accumulated contributions~~Accumulated Contributions from the Annuity Savings Fund until the date he~~/~~ or she was eligible to retire had he~~/~~ or she continued in City employment.~~]~~

---

**~~DPCOA~~**

(c)     Effective in accordance with the specific date and terms of the ~~Detroit Police Officers Association (~~DPOA~~)~~ award in Act 312 No. D98 E-0840 (Chairman Donald F. Sugerman, dated July 21, 2000~~) the membership of this bargaining unit~~, a DPOA member shall have the right to leave his~~/~~ or her withdrawn ~~annuity~~Annuity in the ~~pension~~Pension system and accumulating interest, as provided therein.

# ARTICLE G.  METHOD OF FINANCING.

## Sec. G-1.        General.

**ARTICLE VII.**

**Method of Financing.**

The funds of the ~~retirement system~~Retirement System shall be the Annuity Savings Fund, Annuity Reserve Fund, Pension Accumulation Fund, Pension Reserve Fund, Expense Fund and the Survivors Benefit Fund. ~~(As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII.)~~

**Sec. ~~1~~G-2.    Annuity Savings Fund.**

(a)    The Annuity Savings Fund shall be the fund in which shall be accumulated at ~~regular interest~~Regular Interest, the contributions deducted from the compensation of ~~members~~Members to provide for their ~~annuities. The~~Annuities. Subject to Section B-1(c), the contributions of a ~~member~~Member as defined in ~~article IV, section~~Article D, Section D-1(a), (b) or (c) shall be five percent of a ~~member~~Member's compensation until the ~~member~~Member has acquired twenty-five years of creditable service. ~~The~~Subject to Section B-1(c), the contribution of a ~~member~~Member as defined in ~~article IV, section~~Article D, Section D-1(d) shall be five ~~per cent~~percent of his or her compensation until he or she has acquired at least twenty-five years of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) and attained age fifty-five. No ~~member~~Member shall have the option of choosing to receive the compensation required to be contributed hereunder directly instead of having such amounts paid by the City to the Annuity Savings Fund.

(b)    The ~~officer or officers responsible for making up the payroll~~City shall cause the contributions provided for in paragraph (a) above to be deducted from the compensation of each ~~member~~Member on each and every payroll, for each and every payroll period, from the date of his or her entrance in the ~~system to~~System to the earlier of (i) the date he or she ceases to be a ~~member~~Member or (ii) the last payroll date occurring in July 2014.

(c)    The deductions provided for herein shall be made notwithstanding that the minimum compensation provided by law for any ~~member~~Member shall be reduced thereby. Every ~~member~~Member shall be deemed to consent and agree to the deductions made and provided for herein, and payment of his or her salary or compensation, less said deduction, shall be a full and complete discharge and acquittance of all claims and demands whatsoever for the services rendered by such person during the period covered by such payments, except as to the benefits provided under this ~~chapter~~Retirement System. The amounts to be deducted shall be deducted by the ~~city treasurer~~City Treasurer and when deducted shall be paid into the Annuity Savings Fund and shall be credited to the individual account of the ~~member~~Member from whose compensation said deduction was made.

(d)    If, under the provisions of this ~~chapter~~Component II, any person shall withdraw or be paid any part or all of his ~~accumulated contributions~~Accumulated Contributions and shall thereafter again become a ~~member~~Member on or before June 30, 2014, he or she shall, in addition to the contributions provided for in paragraph (a) above, redeposit in the Annuity Savings Fund, by an increased rate of contribution to be determined by the ~~board~~Board of ~~trustees~~Trustees, or by a single payment, such amount that his ~~accumulated contributions~~or her Accumulated Contributions at the date of his or her eligibility for retirement will be the same amount it would have been had no withdrawal or payment been made therefrom.

(e)    Except as is otherwise provided in this ~~chapter~~Component II, upon the death or retirement of a ~~member, his accumulated contributions~~Member, his or her Accumulated Contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund. ~~(As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)~~

~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 1.)~~

(f)    In any Plan Year during the period beginning on or after July 1, 2014 and ending June 30, 2023 in which the annual rate of return credited to the accounts of Members investing in the Annuity Savings Fund as provided in paragraph (a) is less than the actual rate of return net of expenses of the Retirement System's invested assets for the second Plan Year immediately preceding the Plan Year in which the annual rate of return is credited ("ASF Return Excess"), an amount equal to the value of the ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component I of the Combined Plan and shall be used to fund the Transition Cost relating to Component I  The Transition Cost is a measure of the liability that Component I of the Retirement System has at its inception; due to the fact that at its inception, Members in Component I of the Retirement System receive vesting and eligibility credit under Component I for service that was earned prior to July 1, 2014 and is otherwise credited to Members under Component II of the Retirement System, as such Transition Cost is calculated by the Plan Actuary.  In the event there is an ASF Return Excess for a Plan Year following the Plan Year in which such transfers have fully funded the Transition Costs relating to Component I, fifty percent (50%) of such ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component II and the remaining fifty percent (50%) of such ASF Return Excess shall be transferred to Component I and credited to the Rate Stabilization Fund maintained under Component I.  "Transition Cost" shall be determined by the Plan Actuary.

## Sec. ~~2~~G-3.    Annuity Reserve Fund.

The Annuity Reserve Fund shall be the fund from which shall be paid all ~~annuities~~Annuities payable as provided in this ~~chapter~~Component II, except ~~annuities~~Annuities which are payable from the Survivors Benefit Fund.  Should a disability ~~beneficiary~~retiree be restored to active service, his ~~annuity reserve~~or her Annuity Reserve at the time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his or

her individual account therein. (As amended September 1, 1964. In effect September 15, 1964.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 2.)

**Sec. ~~3~~G-4.**     **Alternative Financing Method.**

Except as provided regarding the ~~survivors benefit fund, the pension accumulation fund~~Survivors Benefit Fund, the Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the ~~pensions~~Pensions and other benefits payable from contributions made by the ~~city~~City, and from which transfers shall be made as provided in this section.

(a)     *Accrued Liability Fund.* Pursuant to *Ordinance No. 05-05*, which ~~authorizes~~authorized the creation of the Detroit Police and Fire Retirement System Service Corporation, the City ~~has~~ entered into a transaction ("the Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described in Section ~~4~~G-5. The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transaction, as described below) that ~~will be~~were deposited into the Retirement System will be termed the "Funding Proceeds." The Funding Proceeds ~~will be~~were deposited into a new Fund in the Retirement System ~~to be~~ called the Accrued Liability Fund. The purpose of the Funding Proceeds ~~will be~~is to fund all or part of the heretofore unfunded accrued liabilities ("UAAL") of the Retirement System~~, as determined as of a date certain, i.e., the "Determination Date," pursuant to the System's actuarial valuation as of that date~~. The Funding Proceeds ~~will be~~are the assets of the Retirement System and will be applied, together with all other assets of the Retirement System, to fund the Retirement System's obligation to pay accrued benefits, as adjusted in the Plan of Adjustment.

This Accrued Liability Fund shall contain only the Funding Proceeds of the Pension Funding Transaction, and any earnings thereon. ~~Should the City, by future ordinance, choose to raise additional monies by additional pension funding transactions ("Additional Pension Funding Transactions") in order to fund the then existing UAAL of the System as of a future date certain, a new and separate~~Prior to Fiscal Year 2013, funds were transferred each Fiscal Year (or monthly portion thereof) from the Accrued Liability Fund ~~shall be created within the System to contain the proceeds, and any earnings thereon, of any Additional Pension Funding Transactions, and a new Accrued Liability Fund will be created for each successive Additional Pension Funding Transaction entered into by the City, if any. The treatment of any Additional Accrued Liability Funds shall be the same as described below.~~to the Pension Accumulation Fund as provided in the documents governing the Retirement System, including *Ordinance No. 5-05.*

(b)     As soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.

      (b)     ~~The Funding Proceeds deposited in the applicable Accrued Liability Fund will be subject to the oversight and investment direction of the Board of~~

Trustees of the Police and Fire Retirement System, consistent with the Board's obligations under Article VIII (Management of Funds), The Board will invest the Funding Proceeds as part of the System's overall assets, and will not differentiate the Funding Proceeds from other System assets for investment purposes.

(c) All Interest, dividends and other income derived from the investment of the Funding Proceeds shall be credited annually to the Accrued Liability Fund on a total System rate of return basis, determined by crediting the applicable Accrued Liability Fund with the investment return experienced by the System in total for all of its investments for the year. This shall be done by first determining the rate of return for the total assets of the System for the fiscal year, and then crediting back to each Accrued Liability Fund an amount that is determined by multiplying that rate of return times the balance in the Accrued Liability Fund as of the beginning of the fiscal year.

The interest, dividends and other income derived from the investment of the Funding Proceeds deposited in any Accrued Liability Fund will not be credited to any Funds other than the Pension Accumulation Fund. Morever, because the Accrued Liability Fund has been impressed with a certain and definite purpose, it shall be accounted for separately as provided for in Section 8, Maintenance of Reserves.

(d) Upon the creation of an Accrued Liability Fund and the deposit of the Funding Proceeds into the applicable Accrued Liability Fund, there shall be established a schedule for transferring assets of the applicable Accrued Liability Fund by crediting them to the Pension Accumulation Fund on an annual basis over the period required to fully amortize the System's UAAL determined as of the applicable Determination Date.

The System's UAAL determined as of the Determination Date shall be the "Determined Accrued Liability." The period over which the Determined Accrued Liability is to be fully amortized, as specified in the System's actuarial valuation as of the applicable Determination Date, is the "Amortizing Period." The amount to be transferred each fiscal year to the Pension Accumulation Fund from the Accrued Liability Fund is the "Scheduled Amortizing Amount."

With respect to the Pension Funding Transaction and any Additional Pension Funding Transactions, the Scheduled Amortizing Amount will equal a level percentage of the City's payroll for each fiscal year. The level percentage of the City payroll that will be used to determine the Scheduled Amortizing Amount shall be a level percentage that is equal to the percentage that is specified in the actuarial valuation as of the applicable Determination Date as being the percentage of City's annual payroll required to amortize the Determined Accrued Liability over the

Amortizing Period, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the Determined Accrued Liability as of the Determination Date. The denominator of the fraction shall be the System's Determined Accrued Liability on that date.

**Commentary**: By way of example only, the Scheduled Amortizing Amount would be determined as follows: (1) the Determination Date is June 30, 2004, (2) the Funding Proceeds are deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2004 actuarial valuation produced a UAAL of $600 million, (4) the City's contribution required to amortize that UAAL is 21% of the City's payroll, and (5) the Funding Proceeds are $400 million, then the Scheduled Amortizing Amount for Fiscal Year 2005-06 would be 21% times ($400 million/$600 million) times the City's payroll for 2005-2006.This would be 14% times the City's payroll for that fiscal year.

With respect to the Pension Funding Transaction or any Additional Pension Funding Transactions, where the applicable Determination Date occurs after the date of the actuarial valuation that determines the City's contribution for the fiscal year during which the applicable Funding Proceeds are deposited into the System, for each fiscal year, there will be transferred from the applicable Accrued Liability Fund to the Pension Accumulation Fund, an amount that is specified in such actuarial valuation as being the City's required contribution needed to amortize the System's UAAL as of the date of such actuarial valuation, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the UAAL specified in such actuarial valuation, and the denominator of the fraction shall be the System's total UAAL as set forth in that same actuarial valuation.

**Commentary**: By way of example only, the Scheduled Amortizing Amount in this case would be determined as follows: (1) the Determination Date is June 30, 2004, (2) the Funding Proceeds had been deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2003 actuarial valuation produced a UAAL of $516 million, (4) the City's contribution required to amortize that UAAL is 19.07% of the City's payroll and (5) the Funding Proceeds are $400 million, then the Scheduled Amortizing Amount for Fiscal Year 2004-2005 would be 19.07% times ($400 milllon/$516 million) times the City's payroll for 2004-2005. This would be 14.77% times the City's payroll for that fiscal year.

Should the Board at some future time adopt a different period for amortizing the System's UAAL (a "Revised Amortizing Period"), the Scheduled Amortizing Amount for ensuing years may change. If the Revised Amortizing Period provides for a longer period during which to amortize the System's UAAL (i.e., an "Extended Amortizing Period"),

then the Amortizing Period initially used to amortize the applicable Determined Accrued Liability will also be revised. There will then be established a new schedule for amortizing the Determined Accrued Liability and the Scheduled Amortizing Amount will be based on the level percentage of the City's payroll being equal to what it would be if the then unamortized balance of the Determined Accrued Liability were re-amortized over the Extended Amortizing Period. If the Revised Amortizing Period is changed so that the System's UAAL is to be amortized over a shorter period than the one initially used to amortize the applicable Determined Accrued Liability, then that Scheduled Amortizing Amount will not be changed.

(e)     Each year, when the City is required to make its annual contribution to the System — the amount of which is to be determined pursuant to Section 4 and the timing of which is set forth in Section 4(b) — the Board will transfer the Scheduled Amortizing Amount from the Accrued Liability Fund and credit it to the Pension Accumulation Fund; provided, however, that this transfer cannot occur unless and until the Board has been notified pursuant to the Pension Funding Transaction, or any Additional Pension Funding Transaction, that the City is current on the service payments required under the applicable Pension Funding Transaction.

(f)     Should the Scheduled Amortizing Amount not be available for transfer because of the City's failure to make a timely service payment as required by the applicable Pension Funding Transaction, the Board will take any permitted action, including the filing of a civil action against the City, as contemplated in Article VIII, Section 7, to effectuate the transfer of the Scheduled Amortizing Amount.

Should the City's Finance Director certify to the Board by a duly attested notice that the City has no available funds to make the service payments required by the applicable Pension Funding Transaction, in that specific circumstance, the Board shall be authorized to transfer the Scheduled Amortizing Amount for that fiscal year to the Pension Accumulation Fund, absent the notice requirement set forth in Section 3(e).

(g)     Since the Funding Proceeds are to be considered assets of the System and are intended to fund the applicable Determined Accrued Liability, the City shall be required to make only a proportional contribution for any fiscal year ending after the date the Funding Proceeds are deposited into the applicable Accrued Liability Fund, but prior to a fiscal year whose corresponding actuarial valuation includes the Funding Proceeds in the System's total assets. The proportional contribution to fund the System's then existing UAAL, if any, shall be the level percentage of the City's payroll specified in the actuarial valuation for the applicable fiscal year as the City's required contribution needed to amortize the System's then existing UAAL, multiplied by a fraction. The numerator of the fraction

–84–

shall be the amount of the System's total UAAL as determined in such actuarial valuation minus the amount of the applicable Funding Proceeds, but not less than zero. The denominator of the fraction shall be the amount of the System's total UAAL in such valuation. Actuarial valuations following the deposit of the applicable Funding Proceeds into the System shall Include the Funding Proceeds in the total assets of the System to determine any ensuing UAAL of the System, and the Funding Proceeds shall offset any such actuarial liability accordingly.

**Commentary**: By way of example, the following indicates how the procedure describe above would operate. Assume the following facts — (1) the Determination Date was June 30, 2004, (2) the June 30, 2004 actuarial valuation produced a UAAL of $600 million and a contribution toward the UAAL of 21% of the City's payroll, (3) the Funding Proceeds were $400 million and were deposited in the System during the 2004-2005 Fiscal Year, (4) the first actuarial valuation which included the Funding Proceeds in the System's assets was as of June 30, 2005 and (5) the June 30, 2003 valuation which determines the City's required contribution for fiscal 2004–05 produced a total UAAL of $516 million and a contribution toward that UAAL of 19.07% of the City's payroll. Then:

- The fiscal year ending after the date of deposit would be the year ending June 30, 2005, or the 2004-2005 Fiscal Year

- The first fiscal year whose corresponding valuation reflected the Funding Proceeds in its assets would be the 2006–2007 year.

- Thus, the City's required UAAL. contribution for fiscal 2004-2005 would be 19.07% of the payroll times ($516 million — $400 million) divided by $516 million, or 4.3% of payroll. The City's required UAAL contribution for fiscal 2005-06 would be 21% of payroll times ($800 million — $400 million) divided by $600 million, or 7% of the City's payroll.

- Beginning with the Fiscal Year 2006–2007, whose contribution is determined by the June 30, 2005 actuarial valuation, the City's required UAAL contribution would be the percentage of payroll developed in the corresponding actuarial valuation that included the Funding Proceeds as being part of the System's assets.

Any contribution the City has made to the System for any fiscal year prior to the date the Funding Proceeds from any applicable Pension Funding Transaction have become assets of the System. Where the amount of the contribution is equal to or less than the normal cost of that fiscal year it shall be deemed to have been made in satisfaction of the City's obligation to contribute an amount equal to the System's normal cost for that fiscal year, and not as payment towards any portion of its obligation to pay an

amortized portion of the System's UAAL due in that fiscal year. The term "normal cost" as used in this Section 3(g), shall be given its generally accepted actuarial meaning.

To the extent the City's contribution for that fiscal year exceeds its required contribution for the normal cost owed in that fiscal year, its excess contributions shall be deemed as having been made for that immediately following fiscal year, and shall offset the City's normal cost contribution obligation for that immediately following fiscal year.

**Commentary**: By way of example, the following indicates how the procedure described in the preceding paragraphs would operate. Assuming the same facts as in the prior Commentary, and the City contributed $40 million for the 2004-2005 Fiscal Year and the total normal cost for that year was $40 million:

- The entire $40 million would be deemed as payment of the required normal cost for 2004-2005, and

- No part of the $40 million contribution would be deemed payment toward UAAL, as no UAAL contribution is required for that year.

Now assume that the facts remain the same, but that the City had contributed a total of $45 million for 2004-2005:

- The City's total required contribution for 2004-2005 would be deemed paid in full, and

- $5 million, i.e., $45 million minus $40 million, would be deemed prepayment of the City's required normal cost for 2005-2006 and its required normal cost contribution for 2005-2006 would be reduced accordingly.

(h)    The System's auditor shall verify (1) the assets credited to the Pension Accumulation Fund and any Accrued Liability Fund at the beginning and end of each fiscal year, (2) that each Fund had been properly credited, and (3) that transfers from the Accrued Liability Fund(s) to the Pension Accumulation Fund had occurred as intended, under this Section 3.

(i)    Should the System's auditor certify that the total assets then remaining in the System, not including the assets of any Accrued Liability Fund, together are insufficient to pay the benefits then currently due under the System, the System's auditor will then determine and certify the minimum amount needed to fund the benefits then due and owing (the "Minimum Necessary Amount"). In this limited circumstance, the Board is authorized to transfer the Minimum Necessary Amount from the Accrued Liability Fund to the Pension Accumulation Fund absent the notification required pursuant to Section 3(e).

–86–

At the end of the Amortizing Period, or the end of the Extended Amortizing Period, if applicable, should there be any moneys that remain credited to the Accrued Liability Fund, the Board may transfer, at its discretion, any such remaining funds, in whole or in part, by crediting them to the Pension Accumulation Fund. The Pension Accumulation Fund is the only Fund into which the remaining moneys credited to the Accrued Liability Fund may be transferred.

(Ord. No. 04-05, Sec. 54-43-4.)

**Sec. 4G-5.    Contributions to and payments from ~~pension accumulation fund~~Pension Accumulation Fund.**

Contributions to and payments from the ~~pension accumulation fund~~Pension Accumulation Fund shall be made as follows:

(a)    ~~Upon~~For Fiscal Years commencing prior to July 1, 2014, upon the basis of such assumptions as to future financial experiences as the ~~board of trustees~~Board of Trustees shall from time to time adopt, the ~~actuary shall~~Actuary annually ~~compute~~computed the ~~city~~City's contribution, expressed as a percent of active ~~member~~Member contributions, to provide the ~~pension reserves~~Pension Reserves covering the ~~pensions~~Pensions or other ~~city-financed~~City-financed benefits to which ~~members~~Members might be entitled or which might be payable at the time of their discontinuances of ~~city~~City employment; provided, such contribution percents shall not be less than amounts which, expressed as percents of active ~~member compensations,~~Member compensation will remain level from generation to generation of Detroit citizens.  Upon the retirement or death of a ~~member~~Member, the ~~pension reserve~~Pension Reserve for any benefits payable on his or her behalf shall be transferred from the ~~pension accumulation fund to the pension reserve fund~~Pension Accumulation Fund to the Pension Reserve Fund, to the extent of there being assets in the ~~pension accumulation fund~~Pension Accumulation Fund.

(b)    ~~The board of trustees shall~~For Fiscal Years commencing prior to July 1, 2014, the Board of Trustees annually ~~ascertain~~ascertained and ~~report~~reported to the ~~mayor~~Mayor and the ~~council~~Council the amount of contributions due the ~~retirement system~~Retirement System by the ~~city~~City, and the ~~council shall appropriate and the city shall pay~~Council may have appropriated and the City may have paid such contributions to the ~~retirement system~~Retirement System during the ensuing ~~fiscal year~~Fiscal Year.  When paid, such contributions ~~shall be~~were credited to the ~~pension accumulation fund~~Pension Accumulation Fund.

