```
 1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION

 3  IN THE MATTER OF,            Case No. 13-53846
                                 Detroit, Michigan
 4  CITY OF DETROIT, MI          October 22, 2014
    _____/ 8:30 a.m.
 5
        IN RE: CONTINUED TRIAL RE: OBJECTIONS TO CHAPTER 9 PLAN
 6              BEFORE THE HONORABLE STEVEN W. RHODES
              TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  HEATHER LENNOX, ESQ.
 9                                 Jones, Day
                                   222 East 41st Street
10                                 New York, NY 10017-2113
                                   212-326-3939
11
                                   GEOFFREY STEWART, ESQ.
12                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
13                                 Washington, D.C. 20001-2113
                                   202-879-3939
14
                                   BRUCE BENNETT, ESQ.
15                                 Jones, Day
                                   555 S. Flower Street
16                                 50th Floor
                                   Los Angeles, CA 90071
17                                 213-243-2382

18  For COPS:  (By Phone):        JONATHAN WAGNER, ESQ.
                                   Kramer, Levin, Naftalis &
19                                 Frankel
                                   1177 Avenue of the Americas
20                                 New York, NY 10036
                                   212-715-9100
21
                                   DEBORAH FISH, ESQ. (P36580)
22                                 Allard & Fish
                                   2600 Buhl Building
23                                 353 Griswold
                                   Detroit, MI 48226-3687
24                                 313-961-6141

25
```

| | | |
|---|---|---|
| 1 | For the Official Committee of | CLAUDE MONTGOMERY, ESQ. |
| | Retirees of the City of | Dentons, LLP |
| 2 | Detroit, Michigan: | 1221 Avenue of the Americas |
| | | 25th Floor |
| 3 | | New York, NY 10020-1089 |
| | | 212-768-6700 |
| 4 | | |
| | For Detroit Fire Fighters | BARBARA PATEK, ESQ. (P34666) |
| 5 | | Erman, Teacher, Miller, Zucker |
| | | & Freedman |
| 6 | | 400 Galleria Officentre |
| | | Suite 444 |
| 7 | | Southfield, MI 48034 |
| | | 248-827-4100 |
| 8 | | |
| | For State of Michigan: | STEVEN HOWELL, ESQ. (P28982) |
| 9 | | Dickinson, Wright |
| | | 500 Woodward Avenue |
| 10 | | Suite 4000 |
| | | Detroit, MI 48226-3425 |
| 11 | | 313-223-3033 |
| 12 | For Martha Kopacz: | MICHAEL KREITZER, ESQ. |
| | | Bilzin, Sumberg, Baena, Price |
| 13 | | & Axelrod |
| | | 1450 Brickell Avenue |
| 14 | | 23rd Floor |
| | | Miami, FL 33131 |
| 15 | | 305-374-7580 |
| 16 | For the Retirement Systems: | RONALD KING, ESQ. (P45088) |
| | | Clark, Hill |
| 17 | | 212 East Grand River Avenue |
| | | Lansing, MI 48906 |
| 18 | | 517-318-3015 |
| 19 | PRESENT: | Michael Karwoski |
| 20 | Court Recorder: | Letrice Calloway |
| 21 | Transcriber: | Deborah L. Kremlick |
| 22 | | |
| 23 | Proceedings recorded by electronic sound recording, transcript | |
| | produced by transcription service. | |
| 24 | | |
| 25 | | |

1                          INDEX

2    <u>WITNESS FOR</u>          <u>Examination by Judge</u>
     <u>THE COURT:</u>
3
     MARTHA KOPACZ                    8
4
     <u>EXHIBIT:</u>                                    <u>ID</u>    <u>ADM</u>
5
     CX12002    Second Supplemental Report              9      9
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Court in Session)

2           THE CLERK:  All rise.  Court is in session.  Please

3   be seated.  Case number 13-53846, City of Detroit, Michigan.

4           MS. LENNOX:  Good morning, Your Honor.  Just a

5   couple preliminary matters.  Heather Lennox from Jones, Day on

6   behalf of the city.

7       A couple of things.  I do want to respond to a question

8   that Your Honor posed yesterday in the courtroom.  We are

9   indeed working on a supplemental voting declaration to

10  indicate the FGIC settlement.

11          THE COURT:  Okay.

12          MS. LENNOX:  Also in the wee hours of last night we

13  also filed an eighth amended plan which is not in draft, it is

14  final, I am pleased to report.  And so that is currently on

15  the docket this morning.  So I just wanted to bring that to

16  Your Honor's attention.  If you had a question --

17          THE COURT:  I saw that, 3:48 this morning.

18          MS. LENNOX:  Yes.  It was a very long night, Your

19  Honor.  So if you -- that's all I needed to bring to your

20  attention if Your Honor doesn't have any questions.

21          THE COURT:  Okay.  I actually have something for

22  you.  One of the pro se people --

23          MS. LENNOX:  Uh-huh.

24          THE COURT:  -- that I permitted to participate was

25  Mr. Wojtowicz

1          MS. LENNOX:  Yes, sir.

2          THE COURT:  I hope I'm pronouncing his name

3   correctly.  He had a question for you or for the city --

4          MS. LENNOX:  Uh-huh.

5          THE COURT:  -- and he called yesterday to remind us

6   that we still need to get this answer.  And so I'm going to

7   try to restate his question as best I can here.

8          MS. LENNOX:  Okay.

9          THE COURT:  The message is he wants clarification

10  that they, which I assume means the city, cannot take more

11  than the ASF recoupment cap that it ends at a certain point in

12  and does not go on until a person dies or the spouse dies.

13     So his questions are, does the ASF recoupment end once

14  you pay it off?  Can this be clarified in writing in the plan

15  or some other written document?

16         MS. LENNOX:  Okay.  After the pro se day, Your

17  Honor, I had spoken to -- to this gentleman and told him that

18  I didn't recall receiving correspondence from him.  Talked to

19  him about the answers to his question that in essence contact

20  me so I would have his contact information so I could contact

21  him back.  So if Chris has his contact information, I'm happy

22  to call and talk with him.

23         THE COURT:  Can you -- can you answer these

24  questions here on the record?

25         MS. LENNOX:  I can.  And the answer to the questions

1 are actually reflected in the eighth amended plan.  And

2 they're consistent with what we have told the Court and what I

3 believe a couple of folks have testified in Court.

4      Which is the ASF recoupment caps including the -- if the

5 payments are going to be amortized, including a 6.75% interest

6 rate, once that factor is paid off if the person is still

7 alive, those payments will -- or those deductions will cease.

8      But the caps do include if -- if they're not -- if they

9 don't take the cash option to pay it in one lump sum, if

10 they're amortized over time they will include an interest

11 factor.

12           THE COURT:  Okay.  We actually do have an email from

13 Mr. Wojtowicz and -- and so let me just give this to you and

14 you can email him however you see fit.

15           MS. LENNOX:  I'll do that.  Thank you, Your Honor.

16           THE COURT:  Okay.  And so I think you're all set.

17 Ms. Fish, something you'd like to say?

18           MS. FISH:  Yes, Your Honor.  Deborah Fish from

19 Allard and Fish along with Kramer, Levin on behalf of the ad

20 hoc COP holders.

21      As the Court may recall, when Mr. Fornia was testifying a

22 week ago there was an exhibit, COPS Exhibit 1068 was admitted

23 subject to changing the heading and removing the footnote.  I

24 have the revised exhibit with me today to hand to the Court

25 and it's been approved by the attorneys at Jones, Day.  If I

1  may approach.

2            THE COURT:  Yes.

3            MS. FISH:  Thank you.

4            THE COURT:  So this is the -- the revised 1068?

5            MS. FISH:  That's correct, Your Honor.

6            THE COURT:  Okay, good.  Thank you so much.

7            MS. FISH:  You're welcome.

8            THE COURT:  One more moment, please.  Okay.  Okay.

9   Mr. Bennett, I see you here.  May I have your attention for

10  one minute and then we will get to our witness' testimony

11  here.

12            MR. BENNETT:  Good morning, Your Honor.  Bruce

13  Bennett of Jones, Day.

14            THE COURT:  You're probably going to do this anyway

15  in your closing argument, but I just -- I want to be sure that

16  you do.  So what I'm focusing on here is in the legislative

17  history of Section 943 there are these two cases mentioned.

18  And you've discussed them before.

19       Kelley v Everglades Drainage District and Fano v Newport

20  Heights Irrigation District.  And so I want to be sure we are

21  fully prepared to discuss those cases and their implication in

22  Chapter 9 as it has since been revised after those cases were

23  decided.

24            MR. BENNETT:  Okay.

25            THE COURT:  The other one is more of a technical

1  financial question.  The -- the B notes are apparently in the

2  plan a first budget obligation so the question is, what

3  exactly does that mean or what does the city intend for that

4  to mean, especially in the context where in the future the

5  city might not be able to make all of the obligations that the

6  plan and its budget requires.

7           MR. BENNETT:  Okay.

8           THE COURT:  So let me ask you to be prepared to

9  address that.  And I'll also be discussing that with my

10  witness here this morning.  Thank you, sir.

11           MR. BENNETT:  Thank you, Your Honor.

12           THE COURT:  All right.  Anything else before we

13  begin with our testimony?  Okay.  Ms. Kopacz, will you step

14  forward, please?  And you should bring with you your report

15  and your supplements if you have them.  They're there already?

16  Okay.

17      (WITNESS MARTHA KOPACZ WAS SWORN)

18           THE COURT:  All right.  Please sit down.  Okay.  So,

19  yes, speak right into the microphone.  What is your name,

20  please?

21  A    Martha E.M. Kopacz.

22           THE COURT:  And you are the Court's expert on the

23  feasibility of the city's plan?

24  A    I am.

25           THE COURT:  And you previously testified during this

1 trial concerning your qualifications and methodologies?

2 A    I did.

3          THE COURT:  And are you aware that on September 16th,

4 2004, the Court entered an order docket number 7511

5 determining that you are qualified to provide expert testimony

6 concerning the feasibility of the city's plan and whether the

7 assumptions that underlie the city's cash flow projections and

8 forecasts regarding revenue and expenses are reasonable?

9 A    Yes.

10          THE COURT:  And are you aware that on October 3rd of

11 this year, the Court admitted into evidence your original

12 report dated July 18th as exhibit -- as exhibit number 12000?

13 A    Yes.

14          THE COURT:  And that on that same date the Court

15 admitted into evidence your supplemental report dated August

16 27, 2014, exhibit number 12001?

17 A    Yes.

18          THE COURT:  Counsel, is there any objection to the

19 admission into evidence of the second supplemental report from

20 yesterday as Exhibit 12002?

21          MR. STEWART:  No objection.

22          MS. FISH:  No objection, Your Honor.

23          THE COURT:  All right.  It is admitted.

24      (Court's Exhibit 12002 was identified and admitted)

25          THE COURT:  Now since you last testified, have you

1  and I discussed the substance of your conclusions or the basis

2  of them?

3  A    No.

4          THE COURT:  And like last time, for this time, did I

5  email you the questions that I intend to ask you so that you

6  can be prepared to answer them?

7  A    Yes.

8          THE COURT:  What is your opinion on whether the

9  city's plan is feasible?

10  A    I believe the city's plan is feasible.

11          THE COURT:  And what is your opinion on whether the

12  assumptions that underlie the city's cash flow projections and

13  forecasts regarding its revenues, expenses, and plan payments

14  are reasonable?

15  A    I believe they're reasonable.

16          THE COURT:  In the order appointing you as the

17  Court's expert, did the Court provide you with a definition or

18  a standard by which to determine the feasibility of the city's

19  plan?

20  A    No.

21          THE COURT:  Would you open up to your report Exhibit

22  12000, please, and look at Page 13?

23  A    Yes.

24          THE COURT:  And on that page did you identify a test

25  for feasibility that you would apply in this case?

1   A    Yes.  I developed the following feasibility definition

2   which I referred to as the standard.

3             THE COURT:  Go ahead.

4   A    Okay.  Is it likely that the City of Detroit after the

5   confirmation of the plan of adjustment will be able to

6   sustainably provide basic municipal services to the citizens

7   of Detroit and to meet the obligations contemplated in the

8   plan without the significant probability of a default.

9             THE COURT:  And that is the test that you applied

10  when you gave me your opinion a moment ago?

