UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .       Docket No. 13-53846
        MICHIGAN,               .
                                .       Detroit, Michigan
                                .       October 21, 2014
                    Debtor.     .       9:00 a.m.
. . . . . . . . . . . . . . .

            TRIAL RE. OBJECTIONS TO CHAPTER 9 PLAN
            BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:         Jones Day
                        By:  GEOFFREY S. STEWART
                             GREGORY M. SHUMAKER
                        51 Louisiana Avenue, N.W.
                        Washington, DC  20001
                        (202) 879-3939

                        Jones Day
                        By:  HEATHER LENNOX
                        222 East 41st Street
                        New York, NY  10017
                        (212) 326-3837

                        Jones Day
                        By:  ROBERT HAMILTON
                        325 John H. McConnell BLVD., Suite 600
                        Columbus, OH  43215
                        (614) 469-3939

For Ad Hoc COPs         Kramer Levin Naftalis & Frankel, LLP
Holders:                By:  THOMAS MOERS MAYER
                        1177 Avenue of the Americas
                        New York, NY  10036
                        (212) 715-9169

APPEARANCES (continued):

For Financial         Weil, Gotshal & Manges, LLP
Guaranty Insurance    By:  ALFREDO PEREZ
Company:              700 Louisiana, Suite 1600
                      Houston, TX  77002
                      (713) 546-5040

                      Weil, Gotshal & Manges, LLP
                      By:  EDWARD SOTO
                      1395 Bricknell Avenue, Suite 1200
                      Miami, FL  33131
                      (305) 577-3177


Court Recorder:       Letrice Calloway
                      United States Bankruptcy Court
                      211 West Fort Street, 21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2      be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Before we begin with our testimony, I

4      need an explanation regarding the status of the plan, please,

5      because I built the schedule that I announced in court

6      yesterday for closing this case around the representation

7      that I would have a final plan last night, and I didn't get

8      it.

9          MS. LENNOX:  That's correct, your Honor.  For the

10     record, Heather Lennox of Jones Day on behalf of the city.

11     What we did file last night we have termed a draft plan, and

12     I'd like to explain what is still sort of open for your

13     Honor.  The economics of the FGIC settlement are all worked

14     out.  What is still being thrashed out among the COPs parties

15     and Syncora is what we're calling -- what really is the

16     integration of both deals both between FGIC and its insureds

17     and between FGIC and Syncora.  Mr. Perez referred to this to

18     me this morning as plumbing, and I think that's right, but

19     plumbing mechanics are important parts of a plan, so we need

20     to have these sort of intermural issues resolved in order to

21     file the final version of the plan.

22          Now, we do have, as your Honor may know, mediation

23     scheduled all day today, and it's the city's intent that no

24     one leaves that mediation until this is all worked out so we

25     can file a final plan, if not late this evening, then

1 tomorrow.  However, we do think the meat and the substance of
2 the deal are in what we filed last night.

3         Also, your Honor, to report -- and what we filed
4 last night were the issues -- you may recall there were
5 issues raised yesterday morning between the library unions
6 and the Retiree Committee.  Those are resolved, and that
7 resolution is reflected in what we filed last night.

8         THE COURT:  Well, I have to say that while I accept
9 these representations at face value, it's still a little
10 uncomfortable for me to have my expert witness on feasibility
11 testify about a plan and prepare to testify about a plan that
12 hasn't been filed yet.

13         MS. LENNOX:  So, your Honor, with respect to that,
14 if your Honor chooses to proceed today as originally
15 scheduled, the witnesses that the city intends to present
16 today will deal with the economic substance and how the
17 settlement will work in principle, and that testimony will
18 not change.  That is already in the plan.  That's baked in
19 the plan.  That's baked in the evidence that your Honor would
20 hear today and has been discussed with your expert already by
21 the city's parties.  I do think -- and perhaps somebody who's
22 been involved in the trenches in these discussions can
23 characterize it better than I can, but I do think this is --
24 these issues that we're talking about are how distributions
25 are going to be made, how -- there are several intercreditor

1  issues and how those are going to be resolved among

2  themselves, which really don't affect treatment in the plan

3  and that sort of thing, so I do think what your Honor --

4  should your Honor choose to proceed today, what you would

5  hear would not change based on whatever plumbing we need to

6  resolve going forward.

7         THE COURT:  Well, I don't think there's any doubt

8  about proceeding today.  My concern is for tomorrow and my

9  expert witness.

10         MS. LENNOX:  Yes.

11         THE COURT:  All right.  Well, maybe the best course

12  then would be for us to make the decision about whether to

13  proceed tomorrow after hearing the evidence today to see if

14  there is, indeed, a complete enough record without a final

15  plan to warrant going ahead tomorrow.

16         MS. LENNOX:  Thank you, your Honor.

17         THE COURT:  All right.  Sir.

18         MR. PEREZ:  Good morning, your Honor.  Alfredo Perez

19  on behalf of FGIC.  And I should obviously share some of the

20  blame for her because we were the ones who were kind of

21  holding it up, so I apologize.

22         THE COURT:  Okay.

23         MR. PEREZ:  Your Honor, in essence, I think, as it

24  relates to the economic transaction, the impact on the city

25  and the deal, I think all of that is pretty much done, and I

1   think Mr. Mayer would agree.  The problem was that the

2   mechanism that was in the plan to distribute to Class 9

3   simply didn't work for us, and the mechanism was done in a

4   way where Syncora owns all of their COPs claims except for 24

5   million, whereas we don't, and it's -- and to some extent

6   it's a pass-through, so that concept just didn't work, and

7   that's what really we've been working on trying to meld the

8   two mechanisms so we have something that's acceptable to them

9   and actually gets the consideration to our insureds.  And

10   that's really been what I called the plumbing, but it's

11   really what gets people the consideration.  That's been the

12   big issue.

13       THE COURT:  And this is what you're going to be

14   discussing today in your mediations?

15       MR. PEREZ:  Well, I don't really think that the

16   mediations involved -- there are still little open issues.  I

17   don't think this is an open issue.  This is really just a

18   mechanism, and we just have to get -- you know, Syncora will

19   be here, and we'll have to figure out a way that works both

20   for them and for us.  I'm not sure it's an open issue.  I

21   mean one thing that we could do is just completely divide,

22   and our consideration goes one way and their consideration

23   goes another way.  That creates all kinds of other issues.

24   Then you got to have 1145 because these are tradeable

25   securities, and we don't want to create more issues than need

1   be.  Thank you, your Honor.

2            MR. MAYER:  Good morning, your Honor.  Thomas Moers

3   Mayer of Kramer, Levin, Naftalis & Frankel on behalf of the

4   ad hoc COPs holders holding about well over 90 percent of the

5   insured COPs, the FGIC insured COPs.  Your Honor, we received

6   documentation of our deal with FGIC at approximately three

7   o'clock yesterday afternoon.  It is in shape to go to

8   principals for their sign-off.  The way this has to work -- I

9   shouldn't quite say that.  I have an hour of time allocated

10  today for final changes.  I expect to be on a flight at three

11  and change.  My game plan is to have those documents filed

12  publicly by close of business today with my clients signing

13  off on them in 48 hours, and so certainly by Friday we should

14  be able to give the Court a definitive answer that we will

15  not be maintaining any objections to the plan of

16  reorganization.  In the meantime, we do not expect to cross

17  witnesses.  My partner, Jonathan Wagner, was here in case

18  things went otherwise, but I suspect he will be on an earlier

19  flight home than I will be.  And I think, again, principals

20  have to see documents before I can tell you that we're done,

21  but my anticipation is that these documents will be exposed

22  to principal review by 5 p.m. today.  There is not much red

23  in the redline from the failed deal that we filed last week

24  with the one exception of the acceleration issue, which we

25  will deal with another time.  If you have any questions, I'm

1  happy to answer them.

2          THE COURT:  No.  Thank you, sir.  Sir.

3          MR. PEREZ:  Your Honor, Alfredo Perez.  I did want

4  to report that we did -- we have obtained board approval and

5  the -- our request is in with DSF, and we're prodding them to

6  approve it.

7          THE COURT:  What's your prediction?

8          MR. PEREZ:  Well, we told them it needed to be by

9  the end of this week, so you can't push too hard.

10          THE COURT:  Okay.  No.  I understand.  All right.

11  Let's proceed.

12          MR. MAYER:  Your Honor, I came to say what I may

13  say.  May I be excused from the balance of the proceeding?

14          THE COURT:  Yes, yes.

15          MR. MAYER:  Thank you, your Honor.

16          THE COURT:  Thank you.

17          MR. HAMILTON:  Good morning, your Honor.  Robert

18  Hamilton of Jones Day on behalf of the City of Detroit.

19  First witness we call this morning is Gerald Salzman of

20  Desman.

21          THE COURT:  Step forward, please, sir, and please

22  raise your right hand.

23              GERALD SALZMAN, CITY'S WITNESS, SWORN

24          THE COURT:  Please sit down.

25          MR. HAMILTON:  Your Honor, we have a binder of the

1   three exhibits that I'm going to go through with the witness.

2   One is already at the witness stand.  May my associate, Ms.

3   Nelson, approach with binders for the Court?

4            THE COURT:  Yes, please.  Thank you.

5                          DIRECT EXAMINATION

6   BY MR. HAMILTON:

7   Q   Good morning, Mr. Salzman.  Can you give your full name

8   for the Court?

9   A   Gerald Salzman.

10           THE COURT:  Excuse me one second.  I need you to

11  pull that microphone much closer to you.  I think the base

12  may actually slide, or maybe you can move your chair, either

13  way or both.

14           THE WITNESS:  How's that?

15           THE COURT:  And speak right into it.  Yes.  Good.

16  Thank you.  Go ahead.

17  BY MR. HAMILTON:

18  Q   Full name, sir.

19  A   Gerald Salzman.

20  Q   And, Mr. Salzman, where do you work?

21  A   At Desman, Incorporated.

22  Q   And what is Desman in one or two sentences?

23  A   Desman is a parking firm.  We design garages.  We do

24  studies about garages, and we restore garages.

25  Q   And what is your title at Desman?

1    A    I'm a principal.

2    Q    And what office are you at?

3    A    Chicago.

4    Q    All right.  How long have you been at Desman?

5    A    I've been 11 years at Desman.

6    Q    All right.  And where did you work before you worked at

7    Desman?

8    A    I worked at a firm called Barton Aschman.

9    Q    And what is Barton Aschman?

10    A    It's a similar kind of firm, slightly more engineering

11    oriented than Desman, but basically doing the same kind of

12    parking work.

13    Q    And where did you work before that?

14    A    A firm called Wilbur Smith doing the same --

15    Q    And what is Wilbur Smith?

16    A    It's a transportation planning firm doing the same kind

17    of work.

18    Q    And so how --

19          THE COURT:  One more time, sir.  Pull the

20    microphone --

21          THE WITNESS:  Oh, sorry.

22          THE COURT:  -- even closer.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Speak right into it for me.  Thank you.

25    Go ahead.

1          THE WITNESS:  Thanks.

2    BY MR. HAMILTON:

3    Q    So how long have you been working in the parking

4    consulting industry?

5    A    About 40 years almost.

6    Q    All right.  And can you tell the Court what your post-

7    high school educational background is?

8    A    I went to the University of Rochester, New York, and --

9    for a bachelor's degree, a master's in history at the

10   University of Houston, and a master's of urban planning at

11   Texas A&M.

12   Q    All right.  Can you describe -- a little bit more

13   background on Desman.  When was Desman established?

14   A    About 40 years ago.

15   Q    All right.  And where does it operate?

16   A    We have nine offices across the country stretching from

17   Boston to Denver.

18   Q    And will you describe for the Court what the range of

19   services are that are provided by Desman to its clients?

20   A    Well, we design garages.  We do various kinds of studies,

21   financial studies, feasibility studies.  We do what we call

22   condition assessments, which are physical inventories, and

23   assessments of parking lots and garages.  We do restoration

24   of garages and -- well, that -- we do a few other sort of

25   planning oriented things, traffic planning for garages.

1  Q    Do you do any estimates of costs and finances?

2  A    Of course.  Cost estimating and bond feasibility studies

3  as well.

4  Q    Do you have architects that work at Desman?

5  A    We have architects, yes.

6  Q    What do they do?

7  A    They do primarily design of facilities.

8  Q    And do you have structural engineers?

9  A    Structural engineers.

10 Q    What do they do?

11 A    They work on both the design and the restoration side.

12 Q    How big is Desman?  How many employees do you have?

13 A    We have about 95 people.

14 Q    And what are the type of people that you have?

15 A    Well, there are architects, engineers, planners,

16 primarily structural engineers.

17 Q    Can you describe for the Court some of the market and

18 revenue studies for other private financing projects that

19 Desman has done other than the City of Detroit?

20 A    Sure.  Well, we have recently in the last couple of years

21 worked for the City of Los Angeles and the City of Pittsburgh

22 on financing studies and review of facilities.  We worked on

23 the Ohio State privatization deal and a similar one at the

24 University of Michigan recently and a few --

25 Q    Did you do work in Chicago?

1   A    Pardon me?

2   Q    Did you do work in Chicago?

3   A    We did work on both the Chicago meter deal and the

4   Chicago garage privatizations.

5   Q    And have you done any work for airports?

6   A    Airports, yes.  I've just forgotten --

7   Q    Midway?

8   A    Oh, Midway.  Sorry.  Yes.  Sorry.  Twice we did Midway.

9   Thank you.  The attempted privatization at Midway.

10  Q    And what about in San Juan?

11  A    San Juan we worked on the initial feasibility studies.

12  Q    What did you do for the City of Harrisburg?

13  A    City of Harrisburg we did a study of both the physical

14  assets there and the -- and a financial modeling of the

15  existing conditions and going forward over the --

16  Q    Of the system?

17  A    Of their entire parking system, yes.

18  Q    All right.  And can you describe a little bit what you

19  did for the Ohio State University?

20  A    The Ohio State University, yes.  We were retained on

21  behalf of the university to help them in their -- what would

22  become a privatization of all their parking facilities, and

23  it involved a look at the physical assets, the garages and

24  lots, to do a projection over the 40-year life of the

25  concession, and then as well a second part was the financial

1   review of the existing system and, again, a long-term

2   projection and then assisting the university in its

3   interaction and negotiation with potential bidders.

4   Q   And can you describe for the Court what you did for the

5   University of Michigan?

6   A   It was the same kind of an effort.  They didn't go

7   forward with the final phase of the privatization, but it was

8   the same financial modeling and physical review.

9   Q   Can you tell the Court how you first became involved in

10  working with the City of Detroit?

11  A   Well, earlier this year in the beginning of the year I

12  received a call from Miller Buckfire asking if we would be

13  interested in doing that sort of work, helping the city as it

14  looked to its finances.

15  Q   What was the scope of the project that was described to

16  you?

17  A   It was described as a sort of review of assets with a

18  potential to privatize some or all of the parking assets.

19  Q   And what did you understand as a result of that

20  discussion with Miller Buckfire that the parking assets

21  consisted of?

22  A   There were six or seven garages and 3,100 meters as well

23  as the -- what we came to know as the boot and tow operation

24  and the violations bureau.

25  Q   And what was your understanding of the purpose of your

1  project?

2  A    In part to assist in a potential valuation for the

3  purpose of reorganizing and maybe privatizing.

4  Q    Privatizing what?

5  A    The parking system.

6  Q    So what did you do first?  Who did you meet with?

7  A    We first met with Norm White, the parking director, and

8  his staff to review data and --

9  Q    And when you say "we," can you describe for the Court --

10  A    Sorry.

11  Q    -- who you mean by "we"?

12  A    Well, we as a -- you know, a team of people, me and two

13  other on the financial side and about five or six on the

14  engineering side.  We met with them to obtain plans and

15  historical financial data to understand how things are

16  operating, organizational sort of issues, and provide a

17  foundation for us to do some analysis.

18  Q    And what kind of information did you collect from Mr.

19  White?

20  A    Well, we collected, again, physical plans of the garages,

21  lists of repairs that had been done over time, inventories of

22  equipment, you know, kind of revenue control equipment and

23  whatnot, lists of meters and locations, financial records of

24  the sort of historical records for the past five years or so.

25  Q    All right.  After you reviewed or collected all these

1  historical records, what did your team of ten people from

2  Desman do next?

3  A    Well, we went in two approaches.  The engineers went into

4  the garages and did what we call a condition assessment,

5  which, as you might guess, is exactly what it sounds like, to

6  look at the physical condition of the concrete and the

7  expansion joints, et cetera, and they go through with -- in

8  fair much detail with little hammers and look -- you know,

9  check the concrete and look for spalling, which is breaking

10 off pieces of -- broken off pieces of concrete, checking

11 elevators and whatnot, and then on the other -- on the

12 financial side, we began to develop a financial model based

13 on the data that we had gotten from the city, but then, in

14 addition, we did our own sort of verification.  We did

15 inventory and occupancy counts in the garages.

16 Q   Can you describe for the Court what you mean by

17 "occupancy counts" for both the garages and the meters?

18 A    Yes.  Well, we physically went out and counted the number

19 of cars that were in the garage during the middle of the day

20 during peak times to determine what -- you know, how many

21 spaces were actually occupied at any point in time.  Gives us

22 a good handle on sort of where -- what the potential is for

23 additional occupancy and revenue, and it also helps us to

24 calibrate the financial numbers to sort of reality.

25 Q   Did you do any surveys of the meters --

1  A    We did surveys --

2  Q    -- on-street meters?

3  A    We did surveys of meters in two different ways, one just

4  what numbers of -- we looked to find all the meters basically

5  just driving around to find them and to see how many of them

6  were occupied again at a point in time, and then we did some

7  specialized surveys to understand the percent of violations

8  and the amount of what we call piggybacking, which is using

9  the meters which are -- putting time in that's not spent that

10 goes to the next guy who pulls in after you pull out, which

11 is, in a sense, lost revenue to the system.  We also looked

12 at percent of violations and nonpayment.

13 Q    And what did you do with all this information that you

14 gathered?

15 A    You sort of mix it up and put it into a model, which then

16 builds forward over a long period of time -- I think we did

17 40 years in this case -- looking at revenue and expenses.

18 Q    And what expenses are included in the -- is projection of

19 expenses in the models?

20 A    Yes.

21 Q    And what are the --

22 A    Projections.

23 Q    What are the categories of expenses that you're

24 projecting?

25 A    Well, there's labor costs and capital costs and other

1  operating costs for -- you know, for various pieces of

2  equipment and repairs and whatnot.

3  Q   All right.  And did these models consider different

4  scenarios?

5  A   Yes.  There are four scenarios that we --

6  Q   Can you describe for the Court the four scenarios that

7  Desman modeled for the City of Detroit?

8  A   Hold on.  I'll need to read them off, and I'll tell you

9  exactly.

10 Q   Well, actually, we'll get to that in a second,

11 Mr. Salzman.

12 A   Sure.

13 Q   Can you just describe generally for the --

14 A   Sure.

15 Q   -- Court the four models?

16 A   There's four models, so the first one is what we call the

17 status quo model, which is really a look at the existing

18 trends plus what we know is already in place in terms of

19 changes, updating parking meters, et cetera, and some

20 moderate rate increases.  Then there's a -- sort of a more

21 aggressive city model.  City continues to operate everything

22 but is allowed to make more changes than historically they've

23 made in terms of rates and in terms of expenses and staffing

24 and technology.  Actually, not rates but everything but

25 rates.  We kept rates constant.  Then there's a private model

1  that if you were to in some way outsource this to a private

2  entity and allow them to operate, that's a third scenario.

