# EXHIBIT 2

**Redline of Term Sheet**

## Plan Structure
## Term Sheet

This term sheet proposal (the "*Term Sheet*") and any and all past, present or future discussions, negotiations, conferences, meetings, telephone conferences, drafts of agreements, correspondence and writings, submissions of data, financial information, financial projections and forecasts and term sheets, whether oral, written or both, relating to the various transactions contemplated herein (the "*Discussions*") shall be considered to be communications to compromise and settle disputed matters. Nothing herein is intended to imply that Discussions prior to the date of this Term Sheet were not "compromise negotiations" as defined in the Federal R. Evid. 408 and similar state laws and rules limiting the admissibility or discoverability of evidence concerning "compromise negotiations" or other communications to compromise and settle disputed matters (the "*Rules*"). This Term Sheet and all Discussions shall be considered "compromise negotiations" pursuant to the Rules and no such Discussions shall ever be considered "otherwise discoverable" or be permitted to be discoverable or admissible or constitute evidence in connection with any legal proceeding, case, litigation or bankruptcy proceeding for any purpose, including proving bias, admission of default, prejudice, interest of a witness or a party, or negating a contention of undue delay, as provided by the Rules.

The term sheet herein is a summary and does not purport to include all terms or related documentation that would need to be required in any final agreement. Such terms and conditions will be included in definitive documentation that the parties will use commercially reasonable efforts to execute following execution of this Term Sheet, which documents shall not be inconsistent with the terms set forth herein.

| | |
|---|---|
| **Definitions** | For the purposes of this Term Sheet the following terms have the meanings provided below:<br><br>"Amended Waterfall Provisions" means provisions in the Supplemental Trust Agreements ensuring that all ~~proceeds from the Assets provided to FGIC and the COPs Holders pursuant to the~~ Plan Distributions are distributed (i) only for the benefit of FGIC and the COPs Holders, consistent with the terms of this Term Sheet and (ii) to the COPs Holders ~~consistent with the terms of the Plan~~*pro rata* based upon the outstanding principal amount of their respective beneficial interests in COPs as of the Effective Date and the interest accrued thereon through the Effective Date.<br><br>"Assets" means all of the consideration provided by the City under the Plan with respect to the COPs including, without limitation the New B Notes, the New C Notes, the Class 9 Settlement Credits, and the JLA Parcel together with the related development rights and economic incentives, but excluding any compensation provided by the City under the Plan with respect to the COP Swap Agreements. |

~~"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan presiding over the City's chapter 9 case.~~

"City" means the City of Detroit, Michigan.

"COPs Holders" means the holders of COPs originally insured by FGIC <ins>and/or any accrued and unpaid interest thereon</ins> (including FGIC and the COPs <ins>and/or any accrued and unpaid interest thereon</ins> beneficially held by FGIC).

"Development Proposal" means the proposal for the Development to be submitted pursuant to the Development Agreement.

"Development Agreement" means that certain Development Agreement between the City and the Joint Venture, dated October __, 2014.

"Development" means that certain mixed use facility consisting of (i) hotel and related facilities including not less than 300 hotel rooms, and (ii) such other office, retail, commercial, recreation, residential and/or condominium units as shall be determined by the Joint Venture (industrial, adult entertainment and other noxious uses excepted) given prevailing market conditions, with a height above ground not to exceed 30 floors, to be constructed upon the JLA Parcel by the Joint Venture, together with all onsite improvements, site preparation, onsite infrastructure (including, without limitation, sanitary sewer, water, storm sewer, sidewalks, street lighting, driveways, storm water detention or retention facilities), related parking facilities and landscaping, necessary or appurtenant thereto; in all instances consistent with the City's urban planning policies and the City's comprehensive development plan.

"Effective Date" means the Effective Date of the Plan.

"FGIC" means Financial Guaranty Insurance Company.

<ins>"FGIC COPs Policies" means the financial guaranty insurance policies issued by FGIC guaranteeing the payment of principal of and interest on certain of the COPs.</ins>

"JLA Parcel" means the real property located in the City upon which is presently situated the improvements commonly

referred to as the Joe Louis Arena and the Joe Louis Arena Garage.

