Shirley Scott
15654 Spring Garden St.
Detroit, MI 48205

FILED

2014 OCT 23 A 9: 35

[illegible stamp]

October 21, 2014

The Honorable Steven W. Rhodes
U.S. Bankruptcy Court for the Eastern
 District of Michigan, Southern Division
211 W. Fort St., Ste. 1800
Detroit, MI 48226
Courtroom 1825

Re: The City of Detroit, Case No. 13-53846

Dear Judge Rhodes:

I have made two (2) requests to this Honorable Court for a hearing the latest one being August 30, 2014, and you have denied both requests.

This Honorable Court has approved the City of Detroit's Bankruptcy Plan, which includes a provision that no suits can be filed against the debtor after the conclusion of the bankruptcy. Kevin Orr and the lawfirm of JONES DAY have conspired to cover up violations of the Racketeer Influenced Corrupt Organization Act (RICO) of 1970. Former Mayor Bing's administration committed federal contract fraud and obstruction of justice by retaliating against me for participating in an ongoing investigation by the federal government from April 2011 until March 2013, and the emergency manager and lawfirm were provided with supportive evidence of the protected activity. As Thomas Jefferson wrote:

> "Experience hath shewn, that even under the best forms of government those entrusted with power have, in time, and by slow operations, perverted it into tyranny."

The maximum penalties for racketeering include a fine of up to $25,000 and up to 20 years in prison in addition to the forfeiture of all business interests and gains gleaned from criminal activity. In addition, the case can be tried in civil court and a plaintiff is allowed to sue for triple damages. As this Honorable Court is aware, former Mayor Kilpatrick is currently serving a prison sentence for violating the RICO Act. The corrupt activity "spilled" over into former Bing's administration as well, and I was powerless at my level of employment to get the mayor to meet with me so that I could explain the need for federal compliance. As I was blacklisted

and could not get any assistance from the Mayor or City Council, I retired early anticipating being able to return to work under a new administration.

I provided this Honorable Court with evidence that I was off work from April 2013 until September 2013 with no income, and as I have not been granted a hearing, I must inform this Honorable Court that I also was a debtor in the Bankruptcy Court, Case No. 10-65382, and my case was closed. In order to reopen my case, I need income with which to repay my creditors. My attorney, Leon Gant, allowed my case to be closed because a girlfriend redeemed the residential property for me as I was unemployed with no income, and the property should not have been redeemed. When one suffers from severe depression, cognitive decisions are often not clearly made. I provided evidence to this Honorable Court that I suffer from depression.

From 2009 to 2012 prior to the appointment of the emergency manager, I tried to convince former Mayor Bing's administration to comply with Section 3 of the HUD Act of 1968, but they would not comply. A collective conspiracy group prevented me from interfering with the corrupt activity by denying promotion; suspension, intimidation, making threats, reassignment affecting prospects for promotion, and failure to rehire. As you will see from the attached, Kevin Orr had to come in and order the City to restructure Planning and Development to include Section 3 Compliance. The emergency manager has provided evidence to support my closed case of Retaliation for Seeking to Enforce Section 3 of the HUD Act of 1968, Case No. 12-cv-14048. Even though I did not include violations of the Whistleblower Protection Act and the Equal Pay Act, I had a prevailing case based on the following:

- Documented evidence of the underlying conduct within the City of Detroit;

- Evidence showing that the City of Detroit's conduct occurred on a wide-scale through multiple departments (City Council, Mayor's Office, Law Department, Planning and Development Dept., Building and Safety Engineering Dept., Human Resources Dept., Recreation Dept., Department of Public Works, and Finance-Purchasing Departments) and among several employees as they were not ordered to comply;

- Evidence to support that the Mayor's office allowed the Executive Staff of Planning and Development to conduct federal contract fraud, and did not do anything to prevent it;

- Evidence that I made internal complaints prior to contacting the federal government and nothing was done about it, and as a result I was retaliated against for blowing the whistle;

- Requested the Court to obtain a copy of the City's 2012-13 Section 3 Summary Reports for Community Development Block Grant (CDBG), HOME, and NSP as the federal funds are a source of income for the City.

