UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: CITY OF DETROIT, MICHIGAN, | . | Docket No. 13-53846 |
| | . | Detroit, Michigan |
| | . | October 27, 2014 |
| Debtor. | . | 9:00 a.m. |

. . . . . . . . . . . . . . . .

TRIAL RE. OBJECTIONS TO CHAPTER 9 PLAN
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By: BRUCE BENNETT<br>555 South Flower Street, Fiftieth Floor<br>Los Angeles, CA 90071<br>(213) 243-2382 |
| For Detroit Police Officers Association: | Erman, Teicher, Zucker & Freedman, PC<br>By: BARBARA PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI 48034<br>(248) 827-4100 |
| For the Official Committee of Retirees: | Dentons US, LLP<br>By: CLAUDE D. MONTGOMERY<br>1221 Avenue of the Americas, 25th Floor<br>New York, NY 10020-1089<br>(212) 632-8390 |
| For Ad Hoc COPs Holders: | Kramer Levin Naftalis & Frankel, LLP<br>By: JONATHAN M. WAGNER<br>1177 Avenue of the Americas<br>New York, NY 10036<br>(212) 715-9393 |
| For the State of Michigan: | Dickinson Wright<br>By: STEVEN G. HOWELL<br>500 Woodward Avenue, Suite 4000<br>Detroit, MI 48226-3245<br>(313) 223-3033 |

APPEARANCES (continued):

| | |
|---|---|
| For Financial Guaranty Insurance Company: | Weil, Gotshal & Manges, LLP<br>By:  ALFREDO PEREZ<br>700 Louisiana, Suite 1600<br>Houston, TX  77002<br>(713) 546-5040 |
| | Weil, Gotshal & Manges, LLP<br>By:  EDWARD SOTO<br>1395 Bricknell Avenue, Suite 1200<br>Miami, FL  33131<br>(305) 577-3177 |
| For the Detroit Retirement Systems: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>151 South Old Woodward Avenue, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| For Detroit Retired City Employees Association: | Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, 3rd Floor<br>Birmingham, MI  48009<br>(248) 723-6263 |
| For John P. Quinn: | JOHN P. QUINN<br>2003 Military Street<br>Detroit, MI  48209 |
| For Michael J. Karwoski: | MICHAEL JOSEPH KARWOSKI<br>26015 Felicity Lansing<br>Harrison Township, MI  48085<br>(313) 378-7642 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street, 21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

THE CLERK: All rise. Court is in session. Please be seated. Case Number 13-53846, City of Detroit, Michigan.

THE COURT: One moment, please. Sir.

MR. BENNETT: Good morning, your Honor. Bruce Bennett for Jones Day on behalf of the city. Before we get started with final argument, there's actually one loose end that has to be tied up, and I think Mr. Perez has one comment to make, and I have to read something into the record.

THE COURT: Okay.

MR. PEREZ: Good morning, your Honor. Alfredo Perez on behalf of FGIC. Your Honor, I'm happy to report that just in the nick of time we've resolved each and every one of the kind of pending issues, but we did reach agreement on language that -- reservation of rights language that would go into the confirmation order. That's what Mr. Bennett is going to read. And all the parties, including the swap counterparties, FGIC, Syncora, the city, the COP holders, were basically all agreed on that language.

Your Honor, as of about ten minutes ago, we filed on the record the form of term sheet, the agreement between the COP holders and FGIC, which was largely done, but just had to be updated to reflect everything.

Additionally, your Honor, on Friday we received word from the Department of Financial Services that they had waived the notice period, so we now have the ability to enter

into the settlement.

THE COURT: Thank you.

MR. WAGNER: Your Honor, Jonathan Wagner from Kramer Levin on behalf of holders of a billion dollars of certificates of participation. I owe your Honor answers to two questions. One is our status and, two, the length of my closing. I don't think there's any suspense here, but I'm happy to report that we are withdrawing our objection. The ad hoc COPs holders have reached agreement with FGIC as to how plan distributions will be made and how the policies will be administered, and as Mr. Perez noted, that agreement is now embodied in a term sheet filed with the Court. The city has circulated a form of confirmation order. We haven't been able to give it to our clients yet because it hasn't been publicly filed, but based on the term sheet and the confirmation order as it's been supplied to us, we're prepared to withdraw the objection, obviously reserve all our rights with respect to any confirmation order, but we hope and expect that that won't be necessary. And because of all that, my two-hour closing is now reduced to zero, though I would like to make a statement following Mr. Soto's statement. Thank you.

THE COURT: Okay.

MR. SOTO: Your Honor, very briefly, we will not be making a closing statement, but we've taken up the Court's

time significantly over the last month, and we just wanted to thank the Court for all the accessibility that you've given us. There were many times when we had to call you and your office, and your entire staff has been amazing to work with and given us the opportunity to present our arguments, and your patience was, of course, paramount in all of that, and we wanted to take the time to thank you for that.

THE COURT: Well, you're welcome, and thanks to all of you for your hard work in achieving this resolution.

MR. WAGNER: Your Honor, I noted back on September 3rd that my role here was going to be limited. I didn't expect I would be here every day, but it's been an absolute privilege. It's been a privilege working with the folks at Weil Gotshal, Mr. Perez and Mr. Soto, absolutely outstanding, and Ms. Fish has been just invaluable. And like Mr. Soto, I thank your Honor for all the many courtesies that you've extended throughout the trial. The proceedings have been conducted in a very dignified way. And most of all, I'm prepared to throw out my watch because I think you're more accurate than my watch. And, you know, that's a courtesy to litigants as well. It's very important. And we thank all of the Court's personnel. And, you know, although we opposed the plan until the very -- really the very end -- we're the last creditor group to settle -- we've tried to conduct ourselves with respect to the Court, respect to our

formidable and now former adversaries at Jones Day, respect for the city, its emergency manager, its officials, and its citizens, many of whom have testified very eloquently, and I hope that we've played a constructive role at this trial. Thank you.

THE COURT: Well, you're welcome, and thanks to you also, and let me also say on behalf of my staff you're welcome as well.

MR. BENNETT: Okay. The first order of business, the assignment that I wound up with is to read into the record the additional provisions that will be included in the confirmation order, and I'm told that these provisions are directed at maintaining the status quo as between the COPs and the COPs insurers, on the one hand, and the swap banks, on the other hand. This is a little bit lengthy.

Notwithstanding anything to the contrary in this confirmation order or the plan, open paren, including, without limitation, Sections Roman II, capital B3, small p, small i, capital A, comma, Roman III, capital D6, or Roman IV, period, capital L, of the plan -- so that's IV.L, not the Roman L -- the FGIC settlement or the Syncora, settlement, close paren, colon. Item, open paren one, little i, close paren. None of the form, method, mechanics, or allocation of distributions in Section Roman II, capital B3, small p, small i, capital A, of the plan nor any findings or orders of the

Bankruptcy Court related thereto shall or shall be asserted or construed to affect or prejudice any rights, claims, or defenses between the COP, capital C, capital O, capital P, swap counterparties, comma, on the one hand, comma, and any settling COP claimant, open paren, including Syncora, FGIC -- that's capital F, capital G, capital I, capital C -- and the FGIC COP holders, close paren, or the COP insurer, comma, on the other hand, period. Subject to the proviso at the end of this paragraph, comma, the preceding sentence hereby amends and replaces in its entirety the fourth paragraph of Section Roman II, capital B3, small p, small i, capital A, of the plan, semicolon.

Next paragraph, open paren, two little i's, close paren. Neither, open paren A, close paren, any determinations, adjudications, findings, or rulings in the plan or by the Bankruptcy Court regarding the distributions or consideration provided to the COP insurers or the settling COP claimants under the plan, including whether such distributions or consideration are solely for the benefit of any particular parties nor, open paren, little B, close paren, any acceleration or deemed acceleration of any COPs provided for in the plan or by the Bankruptcy Court shall in any way affect or prejudice any rights, claims, or defenses of the COP swap counterparties including with respect to such distributions or consideration, semi colon, and, open paren,

three little i's, close paren, no release or agreement by any COP agent provided for in the plan, open paren, including, comma, without limitation, any agreement not to sue any COP holder or any COP insurer in Sections Roman II, capital B3, small p, small i, capital A, of the plan, close paren, or by the Bankruptcy Court, comma, shall in any way affect any liability of such COP holder, COP insurer, or COP agent to any COP swap counterparty, open paren, or to any COP agent on behalf of such COP swap counterparty, close paren, or impair in any way the rights or obligations of any COP swap counterparty or COP agent, open paren, on behalf of any COP swap counterparty, close paren, to sue any COP holder, comma, COP insurer or COP agent, semi colon -- this is the last paragraph -- provided, comma, however, comma, that notwithstanding anything in this paragraph to the contrary, the swap counterparties have agreed not to and shall not seek to enjoin, block, prevent, subject to any lien, open paren, other than a judgment lien, close paren, or otherwise interfere with, open paren, one little i, the distribution by the debtor of the Class 9 settlement asset pool and new B notes to, comma, as applicable, comma, FGIC, the FGIC COP holders, Syncora, and the settling COP claimants under and as provided for in Section Roman II, capital B3, small p, small i, capital A, of the plan, open paren, two little i's, close paren, any performance, operation, administration of, sale

of, transfer of, assignment of, or other action with respect to the FGIC development agreement, the Syncora development agreement, or the tunnel lease, open paren, it being understood that this clause, open paren, romanette ii, close paren, shall not impair any rights or claims of the swap counterparties to monetary damages related to such agreements or the value therefore, close paren, or, open paren, three little i's, close paren, except as a defense, counterclaim, or claim against and in response to a party asserting a counterclaim in each case asserted by either of the swap counterparties distributions to FGIC, the FGIC COP holders, Syncora, and the settlement COP claimants, open paren, as applicable, close paren, of the proceeds of any of the foregoing, period.

THE COURT: I look forward to trying to understand that. All right. Before we begin with our closing arguments, I need to find on the record that the evidentiary record is closed. Anyone object to that? All right. The evidentiary record is closed, and we will begin our closing arguments.

CLOSING ARGUMENT

MR. BENNETT: Thank you, your Honor. Again, Bruce Bennett of Jones Day on behalf of the city. I want to begin where we started. This Chapter 11 case, of course, was filed on July 19th, 2013, and it's hard to overstate the

significance of the fact that that's only 15 months and 8 days ago. I think it's definitely true that every significant general purpose municipality I can think of other than those dismissed because the debtor was ineligible has taken far longer, and the smaller but still noteworthy Chapter 9 cases of Stockton and San Bernardino will also last much longer. Even Orange County, which was the prior record holder for large case successful completion in Chapter 9, lasted 18 months. I will say in fairness to the other people who worked on that, we kind of slowed down on purpose in the end because, unlike the Detroit case where the exit financing will be issued in a public offering later, in Orange County the exit financing was a public offering that was issued right on the effective date.

The city firmly believes that for general purposes -- for general purpose municipalities limiting the length of a Chapter 9 case is not a small thing. It's a very big thing, and there's lots of reasons about this, but I'm going to focus on one, and this is one time I'm going to refer to press accounts not for the truth of anything that they say but for the fact that few, if any, press accounts about this case and, frankly, even every article about the City of Detroit published outside the City of Detroit refers to the fact that Detroit is in a bankruptcy case, and actually more often than not they refer to the fact that

Detroit is in a bankruptcy case more than once, and this just isn't good. It's not helpful. It doesn't do much to attract residents and businesses to the city, which, as we'll see later, is extremely important to the city's overall recovery, and even people who are on the precipice of or interested in investing in the city, it's just all too easy to say to themselves or to -- in the discussions where people talk about proceeding, "Well, why don't we wait until we see how that comes out?" Even today many people who read articles which have reported the parade of settlements, the fact that there are very few objectors left in the case, don't fully understand the extent of progress already made or fully understand that the end really is in sight notwithstanding the unfinished business we have here today.

We depart just a little bit from your Honor's witness in believing that the benefits of moving forward vastly outweigh any conceivable advantages of slowing down the progress of the case. We're not sure that there even are any. What Ms. Kopacz says is that there would be more information available. You would see that the restructuring had advanced further, and maybe some risk would be out of the numbers, but the reality is is -- or excuse me -- the reality of experience is is it's not true; that, yes, you will learn more information about some things, but there will be just as many uncertainties about the future. They'll just be

different ones.

I also think that we can learn things from the Chapter 11 model, and while this is debated as being a good or a bad thing, increasingly in Chapter 11 cases the Chapter 11 case is confined to focuses on fixing the capital structure, and fixing the operations may well begin during a Chapter 11 case if it's required, but very frequently it extends afterwards. That's partly because constituents want to set value based upon circumstances as they are and not as they're changed through a restructuring, but it's also because businesses aren't helped by newspaper articles that begin and end with the words "Company X, Y, Z is in bankruptcy," so it was a priority very early on for the debtors -- for the debtor; sorry -- the debtor, the emergency manager, the entire professional team, that we were going to put this case on a fast track. I think the very first time I spoke to your Honor, it was about scheduling eligibility, which had become a big problem in a lot of cases because it extended on for a long time, and we think that it is -- we've succeeded in this regard with your help. We are actually a little bit off schedule, somewhere around a month, but in the scheme of things, that's not bad, and the ultimate -- the fact that we're going to have an ultimate conclusion in this kind of time frame is terrific.

There's a second point I want to comment on, and I

think the start of this hearing really focused on this as well, which is that this plan is very broadly consensual at this point, and all -- and the city has settled with all of the major objectors and all of the major economic players in the City of Detroit. Of course, the case did not start out that way, and, in fact, it's hard to think of any major constituency that was not involved in litigation concerning some aspect of its rights against the city. I think, frankly, the only exception I could think of is the swap parties didn't actually get involved in litigation, but Syncora, by participating in that area, actually made up for that. The transformation of a case from one that is so litigious and involves so much disagreement to one that involves this amount of consensus in so little period of time is also very remarkable.

Third point is to focus a little bit on the plan. I was present at the creation of the city's reorganization strategy, and I will tell you that the one thing every other person who was there understood was that the city would be proposing a plan that would be regarded as radical, and I've chosen that word very carefully, even if it had solid legal support. Again, we should not lose sight about how much is being accomplished here even though there is much more left to be done. There is no municipal debt adjustment case ever that resulted in the discharge of more than $7 billion of

claims and the significant deferral of the remaining obligations no matter what inflation factor you want to attach to historical numbers. No case has ever carved out anything like $1.7 billion in funds to rebuild a distressed municipality. No case has carved out numbers that are as material as that relative to the size of the Chapter 11 case. Nothing has come close. Again, doesn't matter what inflation factor you choose or how far back you go. That the plan includes such dramatic and important changes at the point of confirmation and that this wasn't lost, watered down, or disappeared as a result of running through the Chapter 9 process is, frankly, remarkable and I think not widely expected when the case began.

So the next remarkable development is, frankly, your Honor entering a confirmation order. I've actually prepared to talk about a lot of things, but I'm going to try to spend less time on each of them. The points that I'm covering are those which the Court has to focus on to confirm this plan because it was, in fact, rejected by two classes of claims, and there are dissenting votes in other classes. And to the extent that there are other confirmation tests that are applicable that aren't really related to those two aspects or were not the subject of a specific request by your Honor that I cover them, I have left them out, and they are covered in the papers. At opening I referred you to the table that's

attached to our pretrial brief. It's a good place to go to. You can find where we think we proved everything.

We owed you, your Honor, a supplemental declaration concerning voting. It was filed, the second supplemental declaration of Michael J. Paque I think is the way he pronounces his name. I hope your Honor has it or I --

THE COURT: Yes. I saw it. Thank you.

MR. BENNETT: Okay. Stay organized. When I started at the opening, I started with the topic of what creditor rights really were against the City of Detroit and in specific, in particular, what unsecured creditor rights were against the City of Detroit. I'm going to start there again because it's still important just in a very superficial summary. I'd be happy to go into depth on any part. Our approach is to start with Michigan law where very clearly under Michigan law the exclusive remedy of an unsecured creditor is to obtain a judgment under the Revised Judicature Act and ultimately an order of a court directing the city to levy attacks for the judgment. No unsecured creditors have a right to attach an asset, levy on an asset, or otherwise compel the sale of an asset and apply proceeds to pay a claim. Michigan law. We saw it, and we -- that it's very different from the rights of an unsecured creditor against a corporation, wholly different body of law. The city believes, still does -- believed then, still does, that this

defines what the reasonable expectations of creditors of Detroit are, and also, as a corollary, it's a warning to everyone not to lend money to a municipality based on an expectation that a creditor can compel an asset sale.

And the next step in our reasoning was that Chapter 9 doesn't change any of this, and this is -- in addition to looking through Chapter 9 and looking for a provision that might augment the rights of creditors, there are numerous provisions that you stumble into that are consistent with the view that Chapter 9 is not about deploying municipal assets to pay unsecured claims, and I listed a bunch, Bankruptcy Code, Section 904, limiting court jurisdiction over assets, the absence of anything like a property of the estate concept. Of course, it wouldn't be called property of the estate in Chapter 9. It would be called property of the debtor, but there's nothing like that there. The turnover provision isn't there. If assets were important, why not? There are no controls on the use of property outside the ordinary course of business, and, again, with one irrelevant exception that we talked about, Chapter 9 just doesn't have anything that augments creditor rights. This reading of Chapter 9 was never rebutted by anyone. We have found no cases to the contrary. We talked about the cases that were cited. They are not to the contrary. Mr. Perez's citation to an early decision by Judge Klein to the effect that the

confirmation hearing is the ultimate test of what a municipality does in a Chapter 9 case, that is what Judge Klein said, more or less, but what he was referring to was the confirmation standards, and the confirmation standards apply to rights that creditors do have. They don't apply to rights that creditors don't have.

Your Honor indicated at one of -- in the last couple days of the trial that you wanted to discuss Fano, but I suspect your interest in that case is related to the findings required under the best interest test related to taxes, so I'm not going to revisit Fano here, but I will get to Fano when we talk about best interest. We talked about a lot of cases in this area during opening. I'm going to skip over them.

So what did all this mean for the trial? Well, there was no requirement, in the city's view, that the Court hear evidence concerning efforts to value assets, efforts to market assets, conduct of due diligence on assets, dividing them into core or noncore. We regarded all those issues -- we do regard all those issues as quite irrelevant in the Chapter 9 context, but I'm going to end this topic with asking everyone to bear one point in mind. In fact, as part of this -- as part of the city's restructuring under Chapter 9, the city did deploy city assets to facilitate its restructuring, and it did so in all cases in creative ways.

I'm about to turn to the first example, which is the DIA settlement, but I also want to remind everyone that the COPs/FGIC and COPs/Syncora settlements both deploy city assets but deploy city assets in a way that they are used only in the context where the creditor receiving the assets is going to have to invest money, assist in the city's rehabilitation in order to extract value from those assets. We'll have a little bit more to say about it later, not much.

Your Honor also asked for a list of settlements. We can put it up on the screen, but I also have hard copies. With your Honor's permission, I'll give you some hard copies. I've given it to all of the people present who I identified as being interested. Is there anybody else who wants a copy?

THE COURT: Just so you know, my specific question was --

MR. BENNETT: What was it? Sorry, your Honor. I just wanted to get a copy first of this one.

THE COURT: Right, of course. My specific question was which of these settlements you are asking for court approval of.

MR. BENNETT: Your Honor, I'm asking for court approval of all of the settlements.

THE COURT: Okay.

MR. BENNETT: And the -- we could have a short argument as to whether 9019 technically applies to all of

them, and I don't think 909 (sic) does technically apply to all of them, but the plan is built on all of these settlements, and so whether it was technically required under 9019 or whether we think it's appropriate incident to all the things that are happening in the plan, I think we seek approval of all of them. I mean we do seek approval of all of them.

I want to point out, you know, that when we -- that we -- the top two, the DIA settlement and the state contribution agreement, as we colloquially, everyone else colloquially refers to them as the grand bargain together, but they're actually two separate settlements, albeit conditioned on each other. The UTGO settlement we've talked about quite a bit, same with the LTGO settlement. The retiree settlement, this includes many different components, and -- but ultimately the treatment of the classes, the AS -- how ASF was dealt with, what happened with the amount of the OPEB claim, all of these, including the, you know, kind of -- the assessment of the underfunded amount of the pension plans, all these things were part of a big agreement reached in mediation. It ultimately informed things that are in the plan, and it ultimately forms things that -- whether or not it was separately approved, the votes would mean that they would be implemented pursuant to the plan, but we see it as a settlement, nevertheless, so that is our list, and we seek

approval of all of them.

THE COURT: All right. So I notice that what's not on the list is the Great Lakes Water Authority, any collective bargaining agreements, and the agreement with the Detroit Public Library constituency, and that's fine with me. I just want it clear on the record.

MR. BENNETT: The library -- I would certainly not be offended if your Honor decides to approve that settlement as well. That's been documented as a --

THE COURT: I'll only do it if you ask for it.

MR. BENNETT: Okay. I don't think it's necessary.

THE COURT: Okay.

MR. BENNETT: That one is purely plan treatment. And I don't know whether -- I just should have looked at this before I got here. I will check at the break. I don't know whether the confirmation order includes anything with respect to the Great Lakes Water Authority. It probably does, but let me check, and I'll specifically --

THE COURT: Okay.

MR. BENNETT: -- highlight them after the break.

THE COURT: Okay.

MR. BENNETT: Again, nothing controversial. Okay. So why did I start with settlements at the opening, and why do I start talking about settlements here? It's because they do form the building block of -- building blocks of what

comes next, which is the application of the different confirmation tests. These settlements resolve disputes about what the city has, what the city owes where there are disputes or uncertainties on these things, and that's one thing in common, frankly, of all of them.

Again, in the interest of time, none of these settlements attracted much controversy except for the DIA settlement, the LTGO settlement, the releases with respect to the state settlement, and I think the ASF -- although we'll hear later today, the ASF piece of the retiree settlement. I think those are the parts that were at any point in time controverted. As I read the record, there is no longer any controversy with respect to the DIA settlement, that having all been -- all those objections having been resolved, and I think, unless I missed it during the trial, no one got to object to the LTGO settlement, so what I'm going to do to deal with settlements is I'm going to talk about the DIA settlement and the evidence that was educed to support it because I think that's important, and I'm going to hold the ASF piece of the retiree settlement until after we hear from the two objectors, who I think are going to speak on that topic, and then we'll revisit that. And as to the rest of them, I will answer any questions your Honor has.

THE COURT: Well, I think that many of our pro se objectors do object to the DIA settlement to the extent it

protects the art in this context, in this bankruptcy, from their pension claims.

MR. BENNETT: Okay. Well, I'm going to cover it --

THE COURT: Okay.

MR. BENNETT: -- so we'll cover it fairly thoroughly. Okay. I chose to emphasize the DIA settlement because it informs the fair discrimination test as applied to the remaining objecting classes and the best interest test applicable to dissenters within the retiree class. And, again, just so the record is clear, by the DIA settlement, we mean the agreement to transfer title to the DIA assets to what I've called for a long time the DIA Corp. in trust in exchange for, and then here's the important part -- yes, there is a sum of money from the foundations and the DIA Corp., but -- and there are clearly restrictions on how that money can be used, although I don't think those restrictions are controversial anymore. The attorney general and the DIA Corp. dropped their objections to any dispositions of the DIA assets, and here's the point that frequently gets lost. The city obtains a commitment that the DIA assets will stay in the City of Detroit and the DIA will stay in the City of Detroit. And an important part to start with is that while there have been rumors of alternatives for raising material dollars from the DIA assets in other ways than through the grand bargain or the DIA settlement, none of them have this

element of value.  A sale certainly wouldn't, and to be
clear, because it just seems to be glossed over over and over
again, a loan doesn't work that way either.  A loan that is
secured by the art would have to be paid.  There is no money
in the projections to pay a large art loan, meaning an art
loan that would generate vastly more proceeds than the exit
financing that we will talk about later, and the city's
numbers with the projections which would show you, you know,
if there was space for the repayment of such a loan are, in
what I think is a technical term adopted in this case,
skinny, which means that there isn't room.  There isn't room
in the projections to take on additional debt even if you can
borrow based upon the collateral.  Those who would be making
such a loan would be very, very, very well covered by value
of art.  Otherwise the loan wouldn't be made.  It may well be
that some advocated that position on the view that when the
loan came due, people would be motivated to come up with the
money to pay it somehow, some way.  That is not the way to
make a restructuring of a city and something that the city
was, therefore, never willing to consider.

So the settlement approval elements that we have to
cover with the art is -- with the DIA settlement is whether
or not the deal that was reached, the bargain that was
reached was arm's length and noncollusive by well-represented
adversaries, and then most of our time what I said are three

factors that are in the cases, probability of success in litigation, difficulties of collection, complexity of litigation, including expense, inconvenience, and delay attending to it, and these three things get kind of mixed together or combined into the process of constructing a range of reasonableness, and the settlements are approved if they're above the lowest bound of the range of reasonableness.

And, lastly, the Court also is supposed to be informed by the interests of creditors in a proper deference to their reasonable views. I am now in a position to say that the creditors are substantially all supportive, not entirely supportive but substantially all supportive of this settlement.

So going through the steps, who are the adversaries and were they at arm's length, the evidence showed there were lots of adversaries. They did bargain at arm's length, and there is no evidence of collusion. The city was at arm's length from the retirees. There was testimony from Bloom and from a member of the committee that said exactly that. There was never any allegation that the city was not at arm's length from the UTGO creditors who were interested in this issue. There was no allegation or evidence that the city was not at arm's length with the LTGO creditors, and I don't think your Honor needs any more evidence that the city was at

arm's length with the COPs, with Syncora, and with FGIC. All these parties were adequately represented, and they vigorously represented themselves.

There is also no indication that the city was not at arm's length from the foundations. Your Honor heard testimony I think from Mr. Rapson that demonstrated that the foundations had their own agenda and pursued it. And there was ample evidence that the city was at arm's length from the DIA Corp. This was demonstrated I think partly by their own role in the trial, by the testimony of Mr. Buckfire, who recounted some of the early meetings with the DIA Corp. before the mediation included them, and by the testimony of Annmarie Erickson, the officer of the DIA Corp. who was here.

I said during opening that the showing of an arm's length negotiation does not require either proofs of the step-by-step of who did what to who during the entire process of the negotiations or exactly how much legal research and valuation and analysis was done. That, in fact, is the case from the cases. The cases demonstrate that those are not appropriate area of inquiries. That is a good thing for another reason because otherwise to rebut Mr. Kieselstein's allegations, many members of the city's team would have had to take the stand to testify that they weren't lethargic or lackadaisical. As you can remember, a central theme was that the city never did enough, but I think the -- while we don't

have to prove that, I think the record that was demonstrated during the trial was that the city did an awful lot and understood an awful lot. That their position evolved over time does not mean that they -- that the city didn't do the work. It just means ultimately they didn't agree with some of the other parties.

But because the law doesn't require demonstration of the negotiation steps or proof and analysis of how people change their mind or why people change their mind and what work they did is one of the reasons why the mediation confidentiality order does not prevent the Court from appropriately evaluating settlements, which was an allegation by many. It's just not true. The law doesn't work that way.

On the -- oh, in addition to Mr. Buckfire's testimony, which talked about some of the work that the city did do in connection with evaluating the art, Mr. Orr provided additional testimony about the city's journey as it related to the DIA assets. Additionally, your Honor heard testimony from a Christie's representative that all of that was part of the city's due diligence in this area.

So we now turn to the part of the DIA settlement that I think consumed the most time during the trial, which is the issue of what is the range of reasonableness that your Honor should focus on in determining whether or not the settlement should be approved, and I said at opening that

there are three questions that have to be addressed. First question is can the city sell the DIA assets, and that's the one as to which most of the ink was spilled by the DIA Corp., on the one hand, and by objectors, on the other hand. The second, which I think is the most important and decisive question, do creditors have any right to compel the sale of the DIA assets and recover from them we've talked about already. And the third is should the city be compelled to sell the DIA assets, which really has to do with the whole question of is it a good idea even if the questions one and two were both yes. Your Honor heard evidence on two of --

THE COURT: All right. Excuse me. Before you launch into this really important subject, I've been advised that there is a phone call I have to take, so I'm going to take a break now and do that. Before I do that, though, let me ask is there a representative of the city law department here?

ATTORNEY: Yes, your Honor.

THE COURT: All right. I'd like --

MR. RAIMI: Charles Raimi, deputy corporate counsel.

THE COURT: Thank you. I'd like to see you and Mr. Cullen, please, in chambers in the jury room which is right through the door behind the screen there, and we'll reconvene at ten o'clock, please.

THE CLERK: All rise. Court is in recess.

(Recess 9:40 at a.m., until 10:00 a.m.)

THE CLERK: All rise. Court is in session. Please be seated.

THE COURT: My apologies to you. You were on a roll, and I regret that I had to interrupt it, speaking of which I know you're excited to be here, but I need you to slow down just a little bit for me.

MR. BENNETT: Okay. I think I can do that. Okay. So where we left off I was -- I listed again the three key questions that inform the range of reasonableness for the DIA settlement, and I'm now going to turn to them each individually and talk about them a little bit. The first is can the city sell DIA assets, and with all of these, I guess it's important to remember that the Court's obligation is to canvass the issues. You're not required to conduct a trial and decide how these would come out. I think the record that was developed was ample -- more than ample to allow your Honor to have canvassed the issues and develop a sense for what the range of outcomes and a reasonable range of outcomes for the different issues is.

In the case of issue number one, the can the what I'll call the DIA assets be sold issue, your Honor has papers on all sides of the question that cover the factual background. There were a large number of exhibits that were entered into evidence that cover the factual background, the

legal arguments on both sides concerning the -- whether or
not there's an overall trust, either a charitable trust or a
public trust that covers the DIA assets, and whether there
are separate restrictions that cover individual items or
groups of items in the DIA collection. I'm not going to go
through all of those factual details. I'm happy to answer
any questions about any part of it. There's also an attorney
for the DIA Corp. here who might also be available to answer
questions but I understand is not going to be making any
prepared remarks today. At the opening, we reported that we
saw compelling arguments on all sides. The evidence that is
in the record was cited in different ways by both sides in
support of their positions. From the city's perspective, a
reasonably possible outcome is that no DIA assets could be
sold and a court could reach that result finding that there
has -- was initially and has at all times been a charitable
trust, albeit with potentially differing trustees as the
museum went through time, and it's also possible that a court
could conclude that even if there isn't a trust that covers
all of it, there are restrictions that cover significant
parts of it that either have to be enforced or would give
rise to interests that attach to the proceeds of any sale.
From the city's perspective, since a reasonable outcome -- a
genuinely foreseeable potential outcome is that the entire
collection is protected from sale by applicable law as a

charitable or public trust and that, frankly, the museum could be hurt if the litigation was even started, we think that question number one points to a low end of the range of reasonableness at near zero.

So we now turn to question two. Question two was can creditors compel the sale of DIA assets, and this question is important because ultimately formulated many ways we're talking about expectations of creditors informed by the background law and by alternatives outside of Chapter 9, and as we have seen in great detail at opening, in less detail here, that unsecured creditors of Michigan municipalities do not have an opportunity to get liens on, attachments against, or compel sale of assets in order to pay debts in any circumstances and that nothing in Chapter 9 changes this, the value that creditors could extract from the DIA assets if the city was unwilling to sell them, whether or not it could, is zero. On this point, there's never been any contrary authority. The cases that were originally cited as contrary to this, they're not distinguishable. They're just different, and some of them arise in circumstances where the issue doesn't appear to ever have been litigated. There are no facts that were or could have been offered on this point, and so we submit that question number two points to the lower bound of reasonableness for settlement with respect to art is at zero because that is what creditors could achieve both

outside of Chapter 9 and inside of Chapter 9 if faced with a determined opposition by the city to do anything to raise value from the DIA assets.

