# EXHIBIT A

# Part 2

c.    Members eligible to work are to be selected to work scheduled hours which correspond to the roster from which they are selected.

d.    Employees who have flexible starting times (such as Cruiser crews, 30 Series, Morality crews, etc.) shall have their normal starting times designated at the beginning of the twenty-eight (28) day work cycle in which the holiday(s) fall. This designation is to be used for holiday rosters only and shall not impede management from changing their working hours.

4.    <u>Precinct Rosters</u>. All precinct personnel shall be included on one of the following rosters with the exception as noted in E.4.e. below:

    a.    **Platoon One.** All employees who start work between 12:00 a.m. and 3:59 a.m.

    b.    **Platoon Two.** All employees who start work between 4:00 a.m. and 10:59 a.m. (including staff personnel).

    c.    **Platoon Three.** All employees who start work between 11:00 a.m. and 4:00 p.m.

    d.    **Platoon Four.** All employees who start work between 4:01 p.m. and 11:59 p.m.

    e.    The exception to the above is personnel assigned to Special Operations (formerly Special Events Section) of the First Precinct. Only First Precinct Special Operations shall maintain their own rosters.

    NOTE: These start times shall not include roll call time, nor desk personnel who start earlier than normal hours.

5.    <u>Entries on Roster</u>. Entries on the holiday roster shall be made in the following manner:

    a.    Worked -W- (Black) - indicates an employee worked the holiday.

    b.    Holiday Refused -HR- (Black) - indicates an employee was given the opportunity to work, but refused.

    c.    Holiday -H- (Red) - indicates an employee was not up to work the holiday and was on holiday.

    d.    Holiday Furlough -HF- (Red) - indicates an employee was eligible to work the holiday but declined the holiday due to being on furlough. The furlough period for this designation shall consist of the ten (10) furlough days as well as the customary number of leave days and up to three (3) Bonus Vacation Days attached to the furlough period.

e.  Holiday Sick -HS- (Red) - indicates an employee was eligible to work the holiday, but was unable to do so because of being sick.

f.  Holiday Disabled -HD- (Red) - indicates an employee was eligible to work the holiday, but was unable to do so because of being disabled.

g.  Holiday Jury Duty -HJD- (Red) - indicates an employee was eligible to work the holiday, but was unable to do so because of jury duty.

h.  Holiday Limited Duty -HLD- (Red) - indicates an employee was eligible to work the holiday, but was not allowed to do so due to the fact that there was no job openings available for an employee on limited duty status.

i.  Holiday Late Posting -HLP- (Red) - indicates an employee was not eligible to work the holiday when the holiday roster was posted but after the posting was asked due to a position becoming available and declined.

j.  Holiday Suspended - HX - (Red) - indicates an employee was eligible to work the holiday but was suspended on the holiday and had disciplinary proceedings still pending or an employee who was serving a suspension of more than thirty (30) days as a result of completed disciplinary action (after all appeals have been exhausted).

An officer serving a suspension of thirty (30) days or less as a result of completed disciplinary action (after all appeals have been exhausted) shall be allowed to work a holiday if eligible.

k.  Holiday Absent with Leave - HAWL - (Red) - indicates an employee was eligible to work the holiday but was on an authorized absence with leave.

l.  Holiday Funeral Leave - HFL - (Red) - indicates an employee was eligible to work but was on funeral leave.

6.  Insufficient Personnel. In the event that insufficient Employees volunteer to work the holiday, reverse seniority shall prevail and Employees shall be ordered to work.

Exceptions to this draft shall be as follows:

Employees on furlough (inclusive of the customary number of attached leave days) shall be bypassed in a draft situation.

F.  Special Rules Affecting Rotation.

1.  Sick or Disabled Absences. Employees who are scheduled to work a holiday, but are unable to do so due to being sick or disabled, shall be carried "Holiday Sick" (HS) or "Holiday Disabled" (HD).

2. <u>Employees on Furlough</u>. For purposes of this Article, a furlough period includes the customary five (5) attached leave days and up to three (3) attached Bonus Vacation Days. The furlough includes the holiday even if it should fall on the first day of the regularly scheduled furlough.

Employees scheduled for a furlough period that would include a holiday shall not be charged with a furlough day for the holiday.

Employees on furlough when a holiday occurs shall be offered an opportunity to work the holiday if their names are reached on the roster. If the Employee accepts the opportunity, the entry made on the holiday roster shall be the same as if the holiday had been worked while not on furlough. In order to assure that the holiday scheduling of such Employees can be properly managed, prior to starting their furlough or prior to the minimum posting date, whichever is earlier, the employees must inform their immediate supervisor in writing whether or not they desire to work the holiday.

The supervisor shall take into account the Employee's choice when making up the holiday detail sheet. Furloughed Employees who have expressed a desire to work shall be responsible for ascertaining from the Precinct Desk Supervisor or the supervisor in charge, whether or not they are scheduled to work the holiday. Furloughed Employees who have expressed the desire to work and who successfully receive a holiday assignment are subject to all the employment and payroll rules of other non-furloughed Employees also scheduled to work and should they fail to report to their assignment, the fact that they are on furlough will not be an acceptable excuse.

Employees on furlough when a holiday occurs, and who decline their opportunity to work, shall not be considered as having refused holiday work and shall be entered on the roster as "Holiday Furlough" (HF).

Employees on furlough when a holiday occurs and who did not have an opportunity to work because their names were not reached on the roster, shall be entered on the roster as "Holiday" (H).

3. <u>Employees on Limited Duty</u>. Employees on limited duty status are fully entitled to participate in the normal continuous rotation of holiday work opportunities. However, their opportunity to receive an assignment is restricted to those assignments which can be performed by the Employee on limited duty. Limited duty positions shall not be created by bumping regular assigned Employees from their respective regular job assignments.

4. <u>Employees Temporarily Assigned-Out to Other Commands</u>. Employees assigned-out to other commands shall remain on the holiday roster of their parent command and are fully entitled to work a holiday assignment at that command when their name is reached with the following exceptions:

   a. **Belle Isle Summer Detail (Harbormaster Section).** Employees assigned to this detail shall be removed from their parent command's holiday roster

and placed on the appropriate roster maintained at the Harbormaster Section.

b.  **Auto Theft.** Employees assigned into this entity, on limited duty status (usually long term limited duty employees), shall be removed from their parent command's holiday roster and placed on the appropriate holiday roster maintained at the Auto Theft.

c.  **Telephone Crime Reporting Section.** Employees assigned into this section (usually long term limited duty employees), shall only be allowed to work at TCRS if they are eligible to work on their parent command's roster. If no work is available at this section, the employee retains the right to work at his parent command if a position is available.

d.  **Field Duty Officer - Driver.** The Field Duty Officer may select a driver of his choice for a holiday regardless of whether or not the employee is eligible to work the holiday on the parent command's roster.

e.  **Identification Section.** Employees assigned into this section (usually long term limited duty employees), shall only be allowed to work at the Identification Section if they are eligible to work on their parent command's roster. If no work is available at this section, the employee retains the right to work at his/her parent command if a position is available.

f.  **224-DOPE.** Employees assigned into this section (usually long term limited duty employees) shall only be allowed to work at 224-DOPE if they are eligible to work on their parent command's roster. If no work is available at this section, the employee retains the right to work at his parent command if a position is available.

g.  **Records and Statistics Section.** Employees assigned into this section (usually long term limited duty employees), shall only be allowed to work at this section if they are eligible to work on their parent command's roster. If no work is available at this section, the employee retains the right to work at his parent command if a position is available.

G.  <u>Job Assignment</u>. Employees working a holiday shall normally work their regular assignments. In the event that the Employee's regular assignment is not scheduled to be worked on the holiday, those Employees shall be assigned to other vacant detail sheet assignments from within their respective roster. Job bumping shall not be allowed among those Employees eligible to work the holiday.

## 30. FLOATING HOLIDAYS

Each employee shall be entitled to four (4) floating holidays. Each floating holiday shall be a day off work at the regular straight time rate of pay. An officer may request to take his floating holidays by submitting a request in writing to his commanding officer. An officer may request

to take his floating holidays in any sequence, provided, however, that a floating holiday may not be attached to a furlough. This request will be reviewed for the availability of personnel by his commanding officer. In all cases, preference shall be given for Employee requests for use of floating holidays over requests for bonus vacation days (Article 36) or excused time (Article 31). Seniority will be a prime consideration when several officers request to use a floating holiday on the same day.

This article does not affect or limit the right of the Department to determine the number of employees assigned to work. Consequently, there will be no increase in the total number of employees who are absent and the effect of granting an employee's request could be that the seniority leave day request of another employee (even if more senior) will be denied.

Floating holidays must be used in the fiscal year that they are earned and shall not be carried over to a subsequent fiscal year. The Department shall ensure that floating holidays are expended proportionally throughout the year and are not carried until the last months of the fiscal year; therefore, on April 1st, the commanding officer shall assign any unselected floating holidays at his or her discretion.

## 31. EXCUSED TIME

Employees shall be granted eight (8) hours of "Excused Time" on Good Friday or the last eight (8) hours on the last scheduled day prior to Good Friday, eight (8) hours of "excused time" on Easter or the last eight (8) hours on the last scheduled day prior to Easter, and eight (8) hours of "Excused Time" on the last scheduled paid day before Christmas Day and before New Year's Day and Martin Luther King's Birthday provided they are on the payroll through the holiday in question. Employees required to work any portion of the "Excused Time" on these days will receive equal time off for hours worked or straight time cash at the option of the Chief of Police. No holiday premium will be paid for work on these days.

## 32. PENSION PROVISIONS/PLAN OF ADJUSTMENT

During the term of this Agreement Employees will be entitled to retirement benefits in accordance with the terms of the Memorandum of Understanding Regarding the Police and Fire Retirement System of the City of Detroit, Michigan. The terms of the Memorandum of Understanding may be modified to conform with any plan of adjustment approved by the United States Bankruptcy Court.

