```
 1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION

 3  IN THE MATTER OF,        Case No. 13-53846
                             Detroit, Michigan
 4  CITY OF DETROIT, MI      November 7, 2014
    _____/  1:00 p.m.
 5
                 IN RE: TRIAL RE: BENCH DECISION
 6          BEFORE THE HONORABLE STEVEN W. RHODES
             TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  HEATHER LENNOX, ESQ.
 9                                 Jones, Day
                                   222 East 41st Street
10                                 New York, NY 10017-6702
                                   212-326-3939
11
                                   DAVID HEIMAN, ESQ.
12                                 Jones, Day
                                   North Point
13                                 901 Lakeside Avenue
                                   Cleveland, OH 44114
14                                 216-586-3939

15  For Financial Guaranty         ALFREDO PEREZ, ESQ.
    Insurance Company:             Weil, Gotshal & Manges
16                                 700 Louisiana Street
                                   Suite 1600
17                                 Houston, TX 77002
                                   713-546-5000
18
    For the State of Michigan:     STEVEN HOWELL, ESQ. (P28982)
19                                 Dickinson, Wright
                                   500 Woodward Avenue
20                                 Suite 4000
                                   Detroit, MI 48226-3425
21                                 313-223-3033

22  For the Retired Detroit        LYNN BRIMER, ESQ. (P43291)
    Police Members Association:    Strobl & Sharp
23                                 300 East Long Lake Road
                                   Suite 200
24                                 Bloomfield Hills, MI 48304-2376
                                   248-540-2300
25
```

1  Court Recorder:              Letrice Calloway

2  Transcriber:                Deborah L. Kremlick

3

4  Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Court in Session)

2        THE CLERK:  All rise.  Court is in session.  You may

3  be seated.  Case number 13-53846, City of Detroit, Michigan.

4        THE COURT:  Good afternoon.

5    `    THE ATTORNEYS:  Good afternoon, Your Honor.

6        THE COURT:  In Chapter 9 of the United States

7  Bankruptcy Code, the Federal Government offers help to the

8  states in resolving a problem that under our constitutional

9  structure the states cannot solve by themselves.  That problem

10  is the adjustment of the debts of an insolvent municipality.

11      Today this Federal Bankruptcy Court grants that help to

12  the State of Michigan and the City of Detroit.  The Court

13  concludes that the city's eighth amended plan of adjustment

14  meets the legal requirements for confirmation.  Accordingly,

15  the Court confirms the plan.

16      The Court also concludes that the settlements that are

17  incorporated into the plan of adjustment are reasonable, fair,

18  and equitable.  Accordingly the Court approves those

19  settlements.

20      The Court -- the Court also concludes that the city's

21  proposed exit financing meets the requirements of the

22  Bankruptcy Code, therefore, the Court approves the exit

23  financing.

24      This oral opinion will first address the settlements.

25  There are no outstanding objections to the settlements except

1  for the ASF recoupment portion of the pension settlement.

2  Nevertheless the city has requested the Court to determine

3  that they are reasonable, fair, and equitable.

4      The Court will then review the major issues relating to

5  confirmation.  These are, good faith, best interest of

6  creditors, professional fees, unfair discrimination, fair and

7  equitable, and the treatment of constitutional claims against

8  the city.

9      The Court will then briefly review the city's request for

10 approval of the exit financing.  The Court will then address

11 feasibility and then conclude.

12     The Court will soon issue a supplemental written opinion

13 that will more fully address all of the issues.  Please settle

14 in, this will take some time.  We may take a brief stand up

15 break at some point.

16     After the opinion, the Court will take a recess and then

17 reconvene to discuss next steps with the attorneys.  Nearly

18 every creditor group filed litigation against the city seeking

19 the full protection of its claims as well as objections to

20 confirmation.  The plan is largely comprised of the

21 settlements of those claims and objections.

22     With only one exception every group of creditors

23 represented by counsel has settled with the city.  That

24 exception is a small group of creditors with constitutional

25 claims against the city.

1     The Court previously approved the settlement with the

2  swap counter parties.  Here are the settlements that the Court

3  approves today at the city's request.

4     The grand bargain settlement which includes the pension

5  settlement, the state contribution agreement, and the DIA

6  settlement.  The OPEB settlement, the 36th District Court

7  settlement, the UTGO settlement, the LTGO settlement, the

8  Syncora settlement, and the FGIC settlement.

9     Several factors are relevant to the reasonableness of

10 each of these settlements and are common to all of them.

11 These factors include all of the creditors in these

12 settlements had filed and vigorously pursued objections to the

13 plan.  All of the creditors were highly motivated to pursue

14 these objections and had the resources to do so.  This would

15 include the appellate process if necessary.

16     Many of the objections raised issues that were novel,

17 complex, both legally and factually, and potentially had

18 significance beyond this case.  All of the parties were well

19 represented and well prepared for litigation.

20     For the city litigating with creditors was incompatible

21 with its goal of a prompt and efficient exit from bankruptcy

22 and start to its revitalization.  For the city the stakes in

23 any of the creditor litigation were high.  Even a single loss

24 to any major creditor would seriously compromise its goals in

25 this case.

1    Each settlement was at arm's length and hard fought.

2  Each required perserverance, creativity, and compromise by all

3  involved.  Each of those considerations played a role in each

4  of these settlements.

5    The cornerstone of the plan is the grand bargain.  It is

6  -- it is a collection of settlements among a number of parties

7  with an interest in the city's two pension plans and in

8  protecting the city's art.  These parties include the Official

9  Committee of Retirees, the General Retirement Systems, the

10  GRS, the Police and Fire Retirement Systems, the PFRS, the

11  American Federation of State, County, and Municipal Employees,

12  AFSCME, the United Auto Workers Union, the Detroit Retired

13  City Employees Association, the Retired Detroit Police Members

14  Association, the Retired Detroit Police and Firefighters

15  Association, the Detroit Police Lieutenants and Sergeants

16  Association, the Detroit Police Command Officers Association,

17  the Detroit Police Officers Association, the Detroit

18  Firefighters Association, the State of Michigan, a number of

19  charitable foundations, and the Detroit Institute of Arts.

20    The settlements represented in the grand bargain are, the

21  pension settlement, the state contribution agreement, and the

22  DIA settlement.  The plan of adjustment reflects the grand

23  bargain in its treatment of Class 10 which consists of the

24  PFRS claims and Class 11 which consists of the GRS claims.

25    The State of Michigan, a number of charitable

1 foundations, and the Detroit Institute of Arts, and a number

2 of individuals will contribute to the city's two pension plans

3 a total value of $816,000,000 over 20 years.

4    The key points of the pension settlement are, an allowed

5 claim amount of under funded accrued actuarial liability, the

6 UAAL will be $125,000,000,000 for PFRS, and 1.879 billion for

7 GRS.  And for PFRS, I meant to say 1.25 billion.

8    Through June 30, 2013, the pension plans will use a 6.75%

9 discount rate to value the liabilities and a 6.75% assumed

10 investment return -- return rate to estimate future growth of

11 their assets.  The pension plans will be frozen as of July 1,

12 2014.

13    Active employees continuing to work for the city after

14 July 1, 2014 will have benefits under the new hybrid pension

15 plans.  The pension formulas contained in the new hybrid plans

16 are less generous than those in the present plans.

17    Each pension claimant will receive the adjusted pension

18 amount.  For PFRS retirees this means no reduction in the

19 accrued pension benefit amount, but a 45% reduction in the

20 cost of living amount, the COLA.

21    For GRS retirees the adjusted pension amount is a 4.5%

22 reduction in the accrued pension benefit amount and

23 elimination of COLA.  Some GRS retirees will be subject to an

24 annuity savings fund recoupment.  Because some parties have

25 objected to this ASF recoupment, the Court will address this

1  separately later.

2      There are provisions for restoration of pension benefit

3  payments in certain circumstances.  For 2013 -- sorry, 2023,

4  the pension funding targets are, 70% for GRS, and 78% for

5  PFRS.  For 2053, in 40 years, the targets are 100% for each.

6  PFRS and GRS will each have an investment committee that will

7  make recommendations to and in certain circumstances approve

8  the actions of their boards of trustees.

9      Until June 30, 2023, the parties may not amend the

10 terms, conditions, and rules of the GRS and the PFRS relating

11 to the calculation of pension benefits, the investment return

12 assumptions, or the contributions to the pension systems.  The

13 pension classes voted to accept the plan by 82% in Class 10,

14 PFRS, and 73% in Class 11, GRS.

15     Despite the strong votes in favor of the plan, the

16 treatment of the pension claims in the city's plan of

17 adjustment has been a significant issue in the case.  In the

18 Court's eligibility opinion it held that the federal

19 bankruptcy power could impair pension rights in a municipal

20 case, even if the state constitution protects them.  The Court

21 stands by that decision.

22     Now, at the confirmation stage, the Court must determine

23 whether the plan's treatment of pension claims meets the legal

24 requirements for plan confirmation and settlement approval.

25 The plan confirmation issues include good faith, best interest

1 of creditors, feasibility, and others.  The Court will address

2 those questions later.

3      It will now address whether the pension settlement is a

4 reasonable settlement.  Despite the acceptance of the plan by

5 the pension classes, many pension claimants still strongly

6 oppose the impairment of their pension rights in this

7 bankruptcy.

8      They believe that under the Michigan Constitution their

9 pension rights are not subject to impairment.  They credibly

10 state that they worked hard for the city, that they did

11 nothing wrong, and that these impairments will cause them real

12 hardship.

13      Some also argue that the pension impairments in the plan

14 of adjustment are unnecessary because the pension plans are in

15 fact fully funded.  They further argue that if the pension

16 plans are under funded the city should sell the art at the

17 Detroit Institute of Arts, or other city assets.

18      Many of these objecting parties took the time to come to

19 Court to give a strong sincere and personal voice to their

20 objections.  The Court finds that the pension settlement is a

21 reasonable settlement and overrules those objections to

22 confirmation and to the pension settlement.

23      The several representatives of the pension classes

24 appealed this Court's eligibility decision to the Court of

25 Appeals.  The city of course took the position that the

1  eligibility decision was correct and should be affirmed.

2      To determine the reasonableness of the settlement it is

3  incumbent upon this Court to estimate the parties' likelihood

4  of success on appeal.  That is challenging here.  On balance

5  the Court estimates that the pension creditors' chances of

6  success on appeal were in the range of 25%.

7      The next step would be to determine each side's best case

8  scenario.  For the city that would plainly be to prevail on

9  appeal and to continue in this Chapter 9.  For the pension

10  claimants however, the best case scenario is much less clear.

11  The city would still have no ability to pay their claims even

12  if those claimants were to prevail on appeal.

13      These considerations suggest that it is a vast

14  understatement to say that the pension settlement is

15  reasonable, it borders on the miraculous.  No one could have

16  foreseen this result for the pension creditors when the city

17  filed this case.  The plan's only -- the plan's proposal is

18  the only possible -- is only possible because of the pension

19  settlement and the grand bargain.

20      The pension reductions in the pension settlement are

21  minor compared to any reasonable -- reasonably foreseeable

22  outcome for these creditors without the pension settlement and

23  the -- and the grand bargain.  At the same time, the Court

24  must acknowledge that these pension reductions will cause real

25  hardship and in some cases it is severe.

