**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROSE ROOTS, MARK PHILLIPS, WILLIAM
HARPER, EARNEST JOHNSON, FELICIA
JONES, CLARENCE L. WRIGHT, JR., ANGELA
OBEY-YOUNG, Individually and on behalf of all
others similarly situated,

                                             Case No. 12-12848-CV

        Plaintiffs,

THE CITY OF DETROIT,

        Defendant.

_____/

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Rose Roots, Mark Phillips, William Harper, Earnest Johnson, Felicia Jones, Clarence L. Wright, Jr., and Angela Obey-Young, on behalf of themselves and all others similarly situated, by and through their attorneys, The Miller Law Firm, P.C., state as follows for their Class Action Complaint:

## INTRODUCTION

1.  This case is brought on behalf of the thousands of individuals who retired from their employment with the City of Detroit ("City") with vested health benefits and who are being denied those vested contractual benefits in breach of: (1) contract, (2) statutory, (3) common law, (4) the City Charter, (5) the Municipal Code of the City of Detroit, (6) Resolutions of the City Council, and (7) fundamental federal Constitutional rights.

2.  The City is balancing its budget on the backs of its former employees – retired senior citizens – by making devastating and draconian changes to their promised health care benefits. These seniors have worked for decades, based upon promised health care benefits, and earned the right to these health care benefits. Moreover, the retirees made irrevocable decisions like

selecting survivorship benefits and/or benefit levels, based upon the benefits promised to them. At a time, when they are living on fixed incomes and incurring the medical expenses of old age, the City seeks to deprive them of these promised and earned benefits upon which they so justly relied.

3.   The City of Detroit adopted an Employee Health Benefit Plan ("Plan") pursuant to City Charter and the Municipal Code, and the specific terms of that Plan were subject to collective bargaining agreements ("CBAs"), with the CBAs to take precedence over the Plan.

4.   Under the terms of the CBAs, individuals, who retired from eligible employment with the City of Detroit, are entitled to fully paid hospitalization and medical insurance, based on ward service under the Michigan Variable Fee coverage (MVF-2), and subject to the benefits and premium contributions in effect at the time of retirement, and Drug Prescription coverage.  The prescription drug plan was subject to a $2.00 deductible for retirees.  With the May 9, 1996 execution of the 1995-1998 CBA, the prescription drug deductible was increased to $3.00 for future retirees.  These benefits, co-payments, deductibles and premium contribution rates were part of the contract in force at the time of each employee's retirement from the City.

5.   After July 2006, the City began to, and continues to, unilaterally modify the retiree health insurance benefits and premium contribution rates.  Health care rates were modified again in 2012. Also, the City has undertaken steps to again unilaterally modify the retiree health insurance benefits and premium contribution rates and these changes are imminent and substantial.

6.   These unlawful, unilateral modifications negatively impact retirees who are senior citizens living on fixed incomes and who are among the most vulnerable members of society and, in many instances, residents of the City.

2

7.     Plaintiffs seek a declaration that the City's unilateral changes to the retiree health insurance plan, including but not limited to, changes in covered benefits provided to retirees; increases in deductibles and co-payments assessed to retirees; and increases in premium contribution rates paid by retirees, substantially impair and breach the applicable collective bargaining agreements, and constitute a violation of Plaintiffs' constitutional rights.  Plaintiffs seek injunctive relief to prevent further changes and to require the City to return the contractual benefits owed to the retirees. Plaintiffs also seek compensatory damages for all the wrongfully incurred charges caused by Defendant's unlawful policy and practice.

## **THE PARTIES**

8.     Plaintiff Rose Roots is a resident of the City of Detroit, County of Wayne, and State of Michigan. She worked for the City for approximately 28 years, the vast majority of that time as a member of the American Federation of State, County and Municipal Employees ("AFSCME"). She retired from employment with the City of Detroit in 1997.  Plaintiff was a member of the Senior Accountants, Analysts and Appraisers Association ("SAAA") bargaining unit.

9.     Plaintiff Mark Phillips is a resident of the City of Detroit, County of Wayne, State of Michigan. He worked for the City for approximately 30 years, the vast majority of that time as a member of AFSCME. He retired from employment with the City of Detroit in 2002, at which time he was a member of the Associated Paving Foreman's Association.

10.     Plaintiff William Harper is a resident of the City of Detroit, County of Wayne, State of Michigan.  He was employed by the City for approximately 31 years until he retired in 1992.  For his entire employment, he was a member of AFSCME.

11.     Plaintiff Earnest Johnson is a resident of the City of Detroit, County of Wayne, State of Michigan.  He was employed by the City for approximately 34 years until he retired in 2002.  For his entire employment, he was a member of AFSCME.

12.     Plaintiff Felicia Jones is a resident of the City of Detroit, County of Wayne, and State of Michigan.  She retired from employment with the City of Detroit in 2010.  During her thirty-one and one-half years of employment with the City, she was a member of AFSCME.

13.     Plaintiff Clarence L. Wright, Jr. is a resident of the City of Detroit, County of Wayne, State of Michigan.  He retired from employment with the City of Detroit in 2005. During his almost 31 year employment with the City, he was primarily a non-union employee. At the time of his retirement, he was employed as a non-union Manager in the Recreation Department.

14.     Plaintiff Angela Obey-Young is a resident of the City of Detroit, County of Wayne, State of Michigan.  She retired from employment with the City of Detroit in 2009. During her approximately 32-year employment with the City, she was a member of AFSCME for 22 years and of SAAA for approximately two years.  At the time of her retirement, she had been employed as a non-union supervisory employee for approximately eight years.

15.     Defendant the City of Detroit is a municipal corporation with its principal place of business located at The Coleman Young Municipal Center, Two Woodward Avenue, Detroit, Michigan, the County of Wayne, and State of Michigan.  The City of Detroit was established pursuant to the Constitution of the State of Michigan; the Home Rule Cities Act, the Charter of the City of Detroit and governed by applicable state and federal law; the Charter and its Ordinances and the Municipal Code.

4

## JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction over the subject matter of the action pursuant to 28 U.S.C. §§ 1331 and 1343.  It is a civil action alleging, inter alia, violations of the Fifth and Fourteenth Amendments and impairment of contract arising under Article X of the Constitution of the United States.  This is an action for, inter alia, declaratory, injunctive and monetary relief pursuant to 28 U.S.C. §§ 2201 and 2202 and money damages to redress the Defendant's deprivation of Plaintiffs' rights pursuant to the Contracts Clause (Article 1, Section 10, Clause 1) and the Due Process Clause (Amendments V and XIV of the United States Constitution) and violations of 42 U.S.C. § 1983.

17.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to U.S.C. § 1367.

18.     Venue is proper in this Court because the municipal corporation Defendant and Plaintiffs are located in this District and a substantial part, if not all, of the events or omissions giving rise to the claims arose in the Eastern District of Michigan.  28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS – PART I
## THE ESTABLISHMENT OF THE EMPLOYEE HEALTH BENEFIT PLAN

19.     The City adopted its first Home Rule City Charter in 1918.  That charter was amended on July 1, 1974, January 1, 1997 and January 1, 2012.

20.     The City Employee Health Benefit Plan was established by Title 9, Chapter 8 of the 1918 City Charter as amended.  *See also Charters 1974, 1997 and 2012, Article 13-105.*

21.     Further, since at least some time at around June 1, 1946, the City provided for the establishment of an Employee Health Benefit Plan "for the purpose of providing hospital, surgical and death benefits" to eligible employees and retirees.  *City of Detroit Municipal Code [Code], Chapter 13, Article VIII, Division 1, Sec. 13-8-1; (Charter of the City of Detroit*

5

*[Charter] 1918, T-IX, C-VIII, § 1).  See also Charter, Art. 13, Sect. 13-10; Code, Chapter 13, Art VIII, Division 1, Sec. 13-8-6(b). (Charter 1918, T-I, C-VIII, § 11; Code 1964; 16-9-4).*

22.    A "[m]ember [of the plan] shall mean any person included in the membership of the plan" and "[s]ubscriber [of the plan] shall mean a member of the plan or his family as defined in section 13-8-7 who is receiving a retirement allowance from the city."  *Code, Chapter 13, Art VIII, Division 1, Sec. 13-8-2.  (Charter 1918, T-IX, -VIII, § 2; Code 1964, § 16-9-1).*

23.    An individual remains a member in the plan "[a]fter his retirement from city service with a pension or workman's compensation benefits paid in whole or in part out of funds provided by the city…"  *Code, Chapter 13, Art. VIII, Division 1, Sec. 13-8-3(e) (Charter 1918, T-IX, C-VII, § 8).*

24.    A city employee who retires with a pension shall continue to be a member of the city employees benefit plan.  *Code, Chapter 13, Article 8-3(e), 8-10; Charter 1918, T-IX, C-VIII, § 8, 12; Code 1964 § 16-9-7; Ord. No. 22-97 § 1, 7-2-97.*

25.    "The governing board of the city employees' benefit plan shall pay to the insurer providing the hospital and surgical, and, if applicable major medical services to the members the cost of such services, as provided by contract."  *Code, Chapter 13, Article 8-5 (Code 1964 § 16-9-10)*

26.    The Code provides in pertinent part that the City shall pay "the full cost of surgical and hospitalization coverage and major medical coverage, if applicable for individual employees…."  *Code, Chapter 13, Article 8-11 (Charter 1918, T-IX, C-VIII, § 13; Code 1964 § 16-9-8).*

27.    Further, effective July 1, 1976, the City Council passed a resolution providing for "Drug Prescription" coverage for active employees and retirees who had retired since July 1,

6

1974.   That prescription drug coverage provided for a $2.00 deductible and payment of premiums by the City.

28.   In December, 1976, the City Council passed a resolution to provide the same Drug Prescription coverage with a $2.00 deductible to be effective January 1, 1977, for those retirees of the City who had retired prior to July 1, 1974.

## GENERAL ALLEGATIONS – PART II
## THE BENEFITS AND PROVISIONS OF THE EMPLOYEE HEALTH BENEFIT PLAN WERE SUBJECT TO COLLECTIVE BARGAINING FOR EMPLOYEES WHO WERE MEMBERS OF A UNION

29.   The Public Employment Relations Act "PERA" provides that public employees have the right to "bargain collectively with their public employers through representatives of their own free choice."  Mich. Comp. Laws § 423.209, Public Act 379 of 1965.

30.   The City Charter provides that "[e]mployees of the City have the right to collective organization and collective bargaining."  *Charter of 1997, Article. 6, Chapter 5, Human Resources Department, Sect. 6-507; Charter 2012, Article 6, Chapter 4, Sect. 4-407.*

31.   "The terms of any collective bargaining contract, and all rules and rulings made under it, shall take precedence over any inconsistent classifications, rules or policies of the human resources department." *Charter of 1997, Art. 6, Chapter 5, Human Resources Department, Sect. 6-508; Charter of 2012, Art. 6, Chapter 4, Human Resources Department, Sect. 4-408.*

32.   The employees of the City are represented by many different unions and bargaining units.

33.   Historically, to establish a uniform bargaining policy as to matters such as issues related to the Employee Health Benefit Plan, the City through its labor relations personnel, have

7

always bargained first with AFSCME the union which has the largest enrollment of City employees.

34.      Then, the same bargained-for provisions are applied uniformly to other collective bargaining agreements.  Indeed, many of the contracts contain "me too" provisions which call for identical provisions across bargaining groups.

35.      Upon information and belief, such collective bargaining contracts have been negotiated regarding the terms of the Employee Health Benefit Plan since at least 1947.  Mich. Comp. Laws § 423.201, et. seq., Act 336 of Public Act of 1947.  See also Exhibit 1, Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State County and Municipal Employees, AFL-CIO, 1977-80 (Michigan District Council 77 prior to March 3, 1978), Article 1.[1]  The various Master Agreements are within the City of Detroit's possession.

36.      The negotiated contractual terms of the collective bargaining contracts have consistently provided that the retiree healthcare benefits, co-payments and deductibles applicable to Plaintiffs and other similarly situated class members were established through the collectively bargained labor agreements in force at the time of their retirements.

37.      Under the terms of all contracts, including the Agreements entered into between the City and AFSCME, the retirees' health care plan, benefits, deductibles, co-payments and premium contributions were governed by the CBA in effect at the time of retirement.

---

[1]  Memorandum of Understanding Between the City of Detroit and Michigan Council 25, American Federation of State, County and Municipal Employees, dated 3-22-78, provided that AFSCME 25 was the successor in interest to AFSCME 77, and that the agreement between the City and Council 77 which was effective 9-7-77 and which expires on 6-30-80 shall be the City and Counsel 77, which was effective 9-7-77 and which expires on 6-30-80, shall be the Master Agreement between the parties for its term and otherwise in accordance with Article 47 of the adopted Master Agreement.

38.   The specific CBA under which each retiree retired established vested rights to the healthcare coverage in effect at the time of retirement and the City promised to continue these vested rights the entire period of retirement.

39.   Once the employee retires, the employee is no longer a member of the Union and is no longer subject to future CBAs.

40.   The retired employees are entitled to these benefits for life and they are vested at retirement, and not subject to unilateral modification and/or revocation.

41.   Non-union employees received the same benefits as union employees with regard to Health Care Benefits.

42.   Article 34 of each of the CBAs (Article 36 in the 1977-1980 and 1980-1983 Agreements) consistently provided that retirees would receive fully paid hospitalization and medical insurance, including prescription drug coverage.

43.   Plaintiffs set forth in Subsections A-I below the provisions in the Agreements from 1977 to 2005.  To the extent that there may be retirees subject to Agreements that pre-dated the Agreements cited in Subsections A-I below, upon information and belief, those contracts are in the possession of Defendant and also provided for fully paid hospitalization and medical insurance.

## A.   The 1977-1980 Master Agreement

44.   Article 36 of the 1977-1980 Master Agreement between the City and Michigan Council 25 of AFSCME provided in pertinent part:

> The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries

9

and their legal dependents, as provided by Chapter 16, Article 9 of the Municipal Code for the City of Detroit.

Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. For those employees selecting the optional Metropolitan Health Plan of Blue Cross/Blue Shield the coverage shall be the MHP "AA" program with the City's contribution limited to the premium cost for Blue Cross/Blue Shield health insurance, ward service rates.

\* \* \*

For employees who retire on or after July 1, 1977, the City will pay the premium for regular retirees and their spouses effective as provided by City Council in 1977-78 closing resolutions.

\* \* \*

If, during the term of this Agreement, a Federal Health Security Act is enacted, the City of Detroit will pay during the term of the Agreement any premium, taxes or contributions employees may be required to pay under a Federal Health Security Act that are specifically earmarked or designated for the purpose of the Federal Program.

\* \* \*

The City agrees to institute a Health Maintenance Organization insurance plan prior to June 30, 1980. The employees shall have the further option of choosing this alternative. The City's contribution to this plan shall be limited to the premium cost for Blue Cross/Blue Shield health insurance, ward service rates.

(*See* Exhibit, Article 36, ¶¶ A,C, D and E.)

45.     The Agreement also provided for Optical Care Insurance through the Employee

Benefit Board. (Id., ¶ B.)

### B.     The 1980-1983 Master Agreement.

46.     Article 36 of the 1980-1983 Master Agreement between the City and Michigan

Council 25 of AFSCME provided in pertinent part:

The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate

10

with two dollar ($2.00) co-pay (Certificate #87), known as the two dollar ($2.00) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 16, Article 9 of the Municipal Code for the City of Detroit.

* * *

Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. The City's contribution to the alternative plans shall be limited to the premium cost for Blue Cross/Blue Shield ward service rates, excluding dental insurance.  Total Health Alliance Plan shall comprise the list of alternative hospitalization plans.  If at the end of any fiscal year an alternative hospitalization plan has failed to enroll 5% of the bargaining unit employees, the City shall have the option of removing that plan from the list of eligible carriers.

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution.  **The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City**. (Emphasis added.)

(*See* Exhibit 2, Article 36, ¶¶ A, B, and C.)

47.    The CBA also provided (1) effective 7-1-81, the City would improve its BC hospitalization plan for active employees and their dependents by providing BC Master Medical insurance with a 20% copay benefit and a fifty dollar ($50) per person annual deductible ($100.00) for two or more in a family; (2)  a Dental Plan effective 7-1-80; (3) the continuation of Optical Care Insurance and (4) that the City would pay the costs if a Federal Health Security Act was enacted. (*Id.*, ¶¶ D, E, F and G.)

11

### C.      The 1983-1986 Master Agreement

48.     Article 34 of the 1983-1986 Master Agreement between the City of Detroit and

Michigan Council 25 of AFSCME provided in pertinent part:

> Not later than January 1, 1984, for active employees and employees who
> retire on or after January 1, 1984, coverage shall be as described in the
> Memorandum of Understanding re: Health Care Cost Containment and
> Exhibit III.
>
> * * *
>
> The City shall provide hospitalization and medical insurance based on the
> Blue Cross/Blue Shield ward service under the Michigan Variable Fee
> coverage (MVF-2) and the Prescription Drug Group Benefit Certificate
> with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar
> ($2.00) deductible  Drug Rider for employees and their legal dependents,
> duty disability retirees and their legal dependents and duty death
> beneficiaries and their legal dependents, as provided by Chapter 16,
> Article 9 of the Municipal Code for the City of Detroit.
>
> * * *
>
> Employees shall have the option of choosing alternative hospitalization
> medical coverage made available by the City.  The City's contribution to
> the alternative plans shall be limited to the premium cost of Blue
> Cross/Blue Shield ward service rates, excluding dental insurance.  Total
> Health Care, Michigan Health Maintenance Organization and Health
> Alliance Plan shall comprise the list of alternative hospitalization plans.  If
> at the end of any fiscal year an alternative hospitalization plan has failed to
> enroll 5% of the bargaining unit employees, the City shall have the option
> of removing that plan from the list of eligible carriers.
>
> * * *
>
> The City will pay the premium for regular retirees and their spouses for
> hospitalization and medical insurance based on the Blue Cross/Blue Shield
> ward service under the Michigan variable Fee coverage (MVF-2) and the
> Prescription Drug Group Benefit Certificate with the two dollar ($2.00)
> co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug
> Rider as provided by City Council in the 1977-78 closing resolution.  **The
> City will pay this premium for regular retirees and their spouses for
> only as long as they receive a pension from the City**. (Emphasis added)

(*See* Exhibit 3, Article 34, ¶¶ A, B, C and D.)

49.    The 1983-1986 Agreement also provided that (1) the hospitalization plan for active employees and their dependents would include Blue Cross Master Medical Insurance with a 20% copay benefit and a fifty dollar ($50) per person annual deductible ($100) for two or more in a family; (2) a Dental Plan for actives effective 7-1-80; (3) the continuation of Optical Care Insurance;    (4) effective 11-1-83, employees who wish to insure sponsored dependents were required to pay the premium cost of that coverage and "the City will pay the health insurance premium for dependents who are 19 to 25 as long as they are regularly attending an accredited vocational school, college…and are dependent….Employees at their own expense may provide coverage for these dependents; and (5) the City would pay the costs if a Federal Health Security Act was enacted.  (*Id.,* ¶¶ E, F, G, H and I.)

50.    The 1983-1986 Contract included a Memorandum of Understanding Re: Health Care Cost Containment signed 11-28-1983 which provided:

> ….[t]he parties agree that the most effective way to control health care costs is to limit the choice of hospitals, out-patient laboratories, providers of prescription drugs and other medical services to those who deliver quality care at reasonable prices.  In order to achieve this goal the parties agree to implement the following plan, in lieu of Article 36, not later than January 1, 1984:
>
> A.    The parties agree to create a Health Care Cost Containment Committee made up of an equal number of members from the City and from the Union.  The committee will agree on securing the services of a health care consultant or administrator to assist the committee in designing and implementing a health care cost containment program.  <u>This committee shall review and agree to a health care cost containment plan which will cover active AFSCME employees and **future retirees** and will be implemented by the City no later than January 1, 1984.</u>  The plan will provide for quality health care and will limit the fees of physicians, hospitals, laboratories and druggists to those that charge reasonable fees including approved H.M.O.'s, health care networks and preferred drug providers.  Further cost containment alternatives such as preferred providers, generic mail order drugs, a maintenance drug program,

13

restrictive weekend admission rules, preadmission certification for elective surgery, second opinions, ambulatory surgery, control of out-patient psychiatric care, birthing centers, hospice care coverage other than hospitals, patient incentive audit of hospital bills, worksite blood pressure tests and employee health care education programs will be reviewed and implemented by the Committee. No insurance carrier shall be allowed to underwrite City Health Care insurance unless they offer coordination of benefits. Any savings realized from this effort will be disposed of in accordance with paragraph B.

B.      The Committee will review the costs of this program, on an annual basis, and will report to the Union and the City the amount of savings which the plan has generated. The accounting will be performed by a CPA mutually agreed upon by the parties if so desired to assure accuracy. A similar review and report will be made thereafter on an annual basis. The City and the Union agree that savings associated with this program will be shared equally by the employer and active AFSCME employees. The percentage of savings to be credited to the AFSCME bargaining unit employees shall be equal to one-half of the percentage of the difference in cost per employee of the active and **future retirees** of AFSCME in the general City hospitalization plan during the 1982-83 fiscal year versus the same base and equivalent accounting period in subsequent years. The general City hospitalization plan includes all active AFSCME employees **and future retirees** including those at the Department of Transportation and civilian employees of the Police and Fire Departments. Distribution of the savings attributed to the employees will be used as a bonus."

C.      In the event that the January 1 – June 30, 1984 premium cost exceeds the 1982-83 base year cost, the City will pay up to 50% over the 1982-83 base year costs. In the event that the July 1, 1984 – June 30, 1985 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost. In the event that the July 1, 1985 – June 30, 1986 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost.

D.      Effective July 1, 1983, the health care coverage premium for sponsored dependents must be borne by the employee.

E.      No later than January 1, 1984, the City will also implement a cost containment dental and optical insurance program. The City and the Union agree that savings associated with this program will be shared equally by the employer and the employees in accordance with the formula shown in paragraph B." (Emphasis added.)

14

51.     Exhibit III to the 1983-1986 Agreement provided "Re: HEALTH CARE PLAN"

and outlined the health care benefits under the program:

> The following is a description of the City of Detroit's Basic Health
> Care Plan for employees **and retirees**. They may choose to elect
> coverage under this plan or they may choose alternative coverage
> through one of the Health Maintenance Organizations offered by
> the City.  The City will pay the premium for this alternative health
> care coverage up to an amount equal to the amount the City pay
> (sic) for the Basic Plan.
>
> The basic plan described herein will give member coverages,
> which are nearly the same as they currently enjoy.  It does,
> however, include several cost containment features not found in
> our current program which will control costs of hospitalization and
> other medical services.  Furthermore, the joint union/management
> health cost containment committee will be studying additional cost
> containment programs which shall include prescreening and
> employee awareness programs during the term of the agreement
> and will implement them if they fulfill or object of quality health
> care at reasonable prices. In the event that different optical, dental
> or prescription drug programs are less costly than the current ones
> used, they may be adopted in lieu of them." (Emphasis added.)

(*See* Exhibit 3, which lists the benefits provided by the Plan.)

## D.     The 1986-1989 Master Agreement

52.     Article 34 to the 1986-1989 Master Agreement between the City Council 25 of

AFSCME provided in pertinent part:

> The City shall provide hospitalization and medical insurance based
> on the Blue Cross/Blue Shield ward service under the Michigan
> Variable Fee coverage (MVF-2) and the Prescription Drug Group
> Benefit Certificate with two dollar ($2.00) co-pay (Certificate
> #87), known as the two-dollar ($2.00) deductible  Drug Rider for
> employees and their legal dependents, duty disability retirees and
> their legal dependents and duty death beneficiaries and their legal
> dependents, as provided by Chapter 13, Article 11 of the Municipal
> Code of the City of Detroit.

* * *

15

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person  $100.06
Two person     $238.29
Family         $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution.  The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty

16

dollar ($50.00) per person annual deductible ($100.00) for two or more in a family.

* * *

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees citywide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

* * *

Effective January 1, 1987, the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 4, Article 34, ¶¶ A,B, C, D, F and L.)

53.    The 1986-1989 Agreement also provided a dental plan for active employees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted and that any insurer would be required to offer coordination of benefits (*Id.,* ¶¶ G, H, I and J)

54.    The parties also agreed to form a "Health Care Cost Containment Committee:

…made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph "B" the City will pay

17

fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

(*Id.*, ¶ K.)

55.     Exhibit III "RE: HEALTH CARE PLANS" included as part of the 1986-1989

Agreement provided that:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 4.)

### E.     The 1989-1992 Master Agreement

56.     Article 34 to the 1989-1992 Master Agreement provided in pertinent part:

> The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with one dollar ($2.00) co-pay (Certificate #87), known as the two-dollar ($2.00) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 11 of the Municipal Code of the City of Detroit.

* * *

> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

|  |  |
|---|---|
| Single person | $100.06 |
| Two person | $238.29 |
| Family | $253.54 |

> Fifty percent (50%) of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%) shall be paid by the employer.

* * *

18

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution.  The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person    $238.29

Fifty percent (50%) of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City.  The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable.  If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees citywide, the City shall have the option of removing that plan from the list of eligible plans or programs.  Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person

19

> Two persons
> Family.

* * *

> Effective January 1, 1987, the City shall implement a Preferred Provider
> Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 5, Article 34, ¶¶ A, B, C, D, E, F and L.)

57.     The 1989-1992 Agreement provided a dental plan for active employees and their

Dependents;  continued optical care insurance; that the City would pay the costs if a Federal

Health Security Act was enacted and that any insurer would be required to offer coordination of

benefits. (*Id*., ¶¶ G, and H, I and J.)

58.     The parties agreed to form a Health Care Cost Containment Committee:

> …made up of an equal number of members from the City and the Union
> which will review and agree to further cost containment programs to cover
> both active employees and future retirees during the term of the Contract.
> Said cost containment programs shall not diminish the levels of benefits
> provided in the basic plans but may require the insured to follow
> procedures prescribed by the carrier in order to be eligible for benefits.  If
> premium levels remain below the amounts listed in the 1982-83 base
> premium levels for insurance listed in paragraph B the City will pay fifty
> percent (50%) of that amount to an escrow account which shall be used to
> offset health care costs or increase health care benefits. Furthermore, the
> parties agree during the term of this agreement to continue to discuss the
> City's hospitalization plans.  The parties are committed to investigate
> programs which will reduce costs and bring about a corresponding
> reduction in premium sharing by employees. Programs to be considered
> would include alternative health care providers, additional cost
> containment programs, and alternative traditional plans.  Any programs
> agreed to by the parties will be implemented during the term of this
> agreement.

(*Id.,* ¶ K.)

59.     Exhibit III "Re: HEALTH CARE PLANS" to the 1989-1992 Agreement
provides:

> [T]he City of Detroit offers a traditional hospitalization plan for
> employees and retirees plus they may choose alternative coverage through

20

> one of the health maintenance organizations or preferred provider plans offered by the City.  The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan.   A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 5.)

### F.       The 1992-1995 Master Agreement.

60.     Upon information and belief, the City imposed an Agreement for the 1992-1995

Plan year which contained the exact or substantially similar language in Article 34.  It is believed

that a copy of this document is in the possession of Defendant.

### G.       The 1995-1998 Master Agreement.

61.     Article 34 of the 1995-1998 Agreement which was executed on May 9, 1996

provided in pertinent part:

> The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two-dollar ($2) deductible  Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit until such time during this agreement  cost  containment/reduction  modifications  are implemented pursuant to the Memorandum of Understanding Re; Lowered Health Care Costs dated August 31, 1995.   Such modifications may impact all or part of the provisions contained, including but not limited to medical, dental and optical care coverages.

> * * *

> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

> Single person  $100.06
> Two person     $238.29
> Family         $253.54

21

Fifty percent (50%) of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%) shall be paid by the employer.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution.  The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent (50%) of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City.  The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50

22

employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs.  Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

* * *

Effective January 1, 1995 the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 6, Article 34, ¶¶ A, B, C, D, E, F and L.)

62.    The Agreement provided a dental plan for active employees, duty disability retirees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; and that any insurer would be required to offer coordination of benefits.  (Id., ¶¶ G, H, I, J and M.)

63.    The parties also agreed to form a Health Care Cost Containment Committee:

...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits.  If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans.  The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees.  Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans.  Any programs agreed to by the parties will be implemented during the term of this agreement.

23

(*Id.,* ¶ K.)

64.     The     1995-1998     Agreement     included     a     "MEMORANDUM     OF
UNDERSTANDING INITIATIVE NO. 6 RE: LOWERED HEALTH CARE COSTS" which
provided:

>The parties agree to negotiate agreements which will achieve cost savings
>on the following four initiatives.  It is understood, however, that in
>addition to these mandatory cost reducing changes, the parties' Health
>Care Cost Reductions Committee (HCCRC) will continue to pursue
>potential means of further reducing costs or stunting their escalation in the
>future through other initiatives.
>
>A.     Health Insurance Premiums, Employee Portions Paid with "125K
>Pre-Tax" Dollars (This will be instituted forthwith, as soon as possible,
>upon ratification of the labor agreement.)
>
>B.     Prescription Drugs at $3.00
>
>C.     Mail-Order Prescription Drugs Program
>
>D.     COB Administrative Change (Verify then Pay)
>
>The following issues are **NOT AGREED TO** but are still being mutually
>examined by the Committee with regard to the parameters of such a rule
>as stated:
>
>E.      Emergency Room "Non-Admitting Usage Fee"
>
>F.     Opt-Out Payments When Alternate Coverage Exists
>
>Further, this HCCRC will endeavor to coordinate its activities with and
>make its efforts compatible with any beneficial outcomes from the
>operations between the City and the AFL-CIO Coalition of Unions
>Committee on Health Care Issues.  In that regard, the union has already
>expressed at the contract bargaining table its interest in adopting the
>potential lower-costing "HMO/POS" program now being carefully
>considered by that City/Coalition Committee, subject to the Union's
>concerns about maintenance of the present benefits in the traditional
>BC/BS.
>
>The benefits of this initiative will be initially realized in Year I for
>initiative A and in Year II for initiatives B, C and D.  For initiatives E and
>F, if the parties should come to agreement on them, the benefits will take

24

effect in accordance with the understanding reached between the parties. And lastly, further benefits will be realized to the extent the HMO/POS program is adopted and saves the parties health care costs.

(*See* Exhibit 6.)

65.     The 1995-1998 Agreement included A Memorandum of Understanding between the parties applied to National Health Care, "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits."(*See* Exhibit 6.)

66.     Exhibit II "RE: HEALTH CARE PLANS" to the 1995-1998 Agreement provides:

 [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City.  The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan.  A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 6.)

### H.     The 1998-2001 Master Agreement.

67.     Article 34 to the 1998-2001 Master Agreement executed on March 8, 2000 provided in pertinent part:

The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1], known as the two dollar ($2) deductible  Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.

fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3.

25

Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person  $100.06
Two person    $238.29
Family        $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person    $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3.

26

Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

* * *

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City.  The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable.  If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs.  Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

> Single Person
> Two persons
> Family.

(*See* Exhibit 7, Article 34, ¶¶ A, B, C, D, E, and F.)

68.    The 1998-2001 Agreement also provided a dental plan for active employees, their dependents and duty disability retirees;  continued optical care insurance;  that the City would pay the costs if a Federal Health Security Act was enacted;  that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (Id., ¶¶ G,  H, I, J and L.)

69.    The parties also agreed to form a Health Care Cost Containment Committee:

…made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits

27

> provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

(*Id.*, ¶ K.)

70.     A Memorandum of Understanding between the parties applied to National Health Care provided that "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits." (*See* Exhibit 7.)

71.     Exhibit II "RE: HEALTH CARE PLANS" to the 1998-2001 Agreement provides that:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 7.)

28

## I.      The 2001-2005 Master Agreement.

72.      Article 34 of the 2001-2005 Master Agreement, which was executed on July 1,

2003, provided in pertinent part:

> 34.   Hospitalization, Medical, Dental and Optical Care insurance Status quo of existing hospitalization, medical dental and optical care benefits will be maintained while the parties work cooperatively to institute mutually agreeable changes.
>
> The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1], known as the two dollar ($2) deductible  Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.
>
> fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)
>
> * * *
>
> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:
>
> Single person  $100.06
> Two person     $238.29
> Family         $253.54
>
> Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer. When the City's payroll system has the capability of allowing employees to pay these amount (sic) through the pre-tax IRS code 1225K mechanism, all bargaining unit members shall be entitled to participate.
>
> * * *
>
> Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

29

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City. For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City.  The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable.  If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs.  Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges

30

without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

(*See* Exhibit 8, Article 34, ¶¶ A, B, C, D, E, and F.)

73.     The 2001-2005 Agreement also provided a dental plan for active employees and duty disability retirees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (I. (Id., ¶¶ G, H, I and J.)

74.     The parties agreed to form a Health Care Cost Containment Committee:

> …made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees.  Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans.  Any programs agreed to by the parties will be implemented during the term of this agreement.

(*Id.,* ¶ K.)

75.     The Agreement included a Memorandum of Understanding between the parties

which applied to National Health Care, "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits." (*Id.,* ¶ I.)

76.     Exhibit II "Re: Health Care Plans" to the 2001-2005 Agreement provides that:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 8.)

## J.     In 2006, the City Unilaterally Modified the Retirees' Health Care Plan.

77.     Subsequent to the 2001-2005 CBA, when it came time to negotiate the terms of the 2005-2008 CBA, the collective bargaining representatives for AFSCME engaged in negotiations with the City's labor relations personnel. The City unilaterally imposed contract terms for the 2005-2008 CBA, effective September 2006.

78.     Notwithstanding the absence of a contract, in 2006, the City unilaterally and improperly modified the terms of the Employee Health Care Plan for union and non-union active employees and retirees although such a move was illegal.

79.     The new plan changed the contribution rates, deductibles and benefits for retirees who had retired under prior collective bargaining agreements and had vested benefits in effect prior to July 2006.

80.     Notwithstanding that the City had no right to change the terms of the Health Care plan as to those retirees who had retired with vested rights to retiree health care, the City unilaterally changed the terms of the health care plan.

81.     The terms of the health care plan were mandatory subjects of collective bargaining under the state labor law, past practice and the agreements between the parties.

82.     Yet, after the imposition of the contract, which was accepted by the Union as to the active employees only, the City impermissibly continued to make changes to the imposed contract, including unlawful changes as to retiree health care.

83.     Under the City's new unilateral health care plan, co-payments and contributions were changed for retirees. By way of example and not limitation, changes to the Blue Cross traditional plan included the following:

| BLUE CROSS TRADITIONAL | Prior to change | Post change |
|---|---|---|
| Annual Deductible/Individual | $50 | $175 |
| Annual Deductible/Family | $100 | $350 |
| Urgent care | 100% | 80% after deductible co-payment |
| Prescription Drug Co-pay Generic | $2 | $5 |
| Prescription Brand | $2 | $15 |
| Mail Order Generic (90 days) | $2 | $10 copay |
| Mail Order Brand (90 days) | $2 | $30 copay |

(*See* Exhibit 9.)

84.     These changes were effective in the latter half of 2006.

85.     The City continued to make unilateral, illegal and improper changes to the terms of the health care plan, adversely affecting the retirees.

86.     Thereafter, the City prepared a draft of the Master Agreement dated October 24, 2006 which provided in Article 33:

33

*The parties have reached an agreement in regard to health care plan changes in accordance with MOU Re: Concession Agreement. However, the hospitalization, medical, dental and optical care benefits as of June 30, 2005, will be maintained until the new care design plan changes are implemented. That implementation is to occur on or after July 17, 2006. Changes to this article are reflected in the Memorandum of Understanding RE: Alternative Health Care Plan.*

\* \* \*

The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible   Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.

fn 1:  The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person  $100.06
Two person    $238.29
Family        $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer. When the City's payroll system has the capability of allowing employees to pay these amounts through the pre-tax IRS code 125K mechanism, all bargaining unit members shall be entitled to participate.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

34

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The city will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person    $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1:  The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88

35

fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.  (Emphasis added)

(*See* Exhibit 10, Article 33, ¶¶ A, B, C, D, E and F.)

87.    The October 24, 2006 draft agreement provided a dental plan for active employees and duty disability retirees; continued optical coverage; that the City would pay the costs if a Federal Health Security Act was enacted; and that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (*Id*., ¶¶ G, H, I, J and L.)

