# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |
| _____ | ) |  |

## CREDITOR AFSCME COUNCIL 25'S SUPPLEMENTAL BRIEF IN SUPPORT OF PROOF OF CLAIM 2958 PURSUANT TO SECTIONS 105 AND 502(b) OF THE BANKRUPTCY CODE 3007 AND LOCAL RULE 3007-1

NOW COMES Creditor, AFSCME Council 25, by and through its attorneys, with its Supplemental Brief in Support of Proof of Claim 2958, and states as follows:

## I.    INTRODUCTION

In early November 2011, Detroit Mayor Dave Bing issued a public call to the City of Detroit's forty-seven unions, asking them to accept concessions in wages and benefits because the City was cash strapped. The City's unions responded, forming a civilian-side Coalition of approximately thirty unions, and negotiated with the City intensely for several months. On February 1, 2012, the Coalition agreed to new contractual arrangements which resulted hundreds of

1

millions of dollars in savings for the City; including 10% wage cuts and steep healthcare and pension cuts.

While soliciting these concessions, the City neglected to place the 13th Check issue on the table. This negotiated benefit entitled active employees to certain annuity savings fund credits, and retirees to a separate pension check each year depending on the pension system investment return. At the same time the City sought wage and benefit concessions, on November 30, 2011 the City acted unilaterally to eliminate this 13th Check benefit. The City brief spends substantial time on the wisdom of giving away "excess earnings". The City fails to address why it simply did not follow the law and negotiate-away this benefit, especially given its success in securing concessions from an unprecedented coalition of unions. Instead, the unions were forced to respond to the City's illegal conduct.

This issue was litigated before an Administrative Law Judge (ALJ) at the Michigan Employment Relations Commission (MERC). He described the context and history for why the 13th Check system was implemented at the City's request, in his October 4, 2013 Decision and Recommended Order:

> The rationale for the 2011 ordinance change was premised on what has now become a convenient public relations gambit: that the 13[th] checks amounted to a gift, a gratuity, or a bonus. They were not. In fact, the 13th check system is utilized by many employers as a method of giving some rough protection against inflation in deferred compensation systems. In the 1970s, it was not unusual to have formal inflation hedges in such systems tied directly to the cost of living indicators. That system became perceived as both unpredictable and prohibitively expensive by the late 1970s-early 1980s. It

was replaced by concepts such as the 13th check system which created separate dedicated funding streams to provide an annual bump which, while guaranteed to be paid, was not guaranteed to actually match the rate of inflation. It might be higher than a traditional COLA payment; it would likely be lower; but eh annual receipt was assured.

The 13th check system was such a well-established part of the City's deferred compensation system in 1996 that the City conceded . . . that regardless of a Charter or ordinance change, the City could not revoke the payments without fulfilling the bargaining obligation. It is uncontestable that the 13th check system was a mutually agreed upon obligation.

(*Exhibit A*, pg 15) In other words, it was a negotiated system to slow the impact of inflation. As such, it was a violation of the Public Employment Relations Act (PERA), MCL § 423.201 *et seq.* for the City to unilaterally terminate the benefit.

Michigan AFSCME Council 25 has filed a proof of claim in this court's claims register (Claim No. 2958), consisting of this 13th Check matter, as well as a retiree healthcare grievance and litigation from changes beginning in 2006. The City seeks to disallow the 13th Check and retiree healthcare claims. The City's arguments are without merit, and should be rejected.

## II.    STATEMENT OF FACTS

The parties AFSCME and the City of Detroit had a prior collective bargaining agreement, which was in existence from approximately January 2011 through June 30, 2012. (*Exhibit B*, portion of AFSCME Master Agreement that was attached to the City's Response).

3

Certain employees have annuity plans with the City, in which either 3%, 5% or 7% of their salary is contributed into the plan. As for retirees, they receive a check each month from the Retirement System for their pension. Prior to November 30, 2011, if the market performed above 7.9%, this was considered "excess earnings." Indeed, the GRS Board actuary determined that a normal rate of return for investments to be 7.9%. If earnings in the market realized a return in excess of this percentage figure, it considers the amount by which the actual returns exceed the assumed rate of 7.9% to constitute "excess earnings."

Also, a portion of these "excess earnings" would also be distributed to retirees in the form of a 13th check. This 13th check would be distributed to retirees toward the end of the year, in addition to their normal pension check. The City acknowledges that this distribution system of excess earnings, for annuity accounts and 13th checks, has been in effect since at least the 1980s.

On or about November 30, 2011, the Detroit City Council passed an ordinance prohibiting active and retiree participants from receiving excess earnings. (*Exhibit C*, Ordinance revision) This change eliminated "excess earnings" credits being given to active employee annuity accounts. Further, the Ordinance change caused the assumed rate of investment return to be the ceiling of annuity enhancement, as opposed to the floor. Now, for instance, the annuity rate of enhancement will be no greater than 7.9%, despite how much above that rate the

investments actually perform. The change also eliminated the excess earnings being distributed to retired participants, in the form of a "13th check". This change in the City ordinance changed the City of Detroit prior language, granting such discretion to the GRS Board in paying out excess earnings.

No retiree received the check in 2011 or in 2012. The City did not seek to negotiate this change in the treatment of the excess earnings beyond 7.9% with any City union. Further, the change was made during the existence of the collective bargaining agreement.

The AFSCME bargaining agreement, in Article 47.T, indicates that "[a]ll Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133." Thus, the previous ordinance which established the past practice of the GRS Board making excess earnings distributions was incorporated into the AFSCME bargaining agreement.

By changing the Ordinance, and applying that Ordinance change to the AFSCME membership, the City was violating PERA. As a consequence, active employees are losing both their annuity account investments, as well as the right to a 13th check upon their retirement.

# III.   <u>ARGUMENT</u>

## A.    The Language of the Plan Does Not Release the 13th Check Claim

The Debtor relies almost exclusively on the definition of GRS Pension Claim to argue that the 13th Check Claim is subsumed within Class 11. AFSCME argues that the language of the GRS Pension Claim creates, at the least, an ambiguity – in light of how the definition is used throughout the Class 11. The Mediation Confidentiality Order prevents all of the material facts from being disclosed, yet the below argument will disclose certain non-confidential facts.

The City's brief fails to outline the proper context of the dispute. The question presented is whether AFSCME, in agreeing to encourage its members to vote in favor of the Plan, thereby agreed to the City's interpretation of the Plan; an interpretation releasing the City from liability with two of AFSCME's claims that were properly filed in Class 14 and never formally, or informally, withdrawn. At this juncture, the Plan has not been confirmed, and there is no contract binding AFSCME to support the City's interpretation of the Plan.

Further, there is no document or any indication whatsoever from AFSCME that it released any aspect of its Proof of Claim, filed February 21, 2014.

Even if there were a "contractual" relationship between AFSCME and the City, there must exist a meeting of the minds on all material facts. *Fisk v Fisk*, 328 Mich 570, 574, 44 NW2d 184 (1950). "A meeting of the minds is judged by an

objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Heritage Broadcasting Co v Wilson Communications*, 170 Mich App 812, 818, 428 NW2d 784 (1988); See also *Jamaica Ave, LLC v S & R Playhouse Realty Co*, 540 F3d 433, 440 (6th Cir.2008) Under Michigan law, when you have a contract provision which is ambiguous – or subject to more than one interpretation – parol or extrinsic evidence may be used "for the purpose of aiding in the interpretation or construction of a written instrument, where the language of the instrument itself taken alone is such that it does not clearly express the intention of the parties or the subject of the agreement." *Edoff v Hecht*, 270 Mich 689, 695, 260 NW 93, 96 (1935) Here, given the use of the phrase GRS Pension Plan, at the least an ambiguity exists.

The use of the phrase "GRS Pension Claim" throughout makes clear that the definition is intended to include prospective payment or distribution, as distinct from credits or disbursements which should have been made in the past and are now considered contingent liability. Overall, Class 11 includes "GRS Pension Claims", defined as:

> "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other

obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) *any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.* (*emphasis* added)[1]

This is the same definition found within the initial Plan of Adjustment, filed on February 21, 2014[2] – the same day AFSCME's Proof of Claim was filed. The words "payment or distribution" are not defined in the Plan. The Fourth Disclosure Statement discusses the ASF program, and indicates that the GRS Trustees are "granted discretion to determine the annual interest to be credited on the employee contributions to the ASF accounts." (Fourth Disclosure, pg 23-24)  An "interest credit" into an employee's ASF account is not a "pension, disability or other post-retirement payment or distribution", as required by subclause (a) of the GRS Pension Claim definition. When something is "credited", according to Black's Law Dictionary, it is "enter[ed] (as an amount) on the credit side of an account". The word "credit" is defined as the "availability of funds from either a financial institution or under a letter of credit." Black's Law Dictionary, Ninth Ed., 2004, pg 424.  Receiving a "credit" is distinct from a "payment or distribution."

---

[1] Section 1.A.203

[2] http://www.detroitmi.gov/Portals/0/docs/EM/Bankruptcy%20Information/Plan%20for%20the%20Adjustment%20of%20Debts%20of%20the%20City%20of%20Detroit.pdf

Nor are these credits considered "payments" to persons who "at any time" participated in GRS, as per subclause (b) of the above definition. This language is a clear reference to the individuals who are currently retirees, whereas conversely persons entitled to ASF interest credits are current employees.

The treatment of Class 11 "GRS Pension Claims" is discussed in Section II.B.3.r. However, this Section makes no reference of the treatment of 13th Check distributions. Indeed, there is no language which suggests the City will attempt to recapture 13th Check payments. Nor has there been any literature or information provided to 13th Check recipients to suggest such.

Critically important is the discussion of the modification of the GRS Pension Claim in the Plan. Under the heading "Modification of Benefits for GRS Participants", the Plan explains that

> "During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, _provided_ that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment."[3]

The phrase AFS/GRS Reduction states as follows:

> "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the

---

[3] Section II.B.3.r.ii.C

Current Accrued Annual Pension amount described in Section I.A.202, plus the ASF Recoupment.[4]

Within Class 11, it is clear from the above that the intent of the Plan is to impair future pension benefits of retirees. The Plan makes adjustments in the pension benefit initially until June 30, 2023. It then lists the specific impairments that are applicable to future pension benefits. The Plan does not indicate any impairments of the ASF credits or 13th Checks owed prior to the July 18, 2013 petition.

The Fourth Amended Disclosure Statement also discusses the GRS Pension Claim phrase. *See Pg. 14 and 174.* Much like the Plan, the Disclosure Statement confirms that the pension benefit impairment is due to the "unfunded" – or future liability – of the City.

The omission of the 13th Check Claim from the language of Class 11 was intentional. As noted, the AFSCME 13th Check Claim is a pending claim before the Michigan Employment Relations Commission ("MERC"). The claim itself is one rooted in state labor law and contract law. The City unilaterally changed the terms of the collective bargaining agreement it had with its AFSCME city employees and must reimburse them. Notably, the City has been meticulous in its defining its inclusion and treatment of claims within the Plan. Presently, the Plan, which has been amended numerous times to address each inefficiency, is on its 7th amended version.  Thus, the City's "void" as to these claims is not unintentional.

---

[4] Section 1.A.23

The City acted as if the 13th Check Claim was a live claim, when the Fourth Amended Plan was published. As stated before, February 21st was the day AFSCME filed its Proof of Claim, and that the City filed its first Plan of Adjustment. The definition of GRS Pension Claim was the same as in the current version. In the second week of April 2014 (on or about April 12th), AFSCME reached a deal with the City concerning the pension impairments for GRS Participants. On May 5, 2014, the City filed its Fourth Amended Plan of Adjustment (Docket No 4392), which was intended to encompass the terms of the AFSCME (and other employee creditor groups') pension deals.

