## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

------------------------------------------------------x
:
In re                                            :            Chapter 9
:
CITY OF DETROIT, MICHIGAN,                        :            Case No. 13-53846
:
                              Debtor.            :            Hon. Steven W. Rhodes
:
:
------------------------------------------------------x

## BRIEF OF THE CITY OF DETROIT
## REGARDING THE CITY'S RESPONSIBILITY FOR
## THE PROFESSIONAL FEES OF THE RETIREMENT SYSTEMS

The City of Detroit, Michigan (the "City") submits this brief

(this "Brief") in accordance with the Court's Order Setting Hearing (Docket

No. 8286) inviting parties to submit briefs and supporting documentation

addressing whether the professional fees of the General Retirement System of the

City of Detroit (the "GRS") and the Police and Fire Retirement System of the City

of Detroit (the "PFRS" and, together with the GRS, the "Retirement Systems") fall

within the ambit of section 943(b)(3) of title 11 of the United States Code

(the "Bankruptcy Code") in connection with the Eighth Amended Plan for the

Adjustment of Debts of the City of Detroit (the "Plan of Adjustment").[1]

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to
       them in the Plan of Adjustment.

1.      Section 943(b) of the Bankruptcy Code requires that a chapter 9 debtor's plan of adjustment be confirmed if, among other things "all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable."  11 U.S.C. § 943(b)(3). Because the City ultimately will be responsible for some or all of the professional fees incurred by the Retirement Systems during the Chapter 9 Case, these fees are subject to review by the Court under section 943(b)(3) of the Bankruptcy Code.

***The Retirement Systems' Administrative Expenses, Including Professional Fees, Historically Have Been a Component of the City's Annual Required Contributions to the Retirement Systems***

2.      The Retirement Systems' actuary, Gabriel Roeder Smith & Company, historically has included in its calculation of the City's required annual contributions to each of the Retirement Systems an amount of money to cover administrative expenses, expressed as a percentage of payroll.  See, e.g., GRS 74th Annual Actuarial Valuation as of June 30, 2012 (attached as Exhibit A), at A-1 (including an administrative expense charge of 2.00% of payroll); PFRS 71st Annual Actuarial Valuation as of June 30, 2012 (attached as Exhibit B), at 12, 31 (describing an increase in administrative expenses included in the City's required contribution from 1.20% to 2.50% of payroll).

3.      The administrative expense amounts charged to the City by the Retirement Systems have **expressly** included bankruptcy-related fees or have been

increased as a result of fees related to the Chapter 9 Case.  See GRS 75th Annual Actuarial Valuation as of June 30, 2013 (attached as Exhibit C), at A-1 (increasing the administrative expense charge from 2.00% to 2.10% of payroll and adding an additional bankruptcy-related charge of 2.00% of payroll); PFRS 72nd Annual Actuarial Valuation as of June 30, 2013 (attached as Exhibit D), at 3, 32 (further increasing administrative expenses included in the City's required contribution from 2.50% to 3.00% of payroll).

4.    The City historically has paid these projected administrative fees to the Retirement Systems as part of its bundled payment (along with, inter alia, normal pension costs) of annual contributions.  However, the City has not made any contributions to the Retirement Systems during the Chapter 9 Case, including on account of bankruptcy-related legal fees and other administrative expenses charged to the City.  Upon information and belief, the Retirement Systems have nevertheless been paying their professional advisors during the Chapter 9 Case.  Any such payments, therefore, must have been made from prior City contributions or investment returns.

### *The Treatment of Professional Fees Under the Modified Plans*

5.    On July 1, 2014, the provisions of the GRS and PFRS were amended and restated in the Combined Plan for the General Retirement System of the City of Detroit, Michigan (the "GRS Combined Plan") and the Combined Plan

for the Police and Fire Retirement System of the City of Detroit (the "PFRS

Combined Plan" and, together with the GRS Combined Plan, the "Combined

Plans").  Copies of the GRS Combined Plan and PFRS Combined Plan are attached

hereto as Exhibit E and Exhibit F, respectively.  Each of the Combined Plans

includes:  (a) as Component I, the New GRS Active Pension Plan or New PFRS

Active Pension Plan, as applicable; and (b) as Component II, the Prior GRS

Pension Plan or Prior PFRS Pension Plan, as applicable.[2]

6.     The Combined Plans provide that the Retirement Systems'

professional fees are payable out of the assets of the systems with respect to both

the City's new and prior pension plans.  With respect to the New GRS Active

Pension Plan and the New PFRS Active Pension Plan, the Combined Plans provide:

> Costs and expenses relative to the position of legal advisors to the
> Board shall be payable out of the assets of the Retirement System,
> subject to the provisions of the Public Employee Retirement System
> Investment Act, as amended, MCL 38.1132 et seq.

GRS Combined Plan, Component I, at §§ 1.14(3); accord PFRS Combined Plan,

Component I, at §§ 1.15(3).

---

[2]     The New GRS Active Pension Plan and the New PFRS Active Pension Plan
govern the terms and conditions for future accrual and payment of pensions
for active employees of the City, and, in the case of GRS, another entity that
participates in GRS, in connection with employment service performed on
and after July 1, 2014.  See Plan of Adjustment, at §§ I.A.250, 254.  The
Prior GRS Pension Plan and the Prior PFRS Pension Plan govern the terms
and conditions of the Retirement Systems in effect as of June 30, 2014 and
applicable to benefits accrued by members of the Retirement Systems prior
to July 1, 2014.  See id. at §§ I.A.280, 281.

7. The Combined Plans contain similar provisions with respect to the now-frozen Prior GRS Pension Plan and Prior PFRS Pension Plan. See GRS Combined Plan, Component II, at §§ E-18(c)(2), E-18(f), E-19; accord PFRS Combined Plan, Component II, at § G-7.

***The Extent to Which the City Is Responsible for the***
***Payment of the Retirement Systems' Chapter 9 Professional Fees***

8. Pursuant to the Plan of Adjustment, the City will make no contributions to PFRS and fixed contributions to GRS through June 30, 2023. For GRS, certain of those contributions come from the City's General Fund, and certain of those contributions come from DWSD's revenues. Plan of Adjustment, at §§ II.B.3.q.ii.A, II.B.3.r.ii.A; see also id. at Exs. II.B.3.q.ii.A, II.B.3.r.ii.A (schedules of payments and sources of payments for modified PFRS and GRS pension benefits, respectively); PFRS Combined Plan, Component I, at § 1.3, Component II, at § G-5(c) (providing that the PFRS Combined Plan shall comply with the terms of the Plan of Adjustment); accord GRS Combined Plan, Component I, at § 1.3, Component II, at § E-18(c).

9. Accordingly, during the period from the Effective Date of the Plan of Adjustment through June 30, 2023, the City will make payments attributable to the professional fees incurred by GRS during the Chapter 9 Case as part of the City's contributions thereto.

10. Further, as to both GRS and PFRS, from and after July 1, 2023, although the Retirement Systems will continue to receive certain fixed sums from other sources, the City will nonetheless be responsible for meeting the Retirement Systems' funding requirements and satisfying any underfunding. See Plan of Adjustment, at §§ II.B.3.q.ii.A, II.B.3.r.ii.A. Accordingly, from July 1, 2023, the City will be responsible for the payment of professional fees incurred by the Retirement Systems during the Chapter 9 Case to the extent that the expenditure of Retirement System assets to pay such professional fees contributes to the underfunding as of July 1, 2023. The professional fees incurred by the Retirement Systems during the Chapter 9 Case are, therefore, subject to review under section 943(b)(3) of the Bankruptcy Code because they have been or will be, in whole or in part, "paid by the debtor or by any person for services or expenses in the case or incident to the plan." 11 U.S.C. § 943(b)(3).

## Reservation of Rights

11. The City and the Emergency Manager reserve all of their rights with respect to the mediation or litigation of professional fees under section 943(b)(3) of the Bankruptcy Code in connection with the Court's confirmation of the Plan of Adjustment.

Dated:  November 21, 2014          Respectfully submitted,


 /s/  Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK
        AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT A



# THE GENERAL RETIREMENT SYSTEM OF
# THE CITY OF DETROIT
## 74TH ANNUAL ACTUARIAL VALUATION
## JUNE 30, 2012



# OUTLINE OF CONTENTS

| Section | Pages | Items |
|---|---|---|
| | 1-2 | Cover Letter |
| **A** | | **Retirement System Totals** |
| | 1 | Computed employer contributions |
| | 2-3 | Actuarial accrued liabilities |
| | 4 | Comparative schedule of valuation results |
| | 5-7 | Comments |
| | 8 | Solvency tests |
| | 9 | Experience gain (loss) |
| | 10-11 | Asset information furnished for valuation |
| | 12 | Funding value of assets |
| | 13 | History of assets and accrued liabilities (graph) |
| | 14-20 | Member data included in valuation |
| | 21-22 | Summary of benefit provisions |
| **B** | | **Divisions Separately Experience Rated** |
| | 1 | Member data included in valuation |
| | 2 | Assets included in valuation |
| | 3 | Actuarial accrued liabilities |
| | 4 | Member data - historical schedule |
| | 5 | Computed contributions - historical comparison |
| **C** | | **Financial Disclosures** |
| | 1-2 | GASB Statement No. 25 |
| **D** | | **Financial Principles** |
| | 1 | Financing diagram |
| | 2 | Actuarial valuation process |
| | 3-4 | Financial objective |
| **E** | | **Appendix** |
| | 1-7 | Summary of assumptions used in actuarial valuations |
| | 8 | Meaning of unfunded actuarial accrued liabilities |
| | 9-10 | Glossary |

# GRS

**Gabriel Roeder Smith & Company**
Consultants & Actuaries

One Towne Square
Suite 800
Southfield, MI 48076-3723

248.799.9000 phone
248.799.9020 fax
www.gabrielroeder.com

November 5, 2013

The Board of Trustees
The General Retirement System of the City of Detroit

Dear Board Members:

The results of the **74th Annual Actuarial Valuation** of the annuity and pension liabilities of the General Retirement System of the City of Detroit are presented in this report. This report was prepared at the request of the Board and is intended for use by the Retirement System and those designated or approved by the Board. This report may be provided to parties other than the System only in its entirety and only with the permission of the Board. The purpose of the valuations was to measure the System's funding progress, to determine contribution rates for the 2014 fiscal year in accordance with the established funding policy, and to determine actuarial information for Governmental Accounting Standards Board (GASB) Statements No. 25 and No. 27. The results of the valuation may not be applicable for other purposes. Four divisions are evaluated separately.

The date of the valuation was **June 30, 2012**.

We understand that the City of Detroit has filed for Chapter 9 bankruptcy. This report assumes that the plan sponsor will make all required contributions when due. This report does not evaluate the ability of the plan sponsor to make contributions when due.

Future actuarial measurements may differ significantly from the current measurements presented in this report due to such factors as: plan experience differing from that anticipated by the economic and demographic assumptions; changes in economic or demographic assumptions; increases or decreases expected as part of the natural operation of the methodology used for these measurements (such as the end of an amortization period or additional cost or contribution requirements based on the plan's funded status); and changes in plan provisions or applicable law. Due to the limited scope of the actuary's assignment, the actuary did not perform an analysis of the potential range of such future measurements.

The valuations were based upon records maintained and furnished by the Retirement System staff concerning active members, retirees and beneficiaries, and financial accounts as of the valuation date. Data was checked for year-to-year consistency, but was not otherwise audited by the actuary. We are not responsible for the completeness or accuracy of the data. The assumptions used in the valuations concerning future financial experience are summarized in the Appendix of this report.

**Your attention is directed particularly** to the comments on pages A-5 through A-7 and the contribution rates on page A-1.

This report has been prepared by actuaries who have substantial experience valuing public sector retirement systems. To the best of our knowledge, this report is complete and accurate and was made in accordance with Actuarial Standards of Practice promulgated by the Actuarial Standards Board. The actuarial assumptions used for the valuation are set by the Board. Different assumptions would produce different results. The actuarial assumptions are reasonable.

The signing actuaries are independent of the plan sponsor.

David T. Kausch and Judith A. Kermans are Members of the American Academy of Actuaries and meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

This report replaces our preliminary report dated April 5, 2013 and is based on updated asset information received in July 2013. Although the total amount of reported assets did not change, the allocation of assets between divisions did change. In addition, this report reflects the fact that the 1-year freeze on pension accruals included in the preliminary report has been repealed.

Respectfully submitted,

David T. Kausch, FSA, EA, MAAA

Judith A. Kermans, EA, MAAA

Kenneth G. Alberts

DTK:dj

# SECTION A
## RETIREMENT SYSTEM TOTALS

# SUMMARY OF COMPUTED EMPLOYER CONTRIBUTION RATES
## 2013-2014 FISCAL YEAR

| | Contributions Expressed as a Percent of Payroll | | | | |
|---|---|---|---|---|---|
| **Contributions for** | **General City@** | **D.O.T.** | **Water/ Sewage** | **Library** | **System Total** |
| Normal Cost: | | | | | |
|   Age & Service Pensions | 7.65 % | 6.83 % | 7.30 % | 7.45 % | 7.43 % |
|   Disability Pensions | 1.33 % | 0.88 % | 1.31 % | 1.27 % | 1.27 % |
|   Death-in-Service Pensions | 0.28 % | 0.28 % | 0.31 % | 0.25 % | 0.29 % |
|   Expenses* | 2.80 % | 2.80 % | 2.80 % | 2.80 % | 2.80 % |
|   Employer Normal Cost | 12.06 % | 10.79 % | 11.72 % | 11.77 % | 11.79 % |
| Unfunded Actuarial Accrued Liabilities# | 14.64 % | 22.86 % | 22.88 % | 14.86 % | 18.26 % |
| **Estimated Employer Contribution Rates** | **26.70 %** | **33.65 %** | **34.60 %** | **26.63 %** | **30.05 %** |
|   (Change from last year) | 6.74 % | 9.46 % | 6.28 % | 0.40 % | 6.96 % |
| **Estimated Employer ($ mill)** | $ 36.7 | $ 12.1 | $ 28.2 | $ 3.6 | $ 80.6 |

\*   *Includes 0.80% of payroll for defined contribution (DC) payments and 2.00% of payroll for administrative expenses.*
\#   *Unfunded actuarial accrued liabilities (UAAL) were amortized as a level percent of payroll over an open 30-year period.*
@   *Includes COBO Hall.*

## COMMENT

The valuation results shown above include an adjustment to account for certain retroactive benefits paid as a result of the 1998 Defined Contribution Plan. The adjustment is based on experience to date and limited implementation of the plan.  Full implementation of the plan may have a material impact on the computed employer contribution rates beyond what is included above.

**We understand that the FY 2012 and FY 2013 employer contributions have not yet been made and that the City has filed for Chapter 9 bankruptcy.  The FY 2014 contribution shown above is in addition to the FY 2012 and FY 2013 contribution requirements and was calculated based on the assumption that the FY 2012 and FY 2013 contributions would be made on a timely basis and increased with interest at 7.9% per annum.  The reported assets as of June 30, 2012 include receivable contributions of $33,124,897.**

# DEVELOPMENT OF LIABILITIES AS OF JUNE 30, 2012
## RETIREMENT SYSTEM TOTALS

| | |
|---|---|
| Present Value of Future Benefits | $ 3,797,216,944 |
| Present Value of Future Normal Costs | 153,044,371 |
| Actuarial Accrued Liability | 3,644,172,573 |
| Accrued Assets | 2,806,489,202 |
| Unfunded Actuarial Accrued Liability | $ 837,683,371 |

# ACTUARIAL ACCRUED LIABILITIES AS OF JUNE 30, 2012
## RETIREMENT SYSTEM TOTALS

| Present Value | June 30, 2012 | June 30, 2011 |
|---|---|---|
| **Accrued Pension Liabilities** **(Employer Financed)** | | |
| Retirees and beneficiaries | | |
| Future pensions | $2,213,640,992 | $1,983,919,013 |
| Mortality reserve | 0 | 0 |
| Total | 2,213,640,992 | 1,983,919,013 |
| Inactive members future deferred pensions | 165,251,217 | 186,785,801 |
| Active members | 688,597,028 | 878,193,058 |
| Total accrued pensions | 3,067,489,237 | 3,048,897,872 |
| Pension fund balances | 2,229,805,862 | 2,409,026,428 |
| Unfunded accrued pension liabilities | $   837,683,375 | $   639,871,444 |
| **Accrued Annuity Liabilities** **(Member Financed)** | | |
| Retirees and beneficiaries | | |
| Future annuities | $      92,108,332 | $      75,220,724 |
| Mortality reserve | 0 | 0 |
| Total | 92,108,332 | 75,220,724 |
| Member annuities & future refunds | 484,575,008 | 596,048,582 |
| Total accrued annuity liabilities | 576,683,340 | 671,269,306 |
| Annuity fund balances | 576,683,340 | 671,269,306 |
| Unfunded accrued annuity liabilities | $                    0 | $                    0 |
| **Totals** | | |
| **Actuarial Accrued Liabilities** | **$3,644,172,577** | **$3,720,167,178** |
| **Accrued Assets** | **2,806,489,202** | **3,080,295,734** |
| **Unfunded Actuarial Accrued Liabilities** | **$   837,683,375** | **$   639,871,444** |

# VALUATION RESULTS - COMPARATIVE STATEMENT
## - - - - $ IN MILLIONS - - - -
## RETIREMENT SYSTEM TOTALS

| June 30 | Active Payroll | | % of Payroll Contributions For | | | Actuarial Accrued Liabilities | | | Unfunded/ |
| | Total | Average | Normal Cost | UAAL | Total | Computed Total | Accrued Assets | Unfunded | Active Pay |
|---|---|---|---|---|---|---|---|---|---|
| 1994 | $325.4 | $28,591 | 8.06% | 2.73 % | 10.79% | $2,192.8 | $2,041.9 | $ 150.9 | 0.46 |
| 1995 | 327.6 | 28,451 | 8.11% | 4.80 % | 12.91% | 2,275.2 | 2,043.4 | 231.8 | 0.71 |
| 1996 | 360.1 | 29,729 | 8.14% | 3.44 % | 11.58% | 2,382.8 | 2,193.2 | 189.6 | 0.53 |
| 1997(a) | 382.8 | 30,951 | 7.91% | 3.93 % | 11.84% | 2,528.5 | 2,333.4 | 195.1 | 0.51 |
| 1998(a)# | 387.0 | 31,565 | 9.30% | 4.45 % | 13.75% | 2,814.9 | 2,582.1 | 232.8 | 0.60 |
| 1999# | 383.4 | 31,989 | 9.29% | 3.97 % | 13.26% | 2,900.4 | 2,756.6 | 143.8 | 0.38 |
| 2000 | 417.2 | 34,345 | 9.22% | 4.15 % | 13.37% | 3,077.0 | 2,902.4 | 174.6 | 0.42 |
| 2001 | 439.6 | 34,497 | 9.22% | 5.05 % | 14.27% | 3,179.6 | 2,912.1 | 267.5 | 0.61 |
| 2002(a) | 440.7 | 34,867 | 8.74% | 9.31 % | 18.05% | 3,250.5 | 2,761.2 | 489.3 | 1.11 |
| 2003 | 448.6 | 34,955 | 8.82% | 13.90 % | 22.72% | 3,270.6 | 2,537.7 | 732.9 | 1.63 |
| 2004 | 444.6 | 37,706 | 8.99% | 11.10 % | 20.09% | 3,383.9 | 2,470.2 | 913.7 | 2.06 |
| 2005* | 390.6 | 39,775 | 9.26% | 1.80 % | 11.06% | 3,347.4 | 3,222.4 | 125.0 | 0.32 |
| 2006 | 361.2 | 39,919 | 9.26% | 0.95 % | 10.21% | 3,434.3 | 3,373.7 | 60.6 | 0.17 |
| 2007 | 361.7 | 40,319 | 9.29% | 0.67 % | 9.96% | 3,629.2 | 3,586.6 | 42.6 | 0.12 |
| 2008(a) | 368.5 | 41,763 | 10.09% | (0.53)% | 9.56% | 3,609.6 | 3,641.2 | (31.6) | (0.09) |
| 2009 | 357.1 | 41,525 | 10.84% | 4.54 % | 15.38% | 3,689.1 | 3,412.4 | 276.7 | 0.77 |
| 2010(a) | 334.3 | 41,420 | 10.97% | 8.14 % | 19.11% | 3,719.6 | 3,238.1 | 481.5 | 1.44 |
| 2011 | 303.4 | 41,845 | 11.49% | 11.60 % | 23.09% | 3,720.2 | 3,080.3 | 639.9 | 2.11 |
| 2012 | 258.0 | 41,385 | 12.82% | 18.82 % | 31.64% | 3,706.0 | 2,806.5 | 899.5 | 3.49 |
| **2012#@** | **258.0** | **41,385** | **11.79%** | **18.26 %** | **30.05%** | **3,644.2** | **2,806.5** | **837.7** | **3.25** |

#   *After plan amendments.*
(a)   *After changes in actuarial assumptions and/or methods.*
*   *After POC transfer.*
@   *Reflects missing FY12 and FY13 contributions.*

## Experience

Experience during the year was less favorable than expected. Overall, the experience loss was approximately $245 million (6.6% of the beginning of year liability). The experience loss was comprised of two parts: a recognized investment loss of $191 million and a liability loss of $54 million.

As mentioned above, the investment loss was the primary source of the experience loss during the year. The fund earned a 2.2% rate of return on a market basis and recognized a 1.4% rate of return on a funding value basis, compared to a 7.9% assumed rate of investment return. The recognized rate of investment return was lower than the market rate of investment return due to the phase-in of a large loss from a prior year.

## Funding Value of Assets

Beginning June 30, 2010, gains and losses in excess of the assumed investment return are being recognized over a period of 7 years. As of June 30, 2012, the funding value of assets was nearly $650 million dollars greater than the market value (see page A-12). As that difference is recognized, computed employer contribution rates will continue to increase by approximately an additional 13%-15% of payroll over the next several years, unless the losses are offset by future experience gains. On a funding value basis the system is 77% funded. On a market value of asset basis, the system is 59% funded.

In accordance with the policy adopted by the Board, the market value corridor used in the derivation of the funding value of assets was decreased from 40% last year to 30% this year. A 30% market value corridor means that the funding value of assets may not be more than 130% of the market value of assets nor less than 70% of the market value of assets. This year the funding value of assets was restricted by the market value corridor. This forced the recognition of an additional $28 million of this year's investment loss in order to keep the funding value within 30% of the market value.

The current method of allocation of investment income between divisions (as provided by Retirement System staff) results in each division recognizing a rate of return that may differ from the fund, in total. This has led to changes in divisional contribution rates that were not completely uniform. For example, this year the contribution rates for the library division increased by a smaller margin than other divisions. We recommend that staff continue to review the allocation procedures.

## Active Member Group Size

As mentioned above, the recognition of prior investment losses will continue to put upward pressure on the employer contribution rate. The employer rate, as a percent of payroll, will increase yet more if the active member group continues to contract.

## 1998 DC Plan

We were recently informed that the System has been paying a death benefit to beneficiaries of certain retired members who were retroactively grandfathered into the 1998 DC plan. Based on the data supplied by the Retirement System, the average additional payments of this type have been approximately $2 million per year. We have included an adjustment in the results shown on page 1 to account for these payments. This resulted in an increase in the computed employer contribution rate of approximately 0.80% of covered payroll. We will review this issue further as part of the upcoming experience study.

## Plan Changes

During the year the following plan changes were made:

- Future benefit accruals for certain active members were reduced to 1.5% of final average compensation per year of service
- Post-retirement cost-of-living increases were eliminated on future accruals for certain active members

The Retirement System provided a list of the agency codes indicating which change affected which agency as well as the effective dates of the changes for each agency. These changes, in total, resulted in a reduction in the computed employer contribution rate of 2.64% of payroll. We understand that there is some consideration being given to changing the freeze so that it does not affect eligibility. If this change is implemented, the contribution rate will increase approximately 0.07% of payroll.

## Assumption and Method Changes

Some technical changes were made in this valuation to more closely model the actual administration of the plan. These include:

- An increase in the administrative expense load in accordance with an increase in the actual expenses as a percent of payroll
- Modeling the delay between the valuation date and the assumed employer contribution payment schedule

## Computed Contribution

The computed employer contribution rate was determined assuming that employer contributions due in FY 12 and FY 13 would be made on a timely basis or adjusted by interest for late payments at 7.9% per annum.

## Assumptions, Methods and Bankruptcy

Except as noted above, assumptions and methods used in this valuation were adopted by the Board pursuant to the Experience Study covering 2002 through 2007. In connection with the bankruptcy proceedings, changes to the assumptions are being considered that would result in material differences in valuation results. Assumptions and methods that will be used in future valuations are contingent on the future status of the System which is unusually uncertain due to the bankruptcy filing. Different assumptions and methods are used for different purposes. The assumptions and methods used in this valuation are appropriate for the purposes disclosed in this report, given the known status of the plan at the date of the production of this report.

## Experience Study

We perform an experience study every 5 years for the General Retirement System of the City of Detroit, as required by the ordinance. This study reviews all of the actuarial assumptions and methods and compares them to actual experience during the past 5 years. We then make recommendations for changes to the assumptions and methods for use in prospective valuations. The next experience study is scheduled to begin following the June 30, 2012 actuarial valuation. Revised methods and assumptions would first be included in the June 30, 2013 actuarial valuation. While all of the methods and assumptions will be reviewed, we expect (at a minimum) to recommend consideration of changes to the:

- Assumed rate of investment return;
- Rates of post-retirement mortality;
- Length of the asset smoothing period and/or the amount of the corridor; and
- Amortization period.

We also plan to review in depth the payments resulting from retroactive participation in the 1998 DC plan and the Annuity Fund interest crediting and how it impacts the development of the funding value of assets.

## GASB Changes

For plan years beginning in 2014, new reporting standards will be required. The new reporting standards will be substantially different than the current standards. Some of the changes include reporting of:

- Liabilities that may be materially different than the liabilities currently developed for funding;
- Unfunded liabilities based on the market value of assets;
- Annual plan expenses that may differ materially from the contribution developed for current funding.

Some of the calculations that will need to be performed will differ depending on the existence of a formal written policy. As such, the Board should consider developing a formal written funding policy if one does not currently exist.

## Recommendation

The development of the employer contribution is based on a stable (or growing) total covered payroll. Payroll actually declined during the year ending June 30, 2012. If future payroll contraction is expected over the next 1-2 years, we recommend making employer contributions based on the computed dollar amount shown on page A-1, instead of the percent of payroll, to avoid the contribution loss that occurs with a declining payroll.

## Conclusion

**The Retirement System is 77% funded as of June 30, 2012, based on the funding value of assets (59% on a market value of assets basis). Based upon the funding policy established by the Board, the data furnished by the Retirement System and the actuarial assumptions shown in the Appendix, the weighted average recommended employer contribution rate for the 2013-2014 fiscal year is 30.05% of covered payroll with the rate for each separate division as shown on page A-1.**

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 20 of 505

The DGRS funding objective is to meet long-term benefit promises through contributions made during members' working careers which, combined with investment income on system assets, will be sufficient to pay benefits throughout their retired lives. If the contributions to the System are received in a timely manner, the System will pay all promised benefits when due -- the ultimate test of financial soundness. Testing for level contribution rates is **the long-term solvency test.**

*A **short-term solvency test*** is one means of checking a system's progress under its funding program. In a short-term solvency test, the plan's present assets (cash and investments) are compared with:

1) Active member contributions on deposit;

2) The liabilities for future benefits to present retired lives;

3) The liabilities for service already rendered by active members.

In a system that has been following the discipline of level percent-of-payroll financing, the liabilities for active member contributions on deposit (liability 1) and the liabilities for future benefits to present retired lives (liability 2) will be fully covered by present assets (except in rare circumstances). In addition, the liabilities for service already rendered by active members (liability 3) will be partially covered by the remainder of present assets. The larger the funded portion of liability 3, the stronger the condition of the System.

## SHORT-TERM SOLVENCY TEST
## 5-YEAR COMPARATIVE STATEMENT
## ($ IN MILLIONS)

| June 30 | Actuarial Accrued Liabilities | | | Valuation Assets | Portion of Accrued Liabilities Covered by Assets | | | |
| | (1) Active Member Contr. | (2) Retirees and Benef. | (3) Present Members (Employer-Financed Portion) | | (1) | (2) | (3) | Total |
|---|---|---|---|---|---|---|---|---|
| 2008(a) | $ 732 | $1,805 | $1,073 | $3,641 | 100% | 100% | 103% | 101% |
| 2009 | 709 | 1,901 | 1,080 | 3,412 | 100% | 100% | 74% | 92% |
| 2010(a) | 649 | 1,949 | 1,121 | 3,238 | 100% | 100% | 57% | 87% |
| 2011 | 596 | 2,059 | 1,065 | 3,080 | 100% | 100% | 40% | 83% |
| 2012 | 485 | 2,306 | 854 | 2,806 | 100% | 100% | 2% | 77% & |

*(a) After changes in actuarial assumptions and/or methods.*
*&   59% on a market value basis.*

13-53846-tjt   Doc 8392   Filed 11/21/14   Entered 11/21/14 18:04:24   Page 21 of 505

# DERIVATION OF EXPERIENCE GAIN (LOSS)
## YEAR ENDED JUNE 30, 2012
### ($ IN MILLIONS)

Actual experience will never (except by coincidence) coincide exactly with assumed experience. Gains and losses may cancel each other over a period of years, but sizable year-to-year fluctuations are common. Detail on the derivation of the experience gain (loss) is shown below.

| | | |
|---|---|---:|
| (1) | UAAL* at start of year | $639.9 |
| (2) | Normal cost from last valuation | 29.7 |
| (3) | Employer contributions | 64.2 |
| (4) | Interest accrual: [(1) + 1/2 [(2) - (3)]] x .079 | 49.1 |
| (5) | Expected UAAL before changes: (1) + (2) - (3) + (4) | 654.5 |
| (6) | Increase due to changes in benefits | (61.8) |
| (7) | Other | 0.0 |
| (8) | Expected UAAL after changes: (5) + (6) + (7) | 592.7 |
| (9) | Actual UAAL at end of year | 837.7 |
| (10) | Experience gain (loss): (8) - (9) | $(245.0) |
| (11) | Gain (loss) as % of beginning of year ($3,720 million) accrued pension liability | (6.6)% |
| (12) | Experience gain (loss) | (245.0) |
| (13) | Gain (loss) due to investment experience recognized in this valuation | (191.4) |
| (14) | Gain (loss) from other sources | (53.6) |
| (15) | Gain (loss) from other sources as a % of beginning of year liability | (1.4)% |

*\* Unfunded actuarial accrued liability.*

A large component of the actuarial experience gain (loss) in any given year is typically the Retirement System's investment gain (loss) on valuation assets. Detail on the investment gain (loss) is shown on Page A-11.

13-53846-tjt Doc 8392 Filed 11/21/14 Entered 11/21/14 18:04:24 Page 22 of 505

# ASSET INFORMATION
## FURNISHED FOR THE VALUATION
## RETIREMENT SYSTEM TOTALS

### *Reported Assets*
**(Market Value)**

| Market Value - June 30, 2012 | |
|---|---:|
| Cash & equivalents | $ 7,972,442 |
| Short term investments | 41,982,320 |
| Mortgage securities | 25,281,170 |
| Other securities | 139,342,728 |
| Receivables & accruals | 28,527,344 |
| Contributions receivables | 33,124,897 |
| Stocks | 1,076,798,650 |
| Bonds & government securities | 162,079,138 |
| Real estate | 224,725,424 |
| Private equity | 464,273,343 |
| Mortgages | 106,609,727 |
| Securities lending | (137,864,912) |
| Pooled investments | 7,240,000 |
| Capital assets | 1,318,720 |
| Accounts payable | (22,573,143) |
| **Total Current Assets** | **$ 2,158,837,848** |

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 23 of 505

### *Reserve Accounts*
### (Funding Value)

| Funds | Fund Balances | |
|---|---|---|
| | June 30, 2012 | June 30, 2011 |
| Annuity Savings | $ 484,575,008 | $ 596,048,582 |
| Annuity Reserve | 92,108,332 | 75,220,724 |
| Pension Accumulation | (791,478,253) | (374,150,543) |
| Pension Reserve | 2,213,640,992 | 1,983,919,013 |
| Accrued Liability Fund Reserve | 807,643,123 | 799,257,958 |
| **Total Fund Balances** | **$2,806,489,202** | **$3,080,295,734** |

### *Revenues and Expenditures*
### (Funding Value)

| | Pension Funds | Annuity Funds | Total Funds |
|---|---|---|---|
| Balance, July 1, 2011 | $2,409,026,428 | $ 671,269,306 | $3,080,295,734 |
| Prior valuation audit adjustment | 0 | 0 | 0 |
| Balance July 1, 2011 after adjustment | 2,409,026,428 | 671,269,306 | 3,080,295,734 |
| Revenues | | | |
| Member contributions | 259,388 | 16,325,844 | 16,585,232 |
| Employer contributions # | 64,218,880 | 0 | 64,218,880 |
| Recognized investment income | (1,371,483) | 40,921,823 | 39,550,340 |
| Transfers | (11,136,621) | 11,136,621 | 0 |
| Total | $ 51,970,164 | $ 68,384,288 | $ 120,354,452 |
| Expenditures | | | |
| Benefit payments | 221,953,964 | 8,961,581 | 230,915,545 |
| Refund of member contributions | 2,857,187 | 154,008,673 | 156,865,860 |
| Administrative expenses | 6,379,579 | 0 | 6,379,579 |
| Total | $ 231,190,730 | $ 162,970,254 | $ 394,160,984 |
| Balance, June 30, 2012 | $2,229,805,862 | $ 576,683,340 | $2,806,489,202 |
| Funding Value Rate of Return | (0.1)% | 6.8% | 1.4% |

\#    *Includes contributions receivable.*

| Year Ended June 30: | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|
| A. Funding Value Beginning of Year | $3,238,130,553 | $3,080,295,734 | | | | | | |
| B. Market Value End of Year | 2,421,566,956 | 2,158,837,848 | | | | | | |
| C. Market Value Beginning of Year | 2,246,512,689 | 2,421,566,956 | | | | | | |
| D. Non-Investment Net Cash Flow (Contribution-Benefits) | (265,814,394) | (313,356,872) | | | | | | |
| E. Investment Income | | | | | | | | |
| E1. Market Total: B - C - D | 440,868,661 | 50,627,764 | | | | | | |
| E2. Amount for Immediate Recogn: Reg. Int. on Reserves | 245,312,645 | 230,965,767 | | | | | | |
| E3. Amount for Phased-In Recognition: E1-E2 | 195,556,016 | (180,338,003) | | | | | | |
| F. Phased-In Recognition of Investment Income | | | | | | | | |
| F1. Current Year: E3/7 | 27,936,574 | (25,762,572) | | | | | | |
| F2. First Prior Year | (165,269,644) | 27,936,574 | $(21,042,608) | | | | | |
| F3. Second Prior Year | | (165,269,644) | 27,936,574 | $(21,042,608) | | | | |
| F4. Third Prior Year | | | (165,269,644) | 27,936,574 | $(21,042,608) | | | |
| F5. Fourth Prior Year | | | | (165,269,644) | 27,936,574 | $(21,042,608) | | |
| F6. Fifth Prior Year | | | | | (165,269,644) | 27,936,574 | $(21,042,608) | |
| F7. Sixth Prior Year | | | | | | (165,269,644) | 27,936,572 | $(21,042,606) |
| F8. Total Recognized Investment Gain | (137,333,070) | (163,095,642) | (158,375,678) | (158,375,678) | (158,375,678) | (158,375,678) | 6,893,964 | (21,042,606) |
| G. Total Recognized Investment Income: (E2+F8) | 107,979,575 | 67,870,125 # | | | | | | |
| H. Funding Value End of Year: A + D + G | | | | | | | | |
| H1. Preliminary Funding Value End of Year: A + D + E2 + F8 | 3,080,295,734 | 2,834,808,987 | | | | | | |
| H2. Corridor Limit | 40% | 30% | 30% | 30% | 30% | 30% | 30% | 30% |
| H3. Upper Corridor Limit: (100% + H2) * B | 3,390,193,738 | 2,806,489,202 | | | | | | |
| H4. Lower Corridor Limit: (100% - H2) * B | 1,452,940,174 | 1,511,186,494 | | | | | | |
| **H5. Funding Value End of Year** | 3,080,295,734 | 2,806,489,202 | | | | | | |
| I. Difference between Market & Funding Value: B - H4 | (658,728,778) | (647,651,354) | | | | | | |
| **J. Recognized Rate of Return** | **3.5%** | **1.4%** | | | | | | |
| K. Market Value Rate of Return (net) | 20.9% | 2.2% | | | | | | |
| L. Ratio of Funding Value to Market Value | 127.2% | 130.0% | | | | | | |

# Before application of corridor. After application of corridor, recognized income is $39,550,340.

The Funding Value of Assets recognizes assumed investment income (line E2) fully each year. Differences between actual and assumed investment income (line E3) are phased-in over a closed 7-year period. During periods when investment performance exceeds the assumed rate, the Funding Value of Assets will tend to be less than Market Value. During periods when investment performance is less than the assumed rate, Funding Value of Assets will tend to be greater than market value. The Funding Value of Assets is unbiased with respect to Market Value. At any time it may be either greater or less than Market Value. If assumed rates are exactly realized for 6 consecutive years, it will become equal to Market Value.



13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 26 of 505

# PERSONS IN VALUATIONS - COMPARATIVE STATEMENTS
## RETIREMENT SYSTEM TOTALS

### Active Members

| June 30 | Active Members No. | Active Members Change | Annual Payroll | Group Averages Average Pay $ | Group Averages Average Pay Change | Group Averages Age Years | Group Averages Service Years |
|---------|------|--------|----------------|----------|---------|-------|---------|
| 1983 | 13,156 | (4.2)% | $272,369,708 | $20,703 | 0.2 % | 41.6 | 12.6 |
| 1984 | 13,172 | 0.1 % | 288,048,279 | 21,868 | 5.6 % | 41.5 | 12.0 |
| 1985 | 12,719 | (3.4)% | 281,378,439 | 22,123 | 1.2 % | 41.5 | 11.9 |
| 1986 | 13,423 | 5.5 % | 299,859,070 | 22,339 | 1.0 % | 41.1 | 11.3 |
| 1987 | 13,640 | 1.6 % | 321,402,755 | 23,563 | 5.5 % | 40.9 | 11.0 |
| 1988 | 13,368 | (2.0)% | 326,216,082 | 24,403 | 3.6 % | 41.0 | 11.1 |
| 1989 | 13,554 | 1.4 % | 331,555,458 | 24,462 | 0.2 % | 41.1 | 11.0 |
| 1990 | 13,207 | (2.6)% | 352,622,639 | 26,700 | 9.1 % | 41.5 | 11.4 |
| 1991 | 12,949 | (2.0)% | 362,532,918 | 27,997 | 4.9 % | 41.8 | 11.7 |
| 1992 | 12,137 | (6.3)% | 344,320,379 | 28,369 | 1.3 % | 42.2 | 12.1 |
| 1993 | 11,508 | (5.2)% | 331,009,921 | 28,763 | 1.4 % | 43.0 | 12.9 |
| 1994 | 11,382 | (1.1)% | 325,427,813 | 28,591 | (0.6)% | 43.1 | 12.8 |
| 1995 | 11,515 | 1.2 % | 327,615,936 | 28,451 | (0.5)% | 42.2 | 12.6 |
| 1996 | 12,086 | 5.0 % | 360,068,578 | 29,792 | 4.7 % | 42.8 | 11.9 |
| 1997 | 12,369 | 2.3 % | 382,835,917 | 30,951 | 3.9 % | 42.8 | 11.7 |
| 1998 | 12,261 | (0.9)% | 387,022,423 | 31,565 | 2.0 % | 43.3 | 11.8 |
| 1999 | 11,987 | (2.2)% | 383,449,421 | 31,989 | 1.3 % | 43.7 | 12.1 |
| 2000 | 12,147 | 1.3 % | 417,187,666 | 34,345 | 7.4 % | 43.5 | 12.0 |
| 2001 | 12,744 | 4.9 % | 439,636,072 | 34,497 | 0.4 % | 43.3 | 11.7 |
| 2002 | 12,639 | (0.8)% | 440,680,045 | 34,867 | 1.1 % | 43.7 | 11.8 |
| 2003 | 12,833 | 1.5 % | 448,579,064 | 34,955 | 0.3 % | 43.5 | 11.7 |
| 2004 | 11,791 | (8.1)% | 444,596,299 | 37,706 | 7.9 % | 44.5 | 12.5 |
| 2005 | 9,820 | (16.7)% | 390,593,600 | 39,775 | 5.5 % | 45.9 | 13.8 |
| 2006 | 9,047 | (7.9)% | 361,151,456 | 39,919 | 0.4 % | 46.6 | 14.6 |
| 2007 | 8,971 | (0.8)% | 361,701,481 | 40,319 | 1.0 % | 47.0 | 14.6 |
| 2008 | 8,823 | (1.6)% | 368,470,990 | 41,763 | 3.6 % | 47.2 | 14.7 |
| 2009 | 8,599 | (2.5)% | 357,072,833 | 41,525 | (0.6)% | 47.4 | 14.8 |
| 2010 | 8,072 | (6.1)% | 334,343,506 | 41,420 | (0.3)% | 47.7 | 15.3 |
| 2011 | 7,250 | (10.2)% | 303,379,482 | 41,845 | 1.0 % | 48.3 | 15.4 |
| 2012 | 6,234 | (14.0)% | 257,992,420 | 41,385 | (1.1)% | 48.5 | 15.4 |

# PERSONS IN VALUATIONS - COMPARATIVE STATEMENTS
## RETIREMENT SYSTEM TOTALS

### *Retirees and Beneficiaries*

| June 30 | No. | % of Current Allowances | | | | Current Annual Pensions | | |
| | | Annuities | Initial Pensions | Escalators & Other Increases | Allow. | Total | Average | % of Payroll |
|---|---|---|---|---|---|---|---|---|
| 1983 | 11,418 | 4.1% | 79.6% | 16.3% | 100.0% | $ 64,048,464 | $ 5,609 | 23.5% |
| 1984 | 11,643 | 3.8% | 80.4% | 15.8% | 100.0% | 68,564,556 | 5,889 | 23.8% |
| 1985 | 11,710 | 3.4% | 80.6% | 16.0% | 100.0% | 71,433,168 | 6,100 | 25.4% |
| 1986 | 11,776 | 3.2% | 80.7% | 16.1% | 100.0% | 74,834,820 | 6,355 | 25.0% |
| 1987 | 11,800 | 2.9% | 80.2% | 16.9% | 100.0% | 78,342,384 | 6,639 | 24.4% |
| 1988 | 11,728 | 3.0% | 80.0% | 17.0% | 100.0% | 81,346,500 | 6,936 | 24.9% |
| 1989 | 11,734 | 3.0% | 79.8% | 17.2% | 100.0% | 83,790,744 | 7,141 | 25.3% |
| 1990 | 11,684 | 2.9% | 79.1% | 18.0% | 100.0% | 85,720,620 | 7,337 | 24.3% |
| 1991 | 11,691 | 2.9% | 78.7% | 18.4% | 100.0% | 87,625,800 | 7,495 | 24.2% |
| 1992 | 11,674 | 2.6% | 76.5% | 20.9% | 100.0% | 97,218,012 | 8,328 | 28.2% |
| 1993 | 11,719 | 2.8% | 77.7% | 19.5% | 100.0% | 100,203,596 | 8,551 | 30.3% |
| 1994 | 11,649 | 2.8% | 76.9% | 20.3% | 100.0% | 106,193,220 | 9,116 | 32.6% |
| 1995 | 11,756 | 2.7% | 76.7% | 20.6% | 100.0% | 110,262,876 | 9,379 | 33.7% |
| 1996 | 11,889 | 2.6% | 75.5% | 21.9% | 100.0% | 115,232,400 | 9,692 | 32.0% |
| 1997 | 12,199 | 2.4% | 74.4% | 23.2% | 100.0% | 121,255,488 | 9,940 | 31.7% |
| 1998 | 11,593 | 2.3% | 73.7% | 24.0% | 100.0% | 119,852,820 | 10,338 | 31.0% |
| 1999 | 11,537 | 2.4% | 76.6% | 21.0% | 100.0% | 127,535,748 | 11,054 | 33.3% |
| 2000 | 11,480 | 2.2% | 77.7% | 20.1% | 100.0% | 129,354,696 | 11,268 | 31.0% |
| 2001 | 11,450 | 2.3% | 77.7% | 20.0% | 100.0% | 133,170,804 | 11,631 | 30.3% |
| 2002 | 11,363 | 2.2% | 78.2% | 19.6% | 100.0% | 140,805,120 | 12,392 | 32.0% |
| 2003 | 11,322 | 2.4% | 78.3% | 19.3% | 100.0% | 147,024,720 | 12,986 | 32.8% |
| 2004 | 11,311 | 2.6% | 78.5% | 18.9% | 100.0% | 154,133,460 | 13,627 | 34.7% |
| 2005 | 11,396 | 2.7% | 79.6% | 17.7% | 100.0% | 165,095,736 | 14,487 | 42.3% |
| 2006 | 11,541 | 2.7% | 79.6% | 17.7% | 100.0% | 175,193,088 | 15,180 | 48.5% |
| 2007 | 11,478 | 2.7% | 79.6% | 17.7% | 100.0% | 180,332,688 | 15,711 | 49.9% |
| 2008 | 11,388 | 2.8% | 79.9% | 17.3% | 100.0% | 185,688,852 | 16,306 | 50.4% |
| 2009 | 11,407 | 3.0% | 79.8% | 17.2% | 100.0% | 193,045,584 | 16,923 | 54.1% |
| 2010 | 11,539 | 3.4% | 79.6% | 17.0% | 100.0% | 202,935,852 | 17,587 | 60.7% |
| 2011 | 11,555 | 3.7% | 79.9% | 16.4% | 100.0% | 211,169,292 | 18,275 | 69.6% |
| 2012 | 11,943 | 4.2% | 80.7% | 15.1% | 100.0% | 229,466,507 | 19,213 | 88.9% |



**ACTIVE AND RETIRED MEMBERS**



**BENEFIT PAYOUT AND COMPUTED CONTRIBUTIONS AS A PERCENT OF PAYROLL**

# EXPECTED TERMINATIONS FROM ACTIVE EMPLOYMENT
## FOR CURRENT ACTIVE MEMBERS



The chart shows the expected future development of the present population in simplified terms. The Retirement System presently covers 6,234 active members. Eventually, 420 people are expected to terminate covered employment prior to retirement and forfeit eligibility for an employer provided benefit. 5,262 people are expected to receive monthly retirement benefits either by retiring directly from active service, or by retiring from vested deferred status. 552 people are expected to become eligible for death-in-service or disability benefits.

# RETIREES AND BENEFICIARIES JUNE 30, 2012
## TABULATED BY ATTAINED AGES
## RETIREMENT SYSTEM TOTALS

| Attained Ages | Age & Service# No. | Age & Service# Monthly Allowances | Disability No. | Disability Monthly Allowances | Death-in-Service No. | Death-in-Service Monthly Allowances | Totals No. | Totals Monthly Allowances |
|---|---|---|---|---|---|---|---|---|
| Under 20* | 13 | $ 22,226 | | | 10 | $ 5,121 | 23 | $ 27,347 |
| 20-24 | 4 | 1,333 | | | | | 4 | 1,333 |
| 25-29 | 4 | 2,749 | 2 | $ 422 | | | 6 | 3,171 |
| 30-34 | 5 | 4,644 | 6 | 3,290 | 1 | 793 | 12 | 8,727 |
| 35-39 | 15 | 11,861 | 25 | 14,531 | | | 40 | 26,392 |
| 40-44 | 51 | 66,904 | 51 | 31,541 | 6 | 7,721 | 108 | 106,166 |
| 45-49 | 274 | 579,574 | 130 | 83,065 | 25 | 28,798 | 429 | 691,437 |
| 50-54 | 839 | 2,089,953 | 235 | 195,806 | 36 | 42,920 | 1,110 | 2,328,679 |
| 55-59 | 1,686 | 3,874,154 | 224 | 283,366 | 44 | 69,322 | 1,954 | 4,226,842 |
| 60-64 | 1,893 | 3,599,353 | 186 | 215,878 | 36 | 59,022 | 2,115 | 3,874,253 |
| 65-69 | 1,417 | 2,300,085 | 89 | 77,714 | 46 | 55,977 | 1,552 | 2,433,776 |
| 70-74 | 1,059 | 1,519,638 | 66 | 56,921 | 40 | 44,736 | 1,165 | 1,621,295 |
| 75-79 | 1,102 | 1,386,904 | 50 | 38,781 | 67 | 60,960 | 1,219 | 1,486,645 |
| 80-84 | 1,107 | 1,258,464 | 62 | 54,778 | 56 | 44,225 | 1,225 | 1,357,467 |
| 85-89 | 661 | 681,353 | 20 | 13,992 | 46 | 35,553 | 727 | 730,898 |
| 90-94 | 191 | 151,904 | 9 | 5,705 | 13 | 9,496 | 213 | 167,105 |
| 95-99 | 38 | 29,448 | 1 | 604 | 2 | 624 | 41 | 30,676 |
| **Totals** | **10,359** | **$17,580,547** | **1,156** | **$1,076,394** | **428** | **$465,268** | **11,943** | **$19,122,209** |

*  May include records with defective birth dates.
#  Includes survivor beneficiaries of deceased retirees.

# ACTIVE MEMBERS AS OF JUNE 30, 2012
## BY ATTAINED AGE AND YEARS OF SERVICE
## RETIREMENT SYSTEM TOTALS

| Attained Age | Years of Service to Valuation Date | | | | | | | Totals | |
| | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30 Plus | No. | Valuation Payroll |
|---|---|---|---|---|---|---|---|---|---|
| Under 20 | 2 | | | | | | | 2 | $ 42,619 |
| 20-24 | 47 | 4 | | | | | | 51 | 1,206,349 |
| 25-29 | 96 | 55 | 2 | | | | | 153 | 4,512,743 |
| 30-34 | 101 | 112 | 118 | 5 | | | | 336 | 11,487,949 |
| 35-39 | 147 | 124 | 168 | 93 | 3 | | | 535 | 20,158,433 |
| 40-44 | 128 | 120 | 306 | 224 | 64 | 12 | | 854 | 35,049,228 |
| 45-49 | 130 | 129 | 268 | 332 | 236 | 130 | 2 | 1,227 | 51,335,433 |
| 50-54 | 90 | 110 | 257 | 266 | 291 | 285 | 55 | 1,354 | 57,874,279 |
| 55-59 | 67 | 82 | 202 | 221 | 206 | 273 | 82 | 1,133 | 49,640,827 |
| 60-64 | 37 | 45 | 90 | 74 | 59 | 64 | 43 | 412 | 18,114,901 |
| 65-69 | 10 | 9 | 32 | 26 | 18 | 13 | 19 | 127 | 6,373,444 |
| 70-74 | 1 | 4 | 10 | 9 | 3 | 1 | 6 | 34 | 1,581,010 |
| 75-79 | 0 | 4 | 2 | 2 | 2 | 1 | 5 | 16 | 615,205 |
| **Totals** | **856** | **798** | **1,455** | **1,252** | **882** | **779** | **212** | **6,234** | **$257,992,420** |

Group Averages:

      Age:          48.5 years
      Service:     15.4 years
      Annual Pay:  $41,385

*The General Retirement System of the City of Detroit*
13-53846-tjt   Doc 8392   Filed 11/21/14   Entered 11/21/14 18:04:24   Page 32 of 505
A-19

## RETIREES AND BENEFICIARIES JUNE 30, 2012
## TABULATED BY YEAR OF RETIREMENT

| Year of Retirement | No. | Monthly Allowances | |
| --- | --- | --- | --- |
| | | Total | Average |
| 1950 & before | 1 | $ 341 | $ 341 |
| 1951-1955 | 2 | 493 | 247 |
| 1956-1960 | 3 | 1,304 | 435 |
| 1961-1965 | 25 | 11,508 | 460 |
| 1966-1970 | 66 | 30,585 | 463 |
| 1971-1975 | 254 | 149,216 | 587 |
| 1976-1980 | 704 | 562,382 | 799 |
| 1981-1985 | 1,150 | 1,248,241 | 1,085 |
| 1986-1990 | 1,105 | 1,286,177 | 1,164 |
| 1991-1995 | 1,582 | 2,052,745 | 1,298 |
| 1996-2000 | 1,701 | 2,669,447 | 1,569 |
| 2001 | 329 | 589,348 | 1,791 |
| 2003 | 432 | 826,456 | 1,913 |
| 2004 | 391 | 788,811 | 2,017 |
| 2005 | 460 | 957,373 | 2,081 |
| 2006 | 530 | 1,194,966 | 2,255 |
| 2007 | 459 | 883,253 | 1,924 |
| 2008 | 392 | 726,067 | 1,852 |
| 2009 | 388 | 807,727 | 2,082 |
| 2010 | 504 | 1,009,760 | 2,003 |
| 2010 | 472 | 1,030,022 | 2,182 |
| 2011 | 587 | 1,332,037 | 2,269 |
| 2012 | 406 | 963,947 | 2,374 |
| **Totals** | **11,943** | **$19,122,206** | **$1,601** |

## Age and Service Pension

***Eligibility*** - Any age (minimum age 55 for non-EMS members hired after 1995) with 30 years of service (25 for EMS members), or age 60 with 10 years of service, or age 65 with 8 years of service.

***Annual Amount*** – **EMS Members:** Sum of a) a basic pension of $12 for each of the first 10 years of service, plus b) a pension equal to 2.0% of AFC multiplied by years of service. Maximum benefit is 90% of AFC. **Other Members:** Sum of a) a basic pension of $12 for each of the first 10 years of service, plus b) a pension equal to the first 10 years of service multiplied by 1.6% of AFC, plus 1.8% of AFC for each year of service greater than 10 years up to 20 years, plus 2.0% of AFC for each year of service greater than 20 years up to 25 years, plus 2.2% of AFC for each year of service greater than 25 years. Future benefit accruals for certain active members (depending on bargaining unit) were reduced to 1.5% of final average compensation per year of service.

***Type of Average Final Compensation (AFC)*** - Highest 3 consecutive years out of the last 10. Pension benefits will not be diminished if compensation is reduced because of a fiscal emergency. Effective July 1,1999, in computing the AFC, a member shall have the option of adding the value of 25% of unused accrued sick leave to the earnings used in computing the AFC. Longevity is added to AFC in accordance with the following schedule: $150 after 5 years, $300 after 10 years, $450 after 15 years, $600 after 20 years, and $750 after 25 years.

## Early Retirement

***Eligibility*** - Any age with 25 or more years of service (min. age 55 for members hired after 1995).

***Annual Amount*** - Same as regular retirement but actuarially reduced.

## Deferred Retirement (Vested Benefit)

***Eligibility*** - Hired prior to 7-1-80: Age 40 with 8 years of service. Hired on or after 7-1-80: Any age with 10 years of service.

***Benefit Commencement - APTE hired prior to July 1, 1988:*** Benefit begins at the age the member would have become eligible for regular retirement if service had continued. ***SAAA, Non-Union and lawyers hired prior to June 30, 1986:*** Benefit begins at the age the member would have become eligible for regular retirement. ***Others:*** Benefits based on service rendered by June 30, 1986 begin at the age the member would have become eligible for regular retirement. Benefits based on service rendered after July 1, 1986 begin at age 62.

***Annual Amount*** - Same as regular retirement but based on average final compensation and service at the time of termination.

## Duty Disability Retirement

***Eligibility*** - Service related disability before age 60. No service requirement.

***Annual Amount*** - An annuity which is the actuarial equivalent of the accumulated contributions at date of disability plus a pension of two-thirds of average final compensation at time of disability. The maximum annual pension is $9,000. At the earliest of when the member would have accrued 30 years of service credit (25 for EMS) or age 60, the annuity is recomputed assuming contributions would have continued at a salary level equal to final compensation. The pension is recomputed with additional service credit granted from the date of disability to age 60 (or 30 years of service credit) with no maximum.

# SUMMARY OF BENEFIT PROVISIONS EVALUATED
## (CONCLUDED)

## Non-Duty Disability Retirement

***Eligibility*** - Disability from any cause before age 60 with 10 or more years of service.

***Annual Amount*** - Computed in the same manner as a regular retirement benefit. Maximum annual pension to age 60 is $6,000. Benefit is recomputed at age 60 with no maximum.

## Duty Death Before Retirement

***Eligibility*** - Death from service related causes. No age or service requirements.

***Annual Amount*** - One-third of final compensation to the surviving spouse for life or until remarriage, plus an equal share of 1/4 of final compensation to each unmarried child under age 18. If there is no eligible spouse, eligible children each receive 1/4 of final compensation; if there are more than 2 such children, each child shares an equal part of 1/2 of final compensation. Maximum total amount for spouse and children is $9,000 annually. If there is no eligible spouse or children, dependent parents each receive 1/6 of deceased's final compensation, to a total maximum of $600 annually.

## Non-Duty Death Before Retirement

***Eligibility*** – Death-in-service at any age with 15 years of service; or after age 60 with 10 years of service; or after age 65 with 8 years of service.

***Annual Amount*** - To Surviving Spouse: Computed as a regular retirement benefit but reduced in accordance with a 100% joint and survivor election for members with 20 or more years of service. For members with 15 years of service but less than 20, benefit is reduced in accordance with a 50% joint and survivor election. To Dependent Children if no Surviving Spouse: $9,000 payable to age 19 of the youngest child or for life if child is physically or mentally impaired for members with 20 or more years of service ($6,000 if less than 20 years of service).

## Post-Retirement Cost-of-Living Adjustments

Benefit is increased annually by 2.25% of the **original** pension amount at retirement. Post-retirement cost-of-living increases were eliminated on future accruals for certain active members (depending on bargaining unit).

## Member Contributions

Members have the option of choosing one of four contribution amounts: (1) 0%; (2) 3.0% of compensation up to the Social Security wage base, plus 5.0% of compensation in excess of the Social Security wage base; (3) 5.0% of total compensation; or (4) 7.0% of total compensation. Member contributions can be paid as a lump sum or annuitized at retirement to provide an annuity in addition to the pension (which is not affected by the level of member contributions).

*The General Retirement System of the City of Detroit*
13-53846-tjt  Doc 8392  Filed 11/21/14  Entered 11/21/14 18:04:24  Page 35 of 505
A-22

# SECTION B
## DIVISIONS SEPARATELY EXPERIENCE RATED

# SUMMARY OF MEMBER DATA
## JUNE 30, 2012

### Active Members

|  | General | D.O.T. | Water/ Sewage | Library | Totals |
|---|---|---|---|---|---|
| Number | 3,099 | 986 | 1,825 | 324 | 6,234 |
| % Change in active members | (17.3)% | (20.1)% | (4.2)% | (10.5)% | (14.0)% |
| Annual payroll ($ millions) | $ 132.0 | $ 34.7 | $ 78.4 | $ 12.9 | $ 258.0 |
| Average pay | $42,595 | $35,166 | $42,973 | $39,788 | $41,385 |
| % Change in average pay | (2.8)% | (1.5)% | 1.2 % | 1.1 % | (1.1)% |

### Retired Members and Survivor Beneficiaries

|  | General | D.O.T. | Water/ Sewage | Library | Totals |
|---|---|---|---|---|---|
| Number | 7,525 | 1,621 | 2,466 | 331 | 11,943 |
| Annual benefits ($ millions) # | $ 142.1 | $ 30.4 | $ 59.0 | $ 7.5 | $ 239.0 |
| Average benefits | $18,888 | $18,748 | $23,930 | $22,605 | $20,013 |
| % Change in average benefit | 5.1 % | 6.4 % | 6.0 % | 3.9 % | 5.6 % |

 # Includes Annuities.

### Inactive Vested Members

|  | General | D.O.T. | Water/ Sewage | Library | Totals |
|---|---|---|---|---|---|
| Number | 1,190 | 256 | 391 | 57 | 1,894 |
| Annual benefits ($ millions) | $ 12.0 | $ 2.5 | $ 4.1 | $ 0.5 | $ 19.1 |
| Average benefits | $10,101 | $9,825 | $10,614 | $8,020 | $10,107 |
| % Change in average benefit | (18.3)% | (21.9)% | (22.1)% | (30.8)% | (20.0)% |

# ALLOCATION OF ASSETS USED FOR VALUATION
## RESERVE ACCOUNTS

|  | June 30, 2012 | June 30, 2011 |
|---|---|---|
| **Annuity Savings Fund** | | |
| General | $ 219,393,754 | $ 284,888,534 |
| D.O.T. | 99,389,687 | 111,819,992 |
| Water | 132,184,635 | 164,289,865 |
| Sewage | 14,012,347 | 11,502,201 |
| Housing | 447,049 | 1,617,761 |
| Library | 19,147,536 | 21,930,229 |
| Totals | 484,575,008 | 596,048,582 |
| **Annuity Reserve Fund** | | |
| General | 48,480,832 | 40,578,275 |
| D.O.T. | 8,137,878 | 6,140,779 |
| Water | 27,480,981 | 20,385,428 |
| Sewage | 2,573,678 | 2,618,774 |
| Housing | 1,629,365 | 1,669,483 |
| Library | 3,805,598 | 3,827,985 |
| Totals | 92,108,332 | 75,220,724 |
| **Pension Accumulation Fund** | | |
| General | (385,303,885) | (161,384,581) |
| D.O.T. | (119,736,981) | (55,660,607) |
| Water | (135,731,698) | (46,196,244) |
| Sewage | (112,224,078) | (90,591,178) |
| Housing | (18,310,569) | (2,547,865) |
| Library | (20,171,042) | (17,770,068) |
| Totals | (791,478,253) | (374,150,543) |
| **Pension Reserve Fund** | | |
| General | 1,249,146,935 | 1,123,907,328 |
| D.O.T. | 284,763,471 | 254,044,633 |
| Water | 504,700,502 | 435,521,686 |
| Sewage | 74,044,441 | 73,546,072 |
| Housing | 35,352,558 | 36,704,789 |
| Library | 65,633,085 | 60,194,505 |
| Totals | 2,213,640,992 | 1,983,919,013 |
| **Accrued Liability Fund** | | |
| General | 513,056,701 | 504,590,894 |
| D.O.T. | 104,455,897 | 103,571,123 |
| Water | 152,509,673 | 154,538,076 |
| Sewage | 13,595,765 | 12,600,338 |
| Housing | N/A | N/A |
| Library | 24,025,087 | 23,957,527 |
| Totals | 807,643,123 | 799,257,958 |
| **Retirement System Totals** | $2,806,489,202 | $3,080,295,734 |

13-53846-tjt   Doc 8392   Filed 11/21/14   Entered 11/21/14 18:04:24   Page 38 of 505

# ACTUARIAL ACCRUED LIABILITIES AS OF JUNE 30, 2012
## BY DIVISION
## ($ IN THOUSANDS)

| Present Value, June 30 of | General | D.O.T. | Water/ Sewage | Library | Totals |
|---|---|---|---|---|---|
| **Accrued Pension Liabilities** | | | | | |
| Retirees and beneficiaries | $1,284,499 | $284,763 | $578,745 | $ 65,633 | $2,213,640 |
| Inactive members future deferred pensions | 102,717 | 21,574 | 37,037 | 3,924 | 165,252 |
| Active members | 348,478 | 103,728 | 201,785 | 34,606 | 688,597 |
| Total accrued pension liabilities | 1,735,694 | 410,065 | 817,567 | 104,163 | 3,067,489 |
| Pension fund balances | 1,393,942 | 269,482 | 496,895 | 69,487 | 2,229,806 |
| Unfunded accrued pension liabilities | 341,752 | 140,583 | 320,672 | 34,676 | 837,683 |
| **Accrued Annuity Liabilities** | | | | | |
| Retirees and beneficiaries | 50,110 | 8,138 | 30,055 | 3,806 | 92,109 |
| Members annuities & future refunds | 219,841 | 99,390 | 146,197 | 19,147 | 484,575 |
| Total accrued annuity liabilities | 269,951 | 107,528 | 176,252 | 22,953 | 576,684 |
| Annuity fund balances | 269,951 | 107,528 | 176,252 | 22,953 | 576,684 |
| Unfunded accrued annuity liabilities | 0 | 0 | 0 | 0 | 0 |
| **Totals** | | | | | |
| **Actuarial Accrued Liabilities** | 2,005,645 | 517,593 | 993,819 | 127,116 | 3,644,173 |
| **Accrued Assets** | 1,663,893 | 377,010 | 673,147 | 92,440 | 2,806,490 |
| **Funded Ratio** | 83.0% | 72.8% | 67.7% | 72.7% | 77.0% |
| **Unfunded Actuarial Accrued Liabilities** | $ 341,752 | $ 140,583 | $ 320,672 | $ 34,676 | $ 837,683 |

Note: Totals may be off slightly due to rounding.

# ACTIVE AND RETIRED MEMBERS
## INCLUDED IN VALUATION
### HISTORIC COMPARISONS

## Active Members
## by Valuation Division

| June 30 | General | D.O.T. | Water | Sewage | Housing | Library | Totals |
|---------|---------|--------|-------|--------|---------|---------|--------|
| 1998 | 6,659 | 1,764 | 1,785 | 1,184 | 430 | 439 | 12,261 |
| 1999 | 6,527 | 1,669 | 1,768 | 1,173 | 414 | 436 | 11,987 |
| 2000 | 6,941 | 1,606 | 1,770 | 1,064 | 334 | 432 | 12,147 |
| 2001 | 7,325 | 1,677 | 1,836 | 1,094 | 325 | 487 | 12,744 |
| 2002 | 7,320 | 1,705 | 1,797 | 1,106 | 262 | 449 | 12,639 |
| 2003 | 7,575 | 1,734 | 1,744 | 1,090 | 227 | 463 | 12,833 |
| 2004 | 7,068 | 1,652 | 1,592 | 1,035 | 0 | 444 | 11,791 |
| 2005 | 5,414 | 1,529 | 1,472 | 973 | 0 | 432 | 9,820 |
| 2006 | 4,935 | 1,460 | 1,329 | 886 | 0 | 437 | 9,047 |
| 2007 | 4,914 | 1,509 | 1,289 | 834 | 0 | 425 | 8,971 |
| 2008 | 4,848 | 1,447 | 1,338 | 765 | 0 | 425 | 8,823 |
| 2009 | 4,664 | 1,456 | 1,327 | 727 | 0 | 425 | 8,599 |
| 2010 | 4,286 | 1,303 | 2,041 | # | 0 | 442 | 8,072 |
| 2011 | 3,749 | 1,234 | 1,905 | # | 0 | 362 | 7,250 |
| 2012 | 3,099 | 986 | 1,825 | # | 0 | 324 | 6,234 |

# Included with Water beginning 6/30/2010.

## Retired Members & Beneficiaries
## by Valuation Division

| June 30 | General | D.O.T. | Water | Sewage | Housing | Library | Totals |
|---------|---------|--------|-------|--------|---------|---------|--------|
| 1998 | 7,665 | 1,738 | 1,334 | 247 | 337 | 272 | 11,593 |
| 1999 | 7,599 | 1,719 | 1,360 | 243 | 338 | 278 | 11,537 |
| 2000 | 7,522 | 1,706 | 1,387 | 242 | 330 | 293 | 11,480 |
| 2001 | 7,483 | 1,684 | 1,418 | 235 | 327 | 303 | 11,450 |
| 2002 | 7,392 | 1,667 | 1,446 | 227 | 327 | 304 | 11,363 |
| 2003 | 7,329 | 1,659 | 1,481 | 227 | 319 | 307 | 11,322 |
| 2004 | 7,593 | 1,614 | 1,569 | 226 | * | 309 | 11,311 |
| 2005 | 7,592 | 1,623 | 1,643 | 235 | * | 303 | 11,396 |
| 2006 | 7,638 | 1,617 | 1,714 | 267 | * | 305 | 11,541 |
| 2007 | 7,567 | 1,591 | 1,721 | 299 | * | 300 | 11,478 |
| 2008 | 7,459 | 1,553 | 1,742 | 333 | * | 301 | 11,388 |
| 2009 | 7,376 | 1,559 | 1,819 | 343 | * | 310 | 11,407 |
| 2010 | 7,408 | 1,567 | 2,248 | # | * | 316 | 11,539 |
| 2011 | 7,340 | 1,576 | 2,315 | # | * | 324 | 11,555 |
| 2012 | 7,525 | 1,621 | 2,466 | # | * | 331 | 11,943 |

* Included with General City beginning 6/30/2004.
# Included with Water beginning 6/30/2010.

# EMPLOYER COMPUTED CONTRIBUTIONS - HISTORICAL COMPARISON

| Valuation Date June 30 | As Percents of Valuation Payroll | | | | | | |
|---|---|---|---|---|---|---|---|
| | General | D.O.T. | Water | Sewage | Housing | Library | Totals |
| 1984(a) | 20.27% | 27.45% | 18.36% | 9.48% | 17.22% | 18.15% | 19.78% |
| 1985 | 17.81% | 24.64% | 16.35% | 6.52% | 14.45% | 13.75% | 17.22% |
| 1986* | 16.39% | 23.17% | 15.28% | 5.04% | 12.29% | 11.46% | 15.82% |
| 1987 | 15.62% | 21.67% | 14.74% | 3.26% | 11.24% | 10.10% | 14.87% |
| 1988(a)* | 15.96% | 19.82% | 15.03% | 2.98% | 11.54% | 10.47% | 14.90% |
| 1989 | 15.18% | 18.54% | 14.49% | 1.58% | 11.33% | 8.80% | 14.02% |
| 1990 | 15.72% | 18.62% | 15.10% | 2.02% | 11.08% | 9.04% | 14.46% |
| 1991 | 15.31% | 17.73% | 14.45% | 1.80% | 10.51% | 8.42% | 13.89% |
| 1992(a)* | 11.21% | 10.08% | 10.49% | 0.76% | 6.94% | 6.15% | 9.61% |
| 1993(a) | 11.57% | 10.80% | 12.31% | 0.59% | 8.14% | 5.51% | 10.10% |
| 1994 | 12.31% | 11.35% | 13.42% | 0.25% | 8.55% | 7.65% | 10.79% |
| 1995 | 14.71% | 12.65% | 15.68% | 0.98% | 10.74% | 10.28% | 12.91% |
| 1996 | 13.23% | 12.52% | 15.83% | 0.00% | 9.74% | 7.64% | 11.58% |
| 1997(a) | 13.47% | 12.94% | 15.32% | 0.00% | 9.34% | 7.09% | 11.84% |
| 1998(a)* | 15.80% | 14.23% | 17.16% | 0.00% | 11.38% | 9.73% | 13.75% |
| 1999* | 15.31% | 13.70% | 16.95% | 0.00% | 10.48% | 8.04% | 13.26% |
| 2000 | 15.19% | 14.37% | 17.12% | 0.00% | 9.01% | 6.97% | 13.37% |
| 2001 | 15.92% | 15.36% | 19.12% | 0.00% | 9.25% | 9.20% | 14.27% |
| 2002(a) | 19.32% | 19.51% | 26.33% | 0.33% | 10.90% | 15.82% | 18.05% |
| 2003 | 23.45% | 23.59% | 29.82% | 10.09% | 13.11% | 21.72% | 22.72% |
| 2004 | 19.75% | 19.96% | 31.71% | 6.80% | - | 20.40% | 20.09% |
| 2005# | 10.35% | 10.88% | 20.84% | 2.04% | - | 11.33% | 11.06% |
| 2006 | 9.57% | 9.93% | 20.05% | 0.80% | - | 10.44% | 10.21% |
| 2007 | 9.52% | 10.54% | 18.62% | 0.00% | - | 9.22% | 9.96% |
| 2008(a) | 8.59% | 10.51% | 17.98% | 1.36% | - | 9.18% | 9.56% |
| 2009 | 13.37% | 15.34% | 12.91% | 30.09% | - | 17.23% | 15.38% |
| 2010(a) | 15.26% | 20.26% | 25.82% | & | - | 22.15% | 19.11% |
| 2011 | 19.96% | 24.19% | 28.32% | & | - | 26.23% | 23.09% |
| 2012 | 28.36% | 35.26% | 36.04% | & | - | 28.63% | 31.64% |
| 2012* | 26.70% | 33.65% | 34.60% | & | - | 26.63% | 30.05% |

(a)     *After changes in actuarial assumptions or methods.*
*       *After plan amendments.*
#       *After issuance of POCs.*
&       *Included with Water beginning 6/30/2010.*

# SECTION C

## ACTUARIAL DISCLOSURES REQUIRED BY STATEMENT NO. 25 OF THE GOVERNMENTAL ACCOUNTING STANDARDS BOARD

**This information is presented in draft form for review by the System's auditor. Please let us know if there are any items that the auditor changes so that we may maintain consistency with the System's financial statements.**

# GASB STATEMENT NO. 25 REQUIRED SUPPLEMENTARY INFORMATION

## Schedule of Funding Progress

| Actuarial Valuation Date June 30 | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) -- Entry Age (b) | Unfunded AAL (UAAL) (b - a) | Funded Ratio (a / b) | Covered Payroll (c) | UAAL as a % of Covered Payroll ((b - a) / c) |
|---|---|---|---|---|---|---|
| 1999* | $2,756,614,458 | $2,900,404,223 | $143,789,765 | 95.0% | $383,449,421 | 37.5 % |
| 2000 | 2,902,433,063 | 3,077,001,129 | 174,568,066 | 94.3% | 417,187,666 | 41.8 % |
| 2001 | 2,912,146,389 | 3,179,601,214 | 267,454,825 | 91.6% | 439,636,072 | 60.8 % |
| 2002# | 2,761,203,680 | 3,250,514,916 | 489,311,236 | 84.9% | 440,680,045 | 111.0 % |
| 2003 | 2,537,668,376 | 3,270,627,177 | 732,958,801 | 77.6% | 448,579,064 | 163.4 % |
| 2004 | 2,470,243,470 | 3,383,926,672 | 913,683,202 | 73.0% | 444,596,299 | 205.5 % |
| 2005@ | 3,222,393,861 | 3,347,387,652 | 124,993,791 | 96.3% | 390,593,600 | 32.0 % |
| 2006 | 3,373,687,677 | 3,434,288,153 | 60,600,476 | 98.2% | 361,151,456 | 16.8 % |
| 2007 | 3,586,550,485 | 3,629,217,059 | 42,666,574 | 98.8% | 361,701,481 | 11.8 % |
| 2008(a) | 3,641,197,523 | 3,609,558,628 | (31,638,895) | 100.9% | 368,470,990 | (8.6)% |
| 2009 | 3,412,411,183 | 3,689,065,726 | 276,654,543 | 92.5% | 357,072,833 | 77.5 % |
| 2010# | 3,238,130,553 | 3,719,586,762 | 481,456,209 | 87.1% | 334,343,506 | 144.0 % |
| 2011 | 3,080,295,734 | 3,720,167,178 | 639,871,444 | 82.8% | 303,379,482 | 210.9 % |
| 2012 | 2,806,489,202 | 3,705,965,474 | 899,476,272 | 75.7% | 257,992,420 | 348.6 % |
| 2012* | 2,806,489,202 | 3,644,172,577 | 837,683,375 | 77.0% | 257,992,420 | 324.7 % |

@   *After POC transfer.*
*   *After plan amendments.*
#   *After changes in actuarial assumptions or methods.*

## Schedule of Employer Contributions

| Valuation Year Ended June 30 | Reported Employer Contributions | |
|---|---|---|
| | From Pension Obligation Certificates (POCs) | Employer Contributions other than from POCs |
| 2003 | | $72,859,246 |
| 2004 | | 95,876,076 |
| 2005 | $739,793,898 | 41,689,528 |
| 2006 | | 58,162,088 |
| 2007 | | 41,442,687 |
| 2008 | | 43,546,951 |
| 2009 | | 41,395,719 |
| 2010 | | 34,602,184 |
| 2011 | | 55,138,044 |
| 2012 | | 64,218,880 |

# GASB Statement No. 25 Required Supplementary Information

The information presented in the required supplementary schedules was determined as part of the actuarial valuations at the dates indicated. Additional information as of the latest actuarial valuation follows:

| | |
|---|---|
| Valuation date | June 30, 2012 |
| Actuarial cost method | Entry Age |
| Amortization method | Level percent |
| Remaining amortization period for unfunded accrued liabilities | 30 years (see page A-1) |
| Asset valuation method | 7-year smoothed market |

Actuarial assumptions:

| | |
|---|---|
| Investment rate of return | 7.9% |
| Projected salary increases* | 4.0% - 8.9% |
| *Includes inflation at | 4.0% |
| Cost-of-living adjustments | 2.25% of original pension amount at retirement. |

Membership of the plan consisted of the following at June 30, 2012, the date of the latest actuarial valuation:

| | |
|---|---|
| Retirees and beneficiaries receiving benefits | 11,943 |
| Terminated plan members entitled to but not yet receiving benefits | 1,894 |
| Active plan members | 6,234 |
| Total | 20,071 |



# SECTION D
## FINANCIAL PRINCIPLES



**CASH BENEFITS LINE.** This relentlessly increasing line is the fundamental reality of retirement plan financing. It happens each time a new benefit is added for future retirements (and happens regardless of the design for contributing for benefits).

**LEVEL CONTRIBUTION LINE.** Determining the level contribution line requires detailed assumptions concerning a variety of experiences in future decades, including:

> Economic Risk Areas
>> Rates of investment return
>> Rates of pay increase
>> Changes in active member group size
>
> Non-Economic Risk Areas
>> Ages at actual retirement
>> Rates of mortality
>> Rates of withdrawal of active members (turnover)
>> Rates of disability

*The financing diagram* on page D-1 shows the relationship between two different philosophies of paying for retirement benefits: the method where contributions match cash benefit payments (as in the Federal Social Security program) and is an *increasing contribution method;* and the *level contribution method* which seeks to balance contribution rates between generations.

*The actuarial valuation* is the mathematical process in which the level contribution rate is determined. The flow of activity constituting the valuation may be summarized as follows:

A. **Member Census Data:**

      Retired lives now receiving benefits

      Former employees with vested benefits not yet payable

      Active employees

B. **Benefit provisions** governing future payments from the plan

C. **Asset data** (cash & investments)

D. **Assumptions concerning future experience in various risk areas,** which are established by the Board of Trustees and the City Council after consulting with the actuary

E. **The funding method** for employer contributions (the long-term, planned pattern for employer contributions)

F. **Mathematically combining the assumptions, the funding method, and the data**

G. **Determination of:**

      Plan financial position, and

      New Employer Contribution Rate

# BASIC FINANCIAL OBJECTIVE AND OPERATION
## OF THE RETIREMENT SYSTEM

**Benefit Promises Made Which Must Be Paid For.**  A retirement program is an orderly means of handing out, keeping track of, and financing contingent pension promises to a group of employees. As each member of the retirement program acquires a unit of service credit they are, in effect, handed an "IOU" which reads:  **"The Retirement System promises to pay you one unit of retirement benefits, payments in cash commencing when you retire."**

The principal related financial question is:  When shall the money required to cover the "IOU" be contributed?  This year, when the benefit of the member's service is received?  Or, some future year when the "IOU" becomes a cash demand?

The **Constitution of the State of Michigan** is directed to the question:

> "Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

This retirement system meets this constitutional requirement by having the following *Financial Objective:  To meet long-term benefit promises through contributions made during members' working careers which, combined with investment income on system assets, will be sufficient to pay benefits throughout their retired lives.*

Translated into actuarial terminology, a level percent-of-payroll contribution objective means that the contribution rate must be at least:

> *Normal Cost* (the value of benefits likely to be paid which is assigned to service being rendered in the current year)
>
> . . . plus . . .
>
> *Interest on the Unfunded Actuarial Accrued Liability* (the difference between the actuarial accrued liability and current system assets).

If contributions to the retirement program are less than the preceding amount, the difference, plus investment earnings not realized thereon, will have to be contributed at some later time, or, benefits will have to be reduced, to satisfy the fundamental fiscal equation under which all retirement programs must operate; that is:

$$B = C + I - E$$

**Benefit** payments to any group of members and their beneficiaries cannot exceed the sum of:

**Contributions** received over time on behalf of the group

. . . plus . . .

**Investment** earnings on contributions received and not required for immediate payment of benefits

. . . minus . . .

**Expenses** incurred in operating the program.

There are retirement programs designed to defer the bulk of contributions far into the future. Contributions in early years are low, but the inevitable consequence is a relentlessly increasing contribution rate – to a level greatly in excess of the level percent-of-payroll rate. ***This method of financing is prohibited in Michigan by the state constitution.***

A by-product of the level percent-of-payroll contribution objective is the accumulation of invested assets for varying periods of time. Investment income becomes the major contributor to the retirement program, and the amount is directly related to the amount of past contributions and investment performance.

**Computed Contribution Rate Needed To Finance Benefits.** From a given schedule of benefits and from the data furnished, the contribution rate is calculated ***by means of an actuarial valuation*** - the technique of assigning monetary values to the risks assumed in operating a retirement program.

# SECTION E
## APPENDIX

# SUMMARY OF ASSUMPTIONS USED FOR DGRS ACTUARIAL VALUATIONS
## ASSUMPTIONS ADOPTED BY BOARD OF TRUSTEES
## AFTER CONSULTING WITH ACTUARY

## *Economic Assumptions*

***The investment return rate*** used in making the valuation was 7.9% per year, compounded annually (net after administrative and investment expenses). The real rate of return is the portion of total investment return which is more than the inflation rate. The 7.9% total investment return rate translates to a spread of 3.9% over wage inflation and 4.4% to 4.9% over price inflation.

***Pay increase assumptions*** for individual active members are shown on page E-3. Part of the assumption for each age is for a merit and/or seniority increase, and the other 4.0% recognizes wage inflation. Wage inflation has historically exceeded price inflation by 0.5% to 1.0% a year, on average. Wage inflation of 4% suggests an underlying rate of price inflation of 3.0% to 3.5%. The merit and/or seniority increase assumption was first used in the June 30, 2008 valuation.

***Total active member payroll*** is assumed to increase 4.0% annually, which is the portion of the individual pay increase assumptions attributable to inflation.

## *Non-Economic Assumptions*

***The number of active members*** is assumed to continue at the present number.

***The mortality table*** used to measure retired life mortality was 110% of the RP-2000 Combined Table for males and 110% of the RP-2000 Combined Table set back 2 years for females. These tables provide a margin for mortality improvements of approximately 15% based on the 2002-2007 experience study. For disabled members, a 10-year set forward of the healthy rates was used to measure post-retirement mortality. Related values are shown on page E-3. This table was first used for the June 30, 2008 valuation.

***The probabilities of retirement*** for members eligible to retire are shown on pages E-4 and E-5. These probabilities were revised for the June 30, 2008 valuation.

***The probabilities of separation*** from service (including *death-in-service* and *disability*) are shown for sample ages on page E-6. These probabilities were revised for the June 30, 2008 valuation.

## *Funding Methods*

***The entry age actuarial cost method*** was used in determining age & service pension liabilities and normal cost, vesting liabilities and normal cost, and casualty pension liabilities and normal cost. Under this method, each individual's normal cost is determined as a level percent of pay from plan entry to retirement.

***Unfunded actuarial accrued liabilities*** are amortized over a 30-year period (see page A-1), to produce contribution amounts (principal & interest) which are level percent-of-payroll contributions.

***Employer contribution*** dollars were assumed to be paid in equal monthly installments throughout the employer fiscal year.

***Present assets*** were reported to be valued using a seven-year smoothing of the difference between expected and actual investment income. The actuarial value of assets is restricted to a range of 70% to 130% of the market value of assets.

***The data about persons now covered and about present assets*** were furnished by the System's administrative staff. Although examined for general reasonableness, the data was not audited by the Actuary.

**The actuarial valuation computations were made by or under the supervision of a Member of the American Academy of Actuaries (MAAA).**

# SAMPLE SALARY ADJUSTMENT RATES

| Sample Ages | Salary Increase Assumptions For an Individual Member | | |
| | Merit & Seniority | Base (Economic) | Increase Next Year |
|---|---|---|---|
| 20 | 4.9% | 4.0% | 8.9% |
| 25 | 4.9% | 4.0% | 8.9% |
| 30 | 4.1% | 4.0% | 8.1% |
| 35 | 3.0% | 4.0% | 7.0% |
| 40 | 2.3% | 4.0% | 6.3% |
| | | | |
| 45 | 1.8% | 4.0% | 5.8% |
| 50 | 1.3% | 4.0% | 5.3% |
| 55 | 0.9% | 4.0% | 4.9% |
| 60 | 0.5% | 4.0% | 4.5% |
| Ref | 81 | | |

# SINGLE LIFE RETIREMENT VALUES

| Sample Attained Ages | Present Value of $1 Monthly for Life Increasing 2.25% Annually | | Future Life Expectancy (years) | |
| | Men | Women | Men | Women |
|---|---|---|---|---|
| 50 | $163.69 | $172.57 | 29.97 | 34.61 |
| 55 | 151.88 | 163.09 | 25.38 | 29.91 |
| 60 | 137.56 | 151.16 | 20.98 | 25.33 |
| 65 | 121.19 | 136.98 | 16.90 | 20.98 |
| | | | | |
| 70 | 103.48 | 121.17 | 13.23 | 17.00 |
| 75 | 84.85 | 103.98 | 10.00 | 13.41 |
| 80 | 66.44 | 86.12 | 7.27 | 10.25 |
| Ref: | 506 sb0 x 1.1 | 507 sb2 x 1.1 | | |

# PROBABILITIES OF AGE/SERVICE RETIREMENT
## FOR MEMBERS ELIGIBLE TO RETIRE

| Retirement Ages | Percent of Eligible Active Members Retiring Within Next Year With Unreduced Benefits | | |
|---|---|---|---|
| | EMS | D.O.T. | Others |
| 45 | 25% | | |
| 46 | 25% | | |
| 47 | 25% | | |
| 48 | 22% | | |
| 49 | 20% | | |
| 50 | 18% | 55% | 50% |
| 51 | 15% | 50% | 50% |
| 52 | 15% | 50% | 45% |
| 53 | 15% | 50% | 45% |
| 54 | 15% | 55% | 40% |
| 55 | 15% | 50% | 30% |
| 56 | 15% | 50% | 30% |
| 57 | 15% | 50% | 30% |
| 58 | 15% | 50% | 30% |
| 59 | 15% | 55% | 40% |
| 60 | 40% | 40% | 25% |
| 61 | 30% | 30% | 25% |
| 62 | 30% | 30% | 25% |
| 63 | 30% | 30% | 25% |
| 64 | 30% | 30% | 25% |
| 65 | 30% | 30% | 35% |
| 66 | 30% | 30% | 30% |
| 67 | 30% | 30% | 25% |
| 68 | 30% | 50% | 25% |
| 69 | 30% | 50% | 25% |
| 70 | 100% | 100% | 20% |
| 71 | | | 20% |
| 72 | | | 20% |
| 73 | | | 20% |
| 74 | | | 20% |
| 75 | | | 20% |
| 76 | | | 20% |
| 77 | | | 20% |
| 78 | | | 20% |
| 79 | | | 20% |
| 80 | | | 100% |
| Ref | 537 | 1648 | 1647 |

# PROBABILITIES OF EARLY RETIREMENT
## FOR MEMBERS ELIGIBLE FOR EARLY RETIREMENT

| Retirement Ages | Percent of Eligible Active Members Retiring Within Next Year With Reduced Benefits |
|---|---|
| 55 | 7% |
| 56 | 8% |
| 57 | 9% |
| 58 | 10% |
| 59 | 12% |
| 60 | 12% |
| 61 | 12% |
| 62 | 12% |
| 63 | 12% |
| 64 | 12% |
| Ref | 1649 |

# SAMPLE RATES OF SEPARATION FROM ACTIVE EMPLOYMENT BEFORE RETIREMENT

| Sample Ages | Years of Service | % of Active Members Separating Within Next Year | | | |
|---|---|---|---|---|---|
| | | Withdrawal | | | |
| | | | | Others | |
| | | EMS | D.O.T. | Men | Women |
| ALL | 0 | 11.00% | 18.00% | 18.00% | 20.00% |
| | 1 | 10.00% | 16.00% | 15.00% | 16.00% |
| | 2 | 8.00% | 14.00% | 13.00% | 14.00% |
| | 3 | 8.00% | 11.00% | 11.00% | 12.00% |
| | 4 | 7.00% | 9.00% | 10.00% | 10.00% |
| 25 | 5 & Over | 6.70% | 8.00% | 7.60% | 7.60% |
| 30 | | 5.90% | 7.60% | 7.22% | 7.22% |
| 35 | | 5.20% | 5.56% | 5.28% | 5.28% |
| 40 | | 4.40% | 4.26% | 4.05% | 4.05% |
| 45 | | 3.40% | 3.69% | 3.51% | 3.51% |
| 50 | | 2.40% | 3.50% | 3.33% | 3.33% |
| 55 | | 2.00% | 3.50% | 3.33% | 3.33% |
| 60 | | 0.00% | 3.50% | 3.33% | 3.33% |
| Ref | | 338 | 143 | 584 | 188 |
| | | 1068 | 212 | 212 x 0.95 | 212 x 0.95 |

| Sample Ages | % of Active Members Becoming Disabled Within Next Year | | | |
|---|---|---|---|---|
| | D.O.T. | | Others | |
| | Ordinary | Duty | Ordinary | Duty |
| 25 | 0.02% | 0.03% | 0.01% | 0.25% |
| 30 | 0.05% | 0.08% | 0.04% | 0.29% |
| 35 | 0.14% | 0.21% | 0.11% | 0.34% |
| 40 | 0.27% | 0.42% | 0.21% | 0.39% |
| 45 | 0.51% | 0.79% | 0.40% | 0.45% |
| 50 | 0.66% | 1.03% | 0.51% | 0.52% |
| 55 | 0.76% | 1.18% | 0.59% | 0.60% |
| 60 | 0.86% | 1.34% | 0.67% | 0.70% |
| Ref | 23 x 0.45 | 23 x 0.70 | 23 x 0.35 | 423 x 0.90 |

| Sample Ages | % of Active Members Dying Within Next Year | | | |
|---|---|---|---|---|
| | Non-Duty Death | | Duty Death | |
| | Men | Women | Men | Women |
| 25 | 0.03% | 0.02% | 0.01% | 0.01% |
| 30 | 0.03% | 0.02% | 0.01% | 0.01% |
| 35 | 0.06% | 0.04% | 0.02% | 0.01% |
| 40 | 0.08% | 0.05% | 0.03% | 0.02% |
| 45 | 0.11% | 0.08% | 0.04% | 0.03% |
| 50 | 0.16% | 0.13% | 0.05% | 0.04% |
| 55 | 0.27% | 0.20% | 0.09% | 0.07% |
| 60 | 0.51% | 0.38% | 0.17% | 0.13% |
| Ref | 506 sb0 x 0.75 | 507 sb0 x 0.75 | 506 sb0 x 0.25 | 507 sb0 x 0.25 |

# MISCELLANEOUS AND TECHNICAL ASSUMPTIONS

| | |
|---|---|
| **Benefit Service** | Exact Fractional service is used to determine the amount of benefit payable. |
| **Decrement Operation** | Disability and mortality decrements do not operate during the first 5 years of service. Disability and withdrawal also do not operate during retirement eligibility. |
| **Decrement Timing** | Decrements of all types are assumed to occur mid-year. |
| **Eligibility Testing** | Eligibility for benefits is determined based upon the age nearest birthday and exact fractional service on the date the decrement is assumed to occur. |
| **Forfeitures** | For vested separations from service, it is assumed that 0% of members separating will withdraw their contributions and forfeit an employer financed benefit. |
| **Incidence of Contributions** | Contributions are assumed to be received continuously throughout the year based upon the computed percent of payroll shown in this report, and the actual payroll payable at the time contributions are made. |
| **Liability Adjustments** | Liabilities were increased by 1.0% to adjust for data uncertainty. |
| **Marriage Assumption** | 100% of males and 100% of females are assumed to be married for purposes of death-in-service benefits. Male spouses are assumed to be three years older than female spouses for active member valuation purposes. |
| **Normal Form of Benefit** | Straight life is the normal form of benefit. |
| **Pay Increase Timing** | Beginning of (Fiscal) year. This is equivalent to assuming that reported pays represent amounts paid to members during the year ended on the valuation date. |
| **Service Credit Accruals** | It is assumed that members accrue one year of service credit per year. |
| **Administrative Expenses** | 2.00% of payroll was added to the normal cost for administrative expenses. |
| **Defined Contribution Plan** | 0.80% of payroll was added to the normal cost for DC payments. |

# MEANING OF "UNFUNDED ACTUARIAL ACCRUED LIABILITIES"

*Actuarial accrued liabilities* are *the portion of the present value of plan promises to pay benefits in the future not covered by future normal cost contributions.*

--- a liability has been established ("accrued") because the service has been rendered, but the resulting monthly cash benefit may not be payable until years in the future.

If actuarial accrued liabilities at any time exceed the plan's accrued assets (cash & investments), the difference is *unfunded actuarial accrued liabilities*. If the plan's assets equal the plan's actuarial accrued liabilities, the plan would be termed "fully funded".

Each time a plan adds a new benefit which applies to service already rendered, an actuarial accrued liability is created. If assets are insufficient to cover the value of the new benefit promises, an additional unfunded actuarial accrued liability is also created. Payment for such unfunded actuarial accrued liabilities is generally spread over a period of years, commonly in the 15-30 year range.

Unfunded actuarial accrued liabilities can occur in another way: if actual financial experience is less favorable than assumed financial experience, the difference is added to unfunded actuarial accrued liabilities. For example, during periods of high inflation, unfunded actuarial accrued liabilities generally increase because unexpected rates of pay increase will create additional liabilities which may not be matched by investment performance. Inflation is a very destructive force on financial stability.

The existence of unfunded actuarial accrued liabilities is not bad, but the changes from year-to-year in the amount of unfunded actuarial accrued liabilities are important -- "bad" or "good" or somewhere in between.

Unfunded actuarial accrued liabilities do not represent a bill payable immediately, but it is important that policy-makers prevent the amount from becoming unreasonably high and *it is vital that there is a sound method for making payments toward them*, so that they are controlled.

**Actuarial Accrued Liability**.  The difference between (i) the actuarial present value of future plan benefits, and (ii) the actuarial present value of future normal cost.  Sometimes referred to as "accrued liability" or "past service liability."

**Accrued Service**.  The service credited under the plan which was rendered before the date of the actuarial valuation.

**Actuarial Assumptions**.  Estimates of future plan experience with respect to rates of mortality, disability, turnover, retirement, rate or rates of investment income and salary increases.  Decrement assumptions (rates of mortality, disability, turnover and retirement) are generally based on past experience, often modified for projected changes in conditions.  Economic assumptions (salary increases and investment income) consist of an underlying rate in an inflation-free environment plus a provision for a long-term average rate of inflation.

**Actuarial Cost Method**.  A mathematical budgeting procedure for allocating the dollar amount of the "actuarial present value of future plan benefits" between the actuarial present value of future normal cost and the actuarial accrued liability.  Sometimes referred to as the "actuarial funding method."

**Actuarial Equivalent**.  A single amount or series of amounts of equal value to another single amount or series of amounts, computed on the basis of the rate(s) of interest and mortality tables used by the plan.

**Actuarial Present Value**.  The amount of funds presently required to provide a payment or series of payments in the future.  It is determined by discounting the future payments at a predetermined rate of interest, taking into account the probability of payment.

**Amortization**.  Paying off an interest-bearing liability by means of periodic payments of interest and principal, as opposed to paying it off with a lump sum payment.

**Experience Gain (Loss)**.  A measure of the difference between actual experience and that expected based upon a set of actuarial assumptions during the period between two actuarial valuation dates, in accordance with the actuarial cost method being used.

**Normal Cost**.  The annual cost assigned, under the actuarial funding method, to current and subsequent plan years.  Sometimes referred to as "current service cost."  Any payment toward the unfunded actuarial accrued liability is not part of the normal cost.

**Reserve Account**.  An account used to indicate that funds have been set aside for a specific purpose and are not generally available for other uses.

**Unfunded Actuarial Accrued Liability**.  The difference between the actuarial accrued liability and valuation assets.  Sometimes referred to as "unfunded accrued liability."

**Valuation Assets**.  The value of current plan assets recognized for valuation purposes.  Generally based on market value plus a portion of unrealized appreciation or depreciation.



**GRS** — Gabriel Roeder Smith & Company
Consultants & Actuaries

One Towne Square
Suite 800
Southfield, MI 48076-3723

248.799.9000 phone
248.799.9020 fax
www.gabrielroeder.com

November 5, 2013

Ms. Cynthia Thomas, Executive Director
The General Retirement System of the City of Detroit
2 Woodward Avenue, Suite 908
Detroit, Michigan  48226

**Re:  Report of the June 30, 2012 74th Annual Actuarial Valuation**

Dear Cynthia:

Enclosed are 20 copies of the report.

As always, your questions and comments are welcome.

Sincerely,

*Judith A. Kermans*

Judith A. Kermans, EA, MAAA

JAK:dj
Enclosures

# EXHIBIT B



**THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**
71ST ANNUAL ACTUARIAL VALUATION
JUNE 30, 2012

# OUTLINE OF CONTENTS

| Pages | Items |
|-------|-------|
| 1 | Cover letter |
| | **Valuation Results** |
| 2 | COMPUTED EMPLOYER CONTRIBUTION RATES |
| 3 | Actuarial accrued liabilities |
| 4 | Comparative statement |
| 5 | Solvency tests |
| 6 | History of assets and Accrued liabilities (graph) |
| 7 | Experience (gain)/loss |
| 8 | Active members & valuation payroll comparative statement |
| 9 | Retired members & annual allowances comparative statement |
| 10-11 | Active members & retirees (graph) |
| 12-13 | COMMENTS AND CONCLUSION |
| | **Data Furnished for Valuation** |
| 14-16 | Summary of benefit provisions |
| 17-18 | Reported assets |
| 19 | Funding value of assets |
| 20-24 | Member data included in valuation |
| | **Actuarial Disclosures Required by Statement No. 25 of the Governmental Accounting Standards Board** |
| 25-26 | GASB Statement No. 25 |
| | **Financial Principles** |
| 27 L | Financing diagram |
| 27 R | Actuarial valuation process |
| 28-29 | Financial objective |
| | **Appendix** |
| 30-35 | Summary of assumptions used in actuarial valuation |
| 36 | Meaning of unfunded actuarial accrued liabilities |
| 37-38 | Glossary |



**Gabriel Roeder Smith & Company**
Consultants & Actuaries

One Towne Square
Suite 800
Southfield, MI 48076-3723

248.799.9000 phone
248.799.9020 fax
www.gabrielroeder.com

May 22, 2013

Board of Trustees
The Police and Fire Retirement System of the City of Detroit

The results of the **71st Annual Actuarial Valuation** of the annuity and pension liabilities of the Police and Fire Retirement System of the City of Detroit are presented in this report.  The purpose of the valuation was to measure the system's funding progress, to determine contribution rates for the 2014 fiscal year in accordance with the established funding policy, and to determine actuarial information for Governmental Accounting Standards Board (GASB) Statements No. 25 and No. 27.  The results of the valuation may not be applicable for other purposes.

The date of the valuation was **June 30, 2012**.

Future actuarial measurements may differ significantly from the current measurements presented in this report due to such factors as: plan experience differing from that anticipated by the economic and demographic assumptions; changes in economic or demographic assumptions; increases or decreases expected as part of the natural operation of the methodology used for these measurements (such as the end of an amortization period or additional cost or contribution requirements based on the plan's funded status); and changes in plan provisions or applicable law.  Due to the limited scope of the actuary's assignment, the actuary did not perform an analysis of the potential range of such future measurements.

The actuarial assumptions used in the valuation are summarized in the Appendix.  Benefit provisions are summarized on pages 14-16.  System asset information was provided by retirement system staff.  It was reviewed for general reasonableness, but not otherwise audited by the actuary.

Participant data concerning the active, inactive and retired persons covered by the System was furnished by the retirement system staff, together with needed financial information.  Data was checked for year to year consistency, but was not otherwise audited by the actuary.  The actuary is not responsible for the accuracy of the data provided by the system.  Please see the assumptions section (page 31) which shows that there is a load for "incomplete service" in the data.

**Your attention is directed particularly** to the employer contribution rates on page 2 and the comments on pages 12 and 13.

This report has been prepared by actuaries who have substantial experience valuing public sector retirement systems.  To the best of our knowledge, this report is complete and accurate and was made in accordance with standards of practice promulgated by the Actuarial Standards Board of the American Academy of Actuaries.  The actuarial assumptions used for the valuation produce results which, individually and in the aggregate, are reasonable.

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 65 of 505

One or more of the signing actuaries are Members of the American Academy of Actuaries (MAAA), and meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

The intended audience is the Board of Trustees for the Police and Fire Retirement System of the City of Detroit and their staff.  If supplied to other parties, the report should be supplied in its entirety.  The authors of this report are available to answer questions from the Board and Staff as needed.

Respectfully submitted,

Norman L. Jones, FSA, MAAA          Judith A. Kermans, EA, MAAA          Kenneth G. Alberts

NLJ:bd

Gabriel Roeder Smith & Company

# VALUATION RESULTS

# EMPLOYER CONTRIBUTION RATES
## COMPUTED PAYABLE LAST DAY OF FISCAL YEAR
## EXPRESSED AS PERCENTS OF ACTIVE MEMBER PAYROLL
## 2013-2014 FISCAL YEAR

| Valuation Date June 30<br>Contribution for Fiscal Year | 2012<br>2014 | 2011<br>2013 |
|---|---|---|
| **Normal Cost** | | |
|   Age & service allowances | 22.28 % | 21.09 % |
|   Disability allowances | 3.56 % | 3.71 % |
|   Death-in-service allowances | 0.40 % | 0.38 % |
| Total | 26.24 % | 25.18 % |
| Members current contributions # | 3.88 % | 3.45 % |
| (Future refunds) | (0.38)% | (0.38)% |
| Available for monthly benefits | 3.50 % | 3.07 % |
| **Employer Normal Cost** | **22.74 %** | **22.11 %** |
| **Actuarial Accrued Liabilities** | | |
|   Total ($ millions) | $3,822.7 | $3,808.6 |
|   Funding Value of Assets | 3,675.5 | 3,804.8 |
|   Unfunded Actuarial Accrued Liabilities | | |
|   - dollar (millions) | $ 147.2 | 3.8 |
|   - amortization percent + | 6.70 % | 0.16 % |
| **Computed Employer Rate** | **29.44 %** | **22.27 %** |
| **Computed Employer Rate with Interest Adjustment \*** | **30.59 %** | **23.14 %** |
| **Estimated Dollar Contributions** | | |
|   **Employer Normal Cost ($ million)** | **$ 48.7** | **$ 50.6** |
|   **Actuarial Accrued Liabilities ($ million)** | **14.3** | **0.4** |
|   **Total ($ million) @** | **$ 63.0** | **$ 51.0** |

\#    *Member statutory contributions of 5% to the Annuity Savings Fund are not payable during all periods of covered employment. The rate shown is the weighted average of expected contributions divided by expected pay in the upcoming fiscal year.*

\+    *Based on the Board of Trustees funding policy to continue full normal cost contributions when valuation assets exceed accrued liabilities and the use of a closed 29-year level dollar amortization period when accrued liabilities exceed assets.*

\*    *Computed Employer Rate if paid at end of year.*

@    *In addition, to the estimated dollars shown above for FY 2013 and FY 2014, there is a contribution receivable carried over from FY 2012 of $49.8 million plus interest. The FY 2014 contribution above is based on the assumption that the contributions for FY 2012 and FY 2013 will be paid on a timely basis or with interest, based on the valuation assumed rate of return.*

| Present Value, June 30 | Amount |
|---|---|
| **Accrued Pension Liabilities** | |
| Retirees and beneficiaries | $2,804,974,749 |
| Inactive members future deferred pensions | 23,445,601 |
| Active members | 778,428,228 |
| Total accrued pension liabilities | 3,606,848,578 |
| Pension fund balances | 3,459,632,180 |
| Unfunded accrued pension liabilities | $   147,216,398 |
| **Accrued Annuity Liabilities** | |
| Retirees and beneficiaries | |
| Future annuities | $      4,460,478 |
| Reserve for outstanding refunds & contingencies | 12,800,390 |
| Total | $    17,260,868 |
| Members annuities & future refunds | 198,566,556 |
| Total accrued annuity liabilities | 215,827,424 |
| Annuity fund balances | 215,827,424 |
| Unfunded accrued annuity liabilities | $                 0 |
| **System Totals** | |
| Actuarial accrued liabilities | $3,822,676,002 |
| Accrued assets | 3,675,459,604 |
| Unfunded actuarial accrued liabilities | $   147,216,398 |

# VALUATION RESULTS - COMPARATIVE STATEMENT
## - - $ IN MILLIONS - -

| June 30 | Active Payroll | | Actuarial Accrued Liabilities | | | Unfunded / Active Pays | Employer Contributions % of Pays |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Total | Average | Computed Total | Valuation Assets | Unfunded | | |
| 1987 | $ 202.3 | $30,906 | $2,238.2 | $1,557.0 | $ 681.2 | 3.4 | 44.69% |
| 1988 | 206.1 | 33,120 | 2,386.0 | 1,705.4 | 680.6 | 3.3 | 45.71% |
| 1989(a) | 208.4 | 33,179 | 2,327.9 | 1,848.9 | 479.0 | 2.3 | 36.52% |
| 1990* | 221.5 | 36,874 | 2,453.6 | 2,037.4 | 416.2 | 1.9 | 35.98% |
| 1991 | 213.1 | 39,182 | 2,517.2 | 2,085.5 | 431.7 | 2.0 | 36.19% |
| 1992(a)* | 205.7 | 39,095 | 2,345.9 | 2,163.8 | 182.1 | 0.9 | 27.83% |
| 1993(a) | 204.3 | 38,846 | 2,493.2 | 2,256.0 | 237.2 | 1.2 | 28.97% |
| 1994 | 199.7 | 38,693 | 2,486.2 | 2,304.4 | 181.8 | 0.9 | 27.64% |
| 1995(a) | 209.7 | 39,692 | 2,574.2 | 2,443.0 | 131.2 | 0.6 | 25.90% |
| 1996 | 212.7 | 39,965 | 2,633.4 | 2,628.6 | 4.8 | 0.0 | 21.81% |
| 1997(b) | 217.6 | 40,145 | 2,724.1 | 2,944.2 | (220.1) | - | 7.32% |
| 1998*# | 217.5 | 40,772 | 2,976.8 | 3,325.9 | (349.1) | - | 26.16% |
| 1999#@ | 216.0 | 40,542 | 3,274.1 | 3,668.4 | (394.3) | - | 26.17% |
| 2000*# | 237.7 | 43,376 | 3,342.1 | 3,964.2 | (622.1) | - | 27.25% |
| 2001# | 253.3 | 45,353 | 3,463.2 | 3,900.0 | (436.8) | - | 27.22% |
| 2002(a)# | 248.7 | 46,203 | 3,632.0 | 3,635.1 | (3.1) | - | 23.39% |
| 2003 | 248.7 | 47,305 | 3,721.6 | 3,205.5 | 516.1 | 2.1 | 43.89% |
| 2004 | 258.7 | 51,126 | 3,857.5 | 3,074.5 | 783.0 | 3.0 | 54.36% |
| 2005 | 250.5 | 52,197 | 3,780.4 | 3,757.9 | 22.5 | 0.1 | 25.98% |
| 2006+& | 228.1 | 52,908 | 3,809.0 | 3,980.3 | (171.3) | - | 25.09% |
| 2007+ | 230.2 | 54,647 | 3,870.7 | 4,307.2 | (436.5) | - | 25.16% |
| 2007+* | 230.2 | 54,647 | 3,896.8 | 4,307.2 | (410.4) | - | 26.71% |
| 2008+ | 232.8 | 57,090 | 3,992.4 | 4,316.3 | (323.9) | - | 26.75% |
| 2008+(a) | 232.8 | 57,090 | 4,071.1 | 4,316.3 | (245.2) | - | 26.27% |
| 2009 | 231.8 | 57,418 | 4,221.3 | 3,945.2 | 276.1 | 1.2 | 35.22% |
| 2010 | 228.8 | 57,322 | 4,180.1 | 3,412.8 | 767.3 | 3.4 | 49.75% |
| 2010(a) | 228.8 | 57,322 | 3,987.5 | 3,853.3 | 134.2 | 0.6 | 28.90% |
| 2010(a)* | 228.8 | 57,322 | 3,767.4 | 3,853.3 | (85.9) | - | 23.02% |
| 2011 | 220.5 | 57,773 | 3,808.6 | 3,804.8 | 3.8 | 0.0 | 23.14% |
| 2012(a) | 205.8 | 57,374 | 3,822.7 | 3,675.5 | 147.2 | 0.7 | 30.59% |

(a)  After changes in actuarial assumptions and/or methods.
(b)  After changes in actuarial assumptions and a temporary full funding credit.
*    After Plan Amendments.
#    Employer normal cost before full funding credit.
@    After $55.4 million reserve for 1998-1999 13th check and ASF distributions.
+    Based on the Board of Trustees funding policy to continue full normal cost contributions when valuation assets exceed accrued liabilities.
&    2006 assets were revised following the 6/30/2006 valuation.

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 70 of 505

The Police and Fire Retirement System of the City of Detroit funding objective is to meet long-term benefit promises through contributions that remain approximately level from year to year as a percent of member payroll. If the contributions to the System are level in concept and soundly executed, the System will pay all promised benefits when due -- the ultimate test of financial soundness. Testing for level contribution rates is *the long-term solvency test*.

*A short-term solvency test* is one means of checking a system's progress under its funding program. In a short-term solvency test, the plan's present assets (cash and investments) are compared with:

1) Active member contributions on deposit;

2) The liabilities for future benefits to present retired lives;

3) The liabilities for service already rendered by active members.

In a system that has been following the discipline of level percent-of-payroll financing, the liabilities for active member contributions on deposit (liability 1) and the liabilities for future benefits to present retired lives (liability 2) will be fully covered by present assets (except in rare circumstances). In addition, the liabilities for service already rendered by active members (liability 3) will often be partially covered by the remainder of present assets. The larger the funded portion of liability 3, the stronger the condition of the System.

### Short-Term Solvency Test
### 5-Year Comparative Statement
### ($ millions)

| | Actuarial Accrued Liabilities | | | | Portion of Accrued Liabilities Covered by Assets | | | |
| | (1) Active Member Contr. | (2) Retirees and Benef. | (3) Present Members (Employer Financed Portion) | Funding Value of Assets | (1) | (2) | (3) | Total |
| June 30 | | | | | | | | |
| 2008(a) | $ 268 | $ 2,793 | $ 1,010 | $ 4,316 | 100% | 100% | 124% | 106% |
| 2009 | 301 | 2,837 | 1,083 | 3,945 | 100% | 100% | 75% | 93% |
| 2010#(a) | 298 | 2,743 | 726 | 3,853 | 100% | 100% | 112% | 102% |
| 2011 | 230 | 2,717 | 861 | 3,805 | 100% | 100% | 100% | 100% |
| 2012# | 199 | 2,822 | 801 | 3,675 | 100% | 100% | 82% | 96% |

*(a) After changes in benefit provisions.*
*# After changes in actuarial assumptions and/or methods.*

13-53846-tjt   Doc 8392   Filed 11/21/14   Entered 11/21/14 18:04:24   Page 71 of 505



# DERIVATION OF EXPERIENCE GAIN (LOSS)
## YEAR ENDED JUNE 30, 2012

Actual experience will never (except by coincidence) coincide exactly with assumed experience. Gains and losses will often cancel each other over a period of years, but sizable year to year fluctuations are common. Detail on the derivation of the experience gain (loss) is shown below.

| | | |
|---|---|---:|
| (1) | UAAL* at start of year | $ 3,882,665 |
| (2) | Employer and employee normal cost from last valuation | 54,145,391 |
| (3) | Actual employer and employee contributions | 59,298,613 |
| (4) | Interest accrual: (1) x .080 | 310,613 |
| (5) | Expected UAAL before changes: (1) + (2) - (3) + (4) | (959,944) |
| (6) | Change due to benefit provision modifications | 0 |
| (7) | Change due to revised actuarial methods and/or assumptions | (18,590,896) |
| (8) | Asset method change | 0 |
| (9) | Expected UAAL after changes: (5) + (6) + (7) + (8) | (19,550,840) |
| (10) | Actual UAAL at end of year | 147,216,398 |
| (11) | Experience gain (loss): (9) - (10) | (166,767,238) |
| (12) | Experience gain (loss) as a % of beginning of year accrued liability | (4.4)% |
| (13) | Experience gain (loss) | (166,767,238) |
| (14) | Gain (loss) due to investment experience | (155,700,221) |
| (15) | Gain (loss) from other sources | (11,067,017) |

\* *Unfunded actuarial accrued liability.*

# COMPARATIVE STATEMENT OF ACTIVE MEMBERS
## AND VALUATION PAYROLL

| June 30 | No. of Members 1969 Plan | No. of Members Pre-1969 | Total Members No. | Total Members % Change | Total Members Ratio of Active to Retired | Total Members Annual Payroll | Average Pay $ | Average Pay Change |
|---|---|---|---|---|---|---|---|---|
| 1978 | 4,432 | 2,911 | 7,343 | 9 % | 1.3 | $164,975,236 | $22,467 | 12.3 % |
| 1979 | 4,230 | 2,739 | 6,969 | (5)% | 1.2 | 175,174,674 | 25,136 | 11.9 % |
| 1980 | 3,719 | 2,640 | 6,359 | (9)% | 1.1 | 178,004,349 | 27,993 | 11.4 % |
| 1981 | 2,991 | 2,491 | 5,482 | (14)% | 0.9 | 155,849,804 | 28,429 | 1.6 % |
| 1982 | 3,185 | 2,299 | 5,484 | 0 % | 0.9 | 155,372,732 | 28,332 | (0.3)% |
| 1983 | 3,176 | 2,214 | 5,390 | (2)% | 0.9 | 153,347,716 | 28,450 | 0.4 % |
| 1984 | 3,070 | 2,139 | 5,209 | (3)% | 0.9 | 148,223,416 | 28,455 | 0.0 % |
| 1985 | 3,657 | 1,998 | 5,655 | 9 % | 0.9 | 171,357,741 | 30,302 | 6.5 % |
| 1986 | 4,463 | 1,879 | 6,342 | 12 % | 1.0 | 185,312,563 | 29,220 | (3.6)% |
| 1987 | 4,918 | 1,627 | 6,545 | 3 % | 1.0 | 202,277,028 | 30,906 | 5.8 % |
| 1988 | 4,776 | 1,447 | 6,223 | (5)% | 1.0 | 206,107,980 | 33,120 | 7.2 % |
| 1989 | 4,942 | 1,338 | 6,280 | 1 % | 1.0 | 208,361,567 | 33,179 | 0.2 % |
| 1990 | 4,834 | 1,174 | 6,008 | (4)% | 0.9 | 221,538,387 | 36,874 | 11.1 % |
| 1991 | 4,372 | 1,066 | 5,438 | (9)% | 0.8 | 213,072,553 | 39,182 | 6.3 % |
| 1992 | 4,411 | 850 | 5,261 | (3)% | 0.8 | 205,681,412 | 39,095 | (0.2)% |
| 1993 | 4,534 | 725 | 5,259 | 0 % | 0.7 | 204,289,195 | 38,846 | (0.6)% |
| 1994 | 4,578 | 584 | 5,162 | (2)% | 0.7 | 199,734,550 | 38,693 | (0.4)% |
| 1995 | 4,779 | 505 | 5,284 | 2 % | 0.7 | 209,733,734 | 39,692 | 2.6 % |
| 1996 | 4,889 | 432 | 5,321 | 1 % | 0.7 | 212,656,401 | 39,965 | 0.7 % |
| 1997 | 5,049 | 371 | 5,420 | 2 % | 0.7 | 217,585,229 | 40,145 | 0.5 % |
| 1998 | 5,018 | 316 | 5,334 | (2)% | 0.7 | 217,479,443 | 40,772 | 1.6 % |
| 1999 | 5,099 | 230 | 5,329 | 0 % | 0.7 | 216,049,687 | 40,542 | (0.6)% |
| 2000 | 5,291 | 190 | 5,481 | 3 % | 0.7 | 237,741,560 | 43,376 | 7.0 % |
| 2001 | 5,453 | 132 | 5,585 | 2 % | 0.7 | 253,297,027 | 45,353 | 4.6 % |
| 2002 | 5,290 | 92 | 5,382 | (4)% | 0.7 | 248,663,133 | 46,203 | 1.9 % |
| 2003 | 5,181 | 76 | 5,257 | (2)% | 0.6 | 248,681,461 | 47,305 | 2.4 % |
| 2004 | 5,007 | 53 | 5,060 | (4)% | 0.6 | 258,699,581 | 51,126 | 8.1 % |
| 2005 | 4,768 | 31 | 4,799 | (5)% | 0.6 | 250,491,872 | 52,197 | 2.1 % |
| 2006 | 4,298 | 14 | 4,312 | (10)% | 0.5 | 228,140,160 | 52,908 | 1.4 % |
| 2007 | 4,204 | 8 | 4,212 | (2)% | 0.5 | 230,173,964 | 54,647 | 3.3 % |
| 2008 | 4,071 | 7 | 4,078 | (3)% | 0.5 | 232,812,606 | 57,090 | 4.5 % |
| 2009 | 4,030 | 7 | 4,037 | (1)% | 0.5 | 231,795,528 | 57,418 | 0.6 % |
| 2010 | 3,985 | 7 | 3,992 | (1)% | 0.5 | 228,829,999 | 57,322 | (0.2)% |
| 2011 | 3,809 | 7 | 3,816 | (4)% | 0.5 | 220,461,691 | 57,773 | 0.8 % |
| 2012 | 3,580 | 7 | 3,587 | (6)% | 0.4 | 205,800,278 | 57,374 | (0.7)% |

# COMPARATIVE STATEMENT OF ANNUAL RETIREMENT ALLOWANCES BEING PAID RETIREES AND BENEFICIARIES

| June 30 | No. Retired | | % of Current Allowances | | | Current Allowances | | Allowances as a % of Payroll |
|---|---|---|---|---|---|---|---|---|
| | Pre-69 | Total | Annuities | Pensions | Escalators | Total | Average | |
| 1978 | 5,760 | 5,760 | 2.8% | 44.2% | 53.0% | $ 58,117,007 | $ 10,090 | 35% |
| 1979 | 5,869 | 5,869 | 2.6% | 51.3% | 46.1% | 61,355,273 | 10,454 | 35% |
| 1980 | 5,676 | 5,911 | 2.1% | 45.3% | 52.6% | 72,671,386 | 12,294 | 41% |
| 1981 | 5,691 | 5,951 | 2.0% | 46.7% | 51.3% | 74,565,233 | 12,530 | 48% |
| 1982 | 5,709 | 6,006 | 2.0% | 49.0% | 49.0% | 75,348,490 | 12,545 | 48% |
| 1983 | 5,705 | 6,038 | 2.0% | 50.8% | 47.2% | 75,774,552 | 12,550 | 49% |
| 1984 | 5,641 | 5,986 | 1.9% | 51.7% | 46.4% | 76,126,476 | 12,717 | 51% |
| 1985 | 5,581 | 6,011 | 1.9% | 54.0% | 44.1% | 70,776,660 | 12,773 | 45% |
| 1986 | 5,585 | 6,117 | 1.6% | 52.5% | 45.9% | 85,409,280 | 13,962 | 46% |
| 1987 | 5,486 | 6,264 | 1.5% | 53.5% | 45.0% | 88,608,492 | 14,146 | 44% |
| 1988 | 5,442 | 6,416 | 1.3% | 53.9% | 44.8% | 100,659,780 | 15,689 | 49% |
| 1989 | 5,415 | 6,496 | 1.3% | 55.7% | 43.0% | 103,122,696 | 15,875 | 49% |
| 1990 | 5,412 | 6,660 | 1.1% | 54.3% | 44.6% | 114,650,196 | 17,215 | 52% |
| 1991 | 5,361 | 6,754 | 1.1% | 54.3% | 44.6% | 121,715,028 | 18,021 | 57% |
| 1992 | 5,342 | 6,899 | 1.0% | 57.0% | 42.0% | 124,835,208 | 18,095 | 61% |
| 1993 | 5,349 | 7,091 | 1.0% | 59.5% | 39.5% | 129,027,970 | 18,196 | 63% |
| 1994 | 5,249 | 7,169 | 0.9% | 61.7% | 37.4% | 131,595,379 | 18,356 | 66% |
| 1995 | 5,161 | 7,311 | 0.9% | 61.3% | 37.8% | 138,959,417 | 19,007 | 66% |
| 1996 | 5,049 | 7,469 | 0.8% | 62.6% | 36.6% | 143,536,485 | 19,218 | 67% |
| 1997 | 5,012 | 7,743 | 0.8% | 63.3% | 35.9% | 150,843,744 | 19,481 | 69% |
| 1998 | 4,719 | 7,750 | 0.7% | 65.8% | 33.5% | 154,226,437 | 19,900 | 71% |
| 1999 | 4,573 | 7,883 | 0.7% | 68.4% | 30.9% | 158,523,816 | 20,110 | 73% |
| 2000 | 4,498 | 8,079 | 0.6% | 70.0% | 29.4% | 164,279,376 | 20,334 | 69% |
| 2001 | 4,394 | 8,166 | 0.6% | 67.4% | 32.0% | 180,239,652 | 22,072 | 71% |
| 2002 | 4,229 | 8,179 | 0.5% | 68.4% | 31.1% | 185,658,396 | 22,699 | 75% |
| 2003 | 4,104 | 8,277 | 0.5% | 69.8% | 29.7% | 191,634,636 | 23,153 | 77% |
| 2004 | 3,961 | 8,328 | 0.4% | 68.5% | 31.1% | 203,083,524 | 24,386 | 79% |
| 2005 | 3,791 | 8,376 | 0.4% | 69.5% | 30.1% | 211,114,020 | 25,205 | 84% |
| 2006 | 3,666 | 8,550 | 0.4% | 70.9% | 28.7% | 222,357,372 | 26,007 | 97% |
| 2007 | 3,501 | 8,498 | 0.3% | 70.6% | 29.1% | 227,671,788 | 26,791 | 99% |
| 2008 | 3,318 | 8,442 | 0.3% | 70.0% | 29.7% | 234,223,368 | 27,745 | 101% |
| 2009 | 3,168 | 8,424 | 0.3% | 70.1% | 29.6% | 240,094,968 | 28,501 | 104% |
| 2010 | 3,035 | 8,356 | 0.3% | 70.3% | 29.4% | 243,688,596 | 29,163 | 106% |
| 2011 | 2,861 | 8,379 | 0.2% | 71.6% | 28.2% | 250,376,700 | 29,881 | 114% |
| 2012 | 2,723 | 8,451 | 0.2% | 72.2% | 27.6% | 258,660,084 | 30,607 | 126% |





# EXPECTED TERMINATIONS FROM ACTIVE EMPLOYMENT
## FOR CURRENT ACTIVE MEMBERS



The chart above shows the expected future development of the present population in simplified terms. The retirement system presently covers 3,587 active members. Eventually, 68 members are expected to terminate covered employment prior to retirement and forfeit eligibility for an employer provided benefit. 3,306 members are expected to receive monthly retirement benefits either by retiring directly from active service, or by retiring from vested deferred status. 213 members are expected to become eligible for death-in-service or disability benefits. Shown below is a graph of projected active members remaining in the retirement system. It is projected that less than half of the current active population will be active by 2020.



## Experience during the Past Year

Investment experience for the year ended June 30, 2012 was unfavorable with a market rate of return of (4.3)% which is 12.3% below the assumed 8.00% investment rate of return. Due to the 7-year smoothing of the current loss (as well as prior gains and losses), the recognized rate of return on the funding value of assets was 3.8%. Because of the past unfavorable market returns and the 7-year smoothing, the funding value of assets exceeds the market value by $701 million. Unless the market recovers remarkably within a relatively short period of time, upward pressure on the employer rate can be expected in each of the next several years. If there are no experience gains during the next 7 years, the employer contribution rate could double during that time.

## Annuity Reserve Fund

The Annuity Reserve Fund (ARF), as reported, was $12.8 million higher than the accrued liabilities for Retirees and Beneficiaries. The Board approved a transfer of $12 million from the Annuity Reserve Fund to the Pension Accumulation Fund in 2001, a transfer of $5 million in 2005 and a transfer of $22 million in 2011.

## Employer Contribution Rate

The employer contribution rate increased from 23.14% of covered payroll last year to 30.59% of covered payroll this year. The System experienced actuarial losses this year primarily due to lower than assumed investment return on a funding (smoothed) value of assets basis. The Boards' funding policy is 1) to contribute full normal cost contributions when valuation assets exceed accrued liabilities and 2) to contribute the normal cost plus an amortization payment on the UAAL (based on a closed 29-year period) when accrued liabilities exceed valuation assets. As of June 30, 2012, the System is 96.10% funded so the computed employer contribution is above the employer normal cost. There are approximately $701 million in net investment losses scheduled to be recognized over the next 6 years. On a market value basis, the fund is approximately 78.00% funded. If the market value of assets were used to determine the employer contribution rate as of June 30, 2012, the computed employer contribution rate would have been 63.56% of covered payroll.

## Method Change

Effective with this valuation, a method change was made to align the valuation with the administrative procedures for calculating the post retirement COLA. Our understanding is that the post retirement COLA paid on each retiree's total benefit will be 2.25% multiplied by a ratio of service earned before the COLA rate went to zero to total service earned. For example, if a member retired with 25 years of service and earned 3 of those years after April 5, 2011 (or September 1, 2011 for DPOA members) then they would receive a compound COLA of 1.98% (2.25% * 22 / 25), beginning on their first COLA anniversary date. In addition, the load for administrative expenses was increased (from 1.20% of pay to 2.50% of pay) to better reflect expected long term administrative expenses a percent of payroll.

## Assets and Accrued Contributions

As of June 30, 2012, the annual benefits were approximately 10.80% of the market value of assets, including contribution receivables due form the City. Due to this relationship, failure to receive employer contributions on a timely basis could jeopardize the sustainability of the fund. We recommend that the accrued employer contributions be deposited into the fund as soon as possible.

**Closed Plan**

Due to the plan closing, we recommend that a plan be developed to:

- Reduce the asset smoothing period over the near term.
- Reduce the investment return assumption as the asset allocation is changed to meet changing cash-flow needs.
- Shorten the amortization of unfunded actuarial accrued liabilities over a period of time until it equals the average future working lifetime of the remaining active members.

Traditionally, we have shown the employer contribution rates as percents of payroll. For Fiscal Year 2014, that rate is 30.59%. We understand that the system applies that rate to the actual payroll during the covered period to determine the dollar contributions owed by the City. In a closed plan, this process can result in dollar contributions less than anticipated during the valuation (a contribution loss), due to the declining payroll. The amount of this loss can vary from year to year, but can be substantial during periods of contraction, following the valuation date. This is especially true for plans that have a lag between the valuation date and the contribution effective date, like the Police and Fire Retirement System. To avoid/minimize this loss, we recommend consideration of the following possible alternative administrative or actuarial methods:

1) Base dollar amount of the contribution on the normal cost rate multiplied by the actual payroll during the covered period and then add the dollar amount of the UAAL payment to determine the actual total contributions owed by the City. For FY 2014, this would be: 23.65% x actual payroll + $14.3 million, adjusted with interest at 8% if paid after 6/30/2014 (note that the normal cost of 22.74% show on page 3 is adjusted with ½ year of interest: 23.65% = 22.74% * 1.04);

2) Contribute the total dollar contribution estimated in the valuation. Page 2 shows that this amount is approximately $63 million. A more precise number will be shown in future reports, if this method is selected.

3) Increase the contribution rates for anticipated decreases in payroll. For FY 2014, this would result in a total employer contribution rate of 34.23%, payable on 6/30/2014.

**Methods and Assumption Review**

Actuarial methods and assumptions were last formally reviewed (in aggregate) for the 5-year period ending June 30, 2007. The next review is scheduled to begin subsequent to the valuation and will cover the 5-year period ending June 30, 2012. The City Ordinance requires a formal review be performed every 5 years. This study will review economic assumptions (assumptions about future events affecting money values) and demographic assumptions (assumptions about future events that happen to members). In addition, we will be reviewing methods and assumptions for conformity with recent changes in the actuarial standards (such as the appropriate margin for future mortality improvement to include and the corridor around the market value as well as other areas of operation of the system that is modeled in the annual valuations).

**Conclusion**

**Based upon the funding policy established by the Board, the data furnished by the Retirement System and the actuarial assumptions shown in the Appendix, the recommended employer contribution rate for the 2013-2014 fiscal year is 30.59% of covered payroll.**

# DATA FURNISHED FOR VALUATION

# SUMMARY OF BENEFIT PROVISIONS
## (JULY 1, 2012)

### *Age and Service Retirement*

***Eligibility*** - 25 years of service regardless of age.  20 years of service regardless of age for eligible DPOA and DFFA members.

***Annual Amount*** - An annuity equal to the actuarial equivalent of the member's accumulated contribution account plus a defined benefit, which, when added to the annuity will provide the following:

**Pre-1969 Members**   -   For all service earned up to April 5, 2011 for LSA members (September 1, 2011 for DPOA members), 2.5% of AFC times the first 25 years of service, with a maximum allowance of 15/22 of a police officer's or firefighter's annual rate of compensation.

For all service earned after April 5, 2011 for LSA members (September 1, 2011 for DPOA members), 2.1% of AFC times the first 25 years of service, with a maximum allowance of 15/22 of a police officer's or firefighter's annual rate of compensation.

**1969 Plan Members**   -   For all service earned up to April 5, 2011 for LSA members (September 1, 2011 for DPOA members), 2.5% of AFC times the first 25 years of service plus 2.1% of AFC times each of the next 10 years of service.

For all service earned after April 5, 2011 for LSA members (September 1, 2011 for DPOA members), 2.1% of AFC times each year of service, up to 35 years of service.

Members may elect to receive their accumulated contribution account in a lump sum after 25 years of service (20 years of service for eligible DPOA and DFFA members).  The defined benefit at retirement is then reduced by the actuarial equivalent of the amount of principal withdrawn.  No reduction is made with regard to the interest portion of the withdrawal.

Pre-1969 plan members may elect 1969 plan benefits at the time of retirement.

***Type of Average Final Compensation (AFC)*** - Average of the current compensation for the ranks held in each of last 5 years (last 3 years for DPCOA, Executive Members and their Fire equivalents).  Pension benefits for non-union employees may not be diminished due to a reduction in compensation because of fiscal emergency.  AFC includes prior longevity distributions during the averaging period in accordance with the following schedule: 1% of compensation after 5 years of service, 2% after 11 years, 3% after 16 years and 4% after 21 years.  A member may elect that upon retirement or upon death before retirement either (i) a lump sum payment equal to 85% (100% for DPOA and DPCOA members) of the amount of his or her unused accumulated sick leave bank, or (ii) to have the 3-year average of 25% of the value of the accumulated unused sick leave bank added to his or her AFC.  Any member electing the AFC adjustment option will also be paid a lump sum equal to the remaining value of the sick leave bank as provided in (i) above.  Lump sum payments are not paid by the retirement system.

# SUMMARY OF BENEFIT PROVISIONS
## (CONTINUED)

### Deferred Retirement (vested benefit)

*Eligibility* - 10 years of service for DPOA and Fire equivalents, age 40 with 8 years of service for all others.

*Annual Amount* - Same as regular retirement but based on average final compensation and credited service at the time of termination.

*Benefit Commencement - DPOA and Fire equivalent members hired after 6/30/85*: Unreduced benefit begins at age 62. *All other members*: Unreduced benefit begins at the age when the member would have first been eligible for regular retirement had the member continued in City service. **All** members may elect a reduced benefit payable immediately.

### Duty Disability Retirement

*Eligibility* - No age or service requirement.

*Annual Amount* – A basic benefit of 50% of final compensation and a supplemental benefit of 16-2/3% of final compensation is payable for 24 months. After 24 months, members disabled from any occupation continue to receive both benefits; otherwise, only the 50% benefit is then payable. Upon attaining 25 years of service, the disability benefit is 50% of final compensation. Members convert to regular retirement benefit at age 65. Worker's compensation payments are offset. Members who have already filed under the old duty disability plan will receive 66-2/3% of final compensation payable to eligibility date for regular retirement.

### Non-Duty Disability Retirement

*Eligibility* - 5 years of service.

*Annual Amount* - Computed as a regular retirement benefit, but based on average final compensation and credited service at the time of disability. Minimum benefit is 20% of average final compensation.

### Duty Death Before Retirement

*Eligibility* - No age or service requirement.

*Annual Amount* – Surviving spouse receives 5/11 of police officer's or firefighter's compensation and each child under age 18 receives 1/10 of such compensation with a maximum total of 7/33 of such compensation. If there is no surviving spouse, each child receives 1/4 of such compensation with a maximum total of 1/2 of such compensation. If there is no surviving spouse or children, each dependent parent receives 1/6 of such compensation. Worker's compensation payments are offset.

13-53846-tjt  Doc 8392  Filed 11/21/14  Entered 11/21/14 18:04:24  Page 82 of 505

### *Non-Duty Death Before Retirement*

***Eligibility*** - No age or service requirement.

***Annual Amount*** - Same as a regular retirement benefit to a surviving spouse, but reduced in accordance with a 100% joint and survivor option election. Minimum benefit is 20% of average final compensation. Each child under 18 receives 1/7 of police officer's or firefighter's compensation with a maximum total of 2/7 of such compensation. If there is no spouse or children, each dependent parent receives 1/7 of such compensation.

### *Post-Retirement Cost-of-Living Adjustments*

| | | |
|---|---|---|
| **Pre-1969 Members** | - | Allowances increase in proportion to active member compensation for the corresponding rank. |
| **1969 Plan Members** | - | Police retired after July 1, 2001, certain Police classes retired after July 1, 1998 and all Fire members: For all service earned up to April 5, 2011 for LSA members (September 1, 2011 for DPOA members) pensions increase by 2.25% of the **current** pension amount each July 1. No cost-of-living adjustments for service earned after April 5, 2011 for LSA members (September 1, 2011 for DPOA members). |

### *Member Contributions*

5% of covered compensation payable until first eligible for regular retirement.

### *DROP plan*

Members with 25 years (20 years for DPOA members) of service may elect to participate in the DROP. When a DROP election is made, the member ceases to accrue any further age and service retirement benefits. Seventy five percent (75%) of the member's benefit (accrued to their DROP date) is contributed to a DROP account (a defined contribution account). At retirement the member is entitled to the balance in the DROP account and a monthly benefit equal to 100% of their benefit accrued to their DROP date, increased by any post-retirement increases that the member would have received, had the member been retired. Fire members must retire from the DROP plan at age 60. Participation in the DROP is limited to 10 years for LSA members electing to DROP after April 5, 2011.

### *Participation*

Plan is closed to new members, effective April 5, 2011 for LSA and July 1, 2012 for DPOA.

### Reported Assets
### (Market Value)

| Market Value - June 30, 2012 | |
|---|---:|
| Cash & equivalents | $ 80,135,410 |
| Receivables & accruals | 16,185,265 |
| Contributions receivable | 49,760,229 |
| Stocks | 1,369,740,351 |
| Bonds & government securities | 642,880,961 |
| Real estate | 537,258,408 |
| Private equity | 84,185,928 |
| Securities lending | 309,769,129 |
| Pooled investments | 237,657,224 |
| Capital assets | 1,274,497 |
| Accounts payable | (354,385,769) |
| **Total Current Assets** | **$ 2,974,461,633** |

# ASSET INFORMATION USED FOR VALUATION

## *Reserve Accounts**

| Funds | Fund Balances | |
|-------|---------------|---|
| | June 30, 2012 & | June 30, 2011 |
| Annuity Savings | $  198,566,556 | $  229,666,031 |
| Annuity Reserve # | 17,260,868 | 9,447,153 |
| Total Annuity Funds | 215,827,424 | 239,113,184 |
| | | |
| Pension Accumulation | (45,910,951) | 124,574,896 |
| Pension Reserve | 2,804,974,749 | 2,745,818,143 |
| Accrued Liability Fund Reserve | 694,971,515 | 689,859,074 |
| Survivor Benefit | 5,596,867 | 5,394,571 |
| Total Pension Funds | 3,459,632,180 | 3,565,646,684 |
| | | |
| Total Fund Balances | $3,675,459,604 | $3,804,759,868 |

# *Actual balance was reported to be $31,447,153 as of June 30, 2011. Amount shown is net of $22 million transfer to Pension Accumulation Fund.*

## *Revenues and Expenditures**

| | Pension Funds & | Annuity Funds | Total Funds |
|---|---|---|---|
| Balance, July 1, 2011 | $3,565,646,684 | $  239,113,184 | $3,804,759,868 |
| Prior Valuation Audit Adjustment | 0 | 0 | 0 |
| Balance July 1, 2011 after Adjustment | 3,565,646,684 | 239,113,184 | 3,804,759,868 |
| | | | |
| Revenues | | | |
| Member Contributions | 0 | 9,538,384 | 9,538,384 |
| Employer Contributions | 49,760,229 | 0 | 49,760,229 |
| Recognized Investment Income | 127,401,039 | 10,587,959 | 137,988,998 |
| Transfers | 229,392 | (229,392) | 0 |
| Total | $  177,390,660 | $  19,896,951 | $  197,287,611 |
| Expenditures | | | |
| Benefit Payments | 278,104,785 | 0 | 278,104,785 |
| Refund of Member Contributions | 0 | 43,182,711 | 43,182,711 |
| Administrative Expenses | 5,300,379 | 0 | 5,300,379 |
| Total | $  283,405,164 | $  43,182,711 | $  326,587,875 |
| | | | |
| Balance, June 30, 2012 | $3,459,632,180 | $215,827,424 | $3,675,459,604 |
| | | | |
| Funding Value Rate of Return | 3.7% | 4.8% | 3.8% |

*    *Excludes the Market Stabilization Fund.*

# FUNDING VALUE OF ASSETS

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| A. Funding Value Beginning of Year | $ 3,853,279,381 | $ 3,804,759,868 | | | | | |
| B. Market Value End of Year | 3,380,091,601 | 2,974,461,633 | | | | | |
| C. Market Value Beginning of Year | 3,017,949,235 | 3,380,091,601 | | | | | |
| D. Contributions During Year: | | | | | | | |
| D1. City Contributions (End of Year) | 81,642,112 | 49,760,229 | | | | | |
| D2. Member Contributions | 10,453,905 | 9,538,384 | | | | | |
| E. Expenses: | | | | | | | |
| E1. Benefits Paid During Year | 339,301,840 | 321,287,496 | | | | | |
| E2. Administrative Expenses | 5,486,680 | 5,300,379 | | | | | |
| F. Investment Income: | | | | | | | |
| F1. Market Total: B - C - D + E | 614,834,869 | (138,340,706) | | | | | |
| F2. Assumed Rate | 8.0% | 8.0% | | | | | |
| F3. Amount for Immediate Recognition | 298,154,650 | 293,689,219 | | | | | |
| F4. Amount for Phased-In Recognition: F1-F3 | 316,680,219 | (432,029,925) | | | | | |
| G. Phased-In Recognition of Investment Income: | | | | | | | |
| G1. Current Year: F4/7 | 45,240,031 | (61,718,561) | | | | | |
| G2. 1st Prior Year | (139,221,691) | 45,240,031 | $ (61,718,561) | | | | |
| G3. 2nd Prior Year | | (139,221,691) | 45,240,031 | $ (61,718,561) | | | |
| G4. 3rd Prior Year | | | (139,221,691) | 45,240,031 | $ (61,718,561) | | |
| G5. 4th Prior Year | | | | (139,221,691) | 45,240,031 | $ (61,718,561) | |
| G6. 5th Prior Year | | | | | (139,221,691) | 45,240,031 | $ (61,718,561) |
| G7. 6th Prior Year | | | | | | (139,221,691) | 45,240,033 |
| G8. Total Recognized Investment Gain | (93,981,660) | (155,700,221) | (155,700,221) | (155,700,221) | (155,700,221) | (155,700,221) | (16,478,528) |
| H. Total Interest Distributed - Current Year: (F3 + G8) | 204,172,990 | 137,988,998 | | | | | |
| I. Funding Value End of Year: | | | | | | | |
| I1. Preliminary Funding Value End of Year: A + D - E + H | 3,804,759,868 | 3,675,459,604 | | | | | |
| I2. Upper Corridor Limit 130% x B | 4,394,119,081 | 3,866,800,123 | | | | | |
| I3. Lower Corridor Limit 70% x B | 2,366,064,121 | 2,082,123,143 | | | | | |
| I4. **Funding Value End of Year** | 3,804,759,868 | 3,675,459,604 | | | | | |
| J. Difference Between Market & Funding Value: (B - I) | (424,668,267) | (700,997,971) | | | | | |
| K. Recognized Rate of Return: H / [ 1/2 (A + I4 - H)] | 5.5% | 3.8% | | | | | |
| L. Market Rate of Return: F1 / [ C - 1/2 (E - D)] | 21.3% | (4.3)% | | | | | |
| M. Ratio of Funding Value to Market Value | 112.6% | 123.6% | | | | | |

The Funding Value of Assets recognizes assumed investment income (line F2) fully each year.  Differences between actual and assumed investment income (line F3) are phased-in over a closed 7-year period.  During periods when investment performance exceeds the assumed rate, Funding Value of Assets will tend to be less than market value.  During periods when investment performance is less than the assumed rate, Funding Value of Assets will tend to be greater than market value.  The Funding Value of Assets is unbiased with respect to Market Value.  At any time it may be either greater or less than Market Value.  If assumed rates are exactly realized for six consecutive years, the Funding Value will become equal to Market Value.

# RETIREES AND BENEFICIARIES JUNE 30, 2012
## TABULATED BY ATTAINED AGE

| Attained Age | Age & Service No. | Age & Service Monthly Allowances | Disability No. | Disability Monthly Allowances | Death-in-Service No. | Death-in-Service Monthly Allowances | Totals No. | Totals Monthly Allowances |
|---|---|---|---|---|---|---|---|---|
| Under 20* | 7 | $ 22,594 | | | 69 | $ 35,808 | 76 | $ 58,402 |
| 20-24 | 1 | 1,726 | | | | | 1 | 1,726 |
| 25-29 | 2 | 3,593 | | | | | 2 | 3,593 |
| 30-34 | 3 | 4,648 | 24 | $ 71,762 | 5 | 8,696 | 32 | 85,106 |
| 35-39 | 8 | 13,621 | 49 | 150,418 | 9 | 15,331 | 66 | 179,370 |
| 40-44 | 23 | 26,934 | 77 | 240,769 | 11 | 18,006 | 111 | 285,709 |
| 45-49 | 146 | 360,329 | 107 | 305,332 | 11 | 18,997 | 264 | 684,658 |
| 50-54 | 236 | 590,189 | 119 | 321,749 | 17 | 29,814 | 372 | 941,752 |
| 55-59 | 625 | 1,700,132 | 204 | 544,291 | 40 | 72,551 | 869 | 2,316,974 |
| 60-64 | 1,343 | 4,141,460 | 451 | 1,068,395 | 48 | 78,793 | 1,842 | 5,288,648 |
| 65-69 | 1,234 | 3,524,131 | 402 | 929,513 | 38 | 63,014 | 1,674 | 4,516,658 |
| 70-74 | 748 | 1,987,570 | 155 | 350,989 | 22 | 35,232 | 925 | 2,373,791 |
| 75-79 | 439 | 1,011,855 | 65 | 162,853 | 13 | 25,997 | 517 | 1,200,705 |
| 80-84 | 560 | 1,258,820 | 87 | 210,186 | 29 | 53,323 | 676 | 1,522,329 |
| 85-89 | 606 | 1,252,812 | 74 | 176,580 | 24 | 46,227 | 704 | 1,475,619 |
| 90-94 | 230 | 432,994 | 23 | 58,522 | 7 | 12,698 | 260 | 504,214 |
| 95 & Over | 54 | 101,227 | 4 | 10,428 | 2 | 4,098 | 60 | 115,753 |
| **Totals** | **6,265** | **$16,434,635** | **1,841** | **$4,601,787** | **345** | **$518,585** | **8,451** | **$21,555,007** |

*   *May include records with defective birth dates.*

## INACTIVE VESTED MEMBERS JUNE 30, 2012

| Attained Age | No. | Estimated Annual Allowances |
|---|---|---|
| Under 40 | 36 | $ 582,341 |
| 40-44 | 39 | 673,073 |
| 45-49 | 33 | 691,444 |
| 50-54 | 21 | 513,661 |
| 55-59 | 13 | 292,754 |
| 60-64 | 15 | 366,261 |
| 65 & over | 17 | 508,806 |
| **Totals** | **174** | **$3,628,340** |

13-53846-tjt   Doc 8392   Filed 11/21/14   Entered 11/21/14 18:04:24   Page 87 of 505

# PRE-1969 RETIREES AND BENEFICIARIES JUNE 30, 2012
## TABULATED BY ATTAINED AGE

| Attained Age | Age & Service# No. | Age & Service# Monthly Allowances | Disability# No. | Disability# Monthly Allowances | Death-in-Service No. | Death-in-Service Monthly Allowances | Totals No. | Totals Monthly Allowances |
|---|---|---|---|---|---|---|---|---|
| Under 20* | | | | | | | | |
| 20-24 | | | | | | | | |
| 25-29 | | | | | | | | |
| 30-34 | 1 | $ 958 | 1 | $ 2,534 | | | 2 | $ 3,492 |
| 35-39 | 2 | 2,615 | | | | | 2 | 2,615 |
| 40-44 | 1 | 1,054 | | | | | 1 | 1,054 |
| 45-49 | 0 | 0 | | | | | 0 | 0 |
| 50-54 | 6 | 6,409 | | | | | 6 | 6,409 |
| 55-59 | 5 | 5,972 | | | 2 | $ 3,812 | 7 | 9,784 |
| 60-64 | 27 | 43,658 | 1 | 1,035 | 9 | 17,194 | 37 | 61,887 |
| 65-69 | 266 | 524,760 | 127 | 282,376 | 13 | 24,159 | 406 | 831,295 |
| 70-74 | 383 | 811,574 | 111 | 245,089 | 18 | 28,949 | 512 | 1,085,612 |
| 75-79 | 300 | 610,654 | 47 | 104,797 | 10 | 18,552 | 357 | 734,003 |
| 80-84 | 366 | 733,835 | 78 | 183,284 | 28 | 49,821 | 472 | 966,940 |
| 85-89 | 519 | 1,025,972 | 70 | 166,466 | 23 | 44,188 | 612 | 1,236,626 |
| 90-94 | 222 | 416,399 | 23 | 58,522 | 6 | 11,995 | 251 | 486,916 |
| 95 & Over | 52 | 99,080 | 4 | 10,428 | 2 | 4,098 | 58 | 113,606 |
| **Totals** | **2,150** | **$4,282,940** | **462** | **$1,054,531** | **111** | **$202,768** | **2,723** | **$5,540,239** |

\*   May include records with defective birth dates.
\#   Includes survivor beneficiaries of service and disability retirees.

### Police Members

| Attained Age | Years of Service to Valuation Date | | | | | | | Totals | |
|---|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30 Plus | No. | Valuation Payroll |
| Under 20 | | | | | | | | | |
| 20-24 | 30 | | | | | | | 30 | $ 1,231,765 |
| 25-29 | 117 | 27 | 1 | | | | | 145 | 6,534,859 |
| 30-34 | 78 | 61 | 160 | 5 | | | | 304 | 15,598,404 |
| 35-39 | 38 | 33 | 286 | 154 | | | | 511 | 27,807,802 |
| 40-44 | 22 | 15 | 276 | 326 | 25 | 1 | | 665 | 37,541,444 |
| 45-49 | 9 | 12 | 108 | 147 | 61 | 96 | | 433 | 25,359,283 |
| 50-54 | 5 | 2 | 38 | 50 | 34 | 144 | 4 | 277 | 16,691,359 |
| 55-59 | | 2 | 6 | 19 | 18 | 101 | 39 | 185 | 11,587,335 |
| 60 | | 1 | | | 1 | 12 | 12 | 26 | 1,675,151 |
| 61 | | | | | 1 | 9 | 9 | 19 | 1,217,374 |
| 62 | | | | 1 | 1 | 3 | 3 | 8 | 478,845 |
| 63 | | 1 | 2 | | | 2 | 9 | 14 | 848,624 |
| 64 | | | | | 1 | 1 | 8 | 10 | 591,402 |
| 65 | 1 | | | | 1 | | 4 | 6 | 379,188 |
| 68 | | | | | | | 1 | 1 | 53,237 |
| 69 | | | | | | | 2 | 2 | 121,232 |
| 70 | | | | | | | 2 | 2 | 121,682 |
| 73 | | | | | | | 2 | 2 | 121,232 |
| Totals | 300 | 154 | 877 | 702 | 143 | 369 | 95 | 2,640 | $147,960,218 |

### Fire Members

| Attained Age | Years of Service to Valuation Date | | | | | | | Totals | |
|---|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30 Plus | No. | Valuation Payroll |
| Under 20 | | | | | | | | | |
| 20-24 | | | | | | | | | |
| 25-29 | 1 | 8 | 1 | | | | | 10 | $ 460,788 |
| 30-34 | 5 | 37 | 50 | 1 | | | | 93 | 4,853,700 |
| 35-39 | 1 | 33 | 90 | 18 | | | | 142 | 7,670,494 |
| 40-44 | 2 | 12 | 87 | 70 | 48 | 1 | | 220 | 12,720,162 |
| 45-49 | 1 | 3 | 27 | 48 | 103 | 42 | 1 | 225 | 14,377,889 |
| 50-54 | | 1 | 15 | 21 | 62 | 56 | 8 | 163 | 10,676,538 |
| 55-59 | | 1 | 1 | 3 | 13 | 31 | 42 | 91 | 6,837,514 |
| 60 | | | | | | 1 | 2 | 3 | 242,975 |
| Totals | 10 | 95 | 271 | 161 | 226 | 131 | 53 | 947 | $57,840,060 |

| Attained Age | Years of Service to Valuation Date | | | | | | | Totals | |
|---|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30 Plus | No. | Valuation Payroll |
| Under 20 | | | | | | | | | |
| 20-24 | 30 | | | | | | | 30 | $ 1,231,765 |
| 25-29 | 118 | 35 | 2 | | | | | 155 | 6,995,647 |
| 30-34 | 83 | 98 | 210 | 6 | | | | 397 | 20,452,104 |
| 35-39 | 39 | 66 | 376 | 172 | | | | 653 | 35,478,296 |
| 40-44 | 24 | 27 | 363 | 396 | 73 | 2 | | 885 | 50,261,606 |
| 45-49 | 10 | 15 | 135 | 195 | 164 | 138 | 1 | 658 | 39,737,172 |
| 50-54 | 5 | 3 | 53 | 71 | 96 | 200 | 12 | 440 | 27,367,897 |
| 55-59 | | 3 | 7 | 22 | 31 | 132 | 81 | 276 | 18,424,849 |
| 60 | | 1 | | | 1 | 13 | 14 | 29 | 1,918,126 |
| 61 | | | | | 1 | 9 | 9 | 19 | 1,217,374 |
| 62 | | | | 1 | 1 | 3 | 3 | 8 | 478,845 |
| 63 | | 1 | 2 | | | 2 | 9 | 14 | 848,624 |
| 64 | | | | | 1 | 1 | 8 | 10 | 591,402 |
| 65 | 1 | | | | 1 | | 4 | 6 | 379,188 |
| 67 | | | | | | | | | |
| 68 | | | | | | | 1 | 1 | 53,237 |
| 69 | | | | | | | 2 | 2 | 121,232 |
| 70 | | | | | | | 2 | 2 | 121,682 |
| 72 | | | | | | | | | |
| 76 | | | | | | | | | |
| **Totals** | **310** | **249** | **1,148** | **863** | **369** | **500** | **148** | **3,587** | **$205,800,278** |

| | Group Averages | | |
|---|---|---|---|
| | Police | Fire | Total |
| Age: | 42.4 years | 44.5 years | 42.9 years |
| Service: | 15.7 years | 18.4 years | 16.4 years |
| Annual Pay: | $56,046 | $61,077 | $57,374 |

# RECONCILIATION OF REPORTED DATA
## AS OF JUNE 30, 2012

## Active Data

A)  Number of records reported on data file:     3,842

B)  Number of records excluded due to
    inactive status in "EmployeeMaster" file     255

C)  Number defective:                            -

D)  Number valued:                               3,587

## Retired Data

A)  Number of records reported on data file #:   37,883

B)  Number not in P/F plan #:                    23,760

C)  Number not currently in receipt:             5,672

D)  Number defective:                            -

E)  Number valued:                               8,451

## Deferred Data

A)  Number of records reported on data file:     195

B)  Number of records with reported service
    less than 8 years:                           18

C)  Number defective:                            3

D)  Number valued:                               174

#   For retiree data, file contains members in Police and Fire Retirement system and General Retirement System.

# ACTUARIAL DISCLOSURES REQUIRED BY STATEMENT NO. 25 OF THE GOVERNMENTAL ACCOUNTING STANDARDS BOARD

**This information is presented in draft form for review by the System's auditor. Please let us know if there are any items that the auditor changes so that we may maintain consistency with the System's financial statements.**

# GASB STATEMENT NO. 25 REQUIRED SUPPLEMENTARY INFORMATION

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Schedule of Funding Progress | | | Funded Ratio (a / b) | Covered Payroll (c) | UAAL as a % of Covered Payroll ((b - a) / c) |
|---|---|---|---|---|---|---|---|
| | | Actuarial Accrued Liability (AAL) -- Entry Age (b) | Unfunded AAL (UAAL) (b - a) | | | | |
| 2000* | $3,964,231,470 | $3,342,123,550 | $(622,107,920) | | 118.6% | $237,741,560 | - |
| 2001 | 3,900,020,703 | 3,463,248,393 | (436,772,310) | | 112.6% | 253,297,027 | - |
| 2002# | 3,635,106,581 | 3,631,971,448 | (3,135,133) | | 100.1% | 248,663,133 | - |
| 2003 | 3,205,516,657 | 3,721,593,210 | 516,076,553 | | 86.1% | 248,681,461 | 207.5 % |
| 2004 | 3,074,516,589 | 3,857,493,282 | 782,976,693 | | 79.7% | 258,699,581 | 302.7 % |
| 2005@& | 3,757,884,417 | 3,780,447,414 | 22,562,997 | | 99.4% | 250,491,872 | 9.0 % |
| 2006& | 3,980,254,576 | 3,808,952,741 | (171,301,835) | | 104.5% | 228,140,160 | - |
| 2007*& | 4,307,194,763 | 3,896,814,229 | (410,380,534) | | 110.5% | 230,173,964 | - |
| 2008# | 4,316,263,291 | 4,071,053,752 | (245,209,539) | | 106.0% | 232,812,606 | - |
| 2009 | 3,945,205,453 | 4,221,291,045 | 276,085,592 | | 93.5% | 231,795,528 | 119.1 % |
| 2010#* | 3,853,279,381 | 3,767,364,201 | (85,915,180) | | 102.3% | 228,829,999 | - |
| 2011 | 3,804,759,868 | 3,808,642,533 | 3,882,665 | | 99.9% | 220,461,691 | 1.8 % |
| 2012# | 3,675,459,604 | 3,822,676,002 | 147,216,398 | | 96.1% | 205,800,278 | 71.5 % |

* Plan amended.
# After changes in actuarial assumptions and/or methods.
@ After POC transfer.
& 2005 and 2006 assets were revised following the June 30, 2006 valuation. 2007 assets were revised after the June 30, 2007 valuation.

## SCHEDULE OF EMPLOYER CONTRIBUTIONS

| Fiscal Year Ended June 30 | Reported Employer Contributions | |
|---|---|---|
| | From Pension Obligation Certificates (POCs) | Employer Contributions Other than from POCs |
| 2000 | | $ 19,972,058 |
| 2001 | | 14,443,382 |
| 2002 | | 8,449,645 |
| 2003 | | 66,843,029 |
| 2004 | | 69,475,202 |
| 2005 | $ 630,829,189 | 51,602,596 |
| 2006& | | 57,766,542 |
| 2007 | | 57,423,366 |
| 2008 | | 33,934,636 |
| 2009@ | | 36,151,057 |
| 2010 | | 32,808,485 |
| 2011 | | 81,642,112 |
| 2012@ | | 49,760,229 |

& 2006 assets were revised following the 6/30/2006 valuation.
@ Contribution receivable.

The information presented in the required supplementary schedules was determined as part of the actuarial valuations at the dates indicated. Additional information as of the latest actuarial valuation follows:

| | |
|---|---|
| Valuation date | June 30, 2012 |
| Actuarial cost method | Entry Age |
| Amortization method | Level dollar, closed |
| Remaining amortization period | 29 years |
| Asset valuation method | 7-year smoothed market |

Actuarial assumptions:

| | |
|---|---|
| Investment rate of return | 8.0% |
| Projected salary increases* | 5.0% - 9.2% |
| *Includes inflation at | 0% for two years; 4% thereafter |
| Cost-of-living adjustments | Pre-1969 Plan Members: Allowances increase in proportion to active member compensation for corresponding rank. |
| | 1969 Plan Members: Pensions increase by 2.25% of current pension amount each July 1. |

Membership of the plan consisted of the following at June 30, 2012, the date of the latest actuarial valuation:

| | |
|---|---|
| Retirees and beneficiaries receiving benefits | 8,451 |
| Terminated plan members entitled to but not yet receiving benefits | 174 |
| Active plan members | 3,587 |
| **Total** | **12,212** |

# FINANCIAL PRINCIPLES



**% OF ACTIVE EMPLOYEE PAYS**

PAY-AS-YOU-GO CONTRIBUTIONS

INVESTMENT INCOME

LEVEL CONTRIBUTIONS

CASH BENEFITS

CONTRIBUTIONS: EMPLOYER AND EMPLOYEE COMBINED

START

50 ±

**YEARS OF TIME**

**CASH BENEFITS LINE.** This relentlessly increasing line is the fundamental reality of retirement plan financing. It happens each time a new benefit is added for future retirements (and happens regardless of the design for contributing for benefits).

**LEVEL CONTRIBUTION LINE.** Determining the level contribution line requires detailed assumptions concerning a variety of experiences in future decades, including:

Economic Risk Areas

Rates of investment return

Rates of pay increase

Changes in active member group size

Non-Economic Risk Areas

Ages at actual retirement

Rates of mortality

Rates of withdrawal of active members (turnover)

Rates of disability

**The financing diagram** on the opposite page shows the relationship between two different philosophies of paying for retirement benefits: the method where contributions match cash benefit payments (as in the Federal Social Security program) is an **increasing contribution method**; and the **level contribution method** which seeks to balance contributions between generations.

**The actuarial valuation** is the mathematical process by which the level contribution rate is determined, and the flow of activity constituting the valuation may be summarized as follows:

A. **Member Census Data:**

      Retired lives now receiving benefits

      Former members with vested benefits

      Active members

B. **Benefit provisions** that establish eligibility and amounts of payments to members

C. **Asset Data** (cash & investments)

D. **Assumptions concerning future experience in various risk areas**, which are established by the Board of Trustees and the City Council after consulting with the actuary

E. **The funding method** for employer contributions (the long-term, planned pattern for employer contributions)

F. **Mathematically combining the assumptions, the funding method, and the data**

G. **Determination** of:

      Plan Financial position and

      New Employer Contribution Rate

# BASIC FINANCIAL OBJECTIVE AND OPERATION
## OF THE RETIREMENT SYSTEM

**Benefit Promises Made Which Must Be Paid For.** A retirement program is an orderly means of handing out, keeping track of, and financing contingent pension promises to a group of employees. As each member of the retirement program acquires a unit of service credit they are, in effect, handed an "IOU" which reads: **"The Retirement System promises to pay you one unit of retirement benefits, payments in cash commencing when you retire."**

The principal related financial question is: When shall the money required to cover the "IOU" be contributed? This year, when the benefit of the member's service is received? Or, some future year when the "IOU" becomes a cash demand?

The **Constitution of the State of Michigan** is directed to the question:

> **"Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."**

This retirement system meets this constitutional requirement by having the following *Financial Objective: To establish and receive contributions, expressed as percents of active member payroll, which will remain approximately level* from year to year and will not have to be increased for future generations of taxpayers.

Translated into actuarial terminology, a level percent-of-payroll contribution objective means that the contribution rate must be at least:

> *Normal Cost* (the value of benefits likely to be paid which is assigned to service being rendered in the current year)
>
> . . . plus . . .
>
> *Interest on the Unfunded Actuarial Accrued Liability* (the difference between the actuarial accrued liability and current system assets).

If contributions to the retirement program are less than the preceding amount, the difference, plus investment earnings not realized thereon, will have to be contributed at some later time, or, benefits will have to be reduced, to satisfy the fundamental fiscal equation under which all retirement programs must operate; that is:

$$B = C + I - E$$

__Benefit__ payments to any group of members and their beneficiaries cannot exceed the sum of:

   __Contributions__ received over time on behalf of the group

   . . . plus . . .

   __Investment__ earnings on contributions received and not required for immediate payment of benefits

   . . . minus . . .

   __Expenses__ incurred in operating the program.

There are retirement programs designed to defer the bulk of contributions far into the future. Contributions in early years are low, but the inevitable consequence is a relentlessly increasing contribution rate – to a level greatly in excess of the level percent of payroll rate. ***This method of financing is prohibited in Michigan by the state constitution***.

A by-product of the level percent-of-payroll contribution objective is the accumulation of invested assets for varying periods of time. Investment income becomes the major contributor to the retirement program, and the amount is directly related to the amount of past contributions and investment performance.

**Computed Contribution Rate Needed To Finance Benefits**. From a given schedule of benefits and from the data furnished, the contribution rate is calculated ***by means of an actuarial valuation*** – the technique of assigning monetary values to the risks assumed in operating a retirement program.

# APPENDIX

# SUMMARY OF ASSUMPTIONS USED FOR DPFRS ACTUARIAL VALUATION
## ASSUMPTIONS ADOPTED BY BOARD OF TRUSTEES
### AFTER CONSULTING WITH ACTUARY

## ASSUMPTION REVIEW

As required by City Ordinance, assumptions are formally reviewed every 5 years and changes are recommended as experience emerges. The results of this study (including the actuary's recommendation) are detailed in a report called an Experience Study. The last Experience Study covered the 5-year period ending June 30, 2007.

## ECONOMIC ASSUMPTIONS

**The investment return rate** used in the valuation was 8.0% per year, compounded annually (net after investment expenses). The real rate of return is the portion of total investment return which is more than the inflation rate. Considering other financial assumptions, the 8.0% total investment return rate translates to an assumed real rate of return of 4.0% over wage inflation. This assumption was first used for the June 30, 2010 valuation. It was adopted by the Board outside of the routine 5-year experience studies at the request of the Employer.

**Pay increase assumptions** for individual active members are shown on page 33. Part of the assumption for each age is for a merit and/or seniority increase, and the other recognizes wage inflation (assumed to be 0% for the next 2 years and 4% per year thereafter).

## NON-ECONOMIC ASSUMPTIONS

**The number of active members** is assumed to decrease over time since the Plan is closed.

**The mortality table** used to measure retired life mortality was 95% of the RP-2000 Combined Table for males and 100% of the RP-2000 Combined Table set back 2 years for females. No provision is currently made for future improvements in mortality after the measurement date. Related values are shown on page 33. This table was first used for the June 30, 2008 valuation. For disabled members, a 10 year set forward of the healthy rates was used to measure post-retirement mortality.

**The probabilities of age/service retirement** for members eligible to retire are shown on page 34. Probabilities for service eligibility were first used for the June 30, 2008 valuation.

**The probabilities of separation** from service (including *death-in-service*) are shown for sample ages on page 35. These probabilities were first used for the June 30, 2008 valuation.

# MISCELLANEOUS AND TECHNICAL ASSUMPTIONS
## JUNE 30, 2012

**Marriage Assumption:** 100% of males and 100% of females are assumed to be married for purposes of death-in-service benefits. This assumption is high to account for potential dependent children/dependent parent death benefits. Male spouses are assumed to be three years older than female spouses.

**Pay Increase Timing:** End of (Fiscal) year. This is equivalent to assuming that reported pays represent amounts paid to members during the year beginning the day after the valuation date.

**Decrement Timing:** Decrements are assumed to occur mid-year.

**Eligibility Testing:** Eligibility for benefits is determined based upon the age nearest birthday and exact fractional service nearest the date the decrement is assumed to occur.

**Decrement Relativity:** Decrement rates are used directly from the experience study, without adjustment for multiple decrement table effects.

**Decrement Operation:** Disability and mortality decrements do not operate during the first 5 years of service. Disability and withdrawal do not operate during retirement eligibility.

**Incidence of Contributions:** Member contributions are assumed to be received continuously throughout the year. Employer contributions are assumed to be received on the last day of the fiscal year.

**Longevity in AFC:** Longevity payments included in the computation of Average Final Compensation were assumed to increase age and service costs by 4% and disability and death-in-service costs by 2%.

**Unused Sick Leave Payout:** The normal cost was increased by 1.0% of payroll to account for the inclusion of a percentage of unused sick leave banks in the determination of AFC.

**Post-Retirement COLA:** Active members are assumed to receive a 1.9% COLA rather than 2.25% because the annuity portion is not subject to the COLA. Post retirement increases for retired members were based on the plan in effect at retirement. For the pre-69 plan members, future COLA's are assumed to be the same as wage inflation for active members. The COLA rate is prorated by the ratio of COLA eligible service to total service at retirement.

**FAC Period:** 1 year FAC period was used.

**Disability Change Age:** The duty disability benefit is assumed to change at normal retirement age.

**Administrative Expense Load:** 2.50% of pay is added to the normal cost to account for administrative expenses.

**Miscellaneous Loads:** Normal retirement accrued liability (excluding DROP members) was increased by 3% for service purchases. Active accrued liability (excluding DROP members) was increased by 1% to approximate the effect of incomplete service data.

**DROP Assumption:** Members are assumed to DROP upon first eligibility and stay in the DROP program for 5 years.

***The entry age actuarial cost method*** was used in determining age and service liabilities and normal cost, vesting liabilities and normal cost, and casualty liabilities and normal cost.

***Differences between assumed experience and actual experience*** ("actuarial gains and losses") become part of actuarial accrued liabilities.

***Unfunded actuarial accrued liabilities, if any,*** are amortized over periods of future years to produce contribution amounts (principal & interest) which are level dollar contributions.

***Employer contribution dollars*** were assumed to be *paid in a single sum on the last day* of the employer fiscal year.  (Adopted for the 6-30-79 actuarial valuation.)

***Valuation assets*** recognize investment return above or below the actuarial assumed rate over a seven year period.  (Adopted for the 6-30-10 actuarial valuation.)

---

***The data about persons now covered and about present assets*** was furnished by the System's administrative staff.  Although examined for general reasonableness, the data was not audited by the actuary.

For valuation purposes, members are categorized as DPOA, DFFA or LSA based on class codes provided by the retirement system and are primarily used in the valuation to determine normal retirement eligibility (20&Out versus 25&out).  Therefore, counts in the valuation may not represent actual membership in the respective associations.

**The actuarial valuation computations were made by or under the supervision of a Member of the American Academy of Actuaries (M.A.A.A.).**

# SAMPLE SALARY ADJUSTMENT RATES

| | Salary Increase Assumptions for an Individual Member | | |
|---|---|---|---|
| Service | Merit & Seniority | Base (Economic) | Increase Next Year |
| 5 | 5.20% | 4.00% | 9.20% |
| 10 | 1.70% | 4.00% | 5.70% |
| 15 | 1.00% | 4.00% | 5.00% |
| 20 | 1.00% | 4.00% | 5.00% |
| 25 | 1.00% | 4.00% | 5.00% |
| 30 | 1.00% | 4.00% | 5.00% |
| 35 | 1.00% | 4.00% | 5.00% |
| Ref | | | 306    +    4.00% |

Select and ultimate wage inflation rates are assumed to be 0% for the next 2 years and 4% thereafter.

# SINGLE LIFE RETIREMENT VALUES
## BASED ON RP-2000 COMBINED & 8.0% INTEREST
## 95% OF MALE RATES SET-BACK 0 YEARS
## 100% OF FEMALE RATES SET-BACK 2 YEARS

| Sample Attained Ages | Present Value of $1.00 Monthly Increasing "X"% Annually After Retirement | | | | | | Future Life Expectancy (years) | |
|---|---|---|---|---|---|---|---|---|
| | 4.0% Compound | | 2.25% Simple | | 2.25% Compound | | | |
| | Men | Women | Men | Women | Men | Women | Men | Women |
| 45 | $ 224.52 | $ 236.82 | $ 173.21 | $ 178.99 | $ 180.46 | $ 187.39 | 35.97 | 40.28 |
| 50 | 208.32 | 222.62 | 164.68 | 172.13 | 170.60 | 179.24 | 31.24 | 35.49 |
| 55 | 189.54 | 206.05 | 153.76 | 163.26 | 158.37 | 169.04 | 26.61 | 30.77 |
| 60 | 168.51 | 187.03 | 140.39 | 152.02 | 143.78 | 156.51 | 22.16 | 26.17 |
| 65 | 145.94 | 166.04 | 124.89 | 138.53 | 127.22 | 141.84 | 18.00 | 21.78 |
| 70 | 122.74 | 144.03 | 107.85 | 123.36 | 109.33 | 125.65 | 14.23 | 17.75 |
| 75 | 99.47 | 121.39 | 89.64 | 106.67 | 90.50 | 108.15 | 10.88 | 14.08 |
| 80 | 77.33 | 98.98 | 71.33 | 89.14 | 71.77 | 90.01 | 8.02 | 10.85 |
| Ref: | 506  x  0.95 | 507  x  1.00 | 506  x  0.95 | 507  x  1.00 | 506  x  0.95 | 507  x  1.00 | | |

# PROBABILITIES OF SERVICE RETIREMENT

| Service | Percent of Eligible Active Members Retiring Within Next Year | | | |
|---|---|---|---|---|
| | Police | | Fire | |
| 19 | 25% | | 15% | |
| 20 | 18% | | 12% | |
| 21 | 18% | | 12% | |
| 22 | 18% | | 12% | |
| 23 | 18% | | 12% | |
| 24 | 18% | 35% | 12% | 15% |
| 25 | 18% | 25% | 12% | 15% |
| 26 | 18% | 20% | 12% | 12% |
| 27 | 18% | 20% | 12% | 12% |
| 28 | 18% | 20% | 12% | 12% |
| 29 | 18% | 18% | 15% | 12% |
| 30 | 18% | 18% | 15% | 12% |
| 31 | 18% | 18% | 15% | 12% |
| 32 | 20% | 20% | 15% | 12% |
| 33 | 25% | 25% | 20% | 20% |
| 34 | 30% | 30% | 25% | 20% |
| 35 | 30% | 30% | 30% | 30% |
| 36 | 30% | 30% | 30% | 35% |
| 37 | 30% | 30% | 30% | 35% |
| 38 | 30% | 30% | 30% | 35% |
| 39 | 30% | 30% | 30% | 35% |
| 40 | 100% | 100% | 100% | 100% |
| Ref | 1548 | 823 | 1549 | 1639 |

| Age | Percent of Eligible Active Members Retiring Within Next Year | |
|---|---|---|
| | Police | Fire |
| 60 | 25% | 100% |
| 61 | 25% | 100% |
| 62 | 25% | 100% |
| 63 | 22% | 100% |
| 64 | 20% | 100% |
| 65 | 18% | 100% |
| 66 | 15% | 100% |
| 67 | 15% | 100% |
| 68 | 15% | 100% |
| 69 | 15% | 100% |
| 70 | 100% | 100% |
| Ref | 1638 | 1 |

Members eligible for 20 & out are assumed to be first eligible for normal retirement after 19 years of service due to their ability to purchase service. Members eligible for 25 & out are assumed to be eligible for normal retirement after 25 years of service due to their ability to purchase service.

| Sample Ages | Years of Service | % of Active Members Separating Within Next Year | | | |
|---|---|---|---|---|---|
| | | Withdrawal | | Death | |
| | | Police | Fire | Male | Female |
| ALL | 0 | 8.50% | 5.00% | | |
| | 1 | 7.50% | 4.00% | | |
| | 2 | 6.00% | 3.00% | | |
| | 3 | 5.00% | 2.00% | | |
| | 4 | 4.50% | 2.00% | | |
| 25 | 5 & Over | 4.50% | 1.96% | 0.03% | 0.01% |
| 30 | | 3.30% | 1.62% | 0.03% | 0.02% |
| 35 | | 2.30% | 1.11% | 0.06% | 0.03% |
| 40 | | 1.70% | 0.77% | 0.08% | 0.04% |
| 45 | | 1.50% | 0.60% | 0.11% | 0.07% |
| 50 | | 1.10% | 0.51% | 0.16% | 0.11% |
| 55 | | 0.80% | 0.51% | 0.27% | 0.17% |
| 60 | | 0.80% | 0.51% | 0.51% | 0.29% |
| Ref | | 566 | 230 | 506   x   .75 | 507   x   .75 |
| | | 207 | 113  x  .85 | | |

| Sample Ages | % of Active Members Becoming Disabled Within Next Year | | | |
|---|---|---|---|---|
| | Police | | Fire | |
| | Ordinary | Duty | Ordinary | Duty |
| 25 | 0.06% | 0.13% | 0.07% | 0.34% |
| 30 | 0.07% | 0.19% | 0.08% | 0.52% |
| 35 | 0.08% | 0.34% | 0.09% | 0.90% |
| 40 | 0.11% | 0.49% | 0.12% | 1.30% |
| 45 | 0.16% | 0.73% | 0.18% | 1.92% |
| 50 | 0.47% | 1.16% | 0.53% | 3.06% |
| 55 | 0.73% | 1.96% | 0.82% | 5.18% |
| 60 | 0.83% | 2.82% | 0.94% | 7.47% |
| Ref | 105   x   0.75 | 90   x   0.85 | 105   x   0.85 | 90   x   2.25 |

# MEANING OF "UNFUNDED ACTUARIAL ACCRUED LIABILITIES"

*Actuarial accrued liabilities* are *the portion of the present value of plan promises to pay benefits in the future not covered by future normal cost contributions* --- a liability has been established ("accrued") because the service has been rendered, but the resulting monthly cash benefit may not be payable until years in the future.

If actuarial accrued liabilities at any time exceed the plan's accrued assets (cash & investments), the difference is *unfunded actuarial accrued liabilities*. If the plan's assets equal the plan's actuarial accrued liabilities, the plan would be termed "fully funded."

Each time a plan adds a new benefit which applies to service already rendered, an actuarial accrued liability is created. If assets are insufficient to cover the value of the new benefit promises, an additional unfunded actuarial accrued liability is also created. Payment for such unfunded accrued liabilities is generally spread over a period of years, commonly in the 15-30 year range.

Unfunded actuarial accrued liabilities can occur in another way: if actual financial experience is less favorable than assumed financial experience, the difference is added to unfunded actuarial accrued liabilities. For example, during periods of high inflation, unfunded actuarial accrued liabilities generally increase because unexpected rates of pay increase will create additional liabilities which may not be matched by investment performance.

The existence of unfunded actuarial accrued liabilities is not bad, but the changes from year to year in the amount of unfunded actuarial accrued liabilities are important -- "bad" or "good" or somewhere in between.

Unfunded actuarial accrued liabilities do not represent a bill payable immediately, but it is important that policy-makers prevent the amount from becoming unreasonably high and *it is vital that there is a sound method in place for making payments toward them*, so that they are controlled.

***Actuarial Accrued Liability***.   The difference between (i) the actuarial present value of future plan benefits, and (ii) the actuarial present value of future normal cost.   Sometimes referred to as "accrued liability" or "past service liability."

***Accrued Service***.   The service credited under the plan which was rendered before the date of the actuarial valuation.

***Actuarial Assumptions***.   Estimates of future plan experience with respect to rates of mortality, disability, turnover, retirement, rate or rates of investment income and salary increases.   Decrement assumptions (rates of mortality, disability, turnover and retirement) are generally based on past experience, often modified for projected changes in conditions.   Economic assumptions (salary increases and investment income) consist of an underlying rate in an inflation-free environment plus a provision for a long-term average rate of inflation.

***Actuarial Cost Method***.   A mathematical budgeting procedure for allocating the dollar amount of the "actuarial present value of future plan benefits" between the actuarial present value of future normal cost and the actuarial accrued liability.   Sometimes referred to as the "actuarial funding method."

***Actuarial Equivalent***.   A single amount or series of amounts of equal value to another single amount or series of amounts, computed on the basis of the rate(s) of interest and mortality tables used by the plan.

***Actuarial Present Value***.   The amount of funds presently required to provide a payment or series of payments in the future.   It is determined by discounting the future payments at a predetermined rate of interest, taking into account the probability of payment.

***Amortization***.  Paying off an interest-bearing liability by means of periodic payments of interest and principal, as opposed to paying it off with a lump sum payment.

***Experience Gain (Loss)***.  A measure of the difference between actual experience and that expected based upon a set of actuarial assumptions during the period between two actuarial valuation dates, in accordance with the actuarial cost method being used.

***Normal Cost***.  The annual cost assigned, under the actuarial funding method, to current and subsequent plan years.  Sometimes referred to as "current service cost."  Any payment toward the unfunded actuarial accrued liability is not part of the normal cost.

***Reserve Account***.  An account used to indicate that funds have been set aside for a specific purpose and are not generally available for other uses.

***Unfunded Actuarial Accrued Liability***.  The difference between the actuarial accrued liability and valuation assets.  Sometimes referred to as "unfunded accrued liability."

***Valuation Assets***.  The value of current plan assets recognized for valuation purposes.



**GRS**

**Gabriel Roeder Smith & Company**
Consultants & Actuaries

One Towne Square
Suite 800
Southfield, MI 48076-3723

248.799.9000 phone
248.799.9020 fax
www.gabrielroeder.com

May 22, 2013

Mr. David Cetlinski
Executive Secretary
The Police and Fire Retirement System of the
   City of Detroit
2 Woodward Avenue, Suite 908
Detroit, MI 48226

**Re:  June 30, 2012 Actuarial Valuation**

Dear Dave:

Enclosed are 20 copies of the report of the June 30, 2012 annual actuarial valuation.

Sincerely,

Kenneth G. Alberts

KGA:bd
Enclosures

cc:  Cynthia Thomas, City of Detroit Retirement Systems
     Norman Jones, GRS
     Judith Kermans, GRS

# **EXHIBIT C**



**GRS** Gabriel Roeder Smith & Company
Consultants & Actuaries

# THE GENERAL RETIREMENT SYSTEM OF
# THE CITY OF DETROIT
75TH ANNUAL ACTUARIAL VALUATION
JUNE 30, 2013

# OUTLINE OF CONTENTS

| Section | Pages | Items |
|---------|-------|-------|
| | 1-2 | Cover Letter |
| **A** | | **Retirement System Totals** |
| | 1-2 | Computed employer contributions |
| | 3-4 | Actuarial accrued liabilities |
| | 5 | Comparative schedule of valuation results |
| | 6-8 | Comments |
| | 9 | Solvency tests |
| | 10 | Experience gain (loss) |
| | 11-12 | Asset information furnished for valuation |
| | 13 | Funding value of assets |
| | 14 | History of assets and accrued liabilities (graph) |
| | 15-21 | Member data included in valuation |
| | 22-23 | Summary of benefit provisions |
| **B** | | **Divisions Separately Experience Rated** |
| | 1 | Member data included in valuation |
| | 2 | Assets included in valuation |
| | 3 | Actuarial accrued liabilities |
| | 4 | Member data - historical schedule |
| | 5 | Computed contributions - historical comparison |
| **C** | | **Financial Disclosures** |
| | 1-2 | GASB Statement No. 25 |
| **D** | | **Financial Principles** |
| | 1 | Financing diagram |
| | 2 | Actuarial valuation process |
| | 3-4 | Financial objective |
| **E** | | **Appendix** |
| | 1-7 | Summary of assumptions used in actuarial valuations |
| | 8 | Meaning of unfunded actuarial accrued liabilities |
| | 9-10 | Glossary |

*The General Retirement System of the City of Detroit*

# GRS

Gabriel Roeder Smith & Company
Consultants & Actuaries

One Towne Square
Suite 800
Southfield, MI 48076-3723

248.799.9000 phone
248.799.9020 fax
www.gabrielroeder.com

April 4, 2014

The Board of Trustees
The General Retirement System of the City of Detroit

Dear Board Members:

The results of the **75th Annual Actuarial Valuation** of the annuity and pension liabilities of the General Retirement System of the City of Detroit are presented in this report. This report was prepared at the request of the Board and is intended for use by the Retirement System and those designated or approved by the Board. This report may be provided to parties other than the System only in its entirety and only with the permission of the Board. The purpose of the valuations was to measure the System's funding progress, to determine contribution rates for the 2015 fiscal year in accordance with the established funding policy, and to determine actuarial information for Governmental Accounting Standards Board (GASB) Statements No. 25 and No. 27. The results of the valuation may not be applicable for other purposes. Four divisions are evaluated separately.

The date of the valuation was **June 30, 2013**.

Future actuarial measurements may differ significantly from the current measurements presented in this report due to such factors as: plan experience differing from that anticipated by the economic and demographic assumptions; changes in economic or demographic assumptions; increases or decreases expected as part of the natural operation of the methodology used for these measurements (such as the end of an amortization period or additional cost or contribution requirements based on the plan's funded status); and changes in plan provisions or applicable law. Due to the limited scope of the actuary's assignment, the actuary did not perform an analysis of the potential range of such future measurements.

The valuations were based upon records maintained and furnished by the Retirement System staff concerning active members, retirees and beneficiaries, and financial accounts as of the valuation date. Data was checked for year-to-year consistency, but was not otherwise audited by the actuary. We are not responsible for the completeness or accuracy of the data. The assumptions used in the valuations concerning future financial experience are summarized in the Appendix of this report.

**We presented preliminary valuation results at the March 19, 2014 Board meeting. Subsequent to that meeting, the Retirement System provided additional information for certain members previously excluded from the valuation data files. Based on our analysis, the impact of this additional information was less than our adjustment for missing or incomplete data in our original results. Therefore, we have not incorporated the revised data and results in this final report are unchanged from our March presentation. We recommend staff continue their data cleanup efforts and consider the value of a data audit prior to the next valuation.**

The Board of Trustees
April 4, 2014
Page 2

**Your attention is directed particularly** to the comments on pages A-6 through A-8 and the contribution rates on page A-1.

This report has been prepared by actuaries who have substantial experience valuing public sector retirement systems. To the best of our knowledge, this report is complete and accurate and was made in accordance with Actuarial Standards of Practice promulgated by the Actuarial Standards Board. The actuarial assumptions used for the valuation are set by the Board. Different assumptions would produce different results. The actuarial assumptions are reasonable.

The signing actuaries are independent of the plan sponsor.

David T. Kausch and Judith A. Kermans are Members of the American Academy of Actuaries and meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

The plan sponsor (City of Detroit) is currently in Chapter 9 bankruptcy. Therefore, there is a great deal of uncertainty regarding the structure of the plan (including the level of accrued benefits, future benefits, and funding). If the plan structure changes as a result of the bankruptcy, the Board should consider having this report reissued to account for those changes. This report does not evaluate the plan sponsor's ability to make the required contributions when due. Such an analysis is not within the scope of our assignment. Failure to receive employer contributions on a timely basis could jeopardize the sustainability of the fund.

Respectfully submitted,

David T. Kausch, FSA, EA, MAAA

Judith A. Kermans, EA, MAAA

Kenneth G. Alberts

DTK:sc



# SECTION A
## RETIREMENT SYSTEM TOTALS

# SUMMARY OF COMPUTED EMPLOYER CONTRIBUTION RATES
## 2014-2015 FISCAL YEAR

| Contributions for | Contributions Expressed as a Percent of Payroll | | | | |
|---|---|---|---|---|---|
| | General City@ | D.O.T. | Water/ Sewage | Library | System Total |
| Normal Cost: | | | | | |
|   Age & Service Pensions | 7.58 % | 7.70 % | 7.39 % | 8.35 % | 7.58 % |
|   Disability Pensions | 1.38 % | 1.01 % | 1.38 % | 1.37 % | 1.33 % |
|   Death-in-Service Pensions | 0.29 % | 0.29 % | 0.32 % | 0.27 % | 0.30 % |
|   Administrative Expenses* | 2.90 % | 2.90 % | 2.90 % | 2.90 % | 2.90 % |
| | | | | | |
| Employer Normal Cost | 12.15 % | 11.90 % | 11.99 % | 12.89 % | 12.11 % |
| Other Short Term Expenses& | 2.00 % | 2.00 % | 2.00 % | 2.00 % | 2.00 % |
| | | | | | |
| Unfunded Actuarial Accrued Liabilities# | 27.27 % | 37.03 % | 32.48 % | 18.09 % | 29.72 % |
| | | | | | |
| Estimated Employer Contribution Rates | 41.42 % | 50.93 % | 46.47 % | 32.98 % | 43.83 % |
| Estimated Employer Contributions for FY 2015 ($ mill) | $ 44.6 | $ 16.7 | $ 31.3 | $ 4.6 | $ 97.2 |
| Estimated Employer Contributions for FY 2014 ($ mill) | $ 36.7 | $ 12.1 | $ 28.2 | $ 3.6 | $ 80.6 |

\*   *Includes 0.80% of payroll for defined contribution (DC) payments and 2.10% of payroll for administrative expenses.*
\#   *Unfunded actuarial accrued liabilities (UAAL) were amortized as a level percent of payroll over an open 30-year period.*
@   *Includes COBO Hall.*
&   *Bankruptcy related and/or not expected to occur for more than a few years.*

## COMMENT

The valuation results shown above include an adjustment to account for certain retroactive benefits paid as a result of the 1998 Defined Contribution Plan. The adjustment is based on experience to date and limited implementation of the plan. Full implementation of the plan may have a material impact on the computed employer contribution rates beyond what is included above.

**We understand that the FY 2013 employer contributions have not been made and FY 2014 employer contributions are not being made due to the City's Chapter 9 bankruptcy. The FY 2015 contribution shown above is based on the assumption that the FY 2013 and FY 2014 contributions WOULD NOT be made. The reported assets as of June 30, 2013 include zero receivable contributions.**

# SUMMARY OF COMPUTED EMPLOYER CONTRIBUTION RATES
## 2014-2015 FISCAL YEAR
### INCLUDING PAYMENT OF PAST DUE CONTRIBUTIONS

| Contributions for | Contributions Expressed as a Percent of Payroll | | | | |
|---|---|---|---|---|---|
| | General City@ | D.O.T. | Water/ Sewage | Library | System Total |
| **Normal Cost:** | | | | | |
| Age & Service Pensions | 7.58 % | 7.70 % | 7.39 % | 8.35 % | 7.58 % |
| Disability Pensions | 1.38 % | 1.01 % | 1.38 % | 1.37 % | 1.33 % |
| Death-in-Service Pensions | 0.29 % | 0.29 % | 0.32 % | 0.27 % | 0.30 % |
| Administrative Expenses* | 2.90 % | 2.90 % | 2.90 % | 2.90 % | 2.90 % |
| Employer Normal Cost | 12.15 % | 11.90 % | 11.99 % | 12.89 % | 12.11 % |
| Other Short Term Expenses& | 2.00 % | 2.00 % | 2.00 % | 2.00 % | 2.00 % |
| **Unfunded Actuarial Accrued Liabilities#** | 24.30 % | 33.55 % | 32.48 % | 18.09 % | 27.77 % |
| **Estimated Employer Contribution Rates** | 38.45 % | 47.45 % | 46.47 % | 32.98 % | 41.88 % |
| Estimated Employer Contributions for FY 2015 ($ mill) | $ 41.4 | $ 15.5 | $ 31.3 | $ 4.6 | $ 92.8 |
| Past due Payments for FY 2013 | $ 27.2 | $ 8.8 | $ - | $ - | $ 36.0 |
| Expected Employer Contributions for FY 2014 ($ mill) | $ 36.7 | $ 12.1 | $ 28.2 | $ 3.6 | $ 80.6 |

\*   *Includes 0.80% of payroll for defined contribution (DC) payments and 2.10% of payroll for administrative expenses.*
\#   *Unfunded actuarial accrued liabilities (UAAL) were amortized as a level percent of payroll over an open 30-year period.*
@   *Includes COBO Hall.*
&   *Bankruptcy related and/or not expected to occur for more than a few years.*

## COMMENT

The valuation results shown above include an adjustment to account for certain retroactive benefits paid as a result of the 1998 Defined Contribution Plan. The adjustment is based on experience to date and limited implementation of the plan. Full implementation of the plan may have a material impact on the computed employer contribution rates beyond what is included above.

**We understand that the FY 2013 employer contributions have not been made and FY 2014 employer contributions are not being made due to the City's Chapter 9 bankruptcy. The FY 2015 contribution shown above is based on the assumption that the FY 2013 and FY 2014 contributions WOULD be made.**

| | |
|---|---|
| Present Value of Future Benefits | $ 3,738,180,148 |
| Present Value of Future Normal Costs | 129,106,290 |
| Actuarial Accrued Liability | 3,609,073,858 |
| Accrued Assets# | 2,524,863,146 |
| Unfunded Actuarial Accrued Liability# | $ 1,084,210,712 |

\# *Assumes past due contributions of $36M are NOT made.*

# ACTUARIAL ACCRUED LIABILITIES AS OF JUNE 30, 2013
## RETIREMENT SYSTEM TOTALS

| Present Value | June 30, 2013 | June 30, 2012 |
|---|---|---|
| **Accrued Pension Liabilities** <br> **(Employer Financed)** | | |
| Retirees and beneficiaries | | |
| Future pensions | $2,313,167,260 | $2,213,640,992 |
| Mortality reserve | 0 | 0 |
| Total | 2,313,167,260 | 2,213,640,992 |
| Inactive members future deferred pensions | 201,075,943 | 165,251,217 |
| Active members | 592,551,741 | 688,597,028 |
| Total accrued pensions | 3,106,794,944 | 3,067,489,237 |
| Pension fund balances | 2,022,584,228 | 2,229,805,862 |
| Unfunded accrued pension liabilities | $ 1,084,210,716 | $ 837,683,375 |
| **Accrued Annuity Liabilities** <br> **(Member Financed)** | | |
| Retirees and beneficiaries | | |
| Future annuities | $ 100,686,342 | $ 92,108,332 |
| Mortality reserve | 0 | 0 |
| Total | 100,686,342 | 92,108,332 |
| Member annuities & future refunds | 401,592,576 | 484,575,008 |
| Total accrued annuity liabilities | 502,278,918 | 576,683,340 |
| Annuity fund balances | 502,278,918 | 576,683,340 |
| Unfunded accrued annuity liabilities | $ 0 | $ 0 |
| **Totals** | | |
| **Actuarial Accrued Liabilities** | **$3,609,073,862** | **$3,644,172,577** |
| **Accrued Assets** | **2,524,863,146** | **2,806,489,202** |
| **Unfunded Actuarial Accrued Liabilities** | **$ 1,084,210,716 #** | **$ 837,683,375** |

# *Assumes past due contributions of $36M are NOT made.*

## VALUATION RESULTS – COMPARATIVE STATEMENT
### ---- $ IN MILLIONS ----
### RETIREMENT SYSTEM TOTALS

| June 30 | Active Payroll | | % of Payroll Contributions For | | | Actuarial Accrued Liabilities | | | Unfunded/ Active Pay |
|---|---|---|---|---|---|---|---|---|---|
| | Total | Average | Normal Cost | UAAL | Total | Computed Total | Accrued Assets | Unfunded | |
| 1997(a) | $382.8 | $30,951 | 7.91% | 3.93 % | 11.84% | $2,528.5 | $2,333.4 | $ 195.1 | 0.51 |
| 1998(a)# | 387.0 | 31,565 | 9.30% | 4.45 % | 13.75% | 2,814.9 | 2,582.1 | 232.8 | 0.60 |
| 1999# | 383.4 | 31,989 | 9.29% | 3.97 % | 13.26% | 2,900.4 | 2,756.6 | 143.8 | 0.38 |
| 2000 | 417.2 | 34,345 | 9.22% | 4.15 % | 13.37% | 3,077.0 | 2,902.4 | 174.6 | 0.42 |
| 2001 | 439.6 | 34,497 | 9.22% | 5.05 % | 14.27% | 3,179.6 | 2,912.1 | 267.5 | 0.61 |
| 2002(a) | 440.7 | 34,867 | 8.74% | 9.31 % | 18.05% | 3,250.5 | 2,761.2 | 489.3 | 1.11 |
| 2003 | 448.6 | 34,955 | 8.82% | 13.90 % | 22.72% | 3,270.6 | 2,537.7 | 732.9 | 1.63 |
| 2004 | 444.6 | 37,706 | 8.99% | 11.10 % | 20.09% | 3,383.9 | 2,470.2 | 913.7 | 2.06 |
| 2005* | 390.6 | 39,775 | 9.26% | 1.80 % | 11.06% | 3,347.4 | 3,222.4 | 125.0 | 0.32 |
| 2006 | 361.2 | 39,919 | 9.26% | 0.95 % | 10.21% | 3,434.3 | 3,373.7 | 60.6 | 0.17 |
| 2007 | 361.7 | 40,319 | 9.29% | 0.67 % | 9.96% | 3,629.2 | 3,586.6 | 42.6 | 0.12 |
| 2008(a) | 368.5 | 41,763 | 10.09% | (0.53)% | 9.56% | 3,609.6 | 3,641.2 | (31.6) | (0.09) |
| 2009 | 357.1 | 41,525 | 10.84% | 4.54 % | 15.38% | 3,689.1 | 3,412.4 | 276.7 | 0.77 |
| 2010(a) | 334.3 | 41,420 | 10.97% | 8.14 % | 19.11% | 3,719.6 | 3,238.1 | 481.5 | 1.44 |
| 2011 | 303.4 | 41,845 | 11.49% | 11.60 % | 23.09% | 3,720.2 | 3,080.3 | 639.9 | 2.11 |
| 2012 | 258.0 | 41,385 | 12.82% | 18.82 % | 31.64% | 3,706.0 | 2,806.5 | 899.5 | 3.49 |
| 2012#@ | 258.0 | 41,385 | 11.79% | 18.26 % | 30.05% | 3,644.2 | 2,806.5 | 837.7 | 3.25 |
| 2013 | 213.3 | 39,763 | 13.84% | 29.37 % | 43.21% | 3,596.7 | 2,524.9 | 1,071.8 | 5.02 |
| **2013#** | **213.3** | **39,763** | **14.11%** | **29.72 %** | **43.83%** | **3,609.1** | **2,524.9** | **1,084.2** | **5.08** |
| **2013#&** | **213.3** | **39,763** | **14.11%** | **27.77 %** | **41.88%** | **3,609.1** | **2,560.9** | **1,048.2** | **4.91** |

\#   After plan amendments/clarifications.
(a)  After changes in actuarial assumptions and/or methods.
\*   After POC transfer.
@   Reflects missing FY12 and FY13 contributions.
&   Assumes past due contributions of $36,000,000 are made.

*The General Retirement System of the City of Detroit*

A-5

**The purpose of this report is to measure the funding progress and establish the computed employer contribution rate for Fiscal Year 2015 in an ongoing pension plan. This actuarial valuation does not take into account any of the changes being discussed as part of the Bankruptcy mediation process but presents the results based on plan provisions and actuarial assumptions as they were pre-bankruptcy. This report was prepared for the General Retirement System Board of Trustees and should not be used by any other party or for any purpose other than as described in this paragraph.**

## Computed Contribution

The computed employer contribution rate was determined two ways. First, assuming that employer contributions due in FY 13 and FY 14 would be made on a timely basis, and also assuming that the past due amounts would not be made. Schedules in the report indicate which set of numbers is used. This report does not evaluate the ability of the employer to make the required contributions.

## Experience

Experience during the year was less favorable than expected. Overall, the experience loss was approximately $133 million (3.7% of the beginning of year liability).

The fund earned a 14.2% rate of return on a market basis but, because investment gains and losses are smoothed over a 7-year period, the fund recognized a 2.3% rate of return on a funding value basis. This rate compares to a 7.9% assumed rate of investment return.

## Funding Value of Assets

Beginning June 30, 2010, gains and losses in excess of the assumed investment return are being recognized over a period of 7 years. As of June 30, 2013, the funding value of assets was nearly $426 million dollars greater than the market value (see page A-13). As that difference is recognized, computed employer contribution rates will continue to increase (over the next several years), unless the losses are offset by future experience gains. On a funding value basis the System is 70% funded. On a market value of asset basis, the System is 58% funded.

The current method of allocation of investment income between divisions (as provided by Retirement System staff) results in each division recognizing a rate of return that may differ from the fund, in total. This has led to changes in divisional contribution rates that were not completely uniform. We recommend that staff continue to review the allocation procedures.

## Active Member Group Size

As mentioned above, the recognition of prior investment losses will continue to put upward pressure on the employer contribution rate. The employer rate, as a percent of payroll, will increase yet more if the active member group continues to contract.

## Plan Changes

The following plan changes were recognized in the 2012 valuation:

- Future benefit accruals for certain active members were reduced to 1.5% of final average compensation per year of service.
- Post-retirement cost-of-living increases were eliminated on future accruals for certain active members.

For the 2013 valuation, the Retirement System provided an updated list of the agency codes indicating which change affected which agency as well as the effective dates of the changes for each agency. Reflecting the updated agency codes resulted in an increase in the computed employer contribution rate of 0.96% of payroll.

During the year the following plan changes were made:

- Sick leave and longevity pay were excluded for members of various bargaining units.

This information was provided in the updated list of the agency codes indicating which change affected which agency. These changes, in total, resulted in a reduction in the computed employer contribution rate of 0.34% of payroll.

## Assumptions and Methods

An increase in the administrative expense load was made in accordance with an increase in the actual expenses as a percent of payroll.

Actuarial methods and assumptions were last formally reviewed (in aggregate) for the 5-year period ending June 30, 2007. The next review was scheduled to be completed after the June 30, 2012 valuation to cover the 5-year period ending June 30, 2012. The City Ordinance requires a formal review be performed every 5 years. This study was suspended do to other more urgent projects resulting from the Bankruptcy proceedings as well as the uncertainty of the structure of the plan as a result of the Bankruptcy. The study should be resumed once the changes resulting from the Bankruptcy (if any) are known. It will review economic assumptions (assumptions about future events affecting money values) and demographic assumptions (assumptions about future events that happen to members). In addition, we will be reviewing methods and assumptions for conformity with recent changes in the actuarial standards, such as, the appropriate margin for future mortality improvement and the corridor around the market value of assets.

## GASB Changes

For plan years beginning in 2013, new reporting standards will be required. The new reporting standards will be substantially different than the current standards. Some of the changes include reporting of:

- Liabilities that may be materially different than the liabilities currently developed for funding;
- Unfunded liabilities based on the market value of assets;
- Annual plan expenses that may differ materially from the contribution developed for current funding.

Some of the calculations that will need to be performed will differ depending on the existence of a formal written policy. As such, the Board should consider developing a formal written funding policy if one does not currently exist.

## Recommendations

**As of June 30, 2013, the annual benefits were approximately 9% of the market value of assets. Failure to receive employer contributions on a timely basis could jeopardize the sustainability of the fund. We recommend that all previously computed employer contributions be deposited into the fund as soon as possible.**

The development of the employer contribution is based on a stable (or growing) total covered payroll. Payroll actually declined during the year ending June 30, 2013. If future payroll contraction is expected over the next 1-2 years, we recommend making employer contributions based on the computed dollar amount shown on page A-1, instead of the percent of payroll, to avoid the contribution loss that occurs with a declining payroll.

## Conclusion

**The Retirement System is 70% funded as of June 30, 2013, based on the funding value of assets (58% on a market value of assets basis). Based upon the funding policy established by the Board, the data furnished by the Retirement System and the actuarial assumptions shown in the Appendix, the weighted average recommended employer contribution rate for the 2014-2015 fiscal year is 43.83% of covered payroll assuming past due and currently due contributions are not made or 41.88% of covered payroll if they are made with the rate for each separate division as shown on page A-1.**

# SOLVENCY TESTS

The DGRS funding objective is to meet long-term benefit promises through contributions made during members' working careers which, combined with investment income on System assets, will be sufficient to pay benefits throughout their retired lives. If the contributions to the System are received in a timely manner, the System will pay all promised benefits when due -- the ultimate test of financial soundness. Testing for level contribution rates is *the long-term solvency test.*

*A short-term solvency test* is one means of checking a System's progress under its funding program. In a short-term solvency test, the plan's present assets (cash and investments) are compared with:

1) Active member contributions on deposit;
2) The liabilities for future benefits to present retired lives;
3) The liabilities for service already rendered by active members.

In a System that has been following the discipline of level percent-of-payroll financing, the liabilities for active member contributions on deposit (liability 1) and the liabilities for future benefits to present retired lives (liability 2) will be fully covered by present assets (except in rare circumstances). In addition, the liabilities for service already rendered by active members (liability 3) will be partially covered by the remainder of present assets. The larger the funded portion of liability 3, the stronger the condition of the System.

## SHORT-TERM SOLVENCY TEST
## 5-YEAR COMPARATIVE STATEMENT
## ($ IN MILLIONS)

| June 30 | Actuarial Accrued Liabilities | | | Valuation Assets | Portion of Accrued Liabilities Covered by Assets | | | |
| | (1) Active Member Contr. | (2) Retirees and Benef. | (3) Present Members (Employer-Financed Portion) | | (1) | (2) | (3) | Total |
|---|---|---|---|---|---|---|---|---|
| 2009 | $ 709 | $1,901 | $1,080 | $3,412 | 100% | 100% | 74% | 92% |
| 2010(a) | 649 | 1,949 | 1,121 | 3,238 | 100% | 100% | 57% | 87% |
| 2011 | 596 | 2,059 | 1,065 | 3,080 | 100% | 100% | 40% | 83% |
| 2012 | 485 | 2,306 | 854 | 2,806 | 100% | 100% | 2% | 77% |
| 2013 | 402 | 2,414 | 794 | 2,525 | 100% | 88% | 0% | 70% & |

*(a) After changes in actuarial assumptions and/or methods.*
*&  58% on a market value basis. Assumes past due contributions of $36M are NOT made.*

# DERIVATION OF EXPERIENCE GAIN (LOSS)
## YEAR ENDED JUNE 30, 2013
### ($ IN MILLIONS)

Actual experience will never (except by coincidence) coincide exactly with assumed experience. Gains and losses may cancel each other over a period of years, but sizable year-to-year fluctuations are common. Detail on the derivation of the experience gain (loss) is shown below.

| | | |
|---|---|---|
| (1) | UAAL* at start of year | $837.7 |
| (2) | Normal cost from last valuation | 25.1 |
| (3) | Employer contributions | 26.5 |
| (4) | Interest accrual: [(1) + 1/2 [(2) - (3)]] x .079 | 66.1 |
| (5) | Expected UAAL before changes: (1) + (2) - (3) + (4) | 902.4 |
| (6) | Increase due to changes in benefits or clarifications | 12.4 |
| (7) | Other: Missed FY 2013 Contributions | 36.0 |
| (8) | Expected UAAL after changes: (5) + (6) + (7) | 950.8 |
| (9) | Actual UAAL at end of year | 1,084.2 |
| (10) | Experience gain (loss): (8) - (9) | $(133.4) |
| (11) | Gain (loss) as % of beginning of year ($3,644 million) accrued pension liability | (3.7)% |
| (12) | Experience gain (loss) | (133.4) |
| (13) | Gain (loss) due to investment experience recognized in this valuation | (147.8) |
| (14) | Gain (loss) from other sources | 14.4 |
| (15) | Gain (loss) from other sources as a % of beginning of year liability | 0.4 % |

*Unfunded actuarial accrued liability.*

A large component of the actuarial experience gain (loss) in any given year is typically the Retirement System's investment gain (loss) on valuation assets. Detail on the investment gain (loss) is shown on Page A-13.

---

*The General Retirement System of the City of Detroit*                                        *A-10*

### *Reported Assets*
**(Market Value)**

| Market Value - June 30, 2013 | |
|---|---:|
| Cash & equivalents | $ 16,852,995 |
| Short term investments | 37,680,539 |
| Mortgage securities | 27,285,952 |
| Other securities | 135,823,322 |
| Receivables & accruals | 47,368,800 |
| Contributions receivables | - |
| Stocks | 1,054,606,782 |
| Bonds & government securities | 144,296,396 |
| Real estate | 223,433,016 |
| Private equity | 438,635,231 |
| Mortgages | 109,134,461 |
| Securities lending | (96,535,642) |
| Pooled investments | 7,839,000 |
| Capital assets | 1,278,630 |
| Accounts payable | (48,677,528) |
| **Total Current Assets** | **$ 2,099,021,954** |

### *Reserve Accounts*
### (Funding Value)

| | Fund Balances | |
|---|---|---|
| **Funds** | **June 30, 2013** | **June 30, 2012** |
| Annuity Savings | $ 401,592,576 | $ 484,575,008 |
| Annuity Reserve | 100,686,342 | 92,108,332 |
| Pension Accumulation | (1,104,568,171) | (791,478,253) |
| Pension Reserve | 2,313,167,260 | 2,213,640,992 |
| Accrued Liability Fund Reserve | 813,985,139 | 807,643,123 |
| **Total Fund Balances** | **$2,524,863,146** | **$2,806,489,202** |

### *Revenues and Expenditures*
### (Funding Value)

| | **Pension Funds** | **Annuity Funds** | **Total Funds** |
|---|---|---|---|
| Balance, July 1, 2012 | $2,229,805,862 | $ 576,683,340 | $2,806,489,202 |
| Prior valuation audit adjustment | 0 | 0 | 0 |
| Balance July 1, 2012 after adjustment | 2,229,805,862 | 576,683,340 | 2,806,489,202 |
| Revenues | | | |
| Member contributions | 0 | 13,395,701 | 13,395,701 |
| Employer contributions | 26,515,782 | 0 | 26,515,782 |
| Recognized investment income | 21,700,707 | 38,698,671 | 60,399,378 |
| Transfers | 0 | 0 | 0 |
| Total | $ 48,216,489 | $ 52,094,372 | $ 100,310,861 |
| Expenditures | | | |
| Benefit payments | 246,617,947 | 0 | 246,617,947 |
| Refund of member contributions | 0 | 126,498,794 | 126,498,794 |
| Administrative expenses# | 8,820,176 | 0 | 8,820,176 |
| Total | $ 255,438,123 | $ 126,498,794 | $ 381,936,917 |
| Balance, June 30, 2013 | $2,022,584,228 | $ 502,278,918 | $2,524,863,146 |
| Funding Value Rate of Return | 1.0% | 7.4% | 2.3% |
| Market Value Rate of Return | 16.6% | 7.4% | 14.2% |

\#  *Includes approximately 4.5 million of on-going administrative expenses and 4.3 million of short term expenses.*

## REPORTED FUNDING VALUE OF ASSETS

| Year Ended June 30: | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| A. Funding Value Beginning of Year | $3,080,295,734 | $2,806,489,202 | | | | | | |
| B. Market Value End of Year | 2,158,837,848 | 2,099,021,954 | | | | | | |
| C. Market Value Beginning of Year | 2,421,566,956 | 2,158,837,848 | | | | | | |
| D. Non-Investment Net Cash Flow (Contribution-Benefits) | (313,356,872) | (342,025,434) | | | | | | |
| E. Investment Income | | | | | | | | |
|   E1. Market Total: B - C - D | 50,627,764 | 282,209,540 | | | | | | |
|   E2. Amount for Immediate Recogn: Reg. Int. on Reserves | 230,965,767 | 208,202,642 | | | | | | |
|   E3. Amount for Phased-In Recognition: E1-E2 | (180,338,003) | 74,006,898 | | | | | | |
| F. Phased-In Recognition of Investment Income | | | | | | | | |
|   F1. Current Year: E3/7 | (25,762,572) | 10,572,414 | | | | | | |
|   F2. First Prior Year | 27,936,574 | (21,042,608) | $ 10,572,414 | | | | | |
|   F3. Second Prior Year | (165,269,644) | 27,936,574 | (21,042,608) | $ 10,572,414 | | | | |
|   F4. Third Prior Year | | (165,269,644) | 27,936,574 | (21,042,608) | $ 10,572,414 | | | |
|   F5. Fourth Prior Year | | | (165,269,644) | 27,936,574 | (21,042,608) | $ 10,572,414 | | |
|   F6. Fifth Prior Year | | | | (165,269,644) | 27,936,574 | (21,042,608) | $ 10,572,414 | |
|   F7. Sixth Prior Year | | | | | (165,269,644) | 27,936,574 | (21,042,608) | $ 10,572,414 |
|   F8. Total Recognized Investment Gain | (163,095,642) | (147,803,264) | (147,803,264) | (147,803,264) | (147,803,264) | 17,466,378 | (10,470,192) | 10,572,414 |
| G. Total Recognized Investment Income: (E2+F8) | 67,870,125 # | 60,399,378 | | | | | | |
| H. Funding Value End of Year: A + D + G | | | | | | | | |
|   H1. Preliminary Funding Value End of Year: A + D + E2 + F8 | 2,834,808,987 | 2,524,863,146 | | | | | | |
|   H2. Corridor Limit | 30% | 30% | 30% | 30% | 30% | 30% | 30% | 30% |
|   H3. Upper Corridor Limit: (100% + H2) * B | 2,806,489,202 | 2,728,728,540 | | | | | | |
|   H4. Lower Corridor Limit: (100% - H2) * B | 1,511,186,494 | 1,469,315,368 | | | | | | |
|   H5. Funding Value End of Year | 2,806,489,202 | 2,524,863,146 | | | | | | |
| I. Difference between Market & Funding Value: B - H5 | (647,651,354) | (425,841,192) | | | | | | |
| J. Recognized Rate of Return (net) | 1.4% | 2.3% | | | | | | |
| K. Market Rate of Return (net) | 2.2% | 14.2% | | | | | | |
| L. Ratio of Funding Value to Market Value | 130.0% | 120.3% | | | | | | |

\# Before application of corridor. After application of corridor, recognized income is $39,550,340.

The Funding Value of Assets recognizes assumed investment income (line E2) fully each year. Differences between actual and assumed investment income (line E3) are phased-in over a closed 7-year period. During periods when investment performance exceeds the assumed rate, the Funding Value of Assets will tend to be less than Market Value. During periods when investment performance is less than the assumed rate, Funding Value of Assets will tend to be greater than market value. The Funding Value of Assets is unbiased with respect to Market Value. At any time it may be either greater or less than Market Value. If assumed rates are exactly realized for 6 consecutive years, it will become equal to Market Value.

*The General Retirement System of the City of Detroit*

A-13

# ASSETS AND ACCRUED LIABILITIES



# PERSONS IN VALUATIONS - COMPARATIVE STATEMENTS
## RETIREMENT SYSTEM TOTALS

### *Active Members*

| June 30 | Active Members | | Annual Payroll | Group Averages | | | |
| | No. | Change | | Average Pay | | Age Years | Service Years |
| | | | | $ | Change | | |
|---|---|---|---|---|---|---|---|
| 1984 | 13,172 | 0.1 % | $288,048,279 | $21,868 | 5.6 % | 41.5 | 12.0 |
| 1985 | 12,719 | (3.4)% | 281,378,439 | 22,123 | 1.2 % | 41.5 | 11.9 |
| 1986 | 13,423 | 5.5 % | 299,859,070 | 22,339 | 1.0 % | 41.1 | 11.3 |
| 1987 | 13,640 | 1.6 % | 321,402,755 | 23,563 | 5.5 % | 40.9 | 11.0 |
| 1988 | 13,368 | (2.0)% | 326,216,082 | 24,403 | 3.6 % | 41.0 | 11.1 |
| 1989 | 13,554 | 1.4 % | 331,555,458 | 24,462 | 0.2 % | 41.1 | 11.0 |
| 1990 | 13,207 | (2.6)% | 352,622,639 | 26,700 | 9.1 % | 41.5 | 11.4 |
| 1991 | 12,949 | (2.0)% | 362,532,918 | 27,997 | 4.9 % | 41.8 | 11.7 |
| 1992 | 12,137 | (6.3)% | 344,320,379 | 28,369 | 1.3 % | 42.2 | 12.1 |
| 1993 | 11,508 | (5.2)% | 331,009,921 | 28,763 | 1.4 % | 43.0 | 12.9 |
| 1994 | 11,382 | (1.1)% | 325,427,813 | 28,591 | (0.6)% | 43.1 | 12.8 |
| 1995 | 11,515 | 1.2 % | 327,615,936 | 28,451 | (0.5)% | 42.2 | 12.6 |
| 1996 | 12,086 | 5.0 % | 360,068,578 | 29,792 | 4.7 % | 42.8 | 11.9 |
| 1997 | 12,369 | 2.3 % | 382,835,917 | 30,951 | 3.9 % | 42.8 | 11.7 |
| 1998 | 12,261 | (0.9)% | 387,022,423 | 31,565 | 2.0 % | 43.3 | 11.8 |
| 1999 | 11,987 | (2.2)% | 383,449,421 | 31,989 | 1.3 % | 43.7 | 12.1 |
| 2000 | 12,147 | 1.3 % | 417,187,666 | 34,345 | 7.4 % | 43.5 | 12.0 |
| 2001 | 12,744 | 4.9 % | 439,636,072 | 34,497 | 0.4 % | 43.3 | 11.7 |
| 2002 | 12,639 | (0.8)% | 440,680,045 | 34,867 | 1.1 % | 43.7 | 11.8 |
| 2003 | 12,833 | 1.5 % | 448,579,064 | 34,955 | 0.3 % | 43.5 | 11.7 |
| 2004 | 11,791 | (8.1)% | 444,596,299 | 37,706 | 7.9 % | 44.5 | 12.5 |
| 2005 | 9,820 | (16.7)% | 390,593,600 | 39,775 | 5.5 % | 45.9 | 13.8 |
| 2006 | 9,047 | (7.9)% | 361,151,456 | 39,919 | 0.4 % | 46.6 | 14.6 |
| 2007 | 8,971 | (0.8)% | 361,701,481 | 40,319 | 1.0 % | 47.0 | 14.6 |
| 2008 | 8,823 | (1.6)% | 368,470,990 | 41,763 | 3.6 % | 47.2 | 14.7 |
| 2009 | 8,599 | (2.5)% | 357,072,833 | 41,525 | (0.6)% | 47.4 | 14.8 |
| 2010 | 8,072 | (6.1)% | 334,343,506 | 41,420 | (0.3)% | 47.7 | 15.3 |
| 2011 | 7,250 | (10.2)% | 303,379,482 | 41,845 | 1.0 % | 48.3 | 15.4 |
| 2012 | 6,234 | (14.0)% | 257,992,420 | 41,385 | (1.1)% | 48.5 | 15.4 |
| 2013 | 5,364 | (14.0)% | 213,291,083 | 39,763 | (3.9)% | 48.8 | 15.7 |

### *Retirees and Beneficiaries*

| June 30 | No. | % of Current Allowances | | | | Current Annual Pensions | | |
| | | Annuities | Initial Pensions | Escalators & Other Increases | Allow. | Total | Average | % of Payroll |
|---|---|---|---|---|---|---|---|---|
| 1984 | 11,643 | 3.8% | 80.4% | 15.8% | 100.0% | $ 68,564,556 | $ 5,889 | 23.8% |
| 1985 | 11,710 | 3.4% | 80.6% | 16.0% | 100.0% | 71,433,168 | 6,100 | 25.4% |
| 1986 | 11,776 | 3.2% | 80.7% | 16.1% | 100.0% | 74,834,820 | 6,355 | 25.0% |
| 1987 | 11,800 | 2.9% | 80.2% | 16.9% | 100.0% | 78,342,384 | 6,639 | 24.4% |
| 1988 | 11,728 | 3.0% | 80.0% | 17.0% | 100.0% | 81,346,500 | 6,936 | 24.9% |
| 1989 | 11,734 | 3.0% | 79.8% | 17.2% | 100.0% | 83,790,744 | 7,141 | 25.3% |
| 1990 | 11,684 | 2.9% | 79.1% | 18.0% | 100.0% | 85,720,620 | 7,337 | 24.3% |
| 1991 | 11,691 | 2.9% | 78.7% | 18.4% | 100.0% | 87,625,800 | 7,495 | 24.2% |
| 1992 | 11,674 | 2.6% | 76.5% | 20.9% | 100.0% | 97,218,012 | 8,328 | 28.2% |
| 1993 | 11,719 | 2.8% | 77.7% | 19.5% | 100.0% | 100,203,596 | 8,551 | 30.3% |
| 1994 | 11,649 | 2.8% | 76.9% | 20.3% | 100.0% | 106,193,220 | 9,116 | 32.6% |
| 1995 | 11,756 | 2.7% | 76.7% | 20.6% | 100.0% | 110,262,876 | 9,379 | 33.7% |
| 1996 | 11,889 | 2.6% | 75.5% | 21.9% | 100.0% | 115,232,400 | 9,692 | 32.0% |
| 1997 | 12,199 | 2.4% | 74.4% | 23.2% | 100.0% | 121,255,488 | 9,940 | 31.7% |
| 1998 | 11,593 | 2.3% | 73.7% | 24.0% | 100.0% | 119,852,820 | 10,338 | 31.0% |
| 1999 | 11,537 | 2.4% | 76.6% | 21.0% | 100.0% | 127,535,748 | 11,054 | 33.3% |
| 2000 | 11,480 | 2.2% | 77.7% | 20.1% | 100.0% | 129,354,696 | 11,268 | 31.0% |
| 2001 | 11,450 | 2.3% | 77.7% | 20.0% | 100.0% | 133,170,804 | 11,631 | 30.3% |
| 2002 | 11,363 | 2.2% | 78.2% | 19.6% | 100.0% | 140,805,120 | 12,392 | 32.0% |
| 2003 | 11,322 | 2.4% | 78.3% | 19.3% | 100.0% | 147,024,720 | 12,986 | 32.8% |
| 2004 | 11,311 | 2.6% | 78.5% | 18.9% | 100.0% | 154,133,460 | 13,627 | 34.7% |
| 2005 | 11,396 | 2.7% | 79.6% | 17.7% | 100.0% | 165,095,736 | 14,487 | 42.3% |
| 2006 | 11,541 | 2.7% | 79.6% | 17.7% | 100.0% | 175,193,088 | 15,180 | 48.5% |
| 2007 | 11,478 | 2.7% | 79.6% | 17.7% | 100.0% | 180,332,688 | 15,711 | 49.9% |
| 2008 | 11,388 | 2.8% | 79.9% | 17.3% | 100.0% | 185,688,852 | 16,306 | 50.4% |
| 2009 | 11,407 | 3.0% | 79.8% | 17.2% | 100.0% | 193,045,584 | 16,923 | 54.1% |
| 2010 | 11,539 | 3.4% | 79.6% | 17.0% | 100.0% | 202,935,852 | 17,587 | 60.7% |
| 2011 | 11,555 | 3.7% | 79.9% | 16.4% | 100.0% | 211,169,292 | 18,275 | 69.6% |
| 2012 | 11,943 | 4.2% | 80.7% | 15.1% | 100.0% | 229,466,507 | 19,213 | 88.9% |
| 2013 | 12,089 | 4.2% | 80.7% | 15.1% | 100.0% | 238,498,512 | 19,729 | 111.8% |



ACTIVE AND RETIRED MEMBERS



BENEFIT PAYOUT AND COMPUTED CONTRIBUTIONS AS A
PERCENT OF PAYROLL

# EXPECTED TERMINATIONS FROM ACTIVE EMPLOYMENT FOR CURRENT ACTIVE MEMBERS



The chart shows the expected future development of the present population in simplified terms. The Retirement System presently covers 5,364 active members. Eventually, 348 people are expected to terminate covered employment prior to retirement and forfeit eligibility for an employer provided benefit. 4,544 people are expected to receive monthly retirement benefits either by retiring directly from active service, or by retiring from vested deferred status. 472 people are expected to become eligible for death-in-service or disability benefits.

# RETIREES AND BENEFICIARIES JUNE 30, 2013
## TABULATED BY ATTAINED AGES
### RETIREMENT SYSTEM TOTALS

| Attained Ages | Age & Service# No. | Age & Service# Monthly Allowances | Disability No. | Disability Monthly Allowances | Death-in-Service No. | Death-in-Service Monthly Allowances | Totals No. | Totals Monthly Allowances |
|---|---|---|---|---|---|---|---|---|
| Under 20* | 13 | $ 22,640 | 1 | $ 517 | 8 | $ 4,357 | 22 | $ 27,514 |
| 20-24 | 6 | 4,894 | | | | | 6 | 4,894 |
| 25-29 | 3 | 1,360 | | | | | 3 | 1,360 |
| 30-34 | 6 | 5,330 | 5 | 963 | | | 11 | 6,293 |
| 35-39 | 8 | 7,219 | 18 | 11,360 | 1 | 809 | 27 | 19,388 |
| 40-44 | 32 | 29,586 | 35 | 21,626 | 4 | 4,027 | 71 | 55,239 |
| 45-49 | 149 | 261,487 | 77 | 52,729 | 10 | 12,261 | 236 | 326,477 |
| 50-54 | 590 | 1,371,188 | 197 | 152,395 | 36 | 42,743 | 823 | 1,566,326 |
| 55-59 | 1,277 | 3,182,035 | 245 | 254,129 | 35 | 40,903 | 1,557 | 3,477,067 |
| 60-64 | 2,194 | 4,466,994 | 215 | 264,236 | 46 | 81,823 | 2,455 | 4,813,053 |
| 65-69 | 1,680 | 3,062,234 | 135 | 147,893 | 40 | 58,480 | 1,855 | 3,268,607 |
| 70-74 | 1,225 | 1,857,415 | 86 | 79,756 | 40 | 48,745 | 1,351 | 1,985,916 |
| 75-79 | 1,014 | 1,416,432 | 42 | 35,148 | 43 | 47,823 | 1,099 | 1,499,403 |
| 80-84 | 1,046 | 1,281,314 | 44 | 34,313 | 69 | 55,756 | 1,159 | 1,371,383 |
| 85-89 | 851 | 957,236 | 51 | 40,369 | 42 | 36,315 | 944 | 1,033,920 |
| 90-94 | 337 | 324,995 | 9 | 7,082 | 25 | 17,802 | 371 | 349,879 |
| 95 and Over | 92 | 64,674 | 2 | 846 | 5 | 2,636 | 99 | 68,156 |
| Totals | 10,523 | $18,317,033 | 1,162 | $1,103,362 | 404 | $454,480 | 12,089 | $19,874,875 |

\* *May include records with defective birth dates.*
\# *Includes survivor beneficiaries of deceased retirees.*

## ACTIVE MEMBERS AS OF JUNE 30, 2013
## BY ATTAINED AGE AND YEARS OF SERVICE
## RETIREMENT SYSTEM TOTALS

| Attained Age | Years of Service to Valuation Date | | | | | | | Totals | |
|---|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30 Plus | No. | Valuation Payroll |
| Under 20 | 3 | | | | | | | 3 | $      56,763 |
| 20-24 | 49 | 7 | | | | | | 56 | 1,205,660 |
| 25-29 | 61 | 42 | 2 | | | | | 105 | 3,108,941 |
| 30-34 | 72 | 81 | 93 | 5 | | | | 251 | 8,065,834 |
| 35-39 | 89 | 111 | 170 | 80 | 1 | | | 451 | 16,329,807 |
| 40-44 | 104 | 114 | 218 | 243 | 37 | 7 | | 723 | 28,098,885 |
| 45-49 | 90 | 107 | 211 | 313 | 172 | 119 | 3 | 1,015 | 41,139,670 |
| 50-54 | 73 | 102 | 226 | 299 | 228 | 260 | 38 | 1,226 | 49,995,385 |
| 55-59 | 61 | 84 | 162 | 236 | 191 | 254 | 78 | 1,066 | 44,443,613 |
| 60-64 | 39 | 31 | 69 | 53 | 53 | 61 | 28 | 334 | 14,673,035 |
| 65-69 | 10 | 11 | 15 | 25 | 10 | 11 | 13 | 95 | 4,478,010 |
| 70-74 | 3 | 1 | 16 | 5 | 1 | 3 | 3 | 32 | 1,430,650 |
| 75-79 | 0 | 1 | 2 | 0 | 1 | 0 | 3 | 7 | 264,830 |
| **Totals** | **654** | **692** | **1,184** | **1,259** | **694** | **715** | **166** | **5,364** | **$213,291,083** |

Group Averages:

| | |
|---|---|
| Age: | 48.8 years |
| Service: | 15.7 years |
| Annual Pay: | $39,763 |

## RETIREES AND BENEFICIARIES JUNE 30, 2013
## TABULATED BY YEAR OF RETIREMENT

| Year of Retirement | No. | Monthly Allowances | |
| --- | --- | --- | --- |
| | | Total | Average |
| 1950 & before | 2 | $ 3,323 | $ 1,662 |
| 1951-1955 | 1 | 3,616 | 3,616 |
| 1956-1960 | 3 | 1,332 | 444 |
| 1961-1965 | 20 | 9,056 | 453 |
| 1966-1970 | 57 | 26,498 | 465 |
| 1971-1975 | 206 | 122,402 | 594 |
| 1976-1980 | 592 | 468,013 | 791 |
| 1981-1985 | 1,026 | 1,114,978 | 1,087 |
| 1986-1990 | 1,029 | 1,208,476 | 1,174 |
| 1991-1995 | 1,537 | 2,018,527 | 1,313 |
| 1996-2000 | 1,661 | 2,630,622 | 1,584 |
| 2001-2005 | 2,116 | 4,326,140 | 2,044 |
| 2006 | 453 | 873,987 | 1,929 |
| 2007 | 393 | 727,094 | 1,850 |
| 2008 | 390 | 816,641 | 2,094 |
| 2009 | 502 | 1,022,098 | 2,036 |
| 2010 | 474 | 1,034,872 | 2,183 |
| 2011 | 603 | 1,339,281 | 2,221 |
| 2012 | 791 | 1,658,776 | 2,097 |
| 2013 | 233 | 469,143 | 2,013 |
| **Totals** | **12,089** | **$19,874,875** | **$1,644** |

### Age and Service Pension

*Eligibility* - Any age (minimum age 55 for non-EMS members hired after 1995) with 30 years of service (25 for EMS members), or age 60 with 10 years of service, or age 65 with 8 years of service.

*Annual Amount* – **EMS Members:** Sum of a) a basic pension of $12 for each of the first 10 years of service, plus b) a pension equal to 2.0% of AFC multiplied by years of service. Maximum benefit is 90% of AFC. **Other Members:** Sum of a) a basic pension of $12 for each of the first 10 years of service, plus b) a pension equal to the first 10 years of service multiplied by 1.6% of AFC, plus 1.8% of AFC for each year of service greater than 10 years up to 20 years, plus 2.0% of AFC for each year of service greater than 20 years up to 25 years, plus 2.2% of AFC for each year of service greater than 25 years. Future benefit accruals for certain active members (depending on bargaining unit) were reduced to 1.5% of final average compensation per year of service.

*Type of Average Final Compensation (AFC)* - Highest 3 consecutive years out of the last 10. Pension benefits will not be diminished if compensation is reduced because of a fiscal emergency. Effective July 1, 1999, in computing the AFC, a member shall have the option of adding the value of 25% of unused accrued sick leave to the earnings used in computing the AFC. Longevity is added to AFC in accordance with the following schedule: $150 after 5 years, $300 after 10 years, $450 after 15 years, $600 after 20 years, and $750 after 25 years.

### Early Retirement

*Eligibility* - Any age with 25 or more years of service (min. age 55 for members hired after 1995).

*Annual Amount* - Same as regular retirement but actuarially reduced.

### Deferred Retirement (Vested Benefit)

*Eligibility* - Hired prior to 7-1-80: Age 40 with 8 years of service. Hired on or after 7-1-80: Any age with 10 years of service.

*Benefit Commencement - APTE hired prior to July 1, 1988:* Benefit begins at the age the member would have become eligible for regular retirement if service had continued. *SAAA, Non-Union and lawyers hired prior to June 30, 1986:* Benefit begins at the age the member would have become eligible for regular retirement. *Others:* Benefits based on service rendered by June 30, 1986 begin at the age the member would have become eligible for regular retirement. Benefits based on service rendered after July 1, 1986 begin at age 62.

*Annual Amount* - Same as regular retirement but based on average final compensation and service at the time of termination.

### Duty Disability Retirement

*Eligibility* - Service related disability before age 60. No service requirement.

*Annual Amount* - An annuity which is the actuarial equivalent of the accumulated contributions at date of disability plus a pension of two-thirds of average final compensation at time of disability. The maximum annual pension is $9,000. At the earliest of when the member would have accrued 30 years of service credit (25 for EMS) or age 60, the annuity is recomputed assuming contributions would have continued at a salary level equal to final compensation. The pension is recomputed with additional service credit granted from the date of disability to age 60 (or 30 years of service credit) with no maximum.

13-53846-tjt   Doc 8392   Filed 11/21/14   Entered 11/21/14 18:04:24   Page 138 of 505

# SUMMARY OF BENEFIT PROVISIONS EVALUATED
## (CONCLUDED)

### Non-Duty Disability Retirement

*Eligibility* - Disability from any cause before age 60 with 10 or more years of service.

*Annual Amount* - Computed in the same manner as a regular retirement benefit. Maximum annual pension to age 60 is $6,000. Benefit is recomputed at age 60 with no maximum.

### Duty Death Before Retirement

*Eligibility* - Death from service related causes. No age or service requirements.

*Annual Amount* - One-third of final compensation to the surviving spouse for life or until remarriage, plus an equal share of 1/4 of final compensation to each unmarried child under age 18. If there is no eligible spouse, eligible children each receive 1/4 of final compensation; if there are more than 2 such children, each child shares an equal part of 1/2 of final compensation. Maximum total amount for spouse and children is $9,000 annually. If there is no eligible spouse or children, dependent parents each receive 1/6 of deceased's final compensation, to a total maximum of $600 annually.

### Non-Duty Death Before Retirement

*Eligibility* – Death-in-service at any age with 15 years of service; or after age 60 with 10 years of service; or after age 65 with 8 years of service.

*Annual Amount* - To Surviving Spouse: Computed as a regular retirement benefit but reduced in accordance with a 100% joint and survivor election for members with 20 or more years of service. For members with 15 years of service but less than 20, benefit is reduced in accordance with a 50% joint and survivor election. To Dependent Children if no Surviving Spouse: $9,000 payable to age 19 of the youngest child or for life if child is physically or mentally impaired for members with 20 or more years of service ($6,000 if less than 20 years of service).

### Post-Retirement Cost-of-Living Adjustments

Benefit is increased annually by 2.25% of the **original** pension amount at retirement. Post-retirement cost-of-living increases were eliminated on future accruals for certain active members (depending on bargaining unit).

### Member Contributions

Members have the option of choosing one of four contribution amounts: (1) 0%; (2) 3.0% of compensation up to the Social Security wage base, plus 5.0% of compensation in excess of the Social Security wage base; (3) 5.0% of total compensation; or (4) 7.0% of total compensation. Member contributions can be paid as a lump sum or annuitized at retirement to provide an annuity in addition to the pension (which is not affected by the level of member contributions).

# SECTION B
## DIVISIONS SEPARATELY EXPERIENCE RATED

# SUMMARY OF MEMBER DATA
## JUNE 30, 2013

### Active Members

| | General | D.O.T. | Water/Sewage | Library | Totals |
|---|---|---|---|---|---|
| Number | 2,585 | 880 | 1,567 | 332 | 5,364 |
| % Change in active members | (16.6)% | (10.8)% | (14.1)% | 2.5 % | (14.0)% |
| Annual payroll ($ millions) | $ 103.6 | $ 31.5 | $ 64.8 | $ 13.3 | $ 213.2 |
| Average pay | $40,085 | $35,782 | $41,376 | $40,206 | $39,763 |
| % Change in average pay | (5.9)% | 1.8 % | (3.7)% | 1.1 % | (3.9)% |

### Retired Members and Survivor Beneficiaries

| | General | D.O.T. | Water/Sewage | Library | Totals |
|---|---|---|---|---|---|
| Number | 7,545 | 1,648 | 2,568 | 328 | 12,089 |
| Annual benefits ($ millions) # | $ 147.1 | $ 31.8 | $ 62.6 | $ 7.5 | $ 249.0 |
| Average benefits | $19,499 | $19,286 | $24,362 | $22,904 | $20,595 |
| % Change in average benefit | 3.2 % | 2.9 % | 1.8 % | 1.3 % | 2.9 % |

# Includes Annuities.

### Inactive Vested Members

| | General | D.O.T. | Water/Sewage | Library | Totals |
|---|---|---|---|---|---|
| Number | 1,539 | 334 | 454 | 68 | 2,395 |
| Annual benefits ($ millions) | $ 16.3 | $ 3.7 | $ 5.0 | $ 0.5 | $ 25.5 |
| Average benefits | $10,611 | $11,085 | $10,946 | $7,927 | $10,664 |
| % Change in average benefit | 5.0 % | 12.8 % | 3.1 % | (1.2)% | 5.5 % |

The General Retirement System of the City of Detroit

# ALLOCATION OF ASSETS USED FOR VALUATION
## RESERVE ACCOUNTS

| | June 30, 2013 | June 30, 2012 |
|---|---|---|
| **Annuity Savings Fund** | | |
| General | $ 170,145,058 | $ 219,393,754 |
| D.O.T. | 89,564,032 | 99,389,687 |
| Water | 109,067,468 | 132,184,635 |
| Sewage | 15,617,942 | 14,012,347 |
| Housing | (1,759,846) | 447,049 |
| Library | 18,957,922 | 19,147,536 |
| Totals | 401,592,576 | 484,575,008 |
| **Annuity Reserve Fund** | | |
| General | 55,106,600 | 48,480,832 |
| D.O.T. | 9,130,585 | 8,137,878 |
| Water | 28,567,733 | 27,480,981 |
| Sewage | 2,517,001 | 2,573,678 |
| Housing | 1,597,690 | 1,629,365 |
| Library | 3,766,733 | 3,805,598 |
| Totals | 100,686,342 | 92,108,332 |
| **Pension Accumulation Fund** | | |
| General | (563,843,041) | (385,303,885) |
| D.O.T. | (171,103,429) | (119,736,981) |
| Water | (185,411,333) | (135,731,698) |
| Sewage | (137,009,452) | (112,224,078) |
| Housing | (23,345,368) | (18,310,569) |
| Library | (23,855,548) | (20,171,042) |
| Totals | (1,104,568,171) | (791,478,253) |
| **Pension Reserve Fund** | | |
| General | 1,298,389,103 | 1,249,146,935 |
| D.O.T. | 300,416,469 | 284,763,471 |
| Water | 539,574,009 | 504,700,502 |
| Sewage | 74,237,501 | 74,044,441 |
| Housing | 34,529,925 | 35,352,558 |
| Library | 66,020,254 | 65,633,085 |
| Totals | 2,313,167,260 | 2,213,640,992 |
| **Accrued Liability Fund** | | |
| General | 520,639,947 | 513,056,701 |
| D.O.T. | 105,049,997 | 104,455,897 |
| Water | 157,087,749 | 152,509,673 |
| Sewage | 7,199,642 | 13,595,765 |
| Housing | N/A | N/A |
| Library | 24,007,804 | 24,025,087 |
| Totals | 813,985,139 | 807,643,123 |
| **Retirement System Totals** | $2,524,863,146 | $2,806,489,202 |

## ACTUARIAL ACCRUED LIABILITIES AS OF JUNE 30, 2013
## BY DIVISION
### ($ IN THOUSANDS)

| Present Value, June 30 of | General | D.O.T. | Water/ Sewage | Library | Totals |
|---|---|---|---|---|---|
| **Accrued Pension Liabilities** | | | | | |
| Retirees and beneficiaries | $1,332,919 | $300,416 | $613,812 | $ 66,020 | $2,313,167 |
| Inactive members future deferred pensions | 127,560 | 27,369 | 41,623 | 4,523 | 201,075 |
| Active members | 276,358 | 102,378 | 175,166 | 38,649 | 592,551 |
| Total accrued pension liabilities | 1,736,837 | 430,163 | 830,601 | 109,192 | 3,106,793 |
| Pension fund balances | 1,266,371 | 234,363 | 455,678 | 66,173 | 2,022,585 |
| Unfunded accrued pension liabilities | 470,466 | 195,800 | 374,923 | 43,019 | 1,084,208 |
| | | | | | |
| **Accrued Annuity Liabilities** | | | | | |
| Retirees and beneficiaries | 56,703 | 9,131 | 31,085 | 3,767 | 100,686 |
| Members annuities & future refunds | 168,386 | 89,564 | 124,685 | 18,958 | 401,593 |
| Total accrued annuity liabilities | 225,089 | 98,695 | 155,770 | 22,725 | 502,279 |
| Annuity fund balances | 225,089 | 98,695 | 155,770 | 22,725 | 502,279 |
| Unfunded accrued annuity liabilities | 0 | 0 | 0 | 0 | 0 |
| **Totals** | | | | | |
| **Actuarial Accrued Liabilities** | 1,961,926 | 528,858 | 986,371 | 131,917 | 3,609,072 |
| **Accrued Assets** | 1,491,460 | 333,058 | 611,448 | 88,898 | 2,524,864 |
| **Funded Ratio** | 76.0% | 63.0% | 62.0% | 67.4% | 70.0% |
| **Unfunded Actuarial Accrued Liabilities** | $ 470,466 | $ 195,800 | $ 374,923 | $ 43,019 | $ 1,084,208 |

Note: Totals may be off slightly due to rounding. Assumes past due contributions of $36M for General and D.O.T. are NOT made.

*The General Retirement System of the City of Detroit*

# ACTIVE AND RETIRED MEMBERS
## INCLUDED IN VALUATION
### HISTORIC COMPARISONS

### Active Members
### by Valuation Division

| June 30 | General | D.O.T. | Water | Sewage | Housing | Library | Totals |
|---|---|---|---|---|---|---|---|
| 1999 | 6,527 | 1,669 | 1,768 | 1,173 | 414 | 436 | 11,987 |
| 2000 | 6,941 | 1,606 | 1,770 | 1,064 | 334 | 432 | 12,147 |
| 2001 | 7,325 | 1,677 | 1,836 | 1,094 | 325 | 487 | 12,744 |
| 2002 | 7,320 | 1,705 | 1,797 | 1,106 | 262 | 449 | 12,639 |
| 2003 | 7,575 | 1,734 | 1,744 | 1,090 | 227 | 463 | 12,833 |
| 2004 | 7,068 | 1,652 | 1,592 | 1,035 | 0 | 444 | 11,791 |
| 2005 | 5,414 | 1,529 | 1,472 | 973 | 0 | 432 | 9,820 |
| 2006 | 4,935 | 1,460 | 1,329 | 886 | 0 | 437 | 9,047 |
| 2007 | 4,914 | 1,509 | 1,289 | 834 | 0 | 425 | 8,971 |
| 2008 | 4,848 | 1,447 | 1,338 | 765 | 0 | 425 | 8,823 |
| 2009 | 4,664 | 1,456 | 1,327 | 727 | 0 | 425 | 8,599 |
| 2010 | 4,286 | 1,303 | 2,041 | # | 0 | 442 | 8,072 |
| 2011 | 3,749 | 1,234 | 1,905 | # | 0 | 362 | 7,250 |
| 2012 | 3,099 | 986 | 1,825 | # | 0 | 324 | 6,234 |
| 2013 | 2,585 | 880 | 1,567 | # | 0 | 332 | 5,364 |

# Included with Water beginning 6/30/2010.

### Retired Members & Beneficiaries
### by Valuation Division

| June 30 | General | D.O.T. | Water | Sewage | Housing | Library | Totals |
|---|---|---|---|---|---|---|---|
| 1999 | 7,599 | 1,719 | 1,360 | 243 | 338 | 278 | 11,537 |
| 2000 | 7,522 | 1,706 | 1,387 | 242 | 330 | 293 | 11,480 |
| 2001 | 7,483 | 1,684 | 1,418 | 235 | 327 | 303 | 11,450 |
| 2002 | 7,392 | 1,667 | 1,446 | 227 | 327 | 304 | 11,363 |
| 2003 | 7,329 | 1,659 | 1,481 | 227 | 319 | 307 | 11,322 |
| 2004 | 7,593 | 1,614 | 1,569 | 226 | * | 309 | 11,311 |
| 2005 | 7,592 | 1,623 | 1,643 | 235 | * | 303 | 11,396 |
| 2006 | 7,638 | 1,617 | 1,714 | 267 | * | 305 | 11,541 |
| 2007 | 7,567 | 1,591 | 1,721 | 299 | * | 300 | 11,478 |
| 2008 | 7,459 | 1,553 | 1,742 | 333 | * | 301 | 11,388 |
| 2009 | 7,376 | 1,559 | 1,819 | 343 | * | 310 | 11,407 |
| 2010 | 7,408 | 1,567 | 2,248 | # | * | 316 | 11,539 |
| 2011 | 7,340 | 1,576 | 2,315 | # | * | 324 | 11,555 |
| 2012 | 7,525 | 1,621 | 2,466 | # | * | 331 | 11,943 |
| 2013 | 7,545 | 1,648 | 2,568 | # | * | 328 | 12,089 |

* Included with General City beginning 6/30/2004.
# Included with Water beginning 6/30/2010.

# EMPLOYER COMPUTED CONTRIBUTIONS – HISTORICAL COMPARISON

| Valuation Date June 30 | General | D.O.T. | Water | Sewage | Housing | Library | Totals |
|---|---|---|---|---|---|---|---|
| | | | As Percents of Valuation Payroll | | | | |
| 1987 | 15.62% | 21.67% | 14.74% | 3.26% | 11.24% | 10.10% | 14.87% |
| 1988(a)* | 15.96% | 19.82% | 15.03% | 2.98% | 11.54% | 10.47% | 14.90% |
| 1989 | 15.18% | 18.54% | 14.49% | 1.58% | 11.33% | 8.80% | 14.02% |
| 1990 | 15.72% | 18.62% | 15.10% | 2.02% | 11.08% | 9.04% | 14.46% |
| 1991 | 15.31% | 17.73% | 14.45% | 1.80% | 10.51% | 8.42% | 13.89% |
| 1992(a)* | 11.21% | 10.08% | 10.49% | 0.76% | 6.94% | 6.15% | 9.61% |
| 1993(a) | 11.57% | 10.80% | 12.31% | 0.59% | 8.14% | 5.51% | 10.10% |
| 1994 | 12.31% | 11.35% | 13.42% | 0.25% | 8.55% | 7.65% | 10.79% |
| 1995 | 14.71% | 12.65% | 15.68% | 0.98% | 10.74% | 10.28% | 12.91% |
| 1996 | 13.23% | 12.52% | 15.83% | 0.00% | 9.74% | 7.64% | 11.58% |
| 1997(a) | 13.47% | 12.94% | 15.32% | 0.00% | 9.34% | 7.09% | 11.84% |
| 1998(a)* | 15.80% | 14.23% | 17.16% | 0.00% | 11.38% | 9.73% | 13.75% |
| 1999* | 15.31% | 13.70% | 16.95% | 0.00% | 10.48% | 8.04% | 13.26% |
| 2000 | 15.19% | 14.37% | 17.12% | 0.00% | 9.01% | 6.97% | 13.37% |
| 2001 | 15.92% | 15.36% | 19.12% | 0.00% | 9.25% | 9.20% | 14.27% |
| 2002(a) | 19.32% | 19.51% | 26.33% | 0.33% | 10.90% | 15.82% | 18.05% |
| 2003 | 23.45% | 23.59% | 29.82% | 10.09% | 13.11% | 21.72% | 22.72% |
| 2004 | 19.75% | 19.96% | 31.71% | 6.80% | - | 20.40% | 20.09% |
| 2005# | 10.35% | 10.88% | 20.84% | 2.04% | - | 11.33% | 11.06% |
| 2006 | 9.57% | 9.93% | 20.05% | 0.86% | - | 10.44% | 10.21% |
| 2007 | 9.52% | 10.54% | 18.62% | 0.00% | - | 9.22% | 9.96% |
| 2008(a) | 8.59% | 10.51% | 17.98% | 1.36% | - | 9.18% | 9.59% |
| 2009 | 13.37% | 15.34% | 12.91% | 30.09% | - | 17.23% | 15.38% |
| 2010(a) | 15.26% | 20.26% | 25.82% | & | - | 22.15% | 19.11% |
| 2011 | 19.96% | 24.19% | 28.32% | & | - | 26.23% | 23.09% |
| 2012 | 28.36% | 35.26% | 36.04% | & | - | 28.63% | 31.64% |
| 2012* | 26.70% | 33.65% | 34.60% | & | - | 26.63% | 30.05% |
| 2013 | 41.86% | 51.13% | 46.82% | & | - | 32.98% | 44.17% |
| 2013* | 41.42% | 50.93% | 46.47% | & | - | 32.98% | 43.83% |
| 2013+ | 38.45% | 47.45% | 46.47% | & | - | 32.98% | 41.88% |

(a)  *After changes in actuarial assumptions or methods.*
*    *After plan amendments.*
#    *After issuance of POCs.*
&    *Included with Water beginning 6/30/2010.*
+    *Assumes past due contributions of $36,000,000 are made.*

*The General Retirement System of the City of Detroit*

# SECTION C
ACTUARIAL DISCLOSURES REQUIRED BY STATEMENT NO. 25 OF THE GOVERNMENTAL ACCOUNTING STANDARDS BOARD

**This information is presented in draft form for review by the System's auditor. Please let us know if there are any items that the auditor changes so that we may maintain consistency with the System's financial statements.**

# GASB STATEMENT NO. 25 REQUIRED SUPPLEMENTARY INFORMATION

## Schedule of Funding Progress

| Actuarial Valuation Date June 30 | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) -- Entry Age (b) | Unfunded AAL (UAAL) (b - a) | Funded Ratio (a / b) | Covered Payroll (c) | UAAL as a % of Covered Payroll ((b - a) / c) |
|---|---|---|---|---|---|---|
| 2000 | $2,902,433,063 | $3,077,001,129 | $174,568,066 | 94.3% | $417,187,666 | 41.8 % |
| 2001 | 2,912,146,389 | 3,179,601,214 | 267,454,825 | 91.6% | 439,636,072 | 60.8 % |
| 2002# | 2,761,203,680 | 3,250,514,916 | 489,311,236 | 84.9% | 440,680,045 | 111.0 % |
| 2003 | 2,537,668,376 | 3,270,627,177 | 732,958,801 | 77.6% | 448,579,064 | 163.4 % |
| 2004 | 2,470,243,470 | 3,383,926,672 | 913,683,202 | 73.0% | 444,596,299 | 205.5 % |
| 2005@ | 3,222,393,861 | 3,347,387,652 | 124,993,791 | 96.3% | 390,593,600 | 32.0 % |
| 2006 | 3,373,687,677 | 3,434,288,153 | 60,600,476 | 98.2% | 361,151,456 | 16.8 % |
| 2007 | 3,586,550,485 | 3,629,217,059 | 42,666,574 | 98.8% | 361,701,481 | 11.8 % |
| 2008(a) | 3,641,197,523 | 3,609,558,628 | (31,638,895) | 100.9% | 368,470,990 | (8.6)% |
| 2009 | 3,412,411,183 | 3,689,065,726 | 276,654,543 | 92.5% | 357,072,833 | 77.5 % |
| 2010# | 3,238,130,553 | 3,719,586,762 | 481,456,209 | 87.1% | 334,343,506 | 144.0 % |
| 2011 | 3,080,295,734 | 3,720,167,178 | 639,871,444 | 82.8% | 303,379,482 | 210.9 % |
| 2012 | 2,806,489,202 | 3,705,965,474 | 899,476,272 | 75.7% | 257,992,420 | 348.6 % |
| 2012* | 2,806,489,202 | 3,644,172,577 | 837,683,375 | 77.0% | 257,992,420 | 324.7 % |
| 2013* (b) | 2,524,863,146 | 3,609,073,862 | 1,084,210,716 | 70.0% | 213,291,083 | 508.3 % |

@    *After POC transfer.*
*    *After plan amendments.*
#    *After changes in actuarial assumptions or methods.*
(b)    *Assumes past due contributions of $36M are NOT made.*

## Schedule of Employer Contributions

| Valuation Year Ended June 30 | Reported Employer Contributions | |
|---|---|---|
| | From Pension Obligation Certificates (POCs) | Employer Contributions other than from POCs |
| 2004 | | $95,876,076 |
| 2005 | $739,793,898 | 41,689,528 |
| 2006 | | 58,162,088 |
| 2007 | | 41,442,687 |
| 2008 | | 43,546,951 |
| 2009 | | 41,395,719 |
| 2010 | | 34,602,184 |
| 2011 | | 55,138,044 |
| 2012 | | 64,218,880 |
| 2013 | | 26,515,782 |

# GASB STATEMENT NO. 25 REQUIRED SUPPLEMENTARY INFORMATION

The information presented in the required supplementary schedules was determined as part of the actuarial valuations at the dates indicated. Additional information as of the latest actuarial valuation follows:

| | |
|---|---|
| Valuation date | June 30, 2013 |
| Actuarial cost method | Entry Age |
| Amortization method | Level percent |
| Remaining amortization period for unfunded accrued liabilities | 30 years (see page A-1) |
| Asset valuation method | 7-year smoothed market, 30% corridor |

Actuarial assumptions:
| | |
|---|---|
| Investment rate of return | 7.9% |
| Projected salary increases* | 4.0% - 8.9% |
| *Includes inflation at | 4.0% |
| Cost-of-living adjustments | 2.25% of original pension amount at retirement. |

Membership of the plan consisted of the following at June 30, 2013, the date of the latest actuarial valuation:

| | |
|---|---|
| Retirees and beneficiaries receiving benefits | 12,089 |
| Terminated plan members entitled to but not yet receiving benefits | 2,395 |
| Active plan members | 5,364 |
| Total | 19,848 |

# SECTION D
## FINANCIAL PRINCIPLES



**% OF ACTIVE EMPLOYEE PAYS**

*CASH BENEFITS*

*PAY-AS-YOU-GO CONTRIBUTIONS*

INVESTMENT INCOME

LEVEL CONTRIBUTIONS

CONTRIBUTIONS:
EMPLOYER
AND EMPLOYEE
COMBINED

**START**

**50 ±**

**YEARS OF TIME**

**CASH BENEFITS LINE.** This relentlessly increasing line is the fundamental reality of retirement plan financing. It happens each time a new benefit is added for future retirements (and happens regardless of the design for contributing for benefits).

**LEVEL CONTRIBUTION LINE.** Determining the level contribution line requires detailed assumptions concerning a variety of experiences in future decades, including:

> Economic Risk Areas
>> Rates of investment return
>> Rates of pay increase
>> Changes in active member group size
> Non-Economic Risk Areas
>> Ages at actual retirement
>> Rates of mortality
>> Rates of withdrawal of active members (turnover)
>> Rates of disability

*The financing diagram* on page D-1 shows the relationship between two different philosophies of paying for retirement benefits: the method where contributions match cash benefit payments (as in the Federal Social Security program) and is an *increasing contribution method;* and the *level contribution method* which seeks to balance contribution rates between generations.

*The actuarial valuation* is the mathematical process in which the level contribution rate is determined. The flow of activity constituting the valuation may be summarized as follows:

A. *Member Census Data:*

> Retired lives now receiving benefits
> Former employees with vested benefits not yet payable
> Active employees

B. *Benefit provisions* governing future payments from the plan

C. *Asset data* (cash & investments)

D. *Assumptions concerning future experience in various risk areas,* which are established by the Board of Trustees and the City Council after consulting with the actuary

E. *The funding method* for employer contributions (the long-term, planned pattern for employer contributions)

F. *Mathematically combining the assumptions, the funding method, and the data*

G. *Determination of:*

> Plan financial position, and
> New Employer Contribution Rate

# BASIC FINANCIAL OBJECTIVE AND OPERATION
## OF THE RETIREMENT SYSTEM

**Benefit Promises Made Which Must Be Paid For.** A retirement program is an orderly means of handing out, keeping track of, and financing contingent pension promises to a group of employees. As each member of the retirement program acquires a unit of service credit they are, in effect, handed an "IOU" which reads: **"The Retirement System promises to pay you one unit of retirement benefits, payments in cash commencing when you retire."**

The principal related financial question is: When shall the money required to cover the "IOU" be contributed? This year, when the benefit of the member's service is received? Or, some future year when the "IOU" becomes a cash demand?

The **Constitution of the State of Michigan** is directed to the question:

> "Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

This retirement system meets this constitutional requirement by having the following *Financial Objective: To meet long-term benefit promises through contributions made during members' working careers which, combined with investment income on system assets, will be sufficient to pay benefits throughout their retired lives.*

Translated into actuarial terminology, a level percent-of-payroll contribution objective means that the contribution rate must be at least:

> *Normal Cost* (the value of benefits likely to be paid which is assigned to service being rendered in the current year)
>
> . . . plus . . .
>
> *Interest on the Unfunded Actuarial Accrued Liability* (the difference between the actuarial accrued liability and current system assets).

If contributions to the retirement program are less than the preceding amount, the difference, plus investment earnings not realized thereon, will have to be contributed at some later time, or, benefits will have to be reduced, to satisfy the fundamental fiscal equation under which all retirement programs must operate; that is:

$$B = C + I - E$$

**Benefit** payments to any group of members and their beneficiaries cannot exceed the sum of:

**Contributions** received over time on behalf of the group

. . . plus . . .

**Investment** earnings on contributions received and not required for immediate payment of benefits

. . . minus . . .

**Expenses** incurred in operating the program.

There are retirement programs designed to defer the bulk of contributions far into the future. Contributions in early years are low, but the inevitable consequence is a relentlessly increasing contribution rate – to a level greatly in excess of the level percent-of-payroll rate. *This method of financing is prohibited in Michigan by the state constitution.*

A by-product of the level percent-of-payroll contribution objective is the accumulation of invested assets for varying periods of time. Investment income becomes the major contributor to the retirement program, and the amount is directly related to the amount of past contributions and investment performance.

**Computed Contribution Rate Needed To Finance Benefits.** From a given schedule of benefits and from the data furnished, the contribution rate is calculated *by means of an actuarial valuation* - the technique of assigning monetary values to the risks assumed in operating a retirement program.



# SECTION E
APPENDIX

# Summary of Assumptions Used For DGRS Actuarial Valuations
## Assumptions Adopted by Board of Trustees
## After Consulting With Actuary

## *Economic Assumptions*

*The investment return rate* used in making the valuation was 7.9% per year, compounded annually (net after administrative and investment expenses). The real rate of return is the portion of total investment return which is more than the inflation rate. The 7.9% total investment return rate translates to a spread of 3.9% over wage inflation and 4.4% to 4.9% over price inflation.

*Pay increase assumptions* for individual active members are shown on page E-3. Part of the assumption for each age is for a merit and/or seniority increase, and the other 4.0% recognizes wage inflation. Wage inflation has historically exceeded price inflation by 0.5% to 1.0% a year, on average. Wage inflation of 4% suggests an underlying rate of price inflation of 3.0% to 3.5%. The merit and/or seniority increase assumption was first used in the June 30, 2008 valuation.

*Total active member payroll* is assumed to increase 4.0% annually, which is the portion of the individual pay increase assumptions attributable to wage inflation.

## *Non-Economic Assumptions*

*The number of active members* is assumed to continue at the present number.

*The mortality table* used to measure retired life mortality was 110% of the RP-2000 Combined Table for males and 110% of the RP-2000 Combined Table set back 2 years for females. These tables provide no margin for future mortality improvements. For disabled members, a 10-year set forward of the healthy rates was used to measure post-retirement mortality. Related values are shown on page E-3. This table was first used for the June 30, 2008 valuation.

*The probabilities of retirement* for members eligible to retire are shown on pages E-4 and E-5. These probabilities were revised for the June 30, 2008 valuation.

*The probabilities of separation* from service (including *death-in-service* and *disability*) are shown for sample ages on page E-6. These probabilities were revised for the June 30, 2008 valuation.

## *Funding Methods*

***The entry age actuarial cost method*** was used in determining age & service pension liabilities and normal cost, vesting liabilities and normal cost, and casualty pension liabilities and normal cost. Under this method, each individual's normal cost is determined as a level percent of pay from plan entry to retirement.

***Unfunded actuarial accrued liabilities*** are amortized over a 30-year period (see page A-1), to produce contribution amounts (principal & interest) which are level percent-of-payroll contributions.

***Employer contribution*** dollars were assumed to be paid in equal monthly installments throughout the employer fiscal year.

***Present assets*** were reported to be valued using a seven-year smoothing of the difference between expected and actual investment income. The actuarial value of assets is restricted to a range of 70% to 130% of the market value of assets.

---

***The data about persons now covered and about present assets*** were furnished by the System's administrative staff. Although examined for general reasonableness, the data was not audited by the Actuary.

**The actuarial valuation computations were made by or under the supervision of a Member of the American Academy of Actuaries (MAAA).**

# SAMPLE SALARY ADJUSTMENT RATES

| Sample Ages | Salary Increase Assumptions For an Individual Member | | |
| --- | --- | --- | --- |
| | Merit & Seniority | Base (Economic) | Increase Next Year |
| 20 | 4.9% | 4.0% | 8.9% |
| 25 | 4.9% | 4.0% | 8.9% |
| 30 | 4.1% | 4.0% | 8.1% |
| 35 | 3.0% | 4.0% | 7.0% |
| 40 | 2.3% | 4.0% | 6.3% |
| 45 | 1.8% | 4.0% | 5.8% |
| 50 | 1.3% | 4.0% | 5.3% |
| 55 | 0.9% | 4.0% | 4.9% |
| 60 | 0.5% | 4.0% | 4.5% |
| Ref | 81 | | |

# SINGLE LIFE RETIREMENT VALUES

| Sample Attained Ages | Present Value of $1 Monthly for Life Increasing 2.25% Annually | | Future Life Expectancy (years) | |
| --- | --- | --- | --- | --- |
| | Men | Women | Men | Women |
| 50 | $163.69 | $172.57 | 29.97 | 34.61 |
| 55 | 151.88 | 163.09 | 25.38 | 29.91 |
| 60 | 137.56 | 151.16 | 20.98 | 25.33 |
| 65 | 121.19 | 136.98 | 16.90 | 20.98 |
| 70 | 103.48 | 121.17 | 13.23 | 17.00 |
| 75 | 84.85 | 103.98 | 10.00 | 13.41 |
| 80 | 66.44 | 86.12 | 7.27 | 10.25 |
| Ref: | 506 sb0 x 1.1 | 507 sb2 x 1.1 | | |

# PROBABILITIES OF AGE/SERVICE RETIREMENT
## FOR MEMBERS ELIGIBLE TO RETIRE

| Retirement Ages | Percent of Eligible Active Members Retiring Within Next Year With Unreduced Benefits | | |
|---|---|---|---|
| | EMS | D.O.T. | Others |
| 45 | 25% | | |
| 46 | 25% | | |
| 47 | 25% | | |
| 48 | 22% | | |
| 49 | 20% | | |
| 50 | 18% | 55% | 50% |
| 51 | 15% | 50% | 50% |
| 52 | 15% | 50% | 45% |
| 53 | 15% | 50% | 45% |
| 54 | 15% | 55% | 40% |
| 55 | 15% | 50% | 30% |
| 56 | 15% | 50% | 30% |
| 57 | 15% | 50% | 30% |
| 58 | 15% | 50% | 30% |
| 59 | 15% | 55% | 40% |
| 60 | 40% | 40% | 25% |
| 61 | 30% | 30% | 25% |
| 62 | 30% | 30% | 25% |
| 63 | 30% | 30% | 25% |
| 64 | 30% | 30% | 25% |
| 65 | 30% | 30% | 35% |
| 66 | 30% | 30% | 30% |
| 67 | 30% | 30% | 25% |
| 68 | 30% | 50% | 25% |
| 69 | 30% | 50% | 25% |
| 70 | 100% | 100% | 20% |
| 71 | | | 20% |
| 72 | | | 20% |
| 73 | | | 20% |
| 74 | | | 20% |
| 75 | | | 20% |
| 76 | | | 20% |
| 77 | | | 20% |
| 78 | | | 20% |
| 79 | | | 20% |
| 80 | | | 100% |
| Ref | 537 | 1648 | 1647 |

## PROBABILITIES OF EARLY RETIREMENT
## FOR MEMBERS ELIGIBLE FOR EARLY RETIREMENT

| Retirement Ages | Percent of Eligible Active Members Retiring Within Next Year With Reduced Benefits |
|:---:|:---:|
| 55 | 7% |
| 56 | 8% |
| 57 | 9% |
| 58 | 10% |
| 59 | 12% |
| 60 | 12% |
| 61 | 12% |
| 62 | 12% |
| 63 | 12% |
| 64 | 12% |
| Ref | 1649 |

## SAMPLE RATES OF SEPARATION FROM ACTIVE EMPLOYMENT BEFORE RETIREMENT

| Sample Ages | Years of Service | % of Active Members Separating Within Next Year | | | |
|---|---|---|---|---|---|
| | | Withdrawal | | | |
| | | | | Others | |
| | | EMS | D.O.T. | Men | Women |
| ALL | 0 | 11.00% | 18.00% | 18.00% | 20.00% |
| | 1 | 10.00% | 16.00% | 15.00% | 16.00% |
| | 2 | 8.00% | 14.00% | 13.00% | 14.00% |
| | 3 | 8.00% | 11.00% | 11.00% | 12.00% |
| | 4 | 7.00% | 9.00% | 10.00% | 10.00% |
| 25 | 5 & Over | 6.70% | 8.00% | 7.60% | 7.60% |
| 30 | | 5.90% | 7.60% | 7.22% | 7.22% |
| 35 | | 5.20% | 5.56% | 5.28% | 5.28% |
| 40 | | 4.40% | 4.26% | 4.05% | 4.05% |
| 45 | | 3.40% | 3.69% | 3.51% | 3.51% |
| 50 | | 2.40% | 3.50% | 3.33% | 3.33% |
| 55 | | 2.00% | 3.50% | 3.33% | 3.33% |
| 60 | | 0.00% | 3.50% | 3.33% | 3.33% |
| Ref | | 338 | 143 | 584 | 188 |
| | | 1068 | 212 | 212 x 0.95 | 212 x 0.95 |

| Sample Ages | % of Active Members Becoming Disabled Within Next Year | | | |
|---|---|---|---|---|
| | D.O.T. | | Others | |
| | Ordinary | Duty | Ordinary | Duty |
| 25 | 0.02% | 0.03% | 0.01% | 0.25% |
| 30 | 0.05% | 0.08% | 0.04% | 0.29% |
| 35 | 0.14% | 0.21% | 0.11% | 0.34% |
| 40 | 0.27% | 0.42% | 0.21% | 0.39% |
| 45 | 0.51% | 0.79% | 0.40% | 0.45% |
| 50 | 0.66% | 1.03% | 0.51% | 0.52% |
| 55 | 0.76% | 1.18% | 0.59% | 0.60% |
| 60 | 0.86% | 1.34% | 0.67% | 0.70% |
| Ref | 23  x  0.45 | 23  x  0.70 | 23  x  0.35 | 423  x  0.90 |

| Sample Ages | % of Active Members Dying Within Next Year | | | |
|---|---|---|---|---|
| | Non-Duty Death | | Duty Death | |
| | Men | Women | Men | Women |
| 25 | 0.03% | 0.02% | 0.01% | 0.01% |
| 30 | 0.03% | 0.02% | 0.01% | 0.01% |
| 35 | 0.06% | 0.04% | 0.02% | 0.01% |
| 40 | 0.08% | 0.05% | 0.03% | 0.02% |
| 45 | 0.11% | 0.08% | 0.04% | 0.03% |
| 50 | 0.16% | 0.13% | 0.05% | 0.04% |
| 55 | 0.27% | 0.20% | 0.09% | 0.07% |
| 60 | 0.51% | 0.38% | 0.17% | 0.13% |
| Ref | 506 sb0 x 0.75 | 507 sb0 x 0.75 | 506 sb0 x 0.25 | 507 sb0 x 0.25 |

## MISCELLANEOUS AND TECHNICAL ASSUMPTIONS

**Benefit Service**

Exact Fractional service is used to determine the amount of benefit payable.

**Decrement Operation**

Disability and mortality decrements do not operate during the first 5 years of service. Disability and withdrawal also do not operate during retirement eligibility.

**Decrement Timing**

Decrements of all types are assumed to occur mid-year.

**Eligibility Testing**

Eligibility for benefits is determined based upon the age nearest birthday and rounded service on the date the decrement is assumed to occur.

**Forfeitures**

For vested separations from service, it is assumed that 0% of members separating will withdraw their contributions and forfeit an employer financed benefit.

**Incidence of Contributions**

Contributions are assumed to be received continuously throughout the year based upon the computed percent of payroll shown in this report, and the actual payroll payable at the time contributions are made.

**Liability Adjustments**

Liabilities were increased by 1.0% to adjust for missing or incomplete data.

**Marriage Assumption**

100% of males and 100% of females are assumed to be married for purposes of death-in-service benefits. Male spouses are assumed to be three years older than female spouses for active member valuation purposes.

**Normal Form of Benefit**

Straight life is the normal form of benefit.

**Pay Increase Timing**

End of (Fiscal) year.

**Service Credit Accruals**

It is assumed that members accrue one year of service credit per year.

**Administrative Expenses**

2.10% of payroll was added to the normal cost for ongoing administrative expenses.

**Defined Contribution Plan**

0.80% of payroll was added to the normal cost for DC payments.

**Sick Leave**

Sick leave is estimated at retirement assuming 4 days per year of service.

*Actuarial accrued liabilities* are **the portion of the present value of plan promises to pay benefits in the future not covered by future normal cost contributions.**

--- a liability has been established ("accrued") because the service has been rendered, but the resulting monthly cash benefit may not be payable until years in the future.

If actuarial accrued liabilities at any time exceed the plan's accrued assets (cash & investments), the difference is *unfunded actuarial accrued liabilities*. If the plan's assets equal the plan's actuarial accrued liabilities, the plan would be termed "fully funded".

Each time a plan adds a new benefit which applies to service already rendered, an actuarial accrued liability is created. If assets are insufficient to cover the value of the new benefit promises, an additional unfunded actuarial accrued liability is also created. Payment for such unfunded accrued liabilities is generally spread over a period of years, commonly in the 15-30 year range.

Unfunded actuarial accrued liabilities can occur in another way: if actual financial experience is less favorable than assumed financial experience, the difference is added to unfunded actuarial accrued liabilities. For example, during periods of high inflation, unfunded actuarial accrued liabilities generally increase because unexpected rates of pay increase will create additional liabilities which may not be matched by investment performance. Inflation is a very destructive force on financial stability.

The existence of unfunded actuarial accrued liabilities is not bad, but the changes from year-to-year in the amount of unfunded actuarial accrued liabilities are important -- "bad" or "good" or somewhere in between.

Unfunded actuarial accrued liabilities do not represent a bill payable immediately, but it is important that policy-makers prevent the amount from becoming unreasonably high and *it is vital that there is a sound method for making payments toward them*, so that they are controlled.

**Actuarial Accrued Liability.** The difference between (i) the actuarial present value of future plan benefits, and (ii) the actuarial present value of future normal cost. Sometimes referred to as "accrued liability" or "past service liability."

**Accrued Service.** The service credited under the plan which was rendered before the date of the actuarial valuation.

**Actuarial Assumptions.** Estimates of future plan experience with respect to rates of mortality, disability, turnover, retirement, rate or rates of investment income and salary increases. Decrement assumptions (rates of mortality, disability, turnover and retirement) are generally based on past experience, often modified for projected changes in conditions. Economic assumptions (salary increases and investment income) consist of an underlying rate in an inflation-free environment plus a provision for a long-term average rate of inflation.

**Actuarial Cost Method.** A mathematical budgeting procedure for allocating the dollar amount of the "actuarial present value of future plan benefits" between the actuarial present value of future normal cost and the actuarial accrued liability. Sometimes referred to as the "actuarial funding method."

**Actuarial Equivalent.** A single amount or series of amounts of equal value to another single amount or series of amounts, computed on the basis of the rate(s) of interest and mortality tables used by the plan.

**Actuarial Present Value.** The amount of funds presently required to provide a payment or series of payments in the future. It is determined by discounting the future payments at a predetermined rate of interest, taking into account the probability of payment.

**AFC.** Average Final Compensation.

**Amortization.** Paying off an interest-bearing liability by means of periodic payments of interest and principal, as opposed to paying it off with a lump sum payment.

**APTE**.  Association of Professional and Technical Employees.

**D.O.T**.  Department of Transportation.

**EMS**.  Emergency Medical Service.

**Experience Gain (Loss)**.  A measure of the difference between actual experience and that expected based upon a set of actuarial assumptions during the period between two actuarial valuation dates, in accordance with the actuarial cost method being used.

**GASB**.  The Governmental Accounting Standards Board.

**Normal Cost**.  The annual cost assigned, under the actuarial funding method, to current and subsequent plan years.  Sometimes referred to as "current service cost."  Any payment toward the unfunded actuarial accrued liability is not part of the normal cost.

**POC**.  Pension Obligation Certificates.

**Reserve Account**.  An account used to indicate that funds have been set aside for a specific purpose and are not generally available for other uses.

**SAAA**.  Senior Accountants, Analysts, and Appraisers Association.

**Unfunded Actuarial Accrued Liability**.  The difference between the actuarial accrued liability and valuation assets.  Sometimes referred to as "unfunded accrued liability."

**Valuation Assets**.  The value of current plan assets recognized for valuation purposes.  Generally based on market value plus a portion of unrealized appreciation or depreciation.

# GRS

Gabriel Roeder Smith & Company
Consultants & Actuaries

One Towne Square
Suite 800
Southfield, MI 48076-3723

248.799.9000 phone
248.799.9020 fax
www.gabrielroeder.com

April 4, 2014

Ms. Cynthia Thomas, Executive Director
The General Retirement System of the City of Detroit
2 Woodward Avenue, Suite 908
Detroit, Michigan  48226

**Re:  Report of the June 30, 2013 75th Annual Actuarial Valuation**

Dear Cynthia:

Enclosed are 20 copies of the report.

As always, your questions and comments are welcome.

Sincerely,

Judith A. Kermans, EA, MAAA

JAK:sc
Enclosures

# EXHIBIT D


Gabriel Roeder Smith & Company
Consultants & Actuaries

THE POLICE AND FIRE RETIREMENT SYSTEM OF THE
CITY OF DETROIT
72ND ANNUAL ACTUARIAL VALUATION
JUNE 30, 2013

# OUTLINE OF CONTENTS

| Pages | Items |
|-------|-------|
| 1 | Cover letter |

**Valuation Results**

| Pages | Items |
|-------|-------|
| 3 | COMPUTED EMPLOYER CONTRIBUTION RATES |
| 4 | Actuarial accrued liabilities |
| 5 | Comparative statement |
| 6 | Solvency tests |
| 7 | History of assets and Accrued liabilities (graph) |
| 8 | Experience (gain)/loss |
| 9 | Active members & valuation payroll comparative statement |
| 10 | Retired members & annual allowances comparative statement |
| 11-12 | Active members & retirees (graph) |
| 13-14 | COMMENTS AND CONCLUSION |

**Data Furnished for Valuation**

| Pages | Items |
|-------|-------|
| 15-17 | Summary of benefit provisions |
| 18-19 | Reported assets |
| 20 | Funding value of assets |
| 21-25 | Member data included in valuation |

**Actuarial Disclosures Required by Statement No. 25 of the Governmental Accounting Standards Board**

| Pages | Items |
|-------|-------|
| 26-27 | GASB Statement No. 25 |

**Financial Principles**

| Pages | Items |
|-------|-------|
| 28 L | Financing diagram |
| 28 R | Actuarial valuation process |
| 29-30 | Financial objective |

**Appendix**

| Pages | Items |
|-------|-------|
| 31-32 | Summary of assumptions used in actuarial valuation |
| 38 | Meaning of unfunded actuarial accrued liabilities |
| 39-40 | Glossary |

# GRS

Gabriel Roeder Smith & Company
Consultants & Actuaries

One Towne Square
Suite 800
Southfield, MI 48076-3723

248.799.9000 phone
248.799.9020 fax
www.gabrielroeder.com

April 4, 2014

Board of Trustees
The Police and Fire Retirement System of the City of Detroit

The results of the **72nd Annual Actuarial Valuation** of the annuity and pension liabilities of the Police and Fire Retirement System of the City of Detroit are presented in this report. The purpose of the valuation was to measure the System's funding progress, to determine contribution rates for the 2015 fiscal year in accordance with the established funding policy, and to determine actuarial information for Governmental Accounting Standards Board (GASB) Statements No. 25 and No. 27 for FY 2014. The results of the valuation may not be applicable for other purposes.

The date of the valuation was **June 30, 2013**.

Future actuarial measurements may differ significantly from the current measurements presented in this report due to such factors as: plan experience differing from that anticipated by the economic and demographic assumptions; changes in economic or demographic assumptions; increases or decreases expected as part of the natural operation of the methodology used for these measurements (such as the end of an amortization period or additional cost or contribution requirements based on the plan's funded status); and changes in plan provisions or applicable law. Due to the limited scope of the actuary's assignment, the actuary did not perform an analysis of the potential range of such future measurements.

The actuarial assumptions used in the valuation are summarized in the Appendix. Benefit provisions are summarized on pages 15-17. System asset information was provided by retirement system staff. It was reviewed for general reasonableness, but not otherwise audited by the actuary.

Participant data concerning the active, inactive and retired persons covered by the System was furnished by the retirement system staff, together with needed financial information. Data was checked for year to year consistency, but was not otherwise audited by the actuary. The actuary is not responsible for the accuracy of the data provided by the System. Please see the assumptions section (page 33) which shows that there is a load for "missing or incomplete data".

**We presented preliminary valuation results at the March 20, 2014 Board meeting. Subsequent to that meeting, the Retirement System provided additional information for certain members previously excluded from the valuation data files. Based on our analysis, the impact of this additional information was less than our adjustment for missing or incomplete data in our original results. Therefore, we have not incorporated the revised data and results in this final report are unchanged from our March presentation. We recommend staff continue their data cleanup efforts and consider the value of a data audit prior to the next valuation.**

**Your attention is directed particularly** to the employer contribution rates on page 3 and the comments on pages 13 and 14.

This report has been prepared by actuaries who have substantial experience valuing public sector retirement systems. To the best of our knowledge, this report is complete and accurate and was made in accordance with standards of practice promulgated by the Actuarial Standards Board of the American Academy of Actuaries. The actuarial assumptions used for the valuation produce results which, individually and in the aggregate, are reasonable.

The signing actuaries are independent of the plan sponsor.

David Kausch and Judith Kermans are Members of the American Academy of Actuaries (MAAA), and meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

The intended audience is the Board of Trustees for the Police and Fire Retirement System of the City of Detroit and their staff. If supplied to other parties, the report should be supplied in its entirety. The authors of this report are available to answer questions from the Board and Staff as needed.

The plan sponsor (City of Detroit) is currently in Chapter 9 Bankruptcy. Due to this situation there is a great deal of uncertainty regarding the structure of the Plan. If the Plan structure changes as a result of the bankruptcy, the Board should consider having this report re-issued to account for those changes. This report does not evaluate the plan sponsor's ability to make the required contributions when due. Such an analysis is not within the scope of our assignment. Failure to receive employer contributions on a timely basis could jeopardize the sustainability of the fund.

Respectfully submitted,

David T. Kausch, FSA, EA, MAAA

Judith A. Kermans, EA, MAAA

Kenneth G. Alberts

JAK:dj

# VALUATION RESULTS

# EMPLOYER CONTRIBUTION RATES
## COMPUTED PAYABLE LAST DAY OF FISCAL YEAR
## EXPRESSED AS PERCENTS OF ACTIVE MEMBER PAYROLL
## 2014-2015 FISCAL YEAR

| Valuation Date June 30<br>Contribution for Fiscal Year | 2013<br>2015<br>**Includes Payment of Required Contributions Prior to FY 2015** | 2013<br>2015<br>**Assuming No Payment of Required Contributions Prior to FY 2015** | 2012<br>2014 |
|---|---|---|---|
| **Normal Cost** | | | |
| Age & service allowances | 21.03 % | 21.03 % | 19.78 % |
| Disability allowances | 3.81 % | 3.81 % | 3.56 % |
| Death-in-service allowances | 0.43 % | 0.43 % | 0.40 % |
| Administrative Expenses | 3.00 % | 3.00 % | 2.50 % |
| Total | 28.27 % | 28.27 % | 26.24 % |
| | | | |
| Members current contributions # | 3.93 % | 3.93 % | 3.88 % |
| (Future refunds) | (0.41)% | (0.41)% | (0.38)% |
| Available for monthly benefits | 3.52 % | 3.52 % | 3.50 % |
| | | | |
| **Employer Normal Cost** | **24.75 %** | **24.75 %** | **22.74 %** |
| | | | |
| **Actuarial Accrued Liabilities** | | | |
| Total ($ millions) | $3,890.1 | $3,890.1 | $3,822.7 |
| Funding Value of Assets | 3,545.5 | 3,474.5 | 3,675.5 |
| Unfunded Actuarial Accrued Liabilities | | | |
| - dollar (millions) | $ 344.6 | $ 415.6 | $ 147.2 |
| - amortization percent + | 18.48 % | 24.70 % | 6.70 % |
| **Computed Employer Rate** | **43.23 %** | **49.45 %** | **29.44 %** |
| | | | |
| **Computed Employer Rate with Interest Adjustment *** | **44.93 %** | **51.39 %** | **30.59 %** |
| | | | |
| **Estimated Dollar Contributions for FY** | | | |
| Employer Normal Cost ($ million) | $ 44.8 | $ 44.8 | $ 48.7 |
| Actuarial Accrued Liabilities ($ million) | 33.4 | 44.7 | 14.3 |
| Total ($ million) @ | $ 78.2 | $ 89.4 | $ 63.0 |
| | | | |
| Past Due Payments of FY 2013 | $ 71.0 | $ - | |
| Currently Due for FY 2014 | $ 63.0 | $ - | |

\# *Member statutory contributions of 5% to the Annuity Savings Fund are not payable during all periods of covered employment. The rate shown is the weighted average of expected contributions divided by expected pay in the upcoming fiscal year.*

\+ *Based on the Board of Trustees funding policy to continue full normal cost contributions when valuation assets exceed accrued liabilities and the use of a closed 28-year level dollar amortization period when accrued liabilities exceed assets.*

\* *Computed Employer Rate if paid at end of year.*

*We understand that the FY2013 employer contributions have not been made and the FY2014 employer contributions are not being made due to the City's Chapter 9 bankruptcy. The FY2015 contributions are shown under two scenarios. One assumes the FY2013 and FY2014 would be made, the other assumes they would be made. The reported assets as of June 30, 2013 include zero receivable contributions.*

13-53846-tjt  Doc 8392  Filed 11/21/14  Entered 11/21/14 18:04:24  Page 172 of 505

# ACTUARIAL ACCRUED LIABILITIES AS OF JUNE 30, 2013

| Present Value, June 30 | Amount |
|---|---|
| **Accrued Pension Liabilities** | |
| Retirees and beneficiaries | $2,911,280,932 |
| Inactive members future deferred pensions | 28,044,895 |
| Active members | 749,847,358 |
| Total accrued pension liabilities | 3,689,173,185 |
| Pension fund balances | 3,273,567,865 |
| Unfunded accrued pension liabilities | $ 415,605,320 |
| **Accrued Annuity Liabilities** | |
| Retirees and beneficiaries | |
| Future annuities | $ 3,865,681 |
| Reserve for outstanding refunds & contingencies | 18,872,770 |
| Total | $ 22,738,451 |
| Members annuities & future refunds | 178,231,705 |
| Total accrued annuity liabilities | 200,970,156 |
| Annuity fund balances | 200,970,156 |
| Unfunded accrued annuity liabilities | $ 0 |
| **System Totals** | |
| Actuarial accrued liabilities | $3,890,143,341 |
| Accrued assets# | 3,474,538,021 |
| Unfunded actuarial accrued liabilities# | $ 415,605,320 |

#  *Assumes past due contributions of $71 million are **NOT MADE**.*

# VALUATION RESULTS - COMPARATIVE STATEMENT
## - - $ IN MILLIONS - -

| June 30 | Active Payroll | | Actuarial Accrued Liabilities | | | Unfunded / Active Pays | Employer Contributions % of Pays |
| | Total | Average | Computed Total | Valuation Assets | Unfunded | | |
|---|---|---|---|---|---|---|---|
| 1994 | $ 199.7 | $38,693 | $2,486.2 | $2,304.4 | $ 181.8 | 0.9 | 27.64% |
| 1995(a) | 209.7 | 39,692 | 2,574.2 | 2,443.0 | 131.2 | 0.6 | 25.90% |
| 1996 | 212.7 | 39,965 | 2,633.4 | 2,628.6 | 4.8 | 0.0 | 21.81% |
| 1997(b) | 217.6 | 40,145 | 2,724.1 | 2,944.2 | (220.1) | - | 7.32% |
| 1998*# | 217.5 | 40,772 | 2,976.8 | 3,325.9 | (349.1) | - | 26.16% |
| 1999#@ | 216.0 | 40,542 | 3,274.1 | 3,668.4 | (394.3) | - | 26.17% |
| 2000*# | 237.7 | 43,376 | 3,342.1 | 3,964.2 | (622.1) | - | 27.25% |
| 2001# | 253.3 | 45,353 | 3,463.2 | 3,900.0 | (436.8) | - | 27.22% |
| 2002(a)# | 248.7 | 46,203 | 3,632.0 | 3,635.1 | (3.1) | - | 23.39% |
| 2003 | 248.7 | 47,305 | 3,721.6 | 3,205.5 | 516.1 | 2.1 | 43.89% |
| 2004 | 258.7 | 51,126 | 3,857.5 | 3,074.5 | 783.0 | 3.0 | 54.36% |
| 2005 | 250.5 | 52,197 | 3,780.4 | 3,757.9 | 22.5 | 0.1 | 25.98% |
| 2006+& | 228.1 | 52,908 | 3,809.0 | 3,980.3 | (171.3) | - | 25.09% |
| 2007+ | 230.2 | 54,647 | 3,870.7 | 4,307.2 | (436.5) | - | 25.16% |
| 2007+* | 230.2 | 54,647 | 3,896.8 | 4,307.2 | (410.4) | - | 26.71% |
| 2008+ | 232.8 | 57,090 | 3,992.4 | 4,316.3 | (323.9) | - | 26.75% |
| 2008+(a) | 232.8 | 57,090 | 4,071.1 | 4,316.3 | (245.2) | - | 26.27% |
| 2009 | 231.8 | 57,418 | 4,221.3 | 3,945.2 | 276.1 | 1.2 | 35.22% |
| 2010 | 228.8 | 57,322 | 4,180.1 | 3,412.8 | 767.3 | 3.4 | 49.75% |
| 2010(a) | 228.8 | 57,322 | 3,987.5 | 3,853.3 | 134.2 | 0.6 | 28.90% |
| 2010(a)* | 228.8 | 57,322 | 3,767.4 | 3,853.3 | (85.9) | - | 23.02% |
| 2011 | 220.5 | 57,773 | 3,808.6 | 3,804.8 | 3.8 | 0.0 | 23.14% |
| 2012(a) | 205.8 | 57,374 | 3,822.7 | 3,675.5 | 147.2 | 0.7 | 30.59% |
| 2013(c) | 186.7 | 57,163 | 3,890.1 | 3,474.5 | 415.6 | 2.2 | 51.39% |
| 2013(d) | 186.7 | 57,163 | 3,890.1 | 3,545.5 | 344.6 | 1.8 | 44.93% |

(a) *After changes in actuarial assumptions and/or methods.*
(b) *After changes in actuarial assumptions and a temporary full funding credit.*
*  *After Plan Amendments.*
#  *Employer normal cost before full funding credit.*
@  *After $55.4 million reserve for 1998-1999 13th check and ASF distributions.*
+  *Based on the Board of Trustees funding policy to continue full normal cost contributions when valuation assets exceed accrued liabilities.*
&  *2006 assets were revised following the 6/30/2006 valuation.*
(c) *Based on 28-year amortization of missed contributions.*
(d) *Assumes past due contributions of $71 million are made.*

The Police and Fire Retirement System of the City of Detroit funding objective is to meet long-term benefit promises through contributions that remain approximately level from year to year as a percent of member payroll. If the contributions to the System are level in concept and soundly executed, the System will pay all promised benefits when due -- the ultimate test of financial soundness. Testing for level contribution rates is *the long-term solvency test*.

*A short-term solvency test* is one means of checking a System's progress under its funding program. In a short-term solvency test, the plan's present assets (cash and investments) are compared with:

1) Active member contributions on deposit;

2) The liabilities for future benefits to present retired lives;

3) The liabilities for service already rendered by active members.

In a System that has been following the discipline of level percent-of-payroll financing, the liabilities for active member contributions on deposit (liability 1) and the liabilities for future benefits to present retired lives (liability 2) will be fully covered by present assets (except in rare circumstances). In addition, the liabilities for service already rendered by active members (liability 3) will often be partially covered by the remainder of present assets. The larger the funded portion of liability 3, the stronger the condition of the System.

### Short-Term Solvency Test
### 5-Year Comparative Statement
### ($ millions)

| | Actuarial Accrued Liabilities | | | | Portion of Accrued Liabilities Covered by Assets | | | |
| | (1) Active Member Contr. (ASF) | (2) Retirees and Benef. | (3) Present Members (Employer Financed Portion) | Funding Value of Assets | | | | |
| June 30 | | | | | (1) | (2) | (3) | Total |
|---|---|---|---|---|---|---|---|---|
| | ------------ $ Millions ------------ | | | | | | | |
| 2009 | $ 301 | $ 2,837 | $ 1,083 | $ 3,945 | 100% | 100% | 75% | 93% |
| 2010#(a) | 298 | 2,743 | 726 | 3,853 | 100% | 100% | 112% | 102% |
| 2011 | 230 | 2,717 | 861 | 3,805 | 100% | 100% | 100% | 100% |
| 2012# | 199 | 2,822 | 801 | 3,675 | 100% | 100% | 82% | 96% |
| 2013* | 178 | 2,934 | 777 | 3,475 | 100% | 100% | 47% | 89% |

(a) *After changes in benefit provisions.*
# *After changes in actuarial assumptions and/or methods.*
* *Assumes past due contributions of $71 million are NOT MADE.*

# ASSETS AND ACCRUED LIABILITIES



Assets and Accrued Liabilities chart showing $ Millions (vertical axis from $0 to $5,000) by Valuation Year (1972 to 2012), with labels for "Actuarial Accrued Liability" and "Assets." Legend: Assets, UAAL, Assets over Accrued Liabilities.

*The Police and Fire Retirement System of the City of Detroit*

## DERIVATION OF EXPERIENCE GAIN (LOSS)
## YEAR ENDED JUNE 30, 2013

Actual experience will never (except by coincidence) coincide exactly with assumed experience. Gains and losses will often cancel each other over a period of years, but sizable year to year fluctuations are common. Detail on the derivation of the experience gain (loss) is shown below.

| | | |
|---|---|---:|
| (1) | UAAL* at start of year | $ 147,216,398 |
| (2) | Employer and employee normal cost from last valuation | 52,726,031 |
| (3) | Actual employer and employee contributions | 7,799,790 |
| (4) | Interest accrual: (1) x .080 | 11,777,312 |
| (5) | Expected UAAL before changes: (1) + (2) - (3) + (4) | 203,919,951 |
| (6) | Change due to benefit provision modifications | 0 |
| (7) | Change due to revised actuarial methods and/or assumptions | 0 |
| (8) | Other: Missed FY 2013 Contributions | 71,000,000 |
| (9) | Expected UAAL after changes: (5) + (6) + (7) + (8) | 274,919,951 |
| (10) | Actual UAAL at end of year | 415,605,320 |
| (11) | Experience gain (loss): (9) - (10) | (140,685,369) |
| (12) | Experience gain (loss) as a % of beginning of year accrued liability | (3.7)% |
| (13) | Experience gain (loss) | (140,685,369) |
| (14) | Gain (loss) due to investment experience | (138,144,755) |
| (15) | Gain (loss) from other sources | (2,540,614) |

\*   *Unfunded actuarial accrued liability.*

# COMPARATIVE STATEMENT OF ACTIVE MEMBERS
## AND VALUATION PAYROLL

| June 30 | No. of Members 1969 Plan | No. of Members Pre-1969 | Total Members No. | Total Members % Change | Ratio of Active to Retired | Annual Payroll | Average Pay $ | Average Pay Change |
|---|---|---|---|---|---|---|---|---|
| 1979 | 4,230 | 2,739 | 6,969 | (5)% | 1.2 | $175,174,674 | $25,136 | 11.9 % |
| 1980 | 3,719 | 2,640 | 6,359 | (9)% | 1.1 | 178,004,349 | 27,993 | 11.4 % |
| 1981 | 2,991 | 2,491 | 5,482 | (14)% | 0.9 | 155,849,804 | 28,429 | 1.6 % |
| 1982 | 3,185 | 2,299 | 5,484 | 0 % | 0.9 | 155,372,732 | 28,332 | (0.3)% |
| 1983 | 3,176 | 2,214 | 5,390 | (2)% | 0.9 | 153,347,716 | 28,450 | 0.4 % |
| 1984 | 3,070 | 2,139 | 5,209 | (3)% | 0.9 | 148,223,416 | 28,455 | 0.0 % |
| 1985 | 3,657 | 1,998 | 5,655 | 9 % | 0.9 | 171,357,741 | 30,302 | 6.5 % |
| 1986 | 4,463 | 1,879 | 6,342 | 12 % | 1.0 | 185,312,563 | 29,220 | (3.6)% |
| 1987 | 4,918 | 1,627 | 6,545 | 3 % | 1.0 | 202,277,028 | 30,906 | 5.8 % |
| 1988 | 4,776 | 1,447 | 6,223 | (5)% | 1.0 | 206,107,980 | 33,120 | 7.2 % |
| 1989 | 4,942 | 1,338 | 6,280 | 1 % | 1.0 | 208,361,567 | 33,179 | 0.2 % |
| 1990 | 4,834 | 1,174 | 6,008 | (4)% | 0.9 | 221,538,387 | 36,874 | 11.1 % |
| 1991 | 4,372 | 1,066 | 5,438 | (9)% | 0.8 | 213,072,553 | 39,182 | 6.3 % |
| 1992 | 4,411 | 850 | 5,261 | (3)% | 0.8 | 205,681,412 | 39,095 | (0.2)% |
| 1993 | 4,534 | 725 | 5,259 | 0 % | 0.7 | 204,289,195 | 38,846 | (0.6)% |
| 1994 | 4,578 | 584 | 5,162 | (2)% | 0.7 | 199,734,550 | 38,693 | (0.4)% |
| 1995 | 4,779 | 505 | 5,284 | 2 % | 0.7 | 209,733,734 | 39,692 | 2.6 % |
| 1996 | 4,889 | 432 | 5,321 | 1 % | 0.7 | 212,656,401 | 39,965 | 0.7 % |
| 1997 | 5,049 | 371 | 5,420 | 2 % | 0.7 | 217,585,229 | 40,145 | 0.5 % |
| 1998 | 5,018 | 316 | 5,334 | (2)% | 0.7 | 217,479,443 | 40,772 | 1.6 % |
| 1999 | 5,099 | 230 | 5,329 | 0 % | 0.7 | 216,049,687 | 40,542 | (0.6)% |
| 2000 | 5,291 | 190 | 5,481 | 3 % | 0.7 | 237,741,560 | 43,376 | 7.0 % |
| 2001 | 5,453 | 132 | 5,585 | 2 % | 0.7 | 253,297,027 | 45,353 | 4.6 % |
| 2002 | 5,290 | 92 | 5,382 | (4)% | 0.7 | 248,663,133 | 46,203 | 1.9 % |
| 2003 | 5,181 | 76 | 5,257 | (2)% | 0.6 | 248,681,461 | 47,305 | 2.4 % |
| 2004 | 5,007 | 53 | 5,060 | (4)% | 0.6 | 258,699,581 | 51,126 | 8.1 % |
| 2005 | 4,768 | 31 | 4,799 | (5)% | 0.6 | 250,491,872 | 52,197 | 2.1 % |
| 2006 | 4,298 | 14 | 4,312 | (10)% | 0.5 | 228,140,160 | 52,908 | 1.4 % |
| 2007 | 4,204 | 8 | 4,212 | (2)% | 0.5 | 230,173,964 | 54,647 | 3.3 % |
| 2008 | 4,071 | 7 | 4,078 | (3)% | 0.5 | 232,812,606 | 57,090 | 4.5 % |
| 2009 | 4,030 | 7 | 4,037 | (1)% | 0.5 | 231,795,528 | 57,418 | 0.6 % |
| 2010 | 3,985 | 7 | 3,992 | (1)% | 0.5 | 228,829,999 | 57,322 | (0.2)% |
| 2011 | 3,809 | 7 | 3,816 | (4)% | 0.5 | 220,461,691 | 57,773 | 0.8 % |
| 2012 | 3,580 | 7 | 3,587 | (6)% | 0.4 | 205,800,278 | 57,374 | (0.7)% |
| 2013@ | 3,260 | 6 | 3,266 | (9)% | 0.4 | 186,694,166 | 57,163 | (0.4)% |

@ *Payroll used was the greater of the payroll reported for the current and prior fiscal years.*

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 178 of 505

# COMPARATIVE STATEMENT OF ANNUAL RETIREMENT ALLOWANCES
## BEING PAID RETIREES AND BENEFICIARIES

| June 30 | No. Retired | | % of Current Allowances | | | Current Allowances | | Allowances as a % of Payroll |
|---|---|---|---|---|---|---|---|---|
| | Pre-69 | Total | Annuities | Pensions | Escalators | Total | Average | |
| 1979 | 5,869 | 5,869 | 2.6% | 51.3% | 46.1% | $ 61,355,273 | $ 10,454 | 35% |
| 1980 | 5,676 | 5,911 | 2.1% | 45.3% | 52.6% | 72,671,386 | 12,294 | 41% |
| 1981 | 5,691 | 5,951 | 2.0% | 46.7% | 51.3% | 74,565,233 | 12,530 | 48% |
| 1982 | 5,709 | 6,006 | 2.0% | 49.0% | 49.0% | 75,348,490 | 12,545 | 48% |
| 1983 | 5,705 | 6,038 | 2.0% | 50.8% | 47.2% | 75,774,552 | 12,550 | 49% |
| 1984 | 5,641 | 5,986 | 1.9% | 51.7% | 46.4% | 76,126,476 | 12,717 | 51% |
| 1985 | 5,581 | 6,011 | 1.9% | 54.0% | 44.1% | 70,776,660 | 12,773 | 45% |
| 1986 | 5,585 | 6,117 | 1.6% | 52.5% | 45.9% | 85,409,280 | 13,962 | 46% |
| 1987 | 5,486 | 6,264 | 1.5% | 53.5% | 45.0% | 88,608,492 | 14,146 | 44% |
| 1988 | 5,442 | 6,416 | 1.3% | 53.9% | 44.8% | 100,659,780 | 15,689 | 49% |
| 1989 | 5,415 | 6,496 | 1.3% | 55.7% | 43.0% | 103,122,696 | 15,875 | 49% |
| 1990 | 5,412 | 6,660 | 1.1% | 54.3% | 44.6% | 114,650,196 | 17,215 | 52% |
| 1991 | 5,361 | 6,754 | 1.1% | 54.3% | 44.6% | 121,715,028 | 18,021 | 57% |
| 1992 | 5,342 | 6,899 | 1.0% | 57.0% | 42.0% | 124,835,208 | 18,095 | 61% |
| 1993 | 5,349 | 7,091 | 1.0% | 59.5% | 39.5% | 129,027,970 | 18,196 | 63% |
| 1994 | 5,249 | 7,169 | 0.9% | 61.7% | 37.4% | 131,595,379 | 18,356 | 66% |
| 1995 | 5,161 | 7,311 | 0.9% | 61.3% | 37.8% | 138,959,417 | 19,007 | 66% |
| 1996 | 5,049 | 7,469 | 0.8% | 62.6% | 36.6% | 143,536,485 | 19,218 | 67% |
| 1997 | 5,012 | 7,743 | 0.8% | 63.3% | 35.9% | 150,843,744 | 19,481 | 69% |
| 1998 | 4,719 | 7,750 | 0.7% | 65.8% | 33.5% | 154,226,437 | 19,900 | 71% |
| 1999 | 4,573 | 7,883 | 0.7% | 68.4% | 30.9% | 158,523,816 | 20,110 | 73% |
| 2000 | 4,498 | 8,079 | 0.6% | 70.0% | 29.4% | 164,279,376 | 20,334 | 69% |
| 2001 | 4,394 | 8,166 | 0.6% | 67.4% | 32.0% | 180,239,652 | 22,072 | 71% |
| 2002 | 4,229 | 8,179 | 0.5% | 68.4% | 31.1% | 185,658,396 | 22,699 | 75% |
| 2003 | 4,104 | 8,277 | 0.5% | 69.8% | 29.7% | 191,634,636 | 23,153 | 77% |
| 2004 | 3,961 | 8,328 | 0.4% | 68.5% | 31.1% | 203,083,524 | 24,386 | 79% |
| 2005 | 3,791 | 8,376 | 0.4% | 69.5% | 30.1% | 211,114,020 | 25,205 | 84% |
| 2006 | 3,666 | 8,550 | 0.4% | 70.9% | 28.7% | 222,357,372 | 26,007 | 97% |
| 2007 | 3,501 | 8,498 | 0.3% | 70.6% | 29.1% | 227,671,788 | 26,791 | 99% |
| 2008 | 3,318 | 8,442 | 0.3% | 70.0% | 29.7% | 234,223,368 | 27,745 | 101% |
| 2009 | 3,168 | 8,424 | 0.3% | 70.1% | 29.6% | 240,094,968 | 28,501 | 104% |
| 2010 | 3,035 | 8,356 | 0.3% | 70.3% | 29.4% | 243,688,596 | 29,163 | 106% |
| 2011 | 2,861 | 8,379 | 0.2% | 71.6% | 28.2% | 250,376,700 | 29,881 | 114% |
| 2012 | 2,723 | 8,451 | 0.2% | 72.2% | 27.6% | 258,660,084 | 30,607 | 126% |
| 2013 | 2,544 | 8,476 | 0.2% | 72.9% | 26.9% | 266,438,460 | 31,434 | 143% |



**Active and Retired Members**



**Retirement Allowances as %s of Active Pays**

# EXPECTED TERMINATIONS FROM ACTIVE EMPLOYMENT
## FOR CURRENT ACTIVE MEMBERS



The chart above shows the expected future development of the present population in simplified terms. The Retirement System presently covers 3,266 active members. Eventually, 48 members are expected to terminate covered employment prior to retirement and forfeit eligibility for an employer provided benefit. 3,033 members are expected to receive monthly retirement benefits either by retiring directly from active service, or by retiring from vested deferred status. 185 members are expected to become eligible for death-in-service or disability benefits. Shown below is a graph of projected active members remaining in the Retirement System. It is projected that less than half of the current active population will be active by 2020.



**The purpose of this report is to measure the funding progress and establish the computed employer contribution rate for Fiscal Year 2015 in an ongoing but closed pension plan. This actuarial valuation does not take into account any of the changes being discussed as part of the Bankruptcy mediation process but presents the results based on plan provisions and actuarial assumptions as they were pre-bankruptcy including a plan closure with an unknown effective date. This report was prepared for the Police and Fire Retirement System Board of Trustees and should not be used by any other party or for any other purpose than as described in this paragraph.**

### Experience during the Past Year

Investment experience for the year ended June 30, 2013 was favorable with a market rate of return of 14.4% which is 6.4% above the assumed 8.00% investment rate of return. However, because of the 7-year smoothing of the current gain (as well as prior gains and losses), the recognized rate of return on the funding value of assets was only 4.1%. Because of the past unfavorable market returns and the 7-year smoothing, the funding value of assets exceeds the market value by $440 million. Substantial upward pressure on the employer rate can be expected in each of the next three years unless offset by investment or other gains.

### Annuity Reserve Fund

The Annuity Reserve Fund (ARF), as reported, was $19 million higher than the related accrued liabilities for Retirees and Beneficiaries. The Board approved a transfer of $12 million from the Annuity Reserve Fund to the Pension Accumulation Fund in 2001, a transfer of $5 million in 2005 and a transfer of $22 million in 2011.

### Employer Contribution Rate

The employer contribution rate increased from 30.59% of covered payroll last year to 51.39% of covered payroll this year (if missing contributions are ignored). As already discussed, the System experienced actuarial losses this year primarily due to lower than assumed investment return on a funding (smoothed) value of assets basis. The Boards' funding policy is: 1) to require full normal cost contributions when valuation assets exceed accrued liabilities and 2) to require the normal cost plus an amortization payment on the UAAL (based on a closed 28-year period) when accrued liabilities exceed valuation assets. As of June 30, 2013, the System is 89.3% funded so the computed employer contribution is above the employer normal cost. There are approximately $440 million in net investment losses scheduled to be recognized over the next 5 years. On a market value basis, the fund is approximately 78.0% funded and would be approximately 79.8% funded if it had received the proper amounts of employer contributions. If the market value of assets were used to determine the employer contribution rate as of June 30, 2013, the computed employer contribution rate would have been 76.09% of covered payroll. That rate is an estimate of where the employer contribution rate would be at the end of the asset smoothing period (in 6 years), if there are no other gains or losses and the payroll remains stable. When the Plan is finally closed, the payroll will decline, and the contribution rate will increase to obtain the same contribution dollars – see discussion on page 14 regarding closed plans and the computation of the required employer contributions).

### Payroll

Pay was temporarily decreased for members during 2013. As we understand it, the decrease in pay is temporary and will not impact Average Final Pay at retirement.

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 182 of 505

## Assets and Accrued Contributions

As of June 30, 2013, the annual benefits were approximately 9% of the market value of assets. Failure to receive employer contributions on a timely basis could jeopardize the sustainability of the fund. **We recommend that all previously computed employer contributions be deposited into the fund as soon as possible.**

## Methods and Assumption Review

Actuarial methods and assumptions were last formally reviewed (in aggregate) for the 5-year period ending June 30, 2007. The next review was scheduled to be completed after the June 30, 2012 valuation to cover the 5-year period ending June 30, 2012. The City Ordinance requires a formal review be performed every 5 years. The review was suspended due to more urgent projects resulting from the Bankruptcy proceedings as well as the uncertainty of the structure of the plan as a result of the Bankruptcy. We recommend that work on this review be authorized once the bankruptcy issues related to this plan are settled.

## Plan Closure

After completion of the June 30, 2012 valuation, we learned that the plan closure date is contingent upon the opening of the new DC replacement plan. Since the replacement plan has not been established, new members continue to enter this plan. For purposes of this valuation we have assumed the plan closure date will occur after FY 2015 (the contribution effective date). If the plan does not close, level percent of payroll financing could be used for financing the UAAL, which would reduce the employer contribution rate by approximately 7%-8% of payroll.

## Conclusion

**Based upon the funding policy established by the Board, the data furnished by the Retirement System and the actuarial assumptions shown in the Appendix, the recommended employer contribution rate for the 2014-2015 fiscal year is 51.39% of covered payroll assuming missed contributions will not be re-paid and 44.93% of covered payroll if they are re-paid/paid.**

# DATA FURNISHED FOR VALUATION

# SUMMARY OF BENEFIT PROVISIONS
## (JULY 1, 2013)

### Age and Service Retirement

*Eligibility* - 25 years of service regardless of age. 20 years of service regardless of age for eligible DPOA and DFFA members. DFFA members must retire by age 60.

*Annual Amount* - An annuity equal to the actuarial equivalent of the member's accumulated contribution account plus a defined benefit, which, when added to the annuity will provide the following:

| | | |
|---|---|---|
| **Pre-1969 Members** | - | For all service earned up to April 5, 2011 for LSA and Fire equivalent members, and up to September 1, 2011 for DPOA and Fire equivalent members, 2.5% of AFC times the first 25 years of service, with a maximum allowance of 15/22 of a police officer's or firefighter's annual rate of compensation (actuarially reduced to reflect early payment). |
| | | For all service earned after April 5, 2011 for LSA and Fire equivalent members, and after September 1, 2011 for DPOA and Fire equivalent members, 2.1% of AFC times the first 25 years of service, with a maximum allowance of 15/22 of a police officer's or firefighter's annual rate of compensation. |
| **1969 Plan Members** | - | For all service earned up to April 5, 2011 for LSA and Fire equivalent members, and up to September 1, 2011 for DPOA and Fire equivalent members, 2.5% of AFC times the first 25 years of service plus 2.1% of AFC times each of the next 10 years of service. |
| | | For all service earned after April 5, 2011 for LSA and Fire equivalent members, and after September 1, 2011 for DPOA and Fire equivalent members, 2.1% of AFC times each year of service, up to 35 years of service. |

Members may elect to receive their accumulated contribution account in a lump sum after 25 years of service (20 years of service for eligible DPOA and DFFA members). The defined benefit at retirement is then reduced by the actuarial equivalent of the amount of principal withdrawn. No reduction is made with regard to the interest portion of the withdrawal. Pre-1969 plan members may elect 1969 plan benefits at the time of retirement.

*Type of Average Final Compensation (AFC)* - Average of the current compensation for the ranks held in each of last 5 years (last 3 years for DPCOA, Executive Members and their Fire equivalents). Pension benefits for non-union employees may not be diminished due to a reduction in compensation because of fiscal emergency. AFC includes prior longevity distributions during the averaging period in accordance with the following schedule: 1% of compensation after 5 years of service, 2% after 11 years, 3% after 16 years and 4% after 21 years. A member may elect that upon retirement or upon death before retirement either (i) a lump sum payment equal to 85% (100% for DPOA and DPCOA members) of the amount of his or her unused accumulated sick leave bank, or (ii) to have the 3-year average of 25% of the value of the accumulated unused sick leave bank added to his or her AFC. Any member electing the AFC adjustment option will also be paid a lump sum equal to the remaining value of the sick leave bank as provided in (i) above. Lump sum payments are not paid by the retirement system.

### Deferred Retirement (vested benefit)

*Eligibility* - 10 years of service for DPOA and Fire equivalents, age 40 with 8 years of service for all others.

*Annual Amount* - Same as regular retirement but based on average final compensation and credited service at the time of termination.

*Benefit Commencement - DPOA and Fire equivalent members hired after 6/30/85*: Unreduced benefit begins at age 62. *All other members*: Unreduced benefit begins at the age when the member would have first been eligible for regular retirement had the member continued in City service. **All** members may elect a reduced benefit payable immediately.

### Duty Disability Retirement

*Eligibility* - No age or service requirement.

*Annual Amount* – A basic benefit of 50% of final compensation and a supplemental benefit of 16-2/3% of final compensation is payable for 24 months. After 24 months, members disabled from any occupation continue to receive both benefits; otherwise, only the 50% benefit is then payable. Upon attaining 25 years of service, the disability benefit is 50% of final compensation. Members convert to regular retirement benefit at age 65. Worker's compensation payments are offset. Members who have already filed under the old duty disability plan will receive 66-2/3% of final compensation payable to eligibility date for regular retirement.

### Non-Duty Disability Retirement

*Eligibility* - 5 years of service.

*Annual Amount* - Computed as a regular retirement benefit, but based on average final compensation and credited service at the time of disability. Minimum benefit is 20% of average final compensation.

### Duty Death Before Retirement

*Eligibility* - No age or service requirement.

*Annual Amount* – Surviving spouse receives 5/11 of police officer's or firefighter's compensation and each child under age 18 receives 1/10 of such compensation with a maximum total of 7/33 of such compensation. If there is no surviving spouse, each child receives 1/4 of such compensation with a maximum total of 1/2 of such compensation. If there is no surviving spouse or children, each dependent parent receives 1/6 of such compensation. Worker's compensation payments are offset.

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 186 of 505

### Non-Duty Death Before Retirement

*Eligibility* - No age or service requirement.

*Annual Amount* - Same as a regular retirement benefit to a surviving spouse, but reduced in accordance with a 100% joint and survivor option election. Minimum benefit is 20% of average final compensation. Each child under 18 receives 1/7 of police officer's or firefighter's compensation with a maximum total of 2/7 of such compensation. If there is no spouse or children, each dependent parent receives 1/7 of such compensation.

### Post-Retirement Cost-of-Living Adjustments

**Pre-1969 Members** - Allowances increase in proportion to active member compensation for the corresponding rank.

**1969 Plan Members** - Police retired after July 1, 2001, certain Police classes retired after July 1, 1998 and all Fire members: For all service earned up to April 5, 2011 for LSA members (September 1, 2011 for DPOA members) pensions increase by 2.25% of the **current** pension amount each July 1. No cost-of-living adjustments for service earned after April 5, 2011 for LSA members (September 1, 2011 for DPOA members).

### Member Contributions

5% of covered compensation payable until first eligible for regular retirement.

### DROP plan

Members with 25 years (20 years for DPOA members) of service may elect to participate in the DROP. When a DROP election is made, the member ceases to accrue any further age and service retirement benefits. Seventy five percent (75%) of the member's benefit (accrued to their DROP date) is contributed to a DROP account (a defined contribution account). At retirement the member is entitled to the balance in the DROP account and a monthly benefit equal to 100% of their benefit accrued to their DROP date, increased by any post-retirement increases that the member would have received, had the member been retired. Fire members must retire from the DROP plan at age 60. Participation in the DROP is limited to 10 years for LSA members electing to DROP after April 5, 2011.

### Participation

Plan is closed to new members, effective with the opening of a replacement DC plan. The opening of the replacement DC plan is assumed to occur after FY 2015.

*Reported Assets*
**(Market Value)**

| Market Value - June 30, 2013 | |
|---|---:|
| Cash & equivalents | $ 84,037,894 |
| Receivables & accruals | 18,746,570 |
| Contributions receivable | - |
| Stocks | 1,546,808,302 |
| Bonds & government securities | 621,018,160 |
| Real estate | 496,775,338 |
| Private equity | 85,647,423 |
| Securities lending | 299,774,500 |
| Pooled investments | 232,149,159 |
| Capital assets | 1,234,407 |
| Accounts payable | (351,618,689) |
| **Total Current Assets** | **$ 3,034,573,064** |

# ASSET INFORMATION USED FOR VALUATION

## Reserve Accounts*

| Funds | Fund Balances | |
|---|---|---|
| | June 30, 2013 | June 30, 2012 |
| Annuity Savings | $ 178,231,705 | $ 198,566,556 |
| Annuity Reserve | 22,738,451 | 17,260,868 |
| Total Annuity Funds | 200,970,156 | 215,827,424 |
| Pension Accumulation | (344,811,707) | (45,910,951) |
| Pension Reserve | 2,911,280,932 | 2,804,974,749 |
| Accrued Liability Fund Reserve | 701,277,898 | 694,971,515 |
| Survivor Benefit | 5,820,742 | 5,596,867 |
| Total Pension Funds | 3,273,567,865 | 3,459,632,180 |
| Total Fund Balances (Funding Value) | $3,474,538,021 | $3,675,459,604 |

## Revenues and Expenditures*

| | Pension Funds & | Annuity Funds + | Total Funds |
|---|---|---|---|
| Balance, July 1, 2012 | $3,459,632,180 | $ 215,827,424 | $3,675,459,604 |
| Prior Valuation Audit Adjustment | 0 | 0 | 0 |
| Balance July 1, 2012 after Adjustment | 3,459,632,180 | 215,827,424 | 3,675,459,604 |
| Revenues | | | |
| Member Contributions | 0 | 7,799,790 | 7,799,790 |
| Employer Contributions | 0 | 0 | 0 |
| Recognized Investment Income | 129,087,870 | 13,080,543 | 142,168,413 |
| Transfers | 85,500 | (85,500) | 0 |
| Total | $ 129,173,370 | $ 20,794,833 | $ 149,968,203 |
| Expenditures | | | |
| Benefit Payments | 279,885,732 | 0 | 279,885,732 |
| Refund of Member Contributions | 0 | 35,652,101 | 35,652,101 |
| Adjustment (Prior Year Cont.) | 29,026,800 | 0 | 29,026,800 |
| Administrative Expenses# | 6,325,153 | 0 | 6,325,153 |
| Total | $ 315,237,685 | $ 35,652,101 | $ 350,889,786 |
| Balance, June 30, 2013 | $3,273,567,865 | $200,970,156 | $3,474,538,021 |
| Funding Value Rate of Return | 3.9% | 6.5% | 4.1% |
| Market Value Rate of Return | 15.0% | 6.5% | 14.4% |

\# Includes approximately $930,000 of uncollectible amounts written off as of June 30, 2013.
\+ Reported Market Value of Annuity Savings Fund and Annuity Reserve Fund.
\* Excludes the Market Stabilization Fund.

# FUNDING VALUE OF ASSETS

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| A. Funding Value Beginning of Year | $ 3,804,759,868 | $ 3,675,459,604 | | | | | | |
| B. Market Value End of Year | 2,974,461,633 | 3,034,573,064 | | | | | | |
| C. Market Value Beginning of Year | 3,380,091,601 | 2,974,461,633 | | | | | | |
| D. Contributions During Year: | | | | | | | | |
| D1.  City Contributions (End of Year) | 49,760,229 | 0 | | | | | | |
| D2.  Member Contributions | 9,538,384 | 7,799,790 | | | | | | |
| D3.  Total | 59,298,613 | 7,799,790 | | | | | | |
| E. Expenses: | | | | | | | | |
| E1.  Benefits Paid During Year | 321,287,496 | 315,537,833 | | | | | | |
| E2.  Administrative Expenses | 5,300,379 | 6,325,153 | | | | | | |
| E3.  Accrued Contribution Write Off | | 29,026,800 | | | | | | |
| E4.  Total | 326,587,875 | 350,889,786 | | | | | | |
| F. Investment Income: | | | | | | | | |
| F1.  Market Total: B – C – D3 + E4 | (138,340,706) | 403,201,427 | | | | | | |
| F2.  Assumed Rate | 8.0% | 8.0% | | | | | | |
| F3.  Amount for Immediate Recognition | 293,689,219 | 280,313,168 | | | | | | |
| F4.  Amount for Phased-in Recognition: F1-F3 | (432,029,925) | 122,888,259 | | | | | | |
| G. Phased-In Recognition of Investment Income: | | | | | | | | |
| G1.  Current Year: F4/7 | (61,718,561) | 17,555,466 | | | | | | |
| G2.  1st Prior Year | 45,240,031 | (61,718,561) | $ 17,555,466 | | | | | |
| G3.  2nd Prior Year | (139,221,691) | 45,240,031 | (61,718,561) | $ 17,555,466 | | | | |
| G4.  3rd Prior Year | | (139,221,691) | 45,240,031 | (61,718,561) | $ 17,555,466 | | | |
| G5.  4th Prior Year | | | (139,221,691) | 45,240,031 | (61,718,561) | $ 17,555,466 | | |
| G6.  5th Prior Year | | | | (139,221,691) | 45,240,031 | (61,718,561) | $ 17,555,466 | |
| G7.  6th Prior Year | | | | | (139,221,691) | 45,240,033 | (61,718,559) | $ 17,555,463 |
| G8.  Total Recognized Investment Gain | (155,700,221) | (138,144,755) | (138,144,755) | (138,144,755) | (138,144,755) | 1,076,938 | (44,163,093) | 17,555,463 |
| H. Total Interest Distributed – Current Year (F3 + G8) | 137,988,998 | 142,168,413 | | | | | | |
| I. Funding Value End of Year: | | | | | | | | |
| I1.  Preliminary Funding Value End of Year: A + D – E + H | 3,675,459,604 | 3,474,538,021 | | | | | | |
| I2.  Upper Corridor Limit 130% x B | 3,866,800,123 | 3,944,944,983 | | | | | | |
| I3.  Lower Corridor Limit 70% x B | 2,082,123,143 | 2,124,201,145 | | | | | | |
| I4.  **Funding Value End of Year** | 3,675,459,604 | 3,474,538,021 | | | | | | |
| J. Difference Between Market & Funding Value: (B-I) | (700,997,971) | (439,964,957) | | | | | | |
| K. Recognized Rate of Return: H / [ 1/2 (A + I4 -H)] | 3.8% | 4.1% | | | | | | |
| L. Market Rate of Return: F1 / [ C - 1/2 (E-D)] | (4.3)% | 14.4% | | | | | | |
| M. Ratio of Funding Value to Market Value | 123.6% | 114.5% | | | | | | |

The Funding Value of Assets recognizes assumed investment income (line F2) fully each year. Differences between actual and assumed investment income (line F3) are phased-in over a closed 7-year period. During periods when investment performance exceeds the assumed rate, Funding Value of Assets will tend to be less than market value. During periods when investment performance is less than the assumed rate, Funding Value of Assets will tend to be greater than market value. The Funding Value of Assets is unbiased with respect to Market Value. At any time it may be either greater or less than Market Value. If assumed rates are exactly realized for six consecutive years, the Funding Value will become equal to Market Value.

*The Police and Fire Retirement System of the City of Detroit*

-20-

# RETIREES AND BENEFICIARIES JUNE 30, 2013
## TABULATED BY ATTAINED AGE@

| Attained Age | Age & Service No. | Age & Service Monthly Allowances | Disability No. | Disability Monthly Allowances | Death-in-Service No. | Death-in-Service Monthly Allowances | Totals No. | Totals Monthly Allowances |
|---|---|---|---|---|---|---|---|---|
| Under 20* | 6 | $ 21,132 | | | 55 | $ 29,113 | 61 | $ 50,245 |
| 20-24 | 2 | 5,115 | | | | | 2 | 5,115 |
| 25-29 | 2 | 4,166 | | | | | 2 | 4,166 |
| 30-34 | 3 | 5,025 | 29 | $ 88,305 | 3 | 4,638 | 35 | 97,968 |
| 35-39 | 7 | 13,087 | 51 | 158,322 | 10 | 16,323 | 68 | 187,732 |
| 40-44 | 27 | 35,150 | 82 | 257,044 | 12 | 19,957 | 121 | 312,151 |
| 45-49 | 174 | 457,658 | 104 | 308,484 | 12 | 22,131 | 290 | 788,273 |
| 50-54 | 265 | 708,482 | 123 | 346,811 | 15 | 26,149 | 403 | 1,081,442 |
| 55-59 | 597 | 1,682,824 | 181 | 484,423 | 32 | 57,874 | 810 | 2,225,121 |
| 60-64 | 1,249 | 3,947,990 | 399 | 985,940 | 46 | 79,175 | 1,694 | 5,013,105 |
| 65-69 | 1,292 | 3,849,847 | 415 | 976,440 | 42 | 71,605 | 1,749 | 4,897,892 |
| 70-74 | 858 | 2,319,945 | 205 | 466,959 | 24 | 42,089 | 1,087 | 2,828,993 |
| 75-79 | 456 | 1,067,410 | 73 | 184,172 | 17 | 30,138 | 546 | 1,281,720 |
| 80-84 | 504 | 1,145,880 | 71 | 171,519 | 24 | 46,728 | 599 | 1,364,127 |
| 85-89 | 578 | 1,210,520 | 72 | 175,415 | 22 | 41,755 | 672 | 1,427,690 |
| 90-94 | 246 | 462,516 | 24 | 57,526 | 9 | 16,804 | 279 | 536,846 |
| 95 & Over | 55 | 92,847 | 3 | 7,771 | 0 | 0 | 58 | 100,618 |
| **Totals** | **6,321** | **$17,029,594** | **1,832** | **$4,669,131** | **323** | **$504,479** | **8,476** | **$22,203,204** |

@ Includes both pre-1969 and 1969 retirees. Allowances being paid to DROP members are not reflected.
* May include records with defective birth dates.

## INACTIVE VESTED MEMBERS JUNE 30, 2013

| Attained Age | No. | Estimated Annual Allowances |
|---|---|---|
| Under 40 | 54 | $ 810,896 |
| 40-44 | 55 | 924,262 |
| 45-49 | 53 | 1,073,963 |
| 50-54 | 24 | 525,176 |
| 55-59 | 14 | 252,907 |
| 60-64 | 16 | 346,531 |
| 65 & over | 19 | 541,032 |
| **Totals** | **235** | **$4,474,767** |

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 191 of 505

## PRE-1969 RETIREES AND BENEFICIARIES JUNE 30, 2013
### TABULATED BY ATTAINED AGE

| Attained Age | Age & Service# No. | Age & Service# Monthly Allowances | Disability# No. | Disability# Monthly Allowances | Death-in-Service No. | Death-in-Service Monthly Allowances | Totals No. | Totals Monthly Allowances |
|---|---|---|---|---|---|---|---|---|
| Under 20* | | | | | | | | |
| 20-24 | | | | | | | | |
| 25-29 | | | | | | | | |
| 30-34 | 0 | $ 0 | 1 | $ 2,534 | | | 1 | $ 2,534 |
| 35-39 | 2 | 1,916 | | | | | 2 | 1,916 |
| 40-44 | 1 | 1,054 | | | | | 1 | 1,054 |
| 45-49 | 0 | 0 | | | | | 0 | 0 |
| 50-54 | 5 | 5,349 | | | | | 5 | 5,349 |
| 55-59 | 7 | 8,224 | | | 1 | $ 1,763 | 8 | 9,987 |
| 60-64 | 12 | 17,635 | 0 | | 5 | 9,696 | 17 | 27,331 |
| 65-69 | 203 | 386,935 | 91 | 202,372 | 13 | 25,259 | 307 | 614,566 |
| 70-74 | 390 | 821,459 | 131 | 288,174 | 16 | 27,899 | 537 | 1,137,532 |
| 75-79 | 309 | 631,376 | 53 | 118,325 | 15 | 25,628 | 377 | 775,329 |
| 80-84 | 324 | 640,011 | 60 | 137,587 | 21 | 37,688 | 405 | 815,286 |
| 85-89 | 474 | 938,743 | 69 | 166,698 | 21 | 39,682 | 564 | 1,145,123 |
| 90-94 | 234 | 435,365 | 23 | 55,986 | 8 | 16,093 | 265 | 507,444 |
| 95 & Over | 52 | 89,739 | 3 | 7,771 | 0 | 0 | 55 | 97,510 |
| **Totals** | **2,013** | **$3,977,806** | **431** | **$979,447** | **100** | **$183,708** | **2,544** | **$5,140,961** |

*\* May include records with defective birth dates.*
*\# Includes survivor beneficiaries of service and disability retirees.*

## DROP PARTICIPANTS JUNE 30, 2013

| Attained Age | No. | Estimated Monthly Allowances & |
|---|---|---|
| 40-44 | 25 | $ 40,715 |
| 45-49 | 134 | 306,200 |
| 50-54 | 179 | 430,177 |
| 55-59 | 166 | 451,976 |
| 60-64 | 49 | 133,640 |
| 65-69 | 9 | 27,146 |
| 70-74 | 3 | 10,192 |
| 75-79 | 0 | 0 |
| **Totals** | **565** | **$1,400,046** |

*& Reflects the 75% of reported monthly benefits being paid into DROP accounts.*

# ACTIVE MEMBERS JUNE 30, 2013
## BY ATTAINED AGE AND YEARS OF SERVICE@

### *Police Members*

| Attained Age | Years of Service to Valuation Date | | | | | | | Totals | |
|---|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30 Plus | No. | Valuation Payroll * |
| Under 20 | | | | | | | | | |
| 20-24 | 13 | 1 | | | | | | 14 | $   554,338 |
| 25-29 | 75 | 37 | 1 | | | | | 113 | 4,979,066 |
| 30-34 | 52 | 72 | 118 | | | | | 242 | 12,322,579 |
| 35-39 | 28 | 37 | 253 | 138 | | | | 456 | 24,647,370 |
| 40-44 | 21 | 16 | 235 | 368 | 35 | | | 675 | 38,032,302 |
| 45-49 | 6 | 12 | 86 | 183 | 64 | 53 | | 404 | 23,437,201 |
| 50-54 | 3 | 2 | 33 | 62 | 36 | 118 | 1 | 255 | 15,159,145 |
| 55-59 | 1 | 2 | 9 | 20 | 18 | 78 | 38 | 166 | 10,442,187 |
| 60 | | | | 1 | | 11 | 11 | 23 | 1,436,012 |
| 61 | | 1 | | | | 5 | 10 | 16 | 955,662 |
| 62 | | | | | | 4 | 8 | 12 | 769,233 |
| 63 | | | | | 1 | 2 | 4 | 7 | 425,608 |
| 64 | | 1 | 2 | | | 2 | 6 | 11 | 659,397 |
| 65 | | | | | 1 | 1 | 4 | 6 | 363,696 |
| 66 | | | | | 1 | | 3 | 4 | 235,931 |
| 70 | | | | | | | 2 | 2 | 121,232 |
| 71 | | | | | | | 1 | 1 | 53,687 |
| 74 | | | | | | | 1 | 1 | 67,995 |
| **Totals** | **199** | **181** | **737** | **772** | **156** | **274** | **89** | **2,408** | **$134,662,641** |

### *Fire Members*

| Attained Age | Years of Service to Valuation Date | | | | | | | Totals | |
|---|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30 Plus | No. | Valuation Payroll * |
| Under 20 | | | | | | | | | |
| 20-24 | | | | | | | | | |
| 25-29 | 1 | 3 | 1 | | | | | 5 | $    223,140 |
| 30-34 | 3 | 19 | 43 | 1 | | | | 66 | 3,429,055 |
| 35-39 | 1 | 20 | 90 | 17 | | | | 128 | 6,857,651 |
| 40-44 | | 8 | 79 | 65 | 33 | 1 | | 186 | 10,550,171 |
| 45-49 | 3 | 2 | 29 | 38 | 107 | 47 | 1 | 227 | 14,281,974 |
| 50-54 | | | 16 | 20 | 56 | 59 | 11 | 162 | 10,579,253 |
| 55-59 | | 1 | 2 | 3 | 14 | 28 | 33 | 81 | 5,892,664 |
| 60 | | | | | 1 | 1 | 1 | 3 | 217,617 |
| **Totals** | **8** | **53** | **260** | **144** | **211** | **136** | **46** | **858** | **$52,031,525** |

@ *Includes 565 members currently in the DROP.*
* *Valuation payroll is the greater of the current year and prior year reported pay.*

| Attained Age | Years of Service to Valuation Date | | | | | | | Totals | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30 Plus | No. | Valuation Payroll * |
| Under 20 | | | | | | | | | |
| 20-24 | 13 | 1 | | | | | | 14 | $ 554,338 |
| 25-29 | 76 | 40 | 2 | | | | | 118 | 5,202,206 |
| 30-34 | 55 | 91 | 161 | 1 | | | | 308 | 15,751,634 |
| 35-39 | 29 | 57 | 343 | 155 | | | | 584 | 31,505,021 |
| 40-44 | 21 | 24 | 314 | 433 | 68 | 1 | | 861 | 48,582,473 |
| 45-49 | 9 | 14 | 115 | 221 | 171 | 100 | 1 | 631 | 37,719,175 |
| 50-54 | 3 | 2 | 49 | 82 | 92 | 177 | 12 | 417 | 25,738,398 |
| 55-59 | 1 | 3 | 11 | 23 | 32 | 106 | 71 | 247 | 16,334,851 |
| 60 | | | | 1 | 1 | 12 | 12 | 26 | 1,653,629 |
| 61 | | 1 | | | | 5 | 10 | 16 | 955,662 |
| 62 | | | | | | 4 | 8 | 12 | 769,233 |
| 63 | | | | | 1 | 2 | 4 | 7 | 425,608 |
| 64 | | 1 | 2 | | | 2 | 6 | 11 | 659,397 |
| 65 | | | | | 1 | 1 | 4 | 6 | 363,696 |
| 66 | | | | | 1 | | 3 | 4 | 235,931 |
| 67 | | | | | | | | | |
| 68 | | | | | | | | | |
| 69 | | | | | | | | | |
| 70 | | | | | | | 2 | 2 | 121,232 |
| 71 | | | | | | | 1 | 1 | 53,687 |
| 72 | | | | | | | | | |
| 73 | | | | | | | | | |
| 74 | | | | | | | 1 | 1 | 67,995 |
| 75 | | | | | | | | | |
| **Totals** | 207 | 234 | 997 | 916 | 367 | 410 | 135 | 3,266 | $186,694,166 |

@   *Includes 565 members currently in the DROP.*
*    *Valuation payroll is the greater of the current year and prior year reported pay.*

| | Group Averages | | |
| --- | --- | --- | --- |
| | Police | Fire | Total |
| Age: | 42.9 years | 45.1 years | 43.5 years |
| Service: | 16.2 years | 18.9 years | 16.9 years |
| Annual Pay: | $55,923 | $60,643 | $57,163 |

# RECONCILIATION OF REPORTED DATA
## AS OF JUNE 30, 2013

## Active Data

| | | |
|---|---|---:|
| A) | Number of records reported on data file: | 3,541 |
| B) | Number of records excluded due to inactive status in "EmployeeMaster" file | 266 |
| C) | Reclassified as General per Staff | 9 |
| D) | Number defective: | - |
| E) | Number valued: | 3,266 |

## Retired Data

| | | |
|---|---|---:|
| A) | Number of records reported on data file #: | 38,972 |
| B) | Number not in P/F plan #: | 24,512 |
| C) | Number not currently in receipt: | 5,984 |
| D) | Number defective: | - |
| E) | Number valued: | 8,476 |

## Deferred Data

| | | |
|---|---|---:|
| A) | Number of records reported on data file: | 254 |
| B) | Number of records with reported service less than 8 years: | 19 |
| C) | Number defective: | - |
| D) | Number valued: | 235 |

# For retiree data, file contains members in Police and Fire Retirement System and General Retirement System.

# ACTUARIAL DISCLOSURES REQUIRED BY STATEMENT NO. 25 OF THE GOVERNMENTAL ACCOUNTING STANDARDS BOARD

This information is presented in draft form for review by the System's auditor. Please let us know if there are any items that the auditor changes so that we may maintain consistency with the System's financial statements.

# GASB STATEMENT NO. 25 REQUIRED SUPPLEMENTARY INFORMATION

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Schedule of Funding Progress | | | | | UAAL as a % of Covered Payroll ((b - a) / c) |
|---|---|---|---|---|---|---|---|
| | | Actuarial Accrued Liability (AAL) -- Entry Age (b) | Unfunded AAL (UAAL) (b - a) | Funded Ratio (a / b) | | Covered Payroll (c) | |
| 2001 | $3,900,020,703 | $3,463,248,393 | $(436,772,310) | 112.6% | | $253,297,027 | - |
| 2002# | 3,635,106,581 | 3,631,971,448 | (3,135,133) | 100.1% | | 248,663,133 | - |
| 2003 | 3,205,516,657 | 3,721,593,210 | 516,076,553 | 86.1% | | 248,681,461 | 207.5 % |
| 2004 | 3,074,516,589 | 3,857,493,282 | 782,976,693 | 79.7% | | 258,699,581 | 302.7 % |
| 2005@& | 3,757,884,417 | 3,780,447,414 | 22,562,997 | 99.4% | | 250,491,872 | 9.0 % |
| 2006& | 3,980,254,576 | 3,808,952,741 | (171,301,835) | 104.5% | | 228,140,160 | - |
| 2007*& | 4,307,194,763 | 3,896,814,229 | (410,380,534) | 110.5% | | 230,173,964 | - |
| 2008# | 4,316,263,291 | 4,071,053,752 | (245,209,539) | 106.0% | | 232,812,606 | - |
| 2009 | 3,945,205,453 | 4,221,291,045 | 276,085,592 | 93.5% | | 231,795,528 | 119.1 % |
| 2010#* | 3,853,279,381 | 3,767,364,201 | (85,915,180) | 102.3% | | 228,829,999 | - |
| 2011 | 3,804,759,868 | 3,808,642,533 | 3,882,665 | 99.9% | | 220,461,691 | 1.8 % |
| 2012# | 3,675,459,604 | 3,822,676,002 | 147,216,398 | 96.1% | | 205,800,278 | 71.5 % |
| 2013#(a) | 3,474,538,021 | 3,890,143,341 | 415,605,320 | 89.3% | | 186,694,166 | 222.6 % |

\* *Plan amended.*
\# *After changes in actuarial assumptions and/or methods.*
@ *After POC transfer.*
& *2005 and 2006 assets were revised following the June 30, 2006 valuation. 2007 assets were revised after the June 30, 2007 valuation.*
(a) *Assumes past due contributions of $71 million are NOT MADE.*

## SCHEDULE OF EMPLOYER CONTRIBUTIONS

| Fiscal Year Ended June 30 | Reported Employer Contributions | |
|---|---|---|
| | From Pension Obligation Certificates (POCs) | Employer Contributions Other than from POCs |
| 2001 | | $ 14,443,382 |
| 2002 | | 8,449,645 |
| 2003 | | 66,843,029 |
| 2004 | | 69,475,202 |
| 2005 | $ 630,829,189 | 51,602,596 |
| 2006& | | 57,766,542 |
| 2007 | | 57,423,366 |
| 2008 | | 33,934,636 |
| 2009@ | | 36,151,057 |
| 2010 | | 32,808,485 |
| 2011 | | 81,642,112 |
| 2012@ | | 49,760,229 |
| 2013 | | 0 |

 & *2006 assets were revised following the 6/30/2006 valuation.*
 @ *Contribution receivable.*

---

13-53846-tjt  Doc 8392  Filed 11/21/14  Entered 11/21/14 18:04:24  Page 197 of 505

The information presented in the required supplementary schedules was determined as part of the actuarial valuations at the dates indicated. Additional information as of the latest actuarial valuation follows:

| | |
|---|---|
| Valuation date | June 30, 2013 |
| Actuarial cost method | Entry Age |
| Amortization method | Level dollar, closed |
| Remaining amortization period | 28 years |
| Asset valuation method | 7-year smoothed market, 30% Corridor |

Actuarial assumptions:

| | |
|---|---|
| Investment rate of return | 8.0% |
| Projected salary increases* | 5.0% - 9.2% |
| *Includes inflation at | 0% for one year; 4% thereafter |
| Cost-of-living adjustments | Pre-1969 Plan Members: Allowances increase in proportion to active member compensation for corresponding rank. |
| | 1969 Plan Members: Pensions increase by 2.25% of current pension amount each July 1. |

Membership of the plan consisted of the following at June 30, 2013, the date of the latest actuarial valuation:

| | |
|---|---|
| Retirees and beneficiaries receiving benefits | 8,476 |
| Terminated plan members entitled to but not yet receiving benefits | 235 |
| Active plan members | 3,266 |
| **Total** | **11,977** |

# FINANCIAL PRINCIPLES



**% OF ACTIVE EMPLOYEE PAYS**

PAY-AS-YOU GO CONTRIBUTIONS

INVESTMENT INCOME

LEVEL CONTRIBUTIONS

CASH BENEFITS

CONTRIBUTIONS: EMPLOYER AND EMPLOYEE COMBINED

START

50 ±

**YEARS OF TIME**

CASH BENEFITS LINE. This relentlessly increasing line is the fundamental reality of retirement plan financing. It happens each time a new benefit is added for future retirements (and happens regardless of the design for contributing for benefits).

LEVEL CONTRIBUTION LINE. Determining the level contribution line requires detailed assumptions concerning a variety of experiences in future decades, including:

    Economic Risk Areas
        Rates of investment return
        Rates of pay increase
        Changes in active member group size
    Non-Economic Risk Areas
        Ages at actual retirement
        Rates of mortality
        Rates of withdrawal of active members (turnover)
        Rates of disability

# THE ACTUARIAL VALUATION PROCESS

*The financing diagram* on the opposite page shows the relationship between two different philosophies of paying for retirement benefits: the method where contributions match cash benefit payments (as in the Federal Social Security program) is an *increasing contribution method*; and the *level contribution method* which seeks to balance contributions between generations.

*The actuarial valuation* is the mathematical process by which the level contribution rate is determined, and the flow of activity constituting the valuation may be summarized as follows:

A. *Member Census Data:*

> Retired lives now receiving benefits
>
> Former members with vested benefits
>
> Active members

B. *Benefit provisions* that establish eligibility and amounts of payments to members

C. *Asset Data* (cash & investments)

D. *Assumptions concerning future experience in various risk areas*, which are established by the Board of Trustees and the City Council after consulting with the actuary

E. *The funding method* for employer contributions (the long-term, planned pattern for employer contributions)

F. *Mathematically combining the assumptions, the funding method, and the data*

G. *Determination* of:

> Plan Financial position and
>
> New Employer Contribution Rate

# BASIC FINANCIAL OBJECTIVE AND OPERATION
## OF THE RETIREMENT SYSTEM

**Benefit Promises Made Which Must Be Paid For.** A retirement program is an orderly means of handing out, keeping track of, and financing contingent pension promises to a group of employees. As each member of the retirement program acquires a unit of service credit they are, in effect, handed an "IOU" which reads: **"The Retirement System promises to pay you one unit of retirement benefits, payments in cash commencing when you retire."**

The principal related financial question is: When shall the money required to cover the "IOU" be contributed? This year, when the benefit of the member's service is received? Or, some future year when the "IOU" becomes a cash demand?

The **Constitution of the State of Michigan** is directed to the question:

> **"Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."**

This retirement system meets this constitutional requirement by having the following *Financial Objective: To establish and receive contributions, expressed as percents of active member payroll, which will remain approximately level* from year to year and will not have to be increased for future generations of taxpayers.

Translated into actuarial terminology, a level percent-of-payroll contribution objective means that the contribution rate must be at least:

> *Normal Cost* (the value of benefits likely to be paid which is assigned to service being rendered in the current year)
> . . . plus . . .
> *Interest on the Unfunded Actuarial Accrued Liability* (the difference between the actuarial accrued liability and current system assets).

If contributions to the retirement program are less than the preceding amount, the difference, plus investment earnings not realized thereon, will have to be contributed at some later time, or, benefits will have to be reduced, to satisfy the fundamental fiscal equation under which all retirement programs must operate; that is:

$$B = C + I - E$$

**Benefit** payments to any group of members and their beneficiaries cannot exceed the sum of:

**Contributions** received over time on behalf of the group

. . . plus . . .

**Investment** earnings on contributions received and not required for immediate payment of benefits

. . . minus . . .

**Expenses** incurred in operating the program.

There are retirement programs designed to defer the bulk of contributions far into the future. Contributions in early years are low, but the inevitable consequence is a relentlessly increasing contribution rate – to a level greatly in excess of the level percent of payroll rate. *This method of financing is prohibited in Michigan by the state constitution.*

A by-product of the level percent-of-payroll contribution objective is the accumulation of invested assets for varying periods of time. Investment income becomes the major contributor to the retirement program, and the amount is directly related to the amount of past contributions and investment performance.

**Computed Contribution Rate Needed To Finance Benefits**. From a given schedule of benefits and from the data furnished, the contribution rate is calculated *by means of an actuarial valuation* – the technique of assigning monetary values to the risks assumed in operating a retirement program.

# APPENDIX

# SUMMARY OF ASSUMPTIONS USED FOR DPFRS ACTUARIAL VALUATION
## ASSUMPTIONS ADOPTED BY BOARD OF TRUSTEES
### AFTER CONSULTING WITH ACTUARY

## ASSUMPTION REVIEW

As required by City Ordinance, assumptions are formally reviewed every 5 years and changes are recommended as experience emerges. The results of this study (including the actuary's recommendation) are detailed in a report called an Experience Study. The last Experience Study covered the 5-year period ending June 30, 2007.

## ECONOMIC ASSUMPTIONS

*The investment return rate* used in the valuation was 8.0% per year, compounded annually (net after investment expenses). The real rate of return is the portion of total investment return which is more than the inflation rate. Considering other financial assumptions, the 8.0% total investment return rate translates to an assumed real rate of return of 4.0% over wage inflation. This assumption was first used for the June 30, 2010 valuation. It was adopted by the Board outside of the routine 5-year experience studies at the request of the Employer.

*Pay increase assumptions* for individual active members are shown on page 35. Part of the assumption for each age is for a merit and/or seniority increase, and the other recognizes wage inflation (assumed to be 0% for the next year and 4% per year thereafter).

## NON-ECONOMIC ASSUMPTIONS

*The number of active members* is assumed to be stable during the period from the valuation date through the contribution effective date.

*The mortality table* used to measure retired life mortality was 95% of the RP-2000 Combined Table for males and 100% of the RP-2000 Combined Table set back 2 years for females. No provision is currently made for future improvements in mortality after the measurement date. Related values are shown on page 35. This table was first used for the June 30, 2008 valuation. For disabled members, a 10 year set forward of the healthy rates was used to measure post-retirement mortality.

*The probabilities of age/service retirement* for members eligible to retire are shown on page 36. Probabilities for service eligibility were first used for the June 30, 2008 valuation.

*The probabilities of separation* from service (including *death-in-service*) are shown for sample ages on page 37. These probabilities were first used for the June 30, 2008 valuation.

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 205 of 505

# MISCELLANEOUS AND TECHNICAL ASSUMPTIONS
## JUNE 30, 2013

**Marriage Assumption:** 100% of males and 100% of females are assumed to be married for purposes of death-in-service benefits. This assumption accounts for potential dependent children/dependent parent death benefits. No other assumption is made for surviving children/dependent parents. Male spouses are assumed to be three years older than female spouses.

**Pay Increase Timing:** End of (Fiscal) year. This is equivalent to assuming that reported pays represent amounts paid to members during the year beginning the day after the valuation date.

**Decrement Timing:** Decrements are assumed to occur mid-year.

**Eligibility Testing:** Eligibility for benefits is determined based upon the age nearest birthday and service nearest whole year on the date of decrement.

**Decrement Relativity:** Decrement rates are used directly from the experience study, without adjustment for multiple decrement table effects.

**Decrement Operation:** Disability and mortality decrements do not operate during the first 5 years of service. Disability and withdrawal do not operate during retirement eligibility.

**Incidence of Contributions:** Member contributions are assumed to be received continuously throughout the year. Employer contributions are assumed to be received on the last day of the fiscal year.

**Longevity in AFC:** Longevity payments included in the computation of Average Final Compensation were assumed to increase age and service costs by 4% and disability and death-in-service costs by 2%.

**Unused Sick Leave Payout:** The normal cost was increased by 1.0% of payroll to account for the inclusion of a percentage of unused sick leave banks in the determination of AFC.

**Administrative Expense Load:** 3.00% of pay is added to the normal cost to account for administrative expenses.

**Miscellaneous Loads:** Normal retirement accrued liability (excluding DROP members) was increased by 3% for service purchases. Active accrued liability (excluding DROP members) was increased by 1% to approximate the effect of missing or incomplete data.

**Post-Retirement COLA:** Active members are assumed to receive a 1.9% COLA rather than 2.25% because the annuity portion is not subject to the COLA. Post retirement increases for retired members were based on the plan in effect at retirement. For the pre-69 plan members, future COLA's are assumed to be the same as wage inflation for active members. The COLA rate is prorated by the ratio of COLA eligible service to total service at retirement.

**AFC Period:** 1-year FAC period was used.

**Disability Change Age:** The duty disability benefit is assumed to change at normal retirement age.

---

# MISCELLANEOUS AND TECHNICAL ASSUMPTIONS
## JUNE 30, 2013
### (CONTINUED)

**DROP Assumption:**     Members are assumed to retire based on the assumed rates of retirement.  Members retiring after first eligibility were assumed to DROP upon the later of first eligibility and 5 years prior to retirement.  Employer contributions are assumed to be made on DROP payroll.  DROP account balances are assumed to grow at 8% per year.

**Workers Compensation Offset:**     No Workers compensation offsets are assumed for duty disability benefits.

**DROP Account:**     DROP account balances are not reported.  No liability is included for DROP account balances.

**Class Codes:**     For valuation purposes, members are categorized as DPOA, DFFA or LSA based on class codes provided by the retirement system and are primarily used in the valuation to determine normal retirement eligibility (20 & Out versus 25 & Out).  Therefore, counts in the valuation may not represent actual membership in the respective associations.

*The entry age actuarial cost method* was used in determining age and service liabilities and normal cost, vesting liabilities and normal cost, and casualty liabilities and normal cost.

*Differences between assumed experience and actual experience* ("actuarial gains and losses") become part of actuarial accrued liabilities.

*Unfunded actuarial accrued liabilities, if any,* are amortized over periods of future years to produce contribution amounts (principal & interest) which are level dollar contributions.

*Employer contribution dollars* were assumed to be *paid in a single sum on the last day* of the employer fiscal year. (Adopted for the 6-30-79 actuarial valuation.)

*Valuation assets* recognize investment return above or below the actuarial assumed rate over a seven year period. (Adopted for the 6-30-10 actuarial valuation.)

*The data about persons now covered and about present assets* was furnished by the System's administrative staff. Although examined for general reasonableness, the data was not audited by the actuary.

**The actuarial valuation computations were made by or under the supervision of a Member of the American Academy of Actuaries (M.A.A.A.).**

## SAMPLE SALARY ADJUSTMENT RATES

| Service | Salary Increase Assumptions for an Individual Member | | |
|---|---|---|---|
| | Merit & Seniority | Base (Economic) | Increase Next Year |
| 5 | 5.20% | 4.00% | 9.20% |
| 10 | 1.70% | 4.00% | 5.70% |
| 15 | 1.00% | 4.00% | 5.00% |
| 20 | 1.00% | 4.00% | 5.00% |
| 25 | 1.00% | 4.00% | 5.00% |
| 30 | 1.00% | 4.00% | 5.00% |
| 35 | 1.00% | 4.00% | 5.00% |
| Ref | | | 306 + 4.00% |

Select and ultimate wage inflation rates are assumed to be 0% for the next 2 years and 4% thereafter.

## SINGLE LIFE RETIREMENT VALUES
## BASED ON RP-2000 COMBINED & 8.0% INTEREST
## 95% OF MALE RATES SET-BACK 0 YEARS
## 100% OF FEMALE RATES SET-BACK 2 YEARS

| Sample Attained Ages | Present Value of $1.00 Monthly Increasing "X"% Annually After Retirement | | | | | | Future Life Expectancy (years) | |
|---|---|---|---|---|---|---|---|---|
| | 4.0% Compound | | 2.25% Simple | | 2.25% Compound | | | |
| | Men | Women | Men | Women | Men | Women | Men | Women |
| 45 | $ 224.52 | $ 236.82 | $ 173.21 | $ 178.99 | $ 180.46 | $ 187.39 | 35.97 | 40.28 |
| 50 | 208.32 | 222.62 | 164.68 | 172.13 | 170.60 | 179.24 | 31.24 | 35.49 |
| 55 | 189.54 | 206.05 | 153.76 | 163.26 | 158.37 | 169.04 | 26.61 | 30.77 |
| 60 | 168.51 | 187.03 | 140.39 | 152.02 | 143.78 | 156.51 | 22.16 | 26.17 |
| 65 | 145.94 | 166.04 | 124.89 | 138.53 | 127.22 | 141.84 | 18.00 | 21.78 |
| 70 | 122.74 | 144.03 | 107.85 | 123.36 | 109.33 | 125.65 | 14.23 | 17.75 |
| 75 | 99.47 | 121.39 | 89.64 | 106.67 | 90.50 | 108.15 | 10.88 | 14.08 |
| 80 | 77.33 | 98.98 | 71.33 | 89.14 | 71.77 | 90.01 | 8.02 | 10.85 |
| Ref: | 506 x 0.95 | 507 x 1.00 | 506 x 0.95 | 507 x 1.00 | 506 x 0.95 | 507 x 1.00 | | |

| | Percent of Eligible Active Members Retiring Within Next Year | | | |
| | Police | | Fire | |
| Service | 20&Out | 25 &Out | 20&Out | 25 & Out |
|---|---|---|---|---|
| 19 | 25% | | 15% | |
| 20 | 18% | | 12% | |
| 21 | 18% | | 12% | |
| 22 | 18% | | 12% | |
| 23 | 18% | | 12% | |
| 24 | 18% | 35% | 12% | 15% |
| 25 | 18% | 25% | 12% | 15% |
| 26 | 18% | 20% | 12% | 12% |
| 27 | 18% | 20% | 12% | 12% |
| 28 | 18% | 20% | 12% | 12% |
| 29 | 18% | 18% | 15% | 12% |
| 30 | 18% | 18% | 15% | 12% |
| 31 | 18% | 18% | 15% | 12% |
| 32 | 20% | 20% | 15% | 12% |
| 33 | 25% | 25% | 20% | 20% |
| 34 | 30% | 30% | 25% | 20% |
| 35 | 30% | 30% | 30% | 30% |
| 36 | 30% | 30% | 30% | 35% |
| 37 | 30% | 30% | 30% | 35% |
| 38 | 30% | 30% | 30% | 35% |
| 39 | 30% | 30% | 30% | 35% |
| 40 | 100% | 100% | 100% | 100% |
| Ref | 1548 | 823 | 1549 | 1639 |

| | Percent of Eligible Active Members Retiring Within Next Year | |
| Age | Police | Fire |
|---|---|---|
| 60 | 25% | 100% |
| 61 | 25% | 100% |
| 62 | 25% | 100% |
| 63 | 22% | 100% |
| 64 | 20% | 100% |
| 65 | 18% | 100% |
| 66 | 15% | 100% |
| 67 | 15% | 100% |
| 68 | 15% | 100% |
| 69 | 15% | 100% |
| 70 | 100% | 100% |
| Ref | 1638 | 1 |

Members eligible for 20 & Out are assumed to be first eligible for normal retirement after 19 years of service due to their ability to purchase service. Members eligible for 25 & Out are assumed to be eligible for normal retirement after 24 years of service due to their ability to purchase service. Members are also eligible to retire at age 60 with no service requirement.

# PROBABILITIES OF SEPARATION

| Sample Ages | Years of Service | % of Active Members Separating Within Next Year | | | |
|---|---|---|---|---|---|
| | | Withdrawal | | Death | |
| | | Police | Fire | Male | Female |
| ALL | 0 | 8.50% | 5.00% | | |
| | 1 | 7.50% | 4.00% | | |
| | 2 | 6.00% | 3.00% | | |
| | 3 | 5.00% | 2.00% | | |
| | 4 | 4.50% | 2.00% | | |
| 25 | 5 & Over | 4.50% | 1.96% | 0.03% | 0.01% |
| 30 | | 3.30% | 1.62% | 0.03% | 0.02% |
| 35 | | 2.30% | 1.11% | 0.06% | 0.03% |
| 40 | | 1.70% | 0.77% | 0.08% | 0.04% |
| 45 | | 1.50% | 0.60% | 0.11% | 0.07% |
| 50 | | 1.10% | 0.51% | 0.16% | 0.11% |
| 55 | | 0.80% | 0.51% | 0.27% | 0.17% |
| 60 | | 0.80% | 0.51% | 0.51% | 0.29% |
| Ref | | 566 | 230 | 506  x  .75 | 507  x  .75 |
| | | 207 | 113  x  .85 | | |

| Sample Ages | % of Active Members Becoming Disabled Within Next Year | | | |
|---|---|---|---|---|
| | Police | | Fire | |
| | Ordinary | Duty | Ordinary | Duty |
| 25 | 0.06% | 0.13% | 0.07% | 0.34% |
| 30 | 0.07% | 0.19% | 0.08% | 0.52% |
| 35 | 0.08% | 0.34% | 0.09% | 0.90% |
| 40 | 0.11% | 0.49% | 0.12% | 1.30% |
| 45 | 0.16% | 0.73% | 0.18% | 1.92% |
| 50 | 0.47% | 1.16% | 0.53% | 3.06% |
| 55 | 0.73% | 1.96% | 0.82% | 5.18% |
| 60 | 0.83% | 2.82% | 0.94% | 7.47% |
| Ref | 105  x  0.75 | 90  x  0.85 | 105  x  0.85 | 90  x  2.25 |

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 211 of 505

# MEANING OF "UNFUNDED ACTUARIAL ACCRUED LIABILITIES"

*Actuarial accrued liabilities* are *the portion of the present value of plan promises to pay benefits in the future not covered by future normal cost contributions* --- a liability has been established ("accrued") because the service has been rendered, but the resulting monthly cash benefit may not be payable until years in the future.

If actuarial accrued liabilities at any time exceed the plan's accrued assets (cash & investments), the difference is *unfunded actuarial accrued liabilities*. If the plan's assets equal the plan's actuarial accrued liabilities, the plan would be termed "fully funded."

Each time a plan adds a new benefit which applies to service already rendered, an actuarial accrued liability is created. If assets are insufficient to cover the value of the new benefit promises, an additional unfunded actuarial accrued liability is also created. Payment for such unfunded accrued liabilities is generally spread over a period of years, commonly in the 15-30 year range.

Unfunded actuarial accrued liabilities can occur in another way: if actual financial experience is less favorable than assumed financial experience, the difference is added to unfunded actuarial accrued liabilities. For example, during periods of high inflation, unfunded actuarial accrued liabilities generally increase because unexpected rates of pay increase will create additional liabilities which may not be matched by investment performance.

The existence of unfunded actuarial accrued liabilities is not bad, but the changes from year to year in the amount of unfunded actuarial accrued liabilities are important -- "bad" or "good" or somewhere in between.

Unfunded actuarial accrued liabilities do not represent a bill payable immediately, but it is important that policy-makers prevent the amount from becoming unreasonably high and *it is vital that there is a sound method in place for making payments toward them*, so that they are controlled.

*Actuarial Accrued Liability.* The difference between (i) the actuarial present value of future plan benefits, and (ii) the actuarial present value of future normal cost. Sometimes referred to as "accrued liability" or "past service liability".

*Accrued Service.* The service credited under the plan which was rendered before the date of the actuarial valuation.

*Actuarial Assumptions.* Estimates of future plan experience with respect to rates of mortality, disability, turnover, retirement, rate or rates of investment income and salary increases. Decrement assumptions (rates of mortality, disability, turnover and retirement) are generally based on past experience, often modified for projected changes in conditions. Economic assumptions (salary increases and investment income) consist of an underlying rate in an inflation-free environment plus a provision for a long-term average rate of inflation.

*Actuarial Cost Method.* A mathematical budgeting procedure for allocating the dollar amount of the "actuarial present value of future plan benefits" between the actuarial present value of future normal cost and the actuarial accrued liability. Sometimes referred to as the "actuarial funding method".

*Actuarial Equivalent.* A single amount or series of amounts of equal value to another single amount or series of amounts, computed on the basis of the rate(s) of interest and mortality tables used by the plan.

*Actuarial Present Value.* The amount of funds presently required to provide a payment or series of payments in the future. It is determined by discounting the future payments at a predetermined rate of interest, taking into account the probability of payment.

*AFC.* Average final compensation

*Amortization*. Paying off an interest-bearing liability by means of periodic payments of interest and principal, as opposed to paying it off with a lump sum payment.

*DPOA.* Detroit Police Officers Association

*DFFA.* Detroit Fire Fighters Association

*DPCOA.* Detroit Police Command Officers Association

*DROP.* Deferred Retirement Option Program

*Experience Gain (Loss)*. A measure of the difference between actual experience and that expected based upon a set of actuarial assumptions during the period between two actuarial valuation dates, in accordance with the actuarial cost method being used.

*LSA.* Lieutenants and Sergeants Association

*Normal Cost*. The annual cost assigned, under the actuarial funding method, to current and subsequent plan years. Sometimes referred to as "current service cost". Any payment toward the unfunded actuarial accrued liability is not part of the normal cost.

*Reserve Account*. An account used to indicate that funds have been set aside for a specific purpose and are not generally available for other uses.

*Unfunded Actuarial Accrued Liability*. The difference between the actuarial accrued liability and valuation assets. Sometimes referred to as "unfunded accrued liability".

*Valuation Assets*. The value of current plan assets recognized for valuation purposes.



**GRS** Gabriel Roeder Smith & Company
Consultants & Actuaries

One Towne Square
Suite 800
Southfield, MI 48076-3723

248.799.9000 phone
248.799.9020 fax
www.gabrielroeder.com

April 4, 2014

Mr. David Cetlinski
Executive Secretary
The Police and Fire Retirement System of the
  City of Detroit
2 Woodward Avenue, Suite 908
Detroit, MI 48226

**Re: June 30, 2013 Actuarial Valuation**

Dear Dave:

Enclosed are 20 copies of the report of the June 30, 2013 annual actuarial valuation.

Sincerely,

Kenneth G. Alberts

KGA:dj
Enclosures

cc: Cynthia Thomas, City of Detroit Retirement Systems
    David T. Kausch, GRS
    Judith A. Kermans, GRS
    Brian B. Murphy, GRS

# EXHIBIT E

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT I ........................................................................................................... 1

ARTICLE 1.   GENERAL PROVISIONS ................................................................... 2

Sec. 1.1.    General Retirement System Established; Adoption of 2014 Combined Plan Document; Amendment and Restatement of 2014 Combined Plan Document ........................................................... 2

Sec. 1.2.    Retirement System Intended to be Tax-Qualified ................... 2

Sec. 1.3.    Compliance With Plan of Adjustment .................................... 2

Sec. 1.4.    Board of Trustees ................................................................. 3

Sec. 1.5.    Board of Trustees – Membership; Appointment ..................... 3

Sec. 1.6.    Board of Trustees; Retiree Member Election .......................... 3

Sec. 1.7.    Board of Trustees; Oath; Term; Vacancies............................. 4

Sec. 1.8.    Board of Trustees; Officers and Employees ........................... 4

Sec. 1.9.    Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum .......... 5

Sec. 1.10.   Board of Trustees; Compensation; Expenses ......................... 5

Sec. 1.11.   Rules for Administration of Funds ........................................ 5

Sec. 1.12.   Board of Trustees; Certain Data to be Kept........................... 5

Sec. 1.13.   Board of Trustees; Annual Audit Report ................................ 6

Sec. 1.14.   Board of Trustees; Legal Advisors ....................................... 6

Sec. 1.15.   Designation of Actuary; Authority to Engage Additional Actuaries......... 6

Sec. 1.16.   Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System ....................................................... 7

Sec. 1.17.   Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities ................................................................... 7

Sec. 1.18.   Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties ................................................................. 7

Sec. 1.19.   Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties................................................................. 8

Sec. 1.20.   Investment Committee; Membership; Appointment ................ 8

Sec. 1.21.   Investment Committee; Term; Resignation and Removal; Vacancies ..................................................................... 9

Sec. 1.22.   Investment Committee; Operation; Meetings; Quorum; Voting ............. 10

Sec. 1.23.    Investment Committee; Compensation; Expenses; Employment of Advisors .............................................................. 11

Sec. 1.24.    Investment Committee; Special Reporting Obligations ......................... 11

ARTICLE 2.   DEFINITIONS ............................................................................. 13

Sec. 2.1.    Definitions ................................................................................... 13

ARTICLE 3.   MEMBERSHIP ............................................................................ 21

Sec. 3.1.    Eligible Employees ...................................................................... 21

Sec. 3.2.    Cessation of Membership; Re-Employment by the Employer ............... 21

Sec. 3.3.    Report of the Employer ................................................................. 22

ARTICLE 4.   SERVICE CREDIT ....................................................................... 23

Sec. 4.1.    Credited Service .......................................................................... 23

Sec. 4.2.    Vesting Service ............................................................................ 23

Sec. 4.3.    Service Credit; Military Service ..................................................... 23

Sec. 4.4.    Service Credit; Qualified Military Service ....................................... 24

ARTICLE 5.   ELIGIBILITY FOR RETIREMENT BENEFITS ............................... 25

Sec. 5.1.    Eligibility for Unreduced Normal Retirement Benefit ......................... 25

Sec. 5.2.    Eligibility for Reduced Early Retirement Benefit ............................... 25

Sec. 5.3.    Eligibility for Deferred Vested Retirement Benefit ............................. 25

Sec. 5.4.    Eligibility for Retirement Benefit – Disabled Members ...................... 25

Sec. 5.5.    Return of Accumulated Mandatory Contributions to Non-Vested Member ...................................................................................... 25

ARTICLE 6.   RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) ................................... 27

Sec. 6.1.    Retirement Allowance ................................................................... 27

Sec. 6.2.    Variable Pension Improvement Factor (Escalator) .............................. 27

ARTICLE 7.   DEATH BENEFITS ...................................................................... 28

Sec. 7.1.    Accidental Death Benefit; Performance of Duty ................................ 28

Sec. 7.2.    Death Benefits for Surviving Spouses Generally ............................... 28

Sec. 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member ...................................................................................... 28

Sec. 7.4.    Benefits Offset by Compensation Benefits; Subrogation ..................... 28

# TABLE OF CONTENTS
## (continued)

ARTICLE 8.  FORMS OF PAYMENT ...................................................................... 30

    Sec. 8.1.     Retirement Allowance Options.................................................. 30

    Sec. 8.2.     Disposition of Surplus Benefits upon Death of Retiree and Beneficiary............................................................................. 31

ARTICLE 9.  FUNDING AND RESERVES.............................................................. 32

    Sec. 9.1.     Funding Objective of the Retirement System........................... 32

    Sec. 9.2.     Funds...................................................................................... 32

    Sec. 9.3.     Method of Financing Retirement System Benefits................... 33

    Sec. 9.4.     Member Contributions Picked-Up............................................ 34

    Sec. 9.5.     Fiscal Responsibility: Increased Funding Obligations and Benefit Reductions.................................................................. 34

ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS ............................ 36

    Sec. 10.1.    Voluntary Employee Contributions; Amount; Vesting ........... 36

    Sec. 10.2.    Changing an Election to Contribute......................................... 36

    Sec. 10.3.    Individual Member Accounting; Crediting of Earnings ........... 36

    Sec. 10.4.    Distribution of Accumulated Voluntary Employee Contributions .......... 36

ARTICLE 11. LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS ............................................................................. 38

    Sec. 11.1.    The Loan Program ................................................................. 38

    Sec. 11.2.    Eligibility for Loan ............................................................... 38

    Sec. 11.3.    Amount of Loan..................................................................... 38

    Sec. 11.4.    Terms and Conditions ............................................................ 38

    Sec. 11.5.    Loan Balance ........................................................................ 39

    Sec. 11.6.    Default.................................................................................. 39

    Sec. 11.7.    Distribution .......................................................................... 40

    Sec. 11.8.    Annual Report ...................................................................... 40

ARTICLE 12. LIMITATION ON BENEFITS AND CONTRIBUTIONS................ 41

    Sec. 12.1.    Compliance With Code Section 415(b) And Regulations ....... 41

    Sec. 12.2.    Compliance with Code Section 415(c) and Regulations ......... 43

ARTICLE 13. RETIREMENT SYSTEM ADMINISTRATION............................... 45

    Sec. 13.1.    Board of Trustees as Retirement System Administrator.......... 45

Sec. 13.2.     Powers and Duties of Board ................................................................. 45

Sec. 13.3.     Executive Director; Employees ............................................................ 47

Sec. 13.4.     Discretionary Authority ....................................................................... 47

Sec. 13.5.     Administrator's Decision Binding ........................................................ 48

ARTICLE 14. MANAGEMENT OF FUNDS ....................................................................... 49

Sec. 14.1.     Board as Trustee of Retirement System Assets .................................... 49

Sec. 14.2.     Maintenance of Segregated Funds ....................................................... 49

Sec. 14.3.     Custodian of Funds .............................................................................. 49

Sec. 14.4.     Exclusive Purpose ................................................................................ 49

Sec. 14.5.     Prohibited Conduct .............................................................................. 49

ARTICLE 15. INVESTMENT OF RETIREMENT SYSTEM ASSETS ................................. 51

Sec. 15.1.     Investment Powers of the Board and the Investment Committee ........... 51

Sec. 15.2.     Investment Management ....................................................................... 52

Sec. 15.3.     Best Practices ....................................................................................... 53

Sec. 15.4.     Chief Investment Officer ..................................................................... 53

Sec. 15.5.     Investment Consultants ........................................................................ 54

ARTICLE 16. RETIREE MEDICAL ACCOUNT ................................................................. 56

Sec. 16.1.     Establishment of Account ..................................................................... 56

Sec. 16.2.     Effective Date of Retiree Medical Account .......................................... 56

Sec. 16.3.     Funding of Benefits .............................................................................. 56

Sec. 16.4.     Limitation on Contributions ................................................................. 56

Sec. 16.5.     Impossibility of Diversion .................................................................... 57

Sec. 16.6.     Administration ...................................................................................... 57

Sec. 16.7.     Right to Amend or Terminate Medical Plans ........................................ 57

Sec. 16.8.     Reversion .............................................................................................. 57

Sec. 16.9.     Limitation of Rights ............................................................................. 57

ARTICLE 17. MISCELLANEOUS ...................................................................................... 58

Sec. 17.1.     Nonduplication of Benefits .................................................................. 58

Sec. 17.2.     Assignments Prohibited ....................................................................... 58

Sec. 17.3.     Protection Against Fraud ...................................................................... 58

Sec. 17.4.    Errors........................................................................................ 58

Sec. 17.5.    Amendment; Termination; Exclusive Benefit ........................... 58

Sec. 17.6.    Forfeitures Not to Increase Benefits ....................................... 59

Sec. 17.7.    Required Distributions - Compliance with Code Section 401(a)(9) and Regulations........................................................................ 59

Sec. 17.8.    Direct Rollovers ...................................................................... 59

Sec. 17.9.    Construction ............................................................................ 61

Sec. 17.10.   Severability ............................................................................. 61

COMPONENT II ......................................................................................... 62

ARTICLE A.  COMMON PROVISIONS OF THE GENERAL RETIREMENT SYSTEM ................................................................................. 63

Sec. A-1.    Common Provisions.................................................................. 63

ARTICLE B.  FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30, 2014............................................................................ 65

Sec. B-1.    Freeze of Eligibility and Benefits Under General Retirement System..................................................................................... 65

ARTICLE C.  DEFINITIONS ..................................................................... 67

Sec. C-1.    Definitions................................................................................ 67

ARTICLE D.  SERVICE CREDIT ............................................................. 72

Sec. D-1.    Service Credit........................................................................... 72

Sec. D-2.    Service Credit; Former Employees of the Founder's Society—Detroit Institute of Arts............................................................. 72

Sec. D-3.    Service Credit; Transfer to Other Governmental Service........ 72

Sec. D-4.    Service Credit; Military Service .............................................. 72

Sec. D-5.    Service Credit; Qualified Military Service (Pre-Employment Service) .................................................................................... 72

ARTICLE E.  DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN OF THE GENERAL RETIREMENT SYSTEM ................................. 74

Sec. E-1.    Membership .............................................................................. 74

Sec. E-2.    Cessation of Membership; Re-Employment by the Employer ............... 74

Sec. E-3.    Service Retirement.................................................................... 77

Sec. E-4.    Service Retirement Allowance ................................................. 80

| | | |
|---|---|---|
| Sec. E-5. | Disability Retirement | 81 |
| Sec. E-6. | Accidental Death Benefit; Performance of Duty | 84 |
| Sec. E-7. | Accumulated Contributions; Return of 1973 Defined Contribution Plan Amount | 85 |
| Sec. E-8. | Retirement Allowance Options | 86 |
| Sec. E-9. | Benefits for Surviving Spouses; Generally | 88 |
| Sec. E-10. | Benefits for Surviving Spouses; Disability Retirees | 88 |
| Sec. E-11. | Disposition of Surplus Benefits upon Death of Retiree and Beneficiary | 89 |
| Sec. E-12. | Pensions Offset by Compensation Benefits; Subrogation | 89 |
| Sec. E-13. | Disability Retirees; Reexamination; Authority of the Board | 89 |
| Sec. E-14. | Transfer of Department or Department Functions; Generally | 90 |
| Sec. E-15. | Pension Improvement Factor (Escalator) | 91 |
| Sec. E-16. | Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate | 91 |
| Sec. E-17. | Funds | 92 |
| Sec. E-18. | Method of Financing | 93 |
| Sec. E-19. | Determination of City's Annual Contribution | 95 |
| ARTICLE F. | PARTICIPANT LOAN PROGRAM | 97 |
| Sec. F-1. | Established | 97 |
| Sec. F-2. | The Loan Program | 97 |
| Sec. F-3. | Eligibility | 97 |
| Sec. F-4. | Amount of Loan | 98 |
| Sec. F-5. | Terms and Conditions | 98 |
| Sec. F-6. | Renewal of Loan | 99 |
| Sec. F-7. | Loan Balance | 99 |
| Sec. F-8. | Distributions | 99 |
| Sec. F-9. | Annual Report | 99 |
| ARTICLE G. | SPECIAL PLAN OF ADJUSTMENT PROVISIONS | 100 |
| Sec. G-1. | Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment | 100 |

Sec. G-2.    Annuity Savings Fund Recoupment ........................................................ 101

Sec. G-3.    Income Stabilization Benefits ................................................................. 104

Sec. G-4.    Restoration of Pension Benefits ............................................................. 107

ARTICLE H.  MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT
SYSTEM ........................................................................................................ 117

Sec. H-1.    Enforcement; Civil Action ..................................................................... 117

Sec. H-2.    Limitation of Other Statutes ................................................................. 117

# COMPONENT I

# ARTICLE 1. GENERAL PROVISIONS

**Sec. 1.1.** **General Retirement System Established; Adoption of 2014 Combined Plan Document; Amendment and Restatement of 2014 Combined Plan Document**

Effective July 1, 1938, a General Retirement System for the employees of the City of Detroit was established for the purpose of providing retirement and survivor benefits for eligible City employees and their beneficiaries. The provisions of the Detroit General Retirement System, as in effect July 1, 2014, were set forth in a Combined Plan Document. As provided in Ordinance 19-14 and Ordinance 20-14 and Section 47-1-1 of the Detroit City Code, this Combined Plan Document replaced in its entirety Chapter 47 of the Detroit City Code as in effect on June 30, 2014 and any conflicting provisions in any collective bargaining agreements covering Members (including, without limitation, the City Employment Terms that applied to Members effective July 18, 2012). All resolutions and policies of the Retirement Board previously adopted which were inconsistent with the provisions of the Combined Plan Document were also repealed to the extent of such inconsistency.

The Combined Plan Document is hereby amended and restated effective July 1, 2014, in the form of this instrument. Component I of the Combined Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Detroit General Retirement System on and after July 1, 2014. Component II of the Combined Plan Document applies to benefits accrued by Members prior to July 1, 2014. Except as specifically provided in Component II, benefits provided under Component II of the Combined Plan Document are frozen effective June 30, 2014.

**Sec. 1.2.** **Retirement System Intended to be Tax-Qualified**

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code. The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

**Sec. 1.3.** **Compliance With Plan of Adjustment**

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment"). Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment. To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

### Sec. 1.4.    Board of Trustees

Effective July 1, 1938, a Board of Trustees of the Detroit General Retirement System was created.  The Board is vested with responsibility for the general administration, management and operation of the Detroit General Retirement System and with the trust and investment powers conferred in this Combined Plan Document.

### Sec. 1.5.    Board of Trustees – Membership; Appointment

The Board of Trustees of the Detroit General Retirement System shall consist of ten Trustees, as follows:

(1)    The Mayor, *ex officio*, or the Mayor's designee;

(2)    One City Council member, *ex officio*, who is selected by the City Council;

(3)    The City Treasurer, *ex officio*;

(4)    Five active employee Members of the Retirement System to be elected by the Members in accordance with such rules and regulations as may be adopted by the Board.  No more than one Trustee shall be elected from any one City Department;

(5)    One individual, appointed by the Mayor subject to the approval of the Board, who is neither an employee of the City nor is eligible to receive benefits under the Retirement System; and

(6)    One retiree who is receiving benefits under the Retirement System and who is elected by Retirees in accordance with procedures described in Section 1.6.

### Sec. 1.6.    Board of Trustees; Retiree Member Election

The procedures for the election of the Retiree member of the Board of Trustees shall be as follows:

(1)    *Notice*.  Notice of a primary election shall be sent to each Retiree by United States Mail.

(2)    *Nominating petitions*.  No candidate's name shall be placed on the primary election ballot unless a nominating petition containing the signatures of at least one hundred and twenty-five Retirees is filed with the executive director of the Retirement System.  The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board.  Notwithstanding the foregoing, an incumbent Retiree Trustee shall not be required to submit a nominating petition but instead shall submit a written communication indicating his or her intention to seek an additional term.

(3)     *Ballot*.  Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position held by the Retiree at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election.  No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4)     *Voting*.  Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)     *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)     *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.6 shall be handled in accordance with such rules and regulations as the Board may adopt.

## Sec. 1.7.     Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the Detroit City Clerk.

The regular term of office for the elected Member Trustees and the Trustee appointed by the Mayor under Section 1.5(5) shall be for a period of six years, one such Trustee to be elected or appointed, as the case may be, each year.  The term of office for the Retiree Trustee shall be two years.

If an active employee Trustee leaves the employ of the City, or if an elected or appointed Trustee fails to attend four consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  By resolution, the Board shall declare the office vacated as of the date of adoption of such resolution.  If a vacancy occurs in the office of Trustee, the vacancy shall be filled at the next regular election held by the Board, or at any special election ordered by resolution adopted by the Board.

## Sec. 1.8.     Board of Trustees; Officers and Employees

The Board shall elect a chair and vice-chair from its members.  The executive director of the Retirement System or its designee shall serve as secretary of the Board.  The Board may employ such actuarial, medical and other contractors and employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec. 1.9. Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)     The Board shall hold regular meetings, at least one in each month, and shall hold special meetings as necessary.  The Board shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.*  All Board meetings shall be held within the City of Detroit.

(2)     Each Trustee shall be entitled to one vote on each question before the Board.  A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Five Trustees shall constitute a quorum.

### Sec. 1.10. Board of Trustees; Compensation; Expenses

Members of the Board of Trustees shall serve without additional compensation from the Employer, but they shall be compensated by the Retirement System as follows:

(1)     *Stipend.*  Trustees are eligible for a meeting stipend, provided the Trustee attends one or more regular or special Board meetings during a month.  The stipend amount shall be a minimum of sixty-seven dollars ($67.00) per week multiplied by the Trustee's years of service.  Eligibility rules and the amount of the stipend shall be set by Board resolution. However, the amount of the weekly meeting stipend shall not exceed two hundred dollars ($200.00).

(2)     *Ex Officio Trustees*.  Ex Officio Trustees are not eligible for a stipend payment.

(3)     *Attendance*.  For purposes of this Section 1.10, attendance at a Board meeting shall include actual attendance at a meeting or being otherwise available to attend a Board meeting canceled for lack of a quorum.

Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

### Sec. 1.11. Rules for Administration of Funds

Subject to the limitations contained in this Combined Plan Document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Plan document and for the transaction of its business.

### Sec. 1.12. Board of Trustees; Certain Data to be Kept

The Board shall keep or cause to be kept, in convenient form, such data as shall be necessary for an actuarial valuation of the Retirement System and for checking and compiling

the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

### Sec. 1.13. Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. 1.14. Board of Trustees; Legal Advisors

(1)     The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)     Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)     Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

### Sec. 1.15. Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board. In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary. The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing their actuarial duties and shall comply with all requests for information or modeling requested by the Board or the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Board and Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the term sheet regarding Investment Committee Governance for General Retirement System, attached to that certain agreement by and between the Michigan Settlement Administration Authority, a Michigan body public corporation (the "Authority"), the Retirement System, the Police and Fire Retirement System for the City of Detroit, Michigan ("PFRS") and the City (the "State Contribution Agreement") as Exhibit A (the "Governance Term Sheet") and the Plan of Adjustment. Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

### Sec. 1.16. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this section shall not permit or be used to provide for an interest rate which would violate the prohibitions of subsection (2) or (3) of this section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System. This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

### Sec. 1.17. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.16, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. 1.18. Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee. To the extent the Board exercises discretion with respect to investment of Retirement System assets, each member of the Board of Trustees shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*, and shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

**Sec. 1.19.  Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties**

As of the effective date of the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to the Board of Trustees with respect to certain investment management matters relating to the Retirement System.  The creation and operation of the Investment Committee is controlled by the Governance Term Sheet.  The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment.  The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6)*.  The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System.  An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose.  Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflict with the provisions set forth in the Governance Term Sheet.

**Sec. 1.20.  Investment Committee; Membership; Appointment**

The Investment Committee shall consist of seven (7) members, determined as follows:

(1)     Five independent members, two of whom must be residents of the State of Michigan, and none of whom may be a party-in-interest with respect to the Retirement System, as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.  Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science.  At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above.  The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment.  If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as is necessary to bring the number of independent Investment Committee members to five (5);

(2)      One Retiree who is a Retiree member of the Board of Trustees who shall be appointed by the Board; and

(3)      One employee who is an active employee member of the Board of Trustees who shall be appointed by the Board.

**Sec. 1.21.   Investment Committee; Term; Resignation and Removal; Vacancies**

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|:---:|:---:|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees. Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier. Notwithstanding any provision of this Combined Plan Document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee. An Investment Committee member may be removed from office by majority vote of the remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in according with the voting procedure set forth in Section 1.22; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government. A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining members attending such meetings. In the event of any such removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("State Treasurer"), in consultation with the Foundation, pursuant to such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the State Treasurer cannot agree on a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

### Sec. 1.22. Investment Committee; Operation; Meetings; Quorum; Voting

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of its proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.* All Investment Committee meeting shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Except as otherwise provided in the Governance Term Sheet, each Investment Committee member shall be entitled to one vote on each question before the Committee and at least four concurring votes shall be necessary for a decision by the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a

State or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

**Sec. 1.23.   Investment Committee; Compensation; Expenses; Employment of Advisors**

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties.   All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.   The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Retirement System.   Such engagements shall not be subject to approval of the Board.

**Sec. 1.24.   Investment Committee; Special Reporting Obligations**

(1)     Beginning in 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the State Treasurer on a semi-annual basis and at such other times as the State Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)     In the event the Retirement System receives a written notice from the State Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the State Treasurer a written certification that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)     Beginning in 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)     Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

(a)     a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

(b)      a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to the Foundation that, as of the date of the annual report required to be provided by the City to the Foundation under the Omnibus Transaction Agreement by and among the City, The Detroit Institute of Arts and Foundation For Detroit's Future ("Annual Report"):

    (i)      the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

    (ii)      the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan Document; and

    (iii)      the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c)      a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the State Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the State Treasurer; and (iv) in the event that the State Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee. Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d)      any additional information that may be reasonably requested by the Foundation from time to time.

(5)      Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

# ARTICLE 2. DEFINITIONS

## Sec. 2.1.     Definitions

Unless a different meaning is plainly required by context, the following words and phrases have the meanings respectively ascribed to them by this section:

(1)     *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)     *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System representing after-tax amounts deducted from the compensation of the Member, together with earning on such contributions.

(3)     *Actuarial Equivalent* or *Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.  The rates of interest, tables and factors adopted by the Board from time to time to determine Actuarial Equivalence shall not violate the terms of the Plan of Adjustment.

(4)     *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5)     *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)     *Age*, *Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)     *Average Final Compensation* means the average Compensation received by a Member during the ten consecutive years of Credited Service under the Retirement System (for this purpose, both before and after July 1, 2014) which immediately precede the date of the Member's last termination of employment with the Employer.  If a Member has less than ten years of Credited Service, the Member's Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.  If a Member is absent from service with the City for a period of not less than two consecutive months during his last two years of employment because of an unpaid leave under the Family and Medical Leave Act, such Member's Average Final Compensation will mean the average Compensation received by the Member during the ten consecutive year period out of the last twelve years of Credited Service which produces the highest average.

(8)     *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance

or pension payable from funds of the Retirement System due to the participation of a Member.

(9) *Board of Trustees* or *Board* or *Retirement Board* means the Board of Trustees of the Retirement System.

(10) *City* means the City of Detroit, Michigan, a municipal corporation.

(11) *City Council* or *Council* means the legislative body of the City.

(12) *Combined Plan* means the Combined Plan for the General Retirement System of the City of Detroit, Michigan, effective July 1, 2014 and as amended thereafter.

(13) *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the taxable income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which are contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the Employer on and after July 1, 2014.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the

numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14) *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of:

    (a)    the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (b)    the 2014 Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15) *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

    (1)    The 1973 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

    (2)    the 1973 Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16) *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document and, solely for purposes of Section 2.1(7), service credited to a Member prior to July 1, 2014 pursuant to Component II of this Combined Plan.

(17) *Disability* or *Disabled* means that a Member has been determined to be eligible to receive long term disability benefits under a policy or plan of insurance or self-insurance maintained by the Employer.

(18) *Employee* means any regular and/or permanent officer, agent, or person in the employ of the Employer, but does not include:

    (a)    individuals whose services for the Employer are compensated on a contractual or fee basis;

    (b)    persons who are not employed as Full-time Employees;

    (c)    any person during any period when such person is classified by the Employer as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the Employer;

    (d)    the medical director of the Retirement System; or

(e)     any Police or Fire employee covered by the Police and Fire Retirement System of the City of Detroit, Michigan by virtue of such employment.

If a person described in (c) above is reclassified by the Employer as a common-law employee of the Employer and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(19)    *Employer* means the City, or any board, commission, or court serving the City, to the extent that both the City, through the action of City Council, and the governing authority of such board, commission or court, shall mutually agree to include the employees of such board, commission, or court, as Employees under the provisions of this Retirement System at such time as they are eligible.  To the extent that any employees of a board, commission, or court are considered Employees for this purpose, all employees of such board, commission, or court, shall be so included.  However, only City board members and commissioners who are also Employees are eligible to participate in the Retirement System, unless otherwise specifically provided for in the Combined Plan Document.  In all cases of doubt, the Board of Trustees shall decide who is an Employee.

(20)    *Family and Medical Leave Act* means the federal Family and Medical Leave Act of 1993, as amended, and regulations issued thereunder.

(21)    *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(22)    *Full-time Employee* means an Employee who is employed in a position normally requiring six hundred hours of work or more per calendar year; provided, however, that an employee who is hired by an Employer as a part-time transit operator to work less than twenty-five hours per week shall not be a full-time employee under the Retirement System.  Notwithstanding the general rule, a special service employee of the City shall be considered a full-time employee under the Retirement System upon completion of fourteen hundred and forty (1440) hours or more in a Fiscal Year.  For purposes of Component I, once a special service employee has worked 1440 hours in a Fiscal Year, the employee will be deemed to be a full-time employee under the Retirement System for all subsequent Fiscal Years.

(23)    *General Retirement System* or *Retirement System* means the General Retirement System of the City of Detroit created and established by Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code and this Combined Plan Document, as amended from time to time, which consists of:

(a)     The 2014 Defined Benefit Plan, the terms of which are described in Component I hereof;

(b)     The 2014 Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, the terms of which are described in Component I hereof;

(c)    The Frozen 1973 Defined Benefit Plan, the terms of which are described in Component II hereof; and

(d)    The Frozen 1973 Defined Contribution Plan, the terms of which are described in Component II hereof.

References to the words Retirement System in Component I of the Combined Plan Document shall mean the provisions of the 2014 Defined Benefit Plan and/or the 2014 Defined Contribution Plan described in Component I, unless a different meaning is plainly required by the context.

(24)    *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the Employer for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the Employer for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(25)    *Internal Revenue Code* or *Code* means the United States Internal Revenue Code of 1986, as amended.

(26)    *Investment Committee* means the committee established pursuant to Section 1.19 which shall have the powers and duties described herein.

(27)    *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(28)    *Medical Beneficiary* means a Member who has retired from employment with the Employers and the spouses and dependants of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by an Employer.

(29)    *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(30)    *Medical Benefits Account* means the bookkeeping account established under Section 16.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(31)    *Member* means any Employee who is included in the membership of the Retirement System and who has not retired or died.

(32)    *Normal Retirement Age* means age sixty-two (62). Notwithstanding the foregoing, the Normal Retirement Age of a Member who is an active Employee as of June 30, 2014 and who has 10 or more years of Vesting Service as of such date shall be as follows solely for purposes of this Component I:

| Age as of July 1, 2014 | Normal Retirement Agee |
|---|---|
| 61 years | 60 years and 0 months |
| 60 years | 60 years and 0 months |
| 59 years | 60 years and 3 months |
| 58 years | 60 years and 6 months |
| 57 years | 60 years and 9 months |
| 56 years | 61 years and 0 months |
| 55 years | 61 years and 3 months |
| 54 years | 61 years and 6 months |
| 53 years | 61 years and 9 months |

(33)   *Normal Retirement Date* means for any Member the later of the date the Member (i) attains 10 years of Vesting Service, or (ii) attains Normal Retirement Age.

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon attainment of his or her Normal Retirement Date while employed by an Employer.

(34)   *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(35)   *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance payable under Component I of the Combined Plan. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(36)   *Plan Actuary* or *Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.15 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Board or the Investment Committee may direct.

(37)   *Plan Document* or *Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(38)   *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846*.

(39)   *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(40)   *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of Component II of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(41)   *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(42)  *Retirement* means a Member's withdrawal from the employ of the Employer with a Retirement Allowance paid by the Retirement System.

(43)  *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(44)  *Service* means personal services rendered to the Employer by a person as an Employee, provided such person is compensated by the Employer for such personal services.

(45)  *Spouse* means the person to whom a Member is legally married under applicable law at the time the determination is made.

(46)  *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(47)  *Vesting Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(48)  *Voluntary Employee Contributions* mean the after-tax contributions made by a Member to the Retirement System pursuant to Section 10.1.

(49)  *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for a Member who elects to make Voluntary Employee Contributions.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 12.2(1) |
| Annual Report | Section 1.24(4)(b) |
| Authority | Section 1.19 |
| compensation | Section 12.1(11) |
| Compliance Report | Section 1.24(1) |
| Cure Certification | Section 1.24(2) |
| Default Notice | Section 1.24(2) |
| Direct Rollover | Section 17.8(2)(a) |
| Distributee | Section 17.8(2)(b) |
| Dollar Limit | Section 12.1(3)(b) |
| Eligible retirement plan | Section 17.8(2)(c) |
| Eligible rollover distribution | Section 17.8(2)(d) |
| Expense Fund | Section 9.2(6) |
| Foundation | Section 1.20(1) |
| funding level | Section 9.5 |
| Governance Term Sheet | Section 1.15 |
| Income Fund | Section 9.2(7) |
| Investment management decision/investment management matter | Section 15.2 |

limitation year                                              Section 12.1(2)
Medical Benefit Fund                                         Section 9.2(5)
Medical Plans                                                Section 16.1
Option "A".  Joint and Seventy-Five Percent Survivor
     Allowance                       Section 8.1(1)(c)
Option "B". Joint and Twenty-Five Percent Survivor
     Allowance                       Section 8.1(1)(e)
Option One.  Cash Refund Annuity                             Section 8.1(1)(a)
Option Three.  Joint and Fifty Percent Survivor
     Allowance                       Section 8.1(1)(d)
Option Two.  Joint and One Hundred Percent Survivor
     Allowance                       Section 8.1(1)(b)
Pension Accumulation Fund                                    Section 9.2(3)
Pension Certificate                                          Section 1.24(4)(b)
Pension Improvement Factor (Escalator)                       Section 6.2
PFRS                                                         Section 1.19
Plan of Adjustment                                           Section 1.3
Pop-up Form                                                  Section 8.1(2)(b)
Rate Stabilization Fund                                      Section 9.2(4)
Standard Form                                                Section 8.1(2)(a)
State Contribution Agreement                                 Section 1.15
State Treasurer                                              Section 1.21
Straight Life Retirement Allowance                           Section 8.1(1)

# ARTICLE 3. MEMBERSHIP

## Sec. 3.1.    Eligible Employees

The membership of the Retirement System shall consist of all persons who are Full-time Employees, except:

(a)     persons who are members of the Police and Fire Retirement System of the City of Detroit, Michigan established under Title IX, Chapter VII of the 1918 Detroit City Charter, continued in the 1974, 1997 and 2012 Detroit City Charters, and continued in the form of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan; and

(b)     Any person who is a member of any other public employee pension or retirement plan or retirement system adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of the State of Michigan.

## Sec. 3.2.    Cessation of Membership; Re-Employment by the Employer

(1)     The following provisions shall apply to a non-vested Member who terminates employment with the Employer and is re-employed:

(a)     Except as otherwise provided in this Article 3, if any non-vested Member leaves the employment of the Employer for any reason other than Retirement or death, such person shall continue to be a Member until such time as the Member receives a total distribution of his Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.   Upon receipt of his Accumulated Mandatory Employee Contributions, the Member's Credited Service and Vesting Service at that time shall be forfeited.

(b)     If the Member is re-employed by an Employer (other than as a part-time transit operator) within a period of six years from and after the date employment with the Employer last terminated, any forfeited Credited Service and Vesting Service rendered on and after July 1, 2014 shall be restored for purposes of determining the Member's Retirement Allowance after re-employment, provided that within the two year period beginning on the Member's re-employment date, the Member re-contributes to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5.

(c)     If a non-vested Member is re-employed (other than as a part-time transit operator) more than six years from and after the date employment with the Employer last terminated, the Member shall not be permitted to re-contribute to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5 and any forfeited Credited Service and Vesting Service shall not be restored at the time of the Member's re-employment.

(2)     A former Employee who is vested but has not yet begun to receive a Retirement Allowance and who is rehired (other than as a part-time transit operator) prior to being separated for six years shall have his benefit pertaining to his total Credited Service earned on and after July 1, 2014 calculated in accordance with the terms of Component I of the Retirement System in effect at the time of his last separation from service.

(3)     A former Employee who is vested but has not yet begun to receive a Retirement Allowance and who is rehired (other than as a part-time transit operator) after being separated for more than six years shall be entitled to two separate and distinct pension benefits under Component I, each to be calculated in accordance with the provisions of Component I of the Retirement System in effect at the time of each separation from service.

(4)     Retirement benefits for a Retiree who returns to active full time employment with an Employer shall be subject to the following provisions:

(a)     A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment.  The variable pension improvement factor (escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

(b)     A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

(c)     A Retiree's Average Final Compensation for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation earned by the Retiree after he returns to work.

(d)     An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance.  However, the individual may select a separate payment option with respect to his second Retirement Allowance.

(e)     The Coordination of Benefits (Equaled Social Security) option will not be available with respect to payment of the second Retirement Allowance.

**Sec. 3.3.     Report of the Employer**

It shall be the duty of the Employer to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

# ARTICLE 4. SERVICE CREDIT

## Sec. 4.1.    Credited Service

(1)    The Board shall keep an accurate record of each Employee's accumulated Service credit from the date of commencement of employment with the Employer to the date of termination of employment with the Employer.

(2)    A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the Employer as an Employee, beginning on the later of July 1, 2014 or his date of hire with the Employer and ending on the date his employment with the Employer is terminated. Service shall be credited in years and twelfths $(1/12^{th})$ of a year. Not more than one-twelfth $(1/12^{th})$ of a year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in a calendar month. Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in any period of 12 consecutive months.

(3)    A Member who does not perform Service for the Employer by reason of a Disability which begins on or after July 1, 2014 shall be credited with Credited Service for the period of his Disability during which he is entitled to receive long-term disability benefits under the Employer's plan or policy.

(4)    Solely for purposes of determining eligibility for a retirement benefit under Section 5.2, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).

## Sec. 4.2.    Vesting Service

(1)    A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the Employer.

(2)    A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

## Sec. 4.3.    Service Credit; Military Service

An Employee who enters the military service of the United States while employed by an Employer shall have the period of such military service credited as Service in the same manner as if the Employee had served the Employer without interruption, provided that (1) the Employee's entry into such military service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the Employer; (2) he or she is re-employed by the Employer upon completion of such military service; and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service. The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder. During the period of military service and until return to employment with the

Employer, the Employee's Mandatory Employee Contributions to the Retirement System shall be suspended.

**Sec. 4.4.    Service Credit; Qualified Military Service**

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u). Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

# ARTICLE 5. ELIGIBILITY FOR RETIREMENT BENEFITS

## Sec. 5.1.    Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his Normal Retirement Date while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

## Sec. 5.2.    Eligibility for Reduced Early Retirement Benefit

Any Member who has attained Age fifty-five, who is credited with thirty or more years of Credited Service, and who has not attained his Normal Retirement Date, shall have the option of retiring upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The Retirement Allowance payable to a Member who retires early shall be the Actuarial Equivalent of the Retirement Allowance that would be payable to the Member at his Normal Retirement Date pursuant to Section 6.1, as determined by the Plan Actuary.  A Member's early retirement benefit shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

## Sec. 5.3.    Eligibility for Deferred Vested Retirement Benefit

Any Member who ceases to be an employee before satisfying the requirements for receipt of a retirement benefit under Section 5.1 or Section 5.2 and who is credited with ten or more years of Vesting Service upon his or her termination of employment (regardless of age), shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his attainment of Age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

## Sec. 5.4.    Eligibility for Retirement Benefit – Disabled Members

Any Member who becomes Disabled prior to his Normal Retirement Date shall be entitled to receive an unreduced Retirement Allowance commencing at any time following the Member's attainment of Age sixty-two.  Disability retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

## Sec. 5.5.    Return of Accumulated Mandatory Contributions to Non-Vested Member

If a Member ceases to be an Employee before becoming eligible for a deferred vested Retirement Allowance under Section 5.3, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly

installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

# ARTICLE 6. RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

## Sec. 6.1.    Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Date or his actual retirement from employment with the Employer in the form of a Straight Life Retirement Allowance shall be equal to one and one-half percent (1.5%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth (1/12th) year) of Credited Service earned after June 30, 2014.

## Sec. 6.2.    Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2018 and effective the first day of each Plan Year thereafter, the Board may determine that a Retiree's annual Retirement Allowance shall be increased by a factor of two percent (2.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement; provided, that the recipient of said Retirement Allowance shall have attained Age sixty-two and shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.   The Pension Improvement Factor (Escalator) shall not be compounded.

# ARTICLE 7. DEATH BENEFITS

## Sec. 7.1.    Accidental Death Benefit; Performance of Duty

(1)    If a Member is killed in the performance of duty in the service of the Employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the Employer, and such death, illness or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the Employer, the Member's surviving Spouse shall be entitled to a monthly annuity benefit equal to the Member's Retirement Allowance at the time of his death, unreduced for early payment.  Such benefit shall be payable until the surviving Spouse's death.

(2)    The minimum annual Retirement Allowance payable to a surviving Spouse under this Section 7.1 shall be equal to ten percent (10%) of the Member's Average Final Compensation determined as of the date of the Member's death.

## Sec. 7.2.    Death Benefits for Surviving Spouses Generally

If any Member dies while in the employ of the Employer (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, the Member's surviving Spouse shall receive a Retirement Allowance.  The Retirement Allowance payable to the Spouse shall be computed in the same manner in all respects as if said Member had (i) retired effective the day preceding the Member's death, notwithstanding that the Member had not attained his or her Normal Retirement Date, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving Spouse as Beneficiary.

## Sec. 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member dies while employed by the City or following termination of employment and the Member is not eligible for a benefit under Section 7.1 or 7.2, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the  Beneficiary nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate.  If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose.  Such expenses shall not exceed a reasonable amount as determined by the Board.

## Sec. 7.4.    Benefits Offset by Compensation Benefits; Subrogation

(1)    Any amounts which may be paid or payable to a  Beneficiary on account of a Member's death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' benefits, shall be an offset against any amounts payable from funds of the Retirement System on account of the Member's death.  If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance

payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System, and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2)     In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

# ARTICLE 8. FORMS OF PAYMENT

## Sec. 8.1.    Retirement Allowance Options

(1)    Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a Beneficiary to receive benefit payments following the Member's death, in accordance with the options set forth below:

   (a)    *Option One.   Cash Refund Annuity.*   If a Retiree who elected a Cash Refund Annuity dies before payment of the Accumulated Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

   (b)    *Option Two.   Joint and One Hundred Percent Survivor Allowance.*   Upon the death of a Retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the reduced Retirement Allowance shall be paid to and continued throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

   (c)    *Option "A".   Joint and Seventy-Five Percent Survivor Allowance*.   Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

   (d)    *Option Three.   Joint and Fifty Percent Survivor Allowance*.   Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

   (e)    *Option "B".   Joint and Twenty-Five Percent Survivor Allowance*.   Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the reduced Retirement Allowance shall be paid throughout the life of the Beneficiary nominated by written designation duly executed and

filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2) *Joint and Survivor Optional Forms of Payment*. The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

    (a) *Standard Form*. Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

    (b) *Pop-up Form*. Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

(3) *Coordination of Benefits*. According to such rules and regulations as the Board shall adopt, until the first payment of a Retirement Allowance becomes due, but not thereafter, a Member under Age sixty-five may elect to have the Member's Straight Life Retirement Allowance provided for under Component I equated on an Actuarial Equivalent basis to provide an increased Retirement Allowance payable to Age sixty-two or Age sixty-five, and to provide a decreased Retirement Allowance thereafter. The increased Retirement Allowance payable to such Age shall approximate the total of the decreased Retirement Allowance payable thereafter and the estimated social security benefit. If a Member elects to receive increased and then decreased Retirement Allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (1) of this Section 8.1. This coordination of benefits option shall not create any additional actuarial costs to the City.

### Sec. 8.2. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1(1), both a Retiree and his Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board. If there are no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the second to die of the Retiree or Beneficiary.

## ARTICLE 9. FUNDING AND RESERVES

### Sec. 9.1.  Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive Employer and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of Component I of the Retirement System).

### Sec. 9.2.  Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Employee Contribution Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Medical Benefit Fund, the Expense Fund, and the Income Fund, as follows:

(1)     The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the Retirement, termination, or death of a Member with a vested Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's Retirement Allowance.

(2)     The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members together with earnings thereon.

(3)     The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the Employer's annual contribution that is not credited to the Rate Stabilization Fund and amounts transferred to Component I as provided in Section E-16(c) of Component II, and from which shall be paid Retirement Allowances and other benefits on account of Members.

(4)     The Rate Stabilization Fund shall be the Fund to which shall be credited Employer annual contributions in excess of the amount of the Employer's contribution which is credited to the Pension Accumulation Fund and amounts transferred to Component I as provided in Section E-16(c) of Component II.

(5)     The Medical Benefit Fund shall be the Fund to which shall be credited contributions made for the purpose of funding Medical Benefits.

(6)     The Expense Fund shall be the fund to which shall be credited any money provided by the Employers to pay the administrative expenses of the Retirement System, and from

which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(7)   The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of Component I of the Retirement System and any earnings thereon, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9.  There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document.  Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

### Sec. 9.3.   Method of Financing Retirement System Benefits

(1)   The pension liabilities for Members shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2)   The Employer's annual contribution to finance the prospective pension liabilities for the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be five percent (5%) of the base Compensation of active Members for the applicable Plan Year. A portion of the Employer's annual contribution for each Plan Year as determined by the City shall be credited to the Rate Stabilization Fund.  The remainder of the City's annual contribution shall be allocated to the Pension Accumulation Fund.

(3)   Except as provided in Section 9.5, for each Plan Year, a Member shall contribute to the Retirement System an amount equal to four percent (4%) of his or her base Compensation for such Plan Year.  A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of the Member's first payroll date occurring in August 2014.  The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014, and (ii) the Member's date of hire to the date he ceases to be an Employee. The contribution shall be deducted from a Member's Compensation, notwithstanding that the minimum compensation provided by law for the Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment.  Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

### Sec. 9.4.  Member Contributions Picked-Up

(1)     The Employer shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)     The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code.  The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)     The Employer shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both.  The Employer shall designate Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions.  No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

### Sec. 9.5.  Fiscal Responsibility: Increased Funding Obligations and Benefit Reductions

(1)     To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below one hundred percent (100%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than one hundred percent (100%):

    (a)     the Trustee may not award the variable pension improvement factor (escalator) described in Section 6.2 to any Retiree;

    (b)     all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under Component I of the Retirement System; and

    (c)     Member Mandatory Employee Contributions shall be increased from four percent (4%) of Compensation to five percent (5%) of Compensation for up to the next following five Plan Years.

(2)     In the event the funding level of Component I of the Retirement System determined as provided in Section 9.5(1) is projected to fall below eighty percent (80%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than eighty percent (80%):

    (a)     the remedial action required in Section 9.5(1) shall be implemented or continued;

(b)     the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for a Plan Year;

(c)     Member Mandatory Employee Contributions shall be increased from five percent (5%) of Compensation to six percent (6%) of Compensation for up to the next following five Plan Years;

(d)     the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (b) above; and

(e)     the Retirement Allowance accrued by Members for up to the next five Plan-Year-period shall be determined as provided in Section 6.1, except that one percent (1%) shall be substituted for one and one-half percent (1.5%) wherever it appears in said Section 6.1.

In determining whether the eighty percent (80%) funding level under this Section 9.5(2) has been achieved, the Plan's Actuary shall calculate the funding percentage of the Retirement System after taking into account the elimination of the variable pension improvement factor (escalator) pursuant to Section 9.5(1)(a) but prior to taking into account the remedial steps provided in Sections 9.5(1)(b) and (c).

(3)     For purposes of this Section 9.5, the "funding level" of Component I of the Retirement System shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System. The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee. The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

## ARTICLE 10. VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec. 10.1.   Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member may elect to reduce his Compensation for any Plan Year by a whole percentage equal to three percent (3%), five percent (5%) or seven percent (7%) and have such amount contributed by the Employer to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

### Sec. 10.2.   Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the City shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

### Sec. 10.3.   Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second Plan Year immediately preceding the Plan Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

### Sec. 10.4.   Distribution of Accumulated Voluntary Employee Contributions

(1)    If a Member ceases to be an Employee other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)    In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the actuarial equivalent value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)    If a Member dies while employed by the Employer or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Voluntary Employee

Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving the Member, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

## ARTICLE 11. LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec. 11.1.  The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account under Component I of the Retirement System.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

### Sec. 11.2.  Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve months or more.  Former Members, Spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.  No Member shall have more than two outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan (under either Component I or Component II) shall not be eligible for a loan from the Retirement System.

### Sec. 11.3.  Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Ten Thousand Dollars ($10,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be One Thousand Dollars ($1,000.00).

### Sec. 11.4.  Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)      Each loan application shall be made in writing.

(b)      All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c)     Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d)     An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Defined Contribution Plans of the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)     Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan. The loan interest rate shall be calculated in a manner that will not negatively affect either the Employers' costs with respect to the Retirement System or the investment return allocated to Members.

(f)     Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec. 11.5.   Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the Employers' costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec. 11.6.   Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last

payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

### Sec. 11.7.   Distribution

No distribution shall be made to a Member, former Member, Spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the individual from the Retirement System.

### Sec. 11.8.   Annual Report

The Retirement System shall include, in its annual report to all Members, an accounting of the Loan Program established by this Article 11, which contains the number and amount of loans made, the costs of administering the Loan Program maintained under this Component I, the amount of payments made including interest received by Component I of the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that Fiscal Year covered the costs of administering the Loan Program under Component I.

# ARTICLE 12. LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec. 12.1.   Compliance With Code Section 415(b) And Regulations

(1)     Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)     The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)     Notwithstanding the foregoing:

   (a)     if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 12.1(2) has been satisfied shall be made, in accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 12.1(8) or (9);

   (b)     if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 12.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System, commencing at Age sixty-two; and

   (c)     if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an annual benefit payable in the form of a straight life annuity, commencing when

the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)     Notwithstanding the foregoing provisions of this Section 12.1, except as provided in Section 12.1(5), the maximum annual benefit specified in Section 12.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by an Employer, does not exceed $10,000 for the Plan Year or any prior Plan Year and (b) the Member was not at any time a participant in a defined contribution plan maintained by an Employer.

(5)     In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 12.1(2) shall be such limitation (without regard to this Section 12.1(5)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten. In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 12.1(2) and in Section 12.1(4) shall be such limitations (determined without regard to this Section 12.1(5)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.

(6)     Notwithstanding anything in this Section 12.1 to the contrary, if the annual benefit of a Member who has terminated employment with the Employer is limited pursuant to the limitations set forth in Section 12.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(7)     For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 12.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(8)     The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 12.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has

the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 12.1(7).

(9)     The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 12.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(10)    For purposes of applying the limitations set forth in this Section 12.1, all qualified defined benefit plans (whether or not terminated) ever maintained by an Employer shall be treated as one defined benefit plan.

(11)    For purposes of this Section 12.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year. The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with an Employer or (b) the end of the limitation year that includes the date of the Member's severance from employment with an Employer, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the Employer and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(12)    This Section 12.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to, any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

## Sec. 12.2.  Compliance with Code Section 415(c) and Regulations

(1)     The "Annual Addition" with respect to a Member for a limitation year (which shall be the Plan Year) shall in no event exceed the lesser of:

(a)      $40,000 (adjusted as provided in Code Section 415(d)); or

(b)      One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)      The Annual Addition with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions for such limitation year to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified defined contribution plan (whether or not terminated) maintained by an Employer, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(3)      In the event the Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 12.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

# ARTICLE 13. RETIREMENT SYSTEM ADMINISTRATION

## Sec. 13.1.   Board of Trustees as Retirement System Administrator

(1)      The Retirement Board shall have the power and authority to manage and administer the Retirement System in accordance with the provisions of the Combined Plan Document.

(2)      The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 13.2.

(3)      The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document.  This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

## Sec. 13.2.   Powers and Duties of Board

(1)      The Board shall have the following powers and duties:

   (a)      exclusive authority regarding the administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

   (b)      to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

   (c)      to determine the contributions to the Retirement System required of the Employer and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

   (d)      to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

   (e)      to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

   (f)      except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

(g)     except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h)     to prepare an annual report for the Retirement System for each Fiscal Year in compliance with generally accepted accounting principles. The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the Fiscal Year. The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and to the Investment Committee. The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)     to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and Accumulated Contributions of each Member who has made contributions to the Retirement System;

(j)     to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the Employer or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System. In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual, in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System. The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)     except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec. 13.3.   Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)     manage and administer the Retirement System under the supervision and direction of the Board;

(b)     annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following Fiscal Year; and

(c)     perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board; and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may, but need not, be an employee of the City.

## Sec. 13.4.   Discretionary Authority

The Board shall have discretion to:

(a)     interpret the provisions of the Retirement System;

(b)     make factual findings with respect to any and all issues arising under the Retirement System;

(c)     determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)     decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)     make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

**Sec. 13.5.   Administrator's Decision Binding**

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

# ARTICLE 14. MANAGEMENT OF FUNDS

## Sec. 14.1. Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City and, subject to the terms of Article 15, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq.* of the *Michigan Compiled Laws, as amended*.

## Sec. 14.2. Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan Document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan Document. Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan Document may be commingled for investment purposes, and transferred as provided in Section E-16(c) of Component II.

## Sec. 14.3. Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System. The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

## Sec. 14.4. Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose other than payment of the reasonable expenses of maintaining the Retirement System. In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

## Sec. 14.5. Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)     Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

(4)     Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

## ARTICLE 15. INVESTMENT OF RETIREMENT SYSTEM ASSETS

### Sec. 15.1.   Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 15, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq*. of the *Michigan Compiled Laws, as amended*.  Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 15.

All investment management decisions made by the Board, as more fully described in Section 15.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has responsibility and authority, including the investment management matters described in Section 15.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If (a) the Board fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee  and the Chief Investment Officer are authorized to implement the decision.

If the Board disapproves an investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not less than five business days, of the request by the Investment Committee to discuss the disapproval by the Board described in the written response.  Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended Investment Management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended Investment Management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision.  Any action taken by the Board or the Investment Committee in violation of the terms of this Article 15 shall constitute an *ultra vires* act and the Investment Committee or the Board is

granted the express right to seek to preliminarily enjoin such violation without the need to show irreparable harm.

### Sec. 15.2. Investment Management

(1) For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

    (a) development of an investment policy statement with sound and consistent investment goals, objectives, and performance measurement standards which are consistent with the needs of the Retirement System;

    (b) within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

    (c) evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

    (d) review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article G of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

    (e) in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of all or a portion of the reduced base monthly pension amounts and the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

    (f) communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

    (g) determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

    (h) the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(i)     interpretation of Retirement System governing documents, existing law, the Plan of Adjustment and other financial information that could affect funding or benefit levels;

(j)     review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Auditor or other professional advisors, as necessary, prior to approval of the annual audit or other financial reports;

(k)     determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(l)     performance of an asset/liability valuation study for the Retirement System every three years or, more often, as requested by the Investment Committee or the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Act No. 314 of the Public Acts of 1965, being Sections 38.1132 et seq*. of the *Michigan Compiled Laws*, as amended, and the Retirement System's investment guidelines.

## Sec. 15.3.   Best Practices

Prior to adopting investment guidelines and asset allocation policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

## Sec. 15.4.   Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.   The chief investment officer shall report directly to the Investment Committee and the executive director of the Board.  The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.  The chief investment officer shall

provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

### Sec. 15.5.   Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Board and the Investment Committee with oversight of the Retirement System's investment portfolio.   Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.   Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.   The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.   The duties of an investment consultant may include, but shall not be limited to:

(a)     providing an asset/liability valuation study for the Retirement System;

(b)     reviewing the Retirement System's asset allocation based on current market assumptions;

(c)     identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)     implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)     monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)     recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations, in the event of a deviation from expectations;

(g)     communicating the investment policies of the Retirement System to the investment managers;

(h)     reviewing the investment policies with the appropriate employees of the Retirement System;

(i)     aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

(j)     attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)     meeting with the Investment Committee and the Board to provide detailed quarterly performance reports and executive summaries of performance;

(l)     meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)    meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manager selections.

# ARTICLE 16. RETIREE MEDICAL ACCOUNT

## Sec. 16.1.   Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board shall pay the cost, which would otherwise be borne by the Employers, for certain medical and related benefits provided under the plans or programs maintained by the Employers to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 16 are intended to comply with Section 401(h) of the Code and shall be construed to comply therewith.

## Sec. 16.2.   Effective Date of Retiree Medical Account

Medical Benefits may be paid from the Medical Benefits Account beginning October ___, 2014, or such other date recommended by an enrolled actuary (within the meaning of Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec. 16.3.   Funding of Benefits

Subject to the Plan of Adjustment and the right reserved to the City to amend or terminate the provision of Medical Benefits under its general power to amend the Plan under Section 17.5, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis, or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year by the Employers pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time any Employer makes a contribution to the Trustee, the Employer shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec. 16.4.   Limitation on Contributions

At all times the aggregate of the contributions made by the Employers to provide Medical Benefits shall not exceed twenty-five percent (25%) of the sum of the aggregate contributions made by the Employers to the Plan under Sections 9.3, 9.4 and 9.5 other than the contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account.  In the event that a contribution under Section 16.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount.

### Sec. 16.5.   Impossibility of Diversion

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits, shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the Employers.

### Sec. 16.6.   Administration

The Medical Plans shall continue to be administered, and claims processed, under their respective terms.  The interpretation and administration of the terms of this Article 16 shall be subject to the provisions of the Combined Plan Document.

### Sec. 16.7.   Right to Amend or Terminate Medical Plans

The Employers expressly reserve the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by any such Employer that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible Spouses and dependents to pay all or any portion of the cost of such medical benefits.

### Sec. 16.8.   Reversion

At no time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, shall any part of the Medical Benefits Account be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account.  If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the Employers to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the Employers.  In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the Employers' contributions to the Medical Benefits Account.

### Sec. 16.9.   Limitation of Rights

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

# ARTICLE 17. MISCELLANEOUS

## Sec. 17.1.  Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by an Employer (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec. 17.2.  Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of payment, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec. 17.3.  Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec. 17.4.  Errors

If any change or error in the records results in any person receiving from the Retirement System more or less than the person would have been entitled to receive from the Retirement System had the records been correct, the Board shall correct such error and, as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such person was correctly entitled shall be paid.

## Sec. 17.5.  Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan Document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments permitted under the terms of the Plan of Adjustment (including amendments contemplated in Section G-4(5) of Component II) may be made to the terms, conditions and rules of operation of the Retirement System, or any successor plan or trust, that govern the calculation of pension benefits during the period ending June 30, 2023, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit

under the Retirement System, except as provided in the Plan of Adjustment. Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan Document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code. The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Retirement System by the City must be approved by the Council or person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

### Sec. 17.6.   Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

### Sec. 17.7.   Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan Document to the contrary. Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year in which he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires. Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section 17.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

### Sec. 17.8.   Direct Rollovers

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(2)     For purposes of this Section 17.8, the following terms shall have the following meanings:

(a)     "Direct rollover" means a payment by the retirement system to an eligible retirement plan specified by a distributee.

(b)     "Distributee" means a Member or former Member. It also includes the Member's or former Member's surviving Spouse, a Spouse or former spouse who is the

alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E). However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

(c)     "Eligible retirement plan" means any of the following that accepts a distributee's eligible rollover distribution:

    (i)      a qualified trust described in Code Section 401(a);

    (ii)     an annuity plan described in Code Section 403(a);

    (iii)    an annuity contract described in Code Section 403(b);

    (iv)    an individual retirement account described in Code Section 408(a);

    (v)     an individual retirement annuity described in Code Section 408(b);

    (vi)    a Roth IRA described in Code Section 408A; or

    (vii)   a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the Retirement System.

(d)     "Eligible rollover distribution" means any distribution of all or any portion of the balance to the credit of a distribute under the Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year. Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the Retirement System. However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan

described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec. 17.9.   Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate.  The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I and/or Component II of this Combined Plan Document or to the Combined Plan Document in its entirety, as the context may require, and not to any particular provision or section thereof.  The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan Document or the Retirement System created hereunder.

## Sec. 17.10. Severability

If any section or part of a section of this Combined Plan Document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan Document or Retirement System or of the Combined Plan Document or Retirement System in its entirety.

# COMPONENT II

**ARTICLE A.  COMMON PROVISIONS OF THE GENERAL RETIREMENT SYSTEM**

**Sec. A-1.  Common Provisions**

Certain provisions of the Combined Plan for the General Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014.  Those provisions are set forth in the following Sections of Component I:

(a)     Article I (General Provisions);

(b)     Article II (Definitions):

Actuarial Equivalent or Actuarially Equivalent

Actuarially Equivalent Value

Administrative Rules and Regulations

Age; Attainment of

Board of Trustees or Board or Retirement Board

City

City Council or Council

Combined Plan

Component I

Component II

Employer

Fiscal Year

General Retirement System or Retirement System

Internal Revenue Code or Code

Investment Committee

Member

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse; and

Straight Life Retirement Allowance;

(c) Article 12 (Limitation on Benefits and Contributions);

(d) Article 13 (Retirement System Administration);

(e) Article 14 (Management of Funds);

(f) Article 15 (Investment of Retirement System Assets); and

(g) Article 17 (Miscellaneous).

**ARTICLE B.  FREEZE OF GENERAL RETIREMENT SYSTEM AS OF JUNE 30, 2014**

**Sec. B-1.  Freeze of Eligibility and Benefits Under General Retirement System**

Notwithstanding anything in Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code or this Combined Plan for the General Retirement System of the City of Detroit, Michigan to the contrary, effective as of June 30, 2014 (the "Freeze Date"):

(a)    No new employee hired by an Employer on or after July 1, 2014 shall become a Member who is eligible to accrue a benefit under the terms of the General Retirement System in effect as of the Freeze Date;

(b)    No employee who is rehired by an Employer on or after July 1, 2014 shall become a Member who is eligible to accrue either a benefit or service credit for any purpose under the terms of the General Retirement System in effect as of the Freeze Date; provided, however, that a Member who is entitled to a Frozen Accrued Benefit as defined in subsection (c) of this Section B-1 and who is rehired by an Employer on or after July 1, 2014 but prior to the date the Member incurs a six-year break in service shall be eligible to accrue service credit following rehire solely for the purpose of determining the Member's vesting in and eligibility for payment of his Frozen Accrued Benefit;

(c)    Benefit accruals for Members with respect to service rendered prior to July 1, 2014 will be frozen based on a Member's years of service, Average Final Compensation, and the pension multiplier formulae in effect as of such Freeze Date under the terms of the General Retirement System ("Frozen Accrued Benefit");

(d)    Except as otherwise provided in subsection (e) of this Section B-1, compensation of a Member shall be frozen effective as of the Freeze Date for purposes of determining the Member's Frozen Accrued Benefit.  No compensation of any type earned by a Member after the Freeze Date shall be taken into consideration for purposes of determining the Member's Frozen Accrued Benefit under the General Retirement System;

(e)    Any Member who, as of June 30, 2014, would have been eligible to elect to use a portion of his unused accrued sick leave to increase his Average Final Compensation ("Sick Leave Rollover") if the Member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election ("Special Election") to add the value of twenty-five percent (25%) of the Member's unused sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance to the earnings used in computing Average Final Compensation for purposes of determining the Member's Frozen Accrued Benefit; provided, however, that at least twenty-five percent (25%) of the Member's sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance remains in the Member's sick leave bank at the time the completed Special Election form is received by the Retirement System and, provided further that the completed Special Election form is received by the Retirement System no later than August 22, 2014 or, if later, the date set forth in a collective bargaining

agreement between the City and a union whose members are eligible to make a Special Election. A Member's Special Election shall be made in the manner set forth by the Board of Trustees and the Retirement System. A Member may revoke a Special Election, as long as such revocation occurs on or before the latest date upon which such Member is permitted to make a Special Election. Notwithstanding anything in this subsection (e) to the contrary, a Member's Special Election will be void and the determination of the Member's Average Final Compensation for purposes of calculating the Member's Frozen Accrued Benefit will not take into account any of the Member's unused sick leave, if (i) the electing Member would not have been eligible to receive an immediate service retirement if he retired as of June 30, 2014, and (ii) the electing Member's employment with an Employer is terminated before the electing Member becomes eligible for an immediate service retirement under the Retirement System;

(f)     Service earned after the Freeze Date shall be credited to a Member solely for purposes of determining the Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all Members for benefit accrual purposes under the terms of the General Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no Member shall earn service credit with respect to benefits payable under the terms of the General Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(g)     No Member shall make contributions to the Annuity Savings Fund under the General Retirement System in effect as of June 30, 2014 with respect to wages earned on or after the earliest date following June 30, 2014 that the City's payroll department can implement the freeze. All after tax contributions made on or after the date referenced in the preceding sentence shall be made to and in accordance with the terms of Component I of the Combined Plan.

The foregoing terms shall be referred to as the "Freeze" of the provisions of the General Retirement System as in effect on the Freeze Date and the provisions of Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code and this Component II of the Combined Plan shall be interpreted and construed by the Board of Trustees and the Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section B-1, the provisions in Chapter 47, or any collective bargaining agreement or other document governing the terms of employment of any employee, the Board of Trustees and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

# ARTICLE C.  DEFINITIONS

## Sec. C-1.  Definitions

Unless a different meaning is plainly required by context, for purposes of this Component II the following words and phrases have the meanings respectively ascribed to them by this Section C-1:

(1)　*Accrued Service* means a Member's credited service for employment rendered before July 1, 2014.

(2)　*Accumulated Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Member's individual account in the Annuity Savings Fund, together with regular interest thereon.

(3)　*Annuity* means the portion of the retirement allowance which is paid for by a Member's accumulated contributions.

(4)　*Annuity Reserve* means the present value of all payments to be made on account of any annuity or benefit in lieu of any annuity.  Such annuity reserve shall be computed upon the basis of such mortality tables and regular interest as shall be adopted by the Board.

(5)　*Average Final Compensation* means:

　　a.　On or before June 30, 1992.  For those Members who retired or separated from active service with vested pension rights on or before June 30, 1992, the highest average compensation received by a Member during any period of five consecutive years of credited service selected by the Member from the ten years of credited service which immediately preceded the date of the Member's last termination of City employment. If a Member has less than five years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

　　b.　On or after July 1, 1992 but before July 1, 1998.  For those Members who retired or separated from active service with vested pension rights on or after July 1, 1992 but before July 1, 1998, the highest average compensation received by a Member during any period of four consecutive years of credited service during the ten years of credited service which immediately preceded the date of the Member's last termination of City employment.  If a Member has less than four years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

　　c.　On or after July 1, 1998.  For those Members who retire or separate from active service with vested pension rights on or after July 1, 1998, the

highest average compensation received by a Member during any period of three consecutive years of credited service during ten years of credited service which immediately precede the date of the Member's last termination of City employment. If a Member has less than three years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the Member's total years of credited service.

d.      Sick Leave Election. For those nonunion Members with a regular or early service retirement who retire on or after July 1, 1999, in computing the highest average compensation received by a Member, the Member shall have the option of adding the value of twenty-five percent (25%) of the Member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation. Bargaining unit members who retire on or after July 1, 1999 and prior to July 1, 2014 shall have the Unused Sick Leave On Retirement benefit provided for in the applicable bargaining agreement. For any Member choosing to exercise this option, the lump sum payment the Member will receive will be the remaining value of the unused accrued sick leave bank as provided in the bargaining agreement.

(6)     *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a retirement allowance or pension payable from funds of the General Retirement System due to the participation of a Member.

(7)     *Compensation* means:

a.      On or before June 30, 1992. For those Members retired or separated from active service with vested pension rights, on or before June 30, 1992, all remuneration, excluding longevity payments, paid to a Member because of personal services rendered by the Member to the Employer. Compensation in excess of the limitations set forth in Section 401(a)(17) of the Internal Revenue Code shall be disregarded.

b.      On or after July 1, 1992. For those Members who retire on or after July 1, 1992, all remuneration, including longevity payments, paid to a Member because of personal services rendered by the Member to the Employer. Compensation in excess of the limitations set forth in Section 401(a)(17) of the Internal Revenue Code shall be disregarded.

(8)     *Conversion* means that date on which a Member's benefits change from disability retirement benefits to normal retirement benefits.

(9)     *Credited Service* means membership service credited to a Member to the extent provided in this Component II.

(10)     *Final Compensation* means a Member's annual rate of compensation at the time employment with all Employers is last terminated.

(11)     *Pension* means, for purposes of this Component II, the portion of a retirement allowance which is paid for by appropriations made by the Employers into the appropriate funds.

(12)     *Pension Reserve* means the present value of all payments to be made on account of any pension, or benefit in lieu of any pension. Such pension reserve shall be computed upon the basis of such mortality and other tables of experience, and regular interest, as shall be adopted by the Board.

(13)     *Regular Interest* means such rate or rates per annum, compounded annually, as the Board of Trustees shall determine in accordance with the limitations contained in Section E-16 of this Component II.

(14)     *Retiree* means a former Member who is receiving a retirement allowance from Component II of the Retirement System.

(15)     *Retirement* means a Member's withdrawal from the employ of the Employers with a retirement allowance or pension paid by Component II of the Retirement System.

(16)     *Retirement Allowance* means the sum of the annuity and the pension.

(17)     *Service* means personal services rendered to the Employer by a person as an employee of the Employer, provided such person is compensated by the Employer for such personal services.

(18)     *Service credit for purposes of the 1973 Defined Benefit/Defined Contribution (Annuity) Plan* means that, in accordance with such rules and regulations as the Board shall adopt, each Member shall be credited with service as follows: (1) One month of service credit is earned when the Member is paid for eighty hours of work during the month; (2) A full year of credit is earned for nine months of credit in any calendar year, except the Member's last year of work, which service credit shall be determined as of the Member's last day on the Employer's payroll. Less than nine months of service rendered in a calendar year shall neither be credited as a full year of service, nor shall more than one year of service be credited to any Member for service rendered in any one calendar year. Service credit is used to determine eligibility for service retirement, vesting, non-duty disability and survivor benefits. Service credit is also earned by a Member while retired on a duty disability or while receiving Workers' Compensation benefits.

The following terms shall have the meanings given to them in the Sections of this Component II set forth opposite such term:

2023 UAAL Amortization                                          Section G-4(3)a
Accrued Liability Fund                                          Section E-18(d)

| | |
|---|---|
| Actual Return | Section G-2(5) |
| Adjusted Accrued Benefit | Section G-1(1)a |
| Adjusted Deferred Accrued Benefit | Section G-1(1)b |
| Annuity Reserve Fund | Section E-18(b) |
| Annuity Savings Fund Excess Amount | Section G-2(1) |
| Annuity Savings Fund of the 1973 Defined Contribution Plan | Section E-18(a) |
| ASF | Section G-2 |
| ASF account | Section G-2(1) |
| ASF Recalculation Period | Section G-2 |
| ASF Excess Return | Section E-16(c) |
| ASF Recoupment | Section G-1(1)(c) |
| Cash Option Cap | Section G-2(4) |
| Cash Repayment Option | Section G-2(4) |
| Certificate of Default | Section G-3(7) |
| COLA | Section G-4 |
| Determination Date | Section E-18 |
| Eligible Pensioner | Section G-3(5) |
| Estimated Adjusted Annual Household Income | Section G-3(3)b |
| Excess Assets | Section G-3(7) |
| Expense Fund | Section E-18(f) |
| Extra Contribution Account | Section G-4(3)b |
| Federal Poverty Level | Section G-3(6) |
| Final Payment Notice | Section G-2(4) |
| Freeze | Section B-1 |
| Freeze Date | Section B-1 |
| Frozen Accrued Benefit | Section B-1(c) |
| Funded Level | Section G-4(2) |
| Funding Conditions | Section G-1(1)a |
| Funding Proceeds | Section E-18(d) |
| Funding Target | Sections G-4(2)a, G-4(3)a, G-4(4)a |
| Governor | Section G-4(5) |
| IME | Section E-5(a) |
| Income Fund | Section E-18(g) |
| Income Stabilization Benefit | Section G-3(2) |
| Income Stabilization Benefit Plus | Section G-3(3) |
| Income Stabilization Fund | Section G-3(4) |
| Monthly Annuity Savings Fund Excess Amount | Section G-2(2) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section E-8(a) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section E-8(a) |
| Option One.  Cash Refund Annuity | Section E-8(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section E-8(a) |
| Option Two. Joint and One Hundred Percent Survivor | |

| | |
|---|---|
| Allowance | Section E-8(a) |
| Participant Loan Program | Section F-1 |
| Pension Accumulation Fund | Section E-18(c) |
| Pension Funding Transaction | Section E-18(d) |
| Pension Improvement Factor (Escalator) | Sections E-15, G-1(2) |
| Pension Reserve Fund | Section E-18(e) |
| Pension Restoration Agreement | Section G-4 |
| Permanent Restoration Target | Section G-4(2)g,  G-4(3)a, G-4(4)a |
| Pop-up Form | Section E-8(b)(2) |
| Restoration Reserve Account | Section G-4(2)a |
| Restoration Reserve Suspension Trigger | Sections G-4(2)g, G-4(3)a, G-4(4)a |
| Restoration Target | Sections G-4(2)a, G-4(3)a, G-4(4)a |
| Sick Leave Rollover | Section B-1(e) |
| Special Election | Section B-1(e) |
| Standard Form | Section E-8(b)(1) |
| Straight Life Retirement Allowance | Section E-8(a) |
| Transition Cost | Section E-16(c) |
| UAAL | Sections E-18(d), G-4 |
| Waterfall Classes | Section G-4(1) |

# ARTICLE D.  SERVICE CREDIT

## Sec. D-1.  Service Credit

The Board shall keep an accurate record of each employee's accumulated service credit from the date of commencement of employment with the Employers.

## Sec. D-2.  Service Credit; Former Employees of the Founder's Society—Detroit Institute of Arts

Pursuant to Section 6-519 of the 1974 Detroit City Charter, and for the sole purpose of computing service credit to determine eligibility for a retirement allowance from the General Retirement System, a person who was inducted into the classified service of the City during the calendar year 1984 as a result of the transfer of certain functions at the Detroit Institute of Arts from The Founder's Society/Detroit Institute of Arts to the City, shall be credited with service credit equivalent to continuous time worked as a full time employee of the Founder's Society/Detroit Institute of Arts retroactive to January 1, 1984.  Such Founder's Society/Detroit Institute of Arts service credit shall have no effect upon the amount of retirement benefits paid by the General Retirement System.  Such Founder's Society/Detroit Institute of Arts service credit shall be added to the service credit earned as a City employee only for purposes of meeting service credit eligibility requirements under the General Retirement System.  The Board of Trustees of the General Retirement System shall make all determinations of crediting of such Founder's Society/Detroit Institute of Arts service credit in accordance with the provisions of this Component II of the Combined Plan.

## Sec. D-3.  Service Credit; Transfer to Other Governmental Service

A Member transferred from the City payroll by his or her department head to the payroll of any City, county, state, or federal government to serve the interests of the City during peace time shall continue to be a Member of the Retirement System for purposes of service credit in accordance with the ordinance or resolution passed to implement such transfer.

## Sec. D-4.  Service Credit; Military Service

An Employee of the Employer who enters the military service of the United States while so employed shall have such service credited as City service for purposes of this Component II in the same manner as if the employee had served the employer without interruption, provided that (1) the employee's entry into such service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the City, and (2) he or she is re-employed by the Employer upon completion of such service.  During the period of service and until return to City employment, his or her contributions to the fund shall be suspended and the fund balance shall be accumulated at regular interest.

## Sec. D-5.  Service Credit; Qualified Military Service (Pre-Employment Service)

(a)     Notwithstanding any provision of this Component II to the contrary, contributions, benefits, and service credit with respect to qualified military service, shall be provided in accordance with Section 414(u) of the Internal Revenue Code.  Up to three years of pre-

employment service credit may be purchased prior to June 30, 2014 for the following periods: service for a period of not less than ninety days between (1) the date of declaration of war by Congress and the recognized date of cessation of military hostilities; (2) the onset of World War II on December 8, 1941 to its conclusion on July 1, 1946; (3) the onset of the Korean Conflict on June 27, 1950 to its conclusion on December 31, 1953; (4) the onset of the Vietnam Conflict on February 28, 1961 to its conclusion on May 7, 1975, or (5) beginning on the date of the recognition of an emergency condition by the issuance of a presidential proclamation or a presidential executive order, during which emergency condition the Member received the Armed Forces Expeditionary or other Campaign Service Medal authorized by the Federal Government for the Expedition or Campaign.

(b)     This time may be applied toward a Member's credited service and may be used in meeting the minimum time needed for an automatic Option Two or automatic Option Three pension.

(c)     This time shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability pension, or for a service pension.

## ARTICLE E.  DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN OF THE GENERAL RETIREMENT SYSTEM

### Sec. E-1.  Membership

The membership of the General Retirement System 1973 Defined Benefit/Defined Contribution (Annuity) Plan – Component II of the Combined Plan - shall consist of all persons who are full time employees of the Employer except:

(a)     persons who are members of the Police and Fire Retirement System of the City of Detroit, Michigan, established under Title IX, Chapter VII of the 1918 Detroit City Charter and continued in the 1974, 1997 and 2012 Detroit City Charters and as continued in the form of the Combined Plan for the Police and Fire Retirement System for the City of Detroit, Michigan, effective July 1, 2014 and as thereafter amended;

(b)     persons who are hired or rehired by an Employer on or after July 1, 2014; and

(c)     Any person who is a member of any other public employee pension or retirement plan adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of the State of Michigan.

Special Service employees who worked more than fourteen hundred forty (1440) hours per Fiscal Year ending on or before June 30, 2014 will be eligible to participate in Component II of the Retirement System.

### Sec. E-2.  Cessation of Membership; Re-Employment by the Employer

(a)     Any Member who retires under Section E-3(a), (b), or (c), or dies, shall have a non-forfeitable right to a benefit.

(b)     With respect to persons not on the active payroll prior to October 1, 2005, the following provisions of this subsection shall apply:

(1)     Except as otherwise provided for in this Component II, if any non-vested Member leaves City employment for any reason other than retirement or death, such person shall thereupon cease to be a Member and his or her credited service at that time shall be forfeited.  In the event of re-employment by the City prior to July 1, 2014, such person shall again become a Member of the Retirement System and shall accrue benefits pursuant to Component II of the Combined Plan.  In the event of reemployment by the employer on or after July 1, 2014, such person shall again become a Member of the Retirement System and shall accrue benefits pursuant to Component I of the Combined Plan.  If re-employment occurs prior to July 1, 2014 and within a period of six (6) years from and after the date City employment last terminated, credited service last forfeited shall be restored to the employee's credit for purposes of accruing a benefit after re-employment.

(2) With respect to persons on the active payroll on or after October 1, 2005, re-employment prior to July 1, 2014 shall restore any previously forfeited service credit notwithstanding the time of re-employment.

(c) Vested former employees rehired prior to receiving pension benefits and prior to July 1, 2014.

(1) Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to July 1, 2014 and prior to being separated for six (6) years shall have their pensions calculated in accordance with the rules in effect at the earlier of (i) the time of their last termination of active service or retirement and (ii) June 30, 2014.

(2) Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 1992 but prior to July 1, 2014 and after being separated for more than six (6) years who accumulate enough service credit to be eligible for a second pension shall be entitled to two (2) separate and distinct pensions, each to be calculated in accordance with the rules in effect at the earlier of (i) the time of each separation from service and (ii) June 30, 2014.

(3) An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor earned through June 30, 2014 added to the vested amount of the original pension for payment when the employee eventually retires.  The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(d) Vested former employees rehired prior to receiving pension benefits and on or after July 1, 2014.

(1) Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to being separated for six (6) years and on or after July 1, 2014 shall have their Component II pension calculated in accordance with the rules in effect on June 30, 2014 and their Component I pension calculated in accordance with the rules in effect at the time of their last termination of active service or retirement.

(2) Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 2014 after being separated for more than six (6) years who accumulate enough service credit to be eligible for a Component I pension shall be entitled to two (2) separate and distinct pensions under Component I and Component II, each to be calculated in accordance with the rules in effect at the time of each separation from service.

(3) An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor added to the vested

amount of the original pension for payment when the employee eventually retires. The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(e)     Retirement benefits for retirees who return to active full time employment prior to July 1, 2014.

    (1)     Retirees who return to work will have their pension benefit amount suspended upon re-employment. However, retirees who have not withdrawn the amounts credited to their defined contribution account shall be entitled to continue to receive the monthly annuity from the 1973 Defined Contribution Plan. The pension improvement factor shall continue to be added to the vested amount of the original pension but shall not be paid on the defined benefit amount until the employee again separates from service.

    (2)     Retirees who return to work prior to July 1, 2014 will be entitled to receive a second pension benefit in accordance with the rules in effect at the earlier of (1) their final separation, or (ii) June 30, 2014, with respect to service credit earned after the retiree returns to active employment. Previous service credit will be used to determine the retirement factors that will be credited to service time earned after return to active employment and used to calculate the new pension amount.

    (3)     Average Final Compensation will be based upon the amounts earned after the retiree returns to work through the earlier of (1) their final separation and (ii) June 30, 2014.

    (4)     Employees who retire under this Section E-2(e) for a second time will not be allowed to change the original option selection with respect to the original pension benefit. However, employees may make a separate option selection on their second pension benefit amount.

    (5)     The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will be included only on the employee's original pension.

    (6)     The coordination of benefits (equated Social Security) option will not be available on a second pension amount.

    (7)     If a retiree who returns to work and dies while working, had an accumulated combined total service time of at least twenty years, the employee's Spouse will be eligible for automatic Option Two benefits, notwithstanding the option form of retirement originally elected.

    (8)     If a retiree who returns to work and dies while working had an accumulated combined total service time of at least fifteen years but less than twenty years, the employee's Spouse will be eligible for automatic Option Three benefits, notwithstanding the option form of retirement originally elected.

(9) If the employee returns to work and dies prior to accumulating a combined total of fifteen years of service credit, the original pension and benefit option chosen shall resume unless the employee had chosen the Straight Life Option which would result in no survivor pension benefits.

(10) The Board of Trustees will determine all entitlements for re-employed individuals on a case by case basis consistent with this section and will resolve all issues based upon special circumstances or unique situations.

## Sec. E-3.  Service Retirement

(a) *Retirement after thirty years of service.*  Any Member hired prior to January 1, 1996 who has accumulated at least thirty or more years of credited service regardless of age, or, for any Member who was hired on or after January 1, 1996 and who has accumulated at least thirty or more years of credited service and has attained age fifty-five, may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement, the Member shall receive a retirement allowance as provided in Section E-4 of this Component II of the Combined Plan.

(b) *Retirement after twenty-five years of service.*  Any Employee who is covered by the provisions of this Component II and who is a member of the International Union of Operating Engineers IUOE Local 324 (Principal Clerks), the International Brotherhood of Teamsters Teamster Local 214, the Police Officers Association of Michigan, or the Emergency Medical Service Officers Association, who on July 1, 1995, or later has twenty-five (25) or more years of credited service may retire upon his or her written application filed with the Board of Trustees setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement the Member shall receive a Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan.

(c) *Retirement at age sixty-five with eight years of service; at age sixty with ten years of service.*

(1) Sixty-five and eight.  Any Member who has attained sixty-five years of age and has at least eight years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

(2) Sixty and ten.  Any Member who has attained sixty years of age and has at least ten years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

The date of retirement shall be effective on the first day following the Member's last day on City payroll.  Upon retirement, the former Member shall receive the retirement allowance provided for in Section E-4 of this Component II of the Combined Plan.

(d)     *Conversion of Duty-Disability benefit to Retirement Allowance.*

    (1)     Retirees who are members of the Emergency Medical Service Officers Association or the Police Officers Association of Michigan and who began receiving a Duty Disability Pension after July 1, 1995 may choose to convert to a service retirement at the time they would have had twenty-five (25) years of service with the City.

(e)     *Retirement after twenty-five years of service without attaining age sixty years; reduced pension.*

    (1)     Early retirement.  Any Member of the Retirement System who is on the payroll on or after July 1, 1992, and who has twenty-five years of credited service and has not attained sixty years of age, shall have the option of early retirement by accepting an actuarially reduced retirement allowance as determined by the Board after consultation with the Plan Actuary, notwithstanding the age of the Member who elects early retirement; provided however that any Member hired by an Employer on or after January 1, 1996 must have twenty-five years of credited service and have attained age fifty-five to have such early retirement option.  Said election shall be made within ninety days of separation from City service. Actuarial tables provided by the Plan Actuary shall always provide this actuarially reduced retirement allowance at no cost to the employee.

    Notwithstanding the foregoing, any Member hired by an Employer on or after January 1, 1996 who has twenty-five years of credited service and has attained age fifty-five shall have the option of early retirement by accepting

    (2)     Fringe benefits.  Employees utilizing the early retirement provision in Section E-3(e)(1) will not be entitled to the fringe benefits, if any, accruing to employees who qualify for a normal service retirement until such time as they would have qualified for a normal service retirement under Section E-3(a) or (b) of this Component II of the Combined Plan.

(f)     *Vested retirement allowance; age forty and eight years of service; ten years of service regardless of age.*

    (1)     Eligibility.

        a.      Any Member hired before July 1, 1980 who has reached forty years of age and has acquired eight or more years of credited service shall be eligible to receive benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan.

        b.      Any Member hired on or after July 1, 1980 who has acquired ten years of credited service shall be eligible to receive the benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan, regardless of age.

c.    Any non-union Member hired on or after July 1, 1980 but before March 31, 1992 who has acquired ten years of credited service regardless of age or has reached age forty with eight or more years of credited service, whichever is earlier, shall be eligible to receive benefits provided by Section E-3(f)(2) of this Component II of the Combined Plan.

(2)    *Benefits.*

a.    Any Member described in Section E-3(f)(1) of this Component II who left City employment on or before June 30, 1992 but prior to the date the Member would have first become eligible to retire as provided in Section E-3(a), (b) or (c) of this Component II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law, retirement or death, shall be entitled to a retirement allowance based upon one point five percent (1.5%) of Average Final Compensation for the first ten years of service and one point six three percent (1.63%) for service in excess of ten years.  There shall be no change to the base pension upon which future increases are based.

b.    Any Member described in Section E-3(f)(1) of this Component II of the Combined Plan who leaves City employment on or after July 1, 1992, but prior to the date the Member would have first become eligible to retire as provided in Section E-3(a), (b) or (c) of this Component II of the Combined Plan, for any reason except discharge for reasons covered by the State Forfeiture Law, retirement or death, shall be entitled to a retirement allowance computed according to Section E-4 of this Component II of the Combined Plan.

(3)    *Commencement of retirement allowance*.  The retirement allowance shall begin on the first day of the calendar month following the month in which a retirement application is filed with the Board, on or after that date on which the Member would have been eligible to retire with an unreduced service retirement under Section E-3(a) or (b) of this Component II of the Combined Plan, had City employment continued or on the date when age sixty is reached, whichever is earlier.  Unless otherwise provided in this Article, no service credit shall be earned for the period of absence from City employment and such person's beneficiary shall not be entitled to any other benefit afforded in this Article except those benefits afforded either in Section E-3 or in Section E-4 of this Component II of the Combined Plan notwithstanding termination of membership.

(4)    *Withdrawal of accumulated contributions*.  Upon separation from City employment, Members who qualify for benefits pursuant to Section E-3(f)(1) of this Component II of the Combined Plan  may withdraw their 1973 Defined Contribution Plan accumulated contributions and all other funds standing to their credit in the Annuity Savings Fund at that time without affecting their benefits under Section E-3(f)(2) or E-4 of this Component II of the Combined Plan.

In the event that any law, State or Federal, is passed during the term of the collective bargaining agreement or City Employment Terms agreement which permits Employees to vest their pension prior to meeting the vesting requirements set forth in this Component II, any Employee who vests his or her pension in such a manner shall not be eligible for any pension benefits until his or her sixty-second (62nd) birthday. This provision will not affect the current practice governing disabled Employees.

### Sec. E-4. Service Retirement Allowance

Upon retirement, a Member who meets the qualifications set forth in section E-3(a), (b) or (c) of this Component II of the Combined Plan, shall receive a Straight Life Retirement Allowance, and shall have the right to elect to receive in lieu of the Straight Life Retirement Allowance, a reduced retirement allowance under an option provided for in E-8 of this Component II of the Combined Plan.

The Straight Life Retirement Allowance shall consist of:

(a)     An Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the 1973 Defined Contribution Annuity Savings Fund at the time of retirement; and

(b)     A Basic Pension of twelve dollars ($12.00) per annum multiplied by the number of years, and fractions of years of credited service, not to exceed ten (10) years; and

(c)     A Membership Service Pension.

(1)     For Members who retire on or before June 30, 1992, a membership service pension of one point five percent (1.5%) of Average Final Compensation for the first ten (10) years of service and one point six three percent (1.63%) for service in excess of ten (10) years.

(2)     For Members who retire on or after July 1, 1992 but prior to July 1, 1998, a membership service pension of one point five percent (1.5%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point seven percent (1.7%) of Average Final Compensation for each year of service in excess of ten (10) years up to twenty (20) years of service, plus one point nine percent (1.9%) of Average Final Compensation for each year of service in excess of twenty years. In no event shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

(3)     For Members who retire on or after July 1, 1998, a membership service pension for service rendered prior to July 1, 2012 of one point six percent (1.6%) of Average Final Compensation for each year of service for the first ten (10) years, plus one point eight percent (1.8%) of Average Final Compensation for each year of service in excess of ten (10) years, up to twenty (20) years of service, plus two percent (2%) of Average Final Compensation for each year of service in excess of twenty (20) years up to twenty-five (25) years, plus two point two percent (2.2%) of Average Final Compensation for each year of service in excess of twenty-five

(25) years; plus, for service rendered after July 1 2012 and prior to July 1, 2014, one and one-half percent (1.5%) of Average Final Compensation for each year of service; plus twelve dollars ($12) for each year of City service not to exceed one hundred twenty dollars ($120). Notwithstanding the foregoing, for members of the Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920 and the Detroit Senior Water Systems Chemists Association bargaining units, the effective date of the one and one-half percent multiplier was April 1, 2013 for all years of service rendered after that date. In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

(d)      With respect to regular service retirees under Section E-3(a) and (b) of this Component II of the Combined Plan only and excluding persons who receive vested benefits under Section E-3(c) and (d) of this Component II of the Combined Plan, in no case shall the total of the annual Straight Life Pension be less than three hundred sixty dollars ($360.00) times each of the first ten (10) years of service at retirement, plus one hundred twenty dollars ($120.00) for each year of service in excess of ten (10) years. Effective July 1, 2007, each year of service in excess of ten (10) years earned prior to July 1, 2014 shall be calculated using two hundred twenty-five dollars ($225.00).

(e)      The recalculation of the pension benefit shall include previous pension improvement factors but shall not include special increases granted by prior separate ordinances.

(f)      If a retiree dies before receipt of Straight Life Retirement allowance payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between these accumulated contributions and the aggregate amount of Straight Life Retirement allowance payments received, shall be paid to such person or persons nominated by written designation duly executed by the retiree and filed with the Board. If there is no such designated person or persons surviving the retiree, such difference shall be paid to his or her estate. In no case shall any benefits be paid under this section because of the death of a retiree if the retiree had elected any of the Options provided for in Section E-8 of this Component II of the Combined Plan.

## Sec. E-5. Disability Retirement

(a)      *Duty Disability; Eligibility.* Upon the application of a Member or the Member's department head, a Member who becomes totally and permanently incapacitated for duty in the employ of the Employer shall be retired by the Board; provided, such incapacity is found by the Board to be the natural and proximate result of the actual performance of duty, without willful negligence on the part of the Member; provided further, that any employee who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner ("IME"). If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City, the employee shall not be eligible for the duty disability retirement.

(b) *Duty disability; Benefits.* Upon retirement for disability as provided in Section E-5(a) of this Component II of the Combined Plan, a retiree shall receive the following benefits:

(1) Any Member who is eligible for a Service Retirement under Section E-3(a) or (b) of this Component II of the Combined Plan shall receive a Service Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan and shall have the right to elect an option provided for in Section E-8 of this Component II of the Combined Plan.

(2) Any Member prior to eligibility for a Service Retirement under Section E-3(a) or (b) of this Component II of the Combined Plan shall receive a Disability Retirement Allowance to begin as of the date of disability. In no case shall the Disability Retirement Allowance be retroactive to more than six months before the date the application for Disability Retirement is filed with the Board, or prior to the date the Member's name last appeared on a City payroll with pay, whichever is later. The Disability Retirement Allowance shall continue until the Member reaches eligibility for Service Retirement or recovers prior to that event. Upon reaching eligibility for Service Retirement, he or she shall receive a pension as provided in Sections E-4(b)-(e) of this Component II of the Combined Plan, together with an annuity which shall be the equivalent of the annuity which would have been received had contributions to the Annuity Savings Fund continued. Said contributions are to be based on the final compensation at the date of duty disability and the annuity percentage in effect for the employee on the July first prior to the effective date on which the employee is added to the disability retirement payroll, provided said July first is at least six months prior to the effective date that the employee is added to the regular retirement payroll. In computing the pension, membership service credit shall be given for the period a Duty Disability Retirement Allowance is received. The Disability Retirement Allowance shall consist of:

(i) Cash Refund Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the Annuity Savings Fund at the time of retirement. If a retiree dies before receipt of annuity payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions, the difference between the accumulated contributions and the aggregate amount of annuity payments received shall be paid in a single lump sum to such person or persons nominated by written designation duly executed and filed with the Board. If there is no such designated person surviving the retiree, such difference shall be paid to the retiree's estate.

(ii) In addition to the Annuity, a Disability Pension of sixty-six and two-thirds percent (66-2/3%) of the Member's Average Final Compensation at the time of duty disability, subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan. This Disability Pension shall in no event exceed fifty-seven hundred dollars ($5,700.00) per annum.

(iii)    For Members who retired on disability on or after January 1, 1999 or on or after July 1, 2012 for members of the Emergency Medical Service Officers Association and Police Officers Association of Michigan bargaining units, in addition to the Annuity, a Disability Pension of sixty-six and two-thirds percent (66-2/3%) of the Member's average compensation at the time of duty disability, subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.  This Disability Pension shall in no event exceed nine thousand dollars ($9,000.00) per annum.

(c)    *Non-Duty Disability; Eligibility*.  Upon the application of a Member or the Member's department head, a Member who has at least ten years of credited service who becomes totally and permanently incapacitated for duty as a result of causes which do not occur in the actual performance of duty to the employer, may be retired by the Board if the IME certifies to the Board after examination that such Member is mentally or physically totally incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such Member should be retired.

(d)    *Non-Duty Disability; Benefits*.  Upon retirement for non-duty disability as provided in Section E-5(c) of this Component II of the Combined Plan, a Member shall receive the following benefits:

(1)    After attaining sixty years of age, a Member shall receive a Service Retirement Allowance as provided in Section E-4 of this Component II of the Combined Plan and shall have the right to elect an Option as provided in Section E-8 of this Component II.

(2)    Prior to age sixty, a Member shall receive benefits as provided in Section E-5(d)(2)(i)-(iv) of this Component II of the Combined Plan:

i.    A Cash Refund Annuity which shall be the actuarial equivalent of the Member's accumulated contributions in the Annuity Savings Fund at the time of retirement.  In the event a retiree dies before the total of the Cash Refund Annuity payments received equals or exceeds the amount of his or her accumulated contributions at the time of retirement, the remainder shall be paid in a single lump sum to such person or persons nominated by written designation duly executed by the Member and filed with the Board.  If there is no such designated person or persons surviving, any such remainder shall be paid to the retiree's estate.

ii.    In addition to the Annuity, a Disability Pension which shall be based on the Service Retirement factors in effect on the effective date of disability.  The service retirement factors shall be multiplied by the Average Final Annual Compensation multiplied by the number of years and fractions of years of service credited to the retiree.  In addition, a basic pension of twelve dollars ($12.00) per annum for a maximum of ten years of credited service shall be added for a total not to exceed one hundred twenty dollars ($120.00) and adjustments thereto, as calculated pursuant to applicable

provisions of this Component II of the Combined Plan. Said Disability Pension shall begin as of the date of the disability. However, in no case shall the Disability Pension begin more than six months before the date the application for disability retirement was filed with the Board, or prior to the date his or her name last appeared on a City payroll with pay, whichever is later. Payment of the Disability Pension shall continue to age sixty. Said Disability Pension shall not exceed thirty-nine hundred dollars ($3,900.00) per annum, and shall be subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.

iii. A Member who retired on disability on or after January 1, 1999 shall receive a Disability Pension as provided for in Section E-5(d)(2)(ii) of this Component II of the Combined Plan. Said Disability Pension shall not exceed six thousand dollars ($6,000.00) per annum, and shall be subject to the provisions of Sections E-12 and E-13 of this Component II of the Combined Plan.

iv. Effective July 1, 1967, notwithstanding the limitations contained in Section E-5(d)(2)(ii) of this Component II of the Combined Plan, disability retirees under Section E-5(c) of this Component II of the Combined Plan, who retired (1) prior to August 13, 1953, shall receive a supplementary Disability Pension of forty dollars ($40.00) per month; or (2) after August 13, 1956 and prior to July 1, 1966, shall receive a supplementary Disability Pension of twenty dollars ($20.00) per month.

v. Upon Attaining Age Sixty, the retiree shall receive a Pension computed according to the provisions of Section E-4(b)-(e) of this Component II of the Combined Plan; provided, that no service credit shall be given for the time a Disability Pension provided for in Section E-5(d)(2)(ii) of this Component II of the Combined Plan was received. Upon attaining age sixty, the retiree shall have the right to make an election under Section E-8 of this Component II of the Combined Plan.

## Sec. E-6. Accidental Death Benefit; Performance of Duty

If a Member is killed in the performance of duty in the service of the employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the employer, and such death, illness, or injuries resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the employer, the following benefits shall be paid, subject to Section E-12 of this Component II of the Combined Plan:

(a) *Annuity Savings Fund.* Accumulated savings in the Member's Annuity Savings Fund at the time of death shall be paid in a single lump sum to such person or persons as the Member nominated in a writing duly executed and filed with the Board. In the event there is no designated person or persons surviving the Member, the accumulated contributions shall be paid to the Member's estate.

(b)     *A Pension* of one-third of the final compensation of said Member shall be paid to the surviving Spouse to continue until remarriage.  If an unmarried child, or children under age eighteen also survive the deceased Member, each surviving child shall receive a pension of one-fourth of said final compensation, to be divided equally.  Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, such child's pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen.  In no event shall any child receive a pension of more than one-fourth of said final compensation.

(c)     *No Surviving Spouse; Children*.  If there is no surviving Spouse, or if such surviving Spouse dies or remarries before the youngest surviving child of a deceased Member shall have attained the age of eighteen, any unmarried child or children under age eighteen, if any, shall receive a Pension equal to one-fourth of the deceased Member's final compensation; provided, that if there are more than two such surviving children, each shall receive a pension of an equal share of one-half of said final compensation.  Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, the child's Pension shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen.  In no case shall any such child's Pension be more than one-fourth of the deceased Member's final compensation.

(d)     *Annual Limit*.  The total amount payable under Section E-6(b) and (c) of this Component II of the Combined Plan on account of the death of a Member, shall not exceed nine thousand dollars ($9,000.00) per annum.

(e)     *Dependent Father and/or Mother*.  If the deceased Member has no surviving Spouse or children eligible for a Pension under this section, a Pension equal to one-sixth of the deceased Member's final compensation shall be paid to the Member's surviving dependent father and/or mother; provided that in no case shall either parent's Pension exceed fifty dollars ($50.00) per month.  Payment to a dependent parent or parents shall be contingent upon a finding by the Board of Trustees after investigation that such parent or parents were actually dependent upon said deceased Member through a lack of earning power resulting from physical or mental disability.

(f)     *Section E-12 of Component II of the Combined Plan Applicable*.  The benefits provided in Section E-6 of this Component II shall be subject to Section E-12 of this Component II.

## Sec. E-7.  Accumulated Contributions; Return of 1973 Defined Contribution Plan Amount

(a)     *Cessation of Employment*.

(1)     If a Member ceases to be an employee of the employer before becoming eligible for a Pension paid out of City contributions to the Retirement System, such Member shall be paid all or part of the Member's Annuity Savings Fund, being the 1973 Defined Contribution Plan amount, as the Member shall demand by written application filed with the Board.

(2)     Except as otherwise provided in this Article, upon the death of a Member, the Member's Annuity Savings Fund shall be paid to such person or persons nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated person or persons surviving, the Member's said accumulated contributions shall be paid to the Member's estate.

(3)     If a Member who dies without a legal will is not survived by a Spouse and has not nominated a beneficiary as provided in Section E-7(a)(2) of this Component II, the Member's accumulated Annuity Savings Fund contributions at the time of death may be used to pay burial expenses, if the Member leaves no other estate sufficient for such purpose.  Such expenses shall not exceed a reasonable amount as determined by the Board.

(4)     Accumulated contributions to be returned as provided in this section may be paid in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.  After a Member ceases to be a Member, any balance in the Annuity Savings Fund which is unclaimed by the said Member or the Member's heirs, shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

(b)     *One-Time Withdrawal; Twenty-Five Years*.  Prior to the receipt of the first retirement benefit check, an employee with twenty-five or more years of service shall be allowed to withdraw either a partial or full amount of his or her accumulated contributions, one time only.

(c)     *One-Time Withdrawal; Duty and Non-Duty Disability Retirees*.  Duty and non-duty disability retirees shall be allowed to withdraw either a partial or full amount of their accumulated contributions, one time only.

(d)     *One-Time Withdrawal*.  Withdrawal by a Member under either (b) or (c) of this Section E-7 constitutes the one time withdrawal allowed.

## Sec. E-8.  Retirement Allowance Options

(a)     *Election by Member*.  Until the earlier of the first time a retirement allowance payment check is cashed, or six months after the first payment check is issued, but not thereafter, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the actuarial equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced retirement allowance payable throughout life, with the exception that there will be no reduction in the benefits received pursuant to Section E-4(e) of this Component II of the Combined Plan, and nominate a beneficiary to receive benefits following the Member's death, in accordance with the options set forth below:

*Option One.  Cash Refund Annuity*.  If a retiree who elected a Cash Refund Annuity dies before payment of the annuity portion of the reduced retirement allowance has been

received in an aggregate amount equal to, but not exceeding the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, the difference between said accumulated contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to such person or person nominated by written designation duly executed by the Member and filed with the Board. If no such designated person or persons survive the retiree, any such difference shall be paid to the retiree's estate.

*Option Two. Joint and One Hundred Percent Survivor Allowance.* Upon the death of a retiree who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the reduced retirement allowance shall be paid to and continued throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "A". Joint and Seventy-Five Percent Survivor Allowance.* Upon the death of a retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option Three. Joint and Fifty Percent Survivor Allowance.* Upon the death of a retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "B". Joint and Twenty-Five Percent Survivor Allowance.* Upon the death of a retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the reduced retirement allowance shall be paid throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

(b)     *Joint and Survivor Optional Forms of Payment.* The Joint and Survivor Optional Forms of Payment provided under Section E-8(a) of this Component II of the Combined Plan shall be made available in either the standard form or the pop-up form, as follows:

(1)     *Standard Form.* Under the Standard Form, the reduced retirement allowance shall be paid throughout the lifetime of the retiree.

(2)     *Pop-up Form.* Under the Pop-up Form, the reduced allowance shall be paid throughout the lifetime of the retiree and the designated beneficiary. In the event of the death of the designated beneficiary during the lifetime of the retiree, the amount of the allowance shall be changed to the amount that would have been payable had the retiree elected the Straight Life Retirement Allowance form of payment.

(c)     *Coordination of Benefits*.  According to such rules and regulations as the Board shall adopt, until the first payment of a retirement allowance becomes due, but not thereafter, a Member under age sixty-five may elect to have the Member's Straight Life Retirement Allowance provided for in Section E-4 of this Component II of the Combined Plan equated on an actuarial equivalent basis to provide an increased retirement allowance payable to age sixty-two or age sixty-five, and to provide a decreased retirement allowance thereafter.  The increased retirement allowance payable to such age shall approximate the total of the decreased retirement allowance payable thereafter and the estimated social security benefit.  If a Member elects to receive increased and then decreased retirement allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (a) of this section.  This coordination of benefits option shall not create any additional actuarial costs.

## Sec. E-9.  Benefits for Surviving Spouses; Generally

(a)     The surviving Spouse of any Member who dies while in the employ of the City or in the employ of a second governmental unit as provided in Section E-14 of this Component II after the date such Member either (1) has earned twenty years of credited service regardless of age, or (2) has earned eight years of credited service and has attained age sixty-five, or (3) has earned ten or more years of credited service and has attained age sixty, shall receive a retirement allowance.  The Spouse's retirement allowance shall be computed according to Section E-4 of this Component II of the Combined Plan in the same manner in all respects as if the said Member had retired effective the day preceding the Member's death, notwithstanding that the Member had not attained age sixty, elected a Joint and One Hundred Percent Survivor Allowance as provided for in Section E-8 of this Component II, and nominated the surviving Spouse as beneficiary.  No payments shall be made under this Section E-9 on account of the death of a Member if any benefits are paid under Section E-6 of this Component II.  If an Employee dies with twenty (20) years of service and without a surviving Spouse, dependent children shall be paid a total of nine thousand dollars ($9,000.00) per year which shall be divided equally among all eligible dependent children until the youngest child reaches age nineteen, or for life, if a child is permanently physically or mentally impaired and such impairment occurred prior to the child's attainment of age nineteen.  There shall be no retirement escalator for this payment.

(b)     In addition to in-service death benefits which existed prior to July 1, 1998 for Members with twenty or more years of service, if a Member dies on or after July 1, 1998 or such later date as provided in a collective bargaining agreement, after having attained fifteen or more but less than twenty years of creditable service at any age below sixty, the surviving Spouse will be paid a Fifty Percent Joint and Survivor benefit.  If there is no eligible surviving Spouse, dependent children shall be paid a total of six thousand dollars ($6,000.00) which shall be divided equally among all eligible dependent children until the youngest child reaches age nineteen, or for life if a child is permanently physically or mentally impaired.

## Sec. E-10.  Benefits for Surviving Spouses; Disability Retirees

The surviving Spouse of a disability retiree who retired under the provisions of Section E-5 of this Component II of the Combined Plan and who died before the age of sixty shall receive a retirement allowance computed in the same manner as if the disability retiree had been a Member who became eligible for death benefits under Section E-9 of Component II of the Combined Plan, provided the disability retiree had earned fifteen or more years of credited service. In the case of a non-duty disability retiree, credited service shall be determined on the effective date of the non-duty disability retirement. In the case of a duty disability retiree, credited service shall be determined on the date of death of the disability retiree assuming City employment had continued until the date of death.

## Sec. E-11. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint Twenty-Five Percent Survivor allowance as provided for under Section E-8 of this Component II of the Combined Plan, both a retiree and beneficiary die before they have received in retirement allowance payments, an aggregate amount equal to the retiree's accumulated contributions in the Annuity Savings Fund at the time of retirement, less withdrawals, the difference between the said accumulated contributions and the said aggregate amount of retirement allowances paid the retiree and beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the retiree duly executed and filed with the Board. If there are no person or persons surviving retiree and beneficiary, any such difference shall be paid to the retiree's estate.

## Sec. E-12. Pensions Offset by Compensation Benefits; Subrogation

(a)     <u>Generally</u>.  Any amounts which may be paid or payable to a Member, retiree, or to the dependents of a Member or retiree on account of any disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be offset against any pensions payable from funds of the Retirement System on account of the same disability or death.  If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for said pension payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the Pension Reserve, and such pensions as may be provided by the Pension Reserve so reduced shall be payable as provided in this Article E.

(b)     <u>The City's right of subrogation</u>.  In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the City shall be subrogated to the rights of said person against such third party to the extent of the benefit which the City or the Retirement System pays or becomes liable to pay.

## Sec. E-13. Disability Retirees; Reexamination; Authority of the Board

(a)  *Medical examination*.  At least once each year during the first five years following the retirement of a Member with a Disability Retirement Allowance or Disability Pension, and at least once in every three year period thereafter, the Board may, and upon the retiree's application shall, require that any disability retiree who has not attained age sixty undergo a medical examination, to be made by, or under the direction of, the Medical Director.  Should any such disability retiree who has not attained age sixty refuse to submit to at least one such medical examination in any such period, the retiree's retirement allowance or pension may be discontinued by the Board until withdrawal of such refusal.  Should such refusal continue for one year, all of the disability retiree's rights in and to the Pension portion of the Retirement Allowance may be revoked by the Board.  If upon such examination of a disability retiree, the Medical Director reports that the retiree is physically able and capable of resuming employment, and such report is concurred in by the Board, the retiree shall be restored to active service with the City and the Disability Retirement Allowance shall terminate.

(b)  *Other employment*.  If such disability retiree is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the retiree's Disability Retirement Allowance and final compensation, the Pension portion of the Disability Retirement Allowance shall be reduced by the amount of such difference.  If the amount of the earnings changes, the Pension may be adjusted accordingly.

(c)  *Reinstatement to active service*.  A disability retiree who has been, or shall be, reinstated to active service in the employ of the City as provided in this Section, shall again become a Member of the Retirement System.  All credited service at the time of the retirement shall be restored to full force and effect and a duty disability retiree shall be given membership service credit for the period said retiree was out of service due to such duty disability.

## Sec. E-14.  Transfer of Department or Department Functions; Generally

In the event a function or functions of a City Department or the Department itself is transferred to the federal or state government, or to a political subdivision of the State of Michigan (second governmental unit), a Member of the Retirement System whose employment is transferred from the City to the second governmental unit shall be entitled to a retirement allowance payable by the Retirement System subject to the following conditions:

(a)  *Employment within sixty days of transfer*.  The employee enters the employment of the second governmental unit within sixty days from and after the effective date of the transfer of the function or functions of a City Department or the Department itself to the second governmental unit.

(b)  *Credited service combined; ten year minimum*.  The employee's credited service as a Member of the Retirement System plus any credited service acquired in the employ of the second governmental unit totals at least ten years.

(c)  *Retirement; second governmental unit*.  If the employee retires from employment with the second governmental unit on account of age and service, the employee's Retirement

Allowance shall be computed in accordance with Section E-3(b) or Section E-4 of this Component II of the Combined Plan, whichever is applicable. If the employee retires from employment in the second governmental unit because of total and permanent disability arising from non-service connected causes, the Retirement Allowance shall be computed in accordance with Section E-5(d) of this Component II of the Combined Plan. In computing the Retirement Allowance, the basic pension shall not exceed twelve dollars ($12.00) per year for a maximum of ten years for a total amount to not exceed one hundred twenty dollars ($120.00), and the membership service pension shall be based only upon City-credited service existing at the time of transfer. In determining the Average Final Compensation defined in Section C-1 of this Component II of the Combined Plan, the compensation received as an employee of the second governmental unit shall be regarded as compensation paid by the City. If the employee leaves the employ of the second governmental unit with a deferred retirement allowance, no City retirement allowance shall be paid unless the employee has met the requirements of Section E-3(d)(1) of this Component II of the Combined Plan. Notwithstanding the foregoing, effective as of the Freeze Date, for purposes of calculating a Retirement Allowance for a Member whose employment was transferred prior to July 1, 2014 from the City to a second governmental unit, Average Final Compensation for the transferred Member shall be compensation received by such transferred Member prior to July 1, 2014 as an employee of the second governmental unit.

(d)     *Allowance starting date*.  The retirement allowance shall begin upon retirement from the employment of the second governmental unit, but in no event prior to the date the employee would have become eligible for retirement had the employee continued in City employment.  If retirement is because of total and permanent disability arising from non-service-connected causes, the retirement allowance shall begin upon the approval of retirement by the Board.

## Sec. E-15.  Pension Improvement Factor (Escalator)

(a)     *Increase of pension*.  On or after July 1, 1992 and prior to the effective date of the Plan of Adjustment, effective as of the first day of July of each year, the pension portion of any Retirement Allowance or Duty Death Benefit which is paid or payable under this Article shall be increased by a factor of two and one quarter percent (2.25%), computed on the basis of the amount of the original pension received at the time of retirement, including, if applicable, any supplemental pensions provided under this Article; provided, that the recipient of said pension shall have been on the retirement rolls at least one year prior to said July first date.  If the recipient has been on the retirement payroll less than one year prior to said July first date, the amount of the increase shall be prorated accordingly.

(b)     *Payment*.  Except as provided in paragraph (c) below, the pension improvement factor of two and one quarter percent (2.25%) provided for in Section E-15(a) of this Component II, shall be payable notwithstanding any Retirement Allowance or pension amount limitation provisions in this Article to the contrary.

(c)     After the effective date of the City Employment Terms between the City of Detroit and Police Officers Association of Michigan presented to the union on July 18, 2012,

employees represented by the union will no longer receive the two and one-quarter percent (2.25%) per annum escalation.

(d)    Effective April 1, 2013, the post-retirement escalator factor for all service after that date shall be eliminated for any employee who is a member of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920.

### Sec. E-16.  Adoption of Rates of Interest; Limitations on Payments By Retirement System; Transfer of Investment Returns in Excess of Crediting Rate

(a)    The Retirement System and the Board of Trustees shall not make any payment to active or retired Members other than payments that are required by the Retirement System as established by this Combined Plan to govern the Retirement System or the Plan of Adjustment.  This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(b)    The Retirement System and the Board of Trustees shall not provide any savings plan, annuity plan, or other Member investment or savings vehicle that provides an annual return to investing Members which in any year is greater than the actual investment return net of expenses of the Retirement System's invested reserves for the year in which the return is earned and accrued, provided that such return shall neither be greater than the assumed annual return as expressed in the Retirement System's valuation for that year nor less than zero.  This prohibition shall apply to all annual returns credited to accounts of investing Members in the Annuity Savings Fund of the 1973 Defined Contribution Plan from the effective date of Ordinance 37-11 to June 30, 2013.  Notwithstanding anything in this Section E-16 to the contrary, effective for Plan Years beginning on and after July 1, 2013, the annual rate of return credited to a Member's account in the Annuity Savings Fund of the 1973 Defined Contribution Plan shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second Plan Year immediately preceding the Plan Year in which the annual return is credited.

(c)    In any Plan Year during the period beginning on or after July 1, 2014 and ending June 30, 2023 in which the annual rate of return credited to the accounts of Members investing in the Annuity Savings Fund as provided in paragraph (b) is less than the actual rate of return net of expenses of the Retirement System's invested assets for the second Plan Year immediately preceding the Plan Year in which the annual rate of return is credited ("ASF Return Excess"), an amount equal to the value of the ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component I of the Combined Plan and shall be used to fund the Transition Cost relating to Component I. The Transition Cost is a measure of the liability that Component I of the Retirement System has at its inception; due to the fact that at its inception, Members in Component I of the Retirement System receive vesting and eligibility credit under Component I for service that was earned prior to July 1, 2014 and is otherwise credited to Members under Component II of the Retirement System, as such Transition Cost is calculated by the Plan Actuary.  In the event there is an ASF Return Excess for a Plan Year following the Plan

Year in which such transfers have fully funded the Transition Costs relating to Component I, fifty percent (50%) of such ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component II and the remaining fifty percent (50%) of such ASF Return Excess shall be transferred to Component I and credited to the Rate Stabilization Fund maintained under Component I. "Transition Cost" shall be determined by the Plan Actuary.

## Sec. E-17.  Funds

The 1973 Defined Benefit/Defined Contribution (Annuity) Plan shall consist of the Annuity Savings Fund, the Annuity Reserve Fund, the Pension Accumulation Fund, the Pension Reserve Fund, and the Income Fund.

## Sec. E-18.  Method of Financing

(a)     *Annuity Savings Fund of the 1973 Defined Contribution Plan*.

(1)     The Annuity Savings Fund of the 1973 Defined Contribution Plan shall be the fund in which shall be accumulated at regular interest, in accordance with the limitations that are contained in Section E-16 of this Component II of the Combined Plan, the contributions of Members made prior to the first payroll date occurring in August 2014 to provide their annuities.  At the election of the Member, the amount of the basic contribution of a Member to the Retirement System prior to the first payroll date occurring in August 2014 were zero percent (0%), three percent (3%), five percent (5%), or seven percent (7%) of annual compensation.  If a Member elected three percent (3%), his or her contribution shall be that amount which is subject to taxation under the provisions of the *Federal Insurance Contribution Act, 26 USC 3101 et seq. (Act)*, plus five percent (5%) of the portion of annual compensation, if any, which exceeds the amount subject to taxation under that *Act*.

(2)     The contribution rate elected by the Member under Section E-18(a)(1) of this Component II of the Combined Plan were deducted from the Member's compensation notwithstanding that the minimum compensation provided by law for any Member were reduced thereby.  Payment of compensation, less said deductions, constituted a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment, except as to benefits provided under this Article E.

(3)     Upon retirement of a Member with a Retirement Allowance, the Member's accumulated contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund, refunded to the Member, or a combination thereof.

(b)     *Annuity Reserve Fund*.  The Annuity Reserve Fund shall be the fund, from which all annuities and benefits in lieu of annuities payable as provided in this Article E, shall be paid.  If a disability retiree is reinstated to active City service, the retiree's Annuity Reserve at that time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his or her individual account therein.

(c) *Pension Accumulation Fund.* The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from the contributions made by the City, including various departments thereof, the Detroit Public Library, and certain third parties pursuant to the Plan of Adjustment and from which shall be paid pensions and other benefits on account of Members with prior service credit, and transfers as provided in this Section E-18. Contributions to the Pension Accumulation Fund from the effective date of the Plan of Adjustment through Fiscal Year 2023, shall be made only in the amounts and from the sources identified in the Plan of Adjustment.

For Fiscal Years beginning after June 30, 2023, contributions to fund pension benefits (adjusted as provided in the Plan of Adjustment) shall be made as follows:

(1) Certain amounts shall be contributed by certain third parties as provided in the Plan of Adjustment.

(2) The City's annual contribution shall be calculated by the Actuary as provided in Section E-19.

(3) Upon the retirement of a Member without prior service credit, or upon a Member's death in the performance of duty, the Pension Reserve Fund for the pension or pensions to be paid on the Member's account shall be transferred from the Pension Accumulation Fund to the Pension Reserve Fund.

(4) Upon the basis of such mortality and other tables of experience and interest as the Board shall adopt from time to time consistent with Section 1.16(d) of Component I, the Actuary shall compute annually the pension reserve liabilities for pension benefits being paid to retirees and beneficiaries.

(5) On an annual basis, the Board shall ascertain and report to the Mayor and the Council the amount of City contributions due to the Retirement System. The Council shall appropriate and the City shall pay such contributions during the appropriate Fiscal Year. When paid, such contributions shall be credited to the Pension Accumulation Fund.

(6) If the amount appropriated by the City and paid to the Retirement System for any Fiscal Year is insufficient to make the transfers and pay the pensions, as adjusted in the Plan of Adjustment, from the Pension Accumulation Fund as provided in this Section E-18, the amount of such insufficiency shall be provided by the appropriating authorities of the City.

(d) *Accrued Liability Fund.* Pursuant to *Ordinance No. 5-05*, which authorized the creation of the Detroit General Retirement Service Corporation, the City previously entered into a transaction (the "Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described above in Subsection (c). The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transactions, as described below) that were deposited into the System are termed the "Funding Proceeds." The Funding Proceeds were deposited into a new fund in the System to be called the Accrued Liability Fund. The purpose of the Funding

Proceeds was to fund all or part of the heretofore unfunded actuarial accrued liability ("UAAL") of the Retirement System, as determined as of a date certain, that is, the "Determination Date," pursuant to the Retirement System's actuarial valuation as of that date. The Funding Proceeds are assets of the Retirement System and will be applied, together with all other assets of the Retirement System, to fund the Retirement System's obligation to pay pension benefits, as adjusted in the Plan of Adjustment.

This Accrued Liability Fund shall contain only the Funding Proceeds of this Pension Funding Transaction, and any earnings thereon. Prior to Fiscal Year 2013, funds were transferred each Fiscal Year (or monthly portion thereof) from the Accrued Liability Fund to the Pension Accumulation Fund as provided in *Chapter 47 of the 1984 Detroit City Code* and *Ordinance No. 5-05*.

As soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.

(e)     *Pension Reserve Fund*. The Pension Reserve Fund shall be the fund from which pensions shall be paid to retirees and beneficiaries. Should a disability retiree be reinstated to active service, the retiree's Pension Reserve at that time, shall be transferred from the Pension Reserve Fund to the Pension Accumulation Fund.

(f)     *Expense Fund*. The Expense Fund shall be the fund to which shall be credited all money provided by the City to pay the administrative expenses of the Retirement System, and from which shall be paid all the expenses necessary in connection with the administration and operation of the Retirement System.

(g)     *Income Fund*. The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the Retirement System (other than those derived from the investments credited to any Accrued Liability Fund), all gifts and bequests received by the Retirement System, and all other moneys the disposition of which is not specifically provided for in this Article E. There shall be paid or transferred from the Income Fund, all amounts required to credit regular interest to the various Funds of the Retirement System, except for the Accrued Liability Fund which is to be credited with interest, dividends and other earnings pursuant to Section E-18(d)(2) of this Component II of the Combined Plan in accordance with the limitations that are contained in Section E-18 of this Component II of the Combined Plan.

(h)     *Maintenance of Reserves*.

(1)     The maintenance of proper reserves in the various Funds of the Retirement System except the Expense Fund are hereby made obligations of the Pension Accumulation Fund.

(2)     City contributions to the Retirement System to the extent necessary to provide pensions on account of Members who are employees of a revenue-supported division of the City shall be made from the revenues of the said division. Any City contribution to the Retirement System from any Fund by law with a certain

and definite purpose shall, at the direction of the Finance Director, be accounted for separately.

### Sec. E-19. Determination of City's Annual Contribution

(a)     For the period ending June 30, 2023, the City shall make only those contributions to the Retirement System as are set forth in the Plan of Adjustment.

(b)     For Fiscal Years beginning on and after July 1, 2023, the annuity and pension reserve liabilities for Members, retirees, and beneficiaries, shall be actuarially evaluated as set forth in this Article for each division as is accounted for separately pursuant to Section E-18(h)(2) of this Component II of the Combined Plan.

    (1)     *Pension Liabilities*.

        a.     The pension liabilities for Members shall be determined by the Actuary using reasonable and appropriate actuarial assumptions approved by the Board and the Investment Committee.

        b.     The City's annual contribution to finance any unfunded accrued pension liabilities, expressed as a percentage of active employees' compensation, shall be determined by amortizing such unfunded accrued pension liabilities as a level percentage of such compensation over a period or periods of future years as established by the Board and approved by the Investment Committee.

    (2)     *Pension Accumulation Fund*.   Based upon the provisions of this Article E including any amendments, the Board shall compute the City's annual contributions to the Retirement System, expressed as a percentage of active Member compensation each Fiscal Year, using actuarial valuation data as of the June thirtieth date which date is a year and a day before the first day of such Fiscal Year.  The Board shall report to the Mayor and Council the contribution percentages so computed.   Such contribution percentages shall be used in determining the contribution dollars to be appropriated by Council and paid to the Retirement System.  Such contribution dollars shall be determined by multiplying the applicable contribution percentage for such Fiscal Year by the Member compensation paid for such Fiscal Year.  Such contribution dollars for each Fiscal Year shall be paid to the Retirement System in such Fiscal Year in a manner to be agreed upon from time to time by the Board and the City, provided, for any Fiscal Year for which an agreement has not been reached before the first day of such Fiscal Year, such contribution dollars shall be paid in equal monthly installments at the end of each calendar month in such Fiscal Year.

# ARTICLE F.  PARTICIPANT LOAN PROGRAM

## Sec. F-1.  Established.

Any loans granted or renewed shall be made pursuant to a Participant Loan Program which shall conform with the requirements of Section 72(p) of the Internal Revenue Code.  Such loan program shall be established in writing by the Board of Trustees, and must include, but need not be limited to the following:

(1)  The identity of the administrator of the Participant Loan Program;

(2)  A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

(3)  The procedures under the program for determining a reasonable rate of interest; and

(4)  The events constituting default and the steps that will be taken to preserve plan assets.

## Sec. F-2.  The Loan Program.

(1)  This Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the Retirement System for prospective participants in the Loan Program.  The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program.  Copies of the rules shall also be made available to prospective Members in the offices of the Retirement System; and

(2)  All collective bargaining agreements which accept the terms of this section are specifically agreeing to be subject to the Board's authority to modify or amend the Participant Loan Program from time to time, including during the effective terms of the applicable labor agreement and no such modification or amendment shall be deemed a violation of said labor agreement and no grievance or other form of action shall be effective to overturn or alter the Board's decision.

## Sec. F-3.  Eligibility.

Subject to rules and procedures established by the Board, loans will initially be made only to non-union Members of the Retirement System.  Union employees will be eligible when their respective bargaining unit has accepted the Loan Program.  Former Members, spouses of Members, and beneficiaries are not eligible to receive any loans from the Retirement System. Subject to rules and procedures established by the Board, a Member who has been in the Combined Plan for twelve (12) months or more is eligible to apply for a loan under this Component II.  No Member shall have more than two outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan (under either Component I or Component II) shall not be eligible for a loan from the Retirement System.

**Sec. F-4. Amount of Loan.**

A Member who has satisfied applicable rules and procedures may borrow from his or her account an amount, which does not exceed fifty percent (50%) of the Member's vested accumulated balance, or ten thousand dollars ($10,000.00) reduced by the excess, if any, of: 1) the highest outstanding balance of loans from the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or 2) the outstanding balance of loans from the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less. The minimum loan amount shall be one thousand dollars ($1,000.00).

**Sec. F-5. Terms and Conditions.**

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(1) Loan applications shall be in writing;

(2) Loans shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period;

(3) Each loan shall be made against the assignment of the Member's entire right, title, and interest in and to the Retirement System, supported by the Member's collateral promissory note for the amount of the loan, including interest payable to the order of the Board of Trustees;

(4) Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the Combined Plan. The loan interest rate shall be calculated in a manner that will not negatively affect the Employers' costs with respect to the Retirement System or the investment return allocated to Members;

(5) Loan repayments shall be suspended under this plan as permitted by Section 414(u)(4) of the Internal Revenue Code. A participant who has an outstanding loan balance from the plan who is absent from employment with the employer, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

**Sec. F-6.  Renewal of Loan.**

Any loans granted or renewed shall be made pursuant to the Participant Loan Program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

**Sec. F-7.  Loan Balance.**

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's account balance, and shall not be part of net investment income or part of the Member's account balance for the purpose of allocation of net investment income under the Retirement System.

**Sec. F-8.  Distributions.**

No distributions shall be made to a Member, former Member, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

**Sec. F-9.  Annual Report.**

The Retirement System shall include, in its annual report to all Members, an accounting of the Loan Program established by this Article F, which contains the number and amount of loans made under this Component II, the costs of administering the Loan Program under Component II, the amount of payments made including interest received by Component II of the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that Fiscal Year covered the costs of administering the Loan Program maintained under this Component II.

# ARTICLE G.  SPECIAL PLAN OF ADJUSTMENT PROVISIONS

## Sec. G-1.  Benefit Changes Implemented Pursuant to the Terms of the Plan Of Adjustment

Notwithstanding anything in Articles A, C, D or E of Component II to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following provisions to comply with the terms of the Plan of Adjustment shall be implemented:

(1)    *Reduction in monthly pension payments.*

    a.    For a retiree or a surviving beneficiary who is receiving a monthly pension benefit as of the effective date of the Plan of Adjustment, as soon as practicable following such effective date such retiree's or surviving beneficiary's monthly pension benefit will be reduced to an amount that is equal to 95.5% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment ("Adjusted Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then such retiree's or surviving beneficiary's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the effective date of the Plan of Adjustment.

    b.    The Frozen Accrued Benefit that will be paid as a monthly Retirement Allowance upon the retirement or death of an active employee Member or a vested former employee Member on or after the Effective Date, will be reduced to an amount that is equal to 95.5% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1 ("Adjusted Deferred Accrued Benefit"); provided, however, that the Board and the Investment Committee shall determine on an annual basis that the "Funding Conditions" as defined herein have been satisfied, and in the event such Funding Conditions have not been satisfied then such active employee Member's or vested former employee Member's Adjusted Accrued Benefit will be reduced in proportion to the funding which is not received by the Retirement System but not below an amount that is equal to 73% of the monthly pension benefit that would otherwise have been paid to the active employee or vested former employee under the terms of this Component II of the Combined Plan without taking into account this Section G-1.

c.   *Cap on Benefit Reductions for Certain Retirees.*  With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, such retiree's or surviving beneficiary's Adjusted Accrued Benefit, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

For purposes of this Sec. G-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2)   *Elimination of Pension Improvement Factor.*  For all pension benefits payable after the Effective Date, the Pension Improvement Factor (Escalator) that will be applied to the monthly Adjusted Accrued Benefit or Adjusted Deferred Accrued Benefit of a Member, retiree, surviving beneficiary or vested former employee will be equal to 0%.

(3)   *Recoupment of Excess Returns on Annuity Savings Fund Account.*  The terms of Section G-2 Annuity Savings Fund Recoupment shall apply to the Annuity Savings Fund account of Members, retirees and vested former employees as provided in Section G-2.

(4)   *Future Disability Pensions Eliminated.*  The Duty Disability Retirement Allowance and Non-Duty Disability Retirement Allowance are eliminated with respect to Members who become disabled on or after July 1, 2014.

(5)   *Effect of Payment Default.*  In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall automatically reduce the monthly pension benefits payable to Members, retirees, surviving beneficiaries, and former employees to the extent of such default.

## Sec. G-2.  Annuity Savings Fund Recoupment

Notwithstanding anything in Articles A, B, C, D or E to the contrary, upon the effective date of the Plan of Adjustment, Members, retirees or vested former employees who were identified by the City as a Class 11 Holder under the Plan of Adjustment and who participated in the Annuity Savings Fund ("ASF") at any time during the period that began on July 1, 2003 and ended on June 30, 2013 ("ASF Recalculation Period") are subject to the following provisions:

(1)   *Recoupment from Members, retirees and vested former employees who maintain an Annuity Savings Fund account ("ASF account") as of the Effective Date.*  For each Member, retiree or vested former employee who maintains an ASF account

in the Retirement System as of the effective date of the Plan of Adjustment, such individual's ASF account balance will be reduced by such individual's Annuity Savings Fund Excess Amount, as determined by the City in accordance with this Section G-2 (1).

a.  For a Member, retiree or former vested employee who did not receive any distribution or loan from such individual's ASF account during the ASF Recalculation Period, the Annuity Savings Fund Excess Amount means the difference between the value of such individual's ASF account as recalculated using the Actual Return (as defined in paragraph (3) below) and the actual value of such individual's ASF account as of June 30, 2013; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance relating to the ASF account) during the ASF Recalculation Period.

b.  For a Member, retiree or vested former employee who during the ASF Recalculation Period has received a distribution (other than a total distribution) or loan from the ASF, the Annuity Savings Fund Excess Amount means the difference between (i) the sum of (A) the value of such individual's ASF account as of June 30, 2013 and (B) all distributions (including any unpaid loans) received by such individual from his or her ASF account during the ASF Recalculation Period, and (ii) the value of such individual's ASF account as of June 30, 2013 as recalculated using the Actual Return; provided, however, that an individual's Annuity Savings Fund Excess Amount shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loans made to the individual) during the ASF Recalculation Period.

(2)  *Recoupment from Members, retirees and former employees who previously took total Annuity Savings Fund account distributions.*   Except as provided in paragraph (4) below, for each Member, retiree or vested former employee who has received a total distribution of the individual's ASF account during the ASF Recalculation Period, the individual's monthly pension benefit (and the survivor monthly pension benefit payable to the Member's survivor, if any) will be reduced by the individual's "Monthly Annuity Savings Fund Excess Amount" as determined by the City in accordance with this Section G-2(2).

A Monthly Annuity Savings Fund Excess Amount means the difference between (i) the value of the ASF account of a Member, retiree or vested former employee as of the date of distribution to such individual from the ASF, provided such date falls within the ASF Recalculation Period, and (ii) the value of the individual's ASF account as of such date, as recalculated using the Actual Return; provided, however, such difference shall not exceed 20% of the highest value of such individual's ASF account balance (including any unpaid loan balance) during the ASF Recalculation Period; provided, further, such amount will be converted into

a monthly annuity amount based on the individual's life expectancy, gender and, if the Member has not already retired, the expected date of retirement.

(3) *Recoupment from Members, retirees and former employees who received partial Annuity Savings Fund account distributions.* A Member, retiree or vested former employee who previously received a distribution of a portion but not the entirety of the Member's Annuity Savings Account shall be subject to paragraph (1) to the extent of any funds then credited to the Member's Annuity Savings Fund account and shall be subject to paragraph (2) to the extent of any Excess Amount that cannot be recovered pursuant to paragraph (1).

(4) *Cash repayment option.* Notwithstanding paragraphs (2) and (3) above and subject to the Cash Option Cap described below, a Member, retiree, employee or former employee whose monthly pension benefit will be reduced pursuant to paragraph (2) or (3) may elect to make a single lump sum cash payment to the Retirement System of the Annuity Savings Fund Excess Amount by cashier's check or wire transfer ("Cash Repayment Option"). Each individual eligible for the Cash Repayment Option shall be provided by first-class U.S. mail an election notice and an election form no later than seven days following the Effective Date. The individual shall have thirty-five days from the date on which the election form is mailed to return the election form as directed on the form. An election of the Cash Repayment Option shall be effective only if it is received by the deadline set forth on the election form.

No later than fourteen days following the election deadline, the Board shall notify each individual who timely elects the Cash Repayment Option of the amount to be repaid to the Retirement System ("Final Payment Notice"). Such amount must be paid to the Retirement System on or before the later of (i) ninety days after the Effective Date, or (ii) fifty days following the date on which the Final Payment Notice is mailed to the individual.

If payment is not timely received, the monthly pension benefit of an individual who elects the Cash Repayment Option shall be reduced as provided in paragraph (2) or (3).

The Cash Repayment Option shall be limited to an aggregate amount of $30 million (the "Cash Option Cap"). In the event the Retirement System receives timely and properly completed election forms representing an aggregate recovery amount in excess of the Cash Option Cap, then each individual who made a timely election of the Cash Repayment Option shall be permitted to repay an amount equal to his pro rata share of the Cash Option Cap. Any Annuity Savings Fund Excess Amount that is not repaid under the Cash Repayment Option shall be repaid as provided in paragraph (2) or (3).

(5) *Definition of Actual Return.* "Actual Return" means the actual net return percentage on the Retirement System's invested assets for each Fiscal Year

during the ASF Recalculation Period; provided, however, that for any such Fiscal Year the net return shall not be greater than 7.9% nor less than 0%.

(6) *Limitation on recoupment.* Notwithstanding anything in this Section G-2 to the contrary:

    a.    a Member's ASF account value after recoupment of the Member's Annuity Savings Fund Excess Amount will never be less than the contributions made to the ASF by such Member and will reflect all interest credited by the Board to the Member's ASF account for the Fiscal Years ending prior to July 1, 2002; and

    b.    in no event shall the amount recovered from a Member described in Section G-2(2) (or G-2(3), with respect to amounts that may not be recovered pursuant to Section G-2(1)) exceed the Member's Annuity Savings Fund Excess Amount plus interest on such amount at a rate of 6.75%. Upon the Member's repayment of such amount in full, the Member's monthly pension benefit in effect immediately prior to adjustment as provided in Section G-2(2) (adjustment as provided in Section G-1), increased as provided in Section G-4, if applicable, shall be fully restored.

(7) *Cap on benefit reductions for certain retirees.* With respect to any retiree or surviving beneficiary receiving monthly pension benefits from the Retirement System as of June 30, 2014, the Adjusted Accrued Benefit of such retiree or surviving beneficiary, as further reduced to take into account any ASF Recoupment under Section G-2, shall not be less than 80% of the monthly pension benefit being paid to such retiree or surviving beneficiary as of the date immediately preceding the Effective Date.

Annuity Savings Fund Excess Amounts of Members described in paragraphs (1) and (3) shall be transferred from the Annuity Savings Fund to the Pension Accumulation Fund and shall be used to pay pensions and other benefits to Members as provided in Component II of the Combined Plan.

## Sec. G-3.  Income Stabilization Benefits

(1) The provisions of this Section G-3 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer.

(2) Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section G-3, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i)  the amount needed to restore an Eligible Pensioner's reduced

annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013. The Income Stabilization Benefit as determined under this Section G-3(2) will not increase after the date on which the Income Stabilization Benefit is determined. The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3)     To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section G-3) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section G-3 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

    a.     The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

    b.     An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the pension benefit paid to the Eligible Pensioner from the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Accrued Benefit that is payable to the Eligible Pensioner for that year as determined under Section G-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section G-4; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4)     A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners. Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of

Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section G-3 (7).

(5)　For purposes of this Section G-3, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section G-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

    a.　An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

    b.　The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion.  The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board.  The Board, with the assistance of the Investment Committee, shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

    c.　After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

    d.　An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death, or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6)　For purposes of this Section G-3, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

(7)　In the event that in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income

Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System. The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8) In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Accrued Benefits or Adjusted Deferred Accrued Benefits, as applicable, payable by the Retirement System.

## Sec. G-4. Restoration of Pension Benefits

The following rules shall govern how accrued pensions, including Pension Improvement Factor ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re. City of Detroit, Michigan*, Case No. 13-53846. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1) *Waterfall Classes.*

There will be three Waterfall Classes:

a. Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries.

b. Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

c. Waterfall Class 3 – All other Members who as of June 30, 2014 are not in retirement benefit pay status.

(2) *Restoration of Benefits Through June 30, 2023*.

a. Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial

accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (investment and administrative), future Employer contributions as set forth in the Plan of Adjustment (subject to the conditions in the Plan of Adjustment) and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 70% funded ratio, the Restoration Target will be a 75% funded ratio, and the Restoration Reserve Suspension Trigger will be a 71% funded ratio, all projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Actuary projects that the projected Funded Level as of June 30, 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 75%), a credit of assets for bookkeeping purposes will be made into a new notional "Restoration Reserve Account". The notional credit will be in an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Reserve Account assets will be credited with interest in an amount equal to the net return on Retirement System investments, but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the Pension Reserve Fund.

b.    To the extent that the City's (including DWSD or a successor authority) actual contributions in any of the Fiscal Years 2015 through 2023 are less than the contributions provided for in the Plan of Adjustment, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c.    Actual restoration payments and credits will work as follows: each year in conjunction with preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore a portion of the 4.5% across the board pension cuts in one or more minimum incremental amounts equal to ½% of the monthly benefit for each member of Waterfall Class 1 (i.e. reducing the initial across the board cut to 4.0%). This restoration only occurs if the funding level in the Restoration Reserve Account can fund 100% of each incremental increase over the remaining actuarially projected lives of the eligible recipients in Waterfall Class 1. If the Restoration Reserve Account satisfies the required funding level, then in the next Fiscal Year, actual restoration payments will be made to Waterfall Class 1 members in amounts equal to the benefit associated with each increment that have been fully funded in the Restoration Reserve Account. Once Waterfall Class 1 has sufficient

assets in the Restoration Reserve Account to fully fund and restore the 4.5% cut in their monthly benefits, and to the extent that additional assets in the Restoration Reserve Account remain and will fully fund at least ½% of the monthly benefit for each member of Waterfall Class 2 over their remaining actuarially projected lives, then Waterfall Class 2 members will receive pension restoration in minimum ½% benefit increments until an amount equal to the 4.5% cuts in their monthly benefits has been fully funded.  At that juncture, and to the extent that additional assets in the Restoration Reserve Account remain and will fund at least a minimum ½% of the monthly benefit of each member in Waterfall Class 3 over their remaining actuarially projected lives, then each such member of Waterfall Class 3 shall receive a credit granting them a right upon retirement to receive pension restoration equal to the benefit increments that are fully funded.  Restoration payments will be calculated and paid on a prospective basis only.

d.      After the full 4.5% across the board pension cuts are restored for all three Waterfall Classes, and to the extent there are additional assets in the Restoration Reserve Account to fully fund COLA benefits over the actuarially-projected lives of the eligible recipient Waterfall Class, such assets will be used to fully fund and restore a portion of the COLA values that were eliminated as part of the Plan of Adjustment.  COLA will be restored in minimum 10% COLA value increments up to 50% of the future COLA values for each member of Waterfall Class 1 (i.e., a 50% future COLA value will constitute a 1.25% simple COLA), then up to 50% of the future COLA values for each member of Waterfall Class 2, and then up to 50% of the future COLA values for each member of Waterfall Class 3 until all members of the three Waterfall Classes have had 50% of the value of their COLAs fully funded and restored.  After 50% of the future values of COLA have been fully funded and restored, and to the extent there are additional assets in the Restoration Reserve Account for each of the three Waterfall Classes, then a second 50% COLA restoration will be made, first to members of Waterfall Class 1, then Waterfall Class 2, and then Waterfall Class 3.  Classes will be restored in minimum 10% COLA value increments.  Restoration payments will be calculated and paid on a prospective basis only.

e.      If the amounts in the Restoration Reserve Account are sufficient to fully-fund the 4.5% across the board pension cuts for all three Waterfall Classes and 100% COLA restoration for all three Waterfall Classes, then any additional assets in the Restoration Reserve Account shall be used to increase the frozen accrued benefits of active and other Members whose Annuity Savings Fund accounts were diminished as part of the Annuity Savings Fund Recoupment (described in Section G-2), such that they receive treatment equal to the 20%/20% ceiling applied to retirees in pay status under the Plan of Adjustment.  If after such pension restoration there are additional assets in the Restoration Reserve Account to fully

fund benefit increments over their remaining actuarially projected lives, Waterfall Class 1 members will receive pension restoration in ½% benefit increments of the reductions to their monthly pension due to Annuity Savings Fund Recoupment, and once such pension benefits are restored, Waterfall Class 2 members will receive pension restoration in ½% benefit increments in connection with the reductions to their monthly pensions due to Annuity Savings Fund Recoupment.  Restoration payments will be calculated and paid on a prospective basis only

f.      Once restoration payments to applicable retirees and restoration credits to active employees begin, as long as the Restoration Reserve Account continues to have assets sufficient to fund 100% of an incremental pension restoration amount for such Waterfall Class members for their actuarially projected lives, such restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments (over their actuarially projected lives), falls below 100% for the second or greater increment, the annual amounts to pay such second or other additional increment can continue until the Restoration Reserve Account lacks any assets to fund it.  For example, assume a ½% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019, (i.e., a 1% pension increase).  Assume further that in the following Fiscal Year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment of ½% would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid).  For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

g.      In the event the Funded Level (not including the assets in the Restoration Reserve Account) falls below 71% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 71% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net investment returns for the Retirement System for the Fiscal Year in question. Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 70%) then restoration payments and credits in the following year will be modified in the following manner: (1) funds previously credited  to the Restoration Reserve Account will be notionally transferred and credited to the Pension  Reserve Account in sufficient amounts to restore the projected Funded Level in 2023 to 70%; (2) following such transfer, the remaining assets in the Restoration Reserve

Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph f.

h.      Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level as of 2023 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 71%.

(3)     *Restoration of Benefits from July 1, 2023 to June 30, 2033.*

a.      During this period, the Funding Target, the Restoration Target, the Permanent Restoration Targets and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |
| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2033 Permanent Restoration Target
75%, or if greater, 1% more  than 2033 Restoration Target

2033 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for variable restoration payments and credits that applied during the period ending June 30, 2023 shall apply during the period ending June 30, 2033 (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Reserve Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows.

- 111 -

For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 at the then current investment return assumption which is assumed to be net of expenses (administrative and investment) and the applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL at market value over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contribution stream would achieve the Funding Target set forth above as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process.). For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded.

b.      To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account. In determining pension restoration during the period from Fiscal Year 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected funded level for the Restoration Target or Permanent Restoration Targets. To the extent that the City's (including for this purpose DWSD or a successor authority) actual contributions in any of the Fiscal Years 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

c.      Each year, in addition to the credit of assets that exceed the amount necessary to satisfy the Restoration Target, existing Restoration Account assets will be credited with interest equal to the net return on Retirement System investments, but capped at the then investment return assumption. In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

d.      In connection with preparation of the actuarial report for Fiscal Year 2028, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, which shall be 75%. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to

satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2028 has satisfied  the Permanent Restoration Target (75%), then the amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.  Variable restoration payments will continue to be paid or credited during the period from July 1, 2028 through June 30, 2033 based on the applicable Restoration Target set forth in paragraph a and otherwise in accordance with this Section G-4, notwithstanding whether the Restoration Target during this period is less than the Permanent Restoration Target as of June 30, 2028 of 75%.

e.  In connection with preparation of the annual actuarial valuation report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target for 2033, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the amounts in the Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more Waterfall Classes over such Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension  Reserve Account and the applicable incremental payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.  Following receipt of the actuarial reports for 2028, and in the event that the projected Funded Level of the Retirement System as of 2033 is less than 71%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual normal course administrative expenses until 2033 equal to the average annual administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus

interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 71%.

(4)   *Restoration of Benefits from July 1, 2033 to June 30, 2043.*

    a.   During this period, the Funding Target, the Restoration Target , the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below:

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
|---|---|
| 75% | 75%/78% |
| 74% | 74%/77% |
| 73% | 73%/76% |
| 72% | 72%/75% |
| 71% | 71%/74% |
| 70% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% |

2043 Permanent Restoration Target
75% ,or if greater, 1% more  than 2043 Restoration Target

2043 Restoration Reserve Suspension Trigger
1%  more than the projected Funding Target for all time periods

The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Target). For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining  whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

    b.   In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the amounts in the

Restoration Reserve Account if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Account and the applicable payments for the applicable Waterfall Class shall be permanently restored and shall no longer be variable.

(5)     *Modification of the Pension Restoration Program.*

If any time after July 1, 2026, the Investment Committee (by vote of 5 of its 7 members), or the Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement, such that the continued operation of the Pension Restoration Agreement without amendment will: (a) materially harm the long-term economic interests of the City, or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the restoration program, if as of that juncture (and for purposes of applying this subsection 5) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section G-4 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund the Retirement System's frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Pension Restoration Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor of the State of Michigan ("Governor") in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall

furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, inter alia, whether or in what manner to amend the Pension Restoration Agreement and this Section G-4.

# ARTICLE H.  MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM

## Sec. H-1.  Enforcement; Civil Action.

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, 1984 Detroit City Code or the terms of this Plan, may be brought by:

(1)     A Plan participant who is or may become eligible to receive benefit;

(2)     A beneficiary who is or may become eligible to receive a benefit;

(3)     A Plan fiduciary, including a Trustee;

(4)     The Finance Director, on behalf of the City as Plan sponsor.

## Sec. H-2.  Limitation of Other Statutes.

No other provision of law, charter, or ordinance, which provides pensions or retirement benefits wholly or partly at the City expense, exclusive of federal Social Security old-age and survivors' insurance benefits for City employees, their surviving spouses and other dependents, shall apply to Members, retirees or beneficiaries of the Retirement System, their surviving spouses or other dependents.

CLI-2249225v7
Last Edited: 10/17/14

# EXHIBIT F

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Amendment and Restatement Effective July 1, 2014**

# TABLE OF CONTENTS

**Page**

COMPONENT I ............................................................................................................... 1

ARTICLE 1.        GENERAL PROVISIONS ......................................................... 1

Sec 1.1.        Police and Fire Retirement System Established; Adoption of 2014 Plan Document ........................................................................... 1

Sec 1.2.        Retirement System Intended to be Tax-Qualified; Governmental Plan ............................................................................................. 1

Sec 1.3.        Compliance With Plan of Adjustment ...................................... 1

Sec 1.4.        Board of Trustees ....................................................................... 2

Sec 1.5.        Board of Trustees – Membership; Appointment ....................... 2

Sec 1.6.        Board of Trustees; Scheduling of Elections for Active and Retiree Trustees ...................................................................................... 3

Sec 1.7.        Procedures for election of Retiree Trustees ............................. 3

Sec 1.8.        Board of Trustees; Oath; Term; Vacancies ............................... 4

Sec 1.9.        Board of Trustees; Officers and Employees ............................. 4

Sec 1.10.        Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum .......... 4

Sec 1.11.        Board of Trustees; Compensation; Expenses ........................... 5

Sec 1.12.        Rules for Administration of Funds ............................................ 5

Sec 1.13.        Board of Trustees; Certain Data to be Kept .............................. 5

Sec 1.14.        Board of Trustees; Annual Audit Report ................................... 5

Sec 1.15.        Board of Trustees; Legal Advisors ............................................ 5

Sec 1.16.        Board of Trustees; Medical Director ......................................... 6

Sec 1.17.        Designation of Actuary; Authority to Engage Additional Actuaries ......... 6

Sec 1.18.        Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System ...................................................................... 6

Sec 1.19.        Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities ................................................................................... 7

Sec 1.20.        Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties ........................................................................................ 7

Sec 1.21.        Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties ........................................................................ 7

Sec 1.22.        Investment Committee; Membership; Appointment ................. 8

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---:|
| Sec 1.23. | Investment Committee; Term; Resignation and Removal; Vacancies | 9 |
| Sec 1.24. | Investment Committee; Operation; Meetings; Quorum; Voting | 10 |
| Sec 1.25. | Investment Committee; Compensation; Expenses; Advisors | 11 |
| Sec 1.26. | Investment Committee; Special Reporting Obligation | 11 |
| ARTICLE 2. | DEFINITIONS | 13 |
| Sec 2.1. | Definitions | 13 |
| ARTICLE 3. | MEMBERSHIP | 21 |
| Sec 3.1. | Eligible Employees | 21 |
| Sec 3.2. | Cessation of Membership; Re-Employment | 21 |
| Sec 3.3. | Report From City | 22 |
| ARTICLE 4. | SERVICE CREDIT | 23 |
| Sec 4.1. | Credited Service | 23 |
| Sec 4.2. | Vesting Service | 23 |
| Sec 4.3. | Service Credit; Military Service | 23 |
| Sec 4.4. | Service Credit; Qualified Military Service | 24 |
| ARTICLE 5. | ELIGIBILITY FOR RETIREMENT | 25 |
| Sec 5.1. | Eligibility for Unreduced Normal Retirement Benefit | 25 |
| Sec 5.2. | Eligibility for Deferred Vested Retirement Benefit | 25 |
| Sec 5.3. | Eligibility for Disability Retirement Benefit – Duty Disability | 25 |
| Sec 5.4. | Eligibility for Disability Retirement Benefit – Non-Duty Disability | 27 |
| Sec 5.5. | Disability Retirees; Reexamination | 27 |
| Sec 5.6. | Disability Benefits; Procedures for Determination of Disability | 28 |
| Sec 5.7. | Return of Accumulated Mandatory Contributions to Non-Vested Member | 30 |
| Sec 5.8. | Benefits Offset by Compensation Benefits; Subrogation | 30 |
| ARTICLE 6. | RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR) | 32 |
| Sec 6.1. | Retirement Allowance | 32 |
| Sec 6.2. | Variable Pension Improvement Factor (Escalator) | 32 |
| ARTICLE 7. | DEATH BENEFITS | 33 |

Sec 7.1.    Accidental Death Benefit; Performance of Duty ..................................... 33

Sec 7.2.    Non-Duty Death Benefits ....................................................................... 34

Sec 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member .......................................................................................... 34

ARTICLE 8.    FORMS OF PAYMENT ................................................................ 35

Sec 8.1.    Retirement Allowance Options ............................................................... 35

Sec 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ....................................................................... 36

ARTICLE 9.    FUNDING AND RESERVES ........................................................ 37

Sec 9.1.    Funding Objective of the Retirement System .......................................... 37

Sec 9.2.    Funds ..................................................................................................... 37

Sec 9.3.    Method of Financing Retirement System Benefits .................................. 38

Sec 9.4.    Member Contributions Picked-Up .......................................................... 39

Sec 9.5.    Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations .............................................................. 39

ARTICLE 10.    VOLUNTARY EMPLOYEE CONTRIBUTIONS ..................... 41

Sec 10.1.    Voluntary Employee Contributions; Amount; Vesting ........................... 41

Sec 10.2.    Changing an Election to Contribute ........................................................ 41

Sec 10.3.    Individual Member Accounting; Crediting of Earnings ......................... 41

Sec 10.4.    Distribution of Accumulated Voluntary Employee Contributions .......... 41

ARTICLE 11.    LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS .............................................. 43

Sec 11.1.    The Loan Program ................................................................................. 43

Sec 11.2.    Eligibility for Loan ............................................................................... 43

Sec 11.3.    Amount of Loan .................................................................................... 43

Sec 11.4.    Terms and Conditions ........................................................................... 43

Sec 11.5.    Loan Balance ........................................................................................ 44

Sec 11.6.    Default .................................................................................................. 44

Sec 11.7.    Distribution ........................................................................................... 45

ARTICLE 12.    DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM ....... 46

Sec 12.1.    General Provisions ................................................................................ 46

Sec 12.2.    Conversion to Retirement Allowance .......................................... 46

Sec 12.3.    Investment of DROP Assets ...................................................... 46

Sec 12.4.    Distribution of Amounts Credited to DROP Account ............................. 47

Sec 12.5.    Death of Member While Participating in the DROP Program ................ 47

Sec 12.6.    Disability of Member While Participating in the DROP Program ......... 47

Sec 12.7.    Cost Neutrality ..................................................................... 48

ARTICLE 13.    LIMITATION ON BENEFITS AND CONTRIBUTIONS.......................... 49

Sec 13.1.    Compliance With Code Section 415(b) And Regulations ...................... 49

Sec 13.2.    Compliance with Code Section 415(c) and Regulations ........................ 52

ARTICLE 14.    RETIREMENT SYSTEM ADMINISTRATION......................................... 53

Sec 14.1.    Board of Trustees as Retirement System Administrator......................... 53

Sec 14.2.    Powers and Duties of Board ..................................................... 53

Sec 14.3.    Executive Director; Employees ................................................ 55

Sec 14.4.    Discretionary Authority ......................................................... 55

Sec 14.5.    Administrator's Decision Binding ............................................. 56

ARTICLE 15.    MANAGEMENT OF FUNDS ............................................................. 57

Sec 15.1.    Board as Trustee of Retirement System Assets ................................ 57

Sec 15.2.    Maintenance of Segregated Funds ............................................. 57

Sec 15.3.    Custodian of Funds .............................................................. 57

Sec 15.4.    Exclusive Purpose ............................................................... 57

Sec 15.5.    Prohibited Conduct ............................................................. 57

ARTICLE 16.    INVESTMENT OF RETIREMENT SYSTEM ASSETS ............................ 59

Sec 16.1.    Investment Powers of the Board and the Investment Committee............ 59

Sec 16.2.    Investment Management ......................................................... 60

Sec 16.3.    Best Practices ...................................................................... 61

Sec 16.4.    Chief Investment Officer ....................................................... 61

Sec 16.5.    Investment Consultants .......................................................... 61

Sec 16.6.    Consistency With Plan of Adjustment ....................................... 63

ARTICLE 17.    RETIREE MEDICAL ACCOUNT................................................... 64

Sec 17.1.    Establishment of Account ....................................................... 64

Sec 17.2.      Effective Date ............................................................ 64

Sec 17.3.      Funding of Benefits.................................................... 64

Sec 17.4.      Limitation on Contributions...................................... 64

Sec 17.5.      Impossibility of Diversion ........................................ 64

Sec 17.6.      Administration .......................................................... 65

Sec 17.7.      Right to Amend or Terminate Medical Plans ........... 65

Sec 17.8.      Reversion ................................................................. 65

Sec 17.9.      Limitation of Rights.................................................. 65

ARTICLE 18.      MISCELLANEOUS ................................................. 66

Sec 18.1.      Nonduplication of Benefits....................................... 66

Sec 18.2.      Assignments Prohibited ........................................... 66

Sec 18.3.      Protection Against Fraud .......................................... 66

Sec 18.4.      Conviction of Felony; Forfeiture of Rights ............. 66

Sec 18.5.      Amendment; Termination; Exclusive Benefit ......... 66

Sec 18.6.      Forfeitures Not to Increase Benefits ........................ 67

Sec 18.7.      Required Distributions - Compliance with Code Section 401(a)(9)
               and Regulations........................................................ 67

Sec 18.8.      Direct Rollovers ...................................................... 67

Sec 18.9.      Construction ............................................................ 69

Sec 18.10.     Severability ............................................................. 69

COMPONENT II ........................................................................... 70

ARTICLE A.      COMMON PROVISIONS OF THE POLICE AND FIRE
               RETIREMENT SYSTEM ........................................... 71

Sec. A-1.      Common Provisions.................................................. 71

ARTICLE B.      FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM AS OF
               JUNE 30, 2014.......................................................... 73

Sec. B-1.      Freeze of Police and Fire Retirement System as of June 30, 2014.......... 73

ARTICLE C.      DEFINITIONS........................................................... 75

Sec. C-1.      Definitions............................................................... 75

ARTICLE D.      MEMBERSHIP.......................................................... 82

Sec. D-1.      Generally.................................................................. 82

Sec. D-2.   Membership election option prior to July 1, 2014 ................................... 83

Sec. D-3.   Cessation of membership .................................................................. 84

ARTICLE E.   SERVICE CREDITABLE .......................................................... 85

Sec. E-1.   Members to file statement of service, etc ............................................ 85

Sec. E-2.   Credit for service .......................................................................... 85

Sec. E-3.   Employees in military service commencing prior to July 1, 2014 ......... 85

Sec. E-4.   Verification of service claimed .................................................... 88

Sec. E-5.   Prior Service certificates .............................................................. 88

Sec. E-6.   Creditable service at retirement ................................................... 88

ARTICLE F.   BENEFITS PROVIDED TO MEMBERS ...................................... 89

Sec. F-1.   Petition for retirement, mandatory age .......................................... 89

Sec. F-2.   Old Plan/New Plan ....................................................................... 91

Sec. F-3.   Pension Multiplier ........................................................................ 92

Sec. F-4.   Disposition of surplus benefits upon death of retired member ............... 93

Sec. F-5.   Retirement allowance for certain persons leaving City employment
            after eight years service (40 & 8) .................................................. 93

Sec. F-6.   Reduced Early Pension Benefits (40 & 8 Vesting Retirees) ................... 94

Sec. F-7.   Duty disability ............................................................................. 95

Sec. F-8.   Duty disability benefits; members in service on or after July 1,
            1941 but prior to January 1, 1969 ............................................. 95

Sec. F-9.   Duty disability benefits; members beginning service on or after
            January 1, 1969 and becoming disabled prior to the dates set forth
            in Section F-10 ........................................................................... 97

Sec. F-10.  Duty Disability benefits; DFFA, DPOA and DPLSA members
            beginning service on or after January 1, 1969 and becoming
            disabled on or after the dates set forth below .......................... 98

Sec. F-11.  Non-duty disability ...................................................................... 100

Sec. F-12.  Disability retirement procedures ................................................. 101

Sec. F-13.  Generally ................................................................................... 103

Sec. F-14.  Increase of Benefits; Pension Improvement Factor (Escalator) ........... 104

Sec. F-15.  Payment .................................................................................... 105

Sec. F-16.  Generally ................................................................................... 105

Sec. F-17. Payment of Accumulated Contributions ................................................. 107

Sec. F-18. Allowances to surviving spouses .......................................................... 107

Sec. F-19. Payment of benefits .............................................................................. 109

Sec. F-20. Payment of benefits .............................................................................. 109

Sec. F-21. Deferred vested benefits ...................................................................... 109

Sec. F-22. Forfeiture of rights ............................................................................... 110

Sec. F-23. Generally ............................................................................................. 110

Sec. F-24. Disposition of surplus benefits upon death of Member and Beneficiary ................................................................................................... 112

Sec. F-25. Generally ............................................................................................. 112

Sec. F-26. Generally ............................................................................................. 112

Sec. F-27. Authority of Board ............................................................................... 113

Sec. F-28. Member With Twenty or Twenty-Five Years of Service ..................... 114

Sec. F-29. Disabled Member ................................................................................. 114

Sec. F-30. Optional Annuity Withdrawal .............................................................. 114

ARTICLE G. METHOD OF FINANCING ................................................................. 117

Sec. G-1. General ................................................................................................. 117

Sec. G-2. Annuity Savings Fund .......................................................................... 117

Sec. G-3. Annuity Reserve Fund .......................................................................... 118

Sec. G-4. Alternative Financing Method .............................................................. 118

Sec. G-5. Contributions to and payments from Pension Accumulation Fund ....... 119

Sec. G-6. Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service ......................................................... 120

Sec. G-7. Expense Fund ....................................................................................... 120

Sec. G-8. Appropriations prior to July 1, 2014 .................................................... 120

Sec. G-9. Maintenance of reserves ....................................................................... 120

Sec. G-10. Survivors Benefit Fund ........................................................................ 120

Sec. G-11. Computation of Annuity and Pension Reserve liabilities for Members, Retirees and Beneficiaries ..................................................... 122

Sec. G-12. Determination of City's annual contribution — Disability Pension liabilities ................................................................................................. 125

Sec. G-13.  Determination of City's annual contribution — Death Pension liabilities........................................................... 125

Sec. G-14.  Determination of City's annual contribution — Actuarial evaluation of annuity and Pension Reserve liabilities ........................... 126

Sec. G-15.  Determination of City's annual contribution — Service Pension liabilities for Fiscal Years commencing prior to July 1, 2014 .............. 126

Sec. G-16.  Board of trustees to compute City's annual contribution ..................... 126

Sec. G-17.  Refunds for certain Members................................................. 127

Sec. G-18.  Employer Contribution ...................................................... 127

ARTICLE H.      MISCELLANEOUS ............................................................ 128

Sec. H-1.  Recall of Retirees during emergencies ................................ 128

ARTICLE I.      DEFERRED RETIREMENT OPTION PLAN ............................................ 129

Sec. I-1.  General provisions .................................................... 129

Sec. I-2.  Conversion to Retirement Allowance ................................... 129

Sec. I-3.  Investment of DROP assets ............................................ 129

Sec. I-4.  Distribution of amounts credited to DROP Account ...................... 130

Sec. I-5.  Death of Member while participating in the DROP program............... 130

Sec. I-6.  Disability of Member While Participating in the DROP Program ........ 131

Sec. I-7.  Cost Neutrality ...................................................... 131

ARTICLE J.      PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM ......... 133

Sec. J-1.  Participant Annuity Savings Fund Loan Program ................. 133

ARTICLE K.      SPECIAL PLAN OF ADJUSTMENT PROVISIONS ............................. 136

Sec. K-1.  Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment........................................................ 136

Sec. K-2.  Income Stabilization Benefits................................................ 136

Sec. K-3.  Restoration of Pension Benefits............................................. 139

APPENDIX A     ........................................................................... 148

ARTICLE IX, SECTION 24 OF STATE OF MICHIGAN CONSTITUTION ....................... 148

CITY OF DETROIT CHARTER ................................................................ 149

DETROIT CITY CODE ...................................................................... 150

COLLECTIVE BARGAINING AGREEMENTS....................................................... 151

13-53846-tjt    Doc 8392    Filed 11/21/14    Entered 11/21/14 18:04:24    Page 351 of 505

# COMPONENT I

# ARTICLE 1.  GENERAL PROVISIONS

## Sec 1.1.    Police and Fire Retirement System Established; Adoption of 2014 Plan Document

Effective July 1, 1941, a Pension System for Policemen and Firemen of the City of Detroit was established for the purpose of providing retirement allowances and death benefits for Policemen and Firemen and their beneficiaries by amendment to the Charter of the City of Detroit.  That Pension System was amended on numerous occasions after July 1, 1941, including an amendment renaming the Retirement System as the "Police and Fire Retirement System of the City of Detroit." The provisions of the Police and Fire Retirement System of the City of Detroit, as in effect July 1, 2014, are set forth in this Plan Document (including Appendix A attached hereto).  Component I of the Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Police and Fire Retirement System of the City of Detroit on and after July 1, 2014.  Component II of the Plan Document generally applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Plan Document are frozen effective June 30, 2014.

Pursuant to Section 47-1-2 of the Detroit City Code, this Combined Plan Document shall replace the provisions of the Police and Fire Retirement System of the City of Detroit as set forth in the City of Detroit Charter, the Detroit City Code and any conflicting provisions in any collective bargaining agreements, rulings or opinions covering Members (including, without limitation, City Employment Terms).  All resolutions and policies of the Board previously enacted which are inconsistent with the provisions of this Plan Document are also hereby repealed to the extent of such inconsistency.

## Sec 1.2.    Retirement System Intended to be Tax-Qualified; Governmental Plan

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code.  The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

## Sec 1.3.    Compliance With Plan of Adjustment

The Retirement System is intended to comply with all relevant provisions (including Exhibits) of the Plan for the Adjustment of Debts of the City of Detroit, as approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan, Case No. 13-53846* ("Plan of Adjustment").  Component I and Component II of the Combined Plan shall be interpreted and construed by the City, the Board of Trustees and the Retirement System to give full effect to the Plan of Adjustment.  To the extent that a conflict arises between the Combined Plan Document and the Plan of Adjustment, the City, the Board of Trustees, the Investment Committee and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Plan of Adjustment.

**Sec 1.4.    Board of Trustees**

Effective July 1, 1941, a Board of Trustees of the Police and Fire Retirement System of the City of Detroit was created. The Board is vested with responsibility for the general administration, management and operation of the Police and Fire Retirement System of the City of Detroit and with the trust and investment powers conferred in this Combined Plan Document.

**Sec 1.5.    Board of Trustees – Membership; Appointment**

The Board of Trustees of the Police and Fire Retirement System of the City of Detroit shall consist of seventeen Trustees, as follows:

(1)    The Mayor, *ex-officio*, or the Mayor's designee;

(2)    The President of City Council or a member thereof elected by the City Council, *ex-officio*;

(3)    The City Treasurer or Deputy City Treasurer, *ex-officio*;

(4)    The City Finance Director, or a designated representative, *ex-officio*;

(5)    The City Budget Director, or a designated representative, *ex-officio*;

(6)    The Corporation Counsel of the City, or a designated representative, *ex-officio*;

(7)    Three Fire Members of the Retirement System to be elected by the Fire Members under such rules and regulations as may be established by the Board of Fire Commissioners to govern such elections, as follows:

   (a)    Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

   (b)    One to be elected by and from Members holding ranks above the rank of lieutenant (or its equivalent);

(8)    Three Police Members of the Retirement System to be elected by the Police Members under the rules and regulations as may be established by the Commissioner of Police to govern such elections, as follows:

   (a)    Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

   (b)    One to be elected by and from Members holding a rank above lieutenant (or its equivalent); and

(9)    One individual who neither is a Member of the Retirement System nor an employee of the City in any capacity to be selected by the Board;

(10) Two Retirees receiving benefits under the Retirement System, one of whom shall be elected by Retired Police Members and one of whom will be elected by Retired Fire Members pursuant to Sections 1.6 and 1.7 below;

(11) One Trustee appointed by the Mayor upon election of a Retiree Police Trustee; and

(12) One Trustee appointed by the Mayor upon election of a Retiree Fire Trustee.

### Sec 1.6.    Board of Trustees; Scheduling of Elections for Active and Retiree Trustees

(1) Annual elections for active Police Officers and Fire Fighters shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(2) Elections to fill vacancies created by the expiration of a term for a Retiree Trustee shall be held every three years during the month of May.

(3) A special election for Retiree Trustees shall be held as soon as practicable after the Plan of Adjustment is confirmed.  Unless a Retiree Trustee elected by reason of this special election resigns or is removed from the position of Trustee in accordance with the terms of the Combined Plan Document, a Retiree elected to the office of Trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the last day of June that follows the third anniversary of the special election, at which time an election for Retiree Trustees shall be held in accordance with Section 1.7.

### Sec 1.7.    Procedures for election of Retiree Trustees

The procedures for the election of the Retiree Trustees shall be as follows:

(1) *Notice*.  Notice of a primary election shall be sent to each Retiree by United States Mail.

(2) *Notice of Candidacy*.  A proposed candidate shall submit a notarized letter to the executive director notifying the Retirement System of his or her candidacy.

(3) *Ballot*.  Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position the Retiree held at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election.  No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4) *Voting*.  Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)    *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)    *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.7 shall be handled in accordance with such rules and regulations as the Board may adopt and Michigan law.

**Sec 1.8.    Board of Trustees; Oath; Term; Vacancies**

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the City Clerk.

The term of office for each elected Trustee under Sections 1.5(7), (8) and (10) shall be three years.  The term of office for the Trustee who is selected by the Board under Section 1.5(9) shall be two years.  The term of office for the Trustees appointed by the Mayor under Sections 1.5(11) and (12) shall be three years.  Except as provided in Section 1.6(3), elected Trustees holding office on June 30, 2014 shall serve the remainder of their terms.

If a Trustee resigns or is removed by the other Trustees for cause, or if an elected or appointed Trustee fails to attend three consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board.  If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled.  No vacancy shall result by reason of a change in the rank or grade of a Trustee during the term of office.

**Sec 1.9.    Board of Trustees; Officers and Employees**

The Board of Trustees shall elect from its membership a chairman and a vice chairman. The executive director of the Retirement System or his or her representative shall serve as secretary of the Board of Trustees.  The Board may employ such special actuarial, medical and other employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

**Sec 1.10.    Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum**

(1)    The Board shall hold regular meetings, at least one in each month, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act, MCL 15.261 et seq.*  All Board meetings shall be held within the City of Detroit.

(2)     Each Trustee shall be entitled to one vote on each question before the Board. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Eight members of the Board, four of whom must be elected members, shall constitute a quorum.

## Sec 1.11.  Board of Trustees; Compensation; Expenses

All members of the Board of Trustees shall serve without additional compensation from the City or the Retirement System; however Retiree Trustees shall receive a hourly stipend from the Retirement System equal to the lowest rate of pay received by an active employee Trustee for attending Board meetings, educational time and travel out of the City on official business of the Retirement System. All Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

## Sec 1.12.  Rules for Administration of Funds.

Subject to the limitations contained in this Combined Plan document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Combined Plan document and for the transaction of its business.

## Sec 1.13.  Board of Trustees; Certain Data to be Kept

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the Retirement System and for checking and compiling the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

## Sec 1.14.  Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

## Sec 1.15.  Board of Trustees; Legal Advisors

(1)     The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems. The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)    Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)    Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

## Sec 1.16.  Board of Trustees; Medical Director

(1)    The Board shall appoint a Medical Director who is directly responsible to and shall hold office at the pleasure of the Board. The Medical Director shall be a physician who has not at any time been regularly or permanently employed by any department, board, or commission of the City, county, or state, has not held an elective, appointive, or salaried office in any city, county, or state government at any time, and is not eligible to participate in a retirement system maintained by the City. However, service as an intern in any city, county, or state hospital or sanitarium and service in any state military body shall not disqualify a physician for appointment as Medical Director.

(2)    The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of the Combined Plan, and shall report in writing to the Board of Trustees his or her conclusions and recommendations on medical matters referred to it.

## Sec 1.17.  Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board.  In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary.  The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing its actuarial duties and shall comply with all requests for information or modeling requested by the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Investment Committee to perform satisfactorily the rights and duties set forth in the Combined Plan, the governance terms attached to the that certain Agreement by and between the Michigan Settlement Administration Authority, the Retirement System, the General Retirement system for the City of Detroit, Michigan ("GRS"), and the City (the "State Contribution Agreement") as Exhibit B (the "Governance Term Sheet"), and the Plan of Adjustment.  Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Governance Term Sheet and the Plan of Adjustment.

## Sec 1.18.  Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this Section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsection (2) or (3) of this Section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System. This prohibition applies to all payments that are not authorized by this Combined Plan, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

### Sec 1.19.   Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.18, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec 1.20.   Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee. To the extent the Board exercises discretion with respect to investment of Retirement System assets, the Board shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*., and a Board member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

### Sec 1.21.   Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties

As of the effective date the Plan of Adjustment, but subject to consummation of the State Contribution Agreement, an Investment Committee is hereby created for the purpose of making recommendations to, and approving certain actions by, the Board of Trustees and/or making determinations and taking action under and with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment

Committee is controlled by the Governance Term Sheet. The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. and shall have all powers granted fiduciaries under the first sentence of *MCL 38.1133(5) and (6)*. The Investment Committee shall serve in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflict with the provisions set forth in the Governance Term Sheet.

### Sec 1.22. Investment Committee; Membership; Appointment

The Investment Committee shall consist of nine (9) members, determined as follows:

(1) Five independent members, at least two of whom must be residents of the State of Michigan, and none of whom may be a party in interest with respect to the Retirement System, as defined in as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*. Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future (the "Foundation"), and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as necessary to bring the number of independent Investment Committee members to five (5);

(2) Two Retirees who shall be appointed by the Board consisting of one elected retired Police Member and one elected retired Fire Member who are serving on the Board and who are receiving benefit payments under the Retirement System; and

(3)    Two Employee members who shall be appointed by the Board consisting of one Fire Department Employee and one Police Department Employee who are active members of the Board.


## Sec 1.23.  Investment Committee; Term; Resignation and Removal; Vacancies

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|---|---|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or Employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees. Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier. Notwithstanding any provision of this Combined Plan document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee. An Investment Committee member may be removed from office by majority vote of the remaining Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in accordance with the voting procedure set forth in Section 1.24; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government. A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining members attending such meetings. In the event of any removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan ("Treasurer"), in consultation with the Foundation, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Governance Term Sheet or the Plan of Adjustment). In the event the Board and the Treasurer cannot agree on a successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more of the initial independent Investment Committee members, a successor to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with either the Governance Term Sheet or the Plan of Adjustment).

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

**Sec 1.24.   Investment Committee; Operation; Meetings; Quorum; Voting**

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be subject to the *Michigan Open Meetings Act, MCL 15.261 et seq*. All Investment Committee meetings shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Each independent Investment Committee member shall be entitled to one vote on each question before the Investment Committee. Each Retiree and Employee member shall be entitled to one-half vote on each question before the Investment Committee. Except as otherwise provided in the Governance Term Sheet, at least four concurring votes shall be necessary for a decision by the Investment Committee and each Investment Committee member shall be entitled to one vote on each question before the Investment Committee.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a state or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

**Sec 1.25.  Investment Committee; Compensation; Expenses; Employment of Advisors**

Investment Committee members shall not receive any compensation from the Retirement System for their services; Investment Committee members shall, however, be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties.  All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.  The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions, and such parties or persons may be reasonably compensated from the assets of the Retirement System.  Such engagements shall not be subject to approval of the Board.

**Sec 1.26.  Investment Committee; Special Reporting Obligation**

(1)     Beginning in calendar year 2015, pursuant to Section 6 of the State Contribution Agreement, the Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults under the State Contribution Agreement, or, if the Investment Committee is aware of a default under the State Contribution Agreement, specifically identifying the facts of such default.

(2)     In the event the Retirement System receives a written notice from the Treasurer declaring and specifically identifying the facts of an alleged default under the State Contribution Agreement ("Default Notice"), and such default is cured as provided in the State Contribution Agreement, the Investment Committee must provide to the Treasurer a written certification that (i) the default has been cured, and (ii) no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification").

(3)     Beginning in calendar year 2015, the Investment Committee shall provide to the City not later than December 31 of each year evidence reasonably necessary to show that the internal controls governing the investment of Retirement System assets are in compliance with the applicable provisions of the Plan of Adjustment.

(4)     Beginning in calendar year 2015 and for each calendar year thereafter, as of a date which is not later than December 31 of each such calendar year the Investment Committee shall provide to the Foundation the following information:

(a)     a copy of the audited annual financial statement and the corresponding management letter for the Retirement System for the Fiscal Year ending June 30 of such calendar year, containing a non-qualified opinion of an independent external auditor to the Retirement System;

(b)     a certification from the Chair of the Investment Committee on behalf of the Investment Committee ("Pension Certificate") in a form reasonably acceptable to

the Foundation that, as of the date of the annual report ("Annual Report") required to be provided by the City to the Foundation:

(i)     the City is current in its obligation to contribute to Component II of the Combined Plan determined in accordance with the Plan of Adjustment;

(ii)    the Investment Committee has been operated in accordance with the terms set forth in this Component I of the Combined Plan document; and

(iii)   the City continues to maintain the pension governance terms reflected in this Component I of the Combined Plan as of the effective date of the Plan of Adjustment, without modification or amendment during the twenty (20) year period following the effective date of the Plan of Adjustment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the Retirement System under the Internal Revenue Code, or to comply with the Plan of Adjustment;

(c)     a copy of (i) the Compliance Report covering the calendar year for which the Annual Report is made; (ii) any additional Compliance Reports provided during the calendar year for which the Annual Report is made as requested by the Treasurer; (iii) either the certificate of compliance or the Default Notice, within the meaning of Section 6 of the State Contribution Agreement, as applicable, that was provided to the Investment Committee by the Treasurer; and (iv) in the event that the Treasurer issued a Default Notice, the Cure Certification, within the meaning of Section 6 of the State Contribution Agreement, provided by the Investment Committee. Notwithstanding anything in this paragraph (c) to the contrary, if the parties to the State Contribution Agreement agree to revise the requirements of Section 6 of the State Contribution Agreement or the information required in the Compliance Report, in order to meet the obligations of this paragraph (c), the Investment Committee shall be required only to provide documentation to the Foundation that meets such revised requirements; and

(d)     any additional information that may be reasonably requested by the Foundation from time to time.

(e)     Beginning in calendar year 2016, before May 15th of each calendar year, the Investment Committee shall provide to the Chief Financial Officer of the City confirmation that, as of the date of the City's report to the Foundation, there has been no impairment or modification of the information contained in the most recent Pension Certificate since the date of such Pension Certificate.

# ARTICLE 2.  DEFINITIONS

## Sec 2.1.   Definitions

Unless a different definition is contained within this Combined Plan Document, or a different meaning is plainly required by context, for purposes of this Combined Plan Document the following words and phrases have the meanings respectively ascribed to them by this section:

(1)  *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the Compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)  *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System.

(3)  *Actuarial Equivalent or Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.  The rates of interest adopted by the Board from time to time shall not violate the terms of the Plan of Adjustment.

(4)  *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5)  *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)  *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)  *Average Final Compensation* means the average Compensation received by a Member during the five consecutive years of Credited Service which immediately precede the date of the Member's last termination of City employment as an employee of the Police Department or the Fire Department.  If a Member has less than five years of Credited Service, the Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.

(8)  *Beneficiary* means any person or persons (designated by a Member pursuant to procedures established by the Board) who are entitled to receive a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

(9)  *Board of Trustees or Board or Retirement Board* means the Board of Trustees of the Police and Fire Retirement System of the City of Detroit.

(10)  *City* means the City of Detroit, Michigan, a municipal corporation.

(11)   *City Council or Council* means the legislative body of the City.

(12)   *Combined Plan* means the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan, effective July 1, 2014, and as amended thereafter.

(13)   *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code or which is contributed by the City on behalf of a Member as provided in Section 9.3(3) and 9.5 pursuant to a qualified "pick-up program".

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation for periods prior to July 1, 2014.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the City.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(14)   *Component I* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)   the 2014 Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b)      the 2014 Defined Contribution Plan which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(15)    *Component II* means the portion of the Retirement System described in this Combined Plan and which consists of:

(a)      the Defined Benefit Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(b)      the Defined Contribution Plan, which is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

(16)    *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(17)    *Disability or Disabled*: see Total Disability or Totally Disabled.

(18)    *DFFA* means the Detroit Fire Fighters Association.

(19)    *DPCOA* means the Detroit Police Command Officers Association.

(20)    *DPLSA* means the Detroit Police Lieutenants and Sergeants Association.

(21)    *DPOA* means the Detroit Police Officers Association.

(22)    *DROP Account* means the account established by the Board for a Member who is eligible for and who elects to participate in the DROP Program.

(23)    *DROP Program* means a program established for eligible Members pursuant to Article 12.

(24)    *Employee* means an employee of the City's Police Department who has taken an oath of office or a Fire Fighter providing services to the City, but does not include:

(a)      individuals whose City services are compensated on a contractual or fee basis;

(b)      any person during any period when such person is classified by the City as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the City;

(c)      the Medical Director of the Retirement System.

If a person described in (b) above is reclassified by the City as a common-law employee of the City and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such

reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(25) *Employer* means the City.

(26) *Final Compensation* means the annual compensation of a Member at the time of his or her termination of employment.

(27) *Fire Fighter* means the rank in the Fire Department currently or formerly classified by the civil service commission as Fire Fighter.

(28) *Fire Member* means an employee of the Fire Department of the City of Detroit who is a participant in the Retirement System.

(29) *Fiscal Year* means the twelve month period commencing each July 1 and ending on the following June 30.

(30) *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the City for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the City for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(31) *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(32) *Investment Committee* means the committee established pursuant to Section 1.22 which shall have the powers and duties described herein.

(33) *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(34) *Medical Beneficiary* means a Member who has retired from employment with the Employers and the spouses and dependents of such Member who are receiving post-retirement benefits in accordance with the terms of a retiree medical plan sponsored or maintained by an Employer.

(35) *Medical Benefits* mean the provision of payments for certain sickness, accident, hospitalization and medical benefits within the meaning of Treasury Regulation section 1.401-14(a), including dental, vision and mental health benefits, as designated by the City.

(36) *Medical Benefits Account* means the bookkeeping account established under Section 17.1 to provide for the payment of Medical Benefits on behalf of Medical Beneficiaries.

(37) *Medical Director* means the physician appointed by the Board pursuant to Section 1.16.

(38) *Member* means any Police Member or Fire Member who has not retired or died.

(39) *Normal Retirement Age* means for any Member Age fifty with twenty-five years of Credited Service, with the following transition period regarding payment of Component I benefits only:

| Fiscal Year | Age and Service |
|---|---|
| 2015 | Age 43 and 20 years |
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |
| 2021 and thereafter | Age 50 and 25 years |

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon Attainment of Normal Retirement Age while in Service.

(40) *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(41) *Patrolman* means the rank in the Police Department currently or formerly known as patrolman.

(42) *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience, and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(43) *Plan Actuary or Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.17 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Investment Committee or the Board may direct.

(44) *Plan Document or Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(45) *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan,* Case No. 13-53846.

(46) *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(47) *Police and Fire Retirement System of the City of Detroit or Retirement System* means the Police and Fire Retirement System of the City of Detroit created and, prior to July 1, 2014, memorialized in Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code, Article 54 of the Detroit City Code of 1964, and

collective bargaining agreements and, on and after July 1, 2014, pursuant to Section 47-1-2 of the Detroit City Code, memorialized in this Combined Plan Document, as amended from time to time.

The Retirement System consists of:

(a)     The 2014 Defined Benefit Plan, which is described in Component I hereof;

(b)     the Defined Contribution Plan, consisting of the Voluntary Employee Contribution Account, which are described in Component I hereof;

(c)     the Frozen Defined Benefit Plan, which is described in Component II hereof; and

(d)     the Frozen Defined Contribution Plan, which is described in Component II hereof.

References to the words Retirement System in Component I of the Plan Document shall mean the provisions of the Defined Benefit Plan and Defined Contribution Plan described in Component I, unless a different meaning is plainly required by context.

(48)     *Police Member* means a Police Officer who has taken the oath of office as prescribed in the Detroit City Charter, excluding patrolmen of other City departments, privately employed patrolmen and special patrolmen, who is a participant in the Retirement System.

(49)     *Police Officer* means the rank in the Police Department currently or formerly known as Police Officer.

(50)     *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(51)     *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(52)     *Retirement* means a Member's withdrawal from the employ of the City with a Retirement Allowance paid by the Retirement System.

(53)     *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(54)     *Service* means personal services rendered to the City by an employee of the Police Department or Fire Department, provided such person is compensated by the City for such personal services.

(55)     *Spouse* means the person to whom a Member is legally married under applicable law at the time a determination is made.

(56)     *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(57)     *Total Disability or Totally Disabled* means:

    (a)     during the first twenty-four (24) months that a Member receives benefits from the Retirement System due to injury, illness or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of the Member's occupation; and

    (b)     during all subsequent months that a Member receives benefits from the Retirement System due to illness, injury or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the Member is suited, based on education, training and experience.

(58)     *Vesting Service* means service credited to a Member to the extent provided in Section 4 of Component I of this Combined Plan Document.

(59)     *Voluntary Employee Contributions* mean the after-tax contributions made by an eligible Member to the Retirement System pursuant to Section 10.1.

(60)     *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for an eligible Member who elects to make Voluntary Employee Contributions.

    The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accumulated Mandatory Employee Contribution Fund | Section 9.2(1) |
| Accumulated Voluntary Employee Contribution Fund | Section 9.2(2) |
| Annual Addition | Section 13.2(2) |
| Annual Report | Section 1.26(4)(b) |
| Authority | Section 1.26(1) |
| compensation | Section 13.1(12) |
| Compliance Report | Section 1.26(1) |
| Cure Certification | Section 1.26(2) |
| current active | Section 9.3(3) |
| Default Notice | Section 1.26(2) |
| Deferred Retirement Option Plan Fund | Section 9.2(3) |
| Deferred Retirement Option Plan Program (DROP) | Section 12.1 |
| Differential Wage Payment | Section 4.4 |
| Direct rollover | Section 18.8(1)(b) |
| Distributee | Section 18.8(1)(c) |
| Dollar Limit | Section 13.1(3)(b) |
| DRRB | Section 5.6 |
| Eligible retirement plan | Section 18.8(1)(d) |
| Eligible rollover distribution | Section 18.8(1)(e) |
| Expense Fund | Section 9.2(7) |

| | |
|---|---|
| Foundation | Section 1.22 |
| funding level | Section 9.5(3) |
| Governance Term Sheet | Section 1.17 |
| Income Fund | Section 9.2(8) |
| ING | Section 12.3(1) |
| investment management decision or investment management matter | Section 16.2 |
| limitation year | Section 13.1(2) |
| Medical Benefits Account Fund | Section 9.2(4) |
| Medical Plans | Section 17.1 |
| new employee | Section 9.3(3) |
| Option "A". Joint and Seventy-Five Percent Survivor Allowance | Section 8.1(1)(c) |
| Option "B". Joint and Twenty-Five Percent Survivor Allowance | Section 8.1(1)(e) |
| Option One. Cash Refund Annuity | Section 8.1(1)(a) |
| Option Three. Joint and Fifty Percent Survivor Allowance | Section 8.1(1)(d) |
| Option Two. Joint and One Hundred Percent Survivor Allowance | Section 8.1(1)(b) |
| Pension Accumulation Fund | Section 9.2(5) |
| Pension Certificate | Section 1.26(4)(b) |
| Pension Improvement Factor (Escalator) | Section 6.2 |
| Plan of Adjustment | Section 1.3 |
| Police and Fire Retirement System of the City of Detroit | Section 1.1 |
| Pop-up Form | Section 8.1(2)(b) |
| Rate Stabilization Fund | Section 9.2(6) |
| Standard Form | Section 8.1(2)(a) |
| State Contribution Agreement | Section 1.17 |
| Straight Life Retirement Allowance | Section 8.1(1) |
| Treasurer | Section 1.23 |

## ARTICLE 3.  MEMBERSHIP

### Sec 3.1.    Eligible Employees

(1)    Except as provided in Section 3.2, the membership of the Retirement System shall consist of all persons who are employed with the Police and Fire Departments of the City and who are employed as Police Officers or Fire Fighters according to the rules and regulations of the respective Departments.  An eligible Employee's membership in the Retirement System shall be automatic; no eligible Employee shall have the option to elect to become a Member of the Retirement System.

(2)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3)    Any Police Officer or Fire Fighter who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member as of his or her date of death.

(4)    Any Member who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

### Sec 3.2.    Cessation of Membership; Re-Employment

(1)    If a Member dies, or is separated from service with the City by resignation, dismissal, retirement or disability, he shall cease to be a Member.  A Member who elects to participate in the DROP Program under Component I, Component II or both shall be considered to have separated from service with the City by reason of retirement and shall neither accrue a benefit under the Retirement System nor be required to make Mandatory Employee Contributions to the Retirement System pursuant to Section 9.3(3) or 9.5 or permitted to make Voluntary Employee Contributions pursuant to Section 10.1.

(2)    If a Member ceases to be a Member under paragraph (1) other than by reason of participation in the DROP Program and later becomes a Police Officer or Fire Fighter other than in the position of Police Assistant, he shall again become a Member, subject to the obligations of a Member.

(3)    If a Member ceases to be a Member under paragraph (1) and later becomes employed as a Police Assistant, such Member shall not become a Member upon reemployment.  If such Member was receiving a Retirement Allowance from the Retirement System prior to his or her date of rehire, such Retirement Allowance shall not be suspended during the period of the Member's reemployment as a Police Assistant.

(4)    Retirement benefits for a Retiree who returns to active full time employment other than as a Police Assistant shall be subject to the following:

(a)     A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment. The variable Pension Improvement Factor (Escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

(b)     A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

(c)     A Retiree's Average Final Compensation and Credited Service for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation and Credited Service earned by the Retiree after he returns to work.

(d)     An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance. However, the individual may select a separate payment option with respect to his second Retirement Allowance.

## Sec 3.3.    Report From City

It shall be the duty of the City to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

# ARTICLE 4.  SERVICE CREDIT

## Sec 4.1.    Credited Service

(1)     The Board shall keep an accurate record of each Member's accumulated Service credit from the date of commencement of employment with the City to the date of termination of employment with the City.

(2)     A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the City as a Police Officer or Fire Fighter beginning on the later of (i) July 1, 2014 or (ii) his date of hire with the City as a Police Officer or Fire Fighter and ending on the date his employment with the City as a Police Officer or Fire Fighter is terminated.  Service shall be credited in years and twelfths ($1/12^{th}$) of a year.  Not more than one-twelfth ($1/12^{th}$) of a year of Credited Service shall be credited to a Member on account of all Service rendered to the City in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the City in any period of 12 consecutive months.

(3)     Not more than one month of Credited Service shall be granted for any period of more than one month during which the Member is absent without pay; notwithstanding the foregoing, any Member who shall  be suspended from duty and subsequently reinstated to duty without further disciplinary action shall receive credit for the time of such period of suspension.

(4)     Solely for purposes of determining eligibility for a retirement benefit under Sections 5.1 and 5.4, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).  The period of time during which a Member is on layoff from the service of the City shall be included in the Member's Credited Service solely for the purposes of determining whether the Member has attained his Normal Retirement Age for purposes of Section 5.1.

## Sec 4.2.    Vesting Service

(1)     A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the City.

(2)     A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

## Sec 4.3.    Service Credit; Military Service

A Member who enters the military service of the United States while employed with the City shall have the period of such military service credited as City Service in the same manner as if the Member had served the City without interruption, provided that (1) the Member's entry into such military service and re-employment thereafter shall be in accordance with applicable

laws, ordinances, and regulations of the State of Michigan and the City, (2) he or she is re-employed by the City upon completion of such military service, and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service.  The Member shall be permitted to make such contributions in accordance with Code Section 414(u) and regulations thereunder.  During the period of military service and until return to City employment, the Member's Mandatory Employee Contributions to the Retirement System shall be suspended.

### Sec 4.4.     Service Credit; Qualified Military Service

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u).  Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than thirty days, such Differential Wage Payment will be treated as compensation under the Code Section 415(c)(3) limits, but not for purposes of benefit accruals under the Retirement System.  For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the City to an individual who is performing service in the uniformed services while on active duty for a period of more than thirty days.

# ARTICLE 5.  ELIGIBILITY FOR RETIREMENT

## Sec 5.1.    Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his Normal Retirement Age while employed by the City may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired.  The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

## Sec 5.2.    Eligibility for Deferred Vested Retirement Benefit

Any Member who terminates employment with the City prior to satisfying the requirements for receipt of a retirement benefit under Section 5.1 and who is credited with ten (10) or more years of Vesting Service upon his or her termination of employment (regardless of Age) shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his Attainment of Age sixty-two.  At a Member's election, the Member may begin receiving a Retirement Allowance following his Attainment of Age fifty-five, actuarially reduced for early commencement, in lieu of an unreduced Retirement Allowance beginning at age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

## Sec 5.3.    Eligibility for Disability Retirement Benefit – Duty Disability

(1)    If, prior to attainment of his Normal Retirement Date, a Member shall become Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty and if, pursuant to Section 5.6, the Board shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board by or on behalf of such Member or by the head of his Department such Member shall be retired; notwithstanding that during such period of notification he or she may have separated from service and provided further that the Medical Director, after examination of such Member shall certify to the Board the Member's Total Disability.  A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

(a)    a basic benefit equal to fifty percent (50%) of his Final Compensation at the time his duty disability retirement begins, and

(b)    a supplemental benefit equal to sixteen and two-thirds percent (16-2/3%) of his Final Compensation at the time his duty disability retirement begins.

Subject to Section 9.5, on the first day of each Plan Year, a Member's duty disability benefit will be increased as provided in Section 6.2.

(2)    After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation.  If the

Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (1)(a) and (1)(b) until such time as the Member would have attained twenty-five years of Credited Service had he continued in active Service with the City. At that time, the Member shall continue to receive the benefit described in paragraph 1(a) above; however, benefits described in paragraph (1)(b) above will cease. If the Member is not disabled from any occupation, he shall continue to receive the benefit described in paragraph (1)(a) above; benefits described in paragraph 1(b) will cease.

(3)     In the event a Member receiving duty disability benefits has attained twenty-five years of Credited Service, duty disability benefits shall continue to be paid to the Member until the earlier of (i) the Member's Attainment of Age sixty-five, or (ii) the date the Member ceases to be Totally Disabled as determined by the Board. Upon termination of disability or Attainment of Age sixty-five, a Member with twenty-five years of Credited Service shall be eligible to receive a Retirement Allowance as provided in Section 6.1. The amount of such Retirement Allowance shall be equal to the amount which would have been payable to the Member if the Member's conversion from duty disability retirement to a Retirement Allowance had occurred on the date the Member attained twenty-five years of Credited Service.

(4)     If a Member on duty disability retirement returns to active Service with the City and shall re-qualify for duty disability retirement for the same or related reasons within twenty-four months of his return to active Service, then the disability shall be deemed a continuation of the prior Total Disability and the period of the Member's active Service following the return to work will not qualify the Member to be entitled to a new initial determination of disability for purposes of determining the benefit payable to the Member. Instead, such Member will return to duty disability retirement benefits based on the number of months of disability with which the Member was credited at the time of his return to active Service, as if there had not been a break in his period of duty disability retirement.

(5)     During the period a Member is eligible to receive duty disability benefits under this Section 5.3, the Member shall continue to be credited with Credited Service until the Member accrues twenty-five years of Credited Service, at which time accrual of Credited Service shall cease.

(6)     In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Plan Year will be adjusted so it does not exceed the difference between (i) the Member's base salary at the date of duty disability, increased by the variable Pension Improvement Factor (Escalator) (if any) applicable to such benefit pursuant to Section 6.2 multiplied by the number of full Plan Years from the date of the Member's duty disability to the year in which the earnings offset is applied, and (ii) the amount of the Member's remuneration from gainful employment during the prior calendar year. The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources. Furnishing such information to the Board at such

times as the Board shall require shall be a condition for the Member's continued eligibility for duty disability benefits.

### Sec 5.4.    Eligibility for Disability Retirement Benefit – Non-Duty Disability

(1)    Upon the application of a Member or the Member's Department head, a Member who becomes totally and permanently disabled prior to his or her Normal Retirement Date in the employ of the City not resulting from the performance of duty shall be retired by the Board; provided that the Medical Director shall certify to the Board after a medical examination, that such Member is mentally or physically totally and permanently disabled for the further performance of duty to the City.  Such a Member shall receive the following applicable benefits:

      (a)    If such Member has less than five years of Credited Service at the time of his disability retirement, his Accumulated Mandatory Employee Contributions standing to his credit in the Accumulated Mandatory Employee Contributions Fund shall be returned to him, or at his option he shall receive a cash refund annuity which shall be the actuarial equivalent of his Accumulated Mandatory Employee Contributions.

      (b)    If such Member has five or more years of Credited Service at the time of his disability retirement, he shall receive a disability Retirement Allowance computed in accordance with the provisions of Section 6.1 payable in any of the optional forms provided in Section 8.1 hereof.  His annual Straight Life Retirement Allowance shall not be less than twenty per cent (20%) of his Average Final Compensation.

(2)    If a Member receiving non-duty disability retirement benefits is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the disabled Member's Retirement Allowance and Average Final Compensation, the Member's Retirement Allowance shall be reduced by the amount of such difference.  If the amount of the Retiree's earnings changes, the Retirement Allowance may be adjusted accordingly.  The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources.  Furnishing such information to the Board at such times as the Board shall require shall be a condition for the Member's continued eligibility for non-duty disability benefits.

### Sec 5.5.    Disability Retirees; Reexamination

(1)    At least once each year during each year following the retirement of a Member under Section 5.3 or Section 5.4, the Board shall require that such disability Retiree who has not attained his Normal Retirement Age undergo a medical examination, to be made by, or under the direction of the Medical Director; provided, however, that medical examinations shall not be required if the Medical Director determines that the Retiree's condition is permanent and there is no need for further reexamination.  Retirees shall be reimbursed for reasonable costs actually incurred by the Retirees in connection with such

examinations. Should any such Retiree who has not attained Normal Retirement Age fail to submit to a required medical examination, the Retiree's Retirement Allowance may be suspended by the Board until the examination is completed. Should such failure continue for one year, all of the disability Retiree's rights in and to the duty or non-duty disability Retirement Allowance may be revoked by the Board. If upon such examination of a Retiree, the examiner reports that the Retiree is no longer Totally Disabled, and such report is concurred in by the Board, the Retiree shall be restored to active service with the City and the Retirement Allowance paid pursuant to Section 5.3 or Section 5.4 shall be suspended until the Retiree terminates active Service with the City.

(2)     A disabled Retiree who has been, or shall be, reinstated to active Service in the employ of the City shall again become a Member. All Credited Service at the time of the disability retirement shall be restored to the Member.

**Sec 5.6.     Disability Benefits; Procedures for Determination of Disability**

(1)     The Board shall establish procedures for determining whether a Member is Totally Disabled. Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(2)     If a Member is determined to be Totally Disabled under Section 5.3(1) or 5.4(1), the Board or its designee will examine the pension file, including the submissions of the Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the Combined Plan. If it is undisputed that the disability did result from the performance of duty, the Board will grant duty disability retirement benefits. If it is undisputed that the disability did not result from the performance of duty, the Board will grant non-duty disability retirement benefits, provided the Member meets the other conditions of eligibility. If the performance of duty issue is in dispute, the Board will refer the matter to arbitration by a member of the Disability Retirement Review Board ("DRRB"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon the Member, the Department and the Board. The DRRB shall consist of three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board. The three members of the DRRB shall be disinterested persons qualified as labor arbitrators and shall be selected in accordance with agreements between the City and the unions representing Members. The procedure for the termination of DRRB members and the selection of new DRRB members also shall be carried out in accordance with the agreements between the City and the unions representing Members.

(3)     The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

(a)     The Member and the City will have the right to appear in person or otherwise may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

(b)    A court reporter will be present and make a stenographic record of the proceedings;

(c)    The hearing will be closed to the public, except that the Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

(d)    The witnesses will be sequestered;

(e)    The witnesses will be sworn by the court reporter and testify under oath;

(f)    The Member may not be called by the City as an adverse witness;

(g)    The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

(h)    If the Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the Member may so inform the Board in writing which, in turn, will submit a written request to the appropriate Department executive for the release of the employee for the purpose of so testifying;

(i)    The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

(j)    The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute;

(k)    The authority of the DRRB member is limited to deciding whether or not the Member's disability "resulted from the performance of duty" within the meaning of the Combined Plan. The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Combined Plan: and

(l)    The costs associated with the hearing, including the arbitrator's fees and expenses and the court reporter's fees and expenses, will be paid by the Retirement System.

(4)    If a disability Retiree is determined by the Board to no longer be Totally Disabled, he or she may appeal that determination within seven (7) days thereof by filing a written request with the Board for a re-examination. The Board shall promptly arrange for such re-examination. The Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the Member is no longer Totally Disabled, his or her disability benefits will be further continued while the Police or Fire Department conducts such examinations and/or investigations as necessary to determine whether the Member is qualified for reappointment to active duty. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a Member represented by DPLSA is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.

(5)     The Board shall not act upon or grant the application filed by a Member who, although he or she is not capable of performing the full duties of a Police Employee or Fire Employee, has not suffered any diminishment of his or her base wages or benefits because he or she is either:

(a)     regularly assigned to a position, the full duties of which he or she is capable of performing; or

(b)     assigned to a restricted duty position, unless the Member's Department advises that it intends to seek a disability retirement for the Member in the foreseeable future.

(6)     The provisions in paragraph (5) above are not intended to and will not:

(a)     affect the right of a Member to seek a disability retirement when no restricted duty position is available; or

(b)     restrict in any way the existing authority of the Chief of Police or the Fire Commissioner to seek a duty or non-duty disability retirement for a Member for that Member at that time to request a duty or non-duty disability retirement.

## Sec 5.7.     Return of Accumulated Mandatory Contributions to Non-Vested Member

If a Member ceases employment with the City before becoming eligible for a Retirement Allowance under Section 5.1 or 5.2 or a disability Retirement Allowance pursuant to Section 5.3 or 5.4, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member. If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

## Sec 5.8.     Benefits Offset by Compensation Benefits; Subrogation

(1)     Any amounts which may be paid or payable to a Member, Retiree, or Beneficiary on account of disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be an offset against any amounts payable from funds of the Retirement System (Component I and Component II combined) on account of the same disability or death. If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance payable by the Retirement System (under both Component I and Component II), the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System (under both Component I and Component II), and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2)     In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

## ARTICLE 6.  RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec 6.1.    Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Age or his actual retirement from employment with the City in the form of a Straight Life Retirement Allowance shall be equal to two percent (2%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth ($1/12^{th}$) year) of Credited Service earned after June 30, 2014.

### Sec 6.2.    Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2015 and effective the first day of each Plan Year thereafter, the Board may determine that the annual Retirement Allowance of a Member shall be increased by a factor of one percent (1.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement ("Pension Improvement Factor (Escalator)"); provided, that the recipient of said Retirement Allowance shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.  The Pension Improvement Factor (Escalator) shall be compounded.

# ARTICLE 7.  DEATH BENEFITS

## Sec 7.1.    Accidental Death Benefit; Performance of Duty

(1)     If a Member is killed in the performance of duty in the service of the City, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the City, and such death, illness, or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the City, the following benefits shall be paid:

(a)     the Accumulated Mandatory Employee Contributions standing to his or her credit in the Accumulated Mandatory Employee Contributions Fund at the time of his or her death shall be paid to such person or persons as the Member shall have nominated by written designation duly executed and filed with the Board.  If no such designated person survives the Member, the said Accumulated Mandatory Employee Contributions shall be paid to the Member's legal representative, subject to paragraph (e) of this Section 7.1(1).

(b)     the surviving spouse shall receive a pension of five-elevenths of the Member's Final Compensation payable for the spouse's lifetime.  If the Member's child or children under age eighteen years also survive the deceased Member, each such child shall receive a pension of one-tenth of such Final Compensation; provided, that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of seven thirty-thirds of such Final Compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution of the benefit by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of the Member's Final Compensation.  In no case shall the total of the benefits provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the Member's Final Compensation.

(c)     if no surviving spouse survives the deceased Member or if the Member's surviving spouse dies before his youngest unmarried surviving child attains Age eighteen years, his unmarried child or children under Age eighteen years shall each receive a pension of one-fourth of the Member's Final Compensation; provided that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of one-half of such Final Compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child, his or her pension shall terminate and there shall be a redistribution by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the Member's Final Compensation.

(d)     if the Member has no surviving spouse or surviving children under Age eighteen years and if the Member leaves surviving either a father or mother or both, whom the Board shall find to be actually dependent upon such Member for financial

support, such dependent father and mother shall each receive a pension of one-sixth of the Member's Final Compensation.

(e)     If a Member dies intestate, without having designated a person or persons, as provided in paragraph (a) of this Section 7.1(1), and without heirs, the amount of his Accumulated Mandatory Employee Contributions in the Accumulated Mandatory Employee Contribution Fund, not to exceed a reasonable sum, to be determined by the Board, shall be used to pay his burial expenses, provided the Member leaves no other estate sufficient for such purpose.  Any balance credited to such Member in the Accumulated Mandatory Employee Contribution Fund, and not used for burial expenses shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

## Sec 7.2.    Non-Duty Death Benefits

The surviving spouse of any Member who dies while in the employ of the City (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, shall receive a Retirement Allowance computed in the same manner in all respects as if said Member had (i) retired effective on the day preceding the Member's death, notwithstanding that the Member had not attained Normal Retirement Age, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving spouse as Beneficiary.

## Sec 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member who is not covered by Section 7.1 dies while employed by the City or following termination of employment but prior to commencement of a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board.  In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate.  If a Member  who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 8.  FORMS OF PAYMENT

## Sec 8.1.    Retirement Allowance Options

(1)     Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a Straight Life Retirement Allowance payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the Straight Life Retirement Allowance computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a Beneficiary, in accordance with the options set forth below:

     (a)    *Option One.  Cash Refund Annuity*.  A Retiree will receive a reduced Retirement Allowance for as long as he or she lives, provided that if the Retiree dies before payment of the Accumulated Mandatory Employee Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board.  If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

     (b)    *Option Two.   Joint and One Hundred Percent Survivor Allowance*.  Upon the death of a Retiree  who elected a Joint and One Hundred Percent Survivor Allowance, one hundred percent of the Member's reduced Retirement Allowance shall be paid to and continued throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

     (c)    *Option "A".   Joint and Seventy-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Seventy-Five Percent Survivor Allowance, seventy-five percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

     (d)    *Option Three.  Joint and Fifty Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Fifty Percent Survivor Allowance, fifty percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

     (e)    *Option "B".  Joint and Twenty-Five Percent Survivor Allowance*.  Upon the death of a Retiree who elected a Joint and Twenty-Five Percent Survivor Allowance, twenty-five percent of the Member's reduced Retirement Allowance shall be

continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2)     *Joint and Survivor Optional Forms of Payment.*  The Joint and Survivor Optional Forms of Payment provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

    (a)     *Standard Form.*  Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

    (b)     *Pop-up Form.*  Under the Pop-up Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary.  In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance payable to the Retiree shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Retirement Allowance Form of Payment.

### Sec 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1, both a Retiree and Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions (and if the Retiree makes an election pursuant to Section 10.4(2), his Accumulated Voluntary Employee Contributions) at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions (and Accumulated Voluntary Employee Contributions, if applicable) and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board.  If there is no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the Retiree or the Beneficiary, whichever is the last to die.

# ARTICLE 9.  FUNDING AND RESERVES

## Sec 9.1.    Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive City and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and to amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of the Retirement System).

## Sec 9.2.    Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Contribution Fund, the Deferred Retirement Option Program Fund (if applicable), the Medical Benefits Account Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Expense Fund and the Income Fund, as follows:

(1)    The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the retirement, termination, disability or death of a Member with a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's or Beneficiary's Retirement Allowance.

(2)    The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members, together with earnings thereon.

(3)    The Deferred Retirement Option Plan Fund shall be the fund in which shall be accumulated the amounts credited to the DROP Accounts of Members who have elected to participate in the DROP Program pursuant to Article 12, together with earnings thereon, provided that the DROP Accounts are held and invested within the Retirement System.

(4)    The Medical Benefits Account Fund shall be the fund in which shall be accumulated the amounts contributed to the Retirement System for the purposes of paying Medical Benefits.

(5)    The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the City's annual contribution that is not credited to the Rate Stabilization Fund and amounts transferred to Component I as provided in Section G-2(f) of Component II and from which shall be paid Retirement Allowances and other benefits on account of Members.

(6)     The Rate Stabilization Fund shall be the Fund to which shall be credited City contributions in excess of the amount of the City's contribution which is credited to the Pension Accumulation Fund and amounts transferred to Component I as provided in Section G-2(f) of Component II.

(7)     The Expense Fund shall be the fund to which shall be credited any money provided by the City, if any, to pay the administrative expenses of the Retirement System, and from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(8)     The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the assets of Component I of the Retirement System, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9.  There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document.  Amounts credited to the Income Fund in excess of amounts needed to credit earnings and losses of the Retirement System as provided in this Component I for any Plan Year shall be transferred to the Pension Accumulation Fund and used to pay Retirement Allowances and other benefits on account of Members.

### Sec 9.3.    Method of Financing Retirement System Benefits

(1)     The pension liabilities for Members under this Component I shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2)     The City's annual contribution to finance the prospective pension liabilities during the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be (a) eleven and two-tenths percent (11.2%) of the base Compensation of active employees who are members of the DFFA (for pay periods ending on or before the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA) and members of DPOA (for pay periods ending on or before October 3, 2014) and (b) twelve and one-quarter percent (12.25%) of the base Compensation of active employees who are members of the DPCOA, the DPLSA, the DPOA (for pay periods beginning on or after October 3, 2014) and the DFFA (for pay periods beginning on or after the effective date of the 2014-2019 collective bargaining agreement between the City and DFFA).  A portion of the City's annual contribution for each Plan Year shall be credited to the Rate Stabilization Fund.  The remainder of the City's annual contribution shall be allocated to the Pension Accumulation Fund.

(3)     Except as provided in Section 9.5, for each Plan Year, a Member who was an active employee as of June 30, 2014 ("current active") shall contribute to the Retirement System an amount equal to six percent (6%) of his or her base Compensation for such Plan Year and a Member who is hired or rehired by the City on or after July 1, 2014 ("new employee") shall contribute to the Retirement System an amount equal to eight percent

(8%) of his or her base Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of the Member's first payroll date occurring in August 2014. The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the later of (i) the Member's first payroll date occurring in August 2014 and (ii) the Member's date of hire, to the date he ceases to be a Member. The contribution shall be deducted from the Members' Compensation, notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment. Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

## Sec 9.4.    Member Contributions Picked-Up

(1)    The City shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)    The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code. The City shall pay the  contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)    The City shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both. The City shall designate the Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

## Sec 9.5.    Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations

(1)    To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below ninety percent (90%), the Trustee may not award the variable Pension Improvement Factor (Escalator) described in Section 6.2 to any individual beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than ninety percent (90%).

(2)    In the event the funding level of the Retirement System projected over a five year period falls below ninety percent (90%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which

such determination is made and continuing until the funding level is projected to be one hundred percent (100%) on a market value basis within the next five years:

(a)     the remedial action required in Section 9.5(1) shall be implemented or continued;

(b)     all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under the Retirement System;

(c)     Mandatory Employee Contributions for active and new employees shall be increased by one percent (1%) for up to the next following five Plan Years;

(d)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(e)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(f)     the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently paid to the Retiree on the date the funding level is projected to fall below ninety percent (90%);

(g)     the Retirement Allowance payable to a Retiree shall not include the variable Pension Improvement Factor (Escalator) that was most recently added to the Member's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (f) above;

(h)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year; and

(i)     contributions made to the Retirement System by the City shall be increased, consistent with applicable actuarial principles and the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq.*

(3)     For purposes of this Section 9.5, the "funding level" shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System.  The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee.  The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

## ARTICLE 10.  VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec 10.1.  Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member who is covered by a collective bargaining agreement with the City that permits the Member to make Voluntary Employee Contributions to Component I of the Retirement System may elect to reduce his Compensation for any Plan Year by a whole percentage not less than one percent (1%) nor more than ten percent (10%) and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  A Member represented by the DPOA may elect to reduce the amount paid to him or her by the City for accumulated sick leave in excess of 400 hours by a whole percentage not less than one percent (1%) nor more than one hundred percent (100%) of such amount and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

### Sec 10.2.  Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the City shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

### Sec 10.3.  Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second Fiscal Year immediately preceding the Fiscal Year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

### Sec 10.4.  Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases employment with the City other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)     In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the Actuarial Equivalent

Value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3) If a Member dies while employed by the City or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Voluntary Employee Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate. If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 11.  LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec 11.1.  The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account.  The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program.  Copies of the rules shall be made available to eligible Members in the offices of the Retirement System.  Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

## Sec 11.2.  Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account.  An eligible Member is any Member who has participated in the Retirement System for twelve (12) months or more.  Former Members, spouses and Beneficiaries are not eligible to receive any loans from the Retirement System.  No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time.  A Member who has previously defaulted on a loan under either Component I or Component II of the Combined Plan shall not be eligible for a loan from the Retirement System.

## Sec 11.3.  Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount, which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Fifteen Thousand Dollars ($15,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System (both Component I and Component II) during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System (both Component I and Component II) on the date on which the loan is made, whichever is less.  The minimum loan amount shall be One Thousand Dollars ($1,000.00).

## Sec 11.4.  Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)     Each loan application shall be made in writing.

(b)     All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c)     Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a

principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period.  A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d)     An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Defined Contribution Plans of the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)     Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among Members in its determination of interest rates on loans.  However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan.  The loan interest rate shall be calculated in a manner that will not negatively affect either the City's costs with respect to the Retirement System or the investment return allocated to Members.

(f)     Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code.  A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

## Sec 11.5.   Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

## Sec 11.6.   Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

**Sec 11.7.   Distribution**

No distribution shall be made to a Member, former Member, spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the Member from the Retirement System.

# ARTICLE 12.  DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM

## Sec 12.1.  General Provisions

The following provisions are hereby established as the Deferred Retirement Option Plan ("DROP") Program under Component I, which shall be available to Members who are covered by collective bargaining agreements with the City that permit such Members to participate in the DROP program and those non-union executives of the Police Department and the Fire Department.

(1)     In lieu of terminating employment and accepting a Retirement Allowance under the Component I, any Member of the Retirement System who is eligible for the DROP program and who is eligible to immediately retire and receive an unreduced Retirement Allowance under Section 5.1 may elect to participate in the DROP program and defer the receipt of his or her Retirement Allowance in accordance with the provisions of this Article 12.  Any such election shall be irrevocable.

(2)     A Member shall be entitled to participate in the DROP program under Component I for a maximum of five years.  At the end of such five year period of participation in the DROP program, the Member shall be retired from employment.

## Sec 12.2.  Conversion to Retirement Allowance

Upon the effective date of a Member's participation in the DROP program, the Member shall cease to accrue a Retirement Allowance pursuant to Section 6.1 and shall elect a form of payment for his Retirement Allowance pursuant to Section 8.1.  Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable Pension Improvement Factor (Escalator) increases) that would have been payable, had the Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the Board.

## Sec 12.3.  Investment of DROP Assets

(1)     ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program.  ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (4) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(2)     As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts invested under the Retirement System.  If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(3)     If amounts credited to a DROP Account are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees. A Member's DROP Account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP Account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(4)     The Board of Trustees entered into an administrative services agreement with ING. Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(5)     The Board of Trustees may replace ING with a trust type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(6)     Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from their DROP Accounts.

## Sec 12.4.   Distribution of Amounts Credited to DROP Account

A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City. Upon termination of employment, a Member who is a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his DROP Account. In addition, one hundred percent (100%) of the Member's monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP program. Termination of employment includes termination of any kind, such as resignation, retirement, discharge or disability.

## Sec 12.5.   Death of Member While Participating in the DROP Program

If a Member dies while participating in the DROP program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate. In addition, one hundred percent (100%) of the Member's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid to the Member but for the Member's decision to participate in the DROP program will be restored. Survivor benefits, if any, shall be paid in accordance with the payment option elected by the deceased Member at the time the Member elected to participate in the DROP program.

## Sec 12.6.   Disability of Member While Participating in the DROP Program

If a Member becomes Totally Disabled while participating in the DROP program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, such Member (a) shall be immediately retired and one hundred percent (100%) of the Retirement Allowance) that would have been paid to the Member but for the Member's decision to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) will commence in accordance with the payment option selected by the Member at the commencement of the Member's participation in the DROP program as provided in Section 12.1(2), and (b) shall be entitled to receive payment of the funds in his DROP Account (in the form of a lump sum or other form of payment described in Section 8.1). Such Member shall not be entitled to disability retirement benefits under Section 5.3 or Section 5.4 hereof.

### Sec 12.7.  Cost Neutrality

(1)  The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(2)  If the City contends that the DROP program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP program was not in effect, the Board and the City, along with the Plan Actuary as well as an actuary appointed by the City (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost.  If the Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan Actuary and the City's actuary.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP program cost-neutral.  Upon the implementation of changes necessary to make the DROP program cost-neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City or (b) withdraw from the DROP program and resume active participation in Component I of the Retirement System.  The Board shall notify DROP participants of these changes prior to implementation.  Those DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP program (under either Component I or Component II).  Those not making either election shall remain participants in the DROP program.

(3)  In the event the DROP program cannot be changed to restore cost neutrality, it shall be discontinued and Members participating in the DROP program at that time shall have the option to either (i) retire or (ii) continue active employment with the City and resume active participation in Component I of the Retirement System.  DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under Component I or Component II).

# ARTICLE 13.  LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec 13.1.  Compliance With Code Section 415(b) And Regulations

(1) Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2) The maximum annual benefit accrued by a Member during a "limitation year" (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3) Notwithstanding the foregoing:

(a) if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 13.1(2) has been satisfied shall be made, in  accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 13.1(9) or (10);

(b) if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 13.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two (adjusted for participation of fewer than 10 years, if applicable); provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System,  commencing at Age sixty-two; and

(c) if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an

annual benefit payable in the form of a straight life annuity, commencing when the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)     The adjustments in Sections 13.1(3)(b) shall not apply to a Member with at least 15 years of Credited Service as a Police Member or a Fire Member within the meaning of Code Section 415(b)(2)(H).  In addition, the adjustments in Sections 13.1(3)(b) and 13.1(6) shall not apply to benefits payable on account of the disability or the death of a Member.

(5)     Notwithstanding the foregoing provisions of this Section 13.1, except as provided in Section 13.1(6), the maximum annual benefit specified in Section 13.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by the City, does not exceed $10,000 for the Plan Year or any prior Plan Year, and (b) the Member was not at any time a participant in a Defined Contribution Plan maintained by the City.

(6)     In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 13.1(2) shall be such limitation (without regard to this Section 13.1(6)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten.  In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 13.1(2) and in Section 13.1(5) shall be such limitations (determined without regard to this Section 13.1(6)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.  The adjustment in this Section 13.1(6) shall not apply to benefits paid on account of the disability or death of a Member.

(7)     Notwithstanding anything in this Section 13.1 to the contrary, if the annual benefit of a Member who has terminated employment with the City is limited pursuant to the limitations set forth in Section 13.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(8)     For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 13.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(9)     The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 13.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 13.1(8).

(10)    The Actuarially Equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 13.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(11)    For purposes of applying the limitations set forth in this Section 13.1, all qualified defined benefit plans (whether or not terminated) ever maintained by the City shall be treated as one defined benefit plan.

(12)    For purposes of this Section 13.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year. The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with the City or (b) the end of the limitation year that includes the date of the Member's severance from employment with the City, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the City and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(13)    This Section 13.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to those interpreting Section 415(b)(2)(H), and any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

**Sec 13.2.   Compliance with Code Section 415(c) and Regulations**

(1)     The "Annual Addition" with respect to a Member for a limitation year shall in no event exceed the lesser of:

    (a)     $40,000 (adjusted as provided in Code Section 415(d)); or

    (b)     One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)     The Annual Addition with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions made to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified Defined Contribution Plan (whether or not terminated) maintained by the City, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(3)     In the event the Annual Addition to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 13.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

# ARTICLE 14.  RETIREMENT SYSTEM ADMINISTRATION

## Sec 14.1.   Board of Trustees as Retirement System Administrator

(1)     The Retirement Board shall have the power and authority to manage and administer  the Retirement System in accordance with the provisions of this Combined Plan Document.

(2)     The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 14.2.

(3)     The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document.  This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

## Sec 14.2.   Powers and Duties of Board

(1)     The Board shall have the following powers and duties:

(a)     exclusive authority regarding the  administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)     to determine the contributions to the Retirement System required of the City and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)     to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)     except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

(g)     except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

(h)     to prepare an annual report for the Retirement System for each Fiscal Year in compliance with generally accepted accounting principles.  The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the Fiscal Year.  The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and the Investment Committee.  The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)     to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and contributions of each Member who has made contributions to the Retirement System;

(j)     to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the City or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System.  In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)     to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System.  The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)   except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec 14.3.   Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)   manage and administer the Retirement System under the supervision and direction of the Board;

(b)   annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following Fiscal Year; and

(c)   perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may but need not be an employee of the City.

## Sec 14.4.   Discretionary Authority

The Board shall have sole and absolute discretion to:

(a)   interpret the provisions of the Retirement System;

(b)   make factual findings with respect to any and all issues arising under the Retirement System;

(c)   determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)   decide benefit claims and disputes arising under the Retirement System pursuant to such procedures as the Board shall adopt; and

(e)   make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

## Sec 14.5.   Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

# ARTICLE 15.  MANAGEMENT OF FUNDS

## Sec 15.1.  Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City, and subject to the terms of Article 16, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.

## Sec 15.2.  Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan document.  Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan document may be commingled for investment purposes and transferred as provided in Section G-2(f) of Component II.

## Sec 15.3.  Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System.  The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

## Sec 15.4.  Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

## Sec 15.5.  Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)    Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

(4)     Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

## ARTICLE 16.  INVESTMENT OF RETIREMENT SYSTEM ASSETS

### Sec 16.1.   Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 16, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314* of the *Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.  Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 16.

All investment management decisions made by the Board, as more fully described in Section 16.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has responsibility and authority, including the investment management matters described in Section 16.2, unless and until such action has been approved by affirmative vote of the Investment Committee.  All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If (a) the Board fails to approve or disapprove an investment management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an investment management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee and the chief investment officer are authorized to implement the decision.

If the Board disapproves an investment management decision within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended investment management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not less than five business days, of the request by the Investment Committee to discuss the disapproval by the Board described in the written response. Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended investment management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended investment management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision. Any action taken by the Board or the Investment Committee in violation of the terms of this Article 16 shall constitute an *ultra vires* act and the Investment Committee or the Board is

granted the express right to seek to preliminarily enjoin such action without the need to show irreparable harm.

### Sec 16.2.  Investment Management

(1)     For purposes of this Combined Plan, "investment management decisions" and "investment management matters" shall include:

(a)     development of an investment policy statement with sound and consistent investment goals, objectives, and performance measurement standards which are consistent with the needs of the Retirement System;

(b)     within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

(c)     evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

(d)     review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Article K of Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after Fiscal Year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

(e)     in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

(f)     communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

(g)     determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

(h)     the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(i)     interpretation of Retirement System governing documents, existing law, the Plan of Adjustment or other financial determination that could affect funding or benefit levels;

(j)     review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Auditor or other professional advisors as necessary prior to approval of the annual audit or other financial reports;

(k)     determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(l)     causing an asset/liability valuation study to be performed for the Retirement System every three years or, more often, as requested by the Investment Committee or the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act 314* and *Plan Investment Guidelines*.

## Sec 16.3.   Best Practices

Prior to adopting investment guidelines and asset allocation policies, selecting investment managers or adopting investment return assumptions, the Investment Committee shall have an understanding of and shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the pension restoration program described in the Plan of Adjustment and Component II of this Combined Plan Document, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

## Sec 16.4.   Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.  The chief investment officer shall report directly to the Investment Committee and the Executive Director of the Board.  The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.  The chief investment officer shall

provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

## Sec 16.5.   Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Investment Committee and the Board with oversight of the Retirement System's investment portfolio.   Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.   Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act, as amended, MCL 38.1132 et seq*.   The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.   The duties of an investment consultant may include, but shall not be limited to:

(a)     providing an asset/liability valuation study for the Retirement System;

(b)     reviewing the Retirement System's asset allocation based on current market assumptions;

(c)     identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)     implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)     monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)     recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations in the event of a deviation from expectations;

(g)     communicating the investment policies of the Retirement System to the investment managers;

(h)     reviewing the investment policies with the appropriate employees of the Retirement System;

(i)     aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

(j)     attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)     meeting with the Investment Committee to provide  detailed quarterly performance reports and executive summaries of performance;

(l)     meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)    meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manager selections.

**Sec 16.6.   Consistency With Plan of Adjustment**

Nothing herein shall be interpreted as permitting the Investment Committee or the Board to alter or depart from the requirements set forth in the Plan of Adjustment.

# ARTICLE 17. RETIREE MEDICAL ACCOUNT

## Sec 17.1.   Establishment of Account

A Medical Benefits Account shall be established and maintained under the Retirement System out of which the Board of Trustees shall pay the cost, which would otherwise be borne by the City, for certain medical and related benefits provided under the plans or programs maintained by the City to provide Medical Benefits (the "Medical Plans") for the benefit of the Medical Beneficiaries.  The provisions of this Article 17 are intended to comply with Section 401(h) of the Code and shall be construed to comply therewith.

## Sec 17.2.   Effective Date

Medical Benefits shall be paid from the Medical Benefits Account beginning October __, 2014 or such other date recommended by an enrolled actuary (within the meaning of Section 7701(a)(35) of the Code) and approved by the Board and Investment Committee.

## Sec 17.3.   Funding of Benefits

Subject to the right reserved to the City to amend or terminate the provision of Medical Benefits under its general power to amend the Combined Plan document under Section 18.5, the City expects and intends to make actuarially determined contributions under the Retirement System from time to time to fund the Medical Benefits Account.  The assets of the Medical Benefits Account may be invested together with the other assets of the Retirement System, in which case earnings of the Retirement System shall be allocated to the Medical Benefits Account on a reasonable basis or such assets may be invested separately.  In any event, no part of the Retirement System, other than the assets of the Medical Benefits Account, shall be available to pay for any part of the cost of Medical Benefits.

The amount determined by the City to be contributed for any Plan Year pursuant to the paragraph above shall be reasonable and ascertainable and shall not exceed the total cost for such Plan Year of providing Medical Benefits to the Medical Beneficiaries, determined in accordance with generally accepted actuarial methods and assumptions that are reasonable in view of the provisions and coverage of the medical and other welfare plans providing such benefits, the funding medium and any other applicable considerations.  At the time the City makes a contribution to the Trustee, the City shall designate the portion thereof that is allocable to the Medical Benefits Account.

## Sec 17.4.   Limitation on Contributions

At all times the aggregate of the contributions made by the City to provide Medical Benefits shall not exceed twenty-five percent (25%) of the sum of the aggregate contributions made by the City to the Plan under Sections 9.3 and 9.5, other than the contributions to fund past service credits, plus the aggregate contributions to the Medical Benefits Account.  In the event that a contribution under Section 17.3 shall exceed the amount described in the preceding sentence, such contribution shall be reduced by the excess amount.

## Sec 17.5.   Impossibility of Diversion

In no event, prior to the satisfaction of all liabilities to provide Medical Benefits shall the Medical Benefits Account be used for, or diverted to, any purpose other than the payment of such benefits and any necessary or appropriate expenses of administration associated therewith. Any amounts credited to the Medical Benefits Account following the satisfaction of all such liabilities shall be returned to the City.

## Sec 17.6.   Administration

The Medical Plans shall continue to be administered, and claims processed, under their respective terms.  Notwithstanding, the interpretation and administration of the terms of this Article 17 shall be pursuant to the provisions of the Combined Plan document.

## Sec 17.7.   Right to Amend or Terminate Medical Plans

The City expressly reserves the exclusive right, retroactively to the extent permitted by law, to amend, modify, change, terminate or revoke any medical or other welfare plan or policy maintained by the City that provides medical or other welfare benefits, including but not limited to Medical Benefits, and to require Members, former Members, their eligible spouses and dependents to pay all or any portion of the cost of such medical benefits.

## Sec 17.8.   Reversion

At any time prior to the satisfaction of all liabilities under the Retirement System to provide Medical Benefits, no part of the Medical Benefits Account may be used for any purpose other than providing Medical Benefits, and any necessary or appropriate expenses attributable to the administration of the Medical Benefits Account.  If any residual assets remain in the Medical Benefits Account after the satisfaction of all obligations of the City to provide Medical Benefits to the Medical Beneficiaries, such assets shall be returned to the City.  In the event a Medical Beneficiary's interest in the Medical Benefits Account is forfeited prior to the termination of the Retirement System, an amount equal to such forfeiture shall be applied as soon as possible to reduce the City's contributions.

## Sec 17.9.   Limitation of Rights

A Medical Beneficiary shall have no right, title or claim in any specific asset of the Medical Benefits Account, but shall have the right only to the Medical Benefits provided from time to time under the Medical Benefits Account.

# ARTICLE 18.  MISCELLANEOUS

## Sec 18.1.  Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by the City (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec 18.2.  Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of benefit, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec 18.3.  Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec 18.4.  Conviction of Felony; Forfeiture of Rights

If a Member or Beneficiary shall be convicted by a court of competent jurisdiction of a felony or high misdemeanor involving moral turpitude committed during active Service, the Board shall have the power to order the forfeiture of all rights of the Member or Beneficiary to benefits hereunder, except the return of the Member's Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.

## Sec 18.5.  Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments permitted under the terms of the Plan of Adjustment (including amendments contemplated in Section K-4(5) of Component II) may be made to the terms, conditions and rules of operation of the Combined Plan or any successors plan or trust that govern the calculation of pension benefits, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit under the Retirement System, except as provided in the

Plan of Adjustment. Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code. The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Retirement System by the City must be approved by the Council or a person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

## Sec 18.6. Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

## Sec 18.7. Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan document to the contrary. Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year that he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires. Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section 18.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

## Sec 18.8. Direct Rollovers

(1) For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the Board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

    (a) For purposes of this Section 18.8, the following terms shall have the following meanings:

    (b) *"Direct rollover"* means a payment by the Retirement System to an eligible retirement plan specified by a distributee.

(c)     *"Distributee"* means a Member or former Member.  It also includes the Member's or former Member's surviving spouse, a spouse or former spouse who is the alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E).  However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

(d)     *"Eligible retirement plan"* means any of the following that accepts a distributee's eligible rollover distribution:

   (i)     a qualified trust described in Code Section 401(a);

   (ii)    an annuity plan described in Code Section 403(a);

   (iii)   an annuity contract described in Code Section 403(b);

   (iv)    an individual retirement account described in Code Section 408(a);

   (v)     an individual retirement annuity described in Code Section 408(b);

   (vi)    a Roth IRA described in Code Section 408A; or

   (vii)   a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the Retirement System.

(e)     *"Eligible rollover distribution"* means any distribution of all or any portion of the balance to the credit of a distributee under the Retirement System, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year.  Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the Retirement System.  However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion

of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec 18.9. Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate. The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I of this Combined Plan document and not to any particular provision or section thereof. The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan document or the Retirement System created hereunder.

## Sec 18.10. Severability

If any section or part of a section of this Combined Plan document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan document or Retirement System or of the Combined Plan document or Retirement System in its entirety.

# COMPONENT II

## ARTICLE A.  COMMON PROVISIONS OF THE POLICE
## AND FIRE RETIREMENT SYSTEM

**Sec. A-1.**        **Common Provisions**

Certain provisions of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan described below are common to both Component I and this Component II as in effect July 1, 2014.  Those provisions are set forth in the following Sections of Component I:

(a)        Article I (General Provisions);

(b)        Article II (Definitions):

Actuarial Equivalent or Actuarially Equivalent

Actuarially Equivalent Value

Administrative Board of Trustees

Administrative Rules and Regulations

Age; Attainment of

Board of Trustees or Board or Retirement Board

City

City Council or Council

Combined Plan

Component I

Component II

DFFA

DPLSA

DPCOA

DPOA

Detroit Police and Fire Retirement System or Retirement System

Fiscal Year

Internal Revenue Code or Code

Investment Committee

Medical Director

Notice to Members, Beneficiaries and Retirees;

Plan Actuary or Actuary;

Plan Document or Combined Plan Document;

Plan of Adjustment;

Plan Year;

Spouse;

Straight Life Retirement Allowance; and

Total Disability or Totally Disabled;

(c)     Article 13 (Limitation on Benefits and Contributions);

(d)     Article 14 (Retirement System Administration);

(e)     Article 15 (Management of Funds);

(f)      Article 16 (Investment of Retirement System Assets); and

(g)     Article 18 (Miscellaneous).

# ARTICLE B.  FREEZE OF POLICE AND FIRE RETIREMENT SYSTEM
## AS OF JUNE 30, 2014

**Sec. B-1.**        **Freeze of Police and Fire Retirement System as of June 30, 2014.**

Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code, or in Chapter 54, Article II of the 1964 Detroit City Code, or any ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 (the "Freeze Date"):

(a)     No new employee hired by the City on or after July 1, 2014 shall become a Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date;

(b)     No employee who is rehired by the City on or after July 1, 2014 and who received a distribution of his accumulated employee contributions prior to July 1, 2014, shall become a Member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date; provided, however, that if a Member who is entitled to a Frozen Accrued Benefit as defined in subsection (d) of this Section B-1 and who is rehired by the City on or after July 1, 2014 repays to the Police and Fire Retirement System in accordance with a payment schedule approved by the Board of Trustees the amount of accumulated employee contributions that he withdrew, then such Member shall be eligible to accrue service credit under this Component II following rehire solely for the purpose of determining the Member's eligibility for payment of his Frozen Accrued Benefit;

(c)     No Member shall make contributions to the Annuity Savings Fund under the Police and Fire Retirement System in effect as of June 30, 2014 with respect to payroll dates occurring on or after August 1, 2014 and all Member contributions made with respect to payroll dates occurring on or after August 1, 2014 shall be made to and in accordance with the terms of Component I of the Combined Plan;

(d)     Benefit accruals for Members with respect to service rendered prior to July 1, 2014 will be frozen based on a Member's years of service and Average Final Compensation and the pension multiplier formulae as of such Freeze Date ("Frozen Accrued Benefit");

(e)     Except as otherwise provided in this Section B-1, compensation of a Member shall be frozen effective as of the Freeze Date for purposes of determining the Member's Frozen Accrued Benefit.  No compensation of any type earned by a Member after the Freeze Date shall be taken into consideration for purposes of determining the Member's Frozen Accrued Benefit under the Police and Fire Retirement System;

(f)     Any Member who, as of June 30, 2014, would have been eligible to elect to use a portion of the unused accrued sick leave that he could have received in cash upon retirement ("Cashable Sick Leave") to increase his Average Final Compensation if the Member had been eligible to retire and had elected to retire as of June 30, 2014,

shall have a one-time election to have the value of twenty-five percent (25%) of the Member's Cashable Sick Leave as of June 30, 2014 included in the computation of the Member's Average Final Compensation for purposes of determining the Member's Frozen Accrued Benefit ("Sick Leave Election"); provided, however, that the amount of the member's Cashable Sick Leave at the time the completed election form is received by the Retirement System is at least equal to the value of twenty-five percent (25%) of the Member's Cashable Sick Leave as of June 30, 2014 and, provided further that the completed election form is received by the Retirement System no later than the dates established by the City. A Member's Sick Leave Election shall be made in the manner set forth by the Board of Trustees and the Police and Fire Retirement System. Notwithstanding anything in this subsection (f) to the contrary, a Member's Sick Leave Election will be void and the determination of the Member's Average Final Compensation for purposes of calculating the Member's Frozen Accrued Benefit will not take into account any of the Member's Cashable Sick Leave, if (i) the electing Member would not have been eligible to receive an immediate service retirement benefit if he retired as of June 30, 2014, and (ii) the electing Member's employment with the City is terminated before the electing Member becomes eligible for an immediate service retirement benefit under the Police and Fire Retirement System;

(g)     Service earned after the Freeze Date shall be credited to a Member under this Component II solely for purposes of determining a Member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit and to a rehired Member solely for purposes of determining the Member's eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all Members for benefit accrual purposes under the terms of the Police and Fire Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no Member shall earn service credit with respect to benefits payable under the terms of the Police and Fire Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(h)     The Deferred Retirement Option Plan ("DROP") shall remain in effect for all Members who have either enrolled in or elected to participate in the DROP as of June 30, 2014. Members also may elect to participate in the DROP after June 30, 2014 with respect to their Frozen Accrued Benefits; however, participation in DROP with respect to such Frozen Accrued Benefits shall be limited to five years.

The foregoing terms of Section B-1 shall be referred to as the "Freeze" of the provisions of the Police and Fire Retirement System as in effect on the Freeze Date and the provisions of Component II of the Police and Fire Retirement System shall be interpreted and construed by the Board of Trustees and the Police and Fire Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section B-1 and the provisions of Chapter 54 of the 1964 Detroit City Code, or any Charter, ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other document governing terms of employment of an employee, the Board of Trustees and the Police and Fire Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

# ARTICLE C.  DEFINITIONS

## Sec. C-1.    Definitions.

Unless a different meaning is plainly required by context, for purposes of this Component II the following words and phrases have the meanings respectively ascribed to them by this Section C-1:

(1)    *Accrued Service* shall mean a Member's credited service for employment rendered before the date of an actuarial valuation of the Retirement System and before July 1, 2014.

(2)    *Accumulated Contributions* shall mean the sum of all amounts deducted from the compensation of a Member and credited to his individual account in the Annuity Savings Fund, together with Regular Interest, as provided in this Component II of the Combined Plan.

(3)    *Annuity* shall mean payments derived from the Accumulated Contributions of a Member.

(4)    *Annuity Reserve* shall mean the present value of all payments to be made on account of any Annuity, or benefits in lieu of any Annuity, computed on the basis of such mortality tables and Regular Interest as shall be adopted by the Board of Trustees.

(5)    *Average Final Compensation* shall mean:

    a.    With respect to an "Old Plan Member" (an employee described in Section F-2(a)) the current maximum salary for the rank(s), grade(s) or position(s) held by the Member over the sixty (60) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.   The salary shall be obtained from the official compensation schedule for the Fiscal Year of the earlier of the dates described in (i) or (ii) and an average shall be determined.  A Member who retires on or after July 1, 2000 (for DPCOA and DFFA members) or July 1, 1998 (for all other Members) shall have the Member's most recent full longevity payment included in his Average Final Compensation.

    b.    With respect to a "New Plan Member" (an employee described in Section F-2(b)) the current maximum salary for the rank(s), grade(s) or position(s) held by the Member over the sixty (60) months immediately preceding the earlier of:  (i) the date his employment with the City last terminated and (ii) June 30, 2014.   The salary shall be obtained from the official compensation schedule for the Fiscal Year of the earlier of the dates described in (i) or (ii) and an average shall be determined.  If more than one (1) rank, grade or position has been held over the sixty (60) month period, a weighted average is determined based on time spent in each rank, grade or position during this sixty (60) month period.

(i)    A Member who retires on or after July 1, 2000 (for DPCOA and fire equivalents) or July 1, 1998 (for all other Members) shall have the Member's most recent full longevity payment included in his Average Final Compensation.

(ii)    Effective July 1, 2000, Average Final Compensation shall be calculated for members of the DPCOA, Executive members and their fire equivalents by using the current maximum salary for the rank(s), grade(s) or position(s) held by the Member over the thirty-six (36) months immediately preceding the earlier of: (i) the date his employment with the City last terminated and (ii) June 30, 2014.

c.    With respect to reduced duty disability retirements occurring on or after July 1, 1992, notwithstanding the provisions of Article F, Part B, Section F-8, for those Members who receive benefits under Article F, Part B, Section F-9(a), the Average Final Compensation used in the computation of the reduced duty disability allowance shall mean the maximum salary at the date of conversion to reduced duty disability retirement for the rank(s), grade(s), or positions(s) which were held by the Member over the sixty (60) months prior to his or her duty disability retirement.

d.    Subject to Section B-1(f), for purposes of computing the Average Final Compensation received by a Member who retires on or after July 1, 2008 and prior to July 1, 2014, the Member shall have the option of adding the value of the three year average of twenty-five percent (25%) of the Member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation.

e.    The Average Final Compensation for "Old Plan" and "New Plan" Members represented by DFFA retiring on or after July 1, 1992 or on or after July 1, 2000 for Members represented by DPOA is calculated pursuant to paragraph (b) above. The salary is obtained from the Official Compensation Schedule for the Fiscal Year prior to the Member's elective date of retirement and an average shall be determined.

f.    Effective July 1, 2000, for Members represented by DFFA with a parity relationship with the DPCOA Inspector, Average Final Compensation shall be calculated pursuant to paragraph (b)(ii) above. The salary is obtained from the Official Compensation Schedule for the Fiscal Year prior to the Member's elective date of retirement and an average shall be determined.

g.    For Members represented by DFFA who have a parity relationship with the DPLSA and the DPCOA Inspector, who retire on or after July 1, 1998 and for those having a parity relationship with the DPOA who retire on or after July 1, 2000 and prior to July 1, 2014, the amount of the Member's

most recent full longevity payment shall be included in the definition of Average Final Compensation.

h. Subject to Section B-1(f), all Members represented by DFFA who retire on or after July 1, 2008 and prior to July 1, 2014, may choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank and have that sum included in the average compensation used to compute the Members' service Pension of their Retirement Allowance.

i. Subject to Section B-1(f), non-union uniformed Police and Fire executives represented by DPCOA who retire on or after January 15, 2010 and prior to July 1, 2014 may choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank, and have that sum included in the Average Final Compensation used to compute the Member's service Pension of their Retirement Allowance.

j. Subject to Section B-1(f), a Member represented by DPLSA who retires on or after July 1, 2008 and prior to July 1, 2014 may choose to receive the 3-year average of twenty-five percent (25%) of eighty-five percent (85%) of his or her unused accrued sick leave bank, and have that sum included in the Average Final Compensation used to compute the Member's service Pension of their Retirement Allowance.

(6) *Beneficiary* shall mean any person or persons (designated by a Member pursuant to procedures established by the Board) who are in receipt of a Retirement Allowance or Pension payable from funds of the Retirement System due to the participation of a Member.

(7) *Decrement Probabilities* shall mean the probabilities of a Member's withdrawal from City employment, death while in the employ of the City, retirement from City employment with a Pension payable from funds of the Retirement System, and death after retirement.

(8) *Final Compensation* shall mean the annual rate of earnable compensation of a Member at the earlier of (i) the time of termination of employment or (ii) June 30, 2014. Effective July 1, 1992 and prior to July 1, 2014, compensation shall also include the value of the percentage reduction in compensation for non-union employees, pursuant to ordinance, resolution or executive order. In cases of any doubt regarding these values, the decisions of the Board of Trustees shall be controlling to implement the intention that no non-union employee will suffer a diminution of Pension benefits computation due to reduction in compensation because of fiscal emergency and that Pension benefits with respect to Fiscal Years beginning July 1, 1992 and ending June 30, 2014 should always be computed as if no reduction in compensation occurred due to ordinance, resolution or executive order or directive.

(9)     *Fire Employees* (formerly referred to as "Firemen") shall mean all employees of the Fire Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter employed therein prior to November 10, 1937, and who shall be in the employ of the Fire Department of the City of Detroit prior to the effective date of this amendment and restatement and, where the context requires, all persons who shall take the said oath of office and become members of the Fire Department thereafter.

(10)    *Fire Fighter* shall mean the rank in the Fire Department currently or previously classified by the civil service commission as Fire Fighter.

(11)    *Member* shall mean any member of the Retirement System who has not retired.

(12)    *Membership Service* shall mean the total service rendered as a Police Employee or Fire Employee prior to July 1, 2014.

(13)    *New Plan* shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(D) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect through June 30, 2014 by Article 11, Section 102 of the City of Detroit Charter.

(14)    *Old Plan* shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(A) and (B) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect through June 30, 2014 by Article 11, Section 102 of the City of Detroit Charter.

(15)    *Patrolman* shall mean the rank in the Police Department currently or previously known as patrolman.

(16)    *Pension* shall mean the portion of a Retirement Allowance which is paid for by appropriations made by the City.

(17)    *Pension Reserve* shall mean the present value of all payments to be made on account of any Pension, or benefit in lieu of any Pension, computed upon the basis of such mortality tables and Regular Interest as shall be adopted by the Board of Trustees.

(18)    *Police Employees* (formerly referred to as "Policemen") shall mean all employees of the Police Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter, and who shall be in the employ of the Police Department of the City of Detroit prior to the effective date of this amendment and restatement and, where the context requires, all persons who shall take the said oath of office and become members of the Police Department thereafter.

(19)    *Prior Service* shall mean service in the military rendered prior to July 1, 2014 as provided in Section E-3.

(20)     *Regular Interest* shall mean, for a period of five years from the effective date of the Retirement System interest at four per centum per annum, compounded annually.  For the subsequent five year period, and each five year period beginning thereafter but prior to July 1, 2013, Regular Interest shall be such rate of interest as the Board of Trustees, in its discretion, may determine and adopt. For Fiscal Years beginning on and after July 1, 2013:

> a.     the annual rate of return for purposes of determining the Regular Interest to be credited to a Member's account in the Annuity Savings Fund shall not be less than zero and shall not be greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second Fiscal Year immediately preceding the Fiscal Year in which the Regular Interest is credited; and

> b.     the rate(s) of Regular Interest adopted by the Board from time to time as necessary for the operation of the Retirement System on an actuarial basis shall not violate the Plan of Adjustment.

(21)     *Retiree* shall mean any Member who has retired with a Pension payable from funds of the Retirement System.

(22)     *Retirement* shall mean for any Member that such Member has retired, with a Pension payable from the funds of the Retirement System.

(23)     *Retirement Allowance* shall mean the sum of the Annuity and the Pension.

(24)     *Retirement System or System* shall mean the Police and Fire Retirement System of the City of Detroit created and established by Title IX, Chapter VII of the 1918 Charter of the City as amended through June 30, 1974 and continued in effect by the provisions of the July 1, 1974 City Charter, and as set forth in the Combined Plan effective as of July 1, 2014 and this amendment and restatement of the Combined Plan.

(25)     *Salary Factors* shall mean the ratio between a Member's rate of compensation as of the date of an actuarial valuation of the Retirement System and his rate of compensation as of the earlier of (i) the date of his Retirement and (ii) June 30, 2014.

(26)     *Service* shall mean service with the City as a Police Employee or Fire Employee.

The following terms shall have the meanings given to them in the Sections of this Combined Plan Document set forth opposite such term:

| | |
|---|---|
| Accrued Liability Fund | Section G-4(a) |
| additional years | Section F-9(a)(3) |
| Adjusted Pension Benefit | Section K-1(1) |
| Annuity Reserve Fund | Section G-3 |
| Annuity Savings Fund | Section G-2(a) |

| | |
|---|---|
| ASF Excess Return | Section G-2(f) |
| Authority | Section K-2(1) |
| Cashable Sick Leave | Section B-1(f) |
| COLA | Section K-3 |
| Deferred Retirement Option Plan (DROP) | Section B-1(h), Article I |
| Determination Date | Section G-4(a) |
| Disability Retirement Review Board | Section F-12(b) |
| Eligible Pensioner | Section K-2(5) |
| Estimated Adjusted Annual Household Income | Section K-2(3)b |
| Expense Fund | Section G-7 |
| Federal Poverty Level | Section K-2(6) |
| Freeze | Section B-1 |
| Freeze Date | Section B-1 |
| Frozen Accrued Benefit | Section B-1(d) |
| Funding Conditions | Section K-1(1) |
| Funding Proceeds | Section G-4(a) |
| Funding Target | Section K-3(2)(a) |
| GRS | Section K-2(1) |
| Income Stabilization Benefit | Section K-2(2) |
| Income Stabilization Benefit Plus | Section K-2(3) |
| Income Stabilization Fund | Section K-2(4) |
| New Plan Member | Section F-2(b) |
| Old Plan Member | Section F-2(a) |
| Optional Forms | Section F-23 |
| Option 1. Cash Refund Annuity | Section F-23(a)(1) |
| Option 2. Joint and Last Survivorship Retirement Allowance | Section F-23(a)(2) |
| Option 3. Joint and Seventy-Five Percent Survivor Allowance | Section F-23(a)(3) |
| Option 3(A). Modified Joint and Last Survivorship Allowance | Section F-23(a)(4) |
| Option 3(B). Joint and Twenty-Five Percent Survivor Allowance | Section F-23(a)(5) |
| Participant Loan Program | Section J-1 |
| Pension Accumulation Fund | Section G-5 |
| Pension Funding Transaction | Section G-4(a) |
| Pension Improvement Factor (Escalator) | Section F-14 |
| Pension Reserve Fund | Section G-6 |
| Pop-up Form | Section F-23(b)(ii) |
| Sick Leave Election | Section B-1(f) |
| Standard Form | Section F-23(b)(i) |
| State Treasurer | Section K-2(1) |
| Straight Life Retirement Allowance | Section F-23 |
| Survivors Benefit Fund | Section G-10 |
| Transition Cost | Section G-2(f) |
| UAAL | Section G-4(a) |

# ARTICLE D.  MEMBERSHIP

**Sec. D-1.     Generally.**

Subject to Section B-1, the membership of Component II of the Retirement System shall consist of the following:

(a)    All Police Employees and Fire Employees who were in Service on or after July 1, 1941, but prior to January 1, 1969; provided, however, that any Police Employee or Fire Employee who, on or before July 1, 1941, shall have been in the employ of the Police or Fire Department for a period of twenty years, or who shall have a total of twenty years of creditable Service, shall be excluded from the provisions hereof and shall retain for himself or herself, his or her wife, children, dependent mother or dependent sister all rights and privileges provided by Chapters XV and XXI of title IV of the 1918 Detroit City Charter, unless any such Police Employee or Fire Employee, on or before June 1, 1941, shall file with the City Controller his or her written election to become a Member of the Retirement System, in which event he or she shall be a Member; such excluded Police Employee not electing to become a Member, from and after July 1, 1941, while he or she remains an active member of the Police Department, shall pay five per cent of each salary payment into the fund for retired Police Employees, and any such excluded Fire Employee not electing to become a Member, from and after July 1, 1941, while he or she remains an active member of the Fire Department, shall pay five per cent of each salary payment into the Fire Department Pension and Retirement Fund, and such salary contributions shall hereafter be used toward the payments of Retirement Allowances provided for under Chapter XV, Section 14, subsections (1), (2), and (3) thereof.  On retirement, the contributions of such excluded members shall cease.

(b)    All persons who became Police Employees or Fire Employees on or after July 1, 1941, but prior to January 1, 1969, and who are confirmed as Police Employees or Fire Employees according to the rules and regulations of the respective Departments shall thereupon become Members of the Retirement System, subject, however, to the following provisions:

    (i)    Any person who shall become a Police Employee or Fire Employee at an attained age of thirty-one years or more may become a Member of the Retirement System only by vote of the Board of Trustees who shall fix the rate of contribution of such Member on a basis recommended by the Actuary for the attained age of such Member.

    (ii)   Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member of the Retirement System, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(iii)    Any Police Employee or Fire Employee who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member of the Retirement System.

(c)    Any Member as defined in paragraph (a) or (b) of this Section D-1 who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

(d)    All persons who became Police Employees or Fire Employees on or after January 1, 1969 and prior to July 1, 2014 and who are not individuals re-employed with the Police and Fire Departments on or after January 1, 1969 and prior to July 1, 2014, and who are confirmed as Police Employees or Fire Employees according to the rules and regulations of the respective Departments shall thereupon become Members of the Retirement System subject, however, to the following provisions:

(i)    Any person who shall become a Police Employee or Fire Employee at an attained age of thirty-one years or more may become a Member of the Retirement System only by vote of the Board of Trustees who shall fix the rate of contribution of such Member on a basis recommended by the actuary for the attained Age of such Member.

(ii)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member of the Retirement System, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(iii)    Any Police Employee or Fire Employee who, prior to being confirmed, shall be killed or Totally Disabled as the result of the performance of active duty, shall be deemed to have been a Member of the Retirement System.

(iv)    Any Member as defined in Section D-1(a), (b), or (c) who was separated from Service by resignation or dismissal or discharge who subsequently again becomes a Member shall be considered a Member for all purposes under this Component II under Section D-1(a), (b), or (c) and shall not be considered a Member under Section D-1(d).

(v)    Any Member as defined in Section D-1(d) who shall be transferred to a civilian position in his Department shall continue as a Member, subject to all the obligations of a Member.

## Sec. D-2.    Membership election option prior to July 1, 2014.

Any person who is a Member as defined in Section D-1(a), (b), or (c) who was in active service on January 1, 1969, shall have had the option to elect to become a Member of the Retirement System as defined in Section D-1(d) by filing his written election with the Board of Trustees on or before January 31, 1969, or any Retiree who retired on or before December 31, 1968, under the provisions of Article F, Part B, Section F-8, who returns to active service prior to July 1, 2014 shall have the option to elect to become a Member of this Retirement System as

defined in Section D-1(d), by filing his written election with the Board of Trustees on or before the earlier of (i) thirty days after his return to active service and (ii) June 30, 2014. The election shall be effective on the date that it is filed with the Board of Trustees.

**Sec. D-3.        Cessation of membership.**

(a)        Should a Member die or become a Retiree or be separated from service by resignation, dismissal, or disability, he shall thereupon cease to be a Member.

(b)        Any person who became a Member under Section D-1(a), (b), or (c) and ceases to be a Member, as provided in Section D-3(a), and who becomes a Police Employee or Fire Employee prior to July 1, 2014, shall again become a Member of Component II of the Retirement System, under section D-1(a), (b), or (c) subject to the provisions of Article G, Section G-2(d).

(c)        Any person who became a Member under Section D-1(d) and ceases to be a Member, as provided in Section D-3(a), and who becomes a Police Employee or Fire Employee prior to July 1, 2014, shall again become a Member of Component II of the Retirement System under Section D-1(d), subject to the provisions of Article G, Section G-2(d).

(d)        Any Member of the Retirement System from the Fire Department who retires as a Member of the Retirement System and who is rehired prior to July 1, 2014 as a civilian Member of the Fire Department may elect on or before June 30, 2014 to again become a Member of Component II of the Retirement System.

# ARTICLE E.  SERVICE CREDITABLE.

### Sec. E-1.        Members to file statement of service, etc.

Under such rules and regulations as the Board of Trustees shall adopt, each Police Employee and Fire Employee who shall become a Member prior to July 1, 2014 shall file a detailed statement of all prior service rendered by him as an employee of the Police Department or Fire Department, for which he claims credit, and of such other facts as the Board of Trustees may require, for the proper operation of the Retirement System.

### Sec. E-2.        Credit for service.

The Board of Trustees shall fix and determine by appropriate rules and regulations how much service in any year is equivalent to a year of service, but in no case shall less than six months' service constitute one year, nor shall more than one year of service be creditable for all service in one calendar year.  The Board of Trustees shall not allow credit as service for any period of more than one month during which the Member was or shall be absent without pay provided that if a Member shall be transferred from his Department payroll to the payroll of any city, county or state government or the federal government, by his Department head, during peace times, then such Member shall continue to be a Member of the System and shall he required to make regular contributions into the Annuity Savings Fund; and provided further, that if a Member, so transferred, shall fail to make such contributions for three consecutive months, he shall cease to be a Member of the System four months (of 31 days each) after the due date of his first defaulted Annuity contribution; and provided further, that any Member who was or shall be suspended from duty and subsequently reinstated to duty without further disciplinary action, shall receive total credit for the time of such period or periods of suspension.

### Sec. E-3.        Employees in military service commencing prior to July 1, 2014.

(a)     If a Member of the Retirement System was or shall be drafted, or enlisted or shall enlist into military, naval, marine, or other service of the United States government during time of war, or if a Member shall be drafted into such service during time of peace, and prior to the earlier of (i) ninety days from the date of his separation from such government service or from the date peace was or shall be established by treaty, whichever date was or shall be earlier, and (ii) June 30, 2014 resumed or shall resume employment as a Police Employee or Fire Employee, then such government service rendered prior to July 1, 2014 shall be credited to him as a Member of the Retirement System.    During the period of such government service of a Member, his contributions to the Annuity Savings Fund shall be suspended and the balance in the Annuity Savings Fund, standing to his credit as of the last payroll date preceding his leave of absence from the service of his Department shall be accumulated at Regular Interest.  Prior to July 1, 2014, even though the applicant may have been unable to satisfy all the foregoing requirements, the Board of Trustees had the power to grant the privileges provided for by this section in exceptional or extraordinary cases.

(b)     A Member on the City payroll on or after January 1, 1979 and prior to July 1, 2014 who, prior to employment in the City service, was called to or entered or is called to

or enters any full time military service of the United States during time of war, period of compulsory military service, or period of unusual emergency as defined in this ordinance, shall have the required period of active duty credited him as Membership Service, subject to the following conditions and limitations:

(1)     The Member files a written election with the Board of Trustees, before the earlier of (i) 180 days following the effective date of this provision or 180 days from the date of his first employment in the City service, whichever is most recent, and (ii) June 30, 2014, to claim military service credit under the provisions of this section.  A Member who is included in a collective bargaining unit shall file a written election to claim military service credit with the Board of Trustees within 180 days following the date of a negotiated approval and acceptance of this section by his duly authorized bargaining agent as transmitted to the Board of Trustees by the Labor Relations Director or, in the case of Members hired subsequent to the transmittal of approval and acceptance by his duly authorized bargaining agent, within 180 days from the date of his first employment in the City service; provided that any such election is required to be filed prior to July 1, 2014.

(2)     The Member furnishes the Board of Trustees such information as the Board of Trustees determines necessary to verify the amount of military service claimed.

(3)     The Member pays to the Pension Accumulation Fund of the Retirement System an amount of five (5) percent of the Member's annual rate of compensation at the time of payment multiplied by the years or parts of years of military service claimed.

(4)     The required payment shall be made under one of the following options:

    a.      Payment in full within 30 days of the election to claim military service.

    b.      Payment in equal bi-weekly installments by payroll deduction over a 36 month period starting 30 days following the election to claim military service.  Interest shall accrue during the period of installment payments at the compound rate of 5 percent per annum.  Payments must be completed prior to application for retirement.

    c.      If a Member has sufficient funds in the principal portion of his Annuity, he may authorize the Board to transfer such funds to the Pension Accumulation Fund to meet the required payment.

(5)     In the event a Member, who has filed the required election of this benefit, and who would be eligible for a Pension in all respects except for paying the full amount, dies prior to completion of the payment required in paragraph (4) preceding, the person otherwise entitled to a Retirement Allowance may pay the full amount due within 30 days of the Member's death to become eligible for an additional Pension credit under this section.

(6) Military service credited under the provisions of Section 54-30-3(c) of the 1964 Detroit City Code shall not be claimed or credited under the provisions of this section.

(7) Military service which is or will be the basis of service credit under any other public employee retirement program shall not be claimed or credited under the provisions of this section.

(8) In no case shall more than 3 years of pre-employment military service be credited a Member on account of military service. For the purpose of this limitation, military service credited pursuant to Section 54-30-3(a) of the 1964 Detroit City Code shall be combined with military service created pursuant to this section.

(9) The required payments made to the Pension Accumulation Fund for military service credit pursuant to this section shall, upon application by the Member or his estate, be returned without interest to any Member who dies or leaves City employment prior to being eligible for a Pension.

(10) Only honorable military service during the following periods shall be covered by this Section E-3(b):

World War II — December 8, 1941 to July 1, 1946.

Korean Conflict — June 27, 1950 to December 31, 1953.

Vietnam Conflict — August 5, 1964 to May 7, 1975.

(11) The military service credit pursuant to this section shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability Pension or for a service Pension. Such service credit may be used in meeting the minimum time needed for an automatic Option Two Pension in case of death of a Member.

(12) In no case shall benefits be based on the military service credit provided by this section unless the Member shall have been credited a minimum of eight years of service credit not including military service credit.

(13) Special service, contractual, part time, seasonal and summer camp employees are not eligible for the military service credit.

(14) In cases of doubt, the Board of Trustees will determine whether a Member is entitled to the benefits of this section consistent with the requirements and limitations herein.

(15) Any member of DFFA, DPCOA or DPLSA who performed military service prior to employment by the City and membership in the Retirement System

may, prior to July 1 2014, claim service credit as a Member of the Retirement System for time spent in the military service.

(16) Effective December 15, 2008, any member of DFFA, DPCOA or DPLSA who has performed any honorable military service may, prior to July 1, 2014, claim up to thirty-six (36) months service in the Pension time for time spent in the military. However, the Member will be required to purchase this military service credit as provided above.

(17) Effective March 8, 2007, all DPOA bargaining unit members who have served in the military may, prior to July 1, 2014, purchase a maximum of three (3) years Pension time.

## Sec. E-4. Verification of service claimed.

Subject to the above restrictions and to such other rules and regulations as the Board of Trustees may adopt, the Board of Trustees shall verify, as soon as practicable after the filing of such statements of service, the service therein claimed.

## Sec. E-5. Prior Service certificates.

Upon verification of the statements of service, the Board of Trustees shall issue Prior Service certificates, certifying to each Member the length of Prior Service rendered, with which he is credited. A Prior Service certificate shall be final and conclusive for retirement purposes as to such service; provided, however, that within one year from the date of issuance or modification of such certificate the Board of Trustees on its own motion or on the request of a Member may modify or correct the Prior Service certificate.

## Sec. E-6. Creditable service at retirement.

Creditable service at retirement, on which the Retirement Allowance of a Member shall consist of the Membership Service rendered by him prior to July 1, 2014 and, if he has a Prior Service certificate in full force and effect as of July 1, 2014, the amount of service certified thereon.

## ARTICLE F.  BENEFITS PROVIDED TO MEMBERS

### Part A - Service Retirement Allowance

**Sec. F-1.      Petition for retirement, mandatory age.**

(a)      Any Member as defined in Article D, Section D-1 (a), (b), or (c) in service may file with the Board of Trustees his written application for retirement setting forth the date not less than fifteen days nor more than ninety days subsequent to the filing thereof, on which he or she desires to be retired; and provided the Board of Trustees shall determine that the Member, at the date so specified for his retirement will have a total of twenty-five years or more of creditable service he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that in the case of any Fire Fighter as defined in Article D, section D-1 (a), (b) or (c) having served twenty-five years or more of creditable service, upon recommendation of the Board of Fire Commissioners, the Fire Fighter shall be retired forthwith, by the Board of Trustees.

(b)      Any Members as defined in Article D, Section D-1 (d) in service may file with the Board of Trustees his written application for retirement setting forth the date not less than fifteen days nor more than ninety days subsequent to the filing thereof, on which he or she desires to be retired; and provided the Board of Trustees shall determine that the Member, at the date so specified for his retirement, will have a total of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service and has attained Age fifty-five, he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that, effective July 1, 1983 for members of DPOA and fire equivalents and June 30, 1986 for DPLSA and fire equivalents and new Members, a Member described in Article D, Section D-1(d) shall be eligible to retire upon attainment of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service, regardless of Age.  Effective July 1, 1998 (June 30, 2001 for DPOA members and their fire equivalents), the time a Member is on layoff from service of the City shall be included in actual service rendered to the City for purposes of determining whether a Member has twenty-five years or twenty years of creditable service.  The Pension benefit to which such Member is entitled shall be based only on his actual years of creditable service.  Effective July 1, 1989, the minimum Age requirement for deferred Pensions payable for post 1969 Members represented by DPOA and hired before June 30, 1985 shall be eliminated.

Notwithstanding the foregoing provisions, effective October 15, 2014, a DPLSA member shall be eligible to terminate employment with the City and commence

receipt of a Retirement Allowance (or make a DROP election as provided in Article I) under this Component II provided the Member satisfies the following requirements:

| Fiscal Year | Age and Service |
| --- | --- |
| 2015 | Age 45 and 24 years |
| 2016 | Age 46 and 23 years |
| 2017 | Age 47 and 23 years |
| 2018 | Age 48 and 22 years |
| 2019 | Age 49 and 23 years |
| 2020 and thereafter | 25 years of service |

(c)      Effective June 30, 2001, any Member represented by DPOA and fire equivalents who has been laid off shall be eligible to retire at what would have been the Member's 25th anniversary. To determine eligibility for retirement, the Member's actual service time and time on lay off shall be combined. To calculate the Member's Retirement Allowance for members of DFFA, however, only actual service time shall be used. For DFFA members having a parity relationship with the DPLSA and the DPCOA Inspector, only lay off time which occurred between July 1, 1973 and July 1, 1998 will be credited. Effective in accordance with the specific date and terms of the DPLSA award in Act 312 No. D98 F-0944, Members represented by DPCOA shall have the right to retire on their 25th anniversary date, notwithstanding any service time they may have lost due to any layoffs, as provided in such award.

(d)      Any Member represented by DPOA who was hired on or after July 1, 1985 and who leaves City employment after being vested shall not be eligible for Pension benefits until said individual reaches his or her sixty-second birthday.

(e)      Any Member of the Retirement System as defined in Article D, Section D-1(a), (b), (c), and (d) who shall reach the Age of sixty years shall be retired forthwith, or on the first day of the calendar month next succeeding that in which the Member shall have reached Age sixty. On the written request of the Member and of the Commissioner of Police or the Board of Fire Commissioners, as the case may be, the Board of Trustees may continue such Member in active service for a period of two years beyond his sixtieth birthday, and on the expiration of such period, on like request, may continue such Member for a further period of two years.

(f)      Any Member of the Retirement System who satisfies the requirements for a Pension as defined in Article F, Section F-5 shall be eligible upon ninety days notice to make an irrevocable election to receive an immediate Retirement Allowance, actuarially reduced for early commencement, in lieu of a deferred Retirement Allowance.

(g)      Any Member of the Retirement System who was in the service of the City on or after July 1, 1941 but prior to January 1, 1969 and who was still an active Member on July 1, 1983 for DPLSA and fire equivalents and July 1, 1986 for DPOA members and fire equivalents shall have the option of retiring under the Old Plan or the New Plan.

(h)     Pursuant to IRC 411(e), as in effect in 1974, an employee shall be 100 percent vested in his or her Retirement System accrued benefit upon attaining normal retirement hereunder while in service.

## Sec. F-2.     Old Plan/New Plan

Effective July 1, 1986, Members of the Retirement System as defined under the terms of the Retirement System in effect on July 1, 1977, who were in service on or after July 1, 1941 but prior to January 1, 1969, and are active Members on July 1, 1986 shall have the option of retiring under the Old Plan or the New Plan.

(a)     *Amount of allowance – Old Plan Members*.  Upon his or her retirement from service, a Member as defined in Article D, Section D-1(a), (b), or (c) ("Old Plan Member") shall receive a straight life Retirement Allowance which shall consist of the benefits provided in paragraphs (1) and (2) below; and he or she shall have the right to elect an option provided for in Part H of this Article F:

(1)     An Annuity which shall be the Actuarial Equivalent of the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement; and

(2)     A Pension which, when added to the Member's Annuity, will provide a straight life Retirement Allowance equal to two percent (2.0%) of his or her Average Final Compensation, multiplied by the number of years, and fraction of a year, of his or her creditable service, not to exceed twenty-five years; provided, that the Retirement Allowance of a Police Employee shall in no case exceed fifteen twenty-seconds of the maximum earnable compensation of a Patrolman and the Retirement Allowance of a Fire Fighter shall not exceed fifteen twenty-seconds of the maximum earnable compensation of a Fire Fighter (and if either or both of the said ranks shall be hereafter abolished, the equivalent thereof).  The foregoing Pension limitation shall not apply to any Police Employee or Fire Employee who on July 1, 1941, shall be entitled to a certificate for twenty years or more of prior service and who remains under the provisions of Chapter XV or Chapter XXI of Title IV of the 1918 Detroit City Charter.

(b)     *Amount of allowance – New Plan Members*.  Upon his retirement from service, a Member as defined in Article D, Section D-1(d) ("New Plan Member") shall receive a straight life Retirement Allowance which shall consist of the benefits provided in paragraphs (1) and (2) below; and he shall have the right to elect an option provided for in Part H of this Article F:

(1)     An Annuity which shall be the Actuarial Equivalent of the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his retirement; and

(2)     A Pension which, when added to his or her Annuity, will provide a straight life Retirement Allowance equal to:

a. two and one-half percent (2.5%) of the Member's Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service, for the first twenty-five (25) years of such service; and

b. two and one-tenths percent (2.1%) of the Member's Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service in excess of twenty-five (25) years, subject to a maximum of thirty-five (35) years.

## Sec. F-3.    Pension Multiplier

(a) Notwithstanding Section F-2(a)(2) and F-2(b)(2), effective July 1, 1992 each Member who retires on or after that date shall be entitled to a Pension which, when added to the Annuity, will provide a straight life Retirement Allowance equal to 2.1% of his or her Average Final Compensation, multiplied by the number of years and fraction of a year, of his or her creditable service, not to exceed thirty-five (35) years of service for New Plan Members and twenty-five (25) years of service for Old Plan Members.

(b) Effective July 1, 1997 or for DPCOA members the effective date of the CET-DPCOA, each Member who retires shall be entitled to a Pension which when added to the Annuity will provide a straight life Retirement Allowance equal to 2.5% (or 2.1% for DPCOA members) of his or her Average Final Compensation multiplied by the number of years and fraction of year of his or her creditable service for the first twenty-five (25) years or, in the case of a DPCOA member of his or her creditable service earned or accrued on or after the effective date of the CET-DPCOA. For Members represented by DFFA, DPCOA and DPLSA, the multiplier shall be 2.1% for each year of service over twenty-five (25) years. Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members.

(c) Effective September 1, 2011, each Member represented by DPOA who retires shall only be entitled to a Pension which, when added to the Annuity, will provide a straight life Retirement Allowance equal to 2.1% of his or her Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service earned or accrued on or after September 1, 2011. Hence, for the first twenty-five (25) years of service accrued on or after September 1, 2011, the multiplier shall no longer be 2.5%; rather, 2.1%. Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members. Service credit accrued prior to September 1, 2011 will be unaffected by this Section F-3(c).

(d) Each DPLSA member who retires shall only be entitled to a Pension which, when added to the Annuity, will provide a straight life Retirement Allowance equal to 2.1% of his or her Average Final Compensation multiplied by the number of years and fraction of a year of his or her creditable service earned or accrued following the date of the Act 312 Award in D09 G-0786. Hence, for the first twenty-five (25) years of

service accrued after the date of the Act 312 Award, the multiplier shall no longer be 2.5% as stated in paragraph (b) above. Maximum years of service for Pension credit shall be thirty-five (35) years for New Plan Members and twenty-five (25) years for Old Plan Members.

**Sec. F-4.        Disposition of surplus benefits upon death of retired member.**

In the event a retired Member dies before he or she has received in straight life Retirement Allowance payments an aggregate amount equal to his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement, the difference between his or her said Accumulated Contributions and the said aggregate amount of straight life Retirement Allowance payments received by him or her shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the Board of Trustees. If there is no such designated person or persons surviving the said deceased Retiree such difference, if any, shall be paid to his or her legal representative. No benefits shall be paid under this Section F-4 on account of the death of such a retired Member if he or she had elected Option 1, 2, 3, 3A or 3B provided for in Part H of this Article F.

**Sec. F-5.        Retirement allowance for certain persons leaving City employment after eight years service (40 & 8).**

(a)        Should any DPLSA member or any fire equivalent who (1) has attained age forty years of Age, and (2) has acquired eight or more years of credited service, or any Member who terminates employment with the City on or after August 29, 2003 with ten or more years of credited service leave the employ of the Police Department or Fire Department prior to the date he or she would have first become eligible to retire as provided in this Part A, for any reason except his or her retirement or death, he or she shall be entitled to a Retirement Allowance computed according to Section F-2 (a) or (b) of this Article F, whichever is applicable, as said Section was in force as of the earlier of (i) the date his or her employment with the City last terminated or (ii) June 30, 2014; provided, that he or she does not withdraw his or her Accumulated Contributions from the Annuity Savings Fund. The Member's Retirement Allowance shall begin the first day of the calendar month next following the month in which his or her application for same is filed with the Board of Trustees, on or after the date he or she would have been eligible to retire had he or she continued in City employment. Notwithstanding the foregoing, prior to March 3, 2008 the Retirement Allowance of a DPOA member or a fire equivalent hired on or after July 1, 1985 shall not begin prior to the date on which the Member reaches his or her sixty-second birthday. Unless otherwise provided in this Component II, such person shall not receive service credit for the period of his or her absence from the City Police Department and/or Fire Department employ, nor shall his or her Beneficiary be entitled to any other benefit afforded in this Component II, except the benefits provided in Part A, Section F-2(a) or (b) or Part F of this Article F, whichever is applicable, subject to the above provisions, notwithstanding, his or her membership has terminated.

(b) Effective August 28, 2003, for DPOA members and fire equivalents who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to 40 & 8 Retirees.

## Sec. F-6.    Reduced Early Pension Benefits (40 & 8 Vesting Retirees)

(a) Members who terminate employment and who are eligible for a Pension pursuant to Article F, Part A, Section F-5 of Component II (40 & 8) shall have the option of receiving an immediate, but reduced early Pension benefit in lieu of a deferred Pension.

(b) This reduced early Pension benefit shall not result in an increase in employer contribution rates; therefore, the value of the Reduced Early Pension Benefit shall be the Actuarial Equivalent of the 40 & 8 Pension.

(c) For employees represented by DFFA in ranks or classifications with a parity relationship to employees represented by the DPLSA and employees in higher ranks or classifications, upon termination, a vested employee must within 90 calendar days make an irrevocable election as to whether or not to take this option.

(d) Individuals represented by DFFA, DPOA or DPLSA, who terminated employment prior to July 1, 1986, are not eligible for this option.

(e) An employee who receives a lump sum payment for accumulated time upon termination is not allowed to have that time count towards his retirement service.

(f) Since Members (other than DPOA and fire equivalents) are eligible to begin collecting their vested Pension as soon as they would have been eligible to retire had they continued their City employment, minimum retirement age (i.e., Age 55) shall not be a factor in computing the actuarially reduced Pension benefit.

(g) All DFFA members, except those members in ranks or classifications with a parity relationship to employees represented by the DPOA, electing to receive the reduced early Pension benefits shall receive upon separation full pay for fifty percent (50%) of the unused sick bank amounts. This provision shall have no effect on a Member electing to receive the deferred 40 & 8 vested Pension who shall continue to be reimbursed for unused sick time in accordance with an applicable collective bargaining agreement.

(h) Effective August 28, 2003, DPOA members and fire equivalents who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to 40 & 8 retirees.

**Part B — Total Disability Pension and Retirement Allowances**

**Sec. F-7.     Duty disability.**

If a Member shall become Totally Disabled for duty by reason of injury, illness or disease resulting from performance of duty and if the Board of Trustees shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board of Trustees by or on behalf of such Member or by the head of his Department such Member shall be retired; notwithstanding that during such period of notification he or she may have separated from service; provided, the Medical Director, after examination of such Member shall certify to the Board of Trustees his or her Total Disability.  If said Member was separated from service after filing of the written application, and he or she had attained twenty-five years or more of service prior to the date of separation, the Board of Trustees, shall retire said Member, under this Part B.

**Sec. F-8.     Duty disability benefits; members in service on or after July 1, 1941 but prior to January 1, 1969.**

(a)     A Member, as defined under Article D, Section D-1(a), (b), or (c), shall receive the following benefits:

    (1)     Each such Member shall receive a disability Pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation at the time of disability retirement. On the date that a Member, who retired under Section F-7 and who receives benefits under this Section F-8, would have accrued twenty-five years of creditable service had the Member continued in active service, or on the date that the Member reaches age sixty, whichever comes first, the Member shall be eligible for optional benefits as provided Part H of this Article F.

    (2)     In addition to the disability Pension provided for in Section F-8(a)(1), any Member who receives a disability Pension pursuant to Section F-8(a)(1) and has not accrued a total of twenty-five (25) years of creditable service as of the date of the Member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the Member's Average Final Compensation at the earlier of (i) the time of disability retirement or (ii) June 30, 2014.  This supplemental payment shall terminate upon the expiration of the period when a Member who retired under Section F-7 of this Part B and who receives benefits under Section F-8(a)(1) would have accrued twenty-five years of creditable service had the Member continued in active service, or on the date that the Member reaches Age sixty, whichever comes first.

        Effective July 1, 1992 for DPLSA members, the Average Final Compensation used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the Member over the sixty months prior to the earlier of (i) the date of retirement (reduced disability/service retirement when the Member would have attained a total of twenty-five years of

credited service) had he or she continued working in that classification which he or she held at the time of his or her disability or (ii) June 30, 2014. For Members who begin receiving such benefits on or after July 1, 1998 and before July 1, 2014, the amount of the Member's most recent full longevity payment shall be included in the definition of Average Final Compensation.

Effective July 1, 1992 for DFFA and DPOA members, the Average Final Compensation used in this computation shall be the highest average annual compensation that would have been received by such a Member had he or she continued working in the classification he or she held at the time of his or her disability, during any period of five consecutive years, selected by the Member, contained within the last ten years immediately preceding the earlier of (i) expiration of the period when the Member would have attained a total twenty-five years of creditable service and (ii) June 30, 2014.

Effective July 1, 2000, the Average Final Compensation used in this computation shall mean the current maximum salary, including the annual longevity payment provided above, for the rank(s), grade(s) or position(s) which would have been held by the Member over the thirty-six (36) months prior to the earlier of (i) retirement or (ii) June 30, 2014.

(3) In the case of a Member retired under Section F-8 who receives benefits under F-8(a)(1) and F-8(a)(2), the Accumulated Contributions standing to the Member's credit at the date of retirement shall continue to be held in the Annuity Savings Fund and Regular Interest shall be credited thereto. If such Member dies before the date upon which the Member would have achieved a total of twenty-five years of creditable service had the Member continued in active service and before such Member reaches Age sixty, the balance of the member's Annuity Savings Account including interest thereon shall be paid as provided in Part D and Part E of this Article F.

(b) This Section shall be applicable to those Members receiving benefits on the date of adoption of this Section who are not covered by the arbitration decision regarding the DPOA which became effective July 1, 1995, or the arbitration decision regarding the DPLSA which became effective June 30, 1998.

(c) This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the July 1, 1995 arbitration award, or the substantive rights of disability retirees from the DPLSA who retired prior to the June 30, 1998 arbitration award.

(d) This Section does not amend any computations used to determine disability benefits payable under this Section F-8, or result in an increase or decrease in such disability benefits.

**Sec. F-9.**   **Duty disability benefits; members beginning service on or after January 1, 1969 and becoming disabled prior to the dates set forth in Section F-10.**

(a)   A Member, as defined under Article D, Section D-1(d), who retired under Section F-7, shall receive the following benefits:

   (1)   Each such Member shall receive a disability Pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation at the earlier of (i) the time of disability retirement or (ii) June 30, 2014. On the date that a Member who retired under Section F-7 of this Part B and who receives benefits under this Section would have accrued twenty-five years of creditable service had the Member continued in active service, or on the date that the Member reaches Age sixty, whichever comes first, the Member shall be eligible for optional benefits as provided Part H of this Article F.

   (2)   In addition to the disability Pension provided for in Section F-8(a)(1) of this Part B, any Member who receives a disability Pension pursuant to Section F-8(a)(1) of this Part B and who has not accrued a total of twenty-five years or more of creditable service as of the date of the Member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the Member's Average Final Compensation at the earlier of (i) the time of the Member's disability retirement and (ii) June 30, 2014. This supplemental payment shall terminate when a Member who retires under Section F-7 and who receives benefits under Section F-8(a)(1) would have accrued twenty-five years of creditable service had he or she continued in active service or on the date that the Member reaches Age sixty, whichever comes first.

   (3)   In addition to the disability Pension provided for in Section F-8, any Member who receives a disability Pension pursuant to Section F-8(a)(1) and who has accrued more than twenty-five years ("additional years") of creditable service as of the earlier of (i) the date of the Member's disability retirement and (ii) June 30, 2014 shall receive another supplemental disability payment equal to two percent (2%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation as of the earlier of such dates, multiplied by the number of additional years of creditable service the Member has accrued; provided, however, that such supplemental disability payment shall not exceed twenty percent (20%), or such other higher percentage that is in effect and applies to such Member, of the Member's Average Final Compensation.

   (4)   In the case of a Member who retires under Section F-7 and who receives benefits described under Section F-8(a)(1) through (3), the Accumulated Contributions standing to the Member's credit at the date of disability retirement shall continue to be held in a separate fund in the Annuity Savings Fund and Regular Interest shall be credited thereto. If such Member dies prior

to the time when the Member would have achieved a total of twenty-five years of creditable service had the Member continued in active service and before such Member reaches Age sixty, the amount of the Member's Accumulated Contributions so set aside and interest thereon shall be paid as provided in Part D and Part E of this Article. F

(5)    The amendment of Section F-8(a)(1) shall not result in an increase or decrease in the amount of disability benefits payable to Members.

(b)    This Section shall be applicable to those Members receiving benefits on the effective date of this Section F who are not covered by the arbitration decision regarding the DPOA which became effective July 1, 1995, or the arbitration decision regarding the DPLSA which became effective June 30, 1998.  This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the July 1, 1995 arbitration award, or the substantive rights of disability retirees from DPLSA who retired prior to the June 30, 1998 arbitration award.

(c)    This Section does not amend any computations used to determine benefits under Section F-8 of this Part, or result in an increase or decrease in such benefits.

### Sec. F-10.    Duty Disability benefits; DFFA, DPOA and DPLSA members beginning service on or after January 1, 1969 and becoming disabled on or after the dates set forth below.

(a)    This Section F-10 shall be applicable to:

(1)    DFFA employees who file applications for disability retirement on or after July 1, 1995 and who have a parity relationship with the DPOA and on or after June 30, 1998, for DFFA employees with a parity relationship with the DPLSA and the DPCOA Inspector;

(2)    all DPLSA employees who file applications for disability retirement on or after June 30, 1998; and

(3)    all DPOA members who file applications for disability retirement on or after July 1, 1995.

(b)    A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

(i)    a basic benefit equal to 50% of the Member's Final Compensation at the earlier of (i) the time his or her duty disability retirement begins or (ii) June 30, 2014; and

(ii)    a supplemental benefit equal to 16-2/3% of the Member's Final Compensation at the earlier of (i) the time his or her duty disability retirement begins or (ii) June 30, 2014.

On July 1st of each year, the benefits determined under paragraphs (i) and (ii) above then payable will each be increased by adding to said amounts the product of the initial amount of said benefit which was computed at the time the duty disability retirement began and the applicable Pension Improvement Factor (Escalator).

(c)     After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation. If the Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (b)(i) and (b)(ii) until such time as the Member would have attained twenty-five years of creditable service had he continued in active Service with the City. At that time, the Member shall continue to receive the benefit described in paragraph (b)(i) above; however, benefits described in paragraph (b)(ii) above will cease. If the Member is not disabled from any occupation, he shall continue to receive the benefit described in paragraph (b)(i) above; benefits described in paragraph (b)(ii) will cease.

(d)     Duty disability retirement benefits shall continue to be paid to a Member on duty disability retirement after the Member has attained twenty-five years of creditable service, to the earlier of (i) the Member's attainment of Age sixty-five, or (ii) termination of disability as determined by the Board. Upon termination of disability or attainment of Age sixty-five, a Member with twenty-five years of creditable service shall be eligible to receive a service retirement benefit. The amount of such service retirement benefit shall be the same amount which would have been payable if the conversion from duty disability retirement to service retirement had occurred at the date of attaining twenty-five years of creditable service. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a DPOA Member is not qualified for reappointment as a Police Employee, for medical reasons, disability benefits will be continued.

(e)     If a Member on duty disability retirement returns to active service and within a twenty-four month period re-qualifies for duty disability retirement for the same or related reasons he or she had been retired, then the disability shall be deemed a continuation of the prior disabling condition and the period of the return to work will not have caused the Member to be entitled to a new initial determination of benefit amounts as set forth in paragraph (b) above. Instead, such Member will return to retirement at the point he or she had reached in sub-paragraphs (b), (c) or (d) above as if there had not been a break in his or her period of placement on duty disability retirement.

(f)     Disability retirement benefits shall continue to be considered benefits provided by the City pursuant to the 1918 Detroit City Charter, as amended, which are paid instead of and not in addition to any benefits under the State Workers' Disability Compensation Act.

(g)     Survivor benefit coverage applicable to active Members shall be continued during the period a Member is eligible for a duty disability benefit. Upon conversion to a service retirement benefit as provided in paragraph (d), automatic survivor benefit

coverage shall terminate. At that time, the Member shall have the right to elect an optional form of payment in the same manner as if he or she had retired from active membership on the conversion date.

(h)   Pension Credit While on Duty Disability Status

(1)   While eligible to receive duty disability benefits, Pension service credit shall continue to accrue, but not beyond June 30, 2014.

(2)   The accrual of Pension service credit will cease on the earlier of (i) the date the Member has twenty-five years of creditable service, or (ii) June 30, 2014.

(i)   Earnings Offset

(1)   In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Fiscal Year will be adjusted so it does not exceed the difference between (i) the Member's base salary at the date of disability, increased by 2.25% times the number of full years from the date of disability to the year in which the earnings offset is applied, and (ii) the amount of remuneration from gainful employment during the prior calendar year.

(2)   The earnings test shall be based on information the Board may periodically require from a duty disability benefit recipient or has secured from other reliable sources. Furnishing such information shall be a condition for a Member's continued eligibility for a duty disability benefit.

(j)   The withdrawal provision of the Retirement System will continue to apply to Members on duty disability. If a duty disability recipient elects annuity withdrawal after attaining twenty-five years of creditable service, the applicable benefit reduction will offset the duty disability benefit until the conversion date, after which it will offset the converted service retirement benefit.

## Sec. F-11.    Non-duty disability.

(a)   On written application to the Board by or on behalf of a Member or by the head of his Department, a Member, who becomes Totally Disabled for duty by reason of injury, illness or disease not resulting from the performance of duty as determined by the Board of Trustees, shall be retired by the Board of Trustees. If said Member was separated from service after the filing of the written application and had attained twenty-five years or more of creditable service prior to the date of separation, the Board shall retire said Member, under this Part B.

(b)   A Member retired under paragraph (a) above shall receive the following applicable benefits:

(1)     If such Member has less than five years of creditable service at the time of his or her disability retirement, his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund shall be returned to the Member, or at his or her option, he or she shall receive a cash refund annuity which shall be the Actuarial Equivalent of his or her Accumulated Contributions.

(2)     If such Member has five or more years of creditable service at the time of his or her disability retirement, he or she shall receive a disability Retirement Allowance computed in accordance with the provisions of this Article F, Part A, Section F-2(a) or (b), whichever is applicable, and he or she shall have the right to elect an Option provided for in Part H of this Article F. The Member's Straight Life Retirement Allowance shall not be less than twenty per cent of his or her Average Final Compensation. Such Retirement Allowance shall be subject to Parts I and K of this Article F.

(3)     If a Member receiving non-duty disability benefits has any Accumulated Contributions standing to his or her credit in the Annuity Savings Fund when the Member would have attained twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service, such Member may withdraw the balance of such contributions at that time.

## Sec. F-12.     Disability retirement procedures.

(a)     The Board shall establish procedures for determining whether a Member is disabled. Such procedures shall be consistent with any collective bargaining agreements between the City and the unions covering Police Employees and Fire Employees.

(b)     If a Member is determined to be disabled, the Board or its designee will examine the pension file, including the submissions of the Member and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the Combined Plan. If it is undisputed that the disability did result from the performance of duty, the Board will grant duty disability retirement benefits. If it is undisputed that the disability did not result from the performance of duty, the Board will grant non-duty disability retirement benefits, provided the Member meets the other conditions of eligibility. If the performance of duty issue is in dispute, the Board will refer the matter to arbitration by a member of the Disability Retirement Review Board ("DRRB"). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon the Member, the Department and the Board. The DRRB shall consist of three qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board. The three members of the DRRB shall be disinterested persons qualified as labor arbitrators and shall be selected in accordance with agreements between the City and the unions representing Members. The procedure for the termination of DRRB members and the selection of new DRRB members also shall be carried out in

accordance with the agreements between the City and the unions representing Members.

(c)      The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

     (1)   The Member and the City will have the right to appear in person or otherwise may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

     (2)   A court reporter will be present and make a stenographic record of the proceedings;

     (3)   The hearing will be closed to the public, except that the Member may select one person to be with him or her in the hearing room; provided, however, that person may not testify;

     (4)   The witnesses will be sequestered;

     (5)   The witnesses will be sworn by the court reporter and testify under oath;

     (6)   The Member may not be called by the City as an adverse witness;

     (7)   The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

     (8)   If the Member wishes to have an employee of the City released from duty to appear as a witness on his or her behalf, the Member may so inform the Board in writing which, in turn, will submit a written request to the appropriate Department for the release of the employee for the purpose of so testifying;

     (9)   The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

     (10)   The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute;

     (11)   The authority of the DRRB member is limited to deciding whether or not the Member's disability "resulted from the performance of duty" within the meaning of the Combined Plan.  The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Combined Plan; and

     (12)   The costs associated with the hearing, including the arbitrator's fees and expenses and the court reporter's fees and expenses, will be paid by the Retirement System.

(d)     If a disability retiree is determined by the Board or its delegate to no longer be disabled, he or she may appeal that determination within seven (7) days thereof by filing a written request with the Board for a re-examination. The Board or its delegate shall promptly arrange for such re-examination. The Member's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the Member is no longer disabled, his or her disability benefits will be further continued while the Police or Fire Department conducts such examinations and/or investigations as necessary to determine whether the Member is qualified for reappointment to active duty. In the event that the examinations and/or investigations conducted by the Police Department result in a determination that a Member represented by DPLSA is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.

(e)     The Board of Trustees shall not act upon or grant the application filed by a Police Employee or Fire Employee who, although he or she is not capable of performing the full duties of a Police Employee or Fire Employee, has not suffered any diminishment of his or her base wages or benefits because he or she is either:

(1)     regularly assigned to a position, the full duties of which he or she is capable of performing; or

(2)     assigned to a restricted duty position, unless the Police Department or Fire Department advises that it intends to seek a disability retirement for the Police Employee or Fire Employee in the foreseeable future.

(f)     The provisions in paragraph (e) above are not intended to and will not:

(1)     affect the right of a Member to seek a disability retirement when no restricted duty position is available; or

(2)     restrict in any way the existing authority of the Chief of Police or the Fire Commissioners to seek a duty or non-duty disability retirement for a Member or for that Member at that time to request a duty or non-duty disability retirement.

(g)     DPCOA and DPLSA members who are retired on disability Pensions pursuant to this Part B shall be entitled to lump sum payments of all accumulated time from the date that the Board of Trustees determines that they are entitled to such a Pension. These members shall not be required to utilize such time delaying their retirement dates.

## Part C — Escalation and Change in Compensation, Rank

### Sec. F-13.     Generally.

Subject to the Plan of Adjustment, if hereafter the rate of compensation of the rank, grade or position on which the service Retirement Allowance, disability Pension or disability Retirement Allowance of a Member who was hired prior to July 1, 1969 or is a Beneficiary of such a Member as defined in Article D, Section D-1(a), (b), or (c) is based shall be changed, his

or her service Retirement Allowance, disability Pension, or disability Retirement Allowance shall be changed proportionately, and if such rank, grade, or position shall have been abolished, his or her service Retirement Allowance, disability Pension, or disability Retirement Allowance shall be changed in proportion to the change made in the compensation of the existing rank, grade, or position most nearly approximating the rank, grade, or position so abolished.

**Sec. F-14.        Increase of Benefits; Pension Improvement Factor (Escalator).**

On and after July 1, 1969, and the first of July of each year thereafter until July 1, 1992, the Pension portion of any Retirement Allowance or death benefit of a Member or Beneficiary of a Member as defined in Article D, Section D-1(d), which is paid or payable under this Component II shall be increased at the rate of two per cent (2.0%) per annum computed on the basis of the amount of the Pension received at the time of retirement.

On or after July 1, 1992 and the first of July each year thereafter until July 1, 2014, the Pension portion of any Retirement Allowance or death benefit of a Member or Beneficiary of a Member as defined in Article D, Section D-1(d), (including those Members who opt to retire under the New Plan provisions) shall be increased at the rate of two and twenty-five one-hundredths per cent (2.25%) per annum computed on the basis of the amount of the Pension received at the time of retirement.

Effective for Members who retire on or after July 1, 1997 (July 1, 1998 for DPCOA members, DPLSA members and DFFA members with a parity relationship with DPCOA and July 1, 2001 for DPOA members and their fire equivalents), the Pension Improvement Factor (Escalator) described in this Section shall be re-computed each Fiscal Year ending before July 1, 2014 on the basis of the amount of Pension received in the previous Fiscal Year (i.e., the 2.25% per annum escalation amount shall be compounded).

Pension benefits for DPCOA members under Component II based on service rendered after November 30, 2012 shall not be subject to any escalation amounts.

The Pension portion of any Retirement Allowance or death benefit of a Member, or Beneficiary of a Member as defined in Article D, Section D-1(d) of the Combined Plan provisions, and Article 51.G. of the DPLSA collective bargaining agreement or Article 3.K. of the DPOA collective bargaining agreement (to include those Members who opt out to retire under the New Plan provisions) earned after April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members), shall not be increased whatsoever, per annum or otherwise. The Pension portion of any Retirement Allowance or death benefit of a Member, or Beneficiary of a Member as defined herein, accrued prior to April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members), shall still be increased as provided herein. Hence, Pension benefits earned based on service rendered after April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members) will no longer receive the 2.25% per annum escalation amount. The 2.25% per annum escalation amount shall continue to apply to Pension benefits earned based on service rendered before April 1, 2011 (for DPLSA members) or September 1, 2011 (for DPOA members).

**Sec. F-15.      Payment.**

Except as provided in the Plan of Adjustment, the escalation factor contained in Section F-14 above shall be payable to the Member or Beneficiary of a Member as defined in Article D, Section D-1(d), notwithstanding any Retirement Allowance or Pension amount limitation provisions in this Component II to the contrary.

**Part D — Death Benefits.**

**Sec. F-16.      Generally.**

If a Member, or a Retiree who was a Member, is killed in the performance of his or her duty or dies as the result of illness contracted or injuries received while in the performance of his or her duty and such death, illness or injuries resulting in death, is found by the Board of Trustees to have resulted from the performance of his or her duty, the following applicable benefits shall be paid, subject to Part I, Section F-25, of this Article F.

(a)      The Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her death shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the Board of Trustees.  If there is no such designated person surviving, his or her said Accumulated Contributions shall be paid to his or her legal representative, subject to paragraph (e) of this Section F-16.

(b)      A Member's surviving spouse shall receive a Pension of five-elevenths of the maximum earnable compensation for the rank of Patrolman or Fire Fighter as the case may be determined as of the earlier of (i) the date of death or (ii) June 30, 2014.  If his or her child or children under Age eighteen years also survive the deceased Member each such child shall receive a Pension of one-tenth of such maximum earnable compensation as of the earlier of (i) the date of death or (ii) June 30, 2014; provided, that if there are more than two such surviving children under Age eighteen years, each such child's Pension shall be an equal share of seven thirty-thirds of such maximum earnable compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child his or her Pension shall terminate and there shall be a redistribution by the Board of Trustees to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's Pension exceed one-tenth of such maximum earnable compensation.  In no case shall the total of the Pensions, provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be, determined as of the earlier of (i) the date of the Member's death or (ii) June 30, 2014.

Effective July 1, 1986, widows of Police Department or Fire Department employees who have been receiving a flat monthly benefit of $300.00 should receive an increase of $500.00 per month thereby making the flat monthly benefit $800.00.

(c)      If no spouse survives the deceased Member or if his or her surviving spouse dies or remarries before his or her youngest unmarried surviving child attains Age eighteen

years, his or her unmarried child or children under age eighteen years shall each receive a Pension of one-fourth of the maximum earnable compensation for the rank of Police Employee or Fire Employee, as the case may be as of the earlier of (i) the date of the Member's death or (ii) June 30, 2014; provided that if there are more than two such surviving children under Age eighteen years, each such child's Pension shall be an equal share of one-half of such maximum earnable compensation.  Upon the death, marriage, adoption, or Attainment of Age eighteen years of any such child his or her Pension shall terminate and there shall be a redistribution by the Board of Trustees to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's Pension exceed one-fourth of the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

(d)     If there is no surviving spouse and if there are no children under Age eighteen years surviving such deceased Member and if he or she leaves surviving either a father or mother or both, whom the Board of Trustees shall find to be actually dependent upon such Member for financial support, such dependent father and mother shall each receive a Pension of one-sixth of the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

(e)     If a Member dies intestate, without having designated a person or persons, as provided in sub-section (a) of this section, and without heirs, the amount of his or her Accumulated Contributions in the Annuity Savings Fund, not to exceed a reasonable sum, to be determined by the Board of Trustees, shall be used to pay his or her burial expenses, provided he or she leave no other estate sufficient for such purpose; any balance credited to such Member in the Annuity Savings Fund, and not used for burial expenses shall remain a part of the funds of the Retirement System and shall be credited to the Pension Accumulation Fund.

(f)     If the maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be, is subsequently changed, the Pensions provided in this Section F-16 for beneficiaries of Members as defined in Article D, Section D-1(a), (b), or (c) shall be proportionately changed; provided, however, that no increases shall be made after June 30, 2014.

(g)     The maximum earnable compensation for the rank of Patrolman or Fire Fighter, as the case may be, to be used in computing the Pensions provided in this Section for beneficiaries of Members as defined in Article D, Section D-1(d) shall be the maximum earnable compensation of the rank of Patrolman or Fire Fighter as established by the City's budget for the Fiscal Year in which occurs the earlier of (i) the date of the Member's death, or (ii) June 30, 2014.

**Sec. F-17.** **Payment of Accumulated Contributions.**

If a Member, or a Member who retires after June 30, 1965, under Part B, Section F-7 of this Article F, dies and no Pension or Pensions become payable under this Component II on account of his or her death, the Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of death shall be paid to such person or persons as he or she shall have nominated by written designation duly executed and filed with the Board of Trustees. If there is no such designated person or persons surviving the said Member, his or her said Accumulated Contributions shall be paid to his or her legal representative. If such Member dies intestate, without having designated a person as above provided, and without heirs, his or her said Accumulated Contributions not to exceed a reasonable sum to be determined by the Board of Trustees, shall be used to pay his or her burial expenses, provided he or she leaves no other estate sufficient for such purpose; and any balance credited to such Member in the Annuity Savings Fund not so used for burial expenses shall be transferred to the Survivors Benefit Fund.

**Sec. F-18.** **Allowances to surviving spouses.**

Upon the death of a Member, or a Member who retires after June 30, 1965, under Part B, Section F-7 of this Article F, and such death is found by the Board of Trustees not to have resulted from the performance of his or her duty, the applicable Retirement Allowances provided in paragraphs (a), (b), (c) and (d) of Section F-1 shall be paid from the Survivors Benefit Fund, to the extent of available funding, and shall be subject to paragraphs (e), (f) and (g) of Section F-1.

(a)     His or her surviving spouse shall receive a Retirement Allowance computed in the same manner in all respects as if the said Member had (1) regularly retired on the earlier of (i) the day preceding the date of his or her death, or (ii) June 30, 2014, notwithstanding that he or she might not have acquired twenty-five years of creditable service, in the case of a Member as defined in Article D, Section D-1(a), (b), or (c), or notwithstanding that he or she might not have acquired twenty-five years of service or more and had not attained age fifty-five, in the case of a Member as defined in Article D, Section D-1(d); (2) elected Option 2 provided for in Part H of this Article F; and (3) nominated his or her surviving spouse as joint Beneficiary; provided, that in no case shall the Retirement Allowance payable to such joint Beneficiary be less than twenty per cent of said Member's Average Final Compensation as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014. If a Member who had less than twenty-five years of creditable service dies prior to July 1, 2001, the Retirement Allowance payable to the surviving spouse shall be terminated in the event the surviving spouse remarries.

(b)     His or her unmarried child or children under Age eighteen years shall each receive a Retirement Allowance of one-seventh of the annual maximum earnable compensation of the rank of a Patrolman or a Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014; provided, that if there are more than two such children, each child shall receive a Retirement

Allowance of an equal share of two-sevenths of said annual maximum earnable compensation. Upon any such child's adoption, marriage, death or Attainment of Age eighteen years, whichever occurs first, his or her Retirement Allowance shall terminate, and there shall be a redistribution by the Board of Trustees to the deceased Member's remaining eligible children under Age eighteen years; provided, that in no case shall the Retirement Allowance payable to any such child exceed one-seventh of the said annual maximum earnable compensation.

(c) If, at the time of the said Member's death, there shall be neither a surviving spouse nor children eligible for a Retirement Allowance provided for in this Section F-18, each of his or her parents shall receive a Retirement Allowance of one-seventh of the annual maximum earnable compensation of a Patrolman, or a Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, and (ii) June 30, 2014; provided, that the Board of Trustees finds that such parent was dependent upon the said Member for at least fifty per cent of his or her financial support. Upon the remarriage of any such parent, his or her Retirement Allowance shall thereupon terminate.

(d) In the event all the Retirement Allowances, provided for in this Section F-18, payable on account of the death of a Member, terminate before there has been paid an aggregate amount equal to the said Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of death, the difference between his or her said Accumulated Contributions and the said aggregate amount of Retirement Allowances shall be paid to such persons as the said Member shall have nominated by written designation duly executed and filed with the Board of Trustees. If there are no such designated person or persons surviving the said Member such difference, if any, shall be paid to his or her legal representative.

(e) In no case shall any Retirement Allowance be paid under this Section F-18 on account of the death of a Member if any benefits are paid under Part D of this Article F on account of his or her death. The Retirement Allowance provided for in this Section F-18 shall be subject to Part I of this Article F.

(f) All benefits provided in this Part E for Beneficiaries of Members as defined in Article D, Section D-1(a), (b), or (c) shall be based on the maximum earnable compensation of the rank of Patrolman or Fire Fighter, as the case may be determined as of the earlier of (i) the Member's date of death, or (ii) June 30, 2014. If a Member died before July 1, 2014 and the compensation of such rank shall be changed prior to July 1, 2014, the benefits provided shall be changed proportionately. All benefits provided in this Part E for Beneficiaries of Members as defined in Article D, Section D-1(d) shall be based on the maximum earnable compensation of the rank of Patrolman or Fire Fighter as established in the City's budget for the year of the earlier of (i) the Member's death or (ii) June 30, 2014.

(g) In the event a Member has withdrawn his or her Accumulated Contributions from the Annuity Savings Fund and has not returned in full all amounts due the fund by him or her, the survivors benefits provided in paragraphs (a), (b), (c) and (d) of this Section

shall be reduced to the proportion that the Member's Accumulated Contributions standing to his or her credit in the Annuity Savings Fund, at the time of his or her death bears to the amount his Accumulated Contributions would have been had he or she not made a withdrawal from the Annuity Savings Fund.

**Part F — Termination of Membership Otherwise than
by Retirement, Death or Becoming a Beneficiary.**

**Sec. F-19.      Payment of benefits.**

If the membership of a Member as defined in Article D, Section D-1(a), (b), or (c) shall terminate for any reason other than retirement, his or her becoming a Beneficiary, or death, the Member shall be paid the Accumulated Contributions standing to the credit of his or her individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a Member eligible for retirement shall resign or be dismissed from service, the Board of Trustees, on the written petition of such Member filed within one year from his or her separation from service and prior to the withdrawal of his or her Accumulated Contributions in the Annuity Savings Fund, shall grant such Member service retirement benefits computed in accordance with Article F, Part A, Section F-2(a), subject to the provisions of Part G of this Article F.

**Sec. F-20.      Payment of benefits.**

If the membership of a Member as defined in Article D, Section D-1(d) shall terminate for any reason other than retirement, his or her becoming a Beneficiary or death, he or she shall be paid the Accumulated Contributions standing to the credit of his or her individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a Member having twenty-five or more years of service and having attained age fifty-five shall resign or be dismissed from service, the Board of Trustees, on the written petition of such Member filed within one year from his or her separation from service and prior to the withdrawal of his Accumulated Contributions in the Annuity Savings Fund, shall grant such Member service retirement benefits computed in accordance with Article F, Part A, Section F-2(b), subject to the provisions of Part G of this Article F.

**Sec. F-21.      Deferred vested benefits.**

A Member (i) whose employment is terminated before August 28, 2003 and who is credited with eight or more years of creditable service and has attained Age forty, or (ii) whose employment is terminated after August 27, 2008 and who is credited with ten or more years of creditable service, but in each case less than twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service shall be eligible to receive a full Retirement Allowance under Component II beginning on the date upon which the Member would have been eligible to commence a full Retirement Allowance had he or she continued in the service of the City until such date. Alternatively, such Member may elect to receive an actuarially reduced early Retirement Allowance at any time following his or her termination of employment with the City.

**Part G — Conviction of Felony.**

**Sec. F-22.      Forfeiture of rights.**

If a Member or retiree as defined in Article D, Section D-1(a), (b), (c) or (d) shall be convicted of by a court of competent jurisdiction or enters a nolo contendere plea accepted by a court for a felony against the City arising out of his or her service as an employee of the City and while a Member of the Retirement System, the court may order the forfeiture of all or a portion of the rights of the Member to benefits hereunder, except the return of his or her Accumulated Contributions, as provided in the *Public Employee Retirement Benefits Forfeiture Act, MCL 38.2701, et. seq.* In such case, the Retirement System shall pay to an individual, if any, who would otherwise be a Beneficiary of the Member or retiree whose retirement benefit is being forfeited under this Section F-22 an Actuarially Equivalent monthly retirement allowance at the Age that the Member or Retiree would have become eligible for unreduced retirement benefits under the Retirement System.

## Part H — Option Elections.

**Sec. F-23.      Generally.**

(a)      Prior to the first payment of any Retirement Allowance normally due, except a disability Pension payable under Part B, Sections F-8 and F-11 of this article, a Member may elect to receive his or her Retirement Allowance as a Straight Life Retirement Allowance payable throughout the Member's life; or the Member may elect to receive the Actuarial Equivalent, as of the date of the Member's retirement, of his or her Straight Life Retirement Allowance in a reduced Retirement Allowance payable throughout the Member's life and nominate a joint Beneficiary, in accordance with the provisions of Options 1, 2, 3, 3(A) or 3(B) as follows:

(1)      OPTION 1. *Cash Refund Annuity.* Under Option 1, a Member will receive a reduced Retirement Allowance. If a Member who selected Option 1 dies before full payment of the Annuity has been received, the person or persons nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees shall receive in a single payment the difference between the present value of the Member's Annuity on the date the Member retired, minus the amount of Annuity payments already paid to the Member. If there is no such designated person(s) surviving the retired deceased Member, such difference, if any, shall be paid to the Member's legal representative.

(2)      OPTION 2. *Joint and Last Survivorship Retirement Allowance.* Under Option 2, upon a Member's death, payment of a reduced Retirement Allowance shall be continued through the life of and paid the person having an insurable interest in the Member's life and nominated by written designation duly executed by the Member and filed with the Board of Trustees prior to the first payment of the Member's Retirement Allowance is due.

(3)      OPTION 3. *Joint and Seventy-Five Percent Survivor Allowance.* Under Option 3, upon a Member's death, payment of seventy-five percent (75%) of

the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(4)     OPTION 3(A).  *Modified Joint and Last Survivorship Allowance*.  Under Option 3(A), upon a Member's death, payment of one-half (50%) of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(5)     OPTION 3(B). *Joint and Twenty-Five Percent Survivor Allowance*. Under Option 3(B), upon a Member's death, payment of twenty-five percent (25%) of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the person having an insurable interest in the Member's life and nominated by that Member's written designation duly executed by the Member and filed with the Board of Trustees prior to the date the first payment of the Retirement Allowance is due.

(b)     The Joint and Survivor Optional Forms of Payment provided under Options 2, 3, 3(A) and 3(B) shall be made available in either the standard form or the pop-up form, as follows:

(i)     *Standard Form*. Under the Standard Form, the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

(ii)     *Pop-up Form*. Under the Pop-up Form, the reduced allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the allowance shall be changed to the amount that would have been payable had the Retiree elected the Straight Life Form of Payment.  The actuarial cost of the change in benefit shall be borne by the Member who seeks change in his or her election.

In addition, a Member may elect to have all or part of his Accumulated Contributions paid to the Member in a single sum or used to purchase an annuity contract from an insurance company of his or her choice in which case, any annuity payments attributable to such amount under the Retirement System shall not be payable from the Annuity Reserve fund but shall be the responsibility of the insurance company.  A Member's Retirement Allowance shall be reduced by the actuarial equivalent of the amount so paid or used.

(c)     This Section does not rescind any substantive rights of disability retirees from the Retirement System who retired prior to the arbitration decision regarding DPOA

members that became effective on July 1, 1995, or the arbitration decision regarding DPLSA members that became effective on June 30, 1998.

(d)     This Section does not amend any computations used to determine benefits under Part B, Sections F-8 and F-11 of this Component II, or result in an increase or decrease in such benefits.

(e)     Retirees of the Retirement System shall be entitled to change their Pension option from either Option 2, Option 3, Option 3(A) or Option 3(B) to a Straight Life Retirement Allowance after they have commenced collection of the Pension if the Member's Beneficiary predeceases the Member.  The actuarial cost of the change in benefit shall be borne by the Member who seeks change in his option election. The pop-up option shall be based upon the investment return assumption as recommended by the Plan Actuary and adopted by the Board of Trustees.

## Sec. F-24.     Disposition of surplus benefits upon death of Member and Beneficiary.

In the event a Member elected Option 2, 3, 3(A) or 3(B) provided for in Section F-23 of this Part H and both the Member and his or her designated joint Beneficiary die before there has been paid in Retirement Allowances an aggregate amount equal to his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her retirement, the difference between his or her said Accumulated Contributions and the said aggregate amount of Retirement Allowances paid shall be paid to the said retired Member's legal representative.

## Part I — Pension Offset by Compensation Benefits.

## Sec. F-25.     Generally.

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a Member, or to the dependents of a Member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the Retirement System on account of the same disability or death.  In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the Pension Reserve or benefits otherwise payable from the funds provided by the City under this Retirement System, then the present value of the commuted payments shall be deducted from the Pension Reserve, and such benefits as may be provided by the Pension Reserve, so reduced, shall be payable under the provisions of the Retirement System.

## Part J — Monthly Payments.

## Sec. F-26.     Generally.

Unless otherwise herein provided, all benefits payable under this Retirement System shall be paid in equal monthly installments.

## Part K — Re-Examination of Beneficiaries.

### Sec. F-27.    Authority of Board.

(a)     Once each year during the retirement of a Member on a disability Pension or a disability Retirement Allowance and at least once in every three year period thereafter the Board of Trustees shall require any disability retiree, if he or she would not then be eligible for a service Retirement Allowance had he or she remained in active service, to undergo a medical examination at a place to be fixed by the Board of Trustees.  If the retiree shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his or her reasonable traveling expenses. Should such disability retiree refuse to submit to such examination, his or her disability Pension or disability Retirement Allowance may be discontinued until he or she shall submit to such examination and should such refusal continue for one year, all of the Member's rights in and to a Pension may be revoked by the Board of Trustees.  If, on medical examination of a Beneficiary, the Board of Trustees determines that the retiree is physically able and capable of resuming active duty, he or she shall be restored to such duty and his or her other disability Pension or disability Retirement Allowance shall cease.  Such Member so restored to active duty shall be returned to duty in a rank or grade equivalent to or higher than the rank or grade in which he or she was serving at the time of his or her last retirement and his or her compensation shall be that provided for the rank or grade in which he or she is restored to service.  It shall be the duty of the Commissioner of Police or the Board of Fire Commissioners to restore such Member to duty forthwith.

(b)     If the Board of Trustees determines that a disabled Old Plan Member is engaged in a gainful occupation, paying more than the difference between his or her Final Compensation as of the earlier of (i) the date of disability or (ii) June 30, 2014 and his or her disability Pension, or disability Retirement Allowance, the amount of his or her Pension shall be reduced to an amount, which together with the amount earned by the Member, shall equal the amount of such Final Compensation.  If the Board of Trustees determines that a disabled New Plan Member is engaged in a gainful occupation, paying more than the difference between his or her base salary at the earlier of (i) the time of disability or (ii) June 30, 2014, increased by two and twenty-five one hundredths percent (2.25%) for each full year from the date of disability and his or her disability Pension, or disability Retirement Allowance, the amount of his or her Pension shall be reduced to an amount, which together with the amount earned by him or her, shall equal the amount of such final compensation.  Should his or her earnings be later changed, the amount of his or her Pension may be further modified in like manner.

(c)     A disability retiree who shall be reinstated to active service prior to July 1, 2014 as provided in this Section, shall from the date of such restoration again become a Member of the Retirement System, and he or she shall contribute to the Retirement System thereafter in the same manner and at the same rate as he or she paid prior to his or her disability retirement.  A disability retiree who shall be reinstated to active service after June 30, 2014, shall from the date of such restoration become an active

Member of the Retirement System and shall accrue future benefits pursuant to Component I. He or she shall contribute to the Retirement System at the rate required of active Members pursuant to Component I. Any Prior Service and Membership Service on the basis of which his or her service was computed at the time of his or her disability retirement shall be restored to full force and effect, and he or she shall be given service credit under Component I or Component II, as applicable, for the period of time he or she was in retirement due to such disability, except in the case of nonservice connected disability.

## Part L — Withdrawal of Accumulated Contributions

### Sec. F-28.     Member With Twenty or Twenty-Five Years of Service.

Effective July 1, 1982, a Member with twenty-five years or more of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) shall be allowed to withdraw either a portion or the full amount of his or her Accumulated Contributions, one time only, whether or not the Member retires. A Member shall make such election prior to the receipt of his or her first retirement benefit check.

### Sec. F-29.     Disabled Member

A Member who is receiving disability benefits (duty or non-duty) from the Retirement System and who has twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) or more of creditable service shall have the right to withdraw the full amount of his or her Accumulated Contributions. If such Member withdraws his or her Accumulated Contributions, his or her retirement benefit shall be actuarially reduced to reflect such withdrawal.

### Sec. F-30.     Optional Annuity Withdrawal

(a)     A Member shall have the right to elect to receive on the effective date of his or her service retirement a partial or total refund of his or her Accumulated Contributions. If a Member makes such an election, an Annuity payable under any Retirement Allowance or reduced Retirement Allowance shall be reduced proportionally. If the total Accumulated Contributions are withdrawn, no Annuity shall be payable.

The limitation of fifteen twenty-seconds of the maximum earnable compensation of a Police Employee and Fire Employee continues in effect. For purposes of determining the fifteen twenty-seconds limitation, a computation based on the Annuity which is an Actuarial Equivalent of the Accumulated Contributions standing to a Member's credit in the Annuity Savings Fund prior to any partial or total refund will be used.

On or after July 1, 1974, Members or former Members who are entitled to begin to receive the 40 & 8 benefit provided under Section F-6 will be entitled to the annuity refund withdrawal option.

On or after July 1, 1974, non-duty disability retirees represented by DFFA, DPCOA and DPLSA who retired pursuant to Article D, Section D-1(a), (b) or (c) prior to

having twenty-five years of service credit, shall be entitled to the annuity refund withdrawal option on the date he or she would have had twenty-five years of service credit had he or she continued as an active employee. Said option shall only apply to the balance of Accumulated Contributions, if any, remaining to such retiree's credit in accordance with the existing annuity refund provisions.

Survivor benefit beneficiaries as defined in Title IX, Chapter VII, Article VI, Part E, Section 2, parts (a), (b) and (c) of the 1918 City Charter in effect as of June 30, 1974, and continued in effect by Section 11-102 of the City Charter shall be entitled to the annuity withdrawal refund option subject to the same rules that would have been applicable to the deceased Member or Members had he or she not died. Said option shall only apply to the balance of Accumulated Contributions, if any, remaining to the applicable former Member's credit.

In any case of doubt, the Board of Trustees shall decide whether a Member or Beneficiary is entitled to an annuity refund withdrawal option.

(b)     A Member shall have the right on or after the effective date of his becoming eligible for a full service Retirement Allowance (Members who have either twenty or twenty-five years of creditable service depending upon the applicable bargaining unit) to elect to receive a partial or total refund of his or her Accumulated Contributions to the Annuity Savings Fund. If a Member makes such an election, an Annuity payable under any Retirement Allowance or reduced Retirement Allowance shall be reduced proportionally. If the total Accumulated Contributions are withdrawn, no Annuity shall be payable.

If a Member makes such an election, the Retirement Allowance shall be reduced to reflect the value of the Annuity withdrawn. The amount of the Annuity at the time of such election shall be the amount used at the time of retirement for purposes of computing the Retirement Allowance.

All members (except DPOA members retiring prior to July 1, 1982) who complete their required years of service, shall have the right to withdraw all or part of their Accumulated Contributions whether they choose to retire or not.

Effective July 21, 2000 for DFFA members having a parity relationship with the DPOA and for the DPCOA Inspector, and effective July 1, 2003 for DPLSA members, and effective July 21, 2000 for DPOA members, a Member who has elected to retire and elected to withdraw his or her Annuity for the purposes of calculating his or her Retirement Allowance (thereby lowering the Retirement Allowance), may nevertheless choose to leave the Annuity in the Retirement System collecting regular annuity interest with the option of a one-time withdrawal of the Annuity funds at a later date.

For a DPCOA, DPLSA or DFFA member or an employee with a parity relationship with the DPLSA and for the DPCOA Inspector who retires on or after July 1, 1990, and who has made or makes an election to receive a total or partial refund of his or

her accumulated contribution to the Annuity Savings Fund, there shall be no reduction of Retirement Allowances due to the portion of withdrawal representing interest credits. For members of DFFA and DPLSA, this Subsection shall be controlled by the requirements of the Act 312 arbitration award issued June 25, 1990 (MERC Case No. B89 C-0622, page numbers 22 and 23).

Effective January 15, 2010 for members of DPCOA and fire equivalents, or December 15, 2008 for DPLSA and fire equivalents, or March 8, 2007 for DPOA members and fire equivalents, a Member who retires and elects to leave a balance in the Annuity Savings Fund shall have the option of receiving a quarterly payment of interest earnings only or to take periodic withdrawals of principal, in addition to a one time complete withdrawal. Members of DPCOA and DPLSA and their fire equivalents must make their elections a minimum of thirty days before the beginning of a quarter; quarter defined as beginning March 1, June 1, September 1, and December 1.

An employee represented by DFFA, DPCOA or DPLSA who is entitled to a Retirement Allowance under Article F, Part A, Section F-5 of the Retirement System and who leaves the employ of the Police or Fire Department of the City on or after July 1, 1982 shall have the right to elect to receive on the effective date of termination a partial or total refund of his Accumulated Contributions. The Pension portion of his Retirement Allowance shall be computed as if the Member had not withdrawn his or her Accumulated Contributions from the Annuity Savings Fund until the date he or she was eligible to retire had he or she continued in City employment.

(c)     Effective in accordance with the specific date and terms of the DPOA award in Act 312 No. D98 E-0840 (Chairman Donald F. Sugerman, dated July 21, 2000), a DPOA member shall have the right to leave his or her withdrawn Annuity in the Pension system and accumulating interest, as provided therein.

## ARTICLE G.  METHOD OF FINANCING.

**Sec. G-1.      General.**

The funds of the Retirement System shall be the Annuity Savings Fund, Annuity Reserve Fund, Pension Accumulation Fund, Pension Reserve Fund, Expense Fund and the Survivors Benefit Fund.

**Sec. G-2.      Annuity Savings Fund.**

(a)     The Annuity Savings Fund shall be the fund in which shall be accumulated at Regular Interest, the contributions deducted from the compensation of Members to provide for their Annuities.  Subject to Section B-1(c), the contributions of a Member as defined in Article D, Section D-1(a), (b) or (c) shall be five percent of a Member's compensation until the Member has acquired twenty-five years of creditable service.  Subject to Section B-1(c), the contribution of a Member as defined in Article D, Section D-1(d) shall be five percent of his or her compensation until he or she has acquired at least twenty-five years of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) and attained age fifty-five.  No Member shall have the option of choosing to receive the compensation required to be contributed hereunder directly instead of having such amounts paid by the City to the Annuity Savings Fund.

(b)     The City shall cause the contributions provided for in paragraph (a) above to be deducted from the compensation of each Member on each and every payroll, for each and every payroll period, from the date of his or her entrance in the System to the earlier of (i) the date he or she ceases to be a Member or (ii) the last payroll date occurring in July 2014.

(c)     The deductions provided for herein shall be made notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby.  Every Member shall be deemed to consent and agree to the deductions made and provided for herein, and payment of his or her salary or compensation, less said deduction, shall be a full and complete discharge and acquittance of all claims and demands whatsoever for the services rendered by such person during the period covered by such payments, except as to the benefits provided under this Retirement System.  The amounts to be deducted shall be deducted by the City Treasurer and when deducted shall be paid into the Annuity Savings Fund and shall be credited to the individual account of the Member from whose compensation said deduction was made.

(d)     If, under the provisions of this Component II, any person shall withdraw or be paid any part or all of his Accumulated Contributions and shall thereafter again become a Member on or before June 30, 2014, he or she shall, in addition to the contributions provided for in paragraph (a) above, redeposit in the Annuity Savings Fund, by an increased rate of contribution to be determined by the Board of Trustees, or by a single payment, such amount that his or her Accumulated Contributions at the date of

his or her eligibility for retirement will be the same amount it would have been had no withdrawal or payment been made therefrom.

(e)    Except as is otherwise provided in this Component II, upon the death or retirement of a Member, his or her Accumulated Contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund.

(f)    In any Plan Year during the period beginning on or after July 1, 2014 and ending June 30, 2023 in which the annual rate of return credited to the accounts of Members investing in the Annuity Savings Fund as provided in paragraph (a) is less than the actual rate of return net of expenses of the Retirement System's invested assets for the second Plan Year immediately preceding the Plan Year in which the annual rate of return is credited ("ASF Return Excess"), an amount equal to the value of the ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component I of the Combined Plan and shall be used to fund the Transition Cost relating to Component I  The Transition Cost is a measure of the liability that Component I of the Retirement System has at its inception; due to the fact that at its inception, Members in Component I of the Retirement System receive vesting and eligibility credit under Component I for service that was earned prior to July 1, 2014 and is otherwise credited to Members under Component II of the Retirement System, as such Transition Cost is calculated by the Plan Actuary.  In the event there is an ASF Return Excess for a Plan Year following the Plan Year in which such transfers have fully funded the Transition Costs relating to Component I, fifty percent (50%) of such ASF Return Excess shall be transferred to the Pension Accumulation Fund maintained under Component II and the remaining fifty percent (50%) of such ASF Return Excess shall be transferred to Component I and credited to the Rate Stabilization Fund maintained under Component I.  "Transition Cost" shall be determined by the Plan Actuary.

## Sec. G-3.    Annuity Reserve Fund.

The Annuity Reserve Fund shall be the fund from which shall be paid all Annuities payable as provided in this Component II, except Annuities which are payable from the Survivors Benefit Fund.  Should a disability retiree be restored to active service, his or her Annuity Reserve at the time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his or her individual account therein.

## Sec. G-4.    Alternative Financing Method.

Except as provided regarding the Survivors Benefit Fund, the Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Pensions and other benefits payable from contributions made by the City, and from which transfers shall be made as provided in this section.

(a)    *Accrued Liability Fund*. Pursuant to *Ordinance No. 05-05*, which authorized the creation of the Detroit Police and Fire Retirement System Service Corporation, the City entered into a transaction ("the Pension Funding Transaction") to obtain funds as

an alternative to those available through the traditional funding mechanism described in Section G-5. The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transaction, as described below) that were deposited into the Retirement System will be termed the "Funding Proceeds." The Funding Proceeds were deposited into a new Fund in the Retirement System called the Accrued Liability Fund. The purpose of the Funding Proceeds is to fund all or part of the heretofore unfunded accrued liabilities ("UAAL") of the Retirement System. The Funding Proceeds are the assets of the Retirement System and will be applied, together with all other assets of the Retirement System, to fund the Retirement System's obligation to pay accrued benefits, as adjusted in the Plan of Adjustment.

This Accrued Liability Fund shall contain only the Funding Proceeds of the Pension Funding Transaction, and any earnings thereon. Prior to Fiscal Year 2013, funds were transferred each Fiscal Year (or monthly portion thereof) from the Accrued Liability Fund to the Pension Accumulation Fund as provided in the documents governing the Retirement System, including *Ordinance No. 5-05*.

(b)     As soon as practicable following the effective date of the Plan of Adjustment, any amounts remaining credited to the Accrued Liability Fund shall be transferred to the Pension Accumulation Fund and the Accrued Liability Fund shall cease to exist.

**Sec. G-5.        Contributions to and payments from Pension Accumulation Fund.**

Contributions to and payments from the Pension Accumulation Fund shall be made as follows:

(a)     For Fiscal Years commencing prior to July 1, 2014, upon the basis of such assumptions as to future financial experiences as the Board of Trustees shall from time to time adopt, the Actuary annually computed the City's contribution, expressed as a percent of active Member contributions, to provide the Pension Reserves covering the Pensions or other City-financed benefits to which Members might be entitled or which might be payable at the time of their discontinuances of City employment; provided, such contribution percents shall not be less than amounts which, expressed as percents of active Member compensation will remain level from generation to generation of Detroit citizens.   Upon the retirement or death of a Member, the Pension Reserve for any benefits payable on his or her behalf shall be transferred from the Pension Accumulation Fund to the Pension Reserve Fund, to the extent of there being assets in the Pension Accumulation Fund.

(b)     For Fiscal Years commencing prior to July 1, 2014, the Board of Trustees annually ascertained and reported to the Mayor and the Council the amount of contributions due the Retirement System by the City, and the Council may have appropriated and the City may have paid such contributions to the Retirement System during the ensuing Fiscal Year.   When paid, such contributions were credited to the Pension Accumulation Fund.

(c)     For Fiscal Years commencing after June 30, 2014, he City shall make contributions to the Pension Accumulation Fund only as provided in the Plan of Adjustment.

### Sec. G-6.     Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service.

Except as to the Survivor's Benefit Fund, the Pension Reserve Fund shall be the fund from which shall be paid Pensions on account of Members.  Should a disability retiree be reinstated to active service, the Member's Pension Reserve, at that time, shall be transferred from the Pension Reserve Fund to the Pension Accumulation Fund.

### Sec. G-7.     Expense Fund.

The Expense Fund shall be the fund to which shall be credited all money provided by the City, if any, to pay the administration expenses of Component II, and from which shall be paid all the expenses necessary in connection with the administration and operation of Component II.

### Sec. G-8.     Appropriations prior to July 1, 2014.

(a)     The Board of Trustees shall certify the amount of the appropriation necessary to pay to the various funds of Component II of the Retirement System the amounts payable by the City as enumerated in this Component II, according to legal budget procedure.

(b)     To cover the requirements of Component II prior to July 1, 2014, such amounts as shall have been necessary to cover the needs of Component II prior to July 1, 2014 shall be paid into the Pension Accumulation Fund and the Expense Fund by special appropriations or transfers to the Retirement System; provided, however that no transfers can be made from the Accrued Liability Fund other than the annual transfer of the scheduled amortizing amount, or transfers under special circumstances pursuant to Section G-4 (as in effect prior to July 1, 2014).

### Sec. G-9.     Maintenance of reserves.

The maintenance of the Annuity Reserves in the Annuity Reserve Fund and the Pension Reserves in the Pension Reserve Fund are hereby made obligations of the Pension Accumulation Fund. All income, interest, and dividends derived from deposits and investments authorized by this Component II, which are not required for the allowance of interest to the funds of the Retirement System as provided herein, shall be credited to the Pension Accumulation Fund. Prior to July 1, 2014, the moneys credited to the Accrued Liability Fund were credited to the Pension Accumulation Fund only to the extent authorized pursuant to the terms of the Retirement System as in effect prior to July 1, 2014.  Any contributions by the City to the System from any fund impressed by law with a certain and definite purpose shall be accounted for separately.

### Sec. G-10.     Survivors Benefit Fund.

(a)     The Survivors Benefit Fund shall be the fund in which shall be accumulated, at Regular Interest, the reserves for survivors benefits provided for in Article F, Part E, Section F-18, hereof, and from which such benefits shall be paid, but only to the

extent sufficient assets are credited to the fund at the time a claim for benefits is made. In the event there are insufficient assets credited to the Survivor's Benefit Fund to pay the benefits provided under this Section G-10, such benefits thereafter shall be payable from the Pension Reserve Fund.

(b)     After June 30, 1965 and prior to July 1, 1986, each Member shall contribute to the Survivors Benefit Fund one per cent of his or her compensation paid by the City until he or she has acquired twenty-five years of creditable service. The City shall cause the said contributions to be deducted from the Member's compensation, on each and every payroll, for each and every payroll period so long as he or she remains a Member and has not acquired twenty-five years of creditable service. Each and every Member shall be deemed to consent and agree to the said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of the said Member's Accumulated Contributions, nor be subject to refund.

(c)     Each Member who retires after June 30, 1965, under Part B, Section F-7 of Article F shall, prior to July 1, 1986, contribute to the Survivors Benefit Fund one per cent of his or her final compensation as defined until he or she would have had a total of twenty-five years of creditable service had he or she continued in active service. The Retirement System shall cause the said contribution to be deducted from the Pension of each such retired Member on each and every retirement roll, for each and every retirement roll period, so long as he or she is receiving a Pension under Part B, Section F-8(a) of Article F. Each and every such retired Member who is receiving a Pension under Part B, Section F-8(a) of Article F shall be deemed to consent and agree to said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of said Member's Accumulated Contributions, nor be subject to refund.

(d)     Effective July 1, 1986, the contributions, required by Article G, Section G-10(b) and G-10(c), to the Survivors Benefit Fund were eliminated for union members. For Fiscal Years ending prior to July 1, 2014, the City shall make the contributions necessary to maintain the benefit level by contributing that amount necessary to replace the contributions of members of DFFA and DPOA to the Survivor's Benefit Fund.

(e)     For Fiscal Years ending prior to July 1, 2014, upon the basis of such mortality and other tables of experience, and Regular Interest, as the Board of Trustees shall from time to time adopt, the Actuary shall annually compute the liabilities for benefits being paid from the Survivors Benefit Fund. The Board of Trustees shall report to the Mayor and the Council the amount of contributions to be made by the City to the Survivors Benefit Fund, and the Council shall appropriate and the City shall pay such amount to the Retirement System during the ensuing Fiscal Year. When paid, such appropriations shall be credited to the Survivors Benefit Fund. For Fiscal Years commencing prior to July 1, 2014, if the balance in the fund is not sufficient to fully cover the liabilities so computed, the City shall appropriate and pay, in the ensuing Fiscal Year, the amount of such insufficiency. For Fiscal Years commencing on and

after July 1, 2014, the City shall not make any contributions to the Survivor's Benefit Fund.

(f)    Upon the death of a Member, on whose account survivors benefits become payable as provided in Article F, Part B, Section F-8, hereof, his or her Accumulated Contributions standing to his or her credit in the Annuity Savings Fund at the time of his or her death shall be transferred from the Annuity Savings Fund to, and shall become a part of, the Survivors Benefit Fund, notwithstanding any provisions in this Component II to the contrary.

### Sec. G-11. Computation of Annuity and Pension Reserve liabilities for Members, Retirees and Beneficiaries.

In computing the Annuity and Pension Reserve liabilities for Members, retirees and beneficiaries, the Board of Trustees shall cause the following annual Decrement Probabilities, Salary Factors and interest assumption to be used.

(a)    The annual Decrement Probabilities and Salary Factors to be used in evaluating the Annuity and Pension liabilities for Members shall be as shown in Tables 1 and 2 hereinafter set forth.

(b)    The total of active Member annual compensation shall be assumed to increase three percent per annum, compounded annually.

(c)    The mortality assumption for retirees and beneficiaries shall be the mortality rates contained in the 1971 group annuity male mortality table, without setback for men and set back five years for women.

(d)    The investment return assumption shall be five percent per annum, compounded annually, for Fiscal Years commencing prior to July 1, 2014.

(e)    For Fiscal Years commencing on or after July 1, 2014, the Annuity and Pension Reserve liabilities shall be calculated in a manner which is consistent with the Plan of Adjustment.

**TABLE 1.**

**City of Detroit Policemen and Firemen
Retirement System
Active Member Annual**

**Probabilities
and Salary Factors**

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 18 | .04120 | .00098 | .10561 |
| 19 | .04090 | .04099 | .11327 |
| 20 | .04030 | .00100 | .12126 |
| 21 | .04000 | .00101 | .12988 |
| 22 | .03960 | .00102 | .13913 |
| 23 | .03910 | .00103 | .14913 |
| 24 | .03890 | .00104 | .15971 |
| 25 | .03840 | .00105 | .17068 |
| 26 | .03800 | .00107 | .18204 |
| 27 | .03700 | .00108 | .19347 |
| 28 | .03600 | .00111 | .20527 |
| 29 | .03480 | .00113 | .21712 |
| 30 | .03340 | .00117 | .22916 |
| 31 | .03200 | .00121 | .24124 |
| 32 | .03000 | .00126 | .25321 |
| 33 | .02730 | .00133 | .26522 |
| 34 | .02370 | .00143 | .27753 |
| 35 | .01990 | .00154 | .29015 |
| 36 | .01500 | .00168 | .30306 |
| 37 | .01160 | .00184 | .31637 |
| 38 | .00850 | .00204 | .32995 |
| 39 | .00600 | .00227 | .34405 |
| 40 | .00390 | .00252 | .35851 |
| 41 | .00210 | .00281 | .37333 |
| 42 | .00090 | .00313 | .38861 |
| 43 | .00000 | .00348 | .40435 |
| 44 | .00000 | .00387 | .42051 |
| 45 | .00000 | .00429 | .43709 |
| 46 | .00000 | .00475 | .45395 |
| 47 | .00000 | .00526 | .47144 |
| 48 | .00000 | .00582 | .48929 |
| 49 | .00000 | .00643 | .50750 |
| 50 | .00000 | .00710 | .52639 |
| 51 | .00000 | .00783 | .54560 |
| 52 | .00000 | .00864 | .56535 |

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 53 | .00000 | .00953 | .58548 |
| 54 | .00000 | .01051 | .60612 |
| 55 | .00000 | .01157 | .62711 |
| 56 | .00000 | .01270 | .64867 |
| 57 | .00000 | .01392 | .67066 |
| 58 | .00000 | .01520 | .69319 |
| 59 | .00000 | .01656 | .71610 |
| 60 | .00000 | .01802 | .73939 |
| 61 | .00000 | .01959 | .76316 |
| 62 | .00000 | .02133 | .78747 |
| 63 | .00000 | .02322 | .81211 |
| 64 | .00000 | .02526 | .83715 |
| 65 | .00000 | .02750 | .86258 |
| 66 | .00000 | .03000 | .88848 |
| 67 | .00000 | .03277 | .91514 |
| 68 | .00000 | .03584 | .94264 |
| 69 | .00000 | .03919 | .97094 |
| 70 | .00000 | .04278 | 1.00000 |

**TABLE 2.**

**City of Detroit Policemen and Firemen
Retirement System
Annual Probabilities of Age and Service
Retirement Applicable to Members
Who Are Eligible to Retire**

| Age | Probabilities of Retirement |
|-----|------------------------------|
| 45 | 25% |
| 46 | 25 |
| 47 | 25 |
| 48 | 25 |
| 49 | 25 |
| 50 | 25 |
| 51 | 25 |
| 52 | 25 |
| 53 | 25 |
| 54 | 20 |
| 55 | 20 |
| 56 | 15 |
| 57 | 10 |
| 58 | 15 |
| 59 | 30 |
| 60 | 100 |

**Sec. G-12.      Determination of City's annual contribution — Disability Pension liabilities.**

For Fiscal Years commencing prior to July 1, 2014, the City's annual contribution, expressed as a percent of active Member compensation, to finance disability Pensions shall be determined by dividing the average of the Pension Reserve liabilities for disability retirements incurred, during the three Fiscal Years ending with the date of the valuation by one percent of the active Members' annual compensation used in the valuation.

**Sec. G-13.      Determination of City's annual contribution — Death Pension liabilities.**

For Fiscal Years commencing prior to July 1, 2014, the City's annual contribution, expressed as a percent of active Member compensations, to finance death-in-service Pensions shall be determined by dividing the average of the Pension reserve liabilities for death-in-service claims incurred during the three Fiscal Years ending with the date of the valuation by one percent of the active Member's annual compensations used in the valuation.

**Sec. G-14.    Determination of City's annual contribution — Actuarial evaluation of annuity and Pension Reserve liabilities.**

The Annuity and Pension Reserve liabilities for Members, retirees and beneficiaries shall be actuarially evaluated as set forth in this Article G and the Plan of Adjustment.

**Sec. G-15.    Determination of City's annual contribution — Service Pension liabilities for Fiscal Years commencing prior to July 1, 2014.**

(a)    The service Pension liabilities for Members shall be determined using the entry age-normal cost method of actuarial valuation.

(b)    The City's annual contribution, expressed as a percent of active Member compensations, to finance the prospective service Pension liabilities shall be determined by dividing the total of the individual annual normal costs of the active Members by one percent (1%) of the active Members' annual compensation used in the valuation.

(c)    The City's annual contribution, expressed as a percent of active Member compensation, to finance any unfunded Accrued Service Pension liabilities, including instances in which assets exceed liabilities, shall be determined by dividing such unfunded Accrued Service Pension liabilities by one percent (1%) of the present value of future compensation payable during a period of future years. Such period of future years shall be thirty years for the actuarial valuation as of June 30, 1974, decreasing one (1) year at each subsequent June 30th until a twenty year period is reached, which twenty year period shall be used in each subsequent actuarial valuation until June 30th, 2004 when the period shall again be thirty years.

**Sec. G-16.    Board of trustees to compute City's annual contribution.**

Based upon the provisions of this Article, including any amendments, the Board of Trustees shall compute the City's annual contributions for Fiscal Years commencing prior to July 1, 2014, expressed as a percent of active Member compensation, to the Retirement System for the Fiscal Year beginning July 1, 1975, using actuarial valuation data as of June 30, 1974, and for each subsequent Fiscal Year prior to July 1, 2014 using actuarial valuation data as of the June 30th date which date is a year and a day before the first day of such Fiscal Year. The Board shall report to the Mayor and to the City Council the contribution percents so computed, and such contribution percents shall be used in determining the contribution dollars to be appropriated by the City Council and paid to the Retirement System. For each Fiscal Year beginning July 1, 1975 and each Fiscal Year thereafter and prior to July 1, 2014, such contribution dollars shall be determined by multiplying the applicable contribution percent for such Fiscal Year by the Member compensation paid for such Fiscal Year; provided that for the one Fiscal Year beginning July 1, 1975 and ending June 30, 1976, such Member compensation so used shall not exceed 106.09 percent of the active Members' annual compensation used in the actuarial valuation determining such contribution percent.

**Sec. G-17.        Refunds for certain Members.**

Effective July 1, 1974, a Member who holds the rank of police inspector and above and who is not covered by a collective bargaining agreement shall, notwithstanding any other provisions of Component II to the contrary, have the right to elect to receive on the effective date of his or her service retirement a partial or total refund of his or her Accumulated Contributions. Effective as of March 8, 2007, a DPOA and fire equivalent retiree who elects not to withdraw his or her Accumulated Contributions as of the effective date of his or her service retirement shall have the option of receiving a quarterly payment of interest credited to his or her Accumulated Contributions or to receive periodic withdrawals of the contributions such Retiree made to Component II of the Retirement System.  If a Member makes such an election, an Annuity payable under any Retirement Allowance or reduced Retirement Allowance shall be reduced proportionately.  If the total Accumulated Contributions are withdrawn no Annuity shall be payable with respect to such withdrawn amounts.

**Sec. G-18.        Employer Contribution**

Effective January 1, 1987 for members of DFFA and DPLSA or upon issuance of the 1986-89 Act 312 Award for members of DPOA, the employee contributions to the Annuity Fund, although designated as employee contributions, shall be paid by the City in lieu of contributions by the Employee.  The Employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the City to the Annuity Fund. There shall be no additional contribution expense to the City, and the amounts so contributed by the City on behalf of the Employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the Employee until these amounts are distributed or made available to the Employee.

This provision shall not affect the amount or benefit level of the Retirement Allowance, or the City's obligation with respect thereto.

# ARTICLE H.  MISCELLANEOUS.

**Sec. H-1.        Recall of Retirees during emergencies.**

During an emergency declared by the Commissioner of Police or the Board of Fire Commissioners, the Commissioner or the Board of Fire Commissioners, as the case may be, shall have power, with the consent of a Retiree, to recall to active duty a Retiree for such period of service as the commissioner or the Board of Fire Commissioners shall deem advisable; provided, however, that the foregoing power shall not apply in the case of a Retiree who has reached the age of sixty-four years, and provided further, that any Retiree so recalled may, at any time, separate from active duty on his or her own application or by order of the Commissioner or the Board of Fire Commissioners.  A Retiree so recalled shall serve in the rank at which he or she retired, or a higher rank, and shall receive the pay of such rank without deduction.  On subsequent separation from active duty, such Retiree shall resume the Retiree status held by him prior to such recall.

# ARTICLE I.  DEFERRED RETIREMENT OPTION PLAN.

**Sec. I-1.        General provisions.**

For periods on and after July 1, 2014, the Deferred Retirement Option Plan ("DROP") Program under Component II shall be available to Members who are covered by collective bargaining agreements with the City that permit such Members to participate in the DROP program and non-union executives of the Police Department and the Fire Department.

(a)        In lieu of terminating employment and accepting a Retirement Allowance under the Component II, any Member of the Retirement System who is eligible for the DROP program and who is eligible to immediately receive a twenty-five year (or twenty year) Retirement Allowance may elect to participate in the DROP program and defer the receipt of his or her Retirement Allowance in accordance with the provisions of this Article I.  Any such election shall be irrevocable.

(b)        Participation in the DROP program for Members for who elected to participate in the DROP program prior to July 1, 2014 shall be limited to ten years.  Participation for Members who elect to participate in DROP program after June 30, 2014 shall be limited to five years.  At the end of such five (or ten) year period of participation in the DROP program, the Member shall be retired from employment.

**Sec. I-2.        Conversion to Retirement Allowance**

Upon the effective date of a Member's participation in the DROP program, the Member shall cease to accrue a Retirement Allowance under Component I and shall elect a form of payment for his Retirement Allowance pursuant to Part H of Article F.  Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable Pension Improvement Factor (Escalator) increases) that would have been payable, had the Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the Board.

**Sec. I-3.        Investment of DROP assets**

(a)        ING was previously selected by the Board as the DROP administration and investment entity for Members who elect to participate in the DROP program.  ING shall continue to be the DROP administration and investment entity, unless and until such time as the Board terminates the agreement with ING as provided in paragraph (d) or determines that it is administratively feasible for the DROP program to be administered and invested under the Retirement System.

(b)        As soon as possible after July 1, 2014, the Board shall determine whether it is administratively feasible for the DROP program to be administered and the assets in DROP accounts to be invested under the Retirement System. If the Board determines that it is feasible to administer the DROP program under the Retirement System, the Board shall promptly take appropriate steps to implement such decision.

(c)     If amounts credited to DROP accounts are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees. A Member's DROP account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(d)     The Board of Trustees entered into an administrative services agreement with ING. Such agreement shall remain in effect until such time as it is terminated by the Board as provided therein.

(e)     The Board of Trustees may replace ING with a trust type vehicle or the Board may determine that amounts subject to a DROP election will be invested with Retirement System assets as provided above.

(f)     Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from their DROP Accounts.

## Sec. I-4.     Distribution of amounts credited to DROP Account

A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City. Upon termination of employment, a Member who is a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP Account equal to the amount then credited to the DROP Account or an annuity based upon the amount credited to his DROP Account. In addition, one hundred percent (100%) of the Member's monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) shall commence to the Member in accordance with the form of payment selected by the Member at the commencement of his or her participation in the DROP program. Termination of employment includes termination of any kind, such as resignation, retirement, discharge or disability.

## Sec. I-5.     Death of Member while participating in the DROP program

If a Member dies while participating in the DROP program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate; provided, notwithstanding anything to the contrary herein, the Member's adjusted DROP Account balance under Component II upon the Member's death while participating in the DROP program shall not be less than total system DROP payments into his or her account (not including earnings and losses). In addition, one hundred percent (100%) of the Member's Retirement Allowance (together with any applicable variable Pension Improvement Factor (Escalator) increases) that would have been paid to the Member but for the Member's decision to participate in the DROP

program will be restored.  Survivor benefits, if any, shall be paid in accordance with the payment option elected by the deceased Member at the time the Member elected to participate in the DROP program.

### Sec. I-6.    Disability of Member While Participating in the DROP Program

If a Member becomes Totally Disabled while participating in the DROP program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, such Member (a) shall be immediately retired and one hundred percent (100%) of the Retirement Allowance) that would have been paid to the Member but for the Member's decision to participate in the DROP program (together with any applicable variable Pension Improvement Factor (Escalator) increases) will commence in accordance with the payment option selected by the Member at the commencement of the Member's participation in the DROP program as provided in Section I-2, and (b) shall be entitled to receive payment of the funds in his DROP Account (in the form of a lump sum or other form of payment described in Part H of Article F). Such Member shall not be entitled to disability retirement benefits under Article F hereof.

### Sec. I-7.    Cost Neutrality

(a)    The DROP program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(b)    If the City contends that the DROP program is not cost-neutral, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP program was not in effect, the Board and the City, along with the Plan Actuary as well as an actuary appointed by the City (who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries) shall meet and confer in good faith regarding the cost.  If the Board and the City are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan Actuary and the City's actuary.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP program cost-neutral.  Upon the implementation of changes necessary to make the DROP program cost-neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City or (b) withdraw from the DROP program and resume active participation in Component I of the Retirement System.  The Board shall notify DROP participants of these changes prior to implementation.  Those DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP program (under either Component I or Component II).  Those not making either election shall remain participants in the DROP program.

(c)    In the event the DROP program cannot be changed to restore cost neutrality, it shall be discontinued and Members participating in the DROP program at that time shall have the option to either (i) retire or (ii) continue active employment with the City

and resume active participation in Component I of the Retirement System. DROP participants resuming participation in Component I of the Retirement System shall not accumulate Credited Service for the time during which such DROP participants participated in the DROP program (under Component I or Component II).

## ARTICLE J. PARTICIPANT ANNUITY SAVINGS FUND LOAN PROGRAM

### Sec. J-1. Participant Annuity Savings Fund Loan Program

A Participant Annuity Savings Fund Loan Program (Participant Loan Program) will be established and available to bargaining unit Members. Its terms will be as follows:

(a) Any loans granted or renewed shall conform to the requirements of Section 72(p) of the Internal Revenue Code. Such loan program shall be established in writing by the Board of Trustees in conformity with the terms of the Combined Plan document and applicable collective bargaining agreements, and must include, but need not be limited to the following:

    (1) The identity of the administrator of the Participant Loan Program;

    (2) A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

    (3) The procedure under the program for determining a reasonable rate of interest;

    (4) The events constituting default and the steps that will be taken to preserve plan assets.

(b) The Participant Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the Retirement System for Members. The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program. Copies of the rules shall also be made available to prospective participating Members of the Retirement System in the offices of the Retirement System.

(c) Subject to the rules and procedures established by the Board, loans may be made to Members from such Member's contributions to the Annuity Savings Fund. Former Members, spouses of Members, and Beneficiaries are not eligible to receive any loans from the Retirement System. Subject to rules and procedures established by the Board, a Member who has been in the Retirement System for twelve (12) months or more is eligible to apply for a loan. No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time. A Member who has previously defaulted on a loan under either Component I or Component II of the Combined Plan shall not be eligible for a loan from the Retirement System.

(d) A Member who has satisfied applicable rules and procedures may borrow from his or her Annuity Savings Fund account an amount, which does not exceed fifty percent (50%) of the Member's vested accumulated balance, up to fifteen thousand dollars ($15,000.00) reduced by the excess, if any, of: (1) the highest outstanding balance of loans from the Retirement System during the one (1) year period ending on the day before the date on which the loan is made (under both Component I and Component II), or (2) the outstanding balance of loans from the Retirement System on the date on

which the loan is made (under both Component I and Component II), whichever is less.  The minimum loan amount shall be one thousand dollars ($1,000.00).

(e)     In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

    (1)     Loan applications shall be in writing.

    (2)     All loans shall be memorialized by a promissory note made to the Retirement System and properly executed by the Member.

    (3)     Loan shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years.  In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period.

    (4)     Each loan granted under Component II shall be made against the assignment of the Member's entire right, title, and interest in and to the Annuity Savings Fund supported by the Member's collateral promissory note for the amount of the loan, including interest payable to the order of the Board of Trustees.

    (5)     Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among Members in its determination of interest rates on loans.  Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the Retirement System.  The loan interest rate shall be calculated in a manner that will not negatively affect the City's costs relating to the Retirement System or the return to Members.

    (6)     Loan repayments shall be suspended under this Retirement System as permitted by Section 414(u)(4) of the Internal Revenue Code.  A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

(f)     Any loans granted or renewed shall be made and administered pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

(g)     A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's account balance (provided that the interest credited shall be reduced appropriately to cover the

administrative cost of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of net investment income or part of the Member's account balance for the purpose of allocation of net investment income under Article G.

(h)     No distributions shall be made to a Member, former Member, or Beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been repaid or offset against the distributable Annuity Savings Fund account balance.

(i)     The Retirement System shall include, in its annual report to all Members, an accounting of the loan program established by this section, which contains the number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the Retirement System, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in the Fiscal Year covered the costs of administering the program.

# ARTICLE K. SPECIAL PLAN OF ADJUSTMENT PROVISIONS

**Sec. K-1.**     **Benefit Changes implemented in accordance with the terms of the Plan Of Adjustment**

Notwithstanding anything in Articles A, C, D or E to the contrary, as of the effective date of the Plan of Adjustment and during the period that ends no earlier than June 30, 2023, the following changes in benefits provided under Component II of the Combined Plan shall be implemented:

(1)     <u>Elimination or Reduction in Pension Improvement Factor (Escalator)</u>. With respect to all Pension benefits payable on or after the effective date of the Plan of Adjustment, the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be equal to 1.0125%; provided, however, that the Board and the Investment Committee shall determine on the effective date of the Plan of Adjustment and not less frequently than annually thereafter that the "Funding Conditions" as defined herein have been satisfied, and in the event that such Funding Conditions have not been satisfied then the Pension Improvement Factor (Escalator) that will be applied to the monthly Pension benefit of a Member, Retiree, surviving Beneficiary or vested former employee will be reduced in proportion to the funding which is not received by the Retirement System ("Adjusted Pension Benefit").

For purposes of this Section K-1, the term "Funding Conditions" shall mean that (i) Class 10 and Class 11 voted in favor of the Plan of Adjustment in accordance with the procedures for such vote under the Plan of Adjustment, (ii) the Plan of Adjustment is confirmed by the U.S. Bankruptcy Court, and (iii) the funds that are pledged to be contributed to the Retirement System pursuant to the terms of the State Contribution Agreement and the DIA Settlement Documents have been received.

(2)     <u>Effect of Payment Default</u>. In the event that all or a portion of the funds pledged to be contributed to the Retirement System pursuant to the terms of the DIA Settlement Agreement are not received by the Retirement System, the Board shall proportionately reduce the Pension Improvement Factor (Escalator) to be applied to the monthly Pension benefit of any retirees, surviving beneficiaries, employees and former employees to the extent of such default.

**Sec. K-2.**     **Income Stabilization Benefits**

(1)     The provisions of this Section K-2 shall become effective only if each of the Conditions Precedent (as that term is defined in the State Contribution Agreement) have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in writing executed by the Authority and the Treasurer.

(2)     Beginning not later than 120 days after the Effective Date, Component II of the Combined Plan shall pay, in accordance with this Section K-2, an annual supplemental pension income stabilization benefit ("Income Stabilization Benefit") to each Eligible Pensioner (as defined in Section G-3(5)) equal to the lesser of either (i) the amount needed to restore an Eligible Pensioner's reduced annual pension benefit to 100% of the amount of the annual pension benefit that the Eligible Pensioner received from the Retirement System in 2013; or (ii) the amount needed to bring the total annual 2013 household income of the Eligible Pensioner up to 130% of the Federal Poverty Level for 2013. The Income Stabilization Benefit as determined under this Section K-2(2) will not increase after the date on which the Income Stabilization Benefit is determined. The Income Stabilization Benefit payable to an Eligible Pensioner will terminate immediately at such time as the Eligible Pensioner ceases to qualify as an Eligible Pensioner.

(3)     To the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined in this Section K-2) in any calendar year after the first year that the Eligible Pensioner receives a benefit under this Section K-2 is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional "Income Stabilization Benefit Plus" benefit commencing as of the next following July 1.

    a.      The Income Stabilization Benefit Plus benefit for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's Pension benefit, as increased by any Pension Improvement Factor (Escalator), under Component II of the Combined Plan; or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

    b.      An Eligible Pensioner's "Estimated Adjusted Annual Household Income" for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation), less the Pension benefit paid to the Eligible Pensioner by the Retirement System in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the Adjusted Pension Benefit that is payable to the Eligible Pensioner for that year as determined under Section K-1, (iii) any pension restoration payment to the Eligible Pensioner as determined under Section K-3; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

(4)     A separate recordkeeping fund called the "Income Stabilization Fund" shall be established by the Board for the sole purpose of paying the Income Stabilization Benefits and Income Stabilization Benefits Plus to Eligible Pensioners. Any funds received by the Retirement System that is designated by the City as UTGO Bond Tax Proceeds or a contribution to the Income Stabilization Fund shall be

credited by the Board to the Income Stabilization Fund. The assets credited to the Income Stabilization Fund will be invested on a commingled basis with assets of the Retirement System and will be credited with a pro-rata portion of the earnings and losses of the Retirement System. Amounts credited to the Income Stabilization Fund may not be used for any purpose other than the payment of Income Stabilization Benefits and Income Stabilization Benefit Plus benefits to Eligible Pensioners, except as expressly provided in Section K-2(6).

(5) For purposes of this Section K-2, an "Eligible Pensioner" is a retiree or surviving spouse who is at least 60 years of age or a minor child receiving survivor benefits, each as of the effective date of the Plan of Adjustment, whose benefit will be reduced as provided in Section K-1, and who is eligible to receive Income Stabilization Benefits because (i) such individual is receiving monthly pension benefits from the Retirement System as of the effective date of the Plan of Adjustment, and (ii) such individual has a total annual household income equal to or less than 140% of the federal poverty level in 2013 (per his or her (or in the case of a minor child, his or her legal guardian's) 2013 income tax return or equivalent documentation).

　　a. An eligible individual must apply for an Income Stabilization Benefit in accordance with procedures established by the Authority and provide such substantiation of the individual's aggregate annual household income as is required by the State in its sole discretion.

　　b. The initial determination of Eligible Pensioners, and amount of the Income Stabilization Benefit payable to each Eligible Pensioner shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board. The Board, with the assistance of the Investment Committee shall be responsible for administering the Income Stabilization Fund and annually certifying to the State Treasurer that it has administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners in accordance with the terms of the State Contribution Agreement.

　　c. After the initial determination of Eligible Pensioners is made, no new individuals will be eligible to receive an Income Stabilization Benefit or an Income Stabilization Benefits Plus benefit at any time in the future.

　　d. An Eligible Pensioner will cease to be an Eligible Pensioner as of the earlier of (i) the Eligible Pensioner's death or (ii) with respect to any minor child receiving survivor benefits, the date the minor child reaches the age of 18 years.

(6) For purposes of this Section K-2, the "Federal Poverty Level" means the poverty guidelines published each year in the Federal Register by the United States Department of Health and Human Resources.

(7)     In the event that, in 2022 (provided that the State has not issued a Certificate of Default (as defined in the State Contribution Agreement) with respect to the Retirement System at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee that the assets of the Income Stabilization Fund exceed the Income Stabilization Benefits and Income Stabilization Benefits Plus benefits anticipated to be made to Eligible Pensioners by the Retirement System in the future ("Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board that all or a portion of the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Benefits payable by the Retirement System. The Investment Committee shall have the right to engage professional advisers to assist in making this determination and such expenses shall be paid by the Retirement System.

(8)     In the event that any funds remain in the Income Stabilization Fund on the date upon which there are no Eligible Pensioners under the Retirement System, such funds shall be used to fund the Adjusted Benefits payable by the Retirement System.

## Sec. K-3.     Restoration of Pension Benefits

The following rules shall govern how Pension Improvement Factor (Escalator) ("COLA") benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the confirmation order issued by the Bankruptcy court in *In Re City of Detroit, Michigan,* Case No. 13-53846. The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto. The pension restoration program shall be deemed a part of this Component II, but in the event of any conflict between the language set forth herein and the pension restoration agreement attached to and made a part of the Plan of Adjustment ("Pension Restoration Agreement"), the terms of the Pension Restoration Agreement will govern.

(1)     *Waterfall Classes.*

There will be three Waterfall Classes:

a.      Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and Beneficiaries.

b.      Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and Beneficiaries, and who are in pay status as of the end of the Fiscal Year prior to the year in which the restoration decision is made.

c.      Waterfall Class 3 – All retirees, surviving spouses, and beneficiaries in pay status and all other Members who as of June 30, 2014 are not in retirement benefit pay status.

(2)    *Restoration of Benefits Through June 30, 2023.*

a.    Each year in conjunction with the annual actuarial valuation report, the Plan Actuary will project the funded ratio of the Retirement System as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (administrative and investment), future employer contributions as set forth in the Plan of Adjustment (subject to conditions in the Plan of Adjustment), and such other actuarial assumptions as utilized by the Plan Actuary. For purposes of restoration of benefits through June 30, 2023, the Funding Target will be a 75% funded ratio, and the Restoration Target will be a 78% funded ratio, both projected to June 30, 2023. For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the Plan Actuary projects that the Funded Level as of 2023 (excluding Restoration Reserve Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 78%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest  in an amount equal to the net return on Retirement System investments but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the PFRS Pension Reserve Fund as provided herein.

b.    Actual restoration payments and restoration credits will work as follows: each year, in conjunction with the preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the Plan Actuary will determine whether there are sufficient funds in such account to restore COLA benefits in a minimum incremental amount of 10% or more. For example: if a retiree's then current COLA benefit is a 1.0% annual compounded COLA, the minimum incremental restoration would increase the COLA benefit to 1.225%. COLA restoration only will occur if the funding level in the Restoration Reserve Account can fund 100% of the COLA increase over the actuarially-projected lives of the eligible recipient Waterfall Class. If the Plan Actuary certifies that the Restoration Reserve Account as of the end of the prior Fiscal Year satisfies the required funding level for one or more increments of restoration, then in the next immediate Fiscal Year actual COLA restoration payments will be made to PFRS Waterfall Class 1 members in such increments until an amount sufficient to fund 66% of the value of their future COLA payments (e.g., a 1.5% compound COLA, or as otherwise applicable) has been funded. At that juncture, and to the

extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 2 members will receive COLA restoration, until an amount sufficient to fund 66% of the value of their future COLA payments has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), Waterfall Class 3 members will receive COLA restoration on a pro-rata basis. For Waterfall Class 3 members who are in pay status at that time of restoration, they will receive COLA payments; for active employees at the time of restoration, they will receive credits granting them a right upon retirement to receive COLA restoration equal to the 10% increments that are fully funded to Waterfall Class 3 members. For example: assume there are sufficient assets credited to the Restoration Reserve Account as of the end of a Fiscal Year to fully fund 66% of the value of the COLA for all Waterfall Class 1 and Class 2 members for their actuarially projected lives. To the extent additional assets remain in the Restoration Reserve Account to fully fund at least a 10% COLA increment for Waterfall Class 3 members for their actuarially projected lives, then (i) all retirees would receive a restoration payment of 76% of the value of their COLAs (their having already received by virtue of their membership in Waterfall Classes 1 and 2 an increase to 66% of the value of their COLAs) and also a 10% COLA increment would be credited to eligible active employees which would be included in their benefit payments upon retirement (thus causing their COLAs to increase in value from 45% to 55%). Restoration amounts actually paid from the Restoration Reserve Account will be debited from such account. Restoration payments will be calculated and paid on a prospective basis only.

c.     Once restoration payments and credits begin, as long as the Restoration Reserve Account continues to have assets to fund 100% of an incremental COLA restoration amount for such Waterfall Class for their actuarially projected lives, the restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments, falls below 100% for the second or greater increment, the annual amounts to pay such second or greater increment can continue until the Restoration Reserve Account lacks any assets to fund such additional increment. For example, assume a 10% increment in Waterfall Class 1 requires $10 million in assets to be fully funded for the Waterfall Class members' actuarially projected lives, and that based on Fiscal Year 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in Fiscal Year 2019. Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second

increment would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid). For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

d.  If the Funded Level (excluding Restoration Reserve Assets) projected to 2023 falls below 76% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected Funded Level in 2023 is 76% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net Retirement System investment returns for the Fiscal Year in question. Furthermore, if the Funded Level projected to 2023 falls below the Funding Target (i.e., 75%) then restoration payments to retirees and credits to active employees in the following year will be modified in the following manner: (1) funds previously credited to the Restoration Reserve Account will be notionally transferred and credited to the Pension Reserve Fund in sufficient amounts to restore the projected Funded Level in 2023 to 75%; (2) following such transfer, the remaining assets in the Restoration Reserve Account shall be applied to make restoration payments in accordance with and pursuant to the same mechanism described in paragraph c.

e.  In connection with preparation of the actuarial report for Fiscal Year 2023, the Plan Actuary will determine whether the Retirement System has satisfied the Permanent Restoration Target, which shall be 78%. Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers, the Funded Level as of June 30, 2023 has satisfied the Permanent Restoration Target (i.e., 78%), then the residual amounts, if any, in the Restoration Reserve Account (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes for their actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.  Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level of the Retirement System as of 2023 is less than 76%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average

annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 Funded Level to 76%.

(3)   *Restoration of Benefits from July 1, 2023 to June 30, 2033*.

    a.   If and to the extent that all COLA payments have not been restored as of June 30, 2023 pursuant to Section (2)(e), then during this period and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2033:

| 2023 Funded Level | 2033 Funding Target/Restoration Target |
|---|---|
| 78% | 81%/84% |
| 77% | 80%/83% |
| 76% | 79%/82% |
| 75% | 78%/81% |
| 74% or lower | 3% >than 2023 Funded Level %/81% |

2033 Permanent Restoration Target - Same as 2033 Restoration Target

2033 Restoration Reserve Suspension Trigger – 1% higher than the projected Funding Target for all time periods

    b.   The same rules for restoration payments that applied during the period ending June 30, 2023 shall apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers to the Pension Reserve Fund in the event the 2033 Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan Actuary shall project investment returns through June 30, 2033 using the then current investment return assumption which is assumed to be net of expenses (administrative and investment), and the then applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the Plan Actuary shall assume, merely for purposes of determining whether the Restoration Target is satisfied, that

the annual City contribution amount shall be the annual amount necessary to fund the Retirement System based upon an amortization of the actual 2023 UAAL (using the market value of assets) over 30 years (hereinafter, the "2023 UAAL Amortization") and in such manner that the resulting annual contributions would achieve the applicable Funding Target (pursuant to paragraph b) as of 2033. Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.

c.      To the extent that the City's actual contributions to the Retirement System in any of the Fiscal Years 2024 (i.e., the year ending June 20, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in the Retirement System called the Extra Contribution Account. In determining pension restoration during the period from Fiscal Year 2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected Funded Level for purposes of determining whether the Retirement System has attained the Restoration Target or the Permanent Restoration Target. To the extent that the City's actual contributions in any of the Fiscal Years 2024 through 2033 are less than the City's projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Pension Reserve Fund.

d.      Each year, in addition to the notional credit of amounts that exceed the amount necessary to satisfy the Restoration Target, existing notional Restoration Account assets will be credited with interest equal to the net return on Retirement System investments; however, such interest shall not exceed the then investment return assumption. In the event of net losses on the Retirement System's investments, the notional assets credited to the Restoration Reserve Account will be reduced to reflect such losses.

e.      In connection with preparation of the actuarial report for Fiscal Year 2033, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target (i.e., the 2033 Restoration Target). Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the funding level as of June 30, 2033 has satisfied the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and

which fully fund one or more increments of COLA restoration payments for one or more Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

f.    Following receipt of the actuarial report for 2028, and in the event that the projected Funded Level as of 2033 is less than 79%, the Plan Actuary shall revisit the restoration calculations that it made during each of the prior four (4) years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual normal course administrative expenses in the prior four (4) years applicable to Component II, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the Restoration Reserve Account than actually were transferred during such look back period, then the Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period) or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period); or (iii) the amount required to increase the projected 2033 Funded Level to 79%.

(4)    *Restoration of Benefits from July 1, 2033 to June 30, 2043.*

a.    If and to the extent that all COLA payments have not been restored pursuant to Section (3)(f) as of June 30, 2033, then during the period ending June 30, 2043 and for purposes of variable restoration, the Funding Target, the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth below, all projected as of June 30, 2043.

| 2023 Funded Level | 2043 Funding Target/Restoration Target |
|---|---|
| 78% | 84%/87% |
| 77% | 83%/86% |
| 76% | 82%/85% |
| 75% | 81%/84% |
| 74% or lower | 3% > than 2023 Funded Level %/84% |

2043 Permanent Restoration Target - Same as 2043 Restoration Target

b.  The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and the making of notional asset transfers from the Restoration Reserve Account to the Pension Reserve Fund in the event the 2043 Funded Level falls below the 2043 Funding Target) and shall be rolled forward.  For example,  for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan Actuary shall project annual contributions using the same 2023 UAAL Amortization.  For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

c.  In connection with preparation of the annual actuarial valuation report for Fiscal Year 2043, the Plan Actuary will determine whether the Retirement System has satisfied the applicable Permanent Restoration Target, as set forth in paragraph a above.  Transfers from the Restoration Reserve Account for credit to the Pension Reserve Fund may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the Funded Level as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target, then the residual amounts in the Restoration Reserve Account, if any  (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), shall be transferred from the Restoration Reserve Account and credited to the Pension Reserve Fund and the applicable incremental COLA payments shall be permanently restored for the applicable Waterfall Class and shall no longer be variable from year to year.

(5)  *Modification of the Pension Restoration Program.*

If at any time after July 1, 2026, the Investment Committee by vote of five of its seven Members, or the Board of Trustees by a greater than 66% vote, determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing the Pension Restoration Agreement attached to and made a part of the Plan of Adjustment, such that the continued operation of the Pension Restoration Agreement and this Section K-3 without amendment will: (a) materially harm the long-term economic interests of the City or Retirement System; (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities; or (c) materially hinder the Restoration Program, if as of that juncture (and for purposes of applying this subsection K-3(5)(a)) annual funding levels (excluding the Extra Contribution Account) had materially exceeded the applicable Restoration Targets for a substantial period yet

without any material actual restoration of benefits as contemplated herein having been made, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend the Pension Restoration Agreement and this Section K-3 (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to fully fund frozen liabilities is, unless the relevant facts demonstrate otherwise, presumptively reasonable). The Investment Committee and the Board shall then meet to negotiate amendments to the Pension Restoration Agreement that address the identified risk of harm or impairment, but which also considers the Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Investment Committee and Board (persons who sit on both the Board and Investment Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation.

If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation upon demand from either the Board or the Investment Committee. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall be consulted in connection with such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, *inter alia*, whether or in what manner to amend the Pension Restoration Agreement and this Section K-3.

# APPENDIX A

The following provisions shall also have general applicability to the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan:

## MCLS Const. Art. IX, § 24 (2003)

### § 24.   Public pension plans and retirement systems, obligation.

Sec. 24.  The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

## ARTICLE 11.
## RETIREMENT PLANS

**Sec. 11-101. City's Duties**.

1.      The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2.      Financial benefits arising on account of service rendered in each Fiscal Year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3.      The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

**Sec. 11-102. Continuation of Existing Plans**.

The retirement plans of the city existing when this Charter takes effect, including the existing governing bodies for administering those plans, the benefit schedules for those plans and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before unless changed by this Charter or an ordinance adopted in accordance with this article.

**Relevant Provisions of the**
**Detroit City Code**

## Sec. 47-1-2. Detroit Police and Fire Retirement System.

Notwithstanding any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of July 1, 2014, the Detroit Police and Fire Retirement System shall hereinafter be memorialized in a separate written document entitled "Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan," which shall comprise the exclusive terms of the Detroit Police and Fire Retirement System and be kept in the Office of the City Clerk for the City of Detroit.

**Collective Bargaining Agreements.**

Except to the extent otherwise provided in the Plan of Adjustment, under Michigan Law if there is any conflict between the Retirement System provisions and collective bargaining agreement provisions, the terms of the collective bargaining agreement control.

(a)    The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Officers Association with respect to police officers covered by said collective bargaining agreement.

(b)    The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association.

(c)    The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Police Command Officers Association.

(d)    The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 2014-2019 collective bargaining agreement between the City of Detroit and the Detroit Fire Fighters Association.

CLI-202256698v4

# CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Brief of the City of Detroit Regarding the City's Responsibility for the Professional Fees of the Retirement Systems was filed and served via the Court's electronic case filing and noticing system on this 21st day of November, 2014.

/s/ Heather Lennox