# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISON

CARL WILLIAMS AND HASSAN ALEEM
Creditor/Petitioners

v

In re:
City OF DETROIT, MICHIGAN
AND EMERGENCY MANAGER
KEVYN D.ORR
Debtors/Respondent

Chapter 9
Case No. 13-53846
Magistrate Judge:
Steven W. Rhodes

_____/

# SECOND VERIFIED MOTION FOR SUMMARY JUDGEMENT AND INCORPORATED BRIEF OF MAGISTRATE JUDGE STEVEN W RHODES CASE NO. 13-53846 INCLUDING NOTICE AND ORAL OPINION ON THE RECORD

NOW COMES the creditors/objectors in the above caption and herein this motion duly sworn depose and say: that we move this court under oath to the Plan of Adjustment and Confirmation of the plan, including Magistrate Judge Steven W Rhodes issued Oral Opinion on the record dated November 7, 2014 and enter for the public November 12, 2014 (see exhibit b) and move for Summary Judgment, pursuant to Federal Rule of Civil Procedures Rule 56 and show the Following:

1) There is no dispute of any material fact that the Plan of Adjustment wasn't file and conducted in good faith matter in this action.

2) It's uncontested the state filed the plan with unclean hands.

1

3) It's undisputed that the bankruptcy doesn't have a state law.

4) The emergency manager, Kevyn Orr is not an elected official.

5) The defendants/debtors have to comply with Fed. R. Civ. Proc Rule 56 (b) and 12. The Rule 56 of the Federal Rule of Civil Procedure evidence, pursuant to MCL 600.2113 statute of statutory evidence.


WHEREFORE, based upon the motion and conclusive evidence upon the verified motion and incorporated brief herein of the creditors/objectors there are no genuine issue of material facts and this case is ripe for summary judgment.

# INCORPORATED BRIEF IN SUPPORT OF SECOND VERIFIED MOTION FOR SUMMARY JUDGEMENT OF MAGISTRATE JUDGE STEVEN W RHODES CASE NO. 13-53846

## **FAILED TO BARGAIN IN GOOD FAITH**

1)     We must emphasis and agree for the record with Judge Steven W Rhodes and other reasons as well that the state through the emergency manager, Kevyn Orr didn't filed the Bankruptcy in "Good Faith:" (1) The state through their appointed contracted representative, agent, or point man has failed to even attempt to provided a financial and operational plan within 45 days after his appointment.

The Emergency Manager Kevyn Orr filed an untimely and beyond the 45 days is irrefutable and prima facie evidence. Therefore, is a violation of P.A. 436 Section 11 (2). He could have filed for an extension of time but, however failed to do so and no record of any attempt to file. State v. Burlingame 146 Mo. 207, 48 S.W. 72

b) The city position was that they was not going to bargain and did not have to because P.A. 436. Three Police Officer Unions challenged the city position not to negotiate for collective bargaining:

> As such, the Employer has no obligation to participate in Act 312 arbitration and is not required to do so. Accordingly, the arbitrations in the cases before us must be dismissed. **Case No.- D09 F-0703, D11 J-1169 and D13 A-0005.**

3

These Labor Relation cases show irrefutably and show prime facie evidence that the city failed and **refused to bargain in good faith and not at all in these cases cited above**, therefore, continue refusal to comply and meet the requirements of title 11 and these violations demand's this case to be dismissed. See exhibit A attached.

## IT'S UNDISPUTED THE STATE FILED WITH UNCLEAN HANDS

2) The State through Governor Richard Snyder, Andy Dillon the state Treasury and the Emergency Manager Kevyn Orr showed material prejudice" and "unclean hands" and a continue failure to conduct business and proceed in good faith such as: When the state withheld and refused to pay $224,000,000.00 million for January 2012, and $224,000,000.00 million for January 2013 and approximately $200,000,000.00 million for 2014 plus interest of unrestricted revenue sharing funds, thus a violation of the Michigan State Revenue Sharing Act 140 of 1971. The revenue is still owed to the City of Detroit.

a) We have repeatedly shown that this bankruptcy was not filed in good faith. The State through Emergency Manager Kevyn Orr has a peculiar way of bargaining in good faith when they deliberately refused to pay the unrestricted revenue sharing money they owed to the city of Detroit and other expenses owed by the state revealed by the formal corporation council Krystal A. Crittendon, as well as the city position not

4

to bargain at all. This is more egregious than just "good faith" also unclean hand.

The state owes this money and the governor Rick Snyder has openly stated he was not going to pay; and this is the conduct the Michigan State called good faith and then turned around and filed for Bankruptcy. What a show of arrogance and disrespect and no sense of good faith what so ever. The state through Governor Snyder who stated he was not going to pay and Andy Dillon the state treasurer, who work at the pressure of the governor Snyder; legally authorized to receive, care for and disbursement of public revenue or corporation, upon lawful order; along with Kevyn Orr all agents or officers of the state has assisted and help caused the financial problems and intentional contributory negligence on the State of Michigan.

b) It is important to understand that "even a petition filed by an entity eligible for chapter 9 reliefs is subject to dismissal "if the debtor did not file the petition in good faith." Where [....] a purported debtor's good faith is in issue, the debtor bears the burden of affirmatively demonstrating that it filed the petition in good faith." Vallejo I, 2008 WL 4146015 at 31, quoting In re Powers, 135 B.R. 980, 997 (Bankr. C. D. Cal 1991). The essence of the good faith requirement is to prevent abuse of the bankruptcy process." Vallejo I, 2008 WL 4146015 at 31, quoting In re Villages at castle Rock Metro Dist. No. 4, 145 B.R. 76, 81 (Bankr D.Col. 1990).

5

"Only a municipality may file for relief under chapter 9 for bankruptcy." The debtor in this case the city of Detroit never affirmatively or otherwise demonstrated they filed in good faith and the court lack jurisdiction Fed.R.Civ.Proc. Rule 12 b (1), (2) and (h3) and case should have been dismissed.

> Whenever it appears by suggestion of the parties or otherwise that the court lack jurisdiction of the subject matter, the court <u>shall dismiss the action. Fed R. Civ. Proc. 12 (h3).</u>

c) The state action is contrary to and just the opposite of what "bargaining in good faith" means. Bankruptcy Court may dismiss a chapter 9 petition, after notice and hearing, if it concludes the debtor did not file a petition in good faith or if the person does not meet the requirements of chapter 9 title 11 U.S.C. Section 921 (c).

## <u>IT'S UNCONTESTED THE BANKRUPTCY DOESN'T HAVE A STATE LAW</u>

3)    The state has no authority in Michigan because there is no governing authority in any statute, legal policy, regulation or any legal law of the state of Michigan. The State of Michigan doesn't have a state statute or any state law that specifically governor bankruptcy. Therefore, there is no genuine issue of material facts to address.

## <u>THE EMERGENCY MANAGER IS NOT AN ELECTED OFFICIAL</u>

4) Kevyn Orr signed a contract with governor Rick Snyder to be the emer-

6

gency manager to run the city of Detroit. Kevyn Orr is not an elected official and only an elected official can legally file for bankruptcy. To emphasis this point is un-refutable no rebuttal of any material or relevant fact and no genuine issue exist in this matter and it is ripe for Summary Judgment.

> Whenever it appears by suggestion of the parties or otherwise that the court lack jurisdiction of the subject matter, the court shall dismiss the action. Fed R. Civ. Proc. 12 (h) (3).

5) The defendants/debtors have to comply with Fed. R. Civ. Proc Rule 56 (b) and 12 (a) (A) (1) and 4(B) (b) (6) *Quinto v Cross & Peters Co, 45 Mich 358, 547 NW2d 314 (1996) Maiden v Rozwood 461 Mich 109, 121, 507 NW2d 817 (1999).*In this instance the defendants/debtors has to present or establish a genuine issue regarding any material fact, or the moving party is entitle to judgment as a matter of law. According to record none of the questions 1 thru 3 has been refuted and opposing party has agreed in according to Fed.R.Civ.P 8 (d), by their action. Fed.R.Civ Proc 56 (c) *Quinto v Cross & Peters Co, supra,; Maiden v Rozwood, supra: Celotex Corp v Catrett 477 U.S. 317, 323, (1986) Matsushita Elect Industrial Co v Zenith Radio 475 US. 547.*

b) The Respondents have twenty (20) days to respond in accordance to Fed.R. Civ. Proc 12(a)(1) (A).

WHEREFORE, and all the above facts and law that there are no genuine issues of material facts or law exist we demand justice and that this court grant summary judgment, pursuant to Fed Rule of Civ Proc. Rule 56.

We hereby certify that the statements made herein this verified motion for summary judgment are true and correct and if called to testify can and will give testimony competently, under the laws of the United States of America, to the best of our knowledge and belief, under penalty of perjury and contempt of Court under the laws of the United States of America.

Sign_____

Carl Williams
10112 Somerset
Detroit, Michigan 48224
313 521-5012

Sign_____

Hassan Aleem
2440 Taylor
Detroit, Michigan 48206
313 205-4353

STATE OF MICHIGAN
EMPLOYMENT RELATIONS COMMISSION
LABOR RELATIONS DIVISION

In the Matter of:

CITY OF DETROIT,
    Public Employer-Respondent,

        -and-                                     Case No. D09 F-0703

POLICE OFFICERS ASSOCIATION OF MICHIGAN
(EMERGENCY MEDICAL TECHNICIAN UNIT),
    Labor Organization-Petitioner.

CITY OF DETROIT,
    Public Employer-Respondent,

        -and-                                     Case No. D11 J-1169

DETROIT POLICE COMMAND OFFICERS ASSOCIATION,
    Labor Organization-Petitioner.

CITY OF DETROIT,
    Public Employer-Respondent,

        -and-                                     Case No. D13 A-0005

DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION,
    Labor Organization-Petitioner.

_____/

APPEARANCES:

Butzel Long, P.C. by Malcolm D Brown, and Miller, Canfield, Paddock and Stone, P.L.C., by John H. Willems, for Respondent

Frank A. Guido, General Counsel, for Petitioner Police Officers Association of Michigan

Sachs Waldman, P.C., by Mary Ellen Gurewitz, Marshall J. Widick, and James A. Britton for Petitioner Detroit Police Command Officers Association

*Miller Cohen P.L.C.*, by Richard G Mack, Jr., and Keith D. Flynn, for Petitioner Detroit Police Lieutenants & Sergeants Association

*Legghio & Israel P.C.*, Christopher P. Legghio for Amicus Curiae Detroit Fire Fighters Association

## DECISION AND ORDER

This matter is before the Commission on the motions of the Employer, the City of Detroit. On April 18, 2013, the Employer filed its Emergency Motion for Determination of Arbitral Jurisdiction and Dismissal of Act 312 Petitions and Motion for Stay Pending Ruling and its supporting brief. In its motion to the Commission, the Employer states that in each of the three Act 312 arbitration proceedings, the Employer filed a motion with the arbitrator seeking dismissal of the petition on the grounds that the arbitrator had no jurisdiction over this matter based on the suspension of the Employer's duty to bargain set forth in § 27(3) of the Local Financial Stability and Choice Act, 2012 PA 436 (PA 436), MCL 141.1541 – 141.1575. The Employer also filed a motion with each arbitrator seeking a stay of proceedings pending the outcome of the arbitrator's ruling. According to the Employer's motion to the Commission, two of the arbitrators denied the Employer's motion to dismiss and the third had failed to rule at the time the Employer filed the instant motion with the Commission.

Each of the Unions involved in the three arbitrations, Police Officers Association of Michigan (POAM), Detroit Police Command Officers Association (DPCOA), and Detroit Police Lieutenants & Sergeants Association (DPLSA) have filed responses to the Employer's motions to the Commission. At our meeting on May 14, 2013, we stayed the Act 312 proceedings pending our decision in this matter, granted leave to the Detroit Fire Fighters Association to file an amicus curiae brief in response to the City's motions, and heard oral argument from the Employer, POAM, DPCOA, and DPLSA.

The Employer claims that each of the three Act 312 arbitration cases should be dismissed based on the suspension of its duty to bargain pursuant to PA 436. Each of the involved Unions and the amicus curiae contend that there is no basis for dismissal of the Act 312 arbitrations and have raised several arguments in an effort to rebut the Employer's contention that the arbitrations should be dismissed. The Unions question the Commission's jurisdiction to dismiss a pending Act 312 arbitration. The three involved Unions contend that the suspension of the Employer's duty to bargain under PA 436 does not impact the parties' rights and obligations to proceed with Act 312 arbitrations on petitions filed prior to March 28, 2013, the effective date of Act 436.

Procedural History

In *City of Detroit and Police Officers Association of Michigan*, Case No. D09 F-0703, the Commission received notice on June 1, 2009, that the parties were in negotiations for a new collective bargaining agreement pursuant to §7(2) of the Public Employment Relations Act (PERA), 1965 PA 379 as amended, MCL 423.207(2). On June 15, 2010, the POAM filed a petition for Act 312 arbitration. The arbitrator currently assigned to the case, William E. Long, was appointed on October 2, 2012. On or about April 15, 2013, the Employer filed two motions with Arbitrator Long, a motion for an Award of Dismissal Due to Lack of Arbitral Jurisdiction,

2

and a motion for a Stay of Proceedings Pending Determination of Jurisdiction by MERC. On April 17, 2013, Long denied the motion to dismiss but granted the stay after learning that the Employer had brought similar motions before this Commission and based on his belief that this Commission was the appropriate body to resolve this issue.

At the time of Long's April 17 ruling, hearing dates had already been scheduled for April 22, April 29, and May 2, 2013. He notified the parties that the hearing scheduled for April 22 would proceed, but directed the parties to meet on the remaining two dates for the purpose of reviewing, clarifying, and possibly resolving some of the issues in advance of any subsequent hearing dates. He concluded that if "MERC rules that Section 27(3) of Act 436 does preclude MERC from retaining jurisdiction of this case, proceeding with the April 22, 2013 hearing and scheduling others, if needed, following a ruling by MERC, is not a significant financial burden on the parties and the information obtained from the April 22, 2013 hearing, and the April 29, 2013 and May 2, 2013 meetings of the representatives for the parties, may assist the parties in ultimate resolution of many matters in dispute through further collective bargaining." The April 22, 2013 hearing was conducted and is the only hearing that has been held in this case.

