**ITEM 5**

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| | ) | |
| _____ | ) | |

### CREDITOR MICHIGAN AFSCME COUNCIL 25 AND ITS AFFILIATED DETROIT LOCALs' RESPONSE TO DEBTOR's OBJECTION TO PROOFS OF CLAIM (DOCKET NUMBER 2958)

Now comes Michigan AFSCME Council 25 and its affiliated Detroit Locals, with this response to the Objection of the City of Detroit (Docket No. 4876), filed pursuant to Sections 105 and 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), and the Federal Rules of Bankruptcy Procedure Local Rules of the Bankruptcy Court of the Eastern District of Michigan (the "Local Rules"), concerning proof of claim number 2958 ("Claim") filed by said Coalition, and states as follows:

### I.  INTRODUCTION

Michigan AFSCME Council 25 and its affiliated Detroit Locals (AFSCME) have filed proof of claim number 2858 (AFSCME Claim), alleging varied sources of liability.  The City of Detroit objects generally, due to purported lack of legal

1

merit or duplication of claims. The objections are not specific about any particular element of the Claim, but make broad brush observations.

AFSCME concurs that continued efforts at resolution between the parties is in order. It is true that a number of the grievances addressed in the Claim have been resolved in principle, with signed agreements forthcoming. It is also true that certain aspects of the asserted damages within the Claim are duplicated within the City's proposed plan of adjustment; the proof of claim as filed on February 21, 2014 could not have accounted for subsequent developments in the bankruptcy litigation. AFSCME disagrees, however, that the Claim is without merit. Thus, resolution efforts amongst the parties should establish all aspects of the Claim still left in dispute.

With its Objections, the City has sought to treat the October 1, 2014 hearing date (Docket No. 5454) as a pre-hearing conference, because the volume of disputes within the Claim prevents "a typical claim objection proceeding." AFSCME concurs with this suggestion. Even more, AFSCME suggests that disputed aspects of the Claim be placed before a labor arbitrator for his/her assessment of the merit and value of the claims.

Nonetheless, below AFSCME reviews the legal merit of its claims.[1]

---

[1] The length or absence of a summary below is not indicative of a diminution in the value of the claim. Further, AFSCME reserves all rights to advance all arguments and categories of claims contained within its Proof of Claim but not specifically

2

## II. EVIDENCE AND ARGUMENT TO BE PRESENTED
## REGARDING THE PROOFS OF CLAIM

**A.    Refusal to bargain AFSCME Local 1023: MERC Case Number D13 C-0331**

AFSCME Local 1023 is a union which represents emergency service operators (911 operators) for the City of Detroit Police Department.  As a "public safety" union (representing public safety employees), the local resolves its disputes in negotiating a new union contract with the City through "binding arbitration"; where a neutral third party decides on the provisions to be contained within a union contract.[2]  This statute is commonly known as "Act 312", MCLA §§ 423.231-423.247.  Importantly, Act 312 is a separate statute from the Public Employment Relation Act, MCLA §§ 423.201-423.217.  Under Act 312, either the union or employer may initiate a binding arbitration proceeding. MCLA § 423.233.

On March 16, 2011, the state of Michigan passed Public Act 4 – the emergency manager law.[3]  Among other things, this statute permitted a public employer, in certain conditions, to avoid compliance with one section of PERA, MCLA § 423.215(1). MCL § 141.1514a(10) (no duty to comply thirty days after a consent agreement is executed); MCL § 141.1526(3) (no duty to comply where the

---

addressed here.

[2] Technically, Act 312 sets up a three-person panel of arbitrators to rule on pending disputes in contract negotiations.  The union and employer each select a panel member, and the chair of the panel is the neutral arbitrator. MCLA § 423.235

[3] The Local Government and School District Fiscal Accountability Act.

local government is placed in receivership).  Section 215(1) obligates the employer to bargain with its unions.  On April 10, 2012, the City's consent agreement with the state became effective, thus the City was no longer subject to Section 215(1) of PERA as of May 10, 2012.  In November 2012, Public Act 4 was rejected by a state-wide vote of Michigan's citizenry.  On December 26, 2012, Public Act 436 (MCLA §§ 141.1541-141.1575) was passed, and made effective March 28, 2013.[4] Public Act 436 also contains similar provisions alleviating a public employer from complying with Section 215(1).

On March 12, 2013, AFSCME Local 1023 requested MERC mediation to assist in negotiations (*Exhibit 1*) and made a written request to bargain a new contract to the City. (*Exhibit 1*)  After the effective date of Public Act 436, on April 3, 2013, the City responded by refusing to bargain with the Local, citing to Public Act 436 and the fact that the City was under receivership. (*Exhibit 2*)  On June 3, 2013, Local 1023 requested binding arbitration under Act 312. (*Exhibit 3*)

In requesting Act 312 arbitration, despite the suspension of Section 215(1), AFSCME took the position that Act 312 – a separate state statute from PERA – mandated the binding arbitration process, irrespective of the Public Act 436 and its

---

[4] Between the November 2012 repeal of Public Act 4 and the March 28, 2013 effective date of Public Act 436, the "emergency manager" law in effect in Michigan was a 1990 statute commonly known as Public Act 72.

4

reference to Section 215(1) of PERA. The City took the position that PA 436 obviated its Act 312 obligation to participate in binding arbitration.

In a proceeding with other public safety Detroit unions, the MERC issued a split decision that public safety unions of employers placed in receivership, under PA 436, are not eligible for Act 312. *City of Detroit*, 27 MPER ¶ 6 (2013) Thus, on June 21, 2013, MERC's staff ordered that AFSCME Local 1023's Act 312 petition was being dismissed administratively, based upon the June 14th decision of the MERC in other Detroit public safety unions. (*Exhibit 4*)

For its Claim, AFSCME contends that this decision was in error. The Act 312 statute is clear as to how a union establishes eligibility for participation in binding arbitration:

> "Whenever in the course of mediation of a public police or fire department employee's dispute, except a dispute concerning the interpretation or application of an existing agreement (a "grievance" dispute), the dispute has not been resolved to the agreement of both parties within 30 days of the submission of the dispute to mediation, or within such further additional periods to which the parties may agree, the employees or employer may initiate binding arbitration proceedings by prompt request therefor, in writing, to the other, with copy to the employment relations commission.

MCLA § 423.233. The Act continues by mandating what the parties must do in the furtherance of binding arbitration: Section 234 (the parties "shall" choose a panel member within 10 days), Section 235 (MERC "shall" select a neutral arbitrator within 7 days of the request for arbitration), Section 236 (the arbitrator "shall" call and begin the hearing within 15 days after appointment), Section 240

5

13-53846-tjt Doc 8495-6 Filed 11/26/14 Entered 11/26/14 15:50:55 Page 6 of 148
13-53846-swr Doc 7295 Filed 09/02/14 Entered 09/02/14 15:47:48 Page 6 of 148

(the decision of the arbitrator "shall" be final and binding, "if supported by competent, material, and substantial evidence on the whole record …").

Importantly, the statute prohibits the employer (and union) from changing employment terms during the pendency of the Act 312 proceeding:

> "During the pendency of proceedings before the arbitration panel, existing wages, hours and other conditions of employment shall not be changed by action of either party without the consent of the other but a party may so consent without prejudice to his rights or position under this act."

MCLA § 423.243. Thus, according to the statute, the City cannot unilaterally implement employment terms (i.e., CET) on a party which has sought binding arbitration under Act 312.

The requirements to engage in Act 312 proceedings are contained within the statute. A request in writing is the chief requirement. The Commission has confirmed that Appellant here made such a request. (*Exhibit 4*) MERC's opinion in *City of Detroit*, 27 MPER ¶ 6 (2013) relied on the fact that the duty to bargain in PERA – as referenced in another statute – was no longer present. However, there is no need for the duty to bargain within PERA to exist, in order for Act 312 to be operative. Indeed, the above-quoted Section 240 of Act 312 outlines that statute's self-contained duty to bargain. The employment conditions "shall not be changed by action of either party" without "consent of the other [party]"; stated another way, without bargaining to agreement. The duty to bargain within Act 312 is actually stronger than the duty to bargain within PERA. An employer under PERA

6

is allowed to make adjustments in employment conditions after bargaining with the union to a state of "impasse". Under Act 312, however, even reaching impasse does not permit the employer to change employment conditions without agreement of the union.

Act 312 is supplementary to PERA. However, the state legislature clearly expressed its will of maintaining the employer's obligations to comply with Act 312 – even *vis-a-vis* the emergency manager law. The legislature amended Act 312 with 2011 Public Act 116, during the same legislative session in which it passed the initial emergency manager law – PA 4. In doing so, the legislature did not exempt governments subject to PA 4 from applicability to Act 312. This fact demonstrates a willingness of the legislature to permit Act 312 proceedings to continue, even in the event of an emergency manager being appointed. Act 312 contains certain exemptions from the Act. It defines the employees who may utilize the act and exempts certain groups. It also clarifies that the Act does not apply to "persons employed by a private emergency medical service company who work under a contract with a governmental unit …" or administrative or supporting employees working in emergency medical services. MCLA § 423.233. The legislature could have easily exempted employees who work for governments subject to PA 4 in Section 233; it did not. *Expressio unius est exclusio alterius*.[5]

---

[5] The express mention in a statute of one thing implies the exclusion of other

Even more, explicit language of the 2011 amendments to Act 312 acknowledges that public employers under an emergency manager will still be obligated to participate in Act 312 proceedings. Under 2011 PA 116, The legislature adopted certain factors that the arbitration panel must consider in reaching a final decision. One of those factors is: "Any law of this state or any directive issued under the local government and school district fiscal accountability act, **2011 PA 4**, MCL 141.1501 to 141.1531, that places limitations on a unit of government's expenditures or revenue collection." MCLA § 423.239(1)(a)(iv)(**emphasis** added). Thus, the state legislature clearly contemplated Act 312 when it drafted the PA 4. Nowhere in PA 116 are localities under an emergency manager not obligated to comply with Act 312. Instead, the arbitration panel is merely supposed to include "limitations . . . [on] expenditures or revenue collection" – due to the application of the emergency manager law – as a factor in reaching a decision. Hence, the interpretation of Act 436 to exempt governments in receivership altogether creates a clear conflict with the amended Act 312, and makes the above-quoted Section 9(1)(a)(iv) completely superfluous.

The Legislature is presumed to be aware of all existing statutes when enacting a new statute. *Cameron v. Auto Club Ins Ass'n.,* 263 Mich. App. 95, 98 (2004). Statutes that appear to conflict should be read together and reconciled, if

similar things." *Bradley v. Saranac Community Schools Bd. of Ed*., 455 Mich. 285, 298 (1997).

possible. *World Book, Inc. v. Dep't. of Treasury,* 459 Mich. 403, 416 (1999). When two statutes lend themselves to an interpretation that avoids conflict, that interpretation should control. *Jackson Community College v. Dep't. of Treasury,* 241 Mich. App. 673, 681 (2000). The interpretation should give effect to each statute "'without repugnancy, absurdity, or unreasonableness.'" *Livonia Hotel, LLC v. City of Livonia,* 259 Mich. App. 116, 131 (2003), quoting *Michigan Humane Society v. Natural Resources Comm.,* 158 Mich. App. 393, 401 (1987). Here, MERC's ruling nullifies Act 312, in violation of these doctrines.

For these and other reasons, Claimant contends that MERC erred in dismissing its Act 312 petition and denying that local binding arbitration. As a result of this dismissal, the City imposed significant wage and benefit concessions upon the Local 1023 membership.

**B.    Local 207, 2394 and 2920 DWSD refusal to bargain / Case Number C13 D-069**

AFSCME represents three locals within the City of Detroit Water and Sewerage Department; Locals 207, 2920 and 2934. Prior to the time the City was no longer subject to Section 215(1) of PERA, due to the City being place in receivership, the AFSCME unions sought to bargain a new union contract. AFSCME was unable to secure contracts for all three locals due to the City's bad faith bargaining. This Claim seeks damages due to the City's illegal conduct.

## C.     Imposition of furloughs days in February 2013

In February 2013, the City unilaterally imposed furlough days requiring City employees to take unpaid days off work at least twice per month. (*Exhibit 5*) These furlough days represented a 10% loss in income for those employees placed on furlough.  Since most civilian employees had already incurred a 10% loss in base pay, this change brought the total loss in income for these employees to 20%.

As described in the Response to Objections filed by the Coalition of Detroit Unions (filed September 1, 2014 and responding to Docket No. 4874), during the period between November 2012 and May 10, 2013, the City's continued obligation with its unions before unilateral change in employment conditions is beyond dispute.  The evidence will reveal that in this instance, the City failed to bargain to impasse prior to imposing the additional furlough days.   Thus, the imposition violated PERA.  The imposition lasted nearly one year for hundreds of furloughed employees.   The damages associated with this element of the Claim are the financial losses so incurred.

## D.     Detroit refusal to bargain concerning Transportation Locals: Case Number C12 H-157

AFSCME represents two locals within the City Department of Transportation, Locals 214 and 312. The City has refrained from imposing employment conditions on these two locals in the same manner it imposes employment conditions on other employees.  This is because the federal

government provides funding for transportation departments of municipalities, released pursuant to the Federal Transit Act, 49 U.S.C. 5333(b) (aka "13(c)"). Under that federal statute, the municipality in receipt of federal funds is obligated to bargain with its unionized employees in good faith. Thus, the City has entered into a 13(c) protective agreement with AFSCME and it two locals.

These locals, however, are part of a city-wide bargaining unit, as determined by Michigan courts. AFSCME Council 25 Detroit locals have been considered one bargaining unit throughout the City. *Michigan Ass'n of Public Employees v. Michigan AFSCME Council 25*, 172 Mich. App. 761 (1988) As such, the changes made to the non-DDOT locals were improper, in that they represented the City severing the city-wide bargaining unit.

**E.      AFSCME Council 25 (13th check ULP). MERC Case No. C12-E-092**

On about November 30, 2011, the City passed an ordinance which limited payments into employee annuity accounts and stopped "13th checks" being paid to retirees. By applying this change to union-represented employees and concerning union-negotiated contractual benefits for retirees, the City violated state labor laws. By making these changes, the City ignored its bargaining obligation and repudiated its contractual obligations. AFSCME filed a charge contesting the changes. (*Exhibit 6*)

In February 2013, Administrative Law Judge ("ALJ") Doyle O'Connor of the Michigan Employment Relations Commission ("MERC") heard oral argument on AFSCME's motion for partial summary disposition. Following this Honorable Court's authorization via modification of the automatic stay, on October 4, 2013, ALJ O'Connor issued his Decision and Recommended Order (DRO) granting the AFSCME motion for summary disposition. (*Exhibit 7*) ALJ O'Connor's DRO "restore[s] to the Pension Board" of the Detroit General Retirement System "the discretion previously exercised . . . regarding [distribution of annual] excess earnings" of GRS to "affected retirement plan participants" and explicitly orders that these participants "be made whole by the City to the extent that there is any practical impediment to the Pension Board making those participants whole otherwise." (*Exhibit 7*, pg 24)

In his order, ALJ O'Connor considered the losses realized during the 2011 and 2012 years as the damages in the charge. After that point, the City was under PA 436 and, therefore, the City could make such a change unilaterally. (*Exhibit 7*, pg 18) The ALJ also indicated that the proceedings had not developed to the point where a dollar figure could be conclusively ascertained as to the value of the award. He nonetheless stated the award could be as high as $174,000,000. (Id)

**F.** **City of Detroit 2012 negotiations and implementation with Coalition: MERC Case No. C12 D-065, C12 F-125, C13 G-129**

Following the negotiation of a Coalition tentative agreement in February 2012, the City violated state labor laws by refusing to execute that contract but illegally imposing other terms and conditions of employment. This includes wage and benefit concessions for all AFSCME members, which remain in existence today. The reader is referred to the Coalition of Detroit Unions proof of claim, the Coalition response (filed September 1, 2014) to the City Objections to the Coalition proof of claim. (Docket No. 4874) The AFSCME claim represents a share of the Coalition claim, as AFSCME is a member of the Coalition.

**G.** **Violation of Privatization Ordinance**

The City of Detroit is a home rule city and is governed by its Charter. In 1997, the citizens of Detroit voted to have a Privatization Ordinance, when it approved the City of Detroit City Charter. The Charter included Section 6-307, which contained provisions requiring the City Council ("Council") to adopt an ordinance establishing procedures for the letting of work to private entities that would displace regularly employed city workers. This Charter provision was adopted by the voters of the City of Detroit.

On March 31, 2004 the City Council of the City of Detroit ("City") exercising its proprietary function adopted Ordinance No. 13-04, City Code Section 18-5-100 et seq., to govern the process of hiring entities to perform

13

services for the City of Detroit, which are performed by individuals employed by the City. Prior to hiring a vendor to perform services performed by City employees, there are various steps which must be completed to provide transparency and properly allow for the existing city employees to actively participate in the bidding process. The Privatization Ordinance requires City Council approval in order to solicit entities for bids, and that the City employees must be provided certain information which will enable them to make a bid. Most notably, the ordinance prohibits the letting of the work without a 2/3 affirmative vote of the City Council.

## H.     City of Detroit/DFFA/MERC: MERC Case No. C11 K-201

AFSCME has approximately thirteen (13) members assigned to the Fire Department of the City of Detroit, Apparatus Unit. Beginning May, 2011, AFSCME received notice that members of the Detroit Fire Fighters Association, Local 344 ("DFFA") were performing the duties performed by the AFSCME membership. In November 2011, AFSCME filed an unfair labor practice charge concerning removal of work from the bargaining unit. (*Exhibit 8*) AFSCME contends that the City illegally removed such work. This element of the claim consists of the lost earnings of the AFSCME members.

## I. City of Detroit longevity claim for AFSCME employees: Claim number 12-000522 and 12-000523; Wayne County Circuit Court Number 13-003430-AA

Under Article 25 of the 2005-2008 AFSCME collective bargaining agreement ("CBA"), employees who worked a minimum amount of hours received a yearly "longevity payment." The amount of the payment was based upon the number of years of seniority, starting with $150 for those who have served for five years and escalating up to a maximum of $750.

Effective October 2010, the City imposed new contract terms on AFSCME employees, which removed the longevity pay. However, many AFSCME members had already worked the requisite number of hours, entitling them to full longevity pay. Further, the members who had worked less than the hour-threshold for a full longevity payment were entitled to prorated longevity payments for hours worked in each month during that year. Despite the clear contractual obligation, confirmed by City managers at the hearing, the City refused to pay any AFSCME members the longevity pay owed.

AFSCME City of Detroit employees, Dean Story and Rosemarie Haynesworth, and on behalf of all members of the AFSCME union who were entitled to longevity pay in December 2010, filed claims with the state of Michigan's Department of Licensing and Regulatory Affairs, Wage and Hour Division ("The Division") for this payment. However, the Division rejected

Plaintiffs' claim. (*Exhibits 9* and *10*)  It rationalized that AFSCME had agreed to eliminate the longevity payment as of January 2011, which is accurate.  However, the claims were for longevity earned during the prior year, which the employees earned and which AFSCME had not agreed to waive on their behalf.

Presently, the claims are on appeal before Wayne County Circuit Court. (*Exhibit 11*)

## J. Negotiation of Local 542 supplemental agreement: MERC Case Number C07 L-033

A number of AFSCME locals negotiate "supplemental agreements" with various departments in the City of Detroit.  These supplemental agreements, separate and apart from the Master Agreement which most of the AFSCME Detroit Locals negotiate collectively (there are thirteen Detroit Locals which negotiate the Master Agreement), contain provisions unique to that Local and department. AFSCME Local 542 filed an unfair labor practice charge, challenging the City's failure to negotiate its supplemental agreement.

## K. Detroit & SEMHA: MERC Case No. C05 H-194

In 2005, AFSCME filed a charge to protest the layoff of four individuals from the Detroit Health Department who were immediately rehired by a Detroit contractor, Southeastern Michigan Health Association ("SEMHA"), to perform the same work.  AFSCME alleged that the contractors' performance of unit work was in violation of PERA, and sought to have these employees placed back into the

16

AFSCME unit.  During the litigation of the charge, AFSCME discovered that there were many other former City employees, who had been replaced as SEMHA employees.  After a series of motions to dismiss, motions for reconsideration, subpoena litigation, appeals, hearing delays, etc., the evidentiary hearing has yet to be concluded.  The charge seeks back pay and benefits for those impacted employees.  Additionally, AFSCME Local 457 lost dues for those laid off members as well and the members who were improperly removed from the Local.

**L.     Breach of contract claims**

AFSCME lists a general category of breach of contract claims, including but not limited to grievances.  It is believed that a number of the grievances may be resolved in principle, and further discussion will ascertain any remaining grievances or contract claims.

**M.     City of Detroit/Human Services department: Grievance No. 25-01-12 / COA: 12-0077708-CL**

In July and October, 2012, approximately 174 AFSCME members, in Locals 1642, 273 and 457 members, were permanently laid off and replaced with employees from third party companies.  These employees were employed at the Health Department, the Department of Human Services and the Workforce Development Department for the City of Detroit.  AFSCME argued that the City's actions violated language in the parties' collective bargaining agreement ("CBA").

13-53846-swr   Doc 7235-6   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 18 of 23
13-53846-swr   Doc 8485   Filed 11/26/14   Entered 11/26/14 21:57:43   Page 18 of 23
148

Initially, the issue was arbitrated. Agreeing with AFSCME, the arbitrator found the City's actions to be in violation of the union contract, and awarded back pay and benefits to the members. (*Exhibit 12*) The City refused compliance with the award, requiring AFSCME to seek and secure confirmation of the award in Wayne County Circuit Court. (*Exhibit 13*) The matter is currently in the Court of Appeals.

## N.     City of Detroit Retirees Health Care: Grievance No. C10 A-025

In 2006, the City changed retiree health care benefits, requiring retirees to incur greater cost for health care. AFSCME filed a grievance on behalf of all AFSCME retirees (approximately 6,000), because the changes violated specific provisions of the union contracts under which the employees retired. After some advancement of the grievance, the parties decided to hold the grievance in abeyance because the retirees had decided to proceed with the litigation in federal court, *Roots et al., v. City of Detroit*, Case No. 12-12848 (E.D. Mich, Cohn).

## O.     Payroll disputes

Repeatedly, the City of Detroit payroll system will not issue correct amounts of pay or benefits on payroll checks of AFSCME members. This problem has escalated over the years, resulting in significant losses of money and benefits for AFSCME members. AFSCME has sought to remedy these discrepancies with the City, however, its efforts have been met with inaction.

**P.** **Detroit Service and Maintenance Outsourcing in Downtown Detroit: Grievance Number C09-078**

Beginning in 2009 and successively each year thereafter, the City has reduced the overtime of AFSCME members, due to work performed by private contractors, in the downtown Detroit area. This violation of Article 19 of the AFSCME Master Agreement continued for years. The violations impacted 40-60 employees throughout the period and until the termination of the Master Agreement in July 2012. In the dispute, AFSCME relies upon an arbitration decision concerning similar circumstances on Belle Isle in 2008.

**Q.** **Tree Artisan failure to secure license: Grievance Number 727May08**

Arbitrator George Roumell issued a ruling regarding eleven "tree artisan helpers", discharged from the AFSCME bargaining unit. The grievance was granted in that the City was required to pay for training and restore seniority to some employees. The remaining controversy involves one employee, Hayward Prather, who was not reinstated. Ultimately, Mr. Prather became employed within the water department approximately two years later. However, he is owed damages for the two year period in which he was wrongfully discharged.

## III. ARGUMENT

The Bankruptcy Code broadly defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

19

unsecured." 11 U.S.C. § 101(5)(A). Claims also include "a cause of action or right to payment that has not yet accrued or become cognizable." 2 COLLIER ON BANKRUPTCY ¶ 101.05 at 101-38 (2011).

"Tort claims constitute claims, and thus are payable out of the estate...." Id. ¶ 101.05[6] at 101-49; see also In re Edge, 60 B.R. 690, 694 (Bankr. M.D. Tenn. 1986). Claims also include adversarial administrative proceedings. See e.g., In re Halo Wireless, Inc., Nos. 11–42464–btr–11, 3: 11–cv–0058–DCR, 3: 11–cv–0059–DCR; 2012 WL 1190722, at *2-3 (E.D. Kent. April 9, 2012) Courts give the term "claim" the "broadest possible definition. In re Lipa, 433 B.R. 668, 669 (Bankr. E.D. Mich. 2010).

A properly filed proof of claim is prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.P. 3001(f). A claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). Chapter 9 bankruptcies follow § 502 of the bankruptcy code. Objections may be based upon one of the specific, statutory grounds:

Except as provided in subsection (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that –

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

(2) such claim is for unmatured interest;

(3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

(4) if such claim is for service of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;

(5) such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property...;

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract...;

(8) such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or

(9) proof of such claim is not timely filed....

11 U.S.C. § 502(b).

The party objecting to a proof of claim bears the burden of proof to overcome the prima facie validity of the claim. 4 COLLIER ON BANKRUPTCY ¶ 502.02[3][f] at 502-17. "To defeat the claim, the objector must come forward with sufficient evidence and 'show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'" In re McLaughlin, 320 B.R. 661, 665 (Bankr. N.D. Ohio 2005)(quoting Wright v Holm (In re Holm), 931 F.2d 620, 623 (9th Cir.1991)).

AFSCME contends that the City's Objection falls short of reaching the necessary burden of proof. The Objection does little more than spell out general

observations in the proof of claim as opposed to specific concerns addressed. The Objections should be overruled.

WHEREFORE, Michigan AFSCME Council 25 respectfully requests that this Honorable Court overrule the City of Detroit's Objections.

Dated: September 2, 2014

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
Jack W. Schulz, Esq.
MILLER COHEN PLC
600 West Lafayette Blvd., 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 964-4454
Facsimile: (313) 964-4490
richardmack@millercohen.com
jschulz@millercohen.com

Herbert A. Sanders
THE SANDERS LAW FIRM PC
615 Griswold St., Ste. 913
Detroit, MI 48226
Telephone: (313) 962-0099
Facsimile: (313) 962-0044
hsanders@miafscme.org

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
|  | ) |  |
| _____ | ) |  |

## PROOF OF SERVICE

The undersigned certifies that on September 2, 2014, the Michigan AFSCME Council 25 certifies that *Creditor Michigan AFSCME Council 25 and its Affiliated Detroit Locals' Response to Debtor's Objection to Proofs of Claim (Docket Number 2958)* was electronically with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

> /s/ Richard G. Mack, Jr.
> Richard G. Mack, Jr., Esq.
> MILLER COHEN PLC
> 600 West Lafayette Boulevard, 4th Floor
> Detroit, MI 48226-3191
> Telephone: (313) 566-4787
> Facsimile: (313) 964-4490
> richardmack@millercohen.com

# EXHIBIT 1

13-53846-swr   Doc 8485-1   Filed 11/26/14   Entered 11/26/14 15:47:48   Page 25 of 3
13-53846-swr   Doc 7235-1   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 2 of 3
148



# MICHIGAN COUNCIL 25

**Council 25 AFSCME** — *We Make Michigan Happen*

American Federation of State, County, and Municipal Employees, AFL-CIO
Detroit Office • 600 W. Lafayette, Ste. 500 • Detroit, Michigan 48226
Phone: 313.964.1711 • 1.800.AFSCME25 • Fax: 313.964.0230 • www.miafscme.org

Albert Garrett
*President*

Lawrence A. Roehrig
*Secretary-Treasurer*

**Executive Board**

Sylvester Austin
*Region 2*

Carlos Bass
*Region 3*

David Brandt
*Region 9*

Donna Cangemi
*Region 3*

Susan Christensen
*Region 11*

Sandra Crayton
*Region 6*

Barbara Dauble
*Region 3*

Lorna Davison
*Region 2*

Jonathan Drake
*Region 4*

Caryette Fenner
*Region 1*

Michael Harris
*Region 1*

Bennette Hanley
*Region 1*

Lorraine Jacobson
*Region 10*

Keith January
*Region 1*

Laura Kinch
*Region 6*

Arlean King
*Region 1*

J. Phil McGuire
*Region 2*

Phyllis McMillon
*Region 1*

Dennis Moore
*Region 7*

Sam Muma
*Region 6*

Doug Murch
*Region 5*

Lois Murray
*Region 3*

Stephanie Nahas
*Region 3*

Dennis Overmyer
*Region 7*

Gloria Peterson
*Region 4*

Patricia Ramirez
*Region 6*

James Rhodes, Jr.
*Region 5*

Roger Rice
*Region 1*

Ronnie Skorupski
*Region 6*

Cindy Spurlock
*Region 2*

Chris Vandenbussche
*Region 3*

Russell Williams

March 12, 2013

Lamont Satchel, Director
Labor Relations, City of Detroit
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 332
Detroit, MI  48226

Dear Mr. Satchel:

*Re:   Local 1023 ESO Negotiations*

Michigan AFSCME Council 25 and Local 1023 are notifying you of our intent to bargain a new contract for the referenced group.

