# ITEM 11

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-------------------------------------------------------x
                                    :

In re                           :         Chapter 9

                                      :

CITY OF DETROIT, MICHIGAN,     :         Case No. 13-53846

                                        :

                  Debtor.         :         Hon. Steven W. Rhodes

                                        :

                                        :
-------------------------------------------------------x

## CORRECTED REPLY IN SUPPORT OF OBJECTION TO PROOF OF CLAIM NUMBER 2958 FILED BY MICHIGAN AFSCME COUNCIL 25 AND ITS AFFILIATED DETROIT LOCALS

            The City of Detroit (the "City") hereby files this reply (the "Reply") in support of the *Objection of the City of Detroit, Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 2958 Filed by Michigan Council 25 and Its Affiliated Locals* (Docket No. 4876) (the "Claim Objection").[1] In support of this Reply, the City respectfully represents as follows:

            1.      By the Claim Objection, the City seeks the disallowance and expungement of proof of claim number 2958 (the "Proof of Claim") filed by the American Federation of State, County and Municipal Employees ("AFSCME")

---

[1]      Capitalized terms not otherwise defined herein have the meanings given to them in the Claim Objection.

13-53846-swr  Doc 8003  Filed 10/18/14  Entered 10/18/1

Council 25 and its affiliated locals (together, the "Claimant").  The Proof of Claim is comprised of 20 separate claims asserting aggregate liabilities in the amount of $8,718,697,854.82.  See Claim Objection Ex. 1.

2.     On September 2, 2014, the Claimant filed a response to the Claim Objection (Docket No. 7235) (the "Response").

3.     By agreement between the parties, the Proof of Claim was referred to facilitative mediation before the Honorable Victoria A. Roberts.  See *Order (I) Referring to Facilitative Mediation Objections to Certain Claims Filed by Michigan AFSCME Council 25 and its Affiliated Detroit Locals and the Coalition of Detroit Unions, (II) Continuing Hearing on Related Claim Objections and (III) Modifying Briefing Schedule* (Docket No. 7663), at ¶ 2.  The facilitative mediation was conducted and has been concluded, but did not lead to a resolution.

4.     Since the filing of the Claim Objection and the Response, the Claimant withdrew certain of the claims contained in the Proof of Claim, as more fully discussed below.  Of the remaining claims, one overriding theme is the Claimant's attempt to recover alleged damages arising from the necessary cost-savings mechanisms that the City established through the City Employment Terms implemented on July 18, 2012.  As discussed below, the City Employment Terms (or "CETs") were implemented lawfully, and AFSCME's claims for damages relating to the CETs therefore fail under applicable law.  Certain claims relating to

pension and benefit issues – including claims relating to the so-called "13 Check" program – were addressed by the City separately in the *Supplemental Brief of the City of Detroit, Pursuant to Sections 105 and 502(B) of the Bankruptcy Code, Bankruptcy Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 2958 Filed by Michigan AFSCME Council 25 and Its Affiliated Locals* (Docket No. 7981) ("Supplemental Brief"), a supplement to the Claim Objection filed on October 16, 2014 (Docket No. 7981), which is incorporated herein by reference. The majority of the remaining claims fail because they are too vague and general to state a legitimate and allowable claim.

5.      Each separate claim contained in the Proof of Claim (in the order set forth on the chart attached to the Proof of Claim as Exhibit 1) is addressed below.  These claims are referred to by number below.

## **Reply**

### *Claim 1:  Underfunded Pension and Post Employment Benefit Obligations:*

6.      The Claimant has agreed to withdraw Claim 1.  See *Order Dismissing Claims from Mediation* (Docket No. 7877) (the "Dismissal Order").[2]

---

[2]      Claims for GRS pension and other post-employment benefits ("OPEB") are subject to treatment in Class 11 and Class 12 of the Plan, respectively. Moreover, consistent with the bar date order in this case, no proof of claim is required to preserve a claim in Class 11 or Class 12.  See Bar Date Order, at ¶ 8 (providing that the holders of claims relating to pension liabilities and OPEB liabilities are not required to file proofs of claim on account of such claims).  Because Claim 1 of the Proof of Claim – asserted in an amount not

***Claim 2: Violations of Local, State or Federal Law***

      7.     The Claimant has agreed to withdraw Claim 2. A copy of the *Order Dismissing Claim 2 From Mediation* issued by Judge Roberts is attached hereto as Exhibit 1.[3]

***Claim 3: Refusal to Bargain AFSCME Local 1023 – MERC Case Number D13 C-0331.***

      8.     Through Claim 3, AFSCME asks the Court to ignore a 2013 decision of the State of Michigan Employment Relations Commission ("MERC"), a copy of which is attached hereto as Exhibit 2 (the "Act 312 Decision"). In particular, the Act 312 Decision holds that, as a result of the passage of the Local Financial Stability and Choice Act, 2012 PA 436, MCL § 141.1541, *et seq.* ("PA 436"), the City was not obligated to engage in binding arbitration under 1969 PA 312, MCL § 423.231, *et seq.* ("Act 312") and therefore had a right to unilaterally impose employment terms on various City unions (*i.e.*, through the City Employment Terms).

      9.     Act 312 compels arbitration of labor disputes in municipal police and fire departments under certain circumstances, including disputes over

---

less than $8.1 billion – relates to GRS pension and OPEB liabilities, any valid liabilities will be addressed consistent with Class 11 and Class 12 of the Plan.

[3]     In any event, even if not withdrawn, this claim is too vague to be allowed and is subsumed by the other portions of the Proof of Claim. To the extent applicable, those matters are addressed below.

the negotiation of collective bargaining agreements. Similarly, the Michigan Public Employment Relations Act ("PERA"), MCL 423.201, *et seq.*, imposes a duty to bargain on the City, which was expressly suspended pursuant to PA 436. MCL 141.1567(3) ("A local government placed in receivership under this act is not subject to section 15(1) of 1947 PA 336, MCL 423.215, for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first."). AFSCME nevertheless asserts that the City was required to arbitrate instead of imposing unilateral terms on AFSCME Local 1023 (the Emergency Service Operators). AFSCME therefore seeks unspecified relief as a result of the imposed terms contained in the CETs. The imposed terms included wage and other concessions effective August 2013, consistent with concessions imposed Citywide. AFSCME cannot meet the standard to set aside MERC's Act 312 Award.

10. Specifically, the Police Officers Association of Michigan (Emergency Medical Technician Unit), the Detroit Police Command Officers Association, and the Detroit Police Lieutenants & Sergeants Association (collectively, the "Act 312 Unions") alleged before MERC that the City was obligated to engage in mediation under PERA and compulsory arbitration under Act 312. Ex. 2 at 2, 11. MERC ruled that the City has no obligation to arbitrate

under Act 312 while its PERA duty to bargain is suspended under Section 27(3) of PA 436 and dismissed the Act 312 Unions' petitions for arbitration. Ex. 2 at 14.

11. AFSCME Local 1023 (the Emergency Service Operators) did not join the Act 312 Unions in the challenges addressed by the Act 312 Decision. Instead, AFSCME Local 1023 filed a separate demand for Act 312 arbitration with MERC on June 3, 2013. <u>See</u> Response Ex. 3. MERC dismissed the demand based on the Act 312 Decision. <u>See</u> Response Ex. 4.

12. Through its claim, AFSCME asserts that (a) the Act 312 Decision is in error, (b) the City should have been compelled to arbitrate with AFSCME Local 1023 over the terms of a new collective bargaining agreement and (c) the unilateral imposition of City Employment Terms was unlawful. <u>See</u> Claim Objection Ex. 1 at 6.

13. Contrary to AFSCME's assertions, the Act 312 Decision is sound and not in error (and remains in effect). The City's duty to bargain is derived from Section 15(1) of PERA. MCL § 423.15(1). It is undisputed that this duty was suspended by the express terms of PA 436. MCL 141.1567(3) Act 312 does not confer a duty to bargain on the City, it merely provides a method of dispute resolution premised on the duty to bargain found in PERA. MCL § 423.231, *et seq.* Yet the Claimant asserts in the Response that Section 423.243 of Act 312 creates a duty to bargain apart from PERA because it provides that "during

-6-

the pendency of proceedings before the arbitration panel, existing wages, hours and

other conditions of employment shall not be changed by action of either party

without the consent of the other but a party."  <u>See</u> Response at 6.  However, this

alleged duty would only be triggered "during the pendency of proceedings before

the arbitration panel."  MCL § 423.243.  Absent a PERA duty to bargain,

(a) the City has no obligation to participate in "proceedings before the arbitration

panel;" and (b) it also has no duty to participate in mediation under PERA, which

is a prerequisite to compulsory arbitration under Act 312.  Ex. 2 at 12.

> 14.    As MERC noted in the Act 312 Decision:

> [t]he mediation process is a condition precedent to
> initiation of Act 312 arbitration.  A public employer that
> has no duty to bargain has no duty to participate in
> mediation.  Only a public employer not in receivership
> under PA 436 or a labor organization may be required by
> this Commission under § 10 of PERA to participate in
> mediation.  Therefore, the duty to bargain must be
> present before a party can be compelled to involuntarily
> participate in mediation.  If parties have no duty to
> participate in mediation, they cannot be required to
> participate in Act 312 arbitration.

> Moreover, § 7a of Act 312 gives the arbitration panel
> chair the authority to remand the matter to mediation.
> Mediation is a function of bargaining pursuant to PERA.
> If there is no duty to bargain, there is also no duty to
> engage in mediation. Therefore, § 7a of Act 312
> presupposes the presence of a duty to bargain.  In the
> absence of a duty to bargain, there is no obligation to
> participate in Act 312 arbitration.

Ex. 2 at 12.

-7-

13-53846-tjt  Doc 8485-6  Filed 11/26/14  Entered 11/26/14 05:47:43  Page 8 of 94
13-53846-swr  Doc 8485-6  Filed 11/26/14  Entered 11/26/14 00:46:45  Page 7 of 28

15.     It also bears noting that a failure to abide by the terms of an

Act 312 arbitration award is not a violation of Act 312, but rather is a violation of

the duty to bargain under PERA. *City of Jackson*, 1979 MERC Lab. Op. 1146,

1151-1154 (1979); *see also City of Hamtramck*, 1984 MERC Lab. Op. 520, 524

(1984).   Therefore, a requirement that the City engage in Act 312 arbitration while

its duty to bargain is suspended would be futile – the City cannot breach a duty

where no duty exists.

16.     The Act 312 Decision also addresses the issue of a potential

unilateral implementation of terms and conditions of employment:

> In the light of the language of PA 436, we cannot find
> that the Legislature intended to impose the aforesaid
> "extraordinary restrictions" of Act 312 on an emergency
> manager.  Inasmuch as an Act 312 award serves as the
> parties' collective bargaining agreement, it appears that
> pursuant to § 15(8) of PERA and § 12(1)(j) of PA 436
> that the Emergency Manager could reject, modify, or
> terminate terms of an Act 312 award.  If that is the case,
> it seems doubtful that the Legislature would have
> intended an employer in receivership, with no duty to
> bargain and with an emergency manager in place, to be
> subject to Act 312 arbitration proceedings.

Ex. 2 at 11.

17.     The Michigan Supreme Court summarized the standard of

review of MERC decisions in *Grandville Municipal Executive Ass'n v. City of*

*Grandville,* 453 Mich. 428, 436 (1996), stating:

The decisions of the MERC are reviewed on appeal pursuant to Const. 1963, art. 6, § 28, and M.C.L. § 423.216(e); MSA 17.455(16)(e). The commission's findings of fact are conclusive if they are supported by competent, material, and substantial evidence on the record considered as a whole. *Port Huron Ed. Ass'n v. Port Huron Area School Dist.*, 452 Mich. 309, 322, 550 N.W.2d 228 (1996). The MERC's legal determinations may not be disturbed unless they violate a constitutional or statutory provision or they are based on a substantial and material error of law. MCL 24.306(1)(a), (f); MSA 3.560(206)(1)(a), (f).

*Id.* at 323. Applying this standard, there is no basis to overturn the Act 312 Decision even if such relief were sought by AFSCME. The Act 312 Decision (a) does not violate a constitutional or statutory provision and (b) is not based on a substantial and material error of law.

18.     In addition, the Court of Appeals has held that in applying this standard "an administrative agency's findings and conclusions are entitled to a considerable degree of deference due to the expertise of the agency with respect to the subjects under its jurisdiction." *Central State Bank v. Commissioner of Financial Institutions Bureau*, 136 Mich. App. 368, 372 (Mich. Ct. App. 1984); *see also*, *e.g., Neal v. Light Corp.*, 1998 Mich. App. LEXIS 858, *16-*17 (Mich. Ct. App. Dec. 1, 1998) ("[W]here there is sufficient evidence to support the agency's findings, a reviewing court must not substitute its discretion for that of the agency, even if the court would have reached a different result. Indeed, it is irrelevant

whether alternative findings could have been supported by the evidence, because deference must be afforded to the agency's findings of fact.").

19. Pursuant to section 101 of the Bankruptcy Code, a creditor holds a claim against a debtor only to the extent that it has a "right to payment" for the asserted liability. See 11 U.S.C. §§ 101(5), 101(10). By contrast, there is no right to payment — and therefore no claim — to the extent that the asserted liability is not due and owing by a debtor. MERC properly found that there is no liability due and owing. Claim 3 has no valid basis and should be disallowed and expunged in its entirety.

*Claim 4: Local 207, 2394 and 2920 DWSD Refusal to Bargain – Case Number C13 D-069.*

20. Claim 4 asserts that the City violated PERA by unilaterally imposing City Employment Terms on AFSCME Locals 207, 2394, and 2920. See Claim Objection Ex. 1. Like Claim 3, this is another attempt by AFSCME to pursue liability for the necessary cost-savings achieved through the City Employment Terms.

21. Employees represented by AFSCME Locals 207, 2394 and 2920 (the "DWSD Locals") work for the Detroit Water and Sewerage Department ("DWSD"). The imposed City Employment Terms took effect throughout the City on July 18, 2012. See, e.g., the AFSCME Master Non-Supervisory City

Employment Terms applicable to AFSCME non-supervisory employees both within and without DWSD, which is attached as Exhibit 3.

22.    Prior to that time, in April 2012, the City entered into a Financial Stability Agreement with the State of Michigan (the "<u>Financial Stability Agreement</u>"), which served as a consent agreement under Public Act 4 of 2011, MCL § 141.1501, *et seq*. ("<u>PA 4</u>"), and suspended the City's duty to bargain under PERA (similar to its successor PA 436).  PA 4, at § 10 ("Unless the state treasurer determines otherwise, beginning 30 days after the date a local government enters into a consent agreement under this act, that local government is not subject to section 15(1) of 1947 PA 336, MCL 423.215, for the remaining term of the consent agreement.").  A copy of the Financial Stability Agreement is attached hereto as Exhibit 4.

23.    Thus, during the relevant timeframe, the City had no obligation to bargain with these locals (or any other local) and had the right to unilaterally impose terms and conditions of employment.

24.    AFSCME asserts generally that the City engaged in "bad faith" bargaining but gives no specific basis for this allegation other than implementation of the City Employment Terms.  There can be no bad faith bargaining under PERA when the duty to bargain has been suspended.

25.    As such, Claim 4 should be disallowed and expunged in its entirety because AFSCME cannot show that the City has any debt due and owing as a result of the lawful imposition of the City Employment Terms on the DWSD Locals.

**_Claim 5:  Imposition of Furlough Days in February 2013._**

26.    Claim 5 asserts that the City violated PERA by unilaterally imposing furlough days.  <u>See</u> Claim Objection Ex. 1.  Like Claims 3 and 4, AFSCME again seeks relief for the lawful unilateral implementation of employment terms by the City.

27.    In March 2013, the City implemented furlough days for certain of its employees as a cost saving mechanism.  This practice involved each employee taking an unpaid day off – a furlough day – once every two weeks, thereby reducing hours by 10%.

28.    Section 4.1 of the Financial Stability Agreement, then in effect, provided the Mayor of the City with "the authority to … amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of [the] Agreement."  <u>Id.</u> § 4.1.  Section 4.4 of the Financial Stability Agreement stated that "beginning 30 days after the effective date of this Agreement the City is not subject to Sec. 15(1) of Act 336, Public Acts

-12-

25.    As such, Claim 4 should be disallowed and expunged in its entirety because AFSCME cannot show that the City has any debt due and owing as a result of the lawful imposition of the City Employment Terms on the DWSD Locals.

**_Claim 5:  Imposition of Furlough Days in February 2013._**

26.    Claim 5 asserts that the City violated PERA by unilaterally imposing furlough days.  <u>See</u> Claim Objection Ex. 1.  Like Claims 3 and 4, AFSCME again seeks relief for the lawful unilateral implementation of employment terms by the City.

27.    In March 2013, the City implemented furlough days for certain of its employees as a cost saving mechanism.  This practice involved each employee taking an unpaid day off – a furlough day – once every two weeks, thereby reducing hours by 10%.

28.    Section 4.1 of the Financial Stability Agreement, then in effect, provided the Mayor of the City with "the authority to … amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of [the] Agreement."  <u>Id.</u> § 4.1.  Section 4.4 of the Financial Stability Agreement stated that "beginning 30 days after the effective date of this Agreement the City is not subject to Sec. 15(1) of Act 336, Public Acts

25.    As such, Claim 4 should be disallowed and expunged in its entirety because AFSCME cannot show that the City has any debt due and owing as a result of the lawful imposition of the City Employment Terms on the DWSD Locals.

**_Claim 5:  Imposition of Furlough Days in February 2013._**

26.    Claim 5 asserts that the City violated PERA by unilaterally imposing furlough days.  <u>See</u> Claim Objection Ex. 1.  Like Claims 3 and 4, AFSCME again seeks relief for the lawful unilateral implementation of employment terms by the City.

27.    In March 2013, the City implemented furlough days for certain of its employees as a cost saving mechanism.  This practice involved each employee taking an unpaid day off – a furlough day – once every two weeks, thereby reducing hours by 10%.

28.    Section 4.1 of the Financial Stability Agreement, then in effect, provided the Mayor of the City with "the authority to … amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of [the] Agreement."  <u>Id.</u> § 4.1.  Section 4.4 of the Financial Stability Agreement stated that "beginning 30 days after the effective date of this Agreement the City is not subject to Sec. 15(1) of Act 336, Public Acts

of Michigan, 1947, as amended MCL, 423.215 [which provides the duty to bargain], for the remaining term of [the] Agreement." Id. § 4.1.

29. Because the City entered into the Financial Stability Agreement with the State while PA 4 was in effect, the Financial Stability Agreement, and the suspension of the duty to bargain contained therein, continued in effect even after PA 4 was rejected by referendum in November 2012.[4] Thus, at the time the City imposed furlough days, it was empowered to do so under the Financial Stability Agreement.

30. As a result, the Claimant cannot show that there is any debt due and owing based on Claim 5, therefore it should be disallowed and expunged in its entirety. This claim also should be disallowed because it is duplicative of Claim 8 (City of Detroit 2012 Negotiations and Implementation With Coalition: MERC Case No. C12 D-065, C12 F-125, C13 G-129), which also seeks to recover for the cost-savings provisions imposed by the City Employment Terms (including furlough days).

**Claim 6: Detroit Refusal to Bargain Concerning Transportation Locals – Case Number C12 H-157.**

31. Claim 6 again challenges the implementation of the City Employment Terms. It appears to allege that, because the City has opted to

---

[4] Subsequently, PA 436 was enacted by the State and went into effect as of March 28, 2013.

