# Exhibit 4

# Financial Stability Agreement

between

## the State of Michigan and the City of Detroit

This landmark agreement was jointly developed by my administration, members of the Detroit City Council and the State of Michigan.

Of critical importance to Detroiters, this agreement preserves City Charter, Executive and Legislative powers. It also provides necessary financial mechanisms to execute a process that will ensure the City's fiscal stability over time.

We believe this Financial Stability Agreement puts us on track to restructure our City financially and reestablish an economic infrastructure to make sure Detroit never faces these financial conditions again.

*— Dave Bing, Mayor*

13-53846-swr   Doc 8005-4   Filed 10/18/14   Entered 10/18/14 00:46:45   Page 2 of
150
13-58846-tjt   Doc 8405-17   Filed 11/26/14   Entered 11/26/14 05:47:43   Page 2 of 62

STATE OF MICHIGAN

RECEIVED/FILED
MICHIGAN DEPT OF STATE

2012 APR 10 PM 1:53

OFFICE OF THE GREAT SEAL

In the matter of the City of Detroit, the
Financial Review Team for the City of Detroit
the Michigan Department of Treasury and
Governor of the State of Michigan

CONSENT AGREEMENT

_____

## AFFIDAVIT OF PERSONAL SERVICE

STATE OF MICHIGAN )
              ) ss.
COUNTY OF INGHAM )

      Caleb Buhs, being duly sworn, deposes and says that on April _10_, 2012, he personally
served a copy of the **Financial Stability Agreement** with the **The Office of the Great Seal**,
Michigan Department of State by personally handing said document to:
_Bev Vogt_      _Bev Vogt_      _4/10/2012_    .

_____
Caleb Buhs, Office of Communications
Michigan Department of Treasury

Subscribed and sworn to before me
this _11th_ day of April, 2012

_____
Karyn Howd, Notary Public
County of Ingham, Michigan
Acting in Ingham County
My commission expires: 02-14-2013

KARYN HOWD
NOTARY PUBLIC, STATE OF MI
COUNTY OF INGHAM
MY COMMISSION EXPIRES Feb 14, 2013

## FINANCIAL STABILITY AGREEMENT

WHEREAS, the City of Detroit (the "City"), like many industrial cities throughout the United States, has experienced a prolonged period of economic change stretching over several decades which has eroded the quality of life of the City's residents and businesses; and

WHEREAS, the City currently confronts daunting challenges characterized by persistent and systemic fiscal imbalances and deficit conditions, aggravated by the deterioration in revenues received from property taxes, income taxes, interest earnings, utility revenues, and intergovernmental revenues resulting from the recent serious recession in the U.S. and Michigan economies; by the growth in the City's legacy costs concurrently with the City's diminished ability to carry such costs; and by the difficulty in rapidly restructuring the City's operations so as to bring short-term and long-term expenditures in line with current and projected revenues; and

WHEREAS, a financially stable and vibrant City is important as a catalyst for the State of Michigan's overall image and success in economic development, business attractiveness, quality of life, and a host of other factors; and

WHEREAS, fundamentally changing the City's current trajectory can restore the quality of life which families, businesses and visitors have a right to expect and enjoy; and

WHEREAS, the City, through the Mayor and City Council, seeks to pursue this long-term vision by achieving, first, financial stability for the City, and, second, a sustainable and stable platform for growth ensuring the City's financial integrity in a manner that enables the City to grow, prosper and thrive; and

WHEREAS, the People of the State of Michigan have required the establishment of the Department of Treasury as a principal department of state government under Section 3 of Article V of the State Constitution of 1963 (the "Treasury Department") and provided that the State Treasurer, a constitutional officer appointed by the Governor with the advice and consent of the Michigan Senate (the "State Treasurer"), shall serve as the head of the Department, which is vested with responsibilities related to local government finance, budgeting and administration under state law; and

WHEREAS, the City is a political subdivision of the State of Michigan organized as a body corporate under Act 279, Public Acts of Michigan, 1909, as amended, the Home Rule City Act ("Act 279"), with the People of Detroit having created and provided for their continuing control of the municipal government of the City by adopting a Home Rule Charter of the City of Detroit (the "Charter"), and the People of the State of Michigan conferring comprehensive home rule power to the City through the State Constitution of 1963, subject to the limitations on the exercise of that power contained in the Constitution or the Charter, or imposed by statute;

WHEREAS, the Treasury Department desires to undertake jointly with the City efforts for the betterment of the residents of the City and the State of Michigan (the "State") as a whole through the adoption of this Financial Stability Agreement (this "Agreement"); and

WHEREAS, as a commitment to the long-term cooperative process established in this Agreement, the Mayor and the City Council desire to authorize and perform certain initial restructuring actions detailed herein with the Treasury Department; and

-2-

13-53846-swr    Doc 8665-47    Filed 01/28/14    Entered 01/28/14 00:54:43    Page 5 of 62
150

WHEREAS, the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas; and

WHEREAS, this Agreement contains the terms and conditions authorizing a cooperative undertaking between public agencies for efficiently restructuring the City's operations and tackling the City's systemic issues and accumulated deficit with the goals of (i) ensuring that the City remains a safe and secure environment where residents and visitors can live and work, (ii) promoting the delivery of quality, efficient, and effective public services to residents and businesses, and (iii) creating a civic culture and environment that attracts as well as retains investment, businesses, jobs and new residents to the City and the State; and

WHEREAS, approval of this Agreement is intended to reaffirm the role of the City's executive and legislative branches under the Charter in the development of the strategy, policies and long-term vision of a revitalized City; and

WHEREAS, under this Agreement the City and the Treasury Department agree to jointly exercise powers relating to public finance, budgeting, and administration that they share in common and that each may exercise separately, including, but not limited to, the powers, privileges and authorities of the Treasury Department to protect the credit of the State and municipalities in the State, and to aid, advise and consult with the municipalities with respect to fiscal questions and certain other matters under Act 34,

Public Acts of Michigan, 2001, as amended, the Revised Municipal Finance Act ("Act 34"), and to require local units of government to agree to plans to correct deficit conditions under Act 140, Public Acts of Michigan, 1971, as amended, the Glenn Steil State Revenue Sharing Act of 1971 ("Act 140"), and under other applicable law; and the power and authority of the City under Act 34 and Act 140 in respect of the foregoing, and the comprehensive home rule and other powers, privileges and authority of the City to enter into contracts on matters of municipal concern including, but not limited to, under Act 279, the Charter, and other applicable law; and

WHEREAS, under Act 140 the City previously has submitted to the Treasury Department a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140; and

WHEREAS, this Agreement shall update, supplement and restate the City's deficit elimination plan currently on file with the Treasury Department, as the same may be modified from time to time, and constitutes the City's request that the Treasury Department assist and cooperate with the City in the joint formulation of the financial plan to correct the City's deficit condition.

NOW, THEREFORE, the parties hereby agree as set forth below. Without limiting the foregoing, the City, through its Mayor (the holder of such office at any given time, the "Mayor") and the City Council of the City of Detroit (the holders of such offices, collectively, at any given time, the "City Council"), hereby agree and promise to undertake the steps outlined in this Agreement in consideration of and reliance upon: (i) subject to the terms of this Agreement, the Treasury Department maintaining existing discretionary state revenue sharing initiatives and agreements under Act 140; (ii) subject to the terms of this Agreement, the City's continuing ability to issue new

-4-

municipal securities with appropriate approvals under Act 34 until such time as the City achieves "qualified status;" (iii) subject to the terms of this Agreement, the City's ability to obtain additional financing pursuant to Act 243, Public Acts of Michigan, 1980, as amended, the Emergency Municipal Loan Act ("Act 243") with appropriate approvals; and (iv) the other agreements and commitments made herein by and on behalf of the Treasury Department.

## 1. FINANCIAL ADVISORY BOARD

### 1.1. Establishment and Purpose.

(a) Pursuant to this Agreement and applicable law, a financial advisory board (the "Financial Advisory Board") shall be immediately established to administer and execute this Agreement. The Financial Advisory Board shall be a public body politic and an intergovernmental entity that is neither a commission, board or council of the City nor a commission, board or council of the State.

(b) The parties agree that the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas the City may identify from time to time (the "Support Subjects"). In response to those needs, the Financial Advisory Board is charged with: (a) consulting with and assisting the City regarding implementation of systems and improvements in the Support Subjects; (b) monitoring and reporting upon the City's ongoing financial performance; (c) making certain findings and recommendations to and assisting the City with the City's preparation,

-5-

implementation and execution of an annual Triennial Budget and General Appropriations Act (as described in Section 3.7 of this Agreement, the "Triennial Budget"), which shall include the City's annual Budget (defined below); (d) assisting the City in achieving Financial Stability (defined below); (e) monitoring compliance with this Agreement; and (f) taking certain actions respecting, and pursuing remedies for, non-compliance with this Agreement as provided in this Agreement.

1.2. Composition. The Financial Advisory Board shall be composed of nine members, each of whom shall possess professional qualifications in the Support Subjects and character suitable for the rendering of well-informed judgments within the context of highly complex transactions. The initial Financial Advisory Board shall be appointed by the Governor of the State of Michigan (the holder of such office at any given time, the "Governor"), the Mayor, the City Council, and the State Treasurer (for purposes of this Section 1.2, each respectively an "Appointing Entity") as follows:

(a) Three individuals appointed by the Governor;

(b) Two individuals appointed by the Mayor;

(c) Two individuals appointed by the City Council;

(d) One individual appointed jointly by the Governor and the Mayor and subject to confirmation by the City Council; and

(e) One individual appointed by the State Treasurer.

Each member of the Financial Advisory Board (any such member, a "Member") shall possess at least ten years' experience with one or more of (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, or (e) local government management with government units having consolidated revenues of $250

-6-

million or more. Prior to appointment of an individual as a Member, the Appointing Entity shall request independent confirmation that the individual possesses the qualifications required under this Section 1.2 from the Michigan Association of Certified Public Accountants or the Michigan Government Finance Officers Association.

Members shall not be officers or employees of the City or the State, or of the Mayor's executive staff, or a member or former member of the City Council. The terms of all Members shall be three years, provided that of the members initially appointed (a) of the Members identified in Section 1.2(a), one shall be appointed for an initial 24-month term and one shall be appointed for an initial 12-month term; (b) of the Members identified in Section 1.2(b), one shall be appointed for an initial 24-month term; (c) of the Members identified in Section 1.2(c), one shall be appointed for an initial 12-month term; and (d) the Member identified in Section 1.2(d) shall be appointed for an initial 12-month term; and provided further that one of the Members identified in Section 1.2(c) and the Member identified in Section 1.2(e) shall be appointed to and serve at the will of the respective Appointing Entity (the "At-Will Members"). After the initial appointments, subsequent appointments shall be made in the same manner as the original appointment. Vacancies shall be filled by the Appointing Entity for the balance of the unexpired term. Excepting the At-Will Members, Members may only be removed by the respective Appointing Entity for Cause. "Cause" means misfeasance, malfeasance, gross neglect of duty, corrupt conduct in office, pleading to or conviction of a felony, absence from 3 consecutive meetings without being formally excused, or at the discretion of the Appointing Entity, absence from more than 15% of meetings within a calendar year. Upon the formation of the Financial Advisory Board and thereafter, the Governor and the Mayor shall jointly designate a Member to serve as the Chair of the

Financial Advisory Board (the "Board Chair"). The Board Chair shall serve as such officer at the will of the Governor and the Mayor.

1.3    Compensation. Members shall be entitled to annual compensation in the amount of $25,000.00 (such compensation, the "Annual Compensation") during their terms of service, provided that (a) such Annual Compensation shall be payable in four equal installments on a quarterly basis, (b) such Annual Compensation shall be prorated as necessary in the event that a Member serves less than a full quarter for any reason, and (c) a Member may elect to serve without compensation by notifying the Board Chair of the election in writing within 30 days of his or her appointment and while serving without compensation shall not be considered employed by the Board, the City or the Treasury Department.

. All Members shall be entitled to reimbursement of actual, reasonable, necessary and documented expenses in accordance with applicable standards in force for State employees and appointees (including, but not limited to, expenses related to travel, meals and lodging) incurred in connection with their service as Members of the Financial Advisory Board (such expenses, the "Reimbursable Expenses"). The City shall be responsible for the payment of each Member's Annual Compensation, with 50% of each Member's Annual Compensation reimbursed by the Treasury Department. The City shall be responsible for the payment of each Member's Reimbursable Expenses of up to $3,000.00 each, with 50% of each Member's Reimbursable Expenses of up to $3,000.00 reimbursed by the Treasury Department. Reimbursable Expenses for each Member in excess of $3,000.00 may be 100% reimbursed by the Treasury Department but only with the approval of the State Treasurer. Reimbursement shall be made by the Treasury Department no later than the earlier of (a) 45 days after

-8-

the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made and (ii) incorporated in the Budget (defined below), provided that neither the State, the City, the Treasury Department nor any other entity shall be responsible for the payment of any Reimbursable Expense that is not evidenced by a copy of the corresponding receipt. The Financial Advisory Board shall adopt procedures and policies having the objective of using current technology, communication and other means to constrain Reimbursable Expenses to the extent reasonably practicable.

      1.3a  Standards of Conduct, Conflicts of Interest and Ethics

      (a)     Members of the Financial Advisory Board are public officials in a position of public trust. Upon appointment, each Member shall take the constitutional oath of office under Article XI, § 1 of the State Constitution of 1963.

      (b)     Members of the Financial Advisory Board are public servants subject to the provisions of Act 317, Public Acts of Michigan, 1968, as amended ("Act 317"), pertaining to contracts of public servants with public entities.

      (c)     Within thirty (30) days of its initial meeting, the Financial Advisory Board shall adopt a Standards of Conduct, Conflicts of Interest and Ethics Policy ("Policy"). The Policy shall be designed to assure that governmental decisions are made in the public's best interest by prohibiting members of the Board and its employees and contractors from participating in matters that affect their personal or financial interests. The Policy shall be no less stringent than requirements under (a) Act 317; (b) Act 196, Public Acts of Michigan, 1973, as amended; and (c) Section 2-106 et seq. of the Charter. The Policy also shall include, without limitation, all of the following:

(i)  Provision for the reasonable disclosure of substantial financial interests held by any Member or employee of the Board who regularly exercises significant authority over the approval or renewal of any contracts.

(ii)  Standards of conduct designed to assure the ethical behavior of Members and employees and contractors of the Board.

(iii)  A Member or employee or agent of the Board shall discharge the duties of his or her position in a nonpartisan manner, with good faith, and with that degree of diligence, care, and skill which an ordinarily prudent person would exercise under similar circumstances in a like position. In discharging the duties, a Member or an employee or agent, when acting in good faith, may rely upon the opinion of counsel for the Board, upon the report of an independent appraiser selected with reasonable care by the Board, or upon financial statements of the Board or the City represented to the Member or employee or agent of the Board to be correct by the person having charge of its books or account, or stated in a written report by a certified public accountant or firm of certified public accountants fairly to reflect the financial condition of the Board or the City.

(iv)  A Member shall not make, participate in making, or in any way attempt to use his or her position as a Member to influence a decision providing a personal, family or business benefit to the Member.

(v)  A Member or employee or agent of the Board shall not engage in any conduct that constitutes a conflict of interest and shall immediately advise the Board Chair in writing of the details of any incident or circumstances that may present the existence of a conflict of interest with respect to the performance of the Board-related

-10-

work or duty of the member, employee, or agent. The Board Chair will immediately advise the Treasurer and the Mayor of any personal conflict of interest.

(vi) A Member with a conflict of interest related to any matter before the Board shall disclose the conflict of interest before the Board takes any action with respect to the matter, which disclosure shall become a part of the record of the Board's official proceedings. The member with the conflict of interest shall refrain from doing all of the following with respect to the matter that is the basis of the conflict of interest:

(A) Voting in the Board's proceedings related to the matter.

(B) Participating in the Board's discussion of and deliberation on the matter.

(C) Being present at the meeting of the Board when the discussion, deliberation, and voting on the matter take place.

(D) Discussing the matter with any other Member.

(vii) Members may not directly or as a result of their affiliation with other organizations do business with the City, have any contracts with the City, respond to any RFPs or seek or be seeking any no-bid contracts (pending or future), nor have immediate family or "close kin" relationships with officers or employees of the City.

(ix) Members may not have or acquire financial interest in any property or asset owned by the City, nor have an interest in any provider of goods and services to the City, unless such interest comes through ownership of publicly-traded shares constituting not more than 0.1% ownership in such provider.

(x) Members will be required to formally attest to their independence and understanding of the Standards of Conduct, Conflicts of Interest and Ethics Policy.

(xi) Except as otherwise provided by applicable law, Members or employees or agents of the Board shall not knowingly:

-11-

A. Willfully or grossly neglect the discharge of his or her duties;

B. Use or disclose confidential information concerning the property, government or affairs of the Board not available to members of the public and gained by reason of his or her official position;

C. Engage in or accept private employment or render services when such employment or service is in conflict or incompatible with the proper discharge of his or her official duties or would tend to impair his or her independence of judgment or action in the performance of official duties;

D. Represent a private person, business or organization in any action or proceeding pending before the Board or the City or any office, department or agency thereof.

E. Vote or otherwise participate in the approval of any contract, or any other type of transaction, with any business entity in which he or she or an immediate family member has a financial interest; or

F. Use his or her official position, in violation of applicable law, to improperly influence a decision of the Board, the Mayor, City Council members, City Clerk, appointees or other City employees.

G. Attempt to influence any decision to fill a position in City government with an immediate family member.

(xii)    A Member shall not accept gifts, gratuities, honoraria, or other things of value from any person or company doing business or seeking to do business with the City or the Board, is seeking official action from the City or the Board, has interests that could be substantially affected by the performance of the person's official duties, except as specifically provided in the Policy.

-12-

(xiii)   The Policy may, by reference, incorporate ethics policies of the City that impact the Board.

(xiv)   By a vote of six members of the Board, the Board may waive a portion of this Policy on a case-by-case basis when the Board determines a waiver is in the public interest.

1.4   <u>Board Organizational Matters</u>.  The Financial Advisory Board may:

(a)   Adopt rules of procedure governing the conduct of its business, including, but not limited to, the (i) identification of the responsibilities of the Board Chair (which will include the role of chairing Revenue Conferences (defined below)), (ii) appointment of its officers as necessary and appropriate and (iii) adoption of specific procedures governing the Board's performance of its purposes described in this Agreement.

(b)   Hire, employ, appoint and/or supervise professional staff to assist in the completion of its duties and to assist State and local officials. The City shall be responsible for the payment of all reasonable fees and expenses incurred by the Financial Advisory Board in connection with such professionals' services up to an annual maximum of not more than $250,000.00 or such other amount as shall be agreed to by the City and the Treasury Department, with 50% of all such payments by the City to be (i) reimbursed by the Treasury Department no later than the earlier of (a) 45 days after the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made; and (ii) incorporated in the Budget (defined below).

(c)   Enter into contracts to assist in the completion of its duties and sue and be sued in its own name.

(d)   Obtain appropriate levels of insurance for its Members, including director and officer insurance or its equivalent. The Treasury Department shall be responsible for the payment of all reasonable premiums and expenses incurred by the Financial Advisory Board in connection with such insurance.

1.5   <u>Board Authority</u>. Consistent with this Agreement and applicable law, the Financial Advisory Board shall have authority to do all of the following:

(a)   Recommend financial and operational metrics by which the City's financial performance and operations shall be monitored and evaluated consistent with best management practices for local government entities.

-13-

(b)     Monitor the City's financial and operational performance and the timely implementation of the Triennial Budget consistent with the terms of this Agreement and periodically advise the Governor, the Mayor, and the City Council of the Board's conclusions.  Reports of the Financial Advisory Board under this subsection shall be made available to the public.

(c)     Evaluate the City's existing debt structure and recommend means of achieving rating and credit improvements; and, from and after July 20, 2012, receive from the Mayor, and review, assist, and advise prior to submission to City Council by the Mayor, (i) any material capital markets transaction (including transactions involving new or existing swaps) proposed to be entered into by the City (including, but not limited to, any proposed exchange offers), and (ii) any proposed changes to the City's debt structure or restructuring of the City's outstanding debt; and assist, advise and provide technical support to the City in respect to ratings presentations and other presentations to third-party capital markets participants.

(d)     With respect to debt instruments, securities, financing leases, installment contracts and other financial instruments or securities which are not otherwise subject to Treasury Department approval under Act 34, review and approve or disapprove the issuance of such instruments following City Council approval of appropriate authorizing resolutions or ordinances.

(e)     Provide assistance, advice and technical support to the City in respect of the Support Subjects and in the preparation of the City's annual proposed operating and capital budgets (any such budget a "Budget") and the Triennial Budget.  The Budget shall be prepared on a consistent basis with the Triennial Budget.

(f)     As part of the Revenue Estimation process under Sections 3.1 and 3.2 of and Annex C to this Agreement, review and approve the Revenue Estimation, including any Set-Aside (defined below) for deficit reduction or budget stabilization, to be included in the Budget to be prepared by the Mayor.

(g)     Review, assist, advise and comment to the Mayor and City Council on the financial impact of (i) any proposed amendment or modification to any material contracts to which the City is party (including, but not limited to, the Support Subjects), (ii) any proposed sale of any material asset of the City, and (iii) any other proposed action by the City that could have a material impact on the financial condition of the City.

(h)     Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding any plan or proposed transaction related to the consolidation, disposition or elimination of City departments, including with respect to the impact of such transactions on the Triennial Budget.

(i)     Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding proposed changes to the organizational

-14-

structure of the City involving any positions appointed by or that report directly to the Mayor or City Council.

(j) Receive from the Mayor, and review, evaluate, analyze and comment on proposed judgment levies before submission to a court pursuant to Public Act 236 of 1961, the Revised Judicature Act of 1961.

(k) Monitor the performance by the City and the Treasury Department of compliance with this Agreement.

(l) Take remedial steps set forth in Section 6.3 of this Agreement in the event of a determination by the Board of a material breach of this Agreement under Section 6.2 of this Agreement; supervise the Program Management Director's (defined below) actions in the event of a Reform Default (defined below) as provided in Section 6.4 of this Agreement; and exercise the authority assigned to it by the Mayor and the City Council to take certain additional actions under this Agreement in the event of a material breach of this Agreement.

(m) Consent to the approval of City settlements of claims as provided in Section 5.1 of this Agreement.

1.6    Quorum and Voting.  A majority of the members of the Financial Advisory Board appointed and serving shall constitute quorum. Except as otherwise provided in this Agreement, the Financial Advisory Board may act by a majority vote of its Members present and voting, provided that a declaration of a default under Section 6.2 of this Agreement or of a Reform Default under Section 6.4 of this Agreement shall require a majority vote of all Members then in office.

1.7    Meetings.  The Financial Advisory Board shall be subject to and comply with Act 267, Public Acts of Michigan, 1976, as amended, the Open Meetings Act.

1.8.    Procurement.   The Financial Advisory Board shall adopt rules and/or regulations governing its procurement practices.  As an intergovernmental entity, the Financial Advisory Board is not subject to City rules and/or regulations governing procurement activities or requirements applicable to procurement by State departments or agencies.  The City's and Treasury Department's aggregate obligation for all costs and expenses incurred by the Financial Advisory Board, inclusive of procurement, shall

-15-

not exceed $1,000,000.00 each per year unless otherwise expressly agreed to by the Mayor, the City Council and the Treasury Department.

      1.9.   <u>Taxes and Incurring Debt</u>.  The Financial Advisory Board is not authorized under this Agreement to levy any type of tax within the boundaries of the City or to in any way indebt the City, except as otherwise expressly authorized in this Agreement. The Financial Advisory Board is not authorized under this Agreement to in any way indebt the Treasury Department or the State.

## 2.   THE MAYOR AND CITY COUNCIL

      2.1   <u>Powers and Authority</u>.  The Mayor and the City Council shall continue to exercise all such powers, privileges and authorities as are granted to each under the Charter and applicable law.  The Mayor and the City Council each have determined, in the exercise of their discretion and in furtherance of the joint exercise of power and cooperative undertaking detailed in this Agreement, to restrain their respective exercise of powers, privileges and authorities in certain circumstances as provided in this Agreement.

      2.2   <u>Chief Financial Officer</u>.

      (a)     Within 7 days after the effective date of this Agreement, the Mayor shall create the position of Chief Financial Officer as a group executive within the executive office of the Mayor.  The Chief Financial Officer shall supervise all finance and budget activities of the City, shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor.  The Chief Financial Officer shall directly assist the Chief Operating Officer, the Program Management Director and other Directors, senior executive staff and financial staff on all strategic and tactical matters as they relate to budget management, financial management, financial reporting, cost benefit analysis,

forecasting needs, the securing of new funding, and adherence to the Budget and the Triennial Budget.  The Chief Financial Officer shall be responsible for completing a comprehensive examination of the Budget in order to improve services and promote efficiency.  The Directors of the Budget Department and the Finance Department shall report directly to the Chief Financial Officer.  The Chief Financial Officer shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Chief Financial Officer shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause.  Removal shall be subject to the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving.

      (b)    Not more than 30 days after the creation of the position of Chief Financial Officer, the Mayor shall appoint a Chief Financial Officer from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor.  Candidates shall have substantial experience with at least 2 of the following disciplines:  (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, and (e) local government management with government units having aggregated revenues of $250 million or more.  No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Chief Financial Officer.  No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Chief Financial Officer.  In the event of a vacancy in the office of Chief Financial Officer, the Mayor immediately shall appoint an interim Chief

-17-

Financial Officer with substantially the same qualifications as required by this Section 2.2(b) for the Chief Financial Officer. Within 60 days of the occurrence of the vacancy, the Mayor shall appoint a successor Chief Financial Officer from a list of 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor as set forth above. The Chief Financial Officer from time to time may propose amendments to the projects, priorities and timing set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department. The Chief Financial Officer's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor and the City Council shall approve such amendments to the City's 2011-2012 Official Compensation Schedule (the "White Book") as necessary to reflect the agreed-to compensation.