(Ord. No. 04-05, Sec. 54-43-5; Ord. No. 76-H, Sec. 54-43-4.)

(c)    For Fiscal Years commencing after June 30, 2014, he City shall make contributions to the Pension Accumulation Fund only as provided in the Plan of Adjustment.

**Sec. ~~5~~G-6.** **Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service.**

Except as to the ~~survivor~~Survivor's ~~benefit fund, the pension reserve fund~~Benefit Fund, the Pension Reserve Fund shall be the fund from which shall be paid ~~pensions~~Pensions on account of ~~members~~Members. Should a disability ~~retirant~~retiree be reinstated to active service, the ~~member~~Member's ~~pension reserve~~Pension Reserve, at that time, shall be transferred from the ~~pension reserve fund to the pension accumulation fund. (Ord. No. 04-05, Sec. 54-43-6; Ord. No. 76-H, Sec. 54-43-5.)~~Pension Reserve Fund to the Pension Accumulation Fund.

**Sec. ~~6~~G-7.** **Expense Fund.**

The Expense Fund shall be the fund to which shall be credited all money provided by the City, if any, to pay the administration expenses of ~~the system~~Component II, and from which shall be paid all the expenses necessary in connection with the administration and operation of ~~the System. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 5.)~~Component II.

**Sec. ~~7~~G-8.** **Appropriations prior to July 1, 2014.**

(a)    The Board of Trustees shall certify the amount of the appropriation necessary to pay to the various funds of Component II of the Retirement System the amounts payable by the City as enumerated in this ~~amendment~~Component II, according to legal budget procedure.

(b)    To cover the requirements of ~~the System temporarily~~Component II prior to July 1, 2014, such amounts as shall ~~be~~have been necessary to cover the needs of ~~the System~~Component II prior to July 1, 2014 shall be paid into the Pension Accumulation Fund and the Expense Fund by special appropriations or transfers to the Retirement System; provided, however that no transfers can be made from the ~~accrued liability fund~~Accrued Liability Fund other than the annual transfer of the scheduled amortizing amount, or transfers under special circumstances pursuant to ~~Sections 3(f) and 3(I~~Section G-4 (as in effect prior to July 1, 2014).

~~(Ord. No. 04-05, Sec. 54-43-7; 1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 6.)~~

**Sec. ~~8~~G-9.** **Maintenance of reserves.**

The maintenance of the ~~annuity reserves~~Annuity Reserves in the Annuity Reserve Fund and the ~~pension reserves~~Pension Reserves in the Pension Reserve Fund are hereby made obligations of the Pension Accumulation Fund. All income, interest, and dividends derived from deposits and investments authorized by this ~~ordinance, excluding any amounts credited to the Accrued Liability Fund~~Component II, which are not required for the allowance of interest to the funds of the Retirement System as provided herein, shall be credited to the Pension Accumulation Fund. ~~The~~Prior to July 1, 2014, the moneys credited to the Accrued Liability Fund shall ~~be~~were credited to the Pension Accumulation Fund only to the extent ~~of the annual transfer of the Scheduled Amortizing Amount or the special circumstance transfers~~ authorized pursuant to ~~Sections 3(f) and 3(i)~~the terms of the Retirement System as in effect prior to July 1, 2014. Any contributions by the City to the System from any ~~Fund~~fund impressed by law with a certain

and definite purpose shall be accounted for separately. ~~(Ord. No. 04-05, Sec. 54-43-8; 1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 7.)~~

Sec. ~~9~~G-10.    **Survivors Benefit Fund.**

(a)    The Survivors Benefit Fund shall be the fund in which shall be accumulated, at ~~regular interest~~Regular Interest, the reserves for survivors benefits provided for in ~~article VI, part~~Article F, Part E, ~~section 2~~Section F-18, hereof, and from which such benefits shall be paid~~.~~, but only to the extent sufficient assets are credited to the fund at the time a claim for benefits is made.  In the event there are insufficient assets credited to the Survivor's Benefit Fund to pay the benefits provided under this Section G-10, such benefits thereafter shall be payable from the Pension Reserve Fund.

(b)    After June 30, 1965 and prior to July 1, 1986, each ~~member~~Member shall contribute to the Survivors Benefit Fund one per cent of his or her compensation paid by the ~~city~~City until he or she has acquired twenty-five years of creditable service.  The ~~officer or officers responsible for making up the payroll~~City shall cause the said contributions to be deducted from the ~~member~~Member's compensation, on each and every payroll, for each and every payroll period so long as he or she remains a ~~member and~~Member and has not acquired twenty-five years of creditable service.  Each and every ~~member~~Member shall be deemed to consent and agree to the said deductions.  Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of the said ~~member~~Member's ~~accumulated contributions~~Accumulated Contributions, nor be subject to refund.

(c)    Each ~~member~~Member who retires after June 30, 1965, under ~~part~~Part B, ~~section 1 of article VI~~Section F-7 of Article F shall, prior to July 1, 1986, contribute to the Survivors Benefit Fund one per cent of his or her final compensation as defined until he or she would have had a total of twenty-five years of creditable service had he or she continued in active service.  The ~~officer or officers responsible for making up the retirement roll~~Retirement System shall cause the said contribution to be deducted from the ~~pension~~Pension of each such retired ~~member~~Member on each and every ~~retirement~~every retirement roll, for each and every retirement roll period, so long as he or she is receiving a ~~pension~~Pension under ~~part~~Part B, ~~section 2~~Section F-8(a) of ~~article VI~~Article F.  Each and every such retired ~~member~~Member who is receiving a ~~pension~~Pension under ~~part~~Part B, ~~section 2~~Section F-8(a) of ~~article VI~~Article F shall be deemed to consent and agree to said deductions.  Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of said ~~member~~Member's ~~accumulated contributions~~Accumulated Contributions, nor be subject to refund.

**By Agreement**

**Survivor's Benefit Fund**

~~The~~(d) Effective July 1, 1986, the contributions, required by Article ~~VII~~G, Section ~~8~~G-10(b) and ~~8~~G-10(c) ~~of the Policemen and Firemen Retirement System, to the Survivor's~~, to the Survivors Benefit Fund ~~shall be~~were eliminated for ~~Union~~union members. ~~[The~~For Fiscal Years ending prior to July 1, 2014, the City shall make the contributions necessary to maintain the benefit level by contributing that amount necessary to replace the ~~members'~~ contributions of members of DFFA and DPOA to the Survivor's Benefit Fund.~~]~~

~~[This provision shall be effective July 1, 1986.]~~

---

(~~d~~e) ~~Upon~~For Fiscal Years ending prior to July 1, 2014, upon the basis of such mortality and other tables of experience, and ~~regular interest~~Regular Interest, as the ~~board of trustees~~Board of Trustees shall from time to time adopt, the ~~actuary~~Actuary shall annually compute the liabilities for benefits being paid from the Survivors Benefit Fund. The ~~board of trustees~~Board of Trustees shall report to the ~~mayor~~Mayor and the ~~common council~~Council the amount of contributions to be made by the ~~city~~City to the Survivors Benefit Fund, and the ~~council~~Council shall appropriate and the ~~city~~City shall pay such amount to the ~~retirement system~~Retirement System during the ensuing ~~fiscal year~~Fiscal Year. When paid, such appropriations shall be credited to the Survivors Benefit Fund. ~~If~~For Fiscal Years commencing prior to July 1, 2014, if the balance in the fund is not sufficient to fully cover the liabilities so computed, the ~~city~~City shall appropriate and pay, in the ensuing ~~fiscal year~~Fiscal Year, the amount of such insufficiency. For Fiscal Years commencing on and after July 1, 2014, the City shall not make any contributions to the Survivor's Benefit Fund.

(~~e~~f) Upon the death of a ~~member~~Member, on whose account survivors benefits become payable as provided in ~~article VI, part B, section 2, hereof, his accumulated contributions~~Article F, Part B, Section F-8, hereof, his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her death shall be transferred from the Annuity Savings Fund to, and shall become a part of, the Survivors Benefit Fund, notwithstanding any provisions in this ~~chapter~~Component II to the contrary.~~ (As amended September 1, 1964. In effect September 15, 1964.)~~

~~(1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 8.)~~

## Sec. ~~10~~G-11. Computation of ~~annuity and pension reserve~~Annuity and Pension Reserve liabilities for ~~members, retirants and beneficiaries~~Members, Retirees and Beneficiaries.

In computing the ~~annuity and pension reserve~~Annuity and Pension Reserve liabilities for ~~members, retirants~~Members, retirees and beneficiaries, the ~~board of trustees~~Board of Trustees shall cause the following annual ~~decrement probabilities, salary factors~~Decrement Probabilities, Salary Factors and interest assumption to be used.

(a)      The annual ~~decrement probabilities and salary factors~~ Decrement Probabilities and Salary Factors to be used in evaluating the ~~annuity and pension~~ Annuity and Pension liabilities for ~~members~~ Members shall be as shown in Tables 1 and 2 hereinafter set forth.

(b)      The total of active ~~member~~ Member annual ~~compensations~~ compensation shall be assumed to increase three percent per annum, compounded annually.

(c)      The mortality assumption for ~~retirants~~ retirees and beneficiaries shall be the mortality rates contained in the 1971 group annuity male mortality table, without setback for men and set back five years for women.

(d)      The investment return assumption shall be five percent per annum, compounded annually, for Fiscal Years commencing prior to July 1, 2014.

(e)      For Fiscal Years commencing on or after July 1, 2014, the Annuity and Pension Reserve liabilities shall be calculated in a manner which is consistent with the Plan of Adjustment.

**TABLE 1.**

**City of Detroit Policemen and Firemen
Retirement System
Active Member Annual ~~Decrement~~**

**Probabilities
and Salary Factors**

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 18 | .04120 | .00098 | .10561 |
| 19 | .04090 | .04099 | .11327 |
| 20 | .04030 | .00100 | .12126 |
| 21 | .04000 | .00101 | .12988 |
| 22 | .03960 | .00102 | .13913 |
| 23 | .03910 | .00103 | .14913 |
| 24 | .03890 | .00104 | .15971 |
| 25 | .03840 | .00105 | .17068 |
| 26 | .03800 | .00107 | .18204 |
| 27 | .03700 | .00108 | .19347 |
| 28 | .03600 | .00111 | .20527 |
| 29 | .03480 | .00113 | .21712 |
| 30 | .03340 | .00117 | .22916 |
| 31 | .03200 | .00121 | .24124 |
| 32 | .03000 | .00126 | .25321 |
| 33 | .02730 | .00133 | .26522 |
| 34 | .02370 | .00143 | .27753 |
| 35 | .01990 | .00154 | .29015 |
| 36 | .01500 | .00168 | .30306 |
| 37 | .01160 | .00184 | .31637 |
| 38 | .00850 | .00204 | .32995 |
| 39 | .00600 | .00227 | .34405 |
| 40 | .00390 | .00252 | .35851 |
| 41 | .00210 | .00281 | .37333 |
| 42 | .00090 | .00313 | .38861 |
| 43 | .00000 | .00348 | .40435 |
| 44 | .00000 | .00387 | .42051 |
| 45 | .00000 | .00429 | .43709 |
| 46 | .00000 | .00475 | .45395 |
| 47 | .00000 | .00526 | .47144 |
| 48 | .00000 | .00582 | .48929 |
| 49 | .00000 | .00643 | .50750 |
| 50 | .00000 | .00710 | .52639 |
| 51 | .00000 | .00783 | .54560 |
| ~~.~~52 | .00000 | .00864 | .56535 |

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|-----|-------------------------|------------------|----------------|
| 53 | .00000 | .00953 | .58548 |
| 54 | .00000 | .01051 | .60612 |
| 55 | .00000 | .01157 | .62711 |
| 56 | .00000 | .01270 | .64867 |
| 57 | .00000 | .01392 | .67066 |
| 58 | .00000 | .01520 | .69319 |
| 59 | .00000 | .01656 | .71610 |
| 60 | .00000 | .01802 | .73939 |
| 61 | .00000 | .01959 | .76316 |
| 62 | .00000 | .02133 | .78747 |
| 63 | .00000 | .02322 | .81211 |
| 64 | .00000 | .02526 | .83715 |
| 65 | .00000 | .02750 | .86258 |
| 66 | .00000 | .03000 | .88848 |
| 67 | .00000 | .03277 | .91514 |
| 68 | .00000 | .03584 | .94264 |
| 69 | .00000 | .03919 | .97094 |
| 70 | .00000 | .04278 | 1.00000 |

**TABLE 2.**

**City of Detroit Policemen and Firemen**
**Retirement System**
**Annual Probabilities of Age and Service**
**Retirement Applicable to Members**
**Who Are Eligible to Retire**

| Age | Probabilities of Retirement |
|---|---|
| 45 | 25% |
| 46 | 25 |
| 47 | 25 |
| 48 | 25 |
| 49 | 25 |
| 50 | 25 |
| 51 | 25 |
| 52 | 25 |
| 53 | 25 |
| 54 | 20 |
| 55 | 20 |
| 56 | 15 |
| 57 | 10 |
| 58 | 15 |
| 59 | 30 |
| 60 | 100 |

(Ord. No. 77-H, Sec. 54-2-2; Ord. No. 462-f, Sec. 2.)

**Sec. 11G-12.  Determination of cityCity's annual contribution — Disability pensionPension liabilities.**

The cityFor Fiscal Years commencing prior to July 1, 2014, the City's annual contribution, expressed as a percent of active member compensationsMember compensation, to finance disability pensionsPensions shall be determined by dividing the average of the pension reservePension Reserve liabilities for disability retirements incurred, during the three fiscal yearsFiscal Years ending with the date of the valuation by one percent of the active membersMembers' annual compensation used in the valuation. (Ord. No. 77-H, Sec. 54-2-3; Ord. No. 462-F, Sec. 3.)

**Sec. 12G-13.  Determination of cityCity's annual contribution — Death pensionPension liabilities.**

The cityFor Fiscal Years commencing prior to July 1, 2014, the City's annual contribution, expressed as a percent of active memberMember compensations, to finance death-in-service pensionsPensions shall be determined by dividing the average of the pension,Pension reserve liabilities for death-in-service claims incurred during the three fiscal yearsFiscal Years

ending with the date of the valuation by one percent of the active ~~member~~Member's annual compensations used in the valuation. ~~(Ord. No. 77-H, Sec. 54-2-4; Ord. No. 462-F, Sec. 4.)~~

**Sec. ~~13~~G-14.** **Determination of ~~city~~City's annual contribution — Actuarial evaluation of annuity and ~~pension reserve~~Pension Reserve liabilities.**

The ~~annuity and pension reserve~~Annuity and Pension Reserve liabilities for ~~members, retirants~~Members, retirees and beneficiaries shall be actuarially evaluated as set forth in this ~~article. (Ord. No. 77-H, Sec. 54-2-5.)~~Article G and the Plan of Adjustment.

**Sec. ~~14~~G-15.** **Determination of ~~city~~City's annual contribution — Service ~~pension~~Pension liabilities for Fiscal Years commencing prior to July 1, 2014.**

(a)    The service ~~pension~~Pension liabilities for ~~members~~Members shall be determined using the entry age-normal cost method of actuarial valuation.

(b)    The ~~city~~City's annual contribution, expressed as a percent of active ~~member~~Member compensations, to finance the prospective service ~~pension~~Pension liabilities shall be determined by dividing the total of the individual annual normal costs of the active ~~members~~Members by one percent (1%) of the active ~~members~~Members' annual ~~compensations~~compensation used in the valuation.

(c)    The ~~city~~City's annual contribution, expressed as a percent of active ~~member compensations~~Member compensation, to finance any unfunded ~~accrued service pension~~Accrued Service Pension liabilities, including instances in which assets exceed liabilities, shall be determined by dividing such unfunded ~~accrued service pension~~Accrued Service Pension liabilities by one percent (1%) of the present value of future ~~compensations~~compensation payable during a period of future years.  Such period of future years shall be thirty ~~(30)~~ years for the actuarial valuation as of June 30, 1974, decreasing one (1) year at each subsequent June 30th until a twenty ~~(20)~~ year period is reached, which twenty ~~(20)~~ year period shall be used in each subsequent actuarial valuation until June 30th, 2004 when the period shall again be thirty ~~(30)~~ years.

~~(Ord. No. 39-05, Sec. 54-43-3; Ord. No. 77-H, Sec. 54-2-6; Ord. No. 462-F, Secs. 5, 6.)~~

**Sec. ~~15~~G-16.** **Board of trustees to compute ~~city~~City's annual contribution.**

Based upon the provisions of this ~~article~~Article, including any amendments, the ~~board of trustees~~Board of Trustees shall compute the ~~city~~City's annual contributions for Fiscal Years commencing prior to July 1, 2014, expressed as a percent of active ~~member compensations~~Member compensation, to the ~~retirement system~~Retirement System for the ~~fiscal year~~Fiscal Year beginning July 1, 1975, using actuarial valuation data as of June 30, 1974, and for each subsequent ~~fiscal year~~Fiscal Year prior to July 1, 2014 using actuarial valuation data as of the June 30th date which date is a year and a day before the first day of such ~~fiscal year~~Fiscal Year.  The ~~board~~Board shall report to the ~~mayor~~Mayor and to the ~~city council~~City Council the contribution percents so computed, and such contribution percents shall be used in determining the contribution dollars to be appropriated by the ~~city council~~City Council and paid to the

retirement systemRetirement System.  For each fiscal yearFiscal Year beginning July 1, 1975 and each fiscal yearFiscal Year thereafter and prior to July 1, 2014, such contribution dollars shall be determined by multiplying the applicable contribution percent for such fiscal year by the member compensationsFiscal Year by the Member compensation paid for such fiscal yearFiscal Year; provided that for the one fiscal yearFiscal Year beginning July 1, 1975 and ending June 30, 1976, such member compensationsMember compensation so used shall not exceed 106.09 percent of the active membersMembers' annual compensationscompensation used in the actuarial valuation determining such contribution percent. (Ord. No. 77-H, Sec. 54-2-7; Ord. No. 462-F, Sec. 8.)

Sec. 16.   Repealed.  (Ordinance No. 77-H, Sec. 54-2-8).

## Sec. G-17.        Refunds for certain membersMembers.

Effective July 1, 1974, a member of the policemen and firemen retirement systemMember who holds the rank of police inspector and above and who is not covered by a collective bargaining agreement shall, notwithstanding any other pension provisions of Component II to the contrary, have the right to elect to receive on the effective date of his or her service retirement a partial or total refund of his accumulated contributionsor her Accumulated Contributions. Effective as of March 8, 2007, a DPOA and fire equivalent retiree who elects not to withdraw his accumulated contributionsor her Accumulated Contributions as of the effective date of his or her service retirement shall have the option of receiving a quarterly payment of interest credited to his accumulated contributionsor her Accumulated Contributions or to receive periodic withdrawals of the contributions such retireeRetiree made to Component II of the planRetirement System.  If a memberMember makes such an election, an annuityAnnuity payable under any retirement allowanceRetirement Allowance or reduced retirement allowanceRetirement Allowance shall be reduced proportionately.  If the total accumulated contributionsAccumulated Contributions are withdrawn no annuityAnnuity shall be payable. The limitations of fifteen twenty-seconds of the maximum earnable compensation of a patrolman and fireman continues in effect.   For purposes of determining the fifteen twenty-seconds limitation, a computation based on the annuity which is an actuarial equivalent of the accumulated contributions standing to an above-defined member's credit in the annuity savings fund prior to any partial or total refund will be used.  This provision affords the members as defined above a similar option available to members of the general retirement system pursuant to 1973 Charter Amendment K.  No other benefits or amounts payable pursuant to other provisions of the policemen and firemen retirement system are increased by this section.  The mechanical steps involved in computing the service retirement allowance of a member as defined above shall be determined by the board of trustees of the policemen and firemen retirement system subject to approval of the law department.  (Ord. No. 29-H, § 1; Sec. 54-2-9.) with respect to such withdrawn amounts.

---

**By Agreement**

---

## Sec. G-18.        Employer Contribution

[Effective January 1, 1987 for members of DFFA and DPLSA or upon issuance of the 1986-89 Act 312 Award] for members of DPOA, the employee contributions to the Policemen

~~and Firemen Retirement System~~ Annuity Fund, although designated as employee contributions, shall be paid by the City ~~of Detroit~~ in lieu of contributions by the ~~employee~~Employee. The ~~employee~~Employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the ~~employer~~City to the ~~annuity fund~~Annuity Fund. There shall be no additional contribution expense to the City ~~of Detroit~~, and the amounts so contributed by the ~~employer~~City on behalf of the ~~employee~~Employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the ~~employee~~Employee until these amounts are distributed or made available to the ~~employee~~Employee.

This provision shall not affect the amount or benefit level of the ~~retirement allowance~~Retirement Allowance, or the City ~~of Detroit~~'s obligation with respect thereto.