11  A    Yes.

12            THE COURT:  In your report on Page 19 and 20, you

13  discuss what feasibility does not include.  Can you summarize

14  the key points of that for me?

15  A    Yes.  First of all, feasibility is not a guarantee.  I

16  don't think that the plan in order to be feasible has to

17  guarantee that it will be successful.

18       I similarly don't think that for the plan to be feasible

19  it should be some sort of wild scheme pie in the sky

20  idealistic projections.  I also think that the feasibility

21  test does not question whether there is an alternative better

22  plan out there, or whether the projections could generate more

23  cash to pay off the obligations.

24            THE COURT:  So you did not look at the best interest

25  of creditors?

1  A    Not at all.

2        THE COURT:  Or whether the plan was filed in good

3  faith?

4  A    Not at all.

5        THE COURT:  Or whether the plan complies with

6  Chapter 9 other than as to feasibility?

7  A    That is correct.

8        THE COURT:  Now in your report you divided your

9  feasibility analysis into qualitative and quantitative

10  components.  So what are quantitative components and what are

11  qualitative components?  What do you mean by those terms?

12  A    Okay.  That is in my report on Page 14, but I'll just

13  talk about it.

14        THE COURT:  Summarize it for us, please.

15  A    Yes.  The quantitative assessment looks to the

16  reasonableness of the projections.  The -- is -- are the

17  projections correct, are they materially objective.  Is there

18  -- are the assumptions that are made individually and

19  collectively reasonable.  And is there a contingency provided.

20        THE COURT:  And the qualitative components?

21  A    The qualitative components I put in the category of skill

22  and will.  So it is are the human capital components, the

23  resources, the leadership there, are the systems and the

24  processes in place.  Is there an appropriate structure to

25  insure that the plan's obligations are going to be met

1      Can the city deliver at least a minimum level of

2  municipal services.  And is the trajectory that the city is on

3  sustainable.  Those would be the qualitative assessments.

4          THE COURT:  Okay.  So we'll talk about the

5  quantitative first.

6  A    Okay.

7          THE COURT:  And then the qualitative.

8  A    Okay.

9          THE COURT:  In analyzing the quantitative components

10  of feasibility, did you review the most recent projections

11  from the city's advisors?

12  A    Yes, but I would like to expand upon that.

13          THE COURT:  Yes, go ahead.

14  A    Okay.  The projections that I and my team reviewed in

15  depth, were the city projections dated October 13th.  Okay.

16  And those projections we reviewed with the same rigor that we

17  had reviewed the July projections which were the subject of my

18  July report.

19      Yesterday after Court we received the October 20th

20  projections which are updates.  Those are the ones that --

21  that Mr. Malhotra testified to yesterday.  There were some

22  changes in those.

23      And my team and I only reviewed the changes, we did not

24  do the in depth analysis of the October 20th projections the

25  way we had of the October 13th.  We just looked at the changes.

1              THE COURT:  And for the record you were in Court

2  yesterday?

3  A    I was.

4              THE COURT:  Did you hear all of the testimony

5  yesterday?

6  A    I did.

7              THE COURT:  Okay.  So going back and considering all

8  of the projections that you did look at, what were the

9  different types of projections that the city prepared and that

10 you reviewed?

11 A    The city -- the city's advisors prepared three

12 projections.  They prepared a ten year forecast, a 40 year

13 forecast, and a -- what we call the RRI, so the re-investment

14 initiatives.  The city itself its finance and budget

15 department prepares a tri-annual budget and we've reviewed all

16 of those.

17             THE COURT:  Okay.  And the -- the projections that

18 you received yesterday were they updates to all of those, or

19 just a portion of those?

20 A    Just the ten year and the four year.

21             THE COURT:  Okay.  Now let's talk briefly about the

22 B notes.

23 A    The B notes, okay.

24             THE COURT:  You're familiar with the B notes.

25 A    The B notes, okay.

1           THE COURT:  Yes?

2    A     Yes.

3           THE COURT:  The -- the -- the plan suggests issuing

4    a maximum of $632,000,000 in B notes, yes?

5    A     Yes.

6           THE COURT:  Do you know how much of that the city is

7    -- is actually planning to issue?

8    A     I believe the city is planning to issue all of those.

9           THE COURT:  Okay.  And is the city proposing to make

10   interest only payments on those B notes for the first ten

11   years?

12   A     Yes.

13          THE COURT:  Do you know approximately how much that

14   will be in interest?

15   A     I think we can find it in my report.

16          THE COURT:  Okay.

17   A     Someplace.  I know the totality of the payment on the B

18   notes which would include principal and interest over the 40

19   year period, but we need to go to the report.

20          THE COURT:  Let's start with the first ten to see if

21   -- if you can find it there.

22   A     Okay.  Okay.  In the -- on Page 9 of what is now Exhibit

23   12002, okay, is a variance analysis between the July

24   projections and the October projections which covers the first

25   ten years.  So that the amount of principal and interest paid

1   on the B notes would be $215,000,000 for that period of time.

2          THE COURT: Okay. Do you have an opinion on whether

3   the city will be able to make those payments?

4   A   I believe based on the projections that the city will be

5   able to make those payments.

6          THE COURT: And the plan proposes beginning

7   principal payments in year 11 after plan confirmation, is that

8   correct?

9   A   That's correct.

10         THE COURT: What's your opinion on whether the city

11  will be able to do that at that time?

12  A   Again, based on the projections, I believe the city will

13  be able to start those payments in 2024.

14         THE COURT: Now these obligations on the B notes are

15  separate and apart from their obligations on the C notes?

16  A   Yes.

17         THE COURT: And the exit financing?

18  A   Yes.

19         THE COURT: Do you believe that the city will be

20  able to make its payments on all of those three obligations as

21  they become due?

22  A   I do.

23         THE COURT: You heard in Court yesterday that the

24  city intends to use the exit financing in part to pay off the

25  LTGO bonds?

1  A     Yes.

2           THE COURT:  And that was $55,000,000, is that right?

3  A     Yes.

4           THE COURT:  Do you believe that that's a reasonable

5  and feasible thing for the city to do?

6  A     Yeah.  The -- the -- in earlier plans and earlier

7  projections, the city included paying the LTGO bonds out of

8  cash, okay.  And --

9           THE COURT:  By out of cash you mean over time?

10 A     Sometimes over time and there were projections in which

11 it was paid at emergence as part of the large amount of money

12 that will be paid at consummation of the plan.

13     The -- the city now is obligated to redeem the LTGO notes

14 at confirmation.  So the -- the -- I think at least as late as

15 the July projections, the plan was to pay the debt, to pay the

16 LTGO at confirmation.

17     So I don't think it's -- it's not an incremental

18 55,000,000.  That it -- it's something the city has been

19 planning to pay quickly after bankruptcy and now it is

20 obligated to do so.  At one point it had an option to do that,

21 now it's obligated to do that.

22           THE COURT:  Is it your understanding, going back to

23 the B notes, that the plan does take the obligation to repay

24 them as a "first budget obligation"?

25 A     I -- I have read those words and I -- to me that means

1  that they -- they have committed to a -- a priority for the B

2  notes.

3         THE COURT:  Is that a reasonable and feasible thing

4  for the city to do in the circumstances?

5  A    Yes.

6         THE COURT:  Do you believe it has any impact on

7  feasibility for the city to give this -- that plan of priority

8  going forward?

9  A    No.

10        THE COURT:  Does this priority mean that those

11 payments or those obligations would be paid before any

12 obligations for example to the GRS pension fund, or the

13 restructuring initiatives?

14 A    If there weren't sufficient cash to make all of the

15 proposed payments and expense obligations that are in the

16 plan.  I think that these obligations would have a priority

17 over certain things, but I don't know which ones.

18        THE COURT:  Okay.  All right.  Moving on then.  Did

19 you find the city's projections mathematically correct?

20 A    The October 13 projections which we reviewed in depth

21 were mathematically correct.

22        THE COURT:  Well, what about the ones yesterday, or

23 were you not able to -- to evaluate that?

24 A    You know what, we -- we didn't have -- as again, I didn't

25 have time.  I just looked at the items that changed, okay.  So

1  we've -- we have reviewed projections by the city's advisors

2  and I can tell you that the -- the ones that form the real

3  basis for the eighth amended plan are mathematically correct.

4        THE COURT:  Okay.  But from what you did see of

5  yesterday's projections, nothing struck you as mathematically

6  inaccurate?

7  A    No, absolutely not.

8        THE COURT:  Are the city's projections reasonable?

9  A    They are.

10       THE COURT:  Let's talk now about the -- the C notes

11  briefly.  Do you know what the C notes are?

12  A    I do.

13       THE COURT:  What are they?

14  A    The C notes are obligations of the city which will --

15  will pay the claims of Syncora and FGIC pursuant to those

16  settlements.

17       THE COURT:  Did you review the Desmond Associate

18  projections relating to the city's parking revenues?

19  A    Yes.

20       THE COURT:  And what was your opinion about those

21  projections?

22  A    Those projections were very detailed.  And they have, you

23  know, they have the four different scenarios of the

24  projections.  And we've reviewed all of those.  I was here

25  yesterday and listened to the testimony by the Desmond

1 professional.

2 And, you know, I can tell you the models are very

3 detailed. The assumptions were reasonable based on our

4 review.

5 THE COURT: Okay. And did you hear or review Mr.

6 Doak's testimony and his opinion regarding the city's ability

7 to retire or service the C notes?

8 A I have read Mr. Doak's report. I've listened to his

9 testimony, and I've talked with Mr. Doak about that, yes.

10 THE COURT: What is your conclusion about his

11 opinion on that question?

12 A On that question I agree with him.

13 THE COURT: His opinion is that the city will be

14 able to service the C notes $88,430,000 using parking revenue,

15 is that correct?

16 A That's correct.

17 THE COURT: What are the risks to that assumption or

18 that opinion?

19 A The risk to that assumption would be a couple on the top

20 line in the sense that if you because of, you know, any

21 failure to make repairs, you'd have to take another garage out

22 of service.

23 That would provide a risk. If for whatever reason you

24 had people deciding not to drive cars and park them. That

25 would be a risk. But by and large the assumption around the

1  parking revenue is not significantly different than the

2  historical trend.

3      There is some rate increase.  There is some increased

4  usage.  But it's not hugely -- it's not a hockey stick for

5  objection.  So from the revenue side, I think they're

6  reasonable.

7          THE COURT:  Do you have an opinion based on your

8  review of this issue -- this issue of how long it will take

9  the city to realize its optimized revenues from its parking

10  assets?

11 A    I don't.

12         THE COURT:  Do you know whether the Desmond

13 Associates projections include revenue from the grand circus

14 garage?

15 A    They do not.

16         THE COURT:  And why is that?

17 A    Because the grand circus garage is under an option to go

18 to Syncora.

19         THE COURT:  And is it your view that the plan and

20 especially the parking revenues are feasible despite the

21 exclusion of the grand circus garage?

22 A    Yes.

23         THE COURT:  Now in your report on Page 15 in

24 discussing the quantitative components of feasibility, you

25 state and I'll quote for you.  "Financial modeling is both a

science and an art". What do you mean by that and what aspects of it are science and what aspects of it are art?

A Sometimes -- sometimes you write words and you -- you kind -- like they're not supposed to be controversial, but they --

THE COURT: Well, I don't mean to suggest they're controversial. I just want to know what it means.

A Well, they are, yeah. The financial modeling, okay, is at its core it's about inputs and outputs. It's about trying to take factual data, things that have happened, and hypothesize about what's going to happen in the future.

And all forecasts do that. And it -- and it requires you've got to have some sort of starting point. You then have to make some sort of assumptions and estimates and guesstimates about future values.

And so there is -- there is a way to do it. You wouldn't -- you know, you have to have revenue, you have to have expenses. You would need to have capital expenditures and working capital requirements depending on what you're doing. So you have to have -- there's certain ingredients you have to have.

However, how you make those individual estimates, or how you make those assumptions really are dependent on the person who's developing the model. I think in my report I talked about the different way that salaries are estimated, right.

1   Labor is a huge issue.  It's 60% of our costs in this -- in

2   this model, right.  The 60% of the cost for labor.

3       So how you estimate salaries is important.  And because

4   the city intends to add employees over time, how you add those

5   salaries you can do it multiple ways.