3  And then there's a fourth scenario, which is the private

4  operator but very, very aggressive rate schedule changes and

5  whatnot.

6  Q   And what did each one of these different scenarios in

7  your model -- what did they -- what was the overall

8  projections generally?  Of what?

9  A   It was just revenue and expenses and capital expenditures

10 for each scenario, and --

11 Q   And when did you first complete a draft of a report that

12 came from this model?

13 A   I think it was in May, May of this year.

14 Q   And did there come a time when you actually transmitted a

15 final version of that report to the city manager and the City

16 of Detroit?

17 A   Yes.  And I believe that was in September.

18 Q   Was there a prior version that you sent to Mr. Orr?

19 A   Yes.  There was one in the end of May.

20        MR. HAMILTON:  Can we bring up City Exhibit 753?

21 BY MR. HAMILTON:

22 Q   Mr. Salzman, do you recognize this --

23 A   Yes.

24 Q   -- document?

25 A   Yes.

1  Q    What is this document?

2  A    That's our initial review of the system.

3  Q    Did you provide this document to Mr. Orr and the City of

4  Detroit --

5  A    Yes.

6  Q    -- in July of 2014?

7  A    Yes.

8         MR. HAMILTON:  Your Honor, the city would move City

9  Exhibit 753 into evidence.

10         THE COURT:  Any objections?

11         MR. WAGNER:  No.

12         MR. SOTO:  No objections.

13         THE COURT:  It is admitted.

14     (Exhibit 753 received at 9:24 a.m.)

15  BY MR. HAMILTON:

16  Q    All right.  After you provided this first version of the

17  report in July, what did you continue to do?

18  A    Well, we continued to refine the models and began to

19  think of a more detailed report that would provide some

20  background and additional information.

21  Q    And what was the purpose of providing more background and

22  more detailed and more refined information?

23  A    It was in great part to provide the information that

24  would be needed if there was an outsourcing effort made to

25  concessionaires and provide the background that would help

1  them to understand the system better.

2  Q   Okay.  And did you produce a final report then?

3  A   We did, and that was the one in September.

4        MR. HAMILTON:  Can we bring up City Exhibit 783?

5  BY MR. HAMILTON:

6  Q   Do you recognize this document, Mr. Salzman?

7  A   Yes.  That's our final report.

8  Q   All right.  And is this the report that you prepared?

9  A   Yes.

10  Q   All right.

11        MR. HAMILTON:  Your Honor, the city would move

12  Exhibit 783 into evidence.

13        MR. WAGNER:  No objection.

14        THE COURT:  It is admitted.

15     (City Exhibit 783 received at 9:25 a.m.)

16  BY MR. HAMILTON:

17  Q   All right.  Can we turn to page 5 of that exhibit, 005?

18  Mr. Salzman, can you describe for the Court -- I think this

19  is labeled executive summary -- what this details?

20  A   Well, this is a quick summary of the work that we did of

21  describing first the assets.  What remained is six off-street

22  parking facilities with 6,500 spaces, 3,196 meters, the

23  parking violations and the boot and tow operation.

24  Q   Let me ask you about those assets, Mr. Salzman.  Are you

25  familiar with something that's called -- things that are

1   called APS and PVB?

2   A   Sort of, yes.

3   Q   Okay.  Can you describe your understanding on how they

4   relate to these categories of assets?

5   A   Yes.  There's several of these assets, the -- or there's

6   a -- sorry.  I guess that's hard to -- there's an enterprise

7   fund, which includes the parking meters and the off-street

8   facilities.

9   Q   When you say "off street," you mean the garages?

10  A   The garages, yes.

11  Q   And is that -- what does APS stand for?

12  A   I don't remember.

13  Q   Okay.  And is that the -- that relates to the enterprise

14  fund?

15  A   That's the entity that is -- yes.  And then the -- that's

16  an enterprise fund which is sort of a self-contained

17  financial entity, and then the violations effort is in the

18  main fund of the city, and that is the PB --

19  Q   PVB, the Parking Violations Bureau?

20  A   Parking Violations Bureau.

21  Q   When you say "main fund," is that what --

22  A   The general fund.

23  Q   The general fund.

24  A   I believe.

25  Q   Okay.  All right.  And then if we go to the third

1  paragraph on this executive summary, does that describe the

2  four scenarios that you described for the Court earlier?

3  A    Precisely.

4  Q    And then the next paragraph describes your conclusions;

5  is that correct?

6  A    Yes.

7  Q    And what are those conclusions?

8  A    Well, that each scenario has a different amount of total

9  cash flow basically from 427 million on the -- over the 40

10  years to 1,300 million over the -- in the upside scenario.

11  Q    All right.  Let's go over some of the assumptions in the

12  first scenario on the status quo.  Can we go to page 40 and

13  40 -- first 40 of this exhibit?  And if we look down at the

14  bottom on Section 8.0, this is the modeling assumptions?

15  A    Yes.  These are the modeling --

16  Q    Could you describe for the Court what these are

17  generally?

18  A    Well, I would actually encourage you to look at, unless

19  you have a different reason for wanting to do that, sort of a

20  summary on page 48.

21  Q    Well, let's get there, but I want to ask you --

22  A    Okay.

23  Q    -- about a couple of them.

24  A    Okay.  Sure.

25  Q    Let's go to bottom 8.1, the off-street revenue

1  assumptions.

2  A    Right.

3  Q    What does "off street" refer to?

4  A    Off street is the garages.

5  Q    Okay.

6  A    And it was assumed that the parking volume, the number of

7  cars parking, would grow by .3 percent a year in the first

8  ten years and then .6 percent per year in the second ten

9  years and .7 and .8 in the third and fourth years.

10 Q    And if we go to the next page, if you look at the second

11 and third bullets on that page, could you tell the Court what

12 assumptions were made regarding the Joe Louis Arena?

13 A    So that is assumed that after -- that we would maintain

14 that garage for the three years until 2017 when the new arena

15 would be built and that the Joe Louis Arena would be closed,

16 and then at that point all revenue would stop, and the garage

17 would be essentially closed.

18 Q    Okay.  And then if we go to the next page, page 042, and

19 if I could ask you, sir, about the capital expenditure

20 assumptions and, in particular, bullets number -- the first

21 and fourth bullet.  Can you describe those for the Court?

22 A    Yeah, sure.  We assumed, again, capital expenditures for

23 access and revenue control, which the MPD already has in

24 place to replace the garage except for the Cultural Center

25 garage and the Joe Louis Arena garage, and then --

1    Q    If you look at the fourth bullet line --

2    A    And the fourth one --

3    Q    -- what happens in the first five years?

4    A    Basically the garages get restored to really quite sort

5    of state of the art condition.

6    Q    What does that entail?

7    A    That's physically removing cracked and damaged concrete,

8    replacing the rebar inside the concrete, expansion joints,

9    elevators, modernization and plumbing and other things that

10   need to be done.  The idea is to get the garage in the

11   condition that it can be operated going forward and

12   maintained fairly straightforwardly over the course of the

13   remaining 35 years after that.

14   Q    And I believe this morning at breakfast you mentioned

15   something about membranes?

16   A    Yes.  So the enemy of concrete is salt, and so, you know,

17   it's winter.  We put down salt.  Concrete is fairly porous,

18   and so the salt percolates through the concrete to the steel,

19   and the steel then rusts, expands, and then that's why you

20   have cracked concrete.  One of the ways to -- so once you fix

21   the existing conditions, then in order to maintain it so it

22   doesn't happen again, one method is to use a membrane over

23   the top of the concrete, which is a waterproof barrier

24   basically, which keeps the salt from percolating down and

25   directs it towards the drains.

1   Q   And is that -- applying that membrane an effective method

2   to make the concrete last a lot longer?

3   A   It does.  It dramatically eliminates the impact of the

4   salt.

5   Q   Is there some reason why it didn't have membranes before?

6   A   Well, it's traditionally, not just in Detroit but

7   everywhere -- it's a fairly expensive solution, and unless

8   you're looking at a very long-term sort of payoff, it's often

9   not done.  It's done by practice in Canada where they, you

10  know, have a lot more weather and where it's sort of mandated

11  from day one, and increasingly when you're looking at long-

12  term durability, that's one of the key ways to do it.

13  Q   And so what impact does that have on your projections for

14  capital expenditures for the next 40 years for the City of

15  Detroit?

16  A   Well, if you look at the capital expenditures, there's a

17  lot of expenditures in the first -- in the first five or so

18  years, and then it's fairly modest over the remaining amount

19  of time.

20  Q   And that's in large part due to fixing what?

21  A   Fixing all the -- whatever is wrong and going --

22  existing, and then doing sort of long-term durability

23  protection with the membranes and other things.

24  Q   All right.  If we were to go forward now to 044 of this

25  exhibit, and this is the on-street revenue assumptions.

1  That's reference to the parking meters; is that right?

2  A    Parking meters is the on-street, yes.

3  Q    Okay.  And if you look at the second and third and fourth

4  bullets, could you describe those assumptions and why you

5  made them in the status quo model?

6  A    Right.  We assumed basically an average of a one percent

7  a year increase in rates over time, and that's significantly

8  less than historical inflation, but it represents in some

9  level what has happened, you know, historically.  The rates

10  tend to lag behind the costs, unfortunately, but it's

11  politically and otherwise what tends to happen.

12  Q    And what are the -- it says the hours of enforcement were

13  assumed to remain unchanged.  What are the current hours of

14  enforcement on the meters?

15  A    Well, in general it ends at six o'clock in the evening,

16  and --

17  Q    And then the last bullet there that I mentioned is the no

18  additional meters was assumed.  Why is that there?

19  A    Well, there's 3,100 meters now, and we assumed that that

20  would just maintain itself.

21  Q    All right.  Did you do any investigation to determine if

22  there is a need or an opportunity for more meters?

23  A    We did, and that's reflected in one of the -- in the more

24  optimized scenario.

25  Q    All right.  And if we go to the next page, 045, on on-

1   street expense assumptions --

2   A   Yes.

3   Q   -- the second bullet talks about no additional parking

4   enforcement officers.  Do you see that, sir?

5   A   Yes, sir.

6   Q   What did you discover in doing your due diligence about

7   the current staffing of parking enforcement officers?

8   A   Well, there's a lot -- there's quite a number of

9   enforcement officers, and so we assumed that it would remain

10  the same.  There has been some reports that seem to bear out

11  that there's a lot of staffing issues with getting people to

12  actually be on the job.  There's a lot of absenteeism and

13  whatnot, so we didn't want to increase the staffing there.

14  Q   In the status quo model?

15  A   In the status quo model.

16  Q   All right.  And then the bullet on legacy expenses, can

17  you describe what you did there?

18  A   Yeah.  There we assumed that this whole process that the

19  city is going through would --

20  Q   The plan of adjustment process?

21  A   Plan of adjustment, sorry, would be in -- would impact

22  the legacy costs.

23  Q   All right.  So you accounted for that in your

24  projections?

25  A   Correct.

1  Q   And then can you describe the capital expenditure

2  assumptions that were made with respect to the meters?

3  A   Oh, yes.  That as the city has been planning, we assumed

4  that the meters would -- the existing meters would be

5  replaced by credit card enabled single space meters for the

6  3,196 spaces.

7  Q   Okay.  If we could go to Table 21 of this report,

8  Mr. Salzman, which is on 048.

9  A   Yes.

10         MR. HAMILTON:  If we could bring that up --

11         THE WITNESS:  Yes.

12  BY MR. HAMILTON:

13  Q   All right.  What does this table reflect?

14  A   This is an attempt to briefly summarize -- compare the

15  four scenarios that we have been talking about, the status

16  quo, the optimized, the private, and the private upside.

17  Q   All right.  And if I could, if you could just take the

18  first one, the garage rates --

19  A   Yes.

20  Q   -- could you describe what's different in the last

21  scenario, private upside, from the first three?

22  A   The first three you can see -- and we talked about this

23  before -- that we assumed essentially a ten-percent increase

24  every ten years, which is approximately one percent a year,

25  and so in the status quo, the optimized, and the private

1  model we assumed that.  And then in the private upside we

2  assumed that the operator would be permitted to raise rates

3  essentially equal to inflation.  It's a ten-percent increase

4  every three years, which is approximating the historical rate

5  of inflation.

6  Q    So a little over three percent a year?

7  A    It's about three percent, yeah, which is something that

8  if -- a private operator would want because otherwise they're

9  sort of falling behind, and -- but that's the upside model.

10  Q    All right.  And if we go to --

11          THE COURT:  Excuse me one second.

12          MR. HAMILTON:  Sure.

13          THE COURT:  Has the witness testified about which

14  garages his report here encompasses, or are we going to get

15  there?

16          MR. HAMILTON:  I will deal with it right now, your

17  Honor.

18  BY MR. HAMILTON:

19  Q    All right.  How many garages -- parking garages did the

20  City of Detroit own, Mr. Salzman?

21  A    Well, I believe it's seven.

22  Q    Okay.

23  A    I'm going to find the list right here, yes.  One, two,

24  three, four, five, six --

25          THE COURT:  Can you tell us what you are looking at?

1          THE WITNESS:  Yes.  I am right now trying to find

2     the list.

3     BY MR. HAMILTON:

4     Q    Let's go to page 024.

5     A    24?  Okay.  I was at 55, but --

6     Q    Table 13.

7     A    Yeah.  There we go, yeah.

8     Q    What does this table reflect?

9     A    Okay.  These are the -- two, four, six -- seven garages

10    that are listed in the -- that were included in the system.

11    Q    What are the -- which of these garages did you -- did

12    your team do due diligence on?

13    A    All of them.

14    Q    Okay.

15    A    All of them.  The Ford Underground, the Grand Circus, the

16    Joe Louis, Millennium Underground, Eastern Market, and the

17    Cultural Center.

18    Q    What did you do with respect to the Cultural Center one,

19    the one at the bottom?

20    A    Well, we didn't do any inventory or occupancy counts

21    because the garage was closed, but we did look at the cost to

22    repair it.

23    Q    All right.  And in your models, do you have any

24    projections of any revenues or expenses associated with the

25    Cultural Center parking garage?

1  A   One second.  Just let me check real quick.  I'm not sure

2  if I remember.  I believe we do, yes.

3  Q   Do you anticipate opening that garage again?

4  A   Yes, yeah, that the deficiencies would be corrected and

5  you would open it.

6          MR. HAMILTON:  Does that answer your question, your

7  Honor?

8          THE COURT:  Yes, sir.

9          MR. HAMILTON:  Okay.

10  BY MR. HAMILTON:

11  Q   All right.  If we can go back to Table 21, which is on

12  048 of the exhibit, Mr. Salzman --

13  A   Yes, um-hmm.  Yes.

14  Q   About halfway down one of the rows is titled "additional

15  meters."

16  A   Yes.

17  Q   See that?

18  A   Yes.

19  Q   All right.  Can you describe for the Court what this

20  reflects?

21  A   So as we were investigating the meters, we noticed areas

22  where we thought there could be additional meters, and so in

23  the status quo we assumed no additional meters.  In the

24  optimized model we assumed that there was 114 that we

25  identified, which is half of the 228 that we subsequently

1    identified.  And in the private model we assumed that the

2    private -- a private operator would be very aggressive about

3    pushing to install meters, and so in the private models

4    there's 228 as opposed to just 114 for the optimized.

5    Q    All right.  And then --

6    A    Those are additional beyond the 3,100 that exist now.

7    Q    If we go to 037 of this report, and if you look at the

8    bottom paragraph, does this describe the work that Desman did

9    to identify the opportunities for additional meters?

10   A    Yes, exactly.

11   Q    And if you go to the next page --

12   A    Um-hmm.

13   Q    -- what is the number of additional meters that you

14   identified as an opportunity for?

15   A    We found 370 potential spaces that could be metered, but

16   we assumed sort of conservatively that there would be reasons

17   why some of them couldn't be done, wouldn't be done, and so

18   that's why we ended up with essentially a third of that --

19   two thirds of that and one third of that.

20   Q    Okay.  All right.  If we can go back to the table again,

21   Table 21 on 048, and a little bit below the addition of

22   meters you have ticketing volume.  Do you see that?

23   A    Yes.

24   Q    I'll wait for you.

25   A    Yes.

1    Q   All right.  And on the status quo, it references a

2    realization of 75 percent of additional revenues.  Can you

3    explain that assumption for the Court?

4    A   Yes.  So we've done several things that cause the ability

5    to have more ticketing volume.  There's some growth in demand

6    over time, so more people are parking; therefore, there's

7    more potential to have more violations.  There's a lot of fee

8    increase initially, which I think is the great part of that

9    there.  And then in some of the other scenarios there's

10   different reasons for --

11   Q   Well, in the optimization --

12   A   Optimized.

13   Q   -- column, the one right next to it, it goes up to 80

14   percent.

15   A   Eighty percent, but that --

16   Q   Can you describe for the Court how you went from 75 to 80

17   percent?

18   A   Correct.  So in addition to the raising of fees for

19   tickets, we've also extended meter hours by an hour in most

20   every area, and so that gives the ticket writers more time to

21   write tickets, and --

22   Q   So they're being extended from --

23   A   Six to seven o'clock in the evening in areas where it

24   goes till six.  There's a few areas that are already later

25   than that, but -- so that gives us an extra -- a potential to

1  get that much more ticketing volume.

2  Q   And what is the primary difference on these models

3  between the private model and the private upside?

4  A   The primary difference is the rate increase that we're

5  assuming -- the rate increases that we're assuming for the

6  garages and the meters from basically one percent a year to

7  sort of an inflationary adjustment.

8  Q   Okay.  All right.  If we can go to the next page,

9  Mr. Salzman, this is Table 22.  Can you describe for the

10 Court what this table reflects?

11 A   Well, this is sort of a sample of a summary of the

12 optimized financial model, and there's one ultimately for

13 each of the -- each of the four scenarios.

14 Q   Right.  And let's describe again what is the optimized

15 model?  What does that assume?

16 A   That assumes city ownership and sort of reorganization

17 and a one-percent increase in rates, extended hours, 114 new

18 meters, et cetera.

19 Q   All right.  And so this table reflects what if you make

20 those assumptions?

21 A   Well, it reflects -- and you can see the years one

22 through five, year ten, year twenty, thirty, forty, et

23 cetera -- a total operating income of $529 million.

24 Q   All right.  And if we look at the very first line on

25 Table 22 of garage and lot revenue, and you'll see in year

1    three, which is fiscal year 2017, you're projecting 6.3

2    million; is that right?

3    A    Correct.

4    Q    And then in year four it drops down to 3.9?

5    A    Right.

6    Q    Why is that?

7    A    That's the -- reflecting the closure of the Joe Louis

8    garage in that year.

9    Q    Okay.  And then if we go down to the pro forma operating

10   income, the line right below that category is parking

11   facility CAPEX.

12   A    Yes.

13   Q    Can you describe what that is?

14   A    That's the physical repairs and replacement of revenue

15   control equipment, et cetera.  You can again see, I think, as

16   we've talked before, that the first couple of years they're

17   pretty -- the first five years is pretty extensive, and then

18   after that it's much lower.

19   Q    All right.  So the parking facility CAPEX, that's just

20   the garages; is that right?

21   A    Correct.

22   Q    And the then meter capital expenses is down below that;

23   right?

24   A    Yes.

25   Q    That's the new meters you talked about?

1  A    Meter; right.

2  Q    All right.  So go back to the garage CAPEX.  The first

3  five years, that reflects the CAPEX for all seven of the

4  garages?

5  A    All seven of the garages.

6  Q    And that would include the Grand Circus garage?

7  A    Grand Circus and -- right, and Joe Louis for the first

8  couple of years.