"JLA Rights" :—means the Development Agreement, the Development, any Development Proposal, the JLA Parcel and together with the related development rights and economic incentives granted by the City or the State in connection with any of the forgoing.

"Majority Holders" means at any time, the beneficial holders of a majority in principal amount ofof and/or accrued and unpaid interest on COPs originally insured by FGIC that remain outstanding (including FGIC and the COPs and/or accrued and unpaid interest thereon beneficially held by FGIC in such calculation); provided, however, that for the purposes of extending the milestones for selling Assets, "Majority Holders" shall mean the beneficial holders of 66-2/3% of the principal amount of and/or accrued and unpaid interest on COPs originally insured by FGIC that remain outstanding (including FGIC and the COPs and/or accrued and unpaid interest thereon beneficially held by FGIC in such calculation). FGIC agrees that any "control rights" it may have with respect to the COPs or the Trusts that issued the COPs shall not give FGIC control over any vote cast by COPs Holders in connection with the exercise of rights by "Majority Holders".

"Members" shall mean FGIC and the Trustee on behalf of COPs Holders (including FGIC in that capacity).

"Plan" the City's Eighth Amended Plan of Adjustment, as amended or supplemented.

"Plan Distributions" means Assets and Proceeds of Assets.

"Plan of Rehabilitation" means the First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013.

"Proceeds" means proceeds, repayments, prepayments, interest, dividends, partnership distributions, redemptions, rents, profits, income, fees, products or offspring, or cash, securities or other property received on account of, related to, in exchange for or generated by Assets.

|  |  |
|---|---|
|  | "Trustee" means the trustee with respect to the COPs.

Initially capitalized terms used herein, but not otherwise defined herein, shall have the meanings set forth in the Plan. |
| **Plan COP Settlement** | FGIC shall, on behalf of the COPs Holders, opt into the Plan COP Settlement set forth in the Plan. |
| **Acceleration of Policy Claims** | The Confirmation Order gives FGIC the option to elect, on or prior to the earlier to occur of (i) the Effective Date and (ii) December 15, 2014, by filing a notice with the Court on or prior to such date, to treat the outstanding principal owing on all (but not less than all) FGIC-insured COPs as "Due for Payment" (as such term is defined in the applicable FGIC COPs Policy for purposes of such policy) as of the Effective Date.  If FGIC exercises such option, the following provisions shall apply:

1.  With respect to each FGIC COPs Policy there shall be deemed a Permitted Policy Claim (as defined in the Plan of Rehabilitation) in the amount of (i) the outstanding principal amount of the COPs in each CUSIP, as of the Effective Date, insured by such policy, and (ii) interest accrued and unpaid on such principal amount of such COPs through the Effective Date.

2.  Each COPs Holder will, subject to the terms of the applicable FGIC COPs Policy and the Plan of Rehabilitation, receive within 30 calendar days after the Effective Date, cash equal to its pro rata share (based on the accelerated principal and accrued and unpaid interest amount of its COPs in a CUSIP divided by the total outstanding principal and accrued and unpaid interest amount of all COPs in such CUSIP as of the Effective Date) of 21% (or whatever the effective CPP (as defined in the Plan of Rehabilitation) is at the time) of (x) the accelerated principal amount of such COPs and (y) the interest accrued and unpaid on such COPs through the Effective Date.

3.  The remainder of such Permitted Policy Claim (i.e., [100 - CPP]% of (a) accelerated principal and (b) interest accrued through the Effective Date) shall constitute a DPO (as defined in the Plan of Rehabilitation) with respect to the relevant FGIC COPs Policy in such CUSIP.  Each payment on the |