There was nothing that I could have done alone to help the City and relied upon the assistance of a district judge. I am aware that judges are immune from civil liability except in cases where a patent abuse of judicial power can be demonstrated, and I believe it to be an egregious act on the part of this Honorable Court to deny me a hearing. I should not have had to seek the assistance of the federal government or had to file a civil suit against the City for a federal law that has been

in existence since 1968. I only wanted protection from those employees who willfully participated in corrupt activity, and my equal managerial pay for seeking to enforce a law that should have been enforced by the elected officials of the residents of Detroit.

Your assistance in this matter would be greatly appreciated.

Regards,

*Shirley Scott*

Shirley Scott

Enclosure

Cc: Honorable Sean A. Cox
    Honorable Thomas J. Tucker
    JONES DAY



2014 SEP 25 P 4:02 DETROIT CITY CLERK

# EMERGENCY MANAGER
# CITY OF DETROIT

## ORDER No. 38

## ORDER MODIFYING PLANNING AND DEVELOPMENT DEPARTMENT AND ESTABLISHING HOUSING AND REVITALIZATION DEPARTMENT

BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER
FOR THE CITY OF DETROIT
PURSUANT TO MICHIGAN'S PUBLIC ACT 436 OF 2012,
KEVYN D. ORR, THE EMERGENCY MANAGER,
ISSUES THE FOLLOWING ORDER:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager ("EM") for the City of Detroit ("City") with all the powers and duties provided under PA 436; and

Pursuant to Section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the Detroit Mayor (the "Mayor") and the Detroit City Council (the "City Council"); and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Further, Section 9(2) of PA 436 prohibits, during the pendency of receivership, the Mayor and City Council from exercising "any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by [PA 436] and are subject to any conditions required by the emergency manager;" and

Pursuant to Section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of this act;" and

Pursuant to Section 12(1)(b) of PA 436, "notwithstanding any charter provision to the contrary," the EM may "[a]mend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended;" and

Section 12(1)(g) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[m]ake, approve, or disapprove any appropriation, contract, expenditure, loan, the creation of any new position, or the filling of any vacancy in a position by any appointing authority;" and

Section 12(1)(i) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," and "[n]otwithstanding any minimum staffing level requirement established by charter or contract, [to] establish and implement staffing levels for the local government;" and

Section 12(1)(n) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[c]onsolidate or eliminate departments of the local government or transfer functions from 1 department to another and appoint, supervise, and, at his or her discretion, remove administrators, including heads of departments other than elected officials;" and

Section 12(1)(ff) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[r]emove, replace, appoint, or confirm the appointments to any office, board, commission, authority, or other entity which is within or is a component unit of the local government;" and

The EM, in consultation with the Mayor, has determined that it is appropriate to establish a new Housing and Revitalization Department (the "HRD") to perform certain functions previously performed by the Planning and Development Department. The EM and Mayor believe that establishing a Housing and Revitalization Department will enhance the City's capacity to pursue, advocate, and support social, economic, and physical development and conservation within the City and to administer grants to various City agencies. The EM and Mayor believe this Order will promote the long-term financial recovery of the City and the health, safety and welfare of the public.

**It is hereby ordered that:**

1. All actions taken by any official under this order shall be taken under the supervision of, and with the approval of, the Mayor, or with respect to matters relating to the Bankruptcy Case or the Plan of Adjustment, under the supervision of, and with the approval of, the EM while he is in office.

2. The Group Executive for Jobs and Economy (Executive Assistant Level 5 to the Mayor who the Mayor designates as being in Charge of Economic Development), or the Mayor, is directed to establish the HRD.

3. One HRD Director and one HRD Deputy Director shall be added to the budget of the HRD. The employee hired as the HRD Director shall be appointed by and serve at the pleasure of the Mayor. The employee hired as the HRD Deputy Director will be appointed by the HRD Director in consultation with the Mayor and shall serve at the pleasure of the Mayor.

4. The HRD shall strategically manage the City's Federal entitlement and related resources and shall be comprised of the following three divisions: (a) Administration; (b) Public/Private Partnership; and (c) Underwriting.

5. The Administration Division shall be comprised of the following operational components: Program Management, Reporting and Data Collection; Labor Standards and Section 3 Compliance; and Administrative support.

6. The Public/Private Partnership Division shall lead initiatives to attract public and private investment in city neighborhoods using public land and financing.