And question number three, which is more intensely factual, is should the city sell the DIA assets, and your Honor heard testimony on this point from many witnesses, and I think it was also the subject of some of your Honor's own questioning. Without going into the details, Mr. Orr testified on the importance of the DIA to the city, the DIA witness, Annmarie Erickson. Council President Jones had remarks on this point as well. There was actually some information from the Christie's witness about the importance of the museum and what would happen to it if there were sales. There isn't really a dispute that the DIA is a nationally prominent cultural institution that contributes to the city. It contributes to the image of the city. It contributes to the city's rehabilitation. It might even contribute to bringing residents back. So what does that mean? It means that it is most assuredly a reasonable decision for Detroit to make to keep the DIA assets, to not liquidate them, to not sell any because of the consequences of selling even a few on the standing of this real national treasure in the museum world and its ability to continue to mount exchanges and shows and otherwise be a participant in the museum community. And it's also a reasonable decision

for the city to want and to keep a world-class art museum or any world-class institution in the city as a potential contributor to its future. Additionally informing this test --

THE COURT: Well, in the abstract, that's well and good, but what do we say to the pension claimant whose pension is impaired as a result of that decision?

MR. BENNETT: We say to pension claimants in this instance what we say to other creditors, which is that even pension creditors have rights against municipalities that are defined by statute, and there's no background law that says to even a pension creditor that a pension creditor can be paid by causing the city to liquidate its assets. You know, many -- a few people already have started to ask me to talk about this Chapter 9 case after it's over, and one of the points that I plan to make, which is, I guess, responsive, I think, to your Honor's point here, because I think it's where your question comes from is that I think for years for labor unions, labor representatives, pension funding hasn't been a topic that had a high priority at the bargaining table; that what happened at the bargaining table was that union representatives negotiated for higher pay, of course a great thing, for higher benefits, of course a great thing, but when it came to deciding how they would be funded, deciding what kind of investment return assumptions could be adopted by a

city, deciding what kind of asset smoothing regime could be used to defer contributions when investment returns fell short, that wasn't high on the agenda in bargaining units, and I think, "A," an implication of your Honor's ruling, which I regard as undoubtedly correct, that pension claims can be impaired in bankruptcy -- it's since been followed by Judge Klein in the Sacramento case -- excuse me -- the Stockton case -- it's in Sacramento, but it's the Stockton case. One of the points of information out of this case is that pension funding belongs on the labor agenda because it's not unalterably guaranteed by a constitutional provision, and it's not unalterably guaranteed by every last asset that a municipality has. Like all other unsecured claims against the city, to the extent of underfunding -- it's an unsecured claim -- it can be paid only through city taxing power, and sometimes in some cases the taxing power just isn't there, and we'll get to that when we come to the best interest test, but the -- when I spoke about the limitations of unsecured creditor rights against assets of a municipality, I wasn't just talking about bondholders. I was also talking about the stationery salesman, and I'm also talking about employees. The law is the same.

Picking up where I was on the issue of the reasonableness of decision, there's more reason in Chapter 9 to be deferential to a city's decision on this point or,

frankly, on any point that deals with management of assets. It's the same provisions I've been talking about in other contexts, the presence of Bankruptcy Code Section 904, the absence of restrictions on the use, sale, or lease of property. If Chapter 9 was about liquidating some or all or noncore or any assets, you would expect different provisions than the ones that are in Chapter 9. And, again, I'm going to foreshadow things I'll talk about in more detail later. There are actually many more cases than the ones that I discussed at opening -- I'll add some of them when we get to best interest -- that talk about that the measure of a municipality's ability to pay debts is the taxing power, period, end of story. It comes up in all kinds of other contexts not in cases where assets were in play where courts say that very frequently. They've been saying it since the great depression.

Okay. So where does that -- question three, again, points to a range of reasonableness where the low end of the range is zero because I do believe in the circumstance that Detroit can under the law and responsibly on the record of this case make a decision not to sell DIA assets, and that decision would have to be upheld.

So we have a situation where all of the relevant inquiries point to a range that includes zero or is very close to zero, and so where did we fall in this range? Well,

where we fell in this range is the -- clearly the contributions by the foundations and the DIA Corp. which sum up to $466 million, I think, or something in that ballpark, and that's not zero, and it compares, frankly, well with the only estimates that we have of what the overall collection would really get, and we don't really know what the top of the range is. Of course, this is not -- this is not like inventory where's other inventory selling all the time, you know. If we had an inventory of nuts and bolts, we could figure out what nuts and bolts were worth. If we had an inventory of oil, we could figure out what oil is worth because someone is selling oil. Someone is selling nuts and bolts. And the reality is two things about the art market that I've learned as a result of this case and hadn't fully appreciated before, which is, yes, there are a number of very, very valuable works of art in the world, and there turns out to be a number at the Detroit Institutes of Arts, but as the testimony in this case has demonstrated, the number of pieces that are really valuable is very few relative to the overall population. And the second part we learned about the art market in this case that I didn't really appreciate before and probably knew if I'd thought about it, which is that it's not deep, that there's just a certain amount of art that moves in the different categories at any given period of time, and it's not a lot. It's not

like the oil market. It's not like the nuts and bolts market. It's not like the real estate market. A few times a year there's some blockbuster sales. A limited number changes hands. So we don't know what the upper end is. The city believes that its responsible work points to a number in the $2 billion range, and if that's the upper end of the range -- and we don't think it is because of all of the potential problems of getting from here to there, and we do think at the end of the day there are going to be some restrictions that are going to be either, "A," withheld or, "B," have to be effectively protected through an interest attaching to sales, a number in the vicinity of 466 million is very clearly in the range of reasonableness.

I said at the beginning that it's also important to take a look at the reasonable creditor views, and notwithstanding that there were very vociferous objections, at the end of the day, those objections were abandoned, and they were abandoned in ways that your Honor can look at the settlements and realize that those were abandoned not because they got something else that was worth as much as the art but because, at the end of the day, those claims were weak or these objections were weak.

To summarize with respect to this part, the DIA settlement was negotiated at arm's length without collusion by well-represented adversaries. The settlement is well

above the lower bound of the range of reasonableness, which, for the reasons we stated, is a number that is zero or rounds to zero. It is overwhelmingly supported by the creditors, and it should be approved.

It wasn't pressed at the trial. There were allegations that this transfer -- the proposed transfer as part of the DIA settlement would constitute a fraudulent transfer. Of course, it doesn't because if it's part of a reasonable settlement, it is, by definition, not a fraudulent transfer. I think, as a result, we will include provisions to that effect that it's not a fraudulent transfer in our confirmation order, but I don't think we have to talk about it anymore.

I think at this point if your Honor has questions about other settlements -- and I will come back to the releases question. I have a whole section on releases that I don't think we need to spend much time on the remaining settlements. I was informed that --

THE COURT: I leave it -- I leave it to you.

MR. BENNETT: Okay. I was informed during the break that the collective bargaining agreements do provide for Bankruptcy Court approval of the agreements rather than the settlement, so that will be in the confirmation order as well. I don't think it's controverted.

THE COURT: Okay.

MR. BENNETT: Okay. At this point, I want to move to best interests, and there are two branches of this test really, but they overlap a lot. The first branch, which is also essentially the same as the judicial interpretation of the application of the fair and equitable test to Chapter 9 cases, deals with meeting reasonable expectations of creditors, so whether I talk about the best interest tests or fair and equitable, I'm really talking about the same test. And then the second part of the best interest test is whether the plan is better than alternatives and, in particular, the non-Chapter 9 alternative, which is sometimes colloquially referred to as dismissal. Here again, we have to start with asset sales, and I'm going to start with asset sales because, as I pointed out, the city is firmly convinced that it has no obligation to deploy assets in order to make -- to generate higher recoveries for creditors. There is no reasonable expectation that anyone could conceivably have, based upon the background law in this area. It turns out that the city did deploy assets in order to try to emerge from its Chapter 9 case and make consensual deals, and in order to do so, the evidence shows the city did a ton of work on its assets to see what could be monetized, the word used most often in the case, in order to make this case easier for creditors and to generate more value. Clearly in -- I talked about it in already -- in the DIA area, there was an investigation.

There was aggressive initial positions taken by the city with respect to efforts to raise money from the DIA. There was a valuation exercise that was undertaken. There was lots of work done.

Belle Isle. Belle Isle has been by some creditors criticized, but the reality is by transferring Belle Isle pursuant to a lease, not a sale, to the state, the entire cost of maintaining Belle Isle came off the city's books, and, therefore, money was saved, which means at the margin money was generated to be used for other purposes, and by reason of the determination that the plan is skinny at the margin, it was used for other purposes, including creditor recoveries. So saving money by an asset disposition is, frankly, the same as raising money.

Your Honor is also aware from the record in this case that the city looked at DWSD from many different perspectives, and one of them was efforts to maximize value, which I'm going to define for these purposes as raise money for the general fund in connection with any form of disposition. Certainly the city did tons of work in this area. Others, of course, had very strong views about whether or not DWSD or any part of DWSD's value could ultimately make it to the general fund because of its special status as effectively a utility that performed services for fees. What we have in the end is a solution that I guess from the

creditor perspective does not really generate net dollars for the general fund -- excuse me -- but what it did do was it generates a fund that can be applied to repair the city DWSD infrastructure. And if that didn't happen, the city would have had to find the money elsewhere to do that, and so you could have tacked an additional potential RRI or take a chunk of the RRIs and devote them to rehabilitation of the water and sewer system within the City of Detroit. It really can't be argued that that work would ultimately have to be done, so, once again here, a disposition of the assets, although it did not generate dollars into the general fund that could be sent to other creditors, there's certainly the contribution for purposes of meeting the pension obligations of DWSD personnel, the acceleration of that, which helps the numbers all work, but there wasn't an extra $50 million a year as was at one point sought, and there were even some estimates that the city should get even more, but there was the use of the DWSD assets in a creative transaction that effectively reduced another cost that the city would otherwise have to bear.

The tunnel. There was a continuing story in this case that every professional involved, and I'm sure Mr. Orr, experienced -- I'm sure he gets -- I got stomach aches; he probably has ulcers -- and that is is that as we investigated more and more about more and more things, we found that the

consequences of running the city for so many years with an over indebted condition fanned out in all kinds of ways, and your Honor saw a lot of it, I think, during the bus tour, and I'll particularly remind you about your visit to the police precinct. Well, it turned out -- and we discovered this relatively later on -- that the deferred maintenance extended to the tunnel as well, kind of stumbled into that by accident, thought we understood everything at that point, but it turned out we didn't, and the -- so, once again, the tunnel deal includes a provision that extends the term, has offsets for the use of revenues that would otherwise come from the city in the future to cover CAPEX that, frankly, is going to have to get done that the city would otherwise have to pay for, so, once again, we have an asset that -- just a part of this deal -- there's many other aspects of this deal, but part of this deal relieves the city from an obligation that it would have or an obligation that it should undertake, one or the other -- I think it's a very -- those things are very close together, and, again, an asset is deployed to solve a problem. The evidence showed that there was an effort to look at the Coleman Young Airport to see whether or not the Coleman Young Airport could generate anything towards a restructuring. The answer was there really isn't an immediately available alternative, but it has to be kept alive for all kinds of good reasons, so that's a failure,

couldn't accomplish anything significant there, but it wasn't for lack of trying.

And then we get to other real estate, and other real estate -- it is reported everywhere that there's lots of real estate that Detroit owns. Well, some of it Detroit owns; some of it it's another governmental unit, some of which it's kind of on the way there but not quite yet. There were steps to look at some of that property. There's quite a lot and maybe too much to look at in a micro level parcel by parcel, but, in general, when people looked at property in Detroit, there was a lot of it, which kind of meant there was too much of it to attract interest because every other piece of property is kind of going to be available to somebody else, but at the end of the case -- and I'm referring to the Syncora and FGIC settlements -- there was a drive to create arrangements that, number one, deployed assets for the benefit of creditors and -- but, number two, did so in a way that if the creditors go forward and try to generate value from those assets, that they're going to have to make investments in the City of Detroit. And although Detroit needs all of the relief it can get from this Court and the confirmation order is incredibly important, incremental investment in the city is exceptionally important as well. The Syncora and FGIC transactions have, in this sense, designed to be win-win transactions. You've heard extensive

testimony about that from Mr. Orr and Mr. Doak. So with respect to this part, notwithstanding that on the law there is no reasonable expectation by creditors that city assets would be devoted to maximize creditor recoveries in this case that actually happened, not necessarily to the extent that every creditor would have wished, but it certainly happened to a greater extent than is required by the law, and, frankly, the -- looking back on it, I think it has to be said that the manner in which the DIA assets were used to raise funds for pension creditors and the manner in which other assets were deployed to enhance recoveries for other constituents in this case or reduced expenditures were, in fact, very creative and aggressive and if there is any obligation by a city to deploy its assets in order to win confirmation of a plan of adjustment, this city did that.

Tax increases. There was overwhelming evidence not just in the testimony before your Honor but, frankly, in the eligibility hearing, in the initial presentation to creditors from June 14th, 2003 (sic), that was also admitted into evidence into this hearing, that it's not sensible for this city to try to raise taxes. We're going to come at this in a couple of different ways. I think let's talk a little bit about the -- some of the basic things witnesses told you, and then I want to apply that to some of the cases and some things we know about municipalities. Several witnesses told

you that a review of the law would confirm that the city does not have any legal ability to raise taxes itself, and one witness, at least, told you that the Michigan legislature is not likely to grant the city additional tax raising power, and I think we all know that to be right, and so what we have left when we have to consider raising taxes in the context -- there's two contexts here. There's going to be the context of doing enough to meet the reasonable expectation of creditors, and there will be the next context of what's the out of Chapter 9 alternative. They're related but not exactly the same. We now have to look at whether the city should have deployed the Revised Judicature Act in some way to raise property taxes, and we look at that because the Revised Judicature Act is not subject to the tax limits.

Before we go on -- and this is slightly more relevant for the out of Chapter 9 view, but I don't think we can start talking about the Revised Judicature Act without talking about what the Supreme Court has said about it, the United States Supreme Court. They weren't talking about the Michigan Revised Judicature Act. They were talking about -- I think it was the New Jersey equivalent in the Faitoute -- I never know how to pronounce that case -- Iron and Steel case, and the Supreme Court is reviewing creditor remedies. Of course, the Supreme Court was approving a plan in that case under a state rehabilitation statute, and it's reviewing

creditor alternatives outside of the case, and it talks about
the right to get a mandamus judgment against a municipality
to raise taxes.  And here is what the Supreme Court thought
of that, called it, quote, "an empty right to litigate,"
close quote, and clearly put no value on it at all.  There
are other cases -- and, again, this may be more relevant to
the next part, but it's the appropriate background when
talking about the Revised Judicature Act that talk about one
way to think about whether you should be using something like
the Revised Judicature Act to generate recoveries for
creditors is to compare the tax base of the relevant tax --
in this case, the property tax -- against the amount of debt
that you have to cover.  In Detroit's case, the evidence
showed that the unsecured debt is greater than the aggregate
assessed value of the real property that's subject to
taxation.  And, of course, as additional background, the
Mount Carbon case said it's fairly easy to establish that
municipalities in trouble shouldn't be raising their taxes,
but let's get more specific.  In general terms, the cases
focus on two things.  One is do the taxpayer, the tax base --
and sometimes it's easier to tell if you're dealing with a
small district -- we're dealing, of course, with a major
city -- lack the ability to pay increased taxes or won't do
so either because they will leave or just stay and not pay.
Sound familiar?  If there are -- if this is the case, the

reductions in revenue by people driven out of the city or by less compliance will offset any increased revenue, and, frankly, the people departing the city are a bigger problem because they're not there anymore to pay taxes at all. The second issue is whether raising taxes is compatible with the goal of saving the city. These are the downward spiral cases, and, as I said before, because both of the two different principles at the end of the day are about keeping people where they are and paying taxes, they're kind of related. They're sometimes stated as different standards, but they're very closely related. And the reasoning behind them, of course, is that if a city fails or if an irrigation district fails or if any governmental unit fails or sees its situation significantly worsen, it doesn't have revenue for creditors or for anyone else, so this isn't just a standard that's focusing on the welfare of the population. It was developed to focus on the welfare of the creditors.

So what evidence does your Honor have before you that raising taxes is not going to work? On the first point, which is the kind basic saturation, you have current delinquency levels, which were -- which are in the presentation to creditors and was updated by Ms. Sallee's testimony. You can also, your Honor, note the evidence that talks about -- and, again, a lot of this is in the presentation for creditors. I think it was echoed by other

witnesses.  It was mentioning about the weakness of the tax

base in terms of income of residents, and you also saw that

indirectly in the litigation related to the water system and

the collection of water bills.  It is a sad reality, but the

percentage of the population in poverty or close to poverty

in the Detroit area is high, and we have to recognize that as

a fundamental reality.

On the second point, again, reinforcing the first

because they're kind of -- they're kind of interrelated -- at

opening I focused on the language in Villages at Castle Rock

Metropolitan District Number 4.  I only picked that case

because it's relatively recent compared to the others and

because it had particularly clear language, and I mentioned

that there are a bunch of others, you know, that are older.

And in addition to the Iron and Steel case, the Faitoute Iron

and Steel case, just a partial list -- I mean most

prominently I would guess is Corcoran Irrigation District 27,

which is 1939, Southern District of California; Drainage

District Number 7, Eastern District of Arkansas; Merced

Irrigation District, big California theme here; and Wolf

Creek Valley Metropolitan District, the last one being new,

that one being a 1992 case.  And they're all the same.  In

the case of Corcoran -- no.  I think in the case of all of

them, they're all like Villages at Castle Rock in the sense

that they're all talking about perspective.  They're all --

one of the reasons I wanted to talk about Castle Rock in particular, it was perfectly clear that the existing tax rates were not objectionable, at least as far as the Bankruptcy Court was concerned, but that an increase was going to cause a whole bunch of negative things to occur, all things, frankly, that the record shows is already occurring in Detroit. And I emphasized and I, frankly, think it has to be the most important observation when comparing the decided cases to this case, which is the issue in most of the reported cases are should we raise taxes, will an increase in taxes cause a series of bad consequences. And in the Detroit case -- and I emphasize unfortunately, and I hope it's improving, but not much yet, Detroit already shows -- already exhibits all of the adverse consequences that the Bankruptcy Courts in all these other cases would never visit on a municipality and are deciding to avoid.

Now, if your Honor needs references to the record, again, the presentation to creditors has a lot of the basic statistical information, but you also got a lot of witness testimony. You've got it from Mr. Hill. You've got additional testimony I'm going to talk about in more specifics from the mayor. You heard from Mr. Orr. And what you heard from them and, frankly, other witnesses, which is they are -- none of them believe that raising taxes is a good idea. All believe that raising taxes would be a bad idea.

And they can do it based upon the current reality of the ground. For them it's not fortune telling, trying to guess the future without, you know, having the actual statistics at hand.

Now, your Honor, some people talked about reliance on experts for issues like this, and the answer to that, frankly, is in the cases, and I think to a degree I'm addressing your point about the Kelley case and about the Fano case here, which is if you read all of the cases that mention it, they mention reliance upon city officials for the evidence that shows that raising taxes is not an appropriate thing to do. I found no case -- I think I've read mostly all of them -- where there's a reference to expert testimony as a basis for a determination that the -- that taxes should not be raised because a downward spiral is imminent. And remember I think the Detroit case is actually easier to deal with in a way, easier in a technical sense, not easier in a spiritual sense, but because the facts are already here. The downward spiral facts, unfortunately, are already here in the City of Detroit. The issue is escaping them. It's, frankly, easy to decide taxes should not be increased. In fact, the issue is -- the harder question is should taxes be reduced, and I know that there's a fair amount of debate about that.

Okay. I want to shift now and talk about what I call the department store analogy, which is really about

competitiveness, which is really about the municipalities in today's world are competitors with other municipalities. It's in the news all the time. When -- I guess it was Arizona, California, and Nevada was competing for the Tesla battery plant, but it also is happening every day when people decide where they're going to live. Yep, the size of the house makes a difference, whether it's in good shape and the lawn and all those other things, but it's also important, what does the community offer and how much does it cost to live there. And I will say that not involving the case in Detroit because I think the Detroit facts are so advanced that the existing reality demonstrates that taxes should not be raised. The existing circumstances demonstrate that this is a downward spiral case, unfortunately. I find the cases that are trying to guess whether a downward spiral will result from an increase in taxes to be slightly unsatisfying because they generally, if you read them, talk about will it happen or won't it happen, and then the judge decides, but it's always occurred to me that there was a -- is a more satisfying and more objective basis to go about answering that question, and it's about what are other municipalities' tax loads -- and you got to look at them, you know, aggregated because of the overlapping jurisdiction problem -- and what are relative services because at the end of the day, that's the best indicator of whether or not a municipality

can raise taxes without risking a downward spiral. Again, for our case, this is somewhat, you know, academic, but I would submit that the department store analogy to look at competitiveness is the best and most objective window into whether or not a tax raise would cause or worsen a downward spiral. And I was sitting in the courtroom when Mayor Duggan started talking about where he was in the process of improving services, and he said he was only ten percent of the way along where he thought the city needed to be, and then he started talking about the fact that people are going to compare us with what's going on in the suburbs, and our taxes are higher. And I don't know if he said this on the record, but -- and if he did, I -- didn't, I consent to striking this in advance, you know. Another factor is is that -- he worries about a lot is that auto insurance rates are materially higher in Detroit than in surrounding areas, and he regards that as an issue that has to go into this calculus. But your Honor has -- in many places we have shown you that Detroit's taxes are the highest of any city's in Michigan, and in many places we have shown you and the record has shown you that our services are not anywhere close to the best in Michigan, far from it, unfortunately. Hopefully we'll get there. And so applying the department store analogy with facts that are found here also points to the conclusion that tax raising is not sensible. It's not

reasonable. It will lead to worsened conditions as opposed to better conditions. Regrettably, Detroit is already in a downward spiral. It needs all the help it can to escape. We shouldn't do anything to make it worse.

So to summarize with respect to this part, no one should be surprised that the City of Detroit is not proposing to raise taxes in order to raise additional money to pay creditors or for any other purpose at this point in time, and, moreover, as a matter of law, municipalities with Detroit's characteristics shouldn't raise taxes to enhance creditor recoveries or to do anything else because it would make an existing situation worse. It's self-defeating behavior.

So I'm now going to turn about measuring plan recoveries against the alternative, which is dismissal, and I've kind of -- well, first of all, we know that outside of Chapter 9 asset sales -- creditors can't compel sales of assets, period, end of story, so that part is easy. And as to the next part, which is raising taxes or being visited with raised taxes through judgments under the Revised Judicature Act, on that topic I've kind of given away the best parts of the argument. It is here that the Failoute -- excuse me -- the Faitoute Iron and Steel case speaks volumes because, of course, the Court was there talking about what creditors could be doing outside of Chapter 9 and found that

to be an empty right to litigate. It's amazing that the Supreme Court has delved into that particular question for us, but it has. I think all of the materials that we covered concerning the current condition of Detroit, the problem with its competitiveness, all indicate that if, notwithstanding the city's best efforts, it wound up outside of Chapter 9 with all of the debts that it had, its situation would just get worse and worse because you would have multiple lines of additional taxes showing up on people's tax bills. We already have a delinquency problem. It would get worse. And, moreover, given the discrepancy in the size that the -- the amount of money that would be the subject of judgments as compared to the size of the tax base, no one would come here because they would look at -- they would look at the tax assessments and say this is never going to end. This is going to be a problem that's going to build on itself forever, forever, forever. So to the extent that the city -- Ms. Sallee testified that the city experienced some increases in property values lately, which is great, this would clearly put an end to that, and not only would it discourage people from coming, it would -- people who only had marginal value in their existing problems would assuredly leave, so the idea that somehow revenues could be generated through the Revised Judicature Act outside of Chapter 9 is imaginary. It just can't happen. It won't happen.

In addition, remember, Ms. Sallee had two different projections for property tax revenues. She had the property tax revenue without the RRIs, and then she had property tax revenue with the RRIs. Well, the one without the RRIs is the upper limits of what could be achieved because there would be no RRIs in a non-Chapter 9 perspective. I know there was -- and an expert report never came. There was speculation that somehow you could have the RRIs continue, but the truth is is that the post-petition loan would default. Exit financing would not be available, and here's the part about any form of an effort to get the RRIs on a road outside of Chapter 9 would require some form of orderliness among the creditor body and the ability to reach some form of consensus as to how to proceed. And we have all the evidence we need to show that that's unlikely, which is the preponderance of the evidence finding. In fact, we have all the evidence we need to know that that's never going to happen, coordinated action by creditors outside Chapter 9. And the evidence I'm referring to is, frankly, all of the foundation of your Honor's ruling that it was impracticable for the city to resolve its issues outside of Chapter 9, and, frankly, our Chapter 9 case was in a way a living laboratory for what would happen when debts weren't paid even with the automatic stay. As I mentioned at the beginning, we had litigation with everybody about something. Without the automatic stay,

we would have had all of those cases and many more, so the hypothesis of orderliness, which was not easily achieved and not immediately achieved even with the automatic stay, is a thesis which is just not believable.

Again, just, you know, things to note in that connection is there would be a priority fight outside of Chapter 9, which we did not really have here. I mean it was kind of in the background of some of the litigation. We clearly would have had pensions asserting that the sum of their funding provision and nonimpairment provision amounted to a priority. We certainly -- and this is notwithstanding the fact that, as a technical matter, the different liens that -- excuse me -- the different property taxes under the Judicature Act are supposed to be pari passu, but you would, nevertheless, when not enough money comes in -- and not enough money would come in -- you would have the retirees asserting priority or something like it on the basis of their special statutory positions. You would certainly have UTGO creditors claiming that if taxes are not adequately paid, what is collected would be allocated to them first. I don't know if they would win. They absolutely would say so. They, in so many words, effectively did when it became clear that there actually hadn't been sufficient collections to make a hundred percent of their payments in the prebankruptcy scenario. We know that -- and we're going to come back to

this -- that the LTGO creditors asserted something called a first budget item right, and this would go on and on. There would be arguments that would have to be dealt with and dealt with by a court. What this means to our remaining dissenting classes, which have no arguments, or at least they haven't heard arguments for this kind of priority, is that outside of Chapter 9, there would not be a very good situation at all.

I want to finish up this area with the whole discussion of the dismissal analysis. First, in addition to the absence of any expert witness testimony in the cases or any explicit reliance on expert witness testimony in the cases, we looked around to see whether any reported case used the word "dismissal analysis" and found that none did. We also, of course, took a look at the statute, and we knew but confirmed that the statute doesn't use the words "dismissal analysis," and, of course, it doesn't. The dismissal analysis was a term invented in this case, and, frankly, it's not exactly what the statute points to anyway. The statute points to the out of bankruptcy alternatives. It doesn't -- and shorthand, for better or for worse, it's referred to as dismissal. I don't remember whether it actually got this explicit in the testimony, but the reality is is that if there is something called a dismissal analysis that the city is required to produce in order to prove that the best interest test is satisfied, we actually had one all along

because we've been evaluating what the out of bankruptcy
scenario looked like from the very beginning.  It was, in
fact, in the proposal for creditors of June 14th, and it has
been updated -- I think Mr. Malhotra testified about this --
continuously during the Chapter 9 case, frankly, because we
knew it was a standard of reference.  This is in -- the most
recent update is in Exhibit 782, and this is one of the few
things I want to project because I want to make sure we cover
the base thoroughly, so if we can put up 782 -- I think it's
page 6 -- on the screen.  And I don't have a screen.  Oh,
there it is.  Okay.  I didn't know I had a screen.  Okay.
This, your Honor, is a thorough analysis of the financial
condition of the City of Detroit in the absence of a Chapter
9 case, including revenue assumptions that, quite frankly,
are optimistic because they are the same as the revenue
assumptions that we had -- that are projected for the other
cases, but it shows the growth of debt service and legacy
liabilities strangle the city at every point in time, and for
our purposes the only columns that are really worth looking
at are the years fiscal '15, which we are in right now, and
fiscal '16, which is the year after, and they are the last
two columns on the part that has been blown up for your
Honor.  And, you know, there was a -- Mr. Kieselstein -- we
had a lot of discussions about opening doors in this case,
and Mr. Kieselstein opened the door to Latin.  And as to

these two columns, I think the right expression is res ipsa loquitur. They do speak for themselves. It is important to note that the pension contribution lines, which, again, were not in Chapter 9 in this hypothetical, so we're going to have litigation as the city experienced in its past from its pension funds. Maybe Mr. Gordon will get up and foreswear litigation in an out of bankruptcy scenario, but I tend to doubt it. But there would be litigation to compel the city to pay those amounts out of cash relying on the nonimpairment and the full funding provisions of the Michigan Constitution. We are only in a position to have made the dramatic and fairly immediate changes in health benefits because of the protection of Chapter 9. It's inconceivable that that could happen outside of Chapter 9 absent an agreement. And I'm just focusing on those lines because I'm prepared to engage in the assumption for these purposes because the numbers are so overwhelming that the debt service, POC, and POC swaps would have the -- and this is -- the debt service is the ones that are not covered by the state, the state intercept mechanism -- that all of those guys would get together and make a deal on indefinite deferral, which it could be that they would get that constructive that quickly, but that's not what happened in our case. What happened is they litigated, too, so there is -- what this demonstrates is, to go to the technical issue, in addition to there being no real capacity

to use the Revised Judicature Act to increase taxes, there is no excess cash that a judge could order the city to pay its creditors, and so we rely on this work, again, which we've always been doing, always been paying attention to, and just never called it a dismissal analysis.  And I, for the life of me, don't know why we called it the steady state analysis, but it is the best evidence -- the only evidence, I think, that your Honor has seen about what an out of Chapter 9 situation looks like for the City of Detroit, shows no excess cash, and as I said before, we don't think that there would be any opportunity to raise taxes without destroying the city, so for those reasons the plan is in the best interest of creditors.

Next topic -- and we can take that down -- is discrimination.  An important point for us -- and I understand that your Honor doesn't want to hear a lot about it today, and, therefore, I won't discuss it very much -- is that the city believes and we believe the city has shown that there is no significant discrimination between pension creditors, on the one hand, and other unsecured creditors, on the other hand.

Just reviewing opening a little bit, the key, in our view, is adopting a methodology for determining the hypothetical allowable claims for pension claims that makes them accurately comparable to the liquidation of bond claims

and other unsecured claims in a bankruptcy case. We have clear rules that apply to the treatment of bond claims and other general unsecured claims. We do not have clear rules -- the cases are a little bit of a mess, and you've seen that -- with respect to dealing with pension claims. The example that I used at opening related specifically to the COPs where I basically said one way to test whether things are really comparable is to use the methodology that some are proposing to use for determining pension claims and apply them to the COPs and see what happens, and we saw what would happen to the COPs claims is that they would be allowed in an amount in the vicinity of 25 percent less, so even though the COPs have settled, the point of the exercise is to show that by using the investment return rates to discount pension claims, you are generating noncomparble numbers, and pension claims are being effectively understated. So one very important point is that this view of the world or the need to come up with comparability is completely separate from and an important question even if your Honor decides that outside of bankruptcy and for all of the purposes using an investment return loaded rate for discounting pension claims is perfectly okay. We, by the way, don't think that. We think that the Dutch view and the -- and some of the testimony you heard that indicates that using an investment return assumption to discount pension obligations has a

tendency to understate pension claims for many purposes is probably right, but you don't even have to decide that to decide that for purposes of determining whether or not there is significant discrimination and significant enough discrimination to require a rebutting factor or how much rebuttal is necessary. You can just look at the fact that the investment return approach just generates a result that isn't really comparable with the clear statutory result that applies in other contexts. And as I said at opening, there are a number of choices that your Honor has. There's the U.S. Air approach, there is to just look at a straight risk free approach, and there is to look at the COLA as an interest factor and just kind of treat pension claims like a bond, which is just treat the pension claims as principal, the COLA as interest, and just add up the principal.