## 33. RECALL PAY

Employees are entitled to recall pay at time and one-half (1½) rate if recalled to duty after reporting off duty and before their next tour of duty. A minimum of two (2) hours will be granted to a recalled member. Travel time, not to exceed one-half (½) hour each way shall be granted for travel to and from the duty station when the total time worked exceeds one (1) hour.

The recall rate shall not be paid when a member works continuously beyond his normal tour without first being relieved. The recall rate shall terminate as of the time that his next regular tour was scheduled to begin and he will not receive any travel time back to his residence.

Recall pay shall not be granted when:

A. A mobilization has been ordered;

B. Leave, furlough, bonus vacation days or compensatory time days have been canceled;

C. A member has been directed to appear in court;

D. A member is given notice of a change in shift starting time prior to his going off duty.

## 34. SICK LEAVE

A. <u>Sick Banks</u>.

    1. Current sick bank is designated as that sick time accumulated at the rate of one (1) day for every calendar month in which a member has been credited for not less than eighteen (18) paid time days, excluding overtime.

    2. Current sick time bank shall accumulate without limitation, provided that, for Employees who on July 1st of any year have accumulated more than 400 hours of sick time (including both unused current sick time and unused seniority sick bank time), the Department at its discretion may pay out all or any portion of the Employees' accumulated sick time in excess of 400 hours. Such payments shall be in accordance with the following terms:

        a. The Department will announce whether it has elected to pay out sick time under the terms of this Agreement up to one year in advance. For example, as soon as practicable after the effective date of this Agreement, the Department will announce whether it will elect to pay out sick time accrued as of July 1, 2015. As soon as practical after July 1, 2015, the Department will announce wither it will elect to pay out sick time accrued as of July 1, 2016, and so on.

        b. At the time it makes such announcements, the Department will also announce the amount of sick time that it may buy out.

        c. Any payments under this Section shall be made at 85% of the Employee's base rate of pay during the previous fiscal year. If the Department elects to make a payment under this provision, the payment shall be made on the first pay date after December 1, or earlier if agreed upon by both parties. For example, any payment made based upon sick time accrued as of July 1, 2015 shall be made on the first pay date after December 1, 2015, unless otherwise mutually agreed. Notwithstanding any other provision of this Agreement, an Employee may elect to have a payment made pursuant to this Section contributed into the Employee's Annuity Savings Account in lieu of a cash payment.

    3. Employees shall no longer accumulate additional seniority sick bank time.

B.    Sick Time Credit. The term "sick time" shall be defined as absence due to illness or injury of the member, to exposure to a contagious disease and to the attendance upon immediate members of the family of the member of the Department living within his household, including husband, wife, children, father, mother, sister, brother and relatives living in the same household regardless of degree of relationship. The granting of sick time for attendance upon these relatives is not limited to any given number of days per fiscal year; however, no more than three (3) days will be granted in one instance.

This sick time is granted to permit the member to make arrangements for care of the ill person so that he may return to duty. When it comes to the attention of the Department that a member is abusing sick leave, the Chief of Police may cause an investigation to be initiated. Such investigation may result in disciplinary action, consistent with this Agreement.

C.    Deductions from the Sick Bank. Sick banks, both current and seniority, are designed to provide for non-duty connected illness or disability. No deduction from either current or the seniority sick banks shall be made for any sick time resulting from a service-connected illness or disability which is certified by a physician designated by the Department.

Sick time shall be charged first to the current sick bank and secondly, to the seniority sick bank, in periods of not less than half-days.

When a member starts his shift but is unable to finish the shift because of sickness, sick time will be deducted in the following manner. If less than four (4) hours has been worked, the Employee will be charged half a sick day and credited with half a work day. If four (4) or more hours have been worked from the beginning of the shift, the Employee will be credited with a full work day.

During a period of illness, only that time which would be actual working time will be deducted from the sick bank. Illness or injury during furlough time may be changed to sick time in lieu of the member's furlough, provided such illness or injury during the furlough shall be reported forthwith to the member's commanding officer and to a physician designated by the Department. Such illness or injury will be verified by the physician designated by the Department. The unused portion of the member's furlough will be rescheduled and used immediately following recovery from the illness or injury which made the change necessary.

D.    Reporting Illness or Disability. When any member becomes sick, the officer in charge must be notified without delay and informed where the member is confined. If a member is hospitalized, the officer in charge shall be notified and will cause a physician designated by the Department to be notified, during the next regular office hours, of the nature of the illness and the hospital to which the member was admitted. Members unable to report for duty because of sickness shall have their duty station notified not less than one (1) hour before roll call daily, in order to remain in a sick status. An Employee calling in sick in accordance with this provision will not be allowed to work until his next scheduled tour of duty. Under normal circumstances, a physician designated by the Department will not make visits to an individual member's home. When attending a sick

officer, a physician designated by the Department shall issue him a notice stating the nature of the illness and whether or not the officer shall remain off duty. The notice must be turned in to the commanding officer when the member returns to duty.

Employees on extended sick leave (more than three (3) work days) are required to keep their commands informed of their incapacity and expected date of return. In this instance, the Employee shall not be required to call in daily as specified above. Employees on sick leave of thirty (30) days or more may be ordered to obtain verification by a physician designated by the Department.

E.     Limited Duty.     Officers placed on limited duty by a physician designated by the Department shall report immediately with their limited duty authorization slip to an appropriate command designated by the Chief of Police. Said command will determine an appropriate limited duty assignment and notify the member's commanding officer. Limited duty assignments are made by the Chief of Police under the authority granted by Article VII, Chapter VIII, Section VI, paragraph (4) of the City Charter and are subject to the limitations thereof.

An officer on limited duty normally shall not wear a uniform except under emergency conditions when ordered by his commanding officer. In such cases, however, the officer shall not leave the building or travel to and from work in uniform.

The number, location, and duration of restricted duty assignments, as well as whether a restricted duty assignment vacancy exists, shall be within the discretion of the Department.

The Department may give preference for restricted duty assignments to those Employees whose injury or illness is determined to have occurred in the line of duty over Employees whose injury or illness is determined to have occurred not in the line of duty. When the Department determines that the number of restricted duty Employees exceeds the available number of restricted duty assignments, in accordance with the limitations enumerated below, Employees having or seeking a restricted duty position for a non-duty related medical condition may be required to utilize sick time benefits. An Employee who is required to utilize sick time benefits by operation of this paragraph but who has no accumulated sick time will be allowed to use other accumulated time to cover the absence.

When an Employee having a non-duty related injury or illness is displaced from a restricted duty position, or when no restricted duty position is currently available, the Employee shall be placed on a waiting list for assignment to an available restricted duty position. Placement on this waiting list shall be by departmental seniority and placement in restricted duty positions shall be made in seniority order provided the Employee is able to perform the duties of the particular restricted duty position.

Notwithstanding the provisions of this Article, Employees on restricted duty for a non-duty related injury or illness and who are able to perform the duties of their regularly assigned job shall not be subject to being displaced by either an employee having a duty-related injury or illness or by a more senior employee having a non-duty related injury or illness.

The Department shall maintain a continuous listing of those Employees who are restricted duty which shall indicate their duty assignment, seniority date, whether the status is for a duty or non-duty related reason, and other relevant data the parties may from time to time agree upon. The Department shall provide the Association with a copy of the list on any day that a change has been made.

Nothing in this Article shall affect the right of the Department under the Charter of the City of Detroit to refer Employees for duty or non-duty disability pensions.

F.    Determination of Sick or Disability Status. It is the responsibility of a physician designated by the Department to determine whether the illness or injury of a member is duty incurred. When a member sustains an original injury in the performance of duty during his regular duty hours, and is unable to complete his tour of duty, he shall be carried disabled. At all other times, he shall be carried sick until a final determination is made by a physician designated by the Department. Under no circumstances shall the status of a member being carried sick or disabled be changed in the time book or other Department records without the written authorization of a physician designated by the Department. A physician designated by the Department shall authorize such change by preparing an inter-office memorandum. Employees are automatically assigned to Platoon Two while disabled.

G.    Report for Duty When Ordered. Any member reported fit for duty by a physician designated by the Department who does not report at the roll call indicated by the physician shall be considered absent without leave.

H.    Return to Duty. To assure proper health safeguards for Department personnel, members who are ordered off duty by a physician designated by the Department due to illness or injury, whether service connected or not, shall not be returned to active or limited duty assignments without being certified for such assignment by a physician designated by the Department.

I.    Illness or Injury Services. In non and/or post emergency cases, police personnel who have incurred a service connected illness or injury must obtain approval from a physician designated by the Department before securing any type of medical attention or treatment for the illness or injury, including x-rays and dental care. The Department will not be liable for costs so incurred unless prior approval is obtained.

Officers who are duty disabled or on limited duty shall report for physical examinations when directed by a physician designated by the Department. Furthermore as a condition for continuing disabled or limited duty status and the benefits thereof, the officers must submit to all reasonable examinations ordered by the Department. Failure to do so will lead to immediate termination of such status and benefits.

J.    Depletion of Sick Banks. If a member is unable to perform police duties when all his sick banks are exhausted, he shall be dropped from the payroll unless he is eligible for non-duty connected retirement benefits. A member exhausting his sick banks who has completed five (5) or more years of service and who is otherwise eligible for non-duty connected disability retirement, may be retired at his own request or at the request of the Chief of Police subject to the approval of the Retirement Board.

A member may apply for reinstatement within two (2) years of being removed from the payroll if he recovers sufficiently from his illness or injury to return to duty. He/She may be reinstated in the same status as when he/she left upon proper certification by a physician designated by the Department and appointment by the Chief of Police.