1    This bankruptcy, however, like most is all about the

2 shared sacrifice that is necessary because the city is

3 insolvent and desperately needs to fix its future.  All of the

4 city's unsecured creditors are making sacrifices.  Others

5 sacrificed too, including the city's residents and visitors

6 and even the State of Michigan and its residents.  Even the

7 city's professionals are now contributing to this process and

8 to the city's future.

9    As noted, substantial majorities of the two pension

10 classes accepted the necessity of shared sacrifice for the

11 common good of the city.  That collective judgment is entitled

12 to substantial consideration here.  The Court finds that the

13 pension settlement is a reasonble settlement and approves it.

14    The Court will now address the annuity savings fund

15 recoupment part of the pension settlement.  In the city's

16 longstanding ASF program, GRS employees could voluntarily

17 contribute a percentage of their gross pay to a separate

18 pension account.

19    The GRS then invested those contributions with the other

20 GRS assets.  Each participant's ASF account increased in value

21 based on the participant's contributions and the interest

22 credited to that account.

23    For many years the GRS credited interest in each

24 participant's ASF account at the assumed rate of return even

25 when the actual rate of return was less than that.  The city

1   claims that this diversion of assets increased the GRS

2   unfunded liability.  It claims that it is therefore entitled

3   to recoupment of the excess interest credits from the

4   participants to offset that increased unfunded liability.

5   This in turn would reduce the pension cuts to the GRS

6   retirees.

7        The city calculates that the total of this claim is

8   approximately $387,000,000.  The GRS and the ASF participants

9   assert that there is no basis for recoupment.  The parties

10  have settled this dispute.

11       The key points are, the ASF recoupment amount for each

12  ASF participant will be the amount of excess interest that the

13  GRS credited to the participants between July 1, 2003, and

14  June 30, 2013.  The GRS will amortize each ASF participant's

15  recoupment over the participant's life expectancy with

16  interest at 6.75% to be deducted from the participant's

17  monthly pension check or ASF account.

18       The plan of adjustment caps the ASF recoupment at 20% of

19  the highest value of each participant's ASF account between

20  July 1, 2003, and June 30, 2013.  An additional cap limits the

21  combined pension reduction and ASF recoupment to 20% of such

22  participant's annual pension.

23       Each participant is subject -- that is subject to the ASF

24  recoupment will have the option to pay the ASF recoupment

25  amount in a single lump sum cash payment.  The settlement will

1  net approximately $190,000,000 to the GRS which is about 49%

2  of the city's calculation of its claim here.

3      Several participants object to the ASF recoupment in the

4  plan of adjustment.  They argue one, the ASF recoupment

5  violates the applicable statute of limitations.  Two, under

6  state law, the city's recoupment claim has no merit.  Three,

7  they did nothing that justifies imposing this liability on

8  them.  Four, the GRS board did nothing wrong.  Five, the city

9  has no standing to assert the claim.  Six, they do not consent

10  to the lesser treatment of their pension claim in Class 11

11  that results from the recoupment.  Seven, the treatment of the

12  city's recoupment claim in the plan violates their right to be

13  heard on the merits.  Eight, the city did not properly

14  disclose the 6.75% interest rate.  Nine, the interest rate is

15  illegal, usurious, and unfair.  And ten, the Court should

16  carve the ASF settlement out of the plan and then approve the

17  plan.

18      The Court overrules these objections.  The ASF recoupment

19  settlement is a part of the pension settlement and therefore

20  part of the grand bargain.  It is also a part of the city's

21  plan of adjustment.

22      The Court therefore has only two issues to consider.  The

23  first is whether the settlement is reasonable.  The second is

24  whether the plan provisions that incorporate the ASF

25  settlement violate the Bankruptcy Code.

1    It is not for the Court to rule on the merits of the

2  city's ASF recoupment claim or the merits of the participants'

3  defenses.  The Court only reviews the parties' positions to

4  determine whether the settlement is reasonable.

5    The Court finds substantial merit in the city's

6  recoupment claim.  The legal authority of the GRS board to

7  credit interest in excess of the actual rate of return was

8  doubtful.  The prudence of that practice was even more

9  doubtful.

10    The Court also considers that the asserted defenses have

11  less merit.  On balance it appears that the city's recoupment

12  claim would have a reasonable likelihood of success, 60 to

13  70%.  However, the length, complexity, and expense of

14  litigation on the claim would be substantial.  Should the city

15  prevail, issues of collectibility against ASF participants

16  could also be substantial depending on the structure of the

17  final judgment.

18    The Court also considers that the settlement is a part of

19  a much larger settlement of all pension related issues.  As

20  noted the class of claims affected by the settlement, Class 11

21  accepted the settlement by a vote of 73%.  Finally, the Court

22  notes that the caps and other limitations on the recoupment

23  amount that the parties negotiated should help to reduce the

24  hardship of it.  Fairly weighing these factors suggests that

25  the ASF recoupment settlement is well within the range of

1 possible reasonable settlements, the Court approves it.

2     The Court will now address the state contribution

3 agreement.  This agreement settles the state's potential

4 liability for under funding of the GRS and the PFRS plans

5 under the pension non-impairment provision of the Michigan

6 Constitution, Article 9, Section 24.  It also supports the

7 city's plan of adjustment.

8     The key points of this agreement are, the State of

9 Michigan will immediately contribute 194.8 million dollars.

10 The city, GRS, and PFRS will establish an income stabilization

11 program to insure that pension reductions do not cause any

12 retirees to fall into poverty.

13     The income stabilization program will receive a portion

14 of the payments on the stub UTGO bonds which the Court will

15 describe later.  The pension claimants will release the state

16 and its related entities from liability and cease litigation

17 related to the Chapter 9 case, Public Act 436, or the pension

18 provisions of the Michigan Constitution.

19     The claim settled here would not be a frivolous claim.

20 The language of Article 9, Section 24 of the Michigan

21 Constitution can be read to support the claim.  The

22 non-impairment language is absolute and the state is in a much

23 better position than retirees to monitor and enforce the

24 non-impairment of municipal pensions.

25     There is nonetheless no -- no precedent for such a claim.

1  Any litigation of it would be long, complex, and expensive.

2  If the state loses, it would be responsible for the Detroit

3  pension under funding of $3,000,000,000.  It might also then

4  be responsible for the entire unfunded liability of every

5  municipality in the state.  That would be disastrous for the

6  state.

7      The question then is whether the state's contribution is

8  a fair settlement to obtain a release of any liability that it

9  might have on this claim.  As noted, the contribution is about

10 $195,000,000.  The novelty and the lack of precedent make

11 judging the likelihood of success of this claim challenging.

12 The litigation would, however, be high risk for all concerned.

13     The parties have settled and with the help of the DIA and

14 the charitable foundations.  The many skilled and capable

15 representatives of the pension claimants have concluded that

16 the -- that the state contribution agreement is fair.  They

17 recommended it to their pension claimants who in turn voted

18 strongly to support it and to release their potential

19 litigation claims.

20     In the circumstances the Court finds that it is

21 reasonable, although perhaps at the lowest end of the range of

22 reasonable settlements, the Court approves it.  For reasons

23 that the Court will explain in its written opinion, the Court

24 also approves the release of the state and the state related

25 entities.

1        The Court will now address the DIA settlement.  This

2   settlement resolves all of the disputes relating to the rights

3   of all parties with respect to the DIA and the art.

4        The key points of this settlement are, the DIA will

5   secure and guarantee commitments for contributions to the GRS

6   and the PFRS of $100,000,000 over 20 years.  Various local and

7   national charitable foundations will contribute $366,000,000

8   to the GRS and the PFRS over 20 years.  The city will transfer

9   the art to the DIA Corp. which will hold the art in perpetual

10  charitable trust for the benefit of the people of the city and

11  the state.

12       Two issues arise here.  The first is whether the DIA

13  settlement is a fair settlement.  The Court will address that

14  issue now.  The second is whether the -- whether this

15  settlement is consistent with the best interest of creditors

16  test.  The Court will address that issue later.

17       Addressing the fairness of the settlement, the Court will

18  first examine the relative strengths of the parties'

19  positions.  Both the Michigan Attorney General and the DIA

20  itself take the position that the DIA art is subject to a

21  trust that prohibits the city from selling it to pay debts and

22  places it beyond the creditors' reach.

23       The DIA also asserts that the donors of many of the

24  pieces of art had imposed specific transfer restrictions on

25  them.  The evidence supports these assertions.  The Court was

1  especially impressed with the testimony of Ms. Erickson on

2  these points and with the historical documentary evidence that

3  the DIA cited in its brief and that was admitted into

4  evidence.

5      The evidence further establishes that nationally accepted

6  standards for art museums prohibit the de-acquisition of art

7  to pay debt.  The creditors also admitted, perhaps grudgingly,

8  that no creditor had ever considered the value of the art as a

9  possible source of repayment when it decided to lend money to

10 the city or to acquire the city's debt.

11     On the other hand the creditors did submit substantial

12 evidence and legal grounds supporting the contrary view that

13 the city can legally sell or monetize the DIA art.  On balance

14 the Court concludes that in any potential litigation

15 concerning the city's right to sell the DIA art, or concerning

16 the creditors' right to access the art to satisfy its claims,

17 the positions of the Attorney General and the DIA almost

18 certainly would prevail.

19     However, the evidence also established once -- once again

20 that any such litigation would have taken years to achieve the

21 result and would have been costly to pursue.  It also would

22 have been difficult for the city to endure the delay and

23 expense while at the same time attempting to revitalize

24 itself.

25     The DIA and the Attorney General state with credibility

1  that they would vigorously contest any attempt to sell the

2  art.  Credible evidence also establishes that any attempt by

3  the city to sell its art might result in a cancellation of the

4  county millage taxes that support the DIA's operations and

5  constitute almost 70% of the DIA's budget.

6      The Court concludes that the DIA settlement was a most

7  reasonable and favorable settlement for the city and its

8  pension creditors, the Court readily approves it.

9  Accordingly, the Court approves all aspects of the grand

10 bargain.

11      The Court will now review the OPEB settlement.  The city

12 is currently obligated to its retirees for other

13 post-employment benefits, OPEB.  This includes health care and

14 life insurance benefits.

15      The city claimed that the OPEB liability is 3.8 billion

16 dollars, the retiree committee asserts that it is

17 $5,000,000,000.  The difference largely results from

18 differences in certain actuarial assumption -- assumptions and

19 discount rates.

20      They also disagreed about how to account for

21 post-petition OPEB payments.  Either value, however, would

22 make the OPEB liability the city's largest single liability.

23 The parties settled.

24      The key points of this settlement are, the allowed amount

25 of the OPEB claim is 4.3 billion dollars.  Of that 2.2 billion

1  is for the PFRS retirees, and 2.1 billion is for the GRS

2  retirees.

3      The city will establish two voluntary employees

4  beneficiary associations known as VEBAs to provide

5  post-employment benefits to retirees and certain of their

6  beneficiaries and dependents.  The city will distribute new B

7  notes and other assets to fund the VEBAs.  Various sources

8  will fund the start up costs for the VEBAs.  The city will

9  have no further responsibility to provide other

10  post-employment benefits.

11      The plan treats the OPEB claim in Class 12.  The

12  estimated recovery for Class 12 OPEB claims is 10%.  Class 12

13  accepted the plan.