88.    The October 24, 2006 draft agreement included a provision for a Health Care Cost Containment Committee:

…made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits.  If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agreed during the term of this agreement to continue to discuss the City's hospitalization plans.  The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees.  Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans.  Any programs agreed to by the parties will be implemented during the term of this agreement.

(*Id., ¶ K*.)

36

89.    The October 24, 2006 draft included Exhibit II, "RE: HEALTH ARE PLANS." which added "SECTION VIII, City Alternative Health Care Plan."  In pertinent part, it provided that "Currently, all retirees and their dependents who are eligible for Medicare regardless of age must enroll in Medicare Parts A and B at their own expense to be eligible for continued coverage, and this provision shall remain unchanged and applicable to all persons who retire in the future." (*Id.,* § 8, ¶E at p 154.)

90.    The City did not have the right to unilaterally change the terms of the Employee Health Care Plan for these retirees who had retired with vested benefits.

91.    Even more improperly, the City reduced the health care plan in 2008 from what it unilaterally imposed in 2006.

92.    The City specifically promised the retirees that they would enjoy the medical benefits and contribution rates applicable at the time of their retirements.[2]

93.    Retiree medical benefits are vested lifetime benefits. Once the City of Detroit received the benefit of the retirees' completed service, it could not unilaterally alter or revoke the terms.

94.    The health benefits that are at issue had remained the same until the City of Detroit unilaterally and improperly modified the health care benefits.

### K.    In 2009, 2010, 2011 and 2012 the City Again Unilaterally Changed the Retirees' Health Care Plan.

95.    In 2009, 2010, 2011 and 2012 the City continued to unilaterally raise premiums and make other improper changes to the retirees' health care benefits.

---

[2] For example, the website for the General Retirement System City of Detroit provides that the benefits applicable to a retiree are those that were in effect at the time of the retiree's retirement. Other documents published by the City of Detroit and provided to the retirees set forth this same information to retirees.

37

**L.      The City Imminently Plans to Implement Substantial Modifications to the Retirees' Health Care Plan to the Detriment of Retirees.**

96.      The City imminently plans to unilaterally and wrongfully further modify the employee benefit plan applicable to these retirees including increasing premiums and changing the value of the contracted for benefits.

**GENERAL ALLEGATIONS – PART III**
**THE NON-UNION RETIREES HAVE THE SAME VESTED BENEFITS AS THOSE RETIREES WHO WERE COVERED BY A COLLECTIVE BARGAINING AGREEMENT**

97.      The City agreed to provide non-Union employees with the same Employee Benefit Plan and same terms and provisions as employees who were members of a Union and subject to collective bargaining agreements.  In fact, the Code and Charter make no distinction.

98.      The non-Union employees who retired with vested benefits were unlawfully subject to modifications in July, 2006 and thereafter.  Further, additional unlawful changes were made in 2012.

99.      The City promised these non-Union retirees that they would enjoy the medical benefits and contribution rates applicable at the time of their retirements.

100.      The City as a matter of practice provided the non-Union retirees with the same benefits as the Union retirees and represented that they would continue to obtain the same benefits as Union retirees.

**CLASS ACTION ALLEGATIONS**

101.      This is a class action suit which seeks injunctive and declaratory relief and damages in the amount of wrongfully incurred sums paid by retirees for contributions to both

38

premiums and deductibles and other health care costs due to Defendant's unilateral breaches of the contracts and violations of Plaintiffs' constitutional rights.

102.    Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals and seek to represent a class comprised of all persons who have been or will be subject to Defendant's unlawful policy, practice, procedure of breaching the contracts between the parties and also depriving them of their constitutional rights.

103.    During the periods at issue, Plaintiffs were retirees covered under the City of Detroit Employee Health Care Plan.

104.    Plaintiffs bring this action on their own behalf and on behalf of the following proposed class:

> All persons who retired from the City of Detroit with vested health care benefits and whose health care plan, including, premium contributions, benefits and deductibles, were unilaterally changed by the City of the Detroit.

105.    The class is so numerous that joinder of all members is impracticable.  Class members number in the thousands.  The precise number of Class members and their addresses are unknown to the Plaintiffs, but can be obtained from the records of the City of Detroit.

106.    There are questions of law or fact common to the Class, including at least the following:

a.    Whether the City's retirees had vested health care benefits that could not retroactively changed by the City.

b.     Whether the City unilaterally modified the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees;

c.      Whether such unilateral modification of the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees breached the vested rights of the retirees;

d.      Whether such unilateral modification of the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees, violated the retirees' constitutional rights under the Contract Clause of the U.S. Constitution and the 5th and 14th Amendments of the U.S. Constitution;

e.      Whether Plaintiffs were harmed as a result of the City's wrongful conduct; and

f.      What relief should be imposed in favor of the Plaintiffs and the Class, including declaratory and injunctive relief.

107.   Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs have the same interests in this matter as all other members of the Class, and their claims are substantially identical to and typical of the claims of all members of the Class. Plaintiffs do not have interests antagonistic to or in conflict with those of the other members of the Class.

108.   Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in class actions. Plaintiffs will fairly and adequately represent the interests of the Class members.

109.   The prosecution of separate actions by members of the Class could create a risk of establishing incompatible standards of conduct for Defendant.

110.   Overall, the claims of the individual class members may be too small to warrant individual litigation, especially as to a group of retirees on fixed incomes, but cumulatively the

amount of potential damage is significant and injunctive relief is required to preclude the City's on-going wrongful conduct.

111. The prosecution of individual actions may, as a practical matter, be dispositive of the interests of the Class.

112. Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia,* equitable remedies with respect to the Class as a whole.

113. The common questions of law and fact at issue here, some of which have been enumerated above, predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.

114. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation, particularly when Plaintiffs are retirees living on fixed incomes.

115. Plaintiffs are not likely to be able to vindicate and enforce their constitutional and contractual and statutory rights unless this action is maintained as a class action.

116. The issues raised can be more fairly and efficiently resolved in the context of a single action rather than piece-meal litigation in the context of separate actions.

117. The resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations

118. Defendant has acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate.

119. To Plaintiffs' knowledge, no similar litigation is currently pending by other members of the Class.

120.     Plaintiffs' counsel, who is highly experienced in class actions, foresees little difficulty in the management of this case as a class action.

## COUNT I --BREACH OF CONTRACT

121.     Plaintiffs repeat and re-allege all of the preceding paragraphs as if full set forth herein.

122.     Plaintiffs rendered services to the City of Detroit and performed their duties pursuant to the applicable Agreements.

123.     The maintenance of the contribution rate, employee health insurance benefits, and coverage for medical and prescription drugs is a bargained for part of the compensation for services rendered by these Plaintiffs and the Class Members to the City.

124.     Each of the Agreements under which these Plaintiffs and the Class Members retired is a binding and enforceable agreement between them and the City to provide health insurance and prescription drug benefits and coverage at the benefit and contribution levels during the term of the Contract then in effect when each Plaintiff and Class Member retired.

125.     The City is thereby obligated to maintain the same health insurance and prescription drug benefits and coverage at the same contribution levels as in effect when each Plaintiff and Class Member retired.

126.     For decades, the City engaged in the practice of providing health insurance to all of its retirees, union and non-union, at the benefit levels and contribution rates applicable at the time of their retirements.

127.     This practice was based on mutual agreement and was a term and condition of employment that cannot be changed without the consent of the parties.

128.     The retirees did not consent to the change.

42

129.    The City has violated its promise to the retirees to provide these benefits for life as applicable at the time of retirement.

130.    Plaintiffs and the Class Members relied on the CBAs in good faith and fully performed all of their obligations under them.

131.    The Plaintiffs and Class Members relied on Defendant's past practice and promises.

132.    The City breached its contractual obligations to Plaintiffs and the Class Members by failing to maintain the required contribution levels for health insurance and the same benefit levels in effect at the time of retirement, when the City unilaterally changed same benefits effective first in July 2006 and each time thereafter.

133.    Plaintiffs and the Class Members have each been damaged by Defendant's breaches of the referenced CBAs and past practice and will continue to sustain injury and further damage if Defendant is allowed to continue to breach the terms and conditions of the CBAs.

134.    Plaintiffs and the Class Members are entitled to relief because of Defendant's breaches of the CBAs, and breaches of past practice, including the modification of benefits and contribution rates.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargaining agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT II – BREACH OF IMPLIED CONTRACT

Plaintiffs repeat and re-allege all of the preceding paragraphs as if full set forth herein.

135.    Plaintiffs rendered services to the City of Detroit and performed their duties pursuant to the applicable agreements.

136.    The maintenance of the contribution rate, employee health insurance benefits, and coverage for medical and prescription drugs is an agreed upon part of the compensation for services rendered by these Plaintiffs and the Class Members to the City.

137.    For decades, the City engaged in the practice of providing health insurance to all of its retirees, union and non-union, at the benefit levels and contribution rates applicable at the time of their retirements.

138.    This practice was based on mutual agreement and was a term and condition of employment that cannot be changed without the consent of the parties.

139.    The retirees did not consent to the change.

140.    The retirees relied on these agreements and past practices in good faith and fully performed all of their obligations under these agreements.

141.    The City has violated its promise to the retirees to provide these benefits for life as applicable at the time of retirement.

142.    The City breached its contractual obligations to Plaintiffs and the Class Members by failing to maintain the required contribution levels for health insurance and the same benefit levels in effect at the time of retirement, when the City unilaterally changed same benefits effective first in July, 2006 and each time thereafter.

44

143.    Plaintiffs and the Class Members have each been damaged by Defendant's breaches of these promises and will continue to sustain injury and further damage if Defendant is allowed to continue to breach the terms and conditions of the agreement between the parties.

144.    Plaintiffs and the Class Members are entitled to relief because of Defendant's breaches of the agreements and breaches of past practice, including the modification of benefits and contribution rates.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargaining agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

### COUNT III --VIOLATION OF THE CONTRACTS CLAUSE OF THE UNITED STATES CONSTITUTION (U.S. CONST. ART I, SEC. 10, CL. 1)

145.    Plaintiffs repeat and re-allege all the preceding paragraphs as if fully set forth herein.

146.    At all times relevant hereto, Defendant and its agents and employees were individuals acting under color of State and Municipal law.

147.    At all times relevant hereto, Plaintiffs and the putative Class Members were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit pursuant to 42 U.S.C. § 1983.

45

148.    The Constitution of the United States provides that "[n]o State shall….pass any…law impairing the obligation of contracts."  U.S. Const. Article I, Sec. 10, Cl. 1

149.    Defendant violated the contract clause of the United States Constitution when it took actions impairing its contractual obligations to vested retirees by unilaterally increasing the contribution rates for premiums, the co-payments and deductibles, and other modifications to the health care plan to which it was contractually bound.

150.    Under the collective bargaining agreements, Defendant is contractually obligated to provide health insurance and ancillary benefits at the same levels as the effective date of the CBAs under which the retirees retired.

151.    Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance prescription drug benefits for retired union and non-union members and their dependents substantially impaired the contractual obligations under the parties' CBAs, and violated past practice and federal, state and municipal law.

152.    Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance and prescription drug coverage for retired union and non-union members and their dependents contravened the **reasonable expectations** of Plaintiffs and the Class of retired individuals and their dependents under the CBAs, past practice, and federal, state and municipal law.

153.    Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance and prescription drug coverage for retired union and non-union members and their dependents violated essential terms and conditions under the CBAs, past practice and federal, state and municipal law upon which Plaintiffs and the Class of retired individuals they seek to represent reasonably and materially relied.

154.    Defendant's unilateral increase and modification of contribution rates, co-payments and deductibles diminish the benefit coverage and the contracts with these retirees and has no legitimate public purpose and/or constitutes an abuse of power.

155.    The actions at issue substantially impair the provisions in Plaintiffs' contractual agreements.

156.    As a direct and proximate result of Defendant's actions, Plaintiffs sustained and will continue to sustain injury and damages, including but not limited, to the deprivation of their rights under the U.S. Constitution.

157.    Defendant's substantial impairment of these contractual obligations has proximately caused, and will continue to cause Plaintiffs and their dependents and the putative Class Members irreparable injury and damage, including (1) denial of their **reasonable expectations** under the CBAs, past practice and Municipal and State law, that Defendant would continue to comply with its contractual obligations; (2) interference with the protections under Municipal and State law to collectively bargain under the procedures provided under state law and municipal law; and (3) denial of their constitutional rights under the U.S. Constitution.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT IV -- VIOLATION OF THE PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAUSES OF THE 5TH AND 14TH AMENDMENTS,

158.   Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

159.   At all times relevant hereto, Defendant and its agents and employees were individuals acting under color of State and Municipal law.

160.   At all times relevant hereto, Plaintiffs and the putative Class Members were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit pursuant to 42 U.S.C. § 1983.

161.   The Constitution of the United States provides that no person "shall be deprived of life, liberty, or property, without due process of law…"   U.S. Const. Amendment V.

162.   The rights and protections of the Fifth Amendment are fully applicable to state action.  U.S. Const. Amendment XIV.

163.   Plaintiffs have a vested contractual and constitutionally protected property interest in Defendant's compliance with its contractual obligations; to wit, to continue providing the same retiree contribution rate, co-payments, deductible and benefits under the CBAs and past practice; to return the retiree contribution rate, co-payments, deductible and benefits under the CBAs and past practice to the agreed upon rates and benefits; and to refrain from unilaterally altering and modifying the contribution rates, deductibles, benefits and financial obligations under the collective bargaining agreements and past practice as provided to retired employees.

164.   Under the collective bargaining agreement and past practice, Defendant is contractually obligated to provide health insurance and ancillary benefits at the same levels as the effective date of the CBAs under which the retirees retired.

165.   Plaintiffs vested contractual and constitutionally protected interests derive from, inter alia, the CBA's, the past practice, municipal, state and federal law.

48

166.    Defendant does not have the right to unilaterally modify the contractual obligations.

167.    Defendant deprived Plaintiffs and the retired Class Members of these vested contractual and constitutionally protected interests without notice and without an opportunity to be heard before the deprivation took place, thus, causing a forfeiture of property without due process in violation of the due process clause.

168.    Plaintiffs did not waive their right to adequate notice or the reasonable opportunity to be heard before being deprived of their vested contractual and constitutionally protected interest.

169.    The risks of depriving Plaintiffs and retired Class members of these vested contractual and constitutionally protected interests without first providing notice and a reasonable opportunity to be heard are high.

170.    Defendant's interest to deprive Plaintiffs without first providing notice and a reasonable opportunity to be heard are non-existent or minimal.

171.    The actions at issue substantially impair the provisions in Plaintiffs' contractual agreements and deprive them of a constitutionally protected property interest.

172.    As a direct and proximate result of Defendant's actions, Plaintiffs sustained and will sustain injury and damages, including but not limited, to the deprivation of their rights under the US Constitution.

173.    Defendant's substantial impairment of these contractual obligations has proximately caused, and will continue to cause Plaintiffs and their dependents and the putative Class Members irreparable injury and damage, including (1) denial of their reasonable expectations under the CBAs, past practice and State law, that Defendant would continue to

49

comply with its contractual obligations; (2) interference with the protections under the law to collectively bargain under the procedures provided under state law and municipal law; and (3) denial of their constitutional rights under the U.S. Constitution.

174.    Plaintiffs have a Constitutionally-protected property interest in the health care benefits and contribution rates that they are entitled to receive.

175.    Defendant has denied Plaintiffs the health care benefits and contribution rates without any cognizable procedure whatsoever.

176.    The Charter for the City of Detroit recognizes that these retirees are entitled to representation, to wit, "[r]etired general city employees are entitled to be represented in the city legislative and budgetary proceedings on issues affecting their interest by persons elected by them," but such representation was not given.   *Charter, Article 9, Chapter 6.*

177.    Defendant's actions in unilaterally modifying the retirees' health care benefits and contributions, as set forth herein, deprives and continues to deprive Plaintiffs of their constitutionally protected right to equal protection of the laws and substantive due process as secured by the Fourteenth Amendment of the United States Constitution.

178.    Plaintiffs have been subject to adverse treatment by Defendant as set forth and described herein.

179.    As a direct and proximate result of the Defendant's unfair treatment, Plaintiffs have suffered and will continue to suffer substantial injury, including but not limited to irreparable harm.

180.    As a direct and proximate result of Defendant's failure to provide adequate due process, Plaintiffs have suffered and will continue to suffer substantial injury, including but not

50

limited to irreparable harm by the City's continued implementation of unilateral changes to the retirees' property interest in their health care benefits.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT V -- VIOLATION OF 42 U.S.C. § 1983

181.    Plaintiffs repeat and re-allege all the preceding paragraphs as if fully set forth herein.

182.    The City through its actions and decisions has deprived Plaintiffs and the Class Members of their federally protected rights, provided by federal law and the United States Constitution.

183.    The policies, decisions and actions of the City were based on considerations other than those proper to the good faith administration of justice.

184.    The City's actions constitute a deliberate denial, under color of law, of Plaintiffs' federal rights guaranteed under the 5th Amendment Due Process and Equal Protection Clauses of the 14th Amendment of the United States Constitution, as well in violation of 42 U.S.C. § 1983.

185.    Plaintiffs have, as a direct and proximate result of the City of Detroit's action, suffered and will continue to suffer substantial and irreparable harm and injury.

51

186.   Defendant's actions have substantially harmed Plaintiffs and the putative Class Members and the City has announced future actions which will irreparably harm Plaintiffs and the putative Class Members.  Thus, injunctive relief is required.

187.   The City acted in an arbitrary, capricious and discriminatory manner and their actions show a reckless disregard and callous indifference for Plaintiffs' federally protected rights.  Plaintiffs are therefore entitled to exemplary damages, costs and attorney fees pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT VI - INJUNCTIVE RELIEF AND IRREPARABLE HARM

188.   Defendant has undertaken steps to increase the rates of contribution and increase the o-payments and deductibles and otherwise unilaterally modify the agreed upon contractual terms of the retirees health care.  Upon information and belief, such changes are scheduled to be implemented in July 2012 or some time shortly thereafter to union retirees and have already been implemented as to non-union retirees.

189.   The City Administration, Labor Relations and City Council have authorized these changes.

190.    These changes impair the obligation of contract as to Plaintiffs and the proposed class members.

191.    It is also an unconstitutional impairment of obligation of contract in violation of Section 10 of the United States Constitution.

192.    It is also an unconstitutional impairment of obligation in violation of the City Charter.

193.    It is also an unconstitutional impairment of obligation in violation of the Municipal Code.

194.    The retirees will be forced to make choices to allocate sparse resources, including foregoing health care coverage, prescriptions and medical care which will result in irreparable harm, and a permanent detrimental impact on health and well-being.

195.    The imposition of additional insurance costs on retirees constitutes irreparable harm because of the financial hardship on retirees on fixed incomes, emotional distress and possible deprivation of life's necessities by reallocating scant resources to pay for needed healthcare.  They will have to choose between medical care, food or other life essentials.

196.    These retirees cannot afford to contribute the increased amounts, thus, they may have to reduce their health insurance or lose their level of coverage.

197.    Even if the retirees prevail, reimbursing them at the end of the litigation will not compensate them for the impact on their health in the interim.

198.    The balance of hardships weigh in favor of granting Plaintiffs injunctive relief because the harm to Plaintiffs cannot be undone.

199.    Despite the manifest illegality, invalidity and unconstitutionality of these actions, Defendant, its officials, agents, and employees, unless restrained by order of this Court, will

enforce these changes against Plaintiffs, causing them irreparable injury, including the fact that they will be deprived of the ability to afford adequate health care and by reason of which Plaintiffs do not have an adequate remedy at law.

200.    The Plaintiffs are likely to succeed on the merits as Plaintiffs have vested contractual rights to the health care benefits at issue.

201.    A preliminary injunction is not contrary to the public interest.

WHEREFORE, Plaintiffs respectfully request the Court to issue a temporary injunction restraining Defendant from enforcing its resolution and these changes in the Employee Health Benefit Plan as to retirees and restore the non -union retirees to the status quo prior to the 2012 changes.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.    Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declare that the actions of Defendant described constitute violations of the Contracts Clause of the United States Constitution and the 5th and 14th Amendments to the Constitution;

C.    Enter a permanent injunction prohibiting Defendant from engaging in the violations of the Contracts Clause of the United States Constitution and the 5th and 14th Amendments;

D.    Enter a Judgment finding that Defendant's actions in unilaterally changing the retirees' health care plan, modifying the contribution rate, benefits, deductibles and other terms of the plan constitutes a breach of the parties' CBAs;

54

E.     Award Plaintiffs and the Class they seek to represent compensatory damages in an amount to be determined at trial to fully compensate them for their injuries;

F.     Award any other damages that are permissible;

G.     Award attorneys' fees and costs; and

H.     Award such other relief as the Court deems appropriate and just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Ann L. Miller (P43578)
Sharon S. Almonrode (P33938)
950 West University Dr. Ste. 300
Rochester, MI 48307
(248) 841-2200

Dated: June 27, 2012

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROSE ROOTS, MARK PHILLIPS, WILLIAM
HARPER, EARNEST JOHNSON, FELICIA
JONES, CLARENCE L. WRIGHT, JR., ANGELA          Case No. 12-12848-CV
OBEY-YOUNG, Individually and on behalf of all
others similarly situated,

      Plaintiffs,

THE CITY OF DETROIT,

      Defendant.

_____/

THE MILLER LAW FIRM, P.C.
E. Powell Miller (P39487)
Ann L. Miller (P43578)
Sharon S. Almonrode (P33938)
950 West University Dr. Ste. 300
Rochester, MI 48307
(248) 841-2200
(248) 652-2852 fax

### <u>INDEX OF EXHIBITS</u>

Exhibit 1-    Master Agreement between the City of Detroit and Michigan Council 25 of the
American Federation of State, County and Municipal Employees 1977-1980

Exhibit 2-    Master Agreement between the City of Detroit and Michigan Council 25 of the
American Federation of State, County and Municipal Employees 1980-1983

Exhibit 3-    Master Agreement between the City of Detroit and Michigan Council 25 of the
American Federation of State, County and Municipal Employees 1983-1986

Exhibit 4-    Master Agreement between the City of Detroit and Michigan Council 25 of the
American Federation of State, County and Municipal Employees 1986-1989

Exhibit 5-    Master Agreement between the City of Detroit and Michigan Council 25 of the
American Federation of State, County and Municipal Employees 1989-1992

Exhibit 6-    Master Agreement between the City of Detroit and Michigan Council 25 of the
American Federation of State, County and Municipal Employees 1995-1996

Exhibit 7-     Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 1998-2001

Exhibit 8-     Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 2001-2005

Exhibit 9-     City of Detroit health care plan options 2006

Exhibit 10-    Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 2005-2008

# EXHIBIT 1

# MASTER AGREEMENT

Between the

# CITY OF DETROIT

and

# MICHIGAN COUNCIL 25*

OF THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO

(*Michigan District Council 77 prior to March 3, 1979)

1977 — 1980

formed jury duty on the days for which he claims such payment, provided that the department head shall have discretion in seeking to have the employee excused where his services are essential. The provisions of this section are not applicable to an employee, who, without being summoned, volunteers for jury duty.

The jury duty supplementation shall not apply to special service, contractual, temporary or other employees with less than one year of seniority.

D. When properly notified by an employee under the terms of Section C, the department shall, if necessary, reschedule the work assignment of the employee so as to coincide as closely as possible with the jury duty schedule. This reassignment shall take precedence over other conflicting sections of this contract (except Article 7-F).

E. Employees shall have the option when called to Jury Duty, to use vacation or compensatory time for such service. In that event, the employee will not be required to turn in his jury pay. However, the employee must notify the department of his desire to exercise this option prior to the first date of jury service.

F. Jury Duty shall be considered as time worked.

G. An employee on Jury Duty will be continued on the payroll and be paid at his straight time hourly rate for his normally scheduled hours of work. Upon return from jury duty, the employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an employee fails to turn in his jury duty payment, the City will hold subsequent payments due to the employee until the City is reimbursed for all time lost due to the alleged jury duty service.

54

## 36. HOSPITALIZATION, MEDICAL INSURANCE AND OPTICAL CARE

A. The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate # 87), known as the two-dollar ($2.00), deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal dependents, as provided by Chapter 16, Article 9 of the Municipal Code of the City of Detroit.

Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. For those employees selecting the optional Metropolitan Health Plan of Blue Cross/Blue Shield· the coverage shall be the MHP "AA" program with the City's contribution limited to the premium cost for Blue Cross/Blue Shield health insurance, ward service rates.

B. The city will provide Optical Care Insurance through the Employee Benefit Board and such benefit will include case hardened lenses. The City will continue to provide optical care through the present carrier, through the Employee Benefit Board.

C. For employees who retire on or after July 1, 1977, the City will pay the premium for regular retirees and their spouses effective as provided by City Council in 1977-78 closing resolutions.

D. If, during the term of this Agreement, a Federal Health Security Act is enacted, the City of Detroit will pay during the term of the Agreement any premium, taxes or contributions employees may be

55

required to pay under a Federal Health Security Act that are specifically earmarked or designated for the purpose of the Federal Program.

E. The City agrees to institute a Health Maintenance Organization insurance plan prior to June 30, 1980. The employees shall have the further option of choosing this alternative. The City's contribution to this plan shall be limited to the premium cost for Blue Cross/Blue Shield health insurance, ward service rates.

## 37. WORKER'S COMPENSATION

All employees shall be covered by the applicable Worker's Compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of city employment shall be continued on the payroll and his time shall be charged to sick leave reserve; provided that in the absence of any sick leave reserves he shall be paid regular wages or salary to the extent of two-thirds of his daily wage or salary but for a period of not to exceed seven days; provided, also, that where the employee has a sick leave reserve and receives income under the Worker's Compensation Act, such income shall be supplemented by the City with an amount sufficient to maintain his regular salary or wage for a period not to exceed that of his sick leave reserve, and such reserve shall be charged for all sick leave days or portions thereof paid to such employee.

## 38. DEATH BENEFITS AND LIFE INSURANCE
### A. DEATH BENEFITS

Death benefits for all regular City employees are authorized by the City Charter, Title IX, Chapter VIII. The City Code, Chapter 16, Article 9, Section 16-9-2 currently provides a death benefit of $4,900.00.

56

1. MEMBERSHIP

Mandatory for regular employees.

2. CONTRIBUTIONS

By the City - $20.70 per year per employee. By the employee - 25¢ per week or $13.00 per year.

B. Payment for employees killed or permanently disabled in line of duty:

1. A lump sum duty death benefit of $10,000 will be paid to the beneficiaries or estate of employees who are killed or who die as a direct result of injuries sustained in the actual performance of their duties in accordance with the City Council resolution of March 26, 1974, p. 627, and March 2, 1954, p. 509.

2. A lump sum payment of $10,000 will be made to any employee who is totally and permanently disabled from illness or injury arising solely out of the actual performance of their duties. "totally and permanently disabled" shall be defined exclusively as follows:

a. Total and permanent loss of sight of both eyes.

b. Loss of both legs or both feet at/or above the ankle.

c. Loss of both arms or both hands at/or above the wrist.

d. Loss of any two of the members or facilities enumerated in (a), (b), (c).

e. Permanent and complete paralysis of both legs or both arms or one leg and one arm.

57

## 53. RESIDENCY

All members of the bargaining unit shall be residents of the City of Detroit except as provided by action of the Civil Service Commission in accordance with the authority provided by Ordinance. Employees working and residing in areas which are approved by the Civil Service Commission shall be construed as residents in the event of a reduction in force.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this 26th day of August, 1977.

MICHIGAN DISTRICT COUNCIL 77, and the Local Unions listed below of the American Federation of State, County and Municipal Employees, AFL-CIO

Lloyd Simpson
President/Director

LOCAL #23

Alonzo Wilkins
LOCAL #26

LOCAL #82

LOCAL #207

Little P. Gary
LOCAL #312

Tom Biondo
LOCAL #329

LOCAL #312

CITY OF DETROIT

Coleman A. Young, Mayor
City of Detroit

Mark R. Olleny, Acting Director
Labor Relations Division

Denise Lewis
Denise Lewis, Director
Personnel Department

Roger E. Craig
Law Department

Paul Thompson
Finance Department

APPROVED AND CONFIRMED BY
THE CITY COUNCIL  AUG 31 1977
Michael W. Kenin
DEPUTY CITY CLERK
MICHAEL M. KENIN   SEP 16 1977

A.F.S.C.M.E. LOCAL UNIONS - Continuation

Lloyd Edwards
LOCAL #457

Willie Jackson
LOCAL #542

LOCAL #836

LOCAL #875

Samantha Myrick
LOCAL #1023

LOCAL #1210

Harold L. Treabit
LOCAL #1227

LOCAL #1642

LOCAL #1517

Edward A. Matley Jr.
LOCAL #2799

Charles Smith
LOCAL #2920

74

75

# EXHIBIT 2

# MASTER AGREEMENT

Between the

# CITY OF DETROIT

and

# MICHIGAN COUNCIL 25 *

OF THE AMERICAN FEDERATION OF STATE
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO

1980-1983

Emergency assignments shall be construed to be those assignments which are necessitated by factors beyond the control of management which cannot be anticipated or planned for in the normal course of departmental operations.

When an emergency requires an employee to be so temporarily assigned, for four (4) hours or more because of insufficient available employees who have been pre-qualified in appropriate classifications, a provisional status change will be immediately processed so that each employee so assigned will be compensated in the proper classification for the day or the duration of the emergency.

## 35. JURY DUTY

A. An employee who serves on jury duty will be paid the difference between his pay for jury duty and his regular pay for all days he is required to serve on jury duty.

B. In the event that an employee reports for jury duty but does not actually serve on a jury, he will be paid the difference between the jury pay received and his regular days pay and be excused for the day.

C. In order to receive payment for jury duty supplementation, an employee must have been regularly scheduled to work on a non-overtime basis, must give reasonably prompt prior notice to his supervisor that he has been summoned for jury duty, and must furnish satisfactory evidence that he reported for or performed jury duty on the days for which he claims such payment, provided that the department head shall have discretion in seeking to have the employee excused where his services are essential. The provisions of this section are not applicable to an employee, who, without being summoned, volunteers for jury duty.

The jury duty supplementation shall not apply to special service, contractual, temporary or other employees with less than one year of seniority.

58

D. When properly notified by an employee under the terms of Section C, the department shall, if necessary, reschedule the work assignment of the employee so as to coincide as closely as possible with the jury duty schedule. This reassignment shall take precedence over other conflicting sections of this contract (except Article 7-F).

E. Employees shall have the option when called to jury duty to use vacation or compensatory time for such service. In that event, the employee will not be required to turn in his jury pay. However, the employee must notify the department of his desire to exercise this option prior to the first date of jury service.

F. Jury Duty shall be considered as time worked.

G. An employee on Jury Duty will be continued on the payroll and be paid at his straight time hourly rate of his normally scheduled hours of work. Upon return from jury duty, the employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an employee fails to turn in his jury duty payment, the City will hold subsequent payments due to the employee until the City is reimbursed for all time lost due to the alleged jury duty service.

## 36. HOSPITALIZATION, MEDICAL INSURANCE, DENTAL INSURANCE AND OPTICAL CARE

A. The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar ($2.00), deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal

59

dependents, as provided by Chapter 16, Article 9 of the Municipal Code of the City of Detroit.

B. Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. The City's contribution ot the alternative plans shall be limited to the premium cost for Blue Cross/Blue Shield ward service rates, excluding dental insurance. Total Health Alliance Plan shall comprise the list of alternative hospitalization plans. If at the end of any fiscal year an alternative hospitalization plan has failed to enroll 5% of the bargaining unit employees the City shall have the option of removing that plan from the list of eligible carriers.

C. The City will pay the premium for regular retirees and their spouses for hospitalization and medical insurance based on the blue Cross/blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension form the City.

D. Effective July 1, 1981, the City shall improve its Blue Cross hospitalization plan for active employees and their dependents by providing Blue Cross Master Medical insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50.00) per person annual deductible ($100.00) for two or more in a family).

E. Effective July 1, 1980, the City shall provide for all active employees and their dependents a Dental Plan which shall be the Blue Cross/Blue Shield program which provides Class I benefit on a 25% co-pay basis and Class II and III benefits on a 50% co-pay basis. Classes I, II, and III benefits shall not exceed $1,000

per person per year. In addition, Orthodontic coverage shall be on a 50% co-pay basis with a $1,000 life time maximum. Employees hired on or after the date this Agreement is signed shall not be eligible for these benefits until they shall have worked 1,040 straight time hours.

Other terms and conditions regarding these plans shall be in accordance with the standard Blue Cross/Blue shield policies regarding administration of such programs.

F. The City will provide Optical Care Insurance through the employee Benefit Board and such benefit will include case hardened lenses. The City will continue to provide optical care through the present carrier, through the Employee Benefit Board.

G. If, during the term of this Agreement, a Federal Health Security Act is enacted, the City of Detroit will pay during the term of the Agreement any premium, taxes or contributions employees may be required to pay under a Federal Health Security Act that are specifically earmarked or designated for the purpose of the Federal Program.

## 37. WORKER'S COMPENSATION

All employees shall be covered by the applicable Worker's compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of city employment shall be continued on the payroll and his time shall be charged to sick leave reserve; provided that in the absence of any sick leave reserves he shall be paid regular wages or salary to the extent of two-thirds of his daily wage or salary but for a period not to exceed seven days; provided, also, that where the employee has a sick leave reserve and receives income under the Worker's Compensation Act, such income shall be supplemented by the City with an amount sufficient to

60

61

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this ___*1st*___ day of ___Dec___, 1980.

A.F.S.C.M.E. LOCAL UNIONS · Continuation

78

79

# EXHIBIT 3

# MASTER AGREEMENT

Between the

# CITY OF DETROIT

and

# MICHIGAN COUNCIL 25 *

OF THE AMERICAN FEDERATION OF STATE
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO

**1983-1986**

position.

H. Health and Safety issues arising from out-of-class assignments shall be handled in accordance with procedures set forth in Article 13 - Health and Safety.

## 33. JURY DUTY

A. An employee who serves on jury duty will be paid the difference between his/her pay for jury duty and his/her regular pay for all days he/she is required to serve on jury duty.

B. In the event that an employee reports for jury duty but does not actually serve on a jury, he/she will be paid the difference between the jury pay received and his/her regular days pay and be excused for the day.

C. In order to receive payment for jury duty supplementation, an employee must have been regularly scheduled to work on a non-overtime basis, must give reasonably prompt prior notice to his/her supervisor that he/she has been summoned for jury duty, and must furnish satisfactory evidence that he/she reported for or performed jury duty on the days for which he/she claims such payment, provided that the department head shall have discretion in seeking to have the employee excused where his/her services are essential. The provisions of this section are not applicable to an employee, who, without being summoned, volunteers for jury duty.

The jury duty supplementation shall not apply to special service, contractual, temporary or other employees with less than one year of seniority.

D. When properly notified by an employee under the terms of Section C, the department shall, if necessary, reschedule the work assignment of the employee so as to coincide as closely as possible with the jury duty schedule. This reassignment shall take precedence over other conflicting sections of this contract (except Article 7-F).

E. Employees shall have the option when called to jury duty to use vacation or compensatory time for such service. In that event, the employee will not be required to turn in his/her jury pay. However, the employee must notify the department of his/her desire to exercise this option prior to the first date of jury service.

F. Jury Duty shall be considered as time worked.

G. An employee on Jury Duty will be continued on the payroll and be paid at his/her straight time hourly rate for his/her normally scheduled hours of work. Upon return from jury duty, the employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an employee fails to turn in his/her jury duty payment, the City will hold subsequent payments due to the employee until the City is reimbursed for all time lost due to the alleged jury duty service.

## 34. HOSPITALIZATION, MEDICAL INSURANCE, DENTAL INSURANCE AND OPTICAL CARE

A. Not later than January 1, 1984, for active employees and employees who retire on or after January 1, 1984, coverage shall be as described in the Memorandum of Understanding re: Health Care Cost Containment and Exhibit III.

B. The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar

82

83

($2.00), deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal dependents, as provided by Chapter 16, Article 9 of the Municipal Code of the City of Detroit.

C. Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. The City's contribution to the alternative plans shall be limited to the premium cost for Blue Cross/Blue Shield ward service rates, excluding dental insurance. Total Health Care, Michigan Health Maintenance Organization and Health Alliance Plan shall comprise the list of alternative hospitalization plans. If at the end of any fiscal year an alternative hospitalization plan has failed to enroll 5% of the bargaining unit employees, the City shall have the option of removing that plan from the list of eligible carriers.

D. The City will pay the premium for regular retirees and their spouses for hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

E. The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50.00) per person annual deductible ($100.00 for two or more in a family).