Importantly, on May 15, 2014, the City filed its objection to the AFSCME Proof of Claim. (Docket No. 4876) In that objection, the City addressed the specific claims within AFSCME's plan. The first claim AFSCME made in its February 21st Claim concerned the potential impairment to all City retirees regarding their pension and OPEB, valued at $8.1 billion. The City responded to that claim by indicating that

> "the Plan addresses all pension and OPEB liabilities independent of the Claim by providing for the continuation of modified post-employment benefits for the individuals that the Claimant seeks to protect by filing the Claim. See, e.g., Plan, at §§ II.B.3.r, II.B.3.s (providing for, respectively, the preservation and treatment of GRS pension and OPEB claims). Accordingly, the Claim is unnecessary to preserve these individuals' rights to payment on account of such liabilities. Subject to the confirmation of the Plan, this portion of the Claim may be disallowed."

(Claim Objection, ¶ 14) Thus, the City considered Sections II.B.3.r, II.B.3.s of the plan to "preserve" the "continuation of <u>modified</u> post-employment benefits" – in other words, the future pension and OPEB benefits were being continued but modified. Those Sections of the Plan then set out specifically the modifications of the future pension and OPEB benefits, respectively. However, the Sections never address the modification of any past-due ASF interest credit, or pension check not yet received. Thus, this language clarifies that the City did not consider the 13th Check Claim to be encompassed within Class 11.

Further, in these same objections, the City does address the 13th Check Claim. The City writes as follows:

> "the Claim identifies several alleged liabilities related to various other proceedings identified in Exhibit 1 to the Claim, *including a number of proceedings before the Michigan Employment Relations Commission. To the extent any such proceedings have not been adjudicated on a full and final basis before the applicable tribunal*, the City disputes its liability to the Claimant or the individuals it represents on account of such liabilities."

Id., at ¶ 18. This is the objection the City recorded a mere ten days after the City filed the Fourth Amended Plan of Adjustment, which embodied the retiree pension deal. It did not indicate that the 13th Check MERC charge was addressed within the May 5th Plan. Instead, it indicated as its only objection to the claim was that it had not been fully adjudicated before MERC.

Without disclosing confidential communications, the City's assertion, of the 13th Check Claim being subsumed within the Plan, is a recent one.

**B.     The Language of the Plan Does Not Release the Retiree Healthcare Claim**

The Retiree Health Care Claim within AFSCME's Proof of Claim is not substantially similar to the other claims or interests of Class 12. As discussed above, a claim can only be placed on a particular class if the "claim or interest is substantially similar to the other claims or interests of such class." 11 U.S. Code § 1122. The Retiree Health Care Claim, which does not deal with prospective payments of distributions, is not substantially similar to the other claims or interests of Class 12.

Specifically, Class 12 deals exclusively with prospective payments or distributions moving forward. The definition of OPEB Claim does not include a claim for past due health care. Instead, the OPEB Claim is clearly intended to encompass the City's future obligations to pay retiree health care. OPEB Claims are defined as:

> "OPEB Claim" means any Claim against the City for *OPEB Benefits* held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree. (*Emphasis* Added)[5]

The Plan continues by establishing the two VEBAs, followed by Section II.B.3.s.ii.C which states that:

---

[5] Section 1.A.255

13

13-53846-swr   Doc 8274-10   Filed 11/12/14   Entered 11/12/14 15:08:02   Page 13 of 26
13-53846-swr   Doc 7782   Filed 10/16/14   Entered 10/16/14 17:09:28   Page 13 of 26
61

"From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits."

The Effective Date is defined as a date following Plan Confirmation.[6] Thus, the clear intent is to impair the provision of retiree healthcare benefits following the Effective Date of the Plan. The Disclosure Statement further addresses the definition of OPEB Claim stating:

> *If you are a retiree or a surviving beneficiary and are receiving retiree health benefits, or are entitled to retiree death benefits from the City, you are a holder of what the Plan calls an "OPEB Claim" and your OPEB Claim is included in Class 12 of the Plan.* (*emphasis* in original)

> The estimated amount of all OPEB Claims for purposes of voting on the Plan is $4,095,000,000. *This amount represents the estimated present value of the cost of the City's future obligations*, as of June 30, 2013, *for the City to continue to provide retiree health* benefits (including dental and vision) and death benefits *into the future under the programs that were in effect at the time the City filed its chapter 9 petition.*" (*emphasis* added)

The Plan clearly contemplates that the Plan intends to impair future liability of the City, not past due debts.

## C.     AFSCME Did Not Withdraw Its Proof of Claim

Federal Rule of Bankruptcy Procedure ("FRBP"), Rule 3006 speaks to the withdrawal or release of a proof of claim:

A creditor may withdraw a claim as of right by filing a notice of withdrawal, except as provided in this rule. *If after a creditor has filed a proof of claim an objection is filed thereto or a complaint is filed against*

---

[6] "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived. Section 1.A.168

14

13-53846-swr   Doc 8274-10   Filed 11/12/14   Entered 11/12/14 15:08:02   Page 14 of 26
13-53846-swr   Doc 7982   Filed 10/16/14   Entered 10/16/14 15:08:02   Page 14 of 26
61

*that creditor in an adversary proceeding, or the creditor has accepted or rejected the plan or otherwise has participated significantly in the case, the creditor may not withdraw the claim except on order of the court after a hearing on notice to the trustee or debtor in possession, and any creditors' committee elected pursuant to § 705(a) or appointed pursuant to § 1102 of the Code.* The order of the court shall contain such terms and conditions as the court deems proper. Unless the court orders otherwise, an authorized withdrawal of a claim shall constitute withdrawal of any related acceptance or rejection of a plan.

FRBP 3006. (*Emphasis added*) *See also In re County of Orange,* 203 BR 977 (BankrCDCal1996*)*. Federal Rules of Civil Procedure ("FRCP") Rule 41 governs the interpretation of this Rule, concerning the withdrawal of a proof of claim. *In re Empire Coal Sales Corp,* 45 FSupp 974, 976 (S.C.N.Y.), aff'd sub nom. *Kleid v Ruthbell Coal Co,* 131 F2d 372, 373 (2d Cir1942); *Kelso v MacLaren*, 122 F2d 867, 870 (8th Cir.1941). After an objection has been filed a proof of claim may be withdrawn <u>only subject to approval by the court.</u> *Id.*

Similar to FRCP Rule 41(a), it is the filing of an objection to the claim which initiates a contest that must be disposed of by the court. Thus, a leave of court is required in order for a party to obtain dismissal over the objection of a defendant. *See* Rule FRCP 41(a)(2). On May 15, 2014, the City filed its objection to AFSCME's Proof of Claim. Therefore, AFSCME is unable to release or withdraw its claim following this point without an order of this Court.

**D.    The City Unilaterally Changed a Mandatory Subject of Bargaining**

The City argues the merits of AFSCME's charge inaccurately. Pursuant to the Michigan Public Employment Relations Act (PERA), it is unlawful for a public sector employer to fail to bargain collectively in good faith with a labor organization over mandatory subjects of bargaining like wages, hours, and other terms and conditions of employment. MCL § 425.215(1). A public sector employer may not unilaterally change a mandatory subject of bargaining without providing the labor organization with notice and opportunity to bargain. *Central Michigan Univ Faculty Ass'n v Central Michigan Univ*, 404 Mich 268, 277 (1978); *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974). Both refusal to bargain and unilateral changes are unlawful under MCL § 425.215(1). A mandatory subject of bargaining is defined as wages, hours, and other terms and conditions of employment. All other subjects are either permissive or illegal. As noted by ALJ O'Connor, retirement benefits are mandatory subjects of bargaining regardless of city charter provisions on ordinances to the contrary:

> It's particularly notable that one of the earliest cases interpreting and enforcing PERA involved the City of Detroit and the DPOA [Detroit Police Officers Association], and an assertion by the City that, "*We don't have to bargain about pensions because they're controlled by our charter, and our pension ordinance*," and the Michigan Supreme Court said, "You're wrong". [See, *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974).]

*****

> The change directly affected an existing and fundamental condition of employment. Again, *DPOA v Detroit* held that pension plans and promises made under them were a fundamental condition of employment such that the City of Detroit had to bargain over them in the DPOA case, notwithstanding a preexisting charter provision which set terms different than the DPOA was seeking.

(*Exhibit A*, pg 9-10) The credits into the ASF accounts and the 13th check was a mandatory subject of bargaining.

Indeed, the City has previously acknowledged that a change in the "excess earnings" calculation would be a mandatory subject of bargaining that could not be changed without first bargaining with the union. *AFSCME et al v Detroit*, 218 Mich App 263 (1996). ALJ O'Connor spent a large portion of his Decision and Recommended Order discussing the relevance of that case and the acknowledgement that the City could not implement changes to the pension ordinance without bargaining:

> The City, in the 1996 dispute [*AFSCME et al v Detroit*, 218 Mich App 263 (1996)], sought to change by charter amendment this very issue, or at least part of the very underlying issue at stake here today, and that is the Pension Board's allocation of excess earnings. In 1996, the City sought to change [the handling of excess earnings] by charter amendment. In 2011, the City sought to change [the handling of excess earnings] by pension ordinance change.

> \*\*\*\*\*

> In the 1996 decision, which is a published decision binding on the parties and binding on me, the Court recounts that the City in response to AFSCME's challenge, "Agrees that the challenged provision cannot be legally implemented even if enacted by the voters without first bargaining". [The 1996 decision further found that the City did not dispute "plaintiffs'

17

contention that these challenged provisions may not be legally implemented as to the city's union employees without bargaining".]

ALJ O'Connor then noted:

> Then and now there was no factual dispute; there is no factual dispute. The excess earnings have always been allocated at the discretion of the Pension Board. The Union has argued that that's a binding past practice. The City asserts that it wasn't mutual—an assertion I find frivolous given the prior litigation, given the City's concession in prior litigation that it was an established prior practice. It's also—I also find it frivolous based on the exhibits produced by the City in this case. The Corley letter, which was an advice letter to City Council by its own staff which recounts in very specific terms that there was an existing prior practice that was well recognized, but the City did not like that prior practice and wanted to change it. [The advice letter] acknowledged with incredible specificity the prior practice that existed for over 20 years, spelling out year by year the amount of money allocate by the Pension Board over the City's concern about how it was being allocated, but with the City's acquiescence in collective bargaining agreement after collective bargaining agreement, and the City repeatedly re-adopted collective bargaining agreements [with the same language]. . . . It was more than a tacit agreement. It was an express agreement with full understanding by both parties.

(*Exhibit A*, pg 7-9)

The City has argued that the financial emergency dramatically changes the situation, but this emergency is nothing new. There were other legal mechanisms that the City could have utilized. Judge O'Connor mentioned a few possibilities in his Decision and Recommended Order:

> Notwithstanding the *DPOA v Detroit* and *AFSCME v Detroit* decisions, the City was not locked in perpetuity to the continued payment of the 13[th] checks. It could have forthrightly bargained the obligation away. It could have traded it away. It could have in good faith exhausted its bargaining obligations and then, under controlling labor law, taken the entitlement away. It did none of those things. Instead, it continued over the years to re-

commit itself to the system. In 2010, the parties had been in bargaining and reached what appeared to be, and what the City asserted to be, a good faith impasse in bargaining. In November 2010, the City imposed new conditions of bargaining in place of a 2008-2012 collective bargaining agreement, which the parties had been unable to resolve. The imposed terms altered many conditions of employment for AFSCME members and wrung significant financial concessions from the workforce. In January of 2011, AFSCME conceded the City's position that the parties had reached a lawful impasse and AFSCME expressly acquiesced in treating the City-imposed terms as the 2008-2012 collective bargaining agreement governing the relationship of the parties.