In *City of Detroit and Detroit Police Command Officers Association*, Case No. D11 J-1169, the Employer filed a petition for Act 312 arbitration on October 5, 2011. On September 11, 2012, the Employer withdrew its petition over the objection of the DPCOA. In response, the director of the Bureau of Employment Relations, notified the parties by letter dated September 13, 2012, that the Commission had reviewed the parties' filings at its September 11, 2012 meeting and concluded that nothing in the Act 312 statute and/or rules requires or allows the Commission to approve or deny a party's request to withdraw its petition. The letter went on to explain that the "obvious remedy for a Union that objects to the withdrawal is to file its own Act 312 petition." The DPCOA filed its petition for Act 312 arbitration on September 20, 2012. Arbitrator Gregory M. Saltzman was appointed on October 5, 2012 and held a prehearing conference on March 1, 2013. In an e-mail to the parties dated April 19, 2013, Arbitrator Saltzman acknowledged receipt of the two motions from the Employer and deferred the issue to the Commission.

In *City of Detroit and Detroit Police Lieutenants & Sergeants Association*, Case No. D13 A-0005, a petition for Act 312 arbitration was filed on February 4, 2013 by the DPLSA. Arbitrator Francis L Hill was appointed on February 19, 2013, and held a prehearing conference on February 26, 2013. In an e-mail to the parties on April 28, 2013, Arbitrator Hill notified the parties of hearing dates scheduled for May 15, 16, and 21, and June 11 and 13, 2013. She informed the parties that the Employer's motion to dismiss was pending before the Commission and that she would advise them if MERC's decision had an impact on the scheduled hearing dates.

Discussion and Conclusions of Law:

I.     COMMISSION JURISDICTION

The Employer argues that the Commission should rule on its motion to dismiss because the arbitrators are deferring the question of jurisdiction to MERC. The Employer seeks a global

3

ruling on the legal issues presented by the impact of PA 436 on pending Act 312 arbitrations and wants the Commission to provide guidance on the question of whether the arbitrators may exercise jurisdiction in these matters. Whether the Commission has jurisdiction to rule on the questions presented by the Employer's motion to dismiss depends on the authority granted by the Legislature to MERC in the Labor Relations and Mediation Act (LRMA), Act 176 of 1939; the Public Employment Relations Act (PERA), Act 336 of 1947; and the act that provides for compulsory arbitration of labor disputes in police and fire departments, Act 312 of 1969 (Act 312).

## A. Act 312 Provisions with Respect to MERC's Authority

Matters proceed to Act 312 arbitration following mediation initiated pursuant to §7 of PERA, MCL 423.207[1]. After a matter has been submitted to mediation for at least 30 days, either of the parties may request binding arbitration pursuant to § 3 of Act 312, MCL 423.233. In *City of Manistee v Employment Relations Comm & Manistee Fire Fighters Ass'n*, 168 Mich App 422, 428 (1988), the Court commented: "The only prerequisites [to Act 312 arbitration] are those expressly stated in § 3 of Act 312." Section 3 of Act 312, MCL 423.233, sets the prerequisites for proceeding to Act 312 arbitration as follows:

> Whenever in the course of mediation of a public police or fire department employee's dispute, except a dispute concerning the interpretation or application of an existing agreement (a "grievance" dispute), the dispute has not been resolved to the agreement of both parties within 30 days of the submission of the dispute to mediation, or within such further additional periods to which the parties may agree, the employees or employer may initiate binding arbitration proceedings by prompt request therefor, in writing, to the other, with copy to the employment relations commission.

Only §§ 3, 4, 5, 6 and 7a of Act 312, as amended, mention or refer to the Commission. Section 4, MCL 423.234, provides the process for the parties to select their delegates to the arbitration panel and notify each other and the "mediation board" of their selections. Section 5, MCL 423.235, establishes the procedure to be used in selecting the chair of the arbitration panel

---

[1] Section 7 of PERA provides as follows:

(1) Upon the request of the collective bargaining representative defined in section 11 or, if a representative has not been designated or selected, upon the request of a majority of any given group of public employees evidenced by a petition signed by the majority and delivered to the commission, or upon request of any public employer of the employees, the commission forthwith shall mediate the grievances set forth in the petition or notice, and for the purposes of mediating the grievances, the commission shall exercise the powers and authority conferred upon the commission by sections 10 and 11 of Act No. 176 of the Public Acts of 1939, as amended, being sections 423.10 and 423.11 of the Michigan Compiled Laws.

(2) At least 60 days before the expiration date of a collective bargaining agreement, the parties shall notify the commission of the status of negotiations. If the dispute remains unresolved 30 days after the notification on the status of negotiations and a request for mediation is not received, the commission shall appoint a mediator.

4

from MERC's panel of arbitrators, authorizes MERC to establish and appoint members of the panel of arbitrators, and requires MERC to establish qualifications and training for panel members. Section 6, MCL 423.236, sets time periods for the arbitration and establishes procedures that the arbitration panel members are to follow. It also provides that the fee to be paid to the panel's chair is to be established in advance by the Commission. Section 7a, MCL 423.237a, authorizes the chair of the arbitration panel to remand the matter for further bargaining and requires the chair to notify the Commission of any such remand.

## B. Prior MERC Actions in Act 312 Cases

The Employer contends that the Commission is empowered to determine jurisdictional limits for Act 312 panels, citing *City of Detroit*, 1990 MERC Lab Op 561, 565. In the *City of Detroit* case, after noting that the Commission has jurisdiction to determine what is a mandatory subject of bargaining and whether employees are eligible for Act 312 arbitration, the Commission denied the employer's motion to instruct the Act 312 arbitrator to refrain from deciding those issues. The Commission stated, *id.* at 565:

> The jurisdiction of an Act 312 arbitration panel to make findings on these issues in the absence of, or concurrent with, our rulings has now been firmly established. We see no reason to grant the employer's request that we direct the Act 312 panel's actions in this case. Under Section 12 of Act 312, the employer may seek review by the Circuit Court of findings by the arbitration panel on the grounds that the panel exceeded its jurisdiction.

While it may be noted that the Commission refused to dismiss the Act 312 proceeding in this case, MERC did not find that it lacks the authority to do so.

In support of its contention that the Commission should decide this issue, the Employer also argues that Act 312 panels function under the auspices of the Commission and are bound by the Commission's decisions, citing *Jackson Fire Fighters Ass'n v City of Jackson*, 227 Mich App 520, 523 (1998). In the *Jackson Fire Fighters Ass'n* case, the Act 312 arbitrator held that a matter was a mandatory subject of bargaining. The circuit court affirmed the arbitration award on appeal. In a concurrent unfair labor practice charge case involving the same parties, *City of Jackson*, 1996 MERC Lab Op 125; 9 MPER 27050, the Commission found the disputed matter to be a permissive subject of bargaining. Upon subsequent review of the circuit court ruling and MERC's decision, the Court of Appeals held that MERC had primary jurisdiction to determine whether the matter was a mandatory subject of bargaining, and therefore, the decision of the arbitrator did not bar MERC from adjudicating the issue based on collateral estoppel. In the two cases cited above, it is clear that the Commission has jurisdiction to determine, in an unfair labor practice charge case, whether subjects of bargaining brought before an Act 312 arbitrator are mandatory or permissive.

This Commission also has jurisdiction to determine whether an Act 312 arbitration should proceed by ascertaining whether the employees in the bargaining unit are eligible for Act 312 arbitration. *Metropolitan Council 23, AFSCME v Oakland Co (Prosecutor's Investigators)*, 89 Mich App 564 (1979) rev'd on other grounds, 409 Mich 299 (1980); *Kalamazoo Co, 23*

MPER 22 (2010); *Oakland Co & Oakland Co Sheriff,* 20 MPER 63 (2007); *City of Grand Rapids,* 1981 MERC Lab Op 327. Typically, such determinations are made in the context of a unit clarification or other representation proceeding.

In a representation proceeding, *Oakland Co Sheriff's Dep't,* 1977 MERC Lab Op 843, the Commission was called upon to determine whether a pending Act 312 arbitration was appropriate. The union, Metropolitan Council 23 of AFSCME, and the employer, Oakland County Sheriff's Department, had reached an impasse in negotiations and in mediation. The union initiated arbitration under Act 312. The employer objected, contending that the arbitration included the issue of wages for "nonpolice" classifications that were not eligible for Act 312 arbitration. The employer moved to dismiss the representation hearing, which was scheduled before a MERC ALJ, contending the matter was within the sole discretion of the Act 312 arbitrator. The Commission denied the employer's motion and concluded, *id.* at 846-848, that it did indeed have jurisdiction to resolve the issue. The MERC noted that § 14 of Act 312 specifically makes the Act supplementary to PERA and observed that § 7 of PERA MCL 423.207, and §§ 10 and 11 of the LRMA, MCL 423.10 and 423.11, conferred broad powers upon it. The Commission explained, *id.* at 847,

> We find that the responsibility for implementing Act 312 necessarily includes the power to determine who is covered by the Act. This is simply an extension of the Commission's function in representation matters. The resolution of questions involving employer and employee status, exclusions under PERA and the LRMA, community of interest and appropriate bargaining units, is an integral part of the work of the Commission. Clearly, the Commission's expertise in determining such issues is significant in determining the question raised in these proceedings. In addition, a determination by the Commission ensures the necessary uniformity and consistency in this important area.

> . . . . [A] determination of who is covered by the Act is a condition precedent to the arbitration proceeding itself, and is not properly before the arbitrator since it is not an "issue in dispute" as asserted by the Employer.

In a separate, unrelated matter, *Metropolitan Council 23, AFSCME v Oakland Co (Prosecutor's Investigators),* 89 Mich App 564 (1979) rev'd on other grounds, 409 Mich 299 (1980), the Court of Appeals considered an appeal of MERC's decision in *Oakland Co (Prosecutor's Investigators),* 1978 MERC Lab Op 328, and adopted the Commission's reasoning *Oakland Co Sheriff's Dep't.* There, the Court of Appeals found, at 89 Mich App 567, that the Legislature intended to provide public employees eligible for Act 312 arbitration with an "expeditious, effective and binding procedure for the resolution of disputes." Noting that the Legislature's purpose of establishing an expeditious dispute resolution procedure would be impeded by the lengthy delays inherent in court procedures, the Court reasoned, *id.* at 567-568, that MERC "has the necessary implied authority and expertise in labor relations to initially determine the eligibility of public employees for compulsory arbitration" and cited *Oakland Co Sheriff's Dep't,* 1977 MERC Lab Op 843. The Court of Appeals affirmed MERC's finding, in *Oakland Co (Prosecutor's Investigators),* 1978 MERC Lab Op 328, that the Oakland County prosecutor's investigators were eligible for Act 312 arbitration.

6

Subsequently, the Michigan Supreme Court granted the employer's motion for leave to appeal and both MERC and the Court of Appeals were reversed on the issue of the investigators' eligibility for Act 312 arbitration. *Metropolitan Council 23, AFSCME v Oakland Co (Prosecutor's Investigators)*, 409 Mich 299 (1980). The Supreme Court found the employees were not subject to Act 312 coverage. Although the Supreme Court did not address the issue of whether MERC has the authority to determine Act 312 eligibility, it has been widely accepted that MERC's authority extends to determining the eligibility of employees for Act 312 arbitration. Since that time, MERC has reviewed the Act 312 eligibility of numerous bargaining units in which the union and employer disputed the eligibility of all or part of the unit's members. *Macomb Co (Sheriff's Dep't)*, 1991 MERC Lab Op 542, 547. See, e.g. *Michigan State Univ (Police Dep't)*, 26 MPER 44 (2013); *Kalamazoo Co*, 23 MPER 22 (2010); *Oakland Co & Oakland Co Sheriff*, 20 MPER 63 (2007); *Kent Co & Kent Co Sheriff*, 1991 MERC Lab Op 549; 4 MPER 22071; *Washtenaw Co (Sheriff's Dep't)*, 1990 MERC Lab Op 768; *City of Detroit (Police Detention Facility)*, 1990 MERC Lab Op 598; *Midland Co*, 1989 MERC Lab Op 923; *Mecosta Co*, 1989 MERC Lab Op 607.

We agree with the prior Commission in *Oakland Co Sheriff's Dep't*, and with the Court of Appeals in *Metropolitan Council 23, AFSCME v Oakland Co (Prosecutor's Investigators)* that by enacting § 7 of PERA and §§ 10 and 11 of the LRMA, the Legislature conferred broad powers upon the Commission for the purpose of resolving labor disputes. We also agree with the previous Commission that it is our responsibility to exercise these powers "as are necessary to carry out the purposes of PERA and the supplementary Act 312." As with the Commission in *Oakland Co Sheriff's Dep't*, 1977 MERC Lab Op 843, 847, "We find that the responsibility for implementing Act 312 necessarily includes the power to determine who is covered by the Act." Therefore, given the importance of this issue and the number of parties affected, including those beyond the instant cases, we find it is necessary to provide the parties and our panel of arbitrators with our decision on the question of whether the suspension of the duty to bargain pursuant to § 27(3) of the Local Financial Stability and Choice Act, Public Act 436 of 2012, MCL 141.1567(3), also suspends the authority of the Act 312 arbitrator in a pending arbitration.