Please contact me at cphillips@miafscme.org to confirm dates, times and location to begin this process.

Thank you for your immediate attention.

Sincerely,

*Catherine Phillips*

Catherine Phillips
Staff Representative

Sqc/324iuoeaflcio:revised031213

Copy:  A. Garrett
       E. McNeil
       D. Enright
       L. Bronner-Wilson

Via US Mail and Facsimile (313) 224-0738

RECEIVED by Michigan Court of Appeals 7/11/2013 7:11:31 PM

FILE COPY

STATE OF MICHIGAN
DEPARTMENT OF LABOR & ECONOMIC GROWTH
EMPLOYMENT RELATIONS COMMISSION
MEDIATION DIVISION

## NOTICE OF STATUS OF NEGOTIATIONS - PUBLIC EMPLOYMENT

INSTRUCTIONS: Submit this form at least 60 days before the expiration date of a collective bargaining agreement involving public employees to the Employment Relations Commission. This notice is required by Sec. 7(2) of Act 336 Public Acts of 1947, as amended by Act 25 Public Acts 1973.

1. **Name and Address of Public Employer:**
   City of Detroit Labor Relations
   2 Woodward Avenue, Suite 332
   Detroit, MI 48226

   **Phone No.**
   313 224-3860

   **Name and Title of Official to Communicate with:**
   Lamont Satchel, Labor Relations Director

   **Phone No.**
   Same

   **Address (if different from above)**
   Same

   County: Wayne

2. **Name and Address of Labor Organization:**
   Michigan AFSCME Council 25
   600 West Lafayette Boulevard
   Detroit, MI 48226

   **Phone No.**
   313-964-1711

   **Name and Title of Official to Communicate with:**
   Catherine Phillips, Staff Representative

   **Phone No.**
   Same

   **Address (if different from above)**
   Same

3. **Number of Employees Covered by the Agreement:** 90
   **Description of Bargaining Unit:** Local 1023 ESO's

4. **Expiration or Reopening Date of Agreement:** 6-30-13

5. **Status of Negotiations** (Use separate sheet if necessary) Opening

6. **Name, Title and Address of Official Filing this Notice:**
   Catherine Phillips, Staff Representative
   Michigan AFSCME Council 25
   600 West Lafayette Boulevard
   Detroit, MI 48226

   **Phone No.**
   313-964-1711

*Catherine Phillips*
Signature

March 12, 2013
Date

FILE COPY

# EXHIBIT 2

13-53846-tjt Doc 8485-2 Filed 11/26/14 Entered 11/26/14 15:47:48 Page 28 of 2
13-53846-swr Doc 7135-2 Filed 09/02/14 Entered 09/02/14 21:50:85 Page 4 of 4
148

RECEIVED by Michigan Court of Appeals 7/11/2013 7:11:31 PM

CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
LABOR RELATIONS DIVISION

COLEMAN A. YOUNG
MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 332
DETROIT, MICHIGAN 48226
PHONE 313•224•3860
FAX 313•224•0738
WWW.DETROITMI.GOV

Sent Via Email and First Class Mail

April 3, 2013

Delia Enright, President, Local #1023
AFSCME - Emergency Services Operators (ESO)
600 W. Lafayette, Ste. L-125
Detroit, Mi 48226

RE:     City of Detroit Receivership Status and Act 312

Dear Ms. Enright:

As you are no doubt aware, effective March 28, 2013, the City of Detroit ("City") is in receivership status pursuant to 2012 PA 436 ("Act 436").

Act 436 provides, in Section 27 (3) that:

> A local government placed in receivership under this act is not subject to section 15(1) of 1947 PA 336, MCL 423.215 for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever comes first.

In light of the statutory suspension of the duty to bargain under PERA, the City is no longer obligated to participate in collective bargaining, or by extension, Mediation or Act 312 proceedings regarding a successor agreement to [name of union] current Collective Bargaining Agreement ("CBA"), which expires on June 30, 2013. The City therefore will object to, and decline to participate in, such Mediation or Act 312 proceedings or other matters in connection with such proceedings.

The City will continue to abide by the currently effective CBA until its expiration. To the extent any notice of termination is required under the CBA, this letter shall serve as such notice.

The City will honor all currently scheduled meeting dates to discuss, on a consultative basis only, matters of concern to both parties going forward. While the City will not be engaging in traditional PERA collective bargaining, it will seek your organization's input, and provide information regarding the City's position, on relevant matters.

Sincerely,

Lamont D. Satchel, Esq.
Director of Labor Relations

pc:     Mayor Dave Bing
        Kevyn Orr, Esq.
        Jack Martin
        William Andrews
        Albert Garrett

        John Willems, Esq.
        Craig Schwartz, Esq.
        Malcolm Brown, Esq.
        Patrick Aquart

# EXHIBIT 3



Council 25
AFSCME
We Make Michigan Happen

# MICHIGAN COUNCIL 25

American Federation of State, County, and Municipal Employees, AFL-CIO

Detroit Office • 600 W. Lafayette, Ste. 500 • Detroit, Michigan 48226

Phone: 313.964.1711 • 1.800.AFSCME25 • Fax: 313.964.0230 • www.miafscme.org

lbert Garrett
esident

awrence A. Roehrig
cretary-Treasurer

ecutive Board

lvester Austin
gion 2

rlos Bass
gion 2

avid Brandt
gion 5

onna Cangemi
gion 3

san Christensen
gion 11

ndra Crayton
gion 6

rbara Dauble
gion 3

rna Davison
gion 2

athan Drake
gion 2

ryette Fenner
ion 4

chael Harris
ion 1

nnette Henley
ion 1

raine Jacobson
ion 10

th January
ion 1

ra Kinch
ion 6

ean King
ion 1

il McGuire
on 2

llis McMillon
on 1

nis Moore
on 7

Muma
on 6

g Murch
on 5

Murray
or 3

hanie Nahas
on 3

nis Overmyer
on 7

rla Peterson
on 4

icia Ramirez
on 6

es Rhodes, Jr.
on 1

er Rice

nie Skorupski
on 8

y Spurlock
2

s Vanderbussche
1

June 3, 2013

**Hand Delivered**
Ruth Anne Okun, Director
Bureau of Employment Relations
Cadillac Place
3026 W. Grand Blvd. Suite 2-750
P.O. Box 02988
Detroit, MI 48202-2988

Re:    Petition for ACT 312 Arbitration for:
       City of Detroit –and- Michigan AFSCME Council 25 – Local 1023
       Case #: D13 C-0331

Dear Ms. Okun:

Enclosed for filing please find enclosed the following documents pertaining to the above referenced matter:

1. An Original and (3) three copies of Local 1023's Petition for Act 312 Arbitration
2. Proof of Service
3. A copy of the most recent labor agreement between the parties

Very truly yours,

Shawntane Williams

Shawntane Williams (P72828)
Counsel for Petitioner

Enclosures

Copy:   Delia Enright, President for Local 1023
        Catherine Phillips – Staff Representative
        Kevin Orr, Emergency Manager Hand Delivered June 3, 2013
        Lamont Satchel – Labor Relations Director Hand Delivered June 3, 2013
        Lansing Master File – L3222-1023-2013

Sqc/324iuoeaflcio revised060313

2013 JUN -3 PM 2:34
STATE OF MICHIGAN
EMPLOYMENT RELATIONS COMM.
DETROIT OFFICE
RECEIVED

COPY



## PETITION FOR ACT 312 ARBITRATION
## EMPLOYMENT RELATIONS COMMISSION
Michigan Department of Licensing and Regulatory Affairs

AUTHORITY: P.A. 312 of 1969, as amended
COMPLETION: MANDATORY
PENALTY: CASE WILL NOT BE PROCESSED WITHOUT USE AND COMPLETION OF THIS FORM

MEDIATION CASE NO: | MEDIATOR:

**1. PUBLIC EMPLOYER NAME**
City of Detroit Labor Relations

EMPLOYER CONTACT/REPRESENTATIVE NAME:
Kevin Orr, Emergency Manager and
Lamont Satchel, Labor Relations Director

ADDRESS (STREET NO. & NAME)
2 Woodward Ave., Suite 332

| CITY Detroit | STATE Michigan | ZIP CODE 48226 |

ADDRESS (STREET NO. & NAME)
2 Woodward Ave., Suite 1126

| CITY Detroit | STATE Michigan | ZIP CODE 48226 |

| TELEPHONE WITH AREA CODE 313-224-3860 | FAX NO. 313-224-0738 | E-MAIL |

| TELEPHONE WITH AREA CODE 313-224-3400 | FAX NO 313-224-4433 | E-MAIL |

**2. LABOR ORGANIZATION NAME**
Michigan AFSCME Council 25 - Local 1023

LABOR CONTACT/REPRESENTATIVE NAME:
Shawntane Williams, Staff Attorney

ADDRESS (STREET NO. & NAME)
600 W. Lafayette Blvd., Suite 500

| CITY Detroit | STATE Michigan | ZIP CODE 48226 |

ADDRESS (STREET NO. & NAME)
600 W. Lafayette Blvd., Suite 500

| CITY Detroit | STATE Michigan | ZIP CODE 48226 |

| TELEPHONE WITH AREA CODE 313-964-1711 | FAX NO 313-964-0230 | E-MAIL |

| TELEPHONE WITH AREA CODE 313-964-1711 ext. 2263 | FAX NO. 313-964-0230 | E-MAIL swilliams@miafscme.org |

PURSUANT TO RULE 423.505, THE FOLLOWING DOCUMENTS MUST BE ATTACHED TO THIS PETITION

☒ A COPY OF THE MOST RECENT LABOR AGREEMENT BETWEEN THE PARTIES      ○ A COPY OF THE ISSUES IN DISPUTE

○ THE ISSUES HAVE BEEN IDENTIFIED AS EITHER ECONOMIC OR NON-ECONOMIC

| THIS PETITION IS FILED BY: | ☐ EMPLOYER | ☒ UNION |

| DATE MEDIATION REQUESTED: March 12, 2013 | DATES AND TIMES OF MEDIATION MEETINGS: Employer has refused to bargain or participate in Mediation |

UNIT DESCRIPTION:
Local 1023 Emergency Service Operators

| NO. OF EMPLOYEES IN UNIT: 90 | CONTRACT EXPIRATION DATE: 6/30/13 |

THE PETITIONER HAS ENGAGED IN GOOD FAITH BARGAINING AND MEDIATION, AND THE PARTIES HAVE NOT SUCCEEDED IN RESOLVING THE DISPUTED MATTERS.

I HAVE READ THE ABOVE PETITION AND THE STATEMENTS THERIN ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Shawntane Williams, Staff Attorney

6/3/13

PRINT NAME/TITLE | DATE

_Shawntane Williams_

SIGNATURE

COPY

SERVE ORIGINAL PETITION ON THE OTHER PARTY OR ITS REPRESENTATIVE AND FILE THREE COPIES AND A PROOF OF SERVICE WITH THE COMMISSION. ALSO ATTACH A COPY OF THE DOCUMENTS DESCRIBED ABOVE.

_The Department of Licensing and Regulatory Affairs will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, marital status, handicap or political beliefs._

| OFFICE USE ONLY: | Date Petition Received: | Date Panel Issued: | Date of Last Best Offer: | Date of Hearing: | Date of Final Award: |

rev 02/13

# STATE OF MICHIGAN
## EMPLOYMENT RELATIONS COMMISSION
### LABOR RELATIONS DIVISION

In the Matter of:

CITY OF DETROIT
    Respondent - Public Employer,

-and-

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
MICHIGAN COUNCIL 25, LOCAL 1023
    Petition - Labor Organization.

Petition for Act 312 Arbitration
Case #: D13 C-0331

---

## PROOF OF SERVICE

I HEREBY CERTIFY that I served by hand delivery, a copy of Petitioner's Petition for Act 312 Arbitration and a copy of this proof of service upon:

City of Detroit
Attn: Kevin Orr
2 Woodward Ave., Suite 1126
Detroit, MI 48226

City of Detroit Labor Relations Department
Attn: Lamont Satchel, Labor Relations Director
2 Woodward Ave., Suite 332
Detroit, MI 48226

I declare that the statements above are true to the best of my information, knowledge, and belief.

Dated: June 3, 2013

By: _____
        Support Staff

# EXHIBIT 4

13-53846-tjt   Doc 8485-4   Filed 11/26/14   Entered 11/26/14 15:47:48   Page 34 of 2
13-53846-swr   Doc 7235-4   Filed 09/02/14   Entered 09/02/14 21:50:33   Page 34 of 72
148



**STATE OF MICHIGAN**
RICK SNYDER, GOVERNOR

**EMPLOYMENT RELATIONS COMMISSION**
Cadillac Place, Suite 2-750
3026 W. Grand Boulevard, PO Box 02988
Detroit, Michigan 48202-2988
(313) 456-3510
FAX (313) 456-3511

**DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS**
STEVE ARWOOD, DIRECTOR

June 21, 2013

Lamont Satchel
c/o City of Detroit
Two Woodward Ave., Suite 332
Detroit, MI 48226

Catherine Phillips
c/o Michigan AFSCME Council 25
600 W. Lafayette, Suite 500
Detroit, MI 48226

RE: Detroit, City of -and- Michigan AFSCME Council 25
MERC Case No. D13 C-0331

Greetings Mr. Satchel and Ms. Phillips:

Recently the Michigan Employment Relations Commission issued a ruling that granted an employer's request to dismiss several pending Act 312 matters. Specifically, the employer had declined to participate in Act 312 arbitration, while operating under receivership status with an appointed emergency manager pursuant to 2012 PA 436. (See attached decision involving the City of Detroit.)

In the instant matter, the Union filed a 312 petition on May 31, 2013. However, the Employer has consistently advised all parties as far back as April 18, 2013 that in accordance with its current status in receivership pursuant to 2012 Act 436, it was unwilling to participate in mediation and Act 312 arbitration at this time.

Based on the reasoning set forth by the Commission in dismissing the City of Detroit's Act 312 cases noted above, the petition filed by the Union in this matter has been dismissed administratively.

Should you have any additional questions, feel free to contact me at mcbrides2@michigan.gov or 313-456-3417.

Very truly yours,

L. Sidney McBride, Departmental Specialist
Act 312 & Fact-Finding Administration

Enclosures

cc: Commissioners

COPY

RECEIVED JUN 27 2013

# EXHIBIT 5

13-53846-tjt   Doc 8485-5   Filed 10/26/14   Entered 10/26/14 15:47:48   Page 36 of 2
13-53846-swr   Doc 7235-5   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 36 of 2
148



COLUMN IV. COOM
Municipal Center
2 Woodward Avenue, Suite 332
Detroit, Michigan 48226
Phone 313·224·3860
Fax 313·224·0738
www.detroitmi.gov

City of Detroit
Human Resources Department
Labor Relations Division

**Sent via Email and First Class Mail**

February 06, 2013

Ed McNeil, Asst to the President
AFSCME - Asst to the President Council #25
1035 N. Washington
Lansing, MI 48906

RE:   Imposition of Budget Required Furlough (BRF) Days

Dear President McNeil:

As you know, the City is in a severe fiscal emergency and faces an impending inability to meet payroll and operational costs if labor costs are not reduced immediately.  Our negotiations on this issue with City unions have not uncovered any acceptable alternative to the City's proposed implementation of Budget Required (BRF) days, and therefore the City is compelled to implement BRF days for its workforce at this time to meet immediate cost containment needs.  BRF days have already been approved by City Council for non-union Executive and Legislative Branch employees. Accordingly, employees will serve one BRF day on a bi-weekly basis for a one year period, with the specific schedule to be determined by the City.  The furloughs will begin for union-represented employees Monday, February 25, 2013.

This is an emergency measure to address an immediate economic crisis, which will not foreclose future negotiations for a new collective bargaining agreement.

Please contact the Labor Relations Division at 224-3860 should you have any questions.

Sincerely,

Lamont D. Satchel

Lamont D. Satchel, Esq.
Director, Labor Relations

LDS/ab

Michigan AFSCME Council 25
Accounting Department

FEB 11 2013

Received by

cc:   Honorable Dave Bing, Mayor
      Kirk Lewis, Deputy Mayor
      Jack Martin, Chief Financial Officer
      Kriss Andrews, Program Management Director
      Patrick Aquart, Human Resources Director
      Labor Relations Staff

# EXHIBIT 6

13-53846-tjt   Doc 8485-6   Filed 10/26/14   Entered 10/26/14 15:47:48   Page 38 of 75
13-53846-swr   Doc 7235-6   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 3 of 5
148



AMENDED

# CHARGE

Michigan Department of Licensing and Regulatory Affairs
Employment Relations Commission (MERC)
Labor Relations Division
313-456-3510

Authority: P.A. 380 of 1965, as amended. Case No. C12 E-092

INSTRUCTIONS: File an **original and 4 copies** of this charge (including attachments) with the Employment Relations Commission at: Cadillac Place, 3026 W. Grand Boulevard, Suite 2-750, PO Box 02988, Detroit MI 48202-2988 or 1375 S. Washington St., Lansing MI 48910. **The Charging Party must serve the Charge on the opposing side within the applicable statute of limitations, and must file a statement of service with MERC.** *(Refer to the "How to File a Charge" document under the "Forms" link at www.michigan.gov/merc.)*

**Complete Section 1** if you are filing charges against an employer and/or its agents and representatives. —or—
**Complete Section 2** if you are filing charges against a labor organization and/or its agents and representatives.

**1. EMPLOYER AGAINST WHICH THE CHARGE IS BROUGHT**       Check appropriate box: ☐ Private ☑ Governmental

Name and Address: Lamont Satchel, Director of Labor Relations
City of Detroit
2 Woodward Ave., Ste. 332
Detroit, MI 48226

**RECEIVED**
NOV 08 2012
MICHIGAN ADMIN HEARING SYSTEM

STATE OF MICHIGAN EMPLOYMENT RELATIONS COMM. DETROIT OFFICE
2012 NOV -7 PM 2:37
RECEIVED

**2. LABOR ORGANIZATION AGAINST WHICH THE CHARGE IS BROUGHT**

Name and Address:

**3. CHARGE**

Pursuant to the Labor Mediation Act (LMA) or Public Employment Relations Act (PERA) *(cross out one)*, the undersigned charges that the above-named party has engaged in or is engaging in unfair labor practices within the meaning of the Act.

**On an attached sheet** you must provide a clear and concise statement of the facts which allege a violation of the LMA or PERA, including the date of occurrence of each particular act and the names of the agents of the charged party who engaged in the complained of conduct. The charge should describe who did what and when they did it, and **briefly** explain why such actions constitute a violation of the LMA or PERA.

The Commission may reject a charge for failure to include the required information. However, it is not necessary to present your case in full at this time. Documentary material and exhibits ordinarily **should not** be submitted with this charge form.

**4. Name and Address of Party Filing Charge (Charging Party)**
(if labor organization, give full name, including local name and number)
Michigan AFSCME Council 25
600 W. Lafayette Blvd., Ste. 400, Detroit, MI 48226

Telephone Number:
(313 ) 964-1171

**5. List ALL related MERC case(s) (if any):** _____
(Name of parties)

Case No.: _____  Judge: _____

Case No.: _____  Judge: _____

**I have read this charge and it is true to the best of my knowledge and belief.**

Signature of Representative/Person Filing Charge

Print Name and Title: Keith D. Flynn, Attorney

Email:
kflynn@millercohen.com
Telephone/Cell No.: 313-964-4454
Fax No.: 313-964-4490

Street Address: 600 W. Lafayette Blvd., 4th Floor | City: Detroit | State: MI | Zip Code: 48226

The Department... does not discriminate... on the basis of religion, race, color, marital status, disability, or political beliefs. If you need assistance with reading, writing, hearing, etc., under the Americans with Disabilities Act, you may make your needs known to this agency.

## ATTACHMENT TO AMENDED UNFAIR LABOR PRACTICE CHARGE

Charging Party, AFSCME Council 25 and the Coalition of Detroit Unions alleges that Respondent, City of Detroit, violated the Public Employment Relations Act ("PERA"), Sections 10(1)(a, c, e) and Section 15 in the following manner:

1.      The City of Detroit employs approximately 2,600 persons who are public employees and are represented by Michigan AFSCME Council 25. There are approximately 9,000 unionized employees in the City total.

2.      The parties AFSCME and the City of Detroit have a collective bargaining agreement, which was in existence from approximately January 2011 through June 30, 2012.

3.      The City's actions, described below, constitute repudiation of the AFSCME-City agreement, a violation of the status quo, and constitute a unilateral modification of a mandatory subject of bargaining without bargaining to impasse. It also constitutes a mid-term modification of the AFSCME bargaining agreement.

4.      Certain employees have annuity plans with the City, in which either 3%, 5% or 7% of salary is contributed into the plan. As for retirees, they receive a check each month from the Retirement System.

5.      Prior to November 30, 2011, if the market performed above 7.9%, this was considered "excess earnings".

6.      Prior to November 2011, a portion of these excess earnings were distributed to the active employees' annuity accounts, wherein the active employees would receive an enhanced interest rate of return for that year of excess earnings.

7.      Prior to November 2011, a portion of these excess earnings would also be distributed to retirees in the form of a 13th check. This 13th check would be distributed to retirees toward the end of the year, in addition to their normal pension check.

8.      Prior to November 30, 2011, the GRS Board would review the excess earnings of the System in November or December of each year, and make the excess earnings distributions as outlined above.

9.      On or about November 30, 2011, the Detroit City Council passed an ordinance requiring that active and retiree participants no longer receive excess earnings. This change eliminated excess earnings being given to active employee annuity accounts in the form of enhanced investments. The change also eliminated the excess earnings being distributed to retired participants, in the form of a "13th check".

10.     This change in the City ordinance changed the City of Detroit prior language, granting such discretion to the GRS Board in paying out excess earnings. For decades, the GRS Board had paid out excess earnings to active employees via enhanced annuity earnings, and 13th checks to retirees. The November 30, 2011 ordinance change ended the past practice.

11.     The ordinance change was effective as of December 2011. At that time, the GRS considered that the investment return of the System was higher than 7.9%. However, because of the new Ordinance, the System did not make excess earnings distributions to retirees in the form of a 13th check. Also, the System did not grant any annuity accounts of active employees a higher investment return beyond the 7.9%.

12.     But for the City Council Ordinance as of November 30, 2011, the current retirees would have received an excess distribution in the form of a 13th check. The active employees would have received an excess earnings distribution in the form of enhanced investment return for their annuity account.

13.     The changes of paragraphs 9-12 above applied to all City employees, including the City's unionized workforce. Indeed, in the Corporation Counsel's description of the change, she took the position that the ordinance change could be appropriately applied to unionized City employees, regardless of their bargaining relationship.

14.     The City did not seek to negotiate this change in the treatment of the investment earnings beyond 7.9% with any City union. Charging Party was presented with this change as a fait accompli. Further, the change was made during the existence of the collective bargaining agreement.

15.     The AFSCME bargaining agreement, in Article 47.T., indicates that "[a]ll Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133." Thus, the previous ordinance which established the past practice of the GRS Board making excess earnings distributions was incorporated into the AFSCME bargaining agreement.

16.     By changing the Ordinance, and applying that Ordinance change to the AFSCME membership, the City was violating PERA. As a consequence, active employees are losing both their annuity account investments, as well as the right to a 13th check upon their retirement.

17.     Charging Party requests that this City apply the language of the previous ordinance to the City's unionized workforce, return the practice of the excess earnings distributions to the annuity accounts and the retiree 13th checks, make whole any union employees who suffered a loss as a result of the City's actions, ask that the City post a notice of the violation of the act, and any other relief this Commission deems appropriate.

## STATE OF MICHIGAN
## DEPARTMENT OF ENERGY, LABOR & ECONOMIC GROWTH
## EMPLOYMENT RELATIONS COMMISSION

AFSCME COUNCIL 25,

        Union/Charging Party,

-and-

CITY OF DETROIT,

        Employer/Respondent.

Case No. C12 E-092
MCL No. 12-000777
*Administrative Law Judge*
Doyle O'Connor

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

### PROOF OF SERVICE

MICHELLE COIL says that on *November 5, 2012* she served a copy of *AFSCME Council 25's Amended Charge*, along with this *Proof of Service* upon:

> Letitia C. Jones
> City of Detroit Law Department
> 660 Woodward Avenue, Suite 1650
> Detroit, Michigan 48226-353

via *facsimile* and *U.S. First-Class Mail* and placing said document in a prepaid postage envelope and depositing same in a United States Postal Receptacle in Detroit, Michigan.

MICHELLE COIL

Subscribed and sworn to before me on
November 5, 2012

Kathryn L. Golba, Notary Public
Wayne County, MI
My Commission Expires: **2/20/2019**

# EXHIBIT 7

13-53846-swr   Doc 7205-7   Filed 09/06/14   Entered 09/06/14 15:57:48   Page 43 of 27
13-53846-tjt   Doc 2495-7   Filed 09/06/14   Entered 09/06/14 15:30:49   Page 13 of 27
148

TRUE COPY

**STATE OF MICHIGAN**
**MICHIGAN ADMINISTRATIVE HEARING SYSTEM**
**EMPLOYMENT RELATIONS COMMISSION**

In the Matter of:

CITY OF DETROIT,
    Employer-Respondent,

RECEIVED OCT 10 2013

    -and-

Case No. C12 E-092
Docket 12-000777-MERC

AFSCME COUNCIL 25,
    Labor Organization-Charging Party.

_____/

APPEARANCES:

Richard G. Mack, Jr, Miller Cohen, PLC,
for the Labor Organization–Charging Party

Letitia C. Jones, Assistant Corporation Counsel,
for Respondent-Public Employer

### DECISION AND RECOMMENDED ORDER
### OF ADMINISTRATIVE LAW JUDGE
### ON SUMMARY DISPOSITION

    Pursuant to the Public Employment Relations Act (PERA), 1965 PA 379, MCL 423.201, *et seq*, as amended, this case was assigned to Doyle O'Connor, Administrative Law Judge (ALJ) of the Michigan Administrative Hearing System, acting on behalf of the Michigan Employment Relations Commission (MERC). The following findings of fact, conclusions of law, and recommended order are based upon the entire record:

The Unfair Labor Practice Charge:

    On May 10, 2012, a Charge was filed in this matter by AFSCME Council 25 (Charging Party) against the City of Detroit (Employer or Respondent). The Charge alleged that the Employer had violated PERA by unilaterally altering an established condition of employment. The Union alleged that the City had adopted an ordinance on November 30, 2011, which materially altered the handling of certain retirement benefits. Specifically, the Charge alleged that the long-standing agreement between the parties was that the annual rate of return on employee

1

annuity retirement accounts was essentially guaranteed by the City at a rate of 7.9%, with excess earnings flowing directly to employee accounts, and with any shortfalls covered by the City. The Unions asserted that changes implemented pursuant to the new ordinance adversely affected the approximately 2,600 individuals represented by AFSCME. The Union's contract with the City was alleged to have run from January 2011 and to have been set to expire June 30, 2012.