-13-

13-53846-swr Doc 8405-16 Filed 11/26/14 Entered 11/26/14 00:48:47 Page 14 of 28
13-53846-swr Doc 8063 Filed 10/18/14 Entered 10/18/14 00:48:45 Page 14 of 28
94

bargain with AFSCME Locals 214 and 312, the City had an obligation to bargain with all AFSCME locals, and that the imposition of City Employment Terms on all other AFSCME locals was therefore unlawful. See Claim Objection Ex. 1. The employees represented by AFSCME Locals 214 and 312 work in the Detroit Department of Transportation ("DDOT").

32. This claim is baseless. The City in fact has opted to bargain with AFSCME Locals 214 and 312 – but not with other AFSCME locals – to preserve the City's ability to receive federal funding for DDOT in accordance with Section 13(c) of the Federal Transportation Act, 49 U.S.C. § 5333(b). This staturue provides that:

> As a condition of financial assistance under [the Federal Transportation Act] … the interests of employees affected by the assistance shall be protected under arrangements … [that provide for] the continuation of collective bargaining rights ….

Id.

33. The Claimant has not cited any authority supporting the proposition that the City is prohibited from choosing to bargain with some AFSCME locals, while choosing not to bargain with other AFSCME locals, or that proceeding in such a manner would nullify the suspension of the duty to bargain under PA 436. Under PA 436, the City has no obligation to bargain with any AFSCME local. The 1988 case relied upon by the Claimant in the Response at

-14-

page 11, *Michigan Ass'n. of Public Employees v. Michigan AFSCME Council 25*, 172 Mich. App. 761, 766 (Mich. Ct. App. 1988), is inapposite. That case arose in the context of a representation proceeding in which another union attempted to force a representation vote on the members of AFSCME Local 312. The case does not hold, nor address, the City's ability to negotiate different agreements with different AFSCME locals or even different parts of the same local, which the City has done historically.

34. For example, half of AFSCME Local 1023 (the Emergency Service Operators) historically has reached collective bargaining agreements through Act 312 arbitration, while the other half (the non-Emergency Service Operators) were parties to a different City-wide master collective bargaining agreement. Similarly, AFSCME Local 542 historically has had half of the unit covered by the AFSCME Council 25 Non-Supervisory Master Agreement and the other half of the unit, the Motor City Seasonals, covered under a different master agreement. The recently ratified current agreements for AFSCME Locals 542 and 1023 follow this same historic principle. Thus the Claimant's argument that all AFSCME Locals must be treated the same way contradicts past and current practice.

35. Furthermore, the Claimant's argument that the City was obligated to bargain with non-DDOT AFSCME locals because it opted to bargain

with two DDOT locals is contrary to PA 436.  Akin to MERC's holding in the Act

312 Decision (i.e., that the City has the ability to choose to participate in Act 312

arbitration even though it is not required to), the City has the ability to choose

whether to bargain with some locals and not others – it is not required to bargain

with AFSCME at all. See Ex. 2 at 13.

36.     Finally, this claim is duplicative of Claim 8, which seeks to

recover for the implementation of the City Employment Terms generally.

37.     For all of these reasons, Claim 6 should be disallowed and

expunged in its entirety.

### Claim 7:  AFSCME Council 25 (13th Check ULP) – MERC Case No. C12-E-092.

38.     Claim 7 should be disallowed for all of the reasons set forth in

the Supplemental Brief.

### Claim 8:  City of Detroit 2012 Negotiations and Implementation With Coalition – MERC Case No. C12 D-065, C12 F-125, C13 G-129.

39.     Claim 8 asserts that the City violated PERA by failing to

execute a 2012 tentative agreement with the Claimant and other non-uniform

Detroit unions and subsequently implementing the City Employment Terms

unilaterally in July 2012.  See Claim Objection Ex. 1.  The Claimant places an

upper limit on the value of this claim of approximately $170,000,000.

40.     This claim should be disallowed because it is duplicative of a

portion of Proof of Claim Number 2851 Filed by the Coalition of Detroit Unions,

which seeks relief for the same alleged conduct on behalf of AFSCME and other Detroit unions.

41.     Additionally, this claim should be disallowed and expunged for all of the reasons set forth in detail in the City's concurrently filed *Reply in Support of the Objection of the City of Detroit to Proof of Claim Number 2851 Filed by the Coalition of Detroit Unions*, this claim is meritless and should be disallowed and expunged in its entirety.

**Claim 9:  Violation of Privatization Ordinance.**

42.     Claim 9 alleges generally that "[t]he City has repeatedly violated the City's Privatization Ordinance," but it does not identify a single violation of the ordinance with particularity.  See Claim Objection Ex. 1.  This claim should be disallowed and expunged in its entirety because it is simply too vague and general to state a legitimate and allowable claim.  Moreover, the City is not aware of any such valid liability.

**Claim 10:  City of Detroit/DFFA – MERC Case No. C11 K-201.**

43.     Claim 10 refers to an unfair labor practice charge pending before MERC alleging that work designated for an AFSCME Local bargaining unit was being performed by the Detroit Fire Fighters' Association.  See Claim Objection Ex. 1.

-17-

13-53846-swr   Doc 8465-16   Filed 11/26/14   Entered 11/26/14 00:48:47   Page 18 of 28
13-53846-swr   Doc 8003   Filed 10/18/14   Entered 10/18/14 00:48:47   Page 18 of 26

94

44. This claim should be disallowed and expunged in its entirety because it is duplicative of grievances that already have been resolved through the grievance mediation process.[5]

### Claim 11:  City of Detroit Longevity Claim for AFSCME Employees: Claim number 12-000522 and 12-000523; Wayne County Circuit Court Number 13-003430-AA.

45. Claim 11 seeks a claim based on the City's elimination of longevity payments in 2010.  See Claim Objection Ex. 1.

46. The facts underlying this claim are the same as those presented to Michigan Department of Licensing and Regulatory Affairs, Wage and Hour Division (the "Wage and Hour Division"), Administrative Law Judge David M. Cohen, when the Claimant previously litigated this issue.  See Response Ex. 10. ALJ Cohen's decision is instructive.  In that decision, he ruled that longevity payments were governed by contract, not state law, and that the contract in effect at the time longevity payments would have come due did not require the City to make longevity payments.  See Response Ex. 9 at 12.

---

[5]    The City's Labor Relations Department engaged in facilitative mediation with AFSCME staff representatives over a six-month period ending in April 2014.  During this process, each AFSCME Local President with pending prepetition grievances met with the AFSCME staff representatives and City Labor Relations to mediate an expedited resolution to those grievances. Various of those grievances were resolved for *de minimis* amounts that will be paid in the ordinary course, subject to a settlement agreement that requires AFSCME to amend the Proof of Claim to withdraw the portion of the claim settled through grievance mediation.

47.     It is undisputed that AFSCME and the City were unable to agree on a 2008-2012 collective bargaining agreement.  As a result, the parties engaged in fact-finding and complied with their bargaining obligations under PERA.  Ultimately, the City imposed the recommendations of the fact-finder, which recommended the elimination of longevity payments.  Al Garrett, President, AFSCME Council 25, acknowledged in a letter to the then Director of Labor Relations for the City that AFSCME accepted the imposed terms as the parties' agreement.  A copy of Mr. Garrett's letter is attached as Exhibit 5 hereto.

48.     AFSCME appealed ALJ Cohen's decision to the Wayne County Circuit Court.  See Response Ex. 11.  That appeal remains pending, but currently is subject to the stay of Sections 362 and 922 of the Bankruptcy Code as modified and extended by orders of the Court.

49.     Claim 11 should be disallowed because ALJ Cohen's decision remains in effect, and the Claimant cannot meet the standard under applicable Michigan law for setting aside ALJ Cohen's decision on appeal.  It cannot show that the "substantial rights of the petitioner have been prejudiced because the decision or order is any of the following:

> (a) In violation of the constitution or a statute.
> (b) In excess of the statutory authority or jurisdiction of the agency.
> (c) Made upon unlawful procedure resulting in material prejudice to a party.

(d) Not supported by competent, material and substantial evidence on the whole record.
(e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion.
(f) Affected by other substantial and material error of law.

MCL § 24.306.  As discussed above, the Court of Appeals has held that in applying this standard, an administrative agency's decision is entitled to substantial deference.  <u>See</u> *infra Central State Bank*, 136 Mich. App. at 372; *Neal* 1998 Mich. App. LEXIS 858 at *16-*17**.**

50.     The Claimant argues that Mr. Garrett's letter did not accept the elimination of longevity payments for 2010.  This is incorrect.  *First*, the letter does not state that it rejects elimination of the longevity payment 2010 – to the contrary it states that AFSCME accepts the recommendations of the fact-finder (which eliminated longevity payments as of October 2010).  Ex. 5.  *Second*, regardless of whether Mr. Garrett intended to accept the elimination of the 2010 longevity payments, the City exercised its lawful right to impose the recommendations of the fact-finder, which eliminated longevity payments; AFSCME's agreement was not required for implementation.[6]  It is irrelevant

---

[6]     Under PERA, following fact finding, an employer is entitled to implement the fact finder's recommendations, even absent the assent of the union, so long as the employer has satisfied its duty to meet and bargain with the union for a reasonable period of time following the making of the fact-finder's recommendations. *Orion Twp.*, 18 MPER ¶ 72 at *9 (2005).  Here

-20-

whether AFSCME believes that its members previously had earned the payment –
there was no statutory or contractual obligation on the City to provide the payment
in 2010.

51.    As a result, this claim should be disallowed and expunged in its
entirety.

**_Claim 12: Negotiation of Local 542 Supplement Agreement – MERC Case_**
**_Number C07 L-033._**

52.    The Claimant has agreed to withdraw this claim.  <u>See</u> Dismissal
Order.[7]

**_Claim 13: Detroit and SEMHA – MERC Case No. C05 H-194._**

53.    Claim 13 relates to a 2005 unfair labor practice charge filed by
AFSCME alleging that Department of Health employees were laid off and then
rehired by a contractor in violation of PERA.  <u>See</u> Claim Objection Ex. 1 at 8.

---

AFSCME does not dispute that the imposition of the fact finder's
recommendations was lawful.

[7]    This claim alleges that the City's failure to negotiate a supplemental
agreement with AFSCME Local 542 caused its members unspecified
"financial harm."  <u>See</u> Claim Objection Ex. 1.  The City submits that this
claim has no value because:  (a) supplemental agreements do not address
economic terms (economic terms are  covered by the AFSCME Master
Agreement), thus a failure to have a supplemental agreement would not
cause financial harm to bargaining unit members; and (b) this issue is moot
because Local 542 now has a ratified supplemental agreement.

-21-

13-53846-swr   Doc 8405-16   Filed 11/26/14   Entered 11/26/14 00:48:47   Page 22 of 28
13-53846-swr   Doc 8063   Filed 10/18/14   Entered 10/18/14 00:48:47   Page 22 of 28
94

54.     This claim should be disallowed because:  (a) the Claimant failed to timely prosecute this unfair labor practice charge; (b) the layoffs were allowed under the collective bargaining agreement in place at the time; and (c) contrary to the Claimant's arguments, the underlying events had nothing to do with outsourcing.

***Claim 14:  Breach of Contract Claims.***

55.     Claim 14 apparently alleges that the City breached various AFSCME collective bargaining agreements, but fails to specify any particular breaches.  <u>See</u> Claim Objection Ex. 1 at 8.

56.     This claim is too vague and general to state a legitimate and allowable claim.  Additionally, this claim is duplicative of many of the individual grievances included as part of Claim 15.  As a result, Claim 14 should be disallowed and expunged in its entirety.

***Claim 15:  Exhibit 2 Listing of Specific Grievances.***

57.     Claim 15 refers to a list of over 800 grievances attached as Exhibit 2 to the Claim (the "<u>Grievance Chart</u>").  <u>See</u> Proof of Claim at Ex. 2.

58.     The City's Labor Relations Department engaged in facilitative mediation with AFSCME to secure an expedited resolution to the grievances listed in the Grievance Chart, as well as others that appeared on various iterations of the Grievance Chart provided to the City by AFSCME.

59. Attached hereto as Exhibit 6 is Exhibit A to the City's proposed settlement agreement, which sets forth the resolution of approximately 220 grievances through the mediation process.

60. With respect to the six hundred or so additional grievances included on the Grievance Chart, but not included in Exhibit 6, AFSCME informed the City that the vast majority have been withdrawn, while some remain outstanding. The City anticipates that City Labor Relations will conclude mediation of these individual grievances with AFSCME in the near future, allowing the parties to enter into a settlement agreement requiring AFSCME to withdraw the portions of the Proof of Claim relating to the individual grievances.

**Claim 16: City of Detroit/Human Services Department – Grievance No. 25-01-12 / COA: 12-0077708-CL.**

61. Claim 16 relates to an award issued by Arbitrator Roumell, attached as Exhibit 12 to the Claimant's Response, finding that various AFSCME-represented employees were laid off in violation of the applicable collective bargaining agreement. See Response Ex. 12.

62. To the extent that any liability is due and owing under the arbitration award, such liability is limited. The City's records show that approximately one hundred AFSCME-represented employees were affected by the layoff. Of those affected, more than a third either retired or were re-hired by the City. In addition, other factors mitigate any potential liability, including, for

example, an individual's receipt of unemployment insurance and income derived from subsequent employment of which the City would have no record.

63.     Without adequate support from AFSCME for this alleged liability, Claim 16 should be disallowed.

### Claim 17: City of Detroit Retirees Health Care – Grievance No. C10 A-025.

64.     Claim 17 should be disallowed for all of the reasons set forth in the Supplemental Brief.[8]

### Claim 18: Payroll Disputes.

65.     Claim 18 alleges unspecified "payroll disputes." but fails to allege any particular dispute with particularity.  See Proof of Claim Ex. 1.

66.     This claim is too vague and general to state a legitimate and allowable claim.  Additionally, this claim is duplicative of many of the individual grievances included as part of Claim 15.  As a result, Claim 18 should be disallowed and expunged in its entirety.

---

[8]     The Supplement describes why this claim is properly classified as an OPEB Claim in Class 12 under the Plan.  Even if this claim were properly classified as a Class 14 Claim (which it is not), it nevertheless should be disallowed because the City would have no liability arising from the underlying allegations.  The Claimant opted to file a class action lawsuit that has been stayed predicated on the same facts as this claim. (Copy attached as Exhibit 7.) The allegations of U.S. Constitutional violations and breaches of contract in the class action complaint are baseless for the reasons set forth in the City's Answer and Special and Affirmative Defenses attached hereto as Exhibit 8 and incorporated herein by reference.  The Claimant also alleged the same liability in a grievance that is duplicative of the class action lawsuit.  If the claim is based on the grievance rather than the lawsuit, it would be subject to disallowance for the same reasons.

***Claim 19: Detroit Service and Maintenance Outsourcing in Downtown Detroit –
Grievance Number C09-078.***

67.     Claim 19 alleges that between 2009 and 2012 the City reduced
the overtime of "40-60" AFSCME members in violation of the then-current
collective bargaining agreement.  <u>See</u> Proof of Claim Ex. 1.  However, AFSCME
has failed to provide the referenced grievance, and the claim fails to allege any
particular incident or identify the affected employees with particularity.

68.     This claim is too vague and general to state a legitimate and
allowable claim.  Additionally, this claim may be duplicative of some of the
individual grievances included as part of Claim 15.  As a result, Claim 19 should
be disallowed and expunged in its entirety.

***Claim 20: Tree Artisan Failure to Secure License –  Grievance Number
727May08.***

69.     Claim 20 alleges that the City failed to reinstate one employee
pursuant to an arbitration award finding that the employee was wrongfully
terminated.  <u>See</u> Proof of Claim Ex. 1.

70.     In the absence of more specifics from AFSCME with respect to
this employee, including potential mitigation, the City submits that Claim 20
should be disallowed.

**<u>Conclusion</u>**

71.     For the foregoing reasons, the City requests that the Court sustain the Claim Objection, disallow and expunge the Proof of Claims and grant such other and further relief to the City as the Court may deem proper.

Dated:  October 18, 2014          Respectfully submitted,


 /s/  Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

John A. Simon (P61866)
Tamar N. Dolcourt (P73425)
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700

Detroit, Michigan 48226
Telephone:  (313) 234-7100
Facsimile:  (313) 234-2800
jsimon@foley.com
tdolcourt@foley.com

ATTORNEYS FOR THE CITY

-27-

13-53846-swr   Doc 8465-16 Filed 11/26/14 Entered 11/26/14 15:47:43 Page 28 of
94
13-53846-swr   Doc 8063 Filed 10/18/14 Entered 10/18/14 00:48:45 Page 27 of 28

## CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Corrected Reply in Support of Objection to Proof of Claim Number 2958 Filed by Michigan AFSCME Council 25 and Its Affiliated Detroit Locals was filed and served via the Court's electronic case filing and noticing system on this 18th day of October, 2014.

/s/  Heather Lennox

# Exhibit 1

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re

Chapter 9

CASE NO: 13-53846
Hon. Steven W. Rhodes

CITY OF DETROIT, MICHIGAN

_____/

## ORDER DISMISSING CLAIM FROM MEDIATION

AFSCME has agreed to withdraw the following claim from its Proof of Claims:

1.      POC #2: Violations of local, state or federal law.

Accordingly, the Court **DISMISSES** this claim; it will not be discussed at

mediation.

**IT IS ORDERED**.

# Exhibit 2

Act 312

In the Matter of:

CITY OF DETROIT,
    Public Employer-Respondent,

        -and-

POLICE OFFICERS ASSOCIATION OF MICHIGAN
(EMERGENCY MEDICAL TECHNICIAN UNIT),
    Labor Organization-Petitioner.

Case No. D09 F-0703

CITY OF DETROIT,
    Public Employer-Respondent,

        -and-

DETROIT POLICE COMMAND OFFICERS ASSOCIATION,
    Labor Organization-Petitioner.

Case No. D11 J-1169

CITY OF DETROIT,
    Public Employer-Respondent,

        -and-

DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION,
    Labor Organization-Petitioner.

Case No. D13 A-0005

_____/

APPEARANCES:

Butzel Long, P.C. by Malcolm D Brown, and Miller, Canfield, Paddock and Stone, P.L.C., by John H. Willems, for Respondent

Frank A. Guido, General Counsel, for Petitioner Police Officers Association of Michigan

Sachs Waldman, P.C., by Mary Ellen Gurewitz, Marshall J. Widick, and James A. Britton for Petitioner Detroit Police Command Officers Association

Miller Cohen P.L.C., by Richard G Mack, Jr., and Keith D. Flynn, for Petitioner Detroit Police Lieutenants & Sergeants Association

Legghio & Israel P.C., Christopher P. Legghio for Amicus Curiae Detroit Fire Fighters Association

## DECISION AND ORDER

This matter is before the Commission on the motions of the Employer, the City of Detroit. On April 18, 2013, the Employer filed its Emergency Motion for Determination of Arbitral Jurisdiction and Dismissal of Act 312 Petitions and Motion for Stay Pending Ruling and its supporting brief. In its motion to the Commission, the Employer states that in each of the three Act 312 arbitration proceedings, the Employer filed a motion with the arbitrator seeking dismissal of the petition on the grounds that the arbitrator had no jurisdiction over this matter based on the suspension of the Employer's duty to bargain set forth in § 27(3) of the Local Financial Stability and Choice Act, 2012 PA 436 (PA 436), MCL 141.1541 – 141.1575. The Employer also filed a motion with each arbitrator seeking a stay of proceedings pending the outcome of the arbitrator's ruling. According to the Employer's motion to the Commission, two of the arbitrators denied the Employer's motion to dismiss and the third had failed to rule at the time the Employer filed the instant motion with the Commission.