2.3    Program Management Office; Director.

(a)    Within 7 days after the effective date of this Agreement, the Mayor shall create the Program Management Office within the executive office of the Mayor, headed by the position of Program Management Director as a group executive. The Program Management Office shall implement the Reform Program (defined below) projects set forth on Annex B, as amended and updated from time to time (the "Reform Initiatives" and each a "Reform Initiative"). The Program Management Director shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor. The Program Management Director shall supervise each Reform Initiative and shall have primary responsibility for designing, developing, managing, implementing and executing each Reform Initiative, including acting in the place and stead of the Mayor and the City Council with respect to a Reform Initiative in the event that the Financial Advisory Board

-18-

finds a Reform Default of this Agreement in respect of a Reform Initiative, as provided in and subject to Section 6.4 of this Agreement. The Program Management Director shall coordinate implementation of the Reform Initiatives with the Chief Operating Officer and the Chief Financial Officer to minimize disruptions in City services resulting from the Reform Initiatives. The Program Management Director from time to time may propose amendments to the projects set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department.

(b)     Not more than 30 days of the creation of the position of Program Management Director, the Mayor shall appoint an individual as Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have not less than fifteen years' experience with 1 or more of (a) Support Subjects in the context of distress and transition environments, (b) complex, multi-dimensional governmental restructurings, or (c) local government management with government units having consolidated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Program Management Director. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Program Management Director.

(c)     The Program Management Director shall directly assist the Chief Operating Officer, the Chief Financial Officer and other Directors and senior executive staff, and shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Program Management Director shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to

-19-

the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving. In the event of a vacancy in the office of Program Management Director, the Mayor, within 60 days of the occurrence of the vacancy, shall appoint a successor Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. The Program Management Director's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor, and the City Council shall approve such amendments to the White Book as necessary to reflect the agreed-to compensation.

(d)     The Program Management Director shall make periodic reports to the City Council, as requested by the City Council but no less often than monthly, in respect of the Reform Initiatives.

2.4     Implementation of Phase I Reform.

(a) The City desires to implement a number of actions in fiscal years 2012 and 2013 including, but not limited to, the development and implementation of the City's "Operational Reform Program" attached hereto as Annex B (the "Phase I Reform"). The Mayor and/or City Council may make modifications to Annex B from time to time, and shall promptly make modifications which are required to efficiently accomplish the Reform Program (defined below), including establishing measurable outcomes and metrics and establishing specific program timelines, with the approval of the Financial Advisory Board. In the event that the Mayor and City Council cannot agree to modifications to Annex B, the Financial Advisory Board may modify Annex B but only with the consent of either the Mayor or the City Council.

-20-

(b)     By approval of this Agreement, the City Council has approved of the "Operational Reform Program" attached hereto as Annex B and authorized its implementation.  The City Council shall make such other changes in ordinances and resolutions and coordinate its staff as may be necessary or convenient to fully implement Annex B as contemplated by this Agreement, as well as approve other actions consistent with the Reform Program.

2.5.   <u>Support of Phase I Reform</u>.   Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the Phase I Reform actions taken by the City under Sec. 2.4:

(a)   <u>Cash stabilization transaction</u>:  The Treasury Department will assist with structuring and will grant relevant approvals for the City to complete a refinancing or refinancings of certain of the City's outstanding indebtedness so as to provide liquidity prior to June 30, 2012.  The anticipated aggregate size of the refinancing(s) is approximately $137 million, of which approximately $33 million will be used to refinance existing debt, and approximately $104 million will be placed in an escrow account and used to pay for costs of the Reform Program and for City operating expenses.  Draws from the escrow account shall be as and when approved by the State Treasurer in the State Treasurer's discretion.

(b)   <u>Technical and financial assistance</u>:   The Treasury Department shall provide the City with technical assistance (which may include in-kind financial assistance) and support to the City in rapidly implementing the following information technology projects:

(1)   Completion of a payroll system upgrade.

(2)   Integration of budgeting, accounting and financial reporting systems.

(3)   Implementation of a new grants management system.

(c)   <u>Income tax collection</u>:  The Treasury Department will assist the City in maximizing revenues collected under the City income tax. This will include technical assistance to modernize processing, enhance enforcement, and

-21-

improve collections. The Treasury Department will assist the City in preparation of draft legislation to require withholding of City Income Taxes for City residents working outside the City. Additionally, the Treasury Department will explore the possibility of enabling the collection and distribution of the City income tax in conjunction with the collection and distribution of the State income tax.

(d)  Legislative assistance:  The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.4 (Phase I Reform) objectives, including, but not limited to legislation:

    (1)  Enabling PLD changes;

    (2)  Enabling Bus Rapid Transit legislation;

    (3)  If determined appropriate by the Financial Advisory Board, enabling the long-term funding of unfunded pension and other post-employment benefit liabilities.

    (4)  Enabling appropriations proportional to the City's progress in achieving Reform Initiatives.

The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase I Reform objectives.

2.6    Implementation of Phase II Reform—Following Actions. Consistent with Mayor's and City Council's development of the strategy, policies and long-term vision of a revitalized City and to preserve financial integrity, following the implementation of the Phase I Reform actions detailed in Section 2.4, the City intends to implement a number of additional actions (the "Phase II Reform"), including, but not limited to, the development and implementation of plans related to (a) the further consolidation, disposition or elimination of City departments, (b) grants management restructuring, (c) property management review, and (d) the implementation of "best practices" with respect to the City's pension and other post-employment benefits in consultation with the Financial Advisory Board and in furtherance of the long-term vision. (The Phase I

-22-

Reform and the Phase II Reform are referred to collectively in this Agreement as the "Reform Program.")

    2.7   <u>Support of Phase II Reform</u>. Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the City's Phase II Reform actions taken under Sec. 2.6:

    (a)   <u>Legislative assistance</u>: The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.6 (Phase II Reform) objectives, including but not limited to legislation enabling greater intergovernmental cooperation. The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase II Reform objectives.

    (b)   <u>Health plan and post-employment benefits</u>: The Treasury Department agrees to work cooperatively with the City in formulating options for statewide medical plan designs, retiree health care, and other post-employment benefits funding management and consolidation to achieve administrative simplicity and economies of scale.

    (c)   <u>Demolition of structures</u>: The Treasury Department, at the City's request, will provide technical assistance and support to the City in pursuing and administering federal grant funds to pay for the demolition of abandoned structures.

    (d)   <u>Real estate management</u>: The Treasury Department, at the City's request, will provide technical assistance and support in respect of the City's real estate management efforts.

    2.8   <u>Reporting Requirements.</u>

    (a)   In addition to any other reporting requirements herein, the Chief Financial Officer shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding (a) the City's financial performance in respect of the financial and operational metrics recommended under Section 1.5(a) and (b) the City's adherence to the Budget and the

-23-

Triennial Budget. Any such updates shall be reported in writing to the Financial Advisory Board and the Treasury Department and shall be posted to the City's website.

(b) In addition to any other reporting requirements herein, the Program Management Director shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding the status of Reform Initiatives and completion of Annex B projects. Any such updates shall be reported in writing to the Financial Advisory Board and shall be posted to the City's website.

(c) Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall submit to the Treasury Department a detailed listing of all accounts payable in amounts of $250,000.00 or more, together with the total aggregate amount of all accounts payable, which are more than 30 days beyond each respective due date. For each detailed account payable, the listing shall specify the date upon which payment originally was due, the amount of the payment due including any accrued interest, the name of the person, business, unit of government, or other entity to which payment is due, and a proposed schedule for timely payment. The detailed listing required by this paragraph shall be in a format prescribed by the Treasury Department.

(d) Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall prepare and maintain a forecast of monthly cash demands to meet the expenditures planned in the Budget. The cash flow forecast, prepared in a format acceptable to the Treasury Department, shall be updated and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month. A monthly report

-24-

of actual revenues and expenditures, prepared in a format acceptable to the Treasury Department, shall be prepared and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month.

2.9    Appropriation; Limitation.    The Treasury Department's obligation to provide financial assistance in the form of money to the Reform Program under this Agreement shall at all times be subject to the mandate under Section 17 of Article IX of the State Constitution of 1963 that no money may be paid out of the state treasury except in pursuance of appropriations made by law.

3.    **FINANCIAL AND BUDGET PROCESS; REVENUE CONFERENCES; TRIENNIAL BUDGET**

3.1    Revenue Conferences; Conduct.

(a)    Consistent with Section 8-213 of the Charter, the Directors of the Finance Department, Budget Department, Auditor General and City Council's Fiscal Analysis Division shall hold a revenue estimating conference ("Revenue Conference") each January and July, or such other dates as shall be determined by the Board Chair of the Financial Advisory Board or agreed to by the participants in the Revenue Conference, for the purpose of arriving at a consensus estimate of revenues to be available for the then current fiscal year of the City and the next fiscal year beginning the following July 1st (such estimate, a "Revenue Estimation"). The Board Chair of the Financial Advisory Board or his or her designee and the Chief Financial Officer shall attend and participate in the revenue estimating conference. The Board Chair of the Financial Advisory Board shall set the meeting dates of the Revenue Conference and shall preside over the Revenue Conference or, in the absence of the Board Chair, the Chief Financial Officer

shall preside. The revenues under consideration shall include all general fund, solid waste fund, and risk-management fund revenues, revenues of enterprise agencies that require a general fund subsidy, and all other revenues of the City. The parties shall also compile and consider any and all outstanding delinquent receivables in the possession of City agencies, departments and entities and, in conjunction with Corporation Counsel, recommend to the Mayor, the Chief Financial Officer, the City Council and the Financial Advisory Board the most efficient means to collect this revenue, which may include collection procedures undertaken by the Law Department. Revenue Conference reports should adhere to the reporting standards recommended by the City Council's Fiscal Analysis Division except as otherwise determined by the Financial Advisory Board.

(b)    At or in connection with a Revenue Conference, the Revenue Conference may (a) take testimony from persons with municipal finance, budgetary, economic or related expertise and (b) request and receive from all public officers, departments, agencies and authorities of the City or the Treasury Department any assistance and information necessary to arrive at a Revenue Estimation (together with all other information considered by the Revenue Conference, such testimony, assistance and information, the "Revenue Estimation Evidence").

(c)    The Revenue Estimation shall include a determination by the Revenue Conference of the amount of revenue to be applied to reduce any accumulated deficit or, if there is no accumulated deficit, to a budget stabilization account (the "Set-Aside").

(d)    The Revenue Estimation, including any Set-Aside, shall be reviewed and approved by the Financial Advisory Board as provided in Section 1.5(f) and thereafter shall be effective and binding for the Budget period to which it applies.

-26-

(e)    For purposes of the City's fiscal year 2013 Budget, and in lieu of the foregoing procedure, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the applicable Revenue Estimation and Set-Aside, which shall be provided to the State Treasurer for approval in lieu of approval by the Financial Advisory Board.

3.2    <u>Revenue Conferences; Limitation on Adjournment</u>.    A Revenue Conference shall not be adjourned until the Board Chair, in the Board Chair's discretion, determines that either (a) a consensus regarding the Revenue Estimation based upon reasonable assumptions (economic and otherwise) has been reached or (b) sufficient Revenue Estimation Evidence exists to allow for a Revenue Estimation, despite any inability to reach a consensus with respect to such Revenue Estimation. A Revenue Estimation shall set forth discrete revenue estimates from each of the City's major revenue sources, in a form consistent with Treasury Department pronouncements, including all of the following: (a) property taxes; (b) income taxes; (c) casino gaming taxes; (d) State revenue sharing and other State grants; (e) federal grants; (f) licenses, fees, and permits; (g) interest income; (h) proceeds from the sale or lease of any City-owned assets; (i) operating transfers or reimbursements from other funds; and (i) other funds if required by the Charter. If a consensus cannot be reached with respect to a Revenue Estimation within 14 days after the beginning of the Revenue Conference, the Revenue Estimation Evidence shall be submitted by the Board Chair to the State Treasurer, who shall determine the Revenue Estimation, including any Set-Aside, for the upcoming Budget period.

3.3    <u>Limitation on Mayor's Budget Proposal</u>. Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the Mayor shall not develop or propose

-27-

a Budget or any amendment to a Budget that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 (as defined below) or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

    3.4   <u>Limitation on City Council's Budget Approval</u>.  Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the City Council shall not approve a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

    3.5.   <u>Budget Proceedings and Adoption</u>.  The Budget adopted for each fiscal year for the City shall comply with the following requirements:

(a)    Subject to Sections 3.1 to 3.4 of this Agreement, each Budget shall be prepared and presented, and each appropriations act proposed by the City shall be adopted, in accordance with the provisions of Act 2, Public Acts of Michigan, 1968, as amended, the Uniform Budgeting and Accounting Act ("<u>Act 2</u>"), applicable provisions of the Charter, and Secs. 18-2-16 through 18-2-25 of the Detroit City Code, as amended from time to time.  The milestones for annual Budget adoption, including Revenue Conferences, are set forth on <u>Annex C</u> hereto.

(b)    Beginning with the first Budget adopted after the execution of this Agreement, the proposed Budget for each fiscal year shall be transmitted by the Mayor to the Financial Advisory Board not later than March 29 of each year.

-28-

(c) During the period covered by any Budget, the Mayor shall propose such amendments to the existing Budget as are necessary (e.g., the reduction of budgeted expenditures under Section 3.6 of this Agreement; the adjustment of quarterly allotments) on a timely basis so as to prevent an expenditure from being made for which adequate revenues are unavailable or are projected to be unavailable (e.g., on account of a shortfall in actual revenue, or unusual or extraordinary expenditures) or otherwise to support the initiatives in the Triennial Budget. No amendments or modifications proposed by the Mayor to any proposed or approved Budget or approved by City Council shall become effective unless such amendments are consistent with the Triennial Budget, as certified by the Chief Financial Officer.

(d) Each Budget shall be designed to ensure that the City shall not end the relevant fiscal year with an operating deficit in any fund (any such deficit, an "Operating Deficit"), provided that, upon the recommendation of the Financial Advisory Board, the Mayor shall have the authority to propose, and the City Council shall have the authority to approve, Operating Deficits proposed in Budgets or amendments thereto in the Financial Advisory Board's sole discretion.

(e) If, during a fiscal year, it appears to the Mayor, the Chief Financial Officer or the City Council that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and other proceeds permitted by law, and will be insufficient to satisfy projected expenditures, the Mayor, within 30 days of notification of such revenue shortfall, shall present to the City Council the Chief Financial Officer's recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year. The recommendations shall include proposals for reducing appropriations from the fund for budgetary centers in a manner that would cause the total of appropriations to not be greater than the total of revised estimated revenues of the fund, or proposals for measures necessary to provide revenues sufficient to meet expenditures of the fund, or both.

(f) During the term of this Agreement, no officer or employee of the City shall make or authorize any obligation or other liability (i) not authorized by the Budget or (ii) in excess of any amount authorized in the Budget unless approved by the Mayor and the Financial Advisory Board in compliance with applicable law.

(g) If during a fiscal year the Chief Financial Officer becomes aware of a proposed contract, financial transaction or settlement of claim which, in the Chief Financial Officer's judgment, will have a material adverse impact on the Budget or on City's long-term ability to achieve and maintain Financial Stability, the Chief Financial Officer shall report the Chief Financial Officer's concerns respecting the proposed contract, transaction

-29-

or settlement to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department.

3.6    Budget Reductions; Ordinance; Impasse.  Within 60 days of the effective date of this Agreement, the City Council shall adopt an amendment to the Finance and Taxation Ordinance or other appropriate provisions of the Detroit City Code providing that if the Chief Financial Officer reports to the Mayor, or if the Council Fiscal Analysis Director reports to the City Council and the Chief Financial Officer concurs, that expenditures during a fiscal year have exceeded or are likely to exceed appropriated levels, (i) the Mayor, consistent with Section 3.5(e) of this Agreement, shall submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit; and the City Council promptly shall amend appropriations to avoid the deficit; and further if City Council fails to so amend the appropriation ordinance to avoid the deficit within 30 days after the submittal of the proposed appropriation amendment, then the requested appropriation amendment submitted by the Mayor becomes effective; and further (ii) if the Mayor fails to so submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit within 30 days of notice by the Chief Financial Officer, the Council may introduce and adopt such an amendment on its own motion.  The powers and actions authorized by this Section 3.6 shall be granted pursuant to MCL 141.1514a and MCL 141.1519(1)(b) to the extent necessary to implement this Section 3.6, but only to the limited extent and limited time necessary to implement this Section 3.6.

3.7    Triennial Budget.  (a) As a means of addressing the City's fiscal imbalances and accumulated deficit and to permit continuous planning at least three

fiscal years in the future, beginning with fiscal year 2013 the City, in consultation with the Financial Advisory Board, shall develop and maintain a Triennial Budget for adoption by the City Council. The Triennial Budget shall contain specific and realistic operational metrics, expenditure reductions, revenue set-asides, or specific and realistic revenue enhancements, or any combination of them, in an amount sufficient to address, within a period of not to exceed 5 years, any current or accumulated deficit in any fund maintained by the City. The Financial Advisory Board may approve modifications to the period within which the accumulated deficit will be eliminated. In addition, the Triennial Budget shall provide for the liquidation of all significant inter-fund payables and receivables, not regularly settled, in not to exceed 5 years from the date of this Agreement. The Financial Advisory Board may approve modifications to the period within which the inter-fund payables and receivables will be settled. The Triennial Budget shall include details of the budget appropriation, reductions in employee salary, wages, employee retirement systems, other fringe benefits, debt retirement, and operating expenditures or revenue enhancements.

(b)     The initial Triennial Budget shall be prepared and adopted prior to the end of the Transition Period (defined below), or such other date determined by the Chief Financial Officer and reported to the Financial Advisory Board and the Treasury Department, and shall include the subjects set forth on Annex A-1 hereto. When adopted by the City and approved by the Treasury Department, the initial Triennial Budget shall be attached as Annex A-2 hereto. The Triennial Budget shall be a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140, provided that the Treasury Department shall review compliance with the Triennial Budget annually, and shall retain full discretion under law to annually approve

-31-

of or disapprove of the then-current Triennial Budget as a satisfactory deficit elimination plan.

(c)     Beginning with the City's fiscal year 2014 Budget, a copy of the proposed Triennial Budget shall be filed with the Treasury Department not later than April 12 of each year concurrently with submittal of the Mayor's annual Budget to City Council under the City's Finance and Taxation Ordinance. The City shall approve of and amend the Budget from time to time as necessary to give full effect to the Triennial Budget. The Chief Financial Officer shall have primary responsibility under the Mayor for the development of and adherence to the Triennial Budget. The Triennial Budget shall be posted on the City's website.

## 4.     COLLECTIVE BARGAINING AGREEMENTS

4.1     Authority.  The Mayor shall have the authority to negotiate, renegotiate, execute, amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of this Agreement.

4.2     Collective Bargaining Agreements; Restriction.  The parties hereto agree that the Mayor shall not propose or execute, and the City Council shall not approve, any instrument which modifies, amends, extends, supplements or replaces the terms or conditions of, or is a successor agreement to, any collective bargaining agreement in effect as of the effective date of this Agreement or thereafter unless such modification, amendment, extension, supplement, replacement or successor agreement satisfies the requirements of Annex D as determined by the Financial Advisory Board or if a modification, amendment, extension, supplement, or replacement is required by law. For purposes of this Section 4.2, "collective bargaining agreement" includes an

-32-

arbitration award, excepting an arbitration award resulting from an arbitration proceeding concluded prior to the effective date of this Agreement.

      4.3    Collective Bargaining Agreements; Approval.    The Labor Relations Division shall negotiate and administer collective bargaining contracts in consultation with the Program Management Director.  Upon the prior approval of the Financial Advisory Board following consultation with the Program Management Director, the head of the Labor Relations Division shall deliver to the Mayor any proposed collective bargaining agreement which satisfies the requirements of Section 4.2 of this Agreement for consideration and transmittal to the City Council in accordance with Sec. 6-408 of the Charter. The Mayor shall not approve and transmit to the City Council, and the City Council shall not approve of, any collective bargaining agreement which does not satisfy the requirements of Section 4.2 of this Agreement. If the City Council fails to approve a collective bargaining agreement as proposed by the Mayor and approved by the Financial Advisory Board within 30 days after the submittal of the proposed collective bargaining agreement, then the Program Management Director may approve the collective bargaining agreement in the place and stead of the City Council. The powers and actions of the Program Management Director authorized by this Section 4.3 shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i), or other applicable law, to the extent necessary to implement this Section 4.3, but only to the limited extent and limited time necessary to implement this Section 4.3.

      4.4.    Duty to Bargain.  It is the State Treasurer's determination pursuant to MCL 141.1514a(10) that beginning 30 days after the effective date of this Agreement, the City is not subject to Sec. 15(1) of Act 336, Public Acts of Michigan, 1947, as amended, MCL 423.215, for the remaining term of this Agreement.

-33-

## 5. PENDING LITIGATION REPORT

5.1    Report; Filing.  Beginning on July 15, 2012, and continuing thereafter on a quarterly basis, the City's Law Department shall submit to the Financial Advisory Board a report (the "Pending Litigation Report") identifying all pending lawsuits or other legal actions or proceedings (including, but not limited to, lawsuits, actions or proceedings related to workers' compensation claims) to which the City is a party (any such lawsuit, action or proceeding, a "Pending Action").  Each Pending Litigation Report shall identify, with respect to each Pending Action:  (a) all plaintiffs; (b) all defendants; (c) the court and judge before which the Pending Action is pending; (d) legal counsel representing the City (if other than the Law Department); (e) the specific cause(s) of action; (f) the length of time the Pending Action has been pending; (g) an estimate as to the budgetary impact upon the City (if any) from a disposition of the Pending Action unfavorable to the City; (h) the applicability of any liability insurance maintained by the City; (i) an assessment of the likely outcome of such Pending Action (which section of the Pending Litigation Report shall remain subject to any and all applicable privileges); and (j) any proposed settlement or disposition of any Pending Action.  The City shall not settle or otherwise dispose of any Pending Action in an amount of $250,000.00 or more without the prior written consent of the Financial Advisory Board under Section 1.5(m) of this Agreement or, prior to the first meeting of the Financial Advisory Board, the State Treasurer.  For purposes of the Pending Litigation Report, the Financial Advisory Board shall be the client of the City's Law Department and shall be entitled to the attorney-client privilege, the attorney work product privilege, and all other privileges and duties afforded to clients under the Michigan Rules of Professional Conduct.

## 6. DEFAULTS AND REMEDIES

6.1 <u>Obligations of the parties</u>. (a) The City, through its officers and the City Council and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement. Timely achievement of the Reform Program and performance of the financial and operational requirements set forth in this Agreement are of the essence of this Agreement. The Mayor and the City Council (and all departments, agencies and other entities organized within, and all officers acting on behalf of, the Mayor and the City Council, including in particular the Program Management Director and the Program Management Office) shall provide the Financial Advisory Board with access to all information, documentation and personnel as may be reasonably requested by the Financial Advisory Board from time to time, with respect to all matters related to the Reform Program and/or addressed in this Agreement. During the term of this Agreement, no officer or employee of the City shall knowingly (a) take any action in violation of the terms of, or shall fail or refuse to take any action reasonably required by, this Agreement; or (b) prepare, present or certify any information (including any projections or estimates) or report for the Mayor, the Chief Financial Officer, the Program Management Office, the City Council, the Revenue Conference or the Financial Advisory Board that is false or misleading in any material respect, or, upon learning that any such information is false or misleading in a material respect, shall fail promptly to advise the Financial Advisory Board or the Mayor, the Chief Financial Officer and the Program Management Director thereof. The parties intend that this Agreement may be deemed and function as an agreement entered into under MCL 141.1513.

(b)     The Treasury Department, through the State Treasurer and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement, consistent with applicable law.

6.2     Material Breach; Default. (a) For purposes of this Agreement, a breach of the obligations set forth in this Agreement, if uncured, shall be considered a material breach of this Agreement if, in the judgment of the Financial Advisory Board, the breach (i) materially impairs the timely and complete implementation of the Reform Program, (ii) materially impairs the Financial Advisory Board's ability to exercise its express responsibilities under this Agreement, or (iii) materially adversely affects the completion of 1 or more Reform Initiatives. Without limiting the foregoing, the obligations set forth in Section 1 (Financial Advisory Board), Section 2 (The Mayor and City Council), Section 3 (Financial and Budget Process; Revenue Conferences; Triennial Budget), Section 4.2, Annex B and Annex D shall be considered of primary importance in the achievement of the Reform Program whose performance is essential to the achievement of this Agreement's urgent public purposes.