# ARTICLE ~~VIII~~H.  MISCELLANEOUS.

**Management of Funds.**

**Sec. 1.    Board named Trustees for various funds.**

The Board shall be the Trustee of the several funds provided for in this Article, and shall have full power to invest and reinvest such funds subject to all terms, conditions, limitations, fiduciary duties, and restrictions imposed by The Public Employee Retirement System Investment Act, as amended, provided, that notes, bonds, or obligations of the City shall not be subject to said restrictions or limitations. The Board shall have the power to purchase notes, bonds, or obligations of the City before or after the same are offered to the public and with or without advertising for bids.  (Ord. No. 04-05, Sec. 54-43-9(a); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 1.)

**Sec. 2.    Purchase, sale, etc., of securities and investments.**

The Board shall have full power to hold, purchase, sell, assign, transfer, and dispose of any of the securities and investments of the Retirement System, as well as the proceeds of said investments and any moneys belonging to the System.  (Ord. No. 04-05, Sec. 54-43-9(b); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 2.)

**Sec. 3.    Annual interest.**

The Board annually shall allow Regular Interest on the mean amount of assets in each of the Funds for the preceding year. The amounts so allowed shall be due and payable to said Funds, and shall be annually credited thereto by the Board from interest and other earnings on the moneys of the System; provided, however, that the balance in any Accrued Liability Fund shall not be included in determining the mean amount of assets of the System when the Board makes this determination, and no Regular Interest on the mean amount of assets in the Accrued Liability Fund shall be credited to other Funds in the System until transferred to the Pension Accumulation Fund pursuant to Article VII, Section 3(e) or under special circumstances pursuant to Article VII, Sections 3(f) and 3(i). Any additional amount, required to meet the Regular Interest on the Funds of the System, shall be paid by the City and any excess of earnings, over such amount required, shall be a portion of the amounts to be contributed by the City.  (Ord. No. 04-05, Sec. 54-43-9(c); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 3.)

**Sec. 4.    Custodian of funds.**

The City Treasurer or other person or entity designated by the Board shall be the custodian of the Funds of the Police and Fire Retirement System. All payments from such Funds shall be made by the Treasurer or other designated custodian. Payments made by the System shall be based upon vouchers signed by two persons designated by the Board. A duly attested copy of a resolution of the Board designating such persons and bearing upon its face specimen signatures of such persons, shall be filed with the Finance Director and the custodian of the Funds as their authority for making payments upon such vouchers. No voucher shall be drawn unless it shall have been previously authorized by a specific or continuing resolution adopted by the Board.  (Ord. No. 04-05, Sec. 54-43-9(d); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 4.)

**Sec. 5.     Available funds shall be kept upon deposit.**

Available funds shall be kept on deposit for the purpose of meeting disbursements for pensions, annuities, and other payments.  (Ord. No. 04-05, Sec. 54-43-9(e); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 5.)

**Sec. 6.     Prohibition against reversion of funds to the City.**

This pension plan and trust has been created for the exclusive benefit of the members and beneficiaries as set forth herein.  The funds thereof have been established for the benefit of the members and for the operation of the pension system.  No part of the principal and income of any of the funds of this plan and trust shall revert to or be returned to the city prior to the satisfaction of all liabilities, hereunder to all members, beneficiaries and anyone claiming by or through them. (Ord. No. 153-H, Sec. 54-45-6.)

**Sec. 7.     Enforcement; Civil Action.**

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, the 1984 Detroit City Code or the terms of the System, may be brought by:

(a)     A member or retiree who is or may become eligible to receive a benefit under the System;

(b)     A beneficiary who is or may become eligible to receive a benefit under the System;

(c)     A Plan fiduciary, including a Trustee; or

(d)     The Finance Director, on behalf of the City as sponsor of the System.

(Ord. No. 04-05, Sec. 54-43-10.)

ARTICLE IX.

Miscellaneous.

Sec. 1.	Assignments prohibited.

The right of a person to a pension, an annuity, or a retirement allowance, to return of contributions, the pension, annuity, or retirement allowance itself, an optional benefit, any other right accrued or accruing to any person under the provisions of this amendment and the moneys in the various funds created by this amendment shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever and shall be unassignable except as in this amendment specifically provided.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 1.)

Sec. 2.	Protection against fraud.

Whoever with intent to deceive, shall make any statement or report required under this amendment which is untrue, or shall falsify or permit to be falsified any record or records of this System, or who shall otherwise violate with intent to deceive, any of the terms or provisions of this amendment, upon conviction thereof, shall be fined not to exceed five hundred dollars or imprisoned in the Detroit House of Correction for a period not to exceed ninety days, or both. (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 2.)

Sec. 3.	Errors.

Should any change or error in the records result in any member or beneficiary receiving from the System, more or less than he would have been entitled to receive had the records been correct, the Board of Trustees shall correct such error, and as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such member or beneficiary was correctly entitled shall be paid.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 3.)

## Sec. 4H-1.	Recall of beneficiariesRetirees during emergencies.

During an emergency declared by the Commissioner of Police or the Board of Fire Commissioners, the Commissioner or the Board of Fire Commissioners, as the case may be, shall have power, with the consent of a beneficiaryRetiree, to recall to active duty a beneficiaryRetiree for such period of service as the commissioner or the Board of Fire Commissioners shall deem advisable; provided, however, that the foregoing power shall not apply in the case of a beneficiaryRetiree who has reached the age of sixty-four years, and provided further, that any beneficiaryRetiree so recalled may, at any time, separate from active duty on his or her own application or by order of the Commissioner or the Board of Fire Commissioners.  A beneficiaryRetiree so recalled shall serve in the rank at which he or she retired, or a higher rank, and shall receive the pay of such rank without deduction.  On subsequent separation from active duty, such beneficiaryRetiree shall resume the beneficiaryRetiree status held by him prior to such recall.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 4.)

## ARTICLE I.  DEFERRED RETIREMENT OPTION PLAN.

**Sec. 5.     Limitation of other statutes.**

No other provision of law, Charter or Ordinance, which provides wholly or partly at the expense of the City for pensions or retirement benefits for Policemen or Firemen, their widows, or other dependents, shall apply to members or beneficiaries of the System established by this amendment, their widows, or other dependents.

(a)     All provisions of laws, inconsistent with the provisions of this amendment, are hereby repealed to the extent of such inconsistency.

(b)     This amendment shall not apply to any person who, at the effective date of this amendment shall be receiving a pension or other benefit from the City under the provisions of Chapter XV or XXI of Title IV of the 1918 Detroit City Charter, or who is excluded from membership in this System as provided by article IV, section 1 (a) of this amendment.

(c)     Savings clause.  If any part, article, chapter, section, subsection, sentence, clause or phrase of this amendment is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining parts, articles, chapters, sections, subsections, sentences, clauses and phrases of this amendment or the amendment as an entirety.

(d)     Effective date.  The 1940 amendments of this chapter are effective July 1, 1941.

The 1951 amendments to this chapter are effective November 15, 1951.
The 1953 amendments to this chapter are effective November 13, 1953.
The 1964 amendments to this chapter are effective July 1, 1965.
The 1968 amendments to this chapter are effective January 1, 1969.

(e)     (Adopted November 5, 1940.  In effect November 15, 1940.  As amended November 5, 1968.  In effect January 1, 1969) (Historical Reference: Certain amendments and benefits became effective per defacto operation due to historical administration and collective bargaining agreements. Public Employment Relations Act became effective in 1965.  Supreme Court ruling that pensions are a mandatory subject of bargaining was issued on February 1, 1974.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 5.)

(f)     System provisions are subject to Public Act 314 of 1965 as amended and applicable case law.

(g)     Distributions.   The System will apply the minimum distribution requirements of IRC 401(a)(9) in accordance with the final regulations under IRC 401(a)(9), notwithstanding any provision in the System to the

contrary. Pursuant to IRC 401(a)(9), a member's interest must begin to be distributed by the later of (i) April 1 of the calendar year following the calendar year that he attains the age of 70-1/2, or (ii) April 1 of the calendar year he retires. Distributions will be made in accordance with this Section and Regulations 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options. Pursuant to Code Section 401(a)(9)(H), Annuity Savings Fund minimum required contributions otherwise required for 2009 ("2009 RMDs") will not be distributed for 2009 unless the member so chooses to receive them and 2009 RMDs will be treated as eligible rollover distributions.

(h)    Termination. Upon System termination or upon complete discontinuance of contributions under the System, the rights of all employees to benefits accrued to the date of such termination or discontinuance to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable.

**Sec. 6.    Tax Qualified Plan.**

The Retirement System is intended and has been administered to be a qualified pension plan under § 401 of the Internal Revenue Code, as amended ("IRC" or "Code"), or successor provisions of law, including the Tax Reform Act of 1986 (TRA '86); the Technical and Miscellaneous Revenue Act of 1988 (TAMRA); the Unemployment Compensation Amendments of 1992 (UCA); the Omnibus Budget Reconciliation Acts (OBRA); the Uniformed Service Employment and Reemployment Rights Act of 1994 (USERRA); the Uruguay Round Agreements Act of 1994 (GATT); the Small Business Job Protection Act of 1996 (SBJPA '96); the Taxpayer Relief Act of 1997 (TRA '97); the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA '98); the Economic Growth and Tax Relief Reconciliation Act of 2001 (EGTRRA), and other applicable laws, regulations and administrative authority. The Retirement System is a governmental plan under IRC § 414(d) and is administered for the exclusive benefit of the plan's participants and their beneficiaries. The Retirement System trust is an exempt organization under IRC §501. All applicable provisions of the Internal Revenue Code are incorporated by herein by reference and such IRC provisions supercede any contrary provisions of the Retirement System.

**Sec. 7.    Definition of Compensation**

Compensation will mean compensation as that term is defined in Article II, Sections 14 and 15 of the Plan. For any self-employed individual covered under the Plan, compensation will mean earned income. Compensation shall include only the compensation which is actually paid to the participant during the determination period. The determination period shall be the plan year.

Notwithstanding the above, compensation shall not include any amount which is contributed by the employer pursuant to a salary reduction agreement and which is not includible

in the gross income of the employee under sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code.

The term compensation means the compensation of the member (participant) from the employer for the year consistent with Article II, Sections 14 and 15. The term "compensation" shall include any elective deferral (as defined in IRC Section 402(g)(3)) and any amount which is contributed or deferred by the employer at the election of the employee and which is not includible in the gross income of the employee by reason of IRC Sections 125, 132(f)(4), or 457.

For purposes of the Internal Revenue Code Section 415 limits, Compensation is defined pursuant to IRC Section 415(c)(3), by incorporating by reference the definition of Compensation pursuant to Treas. Reg. 1.415(c)-2. (Note: Notwithstanding that IRC 415(c)(3) applies only to defined contribution plans, this language is added to the defined benefit plan to satisfy the requirements of the Internal Revenue Service.)

**Sec. 8.    Limitation of Compensation**

The Plan is subject to IRC 401(a)(17) and applicable regulations, as amended which currently provide:

Compensation shall not include any amount which is contributed by the employer pursuant to a salary reduction agreement and which is not includible in the gross income of the employee under sections 125, 402(e)(3), 402(h) or 403(b) or other applicable sections of the Internal Revenue Code.

For years beginning on or after January 1, 1989, and before January 1, 1994, the annual compensation of each participant taken into account for determining all benefits provided under the plan for any plan year shall not exceed $200,000. This limitation shall be adjusted by the Secretary at the same time and in the same manner as under section 415(d) of the Internal Revenue Code, except that the dollar increase in effect on January 1 of any calendar year is effective for plan years beginning in such calendar year and the first adjustment to the $200,000 limitation is effective on January 1, 1990.

For years beginning on or after January 1, 1994, the annual compensation limit of each participant taken into account for determining all benefits provided under the plan for any determination period shall not exceed $150,000, as adjusted for the cost-of-living in accordance with section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year.

If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

If compensation for any prior determination period is taken into account in determining a participant's benefits for the current plan year, the compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that prior period. For this purpose, in determining benefits in plan years beginning on or after January 1, 1989, the

–104–

annual compensation limit in effect for determination periods beginning before that date is $200,000. In addition, in determining benefits in plan years beginning on or after January 1, 1994, the annual compensation limit in effect for determination periods beginning before that date is $150,000.

For year beginning on and after July 1, 2001, the annual compensation of a member taken into account for determining benefits for any plan year shall not exceed $200,000.00.

**Sec. 9.** **Limitation of Benefits.**

The amount of annual benefits and contributions that is credited a member in any given year shall be subject to the following limitations:

(a) **Defined Benefit Plans.** The maximum permissible Annual Pension Benefit with respect to any member shall be in accordance with IRC §415(b) which provides that such Annual Pension Benefit shall not exceed $90,000, as adjusted for inflation, which for 2002 is $160,000 (the "Dollar Limit").

(1) Special Dollar Limitations. If the benefit is payable prior to age 62, the dollar limitation shall be reduced to the actuarial equivalent of a benefit commencing at age 62. In the case of any full-time police or fire employee who is a Qualified Participant as defined in IRC §415(b)(2)(G), there is no reduction in the dollar limitation. If the benefit is not payable until after age 65, the dollar limitation shall be increased to the actuarial equivalent of a benefit commencing at age 65.

(2) In the case of an employee who has less than ten (10) years of participation in the Plan, the Dollar Limitation shall be reduced 1/10 for each year of participation in accordance with IRC §415(b)(5).

(b) **Defined Contribution Plans.**

(1) For limitation years beginning after December 31, 1986 the term "annual addition" means, for purposes of this section the sum, credited to a participant's account for any limitation year, of:

a. Employer contributions;

b. Employee contributions; and

c. Forfeitures.

(2) Annual additions that may be contributed or allocated to a participant's account for a limitation year will not exceed the lesser of:

a. 100% percent of participant's compensation, within the meaning of IRC §415(c)(3), or

b. $40,000, as adjusted for increases in the cost of living pursuant to IRC §415(d).

Sec. 10. Direct RolloversI-1. General provisions.

The defined benefit plan does not currently provide for lump sum payments. However, to the extent lump sum payments are allowed, the plan will meet the following requirements regarding IRC 401(a)(31).

(a)  **Direct Rollovers.**  This section applies to distributions made on or after January 1, 1993.  Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the plan administrator, to have any portion of an eligible rollover distribution that is equal to at least $500 paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)  **Eligible rollover distribution**:  An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently that annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under section 401(a)(9) of the Internal Revenue Code; any hardship distribution described in section 401(k)(2)(B)(i)(iv) received after 12-31-98; the portion of any other distribution(s) that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and any other distribution(s) that is reasonably expected to total less than $200 during a year.

(c)  **Eligible retirement plan**:  An eligible retirement plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified plan described in section 401(a) of the Code, that accepts the distributee's eligible rollover distribution.  However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity. On and after January 1, 2008, an eligible retirement plan, for purposes of accepting a rollover, shall include a Roth IRA to the extent permitted by Code Section 408A, and the regulations promulgated thereunder.

(d)  **Distributee**: A distributee includes an employee or former employee. In addition, the employee's or former employee's surviving spouse and the

employee's or former employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in section 414(p) of the Code, are distributees with regard to the interest of the spouse or former spouse. On and after January 1, 2008, the retirement system shall allow nonspousal beneficiary transfers to an individual retirement plan in accordance with and subject to Internal Revenue Code Section 402(c)(11).

(e)     **Direct rollover**:  A direct rollover is a payment by the plan to the eligible retirement plan specified by the distributee.

# ARTICLE X.

## Collective Bargaining Agreements.

Collective Bargaining Agreement Provisions. Under Michigan Law if there is any conflict between the Retirement System provisions and collective bargaining agreement provisions, the terms of the collective bargaining agreement control.

(a) The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 1998-2001 collective bargaining agreement between the City of Detroit and the Detroit Police Officers Association with respect to police officers covered by said collective bargaining agreement. Said provisions are attached as Exhibit A.

(b) The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 1998-2001 collective bargaining agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association. Said provisions are attached as Exhibit B.

(c) The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the July 1, 1996 – June 30, 2004 collective bargaining agreement between the City of Detroit and the Detroit Police Command Officers Association. Said provisions are attached as Exhibit C.

(d) The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the July 1, 1998 – June 30, 2001 collective bargaining agreement between the City of Detroit and the Detroit Fire Fighters Association. Said provisions are attached as Exhibit D.

**ARTICLE XI.**

Compliance With USERRA.

USERRA. The Retirement System shall comply with applicable, required provisions of Internal Revenue Code Section 414(u). On and after January 1, 2007, notwithstanding anything to the contrary herein, if a member dies while performing qualified military service (as defined in Internal Revenue Code Section 414(u)), to the extent required by Internal Revenue Code Section 401(a)(37) the survivors of the member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, on and after January 1, 2009, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than 30 days, such Differential Wage Payment will be treated as compensation under Code Section 415(c)(3) limits, but not for purposes of Plan benefit accruals. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the Retirement System to an individual who is performing service in the uniformed services while on active duty for a period of more than 30 days.

# ARTICLE XII.

## Deferred Retirement Option Plan.

The following provisions are hereby established as For periods on and after July 1, 2014, the Deferred Retirement Option Plan ("Drop DROP") Program with respect to those members of the Retirement System under Component II shall be available to Members who are covered by a collective bargaining agreement with a DROP Program (currently DPOA, DPCOA and DFFA agreements with the City that permit such Members to participate in the DROP program and non-union executives of the Police Department and the Fire Department).

    (a)    In lieu of terminating employment and accepting a service retirement allowance Retirement Allowance under the plan provisions, any applicable member of this system Component II, any Member of the Retirement System who is eligible for the DROP Program program and who is eligible to immediately receive a 25 twenty-five year service retirement allowance (or twenty year) Retirement Allowance may elect to participate in the Deferred Retirement Option Plan (DROP) program and defer the receipt of retirement benefits his or her Retirement Allowance in accordance with the provisions of this resolution. This DROP feature is effective for DROP eligible members retiring on or after March 1, 2002 or after IRS approval of the DROP provisions, whichever is later. Article I. Any such election shall be irrevocable.

    (b)    Participation in the DROP program for Members for who elected to participate in the DROP program prior to July 1, 2014 shall be limited to ten years. Participation for Members who elect to participate in DROP program after June 30, 2014 shall be limited to five years. At the end of such five (or ten) year period of participation in the DROP program, the Member shall be retired from employment.

## Sec. I-2.    Conversion to Retirement Allowance

(b)    No additional service credit shall be earned by a participant in the DROP program.

(c)    There is no limit to the duration of participation in the DROP program.

(d)    Participation in the DROP program shall be consistent with applicable collective bargaining agreements. For DPOA members, Section 33N of the 1998-2001 collective bargaining agreement between the DPOA and the City of Detroit shall be controlling unless modified by future collective bargaining agreement.

    (e)    Upon the effective date of the commencement of participation in the plan, active membership in the Retirement System shall terminate. However employer contributions shall continue to be paid into the Retirement System for the DROP participant as if the DROP participant was not a DROP participant. For purposes of this section, compensation and credit service shall remain as they existed on the effective date of commencement of a Member's participation in the DROP program, the Member shall cease to accrue a Retirement Allowance under Component I and shall elect a form of payment for his Retirement Allowance pursuant to Part H of Article F. Seventy-five percent (75%) percent of the monthly retirement

benefitsRetirement Allowance (including applicable escalatorvariable Pension Improvement Factor (Escalator) increases) that would have been payable, had a memberthe Member elected to ceaseterminate employment with the City on the effective date of his or her DROP election and receive a service retirement allowancean immediate Retirement Allowance, shall be paid into the deferred retirement option plan (DROP) account. Upon termination of employment, deferred benefits (i.e. the DROP account balance) shall be paid as provided by this resolution.a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the Board.

(f)     The ICMA Retirement Trust has been selected as the initial DROP depository entity.

(g)     The Deferred Retirement Option Plan applicable amounts shall be invested as directed by the member within the investment choices as provided by the ICMA Retirement Trust (or substitute entity).

**Sec. I-3.        Investment of DROP assets**

(a)     ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program. ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (d) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(b)     As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts to be invested under the Retirement System. If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(c)     If amounts credited to DROP accounts are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees. A Member's DROP account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(d)     The Board of Trustees entered into an administrative services agreement with ING. Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(e)     The Board of Trustees may replace ING with a trust type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(h̶f) T̶h̶eAny fees f̶o̶rassociated with the maintenance of DROP a̶c̶c̶o̶u̶n̶t̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶ ̶d̶e̶t̶e̶r̶m̶i̶n̶e̶d̶ ̶b̶y̶ ̶t̶h̶e̶ ̶I̶C̶M̶AAccounts outside of the Retirement T̶r̶u̶s̶t̶ ̶(̶o̶r̶ ̶s̶u̶b̶s̶t̶i̶t̶u̶t̶e̶ ̶e̶n̶t̶i̶t̶y̶)̶,̶ ̶w̶h̶i̶c̶h̶ ̶f̶e̶e̶sSystem shall be paid by the D̶R̶O̶P̶ ̶p̶a̶r̶t̶i̶c̶i̶p̶a̶n̶t̶ ̶p̶e̶rMembers by means of deduction from t̶h̶etheir DROP a̶c̶c̶o̶u̶n̶tAccounts.