6       And in some cases those salaries were based on an average

7   hiring rate.  Sometimes they were done position by position

8   and saying I need to hire that person at 50,000, I need to

9   hire this one at sixty.  So there are different ways to do it.

10      And that's where the art comes in.  And because we have

11  -- the -- the -- what we were looking at was prepared by two

12  different organizations which have institutional philosophies

13  about how they model as well as different people within those

14  organizations developing the model.

15      We had lots and lots of different ways of -- of the

16  projections came about.  So as I was -- was trying to think of

17  an analogy.  It's like if I say we're going to make chocolate

18  chip cookies, everybody knows what the chocolate chip cookie

19  is going to look like or they think it's going to look like at

20  the end, right.

21      But whether you use butter or margarine or white sugar or

22  brown sugar is part of the art.  There's a formula there that

23  you need to get to chocolate chip cookie.  But how you do it

24  is your own personal style.

25          THE COURT:  Thank you.  Now in this plan the city is

1  taking on or assuming significant debt.

2  A     Uh-huh.

3         THE COURT:  The Court has stated in the past several

4  times that it will not allow the city to enter into any more

5  bad deals, take on any more bad obligations.  So in your view

6  how is -- how is the debt that the city is taking on here

7  something that the Court should approve as opposed to the

8  kinds of debt that it has taken on in the past which it should

9  not have taken on?

10 A     The debt that the city is taking on as part of the

11 restructuring is -- has enabled it to resolve its bad

12 borrowing practices and bad financial decisions of the past.

13 So the -- the debt is a means to an end.

14        And based on the projections the city can service that.

15 And so while as a financial professional I would like to see

16 -- you know, I would always like to see the -- the borrower

17 take on less than more, it -- and I do believe we are at the

18 edge of what the -- the city can reasonably expect to be able

19 to -- to service in the future.  It is a debt level that the

20 city can manage.

21        THE COURT:  On Page 23 of your report, you state

22 that -- you don't have to turn to it, that's okay.

23 A     Oh, okay.

24        THE COURT:  You state that the speed of this

25 proceeding has negatively impacted the feasibility of the

1  plan, right?

2  A    Yes.

3         THE COURT:  Can you explain what you mean by that?

4  A    Yes.  The speed of this proceeding has been a two edged

5  sword.  And the good side of that is that, you know, in -- in

6  a little bit over a year the city will have gone through a

7  massive restructuring process.

8      And will have significantly de-levered its balance sheet.

9  So going from in excess of $10,000,000,000 down to, you know,

10  three and a half -- less than $4,000,000,000 is a huge de-

11  levering of the city and that's a really good thing.

12      But because the focus has been on that de-levering and

13  the speed with which getting that done, there has not been

14  until recently as much energy put into restructuring the

15  operations of the city.  Okay.  So fundamentally the city

16  operationally was broken.  And -- and that's evident in the --

17  the, I believe you said it's service delivery insolvent,

18  right?

19      So what -- what the speed -- I believe the emergency

20  manager had to pick one of two options.  And, you know, and

21  the focus was on de-levering, not fixing the operations.  So

22  that is one way in which the speed cut against what are

23  necessary long term things that will now have to be

24  accomplished outside of the bankruptcy which could be more

25  difficult to accomplish outside of the bankruptcy than in the

1   bankruptcy under the power of the emergency manager.

2       The other part of that that the -- the speed and the

3   bilateral negotiations with the mediators, the city and the

4   counter party in having all of those bilaterals and none of

5   the -- the multi party sorts of things, really created sort of

6   a win lose situation where the parties were always coming back

7   to the city for more and more and more and more consideration.

8       Whereas in a longer process if there had been more time

9   for the individual constituencies and stakeholders to really

10  get an understanding of the city's needs to fund investments

11  going forward and what its real cash flow were, I think we

12  might have been able to reach settlements where, you know,

13  maybe we weren't as -- quite as close on that continuum of --

14  of feasibility as we are today.  So --

15          THE COURT:  In your report on Page 25 you state that

16  "the ten year projections, the ten year/40 year projections,

17  and the restructuring and re-investment initiatives form an

18  unusual construct for a financial plan for an enterprise

19  attempting to emerge from bankruptcy".  What do you mean by

20  that?

21  A   The -- most plans of restructuring contain a single

22  business plan and a financial plan that say this is what the

23  entity is going to do.  Okay.  In order to figure out what the

24  city is going to do post-bankruptcy, you have to look at all

25  of these put together.  Okay.

1    And that is a -- it requires the user of that information

2  or the reader of that information to have to do a lot more

3  work to understand what the city's plan is post-bankruptcy

4  than you typically have to do.

5    THE COURT:  Along the same lines, I want to quote to

6  you also from your report on Pages 27 and 28, it's a bit of a

7  longer quote, so bear with me.

8  A    Okay.

9    THE COURT:  "The projections in the POA have not

10  been harmonized with the city's budget that was passed by city

11  council on June 5, 2014.  As such any funding of the RRIs will

12  require first identification of a funding source and then

13  approval by the CFO and the Mayor and finally approval by the

14  city council of a budget amendment to support the

15  appropriations.

16    Although the city has many financial reporting

17  priorities, it is highly advisable that the budget department

18  amend the approved June budget for the numerous anticipated

19  changes post-confirmation harmonizing the current head counts

20  and spending levels with the RRIs that the city intends to

21  execute in the coming year and submit a new budget to the city

22  council for approval".

23    So can you explain why you think that is necessary?

24  A    Yes.  The -- the budget that the city is operating under

25  today that was approved by city council in June, is a budget

1 | that does not include the RRIs.  Okay.

2 |     Now the city is beginning to spend that money with the

3 | quality of life loans.  They have a procedure in place for how

4 | departments can access that money to begin their change

5 | processes.  Okay.

6 |     But the budget that the city has authorized to spend

7 | doesn't include that.  And I think that again to -- this is

8 | part of the qualitative side of my feasibility assessment is

9 | that everybody in the city needs to get on the same page

10 | relative to what the plan is post-bankruptcy.

11 |     And right now the budget, the official budget of the city

12 | doesn't include the anticipated spending that is really really

13 | critical to the city's success long term.  And I think that

14 | the budget -- it would be easier rather than having to go to

15 | the council every time a department wants to use funding for

16 | RRIs where you have to get a budget amendment, it seems to

17 | make a lot more sense to do all of the anticipated amendments

18 | once and for all and get that passed so that the city council,

19 | the city departments, the Mayor's leadership, the state, all

20 | of the citizens understand what the new city budget is.

21 |     THE COURT:  On Pages 27 through 29 you state that

22 | "the projections that the city has submitted here are not a

23 | business plan for the city and this has resulted in

24 | confusion".  What do you mean by that and what are the

25 | consequences of that confusion?

1  A    The -- the consequences are of the confusion is that the

2  department heads and the -- the people -- the employees of the

3  city who are instrumental and going to be instrumental in

4  making the changes that need to come about, don't have a good

5  road map.  They don't have a good plan.

6     They -- the -- the -- the lack of integration between the

7  thinking that has gone on around the bankruptcy process and

8  the ongoing thinking in the city, needs to be integrated,

9  harmonized, concatenated in a way that the people who are

10  going to be responsible for executing know what they're going

11  to do and know what they're going to be held accountable for.

12        THE COURT:  And how would you advise the city to go

13  about doing just that?

14  A    The -- and I have had conversations with the Mayor and

15  people in the Mayor's office, and the CFO and the -- the

16  finance people.  I do think that there needs to be a -- a

17  planning effort that lays out top down in terms of the

18  re-investment criteria, in terms of what they're really going

19  to spend, how they're going to prioritize that, what

20  departments are going to do what.

21     Because right now we know that just with the quality of

22  life loan there are more requests for quality of life money to

23  spend than is there, right.  So the departments are eager to

24  start improving their businesses if you will.  And there needs

25  to be a much more vigorous robust planning process around how

1  that's going to be done.  So --

2          THE COURT:  And -- and just to continue here, on

3  Page 37 of your report you point out that the fiscal year 2015

4  budget --

5  A    Uh-huh.

6          THE COURT:  -- which begin -- which is --

7  A    Began July 1st.

8          THE COURT:  Of this year?

9  A    Of this year.  It's the budget now.

10          THE COURT:  Okay.  So that does not reflect many of

11  the POA proposals, right?

12  A    That's what we were just talking about.

13          THE COURT:  Yeah.

14  A    That budget doesn't have the RRI expenditures in them.

15          THE COURT:  Okay.  Are you aware of whether the city

16  has prepared a bridge they call it between its projections and

17  its budget to address this concern?

18  A    What the -- what the city's advisors did was to collapse

19  the ten year plan and the RRIs so that you could have a

20  department view of what the expectation was in terms of adding

21  together the baseline projection and the RRIs.  And they did

22  that at a high level on a department basis.

23          In my second supplemental report that was done yesterday,

24  we provided an example of that at -- for the police

25  department

1          THE COURT:  Uh-huh.

2 A    So at -- at the end of the day you don't have to take

3 okay, here's the baseline police department, here's the RRIs

4 and we're going to try to mush those together to understand.

5 We -- we can now see that in one place.  That is different

6 than the getting the RRIs into the budget process.

7          THE COURT:  Uh-huh.

8 A    So yes, the bridge -- the bridge gives you good view of

9 what a department would look like with the RRIs in it.

10         THE COURT:  So this so-called bridge satisfies your

11 concerns but only in part because of the -- of the fact that

12 it's not in the budget per se?

13 A    It's not in the budget and there's not a -- there's not a

14 robust implementation plan behind that.

15         THE COURT:  Have you expressed these concerns to

16 city management, the Mayor and others?

17 A    Yes.

18         THE COURT:  What reaction have you gotten?

19 A    They agree with me.

20         THE COURT:  Have you seen any evidence of movement

21 toward resolving this issue of getting these changes into the

22 budget?

23 A    Yes, on a department by department basis, yes, they are

24 working on that.

25         THE COURT:  Okay.  All right.  So let's talk a bit

1   about the RRIs.

2   A    Okay.

3            THE COURT:  In your view how important is

4   implementation of the city's RRIs to the feasibility of the

5   plan?

6   A    Very important.

7            THE COURT:  And why is that?

8   A    Without the investment in the RRIs, the city cannot

9   provide a sustainable level of city services.

10           THE COURT:  And -- and how does providing a

11  sustainable level of city services relate to feasibility of

12  the plan?

13  A    It -- it is a component of the standard that I developed.

14           THE COURT:  And generally speaking, what is your

15  understanding of how the city plans to fund the RRIs?

16  A    The RRIs will be funded from surplus at the operating

17  level.  So revenues exceeding expenses as well as the

18  borrowing that will occur with the exit financing.

19           THE COURT:  Is that a reasonable plan to fund RRIs

20  here?

21  A    It is.

22           THE COURT:  Why did you come to that conclusion?

23  A    Because it's really the only option that's available to

24  the city in terms of how to fund that.  And the city is in a

25  challenging period over the next couple of years because it

1  has to invest ahead of when it will reap the benefits from

2  efficiencies and improved services and that sort of thing.

3      So there's a -- there is actually kind of a double

4  layering of cost that the city has to sustain to get to the

5  place that it needs to be three, four, five, ten, 30 years

6  from now.  So it's -- to some extent it has to bootstrap its

7  way by, you know, self funding a lot of the RRIs.  But it also

8  has an opportunity now to borrow some exit financing as was

9  the quality of life to get the thing jump start.

10      THE COURT:  On Page 207 of your report you state and

11  I'm going to quote it here.  "The RRIs are one of the positive

12  outcomes of the bankruptcy process".

13  A    Uh-huh.

14      THE COURT:  "The RRIs provide the backbone for

15  improved services to the citizens of Detroit.  I believe that

16  the development of a score card to track the implementation of

17  the RRIs is an important tracking mechanism that will enable

18  the city and the financial review commission to understand the

19  RRIs implementation progress".

20      Can you expand on what you mean by this concept of a

21  score card?

22  A    The score card would really have two components.  It

23  would have a financial component and it would have a

24  operational or an implementation component to it.

25      I have spoken with the budget director at the city and I

1 believe that her intention is to modify the chart of accounts

2 in the -- in the existing accounting system so that they can

3 actually track RRI spending at a department and line item

4 level.  Okay.