9  Q    Okay.  And if we were to go then forward to City -- the

10  same exhibit, page 074, what is -- what does this portion of

11  the report describe?

12  A    This is the discussion about the Grand Circus garage, the

13  specific physical improvements needed there.

14  Q    Okay.

15  A    Each -- the condition assessment part of the report has a

16  discussion about each garage independently.

17  Q    And who determined what was needed at the Grand Circus

18  garage?

19  A    Our engineers.

20  Q    Okay.  And if you flip to the next page, 075, then the

21  next page, 076 --

22  A    Yes.

23  Q    -- we have a table.

24  A    Correct.

25  Q    What does this table reflect?

1  A   And that is the table of improvements that is almost

2  impossible to read.

3  Q   My guy here can blow it up --

4  A   He can blow it up.

5  Q   -- so we can read it on the screen.

6  A   But you can see that for each component, again, this is

7  year -- each -- the description of the components of types of

8  improvements, structural improvements and stair towers and

9  architectural, elevators, et cetera, mechanical systems, and

10  then it's divided by years one and two, three to five, six to

11  ten, et cetera.

12  Q   So what is the total CAPEX that you're projecting for the

13  Grand Circus garage for the first five years?

14  A   For the first five years is $13.6 million --

15  Q   All right.

16  A   -- 7 million dollars.

17  Q   13.7 million?

18  A   Yeah.

19  Q   All right.  And if Syncora were to exercise its option

20  with respect to the Grand Circus garage, what would happen

21  with respect to those CAPEX projections?

22  A   Those would come right off the top as well as a little

23  bit of revenue.

24  Q   All right.  So let's go back to Table 22, which is page

25  049 of the exhibit.  These financial projections,

1  Mr. Salzman, did you provide these to the city's consultants,

2  including Miller Buckfire?

3  A    Yes.

4  Q    All right.

5            MR. HAMILTON:  Can we bring up City Exhibit 784?

6  BY MR. HAMILTON:

7  Q    All right.  Do you recognize -- well, let's wait till it

8  comes up on the screen here.

9  A    Yeah.

10  Q    All right.  Do you recognize this document?

11  A    Yes.  This is a compilation of our numbers from the model

12  for the first 16 years on this page and then more on the next

13  page.

14  Q    Are you familiar with how Excel spreadsheets work?

15  A    Yes.

16  Q    All right.  And have you reviewed this particular

17  document?

18  A    Yeah.

19  Q    All right.  And is there a spreadsheet for each of the

20  four scenarios that you -- that Desman modeled?

21  A    There is.

22  Q    Okay.  And do you know who prepared these Excel

23  spreadsheets?

24  A    Miller Buckfire.

25  Q    And what information did they use to prepare them?

1   A   They took the numbers from our model that we had provided

2   them with the -- and then this happens to eliminate the

3   violations.

4   Q   I'll talk about that in a second.

5   A   Yes.  This is basically our -- these are exactly our

6   numbers taken from the models that are provided.

7           MR. HAMILTON:  And on that basis, your Honor, the

8   city would offer into evidence Exhibit 784.

9           MR. WAGNER:  No objections.

10          THE COURT:  It is admitted.

11      (City Exhibit 784 received at 9:50 a.m.)

12  BY MR. HAMILTON:

13  Q   All right.  I want to ask you about the optimization --

14  the optimized model, which is still city-owned assets --

15  A   Um-hmm.

16  Q   -- Mr. Salzman, the parking assets, so to do that,

17  because it's an Excel spreadsheet, we have to go, I think,

18  into the fourth page of the printed exhibit --

19  A   Yeah.

20  Q   -- which is the second spreadsheet, I believe.

21  A   Yes.

22  Q   All right.  And it's now on the screen as well, and I

23  think you mentioned -- if we look at the top three rows,

24  that's a projection of revenues; is that right?

25  A   Correct.

1 Q   And you said that there's something that's not there?

2 A   The violations -- fine violations are not included in

3 this.

4 Q   Do you have an understanding as to why that is?

5 A   Yes.  These were the -- originally the enterprise fund

6 monies, and so they were segregated from the general fund

7 monies, which is the violations.

8 Q   So the revenues that comes from the parking violations,

9 the tickets, that goes not into the enterprise fund but

10 directly into the general fund?

11 A   As I understand it, yes.

12 Q   And so those revenues are not included in this document?

13 A   They are excluded.  It's on top of this.

14 Q   Okay.

15       MR. HAMILTON:  Your Honor, I have no further

16 questions.

17       THE COURT:  Thank you.  Any further questions for

18 the witness?

19       MR. WAGNER:  None from us, your Honor.

20       THE COURT:  All right.  Sir, you may step down.

21 Thank you for coming today.

22    (Witness excused at 9:52 a.m.)

23       MR. STEWART:  Good morning, your Honor.  Geoffrey

24 Stewart of Jones Day.  The city's next witness is Gaurav

25 Malhotra, whose flight was canceled this morning.  He caught

1  a second flight.  I think he's probably downstairs now, but

2  if we could break for five minutes, I think Mr. Malhotra will

3  be with us.  His taxi left the airport --

4         THE COURT:  Okay.  Whatever.

5         MR. STEWART:  -- at 9:31.

6         THE COURT:  I don't need --

7         MR. STEWART:  I have leave of the Court to --

8         THE COURT:  I don't need the details.

9         MR. STEWART:  Okay.  That's the most interesting

10  part of his testimony.

11         THE COURT:  Let me use this time productively,

12  however, because I'd like to talk to Mr. Bennett.  Can you

13  make yourself available, for me?

14         MR. BENNETT:  Good morning, your Honor.

15         THE COURT:  Good morning.  Are you the designated

16  hitter for the closing arguments?

17         MR. BENNETT:  Yes, I am, your Honor.

18         THE COURT:  Okay.  I want to give you some advance

19  notice of some questions that I would like you to address

20  during the closing arguments.  This is not intended by any

21  means to suggest that these are the only things you should

22  cover.  You should cover whatever you want to cover, but

23  please do address these for me.  I asked parties' counsel to

24  brief the meaning and operation of Section 943(b)(3) of the

25  Bankruptcy Code.  This is the section that deals with the

1   reasonableness of fees and how that works in this context,

2   and so I want you to be fully prepared to discuss that

3   section with me and how it can work here.

4           I need to know specifically which settlements the

5   city is asking the Court to approve and whether approval of

6   exit financing is part of the city's request at that stage

7   also.  And I'd like you to spend as much time as you think is

8   necessary on the issue of the justification for the

9   discrimination among the classes of unsecured creditors.

10          At the same time, however, while you do that, I want

11  to indicate to you that I am less concerned about numerators

12  and denominators than I am about the business side -- the

13  business justification side of that analysis.

14          MR. BENNETT:  Okay.

15          THE COURT:  Am I making myself clear enough?

16          MR. BENNETT:  Very clear.

17          THE COURT:  All right.  If anything further occurs

18  to me in the meantime, I'll try to let you know.  Thank you,

19  sir.

20          MR. BENNETT:  Thank you, your Honor.

21          THE COURT:  All right.  And if it's okay with

22  everyone  -- let me just ask.  Is it okay with everyone if I

23  discuss with Ms. Kopacz, who I see here in the courtroom, the

24  scheduling of her testimony?  Any objections?

25          MR. WAGNER:  That's fine.

1          THE COURT:  All right.  Ms. Kopacz, may I see you in

2     the chambers here?  I think you can go through that door

3     right over there on the side of the courtroom behind the

4     monitor, and we'll take a break.  Mr. Stewart, are you still

5     here?  When would you suggest we reconvene?

6          MR. STEWART:  Ten minutes.

7          THE COURT:  All right.  We'll make it 10:10 then,

8     please.

9          THE CLERK:  All rise.  Court is in recess.

10         (Recess at 9:56 a.m., until 10:10 a.m.)

11         THE CLERK:  All rise.  Court is back in session.

12    Please be seated.

13         THE COURT:  All right.  Before we continue with the

14    testimony, let me report to you that as a result of my

15    conversation with Ms. Kopacz, we will be proceeding with her

16    testimony tomorrow.  It is based on the city's representation

17    that the draft eighth amended plan that was filed last night

18    does contain all of the economics that she needs to testify

19    and that the final eighth amended plan will not change those

20    economics.  I have asked her, however, even after she

21    testifies, if -- when the final eighth amended plan is filed

22    to have one last look at it to confirm that no economics have

23    changed.  If they have not -- if she determines that they

24    have not changed, then her testimony will stand.  If she has

25    determined that any economics have changed in any material

1 way, it may become necessary for her to reopen her testimony,

2 and that's the basis on which we will proceed here.  Okay.

3 So let's proceed with the next witness.

4         MR. STEWART:  Geoffrey Stewart of Jones Day for the

5 City of Detroit.  The city calls its next witness, Gaurav

6 Malhotra.  Your Honor, if I may approach, I have various

7 materials that I will be using in connection with

8 Mr. Malhotra's examination --

9         THE COURT:  Okay.

10         MR. STEWART:  -- that I'd like to bring forward.

11         THE COURT:  Please raise your right hand.

12          GAURAV MALHOTRA, CITY'S WITNESS, SWORN

13         THE COURT:  All right.  Please sit down.  Thank you.

14                 DIRECT EXAMINATION

15 BY MR. STEWART:

16 Q   Could you please give us your name?

17 A   Gaurav Malhotra.

18 Q   You've testified before in this case, have you not,

19 Mr. Malhotra?

20 A   Yes, I have.

21 Q   Most recently I think on September 29th?

22 A   That is correct.

23 Q   And you've been qualified by the Court as an expert?

24 A   That is correct.

25         MR. STEWART:  Your Honor, unless you believe it

1    necessary, I would -- I'm not sure it's necessary to again

2    proffer Mr. Malhotra as an expert, but I am prepared to

3    requalify him if the Court believes that is necessary.

4              THE COURT:  You should just proceed.

5              MR. STEWART:  Thank you.

6    BY MR. STEWART:

7    Q    In your previous testimony, Mr. Malhotra, I believe you

8    shared with us your analysis of the city's projected cash

9    flows?

10   A    Yes.

11   Q    Since that date, what work has your firm done in terms of

12   analyzing those cash flows?

13   A    We have incorporated additional settlements that the city

14   has reached with its creditors and also updated the

15   assumptions with respect to the exit financing with respect

16   to what we have, so we have updated it for the additional

17   information that has become available.

18   Q    And let me, if I could -- well, let me ask you one thing.

19   In your previous testimony, we put up the native format

20   versions of something EY called the model.  Do you remember

21   that?

22   A    Yes.

23   Q    Once again, for the record, what is the model?

24   A    The model is an Excel spreadsheet that includes some of

25   the historical and projected financial information of the

1   overall restructuring plan for the city.

2   Q   What changes has E&Y made to the model since the time of

3   your previous testimony?

4   A   The changes have been only to reflect the items that I

5   mentioned earlier with respect to the settlements and the

6   updated exit financing assumption.

7           MR. STEWART:  Let's put up on the screen, if we

8   could, the first of these, which is Exhibit 779.

9   BY MR. STEWART:

10  Q   Mr. Malhotra, do you see Exhibit 779 before you?  It may

11  still be loading actually.  Do you see Exhibit 779?

12  A   I do.

13  Q   Please tell the Court what that is.

14  A   That is the latest 40-year projections that we have

15  available.

16  Q   And who prepared Exhibit 779?

17  A   We did.

18          MR. STEWART:  Your Honor, I would move admission of

19  Exhibit 779.

20          THE COURT:  Any objections?

21          MR. WAGNER:  No objection.

22          THE COURT:  It is admitted.

23      (City Exhibit 779 received at 10:15 a.m.)

24          MR. STEWART:  And now, if we could, let's put up

25  Exhibit 780.

1  BY MR. STEWART:

2  Q    Mr. Malhotra, do you have Exhibit 780 before you?

3  A    Yes.

4  Q    Please tell us what is Exhibit 780?

5  A    Those would be the ten-year financial projections for the

6  city.

7  Q    And who prepared this exhibit?

8  A    We did.

9  Q    And based on what?

10  A    Based on all the information we had from the city, the

11  other advisors, the city's management team, so collectively

12  and my team together.

13        MR. STEWART:  Your Honor, I would move admission of

14  Exhibit 780.

15        THE COURT:  Any objections?

16        MR. WAGNER:  No.

17        MR. STEWART:  Let's please put up Exhibit 781.

18        THE COURT:  It is admitted.

19    (City Exhibit 780 received at 10:16 a.m.)

20        MR. STEWART:  As I said, your Honor, prison is the

21  only solution for this.

22        MR. WAGNER:  He has one more day to get it right.

23        MR. STEWART:  There.  One more exhibit to get it

24  right actually, yeah, yeah.  Let's put up Exhibit 781,

25  please.

1   BY MR. STEWART:

2   Q   Do you have Exhibit 781 before you, Mr. Malhotra?

3   A   Yes.

4   Q   What is Exhibit 781?

5   A   781 is the ten-year projections for the city.

6   Q   Once again, this is in native format?

7   A   Yes.

8           THE COURT:  Can you bend that microphone so it's

9   pointed more right at you?

10          THE WITNESS:  Yes.

11          THE COURT:  Thank you.  Yes.

12  BY MR. STEWART:

13  Q   And who prepared Exhibit 781?

14  A   We did.

15  Q   Okay.

16          MR. STEWART:  Your Honor, I would move admission of

17  Exhibit 781.

18          THE COURT:  Any objections?

19          MR. WAGNER:  No.

20          THE COURT:  It is admitted.

21      (City Exhibit 781 received at 10:17 a.m.)

22          MR. STEWART:  Oh, good.  I didn't interrupt you too

23  much that time.  Let's put up Exhibit 793, please, which is a

24  hard copy and is in the books.

25          MR. WAGNER:  I think it's 782.

1          MR. STEWART:  793 is the one I'm going to next.

2    BY MR. STEWART:

3    Q    Do you have it?  Mr. Malhotra, do you have Exhibit 793

4    before you?

5    A    I do.

6    Q    What is that exhibit?

7    A    793 is the latest 40-year projections that we have based

8    on all the information we had as of yesterday.

9    Q    What is the relationship of this exhibit to the

10   electronic models we saw a moment ago?

11   A    It should be the same.

12          MR. STEWART:  Your Honor, I would move the admission

13   of Exhibit 793.

14          THE COURT:  Any objection?

15          MR. SOTO:  No objection, your Honor.

16          THE COURT:  It is admitted.

17      (City Exhibit 793 received at 10:18 a.m.)

18   BY MR. STEWART:

19   Q    And now let's look at Exhibit 782.  Do you have Exhibit

20   782 before you, Mr. Malhotra?

21   A    I do.

22   Q    Please tell us what is Exhibit 782?

23   A    782 is the ten-year projections that were developed about

24   a week or so ago in terms of the information we had as of

25   then.

1  Q   And developed by EY?

2  A   Yes.

3  Q   And what's the relation of these ten-year projections to

4  the electronic models we saw just a minute ago?

5  A   They should be identical.

6          MR. STEWART:  I'd move the admission, your Honor, of

7  Exhibit 782.

8          MR. WAGNER:  No objection.

9          THE COURT:  It is admitted.

10      (City Exhibit 782 received at 10:19 a.m.)

11 BY MR. STEWART:

12 Q   Now, before I go further, Mr. Malhotra, what has E&Y done

13 in terms of sharing these materials with the Court's expert,

14 Ms. Kopacz?

15 A   The information has been shared in both a native and a

16 PDF form to Ms. Kopacz.

17 Q   In addition to sharing this information, what other

18 communications have there been between you or others at E&Y

19 on one hand and Ms. Kopacz and her team on the other?

20 A   Over the last week or so, we've had conversations about

21 the assumptions in terms of the items that have changed as

22 well as provided additional supporting detail for what has

23 been available to support the assumptions that have changed,

24 and so I've been on a couple of calls with Ms. Kopacz over

25 the last week or so.

1  Q   Okay.  Now, you'd mentioned, I think, earlier in your

2  testimony that since you last appeared in court and

3  testified, there have been settlements; correct?

4  A   That's correct.

5  Q   Let me -- and, in particular, with FGIC?

6  A   Yes.

7         MR. STEWART:  Let's, if we could, put up Exhibit

8  788.

9  BY MR. STEWART:

10  Q   Mr. Malhotra, do you have Exhibit 788 before you?

11  A   I do.

12  Q   What is this?

13  A   788 shows the settlement framework for FGIC and primarily

14  highlighting the cash components of the settlement that will

15  be impacting the city's general fund.

16  Q   Who prepared Exhibit 788?

17  A   We did along with Jones Day.

18         MR. STEWART:  Your Honor, I would move the admission

19  of Exhibit 788 as a demonstrative exhibit.

20         MR. SOTO:  No objection, your Honor.

21         THE COURT:  It is admitted.

22      (Sixth Circuit 788 received at 10:21 a.m.)

23  BY MR. STEWART:

24  Q   Let's, if we could, Mr. Malhotra, go through this

25  exhibit.  I see on the left-hand side we have a description

1  of the claim; correct?

2  A   That is correct.

3  Q   And then on the right column the elements of the

4  settlement.  Do I have that correct?

5  A   Yes.

6  Q   And I'm going to start at the bottom.  There's a

7  reference there to settlement credits.

8  A   That is correct.

9  Q   Do you see that?

10  A   Yes.

11  Q   What are those settlement credits?

12  A   That is additional value that is being presented to FGIC

13  in terms of future development efforts into the city.  We

14  have assumed that for purposes of recovery calculations that

15  there's a par recovery on those settlement credits.

16  Q   What effect, if any, will those settlement credits have

17  upon the city's cash flow?

18  A   None.

19  Q   And why not?

20  A   Because in the short term, the city does not have to make

21  any payments for any sort of -- for the settlement credits,

22  and at the time when the settlement credits can be used, I

23  believe there's specific restrictions in terms of when and to

24  what extent they can be used, so this is not a payment that

25  the city is making in any fashion right now or in the future

1  and so, in my view, does not have a cash impact on the city.

2  Q    Okay.  Now, on the right side there's a reference to new

3  city notes.  Do you see that?

4  A    Yes.

5  Q    And tell us, please, what you're talking about when you

6  analyze the C notes in Exhibit 788.

7  A    The new C notes are in a face value $67.2 million.

8  That's going to be paid over 12 years at an interest rate of

9  five percent, so that is new cash compared to the previous

10  testimony that I had that is being incorporated into the plan

11  for the settlement with FGIC.

12  Q    Now, do I understand correctly that C notes also are to

13  be issued in connection with the city's settlement with

14  Syncora?

15  A    Yes.

16  Q    Is there any difference between those C notes and the C

17  notes that we're looking at here on Exhibit 788?

18  A    Just the amount.

19  Q    Now, then there's a reference to B notes.  Can you

20  describe for us what the B notes are in this settlement?

21  A    Yes.

22  Q    What are they?

23  A    The B notes are being -- in aggregate are being issued in

24  the amount of $632 million, and the B notes in aggregate are

25  going to be held by the OPEB class, the LTGO class, the COPs

1    holders, and the general unsecured creditors.  And of the

2    overall amounts that are being issued, $74.2 million is being

3    issued to FGIC, the cash flows of which are already included

4    in the plan assumptions.

5    Q   Okay.  Let's go back to a demonstrative that we used when

6    you testified last month, and that's Exhibit 731.

7            THE COURT:  And I believe, your Honor, this was

8    admitted as a demonstrative at that time.