| | |
|---|---|
| **Acceleration of Policy Claims (continued)** | DPO shall be made through the Depository Trust Company in exchange for transfer of like principal amount of COPs in such CUSIP or interest accrued on such COPs prior to the Effective Date; provided, that in connection with such DPO, FGIC shall also pay DPO accretion to the extent provided under the Plan of Rehabilitation, but such DPO accretion payments shall not entitle FGIC to assignment of any COPs in connection therewith.<br><br>4. As a condition to payment to each COPs Holder and consistent with the terms of the FGIC COPs Policies and related transaction documents, FGIC will receive evidence in form and substance reasonably acceptable to FGIC, including appropriate instruments of assignment, that all of such COPs Holder's rights to payment of principal or interest with respect to which FGIC has made payment shall thereupon vest in FGIC, and that upon such payment, FGIC shall become the owner of such COPs or related coupon for all purposes.<br><br>5. FGIC shall make all payments, including without limitation the accelerated policy payments set forth above and any subsequent payments on account of related DPOs, in accordance with the terms and conditions of the FGIC COPs Policies and the Plan of Rehabilitation.<br><br>6. FGIC agrees that the Permitted Policy Claim equal to the outstanding principal amount of all COPs insured by FGIC (after giving effect to the acceleration thereof) plus interest accrued through the Effective Date, shall be deemed submitted to FGIC on the Effective Date and FGIC agrees to make payment on such Permitted Policy Claim within 30 calendar days of the Effective Date. |
| **Calculation of Policies Claims if Policies Not Accelerated** | If FGIC does not exercise its option to accelerate the claims under the FGIC COPs Policies as set forth above, FGIC and the COPs Holders shall agree (pursuant to the mechanism set forth below) on the appropriate method for applying the cash Plan Distributions distributed to COPs Holders to reduce the amount of principal or interest installment claims payable by FGIC under the FGIC COPs Policies (the "Non-Accelerated Claims Calculation"). FGIC shall consult with any COPs Holder that agrees to become restricted (or any restricted representative of a COPs Holder) without any requirement of a cleansing disclosure (other than as set forth below) with |

|  | respect to the appropriate Non-Accelerated Claims Calculation. FGIC, in consultation with such COPs Holders, shall select a Non-Accelerated Claims Calculation that is as fair as possible to all CUSIPs, without unduly prejudicing FGIC's interests; provided, however that FGIC shall not select a Non-Accelerated Claims Calculation that prejudices any of FGIC's rights under any reinsurance policy.<br><br>FGIC shall disclose the Non-Accelerated Claims Calculation to the COPs Holders, and such calculation will become final within 6 business days after such disclosure, unless the Majority Holders object in writing that such Non-Accelerated Claims Calculation is disproportionately favorable to FGIC at the expense of COPs Holders generally and propose an alternative calculation which does not prejudice FGIC's rights. If no agreement is reached within 2 business days, a neutral arbitrator shall decide which Non-Accelerated Claims Calculation to use within 2 business days of the final selection of such arbitrator. FGIC and the Majority Holders shall propose retired lawyers of national standing to be the neutral arbitrator; if the principals cannot agree on an arbitrator, the retired lawyers shall select a third retired lawyer of national standing as the arbitrator. The arbitrator's fees shall be split between FGIC and the Majority Holders.<br><br>For the avoidance of doubt, notwithstanding the acceleration of the COPs pursuant to the Plan and the distribution of cash Plan Distributions to the COPs Holders pursuant to the Amended Waterfall Provisions, in the event FGIC does *not* elect to exercise its option to accelerate the claims under the FGIC COPs Policies as set forth above: (a) principal installments of COPs originally insured by FGIC shall not be deemed accelerated with respect to or due for payment under the FGIC COPs Policies; (b) with respect to the FGIC COPs Policies, interest accruing on the FGIC-insured COPs shall not be deemed to have ceased accruing; and (c) FGIC shall be obligated to make payments under the FGIC COPs Policies with respect to any interest that accrued on such COPs as of the Effective Date, any interest that would have accrued after the Effective Date, and any principal installment of such COPs, in the amounts and dates set forth under and in accordance with the terms of the COPs, the FGIC COPs Policies and the Plan of Rehabilitation without giving effect to the acceleration of the COPs pursuant to the Plan or the cessation of interest for the purpose of allocating Plan |