7. The Underwriting Division shall invest the City's entitlement funds in affordable, mixed income and mixed-use housing developments and related public improvements in addition to leading the planning associated with Community Development Block Grants, Emergency Solutions Grant Program, HOME funds and Neighborhood Opportunity Fund; and the implementation of a City-wide investment strategy.

8. All finance, accounting, and grant management positions in the City's Planning and Development Department ("PDD") and their respective appropriations shall be transferred to the Office of the Chief Financial Officer. The City's Chief Financial Officer ("CFO") or his designee will identify the specific positions that will be transferred, the appropriations to be transferred, and the timing of these transfers.

9. The PDD and the PDD Director shall no longer perform the functions set forth in paragraphs 4, 5, 6, and 7 of this Order. All positions and the associated funding for positions performing the duties and responsibilities in paragraphs 4, 5, 6, and 7 of this Order are transferred to HRD and the HRD Director from PDD and the PDD Director.

10. The PDD will be comprised of the following operational components: overseeing the development of a City-wide Master Plan of Policies; strategic oversight of land acquisition and land sales in partnership with HRD; site plan review for community planning implementation and coordination; assisting with administering Historic and Environmental regulations; data management, and GIS mapping.

11. Notwithstanding any City or human resources rule, regulation, policy, agreement, ordinance, or practice to the contrary, including, but not limited to, the City's Civil Service Rules, the HRD Director and PDD Director shall have the authority, with the approval of the CFO and in consultation with the Human Resource Department, to do the following for their respective departments:

    a. Determine the placement of all positions, including the selection and removal of incumbents, within the HRD and PDD;

    b. Create or modify job titles, roles, responsibilities and positions in support of the HRD and PDD: and

    c. Make recruitment, hiring, retention, promotion, demotion, reassignment and any other related personnel decisions affecting the HRD and PDD.

In all events, the HRD Director and PDD Director shall comply with the terms of applicable collective bargaining agreements and provide required notices to impacted employees and labor unions, if applicable.

12. Notwithstanding any City or human resources rule, regulation, policy, agreement, ordinance or practice to the contrary, the HRD Director and PDD Director with the approval of the Mayor, shall have the authority to modify the organizational components and functions of HRD and PDD.

13. Notwithstanding any City or human resources rule, regulation, policy, agreement, ordinance, or practice to the contrary, the PDD Director and the HRD Director, with the cooperation and assistance of the Human Resources Department, may create a new classification and compensation system for the positions under their authority, subject to the approval of the CFO and the Mayor. In all events, the HRD Director and PDD Director shall comply with the terms of applicable collective bargaining agreements and provide required notices to impacted employees and labor unions, if applicable. In the event that the PDD Director and HRD Director position are vacant the Mayor or his designee may act in the place of the PDD Director or the HRD Director.

14. The Human Resources Director shall file any employment position or new classification that is created on or after the date of this Order with the City Clerk and the Council on the 15th day of each month (or if such date is not a business day, the next succeeding business day), commencing on November 17, 2014. Such report shall include the compensation range of that employment position. Any new position that is created and filled shall be within available appropriations.

15. Notwithstanding any City Charter provision, regulation, policy, agreement, ordinance, or practice to the contrary, the PDD Director, subject to the approval of CFO, may enter into a contract with the Detroit Building Authority with respect to the management of any City-owned commercial property. Any transfer of City-owned property to the Detroit Building Authority can only be accomplished with City Council approval.

16. Nothing in this Order shall be interpreted as affecting the employees of City Council's Legislative Policy Division that provide support for the City Planning Commission.

17. Nothing in this Order shall affect the right of City Council to confirm the PDD Director.

18. Nothing in this Order shall be interpreted as contrary to applicable law.

19. If any component of this Order is declared illegal, unenforceable, or ineffective by a court of competent jurisdiction, such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

20. This Order shall be distributed to the Mayor, members of the City Council and all City Department Directors and Group Executives.

21. For transparency, the Executive Branch departments of the City described herein shall prepare a monthly report describing actions taken pursuant to this order on 15th day of

each month (or if such date is not a business day, the next succeeding business day), commencing November 17, 2014. This report shall be filed with the City Clerk and City Council and posted on the City's website.

Dated: September 25th, 2014

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc: State of Michigan Department of Treasury
Mayor Michael Duggan
Members of Detroit City Council
City Department Directors and Group Executives