Now, I think that there is in the record more than enough information if your Honor wanted to make a pinpoint, this is my allowance number. The issue of methodology of allowance is a legal issue, and if your Honor decides that you have a particular approach to the issue of determining the denominator for purpose of determining pension claims but you don't know that we have exactly the right number in the record, we'll take your legal ruling, and we'll give you the number. Many times in bankruptcy cases that is a way to fill in the record if it's necessary. I suspect the numbers that

every permutation that your Honor might be interested in is supported by the record, but if there is a permutation that you believe is appropriate as a matter of law, we will supply it. But in any event, the demonstratives that I used at opening, which I'm not going to repeat here, showed what happens when you make adjustments to the denominator to try to get a more comparable view of the aggregate pension claim and something that's comparable to our bankruptcy mandated -- Bankruptcy Code mandated method of liquidating other claims, and it's definitely an important step in the process.

There was two other really small, but they did attract a significant amount of discussion, argument about the denominator, and there were two of those. One was the vested, nonvested issue, and I think it was clear -- I think I said this at opening, but -- and it may have even come out in some of the testimony. Vested is a concept that talks about what an employee keeps if an employee decides to leave. That's what a vested benefit is. You can leave, and you still get it. But if an employee is terminated by the employer breaching contract for any reason or for no reason, the employee's claim isn't limited to his vested benefits. The employee's claim is the employee's expectancy, which -- and there are cases which show that that claim can include an expectancy with respect to pension, an expectancy with respect to healthcare, and an expectancy in the case of

pensions that if you're going to advance in salary either because it's going to go up in your current position or you're going to go into higher positions, that's part of your damages, too. You find all that in the wrongful termination law. So in a bankruptcy case where the result of a city not making pension obligations is a breach of a contract, the measure of the claim that you should be looking to is, well, what would happen in the context of a city breach, not what would happen if an employee voluntarily decided to leave, and so the city's numbers has not made a distinction between vested and unvested benefits. The city has used accrued benefits, accrued, which may or may not be exactly identical to all of the elements that an employee would be entitled to in a termination case, but accrued which more closely approximates what the city thinks the contractual entitlement of an employee really is. Our numbers have always been that way. They've been criticized as not extracting nonvested. We think they're perfectly appropriately included, again, in a claim environment where it's the city breaching.

And the second argument that was made kind of at the edges was the frozen, not frozen argument, which is this -- which is because this plan was -- may have been or will be -- essentially not yet, you know, will be, quote, unquote, frozen for accounting purposes, we should use frozen pension math as opposed to unfrozen pension math, and, frankly, I

don't think we're using either. I think the whole issue of what is the appropriate accounting of liabilities in a frozen plan has nothing to do with the expectancy or nothing to do with the claim that arises as a result of freezing. The claim that arises as a result of freezing if it's not, you know, addressed in some other way is accrued benefits, not, again, what the accounting convention says is left to be dealt with in a frozen plan. So for both of those, we dismiss both of those criticisms -- your Honor should as well -- and use the accrued numbers as the basis.

Okay. I do want to spend, though, a couple of minutes on the whole issue of what is the right rate of return assumption in the event that your Honor decides that it's the appropriate place to use for discounting pension benefits but also because we believe that it was a prudent approach to resolving the pension claims and did not result in giving pensions more money because it was unreasonably low. As we demonstrated in the evidence -- and Mr. -- Milliman's Mr. Perry I think was the -- I would regard as the primary witness for this particular view, although, frankly, the testimony came out in much of the actuarial testimony, which I know is everybody's favorite -- the view is is that there is a risk -- Mr. Perry's view -- the word he used, and I wrote it down a number of different places, and I made sure I wasn't going to forget it -- that the rate of return

assumption was viewed as a risk budget, which seemed to be a
very, very apt way to put it is that you're basically -- what
a municipality is always doing when it makes a rate of return
assumption and the municipality is on the hook to pay the
benefits whether or not the rate of return is achieved, the
amount that it sets as its anticipated rate of return is how
much risk it's ultimately taking.  It exactly describes that
number.  It exactly describes the effect of that number.  So
if the city had recalibrated benefits, I mean -- and by the
way, if the city was going to make a seven-percent rate of
return assumption instead of a 6.75-percent rate of return
assumption, the employees would want more, and the city would
be effectively guaranteeing that seven percent would be
earned.  Same thing happens at 7.9.  Same thing happens, you
know, at 8.0.  And while the city is negotiated -- excuse
me -- insulated -- sorry about that -- insulated from risk of
higher pension claims for the first nine years, from year ten
and on out it has to pay the piper, so if the number is
missed during the first nine years, the first nine-year cash
flow is protected.  In year ten it's got to start paying.
How much will be dependent upon the smoothing assumption or
how long it gives itself -- smoothing is for assets, but it's
a different kind of smoothing.  It's the amount of time it
has to amortize the difference, but it's all there.  It's all
on the city.  And to me, again, we could point to lots of --

THE COURT: That's projected to be a big number.

MR. BENNETT: Pardon?

THE COURT: That's projected to be a big number.

MR. BENNETT: It's projected to be a big number anyway because you're not targeting a hundred percent funding at that point. You're targeting 75-percent funding in the case of PFRS and 70 percent says GRS, so, yes, it's a big number, and it's got an amortization assumption in it, and the projections make it.

So should the city be higher? I mean to me the best evidence or the -- that's a loaded term. The most persuasive evidence that 6.75 is quite high enough, thank you, and it should not be any higher was the testimony with respect to the asset volatility ratio that is applicable to pension funds. PFRS is ten. GRS is 15. And, of course, the reason why these are very, very high numbers -- this was actually the first time ever in court testimony someone under oath said, yes, they're off the chart, and they were. They were way off the chart. The sample that was -- for which this ratio was calculated in the reports that the experts were using cut off long before ten and long before fifteen, and the reason that Detroit gets there is because it's working workforce is so much smaller than its retired workforce. That's the -- at the end of the day, that's the most powerful reason why that ratio is so out of whack, and it basically

says when you're in that condition, your organization size just isn't enough to keep up with the volatility, and so is there any surprise that a financially distressed city in a downward spiral that has as asset volatility ratio of somewhere between ten and fifteen -- I'm not saying that average is the right way to look at it, but just those are the two numbers that we have -- should be at the low end of the risk budget/assumed investment rate of return. Even if we're at the low end and everybody else is right, we should be at the low end. There was ample testimony, I thought, taken on the general question of whether anyone should still be at eight given the testimony that it's basically a 15-year-old convention and that the world has changed somewhat within 15 years, but I think that enough is what I'm going to focus on as being the -- kind of the most compelling reasons why 6.75 is the right number.

Other points that your Honor might refer to and look at is Mr. Perry's testimony concerning the work recently done at Milliman, which took down inflation assumptions. Frankly, inflation has been low for many years. They've taken them down. Other people have not. There was much testimony on that. It seems that the Milliman approach is reasonable. And he also explained that they've recently backed off the return assumptions with respect to equities and alternative investments again reflecting what they think are relatively

recent experience. And, finally, again, a very good way to look at this that encapsulates many factors, Mr. Perry talked about what is the percent likelihood that the plans would actually hit the 6.75-percent assumed rate of return in -- for the ten-year period he pegged it at 52 percent. There's a lot of false precision in that number because there's a lot of different assumptions that total up to that, but that looks like a preponderance of the evidence kind of number. That 6.75 percent is a little bit more likely than not to be hit. And then it gets better after the ten-year period. That was in the ten-year period. Within the thirty-year period it came -- it started drifting up to 60, so it is certainly not the case that 6.75-percent is high. Clearly it was a negotiated number. No one said anything different than that. It was a little bit uncomfortable to hear negotiation turned into a dirty word with respect to this issue, but, frankly, it was a key parameter in resolving the pension differences, and, of course, it was effectively negotiated.

Last part with respect to this issue is some of the efforts that were used to justify continuing with the 7.9 percent, and this methodology or this approach was used not only by the FGIC witness but by opposing counsel in cross-examining the witnesses of the city, and this is to have a discussion about the number of years that the pension funds have done better than 7.9 and the number of years that

pensions did less well than 7.9. I hope it wasn't too subtle, but Mr. Miller asked some questions of the FGIC witness about what happens if a pension fund is up ten in one year and down ten the next and then reversal, and we showed that -- through the testimony of the FGIC witness that in both instances you've lost money, which shows how meaningless it is to take a look at whether a particular pension fund is higher or lower than any particular number in any particular year. The only measure that makes sense is compound annual rate of return and that you have to go back 25 years -- and if you remember the exhibit -- I don't remember the exhibit number, so I can't put it up, but the exhibit that was -- the FGIC witness put up that he had 25 years of GRS experience and only 15 years of PFRS experience, and then, of course, he picked up the first ten years of GRS experience to fill in the data that was missing for PFRS. The only reason your 7.9 percent works on a compound annual basis with respect to the 25 years is that the first three years were outrageously good. There were two 20-plus years way back 25 years ago. So when you're in a world where your 7.9 number on the only measure that matters, cumulative rate of return, is -- you can only meet it by looking at 25 years of experience that every shorter period you're not there, time to reassess, and that's exactly what the city did. The use of the how many years greater or less than 70.9 was very disingenuous and

dead wrong.

Okay. We're now going to move to the part that your Honor wanted me to focus on, which is the -- which is the -- oh, I'm going to skip over it but just note that there were arguments made that the assets were -- that the numerator that the city used, which your Honor has the numbers for the value of the different components, was understated; that the assets were understated. I explained during opening the basis for all of the asset inclusion and the county's methodology. We think the evidence indicated that the county's approach -- city's approach to it -- sorry -- is exactly right.

Okay. And that includes, by the way, the fact that we exclude the state settlement for the reason that was indicated in our discussion of the Bryson Properties case that this was a situation where there was a claim against the state, and the state has made a settlement, and that's the reason for the distinction. And I think that does away with the, you know, kind of under the plan standard for including amounts. It's why the payments are made that is the relevant criteria, not that they are made under the plan or pursuant to a term in the plan.

THE COURT: All right. So what is the city's position on what the percentage payment is in Classes 10 and 11?

MR. BENNETT: If I could get the demonstratives from opening -- can you get the charts? Oh, better yet the summary chart. Is this a summary chart or -- yes. This is a summary chart. Oh, no. This is just -- I'm sorry. This is just PBGC. This is a PBGC chart. We had three of them, and there you have the -- this one is the PBGC rates there at the bottom. There's the recovery elements at the values we put them in at, and there's the ones below it are excluded.

And then if you go to -- the next chart would be risk free rates, and then the last chart is the stripping out COLA, treating COLA as an interest rate and just treating pension claims as principal amounts. Oh, wait a minute. This is not the right chart. The numbers are missing. Do you have the final one with the -- okay. I will get that for you at the break. I have it in my briefcase. I'll get you these numbers. This was an early draft of the chart without the --

THE COURT: So you're telling me that the percentage recovery for these two classes in the city's position is what, in this range? It's not a specific amount?

MR. BENNETT: It's in this range. Well, there's specific -- well, your Honor --

THE COURT: You're not willing to be pinned down on specific numbers like you are with the other classes?

MR. BENNETT: Your Honor, I would live with any --

any of these methodologies I think are -- generate a better approximation of comparability versus the general unsecured claims and bond claims in the case. I would probably -- if I get to write the opinion, I would pick the PBGC rate on the basis of the U.S. Air decision. Oh, there we have it. There's the no discount slide.

THE COURT: All right. We need to pause here. I'm thinking about what a retiree is promised here; right?

MR. BENNETT: Um-hmm.

THE COURT: On the PFRS side, it's no reduction in retirement benefits -- in pension amount and a 50-percent reduction in the COLA; right?

MR. BENNETT: Right.

THE COURT: And a four and -- on the GRS side, a four-and-a-half-percent reduction in the pension amount and a 50-percent reduction in COLA; right?

MR. BENNETT: Well, no. Actually, let me stop you there. To get to the four and a half percent reduction, that -- you get to that number because of the ASF reallocation, and, frankly, we don't think the ASF allocation is part of the distribution, so we -- I agree with your Honor that with respect to the pension claim of a pension person who has no ASF issue --

THE COURT: Okay.

MR. BENNETT: -- that's the right number. People

who do have an ASF issue have a higher number, but within even the 90 -- the 95.5-percent amount, some of that isn't recovery from the city. Some of that is effectively the -- you know, the ASF reallocation, and so that's one of the reason why a -- when you look at it from the perspective of what is a pension person getting versus the monthly pension check, that is one result, but it's different partly because of the ASF issue, partly because of the fact that COLA grows, and then here's another reason is that remember everybody is discounting everything to the petition date, and then after the effective date everybody earns interest, so the math actually gets a little bit tricky here. In the case of a bondholder, a bondholder -- let's say we take a bondholder. Their claim is a hundred.

THE COURT: All right. But pause there. In the balance of my obviously simplistic analysis, I see the UAAL graph, chart --

MR. BENNETT: Um-hmm.

THE COURT: -- that you all produced that shows that although for the first ten years it's either level or sinks slightly in the case of one of the plans --

MR. BENNETT: PFRS.

THE COURT: -- yeah -- but then, according to your projections, does get to a hundred percent --

MR. BENNETT: That's right, but now --

THE COURT: -- for full funding.

MR. BENNETT: Okay. Let's now -- just bear with me a second.

THE COURT: Bear with me.

MR. BENNETT: Okay.

THE COURT: And you were about to answer my question. What are the factors that suggest that that recovery for unfair discrimination purposes, which is what we're talking about here, is not a hundred percent?

MR. BENNETT: Okay. When you have a -- to just go back to the bond example because we keep coming to the one where we have a clear rule -- all right -- if we -- let's talk about a hundred dollar bond, five-percent interest rate. Okay. When we get to a Bankruptcy Court, the claim is a hundred. Anyone walks in and says it's 101 or 99 gets laughed out the door. Okay. We go through the case. It's possible that that is a 75-cent claim; right? Let's just say hypothetically that it is. But on the effective date, if you give that person another debt instrument of 75 cents, it's going to have an interest rate. It's entirely possible on that math, the 75-cent bond with an interest rate, that they're going to get to a hundred, too, if you just look at cash flow. And for looking at cash flow, which is what we're doing with pension holders because pension holders focus on cash flow, is we're looking at -- number one, we're trying to

get to a situation where I'm turning a pension person who's
got a very different claim to look like a bondholder to
figure out what their petition date claim really is, to give
it a distribution on the effective date that has the same
meaning, too.  Remember, COPs are getting B notes, interest
at four percent becoming six percent, not 75 cents, of
course, but they're -- and they're getting C notes that also
have interest factors attached to them.  So when making the
math comparable and understanding that the effective date
distribution isn't that number way out on your curve where it
gets to a hundred, it's something else, when you make those
comparable -- when you really think comparably about all of
these things, you get to these numbers, numbers on these
three charts.  It's a hard thing to do, and that -- and it's
not a focus on, oh, ultimately they're going to get enough
money so that they're going to get par.  Well, right.
Ultimately a lot of creditors that don't get par recoveries
get enough money to get to par, but that's not the relevant
test.  The relevant test is the allowed claim on the petition
date against the value distribution on the effective date,
what it's worth on the effective date, so now let's talk
about that.  What is it worth on the effective date?  Some
elements ought to be discounted at 6.75 because the person
making the distribution, the DIA and the pension funds, they
have the right to pay 6.75-percent discounted numbers to

discharge their obligation. They can do it at any time, and it's their right, so the correct discount rate, even though on your chart that shows it getting paid in full ultimately -- there's 466 million in payments -- the reality is you can't value them at 466 million because the person paying them has the right to discount at any moment at 6.75 percent.

You also talked about the county promises beyond year ten, very big numbers. Do county promises --

THE COURT: Well, but if the DIA does that, the pension fund will have the cash to invest --

MR. BENNETT: True.

THE COURT: -- and earn that presumptively.

MR. BENNETT: I agree, and so you --

THE COURT: So isn't it six of one --

MR. BENNETT: I don't know. My own personal view is is that you -- that the investment return assumption is an assumption that may or may not be achieved. The distributions that we know are coming out of certain sources, they have a different character, and so I'm focusing on the character of the distributions, and, yes, there is an investment return assumption that ultimately the city stands behind, but let's get to that in a second because the investment return is something the city stands behind. I think it's appropriate to look at it. One, it's ten years

from now because that's when the city has to make good on the
6.75 percent, and we then ask ourselves what's the city
promise in year ten worth today.  The City of Detroit's
promise ten years from now today is not zero discount rate.
It has a discount rate, too.  I think we used the five.  Some
of the testimony -- I don't quite know if it got -- it was
coming because it was in the expert reports -- was that that
number should be a nine, and, of course, if you take a look
at the B note structure, it's four in the early years and six
in the later years.  So, again, for a pension person, they
don't care about this math.  They want to know relative to
their pension check what are they going to get, and that's
what the disclosure statement told them.  But if we're in the
world of comparing the pension distributions to a bondholder
distribution, we have more advance math that we have to do,
and it's for that reason -- it's when you do the more
advanced math when you look at things the same way, not
different ways, again, for comparison purposes, sure, you can
make the pension claims look really, really great if you
decide that the city promise ten years from now is money good
and not subject to a discount rate.  It does wonders if you
want to look at it that way, but that's not the way the
bondholders look at their distributions.  You have to look at
them the same way.

            THE COURT:  Wouldn't it be the right thing to do to

look at the stream of payments that a retiree is entitled to outside of bankruptcy with the same eye?

MR. BENNETT: Meaning for purposes of like accounting purposes or --

THE COURT: For purposes of valuing the claim.

MR. BENNETT: Well, and you heard outside of bankruptcy right now it's all done -- the convention people like is because of the use of the investment return assumption to discount them, which, again, I think the most compelling reason why that's wrong is that it's implicitly shifting the rate of return risk to the employee.

THE COURT: Right. I get that.

MR. BENNETT: It's U.S. Air point. But also it's -- I guess it's harmless if you're prepared to believe that the investment return assumption will be realized, period, but you heard the testimony of Bowen that the 6.75 percent has a 52-percent chance of being realized in the first ten years.

THE COURT: Well, but you don't want to argue that your plan isn't feasible.

MR. BENNETT: No. I'm going to get there. It's feasible, and, by the way, on the 52 percent growing to 60 percent and on the more likely than not standard, which has been the standard forever in feasibility in bankruptcy cases, it's feasible. And I don't think anyone from the city has ever stood up to you and said that it would be worse if it

was at 6.5. As you know, the city started out lower, so it made a deal, and I'm going to make a -- I'm going to accelerate another point because it kind of applies here, too. Ms. Kopacz has said that -- and I used the word already -- that the projections are skinny, okay, that that's how it came out. And in a number of ways, the 6.75 percent may look skinny because of the probabilities. Your Honor, we have a consensual plan, a broadly consensual plan. How would you ever expect it not to be skinny? When people negotiate over reorganization plans where you ultimately wind up in the best of circumstances -- and we think we're in the best of circumstances in Detroit -- is that every party gets exactly what they need, not a penny more. That's how these things have a tendency to work. So what are the chances that you could have a negotiation by very spirited adversaries over huge amounts of money, no one wanting to leave an extra nickel on the table, where the city winds up exiting the case --

THE COURT: Well, of course you're right as far as you go, but that assumes the negotiated result is the best result, but, look, I want to get back to the -- I want to get back to the math question because --

MR. BENNETT: Okay.

THE COURT: -- the question I asked is unanswerable. To me the pension claims are a debt just like any other.

Could be bonds, you know, could be notes. It could be anything; right? And here you've got professionals -- we call them actuaries, but they might be accountants -- which says the city has this obligation, but the assets on hand to pay that obligation are short by $3.5 billion or whatever the number is.

MR. BENNETT: Um-hmm.

THE COURT: Now, in the pension context, we call that UAAL, but it -- you know, you'd call it something else in a different context. And now the city comes up with a plan, which it argues is feasible and which, you know, we'll have to decide if it is, but if it is, the UAAL goes away. Now, tell me why that isn't a 100-percent recovery.

MR. BENNETT: Your Honor, if it is realized, it is a hundred percent recovery.

THE COURT: You tell me it's --

MR. BENNETT: By the way --

THE COURT: You tell me it's going to be realized --

MR. BENNETT: Excuse me.

THE COURT: -- because you've got the feasibility thing.

MR. BENNETT: Let's back up a second.

THE COURT: Okay.

MR. BENNETT: First of all, the UAAL that is going to be realized is the UAAL discounted to -- it takes out the

4.5 percent, takes out the COLA, the --

THE COURT: I'm not talking about this case.

MR. BENNETT: Oh, okay.

THE COURT: I'm talking about --

MR. BENNETT: All right. Your Honor, I --

THE COURT: -- some hypothetical debt which the city has --

MR. BENNETT: Okay.

THE COURT: -- which the accountants say you need $3.5 billion more somewhere to pay this debt, and the plan has got that money there. Why isn't that a hundred percent recovery --

MR. BENNETT: Okay. Because --

THE COURT: -- because you're telling me it's not.

MR. BENNETT: Because -- it isn't because the -- if the UAAL is satisfied on the effective date with cash, it's a hundred-cent recovery. If the UAAL is satisfied over time without interest, it is not a hundred-cent recovery under the math that matters, which is the bond math. If you --

THE COURT: Well, but how can that be if every -- I'm going to use the word "claim holder," not "pension holder," because I'm talking about a hypothetical here -- is paid exactly what they are owed until during the time, whatever the time is, for the unfunded piece of it to be paid?

MR. BENNETT: Because you've excluded -- and, again, you want to say that because this has now been a plan and it's being confirmed that they're going to get all those payments when they get them, but there is risk of nonpayment that in our world we compensate or measure with interest, and so it's the difference between on the effective date paying hundred-cent dollars cash or having the United States Treasury step in and cover the pensions on day one. Then there's no collection risk anymore, and the deferral -- the deferral in the obligation is exactly equal to the deferral in the money, but that's not what's happening here. What's happening is --

THE COURT: Okay. So your argument to use some kind of discount, whether it's -- whichever one of these three it is, we're talking about this -- are we only talking about this in the context of measuring recovery for unfair discrimination?

MR. BENNETT: Correct. What I need to do because of the way the Code works is apply blind --

THE COURT: We're not talking about using this for purposes of advising these creditors what their distribution will be.

MR. BENNETT: Exactly. I'm not. What I'm doing is I'm -- there's actually huge amounts of debate over whether the bankruptcy allowance scheme for bonds makes sense or not,

and, of course, the market has tried to opt out of it with
may call provisions and the like, so -- but for better or for
worse, I'm stuck with bond math or bond math as imposed by
Bankruptcy Code, Section 502(b)(2), which is where the
problem is.  I have to use that math when I -- when the COPs
came along, when LTGOs came along, when UTGOs came along.
I'm stuck with it, all right, whether it has perfect merits
or not, and bondholders would tell you it doesn't.  All I'm
trying to do is use the same math to something that is
different, and what we tried to do -- and, frankly, the U.S.
Air court did a good job of it.  It was not concerned about
the distribution side because it was a PBG insured deal.  I
don't have that luxury, so I had to do something with respect
to the asset side that made similar sense.  And so I've
looked at the distributions to the pensions the way a
bondholder would look at the distribution to a bond.  That's
all I did is apply their rules, apply bond rules to pensions
so that the math would be consistent.

      THE COURT:  And your position is that when you do
that --

      MR. BENNETT:  Let's go back to --

      THE COURT:  -- you get these really low percentages.

      MR. BENNETT:  You get modest percentages.

      THE COURT:  Really low percentages.

      MR. BENNETT:  Yes.

THE COURT: Okay. Let me ask you to move on.

MR. BENNETT: Okay. So --

THE COURT: You need to talk about the legal standards for unfair discrimination.

MR. BENNETT: Okay. I want to, first of all, kind of pick up one of the controversies that I think was in the opening statements from the different creditors, and this related to when you talk about the -- when you evaluate discrimination, is it a subjective test or an objective test, and I think that, frankly, the Code answers that question. It's about whether the plan is unfairly discriminated -- discriminating, not whether a particular individual had a thought about why a particular distribution was the way it is. This is an objective test, not a -- you don't go around and figure out every single person who had something to do with a deal and find out why they supported one particular number or another. That's not surprising, by the way, because I think that it will turn out that everybody has got different reasons, particularly when a compromise is made, as to why they talk themselves into a particular compromise. That's not what this is about. What this is about is objectively, what are the objective circumstances as demonstrated by the evidence that would justify a difference, not what was in an individual person's mind.

We have said that the primary justification for a

difference in treatment between pension claims and other unsecured claims is because the pension claims are, open paren one, held by actives as well as by retirees, although the actives are clearly the minority, and, secondly, that actives pay attention to what's happening to retirees for two reasons: one, they'll be retirees someday, too, and, secondly, as a reflection of how their employer is treating people. We think all of these things are supported by common sense. It's just the way the world is. Everyone who has a job and who has a coworker that sits next to them is going to look at what's happening to that coworker as a reflection of what might happen to them in the future.

Now, there was lots of testimony on this, and I'm only going to read a few and a few parts from certain witnesses. Mr. Bloom actually was eloquent on this point, and I lost the question, but let me just give you his testimony. "I think I observed it in two different ways, one direct and one indirect. The direct way is that there were members of our committee who were active -- one was an active employee and one was a representative of active employees. And in both those cases, I heard them say to me directly that they were -- that the active employees did care about how retirees were treated, and that was relevant to them in their view of what was right and what should happen in the case. And second was while, again, I was not involved in the

collective bargaining negotiation itself -- excuse me -- other members of our committee were regularly in touch with other active workers who they knew -- as I said, family relations, et cetera -- and they also -- and they also reported the same thing." In an answer to a different question, "We talked a lot. And it was the committee's brief -- belief" -- sorry -- "that the active employees were concerned, and we had active employees who were putting that forward as a concern." The other witness who talked most eloquently about this was Mayor Duggan.

"Question: Do you have an impression or a judgment as to whether the way pensioners are treated has an impact on the city's dealings with its current employees?

Answer: There's no question that the morale of the employees that I interact with at least got better when the cuts were reduced and ultimately the hybrid plan came out which apparently expectations had been lowered so far, I think people had a pretty bleak outlook, but in my interaction with them, people feel better than they did six months ago."

He went on or flops over to -- oh, it's a different question, but I've lost the question on this one.

"You know, city government is its employees. They're the ones who deliver the service, and

they're interacting with the public every day. You try to motivate them with pay and incentives and supervision, but nothing motivates them better than feeling good about their job, and so there's no question that people who feel like they're being treated fairly tend to do a better job than people who are treated unfairly. I think that's probably true everywhere."

Ms. Jones, city council president, and several questions of foundation, and then she's asked,

"What was that impact?

Well, when you work a job and you look forward to retiring, you look forward to the dollars that you will have to care for yourself and your family, and to know your pensions will be drastically cut and the money that you expected to receive you will not be receiving, that definitely has an effect on you.

Affect your morale?

It can, yes."

And then Kevyn Orr testified about many people he runs into in talking about the -- in talking about voting on the plan.

"Many people that are making these votes are active employees that we're trying to incentivize to

perform some of the RRIs that we're building into the plan. It's important that there be a consensual resolution having recognized that the city had a long history with negotiations and resolutions that there be buy-in."

There are more, but I don't want to spend too much additional time on it. I do think that the point does make common sense. As I pointed out at opening, in the Aztec case itself, the case that, you know, gives its name to a test that most courts use, it talks about discrimination being permitted when, and then it kind of asks a question, and the quote, "Does the proposed discrimination protect the relationship with specific creditors that the debtor needs to reorganize successfully?" It couldn't be more on point than that.

There's another business aspect to this, though, which actually during the case got a little bit stronger. As your Honor knows, that the retiree settlement also included settling the appeal of your Honor's ruling on the impairment of pensions in Chapter 9, and, as I said before, I agree with that ruling. Judge Klein agrees with that ruling. But the Sixth Circuit hasn't ruled. One of the things that happened while we were in this case is that Jefferson County was confirmed and then went up on appeal. And I don't know if your Honor saw the opinion, but it roughly -- I think it's

two or three weeks ago, but it maybe is a month. The District Court in the Jefferson County case wrote an opinion which creates, I think, what to me looks like, although I'm not as up to the law in this area as maybe I should be, the first time equitable mootness -- the equitable mootness doctrine is being limited when a constitutional issue is on appeal.

THE COURT: I did see it.

MR. BENNETT: So this, I think -- before that -- this deal got done before that opinion came out, but one of the reasons for making a settlement and one of the reasons for discrimination was that this particular group of creditors had an appellate argument, an opportunity to reargue with de novo review a legal issue that at least when your Honor made a ruling was fairly unsettled in the law; that other courts had kind of touched on it at the edges and had decided analogous questions that really should be answered the same way, but your Honor is the first who actually took it on straight on and made the specific ruling. And, like all lawyers, we are concerned that we not take unreasonable risk when we have a deal that we can get done where we might get an adverse appellate result. What the Jefferson County -- the most recent Jefferson County case, the District Court case, tells us is that our caution was well justified. The last thing in the world the city would

need would be to go effective on a plan reliant on a particular treatment of a particular class, find out that notwithstanding the absence of a stay pending appeal, notwithstanding the absence of a bond, that there is no mootness protection for an important decision that undermines -- that -- excuse me -- holds up the entire plan of adjustment.

THE COURT: Well, there may be some merit to what you say, but didn't the opinion turn more on the judge's conclusion that the issue at hand, which was a constitutional issue, could be effectively isolated in the sense that the rest of the plan could go effective, in her view, and this piece of it could be held up without prejudicing the parties involved in the sense that you consider when you're talking about equitable mootness?

MR. BENNETT: I certainly saw those words, and I don't understand how they could possibly be true because there you have -- that was a kind of closed system, a -- I don't know the appropriate words to use for that state, but it's --

THE COURT: Right.

MR. BENNETT: What we would call it is analogous to DWSD.

THE COURT: Enterprise; right.

MR. BENNETT: Enterprise fund. And as I understood

the plan, it was, quote, "skinny," close quote, with the rate increases that the board was required to implement that the Bankruptcy Court retain jurisdiction to require that they be implemented, and if those -- I didn't look at the price of the bonds, but if those rate increases are now at risk or at greater risk, open paren one, that's not good for the people who hold the bonds, and, open paren two, they're going to be in Chapter 18 because the bonds aren't going to -- debt service isn't going down, and so if the rate increases are unconstitutional and have to go, you know, back to a body that might not make them, that's the whole plan.

THE COURT: I don't disagree with your criticism of the opinion, but my point was that it was not so much that it was a constitutional issue that the judge carved it out. It was her view that it was a separate and isolated thing that didn't relate to the economics of the deal in the sense that you have characterized it here and with which I don't agree -- I don't disagree.

MR. BENNETT: I will say, your Honor, that I'm thrilled that Michigan courts will distinguish it, but I will tell you that I didn't think that was a good day.

THE COURT: Okay. Well, on this point of unfair discrimination, to what extent is it appropriate for the Court to take into account the fact that the Michigan Constitution does single out pension claims for something,

whatever it is? It's more than other creditors, something more than other creditors. And what does -- what weight is that to be given?

MR. BENNETT: Well, actually, the cases give you a little bit of help in that regard because when talking about discrimination, it talks about their rights under applicable nonbankruptcy law. Several of the cases do that as an additional basis for reasonable -- for the distinction, and I think that one of the points that is clear is that outside of Chapter 9 -- and I said we don't really know how it works. I've made this point several times, but outside of Chapter 9, a pension creditor is going to argue with support that there is some form of priority or better treatment that they're going to get as compared to other unsecured creditors. That is the reality. No court in Michigan -- frankly, I'm not sure if any other court has ever described exactly what that constitutional protection turns into as a matter of dollars and cents versus other creditors, but, as I said when I covered the best interest point --

THE COURT: Yeah. See, you're such a bankruptcy lawyer to be thinking about it in terms of dollars and cents. I was thinking about it in terms of the judgment of the people who ratified the Constitution that's reflected in this special callout. Is that something worth considering?