K.    <u>Retirement and Death Sick Leave Payment</u>. Immediately preceding the effective day of a member's retirement, exclusive of duty and non-duty disability retirement, or at the time of a member's death, he or his estate shall be entitled to pay for his unused accumulated sick banks as follows:

An Employee shall receive full pay for eighty-five percent (85%) of the unused accumulated sick bank amounts.

If a member is granted a duty or non-duty disability retirement, he shall be entitled to a reimbursement of unused sick time according to the preceding formula, upon attaining his normal full duty retirement date and petitioning the Chief of Police for such reimbursement.

## 35. REGULARITY IN THE USE OF SICK LEAVE BENEFITS

A.    <u>General</u>. The Detroit Police Department is responsible for providing efficient law enforcement services. Maximum attendance is required from all members if this responsibility is to be fulfilled.

It is, therefore, necessary to identify and correct members who have developed a pattern of regularity in the use of their sick leave benefits. Therefore, all commanding officers are to review the records of their members quarterly: each January 10th, April 10th, July 10th and October 10th.

B.    <u>Counseling Regarding Regularity in the Use of Sick Leave Benefits</u>. Upon review and approval of the commanding officer, a ranking member shall counsel subordinates whose records show such an indication. The counseling session shall include a discussion of the pattern observed to date, and the member's reason for absences. Where appropriate, the supervisor shall explore positive future courses of available action with the member in an effort to assist the member in adopting corrective measures. At the end of the counseling session, the supervisor shall prepare a detailed report of the meeting and attach the report to the member's Detroit Police Department Attendance Card, D.P.D. 350-C. A copy of this report shall be provided to the member. Note, however, that said counseling does not constitute disciplinary action and as such may not be noted in the administrative counseling register. Further, said detailed report shall be removed from D. P. D. 350-C at the end of six months providing no further corrective action has been necessary since the initial counseling session with the member.

C.    <u>Continued Pattern of Regularity in the Use of Sick Leave Benefits</u>. If counseling does not produce improved attendance, and the supervisor, after meeting with the member, determines that no satisfactory reason exists which would justify said continued regularity in sick leave usage, upon review and approval of the commanding officer, the supervisor shall personally serve the member with a Notice of Regularity in the Use of

Sick Leave Benefits, D.P.D. 350, and forward the necessary copies as outlined on the form. The supervisor shall inform the member of the requirement to obtain documentation of the illness or of the illness of a family member which necessitates the member's absence from work. This documentation shall consist of a statement from a physician concerning the illness for each sick day taken during the next three month period. This requirement must be strictly adhered to during said period of time, except where the commanding officer is convinced that a reasonable basis exists for not requiring a physician's note in conjunction with a particular absence. The member will also be advised that said physician's documentation shall be submitted on D.P.D. 350-A, or an equally detailed doctor's note, and shall be presented to the member's section commanding officer within three days after returning to duty. This documentation is subject to the review of the department physician. Commanding officers shall ensure that the copy of D.P.D. 350-A which is submitted by the member is forwarded to the Medical forthwith for retention.

A member who has been served with a Notice of Regularity in the Use of Sick Leave Benefits, D.P.D. 350, and is being carried sick due to personal illness or injury or for attendance upon a sick family member, must secure permission from the officer in charge of the member's entity or, if the entity is closed, from the officer in charge of the precinct in which the member resides before the member may leave the member's place of confinement. This restriction does not apply on leave days or non-duty hours.

"Improved attendance" as used herein shall mean that the member has consistently and reliably demonstrated the capacity to provide proper and sustained attendance within the meaning of this article. For purposes of interpreting the preceding sentence, the word "sustained" shall be construed to mean an improvement which demonstrates that the abuse has been eliminated.

The supervisor shall further advise the member that failure to satisfactorily comply with the regulation will result in the designation of each working day taken as "Sick" to "Absent No Pay." The supervisor shall also advise the member that unless attendance improves, additional disciplinary action may be imposed.

D.    Improved Attendance. A member placed on a D.P.D. 350 will have his attendance reviewed on a quarterly basis and will be removed from the restrictions of that provision upon a showing of improved attendance within the meaning of the above definition.

E.    Extended Medical Treatment. Members who document that their illness requires treatment on a regular basis may submit D.P.D. 350-A for that ailment on a semi-annual basis. The physician designated by the department, however, may want further verification concerning said ailment, and accordingly the member may be required to see the physician.

F.    Failure to Present Documentation by a Physician. If failure to comply with the regulation set forth on D.P.D. 350 occurs, the section commanding officer shall personally serve the member with a Notice of Failure to Present Documentation by a Physician, D.P.D. 350-B, and shall forward the necessary copies as outlined on the form. A designation of "Absent No Pay" will be entered in timekeeping records.

G.   Appeals. Any member may file a grievance regarding the imposition of a Notice of Regularity in the Use of Sick Leave Benefits, D.P.D. 350. If the grievance is granted, the arbitrator shall be empowered to provide an appropriate remedy, including reimbursement of expenses for medical visits ordered by the Department.

## 36. BONUS VACATION DAYS

Bonus vacation days are granted for unused current sick time. Officers who have accumulated a minimum of thirty-five (35) sick days including both current and seniority days and have a minimum of six (6) years of service on July 1st of each year will be credited with one-half (1/2) of the unused current sick time from the previous fiscal year up to six (6) days. An officer may request to take his bonus vacation days in any sequence (except when attached to a furlough as stated below) by submitting a request in writing to his commanding officer. This request will be reviewed for the availability of personnel by his commanding officer. Seniority will be a prime consideration when several officers request the same period of time off.

An officer shall be allowed to use up to three (3) bonus vacation days in conjunction with a furlough. The request to utilize bonus vacation days in this manner must be included in the leave day request. Bonus vacation days, when connected to a furlough, shall not be canceled unless the accompanying furlough is canceled. This article does not affect or limit the right of the Department to determine the number of employees assigned to work. Consequently, there will be no increase in the total number of employees who are absent and the effect of granting an employee's request could be that the seniority leave day request of another employee (even if more senior) will be denied.

The Department must insure that bonus vacation days are expended proportionately throughout the year and are not carried until the last months of the fiscal year; therefore, on April 1st, the commanding officer shall assign the remaining bonus vacation days at his discretion. Any request to utilize unused bonus vacation days in conjunction with a furlough scheduled during the months of April, May or June must be submitted to the commanding officer by April 1st or those bonus vacation days will be assigned.

Bonus vacation time shall be deducted from the member's bonus vacation bank before compensatory time shall be taken.

## 37. JURY DUTY

A.   All Employees who serve on jury duty on regularly scheduled work days exclusive of leave days, furlough days and holidays will be paid the difference between their pay for jury duty and their regular straight time pay for all days they are required to serve on jury duty.

B.   In the event that an Employee reports for jury duty but does not actually serve on jury, he will be paid the difference between the jury pay received and his regular day's pay and be excused for the day.

C.   In order to receive payment for jury duty supplementation, an Employee must have been regularly scheduled to work on a non-overtime basis, must give reasonably prompt prior

notice to his supervisor that he has been summoned for jury duty, and must furnish satisfactory evidence that he reported for or performed jury duty on the days for which he claims such payment, provided that the commanding officer shall have discretion in seeking to have the Employee excused when his services are essential.

D.  Employees shall have the option when called to jury duty to use vacation, bonus vacation or compensatory time for such service. In that event, the Employee will not be required to turn in his jury pay. However, the Employee must notify the Department of his desire to exercise this option prior to the first date of jury service.

If the date for jury duty falls upon a day when the Employee is scheduled to work other than Platoon 2, the Department, upon request of the Employee, will rearrange the Employee's working schedule so that he will be carried working Platoon 2 on that date(s). If the date for jury duty falls upon a holiday an Employee is scheduled to work, the Employee shall be allowed to attend jury duty without loss of the Employee's holiday work opportunity.

E.  For payroll purposes, jury duty shall be considered as time worked.

F.  An Employee on jury duty will be continued on the payroll and be paid at his straight time hourly rate of his normally scheduled hours of work. Upon return from jury duty, the Employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an Employee fails to turn in his jury duty payment, the City will hold subsequent payments due to the Employee until the City is reimbursed for all time lost due to the alleged jury duty service.

G.  Where Employees once impaneled are excused for days or parts of days, reimbursement shall be made only for time served. Employees should otherwise be expected to report for work.

## 38. DEATH BENEFITS AND LIFE INSURANCE

A.  <u>Death Benefits</u>. Section 13-8-8 of the Municipal Code of the City of Detroit currently provides a death benefit of ten thousand dollars ($10,000).

   1.  Membership shall be mandatory for regular Employees.

   2.  Contribution

   By the City - $13.30 per year per Employee.

   By the Employee - $.20 per week or $10.40 per year.

B.  Payment for employees killed or permanently disabled in line of duty:

   1.  A lump sum duty death benefit of ten thousand dollars ($10,000) shall be paid to the beneficiaries or estate of Employees who are killed or who die as a result of

injuries sustained in the actual performance of their duties in accordance with the City Council resolution of August 23, 1977, p. 1683, March 26, 1974, p. 627, and March 2, 1954, p. 509.

2.  A lump sum payment of ten thousand dollars ($10,000) shall be made to any Employee who is totally and permanently disabled from illness or injury arising solely out of the actual performance of his duties. "Totally and permanently disabled" shall be defined exclusively as follows:

    a.  Total and permanent loss of sight of both eyes.

    b.  Loss of both legs or both feet at/or above the ankle.

    c.  Loss of both arms or both hands at/or above the wrist.

    d.  Loss of any two of the members of facilities enumerated in a., b., c.

    e.  Permanent and complete paralysis of both legs or both arms or one leg and one arm.

    f.  Incurable insanity or imbecility. Claims for this payment shall be made in accordance with the City Council resolution of March 26, 1974, p. 627.