14      The retiree committees' OPEB litigation sought to

15  prohibit the city from terminating OPEB benefits.  It asserted

16  largely equitable grounds relating to the hardship that

17  terminating these benefits would naturally cause to retirees.

18  There did not appear to be any substantial legal grounds for

19  the requested relief.  The city's likelihood of success was

20  very high.

21      The OPEB claim is an unsecured claim.  Unlike the

22  retirees' pension claims, the OPEB claims had no arguable

23  constitutional protection.  The 10% recovery for Class 12, the

24  OPEB class, is approximately the recovery of other unsecured

25  creditors.  The class voted to accept it by over 88%.  The

1  Court finds that the OPEB settlement is reasonable, the Court

2  approves it.

3       The Court will now discuss the 36th District Court

4  settlement.  When the city filed bankruptcy the 36th District

5  Court was defending several employment related claims.

6  Because the city is legally required to fund the 36th District

7  Court, it would ultimately be responsible for any judgments

8  against the 36th District Court in these proceedings -- in

9  those proceedings.

10      The parties in the litigation settled with the city.  The

11  aggregate liquidated amount of the claim is $6,000,000.  These

12  claims are in Class 17.  Their recovery is 33%.  They accepted

13  the vote -- the plan by the vote of 100%.  The Court finds

14  that this settlement is reasonable, the Court approves it.

15      The Court will now address the UTGO bond settlement.

16  Pre-petition the city defaulted -- sorry, post-petition the

17  city defaulted on its obligation to make payments on these

18  unlimited tax general obligation bonds.

19      The bond insurers paid the claims on the defaulted

20  payments.  In the resulting litigation, the UTGO bond

21  creditors claimed that portions of the city's property tax

22  revenues could only be used to pay their claims and that they

23  had a lien on that stream of revenues.

24      They also asserted that this revenue was "special

25  revenue" in Chapter 9 entitled to special protections.  The

1  city opposed the litigation contending that the UTGO claims

2  were unsecured claims.  The city and these bond insurers

3  settled.

4      The key points of this settlement are, the allowed claim

5  of the UTGO bonds will be $388,000,000.  Just under

6  $288,000,000 of the UTGO bonds will be restructured and

7  reallocated among the holders of the bonds.

8      Approximately $43,000,000 of the existing UTGO bonds

9  which the parties have called stub UTGO bonds, will be

10  reinstated to existing holders.  However, these holders'

11  rights to payment on those stub UTGO bonds will be dedicated

12  to the income stabilization program that is part of the state

13  contribution agreement which the Court mentioned earlier.

14      The plan classifies the UTGO bonds in Class 8.  The

15  recovery is 74%.  The class voted to accept the plan by a vote

16  of 87%.  The UTGO settlement, 74% is the highest settlement

17  percentage that the city agreed to for a class of unsecured

18  creditors.

19      The city's chance of success on the merits of the

20  litigation was a coin toss.  On the other hand, the

21  consequence to the city of losing on this issue could have

22  been dire.  It would have lost access to a portion of its

23  property tax revenue that the UTGO bond holders claimed.  The

24  Court concludes therefore, that the UTGO settlement is within

25  the range of possible reasonable settlements, although perhaps

1   at the upper end of that range.  The Court concludes that

2   these circumstances do warrant the premium that this

3   settlement reflects, the Court therefore approves it.

4       The Court will now discuss the LTGO settlement.  The city

5   has almost $164,000,000 in outstanding limited tax general

6   obligation bonds called LTGO bonds.

7       Post-petition the city defaulted on its obligation to

8   make interest payments on the LTGO bonds.  On both occasions

9   Ambac Assurance Corporation, the insurer of two-thirds of the

10  LTGO bonds paid claims on the defaulted payments.

11      In the resulting litigation, the LTGO claimants argued

12  that their claims were entitled to secured treatment and that

13  state law requires the city to pay LTGO bond obligations as a

14  first budget obligation.  The city asserted that the LTGO

15  claims were unsecured claims.  The parties settled their

16  disputes.

17      The key points of this settlement are, the city may

18  either issue new LTGO bonds in the amount of $55,000,000, or

19  pay $55,000,000 in cash using exit financing.  The city has

20  elected to make the $55,000,000 cash payment from the exit

21  financing.

22      The city will also distribute 17.3 million dollars in

23  excess B notes to the holders of the LTGO bond claims.  The

24  class -- I'm sorry, the plan classifies the LTGO bond claims

25  in Class 7.  The recovery for Class 7 is 41%.  The class

1  accepted the plan.

2       The Court's judgment is that the city had a substantial

3  likelihood of prevailing in the LTGO litigation.  Perhaps a

4  75% chance.  The 41% LTGO settlement is nevertheless within

5  the range of reasonable settlements, the Court approves it.

6       The COPS settlement.  The Court will now address the

7  Syncora settlement and the -- and the FGIC and COPS

8  settlements.  Both of these are in part addressed in Class 9

9  of the plan.

10       Each Class 9 claim holder will receive its pro rata share

11  of almost $98,000,000 in new B notes, $88,000,000 in new C

12  notes, and $25,000,000 in settlement credits.  The settlement

13  credits may be used to offset up to 50% of the purchase price

14  of certain eligible city assets.  Syncora and the city have

15  settled their many disputes.

16       The key points of this settlement are, as a settling

17  Class 9 claim holder, Syncora will receive 23.5 million

18  dollars in new B notes, 21.3 million dollars in new C notes,

19  and 6.25 million dollars in Class 9 settlement credits.  The

20  city will make an additional $5,000,000 cash payment to

21  Syncora.

22       Syncora and the city will enter into a development

23  agreement under which a subsidiary of Syncora will be granted

24  a five year option to acquire and develop certain properties

25  owned by the city.  The development agreement will also

1  include a one year option for another Syncora subsidiary to

2  enter into a 30 year concession at the grand circus park

3  parking garage.  This agreement includes specified financial

4  and capital expenditure requirements.

5      The city will assume the Detroit Windsor tunnel lease

6  with a Syncora subsidiary and extend it to December 2040.

7  This lease will be amended to include certain provisions and

8  requirements for capital expenditures and operating and

9  financial reporting.

10     The settlement resolves Syncora's objections to

11  confirmation as well as its several appeals that Syncora had

12  pursued relating to eligibility, the quality of life loan,

13  mediation, and the casino revenue.  The Syncora settlement

14  also frees up $162,000,000 in B notes for the LTGO, OPEB, and

15  other unsecured creditors.

16     The development agreement is a substantial benefit to the

17  city.  James Doak, an expert from Miller -- the Miller,

18  Buckfire firm that the city retained testified that in his

19  opinion the business aspects of the Syncora settlement are a

20  reasonable exercise of the city's business judgment and the

21  Court credits that testimony.

22     Syncora's recovery is about 13% and is about the same as

23  FGIC's settlement recovery to be discussed next.  The recovery

24  for other unsecured creditors in Class 14 is also similar.

25  Accordingly, the Court readily finds that this settlement is

1  reasonable and approves it.

2      The city, FGIC, which is the insurer of the COPS, and the

3  COPS holders, have also entered into a settlement agreement.

4  The key points of this settlement are, FGIC will opt into the

5  Class 9 settlement and receive 74.2 million in new B notes,

6  67.2 million in new C notes, and 19.75 million in Class 9

7  settlement credits.

8      FGIC and the COPS holders will divide the consideration

9  provided under the Class 9 settlement option.  FGIC and the

10  city will also enter into a development agreement for the Joe

11  Louis Arena site.

12      To settle FGIC's claims against the city relating to the

13  swap agreements, FGIC will have an allowed Class 14 claim of

14  6.11 million dollars.  In addition the Downtown Development

15  Authority will assign to FGIC its rights to its distribution

16  of new B notes under the plan of adjustment for its 33.6

17  million dollar Class 13 claim.

18      The city estimates that FGIC will receive approximately

19  4.5 million dollars in new B notes in settlement of its swap

20  related claims.  This settlement resolves the objections to

21  confirmation that FGIC and the COPS holders filed.  These

22  objections were substantial and were zealously litigated.  It

23  also resolves the COPS invalidity litigation in which the city

24  sought to invalidate its obligations to the COPS holders in

25  the approximate amount of 1.5 billion dollars.

1    FGIC's recovery is 13%.  The development agreement is of

2    incalculable value to the city.  The Court readily finds that

3    this settlement is reasonable and approves it.  That concludes

4    the Court's discussion of its approval of the settlements in

5    the city's plan.

6       The Court will now address some of the other confirmation

7    requirements that the plan must meet, including good faith,

8    best interest of creditors, and the reasonableness of attorney

9    fees.  The Court will then address the requirements that apply

10   because two classes of creditors, Classes 14 and 15 rejected

11   the plan.  These are whether the plan unfairly discriminates

12   and whether the plan is fair and equitable.

13      The Court will also briefly address the objections of

14   certain creditors holding constitutional claims against the

15   city.  The Court will then conclude with the feasibility

16   requirement.

17      Section 1129(a)(3) requires the city to establish that it

18   proposed its plan of adjustment in good faith.  When the Court

19   decided that the city was eligible to be in bankruptcy, the

20   Court found that the city acted in good faith in seeking the

21   relief that this Court can provide.

22      The good faith inquiry at this stage is largely an

23   extension of that inquiry.  The Court again finds that the

24   city acted in good faith in proposing its plan of adjustment.

25      Specifically the Court finds first, the city crafted and

1 proposed its plan to achieve the objectives and -- and

2 purposes of Chapter 9.  That is, to adjust the city's debts to

3 enable the city to provide adequate municipal services.

4 Second, the city filed its plan with honesty, good intentions,

5 and the reasonable expectation that the plan is feasible.

6 Third, the process that the city undertook to seek

7 confirmation of the plan was fundamentally fair to the city's

8 creditors.

9      On the first and second points, the record demonstrates

10 that the city has worked honestly, diligently, and tirelessly

11 to accomplish precisely the remedy that the Bankruptcy Code

12 establishes for municipalities, the necessary adjustment of

13 the city's debt.

14      The record also demonstrates that the city is committed

15 to maintaining its debt at a level that it can manage in the

16 long term.  The testimony of several city representatives

17 directly supports these findings.

18      These include emergency manager Kevyn Orr, Mayor Mike

19 Duggan, city council President Brenda Jones, the city's Chief

20 Financial Officer John Hill, the city's Chief Information

21 Officer Beth Niblock, police Chief James Craig, and executive

22 fire commissioner Edsel Jenkins.

23      Ron Bloom's testimony, however, was particularly

24 compelling on this point.  Not only for what he said, but also

25 because he testified as a representative of the retiree

1  committee.

2      He testified, "but I think one of the things the city

3  persuaded us over the course of the case was that they were

4  sincere.  We didn't like what they had to say often, but we

5  felt that their commitment to revitalization was sincere.  And

6  when we saw evidence of that, for instance how they were

7  treating the active workers, that was a positive sign that our

8  long term interest was going to be served and the revised

9  promises we got would eventually be honored".

10     On the third point the Court finds, that the strongest

11 evidence that the city treated its creditors in a

12 fundamentally fair way was the high level of creditor

13 consensus supporting the plan.  The city's good faith in

14 proposing this plan shines with the greatest brilliance in the

15 grand bargain and in the settlements with Syncora, FGIC, and

16 the COPS holders.

17     Those settlements are more than just creditor claim

18 settlements.  They create new ventures and relationships that

19 enable all of the stake holders in this case to achieve their

20 long term missions and goals.