84

F. The City shall provide for all active employees and their dependents a Dental Plan which shall be the Blue Cross/Blue Shield program which provides Class I benefit on a 25% co-pay basis and Class II and III benefits on a 50% co-pay basis. Classes I, II, and III benefits shall not exceed $1,000 per person per year. In addition, Orthodontic coverage shall be on a 50% co-pay basis with a $1,000 life time maximum. Employees hired on or after the date this Agreement is signed shall not be eligible for these benefits until they shall have worked 1,040 straight time hours.

Other terms and conditions regarding these plans shall be in accordance with the standard Blue Cross/Blue Shield policies regarding administration of such programs.

G. The City will provide Optical Care Insurance through the Employee Benefit Board and such benefit will include case hardened lenses.

H. If, during the term of this Agreement, a Federal Health Security Act is enacted, the City of Detroit will pay during the term of the Agreement any premium, taxes or contributions employees may be required to pay under a Federal Health Security Act that are specifically earmarked or designated for the purpose of the Federal Program.

I. Effective November 1, 1983 employees who wish to insure sponsored dependents shall pay the premium cost of this coverage. Also, effective November 1, 1983 the City will pay the health insurance premium for dependents who are 19 to 25 years of age for only as long as they are regularly attending an accredited vocational school, college or university and are dependent upon the employee for support and maintenance and were reported as such on the employee's most recent federal income tax return. Employees at their own expense may provide

85

coverage for these dependents through a payroll deduction.

### 35. WORKER'S COMPENSATION

A. All employees shall be covered by the applicable Worker's Compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of city employment shall be continued on the payroll and his/her time shall be charged to his/her sick leave reserve for all days not covered by Worker's Compensation payments; provided that in the absence of any sick leave reserve he/she shall be paid regular wages or salary to the extent of two-thirds of his/her daily wage or salary but for a period not to exceed seven (7) days; provided, also; that where the employee has a sick leave reserve and receives income under the Worker's Compensation Act, such income shall be supplemented by the City with an amount sufficient to maintain his/her regular salary or wage for a period not to exceed that of his/her sick leave reserve, and such reserve shall be charged for all sick leave days or portions thereof paid to such employee.

B. For employees who receive Worker's Compensation after November 1, 1983 and where the employee has a sick leave reserve and receives income under the Worker's Compensation Act, such income shall be supplemented by the City from his/her sick leave banks in an amount sufficient to bring it up to ninety-five percent (95%) of his/her weekly take-home pay. For the purposes of this article, take-home pay is defined as gross pay from the City less Social Security deductions, and less Federal, State and City income tax withholding amounts based on the employee's actual number of dependents. Employees shall be eligible to earn current sick leave.

86

C. Employees shall not be eligible for holiday pay nor earn additional vacation or reserve sick leave when they are being paid Worker's Compensation benefits.

D. The City and the Union agree to establish a Worker's Compensation Cost Containment Committee made up of an equal number of members from the City and from the Union. The purpose of the committee will be to review changes in the Worker's Compensation laws and any legal ruling and interpretations regarding them, to explore methods of addressing Worker's Compensation problems, and to examine the feasibility of re-employing injured workers in other available vacancies.

### 36. DEATH BENEFITS AND LIFE INSURANCE

A. DEATH BENEFITS

Death benefits for all regular City employees are authorized by the City Charter, Title IX, Chapter VIII. The City Code, Chapter 16, Article 9, Section 16-9-2 currently provides a death benefit of $4,900.00.

1. MEMBERSHIP
   Mandatory for regular employees.

2. CONTRIBUTIONS
   By the City — $13.30 per year per employee.
   By the employee 20¢ per week or $10.40 per year.

   In the event the above contributions are not sufficient to adequately fund this benefit, the level of benefit shall be adjusted to reflect the deficiency.

B. Payment for employees killed or permanently disabled in line of duty:

1. A lump sum duty death benefit of $10,000 will

87

commence thirty (30) days after that date.

In the event that the City and the Union fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 1986, the Agreement will remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) day written notice on or after June 20, 1986.

The parties agree that this sole and complete Agreement is intended to cover all matters affecting wages, hours, and other terms and conditions of employment and that, during the term of this Agreement, neither the City nor the Union will be required to negotiate on any further matters affecting these or any other subjects not specifically set forth in this Agreement, except by mutual agreement of the parties hereto.

IN WITNESSES WHEREOF, the parties hereto have executed this Agreement on this 11th day of November, 1983.

MICHIGAN COUNCIL 25, and
the Local Unions Listed Below of the
American Federation of State, County
and Municipal Employees, AFL-CIO:

CITY OF DETROIT:

Henry Muelner, Executive
Vice-President, AFSCME,
Council #25, AFL-CIO

COLEMAN A. YOUNG, Mayor
City of Detroit

Local 23

Floyd E. Allen, Director
Labor Relations Division

Local 26

Joyce Garrett, Director
Personnel Department

Local 62

Donald Pailen
Law Department

Local 207

Bella Marshall
Finance Department

Local 214

Local 229

106

107

A.F.S.C.M.E. LOCAL UNIONS — Continuation

Local 312 _____

Local 457 _____

*Edward Ann McNeil*
Local 542

*Elliot R. Schose*
Local 836

*Rose Mary Lucas*
Local 1023

*William J. Stinson*
Local 1220

Local 1227 _____

*Ben John*
Local 1642

*Charles Smith*
Local 2920

*Judith Kay Gray*
Local 2799

108

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF DETROIT
AND
MICHIGAN COUNCIL 25, AMERICAN
FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES, AFL-CIO

Re: Contractual Work — Pilot Program

The City and Council #25, AFSCME agree to institute a pilot program at the City's Department of Transportation to analyze the cost effectiveness of using outside contractors and to strive to maintain work in-house. A Joint Labor-Management Committee, consisting of three persons appointed by the City and three persons appointed by the Union shall be established whose objective will be to develop a system that measures in-house costs for specific repair jobs and compares those costs with the costs of having those jobs performed by outside contractors. This committee will then launch pilot projects whose objectives are to perform specified repair tasks at or below the cost of having the work done by contractors. The intended effect of this system is conserving City jobs and City funds.

Subsequent to negotiations, the parties will meet with representatives of the Water and Sewerage Department to discuss the feasibility of adopting this type of plan in that Department.

DATED THIS ___28___ DAY OF ___November___, 1983.

*Henry Mueller*
Henry Mueller, Exec. Vice-President
AFSCME, Council #25, AFL-CIO

*Floyd E Allen*
Floyd E. Allen, Director
Labor Relations Division

109

is allowed for servicing and repairing his automobile is to be determined in supplemental agreements.

6. When an employee covered by this Agreement is regularly assigned to a job which requires the use of an automobile during his normal working hours, he shall be required to furnish said car.

7. In order to receive mileage reimbursement an employee must actually use an automobile on City business.

8. The City and the Union agree to establish a joint committee consisting of three (3) members from the Union and three (3) members of Management to review the feasibility of establishing car pools which would reduce the City's cost for private car mileage.

DATED THIS _____28_____ DAY OF _November_ , 1983.

_Henry Mueller_
Henry Mueller, Exec.-President
AFSCME, Council #25, AFL-CIO

_Floyd E Allen_
Floyd E. Allen, Director
Labor Relations Division

130

---

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF DETROIT
AND
MICHIGAN COUNCIL 25, AMERICAN
FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES, AFL-CIO

Re: Sickness and Accident and Long Term
Disability Insurance

The City reserves the right to offer a Sickness and Accident and Long Term Disability Insurance Program as a substitute for the current Sick Leave program during the term of the Agreement. The Union shall have the right to accept the program or remain in the current program.

DATED THIS _____28_____ DAY OF _November_ , 1983.

_Henry Mueller_
Henry Mueller, Exec. Vice-President
AFSCME, Council #25, AFL-CIO

_Floyd E Allen_
Floyd E. Allen, Director
Labor Relations Division

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF DETROIT
AND
MICHIGAN COUNCIL 25, AMERICAN
FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES, AFL-CIO

Re: Health Care Cost Containment

The City and the Union both recognize that the cost of health care is spiraling out of control. The structure of the

131

traditional health care system assures continued growth and guarantees that most of the growth will be inflationary and not real. It further assures that cost increases will not result in better health care. Until now the operation of the health care system has been left to the physicians, hospitals and the cost reimbursers. There has been nothing to encourage the assumption of personal responsibility over one's health. The parties agree that it is their responsibility to find and implement ways to control health care costs. To this end, the parties agree that the most effective way to control health care costs is to limit the choice of hospitals, out-patient laboratories, providers of prescription drugs and other medical services to those who deliver quality care at reasonable prices. In order to achieve this goal the parties agree to implement the following plan, in lieu of Article 36, not later than January 1, 1984.

A.  The parties agree to create a Health Care Cost Containment Committee made up of an equal number of members from the City and from the Union. The committee will agree on securing the services of a health care consultant or administrator to assist the committee in designing and implementing a health care cost containment program. This committee shall review and agree to a health care cost containment plan which will cover active AFSCME employees and future retirees and will be implemented by the City no later than January 1, 1984. The plan will provide for quality health care and will limit the fees of physicians, hospitals, laboratories and druggists to those that charge reasonable fees including approved H.M.O.'s, health care networks and preferred drug providers. Further cost containment alternatives such as preferred providers, generic mail order drugs, a maintenance drug program, restrictive weekend admission rules, preadmission certification for elective surgery, second opinions, ambulatory surgery,

132

control of out-patient psychiatric care, birthing centers, hospice care coverage other than hospitals, patient incentive audit of hospital bills, worksite blood pressure tests, and employee health care education programs will be reviewed and implemented by the committee. No insurance carrier shall be allowed to underwrite City Health Care insurance unless they offer coordination of benefits. Any savings realized from this effort will be disposed of in accordance with paragraph B.

B.  The Committee will review the costs of this program, on an annual basis, and will report to the Union and the City the amount of savings which the plan has generated. The accounting will be performed by a CPA mutually agreed upon by the parties if so desired to assure accuracy. A similar review and report will be made thereafter on an annual basis. The City and the Union agree that savings associated with this program will be shared equally by the employer and active AFSCME employees. The percentage of savings to be credited to the AFSCME bargaining unit employees shall be equal to one-half of the percentage of the difference in cost per employee of active and future retirees of AFSCME in the general City hospitalization plan during the 1982-83 fiscal year versus the same base and equivalent accounting period in subsequent years. The general City hospitalization plan includes all active AFSCME employees and future retirees including those at the Department of Transportation and civilian employees of the Police and Fire Departments. Distribution of the savings attributed to the employees will be used as a bonus.

C.  In the event that the January 1 - June 30, 1984 premium cost exceeds the 1982-83 base year cost, the City will pay up to 50% over the 1982-83 base year costs.

133

In the event that the July 1, 1984 – June 30, 1985 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost.

In the event that the July 1, 1985 – June 30, 1986 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost.

D. Effective July 1, 1983, the health care coverage premium for sponsored dependents must be borne by the employee.

E. No later than January 1, 1984 the City will also implement a cost containment dental and optical insurance program. The City and the Union agree that savings associated with this program will be shared equally by the employer and employees in accordance with the formula shown in paragraph B.

DATED THIS  28  DAY OF  November ,1983.

Henry Mueller
Henry Mueller, Exec. Vice-President
AFSCME, Council #25, AFL-CIO

Floyd E. Allen
Floyd E. Allen, Director
Labor Relations Division

134

---

Personnel Department
Labor Relations Division
304 City-County Building
Detroit, Michigan 48226
(313) 224-3860

Coleman A. Young, Mayor
City of Detroit

October 20, 1983

Mr. Henry Mueller
Executive Vice President
Michigan Council #25
AFSCME - AFL-CIO
16861 Wyoming Avenue
Detroit, Michigan 48221

Re: Defense and Indemnification of Employees
Against Damage Suits and Claims

Dear Mr. Mueller:

This letter is intended as a statement of current City policy which is set forth in Chapter 16, Article 13 of the Detroit City Code.

Sec. 16-13-1. DEFINITIONS

For the purpose of this article, the following definitions shall apply:

Employees Such term shall include, in addition to appointees as defined in the charter and all employees on the City payroll, including all physicians and dentists employed on a salaried or contractual basis by the health department, retired employees or appointive officers, and all physicians and dentists whether volunteers, staff, intern, resident or special duty, whether or not in city payrolls, assigned to patient care duties in Detroit General

135

## EXHIBIT II (page 15)

| CLASS | EARNINGS MINIMUM | MAXIMUM |
|---|---|---|

## EXHIBIT II (page 17)

| CLASS CODE | TITLE | EARNINGS MINIMUM | MAXIMUM |
|---|---|---|---|
| 73-54-38 | Water Plant Operator | $22,230 | $23,027 |
| 73-54-01 | Water Plant Operator Apprentice | $7,290 | $9,990 |
| 61-70-25 | Water Serviceman - Interim | $7,710 | $8,615 |
| 61-70-11 | Water System Helper - Interim | $7,710 | $8,615 |
| 61-70-32 | Water System Maintenance Man - Interim | $8,020 | $9,070 |
| 71-90-40 | Water Systems Control Instrument Technician | $13,120 | $13,120 |
| 71-90-03 | Water Systems Control Instrument Technician Apprentice | $ 8,545 | $12,470 |
| 74-70-41 | Water Systems Control Operator | $23,747 | $28,067 |
| 71-90-28 | Water Systems Equipment Mechanic | $ 8,675 | $ 9,825 |
| 61-75-06 | Water Systems Helper | $ 7,710 | $ 8,615 |
| 61-72-21 | Water Systems Investigator | $ 8,650 | $ 9,900 |
| 25-20-13 | Water Systems Laboratory Aid | $ 7,740 | $ 8,695 |
| 61-75-31 | Water Systems Mechanic | $ 8,180 | $ 9,260 |
| 61-75-21 | Water Systems Repair Worker | $ 7,975 | $ 8,930 |
| 61-75-11 | Water Systems Worker | $ 7,875 | $ 8,870 |
| 63-10-27 | Window Cleaner | $ 7,875 | $ 8,815 |
| 09-20-33 | Worker's Compensation Adjuster | $18,282 | $21,932 |
| 24-35-11 | X-Ray Technician | $17,183 | $19,940 |
| 53-55-21 | Zookeeper | $ 8,050 | $ 9,120 |
| 53-40-21 | Zoological Parks Landscaper | $ 8,625 | $ 9,690 |

194

EXHIBIT III

CITY OF DETROIT
A.F.S.C.M.E.
MICHIGAN COUNCIL 25, NON-SUPERVISORY
BARGAINING UNIT

### Re: HEALTH CARE PLAN

### INTRODUCTION

The following is a description of the City of Detroit's Basic Health Care Plan for employees and retirees. They may choose to elect coverage under this plan or they may choose alternative coverage through one of the Health Maintenance Organizations offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to the amount the City pay for the Basic Plan.

The basic plan described herein will give the member coverages which are nearly the same as they currently enjoy. It does, however, include several cost containment features not found in our current program which will control costs of hospitalization and other medical services. Furthermore, the joint union/management health cost containment committee will be studying additional cost containment programs which shall include prescreening and employee awareness programs during the term of the agreement and will implement them if they fulfill our object of quality health care at reasonable prices. In the event that different optical, dental or prescription drug programs are less costly than the current ones used, they may be adopted in lieu of them.

### ELIGIBILITY

Persons eligible for health care coverage:

1. The employee:
2. The employee's dependents as explained below:

195



children, legal adoption, or legal guardianship (while a dependent of the subscriber), and children of the subscriber's spouse (while a dependent of the subscriber). These children are covered from birth to the end of the calendar year in which they attain 19 years of age. This limit shall be extended one more year for those children still in high school.

Unmarried, dependent children who are incapable of self-support because of a permanent mental or physical disability are eligible for coverage. An application card, which contains a "physician's certification of disability", must be submitted before December 31st of the year in which the dependent becomes 19 years of age.

Eligible nineteen-year-old dependents continue to be covered until the end of the calendar year in which they attain 25 years of age as long as they are unmarried and are regularly attending an accredited vocational school, college or university on a full-time basis and are dependent upon the Employee for support and maintenance and were reported as such on the employees most recent federal income tax return. There will be no additional charges for this coverage when they are under an employee contract.

In order to continue coverage for dependent children in this category, the employee must recertify eligibility each school year.

Dependents over the age of 19 through the calendar year they reach their 25th year of age, not attending an accredited college or university may be carried at the employee's expense on a family continuation rider.

196

# SECTION I

## BASIC HOSPITALIZATION

### Hospital Charges

The City's hospital benefits include the following:

— The cost (ward room and board rates) for 365 days for treatment of general conditions. (Employees may elect semi-private coverage at their own expense)

— Renewal: Full benefits are restored after a consecutive period of 60 days has elapsed since the date of last discharge from a hospital.

— The cost of ward room and board for treatment of mental and nervous disorders is limited to forty-five (45) days. The full cost of ward room and board at a general hospital for treatment of substance abuse (alcohol and drug related) disorders is limited to five days. Up to forty days of in-patient rehabilitation treatment shall be covered in a free standing facility that specializes in this type of treatment and is preapproved by the plan. (If a member is admitted directly into non-hospital based facility, the maximum number of days will be 45).

— Renewal: In order to re-establish hospital benefits for a nervous or mental disorder, there must be a period of non-confinement equal to at least 60 consecutive days. See master medical section for additional benefits.

### Maternity Benefits

(applies to members of the plan)

Ward hospital room and board charges or birthing center charges and charges for other hospital services resulting from pregnancy, childbirth or miscarriage are covered in accordance with the Plan. The plan shall include an incentive for members who elect to shorten their hospital confinement for maternity purposes or use of birthing

197



centers. The incentive shall be based on the standard number of days allowed for in patient maternity confinement in the hospital admission precertification program. In the event that birthing centers are less expensive than inpatient hospital confinement, an incentive plan will be developed to encourage the use of them.

### Other Hospital Services

The Plan will pay the full cost of the items shown below when furnished by a hospital or its hospital staff and prescribed by your doctor:

— general nursing service
— special diets
— operating, delivery and treatment rooms and equipment
— anesthesia
— Laboratory examinations
— physical therapy and oxygen or other gas therapy
— drugs and medicines
— supplies for dressings and plaster casts
— use of radium (when owned or rented by the hospital)
— routine nursery care for newborn children
— non-routine hospital care for newborn children

### Emergency Services

The Plan will pay all charges in connection with emergency room treatment on non-occupational ''accidental injuries'' and life threatening ''medical emergencies''.

### Pre-Admission Certification

A Hospital Pre-Admission form MUST be completed and returned to the Plan for approval before the Plan will approve any elective non-emergency hospital admission. In order to receive hospital benefits paid for by the plan, inpatient non-emergency admissions MUST be prior authorized by the Plan. An appeal process for the physician and member shall be a part of this plan.

198

Hospital Pre-Admission Forms will be available from the providers, physicians, the Plan Offices, and the employer and must be submitted to the Plan before the proposed hospital admission.

An employee's doctor will complete the form and submit it to the Plan. Both the employee and his/her doctor will receive notification regarding whether or not the admission has been approved.

In cases of emergency admittance to a hospital which shall include emergency admittance for alcohol and drug abuse, the hospital must notify the Plan Administrator within twenty-four hours and the Administrator will certify the number of days allowable based upon the information submitted. If the attending physician requires a member to remain in the hospital for longer than the pre-certified amount of time, they may obtain approval from the Plan administrator for additional days. Unless specifically approved, the Plan will not pay for any days spent in a hospital beyone those approved by the pre-certification.

The Plan will only certify weekend admissions when surgery will be performed on a weekend or based on other medical necessities. Weekend admissions shall be defined as any admission on Friday and Saturday.

### Ambulatory Procedures Requirements

All medical surgical procedures on the attached list must be performed on an ambulatory basis unless precertified by the Plan.

(See Attached)

### Extended Care Facilities

If an employee or an eligible dependent are transferred to an extended care facility immediately following a home or hospital confinement (home health care status shall be considered as hospital confinement for purposes of this

199



section), the Plan will pay the full cost of room and board and other medical services. Pre-certification is required.

Extended care facility benefits are limited to a maximum of 730 days and are reduced by two (2) times the number of days spent in a hospital for the same condition.

## Home Health Care and Hospice Care Benefits

The Plan covers charges for the following home health care services:

1. Professional nursing care
2. Physical therapy
3. Speech therapy
4. Home health aide services.
5. Expenses for equipment or materials used for home health care treatment (e.g., surgical dressings, oxygen, gauze, cotton, etc.).

(Three (3) home health care visits are equivalent to one (1) day of hospital care.)

Home Hospice care is designed specifically for treatment of the terminally ill. Medical care concentrates on pain management and professional counselling for both patients and their families.

All home hospice services must be prior authorized (refer to the section entitled Pre-Admission Approval). Once approved, the Plan pays the full cost of hospice care including nursing and other required medical services up to the Plan limit.

## Billing Audits

Employees are encouraged to review their hospital and doctor bills for accuracy. The health care committee will agree on a remuneration "finders fee" for significant discrepancies discovered.

200

## SECTION II
## MEDICAL SURGICAL BENEFITS

### Surgical Expense Benefits

If an employee or one of their eligible dependents must undergo surgery as the result of a non-occupational injury or illness, the Plan will pay in full for all surgical procedures performed by a surgeon who has agreed to reasonable and customary charges established by the plan.

### Second Surgical Opinion

Mandatory second surgical opinions will be in accordance with the attached list of procedures (Does not apply to emergencies).

For all other procedures:

If a doctor has recommended elective (non-emergency) surgery an employee may seek a second medical opinion before consenting to the surgery.

When employee seeks a second opinion the employee is required to obtain any x-rays or test results from the first physician and have them reviewed by second physician to avoid duplication of tests.

The Plan covers doctor's reasonable and customary fees associated with a second surgical opinion.

In addition to payment for doctor's charges, the Plan will also cover the cost of diagnostic laboratory and x-ray services performed in conjunction with the second surgical opinion.

If a member receives conflicting medical opinions regarding the need for a surgical procedure, the employee will make the final decision about whether or not to have the surgery. If the employee does decide to have the surgery, the Plan will provide surgical benefits.

201



**Maternity Benefits**

(applies to members of the plan)

Charges for outpatient care by member's doctor are eligible expenses under the Plan.

**X-Ray and Laboratory Services**

If a member of the plan has x-ray and/or laboratory services related to a non-occupational illness or accident in a non-hospital setting, the charges are covered in full.

**Mental and Nervous Disorders**

Treatment for substance abuse, psychiatric and nervous disorders shall be limited to $400 per member per calendar year for out-patient services.

Other Items Covered by the Plan:

Physician's Services

- Medical Care of In-patients
  — Hospital
  — Convalescent Care Facility
  — Psych. Day/Night Care Hospital
  — Residential SAT program
- Surg.; Anesthesia; Surg. Asst.

- Consultations
  — In-patient

- Maternity Care
  — Pre & Post Natal Visits
  — Delivery
  — Examination of Newborn

- Emergency Care
  — Injuries; Medical Conditions

202

- Psychiatric Care
  — In-patient
  — Out-patient $400

- Chemotherapy

- Therapeutic Radiology

- Diagnostic Radiology

- Diagnostic Lab & Pathology

- Other Diagnostic Svsc.
  — EKG: EEG: etc.

**Items Not Covered By Hospital-Medical-Surgical Benefits:**

The Plan does not cover the following types of disabilities, expenses or care:

1. Dental care except for extractions or removal of unerupted teeth under general anesthesia when a concurrent hazardous medical condition exists:

2. Cosmetic surgery; except for the correction of birth defects, accidental injuries or traumatic scars, or reconstructive surgery to correct deformities resulting from specified diseases or medically necessary surgery;

3. Hospital admissions that are not medically necessary, such as admissions that are principally for diagnostic evaluation, or physical therapy, or reduction of weight by diet control.

4. Custodial care or domiciliary care which does not require definitive medical or nursing services for an illness or injury. .

5. Care for occupational injury or disease or care obtainable without cost from government agencies or

203

through the facilities of the employer.

6. Routine physical, premarital or pre-employment examinations.

7. Items such as blood, durable medical equipment, prosthetic and other appliances, and ambulance service unless specifically mentioned as being covered in this proposal.

## SECTION III
## MASTER MEDICAL EXPENSE BENEFITS

The City's coverage for major medical benefit shall be 80% of the usual and customary fees for out-patient services provided by the plan after the employer pays for the first $50.00 of cost per person or $100.00 per family per year. After an employee has out of pocket lost over $1,000 in any calendar year, 100% of the eligible expenses are covered. The life-time maximum benefit is $1,000,000.

1. A list of non-hospital based clinics which will provide non-emergency — 24-hour medical services will be established. Employees should use these facilities for non-life threatening medical emergencies.

2. Out-patient treatment for substance abuse, psychiatric and nervous disorders shall be limited to 50% of reasonable fees with an annual limit of $2,000 per year and a life-time limit of $5,000. (This is in addition to the basic benefit.). The Plan's maximum is $15,000 for one year and $30,000 for two or more years for combined in-patient and out-patient psychiatric services.

### Ambulance

If a member of the plan is transported to a medical facility due to an accidental injury or medical emergency or if they or their eligible dependents are transferred from one medical facility to another at their doctor's recommendation, the Plan will pay for such ambulance service under the Master Medical Benefit.

### Items Not Covered by Major Medical:

The Plan does not cover the following types of expenses, disabilities or care:

* Extended Benefits are not available for pulmonary tuberculosis or mental disorders.

* Routine dental care such as fillings, extractions, bridgework, braces, root canals and impacted wisdom teeth.

* Eyeglasses, routine eye examinations, eye refractions, hearing aids and the fitting of hearing aids or eyeglasses.

* Routine physical examinations and related tests.

* Cost of transportation that exceeds ambulance benefit level.

* Personal comfort items while hospitalized, including but not limited to, television and telephone.

* The portion of room charges which exceeds the hospital's ward rate.

* Surgical procedure, treatment or hospital confinement primarily for beautification.

* Expenses for work-related injuries or disabilities (these are covered by Worker's Compensation).

* Expenses for care of injuries or sickness due to war or war-related acts.

* Any treatment or service not prescribed by a physician.

* Screening or other procedures not necessary for diagnosis and generally accepted therapy.

* Any surgery or medical care or service furnished by

204

205

any facility contracted for or operated by the United States Government or by any other governmental unit for medical care or treatment unless a charge is made which the insured is legally required to pay.

- Expenses for the treatment of nervous, mental, or substance abuse disorders that exceed the basic benefit level.

- Any fees that exceed the reasonable and customary fee determination.

- Purchase of wheel chair, hospital bed, artificial respirator, other durable medical equipment.

- Care in convalescent or nursing homes.

## SECTION IV
## PRESCRIPTION DRUG PLAN

A. Coverage — The prescription drug benefit covers the cost of most prescription drugs after the employee pays a $2.00 deductible.

B. A list of preferred providers for prescription drugs which an employee must use to obtain the full benefit will be established.

C. Covered Drugs:
1. Federal Legend Drugs
2. State Restricted Drugs
3. Compounded Medication
4. Insulin

D. The plan will require a pharmacy to use generic drugs, if available, unless specifically directed by the prescribing physician based on medical necessity not to do so. (An alternative would be the Blue Cross/Blue Shield M.A.C. program which is attached).

E. The Plan may seek an administrator for prescription

206

drug coverage which may be different from the administrator of the hospital — medical — surgical plan.

F. Members who are on specified maintenance drugs may purchase them from mail order pharmaceutical providers if agreed to by the Plan. Approved mail order wholesaler pharmaceutical providers will be established by the Plan.

Items Not Covered:

Certain items are not covered by the prescription drug program. Among these are:

- The charge for any take home drug.

- Any charge for a contraceptive medication, even if such medication is a prescription legend drug, and any charge for therapeutic devices or appliances, regardless of their intended use.

- Therapeutic devices or appliances (hypodermic needles, support garments and other non-medicinal substances).

- Drugs or medicines supplied to the covered individual by a prescribing physician or dentist.

- Cosmetic or beauty aids, dietary supplements and vitamins.

- Immunizing agents, injectables, blood or blood plasma or medication prescribed for parenteral administration, except insulin.

- Any drug labeled "Caution — Limited by Federal Law to Investigational Use" or any experimental drug.

- Any charge for administration of covered drugs.

- The charge for more than a 34-day supply of a covered drug except that benefits will be payable for 100 unit doses (e.g., tablet or capsule, etc.) of specified maintenance drugs unless provided by a mail order

207

pharmaceutical provider.

- The charge for any prescription order refill in excess of the number specified by a physician or dentist, or any refill dispensed after one year from the date of the original prescription order.

- The charge for any medication for which the employee or dependent is entitled to without charge from any municipal, State or Federal program of any sort whether contributory or not except Title XIX of Social Security Amendments of 1965 (Public Law 89-97; 89th Congress, First Session).

## SECTION V
## DENTAL CARE PLAN

A. A list of preferred providers who will provide services at established rates will be established. The employee will be required to make co-payments for certain services. If an employee does not use the preferred providers the plan will only pay the amount for services provided that the preferred providers have agreed to accept for that service. The preferred providers could include one or more capitation plans.

B. Coverages —

Class I benefits 75% of usual and customary fees.
Class II benefits 50% of usual and customary fees.
Class III benefits 50% of usual and customary fees.
Orthodontics — 50% of usual and customary fees not to exceed $1,000 maximum life benefit per person covered by the plan.
Annual maximum on Class I, II and III benefits is $1,000 per year.

C. Items not covered.

Dental benefits are not available for the following types of expenses or care:

208

- Treatment or supplies furnished on account of a dental defect which arises out of, or in the course of, any occupation for wage or profit;

- Any loss sustained as a result of declared or undeclared war, or any act thereof, or of military or naval service of any country;

- Dental procedures received from a dental department maintained by a mutual benefit association, labor union, trustee, or other similar group;

- Any expense for dental procedures or supplies to the extent that payment is received from any group policy or prepayment plan;

- Any treatment which is performed for cosmetic purposes;

- Treatment by other than a legally qualified dentist, except charges for dental prophylaxis performed by a licensed dental hygienist under the supervision and direction of a dentist, or licensed dental practitioner; or in connection with dentures, bridgework, crowns, or prosthetic devices for:

1. Expenses for prosthetic devices started prior to the effective date of coverage;

2. Expenses for replacement made less than five years after and immediately preceding placement or replacement which was covered by this Plan or the predecessor plan;

3. Expenses for extension of bridges or prosthetic devices previously paid for by the Plan except for expenses incurred for new extended areas;

4. Loss or theft
   - Temporary restorations, local anesthetics, and/or bases;
   - Expenses for root canal treatments and/or api-

209

coectomies when previously paid; these are pay-able only once per tooth;

- Orthodontic benefits are not available for the member and spouse or dependent children over age 19 (even if a full-time student).

D. Pre-Determination of Benefits (excludes capitation plans):

The following procedures will require pre-determination by the Plan:

1. Prosthodontics
   A. Inlays
   B. Onlays
   C. Crowns
   D. Space Maintainers
   E. Bridges
   F. Removable Full or Partial Dentures

2. Periodontics
   A. Subgingival Currettage
   B. Surgical Periodontics

3. Oral Surgery
   All oral surgical procedures with the exception of 4 or less simple extractions.

4. Othodontics
   All services.

## SECTION VI
## EYE CARE PLAN

Coverage — The Plan will pay for an eye examination and glasses once every two years. A list of preferred providers who will provide services at established rates will be established. The employee may be required to make co-payments for designer frames and contact lenses. If an employee does not use a preferred provider the Plan will only pay the amount for services provided that the pre-ferred providers have agreed to accept.

2t0

### Items Not Covered

Benefits are not payable for the following types of care or expense:

- Procedures or supplies furnished due to a visual defect which arises out of, or in the course of, any occupation for wage or profit;

- Vision care services resulting from declared or undeclared war, or any act thereof, or military or naval service of any country;

- Vision care services or supplies furnished by or at the direction of the United States Government or any agency thereof;

- Vision care services or supplies received from a medical department maintained by a mutual benefit associa-tion, labor union, trustee or other similar group;

- Vision care services or supplies which are payable or furnished by any other group policy or prepayment plan;

- Any medical or surgical treatment of the eye;

- Sunglasses, plain or prescription or safety lenses or goggles, tinting or photochromic lenses;

- Othoptics, vision training or aniseikonia;

- Repair of any kind;

- Loss or theft; and

- Vision expenses incurred by a dependent child after at-taining age 19.

## SECTION VII
## OTHER ITEMS

### Control Procedures

The plan will establish procedures to guard against misuse. This shall include the audit of claims to insure

211

their legitimacy and the collection of health care cards from terminating employees. Other control procedures may be instituted by the administrator.

### Employee Education Programs

The plan will develop a booklet which will describe the benefits and procedures to be followed in using the plan. They will continue to provide educational material to plan members which will help them to become more familiar with methods to contain health cost.

### Prescreening Programs

The plan will develop a prescreening program for employees to help them identify health problems before they become critical. The plan will develop a delivery system for the program which will be convenient for the members and also will guarantee the confidentiality of the program.

### Preferred Provider Hospitals

As soon as practical, the City will designate as "participating" those hospitals which have agreed to accept the City's Plan rate for coverage in non-life threatening emergencies. If an employee elects to enter a non-participating hospital, he/she will be required to pay for the difference in cost between the City's Plan rate and the rate charged by the non-participating hospital. For life threatening emergencies and for treatment which is not available at a participating hospital, the City will pay 100% of the usual and customary fees of any hospital.

212



# EXHIBIT 4



**MASTER AGREEMENT**

Between the

**CITY OF DETROIT**

and

**MICHIGAN COUNCIL 25**

OF THE AMERICAN FEDERATION OF STATE

COUNTY AND MUNICIPAL

EMPLOYEES, AFL-CIO

**1986 - 1989**

to his/her supervisor that he/she has been summoned for jury duty, and must furnish satisfactory evidence that he/she reported for or performed jury duty on the days for which he/she claims such payment, provided that the department head shall have discretion in seeking to have the employee excused where his/her services are essential. The provisions of this section are not applicable to an employee, who, without being summoned, volunteers for jury duty.

The jury duty supplementation shall not apply to special service, contractual, temporary or other employees with less than one year of seniority.

D. When properly notified by an employee under the terms of Section C, the department shall, if necessary, reschedule the work assignment of the employee so as to coincide as closely as possible with the jury duty schedule. This reassignment shall take precedence over other conflicting sections of this contract (except Article 7-F).

E. Employees shall have the option when called to jury duty to use vacation or compensatory time for such service. In that event, the employee will not be required to turn in his/her jury pay. However, the employee must notify the department of his/her desire to exercise this option prior to the first date of jury service.

F. Jury Duty shall be considered as time worked.

G. An employee on Jury Duty will be continued on the payroll and be paid at his/her straight time hourly rate for his/her normally scheduled hours of work. Upon return from jury duty, the employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

90

If an employee fails to turn in his/her jury duty payment, the City will hold subsequent payments due to the employee until the City is reimbursed for all time lost due to the alleged jury duty service.

## 34. HOSPITALIZATION MEDICAL, DENTAL AND OPTICAL CARE INSURANCE

A. The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar ($2.00), deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 11 of the Municipal Code of the City of Detroit.

B. The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person    $100.06
Two person        238.29
Family            253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees, and fifty percent shall be paid by the employer.

C. Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

D. The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug

91

Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

> Single person   $100.06
> Two person        238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

E. The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50.00) per person annual deductible ($100.00 for two or more in a family).

F. Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees citywide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must

92

account for their premium charges without distinguishing between active and retired employees using the following format:

> Single Person
> Two Persons
> Family

G. The City shall provide for all active employees and their dependents a Dental Plan which shall be the Blue Cross/Blue Shield program which provides Class I benefit on a 25% co-pay basis and Class II and III benefits on a 50% co-pay basis. Classes I, II, and III benefits shall not exceed $1,000 per person per year. In addition, Orthodontic coverage shall be on a 50% co-pay basis with a $1,000 life time maximum. Other terms and conditions regarding these plans shall be in accordance with the standard Blue Cross/Blue Shield policies regarding administration of such programs.

The City will contribute an equal amount per employee to a dental capitation plan made available to its employees.

Newly hired employees shall not be eligible for these benefits until they shall have worked 1,040 straight time hours.

H. The City will provide Optical Care Insurance through the Employee Benefit Board, such benefit will include case hardened lenses.