Although the City could have, in November 2010, included in the post-bargaining impasse imposed terms a cut-off of the 13th check obligations, it did not. The resulting agreement, drafted by and initially unilaterally imposed by the City, left intact the 13th check system and expressly re-committed the parties, in Article 47(T) of the Contract, to compliance with the terms of the pension ordinance as it then existed. One year later, without bargaining and during the unexpired terms of that Contract, the City Council voted to materially change the pension ordinance and the Employer followed up by unilaterally implementing the change, in derogation of the City's obligations under PERA, the mandate of *DPOA v Detroit*, and the City's own admission of unalterable obligations as set forth in *AFSCME v Detroit*. The ordinance maneuver by the City administration was a unilateral do-over in the midst of the 2008-2012 contract term which materially, and necessarily unlawfully, and adversely altered existing conditions of employment.

(*Exhibit A*, pg 16)

MERC found that the City violated the law on a number of fronts, as

detailed in the opinion.

### E.	There is No Violation of the Pension Board's Fiduciary Duty in this Case

The statute of limitations prohibits the City's claim that the Pension Board

Trustees violated the Michigan Public Employee Retirement System Act

(PERSIA), MCLA § 38.1132, et seq. The City is complaining about fiduciary breaches that occurred continuously for decades, which would have been known at the time for purposes of accrual. The statute of limitations for breach of a fiduciary duty is three years. MCL 600.5805(10); *The Meyer & Anna Prentis Family Foundation, Inc. v Barbara Ann Karmanos Cancer Institute,* 266 Mich App 39, 47, 698 NW2d 900 (2005); *Miller v Magline, Inc,* 76 Mich App 284, 313, 256 NW2d 761 (1977). This City's claims should be rejected as untimely.

Moreover the City does not have standing to complain about violations of PERSIA. MCL 38.1133(3) provides that "[a]n investment fiduciary shall discharge his or her duties solely in the interest of the participants and the beneficiaries[.]" Since the City is not a participant or beneficiary, it may not challenge the discharge of the Board's fiduciary duties. In *Wayne County Employees Retirement System v Wayne County,* 301 Mich App 1 (2013), the County contended that the 13th-checks were issued despite the underfunded status of benefit plans, that ineligible recipients received 13th-checks, and there were no written policies with respect to financial losses. *Id.* at 67. The court found that "[t]he appropriate party for pursuing a claim based on imprudent 13th-check disbursements would be a retiree or survivor beneficiary concerned with the solvency of the IEF program and the availability of future 13th checks." *Id.* at 68. Thus the court held that the County

13-53846-swr Doc 8274-10 Filed 11/11/14 Entered 11/11/14 17:08:28 Page 20 of 26

did not have standing to bring the claims because the fiduciary duties were owed to retirees and surviving beneficiaries, not the County.

In *Wayne County Employees Retirement System v Wayne County*, 301 Mich App 1 (2013), Wayne County argued that the Wayne County Employees Retirement System breached its fiduciary duties under MCL § 38.1133(3). The court held that that the Retirement Commission had not breached its fiduciary duties. And for a number of the claims, the court held that Wayne County did not have standing to enforce the fiduciary duties. Wayne County's first claim was that the Retirement Commission had failed to allocate losses in proportion to and in correlation with IEF's percentage of the investment pool. Although the court assumed that the County had standing for purposes of the argument, it still held that the Retirement Commission had no fiduciary duty to make IEF loss allocations. Wayne County's second argument was that setting rates of return for purposes of funding the IEF during unfunded years breached the Retirement Commission's duty of care. The court assumed standing for purposes of the argument for this claim as well but held that the Retirement Commission's actions were not financially imprudent from the position that it owed the duty of care to the retirees and surviving beneficiaries.

In terms of the Detroit City Charter, the City adopted a retirement ordinance as Chapter 47 of the Code. AFSCME's charge at MERC related to the City's

adoption of a new City ordinance, which prohibited certain actions by the General Retirement System Pension Board. This change in the City ordinance changed the City of Detroit's prior language, granting such discretion to the GRS Board in paying out excess earnings. It is well established that a public employer, under PERA, cannot change a mandatory subject of bargaining by passing a law or ordinance. *AFSCME et al, supra.* at (finding that "[n]either the city nor the commission disputes plaintiff's contention that these challenged provisions [of the city charter] may not be legally implemented as to the city's union employees without bargaining."); See *DPOA v City of Detroit*, 212 Mich App 383, 389 (1995)

Contrary to the City's claim, the Board did not violate its fiduciary duties under PERSIA. MCL 38.1133(3) does provide that "[a]n investment fiduciary shall discharge his or her duties solely in the interest of the participants and the beneficiaries[.]" Its distribution of excess earnings was done solely in the interest of participants and beneficiaries. The 13th check was designed to maintain the value of benefits that would otherwise be wiped out by inflation.

The City provides no evidence of the Board's alleged breaches of fiduciary duties. There is no evidence that the Board failed to investigate or to follow reasonable procedures. The only evidence on which the City relies consists of newspaper articles, which should be rejected as hearsay. *See* Fed.R.Evid. 801(c).

*See also Turner v City of* Taylor, 412 F3d 629, 652 (6th Cir 2005) (finding newspaper article to be inadmissible hearsay).

The evidence is lacking regarding the Board's attempts to understand the actuarial risk associated with 13th checks and other benefits. In *Jurva v Attorney General of State of Michigan*, 419 Mich 209, 351 NW2d 813 (1984) the court considered a hypothetical burden on the actuarial basis of the pension system. The court first found that the school board had authority under the school code to provide early retirement incentives. It then held that "[t]he presumed adverse effect on the actuarial soundness of the plan cannot defeat a clear delegation of broad authority to provide fringe benefits of an economic nature." *Id.* at 223. Similarly here, a hypothetical burden on the actuarial basis of the pension system cannot defeat a clear statutory mandate, such as the duty to bargain under PERA.

The City inappropriately cites to cases under ERISA. But ERISA does not apply to the City's retirement system. See *Wayne County Employees Retirement System*, 301 Mich App at 44 n26 (holding "ERISA has no application to the Wayne County Employees Retirement System because it is a governmental pension plan.")

The City simply could have bargained the desired change in the retirement benefits. That is the only issue in this case, not the alleged breach of a fiduciary duty. Nor does MERC have jurisdiction to consider the issue. Indeed MERC's

23

13-53846-swr   Doc 8274-10   Filed 11/12/14   Entered 11/12/14 15:08:28   Page 23 of 26
13-53846-swr   Doc 8292-10   Filed 11/14/14   Entered 11/14/14 15:08:02   Page 23 of 26
61

jurisdiction is limited to interpretation of PERA. But even if the court were to consider the City's untimely fiduciary duty claim, the *Wayne County* decision, supra, 301 Mich App 1, should persuade this Court that no such breach occurred.

## IV.   CONCLUSION

WHEREFORE, the Coalition of Detroit Unions respectfully requests that this Honorable Court overrule the City of Detroit's Objections.

Dated: October 16, 2014
　　　　　　　　　　　　　　 /s/ Richard G. Mack, Jr.
　　　　　　　　　　　　　　 Richard G. Mack, Jr., Esq.
　　　　　　　　　　　　　　 MILLER COHEN PLC
　　　　　　　　　　　　　　 600 West Lafayette Blvd., 4th Floor
　　　　　　　　　　　　　　 Detroit, MI 48226-3191
　　　　　　　　　　　　　　 Telephone: (313) 964-4454
　　　　　　　　　　　　　　 Facsimile: (313) 964-4490
　　　　　　　　　　　　　　 richardmack@millercohen.com

　　　　　　　　　　　　　　 Sharon L. Levine
　　　　　　　　　　　　　　 Philip J. Gross
　　　　　　　　　　　　　　 LOWENSTEIN SANDLER LLP
　　　　　　　　　　　　　　 65 Livingston Ave.
　　　　　　　　　　　　　　 Roseland, New Jersey 07068
　　　　　　　　　　　　　　 Telephone: (973) 597-2500
　　　　　　　　　　　　　　 Facsimile: (973) 597-6247
　　　　　　　　　　　　　　 slevine@lowenstein.com
　　　　　　　　　　　　　　 pgross@lowenstein.com

　　　　　　　　　　　　　　 Herbert A. Sanders
　　　　　　　　　　　　　　 THE SANDERS LAW FIRM PC
　　　　　　　　　　　　　　 615 Griswold St., Ste. 913
　　　　　　　　　　　　　　 Detroit, MI 48226
　　　　　　　　　　　　　　 Telephone: (313) 962-0099
　　　　　　　　　　　　　　 Facsimile: (313) 962-0044
　　　　　　　　　　　　　　 hsanders@miafscme.org

24

13-53846-swr   Doc 8274-10   Filed 11/12/14   Entered 11/12/14 15:08:02   Page 24 of 26
13-53846-swr   Doc 7782   Filed 10/16/14   Entered 10/16/14 15:08:02   Page 24 of 26
61

*Counsel to Michigan Council 25 of the*
*American Federation of State, County and*
*Municipal Employees (AFSCME), AFL-CIO*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
|  | ) |  |
| _____ | ) |  |

## PROOF OF SERVICE

The undersigned certifies that on August 1, 2014, the American Federation of State, County and Municipal Employees Council 25 (AFSCME) filed Objections to the Fifth Amended Plan of Adjustment of Debts, Due to Impairment of Non-City Employees/Retirees were electronically filed with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Boulevard, 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 566-4787
Facsimile: (313) 964-4490
richardmack@millercohen.com

1

13-53846-swr   Doc 8274-10   Filed 11/12/14   Entered 11/12/14 15:08:28   Page 26 of 26
13-53846-swr   Doc 7382   Filed 10/16/14   Entered 10/16/14 15:08:02   Page 26 of 61

# EXHIBIT A

# TRUE COPY

**STATE OF MICHIGAN**
**MICHIGAN ADMINISTRATIVE HEARING SYSTEM**
**EMPLOYMENT RELATIONS COMMISSION**

In the Matter of:

CITY OF DETROIT,
      Employer-Respondent,

    -and-
                          Case No. C12 E-092
                      Docket 12-000777-MERC

AFSCME COUNCIL 25,
      Labor Organization-Charging Party.

_____/

APPEARANCES:

Richard G. Mack, Jr, Miller Cohen, PLC,
for the Labor Organization–Charging Party

Letitia C. Jones, Assistant Corporation Counsel,
for Respondent-Public Employer

## DECISION AND RECOMMENDED ORDER
## OF ADMINISTRATIVE LAW JUDGE
## ON SUMMARY DISPOSITION

Pursuant to the Public Employment Relations Act (PERA), 1965 PA 379, MCL 423.201, *et seq*, as amended, this case was assigned to Doyle O'Connor, Administrative Law Judge (ALJ) of the Michigan Administrative Hearing System, acting on behalf of the Michigan Employment Relations Commission (MERC). The following findings of fact, conclusions of law, and recommended order are based upon the entire record:

### The Unfair Labor Practice Charge:

On May 10, 2012, a Charge was filed in this matter by AFSCME Council 25 (Charging Party) against the City of Detroit (Employer or Respondent). The Charge alleged that the Employer had violated PERA by unilaterally altering an established condition of employment. The Union alleged that the City had adopted an ordinance on November 30, 2011, which materially altered the handling of certain retirement benefits. Specifically, the Charge alleged that the long-standing agreement between the parties was that the annual rate of return on employee

1

annuity retirement accounts was essentially guaranteed by the City at a rate of 7.9%, with excess earnings flowing directly to employee accounts, and with any shortfalls covered by the City. The Unions asserted that changes implemented pursuant to the new ordinance adversely affected the approximately 2,600 individuals represented by AFSCME. The Union's contract with the City was alleged to have run from January 2011 and to have been set to expire June 30, 2012.

The Charge asserted that the new ordinance change was implemented without bargaining with AFSCME, during the term of an existing contract, and was therefore unlawful. It was asserted, and ultimately not disputed, that the contract expressly provide that "*all retirement and pension plan provisions provided for by the City Charter and Municipal Code are incorporated herein by reference unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133*". Under the prior Ordinance, excess pension earnings were allocated by the General Retirement System (GRS) Board to further fund employee annuities and to provide for a reserve fund to pay for the issuance of "13th checks". The City filed a response in which it acknowledged that the City Council had substantively amended the pension Ordinance, but denied that its unilateral actions were unlawful.