C. Does This Matter Raise a Constitutional Question That Must Be Resolved by the Courts?

DPCOA argues that the question of whether PA 436 deprives an Act 312 arbitrator of jurisdiction must be determined by the courts, citing *Kent Co Sheriffs Ass'n v Kent Co*, 463 Mich 353, 359-362 (2000).[2] DPCOA argues at length that the Legislature's failure to amend §15(8) of PERA, to replace the reference to 2011 PA 4 with a reference to PA 436, makes the language of that provision invalid and creates a conflict with § 27(3) of PA 436 in violation of the Michigan Constitution. Section 15(8) of PERA states:

Collective bargaining agreements under this act may be rejected, modified, or terminated pursuant to the local government and school district fiscal

---

[2] In the *Kent Co Sheriffs Ass'n* case, the State Supreme Court held that the circuit court correctly ruled on a Freedom of Information Act issue even though the matter impacted a labor dispute over which MERC would have had jurisdiction if it had involved an unfair labor practice charge. Since the case did not involve an unfair labor practice charge, the circuit court was not required to defer to MERC.

7

accountability act, 2011 PA 4, MCL 141.1501 to 141.1531. This act does not confer a right to bargain that would infringe on the exercise of powers under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531.

The Commission has no jurisdiction to resolve questions of the constitutionality of legislative enactments. *Michigan State Univ*, 17 MPER 75 (2004). The Commission must decide matters before it based on the language of PERA and its amendments. *Waverly Cmty Sch*, 26 MPER 34 (2012). Thus, any constitutional issues that the parties wish to raise must be raised elsewhere.

## II.  THE IMPACT OF PA 436 ON RIGHTS AND OBLIGATIONS UNDER ACT 312

The Employer argues that the arbitration panels have no jurisdiction over the parties, the petitions, or the matters in dispute where the City's duty to bargain has been suspended by the operation of § 27(3) of PA 436. According to the Employer, Act 312 is a procedural statute and acts as an extension of, or supplement to, PERA, while PERA is the substantive enabling statute that defines the contents and parameters of the duty to bargain. The Employer contends: "Where the duty to bargain under PERA is suspended, there can be no compulsory arbitration over mandatory subjects of bargaining because no subjects remain 'mandatory' and therefore, [there is] no dispute to resolve."

### A.  The Relationship between 1969 PA 312, As Amended, and 2012 PA 436

This Commission's interpretation of these two statutes is constrained by rules of statutory construction established by the courts. The rules of statutory construction tell us that, much like any literary composition, a statute is enacted and is meant to be read as a whole. *Metropolitan Council 23, AFSCME v Oakland Co Prosecutor*, 409 Mich 299, 317-318 (1980). As such, any provision that is in dispute must be read in the light of the general purpose of the act. *Romeo Homes, Inc v Comm'r of Revenue*, 361 Mich 128, 135 (1960).

While both statutes deal with local government administration there is no express conflict in their purposes or in their wording. Act 312 of 1969 was recently amended by 2011 PA 116 which became effective July 20, 2011. Less than two years later, 2012 PA 436 took effect on March 28, 2013. Indeed, PA 436 makes no reference to Act 312 or to its recent amendment in 2011 PA 116. PA 436 does not exclude bargaining units eligible for Act 312 arbitration from its coverage.[3]

Under well-established principles of statutory construction, the legislature is presumed to be aware of and to have considered the effect on all existing statutes when enacting new ones. *Walen v Dep't of Corrections*, 443 Mich 240, 248 (1993). Moreover, rules of statutory construction hold that the legislature is presumed to be aware of statutory interpretations by the

---

[3] We note that the Legislature expressly excluded employees eligible for Act 312 arbitration from the changes under the "Freedom-to-Work" amendment to PERA, 2012 PA 349, which became effective on the same day as 2012 PA 436.

courts and by the administrative bodies charged with statutory enforcement. *Gordon Sel-Way, Inc v Spence Bros, Inc*, 438 Mich 488, 505-506 (1991); *Melia v Appeal Bd of Michigan Employment Sec Comm*, 346 Mich 544, 565-566 (1956); *Parker v Bd of Ed of Byron Center Pub Sch*, 229 Mich App 565, 570-5712 (1998).

The Commission has found that the failure to honor terms and conditions of employment established by an Act 312 award is a violation of § 10(1)(e) of PERA. *City of Jackson*, 1979 MERC Lab Op 1146, 1151-1154. See also, *City of Hamtramck*, 1984 MERC Lab Op 520, 524.

In *City of Jackson*, at 1151, the Commission explained:

A refusal to execute a completed collective bargaining agreement is an unfair labor practice whether negotiated through voluntary collective bargaining or by submission of unresolved issues to Act 312 arbitration.

The Commission went on to say, *id.* at 1153-1154:

The legislative policy of providing an "expeditious," "effective," and "binding" procedure for resolving labor disputes would be severely undermined if the parties could short circuit the Act by refusing to execute the contract.

\* \* \*

The term "resolution of disputes" in § 1 of the Act [312] means that the product of compulsory arbitration is a completed collective bargaining agreement. The refusal to execute that agreement is a refusal to bargain in good faith

Section 10(1)(e) of PERA prohibits public employers that have a duty to bargain from refusing to bargain collectively with the representatives of their employees. However, if their duty to bargain has been suspended, their refusal to bargain does not violate § 10(1)(e). Quite simply, there can be no breach of duty if there is no duty. Thus, when a public employer's duty to bargain has been suspended, their failure to comply with the terms and conditions of an Act 312 award would not violate § 10(1)(e) of PERA and the Act 312 award cannot be enforced under PERA.

As we stated in *Oakland Co & Oakland Co Sheriff*, 20 MPER 63 (2007):

Act 312 functions primarily as an extraordinary restriction on the ordinary rights of certain public employers to unilaterally impose changes in conditions of employment when good faith negotiations have failed to result in agreement.

Nevertheless, without reference to Act 312, § 12(1)(j) of PA 436 in conjunction with § 15(8) of PERA gives the Emergency Manager the right to reject, modify, or terminate terms of an existing collective bargaining agreement. Section 15(8) of PERA states:

Collective bargaining agreements under this act may be rejected, modified, or terminated pursuant to the local government and school district fiscal

9

accountability act, 2011 PA 4, MCL 141.1501 to 141.1531. This act does not confer a right to bargain that would infringe on the exercise of powers under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531.[4]

Section 12(1)(j) of PA 436 states:

> (1) An emergency manager may take 1 or more of the following additional actions with respect to a local government that is in receivership, notwithstanding any charter provision to the contrary:
>
> * * *
>
> (j) Reject, modify, or terminate 1 or more terms and conditions of an existing contract.

---

[4] We recognize the arguments made by the Petitioners challenging the constitutionality of PA 436 and the substitution of its provisions for the provisions of 2011 PA 4. However, as indicated above in our discussion of Petitioners' constitutional challenge, we must administer the law as it is enacted and must give effect to the provisions of PA 436, as well as its enacting § 2 which provides as follows:

2012 PA 436, enacting § 2, provides:

It is the intent of the Legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following:

(a) The Charter Township Act, 1947 PA 359, MCL 42.1 to 42.34.

(b) 1966 PA 293, MCL 45.501 to 45.521.

(c) 1851 PA 156, MCL 46.1 to 46.32.

(d) The General Law Village Act, 1895 PA 3, MCL 61.1 to 74.25.

(e) The Home Rule Village Act, 1909 PA 278, MCL 78.1 to 78.28.

(f) The Fourth Class City Act, 1895 PA 215, MCL 81.1 to 113.20.

(g) The Home Rule City Act, 1909 PA 279, MCL 117.1 to 117.38.

(h) The Metropolitan Transportation Authorities Act of 1967, 1967 PA 204, MCL 124.401 to 124.426.

(i) 1947 PA 336, MCL 423.201 to 423.217.

In the light of the language of PA 436, we cannot find that the Legislature intended to impose the aforesaid "extraordinary restrictions" of Act 312 on an emergency manager. Inasmuch as an Act 312 award serves as the parties' collective bargaining agreement, it appears that pursuant to § 15(8) of PERA and § 12(1)(j) of PA 436 that the Emergency Manager could reject, modify, or terminate terms of an Act 312 award. If that is the case, it seems doubtful that the Legislature would have intended an employer in receivership, with no duty to bargain and with an emergency manager in place, to be subject to Act 312 arbitration proceedings.

Petitioners have argued that the amendment to § 9 of Act 312 by 2011 PA 116 indicates that an employer in receivership remains subject to the operation of Act 312. Section 9 of Act 312, as amended, provides in relevant part:

> (1) If the parties have no collective bargaining agreement or the parties have an agreement and have begun negotiations or discussions looking to a new agreement or amendment of the existing agreement and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions, and order upon the following factors:

> > (a) The financial ability of the unit of government to pay. All of the following shall apply to the arbitration panel's determination of the ability of the unit of government to pay:

> > > * * *

> > > (iv) Any law of this state or any directive issued under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, that places limitations on a unit of government's expenditures or revenue collection.[5]

The Employer contends that the amendment to § 9 of Act 312 by 2011 PA 116 does not show that an employer in receivership remains subject to the operation of Act 312. The Employer asserts, that the amended § 9 of Act 312 applies to those municipalities where the duty to bargain has not been suspended. We agree.

B.  Is Act 312 Arbitration Dependent on the Presence of a Duty to Bargain?

In *Metropolitan Council 23, AFSCME v Center Line*, 414 Mich 642 (1982), the Court inferred from PERA that the distinction drawn between mandatory and permissive subjects of bargaining determines the scope of the Act 312 arbitration panel's authority. Given the fact that Act 312 supplements PERA and that under § 15 of PERA the duty to bargain only extends to mandatory subjects, the Court concluded that the arbitration panel can only compel agreement as to mandatory subjects. The Court noted further that it would be inconsistent to conclude that the arbitration panel can issue an award on a permissive subject when the parties do not even have a

---

[5] See previous footnote regarding Enacting § 2 of PA 436

duty to bargain over such a subject. Based on that, we might infer that the arbitration panel has no authority over matters for which there is no duty to bargain.

The mediation process is a condition precedent to initiation of Act 312 arbitration. A public employer that has no duty to bargain has no duty to participate in mediation. Only a public employer not in receivership under PA 436 or a labor organization may be required by this Commission under § 10 of PERA to participate in mediation. Therefore, the duty to bargain must be present before a party can be compelled to involuntarily participate in mediation. If parties have no duty to participate in mediation, they cannot be required to participate in Act 312 arbitration.

Moreover, § 7a of Act 312 gives the arbitration panel chair the authority to remand the matter to mediation. Mediation is a function of bargaining pursuant to PERA. If there is no duty to bargain, there is also no duty to engage in mediation. Therefore, § 7a of Act 312 presupposes the presence of a duty to bargain. In the absence of a duty to bargain, there is no obligation to participate in Act 312 arbitration.

C. Does Suspension of the Duty to Bargain Pursuant to 2012 PA 436 Convert Mandatory Subjects of Bargaining to Non-Mandatory Subjects of Bargaining?

The Employer contends: "Where there is no duty to bargain, there are no mandatory subjects in dispute regarding which an Act 312 panel has jurisdiction to fashion an Award." It asserts that "by operation of Act 436, there are no subjects regarding which there is a duty to bargain and therefore none can be the subject of an Award." (Emphasis in original.)

As previously noted, an Act 312 arbitration panel can only issue an award regarding mandatory subjects of bargaining. *Metropolitan Council 23, AFSCME v Center Line*, 414 Mich 642, 654-655 (1982). Moreover, as indicated above, both this Commission's past enforcement of an Act 312 award as a violation of the duty to bargain and the arbitration panel chair's authority under § 7a of Act 312 to remand a matter to mediation indicates an assumption that the duty to bargain is a condition precedent to participation in Act 312. However, we reject the Employer's premise that the suspension of the duty to bargain automatically converts the nature of subjects of bargaining from mandatory to non-mandatory. The existence of a duty to bargain is a separate and distinct issue from the question of whether a particular subject of bargaining is mandatory or permissive.

Whether a matter is a mandatory subject of bargaining depends on whether it has a significant or material impact on wages, hours, and other terms and conditions of employment or settles an aspect of the employer-employee relationship. *Detroit v Michigan Council 25, AFSCME*, 118 Mich App 211, 215 (1982); *Houghton Lake Ed Ass'n v Houghton Lake Cmty Sch, Bd of Ed*, 109 Mich App 1, 6 (1981). Once a subject has been determined to be a mandatory subject of bargaining, parties bound by the duty to bargain under PERA, must bargain concerning the subject. Neither party may take unilateral action on that subject unless the parties arrive at an impasse in their negotiations or there is a clear and unmistakable waiver. *Wayne Co Gov't Bar Ass'n v Wayne Co*, 169 Mich App 480, 486 (1988); 1 MPER 19105, aff'g 1987 MERC Lab Op 230; *Central Michigan Univ Faculty Ass'n v Central Michigan Univ*, 404 Mich 268, 277

12

(1978). See also *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974). The Commission and the courts have adopted an expansive interpretation of "wages, hours, and other terms and conditions of employment" under § 15 of PERA. *Local 1383, Int'l Ass'n of Fire Fighters v Warren*, 411 Mich 642, 652 (1981).

A matter that is a mandatory subject of bargaining remains so, even if a party's duty to bargain is suspended. The nature of the subject does not change just because the duty ceases. Wages, hours, and other terms and conditions of employment continue to be mandatory subjects for the purpose of determining what must be bargained by those parties who have a duty to bargain.

Where a public employer's duty to bargain is statutorily suspended, the employer has no *obligation* to bargain. However, nothing in PERA denies a public employer the *right* to bargain, even when the duty to bargain under 15(1) has been suspended. Indeed, the suspension of a public employer's duty to bargain does not suspend the bargaining obligation of the labor organization representing that employer's employees. Therefore, if an emergency manager of a public employer in receivership determines that the employer should bargain with the labor organization, the employer has the right to bargain with that labor organization. The labor organization, in that situation, still has a duty to bargain in good faith pursuant to §§ 10(3)(c) and 15(1) of PERA. Similarly, if an emergency manager of a public employer in receivership determines that the employer should petition for Act 312 arbitration in an effort to resolve a labor dispute with a bargaining unit of police or fire fighters, that employer may petition for Act 312 arbitration. In that case, unless the parties agree otherwise, the arbitration would be limited to mandatory subjects of bargaining, that is, matters that have a material impact on wages, hours, and other terms and conditions of employment or settle an aspect of the employer-employee relationship.