The Charge asserted that the new ordinance change was implemented without bargaining with AFSCME, during the term of an existing contract, and was therefore unlawful. It was asserted, and ultimately not disputed, that the contract expressly provide that *"all retirement and pension plan provisions provided for by the City Charter and Municipal Code are incorporated herein by reference unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133"*. Under the prior Ordinance, excess pension earnings were allocated by the General Retirement System (GRS) Board to further fund employee annuities and to provide for a reserve fund to pay for the issuance of "13th checks". The City filed a response in which it acknowledged that the City Council had substantively amended the pension Ordinance, but denied that its unilateral actions were unlawful.

The matter was scheduled for trial on July 24, 2012, with that date adjourned by mutual consent, with a new trial date of November 14, 2012. Shortly before the trial date, an Amended Charge was filed, and the Employer requested and was granted an adjournment of the trial. The Amended Charge added allegations that a portion of the excess earnings had been utilized by the General Retirement System's Board of Trustees to fund a hedge against inflation for retirees in the form of a "13th Check" issued annually. The amount of the annual allocation of excess earnings, if any, was calculated by the Trustees pursuant to an established formula. It was alleged that, but for the November ordinance change, individual retirees would have received a 13th check in December 2011 and again in 2012.

A pre-trial conference was held on December 6, 2012. The parties concurred that there were no material disputes of fact and that proceeding on summary disposition would be appropriate. The Union's motion for summary disposition was filed on December 28, 2012, with the City's response and cross-motion for summary disposition filed on January 25, 2013. Oral arguments were heard on February 8, 2013, with a bench opinion issued in the Union's favor. After the hearing and issuance of the bench opinion, the parties sought and were granted the opportunity to file supplemental briefs on the question of relief and regarding an intervening appellate decision. The Union's supplemental

2

brief was filed on June 24, 2013, with the City's supplemental brief filed July 15, 2013.

Subsequent to the supplemental briefing by the parties, Detroit was placed in receivership under State law and an emergency manager with extraordinary powers was put in charge of Detroit's affairs, in place of its elected officials. A bankruptcy filing followed shortly; with its attendant automatic stay of most, if not all, other litigation involving claims against the City. In deference to the bankruptcy proceeding, the bench opinion in this case was not followed by the issuance of a formal decision, as it ordinarily would have been. The multiple City of Detroit related proceedings pending before MERC, and before the several Administrative Law Judges, have all been held in abeyance. This occurred both in deference to the automatic bankruptcy stay and in recognition of the obvious fact that with the appointment of an emergency manager, of a term of uncertain duration, with the attendant suspension of any bargaining obligations, the subsequent bankruptcy filing, it is apparent that the nature of the relationship of the parties, their collective bargaining disputes, and their respective positions on myriad issues will be materially changed and the dormant pending litigation, and the relief sought therein, will all likely be moot.

<u>Discussion and Conclusions of Law:</u>

Counsel for the parties appeared for oral argument on February 8, 2013. Preliminary to the oral argument, I stated on the record my understanding of the position of the parties, as set forth below:[1]

JUDGE O'CONNOR:

We're here on cross motions for summary judgment. I have reviewed the pleadings. I have a couple introductory comments.

The Union's motion for summary disposition in this case relates to the adoption of a new City ordinance which prohibited [certain actions by] the General Retirement System Pension Board, GRS Board, which handles pension questions for all City employees or virtually all City employees other than police and fire. The ordinance prohibited the Board from granting a rate of return on annuities greater than the actual return, and which had the

---

[1] The transcript excerpt reproduced herein, which to aid clarity is set off in an alternate font, contains typographical corrections and other non-substantive edits for clarity purposes. Insertions of explanatory text are bracketed. The completed unedited transcript is maintained within the Commission case file.

3

apparent impact of precluding the issuance of the 13th checks to retirees[2].

The Employer has responded and asserted its own cross motion for summary disposition. There's no dispute over the fact that a changed ordinance was adopted in November of 2011 and that a timely charge was filed. There's likewise no dispute over the fact that the terms of the pension plan are mandatory subjects of bargaining, which the City concedes in its brief.

It's alleged, and seemingly undisputed, that in November 2011 the City adopted a pension ordinance to be effective December 20, 2011 which altered certain prior practices of the Pension Board. That change occurred without bargaining and during the term of an existing collective bargaining agreement. That existing collective bargaining agreement incorporated by reference the prior version of the pension ordinance and City charter provisions.

Based on the pleadings, I have relied on several documents which both advocates also relied on, and I will denominate [those documents] as exhibits.

As I understand it, the Union's assertion is that the change was an unlawful unilateral change in an existing condition of employment, and a repudiation of the then in place collective bargaining agreement. The Union's motion is additionally supported by a facially competent affidavit.

The City earlier asserted the defense that the question of the Pension Board's exercise of discretion in the distribution of excess earnings was not an established condition of employment, and rather was in essence an ultra vires act by the Board. The Union addressed that assertion at least in part by its reliance on the decision in *AFSCME et al v Detroit*, 218 Mich App 263 (1996), in which the City

---

[2] The 13th check system is utilized by many employers as a method of giving some rough protection against inflation in deferred compensation systems. In the 1970s, it was not unusual to have formal inflation hedges in such systems tied directly to the cost of living indicators. That system became perceived as both unpredictable and prohibitively expensive by the late 1970s-early 1980s. It was replaced by concepts such as the 13th check system which created dedicated funding streams to provide an annual bump which while guaranteed to be paid, was not guaranteed to actually match the rate of inflation. It might be higher than a traditional COLA payment; it would likely be lower; but the annual receipt was assured.

prevailed. In that case, the City had sought a similar change regarding distribution of excess earnings; in that case via charter amendment, and according to the Court, the City acknowledged at the time that no such change could actually be implemented without first bargaining because the then current system of distribution of earnings was an established condition of employment. [Such a legal concession by the City in 1996 was regardless mandated by the earlier holding in *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974), which expressly held that while the City could change its pension ordinances, or Charter, as the City Council saw fit, changes to existing retirement benefits could not actually be implemented without fulfilling bargaining obligations.]

As both parties are presumably aware, the wisdom of the prior practice and the wisdom of the ordinance change are not issues before me for review. The only question before MERC is whether a change in mandatory [subjects of bargaining related to] conditions of employment was implemented in an unlawful manner. Similarly, the wisdom of the Court of Appeals decision in 1996 is not before me. It's a published decision involving these same two parties.

After considering the pre-hearing briefs and extensive arguments of both parties, I concluded that there were no questions of material fact and that a decision on summary disposition was appropriate, as urged by both parties, pursuant to Commission Rule R 423.165. See also *Detroit Public Schools*, 22 MPER 19 (2009) and *Oakland County and Oakland County Sheriff v Oakland County Deputy Sheriffs Assoc*, 282 Mich App 266 (2009). Accordingly, I rendered a bench decision, with the substantive portion of my findings of fact and conclusions of law from my bench opinion set forth below:

**JUDGE O'CONNOR:**

I am prepared to issue a bench opinion, which will be followed by a written decision.

I find that this case is controlled by the indistinguishable decision in the 1996 published Court of Appeals decision involving these same parties, AFSCME and Detroit. It is further controlled by judicial estoppel where the City

5

prevailed in that case by asserting the very thing they deny today, and that is the City, in the '96 case as recounted by the Court of Appeals conceded, as it must have done under the then existing law, that regardless of charter provision or any change to it, regardless of ordinance or any change to it, the City could not unilaterally change aspects of the pension plan without bargaining first with the Union.

The City today acknowledges in its brief its duty to bargain, but then asserts to the contrary, there was no duty to bargain under 2011 PA 4, which I'll address later.

The City never addressed, either in oral argument or its brief, the impact of the clearly controlling published decision between these same two parties. I find that shocking and troubling that it wasn't even addressed, because it is so clearly controlling.

The City, in the 1996 dispute [*AFSCME et al v Detroit*, 218 Mich App 263 (1996)], sought to change by charter amendment the very issue, or at least part of the very underlying issue at stake here today, and that is the Pension Board's allocation of excess earnings. In 1996, the City sought to change [the handling of excess earnings] by charter amendment. In 2011, the City sought to change [the handling of excess earnings] by pension ordinance change. The [difference between a charter amendment and an ordinance change] is not a distinction [which would alter the statutory duty to bargain].

[In the 1996 case, the Court of Appeals found that the City sought to change the City Charter to: "*require so-called "excess earnings" prom pension investments to be allocated among certain pension benefit funds in proportion to each fund's percentage of total system assets, with the remainder to be credited to the fund contributed to by the city, thereby reducing the city's future contribution obligations. This revision would limit the discretion exercised under the current charter by the pension board of trustees to allocate excess earnings among the several pension funds in its sole determination".* The 1996 charter amendment effort was therefore functionally indistinguishable from the 2011 ordinance amendment in the goal of diverting funds from benefiting employees and

6

into the City coffers while taking away from the trustees the discretion to allocate funds to pay out the 13th checks. In the 1996 decision, the Court, in denying AFSCME relief, expressly relied on the City acknowledgment that it could not unilaterally accomplish that goal by charter amendment.]

Then and now there was no factual dispute; there is no factual dispute. The excess earnings have always been allocated at the discretion of the Pension Board. The Union has argued that that's a binding past practice. The City asserts that it wasn't mutual--an assertion I find frivolous given the prior litigation, given the City's concession in the prior litigation that it was an established prior practice. It's also -- I also find it frivolous based on the exhibits produced by the City in this case. The Corley letter[3], which was an advice letter to City Council by its own staff which recounts in very specific terms that there was an existing prior practice that was well recognized, but the City did not like that prior practice and wanted to change it. [The advice letter] acknowledged with incredible specificity the prior practice that existed for over 20 years, spelling out year by year the amount of money allocated by the Pension Board over the City's concern about how it was being allocated, but with the City's acquiescence in collective bargaining agreement after collective bargaining agreement, and the City repeatedly re-adopted collective bargaining agreements [with the same language]. [The contractual reaffirmation of the obligation included] the 2008-2012 agreement which was initially unilaterally imposed on the Union and then expressly acquiesced [in] by the Union which incorporates by reference the very pension ordinance that the City [has now] sought to unilaterally change. It was more than a tacit agreement. It was an express agreement with full understanding by both parties.

Then -- in 1996 that is -- and now, [until] the change in 2011, the excess earnings have always been allocated at the discretion of the Pension Board. The Board, as set forth in the City's exhibits, allocated the so-called excess earnings, that is earnings above a projected target rate of

---

[3] Letter of November 2011 from Irvin Corley, Jr, director of the City Council's fiscal analysis division to the City Council.

7

return, to essentially three different funds; the retiree 13th check; secondly to supplement the holdings in individual employee annuity funds; and third to reduce the City pension contribution. The Esuchanko charts which the City submitted made clear that in each and every year where there were excess earnings the Pension Board allocated them amongst those three funds at the Pension Board's discretion and in roughly comparable amounts each time.

There was no dispute even in 1996 that the practice had been longstanding. It's obvious that the City's preference, for understandable reasons, was to change that practice. It attempted to do so unilaterally in 1996 and again in 2011. As I said, I see no distinction between the City's unilateral effort to change it by pension ordinance or by charter amendment. In each case, as the City rightly conceded in 1996, regardless of a change to those ordinances or charter provisions, the duty to bargain remained.

In the 1996 decision, which is a published decision binding on the parties and binding on me, the Court recounts that the City in response to AFSCME's challenge, *"Agrees that the challenged provision cannot be legally implemented even if enacted by the voters without first bargaining"*. [The 1996 decision further found that the City did not dispute *"plaintiffs' contention that these challenged provisions may not be legally implemented as to the city's union employees without bargaining"*.]

The City's concession in 1996 that there was a duty to maintain these precise conditions of employment absent bargaining was correct under the law then, and remains correct under current case law interpreting PERA. Regardless, I would otherwise find the City bound by *res judicata* and by collateral estoppel by that 1996 decision involving these two parties before me today on that same mixed question of fact and law.

It's particularly notable that one of the earliest cases interpreting and enforcing PERA involved the City of Detroit and the DPOA [Detroit Police Officers Association], and an assertion by the City that, *"We don't have to bargain about pensions because they're controlled by our charter, and our pension ordinance,"* and the Michigan Supreme Court said,

8

"You're wrong". [See, *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974).]

[The City was] right in 1996 in acknowledging that they had to bargain before they could make a change, and it's not just wrong, but frivolous today to argue otherwise.

The City adopted the change disputed in this case by not just amending a pension ordinance. It's undisputed that after the [2011] pension ordinance was adopted, the City unilaterally implemented that change, unlike the position the City took in 1996, which was that they needed to change the charter, and that even if the charter were changed, which has a higher status than a pension ordinance, the City acknowledged they would still not be able to implement the change until they bargained with the Unions over it. Here the City threw out that concession and actually implemented the change without bargaining.

It's undisputed and supported by affidavit submitted by the Union and not contradicted by the City, that in each year in which there were excess earnings, the Pension Board allocated those earnings, then divided the monies as I've described into three separate pots, essentially; part to reduce the City's contribution under the defined benefit plan, part to the 13th check, and part to the annuity accounts. The Corley and Esuchanko documents submitted by and relied on by the City unequivocally establish that the practice was consistent and of longstanding.

Again, the 1996 Court of Appeals decision alone would have regardless established [that] this process was an established condition of employment. If it existed in 1996 and still existed in 2011, it's an established condition of employment.

The change directly affected an existing and fundamental condition of employment. Again, *DPOA v Detroit* held that pension plans and promises made under them were a fundamental condition of employment such that the City of Detroit had to bargain over them in the DPOA case, notwithstanding a preexisting charter provision which set terms different than the DPOA was seeking. [In *DPOA*, the Supreme Court allowed the unilateral change to stand,

9

because the law had been uncertain in 1973, but the Court expressly cautioned the City that it must bargain over any future changes to the pension. Quite literally, the Supreme Court ruled that because the law had been unclear, the City could get away with a unilateral change to the pension plan that one time, but to not ever try it again.] The City's conduct [here] was unlawful and constitutes a refusal to bargain in good faith by unilaterally changing an existing condition of employment as to active employees.

Additionally, the City's conduct occurred at a point in time when the parties had in place a negotiated collective bargaining agreement. This is really the second half of the charge, and it's subject to a separate analysis.

That binding collective bargaining agreement expressly incorporated by reference the prior version of the pension ordinance and charter provisions, and taking judicial notice, was negotiated in the context of both parties understanding and being aware of the 1996 Court of Appeals decision on this very topic as they were both parties to that case. They can't deny knowledge of it having previously litigated the very dispute that we're here on today.

The law, the case law, and PERA did not change in any relevant aspect between the 1996 decision by the Court of Appeals and the 2011 action by the Employer.

The City had and has no colorable claim that it did not face a clear and binding contractual obligation to keep in place the preexisting and previously litigated method of allocating excess earnings. As such, the City's conduct further constituted an unfair labor practice as it was an unlawful repudiation of the binding 2008-2012 collective bargaining agreement, which obviously was still in effect at the point of the November 2011 pension ordinance change.

Union Counsel appropriately cited to the ATU past practice case [*Amalgamated Transit Union v SMART*, 437 Mich 441 (1991)] and the line of cases following ATU. This was, I think, beyond a tacit agreement, but it was at minimum a tacit agreement. A practice that continues for three decades is a tacit agreement. A practice where the City has previously sought a charter amendment unsuccessfully to

10

end the practice is, at minimum, a tacit agreement.  I think, frankly, it rises to the level of an express agreement where the parties, having previously fought over the terms of the charter and the pension ordinance, then incorporate them by reference in the collective bargaining agreement.

The City's sole proffered defense really was, in its brief, that the financial stability agreement entered into under 2011 PA 4 suspended the duty to bargain.[4]  [At oral argument I strongly suggested to the City that such an argument was inapposite based on the timing of relevant events. Subsequent to the bench opinion, the City sought and was granted leave to withdraw that issue and argument from contention.]

The City has further raised the question of AFSCME's standing to represent already retired former employees. The City is incorrect in its assertions that the case law cited provides that AFSCME former employees who are retirees are not members of AFSCME.  They may well be, they may not be.  Its individual-- some retirees continue to belong to unions, some don't.  They are, however, no longer part of the bargaining unit.  The City was correct to that extent.

It is axiomatic that neither the Employer nor the Union can demand to bargain over changes in conditions affecting already retired former employees.  It doesn't alter the Union's claim as to the impact on active employees who were promised that the Pension Board would have the discretion to allocate certain funds, excess earnings, to their annuity accounts and were promised that upon

---

[4] Effective March 28, 2013, the Local Financial Stability And Choice Act, (LFSCA), PA 436 of 2012, MCL 141.1541 *et seq.* was enacted by the Legislature for the stated purpose of placing financial checks and balances on public employers in a state of financial stress or emergency. As part of that statutory scheme, the Act authorizes the state treasurer to enter into a consent agreement with a local government in a state of financial stress or emergency for a period necessary to achieve the goals and objectives of the agreement. Section 8(11) of the LFSCA suspends the duty to bargain set forth in Section 15(1) of PERA for employers subject to a consent agreement, including consent agreements entered into pursuant to the Act's predecessor, Public Act 4 of 2011. Similarly, Section 27(3) of the LFSCA provides that a local government placed in receivership under the Act is not subject to Section 15(1) of PERA for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first. For purposes of the LFSCA, "receivership" means the process under the Act by which a financial emergency is addressed through the appointment of an emergency manager. MCL 141.1542(q). No provisions of that Act applied to Detroit at the time of the adoption or implementation of the disputed ordinance.

retirement they would be eligible for 13th checks to the extent that there were excess earnings above the [projected rate of return].

As I said, there's no duty to bargain over changes in conditions affecting already retired former employees. However, that doesn't fully answer the question in this case. The parties may, of course, voluntarily enter into negotiations over permissive subjects of bargaining. The question of possibly raising a pension benefit for people who already are retired is a permissive subject of bargaining. It's not prohibited. The parties can, if they choose to, negotiate over it.

Here the Union has not sought as relief any demand over any right to bargain as to former employees. Rather the Union is seeking to enforce the Employer's obligation to not make unilateral changes in promises that had already been made and were still in effect, both [as to] the current employees regarding their entitlements once they retire, which is a perfectly ordinary mandatory subject of bargaining, and as to individuals who were part of the bargaining unit and since retired.

The Union is asserting, and I have found the Employer in implementing unilaterally the changes to the pension ordinance and cutting off the 13th check, has repudiated the terms of an existing collective bargaining agreement. Under PERA, the repudiation of the clear, undisputed terms of an existing contract is more than a mere contract breach which would otherwise be left to the grievance procedure or circuit court suit over damages or whatnot. Rather it's treated as a refusal to bargain in good faith and is therefore an unfair labor practice even if related to a permissive subject of bargaining over which there was necessarily no duty to bargain as in the Commission decisions in the *Kalamazoo County Sheriff* case [*Kalamazoo County & Sheriff*, 24 MPER 17 (2010] where the Commission held that where there is a mixed question, a collective bargaining agreement that covers both mandatory subjects and permissive subjects, the package is the package. It's a single package. Neither side can unilaterally carve it up into pieces and say, "*We'll comply with one piece. We won't comply with this other piece*," unilaterally and without

12

violating the duty to bargain. Once a contract has been reached, it must be treated as binding on both parties, as the Commission held in *Kalamazoo County Sheriff*, or the possibility of productive future bargaining is destroyed.

I will be recommending the restoration of the status quo by restoring to the Pension Board the discretion it previously exercised, by the City being ordered to not interfere in the exercise of that discretion by the Pension Board regarding excess earnings, that the Retirement Board be notified by the City of the restoration of their preexisting discretion, that affected retirement plan participants, both active employees and retirees, be made whole by the City to the extent that there is any practical impediment to the Pension Board making those participants whole otherwise.

The most practical resolution may be for the Pension Board to reallocate those assets. Either way, it is ultimately the obligation of the City to correct the problem it caused by its unilateral action which, again, was taken in direct rejection of the obligations it conceded that it had in the 1996 litigation.

I will recommend a posting of a notice at the work places to reaffirm for active employees that the contractual promises made to them must be kept.

***

[In response to a question from counsel] Well, what I've indicated I intend to order is that the *status quo* be restored, the steps that I'll be recommending be ordered are that the City restore to the Pension Board the discretion previously exercised, specifically that the City notify the Pension Board that the discretion has been restored. The Pension Board will have to act based on that discretion and determine what they think is necessary to put back together what would have otherwise happened. And the Pension Board has a prior history as laid out by Corley and Esuchanko of how they typically did that, but it is within the discretion of the Pension Board how precisely they do that . . . my expectation is that the first level response will be by the Pension Board just using their discretion to decide what they think should happen.

What I propose to order is that to the extent that there's any practical impediment to the Pension Board making the participants whole, it will be upon the City to make the participants whole.

In my bench opinion, I failed to address a part of how this controversy arose, which I found inexplicable. Before it adopted the November 2011 ordinance changes, the City Council had before it an advice memo from the corporation counsel's office on which presumably they were intended to rely. That memo, which was introduced in the record in this hearing at the behest of the City, has a section titled *"Labor Law Considerations"*. The memo acknowledges that the benefits were calculated and paid out in an unaltered fashion for decades. The memo inexplicably asserts that the benefits were not "bargained" for, but the memo fails to ever address the *DPOA v Detroit* 1974 decision, which established as a matter of first impression the obligation to bargain over the implementation of any legislated changes to the detailed provisions of the Detroit pension plan. Likewise, the memo fails to address the impact of, or even advise the Council of the existence of, the 1996 *AFSCME v Detroit* appellate decision in which the City prevailed expressly premised on the City's acknowledgment that it was aware that it could legislate changes to the pension plan, but that it could not implement those changes without bargaining. That the City Council acted on such an advice memo does not excuse their conduct; nonetheless, that such a fundamental matter was decided on by the Council in the absence of a review of the directly controlling law, including two directly relevant appellate cases wherein the City was the defendant, is troubling.

Further, the Corporation Counsel advice memo to City Council has, as a starting point, the 1997 Charter amendments adopted by the vote of the City electorate. An analysis was offered that the excess earnings distribution system was not "specifically authorized" in the 1997 Charter provisions regarding the pension plan. What is entirely omitted from the analysis is the occurrence of the 1996 decision of the Court of Appeals in *AFSCME v Detroit*, supra, and its sequelae. The proposal that would become the 1997 Charter initially included a provision, offered by the City administration, which would have ended the excess earnings distribution system and turned over that funding stream almost entirely to the City. The Wayne Circuit Court enjoined the Detroit Charter Revision Commission from including the disputed "excess earnings" related proposed Charter revisions in the ballot proposal which passed on August 6, 1996, and which became the 1997 Charter for the City. The Corporation Counsel memo relies on the Charter as adopted in August 1996.

14

In ignoring the decision in *AFSCME et al v Detroit*, the City likewise ignores the fact that the Court ruled just one week after that August 1996 election, finding that the injunction regarding the disputed Charter provision on excess earnings was improvidently granted, and allowing the disputed provisions to be placed before the voters in the election of November 1996. At that election, the electorate of the City, at a point in time when they still had a seemingly effective right to vote on such matters, voted down the specific proposal to shift the "excess earnings" away from deferred compensation for employees for the benefit of the City, and rejected the Charter amendment. Notwithstanding that express voicing of the will of the electorate, the 2011 ordinance amendment by the City Council, without so much as a nod of recognition, sought to mandate exactly what the voters had prohibited.

The rationale for the 2011 ordinance change was premised on what has now become a convenient public relations gambit: that the 13th checks amounted to a gift, a gratuity, or a bonus. They were not.[5] In fact, the 13th check system is utilized by many employers as a method of giving some rough protection against inflation in deferred compensation systems. In the 1970s, it was not unusual to have formal inflation hedges in such systems tied directly to the cost of living indicators. That system became perceived as both unpredictable and prohibitively expensive by the late 1970s-early 1980s. It was replaced by concepts such as the 13th check system, which created separate dedicated funding streams to provide an annual bump which, while guaranteed to be paid, was not guaranteed to actually match the rate of inflation. It might be higher than a traditional COLA payment; it would likely be lower; but the annual receipt was assured.

The 13th check system was such a well-established part of the City's deferred compensation system in 1996 that the City conceded, consistent with the earlier decision in *DPOA v Detroit*, that regardless of a Charter or ordinance change, the City could not revoke the payments without fulfilling the bargaining obligation. It is uncontestable that the 13th check system was a mutually agreed upon obligation.

---

[5] The reference to retirement obligations for public employees as "gratuities" is not without historical precedent, *albeit* not supportive of the City's position. In *Bowler v Nagel*, 228 Mich 434 (1924), the Court specifically rejected Detroit's assertion that amounts paid from retirement funds were "gratuities". However, in *Brown v Highland Park*, 320 Mich 108 (1948), the Court faced a financially beleaguered city and held that, despite *Bowler*, such pension obligations were not individually enforceable "contractual" obligations in nature, such that the City of Highland Park could cut the widows of police and firemen off from their pensions, by the expedient of a Charter amendment, without offending State law or the Federal Constitutional impairment of contracts clause. Outrage over the impact of that decision helped lead to the 1963 Constitution, which in article 9, section 24, put the theory to rest and defined such public pension benefits as Constitutionally protected entitlements. The same Constitutional Convention adopted article 4, section 48, which authorized the creation of PERA, the unionization of public employees, and the negotiation of enforceable collective bargaining agreements.

15

Notwithstanding the *DPOA v Detroit* and *AFSCME v Detroit* decisions, the City was not locked in perpetuity to the continued payment of the 13th checks. It could have forthrightly bargained the obligation away. It could have traded it away. It could have in good faith exhausted its bargaining obligations and then, under controlling labor law, taken the entitlement away. It did none of those things. Instead, it continued over the years to re-commit itself to the system. In 2010, the parties had been in bargaining and reached what appeared to be, and what the City asserted to be, a good faith impasse in bargaining. In November 2010, the City imposed new conditions of bargaining in place of a 2008-2012 collective bargaining agreement, which the parties had been unable to resolve. The imposed terms altered many conditions of employment for AFSCME members and wrung significant financial concessions from the workforce. In January of 2011, AFSCME conceded the City's position that the parties had reached a lawful impasse and AFSCME expressly acquiesced in treating the City-imposed terms as the 2008-2012 collective bargaining agreement governing the relationship of the parties.[6]

Although the City could have, in November 2010, included in the post-bargaining impasse imposed terms a cut-off of the 13th check obligations, it did not. The resulting agreement, drafted by and initially unilaterally imposed by the City, left intact the 13th check system and expressly re-committed the parties, in Article 47(T) of the Contract, to compliance with the terms of the pension ordinance as it then existed. One year later, without bargaining, and during the unexpired terms of that Contract, the City Council voted to materially change the pension ordinance and the Employer followed up by unilaterally implementing the change, in derogation of the City's obligations under PERA, the mandate of *DPOA v Detroit*, and the City's own admission of unalterable obligations as set forth in *AFSCME v Detroit*. The ordinance maneuver by the City administration was a unilateral do-over in the midst of the 2008-2012 contract term which materially, and necessarily unlawfully, and adversely altered existing conditions of employment.

It is also notable that the advice memo upon which the City Council relied was itself substantially premised on a favorable reading of the then quite recent Wayne County Circuit Court decision in *Wayne County Retirement Commission v Wayne County*, Case No 10-013013 (Hon. Michael Sapala, September 29, 2011). In that case, at the trial level, relief was granted to Wayne County in a similar dispute over the

---

[6] The 2008-2012 terms were held to be a binding and voluntary collective bargaining agreement between the parties, which fulfilled their bargaining obligations for the period 2008-2012, in *City of Detroit and AFSCME*, Case No. C10 L-295, (ALJ Peltz, August 2012)(on exceptions).

distribution of excess earnings from its pension fund, and in which Wayne County, via a comparable ordinance amendment, seized some $32 million from its employees' pension funds. It is certainly understandable that such a transfer of wealth seemed attractive to both the City and County; however, the Circuit Court decision was subsequently reversed in *Wayne County Retirement System v Wayne County*, 301 Mich App 1 (2013), with the County ordered to restore the funds to its pension plan. Like the City's own legal counsel's memo, the *Sapala* decision reviewed both Constitutional and Charter issues, but ignored the well-settled labor law implications of such unilateral actions by Employers who are subject to bargaining obligations.