Each of the Unions involved in the three arbitrations, Police Officers Association of Michigan (POAM), Detroit Police Command Officers Association (DPCOA), and Detroit Police Lieutenants & Sergeants Association (DPLSA) have filed responses to the Employer's motions to the Commission. At our meeting on May 14, 2013, we stayed the Act 312 proceedings pending our decision in this matter, granted leave to the Detroit Fire Fighters Association to file an amicus curiae brief in response to the City's motions, and heard oral argument from the Employer, POAM, DPCOA, and DPLSA.

The Employer claims that each of the three Act 312 arbitration cases should be dismissed based on the suspension of its duty to bargain pursuant to PA 436. Each of the involved Unions and the amicus curiae contend that there is no basis for dismissal of the Act 312 arbitrations and have raised several arguments in an effort to rebut the Employer's contention that the arbitrations should be dismissed. The Unions question the Commission's jurisdiction to dismiss a pending Act 312 arbitration. The three involved Unions contend that the suspension of the Employer's duty to bargain under PA 436 does not impact the parties' rights and obligations to proceed with Act 312 arbitrations on petitions filed prior to March 28, 2013, the effective date of Act 436.

Procedural History

In *City of Detroit and Police Officers Association of Michigan*, Case No. D09 F-0703, the Commission received notice on June 1, 2009, that the parties were in negotiations for a new collective bargaining agreement pursuant to §7(2) of the Public Employment Relations Act (PERA), 1965 PA 379 as amended, MCL 423.207(2). On June 15, 2010, the POAM filed a petition for Act 312 arbitration. The arbitrator currently assigned to the case, William E. Long, was appointed on October 2, 2012. On or about April 15, 2013, the Employer filed two motions with Arbitrator Long, a motion for an Award of Dismissal Due to Lack of Arbitral Jurisdiction,

and a motion for a Stay of Proceedings Pending Determination of Jurisdiction by MERC. On April 17, 2013, Long denied the motion to dismiss but granted the stay after learning that the Employer had brought similar motions before this Commission and based on his belief that this Commission was the appropriate body to resolve this issue.

At the time of Long's April 17 ruling, hearing dates had already been scheduled for April 22, April 29, and May 2, 2013. He notified the parties that the hearing scheduled for April 22 would proceed, but directed the parties to meet on the remaining two dates for the purpose of reviewing, clarifying, and possibly resolving some of the issues in advance of any subsequent hearing dates. He concluded that if "MERC rules that Section 27(3) of Act 436 does preclude MERC from retaining jurisdiction of this case, proceeding with the April 22, 2013 hearing and scheduling others, if needed, following a ruling by MERC, is not a significant financial burden on the parties and the information obtained from the April 22, 2013 hearing, and the April 29, 2013 and May 2, 2013 meetings of the representatives for the parties, may assist the parties in ultimate resolution of many matters in dispute through further collective bargaining." The April 22, 2013 hearing was conducted and is the only hearing that has been held in this case.

In *City of Detroit and Detroit Police Command Officers Association*, Case No. D11 J-1169, the Employer filed a petition for Act 312 arbitration on October 5, 2011. On September 11, 2012, the Employer withdrew its petition over the objection of the DPCOA. In response, the director of the Bureau of Employment Relations, notified the parties by letter dated September 13, 2012, that the Commission had reviewed the parties' filings at its September 11, 2012 meeting and concluded that nothing in the Act 312 statute and/or rules requires or allows the Commission to approve or deny a party's request to withdraw its petition. The letter went on to explain that the "obvious remedy for a Union that objects to the withdrawal is to file its own Act 312 petition." The DPCOA filed its petition for Act 312 arbitration on September 20, 2012. Arbitrator Gregory M. Saltzman was appointed on October 5, 2012 and held a prehearing conference on March 1, 2013. In an e-mail to the parties dated April 19, 2013, Arbitrator Saltzman acknowledged receipt of the two motions from the Employer and deferred the issue to the Commission.

In *City of Detroit and Detroit Police Lieutenants & Sergeants Association*, Case No. D13 A-0005, a petition for Act 312 arbitration was filed on February 4, 2013 by the DPLSA. Arbitrator Francis L Hill was appointed on February 19, 2013, and held a prehearing conference on February 26, 2013. In an e-mail to the parties on April 28, 2013, Arbitrator Hill notified the parties of hearing dates scheduled for May 15, 16, and 21, and June 11 and 13, 2013. She informed the parties that the Employer's motion to dismiss was pending before the Commission and that she would advise them if MERC's decision had an impact on the scheduled hearing dates.

Discussion and Conclusions of Law:

I.   COMMISSION JURISDICTION

The Employer argues that the Commission should rule on its motion to dismiss because the arbitrators are deferring the question of jurisdiction to MERC. The Employer seeks a global

13-53846-swr   Doc 8488-16   Filed 10/29/14   Entered 10/29/14 05:47:43   Page 35 of 6

ruling on the legal issues presented by the impact of PA 436 on pending Act 312 arbitrations and wants the Commission to provide guidance on the question of whether the arbitrators may exercise jurisdiction in these matters. Whether the Commission has jurisdiction to rule on the questions presented by the Employer's motion to dismiss depends on the authority granted by the Legislature to MERC in the Labor Relations and Mediation Act (LRMA), Act 176 of 1939; the Public Employment Relations Act (PERA), Act 336 of 1947; and the act that provides for compulsory arbitration of labor disputes in police and fire departments, Act 312 of 1969 (Act 312).

### A. Act 312 Provisions with Respect to MERC's Authority

Matters proceed to Act 312 arbitration following mediation initiated pursuant to §7 of PERA, MCL 423.207[1]. After a matter has been submitted to mediation for at least 30 days, either of the parties may request binding arbitration pursuant to § 3 of Act 312, MCL 423.233. In *City of Manistee v Employment Relations Comm & Manistee Fire Fighters Ass'n*, 168 Mich App 422, 428 (1988), the Court commented: "The only prerequisites [to Act 312 arbitration] are those expressly stated in § 3 of Act 312." Section 3 of Act 312, MCL 423.233, sets the prerequisites for proceeding to Act 312 arbitration as follows:

> Whenever in the course of mediation of a public police or fire department employee's dispute, except a dispute concerning the interpretation or application of an existing agreement (a "grievance" dispute), the dispute has not been resolved to the agreement of both parties within 30 days of the submission of the dispute to mediation, or within such further additional periods to which the parties may agree, the employees or employer may initiate binding arbitration proceedings by prompt request therefor, in writing, to the other, with copy to the employment relations commission.

Only §§ 3, 4, 5, 6 and 7a of Act 312, as amended, mention or refer to the Commission. Section 4, MCL 423.234, provides the process for the parties to select their delegates to the arbitration panel and notify each other and the "mediation board" of their selections. Section 5, MCL 423.235, establishes the procedure to be used in selecting the chair of the arbitration panel

---

[1] Section 7 of PERA provides as follows:

(1) Upon the request of the collective bargaining representative defined in section 11 or, if a representative has not been designated or selected, upon the request of a majority of any given group of public employees evidenced by a petition signed by the majority and delivered to the commission, or upon request of any public employer of the employees, the commission forthwith shall mediate the grievances set forth in the petition or notice, and for the purposes of mediating the grievances, the commission shall exercise the powers and authority conferred upon the commission by sections 10 and 11 of Act No. 176 of the Public Acts of 1939, as amended, being sections 423.10 and 423.11 of the Michigan Compiled Laws.

(2) At least 60 days before the expiration date of a collective bargaining agreement, the parties shall notify the commission of the status of negotiations. If the dispute remains unresolved 30 days after the notification on the status of negotiations and a request for mediation is not received, the commission shall appoint a mediator.

from MERC's panel of arbitrators, authorizes MERC to establish and appoint members of the panel of arbitrators, and requires MERC to establish qualifications and training for panel members. Section 6, MCL 423.236, sets time periods for the arbitration and establishes procedures that the arbitration panel members are to follow. It also provides that the fee to be paid to the panel's chair is to be established in advance by the Commission. Section 7a, MCL 423.237a, authorizes the chair of the arbitration panel to remand the matter for further bargaining and requires the chair to notify the Commission of any such remand.

### B. Prior MERC Actions in Act 312 Cases

The Employer contends that the Commission is empowered to determine jurisdictional limits for Act 312 panels, citing *City of Detroit*, 1990 MERC Lab Op 561, 565. In the *City of Detroit* case, after noting that the Commission has jurisdiction to determine what is a mandatory subject of bargaining and whether employees are eligible for Act 312 arbitration, the Commission denied the employer's motion to instruct the Act 312 arbitrator to refrain from deciding those issues. The Commission stated, *id.* at 565:

> The jurisdiction of an Act 312 arbitration panel to make findings on these issues
> in the absence of, or concurrent with, our rulings has now been firmly established.
> We see no reason to grant the employer's request that we direct the Act 312
> panel's actions in this case. Under Section 12 of Act 312, the employer may seek
> review by the Circuit Court of findings by the arbitration panel on the grounds
> that the panel exceeded its jurisdiction.

While it may be noted that the Commission refused to dismiss the Act 312 proceeding in this case, MERC did not find that it lacks the authority to do so.

In support of its contention that the Commission should decide this issue, the Employer also argues that Act 312 panels function under the auspices of the Commission and are bound by the Commission's decisions, citing *Jackson Fire Fighters Ass'n v City of Jackson*, 227 Mich App 520, 523 (1998). In the *Jackson Fire Fighters Ass'n* case, the Act 312 arbitrator held that a matter was a mandatory subject of bargaining. The circuit court affirmed the arbitration award on appeal. In a concurrent unfair labor practice charge case involving the same parties, *City of Jackson*, 1996 MERC Lab Op 125; 9 MPER 27050, the Commission found the disputed matter to be a permissive subject of bargaining. Upon subsequent review of the circuit court ruling and MERC's decision, the Court of Appeals held that MERC had primary jurisdiction to determine whether the matter was a mandatory subject of bargaining, and therefore, the decision of the arbitrator did not bar MERC from adjudicating the issue based on collateral estoppel. In the two cases cited above, it is clear that the Commission has jurisdiction to determine, in an unfair labor practice charge case, whether subjects of bargaining brought before an Act 312 arbitrator are mandatory or permissive.

This Commission also has jurisdiction to determine whether an Act 312 arbitration should proceed by ascertaining whether the employees in the bargaining unit are eligible for Act 312 arbitration. *Metropolitan Council 23, AFSCME v Oakland Co (Prosecutor's Investigators)*, 89 Mich App 564 (1979) rev'd on other grounds, 409 Mich 299 (1980); *Kalamazoo Co, 23*

5

MPER 22 (2010); *Oakland Co & Oakland Co Sheriff,* 20 MPER 63 (2007); *City of Grand Rapids,* 1981 MERC Lab Op 327. Typically, such determinations are made in the context of a unit clarification or other representation proceeding.

In a representation proceeding, *Oakland Co Sheriff's Dep't,* 1977 MERC Lab Op 843, the Commission was called upon to determine whether a pending Act 312 arbitration was appropriate. The union, Metropolitan Council 23 of AFSCME, and the employer, Oakland County Sheriff's Department, had reached an impasse in negotiations and in mediation. The union initiated arbitration under Act 312. The employer objected, contending that the arbitration included the issue of wages for "nonpolice" classifications that were not eligible for Act 312 arbitration. The employer moved to dismiss the representation hearing, which was scheduled before a MERC ALJ, contending the matter was within the sole discretion of the Act 312 arbitrator. The Commission denied the employer's motion and concluded, *id.* at 846-848, that it did indeed have jurisdiction to resolve the issue. The MERC noted that § 14 of Act 312 specifically makes the Act supplementary to PERA and observed that § 7 of PERA MCL 423.207, and §§ 10 and 11 of the LRMA, MCL 423.10 and 423.11, conferred broad powers upon it. The Commission explained, *id.* at 847,

> We find that the responsibility for implementing Act 312 necessarily includes the power to determine who is covered by the Act. This is simply an extension of the Commission's function in representation matters. The resolution of questions involving employer and employee status, exclusions under PERA and the LRMA, community of interest and appropriate bargaining units, is an integral part of the work of the Commission. Clearly, the Commission's expertise in determining such issues is significant in determining the question raised in these proceedings. In addition, a determination by the Commission ensures the necessary uniformity and consistency in this important area.

> . . . . [A] determination of who is covered by the Act is a condition precedent to the arbitration proceeding itself, and is not properly before the arbitrator since it is not an "issue in dispute" as asserted by the Employer.

In a separate, unrelated matter, *Metropolitan Council 23, AFSCME v Oakland Co (Prosecutor's Investigators),* 89 Mich App 564 (1979) rev'd on other grounds, 409 Mich 299 (1980), the Court of Appeals considered an appeal of MERC's decision in *Oakland Co (Prosecutor's Investigators),* 1978 MERC Lab Op 328, and adopted the Commission's reasoning *Oakland Co Sheriff's Dep't.* There, the Court of Appeals found, at 89 Mich App 567, that the Legislature intended to provide public employees eligible for Act 312 arbitration with an "expeditious, effective and binding procedure for the resolution of disputes." Noting that the Legislature's purpose of establishing an expeditious dispute resolution procedure would be impeded by the lengthy delays inherent in court procedures, the Court reasoned, *id.* at 567-568, that MERC "has the necessary implied authority and expertise in labor relations to initially determine the eligibility of public employees for compulsory arbitration" and cited *Oakland Co Sheriff's Dep't,* 1977 MERC Lab Op 843. The Court of Appeals affirmed MERC's finding, in *Oakland Co (Prosecutor's Investigators),* 1978 MERC Lab Op 328, that the Oakland County prosecutor's investigators were eligible for Act 312 arbitration.

6

Subsequently, the Michigan Supreme Court granted the employer's motion for leave to appeal and both MERC and the Court of Appeals were reversed on the issue of the investigators' eligibility for Act 312 arbitration. *Metropolitan Council 23, AFSCME v Oakland Co (Prosecutor's Investigators)*, 409 Mich 299 (1980). The Supreme Court found the employees were not subject to Act 312 coverage. Although the Supreme Court did not address the issue of whether MERC has the authority to determine Act 312 eligibility, it has been widely accepted that MERC's authority extends to determining the eligibility of employees for Act 312 arbitration. Since that time, MERC has reviewed the Act 312 eligibility of numerous bargaining units in which the union and employer disputed the eligibility of all or part of the unit's members. *Macomb Co (Sheriff's Dep't)*, 1991 MERC Lab Op 542, 547. See, e.g. *Michigan State Univ (Police Dep't)*, 26 MPER 44 (2013); *Kalamazoo Co*, 23 MPER 22 (2010); *Oakland Co & Oakland Co Sheriff*, 20 MPER 63 (2007); *Kent Co & Kent Co Sheriff*, 1991 MERC Lab Op 549; 4 MPER 22071; *Washtenaw Co (Sheriff's Dep't)*, 1990 MERC Lab Op 768; *City of Detroit (Police Detention Facility)*, 1990 MERC Lab Op 598; *Midland Co*, 1989 MERC Lab Op 923; *Mecosta Co*, 1989 MERC Lab Op 607.

We agree with the prior Commission in *Oakland Co Sheriff's Dep't*, and with the Court of Appeals in *Metropolitan Council 23, AFSCME v Oakland Co (Prosecutor's Investigators)* that by enacting § 7 of PERA and §§ 10 and 11 of the LRMA, the Legislature conferred broad powers upon the Commission for the purpose of resolving labor disputes. We also agree with the previous Commission that it is our responsibility to exercise these powers "as are necessary to carry out the purposes of PERA and the supplementary Act 312." As with the Commission in *Oakland Co Sheriff's Dep't*, 1977 MERC Lab Op 843, 847, "We find that the responsibility for implementing Act 312 necessarily includes the power to determine who is covered by the Act." Therefore, given the importance of this issue and the number of parties affected, including those beyond the instant cases, we find it is necessary to provide the parties and our panel of arbitrators with our decision on the question of whether the suspension of the duty to bargain pursuant to § 27(3) of the Local Financial Stability and Choice Act, Public Act 436 of 2012, MCL 141.1567(3), also suspends the authority of the Act 312 arbitrator in a pending arbitration.

## C. Does This Matter Raise a Constitutional Question That Must Be Resolved by the Courts?

DPCOA argues that the question of whether PA 436 deprives an Act 312 arbitrator of jurisdiction must be determined by the courts, citing *Kent Co Sheriffs Ass'n v Kent Co*, 463 Mich 353, 359-362 (2000).[2] DPCOA argues at length that the Legislature's failure to amend §15(8) of PERA, to replace the reference to 2011 PA 4 with a reference to PA 436, makes the language of that provision invalid and creates a conflict with § 27(3) of PA 436 in violation of the Michigan Constitution. Section 15(8) of PERA states:

Collective bargaining agreements under this act may be rejected, modified, or terminated pursuant to the local government and school district fiscal

---

[2] In the *Kent Co Sheriffs Ass'n* case, the State Supreme Court held that the circuit court correctly ruled on a Freedom of Information Act issue even though the matter impacted a labor dispute over which MERC would have had jurisdiction if it had involved an unfair labor practice charge. Since the case did not involve an unfair labor practice charge, the circuit court was not required to defer to MERC.

accountability act, 2011 PA 4, MCL 141.1501 to 141.1531. This act does not confer a right to bargain that would infringe on the exercise of powers under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531.

The Commission has no jurisdiction to resolve questions of the constitutionality of legislative enactments. *Michigan State Univ*, 17 MPER 75 (2004). The Commission must decide matters before it based on the language of PERA and its amendments. *Waverly Cmty Sch*, 26 MPER 34 (2012). Thus, any constitutional issues that the parties wish to raise must be raised elsewhere.

## II. THE IMPACT OF PA 436 ON RIGHTS AND OBLIGATIONS UNDER ACT 312

The Employer argues that the arbitration panels have no jurisdiction over the parties, the petitions, or the matters in dispute where the City's duty to bargain has been suspended by the operation of § 27(3) of PA 436. According to the Employer, Act 312 is a procedural statute and acts as an extension of, or supplement to, PERA, while PERA is the substantive enabling statute that defines the contents and parameters of the duty to bargain. The Employer contends: "Where the duty to bargain under PERA is suspended, there can be no compulsory arbitration over mandatory subjects of bargaining because no subjects remain 'mandatory' and therefore, [there is] no dispute to resolve."

### A. The Relationship between 1969 PA 312, As Amended, and 2012 PA 436

This Commission's interpretation of these two statutes is constrained by rules of statutory construction established by the courts. The rules of statutory construction tell us that, much like any literary composition, a statute is enacted and is meant to be read as a whole. *Metropolitan Council 23, AFSCME* v *Oakland Co Prosecutor*, 409 Mich 299, 317-318 (1980). As such, any provision that is in dispute must be read in the light of the general purpose of the act. *Romeo Homes, Inc* v *Comm'r of Revenue*, 361 Mich 128, 135 (1960).

While both statutes deal with local government administration there is no express conflict in their purposes or in their wording. Act 312 of 1969 was recently amended by 2011 PA 116 which became effective July 20, 2011. Less than two years later, 2012 PA 436 took effect on March 28, 2013. Indeed, PA 436 makes no reference to Act 312 or to its recent amendment in 2011 PA 116. PA 436 does not exclude bargaining units eligible for Act 312 arbitration from its coverage.[3]

Under well-established principles of statutory construction, the legislature is presumed to be aware of and to have considered the effect on all existing statutes when enacting new ones. *Walen v Dep't of Corrections*, 443 Mich 240, 248 (1993). Moreover, rules of statutory construction hold that the legislature is presumed to be aware of statutory interpretations by the

---

[3] We note that the Legislature expressly excluded employees eligible for Act 312 arbitration from the changes under the "Freedom-to-Work" amendment to PERA, 2012 PA 349, which became effective on the same day as 2012 PA 436.