(b)     If the Financial Advisory Board determines that a material breach of this Agreement has occurred or is occurring, the Financial Advisory Board shall immediately notify the Mayor, the City Council and the Treasury Department of its determination. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the material breach within 30 days, or, if the material breach is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department. The Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the cure or attempted cure by the

-36-

Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the material breach and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the material breach has been adequately cured. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement. A declaration that a default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

6.3     Default; Remedies. A declaration of default on account of a material uncured breach of this Agreement as provided in Section 6.2 may result in (a) the suspension by the Treasury Department of (i) discretionary State revenue sharing initiatives and agreements between the Treasury Department or the State and the City pursuant to Act 140 and/or (ii) Economic Vitality Incentive Program payments or other intergovernmental assistance between the Treasury Department or the State and the City pursuant to Act 140 and other applicable law, in each case to the extent permitted by law; (b) the withholding by the Treasury Department of approvals to enter the capital markets under Act 34; (c) accelerating or exercising other rights and remedies by the Treasury Department for collection of any existing loans from the State to the City under, e.g., Act 243 or other applicable law; (d) the filing of court proceedings by the Financial Advisory Board or the State Treasurer in the Circuit Court for Wayne County, Michigan, or the U.S. District Court for the Eastern District of Michigan seeking mandamus, an injunction, appointment of a referee, or other equitable relief consistent with the urgent public purposes of this Agreement so as to cause the obligations of this

-37-

Agreement to be fully and timely performed; (e) the placement by the State Treasurer of the City in receivership as provided in MCL 141.1515; and/or (f) other remedies available to the Treasury Department or under State law. The remedies provided in this Section 6.3 shall be cumulative.

6.4 <u>Program Management Director; Board; Reform Initiative Remedies</u>. Timely achievement of the Reform Program being of the essence of this Agreement, in addition to the other remedies provided in this Agreement, the City and the Treasury Department agree that the following provisions shall apply in respect of individual Reform Initiatives:

(a) If in the judgment of the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department a breach in the provisions of this Agreement, including the Annexes, has occurred or is imminently likely to occur which is materially frustrating or will materially frustrate the timely implementation of one or more Reform Initiatives (a "<u>Reform Default Condition</u>"), the Program Management Director shall provide written notice of the Reform Default Condition to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the Reform Default Condition within 30 days, or, if the Reform Default Condition is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department.

(b) Upon receipt of the notice of a Reform Default Condition, the Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the

-38-

cure or attempted cure by the Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the Reform Default Condition and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the Reform Default Condition has been adequately cured so as to prevent a material breach of this Agreement respecting one or more Reform Initiatives. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement in respect of one or more Reform Initiatives has occurred (a "Reform Default"). A declaration that a Reform Default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

(c)     In the event of a determination of a Reform Default by the Financial Advisory Board, and immediately upon the approval of the declaration that a Reform Default has occurred, the Mayor shall be deemed to have delegated his executive authority with respect of the Reform Initiative or Initiatives for which a Reform Default has been declared, but only in respect of such Reform Initiative or Initiatives, to the Program Management Director; and the City Council, by approval of this Agreement, shall be deemed to have given full legislative approval and authority to proceed with the implementation and execution of such Reform Initiative or Initiatives, but only in respect of such Reform Initiative or Initiatives. The Program Management Director thereafter shall exercise all lawful authority of the City in respect of the accomplishment, implementation and execution of the Reform Initiative or Initiatives for which the Reform Default was declared, provided that the Program Management Director shall be under

-39-

the supervision of, and shall report frequently, but not less often than monthly, to the Financial Advisory Board, the Treasury Department, the Mayor and the City Council in respect of the Program Management Director's actions, and the Financial Advisory Board shall review and approve or disapprove the proposed actions of the Program Management Director, including specifically the approval of any contracts proposed to be executed by the Program Management Director. The powers and actions of the Program Management Director authorized by this Section 6.4(c) additionally shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i) to the extent necessary to implement this Section 6.4(c), but only to the limited extent and limited time necessary to implement this Section 6.4(c).

(d)     Upon the earlier of (i) the accomplishment of the Reform Initiative or Initiatives for which the Financial Advisory Board had declared a Reform Default or (ii) the elimination or cure of the event or condition which was the basis of the Reform Default, the Financial Advisory Board, upon the recommendation of the Program Management Director or on its own motion, shall, by majority vote, declare the Reform Default terminated.  The Financial Advisory Board also may consider a declaration that the Reform Default is terminated upon petition by the Mayor or the City Council. Immediately upon such declaration, the executive authority of the Mayor and the legislative approval of the City Council temporarily empowering the Program Management Director in respect of the specific Reform Initiative or Initiatives shall be deemed restored to the Mayor and City Council and the grants under Section 6.4(c) shall be withdrawn.

6.5     Additional Forbearance by Treasury Department.     Provided that this Agreement remains in effect and there is no material failure to comply with, or adhere

-40-

to, this Agreement on the part of the City, the Treasury Department and the Financial Advisory Board shall forbear from exercising any of its respective remedies under Section 6.3.

      6.6   Obligation Not Discharged by Contingencies.  The obligations of the City as expressed and agreed to herein are not subject to release or discharge due to any contingencies within the City's reasonable control, including, but not limited to, clerical errors, computer failures, late mailings or the failure to comply with reporting due dates or other scheduled due dates excepting due to adverse weather, acts of God, acts of third parties or compliance with court orders.  If the due date for a report, listing or other document falls on a weekend or legal holiday, then the report, listing, or other document shall be due on the first day thereafter that is not a weekend or legal holiday.

      6.7   Transitional Provisions.

      (a)  The parties acknowledge that on account of inadequate systems and other operational constraints, the City will be unable to satisfy the reporting and budgeting requirements set forth in this Agreement as of the effective date of this Agreement.  The parties agree that from the effective date of this Agreement until 60 days after the date that the Chief Financial Officer commences serving (the "Transitional Period"), the City will make every effort to comply with the reporting requirements set forth in this Agreement, but any failure to comply with the any such reporting requirements during the Transitional Period shall not be deemed to be a material breach of this Agreement.

      (b)    The parties acknowledge that as of the effective date of this Agreement and during the Transitional Period, the City will be in the midst of its budget preparation process for the fiscal year 2013 Budget, and that therefore the Budget provisions of this Agreement, including the responsibilities of the Financial Advisory Board and the

adoption of the initial Triennial Budget, cannot be fully accomplished for the fiscal year 2013 Budget. The City and the Treasury Department agree that during the Transitional Period, the City will make every effort to comply with the Budget process requirements set forth in this Agreement, and any failure to comply with any such Budget process requirements during the Transitional Period may be waived by the State Treasurer. Until the Board Chair of the Financial Advisory Board has been appointed and the Chief Financial Officer has commenced serving, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the Revenue Estimation for fiscal year 2013, and State Treasurer shall approve of the Revenue Estimation in lieu of the Financial Advisory Board under Sections 3.1 and 3.2 of this Agreement, which shall form the basis of the Mayor's proposed fiscal year 2013 Budget submitted pursuant to Section 3.3 of this Agreement and the City Council's approved fiscal year 2013 Budget pursuant to Section 3.4 of this Agreement. Notwithstanding the provisions of this Section 6.7(b), the Mayor and the City Council shall fully perform their respective obligations under Act 2 and the Charter in respect of the fiscal year 2013 Budget preparation and shall cause the fiscal year 2013 Budget and the 2013 general appropriations ordinance to be in effect as of July 1, 2012. During the Transitional Period, the Mayor shall not propose, and the City Council shall not approve, a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that reflects revenues in excess of, or collected from sources not included in, the applicable Revenue Estimation, net of any Set-Aside, for the 2013 Budget year.

## 7.   AMENDMENT; WAIVER OF PROVISIONS

7.1   Amendment; Waiver.  This Agreement and the Annexes hereto may be amended only in writing by the mutual consent of the Financial Advisory Board, the

State Treasurer and the City (or their respective successors or permitted assigns), evidenced by all necessary and proper authority. By agreement of the parties, the Financial Advisory Board, in its sole discretion, may waive or forbear from any provision of this Agreement that requires an act by the City, provided that, for the avoidance of doubt, no entity other than the Financial Advisory Board shall be permitted to waive or forbear from any provision hereof that otherwise relates to a power reserved for the Financial Advisory Board. No waiver of or forbearance from any provision of this Agreement shall arise from any action or inaction of the Financial Advisory Board, except pursuant to an instrument in writing expressly waiving or forbearing from the provision executed by the party entitled to the benefit of the provision. The parties anticipate that Annex B to this Agreement will be amended and updated from time to time to reflect the dynamic nature of the Reform Program. Amendments to Annex B may be adopted by the Mayor and City Council with the approval of the Financial Advisory Board, as set forth in Section 2.4(a) of this Agreement. Amendments to Annex B may be proposed by the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department.

## 8. DURATION OF AGREEMENT; RELEASE

8.1 Duration of Agreement; Termination; City's Release from Obligations. This Agreement shall remain in effect until both of the following occur ("Financial Stability"):

  (a) The date of the earlier of:

  (i) the end of the third consecutive fiscal year of the City in which each of the following conditions have been satisfied: (A) the City's audited financial statements indicate, on the basis of accounting

principles generally accepted in the United States, that the City general fund, excluding any revenues derived from borrowed funds, is not in a deficit condition; and (B) the City's accumulated deficit has been eliminated; or

(ii)     the City has achieved and maintained for at least two consecutive calendar years a credit rating by two or more nationally recognized securities rating agencies (without regard to any third party credit enhancement) on the City's outstanding long-term unsubordinated debt in any of the four highest long-term debt rating categories of such rating agency (BBB/Baa or higher), without regard to any refinement or gradation of such rating category by numerical modifier or otherwise; and

(b)     The date that the State Treasurer certifies to the Governor that no material condition exists within the City, and that no action has been taken, or is being contemplated, by City officials, that would (A) implicate the need for a deficit elimination plan under Sec. 21 of Act 140, excepting for fund deficits of an immaterial nature; or (B) require implementation of the Treasury Department's authority under Sec. 802 of Act 34.

(c)     The Mayor, with the approval of the City Council, may apply to the Financial Advisory Board to be released from the terms and conditions of this Agreement. If the financial conditions set forth in Section 8.1(a) and (b) have been satisfied by the City, the Financial Advisory Board shall release the City from the terms and conditions of this Agreement.

(d)     Notwithstanding the provisions of subsections 8.1(a), (b) and (c) of this Section 8.1, this Agreement shall be earlier terminated by the Financial Advisory Board, with the consent of the State Treasurer, if requested by the Mayor and the City Council on behalf of City or by the Treasury Department.

-44-

## 9. CONTINUING EFFECT; EMPLOYEES; SEVERABILITY

9.1    <u>Continuing Effect</u>. This Agreement shall remain in effect until terminated or until the Financial Advisory Board has released the City from the terms and conditions of this Agreement pursuant to Sections 8.1(c) or 8.1(d).

9.2    <u>Joint Exercise of Power; Transfer</u>. While this Agreement represents a joint exercise of power by the City and the Treasury Department, this Agreement does not transfer functions or services from the City or the Treasury Department to the Financial Advisory Board. Nothing in this Agreement prohibits the City from subsequently entering into a contract with the Financial Advisory Board for the transfer of functions or services from the City to the Financial Advisory Board, to the extent authorized under 1967 (Ex Sess) PA 8, as amended, MCL 124.531 to 124.536. The City and the Treasury Department intend that this Agreement be construed as an agreement between the City and the Treasury Department authorized under Act 7, Public Acts of Michigan, Extra Session of 1967, as amended, the Urban Cooperation Act of 1967, with the exception of the provisions of this Agreement authorized solely under MCL 141.1501 to 141.1531.

9.3    <u>Employees</u>. In no event shall this Agreement direct, permit or enable the transfer of employees or groups of employees from the City to the Financial Advisory Board or otherwise to merge or create a "workforce" of the Financial Advisory Board.. Nothing in this Agreement creates an employment relationship between the employees of the City or the Treasury Department and the Financial Advisory Board. The City shall function as the employer of personnel and staff of the City needed for the joint exercise of power under this Agreement. The Treasury Department shall function as the employer of personnel and staff of the Treasury Department needed for the joint

-45-

exercise of power under this Agreement. The Financial Advisory Board shall function as the employer of any personnel and staff of the Financial Advisory Board not otherwise employed by the City or the Treasury Department needed for the joint exercise of power under this Agreement. No employees of the City or the Treasury Department are transferred from the City or the Treasury Department to the Financial Advisory Board under this Agreement.

9.4     Management and Direction.    The Financial Advisory Board has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Financial Advisory Board performed or exercised by the Financial Advisory Board under this Agreement. The City has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the City performed or exercised by the City under this Agreement. The State Treasurer has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Treasury Department performed or exercised by the Treasury Department under this Agreement.  The functions or services of the Financial Advisory Board, the City, and the Treasury Department, respectively, under this Agreement are deemed to be in the interests of the public health, safety and welfare, and the accomplishment of the objectives of this Agreement is an urgent public purpose.

9.5     Severability.  If any provision of this Agreement, or its application to any person, party or circumstance, is determined to be invalid or unenforceable for any reason, the remainder of this Agreement and its application to other persons, parties or circumstances shall not be affected and shall remain enforceable to the full extent permitted by law.  On account of the urgent public purpose and the protection of the

-46-

public health, safety and welfare sought to be accomplished by this Agreement, It is the intent of the parties to continue to implement the provisions of this Agreement, in whole or in part, to the fullest extent possible under applicable law.

## 10. COUNTERPARTS

10.1 <u>Counterparts; Signatures</u>. This Agreement may be executed in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Execution may be accomplished by delivery of original or electronic copies of the signature page hereto (<u>e.g.</u>, by facsimile or email).

## 11. EFFECTIVE DATE

11.1 <u>Effective Date.</u> The effective date ("<u>Effective Date</u>") for this Agreement and the joint exercise of power under this Agreement shall be the date on which the last of all of the following have occurred: (a) the Agreement is approved and executed by the Mayor; (b) the Agreement is approved by the City Council, (c) the Agreement is approved and executed by the State Treasurer; (e) the Agreement is approved by the Governor; (d) the Agreement is filed with the Clerk for the Charter County of Wayne, Michigan, (e) the Agreement is filed with the Clerk for the County of Ingham, Michigan; and (f) the Agreement is filed in the Office of the Great Seal, Michigan Department of State.

-47-

IN WITNESS WHEREOF, the parties, by their designated representatives, have signed and executed this Agreement on this 4ᵗʰ day of April , 2012.

**ON BEHALF OF THE CITY OF DETROIT:**

_____
Kirk J. Lewis, Deputy Mayor  (Acting As Mayor)

_____
Dave Bing, Mayor

**ON BEHALF OF THE MICHIGAN DEPARTMENT OF TREASURY:**

_____
Andy Dillon, State Treasurer

Consistent with my duty under Section 8 of Article V of the State Constitution to take care that the laws be faithfully executed, I find that this Agreement is in proper form, and is compatible with the laws of the State of Michigan.

Dated: 4/5/12

_____
Richard D. Snyder, Governor

## CERTIFICATION

I, Janice M. Winfrey, City Clerk for the City of Detroit, hereby certify that the foregoing Agreement has been duly authorized by resolution adopted by the City Council of the City of Detroit, County of Wayne, State of Michigan, at a Special Session held on April 4, 2012, that said resolution remains in effect, and that the foregoing meeting was conducted and public notice of said meeting was given pursuant to and in full compliance with the Open Meetings Act, being Act 267, Public Acts of Michigan, 1976, and that the minutes of said meeting were kept and will be or have been made available as required by said Act.

Janice M. Winfrey, City Clerk

Date of Certification: April 9, 2012

Time of Certification: 4:37 , p.m.

-2-

**BY THE FINANCIAL REVIEW TEAM FOR THE CITY OF DETROIT:**

_____
Andy Dillon

_____
Glenda D. Price

_____
Frederick Headen

_____
Irvin D. Reid

_____
Jack Martin

_____
Doug Ringler

_____
Conrad Mallett, Jr.

_____
Shirley R. Stancato

_____
Isaiah McKinnon

_____
Brom Stibitz

**APPROVED AS STATE FINANCIAL AUTHORITY:**

_____
Andy Dillon, State Treasurer

14-12 txt    Doc 8805-17    Filed 04/26/14    Entered 04/26/14 05:47:43    Page 54 of 62
13-53846-swr    Doc 8805-4    Filed 04/18/14    Entered 04/18/14 00:48:43    Page 54 of 62
-3-
150

## ANNEX A-1

The Triennial Budget and General Appropriations Act shall, at a minimum, include all of the following:

(a)     A detailed projected budget of revenues and expenditures over not less than 3 fiscal years which demonstrates that, subject to exceptions, the City's general fund expenditures will not exceed its general fund revenues and that any existing deficits will be eliminated during the projected budget period.

(b)     A cash flow projection for the budget period.

(c)     An operating plan for the budget period.

(d)     A plan showing reasonable and necessary maintenance and capital expenditures for the budget period.

(e)     An evaluation of the costs associated with pension and postemployment health care obligations for which the City is responsible and a plan for how those costs will be addressed over the budget period.

(f)     A provision for submitting quarterly compliance reports to the Financial Advisory Board demonstrating compliance with the Triennial Budget.

The Triennial Budget shall be updated annually as part of the approval of the annual Budget under Act 2 and the Charter.

## ANNEX A-2

*[Initial Triennial Budget to be included pursuant to Section 3.7(b)
upon approval following appointment of CFO]*

-5-

## ANNEX B

### City's Operational Reform Program

**(Prioritization and timing to be mutually agreed upon by Mayor and Council and approved by Financial Advisory Board as provided in the Agreement)**

1. Public safety initiatives;
2. Lighting Department Changes;
3. DDOT Changes;
4. Income tax collection;
5. Implementation of payroll system upgrade if needed – following a review of other options that streamline payroll process and implement;
6. Implementation of new grants management system to streamline requisition and monitoring process of grants;
7. Integration of budgeting, accounting and financial reporting system with appropriate process mapping;
8. Demolition of structures;
9. Implementation of medical and pension changes;
10. Labor reform to streamline and consolidate number of collective bargaining agreements into single template and evaluating integration with statewide plans as available;
11. Health and Wellness Department changes;
12. Human Services Department changes;
13. Real estate management;
14. Workers Compensation Reform;
15. Employee Training;
16. Bank Project to improve AR and AP process;
17. Fire Authority review;
18. Permits;
19. Planning and Development to DEGC;
20. Claim/Risk Management for reducing claims costs;
21. Long-Term Liability Restructuring;

-6-

## ANNEX C

### Revenue Estimation and Budget Approval Calendar

| Date (on or before) | Action |
|---|---|
| December 8 | All officers, departments, commissions and boards of the City are required to transmit to the Budget Director their estimates of the amounts of money required for each activity within their respective Departments for the ensuing fiscal year. |
| January 31* | Semi-annual Revenue Conference |
| February 22 | The Budget Director shall transmit to the Mayor an estimated Budget showing the Budget Director's estimate of the total amount of money required to be raised for each of the City's funds. |
| March 15 | Revenue Estimation for next fiscal year established by Financial Advisory Board following Revenue Conference. |
| March 29 | The Mayor shall complete a revision of the Budget and return the Budget to the Budget Director for tabulation. |
| | The Mayor shall submit the proposed Budget and Triennial Budget to Financial Advisory Board |
| April 12 | The Mayor shall transmit the Budget (including Triennial Budget) to City Council. |
| | The Mayor shall transmit the Triennial Budget to the Treasury Department. |
| May 24 | The City Council shall complete its consideration of the Budget. |
| May 27 | The City Council shall transmit the Budget to the Mayor for the Mayor's approval or rejection. |
| May 27 + 3 business days | The Mayor shall return the Budget to the City Council with the Mayors' approval, or, if the Mayor shall disapprove the whole or any item or items, with a statement of reasons for the disapproval. |
| Later of 3 calendar days or 2 business days following maximum return date of the Budget by the Mayor | The City Council shall act upon any item that shall have been disapproved by the Mayor. |
| July 1 | Beginning of Fiscal Year |
| July 31* | Semi-annual Revenue Conference |

\* Or as otherwise determined by the Revenue Confernce or Financial Advisory Board

## ANNEX D

### Required Provisions of Collective Bargaining Agreements

On or before July 16, 2012, the City shall have either negotiated or imposed new labor agreements with those Unions whose contracts have expired or will expire on or about June 30, 2012. The newly negotiated agreements shall include among other items the following terms and conditions, which shall set the pattern for future agreements:

1.      Uniformity goal: All new labor agreements will be structured so as to achieve the goal of creating a common base form of agreement enabling a known, measurable basis for cost evaluation and comparison.

2.      Joint committees, if any, will be patterned in structure and role after the committees included in the contracts recently negotiated between the State and unions representing State employees.

3.      Outsourcing will be permitted where service improvements or cost savings can be achieved. Language shall require the City to provide advance notice of competitive bids to its Unions and enabling Unions to bid on the work.

4.      Departmental consolidation shall be permitted where service improvements or cost savings can be achieved.

5.      There may be no snap-back provisions during the term or at expiration of the agreement. Wage increases shall be subject to negotiation.

6.      New hires will have a defined contribution retirement health care benefit.

7.      Merit-based promotions shall be permitted for certain key positions (specific positions to be defined by the common agreement form).

8.      Current resources should be maximized, therefore to exercise bumping rights an employee must have current or prior year service in the classification into which they are bumping and employees shall be permitted to work outside their classification.

9.      Existing favorable concessions negotiated in the TAs shall remain, especially those dealing with wages, benefits and pension multipliers, as approved by the Project Management Director, Labor Relations Director, and the Financial Advisory Board.

10.     Multi-year term of the new agreement to be determined by the Labor Relations Director, Project Management Director, and Financial Advisory Board as required to support the City's financial restructuring.

11.     Dispute resolution procedures shall be made simpler and the process expedited to achieve predictability for both sides.

12.     The parties will agree to address work rule modifications during the first year of the new agreement where changes will support the City's financial restructuring, achieve efficient use of labor resources, and/or improve cost-effective service.

-8-

# ANNEX E

## SUPPORTIVE ACTIVITIES OF TREASURY DEPARTMENT AND STATE

**Introduction**
The Treasury Department and the State remain committed to the overall growth and health of Michigan cities, and particularly so with the city of Detroit, the State's largest municipality. Ways to ensure this growth and health are emerging through a number of supportive initiatives.

Supportive activities already in process include:

**Improve Quality of Life and Safety for Detroiters**
- *Street lighting* – Improve public lighting by working with the city to create a separate authority to manage and finance streetlights. State legislation can create a new option for separate governmental authorities (similar to those for sewers) that allow for independent bonding authority against revenue as well as general funds. Detroit can then create such an entity to make financing more attractive to bondholders and thus lower the overall cost of the upgrades. This group would also have to develop multi-year lighting plans with the revenue to support them.
- *Law Enforcement* – As discussed in the governor's public safety message, over the next two years MSP will graduate two trooper classes – meaning approximately 180 troopers will be added, and will support our strategy to increase law enforcement resources in four Michigan cities, including Detroit.
- *Demolition* – Streamline, coordinate and accelerate demolition activities in the city.
- *Land Stewardship* – Improve the state's stewardship of its own land in the city with an emphasis on redevelopment, including undertaking a full review to determine what land can be redeveloped effectively and responsible ways to transition other parcels to successional landscapes.
- *Client Service* – The state will continue to enhance its presence within the city to better serve the client base for both DHS assistance and unemployment insurance.
- *Auto insurance* – Reduce auto insurance costs for residents through the Michigan Automobile Insurance Placement Facility, creating a base rate that reflects a more neutral score, resulting in noticeable rate reductions.

**Enhance Education**
- *K-12* – Ensure a quality school for every Detroit child through continued reforms of DPS, a strong start for the Education Achievement Authority, and support for Excellent Schools Detroit. Continue to drive a philanthropic agenda to provide post-secondary scholarship funding to Detroit graduates.
- *Early Childhood Education* – Ensure high quality early childhood education through a partnership with the Office of Great Start and increased collaboration with private and non-profit entities involved in providing these services to Detroiters.
- *Foundations for Learning* – Provide better access to services that enhance a child's learning process by moving DHS family independence specialists out of county offices and stationing them within 50 Detroit elementary schools. This will help eligible families access resources immediately, before barriers such as transportation, child care, housing instability, food insecurity, and access to healthcare impede a child's learning process.

-9-

**Invest in Transportation Infrastructure**

- Move ahead with the New International Trade Crossing project.
- Expand and facilitate the Detroit Intermodal Freight Terminal, ensuring that southeast Michigan has regional facilities with sufficient capacity and interconnectivity to provide for existing and future intermodal demand and reducing time, monetary costs, and congestion.
- Establish the authority and board for, and develop a funding mechanism for, the new Regional Transit Authority. Invest in a regional, multi-modal system including BRT, bike paths and walkability.
- Working with CN and Amtrak, create a commuter rail station and stop at the former state fairgrounds, expand the West Grand Blvd. station to include better facilities for transfers and assist in the rebuilding of the Royal Oak and Troy stops.
- Accelerate a capacity improvement project for I-94 from I-96 to Conner Avenue, supporting more than 13,000 jobs between 2012 and 2020.
- Complete final engineering and start construction this summer for the West Detroit Junction Railroad Project to provide a shorter, faster route for intercity passenger trains, relieve congestion for freight trains, and help lay the groundwork for future commuter rail service between Ann Arbor and Detroit.