(i) U̶p̶o̶n̶ ̶t̶e̶r̶m̶i̶n̶a̶t̶i̶o̶n̶ ̶o̶f̶ ̶e̶m̶p̶l̶o̶y̶m̶e̶n̶t̶,̶ ̶a̶ ̶p̶a̶r̶t̶i̶c̶i̶p̶a̶n̶t̶ ̶i̶n̶ ̶t̶h̶e̶ ̶D̶R̶O̶P̶ ̶p̶r̶o̶g̶r̶a̶m̶ ̶s̶h̶a̶l̶l̶ ̶r̶e̶c̶e̶i̶v̶e̶,̶ ̶a̶t̶ ̶h̶i̶s̶ ̶o̶r̶ ̶h̶e̶r̶ ̶o̶p̶t̶i̶o̶n̶ ̶e̶i̶t̶h̶e̶r̶ ̶a̶ ̶l̶u̶m̶p̶ ̶s̶u̶m̶ ̶p̶a̶y̶m̶e̶n̶t̶ ̶f̶r̶o̶m̶ ̶t̶h̶e̶ ̶D̶R̶O̶P̶ ̶a̶c̶c̶o̶u̶n̶t̶ ̶e̶q̶u̶a̶l̶ ̶t̶o̶ ̶t̶h̶e̶ ̶p̶a̶y̶m̶e̶n̶t̶s̶ ̶t̶o̶ ̶t̶h̶e̶ ̶a̶c̶c̶o̶u̶n̶t̶ ̶p̶l̶u̶s̶ ̶e̶a̶r̶n̶i̶n̶g̶s̶ ̶a̶d̶j̶u̶s̶t̶e̶d̶ ̶f̶o̶r̶ ̶a̶n̶y̶ ̶l̶o̶s̶s̶e̶s̶ ̶o̶r̶ ̶a̶ ̶t̶r̶u̶e̶ ̶a̶n̶n̶u̶i̶t̶y̶ ̶b̶a̶s̶e̶d̶ ̶u̶p̶o̶n̶ ̶h̶i̶s̶ ̶o̶r̶ ̶h̶e̶r̶ ̶a̶d̶j̶u̶s̶t̶e̶d̶ ̶a̶c̶c̶o̶u̶n̶t̶,̶ ̶o̶r̶ ̶h̶e̶ ̶o̶r̶ ̶s̶h̶e̶ ̶m̶a̶y̶ ̶e̶l̶e̶c̶t̶ ̶a̶n̶y̶ ̶o̶t̶h̶e̶r̶ ̶m̶e̶t̶h̶o̶d̶ ̶o̶f̶ ̶p̶a̶y̶m̶e̶n̶t̶ ̶a̶l̶l̶o̶w̶e̶d̶ ̶b̶y̶ ̶t̶h̶e̶ ̶I̶C̶M̶A̶ ̶R̶e̶t̶i̶r̶e̶m̶e̶n̶t̶ ̶T̶r̶u̶s̶t̶ ̶(̶o̶r̶ ̶s̶u̶b̶s̶t̶i̶t̶u̶t̶e̶ ̶e̶n̶t̶i̶t̶y̶)̶;̶ ̶p̶r̶o̶v̶i̶d̶e̶d̶,̶ ̶n̶o̶t̶w̶i̶t̶h̶s̶t̶a̶n̶d̶i̶n̶g̶ ̶a̶n̶y̶t̶h̶i̶n̶g̶ ̶t̶o̶ ̶t̶h̶e̶ ̶c̶o̶n̶t̶r̶a̶r̶y̶ ̶h̶e̶r̶e̶i̶n̶,̶ ̶t̶h̶e̶ ̶P̶a̶r̶t̶i̶c̶i̶p̶a̶n̶t̶'̶s̶ ̶a̶d̶j̶u̶s̶t̶e̶d̶ ̶D̶R̶O̶P̶ ̶a̶c̶c̶o̶u̶n̶t̶ ̶b̶a̶l̶a̶n̶c̶e̶ ̶a̶t̶ ̶t̶e̶r̶m̶i̶n̶a̶t̶i̶o̶n̶ ̶o̶f̶ ̶e̶m̶p̶l̶o̶y̶m̶e̶n̶t̶ ̶s̶h̶a̶l̶l̶ ̶n̶o̶t̶ ̶b̶e̶ ̶l̶e̶s̶s̶ ̶t̶h̶a̶n̶ ̶t̶o̶t̶a̶l̶ ̶s̶y̶s̶t̶e̶m̶ ̶D̶R̶O̶P̶ ̶p̶a̶y̶m̶e̶n̶t̶s̶ ̶i̶n̶t̶o̶ ̶h̶i̶s̶ ̶o̶r̶ ̶h̶e̶r̶ ̶a̶c̶c̶o̶u̶n̶t̶ ̶(̶n̶o̶t̶ ̶i̶n̶c̶l̶u̶d̶i̶n̶g̶ ̶e̶a̶r̶n̶i̶n̶g̶s̶ ̶a̶n̶d̶ ̶l̶o̶s̶s̶e̶s̶)̶.̶ ̶ ̶T̶h̶e̶ ̶p̶a̶r̶t̶i̶c̶i̶p̶a̶n̶t̶'̶s̶ ̶m̶o̶n̶t̶h̶l̶y̶ ̶b̶e̶n̶e̶f̶i̶t̶s̶ ̶t̶h̶a̶t̶ ̶w̶o̶u̶l̶d̶ ̶h̶a̶v̶e̶ ̶o̶t̶h̶e̶r̶w̶i̶s̶e̶ ̶b̶e̶e̶n̶ ̶p̶a̶i̶d̶ ̶a̶t̶ ̶r̶e̶t̶i̶r̶e̶m̶e̶n̶t̶ ̶p̶r̶i̶o̶r̶ ̶t̶o̶ ̶p̶a̶r̶t̶i̶c̶i̶p̶a̶t̶i̶o̶n̶ ̶i̶n̶ ̶t̶h̶e̶ ̶D̶R̶O̶P̶ ̶p̶r̶o̶g̶r̶a̶m̶ ̶(̶i̶.̶e̶.̶ ̶1̶0̶0̶%̶)̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶g̶i̶n̶ ̶t̶o̶ ̶b̶e̶ ̶p̶a̶i̶d̶ ̶t̶o̶ ̶t̶h̶e̶ ̶r̶e̶t̶i̶r̶e̶e̶.̶ ̶ ̶T̶e̶r̶m̶i̶n̶a̶t̶i̶o̶n̶ ̶o̶f̶ ̶e̶m̶p̶l̶o̶y̶m̶e̶n̶t̶ ̶i̶n̶c̶l̶u̶d̶e̶s̶ ̶t̶e̶r̶m̶i̶n̶a̶t̶i̶o̶n̶ ̶o̶f̶ ̶a̶n̶y̶ ̶k̶i̶n̶d̶,̶ ̶s̶u̶c̶h̶ ̶a̶s̶,̶ ̶r̶e̶s̶i̶g̶n̶a̶t̶i̶o̶n̶,̶ ̶d̶i̶s̶c̶h̶a̶r̶g̶e̶ ̶o̶r̶ ̶d̶i̶s̶a̶b̶i̶l̶i̶t̶y̶.

## Sec. I-4. Distribution of amounts credited to DROP Account

A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City.  Upon termination of employment, a Member who is a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his DROP Account.  In addition, one hundred percent (100%) of the Member's monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP program. Termination of employment includes termination of any kind, such as resignation, retirement, discharge or disability.

## Sec. I-5. Death of Member while participating in the DROP program

(j) If a p̶a̶r̶t̶i̶c̶i̶p̶a̶n̶tMember dies d̶u̶r̶i̶n̶g̶ ̶t̶h̶e̶ ̶p̶e̶r̶i̶o̶d̶ ̶o̶f̶ ̶p̶a̶r̶t̶i̶c̶i̶p̶a̶t̶i̶o̶nwhile participating in the DROP program,̶ a lump sum payment equal to h̶i̶s̶ ̶o̶r̶ ̶h̶e̶r̶ ̶a̶c̶c̶o̶u̶n̶tthe Member's DROP Account balance shall be paid to h̶i̶s̶ ̶o̶r̶ ̶h̶e̶r̶ ̶n̶a̶m̶e̶d̶ ̶b̶e̶n̶e̶f̶i̶c̶i̶a̶r̶y̶,̶ ̶o̶r̶ ̶i̶f̶ ̶n̶o̶n̶e̶,̶ ̶t̶o̶ ̶h̶i̶s̶ ̶o̶r̶ ̶h̶e̶rthe Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate; provided, notwithstanding anything to the contrary herein, the P̶a̶r̶t̶i̶c̶i̶p̶a̶n̶tMember's adjusted DROP a̶c̶c̶o̶u̶n̶tAccount balance a̶t̶ ̶d̶e̶a̶t̶h̶ ̶d̶u̶r̶i̶n̶g̶ ̶t̶h̶e̶ ̶p̶e̶r̶i̶o̶d̶ ̶o̶f̶ ̶p̶a̶r̶t̶i̶c̶i̶p̶a̶t̶i̶o̶nunder Component II upon the Member's death while participating in the DROP program shall not be less than total system DROP payments into his or her account (not including earnings and losses).

(k̶) I̶n̶ ̶t̶h̶e̶ ̶e̶v̶e̶n̶t̶ ̶t̶h̶a̶t̶ ̶a̶ ̶m̶e̶m̶b̶e̶r̶ ̶d̶i̶e̶s̶ ̶p̶r̶i̶o̶r̶ ̶t̶o̶ ̶t̶e̶r̶m̶i̶n̶a̶t̶i̶o̶n̶ ̶o̶f̶ ̶e̶m̶p̶l̶o̶y̶m̶e̶n̶t̶ ̶w̶h̶i̶l̶e̶ ̶p̶a̶r̶t̶i̶c̶i̶p̶a̶t̶i̶n̶g̶ ̶i̶n̶ ̶t̶h̶e̶ ̶D̶R̶O̶P̶,̶ ̶t̶h̶e̶ ̶m̶e̶m̶b̶e̶r̶'̶s̶ ̶d̶e̶s̶i̶g̶n̶a̶t̶e̶d̶ ̶b̶e̶n̶e̶f̶i̶c̶i̶a̶r̶y̶(̶i̶e̶s̶)̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶ ̶e̶n̶t̶i̶t̶l̶e̶d̶ ̶t̶o̶ ̶t̶h̶e̶ ̶f̶u̶n̶d̶s̶ ̶i̶n̶ ̶t̶h̶e̶ ̶D̶R̶O̶P̶ ̶a̶c̶c̶o̶u̶n̶t̶.̶ ̶ ̶I̶n̶ ̶a̶d̶d̶i̶t̶i̶o̶n̶,̶ ̶t̶h̶e̶ ̶m̶e̶m̶b̶e̶r̶'̶s̶ ̶r̶e̶t̶i̶r̶e̶m̶e̶n̶t̶ ̶a̶l̶l̶o̶w̶a̶n̶c̶e̶,̶ ̶w̶i̶t̶h̶ ̶e̶s̶c̶a̶l̶a̶t̶o̶r̶s̶,̶

will be restored toIn addition, one hundred percent (100%) of the amountMember's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid, to the Member but for the memberMember's decision to participate in the DROP program will be restored.  Survivor benefits, if any, shall be paid in accordance with the payment option elected by the deceased member's election option; provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at death shall not be less than total system DROP payments into his or her account (not including earnings and losses)..Member at the time the Member elected to participate in the DROP program.

### Sec. I-6.        Disability of Member While Participating in the DROP Program

If a Member becomes Totally Disabled while participating in the DROP program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, such Member (a) shall be immediately retired and one hundred percent (100%) of the Retirement Allowance) that would have been paid to the Member but for the Member's decision to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) will commence in accordance with the payment option selected by the Member at the commencement of the Member's participation in the DROP program as provided in Section I-2, and (b) shall be entitled to receive payment of the funds in his DROP Account (in the form of a lump sum or other form of payment described in Part H of Article F). Such Member shall not be entitled to disability retirement benefits under Article F hereof.

(l)     If an employee becomes disabled after the period of participation in the DROP program but while still an employee and his employment is terminated because he is disabled, he or she (A) shall be immediately retired with the form of retirement selected by the employee at the commencement of the DROP program plus any applicable pension improvement increases, and (B) shall be entitled to the funds in the DROP account (as a lump sum or other allowed method).  Such employee shall not be entitled to disability retirement benefits.

(m)     The ICMA Retirement Trust (or substitute entity), consisting of five (5) pages which are attached hereto, will receive the DROP funds and the funds of each participant shall be invested as directed by the member within the investment choices provided by the ICMA Retirement Trust (or substitute entity).

(n)     The Board of Trustees of the Policemen and Firemen Retirement System will enter into an Administrative Services Agreement with the International City Management Association Retirement Corporation "RC" (or substitute entity) which will serve as Investment Advisor to the ICMA Retirement Trust (or substitute entity).

(o)     The ICMA Retirement Trust (or substitute entity) will offer a series of separate funds for the investment of DROP account assets as referenced in the ICMA Retirement Trust's (or substitute entity) disclosure documents.

(p)     Any matters relating to the DROP program not covered by the July 21, 2000 DPOA Act 312 Act Award, collective bargaining provisions, the ICMA Retirement Trust (or

substitute entity) or any applicable law or authority shall be resolved by decision of the Board of Trustees of the Policemen and Firemen Retirement System.

(q)     The Board of Trustees may replace the ICMA Retirement Trust with an equivalent trust type vehicle subject to approval of the applicable collective bargaining associations.

(r)     The effective date of the foregoing DROP Program provisions are subject to confirmation from the Internal Revenue Service that the DROP Program does not adversely affect the qualified status of the Defined Benefit Plan of the Policemen and Firemen Retirement System.  The appropriate forms applying for a qualified plan determination letter with the DROP provisions shall be filed by the Retirement System and any other applicable party.

The DROP program is subject to all applicable Internal Revenue Service rules, regulations, authority and applicable provisions of the Internal Revenue Code.

**Sec. I-7.      Cost Neutrality**

---

**By Agreement**

---

**Deferred Retirement Option Program (DROP)**

**[The Deferred Retirement Option Program (DROP) plan option shall be discontinued and no longer available to members not currently enrolled in the plan.  The plan shall remain in effect for all members currently enrolled.]**

**[Effective July 1, 2003 or July 21, 2000]** a Deferred Retirement Option Program (DROP) plan option shall be made available as a retirement option with the following features:

(a)     **[To participate in the program a member must have at least twenty-five (25) [or twenty (20)] years of [active] service with the City as a member of the Policemen and Firemen Retirement System.] [Members entering the DROP Plan after the date of the Award must remain in a full-duty status for the duration of their participation in the DROP Plan.  If a member is not able to return to full-duty status within six months, their participation in the DROP Plan shall terminate and he/she shall revert to a regular pension.]**

(b)     There will be no limit on the number of years a member may participate in the program. **[For members of the bargaining unit entering into the DROP Plan after the date of this Award, participation in the DROP Plan shall be limited to ten (10) years.]**

(c)     If a member is injured to the point that the member is disabled and placed off on a duty disability per the Retirement System, the member will revert to his regular pension.

(d)     A DROP accumulation account will be established with an outside investment company chosen by the Union.

(e)     The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the applicable annual escalator **[of 2.25% times that portion of any retirement allowance earned prior to the date of the Award.]**

– 114 –

~~[applicable to the credited service years.] [(applicable escalator x the full regular retirement allowance x 75%)] [or (2.25% x the full regular retirement x 75%).]~~

~~(f) Once a member has chosen to place his DROP proceeds into the DROP accumulation account, the member shall not be allowed to remove those funds until the member permanently retires.~~

~~(g) Upon permanent retirement, the member shall be given the right to remove funds from the DROP accumulation account.~~

~~(h) When the member permanently retires, the member will receive a regular retirement allowance calculated as if the member retired on the day the DROP account started. The member's retirement allowance shall include all annual escalator amounts [(2.25%) or subject to Article 31(K)] that would have been added while the member was participating in the DROP plan.~~

~~(i) [This program will not be put into effect unless it is certified by the IRS that it will not affect the tax exempt status of the Retirement System under the Internal Revenue Code.~~

(~~j~~a) ~~This~~The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP ~~Plan~~program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the ~~Plan~~Retirement System to cost neutrality.

(~~k~~b) If the City contends that the DROP program is ~~costing it money~~not cost-neutral, including, but not limited to, making the City's annual contribution to the ~~P&F Pension~~Retirement System higher than it would be if the DROP ~~Plan~~program was not in effect, the ~~parties~~Board and the City, along with the Plan~~'s actuary~~ Actuary as well as an actuary appointed by the City~~, shall meet and confer in good faith regarding the cost. If the parties are unable to reach an understanding, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan's actuary and the City's actuary~~ (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost. If the Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan Actuary and the City's actuary. This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP program ~~cost neutral~~cost-neutral. Upon the implementation of changes necessary to make the DROP program ~~cost neutral, participants~~cost-neutral, Members shall have thirty days to elect to either (a) ~~retiring~~retire from active employment with the City or (b) withdraw from the DROP ~~Plan, continuing active employment and resuming~~program and resume active participation in ~~the regular retirement plan~~Component I of the Retirement System. The Board shall notify ~~the participant~~DROP participants of these changes prior to implementation. Those DROP participants resuming participation in ~~the regular retirement plan~~Component I of the Retirement System shall not accumulate

~~service credit~~Credited Service for any time that they were participating in the DROP ~~Plan~~program (under either Component I or Component II).  Those not making either election shall remain participants in the DROP ~~Plan~~program.

(~~b~~c)  In the event the DROP ~~Plan~~program cannot be changed to restore cost neutrality, it shall be discontinued and ~~participants~~Members participating in the DROP program at that time shall have the option ~~of~~to either (~~a~~i) ~~retiring,~~retire or (~~b~~ii) ~~continuing~~continue active employment ~~and~~with the City and resume active participation in Component I of the Retirement System.  DROP participants resuming participation in ~~the regular retirement plan.~~Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under Component I or Component II).

## ARTICLE J.  PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM

13-53846-tjt    Doc 8046    Filed 10/22/14    Entered 10/22/14 03:50:41    Page 650 of 725

**ARTICLE XIII.**

**Participant Annuity Savings Fund Loan Program**

―――――――――――――――――――――  **By Agreement**  ―――――――――――――――――――――

**Sec. J-1.** **Participant Annuity Savings Fund Loan Program**

The undersigned parties have agreed that aA Participant Annuity Savings Fund Loan Program (Participant Loan Program) will be established and available to bargaining unit membersMembers.  Its terms will be as follows:

(a)  ~~Established:~~  Any loans granted or renewed shall conform to the requirements of Section 72(p) of the Internal Revenue Code, 26 U.S.C.1 et seq.  Such loan program shall be established in writing by the Board of Trustees of the Police and Fire Retirement System, in conformity with the terms of this Memorandum of Agreementthe Combined Plan document and applicable collective bargaining agreements, and must include, but need not be limited to the following:

   (1.)  The identity of the administrator of the Participant Loan Program;

   (2.)  A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

   (3.)  The procedure under the program for determining a reasonable rate of interest;

   (4.)  The events constituting default and the steps that will be taken to preserve plan assets.

(b)  ~~The Loan Program:~~  The Participant Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the City of Detroit Police and Fire Retirement System for prospective participants in the programMembers.   The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program.  Copies of the rules shall also be made available to prospective participating membersMembers of the systemRetirement System in the offices of the Police and Fire Retirement System.

(c)  ~~Eligibility:~~  Subject to the rules and procedures established by the Police and Fire Retirement System Board, loans may be made to bargaining unit membersMembers from such memberMember's contributions to the Annuity Savings Fund.  Former participantsMembers, spouses of participantsMembers, and beneficiariesBeneficiaries are not eligible to receive any loans from the PlanRetirement System.  Subject to rules and procedures established by the Board, a participantMember who has been in the planRetirement System for twelve (12) months or more is eligible to apply for a loan from this plan.  No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A

Member who has previously defaulted on a loan under either Component I or Component II of the Combined Plan shall not be eligible for a loan from the Retirement System.

(d)   ~~Amount of Loan:~~  A ~~participant~~Member who has satisfied applicable rules and procedures may borrow from his or her ~~annuity savings fund~~Annuity Savings Fund account an amount, which does not exceed fifty percent (50%) of the ~~participant~~Member's vested accumulated balance, up to fifteen thousand dollars ($15,000.00) reduced by the excess, if any, of: (1) the highest outstanding balance of loans from the ~~trust~~Retirement System during the one (1) year period ending on the day before the date on which the loan is made (under both Component I and Component II), or (2) the outstanding balance of loans from the ~~trust~~Retirement System on the date on which the loan is made (under both Component I and Component II), whichever is less.  The minimum loan amount shall be one thousand dollars ($1,000.00).