5     So that's what the old system that ultimately has to get

6 fixed.  But at least they're going to attempt to implement a

7 way to keep track of those dollars in terms of how they get

8 spent.

9     From an operational standpoint, one of the things that

10 the Mayor and, you know, ultimately the review commission will

11 have to deal with over time is how the priorities change.  So,

12 you know, we know -- I know -- I believe that, you know,

13 blight is a huge priority.

14     And at various points in time there have been different

15 estimates for blight dollars in the plan.  Well, blight money

16 should only be spent to the extent it can be spent

17 effectively.

18     So the period to ramp up and -- and the like, affects how

19 the cash is.  So at some point in time the Mayor may decide

20 that the blight remediation is going really really well and --

21 and seeing significant benefit from that, and he may decide

22 that it's better to take money that might be spent, for

23 example, on DDOT and move it forward to blight because he

24 feels like he's getting a better return.

25     There has to be a score card of metrics relative to each

1 of the RRIs as to how effective those dollars are being spent.

2 And I think that -- that that will give good information, it

3 will give good transparency not only for the review

4 commission, but for the citizens to understand how the city is

5 doing in terms of making these re-investments successful.

6          THE COURT:  So -- so you -- you foresee this score

7 card to serve both an internal management function and an

8 external public accountability function?

9 A    Yes.

10          THE COURT:  What can the city do in -- in -- in

11 executing this score card to enhance the public accountability

12 of -- of its RRI implementation progress?

13 A    I think just regular reporting.  I don't know what sort

14 of reporting the oversight committee is going to seek, or you

15 know, how that will all work out.  But there will be, you

16 know, the -- the city should be reporting its progress more

17 than through, you know, the CAFR that it does once a year.

18     So I think that there has to be a good dialogue between

19 the city, the review commission, obviously the city council in

20 terms of reporting things out in a way that is just -- it's

21 just factual, it's not -- it -- it doesn't have public

22 relation spin to it, it's just data.  And I think that that --

23 that should happen.

24          THE COURT:  Have you had conversations with city

25 management about this -- this concept other than with the

1  budget director changing charts of accounts?

2  A    Not really, no.

3        THE COURT:  All right.  Let's -- let's dig into the

4  weeds of the city's ten year revenue projections a little bit.

5  A    Okay.

6        THE COURT:  Broadly speaking first, what are the

7  city's main sources of revenue?

8  A    The city's main sources of revenue are income tax,

9  property tax, and then charges from fees and services.  And

10 lastly, the largest bucket is revenue sharing and the other

11 piece is wagering.

12       THE COURT:  Casino revenue?

13 A    Casino revenue, yeah.

14       THE COURT:  All right.  So what does the city's

15 projections assert for income tax revenue?

16 A    Income tax revenue is about 25% of the budget going

17 forward.  It is comprised of estimates for employment, how

18 many people are employed and what the level of wages is.

19     The -- the projections in the plan assume a modest growth

20 of wages around 2%.  And an even more modest level of

21 employment growth around a tenth of a percent over the first

22 ten years.

23       THE COURT:  Did you find those projections

24 reasonable?

25 A    I did.

1          THE COURT:  Why?

2   A    Well, I actually think they could be conservative.  When

3   I looked at them I thought they could be conservative.

4          Even with the re-investments initiatives it -- it -- you

5   -- I think it's reasonable that not only can wages increase,

6   but the number of employees, people employed in the city can

7   increase.

8          THE COURT:  By conservative you mean there's a

9   reasonable chance that employment and wages might wind up

10  being higher than projected?

11  A    Yes.

12         THE COURT:  Did you see any material risks

13  associated with the city's income tax projections?

14  A    I -- I -- I think the risk is more external to the city

15  in terms of macro risk again, you know, God forbid there's

16  another great recession or, you know, something like that or

17  some natural disaster that affects the city.  So I think the

18  risks associated with that are more external than internal.

19         THE COURT:  And as a result not risks that the city

20  can take any action to minimize?

21  A    Probably not.

22         THE COURT:  What does the city's ten year projection

23  assert for state revenue sharing?

24  A    State revenue sharing is -- two components of state

25  revenue sharing, there is the constitutional piece and there

1   is the statutory piece.  The constitutional piece is based on

2   a formula that is calculated once every ten years and will be

3   calculated again after the 2020 census and effective in '22.

4       So it -- the --

5           THE COURT:  Effective when?

6   A    About 2022.  I think that comes into fiscal '23, but it's

7   -- the constitutional piece is based on the percentage of

8   population in Detroit relative to the state.  And so that's

9   fixed over ten years.

10      So that's the -- the -- the percentage that Detroit gets

11  is going to stay the same for the next eight years.  And

12  there's really nothing the city can do to change that, you

13  just hope that the revenue collected from taxes at the state

14  level continues to be stable or grow.

15      The EVIP which is the incentive portion, or the statutory

16  portion is based on the city needing certain standards of

17  performance.  And the city has always received 100% of what

18  they're eligible for in the EVIP program and the city -- the

19  projections assume that that number will stay flat for the

20  next ten years.

21          THE COURT:  And -- and in connection with the -- the

22  revenue sharing projections, did you review how E & Y and Ms.

23  Sallee there constructed these projections?

24  A    I did.  I mean my -- my team did it more than I did to be

25  on it, yeah.

1          THE COURT:  And what is your conclusion about

2    whether her methodologies and her conclusions are reasonable

3    in the circumstances?

4    A    I think they're reasonable.

5          THE COURT:  What are the risks associated with this

6    specific part of the projection?

7    A    The -- the risks are at the state level in the sense that

8    the pool of revenue that gets shared will decrease.  The other

9    risk is that Detroit's percentage of state population will

10   change in a way that's negative.  So that there would be, you

11   know, either the -- the -- the state grows faster than Detroit

12   so that Detroit's share is smaller, right, that's -- that's a

13   risk.

14       And I suppose that there's a risk that Detroit would miss

15   the requirements for the incentive portion of revenue sharing,

16   although I find that hard to -- to fathom given the capability

17   of the current Mayor and the CFO.  So I don't think that's a

18   very big risk.

19          THE COURT:  What does the city's ten year projection

20   assert for casino revenue?

21   A    The casino revenue, the wagering tax revenue is assumed

22   to -- and this is a number that has changed in the

23   projections, actually changed down.  And the -- the assumption

24   is that the wagering tax will drop a little bit in the next

25   couple years it will flatten out and then it will grow very

1   slowly at a percent a year.

2         THE COURT:  Uh-huh.  What is your opinion on whether

3   that is a reasonable projection?

4   A    I think the projection that -- that's there now is

5   reasonable.

6         THE COURT:  Why?

7   A    Because it has been decreased as a result of some -- the

8   recent decline in wagering tax revenues that the -- the city

9   has experienced over the last year.

10        THE COURT:  Uh-huh.  And what are the risks

11  associated with these -- this projection?

12  A    I think the risks are obviously increased competition

13  from outside the area like as was seen with the -- the Ohio

14  casinos when they came in.  Obviously if you had more -- more

15  casino development outside of the area that could be a factor.

16       And the other risk is really that the casinos don't

17  operate themselves well.  So if -- if the -- if the casinos

18  fail to attract enough business then that's going to affect

19  the city.

20        THE COURT:  Uh-huh.  Is there anything the city can

21  do to minimize any of these risks?

22  A    Not that I know of.

23        THE COURT:  What does the city's ten year projection

24  assert for its revenue from fees and charges for services?

25  A    That is -- there are lots and lots of things in there

1   Can I turn to my report?

2           THE COURT:  Sure.

3   A    To give you the list.  Okay.

4           THE COURT:  Sure.  When you get there, just tell us

5   what page you are on.

6   A    Page I'm on.  It -- it starts on Page 55 of the July

7   report.  Okay.

8        And this is a -- these are revenues at the department

9   level that the city charges for permits, fees, ambulance runs,

10  all that sort of thing.  So it is a -- it runs about 10% of

11  the budget is my recollection.  But it's comprised of probably

12  50 to 100 different items.  And the projections were really

13  based on historical continuing the trends of the past.

14          THE COURT:  Well, is the city's projection regarding

15  these into the -- the ten years a reasonable projection?

16  A    It is.

17          THE COURT:  Okay.  And why?

18  A    Because again it is -- it's based on recent operating

19  trends.  The ten year projection does not include, you know,

20  benefit from the RRIs.  We'll talk about that I'm sure at some

21  point.

22       But this is the baseline and the baseline is projected

23  without any sort of hockey stick increase on its own.  So I

24  think it's reasonable.

25          THE COURT:  We should -- we should pause here and

1  those of us in the business know what you mean by the phrase

2  hockey stick, but others may not.  So perhaps you can fill

3  that in for us.

4  A    Yes.

5         THE COURT:  I have to ask that even though this is a

6  hockey town.

7  A    It is a hockey town.  One of the things that often

8  happens is that with businesses or -- or entities that are

9  distressed is they -- they've been on a down turn.  So they've

10  been -- you know, their performance goes down, their revenues

11  go down, you know, maybe their expenses go up, so their

12  profitability goes down.

13        Similarly with the city in its cash, right, its -- its

14  revenues haven't kept up with the increase in its expenses.

15  And so it's -- it's been on a downward trend.  When you untake

16  a restructuring be that formal or informal, like the city's in

17  now, you expect there to be a turnaround.

18        And what you often see from the people making the

19  projections is all of a sudden the projections go up to the

20  right as if they were going on a 45 degree angle, right.  And

21  it -- so it looks like -- it looks like a hockey stick.

22        And, you know, for the -- for the most part and I'm

23  really trying to think if there's any place -- there -- there

24  is nothing in these projections that I've seen that is a

25  hockey stick.  And that is a good thing because while yes,

1  there is a turnaround, there is always a lot that you don't

2  know and so being conservative in terms of how much you grow

3  revenue or conservative in terms of how much you expect from

4  -- from expenses, is a good thing.  You don't want to have

5  hockey sticks.

6          THE COURT:  And just to complete the point.  What

7  level of scrutiny or skepticism do you in your profession have

8  when you see a projection that you characterize as a hockey

9  stick projection?

10 A    I -- we are a cynical profession and it's just not

11 believable.

12         THE COURT:  Okay.  But to -- to restate you don't

13 see any of that here?

14 A    I don't see that here.

15         THE COURT:  Okay.  Well, what does the city's ten

16 year projection assert for its property tax revenue?

17 A    Property tax revenue is actually, and there's -- there's

18 some good charts in my report on Page 58 that explain the

19 components of property taxes, both residential, commercial,

20 and industrial.

21     And the forecast is that property taxes will decrease

22 during this period.  And that is a factor of property values

23 declining.

24         THE COURT:  Is that a reasonable projection?

25 A    I think it's reasonable.  I think it's -- it probably in

1  the out years is probably conservative.

2        THE COURT:  Why do you conclude that?

3  A    Well, again it's -- the city is going through a large

4  reassessment program right now and which will be -- you know,

5  will -- within the next couple of years will have all of its

6  property reassessed.  Those assessed values are going to be

7  lower in -- in total is the expectation.

8        And however the -- the -- one of the benefits of some of

9  the RRIs like blight removal, like improved safety is that

10  Detroit will be desirable place to live, that real estate

11  values will increase.  And eventually, you know, maybe towards

12  the end of this ten year period you actually will begin to see

13  property values rise again and property taxes increase.  But

14  for purposes of -- of the plan projections, those property tax

15  revenues have been assumed to continue to be declining over

16  the time.

17        THE COURT:  So let's turn to those RRIs.  What does

18  the city's ten year projection assert for its additional

19  revenue if the RRIs are successfully implemented?

20  A    I think it's 438,000,000 is my recollection over the ten

21  year period.

22        THE COURT:  So now just to be clear, is -- is that

23  amount of additional revenue already included in the revenue

24  projections that we have just discussed?

25  A    No.

1          THE COURT:  Or are they over and above those?

2   A    It's over and above that.

3          THE COURT:  Okay.

4   A    Its outside of the baseline.

5          THE COURT:  And is that a reasonable projection of

6   additional income resulting from the RRIs?

7   A    This is -- this is a assessment that we did based on each

8   RRI.  And so the -- of the total 483,000,000, about half of

9   that comes from increased pricing entities.

10         And the -- about a little less than half comes from

11  better collections.  The city does a really poor job of

12  collecting money that its owed.  And so by improving systems

13  and improving technology, improving management, there is

14  incremental revenue -- incremental cash that the city can

15  collect that it's already owed without having to increase

16  pricing and fees.