9    BY MR. STEWART:

10   Q   Do you have Exhibit 731 in front of you?

11   A   Yes.

12   Q   Do you remember your testimony about this exhibit last

13   month?

14   A   Yes.

15   Q   And what does Exhibit 731 show us?

16   A   It shows the initial breakdown of the $632 million

17   between the different classes and claims, and at that point

18   of time what was the COPs reserve residual after the Syncora

19   settlement got done, so this was before the FGIC settlement.

20   Q   And the residual is the $123 million we see on Exhibit

21   731?

22   A   That's correct.

23   Q   Okay.  And at the time, that residual was to be divided

24   up in a certain way.  Do you see how it was to be divided up?

25   A   That is -- yes.  Sixty-five percent for the OPEB, twenty

1   percent for the LTGOs, and fifteen percent for the other
2   unsecureds.
3   Q    All right.  Let's now go, if we could, to Exhibit 792.
4   Do you have 792 before you, Mr. Malhotra?
5   A    Yes.
6   Q    Who prepared Exhibit 792?
7   A    We did.
8           MR. STEWART:  Your Honor, I would move Exhibit 792
9   into evidence as a demonstrative exhibit only.
10          MR. SOTO:  No objection, your Honor.
11          THE COURT:  It is admitted.
12      (City Exhibit 792 received at 10:25 a.m.)
13  BY MR. STEWART:
14  Q    Mr. Malhotra, what does Exhibit 792 depict?
15  A    It depicts the breakdown of the $632 million of B notes
16  and into the different claims or classes.
17  Q    And does this -- this is the same pool of B notes that we
18  looked at a minute ago when we were looking at Exhibit 731?
19  A    Yes.  The aggregate B notes are the same.
20  Q    How has the $123 million of B notes in the reserve been
21  allocated in 792?
22  A    The reserve is now allocated in which $74.2 million is
23  going to FGIC.  Then the balance is split between the other
24  unsecureds, OPEB, and the LTGOs, and that --
25  Q    Please continue.  I'm sorry.

1   A   So that would be the breakdown of the incremental portion

2   that goes to the LTGOs, the incremental portion that goes to

3   the OPEB, and the other unsecureds after FGIC gets its share

4   of B notes.

5   Q   That's the question I was going to ask you, which is what

6   does Exhibit 792 depict in terms of the settlement with FGIC?

7   A   $74.2 million of B notes specifically, just the B notes.

8   Q   Now, as part of this allocation, has there been a change

9   in the number or amount of B notes going to Class 7; that is

10  to say, the LTGO class?

11  A   Yes.  As a part of the settlement, the amount going to

12  the LTGO class has increased overall or has become 17 million

13  compared to what it was earlier.

14  Q   And let's look, if we could --

15          MR. STEWART:  Let's put up Exhibit 789.

16  BY MR. STEWART:

17  Q   Do you have Exhibit 789 before you?  Who prepared Exhibit

18  789?

19  A   We did.

20  Q   And what does it depict?

21  A   It shows the overall settlement impact on the LTGOs as a

22  part of the FGIC settlement as well in terms of what amount

23  they would get under the COPs reserve as well as it shows the

24  $55 million of new LTGO bonds are being paid at emergence.

25          MR. STEWART:  Your Honor, I would move into evidence

1  solely as a demonstrative exhibit Exhibit 789.

2          MR. SOTO:  No objection, your Honor.

3          THE COURT:  It is admitted.

4      (City Exhibit 789 received at 10:28 a.m.)

5  BY MR. STEWART:

6  Q   So, Mr. Malhotra, let me now ask you a couple of things

7  about Exhibit 789, first of all, about the B notes and what

8  this shows has happened in terms of Class 7 and the new B

9  notes from the COPs reserve.

10 A   Compared to the previous version of this before the FGIC

11 settlement, the amount for the B notes going to the LTGOs has

12 increased as they get their share of the COPs reserve.

13 Q   Okay.  And you mentioned something about -- we see here

14 the new LTGO bonds.  Do you see the column referencing that?

15 A   Yes.

16 Q   What is to be done with reference to the new LTGO bonds?

17 A   They're going to be paid at exit.

18 Q   In cash from the city?

19 A   That's correct.

20 Q   Could you tell us where the city is to get the cash to

21 make that payment?

22 A   It's going to come from the exit financing.

23 Q   Is the amount of exit financing going to be increased to

24 allow that to happen?

25 A   No.

1  Q   How then is it to come from the exit financing if the

2  exit financing is not to be increased?

3  A   The initial assumptions of the exit financing at $275

4  million also incorporated the assumption of paying off the

5  LTGO bonds at the exit, although the city had the option to

6  pay them off over 23 years, but the city's assumption with

7  respect to the exit financing gross amount of 275 has not

8  changed.

9  Q   Okay.

10         THE COURT:  All right.  Before we leave that, let me

11  ask how do you know personally that it is the city's

12  intention to pay off this $55 million debt to the LTGOs?

13         THE WITNESS:  Your Honor, based on all the

14  discussions I've had with the CFO of the city, the --

15         THE COURT:  Mr. Hill?

16         THE WITNESS:  Yes, with Mr. Hill.  The $55 million

17  is being paid off at the exit, so --

18         THE COURT:  Um-hmm.  Do you have an opinion about

19  whether that payment of $55 million instead of the issuance

20  of bonds is in the city's better interest?

21         THE WITNESS:  In my opinion, the cash impact, of

22  course, of not paying off the $55 million right now and

23  paying it off over a longer time frame would cost the city

24  more because of interest, and in our view -- in my view, at

25  least, the city has the capacity under its proposed exit

1  financing to pay off the $55 million, so, in my view, they

2  should.

3          THE COURT:  And -- okay.  So the city is borrowing

4  money to pay this debt; right?  How do the interest rates

5  compare?

6          THE WITNESS:  The interest rates are comparable,

7  your Honor, on the exit financing.  From the assumptions we

8  have, it's 5.75 percent, and I think those rates are very

9  comparable to what they would have been under the new LTGO

10 bonds.  I believe I remember it was about 5.65 if I recall

11 correctly, but they were very comparable.

12         THE COURT:  Well, if the interest rates are so

13 close, how does it save the city money to pay these bonds

14 off?

15         THE WITNESS:  At the end of the day, it is -- we are

16 just going from one pocket to the other.  At the end of the

17 day, it's debt versus debt, so if the city was going to

18 further look at reducing borrowing, then it may be a

19 different question, but otherwise it is debt versus debt, so

20 there is no specific math that says we have to keep this 55

21 out.

22         THE COURT:  Okay.

23 BY MR. STEWART:

24 Q   If we could, let's now look at our next demonstrative

25 exhibit, Number 790.  Mr. Malhotra, who prepared Exhibit 790?

1    A    We did.

2    Q    And why did you prepare it?

3    A    To show what the impact on the OPEB Class 12 settlement

4    was compared to my previous testimony after the FGIC

5    settlement has been incorporated.

6            MR. STEWART:  Your Honor, I'd move admission of

7    Exhibit 790.

8            MR. SOTO:  No objection, your Honor.

9            THE COURT:  It is admitted.

10        (City Exhibit 790 received at 10:33 a.m.)

11   BY MR. STEWART:

12   Q    And, by the way, one thing I meant to ask on our previous

13   exhibit, 788, if we could put it up again quickly, could you

14   tell us now as a result of the Syncora settlement what is the

15   illustrative recovery for Class 9?

16   A    Based on the assumptions we have used, it's 13 percent.

17   Q    Now, let's go back to 790.  The OPEB class is Class 12?

18   A    Yes.

19   Q    Okay.  And what has been the effect on Class 12 of the

20   settlement with FGIC?

21   A    The only effect is that the amount of the B notes that

22   are coming to the OPEB class have increased as a part of the

23   FGIC settlement.

24   Q    Okay.  From what to what?

25   A    Previous to the settlement, they were shown at roughly

1  $11 million is my recollection, and I think they've gone up

2  by about $32 million to come up with a total of 42.7.

3  Q   Okay.  And what's the illustrative recovery for Class 12

4  now?

5  A   It's approximately ten percent.

6  Q   There's also a Class 14 interest in the COPs reserve, is

7  there not?

8  A   Yes.

9  Q   How has that changed as a result of the FGIC settlement?

10 A   The amount of the B notes has gone up as a part of the

11 settlement.

12 Q   Okay.  We'll come back to that in a minute.  Let's, if we

13 could, now go to Exhibit 791.  Do you have Exhibit 791 before

14 you, Mr. Malhotra?

15 A   I do.

16 Q   What is this exhibit?

17 A   This exhibit shows the new notes that are being issued as

18 a part of the overall restructuring.

19         MR. STEWART:  And, your Honor, I would move for the

20 admission of Exhibit 791 as a demonstrative.

21         MR. SOTO:  No objection, your Honor.

22         THE COURT:  It is admitted.

23     (City Exhibit 791 received at 10:35 a.m.)

24 BY MR. STEWART:

25 Q   And tell us, if you could -- first of all, this reflects

1  all of the settlements the city has reached?

2  A    Yes.

3  Q    And so, if you could, could you describe to us what these

4  notes are that are being issued?

5  A    The first ones are the restructured UTGO notes with $288

6  million of face value that are getting paid at -- over 14

7  years at a variety of interest rates that existed even prior

8  to the bankruptcy, and those would be the restructured UTGO

9  notes; the new LTGO bonds in the face value 55 million, which

10  are going to be paid upon exit; the new B notes of $632

11  million that are payable over 30 years with an interest rate

12  of four percent for the first two decades and six percent for

13  the third decade, these are interest only for the first ten

14  years, and the holders will be the OPEBs, the LTGO holders,

15  the COPs and the other unsecureds.  The new C notes are $88

16  million that are being paid over 12 years at a five-percent

17  discount rate.

18  Q    I notice that three of these are called new, new LTGO

19  bonds, new B notes, and new C notes.  Why are they new?

20  A    Because they are -- they did not -- they do not exist

21  today.  They have to be issued as a part of the overall plan.

22  Q    Now, of all these notes, which ones are additional to the

23  notes we knew of when you testified before on September 29th?

24  A    The only new notes would be the FGIC component of the C

25  notes would be the new additional notes.

1  Q   We'd call them new new C notes.

2  A   Sure.

3  Q   Okay.  All right.  So, if we could, let's go now to

4  Exhibit 793, and that's the --

5          THE COURT:  Well, hold on.  Before we leave 791 --

6  791 --

7          MR. STEWART:  Yes, your Honor.

8          THE COURT:  -- what's the chart in the lower right-

9  hand corner?

10          THE WITNESS:  The chart in the lower right-hand

11  corner includes the debt service for all of the bonds that --

12  all of the new notes, your Honor, over the course of the next

13  40 years, so it shows the deleveraging of the city.

14          THE COURT:  So the amounts on the Y axis are the

15  ten-year aggregates by those years in the X axis?

16          THE WITNESS:  That is correct.

17          THE COURT:  And debt service includes required

18  principal and interest payments?

19          THE WITNESS:  Yes, your Honor.

20          THE COURT:  All right.

21  BY MR. STEWART:

22  Q   In this part of the demonstrative debt service bar chart,

23  how much has debt service increased because of what I just

24  called the new new C notes?

25  A   It's about -- roughly about $85 million was the cash

1    impact of paying the additional C notes to FGIC.

2              THE COURT:  Over what period of time?

3              THE WITNESS:  Over 12 years, your Honor.

4    BY MR. STEWART:

5    Q   Now, if we could, let's look at Exhibit 793.  Do you have

6    that before you, Mr. Malhotra?

7    A   Yes.

8    Q   And I think you identified for us these are the city's

9    revised and updated 40-year projections?

10   A   Yes.

11   Q   Where in this document is the additional interest or the

12   interest for the new C notes reflected for ten years?

13   A   It would be shown under two places, on page 8 of 15.

14   Excuse me.

15   Q   Okay.  And where on page 8 of 15?

16   A   Under the uses -- under the uses, under the section "note

17   and cash payments."

18   Q   And that is the row that foots to $84.8 million?

19   A   This shows the payments of all of the FGIC notes and the

20   Syncora notes in total, which will be the $10 million a year,

21   which is the payments on Note C.  The incremental amount

22   compared to what we had in the previous version is shown on

23   page 12.

24   Q   Well, before we go to page 12, so the first ten years of

25   service of the C notes is shown on the line that says "New C,

1  parens, POC"?

2  A   Yes.  It says "Note C POC."

3  Q   Okay.  And that is all the new C notes, not just the FGIC

4  portion of those notes.  Am I correct?

5  A   That is correct.

6  Q   And where in this do we see the cost of those notes for

7  years 11 and 12?

8  A   They would be on the following decade is how we have

9  shown it, so if we go to -- we want to go to page 5 of 15

10 under that same line.  It would show that in years 11 and 12

11 the amount of debt service related to Note C in that second

12 decade.

13 Q   Is that $29.9 million?

14 A   That's correct.

15 Q   Okay.  Now, Exhibit 793 is an update of previous

16 projections that EY prepared and which have been used in our

17 confirmation hearing; correct?

18 A   That's correct.

19 Q   Did you prepare a bridge connecting these newest

20 projections to the last ones that we had seen when you

21 testified on September 29th?

22 A   Yes.

23 Q   Let's go, if we could, to the bridge.  I have it

24 beginning on page 10 of 13.  Am I right?  That's the bridge

25 from the July projections to present?

1   A    That's correct.

2   Q    Okay.  And let's go to 12 of 15.  Can you tell us what 12

3   of 15 is?

4   A    Page 12 of 15 is a bridge between the last set of

5   projections that I testified to that did not include the FGIC

6   settlement and the changes that we have incorporated and the

7   information we have incorporated as of now.

8   Q    And so tell us generally what does this bridge do?  It

9   connects two things.  What are the two things it connects?

10  A    It basically looks at the cash that we were projecting at

11  the end as a part of the previous projections at the end of

12  every ten year -- throughout the ten years what that cash

13  position would be.  We incorporate all the changes and the

14  settlements we know of, and now we have the updated cash

15  position in terms of what it will be.

16  Q    Okay.  So I'd like you to explain the document to us row

17  by row, and at the top it's financing changes, I believe;

18  correct?

19  A    Yes.  The financing changes -- since my last testimony we

20  were provided information that there is going to be

21  approximately a ten-percent holdback or a reserve that would

22  have to be created in order to ensure that the rest of the

23  financing terms did not change in an adverse position, so

24  what this shows in the first line is money not being

25  available to the city to the tune of almost $27 million

1  looking at the first two years combined because that money

2  would be held in escrow, and that money would then be

3  available in the following decade or when the facility is

4  maturing, so it reduces the cash available in the first

5  couple of years, but it increases the cash again or makes it

6  neutral in the second decade, so that was showing the impact

7  of the timing.

8  Q   Has this changed the amount the city will borrow under

9  the exit facility?

10 A   No.  This is just -- this exit facility will be 275

11 million.  This is just approximately the ten percent that

12 would be held in escrow.

13 Q   Now, when you say "held in escrow," do you mean that the

14 city will borrow this money and deposit it into a bank

15 account or that it will work some other way?

16 A   My understanding is it's more of a credit enhancement, so

17 the city will borrow the entire amount, and it will be held

18 at likely a bank without the city having access to it.  The

19 city will have access to it at the end of the term of the

20 facility where the city will be able to draw upon this cash

21 to pay the final installments of the exit facility.

22 Q   Is there a cost to the city of structuring the borrowing

23 in this manner?

24 A   From my understanding, what I have been told is not doing

25 it in this manner adds incremental cost to the city because

1  of a potential increase in the interest rates.

2  Q   All right.  Okay.  The next -- by the way, there's two

3  lines.  One is the proceeds, and below it it says QOL exit

4  financing principal interest payments.  What's the difference

5  between those two lines?

6  A   The first line is predominantly looking at the overall

7  escrow amount, and the second amount, the 600,000, was just

8  looking at the overall change in the interest rate assumption

9  compared to probably what we had earlier.

10 Q   Okay.

11         THE COURT:  We need a pause here.  I'm a little

12 confused.  What happened with $325 million in exit financing?

13         THE WITNESS:  Your Honor, on the $325 million exit

14 financing, we have a commitment from Barclays to provide the

15 city with $325 million exit financing pretty much on the same

16 terms as those that are modeled in here.  It is the city's

17 view to borrow less because of the overall cost of that

18 financing that has to eventually be paid, although it would

19 be in the second decade, but based on my discussions with the

20 mayor and with John Hill, there has been a preference to

21 borrow less versus more unless that has changed, but that is

22 what has been decided as of now.

23         THE COURT:  Can you speak to this?

24         MR. STEWART:  I cannot, your Honor.  I was going to

25 ask another question, though, to clarify a certain amount of

1  confusion on my own part.

2       THE COURT:  Go ahead.

3  BY MR. STEWART:

4  Q   Then when one speaks of borrowing $275 million, the

5  actual cash that would be available to the city in the short

6  term is 275 minus this ten-percent holdback; is that correct?

7  A   That is correct.

8       MR. STEWART:  Okay.  And, your Honor, beyond that, I

9  cannot speak to it, but we can certainly get you an answer.

10      THE COURT:  Okay.

11      MR. STEWART:  Good.

12  BY MR. STEWART:

13  Q   If we could now, Mr. Malhotra, on the same page, look at

14  the FGIC settlement and tell us, if you could, what the first

15  line there represents.

16  A   The first line represents the portion of the FGIC

17  settlement that has been now added to these projections, so

18  the cost of the servicing the $67.4 million note over the 12

19  years, and that's what is reflected in that particular line.

20  Q   And those are negative numbers; correct?

21  A   That is correct.

22  Q   And so what does it mean in this bridge to have a

23  negative number?

24  A   It's making the cash position of the city worse compared

25  to what we had shown previously.

1    Q    The next line reads, "Increased other fund

2    reimbursements."  Do you see that?

3    A    Yes.

4    Q    Please tell us what that is.

5    A    Those increased other fund reimbursements and, in fact,

6    the increased DWSD revenue stream are higher reimbursements

7    that we will be getting from the nongeneral fund funds for

8    their share of the POC cost that is allocated, so as the cost

9    of the settlement has increased, the pro rata reimbursement

10   that has to come through has increased.

11   Q    And below that it says "increased DWSD" -- pardon me --

12   "revenue stream," and please tell us what that's a reference

13   to.

14   A    That's for DWSD to pay its share of the FGIC settlement.

15   Q    So similar to the line above it but for DWSD only?

16   A    That's correct.

17   Q    Okay.  Now, the next -- and those total to a series of

18   negative numbers that foot to negative 83.9 million over 40

19   years?

20   A    That is correct.

21   Q    Now, let's go below that.  There's a column that says

22   "reinvestment deferrals and other differences."  Please tell

23   us, first of all, the first one, which is reinvestment

24   deferrals, what is that?

25   A    So what that is showing, that of the overall $1.4 billion

1   that the city has planned to spend, there are some deferrals

2   that are included in the plan over the first ten years

3   predominantly in order to ensure that the city has adequate

4   liquidity, so what this shows is year by year what the

5   incremental deferrals would be compared to the previous

6   forecast in order for the city to ensure it meets its

7   liquidity requirements and thresholds.

8   Q   Now, in your testimony last month, among the things that

9   you covered was the fact that certain reinvestment activities

10  would increase revenue or decrease expenses for the city.  Do

11  you remember your testimony in September to that effect?

12  A   Yes.

13  Q   Which, if any, of these reinvestment deferrals would

14  affect future income or expense reductions for the city?

15  A   Based on my discussions with John Hill, these

16  reinvestment deferrals will not have an impact on the overall

17  revenue initiatives of the city.