|  |  |
|---|---|
|  | Distributions among COPs Holders pursuant to the Plan, as such amounts and dates may be modified pursuant to the Non-Accelerated Claims Calculation. |
| **Policies Governed by Plan of Rehabilitation** | All matters concerning the FGIC COPs Policies shall remain governed in all respects by the terms and conditions of the Plan of Rehabilitation. |
| **Joint Venture** | FGIC and the Trustee, on behalf of the COPs Holders, subject to the terms set forth herein, desire to form a joint venture (the "Joint Venture"), to hold, operate, manage and liquidate the Assets. |
| **Structure** | FGIC and the Trustee shall form a limited liability company for the ownership and management of the Assets.<br><br>FGIC and the Trustee acknowledge that the parties will reasonably cooperate with each other to implement structures that are tax-efficient for FGIC and the COPs Holders. |
| **Term** | The term of this Joint Venture will remain effective until such time as the Trustee at the direction of the Majority Holders including FGIC to the extent it acquires COPs and FGIC, agree to dissolve the Joint Venture or it is terminated pursuant to the terms to be contained in an agreement governing the Joint Venture (the "Joint Venture Agreement"). |
| **Members** | FGIC will hold a membership interest in the Joint Venture to reflect its voting rights, with a zero percent economic interest.<br><br>The Trustee will hold a 100% economic interest on behalf of all COPs Holders, including FGIC to the extent it acquires COPs and/or any accrued and unpaid interest thereon.<br><br>FGIC shall contribute and, as applicable, direct the Trustee to contribute to the Joint Venture all of the consideration provided by the City under the Plan in respect of COPs originally insured by FGIC including, without limitation, the New B Notes, the New C Notes, the Class 9 Settlement Credits, and the JLA Parcel together with the related development rights and economic incentives as provided in the Development Agreement and related planned unit development agreement. |

| | |
|---|---|
| **Additional Capital Contributions** | Future capital needs of the Joint Venture shall be specified in the business plan. The business plan (and any amendment thereto) shall be adopted by the Joint Venture with the consent of FGIC and the consent of the Majority Holders including FGIC.<br><br>Capital needs shall be funded as follows: For the purpose of funding the capital needs of the Joint Venture as provided in the business plan as proposed by FGIC and approved by the Majority Holders including FGIC, the Joint Venture may, from time to time, request that each COPs Holder fund its respective percentage of the required capital as a capital contribution to the Joint Venture. The Joint Venture shall provide not less than 30 days' notice of any such capital need included in the business plan to the Trustee for transmission to each COPs Holder (including FGIC). Each COPs Holder electing to fund its percentage of a capital call (a "Funding Holder") may also specify the percentage of unfunded calls, if any, that it will agree to fund. If any COPs Holder fails to contribute its respective percentage of such capital call, then those COPs Holders agreeing to fund such additional percentages of the capital call may, but shall not be required to, fund such additional amounts and such additional amounts shall be treated as additional capital contributions and distributed as set forth herein together with a preferred return (the "Preferred Return") thereon, compounded annually. If such additional percentages over-fund the call, the Funding Holders' additional percentages will be cut-back in accordance with their proportionate COPs holdings.<br><br>If such funding of additional percentages are insufficient to provide for full funding of such capital call as provided in the preceding paragraph, then FGIC shall have the right, but not the obligation, to make further additional capital contributions ("Super Preferred Contributions") in an amount not to exceed the amount of such deficiency. Super Preferred Contributions contributed by FGIC shall be distributed as set forth herein together with a super preferred return ("Super Preferred Return") thereon, compounded annually.<br><br>If (i) further capital contributions are required by the Joint Venture for the purpose of avoiding or curing a loan default or preserving the Development in accordance with the terms |