MR. BENNETT: It is. It is worth considering under

the part of the rubric that focuses on applicable nonbankruptcy law. It is not a rubric worth considering as a basis to modify or restrict your ruling on the priority of pension claims.

THE COURT: Yeah. I mean I've already held that it's not conclusive; right?

MR. BENNETT: Correct.

THE COURT: That's what the eligibility opinion said, but that doesn't mean it's entitled to no weight.

MR. BENNETT: As I said, there is a -- there is a rubric in this category of where it would belong.

THE COURT: Okay.

MR. BENNETT: A couple of few extra points on this, which is there is another element that is recognized as a basis for discrimination, which is a necessity for confirmation to confirm a plan. And I think there actually the last quote that I read, Mr. Orr's quote about the fact that at the end of the day this plan is dependent on a bunch of things in order for it to work. When I get further on, we're going to find out that, you know, many things have to happen. One of them is implementation of the RRIs and, frankly, a general improvement in the level of services to residents. Having a consensual resolution with the workforce is extremely valuable in achieving those things.

THE COURT: I've always wondered what that

particular element actually adds to the analysis because really if the other tests are met, is a judge going to reject it on this ground?

MR. BENNETT: I would hope not, but it's an additional --

THE COURT: I mean but can you even construct a hypothetical where that might happen? It's just -- it seems highly unlikely.

MR. BENNETT: I find it hard to do. And then the last point -- the last item in the list of treatment issues is meaningful recovery, and here, frankly, meaningful has to be determined against the circumstances of the case that it -- a meaningful recovery can't be that, oh, let's do it always versus a hundred because a meaningful recovery has to be, to some extent, calibrated by the economic circumstances of the relevant debtor. And here the economic circumstances of the debtor -- I mean look where we are. We are $7 billion plus coming off the books, massive deferrals of others. You know, this is -- should be regarded as a great case in terms of how much has been accomplished, but it's never going to be regarded as a great case in terms of recoveries. It's great only under the circumstances, and so we think that even though there are low recoveries in this case -- and we don't like that part. This case would have been much easier with higher recoveries to creditors generally. Under the

circumstances, the recovery is meaningful.

THE COURT: So you've gone through the Aztec factors.

MR. BENNETT: I have.

THE COURT: You remember that dialogue I had with Mr. Hackney about not liking that one or the Markell one, and he said the Rhodes test?

MR. BENNETT: Well, you're not alone.

THE COURT: Here's my problem with Aztec and Markell. If Congress wanted to be any more specific about how a judge should go about evaluating unfair discrimination, it would have said so in 1129(b) just like it did, by the way, on fair and equitable. I mean there's a page of description there on how a judge should do that, and yet for unfair discrimination all we've got is unfair discrimination.

MR. BENNETT: Right.

THE COURT: Why is that anything more than the judge making the best judgment he or she can on whether it's fair or not in --

MR. BENNETT: You have distinguished company. He's in the wrong circuit. His name is Judge Posner, who wrote an unfair discrimination case -- I think we cited it -- where he says exactly what you just said, which is that he's unsatisfied with the Aztec case. I don't remember whether he covered the Markell test as well, but he was very unsatisfied

with the tests and said at the end of the --

THE COURT: Well, if he didn't like Aztec, he surely isn't going to like Markell.

MR. BENNETT: So but at the end of the day, he comes exactly to your Honor's conclusion that this is -- that this has to be a matter of fairness and equity, and it's -- and it is left to the discretion of the trier of fact and --

THE COURT: Is there any Sixth Circuit law that requires the adoption of one test or the other?

MR. BENNETT: No, there is not. We looked. There is not. And the fact that some judges -- the Aztec court is -- what the Aztec court is doing is trying to put order in the cases that it got. You know, that's -- when you read the Aztec case --

THE COURT: Well --

MR. BENNETT: -- that's what they're trying to do. Doesn't necessarily mean it's the right thing to do, but he -- but I think the standards of Aztec are really that judge collecting cases that, frankly, are more like the -- that themselves are decided more along the lines as you would decide them, and then they say, "Okay. By collecting these cases, I find --

THE COURT: Okay.

MR. BENNETT: -- these are the things that predominate."

THE COURT: These are the things that were looked at. All right.

MR. BENNETT: If we're going to take a break, this is a good place to do so. I know I'm running a little over, but there were interruptions, so --

THE COURT: It's my fault. Got it.

MR. BENNETT: Well, some of it was those COPs and the reading --

THE COURT: All right. Let me give you a little bit of homework over the break --

MR. BENNETT: Okay.

THE COURT: -- in addition to the questions that I already posed to you last time. Hold on one second. Okay. In addition to the list, which we've made good progress on, we need to review the whole issue of what the plan intends to do with respect to 1983 claims against individuals in their -- against officers in their individual capacity because we have dug deep into the weeds of what the plan says about this, and we cannot figure it out, so we need to know what your intent is before we can determine whether it's consistent with the law.

MR. BENNETT: Okay.

THE COURT: Second, fair and equitable. In the context of a municipal case, what does it mean because in a Chapter 11 case mostly it focuses on whether the plan

properly prioritizes among different classes or different kinds of creditors? How does that work in a Chapter 9 case?

MR. BENNETT: Okay.

THE COURT: With regard to exhibits, we have a list of all of the exhibits we think were admitted into evidence. We will give that to you and ask you to, "A," review it, let us know any discrepancies that you identify, and, "B," please give us either one paper set or one electronic set of just those exhibits that were admitted. Okay?

MR. BENNETT: Okay.

THE COURT: We'll break now for lunch and reconvene at 1:30.

MR. BENNETT: Thank you.

THE CLERK: All rise. Court is in recess.

(Recess at 12:02 p.m., until 1:30 p.m.)

THE CLERK: All rise. Court is in session. Please be seated.

MR. BENNETT: Good afternoon, your Honor. Bruce Bennett, Jones Day, for the City of Detroit.

THE COURT: You may proceed.

MR. BENNETT: Thank you, your Honor. Why don't I deal with the homework assignments first? On 1983 claims, there are actually several provisions in the plan that come together to deal with them, so let me give them to you. The first is the definition of indirect employee indemnity claim.

That's definition Number 224. And what that does is it basically -- well, I mean the fundamental problem is for all these issues you have an employee of the city, police officer, fire, whatever, who is acting within the course and scope of his employment and something happens, and the applicable nonbankruptcy law prefiling would be that the officer gets sued even though it's within the course and scope of his employment. The city is sued. That's who the target really is. There is a claim against the city to the extent within course and scope, and if for some reason a judgment is entered into against the officer within the course and scope but the city isn't, the officer has indemnification. As a baseline matter --

THE COURT: And just to be clear, this can happen because under 1983 law, there is no respondeat superior liability; right?

MR. BENNETT: Well, it -- okay.

THE COURT: There's only liability if the individual was acting pursuant to municipal policy or direction or law or whatever.

MR. BENNETT: Exactly. So this is the only universe we're talking about. None of the plan provisions I'm about to get into deal with a situation where an employee is determined to have acted outside the scope of employment and inappropriately, you know, beyond that scope, and that's when

the employee is on his or her own, and none of these provisions deal with that case.

THE COURT: That would not be a 1983 case?

MR. BENNETT: Correct.

THE COURT: So in this context, what have we tried to do? What we tried to do is because now a claim against the city is a 13-cent claim under -- is a general unsecured claim, the officer's indemnification claim, in the absence of doing something to protect it, would also be an unsecured claim. And what we are trying to prevent is the idea that an officer acting within the scope of -- course and scope of his authority would become liable for a judgment either together with the city or somehow separately from the city and would only have the 14-cent indemnification or the -- or not have anything at all so have to make up the difference between the 14 cents and a hundred cents. So what we've done is identified this class of indirect employee indemnity claims, which is the claim of the third party to the extent that the officer is entitled to indemnification, so it's really the claim that is effectively the claim against the city that someone is trying to enforce --

THE COURT: Okay. But this is where I get confused because the fact that the employee has a right of indemnification against the city -- and that raises other questions, but does that somehow create any rights in the

plaintiff?

MR. BENNETT: It doesn't create rights in the plaintiff. What we're trying to prevent is for a claim that is a claim against the city and, incidentally, a claim against the employee becoming the employee's problem because the city is not going to pay in full.

THE COURT: Okay.

MR. BENNETT: That's what we're trying to deal with, and we also don't want to put the city in a position where by litigants going after individuals the city then feels pressured to pay hundred cent indemnities, thereby indirectly creating a favored class of unsecured creditors against the city, so we're trying to prevent both those things from happening at once.

THE COURT: Wait. Could you repeat the second one?

MR. BENNETT: Again, dealing solely with a group of claims where it's within the course and scope of the individual's employment, if a plaintiff sues the city and sues the individual, maybe even drops the city, sues the individual and the individual then for whatever reason the city feels compelled to do a post-effective date indemnification of that person, you've effectively wound up elevating a class of claims against the city because they can harass an officer, and so we are -- that's the entire purpose of the series of provisions is designed to prevent that by

 basically saying --

THE COURT: All right. Well, let's pause again. The city does not intend to discharge or in any way deal with a plaintiff's claim against an officer when that officer is sued in his or her individual capacity; is that right?

MR. BENNETT: In his individual capacity and outside of the course and scope of his employment. If he's being sued in his individual capacity but within the course and scope of his employment, he's being protected. If it's outside the scope of his employment, he is not protected.

THE COURT: All right. So how is that consistent with Barber --

MR. BENNETT: Your Honor, I think --

THE COURT: -- because I thought Barber said that the city's bankruptcy cannot discharge claims against an individual when they are sued in their individual capacities?

MR. BENNETT: I think Barber when it says "individual capacity," it means outside the course and scope if I remember the case correctly. I have read it. I haven't read it recently. I think Barber draws the line in exactly the place I was drawing the line, and that is when an individual is being sued in the course and scope of his employment, Barber says that's really a claim against the city masquerading a claim as an individual. I think Barber is carving out --

THE COURT: Well, but I think we have to be careful about our language here because, again, under 1983 law, it isn't enough to impose liability on the city that the officer was acting within the scope of their employment. That may impact the employee's rights against the city, but it doesn't impact the plaintiff's rights against the city. The only time the city is liable for the act of an individual is when it's pursuant to municipal policy or rule or practice or whatever, and there's a distinction between that and scope of employment.

MR. BENNETT: Okay. I understand what your Honor is saying, and I'm not remembering exactly where the Barber line is. We are trying very hard to limit lawsuits against individuals in circumstances where it's really a claim against the city and that there shouldn't be a separate claim against the individuals because, frankly, we're not seeking to create more business for the Bankruptcy Courts for all those individuals, and so we think that well within Chapter 9 law is the concept of protecting officers and inhabitants to the same extent as the city is protected when it's really a claim against the city, and if there's -- you know, if your Honor thinks the line is somewhere between the -- within policies and course and scope, we'll have to live with the line that you draw, but we are certainly looking for the maximum protection possible for the employee in that

circumstance and are not seeking protection for the employee who has suffered --

THE COURT: Well, to what extent, though, is the city obligated to provide indemnity?

MR. BENNETT: The city, I think, is -- I think the city's indemnity goes all the way to course and scope, but I'm not exactly certain of that, and I'll find out before --

THE COURT: Well, I was actually asking a slightly different question. If I recall correctly from prior hearings, what the position of the city has been is that it has the discretion to indemnify or not. Sometimes it does, and sometimes it doesn't. It's not a legal obligation.

MR. BENNETT: I'm actually informed that in some instances it's contractual under CBAs, so I don't -- there may be discretion in some area, but I don't know exactly where the discretion kicks in. I can get those answers.

THE COURT: Wouldn't the city's obligation to provide indemnity be a dischargeable debt in and of itself?

MR. BENNETT: Yes, it would, your Honor, but the -- but there are practical circumstances that the city has to consider in whether it can rely upon a discharge in those circumstances.

THE COURT: So the city's position is that if a claim against an individual, however it's denominated, might result -- we'll argue about might or would -- in a claim by

that officer against the city, then the plaintiff's claim against the officer is discharged and dealt with in Class 14?

MR. BENNETT: Actually, to clarify, as a technical matter, the claim against the individual is subject to the plan injunction, and, frankly, that provides its own escape valve because if there's some way in which that's misinterpreted, it comes back here in the form of some effort to get relief from that injunction.

THE COURT: But otherwise what I said is correct?

MR. BENNETT: Right; correct. With that exception, what you said is correct.

THE COURT: And so the question remains how to reconcile that with Barber or to disagree with Barber. I had thought -- I mean we went back and actually looked at the transcript of the hearing on the legal issues, and this was one of the legal issues, and I had thought you had represented to the Court that it was the intention of the city in the plan to comply with Barber.

MR. BENNETT: Your Honor, I may not have spotted the difference between the two standards that you did. I think the city clearly is looking for the maximum protection for the employees in these circumstances.

THE COURT: And for itself.

MR. BENNETT: And for itself, but I mean the city ultimately can get the protection, but insisting on all the

protection the city might insist upon creates a problem without this additional relief, so --

THE COURT: Okay.

MR. BENNETT: -- it all fits together in that way. And you must have found it, but the paperwork on this -- the briefing was in Docket 7143, and it starts at paragraph 302.

THE COURT: Right. Thank you.

MR. BENNETT: Okay. Second question that your Honor -- well, before we get to the second question, there is one thing I did not mention in connection with the business considerations that might be relevant to your Honor in the discrimination analysis, and that is is that prefiling -- I think this was also in the eligibility hearing record -- employees did have salary cuts -- had pay cuts and other changes to work rules, so in some sense their contributions is not just measured by the pension changes but other aspects of their relationship as well.

With respect to fair and equitable, first of all, your Honor is absolutely right that in the Chapter 11 context it's got the ordering provision effectively. Where the money runs out is where the distributions stop. And I will point out to your Honor that in our plan we do that as well. We do have a class of subordinated claims, and there is no distribution there, so at least to the extent that it can be applicable to a Chapter 9 case, we've complied with it. With

respect to the --

THE COURT: But is that the end of the analysis?

MR. BENNETT: The cases add basically -- in my view, they say and we really mean it when we said best interest because they basically apply in the fair and equitable standard the reasonable expectations approach, which is why I said when I started that section that I'm going to say best interest, but it is a fair and equitable consideration as well. And, you know, that, of course -- it doesn't really connect up with things that we think of as the fair and equitable rule --

THE COURT: Right.

MR. BENNETT: -- accomplishing in a Chapter 11 case, but I suppose it's a substitute for the discipline that comes from a plan that wipes out equity. I can't -- I don't really have another explanation for it, but it does not seem to have a distinct meaning from the best interest test at least as we've dealt with it in this case.

THE COURT: And yet I was looking at one of the City of Avon Park decisions by the Supreme Court that dealt with the 943(b)(3) fee issue, which we will get to --

MR. BENNETT: Um-hmm.

THE COURT: -- which goes on at great length about the fundamental duty of the Court to assure that the plan is fair and equitable and does not marginalize it at all in the

way, you know, that just sort of linking it up with best interest of creditors does.

MR. BENNETT: Your Honor, I've read as many cases as I can possibly read on this, and I don't find anything different substantively than what is -- that was already embodied in best interest. I do understand that the Code says that it's supposed to be fair -- not discriminate and fair and equitable. That's still part of -- that is still part of the standard, and as I said before, we have complied with it to the extent that we --

THE COURT: No. The law doesn't like redundancy in statutes, doesn't like to interpret them as redundant.

MR. BENNETT: Well, it is defensible. We don't actually know whether best interest expanded to duplicate fair and equitable or fair and equitable bothered because you could decide if you were seeking to rationalize this in a defensible way and clean up what may be some ambiguity that doesn't belong is you could find that the best interest test is really about the -- is really about the comparison to nonbankruptcy alternatives, and the fair and equitable is really about reasonable expectations. And, in fact, that does fit nicely with the differences between the tests in the non-Chapter 9 environment, but you would not find it's --

THE COURT: But reasonable expectation of what?

MR. BENNETT: Creditors.

THE COURT: Right, but reasonable expectation of creditors regarding what? What they could get outside of bankruptcy or what they should be able to get inside of bankruptcy?

MR. BENNETT: I think it's -- I think it is measured with respect to what they can get outside of bankruptcy as every creditor's rights ultimately are, but I think it has something to do --

THE COURT: Well, but that's the best interest test. That doesn't feel like a fair and equitable test.

MR. BENNETT: I can't help.

THE COURT: Thanks.

MR. BENNETT: Can't help.

THE COURT: Well, I'm --

MR. BENNETT: I was in law school when they wrote this.

THE COURT: You know, the judge in me wants to try to rationalize all of this and doesn't like, you know, the fact that Congress very explicitly decided which pieces of Chapter 11 were going to go into Chapter 9, and I have to assume that these tests are intended to have different meanings and different effects and different --

MR. BENNETT: Well, remember, it does. I mean because we have the -- because we have publicly issued securities, because we have the possibility of penalty

claims -- we actually do have a hierarchy as to which the fair and equitable test applies in this case, no question.

THE COURT: In this case, and there could be a circumstance where we have senior debt --

MR. BENNETT: Exactly.

THE COURT: -- and all of that, but -- and I get that, but it's hard to rationalize this decision in Avon Park with that.

MR. BENNETT: I understand that.

THE COURT: Okay.

MR. BENNETT: Okay. The next topic -- and I don't think this has to deter us very long -- is the issue of whether the plan was proposed in good faith. I think there's been ample evidence that the city's intent in going through this process has been to restructure its indebtedness and, frankly, revitalize this municipality through improving services and overcoming years of deferred investment. That's exactly what these Chapter 9 cases are supposed to be about. This is exactly the relief Detroit needed, and it's gone about it, I think, in the right way. The plan as well -- the actual details and terms and conditions of the plan were also proposed in good faith. We've now been through eight iterations adding increasing amounts of compromise every step of the way.

THE COURT: Yeah. There's another test that's hard

to define without overlapping everything else.

MR. BENNETT: There's no question that it is, and it gives objectors lots of things to talk about, but we definitely believe that we meet the test, and we meet the test through, frankly, the conduct that your Honor has observed from the very beginning.

Before I get to feasibility, which is going to be my last topic, I have a few additional topics that I need to cover, some of which picks up the questions that your Honor asked about, and the first one is exit financing. A couple of different things about exit financing. First of all, 364 is not applicable to exit financing. There's actually a series of cases that say that, and I can give you the cites for them. It also makes sense because the exit facility, of course, is not borrowed until the effective date when the Chapter 9 case is effectively over, and all of the obligations that go after that are after that, after the city is long out of its Chapter 9 case. There are --

THE COURT: Is that point in your brief somewhere?

MR. BENNETT: That point I don't think is in my brief anywhere, so --

THE COURT: Then give me your best case.

MR. BENNETT: One second. Okay. The best case is _In re. Hickey Properties, Ltd._, 181 Bankruptcy Reports 173, Bankruptcy District Vermont, 1995.

THE COURT: Okay. So if 364 doesn't apply, what is the standard for approval if you are, indeed, requesting approval?

MR. BENNETT: We are, indeed, requesting approval. As is conventional, of course, in Chapter 11 cases, the exit facility lender is requesting approval of a number of different things, and so I went through the statute, and so let me explain the several places where I think this fits and show you that we think the record is covered.

THE COURT: Okay.

MR. BENNETT: First of all, 1123(a)(5), which, of course, is incorporated, requires that the plan provide adequate means for implementation, including, open paren J, issuance of securities of the debtor for any appropriate purpose. The exit facility, of course, is going to ultimately be public. We regard that as arguably securities of the debtor, and so it is appropriate for this Court to enter an order that the purpose of the exit financing is appropriate, the uses are shown in the projections, there's been ample testimony about them, there are no inappropriate uses of the exit facility.

Section 1123(b) permits the plan to include any other provision not inconsistent with the applicable provisions of this title. We're actually going to come back to this provision in a different context later. The plan

provides for the exit facility, so a finding that it is appropriate and not inconsistent with the applicable provisions of Title 11 is an appropriate thing to ask for, and we think it's true.

Section 943(b)(3), which we're going to come to in a minute, deals with the fee question. There are fees and reimbursements to Barclays. There has been testimony -- and I'll put up a demonstrative of it in a second -- showing that the fees that are proposed to be paid to Barclays and the expense reimbursement was on the low end of the different proposals. It was one of the reasons Mr. Buckfire testified that the Barclays proposal was the one that should be accepted by the city so we think a determination that the fee and expense payments are reasonable.

943(b)(4) requires the Court find the debtor is not prohibited by law from taking any action necessary to carry out the plan, so we're asking for a provision that fits within that as well. By the way, this is authorized as LTGO debt because it's basically the pocket it's going to fit in in a post-reorganization world.

943(b)(6) requires the Court find that any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained or such provision is expressly conditioned on such approval. Here Mr. Buckfire testified

that the city council approval, Michigan Finance Authority approval, and Emergency Loan Board approval had all been obtained. These are regulatory approvals, so we think that that's an appropriate request. And, in addition, again, as is customary, the lender has requested as a condition to financing or to funding findings that it acted in good faith, that the terms are reasonable, not subject to attack in a later bankruptcy, as an avoidable transfer or obligation. By the way, that one is really easy. This is a loan, so you can pledge collateral for a loan without it ever being a fraudulent transfer. It's not a preference. And, finally, that the obligations are legal, valid, and binding, and, again, I mentioned that this is a -- covered by the UTGO pocket for purposes of --

THE COURT: Earlier you said LTGO.

MR. BENNETT: I'm sorry. LT. I misspoke. LTGO pocket. And so it does fit within the relevant statutory scheme. Two points. Two more points. One, what does first budget obligation mean or first budget item? I think your Honor asked a question about that.

THE COURT: Okay. Before you go there, I have one last question on the exit financing. Section 364 for this kind of financing requires the Court to find that unsecured credit was not available. I take it it's your position that that finding is not necessary in this circumstance.

MR. BENNETT: That's absolutely correct, your Honor. We don't think it's necessary, and in a minute I'll show you a demonstrative actually in one of the exhibits to clear up some ambiguity about what we thought about costs and what have you.

THE COURT: Okay.

MR. BENNETT: I'll get there in a second. I did want to talk about the first budget item. What does it mean? The reason the language becomes relevant for the exit facility is not because we put it there but because it's an attribute of LTGO financing. This is a statutory point, and what it means as a matter of applicable nonbankruptcy law turns out not to be clear at all. There has been never a case that has been ever decided on this point, and, as your Honor probably figured out, this first budget item language is used elsewhere referring generally to things like police protection, fire protection, and I assume in the Ebola age public health protection, so we can't offer you any additional content to the meaning of this, but it is not something that we're --

THE COURT: My question on first budget was in the context of B notes.

MR. BENNETT: Okay.

THE COURT: Are B notes first budget items, too?

MR. BENNETT: They're also issued under the same

LTGO-type pocket.

THE COURT: So how many first budget items can a city have?

MR. BENNETT: It already had a bunch when you include the police and the fire and public health and all of such things. Your Honor, I regard that as -- I'm going to go back to the eligibility hearing where I talked about this problem, which is actually not a Michigan law problem. This is pervasive in municipal law generally. What seems to happen is that an interest group or a governmental unit aided by an interest group wants to create some form of financing or wants to create -- protect some form of constituent, and one guy over there says, "Oh, I want a constitutional amendment that says you can't impair. The other guy says, "I got a better idea. I want a pledge." And the other guy says, "Oh, I got an even better idea. I want a first budget item," but these happen. This one happens in January. That one happens in March. The next one happens in September, and no one ever considers them together, and they get rolled in. And so a very, very --

THE COURT: No one ever thinks about what they mean in the context of a bankruptcy?

MR. BENNETT: They don't -- well, forget -- certainly that. They don't ever reflect on what they mean in competition with each other.

THE COURT: Um-hmm.

MR. BENNETT: And this to me is a very, very good reason why, open paren one, we have Chapter 9 and, open paren two, why Chapter 9 must preempt all of this. Now, that's not the issue when we go forward from here. When we go forward from here, we assume and believe that the -- all of the debts that are created -- that are obligations of the city post-reorganization, post the plan of adjustment are going to be paid and they're going to be paid when due, and we're not coming back for Chapter 18. And in that context, hopefully, none of this will ultimately have any significance, but the --

THE COURT: Is the city's obligation to fund the pension UAAL also a first budget item?

MR. BENNETT: Well, actually, it doesn't seem to be covered by that particular rubric, but it's the second half of the constitutional protection that says you're supposed to do full funding, so do I have any idea what it means to collide between a first budget item and a full funding? No, I don't have any idea. I think -- I hope we never get there, and I hope similar questions don't come up with very many municipalities, but I know how it happens, and it is not a great state of affairs from the perspective of insolvency lawyers who want to achieve out-of-court deals.

Back to the issue of the collateral, last time we

used the projector, I think, is to take a quick look at Exhibit 642, which is in evidence, and I've asked Mr. Ferry to take -- to give us one column from page 12 and one column from page 9 to make this very easy, and this is a comparison of the Barclays proposals. And, your Honor, the one thing I want to draw out of this is the differences in price, and, as you'll see if you zero into the pricing box, the pricing boxes on both pages -- they're more or less next to each other -- the differences are in the ballpark of 200 basis points, which is not insignificant. The other point that --

THE COURT: Well, I remember this, but I also remember very different testimony from Mr. Buckfire.

MR. BENNETT: I remember that as well, and he was very optimistic about how this might close up, but at the end of the day it didn't close up. These are the -- this is the last unsecured proposal that the city actually obtained.

THE COURT: Well, but his testimony was after this.

MR. BENNETT: No. I know his testimony was after it, but it was a projection of how he thought that the market would be more -- prove to be ultimately more receptive.

THE COURT: Well, but he's your expert.

MR. BENNETT: I understand that, your Honor. We do think that the secured financing that's been arranged is the best opportunity for the city for exit financing and that it ought to be approved. I will point out one other thing,

which is that the unsecured alternative was going to include restrictions as well and coverage tests and other things that would govern future financing and affect the city's flexibility, so it's not -- it is not true that secured means --

THE COURT: Well, but Mr. Buckfire didn't testify to that.

MR. BENNETT: I don't think they got far enough in fleshing out the specific terms and conditions, but I've done this long enough --

THE COURT: Well, I have to go by the record; right?

MR. BENNETT: You do, and this is in the record as well. So with that on the financing, we urge that your Honor approve it, and the provisions that will be included in the proposed confirmation order are, of course, you know, things the city wants to do but, more importantly, they're things that Barclays is insisting on.

THE COURT: Well, let me just ask you this question in the alternative. If the Court does conclude that Section 364 applies here, contrary to your position, and, therefore, has to find that unsecured financing is not available, what does the case law say about the circumstance where the unsecured financing is more expensive than the secured financing? Do you know?

MR. BENNETT: I don't know what the cases say in

that context.

THE COURT: All right.

MR. BENNETT: I would hope they take into consideration the difference. I now want to turn to the issue of releases, and this applies actually to several aspects of the plan. We just saw one in the 1983 context. It most prominently applies to the state settlement and the releases to be running to the state. And we briefed this extensively, and we took the Court through the list of factors that really come from the Dow case, but before -- I mean I'm not going to repeat that. I want to add an overlay that I think is important that we do mention in our brief, but I think it bears the most emphasis. Bankruptcy Code Section 524(e), which is the provision that prohibits third-party releases in every other chapter of the Bankruptcy Code, does not apply to Chapter 9, and, moreover, that doesn't look like an accident because 524(a)(2), which is on the page or two before, is incorporated, so it's not as if people skipped over the section without thinking carefully what was in and what was out. Clearly there was examination of 524, and (e) was explicitly left out. And it is 524(e) which many courts mention it, many don't, that is the provision that would cause a plan that had a third-party release to offend 1129 -- excuse me -- 1123(b), which is provisions inconsistent with this title, and it would -- obviously it could cause, if it

was incorporated into Chapter 9, violation of the 943 provision that keys off of violating provisions of the chapter. And, in addition, it is that same 524(e) that has frequently prevented courts from using Section 105 to extend injunctions to third parties where they need to, so the first point of --

THE COURT: For whatever it's worth to you, probably nothing in light of Dow, I actually never thought that Section 524(e) had anything to do with third-party releases --

MR. BENNETT: Okay.

THE COURT: -- because it talks about the discharge not affecting the liability of another person, but I think we're long since past that.

MR. BENNETT: Okay. In any event, the -- what I think that observation does is basically, first, clear the field in terms of whether Chapter 9 has anything in it that prohibits third-party releases, but I would also submit that there's another aspect of Chapter 9 that suggests that we're supposed to be looking at things a little more broadly because -- and, by the way, there's the same -- there's the same kind of thing in Chapter 13 with respect to co-debtors in certain circumstances. In Chapter 9 we have 922(a)(1), which is the provision that applies the automatic stay to officers and inhabitants, so, in addition to there being

the -- what looks like conscious exclusion of a provision that might get in the way of third-party releases and make them extraordinary under something like the Dow standard, we actually have a signal that in Chapter 9 there's a little bit broader thinking about which kinds of entities ought to be protected as a result of the Chapter 9 case. And with respect to at least the state settlement, the state is providing quite a bit of money that gets distributed to all pensioners on account of claims that pensioners might have, may have been threatened against the state, and it is perfectly reasonable within the contemplation of the test even without the observations just made here, but particularly in light of the observations made here, it is an appropriate provision in a plan in this case. I would also say that for the very same reasons, to the extent that the pension funds, which are really just city property on a way station on the way to pensioners, that the fact that they are protected by the plan injunction is also eminently reasonable and appropriate, and it seems like the other -- the kind of situation that might have been contemplated when 524(e) was excluded from application to Chapter 9.

Next topic, disclosure and reasonableness of payments, really fees. I want to start with the facts of the case because they're important, too. I think all the things that I mentioned at the beginning are quite relevant when

considering reasonableness of fees in the case and in a slightly different order. We are on the verge of confirming a plan that in many senses was regarded by many people as pretty radical when it was first proposed, and it is a -- was then and still is a comprehensive effort to solve some really bad problems, and it really did -- really does create new precedents in the field of Chapter 9 and uses the law in the way it was intended but a way it hasn't been used before. That it's largely consensual is great, but it certainly didn't start out that way, and it is the -- because it didn't start out that way for the most part that the case did cost a lot of money. And it was done in record time. You know, that's actually significant because we did some looking at professional fees in cases that were more or less the same size as the City of Detroit case, and while you can find some that were less like GM and Chrysler that are bigger, but because they were done so quickly, as a matter of weeks, they came in lower, although still, you know, a huge amount of money, the cases that are about this size that ran normal course through Chapter 11 are all more expensive, much more expensive than this case has been.

From the perspective of a person who's spent a fair amount of time at the podium in this case, I have some other observations that are important. You know, at virtually one point or another every major creditor constituency was here

asserting a litigation position.  I mentioned the swaps as an
exception but Syncora taking their place.  It was the
retirees in eligibility, COPs in many contexts, the UTGO and
LTGO in their adversary proceedings, the DWSD debt in the
confirmation hearing, counties in opposition to the plan, the
36th Court District, the library employees.  In almost every
case and certainly in every matter I handled personally here,
there were multiple parties, each of which had a big budget
and using it opposing the city, so, again, for examples as to
which I and you have personal knowledge, in the UTGO and LTGO
litigation, I think we had three pairs of law firms on the
other side.  In the DWSD debt litigation, which didn't
actually make it into open court, but we had that one
session, I think it was six against one or something like
that.  And this pattern continued over and over again even as
the confirmation hearing began.  I said to someone outside
that I had kind of gotten used to it, and I'm slightly
uncomfortable having all these people on my side of the room
for a change.  But are the city's professional fees going to
be high in a case like this?  Of course they are.  And
because they are high, are they unreasonable?  Of course they
are not.  It is a public case, though, and there is,
therefore a need that the costs of the case be disclosed and
vetted to make sure that there's no abuse, and from the very
beginning of this case, I think your Honor has adequately

addressed this need. And, of course, you have a fee examiner who is applying what he believes the 943(b)(3) standard is, and, frankly, it does appear he's applying it -- frankly, if there's a continuum between reasonableness testing under 943(b)(3) or the Chapter 11 analog and the allowance process under the Chapter 11, Chapter 7, other chapters of the bankruptcy law, he's somewhere in between and maybe even tilting toward -- more toward item-by-item review, which, of course, the cases say isn't what is required in the 943(b)(3) context. The plan has a provision requiring that the fee examiner process continue even after the end of the case to deal with fees that have been accrued but not yet been the subject of invoices.