3.  Employees who receive a permanent disability under this Article shall be ineligible for the $10,000 Duty Death Benefit described in Section B.1. above. Denial of the $10,000 Duty Death Benefit may be appealed directly to arbitration in accordance with Article 8 (Arbitration) of this Agreement.

C.  Group Life Insurance:

A group life insurance program for the Employee and his family is available for all members of the Employees Benefit Plan on an optional basis, under the provisions of the City Code, Chapter 13, Article 9.

1.  Membership

    Optional for members of the Employees Benefit Plan.

2.  Contributions

    The City shall pay one hundred percent (100%) of the premium for insurance up to and including thirty-five thousand dollars ($35,000) for each member plus five thousand dollars ($5,000) for each dependent.

    Additional life insurance may be purchased through this plan at the Employee's expense.

    Employees and their dependents who are on a duty disability retirement shall be covered by this program.

# 39. MISCELLANEOUS

A.  <u>Relation to Regulations, etc</u>. This Agreement shall supersede any rules, regulations, ordinances or resolutions inconsistent herewith.

B.  <u>Savings Clause</u>. If any article or section of this Agreement or any supplement thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any article or section should be restrained by such tribunal, the remainder of this Agreement and supplements shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such article or section.

C.  <u>Service Weapon</u>. All Employees shall be provided at no charge with their department-issued service weapon upon full service retirement. An Employee will have no more than thirty (30) days after separation to make such request to the Chief of Police. The Department may refuse to give Employees their weapon for good cause shown. Good cause will be established where an Employee has pending criminal charges or has been convicted of a crime, is subject to departmental investigations, or psychological restrictions. Employees who are involuntarily discharged will not receive a service weapon.

D.  <u>Longevity Pay</u>. There will be no longevity payments during the term of this Agreement.

E.  <u>Direct Deposit</u>. Members of the bargaining unit may participate in the direct deposit programs offered by the City.

F.  <u>Lump Sum for Banked Time</u>. Whenever an Employee leaves employment with the Department, such Employee will be paid for all banked time, other than sick time, at the prevailing rate of pay in effect at the time of separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. DROP plan participants will only receive payout for banked time when they permanently retire, not when they enter the DROP plan. Payments will be paid within ninety (90) days if the amount is less than ten thousand dollars ($10,000), and if in excess of ten thousand dollars ($10,000), the amount will be made in semi-annual installments over a three (3) year period with the installments due on February 1 and August 1 with no interest due.

G.  <u>Correction of Overpayments and Underpayments</u>. Where by payroll error an Employee is underpaid or overpaid, the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment. The City shall notify an Employee in writing fourteen (14) calendar days prior to making any payroll recovery. Each deduction by the City shall be substantiated in the records of the City and shall be identified as to the individual Employee.

H.  <u>Civilianization</u>. Positions within the Department that do not require Michigan Commission on Law Enforcement Standards (M.C.O.L.E.S.) certification are subject to civilianization at any time. Any reductions in force (lay-offs) resulting from civilianization will comply with Article 10.I. (Seniority – Lay-off and Recall).

13-53846-tjt   Doc 8184-2   Filed 11/05/14   Entered 11/05/14 17:35:37   Page 16 of 58

I.     <u>Ammunition</u>. All members shall be provided with limited penetration, full expansion rounds to be carried on or off duty. Members shall also be allowed to purchase (at their own expense) and carry other Department approved limited penetration, full expansion rounds.

J.     <u>Canine</u>. With respect to any assignment made to Canine (K-9), the City may, at its discretion, direct the member on said assignment to return all departmental dogs under the age of five (5) and all departmental equipment to the department at such time as that member is no longer assigned to Canine.

K.     <u>Care of Departmental Dogs</u>. Employees will be paid at a rate of time and one-half for the actual off-duty time spent caring for Department dogs, provided such work is authorized. Employees may expend a maximum of forty (40) minutes per day caring for Department dogs; provided, however, that Employees may expend additional time per day with the prior approval of their supervisor. Employees caring for more than one Department dog shall receive an additional fifteen (15) minutes per day, per dog. The Department retains the discretion to determine whether time spent in excess of the above is necessary and whether it shall be performed while the member is on duty or off duty. Employees shall maintain a record, on a form to be established by the Department, of the time spent in the performance of these duties, and submit the form to the Administrative Sergeant on a bi-weekly basis. This time shall be reported on the bi-weekly Time and Attendance Report as kind-of-time 66.

## 40. WAGES

A.     Wages – September ___, 2014 through June 30, 2019 – Base Salary:

-     8% wage increase effective first payroll period after the ratification of this Agreement.

-     2.5% wage increase effective July 1, 2016.

-     2.5% wage increase effective July 1, 2017.

-     2.5% wage increase effective July 1, 2018.

In addition to the foregoing, DPOA members shall receive their pro rata share of the lump sum payments described in Section 5 of the July 8, 2014 Term Sheet between the DPOA and the City of Detroit. In all other respects, this wage provision supersedes any prior agreement or term sheet between the parties.

B.     <u>Wage Scale</u>. Employees' wages during the term of this Agreement are set forth in the attached Official Compensation Schedule.

C.     <u>Differential</u>. Salaries for the following classifications will be maintained at the dollar differentials indicated for the term of this Agreement.

1.     Communications Officer - Police Officer (Class Code 33-12-11)

| Start | $450 over starting salary of Police Officer |
| After one year | $450 over salary of one-year Police Officer |
| After two years | $450 over salary of two-year Police Officer |
| After three years | $450 over salary of three-year Police Officer |
| After four years | $450 over salary of four-year Police Officer |
| After five years | $450 over salary of five-year Police Officer |

2.     Band Director - Police Officer (Class Code 33-12-14)

        $821 over maximum of salary of Police Officer

3.     Assistant Supervisor of Motor Vehicles - Police Officer (Class Code 33-12-15)

        $862 over maximum salary of Police Officer

4.     Police Data Processing Programmer - Police Officer (Class Code 33-12-26)

        Minimum: $589 over maximum salary of Police Officer
        Maximum: $1,738 over maximum salary of a Police Officer

5.     Radio Maintenance Officer - Police Officer (Class Code 33-12-12)

        $862 over maximum salary of a Police Officer

6.     Radio Systems and Planning Officer - Police Officer (Class Code 33-12-13)

        $1,567 over maximum salary of a Police Officer

7.     Senior Police Data Processing Programmer - Police Officer (Class Code 33-12-36)

        Police Lieutenant salary

8.     Neighborhood Police Officer (Class Code __-__-__)

        $1,198 over maximum salary of a Police Officer

9.     Police Detective Trainee (Class Code __-__-__)

        $1,198 over maximum salary of a Police Officer

10.    Police Corporal (Class Code __-__-__)

| Start | $1,198 over maximum salary of a Police Officer |
| When engaged in field training operations | $2,396 over maximum salary of a Police Officer |

# 41. PERMANENT SHIFT PROGRAM

A.   The permanent shift program shall only apply to precinct job assignments on the day, afternoon and midnight shifts that historically rotated among all three (3) shifts. In addition, the permanent shift program shall apply to the Harbormaster which for purposes of the program shall be treated as an entity distinct from the Northeastern Precinct and to the Tactical Response Unit (TRU), Canine and the Public Housing Section. All assignments shall be based on seniority provided the Employee is qualified.

B.   There shall be no periodic re-bidding procedure and vacancies will be filled, if and when the Department decides to fill them, in accordance with the following procedures:

1.   A vacancy exists when an officer performing the assignment is permanently transferred, permanently reassigned, resigns, retires, dies, is separated, or when the Department increases the number of officers on a shift.

2.   Employees having less than two (2) years of service may be assigned to shifts and assignments within the discretion of management. At the end of two (2) years of service, their positions shall be considered vacancies and shall be subject to the procedures of this Article except where an officer has obtained a permanent job reassignment through the blue slip procedure in accordance with the provisions of Subsection 4 of this Section B.

3.   Whenever the Department chooses to fill vacancies created as a result of officers completing two (2) years of service, the positions to be filled shall be posted at least ten (10) days before they are permanently filled.

4.   Employees with less than eighteen (18) months service shall not be entitled to use the blue slip procedure to bid on a permanent job assignment. Employees with at least eighteen (18) months and less than twenty-four (24) months service shall be entitled to use the blue slip procedure to bid on a permanent job assignment other than a scout car.

5.   In addition to the existing procedure for filling job assignments, Employees may also submit a blue slip indicating their preference for a shift change. In accordance with present practice, a blue slip that is accepted shall be reviewed promptly to determine if the Employee is qualified. When vacancies occur the most senior qualified Employee will have his blue slip request honored. All blue slips will expire on October 1 of each year. The blue slip procedure is for the filling of vacancies and no Employee may be bumped. The blue slip of an officer requesting a particular assignment on a shift shall be honored before the blue slip of an officer requesting the shift only.

6.   In the event of an involuntary reassignment from one shift to another, the officer having the least Department seniority shall be reassigned. This provision shall not affect the Department's right to reassign members in accordance with B.2.

7.      Employees transferring into an entity participating in the permanent shift plan, may be initially assigned to shifts and assignments within the discretion of management, provided there are no blue slips on file for the requested shift or assignment. Thereafter, except as limited by the provisions of Subsections 2 and 4 of this Section B., Employees may utilize the blue slip procedure in Article 10, Section G.1. While Employees shall be entitled to submit a blue slip for a shift or assignment they shall not be eligible to exercise seniority for shifts for a period of six (6) months or assignments for one (1) year. When Employees are involuntarily transferred to an entity participating in the permanent shift program they shall not be eligible to exercise seniority for shifts for a period of three (3) months or assignments for six (6) months.