21     This is an extraordinary accomplishment in bankruptcy and

22 an ideal model for future municipal debt restructurings.  The

23 city has proven that upon confirmation it intends to implement

24 its plan of adjustment.  The city has also proven its

25 commitment and ability to begin the challenging process of

1  revitalization.  The Court finds that the city's proposed --

2  that the city proposed its plan of adjustment in good faith.

3      Section 943(b)(7) requires that the plan be in the best

4  interests of creditors.  The cases generally hold that in

5  Chapter 9 this means that the creditors will receive all that

6  they can reasonably expect under the circumstances.  The only

7  legal alternative to plan confirmation is dismissal because no

8  other party can file a plan of adjustment in Chapter 9, and

9  the liquidation of the municipality's assets is not permitted

10 in Chapter 9.  Accordingly, the Court will also consider

11 whether the plan is a better alternative for creditors than

12 dismissal.

13     Under the plain language of Section 943(b)(7), the issue

14 is the best interest of creditors as a whole, not any

15 particular creditor or class of creditors.  The Court finds

16 that the plan is in the best interest of creditors.

17     Some creditors have argued that the city could pay more

18 to creditors by raising taxes or by monetizing assets,

19 specifically the art at the DIA.  No provision of law allows

20 creditors to access the DIA art to satisfy their claims,

21 whether in bankruptcy or outside of bankruptcy.

22     The market value of the art therefore is irrelevant to

23 this case.  A judgment creditor's sole remedy is court ordered

24 property tax assessment process under Michigan's Revised

25 Judicature Act.  Michigan law prohibits execution on municipal

1  property.

2      Some creditors argue that the best interest test in

3  Chapter 9 requires the Court's full consideration of all of

4  the city's assets, including the art even if the assets would

5  not be accessible to unsecured creditors outside of

6  bankruptcy.  The Court rejects this argument.

7      The legal limitation on the collection of judgments that

8  apply outside of bankruptcy also constrain the best interest

9  of creditors test in bankruptcy.  Neither the Bankruptcy Code

10 nor the case law suggests otherwise.  As noted, the Court --

11 I'm sorry, the city determined not to sell or monetize the DIA

12 art in the art market.

13     Under Section 904 of the Bankruptcy Code, that decision

14 is off limits to this Court.  However, even if the law did

15 give the Court some authority here, the Court would not have

16 interfered with the city's decision.  The city made the only

17 appropriate decision.  Maintaining the art at the DIA is

18 critical to the feasibility of the city's plan of adjustment

19 and to the city's future.

20     The Court toured parts of the DIA and saw the art there

21 as well as how its many visitors were experiencing the art.

22 It also accepts the testimony of Ms. Erickson on the priceless

23 value of -- that the DIA art creates for the city, the region,

24 and the state.

25     The evidence unequivocally establishes that the DIA

1 stands at the center of the city as an invaluable beacon of

2 culture, education for both children and adults, personal

3 journey, creative outlet, family experience, worldwide visitor

4 attraction, civic pride and energy, neighborhood and community

5 cohesion, regional cooperation, social service, and economic

6 development.

7      Every great city in the world actively pursues these

8 values.  They are the values that Detroit must pursue to

9 uplift, inspire, and -- and enrich its residents and its

10 visitors.  They are also the values that Detroit must pursue

11 to compete in the national and global economy to attract new

12 residents, visitors, and businesses.

13      To sell the DIA art would only deepen Detroit's fiscal

14 and economic and social problems.  To sell the DIA art would

15 be to forfeit Detroit's future.  The city made the right

16 decision.

17      The city also rejected the concept of using the art as

18 collateral for a loan to pay creditors for two reasons.

19 First, that proposal would substitute debt for debt and would

20 not help the city.  Second, if the city defaulted, it might

21 lose the art.  The city made the -- the right decision here

22 too.

23      Beyond that the record reflects that the city has made

24 reasonable efforts to monetize other assets, including the

25 Detroit Windsor tunnel, certain real estate properties,

1 certain parking properties, the Joe Louis Arena property, and

2 certain other property that it no longer needs.

3     It also entered into the Great Lakes Water Authority

4 memorandum of understanding with Wayne, Oakland, and Macomb

5 counties which benefits all creditors.  The Court finds that

6 the city has made reasonable efforts to monetize its assets to

7 satisfy the best interests of creditors test.

8     The evidence also establishes that raising taxes is not a

9 viable option for the city.  In the eligibility opinion, the

10 Court found that the city cannot legally increase its tax

11 rates.  Mayor Duggan testified that the likelihood of the

12 people of Detroit, or the state legislature voting to raise

13 taxes is remote.

14     Further, a property tax increase would produce very

15 little additional income.  The Mayor testified that taxes in

16 Detroit are among the highest relative to the surrounding

17 communities and the city services are comparatively low.

18     Kevyn Orr credibly testified that the city is at tax

19 saturation and raising taxes would likely add to the

20 population decline.

21     The evidence also establishes that the plan is better,

22 indeed much better -- a better -- indeed much better

23 alternative for creditors than dismissal.  Significant city

24 obligations would become immediately due in that event.

25     As mentioned earlier in that scenario, the creditors'

1   only remedy is the property tax assessment remedy under the

2   Revised Judicature Act.  It is easy to foresee that a great

3   number of creditors would race for that relief and the result

4   would be chaos and an administrative nightmare for all

5   involved.

6       The city's reinvestment and revitalization initiatives

7   would stall.  The pension UAAL and the OPEB claims in the

8   billions of dollars would go unresolved.

9       There is no more money available for creditors in the

10  city's already tight budget projections.  The Court's

11  feasibility expert so testified as the Court will review here

12  shortly.

13      Every dollar is accounted for in providing necessary

14  services in implementing the city's necessary RRIs and in

15  repaying plan obligations.  All of those cash uses are

16  essential to the city's future.  Accordingly, the Court finds

17  that the plan will provide creditors all that they can

18  reasonably expect under the circumstances and that the plan is

19  in their best interests.

20      The Court will now discuss the issue of fees.  As a

21  condition of confirmation, Section 943(b)(3) requires that,

22  "all amounts to be paid by the debtor, or by any person, for

23  services or expenses in the case, or incident to the plan,

24  have been fully disclosed and are reasonable".

25      On August 19th, 2013, with the city's consent, the Court

1  entered an order appointing a fee examiner and requiring him

2  to act, "to assure the Court, the city, the creditors, and the

3  public that the city's professional fee expenses are fully

4  disclosed and are reasonable as required by Section

5  943(b)(3)".

6      The fee examiner has filed quarterly reports that have

7  fully disclosed the city's professional fee expenses through

8  June 2014.  Under the plan of adjustment the process will

9  continue as necessary to address fees incurred through the

10  effective date of the plan.

11      Two issues are raised here.  Does Section 943(b)(3)

12  require that all of the city's professional fees in the case

13  be disclosed and reasonable, or only the fees that are unpaid

14  as of confirmation.  Two, should the Court accept without

15  further review the fee examiner's findings that the fees have

16  been reasonable.

17      The Court concludes that Section 943(b)(3) does require

18  that all of the city's professional fees in connection with

19  the case be disclosed and reasonable.  The Court further

20  concludes that it is not appropriate to accept without further

21  judicial review the fee examiner's findings that the fees have

22  been reasonable.

23      The plain language of Section 943(b)(3) requires only

24  that fees, "to be paid" must be reasonable, yet the Court

25  cannot find any rational basis to distinguish between paid and

1  unpaid fees in applying Section 943(b)(3).  It is an arbitrary

2  line and may be subject to manipulation.

3      The Supreme Court's decision in American United Mutual

4  Life Insurance Company v City of Avon Park, Florida is highly

5  instructive on this question.  In that case the Supreme Court

6  discussed at length the legal and equitable necessity for the

7  Bankruptcy Court to review a municipality's professional fees.

8      It is a lengthy passage, but worth quoting because it is

9  powerful and it will also be relevant to the discussion on the

10 fair and equitable issue later.  The Court will omit the case

11 citations.

12     "A Bankruptcy Court is a Court of equity and is guided by

13 equitable doctrine -- doctrines and principals, except insofar

14 as they are inconsistent with the act.  A Court of equity may

15 in its discretion in the exercise of the jurisdiction

16 committed to it, grant or deny relief upon performance of a

17 condition which will safeguard the public interest.

18     These principals are a part of the control which the

19 Court has over the whole process of formulation and approval

20 of plans of composition or reorganization and the obtaining of

21 assents thereto.  Where such investigation discloses the

22 existence of unfair dealing, breach of fiduciary obligations,

23 profiting from a trust, special benefits for the reorganizers,

24 or the need for protection of investors against an inside few,

25 or one class of investors from the encroachments of another,

1 | the Court has ample power to adjust the remedy to meet the

2 | need.

3 | That power is ample for the exigencies of varying

4 | situations. It is not dependent on express statutory

5 | provisions, it inheres in the jurisdiction of a Court of

6 | bankruptcy.

7 | The necessity for its exercise is based on the

8 | responsibility of the Court before entering an order of

9 | confirmation to be satisfied that the plan is in practical

10 | incidence embodies a fair and equitable bargain openly arrived

11 | at and devoid of overreaching however subtle".

12 | In City of Avon Park, all of the professional fees at

13 | issue were unpaid upon confirmation. Nevertheless the Supreme

14 | Court's mandate to review professional fees in a municipal

15 | case was not so spineless as to permit an exception for paid

16 | fees. Rather, the Supreme Court's mandate is imperative.

17 | This Court must abide by it with the greatest

18 | consideration and care. That is particularly so in this case

19 | because it appears that the fees will exceed $100,000,000.

20 | Accordingly, the Court concludes that it has the obligation as

21 | a condition of confirming the city's plan to determine that

22 | the professional fees for which the city is obligated in

23 | connection with this case, whether paid or unpaid, are

24 | disclosed and reasonable.

25 | The City of Avon Park case linked the Bankruptcy Court's

1   obligation to review fees to its obligation to determine

2   whether the plan is fair and equitable.  Accordingly, the

3   Court cannot outsource this responsibility to the fee

4   examiner, it must make an independent determination that

5   Section 943(b)(3) is met.

6       The next question is how to review the fees in this case.

7   In In Re: Corcoran Hospital District, the Court found that the

8   debtor could satisfy Section 943(b)(3) through a

9   post-confirmation process to review fees for reasonables --

10  reasonableness.  This makes good sense in this case because

11  the fees will -- will continue to accrue post-confirmation.

12  Accordingly, to expedite confirmation, the Court will defer

13  this issue.  The Court will later request the assistance of

14  counsel in establishing a mediation and litigation process for

15  determining the disclosure and reasonableness of the fees for

16  which the city is obligated.

17      There is another issue here that will have to be

18  addressed.  As I noted, the reasonableness of fees is a

19  requirement for confirmation in Chapter 9.  This is unlike

20  Chapter 11 where objections to fees are not confirmation

21  objections.

22      The general deadline to object to this city's plan was

23  May 12, 2014.  And for bond holders and retirees it was July

24  11, 2014.  As far as the Court can determine, only one party,

25  David Sole asserted an objection to the reasonableness of fees

1   in this case.

2       So the issue becomes whether everyone else in the case

3   has waived the issue.  This problem would include, the Court

4   might add, the Detroit Firefighters Association which recently

5   issued a premature counter productive and inaccurate press

6   release criticizing the Court's processing of the fee issue.