I. If, during the term of this Agreement, a Federal Health Security Act is enacted, the City of Detroit will pay during the term of the Agreement any premium, taxes or contributions employees may be required to pay under a Federal Health Security Act that are specifically ear-marked or designated for the purpose of the Federal Program.

J. No insurance carrier shall be allowed to underwrite City Health Care Benefits unless it offers

93



coordination of benefits.

K. The parties agree to form a Health Care Cost Containment Committee made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph "B" the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

L. Effective January 1, 1987, the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

NOTE: A description of the City's health care and dental plans appear in Exhibit III.

## 35. WORKERS' COMPENSATION

A. All employees shall be covered by the applicable Workers' Compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of City employment shall be continued on the payroll and his/her time shall be charged to his/her sick leave reserve for all days not covered by Workers' Compensation payments; provided that in the absence of any sick leave reserve he/she shall be paid regular wages or salary to the extent of two-thirds of his/her daily wage or

94

salary but for a period not to exceed seven (7) days; provided, also; that where the employee has a sick leave reserve and receives income under the Workers' Compensation Act, such income shall be supplemented by the City from his/her sick leave banks in an amount sufficient to bring it up to ninety-five percent (95%) of his/her weekly take-home pay. For the purposes of this article, take-home pay is defined as gross pay from the City less Social Security deductions, and less Federal, State and City income tax withholding amounts based on the employee's actual number of dependents. Employees shall be eligible to earn current sick leave.

B. Employees shall not be eligible for holiday pay nor earn additional vacation or reserve sick leave when they are being paid Workers' Compensation benefits.

C. The City agrees to continue hospitalization and life insurance benefits for employees with one or more years of seniority who have been approved for Workers' Compensation benefits for a period of 9 months. Thereafter employees will be entitled to benefits which accrue to them through the Pension Plan and the Income Protection Plan.

D. The City and the Union agree to establish a Workers' Compensation Cost D. The City and the Union agree to establish a Workers' Compensation Cost Containment Committee made up of an equal number of members from the City and from the Union. The purpose of the committee will be to review changes in the Workers' Compensation laws and any legal rulings and interpretations regarding them and to explore methods of addressing Workers' Compensation problems and to examine the feasibility of reemploying injured workers in other available vacancies.

95

IN WITNESSES WHEREOF, the parties hereto have executed this Agreement on this 4th day of February, 1987.

MICHIGAN COUNCIL 25, and the Local Unions Listed Below of the American Federation of State, County and Municipal Employees, AFL-CIO:

A. F. S. C. M. E. LOCAL UNIONS - Continuation

CITY OF DETROIT:

*[signature]*
JAMES GLASS, President
AFSCME, Council #25, AFL-CIO

*[signature]*
COLEMAN A. YOUNG, Mayor
City of Detroit

*[signature]*
FLORA WALKER, Staff Supervisor
AFSCME, Council #25, AFL-CIO

*[signature]*
ROGER W. CHEEK, Director
Labor Relations Division

*[signature]*
ALBERT GARRETT, Staff Representative
AFSCME, Council #25, AFL-CIO

*[signature]*
JOSEF GARRETT, Director
Personnel Department

*[signature]*
LEONARD McNEIL, Staff Representative
AFSCME, Council #25, AFL-CIO

*[signature]*
DONALD PAILEN, Corporation Counsel
Law Department

*[signature]*
CRESCPHUS R. KING, President
Local 23

*[signature]*
BELLA MARSHALL, Director
Finance Department

*[signature]*
JIMMY A. HEARNS, President
Local 26

APPROVED BY THE CITY COUNCIL

*[signature]*
BRENDA JONES, President
Local 62

*[signature]*
JAMES H. BRADLEY, City Clerk

*[signature]*
JULIUS R. STEPHENS, President
Local 207

116

*[signature]*
CHARLES R. TAYLOR, President
Local 214

*[signature]*
MARK PHILLIPS, President
Local 229

*[signature]*
DOROTHY MOTLEY, President
Local 273

*[signature]*
WILLIAM C. WILBORN, President
Local 312

*[signature]*
ANITA L. HICKS, President
Local 457

*[signature]*
WILLIAM L. HARPER, President
Local 542

*[signature]*
ELLIOT R. SCHORE, President
Local 836

*[signature]*
SAUNDRA L. WILLIAMS, President
Local 1023

117

## A.F.S.C.M.E. LOCAL UNIONS - Continuation

*Elmira Willis*
ELMIRA WILLIS, President
Local 1220

RAYMOND WELBORNE, President
Local 1227

TATUM T. EASONS, JR., President
Local 1642

LOGAN C. LLOYD, President
Local 2799

*Charles C. Smith*
CHARLES C. SMITH, President
Local 2920

118

---

## MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
## CITY OF DETROIT
## AND
## MICHIGAN COUNCIL 25, AMERICAN
## FEDERATION OF STATE, COUNTY AND
## MUNICIPAL EMPLOYEES, AFL-CIO

Re: Application of Terms and Conditions of the Master Agreement to Junior Health Inspector, Senior Health Inspector (Food), Senior Health Inspector (Sanitary), Local 457, Health Department.

During the 1986-89 contract negotiations, Council #25 indicated that il wished to fold the above named classes under the terms of the Master Agreement.

In consideration of this request, the City agrees that all terms and conditions of the Master Agreement shall apply with the exception that persons shall be required to successfully complete a six (6) month probation period prior to gaining status in any of the above classes.

Dated this _14th_ day of _February_, 1986

*Albert Garrett*
Albert Garrett
Staff Representative
AFSCME, Council 25,
AFL-CIO

*Roger N. Cheek*
Roger N. Cheek
Director
Labor Relations Division

119

EXHIBIT III

CITY OF DETROIT

A.F.S.C.M.E.

MICHIGAN COUNCIL 25, NON-SUPERVISORY
BARGAINING UNIT

RE:  HEALTH CARE PLANS

## INTRODUCTION

The City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

Furthermore, the traditional health plan described herein includes several cost containment features. Furthermore, the joint union/management health cost containment committee will be studying additional cost containment programs which will be included during the term of the agreement.

## ELIGIBILITY

NOTE:  This summary of health insurance plans described herein contain the essential features of the hospitalization insurance plans offered by the City in general terms. It is not intended to be a full description of coverage. The complete plans are described in the certificate of coverage issued by each plan.

222

Persons eligible for health care coverage:

1.  The employee;

2.  The employee's dependents as explained below:

The legal spouse of the subscriber, unmarried children related by birth, legal adoption, or legal guardianship (while a dependent of the subscriber), and children of the subscriber's spouse (while a dependent of the subscriber). These children are covered from birth to the end of the calendar year in which they attain 19 years of age. This limit shall be extended one more year for those children still in high school.

Unmarried, dependent children who are incapable of self-support because of a permanent mental or physical disability are eligible for coverage. An application card, which contains a "physician's certification of disability", must be submitted before December 31st of the year in which the dependent becomes 19 years of age.

Nineteen to twenty-five year old dependents continue to be covered until the end of the calendar year in which they attain 25 years of age as long as they are unmarried and are dependent upon the employee for support and maintenance and were reported as such on the employee's most recent federal income tax return. There will be no additional charges for this coverage when they are under an employee contract.

Under the "Consolidate Omnibus Budget Reconciliation Act of 1985 (COBRA)," employees and their eligible dependents will have the option to continue group health coverage at their own expense after that coverage would have normally terminated. This option becomes available upon certain qualifying events that occur on or after July 1, 1986. Group health coverage includes hospitalization, dental and eye care coverage as one complete package.

223

Qualifying Events Affecting Employees:

A. The reduction of work hours or a temporary lay off that causes employees to lose their group coverage.

B. Termination of employment, either voluntary or involuntary (except for termination for gross misconduct.)

Employees may elect to continue their group health coverage up to 18 months beyond the qualifying event in A or B above. (The full monthly premium cost must be paid each month to continue coverage.)

Qualifying Events for Employees Beneficiaries:

A. Upon divorce or legal separation of employee and the employee's spouse (spouse option to include the dependent children).

B. The date a dependent child no longer qualifies as a dependent under the plan. (example, dependent child passes the maximum age for coverage as a dependent child.)

C. Upon the death of the employee.

D. Upon the employee becoming entitled to benefits under Title XVIII of the Social Security Act (and the spouse and dependent children lose the employer provided group health coverage).

The employee's spouse and dependent children may elect to continue the same group coverage up to 36 months from the date of the qualifying event noted in A,B,C, or D above. The full monthly premium cost must be paid each month to continue coverage.

Cancellation of Coverage:

Continuation of coverage will be cancelled upon the occurance of the following circumstances:

1. Cancellation of group health plan to active employees.

224



2. The qualified beneficiary becomes a covered employee under another group health plan or become entitled to medicare benefits.

3. The qualified beneficiary fails to pay the required premium.

4. The qualified beneficiary remarries and becomes covered under a group health plan.

5. The end of the continuation coverage period.

Effective Dates for Hospitalization Coverage

Coverage Period: First (1st) through thirty-first (31st)

Qualifying for Continuing Coverage: Any month in which an employee receives a paycheck with at least eight (8) hours of pay, he/she will have coverage for the entire month; less than eight (8) hours of pay — no coverage.

Note: Suspensions and Departmental Leave are governed by this section.

Coverage Effective Date: For new hires or employees returning from Personnel leaves or lay-offs, coverages are effective the day they receive their first paycheck.

Note: For new or returning employees, coverage dates will be determined as of the date the employee would have normally received his/her paycheck.

Coverage Ending Date: End of the month in which an employee receives the last paycheck. Lump-sum payments or special-pay adjustments, after an employee has left the payroll, do not continue hospitalization coverage.

225

# SECTION I
## TRADITIONAL HOSPITALIZATION

### Hospital Charges

The City's hospital benefits include the following:

- The cost (ward room and board rates) for 365 days for treatment of general conditions. (Employees may elect semi-private coverage at their own expense).

- Renewal: Full benefits are restored after a consecutive period of 60 days has elapsed since the date of last discharge from a hospital.

- The cost of ward room and board for treatment of mental and nervous disorders is limited to forty-five (45) days. The full cost of ward room and board at a general hospital for treatment of substance abuse (alcohol and drug related) disorders is limited to five days. Up to forty days of in-patient rehabilitation treatment shall be covered in a free standing facility that specializes in this type of treatment and is preapproved by the plan. (If a member is admitted directly into non-hospital based facility, the maximum number of days will be 45).

- Renewal: In order to re-establish hospital benefits for a nervous or mental disorder, there must be a period of non-confinement equal to at least 60 consecutive days.

  See master medical section for additional benefits.

### Maternity Benefits
(applies to members of the plan)

Ward hospital room and board charges or birthing center charges and charges for additional hospital services resulting from pregnancy, childbirth or miscarriage are covered in accordance with the Plan.



### Other Hospital Services

The Plan will pay the full cost of the items shown below when furnished by a hospital or its hospital staff and prescribed by your doctor:

- general nursing service
- special diets
- operating, delivery and treatment rooms and equipment
- anesthesia
- laboratory examinations
- physical therapy and oxygen or other gas therapy
- drugs and medicines
- supplies for dressing and plaster casts
- use of radium (when owned or rented by the hospital)
- routine nursery care for newborn children
- non-routine hospital care for newborn children

### Emergency Services

The Plan will pay all charges in connection with emergency room treatment on non-occupational "accidental injuries" and life threatening "medical emergencies".

### Pre-Admission Certification

A Hospital Pre-Admission certification form MUST be completed and returned to the Plan for approval before the Plan will approve any elective non-emergency hospital admission. In order to receive hospital benefits paid for by the plan, in-patient non-emergency admissions MUST be prior authorized by the Plan. An appeal process for the physician and member shall be a part of this plan.

Hospital Pre-Admission certification Forms will be available from the providers, physicians, the Plan Offices, and the employer and must be submitted to the Plan before the proposed hospital admission.

An employee's doctor will complete the form and submit it to the Plan. Both the employee and his/her

...not the admission has been made... ...mation regarding whether or...

In cases of emergency admittance to a hospital which shall include emergency admittance for alcohol and drug abuse, the hospital must notify Blue Cross within twenty-four hours and they will certify the number of days allowable based upon the information submitted. If the attending physician requires a member to remain in the hospital for longer than the pre-certified amount of time, they must obtain approval from Blue Cross for additional days. Unless specifically approved, the Plan will not pay for any days spent in a hospital beyond those approved by the pre-certification.

## Ambulatory Procedures Requirements

All medical surgical procedures on the attached list must be performed on an ambulatory basis unless precerlified by the Plan.

## Extended Care Facilities

If an employee or an eligible dependent are transferred to an extended care facility immediately following a home or hospital confinement (home health care status shall be considered as hospital confinement for purposes of this section), the Plan will pay the full cost of room and board and other medical services. Pre-certification is required.

Extended care facility benefits are limited to a maximum of 730 days and are reduced by two (2) times the number of days spent in a hospital for the same condition.

## Home Health Care and Hospice Care Benefits

The Plan covers charges for the following home health care services:

1. Professional nursing care
2. Physical therapy
3. Speech therapy

228

4. Home health aide services.
5. Expenses for equipment or materials used home health care treatment (e.g., surgi dressings, oxygen, gauze, cotton, etc.).

(Three (3) home health care visits are equivalent one (1) day of hospital care.)

Home Hospice care is designed specifically for trea ment of the terminally ill. Medical care concentrat on pain management and professional counselling fe both patients and their families.

All home hospice services must be prior authorize (refer to the section entitled Pre-Admission Ap proval). Once approved, the Plan pays the full cost c hospice care including nursing and other require medical services up to the Plan limit.

## Billing Audits

Employees are encouraged to review their hospita and doctor bills for accuracy.

# MEDICAL SURGICAL BENEFITS

## Surgical Expense Benefits

If an employee or one of their eligible dependents must undergo surgery as the result of a non-occupational injury or illness, the Plan will pay in full for all surgical procedures performed by a surgeon who has agreed to reasonable and customary charges established by the plan.

## Second Surgical Opinion

Mandatory second surgical opinions will be in accordance with the attached list of procedures (Does not apply to emergencies).

For all other procedures:

If a doctor has recommended elective (non-emergency) surgery an employee must seek a second medical opinion before consenting to the surgery.

229

When employee seeks a second opinion the employee is required to obtain any x-rays or test results from the first physician and have them reviewed by second physician to avoid duplication of tests.

The Plan covers doctor's reasonable and customary fees associated with a second surgical opinion.

In addition to payment for doctor's charges, the Plan will also cover the cost of diagnostic laboratory and x-ray services performed in conjunction with the second surgical opinion.

If a member receives conflicting medical opinions regarding the need for a surgical procedure, the employee will make the final decision about whether or not to have the surgery. If the employee does decide to have the surgery, the Plan will provide surgical benefits.

Maternity Benefits
(applies to members of the plan)

Charges for outpatient care by member's doctor are eligible expenses under the Plan.

X-Ray and Laboratory Services

If a member of the plan has x-ray and/or laboratory services related to a non-occupational illness or accident in a non-hospital setting, the charges are covered in full.

Mental and Nervous Disorders

Treatment for substance abuse, psychiatric and nervous disorders shall be limited to $400 per member per calendar year for out-patient services.

Other Items Covered by the Plan:

Physician's Services

Medical Care of In-patients
- Hospital

230

- Convalescent Care Facility
- Psych. Day/Night Care Hospital
- Residential SAT program

Surg.; Anesthesia; Surg. Asst.

• Consultations
- In-patient

• Maternity Care
- Pre & Post Natal Visits
- Delivery
- Examination of Newborn

◦ Emergency Care
- Injuries; Medical Conditions

• Psychiatric Care
- In-patient
- Out-patient $400
◦ Chemotherapy
◦ Therapeutic Radiology
• Diagnostic Radiology
• Diagnostic Lab & Pathology
◦ Other Diagnostic Svcs.
- EKG; EEG; etc.

Items Not Covered By Hospital-Medical-Surgical Benefits:

The Plan does not cover the following types of disabilities, expenses or care:

1. Dental care except for extractions or removal of unerupted teeth under general anesthesia when a concurrent hazardous medical condition exists;

2. Cosmetic surgery, except for the correction of birth defects, accidental injuries or traumatic scars, or reconstructive surgery to correct deformities resulting from specified diseases or medically necessary surgery;

3. Hospital admissions that are not medically necessary, such as admissions that are principally for diagnostic evaluation, or physical therapy, or reduction of weight by diet control.

231

4.  Custodial care or domiciliary care which does not require definitive medical or nursing services for an illness or injury.

5.  Care for occupational injury or disease or care obtainable without cost from government agencies or through the facilities of the employer.

6.  Routine physical, premarital or pre-employment examinations.

7.  Items such as blood, durable medical equipment, prosthetic and other appliances, and ambulance service unless specifically mentioned as being covered in this proposal.

## SECTION II
## MASTER MEDICAL EXPENSE BENEFITS

The City's coverage for master medical benefits shall be 80% of the usual and customary fees for out-patient services provided by the Plan after the employee pays for the first $50.00 of cost per person or $100.00 per family per year. After an employee has out of pocket expenses over $1,000 in any calendar year, 100% of the eligible expenses are covered. The life-time maximum benefit is $1,000,000.

Out-patient treatment for substance abuse, psychiatric and nervous disorders shall be limited to 50% of reasonable fees with an annual limit of $2,000 per year and a life-time limit of $5,000. (This is in addition to the basic benefit.). The Plans maximum is $15,000 for one year and $30,000 for two or more years for combined in-patient and out-patient psychiatric services.

### Ambulance

If a member of the plan is transported to a medical facility due to an accidental injury or medical

232



emergency or if they or their eligible dependents are transferred from one medical facility to another at their doctor's recommendation, the Plan will pay for such ambulance service under the Master Medical Benefit.

Items Not Covered by Major Medical:

The plan does not cover the following types of expenses, disabilities or care:

*   Extended Benefits are not available for pulmonary tuberculosis or mental disorders.

*   Routine dental care such as fillings, extractions, bridgework, braces, root canals and impacted wisdom teeth.

*   Eyeglasses, routine eye examinations, eye refractions, hearing aids and the fitting of hearing aids or eyeglasses.

*   Routine physical examinations and related tests.

*   Cost of transportation that exceeds ambulance benefit level.

*   Personal comfort items while hospitalized, including but not limited to, television and telephone.

*   The portion of room charges which exceeds the hospital's ward rate.

*   Surgical procedure, treatment or hospital confinement primarily for beautification.

*   Expenses for work-related injuries or disabilities (these are covered by Worker's Compensation).

*   Expenses for care of injuries or sickness due to war or war-related acts.

*   Any treatment or service not prescribed by a physician.

*   Screening or other procedures not necessary for diagnosis and generally accepted therapy.

233

Any surgery or medical care or service furnished by any facility contracted for or operated by the United States Government or by any other governmental unit for medical care or treatment unless a charge is made which the insured is legally required to pay.

- Expenses for the treatment of nervous, mental, or substance abuse disorders that exceed the basic benefit level.

- Any fees that exceed the reasonable and customary fee determination.

- Purchase of wheel chair, hospital bed, artificial respirator, other durable medical equipment.

- Care in convalescent or nursing homes.

## SECTION III
## PRESCRIPTION DRUG PLAN

A. Coverage — The prescription drug benefit covers the cost of most prescription drugs after the employee pays a $2.00 deductible.

B. A list of preferred providers for prescription drugs which an employee must use to obtain the full benefit is attached.

C. Covered Drugs:
1. Federal Legend Drugs
2. State Restricted Drugs
3. Compounded Medication
4. Insulin

D. The plan will require a pharmacy to use generic drugs, if available, unless specifically directed by the prescribing physician based on medical necessity not to do so.

Items Not Covered:

Certain items are not covered by the prescription drug program. Among these are:

234



- The charge for any take home drug.

- Any charge for a contraceptive medication, even if such medication is a prescription legend drug, and any charge for therapeutic devices or appliances, regardless of their intended use.

- Therapeutic devices or appliances (hypodermic needles, support garments and other non-medicinal substances).

- Drugs or medicines supplied to the covered individual by a prescribing physician or dentist.

- Cosmetic or beauty aids, dietary supplements and vitamins.

- Immunizing agents, injectables, blood or blood plasma or medication prescribed for parenteral administration, except insulin.

- Any drug labeled "Caution — Limited by Federal Law to Investigational Use" or any experimental drug.

- Any charge for administration of covered drugs.

- The charge for more than a 34-day supply of a covered drug except that benefits will be payable for 100 unit doses (e.g., tablet or capsule, etc.) of specified maintenance drugs unless provided by a mail order pharmaceutical provider.

- The charge for any prescription order refill in excess of the number specified by a physician or dentist, or any refill dispensed after one year from the date of the original prescription order.

- The charge for any medication for which the employee or dependent is entitled to without charge from any municipal, State or Federal program of any sort whether

235

contributory or not except Title XIX of Social Security Amendments of 1965 (Public Law 89-97; 89th Congress, First Session).

## SECTION IV
## PREFERRED PROVIDER ORGANIZATION AND HEALTH MAINTENANCE ORGANIZATIONS

The benefit levels for the Blue Cross Blue Shield P.P.O. are for the most part equivalent to the Blue Cross Blue Shield Traditional Plan except that the PPO covers the first $100 of routine office calls and thereafter 70% of the cost. Furthermore all services received outside the networks are generally covered at 85% of the charge.

The health maintenance organizations currently being offered to employees are as follows:

Health Care Network
Independence Health Plan
Total Health Care
Michigan HMO
Comprehensive Health Services
Health Alliance Plan

Benefits provided by these carriers are as follows:

| Benefit | Extent of Coverage |
| --- | --- |
| Service in hospital | Full coverage |
| Human Organ transplants | Varies with Carrier |
| Emergency Care – Medical | Full coverage |
| Emergency Care – Accidents | Full coverage |
| Routine Medical Services | Full coverage |
| Maternity Services Provided by doctor | Full coverage |

236

| | |
| --- | --- |
| Prescription Drugs | Full coverage except for Health Care Network and Health Alliance Plan which have a $2.00 co-pay |
| Diagnostic and Therapeutic Procedures | Full coverage |
| Immunizations | Full coverage |
| Family Planning | Full coverage for most services |
| Mental Health Care | Outpatient – 20 visits 12 month period Inpatient – most carriers 45 days per year |
| Alcoholism Drug Abuse | Michigan HMO – 30 days Varies with carrier |
| Skilled Nursing Care (not in hospital) | Nursing home care – 730 days except for Michigan HMO which covers 30 days per year; other services excluding custodial care covered in full |
| Appliances and Prosthetic Devices Devices and Durable Medical Equipment | Full coverage |

Prior to the annual enrollment each year a comparison of coverages provided by each of the plans will be provided to members of the Union.

## SECTION V
## DENTAL CARE PLAN

A. Coverages –

Class 1 benefits 75% of usual and customary fees.

Class II benefits 50% of usual and customary fees.

Class III benefits 50% of usual and customary fees.

237

Orthodontics — 50% of usual and customary fees not to exceed $1,000 maximum life benefit per person covered by the plan.

Annual maximum on Class I, II and III benefits is $1,000 per year.

B.  Items not covered.

Dental benefits are not available for the following types of expenses or care:

* Treatment or supplies furnished on account of a dental defect which arises out of, or in the course of, any occupation for wage or profit;

* Any loss sustained as a result of declared or undeclared war, or any act thereof, or of military or naval service of any country;

* Dental procedures received from a dental department maintained by a mutual benefit association, labor union, trustee, or other similar group;

* Any expense for dental procedures or supplies to the extent that payment is received from any group policy or prepayment plan;

* Any treatment which is performed for cosmetic purposes;

* Treatment by other than a legally qualified dentist, except charges for dental prophylaxis performed by a licensed dental hygienist under the supervision and direction of a dentist, or licensed dental practitioner; or in connection with dentures, bridgework, crowns, or prosthetic devices for:

   1.  Expenses for prosthetic devices started prior to the effective date of coverage;

   2.  Expenses for replacement made less than five years after and immediately preceding placement or replacement which was covered by this Plan or the predecessor plan;

238

   3.  Expenses for extension of bridges or prosthetic devices previously paid for by the Plan except for expenses incurred for new extended areas;

   4.  Loss or theft

   * Temporary restorations, local anesthetics, and/or bases;

   * Expenses for root canal treatments and/or apicoectomies when previously paid; these are payable only once per tooth;

   * Orthodontic benefits are not available for the member and spouse or dependent children over age 19 (even if a full-time student).

C.  Pre-Determination of Benefits (excludes capitation plans);

The following procedures will require pre-determination by the Plan:

   1.  Prosthodontics

      A.  Inlays
      B.  Onlays
      C.  Crowns
      D.  Space Maintainers
      E.  Bridges
      F.  Removable Full or Partial Dentures

   2.  Periodontics

      A.  Subgingival Currettage
      B.  Surgical Periodontics

   3.  Oral Surgery

      All oral surgical procedures with the exception of 4 or less simple extractions.

   4.  Othodontics

      All services.

239

D. Currently the City is offering Den Cap and Dental Care Network as capitation dental carriers. These plans have smaller co-pays and deductibles in most areas than our traditional plan. However, you must select your Dentist from their network.

## SECTION VI
## EYE CARE PLAN

**Coverage** — The Plan will pay for an eye examination and glasses once every two years. Co-op Optical Company and Heritage Optical Company are the current providers of this service. This coverage is only available at one of these two firms. The employee may be required to make co-payments for designer frames, special lenses, and contact lenses.

**Items Not Covered**

Benefits are not payable for the following types of care or expense:

- Procedures or supplies furnished due to a visual defect which arises out of, or in the course of, any occupation for wage or profit;
- Vision care services resulting from declared or undeclared war, or any act thereof, or military or naval service of any country;
- Vision care services or supplies furnished by or at the direction of the United States Government or any agency thereof;
- Vision care services or supplies received from a medical department maintained by a mutual benefit association, labor union, trustee or other similar group;
- Vision care services or supplies which are payable or furnished by any other group policy or prepayment plan;



- Any medical or surgical treatment of the eye;
- Sunglasses, plain or prescription or safety lenses or goggles, tinting or photochromic lenses;
- Othoptics, vision training or anisekonia;
- Repair of any kind;
- Loss or theft; and
- Vision expenses incurred by a dependent child after attaining age 19.

## SECTION VII
## PENDING CHANGES

During the term of the contract the joint Union/Management health care committee will be examining additional alternatives to control health care cost. Some of the alternatives being considered as of the date of this agreement are as follows.

1. Control Procedures

   The plan will establish procedures to guard against misuse. This shall include the audit of claims to insure their legitimacy and the collection of health care cards from terminating employees. Other control procedures may be instituted by the administrator.

2. Employee Education Programs

   The plan will develop a booklet which will describe the benefits and procedures to be followed in using the plan. They will continue to provide educational material to plan members which will help them to become more familiar with methods to contain health cost.

3. Prescreening Programs

   The plan will develop a prescreening program for employees to help them identify health problems before they become critical. The plan will

240                                                          24t

develop a delivery system for the program which will be convenient for the members and also will guarantee the confidentiality of the program.

4.  Maternity Confinement

The Plan may include a incentive for members who elect to shorten their hospital confinement for maternity purposes or use of birthing centers. The incentive shall be based on the standard number of days allowed for in-patient maternity confinement in the hospital admission precertification program. In the event that birthing centers are less expensive than inpatient hospital confinement, an incentive plan will be developed to encourage the use of them.

5.  Billing Audits

Employees are encouraged to review their hospital and doctor bills for accuracy. The health care committee will agree on a remuneration "finder's fee" for significant discrepancies discovered.

6.  Emergency Clinics

A list of non-hospital based clinics which will provide non-emergency 24-hour medical services will be established. Employees should use these facilities for non-life threatening medical emergencies.

7.  Prescription Drugs

The Plan may seek an administrator for prescription drug coverage which may be different from the administrator of the hospital-medical-surgical plan.

242

## AMBULATORY PROCEDURES

| Procedure Code | English Description |
|---|---|
| 0145 | Excision of pilonidal cyst of sinus, simple |
| 0454 | Excision of cyst, fibroadenoma or other benign tumor, aberrant breast tissue, duct lesion of nipple lesion (except 0465-047 1) bilateral |
| 0465 (T) | Mastecomy for gynecomastia, unilateral |
| 0521 | Biopsy, deep bones (e.g. vertegral body femur) |
| 0522 | Biopsy, excisional, bone, superficial (e.g., ilium, sternum, ribs, spinous process, trochanter of femur) |
| 0588 | Excision of calcaneal spur |
| 1342 | Arthroplasty, metatarsophalangeal joint, other than hallux, with silastic implant |
| 1601 | Muscle biopsy, deep |
| 2060 | Infraction of turbinates, unilateral or bilateral |
| 2085 | Antrotomy, intranasal, bilateral |
| 2790 | Biopsy or excision of lymph node |
| 2791 | — deep cervical node |
| 3740 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectomy, bilateral |
| 3745 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectomy, bilateral |
| 4040 | Cystourethroscopy with biopsy, initial |
| 5620 (T) | Extraocular muscle surgery (resection, recession, advancement, etc.), one muscle |
| 5696 (T) | Slepharoplasty: plastic repair of eyelid with or without graft |
| 0994 | Fracture, humerus, surgical neck, closed reduction |

243

| | |
|---|---|
| 1493 | Dislocation, elbow, closed manipulative reduction, without anesthesia |
| 3163 | Esophagoscopy, diagnostic with biopsy |
| 3165 | — with dilation, direct |
| 3190 | Dilation of esophagus by sound or bougie, indirect, initial |
| 3220 | Gastroscopy, diagnostic |
| 3417 | Colonoscopy (by fiberoptic instrument), transverse colon |
| 3696 | Peritoneocentesis: abdominal paracentesis, initial |
| 5155 | Spinal puncture, lumbar diagnostic |

### EXHIBIT IV
### LONG TERM DISABILITY INSURANCE
### (INCOME PROTECTION PLAN)

NOTE: IT IS IMPORTANT FOR EMPLOYEES TO APPLY FOR THIS BENEFIT AS SOON AS THEY BELIEVE THAT THEY WILL BE DISABLED FOR AN EXTENDED PERIOD OF TIME IN ORDER TO RECEIVE THE BENEFITS. (See provisions I-C & II-B).

I. PROVISIONS RELATING TO ELIGIBILITY

A. Employees Eligible

All full time classified and appointed civilian employees will be eligible for insurance upon completion of three (3) years of continuous employment.

B. Effective Date

The effective date of the insurance is the date he becomes eligible.

244



Employees not performing each and every duty of their occupation on the last work day immediately before the date they would become insured, shall become insured on the date they resume such duties.

C. Applying for Benefits

Eligible employees who become disabled must apply through their department to the City Pension Bureau within sixty (60) days after becoming disabled.

II. DETERMINING THE AMOUNT OF THE DISABILITY BENEFIT

A. Monthly Accident-Sickness Benefit

The benefit shall be $200.00 per month unless:

1. When added to the following benefits: (i) workmen's compensation; (ii) social security disability insurance; and (iii) city disability pension, if the total exceeds 90% of "take home" pay, as defined, this benefit will be reduced to provide that this benefit plus the other above mentioned benefits equal 90% of "take home" pay; or

2. When added to the following benefits; (i) workmen's compensation; (ii) social security disability insurance; and (iii) city disability pension, if the total is less than 75% of "take home" pay, as defined, this benefit will be increased to provide that this benefit plus the other above mentioned benefits equal 75% of "take home" pay; but this benefit shall not exceed $1,500.00 per month.

245

# EXHIBIT 5

**MASTER AGREEMENT**

Between the

# CITY OF DETROIT

and the

# MICHIGAN COUNCIL 25

OF THE AMERICAN FEDERATION OF STATE
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO

**1989-1992**

on a non-overtime basis, must give reasonably prompt prior notice to his/her supervisor that he/she has been summoned for jury duty, and must furnish satisfactory evidence that he/she reported for or performed jury duty on the days for which he/she claims such payment, provided that the department head shall have discretion in seeking to have the employee excused where his/her services are essential. The provisions of this section are not applicable to an employee, who, without being summoned, volunteers for jury duty.

The jury duty supplementation shall not apply to special service, contractual, temporary or other employees with less than one year of seniority.

D.  When properly notified by an employee under the terms of Section C, the department shall, if necessary, reschedule the work assignment of the employee so as to coincide as closely as possible with the jury duty schedule. This reassignment shall take precedence over other conflicting sections of this contract (except Article 7-F).

E.  Employees shall have the option when called to jury duty to use vacation or compensatory time for such service. In that event, the employee will not be required to turn in his/her jury pay. However, the employee must notify the department of his/her desire to exercise this option prior to the first date of jury service.

F.  Jury Duty shall be considered as time worked.

G.  An employee on Jury Duty will be continued on the payroll and be paid at his/her straight time hourly rate for his/her normally scheduled hours of work. Upon return from jury duty, the employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an employee fails to turn in his/her jury duty payment, the City will hold subsequent payments due to the employee until the City is reimbursed for all time lost due to the alleged jury duty service.

76

## 34. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE INSURANCE

A.  The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article II of the Municipal Code of the City of Detroit.

B.  The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

| | |
|---|---|
| Single person | $100.06 |
| Two person | 238.29 |
| Family | 253.54 |

Fifty percent (50%) of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%) shall be paid by the employer.

C.  Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

D.  The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87 known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986, the City will pay the following amounts per month for hospitalization and medical insurance:

77

Single person     $100.06
Two person     238.29

Fifty percent (50%) of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

E. The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

F. Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll fifty (50) employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year, all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two Persons
Family

G. The City shall provide for all active employees and their dependents a Dental Plan which shall be the Blue Cross/Blue Shield program which provides Class I benefits on a twenty-five percent (25%) co-pay basis and Class II and III benefits on a fifty percent (50%) co-pay basis. Classes I, II, and III benefits shall not exceed $1,000 per person per year. In addition, Orthodontic coverage shall be on a fifty percent (50%) co-pay basis with a $1,000 lifetime maximum. Other terms and conditions regarding these plans shall be in accordance with the standard Blue Cross/Blue Shield policies regarding administration of such programs.

78

The City will contribute an equal amount per employee to a dental capitation plan made available to its employees.

Newly hired employees shall not be eligible for these benefits until they shall have worked 1,040 straight time hours.

H. The City will provide Optical Care Insurance through the Employee Benefit Board and such benefit will include case hardened lenses.

Provided that the City's cost for eye care insurance will not be increased, the City agrees to institute an eye care enrollment between competing carriers by August 1, 1990. Employees will make a carrier selection during the enrollment period which will be effective for the following two years.

I. If, during the term of this Agreement, a Federal Health Security Act is enacted, the City of Detroit will pay during the term of the Agreement any premium, taxes or contributions employees may be required to pay under a Federal Health Security Act that are specifically ear-marked or designated for the purpose of the Federal Program.

J. No insurance carrier shall be allowed to underwrite City Health Care Benefits unless it offers coordination of benefits.

K. The parties agree to form a Health Care Cost Containment Committee made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B, the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans.

79

the parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

L.  Effective January 1, 1987, the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

    NOTE:   A description of the City's health care and dental plans appears in Exhibit III.

## 35. WORKERS' COMPENSATION

A.  All employees shall be covered by the applicable Workers' Compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of City employment shall be continued on the payroll and his/her time shall be charged to his/her sick leave reserve for all days not covered by Workers' Compensation payments; provided that in the absence of any sick leave reserve he/she shall be paid regular wages or salary to the extent of two-thirds of his/her daily wage or salary but for a period not to exceed seven (7) days; provided also that where the employee has off-time banks and receives income under the Worker's Compensation Act, such income shall be supplemented by the City from his/her off-time banks in an amount sufficient to bring it up to ninety-five percent (95%) of his/her weekly take-home pay. For the purposes of this article, take-home pay is defined as gross pay from the City less Social Security deductions, and less Federal, State and City income tax withholding amounts based on the employee's actual number of dependents. Employees shall be eligible to earn current sick leave.

B.  Employees shall not be eligible for holiday pay nor earn additional vacation or reserve sick leave when they are being paid Worker's Compensation benefits.

80

C.  The City agrees to continue hospitalization and life insurance benefits for employees with one or more years of seniority who have been approved for Workers' Compensation benefits for a period of 9 months after they go off the payroll. Thereafter employees will be entitled to benefits which accrue to them through the Pension Plan and the Income Protection Plan.

    NOTE:   In order to continue hospitalization and life insurance benefits, employees are responsible for their portion of the premium as required by the Contract. Those deductions will be made automatically while they remain on the payroll because they are supplementing. Once they leave the payroll, they must make arrangements with the Pension Bureau to pay those premiums in order to continue coverage.