The matter was scheduled for trial on July 24, 2012, with that date adjourned by mutual consent, with a new trial date of November 14, 2012. Shortly before the trial date, an Amended Charge was filed, and the Employer requested and was granted an adjournment of the trial. The Amended Charge added allegations that a portion of the excess earnings had been utilized by the General Retirement System's Board of Trustees to fund a hedge against inflation for retirees in the form of a "13th Check" issued annually. The amount of the annual allocation of excess earnings, if any, was calculated by the Trustees pursuant to an established formula. It was alleged that, but for the November ordinance change, individual retirees would have received a 13th check in December 2011 and again in 2012.

A pre-trial conference was held on December 6, 2012. The parties concurred that there were no material disputes of fact and that proceeding on summary disposition would be appropriate. The Union's motion for summary disposition was filed on December 28, 2012, with the City's response and cross-motion for summary disposition filed on January 25, 2013. Oral arguments were heard on February 8, 2013, with a bench opinion issued in the Union's favor. After the hearing and issuance of the bench opinion, the parties sought and were granted the opportunity to file supplemental briefs on the question of relief and regarding an intervening appellate decision. The Union's supplemental

2

brief was filed on June 24, 2013, with the City's supplemental brief filed July 15, 2013.

Subsequent to the supplemental briefing by the parties, Detroit was placed in receivership under State law and an emergency manager with extraordinary powers was put in charge of Detroit's affairs, in place of its elected officials. A bankruptcy filing followed shortly; with its attendant automatic stay of most, if not all, other litigation involving claims against the City. In deference to the bankruptcy proceeding, the bench opinion in this case was not followed by the issuance of a formal decision, as it ordinarily would have been. The multiple City of Detroit related proceedings pending before MERC, and before the several Administrative Law Judges, have all been held in abeyance. This occurred both in deference to the automatic bankruptcy stay and in recognition of the obvious fact that with the appointment of an emergency manager, of a term of uncertain duration, with the attendant suspension of any bargaining obligations, the subsequent bankruptcy filing, it is apparent that the nature of the relationship of the parties, their collective bargaining disputes, and their respective positions on myriad issues will be materially changed and the dormant pending litigation, and the relief sought therein, will all likely be moot.

Discussion and Conclusions of Law:

Counsel for the parties appeared for oral argument on February 8, 2013. Preliminary to the oral argument, I stated on the record my understanding of the position of the parties, as set forth below:[1]

JUDGE O'CONNOR:

We're here on cross motions for summary judgment. I have reviewed the pleadings. I have a couple introductory comments.

The Union's motion for summary disposition in this case relates to the adoption of a new City ordinance which prohibited [certain actions by] the General Retirement System Pension Board, GRS Board, which handles pension questions for all City employees or virtually all City employees other than police and fire. The ordinance prohibited the Board from granting a rate of return on annuities greater than the actual return, and which had the

---

[1] The transcript excerpt reproduced herein, which to aid clarity is set off in an alternate font, contains typographical corrections and other non-substantive edits for clarity purposes. Insertions of explanatory text are bracketed. The completed unedited transcript is maintained within the Commission case file.

3

apparent impact of precluding the issuance of the 13th checks to retirees[2].

The Employer has responded and asserted its own cross motion for summary disposition. There's no dispute over the fact that a changed ordinance was adopted in November of 2011 and that a timely charge was filed. There's likewise no dispute over the fact that the terms of the pension plan are mandatory subjects of bargaining, which the City concedes in its brief.

It's alleged, and seemingly undisputed, that in November 2011 the City adopted a pension ordinance to be effective December 20, 2011 which altered certain prior practices of the Pension Board. That change occurred without bargaining and during the term of an existing collective bargaining agreement. That existing collective bargaining agreement incorporated by reference the prior version of the pension ordinance and City charter provisions.

Based on the pleadings, I have relied on several documents which both advocates also relied on, and I will denominate [those documents] as exhibits.

As I understand it, the Union's assertion is that the change was an unlawful unilateral change in an existing condition of employment, and a repudiation of the then in place collective bargaining agreement. The Union's motion is additionally supported by a facially competent affidavit.

The City earlier asserted the defense that the question of the Pension Board's exercise of discretion in the distribution of excess earnings was not an established condition of employment, and rather was in essence an ultra vires act by the Board. The Union addressed that assertion at least in part by its reliance on the decision in *AFSCME et al v Detroit*, 218 Mich App 263 (1996), in which the City

---

[2] The 13th check system is utilized by many employers as a method of giving some rough protection against inflation in deferred compensation systems. In the 1970s, it was not unusual to have formal inflation hedges in such systems tied directly to the cost of living indicators. That system became perceived as both unpredictable and prohibitively expensive by the late 1970s-early 1980s. It was replaced by concepts such as the 13th check system which created dedicated funding streams to provide an annual bump which while guaranteed to be paid, was not guaranteed to actually match the rate of inflation. It might be higher than a traditional COLA payment; it would likely be lower; but the annual receipt was assured.

4

prevailed. In that case, the City had sought a similar change regarding distribution of excess earnings; in that case via charter amendment, and according to the Court, the City acknowledged at the time that no such change could actually be implemented without first bargaining because the then current system of distribution of earnings was an established condition of employment. [Such a legal concession by the City in 1996 was regardless mandated by the earlier holding in *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974), which expressly held that while the City could change its pension ordinances, or Charter, as the City Council saw fit, changes to existing retirement benefits could not actually be implemented without fulfilling bargaining obligations.]

As both parties are presumably aware, the wisdom of the prior practice and the wisdom of the ordinance change are not issues before me for review. The only question before MERC is whether a change in mandatory [subjects of bargaining related to] conditions of employment was implemented in an unlawful manner. Similarly, the wisdom of the Court of Appeals decision in 1996 is not before me. It's a published decision involving these same two parties.

After considering the pre-hearing briefs and extensive arguments of both parties, I concluded that there were no questions of material fact and that a decision on summary disposition was appropriate, as urged by both parties, pursuant to Commission Rule R 423.165. See also *Detroit Public Schools*, 22 MPER 19 (2009) and *Oakland County and Oakland County Sheriff v Oakland County Deputy Sheriffs Assoc*, 282 Mich App 266 (2009). Accordingly, I rendered a bench decision, with the substantive portion of my findings of fact and conclusions of law from my bench opinion set forth below:

**JUDGE O'CONNOR:**

I am prepared to issue a bench opinion, which will be followed by a written decision.

I find that this case is controlled by the indistinguishable decision in the 1996 published Court of Appeals decision involving these same parties, AFSCME and Detroit. It is further controlled by judicial estoppel where the City

5

prevailed in that case by asserting the very thing they deny today, and that is the City, in the '96 case as recounted by the Court of Appeals conceded, as it must have done under the then existing law, that regardless of charter provision or any change to it, regardless of ordinance or any change to it, the City could not unilaterally change aspects of the pension plan without bargaining first with the Union.

The City today acknowledges in its brief its duty to bargain, but then asserts to the contrary, there was no duty to bargain under 2011 PA 4, which I'll address later.

The City never addressed, either in oral argument or its brief, the impact of the clearly controlling published decision between these same two parties. I find that shocking and troubling that it wasn't even addressed, because it is so clearly controlling.

The City, in the 1996 dispute [*AFSCME et al v Detroit*, 218 Mich App 263 (1996)], sought to change by charter amendment the very issue, or at least part of the very underlying issue at stake here today, and that is the Pension Board's allocation of excess earnings. In 1996, the City sought to change [the handling of excess earnings] by charter amendment. In 2011, the City sought to change [the handling of excess earnings] by pension ordinance change. The [difference between a charter amendment and an ordinance change] is not a distinction [which would alter the statutory duty to bargain].

[In the 1996 case, the Court of Appeals found that the City sought to change the City Charter to: *"require so-called "excess earnings" prom pension investments to be allocated among certain pension benefit funds in proportion to each fund's percentage of total system assets, with the remainder to be credited to the fund contributed to by the city, thereby reducing the city's future contribution obligations. This revision would limit the discretion exercised under the current charter by the pension board of trustees to allocate excess earnings among the several pension funds in its sole determination"*. The 1996 charter amendment effort was therefore functionally indistinguishable from the 2011 ordinance amendment in the goal of diverting funds from benefiting employees and

6

into the City coffers while taking away from the trustees the discretion to allocate funds to pay out the 13th checks. In the 1996 decision, the Court, in denying AFSCME relief, expressly relied on the City acknowledgment that it could not unilaterally accomplish that goal by charter amendment.]

Then and now there was no factual dispute; there is no factual dispute. The excess earnings have always been allocated at the discretion of the Pension Board. The Union has argued that that's a binding past practice. The City asserts that it wasn't mutual--an assertion I find frivolous given the prior litigation, given the City's concession in the prior litigation that it was an established prior practice. It's also -- I also find it frivolous based on the exhibits produced by the City in this case. The Corley letter[3], which was an advice letter to City Council by its own staff which recounts in very specific terms that there was an existing prior practice that was well recognized, but the City did not like that prior practice and wanted to change it. [The advice letter] acknowledged with incredible specificity the prior practice that existed for over 20 years, spelling out year by year the amount of money allocated by the Pension Board over the City's concern about how it was being allocated, but with the City's acquiescence in collective bargaining agreement after collective bargaining agreement, and the City repeatedly re-adopted collective bargaining agreements [with the same language]. [The contractual reaffirmation of the obligation included] the 2008-2012 agreement which was initially unilaterally imposed on the Union and then expressly acquiesced [in] by the Union which incorporates by reference the very pension ordinance that the City [has now] sought to unilaterally change. It was more than a tacit agreement. It was an express agreement with full understanding by both parties.

Then -- in 1996 that is -- and now, [until] the change in 2011, the excess earnings have always been allocated at the discretion of the Pension Board. The Board, as set forth in the City's exhibits, allocated the so-called excess earnings, that is earnings above a projected target rate of

---

[3] Letter of November 2011 from Irvin Corley, Jr, director of the City Council's fiscal analysis division to the City Council.

return, to essentially three different funds; the retiree 13th check; secondly to supplement the holdings in individual employee annuity funds; and third to reduce the City pension contribution. The Esuchanko charts which the City submitted made clear that in each and every year where there were excess earnings the Pension Board allocated them amongst those three funds at the Pension Board's discretion and in roughly comparable amounts each time.

There was no dispute even in 1996 that the practice had been longstanding. It's obvious that the City's preference, for understandable reasons, was to change that practice. It attempted to do so unilaterally in 1996 and again in 2011. As I said, I see no distinction between the City's unilateral effort to change it by pension ordinance or by charter amendment. In each case, as the City rightly conceded in 1996, regardless of a change to those ordinances or charter provisions, the duty to bargain remained.

In the 1996 decision, which is a published decision binding on the parties and binding on me, the Court recounts that the City in response to AFSCME's challenge, *"Agrees that the challenged provision cannot be legally implemented even if enacted by the voters without first bargaining"*. [The 1996 decision further found that the City did not dispute *"plaintiffs' contention that these challenged provisions may not be legally implemented as to the city's union employees without bargaining"*.]

The City's concession in 1996 that there was a duty to maintain these precise conditions of employment absent bargaining was correct under the law then, and remains correct under current case law interpreting PERA. Regardless, I would otherwise find the City bound by *res judicata* and by collateral estoppel by that 1996 decision involving these two parties before me today on that same mixed question of fact and law.

It's particularly notable that one of the earliest cases interpreting and enforcing PERA involved the City of Detroit and the DPOA [Detroit Police Officers Association], and an assertion by the City that, *"We don't have to bargain about pensions because they're controlled by our charter, and our pension ordinance,"* and the Michigan Supreme Court said,

8

"You're wrong". [See, *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974).]

[The City was] right in 1996 in acknowledging that they had to bargain before they could make a change, and it's not just wrong, but frivolous today to argue otherwise.