The finding urged by the Employer on this issue, could result in the denial of an employer's right to settle a pending labor dispute through Act 312 proceedings. Even though we agree with the Employer that the suspension of its duty to bargain under PA 436 also suspends its obligation to participate in Act 312 proceedings, we cannot agree that such suspension denies the Employer the opportunity to participate in Act 312 arbitration should it so choose. Accordingly, we find the suspension of the duty to bargain does not convert mandatory subjects of bargaining to non-mandatory subjects. The underlying nature of subjects of bargaining, whether they are mandatory or permissive, does not change upon the suspension of an employer's duty to bargain. Indeed, nothing in PA 436 declares a change in the nature of subjects of bargaining. It merely suspends the duty to bargain of an employer in receivership. That employer still retains the right to bargain and the right to proceed to Act 312 arbitration if it determines that to be appropriate under the circumstances. However, where an employer in receivership chooses not to participate in Act 312 arbitration they have no obligation to do so. For the foregoing reasons, we conclude that where an employer has no duty to bargain under PERA and has not voluntarily consented to Act 312 arbitration, the arbitration panel has no authority to issue an award binding that employer.

13

## III. CONCLUSION

The Employer in this matter is in receivership and has no duty to bargain under PA 436. It has expressed an unwillingness to bargain or participate in Act 312 arbitration in light of PA 436. As such, the Employer has no obligation to participate in Act 312 arbitration and is not required to do so. Accordingly, the arbitrations in the cases before us must be dismissed.

We have considered all other arguments submitted by the parties and conclude that they would not change the result in this case.

### ORDER

The Employer's motion to dismiss the Act 312 arbitrations pending in these three cases is granted. The Act 312 arbitrations in *City of Detroit and Police Officers Association of Michigan*, Case No. D09 F-0703, *City of Detroit and Detroit Police Command Officers Association*, Case No. D11 J-1169, and *City of Detroit and Detroit Police Lieutenants & Sergeants Association*, Case No. D13 A-0005, are hereby dismissed.

MICHIGAN EMPLOYMENT RELATIONS COMMISSION

_____
Edward D. Callaghan, Commission Chair

_____
Robert S. LaBrant, Commission Member

Dated: _____

COMMISSIONER GREEN, CONCURRING IN PART; DISSENTING IN PART:

Although I agree with the Majority's rejection of the Employer's argument that the suspension of the duty to bargain converts mandatory subjects of bargaining to permissive subjects, I disagree with the Majority's conclusion that the three Act 312 arbitration cases should be dismissed.

In numerous representation cases, we have been called upon to determine whether Act 312 petitions met the requirements of § 3 of Act 312 to initiate binding arbitration proceedings. In those cases, we were required to decide whether bargaining unit members met the definition of "public police or fire department employee" contained in § 2 of Act 312. Where the bargaining unit members were not public police or fire department employees, the requirements for initiating an Act 312 proceeding under § 3 were not met and, we dismissed the proceeding. For this Commission to initially determine the eligibility of public employees for compulsory arbitration in the context of representation proceedings is simply an extension of the Commission's function in representation matters.

14

However, in the three cases before us, there is no assertion by the Employer that the requirements for initiating Act 312 proceedings were not met. The Employer has not filed any representation proceeding claiming that the members of the three involved bargaining units are not public police or fire department employees as defined by § 2 of Act 312 nor has the Employer made any assertion that a creditable claim could be filed on that basis.

In these cases, the requirements for submitting the matters to mediation were met before PA 436 took effect and nothing in PA 436 indicates that the suspension of the duty to bargain is retroactive. When the parties were in mediation, the employer had a duty to bargain. In each case, the labor dispute was not resolved to the agreement of both parties and a petition for Act 312 arbitration was filed. All three petitions were filed and arbitrators were appointed in each case before PA 436 became effective.

I find nothing in PERA or Act 312 that authorizes this Commission to dismiss an Act 312 petition when the conditions in § 3 of Act 312 have been fully met. The Employer contends that the suspension of its duty to bargain, by PA 436, also suspends its obligations under Act 312. However, PA 436 contains no explicit prohibition barring Act 312 arbitration. Whether there is an implicit bar of binding arbitration by virtue of Act 436 is a matter for the courts to decide.

Although an emergency manager's authority to reject, modify, or terminate the provisions of a labor contract raises doubt as to whether a compulsory arbitration award is enforceable against an emergency manager, I conclude that the Commission lacks authority to dismiss an Act 312 arbitration where the requirements of Act 312 have been met. Consequently, I would deny the Employer's motion to dismiss the three Act 312 petitions.


MICHIGAN EMPLOYMENT RELATIONS COMMISSION


_____
Nino E. Green, Commissioner

Dated: _____

15

# Exhibit B

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
                                                      :
In re                                                 :        Chapter 9
                                                      :
CITY OF DETROIT, MICHIGAN,                            :        Case No. 13-53846
                                                      :
                                    Debtor.           :        Hon. Steven W. Rhodes
                                                      :
                                                      :
                                                      :
-------------------------------------------------------x

## ORDER CONFIRMING EIGHTH AMENDED PLAN FOR
## THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

*For Release and Posting Following the
Conclusion of the Oral Opinion*

ORAL OPINION ON THE RECORD

**In re City of Detroit**

**Bankruptcy Judge Steven Rhodes**

**November 7, 2014**

# Table of Contents

Introduction ............................................................................ 1

The Plan ................................................................................ 2

The Grand Bargain ................................................................ 3

The Pension Settlement ......................................................... 4

The Annuity Savings Fund Recoupment Settlement .............. 8

The State Contribution Agreement ...................................... 10

The DIA Settlement ............................................................. 12

The OPEB Settlement ......................................................... 14

The 36th District Court Settlement ...................................... 15

The UTGO Settlement ......................................................... 15

The LTGO Settlement .......................................................... 16

The COPS Settlement .......................................................... 17

The Syncora Settlement ....................................................... 18

The FGIC Settlement ........................................................... 19

Good Faith ........................................................................... 20

Best Interests of Creditors ................................................... 22

Fees ...................................................................................... 25

Unfair Discrimination .......................................................... 28

Fair and Equitable ............................................................... 33

The Constitutional Claims Against the City ........................ 35

The Exit Financing .............................................................. 37

Feasibility ............................................................................ 38

Conclusion ........................................................................... 44

In chapter 9 of the bankruptcy code, the federal government offers help to the states in solving a problem that, under our constitutional structure, the states cannot solve by themselves. That problem is the adjustment of the debts of an insolvent municipality. Today, this federal bankruptcy court grants that help to the State of Michigan and the City of Detroit.

The Court concludes that the City's eighth amended plan of adjustment meets the legal requirements for confirmation. Accordingly, the Court confirms that plan.

The Court also concludes that the settlements incorporated into the plan of adjustment are reasonable, fair and equitable. Accordingly, the Court approves those settlements.

The Court also concludes that the City's proposed exit-financing meets the requirements of the bankruptcy code. Therefore, the Court approves the exit financing.

This oral opinion will first address the settlements. There are no outstanding objections to the settlements, except for the ASF recoupment portion of the pension settlement. Nevertheless, the City requested the Court to determine that they are reasonable, fair and equitable.

The Court will then review the major issues relating to confirmation. These are good faith, best interests of creditors, professional fees, unfair discrimination, fair and equitable, and the treatment of the constitutional claims against the City. The Court will then briefly review the City's request for approval of the exit financing. The Court will then address feasibility and conclude. The Court will soon issue a supplemental opinion that will more fully address all of the issues.

1

## The Plan

Nearly every creditor group filed litigation against the City seeking the full protection of its claims, as well as objections to confirmation. The plan is largely comprised of the settlements of those claims and objections. With only one exception, every group of creditors represented by counsel has settled with the City. That exception is a small group of creditors with constitutional claims against the City.

The Court previously approved the settlement with the swap counterparties. Here are the settlements that Court approves today at the City's request:

- The Grand Bargain settlement, which includes the pension settlement, the State Contribution agreement and the DIA settlement.

- The OPEB settlement.

- The 36th District Court settlement.

- The UTGO settlement.

- The LTGO settlement.

- The Syncora settlement.

- The FGIC settlement.

Several factors are relevant to the reasonableness of each settlement and are common to all of them. These include the following:

All of the creditors in these settlements had filed and vigorously pursued objections to the plan.

All of the creditors were highly motivated to pursue those objections and had the resources to do so. This would include the appellate process if necessary.

2

Many of the objections raised issues that were novel, complex legally and factually, and potentially significant beyond this case.

All of the parties were well represented and well prepared for litigation.

For the City, litigating with creditors was incompatible with its goal of a prompt and efficient exit from bankruptcy and start to its revitalization.

For the City, the stakes in any of the creditor litigation were high. Even a single loss to any major creditor would seriously compromise its goals in this case.

Each settlement was at arms' length, hard-fought. Each required perseverance, creativity and compromise by all involved.

Each of those considerations played a role in each of these settlements.

## THE GRAND BARGAIN

The cornerstone of the plan is the Grand Bargain. It is a collection of settlements among a number of parties with an interest in the City's two pension plans and in protecting the City's art. These parties include:

- The official committee of retirees.

- The General Retirement System, GRS.

- The Police and Fire Retirement System, PFRS.

- The American Federation of State, County and Municipal Employees, AFSCME.

- The United Auto Workers Union.

- The Detroit Retired City Employees Association.

- The Retired Detroit Police Members Association.

- The Retired Detroit Police & Fire Fighters Association.

3

- The Detroit Police Lieutenants and Sergeants Association.

- The Detroit Police Command Officers Association.

- The Detroit Police Officers Association.

- The Detroit Fire Fighters Association.

- The State of Michigan.

- A number of charitable foundations.

- The Detroit Institute of Arts.

The settlements represented in the Grand Bargain are the pension settlement, the state contribution agreement, and the DIA settlement. The plan of adjustment reflects the Grand Bargain in its treatment of class 10, which consists of the PFRS claims, and class 11, which consists of the GRS claims. The State of Michigan, a number of charitable foundations, the Detroit Institute of Arts and a number of individuals will contribute to the City's two pension plans a total value of $816 million over 20 years.

## THE PENSION SETTLEMENT

The key points of the pension settlement are:

- The allowed claim amount of Unfunded Accrued Actuarial Liability, the UAAL, will be $1.25 billion for PFRS and $1.879 billion for GRS.

- Through June 30, 2023, the pension plans will use a 6.75% discount rate to value the liabilities and a 6.75% assumed investment return rate to estimate the future growth of their assets.

- The pension plans will be frozen as of July 1, 2014.

4

- Active employees continuing to work for the City after July 1, 2014, will have benefits under new hybrid pension plans. The pension formulas contained in the new hybrid plans are less generous than those in the present plans.

- Each pension claimant will receive the Adjusted Pension Amount. For PFRS retirees, this means no reduction in the accrued pension benefit amount but a 45% reduction in the cost of living adjustment, COLA. For GRS retirees, the Adjusted Pension Amount is a 4.5% reduction in accrued pension benefit amount and elimination of COLA.

- Some GRS retirees will be subject to an annuity savings fund recoupment. Because some parties have objected to this ASF recoupment, the Court will address this separately later.

- There are provisions for restoration of pension benefit payments in certain circumstances.

- For 2023, the funding targets are 70% for GRS and 78% for PFRS. For 2053, in 40 years, the targets are 100% for each.

- PFRS and GRS will each have an investment committee that will make recommendations to, and in certain situations approve the actions of, their boards of trustees.

- Until June 30, 2023, the parties may not amend the terms, conditions and rules of the GRS and PFRS relating to the calculation of pension benefits, the investment return assumptions, or the contributions to the pension systems.

The pension classes voted to accept the plan by 82% in class 10, PFRS, and 73% in class 11, GRS.

Despite these strong votes in favor of the plan, the treatment of pension claims in the City's plan of adjustment has been a significant issue in the case. In the Court's eligibility opinion, it held that the federal bankruptcy power could impair pension right in a municipal case, even if the state constitution protects. The Court stands by that decision.

5

Now, at the confirmation stage, the Court must determine whether the plan's treatment of pension claims meets the legal requirements for plan confirmation and settlement approval. The plan confirmation issues include good faith, best interests of creditors, feasibility and others. The Court will address these questions later. It will now address whether the pension settlement is a reasonable settlement.

Despite the acceptance of the plan by the pension classes, many pension claimants still strongly oppose the impairment of their pension rights in this bankruptcy. They believe that under the Michigan constitution, their pension rights are not subject to impairment. They credibly state that they worked hard for the City, that they did nothing wrong, and that these impairments will cause them real hardship. Some also argue that the pension impairments in the plan of adjustment are unnecessary because the pension plans are in fact fully funded. They further argue that if the pension plans are underfunded, the City should sell the art at the Detroit Institute of Arts or other City assets. Many of these objecting parties took the time to come to court to give a strong, sincere and personal voice to their objections.

The Court finds that the pension settlement is a reasonable settlement and overrules those objections to confirmation and to the pension settlement.

The several representatives of the pension classes appealed this Court's eligibility decision to the Court of Appeals. The City of course took the position that the eligibility decision was correct and should be affirmed. To determine the reasonableness of the settlement, it is incumbent upon this Court to estimate the parties' likelihood of the success of the appeal. That is challenging here. On balance, the Court estimates that the pension creditors' chances of success on appeal were in the range of 25%.

6

The next step would be to determine each side's best-case scenario. For the City, that would plainly be to prevail on appeal and to continue in this chapter 9.

For the pension claimants, however, the best-case scenario is much less clear. The City would still have no ability to pay the claim even if those claimants were to prevail on appeal.