## The Post-Bench Opinion Supplemental Pleadings

As noted above, after issuance of the bench opinion, the parties sought and were granted an opportunity to provide supplemental briefing on the question of relief and on the impact of an intervening appellate decision. AFSCME proposed several refinements to the scope or nature of the intended relief that I had described in the bench opinion.

AFSCME began by noting the substantial uncertainties inherent in attempting to restore the *status quo* in a dispute of this nature which goes well beyond the ordinary order of reinstatement of an employee with backpay. Pointing to the decision in *MSU Clerical Technical Union v MSU*, 214 Mich App 42 (1995), a case in which MERC was reversed for a failure to provide a full measure of relief, AFSCME understandably and correctly notes that the burden of uncertainty as to the amount or extent of a remedy awarded should be upon the wrongdoer and not upon the prevailing claimant. In my bench opinion, it was indicated that what was intended was a full make whole remedy, and that the first step response would be to restore to the pension board its proper freedom to exercise its discretion. I also noted from the bench that all of the parties, and the pension board, are aware of and capable of calculating and addressing the average prior annual payouts, and the basis on which they were in turn calculated, should this case ever reach the remedy stage.

Specifically, AFSCME proposes that I direct that the excess earnings be premised on a specific averaging of the percentages used over a multiple year period to divide up the money among the three recipient funds. AFSCME notes, based on the City's own figures, that going back for an eleven year period, the total excess earnings were divided so that the active employee share averaged 55% annually, while the amount devoted to the 13th checks averaged 17% annually of the total fund, with the remaining 28% going to the City itself. While such a mechanism is plausible, the City unsurprisingly faults AFSCME for selecting a specific period of years, rather than a longer period of time.

17

The City offers no alternative method of calculating the remedy, proposing instead that I revisit the merits and deny relief, a suggestion which is hereby rejected.[7]

Neither party has proposed, in their supplemental pleadings, a dollar figure for the relief. This very omission underscores the fundamental uncertainty of the amount which would be necessary to afford make-whole relief. In their arguments for summary disposition, both parties relied on the November 2011 memo from Irvin Corley, Jr, director of the City Council's fiscal analysis division, which provided specific advice to City Council regarding the prior handling of the excess earnings distribution system. In that memo, which was introduced in the record by the City, Corley provides dollar figures which were not placed in dispute. For 2008, the last year Corley analyzed, the excess earnings distribution was $121,100,000. With approximately 72% of that money going for the benefit of the employee deferred compensation system, and the remaining 28% going for the City's benefit, the amount distributed for the benefit of employees was $87,120,000 for that one year. Pursuant to its new ordinance, the City withheld the payments which otherwise would have been made in 2011 and 2012. The record does not reflect the amounts earned and paid out in 2009 and 2010. If one made the enormous assumption that the excess earnings, if any, which would have been the basis for payments in 2011 and 2012 were in any way comparable, the City would need to reserve something on the order of $174,240,000 to satisfy claims. It is entirely unwarranted at this stage of the proceedings to order the reservation or payment of such a sum, which absent agreement of the parties on a specific amount, will require proofs as to what amount of gross excess earnings were generated relative to the withheld payments for 2011 and 2012. No relief can be ordered as to 2013, as the appointment of an emergency manager suspended the duty to bargain and thereby the enforceability under PERA of such obligations.

AFSCME's post-hearing suggestion that the remedial order direct payment based on some averaging of prior payments merely restates the obvious suggestion made in the bench opinion of a benchmark method for assessing compliance, when and if the question becomes relevant. Parties frequently find themselves successfully agreeing upon appropriate make whole remedies post-judgment in MERC cases, whether by compromise, rough estimate or with mathematical certainty. Failing at that, the statute and Commission Rule R423.177 provide for post-judgment compliance proceedings which are fully capable of resolving the question of the calculation of necessary payments, should

---

[7] Incredibly, the City's supplemental post-judgment brief persisted in aggressively ignoring the controlling 1974 *DPOA v Detroit* and 1996 *AFSCME v Detroit* decisions.

this dispute reach that stage. That Rule would require Charging Party to file a detailed specification of amounts claimed, with Respondent required to promptly respond with equal specificity. The parties are obviously far from a terminal point in this litigation and it would require an unwarranted degree of speculation upon speculation to attempt, at this stage, to engineer a more specific directive regarding relief.

AFSCME next raises a concern with the real possibility that, when and if this dispute resurfaces, the composition of the pension board of trustees may well have changed, either through the mere passage of time or through direct action by the emergency manager utilizing his extraordinary powers. The prospect is very real that the remedial order restoring discretion over the funding decision to the pension board may well place it in the hands of a new cast of characters, which may well have been selected in whole or in part by the emergency manager. While a legitimate concern, this is, at this point, speculation which cannot be addressed in a mere recommended remedial order. Again, regardless of who might constitute the pension board when, and if, this matter ever returns to them, there remain the compliance procedures to resolve disputes over implementation of any relief ultimately ordered. Regardless, it is implausible to suggest that this Agency could or should attempt to prospectively reconfigure the membership of an elected pension board.

Finally, despite noting in its supplemental pleading the intervening appointment in 2013 of an emergency manager, AFSCME proposes that the remedial order direct the City to bargain with the Union and to refrain from making any further changes in conditions until fulfilling its bargaining obligations. The City of course opposes such relief, which would be an ordinary portion of a standard MERC remedial order. The appointment of an emergency manager, under recently adopted Michigan law, suspends the obligation to bargain and with it, the obligation to maintain conditions of employment. The emergency manager is free to bargain with AFSCME, but cannot, under PERA, be compelled to do so, nor can the City be compelled, under PERA, to maintain pre-existing conditions of employment.

In its supplemental pleadings, the City, equally and similarly implausibly, proposes that I re-visit the question of summary disposition and dismiss the Charge. The City makes that request without, as noted above, any substantive discussion of the 1974 *DPOA v Detroit* and 1996 *AFSCME v Detroit* decisions. The City grants a mere nod to the existence of the decisions, placing the citations in footnote, *sans* discussion. The request for reconsideration of the substantive decision as issued from the bench is denied.

19

The City suggests, again, in its supplemental pleadings, that the matter should have been arbitrated. That suggestion was first made by the City in its first responsive pleading in September 2012, by which point the 2008-2012 collective bargaining agreement between the parties had been expired for months. Therefore, arbitration was not available. MERC does leave the parties to their available contractual remedies when there is a *bona fide* dispute over the interpretation of the parties' collective bargaining agreement and arbitration is available. Here, there was never a *bona fide* good-faith dispute over the question of the contractually mandated benefits, or over the right of either party to unilaterally abandon or modify its own obligations. There is no question amenable to arbitration here, as the City has repudiated its obligations rather than asserted a good faith dispute over some detail of its duties. The Commission will not find repudiation on the basis of an isolated breach, *Crawford County Bd of Comm'rs*, 1998 MERC Lab Op 17, 21; however, here the deferred compensation benefit cut applied across the board to the entirety of the AFSCME unit. The cut was indisputably unilateral and occurred during a period when a collective bargaining agreement was in place.

The City proposal to the Commission to remand the matter to arbitration is merely a tactic intended to avoid substantive and effective review or remedy. The Commission has the authority to interpret the terms of a collective bargaining agreement where necessary to determine whether a party has breached its collective bargaining obligations. *University of Michigan*, 1971 MERC Lab Op 994, 996, citing *NLRB v C & C Plywood Corp*, 385 US 421 (1967). If the term or condition in dispute is "covered by" a provision in the collective bargaining agreement, and the parties have agreed to a grievance resolution procedure ending in binding arbitration, the details and enforceability of the provision are generally left to arbitration, but only where there is a good faith dispute as to the nature of the contractual obligation. *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich. 309, 317-321 (1996).

Here, there is no good faith dispute over the parameters of the Employer's obligations; rather, the City seeks to instead unlawfully reject its existing obligations contrary to its then-existant duty to bargain. Where such repudiation has occurred, the Commission is prohibited, by prior decision of our Supreme Court, from deferring to contractual arbitration and must instead enforce the statutory obligations on behalf of the people of the State. See, *Detroit Fire Fighters Ass'n v. City of Detroit*, 408 Mich. 663, 676 (Mich 1980).

Moreover, the City's asserted defenses are statutory and Constitutional rather than contractual and are not within the purview of

a private arbitrator. An arbitrator is not specially suited to resolve the dispute about the interplay between collective bargaining agreements, ordinances, City Charter provisions, and PERA bargaining obligations. The complexity of those very issues so vexed the Michigan Supreme Court in 1974 that it found the unilateral pension changes made by Detroit to have been improper, but gave the City a free pass for that event, while cautioning it to never similarly violate its bargaining obligations via charter or ordinance amendment. See, *DPOA v Detroit*. This is not a proper case for review by an arbitrator.

In its supplemental brief on remedies, the City raised the intervening decision of the Michigan Supreme Court in *Macomb County v AFSCME Council 25*, ___Mich___ (No. 144303, June 12, 2013).[8] In that case, the Court reversed MERC in its earlier finding of a violation where Macomb County, acting through its retirement board, altered a long standing reliance on a particular actuarial table used to calculate benefits, to the disadvantage of some retirees. The decision functioned primarily to return the Commission to a closer hewing to the standard provided under *Port Huron Education Ass'n v Port Huron Sch Dist*, 452 Mich 309 (1996).

In *Macomb County*, at the MERC ALJ level, no violation of the statute was found. The Commission decision reversing ALJ Stern was in turn ultimately reversed by the Supreme Court. The grounds prove not relevant to the present matter. The Supreme Court found the underlying collective bargaining agreement in Macomb to be unambiguous and that it expressly provided discretion to the retirement board to make the challenged change in mortality tables. The Court held that MERC had erred by relying on a past practice, albeit of several decades duration, of using the same actuarial table as a basis for finding an unlawful unilateral change, rather than respecting the unambiguous language of the contract which, even if long unused, expressly allowed the retirement board to make the change in mortality tables.

The Court in *Macomb* reaffirmed the right of parties to rely on their agreements, as held in the earlier *Port Huron* case, the holding of which remains controlling law. Here, the finding of a violation is not based on any asserted past-practice; rather the unambiguous language of the then recently re-negotiated contract between the parties supports a finding of a repudiation. The parties here expressly provided for a particular benefit to be funded and disbursed in a particular manner. Their agreements were memorialized both in contract and in ordinance. The City Council

---

[8] While AFSCME sought to strike the City pleading as having gone beyond the leave granted to file a supplemental brief on the issue of remedies, I determined that the raising of intervening appellate authority was proper.

acted unilaterally in passing and then enforcing an ordinance to unilaterally take away a negotiated benefit. The *Macomb* decision affirms rather than detracts from the enforcement of rights as to an unambiguous agreement.

A portion of the *Macomb* decision re-affirmed earlier case law requiring MERC to refer back to arbitration disputes "covered by" a collective bargaining agreement which had in it an arbitration clause where there was any colorable claim that the complained of conduct was allowed under the contract. The Supreme Court held that such disputes are for arbitrators, not the Commission, to decide. Here, the "covered by" analysis is inapposite for two separate reasons. First, there was no contract in place when this Charge was brought and no arbitration clause to which the parties could defer to. Second, as more fully discussed above, the City simply advanced no arguable basis under the prior ordinance or several collective bargaining agreements which could excuse its conduct. Simply, no plausible contractual defense was proffered. Rather, the Employer here advanced statutory and Constitutionally based defenses which, as noted above, are not amenable to resolution by a private arbitrator.

Moreover the City's theory would turn the *Macomb* decision on its head. In *Macomb*, the Court found that the contract language expressly granted the retirement board the discretion to make certain decisions, and the retirement board made such a decision well within its established discretion. Here, the unilaterally imposed new ordinance took away from the pension board the discretion which the parties had expressly agreed the pension board alone would wield.

### The Bankruptcy Court Related Developments

On the petition of AFSCME, and at 2:41 PM on October 2, 2013, the Bankruptcy Court issued an order which in relevant part provided that the automatic stay was *"modified through 11:59 PM on October 4, 2013 to permit Administrative Law Judge Doyle O'Connor to execute his recommended decision"* in this pending case. While this Decision is being released consonant with the Bankruptcy Court's partial lifting of the stay at AFSCME's request, and with full consideration of the significant claims of the parties, its release may well offer little more solace than a an assurance of a full ticket-price refund offered while still on the sharply tilting deck of the *Titanic*.

The parties are cautioned that, as they well know, the Bankruptcy Court also ordered that *"all deadlines for any party to act under state law that would otherwise result from any opinion or recommendation issued by the ALJ are tolled indefinitely pending further order of the Court"*. The

parties are further reminded that this Decision and Recommended Order, and the relief recommended herein, is premised on the finding that the City failed, as to the complained of events, to meet its obligations under Sections 15 and 10(1)(e) of PERA to bargain in good faith and to refrain from unilaterally implementing changes to established conditions of employment contrary to that good faith bargaining obligation. Pursuant to State law, that obligation to bargain was suspended upon the appointment of an emergency manager, such that the Employer, acting through the Emergency Manager, is empowered in 2013 to now engage in just the sort of unilateral action which would otherwise be unlawful under PERA. For that reason, no prospective relief has been ordered, beyond 2012, as any such relief would be both speculative and inappropriate until such time as the City of Detroit is no longer exempted from the ordinary obligations under Section 15 of PERA.

## Conclusion

I have carefully considered any additional arguments asserted by the parties in this matter and have determined that they do not warrant a change in the result. For the reasons set forth above, I find that the deferred compensation related benefit cuts were an unlawful unilateral change in basic conditions of employment implemented in violation of the City's well-established obligations under Section 10(1)(e) of PERA to bargain in good faith, to refrain from repudiating prior agreements, and to refrain from unilaterally imposing adverse changes in conditions of employment. I recommend that the Commission issue the following order:

## RECOMMENDED ORDER

The City of Detroit, its officers, agents, and representatives shall:

1. Cease and desist, during such periods when the bargaining obligation is not otherwise suspended by operation of law, from:

   a. Failing to bargain in good faith with the representative of its employees;
   b. Unilaterally altering any established conditions of employment during the term of any collective bargaining agreement;
   c. Seizing or transferring, or failing to return, assets held for the benefit of employees in pension funds or accounts or which were or are otherwise under the control or possession of the pension board of trustees;

23

d. Where an unexpired collective bargaining agreement is in place, repudiating the terms of such agreements by refusing to comply with the unambiguous obligations under such agreement;

e. Interfering in the pension board's distribution of the excess earnings, if any, for the years 2011 and 2012;

f. Interfering in the holding and distribution of assets by the retirement board when it is acting pursuant to authority expressly granted to it by the parties, whether through agreement memorialized in the pension ordinance or in separate written collective bargaining agreements.

2. Take the following affirmative action necessary to effectuate the purposes of the Act:

a. Affirmatively renounce reliance on and cease any effort at enforcement of the November 30, 2011, pension ordinance amendment;

b. Restore to the control of the pension board the entirety of any assets diverted from the control of the board following the adoption of the November 30, 2011 ordinance amendment and as anticipated by that ordinance change, including restoring to the board's control any "excess earnings" as previously defined by the pension board and attributable to 2011 and 2012;

c. Take whatever steps are necessary to facilitate the distribution of the 2011 and 2012 excess earnings, if any, in keeping with the previously utilized methodology whereby a portion was utilized for 13th checks, a portion was transferred to active employee annuity accounts, and a portion was transferred for the benefit of the Employer;

d. Provide statutory interest to, or otherwise make whole, the pension plan for the diversion of assets and the intervening lost earnings on those assets;

e. Refrain from any interference in the distribution of the so-called "13th checks" by the retirement board, including in the distribution of any make-up or backpay checks for the years 2011 and 2012, as may be issued in the discretion of the retirement board;

24

f.   Refrain from any interference in the distribution of funds by the retirement board for the benefit of active employee annuity accounts for the years 2011 and 2012;

g.   Otherwise make whole all AFSCME bargaining unit members adversely effected by the unilateral changes in conditions of employment found unlawful in this Decision, to the extent that such individuals are not made whole by remedial steps taken by the pension board;

h.   Provide the Union with the full calculation of amounts reimbursable to the pension plan, or unit members, and interest on same;

i.   Maintain all existing conditions of employment throughout the bargaining and fact-finding process, during such periods when the bargaining obligation is not otherwise suspended by operation of law.

3. Post an appropriate notice, as may be directed by the Commission, to employees in a conspicuous place at each City worksite and post it prominently on any website maintained by the City for employee access for a period of thirty (30) consecutive days, and additionally deliver a copy of the notice by mail or email to each employee in the AFSCME bargaining units.

MICHIGAN EMPLOYMENT RELATIONS COMMISSION

_____
Doyle O'Connor
Administrative Law Judge
Michigan Administrative Hearing System

Dated:  October 4, 2013
       Released to the parties at 5:55 PM.

13-53846-swr Doc 8485-6 Filed 09/29/14 Entered 09/29/14 21:57:43 Page 69 of 27
13-53846-swr Doc 7288-6 Filed 09/29/14 Entered 09/29/14 21:50:35 Page 29 of 27
148

# EXHIBIT 8

13-53846-tjr   Doc 8485-8   Filed 10/26/14   Entered 10/26/14 15:47:48   Page 70 of 75
13-53846-swr   Doc 7235-8   Filed 09/02/14   Entered 09/02/14 21:50:33   Page 70 of 75
148

Michigan Department of Energy, Labor & Economic Growth
Employment Relations Commission (MERC)
Labor Relations Division
313-456-3510

# CHARGE

Authority: P.A. 380 of 1965, as amended.

DO NOT WRITE IN THIS SPACE

Case No. CU K-201    Date Filed 11|22|2011

**INSTRUCTIONS:** File an **original** and **4 copies** of this charge (including attachments) with the Employment Relations Commission at: Cadillac Place, 3026 W. Grand Boulevard, Suite 2-750, PO Box 02988, Detroit MI 48202-2988 or 1375 S. Washington St., Lansing MI 48910. **The Charging Party must serve the Charge on the opposing side within the applicable statute of limitations, and must file a statement of service with MERC.** *(Refer to the "How to File a Charge" document under the "Forms" link at www.michigan.gov/merc.)*

**Complete Section 1** if you are filing charges against an employer and/or its agents and representatives. —or—
**Complete Section 2** if you are filing charges against a labor organization and/or its agents and representatives.

**1. EMPLOYER AGAINST WHICH THE CHARGE IS BROUGHT**     Check appropriate box: ☐ Private ☑ Governmental

Name and Address:

Mr. Joseph Martinico, Director
Labor Relations Department
City of Detroit
2 Woodward Avenue, Suite 304
Detroit, Michigan 48226

STATE OF MICHIGAN
EMPLOYMENT RELATIONS COMM
DETROIT OFFICE
2011 NOV 22 PM 4: 39
RECEIVED

**2. LABOR ORGANIZATION AGAINST WHICH THE CHARGE IS BROUGHT**

Name and Address:

**3. CHARGE**

Pursuant to the Labor Mediation Act (LMA) or Public Employment Relations Act (PERA) *(cross out one)*, the undersigned charges that the above-named party has engaged in or is engaging in unfair labor practices within the meaning of the Act.

**On an attached sheet** you must provide a clear and concise statement of the facts which allege a violation of the LMA or PERA, including the date of occurrence of each particular act and the names of the agents of the charged party who engaged in the complained of conduct. The charge should describe who did what and when they did it, and **briefly** explain why such actions constitute a violation of the LMA or PERA.

The Commission may reject a charge for failure to include the required information. However, it is not necessary to present your case in full at this time. Documentary material and exhibits ordinarily **should not** be submitted with this charge form.

**4. Name and Address of Party Filing Charge (Charging Party)**
(if labor organization, give full name, including local name and number)

MI AFSCME Council 25, Local 542

Telephone Number:

( 313 ) 964-1711

**5. List ALL related MERC case(s) (if any):** _____

(Name of parties)

Case No.: N/A _____   Judge: N/A _____

Case No.: N/A _____   Judge: N/A _____

I have read this charge and it is true to the best of my knowledge and belief.

_____
Signature of Representative/Person Filing Charge

Email:
awatkins@miafscme.org
Telephone/Cell No.:
313/964-1711/313-515-9977

Print Name and Title:
Aina N. Watkins, Staff Attorney

Fax No.:
313-964-0230

Street Address:
600 W. Lafayette, Ste 500

City:
Detroit

State:
MI

Zip Code:
48226

The Department of Energy, Labor & Economic Growth will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, marital status, disability, or political beliefs. If you need assistance with reading, writing, hearing, etc., under the Americans with Disabilities Act, you may make your needs known to this agency.

BER_____ (2/11)

In the Matter of:

CITY OF DETROIT
     Respondent-Public Employer,

-and-

**Unfair Labor Practice Charge**

AMERICAN FEDERATION OF STATE
COUNTY AND MUNICIPAL EMPLOYEES,
MICHIGAN COUNCIL 25, LOCAL 542
     Charging Party-Labor Organization,

_____/

2011 NOV 22 PM 4: 39
STATE OF MICHIGAN
EMPLOYMENT RELATIONS COMM.
DETROIT OFFICE
RECEIVED

## <u>CHARGING PARTY-LABOR ORGANIZATION'S CHARGE</u>
## <u>AGAINST RESPONDENT CITY OF DETROIT</u>

    **NOW COMES** Charging Party, MI AFSCME Council 25 ("Union") and its affiliated Local 542,

by and through its attorney, Aina N. Watkins, and files this Unfair Labor Practice charge against

Respondent, City of Detroit, ("City" or "Employer") and hereby states as follows:

1. The parties are subject to an imposed Collective Bargaining Agreement effective July 1, 2008 - June 30, 2012.
2. AFSCME has 13 members assigned to the Fire Department of the City of Detroit, Fire Apparatus Division.
3. The classifications of bargaining unit members consist of General Auto Mechanic, Painters, General Auto Body Mechanic, Air Equipment Mechanic, Auto Mechanic Sub Foreman and Storekeeper, etc.
4. On about May 23, 2011, June 7, 8, 9, 11, 2011 and continuing, the Union received notice that Apparatus Emergency Mechanics (also known as "Emergency Repairman") who are members of the Detroit Fire Fighters Association, DFFA Local 344, were performing General Auto Mechanic work.
5. The Apparatus Emergency Mechanics make emergency repairs and service automotive fire apparatus at fires, on the road or at the stations.
6. The General Auto Mechanic performs any and all automotive or mechanical repairs, or maintenance tasks to the types of mobile equipment employed by the Department; such as fire fighting apparatus and other special purpose vehicles, automobiles, trucks etc.
7. There are currently six (6) General Auto Mechanics in Fire Apparatus Division; two (2) were recently promoted to Emergency Repairman in February 2011.
8. Pursuant to the supplemental agreement Article 9 <u>Career Development and Training,</u> General Auto Mechanic and Auto Sub-Foreman classifications promote into the position of Emergency Repairman.

9. The Union contends that the Employer has improperly assigned work traditionally performed by AFSCME members to employees in another classification represented by Detroit Fire Fighters Association, DFFA Local 344.

10. The Union contends that the Employer is obligated to bargain over a decision to replace bargaining unit employees with employees from a different bargaining unit, where the work has been exclusively performed by employees in one unit.

11. The Employer has refused to bargain with the Union over the reassignment of work; the bargaining unit has been impacted adversely.

**WHEREFORE,** Charging Party alleges that Respondent has violated Section 10 (1) (e) and 15 (1) of PERA.

**WHEREFORE,** Charging Party respectfully asks that the Employer be ordered to take the following affirmative action to remedy the Unfair Labor Practice:

1. Cease and desist from refusing to bargain in good faith with the Union;

2. Make the members whole for any loss of pay or other financial or fringe benefits that he/she may have suffered;

3. Assign work traditionally performed by General Auto Mechanic to individuals properly placed in the classification; and

4. Post notices of its violations of the Act.

Respectfully Submitted,

*Aina N. Watkins*

BY: _____

Aina N. Watkins (P69196)
Counsel for Charging Party-Labor Organization
Michigan AFSCME Council 25, AFL-CIO
600 W. Lafayette Blvd., Suite 500
Detroit, MI 48226
Phone: (313) 964-1711 ext. 2237
Fax: (313) 964-0230

Dated: November 22, 2011

bsr/324iuoeaflcio

# STATE OF MICHIGAN
## EMPLOYMENT RELATIONS COMMISSION
### LABOR RELATIONS DIVISION

In the Matter of:

CITY OF DETROIT
     Respondent-Public Employer,

-and-                                                          **Unfair Labor Practice Charge**

AMERICAN FEDERATION OF STATE
COUNTY AND MUNICIPAL EMPLOYEES,
MICHIGAN COUNCIL 25, LOCAL 542
     Charging Party-Labor Organization,
_____/

## PROOF OF SERVICE

I HEREBY CERTIFY that I served a true and correct copy of this **Unfair Labor Practice Charge** upon:

Mr. Joseph Martinico, Director
Labor Relations Department
City of Detroit
2 Woodward Avenue, Suite 304
Detroit, Michigan 48226

I declare that the statements above are true to the best of my information, knowledge, and belief.

MI AFSCME Council 25, AFL-CIO

BY: _____

Dated: ___11 / 22 / 11___

bsr/324iuoeaflcio

RECEIVED 2011 NOV 22 PM 4:39 STATE OF MICHIGAN EMPLOYMENT RELATIONS COMM. DETROIT OFFICE

# EXHIBIT 9

| IN THE MATTER OF: | Docket No.: 12-000523-WH |
|---|---|
| Dean Story,<br>      Petitioner | Case No.:   160450 |
| v | Agency:    Wage Hour |
| City of Detroit,<br>      Respondent | Case Type: Wage and Hour |
| | Filing Type: Appeal |

_____/

Issued and entered
this 15th day of January, 2013
by: David M. Cohen
Administrative Law Judge

## DECISION OF THE ADMINISTRATIVE LAW JUDGE

### PROCEDURAL HISTORY

This is a proceeding held under Section 11 of 1978 PA 390, as amended, the Wage and Fringe Benefit Act (Act 390), MCL 408.481; and in accordance with 1969 PA 306, as amended, the Administrative Procedures Act (APA), MCL 24.201 et seq.

The purpose of this review is to examine Determination Order No. 160450 issued by the Department of Licensing & Regulatory Affairs, Wage Hour Division on March 8, 2012.

The Department determined that Act 390 was not violated "because payment of fringe benefit(s), longevity pay bonus, is not required by the terms set forth in the written fringe benefit policy/contract." Employee Story, through counsel, filed a March 20, 2012 appeal of the Determination Order.

This matter was subject to a fairly long procedural history. A hearing was originally scheduled for May 9, 2012. On April 18, 2012, Employer's counsel requested an adjournment of the initial hearing date. An April 26, 2012 Order Granting Adjournment set a new hearing date of June 11, 2012. On May 2, 2012, Employee's counsel requested an adjournment of the June 11, 2012 hearing date. A May 17, 2012 Order Granting Adjournment set a new hearing date of July 12, 2012.

On June 21, 2012, Employee's counsel submitted a correspondence requesting that a pre-hearing conference be scheduled for the purpose of allowing counsel time to inspect documents held by the City of Detroit. On June 22, 2012, Employer's counsel submitted a correspondence objecting to the necessity of the proposed pre-hearing conference. In response to these communications, I convened a telephone pre-hearing on June 28, 2012. After the phone conference, the hearing remained scheduled for July 12, 2012 and the

daylong hearing proceeded as scheduled at the Michigan Administrative Hearing System, Cadillac Place, Detroit, Michigan.

The hearing on this Determination Order and Docket 12-000522, another very similar claim concerning the same Employer, were consolidated on July 12, 2012 for hearing purposes only. Although necessarily similar in content, a separate Decision and Order will be issued regarding Docket 12-000522.

Employee was represented at the hearing by Attorney Richard G. Mack, Jr. The City of Detroit was represented at the hearing by Attorney Letitia C. Jones. A representative of the Wage Hour Division did not appear. The hearing proceeded in the absence of this party pursuant to Section 72(1) of the APA. Administrative Law Judge David Cohen presided.