8

courts and by the administrative bodies charged with statutory enforcement. *Gordon Sel-Way, Inc v Spence Bros, Inc*, 438 Mich 488, 505-506 (1991); *Melia v Appeal Bd of Michigan Employment Sec Comm*, 346 Mich 544, 565-566 (1956); *Parker v Bd of Ed of Byron Center Pub Sch*, 229 Mich App 565, 570-5712 (1998).

The Commission has found that the failure to honor terms and conditions of employment established by an Act 312 award is a violation of § 10(1)(e) of PERA. *City of Jackson*, 1979 MERC Lab Op 1146, 1151-1154. See also, *City of Hamtramck*, 1984 MERC Lab Op 520, 524.

In *City of Jackson*, at 1151, the Commission explained:

A refusal to execute a completed collective bargaining agreement is an unfair labor practice whether negotiated through voluntary collective bargaining or by submission of unresolved issues to Act 312 arbitration.

The Commission went on to say, *id.* at 1153-1154:

The legislative policy of providing an "expeditious," "effective," and "binding" procedure for resolving labor disputes would be severely undermined if the parties could short circuit the Act by refusing to execute the contract.

\* \* \*

The term "resolution of disputes" in § 1 of the Act [312] means that the product of compulsory arbitration is a completed collective bargaining agreement. The refusal to execute that agreement is a refusal to bargain in good faith

Section 10(1)(e) of PERA prohibits public employers that have a duty to bargain from refusing to bargain collectively with the representatives of their employees. However, if their duty to bargain has been suspended, their refusal to bargain does not violate § 10(1)(e). Quite simply, there can be no breach of duty if there is no duty. Thus, when a public employer's duty to bargain has been suspended, their failure to comply with the terms and conditions of an Act 312 award would not violate § 10(1)(e) of PERA and the Act 312 award cannot be enforced under PERA.

As we stated in *Oakland Co & Oakland Co Sheriff*, 20 MPER 63 (2007):

Act 312 functions primarily as an extraordinary restriction on the ordinary rights of certain public employers to unilaterally impose changes in conditions of employment when good faith negotiations have failed to result in agreement.

Nevertheless, without reference to Act 312, § 12(1)(j) of PA 436 in conjunction with § 15(8) of PERA gives the Emergency Manager the right to reject, modify, or terminate terms of an existing collective bargaining agreement. Section 15(8) of PERA states:

Collective bargaining agreements under this act may be rejected, modified, or terminated pursuant to the local government and school district fiscal

9

accountability act, 2011 PA 4, MCL 141.1501 to 141.1531. This act does not confer a right to bargain that would infringe on the exercise of powers under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531.[4]

Section 12(1)(j) of PA 436 states:

> (1) An emergency manager may take 1 or more of the following additional actions with respect to a local government that is in receivership, notwithstanding any charter provision to the contrary:
>
> * * *
>
> (j) Reject, modify, or terminate 1 or more terms and conditions of an existing contract.

---

[4] We recognize the arguments made by the Petitioners challenging the constitutionality of PA 436 and the substitution of its provisions for the provisions of 2011 PA 4. However, as indicated above in our discussion of Petitioners' constitutional challenge, we must administer the law as it is enacted and must give effect to the provisions of PA 436, as well as its enacting § 2 which provides as follows:

2012 PA 436, enacting § 2, provides:

It is the intent of the Legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following:

(a) The Charter Township Act, 1947 PA 359, MCL 42.1 to 42.34.

(b) 1966 PA 293, MCL 45.501 to 45.521.

(c) 1851 PA 156, MCL 46.1 to 46.32.

(d) The General Law Village Act, 1895 PA 3, MCL 61.1 to 74.25.

(e) The Home Rule Village Act, 1909 PA 278, MCL 78.1 to 78.28.

(f) The Fourth Class City Act, 1895 PA 215, MCL 81.1 to 113.20.

(g) The Home Rule City Act, 1909 PA 279, MCL 117.1 to 117.38.

(h) The Metropolitan Transportation Authorities Act of 1967, 1967 PA 204, MCL 124.401 to 124.426.

(i) 1947 PA 336, MCL 423.201 to 423.217.

10

In the light of the language of PA 436, we cannot find that the Legislature intended to impose the aforesaid "extraordinary restrictions" of Act 312 on an emergency manager. Inasmuch as an Act 312 award serves as the parties' collective bargaining agreement, it appears that pursuant to § 15(8) of PERA and § 12(1)(j) of PA 436 that the Emergency Manager could reject, modify, or terminate terms of an Act 312 award. If that is the case, it seems doubtful that the Legislature would have intended an employer in receivership, with no duty to bargain and with an emergency manager in place, to be subject to Act 312 arbitration proceedings.

Petitioners have argued that the amendment to § 9 of Act 312 by 2011 PA 116 indicates that an employer in receivership remains subject to the operation of Act 312. Section 9 of Act 312, as amended, provides in relevant part:

(1) If the parties have no collective bargaining agreement or the parties have an agreement and have begun negotiations or discussions looking to a new agreement or amendment of the existing agreement and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions, and order upon the following factors:

(a) The financial ability of the unit of government to pay. All of the following shall apply to the arbitration panel's determination of the ability of the unit of government to pay:

* * *

(iv) Any law of this state or any directive issued under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, that places limitations on a unit of government's expenditures or revenue collection.[5]

The Employer contends that the amendment to § 9 of Act 312 by 2011 PA 116 does not show that an employer in receivership remains subject to the operation of Act 312. The Employer asserts, that the amended § 9 of Act 312 applies to those municipalities where the duty to bargain has not been suspended. We agree.

B. Is Act 312 Arbitration Dependent on the Presence of a Duty to Bargain?

In *Metropolitan Council 23, AFSCME v Center Line*, 414 Mich 642 (1982), the Court inferred from PERA that the distinction drawn between mandatory and permissive subjects of bargaining determines the scope of the Act 312 arbitration panel's authority. Given the fact that Act 312 supplements PERA and that under § 15 of PERA the duty to bargain only extends to mandatory subjects, the Court concluded that the arbitration panel can only compel agreement as to mandatory subjects. The Court noted further that it would be inconsistent to conclude that the arbitration panel can issue an award on a permissive subject when the parties do not even have a

---

[5] See previous footnote regarding Enacting § 2 of PA 436

11

duty to bargain over such a subject. Based on that, we might infer that the arbitration panel has no authority over matters for which there is no duty to bargain.

The mediation process is a condition precedent to initiation of Act 312 arbitration. A public employer that has no duty to bargain has no duty to participate in mediation. Only a public employer not in receivership under PA 436 or a labor organization may be required by this Commission under § 10 of PERA to participate in mediation. Therefore, the duty to bargain must be present before a party can be compelled to involuntarily participate in mediation. If parties have no duty to participate in mediation, they cannot be required to participate in Act 312 arbitration.

Moreover, § 7a of Act 312 gives the arbitration panel chair the authority to remand the matter to mediation. Mediation is a function of bargaining pursuant to PERA. If there is no duty to bargain, there is also no duty to engage in mediation. Therefore, § 7a of Act 312 presupposes the presence of a duty to bargain. In the absence of a duty to bargain, there is no obligation to participate in Act 312 arbitration.

### C. Does Suspension of the Duty to Bargain Pursuant to 2012 PA 436 Convert Mandatory Subjects of Bargaining to Non-Mandatory Subjects of Bargaining?

The Employer contends: "Where there is no duty to bargain, there are no mandatory subjects in dispute regarding which an Act 312 panel has jurisdiction to fashion an Award." It asserts that "by operation of Act 436, there are no subjects regarding which there is a duty to bargain and therefore none can be the subject of an Award." (Emphasis in original.)

As previously noted, an Act 312 arbitration panel can only issue an award regarding mandatory subjects of bargaining. *Metropolitan Council 23, AFSCME v Center Line*, 414 Mich 642, 654-655 (1982). Moreover, as indicated above, both this Commission's past enforcement of an Act 312 award as a violation of the duty to bargain and the arbitration panel chair's authority under § 7a of Act 312 to remand a matter to mediation indicates an assumption that the duty to bargain is a condition precedent to participation in Act 312. However, we reject the Employer's premise that the suspension of the duty to bargain automatically converts the nature of subjects of bargaining from mandatory to non-mandatory. The existence of a duty to bargain is a separate and distinct issue from the question of whether a particular subject of bargaining is mandatory or permissive.

Whether a matter is a mandatory subject of bargaining depends on whether it has a significant or material impact on wages, hours, and other terms and conditions of employment or settles an aspect of the employer-employee relationship. *Detroit v Michigan Council 25, AFSCME*, 118 Mich App 211, 215 (1982); *Houghton Lake Ed Ass'n v Houghton Lake Cmty Sch, Bd of Ed*, 109 Mich App 1, 6 (1981). Once a subject has been determined to be a mandatory subject of bargaining, parties bound by the duty to bargain under PERA, must bargain concerning the subject. Neither party may take unilateral action on that subject unless the parties arrive at an impasse in their negotiations or there is a clear and unmistakable waiver. *Wayne Co Gov't Bar Ass'n v Wayne Co*, 169 Mich App 480, 486 (1988); 1 MPER 19105, aff'g 1987 MERC Lab Op 230; *Central Michigan Univ Faculty Ass'n v Central Michigan Univ*, 404 Mich 268, 277

12

(1978). See also *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974). The Commission and the courts have adopted an expansive interpretation of "wages, hours, and other terms and conditions of employment" under § 15 of PERA. *Local 1383, Int'l Ass'n of Fire Fighters v Warren*, 411 Mich 642, 652 (1981).

A matter that is a mandatory subject of bargaining remains so, even if a party's duty to bargain is suspended. The nature of the subject does not change just because the duty ceases. Wages, hours, and other terms and conditions of employment continue to be mandatory subjects for the purpose of determining what must be bargained by those parties who have a duty to bargain.

Where a public employer's duty to bargain is statutorily suspended, the employer has no *obligation* to bargain. However, nothing in PERA denies a public employer the *right* to bargain, even when the duty to bargain under § 15(1) has been suspended. Indeed, the suspension of a public employer's duty to bargain does not suspend the bargaining obligation of the labor organization representing that employer's employees. Therefore, if an emergency manager of a public employer in receivership determines that the employer should bargain with the labor organization, the employer has the right to bargain with that labor organization. The labor organization, in that situation, still has a duty to bargain in good faith pursuant to §§ 10(3)(c) and 15(1) of PERA. Similarly, if an emergency manager of a public employer in receivership determines that the employer should petition for Act 312 arbitration in an effort to resolve a labor dispute with a bargaining unit of police or fire fighters, that employer may petition for Act 312 arbitration. In that case, unless the parties agree otherwise, the arbitration would be limited to mandatory subjects of bargaining, that is, matters that have a material impact on wages, hours, and other terms and conditions of employment or settle an aspect of the employer-employee relationship.

The finding urged by the Employer on this issue, could result in the denial of an employer's right to settle a pending labor dispute through Act 312 proceedings. Even though we agree with the Employer that the suspension of its duty to bargain under PA 436 also suspends its obligation to participate in Act 312 proceedings, we cannot agree that such suspension denies the Employer the opportunity to participate in Act 312 arbitration should it so choose. Accordingly, we find the suspension of the duty to bargain does not convert mandatory subjects of bargaining to non-mandatory subjects. The underlying nature of subjects of bargaining, whether they are mandatory or permissive, does not change upon the suspension of an employer's duty to bargain. Indeed, nothing in PA 436 declares a change in the nature of subjects of bargaining. It merely suspends the duty to bargain of an employer in receivership. That employer still retains the right to bargain and the right to proceed to Act 312 arbitration if it determines that to be appropriate under the circumstances. However, where an employer in receivership chooses not to participate in Act 312 arbitration they have no obligation to do so. For the foregoing reasons, we conclude that where an employer has no duty to bargain under PERA and has not voluntarily consented to Act 312 arbitration, the arbitration panel has no authority to issue an award binding that employer.

13

III. CONCLUSION

The Employer in this matter is in receivership and has no duty to bargain under PA 436. It has expressed an unwillingness to bargain or participate in Act 312 arbitration in light of PA 436. As such, the Employer has no obligation to participate in Act 312 arbitration and is not required to do so. Accordingly, the arbitrations in the cases before us must be dismissed.

We have considered all other arguments submitted by the parties and conclude that they would not change the result in this case.

## ORDER

The Employer's motion to dismiss the Act 312 arbitrations pending in these three cases is granted. The Act 312 arbitrations in *City of Detroit and Police Officers Association of Michigan*, Case No. D09 F-0703, *City of Detroit and Detroit Police Command Officers Association*, Case No. D11 J-1169, and *City of Detroit and Detroit Police Lieutenants & Sergeants Association*, Case No. D13 A-0005, are hereby dismissed.

### MICHIGAN EMPLOYMENT RELATIONS COMMISSION

_____
Edward D. Callaghan, Commission Chair

_____
Robert S. LaBrant, Commission Member

Dated: _____

COMMISSIONER GREEN, CONCURRING IN PART; DISSENTING IN PART:

Although I agree with the Majority's rejection of the Employer's argument that the suspension of the duty to bargain converts mandatory subjects of bargaining to permissive subjects, I disagree with the Majority's conclusion that the three Act 312 arbitration cases should be dismissed.

In numerous representation cases, we have been called upon to determine whether Act 312 petitions met the requirements of § 3 of Act 312 to initiate binding arbitration proceedings. In those cases, we were required to decide whether bargaining unit members met the definition of "public police or fire department employee" contained in § 2 of Act 312. Where the bargaining unit members were not public police or fire department employees, the requirements for initiating an Act 312 proceeding under § 3 were not met and, we dismissed the proceeding. For this Commission to initially determine the eligibility of public employees for compulsory arbitration in the context of representation proceedings is simply an extension of the Commission's function in representation matters.

14

However, in the three cases before us, there is no assertion by the Employer that the requirements for initiating Act 312 proceedings were not met. The Employer has not filed any representation proceeding claiming that the members of the three involved bargaining units are not public police or fire department employees as defined by § 2 of Act 312 nor has the Employer made any assertion that a creditable claim could be filed on that basis.

In these cases, the requirements for submitting the matters to mediation were met before PA 436 took effect and nothing in PA 436 indicates that the suspension of the duty to bargain is retroactive. When the parties were in mediation, the employer had a duty to bargain. In each case, the labor dispute was not resolved to the agreement of both parties and a petition for Act 312 arbitration was filed. All three petitions were filed and arbitrators were appointed in each case before PA 436 became effective.

I find nothing in PERA or Act 312 that authorizes this Commission to dismiss an Act 312 petition when the conditions in § 3 of Act 312 have been fully met. The Employer contends that the suspension of its duty to bargain, by PA 436, also suspends its obligations under Act 312. However, PA 436 contains no explicit prohibition barring Act 312 arbitration. Whether there is an implicit bar of binding arbitration by virtue of Act 436 is a matter for the courts to decide.

Although an emergency manager's authority to reject, modify, or terminate the provisions of a labor contract raises doubt as to whether a compulsory arbitration award is enforceable against an emergency manager, I conclude that the Commission lacks authority to dismiss an Act 312 arbitration where the requirements of Act 312 have been met. Consequently, I would deny the Employer's motion to dismiss the three Act 312 petitions.

MICHIGAN EMPLOYMENT RELATIONS COMMISSION

Nino E. Green, Commissioner

Dated: _____

15

# Exhibit 3

# CITY EMPLOYMENT TERMS

# BETWEEN THE

# CITY OF DETROIT

# AND

# AFSCME
# NON SUPERVISORY

# City Employment Terms
# Non-Uniform Employees

## TABLE OF CONTENTS

**ARTICLE**                                                         **PAGE**

Preamble...............................................................................................1
1.   Purpose and Intent............................................................................1
2.   Union Recognition............................................................................2
3.   Management Rights and Responsibilities...........................................2
4.   Union Rights and Obligations............................................................4
5.   Agency Shop.....................................................................................4
6.   Dues Check-Off................................................................................5
7.   Service Fee Check-Off......................................................................5
8.   Union Representation.........................................................................6
9.   Grievance and Arbitration Procedures................................................7
10.  Disciplinary Procedure....................................................................10
11.  Special Conference..........................................................................11
12.  Health and Safety............................................................................11
13.  Seniority..........................................................................................12
14.  Seniority of Union Representatives...................................................15
15.  Reduction in Force, Lay Off, Demotion and Recall..........................15
16.  Transfers and Promotions................................................................18
17.  Contractual Work............................................................................18
18.  Leaves of Absence...........................................................................19
19.  Union Bulletin Board.......................................................................19
20.  Strikes and Lockouts.......................................................................19
21.  Severability Clause..........................................................................20
22.  Successor Clause.............................................................................20
23.  Employee Assistance Program.........................................................20
24.  Career Development and Training.....................................................21
25.  Equal Employment Opportunity and Affirmative Action Statement..............21
26.  Defense and Indemnification of Employees against Damage Suits, Claims......22
27.  HR / Payroll Systems.......................................................................22
28.  Confidential Employees...................................................................22
29.  Joint Labor Management Committees...............................................22
30.  Copies of the City Employment Terms (CET)..................................22
31.  Economic Advantage/Disadvantage.................................................22
32.  Modification and Duration...............................................................23
33.  Unemployment Benefits...................................................................23
34.  Funeral Leave..................................................................................23
35.  Sick Leave.......................................................................................24
36.  Work Week, Work Day, Shift Premium............................................24
37.  Overtime.........................................................................................25

# City Employment Terms
# Non-Uniform Employees

## TABLE OF CONTENTS

**ARTICLE**                                                              **PAGE**

| | | |
|---|---|---|
| 38. | Holidays and Excused Time off | 27 |
| 39. | Unused Sick Leave on Retirement | 29 |
| 40. | Vacations | 29 |
| 41. | Temporary Assignments | 30 |
| 42. | Jury Duty | 31 |
| 43. | Hospitalization, Medical, Dental and Optical Care Insurance | 31 |
| 44. | Workers' Compensation | 33 |
| 45. | Death Benefits and Life Insurance | 33 |
| 46. | Wages | 33 |
| 47. | Clothing and Uniform Allowances | 34 |
| 48. | Retirement | 35 |
| 49. | General Retirement System, Board Composition | 39 |
| 50. | Private Care Mileage Reimbursement | 40 |
| 51. | Long Term Disability Benefits (Income Protection Plan) | 41 |

EXHIBIT 1- Health Care Plan Design..................................................42

## CITY EMPLOYMENT TERMS FOR ALL NON-UNIFORM EMPLOYEES

### PREAMBLE

Pursuant to the Financial Stability Agreement ("FSA") entered into between the City of Detroit and the State of Michigan on April 4, 2012, these City Employment Terms ("CET") sets forth the terms and conditions of employment of certain employees and the terms of representation by the Union of those employees. Any provisions in the most recently expired Collective Bargaining Agreements, memorandums of understandings, practices, and/or supplemental agreements that are not expressly referenced in this CET or any addendum and are inconsistent with the terms in this CET or any addendum are null and void as of the effective date of this CET. Arbitration awards or other dispositions relating to such inoperative provisions shall be deemed not binding or precedential with respect to the terms of this CET. The relevant provisions of the FSA, and all modifications thereof, are incorporated herein.

**NOTE:** The headings used in this CET and Exhibits neither add to nor subtract from the meanings but are for reference only.

### 1. PURPOSE AND INTENT

A.  The purpose of this CET is to set forth wages, hours, terms and conditions of employment for the duration of this CET and to promote orderly and peaceful employment relations in the interest of serving the citizens of the City of Detroit.