**Invest in Physical Assets and Economic Drivers**

- *Citywide* –
  - Consolidate the planning and economic development functions for the city within the Detroit Economic Growth Corporation to avoid duplication, enable the development of unified strategy and execution, and simplify the process for new economic development within the city.
  - Coordinate and/or consolidate the state, Wayne County and city land banks to ensure the creation and execution of a common plan.
  - Devote $3 million of state funds to clearing title on parcels identified by DEGC to ready them for speedy economic development.
- *Eastern Market* – Contribute to the revitalization of Eastern Market by investing in the conversion of Shed 1 (including incubator kitchens, entrepreneurial training, and business start-ups) and the renovation of Shed 5 into a full-scale grocery. Position the market as a Regional Food Innovation Cluster, focusing on science, technologies and enhanced management practices that will reshape food production and business. Assist the market in applying for a federal TIGER grant to create a seamless trail system from the Riverfront through the Eastern Market, Brush Park, and Wayne State University areas.
- *Riverfront* – Develop the Globe Building, expand Milliken State Park, dedicate a new launch for citizens near Riverfront Park and assist DEGC with resources and talent to transform Hart Plaza.
- *Belle Isle* – Create park funding for Belle Isle while ensuring continued City ownership by designating Belle Isle as a part of a cooperative relationship with Milliken State Park. This would include a long-term lease that would accrue the cost of the park's maintenance and improvements out of the Park Endowment Fund. We will partner with Belle Isle Conservancy and the City to implement a master plan for the Island.
- *Fairgrounds* – Transfer ownership of the former state fairgrounds to the State Land Bank and create a neighborhood and commercial center on the site.
- *Cobo Center* – Encourage its continued expansion in coordination with the Metropolitan Detroit CVB, and support improvements.

-10-

- *Midtown* – Continue to be a key partner in local efforts to create a Regional Innovation Cluster in Midtown through MEDC investments in the incubation and growth of small business, as well as support for residential, commercial and retail development projects.
- *Community Ventures* – A public-private partnership will identify employers willing to create new jobs and organizations that can provide training and other job readiness services for the structurally unemployed. For the first time, state agencies like MEDC, Workforce Development Agency and Department of Human Services will bring together employers, job readiness partners and private funders in a comprehensive and measurable program to assist young people aged 15 to 29 and ex-offenders. The outcome will create new, long-term jobs in Detroit.
- *Detroit-Focused Economic Gardening* – Use a comprehensive set of tools for accelerating entrepreneurship, business growth, access to capital, placemaking and talent enhancement.
- *Detroit Works Project* – Support concentrated services of blight elimination and rehabilitation for four city-targeted neighborhoods contiguous to important economic development anchors. This will be supported through coordination with MSHDA's Neighborhood Stabilization Program and the MEDC's Community Revitalization Program.

**Improve Detroit's Capacity to Collect Tax Revenues**
- Enhance city revenue collection capacity as requested by city of Detroit through technical assistance for collections, audit and city income tax administration.
- *Create a common assessment template* – Move the property assessment function from the city to the county to allow for efficiencies, commonality of method and improvements in communication between taxing entities as well as between property owners.

**Municipal Assistance/Services Authority**
- The Department of Treasury will partner with municipal governments in this state to establish the Municipal Assistance/Services Authority. The Authority will function as a center of best practices for the delivery of local government services and provide enhanced opportunities for local governments in Michigan to engage in service sharing and consolidation of activities, with State support.

-11-

# Exhibit 5

13-53846-swr  Doc 8465-17  Filed 10/26/14  Entered 10/26/14 05:47:48  Page 63 of 8
13-53846-swr  Doc 8005-7  Filed 10/20/14  Entered 10/20/14 05:48:48  Page 53 of 8
150



Albert Garrett
President

Lawrence A. Roehrig
Secretary/Treasurer

Executive Board

Sylvester Austin
Region 2

Carlos Bass
Region 3

Mel Brabson
Region 1

David Brandt
Region 9

Donna Cangemi
Region 13

Susan Christensen
Region 11

Sandra Clayton
Region 6

Barbara Dauble
Region 12

Lorna Davison
Region 12

Jonathan Drake
Region 2

Caryette Fenner
Region 4

Lori Hamilton
Region 4

Michael Harris
Region 1

Benneata Henley
Region 1

Keith January
Region 3

Arlean King
Region 7

J. Phil McGuire
Region 2

Dennis Moore
Region 7

Sam Muma
Region 6

Doug Murch
Region 5

Lois Murray
Region 3

Stephanie Nshas
Region 3

Gloria Peterson
Region 6

Patricia Ramirez
Region 6

James Rhodes, Jr.
Region 5

Roger Rice
Region 1

Robbie Skorupski
Region 8

Cindy Spurlock
Region 2

Chris Vanderbussche
Region 7

Scott Whitman
Region 7

Russell Williams
Region 11

Sam Zocmer
Region 3

January 19, 2011

Joseph P. Martinico
Director of Labor Relations
City of Detroit
Coleman A. Young Municipal Center, Suite 332
Detroit, MI 48226

RE:     2008-2012 City of Detroit & AFSCME, Council 25 Labor Contracts

Dear Mr. Martinico:

This letter is intended to clarify AFSCME's position as it relates to bringing closure to the 2008-2012 Labor Agreements between the parties.

As we both know, the City of Detroit and AFSCME have engaged in negotiations over the terms of a collective bargaining agreement for more than two years. The process included mediation and ultimately fact finding before a State appointed Fact Finder. The Fact Finder's report was issued on June 25, 2010 and the parties continued bargaining for more than 60 days following the release of the report, without reaching agreement. Following exhaustion of all of the procedures required by law, the City exercised its right to impose contract terms.

AFSCME understands that the City has lawfully imposed a full agreement on AFSCME and its affiliated units of the City of Detroit. AFSCME understands that this imposition is for the full agreement, including all terms imposed by the City and all other Articles tentatively agreed to by the parties during negotiations, for all five master agreements representing the AFSCME and all units (except the Emergency Services Operators (ESO) unit, as indicated below). AFSCME, and its affiliated City of Detroit unions and locals, accepts the imposed agreements and accepts said terms as final and binding upon the parties and shall withdraw all fact finding petitions filed on behalf of said unions and locals, based upon said understandings.

AFSCME acknowledges that the imposition will be effective for all of its affiliated unions and locals (and their respective bargaining agreements), except for the ESO unit. It is AFSCME's position that ESO's are eligible for arbitration under Act 312 and the City disputes their eligibility at this time. Additionally, the City has informed the union that the application of furlough days for the Crossing Guards (Local 1863), Senior ESOs, Telecommunication Operators (TCOs) and Senior TCOs have been waived for reasons of operational necessity. AFSCME's acceptance of the imposed terms is reliant upon these understandings as well.



RECEIVED

JAN 2 5 2011

CITY OF DETROIT
LABOR RELATIONS DIVISION

Finally, AFSCME agrees to withdraw and/or refrain from filing any/all claims, charges, grievances or other litigation related in any way to the negotiation process or the imposition of contract terms by the City. This does not limit the union's right to grieve the City's interpretation or application of any of such terms, or any subsequent unfair labor practice charges or grievances.

Very truly yours,

Albert Garrett
President, AFSCME Michigan Council 25

AGREED: Joseph P. Martinico

# Exhibit 6

13-53846-swr   Doc 8405-17   Filed 10/26/14   Entered 10/26/14 05:47:49   Page 66 of 5
13-53846-swr   Doc 8005-7   Filed 10/26/14   Entered 10/26/14 05:43:48   Page 66 of 5
150

| CASE_NUM | DEPT | ASSOCIATION | GR_NUM | GR_NAME | GR_TYPE | ISSE_DESC | DISPOSITION | MED_DATE | SUMMARY | CITY COST |
|---|---|---|---|---|---|---|---|---|---|---|
| 15899 | POLICE | AFSCME 1023 | ESO-30-11 | KING, KATHERINE | 5 WK DAY SUSP | ATTENDANCE | WITHDRAWN BY UNION | 12/16/2013 | NO PAYMENT | |
| 15015 | POLICE | AFSCME 1023 | ESO-05-10 | BASS, SHEREE ANN | 1 WK DAY SUSP | INSUBORDINATION | GRANTED | 12/16/2013 | PAY 1 DAY | |
| 15016 | POLICE | AFSCME 1023 | ESO-02-10 | KING, KATHERINE | 1 WK DAY SUSP | INSUBORDINATION | DENIED | 12/16/2013 | NO PAYMENT | |
| 15470 | POLICE | AFSCME 1023 | ESO-24-11 | MYLES, MARQUITA | VOLUNTARY QUIT | ATTENDANCE | RETURN TO WORK - ALL TIME OFF AS SUSPENSION | 12/16/2013 | NO BACKPAY | |
| 14686 | POLICE | AFSCME 1023 | ESO-24-09 | JOHNSON, PAMELA | I WK DAY SUSP | FORCED OVERTIME | GRANTED | 12/16/2013 | PAY 1 DAY | |
| 14212 | POLICE | AFSCME 1023 | ESO-37-08 | MARZETT, ELIZABETH | 10 WK DAY SUSP | INSUBORDINATION | REDUCE TO A FIVE WORK DAY SUSPENSION | 12/16/2013 | PAY 5 DAYS | |
| 14213 | POLICE | AFSCME 1023 | ESO-36-08 | MARZETT, ELIZABETH | 1 WK DAY SUSP | FORCED OVERTIME | DENIED | 12/16/2013 | NO PAYMENT | |
| 14215 | POLICE | AFSCME 1023 | ESO-35-08 | SUTTON, TERRI C. | 1 WK DAY SUSP | INSUBORDINATION | WITHDRAWN BY UNION | 12/16/2013 | NO PAYMENT | |
| 14616 | POLICE | AFSCME 1023 | ESO-17-09 | REYNOLDS, JUANITA | 1 WK DAY SUSP | INSUBORDINATION | RESCINDED | 12/16/2013 | PAY 1 DAY | $183.54 |
| 15514 | POLICE | AFSCME 1023 | DPD-03-11 | JOHNSON, IVA DALE | PAY SHORTAGE | PAY SHORTAGE OF 5 HOURS | GRANTED - PAY 4 HRS. SICK AND 1 HR COMP TIME | 12/16/2013 | PAY 5 HOURS | $77.64 |
| 15390 | POLICE | AFSCME 1023 | ESO-22-10 | KING, KATHERINE | 10 WK DAY SUSP | INTIMIDATION | REDUCE TO A FIVE WORK DAY SUSPENSION | 12/16/2013 | PAY 5 DAYS | |
| 15446 | POLICE | AFSCME 1023 | ESO-25-10 | KING, KATHERINE | 30 WK DAY SUSPENSION | VIOLATION OF GENERAL ORDERS | REDUCE TO A 25 WK DAY SUSPENSION PD IN VAC | 12/16/2013 | RESTORE 5 DAYS VAC | $917.60 |
| 15482 | POLICE | AFSCME 1023 | ESO-09-11 | OWENS, EBONY | 5 WK DAY SUSP | INSUBORDINATION | DENIED | 12/16/2013 | NO PAYMENT | |
| 15481 | POLICE | AFSCME 1023 | ESO-02-11 | OWENS, EBONY | 1 WK DAY SUSP | INSUBORDINATION | WITHDRAWN BY UNION | 12/16/2013 | NO PAYMENT | |
| 15480 | POLICE | AFSCME 1023 | ESO-03-11 | FRANCE, LAKISHA D. | 1 WK DAY SUSP | INSUBORDINATION | WITHDRAWN BY UNION | 12/16/2013 | NO PAYMENT | |
| 15483 | POLICE | AFSCME 1023 | ESO-08-11 | JEFFRIES, SHAWNTEE | 1 WK DAY SUSP | INSUBORDINATION | WITHDRAWN BY UNION | 12/16/2013 | NO PAYMENT | |
| 15732 | POLICE | AFSCME 1023 | DPD-05-11 | TREADWELL, TRACY | 3 WK DAY SUSP | NOT WEARING PROPER HEADSET | REDUCE TO ONE DAY SUSPENSION | 12/16/2013 | PAY 2 DAYS | $235.38 |
| 15734 | POLICE | AFSCME 1023 | ESO-21-11 | HUTCHERSON, ANTOINETTE | 1 WK DAY SUSP | EXCESSIVE TARDINESS | WITHDRAWN BY UNION | 12/16/2013 | NO PAYMENT | |
| 15898 | POLICE | AFSCME 1023 | ESO-29-11 | RALLS, N KNGE A | 1 WK DAY SUSP | EXCESSIVE TARDINESS | WITHDRAWN BY UNION | 12/16/2013 | NO PAYMENT | |
| 15697 | POLICE | AFSCME 1023 | ESO-22-11 | WILLIAMS, LISA | 1 WK DAY SUSP | EXCESSIVE TARDINESS | WITHDRAWN BY UNION | 12/16/2013 | NO PAYMENT | |
| 15164 | POLICE | AFSCME 1023 | DPD-08-10 | COSS, PEDRO | LAYOFF-SENIORITY | IMPROPER LAYOFF | WITHDRAWN BY UNION | 12/16/2013 | NO PAYMENT | |
| 15845 | POLICE | AFSCME 1023 | ESO-13-11 | JACKSON, ALTROSIUS | DISCHARGE | PROBATIONARY DISCHARGE | DENIED | 12/16/2013 | NO PAYMENT | |
| 15347 | POLICE | AFSCME 1023 | DPD-09-10 | UNION POLICY | RADIO MAINTENANCE TECHNICIAN | OUTSOURCING THE INSTALLATION | DENIED | 4/2/2014 | NO PAYMENT | |
| 15165 | POLICE | AFSCME 1023 | DPD-09-10 | UNION POLICY | RADIO MAINTENANCE TECHNICIAN | OUTSOURCING THE INSTALLATION | DENIED | 4/2/2014 | | |
| 14049 | POLICE | AFSCME 1023 | ESO-1308 | YOUNG, GWENDOLYN | PAYROLL ERRORS | ADVANCE CHECKS ISSUED FOR SEVERAL WEEKS | GRANTED - TIME TO BE AUDITED FROM 6/2008 - 9/4/2008 | 4/2/2014 | | |
| 14286 | POLICE | AFSCME 1023 | ESO-0309 | UNION POLICY | AIR FILTERS | DEPARTMENT FAILED TO CLEAN FILTERS | GRANTED - AIR FILTERS TO BE CLEANED QUARTERLY | 4/2/2014 | NO PAYMENT | |
| 14630 | 311 CALL CENTER | AFSCME 1023 | 311-0509 | UNION POLICY | IMPROPER LAY-OFF NOTICE | IMPROPER NOTIFICATION TO UNION | WITHDRAWN BY UNION | 4/2/2014 | NO PAYMENT | |
| 15056 | POLICE | AFSCME 1023 | SPJ-32-09 | AYERS-JOHNSON, LOLITA | MANAGEMENT AUTHORITY | FAILURE TO PROCESS STATUS CHANGE | WITHDRAWN BY UNION | 4/2/2014 | NO PAYMENT | |
| 15346 | POLICE | AFSCME 1023 | DPD-14-10 | COSS, PEDRO | PAROLL ERRORS | PAY SHORTAGE | WITHDRAWN BY UNION | 4/2/2014 | NO PAYMENT | |
| 15388 | POLICE | AFSCME 1023 | DPD-15-10 | UNION POLICY | OUT-OF-CLASS ASSIGNMENTS | DEPARTMENT FAILED TO REQUEST VOLUNTEERS | CEASE AND DESIST OF PICKING ARBITRARILY | 4/2/2014 | | |
| 15469 | POLICE | AFSCME 1023 | ESO-11-11 | CUNNINGHAM, ADRIENNE | MEDICAL BENEFITS | BRAND NAME PRESCRIPTIONS | WITHDRAWN BY UNION | 4/2/2014 | NO PAYMENT | |
| 15471 | POLICE | AFSCME 1023 | ESO-18-11 | NEALY, JANISS | OVERTIME POLLING POLICY | DEPARTMENT FAILED TO FOLLOW POLLING | GRANTED - DEPT TO FOLLOW OVERTIME POLLING | 4/2/2014 | NO PAYMENT | |
| 15517 | POLICE | AFSCME 1023 | ESO-17-11 | LASTER, VERONICA | WRONG PAY RATE | PAY RATE INCORRECT FROM REHIRE DATE | GRANTED - SHOULD HAVE BEEN PAID AT NEW ESO RATE | 4/2/2014 | $1,000 | $1,000 |
| 15525 | POLICE | AFSCME 1023 | ESO-16-11 | WILLIAMS, LISA | WRONG PAY RATE | PAY RATE INCORRECT - HAD ADVANCES | DENIED | 4/2/2014 | NO PAYMENT | |
| 16277 | MAYOR'S OFFICE | AFSCME 1023 | NCH-03-12 | UNION POLICY | CONTRACTING OUT | NON BU MEMBERS PERFORMING WORK | WITHDRAWN BY UNION | 4/2/2014 | NO PAYMENT | |
| 15590 | MAYOR'S OFFICE | AFSCME 1023 | DPD-07-11 | UNION POLICY | IMPROPER LAY-OFF NOTICE | IMPROPER NOTIFICATION TO UNION | WITHDRAWN BY UNION | 4/2/2014 | NO PAYMENT | |
| 15589 | MAYOR'S OFFICE | AFSCME 1023 | NCH-01-11 | UNION POLICY | IMPROPER LAY-OFF NOTICE | IMPROPER ISSUANCE OF LAYOFF NOTICES | WITHDRAWN BY UNION | 4/2/2014 | NO PAYMENT | |
| 14687 | POLICE | AFSCME 1023 | ESO-2509 | UNION POLICY | UNION DUES | UNION DUES WRONGFULLY TERMINATED FOR 2 WEEKS | GRANTED | 4/2/2014 | $1,000 | $1,000 |
| 16149 | MPD | AFSCME 62 | 01-12MPD | TAYLOR, TERRANCE | DISCHARGE | AWOL | WITHDRAWN BY UNION | 10/30/2013 | NO PAYMENT | |
| 16278 | MPD | AFSCME 62 | 52-12MP | PORTER, LEO | HOURS | SHORTED HOURS | RESOLVED | 10/30/2013 | NO PAYMENT | |
| 16200 | HR | AFSCME 62 | 04-23-HR | MURRIEL, BRIDGET | IMPROPER LAYOFF | IMPROPER LAYOFF AND WRONG SENIORITY | WITHDRAWN BY UNION | 10/30/2013 | NO PAYMENT | |
| 14820 | DPW | AFSCME 62 | 020609DPW | SMITH, SAMANTHA | DISCHARGE | EXCESSIVE ATTENDANCE & TARDINESS | DENIED | 10/30/2013 | NO PAYMENT | |
| 14958 | BSE | AFSCME 62 | 07-10-BSE | WATTS, EMILIA | WRITTEN REPRIMAND | MISCONDUCT | WITHDRAWN BY UNION | 10/30/2013 | NO PAYMENT | |
| 16198 | ITS | AFSCME 62 | 40-05-ITS | THOMAS, JOE | LAYOFF & DEMOTION | LAYOFF/ELIMINATION OF JOB | WITHDRAWN BY UNION | 10/30/2013 | NO PAYMENT | |
| 14629 | ITS | AFSCME 62 | 15-09ITS | MCKINNEY, JOEL | DISCHARGE | UNACCEPTABLE WORK BEHAVIOR | DENIED | 10/30/2013 | NO PAYMENT | |
| 15594 | GSD | AFSCME 229 | 11-16 SM | BIVENS, RODNEY | VOLUNTARY QUIT | FAILURE TO REPORT/NO CALL/NO SHOW | RETURN TO ELIGIBLE REGISTER AS LABORER A | 10/30/2013 | NO PAYMENT | |
| 15593 | DPW | AFSCME 229 | 11-06V | McCLURE, MARLANDO | 15 WK DAY SUSP | CONDUCT UNBECOMING A CITY EMPLOYEE | WITHDRAWN BY UNION | 10/30/2013 | NO PAYMENT | |
| 15595 | DPW | AFSCME 229 | 11-15 SM | GLADNEY, WILLIAM N. | 30 WK DAY SUSP | EXCESSIVE ABSENTEEISM | DENIED | 10/30/2013 | NO PAYMENT | |
| 15586 | GSD | AFSCME 229 | 11-04 V | SMITH, TYRONE | SICK TIME | DENIED SICK TIME USAGE | GRANTED - PAY ONE SICK DAY | 10/30/2013 | PAY 1 SICK DAY | $160.32 |
| 15027 | GSD | AFSCME 229 | 09-31 V | DANFORTH, ALBERT | 10 WK DAY SUSP | UNSATISFACTORY WORK PERFORMANCE | REDUCE TO FIVE WORK DAY | 10/30/2013 | PAY 5 DAYS | $832.80 |
| 16242 | GSD | AFSCME 229 | 11-11 V | AGENS, THOMAS A. | 3 WK DAY SUSP | POOR WORK PERFORMANCE | GRANTED - PAY THREE DAYS | 10/30/2013 | PAY 3 DAYS | $500.40 |
| 14245 | DPW | AFSCME 229 | 08-28SM | GRAY, BRENDA | 5 WK DAY SUSPENSION | INSUBORDINATION | WITHDRAWN BY UNION | 10/30/2013 | NO PAYMENT | |
| 14956 | DPW | AFSCME 229 | 10-05S | PALMER, DEXTER | DISCHARGE | SUBSTANCE ABUSE | RTW ON 2 YR. LCA - ALL TIME OFF AS SUSPENSION | 10/30/2013 | NO PAYMENT | |
| 15346 | HEALTH | AFSCME 457 | 10-18H | EVANS, LINDA | 5 WK DAY SUSP | SLEEPING ON THE JOB | REDUCE TO THREE DAY SUSP - PAY 2 DAYS | 10/30/2013 | PAY 2 DAYS | $213.07 |
| 15442 | HEALTH | AFSCME 457 | 10-13H | McADORY, TAMMY | 15 WK DAY SUSP | INSUBORDINATION | GRANTED - PAY 9 DAYS BACK PAY & 6 VAC DAYS | 10/30/2013 | PAY 9 DAYS & 6 VAC | $1,093.82 |
| 15443 | HEALTH | AFSCME 457 | 10-14H | UNION POLICY | CONTRACTING OUT | WORK PERFORMED BY NON BU MEMBERS | WITHDRAWN BY UNION | 10/30/2013 | NO PAYMENT | |