(e)   ~~Terms and Conditions:~~  In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(1~~.~~)   Loan applications shall be in writing.

(2~~.~~)   All loans shall be memorialized by a promissory note made to the ~~Police and Fire~~ Retirement System and properly executed by the ~~participant~~Member.

(3~~.~~)   Loan shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period.

(4~~.~~)   Each loan granted under Component II shall be made against the assignment of the ~~participant~~Member's entire right, title, and interest in and to the ~~trust~~Annuity Savings Fund supported by the ~~participant~~Member's collateral promissory note for the amount of the loan, including interest payable to the order of the ~~trustee~~Board of Trustees.

(5~~.~~)   Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among ~~participants~~Members in its determination of interest rates on loans.  Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the ~~pension system~~Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the ~~pension trust~~Retirement System of administering the ~~trust~~Retirement System. The loan interest rate shall be calculated in a manner that will not negatively

affect the City's costs ~~trust~~ relating to the ~~trust~~Retirement System or the return to ~~trust members~~Members.

(6~~.~~) Loan repayments shall be suspended under this ~~plan~~Retirement System as permitted by Section 414(u)(4) of the Internal Revenue Code~~, 26 U.S.C. 414(u)(4)~~. A ~~participant~~Member who has an outstanding loan balance from the ~~plan~~Retirement System who is absent from employment with the ~~employer~~City, and who has satisfied the requirements of ~~26 USC~~Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the ~~fund~~Retirement System during said periods of absence.

(f) ~~Renewal of Loan:~~ Any loans granted or renewed shall be made and administered pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code~~, 26 U.S.C.72(p)~~ and the regulations thereunder.

(g) ~~Loan Balance:~~ A ~~participant~~Member's outstanding loan balance shall be considered a directed investment by the ~~participant~~Member and interest payments shall be credited to the ~~participant~~Member's account balance (provided that the interest credited shall be reduced appropriately to cover the administrative cost of the loan program and avoid negatively affecting the City's costs or the ~~trust~~Retirement System's investment returns), and shall not be part of net investment income or part of the ~~participant~~Member's account balance for the purpose of allocation of net investment income under ~~[Article VII]~~G.

(h) ~~Distribution:~~ No distributions shall be made to a ~~participant~~Member, former ~~participant~~Member, or ~~beneficiary~~Beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been ~~liquidated~~repaid or offset against the distributable Annuity Savings Fund account balance.

(i) ~~Annual Report:~~ The ~~Police and Fire~~ Retirement System shall include, in ~~their~~its annual report to all ~~members~~Members, an accounting of the loan program established by this section, which contains the number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the ~~trust~~Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in the ~~fiscal year~~Fiscal Year covered the costs of administering the program.

~~The parties agree that eligibility for participation in said loan program will be in accordance with the provisions contained herein, and shall be effective immediately upon the signing of this Memorandum of Understanding. All necessary steps shall be taken to ensure that the implementation date of the Employee Loan Program for members of this bargaining unit shall occur as soon as administratively possible so that it coincides with the initial implementation date established by the Police and Fire Retirement System.~~

~~The parties agree that this Memorandum of Understanding represents the sole and complete agreement regarding the Participant Loan Program for members of this bargaining unit, that this~~

Agreement shall be incorporated in the Labor Agreement and shall remain in full force for the duration of said agreement, and that no modifications can be made unless collectively bargained and mutually agreed between the parties hereto.

## ARTICLE K.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS

**Sec. K-1.** **Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment**

Notwithstanding anything in Articles A, C, D or E to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following changes in benefits provided under Component II of the Combined Plan shall be implemented:

(1) Elimination or Reduction in Pension Improvement Factor (Escalator).  With respect to all Pension benefits payable on or after the effective date of the Plan of Adjustment, the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be equal to 1.0125%; provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be reduced in proportion to the funding which is not received by the Retirement System ("Adjusted Pension Benefit").

For purposes of this Section K-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2) Effect of Payment Default.  In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall proportionately reduce the Pension Improvement Factor (Escalator) to be applied to the monthly Pension benefit of any retirees, surviving beneficiaries, employees and former employees to the extent of such default.

**Sec. K-2.** **Income Stabilization Benefits**

(1) The provisions of this Section K-2 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in writing executed by the Authority and the Treasurer.

(2)     Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section K-2, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i)  the amount needed to restore an Eligible Pensioner's reduced annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013.  The Income Stabilization Benefit as determined under this Section K-2(2) will not increase after the date on which the Income Stabilization Benefit is determined.  The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3)     To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section K-2) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section K-2 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

   a.     The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's Pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

   b.     An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the Pension benefit paid to the Eligible Pensioner by the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Pension Benefit that is payable to the Eligible Pensioner for that year as determined under Section K-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section K-3; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4)     A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners.  Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be

-124-

credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section K-2(6).

(5) For purposes of this Section K-2, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section K-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

a. An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

b. The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board. The Board, with the assistance of the Investment Committee shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

c. After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

d. An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6) For purposes of this Section K-2, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

(7)     In the event that, in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Benefits payable by the Retirement System.  The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8)     In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Benefits payable by the Retirement System.

## Sec. K-3.     Restoration of Pension Benefits

The following rules shall govern how Pension Improvement Factor (Escalator) ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re City of Detroit, Michigan,* Case No. 13-53846.  The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto.  The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1)     *Waterfall Classes.*

There will be three Waterfall Classes:

a.     Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and Beneficiaries.

  b.  Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and Beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

**LEGEND TO FOOTNOTES**

  c.  Waterfall Class 3 – All retirees, surviving spouses, and beneficiaries in pay status and all other Members who as of June 30, 2014 are not in retirement benefit pay status.

As used in the footnotes to this compilation, the acronyms below refer to the following documents:

- **DFFA** means the Master Agreement between the City of Detroit and the Detroit Fire Fighters Association (2009-2013). Although the CBA is expired, the Director of Labor Relations kept the current terms in place until a subsequent agreement is negotiated in a letter dated June 28, 2013, "Re: Terms and Conditions of employment following the expiration of the 09-13 Collective Bargaining Agreement (CBA)."

 (2)  *Restoration of Benefits Through June 30, 2023.*

  a.  Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (administrative and investment), future employer contributions as set forth in the Plan of Adjustment (subject to conditions in the Plan of Adjustment), and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 75% funded ratio, and the Restoration Target will be a 78% funded ratio, both projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Plan Actuary projects that the Funded Level as of 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 78%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest in an amount equal to the net return on Retirement System investments but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the PFRS Pension Reserve Fund as provided herein.

b.   Actual restoration payments and restoration credits will work as follows: each year, in conjunction with the preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore COLA benefits in a minimum incremental amount of 10% or more.  For example: if a retiree's then current COLA benefit is a 1.0% annual compounded COLA, the minimum incremental restoration would increase the COLA benefit to 1.225%.  COLA restoration only will occur if the funding level in the Restoration Reserve Account can fund 100% of the COLA increase over the actuarially-projected lives of the eligible recipient Waterfall Class.  If the Plan Actuary certifies that the Restoration Reserve Account as of the end of the prior Fiscal Year satisfies the required funding level for one or more increments of restoration, then in the next immediate Fiscal Year actual COLA restoration payments will be made to PFRS Waterfall Class 1 members in such increments until an amount sufficient to fund 66% of the value of their future COLA payments (e.g., a 1.5% compound COLA, or as otherwise applicable) has been funded.  At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 2 members will receive COLA restoration, until an amount sufficient to fund 66% of the value of their future COLA payments has been funded.  At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 3 members will receive COLA restoration on a pro-rata basis. For Waterfall Class 3 members who are in pay status at that time of restoration, they will receive COLA payments; for active employees at the time of restoration, they will receive credits granting them a right upon retirement to receive COLA restoration equal to the 10% increments that are fully funded to Waterfall Class 3 members.  For example: assume there are sufficient assets credited to the Restoration Reserve Account as of the end of a Fiscal Year to fully fund 66% of the value of the COLA for all Waterfall Class 1 and Class 2 members for their actuarially projected lives.  To the extent additional assets remain  in the Restoration Reserve Account to fully fund at least a 10% COLA increment for Waterfall Class 3 members for their actuarially projected lives, then (i) all retirees would receive a restoration payment of 76% of the value of their COLAs (their having already received by virtue of their membership in Waterfall Classes 1 and 2 an increase to 66% of the value of their COLAs) and also a 10% COLA increment would be credited to eligible active employees which would be included in their benefit payments upon retirement (thus causing their COLAs to increase in value from 45% to 55%).  Restoration amounts actually paid from the Restoration Reserve Account will be debited from such account.

13-53846-tjt   Doc 8046   Filed 10/22/14   Entered 10/22/14 03:50:41   Page 660 of 725

Restoration payments will be calculated and paid on a prospective basis only.

c. Once restoration payments and credits begin, as long as the Restoration Reserve Account continues to have assets to fund 100% of an incremental COLA restoration amount for such Waterfall Class for their actuarially projected lives, the restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments, falls below 100% for the second or greater increment, the annual amounts to pay such second or greater increment can continue until the Restoration Reserve Account lacks any assets to fund such additional increment. For example, assume a 10% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019. Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid). For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

d. If the Funded Level (excluding Restoration Reserve Assets) projected to 2023 falls below 76% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 76% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net Retirement System investment returns for the Fiscal Year in question. Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 75%) then restoration payments to retirees and credits to active employees in the following year will be modified in the following manner: (1) funds previously credited to the Restoration Reserve Account will be notionally transferred and credited to the Pension Reserve Fund in sufficient amounts to restore the projected Funded Level in 2023 to 75%; (2) following such transfer, the remaining assets in the Restoration Reserve Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph c.

e. In connection with preparation of the actuarial report for Fiscal Year 2023, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target, which shall be 78%. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the

Permanent Restoration Target. If following such transfers, the Funded Level as of June 30, 2023 has satisfied the Permanent Restoration Target (i.e., 78%), then the residual amounts, if any, in the Restoration Reserve Account (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes for their actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.      Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level of the Retirement System as of 2023 is less than 76%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 76%.

(3)     *Restoration of Benefits from July 1, 2023 to June 30, 2033.*

a.      If and to the extent that all COLA payments have not been restored as of June 30, 2023 pursuant to Section (2)(e), then during this period and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2033:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 78% | 81%/84% |
| 77% | 80%/83% |
| 76% | 79%/82% |
| 75% | 78%/81% |
| 74% or lower | 3% >than 2023 Funded Level %/81% |

-130-

2033 Permanent Restoration Target - Same as 2033 Restoration Target

- **DPCOA** means the City Employment Terms Between the City of Detroit and Detroit Police Command Officers Association, executed on July 18, 2012.

2033 Restoration Reserve Suspension Trigger – 1% higher than the projected Funding Target for all time periods

- **DPLSA** means the Master Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association (2009–2013), as modified by the Act 312 Award executed March–April, 2011 in the matter of CITY OF DETROIT and DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION, MERC Case No. D09-G-0786 before Chairman Thomas W. Brookover.

b. The same rules for restoration payments that applied during the period ending June 30, 2023 shall apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 using the then current investment return assumption which is assumed to be net of expenses (administrative and investment), and the then applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL (using the market value of assets) over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contributions would achieve the applicable Funding Target (pursuant to paragraph b) as of 2033. Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.

c. To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (i.e., the year ending June 20, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account. In determining pension restoration during the period from Fiscal Year 2024 through 2033,

-131-

none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected Funded Level for purposes of determining whether the Retirement System has attained the Restoration Target or the Permanent Restoration Target. To the extent that the City's actual contributions in any of the Fiscal Years 2024 through 2033 are less than the City's projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

d.      Each year, in addition to the notional credit of amounts that exceed the amount necessary to satisfy the Restoration Target, existing notional Restoration Account assets will be credited with interest equal to the net return on Retirement System investments; however, such interest shall not exceed the then investment return assumption. In the event of net losses on the Retirement System's investments, the notional assets credited to the Restoration Reserve Account will be reduced to reflect such losses.

e.      In connection with preparation of the actuarial report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target (i.e., the 2033 Restoration Target). Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the funding level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.      Following receipt of the actuarial report for 2028, and in the event that the projected Funded Level as of 2033 is less than 79%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at

a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 79%.

(4)    *Restoration of Benefits from July 1, 2033 to June 30, 2043.*

    a.    If and to the extent that all COLA payments have not been restored pursuant to Section (3)(f) as of June 30, 2033, then during the period ending June 30, 2043 and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2043.

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
|:---:|:---:|
| 78% | 84%/87% |
| 77% | 83%/86% |
| 76% | 82%/85% |
| 75% | 81%/84% |
| 74% or lower | 3% > than 2023 Funded Level %/84% |

2043 Permanent Restoration Target - Same as 2043 Restoration Target

• ~~**DPOA** means the Master Agreement Between the City of Detroit and the Detroit Police Officers Association (2009-2012).~~

    2043 Restoration Reserve Suspension Trigger – 1% higher than the projected Funding Target for all time periods

• ~~**312 Award # 1** means the Act 312 Award effective March 25, 2013 in the Matter of CITY OF DETROIT and DETROIT POLICE OFFICERS ASSOCIATION, MERC Case No. D12 D-0354 before Chairman George T. Roumell, Jr. This Award invalidated the City Employment Terms between the City of Detroit and Detroit Police Officers Associated, executed on July 18, 2012, and reinstated the Master Agreement Between the City of Detroit and the Detroit Police Officers Association (2009-2012), subject to the modifications made by the Award. See pg. 6 of 312 Award # 1.~~

    b.    The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and the making of notional asset transfers from the Restoration Reserve Account to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Target) and shall be rolled forward. For example, for purposes of determining whether the 2043 Restoration Target has been

satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization.  For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

    c.    In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a above.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any  (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

(5)    *Modification of the Pension Restoration Program.*

If at any time after July 1, 2026, the Investment Committee by vote of five of its seven Members, or the Board of Trustees by a greater than 66% vote, determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement attached to and made a part of the Plan of Adjustment, such that the continued operation of the Pension Restoration Agreement and this Section K-3 without amendment will: (a) materially harm the long-term economic interests of the City or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the Restoration Program, if as of that juncture (and for purposes of applying this subsection K-3(5)(a)) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section K-3 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable).  The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Agreement's objective of providing pension restoration.  Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or

impairment.  Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote).  Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee.  In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan.  The two selected mediators shall appoint a third neutral mediator from the approved list.  Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator.  Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, *inter alia,* whether or in what manner to amend the Pension Restoration Agreement and this Section K-3.

# APPENDIX A

The following provisions shall also have general applicability to the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan:

## MCLS Const. Art. IX, § 24 (2003)

**§ 24.** **Public pension plans and retirement systems, obligation.**

Sec. 24. The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

**Relevant Provisions of**
**January 1, 2012**
**City of Detroit Charter**

**ARTICLE 11.**
**RETIREMENT PLANS**

**Sec. 11-101. City's Duties.**

1. The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2. Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3. The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

**Sec. 11-102. Continuation of Existing Plans.**

The retirement plans of the city existing when this Charter takes effect, including the existing governing bodies for administering those plans, the benefit schedules for those plans and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before unless changed by this Charter or an ordinance adopted in accordance with this article.

- **312 Award # 2** means the Act 312 Award effective January 15, 2010 in the Matter of CITY OF DETROIT and DETROIT COMMAND OFFICERS ASSOCIATION, MERC Case No. D07 K-1456 before Chairman Mark J. Glazer.

**Relevant Provisions of the**
**Detroit City Code**

- **DPLSA MOU** means the Memorandum of Understanding Between the City of Detroit and Detroit Police Lieutenants and Sergeants Association regarding Adding Unused Sick Leave to Average Final Compensation, dated May 13, 2008.

**Sec. 47-1-2. Detroit Police and Fire Retirement System.**

Notwithstanding any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of July 1, 2014, the Detroit Police and Fire Retirement System shall hereinafter be memorialized in a separate written document entitled "Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan," which shall comprise the exclusive terms of the Detroit Police and Fire Retirement System and be kept in the Office of the City Clerk for the City of Detroit.

**Collective Bargaining Agreements.**

Except to the extent otherwise provided in the Plan of Adjustment, under Michigan Law if there is any conflict between the Retirement System provisions and collective bargaining agreement provisions, the terms of the collective bargaining agreement control.

(a)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Officers Association with respect to police officers covered by said collective bargaining agreement.

(b)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association.

(c)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Command Officers Association.

(d)     The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Fire Fighters Association.

**EXHIBIT I.A.332**

STATE CONTRIBUTION AGREEMENT

## CONTRIBUTION AGREEMENT

This Contribution Agreement ("Agreement"), dated as of _____, 2014, is made by and among the Michigan Settlement Administration Authority, a Michigan body public corporate (the "Authority"), the General Retirement System of the City of Detroit, the Police and Fire Retirement System of the City of Detroit and the City of Detroit (the "City").

## RECITALS

A.      The City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 (the "Chapter 9 Case") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

B.      During the course of the Chapter 9 Case, the City has asserted that the City's Police and Fire Retirement System (the "PFRS" or a "System") and the General Retirement System (the "GRS" or a "System" and collectively with the PFRS, the "Systems") are underfunded.

C.      During the course of the Chapter 9 Case, there have been suggestions that the State of Michigan (the "State") may be obligated to pay all or a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes.

D.      As part of the mediation process in the Chapter 9 Case, the mediators asked the State and other parties to assist in reducing the amount of underfunding in the PFRS and GRS pension funds by providing settlement funds for the benefit of pensioners that would not be otherwise available.

E.      As part of its determination that the City was eligible to file the Chapter 9 Case, the Court determined that pension obligations of the City can be impaired or diminished in the Chapter 9 Case and are not protected from such impairment or diminution by the State Constitution.

F.      In support of confirmation of the City's Fourth Amended Plan of Adjustment dated May 5, 2014 (as may be further amended from time to time, the "Plan"), the State has agreed, subject to satisfaction of the terms and conditions set forth herein and in the Plan, to make a contribution to the GRS and PFRS in return for releases from, among others, the GRS and PFRS as set forth in the Support and Release Agreement entered into by the State and each of the Systems in connection with this matter.

G.      On June 20, 2014, the Authority was established as the disbursement agent for the State with respect to the State Contribution (as defined below).

H.      Capitalized terms used in this Agreement but not defined have the same meanings as set forth in the Plan.

NOW THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1.      State Contribution.      On the later of (a) the date on which the Conditions Precedent have been satisfied, and (b) 60 days after the Effective Date of the Plan, the Authority shall disburse $98,800,000 to GRS and $96,000,000 to PFRS (collectively, the "State Contribution") for the purpose of increasing the assets of the PFRS and GRS. The total

1

aggregate State Contribution is equal to the net present value of $350,000,000 payable over 20 years determined using a discount rate of 6.75%, which results in a total contribution by the State of $194,800,000. The State Contribution shall only be used to fund payments to holders of GRS Pension Claims and PFRS Pension Claims, each as defined in the Plan.

2. <u>Governance Requirements of the GRS and PFRS</u>. At all times during the 20 year period following the disbursement of the State Contribution to the GRS and PFRS, the GRS and PFRS each must establish an investment committee (the "<u>Investment Committee</u>") for the purpose of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on **Exhibit A** and **Exhibit B**, respectively, each attached to and incorporated by reference into this Agreement. Further, the Emergency Manager for the City and any subsequently appointed emergency manager for the City, appointed under PA 436 or under any successor or replacement statutes to PA 436, shall not seek to exercise any powers granted under section 12(1)(m) of PA 436 (or equivalent provision under any successor or replacement statute) against the Board of GRS or the Board of PFRS until the earlier of (a) one year following entry of an order confirming the Plan, and (b) December 31, 2015.