17         THE COURT:  So is this $483,000,000 projection of

18  additional revenue from the RRIs, a reasonable projection?

19  A    I believe in total it is.

20         THE COURT:  And why?

21  A    Again, because I think there is -- looking at a build up

22  of -- of the assumptions, each of the assumptions are

23  reasonable to reasonably conservative.  And therefore in

24  totality I think they're reasonable.

25         THE COURT:  What are the risks that are associated

1  with the projections relating to these increased or additional

2  revenues?

3  A    The risks are that the -- the pricing increases.  So

4  pricing increases for example in parking.  Pricing increases

5  down the road in transportation won't be -- will be negatively

6  impacted by the amount of usage.  Okay.

7      So while for example in transportation several years out

8  once the transportation system is assumed to be functioning

9  better, there is a fare increase assumed.  Now there's also an

10  assumption that says as the fare goes up, fewer people will

11  ride.

12      Well, if more than a fewer people don't ride, then

13  there's a risk to that.  So it -- it is -- it is a -- the risk

14  is around implementing the change and will the change be

15  successfully received by the citizens.

16          THE COURT:  Is there also a risk from the speed or

17  pace that the RRIs are implemented?

18  A    The -- there is.  And it's -- it would be particularly

19  around a couple of things in the near term.  One would be

20  collection of past dues accounts.  So that's something that

21  needs to happen sooner rather than later or you're not going

22  to collect a five year old, you know -- seven year old bill.

23      So that there's a risk there.  There is also a -- a short

24  term pickup in grant revenue.  And this is an area that

25  probably has a lot longer term impact than what's reflected in

1  the plan.

2      But there is a lot of focus going on at the city with

3  developing the ability to get the kind of grants that the city

4  should have that other cities should have.  So I think that

5  it's -- it is a -- a large near term piece of the incremental

6  revenue and the RRIs for grant funding.  But at least based on

7  conversations I've had the city is really focused on that and

8  is making good progress.

9          THE COURT:  What other advice would you give to the

10  city in terms of prioritizing RRIs to minimize the risk to the

11  additional revenue from the RRIs?

12  A   I don't have anything that I can think of.  It would be

13  on a department level basis and I really haven't thought about

14  that.

15          THE COURT:  Okay.  Okay.  So let's go to the other

16  side of the ledger and look at expenditures.  But instead of

17  reviewing each of them on a category by category basis, or

18  even a department by department basis, let me just ask you

19  generally what is your opinion on whether the city's overall

20  expense projection in its ten year plan is reasonable?

21  A   I think the overall expense projection is reasonable.

22          THE COURT:  What components of the ten year expense

23  projection carry the greatest risk?

24  A   Labor.  It's 60% of the city spent.  And it is -- again

25  it's comprised of base salary over time, benefits, and head

1   count.  So --

2           THE COURT:  And what are the risks associated with

3   that that lead you to that conclusion?

4   A    The -- the good news is that some of the benefits as a

5   result of the restructuring have been fixed at reasonable

6   levels going forward, i.e. pension and that sort of thing.

7   Obviously the city still has susceptibility to changes in

8   health care which everybody does.  That's -- that's just

9   challenging for all employers.

10      You know, currently the city doesn't have as many

11  employees as it needs and so there is a risk that the existing

12  employees are actually working more overtime.  So you probably

13  have an offset there between, you know, a lower head count but

14  some more overtime.

15      I don't think there is a large risk that the city will

16  get out ahead of its head count projections.  So I'm not

17  particularly worried that the city will hire too many people

18  too fast.  Again, that's a double edge sword in terms of

19  getting the change implemented that needs to happen.

20          THE COURT:  Uh-huh.

21  A    I think the other part -- let me -- that's the big part.

22  The other part is really on the procurement side with

23  expenses.

24      The other large components of city expense are purchase

25  services of all -- of all kinds as well as, you know, things

1 that it buys for itself like materials and supplies, and that

2 sort of thing. Procurement is an area where there was a lot

3 of mischief in the past. I don't want to get anybody mad at

4 me, but there was a lot of mischief and procurement in the

5 past.

6     And -- and the city hasn't fundamentally changed much of

7 its procurement process although it is part of the overall

8 rework in finance. I do think it's going to get better.

9     I think the information systems are going to -- are all

10 of those changes are going to help a lot. But there is --

11 there is a risk that, you know, the whole purchased side of

12 city expenditures could be higher than expected.

13         THE COURT: Well, let -- let me just ask you to

14 explain in a little more depth what the city can do to

15 minimize its -- the risks that you see here to its expense

16 projections.

17 A   Yeah. I think it -- it -- twofold. One is get the

18 financial system and the new IT systems put in ASAP. And with

19 the restructuring of the finance department, the putting in

20 stronger processes and policies and then actually holding

21 people accountable to that which I believe Mr. Hill and -- and

22 his senior management are intent on doing will really help.

23         THE COURT: What is your opinion on whether the city

24 can comply with the state imposed requirement that the city

25 maintain a 5% contingency?

1  A     What the city has told me is they believe they will get

2  that figured out with the review commission.  It is not clear

3  to me how that 5% is really going to be defined and measured.

4         THE COURT:  What do you mean by that?

5  A     Well, it -- the -- the -- the statute, it's probably an

6  exhibit here somewhere, but the statute says of contingency

7  equal to 5% of expenditures.  I don't know what that really

8  means.  It sounds like it's simple, but --

9         THE COURT:  It does.  But what's the ambiguity about

10 it?

11 A     The ambiguity is what's included in the expenses.  Does

12 that include debt service, does it not?  Does it include what

13 you're spending on capital.

14        THE COURT:  Uh-huh.

15 A     How long.  What's the time frame for that.  Is it do you

16 have to have 5% of your annual expenses in a contingency on

17 day one?  Is it something you can build over time?  It's just

18 again, I don't know what it means.

19        THE COURT:  Uh-huh.

20 A     It seems really simple.

21        THE COURT:  Uh-huh.

22 A     But it's not.  And the city believes I -- I know in -- in

23 speaking with at least the city's professionals, that they

24 think there is -- it is something that they can build up over

25 time.  And I think it's going to be one of those things left

1  to the city and the review commission to figure out what it is

2  -- what it means and how the city is going to comply.

3      Right now I don't see -- I don't see excess cash equal to

4  a year -- 5% of a year's worth of -- of expenditures being

5  able to be set aside and put in a bank account.

6          THE COURT:  In terms of good business practice here,

7  how would you advise the commission to define expenditures in

8  the context of fixing this contingency?

9  A    I would have to think about it much more deeply than --

10  than maybe I have.  But it is -- the contingency needs to be

11  adequate to handle some of those unknown and unknowable

12  things.  Okay.

13      So for example there has to be enough contingency that if

14  the city gets five times the amount of snow in a year that

15  it's ever had before, that there is enough cash to get rid of

16  it because otherwise you'll bring the city to its knees.

17          THE COURT:  Uh-huh.

18  A    So it's -- it -- not every expense needs a contingency.

19  But expenses are variable, highly variable, right.

20          THE COURT:  Uh-huh.

21  A    Need a contingency.  Revenues that are not dependable,

22  you need to have a contingency around it.  So I'm not -- the

23  whole idea of 5% of expenses -- I know it's somebody's good

24  intent to come up with something that seems reasonable and

25  easily measurable and that sort of stuff, but it really

1  wasn't.

2          THE COURT:  Uh-huh.

3  A    So I think it needs -- there is -- as I've said before,

4  I'm not comfortable with the level of contingency.  I would

5  like more than the 1% that is factored into these projections.

6  I understand that --

7          THE COURT:  Uh-huh.

8  A    -- you know, it may not be possible but yeah, it's --

9          THE COURT:  Uh-huh.

10 A    It's a continuing concern.  It's been -- it was almost a

11 day one concern.  It's still a concern, but it doesn't -- at

12 the end of the day, it doesn't push me to a point where I

13 think the plan is not feasible because of it.

14         THE COURT:  So if it were left to you to construct a

15 formula for determining contingency, appropriate contingency,

16 it would be more functional than formulaic?

17 A    It would be more functional than formulaic and it would

18 probably be -- it would be a whole number that would be --

19         THE COURT:  Uh-huh.

20 A    -- determined based on some good analysis --

21         THE COURT:  Uh-huh.

22 A    -- and conversation.

23         THE COURT:  So let me just ask the question.  Are --

24 are you prepared to state based on your knowledge of the

25 city's budget and projections a -- a dollar amount contingency

1  that you think the city should maintain on a going forward

2  basis?

3  A    Not today.

4        THE COURT:  Okay.  On Page 111 of your report you

5  review the deficiencies in the city's information technology

6  infrastructure.  You -- you state on Page 122, "it is critical

7  that the city effectively implements the IT initiatives which

8  lay the foundation of many of the other benefits associated

9  with the RRIs".

10     What is your opinion on the city's willingness and

11  ability to efficiently and effectively correct those

12  deficiencies so that it can achieve the benefits of the RRIs?

13  A    Yes.  I think the -- the city is absolutely committed to

14  fixing this problem.  I think the city's Chief Information

15  Officer and Chief Financial Officer are very focused on it.

16     In my most recent conversations with the city about this,

17  the city is within days, literally days at -- at most a week

18  or two of completing all of the selection process for both the

19  financial management system as well as the human resource and

20  payroll system.

21     So I think that is -- they're farther ahead today than I

22  would have thought they would have been when I wrote this in

23  July.  So that's a real qualitative benefit.  I am encouraged

24  by the way that they've approached it in terms of the

25  solution.

1    And I think they've really -- they've really figured out

2   a way to minimize some of the -- or at least manage some of

3   the typical risk with large symptom -- systems implementation

4   in terms of how they're selecting their solution and how

5   they're selecting their vendors.

6    So I think they are -- Mr. Hill and Ms. Niblock are

7   really -- they're focused, they're moving it ahead and, you

8   know, it could be done within a couple of years.

9    THE COURT:  You mentioned risks.  What are the risks

10   associated with the city's efforts to correct its IT

11   deficiencies?

12   A   Well, I mean it's -- it's contracting risk.  I think

13   there, you know, there will be if they end up with a single

14   provider for all of these systems, that would be less risky.

15   It may not ultimately be the best decision, but it would be

16   less risky because you don't have multiple systems providers

17   all working in the same time and space.

18    And, you know, you've got a time frame that if something

19   doesn't go well, it could take longer.  But like I said, I

20   think they're very focused on managing those risks and I think

21   from a -- a qualitative standpoint it's right -- it's very

22   high on the priority list and it's -- it -- it's making me

23   feel better about that than I did a couple of months ago.

24    THE COURT:  On Page 115 of your report you state,

25   "Ernst & Young prepares daily, weekly, and monthly reports of

1 | cash revenues and expenditures".

2 | And then you further state, "These report are

3 | independently generated and are not reconciled to the city's

4 | ledger system through account reconciliations or bank

5 | reconciliations".

6 | And then again later you state, "the current cash

7 | management and cash reporting system has been managed by E & Y

8 | personnel since before the appointment of the emergency

9 | manager. It is my understanding that the city has not

10 | budgeted for E & Y continuing in this role after confirmation,

11 | nor has the city made accommodations to take over this work

12 | from E & Y. This is an unacceptable risk to the success of

13 | the POA and the city must identify and fund a solution for

14 | both the near term and the longer term".

15 | Do you know whether the city has addressed this

16 | unacceptable risk that you have identified?

17 | A   They have.

18 | THE COURT:  And what -- what -- what is your

19 | understanding?

20 | A   Yes.  The city and Ernst & Young have agreed on a

21 | continued retention.  The -- the term of that is through

22 | December of 2016 for Ernst & Young to continue to support the

23 | city with respect to cash monitoring, cash management.

24 | And the city is -- the finance department is beginning to

25 | undertake its own massive restructuring and will be hiring or

1  training employees to do this going forward.  So I'm -- I'm

2  satisfied that Ernst & Young isn't going to walk out of here

3  and leave the city without a good cash management system in a

4  couple of months.

5          THE COURT:  On Page 116 of your report you state,

6  "the efficient and controlled execution of the accounting and

7  finance functions are essential to achieving the financial

8  initiatives set forth in the plan".