18  Q   The next line is reduction in professional fees.  Can you

19  tell us where that came from?

20  A   That was provided to me by Mr. Orr.

21  Q   Has that been allocated yet?

22  A   Not to my knowledge.

23  Q   Do you know who will allocate it or when?

24  A   I do not know.

25  Q   Okay.  Below that is increased parking revenue, EF

1  revenue stream.  Do you see that?

2  A   Yes.

3  Q   Please tell us what -- first of all, what does "EF

4  revenue stream" mean?

5  A   EF -- it's the parking enterprise fund revenue stream, so

6  going forward the assumption is that the parking enterprise

7  fund will be collapsed into the general fund, and based on

8  the information in the report that has been done by Desman

9  under the optimized scenario, we have included the overall

10  improved performance of parking after netting out the CAPEX

11  that is required to be invested into parking, so this is a

12  net improvement in the overall plan for parking that will be

13  available to fund some of these costs up above.

14  Q   Are you familiar with an analysis conducted by Miller

15  Buckfire of the financial effect of the APS optimized plan

16  for the parking?

17  A   Yes.

18        MR. STEWART:  Let's put up, if we could, Exhibit

19  784, and, in particular -- get the right page -- can you

20  scroll down, please?

21  BY MR. STEWART:

22  Q   Is this the Miller Buckfire report that you relied on in

23  your work?

24  A   Yes.  This is the spreadsheet that we relied upon.

25  Q   And where on Exhibit 784 are the numbers that have found

1    their way into your analysis; that is to say, 793?

2    A    They're on Row 35.

3    Q    Okay.  And how are those -- how do the numbers compare

4    between the two exhibits?

5    A    They're the same.

6    Q    Okay.  All right.  Let's go back, if we could, to Exhibit

7    793.  The next line refers to copper wire and other asset

8    sales.  Could you tell me, first of all, what is this

9    referring to?

10   A    This is referring to two components of asset sales that

11   have been highlighted by the city as additional opportunities

12   and that were not included in the previous assumptions.

13   Q    Let me stop you there.  It starts with copper wire.  What

14   copper wire are we talking about here?

15   A    This is the copper wire that's going to -- that's from

16   the decommissioning of PLD, the Public Lighting Department,

17   so it's wire that exists both overhead and underground.  And

18   based on the information that we have been provided --

19          THE COURT:  Excuse me one second.  Whose electronic

20   device is beeping, please?  Would you -- yeah.  Please turn

21   it off if it's not already off.  Go ahead, sir.

22          THE WITNESS:  So the copper wires.  The PLD grid is

23   going to get decommissioned over the next seven years, and

24   it's the copper wire that exists basically on the overhead

25   and the underground.  There's about 13-1/2 million pounds of

1    copper wire.  The estimates that have been provided to us

2    show that the amounts could be double of what we have

3    included in here.

4    BY MR. STEWART:

5    Q    Let me stop you right there.  You said 13 million pounds

6    of copper wire.

7    A    Yes.  That was the --

8    Q    Who told you that?

9    A    I got it from the city.

10   Q    And who at the city?

11   A    It was based on a document from John Hill, the CFO, and

12   Gary Brown, actually the COO.

13   Q    Now, did anyone put a value or an estimate of value on

14   this copper wire?

15   A    The value that we saw was 35 to $40 million as one of the

16   estimates that we have seen.

17   Q    And how much copper -- how much have you put in your

18   bridge here, the 793, for the copper wire sales?

19   A    Twenty million.

20   Q    Why 20 instead of some other number?

21   A    That was given to me by the city.

22   Q    Okay.  And then it says "other asset sales" on this line

23   as well.  What are the other assets in question?

24   A    The other assets include certain fleet, so police cars,

25   buses are some of the assets that are included in there.

1   Q   Has the city signed any contract or put out any requests

2   for proposals with respect to these two items?

3   A   The city has signed a contract with Hilco.

4   Q   Hilco?

5   A   Yes.

6   Q   Who is Hilco?

7   A   They're a global auctioneering firm.

8   Q   Okay.  Is that for all of this or just part of this?

9   A   I do not know if it's for all or not.

10  Q   Okay.  Anyhow, that adds up to -- over the ten- and the

11  forty-year period to $25 million?

12  A   That is correct.

13  Q   Okay.  And just to be clear, that's $25 million of cash

14  the city expects to receive?

15  A   Yes.

16  Q   Okay.  Next line is litigation settlement.  What can you

17  tell us about that?

18  A   The litigation settlement is a confidential matter which

19  I'm sure maybe Mr. Orr will talk to, but from the

20  documentation I have seen, it's a settlement of $27 million

21  that will net the city approximately $24 million, and the

22  proceeds are expected to be received in the next 30 to 40

23  days.

24  Q   Okay.  Then finally there is POC swap settlement delay of

25  half a million dollars.  What is that?

1  A   I believe that was the net impact of just the delay from

2  not happening -- this settlement not happening in October and

3  certain reimbursements coming through from the other

4  enterprise funds.

5  Q   So we have below that then a total for the reinvestment

6  deferrals and other differences and then below that a line

7  that says "total adjustments"?  Do you see that?

8  A   Yes.

9  Q   And the total adjustments for any given year appear to be

10 zero; is that correct?

11 A   Yes.  In the first ten years, the adjustments are zero

12 because we are deferring more in order to make sure that the

13 cash balance does not go below a certain level.

14 Q   That was my next question.  How has this affected your

15 projections of the city's cash balance?

16 A   Over the next ten years -- in fact, throughout the next

17 thirty years, we've kept the cash balance flat, and the cash

18 position actually improves in the last decade of these

19 projections because of the city's now getting the full

20 benefit of the parking enterprise fund, the long-term

21 benefits of it after the Syncora and the FGIC settlements are

22 also paid.

23 Q   What does your analysis indicate to you in terms of the

24 city's ability in coming years to pay its operating expenses?

25 A   I believe, based on these projections, the city should be

1  able to meet its operating expenses.

2  Q    And to pay its obligations as forecast under the plan?

3  A    Based on these assumptions, I believe the city should be

4  able to meet its obligations under the plan.

5  Q    And the cash that it would have on hand would be that

6  shown on the bottom line here of our exhibit?

7  A    I think that the cash position of the city should be

8  sufficient to operate.  I don't know if it'll be the exact

9  number.

10  Q    Okay.  As I think you testified before, these numbers are

11  as of June 30th of every year; correct?

12  A    That is correct.

13  Q    And historically what is the low point of the city's cash

14  levels every year?

15  A    June 30th.

16  Q    Before we finish, I'd like to ask you in the same exhibit

17  to look, if you could, at page 3 of 15.

18          THE COURT:  Well, hold on one second before we leave

19  this one.  Does this exhibit take into account, sir, any

20  amounts that the city's professionals in this case might

21  contribute?

22          THE WITNESS:  Yes, your Honor, in terms of the $5

23  million of reduction in professionals' fees.

24          THE COURT:  Oh, that's -- it's counted as the

25  reduction?

1          THE WITNESS:  It is counted as the reduction.

2          THE COURT:  Oh, all right.  So that line doesn't

3    predict a court ruling regarding reduction in fees?

4          THE WITNESS:  No, your Honor.

5          THE COURT:  All right.

6    BY MR. STEWART:

7    Q    Mr. Malhotra, given all the cash we have at the bottom, I

8    would imagine we could increase professional fees --

9          MR. STEWART:  I'm sorry, your Honor.

10         THE COURT:  Yeah.  Be careful.

11         MR. STEWART:  Yeah.  Based on a wrong turn there.

12         THE COURT:  Yeah.

13         MR. STEWART:  All right.

14   BY MR. STEWART:

15   Q    Let's, if we could, Mr. Malhotra, go to page 3 of your

16   exhibit, 3 of 15.  Do you have that before you?

17   A    I do.

18   Q    What is page 3 of 15?

19   A    Excuse me.  Three of fifteen breaks down the -- over ten

20   years on the table on top and forty years on the table below

21   the different classes, the claims and the sources of their

22   distribution, and what the PV of that recovery would be under

23   the five-percent discount rate.

24   Q    Okay.

25         MR. STEWART:  Let's go, if we could -- if we could

1    call up an old exhibit, 111, and, in particular, page 3 of

2    111.

3              THE COURT:  I'm sorry.  Can you go back to the prior

4    exhibit for one second --

5              MR. STEWART:  Sure.

6              THE COURT:  -- or tell me what exhibit number it

7    was?

8              MR. STEWART:  That was 793, your Honor.

9              THE COURT:  Is that in evidence yet?

10             MR. STEWART:  It was.  That was one of the group

11   that we moved in --

12             THE COURT:  I'm sorry.  The chart that was just up.

13             MR. STEWART:  Page 3, yes.  That's page 3 of Exhibit

14   793.

15             THE COURT:  Page 3 of it.

16             MR. STEWART:  Yes.

17             THE COURT:  All right.  Stand by one second, please.

18   Well, maybe you were going to ask this, but let me just be

19   sure it does get asked.  If we can direct your attention,

20   sir, to the part at the top that talks about distributions

21   and the line that talks about GRS pension, you see that?

22             THE WITNESS:  Yes, your Honor.

23             THE COURT:  And then in the column that talks about

24   cash, 575, you see that?

25             THE WITNESS:  Yes, your Honor.

1          THE COURT:  And by "cash," what -- let me just ask.

2    What do you mean by "cash" there?

3          THE WITNESS:  It's --

4          THE COURT:  That's the city's contribution?

5          THE WITNESS:  It's the city's contribution, your

6    Honor; however, in excess of $400 million of that cash that's

7    coming in in the first ten years is coming from DWSD, so,

8    yes, it is cash contributions going into GRS.

9          THE COURT:  Um-hmm.  So where is the balance coming

10   from?

11         THE WITNESS:  There is 429 million from DWSD.

12   There's roughly $80 million from the city directly.  That

13   gets us to about $500 million.  There is also monies that are

14   coming in from parking and library that are also included in

15   that.  I would say those would be the big components that

16   would be going into that column.

17         THE COURT:  Is there an exhibit, if you know off the

18   top of your head, that sets out more specifically what you

19   just testified to?

20         THE WITNESS:  Yes, your Honor.  I do not recall from

21   the top of my head, but I think there is in the plan of

22   adjustment an exhibit in the back that highlights the sources

23   of cash as to where they're coming from.

24         THE COURT:  For GRS?

25         THE WITNESS:  For GRS.

1    MR. STEWART:  Your Honor, we would -- once we're

2    finished with Mr. Malhotra, I will somehow find that and get

3    that to the Court.

4    THE COURT:  Thank you.

5    MR. STEWART:  Yes.

6    BY MR. STEWART:

7    Q   If we could go to Exhibit 111, page 3 of 111, Exhibit

8    111, Mr. Malhotra, were the July projections that I think

9    you've testified to previously.

10    MR. STEWART:  And Exhibit 111, your Honor, I believe

11    is in evidence.

12    BY MR. STEWART:

13    Q   Could you compare for us or tell us that as of -- well,

14    let me back up.  As of July there had not been a settlement

15    with Syncora nor a settlement with FGIC; is that correct?

16    A   That is correct.

17    Q   What was the projected recovery for Class 14 at that

18    time?

19    A   It was -- Class 14 was the other unsecured items, and

20    that was ten percent as shown on the bottom page.

21    Q   Okay.  And if we could now go back to Exhibit 793 and

22    page 3 -- that's the table we were just looking at a moment

23    ago -- could you tell us how the recovery for Class 14 has

24    changed?

25    A   Under the new assumptions, it's gone from ten percent to

1    twelve percent for Class 14.

2         MR. STEWART:  Okay.  Thank you.  Your Honor, that is

3    all I have.  I'm told that the pension contributions are set

4    forth in Exhibit 732, and I will at the break print -- make

5    sure we have a copy of it.  Knowing how much paper we have,

6    it might be easier for us just to print that and give it to

7    the Court.

8         THE COURT:  Okay.

9         MR. STEWART:  That is all the questions I have of

10   this witness, your Honor.

11        THE COURT:  Any questions?

12        MR. SOTO:  No, your Honor.

13        MR. WAGNER:  Your Honor, we have no questions.

14        THE COURT:  Sir, you may step down.  Thank you.

15   Actually, Mr. Malhotra, if you could remain available in case

16   I have any further questions from you after this document

17   that Mr. Stewart offered is actually produced.

18        MR. STEWART:  Your Honor, that is fine.  We could

19   put up Exhibit 732 on the screen --

20        THE COURT:  That's fine, too.  Let's just do that.

21        MR. STEWART:  -- in case you have questions right

22   now.  Perhaps we should recall the witness in that case just

23   so he could answer any questions the Court may have.  Oh,

24   this is just the chart.  I think we were --

25        THE COURT:  No.  The chart is fine.

1           MR. STEWART:  Okay.  Mr. Malhotra --

2           THE COURT:  Yeah.  Let me ask him to retake the

3    witness stand.  I just want to pin this down.  Okay?  So does

4    this chart show the first ten years of contributions to GRS?

5           THE WITNESS:  Yes, your Honor.

6           THE COURT:  And the legend at the bottom under the

7    pie chart accurately shows what the sources of the

8    contributions are?

9           THE WITNESS:  Yes, your Honor.

10          THE COURT:  All right.  So the green one in the

11   upper left-hand corner, the legend says "General/Other

12   Funds."  You see that?

13          THE WITNESS:  Yes, your Honor.

14          THE COURT:  What does that mean?

15          THE WITNESS:  It includes the general fund

16   contributions of approximately $80 million.  Of that 114.6,

17   80 is coming from the city's general fund itself.

18          THE COURT:  But that's not 80 a year.  That's 80 for

19   ten years?

20          THE WITNESS:  That's 80 for ten years, yes.  It's 80

21   of the 114.6, yes, your Honor.

22          THE COURT:  Okay.  And what about the rest of it

23   then?

24          THE WITNESS:  The rest of it is coming through

25   parking and library, but I can give you the breakouts.  I

1  believe library is going to be somewhere close to 20-plus

2  million dollars.  There's going to be a parking contribution

3  as well and if there's any other small funds that are also

4  contributing.

5          THE COURT:  All right.  That's sufficient.  Thank

6  you, sir.

7  BY MR. STEWART:

8  Q   Let me ask, Mr. Malhotra, is there a detail either that

9  exists or that EY could prepare that would break that out in

10  a numerical form as a table or a spreadsheet?

11  A   Yes.

12          MR. STEWART:  Okay.  Your Honor, we will endeavor to

13  get that to the Court.  Perhaps it's in an existing exhibit

14  but one way or another.

15          THE COURT:  Do you think it is in an existing

16  exhibit?

17          THE WITNESS:  It would be in an exhibit because the

18  models that we have produced are in evidence and are also

19  exhibits, so it would have --

20          THE COURT:  All right.

21          THE WITNESS:  I would probably have to go through

22  the native version to get it.

23          THE COURT:  All right.

24          MR. STEWART:  What I would propose, your Honor, is

25  that we have EY prepare as a demonstrative exhibit just that

1  detail, and unless there'd be an evidentiary objection

2  because Mr. Malhotra may not be on the stand again at the

3  time we have it for you, we would --

4          THE COURT:  All right.

5          MR. STEWART:  -- mark it and offer it to the Court.

6          THE COURT:  All right.  I'll accept your

7  representation regarding the accuracy of the exhibit when it

8  is prepared.  You're all set now, sir.

9          THE WITNESS:  Thank you.

10      (Witness excused at 11:11 a.m.)

11          MR. SHUMAKER:  Good morning, your Honor.  Greg

12  Shumaker of Jones Day for the city.  The city calls Kevyn Orr

13  to the stand.

14          THE COURT:  Okay.

15          MR. SHUMAKER:  Your Honor, I have some binders, if I

16  may approach.

17          THE COURT:  Sure.  Please raise your right hand.

18              KEVYN ORR, CITY'S WITNESS, SWORN

19          THE COURT:  Please sit down.  Thank you.

20                   DIRECT EXAMINATION

21  BY MR. SHUMAKER:

22  Q   Good morning, Mr. Orr.

23  A   Good morning, Mr. Shumaker.

24  Q   Could you please state your full name for the record?

25  A   Yes.  Kevyn D. Orr.

1　Q　Mr. Orr, did you do anything to prepare for your

2　testimony today?

3　A　Yes.  I did my homework.

4　Q　You did your homework.  Okay.  Do you have anything up at

5　the witness box with you?

6　A　My glasses and Mr. Malhotra's binder.

7　Q　Wonderful.  Mr. Orr, are you familiar with the settlement

8　between the city and Financial Guaranty Insurance Company

9　that was announced last week?

10　A　Yes.  I have some familiarity with that.

11　Q　Could you share with the Court when the settlement

12　discussions with -- and I'm going to refer to it as FGIC.

13　We'll understand what that means.

14　A　Sure.

15　Q　Could you share with the Court when those settlement

16　discussions began?

17　A　Settlement discussions with Financial Guaranty Insurance

18　Corporation, known as FGIC, had been halting, but they began

19　in ernest approximately a week or so after the Syncora

20　settlement, I would say, and picked up speed within the last

21　three weeks or so.

22　Q　And did those discussions involve the mediators?

23　A　Yes, very much so.

24　Q　When did you get involved in these discussions?

25　A　I was involved throughout.

1    Q    What was your involvement?

2    A    My involvement was to act as the city's representative

3    both with the advisors for FGIC, my advisors, led by Corinne

4    Ball, and others and interface also with the mediators,

5    principally Chief Judge Rosen.

6    Q    Okay.  So Chief Judge Rosen and the other mediators, Ms.

7    Ball, who else was involved in the discussions?

8    A    There were many people, Judge Perris, I believe at some

9    point Professor Torielli.  There were representatives from

10   the city, from the mayor's team, Mr. Tom Lewand, development

11   director, Dave Massaron from corporation counsel.  From the

12   state there was Richard Baird from the governor's office and

13   other state representatives.

14   Q    Why was the mayor's team involved?

15   A    Since entering Order 42, the transition order, the powers

16   of the emergency manager with regard to city assets had been

17   transcribed, plus I also made a firm pledge, which I wanted

18   to keep, with the mayor to work with him and his team to go

19   through effective transition, so I no longer felt that I had

20   the authority under the statute to deal with city properties,

21   but I also felt as a matter of prudence it was very important

22   to make sure the mayor's team was involved because we're

23   going forward.

24   Q    Now, you mentioned Mr. Lewand.

25   A    Yes.

1  Q   Who is Mr. Lewand?

2  A   Mr. Lewand is the development director for the city,

3  economic development director.

4  Q   Can you share with the Court why the state was involved

5  in the discussions?

6  A   Yes.  It became clear early on that the city alone -- I

7  think I said before it scraped the cupboard pretty bare.  We

8  did not have a lot of remaining city assets to provide to

9  FGIC.  Their interest was significant, $1.1 billion, roughly

10  three times the size of Syncora's interest, thereabouts.  We

11  wanted to reach a final settlement and to make a good faith

12  effort to provide them with as much value as we could, and it

13  became clear that some of that value was going to have to be

14  in kind as opposed to debt or cash and that we would need the

15  state's ability to provide different types of programs and

16  support different types of programs to provide that value in

17  connection with a development component.

18  Q   And I'm sorry.  I may have missed it, but who from the

19  state was involved in the negotiations?

20  A   Mr. Baird, Richard Baird, who's the -- I think he's still

21  governor's transition manager.  Mr. Steve Arwood's

22  department, Michigan Economic Development Corporation.  There

23  were a number of other parties from the state at various

24  times in person and/or on the phone.