| | |
|---|---|
| | of the Development Proposal and the approved business plan with respect to which the manager determines (and FGIC agrees) that there is insufficient time to hold a capital call as set forth above, (ii) further capital contributions are required by the Joint Venture for certain necessary expenses to be specified in the Joint Venture Agreement with respect to which the manager determines (and FGIC agrees) that there is insufficient time to hold a capital call as set forth above, or (iii) further capital contributions are required by the Joint Venture that are not provided for in the approved business plan that the manager and FGIC may, from time to time, deem necessary or desirable, to construct, complete, operate or manage the Development in accordance with the Development Proposal (as defined in the Development Agreement) or to otherwise protect the value of the Development and with respect to which the manager determines (and FGIC agrees) that there is insufficient time to hold a capital call as set forth above, then FGIC and any COPs Holder shall have the right, but not the obligation, to make further additional capital contributions to the Joint Venture as Super Preferred Contributions, in an amount not to exceed $5,000,000 in the aggregate to fund such amounts. Super Preferred Contributions contributed by FGIC or any such COPs Holder shall be distributed as set forth herein together with a Super Preferred Return thereon, compounded annually.<br><br>Neither FGIC nor the COP Holders, will have any obligation to make any capital contributions or additional capital contributions for any reason except as specifically provided herein. |
| **Preferred Returns** | <u>Preferred Return</u>: 10**%** cumulative annual return, compounded annually, to be paid as set forth below.<br><br><u>Super Preferred Return</u>: 15**%** cumulative annual return, compounded annually, to be paid as set forth below. |
| **Distributions** | All net cash flow from operations, including, without limitation, payments on the New B Notes and New C Notes (after debt service ~~payments~~<u>reserved from the cash Proceeds of JLA Rights</u> and the establishment of reasonable reserves <u>for other expenses</u>) and any net <u>cash</u> ~~p~~<u>P</u>roceeds from sales, refinancings and other capital events shall be distributed on a periodic basis to all Members as follows. All net <u>cash</u> |

|  | pProceeds derived from the ownership or sale of the New B Notes, the New C Notes and the Class 9 Settlement Credits (to the extent such credits are sold to third parties and not applied directly or indirectly to the purchase of real property by the Joint Venture) shall be distributed to the Trustee for disbursement by the Trustee to the COPs Holders, including FGIC, pursuant to the Amended Waterfall Provisions.<br><br>Cash Proceeds of the JLA Rights shall be distributed as follows and in the following order of priority:<br><br>(a) To FGIC and any COPs Holder making Super Preferred Contributions *pari passu*, a Super Preferred Return, compounded annually, on the amount of their respective Super Preferred Contributions;<br><br>(b) To FGIC and any COPs Holder making Super Preferred Contributions *pari passu*, the return of their respective Super Preferred Contributions;<br><br>(c) To FGIC and any COPs Holder making capital contributions *pari passu*, a Preferred Return, compounded annually, on the amount of their respective capital contributions (other than Super Preferred Contributions);<br><br>(d) To FGIC and any COPs Holder making capital contributions *pari passu*, the return of their respective capital contributions (other than Super Preferred Contributions); and<br><br>(e) The balance, if any, to the Trustee, to be applied to the payment of the Trustees reasonable unpaid fees and expenses accrued from and after the Effective Date and then to be disbursed to the COPs Holders, including FGIC, pursuant to the Amended Waterfall Provisions. |
| --- | --- |
| **Supplemental Trust Agreements** | FGIC shall direct the Trustee to distribute the AssetsPlan Distributions in a manner consistent with the "Distributions" Section above, and shall direct the Trustee to enter into Supplemental Trust Agreements that include the Amended Waterfall Provisions and any and all other amendments necessary to effectuate the terms of this Term Sheet. |
| **Joint Venture Management** | FGIC shall designate a manager of the Joint Venture with the consent of the Majority Holders (not to be unreasonably withheld) to be in charge of the day-to-day operations of the |

| | Joint Venture and the Development, subject to the "Major Decisions" provision below. The designation shall include the fees to be paid to the manager, which shall be (i) paid solely for services actually performed or to be performed for the Joint Venture, and (ii) based on fees payable to arms-length managers of comparable projects involving comparable amounts of work. The designation and fees shall be subject to the consent of the Majority Holders, not to be unreasonably withheld. The Majority Holders' consent shall be deemed given with respect to the manager if the manager is FGIC. With respect to the designation of another manager, and with respect to the fees payable to FGIC or such other manager, the Majority Holders' consent shall be deemed given unless the Majority Holders object to the designee or the proposed fees in writing, specifying the reasons for such objection within 10 days of receiving notice thereof, in which case FGIC may submit either a new designee or a new fee schedule or its own written rebuttal of the objection, in which case an acceptable neutral third party will decide based solely on the written submissions whether the objection is reasonable; provided, however that FGIC may designate itself as the manager, without consent of the Majority Holders so long as FGIC, in its capacity as the manager, causes the Joint Venture to retain a construction manager, consultant or development partner with the consent of the Majority Holders not to be unreasonably withheld, upon terms reasonably satisfactory to the Majority Holders. |
|---|---|