THE COURT: What's the end of the case?

MR. BENNETT: We're hoping -- I don't know if I'm speaking out of school, but we're hoping before Thanksgiving for an effective date. That, of course, depends upon exactly when your Honor rules and --

THE COURT: That was really my question. Is the end of the case defined as the effective date?

MR. BENNETT: I don't remember how it's defined, and I don't think the -- I don't think anyone has a stake in when it's defined. I'm perfectly comfortable defining it as of the effective date. I'm not intending for anything to be left out.

THE COURT: So the city's position is that 943(b)(3) would require the Court to review fees incurred through the effective date?

MR. BENNETT: I think it's -- I'm prepared to stipulate that that's what it should be -- how it should be determined because technically the case is still open. So, in any event, the -- so we think that that process is working. The emergency manager's office, which has retained the responsibility for the Chapter 11 case, is committed to review all fee and expense requests and make sure that they are satisfied that they are reasonable. There is no feasibility question related to the fees. There has been a -- they've been budgeted from the beginning, adjustments made where adjustments were deemed necessary as a result of what actually happened on the ground, and, lastly, there is a provision in the plan to create an appropriate reserve in order to see that these items are paid. These arrangements satisfy the requirements of 943(b)(3), and I think your Honor is in a position, therefore, to make a ruling that there's no obstacle to confirmation because some fees have not yet worked their way completely through the system. Last topic.

THE COURT: Well, you cited a case to me, which I can get for you, but I'm sure you're aware of it, that said that as long as the plan or the order confirming the plan creates a process for review of the fee post-confirmation,

which in a case like this turns out to be necessary anyway because there are going to be post-confirmation fees, that satisfies 943(b)(3). Yes?

MR. BENNETT: Absolutely correct, yes.

THE COURT: So you have no objection to that here?

MR. BENNETT: No.

THE COURT: In fact, you support that. Okay.

MR. BENNETT: Correct.

THE COURT: Here's my problem with giving conclusive weight to the reasonableness determinations by the fee examiner. His review of fees, as you have pointed out, is based strictly on the information that was provided to him by the professionals. Is that fair to say?

MR. BENNETT: I don't think that's fair to say. My impression is is that he's aware of what's going on in this case and is aware of what the docket is in this case, and I --

THE COURT: Okay. And that's a fair qualification on what I said, but where I was going was in the context of what happened in mediation, confidentiality would prohibit him from knowing any of that. Yes?

MR. BENNETT: That is true. He certainly knows how many mediation sessions there were, and someone counted I think 150.

THE COURT: Really?

MR. BENNETT: No kidding. There were some -- I mean it may be that they counted some multiple --

THE COURT: All right.

MR. BENNETT: -- tracks as multiple sessions, but I did see that number. He certainly understood that that was going on, and he certainly understands, you know, how many people were at which one and each one.

THE COURT: But not to say this happened, but if, for example, one party or another unreasonably extended the mediation, wouldn't that have a potential impact on reasonableness of fees?

MR. BENNETT: I suppose in a perfect world it would. I don't quite know how to adjudicate that, and I agree with you that it's unlikely that the fee examiner would have found out about that, but I do agree that --

THE COURT: I don't want to say that happened because I don't know. Unfortunately, I am subject to mediation confidentiality, meaning I've excluded myself. So what I'm thinking about is after the plan becomes effective because I don't want you all to have to worry about fees in the meantime, referring this back to Judge Rosen for mediation to see if everyone can agree upon what reasonable fees are and then if not engage in some kind of litigation process.

MR. BENNETT: I certainly don't have any problem

with trying to iron out whatever difficulties there might be in mediation before a litigation process. I think a litigation process over fees at the end of this case would be a very unfortunate result, particularly in light of the overall economic success of this enterprise.

THE COURT: Now, of course, I have to say on the record here that no one should interpret the conversation that we are having here as any indication that the Court will actually confirm the plan.

MR. BENNETT: Okay. I'm aware of that.

THE COURT: Yet to be decided.

MR. BENNETT: On feasibility -- and I think this is the last topic I have to cover -- as recognized, I think, by your Honor, by the Court's expert, and by I think everyone in the courtroom, the feasibility test is a prediction about the future. Cases recognize that predictions about the future are probabilistic determinations. They're not certainties. And it's about demonstrating -- in my words, slightly different than the Court's expert's words, it's demonstrating that a successful rehabilitation of the city is more likely than not. In a case like the city's where we began with service insolvency in a downward spiral, the test has to have two basic dimensions. The first, which is the most common and the one we expect, which is is it likely that the city will be able to perform its adjusted obligations, and the

second is is it likely that the city will successfully rehabilitate itself and ultimately provide adequate services to its residents. You need both. The city, your Honor, has demonstrated that the plan is feasible on the first test. The basic evidence of the city's ability to meet its adjusted obligations is its projections. You've heard testimony from many sources that the projections were reasonably prepared or based upon reasonable assumptions and are arithmetically correct. The most important witnesses in that area are Mr. Malhotra and Ms. Kopacz. The projections show that the city can meet its adjusted obligations based upon assumptions that may be conservative in some areas. What I'm referring to is some of the revenue projections were described to your Honor as conservative. But just as Mayor Duggan said, there are some risks he signed up for when he ran for mayor, and there are some risks that every city must deal with whether it likes it or not. Most prominent in this category, of course, was another shock to the macro economy along the lines of the great recession. It would be a really bad thing if that happened later this year or next.

I'll incorporate here and not say it again what I said about skinniness, that the fact that the deals that were reached with creditors had the result of leaving the city with just about enough to accomplish its principal objectives through reinvestment and service improvement but did not

create an overwhelming margin is the result you should exactly expect from a largely consensual plan. That's how they come out. Every side tries for as much as they can get and leaves for the other side only what is perceived they need. No one gets extra.

THE COURT: What would you, after sitting through the trial, say are the top two or three risks to feasibility that are within the city's control, not the possibility of recession or calamity?

MR. BENNETT: Okay. I think Mr. -- you asked the question of Mr. Malhotra. I thought he gave a good answer about the ones, but he focused on ones that are outside its control. I think within its control everyone recognizes that there has to be flexibility in implementing the RRIs going forward and that it's impossible sitting here in -- sitting here in 2014 to decide exactly how monies to be appropriated in like 2018 or --

THE COURT: Right.

MR. BENNETT: -- 2019 should be spent. And by the way, it's -- I know that your Honor -- I certainly have confidence in Mayor Duggan and his administration, all the people he's brought on board. It's a very impressive group. We don't know how long they're going to stay, and so we have to make guesses about who will be there in the future. And so I would say the most important, you know, risks that are

controllable are the risks of sticking with the plan and making -- using the money -- you know, huge amount of budget surpluses that are projected and earmarked, and the only reason they're justifiable is they're earmarked for critical investments in critical areas to summarize it as succinctly as I possibly can. And to the extent that they're redeployed or adjusted in any way, it's got to stay for that, use for critical purposes in critical areas, which may evolve over time to a degree, but what we don't need is the use of that money for other purposes that someone might decide is politically more expedient.

THE COURT: Such as?

MR. BENNETT: Who knows? I used the example at the eligibility hearing about gold-plated faucets in the executive washrooms. I don't want to draw exactly where the line is and put one thing on the other. I think we know what wasteful spending that does not advance the ball for the city looks like that all of us can come up with examples. There is, though -- I mean I heard and your Honor heard the fight over whether -- opening parks before there were settlements. There was a fight over is parks on the list of things that are essential, so essential that they belonged in the RRIs, and you saw there was a debate about that. Frankly, that there was is incredibly healthy as opposed to that there not be a debate about something like that, and very clearly at

the end of the day the decision was made, yes, parks matter.
It's about quality of life in the city.  It is, as I have
defined it, back to the department store analogy, yes, people
care about whether there's a park around the corner.  I did
when I bought a house and had young children.  It matters
less now, but it is a -- so I don't know that we're ever
going to be able to define the categories of permissible RRI
expenditures, particularly as you go out, or permissible
substitutes.  I will say they're something that the city
shouldn't ever let happen again, and I think all of us will
agree on them.  The deferral of expenditures on management
information systems cannot happen again.  The extent to which
that creates costs and ripples through the rest of the fabric
can't be overstated.  I've been closer to it than your Honor,
but it is a huge problem, and series of costs upon costs upon
costs were created because that was allowed to occur.  And
deferring capital projects generally because capital projects
maybe don't create votes right away and are, you know, longer
term benefit, that, again, at some point the costs come
cascading upon you.  They have certainly cascaded upon the
city, and that's what drives the 1.7 billion number to be as
big as it is.

          I don't know what other advice to give, but I do say
that the worst thing that could possibly happen for the
city -- and I don't know that it would get another chance --

is if the $1.7 billion is misused or perceived to be misused. Either would be an enormous problem.

THE COURT: What can we do to assure, as best we can, that the city sticks to its commitments over the next ten, twenty, thirty, forty years in regard to pension funding?

MR. BENNETT: I think -- I actually think I gave you that answer in response to another question, which is that it has to be on the represented employee's agenda to assure appropriate funding. They are the only people at the end of the day who are going to be -- not the only, but they're going to be an important player in this. I think all of the --

THE COURT: Well, what role could the Financial Review Commission play on this specific question?

MR. BENNETT: The Financial Review Commission, frankly, is going to play a role on all of these questions because I think the Financial Review Commission is going to understand -- and if they read the transcript, for whatever it's worth, they'll hear my view about it -- that the proper use of the 1.7 billion, the proper deployment of that has got to be an incredibly high priority. Also, not allowing the pension situation to get out of hand again has got to be an incredible priority given the amount of work it took to put it back together and get it on a decent path, but I will say,

in addition to the Financial Review Commission -- and I believe that this is a national point, not just a local point -- the labor organizations have to put pension funding high on their bargaining list, and then it'll happen. I'm not saying they won't have to give up other things for it, but it'll happen if it's high on labor's bargaining list.

Moving on, so I am not surprised that it's skinny. I don't think we have any expectations that would be any different. I think the expert's views that, yes, it may be skinny, but more likely than not the city can perform its obligations under the plan is the right answer. The city's professionals get to the same place as well. They've so testified.

The second part of the test is about whether the city will be able to deliver adequate services, and your Honor advertently or inadvertently managed to create a system where that got tested effectively three times. So, first, when Conway & MacKenzie did the initial buildup supervised by Mr. Orr -- and a lot of other people had input as well -- you got the first draft effectively or the first version of the RRRs. You know from the testimony that the mayor got involved a little bit at the beginning, but then when your Honor transmitted through us to the mayor that he was going to have to testify concerning the viability of the plan, he did what you would exactly expect him to do. He went to each

and every department, made them look at the RRRs again because they'd all seen them as part of the process of building them and made them say in writing --

THE COURT: That's RRI?

MR. BENNETT: Sorry. Sorry. RRIs again and made each and every one of them write a memo and put it in writing, and all those memos are in evidence. And they had different kinds of reservations about different things, but the sum and substance of all of them are, yes, there's enough money to cover the things that we need to cover here, and, yes, we can bring our services up to a much better level if we have this money. By the way, interestingly, there was some evidence that at the end of the day even with the RRRs there will be progress but maybe not get all the way to the finish line, and I know that sticking in my mind is the fire commissioner's testimony where he basically said that the -- that his RRIs and the budget improvements that he was going to get were going to get him most of the way there or going to get him a long distance to it, but he didn't think it would get him where he really wanted to be, and that, unfortunately, may be true, but I'm not quite sure how it would be possible to get any more in light of the circumstances of this case and, again, the overall economic results. At any rate, that was the second test.

And then when your Honor engaged its own expert, the

Court's own expert, Ms. Kopacz, she did a separate review certainly relying on the two previously mentioned sources and came to the similar conclusion that the RRIs are going to work.

Now, that's the objective review. The next part is a little bit more subjective, which is looking forward to see about implementation, which was the subject of our discussion a few minutes ago, and, again, we don't know who's going to be here five years from now, but we know the team we have now, and through the efforts I think of Mr. Orr at the beginning and Mayor Duggan following, you have had a significant infusion of human talent into the city, and there are a number of examples. And by leaving someone out I don't mean to denigrate them in any way, but you heard from John Hill; Beth Niblock, the MIS person; Fire Commissioner Jenkins; Police Chief Craig. And I think you heard people who are -- understand their business, understand what really is going on in the City of Detroit and aren't misleading themselves about the challenges ahead. They understand what they are, and they seem and demonstrated in their testimony to be very equipped to deal with them.

So I think Mayor Duggan, of course -- I said this before -- recognizes that they're nowhere near done. You're only ten percent of the way there. But I think you saw commitment from the mayor. You saw commitment from the city

council president. You saw commitment from their staff, and I think you have seen ample evidence that you've got a good team. The city has a good team. The city has enough resources, and there is a likelihood that they will be able to address the problems of the city and improve conditions here. Again, it's just a reflection of reality that there is a need for some flexibility in how these things are going to be carried out. After all, things will not turn out as predicted, at least not in year 40.

I think that this is the right place to conclude. I said at the beginning that the city had already achieved some pretty impressive things and that it had a consensual plan. It really makes genuinely radical adjustments, ought to create vast improvement in the city, and did so in record time. It is for your Honor to take the next big step and confirm this plan and enable it go effective. I think I said before we ask that you rule as soon as possible because we would like to achieve an effective date before Thanksgiving if we possibly can. We know you have a lot of work to do.

The emergency manager and his professionals are keenly aware that we are leaving the city long before the hard work necessary to complete the recovery is done. We believe we have left adequate resources, a viable financial structure, and a good plan in place. We are confident that Mayor Duggan, the city council, city management, city

employees are up to this task. It's their turn now, and we
wish them well.

One last point. This is probably not the last time
I will have to speak. I may have to reply to some things
later, but I expect to be rushed, which I have been before in
those circumstances, and so I have one more important piece
of business to attend to. It is certainly true that many
people on my side of the courtroom and others not here have
worked very hard to get here today, and I include the
mediators in that. They're obviously, you know, not here
either. But I'm also reasonably sure that your Honor and
your staff, the court staff more generally, including the
marshals, have worked at least as hard as we have and
sometimes harder. On behalf of the city and the emergency
manager and its professionals, we acknowledge your
contribution to this great effort and to this great city, and
we thank you. We also appreciate the hospitality of the
usual occupants of this building and apologize for making
noise in the halls and any other inconvenience we may have
caused.

For myself, I just want to say I will come back to
Detroit as a tourist. In all the time I've been here, I
haven't yet had the chance to visit the Detroit Institute of
Arts. I'm not in a rush. I understand the DIA will be here
for a long time. Happy to answer any questions.

THE COURT: Well, you are welcome, and on behalf of the occupants of the building, we accept your apology.

MR. BENNETT: Thank you.

THE COURT: Before we proceed, Mr. Cullen, Mr. Orr, if the plan is confirmed, what can you tell me about when you foresee the effective date?

MR. ORR: Your Honor, I would like to consult, but the reason we say before Thanksgiving, as your Honor is aware, a lot of the financial community and capital markets start to spread apart from the Thanksgiving to the New Year's holidays, so we're trying to focus on a date before Thanksgiving, and that is why. Probably at least a few days before that week would be helpful so that --

THE COURT: Okay.

MR. ORR: -- we can do some of the financings.

THE COURT: Okay.

MR. ORR: Thank you, your Honor.

THE COURT: All right. Who'd like to address the Court next?

MR. HOWELL: Good afternoon, your Honor. Seven G. Howell, Dickinson Wright, special assistant attorney general appearing on behalf of the State of Michigan. Your Honor, with me today are Matthew Schneider, chief legal counsel to Attorney General Bill Schuette, and also in the courtroom is Representative John Walsh, speaker pro tem of the House, and

the co-chair of the ad hoc committee for Detroit's recovery. I will try to be considerably briefer than Mr. --

THE COURT: Before you proceed, would you identify yourselves by either standing or raising your hands? Welcome, gentlemen.

MR. HOWELL: I will be much briefer than Mr. Bennett. I assure you of that, your Honor.

THE COURT: Okay.

CLOSING ARGUMENT

MR. HOWELL: Your Honor, the state agrees with Mr. Bennett's argument that the city has met its burden of establishing that the plan satisfies the requirements of Sections 1129 and 943 of the Bankruptcy Code and should be confirmed. Particularly, the state has reviewed the plan and believes that nothing in state law would prevent it from being carried out and carried out successfully. The state's role in the case, however, is not to wade into the thick of every one of the legal issues that must be decided by this Court to reach that conclusion. The state's role has been to provide assistance in the effort to restructure and adjust the city's debt in this Chapter 9 case so that the city may succeed and one day flourish again.

As the Court recognized in its eligibility opinion, the city had been facing financial and operational struggles for years prior to the filing of this Chapter 9. In 2011 the

governor appointed a financial review team for the city. Financial review team ultimately made a finding of severe financial distress, and, as a result, a financial stability agreement was entered into known as the consent agreement. When the city was unable to meet the requirements of the consent agreement, a second review team was appointed and found that a local government financial emergency existed. Based upon that finding, the governor appointed Kevyn Orr as emergency manager. Enormous amount of time, effort was put into an attempt to address the challenges of the city before any filing of bankruptcy. When those efforts proved unsuccessful, the emergency manager recommended to the governor the city be authorized to file for Chapter 9 protection. Governor Snyder accepted the recommendation and authorized the filing of the Chapter 9 petition. In that authorization, he said the only feasible path to ensuring the city will be able to meet obligations in the future is to have a successful restructuring via the bankruptcy process that recognizes the fundamental importance of ensuring the city can meet its basic obligations to its citizens. The Court similarly noted in the eligibility opinion that, quote, "in seeking Chapter 9 relief, the City not only reorganizes its debt and enhances City services, but it creates an opportunity for investments in the revitalization efforts for the good of the residents of Detroit." Although the filing

of Chapter 9 has not been popular, there's no question it was the right thing to do. And now with the case at the confirmation stage, the path to the successful future of the city has been charted. We ask that you look at the progress made since the eligibility stage. What is encouraging at this point of the case is that the overwhelming majority of those who were objectors are now supporters, and we have begun to see the improvements that have resulted from the filing and the hard work of all concerned. In its eligibility opinion, the Court found the city's service delivery insolvency to be, quote, "strikingly disturbing," close quote, but in this confirmation hearing, many of the city's witnesses have since testified to the strides the city has made in improving services to its residents.

Chief Craig testified that the crime rate has dropped. The police response time improved from 58 minutes to 21 minutes, and the clearance rate for homicides has been improved from 11 percent to 72 percent. Commissioner Jenkins testified that the fire department has now over 40 ambulances with 20 EMS units running daily on average when before it had only 4 working ambulances and that fire and EMS response times have improved. Mayor Duggan testified that blight is being attacked with the city auctioning and selling houses every day. Those houses that are beyond renovation and sale are being demolished at the rate of 200 per week. The

streetlights are coming on, the trash being picked up. But while the signs of the recovery are all around us, it is still a fragile recovery. It has, in part, depended upon the cash flow impact of the Chapter 9 filing and the quality of life financing made possible by the bankruptcy.

The continuation of this upward trajectory depends on confirming this plan, continuing to implement the reinvestment and revitalization initiatives, ensuring Detroit's neighborhoods and downtown core continue to see better services, and building upon the fiscal discipline implemented to date. While the witnesses' testimony about the improvements is encouraging, the city's service delivery still falls well below national averages, but make no mistake about it, the alternative to moving forward with the plan of adjustment would be disastrous. We cannot allow the city to revert and fall back into the downward spiral.

In reaching its decision whether to confirm the city's plan of adjustment, the Court must answer the question of whether the plan offers the better alternative for city's creditors, residents, retirees, and active employees. The city has presented the Court with evidence that the answer to this question is a resounding yes and that the alternatives outside of this Chapter 9 are not viable. As the Court in the Corcoran Irrigation District case stated, quote, "We must avoid replacing reality with fancy," such as suggesting that

the DIA land and building without the art are worth $200 million or that judgment levy taxes should be imposed on the city's residents when Ms. Sallee of E&Y testified that the city's property taxes are the highest in the state and the collection rate is just 50 percent or that the city could satisfy judgments through the issuance of judgment bonds that would result from the race to the courthouse that most assuredly would occur if this plan is not confirmed. The Court recognized in its eligibility opinion that the city was unable to satisfy its crippling debt prior to this Chapter 9 case, and unless the city is authorized to adjust its debts through confirmation of its plan, nothing will have changed financially since the Court issued that eligibility opinion in December of 2013. In fact, your Honor, the Court heard testimony from Mr. Malhotra and Mr. Hill that if the city's debts are not adjusted and the city is required to pay its existing debt service and legacy costs, the city would experience a deficit of $4 billion over the next ten-year period, and this is without any expenditures for the reinvestment initiatives that are so desperately needed to help the city avoid -- halt the city's downward spiral and restore to it financial and operational health.

This plan should also be confirmed because it represents a rare opportunity to leverage funds to which the city would not otherwise have access. State of Michigan has

agreed to contribute $194.8 million, which is the present value of 350 million, over 20 years to the two pension funds to mitigate the reductions in the pension benefits of the city's retirees, both uniform and nonuniform, that would otherwise have been necessary. As part of the grand bargain, the state contribution is combined with the generous contributions of the participating foundations and the DIA in an amount of at least 366 million and $100 million respectively, each payable over 20 years. If this plan is not confirmed, that rare opportunity will be lost.

There are, understandably, conditions to the state contribution, including the condition that holders of the pension claims release the state from specific claims whether or not such holders vote in favor of the plan. Although the state believes there's no legal merit to claims against the state by the holders of pension claims, the state sees real value to preventing even meritless lawsuits by holders of pension claims. At the same time, it would be untenable to ask the state to voluntarily contribute the cash equivalent of $350 million over 20 years and expect that the group of people benefitting from those funds would be permitted to sue the state afterward.

Your Honor, no one can question that unusual circumstances exist in this Chapter 9 case to justify the grant of the release requested. First, the foundation of

Chapter 9 is that governments, unlike companies, must
continue to exist and be able to provide the health, safety,
and welfare of their residents.  This is the largest Chapter
9 in the history of the United States involving a city that
is service delivery insolvent to the point that the health,
safety, and welfare of the people that live, work, and play
in Detroit was at risk.  The very real prospect of even more
significant cuts in pension benefits exist absent
confirmation.  These facts and circumstances that exist in
the City of Detroit's Chapter 9 case, among others, are
vastly different from and, therefore, warrant a different
approach from those applied in Chapter 11 mass tort cases and
securities class actions.  In this case, the release should
be granted because, first, the state is contributing
substantial funds to the pension systems for the benefit of
the parties from whom a release is sought.  Second, the
release is essential to confirmation of the plan, and, third,
the impacted classes have overwhelming voted to accept the
plan.

Your Honor, this plan will succeed because the
foundation of cooperation at its heart and its recognition of
the needs of the citizens of Detroit is the only way to begin
and continue rebuilding the city.  One great example of
cooperation is evidenced by the water and sewer deal.  After
over four decades of trying, there will now be a regional

water and sewer system and rebuilding the infrastructure that 40 percent of the state relies on, none more than the residents of the City of Detroit, has been made a priority. But it is easy to think of example after example of the new spirit of cooperation. There's the decision by the city council, the mayor, and the emergency manager to conclude this case in a cooperative way and find a governance compromise. There is the new legislation related to this bankruptcy whether involving pension structures or post-bankruptcy governance were resolved in a bipartisan manner and working across geographic and party lines during an election year. Mayor Duggan and Council President Brenda Jones traveled to Lansing and sat down with the legislative leaders and members of the governor's team to address concerns regarding the legislation. These discussions resulted in negotiated changes to the Michigan Financial Review Commission Act, which earned overwhelming legislative support along with the support of city officials, as evidenced in Mayor Duggan's trial testimony, but this Court does not have to simply hope cooperation will continue to make this plan work. You can have confidence that there are safeguards in place to help the city succeed. As Mr. Stibitz testified, there will be a Financial Review Commission in place to provide vital safeguards under the Michigan Financial Review Commission Act, including, among others,

meaningful reporting requirements, requirements for specific certifications that projections and balanced budgets are prepared and adhered to and that the terms of the plan are complied with and review and approval by the commission of the proposed issuance of debt by the city, contracts over a specified dollar amount, and collective bargaining agreements. There's the establishment of the chief financial officer position and the commission's involvement in the hiring, retention, and discharge of the CFO and the ability of the Financial Review Commission to act if the city fails to comply with the statute or the plan.

Your Honor, as these examples highlight, from the very beginning there has been an awareness of the importance of what this bankruptcy case is about, a certain weight and responsibility we all carry to get this right. We may never again have an opportunity to do something this important for our community. In fact, we may only get this one shot at it.

Your Honor, let me close by saying that this bankruptcy has presented an unprecedented opportunity and forum to exchange views, to debate the issues, consider the alternatives, and come to a consensus on a broad range of extremely difficult challenges by compromising for the greater good of the city, the metropolitan Detroit area, and the state. There have been a lot of painful decisions made by the parties involved in this case, none more than by the

pensioners, but those painful decisions are why we have a feeling of hope today for the City of Detroit. The spirit of compromise has been reflected in the bipartisan state legislation embodying the grand bargain, the tough decision by pensioners to support the plan of adjustment in large numbers, the cooperation among Mayor Duggan, the city council, and the emergency manager, between the city and the state with the support of the unions, the counties, and the mayor creditors in the case. As Mayor Duggan testified, quote, "There is a feeling of hope in the city. There is a feeling that something good is happening."

Your Honor, there is a new spirit of Detroit, a spirit of cooperation. With the confirmation of the city's plan of adjustment, this spirit will receive a very powerful boost. Even the creditors who fought the longest against this plan are now literally invested in its redevelopment and its success, but this new spirit of Detroit must be nurtured and built upon. Every one of us must embrace the spirit and remain committed to the revitalization of Detroit. If that is done, the future of Detroit and of Michigan will be bright.

Your Honor, this plan is in the best interest of creditors as well as the residents of the City of Detroit, the greater Detroit area, and the State of Michigan. The State of Michigan strongly supports the city's plan of

adjustment and respectfully requests that this Court confirm the plan as requested by the city.

Your Honor, before I finish, I, too, would like to commend the Court and the staff for the patience and hard work on behalf of the state and for all the parties in the case because there has truly been a spirit of cooperation and a feeling that this was a tough job but one that we all took very seriously. This Court did, the mediators did, the parties did, and the result reflects that. Thank you, your Honor. Appreciate your time.

THE COURT: You're welcome. And we will be in recess now, please, until 3:05.

THE CLERK: All rise. Court is in recess.

(Recess at 2:49 p.m., until 3:05 p.m.)

THE CLERK: All rise. Court is in session. Please be seated.

MR. MONTGOMERY: Good afternoon, your Honor.

THE COURT: Good afternoon. You may proceed, sir.

MR. MONTGOMERY: Thank you, your Honor. May I approach the bench with three copies of the presentation?

THE COURT: Sure.

MR. MONTGOMERY: We'll be putting them up electronically, but just in case.

THE COURT: Okay.

CLOSING ARGUMENT

MR. MONTGOMERY: Your Honor, Claude Montgomery, Dentons US, LLP, for the Retiree Committee. I rise today to support the city's eighth amended plan of adjustment. I propose to spend some time speaking to these issues, your Honor, today because I have known for some time that one cannot presume how your Honor will rule. In fact, your Honor has shown a remarkable ability to stick to the evidence no matter how uncomfortable or inconvenient it is for the parties who are presenting it, so I propose, if your Honor will permit, to walk through the case that we think actually supports the plan that the Retiree Committee endeavored to negotiate, endeavored to support, endeavored to solicit acceptances, and ultimately Classes 10, 11, and 12 voted in favor.

Now, your Honor, this municipal reorganization from our perspective was about two fundamental issues, which we will describe. We will try to tell you what it is that we said we would show. We will try to tell you what are the obligations to be addressed under the POA from our perspective, and then, most importantly, we will walk through the settlements that are to be approved by the Court from the Retiree Committee's perspective.

There is no doubt that this case was about offering the citizens of Detroit a financial path for economic and civic revitalization. There is also no doubt, unfortunately,

that it was all about shedding retiree debt that had been
accumulated over decades and that from a retiree perspective,
this municipal reorganization was trying to make the city and
state live up to its promises reflected in its Constitution,
its local ordinances, and the collective bargaining
agreements while at the same time endeavoring to participate
in the fabric of the city economic and its cultural life.  We
said we would show you in our opening statements that the
settlements were within the range of reasonable and not
unfair to retirees or to financial creditors.  We said we
would show you that the impact upon retirees was real and
that, in fact, the retirees were woven into the community.
The obligations to be addressed are, most importantly, the
defined benefit pension plan rights and obligations under
both the General Retirement System and the Police and Fire
Retirement System.  There are the annuity savings fund
obligations that exist only under the General Retirement
System.  There are, of course, healthcare, dental, and life
insurance benefits often referred to throughout the case as
OPEB or other post-employment benefits, and, finally, there
are death benefits provided pursuant to the terms of the
specific trust.

So the city gave you a chart of what the settlements
are.  Our view of those settlements is slightly different.
Of course, the official request comes only from the city, but

we would start with asking you to approve the global Retiree Committee settlement, which includes the pension settlement, which can be found at Docket 4391 at 168, and the three OPEB settlements, which can be found at Docket 4391 at 167. There are association settlements, first and foremost, the RDPFFA or the Retired Detroit Police and Fire Fighters Association settlement, which provides for a separate PFRS VEBA. There is the DRCEA or the Detroit Retired City Employees Association settlement, which provides for a catastrophic drug program under the GRS VEBA separately negotiated from the other settlements. There is an RDPMA, Retired Detroit Police Members Association, which provides for some temporary special governance rules and the police and fire VEBA, and then, of course, importantly, there is the Retirement Systems settlement which from the committee's perspective most importantly provides for a restoration mechanism, and then there are settlements which help retirees with the obligations that the plan proposes under the -- for the benefit of retirees, the UTGO settlement, which provides $31.7 million for income stabilization program. It was mandated by the state contribution agreement and is provided principally in funding to Class 11. There's, of course, the DIA, which is -- settlement, which is sometimes characterized as the foundation or the grand bargain itself, which provides 466 million over 20 years to Classes 10 and 11, and in the

first 10 years it goes 164 million to Class 10 and 45 million to Class 11. The state settlement itself, which is critical -- neither the DIA settlement nor the retiree settlement entered into by the committee could have been possible without the state settlement. It provides $195 million to Classes 10 and 11, and in -- it all coming in just after the effective date. Class 10 gets 96 million of it. Class 11 gets $98.8 million of it. In addition, it provides for an investment committee oversight, causes the release of claims. In fact, the state, as you heard Mr. Howell say, would not have put any money in, and, in fact, we, on behalf of the retirees, would not have accepted the settlement were the state not putting the money only in the pensions, which, of course, would have required the release. It also causes the relinquishment of pension clause challenges to the city eligibility and plan treatment, all of which are still pending. Then there's the Syncora settlement, which provides $11.3 million in new B notes to Class 12, and, importantly -- and I'll come back to this later -- as part of that settlement, there was start-up funding that the mediators helped bring to the Class 12 in order to achieve consent to the Syncora settlement. The FGIC settlement --

THE COURT: What's the source of that funding?