C.      A Joint Labor Management Permanent Shift Committee, consisting of not more than five (5) representatives from the Association and five (5) representatives of the Department shall meet within five (5) working days of the request by either party. The Committee shall meet to discuss issues related to the transition from rotating to permanent shifts and to the implementation and continuation of the permanent shifts concept. The Committee will attempt to resolve any such issues without the filing of a formal grievance with due regard to the fact that in negotiating permanent shifts the parties may not have considered all of the effects of such change and that flexibility is necessary and desirable to ensure that an orderly transition from rotating shifts to permanent shifts is effectuated.

D.      The Panel shall retain jurisdiction over the permanent shift award and, upon the request of either party, for a period of one (1) year after permanent shifts are implemented, shall convene, with substitute delegates if a party so designates, to resolve any dispute concerning permanent shifts which has not been resolved by the Committee.

E.      In the case of a bona fide hardship, reviewed and approved by the Chief of Police or the appropriate Deputy Chief, management may change an Employee's shift for a period not to exceed thirty (30) days. No other Employee shall be displaced from his shift or assignment as the result of such a reassignment. The Association will be notified of any approved request. This provision shall be applicable not only to those entities participating in the permanent shift plan, but to all assignments on a Department-wide basis.

## 42. OUTSIDE EMPLOYMENT

An Employee may engage in outside business activity or outside employment provided it is not inconsistent or incompatible with or does not interfere with the proper discharge of the Employee's duties and responsibilities as a police officer.

Approval for outside business activity or outside employment must be obtained from the Chief of Police, and shall be for a period of one (1) year. The Employee may request it be renewed after one (1) year. If an Employee is on the Attendance Control Program (DPD 350), that Employee cannot be approved for outside employment, and prior approval can be revoked at the discretion of the Chief of Police.

Approval will not be granted for an outside business activity or outside employment which would involve more than thirty (30) hours per week of work, or for work in businesses that are regulated by the Detroit Police Department (e.g., bars, adult movies or adult bookstores, etc.)

Officers may not be in uniform when engaged in any outside employment. Officers may not carry or use any equipment or accessories issued by the Department when engaged in any outside business activity or outside employment in private or personal security.

Approval to engage in outside business activity or outside employment shall not be unreasonably withheld.

## 43. WORK AREAS

The City will provide and maintain safe, clean, sanitary and healthful work premises, facilities and equipment. The City shall have the responsibility and authority first to determine what constitutes safe, clean, sanitary and healthful work premises, facilities and equipment. Grievances alleging a violation, that is, whether or not the City has provided and maintained safe, clean, sanitary and healthful work premises, facilities and equipment, shall be entered at the last step of the grievance procedure and shall be subject to arbitration.

## 44. DURATION

This Agreement shall be effective and binding on the Union and the City as of October __, 2014, and shall continue in full force and effect through June 30, 2019 (the "Term"). This Agreement, including the Term, shall be incorporated into and become a part of both the plan of adjustment and order confirming the plan of adjustment, and the Agreement shall be subject to the post-confirmation ongoing jurisdiction of the Bankruptcy Court for the full Term, including without limitation, whatever jurisdiction the Bankruptcy Court's retains to enforce the Term. This Agreement, including specifically, the Term, shall be duly authorized and approved by and consented to by the Governor, the Treasurer and the Emergency Manager, with these consents reflected by duly authorized signatures.

If either party desires to modify this Agreement, it may give written notice to the other party during the month of March 2019.

In the event that the Department and the Association fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2019, this Agreement will remain in effect on a day-to-day basis. Either party may terminate this Agreement by giving the other party a ten (10) day written notice on or after June 30, 2019.

IN WITNESS WHEREOF, the parties hereto have executed this

Agreement on this ___ day of October, 2014.

DETROIT POLICE OFFICERS
ASSOCIATION:

CITY OF DETROIT:

Mark Diaz, President

Michael E. Duggan, Mayor

Bernard Cybulski, Vice President

James Craig, Chief of Police

[see next page]

Donna Latouf, Secretary-Treasurer

Office of the State Treasurer, Michigan

Linda Broden, Sergeant at Arms

Michael A. Hall, Labor Relations

## 44. DURATION

This Agreement shall be effective and binding on the Union and the City as of October __, 2014, and shall continue in full force and effect through June 30, 2019 (the "Term"). This Agreement, including the Term, shall be incorporated into and become a part of both the plan of adjustment and order confirming the plan of adjustment, and the Agreement shall be subject to the post-confirmation ongoing jurisdiction of the Bankruptcy Court for the full Term, including without limitation, whatever jurisdiction the Bankruptcy Court's retains to enforce the Term. This Agreement, including specifically, the Term, shall be duly authorized and approved by and consented to by the Governor, the Treasurer and the Emergency Manager, with these consents reflected by duly authorized signatures.

If either party desires to modify this Agreement, it may give written notice to the other party during the month of March 2019.

In the event that the Department and the Association fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2019, this Agreement will remain in effect on a day-to-day basis. Either party may terminate this Agreement by giving the other party a ten (10) day written notice on or after June 30, 2019.

IN WITNESS WHEREOF, the parties hereto have executed this

Agreement on this __ day of October, 2014.

DETROIT POLICE OFFICERS ASSOCIATION:

CITY OF DETROIT:

_____
Mark Diaz, President

_____
Michael E. Duggan, Mayor

_____
Bernard Cybulki, Vice President

_____
James Craig, Chief of Police

_____
Donna Latouf, Secretary-Treasurer

_____
Office of the State Treasurer, Michigan

_____
Linda Broden, Sergeant at Arms

_____
Michael A. Hall, Labor Relations

# 44. DURATION

This Agreement shall be effective and binding on the Union and the City as of October __, 2014, and shall continue in full force and effect through June 30, 2019 (the "Term"). This Agreement, including the Term, shall be incorporated into and become a part of both the plan of adjustment and order confirming the plan of adjustment, and the Agreement shall be subject to the post-confirmation ongoing jurisdiction of the Bankruptcy Court for the full Term, including without limitation, whatever jurisdiction the Bankruptcy Court's retains to enforce the Term. This Agreement, including specifically, the Term, shall be duly authorized and approved by and consented to by the Mayor of the City of Detroit, the Treasurer of the State of Michigan, and the Emergency Manager, with these consents reflected by duly authorized signatures.

If either party desires to modify this Agreement, it may give written notice to the other party during the month of March 2019.

In the event that the Department and the Association fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2019, this Agreement will remain in effect on a day-to-day basis. Either party may terminate this Agreement by giving the other party a ten (10) day written notice on or after June 30, 2019.

IN WITNESS WHEREOF, the parties hereto have executed this

Agreement on this __ day of October, 2014.

DETROIT POLICE OFFICERS
ASSOCIATION:

CITY OF DETROIT:

_____
Mark Diaz, President

_____
Michael E. Duggan, Mayor

_____
Bernard Cybulski, Vice President

_____
James Craig, Chief of Police

_____
Donna Latouf, Secretary-Treasurer

_____
Office of the State Treasurer, Michigan

_____
Linda Broden, Sergeant at Arms

_____
Michael A. Hall, Labor Relations

_____
Kevin Orr, Emergency Manager

## SCHEDULE A

| District | Work Location & Platoon | Stewards | Alternates |
|---|---|---|---|
| 1 | 1st Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 3rd Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | Downtown SVS / Gaming<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 2 | 2nd Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 4th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 3 | 6th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 8th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 4 | 10th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 12th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |

| District | Work Location & Platoon | Stewards | Alternates |
|----------|------------------------|----------|------------|
| 5 | 5th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 9th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 6 | 7th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| | 11th Precinct<br>Platoon 1<br>Platoon 2<br>Platoon 3<br>HMS | 3 | 3 |
| | Mound Rd. / Detention Center<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 7 | Communications Ctr. / Tech Support/ Fleet<br>Communications Systems<br>Platoon 1<br>Platoon 2<br>Platoon 3 | 3 | 3 |
| 8 | Narcotics / Firearms Inventory | 2 | 2 |
| | Forfeiture / Auction Detail / Magnet | 1 | 1 |
| 9 | DPSH 1301 Third Floors 1-7 | 4 | 4 |
| | Police Personnel / Recruiting / IA / Medical | | |
| | Sex Crimes / Homicide | | |
| | Domestic Violence / Child Abuse | | |
| | Evidence Tech. Unit | | |

| District | Work Location & Platoon | Stewards | Alternates |
|---|---|---|---|
| 10 | Law Dept. / OCI / EPU / Disciplinary CRIB / Ident. / Records / Liquor License | 1 | 1 |
| | DMPA / Range | 1 | 1 |
| | Commercial Auto Theft | 1 | 1 |
| 11 | Canine / Support Svc. | 1 | 1 |
| | Tac Response Unit | 1 | 1 |
| | SRT / Bomb Squad | 1 | 1 |
| | Special Crimes | 1 | 1 |
| | TEU / TSU | 1 | 1 |
| | Totals | 60 | 60 |

# EXHIBIT I
## Official Compensation Schedule

CHI-1939680v4

## MEMORANDUM OF UNDERSTANDING
## REGARDING THE POLICE AND FIRE RETIREMENT SYSTEM
## BETWEEN
## THE CITY OF DETROIT
## AND
## THE DETROIT POLICE OFFICERS ASSOCIATION

This Memorandum of Understanding is made and entered into this 1st day of October, 2014, by and between the City of Detroit ("City") and the Detroit Police Officers Association ("DPOA" or the "Association").