7       Within the next few days the Court will establish a

8   process to review fees which it will do with the help of

9   counsel, including counsel for the DFFA should it choose to

10  participate.  As part of that process the Court will invite

11  briefing on this waiver issue.

12      In the meantime until this process is established and the

13  Court orders otherwise, the Court's order of October 31, 2014

14  prohibiting the filing of papers relating to the fee issue

15  remains in effect.  The Court, however, reaffirms that even if

16  there has been such a waiver, the Court intends to fulfill its

17  independent obligation to review the reasonableness and

18  disclosure of fees.

19      As noted, two classes of claims voted to reject the plan.

20  Class 14, the other unsecured claims, and Class 15, the

21  convenience claims under $25,000.

22      Section 1129(b) allows the Court to confirm the plan

23  despite those dissenting class votes.  With respect to those

24  dissenting classes, "if the plan does not discriminate

25  unfairly and is fair and equitable".

1    The Court will now address the unfair discrimination test

2 and then the fair and equitable test next.  To analyze the

3 unfair discrimination issue, the first step is to determine

4 the recoveries for each unsecured class in the plan.  The

5 second step is to determine whether there is any

6 discrimination against any of the rejecting classes.  If so,

7 the final step is to determine whether the discrimination is

8 unfair.

9    Here, the recoveries for the rejecting classes are 13%

10 for Class 14, and 25% for Class 15.  The next step is to

11 identify any discrimination by identifying the classes of

12 unsecured claims that have higher recovery than the classes of

13 the rejecting -- than the recoveries of the rejecting classes.

14    It is readily apparent that the plan does discriminate in

15 favor of Class 7, the LTGO claims with a 41% recovery, Class

16 8, the UTGO claims with a 74% recovery, and Class 17, the 36th

17 District Court claims with a 33% recovery.

18    Calculating a percentage recovery for the pension claims

19 in Classes 10 and 11 is complex.  The city's disclosure

20 statement which the Court approved, stated that the recoveries

21 are 59% for PFRS, and 60% for GRS.

22    Based on a number of complex arguments, however, the city

23 now asserts that the true recovery percentages are much lower

24 and that there is no discrimination in favor of the pension

25 Classes 10 and 11.  Fortunately, the Court does not need to

1 resolve the difficult issues raised here.

2      The Court concludes that even if the pension classes

3 recoveries are what the disclosure statement declares, the

4 resulting discrimination against the unsecured and convenience

5 classes is not unfair.

6      In connection with this final step, the Court must

7 determine the meaning of the phrase unfair discrimination in

8 Section 1129(b).  The Court concludes that fairness and

9 unfairness are matters of conscience.  And that fairness is a

10 matter of relying upon the judgment of conscience.  Whether a

11 discrimination in a plan is unfair is a question that requires

12 the Court to focus on the judgment of its conscience regarding

13 that discrimination.

14      Several factors will naturally inform this judgment.

15 These factors include the circumstances that bear upon the

16 fairness of the discrimination in light of the purpose of

17 Chapter 9 which is to adjust an insolvence -- an insolvent

18 municipality's debt so that it can provide adequate municipal

19 services.

20      These factors also naturally include the Court's

21 experience, education, and sense of morality.  That is what

22 the Court meant in its eligibility opinion when it addressed

23 the potential for the impairment of pension rights in the

24 city's plan.  It stated that when considering any such

25 impairment, the Bankruptcy Code demands, "this Court's

1  judicious legal and equitable considerations of the interests

2  of the city and all of its creditors as well as the laws of

3  the State of Michigan".

4      The Court concludes that Congress intended this approach

5  to unfair discrimination.  Congress certainly could have

6  established in Section 1129(b) a more specific standard to

7  determine unfair discrimination, including any of the more

8  specific standards adopted in the case law.  The sole

9  statutory test, however, is whether the discrimination is

10 unfair.

11     The Court will first address the fairness of the

12 discrimination in the plan in favor of the pension classes.

13 It will then discuss the fairness of the discrimination in

14 favor of the UTGO, LTGO, and 36th District Court classes.

15     The Court finds that the city has demonstrated by a --

16 has demonstrated a substantial mission related justification

17 to propose a higher recovery to its pension claimants.  The

18 city is a municipal service enterprise.  Viewed broadly its

19 mission is to provide municipal services to residents and

20 visitors, to promote their health, welfare, and safety.

21     Its employees and retirees are and were the backbone of

22 the structures by which the city fulfills its mission.  The

23 city therefore has a strong interest in preserving its

24 relationships with its employees and in enhancing their

25 motivation consistent with its financial resources.

1    The city has reasonably and properly concluded that its

2  discrimination in favor of the pension claims in the plan is

3  necessary to its mission.  In contrast the city has no similar

4  mission related investment in its relationships with its other

5  unsecured creditors in Classes 14 and 15.

6    Second, the city is an agency of the State of Michigan.

7  Its existence, its mission, its means of fulfilling that

8  mission are all subject to the provisions of the Constitution

9  and the laws of the State of Michigan.  Among these provisions

10  is Article 9, Section 4 of the Michigan Constitution which

11  singles out municipal pensions claims for special protection.

12    In the Court's eligibility opinion, it held that because

13  of a supremacy clause of the United States Constitution this

14  specific protection of the state constitution is not entitled

15  to vindication in a federal bankruptcy proceeding.

16  Nevertheless, that provision of the Michigan Constitution does

17  express the considered judgment of the people of the State of

18  Michigan.

19    The Court concludes that in determining the fairness of

20  the discrimination against unsecured claims proposed in the

21  city's plan, this judgment of the people of the State of

22  Michigan is entitled to substantial deference.

23    Another consideration that appeals to the Court's

24  conscience is the reasonable expectation of the parties.

25  Generally unsecured creditors reasonably expect similar

1   treatment in bankruptcy.  The differences here, however -- the

2   difference here however, is that the Michigan Constitution

3   gives notice to all unsecured creditors of a municipality that

4   the rights of pension creditors are distinct even if their

5   pension claims are unsecured.

6       That constitutional notice reasonably justifies the

7   enhanced expectations of the pension creditors in this case.

8   At the same time that notice should also lower the reasonable

9   expectations of other unsecured creditors in the case.  And

10  final consideration also suggests that this discrimination is

11  not unfair.

12      The Court has already observed here that the city's plan

13  is largely a collection of inter connected settlements.  Mr.

14  Montgomery, counsel for the retiree committee astutely argued

15  that if each of the settlements in the plan is reasonable,

16  then the resulting discrimination in the plan must be fair,

17  the Court agrees.

18      The factors that inform the reasonableness of each

19  individual settlement are the same that inform the Court's

20  judgment about whether the resulting discrimination is fair.

21  Here, the classes that did not settle and -- and instead

22  rejected the plan, are two classes of general unsecured

23  claims.  There is however, nothing about those claims that

24  warrants any favorable consideration than the Court's unfair

25  discrimination analysis.  In the Court's judgment therefore,

1   the discrimination in the city's plan of adjustment in favor

2   of the pension creditors is not unfair.

3       The Court comes to the same conclusion about the -- the

4   discrimination in the plan in favor of the UTGO, LTGO, and 36th

5   District Court classes.  The Court has already found that

6   these settlements are reasonable settlements.  They fairly and

7   reasonably reflect the strengths and weaknesses of the

8   creditors' claims and the city's defenses, the complexity and

9   expense of possible litigation, and collectibility issues.

10      These considerations also justify discriminating in their

11  favor and against other unsecured claims and the convenience

12  claims.  The Court only adds that the city has a mission

13  related reason to favor the 36th District Court claim due to

14  its continuing legal and funding relationship with that Court.

15  Accordingly, the Court finds that the city's plan does not

16  unfairly discriminate against the two rejecting unsecured

17  Classes 14 and 15.

18      Let's stand for one minute and relax.

19          THE CLERK:  Please be seated.

20          THE COURT:  The Court will now discuss whether the

21  plan is fair and equitable to the dissenting Classes 14 and

22  15.  To properly determine the meaning of this test, it is

23  important to understand its affect.

24      In practical consequence the law allows the Judge who has

25  no stake in the outcome of the plan to substitute his or her

1  own judgment about the fairness and equity of the plan for the

2  judgment of the creditors who have every stake in the outcome.

3  Ultimately the issue is whether the Court should force a debt

4  adjustment on unwilling creditors.  We colloquially call this

5  cram down.  That is the power that the city requests the Court

6  to exercise here.

7      The language fair and equitable suggests the same kind of

8  process of adjudication that the Court just discussed for the

9  fair -- for the unfair discrimination test.  Indeed the words

10  of these two requirements overlap somewhat but the fair and

11  equitable test has a broader focus as the Court will discuss

12  in a moment.

13      In <u>American United Mutual Life Insurance Company v City</u>

14  <u>of Avon Park, Florida</u> which the Court discussed earlier, the

15  Supreme Court reviewed at length the Bankruptcy Court's role

16  in determining whether a Chapter 9 plan is fair and equitable.

17  The Court concludes that under <u>City of Avon Park</u> the city's

18  plan is fair and equitable as to dissenting Classes 14 and 15.

19      That case first mandates the Court to investigate whether

20  there is evidence of any misconduct that would require the

21  Court's remedy as a condition of confirmation, or whether the

22  city or any class of creditors has committed any overreaching.

23      The Court readily finds that there is no such evidence in

24  this case.  But under the <u>City of Avon Park</u> case, overriding

25  the dissenting creditors' judgment about a plan of adjustment,

1   requires more than just the absence of misconduct.  It must

2   also mean something more than what all of the other

3   confirmation requirements mean.

4       The Court concludes that the fair and equitable treatment

5   requirement asks this question.  Are there circumstances in

6   the case that suggest to the Court's conscience that it is

7   fair and equitable to impose the plan on dissenting creditors

8   against their stated will.

9       The Court finds that there are such circumstances in this

10  case.  First, it is appropriate to look at exactly how this

11  class reacted to the plan.  Very few of the creditors in

12  Classes 14 and 15 filed objections to the plan.  Although the

13  classes did vote to reject the plan, the margins were small.

14      In Class 14 the margin was slim, 51% rejecting, 49%

15  accepting.  In Class 15 it was a bit more significant, 58%

16  rejecting, 42% accepting.  But the numbers behind those

17  percentages tell a story here too.

18      The actual vote in Class 14 was 97 rejecting, 93

19  accepting.  This means that if three rejecting votes had gone

20  the other way, the necessary majority in number would have

21  been achieved.  The actual vote in Class 15 was 189 rejecting,

22  153 accepting.  That means that if 19 rejecting creditors in

23  this class had accepted, the necessity majority in number

24  would have been reached.

25      These circumstances raise this question.  Is it fair and

1  equitable to confirm this plan over the dissent of literally a

2  handful of unsecured creditors, most of whom have claims under

3  $25,000 when thousands of creditors with claims in the

4  billions of dollars support the plan.  To the Court's

5  conscience this is fair and equitable and the Court so finds.

6      The Court accepts the likelihood that the dividend to the

7  creditors in Classes 14 and 15 will cause those creditors real

8  hardship.  But the Court must analyze and balance the hardship

9  on the other side too.