D.  The City and the Union agree to establish a Workers' Compensation Cost Containment Committee made up of an equal number of members from the City and from the Union. The purpose of the committee will be to review changes in the Workers' Compensation laws and any legal rulings and interpretations regarding them and to explore methods of addressing Workers' Compensation problems and to examine the feasibility of reemploying injured workers in other available vacancies.

## 36. DEATH BENEFITS AND LIFE INSURANCE

A.  **DEATH BENEFITS**

Death benefits for all regular City employees are authorized by the City Charter, Title IX, Chapter VIII. The City Code, Chapter 13, Article 8, Section 8, currently provides a death benefit of $5,500.00.

1.  Membership
    Mandatory for regular employees.
2.  Contributions
    By the City—$13.30 per year per employee.
    By the employee 20¢ per week or $10.40 per year.

81

remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) day written notice on or after June 20, 1992.

The parties agree that this sole and complete Agreement is intended to cover all matters affecting wages, hours, and other terms and conditions of employment and that, during the term of this Agreement, neither the City nor the Union will be required to negotiate on any further matters affecting these or any other subjects not specifically set forth in this Agreement, except by mutual agreement of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this 24ᵗʰ day of May , 1990.

MICHIGAN COUNCIL #25, and the Local Unions listed below of the American Federation of State, County and Municipal Employees, AFL-CIO:

CITY OF DETROIT:

JAMES GLASS, President
AFSCME, Council #25, AFL-CIO

COLEMAN A. YOUNG, Mayor
City of Detroit

LINDA HIGHLEY, President
Local #23

ROGER A. CHEEK, Director
Labor Relations Division

JIMMY A. ISGARRO, President
Local #26

JOYCE GARNETT, Director
Personnel Department

BRENDA JONES, President
Local #62

DONALD PAILEN, Corporation Counsel
Law Department

WILLIE D. EVERGING, President
Local #207

BELLA MARSHALL, Director
Finance Department

APPROVED AND CONFIRMED BY
THE CITY COUNCIL JULY 5, 1990

JEFFERY O. BLAINE
DEPUTY CITY CLERK

98

99

A. F. S. C. M. E. LOCAL UNIONS - Continuation

A. F. S. C. M. E. LOCAL UNIONS - Continuation

STAMINA BROOKS, President
Local #214

MARK PHILLIPS, President
Local #229

DOROTHY MOTLEY, President
Local #273

JAMES THOMAS, President
Local #312

ANITA L. HICKS, President
Local #457

WILLIAM L. HARPER, President
Local #542

ELLIOT R. SCHORE, President
Local #836

SHAKORA L. WILLIAMS, President
Local #1023

ELMIRA WILLIS, President
Local #1220

RAYMOND WELBORNE, President
Local #1227

TATUM T. EASON, JR., President
Local #1642

JAMES HUNTER, President
Local #2799

CARLTON McBURROWS, President
Local #2920

100

101



*Personnel Department*
*Labor Relations Division*
*304 City-County Building*
*Detroit, Michigan 48226*
*(313) 224-3860*

*Coleman A. Young, Mayor*
*City of Detroit*

October 27, 1989

Mr. James Glass, President
AFSCME, Michigan Council #25
1034 N. Washington
Lansing, Michigan 48906

Re:  Evaluation of Traditional Dental Care Providers

Dear Mr. Glass:

During the 1989 negotiations there was discussion between
the parties concerning the possibility of changing the traditional
dental carrier. As a result the City agrees that during the terms
of the Contract, it will evaluate other traditional dental care
providers. It is understood that before any such change is im-
plemented, it must be mutually agreed to by the parties.

Sincerely,

Roger N. Cheek
Labor Relations Director

148

---

**EXHIBIT I**

**CITY OF DETROIT: AFSCME MICHIGAN COUNCIL #25**
**NON-SUPERVISORY BARGAINING UNIT AND JULY 1, 1989 PAY RATES**

A.  This Agreement covers certain non-supervisory non-confidential employees within various City depart-
ments as defined and listed below. Each unit includes those employees in the classifications listed,
subject to the exclusions in each unit as noted in the Michigan Employment Relations Commission
Unit Certifications and the unit descriptions in the voluntary recognition agreements.

B.  Michigan Council #25 shall represent all employees in the classifications listed in Exhibit I provided
that employees in those classifications are not:

1.  supervisory or confidential, including all employees of the Personnel Department (When persons
in the Temporary Office Service pool work outside of the Personnel Department of the offices of
the Mayor, City Council, or City Clerk they shall pay agency shop fees in accordance with Article 4);

2.  in classifications represented by another labor organization;

3.  employed in the offices of the Mayor, City Clerk, City Council, or Personnel Department.

C.  Unless footnoted otherwise, the classifications listed in this section are represented by Michigan Council
#25 on a City-wide basis except in the Personnel Department and the offices of the Mayor, City
Clerk and City Council.

149

---

EXHIBIT F
CITY OF DETROIT
A.F.S.C.M.E
MICHIGAN COUNCIL 25#, NON-SUPERVISORY
BARGAINING UNIT

Re:   HEALTH CARE PLANS

## INTRODUCTION

The City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to the amount the City pays for the traditional plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

Furthermore, the traditional health plan described herein includes several cost containment features. Furthermore, the joint union/management health cost containment committee will be studying additional cost containment programs which will be included during the term of the agreement.

## ELIGIBILITY

NOTE:    This summary of health insurance plans described herein contains the essential features of the hospitalization insurance plans offered by the City in general terms. It is not intended to be a full description of coverage. The complete plans are described in the certificate of coverage issued by each plan.

Persons eligible for health care coverage:

1.   The employee;

2.   The employee's dependents as explained below:

The legal spouse of the subscriber, unmarried children related by birth, legal adoption, or legal guardianship (while a

170

dependent of the subscriber), and children of the subscriber's spouse (while a dependent of the subscriber). These children are covered from birth to the end of the calendar year in which they attain 19 years of age. This limit shall be extended one more year for those children still in high school.

Unmarried, dependent children who are incapable of self-support because of a permanent mental or physical disability are eligible for coverage. An application card, which contains a "physician's certification of disability," must be submitted before December 31st of the year in which the dependent becomes 19 years of age.

Nineteen to twenty-five year old dependents continue to be covered until the end of the calendar year in which they attain 25 years of age as long as they are unmarried and are dependent upon the employee for support and maintenance and were reported as such on the employee's most recent federal income tax return. There will be no additional charges for this coverage when they are under an employee contract.

Under the "Consolidate Omnibus Budget Reconciliation Act of 1985 (COBRA)," employees and their eligible dependents will have the option to continue group health coverage at their own expense after that coverage would have normally terminated. This option becomes available upon certain qualifying events that occur on or after July 1, 1986. Group health coverage includes hospitalization, dental and eye care coverage as one complete package.

Qualifying Events Affecting Employees:

A.    The reduction of work hours or a temporary layoff that causes employees to lose their group coverage.

B.    Termination of employment, either voluntary or involuntary (except for termination for gross misconduct).

Employees may elect to continue their group health coverage up to 18 months beyond the qualifying event in A or B above. (The full monthly premium cost must be paid each month to continue coverage.)

171

Qualifying Events for Employee Beneficiaries:

A. Upon divorce or legal separation of employee and the employee's spouse (spouse option to include the dependent children).

B. The date a dependent child no longer qualifies as a dependent under the plan (example, dependent child passes the maximum age for coverage as a dependent child).

C. Upon the death of the employee.

D. Upon the employee becoming entitled to benefits under Title XVIII of the Social Security Act (and the spouse and dependent children lose the employer provided group health coverage).

The employee's spouse and dependent children may elect to continue the same group coverage up to 36 months from the date of the qualifying event noted in A, B, C, or D above. The full monthly premium cost must be paid each month to continue coverage.

Cancellation of Coverage:

Continuation of coverage will be cancelled upon the occurrence of the following circumstances:

1. Cancelation of group health plan to active employees.

2. The qualified beneficiary becomes a covered employee under another group health plan or becomes entitled to medicare benefits.

3. The qualified beneficiary fails to pay the required premium.

4. The qualified beneficiary remarries and becomes covered under a group health plan.

5. The end of the continuation coverage period.

Effective Dates for Hospitalization Coverage

Coverage Period: First (1st) through thirty-first (31st).

Qualifying for Continuing Coverage: Any month in which an employee receives a paycheck with a least eight (8) hours of pay, he/she will have coverage for the entire month; less than eight (8) hours of pay—no coverage.

172

Note:   Suspensions and Departmental Leave are governed by this section.

Coverage Effective Date: For new hires or employees returning from Personnel leaves or lay-offs, coverages are effective the day they receive their first paycheck.

Note:   For new or returning employees, coverage dates will be determined as of the date the employee would have normally received his/her paycheck.

Coverage Ending Date: End of the month in which an employee receives the last paycheck. Lump-sum payments or special-pay adjustments, after an employee has left the payroll, do not continue hospitalization coverage.

## SECTION I
## TRADITIONAL HOSPITALIZATION

Hospital Charges

The City's hospital benefits include the following:

• The cost (ward room and board rates) for 365 days for treatment of general conditions. (Employees may elect semi-private coverage at their own expense.)

  Renewal:   Full benefits are restored after a consecutive period of sixty (60) days has elapsed since the date of last discharge from a hospital.

• The cost of ward room and board for treatment of mental and nervous disorders is limited to forty-five (45) days. The full cost of ward room and board at a general hospital for treatment of substance abuse (alcohol and drug related) disorders is limited to five (5) days. Up to forty (40) days of in-patient rehabilitation treatment shall be covered in a free standing facility that specializes in this type of treatment and is preapproved by the plan. (If a member is admitted directly into non-hospital based facility, the maximum number of days will be forty-five (45).)

  Renewal:   In order to re-establish hospital benefits for a nervous or mental disorder, there must be a period of non-confinement equal to at least

173

sixty (60) consecutive days.
See master medical section for additional benefits.

**Maternity Benefits**

(applies to members of the plan)

Ward hospital room and board charges or birthing center charges and charges for other hospital services resulting from pregnancy, childbirth or miscarriage are covered in accordance with the plan.

**Other Hospital Services**

The plan will pay the full cost of the items shown below when furnished by a hospital or its hospital staff and prescribed by your doctor:

* general nursing service
* special diets
* operating, delivery and treatment rooms and equipment
* anesthesia
* laboratory examinations
* physical therapy and oxygen or other gas therapy
* drugs and medicines
* supplies for dressings and plaster casts
* use of radium (when owned or rented by the hospital)
* routine nursery care for newborn children
* non-routine hospital care for newborn children

**Emergency Services**

The plan will pay all charges in connection with emergency room treatment on non-occupational "accidental injuries" and life threatening "medical emergencies."

**Pre-Admission Certification**

A Hospital Pre-Admission certification form MUST be completed and returned to the plan for approval before the plan will approve any elective non-emergency hospital admission. In order to receive hospital benefits paid for by the plan, in-patient non-emergency admissions MUST be prior authorized by the plan. An appeal process for the physician and member shall be a part of this plan.

Hospital Pre-Admission Certification forms will be available from the providers, physicians, the Plan Offices, and the employer and must be submitted to the plan before the proposed hospital admission.

174

An employee's doctor will complete the form and submit it to the plan. Both the employee and his/her doctor will receive notification regarding whether or not the admission has been approved.

In cases of emergency admittance to a hospital which shall include emergency admittance for alcohol and drug abuse, the hospital must notify Blue Cross within twenty-four (24) hours and they will certify the number of days allowable based upon the information submitted. If the attending physician requires a member to remain in the hospital for longer than the pre-certified amount of time, they must obtain approval from Blue Cross for additional days. Unless specifically approved, the plan will not pay for any days spent in a hospital beyond those approved by the pre-certification.

**Ambulatory Procedures Requirements**

All medical surgical procedures on the attached list must be performed on an ambulatory basis unless pre-certified by the Plan.

**Extended Care Facilities**

If an employee or an eligible dependent are transferred to an extended care facility immediately following a home or hospital confinement (home health care status shall be considered as hospital confinement for purposes of this section), the plan will pay the full cost of room and board and other medical services. Pre-certification is required.

Extended care facility benefits are limited to a maximum of 730 days and are reduced by two (2) times the number of days spent in a hospital for the same condition.

**Home Health Care and Hospice Care Benefits**

The plan covers charges for the following home health care services:

1. Professional nursing care
2. Physical therapy
3. Speech therapy
4. Home health aide services
5. Expenses for equipment or materials used for home health care treatment (e.g., surgical dressings, oxygen, gauze, cotton, etc.).

175

(Three (3) home health care visits are equivalent to one (1) day of hospital care.)

Home hospice care is designed specifically for treatment of the terminally ill. Medical care concentrates on pain management and professional counselling for both patients and their families.

All home hospice services must be prior authorized (refer to the section entitled Pre-Admission Approval). Once approved, the plan pays the full cost of hospice care including nursing and other required medical services up to the plan limit.

**Billing Audits**

Employees are encouraged to review their hospital and doctor bills for accuracy.

## MEDICAL SURGICAL BENEFITS

**Surgical Expense Benefits**

If an employee or one of their eligible dependents must undergo surgery as the result of a non-occupational injury or illness, the plan will pay in full for all surgical procedures performed by a surgeon who has agreed to reasonable and customary charges established by the plan.

**Second Surgical Opinion**

Mandatory second surgical opinions will be in accordance with the attached list of procedures (does not apply to emergencies).

For all other procedures:

If a doctor has recommended elective (non-emergency) surgery, an employee must seek a second medical opinion before consenting to the surgery.

When employee seeks a second opinion the employee is required to obtain any x-rays or test results from the first physician and have them reviewed by second physician to avoid duplication of tests.

The plan covers doctor's reasonable and customary fees associated with a second surgical opinion.

In addition to payment for doctor's charges, the plan will also cover the cost of diagnostic laboratory and x-ray services performed in conjunction with the second surgical opinion.

176

If a member receives conflicting medical opinions regarding the need for a surgical procedure, the employee will make the final decision about whether or not to have the surgery. If the employee does decide to have the surgery, the plan will provide surgical benefits.

**Maternity Benefits**
(applies to members of the plan)

Charges for outpatient care by member's doctor are eligible expenses under the plan.

**X-Ray and Laboratory Services**

If a member of the plan has x-ray and/or laboratory services related to a non-occupational illness or accident in a non-hospital setting, the charges are covered in full.

**Mental and Nervous Disorders**

Treatment for substance abuse, psychiatric and nervous disorders shall be limited to $400 per member per calendar year for out-patient services.

**Other Items Covered by the Plan:**

Physician's Services

- Medical Care of In-patients
  — Hospital
  — Convalescent Care Facility
  — Psychiatric Day/Night Care Hospital
  — Residential SAT program

- Surgery; Anesthesia; Surgical Assistant

- Consultations
  — In-patient

- Maternity Care
  — Pre & Post Natal Visits
  — Delivery
  — Examination of Newborn

- Emergency Care
  — Injuries; Medical Conditions

177

- Surgical procedure, treatment or hospital confinement primarily for beautification.
- Expenses for work-related injuries or disabilities (these are covered by Workers' Compensation).
- Expenses for care of injuries or sickness due to war or war-related acts.
- Any treatment or service not prescribed by a physician.
- Screening or other procedures not necessary for diagnosis and generally accepted therapy.
- Any surgery or medical care or service furnished by any facility contracted for or operated by the United States Government or by any other governmental unit for medical care or treatment unless a charge is made which the insured is legally required to pay.
- Expenses for the treatment of nervous, mental, or substance abuse disorders that exceed the basic benefit level.
- Any fees that exceed the reasonable and customary fee determination.
- Purchase of wheel chair, hospital bed, artificial respirator, other durable medical equipment.
- Care in convalescent or nursing homes.

## SECTION III

## PRESCRIPTION DRUG PLAN

A. Coverage—The prescription drug benefit covers the cost of most prescription drugs after the employee pays a $2 deductible.

B. A list of preferred providers for prescription drugs which an employee must use to obtain the full benefit is attached.

C. Covered Drugs:
1. Federal Legend Drugs
2. State Restricted Drugs
3. Compounded Medication
4. Insulin

D. The plan will require a pharmacy to use generic drugs, if available, unless specifically directed by the prescribing physician based on medical necessity not to do so.

180

Items Not Covered:

Certain items are not covered by the prescription drug program. Among these are:

- The charge for any take home drug.
- Any charge for a contraceptive medication, even if such medication is a prescription legend drug, and any charge for therapeutic devices or appliances, regardless of their intended use.
- Therapeutic devices or appliances (hypodermic needles, support garments and other non-medicinal substances).
- Drugs or medicines supplied to the covered individual by a prescribing physician or dentist.
- Cosmetic or beauty aids, dietary supplements and vitamins.
- Immunizing agents, injectables, blood or blood plasma or medication prescribed for parental administration, except insulin.
- Any drug labeled "Caution—Limited by Federal Law to Investigational Use" or any experimental drug.
- Any charge for administration of covered drugs.
- The charge for more than a 34-day supply of a covered drug except that benefits will be payable for 100 unit doses (e.g., tablet or capsule, etc.) of specified maintenance drugs unless provided by a mail order pharmaceutical provider.
- The charge for any prescription order refill in excess of the number specified by a physician or dentist, or any refill dispensed after one year from the date of the original prescription order.
- The charge for any medication for which the employee or dependent is entitled to without charge from any municipal, state or federal program of any sort whether contributory or not except Title XIX of Social Security Amendments of 1965 (Public Law 89-97; 89th Congress, First Session).

## SECTION IV

## PREFERRED PROVIDER ORGANIZATION AND HEALTH MAINTENANCE ORGANIZATIONS

The benefit levels for the Blue Cross Blue Shield PPO are for the most part equivalent to the Blue Cross Blue Shield

181

Traditional Plan except that the PPO covers the first $100 of routine office calls and thereafter 70% of the cost. Futhermore, all services received outside the networks are generally covered at 85% of the charge.

The health maintenance organizations currently being offered to employees are as follows:

Health Care Network
Independence Health Plan
Total Health Care
Omnicare
Comprehensive Health Services
Health Alliance Plan

Benefits provided by these carriers are as follows:

| Benefit | Extent of Coverage |
| --- | --- |
| Service in hospital | Full coverage |
| Human Organ Transplants | Varies with carrier |
| Emergency Care — Medical | Full coverage |
| Emergency Care — Accidents | Full coverage |
| Routine Medical Services | Full coverage |
| Maternity Services Provided by Doctor | Full coverage |
| Prescription Drugs | Full coverage except for Health Network and Health Alliance Plan which have a $2 co-pay |
| Diagnostic and Therapeutic Procedures | Full coverage |
| Immunizations | Full coverage |
| Family Planning | Full coverage for most services |
| Mental Health Care | Outpatient — 20 visits 12 month period Inpatient — most carriers 45 days per year Omnicare — 45 days |
| Alcoholism/Drug Abuse | Varies with carrier |
| Skilled Nursing Care (not in hospital) | Nursing home care — 730 days |
| Appliances and Prosthetic Devices and Durable Medical Equipment Devices | Full coverage |

182

Prior to the annual enrollment each year a comparison of coverage provided by each of the plans will be provided to members of the Union.

## SECTION V
## DENTAL CARE PLAN

A.  Coverages —

Class I benefits 75% of usual and customary fees.

Class II benefits 50% of usual and customary fees.

Class III benefits 50% of usual and customary fees.

Orthodontics — 50% of usual and customary fees not to exceed $1,000 maximum life benefit per person covered by the plan.

Annual maximum on Class I, II and III benefits is $1,000 per year.

B.  Items not covered. Dental benefits are not available for the following types of expenses or care:

- Treatment or supplies furnished on account of a dental defect which arises out of, or in the course of, any occupation for wage or profit;
- Any loss sustained as a result of declared or undeclared war, or any act thereof, or of military or naval service of any country;
- Dental procedures received from a dental department maintained by a mutual benefit association, labor union, trustee, or other similar group;
- Any expense for dental procedures or supplies to the extent that payment is received from any group policy or prepayment plan;
- Any treatment which is performed for cosmetic purposes;
- Treatment by other than a legally qualified dentist, except charges for dental prophylaxis performed by a licensed dental hygienist under the supervision and direction of a dentist, or licensed dental practitioner; or in connection with dentures, bridgework, crowns, or prosthetic devices for:
  1. Expenses for prosthetic devices started prior to the effective date of coverage;

183

2. Expenses for replacement made less than five years after and immediately preceding placement or replacement which was covered by this plan or the predecessor plan;

3. Expenses for extension of bridges or prosthetic devices previously paid for by the plan except for expenses incurred for new extended areas;

4. Loss or theft
   - Temporary restorations, local anesthetics, and/or bases;
   - Expenses for root canal treatments and/or apicoectomies when previously paid; these are payable only once per tooth;
   - Orthodontic benefits are not available for the member and spouse or dependent children over age 19 (even if a full-time student).

C. Pre-Determination of benefits (excludes capitation plans):

The following procedures will require pre-determination by the plan:

1. Prosthodontics
   A. Inlays
   B. Onlays
   C. Crowns
   D. Space Maintainers
   E. Bridges
   F. Removable Full or Partial Dentures

2. Periodontics
   A. Subgingival Currettage
   B. Surgical Periodontics

3. Oral Surgery

   All oral surgical procedures with the exception of four (4) or less simple extractions.

4. Orthodontics

   All services.

D. Currently the City is offering Den Cap and Dental Care Network as capitation dental carriers. These plans have smaller co-pays and deductibles in most areas than our traditional plan. However, you must select your Dentist from their network.

## SECTION VI
## EYE CARE PLAN

Coverage — The plan will pay for an eye examination and glasses once every two years. Co-op Optical Company and Heritage Optical Company are the current providers of this service. This coverage is only available at one of these two firms. The employee may be required to make co-payments for designer frames, special lenses, and contact lenses.

Items Not Covered

Benefits are not payable for the following types of care or expense:

- Procedures or supplies furnished due to a visual defect which arises out of, or in the course of, any occupation for wage or profit;

- Vision care services resulting from declared or undeclared war, or any act thereof, or military or naval service of any country;

- Vision care services or supplies furnished by or at the direction of the United States Government or any agency thereof;

- Vision care services or supplies received from a medical department maintained by a mutual benefit association, labor union, trustee or other similar group;

- Vision care services or supplies which are payable or furnished by any other group policy or prepayment plan;

- Any medical or surgical treatment of the eye;

- Sunglasses, plain or prescription or safety lenses or goggles, tinting or photochromic lenses;

- Othoptics, vision training or anisekonia;

- Repair of any kind;

- Loss or theft; and

- Vision expenses incurred by a dependent child after attaining age 19.

184                          185

## PENDING CHANGES

During the term of the contract the joint Union/Management Health Care Committee will be examining additional alternatives to control health care cost. Some of the alternatives being considered as of the date of this agreement are as follows.

1. Control Procedures

   The plan will establish procedures to guard against misuse. This shall include the audit of claims to insure their legitimacy and the collection of health care cards from terminating employees. Other control procedures may be instituted by the administrator.

2. Employee Education Program

   The plan will develop a booklet which will describe the benefits and procedures to be followed in using the plan. They will continue to provide educational material to plan members which will help them to become more familiar with methods to contain health cost.

3. Prescreening Programs

   The plan will develop a prescreening program for employees to help them identify health problems before they become critical. The plan will develop a delivery system for the program which will be convenient for the members and also will guarantee the confidentiality of the program.

4. Maternity Confinement

   The plan may include an incentive for members who elect to shorten their hospital confinement for maternity purposes or use of birthing centers. The incentive shall be based on the standard number of days allowed for in-patient maternity confinement in the hospital admission pre-certification program. In the event that birthing centers are less expensive than inpatient hospital confinement, an incentive plan will be developed to encourage the use of them.

186

5. Billing Audits

   Employees are encouraged to review their hospital and doctor bills for accuracy. The Health Care Committee will agree on a remuneration "finder's fee" for significant discrepancies discovered.

6. Emergency Clinics

   A list of non-hospital based clinics which will provide non-emergency 24-hour medical services will be established. Employees should use these facilities for non-life threatening medical emergencies.

7. Prescription Drugs

   The Plan may seek an administrator for prescription drug coverage which may be different from the administrator of the hospital-medical-surgical plan.

## AMBULATORY PROCEDURES

| Procedure Code | English Description |
|---|---|
| 0145 | Excision of pilonidal cyst of sinus, simple |
| 0454 | Excision of cyst, fibroadenoma or other benign tumor, aberrant breast tissue, duct lesion of nipple lesion (except 0465-0471) bilateral |
| 0465 (T) | Mastecomy for gynecomastia, unilateral |
| 0521 | Biopsy, deep bones (e.g. vertegral body femur) |
| 0522 | Biopsy, excisional, bone superficial (e.g., illium, sternum, ribs, spinous process, trochanter of femur) |
| 0588 | Excision of calcaneal spur |
| 1342 | Arthroplasty, metatarsophalangeal joint, other than hallux, with silastic implant |
| 1601 | Muscle biopsy, deep |
| 2060 | Infraction of turbinates, unilateral or bilateral |
| 2085 | Antrotomy, intranasal, bilateral |
| 2790 | Biopsy or excision of lymph node |

187

| 2791 | —deep cervical node |
| 3740 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectomy, bilateral |
| 3745 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectamy, bilateral |
| 4040 | Cystourethroscpy with biopsy, initial |
| 5620 (T) | Extraocular muscle surgery (resection, recession, advancement, etc.), one muscle |
| 5696 (T) | Slepharoplasty: plastic repair of eyelid with or without graft |
| 0994 | Fracture, humerus, surgical neck, closed reduction |
| 1493 | Dislocation, elbow, closed manipulative reduction, without anesthesia |
| 3163 | Esophagoscopy, diagnostic with biopsy |
| 3165 | —with dilation, direct |
| 3190 | Dilation of esophagus by sound or bougie, indirect, initial |
| 3220 | Gastroscopy, diagnostic |
| 3417 | Colonoscopy (by fiberoptic instrument), transverse colon |
| 3696 | Peritoneocentesis: abdominal paracentesis, initial |
| 5155 | Spinal puncture, lumbar diagnostic |

## EXHIBIT III

## LONG TERM DISABILITY INSURANCE
### (INCOME PROTECTION PLAN)

NOTE:   It is important for employees to apply for this benefit as soon as they believe that they will be disabled for an extended period of time in order to receive the benefits. (See provisions I-C & II-B.)

188

I.   PROVISIONS RELATING TO ELIGIBILITY

A.   Employees Eligible

All full time classified and appointed civilian employees will be eligible for insurance upon completion of three (3) years of continuous employment.

B.   Effective Date

The effective date of the insurance is the date he becomes eligible.

Employees not performing each and every duty of their occupation on the last work day immediately before the date they would become insured, shall become insured on the date they resume such duties.

C.   Applying for Benefits

Eligible employees who become disabled must apply through their department to the City Pension Bureau within sixty (60) days after becoming disabled.

II.   DETERMINING THE AMOUNT OF THE DISABILITY BENEFIT

A.   Monthly Accident-Sickness Benefit

The benefit shall be $200 per month unless:

1.   When added to the following benefits: (i) workmen's compensation; (ii) social security disability insurance; and (iii) city disability pension, if the total exceeds 90% of "take home" pay, as defined, this benefit will be reduced to provide that this benefit plus the other above mentioned benefits equal 90% of "take home" pay; or

2.   When added to the following benefits; (i) workmen's compensation; (ii) social security disability insurance; and (iii) city disability pension, if the total is less than 75% of "take home" pay, as defined, this benefit will be increased to provide that this benefit plus the other above mentioned benefits equal 75% of "take home" pay; but this benefit shall not exceed $1,500 per month.

189

# EXHIBIT 6

# MASTER AGREEMENT

BETWEEN THE

## CITY OF DETROIT

AND

## MICHIGAN COUNCIL 25
OF THE AMERICAN FEDERATION OF STATE
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO

## 1995 - 1998

## 34. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE INSURANCE
*(Also See Memorandum of Understanding Initiative No. 6, Page 140)*

A. The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service rate under the Michigan Variable Fee Coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit until such time during this agreement cost containment/reduction modifications are implemented pursuant to the Memorandum of Understanding Re: Lowered Health Care Costs dated August 31, 1995. Such modifications may impact all or part of the provisions herein contained, including but not limited to medical, dental and optical care coverages.

B. The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

| | |
|---|---|
| Single person | $100.06 |
| Two person | $238.29 |
| Family | $253.54 |

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

C. Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

D. The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided

92

by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986, the City will pay the following amounts per month for hospitalization and medical insurance:

| | |
|---|---|
| Single person | $100.06 |
| Two person | $238.29 |

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

E. The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

F. Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year, all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two Persons
Family

93

G. The City shall provide for all active employees and their dependents a Dental Plan which shall be the Blue Cross/Blue Shield program which provides Class I benefits on a 25% co-pay basis and Class II and III benefits on a 50% co-pay basis. Classes I, II, and III benefits shall not exceed $1,000 per person per year. In addition, Orthodontic coverage shall be on a 50% co-pay basis with a $1,000 life time maximum. Other terms and conditions regarding these plans shall be in accordance with the standard Blue Cross/Blue Shield policies regarding administration of such programs.

The City, in mutual agreement with the Union and the Health Care Cost Reductions Committee (HCCRC), will make available cost effective alternative dental plans.

Newly hired employees shall not be eligible for these benefits until they shall have worked 1,040 straight time hours.

H. The City will provide Optical Care Insurance through the Employee Benefit Board according to the schedule of benefits outlined in Exhibit II.

Optical care enrollments will occur at two (2) year intervals.

I. If, during the term of this Agreement, a Federal Health Security Act (National Health Insurance) is enacted, the parties agree to reopen discussions with respect to health care benefits if there is need to do so due to the impact of such a Federal program.

J. No insurance carrier shall be allowed to underwrite City Health Care Benefits unless it offers coordination of benefits. All carriers will be required to provide group specific utilization and cost data as a condition of doing business with the City. Copies of all information will be provided to Union and City representatives as directed.

K. The parties agree to form a Health Care Cost Containment Committee made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph "B", the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

L. Effective December 1, 1995, the City shall implement the Blue Cross/Blue Shield Preferred Prescription Drug Program.

M. Duty Disability Retiree Dependent Dental Coverage: Assuming that Duty Disability Retirees are treated the same as active employees for the provision of dental benefits, the eligible dependents of said group should be treated the same as eligible dependents of active employees. As such, the dependents of duty disability retirees shall be eligible for dental coverage in accordance with the eligibility provisions established for dependents of active employees.

94

95

It is recognized that the current administrative and systems capability may impact the implementation of this provision.

NOTE: A description of the City's health care and dental plans appear in Exhibit II.

## 35. WORKERS' COMPENSATION
*(Also See Memorandum of Understanding Initiative No. 2, Page 134)*

A. All employees shall be covered by the applicable Workers' Compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of City employment shall be continued on the payroll and his/her time shall be charged to his/her sick leave reserve for all days not covered by Workers' Compensation payments; provided that in the absence of any sick leave reserve he/she shall be paid regular wages or salary to the extent of two-thirds of his/her daily wage or salary but for a period not to exceed seven (7) days; provided also that where the employee has off-time banks and receives income under the Worker's Compensation Act, such income shall be supplemented by the City from his/her off-time banks in an amount sufficient to bring it up to ninety-five percent (95%) of his/her weekly take-home pay. For the purposes of this article, take-home pay is defined as gross pay from the City less Social Security deductions, and less Federal, State and City income tax withholding amounts based on the employee's actual number of dependents. Employees shall be eligible to earn current sick leave.

B. Employees shall not be eligible for holiday pay nor earn additional vacation or reserve sick leave when they are being paid Workers' Compensation benefits.

C. The City agrees to continue hospitalization and life insurance benefits for employees with one (1) or more

96

years of seniority who have been approved for Workers' Compensation benefits for a period of nine (9) months after they go off the payroll. Thereafter employees will be entitled to benefits which accrue to them through the Pension Plan and the Income Protection Plan.

NOTE: In order to continue hospitalization and life insurance benefits, employees are responsible for their portion of the premium as required by the Contract. Those deductions will be made automatically while they remain on the payroll because they are supplementing. Once they leave the payroll, they must make arrangements with the Pension Bureau to pay those premiums in order to continue coverage.

D. JOINT LABOR/MANAGEMENT REVIEW COMMITTEE

A joint committee of three representatives of the union and three representative of management shall be established to review all situations involving the return of employees to active employment from job injury. The committee shall meet periodically at mutually agreeable time and places or upon request to discuss problems associated with the return to work program.

NOTE: This matter may also be referred to the Central Labor/Management Committee by mutual agreement of the parties, (see Memorandum of Understanding, page 146)

## 36. DEATH BENEFITS AND LIFE INSURANCE

A. DEATH BENEFITS:

Death benefits for all regular City employees are authorized by the City Charter, Title IX, Chapter VIII. The City Code, Chapter 13, Article 8, Section 8, currently provides a death benefit of $6,000.00.

97

2:12-cv-13843-AC-DRG Doc # 17-2 Filed 06/27/12 Pg 6 of 22 Pg ID 129

difficulties or special job skills, shall not require an equivalent increase for the AFSCME unit at large; the parties further agree, however, that an adjustment shall be required for an AFSCME classification to maintain the recognized traditional wage relationship to another bargaining unit's classification which received such a special wage adjustment.

## 52. CONFIDENTIAL EMPLOYEES

The parties agree that certain City employees are designated as confidential employees and are, therefore, to be exempt from membership in the bargaining unit covered by this Agreement. These employees are those holding the positions as outlined in the Memorandum of Understanding reached by the parties and submitted, and approved by the Michigan Employment Relations Commission in connection with Case No. C79 D-110 as well as the Decision and Order of the Commission in that case dated June 4, 1980. The City shall not designate other employees as confidential without the agreement of the Union; but may, if the Union fails to so agree, petition the Michigan Employment Relations Commission to approve such designation.

## 53. MODIFICATION AND TERMINATION

It is agreed between the parties that this Contract shall continue in full force and effect until 11:59 p. m., June 30, 1998. If either party desires to modify this Contract they shall give written notice during the month of February 1998. Negotiations for a new contract shall commence thirty (30) days after that date.

In the event that the City and the Union fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 1998, the Agreement will remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) day written notice on or after June 20, 1998.

118

terms and conditions of employment and that, during the term of this Agreement, neither the City nor the Union will be required to negotiate on any further matters affecting these or any other subjects not specifically set forth in this Agreement, except by mutual agreement of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this 9th day of May, 1996.

MICHIGAN COUNCIL #25,
and the Local Unions listed below
of the American Federation of
State, County and Municipal
Employees, AFL-CIO:

FLORA WALKER, President
AFSCME, Council #25, AFL-CIO

ALBERT GARRETT, Executive
Assistant to the President

JOSEPHUS R. KING, President
Local #23

JAMES FUNDERBURG,
Acting President Local #26

EULA M. MURRAY, President
Local #62

**CITY OF DETROIT:**

DENNIS W. ARCHER, Mayor
City of Detroit

ROGER N. CHEEK, Director
Labor Relations Division

GARY K. DENT, Director
Human Resources Department

PHYLLIS A. JAMES, Corporation
Council, Law Department

VALERIE L. JOHNSON, Director
Finance Department

Approved and Confirmed by the
City Council June 19, 1996

Jackie L. Curry, City Clerk

119

SIGNATURE PAGE CONTINUED
Page 3 of 3

**MICHIGAN COUNCIL #25,**
and the Local Unions listed below
of the American Federation of
State, County and Municipal
Employees, AFL-CIO:

DELBERT WALLS, SR., President
Local #207

CARLTON M. BALLARD, President
Local #214

JESSE J. MANNS, JR., President
Local #229

DOROTHY MOTTLEY, President
Local #273

LEAMON B. WILSON, President
Local #312

ALVIN JONES, President
Local #457

NANCY WILLIS, President
Local #542

JAMES T. MCCALL, President
Local #836

120

SIGNATURE PAGE CONTINUED
Page 3 of 3

**MICHIGAN COUNCIL #25,**
and the Local Unions listed below
of the American Federation of
State, County and Municipal
Employees, AFL-CIO:

SYLVIA GAMBLE, President
Local #1023

ELMIRA WILLIS-STUCKEY,
President, Local #1220

DAVID C. CLARK, President
Local #1227

DREE SUMLING, President
Local #1642

GERALDINE CHATMAN, President
Local #2799

CATHERINE PHILLIPS, President
Local #2920

121

MEMORANDUM OF UNDERSTANDING
INITIATIVE NO. 5

RE:   PERFORMANCE EVALUATIONS
TO BE DEVELOPED, SERVICE
IMPROVEMENTS TO BE REALIZED

After considerable discussion of the subject of all management, supervisors, and workers being required to give a high quality work performance for the City of Detroit, the parties acknowledge that the City government management, serving as "the employer," is obligated to provide adequate leadership in the operation of the City services, and has the responsibility to require adequate performance for the public's benefit by all levels of employees whose wages are paid for with the public's resources. Furthermore, that management in that role and with such responsibilities possesses the inherent authority to express and record evaluations of the performance of all employees at all levels in the government and to utilize such in the running of the government, so long as such usage does not violate any employee's rights or the provisions of the labor agreement.