The City adopted the change disputed in this case by not just amending a pension ordinance. It's undisputed that after the [2011] pension ordinance was adopted, the City unilaterally implemented that change, unlike the position the City took in 1996, which was that they needed to change the charter, and that even if the charter were changed, which has a higher status than a pension ordinance, the City acknowledged they would still not be able to implement the change until they bargained with the Unions over it. Here the City threw out that concession and actually implemented the change without bargaining.

It's undisputed and supported by affidavit submitted by the Union and not contradicted by the City, that in each year in which there were excess earnings, the Pension Board allocated those earnings, then divided the monies as I've described into three separate pots, essentially; part to reduce the City's contribution under the defined benefit plan, part to the 13th check, and part to the annuity accounts. The Corley and Esuchanko documents submitted by and relied on by the City unequivocally establish that the practice was consistent and of longstanding.

Again, the 1996 Court of Appeals decision alone would have regardless established [that] this process was an established condition of employment. If it existed in 1996 and still existed in 2011, it's an established condition of employment.

The change directly affected an existing and fundamental condition of employment. Again, *DPOA v Detroit* held that pension plans and promises made under them were a fundamental condition of employment such that the City of Detroit had to bargain over them in the DPOA case, notwithstanding a preexisting charter provision which set terms different than the DPOA was seeking. [In *DPOA*, the Supreme Court allowed the unilateral change to stand,

9

because the law had been uncertain in 1973, but the Court expressly cautioned the City that it must bargain over any future changes to the pension. Quite literally, the Supreme Court ruled that because the law had been unclear, the City could get away with a unilateral change to the pension plan that one time, but to not ever try it again.] The City's conduct [here] was unlawful and constitutes a refusal to bargain in good faith by unilaterally changing an existing condition of employment as to active employees.

Additionally, the City's conduct occurred at a point in time when the parties had in place a negotiated collective bargaining agreement. This is really the second half of the charge, and it's subject to a separate analysis.

That binding collective bargaining agreement expressly incorporated by reference the prior version of the pension ordinance and charter provisions, and taking judicial notice, was negotiated in the context of both parties understanding and being aware of the 1996 Court of Appeals decision on this very topic as they were both parties to that case. They can't deny knowledge of it having previously litigated the very dispute that we're here on today.

The law, the case law, and PERA did not change in any relevant aspect between the 1996 decision by the Court of Appeals and the 2011 action by the Employer.

The City had and has no colorable claim that it did not face a clear and binding contractual obligation to keep in place the preexisting and previously litigated method of allocating excess earnings. As such, the City's conduct further constituted an unfair labor practice as it was an unlawful repudiation of the binding 2008-2012 collective bargaining agreement, which obviously was still in effect at the point of the November 2011 pension ordinance change.

Union Counsel appropriately cited to the ATU past practice case [*Amalgamated Transit Union v SMART*, 437 Mich 441 (1991)] and the line of cases following ATU. This was, I think, beyond a tacit agreement, but it was at minimum a tacit agreement. A practice that continues for three decades is a tacit agreement. A practice where the City has previously sought a charter amendment unsuccessfully to

10

end the practice is, at minimum, a tacit agreement. I think, frankly, it rises to the level of an express agreement where the parties, having previously fought over the terms of the charter and the pension ordinance, then incorporate them by reference in the collective bargaining agreement.

The City's sole proffered defense really was, in its brief, that the financial stability agreement entered into under 2011 PA 4 suspended the duty to bargain.[4]  [At oral argument I strongly suggested to the City that such an argument was inapposite based on the timing of relevant events. Subsequent to the bench opinion, the City sought and was granted leave to withdraw that issue and argument from contention.]

The City has further raised the question of AFSCME's standing to represent already retired former employees. The City is incorrect in its assertions that the case law cited provides that AFSCME former employees who are retirees are not members of AFSCME. They may well be, they may not be. Its individual-- some retirees continue to belong to unions, some don't. They are, however, no longer part of the bargaining unit. The City was correct to that extent.

It is axiomatic that neither the Employer nor the Union can demand to bargain over changes in conditions affecting already retired former employees. It doesn't alter the Union's claim as to the impact on active employees who were promised that the Pension Board would have the discretion to allocate certain funds, excess earnings, to their annuity accounts and were promised that upon

---

[4] Effective March 28, 2013, the Local Financial Stability And Choice Act, (LFSCA), PA 436 of 2012, MCL 141.1541 *et seq.* was enacted by the Legislature for the stated purpose of placing financial checks and balances on public employers in a state of financial stress or emergency. As part of that statutory scheme, the Act authorizes the state treasurer to enter into a consent agreement with a local government in a state of financial stress or emergency for a period necessary to achieve the goals and objectives of the agreement. Section 8(11) of the LFSCA suspends the duty to bargain set forth in Section 15(1) of PERA for employers subject to a consent agreement, including consent agreements entered into pursuant to the Act's predecessor, Public Act 4 of 2011. Similarly, Section 27(3) of the LFSCA provides that a local government placed in receivership under the Act is not subject to Section 15(1) of PERA for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first. For purposes of the LFSCA, "receivership" means the process under the Act by which a financial emergency is addressed through the appointment of an emergency manager. MCL 141.1542(q). No provisions of that Act applied to Detroit at the time of the adoption or implementation of the disputed ordinance.

retirement they would be eligible for 13th checks to the extent that there were excess earnings above the [projected rate of return].

As I said, there's no duty to bargain over changes in conditions affecting already retired former employees. However, that doesn't fully answer the question in this case. The parties may, of course, voluntarily enter into negotiations over permissive subjects of bargaining. The question of possibly raising a pension benefit for people who already are retired is a permissive subject of bargaining. It's not prohibited. The parties can, if they choose to, negotiate over it.

Here the Union has not sought as relief any demand over any right to bargain as to former employees. Rather the Union is seeking to enforce the Employer's obligation to not make unilateral changes in promises that had already been made and were still in effect, both [as to] the current employees regarding their entitlements once they retire, which is a perfectly ordinary mandatory subject of bargaining, and as to individuals who were part of the bargaining unit and since retired.

The Union is asserting, and I have found the Employer in implementing unilaterally the changes to the pension ordinance and cutting off the 13th check, has repudiated the terms of an existing collective bargaining agreement. Under PERA, the repudiation of the clear, undisputed terms of an existing contract is more than a mere contract breach which would otherwise be left to the grievance procedure or circuit court suit over damages or whatnot. Rather it's treated as a refusal to bargain in good faith and is therefore an unfair labor practice even if related to a permissive subject of bargaining over which there was necessarily no duty to bargain as in the Commission decisions in the *Kalamazoo County Sheriff* case [*Kalamazoo County & Sheriff*, 24 MPER 17 (2010] where the Commission held that where there is a mixed question, a collective bargaining agreement that covers both mandatory subjects and permissive subjects, the package is the package. It's a single package. Neither side can unilaterally carve it up into pieces and say, "*We'll comply with one piece. We won't comply with this other piece,*" unilaterally and without

12

violating the duty to bargain. Once a contract has been reached, it must be treated as binding on both parties, as the Commission held in *Kalamazoo County Sheriff,* or the possibility of productive future bargaining is destroyed.

I will be recommending the restoration of the status quo by restoring to the Pension Board the discretion it previously exercised, by the City being ordered to not interfere in the exercise of that discretion by the Pension Board regarding excess earnings, that the Retirement Board be notified by the City of the restoration of their preexisting discretion, that affected retirement plan participants, both active employees and retirees, be made whole by the City to the extent that there is any practical impediment to the Pension Board making those participants' whole otherwise.

The most practical resolution may be for the Pension Board to reallocate those assets. Either way, it is ultimately the obligation of the City to correct the problem it caused by its unilateral action which, again, was taken in direct rejection of the obligations it conceded that it had in the 1996 litigation.

I will recommend a posting of a notice at the work places to reaffirm for active employees that the contractual promises made to them must be kept.

*** 

[In response to a question from counsel] Well, what I've indicated I intend to order is that the *status quo* be restored, the steps that I'll be recommending be ordered are that the City restore to the Pension Board the discretion previously exercised, specifically that the City notify the Pension Board that the discretion has been restored. The Pension Board will have to act based on that discretion and determine what they think is necessary to put back together what would have otherwise happened. And the Pension Board has a prior history as laid out by Corley and Esuchanko of how they typically did that, but it is within the discretion of the Pension Board how precisely they do that . . . my expectation is that the first level response will be by the Pension Board just using their discretion to decide what they think should happen.

13

What I propose to order is that to the extent that there's any practical impediment to the Pension Board making the participants whole, it will be upon the City to make the participants whole.

In my bench opinion, I failed to address a part of how this controversy arose, which I found inexplicable. Before it adopted the November 2011 ordinance changes, the City Council had before it an advice memo from the corporation counsel's office on which presumably they were intended to rely. That memo, which was introduced in the record in this hearing at the behest of the City, has a section titled *"Labor Law Considerations"*. The memo acknowledges that the benefits were calculated and paid out in an unaltered fashion for decades. The memo inexplicably asserts that the benefits were not "bargained" for, but the memo fails to ever address the *DPOA v Detroit* 1974 decision, which established as a matter of first impression the obligation to bargain over the implementation of any legislated changes to the detailed provisions of the Detroit pension plan. Likewise, the memo fails to address the impact of, or even advise the Council of the existence of, the 1996 *AFSCME v Detroit* appellate decision in which the City prevailed expressly premised on the City's acknowledgment that it was aware that it could legislate changes to the pension plan, but that it could not implement those changes without bargaining. That the City Council acted on such an advice memo does not excuse their conduct; nonetheless, that such a fundamental matter was decided on by the Council in the absence of a review of the directly controlling law, including two directly relevant appellate cases wherein the City was the defendant, is troubling.

Further, the Corporation Counsel advice memo to City Council has, as a starting point, the 1997 Charter amendments adopted by the vote of the City electorate. An analysis was offered that the excess earnings distribution system was not "specifically authorized" in the 1997 Charter provisions regarding the pension plan. What is entirely omitted from the analysis is the occurrence of the 1996 decision of the Court of Appeals in *AFSCME v Detroit*, supra, and its sequelae. The proposal that would become the 1997 Charter initially included a provision, offered by the City administration, which would have ended the excess earnings distribution system and turned over that funding stream almost entirely to the City. The Wayne Circuit Court enjoined the Detroit Charter Revision Commission from including the disputed "excess earnings" related proposed Charter revisions in the ballot proposal which passed on August 6, 1996, and which became the 1997 Charter for the City. The Corporation Counsel memo relies on the Charter as adopted in August 1996.

14

In ignoring the decision in *AFSCME et al v Detroit*, the City likewise ignores the fact that the Court ruled just one week after that August 1996 election, finding that the injunction regarding the disputed Charter provision on excess earnings was improvidently granted, and allowing the disputed provisions to be placed before the voters in the election of November 1996. At that election, the electorate of the City, at a point in time when they still had a seemingly effective right to vote on such matters, voted down the specific proposal to shift the "excess earnings" away from deferred compensation for employees for the benefit of the City, and rejected the Charter amendment. Notwithstanding that express voicing of the will of the electorate, the 2011 ordinance amendment by the City Council, without so much as a nod of recognition, sought to mandate exactly what the voters had prohibited.

The rationale for the 2011 ordinance change was premised on what has now become a convenient public relations gambit: that the 13th checks amounted to a gift, a gratuity, or a bonus. They were not.[5] In fact, the 13th check system is utilized by many employers as a method of giving some rough protection against inflation in deferred compensation systems. In the 1970s, it was not unusual to have formal inflation hedges in such systems tied directly to the cost of living indicators. That system became perceived as both unpredictable and prohibitively expensive by the late 1970s-early 1980s. It was replaced by concepts such as the 13th check system, which created separate dedicated funding streams to provide an annual bump which, while guaranteed to be paid, was not guaranteed to actually match the rate of inflation. It might be higher than a traditional COLA payment; it would likely be lower; but the annual receipt was assured.