These considerations suggest that it is a vast understatement to say that the pension settlement is reasonable. It borders on the miraculous. No one could have foreseen this result for the pension creditors when the City filed this case. The plan's proposal is only possible because of the pension settlement and the Grand Bargain. The pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain.

At the same time, the Court must acknowledge that these pension reductions will cause real hardship. In some cases, it is severe.

This bankruptcy, however, like most, is all about the shared sacrifice that is necessary because the City is insolvent and desperately needs to fix its future. All of the City's unsecured creditors are making sacrifices. Others sacrifice too, including the City's residents and visitors, and even the State of Michigan and its residents. Even the City's professionals are now contributing to this process and to the City's future.

As noted, substantial majorities of the two pension classes accepted the necessity of shared sacrifice for the common good of the City. That collective judgment is entitled to substantial consideration here.

The Court finds that the pension settlement is reasonable and approves it.

7

## The Annuity Savings Fund Recoupment Settlement

The Court will now address the Annuity Savings Fund recoupment part of the pension settlement. In the City's long-standing ASF program, GRS employees could voluntarily contribute a percentage of their gross pay to a separate pension account. The GRS then invested these contributions with the other GRS assets. Each participant's ASF account increased in value based on the participant's contributions and the interest credited to that account.

For many years, the GRS credited interest in each participant's ASF account at the assumed rate of return even when the actual rate of return was less than that. The City claims that this diversion of assets increased the GRS unfunded liability. It claims that it is therefore entitled to recoupment of the excess interest credits from the participants to offset that increased unfunded liability. This in turn would reduce the pension cuts to the GRS retirees. The City calculates that the total of this claim is approximately $387 million. The GRS and the ASF participants assert that there is no basis for recoupment.

The parties have settled this dispute. The key points are:

• The ASF Recoupment amount for each ASF participant will be the amount of excess interest that GRS credited to the participant between July 1, 2003 and June 30, 2013.

• The GRS will amortize each ASF participant's recoupment amount over the particpant's life expectancy with interest at 6.75%, to be deducted from the participant's monthly pension check or ASF account.

• The plan of adjustment caps the ASF recoupment at 20% of the highest value of each participant's ASF account between July 1, 2003 and June 30, 2013. An additional cap limits the combined pension reduction and ASF recoupment to 20% of such participant's annual pension.

8

- Each participant that is subject to the ASF Recoupment will have the option to pay the ASF Recoupment amount in a single lump sum cash payment.

- The settlement will net approximately $190 million for the GRS, which is about 49% of the City's calculation of its claim here.

Several participants object to the ASF recoupment in the plan of adjustment. They argue:

1. The ASF recoupment violates the applicable statute of limitations.

2. Under state law, the City's recoupment claim has no merit.

3. They did nothing that justifies imposing this liability on them.

4. The GRS board did nothing wrong.

5. The City has no standing to assert the claim.

6. They do not consent to the lesser treatment of their pension claim in class 11 that results from the recoupment.

7. The treatment of the City's recoupment claim in the plan violates their right to be heard on the merits.

8. The City did not properly disclose the 6.75% interest rate.

9. The interest rate is illegal, usurious and unfair.

10. The Court should carve the ASF settlement out of the plan and then approve the plan.

The Court overrules those objections.

The ASF recoupment settlement is a part of the pension settlement and therefore a part of the Grand Bargain. It is also a part of the City's plan of adjustment. The Court, therefore, has only two issues to consider. The first is whether the settlement is reasonable. The second is whether the plan provisions that incorporate the ASF settlement violate the bankruptcy code.

9

It is not for the Court to rule on the merits of the City's ASF recoupment claim or the merits of the participants' defenses. The Court only to reviews the parties' positions to determine whether the settlement is reasonable.

The Court finds substantial merit in the City's recoupment claim. The legal authority of the GRS board to credit interest in excess of the actual rate of return was doubtful. The prudence of the practice was even more doubtful. The Court also considers that the asserted defenses have less merit.

On balance, it appears that the City's recoupment claim would have a reasonable likelihood of success, 60-70%. However, the length, complexity and expense of litigation on the claim would be substantial. Should the City prevail, issues of collectability against ASF participants could also be substantial, depending upon the structure of the final judgment.

The Court also considers that this settlement is a part of the much larger settlement of all pension-related issues. The class of claims affected by the settlement, class 11, accepted the settlement by a vote of 73%. Finally, the Court notes that the caps and other limitations on the recoupment amount that the parties negotiated should reduce the hardship of it.

Fairly weighing these factors suggests that the ASF recoupment settlement is well within the range of possible reasonable settlements. The Court approves it.

## THE STATE CONTRIBUTION AGREEMENT

The Court will now address the state contribution agreement.

This agreement settles the state's potential liability for the underfunding of the GRS and the PFRS under the pension non-impairment provision of the Michigan constitution, Article IX, section 24. It also supports the City's plan of adjustment. The key points of this agreement are:

10

- The state of Michigan will immediately contribute $194.8 million.

- The City, GRS and PFRS will establish an income stabilization program established to ensure that pension reductions do not cause any retirees to fall into poverty. This income stabilization program will receive a portion of the payments on the Stub UTGO Bonds, which the Court will describe later.

- The pension claimants will release the state and its related entities from liability and cease litigation related the chapter 9 case, PA 436, or the pension provisions of the Michigan constitution.

The claim settled here would not be a frivolous claim. The language of article IX, section 24, of the Michigan constitution can be read to support the claim. The non-impairment language is absolute and the state is in a much better position than retirees to monitor and enforce the non-impairment of municipal pensions.

There is nonetheless no precedent for such a claim. Any litigation of it would be long, complex and expensive. If the state loses, it would be responsible for the Detroit pension underfunding of $3 billion. It might also then be responsible for the entire unfunded liability of every municipality in the state. That would be disastrous for the state.

The question then is whether the state's contribution is a fair settlement to obtain a release of any liability that it might have on this claim. As noted, the contribution is $195 million.

The novelty and the lack of precedent make judging its likelihood of success challenging. The litigation would, however, be high-risk for all concerned.

The parties have settled, with the help of the DIA and the charitable foundations. The many skilled and capable representatives of the pension claimants have concluded that the state contribution agreement is fair. They recommended it to their pension claimants, who, in turn, voted strongly to support it and to release their potential litigation claims.

11

In the circumstances, the Court finds that it is reasonable, although perhaps at the lowest end of the range of reasonable settlements. The Court approves it. For reasons that the Court will explain in its written opinion, the Court also approves the release of the state and the state related entities.

### THE DIA SETTLEMENT

The Court will now address the DIA settlement.

This settlement resolves all of the disputes relating to the rights of all parties with respect to the DIA and the art. The key points of this settlement are:

• The DIA will secure and guaranty commitments for contributions to the GRS and the PFS of $100 million over twenty years.

• Various local and national charitable foundations will contribute $366 million to the GRS and PFRS over 20 years.

• The City will transfer the art to the DIA Corp., which will hold the art in a perpetual charitable trust for the benefit of the people of the City and the State.

Two issues arise here. The first is whether the DIA settlement is a fair settlement. The Court will address this issue now. The second is whether the settlement is consistent with the best interests of creditors test. The Court will address that issue later.

Addressing the fairness of the settlement, the Court will first examine the relative strengths of the parties' positions. Both the Michigan Attorney General and the DIA itself take the position that the DIA art is subject to a trust that prohibits the City from selling it to pay debts and places it beyond the creditors' reach. The DIA also asserts that the donors of many of the pieces of art had imposed specific transfer restrictions on them.

12

The evidence supports these assertions. The Court was especially impressed with the testimony of Ms. Erickson on these points, and with the historical documentary evidence that the DIA cited in its brief and that was admitted in evidence.

The evidence further establishes that nationally accepted standards for museums prohibit the de-acquisition of art to pay debt. The creditors also admitted, perhaps grudgingly, that no creditor had ever considered the value of the art as a possible source of repayment when it decided to lend money to the City or to acquire City debt.

On the other hand, the creditors did submit substantial evidence and legal grounds supporting the contrary view that the City can legally sell or monetize the DIA art.

On balance, the Court concludes that in any potential litigation concerning the City's right to sell the DIA art, or concerning the creditors' right to access the art to satisfy its claims, the position of the Attorney General and the DIA almost certainly would prevail.

However, evidence also established that any such result in litigation might well have taken years to achieve and would have been costly to pursue. It also would have been difficult for the City to endure the delay and expense while at the same time attempting to revitalize itself. The DIA and the attorney general state with credibility that they would vigorous contest any attempt to sell any art. Credible evidence also establishes that an attempt by the City to sell its art might result in a cancellation of the county millage taxes that support the DIA's operations and constitute almost 70% of the DIA's budget.

The Court concludes that the DIA settlement was a most reasonable and favorable settlement for the City and its pension creditors. The Court readily approves it. Accordingly, the Court approves all aspects of the grand bargain.

13

## THE OPEB SETTLEMENT

The Court will now review the OPEB settlement.

The City is currently obligated to its retirees for other post-employment benefits, OPEB. This includes health care and life insurance benefits. The City claimed the OPEB liability is $3.8 billion. The retiree committee asserts that it is $5 billion. The difference largely results from differences in certain actuarial assumptions and discount rates. They also disagreed about how to account for postpetition OPEB payments. Either value would make the OPEB liability the City's largest single liability.

The parties settled. The key points of this settlement are:

- The allowed amount of OPEB Claims is $4.3 billion. Of that, $2.2 billion is for PFRS retirees and $2.1 billion is for GRS retirees.

- The City will establish two voluntary employees' beneficiary associations, known as VEBAs, to provide post-employment benefits to retirees and certain of their beneficiaries and dependents.

- The City will distribute New B Notes and other assets to fund the VEBAs.

- Various sources will fund the start-up costs for the VEBAs.

- The City will have no further responsibility to provide other post-employment benefits.

The plan treats the OPEB claim in class 12. The estimated recovery for Class 12 OPEB claims is 10%. Class 12 accepted the plan.

The retiree committee's OPEB litigation sought to prohibit the City from terminating OBEP benefits. It asserted largely equitable grounds relating to the hardship that terminating these benefits would naturally cause to retirees. There did not appear to be any substantial legal grounds for the requested relief. The City's likelihood of success was very high. The OPEB claim is an

14

unsecured claim. Unlike the retirees' pension claims, their OPEB claims had no arguable constitutional protection.

The 10% recovery for class 12, the OPEB class, is approximately the recovery of other unsecured creditors. The class voted to accept it by over 88%. The Court finds that the OPEB settlement is reasonable. The Court approves it.

## The 36th District Court Settlement

The Court will now discuss the 36th District Court settlement.

When the City filed bankruptcy, the 36th District Court was defending several employment-related claims. Because the City is legally required to fund the 36th District Court, it would ultimately be responsible for any judgments against the 36th District Court in those proceedings. The parties in the litigation settled with the City. The aggregate liquidated allowed amount of the claims is $6 million.

These claims are in class 17. Their recovery is 33%. They accepted the plan by a vote of 100%. The Court finds that this settlement is reasonable. The Court approves it.

## The UTGO Settlement

The Court will now address the UTGO bond settlement.

Postpetition, the City defaulted on its obligation to make payments on these Unlimited Tax General Obligation bonds. The bond insurers paid claims on the defaulted payments.

In the resulting litigation, the UTGO bond creditors claimed that portions of the City's property taxes could only be used to pay their claims and that they had a lien on that stream of revenues. They also asserted that this revenue was "special revenue" in chapter 9, entitled to special protections.

15

The City opposed the litigation, contending that the UTGO claims were unsecured claims. The City and the bond insurers settled. The key points of this settlement are:

- The allowed claim on the UTGO Bonds will be $388 million.

- Just under $288 million of the UTGO Bonds will be restructured and reallocated among the holders of the bonds.

- Approximately $43 million the UTGO bonds, which parties have called the Stub UTGO bonds, will be reinstated to existing holders. However, those holders' rights to payment on those Stub UTGO bonds will be dedicated to the income stabilization program that is part of the State Contribution Agreement, which the Court mentioned earlier.

The plan classifies the UTGO Bond Claims in Class 8. The recovery is 74%. The class accepted the plan by a vote of 87%.

The UTGO settlement, 74%, is the highest settlement percentage that the City agreed to for unsecured creditors. The City's chance of success on the merits of the litigation was a coin-toss. On the other hand, the consequence to the City of losing on this issue could have been dire. It would have lost access to the portion of its property tax revenue that the UTGO bondholders claimed.

The Court concludes, therefore, that the UTGO settlement is within the range of possible reasonable settlements, although perhaps at the upper end of that range. The Court concludes that these circumstances do warrant the premium that the settlement reflects. The Court therefore approves it.

## THE LTGO SETTLEMENT

The Court will now discuss the LTGO settlement.

16

The City has almost $164 million in outstanding limited tax general obligation bonds, called LTGO bonds. Postpetition, the City defaulted on its obligation to make interest payments on the LTGO Bonds. On both occasions, Ambac Assurance Corporation, insurer of two-thirds of the LTGO bonds, paid claims on the defaulted payments. In the resulting litigation, the LTGO claimants argues that their claims were entitled to secured treatment and that state law requires the City to pay the LTGO bonds as a first budget obligation. The City asserted that the LTGO claims were unsecured claims.

The parties settled their disputes. The key points of this settlement are:

• The City may either issue new LTGO Bonds in the amount of $55 million or pay $55 million in cash using exit financing. The City has elected to make the $55 million cash payment from the exit financing.

• The City will also distribute $17.3 million in Excess New B Notes to the holders of LTGO bond claims.

The plan classifies the LTGO bonds claims in Class 7. The recovery for class 7 is 41%. The class accepted the plan.

The Court's judgment is that the City had a substantial likelihood of prevailing in the LTGO litigation, perhaps a 75% chance. The 41% LTGO settlement is within the range of reasonable settlements. The Court approves it.