At the close of the hearing, I acquiesced to a request from Employee's counsel to allow closing arguments via brief. A briefing schedule was set after the parties were in receipt of the transcript in the matter.

## ISSUES AND APPLICABLE LAW

Are fringe benefits (a longevity pay bonus) due Employee? That is, did the Employer violate Section 3 of Act 390?

A bonus, such as a longevity payment, is a fringe benefit under Act 390. Section 1(e) defines "Fringe benefits" as:

> "Fringe benefits" means compensation due an employee pursuant to a written contract or written policy for holiday, time off for sickness or injury, time off for personal reasons or vacation, bonuses, authorized expenses incurred during the course of employment, and contributions made on behalf of an employee.

Section 3 of Act 390 provides:

> An employer shall pay fringe benefits to or on behalf of an employee in accordance with the terms set forth in the written contract or written policy.

## WITNESSES

*For Employee:*
AFSCME Local 542 President Phyllis McMillon
Senior Personnel Payroll Clerk Derek Gibson
Employee Dean Story

*For Employer:*
Employee Dean Story (recalled)
Senior Personnel Payroll Clerk Derek Gibson (recalled)
Detroit Law Department Legal Assistant Sharon Guillory
Detroit Labor Relations Specialist Laverne Bronner-Wilson

## EMPLOYEE EXHIBITS

1. The July 1, 2005 – June 30, 2008 Master Agreement between the City of Detroit and Michigan Council 25

2. An October 13, 2010 correspondence from City of Detroit Director of Labor Relations Joseph Martinico to AFSCME Council 25 President Albert Garrett

3. A Class Action Petition for Writ of Mandamus in the Wayne County Circuit Court matter of Dean Story and Rosemarie Haynesworth v State of Michigan and its Wage and Hour Division and Lisa Gould and Randall Hairston, case number is indecipherable on exhibit

4. An October 5, 2009 correspondence from City of Detroit Chief Financial Officer Norman White with attached Annual Longevity Pay policy outline

5. An October 2007 document entitled City of Detroit Payroll Department Longevity Procedure1

## EMPLOYER EXHIBITS

1.   A December 21, 2010 correspondence to the City of Detroit from the Wage & Hour Division

2a.   A City of Detroit Personnel Department Employee History File regarding Employee Dean Story

2b.   Excerpts from the Master Agreement between City of Detroit and Michigan Counsel 25, July 1, 2001 through June 30, 2005

2c.   Department of Labor and Economic Growth Michigan Employment Relations Commission Fact Finding Report, MERC Case No. A-0062 (129 Pages)

2d.   A September 9, 2010 correspondence to Detroit City Council from Labor Relations Director Joseph Martinico with attachment

2e.   A September 28, 2010 correspondence to Detroit City Council from Labor

---

1 Largely duplicative of Exhibit 4

Relations Director Joseph Martinico, with a revised "Schedule A-12"

2f.    Resolution approved by City Counsel on September 28, 2010 and approved by Mayor of Detroit on October 5, 2010

2g.    Chart entitled Bargaining Units Not Receiving Longevity

3.    A February 14, 2012 correspondence to Employee Dean Story from Wage & Hour Division Investigator Randall Harrison, with a copy of Determination Order #160450

4.    A March 28, 2012 Notification of Appeal sent by the Wage & Hour Division to the Employer and Employee

5.    A January 19, 2011 letter from AFSCME Michigan Counsel 25 President Albert Garrett to Director of Labor Relations Joseph Martinico, bearing the signatures of both Albert Garrett and Joseph Martinico

6.    The Cover Page and Table of Contents from the document titled "Master Agreement between City of Detroit and Michigan Counsel 25, July 1, 2008 through June 30, 2012"

## FINDINGS OF FACT

Employee Dean Story is employed by the City of Detroit in the city's General Services Department. Employee Story is a member of the American Federation of State County and Municipal Employees (AFSCME) Local 542. The present matter solely concerns Employee Story's claim for a $600.00 longevity bonus for the year 2010.

It should be noted that throughout the proceeding, Employee's counsel repeatedly drew attention to the fact that a large number of similarly situated AFSCME employees have filed Wage & Hour claims regarding the issue of a longevity bonus.

Traditionally, the City of Detroit has annually paid a longevity bonus to city employees during the month of December. The amount of the bonus was determined by the individual employee's years of service.

The longevity bonus was incorporated into past Master Agreements between the City of Detroit and AFSCME (Employee Exhibit 1 & Employer Exhibit 2b). The 2005-2008 collective bargaining agreement (CBA) language stated in pertinent part:

> Employees who have qualified for longevity pay and have accumulated at least sixteen hundred (1600) hours of straight time regular payroll hours of paid time during the year immediately preceding any December 1 date or other day of payment will qualify for a full longevity payment provided they are on the payroll on the December 1 date or any other date of qualification. Except for employees first qualifying for increments, the payment will be

made in a lump sum annually on the first pay date after December 1 (Employee Exhibit 1 at Page 43).

One of the disputes between the parties concerns whether employees were required to work 1600 hours or 1800 hours to obtain the 2010 longevity bonus (Exhibit 1 compared to Exhibit 2b). It appears that originally 1800 hours was required to obtain the bonus, but this was revised down to 1600 hours to factor into consideration employee furlough days.

Further, Senior Personnel Payroll Clerk Derek Gibson testified that traditionally the calculation for longevity pay involved "all paid bank time". Elaborating, Mr. Gibson indicated that this included regular work time, vacation time, sick time, reserved sick time, holidays, comp time and jury duty (Tr. Page 87, lines 14-18). I find that this was the policy for calculating the longevity payment, although it was not a policy clearly specified in the actual written contract between the parties (Employee Exhibit 4 & 5 compared to Employee Exhibit 1).

Mr. Gibson also testified credibly that historically a formula was utilized to provide longevity pay on a pro-rated basis to employees who did not meet the 1600 hour requirement by December 1st (Tr. Page 90, lines 9-19). Employee's counsel argued that this information was not utilized by the Wage Hour Investigator in determining Employee's eligibility for a longevity payment. For the reasons discussed below, neither the longevity payment calculation criteria nor the pro-rata formula is relevant in the final analysis.

Although the longevity pay bonus was provided historically, longevity pay is not contained within the document which is titled as the 2008-2012 Master Agreement between the City of Detroit and AFSCME (Employer Exhibit 6). The record establishes that the City of Detroit and AFSCME engaged in a protracted two year negotiation process concerning the terms of the 2008-2012 collective bargaining agreement between the parties.

AFSCME ultimately filed an August 10, 2009 Petition for Fact Finding with the Michigan Employment Relations Commission (MERC). As a result, a Fact Finder was appointed on October 21, 2009 (Employer Exhibit 2c at Page 2). A Fact Finding Hearing began on December 21, 2009 and continued on twenty two additional dates, ending with the exchange of post-hearing briefs in May 2010. The Fact Finding Report that resulted was issued on June 25, 2010. Many issues were addressed by the Fact Finder. Relevant to this proceeding is that the Fact Finder recommended that longevity pay be discontinued.

Prior to the Fact Finding proceeding, the last offer made by the City of Detroit to AFSCME was rejected by the Union. The hearing record indicates that this offer, rejected in November 2009, would have generally maintained the longevity bonus. Specifically, the offer proposed that if an employee had a ten-day suspension or more, they would not receive longevity pay for that year.

During this period of Fact Finding and negotiations, Union members meeting the appropriate qualifications were paid annual longevity bonuses in December 2009.

After issuance of the June 2010 Fact Finding Report, in conjunction with MERC procedures a sixty (60) day period ensued where the parties were allowed to continue bargaining in an attempt to reach a resolution. The parties remained unable to come to terms on a collective bargaining agreement and effectively reached an impasse. On September 9, 2010, after the sixty (60) day period elapsed, City of Detroit Labor Relations Director Joseph Martinico notified AFSCME and the Detroit City Council that it would exercise its legal right to impose the City's last proposals on the open issues between the parties. On September 28, 2010, the Detroit City Council passed a resolution, implementing terms which included longevity pay being eliminated in its entirety (Employer Exhibit D at Page 3). This resolution was approved by Detroit's Mayor on October 5, 2010 (Employer Exhibit F).

On October 13, 2010, the City of Detroit wrote a correspondence to AFSCME Council 25 President Albert Garrett (Employee Exhibit 2). The letter stated in pertinent part:

> In light of the fact that the City has fully fulfilled its bargaining duty with regard to the Fact-Finder's Report and Recommendations, the City maintains that it has the legal right under PERA {Michigan Public Employment Relations Act} to implement its final impasse position regarding all of the issues presented to the Fact-Finder. Attached please find a list of the economic provisions that the City intends to implement. Effective on October 25, 2010...longevity pay shall be eliminated and tuition refund suspended, effective immediately (Employee Exhibit 2 at Page 2).

On January 19, 2011, AFSCME Council 25 President Albert Garrett wrote Director of Labor Relations Joseph Martinico regarding the "2008-2012 City of Detroit & AFSCME, Council 25 Labor Contracts" (Employer Exhibit 5). This correspondence accepts the terms that were imposed on October 25, 2010 by the City of Detroit. The language in the January 19, 2011 letter states:

> As we both know, the City of Detroit and AFSCME have engaged in negotiations over the terms of a collective bargaining agreement for more than two years. The process included mediation and ultimately fact finding before a State appointed Fact Finder. The Fact Finder's report was issued on June 25, 2010 and the parties continued bargaining for more than 60 days following the release of the report, without reaching agreement. Following exhaustion of all of the procedures required by law, the City exercised its right to impose contract terms.
>
> AFSCME understands that the City has lawfully imposed a full agreement on AFSCME and its affiliated units of the City of Detroit. AFSCME understands that this imposition is for the full agreement, including all terms imposed by the City and all other Articles tentatively agreed to by the parties during negotiations, for all five master agreements representing the AFSCME and all units (except the Emergency Services Operations (ESO) unit, as indicated below). AFSCME, and its affiliated City of Detroit unions and locals, accepts the imposed agreements and accepts said terms as final and binding upon the parties and shall withdraw all fact finding petitions filed on behalf of said

unions and locals, based upon said understandings.

AFSCME acknowledges that the imposition will be effective for all of its affiliated unions and locals (and their respective bargaining agreements), except for the ESO unit. It is AFSCME's position that ESOs are eligible for arbitration under Act 312 and the City disputes their eligibility at this time. Additionally, the City has informed the union that the application of furlough days for the Crossing Guards (Local 1863), Senior ESOs Telecommunications Operations (TCOs) and Senior TCOs have been waived for reasons of operational necessity. AFSCME's acceptance of the imposed terms is reliant upon these understandings as well.

Finally, AFSCME agrees to withdraw and/or refrain from filing any/all claims, charges, grievances or other litigation related in any way to the negotiation process or the imposition of contract terms by the City. This does not limit the union's right to grieve the City's interpretation or application of any such terms, or any subsequent unfair labor practice charges or grievances (Employer Exhibit 5).

## CONCLUSIONS OF LAW

The principles that govern judicial proceedings also apply to administrative hearings. The Employee is the appellant in this case and must prove by a preponderance of the evidence that the determination order should be rescinded or modified.

As a general rule, there is no longer any authority under Act 390 to interpret a collective bargaining agreement covered by federal labor law (Wage Hour General Entry XV). However, this does not apply to collective bargaining agreements involving CBAs in public employment. Therefore, there is jurisdiction over public sector claims *Lawrence* v *City of Detroit* WH 90-669 (1992), *Wage Hour Digest*, *supra*, ¶1232.

Employee's counsel avers that the Division's Determination Order committed a fundamental error in how it viewed the longevity payment, arguing that the longevity payment at issue should be viewed as wages as opposed to a fringe benefit.

I find that the longevity pay being sought is properly viewed as a fringe benefit bonus as opposed to earned wages. The clear language of Section 1(e), quoted above, indicates that the term fringe benefit includes *bonuses* paid by an Employer pursuant to a written contract or written policy. R 408.9002(2)(d) defines the term *bonus*, as used in Act 390, to mean a premium or extra or irregular remuneration in addition to wages that is awarded to an employee under a written contract or written policy.

In the present matter, the longevity payment was clearly a premium or extra remuneration allowed under previous collective bargaining agreements. It was an incentive for attendance and loyalty to Employer derived by looking at years of service and the yearly hours of service provided by an employee, but it was not a wage. In *Elarton* v *Lenawee Hills Memorial Park Association, Inc* WH 84-4216 (1985), *Wage Hour Digest, supra,* ¶557,

an employee was to receive a payment, characterized as a bonus, if still employed on June 1, 1984. The bonus was to be calculated at a rate of 50 cents for each hour the employee had worked. The *Elarton* Administrative Law Judge held that the disputed sum was indeed a bonus and subject to the requirement of a written contract. It was not viewed as a wage even though the sum was clearly calculated by looking at the hours worked by the employee. A longevity payment, such as the one at issue presently, is properly characterized under Act 390 as a bonus and should not be viewed as akin to an hourly wage.

Employee, through counsel, raises numerous arguments that a 2010 longevity bonus should be paid. Looking to the rationale of the Wage Hour Investigator, Employee's counsel argues that there was a miscalculation of whether Employee met the 1600 hour requirement for the longevity payment. Employee's counsel noted that the Wage Hour Investigator calculated Employee's 2010 hours by looking at only the straight time worked by Employee until October 2010. As indicated above, the testimony of Payroll Clerk Derek Gibson clearly conveyed that the calculation was based upon straight time, as well as vacation time, sick time, holidays, and other periods.

Employee argues further that there was a policy to pay even partial, pro-rated longevity payments to employees who did not meet the minimum hours worked in a year (Exhibit 4 & 5). As such, Employee's counsel asserts that at least a pro-rata payment should be due to Employee based upon hours worked until imposition of terms by the City of Detroit.

Further, Employee's counsel, drawing upon labor law, asserts that Employer could not impose the terms recommended by the Fact Finder, but should instead be left with the terms last offered by Employer prior to fact finding, which would have largely preserved the longevity bonus.

However, I find that Employee's arguments, whether based on last best offer, or past longevity payment calculation and pro-rata disbursement methods, do not overcome the fact that Employer and AFSCME agreed to a contract that no longer provided for the longevity payment.

The key document in this analysis is the January 19, 2011 correspondence from AFSCME Council 25 President Albert Garrett to Employer's Director of Labor Relations, Joseph Martinico. It is quoted above in its entirety due to the language it employs. In the January 2011 correspondence, President Garrett unambiguously agrees, on behalf of AFSCME membership, to the changes in conditions of employment that were imposed by the City of Detroit; terms which eliminate longevity payments. In key part, the letter states that "AFSCME understands that the City has lawfully imposed a full agreement on AFSCME and its affiliated units of the City of Detroit. AFSCME understands that this imposition is for the full agreement, including all terms imposed by the City...AFSCME, and its affiliated City of Detroit unions and locals, accepts the imposed agreements and accepts said terms as final and binding upon the parties" (Employer Exhibit 5). This language is unambiguous and indicates an acceptance of contract terms which included the elimination of the longevity bonus.

Additionally, the correspondence states that "AFSCME agrees to withdraw and/or refrain from filing any/all claims, charges, grievances or other litigation related in any way to the negotiation process or the imposition of contract terms by the City. This does not limit the union's right to grieve the City's interpretation or application of any of such terms, or any subsequent unfair labor practices charges or grievances" (Employer Exhibit 5 at Page 2). I note that a signature block was provided on the letter for Director of Labor Relations Martinico and that it was signed above typed print indicating "AGREED" (Employer Exhibit 5 at Page 2) (Emphasis from original).

In Petitioner's Post Hearing Brief, counsel acknowledges that the Union can waive an unfair labor practice charge or a grievance, but notes that the Union can not waive the rights of its membership to bring a claim under Act 390. Employee's counsel cites the case of *Admiral Merchants Motor Freight, Inc v Dept of Labor*, 149 Mich App 344 (1986) in support of the position that an individual employee's rights under Act 390 cannot be waived by a contract or agreement negotiated by an exclusive bargaining representative (Petitioner's Post Hearing Brief at Page 10).

In reviewing *Admiral Merchants*, I note that the factual circumstances were somewhat different then the present matter. *Admiral Merchants* concerned an Act 390 claim by two employees. The employees' claims concerned the same issues embodied in a federal suit filed by the International Teamsters Union.

Clearly, *Admiral Merchants* reinforces the rights of employees to seek relief through a claim under Act 390. Employee Story has that right and has exercised it in the present matter. However, while an employee has a right to pursue an Act 390 claim, the employee can not obtain relief greater than that afforded by the statute.

The January 19, 2011 letter between the City of Detroit and the Union represents a meeting of the minds, both sides receiving consideration for their agreement. I find that it is a contract made on behalf of AFSCME members, including Employee Story, by an individual with apparent and actual authority to act on behalf of the AFSCME membership.

A recurrent theme present in the arguments of Employee's counsel sounded in equity. Counsel drew an analogy, arguing that the present situation was similar to an Employer hiring an Employee for $500.00 a week, to be paid on Friday, and then reducing the compensation to $400.00 on Thursday (Tr. Page 30). Counsel was eloquent in repeatedly noting that most of the employees affected by the longevity bonus made modest incomes for their hard work on behalf of the City of Detroit. In *Todd v Nemic Machinery Company* WH 96-51 (1996), *Wage Hour Digest*, *supra*, ¶1070, it was acknowledged that an Administrative Law Judge has no equitable powers to create a solution at odds with Act 390. In *Todd*, a change to an employee handbook in January 1995 resulted in an employee being denied a bonus by a narrow window of time. The employee worked through the entire bonus calculation period which ended on March 31, 1995, but was denied the bonus due to not being employed when the bonuses were physically issued two weeks later.

Under Act 390, the payment of bonuses, such as a longevity payment bonus, is determined pursuant to the terms of a written contract or written agreement between the parties. The contract agreement, demonstrated by the January 19, 2011 correspondence, applies in this matter. It no longer provides for a longevity bonus.

## DECISION

The Department's Determination Order 160450, dated March 8, 2012 is **AFFIRMED**.


David Cohen
Administrative Law Judge

## APPEAL PROCEDURE

The parties may appeal decision based on MCL 408.481(9), which provides:

> *MCL 408.481(9)  A party to the proceeding may obtain judicial review of the determination of the hearings officer pursuant to Act No. 306 of the Public Acts of 1969, as amended.  Venue for an appeal under this act shall only be in the circuit where the employee is a resident, where the employment occurred, or where the employer has a principal place of business.*

> *MCL 24.304 requires an appeal to be filed "within 60 days after the date of mailing notice of the final decision or order of the agency."*

## PROOF OF SERVICE

I hereby state, to the best of my knowledge, information and belief, that a copy of the foregoing document was served upon all parties and/or attorneys of record in this matter by Inter-Departmental mail to those parties employed by the State of Michigan and by UPS/Next Day Air, facsimile, and/or by mailing same to them via first class mail and/or certified mail, return receipt requested, at their respective addresses as disclosed below this 15th day of January, 2013.

Maria Ardelean
Maria Ardelean
**Michigan Administrative Hearing System**

Richard G. Mack
Miller Cohen, PLC
600 West Lafayette Blvd, 4th Floor
Detroit, MI 48226

Letitia C. Jones
City of Detroit Law Department
1st National Bldg., Ste. 1650
660 Woodward Avenue
Detroit, MI 48226

Kim Wright
Wage & Hour Division
7150 Harris -1st Floor-A-Wing
P.O. Box 30476
Lansing, MI 48909

Dean Story
24060 Ithaca
Oak Park, MI 48237

City of Detroit
65 Cadillac Square, Suite 3900
Detroit, MI 48202

Letitia C. Jones
City of Detroit Law Department
2 Woodward Avenue, Ste. 500
Detroit, MI 48226

# EXHIBIT 10

13-53846-swir  Doc 8485-10  Filed 11/26/14  Entered 11/26/14 15:47:48  Page 88 of 12
13-53846-swir  Doc 7235-10  Filed 09/02/14  Entered 09/02/14 21:50:35  Page 8 of 9
148

IN THE MATTER OF:

Rosemary C. Haynesworth,
    Petitioner

v

City of Detroit,
    Respondent

_____ /

Docket No.: 12-000522-WH

Case No.:   160794

Agency:     Wage Hour

Case Type: Wage and Hour

Filing Type: Appeal

Issued and entered
this 15th day of January, 2013
by: David M. Cohen
Administrative Law Judge

## DECISION OF THE ADMINISTRATIVE LAW JUDGE

### PROCEDURAL HISTORY

This is a proceeding held under Section 11 of 1978 PA 390, as amended, the Wage and Fringe Benefit Act (Act 390), MCL 408.481; and in accordance with 1969 PA 306, as amended, the Administrative Procedures Act (APA), MCL 24.201 *et seq.*

The purpose of this review is to examine Determination Order No. 160794 issued by the Department of Licensing & Regulatory Affairs, Wage Hour Division on March 8, 2012.

The Department determined that Act 390 was not violated "because payment of fringe benefit(s), longevity pay bonus, is not required by the terms set forth in the written fringe benefit policy/contract." Employee Haynesworth, through counsel, filed a March 20, 2012 appeal of the Determination Order.

This matter was subject to a fairly long procedural history. A hearing was originally scheduled for May 9, 2012. On April 18, 2012, Employer's counsel requested an adjournment of the initial hearing date. An April 26, 2012 Order Granting Adjournment set a new hearing date of June 11, 2012. On May 2, 2012, Employee's counsel requested an adjournment of the June 11, 2012 hearing date. A May 17, 2012 Order Granting Adjournment set a new hearing date of July 12, 2012.

On June 21, 2012, Employee's counsel submitted a correspondence requesting that a pre-hearing conference be scheduled for the purpose of allowing counsel time to inspect documents held by the City of Detroit. On June 22, 2012, Employer's counsel submitted a correspondence objecting to the necessity of the proposed pre-hearing conference. In response to these communications, I convened a telephone pre-hearing on June 28, 2012.

After the phone conference, the hearing remained scheduled for July 12, 2012 and the daylong hearing proceeded as scheduled at the Michigan Administrative Hearing System, Cadillac Place, Detroit, Michigan.

The hearing on this Determination Order and Docket 12-000523, another very similar claim concerning the same Employer, were consolidated on July 12, 2012 for hearing purposes only. Although necessarily similar in content, a separate Decision and Order will be issued regarding Docket 12-000523.

Employee Haynesworth was not present at the hearing and this is discussed below. Employee was represented by Attorney Richard G. Mack, Jr. The City of Detroit was represented at the hearing by Attorney Letitia C. Jones. A representative of the Wage Hour Division did not appear. The hearing proceeded in the absence of this party pursuant to Section 72(1) of the APA. Administrative Law Judge David Cohen presided.

At the close of the hearing, I acquiesced to a request from Employee's counsel to allow closing arguments via brief. A briefing schedule was set after the parties were in receipt of the transcript in the matter.

## ISSUES AND APPLICABLE LAW

Are fringe benefits (a longevity pay bonus) due Employee? That is, did the Employer violate Section 3 of Act 390?

A bonus, such as a longevity payment, is a fringe benefit under Act 390. Section 1(e) defines "Fringe benefits" as:

> "Fringe benefits" means compensation due an employee pursuant to a written contract or written policy for holiday, time off for sickness or injury, time off for personal reasons or vacation, bonuses, authorized expenses incurred during the course of employment, and contributions made on behalf of an employee.

Section 3 of Act 390 provides:

> An employer shall pay fringe benefits to or on behalf of an employee in accordance with the terms set forth in the written contract or written policy.

## WITNESSES

*For Employee:*
AFSCME Local 542 President Phyllis McMillon
Senior Personnel Payroll Clerk Derek Gibson
Employee Dean Story

*For Employer:*
Employee Dean Story (recalled)
Senior Personnel Payroll Clerk Derek Gibson (recalled)
Detroit Law Department Legal Assistant Sharon Guillory
Detroit Labor Relations Specialist Laverne Bronner-Wilson

## EMPLOYEE EXHIBITS

1. The July 1, 2005 – June 30, 2008 Master Agreement between the City of Detroit and Michigan Council 25

2. An October 13, 2010 correspondence from City of Detroit Director of Labor Relations Joseph Martinico to AFSCME Council 25 President Albert Garrett

3. A Class Action Petition for Writ of Mandamus in the Wayne County Circuit Court matter of Dean Story and Rosemarie Haynesworth v State of Michigan and its Wage and Hour Division and Lisa Gould and Randall Hairston, case number is indecipherable on exhibit

4. An October 5, 2009 correspondence from City of Detroit Chief Financial Officer Norman White with attached Annual Longevity Pay policy outline

5. An October 2007 document entitled City of Detroit Payroll Department Longevity Procedure1

## EMPLOYER EXHIBITS

1. A December 21, 2010 correspondence to the City of Detroit from the Wage & Hour Division

2a. A City of Detroit Personnel Department Employee History File regarding Employee Rosemarie Haynesworth

2b. Excerpts from the Master Agreement between City of Detroit and Michigan Counsel 25, July 1, 2001 through June 30, 2005

2c. Department of Labor and Economic Growth Michigan Employment Relations Commission Fact Finding Report, MERC Case No. A-0062 (129 Pages)

2d. A September 9, 2010 correspondence to Detroit City Council from Labor Relations Director Joseph Martinico with attachment

2e. A September 28, 2010 correspondence to Detroit City Council from Labor

---

1 Largely duplicative of Exhibit 4

Relations Director Joseph Martinico, with a revised "Schedule A-12"

2f.     Resolution approved by City Counsel on September 28, 2010 and approved by Mayor of Detroit on October 5, 2010

2g.     Chart entitled Bargaining Units Not Receiving Longevity

3.      A February 14, 2012 correspondence to Employee Rosemarie Haynesworth from Wage & Hour Division Investigator Randall Harrison, with a copy of Determination Order #160794

4.      A March 28, 2012 Notification of Appeal sent by the Wage & Hour Division to the Employer and Employee

5.      A January 19, 2011 letter from AFSCME Michigan Counsel 25 President Albert Garrett to Director of Labor Relations Joseph Martinico, bearing the signatures of both Albert Garrett and Joseph Martinico

6.      The Cover Page and Table of Contents from the document titled "Master Agreement between City of Detroit and Michigan Counsel 25, July 1, 2008 through June 30, 2012."

## FINDINGS OF FACT

Employee Rosemary Haynesworth is employed by the City of Detroit in the city's General Services Department. Employee Haynesworth is a member of the American Federation of State County and Municipal Employees (AFSCME) Local 542. The present matter solely concerns Employee Haynesworth's claim for a $150.00 longevity bonus for the year 2010.

It should be noted that throughout the proceeding, Employee's counsel repeatedly drew attention to the fact that a large number of similarly situated AFSCME employees have filed Wage & Hour claims regarding the issue of a longevity bonus.

Traditionally, the City of Detroit has annually paid a longevity bonus to city employees during the month of December. The amount of the bonus was determined by the individual employee's years of service.

The longevity bonus was incorporated into past Master Agreements between the City of Detroit and AFSCME (Employee Exhibit 1 & Employer Exhibit 2b). The 2005-2008 collective bargaining agreement (CBA) language stated in pertinent part:

Employees who have qualified for longevity pay and have accumulated at least sixteen hundred (1600) hours of straight time regular payroll hours of paid time during the year immediately preceding any December 1 date or other day of payment will qualify for a full longevity payment provided they are on the payroll on the December 1 date or any other date of qualification.

Except for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December 1 (Employee Exhibit 1 at Page 43).

One of the disputes between the parties concerns whether employees were required to work 1600 hours or 1800 hours to obtain the 2010 longevity bonus (Exhibit 1 compared to Exhibit 2b). It appears that originally 1800 hours was required to obtain the bonus, but this was revised down to 1600 hours to factor into consideration employee furlough days.