B.  To effectuate this purpose, this CET serves to establish employment relations and workplace processes and functions that serve the interest of the community and achieve the goal of customer service excellence for citizens, businesses and visitors of Detroit and achieve financial stability for the government of the City of Detroit and provide effective community policing, safe and stimulating programs for young people, and improving the environment in neighborhoods to instill civic pride and encourage new development.

C.  The City is legally and morally obligated to provide equality of opportunity, consideration, and treatment of all employees of the City and, accordingly, to establish policies, practices and rules that insure such equality of opportunity, consideration and treatment of all persons employed in all phases of the employment process, without regard to race, color, creed, national origin, age, political orientation, sex, sexual orientation, marital status, or disability in accordance with applicable State and Federal laws. The City shall continue to comply with all other applicable state federal and laws and regulations.

## 2. UNION RECOGNITION

A.  The Employer recognizes the bargaining unit as the representative, for the purposes set out in this CET, of the employees who hold the classified positions covered by the bargaining unit.

B.  The classified positions are subject to change in title, duties, responsibilities and qualifications pursuant to the Employer's rights under the Management Rights provision of this CET. The positions may also be added to or eliminated. The Employer will give the Union reasonable notice and the opportunity to discuss and provide input with respect to proposed permanent changes prior to implementation. Positions covered shall be realigned consistent with current practice.

## 3. MANAGEMENT RIGHTS AND RESPONSIBILITIES

A.  The City has the right and obligation to operate and manage its affairs in all respects in accordance with its responsibilities and powers of authority in accordance with applicable law and the FSA.

B.  Every incidental duty connected with operations enumerated in job descriptions is not always specifically described.

C.  The City shall have the right and obligation to determine and establish the policies, goals and scope of its operations. Consistent with this right the City has the right to determine and implement work schedules/shifts, vacation schedules, and flex time and to establish the goals, methods and processes by which such work is performed and the qualifications of employees assigned to do the work. These rights and obligations include, but are not limited to:

1.  Implement changes in the structure of Department operations, including establishment or consolidation of service areas and work locations within the Department;

2.  Cease or outsource functions or operations;

3.  Initiate new functions or operations;

4.  Achieve uniformity of employment terms across the Department;

5.  Provide appropriate training, education, performance evaluation and job assignments for employees;

6.  Establish wage and benefits for new and existing employees that achieve the goal of financial stability in City Government;

7.  Establish qualifications and methods for hire, transfer, assignment, position retention and promotion in employment;

8.  Revise, create, combine, and/or eliminate classifications, duties and/or positions;

9.  Determine classification, status and tenure of employees;

10. Initiate promotions and disciplinary actions;

11. Determine personnel hiring and reductions;

12. Discipline and discharge employees for just cause;

13. Recruit, assign, transfer employees to positions within the Department;

14. Suspend, demote, discharge or take other disciplinary action against employees for just cause;

15. Establish rules and policies; adopt and enforce work rules and policies applicable to this unit and/or all employees, including but not limited to, the Universal Work Rules promulgated by the City;

16. Determine the requirements and payments related to an employee's job functions including, but not limited to, equipment, tools, clothing and uniforms;

17. Suspend past practice;

18. Enforce state and local licensing and other requirements;

19. Assign employees to any function or duties in the Department involving direct supervision of other bargaining unit members;

20. Assign employees to any function or duties in the Department not involving direct supervision of other bargaining unit members without payment of "out-of-class" compensation;

21. Relieve employees from duties because of lack of work, lack of funds or for disciplinary reasons;

22. Determine methods, means and employees necessary for departmental operations;

23. Control the departmental budget;

24. Determine and implement such other actions deemed appropriate to achieve the City's goals and objectives.

D.  The City reserves the right to amend or modify this CET and any addendums, supplements, MOUs, letters of agreement, and all other writings and practices. The City, where practical, shall provide reasonable notice and an opportunity to discuss changes with the Union.

## 4. UNION RIGHTS AND OBLIGATIONS

A. Any member shall have the right to discussion or services of Union Representative. When such a request is made to the supervisor, permission for services or discussion shall be granted without undue delay unless such request adversely impacts operations. Permission shall not be unreasonably withheld. This right shall not be abused. If the employee's requested Union Representative is unavailable, the Union will promptly substitute another union representatives in the represented unit, if on duty and available.

B. The Union shall have the right and obligation to assist and cooperate with the City in effectuating the provisions of this CET and to encourage its members to do the same.

C. The Union shall have the right and obligation to educate its members regarding the intent of this CET and the terms contained herein.

D. The Union shall have the right to grieve the interpretation and application of the terms herein and to exercise such other rights as are set forth in this CET.

E. Activities involving internal management of the Union such may be conducted during non-working hours. These activities shall not interfere with normal work operations of any department or work area of the City.

F. Requests for meetings by Union officials other than Special Conferences shall be scheduled at a mutually agreeable time.

G. When a union representative goes into a City operation for the purpose of conducting Union business, the Division Head must be notified of his/her presence and the nature of their business, prior to arrival, and obtain permission from the Division Head. If it is necessary for a Steward or Union President to speak to an employee about a grievance, management will notify the employee's immediate supervisor and arrangement will be made to accommodate the meeting with due regard for Departmental operations.

## 5. AGENCY SHOP

A. All employees in the bargaining unit shall be required, as a condition of employment, to pay the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union for the duration of this Agreement. Such requirement shall be in effect 31 days after the effective date of the Agreement, and for new full-time employees, 31 days after they commence full-time employment.

B. An employee shall be deemed to be in compliance within the meaning of this section, if they are not more than sixty (60) days in arrears in payment of membership dues.

C. Once the Employer receives written notice of the Union's intent to seek the discharge of an employee for failure to meet his/her financial obligations to the Union, the employee shall have a ten (10) day grace period to meet their financial obligations or the Union's demand shall be honored.

D.  The Union agrees that, in the event of litigation against the City, its agents or employees arising out of this provision, it will co-defend, indemnify, and hold harmless the City, its agents or employees from any monetary award arising out of such litigation.

### 6.  DUES CHECK-OFF

A.  The Employer agrees to deduct from the wages of any employee who is a member of this Union, all union membership dues and initiation fees uniformly required, if any, as provided in a written authorization executed by the employee. The written authorization for union dues deduction shall remain in full force and effect during the period of this contract and may be revoked only by written notice given during the period thirty (30) days immediately prior to expiration of this CTE. The termination notice must be given both to the Employer and to the Union.

B.  Dues and initiation fees will be authorized, levied and certified in accordance with the constitution and By-Laws of the local union. Each employee and the Union hereby authorize the City to rely upon and to honor certifications by the Secretary-Treasurer of the local union, regarding the amounts to be deducted and the legality of the adopting action specifying such amounts of union dues and/or initiation fees.

C.  The Employer shall continue the dues check-off except that the union shall reimburse the City an amount equal to 2% for all union dues amounts remitted to the Union. If the Union fails to reimburse the City within 45 days of the dues remittance by the City to the Union, the City shall have no further obligation to continue dues check-off.

D.  The Dues Deduction Check-Off Card shall be presented to the bargaining unit member within thirty (30) days of his or her arrival in the employing department. If the dues deduction is stopped during the term of this CET because the employee left the payroll, the employing department shall have the bargaining unit member resubmit a Dues Deduction Check-Off Card on each occasion that the employee returns to the payroll.

E.  The Employer agrees to deduct from the wages of any employee who authorizes a deduction for a Union Political Action Committee as provided for in a written authorization in accordance with the standard form used by the Employer, provided that the said form shall be executed by the employee. This deduction may be revoked by the employee at any time by giving written notice to both the Finance Department and to the Union. Article 4-E, F and G shall apply to this section.

### 7.  SERVICE FEE CHECK-OFF

A.  The Employer agrees to deduct from the wages of any employee who is not a member of the Union, all Union service fees as provided in a written authorization executed by the employee. The written authorization for service fee deduction shall remain in full force and effect during the period of this Contract and may be revoked only by written notice given during the period thirty (30) days immediately prior to expiration of this CTE. The termination notice must be given both to the Employer and to the Union.

B.   The amount of such fees will be as provided and determined by Article 4 and 5 of this CTE.

C.   The Employer shall continue the existing service fee check-off structure except that the union shall reimburse the City an amount equal to 2% for all service fee amounts remitted to the Union. If the Union fails to reimburse the City within 45 days of the dues remittance by the City to the Union, the City shall have no further obligation to continue dues check-off.

D.   The Service Fee Check-Off Card shall be presented to the bargaining unit member within thirty (30) days of his or her arrival in the employing department. If the service fee check-off is stopped during the term of this CET because the employee left the payroll, the employing department shall have the bargaining unit member re-submit a Service Fee Check-Off Card on each occasion the employee returns to the payroll.

## 8.   UNION REPRESENTATION

A.   It is mutually recognized that the principle of proportionate representation is a sound and sensible basis for determining the number of Union representatives.

B.   In each Department, district, building, work location, unit, area, site, division or floor ("Work Unit"), the employees on each shift shall be represented by one Union representative who shall be a regular employee working in that work unit on that shift. Work Units shall be defined by the Employer. Where such work unit is permanently or temporarily discontinued in its current form, union representation shall be adjusted consistent with this paragraph. In the absence of the union representative, an alternate Union representative shall represent the employees in that work unit. The Union shall promptly notify each employing department with copy to the Human Resources Department of the names and locations of representatives selected. At the request of the Union, the Labor Relations Division may agree to exceptions to this provision.

In the absence of a Union representative and his alternate, the Union will notify the department of a designated representative and shall promptly confirm such designation in writing.

C.   The number of Union representatives and districts shall be that number negotiated between the Union and the City's representatives for each department. Absent agreement between the parties, the City shall designate the number of Union representatives and districts.

D.   The Union shall reimburse the Employer for all full-time and part-time paid Union officials, including any additional compensation arrangements (including un-worked overtime) paid to employees holding union positions. If the Union fails to reimburse the City within 45 days of the end of a calendar month the City shall have no further obligation to pay such officials for union time thereafter until all reimbursement obligations and arrears are satisfied. Union representatives may elect to use vacation or compensatory time for attendance at Union meetings, conferences, conventions and other time on union activities, or take unpaid time off.

E.   Working Stewards and Chief Stewards shall request time off for Weingarten representation duties or grievance processing from their supervisor and the supervisor shall grant or deny such requests in writing.

## 9.   GRIEVANCE AND ARBITRATION PROCEDURES

A.   Should any dispute arise between the City and the Union concerning the application or interpretation of this CET, an earnest effort shall be made to settle such dispute promptly in accordance with the following Grievance Procedure:

Step 1.        Employee, Supervisor and Steward

Any employee having a grievance may report the same to his Supervisor and an endeavor shall be made to adjust the grievance between the employee and the Supervisor. If a satisfactory adjustment is not obtained, the employee may request a Steward, and the three will attempt to resolve the matter. Where the matter involves imposition of disciplinary suspension or above, Step 1 does not apply and grievances shall be filed at Step 2.

Step 2.        Department Head Level

If a satisfactory adjustment is not obtained under Step 1, the grievance shall be reduced to writing on a standard grievance form setting forth all facts believed to be relevant to the dispute, and the grievance shall be signed by the employee or employees involved. The written grievance must then be submitted to the Department Head. A meeting shall be held at a mutually convenient date and time to discuss the grievance. Up to two (2) Union Representatives, other than the Grievant, may attend the Step 2 meeting. Any resolution reached at this meeting shall be reduced to writing. The Department Head shall endeavor to furnish the Union with his/her written decision within fifteen (15) working days of the Step 2 meeting, excluding Saturdays, Sundays and holidays.

Step 3.        Labor Relations Division Level

If a satisfactory adjustment is not obtained under Step 2, the Union may request a Step 3 meeting with the Labor Relations Director. Such appeal and request for a Step 3 meeting must be submitted in writing to the Labor Relations Director within five (5) working days from the receipt of the Department Head's Step 2 answer. Not more than two (2) Union Representatives may attend the Step 3 meeting, and the Labor Relations Director may designate members of his staff to represent the City. Any resolution reached at this meeting shall be reduced to writing. The Labor Relations Director or his or her designee shall endeavor to furnish the Union with his/her decision within thirty (30) working days of the Step 3 meeting.

Step 4.     Arbitration

    a.    If a grievance is not settled after it has gone through Step 3 of the Grievance Procedure, the Union must file a written notice with the Labor Relations Director of appeal and intent to submit the dispute to arbitration. The Notice of Intent to Arbitrate must be filed within fourteen (14) calendar days of its receipt of the Labor Relation Director's Step 3 answer. If the Union fails to request arbitration in writing within this time limit, the grievance shall be deemed settled on the basis of the Step 3 answer and not eligible to go to arbitration.

    b.    Arbitrations shall generally be heard by a member of a permanent umpire panel consisting of individuals mutually agreed-to by the City and the Union. Arbitrators will hear cases on a rotating basis. In non-disciplinary contract interpretation cases, however, the City may, at its election, choose to have the dispute arbitrated pursuant to the Labor Arbitration Rules of the American Arbitration Association. The Arbitration's fees and expenses shall be borne equally by the parties, and all other expenses shall be borne by the party incurring them. The Grievant, one (1) witness, and one (1) Union Representative shall not lose pay for time off the job while attending the arbitration proceeding.

    c.    The decision of the Arbitrator shall be final and binding on the Union and its members, the employees involved and the City. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms of this CET, and shall have due regard for the rights and responsibilities of the Employer set forth in Article 2 of the CET "Management Rights." The Arbitrator shall have no power to grant any wage increases or decreases, and shall not uphold any grievance against the City on the basis of past practice. The Authority of the Arbitrator is limited to interpretation and application of the provisions of this CET. The Arbitrator shall have no authority to apply or interpret the provisions of the expired collective bargaining agreement between the Union and the City, unless the grievance at issue was submitted during the term of that agreement, or grant any right or relief for any alleged grievance under the terms of the expired collective bargaining agreement between the Union and the City, unless the grievance at issue was submitted during the term of that agreement.

B.    A grievance shall be deemed untimely, settled and withdrawn unless a written Step 2 grievance is filed with the Department Head within five (5) working days (excluding Saturdays, Sundays and holidays) after the Grievant first knew, or should have known, of the facts giving rise to the grievance. Grievances concerning a continuing practice or continuing act of the Employer must be grieved within ten (10) working days of the date the Grievant first knew, or should have known, of the act or practice. Any extensions of these time limits must be agreed to by the City in writing.

C.	In the event the Employer fails to respond to a grievance or schedule a meeting within the time periods provided in any steps of the Grievance Procedure, said grievance shall be denied and the Union may make a written request that the grievance be referred to the next step.

D.	Any agreement reached between the Employer and the Union under the Grievance Procedure shall be binding upon the Employer, the Union and the employees concerned and cannot be changed by any individual. No settlement at any stage of the grievance procedure, except an arbitration decision, shall be a precedent in any arbitration and shall not be admissible in evidence in any future arbitration proceeding.

E.	The City shall not be required to pay back wages more than five working days prior to the date a written grievance is filed.

F.	All claims for back wages shall be limited to the amount of wages that the employee would have earned, less any compensation received for temporary employment obtained subsequent to his/her removal from the City payroll, and payments from Unemployment Insurance, Social Security Disability, Welfare, Department of Health and Human Services, City-Funded Long-Term Disability Insurance, Sickness and Accident Insurance or Automobile Accident Income Replacement Insurance. Where appropriate, the City shall reimburse those agencies and insurance funds so as to not affect the employee's equity therein.

G.	In the case of a pay shortage in which the employee would not have been aware before receiving his pay, any adjustment made shall be retroactive to the beginning of the pay period covered by such pay, if a grievance is filed within the twenty (20) working days within receipt of such paycheck.

H.	Exchanging, pertinent information regarding a grievance is beneficial to both parties in attempting to resolve the grievance.

	The Union shall be advised of the factors considered in the imposition of discipline and shall have the right to request copies of available written documents or statements pertaining thereto. If the Union requests information regarding a grievance from an employee's personnel file, the Union must present written authorization from the employee to release the information. Management shall be advised of the basis of the grievance and have the right to request copies of available written information or statements pertaining thereto and which the Union proposes to present in support of the grievance.

	It is agreed that any information requested in accordance with the above provisions which is not made available to the other party shall not be admissible as evidence in any arbitration hearing provided that a written request has been made to the appropriate Local Union President or Departmental Representative.

I.	The grievance procedure contained in this CET shall be the exclusive grievance procedure and remedy for all members of the bargaining unit claiming a violation of this CET.

## 10. DISCIPLINARY PROCEDURE

A.    The City retains the right to promulgate, amend and modify disciplinary rules, procedures and penalties.

B.    All disciplinary action taken against an employee shall be for just cause and subscribe to the general philosophy that the primary purpose of disciplinary action is to correct employee behavior or conduct. The City will make an effort to utilize a progressive discipline process; however, the City reserves the right to invoke more severe discipline, up to and including, termination. The issuance of disciplinary action shall take place in a timely manner with due regard for the Employer's right to conduct workplace investigations of employee misconduct. Any dispute regarding the timeliness of the discipline shall be resolved through the grievance procedure.

C.    **NOTIFICATION REQUIREMENTS:** Notification shall be given to the appropriate union representative of any disciplinary action taken against any member which may result in any official entries being added to the employee's personnel file. Both employee and the Union representative shall be given a copy of such official entry.

In all cases when a supervisor contemplates issuance of disciplinary action, the supervisor shall inform the employee and allow the employee the opportunity to have union representation. If the employee's requested representative is unavailable, the Union shall promptly substitute other union representatives in the represented unit, if on duty and available. If the employee declines union representation, he/she shall indicate so in writing and a copy shall be given to the Union.

When the department has decided to issue discipline, the employee will be allowed adequate time and an available area to discuss the discipline with his/her steward, or in the absence of a steward an appropriate union representative. In the case of a suspension or discharge, where Union representation is available, this discussion will take place prior to the employee leaving City property. Upon request the management representative who is present and issuing the action will discuss the disciplinary action with the employee and his/her steward. Exceptions to this procedure would be in situations where the suspended or discharged employee is absent without leave, or the parties agree that such discussion would not be beneficial at this time.

In the case of an oral reprimand, a notation by date and subject only shall be placed in the employee's personnel file.

D.    All disciplinary actions shall be subject to the grievance procedure. It shall be the responsibility of the grievant to keep the Union and City informed of his/her mailing address and telephone number(s) at which he/she may be reached for purposes of notification. Certified mail to the address of record shall constitute proper notification to the grievant.

E.    During investigation, an employee shall have the right to request to have his/her steward present if the employee reasonably believes that his/her statements may lead to

disciplinary action. Before an employee is required to make any statements pertaining to his/her possible misconduct, the employee shall have the opportunity to discuss the matter first with his/her steward.

F.   **PERSONNEL RECORDS:**  All employees within the bargaining unit shall have the right to review his/her personnel records pursuant to applicable law.

G.   **USE OF PAST RECORD:**  In imposing any discipline on a current charge or in evaluating an employee for promotion or transfer, management will not take into account any prior infractions or disciplinary action taken which occurred more than three years previously.

H.   **GUIDELINES FOR ADMINISTRATION OF A CORRECTIVE DISCIPLINE PROGRAM:**

1.   Disciplinary action should be appropriate and take into account both the offense and the employee.

   Factors which should be considered in imposing discipline in each case are:

   a.   The seriousness and circumstances of the particular offense.
   b.   The employment history of the employee involved including length of service.
   c.   The recency and nature of prior disciplinary action taken with respect to the employee.
   d.   Prior departmental action in comparable stipulations.