| 15445 | HEALTH | AFSCME 457 | 10-16H | UNION POLICY | CONTRACTING OUT | WORK PERFORMED BY NON BU MEMBERS | WITHDRAWN BY UNION | 10/30/2013 | NO PAYMENT | |
|---|---|---|---|---|---|---|---|---|---|---|
| 15415 | RECREATION | AFSCME 836 | 3-600-2011 | WILLIAMS, MIKE | SHIFT PREMIUM | DENIED AFTERNOON SHIFT PREMIUM | GRANTED - PAY 88 HRS OF AFTERNOON SFT. PRE | 11/15/2013 | PAY 88 HRS SHIFT PREM | $44.00 |
| 15415 | RECREATION | AFSCME 836 | 3-600-2011 | WEST, MICHAEL | SHIFT PREMIUM | DENIED AFTERNOON SHIFT PREMIUM | GRANTED - PAY 56 HRS OF AFTERNOON SFT PRE | 11/15/2013 | PAY 56 HRS SHIFT PREM | $28.00 |
| 15415 | RECREATION | AFSCME 836 | 3-600-2011 | JONES, KIM | SHIFT PREMIUM | DENIED AFTERNOON SHIFT PREMIUM | GRANTED - PAY 16 HRS OF AFTERNOON SFT PRE | 11/15/2013 | PAY 16 HRS SH PREM | $8.00 |
| 15415 | RECREATION | AFSCME 836 | 3-600-2011 | JONES, KIM | SHIFT PREMIUM | DENIED HOLIDAY SHIFT PREMIUM | GRANTED - PAY 16 HRS OF AFTERNN HOL. SFT PRE | 11/15/2013 | PAY 16 HRS HOL SH PREM | $12.00 |
| 15431 | RECREATION | AFSCME 836 | 3-400-2011 | JONES, KIM | DENIAL OF SICK TIME | DENIAL OF BENEFITS | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 15147 | RECREATION | AFSCME 836 | 10-100-05-08 | WILLIAMS, MICHAEL | VACATION TIME | TIME NOT PAID | GRANTED - PAY 46 HRS OF VACATION | 11/15/2013 | PAY 46 HRS. OF VACATION | $961.35 |
| 15258 | RECREATION | AFSCME 836 | 200-10-10 | WILLIAMS, MICHAEL | OT NOT PAID INCORRECTLY | PAID AT STRAIGHT TIME INSTEAD OF 1.5 | GRANTED - PAY ADJUSTED OT AMOUNT | 11/15/2013 | PAY ADJUSTMENT | $408.90 |
| 11834 | RECREATION | AFSCME 836 | 2005-07-200 | KOKOSZKA, VALERIE | OUT OF CLASS | NOT PAID OUT OF CLASS | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 11835 | RECREATION | AFSCME 836 | 2005-06-200 | KOKOSZKA, VALERIE | OUT OF CLASS | NOT PAID OUT OF CLASS | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 14324 | BSE | AFSCME 1227 | JW514 | BOYD, JAMES | 3 WK DAY SUSP | POOR WORKMANSHIP | REDUCE TO ONE AND ONE HALF DAY SUSPENSION | 11/15/2013 | PAY 1.5 DAYS | $308.07 |
| 14561 | BSE | AFSCME 1227 | JW517 | SOLOMON, JOSEPH | DENIED OVERTIME | DENIED OVERTIME 6/4  AND 6/6/09 | GRANTED IN PART - PAY 4 HOURS OVERTIME | 11/15/2013 | PAY 4 HOURS OT | $164.42 |
| 15301 | BSE | AFSCME 1227 | JW531 | SHARPE, ANTHONY | DISCHARGE | CONFLICT OF INTEREST WITH PRIVATE BS | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 15413 | BSE | AFSCME 1227 | JW 535 | REILLY, DAVID | 3 WRK DAY SUSPENSION | NEGLIGENCE IN PERFORMANCE | GRANTED BY DEPT. (NOT PAID) - PAY 3 DAYS | 11/15/2013 | PAY 3 DAYS | $657.69 |
| 15703 | BSE | AFSCME 1227 | JW522 | REILLY, DAVID | OVERTIME | DENIED OVERTIME 8/26/09 | GRANTED - PAY 2 HOURS OVERTIME | 11/15/2013 | PAY 2 HOURS OT | $82.21 |
| 14700 | BSE | AFSCME 1227 | JW521 | SOLOMON, JOSEPH | DENIED OVERTIME | DENIED OVERTIME 6/9/09 & 8/29/09 | GRANTED PAY 4 HOURS OVERTIME | 11/15/2013 | PAY 2 HOURS OT | $164.42 |
| 16528 | FINANCE | AFSCME 2799 | PA 06-2012 | JONES, SHARNISE | DISCHARGE | FRAUD | GIP - RTW ON 3 YR LCA ALL TIME OFF AS SUSPENSION | 11/15/2013 | NO PAYMENT | |
| 15328 | FINANCE | AFSCME 2799 | FIN 05-2010 | TOLES, JANETTA | DISCHARGE | WILLFUL NEGLECT | GIP - RTW ON 2 YR LCA ALL TIME OFF AS SUSPENSION | 11/15/2013 | NO PAYMENT | |
| 16257 | FINANCE | AFSCME 2799 | PA 05-2012 | KHADIJAH, AHMAD | DISCHARE | FRAUD | DENIED | 11/15/2013 | NO PAYMENT | |
| 15753 | FINANCE | AFSCME 2799 | FIN 07-2011 | HALE, MARY | DENIED LEAVE TIME | DENIED SICK LEAVE | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 15297 | FINANCE | AFSCME 2799 | FIN.INT 03-2010 | WOODS, TANYA | 3 WK DAY SUSP | INSUBORDINATION | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 15838 | FINANCE | AFSCME 2799 | 2/28/2000 | FOSTER, GEMMA | DEMOTION | IMPROPER DEMOTION | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 15073 | FINANCE | AFSCME 2799 | PA-13-2010 | TOLES, JANETTA | HARASSMENT | HARASSMENT | DENIED | 11/15/2013 | NO PAYMENT | |
| | LAW | AFSCME 2799 | LAW 03-2013 | STEWART, SALENE | 2 WORK DAY SUSPENSION | UNSATISFACTORY WORK PERFORMANCE | GRANTED BY DEPT. (NOT PAID) - PAY 2 DAYS | 2/18/2014 | PAY 2 DAYS | $200.77 |
| 14557 | PLD | AFSCME 207 | 0107-09 | HORTON, PEAVY | 5 WK DAY SUSPENSION | LEAVING WORKSITE WITH PERMISSION | REDUCED TO A TWO WK DAY SUSP. - PAY 3 DAYS | 11/15/2013 | PAY 3 DAYS | $422.64 |
| 14739 | PLD | AFSCME 207 | 0281-09 | HORTON, PEAVY | 15 WK DAY SUSPENSION | LEAVING WORKSITE WITH PERMISSION | REDUCED TO A EIGHT DAY SUSP. - PAY 7 DAYS | 11/15/2013 | PAY 7 DAYS | $845.28 |
| 14747 | POLICE | AFSCME 2394 | 09-24P | MUIR, RONALD D. | 3 WK DAY SUSPENSION | UNSATISFACTORY WORK PERFORMANCE | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 15408 | POLICE | AFSCME 2394 | 11-02P | STANLEY, DAWNZELLA | 3 WK DAY SUSPENSION | UNSATISFACTORY WORK PERFORMANCE | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 15711 | POLICE | AFSCME 2394 | 11-07-B | WOODS, ARCHIE | SUSPENSION/DISCHARGE | SUBSTANCE ABUSE | WITHDRAWN BY UNION | 11/15/2013 | NO PAYMENT | |
| 15298 | HUMAN SERVICES | AFSCME 1642 | 001-JL-06-10TT | TURNER, TERRANCE | 5 WK DAY SUSPENSION | OUTSIDE JOB - UNAUTHORIZED BUSINESS | RESCINDED - PAY 5 DAYS | 11/15/2013 | PAY 5 DAYS | $532.69 |
| 14543 | RECREATION | AFSCME 542 | 721JUN.09 | BOOKER, ANESIA | 29 1/2 DAY SUSPENSION | UNACCEPTABLE WORK BEHAVIOR | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 15534 | RECREATION | AFSCME 542 | 716MAY11 | VAUGHN, ALVON | DISCHARGE | SUBSTANCE ABUSE | GIP - ALLOWED TO BE PLACED ON ELIGIBLE REGISTER | 11/22/2013 | NO PAYMENT | |
| 15535 | RECREATION | AFSCME 542 | 717MAY11 | WILSON, RONA A. | 29 1/2 WK DAY SUSPENSION | UNACCEPTABLE WORK BEHAVIOR | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 15658 | RECREATION | AFSCME 542 | 1004JUL11 | RATLIFF, JAMES | 3 WK DAY SUSPENSION | TALKING ON CELL PHONE WHILE ON POOL DECK | REDUCED TO A ONE AND ONE-HALF DAY SUSPENSION | 11/22/2013 | PAY 1.5 DAYS | $138 |
| 15660 | RECREATION | AFSCME 542 | | HAYES, CLARA | DISCHARGE | UNACCEPTABLE WORK BEHAVIOR | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 15714 | GSD | AFSCME 542 | 720JUL11 | FAVORS, ROBERT | VOLUNTARY QUIT | AVAILABLE FOR WORK - INCARCERATED | DENIED | 11/22/2013 | NO PAYMENT | |
| 15713 | GSD | AFSCME 542 | 719JUL11 | SIMPSON, GARRICK | 3 WK DAY SUSPENSION | INSUBORDINATION | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 15558 | GSD | AFSCME 542 | 702JAN11 | HAYNESWORTH, ROSEMARY | 3 WK DAY SUSPENSION | INSUBORDINATION | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 15373 | GSD | AFSCME 542 | 1000JAN11 | PATTON, JONATHAN | SUSPENSION | MISCONDUCT | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 15395 | GSD | AFSCME 542 | 705FEB11 | WILSON, RONA A. | 10 WK DAY SUSPENSION | MISCONDUCT | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 15394 | GSD | AFSCME 542 | 704FEB11 | JOHNSON, JAMES | SUSPENSION | INSUBORDINATION | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 15293 | GSD | AFSCME 542 | 770OCT10 | SMITH, BRADLEY | SUSPENSION | TARDINESS | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 15775 | GSD | AFSCME 542 | 730OCT11 | BROWN, RICHARD | SUSPENSION | UNACCEPTABLE WORK BEHAVIOR | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 16264 | GSD | AFSCME 542 | 708MAY13 | HOBBS, MARK | WRITTEN REPRIMAND | TARDINESS | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 16244 | GSD | AFSCME 542 | 725NOV12 | HOBBS, MARK | SUSPENSION | POOR WORK PERFORMANCE | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 16245 | GSD | AFSCME 542 | 726NOV | HOBBS, MARK | SUSPENSION | POOR WORK PERFORMANCE | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 16256 | GSD | AFSCME 542 | 703APR13 | FORD, KEISHA | 3 WK DAY SUSPENSION | INSUBORDINATION | REDUCED TO A ONE WORK DAY SUSPENSION | 11/22/2013 | PAY 2 DAYS | $193.04 |
| 16257 | GSD | AFSCME 542 | 704APR13 | JOHNSON, DOROTHY | 3 WK DAY SUSPENSION | ABSENT WITHOUT LEAVE | REDUCED TO A ONE WORK DAY SUSPENSION | 11/22/2013 | PAY 2 DAYS | $193.04 |
| 16258 | GSD | AFSCME 542 | 705APR13 | JOHNSON, EARL | 3 WK DAY SUSPENSION | ABSENT WITHOUT LEAVE | REDUCED TO A ONE WORK DAY SUSPENSION | 11/22/2013 | PAY 2 DAYS | $193.04 |
| 16259 | GSD | AFSCME 542 | 706APR13 | FLOWERS, ROBERT | 3 WK DAY SUSPENSION | ABSENT WITHOUT LEAVE | REDUCED TO A ONE WORK DAY SUSPENSION | 11/22/2013 | PAY 2 DAYS | $185.28 |
| 16262 | GSD | AFSCME 542 | 707APR13 | BAILEY, LaDENNA | 1 WORK DAY SUSPENSION | FAILURE TO WORK MANDATORY OVERTIME | DENIED | 11/22/2013 | NO PAYMENT | |
| 16263 | GSD | AFSCME 542 | 708APR13 | MACK, RODNEY | 1 WORK DAY SUSPENSION | FAILURE TO WORK MANDATORY OVERTIME | DENIED | 11/22/2013 | NO PAYMENT | |
| 16265 | GSD | AFSCME 542 | 709APR13 | WILKERSON, ALVIN | 1 WORK DAY SUSPENSION | FAILURE TO WORK MANDATORY OVERTIME | DENIED | 11/22/2013 | NO PAYMENT | |
| 16284 | GSD | AFSCME 542 | 714JUN12 | McBRAYER, ROBERT | 3 WORK DAY SUSPENSION | INSUBORDINATION | REDUCED TO A TWO WK DAY SUSP. - PAY 1 DAY | 11/22/2013 | PAY 1 DAY | $81.04 |
| 16251 | GSD | AFSCME 542 | 716OCT10 | SMITH, BRADLEY | UNACCEPTABLE ATTENDANCE | UNACCEPTABLE ATTENDANCE | WITHDRAWN BY UNION | 11/22/2013 | NO PAYMENT | |
| 16133 | GSD | AFSCME 542 | 711APR12 | BAILEY, LaDENNA | 3 WORK DAY SUSPENSION | INSUBORDINATION | REDUCED TO A ONE AND ONE-HALF DAY SUSP | 11/22/2013 | PAY 1.5 DAYS | $146.94 |
| 15718 | GSD | AFSCME 542 | 724AUG11 | ROBINSON, LUCREASIA | 3 WORK DAY SUSPENSION | INSUBORDINATION | REDUCED TO A ONE DAY SUSPENSION | 12/3/2013 | PAY 2 DAYS | $188.80 |
| 15157 | RECREATION | AFSCME 542 | 1011JUL10 | NORRIS, MARCUS | 3 WORK DAY SUSPENSION | LEAVING WORKSITE WITH PERMISSION | REDUCED TO A ONE AND ONE-HALF DAY SUSP | 12/3/2013 | PAY 1.5 DAYS | $138 |
| 15158 | RECREATION | AFSCME 542 | 1012JUL10 | ROBERTSON, HORACE | 5 WORK DAY SUSPENSION | EXCESSIVE TARDINESS | REDUCED TO A TWO AND ONE-HALF DAY SUSP | 12/3/2013 | PAY 2.5 DAYS | $156.20 |

| 15159 | RECREATION | AFSCME 542 | 1013JUL10 | STURDIVANT, IZAAK | 3 WORK DAY SUSPENSION | ABSENT WITHOUT LEAVE | REDUCED TO A ONE AND ONE-HALF DAY SUSF | 12/3/2013 | PAY 1.5 DAYS | $111.84 |
|---|---|---|---|---|---|---|---|---|---|---|
| 15116 | RECREATION | AFSCME 542 | 729JUN10 | WILCOXSON-PICKENS, LESLIE | NOT PAID SICK TIME OR SHIFT PR | OWED 4 HRS SICK AND 4 HRS AFT SHIFT PRE | GRANTED - PAY 4 HRS SICK & 4 HRS AFT. SHIFT PRE | 2/10/2014 | PAY 4 HRS SICK & 4 HRS SP | $47.36 |
| 16101 | FIRE | AFSCME 542 | 14AUG11F | MCGHEE, DARROL | OVERTIME | SHORTED 8 HRS OVERTIME 7/30/11 | GRANTED - DEPART APPROVED NOT PAID | 2/10/2014 | PAY 8 HRS OVERTIME | $250.20 |
| | GSD | AFSCME 542 | 714JUL13 | WYCHE, YOLANDA | 3 WORK DAY SUSPENSION | INSUBORDINATION | RESCINDED - PAY 3 DAYS | 2/10/2014 | PAY 3 DAYS | $266.52 |
| 15259 | RECREATION | AFSCME 542 | 1027SEPT10 | BROWN, DARRYL E. | SUSPENSION | LEAVING WORKSITE WITH PERMISSION | WITHDRAWN BY UNION | 2/10/2014 | NO PAYMENT | |
| 14980 | RECREATION | AFSCME 542 | 10400CT09 | DRUMGOOLE, DORIS | SHIFT PREMIUM | DENIED SHIFT PREMIUM | WITHDRAWN BY UNION | 2/10/2014 | NO PAYMENT | |
| 16285 | GSD | AFSCME 542 | 718JUL12 | WHEATLEY, OSCAR | OVERTIME | SHORTED 8 HRS OVERTIME 07/07/12 | GRANTED - PA Y 8 HRS OVERTIME FOR 7/7/2012 | 2/10/2014 | PAY 8 HRS OVERTIME | $160.92 |
| 16253 | RECREATION | AFSCME 542 | 10080VT12 | BENSON, MARICO | IMPROPER LAYOFF | FAILED TO BE RECALLED TO DEPT | DENIED | 2/10/2014 | NO PAYMENT | |
| 15787 | RECREATION | AFSCME 542 | 1019SEPT11 | STOVALL, PATRICIA | OVERTIME | NOT OFFERED OVERTIME ASSIGNMENT | WITHDRAWN BY UNION | 2/10/2014 | NO PAYMENT | |
| 16299 | GSD | AFSCME 542 | 701FEB13 | DRURY, TONY | OVERTIME | EQUALIZATION OF OVERTIME | WITHDRAWN BY UNION | 2/10/2014 | NO PAYMENT | |
| 15699 | RECREATION | AFSCME 542 | 1010AUG11 | TITUS, KIANDRA | OVERTIME | EQUALIZATION OF OVERTIME | WITHDRAWN BY UNION | 2/10/2014 | NO PAYMENT | |
| 15750 | GSD | AFSCME 542 | 04SEPT11G | POWELL, DAVID | OVERTIME | EQUALIZATION OF OVERTIME | WITHDRAWN BY UNION | 2/10/2014 | NO PAYMENT | |
| 15320 | GSD | AFSCME 542 | 773DEC10 | PERAULT, RENEE | OUT OF CLASS | NOT PAID OUT OF CLASS | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 14789 | GSD | AFSCME 542 | 702JAN10 | RIEVES, EDWIN | UNIFORM ALLOWANCE | NOT PAID $350 UNIFORM ALLOWANCE | GRANTED - PAY UNIFORM ALLOWANCE | 2/10/2014 | PAY $350 | $350.00 |
| 15597 | RECREATION | AFSCME 542 | 1001MAY11 | WALKER, JONATHAN | PUT ON NO WORK STATUS | CERTIFICATION WASN'T EXPIREI | GRANTED IN PART - PAY 1.5 DAYS | 2/10/2014 | $138.00 | $138.00 |
| 16203 | FIRE | AFSCME 542 | 14JUNE12F | UNION POLICY | PERFORMING BU WORK | OTHER UNION PERFORMING BU WORK | CEASE AND DESIST OF USING NON BU MEMBERS | 2/18/2014 | NO PAYMENT | |
| 15128 | GSD | AFSCME 542 | 743JULY10 | MAY, JR., HARRY | WRITTEN REPRIMAND | UNSATISFACTORY WORK PERFORMANCE | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15407 | GSD | AFSCME 542 | 708FEB11 | JOHNSON, ANGELO | WRITTEN REPRIMAND | UNSATISFACTORY ATTENDANCE | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16255 | GSD | AFSCME 542 | 702FEB13 | JELKS, NORMA | WRITTEN REPRIMAND | UNSATISFACTORY ATTENDANCE | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 14160 | RECREATION | AFSCME 542 | 1005APR08 | BROWN, ALVIN | SUSPENSION | THREATENING PHYSICAL VIOLENCE | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16099 | FIRE | AFSCME 542 | 6MAR12F | UNION POLICY | SUBCONTRACTING | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16100 | FIRE | AFSCME 542 | 09MAR12F | UNION POLICY (Johnny Morrison) | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | GIP - WILL BE PAID 4 HRS OVERTIME | 2/18/2014 | PAY 4 HOURS OVERTIME | $125.10 |
| 16012 | FIRE | AFSCME 542 | 3FEB12F | UNION POLICY | SUBCONTRACTING | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16014 | FIRE | AFSCME 542 | 5FEB12F | UNION POLICY | SUBCONTRACTING | NON BU EMPLOYEES PERFORMING WORK | CEASE AND DESIST OF USING NON BU MEMBERS | 2/18/2014 | NO PAYMENT | |
| 16011 | FIRE | AFSCME 542 | 2FEB12F | UNION POLICY | SUBCONTRACTING | NON BU EMPLOYEES PERFORMING WORK | CEASE AND DESIST OF USING NON BU MEMBERS | 2/18/2014 | NO PAYMENT | |
| 15260 | RECREATION | AFSCME 542 | 1029SEPT10 | WOFFORD, MAURICE | BENEFITS | EMPLOYEE BENEFITS NOT ACTIVATED | GRANTED, EMPLOYEE'S BENEFITS RESTORED | 2/18/2014 | NO PAYMENT | |
| 13922 | FIRE | AFSCME 542 | 752JULY08 | UNION POLICY | CONTRACTING OUT | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15396 | FIRE | AFSCME 542 | 706FEB01 | UNION POLICY | SUBCONTRACTING | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15419 | FIRE | AFSCME 542 | 05MAR11F | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15418 | FIRE | AFSCME 542 | 06MAR11F | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15126 | FIRE | AFSCME 542 | 735JUN10 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15391 | RECREATION | AFSCME 542 | 795DEC10 | WILLIAMS, JULIUS | SUSPENSION | UNSATISFACTORY WORK PERFORMANCE | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15550 | FIRE | AFSCME 542 | 714MAY11 | UNION POLICY | CONTRACTING OUT | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15551 | FIRE | AFSCME 542 | 715MAY11 | UNION POLICY | CONTRACTING OUT | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15511 | FIRE | AFSCME 542 | 20MAY11F | UNION POLICY | CONTRACTING OUT | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15513 | FIRE | AFSCME 542 | 22.MAY.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15467 | POLICE | AFSCME 1023 | ESO 05-11 | BLACK, BRENDA | FMLA LEAVE | EFFECTIVE DATE OF FMLA | GRANTED | 4/2/2014 | PAY $500 | $500 |
| 15515 | POLICE | AFSCME 1023 | ESO 06-11 | BLACK, BRENDA | DUTY DISABILITY | DENIED DUTY DISABILITY | DENIED | 4/2/2014 | NO PAYMENT | |
| 15516 | POLICE | AFSCME 1023 | ESO 15-11 | BLACK, BRENDA | LEAVE OF ABSENCE | DENIED LEAVE OF ABSENCE | DENIED | 4/2/2014 | NO PAYMENT | |
| 15530 | FIRE | AFSCME 542 | 11APR.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15531 | FIRE | AFSCME 542 | 12APR.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15533 | FIRE | AFSCME 542 | 14APR.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15547 | GSD | AFSCME 542 | 16DEC.10 | UNION POLICY | SPECIAL CONFERENCE | FAILURE TO FOLLOW PROCEDURES | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 14987 | GSD | AFSCME 542 | 708MAR.10 | UNION POLICY | TRANSFER | DEPARTMENT DID NOT FOLLOW CONTRACT | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15508 | FIRE | AFSCME 542 | 15APR.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15785 | RECREATION | AFSCME 542 | 1016SEPT.11 | AUSTIN, BRANDI | ADVANCE PAYCHECK | EMPLOYEE DID NOT PAID CORRECTLY | DENIED | 2/18/2014 | NO PAYMENT | |
| 15355 | GSD | AFSCME 542 | 700JAN.11 | UNION POLICY | SIGNING FOR DOCUMENTS | VIOLATON OF GRIEVANCE PROCEDURE | DENIED | 2/18/2014 | NO PAYMENT | |
| 15318 | FIRE | AFSCME 542 | 13DEC.10 | UNION POLICY | CONTRACTING OUT | NON BU EMPLOYEES PERFORMING WORK | DENIED | 2/18/2014 | NO PAYMENT | |
| 15124 | GSD | AFSCME 542 | 736JUL.10 | UNION POLICY | CONTRACTING OUT | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15839 | GSD | AFSCME 542 | 11SEPT.11 | POWELL, DAVID | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | GIP - WILL BE PAID 2 HRS OVERTIME | 2/18/2014 | PAY 2 HOURS OVERTIME | $62.55 |
| 15510 | FIRE | AFSCME 542 | 19APR.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | CEASE AND DESIST OF USING NON BU MEMBERS | 2/18/2014 | NO PAYMENT | |
| 16286 | RECREATION | AFSCME 542 | 1004JUL.12 | UNION POLICY (DAVID MITCHELL) | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16278 | RECREATION | AFSCME 542 | 1005JUL.12 | UNION POLICY | NON WORKING TELEPHONES | HEALTH AND SAFETY CONDITIONS | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16299 | GSD | AFSCME 542 | 701FEB13 | UNION POLICY | MANDATORY OVERTIME | EXCESSIVE USAGE BY MANAGEMENT | GRANTED - DEPARTMENT WILL CREATE OF POLICY | 2/18/2014 | NO PAYMENT | |
| 15739 | GSD | AFSCME 542 | 10AUG.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | CEASE AND DESIST OF USING NON BU MEMBERS | 2/18/2014 | NO PAYMENT | |
| 15730 | RECREATION | AFSCME 542 | 1012.SEPT.11 | UNION POLICY | PROPER LAYOFF NOTICE | EMPLOYEE NOT GIVEN NOTICE OF LAYOFF | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15719 | GSD | AFSCME 542 | 726AUG.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16098 | GSD | AFSCME 542 | 708APR.12 | UNION POLICY | JOB SPECIFICATIONS CHANGED | EMPLOYER SHOULD HAVE MET WITH UNION | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16097 | GSD | AFSCME 542 | 706APR. 12 | UNION POLICY | DISRESPECTING THE UNION | MANAGEMENT TO RESPECT THE UNION | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 15841 | GSD | AFSCME 542 | 735NOV.11 | UNION POLICY | SPECIAL CONFERENCE | DEPT DID NOT FOLLOW CONTRACT | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15840 | GSD | AFSCME 542 | 731OCT.11 | MACK, RODNEY | ATTENDANCE CONTROL | EMPLOYEE HAD NOT RECEIVED AN ORAL | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15512 | FIRE | AFSCME 542 | 21MAY.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15627 | FIRE | AFSCME 542 | 15JULY.11 | GAJEWSKI, SANDY | OVERTIME | FAILED TO BE REQUESTED TO WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15626 | FIRE | AFSCME 542 | 30JUN.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15623 | FIRE | AFSCME 542 | 27JUN.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15624 | FIRE | AFSCME 542 | 28JUN.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15625 | FIRE | AFSCME 542 | 29JUN.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15628 | FIRE | AFSCME 542 | 4JUL.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15570 | FIRE | AFSCME 542 | 24MAY.11 | UNION POLICY | GAM NOT OFFERED OVERTIME | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15571 | FIRE | AFSCME 542 | 25MAY.11 | UNION POLICY | GAM NOT OFFERED OVERTIME | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15204 | RECREATION | AFSCME 542 | 102SSEPT.10 | UNION POLICY | | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15569 | FIRE | AFSCME 542 | 23MAY.11 | UNION POLICY | | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15748 | FIRE | AFSCME 542 | 2SEPT.11 | UNION POLICY (DAVID POWELL) | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | GIP - WILL BE PAID 2 HRS OVERTIME | 2/18/2014 | PAY 2 HOURS OVERTIME | $62.55 |
| 15747 | FIRE | AFSCME 542 | 13SEPT.11 | UNION POLICY (SAM MOORE) | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | GIP - WILL BE PAID 2 HRS OVERTIME | 2/18/2014 | PAY 2 HOURS OVERTIME | $62.55 |
| 15744 | FIRE | AFSCME 542 | 7JUL.11 | UNION POLICY (Johnny Morrison) | GAM NOT OFFERED OVERTIME | NON BU EMPLOYEES PERFORMING WORK | GIP - WILL BE PAID 2 HRS OVERTIME | 2/18/2014 | PAY 2 HOURS OVERTIME | $62.55 |
| 15742 | FIRE | AFSCME 542 | 5JUL.11 | UNION POLICY | | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15741 | FIRE | AFSCME 542 | 3JUL.11 | UNION POLICY (DARROL McGHEE) | GAM NOT OFFERED OVERTIME | NON BU EMPLOYEES PERFORMING WORK | GIP - WILL BE PAID 2 HRS OVERTIME | 2/18/2014 | PAY 2 HOURS OVERTIME | $62.55 |
| 15749 | FIRE | AFSCME 542 | 3SEPT.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | CEASE AND DESIST OF USING NON BU MEMBERS | 2/18/2014 | NO PAYMENT | |
| 16243 | FIRE | AFSCME 542 | 727DEC.12 | UNION POLICY | | NON BU EMPLOYEES PERFORMING WORK | DENIED | 2/18/2014 | NO PAYMENT | |
| 16251 | FIRE | AFSCME 542 | 20DEC.12 | SMITH, BRADLEY | NOT OFFERED OVERTIME | DENIED THE OPPORTUNITY TO WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16250 | FIRE | AFSCME 542 | 19DEC.12 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16247 | FIRE | AFSCME 542 | 21DEC.12 | UNION POLICY (GAJEWSKI, SANDY) | OVERTIME | FAILED TO ASK UNION STEWARD | GIP - WILL BE PAID 2 HRS OVERTIME | 2/18/2014 | PAY 2 HOURS OVERTIME | $70.00 |
| 15842 | GSD | AFSCME 542 | 732OCT.11 | ATTENDANCE MONITORING | DID FOLLOW DEPARTMENT RULES | SHOULD NOT HAVE RECEIVED REVIEW | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15319 | GSD | AFSCME 542 | 15DEC.10 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | DENIED | 2/18/2014 | NO PAYMENT | |
| 15532 | FIRE | AFSCME 542 | 13APR.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15417 | FIRE | AFSCME 542 | 07MAR.11 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15123 | FIRE | AFSCME 542 | 737JUL.10 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 14119 | FIRE | AFSCME 542 | 802NOV.08 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 14524 | RECREATION | AFSCME 542 | 1010MAY.09 | UNION POLICY | REASSIGNMENT | PLAYLEADER RE-ASSIGNED IN ERROR | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 13798 | FIRE | AFSCME 542 | 1MAR.08 | UNION POLICY | POSITION RECALL | SENIOR CLERK NOT RECALL BY SENIORITY | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16204 | FIRE | AFSCME 542 | 15JUNE.12 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16205 | FIRE | AFSCME 542 | 16JUNE.12 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15509 | FIRE | AFSCME 542 | 16APR.12 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 16281 | GSD | AFSCME 542 | 713JUN.13 | UNION POLICY | WAGES | NOT OFFERED OVERTIME ASSIGNMENT | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15596 | RECREATION | AFSCME 542 | 03JUNE.12 | WIGGINS, CANTELL | SUSPENSION | PARKING VEHICLE IN UNSECURE LOCATION | GIP - REDUCE SUSP TO A ONE AND ONE-HALF DAY | 2/18/2014 | PAY 1.5 DAYS | $104.64 |
| 15309 | RECREATION | AFSCME 542 | 10310CT.10 | SIMS, JENELLE | NOT OFFERED OVERTIME | DENIED THE OPPORTUNITY TO WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15720 | GSD | AFSCME 542 | 727SEP.11 | UNION POLICY | REQUESTED SPECIAL CONFERENCE | DEPARTMENT DID NOT FOLLOW CONTRACT | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15782 | GSD | AFSCME 542 | 8110CT.11 | UNION POLICY | IMPROPER LAYOFF | CITY'S FAILURE TO PROPERLY NOTIFY UNION | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15089 | GSD | AFSCME 542 | 721APR.10 | UNION POLICY | PERFORMING BU WORK | BU WORK PERFORMED BY CLEAN SWEEF | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 14990 | GSD | AFSCME 542 | 706MAR.10 | UNION POLIICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15084 | GSD | AFSCME 542 | 710APR.10 | UNION POLICY | HEALTH AND SAFETY | VIOLATION OF MIOSHA SANITATION STANDARD | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15529 | GSD | AFSCME 542 | 17DEC.10 | UNION POLICY | SCHEDULING | UNION STEWARD SHIFT SCHEDULE | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15305 | GSD | AFSCME 542 | 05DEC.10 | UNION POLICY | SPECIAL CONFERENCE | MANAGEMENT AUTHORITY | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15294 | GSD | AFSCME 542 | 717NOV.10 | UNION POLICY | SPECIAL CONFERENCE | MANAGEMENT AUTHORITY | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| 15463 | GSD | AFSCME 542 | 711APR.11 | UNION POLICY | CONTRACTING OUT | STOEPEL PARK | DENIED | 2/18/2014 | NO PAYMENT | |
| 16010 | FIRE | AFSCME 542 | 01FEB.12 | UNION POLICY | PERFORMING BU WORK | NON BU EMPLOYEES PERFORMING WORK | WITHDRAWN BY UNION | 2/18/2014 | NO PAYMENT | |
| | | | | | | | | | | $15,105.80 |