3. <u>Income Stabilization Funds and Income Stabilization Payments</u>. The City, GRS and PFRS shall establish an income stabilization program and amend the governing documents for GRS and the governing documents for PFRS to include the following:

    a.    A supplemental pension income stabilization payment (the "<u>Income Stabilization Payments</u>") payable on an annual basis beginning not later than 120 days after the Effective Date, to each Eligible Pensioner equal to the lesser of (a) the amount needed to restore the Eligible Pensioner's reduced pension benefit to the amount of the pension benefit that the Eligible Pensioner received from GRS or PFRS in 2013, or (b) the amount needed to bring the total annual household income of the Eligible Pensioner up to 130% of the Federal Poverty Level in 2013.

    b.    In addition, to the extent an Eligible Pension's Estimated Adjusted Annual Household Income in any calendar year is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit ("<u>Income Stabilization Benefit Plus</u>"). The Income Stabilization Benefit Plus shall be equal to the lesser of either (a) 100% restoration of pension benefits, including escalators and cost of living adjustments; or (b) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

    c.    An Eligible Pensioner's "<u>Estimated Adjusted Annual Household Income</u>" shall be calculated as follows: (i) the annual pension benefit amount paid in 2013 shall be subtracted from the Eligible Pensioner's 2013 total household income (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation) as

adjusted for inflation or Social Security COLA increases to create a base additional income amount, plus (ii) the following three items as applicable, (x) the reduced pension benefit that GRS will pay the Eligible Pensioner for that year, (y) any GRS pension restoration due to an improved GRS funding level, and (z) the Eligible Pensioner's Income Stabilization Benefit. Notwithstanding the foregoing, Income Stabilization Payments, including the Income Stabilization Benefit Plus, under both GRS and PFRS shall not exceed $20 million in aggregate.

d. A separate recordkeeping sub-account called the "Income Stabilization Fund" will be set up under each of GRS and PFRS for the sole purpose of paying the Income Stabilization Payments to Eligible Pensioners. The assets credited to the sub-accounts will be invested on a commingled basis with the applicable System's assets and will be credited with a pro-rata portion of the System's earnings and losses.

e. Amounts credited to the Income Stabilization Fund, including the Assigned UTGO Bond Tax Proceeds, may not be used for any purpose other than the payment of Income Stabilization Payments to Eligible Pensioners, except as expressly provided in subparagraph (f) below.

f. In 2022, provided that the State has not issued a certificate of default with respect to a System at any time prior to 2022, the Investment Committee for that System shall conduct a valuation to determine the Income Stabilization Payments anticipated to be made from the System in the future, in order for the System to fulfill the obligation to make Income Stabilization Payments (the "Estimated Future Liability"). In the event that 75% of the independent members of the Investment Committee determine that the GRS or PFRS Income Stabilization Fund is credited with assets in excess of its Estimated Future Liability (the "Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board of Trustees that the Excess Assets, but not more than $35 million, be used to fund each System's payment of Adjusted Pension Amounts. The Investment Committee shall have the right to engage professionals to assist in this task as necessary, and such expenses shall be paid by the Systems. If any funds remain in the GRS or PFRS Income Stabilization Fund on the date upon which no Eligible Pensioners under their respective System are living, the remainder of each System's Income Stabilization Fund shall be used to fund each System's payment of Adjusted Pension Amounts.

g. "Eligible Pensioners" are those retirees or surviving spouses who are at least 60 years of age or those minor children receiving survivor benefits from GRS or PFRS, each as of the Effective Date, whose pension benefit from GRS or PFRS will be reduced by the confirmed Plan, and who have a total household income equal to or less than 140% of the Federal Poverty Line in 2013 (per their (or in the case of minor children, their

3

legal guardian's) 2013 income tax returns or equivalent documentation). No new persons will be eligible to receive an Income Stabilization Payment at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

h. The initial determination of Eligible Pensioners, and the amounts of Income Stabilization Payments payable to Eligible Pensioners shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board of Trustees of GRS and PFRS, as applicable. The Board of Trustees, with the assistance of the Investment Committee of GRS and PFRS, shall be responsible for properly administering the respective Income Stabilization Fund and annually certifying to the Treasurer that it has properly administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners.

4. <u>Conditions Precedent</u>.  The Authority's obligations under this Agreement are not effective or enforceable until each of the following conditions (the "<u>Conditions Precedent</u>") have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer:

a. The Authority receives the State Contribution from the State.

b. An endorsement of the Plan by the Official Retiree Committee which will include a letter from the Official Retiree Committee as part of the Plan solicitation package recommending to Classes 10 and 11 a vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in the respective classes.

c. Cessation of all litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City (a) challenging PA 436 or any actions taken pursuant to PA 436, including but not limited to, a dismissal with prejudice of the cases set forth on **Exhibit D**, or (b) seeking to enforce Article IX, Section 24 of the Michigan Constitution; provided, however, (i) until the State Contribution is received by the Systems, the Systems agree to stay any pending litigation described in this subparagraph, and (ii) that as a condition precedent to the GRS and the PFRS dismissing any pending litigation described in this subparagraph that they are prosecuting, the GRS and the PFRS have the right to receive written confirmation from the Authority that the Authority is prepared and authorized to disburse the State Contribution in accordance with this Agreement and the Plan, subject only to the dismissal by the GRS and PFRS of any pending litigation described in this subparagraph that they are prosecuting.

d.   Active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way (including funding) the litigation described in subparagraph 4(c) by the parties listed on **Exhibit C**, or equivalent assurance of litigation finality (which, as to the Systems, shall be deemed satisfied by the execution of the Support and Release Agreement to be entered into by the State and each of the Systems in connection with this matter).

e.   Classes 10 and 11 accept the Plan.

f.   By December 31, 2014, the Court enters a final, non-appealable order confirming the Plan that includes, at a minimum, the following:

  i.   A release of the State and State Related Entities by each holder of a Pension Claim of all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.

  ii.   A requirement that the governing documents of GRS and the governing documents of PFRS be amended to include:

   a)   the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of this Agreement; and

   b)   the Income Stabilization Payments and Income Stabilization Fund described in Paragraph 3 of this Agreement.

  iii.   Approval of, and authority for the City to enter into, the UTGO Settlement.

  iv.   A requirement that the City irrevocably assigns the right to receive not less than an aggregate amount of $20,000,000 of the payments on the Reinstated Stub UTGO Bonds to the Income Stabilization Funds of the GRS and PFRS.  Such payments will be made to the Income Stabilization Funds in the form of annual installment payments over a 14 year period, pursuant to a payment schedule approved by the State.

  v.   Approval of, and authority for the City to enter into, the DIA Settlement.

  vi.   Agreement to and compliance with MCL 141.1561 and cooperation with the transition advisory board appointed pursuant

5

to MCL 141.1563, or compliance with any new legislation that is enacted regarding post-bankruptcy governance.

g.    Evidence satisfactory to the State of an irrevocable commitment by:

    i.    The Foundations to fund $366,000,000 (or the net present value thereof) as part of the DIA Settlement; and

    ii.    The DIA Corp. to fund $100,000,000 (or the net present value thereof) as part of the DIA Settlement.

h.    The Plan Effective Date occurs on or before April 1, 2015.

5.    <u>Non-occurrence of Conditions Precedent</u>.    If the Conditions Precedent are not met to the satisfaction of the Authority and the Treasurer on or before April 1, 2015, upon written request of the Treasurer, the Authority shall remit the State Contribution to the Department and shall have no further obligations under this Agreement.

6.    <u>Default by GRS and PFRS; Cure Period; Remedies</u>.

a.    A System will be in default if the System has not materially complied with any of the terms and conditions set forth in (i) the Plan, (ii) the Governing Documents, or (iii) this Agreement, including, but not limited to, failing to make the required Income Stabilization Payments or using funds in the Income Stabilization Fund for unauthorized purposes.  For the purposes of this Agreement, "<u>Governing Documents</u>" shall mean, (x) for the GRS, the Combined Plan for the General Retirement System of the City of Detroit, Michigan, and (y) for the PFRS, the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan.  Notwithstanding subparagraph 'e' below, there shall not be an event of default for purposes of this paragraph 6 unless and until the Treasurer delivers to the alleged defaulting System a written notice declaring and specifically identifying the facts of an alleged default (the "<u>Default Notice</u>").  Nothing herein shall prohibit the subject System from contesting the alleged default; provided, however, until the contest over the alleged default is resolved, the subject System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

b.    In the event of  a default by a System, the System shall have 100 days after receiving the Default Notice in accordance with subparagraph 'a' above (the "<u>Cure Period</u>") to cure such default by remedying the damages sustained as a result of the default, as well as making any delinquent Income Stabilization Payments, and restoring any funds improperly removed from any other fund maintained by the System, including the Income Stabilization Fund,  as applicable.  Prior to the expiration of the Cure Period, at least six of the seven total aggregate votes of the Investment Committee for the defaulting System must certify to the

Treasurer that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification"). During the Cure Period, the defaulting System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

c.     If the Investment Committee for the defaulting System provides the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then the default will be deemed cured and the defaulting System may once again include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

d.     If the Investment Committee for the defaulting System fails to provide the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then no portion of the total State Contribution to the defaulting system, as adjusted for earnings and losses, may be taken into consideration by the System during the remainder of the 20 year period following the date of such default for purposes of determining whether benefits reduced by the Plan may be restored. Notwithstanding the foregoing, if at any time during or after the Cure Period the Investment Committee certifies by a simple majority vote, that (i) the default has been cured; and (ii) that no material damages have been caused by the default that have not otherwise been remedied, then the Treasurer may consent to the defaulting System once again including its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored, which consent shall not be unreasonably withheld.

e.     Each Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults, or, if the Investment Committee is aware of a default, specifically identifying the facts of such default. After review of a Compliance Report, the Treasurer shall provide to the System either a certificate of compliance or a Default Notice.

f.     Notwithstanding the foregoing, in the event of a default, the Treasurer and the Authority shall have the right to pursue all available legal and equitable remedies against the Board of Trustees for the defaulting System, the Investment Committee, or any other person.

7.     Execution in Counterparts. This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

7

8.　　Governing Law/Jurisdiction.　This Agreement shall be construed in accordance with the laws of the State of Michigan, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.　The Bankruptcy Court of the Eastern District of Michigan shall have exclusive jurisdiction over any action or proceeding solely with respect to this Agreement, and each party, to the extent permitted by law, agrees to submit to such jurisdiction and to waive any defense based on venue or jurisdiction of such court.

9.　　Amendment.　This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

10.　　Limitation of Liability.　The obligation to make the State Contribution is not a general obligation or indebtedness of the State or the Authority and is subject to satisfaction of the conditions described herein.　Furthermore, neither the State nor the Authority has any liability or obligation arising from or related to the contributions and funding of the Income Stabilization Fund of each System.　Notwithstanding anything contained herein to the contrary, no State Related Entity or board member of the Authority shall have any liability for the representations, warranties, covenants, agreements or other obligations of the State or the Authority hereunder or in any of the certificates, notices or agreements delivered pursuant hereto.

11.　　Severability.　If any one or more of the covenants, agreements or provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, the invalidity of any such covenants, agreements and provisions shall in no way affect the validity or effectiveness of the remainder of this Agreement, and it shall continue in force to the fullest extent permitted by law.

12.　　Headings.　Any headings preceding the text of the several articles and sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience or reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

[Remainder of Page Intentionally Left Blank – Signatures on Following Page]

**MICHIGAN SETTLEMENT ADMINISTRATION AUTHORITY**


By: _____
Title: Authorized Officer


**GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**CITY OF DETROIT**

By: _____
Title: Emergency Manager

**EXHIBIT A – GRS Governance Terms**

*In re City of Detroit, Michigan*

# INVESTMENT COMMITTEE GOVERNANCE
## FOR GENERAL RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the General Retirement System of the City of Detroit (GRS). |
| SCOPE OF SETTLEMENT | The GRS is currently administered by a ten (10) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System. The Board currently makes all administrative, actuarial and investment related decisions for the GRS. Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at GRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA. All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of seven (7) voting members consisting of:<br>    i.  Five (5) Independent Members;<br>    ii.  One (1) Employee Member; and<br>    iii.  One (1) Retiree Member.<br>Collectively, or individually, "Members" or "Member."<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan. None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the GRS.<br><br>Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either: (a) economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above.<br><br>The five (5) initial IC Independent Members shall be selected by mutual agreement of the appropriate representatives of the State, the |

City and the Board, in consultation with the Foundation for Detroit's Future, and named in the POA. The initial Independent Members and their terms of office will be as follows: Ken Whipple (2 years), David Sowerby (3 years), Robert Rietz (4 years), Doris Ewing (5 years) and Kerrie VandenBosch (6 years). Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Member shall be an employee-elected Member from the Board appointed by the Board. The initial Employee Member will be ~~_____~~ June Nickleberry.

The Retiree Member shall be a retiree-elected Member from the Board appointed by the Board. The initial Retiree Member will be ~~_____~~ Thomas Sheehan.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until

2

his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial term.

The terms of office of the Employee Members and Retiree Members of the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of GRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the GRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

The IC shall be an investment fiduciary to the GRS. An IC Member or other fiduciary under the GRS shall discharge his or her duties with respect to the GRS in compliance with the provisions of Public Act 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and

3

| | familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |
|---|---|
| IC MEETINGS | The IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members.

Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.).

The IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all GRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below. The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6).

All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and are subject to Board approval. The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC. If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within such 45-day period a |

4

detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision. If the Board disapproves an Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone. Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision. After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision. Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board, whichever is applicable, is granted the express right to seek to preliminarily enjoin such violation of the breaching party without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.
2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.
3. Evaluating, retaining, terminating, and selecting qualified managers to invest and manage the plan assets.
4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii)

5

on or after fiscal year 2024 the recommended annual contributions to GRS in accordance with applicable law.

5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of a portion of the 4.5% reduction in base monthly pension amounts and the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.

8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the GRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.

12. Causing an asset/liability valuation study to be performed for GRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return assumptions:

6

| | |
|---|---|
| | 1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets.<br>2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the extent that is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Plan.<br>3. The liquidity needs of the GRS Plan. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the GRS's investment portfolio.<br><br>The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC.<br><br>Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the GRS and other duties to GRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

**EXHIBIT B – PFRS Governance Terms**

*In re City of Detroit, Michigan*

INVESTMENT COMMITTEE GOVERNANCE
FOR POLICE AND FIRE RETIREMENT SYSTEM

| | |
|---|---|
| PREAMBLE | This document was prepared to set forth the pension governance requirements under the State Contribution Agreement (as that term is defined in the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, as amended from time to time) applicable to the Police and Fire Retirement System of the City of Detroit (PFRS). |
| SCOPE OF SETTLEMENT | The PFRS is currently administered by a seventeen (17) member Board of Trustees (the "Board") that is vested with the fiduciary authority for the general administration, management and operation of the Retirement System. The Board currently makes all administrative, actuarial and investment related decisions for the PFRS. Upon the Effective Date under the POA, but subject to consummation of the State Contribution Agreement, there shall be established, by appropriate action and amendments to governing documents, an Investment Committee ("IC") at PFRS which shall be vested with the authority and responsibilities as outlined herein for a period of twenty (20) years after the Effective Date of the POA. All administrative, managerial, and operational matters not addressed in this Term Sheet shall continue to be addressed by the Board in the ordinary course of its affairs. |
| INVESTMENT COMMITTEE | The IC shall consist of nine (9) voting members consisting of:<br>  i. Five (5) Independent Members;<br>  ii. Two (2) Employee Members; and<br>  iii. Two (2) Retiree Members.<br>Collectively, or individually, "Members" or "Member."<br><br>At least two (2) of the five (5) Independent Members of the committee shall be residents of the State of Michigan. None of the Independent Members shall be a party in interest as defined by MCL 38.1132d (4) to the City or the PFRS.<br><br>Each Independent Member of the IC shall have expert knowledge or extensive experience with respect to either: (a)economics, finance, or institutional investments; or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one (1) of the IC Independent Members shall satisfy the requirements of (a) above and at least one (1) of the IC Independent Members shall satisfy the requirements of (b) above.<br><br>The five (5) initial IC Independent Members shall be selected by |

1

mutual agreement of the appropriate representatives of the State, the City and the Board, in consultation with the Foundation for Detroit's Future, and named in the POA. The initial Independent Members and their terms of office will be as follows: Rebecca Sorenson (2 years), Joseph Bogdahn (3 years), Robert C. Smith (4 years), McCullough Williams III (5 years) and Woodrow S. Tyler (6 years). Successor Independent Members shall be recommended by a majority of the remaining Independent Members and confirmed by the Board and the State Treasurer in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement. In the event the Board and the State Treasurer cannot agree on the successor Independent Member within thirty (30) days of the receipt of the recommendation of the IC, the remaining Independent Members of the IC shall appoint the successor Independent Member.

If no mutual agreement is reached as to the selection of one or more of the initial IC Independent Members by the time of confirmation of the City's Plan of Adjustment, then the Bankruptcy Court shall select the Independent Members necessary to fill the five (5) initial IC Independent Member positions for which no agreement has been reached.

In the event the Bankruptcy Court selects the initial Independent Members as described immediately above, successor Independent Members shall be appointed in the same manner as the Independent Member being replaced, as described immediately above, after three (3) weeks' notice to the Board of the individuals chosen, in accordance with such rules and regulations as may be adopted by the IC, provided such rules and regulations are not inconsistent with the POA and this agreement.

The Employee Members shall consist of one active police member and one active fire member from the Board, appointed by the Board. The initial Employee Members will be Mark Diaz and Sean Neary.

The Retiree Members shall consist of one retired retiree-elected police member and one retired retiree-elected fire member from the Board, each receiving a pension from PFRS and appointed by the Board. The initial elected Retiree Members will be Michael Simon and Louis Sinagra.

Each of the four (4) uniformed Members shall have one-half (1/2) vote.

The terms of office of the initial IC Independent Members shall be staggered at the time of appointment so that Independent Members shall have varying initial terms of office, with one each having a 2, 3, 4, 5 and 6 year term. Each initial Independent Member shall

serve until the expiration of his/her initial term. After the initial term of office, the term of office of the IC Independent Members shall be six years. Each successor Independent Member shall be selected in accordance with the provisions above and shall serve until his or her death, incapacity, resignation or removal in accordance with the paragraph below. Upon expiration of his or her term of office, an Independent Member shall continue to serve until his or her successor is appointed. Nothing herein shall bar an initial Independent Member from becoming a successor Independent Member after his/her initial term.

The terms of office of the Employee Members and Retiree Members of the IC shall conform to their respective terms of office on the Board.

A Member may be removed by the remaining Members for any of the following reasons: (a) the Member is legally incapacitated from executing his or her duties as a Member of the IC and neglects to perform those duties, (b) the Member has committed a material breach of PFRS provisions, policies or procedures and the removal of the Member is in the interests of the system or its participants or its participants' beneficiaries, (c) the Member is convicted of a violation of law and the removal shall be accomplished by a vote of the IC in accordance with the voting procedures in this agreement, (d) if the Member holds a license to practice and such license is revoked for misconduct by any State or federal government, or (e) if an IC Member shall fail to attend scheduled meetings of the IC for four (4) consecutive meetings, unless in each case excused for cause by the remaining Members attending such meetings, the Member shall be considered to have resigned from the IC, and the IC shall, by resolution, declare the office of the Member vacated as of the date of adoption of such resolution. In addition, a Member of the IC may have voting privileges temporarily suspended by a 70% or higher vote of the other members if the Member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the IC, or for other alleged financial crimes, including fraud. Any vacancy occurring in the office of Member shall be filled within sixty (60) days following the date of the vacancy, for the unexpired portion of the term, in the same manner in which the office was previously filled.

All members of the IC shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the IC, including but not limited to the purchase of insurance, shall be payable out of the assets of the PFRS. The IC may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the IC as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Plan; such engagements shall not be subject to the approval of the Board.

3

| | |
|---|---|
| | The IC shall be an investment fiduciary to the PFRS. An IC Member or other fiduciary under the PFRS shall discharge his or her duties with respect to the PFRS in compliance with the provisions of Public Act 314 of 1965, as amended. An IC Member shall discharge his or her duties with the care, skill, and caution under the circumstances then prevailing which a prudent person, acting in a like capacity and familiar with those matters, would use in the conduct of an activity of like character and purpose. Members of the IC shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance violates the Member's fiduciary duties or conflicts with the terms and conditions of this agreement. |

| | |
|---|---|
| IC MEETINGS | The IC shall meet at least once every other month. The Members shall determine the time for the regular meetings of the IC and the place or places where such meetings shall be held. The Secretary or his or her designee shall be responsible for giving notice of the time and place of such meetings to the other Members.<br><br>Notice and conduct of all meetings of the IC, both regular and special, shall be held within the City of Detroit and in accordance with applicable law including the Michigan Open Meetings Act (MCL §15.261 et seq.).<br><br>The IC shall adopt its own rules of procedure and shall keep a record of its proceedings. Five (5) Members shall constitute a quorum at any meeting of the IC, so long as at least three (3) Independent Members are present. Each Member shall be entitled to one vote on each question before the IC and at least four (4) concurring votes shall be necessary for a decision of the committee, except as otherwise provided in this Term Sheet. |
| INVESTMENT COMMITTEE - RESPONSIBILITY | The IC shall serve in a fiduciary capacity with respect to the Investment Management of all PFRS Plan Assets, determination of the investment return assumption, and Board compliance with benefit plan provisions, as set forth more fully below. The IC shall have all the powers as a fiduciary under the first sentence of MCL §38.1133(5) and (6).<br><br>All Investment Management decisions approved by the Board shall require a recommendation by an affirmative vote of the IC, in accordance with the provisions of this agreement. All actions and recommendations of the IC shall be forwarded to the Board for consideration and are subject to Board approval. The Board shall take no action with respect to any matter for which the IC has responsibility and authority, including the Investment Management matters described in the next paragraph, unless and until such action has been approved by affirmative vote of the IC. If (a) the Board |

4

fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the IC, and such failure continues for 45 days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such 45-day period but fails to provide to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC and the Chief Investment Officer are authorized to implement the decision.  If the Board disapproves an Investment Management decision within such 45-day period and provides to the IC within such 45-day period a detailed written response outlining the reasons for such disapproval, then the IC shall have 45 days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten (10) days, but not less than five (5) business days, of such request by the IC, unless a later date is agreed to in writing by the Board and the IC, to discuss the disapproval by the Board described in the written response.  Any such conference shall be conducted with at least three (3) Independent Members present in person or by phone.  Within ten (10) days of the commencement of the conference, or twenty (20) days following the IC's request for a conference if no conference is held, the IC shall either withdraw the recommended Investment Management decision or provide the Board a written explanation of the IC's decision to proceed with the recommended Investment Management decision.  After delivery of such written explanation by the IC, the IC and the Chief Investment Officer are authorized to implement the decision.  Any action taken by the Board or the IC in violation of the terms of this agreement shall constitute an ultra vires act and the IC or the Board is granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

"Investment Management" with respect to plan assets shall mean:

1. Developing an Investment Policy Statement with sound and consistent investment goals, objectives and performance measurement standards which are consistent with the needs of the Plan.
2. Within 120 days after the Effective Date of the POA, all of the plan assets not already under qualified management, if any, must be managed by qualified managers selected by the IC.
3. Evaluating, retaining, terminating and selecting qualified managers to invest and manage the plan assets.
4. Reviewing and affirming or rejecting the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Plan Actuary including, but not limited to, (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in

accordance with the Pension Restoration Program attached to the City's Plan of Adjustment, (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024, the recommended annual contributions to PFRS in accordance with applicable law.