9          And then on the next Page 117, you state, "the city does

10 not -- if the city does not build internal capacity in its

11 finance and accounting functions in a timely fashion, it could

12 threaten the execution of the POA".

13         Please explain that.

14 A    Yes.  The -- the finance department, the prior finance

15 department, was woefully under performing.  Where that

16 department is today is there is a -- the city is in a process

17 of consolidating all of the finance function under the CFO

18 which show that -- that there will not be the departmental

19 CFOs if you will.

20         So at -- prior to the restructuring, police had its

21 person functioning like police CFO and transportation had

22 their CFO, right.  So now all of those functions are going to

23 be under John Hill and his department.

24         They have been through a extensive review of each

25 position that's needed in the new finance world.  What the

1 requirements are for that position, what the staffing needs to

2 be for budget, for financial reporting, for procurement, for

3 payroll, for all those sorts of things.  And they are in the

4 process of sorting through both new hires and retaining

5 existing people and training people who will be able to do

6 those things in the future.

7        So it is a -- it is a very robust rigorous restructuring

8 of finance that I think is again -- gives me more confidence

9 that the city is going to be able to actually do the things

10 that a finance department needs to do to monitor spending

11 monitor performance and support the Mayor and the department

12 heads in turning the city around.

13             THE COURT:  And does the city have or is it

14 developing appropriate systems and procedures to provide early

15 warning signs of variances in departmental or other city level

16 performance that might cause the city to fall short of its

17 projections and become unable to meet its obligations under

18 the plan?

19 A    I believe Mr. Hill and his staff are working on that.

20             THE COURT:  Let's turn now to the city's pension

21 obligations.

22 A    Okay.

23             THE COURT:  What risk to the successful

24 implementation of the plan of adjustment arises from the

25 hybrid pension plan that becomes effective on July 1st of this

1  year under the plan?

2  A     The -- the risk from the hybrid plan is really to

3  retention and hiring.  So to the -- you know, because the city

4  needs to attract new employees.  You know, whether or not that

5  plan will be attractive to people who, you know, want to be

6  employed in the city long term or short term, is left to be

7  seen.

8      How the hybrid plan affects the existing work force in

9  terms of morale and motivation again is -- is left to be seen.

10  So it's not -- it doesn't have a -- an economic impact per se,

11  it just has an economic -- it has an impact on how employees

12  view their role with the city.

13          THE COURT:  On Page 134 of your report you make a

14  statement that I'd like you to explain.  It is, "the PRA

15  stipulates that the board of trustees of the PFRS and GRS must

16  maintain a 6.75% investment return assumption through the

17  period ending June -- June 30, 2023.  Thereafter that rate is

18  at the discretion of the retirement systems.

19      While the new proposed rate is more conservative than the

20  historically used 7.9% and 8% rates, current debate abounds as

21  to whether a municipal pension plan that is not 100% funded

22  should use any rate for its liability discount rate other than

23  a government risk free rate".

24      And then later on Page 145 you state, "there is

25  considerable debate regarding the selection of the discount

1 rate for calculating liabilities in government sponsored

2 defined benefit (DB) plans.

3      At one end of the debate is the thought that the discount

4 rate of liabilities should equal the expected return on

5 pension assets.  At the other end is the thought that

6 liabilities have a very strong contractual and legal

7 requirement and therefore represent a certainty of payment and

8 therefore should be discounted at or near the risk free rate".

9      Can you please explain all of that in plain English for

10 us?

11 A    That's what I tried to do.  Obviously I didn't do a very

12 good job.

13      The -- the -- the challenge that I see and the concern

14 that I have about pension obligations and how those affect

15 feasibility of a plan is that the city has pension obligations

16 far into the future.  You know, into the 40 year horizon that

17 the plan has an obviously beyond that.

18      And -- and the estimation of that is challenging.  What

19 the city has done in the plan is fixed how much it's going to

20 pay on those obligations over the next ten years.  Okay.

21      So simply because -- it -- it's a good thing from a

22 feasibility standpoint because the city has fixed what it's

23 going to spend on pension for the next ten years.  However,

24 you can't assume that what it's going to spend on pension

25 necessarily is the same as what's going to happen to the

1  future liability.

2      So the -- the risk, and there's a chart in here in terms

3  of looking at assumptions about what the pension fund assets

4  will return versus looking at assumptions as to what the

5  pension fund obligations are over time.

6      And the way the plan works is that at the 6.75% return

7  rate, the -- the -- the funding for GRS actually goes down.

8  So the -- the percent of the plan that's funded over the next

9  ten years is less than it is today.  And then that recovers in

10 the long term.  Okay.

11     And there's a -- there's a academic debate about how you

12 measure those unfunded liabilities in the long run.  And I had

13 -- I had a very healthy academic debate on my own team as to

14 whether you do it the way municipalities in this country have

15 done it for a long time, or whether you do it in a way that is

16 more in sync with commercial finance approaches that are used

17 say by private companies in how they fund their pension plans

18 or how other countries do it, or just quite frankly how people

19 measure liabilities and assets in the future.

20     The concern that I have is that if the city does not

21 monitor the obligation that is going to be there in 2023 and

22 beyond, and they monitored it all along, that they could wake

23 up with a bad nightmare, not unlike what they've been through

24 with the pension system to get to this point.

25     And I -- because this -- this fund, this plan is not

1  funded because it's terminated, okay.  It is going to have to

2  some day be 100% funded.  There is going to be somebody 40

3  years from now who is 106 years old and needs to get their

4  retirement check.

5      So the idea that you just kind of bounce around at 60,

6  70, whatever percent funding ad infinitum and somehow it all

7  works out, is just -- doesn't make sense to me as a finance

8  person.

9      And I think the city needs to monitor that.  And so while

10  there's a ton of debate and I've, you know, I had a lot of

11  this in my deposition, a lot of this in my prior testimony, at

12  the end of the day my issue with pension is simply twofold.

13      One, the fact that the city has capped what it's going to

14  spend for this plan in the next ten years enhances

15  feasibility.  Okay.

16      But secondarily, my recommendation is that the city needs

17  to monitor this obligation every year same way year after year

18  after year after year that needs to be transparent.  It needs

19  to, you know, have sunlight shined on it so that people

20  understand that this is an obligation that is going to be

21  there in the future.  And that's kind of the whole sum and

22  total of what I'm trying to communicate in -- in all of this

23  in pension.

24          THE COURT:  Well, but reporting potential

25  liabilities is not an end in and of itself, right?  It --

1  A    No.

2          THE COURT:  It serves as the basis for some decision

3  making?

4  A    Yes.

5          THE COURT:  What is that decision making should the

6  reporting reflect a -- a continuing liability?

7  A    Well, it's -- it will be left to the pension -- it will

8  be left to the retirement system trustees to figure all of

9  that out okay, over time.  What the plan has done is created a

10 requirement that a -- a level of funding be present as well as

11 a discount rate be used for future liabilities.  Okay.

12     So that's -- it's created that construct.  But I do think

13 that it's important for the city and the retirement systems to

14 have alternative, you know, what if views if you will, on

15 what's happening.

16     Because right now, you know, pension assets are

17 returning, you know, ten, 11% depending on what they're

18 invested in.  If you have three or four years where the assets

19 are returning more than 6.5, okay.

20          THE COURT:  6.75?

21 A    6.75, that's a good thing.  And even if they drop below

22 6.75 in the end, and we do a sensitivity analysis around this

23 in -- in the report, the plan can still be funded at the level

24 that's envisioned even if you have this change from really

25 good returns to really not so good returns.

1      If that ends up reversing, if all of a sudden next year

2  these plans -- the next two years these plans return 3% a

3  year, right, your ability to recover from that long term is

4  really really difficult.

5      So even though the math works and the averages work, and

6  6.7 seems like it's a reasonable number, if that number is

7  really 2 and 12, right and it averages where you're supposed

8  to over time, it doesn't work -- the math doesn't work out

9  that way anymore.  And that is -- again it's not -- the -- the

10  plumbing as it was referred to yesterday, I thought it was a

11  good -- good concept, the plumbing of all these analyses is

12  very intricate.

13      But the observation it gives you is really quite simple.

14  And -- and that's what I'm struggling to communicate here and

15  not doing a really good job.

16          THE COURT:  Well, if the rate of return that the

17  plan required were less than 6.75, what impact would that have

18  on feasibility?

19  A    If the rate of return was less than 6.5 --

20          THE COURT:  The assumed rate of return.

21  A    The assumed rate of return, okay.  So if the asset --

22  everything else was the same, and the assets only did 5%,

23  right.  The --

24          THE COURT:  But I'm not talking about actual

25  returns.  I'm talking about assumed rate of return.

1  A    I don't think it matters.  The assumed rate of return.

2  I'm -- I'm just talking -- I don't think it matters.

3       I mean if -- if the assumed rate of return I don't think

4  it matters.  I think it only is when you use that assumed rate

5  of return as the discount rate that it changes.

6            THE COURT:  Well, isn't that what's proposed here,

7  that the discount rate and the assumed rate of return are the

8  same?

9  A    They are absolutely the same.  And the -- that's what --

10 that's what is -- and that's this -- this academic debate that

11 goes back and forth.

12           THE COURT:  Uh-huh.

13 A    And I know you've heard a lot of testimony on both sides

14 of this.  But the -- if you use the 6.75, if you used a lower

15 discount rate than 6.75, the unfunded portion would go up all

16 other things equal.  If you used a higher discount rate than

17 6.75, the unfunded portion would go down all other things

18 equal.

19           THE COURT:  Uh-huh.  Well, let's assume in -- in ten

20 years for whatever reason the actuarial assumptions turned out

21 to have been wrong, the rates of return turned out to be less

22 than projected, there is an unfunded liability.  What happens

23 to that?  How does it get paid?  Does it get paid?

24 A    It is -- there is the --

25           THE COURT:  Under this plan, right.

1  A    Under this plan -- under this plan there is only an

2  assumption that the projected unfunded piece gets -- gets

3  funded.

4        THE COURT:  Gets what?

5  A    Gets funded.

6        THE COURT:  By?

7  A    By the city.  So if that number is much bigger than is in

8  the projections, you've got to hope that the city is

9  generating much more cash flow, right.  Or if it's much better

10  then that's easy, you don't have to spend as much.

11        THE COURT:  The -- the city argues in part here,

12  that the 6.75% assumed rate of return/discount rate is

13  justified because as an entity that is either insolvent or in

14  the zone of insolvency --

15  A    Uh-huh.

16        THE COURT:  -- it can't tolerate the risk -- the

17  risk -- the higher risk that would be associated -- higher

18  risk to it that would be associated with a higher assumed rate

19  of return/discount rate such as 7.9 or 8%.  What -- what do

20  you think about that argument?

21  A    In this case for the city, okay, a lower -- a lower rate,

22  okay, is more conservative.

23        THE COURT:  And what do you think of the argument

24  that the city needs a more conservative rate because of its

25  financial condition?

1  A    I absolutely agree.  It would be better if it was 5 and

2  that the discount rate was -- you know, again I would have a

3  different return rate from a discount rate if it -- if I

4  had --

5          THE COURT:  Uh-huh.

6  A    If I ruled the world, but yeah.

7          THE COURT:  Okay.  You requested from the city

8  sensitivity analyses for the two pension plans.

9  A    Uh-huh.

10          THE COURT:  Assuming various average rates of return

11  for the -- the ten year period.

12  A    Yes.

13          THE COURT:  First, what is a sensitivity analysis

14  and -- and when you -- when you got them, what did they

15  demonstrate in relation to the feasibility of the plan?

16  A    Yes.  A sensitivity analysis is a what if analysis.  It

17  is simply a question if -- if I do X what will be the outcome.

18  So it doesn't have any connotation of, you know, is this a

19  good question or a bad question.  Is this the right question,

20  or the wrong question.  It's just a what if.  And that's what

21  this is.

22          THE COURT:  It's just a mathematical --

23  A    Just a mathematical --

24          THE COURT:  -- calculation based on a set of

25  assumptions that you want to test?

1  A    Yes, yes.

2         THE COURT:  Okay.

3  A    This is in my first supplemental report which is Exhibit

4  12001.  And -- and there are -- it's on Page 7 and it's on

5  Page 8.  PFRS is on 7, and GRS is on Page 8 of those exhibits.

6         And this is -- this is the sensitivity that I asked the

7  city to have Milliman do on -- at our request.  And -- okay.