25  Q   Okay.  And so the settlement resolved disputes between

1  FGIC and the city; is that correct?

2  A    Yes.

3  Q    Could you share with the Court what disputes were

4  resolved by the settlement?

5  A    As the Court may recall, there were disputes related to

6  the certificates of participation.  In particular, the city

7  had filed litigation, I believe, in January, January 28th of

8  this year, seeking a -- I think three counts, one for a

9  declaratory judgment that the certificates of participation

10  were void ab initio.  I think it's paragraph 38 of that

11  complaint.

12  Q    Well, I'm going to -- I'm going to ask you a bunch of

13  questions about that, but --

14  A    Okay.

15  Q    -- just for now if you could stick with what the disputes

16  in a very broad sense were for the Court.  So you've got the

17  COPs litigation that you just mentioned.  What else?

18  A    There were disputes regarding a potential claim that FGIC

19  had in class treatment for Class 9 and Class 14, and there

20  were also disputes regarding their priority relative to other

21  potential creditors and/or creditor disputes.

22  Q    And these claims were reflected in their objections to

23  the plan; is that correct?

24  A    Yes.  They had filed objections to the plan.  They'd

25  filed objections to litigation, and they filed a proof of

1  claim.

2  Q   Okay.  So we got the plan of adjustment objections, the

3  proof of claim --

4  A   Right.

5  Q   -- which would be related to the swaps --

6  A   Yes.

7  Q   -- claims, and then the COPs litigation that you started

8  telling us about.

9  A   Yes.

10  Q   Okay.  Let me start with FGIC's objections to the plan.

11  A   Yes.

12  Q   I take it their objections were reflected in a document.

13  A   Yes, they were.

14  Q   And you reviewed that document?

15  A   Yes, sir.

16  Q   With regard to FGIC's objections, what was the city's

17  position vis-a-vis them?

18  A   The city was contesting those objections and felt that

19  they were unfounded.

20  Q   Now, could you share with the Court what your

21  understanding was of the nature of the objections that FGIC

22  had?

23  A   Yes.  FGIC was objecting to unfair discrimination.  They

24  felt that they weren't being treated fairly as creditors

25  within their class but also on the basis that the plan was

1    infeasible and could not work.

2    Q   Now, if FGIC's plan objections were to be sustained by

3    this Court, what would happen?

4    A   We had -- well, in the plan we had a treatment if the

5    plan did not work of an Alternative B, but that was our

6    alternative.  It might well be that if their plan objections

7    were sustained, then the plan from its various iterations

8    that we have proposed would fail, and we would, as I've said

9    sometimes, hit the reset button and have to go back to plan

10   development, but in the concept of plan development, all of

11   the settlements that we have, LTGO, UTGO, OPEB, Class 10, 11,

12   12 and the other creditors depend on each other, including

13   the so-called grand bargain, the DIA settlement, and the

14   state contribution, and all of those would fall by the

15   wayside, too, in addition to we would not be able to reach a

16   time this fall where this process would conclude I would

17   presume.

18   Q   So it would have an impact on the timing of getting out

19   of the bankruptcy?

20   A   It would be fairly catastrophic from my perspective.

21   Q   Now, if FGIC's objections to the plan were to be rejected

22   by the Court, what would that mean for the city?

23   A   Presumably FGIC would still have a claim, and there

24   potentially might be litigation to determine whether that

25   claim was valid or not or was void.  If it was void, then

1    presumably they would not have a claim.  If it was not, then

2    they would become an unsecured creditor, I would presume.

3    Q    And let's go back to the COPs litigation that you

4    mentioned.  Have you heard it referred to as the invalidity

5    litigation?

6    A    Yes.  The COPs litigation, invalidity litigation.

7    Q    Okay.  I'm going to refer to it as that.

8    A    Um-hmm.

9    Q    What was the city's position in the COPs invalidity

10   litigation?

11   A    Briefly, as I'm sure the Court is aware, the city had

12   taken the position that the whole COPs transaction was a

13   sham.  It was a fraud on the city, and, therefore, it was

14   void ab initio, and the entirety of the COPs transaction, the

15   $1.47 billion that was lent to the city in 2005 and 2006,

16   should be -- the city should be absolved from that debt.

17   Q    And why was it a sham?

18   A    There were -- the city had limitations on debt borrowing

19   under Revised Municipal Finance Act and the Home Rule City

20   Act, and I don't think it was any secret when the transaction

21   was constructed that it was designed to circumvent those

22   restrictions.  I think in the documents themselves they speak

23   to it, and it created a series of service corporations and a

24   trust so that the city would not be the direct borrower on

25   these transactions and, therefore, could be said to have

1  avoided the restrictions of state law in doing it, but
2  clearly it appeared to us that it was the intent of everyone
3  to do an end around that transaction.
4  Q    So this is pretty basic, but what was --
5  A    That law.
6  Q    What was FGIC's relationship with the COPs?
7  A    FGIC was the monoline insurer behind the certificates of
8  participation transaction for about a billion dollars plus of
9  that debt.
10 Q    So if the COPs were invalid, as the city suggested, what
11 would that mean financially for FGIC?
12 A    Well, I would presume that they would have an obligation
13 to pay on the insurance.
14 Q    Do you know how much that insurance was?
15 A    It was a billion dollars or so, yeah.
16 Q    Now, and how did FGIC's situation compare with Syncora's?
17 A    FGIC was a different order of magnitude, two and a half
18 to three times as large.  Syncora also actually held
19 certificates themselves.  They weren't just an insurer.
20 Q    Okay.  Now, you mentioned that the city filed a
21 complaint; correct?
22 A    Yes, sir.
23 Q    And when did you say that was?
24 A    I believe it was January 28th, 2014.
25 Q    And you reviewed that complaint before it was filed?

1  A    I remember the weekend, yes.

2  Q    And you approved of its filing?

3  A    Yes.

4  Q    Who did the city sue in that lawsuit, the invalidity

5  litigation?

6  A    It sued FGIC but also the service corporations and the

7  trust, I believe.

8  Q    What are the service corporations?

9  A    The service corporations were the entities created for

10 the General Retirement System and Police and Fire Retirement

11 System by which the monies would flow and the city's

12 obligation to pay on those monies to flow so that it would

13 not be in direct relationship with the lender.

14 Q    How about the funding trusts?  Where were they situated?

15 A    The funding trusts were in that line as well, that they

16 would hold the monies as it flowed back and forth in the

17 conduit.

18 Q    You've already shared with us what the general

19 allegations were in the complaint.  What was FGIC's response

20 to the complaint?

21 A    FGIC had a very robust response to the complaint, as you

22 might imagine.

23 Q    What was that response?  What did they file?

24 A    They initially filed, I believe, an answer and

25 affirmative defenses sometime later, July or August.  There

1  were 16 affirmative defenses, I believe.

2  Q   Can you share with the Court some of those affirmative

3  defenses?

4  A   Yes.  They sounded mostly in equity, I believe it was,

5  mutual mistake, fraud, equitable estoppel.  There may have

6  been unjust enrichment, may have been fraud in the

7  inducement.  There were a fairly significant number of

8  affirmative defenses and a quite robust response.

9  Q   Did they file counterclaims?

10 A   Eventually, yes.

11 Q   And could you share with the Court what those

12 counterclaims were?

13 A   Yes.  I think they filed six counterclaims seeking --

14 pretty much matching the affirmative defenses, unjust

15 enrichment, equitable estoppel, fraud in the inducement.

16 Fraud on the contract I think was Count I, but a number of

17 counts essentially alleging that they themselves had been

18 defrauded and that in terms of equity the city shouldn't

19 benefit from this but had an obligation.

20 Q   I'm sorry.  Could you elaborate on that just -- if you

21 could give the basic thrust of FGIC's position as exhibited

22 in the answer and in the counterclaims.  What were they

23 saying?

24 A   They were basically saying that the city had

25 misrepresented its intent and its condition, and I believe

1    one of the counterclaims -- one of the -- yeah, one of the

2    counterclaims was that the city had not provided them with

3    adequate information and the fact that one of the city's

4    chief law firms had refused to do the transaction and that

5    the city owed them a duty to be fully forthcoming in this

6    transaction -- it was a public transaction -- and that its

7    failure to do so was -- the city was liable for that failure

8    itself.

9    Q    So the battle enjoined.

10   A    Yeah.

11   Q    How would you describe for the Court the complexity and

12   expense of the COPs invalidity litigation?

13   A    I anticipated that it was going to be complex, both

14   factually and legally, under some of the theories.

15   Q    Why was that?

16   A    Well, for several reasons.  One, it was pretty clear that

17   both parties are going to be killing a lot of trees in terms

18   of throwing paper back and forth at each other.  Also, I'm

19   familiar with the counsel representing FGIC.  I've known some

20   of them for over three decades.  They're quite capable.  They

21   will represent their client zealously within the bounds of

22   the law as well as FGIC was a sophisticated entity that was

23   under state conservatorship itself and so probably felt --

24   having done this type of work before at the RTC, I know that

25   institutions feel quite strongly that they must not only for

1  their public persona but also for their regulatory reasons be

2  quite robust in positions they take in litigation, so they

3  were highly motivated and quite capable.

4  Q   You were sharing with us what the complexity -- why would

5  this litigation have been complex?

6  A   Well, factually complex because there were -- I think

7  there were at least three legal opinions by various law firms

8  validating the transaction at the time.  There was one that

9  said it wouldn't.  The parties had a number of different

10  positions regarding the paper flow that was going back and

11  forth at the time and who knew what, when, where, how, and

12  why.  The legal issues were somewhat novel, not the theories

13  themselves, equitable estoppel, fraud in the inducement.

14  Those are common equitable theories, but the theories in

15  conjunction with the facts surrounding this particular

16  transaction and the magnitude of debt made me believe, based

17  upon my experience, that it was going to be very complex and

18  very costly.

19  Q   So the magnitude of the debt had some influence on you?

20  A   It's 75 percent, roughly, of the general unsecured class,

21  both of the COPs transactions, so it's quite significant.

22  Q   Now, the expense of the litigation, how would you

23  characterize the expectations regarding the expense?

24  A   As I said, the counsel representing -- as we've seen, the

25  counsel, as we talked about with Syncora, the counsel

1  representing FGIC was equally motivated.  They're capable.

2  They handle this type of litigation.  I certainly think that

3  my law firm is quite capable of providing the city with the

4  type of defense it needed.  I did not anticipate that either

5  side was going to pull any punches.

6  Q   And let me -- along those lines, how long -- what sort of

7  potential length did you see for this litigation?

8  A   I anticipated that we were -- we've spent basically the

9  past year at the pleading stage with pleadings still

10  outstanding.  We have not gotten to the discovery stage let

11  alone the summary judgment motion stage, the trial prep

12  stage, and the actual trial itself on the claim.

13  Fortunately, Bankruptcy Courts move quite quickly, but given

14  the magnitude that was at risk, this was going to take, in my

15  estimation, at least several years.

16  Q   Now, you're aware that the city's motion to dismiss

17  FGIC's counterclaims was recently argued here in court?

18  A   Yes.

19  Q   Were you present that day?

20  A   I think I was present during Mr. Stewart's -- I think I

21  was present at the beginning of the argument.  I think I had

22  to leave for a period of time.  I don't recall whether I sat

23  for the whole argument.

24  Q   Okay.  Are you familiar or unfamiliar with the city's

25  arguments with regard to the counterclaims?

1  A    I'm familiar.

2  Q    Now, if FGIC were to win or succeed in its defense and in

3  its counterclaims in the invalidity litigation, what would

4  that have meant for the city?

5  A    Well, in the invalidity litigation supposedly, I presume

6  FGIC would have essentially swamped the class with a billion

7  dollar claim.

8  Q    What do you mean by swamping the class?

9  A    They would have gotten certain class treatment within

10 their class in the COPs litigation, and if they were a

11 billion dollars of that potential class, and say that class

12 was about a billion and a half, they would have been

13 significant.

14 Q    And which class was that?

15 A    I believe it's Class 9.

16 Q    Okay.  And so when you say swamping the class, it would

17 have had an effect on other members in that class, other

18 creditors in that class?

19 A    Yes.  It would have diluted their recovery because they

20 would have been the largest claimant in that class.

21 Q    Conversely, what would happen if the city were to have

22 been successful with its claims in the invalidity litigation?

23 A    I would presume that the void ab initio argument, if it

24 would have prevailed, would have extinguished the debt from

25 the city's perspective.  There might have been follow-on

1 litigation against other parties.

2 Q    Which other parties?

3 A    I think in their pleadings they speak -- in fact, as I

4 recall, I think in one of their pleadings they speak that the

5 city had -- one of the defenses, I believe, was that the city

6 had not joined the necessary party -- necessary parties, the

7 Retirement System, the General Retirement System and the

8 Police and Fire Retirement System.

9 Q    So what impact would a city's not being successful with

10 respect to FGIC's counterclaims have had on the Retirement

11 Systems?

12 A    It might well have exposed those Systems to a claim by

13 FGIC.

14 Q    What kind of claim?

15 A    A claim for a billion dollars.

16 Q    And what would that have meant for the city if such a

17 claim had been inserted against the Retirement Systems?

18 A    Well, this is a little not quite speculative, but

19 presumably if we didn't have these settlements and it had hit

20 the Systems, there is conceivable that they would have sought

21 a recovery against those Systems, which would have made them

22 even more underfunded, which would have made the obligations

23 of the city potentially increase.

24 Q    So let's talk a little bit about the FGIC settlement

25 itself.  Can you outline for the Court the general contours

1  of the settlement?

2  A    Yes.  I believe, as Ms. Ball presented to the Court last

3  week, your Honor, there's basically three components.

4  There's a Class 9 treatment, there's a Class 14 treatment,

5  and then there's a development agreement that's related to

6  the invalidity litigation.

7  Q    Okay.  And were you present last Thursday in the

8  courtroom when Ms. Ball made her presentation to Judge

9  Rhodes?

10 A    Yes.

11 Q    And you indicated previously that Ms. Ball was involved

12 in the negotiations of the FGIC settlement; is that correct?

13 A    She was central to those negotiations.

14 Q    Based on what you heard, did she accurately describe the

15 FGIC settlement when she addressed this Court?

16 A    Yes.

17 Q    Did you see the PowerPoint presentation she gave to the

18 Court?

19 A    Yes, with great detail.

20 Q    Do you believe it fairly and accurately described the

21 FGIC settlement?

22 A    Yes.  I'm glad she did it.

23 Q    Okay.

24        MR. SHUMAKER:  Let's put up Exhibit 785, please.

25 BY MR. SHUMAKER:

1    Q    Mr. Orr, if you could take a look at the screen in front

2    of you, do you see that document?

3    A    Yes, sir.

4    Q    And what is it?

5    A    This is the slide deck for the preliminary briefing

6    materials for the FGIC global settlement as of last week.

7    Q    That Ms. Ball presented?

8    A    Yes.

9         MR. SHUMAKER:  Your Honor, we'd move Exhibit 785

10   into evidence.

11        THE COURT:  Any objections?

12        MR. SOTO:  No objection, your Honor.

13        MR. WAGNER:  No.

14        THE COURT:  It is admitted.

15     (City Exhibit 785 received at 11:34 a.m.)

16   BY MR. SHUMAKER:

17   Q    All right.  Mr. Orr, I want to talk --

18        MR. SHUMAKER:  You could take that down, please.

19   BY MR. SHUMAKER:

20   Q    Now, if you need to refer to that document at any time,

21   Mr. Orr, please indicate that to me, and we'll go to it --

22   A    That's fine.

23   Q    -- but I want to talk first about the plan objections,

24   the Class 9 --

25   A    Yes.

1   Q   -- that you mentioned.  Pursuant to the settlement, what
2   happens to FGIC's objections to the plan?
3   A   FGIC will withdraw its objection to the plan.  It will
4   engage in plan support; that is, support the confirmation of
5   this plan, remove its objections regarding feasibility and
6   unjust enrichment, and cease litigating with the city
7   surrounding this confirmation hearing.
8   Q   Does it do anything with regard to the plan's Class 9
9   treatment?
10  A   Yes.
11  Q   What is that?
12  A   With regard to Class 9 treatment, it settles that class
13  along certain categories for certain compensation.
14  Q   Okay.  What types of consideration is the city giving to
15  resolve FGIC's plan objections?
16  A   It's giving B note treatment, C note treatment, and then
17  some credits.
18  Q   And that's similar to the deal that Syncora got, correct,
19  at least the types of consideration that were given?
20  A   Very similar types of consideration in the stack, just
21  different multiples representing FGIC's level of interest.
22  Q   Okay.
23          MR. SHUMAKER:  Let's put up 788, please.  Your
24  Honor, this was just admitted with Mr. Malhotra for
25  demonstrative purposes.

1 BY MR. SHUMAKER:

2 Q   Mr. Orr, I know that you've seen this before.  What does

3 it reflect?

4 A   This is an accurate representation of the FGIC settlement

5 with regard to its Class 9 treatment.

6 Q   Okay.  Could you briefly walk through with the Court what

7 FGIC was receiving in the settlement?

8 A   Yes.  In consideration for their treatment of their

9 portion of the certificates of participation, which are sized

10 at 1.119 million, $1.1 billion, roughly 76 percent of the

11 total COPs principal, they'll receive a combination of the

12 new B notes of 74.2 million, the new new C notes at 67.2

13 million.  It has the corresponding interest rates for those

14 notes with the corresponding maturities, and in addition to

15 the financial compensation, they'll receive roughly a ratio

16 of settlement credits that can be used similar to the six

17 million some-odd credits that were provided to Syncora.

18 Their ratio, though, equals 19.75 million.

19 Q   And I know you did this before with regard to Syncora,

20 but could you share with the Court what the settlement

21 credits allow FGIC to do?

22 A   It's the same thing, your Honor.  They're allowed to bid

23 on city asset sales in the future.  No more than 50 percent

24 of the credits are freely transferrable, and they do not

25 expire.

1  Q   Are there any limitations on how they can be used?

2  A   There are just limits in terms of the amount for each

3  bid, and the area around there can bid, but there are no

4  limitations on time or subject.

5  Q   How about with regard to the purchase price?

6  A   Yes.

7  Q   Is there any limitation on that?

8  A   Yes.  Fifty percent.

9  Q   Okay.

10 A   No more than 50 percent.

11 Q   Let's talk a little bit -- you talked about the Class 14

12 claims that FGIC was giving up in the settlement.  What are

13 the -- the Class 14 is the general unsecured for the --

14 A   General unsecured claims, yes.

15 Q   What's the nature of FGIC's general unsecured claims?

16 A   FGIC took the position that in addition to having COPs

17 claims that they had general unsecured claims for payments

18 that they had made that would fall in the Class 14 and that

19 they should receive some recovery in that class.  The city

20 did not necessarily have a whole lot of cash available to

21 provide for that class claim by FGIC, so we came up with a

22 proposal whereby a combination of a $6.11 million payment,

23 but in addition the Downtown Development Authority, of which

24 Mr. Lewand and the mayor have independent authority, but they

25 have a relationship, had agreed to give up about 33.3 or so

1 million dollars of their claim in that class, which would

2 yield a recovery for FGIC.

3 Q   So did the Class 14 claims of FGIC relate to the COPs or

4 to the swaps?

5 A   To the swaps claims, about $74 million of the swaps.

6 Q   And the swaps that they insured?

7 A   Swaps that they insured, yes.

8 Q   You mentioned the Downtown Development Authority;

9 correct?