| | |
|---|---|
| **Major Decisions** | Major decisions shall require (a) the consent of FGIC and (b) consent of the Majority Holders, provided, however, that the failure of the Majority Holders to object to a request to consent to any such major decision within 15 days of notice thereof shall be deemed consent. Such major decisions shall include (A) the initial business plan, (B) material amendments to the business plan, (C) the Developer Proposal, (D) sale of (i) New B Notes in excess of $5 million face value per transaction or $15 million face value in the aggregate, (ii) New C Notes in excess of $5 million face value per transaction or $15 million face value in the aggregate, (iii) Class 9 Settlement Credits in excess of $5 million in the aggregate, (E) application of Class 9 Settlement Credits to the purchase of real property, and (F) financings in excess of $1 million. The Joint Venture shall not sell the JLA Rights other than in whole, unless the Majority Holders consent. In any event, neither Member shall be allowed to engage in self-dealing, entering into contracts that are not arms-length, third-party for full consideration, or amending or modifying the Joint Venture Agreement to the economic detriment of other Member.[1] |
| **JLA And Class 9 Settlement Credits** | Within six (6) months following the Joint Venture's acquisition of title to the JLA Parcel, FGIC will consult with the Majority Holders concerning the Joint Venture's plans for the Development, and thereafter, at the request and direction of the Majority Holders, upon reasonable notice to the Trustee and COPs Holders, FGIC shall commence a process to either (i) cause the Joint Venture to sell or otherwise monetize, in whole, but not in part, the JLA Rights and any unused Class 9 Settlement Credits then held by the Joint Venture at a price mutually acceptable to FGIC and the Majority Holders, or (ii) use reasonable efforts to otherwise recapitalize or restructure the Joint Venture in order to buy out the indirect interests in the Joint Venture of those COPs Holders electing not to participate in future capital calls for the development of |

---

[1] The business plan will include, among other things, an undertaking by the Joint Venture to use commercially reasonable efforts to liquidate (i) the New B Notes within 12-18 months of the Effective Date at a price acceptable to FGIC and the Majority Holders and (ii) the New C Notes within 24 months of the Effective Date at a price at or near (as determined by FGIC) nominal par plus interest accrued through the date of sale.

| | |
|---|---|
| | the JLA Parcel in accordance with the Development Proposal and the then current approved business plan. |
| **Fees** | The manager of the Joint Venture may, and if FGIC is acting as manager shall, select appropriate firms to manage, construct and/or lease property. The selection of such firms and the fees payable to such firms shall be "Major Decisions". The fees and costs of any such asset or construction manager shall be paid by the Joint Venture. |
| **Cost Reimbursement** | FGIC and the manager shall be reimbursed by the Joint Venture for all costs and expenses incurred by FGIC and the Manager (without duplication) after the Effective Date of the Plan in connection with the administration and operation of the Joint Venture, including, without limitation, all reasonably allocated employee costs and related overhead, and all in-house and reasonable third party costs and expenses.<br><br>FGIC shall also have the right to retain a person or entity to act as FGIC's asset or construction manager with respect to the Development. The costs of such asset or construction manager shall be paid by the Joint Venture. |
| **Indebtedness** | The Joint Venture shall exercise commercially reasonable efforts to obtain construction and permanent financing from an institutional lender or such other lender as FGIC or any of the COPs Holders may suggest ("Lender") in an amount or amounts not to exceed an amount approved by FGIC and the Majority Holders (the "Loan"). Any indebtedness in excess of $1 million shall have no principal installment due or maturity date prior to 36 Months after the Effective Date, shall pay interest for the first 36 Months out of a reserve pre-funded for such purpose, and shall have recourse solely to the JLA Rights. FGIC may, but shall have no obligation to, provide all guarantees and other credit enhancements as the Lender may require, including, without limitation, any limited or springing recourse guarantee, environmental indemnity and, if applicable, completion guarantee on terms to be negotiated with the Lender and the Joint Venture (including any compensation for FGIC in connection therewith), subject to the consent of the Majority Holders not to be unreasonably |