MR. MONTGOMERY: The source of that funding is threefold, your Honor. There are two foundations that are

putting in money, and what's called the employee benefits board, which is a separate trust, also called the rate stabilization board, is putting up $8 million to aid that process.

THE COURT: Does this exhibit that you have identified here, 790 --

MR. MONTGOMERY: Yes.

THE COURT: -- identify those sources and amounts?

MR. MONTGOMERY: It does, your Honor.

THE COURT: Okay.

MR. MONTGOMERY: It's a city exhibit. Now, we say that when you're trying -- when this Court is looking at the totality of whether or not to affirm the city's request for confirmation, good faith under 1129(a) and good faith under 943(b)(1) sort of overrides everything. We think understanding the city's transformation on the question of good faith and the manner in which it was applied is critical to understanding. Why do we say that? Because, as your Honor found at the outset of the case, the debtor did not negotiate with its creditors in good faith. You found that in the eligibility opinion. The lack of good faith on the part of the city was met with unforgiving -- and this is the only way to characterize it gently -- retiree and active employee hostility because of the city's effort to cut pensions.

We, on behalf of the retirees, said the city was ignoring explicit and specific protections provided under the Michigan Constitution. Your Honor is quite familiar with Article IX, Section 24, the pensions clause. The city took this approach at the beginning to cease all future funding for the pension plans. It was basically a defunding proposal. It offered what your Honor found to be a somewhat problematic offer for a pro rata portion of a $2 billion nonrecoursed interest only note with what we thought was an illusory upside with a strange Dutch auction feature, if your Honor will recall, that required the creditors to bid against themselves to actually get the cash. Not only did the city make that offer for pension promises, but that was the same -- excuse me -- it made it for the benefits on the healthcare side as well. It would have yielded to or resulted in massive pension cuts and in a complete elimination of healthcare obligations.

Now, what changed? Well, today the city has proposed to fund all of the downward adjusted benefits. That is very important. There could have been no deal with retirees without that promise, and how is that promise manifested? Well, in the eighth amended plan, it appears at pages 45 and 47. It appears for each of the two pension systems. After June 30, 2023, the city will contribute sufficient funds required to pay each holder of a pension

claim his or her adjusted pension amount in accordance with and as modified by the terms and conditions contained in the plan. Those ellipses refer to the GRS or the PFRS plans, your Honor.

It creates two VEBAs, another major change. Instead of simply walking away from obligations, it created a structure going forward, and under the plan there's $492.7 million of B notes, those first budget notes that your Honor referenced earlier, which go to fund the two trusts, one for PFRS and one for GRS. The aggregate dollars involved are substantially more than was being contemplated. The nominal dollar value is $959 million, and that can be seen from the city's Exhibit 793 at page 3, your Honor. You can see the math that's been pulled out there, $493 million for the PFRS VEBA and $466 million for the GRS VEBA. So the bottom line is that the city moved dramatically in the creation of a structure to deal with retiree healthcare issues. So it starts out dramatically cutting pensions, totally eliminating healthcare obligations, ending up reducing benefits still on the pension side but agreeing to fund them going forward and putting in more cash.

Now, what changed, we say, was the demonstration of courage and resolve and belief that nothing was impossible by a host of individuals, your Honor, each acting individually within their realm of appointed responsibilities. Two

serious strategic decisions made by the city and by the Court at the beginning helped this process. The city's strategic decision was to ask for the appointment of a Retiree Committee. The U.S. Trustee appointed nine individuals identified as Terri Renshaw, retired deputy corporation counsel; Don Taylor, retired city patrol officer; Shirley Lightsey, a retired DWSD director of HR; Ed McNeil, a retired city arborist and an AFSCME special representative; Gail Turner, retired city police inspector; Mike Karwoski, a retired city lawyer; Gail Wilson, a retired city lawyer; Rob Shinske, a DROP fire fighter; and the UAW as an institution with two representatives.

The city asked for the Court to create it, and the city and the Court agreed, but what did the Court do? Well, the Court said this is all going to be subject to mediation. Whether it was a brilliant move, a lucky move, whatever, it turns out to have been a fantastic move for the sake of the city. Chief Judge Rosen --

THE COURT: I'll take brilliant.

MR. MONTGOMERY: -- turned out to be a tireless advocate for the city and a skilled facilitator between what can only be called the city's seriously competing interests. He, in turn, appointed two individuals from Detroit, Judge Victoria Roberts and Eugene Driker, and from outside of Detroit Bankruptcy Judge Elizabeth Perris and District Judge

Wiley Daniel. These individuals, from the perspective of the retirees, participated not in eight settlements but in 14 settlements without which the plan really could not have functioned well.

There's, of course, the grand bargain. There, of course, is the global Retiree Committee settlement. There is, of course, the financial creditors' settlements of the UTGO, LTGO, Syncora, and FGIC, and the earliest, which was the swap counterparty settlement. And then there are two retiree association settlements, each of which are independently listed. There are three collective bargaining sets of agreements, one by AFSCME, one by the police unions, and one by the fire fighters. Then there is the Retirement Systems themselves that participated, and, finally, in order to prevent the case from sort of going off the rails at the very last second, there is the library settlement with the UAW.

We said we would show you that we represent 23,000 people. Well, we have done that. Exhibit 1023 from the PFRS valuation by Gabriel, Roeder shows 12,089, and a similar exhibit, 1024, for GRS shows 11,539. That's how we get our 23,000 retirees, your Honor. We said that we would show that there was an average of 20,000 a year in annual pension benefits for GRS. How did we establish that? Well, in the process of Ms. Nicholl testifying about the effects of COLA,

she told the Court that the starting point was the $20,000 average benefit for GRS retirees. We told you that we would show that the average PFRS individual made 30,000 a year in pension, typically retired earlier due to mandatory requirements, and did not receive Social Security benefits or Social Security increases. How did we show that? Again, Ms. Nicholl, through testimony regarding COLA, indicated that her starting point was $30,000 for PFRS.

We think we would -- we also told you that we would show that the promises relating to these modest pensions and healthcare benefits were clear and immutable. We start with the immutable nature of Article IX, Section 24, the pension clause. We then go to what makes it clear that there were retiree benefits. Ms. Renshaw testified regarding -- it came into evidence -- the Weiler consent judgment, which says the city shall provide healthcare coverage pursuant to this agreement to each class member for so long as the class member is receiving a city pension. That's basically your police and fire fighters who retired prior to 2007.

Contractual promises began for AFSCME and the general service employees going back as early as 1971 where Exhibit 1001 admitted into evidence shows that the city agrees to pay the premium for regular retirees but not their families. In the next collective bargaining agreement the city agreed to pay half the premium for spouses as well as

regular retirees, so by 1974 it was absolutely clear that the collective bargaining world had clear rights that incorporated the city charter municipal code provisions for such benefits.

Your Honor asked a number of questions today of the city. I'm going to try to show you how we see how the pension treatment is financially possible. We start with something that was actually identified by Emergency Manager Orr in his testimony. The existing assets of the Retirement Systems and the assumed strong financial performance from 2013 and 2014 was a critical starting point. Milliman indicated through its Exhibits 473 and 474 for PFRS and GRS that in order for the frozen plan system to work, the assumed rates for PFRS would be between 11-1/2 and 14 percent for that two-year period, and for the GRS it would be 11 percent, so step one is existing assets, strong early returns before the plan becomes effective.

Second step was DWSD contributions totaling $428.5 million over the next ten years. That was essentially the liability of DWSD under its existing programs on accelerated funding. Ms. Nicholl identified that as being her number and her assessment of what the various sources of contributions for the next ten years were in Exhibit 10100.

The next is noncity contributions to GRS totaling 175 million over the next ten years. There's a 20-year

promise, but important to getting the plan promise in place from the city is what would the plans look like in ten years. Well, to get there noncity contributions total $175.5 million. Again, Ms. Nicholl identified the UTGO, the state, and the DIA as those noncity contributions for a total with DWSD of $604 million in the first ten years.

Library, enterprise, and general fund reimbursements total $114.6 million. The same exhibit identifies those. And then noncity contributions to PFRS -- all of the prior contributions were for GRS -- $260.7 million over the next ten years. City promised to fund benefits, which we've already discussed, and then, importantly -- and you cannot lose -- we would ask the Court not to lose sight of the fact that the GRS retiree losses occasioned by acceptance of the plan are critical to the funding structure of these plans. Every retiree suffers more than four-and-a-half-percent reduction over their lifetime. Sixty percent suffer 15 percent or more. Ms. Nicholl testified to that and on Exhibit 10107.

PFRS retiree losses occasioned by acceptance of the plan, the total present value to the partial COLA reduction is itself $688 million, so any notion that there is a hundred cent recovery here goes out the window once you understand that retirees have to lose money over their lifetimes for these plans to be feasible.

We also showed you that the impact of COLA for PFRS varies dramatically by age. As you can see in 10112, if a younger retiree at age 55 can lose as much as 15 percent, the older retiree at age 90 could lose relatively little on a compound COLA, and the answer for why is straightforward. If you don't have very long to live, COLA doesn't mean very much to you. If you have a long time to live, COLA means a lot to you. Same is true with simple COLAs, your Honor.

Also important was another benefit loss, another benefit expectation loss. GRS and PFRS active employees accepted the frozen plans. Milliman calculated that those values were $95 million for the DGRS and $55 million for the PFRS. GRS and PFRS participants agreed to release state from claims and the losses occasioned by Class 11 acceptance of ASF recoupment from both active and retirees. Again, each of these elements is necessary for the funding structure. This chart that Ms. Nicholl developed shows the distribution of ASF cuts -- recoupment cuts alone. Ignore COLA. Ignore the four and a half percent. This exhibit, your Honor, shows what recoupment means. There are 1,055 individuals whose ASF recoupment is 15-1/2 percent, meaning that they're at the 20-percent pain cap. Your Honor may recall testimony regarding the pain cap. And at the other end, you have $1,216 who lose as little as three percent, meaning that their total losses will be under seven and a half.

In real terms, the city's funding commitment we said is absolute, but it depends on the 6.75 projection, which is a negotiated number. It's a negotiated number because a higher number meant less benefit cuts but greater city susceptibility to financial risk. A lower number meant greater cuts, and it also meant if there weren't greater cuts, greater contributions being required from the city. The 40-year projections that the debtor uses show that on a nominal basis at 6.75 percent, a billion three is going to PFRS and a billion eight, important foundation for the pension plan treatment. As I've indicated, raising the assumed rate of return lowers contributions, lowers liabilities. Converse is also true.

Mr. Fornia agreed that a higher assumed rate of return lowers projected contributions and liabilities. He testified to that on the 14th of October. Your Honor may recall that testimony.

Bottom line, if the 6.75 percent is exceeded, the city will, in fact, have the ability to lower its future projected contributions from the billion three and the billion four that your Honor saw on the prior exhibit. If, however, conversely, 6.75 is not achieved, the city will need to raise its projected contributions.

THE COURT: Well, but that's true. Go back to the prior slide if --

MR. MONTGOMERY: Yes, sir.

THE COURT: Can you get the button for that?

MR. MONTGOMERY: Yep.

THE COURT: The second bullet point from the bottom only works to a certain extent because of restoration; right?

MR. MONTGOMERY: No. This is completely independent of restoration, your Honor. The projections are not dependent upon restoration. They are only dependent upon the funds earning 6.75 percent, and the math of what the city has to put in is the difference between the cuts, the 6.75, and the contributions from other sources.

THE COURT: Well, but doesn't the city give away some of the upside potential through restoration agreements?

MR. MONTGOMERY: If certain funding levels are achieved -- I think it's 75 percent at 2023 and so forth up to 45 percent, your Honor -- absolutely, but only on investment returns. You cannot get restoration as a result of simply contributing more money by the city or simply meeting the 6.75 percent.

THE COURT: So I'm right that the city gives up some of the upside potential in the market through restoration?

MR. MONTGOMERY: Oh, absolutely, your Honor. Absolutely. And that was part of the basic understanding of the parties that if the city, in fact, didn't need to ask for these pension cuts --

THE COURT: So the assumed rate of return of 6.75 percent is a little bit illusory then, isn't it?

MR. MONTGOMERY: Not at all, your Honor, because the funding structure runs off the math of 6.75 percent. If the city yields more than 6.75 percent, it can only achieve -- or, rather, cause restoration if not only funding levels are concerned but that the excess is actually available to purchase future benefits. It's not a one year at a time process. It's a look forward process. And not only does it require the ability of the city --

THE COURT: Well, but answer this for me.

MR. MONTGOMERY: Sure.

THE COURT: Isn't it true that without restoration, if we can create that universe for a second --

MR. MONTGOMERY: That hypothetical.

THE COURT: -- the city would be incurring less risk regarding its future pending obligations?

MR. MONTGOMERY: Absolutely correct, your Honor, and part of the drama, if you can well imagine, the drama over whether or not the city's original 6.25 and 6.5 would be acceptable or what you might expect what the Retiree Committee and the other retiree groups were asking for, part of the mix on how you yield up to 6.75 is this mix of give and take on the city's future risks.

THE COURT: Um-hmm.

MR. MONTGOMERY: So your Honor is 100 percent correct. In fact, your Honor, I was going to just tell you what the connection between funding targets and restoration was. Now I can skip it. The one area where there's not a lot of room for, gee, couldn't the city do better --

THE COURT: Before we go to OPEB, though --

MR. MONTGOMERY: Sure.

THE COURT: -- I'd like to press you with the same question that I pressed to Mr. Bennett, which is what is your position on the percentage recovery for Classes 10 and 11?

MR. MONTGOMERY: Oh, your Honor, I am, for better or for worse, much -- I'm sort of fixed by my own witness' testimony. You'll recall Ms. Nicholl, and I actually have that identified.

THE COURT: Is that a later slide? If it is --

MR. MONTGOMERY: Yes, it is.

THE COURT: -- we can put this off until you get there. That's fine.

MR. MONTGOMERY: Yes. Absolutely.

THE COURT: Okay.

MR. MONTGOMERY: Every retiree is affected by OPEB reductions, and there are a couple of ways -- three ways that we suggest that you can sort of measure it without going into the human by human story of the horror of losing medical benefits. One, of course, is the claim value. We know that

the B notes on the basic deal was 450. It then evolved to another 11 and then another 31.7, so the $493 million is the total take. The allowed claim is $4.3 billion. The nominal recovery -- and it's strictly nominal -- it has no present value computations in there at all -- is 11.5 percent, your Honor.

Second way of looking at it is to sort of think about what it was going to cost the City of Detroit at various points in time. You may recall that a lot of emphasis was placed on how high the cost of OPEB was going to get by 2023 and later. Well, the city put on testimony through Exhibit 33 that in 2023 health benefits were going to cost the city prebankruptcy $234 million. 233.7 is the number they used. And so if the annual payout on the B notes at four percent is 19.7 -- and that's just the simple math of four percent times the 493 -- the implied cost reduction for the year 2023 is 92 percent. That's another way of sort of looking -- the scale of what's happening to healthcare costs for retirees.

The third way is, of course, that there is no cap under the plan of adjustment for increased healthcare costs. The retirees simply have to absorb it. There's no way around it.

Third way is that the VEBAs themselves, these creatures with $493 million worth of notes, needed start-up

funding assistance. They couldn't actually get going without contributions from third parties in the form of $11-1/2 million plus acceleration on certain of the excess B notes. That is what's known as a slender recovery if your basic vehicle to provide some sort of healthcare protection needs outside funding just to get started, which is what happened here, your Honor. This is the chart that I said we -- the city exhibit that shows what the start-up funding was. It's the cutout from Exhibit 790.

THE COURT: Well, in the VEBAs has it been determined how each VEBA will determine who gets what benefits?

MR. MONTGOMERY: First, under the plan of adjustment and the trust agreements, it's completely discretionary on the part of the future retirees. There has been a basic decision that the existing benefit structure for 2014 will be continued in 2015 while the trustees try to figure out what they're going to do going forward.

THE COURT: What will the cost of that be?

MR. MONTGOMERY: It should be roughly $36 million.

THE COURT: Where will that come from?

MR. MONTGOMERY: It'll come from interest on the notes plus the start-up funding plus it is likely that the trustees will decide to sell some or all of the B notes to the marketplace. They have to because otherwise there's not

enough cash to make it through the end of the first year, and -- and your Honor will be familiar with this -- the interest arbitrage is pretty critical to the long-run success of the plans. If all you're going to do is gain four-percent interest for the next 30 years, that is a pretty thin opportunity for financial benefits, and so there's going to be some, we are presuming -- our investment advisors have told us -- everybody has kind of accepted the proposition that you're going to have to try to get better than four percent from the rest of the market, but whether it's going to be four and a half or six or six and a half I have no way of saying, your Honor.

THE COURT: Okay.

MR. MONTGOMERY: From our perspective, your Honor, we ask you to think about the sum of the settlements as the key to unfair discrimination. If every settlement is fair and reasonable and the plan is unquestionably premised on eight or fourteen fair and reasonable settlements, how can the plan itself be unfair? That's the proposition we want to work through with you, your Honor. The separate creditor classification, of course, is permitted under U.S. Truck based on the independent classifications -- or independent interests of the creditors themselves, and the litigation settlement's business justifications we assert will serve as the business justifications for the class discrimination

under the plan of adjustment.

Now, what facts on discrimination were raised at trial? First, the actual claim question, and this goes back to -- your Honor, this is the slide I was going to try to find. Ms. Nicholl testified that the allowed settlement claims, which are the plan-based settlement claims, at 6.75 percent was $1.9 billion for GRS and $1.25 billion for PFRS. She compared that, though, with her actual values, which she said should be based on risk-free rates rather than the negotiated 6.75 rate would have yielded claim values of three and a half and 3.9. Your Honor says -- okay. So what's the next step? The consideration provided by the city for Classes 10 and 11 is far less than that which is described in the disclosure statement because it includes the noncity contributions. The city has acknowledged that in its presentations today, and that's pretty straightforward. Again, Ms. Nicholl showed you the value of the city contributions, quite different than the total contributions coming in from the plan, 750 and 361 for GRS and PFRS using the 6.75 percent and a billion one and just under $682 million for PFRS.

What happened to the discrimination? Well, between Classes 7 and 9 on one hand and Classes 10 and 11, those were resolved by settlement after all objections and the class consents. Between 14 and 10 and 11, however, there appears

to be a lack of objections, but your Honor still has to make the finding that it's not unfair. Again, we assert that since the discrimination arises from the settlement of a series of litigations and the discrimination is critical to the survival of the city and resolves important constitutional issues on appeal about which there was arguably material doubt despite the clarity, the absolute clarity of this Court's opinion in the eligibility, so how does this actually shake out from our vantage point?

Again, the exclusion of noncity sources, we cite these cases in our pretrial briefs. Recoveries requiring new or creditor cash investments can also be excluded from the recovery analysis. And so let's talk about the settlements itself. Complexity, interest of creditors, arm's length nature are three of the five central factors. We say these standards overlap with Aztec. We say that in the circumstances of the case, the litigation settlement standards will yield a similar result under the Markell theory because the presumption of unfairness could be rebutted by necessity and nonbankruptcy differences. Outside of Chapter 9, as your Honor has acknowledged or raised today, the obligations of pension creditors are subject to pension clause protection or as general trade or not.

What about basic reasonableness, arm's length and good faith? Ms. Renshaw and Mr. Bloom both testified on this

question. The city actually cited Ms. Renshaw's testimony and also cited Mr. Bloom's testimony. These are page references if your Honor wants them for the record.

The retiree settlement ties to the city and its active workers. Kevyn Orr indicated that. First he pointed out that there were 9,000 city employees spread out over the various departments. He then pointed out that 6,000 of them were dedicated to public safety. The implication your Honor is supposed to draw or may wish to draw from these facts is that since it's unquestioned that public safety is a central problem that this city faces, if your residents are afraid, if your residents' property is not safe, it's very hard to maintain a stable population. It's impossible to grow that population. So anything that makes these service providers have greater morale or be more involved in the city is important, and Mr. Orr testified that in his dealings with public safety employees, they brought up very strong concerns about their pensions and particularly in the public safety unions. There were concerns about retiree healthcare, but those concerns were pretty strong throughout the whole labor stack both on the civil -- that should be civil side -- and on the public safety side, your Honor.

Mr. Bloom testified in a very comparable manner. This is the citation that the city actually gave to you earlier. This is the particular date referenced. It was the

committee's belief that active employees were concerned, and
we had employees who were putting forward that concern. He
was talking about the active union -- active and union
representation on our committee.

The integral nature of the retirees, this chart came
in in lieu of the testimony of Stu Wohl by agreement by all
sides. This shows that 73.5 percent of the retirees live in
the greater Detroit metro area and 85 percent -- or just
under 85 percent live in the State of Michigan itself.

Of course, one cannot lose sight that the pension
settlement is not just retirees. Classes 10 and 11 include
both active and retired employees and their beneficiaries.
The resolution of complex issues was obviously critical to
the OPEB resolution. You could not have gotten an OPEB deal
without a pension deal, and concessions from retirees were
the center of restructuring healthcare.

The critical nature of healthcare, again, came from
Mr. Orr. He testified on October 1 that 40 percent of the
city budget was projected to be 400 million roughly dedicated
to legacy expenses, both debt service and half of that to
100-plus was retiree health. We knew that at the current
rate of increase over the next nine years, legacy costs were
going to grow to 73 percent on average of the billion dollar
budget. That was a problem the emergency manager said was
critical to his resolution of these issues. Pension

settlement was critical to that. The only way for the VEBAs -- excuse me -- for the retiree healthcare to work was for there to be a fixed obligation of a fixed duration of a known nature, and, as Mr. Bloom testified, in other words, the city eventually provided to the two VEBAs notes, financial instruments that had a fixed obligation, a fixed interest rate, and a fixed period of payment. That defines entirely the city's obligation on this benefit.

As is evident to your Honor, as you've heard the testimony, you couldn't reach a pension settlement without a compromise on the investment return assumption. It has an impact on the sufficiency of both the ten-year and the forty-year projections. Mr. Bowen testified to that. And he also indicated the basic view that higher investment return assumptions, ultimate benefits will be paid by the investment return. In the short term, that depresses contribution levels. And the converse was also true.

As a matter of actuarial practice, Ms. Nicholl testified that it was appropriate for the parties to negotiate a prescribed investment rate assumption to determine both the level of benefit cuts upon retirees and for funding, as she mentions, ASOP 4 in her testimony on September 16. ASOP 4 specifically permits a governmental entity to set a prescribed assumption. Committee Exhibit 10996 is the relevant language from ASOP 4, your Honor.

That 6.75 percent was a compromise not just on the benefit reduction issue but on the question of what was the claim worth since she testified that the actual claim should be based on a risk-free discount rate. She gave that testimony on September 16.

Your Honor has been very sensitive, and I just want the record to reflect that the pension settlement also required sensitivity to market volatility. Of course, the largest cause of the Detroit Retirement Systems' underfunding was the great recession, according to Cynthia Thomas. She said that on October 15 as this being an example of the rare circumstances would be the severe market downturn at the beginning of the great recession, which caused significant amount of asset losses in all pension plans across the country.

Market volatility, however, was not restricted to the events of 2008 and 2009, as your Honor well knows. Exhibit 1017 was utilized in the testimony of Mr. Fornia. We identified five different years from the period 2000 to 2013 which had either less than one percent or actually negative returns. That is volatility by any definition.

Pension settlement required use of a liability cost method. Ms. Nicholl testified that it's required by city charter to use the EAN methodology. The effect of the balance cap and the pain cap is also part of the

reasonableness of the pension settlement.  Again, this is the

chart you saw earlier regarding the distribution of ASF

recoupment.  There is a lump sum payout alternative under the

eighth amended plan at Docket 8045 at pages 11 and 48.  This

is where you can find it, your Honor.  There's a maximum

payment limitation which can be found at Docket 8045 at 48.

The total ASF recoupment from the ASF distribution

recipients' monthly pension checks over time shall not exceed

the amount necessary to amortize the applicable annuity

savings fund excess amount at 6.75 percent.  That language,

your Honor, is the language that was put in the plan to match

Mr. Moore's testimony and to answer your questions.  But,

again, ASF recoupment itself is integral and a critical part

of the global retiree settlement under the plan of

adjustment.  The global settlement simply doesn't work

without this feature.  The math doesn't work.  The concepts

don't work.  The benefit structure doesn't work.  Either

greater pension cuts would be required across the board or

the city would have to contribute more money.  Those are the

only two possibilities.  Seventy percent funding target is a

centerpiece of the city's willingness to contribute 70 --

contribute funds after 2023, and ASF is important to that.

        We believe that the bankruptcy rules permit a

settlement.  We believe it's consistent with Michigan law of

the exclusive benefit rule, and particularly by effectuating

a class settlement which minimizes across-the-board cuts, settled costly litigation, and limits the downside risk to each retiree, the essence of the exclusive benefit rule has been achieved.

The settlement is necessary and critical to the city's restructuring. The pension settlements fairly distribute benefit losses among actives and retirees. The OPEB settlement creates fixed obligations that assures the city and retirees of some future healthcare benefit protection. The release of the state in return for voluntary contributions to the pension plan works for both the city and for the retirees, and as a result, the Retiree Committee requests the Court to exercise its discretion and approve the city's eighth amended plan of adjustment.

At this moment, your Honor, I would like to do better than engage in the formalities. Your Honor has heard a number of issues in which my clients put forward in the strongest possible terms factual and legal assertions that your Honor often did not agree with, but there is no doubt that as far as the evidence is concerned, your Honor took the good with the bad and made rulings that we can only respect and for which we thank you.

THE COURT: You're welcome.

CLOSING ARGUMENT

MR. GORDON: Good afternoon, your Honor. Robert

Gordon on behalf of the Detroit Retirement Systems. Your Honor, I will be brief and will not be repeating as much as I can avoid anything that has been said by Mr. Bennett or by Mr. Montgomery. They have ably set forth many of the important points.

Your Honor, this case obviously involves a complex set of creditor classes, including multiple species of bond and bond-related debt as well as pension and healthcare claims and the legal rights asserted by these different classes of creditors very significantly. Classes 10 and 11 under the city's eighth amended plan of adjustment comprise the pension claims of the beneficiaries of each of the Detroit Retirement Systems, the Police and Fire Retirement System and the General Retirement System respectively. The Retirement Systems' beneficiaries consisting of both active and retired city employees are an integral part of the life and fabric of the community, the community that is the City of Detroit. In settling with holders of Class 10 and 11 pension claims under the plan, the holders have agreed, among other things, to dismiss their pending claims and Sixth Circuit appeals against the city relating to the state Constitution's so-called pensions clause, and they have agreed to release any related claims against the state under the pensions clause. These causes of action involve claims and arguments that only holders of Class 10 and 11 pension

claims can assert.

THE COURT: Slow down just a bit for me, please.

MR. GORDON: I shall, your Honor. Thank you. No other creditor class has asserted or could assert any such rights and arguments under the Michigan Constitution. These causes of action, if successfully appealed by these creditors, would result in either a dismissal of this entire bankruptcy case or a requirement that these classes of claims be paid in full under the plan. As such, these released claims have a value that is significant and unique to these classes. Mr. Bennett referred to Judge Klein's ruling in Stockton recently as perhaps undermining that value, but I would submit that that ruling was in a completely different context starting with the fundamental fact that California -- the California Constitution does not have a pensions clause at all.

In addition to the effective resolution of litigation claims held by Classes 10 and 11 claimants, the settlement of the pensions claims is supported by certain economic considerations that we would submit go to the heart of the issue of what is the business of a municipal debtor and what does it mean to rehabilitate such a debtor. The treatment of pension claims directly impacts active and retired employees who are residents of the city. As such, the business justification for providing a meaningful

recovery to these claimants is manifest. As the city has alluded, the greater the impairment of pension claims, the greater the demoralizing impact on the current workforce and the greater the threat of defections. And it is generally the case that the first to leave are those with the best opportunities to switch employers; i.e., the best and brightest of the class. That concern was echoed through the testimony of Mayor Duggan, among others. Such talent drain would run contrary to the goal of restoring the city's ability to deliver a reasonable level of essential services to its residents.

Moreover, if a portion of that resident population is impoverished by operation of the plan, particularly when one considers the double impact to thousands of retirees of receiving both a pension cut and a drastic reduction in healthcare benefits, this would also run contrary to the goal of the city to create a vibrant community in which residents maintain their homes and neighborhoods and can afford to consume goods and services which, in turn, attracts new business to the city.

Both the release of pending litigation and related claims and the foregoing business or economic considerations provide ample justification for the plan settlement of Class 10 and 11 pension claims. Moreover, the settlement is a fair and appropriate one that properly balances the city's desire

to reduce its risk of future underfunding liability with the desire to minimize any resulting reductions to pension benefits. This was the subject of much lengthy negotiation in mediation.

In addition, it should be noted that the settlement includes the creation of new investment committees for each of the Retirement Systems with substantial oversight and control of investment-related decisions of the Systems, which creates a structure that many view as reflecting best practices in the pension industry and which should greatly support any analysis as to the feasibility of a system's investment performance on a go forward basis. And, as I can personally attest and has been represented unequivocally to the Court by parties in various pleadings and hearings, the settlement of these claims, your Honor, was the product of untold hours of arm's length intense negotiations that included the sophisticated inputs of numerous lawyers, financial advisors, and actuaries on behalf of the city, the Retirement Systems, and the Retiree Committee.

Subsequent to the settlement of the pension claims, the city reached settlements with numerous other classes of creditors, including the UTGOs, the LTGOs, and the COPs holders and their insurers. These settlements vary in their structure and projected recoveries reflecting the differing legal rights asserted by each creditor group and the city's

differing evaluation of those rights under the Bankruptcy Code.

Notwithstanding the complexity of the city's financial issues, somewhat miraculously a consensual plan is now before the Court. A tremendous coalescence has occurred through the dogged and courageously pragmatic efforts of a vast number of parties. The list includes the retiree community, including the Retirement Systems, the Retiree Committee, and the retiree associations, the city's active employees and their unions, the charitable foundations and the DIA, the financial creditors, Governor Snyder, and the state legislature, the counties, the emergency manager, Mayor Duggan, Judge Rosen, Judge Roberts, Eugene "don't call me judge" Driker, Judge Perris, Judge Daniel, Judge Coar, and, indeed, this Court. The product of these efforts, a consensual plan, is remarkable, and all of Michigan should be proud.

We agree with Mr. Bennett that the plan provides the city with the resources, both financial and operational, to successfully revitalize. Therefore, it is our sincere hope that the Court will issue an opinion confirming this plan and continuing the positive momentum that this plan reflects for the future of the city and the region. We do thank the Court's staff and the marshal services for their tireless efforts and their patience in facilitating this case.

But, finally, on behalf of the Detroit Retirement Systems and personally, I thank the Court for its courage in taking on this challenge, for its service and stewardship throughout this case, putting aside that one little pension clause ruling, and for your willingness to postpone your Honor's well-deserved retirement. It has been an honor to appear before you throughout this case and throughout the years. Thank you, your Honor.

THE COURT: You're welcome, and thank you.

MR. GORDON: I must mention, by the way, though I hate to mention it as late as the hour is getting, I do have one very important housekeeping matter that I'd like to raise with the Court when people are done with their closing arguments, if I may.

THE COURT: Oh, sure.

MR. GORDON: Thank you, your Honor.

THE COURT: Yes. I have several myself. Who's next? Yes, sir.

CLOSING ARGUMENT

MR. PLECHA: Good afternoon, your Honor. Ryan Plecha of Lippitt O'Keefe Gornbein on behalf of the retiree association parties. My comments today will be brief and in favor of confirming the city's plan of adjustment.

Both my clients, the Detroit Retired City Employees Association and the Retired Detroit Police and Fire Fighters

Association, have been actively involved in the bankruptcy process from attending pre-petition presentations to challenging the city's eligibility through trial and appellate process, to participating in mediation, to reaching a resolution with the city, and to ultimately promoting the plan to their members, retirees, and to this Court.