WHEREAS, on July 18, 2013, the City filed for protection under Chapter 9 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1550; and

WHEREAS, on December 5, 2013, the U.S. Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court") ruled that the City is eligible to be a debtor under Chapter 9 of the U.S. Bankruptcy Code; and

WHEREAS, the City's duty to bargain with the Association over changes to terms and conditions of employment has been suspended pursuant to Public Act 436, MCL § 141.1541 *et seq.*; and

WHEREAS, on August 16, 2013 the Bankruptcy Court ordered the City and the Association to participate in Court-supervised mediation regarding the terms of a successor collective bargaining agreement, including retirement benefits for current employees; and

WHEREAS, the City and the Association agree that it is in the best interests of the City and its employees for the City to provide fiscally responsible but high quality retirement benefits to its future retirees; and

WHEREAS, in connection with the mediation, the City and the Association have discussed ways to address the unfunded liabilities of the Police and Fire Retirement System ("PFRS") and to reach an agreement to provide sustainable retirement benefits to future retirees of the City; and

WHEREAS, benefit accruals under the PFRS ceased effective June 30, 2014, pursuant to Ordinance No. 12-14; and

WHEREAS, effective July 1, 2014, employees represented by certain City unions, including the DPOA, became eligible to participate in the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (the "Combined Plan"), which consists of provisions relating to benefits accrued by members under PFRS prior to July 1, 2014 ("Old PFRS") and provisions relating to benefits accrued by members under PFRS on and after July 1, 2014 ("New PFRS"); and

1

WHEREAS, this Memorandum of Understanding supplements any collective bargaining agreements entered into between the City and the Association and/or any Act 312 Arbitration Award pertaining to the Association and the City until the expiration of this Memorandum of Understanding;

NOW, THEREFORE, it is agreed that the City and the Association have entered into this Memorandum of Understanding, and any proposals or counter-proposals made during related discussions by either the City or the Association, but not included in this Memorandum of Understanding, are hereby withdrawn. The City and the Association further agree as follows:

A.    The Police and Fire Retirement System.  During the term of this Memorandum of Understanding, pension benefits for eligible employees (which, in all cases, shall exclude Police Assistants) represented by the DPOA shall be in accordance with this Memorandum of Understanding, as follows:

1.    City Contribution.  The City shall contribute to New PFRS, on an annual basis, an amount equal to twelve and one-quarter percent (12.25%) of each eligible employee's base compensation.  A portion of such contribution will be credited to a rate stabilization fund.

2.    Employee Contribution.  Eligible employees hired by the City on or before June 30, 2014 shall make pre-tax contributions equal to six percent (6%) of their base compensation to New PFRS (pre-risk shifting).  Eligible employees hired or rehired by the City on and after July 1, 2014 shall make pre-tax contributions equal to eight percent (8%) of their base compensation to New PFRS (pre-risk shifting).

3.    Plan Terms.  Except as set forth herein, the following key terms relating to New PFRS shall apply to benefits accrued by eligible employees on and after July 1, 2014 and prior to January 1, 2024:

| BENEFIT FORMULA | Final Average Compensation (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014 x 2.0%.  Average base compensation does not include overtime, unused sick leave, longevity payments, or any other form of bonus or additional compensation – just the employee's base salary. |
| --- | --- |
| | Actual time for benefit accrual is actual time served. For vesting service, an eligible employee must work 1,000 hours in a 12-month period to accrue a year of service. |

2

| | |
|---|---|
| **NORMAL RETIREMENT AGE** | Age 50 with 25 years of service, with the following 7 year transition period:<br><br>Fiscal Year              Age and Service<br>2015                       Age 43 and 20 years<br>2016                       Age 43 and 20 years<br>2017                       Age 44 and 21 years<br>2018                       Age 45 and 22 years<br>2019                       Age 46 and 23 years<br>2020                       Age 47 and 24 years<br>2021 and thereafter      Age 50 and 25 years |
| | 10 Years of Service for vesting. |
| | Deferred vested pension -- 10 years of service and age 55. |
| | Duty Disability - consistent with Old PFRS. |
| | Non-Duty Disability – consistent with Old PFRS. |
| | Non-Duty Death Benefit for Surviving Spouse – consistent with Old PFRS. |
| | Duty Death Benefit for Surviving Spouse – consistent with Old PFRS. |
| **COLA** | 1% compounded, variable. |
| **DROP ACCOUNTS** | Available for frozen Old PFRS benefits and future accrued benefits under New PFRS for employees who are eligible to retire under concurrent eligibility requirements. No more than 5 years of DROP participation for employees not already in DROP as of June 30, 2014. DROP accounts will be managed by PFRS instead of ING, if administratively and legally feasible. If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%. |
| **ANNUITY SAVINGS** | Voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted. |
| | Investment Return/Discount rate – 6.75%. |

3

| | |
|---|---|
| **RISK SHIFTING** | If the funding level is less than 90% (using the fair market value of assets), COLAs will be eliminated (to the extent applicable).<br><br>If the funding level is 90% or lower (using the fair market value of assets and a 3-year look back period), the following corrective actions will be taken in the order listed below, until PFRS actuaries can state that by virtue of the use of corrective action, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years:<br><br>1. eliminate COLAs (if applicable);<br>use amounts credited to the rate stabilization fund to fund accrued benefits;<br>2. increase employee contributions by 1% per year (6% to 7% for current actives and 8% to 9% for new employees in year 1) for up to 5 years;<br>3. increase employee contributions (active and new employees) by an additional 1% per year;<br>4. increase employee contributions (active and new employees) by an additional 1% per year;<br>5. implement a 1 year COLA fallback;<br>6. implement a second 1 year COLA fallback;<br>7. increase employee contributions by an additional 1% per year; and<br>8. increase City contributions consistent with applicable actuarial principles and PERSIA. |

a)      In accordance with the 2014-2019 collective bargaining agreement between the City and the DPOA ("CBA"), the ten percent (10%) cap on annual contributions to the Annuity Savings Account will not apply to payments of accrued sick leave into an Annuity Savings Account made pursuant to Article 34, Section A.2.c. of the CBA.

b)      Employees in the DPOA bargaining unit will have the option to participate in a one-time irrevocable "roll-in election" with respect to calculation of their frozen accrued benefits under Old PFRS. The purpose of this roll-in election is to give each eligible employee the option to allocate a portion of his or her unused sick pay bank to the employee's Average Final Compensation, which in turn will be used to determine the employee's frozen accrued benefits under Old PFRS as of June 30, 2014. If the employee elects to roll-in a portion of his or her unused sick pay, the employee's Average Final Compensation will include the portion of the employee's sick pay bank determined as of June 30, 2014 that would have been included in the member's Average Final Compensation in accordance with the terms of Old PFRS, as though the employee had retired on June 30, 2014 with 20 years of service. In the event an employee terminates employment with the City prior to attaining 20 years of service, the employee's roll-in election will be nullified. If an employee makes a roll-in election, the employee's unused sick leave bank

4

will be reduced by the number of hours included in the employee's Average Final Compensation calculation and the employee may not use those hours for sick leave or receive the value in cash when the employee retires. The form for making a roll-in election will be available to employees on-line, and paper copies of the form will also be made available. An eligible employee wishing to roll-in a portion of his or her unused sick pay must sign the form in the presence of a witness and return the form to the PFRS office no later than October 15, 2014. The one-time roll-in election will have no impact on benefits accrued under New PFRS.

c)     For avoidance of doubt, 'eligible to retire under concurrent eligibility requirements' of the Combined Plan means that an Association member with accrued benefits under Old PFRS may retire upon attaining 20 years of service, regardless of age. This member would immediately receive a frozen pension under Old PFRS. If the member does not meet the age and years of service requirements of the New PFRS, he or she will begin receiving an additional payment (actuarially reduced to reflect early commencement) based on his or her accrued benefit under New PFRS when he or she turns 55. He or she can begin receiving an unreduced normal retirement benefit under New PFRS when he/she reaches age 62.

The age 50 and 25 years of service requirements of New PFRS apply only to New PFRS and are subject to the 7 year transition period set forth above. The transition applies as set forth below:

> 1.     Under the transition, after July 1, 2014, an Association member who reaches 20 years of service and age 43 on or before June 30, 2015 can retire anytime after reaching 20 years of service and age 43, and he or she will immediately receive an unreduced accrued New PFRS benefit.

> 2.     Beginning on July 1, 2015, an Association member who reaches 20 years of service and age 43 on or before June 30, 2016 can retire anytime after reaching 20 years of service and age 43, and he or she will immediately receive an unreduced accrued New PFRS benefit.

> 3.     After June 30, 2020, an Association member must be at least 50 years old with 25 years of service to retire and immediately receive his or her unreduced accrued New PFRS benefit.

An Association member who does not meet these New PFRS requirements will not begin receiving his or her unreduced accrued New PFRS benefit until the Association member reaches age 62 and has been credited with 10 years of service. An Association member with 10 years of service may elect to retire at age 55 with an actuarially reduced benefit.

5

d)      Section 1.4 (Board of Trustees – Membership; Appointment) of the New PFRS  and Article III, Section 2 of the Old PFRS (Membership of Board) shall not be modified during the term of the CBA.

e)      The City will remit to the New PFRS all contributions withheld from employees' pay checks.

The City shall promptly transfer these employees' contributions to the new PFRS, but in no event shall such City transfers be made later than the 15th day of the month following the month of the pay dates when the employees' contributions are withheld by the City (hereinafter "Contribution Due Date"). (By way of illustration and example only, the City must transfer to the New PFRS by no later than February 15 all of the employees' contributions withheld on the pay dates of the immediately preceding January.)

If the City does not transfer the employees' withheld contributions to the New PFRS by the Contribution Due Date, these contributions shall be deemed delinquent contributions (hereinafter "Delinquent Contributions"). The City shall be liable to the New PFRS in the amount of the Delinquent Contributions and any Lost Earnings ("Lost Earnings") on the Delinquent Contributions, which would have been earned on the employees' contributions, had the City timely made the transfer of these employees' contributions.