10      A large number of people in this city are suffering

11  hardship because of what we have anticeptically called service

12  delivery insolvency.  What this means is that the city is

13  unable to provide basic municipal services such as police,

14  fire, and EMS services to protect the health, safety -- health

15  and safety of the people here.

16      Detroit's inability to provide adequate municipal

17  services runs deep and has for years.  It is inhumane and

18  intolerable and it must be fixed.  This plan can fix these

19  problems and the city is committed to it.

20      So if to fix this problem, the Court must require these

21  few creditors that rejected the plan to nevertheless share in

22  the sacrifice that the other creditors have agreed to endure,

23  then so be it.  There really is no choice here.

24      There are no viable alternatives to this plan that will

25  solve the city's problems and that at the same time pay more

1  to Classes 14 and 15 to get their support.  To revitalize

2  itself for the good of all, the city and its people

3  desperately need the shared sacrifice that this plan will

4  impose on all of its creditors even these few rejecting

5  creditors.  And the city and its people need it now.

6  Accordingly, the Court concludes that it should exercise its

7  power under the Bankruptcy Code to impose the plan of

8  adjustment in Classes 14 and 15 despite their dissenting

9  votes.  The Court finds that the plan is fair and equitable as

10  to them.

11      The Court will now state its resolution of the objections

12  that the creditors with constitutional claims against the city

13  filed.  The Court's written opinion will explain in depth the

14  Court's reasons for these conclusions.

15      The Court first concludes that the Fourteenth Amendment

16  does not provide a constitutional right to damages for a

17  constitutional violation.  Accordingly, the Court overrules

18  the 1983 claimant's objection that Chapter 9 cannot provide

19  for the discharge of a claim under 42 USC Section 1983.

20      The Court further concludes that the Section 1983 claims

21  against individuals in their personal capacity are not claims

22  against the city.  Accordingly, the Bankruptcy Code does not

23  permit a Chapter 9 plan to treat those claims nor does it

24  provide for their discharge.

25      If a collective bargaining agreement or other contract

1  obligates the city to defend and indemnify its officers on

2  these claims in their personal capacity, and that contract is

3  assumed in this bankruptcy, then that contractual obligation

4  survives the discharge and remains fully enforceable

5  post-confirmation.  Otherwise the city's contractual

6  indemnification obligation is discharged in this bankruptcy.

7      To the extent that the city seeks to release its officers

8  from liability under the standards in the <u>Dow Corning</u> case,

9  the Court denies that.  The city certainly has a strong

10  interest in the efficient and effective functioning of the

11  police department.  The Court accepts that protecting its

12  officers from personal liability for Section 1983 claims is

13  necessary to that mission.  However, the record is barren of

14  any evidence suggesting that the contractual indemnity

15  obligations that the city is assuming are inadequate to

16  accomplish that purpose.

17      A third party release -- release would deny injured

18  parties their just relief.  There is no evidence that the

19  projection -- protection of a third party release for these

20  officers in addition to their indemnity is also necessary for

21  the proper functioning of the police department.

22      Finally, the Court concludes that the Fifth Amendment

23  does -- does establish a right to just compensation when a

24  municipality takes private property for public use.  Chapter 9

25  would violate the Fifth Amendment if its application in this

1  case would result in less than just compensation to these

2  objecting claimants.  There is, however, a ready solution.

3      Section 944(c)(1) gives the Court the discretion to

4  exempt debts from discharge in the confirmation order.  At the

5  suggestion of the Attorney General to avoid any issue as to

6  the constitutionality of Chapter 9 in this respect, the Court

7  would use its authority under Section 944(c)(1) to order that

8  the objecting parties taking clause claims are exempt from

9  discharge.  This ruling eliminates any constitutional grounds

10  to deny confirmation of the city's plan of adjustment.  These

11  rulings will be reflected in the Court's order confirming the

12  plan.

13      The Court will now address the city's request for

14  approval of its exit financing.  No party has objected to the

15  exit financing.

16      The Court requests the authority to borrow up to

17  $325,000,000 as part of its exit from bankruptcy.  The city

18  has recently stated, however, the intent to borrow only

19  $275,000,000.  The loan agreement requires an escrow reserve

20  of 27.5 million dollars.  Barclay's Capital, the issuer, will

21  hold the notes but they will be sold or refinanced in the

22  municipal bond market within 150 days.

23      The notes are secured by the city's revenue from its

24  income tax which reduces its interest costs slightly.  This

25  security interest may, however, impair the city's ability to

1 access the municipal bond market in the future should the need

2 arise.

3      From these loan proceeds the city will use $120,000,000

4 for the post-petition loan to repay that, $45,000,000 to repay

5 the outstanding swaps settlement obligation, and $55,000,000

6 to pay the outstanding LTG -- LTGO obligation.  The balance

7 will be used to begin to fund the restructuring --

8 restructuring and reinvestment initiatives.

9      As the Court will address in a moment these RRIs are

10 critically important to the feasibility of the plan and to the

11 city's future.  The borrowing was approved by the city

12 council, the Michigan Finance Authority, and the local

13 emergency financial assistance loan board.

14      The Court finds that both the terms of the financing and

15 the uses of the loan are -- loan proceeds are reasonable.  The

16 lender is acting in good faith.  Accordingly, the financing

17 meets the requirements of the Bankruptcy Code, the Court

18 approves it.

19      The Court will now address feasibility.  The Court

20 appointed expert Martha E.M. Kopacz on the -- the Court

21 appointed an expert, Martha E.M. Kopacz on the issue of

22 feasibility.  Ms. Kopacz submitted a report and two

23 supplements.  She testified regarding her observations,

24 conclusions, and recommendations.

25      The GRS filed two related motions to exclude portions of

1  Ms. Kopacz's testimony and to preclude her evidence relating

2  to alleged historical mismanagement and conduct -- misconduct

3  by the GRS and the PFRS.  For reasons that the Court will

4  explain in its written opinion, both motions are denied.

5      The Court finds that Ms. Kopacz's reports and testimony

6  are fully credible and it accepts and adopts her findings with

7  the minor exception of her conclusions about the Court's

8  pacing of the case.

9      Ms. Kopacz adopted this test for feasibility in this

10 case.  "Is it likely that the City of Detroit after

11 confirmation of the plan of adjustment, will be able to -- to

12 sustainably provide basic municipal services to the citizens

13 of Detroit and to meet the obligations contemplated in the

14 plan without the significant probability of default".

15     The Court concludes that this standard is the appropriate

16 standard for determining feasibility under Section 943(b)(7).

17 Accordingly, the Court adopts it.

18     Her opinion is that the city's plan is feasible as

19 required by Section 943(b)(7) and that the assumptions that

20 underlie the city's plan of adjustment projections regarding

21 its revenues, expenses, and plan payments are reasonable.  In

22 Ms. Kopacz's initial report she concludes, "the POA and the

23 projections that support the POA are designed to allow the

24 city to continue to improve its level of service to the

25 citizens of Detroit.  I believe that the RRIs are reasonable

1  and well considered.

2      If executed they will allow the city to deliver essential

3  services.  It is my opinion that the city is beginning to

4  emerge from the service delivery insolvency referenced in

5  Judge Rhodes' opinion concerning eligibility".

6      In her second supplemental report she concludes, "my

7  opinion based on the information provided to me and my team

8  and certain testimony during the confirmation trial is the

9  current projections are within the range of reasonableness and

10 the plan of adjustment remains feasible".

11     Ms. Kopacz did, however, add this caution in her

12 supplemental -- second supplemental report.  "I want to

13 emphasize, however, that there is little space remaining on

14 the continuum of reasonableness.  The recent settlements and

15 the corresponding amendments to the plan of adjustment have

16 served the laudable goals of -- of efficiently resolving

17 disputes and garnering additional support for the plan of

18 adjustment.

19     Conversely they have imposed additional financial

20 obligations on the city.  I have already expressed concerns

21 regarding the level of contingency provided for in the plan of

22 adjustment.  The financial obligations associated with the

23 recent settlements only intensify this concern.  While my

24 opinion is the plan of adjustment remains feasible and there

25 is not yet a significant probability of default as described

1  in the standard, there is no denying that the possibility of

2  default has increased.

3      It is not realistic or prudent to believe that the city

4  could take on any additional plan obligations and remain

5  within the continuum of reasonableness necessary to establish

6  feasibility".

7      Ms. Kopacz's testimony was to the same effect.  Her

8  conclusions regarding the feasibility of the plan were

9  corroborated by the testimony from Rob Malhotra, Robert Cline,

10  Caroline Sallee, John Hill, Charles Moore, Kevyn Orr, council

11  President Jones, and Mayor Duggan.

12      In this case the evidence establishes that there are

13  three components to the feasibility of the plan and to the

14  ultimate success of the City of Detroit.  They are one, a long

15  term workable financial plan.  Two, the human and capital

16  resources to execute the plan.  And three, the commitment to

17  implement the plan.

18      The emergency manager and his team working in conjunction

19  with the Mayor and his team have created a workable plan for

20  the city.  It will be for the city council, the Mayor, and his

21  administration to implement the plan.

22      The Mayor testified that he and his team are fully

23  committed to implementing the plan and council President Jones

24  testified that the plan has the support of the city council.

25  The Court fully credits that testimony.

1    The Court finds further support for -- for the

2  feasibility of the plan and the establishment of the financial

3  review commission under PA 181 of 2014.  The act gives the

4  commission the responsibility to insure that the city complies

5  with the plan of adjustment.  It also gives the commission a

6  broad array of responsibilities and tools to oversee the

7  city's fiscal integrity.

8    For example, the commission has the authority to review

9  and approve the city's four year financial plans, contracts

10  over $750,000, and all collective bargaining agreements.  It

11  also appears to give oversight responsibility for the city's

12  pension funding obligations.

13    It cannot be emphasized enough that the long term

14  feasibility of the plan -- plan of adjustment will depend upon

15  the effectiveness of the financial review commission.  This is

16  a matter of extraordinary weight and responsibility.  It will

17  certainly require substantial budget resources and skilled

18  staffing for the commission.

19    The Court is satisfied that the state will provide the

20  commission with adequate resources to meet its

21  responsibilities.  In conclusion therefore, the Court finds

22  that it is likely that the City of Detroit after the plan --

23  plan of adjustment will be able to sustainably provide basic

24  municipal services to the citizens of Detroit and to meet the

25  obligations contemplated in the plan without the significant

1  probability of default.  Accordingly, the Court finds that the

2  city's plan of adjustment is feasible.

3      It appears that Ms. Kopacz's greatest concern for the

4  feasibility of the plan and for the future of the city arises

5  from the risks that the city retains regarding pension

6  funding.  Ms. Kopacz states in her report, "the city must

7  continually -- must be continually mindful that a root cause

8  of the financial troubles that it now experiences is the

9  failure to properly address future pending obligations".

10     The Court shares that concern.  What happened in Detroit

11 must never happen again.  The hardship and anxiety that its

12 employees and retirees and their families have endured and

13 will continue to endure must never happen again.  This must

14 never be repeated anywhere in this state.  Therefore, the

15 Court's confirmation of this plan comes with three further

16 appeals.

17     The first is to the city's labor unions and retiree

18 associations.  In its closing argument Mr. Bennett, the city's

19 attorney perceptively asserted that the goal of protecting

20 municipal pensions in this city and in this country requires

21 municipal labor to enhance its vigilance of municipal pension

22 funding.