MEMORANDUM OF UNDERSTANDING
INITIATIVE NO. 6

RE:   LOWERED HEALTH CARE COSTS

The parties agree to negotiate agreements which will achieve cost savings on the following four initiatives. It is understood, however, that in addition to these mandatory cost reducing changes, the parties' Health Care Cost

140

Reductions Committee (HCCRC) will continue to pursue potential means of further reducing costs or stunting their escalation in the future through other initiatives.

A.   Health Insurance Premiums, Employee Portions Paid With "125K Pre-Tax" Dollars  (This will be instituted forthwith, as soon as possible, upon ratification of the labor agreement.)
B.   Prescription Drugs at $3.00
C.   Mail-Order Prescription Drugs Program
D   COB Administrative Change (Verify then Pay)

The following issues are NOT AGREED TO but are still being mutually examined by the Committee with regard to the parameters of such a rule as stated:

E.   Emergency Room "Non-Admitting Usage Fee"
F.   Opt-Out Payments When Alternate Coverage Exists

Further, this HCCRC will endeavor to coordinate its activities with and make its efforts compatible with any beneficial outcomes from the operations between the City and the AFL-CIO Coalition of Unions Committee On Health Care Issues. In that regard, the union has already expressed at the contract bargaining table its interest in adopting the potential lower-costing "HMO/POS" program now being carefully considered by that City/Coalition Committee, subject to the Union's concerns about maintenance of the present benefits in the traditional BC/BS.

The benefits of this initiative will be initially realized in Year I for initiative A and in Year II for initiatives B, C, and D.  For initiatives E and F, if the parties should come to agreement on them, the benefits will take effect in accordance with the understanding reached between the parties. And lastly, further benefits will be realized to the extent the HMO/POS program is adopted and saves the parties health care costs.

141

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF DETROIT
AND
AMERICAN FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES MICHIGAN COUNCIL 25,
AFL-CIO

## RE:   NATIONAL HEALTH CARE

If, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits.

Dated this 9th day of May, 1996.

FOR THE UNION:

Flora Walker, President
AFSCME, Council #25, AFL-CIO

FOR THE CITY:

Roger N. Cheek, Director
Labor Relations Division

154

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF DETROIT
AND
AMERICAN FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES MICHIGAN COUNCIL 25,
AFL-CIO

## RE:   1998 NEGOTIATIONS

1. It is agreed that, beginning May 1, 1998, if a Local Union President is occupied with Master Agreement negotiations, the Local Union may be represented by a person designated by the Local Union President at grievance hearings, Special Conferences, and Supplemental Contract negotiations. The Local Union President shall submit, in writing, the name of such designated representative prior to May 1, 1998.

2. It is agreed that Section B(2) of the Memorandum of Understanding of Local Union Presidents shall be amended so that vacation time for the current Presidents which was credited on or after July 1, 1997 may be carried over July 1, 1998 provided that total vacation accumulation shall not exceed forty (40) days on that date. It is also understood that any vacation carried over into the 1997-98 fiscal year will be liquidated within that fiscal year along with any other vacation which must be liquidated under the terms of the Memorandum of Understanding.

3. It is agreed that the location for negotiations shall be alternated between the site selected by the City and the site selected by the Union. The meeting scheduled for April 24th will be held in the City's Labor Relations Division Conference Room. Thereafter, the alternating of meeting locations will begin.

155



City of Detroit
Human Resources Department
Labor Relations Division

332 City-County Building
Detroit, Michigan 48226
Phone 313-224-3860
Fax 313-224-0738

August 31, 1995

Ms. Flora Walker, President
AFSCME, Michigan Council 25
1034 N. Washington
Lansing, Michigan 48906

*As Its*

RE:   **EVALUATION OF TRADITIONAL DENTAL
      CARE PROVIDERS**

Dear Ms. Walker:

During the 1995 negotiations there was discussion between the parties concerning the possibility of changing the traditional dental carrier. As a result the City agrees that during the term of the Contract, it will evaluate other traditional dental care providers. It is understood that before any such change is implemented, it must be mutually agreed to by the parties.

Sincerely,

Roger N. Cheek, Director
Labor Relations Division

*Dennis W. Archer, Mayor*

184

---

City of Detroit
Human Resources Department
Labor Relations Division

332 City-County Building
Detroit, Michigan 48226
Phone 313-224-3860
Fax 313-224-0738

August 31, 1995

Ms. Flora Walker, President
AFSCME, Michigan Council 25
1034 N. Washington
Lansing, Michigan 48906

*Talk with Bill*

RE:   **JURISDICTIONAL DISPUTES**

Dear Ms. Walker:

Both the City and Council 25 recognize that jurisdictional disputes are basically between Unions. During 1995 negotiations, Council 25 discussed at great lengths jurisdictional disputes between their Union and other unions and the following classifications were mentioned as prime sources of friction:

Laborer A - Truck Driver/Vehicle Operator
G.A.M. - CEO
Building Inspector - Housing Inspector
Mechanics - P.L.D.

The City agreed to do what it can by the special conference method to resolve these disputes between Council 25 and other City Unions.

*Dennis W. Archer, Mayor*

185

**EXHIBIT II**
CITY OF DETROIT
AFSCME MICHIGAN COUNCIL 25
NON-SUPERVISORY BARGAINING UNIT

RE:   **HEALTH CARE PLANS**

## INTRODUCTION

The City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to the amount the City pays for the traditional plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

Furthermore, the traditional health plan described herein includes several cost containment features. Furthermore, the joint union/management health cost containment committee will be studying additional cost containment programs which will be included during the term of the agreement.

Note:   This matter may also be referred to the Central Labor/Management Committee by mutual agreement of the parties, (see Memorandum of Understanding, page 146).

## ELIGIBILITY

NOTE:  This summary of health insurance plans described herein contain the essential features of the hospitalization insurance plans offered by the City in general terms. It is not intended to be a full description of coverage. The complete plans are described in the certificate of coverage issued by each plan.

208

PERSONS ELIGIBLE FOR HEALTH CARE COVERAGE:

1.  The employee;

2.  The employee's dependents as explained below:

The legal spouse of the subscriber, unmarried children related by birth, legal adoption, or legal guardianship (while a dependent of the subscriber), and children of the subscriber's spouse (while a dependent of the subscriber). These children are covered from birth to the end of the calendar year in which they attain 19 years of age. This limit shall be extended one more year for those children still in high school.

Unmarried, dependent children who are incapable of self-support because of a permanent mental or physical disability are eligible for coverage. An application card, which contains a "physician's certification of disability," must be submitted before December 31st of the year in which the dependent becomes 19 years of age.

Nineteen to twenty-five year old dependents continue to be covered until the end of the calendar year in which they attain 25 years of age as long as they are unmarried and are dependent upon the employee for support and maintenance and were reported as such on the employee's most recent federal income tax return. There will be no additional charges for this coverage when they are under an employee contract.

Under the "Consolidate Omnibus Budget Reconciliation Act of 1985 (COBRA)," employees and their eligible dependents will have the option to continue group health coverage at their own expense after that coverage would have normally terminated. This option becomes available upon certain qualifying events that occur on or after July 1, 1986. Group health coverage includes hospitalization, dental and eye care coverage as one complete package.

209

## QUALIFYING EVENTS AFFECTING EMPLOYEES

A. The reduction of work hours or a temporary layoff that causes employees to lose their group coverage.

B. Termination of employment, either voluntary or involuntary (except for termination for gross misconduct).

Employees may elect to continue their group health coverage up to 18 months beyond the qualifying event in A or B above. (The full monthly premium cost must be paid each month to continue coverage).

## QUALIFYING EVENTS FOR EMPLOYEES BENEFICIARIES

A. Upon divorce or legal separation of employee and the employee's spouse (spouse option to include the dependent children).

B. The date a dependent child no longer qualifies as a dependent under the plan. (example, dependent child passes the maximum age for coverage as a dependent child).

C. Upon the death of the employee.

D. Upon the employee becoming entitled to benefits under Title XVIII of the Social Security Act (and the spouse and dependent children lose the employer provided group health coverage).

The employee's spouse and dependent children may elect to continue the same group coverage up to 36 months from the date of the qualifying event noted in A, B, C, or D above. The full monthly premium cost must be paid each month to continue coverage.

## CANCELLATION OF COVERAGE

Continuation of coverage will be cancelled upon the occurrence of the following circumstances:

210

1. Cancellation of group health plan to active employees.
2. The qualified beneficiary becomes a covered employee under another group health plan or becomes entitled to medicare benefits.
3. The qualified beneficiary fails to pay the required premium.
4. The qualified beneficiary remarries and becomes covered under a group health plan.
5. The end of the continuation coverage period.

## EFFECTIVE DATES FOR HOSPITALIZATION COVERAGE

COVERAGE PERIOD:  First (lst) through thirty-first (31st)

QUALIFYING FOR CONTINUING COVERAGE: Any month in which an employee receives a paycheck with a least eight (8) hours of pay, he/she will have coverage for the entire month; less than eight (8) hours of pay - no coverage.

NOTE:  Suspensions and Departmental Leave are governed by this section.

COVERAGE EFFECTIVE DATE:  For new hires or employees returning from Human Resources leaves or lay-offs, coverages are effective the day they receive their first paycheck.

NOTE:  For new or returning employees, coverage dates will be determined as of the date the employee would have normally received his/her paycheck.

COVERAGE ENDING DATE:  End of the month in which an employee receives the last paycheck. Lump-sum payments or special-pay adjustments, after an employee has left the payroll, do not continue hospitalization coverage.

211

# SECTION I

## TRADITIONAL HOSPITALIZATION

### HOSPITAL CHARGES:

The City's hospital benefits include the following:

- The cost (ward room and board rates) for 365 days for treatment of general conditions. (Employees may elect semi-private coverage at their own expense).

  Renewal:   Full benefits are restored after a consecutive period of 60 (sixty) days has elapsed since the date of last discharge from a hospital.

- The cost of ward room and board for treatment of mental and nervous disorders is limited to forty-five (45) days. The full cost of ward room and board at a general hospital for treatment of substance abuse (alcohol and drug related) disorders is limited to five (5) days. Up to forty (40) days of in-patient rehabilitation treatment shall be covered in a free-standing facility that specializes in this type of treatment and is preapproved by the plan. (If a member is admitted directly into non-hospital based facility, the maximum number of days will be forty-five [45]).

  Renewal:  In order to re-establish hospital benefits for a nervous or mental disorder, there must be a period of non-confinement equal to at least sixty (60) consecutive days.

- See master medical section for additional benefits.

### MATERNITY BENEFITS:

(applies to members of the plan)

Ward hospital room and board charges or birthing center charges and charges for other hospital services resulting from pregnancy, childbirth or miscarriage are covered in accordance with the plan.

212

### OTHER HOSPITAL SERVICES:

The plan will pay the full cost of the items shown below when furnished by a hospital or its hospital staff and prescribed by your doctor:

- general nursing service
- special diets
- operating, delivery and treatment rooms and equipment
- anesthesia
- laboratory examinations
- physical therapy and oxygen or other gas therapy
- drugs and medicines
- supplies for dressings and plaster casts
- use of radium (when owned or rented by the hospital)
- routine nursery care for newborn children
- non-routine hospital care for newborn children

### EMERGENCY SERVICES:

The plan will pay all charges in connection with emergency room treatment on non-occupational "accidental injuries" and life threatening medical emergencies.

### PRE-ADMISSION CERTIFICATION:

A Hospital Pre-Admission certification form MUST be completed and returned to the plan for approval before the plan will approve any elective non-emergency hospital admission. In order to receive hospital benefits paid for by the plan, in-patient non-emergency admissions MUST be prior authorized by the plan. An appeal process for the physician and member shall be a part of this plan.

Hospital Pre-Admission Certification forms will be available from the providers, physicians, the Plan Offices, and the employer and must be submitted to the plan before the proposed hospital admission.

213

An employee's doctor will complete the form and submit it to the plan. Both the employee and his/her doctor will receive notification regarding whether or not the admission has been approved.

In cases of emergency admittance to a hospital which shall include emergency admittance for alcohol and drug abuse, the hospital must notify Blue Cross within twenty-four (24) hours and they will certify the number of days allowable based upon the information submitted. If the attending physician requires a member to remain in the hospital for longer than the pre-certified amount of time, they must obtain approval from Blue Cross for additional days. Unless specifically approved, the plan will not pay for any days spent in a hospital beyond those approved by the pre-certification.

## AMBULATORY PROCEDURES REQUIREMENTS:

All medical surgical procedures on the attached list must be performed on an ambulatory basis unless pre-certified by the Plan.

## EXTENDED CARE FACILITIES:

If an employee or an eligible dependent are transferred to an extended care facility immediately following a home or hospital confinement (home health care status shall be considered as hospital confinement for purposes of this section), the plan will pay the full cost of room and board and other medical services. Pre-certification is required.

Extended care facility benefits are limited to a maximum of 730 days and are reduced by two (2) times the number of days spent in a hospital for the same condition.

214

## HOME HEALTH CARE AND HOSPICE CARE BENEFITS:

The plan covers charges for the following home health care services:

1. Professional nursing care
2. Physical therapy
3. Speech therapy
4. Home health aide services.
5. Expenses for equipment or materials used for home health care treatment (e.g., surgical dressings, oxygen, gauze, cotton, etc.).

(Three (3) home health care visits are equivalent to one (1) day of hospital care.)

Home hospice care is designed specifically for treatment of the terminally ill. Medical care concentrates on pain management and professional counselling for both patients and their families.

All home hospice services must be prior authorized (refer to the section entitled Pre-Admission Approval). Once approved, the plan pays the full cost of hospice care including nursing and other required medical services up to the plan limit.

## BILLING AUDITS:

Employees are encouraged to review their hospital and doctor bills for accuracy.

# MEDICAL SURGICAL BENEFITS

## SURGICAL EXPENSE BENEFITS:

If an employee or one of their eligible dependents must undergo surgery as the result of a non-occupational injury or illness, the plan will pay in full for all surgical procedures performed by a surgeon who has agreed to reasonable and customary charges established by the plan.

215

SECOND SURGICAL OPINION:

Mandatory second surgical opinions will be in accordance with the attached list of procedures (Does not apply to emergencies).

For all other procedures:

If a doctor has recommended elective (non-emergency) surgery, an employee must seek a second medical opinion before consenting to the surgery.

When employee seeks a second opinion the employee is required to obtain any x-rays or test results from the first physician and have them reviewed by second physician to avoid duplication of tests.

The plan covers doctor's reasonable and customary fees associated with a second surgical opinion.

In addition to payment for doctor's charges, the plan will also cover the cost of diagnostic laboratory and x-ray services performed in conjunction with the second surgical opinion.

If a member receives conflicting medical opinions regarding the need for a surgical procedure, the employee will make the final decision about whether or not to have the surgery. If the employee does decide to have the surgery, the plan will provide surgical benefits.

MATERNITY BENEFITS:

(applies to members of the plan)

Charges for outpatient care by member's doctor are eligible expenses under the plan.

216

X-RAY AND LABORATORY SERVICES:

If a member of the plan has x-ray and/or laboratory services related to a non-occupational illness or accident in a non-hospital setting, the charges are covered in full.

MENTAL AND NERVOUS DISORDERS:

Treatment for substance abuse, psychiatric and nervous disorders shall be limited to $400 per member per calendar year for out-patient services.

OTHER ITEMS COVERED BY THE PLAN:

Physician's Services

- Medical Care of In-patients
  -- Hospital
  -- Convalescent Care Facility
  -- Psychiatric Day/Night Care Hospital
  -- Residential SAT program
- Surgery; Anesthesia; Surgical Assistant
  -- Consultations
  -- In-patient
- Maternity Care
  -- Pre & Post Natal Visits
  -- Delivery
  -- Examination of Newborn
- Emergency Care
  -- Injuries; Medical Conditions
- Psychiatric Care
  -- In-patient
  -- Out-patient $400
- Chemotherapy
- Therapeutic Radiology
- Diagnostic Radiology
- Diagnostic Lab & Pathology
- Other Diagnostic Services
  -- EKG: EEG: etc.

217

ITEMS NOT COVERED BY HOSPITAL-MEDICAL-SURGICAL BENEFITS:

The plan does not cover the following types of disabilities, expenses or care:

1. Dental care except for extractions or removal of unerupted teeth under general anesthesia when a concurrent hazardous medical condition exists;

2. Cosmetic surgery; except for the correction of birth defects, accidental injuries or traumatic scars, or reconstructive surgery to correct deformities resulting from specified diseases or medically necessary surgery;

3. Hospital admissions that are not medically necessary, such as admissions that are principally for diagnostic evaluation, or physical therapy, or reduction of weight by diet control;

4. Custodial care or domiciliary care which does not require definitive medical or nursing services for an illness or injury;

5. Care for occupational injury or disease or care obtainable without cost from government agencies or through the facilities of the employer;

6. Routine physical, premarital or pre-employment examinations;

7. Items such as blood, durable medical equipment, prosthetic and other appliances, and ambulance service unless specifically mentioned as being covered in this proposal.

218

# SECTION II

## MASTER MEDICAL EXPENSE BENEFITS

The City's coverage for master medical benefits shall be 80% of the usual and customary fees for out-patient services provided by the plan after the employee pays for the first $50 of cost per person or $100 per family per year. After an employee has out of pocket expenses over $1,000 in any calendar year, 100% of the eligible expenses are covered. The life-time maximum benefit is $1,000,000.

Out-patient treatment for substance abuse, psychiatric and nervous disorders shall be limited to 50% of reasonable fees with an annual limit of $2,000 per year and a life-time limit of $5,000. (This is in addition to the basic benefit.). The plan's maximum is $15,000 for one year and $30,000 for two or more years for combined in-patient and out-patient psychiatric services.

AMBULANCE:

If a member of the plan is transported to a medical facility due to an accidental injury or medical emergency or if they or their eligible dependents are transferred from one medical facility to another at their doctor's recommendation, the plan will pay for such ambulance service under the master medical benefit.

ITEMS NOT COVERED BY MAJOR MEDICAL:

The plan does not cover the following types of expenses, disabilities or care:

- Extended benefits are not available for pulmonary tuberculosis or mental disorders.
- Routine dental care such as fillings, extractions, bridgework, braces, root canals and impacted wisdom teeth.

219

ITEMS NOT COVERED BY MAJOR MEDICAL CONTINUED:

- Eyeglasses, routine eye examinations, eye refractions, hearing aids and the fitting of hearing aids or eyeglasses.
- Routine physical examinations and related tests.
- Cost of transportation that exceeds ambulance benefit level.
- Personal comfort items while hospitalized, including but not limited to, television and telephone.
- The portion of room charges which exceeds the hospital's ward rate.
- Surgical procedure, treatment or hospital confinement primarily for beautification.
- Expenses for work-related injuries or disabilities (these are covered by Workers' Compensation).
- Expenses for care of injuries or sickness due to war or war-related acts.
- Any treatment or service not prescribed by a physician.
- Screening or other procedures not necessary for diagnosis and generally accepted therapy.
- Any surgery or medical care or service furnished by any facility contracted for or operated by the United States Government or by any other governmental unit for medical care or treatment unless a charge is made which the insured is legally required to pay.
- Expenses for the treatment of nervous, mental, or substance abuse disorders that exceed the basic benefit level.
- Any fees that exceed the reasonable and customary fee determination.
- Purchase of wheel chair, hospital bed, artificial respirator, other durable medical equipment.
- Care in convalescent or nursing homes.

220

# SECTION III

## PRESCRIPTION DRUG PLAN

A. Coverage – The prescription drug benefit covers the cost of most prescription drugs after the employee pays a $3 deductible.

B. A list of preferred providers for prescription drugs which an employee must use to obtain the full benefit is attached.

C. Covered Drugs:

1. Federal Legend Drugs
2. State Restricted Drugs
3. Compounded Medication
4. Insulin

D. The plan will require a pharmacy to use generic drugs, if available, unless specifically directed by the prescribing physician based on medical necessity not to do so.

ITEMS NOT COVERED:

Certain items are not covered by the prescription drug program. Among these are:

- The charge for any take home drug.
- Any charge for a contraceptive medication, even if such medication is a prescription legend drug, and any charge for therapeutic devices or appliances, regardless of their intended use.
- Therapeutic devices or appliances (hypodermic needles, support garments and other non-medicinal substances).

221

ITEMS NOT COVERED CONTINUED:

- Drugs or medicines supplied to the covered individual by a prescribing physician or dentist.
- Cosmetic or beauty aids, dietary supplements and vitamins.
- Immunizing agents, injectables, blood or blood plasma or medication prescribed for parental administration, except insulin.
- Any drug labeled "Caution - Limited by Federal Law to Investigational Use" or any experimental drug.
- Any charge for administration of covered drugs.
- The charge for more than a 34-day supply of a covered drug except that benefits will be payable for 100 unit doses (e.g., tablet or capsule, etc.) of specified maintenance drugs unless provided by a mail order pharmaceutical provider.
- The charge for any prescription order refill in excess of the number specified by a physician or dentist, or any refill dispensed after one year from the date of the original prescription order.
- The charge for any medication for which the employee or dependent is entitled to without charge from any municipal, state or federal program of any sort whether contributory or not except Title XIX of Social Security Amendments of 1965 (Public Law 89-97; 89th Congress, First Session).

## SECTION IV
## PREFERRED PROVIDER ORGANIZATION
## AND
## HEALTH MAINTENANCE
## ORGANIZATIONS

The benefit levels for the Blue Cross Blue Shield PPO are for the most part equivalent to the Blue Cross Blue Shield Traditional Plan except that the PPO covers the first $100 of routine office calls and thereafter 70% of the cost. Furthermore, all services received outside the networks are generally covered at 85% of the charge.

222

The health maintenance organizations currently being offered to employees are as follows:

> Blue Care Network
> Total Health Care
> Omnicare
> Comprehensive Health Services
> Health Alliance Plan

Benefits provided by these carriers are as follows:

| Benefit | Extent of Coverage |
|---|---|
| Service in hospital | Full coverage |
| Human Organ transplants | Varies with carrier |
| Emergency Care - Medical | Full coverage |
| Emergency Care - Accidents | Full coverage |
| Routine Medical Services | Full coverage |
| Maternity Services Provided by Doctor | Full coverage |
| Prescription Drugs | Full coverage except for Blue Care Network and Health Alliance Plan which have a $3 co-pay |
| Diagnostic and Therapeutic Procedures | Full coverage |
| Immunizations | Full coverage |
| Family Planning | Full coverage for most services |
| Mental Health Care | Outpatient - 20 visits 12 month period Inpatient - most carriers 45 days per year Omnicare - 45 days |
| Alcoholism/Drug Abuse | Varies with carrier |
| Skilled Nursing Care (not in hospital) | Nursing home care - 730 days |
| Appliances and Prosthetic Devices and Durable Medical Equipment Devices | Full coverage |

223

Prior to the annual enrollment each year a comparison of coverages provided by each of the plans will be provided to members of the Union.

# SECTION V
# DENTAL CARE PLAN

A. COVERAGES:

Class I benefits 75% of usual and customary fees.
Class II benefits 50% of usual and customary fees.
Class III benefits 50% of usual and customary fees.
Orthodontics - 50% of usual and customary fees not to exceed $1,000 maximum life benefit per person covered by the plan.
Annual maximum on Class I, II and III benefits is $1,000 per year.

B. ITEMS NOT COVERED: Dental benefits are not available for the following types of expenses or care:

- Treatment or supplies furnished on account of a dental defect which arises out of, or in the course of, any occupation for wage or profit;
- Any loss sustained as a result of declared or undeclared war, or any act thereof, or of military or naval service of any country;
- Dental procedures received from a dental department maintained by a mutual benefit association, labor union, trustee, or other similar group;
- Any expense for dental procedures or supplies to the extent that payment is received from any group policy or prepayment plan;
- Any treatment which is performed for cosmetic purposes;
- Treatment by other than a legally qualified dentist, except charges for dental prophylaxis performed by a licensed dental hygienist under the supervision and direction of a dentist, or licensed dental practitioner; or in connection with dentures, bridgework, crowns, or prosthetic devices for:

224

1. Expenses for prosthetic devices started prior to the effective date of coverage;

2. Expenses for replacement made less than five years after and immediately preceding placement or replacement which was covered by this plan or the predecessor plan;

3. Expenses for extension of bridges or prosthetic devices previously paid for by the plan except for expenses incurred for new extended areas;

4. Loss or theft:

   a. Temporary restorations, local anesthetics, and/or bases;
   b. Expenses for root canal treatments and/or apicoectomies when previously paid; these are payable only once per tooth;
   c. Orthodontic benefits are not available for the member and spouse or dependent children over age 19 (even if a full-time student).

C. Pre-Determination of benefits (excludes capitation plans):

The following procedures will require pre-determination by the plan:

1. Prosthodontics

   a. Inlays
   b. Onlays
   c. Crowns
   d. Space Maintainers
   e. Bridges
   f. Removable Full or Partial Dentures

2. Periodontics

   a. Subgingival Curettage
   b. Surgical Periodontics

225

3. Oral Surgery

All oral surgical procedures with the exception of four (4) or less simple extractions.

4. Orthodontics

All services.

D. Currently the City is offering Den Cap, Golden Dental Centers and Dental Care Network as capitation dental carriers. These Plans have smaller co-pays and deductibles in most areas than our traditional plan. However, you must select your Dentist from their network.

## SECTION VI
## EYE CARE PLAN

Coverage - The plan will pay for an eye examination and glasses once every two years. Co-op Optical Company and Heritage Optical Company are the current providers of this service. This coverage is only available at one of these two firms. The employee may be required to make co-payments for designer frames, special lenses, and contact lenses.

### ITEMS NOT COVERED:

Benefits are not payable for the following types of care or expense:

- Procedures or supplies furnished due to a visual defect which arises out of, or in the course of, any occupation for wage or profit;
- Vision care services resulting from declared or undeclared war, or any act thereof, or military or naval service of any country;
- Vision care services or supplies furnished by or at the direction of the United States Government or any agency thereof:

Eye Care Plan Items Not Covered Continued:

- Vision care services or supplies received from a medical department maintained by a mutual benefit association, labor union, trustee or other similar group;
- Vision care services or supplies which are payable or furnished by any other group policy or prepayment plan;
- Any medical or surgical treatment of the eye;
- Sunglasses, plain or prescription or safety lenses or goggles, tinting or photochromic lenses;
- Orthoptics, vision training or aniseikonia;
- Repair of any kind;
- Loss or theft; and
- Vision expenses incurred by a dependent child after attaining age 19.

## SECTION VII
## PENDING CHANGES

During the term of the contract the joint Union/Management Health Care Committee will be examining additional alternatives to control health care cost. Some of the alternatives being considered as of the date of this agreement are as follows.

1. Control Procedures:
   The plan will establish procedures to guard against misuse. This shall include the audit of claims to insure their legitimacy and the collection of health care cards from terminating employees. Other control procedures may be instituted by the administrator.

2. Employee Education Programs:
   The plan will develop a booklet which will describe the benefits and procedures to be followed in using the plan. They will continue to provide educational material to plan members which will help them to become more familiar with methods to contain health cost.

226

227

Prescreening Programs:

The plan will develop a prescreening program for employees to help them identify health problems before they become critical. The plan will develop a delivery system for the program which will be convenient for the members and also will guarantee the confidentiality of the program.

4. Maternity Confinement:

The plan may include an incentive for members who elect to shorten their hospital confinement for maternity purposes or use of birthing centers. The incentive shall be based on the standard number of days allowed for in-patient maternity confinement in the hospital admission pre-certification program. In the event that birthing centers are less expensive than inpatient hospital confinement, an incentive plan will be developed to encourage the use of them.

5. Billing Audits:

Employees are encouraged to review their hospital and doctor bills for accuracy. The Health Care Committee will agree on a remuneration "finder's fee" for significant discrepancies discovered.

6. Emergency Clinics:

A list of non-hospital based clinics which will provide non-emergency 24-hour medical services will be established. Employees should use these facilities for non-life threatening medical emergencies.

7. Prescription Drugs:

The Plan may seek an administrator for prescription drug coverage which may be different from the administrator of the hospital-medical-surgical plan.

228

## AMBULATORY PROCEDURES

| Procedure Code | English Description |
| --- | --- |
| 0145 | Excision of pilonidal cyst of sinus, simple |
| 0454 | Excision of cyst, fibroadenoma or other benign tumor, aberrant breast tissue, duct lesion of nipple lesion (except 0465-0471) bilateral |
| 0465 (T) | Mastectomy for gynecomastia, unilateral |
| 0521 | Biopsy, deep bones (e.g. vertebral body femur) |
| 0522 | Biopsy, excisional, bone superficial (e.g., ilium, sternum, ribs, spinous process, trochanter of femur) |
| 0588 | Excision of calcaneal spur |
| 1342 | Arthroplasty, metatarsophalangeal joint, other than hallux, with silastic implant |
| 1601 | Muscle biopsy, deep |
| 2060 | Infraction of turbinates, unilateral or bilateral |
| 2085 | Antrotomy, intranasal, bilateral |
| 2790 | Biopsy or excision of lymph node |
| 2791 | --deep cervical node |
| 3740 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectomy, bilateral |
| 3745 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectamy, bilateral |
| 4040 | Cystourethroscopy with biopsy, initial |
| 5620 (T) | Extraocular muscle surgery (resection, recession, advancement, etc.), one muscle |
| 5696 (T) | Slepharoplasty: plastic repair of eyelid with or without graft |
| 0994 | Fracture, humerus, surgical neck, closed reduction |
| 1493 | Dislocation, elbow, closed manipulative reduction, without anesthesia |

229

AMBULATORY PROCEDURES CONTINUED:

| Procedure Code | English Description |
|---|---|
| 3163 | Esophagoscopy, diagnostic with biopsy |
| 3165 | --with dilation, direct |
| 3190 | Dilation of esophagus by sound or bougie, indirect, initial |
| 3220 | Gastroscopy, diagnostic |
| 3417 | Colonoscopy (by fiberoptic instrument), transverse colon |
| 3696 | Peritoneocentesis: abdominal paracentesis, initial |
| 5155 | Spinal puncture, lumbar diagnostic |

230

---

**EXHIBIT III**
CITY OF DETROIT
AFSCME MICHIGAN COUNCIL 25
NON-SUPERVISORY BARGAINING UNIT

RE:   **LONG TERM DISABILITY BENEFITS
(INCOME PROTECTION PLAN)**

Note:   It is important for employees to apply for this benefit as soon as they believe that they will be disabled for an extended period of time in order to receive the benefits.  (See provisions I-C & II-B)

1.   PROVISIONS RELATING TO ELIGIBILITY

A.   Employees Eligible:

All full time classified and appointed civilian employees will be eligible for benefits upon completion of three (3) years of continuous employment.

B.   Effective Date:

The effective date of the benefits is the date he becomes eligible.

Employees not performing each and every duty of their occupation on the last work day immediately before the date they would become eligible, shall become eligible on the date they resume such duties.

C.   Applying for Benefits

Eligible employees who become disabled must apply through their department to the City Pension Bureau within sixty (60) days after becoming disabled.

231

# EXHIBIT 7

# MASTER AGREEMENT

BETWEEN THE

# CITY OF DETROIT

AND

# MICHIGAN COUNCIL 25

OF THE AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO
NON-SUPERVISORY BARGAINING UNIT

# 1998 - 2001

employee must notify the department of his/her desire to exercise this option prior to the first date of jury service.

F. Jury duty shall be considered as time worked.

G. An employee on jury duty will be continued on the payroll and be paid at his/her straight time hourly rate for his/her normally scheduled hours of work. Upon return from jury duty, the employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an employee fails to turn in his/her jury duty payment, the City will hold subsequent payments due to the employee until the City is reimbursed for all time lost due to the alleged jury duty service.

## 34. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE INSURANCE

A. The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service rate under the Michigan Variable Fee Coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.

B. The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person    $100.06
Two person       $238.29
Family           $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

-96-

C. Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

D. The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986, the City will pay the following amounts per month for hospitalization and medical insurance:

Single person    $100.06
Two person       $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

E. The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

F. Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the

-97-

option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year, all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

**Single Person**
**Two Persons**
**Family**

G. The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a Dental Plan which shall be the Blue Cross/Blue Shield program which provides Class I benefits on a 25% co-pay basis and Class II and III benefits on a 50% co-pay basis. Classes I, II, and III benefits shall not exceed $1,000 per person per year. In addition, Orthodontic coverage shall be on a 50% co-pay basis with a $1,000 life time maximum. Other terms and conditions regarding these plans shall be in accordance with the standard Blue Cross/Blue Shield policies regarding administration of such programs.

The City, in mutual agreement with the Union and the Health Care Cost Reductions Committee (HCCRC), will make available cost effective alternative dental plans.

Newly hired employees shall not be eligible for these benefits until they shall have worked 1,040 straight time hours.

H. The City will provide Optical Care Insurance through the Employee Benefit Board according to the schedule of benefits outlined in Exhibit II. Effective July 1, 1999 through June 30, 2001, the City will contribute $5.50 per month for employees covered by CO/QP Optical and $5.43 per month for employees covered by Heritage Optical.

Optical care enrollments will occur at two (2) year intervals.

-98-

I. If, during the term of this Agreement, a Federal Health Security Act (National Health Insurance) is enacted, the parties agree to reopen discussions with respect to health care benefits if there is need to do so due to the impact of such a Federal program.

J. No insurance carrier shall be allowed to underwrite City Health Care Benefits unless it offers coordination of benefits. All carriers will be required to provide group specific utilization and cost data as a condition of doing business with the City. Copies of all information will be provided to Union and City representatives as directed.

K. The parties agree to form a Health Care Cost Containment Committee made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph "B", the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

Furthermore, the parties agree during the term of this Agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this Agreement.

-99-

**L. HOSPITALIZATION-MEDICAL COVERAGE OPT-OUT PROGRAM:** Effective July 1, 1999, employees on the active payroll who are covered by a health care plan offered by an employer other than the City, and can furnish proof of such coverage, may elect to take an annual $950 cash payment, which will be paid in four (4) equal installments ($237.50) at the end of each three (3) month period, in lieu of the hospitalization-medical coverage offered by the City. This election shall take place annually during the open enrollment period.

Once an employee elects the cash payment, the employee will not receive hospitalization-medical coverage until the next year's enrollment period. If the employee loses his eligibility for the alternate coverage, the employee, upon submitting appropriate proof of loss of coverage, will be able to resume the City's hospitalization-medical coverage the month following completion of the applicable enrollment forms. The cash payments will cease upon the employee resuming the City's hospitalization-medical coverage.

The City shall have the sole discretion to offer this opt-out provision to current and future retirees who are eligible for the City's hospitalization-medical coverage. This discretion shall extend to the determination of the amount of the cash payment, the method of payment, the eligibility requirements, and the continuance of the opt-out plan itself.

**Note:** A description of the City's health care, optical and dental plans appear in Exhibit II.

The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.

-100-

## 35. WORKERS' COMPENSATION

A. All employees shall be covered by the applicable Workers' Compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of City employment shall be continued on the payroll and his/her time shall be charged to his/her sick leave reserve for all days not covered by Workers' Compensation payments; provided that in the absence of any sick leave reserve he/she shall be paid regular wages or salary to the extent of two-thirds of his/her daily wage or salary but for a period not to exceed seven (7) days; provided also that where the employee has off-time banks and receives income under the Worker's Compensation Act, such income shall be supplemented by the City from his/her off-time banks in an amount sufficient to bring it up to ninety-five percent (95%) of his/her weekly take-home pay. For the purposes of this Article, take-home pay is defined as gross pay from the City less Social Security deductions, and less Federal, State and City income tax withholding amounts based on the employee's actual number of dependents. Employees shall be eligible to earn current sick leave.