The 13th check system was such a well-established part of the City's deferred compensation system in 1996 that the City conceded, consistent with the earlier decision in *DPOA v Detroit*, that regardless of a Charter or ordinance change, the City could not revoke the payments without fulfilling the bargaining obligation. It is uncontestable that the 13th check system was a mutually agreed upon obligation.

---

[5] The reference to retirement obligations for public employees as "gratuities" is not without historical precedent, *albeit* not supportive of the City's position. In *Bowler v Nagel*, 228 Mich 434 (1924), the Court specifically rejected Detroit's assertion that amounts paid from retirement funds were "gratuities". However, in *Brown v Highland Park*, 320 Mich 108 (1948), the Court faced a financially beleaguered city and held that, despite *Bowler*, such pension obligations were not individually enforceable "contractual" obligations in nature, such that the City of Highland Park could cut the widows of police and firemen off from their pensions, by the expedient of a Charter amendment, without offending State law or the Federal Constitutional impairment of contracts clause. Outrage over the impact of that decision helped lead to the 1963 Constitution, which in article 9, section 24, put the theory to rest and defined such public pension benefits as Constitutionally protected entitlements. The same Constitutional Convention adopted article 4, section 48, which authorized the creation of PERA, the unionization of public employees, and the negotiation of enforceable collective bargaining agreements.

15

Notwithstanding the *DPOA v Detroit* and *AFSCME v Detroit* decisions, the City was not locked in perpetuity to the continued payment of the 13th checks. It could have forthrightly bargained the obligation away. It could have traded it away. It could have in good faith exhausted its bargaining obligations and then, under controlling labor law, taken the entitlement away. It did none of those things. Instead, it continued over the years to re-commit itself to the system. In 2010, the parties had been in bargaining and reached what appeared to be, and what the City asserted to be, a good faith impasse in bargaining. In November 2010, the City imposed new conditions of bargaining in place of a 2008-2012 collective bargaining agreement, which the parties had been unable to resolve. The imposed terms altered many conditions of employment for AFSCME members and wrung significant financial concessions from the workforce. In January of 2011, AFSCME conceded the City's position that the parties had reached a lawful impasse and AFSCME expressly acquiesced in treating the City-imposed terms as the 2008-2012 collective bargaining agreement governing the relationship of the parties.[6]

Although the City could have, in November 2010, included in the post-bargaining impasse imposed terms a cut-off of the 13th check obligations, it did not. The resulting agreement, drafted by and initially unilaterally imposed by the City, left intact the 13th check system and expressly re-committed the parties, in Article 47(T) of the Contract, to compliance with the terms of the pension ordinance as it then existed. One year later, without bargaining, and during the unexpired terms of that Contract, the City Council voted to materially change the pension ordinance and the Employer followed up by unilaterally implementing the change, in derogation of the City's obligations under PERA, the mandate of *DPOA v Detroit*, and the City's own admission of unalterable obligations as set forth in *AFSCME v Detroit*. The ordinance maneuver by the City administration was a unilateral do-over in the midst of the 2008-2012 contract term which materially, and necessarily unlawfully, and adversely altered existing conditions of employment.

It is also notable that the advice memo upon which the City Council relied was itself substantially premised on a favorable reading of the then quite recent Wayne County Circuit Court decision in *Wayne County Retirement Commission v Wayne County*, Case No 10-013013 (Hon. Michael Sapala, September 29, 2011). In that case, at the trial level, relief was granted to Wayne County in a similar dispute over the

---

[6] The 2008-2012 terms were held to be a binding and voluntary collective bargaining agreement between the parties, which fulfilled their bargaining obligations for the period 2008-2012, in *City of Detroit and AFSCME*, Case No. C10 L-295, (ALJ Peltz, August 2012)(on exceptions).

16

distribution of excess earnings from its pension fund, and in which Wayne County, via a comparable ordinance amendment, seized some $32 million from its employees' pension funds. It is certainly understandable that such a transfer of wealth seemed attractive to both the City and County; however, the Circuit Court decision was subsequently reversed in *Wayne County Retirement System · v Wayne County*, 301 Mich App 1 (2013), with the County ordered to restore the funds to its pension plan. Like the City's own legal counsel's memo, the Sapala decision reviewed both Constitutional and Charter issues, but ignored the well-settled labor law implications of such unilateral actions by Employers who are subject to bargaining obligations.

### The Post-Bench Opinion Supplemental Pleadings

As noted above, after issuance of the bench opinion, the parties sought and were granted an opportunity to provide supplemental briefing on the question of relief and on the impact of an intervening appellate decision. AFSCME proposed several refinements to the scope or nature of the intended relief that I had described in the bench opinion.

AFSCME began by noting the substantial uncertainties inherent in attempting to restore the *status quo* in a dispute of this nature which goes well beyond the ordinary order of reinstatement of an employee with backpay. Pointing to the decision in *MSU Clerical Technical Union v MSU*, 214 Mich App 42 (1995), a case in which MERC was reversed for a failure to provide a full measure of relief, AFSCME understandably and correctly notes that the burden of uncertainty as to the amount or extent of a remedy awarded should be upon the wrongdoer and not upon the prevailing claimant. In my bench opinion, it was indicated that what was intended was a full make whole remedy, and that the first step response would be to restore to the pension board its proper freedom to exercise its discretion. I also noted from the bench that all of the parties, and the pension board, are aware of and capable of calculating and addressing the average prior annual payouts, and the basis on which they were in turn calculated, should this case ever reach the remedy stage.

Specifically, AFSCME proposes that I direct that the excess earnings be premised on a specific averaging of the percentages used over a multiple year period to divide up the money among the three recipient funds. AFSCME notes, based on the City's own figures, that going back for an eleven year period, the total excess earnings were divided so that the active employee share averaged 55% annually, while the amount devoted to the 13th checks averaged 17% annually of the total fund, with the remaining 28% going to the City itself. While such a mechanism is plausible, the City unsurprisingly faults AFSCME for selecting a specific period of years, rather than a longer period of time.

17

The City offers no alternative method of calculating the remedy, proposing instead that I revisit the merits and deny relief, a suggestion which is hereby rejected.[7]

Neither party has proposed, in their supplemental pleadings, a dollar figure for the relief. This very omission underscores the fundamental uncertainty of the amount which would be necessary to afford make-whole relief. In their arguments for summary disposition, both parties relied on the November 2011 memo from Irvin Corley, Jr, director of the City Council's fiscal analysis division, which provided specific advice to City Council regarding the prior handling of the excess earnings distribution system. In that memo, which was introduced in the record by the City, Corley provides dollar figures which were not placed in dispute. For 2008, the last year Corley analyzed, the excess earnings distribution was $121,100,000. With approximately 72% of that money going for the benefit of the employee deferred compensation system, and the remaining 28% going for the City's benefit, the amount distributed for the benefit of employees was $87,120,000 for that one year. Pursuant to its new ordinance, the City withheld the payments which otherwise would have been made in 2011 and 2012. The record does not reflect the amounts earned and paid out in 2009 and 2010. If one made the enormous assumption that the excess earnings, if any, which would have been the basis for payments in 2011 and 2012 were in any way comparable, the City would need to reserve something on the order of $174,240,000 to satisfy claims. It is entirely unwarranted at this stage of the proceedings to order the reservation or payment of such a sum, which absent agreement of the parties on a specific amount, will require proofs as to what amount of gross excess earnings were generated relative to the withheld payments for 2011 and 2012. No relief can be ordered as to 2013, as the appointment of an emergency manager suspended the duty to bargain and thereby the enforceability under PERA of such obligations.

AFSCME's post-hearing suggestion that the remedial order direct payment based on some averaging of prior payments merely restates the obvious suggestion made in the bench opinion of a benchmark method for assessing compliance, when and if the question becomes relevant. Parties frequently find themselves successfully agreeing upon appropriate make whole remedies post-judgment in MERC cases, whether by compromise, rough estimate or with mathematical certainty. Failing at that, the statute and Commission Rule R423.177 provide for post-judgment compliance proceedings which are fully capable of resolving the question of the calculation of necessary payments, should

---

[7] Incredibly, the City's supplemental post-judgment brief persisted in aggressively ignoring the controlling 1974 *DPOA v Detroit* and 1996 *AFSCME v Detroit* decisions.

18

this dispute reach that stage. That Rule would require Charging Party to file a detailed specification of amounts claimed, with Respondent required to promptly respond with equal specificity. The parties are obviously far from a terminal point in this litigation and it would require an unwarranted degree of speculation upon speculation to attempt, at this stage, to engineer a more specific directive regarding relief.

AFSCME next raises a concern with the real possibility that, when and if this dispute resurfaces, the composition of the pension board of trustees may well have changed, either through the mere passage of time or through direct action by the emergency manager utilizing his extraordinary powers. The prospect is very real that the remedial order restoring discretion over the funding decision to the pension board may well place it in the hands of a new cast of characters, which may well have been selected in whole or in part by the emergency manager. While a legitimate concern, this is, at this point, speculation which cannot be addressed in a mere recommended remedial order. Again, regardless of who might constitute the pension board when, and if, this matter ever returns to them, there remain the compliance procedures to resolve disputes over implementation of any relief ultimately ordered. Regardless, it is implausible to suggest that this Agency could or should attempt to prospectively reconfigure the membership of an elected pension board.

Finally, despite noting in its supplemental pleading the intervening appointment in 2013 of an emergency manager, AFSCME proposes that the remedial order direct the City to bargain with the Union and to refrain from making any further changes in conditions until fulfilling its bargaining obligations. The City of course opposes such relief, which would be an ordinary portion of a standard MERC remedial order. The appointment of an emergency manager, under recently adopted Michigan law, suspends the obligation to bargain and with it, the obligation to maintain conditions of employment. The emergency manager is free to bargain with AFSCME, but cannot, under PERA, be compelled to do so, nor can the City be compelled, under PERA, to maintain pre-existing conditions of employment.

In its supplemental pleadings, the City, equally and similarly implausibly, proposes that I re-visit the question of summary disposition and dismiss the Charge. The City makes that request without, as noted above, any substantive discussion of the 1974 *DPOA v Detroit* and 1996 *AFSCME v Detroit* decisions. The City grants a mere nod to the existence of the decisions, placing the citations in footnote, *sans* discussion. The request for reconsideration of the substantive decision as issued from the bench is denied.

19

The City suggests, again, in its supplemental pleadings, that the matter should have been arbitrated. That suggestion was first made by the City in its first responsive pleading in September 2012, by which point the 2008-2012 collective bargaining agreement between the parties had been expired for months. Therefore, arbitration was not available. MERC does leave the parties to their available contractual remedies when there is a *bona fide* dispute over the interpretation of the parties' collective bargaining agreement and arbitration is available. Here, there was never a *bona fide* good-faith dispute over the question of the contractually mandated benefits, or over the right of either party to unilaterally abandon or modify its own obligations. There is no question amenable to arbitration here, as the City has repudiated its obligations rather than asserted a good faith dispute over some detail of its duties. The Commission will not find repudiation on the basis of an isolated breach, *Crawford County Bd. of Comm'rs*, 1998 MERC Lab Op 17, 21; however, here the deferred compensation benefit cut applied across the board to the entirety of the AFSCME unit. The cut was indisputably unilateral and occurred during a period when a collective bargaining agreement was in place.

The City proposal to the Commission to remand the matter to arbitration is merely a tactic intended to avoid substantive and effective review or remedy. The Commission has the authority to interpret the terms of a collective bargaining agreement where necessary to determine whether a party has breached its collective bargaining obligations. *University of Michigan*, 1971 MERC Lab Op 994, 996, citing *NLRB v C & C Plywood Corp*, 385 US 421 (1967). If the term or condition in dispute is "covered by" a provision in the collective bargaining agreement, and the parties have agreed to a grievance resolution procedure ending in binding arbitration, the details and enforceability of the provision are generally left to arbitration, but only where there is a good faith dispute as to the nature of the contractual obligation. *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich. 309, 317-321 (1996).