## THE COPS SETTLEMENT

The Court will now address the Syncora settlement and the FGIC and COPs settlement. Both of these are, in part, addressed in class 9 of the plan. Each Class 9 Claim holder will receive its pro rata share of almost $98 million in New B Notes, $88 million in New C Notes and $25

million in Settlement Credits. The settlement credits may be used to offset up to 50% of the purchase price of certain eligible City assets.

### THE SYNCORA SETTLEMENT

Syncora and the City have settled their many disputes. The key points of this settlement are:

- As a settling Class 9 claim holder, Syncora will receive $23.5 million in New B Notes, $21.3 million in New C Notes, and $6.25 million in Class 9 Settlement Credits.

- The City will make an additional $5 million cash payment to Syncora.

- Syncora and the City will enter into a development agreement, under which a subsidiary of Syncora will be granted a five-year option to acquire and develop certain properties owned by the City.

- The development agreement will also include a one-year option for another subsidiary of Syncora to enter into a thirty-year concession at the Grand Circus Park parking garage. This agreement includes specified financial and capital expenditure requirements.

- The City will assume the Detroit Windsor Tunnel lease with a Syncora subsidiary and extend it to December 2040. This lease will be amended to include certain provisions and requirements for capital expenditures, and operating and financial reporting.

The settlement resolves Syncora's objections to confirmation as well as several appeals that Syncora had pursued relating to eligibility, the quality of life loan, mediation, and the casino revenue. The Syncora settlement also frees up $162 million in B notes for the LTGO, OPEB and general unsecured creditors.

18

The development agreement is a substantial benefit to the City. James Doak, an expert from the Miller Buckfire firm that the City retained, testified that in his opinion, the business aspects of the Syncora settlement are a reasonable exercise of the City's business judgment and the Court credits that testimony.

Syncora's recovery is about 13% and is about the same as FGIC's settlement recovery, to be discussed next. The recovery for other unsecured creditors in class 14 is also similar. Accordingly, the Court readily finds that this settlement is reasonable and approves it.

### THE FGIC SETTLEMENT

The City, FGIC, which is the insurer of the COPs, and the COPs holders have also entered into a settlement agreement. The key points of this settlement are:

- FGIC will opt into the class 9 settlement and receive $74.2 million in New B Notes, $67.2 million in New C Notes, and $19.75 million in Class 9 Settlement Credits. FGIC and the COPs holders will divide the consideration provided under the Class 9 Settlement Option.

- FGIC and the City will also enter into a development agreement for the Joe Louis Arena site.

- To settle FGIC's claims against the City relating to the Swap Agreements, FGIC will have an Allowed Class 14 Claim of $6.11 million. In addition, the Downtown Development Authority will assign to FGIC its rights to its distribution of New B Notes under the plan of adjustment for its $33.6 million Class 13 claim. The City estimates that FGIC will receive approximately $4.5 million in New B Notes in settlement of its swap related claims.

This settlement resolves the objections to confirmation that FGIC and the COPs holders filed. These objections were substantial and were zealously litigated. It also resolves the COPs

19

invalidity litigation in which the City sought to invalidate its obligation to the COPs holders in the approximate amount of $1.5 billion dollars.

FGIC's recovery is 13%. The development agreement is of incalculable value to the City. The Court readily finds that this settlement is reasonable and approves it.

That concludes the Court's discussion of its approval of the settlements in the City's plan.

The Court will now address some of the other confirmation requirements that the plan must meet, including good faith, the best interests of creditors, and the reasonableness of attorney fees. The Court will then address the requirements that apply because two classes of creditors, classes 14 and 15 rejected the plan. These are whether the plan unfairly discriminates and whether the plan is fair and equitable. The Court will also briefly address the objections of certain creditors holding constitutional claims against the City. The Court will conclude with the feasibility requirement.

## GOOD FAITH

Section 1129(a)(3) requires the City to establish that it proposed its plan of adjustment in good faith. When the Court decided that the City was eligible to be in bankruptcy, the Court found that the City acted in good faith in seeking the relief that this Court can provide. The good faith inquiry at this stage is largely an extension of that inquiry. The Court again finds that the City has acted in good faith in proposing its plan of adjustment.

Specifically, the Court finds:

First, the City crafted and proposed the plan to achieve the objectives and purposes of chapter 9, that is, to adjust the City's debt to enable the City to provide adequate municipal services.

20

Second, the City filed its plan with honesty, good intentions, and the reasonable expectation that the plan is feasible.

Third, the process the City undertook to seek confirmation of the Plan was fundamentally fair to the City's creditors.

On the first and second points, the record demonstrates that the City has worked honestly, diligently, and tirelessly to accomplish precisely the remedy that the bankruptcy code establishes for municipalities—the necessary adjustment of the City's debt. The record also demonstrates that the City is committed to maintaining its debt at a level that it can manage in the long-term.

The testimony of several City representatives directly supports these findings. These include Emergency Manager Kevyn Orr, Mayor Mike Duggan, City Council President Brenda Jones, the City's Chief Financial Officer John Hill, the City's Chief Information Officer Beth Niblock, Police Chief James Craig, and Executive Fire Commissioner Edsel Jenkins.

Ron Bloom's testimony, however, was particularly compelling on this point, not only for what he said, but also because he testified as a representative of the retiree committee. He testified:

> But I think one of the things the City persuaded us over the course of the case was [that] they were sincere . . . we didn't like what they had to say often, but we felt that their commitment to revitalization was sincere. And when we saw evidence of that . . . for instance how they were treating the active workers, that was a positive sign that our long-term interest was going to be served and the revised promises we got would eventually be honored.

On the third point, the court finds that the strongest evidence that the City treated its creditors in a fundamentally fair way is the high level of creditor consensus supporting the plan.

The City's good faith in proposing this plan shines with the greatest brilliance in the grand bargain and in the settlements with Syncora, FGIC and the COPs holders. Those settlements are more than just creditor claim settlements. They create new ventures and relationships that enable

21

all of the stakeholders in the case to achieve their long-term missions and goals. This is an extraordinary accomplishment in bankruptcy and an ideal model for future municipal debt restructurings.

The City has proven that upon confirmation, it intends to implement its plan of adjustment. The City has also proven its commitment and ability to begin the challenging process of revitalization.

The Court finds that the City proposed its plan of adjustment in good faith.

### BEST INTERESTS OF CREDITORS

Section 943(b)(7) requires that the plan be in the best interests of creditors. The cases generally hold that in chapter 9, this means that the creditors will receive all that they can reasonably expect under the circumstances. The only legal alternative to plan confirmation is dismissal, because no other party can file a plan of adjustment and the liquidation of a municipality's assets is not permitted in chapter 9. Accordingly, the Court will also consider whether the plan is a better alternative for creditors than dismissal.

Under the plain language of section 943(b)(7), the issue is the best interests of creditors as a whole, not any particular creditor or class of creditors.

The Court finds that the plan is in the best interests of creditors.

Some creditors have argued that the City could pay more to creditors by raising taxes and by monetizing assets, specifically the art at the DIA.

No provision of law allows the creditors to access the DIA art to satisfy their claims, whether in bankruptcy or outside of bankruptcy. The market value of the art, therefore, is irrelevant in this case. A judgment creditor's sole remedy is a court-ordered property tax

assessment process under Michigan's Revised Judicature Act. Michigan law prohibits execution on municipal property.

Some creditors argue that the best interest test in chapter 9 requires this Court's full consideration of all of the City's assets, including the art, even if the assets would not be accessible to unsecured creditors outside of bankruptcy.

The Court also rejects the argument. The legal limitations on the collection of judgments that apply outside of bankruptcy also constrain the best interests of creditors test in bankruptcy. Neither the bankruptcy code nor the case law suggests otherwise.

As noted, the City determined not to sell or monetize the DIA art in the art market. Under section 904, that decision is off-limits to this Court.

However, even if the law did give the Court some authority here, the Court would not have interfered with the City's decision. The City made the only appropriate decision. Maintaining the art at the DIA is critical to the feasibility of the City's plan of adjustment and to the City's future. The Court toured parts of the DIA and saw the art there, as well as how its many visitors were experiencing the art. It also accepts the testimony of Ms. Erickson on the priceless value that the DIA and the art creates for the City, the region and the state.

The evidence unequivocally establishes that the DIA stands at the center of the City as an invaluable beacon of culture, education for both children and adults, personal journey, creative outlet, family experience, worldwide visitor attraction, civic pride and energy, neighborhood and community cohesion, regional cooperation, social service, and economic development. Every great City in the world actively pursues these values. They are the values that Detroit must pursue to uplift, inspire and enrich its residents and its visitors. They are also the values that Detroit must pursue to compete in the national and global economy to attract new residents, visitors and

businesses. To sell the DIA art would only deepen Detroit's fiscal, economic and social problems. To sell the DIA art would be to forfeit Detroit's future. The City made the right decision.

The City also rejected the concept of using the art as a collateral for a loan to pay creditors, for two reasons. First, that proposal would just substitute debt for debt and would not help the City. Second, if the City defaulted, it might lose the art. The City made the right decision here too.

Beyond that, the record reflects that the City has made reasonable efforts to monetize other assets, including the Detroit Windsor Tunnel, certain real estate properties, certain parking properties, the Joe Louis arena property and certain other property that it no longer needs. It also entered into the Great Lakes Water Authority memorandum of understanding with Wayne, Oakland and Macomb Counties, which benefits all creditors. The Court finds that the City has made reasonable efforts to monetize its assets to satisfy the best interests of creditors test.

The evidence also establishes that raising taxes is not a viable option for the City. In the eligibility opinion, the Court found that the City cannot legally increase its tax rates. Mayor Duggan testified that the likelihood of the people of Detroit or the state legislature voting to raise taxes is remote.

Further, a property tax increase would produce very little additional revenue. The Mayor testified that taxes in Detroit are among the highest relative to surrounding communities and the city services are comparatively low. Kevyn Orr credibly testified that the City is at tax saturation and raising taxes would likely add to the population decline.

The evidence also establishes that the plan is a better, indeed much better, alternative for creditors than dismissal. Significant City obligations would become immediately due. As mentioned earlier, in that scenario, the creditors' only remedy is the property tax assessment

remedy under the Revised Judicature Act. It is easy to foresee that a great number of creditors would race for that relief and the result would be chaos and an administrative nightmare for all involved. The City's reinvestment and revitalization initiatives would stall. The pension UAAL and OPEB claims in the billions of dollars would go unresolved.

There is no more money available for creditors in the City's already tight budget projections. The Court's feasibility expert so testified, as the Court will review here shortly. Every dollar is accounted for in providing necessary services, in implementing the City's necessary RRIs, and in repaying plan obligations. All of those cash uses are essential to the City's future.

Accordingly, the Court finds that the plan will provide creditors all that they can reasonably expect under the circumstances and that it is in their best interests.

## FEES

The Court will now discuss the issue of fees. As a condition of confirmation, section 943(b)(3) requires that "all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable."

On August 19, 2013, with the City's consent, the Court entered an order appointing a fee examiner and requiring him to act "to assure the Court, the City, the creditors, and the public that the City's Professional Fee Expenses are fully disclosed and are reasonable, as required by section 943(b)(3)." The fee examiner has filed quarterly reports that have fully disclosed the City's Professional Fee Expenses through June 2014.

Under the plan of adjustment, the process will continue as necessary to address fees incurred through the effective date of the plan.

Two issues are raised here:

(1) Does section 943(b)(3) require that all of the City's professional fees in the case be disclosed and reasonable or only fees that are unpaid as of confirmation?

(2) Should the Court accept, without further review, the fee examiner's findings that the fees have been reasonable?

The Court concludes that section 943(b)(3) does require that all of the City's professional fees in connection with the case be disclosed and reasonable. The Court further concludes that it is not appropriate to accept without further judicial review the fee examiner's findings that the fees have been reasonable.

The plain language of section 943(b)(3) requires only that fees "to be paid" must be reasonable. Yet, the Court cannot find any rational basis to distinguish between paid and unpaid fees in applying section 943(b)(3). It is an arbitrary line and may be subject to manipulation.

The Supreme Court's decision in *American United Mutual Life Insurance Co. v. City of Avon Park, Fla.* is highly instructive on this question. In that case, the Court discussed at length the legal and equitable necessity for the bankruptcy court to review a municipality's professional fees. It is a lengthy passage but worth quoting, because it is powerful and will also be relevant to the discussion on the fair and equitable issue later. The Court will omit the case citations.

> A bankruptcy court is a court of equity and is guided by equitable doctrines and principles except in so far as they are inconsistent with the Act. * * * A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest.' These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization, and the obtaining of assents thereto.
>
> * * *
>
> Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special

26

benefits for the reorganizers, or the need for protection of investors against an inside few or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need. . . . That power is ample for the exigencies of varying situations. It is not dependent on express statutory provisions. It inheres in the jurisdiction of a court of bankruptcy. The necessity for its exercise is based on the responsibility of the court before entering an order of confirmation to be satisfied that the plan in its practical incidence embodies a fair and equitable bargain openly arrived at and devoid of overreaching, however subtle.

In *City of Avon Park*, all of the professional fees at issue were unpaid upon confirmation. Nevertheless, the Supreme Court's mandate to review professional fees in a municipal case was not so spineless as to permit an exception for paid fees. Rather, the Supreme Court's mandate is imperative. This Court must abide it with the greatest consideration and care. This is particularly so in this case, because it appears that the fees will exceed $100 million.

Accordingly, the Court concludes that it has the obligation, as a condition of confirming the City's plan, to determine that the professional fees for which the City is obligated in connection with the case, whether paid or unpaid, are disclosed and reasonable.

The *City of Avon Park* case linked the bankruptcy court's obligation to review fees to its obligation to determine whether the plan is fair and equitable. Accordingly, the Court cannot outsource this responsibility to the fee examiner. It must make an independent determination that section 943(b)(3) is met.

The next question is how to review the fees in this case. In *In re Corcoran Hospital District*, the court found that the debtor could satisfy section 943(b)(3) through a post-confirmation process to review fees for reasonableness. This makes good sense in this case because the fees will continue to accrue post-confirmation.