Further, Senior Personnel Payroll Clerk Derek Gibson testified that traditionally the calculation for longevity pay involved "all paid bank time". Elaborating, Mr. Gibson indicated that this included regular work time, vacation time, sick time, reserved sick time, holidays, comp time and jury duty (Tr. Page 87, lines 14-18). I find that this was the policy for calculating the longevity payment, although it was not a policy clearly specified in the actual written contract between the parties (Employee Exhibit 4 & 5 compared to Employee Exhibit 1).

Mr. Gibson also testified credibly that historically a formula was utilized to provide longevity pay on a pro-rated basis to employees who did not meet the 1600 hour requirement by December 1st (Tr. Page 90, lines 9-19). Employee's counsel argued that this information was not utilized by the Wage Hour Investigator in determining Employee's eligibility for a longevity payment. For the reasons discussed below, neither the longevity payment calculation criteria nor the pro-rata formula is relevant in the final analysis.

Although the longevity pay bonus was provided historically, longevity pay is not contained within the document which is titled as the 2008-2012 Master Agreement between the City of Detroit and AFSCME (Employer Exhibit 6). The record establishes that the City of Detroit and AFSCME engaged in a protracted two year negotiation process concerning the terms of the 2008-2012 collective bargaining agreement between the parties.

AFSCME ultimately filed an August 10, 2009 Petition for Fact Finding with the Michigan Employment Relations Commission (MERC). As a result, a Fact Finder was appointed on October 21, 2009 (Employer Exhibit 2c at Page 2). A Fact Finding Hearing began on December 21, 2009 and continued on twenty two additional dates, ending with the exchange of post-hearing briefs in May 2010. The Fact Finding Report that resulted was issued on June 25, 2010. Many issues were addressed by the Fact Finder. Relevant to this proceeding is that the Fact Finder recommended that longevity pay be discontinued.

Prior to the Fact Finding proceeding, the last offer made by the City of Detroit to AFSCME was rejected by the Union. The hearing record indicates that this offer, rejected in November 2009, would have generally maintained the longevity bonus. Specifically, the offer proposed that if an employee had a ten-day suspension or more, they would not receive longevity pay for that year.

During this period of Fact Finding and negotiations, Union members meeting the appropriate qualifications were paid annual longevity bonuses in December 2009.

After issuance of the June 2010 Fact Finding Report, in conjunction with MERC procedures a sixty day period ensued where the parties were allowed to continue bargaining in an attempt to reach a resolution. The parties remained unable to come to terms on a collective bargaining agreement and effectively reached an impasse. On September 9, 2010, after the sixty day period elapsed, City of Detroit Labor Relations Director Joseph Martinico notified AFSCME and the Detroit City Council that it would exercise its legal right to impose the City's last proposals on the open issues between the parties. On September 28, 2010, the Detroit City Council passed a resolution, implementing terms which included longevity pay being eliminated in its entirety (Employer Exhibit D at Page 3). This resolution was approved by Detroit's Mayor on October 5, 2010 (Employer Exhibit F).

On October 13, 2010, the City of Detroit wrote a correspondence to AFSCME Council 25 President Albert Garrett (Employee Exhibit 2). The letter stated in pertinent part:

> In light of the fact that the City has fully fulfilled its bargaining duty with regard to the Fact-Finder's Report and Recommendations, the City maintains that it has the legal right under PERA {Michigan Public Employment Relations Act} to implement its final impasse position regarding all of the issues presented to the Fact-Finder. Attached please find a list of the economic provisions that the City intends to implement. Effective on October 25, 2010...longevity pay shall be eliminated and tuition refund suspended effective immediately (Employee Exhibit 2 at Page 2).

On January 19, 2011, AFSCME Council 25 President Albert Garrett wrote Director of Labor Relations Joseph Martinico regarding the "2008-2012 City of Detroit & AFSCME, Council 25 Labor Contracts" (Employer Exhibit 5). This correspondence accepts the terms that were imposed on October 25, 2010 by the City of Detroit. The language in the January 19, 2011 letter states:

> As we both know, the City of Detroit and AFSCME have engaged in negotiations over the terms of a collective bargaining agreement for more than two years. The process included mediation and ultimately fact finding before a State appointed Fact Finder. The Fact Finder's report was issued on June 25, 2010 and the parties continued bargaining for more than 60 days following the release of the report, without reaching agreement. Following exhaustion of all of the procedures required by law, the City exercised its right to impose contract terms.
>
> AFSCME understands that the City has lawfully imposed a full agreement on AFSCME and its affiliated units of the City of Detroit. AFSCME understands that this imposition is for the full agreement, including all terms imposed by the City and all other Articles tentatively agreed to by the parties during negotiations, for all five master agreements representing the AFSCME and all units (except the Emergency Services Operations (ESO) unit, as indicated below). AFSCME, and its affiliated City of Detroit unions and locals, accepts the imposed agreements and accepts said terms as final and binding upon

the parties and shall withdraw all fact finding petitions filed on behalf of said unions and locals, based upon said understandings.

AFSCME acknowledges that the imposition will be effective for all of its affiliated unions and locals (and their respective bargaining agreements), except for the ESO unit. It is AFSCME's position that ESOs are eligible for arbitration under Act 312 and the City disputes their eligibility at this time. Additionally, the City has informed the union that the application of furlough days for the Crossing Guards (Local 1863), Senior ESOs Telecommunications Operations (TCOs) and Senior TCOs have been waived for reasons of operational necessity. AFSCME's acceptance of the imposed terms is reliant upon these understandings as well.

Finally, AFSCME agrees to withdraw and/or refrain from filing any/all claims, charges, grievances or other litigation related in any way to the negotiation process or the imposition of contract terms by the City. This does not limit the union's right to grieve the City's interpretation or application of any such terms, or any subsequent unfair labor practice charges or grievances (Employer Exhibit 5).

## CONCLUSIONS OF LAW

The principles that govern judicial proceedings also apply to administrative hearings. The Employee is the appellant in this case and must prove by a preponderance of the evidence that the determination order should be rescinded or modified.

As a general rule, there is no longer any authority under Act 390 to interpret a collective bargaining agreement covered by federal labor law (Wage Hour General Entry XV). However, this does not apply to collective bargaining agreements involving CBAs in public employment. Therefore, there is jurisdiction over public sector claims *Lawrence* v *City of Detroit* WH 90-669 (1992), *Wage Hour Digest, supra,* ¶1232.

At the outset of my analysis, I note that Employee Rosemary Haynesworth did not appear at the hearing in this matter. As such, there is precedent for dismissing Employee Haynesworth's individual claim. In *Cooper, Graft, Martin, Savitski, McCormick, Dara & Trierweiler* v *Auto Mart Inc of Portland d/b/a Davis Ford Mercury* WH 91-565 thru 91-571 (1992), *Wage Hour Digest, supra,* ¶1049, a group of employees brought a claim against an employer. Three employees did not physically appear at the hearing in the matter and their claim was dismissed. This would be in holding with Wage Hour Digest General Entry XVI which indicates that dismissal is appropriate if an appellant fails to appear at a hearing. However, Employee Haynesworth's interests were represented by counsel. Further, both parties, through counsel, have expressed a vested interest in seeking a definitive resolution of the matter through the hearing process. As such, I decline to dismiss this matter based on Ms. Haynesworth's absence from the proceeding.

Employee's counsel avers that the Division's Determination Order committed a fundamental error in how it viewed the longevity payment, arguing that the longevity payment at issue should be viewed as wages as opposed to a fringe benefit.

I find that the longevity pay being sought is properly viewed as a fringe benefit bonus as opposed to earned wages. The clear language of Section 1(e), quoted above, indicates that the term fringe benefit includes *bonuses* paid by an Employer pursuant to a written contract or written policy. R 408.9002(2)(d) defines the term *bonus*, as used in Act 390, to mean a premium or extra or irregular remuneration in addition to wages that is awarded to an employee under a written contract or written policy.

In the present matter, the longevity payment was clearly a premium or extra remuneration allowed under previous collective bargaining agreements. It was an incentive for attendance and loyalty to Employer derived by looking at years of service and the yearly hours of service provided by an employee, but it was not a wage. In *Elarton* v *Lenawee Hills Memorial Park Association, Inc* WH 84-4216 (1985), *Wage Hour Digest, supra*, ¶557, an employee was to receive a payment, characterized as a bonus, if still employed on June 1, 1984. The bonus was to be calculated at a rate of 50 cents for each hour the employee had worked. The *Elarton* Administrative Law Judge held that the disputed sum was indeed a bonus and subject to the requirement of a written contract. It was not viewed as a wage even though the sum was clearly calculated by looking at the hours worked by the employee. A longevity payment, such as the one at issue presently, is properly characterized under Act 390 as a bonus and should not be viewed as akin to an hourly wage.

Employee, through counsel, raises numerous arguments that a 2010 longevity bonus should be paid. Looking to the rationale of the Wage Hour Investigator, Employee's counsel argues that there was a miscalculation of whether Employee met the 1600 hour requirement for the longevity payment. Employee's counsel noted that the Wage Hour Investigator calculated Employee's 2010 hours by looking at only the straight time worked by Employee until October 2010. As indicated above, the testimony of Payroll Clerk Derek Gibson clearly conveyed that the calculation was based upon straight time, as well as vacation time, sick time, holidays, and other periods.

Employee argues further that there was a policy to pay even partial, pro-rated longevity payments to employees who did not meet the minimum hours worked in a year (Exhibit 4 & 5). As such, Employee's counsel asserts that at least a pro-rata payment should be due to Employee based upon hours worked until imposition of terms by the City of Detroit.

Further, Employee's counsel, drawing upon labor law, asserts that Employer could not impose the terms recommended by the Fact Finder, but should instead be left with the terms last offered by Employer prior to fact finding, which would have largely preserved the longevity bonus.

However, I find that Employee's arguments, whether based on last best offer, or past longevity payment calculation and pro-rata disbursement methods, do not overcome the

fact that Employer and AFSCME agreed to a contract that no longer provided for the longevity payment.

The key document in this analysis is the January 19, 2011 correspondence from AFSCME Council 25 President Albert Garrett to Employer's Director of Labor Relations, Joseph Martinico. It is quoted above in its entirety due to the language it employs. In the January 2011 correspondence, President Garrett unambiguously agrees, on behalf of AFSCME membership, to the changes in conditions of employment that were imposed by the City of Detroit; terms which eliminate longevity payments. In key part, the letter states that "AFSCME understands that the City has lawfully imposed a full agreement on AFSCME and its affiliated units of the City of Detroit. AFSCME understands that this imposition is for the full agreement, including all terms imposed by the City...AFSCME, and its affiliated City of Detroit unions and locals, accepts the imposed agreements and accepts said terms as final and binding upon the parties" (Employer Exhibit 5). This language is unambiguous and indicates an acceptance of contract terms which included the elimination of the longevity bonus.

Additionally, the correspondence states that "AFSCME agrees to withdraw and/or refrain from filing any/all claims, charges, grievances or other litigation related in any way to the negotiation process or the imposition of contract terms by the City. This does not limit the union's right to grieve the City's interpretation or application of any of such terms, or any subsequent unfair labor practices charges or grievances" (Employer Exhibit 5 at Page 2). I note that a signature block was provided on the letter for Director of Labor Relations Martinico and that it was signed above typed print indicating "AGREED" (Employer Exhibit 5 at Page 2) (Emphasis from original).

In Petitioner's Post Hearing Brief, counsel acknowledges that the Union can waive an unfair labor practice charge or a grievance, but notes that the Union can not waive the rights of its members to bring a claim under Act 390. Employee's counsel cites the case of *Admiral Merchants Motor Freight, Inc v Dept of Labor*, 149 Mich App 344 (1986) in support of the position that an individual employee's rights under Act 390 cannot be waived by a contract or agreement negotiated by an exclusive bargaining representative (Petitioner's Post Hearing Brief at Page 10).

In reviewing *Admiral Merchants*, I note that the factual circumstances were somewhat different then the present matter. *Admiral Merchants* concerned an Act 390 claim by two employees. The employees' claims concerned the same issues embodied in a federal suit filed by the International Teamsters Union.

Clearly, *Admiral Merchants* reinforces the rights of employees to seek relief through a claim under Act 390. Employee Haynesworth has that right and has exercised it in the present matter. However, while an employee has a right to pursue an Act 390 claim, the employee can not obtain relief greater than that afforded by the statute.

The January 19, 2011 letter between the City of Detroit and the Union represents a meeting of the minds, both sides receiving consideration for their agreement. I find that it

is a contract made on behalf of AFSCME members, including Employee Haynesworth, by an individual with apparent and actual authority to act on behalf of the AFSCME members.

A recurrent theme present in the arguments of Employee's counsel sounded in equity. Counsel drew an analogy, arguing that the present situation was similar to an Employer hiring an Employee for $500.00 a week, to be paid on Friday, and then reducing the compensation to $400.00 on Thursday (Tr. Page 30). Counsel was eloquent in repeatedly noting that most of the employees affected by the longevity bonus made modest incomes for their hard work on behalf of the City of Detroit. In *Todd* v *Nemic Machinery Company* WH 96-51 (1996), *Wage Hour Digest*, supra, ¶1070, it was acknowledged that an Administrative Law Judge has no equitable powers to create a solution at odds with Act 390. In *Todd*, a change to an employee handbook in January 1995 resulted in an employee being denied a bonus by a narrow window of time. The employee worked through the entire bonus calculation period which ended on March 31, 1995, but was denied the bonus due to not being employed when the bonuses were physically issued two weeks later.

Under Act 390, the payment of bonuses, such as a longevity payment bonus, is determined pursuant to the terms of a written contract or written agreement between the parties. The contract agreement, demonstrated by the January 19, 2011 correspondence, applies in this matter. It no longer provides for a longevity bonus.

## DECISION

The Department's Determination Order 160794, dated March 8, 2012 is **AFFIRMED**.

David Cohen
Administrative Law Judge

## APPEAL PROCEDURE

The parties may appeal decision based on MCL 408.481(9), which provides:

> *MCL 408.481(9) A party to the proceeding may obtain judicial review of the determination of the hearings officer pursuant to Act No. 306 of the Public Acts of 1969, as amended. Venue for an appeal under this act shall only be in the circuit where the employee is a resident, where the employment occurred, or where the employer has a principal place of business.*

> *MCL 24.304 requires an appeal to be filed "within 60 days after the date of mailing notice of the final decision or order of the agency."*

## PROOF OF SERVICE

I hereby state, to the best of my knowledge, information and belief, that a copy of the foregoing document was served upon all parties and/or attorneys of record in this matter by Inter-Departmental mail to those parties employed by the State of Michigan and by UPS/Next Day Air, facsimile, and/or by mailing same to them via first class mail and/or certified mail, return receipt requested, at their respective addresses as disclosed below this 15th day of January, 2013.

*Maria Ardelean*

Maria Ardelean
**Michigan Administrative Hearing System**

Kim Wright
Wage & Hour Division
7150 Harris -1st Floor-A-Wing
P.O. Box 30476
Lansing, MI 48909

Richard G. Mack
Miller Cohen, PLC
600 West Lafayette Blvd, 4th Floor
Detroit, MI 48226

Letitia C. Jones
City of Detroit Law Department
2 Woodward Avenue, Ste. 500
Detroit, MI 48226

Letitia C. Jones
City of Detroit Law Department
1st National Bldg., Ste. 1650
660 Woodward Avenue
Detroit, MI 48226

Rosemary C. Haynesworth
18926 Morang
Detroit, MI 48205

# EXHIBIT 11

| IN THE MATTER OF: | Docket Nos.    12-000522-WH |
| | 12-000523-WH |
| **Rosemary C. Haynesworth, and** | |
| **Dean Story,** (appealing on behalf of those | Lower Case Nos.: 160794 & 160450 |
| who work for the City of Detroit and are | Agency Appealed: Wage &Hour |
| represented by the AFSCME union) | |
| **Petitioners-Appellants,** | |

v

13-003430-PZ

**City of Detroit,**

**Respondent-Appellee.**

FILED IN MY OFFICE
WAYNE COUNTY CLERK
3/12/2013 8:38:24 AM
CATHY M. GARRETT

| MILLER COHEN, P.L.C. | CITY OF DETROIT LAW DEPARTMENT |
| Richard G. Mack, Jr. (P58657) | Letitia C. Jones, Esq. |
| Keith D. Flynn (P74192) | *Attorneys for Respondent-Appellee* |
| *Attorneys for Petitioners-Appellants* | 2 Woodward Ave., Ste. 500 |
| 600 W. Lafayette 4th Floor | Detroit, MI 48226 |
| Detroit, Michigan 48226 | (313) 237-3002 |
| (313) 964-4454 | |

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

## PETITION FOR REVIEW

NOW COME Petitioners-Appellants, Dean Story and Rosemarie Haynesworth, by and through their attorneys, Miller Cohen PLC, and for their Petition for Review state as follows:

Petitioners seek review of a Decision entered by Administrative Law Judge David Cohen on January 15, 2013 involving an action brought under the Michigan Wage and Fringe Benefit Act, MCL § 408.481, in which Petitioners alleged that their employer, the City of Detroit, had failed to pay contractually mandated longevity pay that had accrued for time already worked.

### I. JURISDICTION AND VENUE

1.     This Court has jurisdiction to hear appeals from an Administrative Law Judge's decision relating to a determination issued by the Department of Licensing & Regulatory Affairs, Wage Hour Division under MCL § 408.481(9) and per MCL § 24.304.

2. According to MCL § 408.481(9), review is appropriate "in the circuit where the employee is a resident, where the employment occurred, or where the employer has a principal place of business."

3. Petitioner-appellant, Dean Story, is an individual resident of Detroit, MI. He is a member of a labor organization, AFSCME Local 542, the exclusive bargaining representative for bargaining unit members employed by the City of Detroit.

4. Petitioner-appellant, Rosemarie Haynesworth, is an individual resident of Detroit. She is a member of a labor organization, AFSCME Local 542, the exclusive bargaining representative for bargaining unit members employed by the City of Detroit.

5. Respondent-appellee, City of Detroit, is a government entity doing business in the County of Wayne.

## II. NATURE OF THE PROCEEDINGS

6. Petitioners, Rosemary Haynesworth and Dean Story, are members of AFSCME Local 542 who work for the City of Detroit in the general services department. Mr. Story has over twenty-six years of seniority; Ms. Haynesworth about nine years.

7. Local 542 represents employees of the City of Detroit, including the City of Detroit's general services department. Bargaining unit members of Local 542 made until recently, on average, between $25,000 and $30,000 a year. Recently, the City enacted a 10% base wage cut, health care employee costs amounting to almost 10% of employee compensation, and another 10% reduction in pay accomplished through furlough days. Thus, for a furloughing employee making approximately $30,000 per year before these cuts, the employee is now making just above $20,000 per year (gross).

8. AFSCME negotiates a Master Agreement, or collective bargaining agreement covering a number of different union locals, with the City of Detroit. There are approximately

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

2500 AFSCME-represented employees in the City of Detroit, all of whom work under the Master Agreement. This Master Agreement covers employees in eighteen (18) different locals.

9. While the parties were negotiating a successor collective bargaining agreement to the 2005-2008 Master Agreement (hereinafter, the "Master Agreement"), the agreement was in full force and effect up until October 13, 2010. (*Exhibit A*) The City terminated the agreement at that time. Indeed, that Agreement was explicitly extended until one of the parties were to provide ten days of written notice as to termination according to its very terms. (Id.) Specifically, the CBA states that:

> "In the event that the City and the Union fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2008, the Agreement will remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) written notice on or after June 20, 2008."[1]

(Id.) The City terminated the agreement on October 13, 2010.

10. From July 2006 to October 13, 2010, AFSCME members worked under Article 25 of the Master Agreement between AFSCME and the City of Detroit.

11. Under Article 25 of the Master Agreement, employees received longevity pay based on the number of years of seniority, starting with $150 for those who have served for five years and ending with $750 for those who have served twenty-six years. (*Exhibit A*) Specifically, Article 25 subsection B of the collective bargaining agreement defines how employees qualify on an annual basis for longevity pay:

> Employees who have qualified for longevity pay and have accumulated at least sixteen hundred (1600) hours of straight time regular payroll hours of paid time **during the year immediately preceding any December 1 date or other day of payment** will qualify for a full longevity payment provided they are on the payroll on December 1 date or any other date of qualification. Except for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December 1.

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

[1] Also of important note is Article 52, which states that "[T]he Agreement will remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) day written notice on or after June 20, 2008." (Id.)

(Id.)(**emphasis** added)  In determining what time to consider regarding the 1600 hour requirement, the parties included regular work time, banked leave time, vacation time, sick time, bereavement leave, holiday time, comp time, and jury duty with overtime being the only exception. (Id.)

12.  Additionally, if an employee does not meet the 1600 hours, he or she can still receive the prorated amount as long as the employee worked twenty hours per month. (Id.)

13.  Also, according to Detroit's Municipal Code, longevity pay is provided to City employees, and represents "a *reward* based on length of service." Detroit Municipal Code § 13-7-1. Under the City Ordinance, City employees are entitled to longevity pay if they work 216 days from the immediately preceding December first. Detroit Municipal Code § 13-7-2(c).

14.  Also, Respondent maintained a written policy that human resources relied upon to calculate the longevity pay. (*Exhibit B*)

15.  Regardless of these still-effective Ordinance provisions and policies, on October 13, 2010, Respondent sent a letter to Al Garrett, President of AFSCME Council 25, stating that the City was eliminating longevity pay. (*Exhibit C*)  The effect of this was to not only change the policy moving forward into the next year, but to deny City employees longevity pay for time that had already been served in 2010.

16.  By October 13th, both Petitioners had already met the 1600 hour requirement. Specifically, Mr. Story had about 1,784 hours and Ms. Haynesworth had about 1,726.7 hours, according to the payroll audits performed by the Wage and Hour Division.  Additionally, Petitioners were likely not alone. After all, 1600 hours is approximately 77% of a full-time work year of 2080 hours; yet, October 13th rests at the completion of 78% of the year.  A full time AFSCME-represented employee would attain his/her 1600 hours, starting work with the first of December 2009, sometime during the first two weeks of September 2010.  Thus, the average

MILLER COHEN, P.L.C.

ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 46226-0840

(313) 964-4454

AFSCME member has attained the 1600 hour threshold while working under the longevity provisions of the most-recent agreement, as of October 13, 2010.

17. Petitioners filed a charge with the Michigan Department of Licensing and Regulatory Affairs, Wage Hour Division, alleging that the deprivation of longevity pay was a violation of the Michigan Wage and Fringe Benefit Act, MCL § 408.481 (hereinafter, Act 390). The Petitioners and the Department maintained that the result reached with the Petitioners' case would likely control the result of the hundreds of other AFSCME-represented employees who also filed claims with the Department for lost longevity.

18. The Department rendered its determination that there was no violation of Act 390 on March 8, 2012. Petitioners properly filed an appeal that led to a full evidentiary hearing on July 12, 2012 and post-hearing briefs were filed in August 2012.

19. In a Decision from Administrative Law Judge David Cohen issued on January 15, 2013, the ALJ affirmed the Department's determination. (*Exhibit D*) Interestingly, the rationale of the ALJ varied from that of the Department, as to why the claims should be denied.

### III. GROUNDS ON WHICH RELIEF IS SOUGHT

20. Pursuant to the Administrative Procedures Act of 1969, Petitioners bring this Petition for Review on the basis that the ALJ's Decision was in violation of Act 390, was in excess of the statutory authority granted to the agency, was supported by a material error of law, and was not supported by competent, material, and substantial evidence on the whole of the record. MCL § 24.306. According to the Administrative Procedures Act: "The court, on request, shall hear oral arguments and receive written briefs." MCL § 24.304(3).

Accordingly, Petitioners request a briefing schedule from the Court, as well as a date for oral argument.

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

21.     In the January 15th Decision, the ALJ primarily relied on a letter from AFSCME Council 25's President Al Garrett dated January 19, 2011. (*Exhibit E*) In that letter, President Garrett responded to Respondent's imposed agreement accepting that the City had properly imposed terms on the bargaining unit per the requirements of the Public Employment Relations Act, MCL § 423.201 *et seq* (PERA). Nowhere in President Garrett's letter did he waive the right of employees to be paid for already accrued compensation, but instead waived AFSCME's right to bring an unfair labor practice charge or grievance relating to the negotiation process or imposition of collective bargaining terms. Instead, President Garrett merely described the imposed terms prospectively, not accrued benefits that were already owed to bargaining unit members due to their service time that had already been performed.

22.     Regardless of this distinction, the ALJ completely ignored the fact that Petitioners and their fellow employees had already accrued a right to be provided their longevity pay under the CBA that was currently in effect on October 13th. Also, the ALJ provided little rationale for disregarding case law cited to by Petitioners in their post-hearing brief. Namely, in *Admiral Merchants Motor Freight, Inc v Dept of Labor*, the Court of Appeals held that a labor organization cannot waive an employee's individual rights under Act 390. 149 Mich App 344 (1986).

23.     Notably, the Court of Appeals in *Admiral Merchants* compared Act 390 to the Fair Labor Standards Act (FLSA) in deciding that Act 390 rights cannot be waived through the collective bargaining process. *Id.* at 351-53. This comparison to FLSA is quite appropriate considering the equally strong language in Section 11 of 390 Act. Rights under FLSA continue to be held by courts to be nonwaiveable through collective bargaining. *See e.g., Barrentine v Arkansas-Best Freight System, Inc*, 450 US 728 (1981); *Brooklyn Savings Bank v O'Neill*, 324

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

US 697 (1945); *O'Brien v Encotech Constr Serv Inc*, 183 F Supp 2d 1047 (ND Ill 2002); *Gentry v Superior Court*, 165 P3d 556 (Cal. 2007).

24.    Furthermore, the Michigan Employment Relations Commission (MERC) has no authority to enforce the Wage and Fringe Benefits Act (WFBA).  *See e.g., Detroit Public Schools*, 20 MPER P 117 (2007).  A plaintiff alleging a failure of his/her employer to pay wages or fringe benefits may either file a claim under the WFBA, or a lawsuit alleging a theory other than the WFBA (i.e., breach of contract).  There is no obligation for the employee to exhaust the administrative remedies such as a grievance procedure under the WFBA before proceeding with other legal remedies.  *Murphy v Sears, Roebuck & Co*, 190 Mich App 384, 388 (1991).

25.    The ALJ distinguished the above-referenced case law arguing that *Admiral Merchants* only reaffirms that employees have a separate right to pursue remedy through Act 390.  However, this misconstrues the law entirely--both *Admiral Merchants* and the FLSA cases the Court of Appeals cites to in that decision go beyond whether an employee can bring a claim under Act 390 separate and apart from a grievance or ULP.  Instead, those cases indicate that a labor organization cannot negotiate away rights under Act 390 or FLSA.  *Id.* at 195-96 (citing *Barrentine v Arkansas-Best Freight System, Inc*, 450 US 728, 740 (1981)("This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act.  Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it has designed to effectuate. ... Moreover, we have held that congressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement."))

26.    Act 390 protects the rights of employees to be paid accrued wages or fringe benefits.  This statutory right cannot be waived by a labor organization representing a collective

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

body of employees. Otherwise, an employer could change its written compensation policy after employees had already performed according to that document, and deny those employees the benefits they were promised. This interpretation is clearly at odds with the legislative rationale for Act 390.

27.     Also, the ALJ completely ignored Petitioners' citation to relevant law regarding contract interpretation, even though the ALJ reiterated the importance of interpreting contractual language. The performance of City employees is reminiscent of a unilateral contract. The Michigan Court of Appeals stated in *Gaydos v White Motor Corp*, a case dealing with an employer's failure to provide promised severance pay, that "[a]s the employees continued to work [after the policy was established], consideration was supplied for a unilateral contract, upon which the employees had the right to rely." 54 Mich App 146, 148 (1974). In other words, Petitioners in this case had the right to expect payment for longevity pay because they had already begun performance.

28.     Respondent's employees were led to believe that they would be paid longevity pay for 2009-2010 because Respondent paid longevity pay in 2008 and 2009, had several documents stating that employees would be paid longevity pay on the basis of hours worked in the year, and were even led to believe that longevity pay was not being removed from the successor agreement on the basis of their last best offer. Employees performed accordingly. In fact, by the time Respondent actually eliminated the longevity pay provision, over three-quarters of the year had passed. Consequently, Respondent has breached its duties and must provide all of its employees full longevity pay from December 1, 2009 to December 1, 2010 who achieved the 1600 hour requirement.