2.   Any published departmental standards or rules governing employee conduct or expected work performance should be fairly and consistently applied.

## 11.   SPECIAL CONFERENCE

Special Conferences for important matters including problems of health and safety and periodic discussions of substantial issues which are of concern to Union members may be arranged upon mutual agreement between the Union President and the Department Head or his/her designated representative upon the request of either party. Such meeting shall be between representatives of the department, and no more than three (3) and at least two (2) representatives of the Union.

## 12.   HEALTH AND SAFETY

A.   The City recognizes its responsibility to provide safe and healthful working conditions, and the Union recognizes it's their obligation to cooperate in the maintenance and improvement of those conditions.

B.   All existing safety practices and provisions in expired agreements shall remain in effect until such time as amended by the City.

C.   All protective equipment and devices, first aid kits or similar provisions, physical examination or other tests required by the Employer shall be provided at no cost to the employee.

D.   The City shall act in compliance with Federal, State and Local legislation relating to use or storage of hazardous materials and incidence of contagious disease in the work place. Union representatives will be informed of any testing of employees or precautionary steps taken because of exposure to hazardous materials or a contagious disease which has occurred within the worksite where members of his/her Union are employed.

## 13.   SENIORITY

A.   **SENIORITY** is hereby defined as the length of continuous service beginning on the date of legal certification to a position in the classified service of the City of Detroit. Seniority, as defined above and in accordance with Human Resources Department Rules incorporated herein by reference, is established to serve as a basis for determining employee seniority rights provided for in this CET including the order of demotion or lay off in the event of a reduction in force and the reemployment rights of employees. Note: Seniority is not the same as "service time" as utilized for the various economic benefit provisions.

The seniority date of employees in the bargaining unit who were initially hired into Federal Economic Opportunity Act (FEOA) Service classes shall be made retroactive to the date of placement to a position in such FEOA Service class.

B.   **CONTINUOUS SERVICE** shall mean employment by the City of Detroit without interruption or breaks. The following shall not be considered breaks in service.

**Note:** Seniority is not the same as "service time" as utilized for the various economic benefit provisions.

1.   Service in the Armed Forces of the United States up to four (4) years, or five (5) years if requested by the Government as provided under Federal law.
2.   Absence from work due to injuries compensated for under the Workers' Compensation Act of the State of Michigan.
3.   Duty-disability retirement.
4.   Appointment or election to an exempt non-classified position of the City of Detroit.
5.   Lay off as a result of a reduction in force for a period not exceeding two (4) years.
6.   Leave of absence to serve in a qualifying employee labor organization for the term of said employment.
7.   Leaves of absence for Peace Corps service up to two (2) years.
8.   Other approved leaves of absence for a period not exceeding one (1) year.
9.   Non-duty disability retirement for a period not exceeding one (1) year.

Employees may be granted a personal leave by the City for up to one (1) year. Seniority

accrued prior to the leave will be retained but employees will not accumulate additional seniority for the period of the leave, except that this provision shall not apply to leaves related to military or Peace Corps.

C.   **LOSS OF SENIORITY:** An employee shall lose his/her seniority for the following reasons only:

1.   Discharge or permanent removal from the payroll and the separation is not reversed through the grievance procedure.

2.   Regular service retirement.

3.   Resignation or voluntary quit, which shall include:

   a.   Failure to report within five (5) working days after receiving notice of recall from lay off.

   b.   Failure to report back to work within five (5) working days after expiration of an approved leave of absence or extension thereof.

   c.   Absence from work for three (3) consecutive working days without notice to the Employer unless he/she can demonstrate that he/she was physically or mentally incapable of notifying the department of his/her inability to come to work.

4.   For Seasonal Employees, failure to report for work in any given season within five (5) days of the date of notice to report for work for that season.

D.   **ADJUSTMENT FOR SEASONAL, TEMPORARY OR PART-TIME EMPLOYMENT:** If an employee in a special service classification employed on a seasonal, temporary or part-time basis is subsequently placed in a regular full-time classified position the following adjustments to seniority shall be made:

1.   In the case of the seasonal or temporary employee, for each twelve (12) month period of employment in which the employee worked six (6) months or less, six (6) months shall be deducted from the length of continuous employment.

2.   In the case of the part-time employee, for each period of employment in which the employee worked on a half-time or less basis, the employee shall be awarded one-half seniority credit and the length of continuous employment adjusted accordingly.

   Any adjustment of seniority under this section shall be made from the employee's certification date as a seasonal, temporary or part-time employee.

13-53584-swr   Doc 8605-36   Filed 04/28/14   Entered 04/28/14 05:47:43   Page 64 of 47
94

E.  **RESOLVING TIES IN SENIORITY**:

    1.    Where two or more persons have the same seniority date, the employee with the highest standing (examination rating) on the eligible register from which the employees were certified shall be deemed as having the greater seniority. In the event of identical examination ratings, the employee with the earliest examination date shall be deemed as having the greater seniority. In the further event of identical examination dates, the employee who first submitted his/her employment application (as measured by the examination number) shall be deemed as having the greater seniority.

    2.    In the case of inducted employees with the same seniority date, employees will be ranked in accordance with their length of continuous service in the department, agency or activity in which they were employed when inducted into the classified service. Insofar as possible to determine, such continuous service shall include any adjustments in accordance with procedures outlined in this Article.

    3.    Notwithstanding the above, in all cases of identical seniority dates, persons entitled to preference under the Michigan Veteran's Preference Act shall be deemed as having greater seniority than those employees without such preference.

F.  **PROBATIONARY EMPLOYEES:** New employees hired by the City and others initially placed into the bargaining unit shall be considered as probationary employees for the first six (6) months of their employment depending on the classification except as provided below. The City may extend in its sole discretion this probationary period for up to an additional six (6) months. This decision may not be grieved. The reasons for the extension will be given in writing to the employee, and a copy given to the Union upon request.

The Union shall represent probationary employees for the purposes set forth in this CET except separation from City service or reversion to the formerly held title for reasons other than union activities. For probationary employees with prior City service, the Union shall represent such employees when a department issues a suspension or discharge for cause instead of taking action to revert the employee to his/her prior status.

G.  **SENIORITY LISTS:** The City will furnish to the Union quarterly, a seniority list and a separation list showing each employee's name, address, department, classification, , and total City seniority date. Upon request, the City will annually furnish a Union its relevant city wide seniority list by classification. These computer generated lists will be based on official Human Resources Department documents which have been approved and processed as of the date submitted. Any questions concerning this information or alleged errors should be submitted to the Administrative Services Division of the Human Resources Department. When the City has the capability, such lists will be provided to the Union on compact disks (CDs).

H.  **CLASSIFICATION SENIORITY**: Classification seniority shall be preserved where it is utilized in prior agreements.

## 14.  SENIORITY OF UNION REPRESENTATIVES

A.  Except as follows and as provided in Article 37 - Overtime, there shall be no exceptions or special seniority provisions for Union officers. Notwithstanding their position on the seniority list, all Union Representatives who provide "Weingarten" representation to employees in the bargaining unit, or who are responsible for the adjustment of grievances, shall in the event of a layoff or reduction in force, be retained in employment so long as there are:

   1.  Full-time positions remaining in their current classification in their respective Department;

   2.  Full-time positions remaining in their current classification in any other Departments within the bargaining unit; and

   3.  Full-time positions remaining in any classification other than their current one in which the employee has had prior year service or occupational series and be able to perform the duties and functions of the new job as determined by the Employer.

B.  The provisions of this Article shall apply only so long as Union Representatives engage in the representation and grievance adjustment functions set forth above.

C.  Should a Union Representative lose his/her Weingarten representation or grievance adjustment functions, they shall be subject to displacement by employees with greater seniority who have been laid off or demoted as a result of reductions in force made prior to the former representative's loss of representation or grievance adjustment functions.

## 15.  REDUCTION IN FORCE, LAY OFF, DEMOTION, AND RECALL

A.  The City reserves the right to reduce the work force.

B.  **NOTICE TO THE UNION:**  Where practical, the City will provide advance notice to the Union who may receive such notice fourteen (14) days prior to issuance of any layoffs.

C.  **ORDER OF REMOVAL:**  Reduction in force shall be by job classification in a City department. Within the department, the following categories of employees in the class shall be removed first in the following order.

   1.  Provisionally-hired employees.
   2.  Newly-hired employees who have not completed the probationary period.
   3.  Employees hired on a seasonal, temporary or other limited term basis.
   4.  Seniority employees who have recently been promoted into the class and have not completed the required trial period, and employees promoted to the class on a

limited-term basis. Such employees shall revert to the classification in the department from which they were promoted.

5. Seniority employees who are in the class on a permanent basis and have completed the required trial period. Such employees shall be removed from the class in accordance with their total City seniority and have those displacement rights described below.

D. **DEPARTMENTAL DISPLACEMENT RIGHTS:** Permanent seniority employees who are being removed from a given class shall have the following optional displacement rights in their department:

1. To displace the least seniority employee in a lower class in the same occupational series, provided that they have prior year service in such classification within the last three (3) years and can perform the duties of the new position.

2. To displace the least seniority employee in some other classification which the senior employee previously held within the last three (3) years, provided that they can perform the duties of the new position.

In addition, employees who are unable to displace lesser seniority employees in their department may be transferred or demoted to other available vacant positions in the department for which they are adjudged to be qualified.

Those employees who are unable to displace lesser seniority employees or are not status-changed to other available vacancies in the department shall be laid off by issuance of a layoff notice from their department. Such laid off employees shall then have those City-wide displacement rights described below.

Employees who have an opportunity to displace a lesser seniority employee in the next lower class in their occupational series, but elect not to exercise such displacement rights and request to be laid off instead, shall not be eligible for these City-wide displacement rights. However, such employees will have those recall, reemployment and restoration rights set forth in Section F.

E. **CITY-WIDE DISPLACEMENT RIGHTS:** Permanent seniority employees laid off from a department or demoted to a lower classification due to reduction in force shall have the following displacement rights on a City-wide basis:

1. To displace provisional hires, probationary employees and limited term employees in the laid-off class in any other City department in that order.

2. If the employee was laid off, to displace the least seniority employee in the laid-off class in any other City department; and, if there are no lesser seniority employees in the class, to displace the least seniority employee in a lower class in the same occupational series, provided that they have prior year service in such classification within the last three (3) years and can perform the duties of the new position.

3. If the employee was demoted to a lower class, to displace the least seniority

employee in the class from which he/she was demoted in any other City department, provided that they have prior year service in such classification within the last three (3) years and can perform the duties of the new position.

Such displacement across departmental lines shall coincide with the effective date of the layoff of the employees having such displacement rights, if possible, but, in any event shall be implemented within sixty (60) calendar days of the layoff date. Where two or more laid-off employees have City-wide displacement rights, employees will be given a choice of available displacement opportunities in their class, in order of their seniority. However, employees who do not report for displacement as instructed will waive this right.

F.  **EMPLOYEE RECALL, REEMPLOYMENT AND RESTORATION RIGHTS**:

Employees will be recalled by seniority for available positions either: (a) in their current classification, or (b) in the classification in the same occupational series; provided they have prior year service in such classification within the last three (3) years and can perform the duties in the position they are recalled into. Specific recall and notification procedures shall be determined and modified by the Human Resources Department. Any Human Resources rules or procedures concerning employee recall shall not be interpreted to limit or impair the City's right to fill vacancies through transfer, promotion, or new hire in accordance with the Management Rights or the Transfer and Promotion provisions of this CET. Any existing Human Resource rules or procedures with conflicting provisions shall be modified to conform to this CET.

G.  **MULTIPLE TITLES:** In determining an employee's rights under this Article, an employee can have permanent seniority in only one (1) class at a time. An employee who carries a multiple title shall be treated as having permanent seniority in the lowest part of his/her multiple title.

Exceptions to this general rule would be where the employee previously held a higher part of the multiple title on a single title basis, or where the parties agree that the employee's permanent seniority should be in a higher part of the multiple title based on the employee's nature and history of employment. Such agreement must be in effect no later than ninety (90) days prior to the announcement of a reduction in force.

H.  **NOTICE REQUIREMENTS:** Following notice, a representative of the department shall meet with the Union to discuss the circumstances of the department's reduction in force.

   1.   Employees to be laid off shall receive notice of layoff no less than two (2) calendar weeks prior to the effective date of the separation. A union representative will be permitted to attend the notification meeting. A copy of such notice will be sent to the Union.

   2.   Employees displaced as a result of a reduction in force, including those displaced and laid off as a result of City-wide displacements, shall receive notice of displacement and/or layoff no less than one (1) calendar week prior to the

demotion or separation. A union representative will be permitted to attend the notification meeting. A copy of such notice shall be sent to the Union.

3.  Notice of recall or offer of reemployment to laid off employees shall be sent by certified mail to the person's last address of record. It shall be the responsibility of the laid off employee to notify the Human Resources Department immediately of any change of address. Failure of the laid off employee to report to Human Resources within five (5) calendar days of the date of the notice shall be considered a voluntary quit and result in loss of seniority unless good cause for the employee's failure to report is shown.

4.  Exceptions to the above notice requirements shall be allowed in individual cases where the failure to give timely notice resulted from error or unforeseen circumstances beyond the control of management.

I.  To exercise bumping rights, an employee must have prior year service in such classification within the last three (3) years and can perform the duties of the new position. Employees shall be permitted to work outside their classification.

## 16.    TRANSFERS AND PROMOTIONS

The City shall have the right to transfer and/or promote employees within any department or to any new department in its sole discretion that may take into account an employee's seniority, training, education, expertise, performance, attendance, and work/discipline history, as well as any possible disruption that may result from an inter-departmental transfer and whether it will impede the City's ability to consolidate services or departments. Such transfer and/or promotion shall be on a three (3) month probationary period, during which time the City may determine that the transferred employee is unable to perform the duties and functions of the new position and may exercise its right to transfer that person back to their old position or to another position. Such transfers, promotions and reversions shall occur in accordance with Human Resource Policies.

## 17.    CONTRACTUAL WORK

A.  The right of contracting or subcontracting is vested in the City.

B.  In cases of outsourcing, contracting or subcontracting city operations affecting employees represented by the Union, the City will provide advance notice to Union prior to letting the contract. Union representatives will be advised of the nature and scope of the work or operations to be outsourced or contracted. The Union will be permitted to participate in the competitive bidding process for the work under the same terms and conditions as all other bidders.

## 18.    LEAVES OF ABSENCE

A.    **FAMILY AND MEDICAL LEAVE ACT OF 1993 (FMLA):** The City will promulgate FMLA policies in accordance with the current state of the law. A full explanation of the employee's FMLA rights shall be included in the New Employee Orientation.

B.    **CITY LEAVES OF ABSENCES:** Leaves for purposes covered under the FMLA may be extended, and leaves for other purposes may be granted, at the City's sole discretion pursuant to policies promulgated and modified by Human Resources.

C.    **UNION LEAVES OF ABSENCE**: Members of the Union elected or selected by the Union to do work which takes them from their employment shall, at the written request of the Union, receive leaves of absence without pay or benefits for the period of employment with the Union, and upon return shall be re-employed without any loss of seniority.

## 19.    UNION BULLETIN BOARD

A.    The City will furnish adequate space for the Union one (1) adequate bulletin board at locations to be agreed on by the Union and the Employer.  The boards shall be used only for the following notices:

1.    Recreational and social affairs of the Union.
2.    Union meetings.
3.    Union elections.
4.    Reports of the Union.
5.    Rulings or policies of the Union.

B.    Notices and announcements shall not contain anything political or of a libelous nature. All notices shall be signed by a union representative or his/her designated representative.

The Union's right to bulletin boards shall be contingent on its adherence to the requirements of paragraph A.

## 20.    STRIKES AND LOCKOUTS

A.    Interference with Work:  Employees shall not engage in any strike, work stoppage, slowdown, refusal to cross picket lines, sympathy strike or otherwise neglect of, or interference of any kind with, the operations of the City.

B.    The City will not lockout any employee in furtherance of a labor dispute.  However, if any employee is unable to work because equipment or facilities are not available due to a strike, work stoppage, slowdown or other interference by other employees, such inability to work shall not be deemed a lockout under the provisions of this section.

## 21.    SEVERABILITY CLAUSE

If any Article or Section of this CET or any Supplement thereto, should be held invalid by operation of Law or by any Tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such Tribunal, the remainder of this CET and supplements shall not be affected thereby, and Employer may implement a satisfactory replacement for such Article or Section.

## 22.    SUCCESSOR CLAUSE

This CET, nor any other terms and conditions of City employment regardless of source shall not be binding upon the successors and assignees of the Employer by the consolidation, merger, sale, transfer, lease, or assignment of the Employer in any respect whatsoever by a change of any kind of the ownership or management of either party hereto of any separable, independent segment of either party hereto.

## 23.    EMPLOYEE ASSISTANCE PROGRAM

A.    The City and the Union recognize and acknowledge that behavioral-medical problems have an adverse effect on the employee's job performance and merits special attention. Examples of these problems include but are not limited to substance abuse, including alcohol and drugs, physical illness, mental or emotional illness, marital or family maladjustments and other personal problems. These behavior-medical problems impair the employee's ability to function, and contribute to increased absenteeism and tardiness, and violations of other rules, regulations, and procedures. The combination of factors is recognized as having potentially damaging effects on the employee, the work site and the well-being of co-workers. The City and Union believe most behavioral-medical problems are treatable. The Employee Assistance Program is designed to provide assistance to employees who are experiencing behavior-medical problems that may result in deteriorating job performance.

B.    The Employer may continue to provide an Employee Assistance Program through a third party vendor.

C.    Nothing in this statement is to be interpreted as constituting any waiver of management's responsibility to maintain discipline or the right to invoke progressive disciplinary measures when applicable in the case of misconduct which may result from or be associated with the abuse of any substance or other personal problem; the union may exercise its right to process grievances concerning such matters in accordance with the CET.

D.    During or following treatment, the employee should not expect any special privileges or exemptions from standard personnel practices; however, employees with substance abuse problems or personal problems will be allowed to liquidate sick leave for the purpose of treatment or rehabilitation upon presentation of satisfactory medical evidence.

E.   When a leave of absence is necessary so that an employee may undergo behavioral-medical treatment for alcoholism, drug abuse, or other personal problems in or from an appropriate facility in accordance with this program, and when the employee has voluntarily submitted himself for such treatment, he/she may be granted a leave of absence if the employee has completed one (1) year of continuous classified service immediately prior to the leave.

F.   The confidential nature of medical records of affected employees will be preserved in the strictest manner as all other medical records. To the extent feasible, employee assistance facilities will be located in areas separate from other City activities.

## 24.   CAREER DEVELOPMENT AND TRAINING

A.   The City and the Union recognize the need to provide training and career development opportunities for employees which will develop their skills, knowledge, and abilities to effectively carry out duties and responsibilities of their current classification, and to qualify for more responsible positions in the future.

B.   The City subscribes to the principle of promotion from within, and, in keeping with that principle, the City agrees to focus some of its resources toward those employees in lower job classifications in order to provide opportunities to train and enter new careers.

C.   The City and the Union agree that a major goal of training and career development is improvement of the status of female and minority employees in order to fulfill the City's and Union's commitment to effective affirmative action programs, and to make the work force at all levels reasonably representative of the sex and ethnic composition of the City.

D.   The City and the Union recognize that technological or other changes may occur during the term of this CET. Whenever such changes occur, bargaining unit members may be offered opportunity for training, retraining or reassignment whenever possible. (Example: Detroit Resource Management System [DRMS]).

E.   To insure that employees are adequately trained, The Human Resources Department may conduct periodic training need assessments and employee performance reviews.