# Exhibit 7

13-53846-tjt   Doc 8085-17   Filed 10/26/14   Entered 10/26/14 05:47:43   Page 71 of 58
13-53846-swr   Doc 8008-7   Filed 10/29/14   Entered 10/29/14 05:40:45   Page 71 of 58
150

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ROSE ROOTS, MARK PHILLIPS, WILLIAM
HARPER, EARNEST JOHNSON, FELICIA
JONES, CLARENCE L. WRIGHT, JR., ANGELA
OBEY-YOUNG, Individually and on behalf of all
others similarly situated,

        Case No. 12-12848-CV

        Plaintiffs,

THE CITY OF DETROIT,

        Defendant.

_____/

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Rose Roots, Mark Phillips, William Harper, Earnest Johnson, Felicia Jones,

Clarence L. Wright, Jr., and Angela Obey-Young, on behalf of themselves and all others

similarly situated, by and through their attorneys, The Miller Law Firm, P.C., state as follows for

their Class Action Complaint:

### INTRODUCTION

1. This case is brought on behalf of the thousands of individuals who retired from their

employment with the City of Detroit ("City") with vested health benefits and who are being

denied those vested contractual benefits in breach of: (1) contract, (2) statutory, (3) common law,

(4) the City Charter, (5) the Municipal Code of the City of Detroit, (6) Resolutions of the City

Council, and (7) fundamental federal Constitutional rights.

2. The City is balancing its budget on the backs of its former employees – retired senior

citizens – by making devastating and draconian changes to their promised health care benefits.

These seniors have worked for decades, based upon promised health care benefits, and earned

the right to these health care benefits. Moreover, the retirees made irrevocable decisions like

selecting survivorship benefits and/or benefit levels, based upon the benefits promised to them. At a time, when they are living on fixed incomes and incurring the medical expenses of old age, the City seeks to deprive them of these promised and earned benefits upon which they so justly relied.

3. The City of Detroit adopted an Employee Health Benefit Plan ("Plan") pursuant to City Charter and the Municipal Code, and the specific terms of that Plan were subject to collective bargaining agreements ("CBAs"), with the CBAs to take precedence over the Plan.

4. Under the terms of the CBAs, individuals, who retired from eligible employment with the City of Detroit, are entitled to fully paid hospitalization and medical insurance, based on ward service under the Michigan Variable Fee coverage (MVF-2), and subject to the benefits and premium contributions in effect at the time of retirement, and Drug Prescription coverage. The prescription drug plan was subject to a $2.00 deductible for retirees. With the May 9, 1996 execution of the 1995-1998 CBA, the prescription drug deductible was increased to $3.00 for future retirees. These benefits, co-payments, deductibles and premium contribution rates were part of the contract in force at the time of each employee's retirement from the City.

5. After July 2006, the City began to, and continues to, unilaterally modify the retiree health insurance benefits and premium contribution rates. Health care rates were modified again in 2012. Also, the City has undertaken steps to again unilaterally modify the retiree health insurance benefits and premium contribution rates and these changes are imminent and substantial.

6. These unlawful, unilateral modifications negatively impact retirees who are senior citizens living on fixed incomes and who are among the most vulnerable members of society and, in many instances, residents of the City.

2

7.     Plaintiffs seek a declaration that the City's unilateral changes to the retiree health insurance plan, including but not limited to, changes in covered benefits provided to retirees; increases in deductibles and co-payments assessed to retirees; and increases in premium contribution rates paid by retirees, substantially impair and breach the applicable collective bargaining agreements, and constitute a violation of Plaintiffs' constitutional rights.  Plaintiffs seek injunctive relief to prevent further changes and to require the City to return the contractual benefits owed to the retirees. Plaintiffs also seek compensatory damages for all the wrongfully incurred charges caused by Defendant's unlawful policy and practice.

## THE PARTIES

8.     Plaintiff Rose Roots is a resident of the City of Detroit, County of Wayne, and State of Michigan. She worked for the City for approximately 28 years, the vast majority of that time as a member of the American Federation of State, County and Municipal Employees ("AFSCME"). She retired from employment with the City of Detroit in 1997.  Plaintiff was a member of the Senior Accountants, Analysts and Appraisers Association ("SAAA") bargaining unit.

9.     Plaintiff Mark Phillips is a resident of the City of Detroit, County of Wayne, State of Michigan. He worked for the City for approximately 30 years, the vast majority of that time as a member of AFSCME. He retired from employment with the City of Detroit in 2002, at which time he was a member of the Associated Paving Foreman's Association.

10.     Plaintiff William Harper is a resident of the City of Detroit, County of Wayne, State of Michigan.  He was employed by the City for approximately 31 years until he retired in 1992. For his entire employment, he was a member of AFSCME.

11.     Plaintiff Earnest Johnson is a resident of the City of Detroit, County of Wayne, State of Michigan. He was employed by the City for approximately 34 years until he retired in 2002. For his entire employment, he was a member of AFSCME.

12.     Plaintiff Felicia Jones is a resident of the City of Detroit, County of Wayne, and State of Michigan. She retired from employment with the City of Detroit in 2010. During her thirty-one and one-half years of employment with the City, she was a member of AFSCME.

13.     Plaintiff Clarence L. Wright, Jr. is a resident of the City of Detroit, County of Wayne, State of Michigan. He retired from employment with the City of Detroit in 2005. During his almost 31 year employment with the City, he was primarily a non-union employee. At the time of his retirement, he was employed as a non-union Manager in the Recreation Department.

14.     Plaintiff Angela Obey-Young is a resident of the City of Detroit, County of Wayne, State of Michigan. She retired from employment with the City of Detroit in 2009. During her approximately 32-year employment with the City, she was a member of AFSCME for 22 years and of SAAA for approximately two years. At the time of her retirement, she had been employed as a non-union supervisory employee for approximately eight years.

15.     Defendant the City of Detroit is a municipal corporation with its principal place of business located at The Coleman Young Municipal Center, Two Woodward Avenue, Detroit, Michigan, the County of Wayne, and State of Michigan. The City of Detroit was established pursuant to the Constitution of the State of Michigan; the Home Rule Cities Act, the Charter of the City of Detroit and governed by applicable state and federal law; the Charter and its Ordinances and the Municipal Code.

4

## JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction over the subject matter of the action pursuant to 28 U.S.C. §§ 1331 and 1343· It is a civil action alleging, inter alia, violations of the Fifth and Fourteenth Amendments and impairment of contract arising under Article X of the Constitution of the United States.  This is an action for, inter alia, declaratory, injunctive and monetary relief pursuant to 28 U.S.C. §§ 2201 and 2202 and money damages to redress the Defendant's deprivation of Plaintiffs' rights pursuant to the Contracts Clause (Article 1, Section 10, Clause 1) and the Due Process Clause (Amendments V and XIV of the United States Constitution) and violations of 42 U.S.C. § 1983.

17.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to U.S.C. § 1367.

18.     Venue is proper in this Court because the municipal corporation Defendant and Plaintiffs are located in this District and a substantial part, if not all, of the events or omissions giving rise to the claims arose in the Eastern District of Michigan.  28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS – PART I
## THE ESTABLISHMENT OF THE EMPLOYEE HEALTH BENEFIT PLAN

19.     The City adopted its first Home Rule City Charter in 1918.  That charter was amended on July 1, 1974, January 1, 1997 and January 1, 2012.

20.     The City Employee Health Benefit Plan was established by Title 9, Chapter 8 of the 1918 City Charter as amended.  *See* also Charters 1974, 1997 and 2012, Article 13-105.

21.     Further, since at least some time at around June 1, 1946, the City provided for the establishment of an Employee Health Benefit Plan "for the purpose of providing hospital, surgical and death benefits" to eligible employees and retirees.  *City of Detroit Municipal Code [Code], Chapter 13, Article VIII, Division 1, Sec. 13-8-1; (Charter of the City of Detroit*

5

[Charter] 1918, T-IX, C-VIII, § 1). See also Charter, Art. 13, Sect. 13-10; Code, Chapter 13, Art VIII, Division 1, Sec. 13-8-6(b). (Charter 1918, T-I, C-VIII, § 11; Code 1964; 16-9-4).

22.     A "[m]ember [of the plan] shall mean any person included in the membership of the plan" and "[s]ubscriber [of the plan] shall mean a member of the plan or his family as defined in section 13-8-7 who is receiving a retirement allowance from the city." Code, Chapter 13, Art VIII, Division 1, Sec. 13-8-2. (Charter 1918, T-IX, -VIII, § 2; Code 1964, § 16-9-1).

23.     An individual remains a member in the plan "[a]fter his retirement from city service with a pension or workman's compensation benefits paid in whole or in part out of funds provided by the city…" Code, Chapter 13, Art. VIII, Division 1, Sec. 13-8-3(e) (Charter 1918, T-IX, C-VII, § 8).

24.     A city employee who retires with a pension shall continue to be a member of the city employees benefit plan. Code, Chapter 13, Article 8-3(e), 8-10; Charter 1918, T-IX, C-VIII, § 8, 12; Code 1964 § 16-9-7; Ord. No. 22-97 § 1, 7-2-97.

25.     "The governing board of the city employees' benefit plan shall pay to the insurer providing the hospital and surgical, and, if applicable major medical services to the members the cost of such services, as provided by contract." Code, Chapter 13, Article 8-5 (Code 1964 § 16-9-10)

26.     The Code provides in pertinent part that the City shall pay "the full cost of surgical and hospitalization coverage and major medical coverage, if applicable for individual employees…." Code, Chapter 13, Article 8-11 (Charter 1918, T-IX, C-VIII, § 13; Code 1964 § 16-9-8).

27.     Further, effective July 1, 1976, the City Council passed a resolution providing for "Drug Prescription" coverage for active employees and retirees who had retired since July 1,

6

1974.   That prescription drug coverage provided for a $2.00 deductible and payment of premiums by the City.

28.     In December, 1976, the City Council passed a resolution to provide the same Drug Prescription coverage with a $2.00 deductible to be effective January 1, 1977, for those retirees of the City who had retired prior to July 1, 1974.

**GENERAL ALLEGATIONS – PART II**
**THE BENEFITS AND PROVISIONS OF THE EMPLOYEE HEALTH BENEFIT PLAN**
**WERE SUBJECT TO COLLECTIVE BARGAINING FOR EMPLOYEES WHO WERE**
**MEMBERS OF A UNION**

29.     The Public Employment Relations Act "PERA" provides that public employees have the right to "bargain collectively with their public employers through representatives of their own free choice." Mich. Comp. Laws § 423.209, Public Act 379 of 1965.

30.     The City Charter provides that "[e]mployees of the City have the right to collective organization and collective bargaining." *Charter of 1997, Article. 6, Chapter 5, Human Resources Department, Sect. 6-507; Charter 2012, Article 6, Chapter 4, Sect. 4-407.*

31.     "The terms of any collective bargaining contract, and all rules and rulings made under it, shall take precedence over any inconsistent classifications, rules or policies of the human resources department." *Charter of 1997, Art. 6, Chapter 5, Human Resources Department, Sect. 6-508; Charter of 2012, Art. 6, Chapter 4, Human Resources Department, Sect. 4-408.*

32.     The employees of the City are represented by many different unions and bargaining units.

33.     Historically, to establish a uniform bargaining policy as to matters such as issues related to the Employee Health Benefit Plan, the City through its labor relations personnel, have

7

always bargained first with AFSCME the union which has the largest enrollment of City employees.

34.     Then, the same bargained-for provisions are applied uniformly to other collective bargaining agreements.  Indeed, many of the contracts contain "me too" provisions which call for identical provisions across bargaining groups.

35.     Upon information and belief, such collective bargaining contracts have been negotiated regarding the terms of the Employee Health Benefit Plan since at least 1947.  Mich. Comp. Laws § 423.201, et. seq., Act 336 of Public Act of 1947.  See also Exhibit 1, Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State County and Municipal Employees, AFL-CIO, 1977-80 (Michigan District Council 77 prior to March 3, 1978), Article 1.[1]  The various Master Agreements are within the City of Detroit's possession.

36.     The negotiated contractual terms of the collective bargaining contracts have consistently provided that the retiree healthcare benefits, co-payments and deductibles applicable to Plaintiffs and other similarly situated class members were established through the collectively bargained labor agreements in force at the time of their retirements.

37.     Under the terms of all contracts, including the Agreements entered into between the City and AFSCME, the retirees' health care plan, benefits, deductibles, co-payments and premium contributions were governed by the CBA in effect at the time of retirement.

---

[1]   Memorandum of Understanding Between the City of Detroit and Michigan Council 25, American Federation of State, County and Municipal Employees, dated 3-22-78, provided that AFSCME 25 was the successor in interest to AFSCME 77, and that the agreement between the City and Council 77 which was effective 9-7-77 and which expires on 6-30-80 shall be the City and Counsel 77, which was effective 9-7-77 and which expires on 6-30-80, shall be the Master Agreement between the parties for its term and otherwise in accordance with Article 47 of the adopted Master Agreement.

8

38.     The specific CBA under which each retiree retired established vested rights to the healthcare coverage in effect at the time of retirement and the City promised to continue these vested rights the entire period of retirement.

39.     Once the employee retires, the employee is no longer a member of the Union and is no longer subject to future CBAs.

40.     The retired employees are entitled to these benefits for life and they are vested at retirement, and not subject to unilateral modification and/or revocation.

41.     Non-union employees received the same benefits as union employees with regard to Health Care Benefits.

42.     Article 34 of each of the CBAs (Article 36 in the 1977-1980 and 1980-1983 Agreements) consistently provided that retirees would receive fully paid hospitalization and medical insurance, including prescription drug coverage.

43.     Plaintiffs set forth in Subsections A-I below the provisions in the Agreements from 1977 to 2005. To the extent that there may be retirees subject to Agreements that pre-dated the Agreements cited in Subsections A-I below, upon information and belief, those contracts are in the possession of Defendant and also provided for fully paid hospitalization and medical insurance.

## A.     The 1977-1980 Master Agreement

44.     Article 36 of the 1977-1980 Master Agreement between the City and Michigan Council 25 of AFSCME provided in pertinent part:

> The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries

9

and their legal dependents, as provided by Chapter 16, Article 9 of the Municipal Code for the City of Detroit.

Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. For those employees selecting the optional Metropolitan Health Plan of Blue Cross/Blue Shield the coverage shall be the MHP "AA" program with the City's contribution limited to the premium cost for Blue Cross/Blue Shield health insurance, ward service rates.

\* \* \*

For employees who retire on or after July 1, 1977, the City will pay the premium for regular retirees and their spouses effective as provided by City Council in 1977-78 closing resolutions.

\* \* \*

If, during the term of this Agreement, a Federal Health Security Act is enacted, the City of Detroit will pay during the term of the Agreement any premium, taxes or contributions employees may be required to pay under a Federal Health Security Act that are specifically earmarked or designated for the purpose of the Federal Program.

\* \* \*

The City agrees to institute a Health Maintenance Organization insurance plan prior to June 30, 1980. The employees shall have the further option of choosing this alternative. The City's contribution to this plan shall be limited to the premium cost for Blue Cross/Blue Shield health insurance, ward service rates.

(*See* Exhibit, Article 36, ¶¶ A,C, D and E.)

45.     The Agreement also provided for Optical Care Insurance through the Employee Benefit Board.  (Id., ¶ B.)

### B.     The 1980-1983 Master Agreement.

46.     Article 36 of the 1980-1983 Master Agreement between the City and Michigan Council 25 of AFSCME provided in pertinent part:

> The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate

with two dollar ($2.00) co-pay (Certificate #87), known as the two dollar ($2.00) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 16, Article 9 of the Municipal Code for the City of Detroit.

\* \* \*

Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. The City's contribution to the alternative plans shall be limited to the premium cost for Blue Cross/Blue Shield ward service rates, excluding dental insurance. Total Health Alliance Plan shall comprise the list of alternative hospitalization plans. If at the end of any fiscal year an alternative hospitalization plan has failed to enroll 5% of the bargaining unit employees, the City shall have the option of removing that plan from the list of eligible carriers.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution. **The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.** (Emphasis added.)

(*See* Exhibit 2, Article 36, ¶¶ A, B, and C.)

47.     The CBA also provided (1) effective 7-1-81, the City would improve its BC hospitalization plan for active employees and their dependents by providing BC Master Medical insurance with a 20% copay benefit and a fifty dollar ($50) per person annual deductible ($100.00) for two or more in a family; (2) a Dental Plan effective 7-1-80; (3) the continuation of Optical Care Insurance and (4) that the City would pay the costs if a Federal Health Security Act was enacted. (*Id.*, ¶¶ D, E, F and G.)

11

### C.    The 1983-1986 Master Agreement

48.    Article 34 of the 1983-1986 Master Agreement between the City of Detroit and

Michigan Council 25 of AFSCME provided in pertinent part:

> Not later than January 1, 1984, for active employees and employees who
> retire on or after January 1, 1984, coverage shall be as described in the
> Memorandum of Understanding re: Health Care Cost Containment and
> Exhibit III.
>
> * * *
>
> The City shall provide hospitalization and medical insurance based on the
> Blue Cross/Blue Shield ward service under the Michigan Variable Fee
> coverage (MVF-2) and the Prescription Drug Group Benefit Certificate
> with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar
> ($2.00) deductible  Drug Rider for employees and their legal dependents,
> duty disability retirees and their legal dependents and duty death
> beneficiaries and their legal dependents, as provided by Chapter 16,
> Article 9 of the Municipal Code for the City of Detroit.
>
> * * *
>
> Employees shall have the option of choosing alternative hospitalization
> medical coverage made available by the City.  The City's contribution to
> the alternative plans shall be limited to the premium cost of Blue
> Cross/Blue Shield ward service rates, excluding dental insurance.  Total
> Health Care, Michigan Health Maintenance Organization and Health
> Alliance Plan shall comprise the list of alternative hospitalization plans.  If
> at the end of any fiscal year an alternative hospitalization plan has failed to
> enroll 5% of the bargaining unit employees, the City shall have the option
> of removing that plan from the list of eligible carriers.
>
> * * *
>
> The City will pay the premium for regular retirees and their spouses for
> hospitalization and medical insurance based on the Blue Cross/Blue Shield
> ward service under the Michigan variable Fee coverage (MVF-2) and the
> Prescription Drug Group Benefit Certificate with the two dollar ($2.00)
> co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug
> Rider as provided by City Council in the 1977-78 closing resolution. **The
> City will pay this premium for regular retirees and their spouses for
> only as long as they receive a pension from the City.** (Emphasis added)

(*See* Exhibit 3, Article 34, ¶¶ A, B, C and D.)

12

49.     The 1983-1986 Agreement also provided that (1) the hospitalization plan for active employees and their dependents would include Blue Cross Master Medical Insurance with a 20% copay benefit and a fifty dollar ($50) per person annual deductible ($100) for two or more in a family; (2) a Dental Plan for actives effective 7-1-80; (3) the continuation of Optical Care Insurance;   (4) effective 11-1-83, employees who wish to insure sponsored dependents were required to pay the premium cost of that coverage and "the City will pay the health insurance premium for dependents who are 19 to 25 as long as they are regularly attending an accredited vocational school, college…and are dependent….Employees at their own expense may provide coverage for these dependents; and (5) the City would pay the costs if a Federal Health Security Act was enacted. (*Id.,* ¶¶ E, F, G, H and I.)

50.     The 1983-1986 Contract included a Memorandum of Understanding Re: Health Care Cost Containment signed 11-28-1983 which provided:

> ….[t]he parties agree that the most effective way to control health care costs is to limit the choice of hospitals, out-patient laboratories, providers of prescription drugs and other medical services to those who deliver quality care at reasonable prices. In order to achieve this goal the parties agree to implement the following plan, in lieu of Article 36, not later than January 1, 1984:
>
> A.     The parties agree to create a Health Care Cost Containment Committee made up of an equal number of members from the City and from the Union. The committee will agree on securing the services of a health care consultant or administrator to assist the committee in designing and implementing a health care cost containment program.  This committee shall review and agree to a health care cost containment plan which will cover active AFSCME employees and **future retirees** and will be implemented by the City no later than January 1, 1984. The plan will provide for quality health care and will limit the fees of physicians, hospitals, laboratories and druggists to those that charge reasonable fees including approved H.M.O.'s, health care networks and preferred drug providers.     Further cost containment alternatives such as preferred providers, generic mail order drugs, a maintenance drug program,

13

restrictive weekend admission rules, preadmission certification for elective surgery, second opinions, ambulatory surgery, control of out-patient psychiatric care, birthing centers, hospice care coverage other than hospitals, patient incentive audit of hospital bills, worksite blood pressure tests and employee health care education programs will be reviewed and implemented by the Committee. No insurance carrier shall be allowed to underwrite City Health Care insurance unless they offer coordination of benefits. Any savings realized from this effort will be disposed of in accordance with paragraph B.

B.     The Committee will review the costs of this program, on an annual basis, and will report to the Union and the City the amount of savings which the plan has generated. The accounting will be performed by a CPA mutually agreed upon by the parties if so desired to assure accuracy. A similar review and report will be made thereafter on an annual basis. The City and the Union agree that savings associated with this program will be shared equally by the employer and active AFSCME employees. The percentage of savings to be credited to the AFSCME bargaining unit employees shall be equal to one-half of the percentage of the difference in cost per employee of the active and **future retirees** of AFSCME in the general City hospitalization plan during the 1982-83 fiscal year versus the same base and equivalent accounting period in subsequent years. The general City hospitalization plan includes all active AFSCME employees **and future retirees** including those at the Department of Transportation and civilian employees of the Police and Fire Departments. Distribution of the savings attributed to the employees will be used as a bonus."

C.     In the event that the January 1 – June 30, 1984 premium cost exceeds the 1982-83 base year cost, the City will pay up to 50% over the 1982-83 base year costs. In the event that the July 1, 1984 – June 30, 1985 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost. In the event that the July 1, 1985 – June 30, 1986 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost.

D.     Effective July 1, 1983, the health care coverage premium for sponsored dependents must be borne by the employee.

E.     No later than January 1, 1984, the City will also implement a cost containment dental and optical insurance program. The City and the Union agree that savings associated with this program will be shared equally by the employer and the employees in accordance with the formula shown in paragraph B." (Emphasis added.)