5. In accordance with approved actuarial work as provided in the immediate preceding paragraph and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Plan Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance to the Pension Restoration Program between the City and the Board attached to the Plan of Adjustment.

6. Communicating the investment goals, objectives, and standards to the investment managers; including any material changes that may subsequently occur.

7. Determining and approving the Plan's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Plan.

8. Any interpretation of Plan documents, existing law, the POA or other financial determination that could affect funding or benefit levels.

9. Taking whatever corrective action is deemed prudent and appropriate when an investment manager fails to perform as expected.

10. Complying with the provisions of pertinent federal, state, and local laws and regulations, specifically Public Act 314 and Plan Investment Guidelines.

11. Reviewing and approving, prior to final issuance, the annual audit and all financial reports prepared on behalf of the PFRS and meet and confer with the Plan's outside auditor or other professional advisors as necessary prior to approving the annual audit or other financial reports.

12. Causing an asset/liability valuation study to be performed for PFRS every three (3) years, or as requested by the IC or Board.

The IC shall give appropriate consideration to and have an understanding of the following prior to the adoption of the investment guidelines and asset allocation policies, the selection of manager(s), and/or the adoption of investment return

| | assumptions: |
|---|---|
| | 1. The fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets. |
| | 2. The objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Pension Restoration Program, to the extent that is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Plan. |
| | 3. The liquidity needs of the PFRS Plan. |
| CHIEF INVESTMENT OFFICER (CIO) | The IC shall evaluate and select the CIO, set and approve any and all compensation for, and terms of employment of, the CIO. With respect to plan assets, the CIO shall report directly to the IC and the Executive Director of the Board. The CIO shall be responsible for assisting the IC and the Board in overseeing the PFRS's investment portfolio. |
| | The initial CIO is Ryan Bigelow [subject to State due diligence.] |
| PLAN ACTUARY | The current Plan Actuary is Gabriel Roeder Smith & Company. In the event the Board desires to retain a new actuary, the Board and IC shall collectively participate in the evaluation and selection of a qualified Plan Actuary. The Plan Actuary shall be responsible for assisting the Board and IC in performing its actuarial duties and shall comply with all requests for information or modeling requested by the IC, and shall attend meetings of the IC as requested, so as to allow the IC to perform satisfactorily the rights and duties set forth herein. Furthermore, the Board shall not act on any recommendation made by the Plan Actuary based on any calculation, assumption or assessment rejected by the IC. |
| | Nothing herein shall be interpreted as limiting the IC's authority to engage an actuarial consulting firm other than the Plan Actuary to perform actuarial services deemed necessary to fulfill its fiduciary duties to the PFRS and other duties to PFRS as set forth herein. |
| CONSISTENCY WITH PLAN OF ADJUSTMENT | Nothing herein shall be interpreted as permitting the IC or the Board to alter or depart from the requirements set forth in the confirmed Plan of Adjustment. |

**EXHIBIT C**

1. General Retirement System

2. Police and Fire Retirement System

3. AFSCME

4. UAW

5. Detroit Police Officers Association

6. Detroit Police Command Officers Association

7. Detroit Police Lieutenants and Sergeants Association

8. Detroit Fire Fighters Association

9. Retired Detroit Police and Fire Fighters Association

10. Retired Detroit Police Members Association

11. Detroit Retired City Employees Association

12. Official Retirees Committee

13. City of Detroit

**EXHIBIT D**

Cases to be dismissed:

1.      GRS et al. v. Emergency Manager of Detroit (Ingham County Circuit Court)
2.      Webster et al. v. State of Michigan, Governor, and State Treasurer (Ingham County Circuit Court)
3.      Detroit Library Commission v. Governor, State Treasurer, and Detroit Public Schools Emergency Manager (Ingham County)
4.      Flowers et al. v. Governor, State Treasurer, and State of Michigan (Ingham County Circuit Court)
5.      DPOA v. City of Detroit (Michigan Court of Appeals)

The settling parties will not attempt to amend to include the City of Detroit or its Emergency Manager as a defendant, or collaterally or retroactively attack the Detroit bankruptcy or actions of Detroit or its EM, or otherwise participate, support, fund or appeal in the following cases:

1.      Phillips et al v. Governor and State Treasurer (E.D. Mich.)
2.      Michigan AFSCME Council 25 v. Governor, State Treasurer, et al. (E.D. Mich.)
3.      NAACP v. Governor, State Treasurer, and Secretary of State (E.D. Mich.)
4.      Robert Davis/Citizens United Against Corrupt Government v. Governor, State of Michigan, Dept. of Treasury, Dept. of State Police, et al. (Ingham County Circuit Court)
5.      Robert Davis/Citizens United Against Corrupt Government v. Michigan Department of Treasury and Carla Robert (Wayne County Circuit Court)
6.      Robert Davis v. Local Emergency Financial Assistance Loan Board (Ingham Court)
7.      Robert Davis v. Weatherspoon, Governor, Attorney General, and State Treasurer (E.D. Mich.)
8.      Allen Park Retirees v. EM Parker, City of Allen Park (Wayne Circuit)
9.      Allen Park Retirees v. State (Court of Claims)
10.      Deborah Moore-El v. Snyder (E.D. Mich.)
11.      Faith, et al. v. Snyder (E.D. Mich.)
12.      Sarella Johnson, et al. v. Snyder (E.D. Mich.)
13.      United Retired Government Employees (URGE) et al. v. Governor, et al. (E.D. Mich.)

DETROIT 56620-1 1314985v13

**EXHIBIT II.B.3.q.ii.C**

TERMS OF PFRS PENSION RESTORATION

# TERMS OF PFRS PENSION RESTORATION

## *Pension Restoration Process*

The following rules shall govern how accrued pensions, including COLA benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the Confirmation Order.  The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee of PFRS and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto.  This pension restoration program shall be deemed a part of Component II of the Combined Plan for the Police and Fire Retirement System, but in the event of any conflict between the language set forth herein and the Combined Plan the terms of this Pension Restoration Agreement will govern.


**GENERAL RESTORATION RULES**

**I.     PFRS RESTORATION**

    1.     Waterfall Categories

There will be three Waterfall Classes:

        a.   PFRS Waterfall Class 1 – Retirees in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries

        b.   PFRS Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the PFRS Fiscal Year prior to the year in which the restoration decision is made

        c.   PFRS Waterfall Class 3 – All retirees, surviving spouses, and beneficiaries in pay status and all other PFRS participants who as of June 30, 2014  are not in retirement benefit pay status


    2.     General PFRS Pension Restoration Through June 30, 2023

Each year in conjunction with the annual actuarial valuation report, the PFRS actuary will project the PFRS funded ratio as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (administrative and investment), future employer contributions as set forth in the Plan of Adjustment (subject  to conditions in the Plan of Adjustment), and such other actuarial

assumptions as utilized by the PFRS actuary. For purposes of PFRS Restoration through June 30, 2023, the Funding Target will be a 75% funded ratio, and the Restoration Target will be a 78% funded ratio, both projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the actuary projects that the Funded Level as of 2023 (excluding Restoration Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 78%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest in an amount equal to the net return on plan investments but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the PFRS Pension Reserve Account as provided herein.

Actual restoration payments and restoration credits will work as follows: each year, in conjunction with the preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the PFRS actuary will determine whether there are sufficient funds in such account to restore COLA benefits in a minimum incremental amount of 10% or more. For example: If a retiree's then current COLA benefit is a 1.0% annual compounded COLA, the minimum incremental restoration would increase the COLA benefit to 1.225%. COLA restoration only will occur if the funding level in the Restoration Reserve Account can fund 100% of the COLA increase over the actuarially-projected lives of the eligible recipient PFRS Waterfall Class. If the actuary certifies that the Restoration Reserve Account as of the end of the prior PFRS fiscal year satisfies the required funding level for one or more increments of restoration, then in the next immediate PFRS fiscal year actual COLA restoration payments will be made to PFRS Waterfall Class 1 members in such increments until an amount sufficient to fund 66% of the value of their future COLA payments (e.g., a 1.5% compound COLA, or as otherwise applicable) has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), PFRS Waterfall Class 2 members will receive COLA restoration, until an amount sufficient to fund 66% of the value of their future COLA payments has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), PFRS Waterfall Class 3 members will receive COLA restoration on a pro-rata basis. For PFRS Waterfall Class 3 members who are in pay status at that time of restoration, they will receive COLA payments; for active employees at the time of restoration, they will receive credits granting them a right upon retirement to receive COLA restoration equal to the 10% increments that are fully funded to PFRS Waterfall Class 3 members. For Example: Assume there are sufficient assets credited to the Restoration Reserve Account as of the

end of a fiscal year to fully fund 66% of the value of the COLA for all PFRS Waterfall Class 1 and Class 2 members for their actuarially projected lives.   To the extent additional assets remain  in the Restoration Reserve Account to fully fund at least a 10% COLA increment for PFRS Waterfall Class 3 members for their actuarially projected lives, then (i) all retirees would receive a restoration payment of 76% of the value of their COLAs (their having already received by virtue of their membership in PFRS Waterfall Classes 1 and 2 an increase to 66% of the value of their COLAs) and also a 10% COLA increment would be credited to eligible active employees which would be included in their benefit payments upon retirement (thus causing their COLAs to increase in value from 45% to 55% ). Restoration amounts actually paid from the Restoration Reserve Account will be debited from such account.   Restoration payments will be calculated and paid on a prospective basis only.

Once restoration payments and credits begin, as long as the Restoration Reserve Account continues to have assets to fund 100% of an incremental COLA restoration amount for such Waterfall Class for their actuarially projected lives, the restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account,  after having sufficient assets to fund 100% of two or more increments, falls below 100% for the second or greater increment, the annual amounts to pay such second or greater  increment can continue  until the Restoration Reserve Account lacks any assets to fund such additional increment.  For Example, assume a 10% increment in PFRS Waterfall Class 1 requires $10 million in assets to be fully funded for the PFRS Waterfall Class' actuarially projected  lives, and that based on FY 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in FY 2019.  Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid).  For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

If the PFRS Funded Level (excluding Restoration Reserve Assets) projected to 2023 falls below 76% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected PFRS Funded Level in 2023 is 76% or above,  further interest credits  to the notional Restoration Reserve Account will cease notwithstanding the actual net PFRS investment returns for the fiscal year in question.  Furthermore, if the PFRS Funded Level projected to 2023 falls below the Funding Target (i.e., 75%) then restoration payments to retirees and credits to active employees in the following year will be modified in the following manner:  (1) funds previously credited  to the Restoration Reserve Account will be notionally transferred and credited to the PFRS Pension  Reserve  Account in sufficient amounts to restore the projected PFRS Funded Level in 2023 to 75%; (2) following such transfer, the remaining assets in the Restoration Reserve Account  shall be applied to

make restoration payments in accordance with and pursuant to the same mechanism described in the previous paragraph.

In connection with preparation of the actuarial report for FY 2023, the PFRS actuary will determine whether PFRS has satisfied the Permanent Restoration Target, which shall be 78%. Transfers from the Restoration Reserve Account for credit to the PFRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers, the PFRS Funded Level as of June 30, 2023 has satisfied the Permanent Restoration Target (*i.e.,* 78%), then the residual amounts, if any, in the Restoration Reserve Account (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more PFRS Waterfall Classes for their actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the PFRS Pension Reserve Account and the applicable incremental COLA payments shall be permanently restored for the applicable PFRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level of PFRS as of 2023 is less than 76%, the PFRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual normal course administrative expenses in the prior 4 years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the PFRS Restoration Reserve Account than actually were transferred during such look back period, then the PFRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 PFRS Funded Level to 76%.

3. General PFRS Pension Restoration from July 1, 2023 to June 30, 2033.

If and to the extent that all COLA payments have not been restored pursuant to the permanent restoration feature as of June 30, 2023 described in the immediately preceding paragraph, then during this period and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto, all projected as of June 30, 2033. The same rules for restoration payments that applied during the period ending June 30, 2023 shall apply (including ceasing interest credits in

the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers in the event the 2033 PFRS Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan actuary shall project investment returns through June 30, 2033 at the then current investment return assumption which is assumed to be net of expenses (administrative and investment), and the then applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the PFRS based upon an amortization of the actual 2023 UAAL (using the market value of assets) over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the applicable PFRS' Funding Target (on Exhibit A) as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process). For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded

To the extent that the City's actual contributions to the PFRS in any of the FYs 2024 (i.e., the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in PFRS called the Extra Contribution Account. In determining pension restoration during the period from FY 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Target. To the extent that the City's actual contributions to the PFRS in any of the FYs 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Restoration Reserve Account.

Each year, in addition to the crediting of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account assets will be credited with interest equal to the net return on plan investments, but capped at the then actuarial investment return assumption. In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

In connection with preparation of the annual actuarial valuation report for FY 2033, the PFRS actuary will determine whether PFRS has satisfied the applicable Permanent Restoration Target, as set forth on Exhibit A. Transfers from the Restoration Reserve Account for credit to the PFRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the funding level as of June 30, 2033 has satisfied the applicable Permanent Restoration

Target , then the residual amounts in the Restoration Reserve Account, if any (which will necessarily represent  excess not  necessary to satisfy the Permanent Restoration Target), and which  fully fund one or more increments of  COLA restoration payments for one or more  PFRS Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the PFRS Pension Reserve Account and the applicable incremental COLA payments shall be permanently restored for the applicable PFRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for 2028,  and in the event that the projected Funded Level of PFRS as of 2033 is less than 79%, the PFRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years.   It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual normal course administrative expenses in the prior 4 years applicable to Component II,  in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the PFRS Restoration Reserve Account than actually were transferred during such look back period, then the PFRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period); or (iii) the amount required to increase the projected 2033 PFRS Funded Level to 79%.

4.      General PFRS Pension Restoration from July 1, 2033 to June 30, 2043.

If and to the extent that all COLA payments have not been restored pursuant to the permanent restoration feature as of June 30, 2033 described in the immediately preceding paragraph, then during the period ending June 30, 2044 and for purposes of variable restoration, the Funding Target , the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto.   The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Account asset transfers in the event the 2043 PFRS Funded Level falls below the 2043 Funding Target), and shall be rolled forward.  For example,  for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan actuary shall project annual contributions using the same 2023 UAAL Amortization.  For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target,  including any additions to such account after 2033.

In connection with preparation of the annual actuarial valuation report for FY 2043, the PFRS actuary will determine whether PFRS has satisfied the applicable Permanent Restoration Target, as set forth on Exhibit A.   Transfers from the Restoration Reserve Account for credit to the PFRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the PFRS Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target,   then the residual amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not  necessary to satisfy the Permanent Restoration Target), ~~and which fully fund one or more increments of COLA restoration payments for one or more PFRS Waterfall Classes,~~ shall be transferred from the Restoration Reserve Account and credited to the PFRS Pension Reserve Account and the applicable incremental COLA payments shall be permanently restored for the applicable PFRS Waterfall Class and shall no longer be variable from year to year.


5.     Modification of the Pension Restoration Program

If any time after July 1, 2026, the PFRS Investment Committee (by vote of 5 of its 7 members), or the PFRS Board of Trustees (by a greater than 66% vote) determines  that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing this Pension Restoration Agreement, such that the continued operation of this Agreement without amendment will: (a) materially harm the long-term economic interests of the City ~~or Retirement~~, or Retirement System; ~~or~~ (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the Restoration program, if as of that juncture (and for purposes of applying this subsection 5(c)) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable PFRS Restoration Targets for a substantial period  yet without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend this Restoration Agreement (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to ~~full~~fully fund PFRS frozen liabilities is, unless the relevant facts  demonstrate otherwise, presumptively reasonable ~~, but not irrebutably so~~).  The Investment Committee and the Board shall then meet to negotiate amendments to this Agreement that address the identified risk of harm or impairment, but which also considers this Agreement's objective of providing pension restoration.  Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment.  Any such amendments shall require the approval of a majority vote of the combined members of the Committee and Board (persons who sit on both the Board and Committee shall have one vote).  Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation.  If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee.  In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a

mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan.  The two selected mediators shall appoint a third neutral mediator from the approved list.  Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator.  Representatives of the Mayor and the Governor shall ~~participate in~~be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, inter alia, whether or in what manner to amend this Agreement.

## EXHIBIT A

**PFRS -** The 2033 and 2043 Funding Targets shall be 3.0% and 6% higher than the actual 2023 Funded Level rounded to the nearest 10th decimal. The Restoration Target shall be 3.0% higher than the Funding Target but not less than 81% and 84% in 2033 and 2043, respectively. The Permanent Restoration Targets shall be shall be equal to the Restoration Targets for all time periods. The Restoration Reserve Suspension Trigger will be set 1% higher than the projected Funding Target for all time periods.

| 2023 Funded Level | 2033 Projected Funding Target /Restoration Target | 2043 Projected Funding Target /Restoration Target |
|---|---|---|
| 78% | 81%/84% | 84%/87% |
| 77% | 80%/83% | 83%/86% |
| 76% | 79%/82% | 82%/85% |
| 75% | 78%/81% | 81%/84% |
| 74% or lower | 3% > than 2023 Funded Level %/81% | 3% > than 2023 Funded Level %/84% |

| 2033 Permanent Restoration Target | 2043 Permanent Restoration Target |
|---|---|
| Same as 2033 Restoration Target | Same as 2043 Restoration Target |

**EXHIBIT II.B.3.r.ii.C**

TERMS OF GRS PENSION RESTORATION

# TERMS OF GRS PENSION RESTORATION

## *Pension Restoration Process*

The following rules shall govern how accrued pensions, including COLA benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the Confirmation Order.  The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee of GRS and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto.  This pension restoration program shall be deemed a part of Component II of the Combined Plan for the General Retirement System of the City of Detroit, but in the event of any conflict between the language set forth herein and the Combined Plan the terms of this Pension Restoration Agreement will govern.

**GENERAL RESTORATION RULES**

**I.      GRS RESTORATION**

1.      Waterfall Categories

There will be three Waterfall Classes:

   a.  GRS Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries
   b.  GRS Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their  surviving spouses and beneficiaries, and who are in pay status as of the end of the GRS Fiscal Year prior to the year in which the restoration decision is made
   c.  GRS Waterfall Class 3 – All other GRS participants who as of June 30, 2014 are  not in retirement benefit pay status

2.      General GRS Pension Restoration Through June 30, 2023

Each year in conjunction with the annual actuarial valuation report, the GRS  actuary will project the GRS funded ratio as of 2023 based upon the market value of plan assets relative to  the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (investment and administrative), future employer contributions as set forth in the Plan of Adjustment (subject to the conditions in the Plan of Adjustment) and such other actuarial assumptions as utilized by the GRS actuary. For purposes of GRS Restoration through June 30, 2023, the Funding Target will be a 70% funded ratio, the Restoration Target will be a 75% funded ratio, and the Restoration Reserve Suspension Trigger will be a 71% funded ratio, all

projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded. Each year, if the actuary projects that the projected Funded Level as of June 30, 2023 (excluding Restoration Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 75%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be in an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest in an amount equal to the net return on plan investments, but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the GRS Pension Reserve Account.