8  And then what --

9         THE COURT:  What does it demonstrate in regard to

10 the feasibility of the plan?

11 A    Yeah.  It -- it -- it demonstrates that depending on the

12 rate of return, right, that the projected unfunded liability

13 will change dramatically.  Could change dramatically to the

14 good, or to the bad depending on whether there is a lower rate

15 of return, a higher rate of return, or if the average rate of

16 return is very volatile in that you have a period of low

17 returns and higher returns, or a period of very high returns

18 and a period of low returns.

19        THE COURT:  On Page 206 of your initial report you

20 state, "it is appropriate that the city be required to

21 annually release the undiscounted liability of each of its

22 pension plans.  This will allow outside interested parties to

23 independently evaluate the strength of the plans.

24        Further, I believe that the city should provide

25 sensitivity analysis consistent with those recommended by the

1   Society of Actuaries Blue Ribbon Panel on an annual basis and

2   provide a discount of the liability based on plus or minus 3%

3   from the investment return discount rate used in the plan".

4        Can you please unpack all of that and explain?

5   A    Sure.  What I would like to see the city do is in essence

6   what we did -- what we asked them to do on Pages 7 and 8.

7             THE COURT:  Uh-huh.

8   A    And I think having an analysis like this done on an

9   annual basis provides good transparency, good visibility.  It

10  just data.  It is not good or bad.  It is a exercise by people

11  who, you know, by the actuaries to look at how things have

12  changed and it will give the city early warning if in fact

13  this obligation is changing in a way that's going to be

14  adverse long term.

15            THE COURT:  Uh-huh.  Do you know whether other

16  municipalities have adopted this Society of Actuaries Blue

17  Ribbon Panel recommendation on reporting?

18  A    I don't.

19            THE COURT:  What other recommendations might you

20  make to the city and to the management of the pension plans to

21  minimize the risks to plan feasibility here?

22  A    I don't know that I can make any recommendations to

23  minimize risk.  The only recommendations I could make is as

24  I've done is monitor it.  Look at it and, you know, let other

25  people look at it and see it.

1    THE COURT:  Do you have an opinion on whether the

2    legislation that the State of Michigan adopted to implement

3    the grand bargain might have any impact on the feasibility of

4    the plan?

5    A    It favorably impacts my assessment of the feasibility.

6    THE COURT:  And why is that or how is that?

7    A    Because the -- the existence of the financial review

8    commission, the oversight commission, I think is a very

9    positive qualitative factor in ensuring that the city conducts

10   itself in a way that -- that ensures or helps to ensure that

11   the -- the commitments of the plan are going to be met.

12   THE COURT:  What is your assessment of the ability

13   and willingness of the city's leadership to implement the plan

14   of adjustment successfully?

15   A    I have a great deal of faith in Mayor Duggan and the city

16   council that they are going to work diligently to implement

17   this plan.

18   THE COURT:  And what is that based on?

19   A    Dialogue, interaction, actually monitoring and -- and

20   just seeing the kinds of changes that have occurred since I

21   arrived in April.

22   THE COURT:  What is your assessment of the ability

23   and willingness of the city's work force to implement the plan

24   of adjustment successfully?

25   A    I think there -- and again I've not -- I've not dealt

1   with a -- a significant portion of the city employees.  I have

2   interacted with a lot of department heads, a lot of finance

3   people in departments and, you know, probably middle

4   management and up.

5       I think there is a genuine desire to right the ship, to

6   help the city prosper.  I think that again that group needs,

7   you know, a more -- more detailed plans, more understanding of

8   the changes that are envisioned.

9       But I think there is a -- a significant level of

10  enthusiasm at least amongst the Mayor, his direct reports, and

11  the senior leadership of the city to accomplish in -- in large

12  measure what's been laid out here.

13          THE COURT:  Well, do you have an opinion on whether

14  there are any systemic deficiencies in the -- in the work

15  force in terms of implementing the plan that need to be

16  addressed?

17  A    I -- I think there are -- there are systemic work force

18  issues around training and having the right people in the

19  right spots.

20          THE COURT:  Uh-huh.

21  A    The city is way under invested in human capital.  And I

22  think that, you know, there will be challenges because of --

23  of the collective bargaining agreements and the civil service

24  rules in terms of, you know, what do you do with -- with an

25  employee who isn't -- doesn't have the skills that the city

1  needs going forward, right.

2      And so that is, you know, that is -- that is something

3  that organizations deal with all the time and is going to have

4  to be effectively managed.  But I think that, you know, for

5  the most part, you know, people want to do a good job.  I

6  think a lot of people are -- will be excited to learn.

7      You know, they want -- they want information systems.

8  You know, they -- the -- the -- they don't want to have to

9  wait until 5:00 at night until everybody is off the system to

10  run their reports because their reports are too big because

11  they crash the system.  You know, employees don't want to live

12  in that kind of environment.  So, you know, it can be

13  optimistic.

14          THE COURT:  What challenges does the city face in

15  attracting the talent or the higher level talent that it needs

16  to implement the plan?

17  A    I think compensation.  But the city is undertaking a --

18  you know, a very fulsome HR review.  The Mayor has hired an HR

19  director who begins in January who at least on paper I have

20  not spoken to her, but at least on paper and -- and by

21  reputation is going to be outstanding in this regard.

22      And I -- I think that again getting there is -- there are

23  some good work being done in terms of really looking at

24  compensation levels and trying to adjust so that the city can

25  attract talent.  And I know that the -- the strategy is if it

1  cost more to hire the talent, we will pay the price to hire

2  the good talent, we'll just have to hire less.  And I think

3  that's a pretty good strategy.

4          THE COURT:  All right.  I estimate that I have about

5  30 minutes left to go here.

6  A    Okay.

7          THE COURT:  Although I will not be bound by that

8  estimate.  So let's take a break now.

9  A    Okay.

10         THE COURT:  Until 10:45, please.

11 A    Okay.

12     (WITNESS MARTHA KOPACZ WAS TEMPORARILY EXCUSED AT 10:29

13 A.M.)

14         THE CLERK:  All rise.  Court is in recess.

15     (Court in Recess at 10:29 a.m.; Resume at 10:45 a.m.)

16         THE CLERK:  All rise.  Court is back in session.

17 Please be seated.

18     (WITNESS MARTHA KOPACZ RESUMED THE STAND AT 10:45 A.M.)

19         THE COURT:  Let's turn our attention to blight.

20 A    Blight.

21         THE COURT:  Blight remediation.  On Page 171 of your

22 report you state, "the POA allocates only enough funding to

23 remove about 50% of the structures designated by the task

24 force for blight removal".

25         On that same page you state, "in order to maximize the

1  benefits of the blight removal program, the city must insure

2  that the funding is committed and supported in the longer

3  term.  For better or worse blight has an emotional impact on

4  the perception of what Detroit is and can be.

5      I believe that the blight initiatives are immensely

6  important to creating and sustaining a positive trajectory for

7  the city's revitalization efforts".

8      And then on the next page you state, "I am not troubled

9  by this apparent discrepancy between what the blight task

10  force believes is required to eradicate blight and what the

11  city is proposing".

12      Can you explain that, please?

13  A    Yes.  The blight task force quantified -- their estimate

14  for blight removal assumed 100% eradication of blight both

15  existing blighted structures and structures that show

16  probability of being blighted.

17      And in the blight report about half of the structures are

18  in that category of likely to show signs of blight.  Okay.  So

19  in terms of the existing blighted structures, the -- the cost

20  of that is pretty -- is analogous to what's in the budget for

21  the city.  Okay.

22      However there's another component to that.  The blight

23  task force believes, or -- or takes the position that

24  everything must be demolished.  The city and the land bank and

25  the people that are undertaking the blight remediation program

1  are looking at a more diverse set of options around blighted

2  structures.

3      So yes, demolition is part of it, but so is

4  rehabilitation and other sorts of, you know, the nuisance

5  abatement sorts of programs that the Mayor and the land bank

6  are -- are undertaking.

7      My thinking on this is that blight is not something that

8  has to be 100% solved to benefit the city.  In -- in my tours

9  of some of the neighborhoods that are part of this first

10  targeting for blight as well as the -- the on line sale of

11  homes in those areas and having visited those, as blight

12  remediation continues to progress in a given area, I believe

13  that some of these homes that could -- that are on the could

14  be blighted list will -- the private sector will take care of.

15      So the owners will step to the plate.  There will be

16  investors.  That there will be a private community solution to

17  some of the blight with that which is why I'm comfortable that

18  the city doesn't have to adopt the task force or tearing

19  everything down 100% everything that is blighted or could be

20  blighted.  But it doesn't have to be quite that draconian to

21  get the benefits from blight remediation.

22          THE COURT:  In your first supplemental report you

23  state a conclusion about the impact of the DWSD settlement.

24  A    Uh-huh.

25          THE COURT:  On plan feasibility.  What is that

1  conclusion and what is the basis for it?

2  A    Based on the DWSD settlement the -- the risk that I had

3  identified with the DWSD contribution to the pension funding

4  is now removed.

5        THE COURT:  There are now a number of settlements in

6  the plan, indeed it appears that all of the creditors who

7  filed objections by counsel have settled with the city.

8  A    Uh-huh.

9        THE COURT:  Do you have an opinion on whether that

10 level of consensus that's represented in these settlements has

11 any impact on the feasibility of the plan?

12 A    Yes.  It improves the feasibility.  In my first report

13 there was an entire section on unresolved issues that

14 presented risk to feasibility, risk to execution of the plan.

15      In the report that I filed yesterday, I have identified

16 many of those unresolved issues that are now resolved.  And

17 that is -- that's a favorable contributor to feasibility.  The

18 challenge is that the cost of those settlements has pushed the

19 city to, you know, the -- the -- the skinny end of

20 feasibility.

21      THE COURT:  Are you aware that the city filed a

22 transition plan docket 7681?

23 A    Yes.

24      THE COURT:  Do you have an opinion on whether this

25 transition plan has any impact on the feasibility of the plan

1 of adjustment?

2 A    The transition plan positively affects my opinion of

3 feasibility.

4        THE COURT:  And why is that?

5 A    It was a risk that I had identified in my first report in

6 terms of the hand off of responsibility from the emergency

7 manager back to the Mayor and the city council.  The -- the

8 transition agreement lays out an effective plan whereby the

9 city can continue some of the benefits of the emergency

10 manager's role in -- in -- in completing this proceeding while

11 returning the city to its elected officials.

12        THE COURT:  Have you reviewed the city's very latest

13 proposal regarding exit financing?

14 A    Yes, I think so.

15        THE COURT:  Okay.  Well, let me just ask you.  What

16 is your understanding on how that will work?

17 A    Yeah.  The -- I think that's the last version that I saw

18 is the final version.

19        The exit financing, the city is going -- the city has

20 commitment from Barclay's to fund $325,000,000 of exit

21 financing.  The city intends at this point to borrow

22 275,000,000.

23        Of that 275,000,000, 10% of that, or twenty-seven and a

24 half million dollars has to be put in interest reserve.  So

25 the two hundred and forty-two of borrowing, right, of -- of

1 cash, if you will, will then enure to the benefit of the city.

2     That $275,000,000 loan will be held as a private

3 placement by Barclay's initially.  Then there will be a

4 process by which the city undertakes a typical municipal

5 financing road show and marketing program to sell that into

6 the public.

7     And that will be completed, the time table is I think 150

8 days from confirmation.  So it will be early -- early two

9 thousand -- calendar 2015.  And then that -- that -- those

10 borrowings will be held by the public and the permanent

11 interest rate will be set.

12     Right now the private placement rate with Barclay's is

13 5.75%.  And the market will set the rate in -- in the public

14 sale.

15         THE COURT:  Do you have an opinion on whether the

16 terms of this exit financing as you have described them have

17 any impact on the feasibility of the plan?

18 A    Yes.  The -- the one issue that I identified in my plan

19 -- in my report in July that would cause the plan to tip to

20 infeasibility if you will, was lack of exit financing.  So the

21 fact that there are --

22         THE COURT:  Lack of?

23 A    Exit financing.  So the fact that there is a commitment

24 from Barclay's to fund 275,000,000 takes that -- that risk if

25 you will out of my assessment.