10 A   Yes.

11 Q   What is the Downtown Development Authority?

12 A   The Downtown Development Authority is an independent

13 authority within the city that the city funds that is

14 designed to facilitate and encourage development in the

15 immediate CBD, Central Business District, or the downtown

16 area.

17 Q   And what class of claims did the Downtown Development

18 Authority have?

19 A   They had Class 14 claims.

20 Q   Now, did they -- is Class 13 -- what is Class 13?

21 A   Class 13 may be the -- I don't have the plan in front of

22 me, but I think that is 11 -- let me get this right -- nine,

23 ten, eleven, twelve, thirteen -- it may have been the DDA

24 independent claims.

25 Q   The DDA claims were the Class 13 claims?

1  A    Yes, yes.

2  Q    Okay.  I believe that's correct.

3  A    Yes.  No.  I believe it is.  I'm just -- I'm counting the

4  classes, and lucky 13.  I think that's their class.

5  Q    Okay.  So, again, could you share how the Downtown

6  Development Authority was involved with FGIC?  What did they

7  do?

8  A    Well, the Downtown Development Authority was -- as a

9  component of the settlement, we anticipated that FGIC, like

10 Syncora, to get value that the city did not have in cash was

11 going to have to participate in a development proposal, and

12 since that falls within the bailiwick of the Downtown

13 Development Authority, we knew that they should be involved

14 both from an operational standpoint but to the extent they

15 were anticipating value in the plan because they had a class

16 based upon some prior -- they had a claim based upon some

17 prior transactions with the city that they might be able to

18 transfer that value to FGIC to help provide them additional

19 value within that class.

20 Q    So how did that Class 13 claim get assigned to FGIC?

21 A    I believe Mr. Lewand prevailed upon the authorities --

22 Q    I don't want you to get into anything in the mediation --

23 A    Okay.  Let me do --

24 Q    -- but I do --

25 A    Let me just do it this way then.  That occurred during

1   the mediation.

2   Q    Okay.  Could you share with the Court the combined value

3   of the estimated distribution for the Class 13 and 14 B notes

4   that FGIC is to receive?

5   A    Sure.  I think there's 6.1 million plus another 30 --

6   call it 34, so there's a total of 40.  I believe the class

7   recovery comes in at 11 to 12 percent, so the value to FGIC

8   is about $4-1/2 million.

9   Q    Now, to shift a little bit to the invalidity litigation

10  one more time, what is the settlement with respect to the

11  invalidity litigation?  What does it entail?

12  A    It is a peace accord, more or less.  Both parties will

13  stop the litigation, dismiss their claims, withdraw their

14  objections.  They will, as a component, enter into a

15  development agreement with that litigation, and they will

16  also provide some exculpations.

17  Q    Okay.  Are there --

18  A    Waivers and releases as well.

19  Q    What kind of waivers?

20  A    Well, there are releases inter se between the parties

21  that are actually in claims, and there are waivers of any

22  claims that FGIC might have against third parties which have

23  not been brought, including the Retirement Systems, both the

24  General Retirement System and the Police and Fire Retirement

25  System.

1    Q    And why did you get that waiver?

2    A    Well, as with most of these settlements, we try to have a

3    comprehensive settlement that is global and that doesn't

4    leave any loose ends or allow the parties to participate in

5    litigation against third parties that may blow back on the

6    city.  We want finality and sustainability and certainty

7    going forward.

8    Q    You mentioned the development agreement.  What does FGIC

9    receive in return for settling the COPs invalidity

10   litigation?

11   A    There is a development agreement, the terms of which have

12   been -- are contained in the slide deck, whereby the high

13   points are that FGIC will enter into an agreement with the

14   city where the city will agree to release its claims, provide

15   FGIC with development opportunities, undertake to approve any

16   applications and requests on an expeditious basis, and

17   provide the site, the Joe Louis Arena, at 19 Steve Yzerman

18   Drive, Joe Louis Arena in a developable state, including

19   environmental remediation.

20   Q    Okay.  What does the construct of the agreement -- what

21   does FGIC get as part of the development agreement initially?

22   A    Initially what FGIC gets is an agreement and an

23   opportunity to begin a process to develop that site and along

24   with a commitment by both the city and the state to demolish

25   the Joe Louis Arena and to make -- after a number of years so

1  that the Red Wings can finish their two more seasons -- after
2  a period of years within approximately the end of that
3  season, 90 days, commence demolition.
4  Q  Okay.  It starts with an option that FGIC has?
5  A  Yes.  There's an option.
6  Q  Okay.  What are the city's obligations under this
7  development agreement?
8  A  The city has to --
9  Q  You don't have to be in detail, but just broadly.
10  A  Right.  Generally speaking, have to make the property
11  available for development, have to assist with environmental
12  remediation, if any, at the site along with some state's
13  assistance to do that, and you have to commit to FGIC that
14  should they exercise their option, that their plans and
15  proposals within the time frames contained within the
16  development agreement will be processed and/or approved or
17  negotiated expeditiously.
18  Q  Now, what are FGIC's obligations under the development
19  agreement if it exercises the option?
20  A  If FGIC exercises the option, they have an obligation to
21  go out and find a development partner to expeditiously come
22  forward with a proposal to pursue the closing of the
23  transaction for that proposal and commence construction and
24  complete that construction expeditiously within the stated
25  time frames, but the time frames also allow for an appeal and

1  extension processes.

2  Q    How long under the development agreement does FGIC have

3  to come up with a development proposal that you said?

4  A    You can do it by three, two, one, three as an

5  alliteration.  There are three years to come up with a

6  proposal, 36 months, more or less, but they should pursue

7  that expeditiously.  Doesn't mean they have to use the whole

8  three years, but there's three years provided in the

9  agreement.

10 Q    Okay.  Now, so there's three years to come up with the

11 proposal.  Then what happens if -- presumably a proposal is

12 put forth?

13 A    Right.  A proposal is put forth.  The city will review

14 and expeditiously approve the proposal.  Once that's done,

15 there's another two years for them to commence construction

16 on the site provided the site -- two years, I think, or

17 within 90 days of demolition.  I believe that -- I can look

18 at the number.

19 Q    Yeah, sure.

20 A    I'm just recalling from sight, but I think --

21 Q    Let's take a look.

22 A    I think that's the process.

23        MR. SHUMAKER:  Could you put back up the PowerPoint

24 presentation, please, which is 785, please?

25        THE WITNESS:  If you go to the third to the last

1   page, I believe -- keep going.  Keep going backwards.

2            MR. SHUMAKER:  If you'd go to page 011, please.

3            THE WITNESS:  Yes, one more.  There you go.

4            MR. SHUMAKER:  Actually, go one more.  We're on 012.

5   Okay.

6            THE WITNESS:  There it is.

7            MR. SHUMAKER:  Thank you.

8            THE WITNESS:  Right.

9            MR. SHUMAKER:  Yes.

10  BY MR. SHUMAKER:

11  Q   Now, as you take a look at this, Mr. Orr, does that help

12  you with some of the time frames?

13  A   Yes.  As I was saying, it's the three years that

14  developer has to identify a development partner, prepare a

15  development plan.  We call it a proposal.  It also provides

16  for application of community revitalization program

17  incentives provided by the state and brownfield plan

18  necessary for tax increment financing incentives that are

19  also provided by the state, so when you see CRP or TIF, those

20  are the incentives that the state has pledged to work with

21  the city and with the plan proponent to process

22  expeditiously.

23  Q   Okay.  And you indicated that if the option is exercised

24  by FGIC, how long does it have to close after exercising the

25  option?

1    A    Yes.  If the city -- if they exercise the option, then

2    they have a period of time, roughly two years.

3    Q    And if FGIC closes on the property, what are its

4    subsequent obligations under the development agreement?

5    A    Well, as it says here, they have a period of time after

6    submission to provide their diligence notice, by which they

7    can inspect the property.  If there are any objections after

8    the city receives the notice, there's a period of time to

9    have the objection deadline.  The city has roughly two months

10   to cure any of those issues.  If the city does, you go

11   forward.  If the city doesn't, there's a process by which the

12   developer here, the proponent, can decide whether or not they

13   want to go forward with the transaction.  If they go forward,

14   there's a period of time for them to complete it.

15   Q    Let me stop you there.  Do you recall how long FGIC has

16   before it must commence development once it closes?

17   A    Yeah.  I think it has two years or so to commence

18   development.

19   Q    Okay.

20   A    Strike that.

21   Q    Let me go to -- let me go to page --

22   A    Strike that.  I think it --

23   Q    -- 14.  I don't mean to make this a memory test because I

24   try to --

25            THE COURT:  What do you mean by "strike that"?

1    THE WITNESS:  I'm sorry.

2    BY MR. SHUMAKER:

3    Q   You want to clarify your answer?

4    A   Yeah.  I want to -- I'm sorry.  The witness would like to

5    clarify his answer.

6    Q   I would just direct you to page 14, Mr. Orr, if --

7    A   Yes.

8    Q   -- I could, because I think, again, this is not a memory

9    test, but once -- how long does FGIC have to commence

10   development on the site if it closes on the property?

11   A   This is the answer I would like to clarify.

12   Q   Okay.

13   A   It has a year, your Honor.

14        THE COURT:  Okay.

15        THE WITNESS:  Okay.

16   BY MR. SHUMAKER:

17   Q   And is there some time within which the development must

18   be complete?

19   A   Yes.

20   Q   Okay.

21   A   Excuse me.  Yes.  It has another year to complete the

22   development.

23   Q   Okay.  Look at that -- please look at that first line, if

24   you will.

25   A   Yes.  I'm sorry.  I'm sorry.

1    Q    The developer will commence within one year, and how long

2    does it have to substantially complete?

3    A    It has three years to substantially complete the

4    development.

5    Q    Okay.  Now, you talked about the commencement period of

6    one year.  What happens if the property -- if development

7    does not occur on the property within that one-year time

8    period?

9    A    The option expires, and the property comes back to the

10   city.

11   Q    Now, is the state involved in the FGIC settlement?  You

12   described that they were participants and Mr. Baird and his

13   team were involved in the settlement discussions.  Are they

14   involved in the settlement itself?

15   A    Yes.

16   Q    How?

17   A    The state was central to both the settlement and the

18   discussions by providing some of the incentives, the

19   potential for tax increment financing, community

20   revitalization programs as well.

21   Q    Okay.  And you say the community revitalization program.

22   Is that the CRP?

23   A    That's the CRP.

24   Q    And those are to go to whom during the demolition period?

25   A    Well, those will go to the developer.

1  Q   Okay.  And if the proposal is put forth and the city

2  approves it under the development agreement, what involvement

3  does the state have then?

4  A   Well, at that point the state has involvement to provide

5  some funding for demolition as well.  I believe it's

6  approximately $6 million, and that value will stay with the

7  project as well.

8  Q   Okay.  Let's go to page 013, please.

9  A   Yes.

10       MR. SHUMAKER:  And could you blow up that first

11  dash, Steve?  I mean I don't know exactly how to refer to it.

12  Yes, that.  Actually, the full with the bullet points,

13  please.  Thank you.

14  BY MR. SHUMAKER:

15  Q   Could you take a look at that, Mr. Orr?

16  A   Yes.

17  Q   And it refers to the CRP incentives that you were

18  describing --

19  A   Yes.

20  Q   -- and the TIF incentives?

21  A   Yes.

22  Q   And the state is involved in that way.  Could you explain

23  for the Court what your understanding is of that paragraph?

24  A   Yes.  If the proposal is proposed, city approves it, then

25  the state has agreed to reimburse the developer for certain

1  project costs through state programs, the CRP and tax

2  increment financing incentives they can use in association

3  with the project.  These are the values that are attributed

4  for those two programs, four million from CRP and fourteen

5  million for tax increment financing incentives, which accrue

6  interest at a certain rate for any balance outstanding.

7          MR. SHUMAKER:  You can take that down, please.

8  BY MR. SHUMAKER:

9  Q    Does the development agreement have any impact on third

10 parties?

11 A    Yes.

12 Q    How is that?

13 A    Well, the development agreement also provides -- in

14 connection with the development agreement, it also provides

15 for exculpations and releases.

16 Q    Are there any waivers in the development agreement?

17 A    Yes.

18 Q    For whom?

19 A    Well, the waivers are available -- waivers are available

20 for potential claims against the Retirement Systems.  I think

21 the exculpations relate to the COPs and to Wilmington Trust,

22 the trustee, I believe.

23 Q    Okay.  Could you explain why there's a waiver relating to

24 the Retirement Systems in the development agreement?

25 A    Well, this is the mechanism by which we make sure that

1  there are no claims brought against any third parties by FGIC

2  as a component of the development agreement, and the

3  exculpations are a way that we make sure that we tie up all

4  loose ends related to the COPs as well as to the trustee,

5  Wilmington Trust.

6  Q    Okay.  So Wilmington Trust receives an exculpation.  Does

7  FGIC receive an exculpation?

8  A    FGIC receives one as well.  They're mutual.

9  Q    And the COPs holders?

10 A    And the COPs holders.

11 Q    Why give these parties exculpations?

12 A    We're trying to provide finality in all of our agreements

13 and transactions, and if we want to be a good development

14 partner with FGIC, we do not want any third parties to be

15 embroiled in litigation.  That litigation might bring follow-

16 on litigation against the city in connection, so rather than

17 buying more litigation going forward, we're trying to bring

18 an end to all of that potential at this point and go forward

19 and focus more on the upside and the sustainability and

20 economic development components of the agreement going

21 forward.

22 Q    Is it fair to say or describe this settlement as a global

23 settlement with FGIC?

24 A    Yes, sir.

25 Q    Could you please tell the Court what objective factors

1  justify this global settlement with FGIC?

2  A    Yes, sir.  Your Honor, we are resolving, as I said, some

3  fairly heated litigation with FGIC over a large sum of money.

4  We are getting releases and exculpations both mutually

5  between the parties to the agreement and for third parties.

6  We are getting plan support, and FGIC now in their class will

7  constitute a vote for the plan.  We are getting finality and

8  sustainability going forward as well as a dismissal of all

9  litigation of both our complaint, their affirmative defenses

10 and counterclaims, so it wraps up everything with regard to

11 this transaction and, indeed, the COPs.

12 Q    Does it gain anything from a development standpoint?

13 A    We have, again, a positive.  We have a development

14 partner for the city on one of the prime pieces of property

15 in the city where everyone recognizes needs development.  We

16 have a commitment by the state that we did not have

17 previously both on the demolition side but also provides some

18 of the incentives to make this development work well, and we

19 have the ability of going forward to enhance the riverfront

20 of the city both on the east side with some of the Syncora

21 properties but now on the west side and the new Riverwalk,

22 which was just recently completed, so it takes a period of

23 time.  The total number of years could be up to nine years.

24 We're hopeful that people will move more expeditiously, but

25 we have provided through this process the ability of the

1   city's riverfront to be accelerated in terms of its

2   development enhancement as a benefit to the city.

3          MR. SHUMAKER:  Could you just please take that down,

4   Steve?

5   BY MR. SHUMAKER:

6   Q   I want to switch topics here --

7   A   Um-hmm.

8   Q   -- and ask you a few questions about what Mr. Malhotra

9   was testifying about --

10  A   Sure.

11  Q   -- and that's the latest EY projections.  Are you aware

12  of the projections that Mr. Malhotra was testifying about?

13  A   Yes.

14  Q   And they're different from the prior versions; correct?

15  A   Yes.

16  Q   And what is your understanding of how they're different

17  from the latest versions?

18  A   They are four components.  We had requested and had

19  received authority to enter into an exit facility between

20  $275 million up to, say, 305.  We have now reduced that to

21  275.  That relates to several other components.  One, at that

22  time, we did not have a settlement with one of the city's

23  contractors, a fairly significant settlement of $24 million

24  net to the city.  We did not have the Hilco auction proceeds

25  payment of $5 million coming into the city, and we did not

1  have, as was talked about -- testified to earlier today, the

2  Desman optimized city-owned projections, and so that reduces

3  the amount of money that we may need going forward in terms

4  of debt, so we anticipate in conjunction with the mayor's

5  office and with CFO John Hill reducing that facility to 275

6  million.

7  Q   I wanted to ask you about that and before we talk about

8  the EY projections because the Court has raised the issue of

9  why the city has decided to borrow $275 million from the exit

10 facility as opposed to 325 or some --

11 A   Right; right.

12 Q   -- other number.  Do you have an understanding as to why

13 that decision was made?

14 A   Yes.

15 Q   What is that understanding?

16 A   In discussions with the mayor's finance team and the

17 mayor himself, they have expressed a desire to keep the

18 borrowings for the city as low as possible so that we don't

19 have to pay debt service any more than we have to with these

20 new components that we brought in just recently -- some have

21 been under development, but they actually came to fruition --

22 come in, that now appears a reasonable thing to do.

23 Q   Let me return to the new revenue sources that you

24 mentioned.  One was the Hilco.

25 A   Yes.

1   Q   The other was a vendor settlement?

2   A   Yes.

3   Q   And the third was the parking -- enhanced parking

4   revenues?

5   A   Yes.

6   Q   Okay.  Why were those sources of revenue for the city not

7   included in the prior EY projections?

8   A   Well, if I can take them one at a time, the settlement

9   with our cable revenue vendor -- and I'm being careful here

10  because that came out of the result of -- there was some

11  litigation that existed.  That litigation was sent to Circuit

12  Court mediation, which yielded a settlement, but I think that

13  mediation has a confidentiality provision, and so I don't

14  want to run afoul of any -- even though some of it may have

15  been reported, I don't want to run afoul of it.  As a result

16  of that mediation, I think the settlement was reached, and it

17  had yet to be approved by the Circuit Court at the time of

18  the prior projections.  I think it has since been approved by

19  the Court, so we felt comfortable that both the mediation and

20  the number was now a valid and firm number.

21        On Hilco, we had negotiated with Hilco to come in

22  and act as an auctioneer on what we used to call in federal

23  government a TOA, a task order agreement.  They will have the

24  ability to be the city's chief auctioneer for excess

25  properties for three years.  This is the first in a series of

1   properties, and they were obligated to pay an up front fee of

2   $5 million, which I believe they have paid now, so we felt

3   comfortable putting that number in.  The auction itself --

4   the first auction is set to go on November 5th coming

5   forward, and there will be others as we rotate through excess

6   properties.  This one is focused principally on excess

7   vehicles and fleet cars that we try to salvage.  We can't --

8   I mean it costs it more to maintain them than to keep them,

9   so we're trying to salvage them.

10  Q   And you said that the first one is November 5th?

11  A   Yes, I believe so.

12  Q   Is there a timetable for additional auctions?

13  A   Within the next three years but as they come up from time

14  to time.  The first contract had them required, I believe, to

15  commence within 90 days, and that's why I think there's a

16  November 5th auction.

17  Q   And I want to show you a document relating to -- do you

18  know how Hilco came to be involved with the city, what the

19  genesis of that was?

20  A   Yes.

21  Q   And what was it?

22  A   As part of our efforts at the operational stage with

23  Chief Operating Officer Gary Brown and Chief Financial

24  Officer John Hill, as I said, we scraped the cupboards pretty

25  bare, and we were deciding, well, what do we do, what else do

we have, and we realized we had excess properties, which we

are trying to inventory.  Unfortunately, some of it from time

to time disappears, but we're trying to get ahold of it as

soon as we can, and we started putting them together in

groupings.  So the first grouping is, as I said, vehicles,

forklifts, things along those lines, that are past their

useful life or have been consumed essentially, so --

Q   Let me stop you there.  So the city entered into a

contract with Hilco --

A   Yes.

Q   -- is that right?  Okay.

A   Yes, um-hmm.