|  | withheld (and deemed given if no objection is received within 15 days).  Under no circumstances shall the Trustee or any of the COPs Holders be required to give any guaranty or other credit enhancement, including, without limitation, any limited or springing recourse guarantee, environmental indemnity or completion guarantee.  It shall be a requirement of any Loan that the loan documents permit (i) the Trustee or any COPs Holders to have the right, but not the obligation, to cure any default by the Joint Venture or FGIC; (ii) transfers between FGIC, the Trustee and the COPs Holders as permitted by the organizational documents (as may be amended or supplemented from time to time); (iii) transfers by any COPs Holders of their interests in the COPs; and (iv) transfers of any direct or indirect equity interest in FGIC.  If FGIC or any affiliate of FGIC arranges for or provides financing, the Trustee and all COPs Holders must acknowledge the separate nature of the interests of FGIC in the Joint Venture and debt interests (including interests in any mezzanine loan, if any) of FGIC and/or its affiliates in the capacity as lender. |
|---|---|
| **Reporting** | The Joint Venture shall provide to the Trustee quarterly operating and financial reports and annual financial reports on the Development and the Joint Venture, and the Trustee shall post those reports on a publicly accessible web site.  Any third-party accounting fees for preparing such reports shall be borne by the Joint Venture.  Without limiting the generality of the Cost Reimbursement provisions above, if FGIC is acting as manager, then FGI~~G~~C shall also be reimbursed for its overhead at market rates for its in-house accountants for customary bookkeeping and reports customarily performed by asset and property managers to the extent such work has actually been done for the benefit of the Joint Venture. |
| **Tax/Financial** | FGIC shall select legal counsel for the Joint Venture, which may be Weil, Gotshal and Manges, LLP.  The costs of such counsel shall be paid by the Joint Venture; provided, however, that in the event of any conflict between the Joint Venture and FGIC (as identified by the Majority Holders), Weil Gotshal shall resign from representing the Joint Venture and may continue to represent FGIC in connection therewith and in all other matters. |

| | |
|---|---|
| **Consents** | Except as otherwise provided herein, to the extent that an action or decision requires the consent of Majority Holders, if no response is received from the requisite threshold of COPs Holders constituting Majority Holders within 10 calendar days of the date such consent is requested, Majority Holders will be deemed to have consented to such action or decision.<br><br>The COPs Holders have the right, but not the obligation, to appoint a restricted representative, on behalf of one or more of such holders, with the power to exercise such holders' consent rights for purposes of determining the consent of Majority Holders. The costs and fees of any such representative(s) shall be paid by the Joint Venture in an amount approved by FGIC with the consent of the Majority Holders not to exceed $100,000 per year in the aggregate. |
| **Dispute Resolution** | In connection with the negotiation of the definitive documentation to effect the various settlements of claims provided for in this Term Sheet, the parties shall use good faith efforts to identify and agree upon alternative dispute resolution mechanisms that provide a process for resolution of disputes. |
| **Jurisdiction/Venue/Choice of Law** | The parties agree that, except as provided in the "Dispute Resolution" section of the Term Sheet, jurisdiction shall be exercised by courts located in New York City for all disputes relating hereto arising after the consummation of the Plan. The parties agree that this Term Sheet is to be interpreted by and governed accordance with New York law without regard to the principles of conflicts of law. Each COPs Holder is a third party beneficiary of this Term Sheet (and will be a third party beneficiary of final documentation implementing this Term Sheet) entitled to enforce rights granted hereunder (or such documentation) to any COPs Holder against FGIC. |

| Summary report: Litéra® Change-Pro TDC 7.5.0.112 Document comparison done on 10/26/2014 11:05:02 PM ||
|---|---|
| **Style name:** Default Style ||
| **Intelligent Table Comparison:** Active ||
| **Original DMS:** iw://WEILDMS/WEIL/95118955/16 ||
| **Modified DMS:** iw://WEILDMS/WEIL/95118955/22 ||
| **Changes:** ||
| Add | 21 |
| Delete | 12 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 7 |
| Table Delete | 3 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 43 |