I must thank the Court for ordering the mediation process, which provided the environment for resolution. It was only in this environment and many long hours of intense negotiations that allowed the associations to be harbingers of settlement and plan support. In that same vein, I must also thank Chief Judge Rosen, Judge Roberts, and Eugene Driker for their wisdom and tireless efforts in stewarding the mediation process.

I must also note the courage and dedication of the RDPFFA through its board and led by its president, Don Taylor, along with the same resolve and efforts of the DRCEA through its board under the guidance of its president, Shirley Lightsey, in making the difficult choice to reach an agreement with the city and to support the plan of adjustment. This was no easy feat for obvious reasons, but these retiree settlements and retiree plan support were critical and acted as a catalyst to many other settlements. Both the RDPFFA and the DRCEA were critical in creating positive momentum towards resolution and, as Mr. Bennett

said, a parade of settlements. The DRCEA and the RDPFFA have vocally supported the plan, testified to the House and Senate committees in favor of the grand bargain legislation in support of the plan in this case.

Detroit's retirees devoted their careers and their lives to the city and now, as a class and as classes, have agreed and voted to make one more sacrifice for the city they served both in financial concessions and compromising constitutional claims. The associations have championed this last sacrifice to protect retirees from more severe financial hardship and to help the city exit from bankruptcy.

The associations now hope that this closing statement in support of the plan is the last page in their involvement in the City of Detroit's Chapter 9 case and that the city and its retirees can regain a sense of certainty and begin to heal from this trying process. It is now time for retirees and the city to emerge from bankruptcy to collectively write a new and brighter chapter for the City of Detroit.

With that, your Honor, I would like to rely on the statements, arguments, and evidence presented by the city, the Retiree Committee, the Retirement Systems, and all of the plan supporters and respectively join them in requesting that your Honor confirm the city's plan of adjustment. Thank you.

THE COURT: Thank you, sir.

CLOSING ARGUMENT

MS. PATEK: Good afternoon, your Honor. Barbara
Patek, Erman, Teicher, Zucker & Freedman, on behalf of the
Detroit Police Officers Association, and I, too, will be very
brief in support of the plan.

And before I get into the main part of my argument,
I do want to -- the Court raised the issue of the individual
employee indemnification claims, which is an issue that is of
great importance to the Detroit Police Officers Association.
As the Court is aware, we do support the city's position with
regard to discharging those claims to the extent of the
city's indemnification obligation. We did file Class 14
claims out of an abundance of caution. We do have a
collective bargaining agreement that has now been approved by
the state, and I also think there are parts of the city
charter that set forth exactly what that obligation is. I do
believe it is somewhat broader than in the course of the
employment, but if the Court needs or wants something more
specific, we can certainly provide it.

Other than that, I want to briefly address two
related issues about which the Court has raised questions,
one being the city's reasonable business justification for
discrimination in this case in favor of the Class 10 pension
claims and, second, with regard to feasibility. As the Court
will recall, 15 months ago the Detroit Police Officers

Association together with the other Detroit public safety unions came into the court taking what some thought was the unusual position of supporting the city's request for an order confirming the automatic stay and the application of the extended stay while at the same time vigorously opposing the city's eligibility for bankruptcy based upon the city's stated intent to impair our constitutionally protected pension benefits. There was a reason we took that position, and we took that position because the Detroit Police Officers Association understood, based upon their daily work experience, what this Court learned and so graphically detailed in its eligibility opinion, the depth of the city's service delivery insolvency. We didn't need a bus tour or a complicated series of spreadsheets to understand the depth of that insolvency. We lived it every day or our members lived it every day in their work. As the Court heard from every witness to address the issue, including Chief of Police Craig and Mayor Duggan, the city's police officers were underpaid, undermanned, and overworked at the time the city came into these proceedings. We stand before the Court today with a state-approved collective bargaining agreement that will set the floor and stop the free fall that had been occurring in terms of wages and benefits and so that the police officers of the City of Detroit can now go to work without looking over their shoulders about when the next shoe is going to

drop.

And with that regard, I want to address what I think is almost stating the obvious, that -- I don't want to wade into what the discrimination is because we're not equipped to do that, but to the extent that there is discrimination here, I think the evidence before the Court not only shows that that discrimination is supported by reasonable business judgment but that that discrimination was likely essential to the city's ability to put forth a confirmed and feasible plan. Given the city's economic limitations as this Court has heard, given the skinniness of this plan, the city's ability to be able to continue to provide effective public safety, to treat its police officers fairly, and to provide them with the compensation they deserve necessarily required minimal and the more modest impairment than what was originally suggested. And I think in terms of feasibility itself, the difference -- and I think this Court acknowledged it in its eligibility opinion. I want to point to two things the Court said. There is a material difference when we're looking at feasibility between Chapter 11 and Chapter 9, and I think when this Court found the city service delivery insolvent and more specifically found that the city could not reduce employee expenses without further endangering the public health and safety, that finding justified its statement that no one should assume that this Court will

confirm a plan that impairs pension benefits. There's no doubt that the state and the city under Sections 904 and 903 of the Code and particularly with PA 436, which vests enormous power in a single individual, the emergency manager, have a lot of power and that there are some ways in which this Court's authority over them is limited. Nevertheless, in determining whether or not the plan is fair and equitable, the Court must find, as Ms. Kopacz testified, that the city is able to provide a basic level of essential municipal services, and clearly police protection is one of those services. So based on that, we would ask the Court to confirm the plan.

And I would also indicate as one last point Mr. Bennett indicated, I think, when we went back on the record this morning that the city is going to provide the collective bargaining agreements for approval by the Court, and I believe on the first issue of the Section 1983 claims the language the Court is looking for will be in those agreements. Thank you, your Honor.

THE COURT: Thank you.

CLOSING ARGUMENT

MR. QUINN: Good afternoon, your Honor. I'm John Quinn, an objector representing myself. My objections are stated in Docket Number 5723 filed on July 1st, 2014. This afternoon I intend to respond to the city's arguments on

issues raised in my objections and attempt to answer any questions the Court may have concerning those objections. Except to the extent necessary to serve those objectives, I do not intend to repeat the arguments I made when I initially filed the objections.

I've objected to confirmation of the plan of adjustment as amended on two grounds. First, the plan should not be confirmed unless it is modified to adjust only the city's liability, if any, on the claims included in Class 11, not the General Retirement System's liability on those claims. And, second, by attempting to impose the ASF recoupment on claims whose holders have not individually agreed to its application to their claims, the plan imposes nonconsensual less favorable treatment on those claims than on other claims in Class 11 in violation of 11 U.S.C., Section 123(a)(4).

I maintain that the plan of adjustment as amended is defective as a matter of law. I understand Mr. Karwoski, in addition to discussing his own objections, which overlap mine, will have something to say about how the law I will discuss with regard to ASF recoupment applies to the facts shown in the evidence.

I've prepared a list of authorities and documents I may cite during my closing and provided copies to counsel. If the Court wishes, I could also provide -- may I approach?

THE COURT: Yes, please.

MR. QUINN: I'll discuss my objections in the order in which I've just stated them this afternoon. The city addresses my first objection in its consolidated response, which is Docket Number 7303, filed on September 5th, 2014. The city does not appear to disagree with my reading of 11 U.S.C., Section 941, to permit adjustment of the debts only of the city, not of any other party, nor does it challenge my argument that GRS is an entity distinct from the City of Detroit and, therefore, not a debtor in this bankruptcy. The city does argue that pensions are obligations of the city and seems to conclude that they, therefore, are not obligations of GRS ignoring the obvious point that distinct parties can be joint obligors on the same claim. Michigan law is clear that payments to retirees covered by a public pension system are obligations of the trustees who administer the system whether or not they are also obligations of the governmental entity that sponsors the system. I discussed Michigan law on that point in Docket Number 5723 at pages 12 to 14 and will not consume additional time repeating that discussion here. I do not dispute the city's position that it is liable to me for my monthly pension payment. If the Court's reading of the first sentence in Article IX, Section 24, of the Michigan Constitution is correct, then that liability, the city's liability, can be adjusted in this bankruptcy, but the city

does not actually make those monthly payments. GRS does. It should be obvious that GRS does not send me money every month out of eleemosynary generosity. I get the money from GRS because the GRS trustees owe me the money. They have a fiduciary duty to pay my pension and --

THE COURT: What's the source of that obligation?

MR. QUINN: The source of that obligation is primarily the pension -- the Public Employees Retirement System Investment Act, more commonly known as PERSIA.

THE COURT: That act says the city owes you a pension?

MR. QUINN: No. It says --

THE COURT: What's the source of the obligation?

MR. QUINN: I'm talking -- the source of the trustee's obligation?

THE COURT: To pay you.

MR. QUINN: Yes. That's in PERSIA. They hold the funds in trust for the benefit of all the -- of all retirees, and one of their duties as trustees obviously is at the appropriate time -- that is, when we retire -- to disburse the funds. That's what PERSIA says.

THE COURT: I'm apparently not making myself clear.

MR. QUINN: All right.

THE COURT: What is it that identifies you as a beneficiary?

MR. QUINN: The fact that I am a member of GRS, having been an employee of the city, obtained a vested pension, and --

THE COURT: So it's your relationship with the city that gives rise to your pension rights from GRS? Yes?

MR. QUINN: That's correct.

THE COURT: Okay. Assume there were no plan for just a second --

MR. QUINN: All right.

THE COURT: -- and we were not in bankruptcy.

MR. QUINN: All right.

THE COURT: What would prevent the city and GRS from coming to precisely the same agreement that they have come to here in this bankruptcy?

MR. QUINN: Oh, you mean there were no plan of adjustment? You're not talking about there were no pension plan.

THE COURT: That's the plan I meant. You're right.

MR. QUINN: Okay.

THE COURT: Plan of adjustment. There were no plan of adjustment and no bankruptcy.

MR. QUINN: Well, because it would be inconsistent with the duty that GRS has to the beneficiaries. It's a trustee for the benefit of the beneficiaries, and --

THE COURT: All right. So under what circumstances,

if any, outside of bankruptcy --

MR. QUINN: Um-hmm.

THE COURT: -- can adjustments to pension beneficiaries be made?

MR. QUINN: As to beneficiaries who -- as to benefits that are already vested, I believe the answer is there are no such circumstances under Michigan law. Okay.

THE COURT: Why is that?

MR. QUINN: Because the -- all right. The Michigan Constitution, Article IX, Section 24, has two paragraphs, each one sentence long. The Court in the opinion regarding eligibility construed the first sentence, but the second sentence imposes a duty fully to fund pensions every year. Once that money is there with GRS, GRS has a duty as a trustee to make sure that -- to enforce that duty on the city, and PERSIA tells -- gives GRS the duty to inform the city every year of how much it has to contribute. Once GRS has the contributions, the only -- it can only use it for the benefit of its members and for the administration of the plan, and so GRS has a straightforward duty to pay the pension benefits to the beneficiaries pursuant to the plan documents. It's essentially the ordinances creating the plan and the city charter creating the plan are like a trust instrument, a deed of trust that creates a trust with the city as the settlor and GRS -- the GRS trustees as trustee

for the benefit -- for the benefit of the beneficiaries. The trustee has a duty to administer those funds which the settlor has a duty to provide in this case under Michigan law for the benefit of the beneficiaries.

THE COURT: You may not want to assume this, but let me ask you to assume it for the moment that the Court was correct in its eligibility opinion that each of these obligations is contractual in nature and, therefore, subject to impairment in bankruptcy. What's the problem with impairing your pension claims?

MR. QUINN: Your Honor, I did not read the eligibility opinion -- of course, I'm sure the Court understands what it meant to say better than I do. I did not read the eligibility opinion to construe the second paragraph of Section -- of Article IX, Section 24. That paragraph says nothing about a contractual obligation. It imposes a straightforward constitutional obligation to fund pensions fully every year. That's a duty that the people of the State of Michigan have chosen to impose on their state and all its political subdivisions who have pension plans. Since it's a constitutional duty, it's not something that the city, the governor, the legislature, or any of them in combination have the power to give up to allow it to be adjusted in Chapter 9, and, of course, the Court cannot adjust any obligation in Chapter 9, any obligation of a municipal corporation, without

the consent of the state. And since we're talking about a constitutional provision that does not delegate the governor or the legislature or the city the right to waive it or to allow it to be adjusted in Chapter 9, nothing they have done creates that, and so it's not within the jurisdiction of the Court to adjust that duty.

THE COURT: Well, okay. So what's the case law that says state consent to adjust a particular debt is necessary in Chapter 9? Isn't that consent inherent in the authorization to file?

MR. QUINN: If it's given by someone who has the power to give the consent.

THE COURT: Governor Snyder?

MR. QUINN: No. Since it is a constitutionally imposed obligation, it's not one that anyone other than those who can amend the Constitution can --

THE COURT: Didn't I overrule that argument in the eligibility opinion?

MR. QUINN: If you did, your Honor, I didn't see it. As far as I could see in the --

THE COURT: Well, the argument was made there that because of the first sentence of Article IX, Section 24, the governor can't consent to a bankruptcy that will impair pensions.

MR. QUINN: Right.

THE COURT: I got past that.

MR. QUINN: Right. Well, but there was no discussion that I saw in the opinion --

THE COURT: Right. You're right about that, but my question to you is why wouldn't the same rationale apply to the second sentence?

MR. QUINN: Because the first sentence explicitly says that the obligation it creates is a contractual obligation, and the Court reasoned that contracts are exactly what gets adjusted in bankruptcy. And so when the people of the state chose to call it a contractual obligation, that is the obligation to pay pensions as they come due, which is distinct from the obligation to fund pensions. I think the reason I say it's consent, the Court may recall that it quoted at length from -- I think it was Kosa --

THE COURT: Um-hmm.

MR. QUINN: -- the history at the Constitutional convention, and that history makes it clear that the obligation imposed by the first sentence is distinct from the obligation imposed by the second sentence. And so when you -- when the Court construed the first sentence, I don't think it said anything about the second sentence.

THE COURT: Okay.

MR. QUINN: So, anyway, just to summarize that part of my argument, despite what the plan of adjustment and the

materials accompanying my ballot seemed to indicate, the outcome of this case cannot affect the amount GRS pays me on the first of every month.

I'll now move on to the second issue raised in my objections, whether the plan violates 11 U.S.C., Section 1123(a)(4), by attempting to impose nonconsensual less favorable treatment on claims or interests affected by the ASF recoupment than on other claims or interests in Class 11. The city argues that the ASF recoupment does not treat claims differently. Rather, it treats creditors differently. But my claim as a member of Class 11 is for a monthly pension payment. Same is true of every other present or future retiree who has a claim in Class 11. Each of our claims is for pension payments, and the plan of adjustment does not provide the same treatment.

THE COURT: Well, but hold on there. A moment ago you told me it's not the city that owes you the money.

MR. QUINN: I think what I said, your Honor, is I accept the city's position that it is liable for that even though GRS is also liable. The city says it's liable to me for my pension payments.

THE COURT: Well --

MR. QUINN: Its liability can be adjusted according to the Court's opinion on eligibility.

THE COURT: You've lost me there.

MR. QUINN: All right.

THE COURT: I just don't follow that.

MR. QUINN: The city has --

THE COURT: Is it your argument that there's a kind of joint and several liability, the city's portion of which can be adjusted but the Retirement Systems' portion of which can't be adjusted?

MR. QUINN: As long as the city says it's liable, and it does, yes, that's the case. I really don't take a position on whether the city is liable, but the city says it is. I do say that GRS is liable. If they're both liable, then it is a joint liability, but joint -- when two debtors have a joint liability --

THE COURT: Well, hold on. But a moment ago when you started to launch on this classification issue, you're talking about the liability of the city to you --

MR. QUINN: Yes.

THE COURT: -- unless I missed something.

MR. QUINN: Yes, a liability -- the city's liability -- the city has told us in its reply to these arguments that it is liable to me for my pension. I'm not --

THE COURT: A question on which you don't take a position.

MR. QUINN: I certainly don't dispute it, and if they are liable and the Court is correct in its construction

of the first sentence of Article IX, Section 24, then that liability can be adjusted, and the question is can -- then we have to face the question of whether it's being adjusted in a way that treats all claims in Class 11 the same.

THE COURT: Okay. Give it your best shot.

MR. QUINN: For most claims of retirees in Class 11, the city's liability for monthly pension payments is to be reduced, as the Court knows, by 4.5 percent and the elimination of COLA, but the city's liability on my pension -- on my monthly pension payment is to be reduced by 20 percent plus the loss of COLA, so my claim for a monthly pension benefit is receiving substantially less favorable treatment than the claims of other retirees in Class 11, and I have not been asked to agree to this less favorable treatment.

I do not take a position on the question whether the city's distinction between -- whoops, I think I skipped a page here. I'm sorry. I don't take a position on the question of whether the city's distinction between treatment of claims and treatment of creditors makes sense when applied to current employees who have pension claims and open ASF accounts. As I understand it, the ASF recoupment does not result in additional reductions in their pensions; that is, their claims as members of Class 11. Rather, it results in the removal of money from their ASF accounts. But we

retirees don't have ASF accounts, so no money can be taken

from my ASF account.  Instead, under the plan, my pension is

reduced, and my pension is my claim as a member of Class 11.

THE COURT:  So how would you have preferred to see

classification?

MR. QUINN:  I have no problem keeping the class as

it is, but being what it is all members of the class, all

claims in the class have to receive the same treatment.

THE COURT:  I'll restate the question.

MR. QUINN:  Okay.

THE COURT:  If the city proposed to treat your claim

the way it did and in a way that you argue is different from

the way it is treating other members of the class --

MR. QUINN:  Um-hmm.

THE COURT:  -- in violation of Chapter 11, how would

you have proposed the city classify your claim?

MR. QUINN:  It could either be a separate class or a

subclass of Class 11 that would vote separately.

THE COURT:  Um-hmm.  Would you propose that all

creditors whose monthly payment amounts are reduced because

of this ASF issue be in a separate class from all pension

creditors who are not affected by this issue?

MR. QUINN:  Your Honor, to be perfectly honest,

since I'm a novice at bankruptcy, I'm probably not the best

person to ask, but what would make sense to me is that they

should be in a subclass. The Class 11 --

THE COURT: Well, I don't want to argue class or subclass because --

MR. QUINN: Okay.

THE COURT: -- I've actually never really understood what that distinction is, but --

MR. QUINN: All right. Well, I'm glad to hear that, your Honor, because I don't understand --

THE COURT: Yeah. Okay. Fair enough. But the point is they should be separately classified whether it's --

MR. QUINN: Well, if you --

THE COURT: -- Class 1 and 2 or Class 1-A and 1-B.

MR. QUINN: If we were going to go back and revote, that would make sense, but I don't think --

THE COURT: All right.

MR. QUINN: -- we're about to do that. I hope not.

THE COURT: Okay. But here's where I stumble with your argument. Some people's reduction is less than yours; right?

MR. QUINN: Most are, yes.

THE COURT: So their pension payment is more than yours; right?

MR. QUINN: You mean their pension payment? Oh, the amount they receive?

THE COURT: Yeah.

MR. QUINN: Well, that depends on how much they put in and their years of service and so on, but --

THE COURT: Right, but the reduction that they suffer because of ASF is less.

MR. QUINN: Is less. Is less, yes.

THE COURT: Okay. Should they be in a different class, too?

MR. QUINN: That's a good question, your Honor. If we were at the point where we had to design classes, I think that's an important question. We're well beyond that. We did vote as a single class. The city chose to put us all in one class, and it, therefore, has to --

THE COURT: Well, I want to understand what the practical ramification of your argument might be in this case to judge its merit.

MR. QUINN: All right.

THE COURT: Does it mean that a separate class has to be created for every percentage point of reduction?

MR. QUINN: I wouldn't think so, your Honor.

THE COURT: Where is the line drawn then?

MR. QUINN: Well, I point out that I'm not suggesting that ASF recoupment should not be part of the plan even with the class as it is. I'm simply saying that since it does provide --

THE COURT: And I'm not suggesting that you are

suggesting that. This is a classification question.

MR. QUINN: All right.

THE COURT: Where's the line?

MR. QUINN: Well, perhaps there is no line, and perhaps for that reason they need to be in the same class, but if they do need to be in the same class, then that simply means that every class member who's receiving less favorable treatment has to agree to the less favorable treatment. It's not -- I'm not suggesting that ASF recoupment shouldn't be in the plan or even with Class 11 as it is. I'm simply --

THE COURT: So am I right then that your argument is not a classification issue, it's --

MR. QUINN: No.

THE COURT: -- the argument that everyone whose pension is reduced because of ASF must consent to it?

MR. QUINN: That's correct. That's what 11 --

THE COURT: Ah, that's a different question.

MR. QUINN: That's what 1124 -- or 1123(a)(4) says.

THE COURT: Okay.

MR. QUINN: And that's what I'm relying on.

THE COURT: Okay. So -- okay. So the argument is because they are receiving a less favorable treatment, they are -- this Code section requires their specific consent.

MR. QUINN: That's correct, your Honor.

THE COURT: Okay.

MR. QUINN: And I should point out that the limited option to pay off part of the ASF recoupment in advance doesn't really change this analysis as --

THE COURT: No, it wouldn't. I agree with you on that.

MR. QUINN: Okay. The city goes on to argue that the ASF recoupment without individual agreement is justified because the GRS trustees violated fiduciary duties by making excessive credits to ASF accounts during certain fiscal years. For the moment I'll assume this is true that the trustees did make excessive allocations to ASF accounts. I understand Mr. Karwoski will argue that the evidence fails to support this contention and, in fact, shows it to be false, and I agree with him, but right now I want to explain why the city's position would fail as a matter of law even if it did have evidentiary support. First, under Section 1123(a)(4), the only justification for disparate treatment within a class is agreement to the disparate treatment by each class member whose claim is subjected to less favorable treatment. There's no set of facts and no legal or equitable theory that defeats the requirement of individual agreement to less favorable treatment. It has to be that way to protect the integrity of the voting process within each class to prevent a situation in which a majority of class members can impose a result inimicable to the interests of a minority whose

interests differ from those of the majority.

Second, the city's rationale for the ASF recoupment is fundamentally unsound as a matter of law. The city argues that those GRS members whose accounts received excess credits have become trustees of the funds so credited. The city doesn't cite any Michigan law in support of this position but relies on Harris Trust for the proposition that with certain exceptions, quote, "when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust," but by its own terms the proposition upon which the city relies does not apply to the facts it alleges. This is so for two reasons. First, the creditors affected by the ASF recoupment are not third parties to the trust. We are all GRS members whether current employees, retirees, or beneficiaries designated by deceased retirees and, therefore, trust beneficiaries. And, second, the allegedly improper credits to ASF accounts were not transfers of trust property. The funds so credited remained in the trust corpus. GRS, as trustee, retained title to those funds, and the beneficiaries whose accounts were credited acquired no title continuing to hold only beneficial interests in the funds. Indeed, this case provides an example of the necessity for the limitations included in the principle enunciated in Harris Trust. Those limitations prevent the oxymoronic result in which certain

ASF account holders become trustees of parts of the corpus of
the GRS trust to which they are beneficiaries while acquiring
no title to any part of the corpus. So Harris Trust doesn't
work for the city and wouldn't work even if it were a
Michigan law, but that's not the only authority the city
relies on in its attempt to justify the ASF recoupment. It
also relies on comment G-3 to the Restatement 3d of Trusts,
Section 104, but that comment has nothing to do with trust
beneficiaries becoming unwitting trustees. It's entitled
"Unjust Enrichment." It notes that a beneficiary may incur
liability to the trust under the law of unjust enrichment
except to the extent that a defense to restitution applies
and gives the example quoted by the city of a beneficiary who
because of a breach of the trust receives trust property to
which the beneficiary is not entitled. Of course, a comment
in the Restatement of Trusts is even less helpful than Harper
Harris Trust in discerning Michigan law, but I won't quibble
about that because there are plenty of Michigan cases that
provide a remedy for unjust enrichment defined as, quote,
"The unjust retention of money or benefits which in justice
and equity belong to another." Among the cases are Tkachik
versus Mandeville and Dumas versus Auto Club. If the
plaintiff were GRS, the defendants were creditors who
received excess ASF interest, and the excess credits had
occurred as claimed by the city, then the ASF recoupment just

might jibe with those elements, but even if the elements were made out, there are defenses to an unjust enrichment claim. One is the statute of limitations. To evaluate that defense, it's necessary to identify the appropriate limitations period and determine when the claim accrued. The limitations period is not in dispute. The city, Mr. Karwoski, and I agree that any claim for unjust enrichment would be subject to the six-year limitations period established by Michigan Compiled Laws, Section 600.5813.

THE COURT: Are you sure the city agrees with that?

MR. QUINN: They said so in their consolidated reply. Actually, I should amend that. The city relies on Michigan Compiled Laws, Section 600.5807(8), paren 8, for the six-year limitations period, but it's actually Section 5813 that applies here, so I mean we reach the same result using different statutory sections.

So the next question is when do the claims accrue? In Michigan a claim accrues, with exceptions not applicable here, when the wrong upon which the claim is done. It's when we seek to identify the wrong that was done that it becomes clear why the city has so strenuously struggled against logic to make it appear that the principle that derives from Harris Trust applies to the ASF recoupment. City needs the fiction that GRS members became trustees without knowing it of allegedly excessive funds allocated to their ASF accounts on

the date of each allocation. It uses that fiction to argue that the claim against each such trustee accrues only when she repudiates her fiduciary duty with reference to those claims. Of course, that can't happen until the unwitting trustee is informed that she has a fiduciary duty to repudiate, and none of us were so informed until we read the original plan of adjustment on or after February 21st, 2014. So, according to the city, none of the claims based on the recoupment accrued before February 21st, 2014.

I have to say that's an admirably clever argument, but it doesn't work because we're talking about unjust enrichment claims, not claims against make believe fiduciaries. Under Michigan law that's what we're talking about. The wrong upon which each such claim is based is the alleged unjust enrichment, and that occurred each time a GRS member received an improper increase in their beneficial interest in the corpus of the GRS trust; that is, on the date of each allocation of allegedly excessive interest.

It follows that each claim upon which the ASF recoupment is based is time-barred unless it's based on an allocation of interest that happened less than six years before the date upon which GRS, the only plaintiff with standing, commences an action based on the claim. GRS has not commenced such an action, so we can say, at a minimum, that all ASF recoupment claims based on allocations of

interest earlier than October 2008 are time-barred.

Moreover, under Michigan law as explained in Michigan Educational Employees Mutual Insurance Company versus Morris, GRS is estopped from prosecuting an unjust enrichment claim if the recipient of the unjust benefit relied upon it to her detriment. The form of such reliance might vary among GRS members affected by the ASF recoupment. No doubt many of us relied on the full reported balances in our ASF accounts in making and beginning execution of retirement plans that would become infeasible if the benefits were partially taken away. Others may have made decisions regarding the need for and the expected -- the acceptable level of risk in other investments in reliance on our expected pensions and reported ASF balances.

The city attempts to gloss over all these issues by acting as judge and jury and including its final judgment, the ASF recoupment, in the plan of adjustment thus overruling all defenses of persons affected by the recoupment without even providing them with --

THE COURT: Well, isn't a fair way to state it that instead of the city acting as judge and jury, it has come to a settlement of the issue in light of the complexity of the issues you raise, in light of the complexity of the litigation that would have to result if there were no settlement, and it has asked this Court to act as judge in

approving the reasonableness of the settlement? Isn't that a fair way to look at this?

MR. QUINN: I don't think so, your Honor, because the settlement -- I assume the Court is talking about the settlement with the Retiree Committee, and to be perfectly honest, it seems to me as to ASF recoupment the retiree was in a serious conflict situation because most of the retirees it was supposed to represent are unaffected by ASF recoupment. It's been said that without ASF recoupment, those individuals would be getting much larger cuts in their pensions, and so essentially what the Retiree Committee agreed to was to take money from some of the people it was supposed to be representing and transferring it to other people.

THE COURT: Okay. That may be an argument to make as to why the settlement is not reasonable, but that wasn't my question.

MR. QUINN: All right. I'm sorry, your Honor.

THE COURT: Yeah. My question was how do we look at this? Do we look at this as the city acting as judge and jury and imposing its judgment on this issue on all of you and unfairly so when I suggested that the alternative way to look at this was it was a settlement subject to this Court's approval on whether the settlement is reasonable? Isn't that a better way to look at it? Wouldn't you do better to argue

that the settlement is unreasonable than to say this is the city imposing its judgment on everyone?

MR. QUINN: Well, your Honor, except that the -- and I think Mr. Karwoski is going to address this in more detail.

THE COURT: Oh, okay.

MR. QUINN: Okay. And, of course, the bottom line is the proper way to accomplish this under Section 1123(a)(4), you don't settle with some committee appointed by the U.S. Trustee to represent all retirees. You have to settle with each individual to whom you want to give less favorable treatment. And I should mention that raises a question that I would like to briefly discuss if I could take a few more minutes.

THE COURT: Go ahead.

MR. QUINN: And that is what could possibly motivate us who are affected by the AS recoupment to agree to it? Why would we agree to it?

THE COURT: Why is that an important question?

MR. QUINN: Well, I suppose -- I shouldn't have said "important," your Honor. I guess it's not important. If it's required to do that, it makes no difference what the result would be, but I don't want --

THE COURT: I'm willing to assume none of you would have agreed to this.

MR. QUINN: Well, I'd like to suggest that that

assumption is not necessarily correct, your Honor.

THE COURT: But what difference does it make? It is what it is.

MR. QUINN: In the legal analysis, it makes no difference.

THE COURT: All right.

MR. QUINN: Okay. Now, I need to call the Court's attention to one other issue concerning the ASF recoupment, but, unfortunately, I lack the expertise to be of much help in resolving the issue. It's important because it appears to me, relatively completely untrained in bankruptcy, that it goes to subject matter jurisdiction.

THE COURT: Let me pause to suggest to you that as untrained as you claim to be, you're doing really well.

MR. QUINN: Well, thank you, your Honor. I appreciate it.

THE COURT: I'm sure any of my colleagues would welcome you into their court anytime --

MR. QUINN: Frankly, your Honor, after this --

THE COURT: -- as a representative, of course.

MR. QUINN: Right, yeah. After this baptism of fire into bankruptcy practice, I would decline the invitation.

THE COURT: All right. What's your last point here?

MR. QUINN: Okay. The question I wanted to raise -- and I think it's important because it does go to subject

matter jurisdiction -- is whether a claim that one creditor -- in this case, GRS -- might assert but has not asserted against other creditors is the sort of related matter to which federal jurisdiction attaches in the absence of any possibility that the creditors against whom the claim might be asserted could pass on all or part of their potential liability to the debtor.

If the Court has any questions, I'll be happy to answer them. If not, I thank the Court for its attention, and perhaps more than others I should thank the Court for its patience with -- I appreciate your kind words, but I do feel very much like an amateur here, and so I appreciate the Court's patience with me and with the other individual objectors.

THE COURT: Well, you're welcome, sir. Thank you.

CLOSING ARGUMENTS

MR. KARWOSKI: Good afternoon, your Honor. Mike Karwoski, an individual objector. Like the other counsel and Mr. Quinn before me, I want to thank the Court for allowing Mr. Quinn and me to participate in this confirmation hearing.

THE COURT: Sure.

MR. KARWOSKI: And I want to thank your staff for all the help that they've provided, and they've been very pleasant to deal with and have gone above and beyond the call of duty. I also appreciate the opportunity to have

participated in this Chapter 9 as a member of the Retirees' Committee. I have the highest regard -- and I realize it's getting late.

THE COURT: That's okay. Take your time.

MR. KARWOSKI: I have the highest regard for my -- and affection for my fellow committee members and for the professionals that we hired. I think one of the best things we did was the first things, the first step, which was to hire professionals, Dentons, Matt Wilkins' law firm, Segal, and Lazard, and they've served the committee very well. I appreciate the work that the committee did. I think the committee has -- I hope has been a help to the Court in resolving the issues related to retirees' pensions and healthcare benefits in particular. I appreciate having been a part of it. I hope I've contributed a little bit to the work of the committee.