Notwithstanding the above, the City shall be liable for Lost Earnings in an amount not less than the applicable corporate underpayment rate(s), effective during the delinquency, established under Section 6621(a)(2) of the Internal Revenue Code.

B.      Reservation of Rights by City.  This Memorandum of Understanding shall in no way be construed to interfere with, or add additional requirements with respect to, the City's rights to modify the terms of any pension plan document currently in effect, or that may be in effect during the term of this Memorandum of Understanding, including but not limited to the Combined Plan; provided, however, that the City shall not modify the terms of the applicable pension plan(s), in any manner that conflicts with those terms set forth in Section A above, unless the City is ordered to do so by the Bankruptcy Court in the plan of adjustment dated August 20, 2014 (as it may be amended, modified or supplemented, "Plan of Adjustment") in the case In re: City of Detroit, Case No. 13-53846 or as set forth in Section D below.

C.      Compliance with Plan of Adjustment.   The terms of this Memorandum of Understanding are subject to confirmation of the Plan of Adjustment and may be modified therein to achieve confirmation of the Plan of Adjustment.  Any proposed modification to the Plan of Adjustment is subject to the rights of the DPOA to object to same.  During the term of this Memorandum of Understanding, the City shall not make any modifications to the terms of the Combined Plan that are contrary to the terms of the

6

automatically moved to the next step in the grievance procedure. Additionally, the time limits of the grievance procedure may be shortened or extended by mutual agreement.

G.  Grievances affecting a large number of employees or concerning a transfer between commands may be treated as policy grievances and entered at the third step of the grievance procedure by the Union. One or more members of the Grievance Committee may attend hearings on policy grievances entered at Step 3 with the permission of the Labor Relations Section. Such permission shall not be unreasonably refused.

H.  In instances wherein the subject matter of the grievance lies within the jurisdiction of specific City agencies (e.g., payroll, etc.), the grievance steps may be reduced in order to bring the grievance to the agency's immediate attention for a recommendation as to the action to be taken. Further, the Chief of Police and the President of the Association will be permitted, at their discretion, to participate at any step of the grievance procedure.

I.  Binding Mediation Procedure. By mutual agreement, the parties may submit certain disputes to an abbreviated binding mediation procedure in lieu of arbitration. The parties will identify at least one (1) permanent arbitrator from the permanent panel selected under Article 8 who shall schedule one (1) additional hearing date each month. Prior to each scheduled hearing date, each party may submit up to five (5) grievances and disciplinary matters for a binding recommendation by the arbitrator serving as a mediator. Each party shall provide the other party and the arbitrator with advance notice of the matters to be presented, including relevant documentation. Either party may reject a matter that is proposed to be heard. The mediation hearing shall be informal and the parties agree to be bound by the recommendation of the arbitrator serving as a mediator.

# 8. ARBITRATION

A.  Any unresolved grievance relating only to the interpretation, application or enforcement of a specific article and section of this Agreement or any Supplementary Agreement, hereto, having been processed fully through the last step of the grievance procedure, may be submitted to arbitration by the Department or the Association in strict accordance with the following:

1.  Arbitration may be initiated by written notice to the other party of an intention to arbitrate. Such written notice of intent to arbitrate must be made within ten (10) calendar days after receipt of the Step 3 answer.

2.  Selection of Arbitrator and Permanent Panel

    a.  Within thirty (30) calendar days after the execution of this Agreement, the parties shall convene and select four (4) disinterested persons qualified in labor-management relations to serve as permanent arbitrators. If the parties are unable to agree upon four (4) individuals to serve as permanent arbitrators, for each unfilled position, the Director of the Michigan Employment Relations Commission (MERC) shall be requested to submit the names of five (5) disinterested persons qualified and willing to act as impartial arbitrators. From each list, the Department and Union shall each

alternately strike one name until four (4) names have been eliminated and the person whose name remains on the list shall be selected to act as one of the four (4) permanent arbitrators.

b. If at any time either party desires to terminate the service of an arbitrator, it shall give notice in writing to that effect to the other party, specifying the date of termination. The parties shall then send a joint written notice to the arbitrator of his termination. Neither party may terminate the services of an arbitrator unless he has heard at least one (1) case.

c. Once the arbitrator has received written notice that his services are terminated, he shall not hear any further cases. However, he shall render decisions on all cases that he has heard prior to receiving such notice.

d. In the event an arbitrator is terminated, a new arbitrator shall be immediately selected in accordance with the procedure described in Section 2.a.

e. The arbitrators will hear cases on a chronological rotation.

3. It will be within the authority of the arbitrator to make a decision binding upon the parties regarding the interpretation, application, or enforcement of the Agreement.

4. The arbitrator will not consider any evidence submitted by either party, which was not produced in the grievance procedure unless such evidence was not then known to the party submitting the same.

5. The costs of the arbitration will be shared equally by the parties, except that each party will make arrangements to pay its own attorneys and witnesses. In cases where the arbitrator provides that either party has filed or denied a grievance in bad faith, the arbitrator will have the discretion to assess all costs and expenses of the arbitration hearing, including reasonable attorneys' fees, against the non-prevailing party.

6. The parties may request in writing of each other co-operation to have available at the arbitration proceedings any witnesses requested by the other party.

7. If the central issue in the unresolved grievance is an Employee's medical condition, which may be the case in matters pertaining to sick leave, qualifications to perform work, requests for light duty assignments, or accommodation of disabilities, the arbitration procedure specified in this Article will not apply, and the parties will instead select a neutral physician to resolve any disputes concerning medical issues. Such a neutral physician must be licensed to practice and currently practicing medicine. The neutral physician will be jointly selected by the Department and the Association. To the extent the Department and Association cannot agree on a neutral physician, the neutral physician will be mutually selected by the Employee's treating physician and the Police Department's designated physician. Upon request, the City will provide medical

Plan of Adjustment as confirmed by the Bankruptcy Court.

D.    <u>Compliance with Public Act 183</u>.   Notwithstanding any provision of this Memorandum of Understanding that can be construed to the contrary, this Memorandum of Understanding will not be construed to require the City to fall out of compliance with the requirements of Public Act 183, House Bill 5568 ("<u>PA 183</u>").  In the event that the City determines that it has fallen out of compliance with, or is reasonably likely to fall out of compliance with PA 183, the City will provide written notice to the Association, and offer to meet and confer with the Association for a period not longer than thirty (30) days to discuss potential modifications to the terms of the Memorandum of Understanding in order to comply with the requirements of PA 183. To the extent that the City and the Association are unable to reach an agreement within thirty (30) days, the City may make any necessary modifications to ensure compliance with PA 183.

E.    <u>Duration</u>.  This Memorandum of Understanding will become effective upon approval by the Emergency Manager and the Treasurer of the State of Michigan and shall remain in effect until December 31, 2023. The City and the Association hereby agree to waive any and all collective bargaining rights with respect to pension benefits, including but not limited to benefits provided under, and any other issues relating to, the Combined Plan (the "<u>Waived Issues</u>") from the date that this Memorandum of Understanding is executed through December 31, 2023. The parties acknowledge that they are enjoined from collective bargaining regarding the Waived Issues through June 30, 2023 and further agree to waive any right to raise any of the Waived Issues in any Act 312 arbitration proceeding. The City and the Association agree that they may engage in collective bargaining regarding the Waived Issues beginning June 30, 2023, but that no modifications may be made with respect to any Waived Issue until after December 31, 2023.

F.    <u>Grievance and Arbitration</u>:  Any dispute pertaining to the provision of benefits pursuant to this Memorandum of Understanding shall be subject to the grievance and arbitration procedures set forth in Articles 7 and 8 of the CBA or any comparable provision set forth in a successor collective bargaining agreement entered into between the City and the DPOA. In resolving any dispute pertaining to provision of benefits pursuant to this Memorandum of Understanding, the Arbitrator shall be bound by the terms of this Memorandum of Understanding, the Combined Plan, and the Plan of Adjustment, and shall have no authority to issue any award or order that is contrary to the terms of these documents.

IN WITNESS WHEREOF, the parties hereto have affixed their signatures below:

Dated this 1st day of October 2014.

DETROIT POLICE OFFICERS
ASSOCIATION:

_____
Mark Diaz, President

_____
Bernard Cybulski, Vice President

_____
Donna Latouf, Secretary-Treasurer

_____
Linda Broden, Sergeant at Arms

CITY OF DETROIT:

_____
Michael E. Duggan, Mayor

_____
Michael A. Hall, Director of Labor Relations

_____
James E. Craig, Chief of Police

[see next page]

_____
Office of the State Treasurer, Michigan

8

IN WITNESS WHEREOF, the parties hereto have affixed their signatures below:

Dated this 1st day of October 2014.

DETROIT POLICE OFFICERS
ASSOCIATION:

_____
Mark Diaz, President

_____
Bernard Cybulski, Vice President

_____
Donna Latouf, Secretary-Treasurer

_____
Linda Broden, Sergeant at Arms

CITY OF DETROIT:

_____
Michael E. Duggan, Mayor

_____
Michael A. Hall, Director of Labor Relations

_____
James E. Craig, Chief of Police

_____
Office of the State Treasurer, Michigan

8

IN WITNESS WHEREOF, the parties hereto have affixed their signatures below:

Dated this ___ day of October 2014.

DETROIT POLICE OFFICERS
ASSOCIATION:

CITY OF DETROIT:

_____
Mark Diaz, President

_____
Michael E. Duggan, Mayor

_____
Bernard Cybulski, Vice President

_____
Michael A. Hall, Director of Labor Relations

_____
Donna Latouf, Secretary-Treasurer

_____
James E. Craig, Chief of Police

_____
Linda Broden, Sergeant at Arms

_____
Office of the State Treasurer, Michigan

_____
Kevyn Orr, Emergency Manager

8

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN**
**THE CITY OF DETROIT**
**AND**
**DETROIT POLICE OFFICERS ASSOCIATION**

The Detroit Police Officers Association ("Association") and the City of Detroit ("Detroit") discussed the application of Article 20, Section J.2 and Article 40, Section A of the 2014-2019 Collective Bargaining Agreement. In connection with those discussions, the parties have agreed to the following:

1. The 8% wage increase listed in Article 40, Section A shall become effective the second pay period following the effective date of the Collective Bargaining Agreement.