23     He also implored labor to use its relationships with

24 municipal leadership to achieve that goal.  The Court agrees.

25 The Court would only ask additionally labor to consider

1  whether this goal of protecting municipal pensions in the city

2  and indeed the broader goal of revitalizing the city suggests

3  that it should take a much longer and broader view of the best

4  interests of its members and retirees.

5      The second appeal is to the State of Michigan.  The

6  Revised Municipal Finance Act unequivocally states that the

7  Michigan Department of Treasury is "directed to protect the

8  credit of this state and its municipalities".  That's Michigan

9  Compiled Laws 141.2201.

10     The argument is powerful that this provision of state law

11  together with the constitutional prohibition on impairing

12  municipal -- municipal pensions, and the constitutional

13  mandate on pension funding requires the state to take full

14  responsibility to vigorously supervise and regulate its

15  municipalities to assure adequate pension funding.

16     The Michigan Constitution does not single out the

17  obligations of municipal bonds for protection in the same way

18  it protects pension rights.  Bond obligations can no longer be

19  the only first budget municipal obligations in this state.

20     Moreover, the constitutional protection for municipal

21  pensions can only be realized through honest, complete and

22  realistic accounting and actuarial disclosures.  Ms. Kopacz

23  made several specific and worthy recommendations that the

24  city, the pension plans, and the financial review commissions,

25  and the state should seriously consider adopting and

1  implementing.

2      The municipal employees and retirees of this city and

3  state need and deserve the state's robust commitment to that

4  obligation.  The Court found here today that the state's

5  contribution of $195,000,000 in exchange for a release of

6  liability on the pensioner's constitutional claim is a

7  reasonable settlement.

8      History will judge the correctness of this finding.  And

9  it will judge that this finding was correct only if what

10  happened here in Detroit never happens again.  The State of

11  Michigan can sustain that finding in history only by

12  fulfilling its constitutional, legal, and moral obligation to

13  assure that the municipalities in this state adequately fund

14  their pension obligations.  If the state fails, history will

15  judge that this Court's approval of that settlement was a

16  massive mistake.

17      The third appeal is directly to the Governor.  It relates

18  to -- to the composition of the financial review commission.

19  The Court has found that the responsibilities that PA 181

20  imposes on the commission will contribute to the feasibility

21  of the plan.  The law by itself is not enough.

22      The law by itself is not enough.  The effectiveness of

23  the commission in insuring the long term feasibility of the

24  plan and the city's fiscal health will require that its

25  members have the skill, standing, expertise, experience

1  independence, and commitment that are the most outstanding

2  that can be found and beyond question.

3      This would be so under any circumstances.  But one

4  particular circumstance makes this concern even more

5  compelling here.  In Public Act 181, the Michigan legislature

6  chose to include on the nine member commission two elected

7  City of Detroit office holders.

8      At the commission level therefore the Mayor and the city

9  council President will advocate the city's position, not

10  provide oversight of it.  That means that realistically only

11  seven of the nine members are truly independent.  It also

12  means that only -- that the -- it also means that only the

13  seven independent members of the commission will carry out the

14  oversight function that the legislation contemplates.  This is

15  a major problem.

16      Because the commission acts by majority vote, it will

17  take a super majority vote of the independent members, five

18  out of the seven, to disapprove or reject any action that the

19  city proposes for approval by the commission under state law.

20  This is a plain conflict of interest for the Mayor and the

21  city council President to have a vote.

22      It both skews the commission's voting and risks

23  undermining the commission's effectiveness in insuring the

24  implementation of the plan and the city's fiscal health and

25  integrity.  Equally importantly, it also risks undermining the

1  public's perception of the legitimacy and independence of the

2  commission.

3       The Court believes that this problem requires that the

4  Governor appoint members of the commission who are fully

5  willing and able to exercise the independent skilled and

6  experienced judgment that PA 181 contemplates.  The Court

7  therefore appeals to the Governor to appoint commission

8  members with these qualities.

9       That concludes the Court's decision confirming the city's

10  plan.  This comes with thanks to many people.  First, deeply

11  felt thanks to Chief Judge Rosen –– one second.  Deeply felt

12  thanks to Chief Judge Rosen for his work as the mediator in

13  this case.  Deeply felt thanks also to each of the mediators

14  on his team, Chief Judge –– I'm sorry, Judge Roberts, Judge

15  Cox, Judge Lawson, Judge Daniels, Judge Perris, Eugene Driker,

16  and David Coar.

17       These words of thanks cannot begin to express the depth

18  of gratitude that I and all of the parties and attorneys in ––

19  in this case feel about what Chief Judge Rosen and his

20  mediation team put into this case.  The work, the time, the

21  creativity, the commitment, the nights, the weekends, the

22  holidays.

23       Thanks also to Professor Gina Torelli.  She

24  enthusiastically served as the mediator's consultant on

25  municipal bond issues.  Her assistance was invaluable.

1    The settlements that the mediators assembled in this case

2   are extraordinary and unprecedented.  Never before have

3   bankruptcy mediators proactively sought to marshal the

4   community's financial resources to solve a community problem.

5   Most importantly they knew that their work was not simply

6   about resolving a bankruptcy case, it was about fixing a

7   broken city.  Where else -- where would we be, where would

8   this case be without them.

9    I have said publicly and repeat now, that the smartest

10  thing I did in this case was to ask Judge Rosen to be the

11  mediator.  I don't know if he agrees with that.  But I do

12  think that he would agree that the smartest thing that he did

13  as mediator was to assemble his team.

14    One of the unforeseen but fortuitous consequences of this

15  case has been the development of a true partnership between

16  the Bankruptcy Court and the District Court.  This partnership

17  was essential to the efficient and expeditious resolution of

18  this case and arguably to the very future of the City of

19  Detroit.  Thanks to the chief for having the wisdom,

20  foresight, and willingness to engage in this partnership with

21  us.  I hope this partnership endures.

22    Thanks also to Judge Rosen, to the entire District Court,

23  and to Dave Weaver and his staff for their amazing and

24  gracious hospitalities.  Thanks also to Katherine Gullo the

25  bankruptcy clerk and to her staff for their wonderful support

1  in the case.

2      On behalf of the parties in the case, thanks also must go

3  to the foundations and to the DIA for their generous and

4  unprecedented charitable commitments in this case.  It is

5  unimaginable what the resolution of this case would have

6  looked like without them.

7      Profound thanks to the attorneys and other professionals

8  in this case.  You conducted yourselves with the highest

9  degree of civility, respect, and professionalism, both to each

10  other and to the Court.  At the same time you demonstrated

11  zealous advocacy as well as loyalty to your oaths and to your

12  clients.

13      Your work in this case is a model of the public service

14  role that lawyers and the legal profession perform in our

15  society.  It has made me proud to be a part of the judicial

16  process and of the legal profession and each of you should

17  share in that pride.

18      Also on a more personal level, you made my job

19  manageable.  Even fun sometimes.  Thanks for that.

20      And here I want to single out Kevyn Orr for special

21  recognition and appreciation.  His task was perhaps the most

22  challenging of all of us, yet he met that challenge with

23  skill, determination, and commitment, and at great personal

24  sacrifice.  I hope that some day soon the city will recognize

25  the singular contribution that he made to its fresh start and

1  give him the credit that he truly deserves.

2      Thanks also to Dick Ravitch my consultant on feasibility.

3  His commitment, knowledge, wisdom, expertise, and spirit of

4  public service were remarkable and helped me to more fully

5  understand this case.  I hope a way is found for him to

6  contribute to -- to the fiscal health and revitalization of

7  this city.  He would be a valuable resource in any capacity.

8      Thanks to Marty Kopacz and her team.  Under extraordinary

9  time pressures, she and they performed remarkable service for

10  me with grace and professionalism.

11      Thanks to Bob Fishman my fee examiner and his staff for

12  their skilled assistance on the delicate responsible --

13  responsibility that they took on and embraced.

14      Finally, this case proves that it takes a team and so I

15  want to thank and gush about my team, Caroline Fays, Kelly

16  Dexter, Chris Sicala, Ryan Hamstead, Cindy Person, and Alicia

17  Dobbins.  You are simply the best, thank you.

18      We have talked a lot in this case about how -- about how

19  Chapter 9 is so different from all the other types of

20  bankruptcy.  It is, but only around the edges.  In fundamental

21  ways the -- the Detroit bankruptcy case is just like every one

22  of the other 30,609 bankruptcy cases that were filed in our

23  Court in 2013.

24      In every case we have a debtor who needs help, who made

25  mistakes, who took on warranted risks, who accepted bad

1  advice, who exercised bad judgment, who was too long in

2  denial, or who had just plain bad luck.  But no matter.  Our

3  society holds dear the value of a fresh start and of second

4  chances.  That value is manifest with brilliant clarity in our

5  bankruptcy laws.  And that value is manifested the same in

6  this $18,000,000,000 case as it was in the no asset Chapter 7

7  cases that were filed just before and just after this case on

8  July 18th, 2013.

9       To the current leadership of the city, you are about to

10  get your city back from us in the bankruptcy world.  We give

11  it back to you with a fresh start and second chance that the

12  city needs and deserves under our federal bankruptcy laws.  We

13  hope we helped.

14       It is now on you to implement the plan.  I have found

15  that you will do that.  Please make me right.  It is in the

16  city's best interest, the city's true and full fresh start

17  depends on it.

18       Before I conclude, I want to address the people of the

19  City of Detroit whose passion for the city is remarkable in

20  its breath, in its expression, and in -- and in its unwavering

21  endurance.  I just said that your -- your leaders are about to

22  get the city back.  Actually of course it is you who are about

23  to get your city back, it is your city.

24       A large number of you told me that you were angry that

25  your city was taken away from you and put into bankruptcy

1 You told me in your Court papers, you told me in your

2 statements in Court, you told me in your blogs, letters, and

3 protests.  I heard you.  I urge you now not to forget your

4 anger.

5     Your enduring and collective memory of what happened

6 here, and your memory of your anger about it will be exactly

7 what will prevent this from ever happening again.  It must

8 never happen again.

9     When Fredia Butler testified during the confirmation

10 hearing she quoted the great wisdom of Marian Wright Edelman

11 who said, "democracy is not a spectator sport".

12     And so I ask you for the good of the city's fresh start

13 to move past your anger, move past it, but join in the work

14 that is necessary to fix this city.  Help your leaders do

15 that.  It is your city.

16     This leads to my final thought.  We have used the phrase

17 grand bargain to describe the group of agreements that will

18 fix the city's pension problem.  That is certainly -- that

19 description is entirely fitting.

20     In our nation we join together in the promise and in the

21 idea -- ideal of a much grander bargain.  It is the bargain by

22 which we interact with each other and with our government all

23 for the common good.  That grander bargain enshrined in our

24 Constitution is democracy.  Now is the time to restore

25 democracy to the people of the City of Detroit.  I urge you to

1  participate in it, and I hope that you will soon realize its

2  full potential.

3       We will now take a brief recess.  We will reconvene at

4  3:00 for a brief status conference with the lawyers to discuss

5  the next steps.  We will discuss when and how to get a

6  confirmation order -- order entered and some other matters.

7  Sir.

8           MR. HEIMAN:  Forgive me, Your Honor.  I -- I would

9  like just an extra minute if I may.  David Heiman, Jones, Day

10  on behalf of the city.