B. Employees who are unable to supplement their Workers' Compensation benefit from their off-time banks because the amount of overtime worked causes the benefit to meet or exceed ninety-five (95%) percent of weekly take-home pay, shall be treated like employees who are able to supplement for the purposes of hospitalization, life insurance and current sick leave. This provision does not apply to those employees who are unable to supplement because they have no time available in their off-time banks.

C. Employees shall not be eligible for holiday pay nor earn additional vacation or reserve sick leave when they are being paid Workers' Compensation benefits.

-101-

D. The City agrees to continue hospitalization and life insurance benefits for employees with one (1) or more years of seniority who have been approved for Workers' Compensation benefits for a period of nine (9) months after they go off the payroll. Thereafter employees will be entitled to benefits which accrue to them through the Pension Plan and the Income Protection Plan.

**Note:** In order to continue hospitalization and life insurance benefits, employees are responsible for their portion of the premium as required by the Contract. Those deductions will be made automatically while they remain on the payroll because they are supplementing. Once they leave the payroll, they must make arrangements with the Pension Bureau to pay those premiums in order to continue coverage.

E. Consistent with the Workers' Compensation Act and current City practices:

1. The City shall continue its program of returning workers who suffered job injuries back to active employment to perform work tasks which are compatible with their current physical capabilities. To the maximum extent possible, employees will be returned to their former job classification in their former department, or if no such position is available, in another City department if they are presently able to perform the essential duties with or without reasonable accommodations.

2. If the employee is presently able to perform some but not all of the essential duties, but there is competent medical documentation that he/she will be able to perform all such duties within ninety (90) days, he/she may be placed conditionally in an available position in the classification subject to a review at the end of this period. Work tasks assigned will be those compatible with present work restrictions.

-102-

3. If the employee cannot presently be returned to his/her former job classification, he/she will be placed in an appropriate available position in another classification on a temporary basis until such time as the employee is able to return to his/her former job classification or acquires permanent status in the alternate classification by action of the Human Resources Department. The duration of the temporary status shall be in accordance with the Workers' Compensation Act. During the temporary period, efforts will be made to place the employee in available positions consistent with his/her training and experience and current physical capabilities.

4. While employed in the alternate job classification, whether temporary or permanent, the employee shall be represented by the local union having jurisdiction over employees in that classification and at that location. However, residual seniority rights to the employee's former classification shall remain with his/her former local or other union. An employee in an alternate classification on a permanent basis continues to have a right to return to his former job classification in his former department when physically able to do so.

5. Employees returned to work under these provisions shall not be charged with absences for disciplinary purposes where there is medical documentation that such absences were caused and necessitated by the former job injury.

6. Employees will be eligible for wage increases granted to their alternate job classification.

7. Should a medical dispute arise between the employee's physician and the Employer's physician, a third physician will be mutually selected by the doctors and the third doctor's opinion shall be final and binding on the City and Union.

-103-

## 51. PROTECTION CLAUSE

It is the City's commitment that in terms of a total compensation package, the AFSCME bargaining unit will not be economically disadvantaged as a result of subsequent settlements with other unions. However, it must be understood that compulsory arbitration may result in varied settlements.

The parties agree that special wage adjustments for particular classifications within other bargaining units, when based upon personnel recruitment and retention difficulties or special job skills, shall not require an equivalent increase for the AFSCME unit at large; the parties further agree, however, that an adjustment shall be required for an AFSCME classification to maintain the recognized traditional wage relationship to another bargaining unit's classification which received such a special wage adjustment.

## 52. CONFIDENTIAL EMPLOYEES

The parties agree that certain City employees designated as confidential employees and are, therefore, to be exempt from membership in the bargaining unit covered by this Agreement. These employees are those holding the positions as outlined in the Memorandum of Understanding reached by the parties and submitted, and approved by the Michigan Employment Relations Commission in connection with Case No. C79 D-110 as well as the Decision and Order of the Commission in that case dated June 4, 1980. The City shall not designate other employees may, if the Union fails to so agree, petition the Michigan as confidential without the agreement of the Union; but Employment Relations Commission to approve such

-130-

## 53. MODIFICATION AND TERMINATION

It is agreed between the parties that this Contract shall continue in full force and effect until 11:59 p. m., June 30, 2001. If either party desires to modify this Contract they shall give written notice during the month of February 2001. Negotiations for a new contract shall commence thirty (30) days after that date.

In the event that the City and the Union fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2001, the Agreement will remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) day written notice on or after June 20, 2001.

The parties agree that this sole and complete Agreement is intended to cover all matters affecting wages, hours, and other terms and conditions of employment and that, during the term of this Agreement, neither the City nor the Union will be required to negotiate on any further matters affecting these or any other subjects not specifically set forth in this Agreement, except by mutual agreement of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this 8th day of March, 2000.

**MICHIGAN COUNCIL 25,**
**and the Local Unions listed below**
**of the American Federation of**
**State, County and Municipal**
**Employees, AFL-CIO:**

ALBERT GARRETT, President
AFSCME, Council 25, AFL-CIO

WILLIAM HARPER, Staff Specialist
AFSCME, Council 25, AFL-CIO

**CITY OF DETROIT:**

DENNIS W. ARCHER, Mayor
City of Detroit

ROGER A. CHEEK, Director
Labor Relations

-131-

**SIGNATURE PAGE CONTINUED**
**PAGE 2 of 3**

**MICHIGAN COUNCIL 25,**
**and the Local Unions listed below**
**of the American Federation of**
**State, County and Municipal**
**Employees, AFL-CIO:**

DEADREP PRITCHETT, President
Local 23

JAMES FUNDERBURG, President
Local 26

JOE HARPER, President
Local 62

DELBERT WALLS, SR., President
Local 207

ARMELLA NICKLEBERRY,
President Local 214

WADE K. SMITH, President
Local 229

SCECILIA HUNT, President
Local 273

EAMON B. WILSON, President
Local 312

THERESA McCURTIS, President
Local 457

**CITY OF DETROIT:**

GARY K. BENT, Group Executive
and Human Resources Director

PHYLLIS A. JAMES, Corporation
Counsel Law Department

J. EDWARD HANNAN, Director
Finance Department

Approved and Confirmed by the
City Council on March 8, 2000

JACKIE L. CURRIE, City Clerk

-132-

**SIGNATURE PAGE CONTINUED**
**PAGE 3 of 3**

**MICHIGAN COUNCIL 25,**
**and the Local Unions listed below**
**of the American Federation of**
**State, County and Municipal**
**Employees, AFL-CIO:**

NANCY WILLIS, President
Local 599

ROBERT DONALD, President
Local 836

SYLVIA GAMBLE, President
Local 1023

ELMIRA WILLIS-STUCKEY,
President Local 1220

DAVID C. CLARK, President
Local 1227

LOREE SUMLING, President
Local 1642

GERALDINE CHATMAN, President
Local 2799

CATHERINE PHILLIPS, President
Local 2920

-133-

Unless there is an expressly written conflict between these ordinances and resolutions and the contract language, the ordinances and resolutions shall be used in the full interpretation of the contract language. Where there is an expressly written difference between the contract language and either the ordinances or resolutions, the contract language shall prevail.

D. The City will provide Council 25 with 20 copies of the "1998-1999 Red Book" and each succeeding "Red Book" when they become available.

Dated this 8th day of March, 2000.

FOR THE UNION:

Albert Garrett, President
AFSCME, Council 25, AFL-CIO

FOR THE CITY:

Roger N. Cheek, Director
Labor Relations

-164-

---

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF DETROIT
AND
AMERICAN FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES MICHIGAN COUNCIL 25, AFL-CIO

## RE: National Health Care

If, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits.

Dated this 8th day of March, 2000.

FOR THE UNION:

Albert Garrett, President
AFSCME, Council 25, AFL-CIO

FOR THE CITY:

Roger N. Cheek, Director
Labor Relations

-165-

## EXHIBIT II
CITY OF DETROIT
AFSCME MICHIGAN COUNCIL 25
NON-SUPERVISORY BARGAINING UNIT

### RE: HEALTH CARE PLANS

#### INTRODUCTION

The City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to the amount the City pays for the traditional plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

Furthermore, the traditional health plan described herein includes several cost containment features. Furthermore, the joint union/management health cost containment committee will be studying additional cost containment programs which will be included during the term of the agreement.

**Note:** This matter may also be referred to the Central Labor/Management Committee by mutual agreement of the parties, (see Memorandum of Understanding, page 155).

#### ELIGIBILITY

**Note:** This summary of health insurance plans described herein contain the essential features of the hospitalization insurance plans offered by the City in general terms. It is not intended to be a full description of coverage. The complete plans are described in the certificate of coverage issued by each plan.

-236-

### A. Persons Eligible for Health Care Coverage:

1. The employee;

2. The employee's dependents as explained below:

The legal spouse of the subscriber, unmarried children related by birth, legal adoption, or legal guardianship (while a dependent of the subscriber), and children of the subscriber's spouse (while a dependent of the subscriber). These children are covered from birth to the end of the calendar year in which they attain 19 years of age. This limit shall be extended one more year for those children still in high school.

Unmarried, dependent children who are incapable of self-support because of a permanent mental or physical disability are eligible for coverage. An application card, which contains a "physician's certification of disability", must be submitted before December 31st of the year in which the dependent becomes 19 years of age.

Nineteen to twenty-five year old dependents continue to be covered until the end of the calendar year in which they attain 25 years of age as long as they are unmarried and are dependent upon the employee for support and maintenance and were reported as such on the employee's most recent federal income tax return. There will be no additional charges for this coverage when they are under an employee contract.

Under the "Consolidate Omnibus Budget Reconciliation Act of 1985 (COBRA)", employees and their eligible dependents will have the option to continue group health coverage at their own expense after that coverage would have normally terminated. This option becomes available upon certain qualifying events that occur on or after July 1, 1986. Group health coverage includes hospitalization, dental and eye care coverage as one complete package.

-237-

B. **Qualifying Events Affecting Employees:**

1. The reduction of work hours or a temporary layoff that causes employees to lose their group coverage.
2. Termination of employment, either voluntary or involuntary (except for termination for gross misconduct).

Employees may elect to continue their group health coverage up to 18 months beyond the qualifying event in 1 or 2 above. (The full monthly premium cost must be paid each month to continue coverage).

C. **Qualifying Events for Employees Beneficiaries:**

1. Upon divorce or legal separation of employee and the employee's spouse (spouse option to include the dependent children).
2. The date a dependent child no longer qualifies as a dependent under the plan. (example, dependent child passes the maximum age for coverage as a dependent child).
3. Upon the death of the employee.
4. Upon the employee becoming entitled to benefits under Title XVIII of the Social Security Act (and the spouse and dependent children lose the employer provided group health coverage).

The employee's spouse and dependent children may elect to continue the same group coverage up to 36 months from the date of the qualifying event noted in 1, 2, 3, or 4 above. The full monthly premium cost must be paid each month to continue coverage.

D. **Cancellation of Coverage:**

Continuation of coverage will be canceled upon the occurrence of the following circumstances:

-238-

1. Cancellation of group health plan to active employees.
2. The qualified beneficiary becomes a covered employee under another group health plan or becomes entitled to medicare benefits.
3. The qualified beneficiary fails to pay the required premium.
4. The qualified beneficiary remarries and becomes covered under a group health plan.
5. The end of the continuation coverage period.

E. **Effective Dates for Hospitalization Coverage:**

1. **Coverage Period:** First (1st) through thirty-first (31st)
2. **Qualifying for Continuing Coverage:** Any month in which an employee receives a paycheck with a least eight (8) hours of pay, he/she will have coverage for the entire month; less than eight (8) hours of pay - no coverage.

   **Note:** Suspensions and Departmental Leave are governed by this section.

3. **Coverage Effective Date:** For new hires or employees returning from Human Resources leaves or layoffs, coverages are effective the day they receive their first paycheck.

   **Note:** For new or returning employees, coverage dates will be determined as of the date the employee would have normally received his/her paycheck.

4. **Coverage Ending Date:** End of the month in which an employee receives the last paycheck. Lump-sum payments or special-pay adjustments, after an employee has left the payroll, do not continue hospitalization coverage.

-239-

## SECTION 1

### TRADITIONAL HOSPITALIZATION

**A.   Hospital Charges:**

The City's hospital benefits include the following:

- The cost (ward room and board rates) for 365 days for treatment of general conditions. (Employees may elect semi-private coverage at their own expense).

  **Renewal:**  Full benefits are restored after a consecutive period of 60 days has elapsed since the date of last discharge from a hospital.

- The cost of ward room and board for treatment of mental and nervous disorders is limited to forty-five (45) days. The full cost of ward room and board at a general hospital for treatment of substance abuse (alcohol and drug related) disorders is limited to five (5) days. Up to forty days (40) of in-patient rehabilitation treatment shall be covered in a free standing facility that specializes in this type of treatment and is pre-approved by the plan. (If a member is admitted directly into non-hospital based facility, the maximum number of days will be forty-five (45)).

  **Renewal:** In order to re-establish hospital benefits for a nervous or mental disorder, there must be a period of non-confinement equal to at least sixty (60) consecutive days.

- See master medical section for additional benefits.

**B.   Maternity Benefits:**

(applies to members of the plan)

Ward hospital room and board charges or birthing center charges and charges for other hospital services resulting from pregnancy, childbirth or miscarriage are covered in accordance with the plan.

-240-

**C.   Other Hospital Services:**

The plan will pay the full cost of the items shown below when furnished by a hospital or its hospital staff and prescribed by your doctor.

- general nursing service
- special diets
- operating, delivery and treatment rooms and equipment
- anesthesia
- laboratory examinations
- physical therapy and oxygen or other gas therapy
- drugs and medicines
- supplies for dressings and plaster casts
- use of radium (when owned or rented by the hospital)
- routine nursery care for newborn children
- non-routine hospital care for newborn children

**D.   Emergency Services:**

The plan will pay all charges in connection with emergency room treatment on non-occupational "accidental injuries" and life threatening "medical emergencies".

**E.   Pre-admission Certification:**

A Hospital Pre-Admission certification form MUST be completed and returned to the plan for approval before the plan will approve any elective non-emergency hospital admission. In order to receive hospital benefits paid for by the plan, in-patient non-emergency admissions MUST be prior authorized by the plan. An appeal process for the physician and member shall be a part of this plan.

Hospital Pre-Admission Certification forms will be available from the providers, physicians, the Plan Offices, and the employer and must be submitted to the plan before the proposed hospital admission.

-241-

An employee's doctor will complete the form and submit it to the plan. Both the employee and his/her doctor will receive notification regarding whether or not the admission has been approved.

In cases of emergency admittance to a hospital which shall include emergency admittance for alcohol and drug abuse, the hospital must notify Blue Cross within twenty-four (24) hours and they will certify the number of days allowable based upon the information submitted. If the attending physician requires a member to remain in the hospital for longer than the pre-certified amount of time, they must obtain approval from Blue Cross for additional days. Unless specifically approved, the plan will not pay for any days spent in a hospital beyond those approved by the pre-certification.

F. **Ambulatory Procedures Requirements:**

All medical surgical procedures on the attached list must be performed on an ambulatory basis unless pre-certified by the Plan.

G. **Extended Care Facilities:**

If an employee or an eligible dependent are transferred to an extended care facility immediately following a home or hospital confinement (home health care status shall be considered as hospital confinement for purposes of this section), the plan will pay the full cost of room and board and other medical services. Pre-certification is required.

Extended care facility benefits are limited to a maximum of 730 days and are reduced by two (2) times the number of days spent in a hospital for the same condition.

-242-

H. **Home Health Care and Hospice Care Benefits:**

The plan covers charges for the following home health care services:

1. Professional nursing care
2. Physical therapy
3. Speech therapy
4. Home health aide services.
5. Expenses for equipment or materials used for home health care treatment (e.g., surgical dressings, oxygen, gauze, cotton, etc.).

(Three (3) home health care visits are equivalent to one (1) day of hospital care.)

Home hospice care is designed specifically for treatment of the terminally ill. Medical care concentrates on pain management and professional counseling for both patients and their families.

All home hospice services must be prior authorized (refer to the section entitled Pre-Admission Approval). Once approved, the plan pays the full cost of hospice care including nursing and other required medical services up to the plan limit.

I. **Billing Audits:**

Employees are encouraged to review their hospital and doctor bills for accuracy.

**MEDICAL SURGICAL BENEFITS**

A. **Surgical Expense Benefits:**

If an employee or one of their eligible dependents must undergo surgery as the result of a non-occupational injury or illness, the plan will pay in full for all surgical procedures performed by a surgeon who has agreed to reasonable and customary charges established by the plan.

-243-

B.  **Second Surgical Opinion:**

Mandatory second surgical opinions will be in accordance with the attached list of procedures (Does not apply to emergencies):

For all other procedures:

If a doctor has recommended elective (non-emergency) surgery, an employee must seek a second medical opinion before consenting to the surgery.

When employee seeks a second opinion the employee is required to obtain any x-rays or test results from the first physician and have them reviewed by second physician to avoid duplication of tests.

The plan covers doctor's reasonable and customary fees associated with a second surgical opinion.

In addition to payment for doctor's charges, the plan will also cover the cost of diagnostic laboratory and x-ray services performed in conjunction with the second surgical opinion.

If a member receives conflicting medical opinions regarding the need for a surgical procedure, the employee will make the final decision about whether or not to have the surgery. If the employee does decide to have the surgery, the plan will provide surgical benefits.

C.  **Maternity Benefits:**
(applies to members of the plan)

Charges for outpatient care by member's doctor are eligible expenses under the plan.

D.  **X-Ray and Laboratory Services:**

If a member of the plan has x-ray and/or laboratory services related to a non-occupational illness or accident in a non-hospital setting, the charges are covered in full.

E.  **Mental and Nervous Disorders:**

Treatment for substance abuse, psychiatric and nervous disorders shall be limited to $400 per member per calendar year for out-patient services.

F.  **Other Items Covered by the Plan:**

**Physician's Services**

* Medical Care of In-patients
  * Hospital
  * -- Convalescent Care Facility
  * -- Psychiatric Day/Night Care Hospital
  * -- Residential SAT program
* Surgery; Anesthesia; Surgical Assistant
  * -- Consultations
  * -- In-patient
* Maternity Care
  * -- Pre & Post Natal Visits
  * -- Delivery
  * -- Examination of Newborn
* Emergency Care
  * -- Injuries; Medical Conditions
* Psychiatric Care
  * -- In-patient
  * -- Out-patient $400
* Chemotherapy
* Therapeutic Radiology
* Diagnostic Radiology
  * -- Routine Mammogram
* Diagnostic Lab & Pathology
  * -- Routine PAP Smear
  * -- PSA Testing
* Other Diagnostic Services
  * -- EKG; EEG; etc.

-245-

-244-

## SECTION 2

## MASTER MEDICAL EXPENSE BENEFITS

The City's coverage for master medical benefits shall be 80% of the usual and customary fees for out-patient services provided by the plan after the employee pays for the first $50 of cost per person or $100 per family per year. After an employee has out of pocket expenses over $1,000 in any calendar year, 100% of the eligible expenses are covered. The life-time maximum benefit is $1,000,000.

Out-patient treatment for substance abuse, psychiatric and nervous disorders shall be limited to 50% of reasonable fees with an annual limit of $2,000 per year and a life-time limit of $5,000. (This is in addition to the basic benefit.). The plan's maximum is $15,000 for one year and $30,000 for two or more years for combined in-patient and out-patient psychiatric services.

A. Ambulance:

If a member of the plan is transported to a medical facility due to an accidental injury or medical emergency or if they or their eligible dependents are transferred from one medical facility to another at their doctor's recommendation, the plan will pay for such ambulance service under the master medical benefit.

B. Items Not Covered by Major Medical:

The plan does not cover the following types of expenses, disabilities or care:

- Extended benefits are not available for pulmonary tuberculosis or mental disorders.
- Routine dental care such as fillings, extractions, bridgework, braces, root canals and impacted wisdom teeth.

-247-

G. Items Not Covered by Hospital-medical-surgical Benefits:

The plan does not cover the following types of disabilities, expenses or care:

1. Dental care except for extractions or removal of unerupted teeth under general anesthesia when a concurrent hazardous medical condition exists;

2. Cosmetic surgery; except for the correction of birth defects, accidental injuries or traumatic scars, or reconstructive surgery to correct deformities resulting from specified diseases or medically necessary surgery;

3. Hospital admissions that are not medically necessary, such as admissions that are principally for diagnostic evaluation, or physical therapy, or reduction of weight by diet control.

4. Custodial care or domiciliary care which does not require definitive medical or nursing services for an illness or injury.

5. Care for occupational injury or disease or care obtainable without cost from government agencies or through the facilities of the employer.

6. Routine physical, premarital or pre-employment examinations.

7. Items such as blood, durable medical equipment, prosthetic and other appliances, and ambulance service unless specifically mentioned as being covered in this proposal.

-246-

**Items Not Covered by Major Medical**
*Continued:*

- Eyeglasses, routine eye examinations, eye refractions, hearing aids and the fitting of hearing aids or eyeglasses.
- Routine physical examinations and related tests.
- Cost of transportation that exceeds ambulance benefit level.
- Personal comfort items while hospitalized, including but not limited to, television and telephone.
- The portion of room charges which exceeds the hospital's ward rate.
- Surgical procedure, treatment or hospital confinement primarily for beautification.
- Expenses for work-related injuries or disabilities (these are covered by Workers' Compensation).
- Expenses for care of injuries or sickness due to war or war-related acts.
- Any treatment or service not prescribed by a physician.
- Screening or other procedures not necessary for diagnosis and generally accepted therapy.
- Any surgery or medical care or service furnished by any facility contracted for or operated by the United States Government or by any other governmental unit for medical care or treatment unless a charge is made which the insured is legally required to pay.
- Expenses for the treatment of nervous, mental, or substance abuse disorders that exceed the basic benefit level.
- Any fees that exceed the reasonable and customary fee determination.
- Purchase of wheel chair, hospital bed, artificial respirator, other durable medical equipment.
- Care in convalescent or nursing homes.

-248-

## SECTION 3

## PRESCRIPTION DRUG PLAN

A. Coverage – The prescription drug benefit covers the cost of most prescription drugs after the employee pays a $3 co-pay.

B. A list of preferred providers for prescription drugs which an employee must use to obtain the full benefit is attached.

C. Covered Drugs:
1. Federal Legend Drugs
2. State Restricted Drugs
3. Compounded Medication
4. Insulin

D. The plan will require a pharmacy to use generic drugs, if available, unless specifically directed by the prescribing physician based on medical necessity not to do so.

E. Items Not Covered:

Certain items are not covered by the prescription drug program. Among these are:

- The charge for any take home drug.
- Any charge for a contraceptive medication, even if such medication is a prescription legend drug, and any charge for therapeutic devices or appliances, regardless of their intended use.
- Therapeutic devices or appliances (hypodermic needles, support garments and other non-medicinal substances).
- Drugs or medicines supplied to the covered individual by a prescribing physician or dentist.

-249-

**Items Not Covered** *Continued*

- Cosmetic or beauty aids, dietary supplements and vitamins.
- Immunizing agents, injectables, blood or blood plasma or medication prescribed for parental administration, except insulin.
  Any drug labeled "Caution - Limited by Federal Law to Investigational Use" or any experimental drug.
- Any charge for administration of covered drugs.
- The charge for more than a 34-day supply of a covered drug except that benefits will be payable for 100 unit doses (e.g., tablet or capsule, etc.) of specified maintenance drugs unless provided by a mail order pharmaceutical provider.
- The charge for any prescription order refill in excess of the number specified by a physician or dentist, or any refill dispensed after one year from the date of the original prescription order.
- The charge for any medication for which the employee or dependent is entitled to without charge from any municipal, state or federal program of any sort whether contributory or not except Title XIX of Social Security Amendments of 1965 (Public Law 89-97; 89th Congress, First Session).

## SECTION 4

## PREFERRED PROVIDER ORGANIZATION AND HEALTH MAINTENANCE ORGANIZATIONS

The benefit levels for the **Blue Cross Blue Shield PPO** are for the most part equivalent to the Blue Cross Blue Shield Traditional Plan except that the PPO covers the first $100 of routine office calls and thereafter 70% of the cost. Furthermore, all services received outside the networks are generally covered at 85% of the charge.

-250-

The health maintenance organizations currently being offered to employees are as follows:

**Blue Care Network**
**Health Alliance Plan**
**OmniCare Health Plan**
**The Wellness Plan**
**Total Health Care Plan**

Benefit provided by these carriers are as follows:

| BENEFIT | EXTENT OF COVERAGE |
|---|---|
| Service in hospital | Full coverage |
| Human Organ transplants | Covered, except for experimental |
| Emergency Care - Medical | Full coverage |
| Emergency Care - Accidents | Full coverage |
| Routine Medical Services | Full coverage |
| Maternity Services Provided by Doctor | Full coverage |
| Prescription Drugs | Full coverage (employee responsible for $3 co-pay) |
| Diagnostic and Therapeutic Procedures | Full coverage |
| Immunizations | Full coverage |
| Family Planning | Full coverage for most services |
| Mental Health Care | Outpatient - 20 visits 12 month period Inpatient - 45 days per year |
| Alcoholism/Drug Abuse | Varies with carrier |
| Skilled Nursing Care | Nursing home care - 730 days (not in hospital) |
| Appliances and Prosthetic Devices and Durable Medical Equipment Devices | Full coverage |

-251-

Prior to the annual enrollment each year a comparison of coverages provided by each of the plans will be provided to members of the Union.

## SECTION 5
## DENTAL CARE PLAN

A. **Coverages:**

Class I benefits 75% of usual and customary fees.
Class II benefits 50% of usual and customary fees.
Class III benefits 50% of usual and customary fees.
Orthodontics - 50% of usual and customary fees not to exceed $1,000 maximum life benefit per person covered by the plan.
Annual maximum on Class I, II and III benefits is $1,000 per year.

B. **Items Not Covered:** Dental benefits are not available for the following types of expenses or care:

- Treatment or supplies furnished on account of a dental defect which arises out of, or in the course of, any occupation for wage or profit;
- Any loss sustained as a result of declared or undeclared war, or any act thereof, or of military or naval service of any country;
- Dental procedures received from a dental department maintained by a mutual benefit association, labor union, trustee, or other similar group;
- Any expense for dental procedures or supplies to the extent that payment is received from any group policy or prepayment plan;
- Any treatment which is performed for cosmetic purposes;
- Treatment by other than a legally qualified dentist, except charges for dental prophylaxis performed by a licensed dental hygienist under the supervision and direction of a dentist, or licensed dental practitioner; or in connection with dentures, bridgework, crowns, or prosthetic devices for:

-252-

1. Expenses for prosthetic devices started prior to the effective date of coverage;
2. Expenses for replacement made less than five years after and immediately preceding placement or replacement which was covered by this plan or the predecessor plan;
3. Expenses for extension of bridges or prosthetic devices previously paid for by the plan except for expenses incurred for new extended areas;
4. Loss or theft:
   a. Temporary restorations, local anesthetics, and/or bases;
   b. Expenses for root canal treatments and/or apicoectomies when previously paid; these are payable only once per tooth;
   c. Orthodontic benefits are not available for the member and spouse or dependent children over age 19 (even if a full-time student).

C. **Pre-Determination of Benefits (Excludes Capitation Plans):**

The following procedures will require pre-determination by the plan:

1. Prosthodontics
   a. Inlays
   b. Onlays
   c. Crowns
   d. Space Maintainers
   e. Bridges
   f. Removable Full or Partial Dentures
2. Periodontics
   a. Subgingival Curettage
   b. Surgical Periodontics

-253-

3. Oral Surgery
All oral surgical procedures with the exception of four (4) or less simple extractions.

4. Orthodontics
All services.

D. Currently the City is offering Den Cap, Golden Dental Centers and Dental Care Network as capitation dental carriers. These Plans have smaller co-pays and deductibles in most areas than our traditional plan. However, you must select your Dentist from their network.

## SECTION 6
## EYE CARE PLAN

A. **Coverage:** The plan will pay for an eye examination and glasses once every two years. Co-op Optical Company and Heritage Optical Company are the current providers of this service. This coverage is only available at one of these two firms. The employee may be required to make co-payments for designer frames, special lenses, and contact lenses.

B. **Items Covered Under the Plan:**
* Eye Examination
* Frames: No charge for frames equal to or less than $75
* Eye Glass Lenses:
  Single Vision
  Bifocal covered through Executive Level
* Tint: One (1) single color
* Contact Lenses: Exam and Lenses $90 allowance (in lieu of eye glass service)
* Progressive Myopia: (Rapidly changing near sighted vision) Through age 19 for dependent children; annual exam and new lenses with a prescription change

-254-

**Items Covered Under the Plan** *Continued:*
* Miscellaneous:
  Six month warranty against breakage on in-program frames; 1-year extension for $10
  20% discount on additional glasses after 1st pair secured through benefit plan
  Scratch Coat: Prism (if required) (front only) on in-program lenses
  Oversize: On in-program lenses.

C. **Items Not Covered:**
Benefits are not payable for the following types of care or expense:
* Procedures or supplies furnished due to a visual defect which arises out of, or in the course of, any occupation for wage or profit;
* Vision care services resulting from declared or undeclared war, or any act thereof, or military or naval service of any country;
* Vision care services or supplies furnished by or at the direction of the United States Government or any agency thereof;
* Vision care services or supplies received from a medical department maintained by a mutual benefit association, labor union, trustee or other similar group;
* Vision care services or supplies which are payable or furnished by any other group policy or prepayment plan;
* Any medical or surgical treatment of the eye;
* Sunglasses, plain or prescription, goggles, photo chromic lenses, or tinting, except as specified in B above; or safety lenses, except as provided in the MOU RE: Skilled Trades;
* Orthoptics, vision training or aniseikonia;
* Trifocal
* Repair of any kind, except as specified in paragraph B above;
* Loss or theft; and
* Vision expenses incurred by a dependent child after attaining age 19 -255-

## SECTION 7
## PENDING CHANGES

During the term of the contract the joint Union/ Management Health Care Committee will be examining the alternatives to control health care cost. Some of the alternatives being considered as of the date of this agreement are as follows.

### A. Control Procedures

The plan will establish procedures to guard against misuse. This shall include the audit of claims to insure their legitimacy and the collection of health care cards from terminating employees. Other control procedures may be instituted by the administrator.

### B. Employee Education Programs

The plan will develop a booklet which will describe the benefits and procedures to be followed in using the plan. They will continue to provide educational material to plan members which will help them to become more familiar with methods to contain health cost.

### C. Prescreening Programs

The plan will develop a prescreening program for employees to help them identify health problems before they become critical. The plan will develop a delivery system for the program which will be convenient for the members and also will guarantee the confidentiality of the program.

### D. Maternity Confinement

The plan may include an incentive for members who elect to shorten their hospital confinement for maternity purposes or use of birthing centers. The incentive shall be based on the standard number of days allowed for in-patient maternity confinement in the hospital admission pre-certification program. In the

event that birthing centers are less expensive than inpatient hospital confinement, an incentive plan will be developed to encourage the use of them.

### E. Billing Audits

Employees are encouraged to review their hospital and doctor bills for accuracy. The Health Care Committee will agree on a remuneration "finder's fee" for significant discrepancies discovered.

### F. Emergency Clinics

A list of non-hospital based clinics which will provide non-emergency 24-hour medical services will be established. Employees should use these facilities for non-life threatening medical emergencies.

### G. Prescription Drugs

The Plan may seek an administrator for prescription drug coverage which may be different from the administrator of the hospital-medical-surgical plan.

### AMBULATORY PROCEDURES

| PROCEDURE CODE | ENGLISH DESCRIPTION |
| --- | --- |
| 0145 | Excision of pilonidal cyst of sinus, simple |
| 0454 | Excision of cyst, fibroadenoma or other benign tumor, aberrant breast tissue, duct lesion of nipple lesion (except 0465-0471) |
| 0465 (T) | Mastectomy for gynecomastia, unilateral |
| 0521 | Biopsy, deep bones (e.g. vertebral body (femur) |
| 0522 | Biopsy, excisional, bone superficial (e.g., ilium, sternum, ribs, spinous process, trochanter of femur) |
| 0588 | Excision of calcaneal spur |

EXHIBIT III
CITY OF DETROIT
AFSCME MICHIGAN COUNCIL 25
NON-SUPERVISORY BARGAINING UNIT

RE: **LONG TERM DISABILITY BENEFITS (INCOME PROTECTION PLAN)**

Note: *It is important for employees to apply for this benefit as soon as they believe that they will be disabled for an extended period of time in order to receive the benefits. (See provisions A-3 & B-2)*

A. **Provisions Relating to Eligibility**

1. **Employees Eligible:** All full time classified and appointed civilian employees will be eligible for benefits upon completion of three (3) years of continuous employment.

2. **Effective Date:** The effective date of the benefits is the date he becomes eligible.

   Employees not performing each and every duty of their occupation on the last work day immediately before the date they would become eligible, shall become eligible on the date they resume such duties.

3. **Applying for Benefits:** Eligible employees who become disabled must apply through their department to the City Pension Bureau within sixty (60) days after becoming disabled.

   The purpose of the above language is to put employees on notice that they should, in fact, apply for benefits within sixty (60) days after becoming disabled. Failure to comply with the 60-day notice requirement will not affect eligibility for benefits. Employee applications will be processed and a benefit determination made regardless of when an application is made under the plan.

-259-

| PROCEDURE CODE | ENGLISH DESCRIPTION |
| --- | --- |
| 1342 | Arthroplasty, metatarsophalangeal joint, other than hallux, with siastic implant |
| 1601 | Muscle biopsy, deep |
| 2060 | Infraction of turbinates, unilateral or bilateral |
| 2085 | Antrotomy, intra nasal, bilateral |
| 2790 | Biopsy or excision of lymph node |
| 2791 | —deep cervical node |
| 3740 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectomy, bilateral |
| 3745 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectomy, bilateral |
| 4040 | Cystourethroscopy with biopsy, initial |
| 5620 (T) | Extra ocular muscle surgery (resection, recession, advancement, etc.), one muscle |
| 5696 (T) | Slephanoplasty: plastic repair of eyelid with or without graft |
| 0994 | Fracture, humerus, surgical neck, closed reduction |
| 1493 | Dislocation, elbow, closed manipulative reduction, without anesthesia |
| 3163 | Esophagoscopy, diagnostic with biopsy |
| 3165 | —with dilation, direct |
| 3190 | Dilation of esophagus by sound or bougie, indirect, initial |
| 3220 | Gastroscopy, diagnostic |
| 3417 | Colonoscopy (by fiberoptic instrument), transverse colon |
| 3696 | Peritoneocentesis: abdominal paracentesis, initial |
| 5155 | Spinal puncture, lumbar diagnostic |

-258-

# EXHIBIT 8

# MASTER AGREEMENT

## BETWEEN THE

## CITY OF DETROIT

### AND

## MICHIGAN COUNCIL 25

### OF THE
### AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL
### EMPLOYEES, AFL-CIO
#### (NON-SUPERVISORY BARGAINING UNIT)

## 2001 - 2005

# MASTER AGREEMENT

## BETWEEN THE

# CITY OF DETROIT

## AND

# MICHIGAN COUNCIL 25

### OF THE
### AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO
### (NON-SUPERVISORY BARGAINING UNIT)

# July 1, 2001 - June 30, 2005

*This Contract Book Belongs to*

_____

*Name*

_____

*Title*

_____

*Department*

## 34. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE INSURANCE

Status quo of existing hospitalization, medical dental and optical care benefits will be maintained while the parties work cooperatively to institute mutually agreeable changes.

A.  The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service rate under the Michigan Variable Fee Coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87)[1], known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.

B.  The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

| | |
|---|---|
| **Single person** | **$100.06** |
| **Two person** | **$238.29** |
| **Family** | **$253.54** |

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer. When the City's payroll system has the capability of allowing employees to pay these amount through the pre-tax IRS code 125K mechanism, all bargaining unit members shall be entitled to participate.

C.  Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

D.  The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87)[1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986, the City will pay the following amounts per month for hospitalization and medical insurance:

| | |
|---|---|
| **Single person** | **$100.06** |
| **Two person** | **$238.29** |

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

E.  The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

F.  Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year, all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

> **Single Person**
> **Two Persons**
> **Family**

G.  The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a Dental Plan which shall be the Blue Cross/Blue Shield program which provides Class I benefits on a 25% co-pay basis and Class II and III benefits on a 50% co-pay basis. Classes I, II, and III benefits shall not exceed $1,000 per person per year. In addition, Orthodontic coverage shall be on a 50% co-pay basis with a $1,000 life time maximum. Other terms and conditions regarding these plans shall be in accordance with the standard Blue Cross/Blue Shield policies regarding administration of such programs.