Here, there is no good faith dispute over the parameters of the Employer's obligations; rather, the City seeks to instead unlawfully reject its existing obligations contrary to its then-existant duty to bargain. Where such repudiation has occurred, the Commission is prohibited, by prior decision of our Supreme Court, from deferring to contractual arbitration and must instead enforce the statutory obligations on behalf of the people of the State. See, *Detroit Fire Fighters Ass'n v. City of Detroit*, 408 Mich. 663, 676 (Mich 1980).

Moreover, the City's asserted defenses are statutory and Constitutional rather than contractual and are not within the purview of

20

a private arbitrator. An arbitrator is not specially suited to resolve the dispute about the interplay between collective bargaining agreements, ordinances, City Charter provisions, and PERA bargaining obligations. The complexity of those very issues so vexed the Michigan Supreme Court in 1974 that it found the unilateral pension changes made by Detroit to have been improper, but gave the City a free pass for that event, while cautioning it to never similarly violate its bargaining obligations via charter or ordinance amendment. See, *DPOA v Detroit.* This is not a proper case for review by an arbitrator.

In its supplemental brief on remedies, the City raised the intervening decision of the Michigan Supreme Court in *Macomb County v AFSCME Council 25*, ___Mich___ (No. 144303, June 12, 2013).[8] In that case, the Court reversed MERC in its earlier finding of a violation where Macomb County, acting through its retirement board, altered a long standing reliance on a particular actuarial table used to calculate benefits, to the disadvantage of some retirees. The decision functioned primarily to return the Commission to a closer hewing to the standard provided under *Port Huron Education Ass'n v Port Huron Sch Dist*, 452 Mich 309 (1996).

In *Macomb County*, at the MERC ALJ level, no violation of the statute was found. The Commission decision reversing ALJ Stern was in turn ultimately reversed by the Supreme Court. The grounds prove not relevant to the present matter. The Supreme Court found the underlying collective bargaining agreement in Macomb to be unambiguous and that it expressly provided discretion to the retirement board to make the challenged change in mortality tables. The Court held that MERC had erred by relying on a past practice, albeit of several decades duration, of using the same actuarial table as a basis for finding an unlawful unilateral change, rather than respecting the unambiguous language of the contract which, even if long unused, expressly allowed the retirement board to make the change in mortality tables.

The Court in *Macomb* reaffirmed the right of parties to rely on their agreements, as held in the earlier *Port Huron* case, the holding of which remains controlling law. Here, the finding of a violation is not based on any asserted past-practice; rather the unambiguous language of the then recently re-negotiated contract between the parties supports a finding of a repudiation. The parties here expressly provided for a particular benefit to be funded and disbursed in a particular manner. Their agreements were memorialized both in contract and in ordinance. The City Council

---

[8] While AFSCME sought to strike the City pleading as having gone beyond the leave granted to file a supplemental brief on the issue of remedies, I determined that the raising of intervening appellate authority was proper.

acted unilaterally in passing and then enforcing an ordinance to unilaterally take away a negotiated benefit. The *Macomb* decision affirms rather than detracts from the enforcement of rights as to an unambiguous agreement.

A portion of the *Macomb* decision re-affirmed earlier case law requiring MERC to refer back to arbitration disputes "covered by" a collective bargaining agreement which had in it an arbitration clause where there was any colorable claim that the complained of conduct was allowed under the contract. The Supreme Court held that such disputes are for arbitrators, not the Commission, to decide. Here, the "covered by" analysis is inapposite for two separate reasons. First, there was no contract in place when this Charge was brought and no arbitration clause to which the parties could defer to. Second, as more fully discussed above, the City simply advanced no arguable basis under the prior ordinance or several collective bargaining agreements which could excuse its conduct. Simply, no plausible contractual defense was proffered. Rather, the Employer here advanced statutory and Constitutionally based defenses which, as noted above, are not amenable to resolution by a private arbitrator.

Moreover the City's theory would turn the *Macomb* decision on its head. In *Macomb*, the Court found that the contract language expressly granted the retirement board the discretion to make certain decisions, and the retirement board made such a decision well within its established discretion. Here, the unilaterally imposed new ordinance took away from the pension board the discretion which the parties had expressly agreed the pension board alone would wield.

### The Bankruptcy Court Related Developments

On the petition of AFSCME, and at 2:41 PM on October 2, 2013, the Bankruptcy Court issued an order which in relevant part provided that the automatic stay was *"modified through 11:59 PM on October 4, 2013 to permit Administrative Law Judge Doyle O'Connor to execute his recommended decision"* in this pending case. While this Decision is being released consonant with the Bankruptcy Court's partial lifting of the stay at AFSCME's request, and with full consideration of the significant claims of the parties, its release may well offer little more solace than a an assurance of a full ticket-price refund offered while still on the sharply tilting deck of the *Titanic*.

The parties are cautioned that, as they well know, the Bankruptcy Court also ordered that *"all deadlines for any party to act under state law that would otherwise result from any opinion or recommendation issued by the ALJ are tolled indefinitely pending further order of the Court"*. The

22

parties are further reminded that this Decision and Recommended Order, and the relief recommended herein, is premised on the finding that the City failed, as to the complained of events, to meet its obligations under Sections 15 and 10(1)(e) of PERA to bargain in good faith and to refrain from unilaterally implementing changes to established conditions of employment contrary to that good faith bargaining obligation. Pursuant to State law, that obligation to bargain was suspended upon the appointment of an emergency manager, such that the Employer, acting through the Emergency Manager, is empowered in 2013 to now engage in just the sort of unilateral action which would otherwise be unlawful under PERA. For that reason, no prospective relief has been ordered, beyond 2012, as any such relief would be both speculative and inappropriate until such time as the City of Detroit is no longer exempted from the ordinary obligations under Section 15 of PERA.

## Conclusion

I have carefully considered any additional arguments asserted by the parties in this matter and have determined that they do not warrant a change in the result. For the reasons set forth above, I find that the deferred compensation related benefit cuts were an unlawful unilateral change in basic conditions of employment implemented in violation of the City's well-established obligations under Section 10(1)(e) of PERA to bargain in good faith, to refrain from repudiating prior agreements, and to refrain from unilaterally imposing adverse changes in conditions of employment. I recommend that the Commission issue the following order:

## RECOMMENDED ORDER

The City of Detroit, its officers, agents, and representatives shall:

1. Cease and desist, during such periods when the bargaining obligation is not otherwise suspended by operation of law, from:

   a. Failing to bargain in good faith with the representative of its employees;
   b. Unilaterally altering any established conditions of employment during the term of any collective bargaining agreement;
   c. Seizing or transferring, or failing to return, assets held for the benefit of employees in pension funds or accounts or which were or are otherwise under the control or possession of the pension board of trustees;

23

    d.   Where an unexpired collective bargaining agreement is in place, repudiating the terms of such agreements by refusing to comply with the unambiguous obligations under such agreement;

    e.   Interfering in the pension board's distribution of the excess earnings, if any, for the years 2011 and 2012;

    f.   Interfering in the holding and distribution of assets by the retirement board when it is acting pursuant to authority expressly granted to it by the parties, whether through agreement memorialized in the pension ordinance or in separate written collective bargaining agreements.

2. Take the following affirmative action necessary to effectuate the purposes of the Act:

    a.   Affirmatively renounce reliance on and cease any effort at enforcement of the November 30, 2011, pension ordinance amendment;

    b.   Restore to the control of the pension board the entirety of any assets diverted from the control of the board following the adoption of the November 30, 2011 ordinance amendment and as anticipated by that ordinance change, including restoring to the board's control any "excess earnings" as previously defined by the pension board and attributable to 2011 and 2012;

    c.   Take whatever steps are necessary to facilitate the distribution of the 2011 and 2012 excess earnings, if any, in keeping with the previously utilized methodology whereby a portion was utilized for 13th checks, a portion was transferred to active employee annuity accounts, and a portion was transferred for the benefit of the Employer;

    d.   Provide statutory interest to, or otherwise make whole, the pension plan for the diversion of assets and the intervening lost earnings on those assets;

    e.   Refrain from any interference in the distribution of the so-called "13th checks" by the retirement board, including in the distribution of any make-up or backpay checks for the years 2011 and 2012, as may be issued in the discretion of the retirement board;

24

    f.    Refrain from any interference in the distribution of funds by the retirement board for the benefit of active employee annuity accounts for the years 2011 and 2012;

    g.    Otherwise make whole all AFSCME bargaining unit members adversely effected by the unilateral changes in conditions of employment found unlawful in this Decision, to the extent that such individuals are not made whole by remedial steps taken by the pension board;

    h.    Provide the Union with the full calculation of amounts reimbursable to the pension plan, or unit members, and interest on same;

    i.    Maintain all existing conditions of employment throughout the bargaining and fact-finding process, during such periods when the bargaining obligation is not otherwise suspended by operation of law.

3.    Post an appropriate notice, as may be directed by the Commission, to employees in a conspicuous place at each City worksite and post it prominently on any website maintained by the City for employee access for a period of thirty (30) consecutive days, and additionally deliver a copy of the notice by mail or email to each employee in the AFSCME bargaining units.

MICHIGAN EMPLOYMENT RELATIONS COMMISSION

Doyle O'Connor
Administrative Law Judge
Michigan Administrative Hearing System

Dated:  October 4, 2013
        Released to the parties at 5:55 PM.

25

# EXHIBIT B

C. The City further agrees that a crucial part of an effective affirmative action program is development of an effective training and education program designed to provide existing minority employees maximum opportunity to advance so as to perform at their highest potential.

D. Upon request, the Human Resources Director or his/her designated representative(s) shall meet with the Joint Career Development and Training Committee.

# 47. RETIREMENT

A. Eligibility for Service Retirement Allowance – Any employee who is covered by the provisions of this Agreement and who is a member of the General Retirement System of the City of Detroit who has thirty (30) or more years of credited service may retire upon his/her written application filed with the Board of Trustees setting forth the date, which shall not be less than thirty nor more than ninety days, subsequent to the execution and filing of said written application, he/she desires to be retired. On the date so specified for his/her retirement he/she shall be retired, notwithstanding that pending such period of notification he/she may have separated from City service. Upon his/her retirement he/she shall receive a Retirement Allowance as provided by the City Charter and Municipal Code. Employees may retire on or after July 1, 1992, with 25 years of credited service but less than 30 and receive an actuarially reduced pension which shall be known as the Actuarially Reduced 25 Year Option of the Retirement Plan. Employees who are receiving a duty or a non-duty disability pension or Income Protection benefits may elect to convert to this new option if they otherwise meet the qualifications.

Employees who have resigned with 25 or more years of service since July 1, 1992, shall have ninety (90) days to submit an application for this option from the date they are officially notified by the Pension Bureau that said application can be processed.

After the initial enrollment of applicants by the Pension Bureau, employees who subsequently leave City employment shall have ninety (90) days from their last paid date on the City payroll to select this option.
Retirees who began receiving a Duty or Non-Duty Disability Pension after July 1, 1992, may convert to this option no later than ninety (90) days after they would have had twenty-five (25) years with the City and have been notified by the Pension Bureau of the availability of this option.

Employees who began receiving Income Protection Benefits after July 1, 1992, may convert to this option anytime after they have had twenty-five (25) years of service with the City.

The above paragraphs notwithstanding, employees hired after January 1, 1996, shall not be eligible for a Service Retirement until they shall have attained fifty-five (55) years of age. This age requirement shall apply to both the Regular Service Retirement with thirty (30) years of service and for pension calculation purposes to the Early Service Retirement (actuarially reduced) with twenty-five (25) or more years of service.