27

Accordingly, to expedite confirmation, the Court will defer this issue. The Court will later request the assistance of counsel in establishing a mediation and litigation process for determining the disclosure and reasonableness of the fees for which the City is obligated.

There is another issue here that will have to be addressed. As noted, reasonableness of fees is a requirement for confirmation in chapter 9. This is unlike chapter 11 where objections to fees are not confirmation objections. The general deadline to object to the City's plan was May 12, 2014, and for bondholders and retirees it was July 11, 2014. As far as the Court can determine, only one party, David Sole, asserted an objection to the reasonableness of fees in this case.

So the issue becomes whether everyone else in the case has waived the issue. Within the next few days, the Court will establish a process to review fees, which it will do with the help of counsel. As part of that process, the Court will invite briefing on this waiver issue. In the meantime, until this process is established and the Court orders otherwise, the Court's order of October 31, 2014, prohibiting filing papers relating to the fee issue remains in effect.

Regardless however, the Court reaffirms that even if there has been such a waiver, the Court intends to fulfill its independent obligation to review the reasonableness and disclosure of fees.

## UNFAIR DISCRIMINATION

As noted, two classes of claims voted to reject the plan, class 14, the other unsecured claims, and class 15, the convenience claims under $25,000. Section 1129(b) allows the Court to confirm the plan despite those dissenting class votes with respect to those dissenting classes, "if the plan does not discriminate unfairly, and is fair and equitable." The Court will now address the unfair discrimination test and then the fair and equitable test next.

28

To analyze the unfair discrimination issue, the first step is to determine the recoveries for each unsecured class in the plan. The second step is to determine whether there is any discrimination against any of the rejecting classes. If so, the final step is to determine whether that discrimination is unfair.

Here, the recoveries for the rejecting classes are 13% for class 14, and 25% for class 15.

The next step is to identify any discrimination by identifying the classes of unsecured claims that have a higher recovery than the recoveries of the rejecting classes. It is readily apparent that the plan does discriminate in favor of class 7, the LTGO claims with a 41% recovery, class 8, the UTGO claims with a 74% recovery, and class 17, the 36th District Court claims with 33% recovery.

Calculating a percentage recovery for pension claims in classes 10 and 11 is complex.

The City's disclosure statement, which the Court approved, stated that the recoveries are 59% for PFRS and 60% for GRS. Based on a number of complex arguments, the City now asserts that the true recovery percentages are much lower and that there is no discrimination in favor of the pension class 10 and 11.

Fortunately, the Court does not need to resolve the difficult issues raised here. The Court concludes that even if the pension classes' recoveries are what the disclosure statement declares, the resulting discrimination against the unsecured and convenience classes is not unfair.

In connection with this final step, the Court must determine the meaning of the phrase unfair discrimination in section 1129(b).

The Court concludes that fairness and unfairness are matters of conscience and that determining fairness is a matter of relying upon the judgment of conscience. Whether

discrimination in a plan of adjustment is unfair is a question that requires a court to focus on the judgment of its conscience regarding that discrimination.

Several factors naturally inform this judgment. These factors include the circumstances in the case that bear upon the fairness of the discrimination in light of the purpose of chapter 9, which is to adjust an insolvent municipality's debt so that it can provide adequate municipal services. These factors also naturally include the Court's experience, education and sense of morality.

That is what this Court meant in its eligibility opinion when it addressed the potential for the impairment of pension rights in the City's plan. It stated that when considering any such impairment, the bankruptcy code demands "this Court's judicious legal and equitable consideration of the interests of the City and all of its creditors, as well as the laws of the State of Michigan."

The Court concludes that Congress intended this approach to unfair discrimination. Congress certainly could have established in section 1129(b) a more specific standard to determine unfair discrimination, including any of the more specific standards adopted in the case law. The sole statutory test, however, is whether the discrimination is unfair.

The Court will first address the fairness of the discrimination in the plan in favor of the pension classes. Then it will discuss the fairness of the discrimination in favor of the UTGO, LTGO and 36th District Court classes.

The Court finds that the City has demonstrated a substantial mission-related justification to propose a higher recovery to its pension claimants. The City is a municipal service enterprise. Viewed broadly, its mission is to provide municipal services to its residents and visitors to promote their health, welfare and safety. Its employees and retirees are and were the backbone of the structures by which the City fulfills its mission. The City, therefore, has a strong interest in

30

preserving its relationships with its employees and in enhancing their motivation, consistent with its financial resources. The City has reasonably and properly concluded that its discrimination in favor of the pension claims in its plan is necessary to its mission.

In contrast, the City has no similar mission-related investment in its relationships with its other unsecured creditors in classes 14 and 15.

Second, the City is an agency of the State of Michigan. Its existence, its mission, and its means of fulfilling that mission are all subject to the provisions of the constitution and laws of the State of Michigan. Among these provisions is article 9, section 24 of the Michigan constitution, which singles out municipal pension claims for special protection:

In the Court's eligibility opinion, it held that because of the Supremacy Clause of the United States constitution, this specific protection of the state constitution is not entitled to vindication in a federal bankruptcy proceeding. Nevertheless, that provision of the Michigan constitution does express the considered judgment of the people of the State of Michigan. The Court concludes that in determining the fairness of the discrimination against unsecured claims proposed in the City's plan, this judgment of the people of the State of Michigan is entitled to substantial deference.

Another consideration that appeals to the Court's conscience is the reasonable expectation of the parties. Generally, unsecured creditors reasonably expect similar treatment in bankruptcy. The difference here, however, is that the Michigan constitution gives notice to all of the unsecured creditors of a municipality that the rights of pension creditors are distinct, even if their pension claims are unsecured. That constitutional notice reasonably justifies the enhanced expectations of the pension creditors in this case. At the same time, that notice should also lower the reasonable expectations of the other unsecured creditors in the case.

31

A final consideration also suggests that this discrimination is not unfair. The Court has already observed here that the City's plan is largely a collection of interconnected settlements. Mr. Montgomery, counsel for the retiree committee, astutely argued that if each of the settlements in the plan is reasonable, then the resulting discrimination in the plan must be fair.

The Court agrees. The factors that inform the reasonableness of each individual settlement are the same factors that inform the Court's judgment about whether the resulting discrimination is fair.

Here, the classes that did not settle instead rejected the plan are two classes of general unsecured claims. There is, however, nothing about those claims that warrants any favorable consideration in the Court's unfair discrimination analysis.

In the Court's judgment, therefore, the discrimination in the City's plan of adjustment in favor of the pension creditors is not unfair.

The Court comes to the same conclusion about the discrimination in the plan in favor of the UTGO, LTGO and 36th District Court classes. The Court has already found that these settlements are reasonable settlements. They fairly and reasonably reflect the strengths and weakness of the creditors' claims and the City's defenses, the complexity and expense of possible litigation, and collectability issues. These considerations also justify discriminating in their favor and against the other unsecured claims and the convenience claims.

The Court only adds that the City also has a mission related reason to favor the 36th District Court claim due to its continuing legal and funding relationship with that court.

Accordingly, the Court finds that the City's plan does not unfairly discriminate against the two rejecting unsecured classes, 14 and 15.

32

## FAIR AND EQUITABLE

The Court will now discuss whether the plan is fair and equitable to dissenting classes 14 and 15.

To properly determine the meaning of this test, it is important to understand its effect. In practical consequence, the law allows the judge, who has no stake in the outcome of the plan, to substitute his or her judgment about the fairness and equity of the plan for the judgment of the creditors, who have every stake in the outcome. Ultimately, the issue is whether the Court should force a debt adjustment on unwilling creditors. We colloquially call this cramdown. That is the power that the City requests this Court to exercise here.

The language fair and equitable suggests the same kind of process of adjudication that the Court just discussed for the unfair discrimination test. Indeed, the words of these two requirements overlap somewhat, but the fair and equitable test has a broader focus, as the Court will discuss in a moment.

In *American United Mutual Life Insurance Co. v. City of Avon Park, Fla.*, which the Court discussed earlier, the Supreme Court reviewed at length the bankruptcy court's role in determining whether a chapter 9 plan is fair and equitable.

The Court concludes that under *City of Avon Park*, the City's plan is fair and equitable as to dissenting classes 14 and 15. That case first mandates this Court to investigate whether there is evidence of any misconduct that would require the court's remedy as a condition of confirmation, or whether the City or any class of creditors has committed any overreaching. The Court readily finds that there is no such evidence in this case.

33

But under the *City of Avon Park* case, overriding the dissenting creditors' judgment about a plan of adjustment requires more than just the absence of misconduct. It must also mean something more than what all of the other confirmation requirement mean.

The Court concludes that the fair and equitable requirement asks this question: Are there circumstances in the case that suggest to the Court's conscience that it is fair and equitable to impose the plan on the dissenting creditors against their stated will?

The Court finds that that there are such circumstances in this case.

First, it is appropriate to look at exactly how this class reacted to this plan. Very few of the creditors in classes 14 and 15 filed objections to the plan. Although the classes did vote to reject the plan, the margins were small. In class 14, the margin was slim—51% rejecting, 49% accepting. In class 15, it was a bit more significant—58% rejecting, 42% accepting.

The numbers behind those percentages tell a story here too. The actual vote in class 14 was 97 rejecting, 93 accepting. This means that if 3 rejecting votes had gone the other way, the necessary majority in number would have been achieved. The actual vote in class 15 was 189 rejecting and 153 accepting. That means that if 19 rejecting creditors in this class had accepted, the necessary majority would have been reached.

These circumstances raise this question: Is it fair and equitable to confirm this plan over the dissent of literally a handful of unsecured creditors, most of whom have claims under $25,000, when thousands of creditors with claims in the billions of dollars support the plan? To the Court's conscience, this is fair and equitable and the Court so finds.

The Court accepts the likelihood that the dividend to the creditors in classes 14 and 15 will cause those creditors real hardship. But the Court must analyze and balance the hardship on the other side too.

34

A large number of people in this City are suffering hardship because of what we have antiseptically called service delivery insolvency. What this means is that the City is unable to provide basic municipal services such as police, fire and EMS services to protect the health and safety of the people here. Detroit's inability to provide adequate municipal services runs deep and has for years. It is inhumane and intolerable, and it must be fixed. This plan can fix these problems and the City is committed to it. So if to fix this problem, the Court must require these few creditors that rejected the plan to nevertheless share in the sacrifice that the other creditors have agreed to endure, then so be it.

There is really no choice here. There are no viable alternatives to this plan that will solve the City's problems and at the same time pay more to classes 14 and 15 to get their support.

To revitalize itself for the good of all, the City and its people desperately need the shared sacrifice that this plan will impose on all of its creditors, even these few rejecting creditors, and the City and its people need it now.

Accordingly, the Court concludes that it should exercise its power under the bankruptcy code to impose the plan of adjustment on classes 14 and 15 despite their dissenting votes. The Court finds that the plan is fair and equitable as to them.

## THE CONSTITUTIONAL CLAIMS AGAINST THE CITY

The Court will now state its resolution of the objections that creditors with constitutional claims against the City filed. The written opinion will explain in depth the Court's reasons for these conclusions.

The Court first concludes that the Fourteenth Amendment does not provide a constitutional right to damages for a constitutional violation. Accordingly, the Court overrules the claimants' objection that chapter 9 cannot provide for the discharge of a claim under 42 U.S.C section 1983.

The Court further concludes that section 1983 claims against individuals in their personal capacity are not claims against the City. Accordingly, the bankruptcy code does not permit a chapter 9 plan to treat those claims, nor does it provide for their discharge.

If a collective bargaining agreement or other contract obligates the City to defend and indemnify its officers on these claims in their personal capacity and that contract is assumed in this bankruptcy, then that contractual obligation survives the discharge and remains fully enforceable post-confirmation. Otherwise, the City's contractual indemnification obligation is discharged in this bankruptcy.

To the extent that the City seeks to release its officers from liability under the standards in the *Dow Corning* case, the Court denies that. The City certainly has a strong interest in the efficient and effective functioning of the police department. The Court accepts that protecting its officers from personal liability for section 1983 claims is necessary to that mission. However, the record is barren of any evidence suggesting that the contractual indemnity obligations that the City is assuming are inadequate to accomplish that purpose. A third party release would deny injured parties their just relief. There is no evidence that the protection of a third party release for these officers, in addition to their indemnity, is also necessary for the proper functioning of the police department.

Finally, the Court concludes that the Fifth Amendment does establish a right to just compensation when a municipality takes private property for public use. Chapter 9 would violate

the Fifth Amendment if its application in this case would result in less than just compensation to these objecting claimants. There is, however, a ready solution.

Section 944(c)(1) gives the Court the discretion to exempt debts from discharge in the confirmation order. At the suggestion of the Attorney General, to avoid any issue as to the constitutionality of chapter 9 in this respect, the Court will use its authority under section 944(c)(1) to order that the objecting parties' Takings Clause claims are exempt from discharge. This ruling eliminates any constitutional grounds to deny confirmation of the City's plan of adjustment.

These rulings will be reflected in the order confirming the plan.


## THE EXIT FINANCING

The Court will now address the City's request for approval of its exit financing. No party has objected to the exit financing.

The City requests the authority to borrow up to $325 million as part of its exit from bankruptcy. The City has recently stated, however, the intent to borrow only $275 million. The loan agreement requires an escrow reserve of $27.5 million. Barclays Capital, the issuer, will hold the notes, but they will be sold or refinanced in the municipal bond market within 150 days. The notes are secured by the City's revenue from its income tax, which reduces its interest cost slightly. This security interest may, however, impair the City's ability to access the municipal bond market, should the need arise.

From these loan proceeds, the City will use $120 million for the postpetition loan, $45 million for the outstanding SWAPs settlement obligation, and $55 million of the outstanding LTGO obligation. The balance will be used to begin to fund the restructuring and reinvestment

37

initiales.  As the Court will address in a moment, These RRIs are critically important to the feasibility of the plan and to the City's future.