29.     Finally, the ALJ largely ignored the four other documents that reflect "written policies" or plans that were in place dictating how employees would receive longevity pay. As

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

stated above and during the hearing, Petitioners' Exhibits 4 & 5 reflect the how longevity pay was calculated. In addition, the City Charter Provision directly requires that City employees receive "a reward based on length of service," which is exactly what longevity pay was. Detroit Municipal Code § 13-7-1. Furthermore, the City's own published ordinances state quite clearly that employees are entitled to longevity pay if they work 216 days from December 1st. Hence, there are several written sources that provide for how employees should be paid longevity pay that were deliberately overlooked by Respondent. Consequently, Petitioners and all employees similarly situated should be compensated accordingly.

## IV. REQUESTED RELIEF

**WHEREAS**, Petitioner-Appellants request that this Court provide the parties a briefing schedule and oral argument per MCL § 24.304(3), and after considering those briefs and hearing oral argument, reverse ALJ Cohen's Decision and award Petitioner-Appellants, and all other similarly situated City employees the back longevity pay that was accrued for 2009-2010, along with interest, and all other damages that they would be entitled to under Act 309.

Respectfully submitted,

**MILLER COHEN, P.L.C.**

By: _____

Richard G. Mack (P58657)
Keith D. Flynn (P74192)
*Attorneys for Petitioners-Appellants*
600 W. Lafayette 4th Floor
Detroit, Michigan 48226
(313) 964-4454

Dated: March 11, 2013

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

IN THE MATTER OF:

Rosemary C. Haynesworth, and
Dean Story, (appealing on behalf of those
who work for the City of Detroit and are
represented by the AFSCME union)
      Petitioners-Appellants,

v

City of Detroit,
      Respondent-Appellee.

Docket Nos.   12-000522-WH
              12-000523-WH

Lower Case Nos.: 160794 & 160450
Agency Appealed: Wage &Hour

---

| | |
|---|---|
| MILLER COHEN, P.L.C.<br>Richard G. Mack, Jr. (P58657)<br>Keith D. Flynn (P74192)<br>*Attorneys for Petitioners-Appellants*<br>600 W. Lafayette 4th Floor<br>Detroit, Michigan 48226<br>(313) 964-4454 | CITY OF DETROIT LAW DEPARTMENT<br>Letitia C. Jones, Esq.<br>*Attorneys for Respondent-Appellee*<br>2 Woodward Ave., Ste. 500<br>Detroit, MI 48226<br>(313) 237-3002 |

*(left margin, vertical):* MILLER COHEN, P.L.C. ATTORNEYS AND COUNSELORS AT LAW 600 WEST LAFAYETTE BLVD. DETROIT, MICHIGAN 48226-0840 (313) 964-4454

---

## PROOF OF SERVICE

    MICHELLE COIL says that on *March 11, 2013*, she served a copy of the *Petition for Review*, along with this *Proof of Service* upon:

        Letitia C. Jones, Esq.
        Assistant Corporation Counsel
        660 Woodward Ave., Ste. 1800
        Detroit, MI 48226-3535

via U.S. First-Class Mail by placing same in the United States Postal Receptacle in Detroit, Michigan.

 

*(signature)*

MICHELLE COIL

Subscribed to and sworn before me on
March 11, 2013.

*(signature)*
Sue P. Dolesh, Notary Public
Oakland County, Michigan
Acting in Wayne County
My Commission expires: 3/6/14

# EXHIBIT 12

13-53846-tjt   Doc 7495-2   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 111 of 85
13-53846-swr   Doc 7495-2   Filed 09/26/14   Entered 09/26/14 15:47:43   Page 11 of 85
148

VOLUNTARY LABOR ARBITRATION TRIBUNAL

*In the Matter of the*
*Arbitration Between:*

CITY OF DETROIT

-and-

MICHIGAN AFSCME COUNCIL 25
and its Locals 457, 273 and 1642

Case No. 12-007708-CL
Gr. No. 25-01-12
Log No. D26311-999-2012

## ARBITRATOR'S OPINION AND AWARD

<u>APPEARANCES:</u>

FOR DETROIT MEDICAL CENTER:

Andrew Jarvis, Assistant Corporation Counsel

FOR MICHIGAN AFSCME COUNCIL 25
and its Locals 457, 273 and 1642:

Richard Mack, Attorney

### Introduction

The City of Detroit and Michigan AFSCME Council2 5 and its Affiliate Locals were parties to a Master Agreement, including Council 25's Locals 457, 273 and 1642, who represented employees in the City of Detroit Health and Wellness Promotion Department, the Human Services Department and the Detroit Workforce Development Department. The cover sheet of this Master Agreement contained the following dates -- "July 1, 2008 - June 30, 2012."

Page 81 of the Master Agreement contained the following:

### 51. MODIFICATION AND TERMINATION

It is agreed between the parties that this Contract shall continue in full force and effect until 11:59 p.m., June 30, 2012. If either party desires to modify this Contract they shall give written notice during the month of February 2012. Negotiations for a new contract shall commence thirty (30) days after that date.

In the event that the City and the Union fail to arrive at an agreement on wages, fringe benefits other monetary matters, and non-economic items by June 30, 2012, the Agreement will remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) day written notice on or after June 20, 2012.

The parties agree that this sole and complete Agreement is intended to cover all matters affecting wages, hours, and other terms and conditions of employment and that during the term of this Agreement, neither the City nor the Union will be required to negotiate on any further matters affecting these or any other subjects not specifically set forth in this Agreement, except by mutual agreement of the parties hereto.

On June 20, 2012, Lamont Satchel, Director of the City of Detroit Labor Relations Division, wrote Albert Garrett, President, Michigan Council 25, the following letter:

RE:   Termination of 2008-2012 Collective Bargaining Agreement(s)

Dear President Garrett:

This letter serves as notification that in accordance with our collective bargaining agreement, the City hereby provides ten (10) days written notice of its intent to terminate the master and supplemental bargaining agreements as of July 1, 2012.

Please be advised that the City will continue its practice, where required, of disciplining and discharging non-probationary unit employees under a just cause standard notwithstanding the contract termination. The City also agrees to maintain the grievance and arbitration procedures with regards to all discipline and discharge cases. With regard to non-discipline or discharge cases, the City's position, in accordance with Michigan law, is that the termination of the agreement ends the contractual arbitration procedures for any dispute based upon facts arising after the termination date of the agreement, or not involving rights accrued or vested under the agreement. Accordingly, the City will determine its arbitration obligations on a case-by-case basis, and will act in accordance with its rights and obligations under Michigan law. The City of Detroit reserves all rights pursuant to applicable legal authority.

Previously, on May 31, 2012, DeAngelo Malcolm, Council 25 Staff Representative, had filed the following grievance with the City:

STATEMENT OF FACTS: The Union protests the actions taken by the City of Detroit. The city has shutdown various Departments (The

2

Health Department, Human Services Department, The Detroit Workforce Development Department) and laid off members of this bargaining unit and replaced them with 3rd party entities.

VIOLATIONS: The actions taken by the employer clearly violates, Purpose and Intent, Article -1 Recognition, Article 2, Management Rights and Responsibilities, Article-16 Reductions In Force, Lay Off, Demotion and Recall, Article 19 Contractual Work, Article 21- Maintenance of Condition, Article 42 Successor, Article-47 Retirement, MOU-Labor Management Committees of the CBA., as well as Local and State Laws and any other applicable Articles or Laws.

DISPOSITION REQUESTED: We demand that the City immediately cease and desist violating the CBA, Local and State laws, require the successor entities to recognize the union, hire its members who currently work in the affected positions, adopt a bargaining agreement with the union for said employees, expeditiously return all laid off employees affected and make the Union whole in all areas.

*The Union reserves the right to modify this grievance.

On the same day, the grievance was appealed to arbitration.

## Procedural Background

The question concerning the arbitration of this matter ended up in litigation involving these parties in the Wayne County Circuit Court, namely, American Federation of State, County and Municipal Employees Council 25, and its affiliated Locals 457, 273 and 1642 v. City of Detroit, Loretta Davis and Pamela Moore in Case No. 12-007708-CL before the Honorable Wendy M. Baxter who on June 27, 2012 issued an Order granting partial relief in denying a request for preliminary injunction and writ of mandamus wherein Judge Baxter ordered "that the City of Detroit and AFSCME shall arbitrate in an expedited fashion to commence within 28 days after the date of this Order; and it is further ordered that the arbitrator shall render a decision immediately thereafter on the grievance and/or unfair labor charge;"

Arbitration hearings were held on July 26, August 3, 7, 9, 14, 16 and 20, 2012. Post-

3

hearing briefs were thereafter filed.

### The City of Detroit Health and Wellness Promotion Department

The City of Detroit Health and Wellness Promotion Department is a local health department as defined by the Michigan Public Health Code, MCLA §333.2422. The Michigan Public Health Code imposes certain requirements on the City as a local health department. MCL §333.2431 provides:

> Sec. 2431. (1) A local health department shall:
>
> (a) Have a plan of organization approved by the department.
>
> (b) Demonstrate ability to provide required services.
>
> (c) Demonstrate ability to defend and indemnify employees for civil liability sustained in the performance of official duties except for wanton and willful misconduct.
>
> (d) Meet the other requirements of this part.

MCL §333.2433(1) states that a "local health department shall continually and diligently endeavor to prevent disease, prolong life, and promote the public health through organized programs, including prevention and control of environmental health hazards; prevention and control of diseases; prevention and control of health problems of particularly vulnerable population groups; development of health care facilities and health services delivery systems; and regulation of health care facilities and health services delivery systems to the extent provided by law.

MCL §333.2433(2) states that a local health department shall:

> (a) Implement and enforce laws for which responsibility is vested in the local health department.
>
> (b) Utilize vital and health statistics and provide for epidemiological and other research studies for the purpose of protecting the public health.

4

(c) Make investigations and inquiries as to:

    (i) The causes of disease and especially of epidemics.

    (ii) The causes of morbidity and mortality.

    (iii) The causes, prevention, and control of environmental health hazards, nuisances, and sources of illness.

(d) Plan, implement, and evaluate health education through the provision of expert technical assistance, or financial support, or both.

( e) Provide or demonstrate the provision of required services as set forth in section 2473(2).

(f) Have powers necessary or appropriate to perform the duties and exercise the powers given by law to the local health officer and which are not otherwise prohibited by law.

(g) Plan, implement, and evaluate nutrition services by provision of expert technical assistance or financial support, or both.

If there is an imminent danger to the health or lives of individuals, then the Health Department shall perform certain actions and issue orders incorporating findings concerning the imminent danger and demand certain immediate action. *See* MCL §333.2451. And when there is an epidemic present, there are certain responsibilities placed upon the health department. MCL §333.2453.

Similarly, the health department has responsibilities in monitoring restaurants and evaluating conditions of buildings and approving cemeteries. *See* MCL §333.2455, 333.2458, MCL §333.245.

There is no dispute that prior to July 1, 2012 the Department of Health and Wellness Promotion, consistent with the above State statute, provided services such as immunizations, family planning and TB control programs, pediatric dental, vision and hearing screening, home visits by public nurses, inspection of food service establishments and epidemiology among other

5

various health programs.  (Tr. 603-605).

Prior to July 1, 2012 and subsequent to July 1, 2012 Loretta Davis was and continues as the City's Chief Health Officer and Director of the City of Detroit Health and Wellness Promotion Department.  (Tr. 607).  As such, she is an appointee of the Mayor of Detroit.  As such, she is responsible for enforcement of the health ordinances of the City.  (Tr. 605-608). Betsy Pash, both before and after July 1, 2012, was and continues as Deputy Director of the Health and Wellness Promotion Department for the City of Detroit.  (Tr. 116).

Ms. Pash acknowledged that in late February 2012 City officials decided the City of Detroit Health and Wellness Promotion Department would no longer provide statutory mandated health services to the citizens of Detroit.  These services that had been performed by the City of Detroit Health and Wellness Promotion Department were to be performed by an outside entity.

By April 2012, a new corporation separate from the City of Detroit was incorporated, known as the Institute of Population Health (IPH).  The incorporators were Loretta Davis and Betsy Pash.  Loretta Davis became President and CEO and Betsy Pash became Chief Operating Officer of IPH.  (Tr. 151, 604).  The IPH was incorporated for the purposes of transferring the Health Department functions to the IPH.  According to Ms. Pash, the Mayor no longer wanted the City to directly provide public health services.  (Tr. 119).

On July 1, 2012, virtually all previous services that had been provided by the Department of Health and Wellness Promotion were transferred to the IPH.

According to Ms. Pash and confirmed by Ms. Davis, Ms. Pash acknowledged that "a lot of the money" funding the health department comes from State and Federal grants; that the grant money was either shifted or intended to be shifted over to the IPH.  (Tr. 119-121, 602).  Ms.

6

Davis testified that the Health and Wellness Promotion Department had been funded "around 95%" from State and Federal grants received by the City. (Tr. 602).

There was a discussion concerning four grants that go directly to the City that would be under the plan funneled through the City "through work done by the IPH, and by the SEMHA contractors". (Tr. 169). There was testimony that where the Health Department oversees in the past animal control that since there was no grant funding for animal control, this function would now be transferred to the Police Department. In the past, vital statistics was a source of revenue. Initially, this source of revenue was planned to be funneled to IPH. It was decided that the City would not transfer this function. (Tr. 363-364).

As noted, Ms. Davis is the President and CEO of IPH. Ms. Pash is Chief Operating Officer of IPH. (Tr. 134-135). Ms. Pash identified her and Ms. Davis' relationship as being on loan from the City to IPH as follows:

> The City will continue to pay us. We will continue to be City
> employees. We will be able to enforce laws and ordinances in our
> public health capacity, but we will also be overseeing the operations at
> the IPH.
> (Tr. 134).

The City would pay both Ms. Pash's and Ms. Davis' salary and IPH would reimburse the City. (Tr. 134). When Ms. Davis later testified, she contradicted Ms. Pash's testimony on this point and seemed to be confused about how her salary would be paid. Ms. Davis testified: "I would also be on loan to the IPH for about a year, to help stand that up as their president and CEO. In those two roles, I will have exactly the same responsibilities that I was deemed qualified to do now." (Tr. 606).

The record further reveals that IPH, at least in the near future, would continue to use City

7

facilities to perform the functions that were previously performed by the City Health Department. IPH is not paying rent for the use of facilities.

Prior to any layoffs, there were 167 City employees in the Health Department, though there were 267 budgeted positions. (Tr. 127). It was unclear, however, whether all of these employees were represented by AFSCME. As early as May 4, 2012, the City began notifying AFSCME representatives of layoffs in the Health Department. In regard to the notices of layoffs and the intention of the Health Department concerning layoffs, Ms. Pash testified:

> Q      (By Mr. Mack)  I'm looking at Exhibit 11, page 5. It indicates that their initial layoff notifications to the unions took place on May 4[th].  does that sound right?
>
> A      Correct.
>
> Q      And then the layoff notices to the employees took place on June 8[th]?
>
> A      That sounds right.
> (Tr. 358).

In regard to what actually occurred, Ms. Pash testified:

> ARBITRATOR ROUMELL:  And did I understand you to say that you have continued the City employees until September 20[th]?
>
> THE WITNESS: 28[th], yes.
>
> ARBITRATOR ROUMELL: Have you laid off any people?
>
> THE WITNESS:  We laid off some people because of budget cuts that happened on July 1[st].
>
> ARBITRATOR ROUMELL   All right.  How many people do you still have employed, approximately?
>
> THE WITNESS:  110.
>
> ARBITRATOR ROUMELL:  How many did you lay off?
>
> THE WITNESS:  We laid off – we eliminated 15 positions.  It

8

ended up being about nine people.

     REPORTER: 15?

     THE WITNESS: 15.

     ARBITRATOR ROUMELL:  All right.  so basically, the Health Department is intact.  Am I correct?

     THE WITNESS:  Yes.

     ARBITRATOR ROUMELL:  But you plan to lay off everyone by September 28th?

     THE WITNESS: Everyone but four positions.
(Tr. 356).

     Ms. Pash testified that after the planned layoffs of the City employees, IPH intends to hire new employees to perform the previous functions of the Health Department and have employed an outside employment agency to assist in hiring the new employees.

     The plan to transfer the function of the Health Department to IPH was announced to the City Council on May 7, 2012.  Mayor Bing, in a letter dated June 5, 2012, to Governor Snyder advised the Governor of the plan, announcing it was the City's intention "to partner with the Institute for Population Health (IPH)".  (Exhibit 36).  By letter dated June 27, 2012, Governor Snyder wrote Mayor Bing acknowledging the letter of June 5, 2012 approving the shifting of the grants from the City of Detroit to the IPH.  As noted, the announcement to the City Council and the exchange of letters between the Mayor and the Governor all occurred before the Master Agreement expired.

     In addition, the grievance challenging the change as a successor was filed on May 31, 2012.

9

# Department of Workforce Development

Prior to July 1, 2012, the City of Detroit's Department of Workforce Development provided such services as providing job training and various services to needy families through grants from the State and Federal governments. The Department was governed by a 25 person Workforce Development Board appointed by the Mayor of the City. (Tr. 51-53). In the last fiscal year of the City, the Department received 99.9% of its funding from grants with the City only contributing $1,500 to the Department's operation out of the General Fund. (Tr. 64). Pamela Moore was the Department Director. Calvin Sharp was the Deputy Director of the Department.

The Department on February 10, 2012 had received a letter from Elliott Forsyth, the State Director of Workforce Development, outlining problems in the Department which needed improvement, but did not suggest any outsourcing to another entity. (Tr. 63, 68). The record does not reveal that the Department received any other letter from Mr. Forsyth. Nor is there any evidence that the Department lost any State or Federal funding as a result of performance issues. (Tr. 62).

As of late June 2012, the Department had 48 City employees represented by the Union. On June 28, 2012, the Workforce Development Board signed a governance agreement with the Detroit Employment Solutions Corporation. On June 29, 2012, the 48 employees of the Department of Workforce Development were given a layoff notice and because of the injunction were not laid off until July 13, 2012. (Tr. 74). Three days later on July 16, 2012, 18 of the individuals previously working for the Department were hired by the Detroit Employment Solutions Corporation (DES) and are currently working for DES. They did not keep their City titles. The testimony was that "we found appropriate non-profit titles" for these employees. (Tr.

10

74). The testimony from Pamela Moore who is now the President and Chief Executive Officer of DES is: "We continue to hire. We have not stopped hiring. But to date there are 18 who have been brought over". (Tr. 75).

Pamela Moore resigned on June 30th as Director of the Department of Workforce Development and became President and CEO of DES. Calvin Sharp, who had been Deputy Director of the Department of Workforce Development became Chairman of DES. Pamela Moore also testified that previous employees of the Department of Workforce Development could be candidates for future employment of DES along with other possible candidates from other Workforce areas. In terms of hiring additional staff, Pamela Moore testified: "We project that the organization they have around 40 employees when we're done hiring, 35, 40." (Tr. 77). When asked "What determined that?", Ms. Moore responded, "The need. I mean, we still have the same functions that we have to provide, just in terms of administering $48 million worth of grant. But we still have the same function, plus some additional functions that the City provided when we were part of the City that we now have to procure such as legal – you know, legal advice or ...". (Tr. 77).

In her testimony, Ms. Moore was asked about the governance agreement as follows:

Q    It says, 13.0:

"The City of Detroit is the grant recipient under the Act and will carry out the roles and responsibilities associated with this function for the local Workforce Development area."

Do you see that?

A    I do.

Q    And then it says, 3.2:

"The City of Detroit as the grant recipient is financially

11

responsible and accountable for the management of all Workforce funds available to the board"?

A    That is correct.

Q    But all of the people who were performing the operations upon receiving this grant are now gone from the City?

A    That is correct.

Q    So how then is the City still on the hook financially and made accountable if it has no people to perform that service?

A    So the Workforce Investment Act legislation--

Q    Right.

A    States that the local Workforce area and the chief elected official is the grant recipient of these dollars. So the City of Detroit continues to be the grant recipient of these dollars.

The Mayor and the Workforce Development board chair have the authority and responsibility to appoint a fiscal and administrative agent who will oversee these programs and services responsibly.

In the past that administrative and fiscal agent has been the Department of Workforce Development.

There has been a change, based on problems that were outlined by the State and the board's decision to recommend to the Mayor that the fiscal and administrative agent be changed, because those issues that were laid out in that February 10th letter where Mr. Forsyth does refer to DWDD, if those issues had been able to--

Q    Well, ma'am, you are going beyond my question.

MR. JARVIS: Well, she is giving you an answer.

MR. MACK: No.

Q    (By Mr. Mack)  My question was, how is it that Detroit - the City of Detroit--is financially responsible and accountable for the management of our Workforce funds, but it has no people to oversee those funds?

12

ARBITRATOR ROUMELL: And she is answering that.

MR. JARVIS: She is answering that.

MR. MACK: She--well--

ARBITRATOR ROUMELL: Let her answer.

THE WITNESS: So again, the City of Detroit remains the grant recipient, but the power that is given to the board chair through the Workforce Investment Act and the chief elected official gives them the authority and the responsibility to designate a fiscal and administrative agent that will oversee these funds responsible.

Again, based on the State's issues that were outlined in the letter, a decision was made by the board chair and the Mayor and approved by the State to change the administrative and fiscal agent to Detroit Employment Solutions Corp.

(Tr. 85-87).

The City is financially responsible for the management of the grant money that is administered by DES as it was with the Department of Workforce Development. DES is using the same building previously operated by the Department of Workforce Development without any compensation to the City and the tenant in the building is the City. (Tr. 106-107). DES is using the same equipment and computers that were used by the Department of Workforce Development which are still owned by the City. (Tr. 399). This equipment contains the City serial numbers marked upon said equipment. (Tr. 400). The website of the Michigan State Department of Licensing and Regulatory Affairs shows that the Detroit Employment Solutions Corporation has the same I.D. number as the Workforce Development Board. (Tr. 765-767).

The grant money that previously was used to fund the Department of Workforce Development has been or is intended to be shifted to the DES.

By any conceivable definition, this record establishes that the DES is a successor in the

13

Department of Workforce Development.  The same management at the time of the hearing; same employees; same funding source except for $1,500.  The City of Detroit is responsible for the grants.  The same space and City of Detroit equipment being used, governed by the Workforce Development Board.

## Department of Human Services

The Department of Human Services assists low income members of the community by providing them with basic human needs. (Tr 259).  The Department is 100% grant funded.  (Tr. 262).  The Head Start Grant amounts to about $50 million that DHS received annually, most recently from November 1, 2011 through October 21, 2012. (Tr. 263-264).  The Head Start Grant is a direct award from the Federal government to the City. (Tr. 263).  Another significant grant that is awarded to the City is the Community Service Block Grant.  The City received varying amounts for this grant, but received it annually, and most recently received $6.8 million for October 1, 2011 through September 30, 2012 (Tr. 265).  Cecily McClellan, a former center operations manager within the Department of Human Services, testified that the State had been withholding CSBG money from the City. (Tr. 196-197).

There had been a request from the Director of the Michigan Department of Human Services, Maura Corrigan, to de-designate as a Community Action Agency and to stop receiving CSBG funds.  Ms. Corrigan supported de-designation because of problems with DHS being in compliance (Tr. 230).  She wanted a non-profit to become the recipient of the grant and perform the services and not the City of Detroit.  Director Corrigan had threatened an adversarial de-designation hearing.  The Mayor had favored a voluntary de-designation.  (Tr. 198-200).  The City Council initially refused on March 16th, but later in June acquiesced. (Tr. 202).

14

The whole issue of designation was against a background where the State had delayed payments to the City. The dispute regarding use of City workers had centered compliance issues. (Tr. 230). Specifically "disallowance[s]" regarding grant money expenditures. (Tr. 287). There was some testimony that the State would not release the funds so long as it was city employees working on the projects (Tr. 215). DHS Planning Manager Sheila Washington-Bond indicated that the State would not release the funds if it was City workers doing the work. (Tr. 215). And Usula Holland, the Current Director of the Department of Human Services, testified that the State was very clear they did not want the City of Detroit to provide direct program service delivery. (Tr. 285-286).

The situation was as such that the State had already begun the process of an adversarial de-designation of the City. (Tr. 286). It was as an alternative that the city council acquiesced and all DHS staff were laid off. (Tr. 202, 209). After the lay offs, the State released the CSBG funds that had been withheld. (Tr. 300).

The City submits a new plan to the State every year for CSBG funds. The plan for the 2011-2012 year as originally submitted was similar to the 2010-2011 year, and was rejected by the State. (Tr. 272-273). These grant dollars were only awarded upon the State's recent approval of the Community Action Agency's revised plan for the 2011-2012 year. (Tr. 272-273). A material difference in the plan, and primary contingency upon which the State would grant the CSBG funds, is that the City would commit to go out of the business. (Tr. 285-286). As a result the State finally accepted the proposal and released the funds to be deposited with the City. (Tr. 301).

The understanding between the State and the City that the City would get out of the

15

business is even acknowledged by the Union in its post hearing brief: "The reason the City laid off the workers is because it committed to doing so to the State." (UB 14).

The City is self de-designating as a Community Action Agency and acting as only a temporary agent to contract these limited services funded by the CSBG out to the Detroit Rescue Mission and Salvation Army in the interim while the State looks for a new agency. (Tr. 299-301). This is not a permanent arrangement, as the State only released the funds contingent upon the City agreeing to no longer perform the work in the future. Prior to the Salvation Army and Detroit Rescue Mission taking the work, very little CSBG work had been performed between October, 2011 and February, 2012. And the City had done no CSBG work between February and June 2012. (Tr. 268).

Regarding the Head Start grant, the city has clearly indicated through its actions that it no longer wishes to stay in the business of providing those services. Head Start funds come directly from the federal government. Head Start is being ended. (Tr. 317). The State cut funding that provided weatherization utility assistance. (Tr. 246).

Ursula Holland is Director of Human Services. She acknowledged that the Department had 15 AFSCME employees, but they have been laid off. As she explained, "Our role is strictly closeout and interim provider". (Tr. 693). Ms. Holland explained that the City no longer has the weatherization program; that the federal government has identified another provider for the Head Start program. As she explained, these programs have been ended and Detroit will not be awarded these programs in the future. (Tr. 694-695).

16

## Discussion

1.  Contract

In presenting its grievance, Council 25 and its affiliated Locals 457, 273 and 1642 rely on the following provisions of the Master Agreement between the Council and the City of Detroit for the period July 1, 2008 - June 30, 2012:

### Article 1 - RECOGNITION OF UNION

A.  Pursuant to and in accordance with all applicable provisions of Act 336 of the Public Act of 1947, as amended, the Employer does hereby recognize the Union as the sole and exclusive representative for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other terms and conditions of employment for the term of this Agreement of all employees of the Employer included in the bargaining units described in Exhibit 1, attached.

\* \* \*

E.  When an operational function remains unchanged, but changes location, representation rights shall not be affected.

F.  In all other changes of operational functions, the employee has the right to retain membership in the Union.

### Article 2 - MANAGEMENT RIGHTS AND RESPONSIBILITIES

Consistent with the express terms of this Agreement:

A.  The Union recognizes the prerogatives of the City to operate and manage its affairs in all respects in accordance with its responsibilities and powers of authority as set forth in the Charter and the Home Rule Act.

### Article 19 - CONTRACTUAL WORK

A.  The City is genuinely interested in maintaining maximum employment for all seniority employees covered by this Agreement, consistent with the needs of the City. Therefore, in making these determinations the City intends always to keep the interest of the City's employees in mind.

B.  The right of contracting or subcontracting is vested in the City. The right to contract or subcontract shall not be used for the

17

purpose or intention of undermining the Union nor to discriminate against any of its members nor shall any seniority employee be laid off or demoted or caused to suffer a reduction in overtime work as a direct and immediate result of work performed by an outside contractor.