## 25.   EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION STATEMENT

A.   The City will adhere to a policy of equal opportunity for all employees and continue to prohibit discrimination because of race, color, creed, national origin, age, political orientation, sex, sexual orientation, or disability, continue to comply with all federal state and local civil rights laws, ordinances and regulations and promote a full realization of equal employment opportunity through a positive and continuing effort.

B.     The City may, upon request, provide the Union with copies of statistical minority employment information reports and such reports concerning policies and programs for equal opportunity in employment regarding City employees.

## 26.     DEFENSE AND INDEMNIFICATION OF EMPLOYEES AGAINST DAMAGE SUITS, CLAIMS, ETC.

Current City policy regarding the defense of and indemnification of employees against damage suits, claims, etc. is set forth in the Detroit City Code Chapter 13, Article 11.

## 27.     HR / PAYROLL SYSTEMS

The two-tier systems, referenced herein and in prior agreements, shall be implemented when the HR/Payroll/Benefit system can accommodate each specific change.

## 28.     CONFIDENTIAL EMPLOYEES

The parties agree that certain City employees are designated as confidential employees and are, therefore, to be exempt from membership in the bargaining unit covered by this CET. These employees are those holding the positions as outlined in the Memorandum of Understanding reached by the parties and submitted, and approved by the Michigan Employment Relations Commission in connection with Case No. C79 D-110 as well as the Decision and Order of the Commission in that case dated June 4, 1980. The City shall not designate other employees as confidential without the agreement of the Union; but may, if the Union fails to so agree, petition the Michigan Employment Relations Commission to approve such designation.

## 29.     JOINT LABOR-MANAGEMENT COMMITTEES

All current Labor Management Committees are suspended pending further review and discussion between the City and the Union. Joint committees, if any, shall be patterned in structure and role after the committees included in the contracts recently negotiated between the State and Unions representing state employees.

## 30.     COPIES OF THE CET

The City of Detroit will provide the Union with three (3) original copies of the CET and supplements to the CETs without charge. The Employer and the Union shall each bear the expense of reproducing and distributing their own copies.

## 31.     ECONOMIC ADVANTAGE/DISADVANTAGE

The Employer shall have the right to negotiate terms and conditions of employment with each bargaining unit without any obligation to provide similar terms to this unit. All existing protection and "me too" provisions shall be eliminated

## 32. MODIFICATION AND DURATION

This CET, any subsequent modifications thereof by the Employer, and any supplements thereto, shall be in effect until such time as they are further modified by a collectively bargained agreement or pursuant to Public Act 4 of 2011.

## 33. UNEMPLOYMENT BENEFITS

Employees covered by this Agreement shall receive unemployment benefits in accordance with the unemployment insurance plan administered by the Michigan Employment Security Commission under the Michigan Employment Security Act.

## 34. FUNERAL LEAVE

A. If a death occurs among members of the employee's immediate family or household, the employee, provided he/she attends the funeral and submits documentation of such upon return to work, will be granted two (2) days leave not to be charged to sick leave. An employee may take an additional three (3) days of funeral leave to be charged against current sick leave and then reserve sick leave upon his/her request.

B. **DEFINITION OF IMMEDIATE FAMILY**: The immediate family is defined as wife, husband, son, daughter, brother, sister, father, mother, step-father, step-mother, step-son, step-daughter, grandmother and grandfather.

C. If a death occurs among the relatives of the employee, the employee will be granted one (1) day leave, not to be charged to sick leave provided he/she attends the funeral and submits documentation of such upon return to work. If the funeral which the employee attends is more than 300 miles from the City of Detroit, the employee may extend the leave by two (2) days to be charged against current sick leave and then reserve sick leave upon his/her request.

D. **DEFINITION OF RELATIVES:** Relatives are defined as grandson, granddaughter, brother-in-law, sister-in-law, uncle, aunt, mother-in-law, and father-in-law.

E. If the Local Union President is not available to attend the funeral of a City employee who is a member of his/her local, a representative of the Union, with proper notification to the department head, shall be allowed one (1) funeral day, not to be charged to sick leave, to attend the funeral, provided he/she submits documentation of such upon return to work.

The two-tier system for new hires referenced in this Note will be implemented when the City's Payroll System has the capability.

## 35.    SICK LEAVE

A.    All employees who have completed three (3) months of continuous service shall be granted one (1) day of sick leave for every service month in which they have worked 80% of their scheduled hours, not to exceed twelve (12) sick leave days in any one fiscal year.  Current sick leave banks will be frozen at existing levels.  Future accrual of current sick leave banks will be capped at 300 hours.  Hours currently banked that exceed 300 will be retained, with no additional accrual unless the bank falls below 300, and any accrual thereafter shall not exceed the 300 hours cap.  The award of reserve sick days is eliminated and existing reserve banks are frozen.  .

All employees must be on the payroll for the entire month to be credited with sick leave.

B.    Sick leave may not be granted in anticipation of future service.

C.    Sick leave balances shall be expressed in terms of hours and shall be posted on the employee's check stub.

NOTE:  The two-tier system for new hires referenced in this Article will be implemented when the City's Payroll System has the capability.

## 36.    WORK WEEK, WORK DAY, SHIFT PREMIUM

### A.    STANDARD SERVICE WEEK:

1.    The standard payroll work week shall begin at 12:01 a.m. Monday, and end at 12:00 p.m.  Sunday.  It shall consist of five (5) regularly scheduled eight (8) hour work periods on as many work days.  The two (2) remaining days in the payroll work week shall be known as "off days."  In accordance with the Management Rights Clause, the City reserves the right to determine, and change start and quit times, as well as modify employee schedules.

2.    The first scheduled "off day" within the payroll work week shall be designated as the "sixth day" and the second scheduled "off day" within the payroll work week shall be designated as the "seventh day."

3.    Off days in the work week shall be scheduled consecutively unless such scheduling shall adversely affect or add cost to operations of the department.

4.    The City and the Union will review departmental work schedules which currently do not provide for consecutive off days.  If the parties can agree that scheduling changes which allow for consecutive off days are feasible, such changes will be implemented, provided that such charges do not result in increased costs or loss of productivity.

5.    The City and the Union will also review those departmental operations which currently require rotating shifts.  If the parties can agree that a more productive schedule can be established without an increase in cost, the City will take the steps necessary to implement such schedules.

6.   Employees will be allowed to submit shift preferences within locations for any new work schedules established pursuant to reviews made in accordance with Section A-3 and A-4.

**B.   SERVICE DAY AND WORK DAY:**

1.   The thirty five hour work week shall be eliminated.

2.   Two (2) coffee breaks of not less than fifteen (15) minutes per shift shall be permitted.

3.   When an employee is called to work, he/she shall be guaranteed no less than four (4) hours of pay for "show up" time at the appropriate rate.

4.   A flex-time work schedule may be established in certain departments where the appropriate working conditions exist.

5.   Employees assigned to seven day operations shall be required to call in two (2) hours prior to the start of their shift when requesting a sick day.

**C.   AFTERNOON AND NIGHT SHIFTS:**

1.   **Shift Premium Rates:** Employees who work regularly scheduled afternoon and night shifts shall receive, in addition to their regular pay, a premium of twenty-five cents (25¢) per hour for the afternoon shift and a premium of fifty cents (50¢) per hour for the night, if the employee works their entire regularly scheduled shift.

2.   **Shift Premium Times:**   The afternoon shift shall be any full-time shift commencing between the hours of 11:00 a.m. and 6:59 p.m.

     The night shift shall be any full-time shift commencing at the hour of 7:00 p.m. or between the hours of 7:00 p.m. and 3:59 a.m. in accordance with Chapter 13, Article 2, Section 12, of the Municipal Code of the City of Detroit.

D.   Unless provided for otherwise within this labor agreement, all of the provisions of this Article shall be in accordance with Chapter 13. Article 2, Section 12, of the Municipal Code of the City of Detroit.

E.   Currently, all hourly paid employees shall receive their pay for regularly scheduled hours not later than Friday following the payroll week in which it is worked.  When the City's payroll system has the capability, such employees will be paid on a bi-weekly basis.

## 37.   OVERTIME

A.   The City has the right to schedule overtime work and to require employees to work mandatory overtime.

## 38. HOLIDAYS AND EXCUSED TIME OFF

A. Employees shall be entitled to the following seven (7) holidays: New Year's Day, Martin Luther King's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day, during which premium time will be paid for time worked as set forth below. Employees shall be granted eight (8) hours of "Excused Time" on Good Friday or eight (8) hours on the last scheduled paid day prior to Good Friday, and eight (8) hours of "Excused Time" on the last scheduled paid day before Christmas Day and before New Year's Day and for Veteran's Day, and the day after Thanksgiving. Employees will be paid holiday pay for excused time days, but if employees are required to work on such days, only straight time pay will be paid for hours worked.

Entitlement to swing holidays shall be discontinued after the award of such holidays on July 1, 2012 and for all new hires.

B. Employees shall receive eight (8) hours straight time pay for the above mentioned holidays. Where a holiday is concurrent with the employee's sixth or seventh work day, the Department Head shall have the option of paying for the holiday or granting equivalent time off with pay. When the City elects to give the employee time off, said time shall be granted at the request of the employee with the approval of the Department Head.

C. An employee shall be eligible for holiday pay or excused time pay provided he/she has received at least eight (8) hours of pay (exclusive of overtime and sick leave) the workday before and the day after the holiday or excused time day. Provided, however, the employee continues on the payroll through the holiday or excused time day and is otherwise qualified for the holiday or excused time day.

For the purpose of this section, an employee shall be considered off the payroll if he/she is fired, quits, or is on a formal leave of absence granted by the Human Resources Department (generally over 30 days), is on workers' compensation, or is laid off. An employee's payroll status not covered by the above shall be subject to a Special Conference. Criteria to be used to determine payroll status will be if the absence of the employee shall be for more than thirty (30) days.

D. If an employee is absent without just cause on a holiday or excused time day on which he/she is scheduled to work, he/she shall receive no pay for the holiday.

E. Time and one half (1.5) will be paid for all hours worked on a holiday in addition to the straight time holiday pay due for a holiday as such.

F. Premium payments shall not be duplicated for the same hours worked.

G. Employees who are scheduled to work on any holiday, but who fail to report to work, shall not be eligible for holiday pay.

H.  For the purpose of this Article, an employee shall be considered off the payroll if he/she engages in a work stoppage which extends through a holiday or excused time day. All benefits under this Article will be forfeited for the holiday or excused time in question.

I.  If a holiday or excused time day falls on Saturday it shall be observed on the preceding Friday, and if a holiday or excused time day falls on Sunday it shall be observed on the following Monday for all employees except those assigned to six and seven day operations. Should two (2) consecutive holidays or excused time days occur on a Friday and Saturday, or on a Sunday and Monday, Friday and Monday, respectively, shall be designated as the official holidays.

J.  If an employee engaged in six or seven day operations works either the actual calendar holiday or the substitute holiday, he/she shall receive the holiday premium, but he/she will not be allowed to pyramid holiday premium for working both days.

   1.  An employee assigned to a six or seven day operation may be scheduled off for the holiday on either the calendar holiday or the substitute holiday.

   2.  When an employee works both the calendar holiday and the substitute holiday, the day selected as a holiday for pay purposes shall be the day which allows the employee the maximum pay credit for working both days.

   3.  If an employee works either the calendar holiday or the substitute holiday, but not both, he/she shall be paid holiday premium for the day worked.

   4.  If an employee is off sick on the calendar holiday, or the substitute holiday, or both, he/she shall receive sick pay. If he/she works either of the two days he/she shall receive holiday premium.

   5.  If an employee is AWOL on the actual calendar holiday, but works the substitute holiday, he/she shall not be entitled to holiday pay or holiday premium.

K.  The City shall have the option to close all or part of its facilities for the Christmas and New Year's holiday season consistent with operating needs and the public service. Employees shall have the option of using vacation, swing holidays (if applicable), compensatory time or no-pay for any days off during this period. If an employee has none of the above listed accrued time, departmental leave may be used if available. If an employee has no paid time accrued, and wishes to work, the Department will make every attempt to place an employee in his/her department on a job assignment consistent with their job classification and ability to perform the work.

   The City shall determine optional holiday season closing dates and shall notify the Union by November 1st of each year of whether it intends to implement a holiday closedown.

   Any scheduled time off or uses of departmental leave days during these periods shall not be counted against the employees' attendance records nor adversely affect their benefits.

**NOTE:** The two-tier system for new hires as well as other new changes referenced in this Article will be implemented when the City's Payroll System has the capability.

### 39.   UNUSED SICK LEAVE ON RETIREMENT

A.   Employees shall be entitled to payment for unused sick leave on retirement as follows:

Upon retirement, or death with twenty (20) years of service, an employee shall be entitled to payment of sixty percent (60%) of their unused sick leave accrued prior to the effective date of this CET. All sick leave accumulated after the effective date of this CET and remaining unused upon retirement or death shall not be paid.

This payment shall be made pursuant to City policy, which may be amended at the City's discretion.

B.   The payments will be made as part of the Employee's Pension Program, or the Employee's Benefit Plan, or through the Finance Department.

C.   The City reserves the right, for purposes of retirement payouts, to cap the number of hours a member may accumulate in their sick leave and compensatory time banks or, to the extent allowed by law, cap the amounts of payout from such banks upon retirement.

### 40.   VACATIONS

Employees inducted during the course of the fiscal year shall not be eligible for vacation leave without deduction of pay until they shall have earned at least one thousand (1000) hours of paid time, exclusive of overtime or premium time, and until they have attained status as City employees for a least six (6) months. When employees qualify, as above stated, they shall be entitled to five (5) days of vacation leave. Once employees have earned at least sixteen hundred (1600) hours of paid time, exclusive of overtime, and have attained status as employees for at least twelve (12) months, they are entitled to five (5) additional vacation days. In order that an employee's time may be computed on a fiscal year basis, on the July 1 following his first year anniversary date of employment the employee will be entitled to a prorated vacation leave, computed by multiplying the number of months remaining from the anniversary date, to the end of the fiscal year by 8.3 percent of ten (10) days and rounding the product to the nearest whole number. Thereafter, his vacation shall be computed on a fiscal year basis. The City reserves the right to make changes to any aspect of vacation, including but not limited to, the number of vacation days/units and selection process.

Employees hired on or after effective date of the CET, shall not be eligible for vacation leave without deduction of pay until they shall have earned at least one thousand (1000) hours of paid time, exclusive of overtime or premium time, and until they have attained status as City employees for a least six (6) months. When employees qualify, as above stated, they shall be entitled to five (5) days of vacation leave. In order that an employee's time may be computed on a fiscal year basis, on the July 1 following his first year anniversary date of employment the employee will be entitled to a prorated vacation leave, computed by multiplying the number of months remaining from the anniversary date, to the end of the fiscal year by 8.3 percent of five

(5) days and rounding the product to the nearest whole number. Thereafter, his vacation shall be computed on a fiscal year basis.

The maximum vacation days earned in a fiscal year shall be as follows: Twenty (20) days for employees with fifteen years of service hired before September 28, 2010; fifteen (15) days for employees with fifteen years of service hired on or after September 28, 2010. Maximum annual accrual amounts at less than fifteen years of service shall be in accordance with the vacation policy promulgated by the Human Resources Department, as amended from time to time, at the sole discretion of the City. The vacation policy will govern all aspects of vacations

**NOTE:** The two-tier system for new hires as referenced in this Article will be implemented when the City's Payroll System has the capability.

## 41. TEMPORARY ASSIGNMENTS

A.    The Employer reserves the right to assign employees to positions outside their classification on a temporary basis.

B.    **OUT-OF-CLASS ASSIGNMENTS**:

    1.    For purposes of this Article, an employee is deemed to be working "out-of-class" if he/she is reassigned by management from his/her regularly assigned duties to perform duties and responsibilities not normally performed and characteristic of and requiring the qualifications of a higher classification. Assignment of some duties normally performed by an absent employee shall not constitute an out-of-class assignment if such duties are appropriate to the classification of the person assigned.

    2.    If an employee is so assigned the duties of a higher classification to replace an absent employee for thirty (30) or more consecutive work days, he/she shall be compensated on an out-of-class basis at the rate for the appropriate classification for all such out-of-class hours worked.

    3.    For out-of-class assignments, the most senior pre-qualified employee shall be offered the out-of-class work provided he/she is readily available and able to do the work. Pre-qualified shall mean being on the most recent promotional list for the class. If there is no pre-qualified employee in the work unit, the out-of-class assignment shall be offered to the most senior person provided he/she is readily available and able to do the work.

    4.    The parties recognize that out-of-class work assignments shall not be used to circumvent established procedures for filling vacant positions by transfer or promotion as provided in this CET, nor shall supervisors avoid out-of-class payment by arbitrarily alternating out-of-class assignments.

C. **TEMPORARY PLACEMENT OF EMPLOYEES INTO OTHER DUTIES AND/OR DEPARTMENTS**:

    1.     Employees temporarily placed under these provisions shall not lose his or promotional opportunity at the transferred-out location and shall be treated as if he or she had not been temporarily placed in other duties/department.

    2.     Any vacation period the moved employee had approved at the transferred-in location will continue to be honored at the transferred-out location so long as the vacation does not adversely impact operations.

## 42. JURY DUTY

A.     An employee shall be allowed to attend jury duty without pay. An employee may elect to use paid leave for any days he/she serves on Jury Duty. Jury duty time shall not be counted as time worked for the purpose of computing overtime.

B.     In order to use a paid leave day during jury duty, an employee must have been regularly scheduled to work on a non-overtime basis, must give prompt prior notice to his/her supervisor that he/she has been summoned for jury duty, and must furnish satisfactory evidence that he/she reported for or performed jury duty on the days for which he/she requests paid leave, provided that the department head shall have discretion in seeking to have the employee excused where his/her services are essential.

C.     When properly notified by an employee under the terms of Section B, the department shall, if necessary, reschedule the work assignment of the employee so as to coincide as closely as possible with the jury duty schedule. This reassignment shall take precedence over other conflicting sections of this contract.

D.     The employee must notify the department of his/her desire to use paid leave prior to the first date of jury service.

## 43. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE INSURANCE

**MEDICAL**

The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a hospitalization and medical insurance plan in accordance with the plan design approved by the Employer, subject to the Health Care Policy promulgated by the City. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein. The Employer reserves the right to make changes in contribution structure, plan design, providers, coverage, networks, deductibles, co-pays and other provisions of its insurance programs. Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees shall have the same hospitalization and medical insurance plan options and contribution structure as active employees and will also be

In any represented unit where overtime is not equalized, overtime work shall be offered starting with the senior employee. When there are not enough volunteers, overtime assignments shall be made according to inverse seniority. Seniority-based overtime offers shall not be required where an unexpected emergency arises or it is impractical to seek volunteers. Existing super seniority practices for Union stewards who engage in activities defined in Article 14 for purposes of overtime shall be maintained.

In any represented unit where the City currently equalizes overtime, the Department shall determine the equalization scheme and the sole remedy for a violation of the equalization scheme shall be working the next available overtime opportunity and not payment of any back pay. In no circumstance shall employees be paid for time not worked. Departments may discontinue equalization of overtime with prior notice to the union and approval of Labor Relations Director.

In certain cases, Departments, with the written approval of the Labor Relations Director may use the following factors in overtime assignments: experience, work performance, demonstrated abilities and seniority.

B. **TIME AND ONE-HALF OVERTIME**:

1. **Employees** – Time and one-half [one-hundred and fifty percent (150%)] will be paid to hourly-rated employees for all hours worked over forty (40) in one (1) service week inclusive of a seventh day or a holiday. Overtime hours worked (not to be credited at premium time) in excess of four (4) hours and not exceeding sixteen (16) hours in one (1) service week may, at the discretion of the Department, be substituted in lieu of an equal amount of an employee's regularly assigned forty (40) hours.