14

51.     Exhibit III to the 1983-1986 Agreement provided "Re: HEALTH CARE PLAN"

and outlined the health care benefits under the program:

> The following is a description of the City of Detroit's Basic Health
> Care Plan for employees **and retirees**. They may choose to elect
> coverage under this plan or they may choose alternative coverage
> through one of the Health Maintenance Organizations offered by
> the City. The City will pay the premium for this alternative health
> care coverage up to an amount equal to the amount the City pay
> (sic) for the Basic Plan.
>
> The basic plan described herein will give member coverages,
> which are nearly the same as they currently enjoy.  It does,
> however, include several cost containment features not found in
> our current program which will control costs of hospitalization and
> other medical services.  Furthermore, the joint union/management
> health cost containment committee will be studying additional cost
> containment programs which shall include prescreening and
> employee awareness programs during the term of the agreement
> and will implement them if they fulfill or object of quality health
> care at reasonable prices. In the event that different optical, dental
> or prescription drug programs are less costly than the current ones
> used, they may be adopted in lieu of them." (Emphasis added.)

(*See* Exhibit 3, which lists the benefits provided by the Plan.)

### D.     The 1986-1989 Master Agreement

52.     Article 34 to the 1986-1989 Master Agreement between the City Council 25 of

AFSCME provided in pertinent part:

> The City shall provide hospitalization and medical insurance based
> on the Blue Cross/Blue Shield ward service under the Michigan
> Variable Fee coverage (MVF-2) and the Prescription Drug Group
> Benefit Certificate with two dollar ($2.00) co-pay (Certificate
> #87), known as the two-dollar ($2.00) deductible  Drug Rider for
> employees and their legal dependents, duty disability retirees and
> their legal dependents and duty death beneficiaries and their legal
> dependents, as provided by Chapter 13, Article 11 of the Municipal
> Code of the City of Detroit.

* * *

15

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person  $100.06
Two person     $238.29
Family         $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty

16

dollar ($50.00) per person annual deductible ($100.00) for two or more in a family.

* * *

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees citywide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

* * *

Effective January 1, 1987, the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 4, Article 34, ¶¶ A,B, C, D, F and L.)

53.     The 1986-1989 Agreement also provided a dental plan for active employees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted and that any insurer would be required to offer coordination of benefits (*Id.,* ¶¶ G, H, I and J)

54.     The parties also agreed to form a "Health Care Cost Containment Committee:

...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph "B" the City will pay

17

fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

(*Id.,* ¶ K.)

55.    Exhibit III "RE: HEALTH CARE PLANS" included as part of the 1986-1989

Agreement provided that:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 4.)

### E.    The 1989-1992 Master Agreement

56.    Article 34 to the 1989-1992 Master Agreement provided in pertinent part:

> The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar ($2.00) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 11 of the Municipal Code of the City of Detroit.
>
> * * *
>
> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:
>
> | Single person | $100.06 |
> |---|---|
> | Two person | $238.29 |
> | Family | $253.54 |
>
> Fifty percent (50%) of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%) shall be paid by the employer.
>
> * * *

18

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person    $238.29

Fifty percent (50%) of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees citywide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person

19

Two persons
Family.

* * *

Effective January 1, 1987, the City shall implement a Preferred Provider
Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 5, Article 34, ¶¶ A, B, C, D, E, F and L.)

57.     The 1989-1992 Agreement provided a dental plan for active employees and their

Dependents;   continued optical care insurance; that the City would pay the costs if a Federal

Health Security Act was enacted and that any insurer would be required to offer coordination of

benefits. (*Id.*, ¶¶ G, and H, I and J.)

58.     The parties agreed to form a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union
> which will review and agree to further cost containment programs to cover
> both active employees and future retirees during the term of the Contract.
> Said cost containment programs shall not diminish the levels of benefits
> provided in the basic plans but may require the insured to follow
> procedures prescribed by the carrier in order to be eligible for benefits. If
> premium levels remain below the amounts listed in the 1982-83 base
> premium levels for insurance listed in paragraph B the City will pay fifty
> percent (50%) of that amount to an escrow account which shall be used to
> offset health care costs or increase health care benefits. Furthermore, the
> parties agree during the term of this agreement to continue to discuss the
> City's hospitalization plans.   The parties are committed to investigate
> programs which will reduce costs and bring about a corresponding
> reduction in premium sharing by employees. Programs to be considered
> would include alternative health care providers, additional cost
> containment programs, and alternative traditional plans.   Any programs
> agreed to by the parties will be implemented during the term of this
> agreement.

(*Id.*, ¶ K.)

59.     Exhibit III "Re: HEALTH CARE PLANS" to the 1989-1992 Agreement
provides:

> [T]he City of Detroit offers a traditional hospitalization plan for
> employees and retirees plus they may choose alternative coverage through

20

one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 5.)

**F.      The 1992-1995 Master Agreement.**

60.      Upon information and belief, the City imposed an Agreement for the 1992-1995

Plan year which contained the exact or substantially similar language in Article 34. It is believed

that a copy of this document is in the possession of Defendant.

**G.      The 1995-1998 Master Agreement.**

61.      Article 34 of the 1995-1998 Agreement which was executed on May 9, 1996

provided in pertinent part:

> The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two-dollar ($2) deductible  Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit until such time during this agreement cost containment/reduction modifications are implemented pursuant to the Memorandum of Understanding Re; Lowered Health Care Costs dated August 31, 1995. Such modifications may impact all or part of the provisions contained, including but not limited to medical, dental and optical care coverages.

> \* \* \*

> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

> Single person  $100.06
> Two person     $238.29
> Family         $253.54

21

Fifty percent (50%) of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%) shall be paid by the employer.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent (50%) of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50

22

employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

\* \* \*

Effective January 1, 1995 the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 6, Article 34, ¶¶ A, B, C, D, E, F and L.)

62.     The Agreement provided a dental plan for active employees, duty disability retirees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; and that any insurer would be required to offer coordination of benefits. (Id., ¶¶ G, H, I, J and M.)

63.     The parties also agreed to form a Health Care Cost Containment Committee:

...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans.  The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans.  Any programs agreed to by the parties will be implemented during the term of this agreement.

23

*(Id.,* ¶ K.)

64.     The     1995-1998     Agreement     included     a     "MEMORANDUM     OF

UNDERSTANDING INITIATIVE NO. 6 RE: LOWERED HEALTH CARE COSTS" which

provided:

> The parties agree to negotiate agreements which will achieve cost savings
> on the following four initiatives. It is understood, however, that in
> addition to these mandatory cost reducing changes, the parties' Health
> Care Cost Reductions Committee (HCCRC) will continue to pursue
> potential means of further reducing costs or stunting their escalation in the
> future through other initiatives.
>
> A.     Health Insurance Premiums, Employee Portions Paid with "125K
> Pre-Tax" Dollars (This will be instituted forthwith, as soon as possible,
> upon ratification of the labor agreement.)
>
> B.     Prescription Drugs at $3.00
>
> C.     Mail-Order Prescription Drugs Program
>
> D.     COB Administrative Change (Verify then Pay)
>
> The following issues are **NOT AGREED TO** but are still being mutually
> examined by the Committee with regard to the parameters of such a rule
> as stated:
>
> E.     Emergency Room "Non-Admitting Usage Fee"
>
> F.     Opt-Out Payments When Alternate Coverage Exists
>
> Further, this HCCRC will endeavor to coordinate its activities with and
> make its efforts compatible with any beneficial outcomes from the
> operations between the City and the AFL-CIO Coalition of Unions
> Committee on Health Care Issues. In that regard, the union has already
> expressed at the contract bargaining table its interest in adopting the
> potential lower-costing "HMO/POS" program now being carefully
> considered by that City/Coalition Committee, subject to the Union's
> concerns about maintenance of the present benefits in the traditional
> BC/BS.
>
> The benefits of this initiative will be initially realized in Year I for
> initiative A and in Year II for initiatives B, C and D. For initiatives E and
> F, if the parties should come to agreement on them, the benefits will take

24

effect in accordance with the understanding reached between the parties. And lastly, further benefits will be realized to the extent the HMO/POS program is adopted and saves the parties health care costs.

*(See* Exhibit 6.)

65.     The 1995-1998 Agreement included A Memorandum of Understanding between the parties applied to National Health Care, "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits."*(See* Exhibit 6.)

66.     Exhibit II "RE: HEALTH CARE PLANS" to the 1995-1998 Agreement provides:

[T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

*(See* Exhibit 6.)

## H.      The 1998-2001 Master Agreement.

67.     Article 34 to the 1998-2001 Master Agreement executed on March 8, 2000 provided in pertinent part:

The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1], known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.

fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3.

25

Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

* * *

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person   $100.06
Two person      $238.29
Family          $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

* * *

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person   $100.06
Two person      $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3.

26

Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

> Single Person
> Two persons
> Family.

(See Exhibit 7, Article 34, ¶¶ A, B, C, D, E, and F.)

68.     The 1998-2001 Agreement also provided a dental plan for active employees, their dependents and duty disability retirees; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (Id., ¶¶ G, H, I, J and L.)

69.     The parties also agreed to form a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits

27

provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

(*Id.,* ¶ K.)

70.     A Memorandum of Understanding between the parties applied to National Health Care provided that "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits." (*See* Exhibit 7.)

71.     Exhibit II "RE: HEALTH CARE PLANS" to the 1998-2001 Agreement provides that:

[T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 7.)

28

## I.   **The 2001-2005 Master Agreement.**

72.   Article 34 of the 2001-2005 Master Agreement, which was executed on July 1,

2003, provided in pertinent part:

> 34. Hospitalization, Medical, Dental and Optical Care insurance Status
> quo of existing hospitalization, medical dental and optical care benefits
> will be maintained while the parties work cooperatively to institute
> mutually agreeable changes.
>
> The City shall continue to provide hospitalization and medical insurance
> based on the Blue Cross/Blue Shield ward service under the Michigan
> Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit
> Certificate with two dollar ($2) co-pay (Certificate #87) [fn1], known as
> the two dollar ($2) deductible Drug Rider for employees and their legal
> dependents, duty disability retirees and their legal dependents and duty
> death beneficiaries and their legal dependents, as provided by Chapter 13,
> Article 8 of the Municipal Code of the City of Detroit.
>
> fn 1: the $2 deductible Drug Rider (Certificate #87 as referenced above,
> reflects the benefit at the time the premium sharing arrangement was
> instituted. Currently, the co-pay for the Prescription Drug benefit is $3.
> Retirees shall be responsible for the co-pay amount in effect at the time of
> retirement.)
>
>                               * * *
>
> The City's contribution for the cost of hospitalization on a monthly basis
> shall be as follows:
>
> Single person  $100.06
> Two person     $238.29
> Family         $253.54
>
> Fifty percent of any premium charges that exceed the above amounts will
> be paid by the employees and fifty percent shall be paid by the employer.
> When the City's payroll system has the capability of allowing employees
> to pay these amount (sic) through the pre-tax IRS code 1225K mechanism,
> all bargaining unit members shall be entitled to participate.
>
>                               * * *
>
> Employees who wish to insure sponsored dependents shall pay the
> premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City. For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges

30

150

without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

*(See* Exhibit 8, Article 34, ¶¶ A, B, C, D, E, and F.)

73.    The 2001-2005 Agreement also provided a dental plan for active employees and duty disability retirees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (I. (Id., ¶¶ G, H, I and J.)

74.    The parties agreed to form a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

*(Id.,* ¶ K.)

75.    The Agreement included a Memorandum of Understanding between the parties

which applied to National Health Care, "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits." (*Id.*, ¶ I.)

76.     Exhibit II "Re: Health Care Plans" to the 2001-2005 Agreement provides that:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 8.)

**J.     In 2006, the City Unilaterally Modified the Retirees' Health Care Plan.**

77.     Subsequent to the 2001-2005 CBA, when it came time to negotiate the terms of the 2005-2008 CBA, the collective bargaining representatives for AFSCME engaged in negotiations with the City's labor relations personnel. The City unilaterally imposed contract terms for the 2005-2008 CBA, effective September 2006.

78.     Notwithstanding the absence of a contract, in 2006, the City unilaterally and improperly modified the terms of the Employee Health Care Plan for union and non-union active employees and retirees although such a move was illegal.

79.     The new plan changed the contribution rates, deductibles and benefits for retirees who had retired under prior collective bargaining agreements and had vested benefits in effect prior to July 2006.

32

80.     Notwithstanding that the City had no right to change the terms of the Health Care plan as to those retirees who had retired with vested rights to retiree health care, the City unilaterally changed the terms of the health care plan.

81.     The terms of the health care plan were mandatory subjects of collective bargaining under the state labor law, past practice and the agreements between the parties.

82.     Yet, after the imposition of the contract, which was accepted by the Union as to the active employees only, the City impermissibly continued to make changes to the imposed contract, including unlawful changes as to retiree health care.

83.     Under the City's new unilateral health care plan, co-payments and contributions were changed for retirees. By way of example and not limitation, changes to the Blue Cross traditional plan included the following:

| BLUE CROSS TRADITIONAL | Prior to change | Post change |
|---|---|---|
| Annual Deductible/Individual | $50 | $175 |
| Annual Deductible/Family | $100 | $350 |
| Urgent care | 100% | 80% after deductible co-payment |
| Prescription Drug Co-pay Generic | $2 | $5 |
| Prescription Brand | $2 | $15 |
| Mail Order Generic (90 days) | $2 | $10 copay |
| Mail Order Brand (90 days) | $2 | $30 copay |

(*See* Exhibit 9.)

84.     These changes were effective in the latter half of 2006.

85.     The City continued to make unilateral, illegal and improper changes to the terms of the health care plan, adversely affecting the retirees.

86.     Thereafter, the City prepared a draft of the Master Agreement dated October 24, 2006 which provided in Article 33:

33

*The parties have reached an agreement in regard to health care plan changes in accordance with MOU Re: Concession Agreement. However, the hospitalization, medical, dental and optical care benefits as of June 30, 2005, will be maintained until the new care design plan changes are implemented. That implementation is to occur on or after July 17, 2006. Changes to this article are reflected in the Memorandum of Understanding RE: Alternative Health Care Plan.*

\* \* \*

The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible   Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.

fn 1:  The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

| | |
|---|---|
| Single person | $100.06 |
| Two person | $238.29 |
| Family | $253.54 |

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer. When the City's payroll system has the capability of allowing employees to pay these amounts through the pre-tax IRS code 125K mechanism, all bargaining unit members shall be entitled to participate.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

34

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The city will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person    $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1:  The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

* * *

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88

35

fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family. (Emphasis added)

(*See* Exhibit 10, Article 33, ¶¶ A, B, C, D, E and F.)

87.     The October 24, 2006 draft agreement provided a dental plan for active employees and duty disability retirees; continued optical coverage; that the City would pay the costs if a Federal Health Security Act was enacted; and that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (*Id.*, ¶¶ G, H, I, J and L.)

88.     The October 24, 2006 draft agreement included a provision for a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agreed during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

(*Id.*, ¶ K.)

36

89.     The October 24, 2006 draft included Exhibit II, "RE: HEALTH ARE PLANS." which added "SECTION VIII, City Alternative Health Care Plan." In pertinent part, it provided that "Currently, all retirees and their dependents who are eligible for Medicare regardless of age must enroll in Medicare Parts A and B at their own expense to be eligible for continued coverage, and this provision shall remain unchanged and applicable to all persons who retire in the future." (*Id.*, § 8, ¶E at p 154.)

90.     The City did not have the right to unilaterally change the terms of the Employee Health Care Plan for these retirees who had retired with vested benefits.

91.     Even more improperly, the City reduced the health care plan in 2008 from what it unilaterally imposed in 2006.

92.     The City specifically promised the retirees that they would enjoy the medical benefits and contribution rates applicable at the time of their retirements.[2]

93.     Retiree medical benefits are vested lifetime benefits. Once the City of Detroit received the benefit of the retirees' completed service, it could not unilaterally alter or revoke the terms.

94.     The health benefits that are at issue had remained the same until the City of Detroit unilaterally and improperly modified the health care benefits.

### K.     In 2009, 2010, 2011 and 2012 the City Again Unilaterally Changed the Retirees' Health Care Plan.

95.     In 2009, 2010, 2011 and 2012 the City continued to unilaterally raise premiums and make other improper changes to the retirees' health care benefits.

---

[2] For example, the website for the General Retirement System City of Detroit provides that the benefits applicable to a retiree are those that were in effect at the time of the retiree's retirement. Other documents published by the City of Detroit and provided to the retirees set forth this same information to retirees.

**L.    The City Imminently Plans to Implement Substantial Modifications to the Retirees' Health Care Plan to the Detriment of Retirees.**

96.     The City imminently plans to unilaterally and wrongfully further modify the employee benefit plan applicable to these retirees including increasing premiums and changing the value of the contracted for benefits.

**GENERAL ALLEGATIONS – PART III**
**THE NON-UNION RETIREES HAVE THE SAME VESTED BENEFITS AS THOSE RETIREES WHO WERE COVERED BY A COLLECTIVE BARGAINING AGREEMENT**

97.     The City agreed to provide non-Union employees with the same Employee Benefit Plan and same terms and provisions as employees who were members of a Union and subject to collective bargaining agreements. In fact, the Code and Charter make no distinction.

98.     The non-Union employees who retired with vested benefits were unlawfully subject to modifications in July, 2006 and thereafter. Further, additional unlawful changes were made in 2012.

99.     The City promised these non-Union retirees that they would enjoy the medical benefits and contribution rates applicable at the time of their retirements.

100.    The City as a matter of practice provided the non-Union retirees with the same benefits as the Union retirees and represented that they would continue to obtain the same benefits as Union retirees.

**CLASS ACTION ALLEGATIONS**

101.    This is a class action suit which seeks injunctive and declaratory relief and damages in the amount of wrongfully incurred sums paid by retirees for contributions to both

38

premiums and deductibles and other health care costs due to Defendant's unilateral breaches of the contracts and violations of Plaintiffs' constitutional rights.

102.    Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals and seek to represent a class comprised of all persons who have been or will be subject to Defendant's unlawful policy, practice, procedure of breaching the contracts between the parties and also depriving them of their constitutional rights.

103.    During the periods at issue, Plaintiffs were retirees covered under the City of Detroit Employee Health Care Plan.

104.    Plaintiffs bring this action on their own behalf and on behalf of the following proposed class:

> All persons who retired from the City of Detroit with vested health care benefits and whose health care plan, including, premium contributions, benefits and deductibles, were unilaterally changed by the City of the Detroit.

105.    The class is so numerous that joinder of all members is impracticable.  Class members number in the thousands.  The precise number of Class members and their addresses are unknown to the Plaintiffs, but can be obtained from the records of the City of Detroit.

106.    There are questions of law or fact common to the Class, including at least the following:

a.    Whether the City's retirees had vested health care benefits that could not retroactively changed by the City.

b.    Whether the City unilaterally modified the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees;

39

c.      Whether such unilateral modification of the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees breached the vested rights of the retirees;

d.      Whether such unilateral modification of the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees, violated the retirees' constitutional rights under the Contract Clause of the U.S. Constitution and the 5th and 14th Amendments of the U.S. Constitution;

e.      Whether Plaintiffs were harmed as a result of the City's wrongful conduct; and

f.      What relief should be imposed in favor of the Plaintiffs and the Class, including declaratory and injunctive relief.

107.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs have the same interests in this matter as all other members of the Class, and their claims are substantially identical to and typical of the claims of all members of the Class. Plaintiffs do not have interests antagonistic to or in conflict with those of the other members of the Class.

108.    Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in class actions. Plaintiffs will fairly and adequately represent the interests of the Class members.

109.    The prosecution of separate actions by members of the Class could create a risk of establishing incompatible standards of conduct for Defendant.

110.    Overall, the claims of the individual class members may be too small to warrant individual litigation, especially as to a group of retirees on fixed incomes, but cumulatively the

amount of potential damage is significant and injunctive relief is required to preclude the City's on-going wrongful conduct.

111.   The prosecution of individual actions may, as a practical matter, be dispositive of the interests of the Class.

112.   Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia,* equitable remedies with respect to the Class as a whole.

113. The common questions of law and fact at issue here, some of which have been enumerated above, predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.

114.   The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation, particularly when Plaintiffs are retirees living on fixed incomes.

115.   Plaintiffs are not likely to be able to vindicate and enforce their constitutional and contractual and statutory rights unless this action is maintained as a class action.

116.   The issues raised can be more fairly and efficiently resolved in the context of a single action rather than piece-meal litigation in the context of separate actions.

117.   The resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations

118.   Defendant has acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate.

119.   To Plaintiffs' knowledge, no similar litigation is currently pending by other members of the Class.

120.     Plaintiffs' counsel, who is highly experienced in class actions, foresees little difficulty in the management of this case as a class action.

## COUNT I --BREACH OF CONTRACT

121.     Plaintiffs repeat and re-allege all of the preceding paragraphs as if full set forth herein.

122.     Plaintiffs rendered services to the City of Detroit and performed their duties pursuant to the applicable Agreements.

123.     The maintenance of the contribution rate, employee health insurance benefits, and coverage for medical and prescription drugs is a bargained for part of the compensation for services rendered by these Plaintiffs and the Class Members to the City.

124.     Each of the Agreements under which these Plaintiffs and the Class Members retired is a binding and enforceable agreement between them and the City to provide health insurance and prescription drug benefits and coverage at the benefit and contribution levels during the term of the Contract then in effect when each Plaintiff and Class Member retired.

125.     The City is thereby obligated to maintain the same health insurance and prescription drug benefits and coverage at the same contribution levels as in effect when each Plaintiff and Class Member retired.

126.     For decades, the City engaged in the practice of providing health insurance to all of its retirees, union and non-union, at the benefit levels and contribution rates applicable at the time of their retirements.

127.     This practice was based on mutual agreement and was a term and condition of employment that cannot be changed without the consent of the parties.

128.     The retirees did not consent to the change.

42

129.    The City has violated its promise to the retirees to provide these benefits for life as applicable at the time of retirement.

130.    Plaintiffs and the Class Members relied on the CBAs in good faith and fully performed all of their obligations under them.

131.    The Plaintiffs and Class Members relied on Defendant's past practice and promises.

132.    The City breached its contractual obligations to Plaintiffs and the Class Members by failing to maintain the required contribution levels for health insurance and the same benefit levels in effect at the time of retirement, when the City unilaterally changed same benefits effective first in July 2006 and each time thereafter.

133.    Plaintiffs and the Class Members have each been damaged by Defendant's breaches of the referenced CBAs and past practice and will continue to sustain injury and further damage if Defendant is allowed to continue to breach the terms and conditions of the CBAs.

134.    Plaintiffs and the Class Members are entitled to relief because of Defendant's breaches of the CBAs, and breaches of past practice, including the modification of benefits and contribution rates.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargaining agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

43

## COUNT II – BREACH OF IMPLIED CONTRACT

Plaintiffs repeat and re-allege all of the preceding paragraphs as if full set forth herein.

135.     Plaintiffs rendered services to the City of Detroit and performed their duties pursuant to the applicable agreements.

136.     The maintenance of the contribution rate, employee health insurance benefits, and coverage for medical and prescription drugs is an agreed upon part of the compensation for services rendered by these Plaintiffs and the Class Members to the City.

137.     For decades, the City engaged in the practice of providing health insurance to all of its retirees, union and non-union, at the benefit levels and contribution rates applicable at the time of their retirements.

138.     This practice was based on mutual agreement and was a term and condition of employment that cannot be changed without the consent of the parties.

139.     The retirees did not consent to the change.

140.     The retirees relied on these agreements and past practices in good faith and fully performed all of their obligations under these agreements.

141.     The City has violated its promise to the retirees to provide these benefits for life as applicable at the time of retirement.

142.     The City breached its contractual obligations to Plaintiffs and the Class Members by failing to maintain the required contribution levels for health insurance and the same benefit levels in effect at the time of retirement, when the City unilaterally changed same benefits effective first in July, 2006 and each time thereafter.

44

143.    Plaintiffs and the Class Members have each been damaged by Defendant's breaches of these promises and will continue to sustain injury and further damage if Defendant is allowed to continue to breach the terms and conditions of the agreement between the parties.

144.    Plaintiffs and the Class Members are entitled to relief because of Defendant's breaches of the agreements and breaches of past practice, including the modification of benefits and contribution rates.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargaining agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

### COUNT III – VIOLATION OF THE CONTRACTS CLAUSE OF THE UNITED STATES CONSTITUTION (U.S. CONST. ART I, SEC. 10, CL. 1)

145.    Plaintiffs repeat and re-allege all the preceding paragraphs as if fully set forth herein.

146.    At all times relevant hereto, Defendant and its agents and employees were individuals acting under color of State and Municipal law.

147.    At all times relevant hereto, Plaintiffs and the putative Class Members were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit pursuant to 42 U.S.C. § 1983.

148.    The Constitution of the United States provides that "[n]o State shall....pass any...law impairing the obligation of contracts." U.S. Const. Article I, Sec. 10, Cl. 1

149.    Defendant violated the contract clause of the United States Constitution when it took actions impairing its contractual obligations to vested retirees by unilaterally increasing the contribution rates for premiums, the co-payments and deductibles, and other modifications to the health care plan to which it was contractually bound.

150.    Under the collective bargaining agreements, Defendant is contractually obligated to provide health insurance and ancillary benefits at the same levels as the effective date of the CBAs under which the retirees retired.

151.    Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance prescription drug benefits for retired union and non-union members and their dependents substantially impaired the contractual obligations under the parties' CBAs, and violated past practice and federal, state and municipal law.