To the extent that the City's (including DWSD or a successor authority) actual contributions in any of the FYs 2015 through 2023 are less than the contributions provided for in the Plan of Adjustment, such difference and any investment earnings thereon shall be notionally allocated to the Pension Fund Reserve Account.

Actual restoration payments and credits will work as follows: Each year in conjunction with preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the GRS actuary will determine whether there are sufficient funds in such account to restore a portion of the 4.5% across the board pension cuts in one or more minimum incremental amounts equal to ½% of the monthly benefit for each member of GRS Waterfall Class 1 (i.e. reducing the initial across the board cut to 4.0%). This restoration only occurs if the funding level in the Restoration Reserve Account can fund 100% of each incremental increase over the remaining actuarially projected lives of the eligible recipients in GRS Waterfall Class 1. If the Restoration Reserve Account satisfies the required funding level, then in the next GRS fiscal year, actual restoration payments will be made to GRS Waterfall Class 1 members in amounts equal to the benefit associated with each increment that have been fully funded in the Restoration Reserve Account. Once Waterfall Class 1 has sufficient assets in the GRS Restoration Reserve Account to fully fund and restore the 4.5% cut in their monthly benefits, and to the extent that additional assets in the Restoration Reserve Account remain and will fully fund at least ½% of the monthly benefit for each member of GRS Waterfall Class 2 over their remaining actuarially projected lives, then GRS Waterfall Class 2 members will receive pension restoration in minimum ½% benefit increments until an amount equal to the 4.5% cuts in their monthly benefits has been fully funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account remain and will fund at least a minimum ½% of the monthly benefit of each member in GRS Waterfall Class 3 over their remaining actuarially projected lives, then each such member of the class shall receive a credit granting them a right upon retirement to receive pension restoration equal to the

benefit increments that are fully funded.  Restoration payments will be calculated and paid on a prospective basis only.

After the full 4.5% across the board pension cuts are restored for all three GRS Waterfall Classes, and to the extent there are additional assets in the Restoration Reserve Account to fully fund COLA benefits over the actuarially-projected lives of the eligible recipient GRS Waterfall Class, such assets will be used to fully fund and restore a portion of the COLA values that were eliminated as part of the Plan of Adjustment.  COLA will be restored in minimum 10% COLA value increments up to 50% of the future COLA values for each member of GRS Waterfall Class 1 (i.e., a 50% future COLA value will constitute a 1.25% simple COLA) , then up to 50% of the future COLA values for each member of Waterfall Class 2, and then up to 50% of the future COLA values for each member of Waterfall Class 3 until all members of the three GRS Waterfall Classes have had 50% of the value of their COLAs fully funded and restored.  After 50% of the future values of COLA have been fully funded and restored, and to the extent there are additional assets in the Restoration Reserve Account for each of the three GRS Waterfall Classes, then a second 50% COLA restoration will be made, first to members of GRS Waterfall Class 1, then Waterfall Class 2, and then Waterfall Class 3.  Classes will be restored in minimum 10% COLA value increments.   Restoration payments will be calculated and paid on a prospective basis only.

If the amounts in the Restoration Reserve Account are sufficient to fully-fund the 4.5% across the board pension cuts for all three GRS Waterfall Classes and 100% COLA restoration for all three GRS Waterfall Classes, then any additional assets in the Restoration Reserve Account shall be used to increase the frozen accrued benefits of active and other GRS participants whose ASF accounts were diminished as part of the ASF Recoupment, such that they receive treatment equal to the 20%/20% ceiling applied to retirees in pay status under the Plan of Adjustment.  If after such pension restoration there are additional assets in the Restoration Reserve Account to fully fund benefit increments over their remaining actuarially projected lives, GRS Waterfall Class 1 members will receive pension restoration in ½% benefit increments of the reductions to their monthly pension due to ASF Recoupment, and once such pension benefits are restored, Waterfall Class 2 members will receive pension restoration in ½% benefit increments in connection with the reductions to their monthly pensions due to ASF Recoupment.  Restoration payments will be calculated and paid on a prospective basis only.

Once restoration payments to applicable retirees and restoration credits to active employees begin, as long as the Restoration Reserve Account continues to have assets sufficient to fund 100% of an incremental pension restoration amount for such GRS Waterfall Class members for their actuarially projected lives, such restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account , after having sufficient assets to fund 100% of two or more increments (over their actuarially projected lives), falls below 100% for the second or greater increment, the annual amounts to pay such second or other

additional increment can continue until the Restoration Reserve Account lacks any assets to fund it. For example, assume a ½% increment in GRS Waterfall Class 1 requires $10 million in assets to be fully funded for the GRS Waterfall Class' actuarially projected lives, and that based on FY 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in FY 2019, *i.e.,* a 1% pension increase. Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment of ½% would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid). For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

In the event the GRS Funded Level (not including Restoration Reserve Assets) falls below 71% (hereinafter, "Restoration Reserve Suspension Trigger"),, then, until such time as the projected GRS Funded Level in 2023 is 71% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net GRS investment returns for the fiscal year in question. Furthermore, if the GRS Funded Level projected to 2023 falls below the Funding Target (i.e., 70%) then restoration payments and credits in the following year will be modified in the following manner: (1) funds previously credited to the Restoration Reserve Account will be notionally transferred and credited to the GRS Pension Reserve Account in sufficient amounts to restore the projected GRS Funded Level in 2023 to 70%; (2) following such transfer, the remaining assets in the Restoration Reserve Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in the previous paragraph.

Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level of GRS as of 2023 is less than 71%, the GRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual normal course administrative expenses in the prior 4 years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the GRS Restoration Reserve Account than actually were transferred during such look back period, then the GRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 GRS Funded Level to 71%.

3.     <u>General GRS Pension Restoration from July 1, 2023 to June 30, 2033</u>.

During this period, the Funding Target, the Restoration Target, the Permanent Restoration Targets and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto. The same rules for variable restoration payments and credits that applied during the period ending June 30, 2023 shall apply during the period ending June 30, 2033 (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers in the event the 2033 GRS Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan actuary shall project investment returns through June 30, 2033 at the then current investment return assumption <u>which is assumed to be net of expenses (administrative and investment)</u> and the applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the GRS Plan actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the GRS based upon an amortization of the actual 2023 UAAL at market value over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the GRS Funding Target (on Exhibit A) as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process.). For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.

To the extent that the City's actual contributions to the GRS in any of the FYs 2024 (the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in GRS called the Extra Contribution Account. In determining pension restoration during the period from FY 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Targets. To the extent that the City's <u>(including for this purpose DWSD or a successor authority)</u> actual contributions in any of the FYs 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Fund Reserve Account.

Each year, in addition to the credit of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account assets will be credited with interest equal to the net return on plan investments, but capped at the then

investment return assumption.  In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

In connection with preparation of the actuarial report for FY 2028, the GRS actuary will determine whether GRS has satisfied the applicable Permanent Restoration Target, which shall be 75%.  Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the GRS Funded Level as of June 30, 2028 has satisfied  the  Permanent Restoration Target(75%), then the amounts in the Restoration Reserve Account , if any (which will necessarily represent  excess not  necessary to satisfy the Permanent Restoration Target), and which  fully fund one or more increments of  restoration payments for one or more  GRS Waterfall Classes over such GRS Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the GRS Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable GRS Waterfall Class and shall no longer be variable from year to year.  Variable restoration payments will continue to be paid or credited during the period from July 1, 2028 through June 30, 2033 based on the applicable Restoration Target set forth in Exhibit A and otherwise in accordance with this restoration memorandum, notwithstanding whether the Restoration Target during this period is less than the Permanent Restoration Target as of June 30, 2028 of 75%.

In connection with preparation of the annual actuarial valuation report for FY 2033, the GRS actuary will determine whether GRS has satisfied the Permanent Restoration Target for 2033, as set forth on Exhibit A.   Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target . If following such transfers the GRS Funded Level  as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the amounts in the Restoration Reserve Account if any (which will necessarily represent  excess not  necessary to satisfy the Permanent Restoration Target), and which  fully fund one or more increments of restoration payments for one or more  GRS Waterfall Classes over such GRS Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the GRS Pension  Reserve Account and the applicable incremental  payments shall be permanently restored for the applicable GRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for  2028,  and in the event that the projected Funded Level of GRS as of 2033 is less than 71%, the GRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual normal course administrative expenses until 2033 equal to the average annual administrative expenses in the prior 4 years applicable to

[Component II](#), in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the GRS Restoration Reserve Account than actually were transferred during such look back period, then the GRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2033 GRS Funded Level to 71%.


4.  <u>General GRS Pension Restoration from July 1, 2033 to June 30, 2043</u>.

During this period,  the Funding Target,  the Restoration Target , the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto.  The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Account asset transfers in the event the 2043 GRS Funded Level falls below the 2043 Funding Target). For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan actuary shall project annual contributions  using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

In connection with preparation of the annual actuarial valuation report for FY 2043, the GRS actuary will determine whether GRS has satisfied the applicable Permanent Restoration Target, as set forth on Exhibit A.  Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the GRS Funded Level as of June 30, 2043 is s equal to or greater than the applicable Permanent Restoration Target , then the amounts in the Restoration Reserve Account if any (which will necessarily represent  excess not necessary to satisfy the Permanent Restoration Target), ~~and which  fully fund over their actuarially projected lives one or more increments of restoration payments for one or more  GRS Waterfall Classes,~~ shall be transferred from the Restoration Reserve Account and credited to the GRS Pension  Reserve Account and the applicable payments for the applicable GRS Waterfall Class shall be permanently restored and shall no longer be variable.


5.  <u>Modification of the Pension Restoration Program</u>

If any time after July 1, 2026, the GRS Investment Committee (by vote of 5 of its 7 members), or the GRS Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing this Pension Restoration Agreement, such that the continued operation of this Agreement without amendment will: (a) materially harm the long-term economic interests of the City, or Retirement System; ~~or~~ (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the Restoration program, if as of that juncture (and for purposes of applying this subsection 5(c)) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable PFRS Restoration Targets for a substantial period  yet without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend this Restoration Agreement (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to ~~full~~fully fund GRS frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable~~, but not irrebutably so~~).  The Investment Committee and the Board shall then meet to negotiate amendments to this Agreement that address the identified risk of harm or impairment, but which also considers this Agreement's objective of providing pension restoration.  Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment.  Any such amendments shall require the approval of a majority vote of the combined members of the Committee and Board (persons who sit on both the Board and Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation.  If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee.  In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list.  Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator.  Representatives of the Mayor and the Governor shall ~~participate in~~be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, *inter alia*, whether or in what manner to amend this Agreement.

**EXHIBIT A TO  THE GRS PENSION RESTORATION PROGRAM**

**GRS -** The 2033 and 2043 Funding Targets shall be equal to the actual 2023 Funded Level rounded to the nearest 10th decimal . The Restoration Target shall be 3.0% higher than the Funding Target but not less than 73%.  The Permanent Restoration Targets shall be 75% in 2028,  and 1% higher than the Restoration Targets in 2033 and 2024, but not less than 75%.  The Restoration Reserve Suspension Trigger will be set 1% higher than the projected Funding Target for all time periods.

| 2023 Funded Level | 2033 Funding Target/Restoration Target | 2043 Funding Target/Restoration Target |
|---|---|---|
| 75% | 75%/78% | 75%/78% |
| 74% | 74%/77% | 74%/77% |
| 73% | 73%/76% | 73%/76% |
| 72% | 72%/75% | 72%/75% |
| 71% | 71%/74% | 71%/74% |
| 70% | 70%/73% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% | the % = to 2023 Funded Level %/73% |

| 2033 Permanent Restoration Target | 2043 Permanent Restoration Target |
|---|---|
| 75% ,or if greater, 1% more  than 2033 Restoration Target | 75%, or if greater, 1% more than 2043 Restoration Target |

____

**EXHIBIT II.D.5**

SCHEDULE OF POSTPETITION COLLECTIVE BARGAINING AGREEMENTS

<u>**EXHIBIT II.D.5**</u>

<u>**SCHEDULE OF POSTPETITION COLLECTIVE BARGAINING AGREEMENTS**</u>

**I. FULLY APPROVED AGREEMENTS**[1]

**A. City of Detroit Collective Bargaining Agreements**

1) Master Agreement Between the City of Detroit and the Police Officers Association of Michigan (POAM), 2013-2018, dated November 12, 2013.

2) Master Agreement Between the City of Detroit and the International Brotherhood of Teamsters Local 214 2013-2018, dated December 18, 2013.

   a. Supplemental Agreement Between the City of Detroit Police Department and Teamsters State, County and Municipal Workers, Local 214 2013-2018, dated December 18, 2013.

   b. Supplemental Agreement Between the Department of Public Works and Teamsters Local 214 2013-2018, dated December 18, 2013.

   c. Supplemental Agreement Between the General Services Department and Teamsters Local 214 2013-2018, dated December 18, 2013.

   d. Supplemental Agreement between the City of Detroit Municipal Parking Department and Local #214 Teamsters State, County and Municipal Workers, 2013-2018, dated December 18, 2013.

3) Master Agreement Between the City of Detroit and the International Union of Operating Engineers (IUOE) Local 324 2013-2018, dated December 18, 2013.

4) Master Agreement Between the City of Detroit and the International Union of Operating Engineers (IUOE) Local 324 (Park Management) 2013-2018, dated December 18, 2013.

5) Master Agreement Between the City of Detroit and the International Union of Operating Engineers (IUOE) Local 324 (Principal Clerks) 2013-2018, dated December 18, 2013.

6) Master Agreement Between the Assistant Supervisors of Street Maintenance and Construction and the City of Detroit 2014-2018, dated February 26, 2014.

7) Master Agreement Between the City of Detroit and the Michigan Building and Construction Trades Council 2014-2018, dated May 1, 2014.

8) Master Agreement Between the City of Detroit and the Emergency Medical Service Officers Association (EMSOA) 2014-2019, dated June 11, 2014.

---

[1]   "<u>Fully Approved Agreements</u>" means those collective bargaining agreements that have been (i) ratified by the applicable bargaining unit or units, as necessary (ii) approved by the applicable City or ~~DWSD~~Detroit Water and Sewerage Department bargaining representatives, (iii) approved by the Emergency Manager and (iv) approved by the Office of the Treasurer of the State of Michigan.

CHI-1920748v6

9) Master Agreement Between the City of Detroit and Local 1863 of the American Federation of State County and Municipal Employees, AFL-CIO (Detroit Civilian Crossing Guards) 2014-2018, dated June 27, 2014.

10) Master Agreement Between the City of Detroit and Local 542 of the American Federation of State County and Municipal Employees, AFL-CIO (Motor City Seasonals) 2014-2018, dated June 27, 2014.

11) Master Agreement Between the City of Detroit and Local 1206 of the American Federation of State County and Municipal Employees, AFL-CIO (Detroit Forestry and Landscape Foreman's Union) 2014-2018, dated June 27, 2014.

12) Master Agreement Between the City of Detroit and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    a. Supplemental Agreement Between the City of Detroit Elections Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    b. Supplemental Agreement Between the City of Detroit Municipal Parking Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    c. Supplemental Agreement Between the City of Detroit Planning and Development Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    d. Supplemental Agreement Between the City of Detroit Police Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

    e. Supplemental Agreement Between the City of Detroit Recreation Department and Local 2394 of the American Federation of State County and Municipal Employees, AFL-CIO (Supervisory Unit) 2014-2018, dated June 27, 2014.

13) Master Agreement Between the City of Detroit and Local 6087 of the American Federation of State County and Municipal Employees, AFL-CIO (Paving Forepersons) 2014-2018, dated June 27, 2014.

14) Master Agreement Between the City of Detroit and the Detroit Police Command Officers Association 2014-2019, dated June 18, 2014.

15) Master Agreement Between the City of Detroit and the Detroit Income Tax Investigators Association 2014-2018, dated August 11, 2014.

16) Master Agreement Between the City of Detroit and the Association of Municipal Inspectors 2014-2018, dated June 27, 2014.

17) Master Agreement Between the City of Detroit and the Service Employees International Union (SEIU) Local 517-M (Supervisory Unit) 2014-2018, dated June 25, 2014.

18) Master Agreement Between the City of Detroit and the Service Employees International Union (SEIU) Local 517-M (Non-Supervisory Unit) 2014-2018, dated June 25, 2014.

19) Master Agreement Between the City of Detroit and the Service Employees International Union (SEIU) Local 517-M (Professional and Technical Unit) 2014-2018, dated June 25, 2014.

20) Master Agreement Between the City of Detroit and the Association of City of Detroit Supervisors 2014-2018, dated June 27, 2014.

21) Master Agreement Between the City of Detroit and the Association of Professional and Technical Employees 2014-2018, dated July 22, 2014.

22) Master Agreement Between the City of Detroit and the Senior Accountants, Analysts and Appraisers Association 2014-2018, dated May 27, 2014.

23) Master Agreement Between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO (Non-Supervisory Bargaining Unit) 2014-2018, dated June 27, 2014.

**B.  Detroit Water and Sewerage Department Collective Bargaining Agreements**

~~1~~24)  ~~2012- 2018~~ Master Agreement Between the ~~City of~~ Detroit ~~Water & Sewerage Department and AFSCME, Michigan Council 25 Local 2920~~ and the Detroit Police Officers Association (DPOA) 2014-2019, dated October 1, 2014.

25)  Master Agreement Between the City of Detroit and the Association of Professional Construction Inspectors 2014-2018, dated September 30, 2014.

**II.  RATIFIED AGREEMENTS PENDING FINAL APPROVALS[2]**

**A.  Ratified City of Detroit Collective Bargaining Agreements Pending Final Approvals**

~~1~~26)  Master Agreement Between the City of Detroit and the ~~Detroit Police Lieutenants and Sergeants Association 2014-2019~~ United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) Local 212 – Police Commission Investigators 2014-2018, dated October 20, 2014.

~~a.~~27)  ~~Tentative~~ Master Agreement Between the City of Detroit and the ~~Detroit Police Lieutenants and Sergeants Association~~ United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) Local 412 – Legal Assistants 2014-2018, dated ~~June 19~~ October 20, 2014.

**B.  ~~Ratified~~ Detroit Water and Sewerage Department Collective Bargaining Agreements ~~Pending Approvals~~**

1)  2012-2018 Master Agreement Between the Detroit Water & Sewerage Department and AFSCME, Michigan Council 25 Local 2920.

~~1~~2)  Master Agreement Between the City of Detroit and the Michigan Building and Construction Trades Council 2013-2016, dated June 26, 2013.

    a.  Memorandum of Agreement between the Detroit Water and Sewerage Department and the Michigan Building & Construction Trades Council to amend their June 26, 2013 - June 30, 2016 collective bargaining agreement.

~~2~~3)  2013-2016 Master Agreement Between the Detroit Water & Sewerage Department and the Building Trades Foremen, dated June 26, 2013.

~~3~~4)  2014-2016 Master Agreement Between the Detroit Water & Sewerage Department and the Detroit Senior Water Systems Chemists Association.

~~4~~5)  2014-2019 Master Agreement Between the DWSD and Teamsters State, County and Municipal Workers, Local 214.

---

[2]  ~~"Ratified Agreements Pending Final Approvals" means those collective bargaining agreements approved by the City bargaining representatives, and  ratified by the applicable bargaining unit or units, as necessary, that remain subject to approval by either, or both, the Emergency Manager and the Office of the Treasurer of the State of Michigan.  The inclusion of such collective bargaining agreements in this Exhibit does not, and shall not be deemed to, modify or waive the requirement for such approvals in any way.~~

3

5̶6) Memorandum of Agreement between the Detroit Water and Sewerage Department and the International Union of Operating Engineers, Local 324 to amend their March 25, 2013 - June 30, 2022 collective bargaining agreement.

7) Memorandum of Agreement between the Detroit Water and Sewerage Department and the Association of Professional Construction Inspectors to amend their March 26, 2013 - June 30, 2020 collective bargaining agreement.


## II. RATIFIED AGREEMENTS PENDING FINAL APPROVALS[2]

### A. Ratified City of Detroit Collective Bargaining Agreements Pending Final Approvals

1) Master Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association 2014-2019.

    a. Tentative Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association, dated June 19, 2014.

2) Master Agreement Between the City of Detroit and the Association of Detroit Engineers 2014-2018.

3) Master Agreement Between the City of Detroit and Michigan Building and Construction Trades Council – Tripartite 2014-2018.

---

[2] "Ratified Agreements Pending Final Approvals" means those collective bargaining agreements approved by the City bargaining representatives, and ratified by the applicable bargaining unit or units, as necessary, that remain subject to approval by either, or both, the Emergency Manager and the Office of the Treasurer of the State of Michigan. The inclusion of such collective bargaining agreements in this Exhibit does not, and shall not be deemed to, modify or waive the requirement for such approvals in any way.

# CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Notice of Filing of Redlined Version of Eighth Amended Plan for the Adjustment of Debts of the City of Detroit was filed and served via the Court's electronic case filing and noticing system on this 22nd day of October, 2014.

/s/ Heather Lennox