1          THE COURT:  Do you have a concern that granting a

2    security interest in the city's income tax revenue as this

3    exit financing appears to -- to require, may impair the city's

4    ability to access the capital markets for the next ten years?

5    A    Yes, I do.  The projections -- if the projections end up,

6    the actuals end up matching the projections, the plan is that

7    the city doesn't need to borrow.

8          With that said, I think it's maybe naive to think that

9    the city isn't going to have a desire to borrow during the

10   next ten years.  If the revitalization takes hold, the city is

11   going to want to do more.  It's going to want to borrow more

12   money.

13         And the fact that the exit financing is -- is a secured

14   financing with a revenue pledge, and, you know, could be

15   costly to refinance, is -- is a restriction I would rather not

16   have the city have to endure.

17         I've discussed that with Miller, Buckfire.  Their belief

18   is the secured feature of this exit financing makes the

19   marketability significantly easier.  And that it will lower

20   the overall cost to the city of the borrowing.

21         THE COURT:  Did you listen in on or review the

22   testimony of Mr. Buckfire when I pinned him down on exactly

23   what that savings was?

24   A    Yes.

25         THE COURT:  It wasn't very much.

1   A    Nope.

2           THE COURT:  Well, let me just ask you.  Do you think

3   the city would be better off paying that incremental increased

4   interest rate cost through an unsecured exit financing and

5   thereby maintaining at least the potential for access to

6   capital markets in the ten years rather than what's proposed

7   here to the Court?

8   A    That's a hard question for me to answer because the city

9   is not my client.  I -- my personal preference is to always

10  opt for flexibility and optionality.  It's just my nature.

11          So if there's a small cost associated with that, I would

12  -- I would always personally choose or recommend for my client

13  to -- to keep their options open, keep the flexibility there.

14  The concern that I have today is that the exit financing is a

15  ship that's sailed.

16          And that trying to re-jigger it at this point in time may

17  be destabilizing to what could be a good event for the city in

18  terms of publicly marketing its securities.

19          THE COURT:  In your work did you have an opportunity

20  to review the collective bargaining agreements that the city

21  and its unions have reached during the case to -- to determine

22  their impact on feasibility here?

23  A    I have reviewed what has been filed.  I have reviewed

24  some term sheets.  I've had some dialogue with the attorneys

25  involved on behalf of the unions with the union

1  representatives.

2      I've had some discussions with the Mayor and the

3  emergency manager about them.  I don't know that I've seen --

4  I -- I don't think I've seen the final -- what do they call

5  them?  Ratified, ratified documents.

6          THE COURT:  Uh-huh.

7  A    I've seen the ones that have gone to the state, so yes.

8          THE COURT:  Well, is there anything about what you

9  do know about these collective bargaining agreements that

10  causes you any concern in relation to feasibility?

11  A    Yes, in that I would have liked to -- I would have liked

12  the city to have had a -- a more robust negotiation around

13  work rules.  So that would be the down side.  But that kind of

14  goes to my overall concern that the speed with which we've

15  gotten this done has focused on the balance sheet, not the

16  operations.

17      The fact on the other side of that, the fact that the

18  city has a five year deal really helps feasibility.  So it

19  gets the city beyond this administration right, which is a --

20  a kind of a dotted line in the sand in terms of what you can

21  expect.

22      It gets the city beyond that even for another couple of

23  years in terms of knowing what its economic costs are going to

24  be.  And that's -- that's really helpful.

25          THE COURT:  What's the connection between work rules

1  and feasibility?

2  A    The -- the plan of adjustment is a giant change

3  management exercise.  The fundamental level of change that the

4  city needs to go through, should go through, I think will go

5  through, is it will clearly be unsettling to its employee

6  base.

7      And, you know, with that said, the union contracts in

8  terms of how people do their work will be affected by the

9  change and how easy or not it is to change those sorts of work

10  rules is -- is something that is bargained and, you know, will

11  have to be continually negotiated as the city goes through

12  this.

13          THE COURT:  Apart from what you have already told us

14  about here today --

15  A    Uh-huh.

16          THE COURT:  What are -- of any other material risks

17  to the successful implementation of the city's plan?

18  A    I don't think there are any material risks to the plan

19  that I didn't identify in my reports.  I -- I just -- I think

20  if -- if there was anything that I thought was a significant

21  risk, I put it in there.

22          THE COURT:  Okay.

23  A    Okay.

24          THE COURT:  What specific advice if any might you

25  give to the financial review commission established by Public

1  Act 181 regarding carrying out its responsibilities?

2  A    I'm not sure I'd give them any advice.  I think the --

3  the formation of that commission is really the most important

4  thing that the state is going to undertake and that it -- it

5  will -- it will hopefully support as everyone intends, the --

6  the effective implementation of the plan.

7       Because the state has designated participants and the

8  city has designated participants, who I would believe would

9  look out for the interest of the state and look out for

10 interest of the city, I think it would be advisable if the

11 commission included some more independent maybe more out of

12 geography sort of individuals that have the requisite skills,

13 that that bringing, you know, much like any board of

14 directors, bringing a variety of skills and perspectives will

15 enure to the benefit of the organization more so than just

16 having people who have pretty provincial or limited views.

17      So I would just hope in the -- in the appointed people

18 that they get -- they get some diversity both of mind set and

19 geography and skill set, and -- and all of that.

20           THE COURT:  Uh-huh.  Now you have already testified

21 here today regarding a few suggestions that you might make

22 regarding post-confirmation financial disclosures.  That you

23 believe the city should make in order to enhance feasibility.

24 Are there any other such post-confirmation financial

25 disclosures that you would suggest here?

1  A    Again, I think the -- the ones that I have suggested are

2  pension -- are a score card and really integrating the plan of

3  adjustment with the city's budget and its business planning.

4  So it's just really kind of those three things.

5          THE COURT:  Okay.  In looking at the qualitative

6  components of feasibility.

7  A    Uh-huh.

8          THE COURT:  Can you summarize for us what -- what

9  progress you have observed since your initial report in July

10 and your supplemental report in August?

11 A    Yes.  I think the first qualitative assessment criteria

12 that I defined was around human resources, human capital.  And

13 -- and I think it's first on the list because it's the most

14 important.

15     And the -- like I said a couple of things have happened.

16 One, the Mayor has hired a -- what, you know, everybody

17 believes is a top notch head of HR.  And she'll start in

18 January.

19     And then he has hired a deputy Mayor for economic policy

20 who is almost like another CFO to take on projects around --

21 she specifically focused on revenue, both in terms of looking

22 at new sources of revenue for the city and improving the

23 collection of revenue that the city is already owed.

24     She's working on major projects around policies and

25 procedures in -- at the department level.  And I mean these

1  are things that, you know, in -- in a perfect world might fall

2  under a chief administrative officer, or a CFO.  But there's

3  just not, you know, I mean Mr. Hill does not have any more

4  band width than what he has to do, right.

5      So and -- and they're working very well together.  And I

6  think having yet another really experienced finance and

7  operations person with deep municipal experience is a huge

8  benefit in terms of working through yes, human capital, but

9  also all of the policies and the procedures.

10      So that's -- I think that's the one thing that has

11  happened since July that is really helpful on the qualitative

12  cycle.

13          THE COURT:  Thank you.  That's all the questions I

14  have.  Does anyone else have any questions?

15          MR. STEWART:  No questions from the city.

16          MS. FISH:  No questions, Your Honor.

17          THE COURT:  All right.  You are excused as a

18  witness.

19  A    Thank you.

20          THE COURT:  I'd like to ask you to stay for a few

21  minutes so I can chat with you privately when I'm done here.

22  A    All right.

23          THE COURT:  I'll be done here with the lawyers in

24  just one moment.

25  A    Okay.

1        (WITNESS MARTHA KOPACZ WAS EXCUSED AT 11:08 A.M.)

2              THE COURT:  I'd like to get an idea if it's possible

3   to do that here -- here now, apart from the city who will be

4   making closing arguments on Monday.  And does anybody have

5   that kind of information for me?

6              MR. HOWELL:  Good morning, Your Honor.  Steven

7   Howell, Dickinson, Wright, Special Assistant Attorney General.

8   As I indicated at the beginning when we waived our opening, we

9   do intend to do a closing.  We estimate it now at about 30

10  minutes give or take.

11             THE COURT:  Thank you, sir.

12             MR. HOWELL:  Thank you.

13             MR. MONTGOMERY:  Good morning, Your Honor.  Claude

14  Montgomery for the retiree committee.  It is our expectation

15  -- my personal -- my personal expectation to provide a closing

16  in support of the city that should take about 45 minutes, Your

17  Honor.

18             THE COURT:  All right.  Thank you.

19             MS. FISH:  Good morning, Your Honor.  Deborah Fish.

20  Mr. Wagner is on the phone.  I don't know if he would like to

21  comment or --

22             THE COURT:  Well, let's ask.  Mr. Wagner, are you

23  here?  Are you available?

24             MR. WAGNER:  Yes, I'm here.  I guess the -- the

25  issue of our plan support is still technically open.  So for

1 now I'd like to reserve on that.

2          THE COURT:  Good, that's fine.  I won't -- I won't

3 push you any harder.

4          MR. WAGNER:  Okay.

5          MS. FISH:  Thank you, Your Honor.

6          MR. WAGNER:  Thank you.

7          THE COURT:  All right.

8          MR. KING:  Good morning, Your Honor.  Ron King with

9 Clark, Hill on behalf of the retirement systems.  I expect

10 that we might do closing.  If we do, it will be very brief,

11 15, 20 minutes at the most.

12     I also want to remind the Court that we do have the open

13 item with regard to our objection to the admission of certain

14 portions of Ms. Kopacz's expert report and her supplemental

15 report.

16          THE COURT:  Yes.  Thank you for reminding me of

17 that.  I will -- I will deal with that in the opinion on

18 confirmation.

19          MR. KING:  And if you hadn't heard, Ms. Green did

20 deliver a healthy baby boy two weeks ago.

21          THE COURT:  Oh, congratulations to her.

22          MR. KING:  Thanks.

23          MS. PATEK:  Your Honor, Barbara Patek for the

24 Detroit Police Officers Association.  If we do do a closing,

25 it will be very brief, 10 to 15 minutes.

1          THE COURT:  Okay.  Sir.

2          MR. KARWOSKI:  Good morning, Your Honor.  Michael

3    Karwoski.  John Quinn and I, individual objectors, have

4    preserved some of our time for closings.  We expect that they

5    would take about a half hour to 45 minutes each.

6          THE COURT:  Thank you, sir.  Mr. Bennett, did you

7    want to be heard on this?  I was told you want three hours.

8    Does that -- does that sound right?

9          MR. BENNETT:  Your Honor, that -- that does sound

10   about right.  And inasmuch as a lot of objections have been

11   resolved, it's possible to contract a lot of different

12   sections.  So if Your Honor has specific views about how much

13   time you would prefer to allot, I frankly can probably work

14   within whatever boundaries you set.

15         THE COURT:  No, I -- I don't.  I -- I think you

16   should argue whatever you think you need to argue and we'll

17   deal.

18         MR. BENNETT:  Okay.  Thank you very much, Your

19   Honor.  I -- I -- one thing I was not clear was is the time --

20   is 8:30 the regular time for --

21         THE COURT:  That's -- yeah.  Let's -- you know,

22   let's start at 9:00 on -- on Monday.

23         MR. BENNETT:  Okay.  Thank you.

24         THE COURT:  9:00 Monday everybody, okay?

25         MR. BENNETT:  Okay.

1          THE COURT:  Any other volunteers for closing

2  arguments?

3          MR. BENNETT:  Your Honor, will that be here?

4          THE COURT:  Are we in this room on Monday?  Yes,

5  apparently so.  Okay.  Anything else for today then?  All

6  right.  We are in recess.

7          THE CLERK:  All rise.

8          THE COURT:  Hold on one second.  Tim reminds me that

9  Monday is an immigration day meaning there may be longer

10  security lines, right, so plan accordingly.

11          THE CLERK:  All rise.  Court is adjourned.

12      (Court Adjourned at 11:12 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8   We certify that the foregoing is a correct transcript from the

9   electronic sound recording of the proceedings in the

10  above-entitled matter.

11

12  /s/Deborah L. Kremlick, CER-4872            Dated: 10-24-14
    Letrice Calloway
13

14

15

16

17

18

19

20

21

22

23

24

25