Q   Let me show you Exhibit 787, please.  Now, Mr. Orr, there

may -- this is the first page of this exhibit --

A   Right.

Q   -- but feel free to flip through your binder there to

take a look.  Is that it?  You have it there?

A   This is Mr. Malhotra's binder.

Q   Oh, you don't have it?  It's Mr. Malhotra's?

A   I don't have a binder.

        MR. SHUMAKER:  Your Honor, may I approach the

witness?

        THE COURT:  Yes, sir.

BY MR. SHUMAKER:

Q   You got it?  Well, I just want to make sure.

1   A    Yeah.   Thank you, sir.   Yes.   If you go to the next

2   page --

3   Q    Okay.   So you see that exhibit.   Before we go into it,

4   are you -- as you look at that document that I've handed you,

5   are you familiar with that document?

6   A    Yes.

7   Q    And what is it?

8   A    This is the city's standard PSC, personal service

9   contract, transmittal record which you see by the various

10  departments that it may impact, they get a sign-off.   At the

11  top you have Mr. Brown, our chief operating officer -- well,

12  he now has a different title but was then the chief operating

13  officer for the city, who's chiefly responsible for

14  shepherding this through as the signing party --

15  Q    Okay.

16  A    -- for professional services.

17  Q    And could you go to the next page, please, 002?   Now,

18  Mr. Orr, what is this?

19  A    This is my transmittal memo to the treasurer, Mr.

20  Clinton, Kevin Clinton, the treasurer.   Under my contract and

21  under 436, any contracts in excess -- have the potential to

22  be in excess of $50,000 have to be approved by the treasurer,

23  and this is the transmittal memo for that.

24  Q    Okay.   And you prepared this memo?

25  A    I and my staff, yes.

1  Q   And that's your signature?

2  A   Yes.

3  Q   Okay.  Let's go to page 004, please.  Now, Mr. Orr, this

4  is a similar document, but what is this?

5  A   This is the transmittal document to Governor Snyder after

6  approval by Treasurer Clinton for the personal service

7  contract for these assets.

8  Q   And you prepared this memo to Governor Snyder?

9  A   With the help of my staff.

10  Q   And that's your signature?

11  A   That is my signature.

12  Q   And in that document, what is behind the approval memos

13  that you just described?

14  A   Well, I believe it's the actual contract with Hilco.

15  First comes a city council resolution that approved the entry

16  into these contracts and my transfer of that to the city

17  clerk, and then there's the actual contract.

18  Q   And where does the actual contract start?  A page number,

19  please.

20  A   Starts on page 009.

21          MR. SHUMAKER:  Could you put that up, Steve?

22  BY MR. SHUMAKER:

23  Q   And that's the contract you're familiar with?

24  A   Yes.

25  Q   Okay.

1    MR. SHUMAKER:  Your Honor, the city would move

2  Exhibit 787 into evidence.

3    THE COURT:  Any objections?

4    MR. WAGNER:  No.

5    THE COURT:  It is admitted.

6    (City Exhibit 787 received at 12:08 p.m.)

7  BY MR. SHUMAKER:

8  Q   Mr. Orr, do you know when this contract was entered into?

9  A   The approval process started back in August.  The

10  actual -- I guess the effective date would be early September

11  when the governor signed off on it.

12  Q   So last month it --

13  A   Yes.  It was working its way through the system.

14  Q   Okay.  Now, you talked about the auctioning.  I'd like to

15  show you page 090 of this document.

16    MR. SHUMAKER:  If you can blow up that table of

17  contents, please.

18  BY MR. SHUMAKER:

19  Q   Again, Mr. Orr, you've talked a little bit about

20  vehicles, but could you briefly share with the Court the

21  kinds of assets that Hilco is going to be auctioning off for

22  the city pursuant to this contract?

23  A   Yes.  This is an initial vehicle auction, but it

24  describes the different departments, DOT, Detroit Department

25  of Transportation; PLD, Public Lighting Department;

1    Department of -- DPW, Department of Public Works; DPD,

2    Detroit Police Department; DFD, Detroit Fire Department.  And

3    it shows by the page what those particular vehicles are by

4    department, and there are other exhibits that describe that,

5    the next page in aggregate, and then there's an actual list

6    with the vehicle inventory number vehicle by vehicle that's

7    attached to the contract.

8    Q    Okay.  What page is that just so the Court can see?

9    A    The aggregate list is on the next page, 091, and then the

10   list of each individual vehicle starts at 093.

11   Q    Okay.

12          MR. SHUMAKER:  Just blow up 091, please, Steve.

13   BY MR. SHUMAKER:

14   Q    And these are the types of vehicles that you're talking

15   about that Hilco will be auctioning off?

16   A    Yes.  As you might imagine, you know, you see buses under

17   Detroit Department of Transportation, an aerial device under

18   the Public Lighting Department -- that's like a cherry

19   picker -- trailers, and it's indexed, Y axis by description

20   and X axis by the number of vehicles per department.

21   Q    Now, what are the financial benefits of this contract to

22   the city?

23   A    Well, the initial financial benefit is a $5 million lump

24   sum payment, but there's also a recovery benefit of buyers'

25   premium that depends upon the amount of the auction rate.

1  Q   And that $5 million payment is what made you comfortable

2  in including it in the Ernst & Young projections?

3  A   Yes.

4  Q   And the last new revenue source that you mentioned were

5  the enhanced parking revenues, which we've heard a lot about

6  today, but could you just share with the Court briefly what

7  your basis was for including the additional parking revenues?

8  A   Yes.  We had received an initial report from Desman.

9  Well, let me go back.  We were originally looking at all city

10 operations that might be candidates for enhancement and/or

11 privatization as we did with custodial services, as we did --

12 as we are doing with lighting, as we did with solid waste

13 collection, and parking was one of them.  Desman initially

14 informed us that there were -- as I discussed this morning,

15 there were four potential options, two where the city would

16 continue to own the parking, both the structures, the boot

17 and tow operation, and the meters and fines.  The last two

18 options were if they were privatized and taken outside the

19 city's control.  Since we had gone through transition, in

20 discussions with the mayor's team, it became apparent that

21 the city would like to retain parking to see if they could

22 optimize it.  We thought it was fair that we no longer look

23 at it then just in the status quo operation, but you looked

24 at it as city owned optimize, and that's the discussion that

25 was had this morning.

1          MR. SHUMAKER:  Okay.  Your Honor, those are all the

2    questions I have.

3          THE COURT:  Any questions for the witness?

4          MR. WAGNER:  I have no questions.

5          MR. SOTO:  No, your Honor.

6          THE COURT:  Can someone please put up Exhibit 788?

7    Recognize that?

8          THE WITNESS:  Yes, your Honor.

9          THE COURT:  Okay.  The FGIC settlement is a

10   settlement that you, on behalf of the city, are seeking court

11   approval of.

12         THE WITNESS:  Yes, your Honor.

13         THE COURT:  Is the development agreement part of the

14   settlement?

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  Would you explain to the Court whether

17   this illustrative recovery, 13 percent, in the lower right-

18   hand corner includes the value of the development agreement?

19         THE WITNESS:  I don't think for this class it

20   includes the value of the development agreement and the

21   benefits thereunder.

22         THE COURT:  What is the value of the development

23   agreement to FGIC?

24         THE WITNESS:  Well, the --

25         THE COURT:  Let me rephrase that slightly.  What is

1  the value of what FGIC is getting under the development

2  agreement?

3        THE WITNESS:  Right.  The value that FGIC is getting

4  is the opportunity to potentially develop, but they have to

5  go through a series to get it.  The actual number that you

6  would attribute to that depends upon the ultimate

7  development, what they do.  We have a pro forma of what a

8  development could look like.  I think that was discussed in

9  the mediation, so I'd like to consult, but if it is not

10 confidential, I would have no problem providing it to the

11 Court.

12       THE COURT:  Well, do you have a position on whether

13 the monetary value of the development agreement should or

14 should not be taken into account by the Court in determining

15 whether the settlement with FGIC is a reasonable settlement?

16       THE WITNESS:  I believe that it should, and perhaps

17 I can amend my answer.

18       THE COURT:  You believe what, sir?

19       THE WITNESS:  I believe that it should, but perhaps

20 I can amend my answer this way, your Honor.  I believe

21 there's -- in the development agreement there's the potential

22 credits under the CRP of four million.  I think we saw in

23 Brownfield Tax Increment financing credits of 14 million, so

24 I think that puts you in at 18.  I believe there's a value of

25 six that's being provided for demolition, so nominally

1  there's a number I could give you for those that brings you

2  in somewhere in the neighborhood of about 22.  As to

3  whether -- my understanding and I think the way this was

4  discussed in the mediation was that was for the invalidity --

5          THE COURT:  I don't want you to tell me about --

6          THE WITNESS:  Okay.

7          THE COURT:  -- mediation.

8          THE WITNESS:  Okay.

9          THE COURT:  Well, but FGIC is getting title to the

10  property or properties, right, because there's more than one

11  property here?

12          THE WITNESS:  Yes.

13          THE COURT:  Isn't that so if they exercise their

14  option?

15          THE WITNESS:  If they exercise the option, they get

16  the Joe Louis and the garage.

17          THE COURT:  And has there been any valuation of that

18  property?

19          THE WITNESS:  Yes.  That's the number I was trying

20  to give you because that value for the --

21          THE COURT:  Let me just ask you what is the city's

22  position regarding the value of the real estate that FGIC is

23  getting under this settlement?

24          THE WITNESS:  Right.  Well, the position is the

25  value of the real estate isn't realized until the Joe Louis

1   Arena is demolished, so there's no value attributed to that

2   real estate, but there is a value attributed to some of the

3   enhancements that are being provided.  There were also values

4   discussed, but I'd like to consult with counsel as to whether

5   or not I can testify to those openly.  I would have no

6   problem doing that as long as I get some comfort level with

7   that.

8           THE COURT:  Well, understand.  I'm not asking you to

9   disclose anything from mediation.  I don't want the mediation

10  confidentiality requirements to be violated here.  I'm just

11  asking the city's position.

12          THE WITNESS:  Right.

13          THE COURT:  And ultimately I'd like you to testify

14  either what the value of the real estate is that FGIC has an

15  option to acquire here or tell me that the city doesn't

16  believe it's necessary for the Court to have that in order to

17  determine the reasonableness of the settlement.  If your

18  answer is that, then we have to have a further discussion of

19  why that would be.  Do you want to consult with your

20  attorneys before you answer my questions?

21          THE WITNESS:  Yeah.  I'd like to be -- yes, I'd like

22  to be a little careful here.

23          THE COURT:  Okay.  Let's see.  How much time would

24  you like?

25          THE WITNESS:  Five or ten minutes, your Honor.

1          THE COURT:  All right.  We'll reconvene at 12:30

2     then.

3          THE WITNESS:  Okay.  Thank you.

4          THE COURT:  Let me just ask are there other

5     witnesses for the city today?

6          MR. SHUMAKER:  This is the last witness, your Honor.

7          THE COURT:  All right.  Then we'll just take this

8     brief recess.

9          THE CLERK:  All rise.  Court is in recess.

10         (Recess at 12:18 p.m., until 12:30 p.m.)

11         THE CLERK:  All rise.  Court is back in session.

12    Please be seated.

13         THE COURT:  Sir.

14         THE WITNESS:  Yes, your Honor.  I believe the

15    question was what is the city's position regarding the value

16    with regard to Class 9 treatment and our position that the

17    development agreement is related to the invalidity

18    litigation, and right now that property has no current market

19    value or even negative value because it has to be demolished

20    and remediated before it could be developed.

21         THE COURT:  So just to translate that into slightly

22    different language, the city's position is that the costs

23    associated with attempting to market all of that property

24    either equals or exceeds what the city could sell it for in

25    the market?

1          THE WITNESS:  Yes, because you have to demolish it,

2     you have to potentially remediate it, so that's true, yes,

3     your Honor.

4          THE COURT:  Okay.  All right.  Let's see what else

5     I've got.  Is there anything in the development agreement or

6     elsewhere, for that matter, that prohibits or in any way

7     restricts FGIC's right to transfer its rights under the

8     development agreement?

9          THE WITNESS:  There is a provision, but it has to be

10    with city approval, so there are provisions, but it has to be

11    approved by the city.

12         THE COURT:  All right.  Turning the page to a

13    different subject then, will you have any personal

14    involvement with the Financial Review Commission for the

15    city?

16         THE WITNESS:  I don't know.  I don't know.

17         THE COURT:  Okay.  Well, I'll ask you the next

18    question and at the same time give you the option to decline

19    to answer it.

20         THE WITNESS:  Okay.

21         THE COURT:  The question is what advice would you

22    give to the Financial Review Commission in respect to its

23    responsibilities?

24         THE WITNESS:  You know, I think I can answer that,

25    your Honor.  I think the commission understands the need to

1  have staff for one reason because there are at least --

2      THE COURT:  Well, hold on.  You say the commission

3  understands.  That suggests that the members of the

4  commission have been appointed or at least --

5      THE WITNESS:  No, no, no.  I don't want to get

6  into -- but there's a budget, and so --

7      THE COURT:  All right.

8      THE WITNESS:  As Mr. Stibitz testified --

9      THE COURT:  Right.

10     THE WITNESS:  -- they're in the formation process.

11 They haven't been appointed, as far as I know.  I know some

12 members are going to appoint themselves, but -- and I know

13 that under the statute Treasurer Clinton is a member as well

14 as the budget director and others are members, but it hasn't

15 started, but I know they recognize there's a need for staff.

16 And I think there are functions in the city that in order to

17 truly understand, that staff needs to at least at the initial

18 stages get a fairly comprehensive understanding of how that

19 works, and those are in the areas of HR to understand, for

20 instance, how it works to have a 30-percent absenteeism rate

21 and what that does to efficiencies and working.  Do you have

22 the right people in the right place?  Do you have performance

23 appraisals?  Do you have desk audits?  Do you have the things

24 you need to make an HR -- bring the city into a modern HR

25 system so you can really drive the reinvestment initiatives

1  but also free -- most city workers want to do their jobs, and

2  they want to do them well. Give them the opportunity to do

3  their jobs and train them well, so HR is one. I think

4  obviously in finance, you know, we were fortunate this year.

5  We reported out a unqualified financial opinion for the CAFR,

6  the consolidated annual financial reports, so we think that's

7  a baseline for the city going forward, but you really want

8  someone to be involved in the process, to understand at the

9  budget estimation conference, understand the development of a

10  triennial budget, understand the reports that are required,

11  come back and forth to the commission and you so that there's

12  someone who can digest those and analyze those and really

13  understand the financial projections over actuals, the trend

14  lines, the efficiencies that are able to be driven, for

15  instance, and whether or not you're using the right

16  multiples. For example, it has been traditional that

17  whatever number you use to hire an FTE, the benefits are 108

18  percent of that number, so -- but if you hire that person

19  under a PSC, a personal service contract, you don't have that

20  108 percent, so there's a potential for savings there. You

21  can adjust based upon attrition and, therefore, receive some

22  benefits while performing the same function, so there are

23  people who need to understand how that would work if you are

24  going to privatize civilians over at DPD, the police

25  department. You know, do those dispatchers need to be full-

1   time -- FTE, full-time equivalents, can they be PSC's, those
2   types of things.  I think the commission needs to just
3   have -- not necessarily immerse itself but in terms of the
4   overall review of the city's comprehensive plan for planning
5   and zoning and how that merges in with the blight plan and
6   also with the -- also with the Detroit Future City's -- the
7   mayor is very interested and his group is very motivated to
8   do economic development, and so you just need to have an
9   understanding of how that rolls out.  I don't see that as
10  being quite as involved.

11          And then I think the other thing is discussions
12  surrounding public safety.  How can we do public safety
13  better both on a regional basis but on a statewide basis, you
14  know.  One of the lessons of 9-11 was that your first
15  responders up through the stack, your police, fire, EMT's,
16  emergency rooms, have to be able to communicate even as
17  simple as the same frequencies.  The I-75 corridor, for
18  instance, is a major conduit for some miscreants who engage
19  in certain conduct here, but you have to be able to track
20  them either with an RMS or records management system or a
21  computer assisted dispatch, sort of -- that sort of granular
22  stuff.  We're fortunate that we had the state -- the city is
23  fortunate that we had the state assist us with the jail
24  management system this year so we have that ability to
25  transfer prisoners and know what they did and where they go

1   and what their bond status is, but you have to communicate

2   all that information in to the first responders, so it's

3   those areas that I think -- and I think they understand this.

4   They work with -- I know the mayor is certainly very focused

5   on those areas as well, so I think there's a real opportunity

6   to have an understanding and be supportive and even explain

7   to the state why there might be a need for further state

8   assistance in that regard, but they need to develop a good

9   understanding of sort of the granular level of how that stuff

10  operates.

11          THE COURT:  All right.  That's all I have.  Any

12  further follow-up questions?

13          MR. SHUMAKER:  No questions, your Honor.

14          MR. WAGNER:  No.

15          MR. SOTO:  No questions, your Honor.

16          MR. STEWART:  Your Honor, Mr. Malhotra,

17  unfortunately, had to leave to catch his plane, but I did

18  prepare the schedule that he referred to that we talked about

19  that summarizes the GRS contributions.  It's been marked as

20  City's Exhibit 794.  I'd offer it into evidence, and I

21  believe we have a stipulation as to its admissibility.

22          THE COURT:  Any objections?

23          MR. WAGNER:  No objection, your Honor.

24          MR. SOTO:  No.

25          MR. STEWART:  If I may approach, your Honor.

1          THE COURT:  It is admitted.

2      (City Exhibit 794 received at 12:38 p.m.)

3          THE COURT:  Yes.  I'd like to see it.  Thank you.

4   This is very helpful.  I have one more question for the city,

5   please, and then I think we can conclude for today.  Do you

6   have the intent to file a new ballot summary in light of the

7   new settlements?

8          MR. STEWART:  Let me find the right person to answer

9   that for you, your Honor.

10         THE COURT:  Okay.

11         MR. HAMILTON:  I think Ms. Lennox is upstairs.

12         THE COURT:  All right.  Well, I don't need an answer

13  today.  Perhaps you can give me an answer tomorrow.

14         MR. STEWART:  Yes.  Yes, your Honor.  Thank you.

15         THE COURT:  I hope it's yes.

16         MR. STEWART:  I think that will be the answer.

17         THE COURT:  All right.  We're in recess until 8:30

18  tomorrow morning.

19         MR. SHUMAKER:  Thank you, your Honor.

20         THE CLERK:  All rise.  Court is adjourned.

21      (Proceedings concluded at 12:39 p.m.)

INDEX

WITNESSES:                 <u>Direct</u>  <u>Cross</u>  <u>Redirect</u>  <u>Recross</u>

Gerald Salzman                9
Gaurav Malhotra              45
Kevyn Orr                    86

EXHIBITS:                                          <u>Received</u>

City Exhibit 753                                      20
City Exhibit 779                                      47
City Exhibit 780                                      48
City Exhibit 781                                      49
City Exhibit 782                                      51
City Exhibit 783                                      21
City Exhibit 784                                      40
City Exhibit 785                                     103
City Exhibit 787                                     128
City Exhibit 788 (demonstrative)                      52
City Exhibit 789 (demonstrative)                      58
City Exhibit 790 (demonstrative)                      61
City Exhibit 791 (demonstrative)                      62
City Exhibit 792 (demonstrative)                      56
City Exhibit 793                                      50
City Exhibit 794                                     141

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.



/s/ Lois Garrett                    October 26, 2014
_____        _____
Lois Garrett