I change hats again and part with the committee only as to ASF recoupment. I otherwise would support the plan of adjustment and encourage your Honor to confirm it but without ASF recoupment being a part of it.

THE COURT: Do I have the authority to do that?

MR. KARWOSKI: I hope you have the obligation to do it, your Honor. I believe that ASF recoupment is --

THE COURT: Here's my problem with that. The Bankruptcy Code -- I forgot the specific section, but it does

say that only the city can file a plan, and so if I confirm the plan that you are asking me to confirm, it's not the city's plan. It's my plan.

MR. KARWOSKI: The way I would look at that would be to indicate that you would not confirm this plan including ASF recoupment but that you would confirm an otherwise identical plan that does not include ASF recoupment.

THE COURT: Well, but the city would have to propose that; right?

MR. KARWOSKI: Yes, they would, and if you refuse to confirm this plan, the ball is in their court, so they would likely propose a plan. Whether it would be identical except for ASF or different in other respects, I don't know, but that, of course --

THE COURT: Well, it would create --

MR. KARWOSKI: -- is the city's prerogative.

THE COURT: It would create a hole in their budget of over $200 million; right?

MR. KARWOSKI: No, your Honor. It doesn't create a hole in the city's budget because the ASF recoupment does not go to the city. It goes to GRS.

THE COURT: But the city is responsible to plug any hole in the payments to GRS.

MR. KARWOSKI: Only ten years from now in 2023 depending --

THE COURT: Whenever it is, it's still the city's obligation.

MR. KARWOSKI: Yes. And that's part of the settlement. As Mr. Montgomery indicated, the city has accepted the obligation to fully fund pensions beginning in 2023 and going forward. However, I guess this goes to feasibility, too, which I was going to -- whoops -- address at the end just briefly, but removing ASF recoupment, which is said to be worth about $190 million, does not create an immediate hole in the plan of that amount because, as Mr. Quinn indicated and Ms. Thomas testified, most of the ASF money is already with the GRS. It's invested together. The ASF money, the traditional pension plan money, the money that's set aside to fund annuities is all there within the GRS, so there would be -- the only new money that would come into the GRS through the plan --

THE COURT: Well, what would happen is that the -- is that the monthly checks would go back up, right, would return to a normal level, and, therefore, the plans would be paying out that much more? That's the 190 or -- I thought it was 220, but whatever the number is, that's what would create the hole; right?

MR. KARWOSKI: Well, taking ASF out would create an actuarial hole of 190 million or 200 million up front but not a real dollar hole. The big blue pot that we had up on the

screen a couple of times, which your Honor correctly pointed out, is not an exact representation of what's going on with pensions because it may not be full. There's unfunded accrued actuarial liability, so the pot may be --

THE COURT: That UAAL goes up by a dollar for every dollar that a pension claimant gets if ASF is eliminated; right?

MR. KARWOSKI: Over the course of time.

THE COURT: Of course.

MR. KARWOSKI: And the removal --

THE COURT: This whole plan is about the course of time.

MR. KARWOSKI: Most of the money is in the GRS now. The only new money that would come in potentially shortly after the confirmation of the plan would be the up to $30 million for those ASF participants who --

THE COURT: Yeah. I get that, but the money would be going out faster if ASF is eliminated than it otherwise would; right? That's where the new UAAL or the incremental increase in the UAAL would come from.

MR. KARWOSKI: Well, no. The pension payments would stay the same on each check. There would be a subtraction for the ASF recoupment, and that would be transferred to another fund within the GRS, so the fund wouldn't go down because of that transaction. The fund would go down over

time as payments are made that do not --

THE COURT: Let's just be real clear about this, and we'll use simple numbers that are obviously not reality, but suppose a pension check is a hundred dollars without a reduction for ASF and it's $90 for a check that includes an ASF reduction, okay, just hypothetically.

MR. KARWOSKI: Okay.

THE COURT: Okay. So without ASF, the plan has to pay ten dollars more than it does with the ASF reduction, so money is going out of the pot quicker without the ASF reduction; right? Assets are being depleted quicker, and, therefore, the city is exposed to the risk -- the likelihood of a higher UAAL down the line, yes, but a higher UAAL. Does that make sense to you?

MR. KARWOSKI: Well, in your example, the ten dollars -- I mean the payment on the retiree's check would still be a hundred dollars. It would be reduced by ten on the check as a withholding.

THE COURT: Right, but the "pay to the order of" amount --

MR. KARWOSKI: Would be ten dollars less, yes, but the ten dollars that's withheld is not going to Blue Cross or HAP. It's going back into the plan. It's just going into a different fund in the plan, so in terms of the funding level, the funding level is the same. What's happening is funds are

shifting from one subfund to another within the GRS.

THE COURT: Okay. So what happens to that other fund?

MR. KARWOSKI: Well, the -- the first fund?

THE COURT: The fund that the ASF amount goes into.

MR. KARWOSKI: That fund gets larger.

THE COURT: What happens to it?

MR. KARWOSKI: It is invested along with all the GRS assets, as Ms. Thomas testified.

THE COURT: What's it used -- I guess a better question is what's it used for?

MR. KARWOSKI: It's used to reduce the unfunded liability over time, but as it does that, it earns interest. It earns the same rate of return as the GRS fund overall, so the fact of having ASF exist at all adds to the -- is to the good of everyone. It's to the good of the GRS. It's to the good of the city. It's to the good of retirees. ASF recoupment, if it is approved as part of this plan, will -- over time will diminish the money going into the GRS fund by way of voluntary ASF contributions. There was testimony highlighting some of the numbers from the annual reports that showed over the last few years in the recoupment period for which the reports and the audited financial statements are in evidence, that the voluntary contributions of ASF participants went from about -- in relation to what the city

was contributing -- and, of course, the city was getting into financial trouble, which is why it was contributing less, but in spite of that, in dollar amounts ASF contributions went from one-fourth to one-third to one-half of the amount that the city contributed. If I remember the numbers, in 2013, the 2013 report, ASF contributions were 13 million, and the city's contributions were 26 million, so the ASF voluntary contributions were 50 percent of what the city was putting into the pot. For the one year, an earlier year that we had testimony, the ASF -- the two ASF funds, the annuity savings fund and the reserve fund, together their total was $671 million out of a $2.5 billion total invested in the GRS. It was two-thirds of a billion dollars that was there because of ASF, and I'm not -- I mentioned to Mr. Bennett that --

THE COURT: How much would that have been if the plans had not paid out so-called excess interest?

MR. KARWOSKI: Well, I'm going to -- I hope I'm going to address whether there actually was such a thing as excess interest, and I hope to show that in the long-term view there's no such thing as excess interest because the way the funds are -- the ASF funds are invested together with the GRS funds, they rise and fall together. So if you take a long enough time horizon, the payouts to ASF roughly track the earnings -- the earnings on ASF, rather, roughly track the earnings on GRS, so there's no net loss to the fund

because of ASF, but there's an actual gain because more money is coming in as a result of the voluntary contributions, significantly more money, which would not be there without ASF. ASF recoupment will kill the ASF plan.

THE COURT: Well, but every dollar of contribution is a dollar of liability; right?

MR. KARWOSKI: It's a dollar of liability, but, again, it's somewhere down the road, and within the -- the methodology -- I have one chart that I want to point to. Within the methodology that the city used to calculate the so-called excess interest, there were three years within the ten-year period in which bonus interest was paid. There were also -- which is part of the so-called excess. There were also three years in which the earnings, the market rate of return on the GRS funds was more than the earnings attributed to ASF, so those -- where did those money -- where did that money go? According to Ms. Thomas' testimony and what we understand to be the way the funds are invested, that additional earnings -- those additional earnings stayed in the overall GRS funds, so they added value over time. Yes, there's an accounting for every dollar that comes in, a dollar goes out, but there's interest that that dollar that came in earned while it was in the GRS funds, and ASF money that comes in stays in for a long time. We heard testimony that the only way a person can withdraw money -- the only

time they can withdraw money is when they retire. After 25 years, they can -- they can retire only at a minimum after 8 or 10 years to vest. They can borrow after 25 years or when they retire, and we heard Mr. Moore testify. He gave the example of the one person who worked for 35 or 37 years and invested voluntary -- voluntarily contributed something like -- I think it was a hundred and some thousand dollars to ASF and when he or she retired walked away with $1.4 million, and that was given as an example of what's wrong with ASF. I suggest that that's an example of what's right with ASF if it works correctly in the way that it's intended to. That person, if you -- and I did the math, but I'm not going to -- not introducing evidence here, but if you do the math and divide out that hundred thousand plus dollars that that person put in over 35 to 37 years, that person contributed something like a couple hundred dollars a month. It's just that she had the savings discipline to do it continuously for 37 years, and as that money -- as the earnings on that money was -- those were all voluntary dollars that your Honor suggested went into the fund.

THE COURT: Did you calculate the effective rate of return?

MR. KARWOSKI: I didn't calculate it, but if it's over 37 years, it would probably be pretty close to 7.9 percent because the evidence shows that earnings on the GRS

funds over the long period were very close to the target rate of return. There's a comment in the 2004 fiscal year report that says for the 16 years before the beginning of the recoupment period, the average rate of return on GRS funds was 8.6 percent, so that covers 20 years of the 30-some years of that one example. I would say that the rate of return -- if the rate of return was 7.9 percent, that person did very well, but it was because of their persistence, their commitment to the city to stay on the job for 35 or 37 years and during that time to contribute an admittedly small amount but to do it for so long and through what -- Mr. Quinn asked Mr. Moore if he knew what the miracle of compound interest was, and Mr. Moore said he didn't, but I think we do. It's the compounding of that interest over time that led to the large total that that person walked away with, and I don't think there's anything wrong with that. I think that's what ASF is supposed to do. It's designed to supplement the relatively meager pensions which for GRS members average about $19,000 a year. Rather than putting the onus on the city to improve the DB pension plan, which would cost the city more, this is a way that the city has -- it's the city's plan. Annuity savings fund is the defined contribution plan of whatever year, not 1998 but the -- 1973. It's the city's plan. It's administered by the city, and it's designed to allow employees to build for their retirement to have larger

pensions but to do it with their own money rather than the city being expected to contribute more, which it clearly has not been able to do in recent years, but through voluntary contributions employees can get a significant boost in their pension through their own voluntary contributions. It's because their funds are invested in the large investment portfolio that GRS has, and that portfolio has done pretty well over most of the years. Within the recoupment period, the recoupment period was a very volatile period. It was perhaps the most volatile ten years in financial markets since the great depression, and there were high years and there were low years. And the city has -- the way it's calculated, the alleged excess interest focuses on the years -- on the high earning years and the years in which the funds -- the market rate of return on the funds was higher than what was -- the city focuses on years in which more was paid to -- credited to ASF accounts than was earned, but there were other years within the recoupment period where the funds -- the overall market rate of return on the funds in general was higher than what was credited to ASF, so those additional earnings on the ASF funds stayed in the General Retirement System traditional plan funds and accrued to the benefit of the plan and to retirees and to the city. That's why I have -- if I can approach, your Honor.

THE COURT: Sure.

MR. KARWOSKI: Your Honor, what I just handed out and handed your Honor is one page of Exhibit PS14020, which was admitted by the city during its cross-examination of one of the pro se witnesses, and I only copied the cover page, which shows the exhibit that the chart is from. It's at the 21st page of the presentation. The pages are not numbered, so I just wanted to make it easier to refer to it, and I'm going to -- I'm way out of order here, but I think this is the better point.

THE COURT: Sure.

MR. KARWOSKI: This is my -- the point I want to address here is did the city show that excess interest was awarded. Several times the Court asked witnesses to explain why pension funds not only in Detroit but across the country are more underfunded now than they were a decade or so ago. The main reasons given in evidence were, one, plans not living up to investment expectations; two, the collapse of the financial markets in 2008 which affected all plans -- Mr. Montgomery referred to that from Ms. Thomas' testimony -- and, three, Ms. Thomas' answer as to Detroit that it's a mature plan having significantly more retirees than actives. Although it's the heart of the city's claim for ASF recoupment, there is no evidence from any of the actuaries that GRS trustees' awards of so-called excess interest contributed to the current UAAL.

One area of agreement among the actuaries was that a longer term is better in making financial projections. Discussing the public pension fund survey, Mr. Fornia said that using even a ten-year period is way too volatile. The city uses ten-year and forty-year cash flow projections in the plan of adjustment. The city's theory of ASF recoupment is flawed because it ignores the relationship that the annuity savings fund has had with the GRS traditional pension plan funds over a time period measured in decades. Ms. Thomas testified that ASF funds are commingled with traditional pension funds and invested together. The portions of annual reports which were highlighted during her testimony state that GRS trustees invest for the long term. With that perspective, their investment allocation has averaged more than the 7.9-percent targeted rate of return. I quoted the language from the 2004 report.

The average interest earned on ASF accounts should perform as well over a long time frame because they're invested together. The way the city calculated excess interest on a year-by-year basis within the recoupment period, which is shown in the chart, and adding up the total exaggerates the rise and fall of financial markets which were especially volatile during this ten-year period. The methodology is unfair as applied. It ignores years in which there were higher gains on ASF accounts -- account funds and

were credited to them. Those gains remained with the overall GRS pension accounts to the benefit of all GRS members. Some of the money went the other way. It wasn't just taking money from the GRS members to fund ASF. Some of the ASF earnings when they were higher than what was awarded to them went to the benefit of everybody, including the ASF members, who are part of that overall group, too.

The city's theory of recoupment exploits the short-term view and does it in a way so as to exaggerate the appearance of excess interest. How recoupment was calculated is demonstrated in this chart. The fact that the chart uses market -- the fourth column shows fiscal year market rate of return, and that's the number that's played against the amount awarded to ASF accounts. The amount awarded to ASF accounts is the total of the two numbers in the second and the third column. In the second column it's the -- let's call it the base rate interest on ASF, which for all these years was 7.9. The ASF interest bonus was the three years, '05, '06, and '07. So if you add those three -- those two together for the three years, you get the total returns credited to ASF accounts versus the market rate of return. The fact that the chart uses the market rates of return rather than the smooth rates as were used by GRS in the annual reports further exaggerates the volatility of this approach. No credit is given to ASF participants for years

in which the market rate was greater than the interest
credited to their accounts.  The differential between market
returns and amounts credited for those years were six -- I
just subtracted.  The differential is 7.6 percent in 2004,
12.3 percent in 2011, and 4.3 percent in 2013.  For instance,
looking at 2004, the market rate of return that's reported is
15.6 percent, but no bonus was paid on ASF, only the base 7.9
percent, so the difference between those two is 7.6 percent,
which was not credited to ASF accounts within the recoupment
period.  The city's methodology doesn't take that into
account.  It doesn't credit the ASF participants for the
years in which that happened.  It only takes the years in
which more interest was awarded, like '07 for instance is
the -- is an example of that -- no -- '09, the big loss year,
is one of the years that the city puts a lot of weight on
when the funds lost almost -- the market funds -- rate of
return was almost a minus 20 percent, and the AS interest
awarded was 7.9, so that's one of the big years that adds to
the so-called excess interest, but it doesn't -- the city
does this year by year, which exploits the volatility of the
market, particularly during this period, and it's more
exaggerated because of using the market rate of return in
this calculation.  For instance, in the -- well, I'll leave
it at that.

        There was no evidence during the -- the method -- if

you're going to use that method and, in effect, charge ASF participants for the years in which they got too much interest, you should also credit them for years in which they got too little if you're going to be philosophically consistent and procedurally consistent, and also just in light of what the actuaries talked about about the long time frames and the fact that ASF has this long historical relationship with GRS and the funds are invested together and they average about the same over time, if you look at the long time horizon, you're not going to get excess interest. You're going to get ASF awards that average about what GRS earnings average, but you can exploit these -- the volatility and the fluctuations, which the city did in calculating the alleged excess, but there was no evidence during the trial of any breach of fiduciary duty or wrongdoing by GRS trustees with respect to the awarding of interest. That's the allegation that the city makes in its --

THE COURT: What was the authority to do that?

MR. KARWOSKI: The authority to do what? The trustees? I'm sorry. I didn't understand your question.

THE COURT: What's the authority to do what you say the trustees did that was not a breach of fiduciary duty?

MR. KARWOSKI: The trustees had discretion to award interest on the accounts.

THE COURT: Where did that --

MR. KARWOSKI: Their discretion --

THE COURT: Where did that come from?

MR. KARWOSKI: I believe it comes from the city code, from the section of the city code which was amended in 2011 to put restraints on the discretion, and --

THE COURT: What was that language?

MR. KARWOSKI: Pardon?

THE COURT: What was that -- I'm sorry, sir. What was that language?

MR. KARWOSKI: The language of the ordinance?

THE COURT: Yeah, the preamendment language that you say gave the authority to the trustees to do this.

MR. KARWOSKI: The language is -- I don't have the exact -- I believe the language is in the ordinance, but it's referenced in the same exhibit. Just give me a second. I believe it's in the same exhibit.

THE COURT: Okay. I'll look for it in the exhibit then.

MR. KARWOSKI: But it's been -- Ms. Thomas also testified the trustees had discretion. I believe the language is the section of the city code.

THE COURT: Well, she could hardly be expected to testify otherwise.

MR. KARWOSKI: No, but the -- I mean the fact that the city decided to amend the code to limit the discretion

indicates that there was discretion, that it wasn't limited --

THE COURT: Maybe.

MR. KARWOSKI: -- before, but there's no evidence that the discretion was limited until the ordinance, and within --

THE COURT: Well, that depends on its language, which is why I asked for it.

MR. KARWOSKI: Okay. Well, I think it is in the GRS --

THE COURT: Is this the same ordinance that I had a discussion with Mr. Mack from the UAW and Ms. Lennox from the city on the other day when we were talking about the 13th check issue?

MR. KARWOSKI: I don't think so.

THE COURT: Different language?

MR. KARWOSKI: Maybe it is. No. Maybe it is, the amendment, because the amendment addresses the 13th -- says that you can no longer award a 13th check or anything like that, and with respect to awarding interest on ASF accounts, the --

THE COURT: Okay.

MR. KARWOSKI: -- range is limited, but the --

THE COURT: All right. So if we have that -- if that's the same ordinance, we have that, so --

MR. KARWOSKI: You have that. Page -- of this exhibit, page 19, one of the bullet points under ASF recoupment, which is the city's exhibit -- it's the GRS explaining how recoupment was done -- the fourth bullet point on page 16 says GRS board granted discretion to declare interest credits to the ASF accounts.

THE COURT: Right.

MR. KARWOSKI: And I believe that's referencing --

THE COURT: So my question was what was the authority of the board to do that?

MR. KARWOSKI: I think it's the ordinance.

THE COURT: Okay. We'll have a look at that. Thank you, sir.

MR. KARWOSKI: Well, there's no evidence that the trustees breached. There's no evidence that any trustee breached their discretion. The city is asking the Court to --

THE COURT: If they had it, that's possibly so, but the question I'm raising here is whether they had that discretion.

MR. KARWOSKI: Well, if they didn't have the discretion, then it would have been incumbent upon the city to raise that issue much earlier than 2011. The city -- it's the city's ordinance that creates the program. The city has --

THE COURT: Look, we're here in bankruptcy to fix longstanding practices and policies that were not good.

MR. KARWOSKI: There's no evidence one way or the other that the discretion was bad.

THE COURT: If they had it, you might be right.

MR. KARWOSKI: The city was aware of the awards of interest, knew or should have known of the awards of interest as they were being awarded over the course of years because the city has four --

THE COURT: Mr. Mack argued to me that even if the city knew of it, only the beneficiaries of the trust had standing to raise the issue, and the city was not a beneficiary of the trust.

MR. KARWOSKI: I didn't -- well, I wasn't here for that argument, but the --

THE COURT: Oh, yeah. You did say that. Well, that was his interesting argument.

MR. KARWOSKI: But the -- I mean the city certainly could have thought of a way to raise that issue.

THE COURT: It did. It amended the ordinance.

MR. KARWOSKI: But that was in 2011. I'm talking about the bulk of the recoupment period when the ordinance was not worded that way.

THE COURT: Well, the amendment of the ordinance hardly proves that the city had agreed before the ordinance

there was discretion under it.

MR. KARWOSKI: If it's in the ordinance, then --

THE COURT: Yeah. We'd have to --

MR. KARWOSKI: It's the city's ordinance.

THE COURT: We'd have to have a --

MR. KARWOSKI: It's not a matter of agreeing to it.

THE COURT: Let me ask you to wrap up, if you would.

MR. KARWOSKI: It's whatever the ordinance --

THE COURT: Let me ask you to wrap up, if you would, sir.

MR. KARWOSKI: Okay. I would disagree with Mr. Quinn's answer to your question about how to deal with the settlement aspect, that ASF recoupment is part of the settlement. My answer would be that the settlement is -- the settlement is improper because it includes an illegal and unjust component, which is the ASF interest component. The fact that it was a settlement, it was a settlement by the retirement interests in -- that were working in the bankruptcy, including the Retirees' Committee, but the -- even though I'm a member of the committee, I suggest that this was outside the scope of the jurisdiction of the Retirees' Committee because as to ASF participation, as to ASF recoupment, the Retirees' Committee is a committee that is created to represent -- it's a creditors' committee. As to ASF recoupment, I and the other ASF participants are not

creditors of the city. We're not -- as ASF participants -- I'm a creditor as a --

THE COURT: Okay. So if you're not creditors of the city, are retirees creditors of the city? Let me rephrase that. If ASF creditors are not creditors of the city, are retirees with pension claims creditors of the city?

MR. KARWOSKI: Yes, yes. I'm a member --

THE COURT: Why the distinction?

MR. KARWOSKI: Because the ASF recoupment is of a different nature. The pension is an amount that's owed to retirees by the city, and Mr. Quinn had that discussion about GRS, but I believe Mr. Bennett said in his opening it's a joint obligation, and I would take it at that. There is an obligation to --

THE COURT: He explained to me -- I think it was him -- that ASF is a city plan adopted or implemented pursuant to a city ordinance. Is that so?

MR. KARWOSKI: ASF?

THE COURT: Um-hmm.

MR. KARWOSKI: Yes.

THE COURT: So if that's so, why wouldn't the ASF piece of a pensioner's claim be a claim against the city?

MR. KARWOSKI: Because with respect to ASF, I have no -- as a pensioner who retired two and a half years ago and cashed out my ASF account, I have no relationship now to the

city as a creditor or as a debtor with regard to ASF. The only time I was a --

THE COURT: Whoa, whoa. Time out. Does this ASF recoupment program impact you at all?

MR. KARWOSKI: Yes.

THE COURT: How's that?

MR. KARWOSKI: You mean me personally?

THE COURT: Yeah.

MR. KARWOSKI: Yes.

THE COURT: Oh, I thought you just said you cashed out.

MR. KARWOSKI: No. It impacts me because I am subject to recoupment. If the plan is approved --

THE COURT: You are. Okay.

MR. KARWOSKI: I am.

THE COURT: Okay.

MR. KARWOSKI: It would be -- it would be taken --

THE COURT: Because of your --

MR. KARWOSKI: Recoupment --

THE COURT: Because of your pension check.

MR. KARWOSKI: Because of my pension check.

THE COURT: Okay. Okay. Got it.

MR. KARWOSKI: But with respect to that ASF program, the only time I was a creditor of the city was for the short momentary point of time when the city withheld three, five,

or seven percent from my salary check and transmitted it to GRS. Once that was done, I'm no longer a creditor of the city with respect to ASF. And having retired two and a half years ago, I'm not a creditor with respect to ASF. If you separate my being an ASF participant -- and that part of the settlement is qualitatively different than adjusting the debt that the city owes to me as a pensioner and with regard to OPEB benefits. The city is creating this purported debt out of whole cloth. It's a relationship. The city is suggesting that ASF participants received excess interest from the GRS because of wrongdoing by the GRS trustees. That would be -- in an ordinary sense of things, that would be an action or a claim between the GRS and ASF participants. The city has no part of that, so I'm suggesting that that -- whether that's true or not, that should be a separate action.

THE COURT: But the city pays the price for that.

MR. KARWOSKI: But no action -- the city pays the price for it eventually, but it's asking the Court to come to the conclusion now as to not only the end result but the dollar amount, which is very substantial, without the city or the GRS having to go through the ordinary process of litigation. There was no pending claim here.

THE COURT: You're right. It's a settlement.

MR. KARWOSKI: But I'm suggesting it wasn't a proper settlement because the Retirees' Committee only has authority

to represent creditors, and as to ASF participants --

THE COURT: But it can't be --

MR. KARWOSKI: -- I'm not a creditor.

THE COURT: It can't be an improper settlement because they didn't start litigation.

MR. KARWOSKI: No, but it can be an -- I'm just saying that the fact that there was no litigation shows that there was no established debt or duty to make this payment from ASF participants back to the GRS. The city is saying that --

THE COURT: Well, but there's no requirement in bankruptcy law that says that the plaintiff in a settlement in the bankruptcy context has to show it would have won in order to get the Bankruptcy Court to approve the settlement.

MR. KARWOSKI: But it would not be the plaintiff. The city is not the plaintiff -- would not be the plaintiff --

THE COURT: Why not?

MR. KARWOSKI: -- as to this claim.

THE COURT: You already admitted that the city pays the price for whatever happened with this.

MR. KARWOSKI: The obvious plaintiff would be the GRS, but the GRS -- which would have to say that we paid too much interest, that our trustees --

THE COURT: And the GRS participated in this

settlement.

MR. KARWOSKI: -- did some wrongdoing. Yes, they did, and I question whether that's not a conflict of interest on the part of the Retirement Systems and whether that's not --

THE COURT: Well, but, see, here --

MR. KARWOSKI: -- reflective of them covering --

THE COURT: -- I have to wonder if you're talking in circles because once you say the city can't do it, only the GRS can, but then the GRS did the settlement, and you say, well, they can't because they have a conflict of interest. Somebody has got to be able to deal with this issue. Who is it?

MR. KARWOSKI: Well, the GRS should have brought or could -- I guess it goes outside of bankruptcy -- bring a lawsuit against ASF participants alleging that they --

THE COURT: But this is a settlement. This is a settlement.

MR. KARWOSKI: It's a settlement.

THE COURT: Nothing in bankruptcy law says you have to bring a lawsuit or prove your claim before you can settle it. In fact, we like it when you settle them before you do either one of those.

MR. KARWOSKI: But ASF participants as ASF participants are not parties to the bankruptcy. We're not

creditors.

THE COURT: Okay. That's a different question.

MR. KARWOSKI: We're not creditors. There's no --

THE COURT: That's a different question.

MR. KARWOSKI: -- claim or --

THE COURT: All right. Again, let me ask you to wrap --

MR. KARWOSKI: There's no controversy.

THE COURT: Let me ask you to wrap up.

MR. KARWOSKI: The city has not met procedural due process requirements so as to warrant including ASF recoupment in the plan of adjustment. The city has not met its burden of proof to establish that the GRS trustees acted wrongfully in awarding interest to ASF accounts, particularly in light of the long historical parity between ASF account earnings and GRS overall pension fund earnings. The method used by the city to calculate alleged excess interest is biased in that within the ten-year recoupment period, it does not credit ASF accounts for years when market earnings exceeded what was awarded to ASF accounts. Because of the procedural shortcuts and the city's biased approach to ASF recoupment, the plan of adjustment fails to satisfy the requirement of Section 1129(a)(3) that the plan has been proposed in good faith and not by any means forbidden by law. Thank you, your Honor.

THE COURT: Thank you, sir. Sir.

MR. BENNETT: Do you have any questions of the city?

THE COURT: Just some housekeeping matters, nothing of substance. Thank you. One second here. Bring it up on my screen. Okay. Earlier we talked about getting us either a paper or an electronic version of the exhibits. I guess on reflection my preference would be to get an electronic version if that's easier for you. If it's easier to do the paper, that's fine, but --

MR. BENNETT: We were planning both.

THE COURT: Well, then let's just stick with the electronic version. Okay?

MR. BENNETT: Okay.

THE COURT: And will that include the exhibit -- the admitted exhibits of all the parties or just the city? All the parties?

MR. BENNETT: All the parties.

THE COURT: Okay. That would be our preference as well. I intend to give a summary of a decision in court on the record here on Friday, November 7th, at 2 p.m. And actually it may or may not be this courtroom. We'll have to make an announcement as to which courtroom it will be. And that's all I have. Anybody else have anything further? Yes. Mr. Gordon wanted a chance one more time. Are you going to remind me that I still have under advisement the issues

regarding the admissibility of portions of Ms. Kopacz's report?

MR. GORDON: No, your Honor. I figure you're aware of that. I will not remind you of that. Thank you. But if you'd like me to, I will, but -- no. Quickly --

THE COURT: Not necessary.

MR. GORDON: Quickly, based upon the lateness of the time, I wanted to ask the Court for some guidance. A version of the confirmation order has been circulated. It's about 142 pages long, I believe. Parties need to review that. But, in particular, what's happening with the Retirement Systems is the Retirement Systems has spent a tremendous amount of time working on plan implementation, specifically working on the hybrid plan and change of the payroll and things of that nature. There are other things under the plan that are going to fall upon the Retirement Systems to implement as well that are triggered by the effective date of the plan.

THE COURT: Um-hmm.

MR. GORDON: Now, at one time it was thought that that effective date may be as far out -- I believe the contribution agreement -- state contribution agreement even envisioned it could go out as far as April. Now we're hearing that it's going to be -- recently we've been informed that it's going to be sooner rather than later. As a result,

there are a number of timelines that need to be established that may -- or let's put it this way -- some timelines that may already be envisioned under the plan need to be modified to allow logistically for the Retirement Systems to implement all these different initiatives. They have to deal with changes in payroll. They have to deal with getting notices out for lump sum recoupment.

THE COURT: Why are you telling me all of this?

MR. GORDON: I'm telling you all this because, you know, there's no great methodology under the bankruptcy rules for -- it seems to me that a lot of this needs -- would be well suited to be folded into the confirmation order, but there's really no process for -- at least normally and certainly not right now for discussing with the Court where we are in the process of the confirmation order, and I didn't know how you have envisioned that dovetailing with when you make your ruling this could be something --

THE COURT: Okay. That's a fair enough question. It is my intent to -- assuming the plan is confirmed, to hold a hearing on the form of the confirmation order and to discuss with all parties how the implementation of the plan will roll out to the point of an effective date. So can I suggest that you hold that discussion? Well, let me not suggest that. Let me suggest that you discuss your issues with city counsel, the city attorneys, Jones Day, and then

we'll discuss that question and all the other implementation scheduling questions on that day when we have a hearing on the form of the order. I don't know now whether that will be the Monday or the Wednesday following November 7th. Tuesday, of course, is a federal holiday, but we'll figure out that scheduling after the opinion is given and assuming the plan is confirmed. A lot will depend on how far along you all are in agreeing upon the form of the order by then. I'd like to get the order entered, assuming that the plan is confirmed, as soon as possible after the decision is announced.

MR. GORDON: Understood. And the parties have been consultation --

THE COURT: Good.

MR. GORDON: -- both the city's professionals and the Retirement Systems' professionals, on all these issues, so they will continue to work towards that.

THE COURT: All right. Anything further, anybody? We're in recess until November 7th.

THE CLERK: All rise.

(Proceedings concluded at 5:33 p.m.)

INDEX

| | Page |
|---|---|
| Closing Argument by Mr. Bennett | 9 |
| Closing Argument by Mr. Howell | 141 |
| Closing Argument by Mr. Montgomery | 151 |
| Closing Argument by Mr. Gordon | 179 |
| Closing Argument by Mr. Plecha | 185 |
| Closing Argument by Ms. Patek | 188 |
| Closing Argument by Mr. Quinn | 191 |
| Closing Argument by Mr. Karwoski | 216 |

WITNESSES:

None

EXHIBITS:

None

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett November 3, 2014

Lois Garrett