2. Each Employee who was on the City's payroll as of October 1, 2014 shall receive a one-time signing bonus equal to $620.00.

3. With respect to Article 20, Section J.2, the DPOA shall have 10 business days to identify an existing VEBA to which the City may make the contributions set forth in that provision and confirm that such VEBA is willing to accept said contributions. If the DPOA identifies such a VEBA within the applicable time frame, the parties shall meet and confer with respect to necessary changes to the Collective Bargaining Agreement. If the Association does not identify such a VEBA, the provisions of Article 20, Section J.2 shall remain unchanged.

IN WITNESS WHEREOF, the parties have affixed their signatures below:

Dated this 1st day of October, 2014.

DETROIT POLICE OFFICERS
ASSOCIATION

CITY OF DETROIT

Mark Diaz, President

Michael E. Duggan, Mayor

Bernard Cybulski, Vice President

Michael A. Hall, Director of Labor Relations

Donna Latouf, Secretary-Treasurer

James E. Craig, Chief of Police

Linda Broden, Sergeant-at-Arms

[see next page]

Office of the State Treasurer, Michigan

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE CITY OF DETROIT
## AND
## DETROIT POLICE OFFICERS ASSOCIATION

The Detroit Police Officers Association ("Association") and the City of Detroit ("Detroit") discussed the application of Article 20, Section J.2 and Article 40, Section A of the 2014-2019 Collective Bargaining Agreement. In connection with those discussions, the parties have agreed to the following:

1. The 8% wage increase listed in Article 40, Section A shall become effective the second pay period following the effective date of the Collective Bargaining Agreement.

2. Each Employee who was on the City's payroll as of October 1, 2014 shall receive a one-time signing bonus equal to $620.00.

3. With respect to Article 20, Section J.2, the DPOA shall have 10 business days to identify an existing VEBA to which the City may make the contributions set forth in that provision and confirm that such VEBA is willing to accept said contributions. If the DPOA identifies such a VEBA within the applicable time frame, the parties shall meet and confer with respect to necessary changes to the Collective Bargaining Agreement. If the Association does not identify such a VEBA, the provisions of Article 20, Section J.2 shall remain unchanged.

IN WITNESS WHEREOF, the parties have affixed their signatures below:

Dated this 1st day of October, 2014.

DETROIT POLICE OFFICERS ASSOCIATION

Mark Diaz, President

Bernard Cybulski, Vice President

Donna Latouf, Secretary-Treasurer

Linda Broden, Sergeant-at-Arms

CITY OF DETROIT

Michael E. Duggan, Mayor

Michael A. Hall, Director of Labor Relations

James E. Craig, Chief of Police

Office of the State Treasurer, Michigan

# MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE CITY OF DETROIT
## AND
## DETROIT POLICE OFFICERS ASSOCIATION

The Detroit Police Officers Association ("Association") and the City of Detroit ("Detroit") discussed the application of Article 20, Section J.2 and Article 40, Section A of the 2014-2019 Collective Bargaining Agreement. In connection with those discussions, the parties have agreed to the following:

1. The 8% wage increase listed in Article 40, Section A shall become effective the second pay period following the effective date of the Collective Bargaining Agreement.

2. Each Employee who was on the City's payroll as of October 1, 2014 shall receive a one-time signing bonus equal to $620.00.

3. With respect to Article 20, Section J.2, the DPOA shall have 10 business days to identify an existing VEBA to which the City may make the contributions set forth in that provision and confirm that such VEBA is willing to accept said contributions. If the DPOA identifies such a VEBA within the applicable time frame, the parties shall meet and confer with respect to necessary changes to the Collective Bargaining Agreement. If the Association does not identify such a VEBA, the provisions of Article 20, Section J.2 shall remain unchanged.

IN WITNESS WHEREOF, the parties have affixed their signatures below:

Dated this *15th* day of October, 2014.

| DETROIT POLICE OFFICERS ASSOCIATION | CITY OF DETROIT |
|---|---|
| Mark Diaz, President | Michael E. Duggan, Mayor |
| Bernard Cybulski, Vice President | Michael A. Hall, Director of Labor Relations |
| Donna Latouf, Secretary-Treasurer | James E. Craig, Chief of Police |
| Linda Broden, Sergeant-at-Arms | Office of the State Treasurer, Michigan<br>Kevyn Orr, Emergency Manager |

October 1, 2014

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 Jefferson Ave.
Detroit, MI 48207

Re:   Prescheduled Overtime (2014-2019 Collective Bargaining Agreement)

Dear Mr. Diaz:

During negotiations with respect to the parties' 2014-2019 collective bargaining agreement, the Detroit Police Department (the "Department") and the Detroit Police Officers Association ("DPOA") discussed the methods by which the Department may shift personnel from one assignment to another pursuant to Article 14, Section E.1. The Department shall utilize Employees in the DPOA bargaining unit and, absent exigent circumstances, shall follow the following process:

1.   The Department shall first attempt to address the personnel shortage by shifting Employees within the Command.

2.   To the extent the Department cannot address the personnel shortage by shifting Employees within the Command, the Department shall next attempt to shift Employees from adjacent Precincts.

3.   If the Department cannot fill the vacancy by shifting personnel within the Command or by shifting Employees from an adjacent Precinct, the Department may assign DPOA Employees without restriction.

Sincerely,

James Craig
Chief of Police

Acknowledged and Agreed:

Mark Diaz
President, DPOA

October 1, 2014

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 Jefferson Ave
Detroit, MI 48207

     Re:    Funeral Leave (2014-2019 Collective Bargaining Agreement)

Dear Mr. Diaz:

During negotiations with respect to the parties' 2014-2019 collective bargaining agreement, the Detroit Police Department ("Department") and the Detroit Police Officers Association ("DPOA") discussed the application of Article 12 of the collective bargaining agreement. In connection with those discussions, the parties have agreed that an Employee's Legal Guardian, or an individual over whom the Employee serves as Legal Guardian, shall be treated as an immediate family member for purposes of eligibility for funeral leave. The Department may require the Employee to furnish proof of legal guardianship.

Sincerely,

James Craig
Chief of Police

Acknowledged and Agreed:

Mark Diaz
President, DPOA

October 1, 2014

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 Jefferson Ave.
Detroit, MI 48207

Re: Letter of Agreement – Group Health Care

Dear Mr. Diaz:

In connection with the negotiations regarding the 2014-2019 collective bargaining agreement (the "CBA") between the City of Detroit (the "City") and the Detroit Police Officers Association (the "DPOA") (collectively, the "Parties"), the Parties discussed the administration and application of the language contained in Article 20 of the CBA pertaining to Hospitalization, Medical, Dental and Optical Care (the "Group Health Care Provisions"). In particular, the Parties discussed the interpretation and application of Group Health Care Provisions pertaining to compliance with Michigan Public Act 152, Michigan Combined Laws ("MCL"), §§ 15.561 *et seq.* ("PA 152"), in connection with the administration of the City's group health care program provided to DPOA bargaining unit employees. With respect to the interpretation and application of Article 20.H of the CBA, the Parties agree as follows:

1.    In the event that the annual "Medical Benefit Plan Costs" (as defined in MCL § 15.562(F)) exceed the maximum public employer payment set forth in MCL § 15.563 (the "Hard Cap"), the City agrees to present a resolution to the City Council requesting that, for each applicable year, the City elect to comply with the provisions of MCL § 15.564 (the "80/20 Cost Allocation"), in order to maintain the current Medical Plan Design and premium allocations set forth in Articles 20.A and 20.B of the CBA.

2.    In the event that the City Council does not approve the 80/20 Cost Allocation by majority vote in any year, the City agrees to meet and confer with the Union for a period not longer than thirty (30) days, as outlined in Article 20.H of the CBA, in order to discuss potential modifications to the terms of the Medical Plan Designs (as defined in Article 20.A of the CBA) to maintain compliance with PA 152.

3.    In the event that the Parties are unable to reach an agreement after thirty (30) days, as outlined in Article 20.H of the CBA, the City may make necessary modifications to the Medical Plan Designs to ensure compliance with PA 152 but will not modify the 80/20 monthly contribution allocation set forth in Article 20.B of the CBA without the agreement of the DPOA. However, the Parties agree that, in the event that the City is required to modify the Medical Plan Designs in order to ensure compliance with PA 152, the City shall be relieved of any obligation under Article 20.G of the CBA to provide "Gold"-level coverage.

4.    In the event that any other bargaining unit reaches a different resolution of these issues, the DPOA may elect to adopt that agreement.

Very truly yours,

Michael E. Duggan
Mayor, City of Detroit

2

3.    In the event that the Parties are unable to reach an agreement after thirty (30) days, as outlined in Article 20.H of the CBA, the City may make necessary modifications to the Medical Plan Designs to ensure compliance with PA 152 but will not modify the 80/20 monthly contribution allocation set forth in Article 20.B of the CBA without the agreement of the DPOA. However, the Parties agree that, in the event that the City is required to modify the Medical Plan Designs in order to ensure compliance with PA 152, the City shall be relieved of any obligation under Article 20.G of the CBA to provide "Gold"-level coverage.

4.    In the event that any other bargaining unit reaches a different resolution of these issues, the DPOA may elect to adopt that agreement.

Very truly yours,

Michael E. Duggan
Mayor, City of Detroit

Kevyn Orr
Emergency Manager

2