11      First, I'd like -- this is clearly an historic and

12  momentous occasion that deserves every bit of your brilliant

13  remarks as well as your acknowledgments.  Somehow conveniently

14  you left yourself out and I do want to make it clear to

15  everybody in this courtroom that we would not be here today

16  but for your guidance, your pushing and prodding, your

17  direction, your intelligence, your sense of fairness, your

18  sense of humor, and that pacing that you referred to which to

19  me is among the most important things of all.

20      The winners here are the people of Detroit, the people of

21  the Metropolitan area, the State of Michigan, and also in my

22  mind the American legal system particularly the bankruptcy

23  construct.  So I want to thank you on behalf of everybody here

24  and if I may, I want to thank everybody here, people in -- the

25  people who helped do this will never be properly acknowledged.

1    I want to thank Governor Rick Snyder and his hard working

2  team because they had the courage to start this.  I want to

3  thank the Mayor, the city council, all of their hard working

4  people.  Obviously Kevyn who started off with skepticism and

5  scorn and had a very thick skin to lead us through this.  And

6  I want to thank his wife who sacrificed more than anybody who

7  happens to be in the courtroom today in the jury box.

8    The thank yous go on and on obviously and I'm leaving

9  many people out.  But you've covered it and I just really

10  wanted to make sure that you get the proper acknowledgment

11  that you richly deserve.  So thank you very much.

12        THE COURT:  Well, you're welcome.  All right.  In

13  light of that, let's reconvene at 3:05.

14        THE CLERK:  Court is in recess.

15    (Court in Recess at 2:47 p.m.; Resume at 3:05 p.m.)

16        THE CLERK:  All rise.  Court is in session.  Please

17  be seated.  Recalling case number 13-53846, City of Detroit,

18  Michigan.

19        THE COURT:  I think our next task is the entry of a

20  confirmation order.  My thought was to have -- or to set at

21  least an actual hearing on that and to accommodate whatever

22  interest the city has in the prompt entry of an order.

23    Based on the opinion I gave, I think there are probably

24  at least three changes that need to be made in the proposed

25  order that was submitted on the city's behalf relating to

1  fees, the non-dischargeability of the takings clause claims

2  and the clarification that claims against officers in their

3  individual capacity are not included in the plan, not

4  discharged, or -- or released.

5      I actually took the liberty of crafting some proposed

6  language, but only for your consideration.  It might

7  facilitate your re-drafting of the order and I'm -- I'm

8  willing to share this with you.

9      So let me just ask you when you would like to have this

10  hearing.  Before you answer, I should also tell you that this

11  hearing will also be a status conference on some other issues

12  which I want to give you fair warning about as well.  So you

13  tell me when -- when do you want to do this.  I'm available

14  Monday or Wednesday.  Tuesday, of course, is the federal

15  holiday.

16          MS. LENNOX:  Either of those days would certainly be

17  fine for the city, Your Honor.  As Your Honor noted, we do

18  have an interest in sort of a prompt issuance of an order.  So

19  we're happy to accommodate the Court's schedule.

20          THE COURT:  Well -- well, let's do it Monday then.

21          MS. LENNOX:  Okay.

22          THE COURT:  What time would you suggest?

23          MS. LENNOX:  Probably -- well, what else do you want

24  to have on for a conference, Your Honor?  How long might this

25  take?

1          THE COURT:  An hour at the very most.

2          MS. LENNOX:  Okay.  In that case, to allow people to

3    travel in the morning perhaps later morning, early afternoon,

4    or mid-morning.

5          THE COURT:  The only thing I'm thinking about --

6    well, no.  Shall we say noon then?

7          MS. LENNOX:  Thank you.

8          THE COURT:  All right.  So the other things I want

9    to discuss on Monday is whether any parties object to the

10   waiver of the 14 day stay and to work that through if

11   necessary.

12         MS. LENNOX:  Okay.

13         THE COURT:  Whether any parties intend to file a

14   motion for stay pending appeal and processing that.

15         MS. LENNOX:  Okay.

16         THE COURT:  I'd like to get from you a list of the

17   implementation tasks that have to be accomplished in order to

18   get to effective date.

19         MS. LENNOX:  How would you like that?  We -- we have

20   an exceedingly lengthy task list that we are working on right

21   now.  Would Your Honor like something very abbreviated filed,

22   sent to chambers, just discussed?

23         THE COURT:  You can just bring it.

24         MS. LENNOX:  Okay.

25         THE COURT:  And the schedule of how you propose to

1 | accomplish those tasks.

2 |       MS. LENNOX:  Uh-huh.

3 |       THE COURT:  I'd like to know whether anyone foresees

4 | any issues with regard to the implementation of the plan and

5 | getting to an effective date that might require the Court's

6 | resolution.

7 |       MS. LENNOX:  Okay.

8 |       THE COURT:  As well as your latest projection of

9 | when your effective date might be.

10 |       MS. LENNOX:  Uh-huh.

11 |       THE COURT:  I'd like to know what the status of the

12 | continuing claims objection process is that you foresee and

13 | you might want to have someone from Foley here to address

14 | that.

15 |       MS. LENNOX:  Certainly.

16 |       THE COURT:  We will recall for ourselves the status

17 | of any other post-confirmation litigation.  Any other issues

18 | that we need to address and perhaps most delicately we're

19 | going to create the process for determining the reasonableness

20 | and disclosure of fees.

21 |       MS. LENNOX:  Okay.

22 |       THE COURT:  Is the attorney for the DFFA here?  Ms.

23 | Lennox, can I impose upon you to extend a special invitation

24 | to that attorney to be here at this conference to participate

25 | in the crafting of that process?

1          MS. LENNOX:  Yes, I will do that, Your Honor.

2          THE COURT:  So that's the agenda that I foresaw for

3  this conference on Monday.  Is there anything else you might

4  want to add or that anyone might want to add?

5          MS. LENNOX:  I think that's pretty comprehensive

6  from our perspective, Your Honor.

7          THE COURT:  Mr. Howell.

8          MR. HOWELL:  Your Honor, Steven Howell, Dickinson,

9  Wright special assistant Attorney General appearing on behalf

10 of the state.  We still have a couple of hurdles we're working

11 on with the state contribution agreement conditions that we

12 are hopeful so maybe if we have that on the agenda as well,

13 we're going to continue to try to work those out.  We're

14 having -- we still have an issue with --

15         THE COURT:  Yeah.  I have to say that I was very

16 distressed to hear that there are still open issues.  And that

17 parties are possibly reopening negotiations that we've long

18 since thought were closed and resolved by those parties'

19 agreement to this plan.

20         MR. HOWELL:  Yes.  We -- we -- we would concur in

21 that we think that, you know, the agreements have been out

22 there for some time and just recently some issues have come

23 up.  We're working very hard to get through them, but we're

24 still struggling with the UAW and to a lesser extent AFSCME.

25         THE COURT:  Well, are the -- are the issues that

1  recently came up, or are they issues that someone decided to

2  re-negotiate?

3        MR. HOWELL:  I -- I would say that it's a

4  combination.

5        THE COURT:  Well, all right.  I strongly encourage

6  you to get those resolved by noon on Monday.

7        MR. HOWELL:  We will continue to do that, but if we

8  can't we will discuss it with the Court.

9        THE COURT:  If you need my help the morning of

10 Monday, I will be in my office.

11        MR. HOWELL:  Okay.  Thank you, Your Honor.  I just

12 wanted to make sure we brought that to your attention.

13        THE COURT:  Thank you.

14        MR. HOWELL:  Today and that should be on the agenda.

15 Thank you.

16        THE COURT:  Anything else for my attention today?

17 Mr. Perez.

18        MR. PEREZ:  Yeah.  Your Honor, just a very quick

19 question.  Alfredo Perez on behalf of FGIC.

20     As the Court is aware, because of the timing the

21 confirmation order probably includes more things that -- that

22 -- than normally you would put in a conformation order.  Is

23 the Court -- do I gather from your comments that the Court is

24 inclined to -- has reviewed the order, is inclined to enter

25 the form of order with the changes here or --

1          THE COURT:  Well, this is something I was going to

2   discuss on Monday.  I -- I do not want, and it would be

3   inappropriate for this order to constitute the Court's opinion

4   on confirmation.

5          MR. PEREZ:  Right.

6          THE COURT:  I'm going to issue an opinion on

7   confirmation.  And -- and so having said that, I think the

8   recitals in the order ought to be kept to the minimum that you

9   all think you need --

10          MR. PEREZ:  Right.

11          THE COURT:  -- to accomplish what you think that

12   order needs to accomplish.

13          MR. PEREZ:  Right.  And -- and Your Honor, and just

14   to -- I'm sure the Court is aware, but just to be perfectly

15   blunt.  The -- the deal continued to change a little bit after

16   the eighth plan was -- was filed, not in a material way, but

17   significant.

18          THE COURT:  Right.

19          MR. PEREZ:  And -- and so the confirmation order

20   reflects the continued movement.

21          THE COURT:  And it has to.

22          MR. PEREZ:  Okay.  Just as long as the Court's aware

23   of that.

24          THE COURT:  All of that is just -- all of that is

25   just fine.

 1          MR. PEREZ:  All right.  Thank you, Your Honor.

 2          THE COURT:  Ms. Brimer.

 3          MS. BRIMER:  Good afternoon, Your Honor.  Lynn M.

 4  Brimer appearing on behalf of the Retired Detroit Police

 5  Members Association.  Your Honor, we are one of the parties

 6  that has not yet provided the support and settlement agreement

 7  to the state.

 8          THE COURT:  That is very distressing to me.

 9          MS. BRIMER:  We have executed it.  At the time the

10  city circulated a proposed order, I advised counsel for the

11  city that the order failed to adequately address the

12  settlement between the city and my client.

13      Because I believe that there are certain issues that are

14  subject to mediation and committee confidentiality, I was

15  reluctant to file a direct objection to that and put those in

16  the record.  I am one, more than prepared to address those

17  issues with the Court in chambers with the appropriate parties

18  who I think are all here.  I'm just seeking an order that

19  adequately protects our settlement.

20          THE COURT:  All I can tell you -- I can tell you two

21  things, Ms. Brimer.  First, I wish you had brought this

22  unresolved issue to my attention sometime before the

23  conclusion of my opinion on confirmation.

24      Second, you have until Monday at noon to get it resolved.

25  If you want my help Monday morning, I'm happy to give it to

1  you.

2          MS. BRIMER:  Well, and --

3          THE COURT:  I strongly encourage you to work as

4  diligently as necessary in the meantime to get it done.  Is

5  there anything else you'd like me to say, or have I said

6  enough?

7          MS. BRIMER:  Yeah, and other than the fact, Your

8  Honor, that unfortunately I'm out of town on Monday,

9  unavoidably so I will do my best.

10          THE COURT:  Well, then you have until whenever you

11  leave.

12          MS. BRIMER:  Yeah.  Thank you, Your Honor.

13          THE COURT:  Anybody else have anything?  All right.

14  Then what I would like to do is come down off of this bench

15  and personally greet and thank each and every one of you who

16  have stuck around and express to you on a more personal basis

17  my thanks and appreciation for your help here.  Is that okay?

18  All right.  Let's go off the record.

19      (Court Adjourned at 3:16 p.m.)

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872              Dated: 11-12-14
   Letrice Calloway
12

13

14

15

16

17

18

19

20

21

22

23

24

25