The City, in mutual agreement with the Union and the Health Care Cost Reductions Committee (HCCRC), will make available cost effective alternative dental plans.

Newly hired employees shall not be eligible for these benefits until they shall have worked 1,040 straight time hours.

H.  The City will provide Optical Care Insurance through the Employee Benefit Board according to the schedule of benefits outlined in Exhibit II. Effective July 1, 1999 through June 30, 2001, the City will contribute $5.50 per month for employees covered by CO/OP Optical and $5.43 per month for employees covered by Heritage Optical.

Optical care enrollments will occur at two (2) year intervals.

I.  If, during the term of this Agreement, a Federal Health Security Act (National Health Insurance) is enacted, the parties agree to reopen discussions with respect to health care benefits if there is need to do so due to the impact of such a Federal program.

J.  No insurance carrier shall be allowed to underwrite City Health Care Benefits unless it offers coordination of benefits. All carriers will be required to provide group specific utilization and cost data as a condition of doing business with the City. Copies of all information will be provided to Union and City representatives as directed.

K.  The parties agree to form a Health Care Cost Containment Committee made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-

-57-

83 base premium levels for insurance listed in paragraph "B", the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

Furthermore, the parties agree during the term of this Agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this Agreement.

I. **HOSPITALIZATION-MEDICAL COVERAGE OPT-OUT PROGRAM:** Effective July 1, 1999, employees on the active payroll who are covered by a health care plan offered by an employer other than the City, and can furnish proof of such coverage, may elect to take an annual $950 cash payment, which will be paid in four (4) equal installments ($237.50) at the end of each three (3) month period, in lieu of the hospitalization-medical coverage offered by the City. This election shall take place annually during the open enrollment period.

Once an employee elects the cash payment, the employee will not receive hospitalization-medical coverage until the next year's enrollment period. If the employee loses his eligibility for the alternate coverage, the employee, upon submitting appropriate proof of loss of coverage, will be able to resume the City's hospitalization-medical coverage the month following completion of the applicable enrollment forms. The cash payments will cease upon the employee resuming the City's hospitalization-medical coverage.

The City shall have the sole discretion to offer this opt-out provision to current and future retirees who are eligible for the City's hospitalization-medical coverage. This discretion shall extend to the determination of the amount of the cash payment, the method of payment, the eligibility requirements, and the continuance of the opt-out plan itself.

**Note:**   A description of the City's health care, optical and dental plans appear in Exhibit II.

---

The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.

## 35. WORKERS' COMPENSATION

A.   All employees shall be covered by the applicable Workers' Compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of City employment shall be continued on the payroll and his her time shall be charged to his her sick leave reserve for all days not covered by Workers' Compensation payments; provided that in the absence of any sick leave reserve he she shall be paid regular wages or salary to the extent of two-thirds of his her daily wage or salary but for a period not to exceed seven (7) days; provided also that where the employee has off-time banks and receives income under the Worker's Compensation Act, such income shall be supplemented by the City from his her off-time banks in an amount sufficient to bring it up to ninety-five percent (95%) of his her weekly take-home pay. For the purposes of this Article, take-home pay is defined as gross pay from the City less Social Security deductions, and less Federal, State and City income

## 52. MODIFICATION AND TERMINATION

It is agreed between the parties that this Contract shall continue in full force and effect until 11:59 p. m., June 30, 2005. If either party desires to modify this Contract they shall give written notice during the month of February 2005. Negotiations for a new contract shall commence thirty (30) days after that date.

In the event that the City and the Union fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2005, the Agreement will remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) day written notice on or after June 20, 2005.

The parties agree that this sole and complete Agreement is intended to cover all matters affecting wages, hours, and other terms and conditions of employment and that, during the term of this Agreement, neither the City nor the Union will be required to negotiate on any further matters affecting these or any other subjects not specifically set forth in this Agreement, except by mutual agreement of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement

on this 1st day of July, 2003.

**MICHIGAN COUNCIL 25,**
**and the Local Unions listed below**
**of the American Federation of**
**State, County and Municipal**
**Employees, AFL-CIO:**

ALBERT GARRETT, President
AFSCME, Council 25, AFL-CIO

JIMMY A. KEARNS, Staff Specialist
AFSCME, Council 25, AFL-CIO

**CITY OF DETROIT:**

KWAME M. KILPATRICK, Mayor
City of Detroit

ROGER N. CHEEK, Director
Labor Relations

-75-

MICHIGAN COUNCIL 25,
and the Local Unions listed below
of the American Federation of
State, County and Municipal
Employees, AFL-CIO:

CITY OF DETROIT:

ROBERT STOKES, President
Local 23

WENDY BRODEN, Director
Human Resources Department

JAMES FUNDERBURG, President
Local 26

RUTH CARTER, Corporation Counsel
Law Department

EULA MURRAY, President
Local 62

SEAN WERDLOW, Chief Financial
Officer, Finance Department

RIEHL, JOHN, President
Local 207

Approved and Confirmed by the City
Council on _____:

ARMELLA NICKLEBERRY, President
Local 214

JACKIE L. CURRIE, City Clerk

ROGER RICE, President
Local 229

APPROVED AND CONFIRMED BY
THE CITY COUNCIL  1/14/04
                          DATE

SCECILLA HUNT, President
Local 273

JACKIE L. CURRIE
CITY CLERK

LEAMON B. WILSON, President
Local 312

-76-

**MICHIGAN COUNCIL 25,**
**and the Local Unions listed below**
**of the American Federation of**
**State, County and Municipal**
**Employees, AFL-CIO:**


LAURIE WALKER, President
Local 457


JANET RICHMOND, President
Local 542


ROBERT DONALD, President
Local 836


SYLVIA GAMBLE, President
Local 1023


ELMIRA WILLIS-STUCKEY, President
Local 1220


DAVID SHOCKLEY, President
Local 1227


GINA THOMPSON, President
Local 1642


GERALDINE CHATMAN, President
Local 2799


EMILY KUNZE, President
Local 2920

-77-

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF DETROIT
AND
AMERICAN FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES MICHIGAN COUNCIL 25, AFL-CIO

## RE:   **National Health Care**

If, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits.

Dated this 1st day of July, 2003.

FOR THE UNION:

Albert Garrett, President
AFSCME, Council 25, AFL-CIO

FOR THE CITY:

Roger N. Cheek, Director
Labor Relations

-99-

# EXHIBIT II

CITY OF DETROIT
AFSCME MICHIGAN COUNCIL 25
NON-SUPERVISORY BARGAINING UNIT

## RE:   HEALTH CARE PLANS

### INTRODUCTION

The City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to the amount the City pays for the traditional plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

Furthermore, the traditional health plan described herein includes several cost containment features. Furthermore, the joint union/management health cost containment committee will be studying additional cost containment programs which will be included during the term of the agreement.

**Note:** This matter may also be referred to the Central Labor/Management Committee by mutual agreement of the parties, (see Memorandum of Understanding, page **93**).

### ELIGIBILITY

**Note**: This summary of health insurance plans described herein contain the essential features of the hospitalization insurance plans offered by the City in general terms. It is not intended to be a full description of coverage. The complete plans are described in the certificate of coverage issued by each plan.

#### A.  PERSONS ELIGIBLE FOR HEALTH CARE COVERAGE:

1.  The employee;

2.  The employee's dependents as explained below:

The legal spouse of the subscriber, unmarried children related by birth, legal adoption, or legal guardianship (while a dependent of the subscriber), and children of the subscriber's spouse (while a dependent of the subscriber). These children are covered from birth to the end of the calendar year in which they attain 19 years of age. This limit shall be extended one more year for those children still in high school.

Unmarried, dependent children who are incapable of self-support because of a permanent mental or physical disability are eligible for coverage. An application card, which contains a "physician's certification of disability", must be submitted before December 31st of the year in which the dependent becomes 19 years of age.

-142-

Nineteen to twenty-five year old dependents continue to be covered until the end of the calendar year in which they attain 25 years of age as long as they are unmarried and are dependent upon the employee for support and maintenance and were reported as such on the employee's most recent federal income tax return. There will be no additional charges for this coverage when they are under an employee contract.

Under the "Consolidate Omnibus Budget Reconciliation Act of 1985 (COBRA)", employees and their eligible dependents will have the option to continue group health coverage at their own expense after that coverage would have normally terminated. This option becomes available upon certain qualifying events that occur on or after July 1, 1986. Group health coverage includes hospitalization, dental and eye care coverage as one complete package.

## B.  QUALIFYING EVENTS AFFECTING EMPLOYEES:

1.  The reduction of work hours or a temporary layoff that causes employees to lose their group coverage.
2.  Termination of employment, either voluntary or involuntary (except for termination for gross misconduct).

Employees may elect to continue their group health coverage up to 18 months beyond the qualifying event in 1 or 2 above. (The full monthly premium cost must be paid each month to continue coverage).

## C.  QUALIFYING EVENTS FOR EMPLOYEES BENEFICIARIES:

1.  Upon divorce or legal separation of employee and the employee's spouse (spouse option to include the dependent children).
2.  The date a dependent child no longer qualifies as a dependent under the plan. (example, dependent child passes the maximum age for coverage as a dependent child).
3.  Upon the death of the employee.
4.  Upon the employee becoming entitled to benefits under Title XVIII of the Social Security Act (and the spouse and dependent children lose the employer provided group health coverage).

The employee's spouse and dependent children may elect to continue the same group coverage up to 36 months from the date of the qualifying event noted in 1, 2, 3, or 4 above. The full monthly premium cost must be paid each month to continue coverage.

## D.  CANCELLATION OF COVERAGE:

Continuation of coverage will be canceled upon the occurrence of the following circumstances:

1.  Cancellation of group health plan to active employees.
2.  The qualified beneficiary becomes a covered employee under another group health plan or becomes entitled to medicare benefits.
3.  The qualified beneficiary fails to pay the required premium.
4.  The qualified beneficiary remarries and becomes covered under a group health plan.
5.  The end of the continuation coverage period.

E. **EFFECTIVE DATES FOR HOSPITALIZATION COVERAGE:**

1. **Coverage Period:** First (1st) through thirty-first (31st)

2. **Qualifying for Continuing Coverage:** Any month in which an employee receives a paycheck with a least eight (8) hours of pay, he/she will have coverage for the entire month; less than eight (8) hours of pay - no coverage.

   **Note:** Suspensions and Departmental Leave are governed by this section.

3. **Coverage Effective Date:** For new hires or employees returning from Human Resources leaves or lay offs, coverages are effective the day they receive their first paycheck.

   **Note:** For new or returning employees, coverage dates will be determined as of the date the employee would have normally received his/her paycheck.

4. **Coverage Ending Date:** End of the month in which an employee receives the last paycheck. Lump-sum payments or special-pay adjustments, after an employee has left the payroll, do not continue hospitalization coverage.

# SECTION 1

# TRADITIONAL HOSPITALIZATION

A. **HOSPITAL CHARGES:**

The City's hospital benefits include the following:

- The cost (ward room and board rates) for 365 days for treatment of general conditions. (Employees may elect semi-private coverage at their own expense).
  Renewal: Full benefits are restored after a consecutive period of 60 days has elapsed since the date of last discharge from a hospital.
- The cost of ward room and board for treatment of mental and nervous disorders is limited to forty-five (45) days. The full cost of ward room and board at a general hospital for treatment of substance abuse (alcohol and drug related) disorders is limited to five (5) days. Up to forty days (40) of in-patient rehabilitation treatment shall be covered in a free standing facility that specializes in this type of treatment and is pre-approved by the plan. (If a member is admitted directly into non-hospital based facility, the maximum number of days will be forty-five [45]).
  Renewal: In order to re-establish hospital benefits for a nervous or mental disorder, there must be a period of non-confinement equal to at least sixty (60) consecutive days.
- See master medical section for additional benefits.

B. **MATERNITY BENEFITS:**

(applies to members of the plan)

Ward hospital room and board charges or birthing center charges and charges for other hospital services resulting from pregnancy, childbirth or miscarriage are covered in accordance with the plan.

-144-

C.  **OTHER HOSPITAL SERVICES:**

The plan will pay the full cost of the items shown below when furnished by a hospital or its hospital staff and prescribed by your doctor:

- general nursing service
- special diets
- operating, delivery and treatment rooms and equipment
- anesthesia
- laboratory examinations
- physical therapy and oxygen or other gas therapy
- drugs and medicines
- supplies for dressings and plaster casts
- use of radium (when owned or rented by the hospital)
- routine nursery care for newborn children
- non-routine hospital care for newborn children

D.  **EMERGENCY SERVICES:**

The plan will pay all charges in connection with emergency room treatment on non-occupational "accidental injuries" and life threatening "medical emergencies".

E.  **PRE-ADMISSION CERTIFICATION:**

A Hospital Pre-Admission certification form MUST be completed and returned to the plan for approval before the plan will approve any elective non-emergency hospital admission. In order to receive hospital benefits paid for by the plan, in-patient non-emergency admissions MUST be prior authorized by the plan. An appeal process for the physician and member shall be a part of this plan.

Hospital Pre-Admission Certification forms will be available from the providers, physicians, the Plan Offices, and the employer and must be submitted to the plan before the proposed hospital admission.

An employee's doctor will complete the form and submit it to the plan. Both the employee and his/her doctor will receive notification regarding whether or not the admission has been approved.

In cases of emergency admittance to a hospital which shall include emergency admittance for alcohol and drug abuse, the hospital must notify Blue Cross within twenty-four (24) hours and they will certify the number of days allowable based upon the information submitted. If the attending physician requires a member to remain in the hospital for longer than the pre-certified amount of time, they must obtain approval from Blue Cross for additional days. Unless specifically approved, the plan will not pay for any days spent in a hospital beyond those approved by the pre-certification.

F.  **AMBULATORY PROCEDURES REQUIREMENTS:**

All medical surgical procedures on the attached list must be performed on an ambulatory basis unless pre-certified by the Plan.

-145-

G.  **EXTENDED CARE FACILITIES:**

If an employee or an eligible dependent are transferred to an extended care facility immediately following a home or hospital confinement (home health care status shall be considered as hospital confinement for purposes of this section), the plan will pay the full cost of room and board and other medical services.  Pre-certification is required.

Extended care facility benefits are limited to a maximum of 730 days and are reduced by two (2) times the number of days spent in a hospital for the same condition.

H.  **HOME HEALTH CARE AND HOSPICE CARE BENEFITS:**

The plan covers charges for the following home health care services:

1.  Professional nursing care
2.  Physical therapy
3.  Speech therapy
4.  Home health aide services.
5.  Expenses for equipment or materials used for home health care treatment (e.g., surgical dressings, oxygen, gauze, cotton, etc.).

(Three (3) home health care visits are equivalent to one (1) day of hospital care.)

Home hospice care is designed specifically for treatment of the terminally ill.  Medical care concentrates on pain management and professional counseling for both patients and their families.

All home hospice services must be prior authorized (refer to the section entitled Pre-Admission Approval).  Once approved, the plan pays the full cost of hospice care including nursing and other required medical services up to the plan limit.

I.  **BILLING AUDITS:**

Employees are encouraged to review their hospital and doctor bills for accuracy.

## MEDICAL SURGICAL BENEFITS

A.  **SURGICAL EXPENSE BENEFITS:**

If an employee or one of their eligible dependents must undergo surgery as the result of a non-occupational injury or illness, the plan will pay in full for all surgical procedures performed by a surgeon who has agreed to reasonable and customary charges established by the plan.

B.  **SECOND SURGICAL OPINION:**

Mandatory second surgical opinions will be in accordance with the attached list of procedures (Does not apply to emergencies).

For all other procedures:

Out-patient treatment for substance abuse, psychiatric and nervous disorders shall be limited to 50% of reasonable fees with an annual limit of $2,000 per year and a life-time limit of $5,000. (This is in addition to the basic benefit.). The plan's maximum is $15,000 for one year and $30,000 for two or more years for combined in-patient and out-patient psychiatric services.

A. **AMBULANCE:**

If a member of the plan is transported to a medical facility due to an accidental injury or medical emergency or if they or their eligible dependents are transferred from one medical facility to another at their doctor's recommendation, the plan will pay for such ambulance service under the master medical benefit.

B. **ITEMS NOT COVERED BY MAJOR MEDICAL:**

The plan does not cover the following types of expenses, disabilities or care:

- Extended benefits are not available for pulmonary tuberculosis or mental disorders.
- Routine dental care such as fillings, extractions, bridgework, braces, root canals and impacted wisdom teeth.
- Eyeglasses, routine eye examinations, eye refractions, hearing aids and the fitting of hearing aids or eyeglasses.
- Routine physical examinations and related tests.
- Cost of transportation that exceeds ambulance benefit level.
- Personal comfort items while hospitalized, including but not limited to, television and telephone.
- The portion of room charges which exceeds the hospital's ward rate.
- Surgical procedure, treatment or hospital confinement primarily for beautification.
- Expenses for work-related injuries or disabilities (these are covered by Workers' Compensation).
- Expenses for care of injuries or sickness due to war or war-related acts.
- Any treatment or service not prescribed by a physician.
- Screening or other procedures not necessary for diagnosis and generally accepted therapy.
- Any surgery or medical care or service furnished by any facility contracted for or operated by the United States Government or by any other governmental unit for medical care or treatment unless a charge is made which the insured is legally required to pay.
- Expenses for the treatment of nervous, mental, or substance abuse disorders that exceed the basic benefit level.
- Any fees that exceed the reasonable and customary fee determination.
- Purchase of wheel chair, hospital bed, artificial respirator, other durable medical equipment.
- Care in convalescent or nursing homes.

**Physician's Services** *Continued:*

- Psychiatric Care
  - -- In-patient
  - -- Out-patient $400
- Chemotherapy
- Therapeutic Radiology
- Diagnostic Radiology
  - -- Routine Mammogram
- Diagnostic Lab & Pathology
  - -- Routine PAP Smear
  - -- PSA Testing
- Other Diagnostic Services
  - -- EKG: EEG: etc.

G. **ITEMS NOT COVERED BY HOSPITAL-MEDICAL-SURGICAL BENEFITS:**

The plan does not cover the following types of disabilities, expenses or care:

1. Dental care except for extractions or removal of unerupted teeth under general anesthesia when a concurrent hazardous medical condition exists;

2. Cosmetic surgery; except for the correction of birth defects, accidental injuries or traumatic scars, or reconstructive surgery to correct deformities resulting from specified diseases or medically necessary surgery;

3. Hospital admissions that are not medically necessary, such as admissions that are principally for diagnostic evaluation, or physical therapy, or reduction of weight by diet control.

4. Custodial care or domiciliary care which does not require definitive medical or nursing services for an illness or injury.

5. Care for occupational injury or disease or care obtainable without cost from government agencies or through the facilities of the employer.

6. Routine physical, premarital or pre-employment examinations.

7. Items such as blood, durable medical equipment, prosthetic and other appliances, and ambulance service unless specifically mentioned as being covered in this proposal.

# SECTION 2

# MASTER MEDICAL EXPENSE BENEFITS

The City's coverage for master medical benefits shall be 80% of the usual and customary fees for out-patient services provided by the plan after the employee pays for the first $50 of cost per person or $100 per family per year. After an employee has out of pocket expenses over $1,000 in any calendar year, 100% of the eligible expenses are covered. The life-time maximum benefit is $1,000,000.

# SECTION 3

# PRESCRIPTION DRUG PLAN

A.  Coverage - The prescription drug benefit covers the cost of most prescription drugs after the employee pays a $3 co-pay.

B.  A list of preferred providers for prescription drugs which an employee must use to obtain the full benefit is attached.

C.  **COVERED DRUGS:**

  1.  Federal Legend Drugs

  2.  State Restricted Drugs

  3.  Compounded Medication

  4.  Insulin

D.  The plan will require a pharmacy to use generic drugs, if available, unless specifically directed by the prescribing physician based on medical necessity not to do so.

E.  **ITEMS NOT COVERED:**

  Certain items are not covered by the prescription drug program.  Among these are:

  - The charge for any take home drug.
  - Any charge for a contraceptive medication, even if such medication is a prescription legend drug, and any charge for therapeutic devices or appliances, regardless of their intended use.
  - Therapeutic devices or appliances (hypodermic needles, support garments and other non-medicinal substances).
  - Drugs or medicines supplied to the covered individual by a prescribing physician or dentist.
  - Cosmetic or beauty aids, dietary supplements and vitamins.
  - Immunizing agents, injectables, blood or blood plasma or medication prescribed for parental administration, except insulin.
  - Any drug labeled "Caution - Limited by Federal Law to Investigational Use" or any experimental drug.
  - Any charge for administration of covered drugs.
  - The charge for more than a 34-day supply of a covered drug except that benefits will be payable for 100 unit doses (e.g., tablet or capsule, etc.) of specified maintenance drugs unless provided by a mail order pharmaceutical provider.
  - The charge for any prescription order refill in excess of the number specified by a physician or dentist, or any refill dispensed after one year from the date of the original prescription order.
  - The charge for any medication for which the employee or dependent is entitled to without charge from any municipal, state or federal program of any sort whether contributory or not except Title XIX of Social Security Amendments of 1965 (Public Law 89-97; 89th Congress, First Session).

# SECTION 4

# PREFERRED PROVIDER ORGANIZATION AND
# HEALTH MAINTENANCE ORGANIZATIONS

The benefit levels for the **Blue Cross Blue Shield PPO** are for the most part equivalent to the Blue Cross Blue Shield Traditional Plan except that the PPO covers the first $100 of routine office calls and thereafter 70% of the cost. Furthermore, all services received outside the networks are generally covered at 85% of the charge.

The health maintenance organizations currently being offered to employees are as follows:

**Blue Care Network**
**Health Alliance Plan**
**OmniCare Health Plan**
**The Wellness Plan**
**Total Health Care Plan**

Benefits provided by these carriers are as follows:

| BENEFIT | EXTENT OF COVERAGE |
|---|---|
| Service in hospital | Full coverage |
| Human Organ transplants | Covered, except for experimental |
| Emergency Care - Medical | Full coverage |
| Emergency Care - Accidents | Full coverage |
| Routine Medical Services | Full coverage |
| Maternity Services Provided by Doctor | Full coverage |
| Prescription Drugs | Full coverage (employee responsible for $3 co-pay) |
| Diagnostic and Therapeutic Procedures | Full coverage |
| Immunizations | Full coverage |
| Family Planning | Full coverage for most services |
| Mental Health Care | Outpatient - 20 visits 12 month period Inpatient - 45 days per year |
| Alcoholism/Drug Abuse | Varies with carrier |
| Skilled Nursing Care (not in hospital) | Nursing home care - 730 days |
| Appliances and Prosthetic Devices and Durable Medical Equipment Devices | Full coverage |

Prior to the annual enrollment each year a comparison of coverages provided by each of the plans will be provided to members of the Union.

-151-

# SECTION 5

# DENTAL CARE PLAN

A   **COVERAGES:**

Class I benefits 75% of usual and customary fees.
Class II benefits 50% of usual and customary fees.
Class III benefits 50% of usual and customary fees.
Orthodontics - 50% of usual and customary fees not to exceed $1,000 maximum life benefit per person covered by the plan.
Annual maximum on Class I, II and III benefits is $1,000 per year.

B   **ITEMS NOT COVERED:** Dental benefits are not available for the following types of expenses or care:

- Treatment or supplies furnished on account of a dental defect which arises out of, or in the course of, any occupation for wage or profit;
- Any loss sustained as a result of declared or undeclared war, or any act thereof, or of military or naval service of any country;
- Dental procedures received from a dental department maintained by a mutual benefit association, labor union, trustee, or other similar group;
- Any expense for dental procedures or supplies to the extent that payment is received from any group policy or prepayment plan;
- Any treatment which is performed for cosmetic purposes;
- Treatment by other than a legally qualified dentist, except charges for dental prophylaxis performed by a licensed dental hygienist under the supervision and direction of a dentist, or licensed dental practitioner; or in connection with dentures, bridgework, crowns, or prosthetic devices for:

  1   Expenses for prosthetic devices started prior to the effective date of coverage;

  2.   Expenses for replacement made less than five years after and immediately preceding placement or replacement which was covered by this plan or the predecessor plan;

  3   Expenses for extension of bridges or prosthetic devices previously paid for by the plan except for expenses incurred for new extended areas;

  4   Loss or theft:

     a   Temporary restorations, local anesthetics, and or bases;

     b   Expenses for root canal treatments and or apicoectomies when previously paid, these are payable only once per tooth;

     c   Orthodontic benefits are not available for the member and spouse or dependent children over age 19 (even if a full-time student)

-152-

C   **PRE-DETERMINATION OF BENEFITS (EXCLUDES CAPITATION PLANS):**

The following procedures will require pre-determination by the plan.

1   Prosthodontics

  a   Inlays
  b   Onlays
  c   Crowns
  d   Space Maintainers
  e   Bridges
  f   Removable Full or Partial Dentures

2   Periodontics

  a   Subgingival Curettage
  b   Surgical Periodontics

3   Oral Surgery

  All oral surgical procedures with the exception of four (4) or less simple extractions

4   Orthodontics

  All services.

D   Currently the City is offering Den Cap, Golden Dental Centers and Dental Care Network as capitation dental carriers.  These Plans have smaller co-pays and deductibles in most areas than our traditional plan.  However, you must select your Dentist from their network.


# SECTION 6

# EYE CARE PLAN

A   **COVERAGE:** The plan will pay for an eye examination and glasses once every two years.  Co-op Optical Company and Heritage Optical Company are the current providers of this service.  This coverage is only available at one of these two firms.  The employee may be required to make co-payments for designer frames, special lenses, and contact lenses.

B   **ITEMS COVERED UNDER THE PLAN:**

  * Eye Examination
  * Frames  No charge for frames equal to or less than $15
  * Eye Glass Lenses:
      Single vision
      Bifocal covered through Executive Level
  * Tint  One (1) single color
  * Contact Lenses  Exam and Lenses $90 allowance in lieu of eye glass service
  * Progressive Myopia (Rapidly changing nearsighted vision through age 16 on dependent children, annual exam and new lenses with a prescription change)

-155-

**ITEMS COVERED UNDER THE PLAN** *Continued:*
- Miscellaneous:
  Six month warranty against breakage on in-program frames; 1-year extension for $10
  20% discount on additional glasses after 1ˢᵗ pair secured through benefit plan
- Scratch Cote: Prism (if required) (front only) on in-program lenses
- Oversize: On in-program lenses

## C.  ITEMS NOT COVERED:

Benefits are not payable for the following types of care or expense:

- Procedures or supplies furnished due to a visual defect which arises out of, or in the course of, any occupation for wage or profit;
- Vision care services resulting from declared or undeclared war, or any act thereof, or military or naval service of any country;
- Vision care services or supplies furnished by or at the direction of the United States Government or any agency thereof;
- Vision care services or supplies received from a medical department maintained by a mutual benefit association, labor union, trustee or other similar group;
- Vision care services or supplies which are payable or furnished by any other group policy or prepayment plan;
- Any medical or surgical treatment of the eye;
- Sunglasses, plain or prescription, goggles, photo chromic lenses, or tinting, except as specified in B above; or safety lenses, except as provided in the MOU RE: Skilled Trades;
- Orthoptics, vision training or aniseikonia;
- Trifocal
- Repair of any kind, except as specified in paragraph B above;
- Loss or theft; and
- Vision expenses incurred by a dependent child after attaining age 19.


## SECTION 7

## PENDING CHANGES

During the term of the contract the joint Union/Management Health Care Committee will be examining additional alternatives to control health care cost. Some of the alternatives being considered as of the date of this agreement are as follows.

## A.  CONTROL PROCEDURES

The plan will establish procedures to guard against misuse. This shall include the audit of claims to insure their legitimacy and the collection of health care cards from terminating employees. Other control procedures may be instituted by the administrator.

B.  **EMPLOYEE EDUCATION PROGRAMS**

The plan will develop a booklet which will describe the benefits and procedures to be followed in using the plan. They will continue to provide educational material to plan members which will help them to become more familiar with methods to contain health cost.

C.  **PRESCREENING PROGRAMS**

The plan will develop a prescreening program for employees to help them identify health problems before they become critical. The plan will develop a delivery system for the program which will be convenient for the members and also will guarantee the confidentiality of the program.

D.  **MATERNITY CONFINEMENT**

The plan may include an incentive for members who elect to shorten their hospital confinement for maternity purposes or use of birthing centers. The incentive shall be based on the standard number of days allowed for in-patient maternity confinement in the hospital admission pre-certification program. In the event that birthing centers are less expensive than inpatient hospital confinement, an incentive plan will be developed to encourage the use of them.

E.  **BILLING AUDITS**

Employees are encouraged to review their hospital and doctor bills for accuracy. The Health Care Committee will agree on a remuneration "finder's fee" for significant discrepancies discovered.

F.  **EMERGENCY CLINICS**

A list of non-hospital based clinics which will provide non-emergency 24-hour medical services will be established. Employees should use these facilities for non-life threatening medical emergencies.

G.  **PRESCRIPTION DRUGS**

The Plan may seek an administrator for prescription drug coverage which may be different from the administrator of the hospital-medical-surgical plan.

-155-

# AMBULATORY PROCEDURES

| PROCEDURE CODE | ENGLISH DESCRIPTION |
|---|---|
| 0145 | Excision of pilonidal cyst of sinus, simple |
| 0454 | Excision of cyst, fibroadenoma or other benign tumor, aberrant breast tissue, duct lesion of nipple lesion (except 0465-0471) bilateral |
| 0465 (T) | Mastectomy for gynecomastia, unilateral |
| 0521 | Biopsy, deep bones (e.g. vertebral body femur) |
| 0522 | Biopsy, excisional, bone superficial (e.g., ilium, sternum, ribs, spinous process, trochanter of femur) |
| 0588 | Excision of calcaneal spur |
| 1342 | Arthroplasty, metatarsophalangeal joint, other than hallux, with silastic implant |
| 1601 | Muscle biopsy, deep |
| 2060 | Infraction of turbinates, unilateral or bilateral |
| 2085 | Antrotomy, intra nasal, bilateral |
| 2790 | Biopsy or excision of lymph node |
| 2791 |    --deep cervical node |
| 3740 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectomy, bilateral |
| 3745 (T) | Repair, inguinal hernia, under age 5, with or without hydrocelectamy, bilateral |
| 4040 | Cystourethroscopy with biopsy, initial |
| 5620 (T) | Extra ocular muscle surgery (resection, recession, advancement, etc.), one muscle |
| 5696 (T) | Slepharoplasty:  plastic repair of eyelid with or without graft |
| 0994 | Fracture, humerus, surgical neck, closed reduction |
| 1493 | Dislocation, elbow, closed manipulative reduction, without anesthesia |
| 3163 | Esophagoscopy, diagnostic with biopsy |
| 3165 |    --with dilation, direct |
| 3190 | Dilation of esophagus by sound or bougie, indirect, initial |
| 3220 | Gastroscopy, diagnostic |
| 3417 | Colonoscopy (by fiberoptic instrument), transverse colon |
| 3696 | Peritoneocentesis: abdominal paracentesis, initial |
| 5155 | Spinal puncture, lumbar diagnostic |

# EXHIBIT 9



# City of DETROIT

*health care plan options*

retiree plans

## 2006

# Retiree Medical Plans Benefits Summary

| Benefits | Blue Traditional | Blue Cross Community Blue | Blue Care Network HMO and Medicare Advantage | Health Alliance Plan HMO and Senior Plus Plan |
|---|---|---|---|---|
| Who is eligible to enroll in the Plan? | All City Retirees | All City Retirees, except those who were represented by Detroit Police Lieutenants and Sergeants Association (DPLSA) when they retired on or after July 1, 2003. *Additional medical plan options for uniformed police and fire retirees follow this section.* | | |
| | | | Enrollment in BCN Medicare Advantage and HAP Senior Plus Plan is limited to retirees who are enrolled in Medicare Parts A and B. | |
| Coverage Plan Year | January 1 through December 31 | January 1 through December 31 | July 1 through June 30 | July 1 through June 30 |
| **Preventive Services** | | Limited to $500 per person per calendar year | | |
| Health Maintenance Exam – includes chest X-ray, EKG and select lab procedures | Not covered | Covered – 100%, one per calendar year, payable in-network only | Covered – $10 copay | Covered – $10 copay |
| Annual Gynecological Exam | Not covered | Covered – 100%, one per calendar year, payable in-network only | Covered – $10 copay | Covered – $10 copay |
| Pap Smear Screening – laboratory services only | Covered – 100%, one per calendar year | Covered – 100%, one per calendar year, payable in-network only | Covered – 100% | Covered – 100% |
| Well-Baby and Child Care | Not covered | Covered – 100%, payable in-network only <br> • 6 visits, birth through 12 months <br> • 6 visits 13 months through 23 months <br> • 2 visits 24 months through 35 months <br> • 2 visits 36 months through 47 months <br> • 1 visit per birth year, 48 months through age 15 | Covered – $10 copay | Covered – $10 copay |
| Fecal Occult Blood Screening | Not covered | Covered – 100%, one per calendar year, payable in-network only | Covered – 100% | Covered – 100% |
| Flexible Sigmoidoscopy Exam | Not covered | Covered – 100%, one per calendar year, payable in-network only | Covered – 100% | Covered – 100% |
| Prostate Specific Antigen (PSA) Screening | Covered – 100%, one per calendar year | Covered – 100%, one per calendar year, payable in-network only | Covered – 100% | Covered – 100% |
| Immunizations | Not covered | Covered – 100%, up through age 16*, payable in-network only | Covered – 100%* | Covered – 100% |

Call Customer Service for immunization clarification.

This comparison chart describes the essential features of the above health plans in general terms. It is not intended to be a full description of coverage. The complete plans are described in the certificate of coverage issued by each plan, and are available on request to all interested persons.

# Retiree Medical Plans Benefits Summary

| Benefits | Blue Traditional | Blue Cross Community Blue | Blue Care Network HMO and Medicare Advantage | Health Alliance Plan HMO and Senior Plus Plan |
|---|---|---|---|---|
| **Other Preventive Services** | | | | |
| Mammography Screening | Covered – 100%, one every 12 months | Covered – 100%, one every 12 months | Covered – 100% | Covered – 100% |
| Injections, IUDs and other contraceptive devices | Not covered | Not covered | Covered – 100%; Contraceptives covered under prescription drug coverage (applicable copays apply) | Covered – 100% |
| Infertility Counseling/ Treatment | Not covered | Not covered | Covered – 50% copay <br><br> Medicare Advantage Only : 100% based on Medicare guidelines | Covered – 100% with limitations |
| Nutritional Education and Counseling | Not covered | Not covered | Covered – 100%; Office visit copay may apply per member per visit | Covered – 100% |
| Health Education and Counseling | Not covered | Not covered | Covered – 100%; Office visit copay may apply per member per visit | Covered – 100% |
| **Routine Medical Services** | | | | |
| Routine Office Visits | Covered – 80% under MM after deductible and copay with diagnosis excluding well-baby care | Covered – 100%, $10 copay | Covered – $10 copay | Covered – $10 copay |
| Consulting Specialist Care (when necessary) | Covered – 80% under MM after deductible and copay | Covered – 100%, $10 copay | Covered – $10 copay | Covered – $10 copay |
| Allergy Testing and Therapy | Covered – 80% under MM after deductible and copay | Covered – 100%, $10 copay | Covered – 100%; Office visit copay may apply per member per visit | Covered – 100%; Office visit copay may apply per member per visit |
| Outpatient diabetic management program | Covered – 100% | Covered – 100% | Covered – 100% | Covered – 100% |
| **Services in hospital** | | | | |
| Number of days of care | 365 in full under basic and 100% under MM, maximum $1,000,000 | Covered – 100%, unlimited days | Unlimited | Unlimited |
| Semi-Private Room and Intensive Care | Covered – 100%, unlimited days** | Covered – 100%, unlimited days | Covered – 100% | Covered – 100% |
| Miscellaneous services | 365 days in full | Covered – 100% | Covered – 100% | Covered – 100% |
| Surgery and All Related Surgical Services | Approved amount, may require precertification/ second opinion | Covered – 100% | Covered – 100% | Covered – 100% |
| Anesthesia | Covered at approved amount | Covered – 100% | Covered – 100% | Covered – 100% |
| Laboratory Tests and X-Rays | Covered – 100% | Covered – 100% | Covered – 100% | Covered – 100% |
| Medicines and Drugs | Covered – 100% | Covered – 100% | Covered – 100% | Covered – 100% |

**Ward rates: Member may be liable for difference between ward and semi-private rates.