B.  Retirement benefits shall be modified to include an optional coordination of benefits between regular retirement benefits and Social Security benefits for those employees who retire from the City with a regular retirement or the Actuarially Reduced 25 Year Option prior to becoming eligible for Social Security payments. Such coordination of benefits shall cause an approximate leveling of total monthly benefits derived from both the City's retirement system and Social Security without creating any additional actuarial costs.

C.  For employees hired on or after July 1, 1980, the vesting provisions of the City Retirement Plan shall require ten (10) years of service regardless of age in lieu of the "40 and 8" age and service requirement.

D.  For employees who separate from City service with a vested pension prior to reaching eligibility for a regular service retirement, time earned after July 1, 1986, shall not be factored into the formula for determining their pension benefit until they shall have attained age 62. This provision will not affect the current practice governing disabled employees.

In the event that any law, state or federal is passed during the term of this Agreement which permits employees to vest their pension prior to meeting the vesting requirements set forth in this contract, any employee who vests his/her pension in such a manner shall not be eligible for any pension benefits until his/her sixty-second (62nd) birthday.

E.  Employees who become eligible for a pension under the vesting provisions of the plan, shall be ineligible for any of the hospital, medical, optical or dental benefits provided for other retirees, spouses, dependents or beneficiaries.

F.  Subject to the provisions in Section O, employee contributions to the general retirement annuity fund shall be optional. Balances in the fund standing to the individual credit of employees discontinuing contribution shall be maintained with accumulated interest to be paid out to the employee upon separation from the City. Employees qualified under the pension vesting provision of the general retirement system may withdraw their annuity with accumulated interest upon separation.

Upon attainment of twenty-five (25) years of service, an employee shall be eligible to withdraw, one time only prior to retirement, all or part of his/her annuity savings.

Non-Duty and Duty Disability retirees shall be eligible to withdraw, one time only, all or part of their annuity savings.

G.  At the time of retirement, members of the general City pension system may elect an option which shall entitle them to change their pension option from either option 2 or option 3 to a straight life pension after they have commenced collection of the pension if the member's beneficiary predeceases the member. This shall be known as the Pop-Up Option. The actuarial cost of the change in benefit shall be borne by the member who selects this change in his/her option election.

H.  Employees who retire on or after July 1, 1998, shall have their pensions computed according to the following formula. Using the highest paid 36 consecutive months out of the last 120 including longevity payments, as Average Final Compensation; 1.6% of Average Final Compensation for each year of service for the first 10 years; 1.8% of

Average Final Compensation for each year of service for the second 10 years; 2.0% of Average Final Compensation for each year of service greater than 20 years up to 25 years; and 2.2% of Average Final Compensation in excess of 25 years; plus $12 for each year of City service not to exceed $120. In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation except in the case where a higher pension amount has been earned in accordance with the provisions in effect prior to July 1, 1992.

I.  Effective for bargaining unit members who retire on or after July 1, 1999, they shall have the option to 1) select the Unused Sick Leave On Retirement payment benefit provided for in Article 29 of this labor agreement, or 2) choose to receive twenty-five percent (25%) of the unused accrued sick leave bank provided in Article 29 and have that sum included in the average final compensation used to compute the membership service pension portion of their retirement allowance. For any member choosing to exercise this option the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in Article 29.

J.  Effective January 1, 1999, the maximum annual amount payable to an individual on a Duty Disability pension shall be increased to $9,000 and for Non-Duty Disability pension to $6,000.

    The maximum amount of the Accidental Death Benefit as found in Chapter VI, Article VI, Part C, Section 1, Paragraphs B and C of the City Charter shall be increased from $2,400 to $5,700 per annum.

K.  Effective September 28, 2010, any employee covered by this agreement, who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner (IME). If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City of Detroit, the employee shall not be eligible for the duty disability retirement.

L.  Effective January 1, 1999, minor dependents under age 19 or permanently mentally or physically impaired dependent children who become impaired prior to age 19 of employees who die with 20 years of service without a surviving spouse shall receive a payment of $9,000 per year which shall be divided equally amongst all eligible dependents. The payment will cease when the last minor attains age 19 or for mentally or physically impaired children at death. There shall be no retirement escalator for this payment.

M.  In addition to in-service death pension benefits which already exist for employees with 20 or more years of service, effective July 1, 1998, if a bargaining unit member dies after having attained 15 or more but less than 20 years of creditable service at any age below 60, the surviving spouse will be paid a 50% joint and survivor election. Dependent children, if there is no eligible surviving spouse, are to be paid a total of $6,000 which shall be divided equally amongst all eligible dependents until the youngest child reaches age 19, or for life if a child is permanently physically or mentally impaired.

N.  The post retirement escalator factor shall increase from 2.0% to 2.25% of original base pension effective July 1, 1992.

O. **Pension – Employer Contribution (414h Plan):**

Upon notification by the Union to the City of its desire to activate a 414(h) Plan, the City will take steps to implement the provisions contained in the following paragraphs. The Union initiated the discussions and proposed the provisions contained in the paragraphs and the parties recognize and agree that it will take some time before this program can become operational due to the necessity of making changes in the City's computerized payroll system.

It is hereby agreed that every member of this bargaining unit shall be required to make contributions in the amount of 5% of their annual compensation to the Annuity Savings Fund of the General Retirement System. The said 5% employee contribution to the Retirement System Annuity Fund, although designated as employee contributions, shall be paid by the City of Detroit in lieu of contributions by the employee. The employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the employer to the annuity fund. There shall be no additional contribution expense to the City of Detroit, and the amounts so contributed by the employer on behalf of the employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the employee until these amounts are distributed or made available to the employee.

These provisions shall not affect the amount or benefits level of the retirement allowance, or the City of Detroit's obligation thereto.

The wage rate for members of the bargaining unit shall not be altered or changed in any way as a result of these contract provisions. Consequently, these provisions shall not affect the basis upon which Longevity, sick leave payoff, holiday pay, overtime pay, recall pay, final average earnings, etc., or any wage-based benefit is computed.

The AFSCME – Non Supervisory bargaining unit, agrees to indemnify and hold the City harmless with respect to any adverse ruling, if any, and monetary penalty, judgment, or damages to the City as a consequence of the City's compliance with the provisions of this Agreement.

P. Employees shall have the option of selecting from two additional surviving beneficiary options of 25% and 75%.

Q. Annuity Contribution Amounts: The City will offer employees who choose to contribute to the annuity plan the option of 3% up to the Social Security maximum salary which would then be increased to 5%, a straight 5%, or a straight 7% contribution.

R. Members of the bargaining unit shall have the option of belonging to the City's current defined benefit/defined contribution retirement plan or a new defined contribution retirement plan in accordance with the rules the City will issue for a defined contribution plan. The parties agree that the defined contribution plan the Executive Branch will propose for acceptance by the City Council, although not specifically detailed at this time, is intended to be primarily in accordance with the provisions which were last advocated by the Executive Branch in November-December, 1997.

**IMPOSED SEPTEMBER 28, 2010**          79

S.  Effective July 1, 2003, the membership of the General Retirement System, Board of Trustees [Article II, Section 2, Subsection (1)] shall be modified to provide that one of the trustees is: "The Mayor of the City or his/her designated representative, ex-officio. Such designated person shall be a full-time appointive or classified City employee."

T.  All Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133.

# 48. TUITION REFUND

A.  Effective January 1, 2010, the City's Tuition Refund Program is suspended for the balance of the 2008-2012 contract period. No reimbursement/payment shall be made for course work or employment development program ending after December 31, 2009. Effective July 1, 2012, bargaining unit members with a minimum of three (3) years of service may participate in the City's Tuition Refund Program in accordance with the policies as administered by the Human Resources Department. Employees requesting a tuition refund should submit the applications to the human resources consultant/manager servicing their department. Eligibility to participate in the tuition refund program will begin after attaining three (3) years of service, prior to the start of the course or employment development program.

B.  The maximum amount of the tuition refund shall be as indicated below:

1.  An eligible employee will be entitled to receive a maximum of $2,000 per fiscal year to be applied toward tuition and applicable registration fees in seeking a graduate degree from an accredited university.

2.  An eligible employee will be entitled to receive a maximum of $1,500 per fiscal year to be applied toward tuition and applicable registration fees in seeking an undergraduate degree from an accredited university.

3.  An eligible employee will be entitled to receive a maximum of $1,200 per fiscal year to be applied toward payment for participation in employee development programs.

The above amounts cannot be pyramided to permit any employee to receive more than a total amount of $2,000 in any fiscal year.

# 49. PROTECTION CLAUSE

It is the City's commitment that in terms of a total compensation package, the AFSCME bargaining unit will not be economically disadvantaged as a result of subsequent settlements with other unions. However, it must be understood that compulsory arbitration may result in varied settlements.

IMPOSED SEPTEMBER 28, 2010          80

The parties agree that special wage adjustments for particular classifications within other bargaining units, when based upon personnel recruitment and retention difficulties or special job skills, shall not require an equivalent increase for the AFSCME unit at large; the parties further agree, however, that an adjustment shall be required for an AFSCME classification to maintain the recognized traditional wage relationship to another bargaining unit's classification which received such a special wage adjustment.

## 50. CONFIDENTIAL EMPLOYEES

The parties agree that certain City employees are designated as confidential employees and are, therefore, to be exempt from membership in the bargaining unit covered by this Agreement. These employees are those holding the positions as outlined in the Memorandum of Understanding reached by the parties and submitted, and approved by the Michigan Employment Relations Commission in connection with Case No. C79 D-110 as well as the Decision and Order of the Commission in that case dated June 4, 1980. The City shall not designate other employees as confidential without the agreement of the Union; but may, if the Union fails to so agree, petition the Michigan Employment Relations Commission to approve such designation.

# EXHIBIT C



FIRST NATIONAL BUILDING
660 WOODWARD AVENUE, SUITE 1650
DETROIT, MICHIGAN 48226-3535-
PHONE 313•224•4550   TTY:311
FAX 313•224•5505
WWW.DETROITMI.GOV

CITY OF DETROIT
LAW DEPARTMENT

November 8, 2011

Detroit City Council
1340 Coleman A. Young
 Municipal Center
Detroit, Michigan

RE:   Proposed·Ordinance to Amend Chapter 47 of the 1984 Detroit City Code,
*Retirement Systems*, Article I. *Common Provisions of the General Retirement
System*, and Article II. *Defined Benefit / Defined Contribution (Annuity) Plan of
the General Retirement System*

Honorable City Council:

The above-referenced proposed ordinance was requested by Your Honorable Body through
Council Member Saunteel Jenkins.  This proposed ordinance has been approved as to form.

Pursuant to the applicable provisions of the 1997 Detroit City Charter, the above-referenced
proposed ordinance is being submitted to Your Honorable Body for consideration.  This proposed
ordinance amends Chapter 47 of the 1984 Detroit City Code, *Retirement Systems*, Article I. *Common
Provisions of the General Retirement System*, by amending Sections 47-1-18 and 47-1-21, and
Article II. *Defined Benefit / Defined Contribution (Annuity) Plan of the General Retirement System*,
by amending Section 47-2-18, to limit payments by the General Retirement System so that neither
the General Retirement System nor the trustees charged with management of the System may
provide any savings plan, annuity plan, or other participant investment or savings vehicle that
provides an annual return to investing participants which in any year is greater than the actual
investment return net of expenses of the Retirement System invested reserves for the year in which
the return is earned and accrued, provided, that such return shall neither be greater than the assumed
annual return as expressed in the plan's valuation for that year nor less than zero; to amend the
definition of 'regular interest' to be commensurate with the limitation to be contained in Section 47-
1-18 of this Code, and to make provisions concerning the income fund commensurate with the
limitation to be contained in Section 47-1-18 of this Code.

We are available to answer any questions that you may have concerning this proposed
ordinance.  Thank you for your consideration.

Respectfully submitted,

*Krystal A. Crittendon*
Krystal A. Crittendon
Corporation Counsel

KAC: DAM
Attachment

G:\DOCS\MUNIC\MAZUD\A52000\LTR\DMZ2256.WPD