The borrowing was approved by City Council, the Michigan Finance Authority and the Local Emergency Financial Assistance Loan Board.

The Court finds that both the terms of the financing and the uses of the loan proceeds are reasonable. The lender is acting in good faith. Accordingly, the financing meets the requirements of the bankruptcy code. The Court approves it.

**FEASIBILITY**

The Court will now address feasibility.

The Court appointed an expert, Martha E.M. Kopacz, on the issue of feasibility. Ms. Kopacz submitted a report and two supplements. She also testified regarding her observations, conclusions and recommendations.

The GRS filed two related motion to exclude portions of Ms. Kopacz's testimony and to preclude her evidence relating to alleged historical mismanagement and misconduct by the GRS and the PFRS. For reasons that the Court will explain in its written opinion, both motions are denied.

The Court finds that Ms. Kopacz's reports and testimony are fully credible and it accepts and adopts her findings, with the minor exception of her conclusion about the Court's pacing of this case.

Ms. Kopacz adopted this test for feasibility in this case:

> Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations

38

contemplated in the Plan without the significant probability of a default?

The Court concludes that this standard is the appropriate standard for determining feasibility under section 943(b)(7). Accordingly, the Court adopts it.

Her opinion is that the City's plan is feasible, as required by section 943(b)(7), and that the assumptions that underlie the City's plan of adjustment projections regarding its revenues, expenses and plan payments are reasonable.

In Ms. Kopacz's initial report, she concludes:

> The POA and the projections that support the POA are designed to allow the City to continue to improve its level of service to the citizens of Detroit. I believe that the RRIs are reasonable and well considered. If executed, they will allow the City to deliver essential services. It is my opinion that the City is beginning to emerge from the service delivery insolvency referenced in Judge Rhodes' opinion concerning eligibility.

In her second supplemental report, she concludes:

> My opinion, based on the information provided to me and my team and certain testimony during the Confirmation Trial, is the current projections are within the range of reasonableness and the Plan of Adjustment remains feasible.

Ms. Kopacz did add this caution in her second supplemental report:

> I want to emphasize, however, that there is little space remaining on the continuum of reasonableness. The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment. Conversely, they have imposed additional financial obligations on the City. I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment. The financial obligations associated with the recent settlements only intensify this concern. While my opinion is the Plan of Adjustment remains feasible and there is not yet a significant probability of default as described in the Standard, there is no denying the possibility of default has increased.

> It is not realistic or prudent to believe that the City could take on any
> additional Plan obligations and remain within the continuum of
> reasonableness necessary to establish feasibility.

Ms. Kopacz's testimony was to the same effect.

Her conclusions regarding the feasibility of the plan were corroborated by the testimony from Gaurav Malhotra, Robert Cline, Caroline Sallee, John Hill, Charles Moore, Kevyn Orr, Council President Jones, and Mayor Duggan.

In this case, the evidence establishes that there are three components to the feasibility of the plan and to the ultimate success of the City of Detroit. They are (1) a workable long-term financial plan, (2) the human and capital resources to execute the plan, and (3) the commitment to implement the plan.

The emergency manager and his team, working in conjunction with the Mayor and his team, have created a workable plan for this City. It will be for the City Council, the Mayor and his administration to implement the plan. The Mayor testified that he and his team are fully committed to implementing the plan and Council President Jones testified that the plan has the support of the City Council. The Court fully credits that testimony.

The Court finds further support for the feasibility of the plan in the establishment of the Financial Review Commission under PA 181 of 2014. The Act gives the Commission the responsibility to insure that the City complies with the plan of adjustment. It also gives the Commission a broad array of responsibilities and tools to oversee the City's fiscal integrity. For example, the Commission has the authority to review and approve the City's 4-year financial plans, contracts over $750,000, and all collective bargaining agreements. It also appears to give oversight responsibility for the City's pension funding obligations.

40

It cannot be emphasized enough that the long-term feasibility of the plan of adjustment will depend on the effectiveness of the Financial Review Commission. This is a matter of extraordinary weight and responsibility. It will certainly require substantial budget resources and skilled staffing. The Court is satisfied that the state will provide the Commission with adequate resources to meet its responsibilities.

In conclusion, therefore, the Court finds that it is likely that the City of Detroit, after the confirmation of the plan of adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default. Accordingly, the Court finds that the City's plan of adjustment is feasible.

It appears that Ms. Kopacz's greatest concern for the feasibility of this plan and for the future of the City arises from the risks that the City retains relating to pension funding.

Ms. Kopacz states in her report, "The City must be continually mindful that a root cause of the financial troubles it now experiences is the failure to properly address future pension obligations."

The Court shares that concern. What happened in Detroit must never happen again. The hardship and anxiety that its employees and retirees, and their families, have endured and will continue to endure must never happen again. This must never be repeated anywhere in this state.

Therefore, the Court's confirmation of this plan comes with three further appeals.

The first is to the City's labor unions and retiree associations. In his closing argument, Mr. Bennett, the City's attorney, perceptively asserted that the goal of protecting municipal pensions, and in this country, requires municipal labor to enhance its vigilance of municipal pension funding. He also implored labor to use its relationships with the municipal leadership to achieve that goal.

41

The Court agrees. It would only additionally ask labor to consider whether this goal of protecting municipal pensions in this City, and indeed the broader goal of revitalizing the City, suggests that it should take a much longer and broader view of the best interests of its members and retirees.

The second appeal is to the State of Michigan. The Revised Municipal Finance Act unequivocally states that the Michigan Department of Treasury is "directed to protect the credit of this state and its municipalities." Michigan Compiled Laws 141.2201. The argument is powerful that this provision of state law, together with the constitutional prohibition on impairing municipal pensions and the constitutional mandate on pension funding, requires the state to take full responsibility to vigorously supervise and regulate its municipalities to assure adequate pension funding. The Michigan constitution does not single out the obligations of municipal bonds for protection in the same way it protects pension rights. Bond obligations can no longer be the only first-budget municipal obligations.

Moreover, the constitutional protection for municipal pensions can only be realized through honest, complete and realistic accounting and actuarial disclosures. Ms. Kopacz made several specific and worthy recommendations that the City, the pension plans, the Financial Review Commission and the state should seriously consider adopting and implementing.

The municipal employees and retirees of this state need and deserve the state's robust commitment to that obligation. The Court found here today that the state's contribution of $195 million in exchange for a release of liability on the pensioner's constitutional claim is a reasonable settlement. History will judge the correctness of this finding, and it will judge that this finding was correct only if what happened to Detroit never happens again. The State of Michigan can sustain that finding in history only by fulfilling its constitutional, legal and moral obligation to

42

assure that the municipalities in this state adequately fund their pension obligation. If the state fails, history will judge that this Court's approval of that settlement was a massive mistake.

The third appeal is directly to the governor. It relates to the composition of the Financial Review Commission. The Court has found that the responsibilities that PA 181 imposes on the Commission will contribute to the feasibility of the plan.

But the law by itself is not enough. The effectiveness of the Commission in ensuring the long-term feasibility of the plan and the City's fiscal health will require that its members have the skills, standing, experience, expertise, independence, and commitment that are the most outstanding that can be found, and beyond question. This would be so under any circumstances, but one particular circumstance makes this concern even more compelling.

In Public Act 181, the Michigan legislature chose to include on the nine-member commission two elected City of Detroit officeholders. At the commission level, therefore, the mayor and the council president will advocate the City's position, not provide oversight of it. That means that realistically, only seven of its nine members are truly independent. It also means that only the seven independent members of the commission will carry out the oversight function that the legislation contemplates.

This is a major problem. Because the commission acts by majority vote, it will take a super-majority vote of the independent members, 5 of the 7, to disapprove or reject any action that the City proposes for approval by the commission under the law. It is a plain conflict of interest for the mayor and the council president to have a vote. It both skews the commission's voting and risks undermining the commission's effectiveness in ensuring the implementation of the plan and the City's fiscal health and integrity. Equally importantly, it also risks undermining the public's perception of the legitimacy and independence of the commission.

43

The Court believes that this problem requires that the governor appoint members of the commission who are fully willing and able to exercise the independent, skilled and experienced judgment that PA 181 contemplates. The Court therefore appeals to the governor to appoint commission members with these qualities.

That concludes the Court's decision confirming the City's plan.

## CONCLUSION

This comes with thanks to many people.

First, deeply felt thanks also to Chief Judge Rosen for his work as the mediator in the case. Deeply felt thanks also to each of the mediators on his team—Judge Roberts, Judge Cox, Judge Lawson, Judge Daniels, Judge Perris, Eugene Driker, and David Coar. These words of thanks cannot begin to express the depth of gratitude that I, and all of the parties and attorneys, feel about what Chief Judge Rosen and his mediation team put into this case—the work, the time, the creativity, the commitment, the nights, the weekends, and the holidays.

Thanks also to Prof. Gina Torielli. She enthusiastically served as the mediators' consultant on municipal bond issues. Her assistance was invaluable.

The settlements that the mediators assembled in this case are extraordinary and unprecedented. Never before have bankruptcy mediators proactively sought to marshal the community's financial resources to solve a community problem. Most importantly, they knew that their work was not simply about resolving a bankruptcy case. It was about fixing a broken city. Where would this case be without them?

44

I have said publicly and repeat now that the smartest thing I did in this case was to ask Judge Rosen to be the mediator. I don't know if he agrees with that. I do think that he would agree that the smartest thing he did as the mediator was to assemble his team.

One of the unforeseen but fortuitous consequences of this case has been the development of a true partnership between the bankruptcy court and the district court. This partnership was essential to the efficient and expeditious resolution of this case and, arguably, to the very future of the City of Detroit. Thanks to the Chief for having the wisdom, foresight and willingness to engage in it with us. I hope this partnership endures.

Thanks also to Judge Rosen, to the entire district court, and to Dave Weaver and his staff for their amazing and gracious hospitality.

Thanks also to Katherine Gullo, the bankruptcy clerk, and to her staff for their wonderful support in this case.

On behalf of the parties in the case, thanks also must go to the foundations and to the DIA for their generous and unprecedented charitable commitments in this case. It is unimaginable what the resolution of this case would have looked like without them.

Profound thanks to the attorneys and the other professionals in the case. You conducted yourselves with the highest degree of civility, respect, and professionalism, both to each other and to the Court. At the same time, you also demonstrated zealous advocacy as well as loyalty to your oaths and to your clients. Your work in this case is a model of the public service role that lawyers and the legal profession perform in our society. It has made me proud to be a part of the judicial process and of legal profession, and you should each share in that pride.

Also, on a more personal level, you made my job manageable. Even fun sometimes. Thanks for that.

Here I want to single out Kevyn Orr for special recognition and appreciation. His task was perhaps the most challenging of all of us. Yet he met that challenge with skill, determination and commitment, and at great personal sacrifice. I hope that someday soon, this City will recognize the singular contribution that he made to its fresh start and give him the credit that he truly deserves.

Thanks also to Dick Ravitch, my consultant on feasibility. His commitment, knowledge, wisdom, expertise, and spirit of public service were remarkable and helped me to more fully understand this case. I hope a way is found for him to contribute to fiscal health and revitalization of this City. He would be a valuable resource in any capacity.

Thanks to Marti Kopacz and her team. Under extraordinary time pressure, she and they performed remarkable service for me with grace and professionalism.

Thanks to Bob Fishman, my fee examiner, and his staff, for their skilled assistance on the delicate responsibility that they took on and embraced.

Finally, this case proves that it takes a team. So I want to thank and gush about my team— Caroline Fayz, Kelli Dexter, Chris Sikula, Ryan Hamstead, Cindy Person and Alesia Dobbins. You are simply the best. Thank you.

We have talked a lot in this case about how a chapter 9 case is so different from all the other types of bankruptcy cases. It is, but only around the edges. In fundament ways, the Detroit bankruptcy case is just like every one of the other 30,609 bankruptcy cases that were filed in our court in 2013. In every case, we have a debtor who needs help, who made mistakes, who took unwarranted risks, who accepted bad advice, who exercised bad judgment, who was too long in denial, or who had just plain bad luck. But no matter, our society holds dear the value of a fresh start and of second chances. That value is manifested with brilliant clarity in our bankruptcy laws.

46

And that value is manifested the same in this $18 billion case as it was in the no asset chapter 7 cases that were filed just before and just after this case on July 18, 2013.

To the current leadership of the City, you are about to get your City back from us in the bankruptcy world. We give it back to you with the fresh start that this City needs and deserves under our federal bankruptcy laws. We hope we helped. It is now on you to implement this plan. I have found that you will do that. Please make me right. It is in the City's best interest. The City's true and full fresh start depends on it.

Before I conclude, I want to address the people of the City of Detroit, whose passion for this City is remarkable in its breadth, in its expression, and in its unwavering endurance. I just said that your leaders are about to get the City back. Actually of course, it is you who are about to get your City back. It is your City.

A large number of you told me that you were angry that your City was taken away from you and put into bankruptcy. You told me in your court papers. You told me in your statements in court. You told me in your blogs, letters, and protests. I heard you.

I urge you now not to forget your anger. Your enduring and collective memory of what happened here, and your memory of your anger about it, will be exactly what will prevent this from ever happening again. It must never happen again.

When Fredia Butler testified during the confirmation hearing, she quoted the great wisdom of Marian Wright Edelman, who said, "Democracy is not a spectator sport." And so I ask you, for the good of the City's fresh start, to move past your anger. Move past it and join in the work that is necessary to fix this City. Help your City leaders do that. It is your City.

47

This leads to my final thought. We have used the phrase, the grand bargain, to describe the group of agreements that will fix the City's pension problem. That description is entirely fitting.

In our nation, we join together in the promise and in the ideal of a much grander bargain. It is the bargain by which we interact with each other and with our government, all for the common good. That grander bargain, enshrined in our constitution, is democracy.

It is now time to restore democracy to the people of the City of Detroit.

I urge you to participate in it. And I hope that you will soon realize its full potential.