C.   In cases of contracting or subcontracting, including renewal of contracts, affecting employees covered by this Agreement, the City will hold advance discussion with the Union prior to letting the contract. The Union representatives will be advised of the nature, scope and approximate days of work to be performed and the reasons (equipment, manpower, etc.) why the City is contemplating contracting out the work.

## Article 21 - MAINTENANCE OF CONDITIONS

Wages, hours, conditions of employment and current proper practices which are beneficial to the employees at the execution of this Agreement, shall, except as provided and improved herein, be maintained during the term of this Agreement. Changes must be mutually agreed upon by the City and the Union.

## Article 42 - SUCCESSOR CLAUSE

This Agreement shall be binding upon the successors and assignees of the parties hereto, and no provisions, terms or obligations herein contained shall be affected, modified, altered, or changed to the detriment of the other party in any respect whatsoever by the consolidation, merger, sale, transfer, lease, or assignment of either party hereto, or affected, modified, altered, or changed in any respect whatsoever by a change of any kind of the ownership or management of either party hereto of any separable, independent segment of their party hereto.

By any definition, the Institute for Population Health is the alter ego of the City of Detroit Department of Health and Wellness Promotion. The City has transferred a majority of the functions of the Department of Health and Wellness Promotion to the IPH – services which by State statute the City is obligated to provide. In doing so, the City's Chief Health Officer, along with the Deputy Director of the Health Department were among the incorporators of the IPH and are the Chief Executive Officer and Chief Operating Officer, respectively, of IPH. Loretta Davis

18

and Betsy Pash presented conflicting testimony as to how their City salaries would be paid or reimbursed or whether their salaries would be paid by IPH. IPH would be funded by the State and Federal grants that had been received by the City.

The evidence was overwhelming that IPH was formed and steps were taken prior to June 30, 2012 to execute the plans to transfer the Health Department work. The incorporation took place in April 2012. The State's approval was obtained in June 2012. Plans to layoff were announced as early as May 2012. The layoff plans were delayed by the injunction which was issued prior to June 30, 2012. Yet, after the injunction expired, IPH still continued to employ 110 City employees to perform the former City work required by State statute. (Tr. 358).

Finally, if there is any doubt that IPH is not the alter ego of the City of Detroit Health Wellness Promotion Department, the intention is that IPH employees are going to perform the same duties and work performed as City of Detroit employees is the fact, as just noted, IPH has found itself unable to operate, at least temporarily, without using City of Detroit employees to perform duties that they were performing prior to June 30, 2012.

As to the Department of Workforce Development, the same analysis would apply. Before the contract expired, the City was planning to shift the functions of the Workforce Development Department to the Detroit Employment Solutions Corporation. By June 28, 2012, a governance agreement had been signed between the DES and the Workforce Policy Board (a Board that was appointed by the Mayor) providing for the transfer of the Department to DES. On June 30th, Pamela Moore, who had been Department Chair resigned and became President and CEO of DES. Calvin Sharp was Deputy Director of the Department of Workforce Development and became Chairman of the Board of DES. The 48 employees of the Department of Workforce

19

Development were given notice on June 29, 2012 that they would be laid off. Because of the injunction, they were not laid off until by July 13. Eighteen were rehired on July 16 by DES. DES continued use of City facilities and City equipment.

As already noted, 99.9% of DES funding came from grants of State and Federal sources usually passed through the City.

By any definition, DES is the alter ego for the City. The planning and the action to implement both IPH and DES before June 30, 2012 and even the use of City employees after June 30, 2012 even beyond the expiration of the injunction confirms the alter ego status.

This Arbitrator finds as a fact that the IPH and the DES in labor parlance were alter egos to the City as the alter ego doctrine has been developed both by the Courts, the NLRB and arbitrators, including that the successor employers are bound by collective bargaining obligations. *See, NLRB v. Allcoast Transfer Inc.*, 780 F.2d 576 (6th Cir. 1986). *Also see*, the comments of Arbitrator Wolff in *Clark Food Service, Inc.*, 115 LA 1734 (2001), where he analyzes the NLRB standard as well as the standard of the courts in applying the alter ego doctrine.

However, the circumstances here can also be analyzed from the aspect that the City violated Article 1.A, E and F and Article 19. As this Arbitrator has concluded, the IPH and DES are alter egos of the Departments of Health and Wellness Promotion and Workforce Development. For this reason, this Arbitrator also concludes within the meaning of Article 1.E that the operational function remained unchanged. Therefore, those representation rights shall not be affected. Thus, as Arbitrator Chymy in *County of Santa Clara*, 97 LA 635 (1991), in interpreting similar recognition clauses, found the transfer of bargaining unit work to non-

20

bargaining unit employees violated the recognition clause. Transferring of work formerly performed by AFSCME employees in the Department of Health and Wellness Promotion and Workforce Development to IPH and DES violated the recognition clause.

A third reason why the City violated the 2008-2012 contract is Article 19. As noted, Article 19. B does provide that: "The right to contract or subcontract shall not be used for the purpose or intention of undermining the Union nor to discriminate against any of its members nor shall any seniority employee be laid off ... as a direct and immediate result of work performed by an outside contractor."

This is the intended result of both IPH and DES. Ms. Pash acknowledged that the IPH had employed an employment agency to recruit employees. As of the date of the last arbitration hearing, DES had employed 18 City employees, but DES expected to hire other employees who may not necessarily be City employees which could result in a violation of Article 19. Not to hire laid off City employees from the two Departments – Health and Workforce – would seem to undermine both the employees and the Union when the corporations can be construed as contractors, successors and alter egos.

As already noted, this grievance was filed on May 31, 2012 before the expiration of the 2008-2012 Master Agreement expiring on June 30, 2012. As further noted, there were activities that took place by the City prior to June 30, 2012 in preparation for the transfer of the work of the Department of Public Health and Wellness Promotion and the Department of Workforce Development to IPH and DES.

A dispute "arises under the contract" when material facts and occurrences arose before the expiration of the Collective Bargaining Agreement, even though some facts occur after the

expiration. *See, South Central Power Co. v. International Brotherhood of Electrical Workers Local Union 2359*, 186 F3d 733 (6th Cir. 1999), where the court analyzes the Supreme Court's decision on this point in *Nolde Bros. Inc. v. Local No. 358 Bakery and Confectionary Workers Union*, 430 U.S. 243 (1977), and *Litton Financial Printing Division v. NLRB*, 501 U.S. 190 (1991).

The point is that under the expired contract which the Union sought to enforce prior to the expiration of the contract by filing this grievance, because the City had taken steps, in the view of the Union, and which the Arbitrator agrees at least as to two Departments, violates the Union and the employees it represented of accumulated vested rights. The Union had the vested right to represent the employees under Article 1 and Article 42. The employees and the Union had the right not to be undermined pursuant to Article 19.B and the employees had certain rights under Article 19.B. These rights survived the expiration of the contract.

This point is emphasized by the Sixth Circuit as recently as this summer in *United Steel, Paper and Forestry vs. American Standard Corp.*, __ Fed Appx, 2012 WL 2354365, 193 LRRM 2816 (6th Cir. Ky., June 21, 2012), where the contract was terminated on July 1, 2008. The employer had refused to extend the contract beyond that date for a separation pay provision in the contract. The employer closed the plant but refused to pay any of the employees separation pay. The Union grieved. The Employer refused to arbitrate. The Union sought to compel arbitration to court. The Sixth Circuit held that the separation pay accrued and vested under the expired contract, holding that the grievance for lack of separation pay filed after termination of the contract was arbitral. As the Sixth Circuit noted, "We conclude that the separation pay right in the CBA, accrued under the CBA." This ruling came even though the grievance was filed after

22

the contract had expired.

In this case, the grievance was filed before the contract expired. And the City was taking steps to violate the Master Agreement prior to its expiration, even though some of the actions violating the Agreement did not occur until after the contract was expired. For example, some of the layoffs were prevented by virtue of Judge Baxter's injunction until after July 13, 2012. Some layoffs were delayed for practical reasons.

As to the Department of Human Services, nearly all of the grants going to the Department of Human Services that were funding programs as a Community Action Agency have expired or been cut. This started with the weatherization utility assistance program being cut. (Tr. 246) The City has continually indicated, by permitting these grants to expire or the funding to be cut, that it is no longer looking to provide these services. (Tr. 199). The City has proposed a plan to the State that is largely to reimburse already CSBG incurred costs. (Tr 268). The CSBG grant money that is in excess of this reimbursement is provided as a one time exception and only under the express understanding that the City is to self de-designate and no longer to provide these services. The State has simply found it expedient to use the City as an agent to temporarily pass through this last fund to the Salvation Army and Detroit Rescue Mission while the State selects a new grant recipient for the oncoming fiscal year. The City should not be forced to provide services for which is has continually indicated it is trying to get out of the business of providing. As long as this is the last year the city accepts CSBG funds, and the State eventually contracts directly with a new agent for the performance of these tasks there is no violation by the City with regard to scaling back activities of the Department of Human Services.

The point is that both the State of Michigan and the Federal government have selected or

23

are in the process of selecting agencies other than the City of Detroit to furnish the services that were previously performed by Human Services. Even Ms. Holland is being transferred to another City Department because her job is being eliminated due to the actions that were initiated primarily by the State. It is a far different situation than the IPH or DES situation and for this reason the Arbitrator finds no basis for a contract violation as to what occurred in Human Services.

Having reached this point in the analysis, the Arbitrator turns to the brief filed by the City's Attorney which this Arbitrator, because of his emphasis, has chosen to quote in its totality as follows:

<u>EMPLOYER CITY OF DETROIT'S POST HEARING BRIEF</u>

Now comes, the City of Detroit, by and through its attorney, Andrew Jarvis, I support of its post hearing brief states the following:

I.    <u>INTRODUCTION</u>

On March 16, 2011, Public Act 4 of 2011 was enacted by the legislature. Section 4a of PA 4 suspended Section 15(1) of PERA for employers subject to a consent agreement. On April 4, 2012, the City of Detroit and the State of Michigan entered into a consent agreement pursuant to PA 4.

On June 20, 2012, The City of Detroit sent a letter to all Union President stating: "This letter serves as notification that in accordance with our collective bargaining agreement, the City hereby provides ten (10) days written notice of its intent to terminate the collective bargaining agreement as of July 1, 2012."

On July 18, 2012 the City of Detroit sent a letter to all Union Officials. This letter included the City Employment Terms (CET). The letter indicated that the language was approved by the Financial Advisory Board on June 28, 2012 and July 12, 2012, and submitted to Council for approval. City Council voted not to approve the CET. On July 17, 2012, pursuant to the FSA, the CET was implemented by order of the Program Management Director effective July 18, 2012.[1]

It is with this background that Judge Baxter order expedited

24

Arbitration in this matter. The Union also filed a companion MERC
Unfair Labor Practice Charge C 12 F-123, alleging as alleged in the
Civil case which was the catalyst for the grievance that the City
breached its duty to bargain in good faith. The Union also alleged that
the Successor Language contained in the Master Agreement between the
City and the Union somehow survives the execution of the Finical
Stability Agreement between the City and the State of Michigan as
proscribed under Public Act 4 which in turn eliminated of the Duty to
Bargain under MCR 423.215. The Union attempts to advance the
argument that MCL 423. 211 and MCL 423.210 are in place despite
P.A. 4 and the Finical Stability Agreement. This argument was soundly
addressed in the *Decision and Recommended Order[1]* in the companion
MERC case.

Under PA 4, there was a suspension of the duty to bargain under
PERA. That suspension persisted until the board of canvassers certified
the repeal provisions and placed the issue of PA 4 repeal on the ballot.
The actions complained of in this matter, and the implementation of the
CET, occurred at a time that there was no duty to bargain.

Under the Unions theory, anything previously done under P A 4
is void now that PA 4 is suspended. The Union has not presented any
legal support for this claim. This Court already ruled in *Robert v.
Detroit Board of Education,* Wayne County No. 12-010545 that actions
taken while PA 4 was in effect survive and stand)[3]

Furthermore the relief sought by the Union in this matter is for
the Arbitrator to Order the Chief Executive of the City of Detroit to take
grant monies from the Federal and State government(s) and restart the
operations of Departments that the City has decided not to provide.
This goes far beyond the s four corners of the Collective Bargaining
Agreement and the Arbitrator would become the *de facto* Chief
Executive of the City of Detroit.

## CONCLUSION

It is an unfortunate economic fact of life that public employers
in the State of Michigan have and will continue to have situations which
cost cutting is necessary for continued financial solvency. Personnel
costs in the form of wages and benefits are a large component of the
overall cost of services including the elimination of services provided by
the City of Detroit and its various Departments .

For all of the foregoing reasons, City of Detroit, respectfully
requests that the Arbitrator deny the Unions Grievance in *toto.*

---

1 See Exhibit 1

25

2 See Exhibit 2

3 Exhibit 3, Transcript from *Robert v. Detroit Board of Education* pp. 39-40.

Exhibit 2 attached to the brief was the decision of Michigan Employment Relations Commission Administrative Law Judge David M. Peltz in *City of Detroit -and- Coalition of the City of Detroit Unions and American Federation of State, County and Municipal Employees, Council 25,* Case No. C12 F-125, Docket No. 12-001181-MERC, dated August 20, 2012. In his opinion, ALJ Peltz found at page 8:

> So these other provisions all derive from, when they make reference to the duty to bargain, they derive from the obligations set forth in Section 15 (1) of the Act, they are 'not the source of that obligation. Based on the statutory language itself, I find that by enacting PA 4 and amending Section 15 of PERA, the Legislature intended to relieve public employers found to be in a state of financial stress or emergency and subject to a consent agreement from the obligation to collectively bargain.

ALJ Peltz recommended to the Michigan Employment Relations Commission that it may issue an order dismissing the unfair labor practice charge filed by the Coalition of Detroit Unions and AFSCME Council 25 against the City of Detroit, charging the City with a failure to bargain in good faith concerning the implementation by the City of new terms and conditions of employment unilaterally on or about July 1, 2012.

The case had been assigned to ALJ Peltz who explained the background of the case when he wrote:

> This case arises from an unfair-labor practice charge filed on July 2, 2012, by the Coalition of Detroit Unions, a group comprised of thirty-three labor organizations representing employees of the City of Detroit, and by the American Federation of State, County and Municipal Employees (AFSCME), Council 25. The charge alleges that the City violated PERA when, on or about July 1, 2012, it unilaterally implemented new terms and conditions of employment for City employees, and by refusing to provide information to the Unions concerning those changes. Respondent contends that its actions were

26

authorized by Section 14a(l0), MCL 141.1514a(1) of the Local
Government & School District Fiscal Accountability Act, Public Act 4
of 2011, and by a recent amendment to Section 15 of PERA.[1]

[1] This matter was previously consolidated with Case No. C12 D-065; Docket
No. 12-000577, in which the same Unions assert that the City violated its duty to
bargain in good faith under PERA by failing or refusing to submit tentative
agreements to Respondent's City Council for ratification. Additional
proceedings are still pending in that matter.

Judge Peltz went on to explain the circumstances upon which the parties asked him to

rule at page 2:

On August 8, 2012, the State Board of Canvassers voted to
certify a referendum for the November ballot which, if passed, would
repeal PA 4. Pursuant to Const 1963, art 2, Section 9 and MCL
168.477(2), the Board's action had the effect of suspending PA 4
pending the results of the upcoming election. As result of the
suspension of PA 4, the City acknowledges that Section 15(1) of PERA
once again applies and that Respondent has a duty to negotiate in good
faith with the Unions over terms and conditions of employment for
members of Charging Parties' bargaining units. Nevertheless, both
parties indicated that they wished to proceed with oral argument in this
matter in order to clarify whether the City acted lawfully in
implementing new terms and conditions of employment in July of 2012
while PA 4 was in effect.

Attached to the City's brief was Exhibit 3, the transcript of the Motion for Injunctive

Relief plus the Ruling thereof in Case No. 12-010545-AW, Wayne County Circuit Court, *Roy*

*Roberts v. Rev. David Murray, et al and Detroit Board of Education.* In that case, the Honorable

John A. Murray, Judge of the Circuit Court, issued injunctive relief in effect upholding the status

quo. In doing so, he in effect echoed the belief that actions taken by Roy Roberts pursuant to

Public Act 4 prior to certification of the ballot initiative as to Public Act 4 by the Board of

Canvassers remained valid for at pages 38-40, in ruling on the point, Judge Murphy stated:

Plaintiff Roy Roberts asks that we enter a status quo order
allowing him to exclusively run the Detroit Public Schools
notwithstanding the upcoming referendum vote on Public Act No.4.

27

Defendants believe that as a result of the upcoming referendum vote on Public Act 4, plaintiff has no basis in the interim to exercise any authority over the Detroit Public Schools.

Further, Public Act 4 repealed Public Act 72 and plaintiff cannot exercise authority under this former law.

This court disagrees with defendant's position on this latter point and finds that the actions of the plaintiff up to August 8, 2012 shall have — I will restate that.

The actions up to August 8, 2012 shall be maintained as part of a status quo order.

Article 2 Section 9 of our Michigan Constitution provides no law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.

August 8, 2012, I believe, is the date the State Board of Canvassers certified the referendum.

My interpretation of this constitutional provision is consistent with MCL 168.477(2). It reads in part:

" ... A law that is the subject of the referendum continues to be effective until the referendum is properly invoked which occurs when the Board of State Canvassers makes its official declaration of the sufficiency of the referendum petitions ... "

Any further action taken by the plaintiff under Public Act 4 after August 8, 2012 would not be effective. He is powerless to act except in those areas we will discuss next. But first let me clarify. The status quo going forward includes actions taken by the plaintiff up through the date the State Board of Canvassers certifies the referendum.

The Rulings by ALJ Peltz and Judge Murphy may represent the external law as it affects

the duty to bargain during the time that PA 4 was in effect. However, the reference to the Peltz/

Murphy rulings do not resolve the issue before this Arbitrator. It must be emphasized that this

Arbitrator has found that the City, before the Master Agreement was terminated, namely, prior to

June 30, 2012, and prior to the City's unilaterally imposed City Employment Terms, took

28

specific steps both as to the Departments of Health and Wellness Promotion and Workforce

Development, as explained in this Opinion, to violate provision of the Master Agreement in

effect prior to June 30, 2012 and in particular Articles 1, 19 and 42. And this Arbitrator has been

called upon to interpret the Master Agreement pursuant to Article 8.B.

### The Remedy

Essentially, as to both the Department of Health and Wellness Promotion and IPH and the

Department of Workforce Development and DES, this Arbitrator has found that in each case the

City has violated Article 1 as to representation rights, and Article 19, contracting and

subcontracting for the purposes of undermining the Union and the employees it represented,

resulting in the layoff of seniority employees. Furthermore, by any definition, both IPH and

DES, within the meaning of Article 42, are alter egos of the Health and Wellness Promotion

Department and Department of Workforce Development, respectively, and therefore, successor

employers. To repeat, how can anybody reach any other conclusion when the Chief Health

Officer of the City admits that she is acting in a dual capacity for both the City and the IPH,

along with her Deputy. In the case of DES, the Mayor appointed Workforce Development Board

controlled DES and the former Director of the Department of Workforce Development is now

the CEO, along with her former Deputy, who is Chairman of the Board, who perform the same

functions that they performed for the City.

In formulating a remedy in such situations, arbitrators when finding a violation of a

successor clause or elements of subcontracting have remanded the case back to the parties for a

hearing on damages. *See, e.g., Marley-Wylian Co.*, 88 LA 978 (Jacobowski, 1987); *Boatman*

*Co.*, 91 LA 489 (Har, 1988).

29

Another approach has been taken by arbitrators where the arbitrator has ordered the company to cease and desist from allowing non-bargaining unit personnel from performing work of bargaining unit employees. *See, e.g., Dayton Power and Light Co.*, 111 LA 954 (Modjeska, 1998).

Similar results can be found in the public sector. In *County of Santa Clara*, 97 LA 635 (1991), Arbitrator Chvany, finding that the County violated the recognition, classification and wage provisions of the applicable agreement, ordered the County to cease and desist from transferring work to non-bargaining unit employees.

In *Clark Food Service, Inc.*, 115 LA 1734 (2001), Arbitrator Wolff ordered the successor employer to be bound to follow the contract of the parent employer under the facts of that case.

This Arbitrator has emphasized repeatedly in this Opinion and in this Remedy section that in regard to the IPH and the DES that the relationship between the City and the Department of Health and Wellness Promotion and the Department of Workforce Development and the Board of Workforce Development was virtually indistinguishable, particularly at the leadership level; that in this case that the remedy should be of the type suggested by Arbitrator Wolff in *Clark Food Service, Inc.* because of the obvious violation of the successor clause as well as the Article 19.B contractual work clause and what turned out to be, when one listened to the testimony, a violation of Article 1, Recognition.

And, again, to continue to emphasize the point, this was all planned and began to be executed prior to the June 30, 2012 termination of the July 1, 2008 - June 30, 2012 Master Agreement.

However, for the reasons stated in this Opinion, there is no basis to grant relief as to

30

Human Services and, therefore, as to Human Services, the grievance will be denied.

## A W A R D

1.     The grievance as to the Department of Health and Wellness Promotion is granted

with the following relief:

A.     The City shall direct that the Institute of Population Health and its

President and Chief Executive Officer and Chief Operating Officer, who

also serve as the City's Health Officer and Director of the City's

Department of Health and Wellness Promotion and Deputy Director of the

City's Department of Health and Wellness Promotion to recognize

AFSCME Council 25 and its applicable Locals as representative of all

employees in any positions of the type that were performed by AFSCME

represented employees under the 2008-2012 Master Agreement in the

Department of Health and Wellness Promotion that are now employed or

will be employed by IPH in the future.

B.     If IPH has hired or hires any employee who is not a laid off City of Detroit

AFSCME represented employee in positions or their equivalent,

previously held by AFSCME represented employees under the 2008-2012

Master Agreement in the Department of Health and Wellness Promotion

to perform duties formerly performed in the Department of Health and

Wellness Promotion, then the former AFSCME represented employees

who held said positions either in the Department of Health and Wellness

31

Promotion or IPH and had been laid off shall be reinstated in said

positions and be paid back pay and benefits from the time they were laid

off, either by IPH or the City of Detroit's Department of Health and

Wellness Promotion.

C.     The City shall cease and desist transferring any work previously done or

performed by the City of Detroit's Health and Wellness Promotion

Department prior to June 30, 2012 to IPH unless IPH recognizes AFSCME

and its Local(s) and honors this Award in its totality.

D.     The City shall cease and desist from or assisting in the transferring of any

grants to IPH unless IPH honors this Award in its totality in recognition

that it is the alter ego of the City of Detroit and successor as discussed in

the Opinion.

E.     It is the intent of this Award, as permitted by law, that IPH be obligated to

bargain with AFSCME Council 25 as to wages, hours and other conditions

of employment for the employees referred to in Paragraph 1.A above in

recognition that it is the alter ego of the City of Detroit and successor as

discussed in the Opinion.

F.     As to the planned layoffs testified to by Ms. Pash to take effect on

September 28, 2012 (see Transcript 356), the City and IPH are bound to

comply with Paragraph 1.B of this Award and not hire replacements in

positions or their equivalent previously held by AFSCME members under

the 2008-2012 Master Agreement in the Department of Health and

32

Wellness Promotion to perform duties formerly performed in the Department of Health and Wellness Promotion while there are former AFSCME members who performed those duties under the 2008-2012 Master Agreement who are on layoff or will be laid off.

2. The grievance as to the Workforce Development Department is hereby granted and the remedy shall be as follows:

A. The City shall direct the Detroit Employment Solutions and Workforce Development Board to recognize AFSCME Council 25 and its applicable Locals as representative of all employees in any positions of the type that were performed by AFSCME represented employees under the 2008-2012 Master Agreement in the Department of Workforce Development that are now employed or will be employed by DES in the future.

B. If DES has hired or hires any employee who is not a laid off City of Detroit AFSCME represented employee in positions or their equivalent, previously held by AFSCME represented employees under the 2008-2012 Master Agreement in the Department of Workforce Development to perform duties formerly performed in the Department of Workforce Development, then the former AFSCME represented employees who held said positions either in DES or the Department of Workforce Development and had been laid off shall be reinstated in said positions and be paid back pay from the time they were laid off, either by DES or the City of Detroit's Department of Workforce Development.

33

C.      The City shall cease and desist transferring any work previously done or
performed by the City of Detroit Workforce Development Department
prior to June 30, 2012 to DES unless DES recognizes AFSCME and its
Locals and honors this Award in its totality.

D.      The City shall cease and desist from or assisting in the transferring of any
grants to DES unless DES honors this Award in its totality in recognition
that it is the alter ego of the City of Detroit and successor as discussed in
the Opinion.

E.      It is the intent of this Award, as permitted by law, that DES be obligated to
bargain with AFSCME Council 25 as to wages, hours and other conditions
of employment for the employees referred to in Paragraph 2.A above in
recognition that it is the alter ego of the City of Detroit and successor as
discussed in the Opinion.

3.      The grievance as to Human Services is denied.

4.      The Arbitrator reserves jurisdiction, at the request of either party within six (6)
months of this Award, to address disputes concerning the relief provided in this Award.


GEORGE T. ROUMELL, JR.
Arbitrator

September 26, 2012

34

# EXHIBIT 13

_____

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES
COUNCIL 25, and its affiliated LOCALS 457,
273 and 1642, ALBERT GARRETT, LAURIE
WALKER, SCECILLA HUNT, and GINA
THOMPSON,

/s/ Rita Causey

Plaintiffs,

Case No. 12-007708-CL
Hon. Wendy M. Baxter

vs.

12-007708-CL

FILED IN MY OFFICE
WAYNE COUNTY CLERK
1/8/2013 4:37:23 PM
CATHY M. GARRETT

CITY OF DETROIT, LORETTA DAVIS
and PAMELA MOORE,

Defendants.

| MILLER COHEN, P.L.C. | CITY OF DETROIT LAW DEPARTMENT |
|---|---|
| Richard G. Mack, Jr. (P58657) | Jason McFarlane (P73105) |
| Teri L. Dennings (P68884) | *Attorney for Defendants* |
| *Attorneys for Plaintiffs* | 660 Woodward Ave., Ste. 1800 |
| 600 West Lafayette, Fourth Fl. | Detroit, MI 48226 |
| Detroit, Michigan 48226 | (313) 237-0548 |
| (313) 964-4454 | |

## ORDER GRANTING PLAINTIFFS MOTION TO ENFORCE ARBITRATION AWARD AND DENYING DEFENDANTS' MOTION TO VACATE ARBITRATION AWARD

At a session of said Court, held in the City of Detroit, County of Wayne, and State of Michigan, on _____

1/8/2013

Present: _____ WENDY M BAXTER _____
Circuit Court Judge

Upon Arbitrator George Roumell issuing an Arbitration Award, dated September 26, 2012, concerning the dispute in the above-captioned case, following Plaintiffs' grievance, and

Upon the Plaintiffs having filed a Motion to Enforce The Roumell Arbitration Award, following this Court's Order that Plaintiffs' grievance be arbitrated, and

1

13-53846-swr Doc 8485-13 Filed 11/26/14 Entered 11/26/14 15:47:35 Page 147 of 3
13-53846-swr Doc 8485-13 Filed 09/02/14 Entered 09/02/14 21:56:35 Page 47 of 3
148

Upon Defendant City of Detroit filing a Motion to Partially Vacate The Roumell Arbitration Award, and the Intervenor Detroit Workforce Development Board filing a brief in Opposition to the Plaintiffs Motion to Enforce The Arbitration Award, and

Upon the Court having heard oral argument on November 16, 2012, the Court being fully advised in the premises:

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Enforce the George Roumell Arbitration Award is hereby granted, for the reasons stated on the record. The Arbitration Award is hereby enforced by this Court.

**IT IS FURTHER ORDERED** that Defendants' Motion to Partially Vacate the Arbitration Award is denied, for the reasons stated on the record.

**IT IS SO ORDERED.**

Dated: _____

_____
/s/ Wendy M. Baxter
CIRCUIT COURT JUDGE