2. When a schedule indicates a lunch period but conditions make it impractical to enjoy same, the employee or employees involved will be paid the prevailing overtime rate in lieu of his/her lunch period. The provisions of this section shall not apply to employees whose work day is designated on a measured task basis. In no instance shall payments be made for lunch periods not worked.

3. Premium payments shall not be duplicated for the same hours worked.

4. The Employer shall not be required to pay any overtime compensation that is not required by the Fair Labor Standards Act or other applicable law.

5. Except for any contrary provisions above, all of the above shall be in accordance with Chapter 13, Article 2 of the Municipal Code of the City of Detroit and the Michigan Minimum Wage Law.

subject to such changes as may be determined by the Employer. Non-duty disability retirees are not eligible for hospitalization-medical or prescription drug insurance coverage.

## DENTAL

The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a dental plan in accordance with the plan design approved by the City, subject to the Health Care Policy promulgated by the City. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein. The Employer reserves the right to make changes in contribution structure, plan design, providers, coverage, dental networks, deductibles, co-pays and other provisions of its insurance programs. Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees are not eligible for dental insurance coverage.

## OPTICAL

The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a optical plan in accordance with the plan design approved by the City, subject to the Health Care Policy promulgated by the City. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein. The Employer reserves the right to make changes in contribution structure, plan design, providers, coverage, dental networks, deductibles, co-pays and other provisions of its insurance programs. Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees are not eligible for optical insurance coverage.

## PRESCRIPTION DRUG

Employees in the bargaining unit shall have the option of participating in the BCBSM/CVS Caremark plan (or any successor health care plan made available to City employees generally); provided, that the City's maximum contribution for any health plan shall be no more than 80% of the plan offered by **BCBSM/CVS** Caremark. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein.

All health habits, reproductive (fertility), and lifestyle prescription drugs EXCEPT FOR SMOKING CESSATION AND WEIGHT LOSS will not be covered under the City's prescription drug program.

## FLEXIBLE SPENDING ACCOUNTS (SECTION 125 PLANS)

The City shall provide health care plan participants with a pre-tax premium or illustrative rate contribution, which ever is applicable. The City will implement Flexible Spending accounts for medical, dependent care and commuter accounts. Eligibility for participation in these Flexible Spending Accounts is consistent with Health Care Plan enrollment eligibility. This plan will permit employees to contribute to these accounts, pre-tax.

**Note:** The two-tier system for new hires referenced in this Article will be implemented when the City's Payroll System has the capability.

## 44. WORKERS' COMPENSATION

All employees shall be covered by the applicable Workers' Compensation laws and the City's Worker's Compensation Policy, as may be amended at the discretion of the Employer. An

**Note:** In order to continue hospitalization and life insurance benefits, employees are responsible for their portion of the premium as required by the CET. Those deductions will be made automatically while they remain on the payroll because they are supplementing. Once they leave the payroll, they must make arrangements with the Pension Bureau to pay those premiums in order to continue coverage.

## 45. DEATH BENEFITS AND LIFE INSURANCE

### A. DEATH BENEFITS:

Death benefits for all regular City employees are authorized by the City Charter, Title IX, Chapter VIII. The City Code, Chapter 13, Article 8, Section 8, currently provides a death benefit of $10,000.

1. Membership shall be mandatory for regular employees.

2. Contributions shall be determined by the City

### B. PAYMENT FOR EMPLOYEES KILLED OR PERMANENTLY DISABLED IN LINE OF DUTY:

1. A lump sum duty death benefit of $10,000 will be paid to the beneficiaries or estate of employees who are killed or who die as a direct result of injuries sustained in the actual performance of their duties, as determined by City policy which may be amended in the discretion of the City.

2. Employees who receive a permanent disability payment under this Article shall be ineligible for the $10,000 Duty Death Benefit described above.

## 46. WAGES

**A.** **WAGE DECREASE:** All classifications and positions shall receive a 10% wage reduction, effective the date of implementation of this CET.

**B.** **LONGEVITY:** all longevity payments are hereby eliminated effective the date of this CET.

**C.** **BUDGET REQUIRED FURLOUGHS:** All budget required furloughs are hereby eliminated effective the date of this CET; however, the City reserves the right to reinstitute future furloughs as a means of cost containment.

**D.**   **MERIT & STEP INCREASES:** All employees will no longer be eligible for merit and step increases effective the date of this CET, except that all formal certified apprenticeship programs shall not be affected.

**E.**   **MISCELLANEOUS:**

1.   All salaried employees will have their hourly rate computed by dividing their annual salary by 2080 hours.

2.   Salary and Rate Adjustments:

a.   The pay rates of hourly-rated employees shall be rounded up to the nearest whole cent.

b.   Each employee covered by this CET, whose wages are classified as a yearly salary with minimum and maximum rates more than $20,000 annually, and which rates, as a result of any required change to be made to their wages causes the resulting amounts to fall between even hundred-dollar levels, shall have these rates adjusted to the next higher hundred dollar level.

3.   When it is administratively feasible, the pay check for all employees shall be transmitted via direct deposit or payroll debit card

**F.**   **CORRECTION OF PAYROLL ERRORS:**

Where by payroll error an employee is underpaid or overpaid the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment pursuant to applicable law.

The City reserves the right to seek immediate recovery through appropriate legal proceedings.

## 47.   CLOTHING AND UNIFORM ALLOWANCES

A.   For employees who are required to wear and maintain specific clothing and/or shoes, the clothing allowance shall be $170 every two years.

B.   For employees who are required to furnish a specific uniform at their own expense, the allowance will be $350 every two years.

C.   Clothing and uniform allowances will be paid by the last pay period in September.

D.   This Article shall be administered according to the Resolution of the City Council of May 9, 1974 (J.C.C. p. 1107).

## 48. RETIREMENT

A.  Eligibility for Service Retirement Allowance – Any employee who is covered by the provisions of this CET and who is a member of the General Retirement System of the City of Detroit who has thirty (30) or more years of credited service may retire upon his/her written application filed with the Board of Trustees setting forth the date, which shall not be less than thirty nor more than ninety days, subsequent to the execution and filing of said written application, he/she desires to be retired. On the date so specified for his/her retirement he/she shall be retired, notwithstanding that pending such period of notification he/she may have separated from City service. Upon his/her retirement he/she shall receive a Retirement Allowance as provided by the City Charter and Municipal Code. Employees may retire on or after July 1, 1992, with 25 years of credited service but less than 30 and receive an actuarially reduced pension which shall be known as the Actuarially Reduced 25 Year Option of the Retirement Plan. Employees who are receiving a duty or a non-duty disability pension or Income Protection benefits may elect to convert to this new option if they otherwise meet the qualifications.

Employees who have resigned with 25 or more years of service since July 1, 1992, shall have ninety (90) days to submit an application for this option from the date they are officially notified by the Pension Bureau that said application can be processed.
After the initial enrollment of applicants by the Pension Bureau, employees who subsequently leave City employment shall have ninety (90) days from their last paid date on the City payroll to select this option.

Retirees who began receiving a Duty or Non-Duty Disability Pension after July 1, 1992, may convert to this option no later than ninety (90) days after they would have had twenty-five (25) years with the City and have been notified by the Pension Bureau of the availability of this option.

Employees who began receiving Income Protection Benefits after July 1, 1992, may convert to this option anytime after they have had twenty-five (25) years of service with the City.

The above paragraphs notwithstanding, employees hired after January 1, 1996, shall not be eligible for a Service Retirement until they shall have attained fifty-five (55) years of age. This age requirement shall apply to both the Regular Service Retirement with thirty (30) years of service and for pension calculation purposes to the Early Service Retirement (actuarially reduced) with twenty-five (25) or more years of service.

B.  Retirement benefits shall be modified to include an optional coordination of benefits between regular retirement benefits and Social Security benefits for those employees who retire from the City with a regular retirement or the Actuarially Reduced 25 Year Option prior to becoming eligible for Social Security payments. Such coordination of benefits shall cause an approximate leveling of total monthly benefits derived from both the City's retirement system and Social Security without creating any additional actuarial costs.

C.  For employees hired on or after July 1, 1980, the vesting provisions of the City Retirement Plan shall require ten (10) years of service regardless of age in lieu of the "40 and 8" age and service requirement.

D.  For employees who separate from City service with a vested pension prior to reaching eligibility for a regular service retirement, time earned after July 1, 1986, shall not be factored into the formula for determining their pension benefit until they shall have attained age 62. This provision will not affect the current practice governing disabled employees.

In the event that any law, state or federal is passed during the term of this CTE which permits employees to vest their pension prior to meeting the vesting requirements set forth in this contract, any employee who vests his/her pension in such a manner shall not be eligible for any pension benefits until his/her sixty-second (62nd) birthday.

E.  Employees who become eligible for a pension under the vesting provisions of the plan, shall be ineligible for any of the hospital, medical, optical or dental benefits provided for other retirees, spouses, dependents or beneficiaries.

F.  Subject to the provisions in Section O, employee contributions to the general retirement annuity fund shall be optional. Balances in the fund standing to the individual credit of employees discontinuing contribution shall be maintained with accumulated interest to be paid out to the employee upon separation from the City. Employees qualified under the pension vesting provision of the general retirement system may withdraw their annuity with accumulated interest upon separation.

Upon attainment of twenty-five (25) years of service, an employee shall be eligible to withdraw, one time only prior to retirement, all or part of his/her annuity savings.

Non-Duty and Duty Disability retirees shall be eligible to withdraw, one time only, all or part of their annuity savings.

G.  At the time of retirement, members of the general City pension system may elect an option which shall entitle them to change their pension option from either option 2 or option 3 to a straight life pension after they have commenced collection of the pension if the member's beneficiary predeceases the member. This shall be known as the Pop-Up Option. The actuarial cost of the change in benefit shall be borne by the member who selects this change in his/her option election.

H.  Employees who retire on or after July 1, 1998, shall have their pensions computed according to the following formula. Using the highest paid 36 consecutive months out of the last 120 including longevity payments, as Average Final Compensation; 1.6% of Average Final Compensation for each year of service for the first 10 years; 1.8% of Average Final Compensation for each year of service for the second 10 years; 2.0% of Average Final Compensation for each year of service greater than 20 years up to 25 years; and 2.2% of Average Final Compensation in excess of 25 years; plus $12 for each year of City service not to exceed $120. In no case shall benefits paid by the Retirement

System exceed ninety percent (90%) of Average Final Compensation except in the case where a higher pension amount has been earned in accordance with the provisions in effect prior to July 1, 1992. For all years of credited service accrued by Union members after July 1, 2012, the multiplier shall be reduced to 1.5% of Average Final Compensation per year.

I.  Effective for bargaining unit members who retire on or after July 1, 1999, they shall have the Unused Sick Leave On Retirement payment benefit provided for in Article 25 of this CTE.

J.  Effective January 1, 1999, the maximum annual amount payable to an individual on a Duty Disability pension shall be increased to $9,000 and for Non-Duty Disability pension to $6,000.

   The maximum amount of the Accidental Death Benefit as found in Chapter VI, Article VI, Part C, Section 1, Paragraphs B and C of the City Charter shall be increased from $2,400 to $5,700 per annum.

K.  Effective September 28, 2010, any employee covered by this CET, who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner (IME). If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City of Detroit, the employee shall not be eligible for the duty disability retirement.

L.  Effective January 1, 1999, minor dependents under age 19 or permanently mentally or physically impaired dependent children who become impaired prior to age 19 of employees who die with 20 years of service without a surviving spouse shall receive a payment of $9,000 per year which shall be divided equally amongst all eligible dependents. The payment will cease when the last minor attains age 19 or for mentally or physically impaired children at death. There shall be no retirement escalator for this payment.

M.  In addition to in-service death pension benefits which already exist for employees with 20 or more years of service, effective July 1, 1998, if a bargaining unit member dies after having attained 15 or more but less than 20 years of creditable service at any age below 60, the surviving spouse will be paid a 50% joint and survivor election. Dependent children, if there is no eligible surviving spouse, are to be paid a total of $6,000 which shall be divided equally amongst all eligible dependents until the youngest child reaches age 19, or for life if a child is permanently physically or mentally impaired.

N.  After the effective date of this CET, employees will no longer receive the 2.25% per annum escalation.

O.  Pension – Employer Contribution (414h Plan):

   Upon notification by the Union to the City of its desire to activate a 414(h) Plan, the City will take steps to implement the provisions contained in the following paragraphs. The Union initiated the discussions and proposed the provisions contained in the paragraphs

and the parties recognize and agree that it will take some time before this program can become operational due to the necessity of making changes in the City's computerized payroll system.

It is hereby agreed that every member of this bargaining unit shall be required to make contributions in the amount of 5% of their annual compensation to the Annuity Savings Fund of the General Retirement System. The said 5% employee contribution to the Retirement system Annuity Fund, although designated as employee contributions, shall be paid by the City of Detroit in lieu of contributions by the employee. The employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the employer to the annuity fund. There shall be no additional contribution expense to the City of Detroit, and the amounts so contributed by the employer on behalf of the employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the employee until these amounts are distributed or made available to the employee.

These provisions shall not affect the amount or benefits level of the retirement allowance, or the City of Detroit's obligation thereto.

The City shall not be responsible for any adverse ruling, if any, and monetary penalty, judgment, or damages to the City as a consequence of the City's compliance with the provisions of this CET.

P.      Employees shall have the option of selecting from two additional surviving beneficiary options of 25% and 75%.

Q.      Annuity Contribution Amounts: The City will offer employees who choose to contribute to the annuity plan the option of 3% up to the Social Security maximum salary which would then be increased to 5%, a straight 5%, or a straight 7% contribution.

R.      Members of the bargaining unit shall have the option of belonging to the City's current defined benefit/defined contribution retirement plan or a new defined contribution retirement plan in accordance with the rules the City will issue for a defined contribution plan. The parties agree that the defined contribution plan the Executive Branch will propose for acceptance by the City Council, although not specifically detailed at this time, is intended to be primarily in accordance with the provisions which were last advocated by the Executive Branch in November-December, 1997.

S.      Effective July 1, 2003, the membership of the General Retirement System, Board of Trustees [Article II, Section 2, Subsection (1)] shall be modified to provide that one of the trustees is: "The Mayor of the City or his/her designated representative, ex-officio. Such designated person shall be a full-time appointive or classified City employee."

T.      To the extent that employees in the bargaining unit participate in any supplemental retirement plans other than the General City Retirement System, the City reserves the right to withdraw from such supplemental plans at any time and in accordance with applicable law.

U.  All Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this CET or Ordinance 2-93, J.C.C. Page 133.

V.  **Defined Contribution Plan for Current and New Hires** – The City reserves the right to design, establish, manage, amend, and implement a Defined Contribution Plan for current employees and new hires, which may include a Defined Contribution Retirement health care plan.

W.  Upon the effective date of this CET, all vision and dental benefits shall no longer be provided for any future retires after January 1, 2013.

X.  The City reserves the right to modify, amend, and/or eliminate any and all aspects of its pension/retirement plan(s), unless prohibited by law.

## 49.  GENERAL RETIREMENT SYSTEM, BOARD COMPOSITION

The membership of the Board of Trustees of the General Retirement System (GRS) shall be changed to consist of 11 trustees as follows:

1.  The Mayor, ex-officio or designee.

2.  The President of the City Council, ex-officio.

3.  The City Treasurer, ex-officio.

4.  The Budget Director, ex-officio.

5.  The Finance Director, ex-officio.

6.  The Human Resources Director, ex-officio.

7.  Three members of the retirement system to be elected by the members of the retirement system, under such rules and regulations as may be from time to time adopted by City Council; except that no more than one trustee shall be from any one department.

8.  The Mayor shall appoint, subject to the approval of City Council, as a trustee, an individual with a background in investment and/or municipal finance.

9.  The Mayor shall appoint, subject to the approval of City Council, a retiree who is receiving benefits under the retirement system.

13-53846-swr    Doc 8005-36    Filed 10/26/14    Entered 10/26/14 05:47:53    Page 90 of 47

The City reserves the right to change the composition, structure and decision making procedures of the Pension Board.

Within fifteen (15) days of the effective date of this CET, the Pension Board shall provide to the Mayor and City Council all pension plan documents, including but not limited to: Plan Documents, Plan Amendments, Favorable Determination Letters (Pension Only), Summary Plan Descriptions, All Summaries of Material Modifications, Model Enrollment Forms, Insurance Contracts, All Funding/Actuarial Reports, All Explanations provided to Participants/Employees such as "Benefits at a Glance" and/or other summaries. The Pension Board shall provide to the Mayor and City Council all future amendments to any such documents within five (5) days of the amendment.

## 50. PRIVATE CAR MILEAGE REIMBURSEMENT

A. **RATES OF PAYMENT:**

When an employee covered by this CET is assigned to use his/her automobile to perform his or her job, he or she shall be paid mileage at the current IRS per mile rate, subject to change when that rate changes higher or lower.

B. **DEFINITION OF REIMBURSABLE MILEAGE:**

1. Trips from home to headquarters and back home shall not constitute reimbursable mileage.

2. Trips in either direction between home and any officially designated point (when there is no specific headquarters) shall not constitute reimbursable mileage.

3. Trips from headquarters (or from the designated starting point if the employee has no headquarters) to a job, from job to job, and if directed, back to headquarters or starting point, shall constitute reimbursable mileage.

C. In the event of an automobile breakdown during regular working hours, the time, which an employee is allowed for servicing and repairing his automobile is to be determined by departmental policies.

D. When an employee covered by this CET is regularly assigned to a job which requires the use of an automobile during his normal working hours, he/she shall be required to furnish said car.

E. In order to receive mileage reimbursement an employee must actually use an automobile on City business.

F. Employees shall be subject to the City's Private Car Mileage Reimbursement Policy, which may be amended from time to time in the discretion of the City. In case of conflict, the Policy shall take precedence.

## 51.   LONG TERM DISABILITY BENEFITS (INCOME PROTECTION PLAN)

Employees shall be eligible for the City's Long Term Disability Benefits ("Income Protection") Plan, to the extent allowed by City policy, which may be amended from time to time at the City's discretion.

EXHIBIT I

**Health Care Plan Design**

| PPO Plan, HAP/BCN plan(s), THC plan | In-Network | Out-of-Network |
|---|---|---|
| Participant Premium Contribution | 20% for all plans | 20% for all plans |
| Plan Deductible | $250/$500 | $500/$1000 |
| Co-insurance % | 20% | 40% |
| Co-insurance maximum (OOP Max) | $1,500/$3,000 | $2,500/$5,000 |
| Office visit | $25 | $25 |
| Urgent care co-pay | $25 | $25 |
| Emergency room | $100 | $100 |
| Hospital co-pay | $100 | $100 |
| | | |
| **Rx Drug Plan** | | |
| Co-pay (retail, mail 2x for 90 day supply) | $10/$35/$50 | $10/$35/$50 |
| Mandatory mail | After 34 days | After 34 days |
| Mandatory generic | Required | Required |
| Traditional generic – step therapy | Required | Required |
| Exclusion of lifestyle drugs | Required | Required |
| | | |
| **Other Changes** | | |
| Participants contribute 20% for dental and vision coverage | | |
| **Vision Plans** | | |
| a. The City will no longer offer the Co-Op Optical plan | | |

The above City Employment Terms were presented on the

**18**<sup>th</sup> day of **July** 2012

to the AFSCME, Non Supervisory.

_Lamont D. Satchel_
Lamont D. Satchel, Director
Labor Relations Division