152.    Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance and prescription drug coverage for retired union and non-union members and their dependents contravened the **reasonable expectations** of Plaintiffs and the Class of retired individuals and their dependents under the CBAs, past practice, and federal, state and municipal law.

153.    Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance and prescription drug coverage for retired union and non-union members and their dependents violated essential terms and conditions under the CBAs, past practice and federal, state and municipal law upon which Plaintiffs and the Class of retired individuals they seek to represent reasonably and materially relied.

46

154.    Defendant's unilateral increase and modification of contribution rates, co-payments and deductibles diminish the benefit coverage and the contracts with these retirees and has no legitimate public purpose and/or constitutes an abuse of power.

155.    The actions at issue substantially impair the provisions in Plaintiffs' contractual agreements.

156.    As a direct and proximate result of Defendant's actions, Plaintiffs sustained and will continue to sustain injury and damages, including but not limited, to the deprivation of their rights under the U.S. Constitution.

157.    Defendant's substantial impairment of these contractual obligations has proximately caused, and will continue to cause Plaintiffs and their dependents and the putative Class Members irreparable injury and damage, including (1) denial of their **reasonable expectations** under the CBAs, past practice and Municipal and State law, that Defendant would continue to comply with its contractual obligations; (2) interference with the protections under Municipal and State law to collectively bargain under the procedures provided under state law and municipal law; and (3) denial of their constitutional rights under the U.S. Constitution.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

47

## COUNT IV -- VIOLATION OF THE PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAUSES OF THE 5TH AND 14TH AMENDMENTS.

158.   Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

159.   At all times relevant hereto, Defendant and its agents and employees were individuals acting under color of State and Municipal law.

160.   At all times relevant hereto, Plaintiffs and the putative Class Members were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit pursuant to 42 U.S.C. § 1983.

161.   The Constitution of the United States provides that no person "shall be deprived of life, liberty, or property, without due process of law..." U.S. Const. Amendment V.

162.   The rights and protections of the Fifth Amendment are fully applicable to state action. U.S. Const. Amendment XIV.

163.   Plaintiffs have a vested contractual and constitutionally protected property interest in Defendant's compliance with its contractual obligations; to wit, to continue providing the same retiree contribution rate, co-payments, deductible and benefits under the CBAs and past practice; to return the retiree contribution rate, co-payments, deductible and benefits under the CBAs and past practice to the agreed upon rates and benefits; and to refrain from unilaterally altering and modifying the contribution rates, deductibles, benefits and financial obligations under the collective bargaining agreements and past practice as provided to retired employees.

164.   Under the collective bargaining agreement and past practice, Defendant is contractually obligated to provide health insurance and ancillary benefits at the same levels as the effective date of the CBAs under which the retirees retired.

165.   Plaintiffs vested contractual and constitutionally protected interests derive from, inter alia, the CBA's, the past practice, municipal, state and federal law.

48

166.   Defendant does not have the right to unilaterally modify the contractual obligations.

167.   Defendant deprived Plaintiffs and the retired Class Members of these vested contractual and constitutionally protected interests without notice and without an opportunity to be heard before the deprivation took place, thus, causing a forfeiture of property without due process in violation of the due process clause.

168.   Plaintiffs did not waive their right to adequate notice or the reasonable opportunity to be heard before being deprived of their vested contractual and constitutionally protected interest.

169.   The risks of depriving Plaintiffs and retired Class members of these vested contractual and constitutionally protected interests without first providing notice and a reasonable opportunity to be heard are high.

170.   Defendant's interest to deprive Plaintiffs without first providing notice and a reasonable opportunity to be heard are non-existent or minimal.

171.   The actions at issue substantially impair the provisions in Plaintiffs' contractual agreements and deprive them of a constitutionally protected property interest.

172.   As a direct and proximate result of Defendant's actions, Plaintiffs sustained and will sustain injury and damages, including but not limited, to the deprivation of their rights under the US Constitution.

173.   Defendant's substantial impairment of these contractual obligations has proximately caused, and will continue to cause Plaintiffs and their dependents and the putative Class Members irreparable injury and damage, including (1) denial of their reasonable expectations under the CBAs, past practice and State law, that Defendant would continue to

comply with its contractual obligations; (2) interference with the protections under the law to collectively bargain under the procedures provided under state law and municipal law; and (3) denial of their constitutional rights under the U.S. Constitution.

174. Plaintiffs have a Constitutionally-protected property interest in the health care benefits and contribution rates that they are entitled to receive.

175. Defendant has denied Plaintiffs the health care benefits and contribution rates without any cognizable procedure whatsoever.

176. The Charter for the City of Detroit recognizes that these retirees are entitled to representation, to wit, "[r]etired general city employees are entitled to be represented in the city legislative and budgetary proceedings on issues affecting their interest by persons elected by them," but such representation was not given. *Charter, Article 9, Chapter 6.*

177. Defendant's actions in unilaterally modifying the retirees' health care benefits and contributions, as set forth herein, deprives and continues to deprive Plaintiffs of their constitutionally protected right to equal protection of the laws and substantive due process as secured by the Fourteenth Amendment of the United States Constitution.

178. Plaintiffs have been subject to adverse treatment by Defendant as set forth and described herein.

179. As a direct and proximate result of the Defendant's unfair treatment, Plaintiffs have suffered and will continue to suffer substantial injury, including but not limited to irreparable harm.

180. As a direct and proximate result of Defendant's failure to provide adequate due process, Plaintiffs have suffered and will continue to suffer substantial injury, including but not

limited to irreparable harm by the City's continued implementation of unilateral changes to the retirees' property interest in their health care benefits.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT V -- VIOLATION OF 42 U.S.C. § 1983

181.    Plaintiffs repeat and re-allege all the preceding paragraphs as if fully set forth herein.

182.    The City through its actions and decisions has deprived Plaintiffs and the Class Members of their federally protected rights, provided by federal law and the United States Constitution.

183.    The policies, decisions and actions of the City were based on considerations other than those proper to the good faith administration of justice.

184.    The City's actions constitute a deliberate denial, under color of law, of Plaintiffs' federal rights guaranteed under the 5th Amendment Due Process and Equal Protection Clauses of the 14th Amendment of the United States Constitution, as well in violation of 42 U.S.C. § 1983.

185.    Plaintiffs have, as a direct and proximate result of the City of Detroit's action, suffered and will continue to suffer substantial and irreparable harm and injury.

51

186.    Defendant's actions have substantially harmed Plaintiffs and the putative Class Members and the City has announced future actions which will irreparably harm Plaintiffs and the putative Class Members. Thus, injunctive relief is required.

187.    The City acted in an arbitrary, capricious and discriminatory manner and their actions show a reckless disregard and callous indifference for Plaintiffs' federally protected rights. Plaintiffs are therefore entitled to exemplary damages, costs and attorney fees pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT VI - INJUNCTIVE RELIEF AND IRREPARABLE HARM

188.    Defendant has undertaken steps to increase the rates of contribution and increase the o-payments and deductibles and otherwise unilaterally modify the agreed upon contractual terms of the retirees health care.  Upon information and belief, such changes are scheduled to be implemented in July 2012 or some time shortly thereafter to union retirees and have already been implemented as to non-union retirees.

189.    The City Administration, Labor Relations and City Council have authorized these changes.

190.    These changes impair the obligation of contract as to Plaintiffs and the proposed class members.

191.    It is also an unconstitutional impairment of obligation of contract in violation of Section 10 of the United States Constitution.

192.    It is also an unconstitutional impairment of obligation in violation of the City Charter.

193.    It is also an unconstitutional impairment of obligation in violation of the Municipal Code.

194.    The retirees will be forced to make choices to allocate sparse resources, including foregoing health care coverage, prescriptions and medical care which will result in irreparable harm, and a permanent detrimental impact on health and well-being.

195.    The imposition of additional insurance costs on retirees constitutes irreparable harm because of the financial hardship on retirees on fixed incomes, emotional distress and possible deprivation of life's necessities by reallocating scant resources to pay for needed healthcare. They will have to choose between medical care, food or other life essentials.

196.    These retirees cannot afford to contribute the increased amounts, thus, they may have to reduce their health insurance or lose their level of coverage.

197.    Even if the retirees prevail, reimbursing them at the end of the litigation will not compensate them for the impact on their health in the interim.

198.    The balance of hardships weigh in favor of granting Plaintiffs injunctive relief because the harm to Plaintiffs cannot be undone.

199.    Despite the manifest illegality, invalidity and unconstitutionality of these actions, Defendant, its officials, agents, and employees, unless restrained by order of this Court, will

53

enforce these changes against Plaintiffs, causing them irreparable injury, including the fact that they will be deprived of the ability to afford adequate health care and by reason of which Plaintiffs do not have an adequate remedy at law.

200.    The Plaintiffs are likely to succeed on the merits as Plaintiffs have vested contractual rights to the health care benefits at issue.

201.    A preliminary injunction is not contrary to the public interest.

WHEREFORE, Plaintiffs respectfully request the Court to issue a temporary injunction restraining Defendant from enforcing its resolution and these changes in the Employee Health Benefit Plan as to retirees and restore the non -union retirees to the status quo prior to the 2012 changes.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.    Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declare that the actions of Defendant described constitute violations of the Contracts Clause of the United States Constitution and the 5th and 14th Amendments to the Constitution;

C.    Enter a permanent injunction prohibiting Defendant from engaging in the violations of the Contracts Clause of the United States Constitution and the 5th and 14th Amendments;

D.    Enter a Judgment finding that Defendant's actions in unilaterally changing the retirees' health care plan, modifying the contribution rate, benefits, deductibles and other terms of the plan constitutes a breach of the parties' CBAs;

54

E.      Award Plaintiffs and the Class they seek to represent compensatory damages in an

        amount to be determined at trial to fully compensate them for their injuries;

F.      Award any other damages that are permissible;

G.      Award attorneys' fees and costs; and

H.      Award such other relief as the Court deems appropriate and just.


### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Ann L. Miller (P43578)
Sharon S. Almonrode (P33938)
950 West University Dr. Ste. 300
Rochester, MI 48307
(248) 841-2200

Dated: June 27, 2012

55

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ROSE ROOTS, MARK PHILLIPS, WILLIAM
HARPER, EARNEST JOHNSON, FELICIA
JONES, CLARENCE L. WRIGHT, JR., ANGELA
OBEY-YOUNG, Individually and on behalf of all
others similarly situated,

Case No. 12-12848-CV

      Plaintiffs,

THE CITY OF DETROIT,

      Defendant.

_____/

THE MILLER LAW FIRM, P.C.
E. Powell Miller (P39487)
Ann L. Miller (P43578)
Sharon S. Almonrode (P33938)
950 West University Dr. Ste. 300
Rochester, MI 48307
(248) 841-2200
(248) 652-2852 fax

### INDEX OF EXHIBITS

Exhibit 1-     Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 1977-1980

Exhibit 2-     Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 1980-1983

Exhibit 3-     Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 1983-1986

Exhibit 4-     Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 1986-1989

Exhibit 5-     Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 1989-1992

Exhibit 6-     Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 1995-1996

Exhibit 7-    Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 1998-2001

Exhibit 8-    Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 2001-2005

Exhibit 9-    City of Detroit health care plan options 2006

Exhibit 10-   Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State, County and Municipal Employees 2005-2008

# Exhibit 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSE ROOT, MARK PHILLIPS,
WILLIAM HARPER, EARNEST JOHNSON,
FELICIA JONES, CLARENCE L. WRIGHT, JR.
ANGELA OBEY-YOUNG

                               Case No. 12-12848-AC-DRG
                               Hon. AVERN COHN

        Plaintiffs,

v.

CITY OF DETROIT,

        a Municipal Corporation,

---

| | |
|---|---|
| E. POWELL MILLER (P39487) | JUNE ADAMS  (P43283) |
| Attorney for Plaintiffs | ANDREW JARVIS (P59191) |
| 950 W.  University Drive | CITY OF DETROIT LAW DEPARTMENT |
| Suite 300 | Attorneys for Defendant |
| Rochester, MI 48307 | 660 Woodward Avenue, Suite 1650 |
| (248) 841-2200 | Detroit, MI 48226 |
| (248) 652-2852 (facsimile) | (313) 237-0540/(313) 237-5038 |
| Epm@millerlawpc.com | (313) 224-5505 (facsimile) |
| | adamj@detroitmi.gov |
| | jarva@detroitmi.gov |

---

## DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT
## AND RELIANCE ON JURY DEMAND

1.    Defendant denies.

2.    Defendant denies.

3.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

4.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

K:\DOCS\LABOR\adamj\a39000\answer\540470.WPD       1

5.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

6.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

7.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## THE PARTIES

8.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

9.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

10.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

11.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

12.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

13.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

14.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

15.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## JURISDICTION AND VENUE

16.  Defendant denies.

17.  Defendant denies.

18.  Defendant denies.

## GENERAL ALLEGATIONS- PART I
## THE ESTABLISHMENT OF THE EMPLOYEE HEALTH BENEFIT PLAN

19.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

K:\DOCS\LABOR\adam\la39000\answer\540470.WPD          2

20.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

21.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

22.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

23.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

24.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

25.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

26.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

27.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

28.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

### GENERAL ALLEGATIONS- PART II
### THE BENEFITS AND PROVISIONS OF THE EMPLOYEE HEALTH BENEFIT PLAN WERE SUBJECT TO COLLECTIVE BARGAINING FOR EMPLOYEES WHO WERE MEMBERS OF A UNION

29.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

30.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

31.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

32.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

33.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

34.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

35.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

36.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

37.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

K:\DOCS\LABOR\adam\a39000\answer\540470.WPD          3

38. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

39. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

40. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

41. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

42. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

43. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

### A. THE 1977-1980 MASTER AGREEMENT

44. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

45. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

### B. THE 1980-1983 MASTER AGREEMENT

46. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

47. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

### C. THE 1983-1986 MASTER AGREEMENT

48. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

49. Defendant neither admits nor denies but leave Plaintiff to their proofs.

50. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

51. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

### D. THE 1986-1989 MASTER AGREEMENT

52. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

53. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

54.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

55.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## E. THE 1989-1992 MASTER AGREEMENT

56.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

57.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

58.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

59.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## F. THE 1992-1995 MASTER AGREEMENT

60.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## G. THE 1995-1998 MASTER AGREEMENT

61.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

62.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

63.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

64.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

65.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

66.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## H. THE 1998-2001 MASTER AGREEMENT

67.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

68.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

69.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

70.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

K:\DOCS\LABOR\adamj\a39000\answer\540470.WPD          5

71.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## I. THE 2001-2005 MASTER AGREEMENT

72.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

73.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

74.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

75.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

76.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## J. IN 2006, THE CITY UNILATERALLY MODIFIED THE RETIREES' HEALTH CARE PLAN

77.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

78.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

79.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

80.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

81.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

82.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

83.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

84.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

85.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

86.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

87.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

88.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

89.    Defendant neither admits nor denies but leave Plaintiffs to their proofs.

K:\DOCS\LABOR\adam\la39000\answer\540470.WPD          6

90.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

91.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

92.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

93.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

94.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## K.  IN 2009, 2010, 2011 AND THE 2012 THE CITY AGAIN UNILATERALLY CHANGED THE RETIREES' HEALTH CARE PLAN

95.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## L. THE CITY IMMINENTLY PLANS TO IMPLEMENT SUBSTANTIAL MODIFICATIONS TO THE RETIREES' HEALTH CARE PLAN TO THE DETRIMENT OF RETIREES

96.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## GENERAL ALLEGATIONS- PART III
## THE NON-UNION RETIREES HAVE THE SAME VESTED BENEFITS AS THOSE RETIREES WHO WERE COVERED BY A COLLECTIVE BARGAINING AGREEMENT

97.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

98.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

99.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

100.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## CLASS ACTION ALLEGATIONS

101.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

102.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

103.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

104.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

105.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

106.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

107.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

108.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

109.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

110.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

111.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

112.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

113.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

114.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

115.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

116.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

117.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

118.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

119.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

120.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## COUNT I-BREACH OF CONTRACT

121.   Defendant restates its answers to  paragraphs 1 through 120 as if fully stated herein.

122.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

K:\DOCS\LABOR\adamj\a39000\answer\540470.WPD          8

123. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

124. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

125. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

126. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

127. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

128. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

129. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

130. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

131. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

132. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

133. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

134. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

WHEREFORE, Defendant respectfully requests that this Honorable Court

dismiss this complaint with prejudice and award costs and attorney fees to

Defendant for defense of these claims.

## COUNT II - BREACH OF IMPLIED CONTRACT

Defendant restates its answers to paragraphs 1 through 134 as if fully stated herein.

135. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

136. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

137. Defendant neither admits nor denies but leave Plaintiffs to their proofs.

K:\DOCS\LABOR\adamj\a38000\answer\540470.WPD          9

138.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

139.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

140.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

141.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

142.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

143.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

144.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

WHEREFORE, Defendant respectfully requests that this Honorable Court dismiss this complaint with prejudice and award costs and attorney fees to Defendant for defense of these claims.

## COUNT III - VIOLATION OF THE CONTRACTS CLAUSE OF THE UNITED STATES CONSTITUTION U.S. CONST., ART 1., SEC. 10, CL. 1

145.   Defendant restates its answers to  paragraphs 1 through 144 as if fully stated herein.

146.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

147.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

148.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

149.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

150.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

151.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

152.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

153.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

K:\DOCS\LABOR\adam\a39000\answer\540470.WPD          10

154.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

155.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

156.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

157.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

WHEREFORE, Defendant respectfully requests that this Honorable Court

dismiss this complaint with prejudice and award costs and attorney fees to

Defendant for defense of these claims.

## COUNT IV-VIOLATION OF THE PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAUSES OF THE 5TH AND 14TH AMENDMENTS

158.  Defendant restates its answers to paragraphs 1 through 157 as if fully stated herein.
159.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

160.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

161.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

162.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

163.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

164.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

165.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

166.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

167.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

168.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

169.  Defendant neither admits nor denies but leave Plaintiffs to their proofs.

170.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

171.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

172.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

173.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

174.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

175.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

176.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

177.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

178.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

179.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

180.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## COUNT V - VIOLATION OF 42 U.S.C. §1983

181.   Defendant restates its answers to  paragraphs 1 through 180 as if fully
       stated herein.

182.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

183.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

184.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

185.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

186.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

187.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

## COUNT VI-INJUNCTIVE RELIEF AND IRREPARABLE HARM

188.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

189.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

190.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

191.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

192.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

193.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

194.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

195.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

196.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

197.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

198.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

199.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

200.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

201.   Defendant neither admits nor denies but leave Plaintiffs to their proofs.

WHEREFORE, Defendant respectfully requests that this Honorable Court dismiss this complaint with prejudice and award costs and attorney fees to Defendant for defense of these claims.

## RELIEF REQUESTED

A.   Defendant request that the relief requested be denied.

B.   Defendant request that the relief requested be denied.

C.   Defendant request that the relief requested be denied.

K:\DOCS\LABOR\adamj\a39000\answer\540470.WPD          13

D.    Defendant request that the relief requested be denied.

E.    Defendant request that the relief requested be denied.

F.    Defendant request that the relief requested be denied.

G.    Defendant request that the relief requested be denied.

H.    Defendant request that the relief requested be denied.

**WHEREFORE,** Defendant requests that this court dismiss plaintiff's complaint in its entirety and award attorney fees, costs and interest incurred in defense of this frivolous claim.

Respectfully submitted,

**CITY OF DETROIT LAW DEPARTMENT**

July 20, 2012

/s/June Adams (P43283)
Assistant Corporation Counsel
660 Woodward Avenue, Suite 1650
Detroit, Michigan 48226
(313) 237-0540
Adamj@detroitmi.gov

K:\DOCS\LABOR\adamj\a39000\answer\540470.WPD      15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSE ROOT, MARK PHILLIPS,
WILLIAM HARPER, EARNEST JOHNSON,
FELICIA JONES, CLARENCE L. WRIGHT, JR.
ANGELA OBEY-YOUNG

                                    Case No. 12-12848-AC-DRG
                                    Hon. AVERN COHN

          Plaintiffs,

v.

CITY OF DETROIT,

          a Municipal Corporation,

_____

E. POWELL MILLER (P39487)          JUNE ADAMS  (P43283)
Attorney for Plaintiffs            ANDREW JARVIS (P59191)
950 W. University Drive            **CITY OF DETROIT LAW DEPARTMENT**
Suite 300                          Attorney for Defendant
Rochester, MI 48307               660 Woodward Avenue, Suite 1650
(248) 841-2200                     Detroit, MI 48226
(248) 652-2852 (facsimile)         (313) 237-0540/(313) 237-5038
Epm@millerlawpc.com               (313) 224-5505 (facsimile)
                                   Adamj@detroitmi.gov
                                   jarva@detroitmi.gov

_____

### DEFENDANT'S SPECIAL AND AFFIRMATIVE DEFENSES

In further answer, and by way of special and affirmative defenses (in addition to or in conjunction with the defenses set forth in the foregoing Answer) Defendant, by and through their undersigned counsels, state that they will rely upon the following special and affirmative defenses, if applicable, and if supported by facts to be determined through appropriate discovery:

1.     Defendant had a legitimate, non-discriminatory reason for its employment actions.

2.     Plaintiffs have failed to set forth any direct or circumstantial evidence of a violation of 42 USC §1983.

3.     Plaintiff has failed to state a claim upon which relief may be granted.

4.     There are no genuine issues of fact.

5.     Defendant, City of Detroit is entitled to absolute immunity in actions alleging violations of 42 U.S.C. §1983.

6.     Plaintiff has suffered no constitutional deprivations visited through a governmental custom and no such custom has received approval, whether formal or informal though the City of Detroit's official decision-making channels.

7.     Plaintiffs have failed to demonstrate that they suffered any federal constitutional deprivations.

8.     Plaintiffs have failed to plead sufficient facts of constitutionally-protected activity under the Fourteenth Amendment; they have failed to plead that they did not receive due process to which they may have been due and these claims must be dismissed.

9.     Plaintiffs have failed to plead a *prima facie* underlying claim of any cause of action to support an allegation of violation of 42 U.S.C. §1983.

10.     Plaintiffs have received all of the procedural due process to which they are entitled.

11.     Plaintiffs have received all of the substantive due process to which they are entitled.

12.     Plaintiffs have not established and cannot establish irreparable harm.

13.     Plaintiffs' claims are barred by the applicable statute of limitations.

14.     Plaintiffs have failed to establish a viable federal question.

15.     Defendant City of Detroit reserves the right to supplement and/or modify

K:\DOCS\LABOR\adamj\a39000\answer\540470.WPD          17

these Special and Affirmative Defenses.

**WHEREFORE,** Defendant prays that this Honorable Court grant its prayer for dismissal of Plaintiff's Complaint for the reasons asserted hereinabove. Further, Defendant prays that this Court award its costs, expenses and actual attorney fees incurred in the defense of this action. Finally, Defendant prays that this Court enter such other orders and judgments as it deems appropriate.

Respectfully submitted,

**CITY OF DETROIT LAW DEPARTMENT**

July 20, 2012

/s/June Adams (P43283)
Assistant Corporation Counsel
660 Woodward Avenue, Suite 1650
Detroit, Michigan 48226
(313) 237-0540
Adamj@detroitmi.gov

K:\DOCS\LABOR\adamj\a39000\answer\540470.WPD        18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSE ROOT, MARK PHILLIPS,
WILLIAM HARPER, EARNEST JOHNSON,
FELICIA JONES, CLARENCE L. WRIGHT, JR.
ANGELA OBEY-YOUNG

                                        Case No. 12-12848-AC-DRG
                                        Hon. AVERN COHN

            Plaintiffs,

v.

CITY OF DETROIT,
        a Municipal Corporation,

---

E. POWELL MILLER (P39487)          JUNE ADAMS  (P43283)
Attorney for Plaintiffs            ANDREW JARVIS (P59191)
950 W. University Drive            **CITY OF DETROIT LAW DEPARTMENT**
Suite 300                          Attorney for Defendant
Rochester, MI 48307                660 Woodward Avenue, Suite 1650
(248) 841-2200                     Detroit, MI 48226
(248) 652-2852 (facsimile)         (313) 237-0540/(313) 237-5038
Epm@millerlawpc.com                (313) 224-5505 (facsimile)
                                   Adamj@detroitmi.gov

## **RELIANCE ON JURY DEMAND**

Defendant CITY OF DETROIT, by and through its attorney, JUNE ADAMS

(P43283) files its reliance on the jury demand filed by plaintiff.

                        Respectfully submitted,
                        **CITY OF DETROIT LAW DEPARTMENT**

July 20, 2012           /s/June Adams (P43283)
                        Assistant Corporation Counsel
                        660 Woodward Avenue, Suite 1650
                        Detroit, Michigan 48226
                        (313) 237-0540

K:\DOCS\LABOR\adamj\a39000\answer\540470.WPD        19

Adamj@detroitmi.gov

K:\DOCS\LABOR\adamj\a39000\answer\540470.WPD     20

## CERTIFICATE OF SERVICE

STATE OF MICHIGAN    )
                                       )ss.
COUNTY OF WAYNE    )

     I hereby certify that on <u>July 20, 2012</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

E. POWELL MILLER (P39487)
Attorney for Plaintiffs
950 W. University Drive
Suite 300
Rochester, MI 48307
(248) 841-2200
(248) 652-2852 (facsimile)
Epm@millerlawpc.com

Date: July 20, 2012

                   /s/June Adams (P43283)
                   Assistant Corporation Counsel
                   660 Woodward Avenue, Suite 1650
                   Detroit, Michigan 48226
                   (313) 237-0540
                   Adamj@detroitmi.gov

K:\DOCS\LABOR\winkm\a32000\proof\wm5768.dat    21